William J. O'Shaughnessy (WJO 5256)
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Richard J. Stark
David R. Marriott
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BROADCOM CORPORATION<br><br>        Plaintiff,<br><br>    v.<br><br>QUALCOMM INCORPORATED,<br><br>        Defendant. | Civil Action No. 05-3550 (MLC)<br><br>NOTICE OF MOTION<br><br>Return Date:  February 6, 2006<br>Oral Argument Requested |

TO:        DAVID S. STONE, ESQ.
           Boies, Schiller & Flexner LLP
           150 John F. Kennedy Parkway
           Short Hills, NJ 07078
           (973) 218-1111
           Fax: (973) 218-1106

           Cleary Gottlieb Steen & Hamilton LLP
           2000 Pennsylvania Avenue, NW
           Washington, DC 20006
           (202) 974-1500
           Fax: (202) 974-1999

Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, NY 10022
(212) 446-2300
Fax: (212) 446-2350

Attorneys for Plaintiff

PLEASE TAKE NOTICE that on February 6, 2005, at 10:00 a.m., or as soon thereafter as counsel may be heard, defendant Qualcomm, Incorporated will move this Court, pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, for an order dismissing plaintiff's complaint in its entirety, and for such other further relief that the court deems just and proper (the "Motion").

PLEASE TAKE FURTHER NOTICE that in support of the Motion, Defendants rely on the accompanying Memorandum of Law in Support of Defendant's Motion to Dismiss.

Dated:  December 9, 2005

McCARTER & ENGLISH, LLP,

by
_____/s/ William J. O'Shaughnessy_____
William J. O'Shaughnessy

P.O. Box 652
Four Gateway Center
100 Mulberry Street
Newark, NJ 07101-0652
(973) 622-4444

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
Richard J. Stark
David R. Marriott
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant Qualcomm Incorporated*

2

William J. O'Shaughnessy (WJO 5256)
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4056
(973) 622-4444

Evan R. Chesler
Richard J. Stark
David R. Marriott
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1000


## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>                              Plaintiff,<br><br>              v.<br><br>QUALCOMM INCORPORATED,<br><br>                              Defendant. | Civil Action No. 05-3350 (MLC)<br><br>**CERTIFICATION OF FAILED ATTEMPTS TO FILE ELECTRONICALLY** |

         The undersigned certifies that, on this day, due to a technical failure of the court's

Electronic Case Filing web site, I failed in twice attempting to file the following documents

electronically at least one hour apart after 12:00 noon:

        1.       Notice of Motion;

        2.       Memorandum of Law in Support of Defendant's Motion to Dismiss; and

        3.       Certificate of Service.

Dated:  December 9, 2005

McCARTER & ENGLISH, LLP


By:    s/ William J. O'Shaughnessy
        William J. O'Shaughnessy (WJO-5256)
        Four Gateway Center
        100 Mulberry Street
        Newark, NJ 07102
        (973) 622-4444


CRAVATH, SWAINE & MOORE LLP
        Worldwide Plaza
        825 Eighth Avenue
        New York, NY 10019
        (212) 474-1000

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BROADCOM CORPORATION,

Plaintiff,

v.

QUALCOMM INCORPORATED,

Defendant.

Civil Action No.  05-3350 (MLC)

Return Date: February 6, 2006
Oral Argument Requested

# MEMORANDUM IN SUPPORT OF DEFENDANT'S
# MOTION TO DISMISS

McCARTER & ENGLISH LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant*
*QUALCOMM Incorporated*

December 9, 2005

## Table of Contents

Page

Table of Authorities ...................................................................................................... iii

Preliminary Statement .................................................................................................... 1

Statement of Facts .......................................................................................................... 6

    A.    Wireless Communications Standards and Technology ........................................... 7

    B.    The Relevant Markets Alleged By Broadcom ....................................................... 9

Argument ....................................................................................................................... 10

I.    Broadcom Does Not State a Claim for "Monopolization of Markets For WCDMA Technology" ............................................................................................................... 10

    A.    Broadcom's Claim for Monopolizaton of "WCDMA Technology Markets" Fails ............................................................................................. 11

        1.    QUALCOMM lawfully obtained the "monopoly power" alleged by Broadcom. ......................................................................................... 12

        2.    Broadcom does not properly plead fraud on the SDOs. ........................... 13

        3.    The license terms QUALCOMM offered Broadcom are fair, reasonable and non-discriminatory. .......................................................... 17

    B.    Broadcom's Claim of Monopoly Maintenance in the Alleged "WCDMA Technology Markets" Fails ................................................................................ 19

        1.    QUALCOMM is free to license its patents on terms of its choosing. ....... 19

        2.    QUALCOMM's licensing practices have no anticompetitive effect in the alleged "WCDMA technology markets". ........................................... 22

II.    Broadcom Does Not Plead Viable Claims Related to the "Market for UMTS Chipsets" ...................................................................................................................... 23

    A.    Broadcom Has Not Suffered "Antitrust Injury" in the Alleged UMTS Chipset Market ................................................................................................... 23

        1.    Broadcom's alleged injury was not caused by anticompetitive conduct. .. 24

        2.    Broadcom has not alleged that QUALCOMM's licensing policies have harmed competition in the alleged UMTS chipset market. ....................... 26

i

Page

B.    Broadcom Does Not Plead the Elements of Its Claim for Attempted Monopolization of the Alleged UMTS Chipset Market ........................................26

    1.    Broadcom does not plead facts that would establish a "dangerous probability of achieving monopoly power" in the alleged UMTS chipset market. ...........................................................................27

    2.    The conduct alleged by Broadcom with regard to UMTS chipsets is not "predatory" or "anticompetitive". ..........................................29

C.    Broadcom Does Not State Claims for "Exclusive Dealing" in the Alleged UMTS chipset markets ....................................................................31

D.    Broadcom Does Not State Claims For Tying in the Alleged UMTS chipset markets ...........................................................................................33

III.    Broadcom Does Not Have Standing to Bring Claims Related to the Alleged 3G CDMA Chipset and Technology Markets or to Challenge QUALCOMM's Acquisition of Flarion ...................................................................................37

A.    Broadcom Lacks Standing to Bring Claims Related to Any Alleged CDMA Market ..................................................................................38

B.    Broadcom Lacks Standing to Bring a Section 7 Claim Related to the Flarion Acquisition ...........................................................................40

IV.    Broadcom's State Law Claims Should be Dismissed.........................................43

A.    Broadcom Does Not State Claims Under State Antitrust and Unfair Competition Law ...............................................................................43

    1.    Broadcom's state law antitrust claim should be dismissed........................45

    2.    Broadcom's state law unfair competition claim should be dismissed. .......45

B.    Broadcom Does Not State a Claim for Tortious Interference with Prospective Economic Advantage .......................................................47

C.    Broadcom Does Not State Claims for Promissory Estoppel or Fraud..................49

D.    Broadcom Does Not State a Claim for Breach of Contract ...................................50

Conclusion ...............................................................................................................51

## <u>Table of Authorities</u>

<u>Page(s)</u>

**Cases**

<u>2660 Woodley Road Joint Venture v. ITT Sheraton Corp.</u>, 369 F.3d 732 (3d Cir. 2004) ............................................................................................................ 38, 40

<u>Advo, Inc. v. Philadelphia Newspapers, Inc.</u>, 51 F.3d 1191 (3d Cir. 1995) ............................ 30, 31

<u>Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co.</u>, 826 F.2d 1235 (3d Cir. 1987) ........................................................................................................ 23, 41

<u>Applera Corp. v. MJ Research Inc.</u>, No. 3:98VB1201 (JBA), 2004 WL 2935820 (D. Conn. Dec. 16, 2004) ............................................................................................. 18, 19

<u>Associated General Contractors of California, Inc. v. California State Council of Carpenters</u>, 459 U.S. 519 (1983) ............................................................... 37, 43

<u>Atlantic Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328 (1990) ........................................... 24

<u>Automatic Radio Mfg. Co. v. Hazeltine Research</u>, 339 U.S. 827 (1950), <u>overruled in part on other grounds</u>, 395 U.S. 653 (1969) ........................................................ 17

<u>Axis, S.p.A. v. Micafil, Inc.</u>, 870 F.2d 1105 (6th Cir. 1989) ...................................................... 25

<u>Barr Labs., Inc. v. Abbott Labs.</u>, 978 F.2d 98 (3d Cir. 1992) ..................................................... 32

<u>Barrett v. U.S. Banknote Corp.</u>, No. 7420 (RPP), 1992 WL 232055 (S.D.N.Y. Sept. 2, 1992) ........................................................................................................ 50

<u>Barton & Pittinos, Inc., v. SmithKline Beecham Corp.</u>, 118 F.3d 178 (3rd Cir. 1997) ................................................................................................... 24, 38, 39, 42

<u>Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.</u>, 509 U.S. 209 (1993) ..................... 29

<u>Brown Shoe Co. v. United States</u>, 370 U.S. 294 (1962) ............................................................. 26

<u>Brunson Communications, Inc. v. Arbitron, Inc.</u>, 239 F. Supp. 2d 550 (E.D. Pa. 2002) ....................................................................................................................... 28

<u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477 (1977) .......................................... 23

<u>Chelson v. Oregonian Publ'g Co.</u>, 715 F.2d 1368 (9th Cir. 1983) .............................................. 36

<u>Chicago Title Ins. Co. v. Great Western Fin. Corp.</u>, 69 Cal. 2d 305 (1968) ............................... 45

<u>City of Pittsburgh v. West Penn Power Co.</u>, 147 F.3d 256 (3d Cir. 1998) ....................... 23, 25, 38

Page(s)

Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co., 912 F. Supp. 747
(D.N.J. 1995) ................................................................................................. 48

Crossland v. Canteen Corp., 711 F.2d 714 (5th Cir. 1983) ................................................ 36

Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376 (1995)................................... 48

E. & G. Gabriel v. Gabriel Brothers, Inc., No. 93 CIV. 0894 (PKL), 1994 WL
369147 (S.D.N.Y. July 13, 1994) ......................................................................... 28

ESS Tech. Inc. v. PC-Tel, Inc., No. C-99-20292 RMW, 1999 WL 33520483
(N.D. Cal. Nov. 4, 1999)............................................................................... 25, 26, 47

Farmers Ins. Exchange v. Superior Court, 2 Cal. 4th 377 (1992).................................................. 46

Fineman v. Armstrong World Indus., Inc., 980 F.2d 171 (3d Cir. 1992) .................................... 31

Florida Seed Co., Inc. v. Monsanto Co., 105 F.3d 1372 (11th Cir. 1997)................................... 43

Fresh Made, Inc. v. Lifeway Foods, Inc., No. Civ. A. 01-4254, 2002 WL
31246922 (E.D. Pa. Aug. 9, 2002)......................................................................... 28

Gantes v. Kason Corp., 145 N.J. 478 (1996) ................................................................ 44, 45, 48

Genentech Inc. v. Eli Lilly & Co., 998 F.2d 931 (Fed. Cir. 1993), abrogated on
other grounds, 515 U.S. 277 (1995)......................................................................... 18

Gregory Marketing Corp. v. Wakefern Food Corp., 787 F.2d 92 (3d Cir. 1986)........................ 39

Heindel v. Pfizer, Inc., 381 F. Supp. 2d 364 (D.N.J. 2004).......................................................... 44

High v. Balun, 943 F.2d 323 (3d Cir. 1991) ........................................................................ 45, 46

Hodges v. WSM, Inc., 26 F.3d 36 (6th Cir. 1994)........................................................................ 25

Hoffman-La Roche Inc. v. Genpharm Inc., 50 F. Supp. 2d 367 (D.N.J. 1999)...................... 45, 46

In re Independent Service Organizations Antitrust Litig., 203 F.3d 1322 (Fed. Cir.
2000) ................................................................................................................ passim

Intergraph Corp. v. Intel Corp., 195 F.3d 1346 (Fed. Cir. 1999)...................................... 20, 22, 23

Kentmaster Mfg. Co. v. Jarvis Products Corp., 146 F.3d 691 (9th Cir. 1998) ........................... 48

Kirschner v. Cable/Tel Corp., 576 F. Supp. 234 (E.D. Pa. 1983) ................................................ 50

Kunert v. Mission Fin. Servs. Corp., 1 Cal. Rptr. 3d 589 (Ct. App., 2d Dist. 2003)................... 47

iv

Page(s)

La Salle Street Press, Inc. v. McCormick & Henderson, Inc., 293 F. Supp. 1004
(N.D. Ill. 1968) .................................................................................................. 36

Lear, Inc. v. Adkins, 395 U.S. 653 (1969)........................................................... 17

LePage's Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003) ........................................ 30

Lovell Mfg. v. Export-Import Bank of the U.S., 843 F.2d 725 (3d Cir. 1988) ........................... 43

Lum v. Bank of America, 361 F.3d 217 (3d Cir. 2004) ....................................... passim

Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700 (Fed. Cir. 1992)............................................ 18

Marts v. Xerox, Inc., 77 F.3d 1109 (8th Cir. 1996) ....................................... 36

Mathews v. Lancaster Gen. Hosp., 87 F.3d 624 (3d Cir. 1996) ................................... 26

Miller Insituform, Inc. v. Insituform of N. Am. Inc., 830 F.2d 606 (6th Cir. 1987) .............. 20, 24

Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 319 F. Supp. 2d 1059 (C.D.
Cal. 2003)............................................................................................................ 46

People's Choice Wireless, Inc. v. Verizon Wireless, 31 Cal. Rptr. 3d 819 (Ct.
App., 2d Dist. 2005)...................................................................................... 46, 47

Perry v. Prudential-Bache Securities, Inc., 738 F. Supp. 843 (D.N.J. 1989)............................... 44

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3d Cir. 1997)............................ 27

Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc., 732 F.2d 1403
(9th Cir. 1984)..................................................................................................... 34

Saporito v. Combustion Eng'g Inc., 843 F.2d 666 (3d Cir. 1988), vacated on other
grounds, 489 U.S. 1049 (1989)........................................................................... 14

Schor v. Abbott Labs., 378 F. Supp. 2d 850 (N.D. Ill. 2005)........................................ 25

