# BOIES, SCHILLER & FLEXNER LLP

150 JOHN F. KENNEDY PARKWAY • 4TH FLOOR • SHORT HILLS, NJ 07078 • PH. 973.218.1111 • FAX 973.218.1106

January 17, 2006

**VIA ELECTRONIC FILING**

Clerk of the Court
United States District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, NJ 08608

> **Re:**  **Broadcom Corporation v. Qualcomm Incorporated**
> **Civ. Action No. 05-3350**

Dear Sir or Madam:

Enclosed for electronic filing in the above-referenced action, please find the following:

1. Plaintiff's Letter to the Honorable Mary L. Cooper requesting permission to exceed page limits;
2. Plaintiff's Opposition to Defendant's Motion to Dismiss;
3. Certification of Gerald C. Robinson with Exhibits A - BB; and
4. Certificate of Service.

Very truly yours,

s/ David S. Stone

David S. Stone

Enclosures

cc:    Honorable Mary L Cooper (via Federal Express)
       Honorable John J. Hughes (via Federal Express)
       David R. Marriott (via Federal Express)
       William J. O'Shaughnessy (via Federal Express)
       David Boies
       George Cary

# BOIES, SCHILLER & FLEXNER LLP

150 JOHN F. KENNEDY PARKWAY • 4TH FLOOR • SHORT HILLS, NJ 07078 • PH. 973.218.1111 • FAX 973.218.1106

January 17, 2006

**VIA FAX 609-989-2075**

Honorable Mary L. Cooper
Judge, United States District Court
Clarkson F. Fisher Hall
Federal Building & U.S. Courthouse Room 5000
402 E. State Street
Trenton, NJ 08606

Re:   **Broadcom Corporation v. Qualcomm Incorporated,**
      **Civ. Action No. 05-3350**

Dear Judge Cooper:

Pursuant to Your Honor's instructions, Counsel for Broadcom hereby submits its written request to file a memorandum in excess of the page limit set forth in Local Rule 7.2(b). This request concerns an approximately 55 page memorandum entitled Plaintiff's Opposition to Defendant's Motion to Dismiss, to be filed today. Qualcomm previously consented to this memorandum in excess of page limits in exchange for Broadcom's consent to the approximately 60 page brief Qualcomm filed in support of its motion to dismiss.

Respectfully submitted,

David S. Stone

DSS/r

cc:   William O'Shaughnessy, Esq.
      David R. Marriott, Esq.
      Evan R. Chesler, Esq.

DAVID S. STONE (DSS-8580)
Boies, Schiller & Flexner LLP
150 John F. Kennedy Memorial Parkway
Short Hills, NJ 07078
(973) 218-1111

Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, NY 10022

Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, N.W.
Washington, DC 20006

Counsel for Plaintiff Broadcom Corporation

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON DIVISION

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>              Plaintiff,<br><br>   v.<br><br>QUALCOMM INCORPORATED,<br><br>              Defendant. | Civil Action No. 05-3350 (MLC)<br><br>**Oral argument requested pursuant to L. Civ. R. 7.1(b)(4)**<br><br>**Hearing Date:  February 6, 2006** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 6

I.      DISMISSAL OF AN ANTITRUST COMPLAINT IS RARELY
        APPROPRIATE............................................................................................................ 6

II.     THE COMPLAINT SETS FORTH MULTIPLE VIOLATIONS OF THE
        FEDERAL ANTITRUST LAWS ARISING FROM QUALCOMM'S BAD
        FAITH FRAND COMMITMENTS, DISCRIMINATORY AND
        EXCLUSIONARY LICENSING PRACTICES, AND ANTICOMPETITIVE
        ACQUISITIONS............................................................................................................ 8

        A.      The Complaint Alleges that Qualcomm Willfully Acquired Monopoly
                Power in the WCDMA Technology Markets by Inducing SDOs to
                Incorporate Qualcomm's Technology in the UMTS Standard Through Its
                Bad-Faith Promise to License on FRAND Terms. ................................................ 11

                1.      Qualcomm's Monopoly Power Was Acquired by Inclusion in the
                        UMTS Standard and Does Not Derive from the Patents
                        Themselves. ................................................................................................ 12

                2.      Qualcomm's Abuses of the Standard-Setting Process, Including Its
                        Bad-Faith Commitment to License Its Patented Technology on
                        FRAND Terms, Are Anticompetitive Acts that Can Give Rise to
                        Antitrust Liability....................................................................................... 13

                3.      Although Broadcom Pleads that Qualcomm Committed Fraud on
                        the SDOs, It Need Not Do So to State an Antitrust Claim. ........................ 17

                4.      Whether Qualcomm's Licensing Terms Are Consistent With Its
                        FRAND Obligations Is a Factual Question That Cannot Be
                        Resolved on a Motion to Dismiss. .............................................................. 17

        B.      The Complaint Alleges that Qualcomm Is Attempting to Monopolize the
                UMTS Chipset Market by Using Its Monopoly Power in the WCDMA
                Technology Markets to Drive Competitors Out of the UMTS Chipset
                Market. ................................................................................................................. 19

                1.      The Complaint's Allegations of Discriminatory Licensing to
                        UMTS Chipset Competitors and Handset Manufacturers that Use
                        Competitors' Chipsets Plead Anticompetitive Conduct in the
                        UMTS Chipset Market................................................................................. 20

                2.      The Complaint's Allegations that Qualcomm Has Excluded or
                        Crippled Broadcom and Other Competitors in the UMTS Chipset
                        Market Plead Antitrust Injury. ................................................................... 23

                3.      The Complaint's Allegations that Qualcomm's Conduct Will
                        Result In Its Achieving Monopoly Power in the UMTS Chipset
                        Market Plead Dangerous Probability of Success. ....................................... 24

i

C.    The Complaint's Allegations that Qualcomm Coerces Its Handset Manufacturers to Purchase UMTS Chipsets from Qualcomm and Has Foreclosed a Significant Portion of the UMTS Chipset Market State Claims for Tying and Exclusive Dealing. ................................................................. 27

    1.    The Complaint's Allegations that Qualcomm's Bundling and Discounting Schemes Coerce Handset Manufacturers to Purchase Qualcomm Chipsets State Claims for Tying. ............................................. 27

    2.    The Complaint's Allegations that Qualcomm's Exclusivity Arrangements Foreclose a Significant Share of the UMTS Chipset Market to Rivals States Claims for Exclusive Dealing................................ 32

D.    The Complaint's Allegations that Qualcomm's Actions in the WCDMA Technology and Chipset Markets Are Part of a Scheme to Maintain Its Monopoly in 3G CDMA Technology and Chipsets Establish Broadcom's Standing to Pursue Its CDMA Claims. .................................................................... 34

E.    The Complaint's Allegations that Broadcom Is a Likely Customer in the Markets where Qualcomm's Acquisition of Flarion Would Substantially Lessen Competition Establish Broadcom's Standing to Pursue Its Section 7 Claim................................................................................................................... 38

III.    BECAUSE BROADCOM'S FEDERAL ANTITRUST CLAIMS ARE WELL-PLED, THE COMPLAINT LIKEWISE STATES CLAIMS UNDER THE STATE ANTITRUST AND UNFAIR COMPETITION STATUTES. .............................. 41

IV.    THE COMPLAINT'S ALLEGATIONS OF QUALCOMM'S SPECIFIC BAD FAITH COMMITMENTS AND THEIR IMPACT ON BROADCOM STATE CLAIMS FOR BREACH OF CONTRACT, PROMISSORY ESTOPPEL, FRAUD, AND TORTIOUS INTERFERENCE. ................................................................. 43

A.    The Complaint's Allegations that Qualcomm Made and Broke Binding Contractual Promises to the SDOs that Were Intended to Benefit Third Parties Like Broadcom and that Broadcom Relied on Those Promises to Its Detriment State Claims for Breach of Contract and Promissory Estoppel................................................................................................................... 43

B.    The Complaint's Specific Identification of Qualcomm's FRAND Commitments to SDOs, Qualcomm's Bad Faith, the SDOs' Reliance, and the Effect of Qualcomm's Broken Promises State a Claim for Fraud. .................... 46

    1.    Broadcom's Fraud Claim Is Pled with Sufficient Particularity to Satisfy Fed. R. Civ. P. 9(b). ......................................................... 46

    2.    Qualcomm Cannot Evade Liability for Fraud by Calling Its FRAND Commitments Unenforceable........................................................ 48

C.    The Complaint's Allegations that Qualcomm's Actions Have Interfered with Broadcom's Sales of UMTS Chipsets to Handset Manufacturers State Claims for Tortious Interference........................................................................... 50

CONCLUSION................................................................................................................ 52

## TABLE OF AUTHORITIES

### FEDERAL CASES

*2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732 (3d Cir. 2004) ..................................................................................................37

*AAR International, Inc. v. Vacances Heliades S.A.*, 202 F. Supp. 2d 788 (N.D. Ill. 2002) ..................................................................................................47

*Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191 (3d Cir. 1995) ......................23

*Agere System Guardian Corp. v. Proxim, Inc.*, 190 F. Supp. 2d 726 (D. Del. 2002) ............................................................................................... 44-45

*Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co.*, 826 F.2d 1235 (3d Cir. 1987) ..............................................................................................41

*Allen-Myland, Inc. v. IBM*, 33 F.3d 194 (3d Cir. 1994).....................................................32

*Allied Tube & Conduit Corp. v. Indian Head Inc.*, 486 U.S. 492 (1988) ............... 4, 14, 32

*In re Ann Taylor Stores Securities Litigation*, 807 F. Supp. 990 (S.D.N.Y. 1992) ...........47

*Ansel Communications, Inc. v. Novell, Inc.*, No. C-97-21088 RMW ENE 1999 WL 33302368 (N.D. Cal. March 24, 1999)................................................29

*Applera Corp. v. MJ Research, Inc.*, 309 F. Supp. 2d 293 (D. Conn. 2004)....................31

*Aquatherm Industrial Inc. v. Florida Power & Light Co.*, 971 F. Supp. 1419 (M.D. Fla. 1997) .......................................................................................24

*Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983)..........................................................................................37, 39

*Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572 (Fed. Cir. 1990)...........10

*Automatic Radio Manufacturing Co. v. Hazeltine Research*, 339 U.S. 827 (1950) .........18

*B. Braun Medical, Inc. v. Abbot Laboratories*, 124 F.3d 1419 (Fed. Cir. 1997)...............10

*Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98 (3d Cir. 1992) ..................33

*Barrett v. U.S. Banknote Corp.*, No. 7420 (RPP), 1992 WL 232055 (S.D.N.Y Sept. 2, 1992) ...........................................................................................44

iii

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178 (3d Cir. 1997) ........................................................................................35

*Blue Shield of Virginia  v. McCready*, 457 U.S. 465 (1982) ..............................35

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3rd Cir. 1977)..................7, 8, 30, 34

*Bon-Ton Stores v. May Department Stores Co.*, 881 F. Supp. 860 (W.D.N.Y. 1994) ........................................................................................41

*Bristol Technology  v. Microsoft Corp.*, 42 F. Supp. 2d 153 (D. Conn. 1998).................37

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998).............32

*Brotech Corp. v. White Eagle International Technology Group, Inc.,* No. Civ. A. 03-232, 2004 WL 1427136 (E.D. Pa., June 21, 2004)..................................32

*Brunson Communications, Inc. v. Arbriton, Inc.*, 239 F. Supp. 2d 550 (E.D. Pa. 2002) ....................................................................................26, 27

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ...................24, 39, 41

*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986)....................................39

*Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39 (5th Cir. 1976) ..........................................32

*Carpet Group International v. Oriental Rug Importers Association, Inc.*, 227 F.3d 62 (3d Cir. 2000)...................................................................................35, 36

*Carter Footwear, Inc. v. Graystone World-Wide, Inc.*, 189 F.R.D. 328 (M.D. Pa. 1999) ........................................................................................48

*Central Telecommunications, Inc.  v. TCI Cablevision, Inc.*, 800 F.2d 711 (8th Cir. 1986).......................................................................................40

*Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96 (3d Cir. 1983) ................46

*Compuware Corp. v. IBM Corp.*, 366 F. Supp. 2d 475 (E.D. Mich. 2005)......................30

*Conley v. Gibson*, 355 U.S. 41 (1957) ...............................................................................7

*Data General Corp. v. Grumman System Support Corp.*, 36 F.3d 1147 (1st Cir. 1994) ..........................................................................................9

*DiscoVision Associates v. Discount Manufacturing, Inc.*, 42 U.S.P.Q. 2d 1749 (D. Del. 1997) .....................................................................................30

*Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627 (2005) .........................................7

*E&G Gabriel Brothers v. Gabriel Brothers, Inc.*, 1994 WL 369147 (S.D. N.Y. July 13, 1994).........................................................................................................26, 27

*Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451 (1992).............3, 8, 29, 32

*ESS Technology, Inc. v. PC-Tel, Inc.,* No. C-99-20292 RMW, 1999 WL 33520483 (N.D. Cal. Nov. 4, 1999)........................................................................16, 45

*Fineman v. Armstrong World Industrial, Inc.*, 980 F.2d 171 (3d Cir. 1992)....................23

*First Wall Street Capital Corp. v. International Property Corp.*, No. 97 Civ. 0702(JGK), 1998 WL. 823619 (S.D.N.Y. Nov. 25, 1998)..........................................51

*Fresh Made, Inc. v. Lifeway Foods, Inc.*, No. Civ. A. 01-4254, 2002 WL 31246922 (E.D. Pa. Aug. 9, 2002)........................................................................26, 27

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories, Inc.*, 386 F.3d 485 (2d Cir. 2004)...................................................................................................33

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) .............................................................................................................18

*Gordon v. Lewiston Hospital*, 423 F.3d 184 (3d Cir. 2005) ........................................27, 32

*Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir. 1993) ............................................................................................................24

*H.J., Inc. v. International Telephone & Telegraph Corp.*, 867 F.2d 1531 (8th Cir. 1989) ...............................................................................................................26

*Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241 (Fed. Cir. 2005)........................................18

*Howard Hess Dental Laboratoriess, Inc. v. Dentsply International, Inc.*, 424 F.3d 363 (3d Cir. 2005)....................................................................................................34

*Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ....................................................................................................................9

*In re Independent Service Organizations Antitrust Litigation*, 203 F.3d 1322 (Fed. Cir. 2000).......................................................................................................3, 10

*Intellective, Inc. v. Massachusetts Mutual Life Insurance Co.*, 190 F. Supp. 2d 600 (S.D. N.Y. 2002) ......................................................................................26

*Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999)......................................10

*Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984).........................29, 32

*Kirschner v. Cable/Telegraph Corp.*, 576 F. Supp. 234 (E.D. Pa. 1983).........................44

*Knuth v. Erie-Crawford Dairy Cooperative Association*, 395 F.2d 420 (3d Cir. 1968) ............................................................................................................................ 6-7

*L&W/Lindco Products, Inc. v. Pure Asphalt Co.*, 979 F. Supp. 632 (N.D. Ill. 1997) ...................................................................................................................................24

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003)...................................... 6, 11, 12, 20, 22

*Lear, Inc. v. Adkins*, 395 U.S. 653 (1969) ..........................................................................18

*Lewis v. Philip Morris Inc.*, 355 F.3d 515 (6th Cir. 2004) .................................................19

*Little Souls Inc. v. State Automobile Mutual Insurance, Co.*, No. Civ.A. 03-5722, 2004 WL 503538 (E.D. Pa. Mar. 15, 2004).................................................................48

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ...............................................24

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th Cir. 1998)...........................................................................................40, 41

*Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004)................................................. 49-50

*Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2nd 700 (Fed. Cir. 1992)..............................18