SCM Corp. v. Xerox Corp., 645 F.2d 1195 (2d Cir. 1981) ........................................ 19

Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786 (3d Cir.
1984) ................................................................................................................... 13

Simpson v. Union Oil Co., 377 U.S. 13 (1964) ........................................................ 20

Smith & Johnson, Inc. v. Hedaya Home Fashions Inc., No. 96 Civ. 5821 MBM,
1996 WL 737194 (S.D.N.Y. Dec. 26, 1996) .................................................... 28

Page(s)

SmithKline Beecham Corp. v. Apotex Corp., 383 F. Supp. 2d 686 (E.D. Pa. 2004) ................... 23

SmithKline Corp. v. Eli Lilly & Co., 427 F. Supp. 1089 (E.D. Pa. 1976) ............................ 34, 35

SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056 (3d Cir. 1987) ...................................... 34, 36

Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447 (1993) ............................................................ 27

Standard Oil Co. v. United States, 337 U.S. 293 (1949) ............................................................. 32

State v. New Jersey Trade Waste Ass'n, 96 N.J. 8 (1984) .......................................................... 45

System Operations, Inc. v. Scientific Games Development Corp., 555 F.2d 1131
    (3d Cir. 1977)........................................................................................................................ 44

Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320 (1961) ................................................ 32

Tele Atlas N.V. v. Navteq Corp., No. C-05-01673 RMW, 2005 WL 2893782
    (N.D. Cal. Nov. 2, 2005).................................................................................................. 36

Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468 (3d
    Cir. 1992) ...................................................................................................................... 26, 34

Townshend v. Rockwell Intern. Corp., No. C99-04005BA, 2000 WL 433505
    (N.D. Cal. March 28, 2000) ................................................................. 13, 17, 22, 47

Tunis Bros. Co. Inc. v. Ford Motor Co., 952 F.2d 715 (3d Cir. 1991)...................................... 26

U.S. Philips Corp. v. International Trade Comm'n, 424 F.3d 1179 (Fed. Cir.
    2005) ........................................................................................................................... 18

Ungar v. Dunkin' Donuts of Am., Inc., 531 F.2d 1211 (3d Cir. 1976) ...................................... 35

United Mine Workers v. Gibbs, 383 U.S. 715 (1966) ................................................................. 43

United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377 (1956) ....................................... 12

United States v. Griffith, 334 U.S. 100 (1948) ........................................................................... 12

Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 375 F.3d 1341 (Fed. Cir. 2004)...................... 19

Valley Products Co. Inc. v. Landmark, a Div. of Hospitality Franchise Sys., Inc.,
    128 F.3d 398 (6th Cir. 1997) ......................................................................................... 25

Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S.
    398 (2004).................................................................................................................. 10, 12

vi

Page(s)

Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172 (1965) ................................................................................................................... 20

Watson v. City of Salem, 934 F. Supp. 643 (D.N.J. 1995) ........................................ 49

Wilton v. Seven Falls Co., 515 U.S. 277 (1995) ....................................................... 18

Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co., 953 F. Supp. 617 (E.D. Pa. 1997) ................................................................................................................ 32

**Statutes**

15 U.S.C. § 14 ............................................................................................................ 36

15 U.S.C. § 15 ............................................................................................................ 24

28 U.S.C. § 1367(c) ................................................................................................... 43

35 U.S.C. § 271(d) ..................................................................................................... 20

Cal. Bus. & Prof. Code § 16700 ............................................................................... 45

Cal. Bus. & Prof. Code § 17200 ............................................................................... 46

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 6

Fed. R. Civ. P. 9(b) ....................................................................................... 6, 11, 13

N.J. Stat. Ann. § 56:9-18 ........................................................................................... 45

U.S. Const. art. I, § 8 ................................................................................................. 12

**Other Authorities**

3GPP Working Procedures Art. 55, available at http://www.3gpp.org/About/WP.htm ................................................................. 16

ETSI Guide on Intellectual Property Rights, available at http://www.etsi.org/legal/documents/ ETSI_Guide_on_IPRs.pdf ........................... 16

ITU-T Patent Policy, available at http://www.itu.int/ITU-T/dbase/patent/patent-policy.html ........................................................................................................... 16

Michael A. Epstein, Epstein on Intellectual Property § 15.02 [E](c), (e) (4th ed. 2005) ..................................................................................................................... 18

Page(s)

Operating Procedures for ATIS Forums and Committees, available at
    http://www.atis.org/ATISop.pdf ............................................................................. 16

U.S. Dep't of Justice and Federal Trade Comm'n, Antitrust Guidelines for the
    Licensing of Intellectual Property (1995), available at
    http://www.hyperlaw.com/ipguide.htm ............................................................ 19, 20

**Preliminary Statement**

Over the past 16 years, defendant QUALCOMM Incorporated ("QUALCOMM") has pioneered and led the commercialization of a digital communication technique called Code Division Multiple Access ("CDMA"). As a result of this long history of innovation, QUALCOMM has significant intellectual property, including patents, patent applications and trade secrets, that it licenses to other companies. The wireless communications industry generally recognizes that a company seeking to develop, manufacture or sell products that use CDMA technology will need a patent license from QUALCOMM. Accordingly, virtually every major wireless communications company has taken a license to QUALCOMM's patents.

Plaintiff Broadcom Corporation ("Broadcom") alleges that it seeks to produce and sell integrated circuit chips for use in cell phones that comply with the Wideband Code Division Multiple Access ("WCDMA") Third Generation ("3G") standard, a technology based on CDMA. (¶¶ 1, 12.)[1] As Broadcom concedes (¶¶ 82, 85), it needs to license certain patents from QUALCOMM to produce and sell those chips lawfully. In September 2004, Broadcom and QUALCOMM entered into licensing negotiations regarding those patents. QUALCOMM offered Broadcom its standard rates and terms – rates and terms that have been accepted by a number of other companies. Broadcom responded by asking for better terms based on the alleged strength of its own patent portfolio. Despite its acknowledged need for a license to QUALCOMM's essential patents, Broadcom took the position that it was QUALCOMM that should pay royalties to Broadcom. As the parties were discussing Broadcom's proposal, Broadcom abruptly filed this lawsuit, apparently in an effort to improve its bargaining position.

---

[1] Citations in the form (¶ [Number]) are to the First Amended Complaint filed on September 19, 2005 (the "Complaint").

Fundamentally, the basis for Broadcom's Complaint is that QUALCOMM owns patents that are essential to CDMA and WCDMA, and thus to products Broadcom wants to make and sell. Obviously, there is nothing unlawful about that. Accordingly, Broadcom has dressed up this grievance in the guise of a hodge-podge of federal antitrust and state law claims generally directed at QUALCOMM's licensing practices and at its pricing of baseband modem chips[2] used in cell phones. As discussed below, none of these claims withstand scrutiny.

### <u>Broadcom's "First Claim for Relief": Monopolization of WCDMA "Technology Markets"</u>

Broadcom's first claim is a claim under Section 2 of the Sherman Act alleging that QUALCOMM unlawfully monopolized WCDMA "technology markets" – which Broadcom defines as markets for technologies reading on each patent "essential" to the WCDMA standard – by fraudulently promising certain standard development organizations ("SDOs") that it would license its patents on "fair, reasonable, and non-discriminatory" terms. (¶¶ 139-40.) Broadcom also alleges that QUALCOMM is maintaining the alleged monopolies through a variety of licensing practices. (¶ 141.)

Broadcom's claim of monopolization of the alleged "WCDMA technology markets" fails because:

- Broadcom defines "WCDMA technology markets" as coextensive with QUALCOMM's patents. In such "markets", QUALCOMM's alleged "monopoly power" flows from its lawfully acquired patents, and not from the standards-setting process. Accordingly, there is no unlawful monopoly power. Any alleged "fraud" on the SDOs is irrelevant, because such fraud was not the source of the "monopoly power" alleged in the complaint. <u>See</u> Part I.A.1.

---

[2] A "baseband modem" chip is a chip that converts the cellular (radio) signal to purely digital form for internal processing within the cell phone.

- The allegedly fraudulent statements – commitments to grant licenses on "fair, reasonable, and non-discriminatory" terms – cannot support a fraud claim as a matter of law because they do not constitute promises of specific license terms to the SDOs. Nor does Broadcom plead fraud with the required level of particularity, and it cannot do so for the reasons stated above. <u>See</u> Part I.A.2.

- The license terms of which Broadcom complains are, in any event, fair reasonable and non-discriminatory. <u>See</u> Part I.A.3.

Broadcom's claim of maintenance of the alleged WCDMA technology market monopolies through allegedly anticompetitive licensing practices fails because:

- It is at odds with the fundamental premise of the constitutionally grounded patent system, which expressly permits QUALCOMM to license all, some or none of its rights, free from liability under the antitrust laws absent "exceptional circumstances" that are not present here. <u>See</u> Part I.B.1.

- Broadcom does not (because it cannot) allege that QUALCOMM's licensing practices had any anticompetitive effects in the alleged "WCDMA technology markets". <u>See</u> Part I.B.2.

### <u>Broadcom's "Second Claim for Relief": Attempted Monopolization of the "UMTS Chipset Market"</u>

Broadcom's second claim is a claim under Section 2 of the Sherman Act alleging that QUALCOMM is attempting to monopolize the alleged UMTS chipset market through, among other things, its licensing and pricing practices. (¶¶ 145-46.) This claim fails because:

- Broadcom does not plead any antitrust injury in the alleged UMTS chipset market. To the extent Broadcom has been "exclude[d]" from the alleged market, such exclusion flows from Broadcom's refusal to accept QUALCOMM's license offers. Broadcom simply has not alleged any injury to competition. <u>See</u> Part II.A.

- Broadcom's claim for attempted monopolization of the alleged UMTS chipset market fails for the additional reason that the Complaint contains no allegations that would establish that there is a "dangerous probability" that QUALCOMM will obtain market power in such a market. <u>See</u> Part II.B.1.

- The acts alleged by Broadcom are not anticompetitive. As noted above, QUALCOMM's licensing practices are lawful under the patent laws. Moreover, QUALCOMM's pricing of its chipsets is, in all instances,

3

lawful, <u>above-cost</u> price competition that cannot be held to violate the antitrust laws.[3]  <u>See</u> Part II.B.2.

### **<u>Broadcom's "Third" and "Fifth" Claims for Relief:  Exclusive Dealing</u>**

Broadcom's third and fifth claims are claims under Section 1 of the Sherman Act and Section 3 of the Clayton Act alleging that QUALCOMM has entered into exclusive dealing arrangements that foreclose competition in the alleged UMTS chipset market.  (¶¶ 150-53, 163-64.)  Broadcom's failure to allege antitrust injury in the UMTS chipset market, discussed above, is also fatal to this claim.  <u>See</u> Part II.A.

Broadcom's exclusive dealing claims fail for the additional reason that Broadcom's failure to allege fundamental facts regarding the alleged UMTS chipset market, as discussed above, leaves the Complaint without any allegations that would establish that the alleged "exclusive dealing" agreements foreclose a substantial share of the relevant market.  Accordingly, Broadcom does not allege the essential elements of its exclusive dealing claims. <u>See</u> Part II.C.

### **<u>Broadcom's "Fourth" and "Sixth" Claims for Relief:  Tying</u>**

Broadcom's fourth and sixth claims are claims under Section 1 of the Sherman Act and Section 3 of the Clayton Act alleging that QUALCOMM is tying discounts on licenses to its essential WCDMA patents to sales of WCDMA chipsets, thereby foreclosing competition in the alleged UMTS chipset market.  (¶¶ 157-59, 168-70.)  Broadcom's failure to allege antitrust injury in the UMTS chipset market, discussed above, is also fatal to this claim.  <u>See</u> Part II.A.

Broadcom's tying claims fail for the additional reason that Broadcom does not – and cannot – allege the *sine qua non* of a tying claim:  a refusal to sell the "tying" product unless

---

[3] Broadcom does not and cannot allege that QUALCOMM prices its chipsets below cost or that any discounts or rebates offered by QUALCOMM result in pricing below cost.

the purchaser also purchases the "tied" product.  By the Complaint's own terms, QUALCOMM does not <u>refuse</u> to grant licenses (the alleged tying product) unless the licensee also buys QUALCOMM's chipsets (the alleged tied product).  Rather, QUALCOMM allegedly has offered, in a limited number of instances, a <u>discount</u> on some royalties and license fees if the licensee also buys chipsets.  A discount for purchasing two products together is not a tying arrangement where the two products are also sold separately.  Therefore, Broadcom does not allege the essential elements of a tying claim.  <u>See</u> Part II.D.

### **Broadcom's "Seventh Claim for Relief":  Maintenance of Alleged 3G CDMA Monopolies, and "Eighth Claim for Relief":  Unlawful Acquisition**

To obscure the flaws in its WCDMA-related claims, Broadcom also brings claims related to alleged markets in which it is <u>not</u> a participant – the alleged markets for third generation ("3G") Code Division Multiple Access ("CDMA") technology and chipsets, and the alleged markets for "technologies contending to serve essential functions for B3G [(<u>i.e.</u>, beyond third generation) and 4G (<u>i.e.</u>, fourth generation)] wireless standards and systems".  (¶ 60.)  Specifically, Broadcom alleges that QUALCOMM has unlawfully maintained "monopolies" in the alleged 3G CDMA chipset and technology markets in violation of Section 2 of the Sherman Act (¶ 173), and that QUALCOMM's recently-announced acquisition of Flarion Technologies, Inc. would substantially reduce competition in the alleged markets for "technologies contending to serve essential functions for B3G [and 4G] wireless standards and systems" in violation of Section 7 of the Clayton Act (¶ 177).  But because Broadcom is not a participant in the alleged markets relevant to these claims, it does not have "antitrust standing" to bring these claims.  Accordingly, they should be dismissed.  <u>See</u> Part III.