*Mandeville Island Farms, Inc. v. America Crystal Sugar Co.*, 334 U.S. 219 (1948)......................................................................................................................35

*Mannkraft Corp. v. Bearman*, No. CIV. A. 88-2997, 1988 WL 124720 (D.N.J. 1988) ..................................................................................................................48

*Medtronic AVE, Inc. v. Boston Scientific Corp.*, 2001 WL 652016 (D. Del. March 30, 2001) ...................................................................................................................25

*Microbyte Corp. v .New Jersey State Golf Association*, No. Civ. 84-949, 1986 WL 7231 (D.N.J. June 26, 1986) ..............................................................................28

*In re Microsoft Antitrust Litigation,* No. MDL 1332, Civ. JFM-05-1087, 2005 WL 1398643 (D. Md. June 10, 2005).........................................................................37

*Moore Corp. Ltd. v. Wallace Computer Services, Inc.*, 907 F. Supp. 1545 (D. Del. 1995) .................................................................................................39

*Nelson v. Monroe Regional Medical Center,* 925 F.2d 1555 (7th Cir. 1991) ........... 37-38

*Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998) ..............17

*Northern v. McGraw Edison Co.*, 542 F.2d 1336 (8th Cir. 1976) ....................................32

*In re Pabst Licensing, GMBH Patent Litigation,* No. Civ.A. 99-3118, 2000 WL 1145725 (E.D. La. Aug. 11, 2000) ............................................................................24

*R.J. Longo Construction Co., Inc. v. Transit America, Inc.*, 921 F. Supp. 1295 (D.N.J. 1996)...........................................................................................44, 45

*Rambus, Inc. v. Infineon Technologies AG*, 304 F. Supp. 2d 812 (E.D. Va. 2004) .................................................................................................... 14-15, 17

*Rambus, Inc. v. Infineon Technologies AG,* 330 F. Supp. 2d 679 (E.D. Va. 2004).... 14-15

*Resource Ventures, Inc. v. Resources Management International, Inc.*, 42 F. Supp. 2d 423 (D. Del. 1999) ...................................................................................48

*Roberts v. Elaine Powers Figure Salons, Inc.,* 708 F.2d 1476 (9th Cir. 1983) ........... 31-32

*SEC v. Park*, 99 F. Supp. 2d 889 (N.D. Ill. 2000) ............................................................47

*Seville Industrial Machine Corp. v. Southmost Machine Corp.*, 742 F.2d 786 (3d Cir. 1984) ...........................................................................................................46

*Smith & Johnson, Inc. v. Hedaya Homes Fashions Inc.*, 1996 WL 737194 (S.D. N.Y. Dec. 26, 1996) .................................................................................26, 27

*SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978) ...................... 22, 29-30

*SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161 (Fed. Cir. 1991) ...........................................................................................................18

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ...............................................19

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir. 1999).............................................................................................36

*Surya System, Inc. v. Sunku*, No. Civ. A. 05-146, 2005 WL 1514225 (E.D. Pa. June 24, 2005).................................................................................................43

*Syncsort, Inc. v. Innovative Routines International, Inc.,* No. Civ 04-3623 (WHW), 2005 WL 1076043 (D.N.J. May 6, 2005)..................................................6, 51

*Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320 (1961)................................. 32-33

*Tele Atlas N.V. v. Navteq Corp.,* 397 F. Supp. 2d 1184 (N.D. Cal. 2005).........................29

*Times-Picayune Publishing Co. v. United States,* 345 U.S. 594 (1953).............................3

*Townshend v. Rockwell International Corp.,* No. C99-04005BA, 2000 WL 433505 (N.D. Cal. Mar. 28, 2000)..............................................................................16

*Tumi, Inc. v. Excel Corp.,* No. 05-0477 (WJM), 2005 WL 1828593 (D.N.J. Aug. 1, 2005) ...............................................................................................................48

*In re Tower Air, Inc.,* 416 F.3d 229 (3d Cir. 2005) .............................................................7

*Twombly v. Bell Atlantic Corp.,* 425 F.3d 99 (2d Cir. 2005).................................................7

*United Shoe Machinery Corp. v. United States,* 258 U.S. 451 (1922) ...............................31

*United States Horticultural Supply, Inc. v. Scotts Co.,* No. Civ. A. 03-773, 2004 WL 1529185 (E.D. Pa. Feb. 18, 2004) ...................................:.................................35

*United States v. Dentsply International, Inc.,* Nos. Civ. A. 99-005-SLR, 99-225-SLR, 99-854-SLR, 2001 WL 624807 (D. Del. March 30, 2001) ......................... 33-34

*United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377 (1956) ...........................24

*United States v. Grinnell,* 384 U.S. 563 (1966)..........................................................11, 12

*United States v. Line Materials Co.,* 333 U.S. 287 (1948) ...................................................8

*United States v. Metzinger,* No. Civ. A. 94-7520, 1996 WL 412811 (E.D. Pa. July 18, 1996) ...............................................................................................................46

*United States v. Microsoft Corp.,* 253 F.3d 34 (D.C. Cir. 2001).........................3, 9, 10, 36

*Ware v. Rodale Press, Inc.,* 322 F.3d 218,  (3d Cir. 2003).................................................43

*Watson v. City of Salem,* 934 F. Supp. 643 (D.N.J. 1995).................................................45

*William Cohen & Son v. All America Hero, Inc.,* 693 F. Supp. 201 (D.N.J. 1988)...........31

*Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.,* 953 F. Supp. 617 (E.D. Pa. 1997) ...............................................................................................................26

viii

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969)...........................8, 20

## STATE CASES

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telegraph Co.*, 973 P.2d
    527 (Cal. 1999) ...................................................................................................42

*Patel v. Soriano*, 369 N.J. Super. 192, 848 A.2d 803 (N.J. Super. Ct. App. Div.
    2004) ....................................................................................................................51

*Pop's Cones, Inc. v. Resorts International Hotel, Inc.*, 307 N.J. Super. 461, 704
    A.2d 1321 (N.J. Super. Ct. App. Div. 1998 ................................................... 45-46

*Smith-Cook v. National Railroad Passenger Corp.*, No. 05-00880, 2005 WL
    3021101 (E.D. Pa. Nov. 10, 2005).........................................................................43

## FEDERAL TRADE COMMISSION DECISIONS

*In re Dell Computer Corp.*, 121 F.T.C. 616 (1996)...........................................................15

*In re Union Oil Co. of California*, No. 9305, 2004 WL 1632816 (F.T.C. July 6,
    2004) ....................................................................................................................15

## FEDERAL STATUTES AND RULES

15 U.S.C. § 1 (Sherman Act § 1) ..........................................................................16, 32, 33

15 U.S.C. § 2 (Sherman Act § 2) ..............................................................9, 11, 14, 15, 23

15 U.S.C. § 14 (Clayton Act § 3)..................................................................................32-33

15 U.S.C. § 15 (Clayton Act § 4).................................................................................39, 40

15 U.S.C. § 18 (Clayton Act § 7)............................................................................. 38, 40, 41

15 U.S.C. § 26 (Clayton Act § 16)...............................................................................39, 41

Fed. R. Civ. P. 8.....................................................................................................7, 34, 44

Fed. R. Civ. P. 9(b) ........................................................................................17, 46, 47, 49

Fed. R. Civ. P. 12(b)(6)..................................................................................6, 7, 26, 33, 37, 50

## OTHER AUTHORITIES

5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §
    1297 (3d ed. 2005) ........................................................................................49

*United States Department of Justice & Federal Trade Commission, Antitrust*
    *Guidelines for the Licensing of Intellectual Property* (1995) ..................................9, 14

R. Hewitt Pate, Assistant Attorney General, Antitrust Division, U.S. Department
    of Justice, *Competition and Intellectual Property in the U.S.: Licensing*
    *Freedom and the Limits of Antitrust* (2005) ............................................................. 3-4

Irwin Jacobs, Remarks at Q1 2005 *Qualcomm Inc. Earnings Conference Call*
    (Jan. 19, 2005) (LEXIS-NEXIS, Fair Disclosure Wire Library, Transcript No.
    011905an.727) ...........................................................................................................20

x

**INTRODUCTION**

To induce various standard development organizations ("SDOs") to include its patented technology in the UMTS wireless telephony standard, Qualcomm repeatedly promised to license that technology on fair, reasonable, and non-discriminatory or "FRAND" terms. Based on Qualcomm's commitments, the SDOs included Qualcomm's technology in the UMTS standard, thereby making Qualcomm's technology *essential* for compliance with the UMTS standard. Companies wishing to compete in making UMTS equipment were left with no choice but to seek a license to Qualcomm's technology. Thus, as a result of Qualcomm's promises and the SDOs' reliance on them, Qualcomm acquired monopolies in the markets for technology to provide certain functionality in the UMTS standard.[1]

Qualcomm's FRAND promises were in bad faith. And, in blatant disregard of its FRAND commitments, Qualcomm is using the monopoly power conferred *by the inclusion of its technology in the UMTS standard* (rather than the power conferred by the patents themselves) to acquire and maintain an additional monopoly in a second market, the UMTS chipset market. Qualcomm's scheme includes discrimination (1) in the license terms it imposes on handset and infrastructure manufacturers to penalize those that want to purchase competitors' chipsets rather than Qualcomm's; (2) against such handset manufacturers in the provisioning of marketing assistance and product allocation, particularly with respect to CDMA chipsets over which Qualcomm exercises monopoly power (with 90% share of sales); and (3) in the license terms it offers its UMTS chipset competitors. Through this scheme, Qualcomm set out to make billions

---

[1] The UMTS standard is made up of a variety of technologies performing different functions necessary to wireless communication. Qualcomm's patents are only a small percentage of the patents licenses to which are necessary to comply with the standard. All other patent holders have also agreed to abide by FRAND terms, and Qualcomm is able to participate in the UMTS chipset market as a result of FRAND licenses from other patent holders. If all participants were to adopt Qualcomm's opportunistic practices, total royalty payments would render the UMTS standard uneconomic. (*See* First Amended Complaint ¶¶ 92, 97, 99.)

of dollars of monopoly profits by violating its FRAND commitments, thereby undermining the very reason SDOs require FRAND commitments: to ensure robust competition in the supply of parts and equipment implementing the standard.

Qualcomm's anticompetitive conduct has not stopped with abusive practices in the current generations of mobile wireless standards. Its scheme to acquire and exercise monopoly power over mobile wireless telephony continues with Qualcomm's acquisition of Flarion Technologies, Inc. ("Flarion"), a New Jersey-based company that is a leader in Internet-based technology for future generation mobile wireless communications that are not based on Qualcomm's technology. As Broadcom's complaint alleges, Qualcomm's acquisition of Flarion's assets is likely to substantially lessen competition because it will eliminate one of very few potential escape valves from Qualcomm's chokehold. As a customer of next generation mobile wireless technologies, Broadcom seeks through this action to prevent that reduction in competition.

For purposes of this motion to dismiss, Qualcomm must treat all of Broadcom's allegations as true. Qualcomm nevertheless disregards many of Broadcom's allegations, substituting many of its own factual assertions in arguing that the alleged misconduct is not actionable. To support that dubious proposition, Qualcomm offers arguments predicated on a view of its patent rights that is unsupported by law and that would render antitrust law a dead letter whenever a defendant argues that patents are involved with the products or markets at issue. Most prominently, Qualcomm argues that because it has patents on its technology, *any* conduct that would otherwise be actionable as monopolization or attempted monopolization is *automatically* exonerated. Lies and deception are irrelevant; breaches of express commitments

2

to SDOs are meaningless; monopoly power obtained and extended through anticompetitive acts is legally invulnerable.

Contrary to Qualcomm's position, Qualcomm's patents are not a "talisman" that confers blanket immunity on its violations of law. As the D.C. Circuit made clear in its landmark decision in *United States v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir. 2001), intellectual property rights do not immunize anticompetitive conduct:

> The company claims an absolute and unfettered right to use its intellectual property as it wishes: "[I]f intellectual property rights have been lawfully acquired," it says, then "their subsequent exercise cannot give rise to antitrust liability." That is no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability. As the Federal Circuit succinctly stated: "Intellectual property rights do not confer a privilege to violate the antitrust laws." *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000).

Likewise, the Supreme Court "has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.'" *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 479 n.29 (1992) (quoting *Times-Picayune Publ'g. Co. v. United States*, 345 U.S. 594, 611 (1953)); *see also* R. Hewitt Pate, Assistant Attorney General, Antitrust Division, U.S. Department of Justice, *Competition and Intellectual Property in the U.S.: Licensing Freedom and the Limits of Antitrust*, 2005 EU Competition Workshop (June 3, 2005) ("Today, the statement that IP is essentially like other forms of property is often heard in arguments against claims for complete exemption from antitrust scrutiny. *The mere presence of an IP right that somehow figures in a course of*

3

*otherwise anticompetitive conduct does not act as a talisman that wards off all antitrust enforcement.*") (emphasis added).[2]

Qualcomm seeks to wield its patents as precisely such a talisman. For example, Qualcomm unabashedly asserts that it "is free to license its patents on terms of its choosing," regardless of its FRAND commitments. (Def.'s Mem. in Support of Def's Mot. to Dismiss ("Def's Mem.") at 19.) That premise, if applied to the process by which standards are set, would undercut entirely the procompetitive purpose of standardization and inherently defeat the application of antitrust laws in the standards context. Indeed, Qualcomm would have this Court ignore that Qualcomm's technology has been designated *essential* to mobile wireless standards only because of its FRAND commitment, and that Broadcom's claims rest on this fact, not on the existence of the patents themselves. Were Qualcomm's "absolute immunity" argument correct, there would be nothing to stop parties from doing what Qualcomm did here – make FRAND promises and then simply refuse to license, fatally undermining the SDOs' procompetitive purpose, which is to ensure the development and use of standardized technology.

The Supreme Court has made clear that such abuse of standard-setting processes must not be tolerated: "private standard-setting by associations comprising firms with horizontal and vertical business relations is permitted at all under the antitrust laws *only on the understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits*," and subject to procedures that "prevent the standard-setting process from being biased by members with economic interests." *Allied Tube & Conduit Corp. v. Indian Head Inc.*, 486 U.S. 492, 501, 506-07 (1988) (emphasis added). Once standards are agreed upon, the observance of FRAND commitments – the purpose of which is to ensure access to technology implementing those

---

[2] Available at www.usdoj.gov/atr/public/speeches/209359.pdf.

standards – is necessary if the standards are to serve procompetitive ends, rather than becoming a tool for the creation of monopoly power:

> [T]he standard setting process generally requires that competitors come together to coordinate on a technological standard. In such a setting, there are opportunities for anticompetitive behavior as companies exert their influence over the process. After a standard has been established, there are many issues regarding access to the technology embodied in the standard; limited access could restrict the number of competitors in a market and severely inhibit entry.

Charles James, Opening Day Comments at Joint DOJ-FTC Hearings on Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy (Feb. 6, 2002).[3]

Qualcomm's contention that because FRAND commitments – which are commonplace across industries and technologies and are essential for standards to serve the procompetitive purposes for which they generally are intended – do not specify precisely the particular licensing terms required in all cases, they are inherently unenforceable, and therefore may be flouted at will (Def.'s Mem. at 3, 14-16), is wrong. Were this (unsupported) argument to prevail, it would unleash monopoly power not only in the markets where Qualcomm dominates, but in countless others where collective standard-setting is a way of economic life. In any event, courts routinely interpret terms such as "fair, reasonable, and non-discriminatory" to give effect to the intentions and legitimate expectations of parties, and there is a well-developed body of law explaining what "discrimination" means in the antitrust context. Likewise, Qualcomm's alternative argument that its license terms are *in fact* fair, reasonable and non-discriminatory (Def.'s Mem. at 17-19) is not only incorrect as a factual matter, it also is improper on a motion to dismiss because it contradicts Broadcom's allegations that Qualcomm's practices are well outside any reasonable interpretation of FRAND in myriad specific ways.