### Broadcom's "Ninth" through "Thirteenth" Claims for Relief:  State Statutory and Common Law Claims

Broadcom also brings a number of meritless state-law claims, including purported antitrust and unfair competition claims under the statutes of 39 different states, and several common-law claims.  (¶¶ 179-200.)  Because Broadcom's federal claims should be dismissed, the Court should decline to exercise pendent jurisdiction over these state-law claims.  Moreover, Broadcom's attempt to invoke the antitrust and unfair competition laws of 39 different states fails because it has alleged only one set of conduct and one set of injuries (none of which is specifically alleged to have occurred in any state), and therefore has stated only individual antitrust and unfair competition claims subject to a choice-of-law analysis.  Application of the appropriate state's law to each of Broadcom's state-law claims shows that Broadcom does not plead the elements of <u>any</u> of its state-law claims.  <u>See</u> Part IV.

\* \* \*

For all these reasons, QUALCOMM respectfully requests that this Court dismiss the Complaint in its entirety pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

### Statement of Facts[4]

QUALCOMM is a leader in developing and implementing innovative digital wireless communications technologies.  QUALCOMM broadly licenses its intellectual property rights through its QUALCOMM Technology Licensing ("QTL") business unit.  (¶ 32.) QUALCOMM also sells cell phone chipsets through its QUALCOMM CDMA Technologies

---

[4] For purposes of this motion, we rely only on the allegations in the complaint, matters of public record, and documents that form the basis of Broadcom's claims.  <u>See</u> <u>Lum v. Bank of America</u>, 361 F.3d 217, 222 n.3 (3d Cir. 2004).

("QCT") business unit.  (<u>Id.</u>)[5]  Broadcom is in the business of, among other things, developing and supplying products in the area of "cellular and terrestrial wireless communications".  (¶ 31.)

    A.   <u>Wireless Communications Standards and Technology</u>

    To insure that the wireless communications equipment of one company works with equipment from other companies, the wireless communications industry has developed "standards" that govern how wireless equipment works.  (¶¶ 37-38.)  Standards are developed by "standards development organizations", or "SDOs", which are primarily made up of representatives from industry.  (<u>E.g.</u>, ¶ 40.)  Generally, adoption of a standard by an SDO does not assure that such standard will actually be implemented.  Rather, each cellular carrier must decide for itself whether to implement a standard by deploying equipment compliant with the standard.

    SDOs take varying approaches to intellectual property, such as patents, covering technology that is or might be incorporated into a standard.  According to Broadcom, each SDO relevant to this action requires members to declare whether they hold patents essential for compliance with a standard and whether they are willing to make available licenses to such essential patents on "fair, reasonable, and non-discriminatory" ("FRAND") terms. (¶ 42.)  As discussed in Part I.A.2, below, those SDOs do not articulate specific commercial terms that are "fair, reasonable, and non-discriminatory" but rather explicitly direct that specific licensing terms be negotiated outside the SDO by the owner of the patent and prospective licensees.

    The two cellular standards used most widely today are the Global System for Mobility ("GSM") standard and the Code Division Multiple Access ("CDMA") standard, which

---

[5] QCT and QTL are not separate corporate entities.  Each is an operating unit of QUALCOMM Incorporated.

was pioneered by QUALCOMM.  (¶¶ 3, 5.)  "Code Division" in CDMA refers to a method of breaking up a cell phone conversation into packets, each assigned an identity code, then spreading those packets over a wide spectrum of radio frequencies.  GSM is based on less advanced cell phone technology called "time-division multiple access" ("TDMA"), in which each conversation is broken into packets, which are sent sequentially in assigned time slots, interspersed with the packets of other conversations, over a single selected frequency.  In Europe, government regulators mandated use of GSM.  In the United States and elsewhere, however, cellular carriers were free to choose which technologies best met their needs.  Thus, in the United States, some carriers – such as Cingular Wireless, the nation's largest – use GSM, while others – such as Verizon Wireless – use CDMA.  (¶ 5.)  In Europe, however, virtually every carrier uses GSM.

GSM and CDMA are commonly referred to as "second generation" or "2G" cell phone technologies.  (¶ 44.)  Over time, cell phone technologies have improved to allow increased capacity and faster data transmission.  The leading edge of commercially available cell phone technologies deployed today are "third generation" or "3G" technologies.  (¶¶ 47, 49.)  The 3G technologies used most often by CDMA carriers are CDMA2000-1x and CDMA2000-1xEVDO.  The 3G technology towards which most GSM carriers are migrating is "Wideband Code Division Multiple Access", or WCDMA.  (¶ 48.)  Today, 70-80% of the cell phones and mobile wireless modem cards sold worldwide use GSM and related successor technologies (such as WCDMA), while the remaining 20-30% use CDMA and related successor technologies (such as CDMA2000-1xEVDO).

WCDMA technology is at the heart of this lawsuit.  WCDMA is an air interface technology that is based on the CDMA technology pioneered by QUALCOMM.  In 2004,

Broadcom purchased Zyray Wireless, Inc., a small company that was designing chips for use in WCDMA cell phones (UMTS "chipsets"). (¶ 31.) The Complaint alleges that Broadcom "has developed" UMTS chipsets "that would compete with QUALCOMM's".[6] (¶ 4.) Broadcom acknowledges that it needs a license to QUALCOMM's essential WCDMA patents lawfully to manufacture WCDMA chipsets. (¶¶ 82, 85.)

B.    The Relevant Markets Alleged By Broadcom

Broadcom attempts to gerrymander two types of "markets". "Technology markets", according to Broadcom, are markets for licenses to patents that cover inventions related to wireless communications. Broadcom claims that the standards-making process creates "monopolies" in the markets for licenses to "essential" patents, because "[o]nce a standard has been adopted that incorporates a patented technology, alternatives previously available [i.e., alternative inventions covered by other patents or in the public domain] can no longer be used". (¶ 82.) Thus, according to Broadcom, "the technology reading on each essential patent" for a standard constitutes its own "market" for antitrust purposes, which Broadcom calls a "[Standard Name] technology market" (i.e., "GSM technology market", "WCDMA technology market", etc.). (¶¶ 58-60.)[7]

_____

[6] The Complaint contains no allegation that Broadcom has developed or intends to develop chipsets compliant with any other wireless communications standard.

[7] Because QUALCOMM sells less than 20% of the baseband modem chips used in cell phones worldwide (far less than, for example, Texas Instruments), Broadcom's complaint attempts artfully to slice the cell phone industry (which is, in turn, only a portion of the communications industry) into many allegedly distinct "markets" that purportedly do not compete with each other. Broadcom's antitrust claims depend upon these market definitions, which any cell phone user knows to be illogical and untenable. For example, according to Broadcom, the technology used by Verizon Wireless in its cellular network does not compete with the technology used by Cingular Wireless despite the indisputable fact that cellular service providers compete head to head for subscribers in the marketplace. Notwithstanding the facial implausibility of Broadcom's market definitions, QUALCOMM accepts them (and all other well-pleaded allegations in the Complaint) as true for purposes of this motion.

According to Broadcom, "chipset markets" are markets for the chips used in wireless devices, such as cell phones.  (¶ 53-55.)  Allegedly, chips compliant with one wireless standard (e.g., CDMA), do not compete with chips compliant with another wireless standard (e.g., GSM).  (¶ 55.)  Thus, claims Broadcom, each type of chipset constitutes its own "market" for antitrust purposes, which Broadcom calls a "[Standard Name] chipset market" (i.e., "GSM chipset market", "UMTS chipset market", etc.).  (¶¶ 56-57.)

**Argument**

**I.    BROADCOM DOES NOT STATE A CLAIM FOR "MONOPOLIZATION OF MARKETS FOR WCDMA TECHNOLOGY"**

Broadcom's "First Claim for Relief" is a claim under Section 2 of the Sherman Act for alleged monopolization of so-called "markets for WCDMA technology".  (¶¶ 139-40.)  According to Broadcom, each patent (or "patent family") essential to the WCDMA standard constitutes a separate relevant product market.  (E.g., ¶¶ 58-59.)  Broadcom asserts that QUALCOMM unlawfully monopolized the alleged "WCDMA technology markets" by fraudulently promising SDOs that it would license its patents on "fair, reasonable, and non-discriminatory" terms and that QUALCOMM unlawfully maintained those monopolies through certain licensing practices.

Broadcom's assertions fail as a matter of law.  To state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must allege:  (1) the possession of monopoly power in the relevant market; and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident".  Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004).  Broadcom does not plead facts that establish the second element – "willful acquisition or maintenance" of QUALCOMM's alleged monopoly

power.  To the contrary, the power to exclude alleged by Broadcom flows directly from QUALCOMM's lawfully-obtained patents, and was therefore, by definition, a "consequence of a superior product" – QUALCOMM's pioneering inventions.  Broadcom's assertion of "fraud" is legally irrelevant, not pled with the requisite particularity, and, in any event, wrong.  Broadcom's monopoly maintenance theory cannot stand because the accused licensing practices are permitted under the patent laws and, in any event, have no anticompetitive effects in the alleged "WCDMA technology markets".

> A.    Broadcom's Claim for Monopolizaton of "WCDMA Technology Markets" Fails

Broadcom claims that QUALCOMM willfully acquired monopoly power in the "WCDMA technology markets" through fraud – specifically, by falsely promising certain SDOs that it would license its essential WCDMA patents on "fair, reasonable, and non-discriminatory" terms.  (¶¶ 82, 84-85, 140, 145.)  Broadcom defines the relevant markets as the "markets" for each patent essential to the WCDMA standard.  (¶ 59.)  By Broadcom's own definition, the only possible source for QUALCOMM's alleged monopoly power is QUALCOMM's ownership of those patents.  That power could not, as a matter of law and as a matter of common sense, have resulted from any alleged fraud on the SDOs.  Therefore, because QUALCOMM acquired its alleged monopoly power lawfully by exercising its rights to obtain patents for its inventions, and not through any fraud, Broadcom's claim fails.  Moreover, Broadcom does not plead the elements of fraud, nor does it plead "the circumstances constituting fraud" with particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure.  Accordingly, its antitrust claims based on fraud should be dismissed.  See Lum v. Bank of America, 361 F.3d 217, 228 (3d Cir. 2004).

      1.     <u>QUALCOMM lawfully obtained the "monopoly power" alleged by Broadcom.</u>

"Monopoly power" is "the power to control prices or exclude competition".

<u>United States v. E.I. du Pont de Nemours & Co.</u>, 351 U.S. 377, 391 (1956). The possession of "monopoly power" is not unlawful. Indeed, "it is an important element of the free-market system". <u>Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP</u>, 540 U.S. 398, 407 (2004). "The opportunity to charge monopoly prices – at least for a short period – is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth." <u>Id.</u> Accordingly, "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive <u>conduct</u>". <u>Id.</u> (emphasis in original). Anticompetitive conduct is "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor". <u>United States v. Griffith</u>, 334 U.S. 100, 107 (1948) .

      According to Broadcom, the "relevant markets" that QUALCOMM allegedly monopolized are markets for technology defined by certain QUALCOMM patents, and QUALCOMM's allegedly anticompetitive conduct was defrauding SDOs by falsely promising to offer licenses on "fair, reasonable, and non-discriminatory" terms. (¶¶ 82, 84-85.) Any alleged "fraud" on the SDOs, however, did not grant QUALCOMM "monopoly power" – <u>i.e.</u>, "power to control prices or exclude competition" – over any alleged "markets" for technology defined by QUALCOMM's patents. Rather, QUALCOMM possesses such power <u>by virtue of the lawfully acquired patents themselves</u>.[8] Thus, QUALCOMM's "power to exclude", which Broadcom calls "monopoly power" in its Complaint, predates, and is wholly independent of, any alleged fraud

---

[8] Indeed, the time-limited power to exclude others from practicing an invention is the very essence of a patent, and is granted to reward the innovator and encourage future innovation. <u>See</u> U.S. Const. art. I, § 8.

on any SDO.  QUALCOMM had such power on the date that the first relevant patent was issued, which, in this case, preceded any activity by any SDO to create standards around WCDMA.  In such circumstances, any supposedly fraudulent statement QUALCOMM made to any SDO cannot be said to have been "anticompetitive", because neither the statement nor any action of any SDO foreclosed competition, gave QUALCOMM a competitive advantage that it did not already possess, or destroyed any competitor.[9]  See Townshend v. Rockwell Intern. Corp., No. C99-04005BA, 2000 WL 433505, at *12 (N.D. Cal. March 28, 2000) ("The adoption of an industry standard incorporating such proprietary technology does not confer any power to exclude that exceeds the exclusionary power to which a patent holder is otherwise logally [sic] entitled.").

### 2.    Broadcom does not properly plead fraud on the SDOs.

Even if QUALCOMM's alleged monopoly power were the result of the standardization process – which it is not – Broadcom's Section 2 claim would nevertheless fail. Broadcom does not and cannot plead facts establishing that QUALCOMM defrauded any SDO at all, let alone plead such facts with particularity, as required by Fed. R. Civ. P. 9(b).  See Lum, 361 F.3d at 229 (holding that an antitrust claim based upon an alleged fraud "is subject to the heightened pleading requirement of Rule 9(b)").

The purpose of Rule 9(b) is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."  Id. at 223-24 (quoting Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)).  Plaintiffs may satisfy Rule 9(b) only

---

[9] Conspicuously absent from Broadcom's Complaint is any allegation that there were alternatives to QUALCOMM's patented technology available to the SDOs before they adopted the WCDMA standard.

"by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud'".  Lum, 361 F.3d at 224.  Plaintiffs also must allege who made a misrepresentation to whom.  Id.

Broadcom meets none of these requirements.  The sole allegation of allegedly fraudulent statements is that "QUALCOMM made repeated and express written representations to SDOs, including the ITU, ETSI, and 3GPP, that it would license any of its essential WCDMA patents on FRAND terms".  (¶ 84.)  The allegation does not identify the "date, place or time" of the allegedly fraudulent statements, nor does it identify the persons at QUALCOMM who made the statements or the persons at the SDOs who received them.  Such a general allegation is woefully insufficient to support Broadcom's "monopolization through fraud" claim.  See Lum, 361 F.3d at 228-29; see also Saporito v. Combustion Eng'g Inc., 843 F.2d 666, 675 (3d Cir. 1988) (allegations of the general content of a representation with no indication of who the speakers were or who received the information do not meet the requirements of Rule 9(b)), vacated on other grounds, 489 U.S. 1049 (1989).