---

[3] Available at http://www.ftc.gov/opp/intellect/james.htm.

The *en banc* decision of the Third Circuit in *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), puts to rest the second antitrust talisman that Qualcomm seeks to wield – that discriminatory bundling, rebating, and exclusivity schemes can never violate the antitrust laws, regardless of their anticompetitive effects, so long as they do not amount to below-cost pricing. Similarly, Qualcomm's arguments that Broadcom lacks standing to asserts claims against Qualcomm's effort to maintain its CDMA monopolies or against Qualcomm's effort to extend its dominance of mobile wireless telephony through its acquisition of Flarion cannot be squared with precedent on antitrust standing. As the target of Qualcomm's anticompetitive conduct and as a potential customer of Flarion's technology, Broadcom is precisely the type of plaintiff that the antitrust laws are designed to protect from such abuse.

Broadcom respectfully submits that the Court should reject Qualcomm's argument that its conduct is immune from scrutiny under the antitrust laws and the various state common law principles alleged in Broadcom's complaint. Qualcomm must not be permitted to use its intellectual property as either a "baseball bat" to pummel its customers and competitors or as a "talisman" to immunize its exclusionary conduct. The Court likewise should turn aside Qualcomm's attempt to have this case dismissed by disputing Broadcom's allegations and advancing factual assertions of its own.

## ARGUMENT

## I. DISMISSAL OF AN ANTITRUST COMPLAINT IS RARELY APPROPRIATE.

"The Supreme Court has expressly stated that motions to dismiss under Rule 12(b)(6) should be granted 'very sparingly' in antitrust cases." *Syncsort, Inc. v. Innovative Routines Int'l, Inc.*, No. Civ 04-3623 (WHW), 2005 WL 1076043, at *2 (D.N.J. May 6, 2005);[4] *see also Knuth*

---

[4] For the convenience of the court, all unpublished decisions cited in Broadcom's memorandum are attached to the declaration of Gerald Robinson, submitted herewith.

*v. Erie-Crawford Dairy Coop. Ass'n*, 395 F.2d 420, 423 (3d Cir. 1968) ("we should be extremely liberal in construing antitrust complaints"). A plaintiff is required only to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[O]rdinary pleading rules are not meant to impose a great burden upon a plaintiff." *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1634 (2005); *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 116 (2d Cir. 2005) ("At the pleading stage, we are concerned only with whether the defendants have 'fair notice' of the claim . . . not with whether the [claim] can be established at trial.").

The test is, "whether taking all the allegations of the complaint as true, and viewing them liberally giving plaintiffs the benefit of all inferences which fairly may be drawn therefrom, it appears beyond doubt that the plaintiff(s) can prove no set of facts in support of (their) claim which would entitle (them) to relief." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 444 (3d Cir. 1977) (citations omitted). Particularly in cases like this, where the critical facts (for example, the specifics of Qualcomm's licensing practices) are almost all in the hands of the defendant, a claim cannot be dismissed simply because the facts are not alleged with the same particularity with which they will be proven at trial. Indeed, "a plaintiff will not be thrown out of court on a Rule 12(b)(6) motion for lack of detailed facts." *In re Tower Air, Inc.*, 416 F.3d 229, 237 (3d Cir. 2005); *accord Twombly*, 425 F.3d at 112; *see also Bogosian*, 561 F.2d at 446 ("It is not necessary to plead evidence, nor is it necessary to plead the facts upon which the claim is based. 'To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

As shown below, Broadcom's allegations, which span 200 paragraphs and 57 pages, more than meet the requirement of a short and plain statement of allegations that, if proven, would entitle Broadcom to relief. Qualcomm disputes those facts or argues they are not sufficiently detailed. But it does not establish that there is "no set of facts" consistent with Broadcom's allegations under which Broadcom would be entitled to relief, *Bogosian*, 561 F.2d at 444, or that it has not been given fair notice of Broadcom's claims. Qualcomm's motion to dismiss accordingly must be denied.

## II.    THE COMPLAINT SETS FORTH MULTIPLE VIOLATIONS OF THE FEDERAL ANTITRUST LAWS ARISING FROM QUALCOMM'S BAD FAITH FRAND COMMITMENTS, DISCRIMINATORY AND EXCLUSIONARY LICENSING PRACTICES, AND ANTICOMPETITIVE ACQUISITIONS.

As the Supreme Court consistently has held, a patent is *not* a license to violate the antitrust laws. *See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 479 n.29 (1992) ("[This] Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.'"). The Court has held that, even the refusal to grant a patent license – the very conduct that Qualcomm claims is absolutely immune from antitrust scrutiny here – could violate the Sherman Act. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 120 (1969); *see also United States v. Line Materials Co.*, 333 U.S. 287, 308 (1948) ("It is equally well settled that the possession of a valid patent or patents does not give the patentee any exemption from the provisions of the Sherman Act beyond the limits of the patent monopoly."). The centerpiece of Qualcomm's motion to dismiss Broadcom's antitrust claims – its argument that "the patent laws immunize the enforcement of patent rights, including licensing activities, from antitrust liability, absent the exceptional circumstances of illegal tying, fraud in the Patent and Trademark Office, or sham

8

litigation" (Def.'s Mem. at 24 (quotation marks omitted); *see also id.* at 3, 11, 12, 13, 18, 19, 20, 21, 22, 23, 25, 29, and 33 (repeating same argument)) – is therefore wrong.

Several Courts of Appeals have explicitly rejected Qualcomm's sweeping immunity argument. In *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1214 (9th Cir. 1997), Kodak, like Qualcomm here, argued that "exercising lawful patents and copyrights" could not, as a matter of law, constitute exclusionary conduct under Section 2 of the Sherman Act.    While recognizing that patent holders are often free to refuse to license their patents, the Ninth Circuit nonetheless rejected he same argument that Qualcomm advances, that the freedom to refuse a license is unfettered and held that conduct aimed at extending a monopoly to downstream markets (rather than simply defending intellectual property rights) is actionable under Section 2.  *See Image Tech. Servs.*, 125 F.3d at 1218-20; *see also Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1184, 1187 (1st Cir. 1994) (rejecting "powerful irrebutable presumption" that "a unilateral refusal to license a copyright can never constitute exclusionary conduct"); *United States v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir. 2001).

Likewise, the antitrust agencies reject Qualcomm's argument:

> If a patent or other form of intellectual property does confer market power, that market power does not *by itself* offend the antitrust laws. As with any other tangible or intangible asset that enables its owner to obtain significant supracompetitive profits, market power (or even a monopoly) that is solely "a consequence of a superior product, business acumen, or historic accident" does not violate the antitrust laws.  Nor does such market power impose on the intellectual property owner an obligation to license the use of that property to others. *As in other antitrust contexts, however, market power could be illegally acquired or maintained, or, even if lawfully acquired and maintained, would be relevant to the ability of an intellectual property owner to harm competition through unreasonable conduct in connection with such property.*

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* ("*Licensing Guidelines*") § 2.2 (1995) (emphasis added).

Ignoring these cases and the reasoning on which they rest, Qualcomm seeks to immunize its conduct through an overbroad reading of *In re Independent Service Organizations Antitrust Litigation*, 203 F.3d 1322 (Fed. Cir. 2000) ("*ISO*"), even though such a reading would be inconsistent with all of the precedent discussed above. Indeed, the *ISO* panel itself – having recognized that tying, fraud on the patent office, and sham litigation violate the antitrust laws – made clear that patent rights do not preempt antitrust obligations when it set as its touchstone the principle that a "patent owner may not take the property right granted by patent and use it to extend his power in the marketplace improperly, *i.e.* beyond the limits of what Congress intended to give in the patent laws." *ISO,* 203 F.3d at 1327 (citing *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990)). *See also Microsoft*, 253 F.3d at 63 (citing *ISO* in concluding that Qualcomm immunity argument "border[ed] upon the frivolous"). Indeed, the Federal Circuit routinely applies antitrust law to refusals to license – giving due regard to the right to exclude others from practicing the claims of the patent – rather than rejecting the applicability of antitrust principles out of hand as Qualcomm would have this Court do. *See, e.g.*, *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999); *B. Braun Med., Inc. v. Abbot Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) (conditions on patent license "are subject to *antitrust*, patent, contract, and any other applicable law, as well as equitable considerations such as patent misuse") (emphasis added).

Whatever rules might apply to simple, unconditional refusals to license intellectual property that the patent owner has not willfully rendered essential to implementation of an industry standard bear no relation to Broadcom's allegations here. As discussed in greater detail below, Broadcom alleges that Qualcomm has engaged in repeated discriminatory, conditional refusals, coupled with a thoroughgoing campaign of anticompetitive conduct designed to exclude

10

competition, all in violation of the explicit FRAND commitments that Qualcomm made in procuring the monopoly. Those allegations state claims under the antitrust laws.

A. **The Complaint Alleges that Qualcomm Willfully Acquired Monopoly Power in the WCDMA Technology Markets by Inducing SDOs to Incorporate Qualcomm's Technology in the UMTS Standard Through Its Bad-Faith Promise to License on FRAND Terms.**

The "willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident" violates Section 2 of the Sherman Act. *United States v. Grinnell*, 384 U.S. 563, 570-71 (1966). "[A] defendant company which possesses monopoly power in the relevant market will be found in violation of § 2 of the Sherman Act if the defendant willfully acquired or maintained that power. . . . A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits." *LePage's Inc. v. 3M*, 324 F.3d 141, 146-147 (3d Cir. 2003) (*en banc*).

Broadcom's complaint alleges that Qualcomm illegally obtained monopoly power in the WCDMA technology markets by inducing several standards development organizations (the "SDOs") to include its technology in the UMTS standard through promises to license all comers on FRAND terms (First Amended Complaint ("Compl.") ¶¶ 3, 9, 81-86); that the SDOs would not have included Qualcomm's technology in the standard without that assurance (*id.* ¶¶ 42, 85); and that Qualcomm consequently willfully acquired monopoly power over the WCDMA technology markets in violation of Section 2 of the Sherman Act (*id.* ¶¶ 3, 9, 81-86).[5] Qualcomm's securing a monopoly by making FRAND licensing commitments, on which SDOs relied in agreeing to make technology "essential" to provide the particular functionality to the

---

[5] There is no dispute that Broadcom adequately has pled the relevant product and geographic markets and, indeed, Qualcomm concedes that Broadcom's market definition allegations are sufficient. (Def.'s Mem. at 9 n.7.) Similarly, Qualcomm does not dispute, nor could it, that Broadcom has alleged the required intent. (*See* Compl. ¶¶ 145, 146.)

standard, is willful conduct – it is neither "superior product, business acumen, or historic accident," *Grinnell*, 384 U.S. at 570-71, nor "competition on the merits," *LePage's*, 324 F.3d at 147.

Ignoring well-settled law, Qualcomm raises three issues with Broadcom's pleading, none of which withstand scrutiny. First, Qualcomm's argument that its monopolization of the WCDMA technology markets was lawful ignores the fact inclusion in the standard – which occurred only because of Qualcomm's FRAND commitments – gave Qualcomm a monopoly in providing the particular functionality to the standard, and improperly substitutes its own version of the facts for the allegations in the complaint. Second, Qualcomm's argument that Broadcom must plead fraud on the SDOs before its conduct can be a violation of the antitrust laws is supported by no precedent, and, in any event, Broadcom does plead such fraud with requisite specificity. Third, Qualcomm's argument that its FRAND commitments are meaningless is as groundless as it is cynical. Relatedly, Qualcomm's assertion that, as a matter of fact, it has not violated its FRAND obligation again relies on factual assertions outside the complaint and cannot be considered on a motion to dismiss.

### 1. Qualcomm's Monopoly Power Was Acquired by Inclusion in the UMTS Standard and Does Not Derive from the Patents Themselves.

Broadcom's allegations – which must be accepted as true for present purposes – are that Qualcomm has an economically meaningful monopoly in the alleged WCDMA technology markets because Qualcomm induced the SDOs to *include* the technology in the standard, not because Qualcomm's technology is *patented*. The complaint further alleges that Qualcomm would not have its monopoly power had it not made its commitment to license its technology on FRAND terms. (*See* Compl. ¶¶ 3, 9, 42.)

That distinction is critical. A patent unadorned by inclusion in an industry standard raises far different legal considerations than a patent monopoly anointed as an essential part of an industry standard. The former does not inherently threaten competition because there remains the possibility of significant inter-technology and inter-patent competition to provide the functionality at issue, whereas, in the latter case, the fact of standardization precludes any such competition. That is precisely why SDOs require FRAND commitments and why Broadcom's complaint states a claim for unlawful monopolization of the WCDMA technology markets.

It is immaterial that the relevant technology markets are for technology that happens to be patented. The material factual allegation is that the relevant markets are for technology that is essential to perform particular functionalities in the UMTS standard. (Compl. ¶¶ 3, 58, 60.) Qualcomm may disagree that the inclusion of its technology in the UMTS standard is the source of its monopoly power here, but that is a factual question, not one subject to determination on a motion to dismiss.[6]

> **2.    Qualcomm's Abuses of the Standard-Setting Process, Including Its Bad-Faith Commitment to License Its Patented Technology on FRAND Terms, Are Anticompetitive Acts that Can Give Rise to Antitrust Liability.**

Qualcomm's argument that its abuse of the standard-setting process cannot violate the antitrust laws because such abuse cannot possibly cause anticompetitive harm cannot be squared with applicable precedent. As recognized by the Supreme Court, lower courts, and the antitrust enforcement agencies, standard-setting has inherent competitive pitfalls in that by agreement of competitors it eliminates inter-technology competition to perform particular functionalities within the standard, and thereby confers monopoly power on the selected technology for

---

[6] In any event, Qualcomm's factual premise makes no sense: if Qualcomm had monopoly power for the relevant functionalities through its patents alone, it would have been pointless and irrational for it to have committed to license them on FRAND terms.

providing a particular functionality. For this reason, the antitrust laws are particularly sensitive to manipulation or abuse of the standards-setting process. *See, e.g., Allied Tube & Conduit Corp. v. Indian Head Inc.*, 485 U.S. 492, 506-07 (1988) ("[P]rivate standard-setting by associations comprising firms with horizontal and vertical business relations is permitted at all under the antitrust laws only on the understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits.").

Where, as here, patented technology is incorporated in a standard (Compl. ¶¶ 3, 9), the opportunity for anticompetitive mischief is at its greatest. *See, e.g., Licensing Guidelines* § 2.2 & n.10. If left unchecked, the patentholder thereby obtains unfettered control over who can and cannot compete in the markets for products that implement the standard (in this case, UMTS chipsets). To prevent this problem, the SDOs at issue here do *not* include patented technology in the standard *unless* the patent holder agrees to license on FRAND terms. (Compl. ¶ 42.) If actually enforced – the very thing that Qualcomm is seeking to avoid through its motion to dismiss – the FRAND requirement ensures that a patent holder cannot exploit its standard-created monopoly through its licensing practices and ensures that competition in the downstream markets that require the technology to implement the standard is not distorted. (*Id.* ¶¶ 39-42.)