More fundamentally, the statements alleged by Broadcom – commitments to offer licenses on "fair, reasonable, and non-discriminatory" terms – cannot support a fraud claim as a matter of law.  The Third Circuit explicitly held in Lum v. Bank of America that where "it is reasonable for the parties to have different understandings of [a statement's] meaning", then the statement cannot support a claim for fraud (or an antitrust claim based on fraud).  Lum, 361 F.3d at 226, 228.  The allegedly fraudulent term at issue in Lum was "prime rate", which the plaintiffs alleged meant "the lowest rate available to a bank's most creditworthy borrowers".  Id. at 227.  The Third Circuit affirmed the dismissal of plaintiff's complaint – at the pleading stage –

because it held that the term "prime rate" was susceptible of multiple reasonable interpretations. As the court put it,

> "It is . . . unreasonable to infer that defendants' use of the equivocal term 'prime rate' was reasonably calculated to deceive persons of ordinary prudence and comprehension into believing that no borrower obtained an interest rate below the prime rate. Plaintiffs' claim boils down to a disagreement about the meaning of the term 'prime rate.' This disagreement does not rise to the level of fraud; at most, it alleges a contract dispute." Id. at 226.

Here, as in Lum, Broadcom's claim boils down to a disagreement about the meaning of a term. Indeed, the term relied upon by Broadcom in this case – "fair, reasonable and non-discriminatory" – is even more susceptible of multiple interpretations than the term "prime rate" at issue in Lum. To support a fraud claim, however, the term would not only have to have a single meaning, but that meaning would also have to be "so universally accepted that it is the only possible meaning and that a reasonable person could not understand the term to mean anything else". Id. (emphasis in original). Thus, Broadcom does not properly allege a claim of fraud.

In fact, Broadcom cannot allege that the relevant SDOs understood "fair, reasonable and non-discriminatory" to mean any given set of licensing terms because the relevant SDOs leave the determination of specific license terms to negotiations between licensors and licensees outside of SDO proceedings. For example, the ITU-T Patent Policy,[10] states that "[t]he detailed arrangements arising from patents (licensing, royalties, etc.) are being left to the parties concerned" and "negotiations [of license terms] are left to the parties concerned and are performed outside the ITU-T." ITU-T Patent Policy at preamble, ¶ 2.2, available at

---

[10] The "ITU" is the International Telecommunications Union, which is identified in the Complaint as "the central telecommunications SDO". (¶ 39.)

http://www.itu.int/ITU-T/dbase/patent/patent-policy.html.  Similarly, the <u>ETSI Guide on</u>

<u>Intellectual Property Rights</u>[11] states:

> "<u>Specific licensing terms and negotiations are commercial issues between</u>
> <u>the companies and shall not be addressed within ETSI</u>.  Technical Bodies
> are not the appropriate place to discuss IPR Issues.  Technical Bodies do
> not have the competence to deal with commercial issues.  Members
> attending ETSI Technical Bodies are often technical experts who do not
> have legal or business responsibilities with regard to licensing issues.
> Discussion on licensing issues among competitors in a standards making
> process can significantly complicate, delay or derail this process."  <u>ETSI</u>
> <u>Guide on IPRs</u> ¶ 4.1, <u>available at</u> http://www.etsi.org/legal/documents/
> ETSI_Guide_on_IPRs.pdf (emphasis added).

As another example, the Operating Procedures of the Alliance for Telecommunications Industry

Solutions ("ATIS")[12] state that "[t]o the extent a Forum or Committee participant, or any other

third party, desires a license for a patented invention referenced in a standard, guidelines or other

ATIS deliverable, <u>all negotiations and discussion of license terms shall occur between the patent</u>

<u>owner and the prospective licensee outside the deliberations of the Forum or Committee.  No</u>

<u>discussion or negotiation of license terms shall be permitted in any Forum or Committee</u>."

<u>Operating Procedures for ATIS Forums and Committees</u> at § 10.4 (emphasis added), <u>available at</u>

http://www.atis.org/ATISop.pdf.  ETSI and ATIS are both members of the Third Generation

Partnership Project,[13] which "has focused on the evolution of GSM and UMTS [<u>i.e.</u>, WCDMA]

technology" (¶ 41), and thus were directly involved in the development of the WCDMA

standard.

---

[11] "ETSI" is the European Telecommunications Standards Institution, "an SDO based in France with a leadership role in Europe". (¶ 40.)

[12] ATIS is "an SDO based in the United States". (¶ 40.)

[13] The 3GPP is not an SDO but rather is an international umbrella organization for national and regional SDOs and does not have an intellectual property policy independent of those of its organizational members.  <u>See 3GPP Working Procedures</u> Art. 55, <u>available at</u> http://www.3gpp.org/About/WP.htm.

Through this lawsuit, Broadcom seeks to stand the policies and practices of the relevant SDOs on their heads. Broadcom asks this Court to do that which the SDOs themselves have expressly declined, and recognized that they are not competent, to do: mandate a one-size-fits-all set of commercial terms that would ignore the complex and unique attributes and needs of each licensor and licensee that require FRAND to be a flexible concept. In other words, rather than negotiate a license as the SDO policies contemplate, Broadcom wants this Court to <u>mandate</u> Broadcom's desired license terms based on a novel and untenable antitrust-violation-by-FRAND theory. If such judicial reinterpretations of standards practices were permitted, any potential licensee unhappy with proposed license terms for patents "essential" to a standard would rush to the courthouse to file an antitrust suit. This Court should reject Broadcom's attempt to override the SDOs' established policies and its misuse of the antitrust laws as a license-negotiating tactic.

  3. <u>The license terms QUALCOMM offered Broadcom are fair, reasonable and non-discriminatory.</u>

Broadcom's claim for monopolization of the alleged WCDMA technology markets fails for the additional reason that the facts that it pleads do not establish that QUALCOMM violated any FRAND commitment. None of the alleged license terms is inconsistent with FRAND. To the contrary, each of the terms about which Broadcom complains is a fair, reasonable and commercially routine requirement:

- Broadcom's complaint about the requirement "that the licensee agree to pay royalties on components over which Qualcomm has no claim to patent rights" is a dispute over the cost basis by which royalties are calculated. (¶¶ 13(a), 89-90.) Contrary to Broadcom's claims, the Supreme Court has expressly held that a patent holder may reasonably require royalties to be calculated in a manner that captures both patented and unpatented products. See Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 834 (1950), overruled in part on other grounds by Lear, Inc. v. Adkins, 395 U.S. 653 (1969).

- The requirement that a licensee grant QUALCOMM a cross-license (¶¶ 13(b), 91) is likewise a fair and procompetitive practice because "it can facilitate the integration of complementary technologies". Townshend, 2000 WL 433505, at *8.

- There is nothing unreasonable about the requirement that different licensees pay royalties for different rights (i.e., one licensee paying a royalty to make chipsets, and another licensee paying a royalty to use chipsets in connection with a patented method of communication). (¶¶ 13(c), 92-93.) The Federal Circuit has expressly held that a patent holder may reasonably place restrictions on the manner in which licensees may use the patent holder's inventions. See Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700, 703-05 (Fed. Cir. 1992). Thus, there is nothing impermissible about QUALCOMM separately licensing the right to manufacture chipsets and the right to use chipsets in manufacturing end-user products, nor is there anything unfair about QUALCOMM requiring that its licensees refrain from inducing infringement of QUALCOMM's patents by dealing with unlicensed parties.

- Broadcom's complaint regarding QUALCOMM's requirement that licensees report information from which it can be determined whether royalties have been correctly calculated – such as the prices of licensed products (¶¶ 13(d), 102) – is commercially absurd. Such a requirement is a normal part of virtually every license agreement involving royalties. See, e.g., Michael A. Epstein, Epstein on Intellectual Property § 15.02 [E] & [E](c), (e) (4th ed. 2005) (noting that reporting requirements are "often included" in license agreements). Without such information, a licensor would have no practical ability to ensure that a licensee was living up to its royalty obligations. Broadcom does not – and cannot – plead that QUALCOMM has ever used information received from its licensees in any anticompetitive or otherwise improper way.

Broadcom's allegations are essentially that the price QUALCOMM charges for a license is too high. (e.g., ¶ 99.) Charging what the market will bear, however, is not an anticompetitive or unreasonable act. It is the lawful use of rights granted under the patent laws. See, e.g., U.S. Philips Corp. v. International Trade Comm'n, 424 F.3d 1179, 1191-92 (Fed. Cir. 2005) ("Because a license to the essential patent is, by definition, a prerequisite to practice the technology in question, the patentee can charge whatever maximum amount a willing licensee is able to pay to practice the technology in question."); see also Genentech Inc. v. Eli Lilly & Co., 998 F.2d 931, 949 (Fed. Cir. 1993) (patent owner's pursuit of optimum royalty income not an antitrust violation), abrogated on other grounds by Wilton v. Seven Falls Co., 515 U.S. 277 (1995). Since QUALCOMM is free not to license its patents at all, its practice of broadly licensing its patents "is an activity that aids rather than impedes competition". Applera Corp. v. MJ Research Inc., No. 3:98VB1201 (JBA), 2004 WL 2935820, at *10 (D. Conn. Dec. 16, 2004).

18

B.    Broadcom's Claim of Monopoly Maintenance in the Alleged "WCDMA Technology Markets" Fails

Broadcom alleges that QUALCOMM "maintained" monopoly power in the "WCDMA technology markets" by failing to license its essential WCDMA patents on terms that Broadcom considers "fair, reasonable, and non-discriminatory". (¶¶ 140, 145.) These allegations fail to state a claim under Section 2 of the Sherman Act.

1.    QUALCOMM is free to license its patents on terms of its choosing.

Absent certain "exceptional circumstances" – none of which is present here – even an absolute refusal to license a patent (which is not alleged here) is immunized from antitrust liability. See In re Independent Service Orgs. Antitrust Litig., 203 F.3d 1322, 1326-27 (Fed. Cir. 2000) ("ISO"); see also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1356 (Fed. Cir. 2004) ("As a general rule, behavior conforming to the patent laws oriented towards procuring or enforcing a patent enjoys immunity from the antitrust laws."); SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1206 (2d Cir. 1981) ("conduct permissible under the patent laws cannot trigger any liability under the antitrust laws."). QUALCOMM's licensing practices, then, which include licensing its patents to many companies and offering a license to Broadcom – albeit on different terms than Broadcom would prefer – cannot be held to violate the antitrust laws. To the contrary, licensing "is an activity that aids rather than impedes competition." Applera Corp., 2004 WL 2935820, at *10.[14]

---

[14] See also U.S. Dep't of Justice and Federal Trade Comm'n, Antitrust Guidelines for the Licensing of Intellectual Property, at 2, 5 (1995) ("intellectual property licensing allows firms to combine complementary factors of production and is generally procompetitive. . . . Licensing, cross-licensing, or otherwise transferring intellectual property . . . can facilitate integration of the licensed property with complementary factors of production. This integration can lead to more efficient exploitation of the intellectual property, benefiting consumers through the reduction of costs and the introduction of new products. Such arrangements increase the value of intellectual property to consumers and to the developers of the technology. By potentially increasing the expected returns from intellectual property, licensing also can increase the incentive for its

The Supreme Court has explicitly held that the patent laws, which grant the right to exclude others from practicing an invention, "modify" the antitrust laws to the extent they conflict.  See Simpson v. Union Oil Co., 377 U.S. 13, 24 (1964) (stating that the patent laws "are in pari materia with the antitrust laws and modify them pro tanto") (emphasis added).  Indeed, courts have repeatedly recognized that patent holders do not violate the antitrust laws by unilaterally refusing to license or sell a patent.  See, e.g., ISO, 203 F.3d at 1326; Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1362 (Fed. Cir. 1999); see also Miller Insituform, Inc. v. Insituform of N. Am. Inc., 830 F.2d 606, 609 (6th Cir. 1987) ("A patent holder who lawfully acquires a patent cannot be held liable under Section 2 of the Sherman Act for maintaining the monopoly power he lawfully acquired by refusing to license the patent to others.")  The principles underlying the antitrust immunity conferred by the patent laws are codified in Section 271(d) of the Patent Act, which expressly provides that "[n]o patent owner otherwise entitled to relief . . . shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having . . . (4) refused to license or use any rights to the patent . . .'".  ISO, 203 F.3d at 1326 (quoting 35 U.S.C. § 271(d) (emphasis and ellipses in original)).

The Federal Circuit has recognized only three exceptions to the antitrust immunity conferred by the patent laws:  "illegal tying, fraud in the Patent and Trademark Office, or sham litigation".  Id. at 1327.  Broadcom does not even attempt to allege that QUALCOMM has engaged in any fraud in the Patent Office or that it has brought sham litigation.[15]

---

creation and thus promote greater investment in research and development.") available at http://www.hyperlaw.com/ipguide.htm.

[15] "Fraud in the Patent and Trademark Office" refers to fraud in the procurement of a patent within the meaning of Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177 (1965).  ISO, 203 F.3d at 1326.  "Sham litigation" is an attempt to enforce a

Broadcom's attempt to allege "illegal tying" fails. In this context, illegal tying refers <u>only</u> to "ties" that extend beyond the scope of the relevant patents – <u>i.e.</u>, ties of <u>unpatented products</u> to patents or patented products. <u>See id.</u> at 1326-27. "Ties" between products that are both covered by the relevant patents or, as alleged here, between a patent and a product covered by that patent are permissible <u>even if</u> those products are in different relevant markets. <u>See id.</u> at 1327 ("[W]e have expressly held that, absent exceptional circumstances, a patent may confer the right to exclude competition altogether in more than one antitrust market".). Put another way, the rule against "illegal tying" is that "the patent holder cannot use his statutory right to refuse to [license or] sell . . . to gain a monopoly in a market <u>beyond the scope of the patent</u>". <u>Id.</u> (emphasis in original).