Recent cases and Federal Trade Commission ("FTC") actions make clear that the creation of monopoly power through disregard of FRAND commitments to SDOs can constitute willful acquisition of monopoly power in violation of Section 2. For example, in *Rambus, Inc. v. Infineon Techs. AG*, 330 F. Supp. 2d 679, 684-85 (E.D. Va. 2004) ("*Rambus II*") and *Rambus Inc. v. Infineon Techs. AG*, 304 F. Supp. 2d 812, 814-17 (E.D. Va. 2004), (*"Rambus I"*) Rambus was accused of manipulating the standard-setting process by concealing its patent applications from the SDO and amending those applications to parallel the development of the standard as it

14

was being formed, all in a successful effort to ensure that the functionality included in the standard was covered by its patents. The court rejected Rambus' argument that its patent rights immunized its conduct from antitrust scrutiny and held that the plaintiff's allegations that Rambus's "manipulative and bad faith participation in the . . . standard-setting process," *Rambus I*, 304 F. Supp. 2d at 817, could proceed under Section 2 of the Sherman Act and California's unfair competition law. *See also* 304 F. Supp. 2d at 816, 828-29; *Rambus II*, 330 F. Supp. 2d at 693-97. The court emphasized the very issue here: "antitrust law has historically been concerned with the risk of one or a small number of participants *capturing the economic power of an industry-wide standard and turning the SSO [standard-setting organization] into a source of exclusionary power*." *Rambus II,* 330 F. Supp. 2d at 696 (emphasis added).

Qualcomm's argument that patent-related conduct in the standard-setting context is immune from antitrust scrutiny as a matter of law also cannot be reconciled with the FTC's recent efforts to police standard-setting abuse to anticompetitive ends. For example, in *In re Dell Computer Corp.*, 121 F.T.C. 616 (1996), the FTC based a demand for relief on its conclusion that an abuse of the standard-setting process (in that case, concealing patents that covered functionality adopted into a standard) was anticompetitive. Similarly, in *In re Union Oil Co. of California ("Unocal")*, No. 9305, 2004 WL 1632816 (F.T.C. July 6, 2004), the FTC overturned the dismissal of a claim that Unocal violated the antitrust laws by manipulating the process that led to the creation of a standard for reduced-emissions gasoline. Again, the fact that the instrument of anticompetitive action at issue involved the assertion of a patent right did not excuse the manipulation of the process that afforded monopoly power to the technology covered by the patent.

15

Qualcomm's reliance on *Townshend v. Rockwell International Corp.*, No. C99-04005BA, 2000 WL 433505 (N.D. Cal. Mar. 28, 2000), is misplaced. First, unlike Broadcom, the plaintiff in *Townshend* did not allege *any* causal relationship between the alleged misrepresentations to the SDO and the SDO's adoption of the standard. 2000 WL 433505 at *11. Second, the *Townshend* court relied on the fact that the defendant provided the SDO with the proposed licensing terms *before* the SDO adopted the standard, and the defendant had refused to license in accordance with the disclosed terms. *Id.* at *7, *10-11. Unlike here, there was no issue in *Townshend* of an industry's having been duped into adopting standards granting additional market power to a technology in reliance on FRAND commitments that were then violated.[7]

Indeed, the *Townshend* court itself explicitly recognized, citing *Dell*, that incorporation of proprietary technology into an industry standard can create market power in the market for products incorporating that technology, such as the UMTS chipset market here. 2000 WL 433505 at *12. In part on that basis, the court declined to dismiss a Section 1 claim that paralleled the claims at issue here, involving "'agreements . . . to expand the market power conferred by Townshend's patents by (i) fraudulently obtaining from the ITU [the relevant SDO] a standard incorporating those patents; (ii) using the market power conferred by that standard as leverage to acquire competitors' technology; and (iii) barring competitors from access to the patents they need in order to block them from manufacturing standard-compliant products, and thus, preventing them from competing in the relevant markets.'" *Id.* at *6.[8]

---

[7] Qualcomm's argument that "Broadcom defines 'WCDMA technology markets' as coextensive with Qualcomm's patents" and therefore cannot provide the basis for antitrust liability (Def.'s Mem. at 2, 12) is the same argument and fails for the same reason.

[8] Similarly, *ESS Technology, Inc. v. PC-Tel, Inc.*, No. C-99-20292 RMW, 1999 WL 33520483 (N.D. Cal. Nov. 4, 1999), does not help Qualcomm. In *ESS*, dismissal turned on the plaintiff's failing to allege injury to competition beyond injury to itself, for example by alleging that consumers faced diminished choices or higher prices. 1999 WL 33520483 at *3. To the extent

**3.    Although Broadcom Pleads that Qualcomm Committed Fraud on the SDOs, It Need Not Do So to State an Antitrust Claim.**

Qualcomm's assertion that Broadcom must plead fraud on the SDOs under Rule 9(b) state a monopolization claim is both incorrect and unsupported by any case. In *Rambus I,* 304 F. Supp. 2d at 816, 823, federal and state antitrust and unfair competition claims relating to misconduct before the SDO that led to the adoption of the standard that included the patent holder's patented technology went forward despite an explicit Federal Circuit determination during earlier proceedings in the case that there had been no common-law fraud.[9]

In any event, to the extent Broadcom need plead fraud on the SDOs in making the FRAND commitment, Broadcom has done so. *See infra* Section IV.B.

**4.    Whether Qualcomm's Licensing Terms Are Consistent With Its FRAND Obligations Is a Factual Question That Cannot Be Resolved on a Motion to Dismiss.**

Qualcomm's ultimate fallback – the curious and contradictory factual assertions that Broadcom's monopolization claim should be dismissed either because Qualcomm has offered to license Broadcom on FRAND terms or that FRAND has no meaning and is therefore unenforceable – are contrary to the complaint and can only be resolved on a full factual record. As to Qualcomm's licensing proposals to Broadcom being consistent with FRAND, the cases that Qualcomm cites (Def.'s Mem. at 17-18) go no further than holding that certain practices *may* be allowable under the patent laws, not that they are allowable in all circumstances,

---

there is such a requirement, Broadcom meets it here. (*See, e.g.*, Compl. ¶¶ 90, 91, 98, 102, 105, 109, 111.)

[9] In the analogous sham litigation context, a party enforcing patents it knows are invalid violates Section 2, even though it may have obtained the patents at issue without having committed fraud. *See, e.g., Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998). Likewise, where a party's FRAND promises secure its technology in a standard, it makes no sense to allow that party to exploit the resulting monopoly power later, regardless of whether the FRAND promise was fraudulent or in bad faith in the first place.

including where they are part of an anticompetitive scheme as alleged here.[10]  They therefore

certainly cannot be held to be consistent with FRAND and not anticompetitive as a matter of

law, as Qualcomm argues.  (*Id.*)

Qualcomm's assertion that FRAND commitments are incapable of judicial enforcement

(Def.'s Mem. at 13-17) is also incorrect.  Even if there is a range of royalty rates and licensing

conditions that would satisfy the FRAND obligation (as Qualcomm contends), that does not

absolve Qualcomm of liability associated with terms that a jury or the court find are well outside

the range.  When informed by a full record, the inquiry required will be no more burdensome

than the inquiry courts engage in routinely in interpreting and enforcing language such as "good

faith," "commercially reasonable," and "usual and customary."  *See, e.g. Harris Corp. v.

Ericsson Inc.*, 417 F.3d 1241, 1257-58 (Fed. Cir. 2005) (discussing principles for determining a

"reasonable royalty" to be paid in case of patent infringement); *SmithKline Diagnostics, Inc. v.

Helena Labs. Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991) (approving use of the factors set forth

in *Georgia-Pac. Corp. v. U. S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), for

determination of a "reasonable royalty").[11]

---

[10] *See, e.g., Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 834 (1950), *overruled in part on other grounds by Lear, Inc. v. Adkins*, 395 U.S. 653 (1969) (upholding summary judgment where the record did not support claims of patent misuse as to particular licensing practices and declining to hold that it was "per se a misuse of patents to measure the consideration by a percentage of the licensee's sales"); *Mallinckrodt, Inc.*, 976 F.2d at 708 ("Unless the condition violates some other law or policy (in the patent field, notably the misuse or antitrust law), private parties retain the freedom to contract concerning conditions of sale."); *Townshend*, 2000 WL 433505 at *8 (accepting general proposition that cross-licensing is not always anticompetitive, but only, unlike here, where there were no allegations or authority that specific cross-licensing terms at issue were anticompetitive).

[11] Likewise, the cases that Qualcomm cites regarding the rights of a patent owner that has *not* made FRAND commitments (*see* Def.'s Mem. at 18) are inapposite.  As discussed in Section II.A.1., it is not the patent right that is at issue; it is the patentee's breached commitment to license the patented technology on FRAND terms.

18

Furthermore, Qualcomm does not even try to argue that it is impossible to determine whether its licensing terms are discriminatory. There is nothing vague, ambiguous or unenforceable about Qualcomm's obligations not to discriminate among its licensees, and no dictionary need be consulted to conclude that charging handset manufacturers a higher royalty when they use Broadcom's chipsets than when they use Qualcomm's, as alleged in the complaint (Compl. ¶¶ 14, 94, 104, 106), violates Qualcomm's commitment not to discriminate. *See, e.g., Lewis v. Philip Morris Inc.*, 355 F.3d 515, 521 (6th Cir. 2004) (holding that consideration of "discriminatory pricing" in Robinson-Patman Act includes price and other things of value given to one buyer but not others).

**B.    The Complaint Alleges that Qualcomm Is Attempting to Monopolize the UMTS Chipset Market by Using Its Monopoly Power in the WCDMA Technology Markets to Drive Competitors Out of the UMTS Chipset Market.**

Where a "defendant has engaged in predatory or anticompetitive conduct with . . . a specific intent to monopolize and . . . a dangerous probability of achieving monopoly power," illegal attempted monopolization has occurred. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Broadcom alleges that Qualcomm engaged in predatory or anticompetitive conduct by punishing customers that deal with its chipset competitors through abuse of Qualcomm's CDMA chipset monopolies and discriminatory terms for licenses to its essential UMTS technology, in violation of Qualcomm's FRAND commitments. (Compl. ¶¶ 14, 94, 104, 106.) The complaint describes in detail the anticompetitive and discriminatory practices in which Qualcomm has engaged. (*Id.* ¶¶ 104-11.) Broadcom also alleges that Qualcomm's anticompetitive conduct creates the dangerous probability that Qualcomm will achieve a

monopoly in the market for UMTS chipsets.[12]  Similar practices in the past led to Qualcomm's

monopoly of the CDMA chipset market, in which it now enjoys a 90% or greater share.  (*Id.* ¶

64.)

> **1.    The Complaint's Allegations of Discriminatory Licensing to UMTS Chipset Competitors and Handset Manufacturers that Use Competitors' Chipsets Plead Anticompetitive Conduct in the UMTS Chipset Market.**

Qualcomm's argument that Broadcom's attempted monopolization claim does not plead

antitrust injury because the alleged exclusion results from Broadcom's not having a license to

Qualcomm's technology is a mere restatement of the incorrect argument that Qualcomm's

monopoly power flows from the patents alone and ignores the clear pattern of discriminatory and

competition-impeding licensing practices that is alleged in the complaint.[13]  (Compl. ¶¶ 86-111.)

*See also LePage's*, 324 F.3d at 152 ("Anticompetitive conduct can come in too many different

forms, and is too dependent upon context, for any court or commentator ever to have enumerated

all the varieties." (internal quotation marks omitted)).

---

[12] Indeed, Qualcomm itself has admitted it is targeting a share of the UMTS chipset market of greater than 50%, and its conduct, unless checked now, will likely lead it well beyond even that. *See* Irwin Jacobs, Remarks at Q1 2005 QUALCOMM Inc. Earnings Conference Call (Jan. 19, 2005) (LEXIS-NEXIS, Fair Disclosure Wire Library, Transcript No. 011905an.727) ("We believe we are well-positioned to further increase our share of the WCDMA chipset market, with our target of 50 percent.").

[13] However much Qualcomm argues that Broadcom wants a different license offer (Def.'s Mem. at 1, 18, 19, 23), this is its version of the facts and not what Broadcom alleges in the complaint. The complaint alleges why as a matter of fact and sound economics, had Broadcom accepted Qualcomm's license terms, it still would not be able to compete for the reasons discussed below. (*See* Compl. ¶¶ 90, 94, 95, 102, 105, 107.)  The law does not create a threshold requirement that Broadcom give in to Qualcomm's illegal tactics before it can bring an antitrust suit.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 120 n.15 (1969).  (Indeed, had Broadcom done so, Qualcomm undoubtedly would be arguing estoppel.)

The complaint sets out a clear pattern of anticompetitive conduct – in addition to and wholly aside from the license negotiations – that harms competition in the UMTS chipset market, including[14]:

- Discriminatorily requiring *double* royalties – one on the value of the chipset and one on the value of the chipset once incorporated into the handset – if handset manufacturers buy chipsets from Qualcomm's competitors but not if they buy Qualcomm's chipsets (Compl. ¶¶ 92-98, 106), thereby illegitimately advantaging Qualcomm's chipsets in a way that an equally efficient competitor cannot match (*id.* ¶¶ 108-09);

- Discriminating in the rates it charges to handset manufactures depending on whether manufacturers agree to purchase chipsets exclusively from Qualcomm (*Id.* ¶ 104);

- Discriminatory use of marketing payments, discounts, and other rewards, as well as threats of loss of CDMA chipset supply or favorable pricing, all conditioned on the use of Qualcomm's UMTS chipsets (*id.* ¶ 110);

- Abusing its CDMA chipset monopoly by conditioning supply of CDMA chipsets on manufacturers' purchase of Qualcomm's UMTS chipsets (*id.* ¶ 64) [15]; and

- Discriminatorily abusing its monopoly power in the WCDMA technology markets to require that licensees give *Qualcomm* a license to broad portfolios of its own technology, including technology that has not been declared essential to the standard, regardless of the size or strength of licensee' portfolios (*id.* ¶ 91), and requiring a percentage of royalties on the *entire* price of the chipset, without regard to how much (or how little) of that chipset's value is related to the Qualcomm technology (*id.* ¶¶ 89, 90).

The complaint alleges that *all* of these practices are anticompetitive. Among other things, Qualcomm's discriminatory licensing practices undermines "UMTS innovation and competition" (Compl. ¶ 90; *see also id.* ¶¶ 98, 105, 107), "undermine[s] the ability of UMTS

[14] Qualcomm's insistence on confidentiality in its negotiations with potential licensees constrains Broadcom's ability to reveal the specifics of Qualcomm's efforts to impose a license on Broadcom that was not FRAND. (*See* Compl. ¶ 88.) Qualcomm has used the pretense of enforcing these confidentiality requirements against competitors to force them out of the market by seeking cancellation of their licenses as the remedy. (*Id.*)

[15] Qualcomm knows that withholding CDMA chipset supply from one handset manufacturer costs it nothing. The complaint alleges that Qualcomm maintains artificial shortages of CDMA chipsets. (Compl. ¶¶ 65, 70-73.) To the extent that a handset manufacturer chooses not to give in to the coercion, Qualcomm will simply sell the chipsets to another handset manufacturer.

chipset manufacturers such as Broadcom to compete against Qualcomm" (*id.* ¶ 94), "enables Qualcomm to control or influence the transaction between the chipset competitors and their manufacturer customers" (*id.* ¶ 95), "prevent[s] competition" (*id.* ¶ 102), and "has made meaningful competition impossible" (*id.* ¶ 109) by "protecting Qualcomm from competition on the merits" (*id.* ¶ 111). Broadcom likewise alleges injury to the consuming public as a result of Qualcomm's actions. (*Id.* ¶¶ 30, 102.)