In this case, Broadcom has not even properly alleged that QUALCOMM "tied" licenses to its WCDMA patents to purchases of UMTS chipsets. <u>See</u> Part II.D., <u>infra</u>.[16] However, even if it had, any such "tie" could not violate the antitrust laws. Broadcom admits (<u>see</u> ¶¶ 82, 14) that both the alleged "tying product" – licenses to QUALCOMM's patents – and the alleged "tied product" – UMTS chipsets – are within the scope of QUALCOMM's statutory patent rights. <u>See</u> <u>ISO</u>, 203 F.3d at 1327. Thus, the alleged conduct does not constitute an attempt to extend the lawful power to exclude granted by QUALCOMM's patents beyond the scope of the patents' claims. Rather, to the extent QUALCOMM's conduct is exclusionary at all, the exclusionary effect is limited only to products that are indisputably covered by the

---

patent in the courts that is "a mere sham to cover what is actually no more than an attempt to interfere directly with the business relationships of a competitor". <u>Id.</u>

[16] As we discuss in Part II.D., Broadcom does not allege that QUALCOMM ties the sale of one product to the sale of another; it does not allege that QUALCOMM refuses to license its WCDMA patents unless the licensee also purchases QUALCOMM's UMTS chipsets. It alleges only that QUALCOMM offers discounts on its patent licenses to some customers who purchase QUALCOMM's chipsets, and that is not an unlawful tying arrangement.

patents.  That conduct is immunized from antitrust liability by the patent laws.  See id. at 1326;

see also Townshend, 2000 WL 433505, at *8 (finding allegedly "unfair" licensing practices not

anticompetitive because, among other things, "[a] patent owner's pursuit of optimum royalty

income is not an act in restraint of trade which violates the antitrust laws" and "cross-licensing is

considered a pro-competitive practice because it can facilitate the integration of complementary

technologies".)

        2.        <u>QUALCOMM's licensing practices have no anticompetitive effect in the</u>
<u>alleged "WCDMA technology markets".</u>

Even if QUALCOMM's licensing practices were somehow "exclusionary" within

the meaning of the antitrust laws – which they are not – they nevertheless could not support a

claim for maintenance of alleged monopolies in the so-called "WCDMA technology markets"

because they do not have any anticompetitive effects <u>in those markets</u>.  Only conduct having an

anticompetitive effect in the relevant market can support a claim under Section 2 of the Sherman

Act.  See, e.g., Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1355 (Fed Cir. 1999).  Here,

Broadcom does not allege that QUALCOMM's licensing conduct has any anticompetitive effect

whatsoever in the "WCDMA technology markets" – i.e., the relevant markets for purposes of its

monopolization claim.  Rather, the alleged effects all relate to the UMTS chipset market.  (E.g., ¶

11 (alleging that QUALCOMM's refusal to license on FRAND terms "thwart[s] meaningful

competition in the market for UMTS chipsets"); ¶ 105 (alleging that QUALCOMM's royalty

rate discrimination "is intended to harm . . . competition in the UMTS chipset market"); ¶ 109

(alleging that QUALCOMM's licensing terms "put Broadcom at a significant disadvantage in

pricing its UMTS chipsets).)  Thus, Broadcom's allegations regarding licensing practices cannot

support its claim for monopolization of the "WCDMA technology markets".  See Intergraph, 195

F.3d at 1355 (no claim for monopolization of market for "high-end microprocessors" where allegedly anticompetitive acts affected other markets, and not the alleged relevant market).

## II.     BROADCOM DOES NOT PLEAD VIABLE CLAIMS RELATED TO THE "MARKET FOR UMTS CHIPSETS"

Broadcom's "Second" through "Sixth" "Claim[s] for Relief" are claims related to the "market" for UMTS chipsets.  (¶¶ 145-48, 150-55, 157-61, 163-66, 168-71.)  Specifically, Broadcom alleges attempted monopolization of that alleged market (second claim), exclusive dealing (third and fifth claims) and tying (fourth and sixth claims).  (Id.)  Each of these claims fails because, to the extent Broadcom has been excluded from the alleged market, this exclusion is not the result of any anticompetitive conduct by QUALCOMM.  Rather, it is the result of Broadcom's refusal to accept QUALCOMM's offer to license its patents.  Thus, Broadcom has not suffered any "antitrust injury".  Moreover, Broadcom's allegations are insufficient to establish attempted monopolization, exclusive dealing or tying.

### A.     Broadcom Has Not Suffered "Antitrust Injury" in the Alleged UMTS Chipset Market

An "antitrust injury" is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  Thus, to allege an antitrust injury, a plaintiff must allege:  (1) that the alleged injury-causing conduct reduced competition and thereby injured consumers, see, e.g., SmithKline Beecham Corp. v. Apotex Corp., 383 F. Supp. 2d 686, 697-99 (E.D. Pa. 2004); and (2) that the plaintiff's injury was actually caused by the alleged anticompetitive conduct, see Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co., 826 F.2d 1235, 1240 (3d Cir. 1987).  An antitrust complaint that does not plead facts sufficient to show that the plaintiff has suffered antitrust injury must be dismissed.  See, e.g., City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 265 (3d Cir. 1998); Barton & Pittinos,

Inc., v. SmithKline Beecham Corp., 118 F.3d 178, 184 n.9 (3rd Cir. 1997).  In this case,

Broadcom's failure to allege antitrust injury in the alleged UMTS chipset market is fatal to its

attempted monopolization claim, its exclusive dealing claims and its tying claims related to that

alleged market.  See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990)

(antitrust injury requirement applies to all private antitrust claims authorized by section 4 of the

Clayton Act, 15 U.S.C. § 15.).

               1.      Broadcom's alleged injury was not caused by anticompetitive conduct.

Broadcom alleges that its "injury" is exclusion from the UMTS chipset market.

(¶¶ 142, 147.)  But Broadcom concedes that it needs a license to QUALCOMM's essential

WCDMA patents in order lawfully to enter the alleged market.  (¶¶ 82, 140, 145.)  Thus, to the

extent Broadcom has been "excluded" from the alleged market, Broadcom necessarily concedes

that its exclusion results from its own failure to accept a license to QUALCOMM's lawfully

acquired patent rights.

That type of exclusion is not an injury "that flows from" a violation of the

antitrust laws.  As discussed above, see Part I.B, supra, the patent laws immunize the

enforcement of patent rights – including licensing activities – from antitrust liability, absent the

"exceptional circumstances" of "illegal tying, fraud in the Patent and Trademark Office, or sham

litigation".  ISO, 203 F.3d at 1326-27.  None of these is present here.  Broadcom does not allege

fraud in the Patent Office or sham litigation.  Broadcom admits that the relevant patents cover

WCDMA chipsets (¶ 14), so the alleged tie does not extend beyond the scope of

QUALCOMM's patent rights.  See ISO, 203 F.3d at 1326-27.  It therefore cannot constitute the

"illegal tying" necessary to pierce QUALCOMM's antitrust immunity.  See id. at 1327; see also

Miller Insituform, 830 F.2d at 609 (finding "no adverse effect on competition" by termination of

patent license by patent holder that also competed with its licensees, because the patent holder

"from the start, had [the] exclusive right to manufacture, use, and sell his invention"); <u>Schor v. Abbott Labs.</u>, 378 F. Supp. 2d 850, 855-60 (N.D. Ill. 2005) (allegations that defendant used "monopoly power" in market for patented drug to attempt to monopolize market for protease inhibitors that used that drug as a "booster" dismissed for failure to state a claim where relevant patent indisputably covered the drug whether used alone or used as a "booster").

        Because Broadcom's alleged exclusion is not the result of any violation of the antitrust laws by QUALCOMM, but rather flows from QUALCOMM's lawful acquisition and exercise of its patent rights, it is not an "antitrust injury". <u>See</u> <u>Axis, S.p.A. v. Micafil, Inc.</u>, 870 F.2d 1105 (6th Cir. 1989) (no antitrust injury where plaintiff was excluded from market by patents); <u>ESS Tech. Inc. v. PC-Tel, Inc.</u>, No. C-99-20292 RMW, 1999 WL 33520483, at *3 (N.D. Cal. Nov. 4, 1999) (averments that defendant holds patents essential to comply with standards and that plaintiff cannot compete in the relevant market due to defendant's refusal to license its patents in a reasonable and non-discriminatory way do not allege antitrust injury); <u>see also</u> <u>City of Pittsburgh</u>, 147 F.3d at 268 ("[A] plaintiff cannot be injured in fact by private conduct excluding him from the market when a statute prevents him from entering that market in any event" (quotation and citation omitted)); <u>Hodges v. WSM, Inc.</u>, 26 F.3d 36, 39 (6th Cir. 1994) (no "antitrust injury" where plaintiff was excluded from market by lawful exercise of property rights); <u>Valley Products Co. Inc. v. Landmark, a Div. of Hospitality Franchise Sys., Inc.</u>, 128 F.3d 398, 404-07 (6th Cir. 1997) (no "antitrust injury" where plaintiff was excluded from market by defendant's termination of trademark license). For this reason alone, all of Broadcom's claims related to the alleged UMTS chipset market fail.

2.  Broadcom has not alleged that QUALCOMM's licensing policies have harmed competition in the alleged UMTS chipset market.

In addition, it is axiomatic that the antitrust laws protect competition, not competitors.  See, e.g., Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962).  Thus, an antitrust plaintiff must allege "'that challenged conduct affected the prices, quantity or quality of goods or services,' not just his own welfare".  Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 641 (3d Cir. 1996) (quoting Tunis Bros. Co. Inc. v. Ford Motor Co., 952 F.2d 715, 728 (3d Cir. 1991)).

In this case, Broadcom does not allege that QUALCOMM's licensing terms have excluded anyone other than Broadcom from the alleged UMTS chipset market.[17]  Thus it has failed to plead facts that establish an injury to competition, as opposed to an injury to itself.  See, e.g., Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 494 n.40 (3d Cir. 1992) (en banc) (Even if "a certain class of competitors . . . might be doomed to competitive oblivion", "that would be no concern of the antitrust laws unless consumers were also hurt because of diminished competition"); ESS Tech., 1999 WL 33520483, at *3.  This failure is also fatal to all of Broadcom's claims related to the alleged UMTS chipset market.

B.  Broadcom Does Not Plead the Elements of Its Claim for Attempted Monopolization of the Alleged UMTS Chipset Market

Broadcom's attempted monopolization claim fails not only because Broadcom does not allege antitrust injury, as discussed above, but also because Broadcom does not plead other essential elements of this claim.  The elements of an attempted monopolization claim are

---

[17] Nor could it –there is, in fact, vigorous competition in the alleged market.  Several companies have taken licenses to QUALCOMM's essential WCDMA patents (on terms mutually agreed upon with QUALCOMM) and are currently manufacturing and selling UMTS chipsets.  Indeed, one of the licensees – Texas Instruments – has the largest share of the alleged market (far larger than QUALCOMM), and other companies also have a larger share than QUALCOMM.  Broadcom does not plead otherwise.

"(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997). Broadcom fails to plead any allegations regarding the structure of, and competition in, the alleged UMTS chipset market, and thus it fails to plead that there is a dangerous probability of QUALCOMM's achieving monopoly power in the alleged UMTS chipset market. And, in any event, the conduct of which Broadcom complains is neither predatory nor anticompetitive as a matter of law.

        1.    <u>Broadcom does not plead facts that would establish a "dangerous probability of achieving monopoly power" in the alleged UMTS chipset market.</u>

        The only facts in the complaint regarding the alleged UMTS chipset market are the unremarkable (from a legal perspective) points that (1) the market is experiencing rapid growth, with 50 million WCDMA cell phones expected to be sold in 2005, and (2) that QUALCOMM has sales in the market. (¶¶ 112-13.) Not one of the 200 paragraphs in Broadcom's complaint describes QUALCOMM's competitors in that market. Nor does Broadcom aver QUALCOMM's share of that market or that of any other competitor in that market.[18]

        Although Broadcom's complaint states that "there is a dangerous probability that QUALCOMM will obtain monopoly power" in the alleged UMTS chipset market, courts have repeatedly held that such conclusory and unsupported allegations of "dangerous probability" are

---

[18] That is undoubtedly because Broadcom seeks to obscure the fact that there is vigorous competition among manufacturers of UMTS chipsets, including Texas Instruments (with the largest sales volume by far), Freescale, Agere and NEC. Indeed, if there is a relevant market for UMTS chipsets (which we believe there is not), QUALCOMM's share of it, according to industry analysts, is less than 20%.

insufficient to withstand a motion to dismiss an attempted monopolization claim.  See, e.g.,

Brunson Communications, Inc. v. Arbitron, Inc., 239 F. Supp. 2d 550, 571-72 (E.D. Pa. 2002);

Fresh Made, Inc. v. Lifeway Foods, Inc., No. Civ. A. 01-4254, 2002 WL 31246922, at *8 (E.D.

Pa. Aug. 9, 2002); Smith & Johnson, Inc. v. Hedaya Home Fashions Inc., No. 96 Civ. 5821

MBM, 1996 WL 737194, at *7 (S.D.N.Y. Dec. 26, 1996); E. & G. Gabriel v. Gabriel Brothers,

Inc., No. 93 CIV. 0894 (PKL), 1994 WL 369147, at *5 (S.D.N.Y. July 13, 1994).  For example,

in Fresh Made, the plaintiff – a maker of dairy products – alleged only that the defendant's gross

annual revenues were five times as large as plaintiff's, and that defendant had used its influence

to threaten distributors and merchants who did not agree to its demands.  Id. at *8.  But the

plaintiff in Fresh Made failed to "allege the overall size of the proposed market, identify

[defendant's] percentage share of the proposed market, identify other participants and

competitors in the market, or allege what percentage of [defendant's] gross annual revenues are

derived from the proposed market."  Id.  Therefore, the court held, plaintiff's allegations

regarding "dangerous probability" were insufficient to withstand a motion to dismiss.  Id.

Here, Broadcom pleads even fewer facts about the market than did the plaintiff in

Fresh Made.  Broadcom fails to plead QUALCOMM's percentage share of the alleged UMTS

chipset market, the other participants and competitors in that alleged market, or the percentage of

QUALCOMM's revenues attributable to the alleged market.  Thus, Broadcom fails to allege

facts sufficient to establish that there is a "dangerous probability" that QUALCOMM will

monopolize the alleged UMTS chipset market.  See id.; see also Smith & Johnson, 1996 WL

737194, at *7 (conclusory allegations of "dangerous probability" insufficient where "plaintiff has

failed to allege any facts regarding the afghan industry structure, let alone [defendant's] current

market share").