The Third Circuit's *en banc* decision in *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), put to rest Qualcomm's argument (Def.'s Mem. at 4 n.3, 29-30) that Broadcom's allegations of discriminatory bundling, rebating, and exclusivity arrangements cannot state an antitrust claim in the absence of an allegation of "below-cost" pricing. Indeed, in *LePage's*, the Third Circuit rejected that argument after considering it at length. 324 F.3d at 147-57; *see also SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978) (holding that conditioning bundled discount on buyer purchasing certain unpatented drugs with patented drug was anticompetitive and exclusionary, even if the resulting "price" was above cost). That determination was made after full discovery and jury trial. *See LePage's*, 324 F.3d at 144. Obviously, one cannot conclude, as a matter of law and based solely on Broadcom's pleadings, that the similar practices at issue here could not possibly be anticompetitive, as Qualcomm would have it.[16]

Qualcomm is also incorrect that its actions in the CDMA market cannot help establish attempted monopolization. To support that assertion, Qualcomm injects factual assertions about market participants and entry conditions that have no place in a motion to dismiss. (*See, e.g.,*

---

[16] Qualcomm's effort to avoid *LePage's* on the ground that Qualcomm may not yet have monopoly power in the *UMTS chipset market* simply ignores that the gravamen of Broadcom's complaint in this respect is the abuse of Qualcomm's *existing* monopolies in the WCDMA technology markets and the CDMA chipset markets unlawfully to *acquire* monopoly power in the UMTS chipset market. In that context, *LePage's* unquestioned holding that bundling that is still above-cost can violate the antitrust laws, 324 F.3d at 152, is equally applicable.

Def.'s Mem. at 31.)  It also cites cases in which the defendant was accused of using monopoly profits simply to invest in other markets, to the possible benefit of consumers (the so-called "monopoly leveraging" argument) and *not* to monopolize those other markets.  (Def.'s Mem. at 30-31 (citing *Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191 (3d Cir. 1995); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992)).  The conduct here is different: Broadcom alleges that Qualcomm withholds or threatens to withhold CDMA chipsets from handset manufacturers to coerce them to purchase Qualcomm's UMTS chipsets, conduct that if left unchecked and in combination with Qualcomm's other anticompetitive conduct, would lead to Qualcomm squeezing out its UMTS chipset competitors, leaving Qualcomm with monopoly power in the UMTS chipset market.  *That* sort of monopoly leveraging – where the end result is the defendant's obtaining a separate monopoly in a different market – is certainly a violation of Section 2.  *See Advo*, 51 F.3d at 1202-03; *Fineman*, 980 F.2d at 204-06.

### 2.    The Complaint's Allegations that Qualcomm Has Excluded or Crippled Broadcom and Other Competitors in the UMTS Chipset Market Plead Antitrust Injury.

To meet its pleading obligation as to antitrust injury, Broadcom alleges that Qualcomm is attempting to monopolize the UMTS chipset market through a raft of anticompetitive schemes, all with the purpose and effect of excluding Broadcom and other UMTS chipset manufacturers from competing on the merits in the UMTS chipset market.  Some competitors (including Broadcom) have been excluded or substantially impeded by Qualcomm's refusal to license on FRAND terms.  Others apparently have accepted the license that Qualcomm imposed, but over time, the complaint alleges, Qualcomm's anticompetitive practices will lead to its obtaining monopoly power in the UMTS chipset market, as occurred in the CDMA chipset market.  (Compl. ¶¶ 112-14.)  The critical point is that Qualcomm's anticompetitive conduct in the UMTS chipset market is intended to exclude effective competitors in that market, has been and

will be effective in doing so, and that Broadcom is one of the excluded parties. *See Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993) (holding that antitrust injury requirement is generally met if the plaintiff is a competitor in the relevant market); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 484 n.14 (1977) ("[C]ompetitors may be able to prove antitrust injury before they actually are driven from the market, and competition is thereby lessened."). The allegations to that effect in the complaint plead antitrust injury.

### 3.    The Complaint's Allegations that Qualcomm's Conduct Will Result In Its Achieving Monopoly Power in the UMTS Chipset Market Plead Dangerous Probability of Success.

To maintain a claim of attempted monopolization, a plaintiff need not establish that a defendant *currently* has monopoly power but rather that the defendant is poised to gain such power. *See L&W/Lindco Prods., Inc. v. Pure Asphalt Co.*, 979 F. Supp. 632, 636 (N.D. Ill. 1997) ("Lindco need not prove that Pure Asphalt has succeeded in establishing monopoly power but must merely show that Pure Asphalt has the capacity to make a serious attempt to acquire monopoly status.") (citing *Lorain Journal Co. v. United States*, 342 U.S. 143, 153 (1951)). Allegations that the defendant has the present ability to exclude competitors or to control price in the relevant market support a claim of dangerous probability. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) (defining market power as "the power to control prices or exclude competition"); *Aquatherm Indus. Inc. v. Fla. Power & Light Co.*, 971 F. Supp. 1419, 1426 (M.D. Fla. 1997), *aff'd*, 145 F.3d 1258 (11th Cir. 1998) (concluding that ability to control prices is an element of dangerous probability); *see also In re Pabst Licensing, GMBH Patent Litig.*, No. Civ.A. 99-3118, 2000 WL 1145725, at *7 (E.D. La. Aug. 11, 2000) (holding that conditioning the grant of technology licenses on payment of royalties on sales of downstream products "alleges the control of pricing").

The complaint meets the pleading requirements by alleging that, if left unchecked,

Qualcomm will achieve a monopoly in the UMTS chipset market. (Compl. ¶¶ 112-14.) By

discriminating against its UMTS chipset competitors, Qualcomm raises those competitors' costs

in ways that make it difficult if not impossible to compete on a sustained basis with Qualcomm

in the UMTS chipset market. (*Id.* ¶¶ 86, 94, 98, 105, 109, 111.) Qualcomm's dangerous

probability of success is demonstrated by, among other things, allegations that Qualcomm's

similar tactics have already succeeded in excluding virtually all competitors, including Intel,

from the CDMA chipset market, resulting in Qualcomm's 90% market share (*id.* ¶¶ 64, 67); that

Qualcomm possesses economic power over UMTS handset manufacturers by virtue of its

CDMA monopolies (*id.* ¶¶ 115-16); that Qualcomm's share of the UMTS chipset market is on an

upward trajectory (*id.* ¶ 113), and that high barriers to entry protect Qualcomm in the chipset

markets (*id.* ¶¶ 66, 82). Indeed, Qualcomm itself repeatedly has stated an expectation that it will

achieve at least a 50% share of the UMTS chipset market in short order.[17]

In the face of all those allegations, Qualcomm focuses on a *single* factor – its current

market share – and suggests that Broadcom's attempted monopolization claim must be dismissed

for failure to allege it sufficiently. Courts, including the Third Circuit, consistently hold that

market share is but one factor to be considered in evaluating dangerous probability of successful

monopolization and that there is no "magic" minimum market share required. *See e.g.,*

*Medtronic AVE., Inc. v. Boston Scientific Corp.*, No. Civ. A. 98-478-SLR, 2001 WL 652016 (D.

Del. March 30, 2001) (denying a motion to dismiss claims of attempted monopolization and

concluding that defendant was "incorrect in its assertion that there is a minimum market share

requirement for an attempted monopolization claim"). Indeed, the Eighth Circuit has held that

---

[17] *See supra* note 11.

there is no market share requirement for an attempted monopolization claim. *See H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1542-43 (8th Cir. 1989) (upholding *jury* finding of dangerous probability of successful monopolization in the face of a defendant's current market share of *zero* percent based on the plaintiff's demonstration *at trial* that the defendant was "poised forcefully" to enter the market).

As the cases make clear, the issue of dangerous probability of success requires a factual inquiry into many factors.[18]  Broadcom has alleged not only that Qualcomm is "poised forcefully" to take over the UMTS chipset market, but each of the factors relevant to the dangerous probability element.  No more is required to state a claim for purposes of Rule 12(b)(6).  Details about Qualcomm's market share and the other pertinent factors will emerge during discovery. *See also Intellective, Inc. v. Mass. Mutual Life Ins. Co.*, 190 F. Supp. 2d 600, 614-15 (S.D.N.Y. 2002) (denying motion to dismiss claim of attempted monopolization because determination of dangerous probability "must await further factual development").[19]

---

[18] One of the cases cited by Qualcomm confirms this in holding that *summary judgment* was unavailable to the defendant where the plaintiff showed that the defendant had a growing share of sales, augmented by "[1] the strength of the competition, [2] probable development of the industry, [3] the barriers to entry, [4] the nature of the anticompetitive conduct, and [5] the elasticity of consumer demand." *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617, 646-50 (E.D. Pa. 1997).

[19] The other cases that Qualcomm cites are inapposite.  In each of those cases, the court dismissed complaints that utterly lacked the detail found in Broadcom's allegations of Qualcomm's likelihood of successful monopolization. *See, e.g., Brunson Commc'ns, Inc. v. Arbriton, Inc.*, 239 F. Supp. 2d 550, 570 (E.D. Pa. 2002) ("Plaintiff has not only failed to allege any facts regarding Arbriton's market share, but also, none of the other factors associated with monopoly power."); *Fresh Made, Inc. v. Lifeway Foods, Inc.*, No. Civ. A. 01-4254, 2002 WL 31246922, at *8 (E.D. Pa. Aug. 9, 2002) (no allegations about market, market power, or competition); *Smith & Johnson, Inc. v. Hedaya Homes Fashions Inc.*, No. 96 Civ. 5821 MBM, 1996 WL 737194, at *7 (S.D.N.Y. Dec. 26, 1996), *aff'd* 125 F.3d 844 (2d Cir. 1997) (plaintiff "failed to allege any facts regarding the afghan industry structure, let alone [defendant's] current market share"); *E&G Gabriel Bros. v. Gabriel Bros., Inc.*, No. 93 Civ. 0894 (PKL), 1994 WL 369147, at *5 (S.D.N.Y. July 13, 1994) (complaint contained only a "verbatim recitation of statutory language" without "any other facts in support of a claim of monopoly power").  In each

C.    **The Complaint's Allegations that Qualcomm Coerces Its Handset Manufacturers to Purchase UMTS Chipsets from Qualcomm and Has Foreclosed a Significant Portion of the UMTS Chipset Market State Claims for Tying and Exclusive Dealing.**

Qualcomm's primary response to Broadcom's unlawful tying and exclusive dealing claims is to ask this Court to apply a highly restrictive and incorrect view of the law to a raft of factual contentions not in the complaint. Qualcomm's motion to dismiss those claims (the Third, Fourth, Fifth, and Sixth Claims for Relief) accordingly should be denied.

1.    **The Complaint's Allegations that Qualcomm's Bundling and Discounting Schemes Coerce Handset Manufacturers to Purchase Qualcomm Chipsets State Claims for Tying.**

Broadcom states tying claims, whether under the *per se* standard required by Supreme Court precedent or the "rule of reason" standard. "Tying is selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)," and to state a tying claim "[u]nder the per se analysis, a plaintiff must prove that (1) the defendant sells two distinct products, (2) the seller possesses market share in the tying product market, and (3) a substantial amount of interstate commerce is affected." *Gordon v. Lewiston Hospital*, 423 F.3d 184, 213-14 (3d Cir. 2005). Under a rule of reason analysis, liability may likewise be established upon a showing of actual restraint of competition in the market for the tied product. *Id.* at 214 n.20.

Qualcomm does not dispute the adequacy of Broadcom's allegations as to those elements. Nor could it. First, Broadcom specifically alleges that UMTS chipsets and WCDMA

---

case the plaintiffs also failed properly to allege the relevant markets. *See Brunson Commc'ns*, 239 F. Supp. 2d at 569; *Fresh Made*, 2002 WL 31246922, at *5; *Smith & Johnson*, 1996 WL 737194, at *6; *E&G Gabriel Bros.*, 1994 WL 369147, at *5 & n.6. Here, Qualcomm does not challenge Broadcom's relevant market allegations. (*See* Def.'s Mem. at 9 n.7.)

technology are separate products. (Compl. ¶ 157.)[20]  Second, Broadcom specifically alleges that

Qualcomm possesses monopoly power in the WCDMA technology markets resulting from the

inclusion of its technology in the UMTS standard. (*Id.* ¶¶ 83, 140, 158.)  Third, there is no doubt

that a substantial volume of commerce is at issue, well beyond the *de minimis* requirement,

whether the relevant commerce is the entire market for UMTS chipsets (50 million unit sales per

year and growing (*Id.* ¶ 112)), or some subset of that market.  *See Microbyte Corp. v. New Jersey*

*State Golf Ass'n*, Civ.A.No. 84-949, 1986 WL 7231, at *5 (D.N.J. June 26, 1986) ("Even

$27,264 is not a paltry sum, and the court cannot find it to be *de minimis*.").  As to the additional

element in rule of reason tying claims, Broadcom alleges that Qualcomm's tying practices have

damaged competition in the UMTS chipset market by putting competitors at "a significant

disadvantage in pricing [...] UMTS chipsets to a cell phone manufacturer" and by "mak[ing]

meaningful competition impossible." (Compl. ¶ 109.)

      Qualcomm's challenge to Broadcom's tying claims rests on the mistaken arguments that,

because Broadcom's tying allegations are based on linkage of the tying and tied products through

economic threats rather than explicit and absolute requirements that one not be purchased

without the other, and because Qualcomm in some instances sells its WCDMA technology

licenses separately from its UMTS chipsets, Qualcomm cannot, as a matter of law, be deemed to

engage in tying  (Def.'s Mem. at 4-5, 34-36); and that its tying conduct is immune from antitrust

challenge because both the tying and tied products are "covered" by Qualcomm patents (*id.* at

21-22).[21]

---

[20] Qualcomm concedes that Broadcom has properly alleged that WCDMA technology and
UMTS chipsets are separate product markets. (*See supra* note 3; Def.'s Mem. at 9 n.7.)
[21] Qualcomm's separate argument that Broadcom's claim under Section 3 of the Clayton Act
cannot go forward because the Clayton Act only applies to commodities (Def.'s Mem. at 36), is
at best premature.  Indeed, one of the cases upon which Qualcomm relies contradicts

Contrary to Qualcomm's argument, there is no absolute requirement that explicit agreements are required for tying. The critical question is whether some or all buyers of Qualcomm's WCDMA technology for UMTS are economically *coerced* into buying Qualcomm's UMTS chipsets. In *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), the Supreme Court concluded that the defendant's economic power in the tying product and its exploitation of that power is the touchstone of a tying claim, not arbitrary black-letter distinctions as Qualcomm seeks to impose:

> Our cases have concluded that the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*See also Eastman Kodak Co.*, 504 U.S. at 466-47 ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the particular facts disclosed by the record." (citations and internal quotation marks omitted)).