     2.     <u>The conduct alleged by Broadcom with regard to UMTS chipsets is not "predatory" or "anticompetitive".</u>

Broadcom alleges three types of allegedly anticompetitive conduct:  (1) that QUALCOMM (i) fraudulently induced SDOs to include QUALCOMM's patented technology in the WCDMA standard by falsely promising to license that technology on FRAND terms and then failing to abide by its promise (including failing to give Broadcom a license on FRAND terms) and (ii) offered discounted royalties or waived licensing fees in exchange for the purchase of QUALCOMM UMTS chipsets (the "licensing conduct");  (2) that QUALCOMM offered "marketing funds and/or other incentives" conditioned on the use of QUALCOMM's UMTS chipsets (the "pricing conduct"); and (3) that QUALCOMM leveraged its alleged CDMA monopolies by "using threats regarding . . . chipset supply" to coerce phone manufacturers into buying QUALCOMM's UMTS chipsets (the "CDMA supply conduct").  Neither the alleged licensing conduct nor the alleged pricing conduct is "anticompetitive", and Broadcom does not plead facts that would establish that QUALCOMM could monopolize the alleged UMTS chipset market through the alleged CDMA supply conduct.  Therefore, the attempted monopolization claims should be dismissed.

     <u>First</u>, for the reasons set forth in Part I.B, <u>supra</u>, QUALCOMM's licensing practices are expressly authorized by the patent laws and therefore cannot be "anticompetitive" within the meaning of the antitrust laws.

     <u>Second</u>, the pricing conduct as alleged is nothing more than lawful, pro-competitive price competition.  Conspicuously absent from the Complaint, and rightly so, is any allegation that QUALCOMM has engaged in below-cost pricing.  Absent such an allegation, discounting cannot support an attempted monopolization claim.  <u>See</u> <u>Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.</u>, 509 U.S. 209, 223-24 (1993); <u>see also</u> <u>Advo, Inc. v.</u>

Philadelphia Newspapers, Inc., 51 F.3d 1191, 1195-99 & n.3 (3d Cir. 1995) (applying Brooke Group to an attempted monopolization claim).  Although the Third Circuit has allowed an exception to Brooke Group in the case of pricing conduct by a monopolist, that court has made clear that the exception only applies because "a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior".  LePage's Inc. v. 3M, 324 F.3d 141, 151-52 (3d Cir. 2003) (en banc).  Here, Broadcom does not – and cannot – plead that QUALCOMM is a "monopolist" in the alleged UMTS chipset market or that there is "no market constraint" on QUALCOMM's behavior.  To the contrary, there is vigorous competition among firms manufacturing UMTS chipsets and QUALCOMM does not even have the largest share among these manufacturers.  Indeed, perhaps the best evidence of "market constraint" on QUALCOMM's behavior is alleged in the complaint – that QUALCOMM competes by lowering the prices of its products, rather than raising them.  (¶¶ 106-07, 110.)

Third, Broadcom does not plead facts that would establish that the CDMA supply conduct has anticompetitive effects in the alleged market for UMTS chipsets.  In essence, this is an allegation of "monopoly leveraging" – i.e., an effort by a seller with power in one market (the alleged CDMA chipset market) to transfer that power to a second market (the alleged UMTS chipset market), thereby achieving economic power in the second (or "leveraged") market.  See, e.g., Advo, 51 F.3d at 1202-03.  As the Third Circuit has noted, monopoly leveraging theories "have come under increasing attack as economically groundless" because they rarely make sense.  Id.  In Advo, for example, plaintiff alleged that the defendant had a monopoly in newspaper advertising, and was using discounts on newspaper advertising to attempt to monopolize the market for advertising in another type of publication – weekly circulars.  Id. at

30

1192-94.  The Third Circuit found plaintiff's leveraging theory nonsensical, because "[e]ven if it successfully monopolizes the circular distribution advertising market by investing the proceeds from its [newspaper advertising] monopoly in predation, it will be unable to recoup those profits as long as there are low barriers to entering the circular distribution market".  Id. at 1203.

Here, it similarly makes no sense for QUALCOMM to forgo profits from selling CDMA chipsets to attempt to boost sales of UMTS chipsets.  Even if QUALCOMM were able to "monopolize" the "market" for UMTS chipsets, it would be unable to recoup the lost CDMA profits because QUALCOMM's UMTS chipset pricing would be constrained by the presence of WCDMA licensees like Texas Instruments, who could easily reenter the market.

In addition, in Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 206 (3d Cir. 1992), the Third Circuit unequivocally held that "in order to prevail upon a theory of monopoly leveraging, a plaintiff must prove threatened or actual monopoly in the leveraged market" – i.e., the market to which the alleged monopolist is exporting its market power (here, the alleged UMTS chipset market).   Here, as noted above, Broadcom does not plead any facts regarding the structure of the alleged UMTS chipset market or QUALCOMM's position in it, let alone the requisite showing of a threatened or actual monopoly.

C.    Broadcom Does Not State Claims for "Exclusive Dealing" in the Alleged UMTS Chipset Markets

Broadcom's claims for alleged anticompetitive "exclusive dealing" arrangements under the Sherman Act (Third claim) and the Clayton Act (Fifth claim) also fail.  An "exclusive dealing" claim under Section 3 of the Clayton Act requires a showing of an exclusive agreement or agreements for the sale of goods that forecloses a substantial share of a relevant market.  Barr

Labs., Inc. v. Abbott Labs., 978 F.2d 98, 110-11 (3d Cir. 1992).[19]  The Supreme Court has

articulated two tests for determining whether a foreclosure is "substantial":  the "quantitative"

substantiality test espoused in Standard Oil Co. v. United States, 337 U.S. 293, 309-14 (1949),

and the "qualitative" substantiality test set forth in Tampa Electric Co. v. Nashville Coal Co.,

365 U.S. 320, 327-29 (1961).  See Barr, 978 F.2d at 110-11.  The "quantitative" substantiality

test requires consideration only of the share of the relevant market that has been foreclosed.  The

"qualitative" substantiality test requires the court to evaluate the probable effect of the exclusive

dealing arrangements on "the relevant area of effective competition, taking into account the

relative strength of the parties, the proportionate volume of commerce involved in relation to the

total volume of commerce in the relevant market area, and the probable immediate and future

effects which pre-emption of that share of the market might have on effective competition

therein."  Tampa Electric, 365 U.S. at 329.  The Third Circuit has held that the "qualitative"

substantiality test has subsumed the "quantitative" substantiality test such that "the degree of

market foreclosure is only one of the factors involved in determining the legality of an exclusive

dealing arrangement".  See Barr, 978 F.2d at 111.

        In this case, as noted above, Broadcom does not plead any relevant facts

regarding the structure of, or competition in, the alleged UMTS chipset market.  In particular, it

---

[19] While a claim under section 1 of the Sherman Act "applies to actual restraints of trade, § 3 [of the Clayton Act] 'condemn[s] sales or agreements where the effect of such sale or contract would, under the circumstances disclosed, probably lessen competition or create an actual tendency to monopoly'".  Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co., 953 F.Supp. 617, 662 (E.D. Pa. 1997) (quoting Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 326 (1961)).  The Third Circuit has stated that if an alleged exclusive dealing arrangement is permissible under "the stiffer standards of anti-competitiveness under the Clayton Act", it will also be lawful under the less restrictive provisions of the Sherman Act.  Barr, 978 F.2d at 110; see also Standard Oil Co. v. United States, 337 U.S. 293, 312 (1949) (stating that the Clayton Act was intended to prohibit antitcompetitive conduct that was not within the proscriptions of the Sherman Act).

does not plead QUALCOMM's share of that alleged market <u>at all</u>, let alone the share of the market allegedly foreclosed by the alleged "exclusive dealing" arrangements.  Nor does Broadcom plead facts – such as the number of competitors and non-foreclosed customers – necessary to evaluate "the probable immediate and future effects" of the alleged foreclosure on competition.  Thus, Broadcom pleads no facts from which a factfinder could conclude that the alleged foreclosure is "substantial" under the "qualitative" substantiality test.[20]  For this reason – and because of the lack of antitrust injury, <u>see</u> Part II.A, <u>supra</u> – Broadcom's "exclusive dealing" claims should be dismissed.

      D.     <u>Broadcom Does Not State Claims For Tying in the Alleged UMTS Chipset Markets</u>

Broadcom's tying claims (Fourth and Sixth claims) allege that QUALCOMM "ties" licenses to essential WCDMA patents to the sale of UMTS chipsets.  As discussed above, these claims fail because Broadcom does not plead an "antitrust injury" in the alleged UMTS chipset market.  <u>See</u> Part II.A, <u>supra</u>.  These claims fail for the additional reason that Broadcom does not – and cannot – plead that QUALCOMM refuses to license its patents to companies that will not buy its chipsets.  Accordingly, Broadcom's tying claims under both the Sherman and Clayton Acts are insufficient as a matter of law.  Plaintiff's tying claim under the Clayton Act should be dismissed on the additional ground that the licensing of QUALCOMM's patents does not involve the "sale" of "commodities".

To plead adequately a claim of tying under both the Sherman and Clayton Acts, a plaintiff must plead that: "(1) a defendant seller ties two distinct products; (2) the seller possesses market power in the tying product market; and (3) a substantial amount of interstate commerce is

---

[20] Because Broadcom has not pleaded any facts about QUALCOMM's market share, it has also not pleaded any facts that would satisfy the "quantitative" substantiality test.

affected." <u>Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.</u>, 959 F.2d 468, 477 (3d

Cir. 1992). The Third Circuit has defined a "tie" as "selling one good (the tying product) on the

condition that the buyer also purchase another, separate good (the tied product)." <u>Town Sound</u>,

949 F.2d at 475. In interpreting this requirement under both the Sherman and Clayton Acts,

courts have found that there can only be a tie where a defendant <u>refuses</u> to sell the tying product

unless the customer also purchases the tied product. <u>See, e.g.</u>, <u>SmithKline Corp. v. Eli Lilly &</u>

<u>Co.</u>, 575 F.2d 1056, 1062 n.3 (3d Cir. 1987); <u>SmithKline Corp. v. Eli Lilly & Co.</u>, 427 F. Supp.

1089, 1112-13 & n.18 (E.D. Pa. 1976). A discount for purchasing two products together – even

so large a discount as to make it economically unreasonable to buy the products separately –

does not constitute "tying" so long as both products are in fact available separately. <u>Id.</u> at 1113-

14.

  Broadcom does not – and cannot – allege that QUALCOMM <u>refuses</u> to license its

patents. At most, Broadcom alleges that QUALCOMM offers <u>discounts</u> on royalty rates or

upfront licensing fees if a licensee also purchases QUALCOMM chipsets. (¶¶ 7-18, 104-11,

145, 157, 168-69.) But a discount is not a separate product, and thus a discount cannot constitute

a "tie" under the antitrust laws. <u>See, e.g.</u>, <u>Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car</u>

<u>Sys., Inc.</u>, 732 F.2d 1403 (9th Cir. 1984); <u>SmithKline</u>, 427 F. Supp. at 1112-13 & n.18.

Therefore, Broadcom does not plead that QUALCOMM "[sold] one good (the tying product) on

the condition that the buyer also purchase another, separate good (the tied product)." <u>Town</u>

<u>Sound</u>, 959 F.2d at 475.

  The District Court for the Eastern District of Pennsylvania addressed a similar

allegation in <u>SmithKline</u>. In <u>SmithKline</u>, both parties manufactured antibacterial drugs called

cephalosporins. <u>SmithKline</u>, 427 F. Supp. at 1091 & n.5. The defendant manufactured five

cephalosporins and offered customers a 3% rebate on purchases of all of the defendants'

cephalosporins if the customer purchased minimum amounts of at least three of the five that the

defendant manufactured.  Id. at 1091.  The plaintiff manufactured a drug that directly competed

with one of the defendant's cephalosporins.  Id. at 1103.  The plaintiff argued that the rebate

constituted an illegal tie under the Sherman and Clayton Acts because the rebate effectively

meant that plaintiff would have to offer a 16-35% rebate on its product to compete with the

defendant's product.  Id. at 1110.

       The district court found no illegal tie – notwithstanding the size of the discount –

because the plaintiff failed to show that the defendant refused to sell the tying drugs unless a

customer also purchased the tied drug.  See id. at 1113.  The court stated that in order for the

plaintiff to show that there was an illegal tie, "the plaintiff must prove that the defendant's

conduct amounted to a refusal to sell [the tying drugs] unless a hospital also purchased [the tied

drug]" – i.e., that the defendant "refused to sell [the tying products] and [the tied product]

separately".  Id. (emphasis added).  The court rejected the plaintiff's argument that the rebate

effectively forced customers to purchase the defendant's products, explaining that:

> "From an abstract perspective, if one disregards the economics of the
> market place, hospital pharmacists had the 'freedom to choose' any of [the
> defendant's] products without having to buy a tied product; thus they were
> 'free to take either product by itself.'  The economics of the marketplace
> precluded that freedom of choice for most hospitals; such a freedom of
> choice, more prevalent in theory than in operational reality, is enough to
> circumvent the tie-in prohibitions of the relevant antitrust laws."  Id. at
> 1114 (internal citations omitted) (quoting Ungar v. Dunkin' Donuts of
> Am., Inc., 531 F.2d 1211, 1226 (3d Cir. 1976)).

On appeal, the Third Circuit agreed that there could be no illegal tie without a requirement that

customers purchase the tied product in order to receive the tying product:

> "The district court found, and it is not disputed, that Lilly did not
> condition the availability of any of its products on the purchase of any
> other of its products or on the refusal of purchasing hospitals to deal with

its competitors.  Thus, Lilly did not 'tie' purchases of Kefzol to purchases of Keflin or Keflex.  . . . Lilly's marketing scheme lacks the element of coercion necessary for liability under the theory of tie-ins."  <u>SmithKline</u>, 575 F.2d at 1061 n.3.

A straightforward application of the rule in <u>SmithKline</u> is fatal to Broadcom's tying claims here.