Indeed, in the very case that Qualcomm cites in support of its argument, *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978), the Third Circuit concluded that an

---

Qualcomm's proposed bright-line rule that all elements of a contract must relate solely to tangible goods for the Clayton Act to apply. In *Tele Atlas N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184, 1192 (N.D. Cal. 2005), the court explained that where the "subject of the contract is a combination of goods and intangible rights and services," a court should apply the "dominant nature" test to determine whether the transaction comes within the ambit of the Clayton Act. Because the tying arrangement at issue here involves tangible UMTS chipsets and discovery may well reveal that to be the most important aspect of the arrangement, the court should allow development of an appropriate factual record for analysis of whether the chipsets are the dominant element of the transaction for Clayton Act purposes. *See also Ansel Commc'ns, Inc. v. Novell, Inc.*, No. C-97-21088 RMW ENE, 1999 WL 33302368, at *3 (N.D. Cal. March 24, 1999) (denying summary judgment on issue of whether a software license has the "dominant nature" of a sale of goods under the Robinson-Patman Act).

explicit tie is *not* needed to establish an illegal tie for antitrust purposes, where there otherwise is coercion:

> Obviously, with respect to the [conditioning the sale of one product upon the sale of another product] element, *a formal agreement is not necessary*, although it is sufficient. But, in the absence of a formal agreement, a plaintiff must establish in some way that a tie-in was involved . . . . This can be done by proof that purchase of one product, the tied product, was not voluntary, i.e., *by proof of coercion.*

575 F.2d at 1061 n.3 (emphasis added)[22]; *see also Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449-54 (3d Cir. 1977) (affirming that illegal tying arrangement can be established by demonstrating coercion even in the absence of an explicit tie). Applying *SmithKline* as binding precedent, the court in *DiscoVision Associates v. Disc Manufacturing, Inc.*, 42 U.S.P.Q. 2d 1749 (D. Del. 1997), considered and rejected the same argument that Qualcomm raises here:

> [Defendants] argue that [plaintiff's] allegations of "economic coercion" cannot, as a matter of law, "constitute the type of coercion that is cognizable under the Sherman Act." They argue that [plaintiff's] allegations of "economic coercion" are essentially a complaint about [defendant A's] royalty rates. According to [defendants], [plaintiff] has not and cannot allege that [defendant A] has expressly conditioned the availability of any of its patents to the license of any other patents. . . . *[But] the court finds that [plaintiff] has sufficiently alleged the type of coercion necessary to sustain a tying claim under the Sherman Act.*

42 U.S.P.Q. 2d at 1759 (citations omitted; emphasis added).

Similarly, allegations of an absolute *refusal* to sell the two products separately *to all purchasers* is *not* required. For example, in *Compuware Corp. v. IBM Corp.*, 366 F. Supp. 2d 475, 480-82 (E.D. Mich. 2005), the court rejected defendant's argument *at summary judgment* – identical to the assertions made here by Qualcomm – that, because only 10% of its sales of the tying products included sales of the tied product, plaintiff's claim of tying failed as a matter of

---

[22] Whether there was coercion in the *SmithKline* case that could give rise to a tying claim was not disputed at the Third Circuit. *See* 575 F.2d at 1061 n.3.

law. "[T]he fact that only 10% of IBM's mainframe [the tying product] customers are also purchasing its tools [the tied product] is of no significance in determining whether the company is engaged in forcing sales, so long as the volume of those sales is not insignificant." 366 F. Supp. 2d at 481; *see also Applera Corp. v. MJ Research, Inc.*, 309 F. Supp. 2d 293, 296-97 (D. Conn. 2004) (denying *in limine* motion to exclude evidence of economic coercion constituting tying despite evidence showing products were often offered separately). These cases are the mere modern embodiment of *United Shoe Machinery Corp. v. United States*, 258 U.S. 451 (1922), the seminal Supreme Court tying decision, which rejected the argument that there could be no tie because the defendant offered a non-tied alternative. 258 U.S. at 464.

Broadcom's allegations therefore meet its pleading obligations. As alleged in the complaint, Qualcomm's forcing bundled packages on certain customers "make[s] meaningful competition impossible" (Compl. ¶ 109), "substantially raise[s] competitors' costs of selling and marketing UMTS chipsets, and strongly discourages chipset buyers from dealing with Qualcomm's competitors" (*id.* ¶ 111). Those allegations not only suffice to describe unlawful ties, they also are a complete answer to Qualcomm's argument that Broadcom somehow does not allege antitrust injury as part of its tying claims (Def.'s Mem. at 4).

Finally, Qualcomm's assertion that there can never be an illegal tie between a license for a patent and the downstream product that incorporates that patent (Def.'s Mem. at 21-22) is incorrect. It is settled law that intellectual property and products employing that intellectual property generally are separate products for tying purposes. *See, e.g., William Cohen & Son v. All Am. Hero, Inc.*, 693 F. Supp. 201, 205-07 (D.N.J. 1988) (concluding that conditioning purchase of franchise restaurant trademark to purchase of food supplies could constitute tying); *see also Roberts v. Elaine Powers Figure Salons*, 708 F.2d 1476, 1481 (9th Cir. 1983) (same as

31

to weight loss franchise trademark and accounting services); *Northern v. McGraw Edison Co.*, 542 F.2d 1336, 1345 (8th Cir. 1976) (same as to dry cleaning franchise trademark and equipment); *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 45-47 (5th Cir. 1976) (same as to restaurant franchise trademark and food, equipment and supplies). It is also well established that items may exist in different markets even if one is functionally linked to the other. *See, e.g., Eastman Kodak*, 504 U.S. at 463; *Jefferson Parish*, 466 U.S. at 19, n.30; *Brotech Corp. v. White Eagle Int'l Tech. Group, Inc.*, No. Civ. A. 03-232, 2004 WL 1427136, at *4 (E.D. Pa. June 21, 2004) (recognizing separate market for finished product incorporating patent at issue in alleged sham litigation).

If followed, Qualcomm's argument would undermine the basic reason tying is prohibited – to protect competition in the tied market from abuse by a dominant player in the tying market. *See, e.g., Gordon*, 423 F.3d at 214; *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 510 (3d Cir. 1998); *Allen-Myland, Inc. v. IBM*, 33 F.3d 194, 201 (3d Cir. 1994). That principle is of particular significance where industry standards are involved. Were Qualcomm's argument correct, any company could convert the designation of its patented technology as an essential element of an *industry* standard into a *proprietary* standard (*i.e.*, force all customers to use its own products implementing the technology) when the manifest intention of standards – and the only reason they are "permitted at all under the antitrust laws," *Allied Tube*, 486 U.S. at 506 – is to promote a competitive market in those products.

**2.    The Complaint's Allegations that Qualcomm's Exclusivity Arrangements Foreclose a Significant Share of the UMTS Chipset Market to Rivals States Claims for Exclusive Dealing.**

Broadcom has adequately stated a claim of exclusive dealing under Section 1 of the Sherman Act and Section 3 of the Clayton Act. Qualcomm concedes (Def.'s Mem. at 32) that, even under its view of the operative test, the fact finder must evaluate "the relevant area of

effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961). Despite the obviously fact-intensive nature of this inquiry, Qualcomm implausibly asserts that this analysis can be done here in the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). (Def.'s Mem. at 31-33.)

Qualcomm's bald assertion that Broadcom has not alleged that Qualcomm's practices have foreclosed a sufficiently "substantial share of a relevant market" (Def.'s Mem. at 31), simply ignores the allegations in Broadcom's complaint that Qualcomm has "agreements with cell phone manufacturers – pursuant to which such companies agree to purchase Qualcomm's UMTS chipsets only, not to purchase competitors' chipsets, or to do so only on terms that materially disadvantage such products, constituting an effective refusal to deal on commercially reasonable terms – unreasonably restrain competition and *foreclose a substantial share* of the UMTS chipset market in violation of Section 1 of the Sherman Act." (Compl. ¶ 150 (emphasis added); *see also id.* ¶¶ 110, 111, 163.) Qualcomm apparently disagrees with these allegations, but the rate of foreclosure of competition as a result of an exclusive dealing arrangement is a question of fact, not a question to be resolved on a motion under Fed. R. Civ. P. 12(b)(6). *See Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,* 386 F.3d 485, 508-09 (2d Cir. 2004) (denying motion for summary judgment because of fact dispute over whether a "significant fraction of buyers or sellers" were frozen out of the market); *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 111 (3d Cir. 1992) (confirming that analysis requires inquiry into actual market conditions); *United States v. Dentsply Int'l, Inc.*, Nos. Civ. A. 99-005-SLR, 99-225-SLR, 99-854-SLR, 2001

33

WL 624807, at *9 (D. Del. March 30, 2001), *aff'd sub nom. Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,* 424 F.3d 363 (3d Cir. 2005) (denying motion for summary judgment because of a fact dispute "with respect to the foreclosure rate").[23]

More generally, despite Qualcomm's protestations to the contrary, Fed. R. Civ. P. 8 simply does not require Broadcom to plead every fact it will use to establish its claims. *See supra* Section I; *Bogosian,* 561 F.2d at 446 ("It is not necessary to plead evidence."). That rule is particularly apt here, where Qualcomm has made every effort to conceal the terms of the very agreements that Broadcom alleges to be unlawfully exclusionary through strict non-disclosure and confidentiality agreements. (*See* Compl. ¶ 88.)

### D. The Complaint's Allegations that Qualcomm's Actions in the WCDMA Technology and Chipset Markets Are Part of a Scheme to Maintain Its Monopoly in 3G CDMA Technology and Chipsets Establish Broadcom's Standing to Pursue Its CDMA Claims.

Qualcomm does *not* argue that Broadcom's allegations that Qualcomm illegally has maintained its CDMA technology and CDMA chipset monopolies fail to state claims for illegal monopoly maintenance. Qualcomm only challenges Broadcom's *standing* to pursue those claims. (Def.'s Mem. at 36-40.)

---

[23] Qualcomm's assertion that Broadcom has made *no* allegations regarding competition in the UMTS chipset market or the effects of Qualcomm's exclusivity requirements (Def.'s Mem. at 32-33) is simply unfounded. Broadcom has identified UMTS cellphone manufacturers whom Qualcomm has identified as "major customers" and thus whose business Qualcomm's competitors would be excluded from obtaining by Qualcomm's exclusivity requirements. (Compl. ¶ 29.) As alleged in the complaint, Qualcomm already has preempted competitors from tens of millions of dollars of chipset business through its exclusivity requirements, including by signing chipset agreements with the leading UMTS cellphone manufacturers. (*See Id.* ¶¶ 16, 110, 113.) Qualcomm's practices operate to raise competitors' costs and thereby to prevent them from competing with Qualcomm on the merits. (*Id.* ¶ 111.) Ample allegations of the competitive issues involved are in Broadcom's complaint as well, including in recounting what happened in the parallel CDMA markets when Qualcomm engaged in the same sorts of activity in which it is engaging in and has engaged in the UMTS chipset markets. (*See Id.* ¶¶ 17-20, 114.)

Qualcomm rests its motion to dismiss Broadcom's CDMA monopolization claims on the simplistic – and incorrect – argument that to have standing to pursue antitrust claims in the CDMA technology and chipset markets, Broadcom must be a direct "participant," presumably as a customer or competitor, in those markets. (Def.'s Mem. at 37.) To the contrary, there is no such bright-line requirement. *See, e.g., Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 76-77 (3d Cir. 2000) (rejecting requirement that plaintiff must be a customer or competitor in market in which competition is harmed through defendants' actions); *see also Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982) ("[t]he [standing] statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers") (quoting *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)). Rather, where the alleged harm to the plaintiff is "inextricably intertwined" with the alleged antitrust violation or is the means by which the defendant sought to restrain competition, the plaintiff has standing. *See, e.g., Carpet Group Int'l*, 227 F.3d at 76-77 (3d Cir. 2000) ("[A]ntitrust injury . . . may in some circumstances inhere where the harm is 'inextricably intertwined' with the defendant's wrongdoing.") (citations omitted); *U.S. Horticultural Supply, Inc. v. Scotts Co.*, No. Civ. A. 03-773, 2004 WL 1529185, at *3-4 (E.D. Pa. Feb. 18, 2004) (holding that plaintiff had antitrust standing because plaintiff's injury was "the very means by which the defendant sought to restrain or destroy competition").[24]

Broadcom has standing under that precedent. Qualcomm's exclusionary conduct in UMTS chipsets has reinforced and entrenched Qualcomm's CDMA monopolies by increasing

---

[24] In supporting its absolutist "only customers or competitors have standing" argument with *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178 (3d Cir. 1997), and similar cases (Def.'s Mem. at 39), Qualcomm ignores the Third Circuit's later holding in *Carpet Group Int'l*, in which the Third Circuit explicitly held that such a standing requirement "may in some circumstances lead to results that conflict with Supreme Court and other precedent" and that *Barton & Pittinos* therefore should not be read as imposing such a requirement. 227 F.3d at 76.

costs to parties that manufacture and supply equipment and services that use the UMTS standard. (*See* Compl. ¶¶ 115-16.) Broadcom's harm is therefore "the very means" by which Qualcomm sought to reinforce and maintain its CDMA monopolies. It is therefore "inextricably intertwined" with those actions and Broadcom accordingly has standing under the antitrust laws to challenge it. *See Carpet Group Int'l*, 227 F.3d at 76-77; *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 926 n.8 (3d Cir. 1999)).

The D.C. Circuit's decision in *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001), and subsequent private cases confirm that victims of anticompetitive actions aimed at preserving a monopoly in one market but aimed at targets in another market have standing to pursue monopoly maintenance claims in the first market. In *Microsoft*, the D.C. Circuit held that Microsoft's efforts to undermine non-Microsoft Internet browsers and the JAVA cross-platform programming language was monopoly maintenance in the operating system market even though rival browsers and JAVA were not in the same market as operating systems. 253 F.3d at 51-79. When Novell, a market participant in another market (specifically, office productivity programs) challenged Microsoft's maintenance of its operating system monopoly under the antitrust laws, Microsoft raised the identical standing arguments that Qualcomm raises, and the court roundly rejected those arguments:

> Microsoft next argues that Novell lacks antitrust standing . . . because the office productivity applications alleged to have been damaged did not compete in the operating system market. According to Microsoft, there is a black-letter rule that only competitors or consumers in a relevant market have standing to sue for harm caused by anti-competitive behavior in that market. Microsoft overstates the proposition. . . . According to Novell, WordPerfect and Quattro Pro, its popular office productivity applications, posed a threat to Microsoft's operating system monopoly . . . . Against this background, it is clear to me that Novell meets the various parts of the multi-factored test

established by *Associated General Contractors* for antitrust standing.

*In re Microsoft Antitrust Litig.*, No. MDL 1332, Civ. JFM-05-1087, 2005 WL 1398643, at *2-3 (D. Md. June 10, 2005); *see also Bristol Tech. v. Microsoft Corp.*, 42 F. Supp. 2d 153, 163-66 (D. Conn. 1998) (holding that party with product that threatens monopoly product had standing when monopolist took steps against that party and its product).

As with Novell's claims against Microsoft's operating system monopolization, the five factors relevant for standing set forth in *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), are all present here. There is no question regarding the sufficiency of the allegations regarding the first AGC factor – here Broadcom alleges a direct causal connection between Qualcomm's antitrust violations in CDMA through its actions in UMTS and Broadcom's harm – lost sales of UMTS chipsets as a result of discriminatory higher prices for essential UMTS technological inputs. (Compl. ¶¶ 4, 108-11, 116). As to the second factor – that the alleged harm to Broadcom is of the type the antitrust laws were intended to provide redress – Broadcom alleges that its injury is lost sales resulting from anticompetitive actions in a market adjacent to Qualcomm's CDMA monopoly (*Id.* ¶ 116), the very sort of antitrust injury that Novell suffered at the hands of Microsoft. The injury is also "direct" under the third and fourth AGC factors – Qualcomm's actions directly have caused and will cause Broadcom to lose sales of UMTS chipsets (*Id.* ¶¶ 4, 108-11, 116), and as to *those* lost sales, there are no more direct victims than Broadcom. Finally, under the fifth AGC factor, there is no risk of duplicative recovery or complex apportionment of damages.[25]

---

[25] Qualcomm's argument that, because to a certain extent Broadcom's other claims logically overlap as they relate to damages, this claim should be dismissed on standing grounds, is makeweight. Obviously the concern about "duplicative recovery" and "complex apportionment of damages" relates to other potential claims by *other* parties, not to potentially overlapping claims by the same party. *See, e.g., Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1563 (7th

**E.     The Complaint's Allegations that Broadcom Is a Likely Customer in the Markets where Qualcomm's Acquisition of Flarion Would Substantially Lessen Competition Establish Broadcom's Standing to Pursue Its Section 7 Claim.**

Qualcomm does not contest that Broadcom has stated a claim on the merits under Section 7; rather, Qualcomm argues that Broadcom does not have standing to pursue such a claim.[26] Qualcomm's argument is that Broadcom's harm with respect to Qualcomm's acquisition of Flarion is too speculative because it has not happened yet and, curiously, that Broadcom is a competitor of Qualcomm and Flarion. Qualcomm is wrong on both points, and Qualcomm's motion to dismiss the Section 7 claim (the Eighth Claim for Relief) accordingly should be denied.