Broadcom's tying claims under Section 3 of the Clayton Act should be dismissed on the additional ground that Broadcom cannot meet the Clayton Act's requirement that <u>both</u> the tying product and the tied product be "commodities".  15 U.S.C. § 14; <u>see, e.g.</u>, <u>Marts v. Xerox, Inc.</u>, 77 F.3d 1109, 1113 n.6 (8th Cir. 1996); <u>Chelson v. Oregonian Publ'g Co.</u>, 715 F.2d 1368, 1372 (9th Cir. 1983); <u>Crossland v. Canteen Corp.</u>, 711 F.2d 714, 719 n.1 (5th Cir. 1983).  A patent license is not a "commodity" for purposes of the Clayton Act.  <u>See</u> <u>Tele Atlas N.V. v. Navteq Corp.</u>, No. C-05-01673 RMW, 2005 WL 2893782, at *6-*7 (N.D. Cal. Nov. 2, 2005); <u>La Salle Street Press, Inc. v. McCormick & Henderson, Inc.</u>, 293 F. Supp. 1004, 1006 (N.D. Ill. 1968).  Thus, Broadcom's allegations that QUALCOMM tied licenses to its patents to sales of its chipsets do not state a claim under the Clayton Act.

* * *

In sum, Broadcom does not allege the requisite anticompetitive conduct with respect to of any of its claims related to the alleged UMTS chipset market.  Moreover, Broadcom does not allege "antitrust injury" with respect to those claims, because to the extent it has been "excluded" from the alleged market, that exclusion is entirely attributable to Broadcom's rejection of QUALCOMM's licensing terms.  For all these reasons, Broadcom's UMTS chipset-related claims should be dismissed.

### III.  BROADCOM DOES NOT HAVE STANDING TO BRING CLAIMS RELATED TO THE ALLEGED 3G CDMA CHIPSET AND TECHNOLOGY MARKETS OR TO CHALLENGE QUALCOMM'S ACQUISITION OF FLARION

In an attempt to bolster its fatally flawed Complaint, Broadcom spends dozens of paragraphs making baseless allegations regarding the alleged monopolization of the so-called "3G CDMA chipset market" and "3G CDMA technology markets".[21] (¶¶ 61-80, 114-116, 172-75, 181.)  Broadcom spends dozens more paragraphs complaining that QUALCOMM's planned acquisition of Flarion will supposedly have anticompetitive effects in the alleged market for "technologies contending to serve essential functions for B3G[22] [and 4G] wireless standards and systems".  (¶¶ 60, 117-138, 176-78.)  Broadcom does not – and cannot – allege that it even participates in any of these alleged "markets".  Therefore, Broadcom lacks standing to bring either its claim for monopolization of the alleged "3G CDMA chipset market" and "3G CDMA technology markets" in violation of Section 2 of the Sherman Act (the "Seventh Claim for Relief") or its claim for "unlawful purchase, holding and use" of Flarion in violation of Section 7 of the Clayton Act (the "Eighth Claim for Relief").

To determine whether a plaintiff has standing to bring a claim under the antitrust laws ("antitrust standing"), courts must analyze "plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them".  See Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 534-35 & n.31 (1983)

---

[21] "3G CDMA" uses different standards than WCDMA.  (¶ 48.)  Thus, according to Broadcom's market definitions, 3G CDMA markets are distinct from WCDMA markets for antitrust purposes.  (¶ 53.)  Broadcom is wrong, but we do not challenge this market definition for purposes of this motion.

[22] "B3G" stands for beyond third generation. (¶ 23.)

("AGC").  In this Circuit, courts must analyze the following factors (the "AGC factors") to

determine whether a plaintiff has "antitrust standing"[23]:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing;
>
> (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress;
>
> (3) the directness of the injury, which addressed the concerns that liberal application of standing principles might produce speculative claims;
>
> (4) the existence of more direct victims of the alleged antitrust violations; and
>
> (5) the potential for duplicative recovery or complex apportionment of damages.

2660 Woodley Road Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 740-41 (3d Cir. 2004).

The first two of these factors are equivalent to the "antitrust injury" requirement.

Thus, "antitrust injury" is "a necessary but insufficient condition of antitrust standing".  Id. at

741 ("[E]ven a plaintiff who can show antitrust injury may lack antitrust standing, because the

remaining ACG factors may weigh against allowing him or her to sue under the antitrust laws.")

(quoting Barton & Pittinos, Inc., 118 F.3d at 182).

A.    Broadcom Lacks Standing to Bring Claims Related to Any Alleged CDMA Market

To evaluate whether Broadcom has standing to bring its CDMA-related claims

using the AGC factors, the Court must consider the nature of the alleged wrongdoing and the

nature of the alleged injury.  The alleged anticompetitive acts, for purposes of the CDMA claims,

are acts that allegedly excluded CDMA chipset competitors so as to maintain QUALCOMM's

---

[23]  "[T]he antitrust standing inquiry is not a black-letter rule, but rather, [it] is essentially a balancing test comprised of many constant and variable factors."  City of Pittsburgh, 147 F.3d at 264-65 (internal quotation marks omitted).

alleged CDMA chipset "monopoly".[24]  (e.g., ¶¶ 69-80.)  But because Broadcom does not

manufacture CDMA chipsets or otherwise participate in any "CDMA market", it has not – and

cannot – aver that any of these allegedly anticompetitive acts caused it any direct injury.  Rather,

Broadcom alleges that (1) these acts enabled QUALCOMM to "maintain" its "CDMA

monopolies"; (2) QUALCOMM is leveraging is "monopoly power" over CDMA chipsets to

attempt to monopolize the alleged UMTS chipset market; and (3) that leveraging is harming

Broadcom's ability to compete in the alleged UMTS chipset market.  (¶¶ 69, 145, 174.)

Applying the AGC factors to these allegations is fatal to Broadcom's CDMA-related claims.

       First, Broadcom does not allege that it has suffered "antitrust injury" (AGC

factors 1 and 2).  The alleged acts that supposedly "maintained" QUALCOMM's "CDMA

monopolies" were allegedly directed toward excluding CDMA chipset competitors, not

WCDMA chipset competitors.  (¶¶ 69-80.)  Broadcom makes no allegation that it is (or has any

intention of becoming) a CDMA chipset manufacturer, or a customer or similar participant in

any alleged CDMA "market".  Thus, there is no causal connection between the alleged harm –

exclusion from the alleged UMTS chipset market – and the alleged antitrust violation –

maintenance of a "monopoly" in the alleged CDMA chipset market.  See Gregory Marketing

Corp. v. Wakefern Food Corp., 787 F.2d 92, 95-96 (3d Cir. 1986) (no antitrust standing where

alleged injuries were not caused by the allegedly anticompetitive conduct); see also, e.g., Barton

& Pittinos, Inc., 118 F.3d at 184 (no antitrust injury where plaintiff was not a customer or

competitor in the relevant market).

---

[24] Broadcom also conclusorily alleges that QUALCOMM "obtained and . . . willfully maintained
monopoly power in the market[] for . . . 3G CDMA technology" (¶ 115), but Broadcom has
alleged no facts to support such a claim.

Second, the alleged injury is too remote to support standing under AGC factors 3 (directness of injury) and 4 (existence of "more direct victims").  As noted above, Broadcom alleges not that it suffered any direct injury as a result of QUALCOMM's "maintenance" of its "CDMA monopolies", but rather that it was injured because QUALCOMM allegedly leveraged those "monopolies" to obtain market power over UMTS chipsets.  Moreover, even if Broadcom's allegations of anticompetitive conduct in so-called CDMA markets had any merit – which they do not – there would be numerous "more direct victims" of the alleged anticompetitive conduct, including manufacturers of CDMA chipsets listed in paragraph 67 of the Complaint (i.e., competitors) and handset manufacturers that purchase CDMA chipsets (i.e., customers).

Third, AGC factor 5 weighs against standing because Broadcom's CDMA-related claims have the potential to present problems of apportionment of damages.  Broadcom has brought a number of different claims that arise out of alleged injuries to its putative WCDMA chipset business, including other antitrust claims based on different conduct and state law claims. In similar circumstances, the Third Circuit held that allowing an antitrust claim "creates insurmountable problems in apportioning damages along with the real possibility of cumulative damages".  2660 Woodley Road, 369 F.3d at 743.

Because all of the AGC factors weigh against standing, Broadcom's claims related to the alleged CDMA chipset and technology markets should be dismissed.

B.    Broadcom Lacks Standing to Bring a Section 7 Claim Related to the Flarion Acquisition

Broadcom's Section 7 claim related to the Flarion Acquisition is a transparent attempt to interfere with a transaction with which Broadcom has nothing whatsoever to do.

As with the CDMA-related claims, the Court must consider the nature of the alleged wrongdoing and the nature of the alleged injury to evaluate whether Broadcom has standing to bring claims related to the Flarion acquisition using the <u>AGC</u> factors. The wrongdoing, according to Broadcom, is that QUALCOMM's acquisition of Flarion will reduce competition in the so-called "markets for B3G and 4G technology". (¶ 177.) Broadcom defines those alleged markets as markets for "technologies contending to serve essential functions for B3G [and 4G] wireless standards and systems". (¶ 60.) Thus, unlike the other technology markets alleged by Broadcom, which are "markets" for patents essential to a particular standard, the B3G and 4G "markets", according to Broadcom, comprise competition among "technologies" that may <u>become</u> standards sometime in the future. (<u>Id.</u>) Broadcom claims it will be injured (i) because it "expects to be a competitor to QUALCOMM in the chipset markets for B3G and 4G technologies"; and (ii) as "a customer in the B3G and 4G technology markets", because it "may require a license to intellectual property necessary to manufacture B3G and 4G equipment". (¶¶ 137-38.)

Broadcom's claim of injury as a competitor fails for at least two independent reasons. <u>First</u>, it is the black-letter law of this Circuit that a competitor does not have standing to bring an action under Section 7 of the Clayton Act. <u>See</u> <u>Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co.</u>, 826 F.2d 1235, 1241-42 (3d Cir. 1987).

<u>Second</u>, Broadcom does not allege that it is a competitor in any alleged relevant market. As noted above, the relevant markets, according to Broadcom, are the markets for "technologies contending to serve essential functions for B3G [and 4G] wireless standards and systems". (¶ 60.) Broadcom does not – and cannot – allege that it is competing to provide technologies for adoption into B3G and 4G standards. Rather, Broadcom alleges only that it

"expects to be" a competitor in completely different "markets" – the "chipset markets for B3G and 4G technologies".  By the Complaint's own terms, however, those "chipset markets" do not – and cannot – yet exist, because no B3G or 4G standard has yet been adopted.  (See ¶¶ 53-57 (alleging that "chipset markets" are defined as markets for chipsets practicing an adopted standard).)  Thus, Broadcom does not plead that it is a competitor in a relevant market affected by the Flarion acquisition.

Broadcom similarly is not a customer in the markets for "technologies contending to serve essential functions for B3G [and 4G] wireless standards and systems".  (¶ 60.)  Broadcom claims that it is a customer because it "may require a license to intellectual property necessary to manufacture B3G and 4G equipment".  (¶ 137.)  Because no B3G or 4G standard has yet been adopted, however, there is no basis for Broadcom to conclude one way or another that it needs a license at all – let alone a license from either QUALCOMM or Flarion – to "manufacture B3G and 4G equipment".[25]  (See ¶ 58 (alleging that a technology market is created when a standard is adopted).)

Because Broadcom's allegations of injury as a competitor or customer are insufficient, Broadcom does not allege that it will suffer antitrust injury (ACG factors 1 and 2) from QUALCOMM's acquisition of Flarion.  See, e.g., Barton & Pittinos, Inc., 118 F.3d at 184.  That alone is fatal to Broadcom's Section 7 claim.[26]  See id. at 184 n.9 (stating that in the absence of antitrust injury, no further inquiry into the AGC factors is necessary).

---

[25] Furthermore, read literally, the alleged "B3G" and "4G" "technology markets" contemplate customers that are standard–setting organizations.  Clearly, Broadcom is not such an organization and, therefore, is not a "customer" under this reading.

[26] Although the paragraphs under the heading "Eighth Claim for Relief" conclusorily allege that "QUALCOMM's previous acquisition, holding, and use of other companies" has had anticompetitive effects in alleged CDMA and WCDMA markets, no factual allegations regarding

Broadcom's claims also fail under factor 3 (directness of injury).  By their own terms, Broadcom's claims of injury are contingent on future events that may not ever come to pass (e.g., the adoption of B3G and 4G standards that incorporate patented inventions owned by Flarion).  (See, e.g., ¶ 137 (alleging that Broadcom "may require a license") (emphasis added); ¶ 138 (alleging that Broadcom "expects to be a competitor") (emphasis added).)  "Remote" and "speculative" injuries are beyond the reach of the Clayton Act.  AGC, 459 U.S. at 545 n.52; see also, e.g., Florida Seed Co., Inc. v. Monsanto Co., 105 F.3d 1372, 1374 (11th Cir. 1997) ("[T]he doctrine of antitrust standing reflects prudential concerns and is designed to avoid burdening the courts with speculative or remote claims.").  For this reason, too, Broadcom's Section 7 claim should be dismissed.

## IV.     BROADCOM'S STATE LAW CLAIMS SHOULD BE DISMISSED

Because all of Broadcom's federal claims fail, see Parts I-III, supra, this Court should decline to exercise supplemental jurisdiction over Broadcom's state law claims pursuant to 28 U.S.C. § 1367(c).  See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); Lovell Mfg. v. Export-Import Bank of the U.S., 843 F.2d 725, 734 (3d Cir. 1988) ("[O]nce all federal claims have been dropped from a case, the case simply does not belong in federal court.").  Moreover, each of Broadcom's state-law claims fails under its own terms, as discussed below.

### A.     Broadcom Does Not State Claims Under State Antitrust and Unfair Competition Law

In a transparent attempt to complicate this litigation, Broadcom purports to plead claims under the antitrust laws of New Jersey, 38 other states and the District of Columbia and under the unfair competition laws of 38 states (but not New Jersey) and the District of Columbia.