Qualcomm's argument that Broadcom lacks standing because its injury is too speculative apparently stems from a misunderstanding as to which section of the Clayton Act provides the basis of Broadcom's standing with respect to the Flarion acquisition. Because Broadcom seeks injunctive relief, including divestiture of some or all of the assets acquired and/or the imposition of conditions on Qualcomm's use of some or all of the assets acquired (Compl. ¶ 178, Prayer for Relief, Part E), the pertinent question is whether Broadcom has standing under Section 16 of the Clayton Act. Qualcomm, however, relies exclusively on cases having to do with standing to

---

Cir. 1991) ("[W]e note that this case raises no concerns of duplicative recoveries or difficulties in apportioning the damages plaintiffs claim between them or others injured by defendant's merger."); *cf. 2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 742 n.17 (3d Cir. 2004) (finding "duplicative recovery" issue where plaintiffs' various theories made "duplicative recovery . . . not only possible, [but] exceedingly probable if not inevitable").

[26] There is no serious argument that Qualcomm's proposed acquisition could be challenged on the merits under Section 7 of the Clayton Act, which prohibits acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Flarion presents a fundamental competitive challenge to Qualcomm's technology, and its acquisition by Qualcomm would substantially lessen competition in B3G and 4G technology markets. (Compl. ¶¶ 119, 132-35.)

pursue *damages* under Section 4 of the Clayton Act.[27]  Because the requirements for standing

under Section 16 are different, Qualcomm's cases are inapposite.  *See Cargill, Inc. v. Monfort of

Colo., Inc.*, 479 U.S. 104, 111 (1986) ("It is plain that § 16 and § 4 do differ in various ways.");

*AGC*, 459 U.S. at 525 n.5 ("Plaintffs do not seek injunctive relief under Section 16 of the

Clayton Act, 15 U.S.C. § 26, and they do not ask us to consider whether they have standing to

request such relief.").[28]

Under Section 16, Broadcom need only allege that (1) there is a threatened loss or injury

cognizable in equity; and (2) the threatened loss or injury qualifies as antitrust injury reflecting

the anticompetitive effect of an alleged violation.  *See Cargill*, 479 U.S. at 111.  Broadcom's

allegations meet those requirements.  Broadcom specifically alleges that the proposed Flarion

acquisition would directly injure Broadcom by reducing competition in the alleged B3G and 4G

technology markets:

> Broadcom is a customer in the B3G and 4G technology markets.
> As an equipment manufacturer, Broadcom may require a license to
> intellectual property necessary to manufacture B3G and 4G
> equipment.  Reduced competition among B3G and 4G
> technologies, and particularly an increase in Qualcomm's market
> power in the markets for B3G and 4G technologies, will reduce
> Broadcom's ability to obtain such technology licenses on
> competitive terms, or to obtain those licenses at all.

---

[27] None of Qualcomm's cases involve claims challenging an acquisition under Section 7 of the
Clayton Act, either.  Section 7 of the Clayton act is intended to deal with potential
anticompetitive effects in their incipiency, further undermining Qualcomm's argument that
competitive harm is too speculative to be actionable.  *Brunswick Corp. v. Pueblo Bowl-O-Mat,
Inc.*, 429 U.S. 477, 485 (1977) (Section 7 is "a prophylactic measure, intended primarily to arrest
apprehended consequences of intercorporate relationships before those relationships could work
their evil." (quotation marks omitted)); *Moore Corp. Ltd. v. Wallace Computer Servs., Inc.*, 907
F. Supp. 1545, 1574 (D. Del. 1995) ("Wallace need not prove the fruition of actual
anticompetitive effects of the acquisition.").

[28] Of course, should the threatened harm from Qualcomm's acquisition of Flarion become actual
harm before this case is adjudicated, Broadcom would have standing under Section 4 to seek
money damages for any provable losses, just as it does with respect to Qualcomm's past
acquisitions.

(Compl. ¶ 137.)

This injury is an "antitrust injury" that flows from the anticompetitive effects that would occur as a result of the acquisition. As alleged in the complaint, if the Flarion transaction were consummated, competition in the market to provide technology for B3G and 4G to chipset customers would be substantially lessened (Compl. ¶¶ 129-38). Broadcom expects to sell chipsets for use in B3G and 4G applications. Accordingly, Broadcom would be a customer in the market for that technology, and therefore would be injured by having to pay higher prices as a result of such a lessening of competition. *See, e.g., Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235-37 (9th Cir. 1998) (reversing district court's summary judgment dismissing on standing grounds Section 7 claim of customer in market where acquisition caused substantial lessening of competition); *see also Cent. Telecommc'ns v. TCI Cablevision, Inc.*, 800 F.2d 711, 727-29 (8th Cir. 1986) (concluding that plaintiff, trying to become a cable television operator, had standing under Section 4 (and therefore under Section 16) where it demonstrated experience and expertise in the field). To the extent Qualcomm argues otherwise, it merely seeks to substitute facts of its own invention for those in the complaint. Broadcom certainly alleges the "experience and expertise" in the field (*see* Compl. ¶¶ 4, 12, 31) to convey standing. If potential customers like Broadcom were not allowed to challenge the transaction, no private party would be.[29]

---

[29] Qualcomm's related argument that, because no standard for B3G or 4G has yet been set (*see* Def.'s Mem. at 41-42), Broadcom lacks standing, is likewise wrong. If Flarion were to remain independent, it would compete against Qualcomm for inclusion of its technology in B3G and 4G standards, including, for example, by offering more favorable licensing terms to customers like Broadcom. That is particularly important in light of Qualcomm's assertion in its memorandum that its FRAND commitments are meaningless (*see* Def.'s Mem. at 13-17), a position to which an independent Flarion presumably would not adhere. In any event, even if no standard is promulgated, Broadcom will be a customer.

Qualcomm's reliance on *Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co.*, 826 F.2d 1235 (3d Cir. 1987), is misplaced because that case applies to *competitors* of the merging parties *in the market in which competition was reduced. See* 826 F.2d at 1243 ("It is curious that [plaintiff] would assert a loss by conduct of [defendant] which, if [plaintiff] is to be credited, reduced the number of suppliers in the marketplace. If that action helps [defendant] *as a producer*, it inevitably aids [plaintiff] *as well as every other producer*." (emphasis added)). Here the anticompetitive effect is in the technology markets in which Qualcomm and Flarion compete and in which Broadcom is a *customer*. As in *Bon-Ton Stores v. May Department Stores Co.,* 881 F. Supp. 860, 877 (W.D.N.Y. 1994), where a party in Broadcom's position was held to have standing, the acquisition would enable Qualcomm to deprive Broadcom of an essential input in the downstream markets as a customer of such technology.[30]

### III.   BECAUSE BROADCOM'S FEDERAL ANTITRUST CLAIMS ARE WELL-PLED, THE COMPLAINT LIKEWISE STATES CLAIMS UNDER THE STATE ANTITRUST AND UNFAIR COMPETITION STATUTES.

As to the state antitrust causes of action, Qualcomm concedes that if Broadcom *has* stated one or more federal antitrust causes of action, it likewise *has* stated state antitrust law causes of action. (Def.'s Mem. at 45.) Should the Court deny Qualcomm's motion to dismiss Broadcom's federal antitrust claims (as it should), Qualcomm therefore concedes that the Court should likewise deny Qualcomm's motion to dismiss Broadcom's state antitrust claims (Ninth Claim for Relief).

---

[30] Broadcom's reference in the Amended Complaint to being a competitor in the downstream chipset market hardly disqualifies it from bringing a Section 7 claim based on anticompetitive effects in the upstream technology markets in which it is a customer, not a competitor. *Compare Lucas Auto.*, 140 F.3d at 1237 ("We conclude that Lucas Automotive, as a competitor at the secondary level, *i.e.*, as a customer in a market controlled by a monopolist, has standing to assert a § 7 claim for equitable relief, including divestiture, under § 16.") *with Brunswick Corp.*, 429 U.S. at 488 (holding that competitor that *benefited* from alleged lessened competition in market in which it competed lacked standing for Section 7 claim).

Likewise, Qualcomm does not present any grounds to dismiss Broadcom's state unfair competition claims. Rather, Qualcomm detours into a premature discussion of whether Broadcom states one claim or multiple claims, ultimately concluding that, if Broadcom states claims under California's unfair competition law, it encompasses all of Broadcom's claim under the various states' statutes.[31] (Def.'s Mem. at 46.) As with the state antitrust causes of action, however, Qualcomm concedes that, if Broadcom states a violation of the federal antitrust laws, it necessarily has stated a claim under California's unfair competition law. (*Id.*)

Qualcomm further concedes (Def.'s Mem. at 46) that even if Broadcom failed to plead a federal antitrust violation as to one or more of its federal antitrust claims (which it did not), Broadcom still has stated a claim under California's unfair competition law if it alleges "conduct that (i) threatens an incipient violation of an antitrust law; (ii) violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law; or (iii) otherwise significantly threatens or harms competition" or "fraud." *See also Cel-Tech Commc'ns., Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 544 & n.12 (Cal. 1999) (adopting those standards and noting they are broader than under the federal antitrust laws).

Broadcom's complaint more than meets those requirements. First, to the extent that Qualcomm argues that Broadcom's claims are premature because they occur in markets in their formative stages, as it does, for example, as to Broadcom's claim against Qualcomm's attempted monopolization of UMTS chipsets (*see* Def.'s Mem. at 27-28) or Qualcomm's acquisition of Flarion (*see id.* at 40-43), Broadcom unquestionably alleges an "incipient" violation of the antitrust laws in those markets. Second, the effect of Qualcomm's conduct as alleged in the

---

[31] Other than California's unfair competition law, which Qualcomm contends applies as a choice-of-law matter to the conduct at issue here, whether one or another other state's unfair competition law also applies ultimately will depend on the facts and circumstances that are revealed in discovery.

amended complaint would be to undermine competition in UMTS chipsets, which is comparable, at a minimum, to the kinds of harm the antitrust laws are intended to prevent. Third, Broadcom states a claim for fraud, as discussed *infra* in Section IV.B.

## IV. THE COMPLAINT'S ALLEGATIONS OF QUALCOMM'S SPECIFIC BAD FAITH COMMITMENTS AND THEIR IMPACT ON BROADCOM STATE CLAIMS FOR BREACH OF CONTRACT, PROMISSORY ESTOPPEL, FRAUD, AND TORTIOUS INTERFERENCE.

### A. The Complaint's Allegations that Qualcomm Made and Broke Binding Contractual Promises to the SDOs that Were Intended to Benefit Third Parties Like Broadcom and that Broadcom Relied on Those Promises to Its Detriment State Claims for Breach of Contract and Promissory Estoppel.

To state a claim for breach of contract, a plaintiff must simply allege the existence of a contract, a breach of that contract, and resulting damages. *See Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003); *Smith-Cook v. Nat'l R.R. Pass. Corp.*, No. 05-00880, 2005 WL 3021101, at *10 (E.D. Pa. Nov. 10, 2005); *Surya Sys., Inc. v. Sunku*, No. Civ. A. 05-146, 2005 WL 1514225, at *2 (E.D. Pa. June 24, 2005).

Qualcomm's assertion that Broadcom's contract claims are "conclusory" (Def.'s Mem. at 49) is simply wrong. Broadcom's allegations put Qualcomm on notice of the contracts it alleges, including the parties to the contracts, the nature of the contracts breached, and the basis of Broadcom's claims as a third-party beneficiary. First, Broadcom identifies by name the SDOs with whom Qualcomm formed the contracts. (Compl. ¶¶ 39, 40, 41.) Second, Broadcom specifies that prior to adoption of the UMTS standard by the relevant SDOs, Qualcomm offered "in writing that it would license its WCDMA patents on fair, reasonable, and non-discriminatory terms." (*Id.* ¶ 3.) The complaint further describes the bargain sought by Qualcomm: "In order to secure the inclusion of the WCDMA technology to which Qualcomm purports to hold essential patents included in the UMTS standard, Qualcomm made repeated and express written representations to SDOs, including the ITU, ETSI, and 3GPP, that it would license any of its

43

essential WCDMA patents on FRAND terms." (*Id.* ¶ 84.) The SDOs accepted Qualcomm's

representations, and in exchange included its technology within the scope of the UMTS standard.

(*Id.* ¶¶ 85, 188.) Qualcomm then breached the contracts by licensing on non-FRAND terms. (*Id.*

¶¶ 13, 86, 188.) Qualcomm's breach has injured Broadcom. (*Id.* ¶¶ 86, 189.) Each of the cases

cited by Qualcomm address claims against multiple defendants and focuses on ambiguity as to

which defendants were parties to the contracts at issue, which is plainly not at issue here. *See,*

*e.g., Kirschner v. Cable/Tel Corp.*, 576 F. Supp. 234, 245 (E.D. Pa. 1983); *Barrett v. U.S.*

*Banknote Corp.*, No. 7420 (RPP), 1992 WL 232055, at *9 (S.D.N.Y Sept. 2, 1992).[32]

      Any argument that Broadcom has failed to allege contracts to which it is a third-party

beneficiary likewise fails. As this court has explained, third-party beneficiary status is a factual

question and there is no requirement that a third-party beneficiary be named on the face of the

contract, where, as here, the circumstances suggest that one or more third parties were the

intended beneficiary. *R.J. Longo Constr. Co., Inc. v. Transit Am., Inc.*, 921 F. Supp. 1295, 1309

(D.N.J. 1996).[33] Indeed, Qualcomm's agreements to license on FRAND terms would make no

sense if not enforceable by those that seek to license the technology.

      Courts in identical factual circumstances have found that potential licensees may be third-

party beneficiaries to a technology licensor's commitments to an SDO and have denied motions

to dismiss based on the identical arguments that Qualcomm raises here. *See, e.g., Agere Sys.*

*Guardian Corp. v. Proxim, Inc.,* 190 F. Supp. 2d 726, 738 (D. Del. 2002) (denying motion to

dismiss and explaining, "While Agere Guardian is correct that, on the merits, Proxim will have

---

[32] In *Kirschner*, the court expressly rejected one of the arguments that Qualcomm advances here – that it was necessary under Rule 8 to have detailed allegations regarding the terms of the contracts or the circumstances leading to the alleged breach. 576 F. Supp. at 244-45.

[33] The court analyzed third party beneficiary status in *R.J. Longo* under the Pennsylvania law of contracts but specifically noted that ultimate determination of what law governs a contract is likewise dependent on a factual inquiry. 921 F. Supp. at 1306 n.13.

to prove that there was a contractual relationship between the parties and that Proxim was an intended beneficiary of the contract, that does not mean that the claim, as alleged, is futile."); *ESS Tech., Inc. v. PC-Tel, Inc.,* No. C-99-20292 RMW, 1999 WL 33520483, at *4 (N.D. Cal. Nov. 4, 1999) (denying motion to dismiss a claim for specific performance by third-party licensees based on defendant's commitments to ITU to license on FRAND terms).