---

such acquisitions appear in the Complaint.  Accordingly, Broadcom's lack of standing as to the Flarion acquisition is fatal to the entirety of its section 7 claim.

(¶¶ 179-83.)  Each of these allegedly "separate" claims arises from exactly the same conduct.

(¶¶ 180-82.)  Moreover, Broadcom does not allege that it suffered any distinct harm in each of

these states.  (Id.)  Accordingly, Broadcom does not plead 40 distinct state law antitrust claims

and 39 distinct state law unfair competition claims.  Rather, it pleads a single state antitrust law

claim, and a single state unfair competition claim, subject to a choice-of-law analysis.  See, e.g.,

Heindel v. Pfizer, Inc., 381 F. Supp. 2d 364, 370-78 (D.N.J. 2004) (consumer fraud claims

arising from the same conduct pled under the law of New Jersey "and 'other states' consumer

protection statutes'" decided as single claim under one state's law following choice-of-law

analysis); Perry v. Prudential-Bache Securities, Inc., 738 F. Supp. 843, 853-54 (D.N.J. 1989)

(claims arising from same conduct pled under both New York and New Jersey employment law

decided as one claim under New York law following choice-of-law analysis; New Jersey claim

dismissed as "inappropriately raised").

A federal court exercising pendent jurisdiction over a state-law claim must use the

choice-of-law rules of the forum state.  System Operations, Inc. v. Scientific Games

Development Corp., 555 F.2d 1131, 1136 (3d Cir. 1977).  Under New Jersey's choice-of-law

analysis, a court "applies a flexible 'governmental-interest' standard, which requires application

of the law of the state with the greatest interest in resolving the particular issue that is raised in

the underlying litigation."  Gantes v. Kason Corp., 145 N.J. 478, 484 (1996) (citations omitted).

This test has two prongs: (1) "an inquiry into whether there is an actual conflict between the laws

of the respective states, a determination that is made on an issue-by-issue basis"; and (2) "to

determine the interest that each state has in resolving the specific issue in dispute[, an] . . .

analysis [that] requires the court to 'identify the governmental policies underlying the law of

each state and how those policies are affected by each state's contacts to the litigation and to the

44

parties.'"  Id. at 485.  In this case, the states most relevant to the choice of law analysis are New Jersey, in which Broadcom has chosen to bring its action, and California, the home state of both parties.

        1.      <u>Broadcom's state law antitrust claim should be dismissed.</u>

In this case, there is no actual conflict between the antitrust laws of New Jersey and the antitrust laws of California.  Both New Jersey's and California's antitrust statutes are construed in harmony with the federal antitrust statutes.  <u>See</u> N.J. Stat. Ann. § 56:9-18 (2005); Cal. Bus. & Prof. Code § 16700 et seq. (2005); <u>State v. New Jersey Trade Waste Ass'n</u>, 96 N.J. 8, 19, (1984); <u>Chicago Title Ins. Co. v. Great Western Fin. Corp.</u>, 69 Cal. 2d 305, 315 (1968). Accordingly, for the same reasons Broadcom's federal antitrust claims fail, <u>see</u> Parts I-III, <u>supra</u>, its state law antitrust claims would also fail under either New Jersey or California law.  We have found no difference in the antitrust law of any of the other 38 jurisdictions that leads to a different result.  <u>See</u> <u>High v. Balun</u>, 943 F.2d 323, 325 (3d Cir. 1991) ("Where the application of either state's law would yield the same result, no conflict exists to be resolved.").

        2.      <u>Broadcom's state law unfair competition claim should be dismissed.</u>

The unfair competition laws of New Jersey and California differ.  In New Jersey, "[t]he tort of unfair competition 'consists of the misappropriation of one's property by another-property which has some sort of commercial or pecuniary value'".  <u>Hoffman-La Roche Inc. v. Genpharm Inc.</u>, 50 F. Supp. 2d 367, 380 (D.N.J. 1999) (citations omitted).  California's unfair competition law broadly defines "unfair competition" as "any unlawful, unfair or fraudulent

45

business act or practice". Cal Bus. & Prof. Code § 17200. Nevertheless, there is no conflict because Broadcom's claims fail under either state's laws.[27] See High, 943 F.2d at 325.

Under New Jersey law, Broadcom's unfair competition claim fails because it does not plead that QUALCOMM "misappropriated" any of Broadcom's property. See Hoffman-La Roche, 50 F. Supp. 2d at 380 (stating that "the key to the tort of unfair competition is misappropriation of property of commercial value").

Under California law, Broadcom's unfair competition claim fails because Broadcom does not plead any "unlawful", "unfair", or "fraudulent" conduct by QUALCOMM within the meaning of section 17200 of California's Business and Professions Code.

A claim under the "unlawful" prong of section 17200 requires a showing that the defendant violated a statute. See Farmers Ins. Exchange v. Superior Court, 2 Cal. 4th 377, 383 (1992) (stating that the "unlawful" prong effectively incorporates violations of any other laws and makes them independently actionable under section 17200). Broadcom's claim fails under this prong because its only allegations of statutory violations relate to the antitrust laws, and are meritless for the reasons discussed above.[28]

A claim under the "unfair" prong of section 17200 requires a showing of conduct that (i) threatens an incipient violation of an antitrust law; (ii) violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law; or (iii) otherwise significantly threatens or harms competition. See People's Choice Wireless, Inc. v. Verizon Wireless, 31 Cal. Rptr. 3d 819, 822-27 (Ct. App., 2d Dist. 2005). For the same reasons

---

[27] As with the state antitrust claims, we have found no difference in the unfair competition laws of any of the other 38 jurisdictions that leads to a different result.

[28] Violations of common law, such as claims for fraud or breach or contract, are insufficient to state a claim under the "unlawful" prong. See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 319 F. Supp. 2d 1059, 1074-75 (C.D. Cal. 2003).

Broadcom's antitrust claims fail, see Parts I-III, supra, Broadcom does not allege "an incipient violation of an antitrust law" or conduct that "violates the policy or spirit" of those laws.  See People's Choice Wireless, 31 Cal. Rptr. at 824-27 (stating that conduct violates the "policy or spirit" of the antitrust laws only if it results in a "significant" threat or harm to competition). Broadcom also does not allege conduct that "otherwise significantly threatens or harms competition" because is does not – and cannot – allege that there is not ample competition in the UMTS chipset market.  See id. at 827; see also Townshend, 2000 WL 433505, at *15 (dismissing claim brought under section 17200 based on similar allegations, with prejudice, on the ground that the allegations did not state "unfair" conduct); ESS Tech., 1999 WL 33520483, at *3 (same).  Thus, Broadcom does not plead a section 17200 claim under the "unfair" prong.

       A claim under the "fraudulent" prong of section 17200 requires a showing that the defendant made statements that were likely to cause members of the "consuming public" to be deceived.  See Kunert v. Mission Fin. Servs. Corp., 1 Cal. Rptr. 3d 589, 606 (Ct. App., 2d Dist. 2003).  Broadcom's claims fail under this prong because the allegedly fraudulent statements – commitments to license on FRAND terms – were not likely to cause members of the consuming public (here, presumably, the SDOs) to be deceived.  As discussed in Part I.A, supra, "it is reasonable for the parties to have different understandings" of the meaning of "fair, reasonable, and non-discriminatory."  See Lum, 361 F.3d at 226.  Thus, that term cannot support a claim for fraudulent conduct.  See id. at 228.

   B.    Broadcom Does Not State a Claim for Tortious Interference with Prospective Economic Advantage

       There is a conflict between the law of tortious interference of California and New Jersey.  Under California law, a claim for tortious interference with prospective contractual or economic relations should be dismissed at the pleading stage if the plaintiff fails to plead that the

defendant both: (1) "knowingly interfered with the plaintiff's expectancy"; and (2) "engaged in conduct that was wrongful by some legal measure other than the fact of interference itself."  See Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 393 (1995).  New Jersey law, however, does not require that the plaintiff meet the second prong of California's test for tortious interference claims.  See Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co., 912 F. Supp. 747, 771 (D.N.J. 1995).  Thus, it is necessary to proceed to the second prong of New Jersey's choice-of-law analysis, a determination of "the interest that each state has in resolving the specific issue in dispute."  Gantes, 145 N.J. at 485.

The "specific issue in dispute" here is whether QUALCOMM's allegedly anticompetitive conduct "interfered" with Broadcom's "prospective economic relationship" with manufacturers of WCDMA cell phones.  (¶ 185.)  Both the allegedly interfering party and the allegedly interfered-with party are California corporations, and accordingly at least some of the allegedly unlawful conduct (e.g., QUALCOMM's licensing negotiations with Broadcom) took place in California.  In contrast, the Complaint does not specify any WCDMA-related conduct that took place in New Jersey.  Thus, California has a greater interest in the "specific issue in dispute" in that California has a strong interest in protecting contracts initiated by its residents, as well as regulating the in-state conduct of its residents who might tortiously interfere with such a contract.  Accordingly, California law should apply.

For the reasons set forth in Parts I and II, none of the conduct that allegedly interfered with Broadcom's prospective WCDMA chipset contracts "was wrongful by some legal measure other than the fact of interference itself."  Della Penna, 11 Cal. 4th at 393.  Accordingly, Broadcom's tortious interference claim should be dismissed.  See Kentmaster Mfg. Co. v. Jarvis Products Corp., 146 F.3d 691, 695 (9th Cir. 1998) (affirming dismissal of claim of

48

interference with prospective economic advantage on the ground that the only allegations of wrongful conduct were insufficiently pled claims of violation of the antitrust laws).

      C.    <u>Broadcom Does Not State Claims for Promissory Estoppel or Fraud</u>

      Broadcom's claims for promissory estoppel and fraud fail because each is based on the alleged commitment to license patents on "fair, reasonable, and non-discriminatory" terms.[29]  As discussed in Part I.A, <u>supra</u>, the phrase "fair, reasonable, and non-discriminatory" is not susceptible to a single, universal interpretation of what licensing terms will apply in each and every case, and thus cannot support a fraud claim as a matter of law.  <u>See</u> <u>Lum</u>, 361 F.3d at 226.

      For the same reason, the phrase "fair, reasonable, and non discriminatory" cannot support a claim for promissory estoppel.  The elements of a promissory estoppel claim are (1) a clear and definite promise by the promisor; (2) made with the expectation that the promisee will rely thereon; (3) that the promisee in fact reasonably relied on the promise; and (4) thereby incurred detriment of a definite and substantial nature.  <u>See, e.g.</u>, <u>Watson v. City of Salem</u>, 934 F.Supp. 643, 661 (D.N.J. 1995).  The commitment to license patents on "fair, reasonable, and non-discriminatory" terms cannot be understood to be a "clear and definite" promise of specific license terms.  <u>See</u> Part I.A, <u>supra</u>.  In the absence of such a "clear and definite" promise, Broadcom's promissory estoppel claim fails.  <u>See</u> <u>Watson</u>, 934 F. Supp. at 661 (stating that the "clear and definite promise requirement . . . is considered the <u>sine</u> <u>qua</u> <u>non</u> for applicability of this theory of recovery").

      Further, Broadcom's state-law fraud claim should be dismissed for failure to plead fraud with particularity.  <u>See</u> Part I.A.2, <u>supra</u>.

---

[29] We have found no meaningful difference between the laws of New Jersey and the laws of California with respect to Broadcom's common-law claims of fraud, promissory estoppel and breach of contract.

D.    <u>Broadcom Does Not State a Claim for Breach of Contract</u>

Broadcom's claim for breach of contract should be dismissed because Broadcom fails to plead adequately the most fundamental element of a breach of contract claim: the existence of a contract.  Broadcom makes only the most conclusory of allegations that "QUALCOMM entered into actual or implied contracts with various SDOs".  (¶ 188.) Broadcom makes no allegation that QUALCOMM entered into any specific contract, with any specific terms, with any specific SDO.  Nor does Broadcom identify the dates of any of the alleged "contracts".  Indeed, Broadcom does not plead any of the particulars of any of these "contracts".  Without these basic facts, Broadcom's breach of contract claim fails. <u>See</u> <u>Barrett v. U.S. Banknote Corp.</u>, No. 7420 (RPP), 1992 WL 232055, at *9 (S.D.N.Y. Sept. 2, 1992) (rejecting breach of contact claim because of failure to specifically identify the parties to each contract); <u>Kirschner v. Cable/Tel Corp.</u>, 576 F. Supp. 234, 244-245 (E.D. Pa. 1983) (dismissing contract claim where plaintiff "failed to adequately show the existence of any third party contracts entered into by defendants for plaintiffs benefit").

## <u>Conclusion</u>

For the foregoing reasons, Broadcom's First Amended Complaint should be dismissed in its entirety.

December 9, 2005

Respectfully submitted,

McCARTER & ENGLISH LLP

by      /s/ William J. O' Shaughnessy
        William J. O' Shaughnessy (WJO-5256)

Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Richard J. Stark
David R. Marriott
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
    825 Eighth Avenue
        New York, NY 10019
        (212) 474-1000

*Attorneys for Defendant*
*QUALCOMM Incorporated*

51

William J. O'Shaughnessy (WJO 5256)
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Richard J. Stark
David R. Marriott
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BROADCOM CORPORATION<br><br>          Plaintiff,<br><br>     v.<br><br>QUALCOMM INCORPORATED,<br><br>          Defendant. | Civil Action No. 05-3550 (MLC)<br><br>CERTIFICATE OF SERVICE |

          The undersigned certifies that, on this day, I caused the original of the

following to be electronically filed with the United States District Court of New Jersey

Clerk's Office:

          1.          Notice of Motion; and

          2.          Memorandum of Law in Support of Defendant's Motion to
                         Dismiss.

          I further certify that, on this day, I caused copies of the foregoing

documents to be served upon the counsel of record by overnight mail:

DAVID S. STONE, ESQ.
Boies, Schiller & Flexner LLP
150 John F. Kennedy Parkway
Short Hills, NJ 07078
(973) 218-1111
Fax: (973) 218-1106

Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500
Fax: (202) 974-1999

Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, NY 10022
(212) 446-2300
Fax: (212) 446-2350

Dated:  December 9, 2005

___/s/ William J. O'Shaughnessy_____
William J. O'Shaughnessy