The complaint also states a claim for promissory estoppel, which requires *less* than is required for a breach of contract claim. *See, e.g., R.J. Longo Constr. Co.,* 921 F. Supp. at 1305 ("promissory estoppel obviates plaintiff's need to establish the formal elements of a contract"). Broadcom alleges reasonable reliance on Qualcomm's promise to license on FRAND terms. (Compl. ¶ 85.) Broadcom further alleges that Qualcomm's FRAND commitments were a promise upon which Broadcom could be expected to and did, in fact, rely. (*Id.* ¶¶ 193-94.) No more is required.

Finally, Qualcomm's argument that it did not make a "clear and definite promise" when it agreed to license on FRAND terms is wrong as a matter of fact and certainly inappropriate for a motion to dismiss. Indeed, when presented with a nearly identical promise to license on FRAND terms, the court in *ESS Technology* held that it "easily" could determine the meaning of the promise by looking at the customary practices of the defendant and the relevant industry but that such an inquiry into factual matters "would be outside the scope of the pleadings." 1999 WL 33520483 at *4.[34] *See also supra* Section II.A.4 (discussing judicial enforceability of FRAND commitment).

---

[34] The sole case that Qualcomm advances, *Watson v. City of Salem*, 934 F. Supp. 643 (D.N.J. 1995), was decided at the summary judgment stage, not on a motion to dismiss. Moreover, later courts have rejected the doctrinal underpinning of what Qualcomm advances as "the sine qua non" of promissory estoppel – a "clear and definite promise by the promisor" (*see* Def.'s Mem. at 49). *See, e.g., Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc.*, 307 N.J. Super. 461, 472, 704

**B.    The Complaint's Specific Identification of Qualcomm's FRAND Commitments to SDOs, Qualcomm's Bad Faith, the SDOs' Reliance, and the Effect of Qualcomm's Broken Promises State a Claim for Fraud.**

Despite Broadcom's detailed allegations regarding the fraudulent statements that Qualcomm made to the SDOs in which it committed to licensing its patents on FRAND terms, Qualcomm argues that Broadcom's fraud claims should be dismissed because (1) Broadcom's pleading lacks the requisite particularity, and (2) FRAND commitments cannot support fraud claims as a matter of law.  Qualcomm is wrong on both counts, and the court should deny its motion to dismiss Broadcom's fraud claim (Thirteenth Claim for Relief).

**1.    Broadcom's Fraud Claim Is Pled with Sufficient Particularity to Satisfy Fed. R. Civ. P. 9(b).**

Broadcom has pled its fraud claim with the requisite particularity.  Contrary to the implications of Qualcomm's position, a fraud claim need neither "describe the precise words used" nor pinpoint the "date, place or time" of the fraud, because such requirements represent "too narrow an approach and fail[] to take account of the general simplicity and flexibility contemplated by the rules." *Christidis v. First Penn. Mortgage Trust*, 717 F.2d 96, 100 (3d Cir. 1983).  Rather, a plaintiff may satisfy the pleading requirements of Fed. R. Civ. P. 9(b) in *either* one of two ways:  (1) by describing the "date, place, or time" of the fraud, *or* (2) through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).  Qualcomm essentially ignores the alternative second means of meeting the Rule 9(b) requirement. *See also United States v. Metzinger*, No. Civ. A. 94-7520, 1996 WL 412811, at *5 (E.D. Pa. July 18, 1996) ("The Rule 9(b) standard . . . is 'a generous one.'").

---

A.2d 1321, 1326 (N.J. Super. Ct. App. Div. 1998) ("the strict adherence to proof of a 'clear and definite promise' as discussed in *Malaker* [on which *Watson* relied] is being eroded by a more equitable analysis designed to avoid injustice").

Broadcom's extensive allegations of Qualcomm's fraudulent commitments to the SDOs
to license on FRAND terms satisfy the requirement to provide "precision and some measure of
substantiation." Broadcom's complaint sets forth *what* the fraudulent statements were
("representations . . . that it [Qualcomm] would license any of its essential WCDMA patents on
FRAND terms" (Compl. ¶ 84)), *who* made them (Qualcomm), *to whom* (the SDOs), *how*
Qualcomm made them ("repeated and express written representations" (*id.*)), *when* Qualcomm
made them ("as the UMTS standard was being developed" (*id.* ¶¶ 84, 41)), and *why* Qualcomm
made them ("in order to secure the inclusion of the WCDMA technology to which Qualcomm
purports to hold essential patents included in the UMTS standard" (*id.* ¶ 84)).[35] Broadcom's
complaint likewise provides ample allegations of the wrongdoing engaged in by Qualcomm.
Specifically, Qualcomm (1) represented to the SDOs and to the public that if its patented
technology was incorporated into the UMTS standard, it would license that technology to all
practitioners of the standard on FRAND terms (*id.* ¶ 197), (2) Qualcomm had no intent to do so
(*Id.* ¶ 198), (3) Qualcomm intended to induce reliance on its representations (*id.*), and (4)
Broadcom and others, including the SDOs reasonably relied on Qualcomm's representations to
their detriment (*id.* ¶¶ 199-200). From those allegations, Qualcomm knows exactly what
statements are at issue – the statements wherein Qualcomm committed to the SDOs and the

---

[35] Broadcom is not, of course, required to identify the specific individual at Qualcomm who
made the fraudulent statements nor the specific individuals at the SDOs who received them.
Organizational identity is enough. *See, e.g., In re Ann Taylor Stores Securities Litig.*, 807 F.
Supp. 990, 1005 (S.D.N.Y. 1992) ("Furthermore, identification of statements made by, or on
behalf of, a corporate defendant . . . satisf[ies] Rule 9(b)."); *AAR International, Inc. v. Vacances
Heliades S.A.*, 202 F. Supp. 2d 788, 800 (N.D. Ill. 2002) ("where the only defendant is a
corporation or institution, the institutional identity of the caller, viz. that she or he was from the
corporate defendant, is what matters" (internal quotation marks and alterations omitted)); *SEC v.
Park*, 99 F. Supp. 2d 889, 901 (N.D. Ill. 2000) (denying a motion to dismiss because identifying
the organizational affiliation of the defrauded "reasonably notif[ies] the defendants of their
purported role in the scheme").

industry to license its intellectual property that it said was "essential" to practicing the UMTS
standard on FRAND terms.

Courts in this Circuit repeatedly have denied motions to dismiss fraud claims that were
alleged with substantially *less* detail than found in Broadcom's complaint. *See, e.g. Tumi, Inc. v.
Excel Corp.*, No. 05-0477 (WJM), 2005 WL 1828593, at *4-5 (D.N.J. Aug. 1, 2005) (allegations
limited to existence of contract and averment that defendant had no intention to abide by it);
*Little Souls Inc. v. State Auto Mut. Ins., Co.*, No. Civ.A. 03-5722, 2004 WL 503538, at *3 (E.D.
Pa. Mar. 15, 2004) (allegations that insurance company "marketed itself as a trustworthy and
reliable insurer that will promptly and fairly evaluate and pay claims, but actually had a
corporate policy to pay as little and as late as it can"); *Resource Ventures, Inc. v. Resources
Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 441 (D. Del. 1999) (allegations that defendants defrauded
plaintiff "by concealing the actual assets and proceeds of the business," "misrepresenting the
assets and proceeds of the business," and "made other misrepresentations"); *Mannkraft Corp. v.
Bearman*, CIV. A. No. 88-2997, 1988 WL 124720, at *2-3 (D.N.J. 1988) (mail and wire fraud
claim allowed to go forward despite plaintiff's failing "to set out who sent documents through
the mail or made wire communications, what documents were sent, and when such documents or
wire communications were transmitted"); *see also Carter Footwear, Inc. v. Graystone World-
Wide, Inc.*, 189 F.R.D. 328, 330 (M.D. Pa. 1999) (claims against individual defendants based
simply on their positions within a corporate defendant, despite lack of specific allegations about
their role in the alleged fraudulent scheme).

### 2. Qualcomm Cannot Evade Liability for Fraud by Calling Its FRAND Commitments Unenforceable.

Qualcomm's argument that FRAND commitments cannot support a fraud claim as a
matter of law because the meaning of FRAND is not sufficiently definite (Def.'s Mem. at 14-17)

is wrong. Under Qualcomm's conception, it could (as Broadcom alleges it did here) make FRAND commitments with no intention of following through on them, without regard to the reliance that others in the industry, including Broadcom, placed on them. *See also supra* Section II.A.4 (discussing judicial enforcement of FRAND commitment).

Qualcomm's reliance on *Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004), is misplaced. In *Lum*, class action plaintiffs asserted RICO claims against a number of large banks related to the banks' practices of soliciting borrowers on the basis that the interest rate that the banks would charge would be related to the "prime rate." The plaintiffs contended the term "prime rate" should be interpreted to mean the rate charged to the banks' best commercial customers, based not on anything that the plaintiffs were told, but rather on an alleged "common understanding." The banks professed a different interpretation of "prime rate," including a definition in some of their written materials that the plaintiffs contended were fraudulent. When the banks sent out routine credit card statements and like documents through the mails, plaintiffs alleged, they committed mail fraud, providing the predicate acts for claims under the RICO statute.[36]

The pivotal circumstances upon which the Third Circuit based its decision in *Lum* are missing here. In particular, the court found that the term "prime rate" was defined in the supposedly fraudulent statements in a way that *was consistent* with how it was applied and, as such, there could be no fraud. 361 F.3d at 227. Plaintiffs tried to avoid this obvious fatal flaw in their case by arguing that, despite the definition in the actual supposedly fraudulent statement,

---

[36] It "has been demonstrated in numerous judicial decisions" that federal courts "have shown a tendency to be more demanding in their application of Rule 9(b) for claims under the Racketeer Influenced and Corrupt Organizations Act (RICO Act), particularly with regard to pleading the predicate acts for claims of extortion and wire and mail fraud." 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1297 (3d ed. 2005). Broadcom does not assert RICO claims and thus should not be held to the standard employed in RICO cases.

the banks committed fraud because plaintiffs alleged they had a different definition in mind. The Third Circuit properly rejected that farcical argument. *Id.* at 226-27. In doing so, the court noted that the argument made particularly little sense in light of ambiguity over the term "prime rate" as used in common practice. *Id.* at 226.

The Third Circuit certainly did not – as Qualcomm would argue – hold that fraud is impossible just because there is more than one reasonable interpretation of the commitment upon which the fraudster has reneged. So, for example, in *Lum*, had the banks offered credit cards at the "prime rate," intending all along to charge rates that were not consistent with the definition in their correspondence with their customers and then did so, that would be fraud. Similarly, had the agreement not defined "prime rate" at all and the banks, intending all along to charge rates that were wildly out of line with any reasonable interpretation of the term "prime rate," then did so, that would be fraud as well.

Those were not the facts of *Lum,* but they are the facts here. Broadcom alleges that Qualcomm, having promised – through active misrepresentations and falsehoods to the SDOs – to license on "fair, reasonable, and non-discriminatory terms," instead intended all along to license on terms that are "unfair," "unreasonable," and quite clearly "discriminatory." (*E.g.* Compl. ¶¶ 3, 13, 82-111.) Whether Qualcomm did so or not is a factual dispute that cannot be resolved on a motion to dismiss under Rule 12(b)(6). The Court accordingly should deny Qualcomm's motion to dismiss Broadcom's fraud claim, specifically its Thirteenth Claim for Relief.

## C. The Complaint's Allegations that Qualcomm's Actions Have Interfered with Broadcom's Sales of UMTS Chipsets to Handset Manufacturers State Claims for Tortious Interference.

Qualcomm concedes that, if Broadcom has stated a claim under the federal antitrust laws, it has likewise stated claims for tortious interference, regardless of whether New Jersey or

California law is applied. (*See* Def.'s Mem. at 48-49.) As demonstrated above, Broadcom has stated such claims. Therefore, Qualcomm's motion to dismiss Broadcom's tortious interference claims (Tenth Claim for Relief) should be denied.

Qualcomm is wrong, however, to limit the inquiry to California law. As alleged in the complaint, several of the customers at issue are located in New Jersey, and New Jersey law may therefore apply to one or more of the related tortious interference claims. (Compl. ¶ 29.) It is premature at this stage of the proceedings to decide which jurisdictions' law will apply, and Broadcom is entitled to the benefit of any doubt. *See, e.g., First Wall St. Capital Corp. v. Int'l Prop. Corp.*, No. 97 Civ. 0702(JGK), 1998 WL 823619, at *7 (S.D.N.Y. Nov. 25, 1998) (denying motion to dismiss where law of one of the two plausible jurisdictions allowed claim to go forward but other did not); *Employers Mut. Cas. Co. v. Key Pharms., Inc.*, No. 91 Civ. 1630 (LBS), 1992 WL 8712, at *8 (S.D.N.Y. Jan. 16, 1992) (finding that facts relevant to determining choice of law were disputed by the parties and thus declining to decide choice of law issue until completion of discovery).

The choice-of-law question may have some relevance here, because, as Qualcomm acknowledges (Def.'s Mem. at 48), under New Jersey law, there is no requirement that the plaintiff allege that the defendant engaged in independently wrongful conduct. Rather, "[t]o establish a cause of action for tortious interference with a prospective economic advantage, a plaintiff must prove that he had a reasonable expectation of advantage from a prospective contractual or economic relationship, that defendant interfered with this advantage intentionally and without justification or excuse, that the interference caused the loss of the expected advantage, and that the injury caused damage." *Patel v. Soriano*, 369 N.J. Super. 192, 242, 848 A.2d 803, 831 (N.J. Super. Ct. App. Div. 2004); *see also Syncsort, Inc. v. Innovative Routines*

51

*Int'l, Inc.*, No. Civ. 04-3623(WHW), 2005 WL 1076043, at *11 (D.N.J. May 6, 2005) (denying motion to dismiss tortious interference claims in part because antitrust claims were stated and noting, "to the extent [counter-defendant] argues that its purpose was to advance its own interest in competing with defendant, that argument is more properly the subject of a motion for summary judgment rather than a motion to dismiss."). Broadcom's allegations meet the pleading requirement under New Jersey law independently of its antitrust claims. (*See* Compl. ¶¶ 185-86.) Thus, regardless of whether Broadcom adequately has pled antitrust claims, it alleges a claim for tortious interference under New Jersey law.

## CONCLUSION

For the foregoing reasons, Broadcom respectfully requests that the Court deny Qualcomm's motion to dismiss in its entirety.

Dated:  January 17, 2006

Respectfully submitted,

DAVID S. STONE (DSS-8580)
Boies, Schiller & Flexner LLP
150 John F. Kennedy Memorial Parkway
Short Hills, NJ 07078
(973) 218-1111

Counsel for Plaintiff Broadcom Corporation

Of Counsel:

Boies, Schiller & Flexner LLP
David Boies
David A. Barrett
Steven C. Holtzman
Scott E. Gant
Damien J. Marshall
Kieran P. Ringgenberg
570 Lexington Avenue
New York, NY 10022
(212) 446-2300
Fax: (212) 446-2350

Cleary Gottlieb Steen & Hamilton LLP

George S. Cary
Mark W. Nelson
Steven J. Kaiser

2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500
Fax: (202) 974-1999

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that the foregoing Plaintiff's Opposition to

Defendant's Motion to Dismiss, and the accompanying Certification of Gerald C.

Robinson, were served this 17th day of January, 2006, as follows:

## VIA FACSIMILE AND FIRST CLASS MAIL:

William J. O'Shaughnessy, Esq.
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102-4056
Fax: 973.624.7070

David R. Marriott, Esq.
Evan R. Chesler, Esq.
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
Fax: 212.474.3700

David S. Stone