Boies, Schiller & Flexner LLP
150 John F. Kennedy Parkway
Short Hills, NJ 07078
(973) 218-1111
Fax: (973) 218-1106
David S. Stone (DSS 8580)

Counsel for Plaintiff BROADCOM CORPORATION

Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500
Fax: (202) 974-1999

Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, NY 10022
(212) 446-2300
Fax: (212) 446-2350

Of Counsel

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BROADCOM CORPORATION, | CIVIL ACTION NO. 05-3350 |
| Plaintiff, | |
| v. | **CERTIFICATION OF**<br>**GERALD C. ROBINSON** |
| QUALCOMM INCORPORATED, | |
| Defendant. | |

I, Gerald C. Robinson, declare:

1. I am an attorney duly admitted to practice before the United States District Court for

the District of New Jersey. I am counsel to the firm of Boies, Schiller & Flexner LLP, attorneys

for plaintiff, Broadcom Corporation, Inc., and am familiar with the matters stated herein. I

- 1 -

submit this Certification in connection with Plaintiff's Opposition to Defendant's Motion to Dismiss.

    2.  Attached hereto for the convenience of the Court are true and correct copies of the following unpublished court decisions and other printed matter not readily available, all of which are cited in Defendant's Opposition to Defendant's Motion to Dismiss:

Exhibit A: *Ansel C'ns., Inc. v. Novell, Inc.*, No. C-97-21088, 1999 WL 33302368 (N.D. Cal. March 24, 1999);

Exhibit B: *Barrett v. United States Banknote Corp.*, No. 7420 (RPP), 1992 WL 232055 (S.D. N.Y. Sept. 2, 1992);

Exhibit C: *Brotech Corp. v. White Eagle International Tech. Group, Inc.*, No. Civ. A. 03-232, 2004 WL 1427136 (E.D. Pa. 2004);

Exhibit D: *Employers Mutual Casualty Co. v. Key Pharms., Inc.*, 91 Civ. 1630, 1992 WL 8712 (S.D.N.Y. Jan. 16, 1992);

Exhibit E: *ESS Technology, Inc. v. PC-Tel, Inc.*, No. C-99-20292 RMW, 1999 WL 33520483 (N.D. Cal. Nov. 4, 1999);

Exhibit F: *First Wall Street Capital Corp. v. Int'l Property Corp.*, No. 97 Civ. 0702(JGK), 1998 WL 823619 (S.D.N.Y. Nov. 25, 1998);

Exhibit G: *Fresh Made, Inc. v. Lifeway Foods, Inc.*, No. Civ. A. 01-4254, 2002 WL 31246922 (E.D. Pa. Aug. 9, 2002);

Exhibit H: *E&G Gabriel Brothers v. Gabriel Brothers, Inc.*, No. 93 Civ. 0894 (PKL), 1994 WL 369147 (S.D.N.Y. July 13, 1994);

Exhibit I: *Little Souls, Inc. v. State Automobile Mutual Insurance Co.*, No. Civ.A. 03-5722, 2004 WL 503538 (E.D. Pa. Mar. 15, 2004);

Exhibit J: *Mannkraft Corp. v. Bearman*, Civ. A. No. 88-2997, 1988 WL 124720 (D.N.J. 1988);

Exhibit K: *Medtronic Avenue, Inc. v. Boston Scientific Corp.*, No. Civ. A. 98-478-SLR, 2001 WL 652016 (D. Del. March 30, 2001);

Exhibit L: *Microbyte Corp. v. New Jersey State Golf Ass'n.*, Civ.A.No. 84-949, 1986 WL 7231, at *5 (D.N.J. June 26, 1986);

Exhibit M: *In re Microsoft Antitrust Litigation*, No. MDL 1332, Civ. JFM-05-1087, 2005 WL 1398643 (D. Md. June 10, 2005);

Exhibit N: *In re Pabst Licensing, GMBH Patent Litigation*, No. Civ. A. 99-3118, 2000 WL 1145725 (E.D. La. Aug. 11, 2000);

Exhibit O: *Smith & Johnson, Inc. v. Hedaya Homes Fashions Inc.*, No. 96 Civ. 5821 MBM, 1996 WL 737194 (S.D. N.Y. Dec. 26, 1996);

Exhibit P: *Smith-Cook v. National R.R. Pass. Corp.*, No. 05-00880, 2005 WL 3021101 (E.D. Pa. Nov. 10, 2005);

Exhibit Q: *Surya Systems, Inc. v. Sunku*, No. Civ. A. 05-146, 2005 WL 1514225 (E.D. Pa. June 24, 2005);

Exhibit R: *Syncsort, Inc. v. Innovative Routines International, Inc.*, No. Civ 04-3623 (WHW), 2005 WL 1076043 (D.N.J. May 6, 2005);

Exhibit S: *Townshend v. Rockwell International Corp.*, No. C99-04005BA, 2000 WL 433505 (N.D. Cal. Mar. 28, 2000);

Exhibit T: *Tumi v. Excel Corp.*, No. 05-0477 (WJM), 2005 WL 1828593 (D.N.J. Aug. 1, 2005);

Exhibit U: *U.S. Horticultural Supply, Inc. v. Scotts Co.*, No. Civ. A. 03-773, 2004 WL 1529185 (E.D. Pa. Feb. 18, 2004);

Exhibit V: *United States v. Dentsply International, Inc.*, Nos. Civ. A. 99-005-SLR, 99-225-SLR, 99-854-SLR, 2001 WL 624807 (D. Del. March 30, 2001);

Exhibit W: *United States v. Metzinger*, No. Civ. A. 94-7520,1996 WL 412811 (E.D. Pa. July 18, 1996);

Exhibit X: *In re Union Oil Co. of California*, No. 9305, 2004 WL 1632816 (F.T.C. July 6, 2004);

Exhibit Y: U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual property* (1995);

Exhibit Z: R. Hewitt Pate, Assistant Attorney General, Antitrust Division, U.S. Department of Justice, *Competition and Intellectual Property in the U.S.: Licensing Freedom and the Limits of Antitrust,* 2005 EU Competition Workshop (June 3, 2005);

Exhibit AA:  Irwin Jacobs, Remarks at Q1 2005 QUALCOMM Inc. Earnings Conference
Call (Jan. 19, 2005)(LEXIS-NEXIS, Fair Disclosure Wire Library, Transcript
No. 011905an.727); and

Exhibit BB:  Charles James, Opening Day Comments at Joint DOJ-FTC Hearings on
Competition and Intellectual Property Law and Policy in the Knowledge-Based
Economy (Feb. 6, 2002)(available at
http://www.ftc.gov/opp/intellect/james.htm).

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 17, 2006

Gerald  C. Robinson

# EXHIBIT A



Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 1999 WL 33302368 (N.D.Cal.)
**(Cite as: 1999 WL 33302368 (N.D.Cal.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. California.
ANSEL COMMUNICATIONS, INC., Plaintiff,
v.
NOVELL, INC., Defendant.
NOVELL, INC., Counterclaim Plaintiff,
v.
ANSEL COMMUNICATIONS, INC., et al. Counterclaim
Defendants.
and
RELATED THIRD PARTY CLAIMS. Third-Party
Defendants
**No. C-97-21088RMWENE.**

March 24, 1999.
Shelley K. Wessels, Mark A. Lemley, Fish & Richardson,
Menlo Park, CA, Maxwell M. Blecher, Harold R. Collins,
Blecher & Collins, Los Angeles, CA, for Plaintiff.

Robert T. Haslam, Heller, Ehrman, White & McAuliffe,
Palo Alto, CA, Brian J. Romriell, Gregory M. Hess, Parr,
Waddoups, Brown, Gee & Loveless, Salt Lake City, UT, for
Defendant.

Mark J. Slater, Bernard C. Shek, Sheppard, Mullin, Richter
& Hampton, San Francisco, CA, Arthur V. Plank, Jon
Michaelson, Hopkins & Carley, San Jose, CA, Eric Houser,
Jeffrey Allison, Malcolm, Cisneros & Houser, Irvine, CA,
for Third-Party Defendants.

ORDER DENYING BOTH PARTIES' CROSS-MOTIONS
FOR SUMMARY ADJUDICATION OF ANSEL'S
SECOND CLAIM FOR RELIEF
WHYTE, J.

**\*1** Plaintiff and counterclaim defendant Ansel
Communications, Inc.'s ("Ansel") [FN1] and defendant and
counterclaim plaintiff Novell, Inc.'s ("Novell")
cross-motions for summary judgment were heard on
December 4, 1998. The court has read the moving and
responding papers and heard the oral argument of counsel.
For the reasons set forth below, the court denies the
motions.

FN1. "Ansel" for the purposes of this order refers
to all counterclaim defendants except Ben Lau.

I. BACKGROUND
Novell is a computer software developer and supplier which
owns and distributes network operating system software
including that known as NetWare®. Novell distributes
NetWare through authorized dealerships, original equipment
manufacturers ("OEMs"), and authorized resellers, who
enter into agreements with Novell regarding the distribution
of NetWare and other Novell software. On October 23,
1996, Ansel executed a standard OEM agreement with
Novell. Ansel thus became an authorized OEM of Novell's
products. In its First Amended Complaint, Ansel asserts a
claim under the Robinson-Patman Act alleging that Novell
unlawfully discriminates in its sale of Novell products to
OEMs, distributors and resellers.

The issue presented by the current cross-motions for
summary judgment is whether Novell's agreements with its
authorized OEMs, distributors and resellers involve the sale
of "commodities" as that term is used in the
Robinson-Patman Act.

II. LEGAL STANDARD FOR SUMMARY JUDGMENT
Summary judgment is proper if the record indicates there is
no genuine issue of material fact and the moving party is
entitled to judgment as a matter of law. Fed.R.Civ.P. §
56(c). A genuine issue of material fact exists only when "the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party." Anderson v. Liberty Lobby, Inc.,
106 S.Ct. 2505, 2510 (1986). Rule 56(c) mandates the entry
of summary judgment against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will
bear the burden of proof at trial. Celotex Corp. v. Catrett,
106 S.Ct. 2548, 2552-53 (1986). The nonmoving party must
reference specific facts to create a triable issue of fact. T.W.
Elec. Serv. v. Pacific Elec. Contractors, 809 F.2d 626, 630
(9th Cir.1987). The court views all evidence in a light most
favorable to the nonmoving party. Masson v. New Yorker
Magazine, Inc., 111 S.Ct. 2419, 2434- 35 (1991). However,
"the mere existence of a scintilla of evidence in support of
the plaintiff's position will be insufficient; there must be
evidence on which the jury could reasonably find for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33302368 (N.D.Cal.)
**(Cite as: 1999 WL 33302368 (N.D.Cal.))**

plaintiff." _Anderson, 106 S.Ct. at 2512._ Credibility determinations, weighing evidence, and drawing inferences are jury functions, not those of a judge deciding a motion for summary judgment. _Liberty Lobby, 106 S.Ct. at 2513._ The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in its favor. _Id._ Moreover, the Ninth Circuit disfavors the use of summary judgment in anti-trust litigation. _May Dept. Store v. Graphic Process Co., 637 F.2d 1211, 1214 (9th Cir.1980)._

III. ANALYSIS

**\*2** The Robinson-Patman Act (the "Act") prohibits price discrimination with respect to sales of commodities of like grade and quantity. _15 U.S.C. § 13(a)._ While undefined by the Act, courts have interpreted "commodities" to mean tangible goods and not services. _May Department Store v. Graphic Process Co., 637 F.2d 1211, 1214-15_ (9 th Cir.1980). The Ninth Circuit has adopted the "dominant nature" standard for determining if a contract represents the sale of a service or a tangible good. _Id. at 1215._ Under this standard, a determination of whether the contract represents a sale of tangible goods, or a service, right or privilege depends on the dominant nature of the transaction between the parties. _Id.; see also Tri-State Broadcasting Co. v. United Press Intern., 369 F.2d 268, 269-70_ (5 th Cir.1966). Tangible elements of a transaction may not transform it into the sale of a commodity if it is truly the transfer of a right, privilege or service. _Aviation Specialties, Inc. v. United Technologies Corp., 568 F.2d 1186, 1191_ (5 th Cir.1978)(contract for engine repair represented a service despite the transfer of a significant amount of engine parts); _see also Kennedy Theater Ticket Service V. Ticketron Inc., 342 F.Supp. 922, 926-27 (E.D.Penn.1972)_(holding that the sale of a theater ticket represented a license to use the seat, rather than a sale of a commodity). Moreover, the mere form of a contract will not be given controlling effect if the substance of the transaction brings it within the ambit of the anti-trust laws. _Tri-State Broadcasting 369 F.2d at 269-70._

The court in _May Dept. Store_ recognized the difficulty of applying the dominant nature test to some factual circumstances and concluded that summary judgment was inappropriate without a clear showing that a particular transaction involved either the sale of a tangible good or the

sale of a service or a license. _May Dept. Store, 637 F.2d at 1215-16_ (reversing summary judgment in favor of defendants and holding that defendant did not satisfy its burden of showing that, as a matter of law, the transaction constituted the sale of a service).

Novell argues that it licenses the right to use, and does not sell, its software. Novell states that all authorized distributors, OEMs and authorized resellers enter into distribution agreements, which require that these customers respect Novell's intellectual property rights and that they distribute the software only in accordance with Novell's policies and procedures. Novell claims that these agreements expressly provide that Novell merely grants a license to market its software and that end-users are only granted a non-exclusive, non-transferable right to use the software. Novell asserts that the license agreements explicitly state that no ownership rights in the software are transferred to the resellers, OEMs, distributors or end-users. Moreover, Novell claims that before a prior end-user can obtain upgraded NetWare software, the end-user must sign an authorized reseller or OEM upgrade agreement which expressly states that the transaction constitutes a license to use NetWare, not a sale of the software. Novell concludes that these agreements establish that the software transactions in question should be considered licenses and not sales of commodities under the Robinson-Patman Act.

**\*3** Novell further argues that the incidental use of tangible materials, such as disks and packaging, does not transform the license to use intangible intellectual property into a tangible commodity pursuant to the Act. In support of its position, Novell explains that no tangible materials are needed to use its products, since the software can be easily downloaded via the Internet. Thus, Novell claims that the insignificant tangible portions of it products, the disks and packaging, should not change the nature of the transaction.

Ansel counters that Novell treats its software transactions as sales, not licenses. Ansel cites various portions of the different agreements in which Novell characterizes the distribution of the software as "sales." Specifically, Ansel refers to the OEM License Agreement Credit Application that states that the OEM is "engaged in the business of selling" the "tangible personal property described herein."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Ansel also provides various correspondence from Novell in which Novell states that the software transactions are "outright purchases" and that Ansel was granted the "rights to resell Novell product." Furthermore, Ansel points to frequent references to purchasing or acquiring property throughout the OEM Agreement. Ansel concludes that based on these and other representations, Novell treats the distribution of its software as sales of tangible goods, and that the dominant nature of these transactions constitutes sales of commodities subject to the provisions of the Robinson-Patman Act.

Neither party has carried its burden of showing as a matter of law the dominant nature of the transactions between them. The case presents a factual question which is not suitable for summary adjudication. *See May Department Store,* 637 F.2d at 1215-16.

Ansel also asserts that Novell is collaterally estopped from arguing that its transactions with Ansel do not represent sales of tangible goods pursuant to the Robinson-Patman Act based upon the district court decision in *Novell v. Network Trade Center, Inc.,* Civil No. 2:95CV523G (D.Utah 1999)(*"NTC* case"). The use of collateral estoppel requires that (1) the issue in the second case be identical to the one in the prior litigation. (2) the issue was actually litigated in the prior litigation by the party against whom the issue preclusion is sought; and (3) the determination of the issue in the prior litigation was a critical and necessary part of the earlier action. *Clark v. Bear Sterns & Co., Inc.,* 966 F.2d 1318, 1320 (9th Cir.1992). Ansel, as the party asserting collateral estoppel, bears the burden of proving that the issues decided in the previous litigation are identical to the issues in the current litigation. *Little v. United States,* 794 F.2d 484, 487 (9th Cir.1986).

Ansel offers the district court's finding in the *NTC* case that the transfer of the software from Novell to end-users represented sales of "goods" for U.C.C. purposes, and, thus, the "first sale" doctrine precluded Novell from asserting its copyright claims against the NTC defendants. However, the *NTC* court did not consider the terms of the OEM agreement with Ansel, the type of conduct in which Ansel allegedly engaged, and whether there was a sale of commodities under the Robinson-Patman Act. Therefore, Ansel has not

satisfied its burden of proving the identity of issues.

### IV. ORDER

*4 Based on the foregoing, the parties' respective motions for summary adjudication of Ansel's second claim for relief under the Robinson-Patman Act are denied.

Not Reported in F.Supp.2d, 1999 WL 33302368 (N.D.Cal.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



Not Reported in F.Supp.                                                                        Page 1
Not Reported in F.Supp., 1992 WL 232055 (S.D.N.Y.), 1992-2 Trade Cases P 69,956
**(Cite as: Not Reported in F.Supp.)**

Briefs and Other Related Documents

United States District Court, S.D. New York.
William BARRETT, Plaintiff,
v.
UNITED STATES BANKNOTE CORPORATION
and Christie, Manson & Woods International, Inc.,
Defendants.
**No. 7420 (RPP).**

Sept. 2, 1992.

Sacks Montgomery, P.C. by Scott D. St. Marie, New York City, for plaintiff.
Weil, Gotshal & Manges by Jeffrey S. Klein, New York City, for defendant U.S. Banknote Corporation.
Hughes Hubbard & Reed by Norman C. Kleinberg, New York City, for defendant Christie, Manson & Woods, Int.

OPINION AND ORDER

ROBERT P. PATTERSON, JR., District Judge.
*1 Defendants United States Banknote Corporation ("U.S. Banknote") and Christie, Manson & Woods, International, Inc. ("Christie's") move (1) pursuant to Rules 13(f) and 15(a) of the Federal Rules of Civil Procedure for leave to assert counterclaims against Plaintiff, and (2) pursuant to Rules 13(h) and 20 of the Federal Rules of Civil Procedure for leave to join an additional party as a counterclaim defendant. For the reasons set forth below, the motion to file counterclaims is granted in part and denied in part; the motion to join an additional party as a counterclaim defendant is granted.

BACKGROUND

Plaintiff William Barrett is a Canadian citizen and president of William Barrett Numismatics Limited ("Barrett Numismatics"), a corporation organized and existing under Canadian law. Defendant U.S. Banknote is a New York corporation and parent of American Bank Note Company ("ABN"), which is engaged in the business of printing currency, stocks, bonds, food stamps, and postage stamps. Defendant Christie's is a New York corporation that conducts public auctions of works of art.

On November 28 and 29, 1990, Christie's held an auction ("November auction"), at which items from ABN's archives, including old and rare bank notes, were sold. At the November auction, Plaintiff submitted successful bids totalling over $1.5 million, which Christie's accepted as agent for U.S. Banknote. On June 5, 1991, Christie's held another auction ("June auction"), which involved the sale of additional items from the ABN archives.

On October 1, 1991, Plaintiff filed a complaint alleging breach of contract and breach of warranty against U.S. Banknote, and alleging intentional misrepresentation against Christie's. Plaintiff based his claims upon alleged misrepresentations made by Defendants concerning the nature and uniqueness of the notes he purchased in the November auction. Defendants filed answers on December 20, 1991.

On April 13, 1992, after discovery had commenced, Defendants moved for leave to amend their answers in order to assert the following counterclaims: (1) violation of the Sherman Act, 15 U.S.C. § 1; (2) violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340; (3) tortious interference with business and economic relationships; (4) prima facie tort; (5) breach of contract; and (6) common law fraud. Defendants also moved to join Barrett Numismatics as a counterclaim defendant.

In the proposed amendment to their answers, Defendants allege that Plaintiff, together with individuals who are not parties to this action, unlawfully conspired and cooperated to restrain trade, fix prices, and stifle competitive bidding with respect to the bank notes auctioned at the November auction. Def. Notice of Mot., Exh. C ("Exh. C"), ¶ 16. Specifically, Defendants allege that Plaintiffs and these other individuals (1) shared information prior to auction relating to how much each was prepared to bid for each lot; (2) agreed to divide up purchased lots among themselves and to refrain from bidding against each other; (3) distributed savings from their collusive actions among themselves; and (4) shared commissions for monies earned upon resale of items purchased at the November auction. Exh. C, ¶ 19.

*2 Defendants allege that these activities constitute violations of 15 U.S.C. § 1 (Sherman Act § 1) (Claim I) and N.Y.Gen.Bus.Law § 340 (Donnelly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1992 WL 232055 (S.D.N.Y.), 1992-2 Trade Cases P 69,956
(Cite as: Not Reported in F.Supp.)

Act) (Claim II).

In their third proposed counterclaim, Defendants allege that, by engaging in this scheme, Plaintiff intentionally interfered with Defendants' "existing and prospective business and economic relationships with registered bidders" who attended the November auction but did not participate in the alleged bidding scheme. Exh. C, ¶ 48 (Claim III). Defendants maintain that without such interference they would have "realized economic advantages and benefits from their relationships [with the registered bidders] in the form of higher bids for the lots being offered." *Id.*

Defendants' fourth proposed counterclaim asserts a claim of intentional injury without justification on the ground that Plaintiff engaged in the bid rigging scheme for the purpose of causing "injury to the business and property of counterclaim Plaintiffs." Exh. C, ¶ 51 (Claim IV).

Defendants further allege that, prior to bidding in the November auction, Plaintiff signed a Bidder Registration Form, in which he agreed to the conditions of sale for the November auction. One of these conditions was that "[t]he respective rights and obligations of the parties to the Conditions of Sale and the conduct of the auction shall be governed by the laws of the state in which the auction is held." Exh. C, ¶ 53. Defendants allege that Plaintiff's successful bids constituted binding contracts for sale of the items. Defendants claim that, by engaging in the unlawful and anticompetitive activities described above, Plaintiff "violated the covenant of good faith and fair dealing inherent in every contract in New York" and thereby breached his contracts with Defendants. Exh. C, ¶ 54 (Claim V).

Finally, Defendants allege that, by failing to disclose the bidding agreements and arrangements, Plaintiff is liable to Defendants for fraudulent concealment. Exh. C, ¶ 56 (Claim VI.)

Plaintiff opposes Defendants' motion to amend the answers on the ground that amendment would be futile because the proposed counterclaims could not overcome a motion to dismiss.

## DISCUSSION

## I. MOTION FOR LEAVE TO AMEND ANSWERS

Under Fed.R.Civ.P. 13(f), a pleader may assert a counterclaim by amendment when the pleader has failed to assert that claim' "through oversight, inadvertence, or excusable neglect, or when justice requires." Rule 13(f) should be read together with Fed.R.Civ.P. 15(a), which provides that leave to amend a pleading "shall be freely given when justice so requires." Leave to amend a pleading should be granted if the movant "has at least colorable grounds for relief," absent any undue delay, bad faith, or undue prejudice to the opposing party. *S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Building 1 Housing Dev. Fund Co.,* 608 F.2d 28, 42 (2d Cir.1979).

Leave to amend will not be granted under Rule 15(a), however, where there are no colorable grounds for the proposed claim-that is, where amendment would prove futile. *Foman v. Davis,* 371 U.S. 178, 182 (1962). The "colorable grounds" requirement mandates "an inquiry-comparable to that required by Fed.R.Civ.P. 12(b)(6) and 12(f)-as to whether the proposed amendments state a cognizable claim or defense." *CBS, Inc. v. Ahern,* 108 F.R.D. 14, 18 (S.D.N.Y.1985) (citation omitted). In sum, amendment is futile if a proposed claim could not withstand a motion to dismiss made pursuant to Fed.R.Civ.P. 12. *S.S. Silberblatt,* 608 F.2d at 42; *CBS,* 108 F.R.D. at 18.

**\*3** A claim will be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see Rapf v. Suffolk County of New York,* 755 F.2d 282, 290 (2d Cir.1985). A claim will also be dismissed under Fed.R.Civ.P. 12(f) when it is so "confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988).

Defendants argue that leave should be granted in this case because Defendants discovered the alleged scheme only after reviewing discovery documents produced by Plaintiff. Because Plaintiff does not contest this claim, the Court need only address whether each proposed counterclaim as pleaded presents colorable grounds for relief.

In determining whether a pleading should be dismissed for failure to state a claim, the court must accept the allegations in the complaint as true and construe all allegations in favor of the pleader. *See*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

_Scheuer v. Rhodes,_ 416 U.S. 232, 236 (1974); _Cruz v. Beto,_ 405 U.S. 319, 322 (1972). "It follows, then, that denial of a motion to amend based upon the asserted inadequacy of the proposed pleading is disfavored." _CBS,_ 108 F.R.D. at 19; _see Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,_ 760 F.2d 1347, 1366 (2d Cir.1985), _aff'd,_ 476 U.S. 409 (1986).


A. Sherman Act, 15 U.S.C. § 1

The Sherman Act provides in pertinent part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (1988). To state a claim under section one the Sherman Act, "a party must allege three elements: (1) a combination or conspiracy; (2) that results in a restraint on interstate or foreign commerce; and (3) injury to the plaintiff's business or property." _CBS,_ 108 F.R.D. at 28 (citing _Oreck Corp. v. Whirlpool Corp.,_ 639 F.2d 75, 78 (2d Cir.1980), _cert. denied,_ 454 U.S. 1083 (1981)). Mere conclusory allegations "of conspiracy or of injury under the antitrust laws without any supporting facts permit[ ] dismissal." _Heart Disease Research Found. v. General Motors Corp.,_ 463 F.2d 98, 100 (2d Cir.1972); _John's Insulation, Inc. v. Siska Constr. Co.,_ 774 F.Supp. 156, 163 (S.D.N.Y.1991).

Plaintiffs argue that Defendants fail to plead (1) restraint on commerce and (2) injury to Defendants.


1. Restraint On Commerce

Although the language of section one prohibits every "restraint of trade," courts have interpreted the Sherman Act to prohibit only those combinations which _unreasonably_ restrain trade. _Arizona v. Maricopa County Medical Soc.,_ 457 U.S. 332, 343 ((1982); _Apex Oil Co. v. DiMauro,_ 713 F.Supp. 587, 594 (S.D.N.Y 1989) (citing _Arizona,_ 457 U.S. at 343). When courts employ this rule of reason approach in antitrust cases, they ordinarily require the plaintiff to identify "the size of the relevant product and geographic markets, the amount of competition foreclosed, and how the acts of the defendants affected that competition." _Bustop Shelters, Inc. v. Convenience & Safety Corp.,_ 521 F.Supp. 989, 997 (S.D.N.Y.1981)).

*4 Certain types of conduct, however, are "so destructive of competition that they almost always

result in unreasonable restraints of trade" and are characterized as _per se_ violations of the Sherman Act. _Apex Oil Co. v. DiMauro,_ 713 F.Supp. 587, 595 (S.D.N.Y.1989); _see Continental T.V., Inc. v. GTE Sylvania, Inc.,_ 433 U.S. 36, 50 (1977); _Northern P.R. Co. v. United States,_ 356 U.S. 1, 5 (1958); _Copy-Data Systems, Inc. v. Toshiba America, Inc.,_ 663 F.2d 405, 408 (2d Cir.1981). The plaintiff who successfully alleges a _per se_ violation relieves himself of the requirement of showing anticompetitive effect: "_Per se_ violations do not require a showing of deleterious impact on competition. The acts involved are considered so repugnant to the policies underlying antitrust law that they create a presumption of anticompetitive effect." _Gianna Enter. v. Miss World Ltd.,_ 551 F.Supp. 1348, 1354 (S.D.N.Y.1982).

Plaintiff argues that Defendants' amendment should not be allowed because Defendants fail to allege the size and scope of the market and the impact of Plaintiff's alleged activities on the market. Defendants counter that (1) the complaint specifically alleges price fixing and bid rigging, (2) both activities constitute _per se_ violations of the Sherman Act, and (3) there is, therefore, no need to allege anticompetitive effect. _See_ Exh. C, ¶ 16. The Court finds Defendants' arguments more persuasive.

Price fixing and bid rigging generally constitute _per se_ violations of the Sherman Act. _See Broadcast Music, Inc. v. CBS,_ 441 U.S. 1, 9 (1979) ("As generally used in the antitrust field, "price fixing" is a shorthand way of describing certain categories of business behavior to which the _per se_ rule has been held applicable."); _United States v. Fischbach & Moore, Inc.,_ 750 F.2d 1183, 1192 (3d Cir.1984) ("[P]rice fixing and bid rigging are _per se_ violations" of the Sherman Act), _cert. denied,_ 470 U.S. 1029 (1985); _United States v. Koppers Co.,_ 652 F.2d 290, 293-94 (2d Cir.) (bid rigging "has been classified by courts as a _per se_ violation" of the Sherman Act), _cert. denied,_ 454 U.S. 1083 (1981).

Unlike bid rigging arrangements, however, not every price fixing agreement constitutes a _per se_ violation. _See National Collegiate Athletic Ass'n. v. Board of Regents_ 468 U.S. 85 (1984); _Broadcast Music,_ 441 U.S. at 9; _Apex Oil,_ 713 F.Supp. at 596-97. For example, the rule of reason rather than the _per se_ approach applies to price fixing schemes in cases involving either (1) "instances of constructive price-fixing, if the _purpose_ of the alleged conspiracy is not price-fixing, but prices are nevertheless effected by the challenged behavior," _Apex,_ 713 F.Supp. at 596,

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 232055 (S.D.N.Y.), 1992-2 Trade Cases P 69,956
(Cite as: Not Reported in F.Supp.)

or (2) markets in which price fixing is found necessary for the market to function efficiently, *see Broadcast Music,* 441 U.S. at 23, and *National Collegiate Athletic Ass'n,* 468 U.S. at 101 (*per se* approach held inapplicable where case "involve[d] an industry in which horizontal restraints on competition are essential if the product is to be available at all.").

*5 Plaintiff fails to show that similarly special considerations exist in the present case to warrant employing the rule of reason approach. Defendants specifically allege, moreover, that the purpose of the alleged conspiracy was price fixing: "Counterclaim Defendants and Co-conspirators embarked on a deliberate plan unlawfully to conspire ... and to fix prices." Exh. C, ¶ 16. Accordingly, the price fixing scheme alleged in this case, like Plaintiff's alleged bid-rigging arrangement, is a *per se* violation of section one of the Sherman Act. Defendants, therefore, have successfully pleaded restraint of commerce.

### 2. Injury to Pleader

The plaintiff who claims a violation of federal antitrust laws "must show more than a mere violation of the antitrust laws; it must also show an injury that is a direct result of anticompetitive behavior of the defendant." *Original Appalachian Artworks, Inc. v. Grenada Electronics, Inc.,* No. 85 Civ. 9064, 1986 W.L. 2402, *4 (S.D.N.Y. Feb. 20, 1986). Plaintiff argues that Defendants fail to allege any injury sustained as a result of the alleged collusive behavior. Specifically, Plaintiff maintains that, because Plaintiff submitted the highest bids, Defendants would have received a lower price for the items had they refused to sell them to Plaintiff.

Plaintiff, however, misconstrues the proposed counterclaim. Defendants' assertion that they would not have sold the items to Plaintiff relates to Defendants' fraud claim, Exh. C, ¶ 57, not Defendants' antitrust claim. In paragraphs 25, 27, 28, 38 and 40 of their proposed amended answers, Defendants allege that without a price fixing or bid rigging scheme bids would have been higher as the result of free competition among the alleged coconspirators.

Defendants have adequately plead restraint of commerce and injury from the alleged activities. Accordingly, leave to amend the answers to add Defendants' Sherman Act counterclaim is granted.

### B. Donnelly Act, N.Y. Gen. Bus. Law § 340

The Donnelly Act provides in pertinent part:
Every contract, agreement, arrangement or combination whereby ... competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state or may be restrained, ... is hereby declared to be against public policy, illegal and void.

N.Y. Gen. Bus. Law § 340 (McKinney 1988).

"[T]he Donnelly Act is patterned after the Sherman Act and governed by its standards." *Venture Technology, Inc. v. National Fuel Gas Co.,* 685 F.2d 41, 42 n. 1 (2d Cir.), *cert. denied,* 459 U.S. 1007 (1982); *R & G Affiliates, Inc. v. Knoll Int'l, Inc.,* 587 F.Supp. 1395, 1405 (S.D.N.Y.1984) (Weinfeld, J.); *Associates Capital Servs. Corp. v. Fairway Private Cars, Inc.,* 590 F.Supp. 10, 13 (E.D.N.Y.1982); *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 381 N.Y.S.2d 426 (1976). Thus, a complaint that fails to state a claim under the Sherman Act is unlikely to satisfy the requirements of the Donnelly Act. *Hsing Chow v. Union Central Life Ins. Co.,* 457 F.Supp. 1303, 1308 (E.D.N.Y.1978).

*6 Plaintiff argues that because Defendants' proposed amendment fails to state a claim under section one of the Sherman Act, it also fails to state a claim under the Donnelly Act. The Donnelly Act counterclaim is not dismissable on these grounds, however, if, as here, the proposed amendment successfully states a claim under the Sherman Act.

Plaintiff, citing *International Television Productions, Ltd. v. Twentieth Century-Fox Television Div.,* 622 F.Supp. 1532 (S.D.N.Y.1985), also argues that the proposed amendment fails to state a claim under the standards of the Donnelly Act itself. In *International Television,* the court dismissed a claim under the Donnelly Act for failing to allege anticompetitive effect and for failing to allege economic impact within New York State. Plaintiff contends that the current claim must be dismissed because Defendants similarly fail to allege anticompetitive effect or economic impact within the state of New York.

Defendants' counter that *International Television* is inapposite because its holding is expressly limited to violations "that [are] susceptible to analysis under the rule of reason" rather than *per se* violations of the

Not Reported in F.Supp.                                                                    Page 5
Not Reported in F.Supp., 1992 WL 232055 (S.D.N.Y.), 1992-2 Trade Cases P 69,956
(Cite as: Not Reported in F.Supp.)

Donnelly Act. *See id.* at 1540. This argument assumes, however, that Plaintiff's actions constitute a *per se* violation of the Donnelly Act. Yet "most Donnelly Act claims are analyzed under a rule of reason analysis." *Id.; see* 14 Julian O. von Kalinowski, *Antitrust Laws and Trade Regulation* § 164.01[1] (1992) ("Use of rule of reason analysis under the Donnelly Act has to a large extent precluded adoption of *per se* categories commonly employed under federal antitrust law."). Although not every New York state court agrees, *see People v. Elmhurst Milk & Cream Co.,* 116 Misc.2d 140, 455 N.Y.S.2d 473, 483-84 (Sup.Ct.1982) (agreement to fix or maintain prices, or to allocate customers to which distributor may sell is, without more, unreasonable restraint of trade which violates Donnelly Act), claims of price-fixing arising under the Donnelly Act generally also fall within the ambit of the rule of reason. *Kalinowski, supra,* § 164.01[1] (stating that in civil cases both horizontal and vertical price fixing arrangements challenged under the Donnelly Act are "judged by a rule of reason analysis").

When the rule of reason approach is employed to analyze a proposed claim, the claim "must allege an anticompetitive effect in the market in which Plaintiff competes." *International Television,* 622 F.Supp. at 1540 (citing *Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.,* 710 F.2d 87, 90 (2d Cir.1983)).

A reasonable inference of anticompetitive effect in New York can be made from Defendants' allegations in the proposed counterclaim. Specifically, the counterclaim alleges that: (1) the Defendants are New York corporations with their principal places of business in New York, Exh. C, ¶ ¶ 5, 6; (2) the alleged antitrust activities occurred in New York, Exh. C, ¶ ¶ 16, 19, 24, 25; and (3) the activities "directly and proximately suppress[ed] or reduc[ed] competition" at the auction which took place in New York, Exh. C, ¶ 37.

*7 Accordingly, leave to amend Defendants' answers to add the Donnelly Act counterclaim is granted.

### C. Interference with Business and Economic Relations

When claiming tortious interference with non-contractual business relations, a plaintiff must show "the defendant's interference with business relationships existing between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by means that are 'dishonest, unfair or in any other way improper.' " *PPX Enter., Inc. v Audiofidelity Enter., Inc.,* 818 F.2d 266, 269 (2d Cir.1987) (quoting *Martin Ice Cream Co. v. Chipwich,* 554 F.Supp. 933, 945 (S.D.N.Y.1983)); *Volvo N. Am. Corp. v. Men's Int'l. Professional Tennis Council.,* 857 F.2d 55, 74 (2d Cir.), *cert. denied,* 487 U.S. 1219 (1988).

Defendants already have plead the second element of this tort, for it "is beyond dispute that a conspiracy to unreasonably restrain trade ... would constitute improper means." *Martin,* 554 F.Supp. at 946.

Defendants do not allege facts, however, that indicate that Plaintiff interfered with Defendants' business relationships. Specifically, the proposed amended answers give no indication of the way in which the alleged collusive bidding practices prevented bidders not involved in the scheme from submitting higher bids. Defendants do not allege that Plaintiff coerced other bidders or otherwise tried to persuade other bidders not to bid. Indeed, according to Defendants' allegation, the existence of the scheme alone did nothing to prevent these other bidders from bidding. Finally, the proposed counterclaim refers only to business relationships between Defendants and "registered bidders ... who had no knowledge of and did not participate in [the] unlawful plan to restrain trade...." Exh. C., ¶ 48. It does not allege interference with Defendants' relationship with co-conspirators who might have made higher bids but for the alleged conspiracy. It is unclear, therefore, how Defendants would have gained economic advantages in the form of higher bids from their relationships with non-conspirators in the absence of the alleged scheme.

Because Defendants do not allege how the existence of the alleged bid rigging scheme in any way injured their relationships with other bidders, and because the Court is unable to conceive of a set of facts that would indicate such injury, leave to amend Defendants' answers to add a counterclaim alleging tortious interference with business and economic relationships is denied.

### D. Intentional Injury

In New York, a general intentional tort has the following elements: (1) the intentional infliction of harm, (2) special damages, (3) lack of excuse or justification, and (4) illegal and corrupt means. *Chen*

*v. United States*, 854 F.2d 622, 627-28 (2d Cir.1988); *see Board of Educ. v. Farmingdale Classroom Teachers Ass'n.*, 38 N.Y.2d 397, 406, 380 N.Y.S.2d 635, 644 (1975).

Plaintiff argues that the claim must be dismissed pursuant to Fed.R.Civ.P. 9(g) because it fails to state special damages with sufficient detail. Rule 9(g) states that "[w]hen items of special damage are claimed, they shall be specifically stated." Fed.R.Civ.P. 9(g). In *Twin Laboratories v. Weider Health & Fitness*, No. 89 Civ. 0949, 1989 WL 85082 (S.D.N.Y. July 21, 1989), the court interpreted the 9(g) requirement to mean that the plaintiff "must plead and prove 'specific and measurable' losses. Those losses must be the actual losses suffered as a result of the tortious act. Round numbers are insufficient." *Id.* at *6 (citations omitted). Plaintiff argues that Defendants fail to allege a round number for the damages, or any detailed itemizations sufficient to satisfy the pleading requirements of Rule 9(g).

***8** "When it comes to pleading special damages there is a distinction between cases in which," as here, "special damage is essential to the cause of action and cases in which a cause of action exists irrespective of special damage." *Stevenson v. Hearst Consol. Publications, Inc.*, 214 F.2d 902, 906 (2d Cir.), *cert. denied*, 348 U.S. 874 (1954); *see* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1310, at 701-02 (2d ed. 1990). When a case falls into the former category, the special damage must be alleged with greater specificity, and at least "with sufficient detail to inform the court of the substance of the claim." Wright & Miller, *supra*, § 1311, at 705-06.

In their proposed counterclaim, Defendants' allegation of damages reads as follows: "As a direct result [of Plaintiff's conspiracy] the bids cast at the Leo Sale were far less than in a competitive market, reducing substantially the amount of Christie's commissions to be earned...." Exh. C, ¶ ¶ 38, 40. This allegation of special damages fails to satisfy the requirements of Rule 9(g). Defendants' proposed amendment offers neither a specific number nor a specific method of computing such a number. Damage claims of this generality do not constitute adequate pleading of special damages. *Sommer v. PMEC Assoc.*, No. 88 Civ. 2537, 1992 WL 196748, at *8, 1992 U.S. Dist. LEXIS 11514, at *23 (S.D.N.Y. Aug. 5, 1992) (Keenan, J.).

Accordingly, leave to amend Defendants' answers to add a claim for intentional injury is denied without prejudice.

E. Breach of Contract

A claim for breach of contract must allege the following: "(1) the making of an agreement; (2) due performance by plaintiff; (3) breach thereof by defendant; and (4) causing damage to the plaintiff." *Stratton Group, Ltd. v. Sprayregen*, 458 F.Supp. 1216, 1217 (S.D.N.Y.1978).

Plaintiff, citing *Hardin v. DuPont Scandinavia*, 731 F.Supp. 1202, 1205 (S.D.N.Y.1990) and *Kirschner v. Cable/Tel Corp.*, 576 F.Supp. 234, 245 (E.D.Pa.1983), argues that the claim for breach of contract should not be allowed because Defendants fail to identify clearly the parties to the contracts at issue.

The proposed amendments to the answers (Exh. C) indicate that two contracts are at issue: (1) the Bidder Registration Form and (2) the contract of sale arising from Plaintiff's successful bids. The proposed amendment states:

53. As a pre-requisite to being permitted to participate as a bidder at the [November] Sale, Counterclaim Defendant Barrett, on behalf of himself and Counterclaim Defendant William Barrett Numismatics Limited, signed a Bidder Registration Form.... The Bidder Registration Form, as well as Counterclaim Defendants' successful bids at the [November] Sale, constituted binding valid contracts for valuable consideration.

Exh. C, ¶ 53. The next paragraph of the proposed amended answers accuses "Counterclaim Defendants" of "breaching their contracts with Counterclaim Plaintiffs." *Id.* ¶ 54.

***9** While pleading "is not a game of skill in which one misstep by counsel may be decisive to the outcome," *Conley v. Gibson*, 355 U.S. 41, 47 (1957), the language contained in a claim nevertheless must give the opposing party "fair notice of what the ... claim is and the grounds upon which it rests," *id.* Defendants fail to state with sufficient detail the identity of the parties to these contracts. Although one discerns from the proposed counterclaim that both Christie's and U.S. Banknote were parties to one or the other of the contracts at issue, the proposed counterclaim does not disclose which defendant was a party to which contract.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1992 WL 232055 (S.D.N.Y.), 1992-2 Trade Cases P 69,956
(Cite as: Not Reported in F.Supp.)

Accordingly, leave to file the proposed counterclaim for breach of contract is denied without prejudice.

### F. Fraudulent Concealment

Plaintiff argues that Defendants' proposed claim of fraudulent concealment should not be allowed because the claim fails: (1) to allege a duty to disclose; (2) to allege that concealment caused damage to the Defendant; and (3) to plead fraud with particularity in accordance with Fed.R.Civ.P. 9(b).

### 1. Duty to Disclose

The duty to disclose is a necessary element of a claim for fraud. It may arise either where the parties to a business transaction enjoy a fiduciary relationship or where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken belief or knowledge. *See Aaron Ferer & Sons, v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir.1984); *Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 524 F.2d 275, 283 (2d Cir.1975). Defendants contend that the proposed amended answers adequately allege fraudulent concealment based on Plaintiff's superior knowledge of the alleged price fixing scheme.

A party's knowledge is not superior where the relevant information "was either a matter of public record, was not pursued by [the pleader], or was disclosed at least in part...." *Grumman Allied Indus. v. Rohr Indus., Inc.,* 748 F.2d 729, 739 (2d Cir.1984) (quoting *Aaron Ferer,* 731 F.2d at 123). The existence of any of these factors would destroy Plaintiff's duty to disclose.

Defendants allege that Plaintiff and various Co-conspirators secretly hatched an elaborate series of private agreements and schemes to divide the money saved on each lot purchased at the November auction. The existence of these agreements, either in whole or in part, was not disclosed or readily available to Defendants until well after the auction was completed; prior to the auction sale, Defendants neither had nor were given reason to seek access to Plaintiff's records or facilities. Defendants adequately show that they had no reason to suspect Plaintiff's alleged illegal arrangement, and Plaintiff had no right to assume that Defendants knew of the scheme.

In sum, when read together the allegations contained in the proposed counterclaim raise an inference of Plaintiff's superior knowledge of the agreements and adequately establish a duty to disclose.

### 2. Injury

**\*10** Plaintiff also argues that Defendants do not show that Plaintiff's failure to disclose the bid rigging agreements injured Defendants. According to the proposed counterclaim,

Had Counterclaim Plaintiffs been aware of the illegal price fixing and anti-competitive agreements entered into by Counterclaim Defendants and the Co-conspirators, Counterclaim Plaintiffs would not have allowed Counterclaim Defendants to participate in the [November] Sale.

Exh. C, ¶ 57.

This counterclaim is not limited to bidders outside of the conspiracy. It alleges that the price-fixing arrangement, allegedly instigated by Plaintiff and concealed from Defendants, precluded the requisite free competition among co-conspirators; and, as the alleged bid rigging agreements indicate, *see, e.g.,* Exh. C. ¶ ¶ 26-27, 29-31, such competition could have resulted in higher bids. Defendants further claim that "normal competitive prices" ordinarily are higher than the prices at which Plaintiffs acquired the auction lots. *See* Exh. C., ¶ ¶ 23 (incorporated by ¶ 55), 38-40. Defendants further allege that the elimination of competitive bidding reduced Defendants' revenue and commissions from the sale of the auction notes. This statement of injury is adequately pleaded in the proposed amended answers.

### 3. Particularity of the Pleading

Fed.R.Civ.P. 9(b) is designed principally to ensure fair notice of the claim to the party preparing a defense. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). Rule 9(b) requires the plaintiff plead all allegations of fraud with particularity, although "[m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally." *Id.* Fraud allegations, moreover, ordinarily "ought to specify the time, place, speaker, and content of the alleged misrepresentations," *Id.* Where, however, "a fraud claim is based upon a [party's] concealment of facts that the [party] had a duty to disclose, the complaint

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1992 WL 232055 (S.D.N.Y.), 1992-2 Trade Cases P 69,956

**(Cite as: Not Reported in F.Supp.)**

'need not detail affirmative false statements. It is enough under 9(b) for the complaint to allege those facts that were not disclosed.' " *Polycast Technology Corp. v. Uniroyal, Inc.,* 728 F.Supp. 926, 950 (S.D.N.Y.1989) (quoting *Von Bulow v. Von Bulow,* 634 F.Supp. 1284, 1303 (S.D.N.Y1986)). Finally, where multiple defendants are accused of fraud, the claim need not inform each defendant of the specific nature of his alleged participation in the fraud if "much of the factual information needed to fill out plaintiff's complaint lies particularly within the opposing parties' knowledge." *DiVittorio,* 822 F.2d at 1247-48.

Upon examination of the proposed amended answers, and drawing all inferences in favor of Defendants, the Court finds that Defendants have met the requirement of Rule 9(b) with respect to their allegations of fraud. The proposed counterclaim specifies the time, place and participants of the alleged concealment, and references paragraphs of the proposed amended answers which contain adequately particularized descriptions of the frauds in which Plaintiff and his company are alleged to have participated-that is, the agreements and arrangements which Plaintiff allegedly failed to disclose. Exh. C, ¶ ¶ 19-36, 56. Defendants also set forth, in detail, the involvement of both Plaintiff and his company in the alleged price fixing agreements and delineate the relationship which exists between them. Exh. C, ¶ 8.

*11 The information provided is sufficient to outline the way in which Plaintiffs Barrett and Barrett Numismatics interacted to perpetrate the alleged fraud. Although Defendants do not pinpoint the precise role of Barrett Numismatics in the fraud, much of this information is likely to lie within Plaintiff's knowledge. This warrants relaxing the requirement of specificity to some degree. *See DiVittorio,* 822 F.2d at 1247-48.

Defendants have described adequately the acts constituting the fraud to give both Plaintiff and Barrett Numismatics fair notice of the counterclaim against them. Accordingly, leave to amend the answers to add a claim for fraudulent concealment is granted.

## II. MOTION TO JOIN ADDITIONAL COUNTERCLAIM DEFENDANT

Fed.R.Civ.P. 13(h) provides that "[p]ersons other than those made parties to the original action may be made parties to a counterclaim ... in accordance with the provisions of Rules 19 and 20."

Defendants maintain that joinder of Barrett Numismatics to this action is proper under Fed.R.Civ.P. 20 because the claims asserted against Barrett Numismatics "aris[e] out of the same transaction, occurrence, or series of transactions or occurrences" and involve "questions of law and fact" which are similar to those contained in the claims against Barrett.

Plaintiff's memorandum contains no arguments against the motion. Accordingly, Defendants' motion to add Barrett Numismatics as a counterclaim defendant is granted.

## CONCLUSION

For the reasons set forth above, Defendants' motion for leave to amend answers to assert counterclaims is granted with respect to claims for violation of section one of the Sherman Act (Claim I), violation of the Donnelly Act (Claim II), and fraudulent concealment (Claim VI). Defendants' motion is denied without prejudice with respect to the claims for intentional injury (Claim IV) and breach of contract (Claim V). Defendant's motion is denied with respect to the claim of tortious interference with business relationships (Claim III). Defendants' motion to add Barrett Numismatics as a counterclaim defendant is granted.

All counsel are to attend a pretrial conference on September 22, 1992 at 9:00 a.m. in courtroom 302.

IT IS SO ORDERED.

S.D.N.Y.,1992.

Barrett v. U.S. Banknote Corp.

Not Reported in F.Supp., 1992 WL 232055 (S.D.N.Y.), 1992-2 Trade Cases P 69,956

Briefs and Other Related Documents (Back to top)

• 1:91cv07420 (Docket) (Nov. 01, 1991)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1427136 (E.D.Pa.), 2004-1 Trade Cases P 74,474

(Cite as: 2004 WL 1427136 (E.D.Pa.))

Page 1

**H**

**Motions, Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
BROTECH CORPORATION and Purolite International,
Ltd.
v.
WHITE EAGLE INTERNATIONAL TECHNOLOGIES
GROUP, INC., et al.
**No. Civ.A.03-232.**

June 21, 2004.

*MEMORANDUM*

PADOVA, J.

**\*1** Before the Court is Plaintiffs Brotech Corporation's and Purolite International, Ltd.'s Motion to Dismiss Defendant RenalTech International, LLC's Amended Counterclaim. For the reasons that follow, the Motion is granted and the Amended Counterclaim is dismissed in its entirety, without prejudice.

**I. BACKGROUND**

Plaintiffs have brought this action to correct the name of the inventor on patents relating to inventions of certain Russian scientists and for a declaration of joint co-ownership and joint equitable title to those patents. They have also brought claims for misappropriation of trade secrets, tortious interference with contract and other common law claims arising from Defendants' alleged interference with the relationship between Plaintiffs and those Russian scientists. The Second Amended Complaint alleges that, for the last ten years, Plaintiffs' employees have engaged in a cooperative research and development program with several Russian scientists led by Professor Vadim A. Davankov of the Russian Academy of Science. (2d Am.Compl.¶ 2.) As a result of that research, Plaintiffs' employees and the Russian scientists have developed unique macronet and micronet copolymer resins for a variety of adsorpitve uses and methods to produce these resins in a commercially viable manner, including their use in renal dialysis. (*Id.* ¶ 4.) The Second Amended Complaint further alleges that Defendants

procured eleven United States patents on these inventions, misrepresenting their ownership and failing to acknowledge Plaintiffs' property rights. (*Id.* ¶ 73-74.) The disputed patents are: U.S. Patent 5,773,384 issued June 30, 1998; U.S. Patent 5,904,663 issued May 18, 1999; U.S. Patent 6,087,300 issued July 11, 2000; U.S. Patent 6,114,466 issued September 5, 2000; U.S. Patent 6,127,311 issued October 3, 2000; U.S. Patent 6,133,393 issued October 17, 2000; U.S. Patent 6,136,424 issued October 24, 2000; U.S. Patent 6,153,707 issued November 28, 2000; U.S. Patent 6,156,851 issued December 5, 2000; U.S. Patent 6,159,377 issued December 12, 2000; U.S. Patent 6,303,702 issued October 16, 2001. (*Id.* ¶ 74.)

Defendant RenalTech International, LLC ("RenalTech") has asserted the instant Amended Counterclaim against both Plaintiffs asserting that Plaintiffs are using their superior economic resources and this litigation to gain control of Defendants' pioneering technology. The Amended Counterclaim alleges that RenalTech is developing new technology to assist chronic renal failure patients by removing middle molecular weight toxins, which are not efficiently removed by renal dialysis, from the blood. (Am.Countercl.¶¶ 15-16.) RenalTech's chemists have developed this technology, a biocompatible adsorbent polymer and a device incorporating this polymer, trademarked BetaSorb, which has been designed to be used in conjunction with hemodialysis. (*Id.* ¶ 16.) A human clinical trial of BetaSorb is currently underway in the United States. (*Id.*) RenalTech is also studying the use of its polymer technology to treat severe sepsis. (*Id.* ¶¶ 23-24.) RenalTech claims to be the only organization currently conducting human clinical trials for such products and the only organization at an advanced stage of seeking regulatory approval from the Food and Drug Administration ("FDA"). (*Id.* ¶ 32.) RenalTech acknowledges that such products cannot be sold or used in the treatment of individuals unless they have received FDA approval. (*Id.*)

**\*2** The Amended Counterclaim alleges that Plaintiffs have brought this action in order to coerce RenalTech into ceding control of its intellectual property to Plaintiffs so that Plaintiffs can unlawfully monopolize the market for its products. (*Id.* ¶ 33.) The Amended Counterclaim alleges

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



claims against Plaintiffs for attempted monopolization pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2; incipient conspiracy to monpolize pursuant to Section 2 of the Sherman Act; and conspiracy to restrain trade pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1.

This is not RenalTech's first attempt to assert antitrust claims against Plaintiffs in this action. RenalTech previously asserted a Counterclaim against Plaintiffs asserting causes of action for attempted monopolization pursuant to Section 2 of the Sherman Act; conspiracy to restrain trade pursuant to Section 1 of the Sherman Act; and for tortious interference with existing and prospective business relations. Plaintiffs filed a motion to dismiss. On November 18, 2003, the Court granted the motion to dismiss RenalTech's counterclaim for attempted monopolization pursuant to 15 U.S.C. § 2 because the market described in the Counterclaim did not "encompass any interchangeable substitute products and [did] not allege that there are no substitute products." (Nov. 18, 2003 Memorandum and Order at 11.) The Court granted the Motion to Dismiss RenalTech's counterclaim for conspiracy to restrain trade pursuant to 15 U.S.C. § 1 because the Counterclaim did not allege an antitrust injury and did not sufficiently allege the relevant product market. (Id. at 16.) The Motion to Dismiss was also granted with respect to RenalTech's claims for tortious interference with existing and prospective business relations. The Order dismissed the Counterclaim without prejudice and with leave to file an amended counterclaim. Defendants subsequently filed the instant Amended Counterclaim.

The Amended Counterclaim attempts to correct the deficiencies in the original Counterclaim by adding allegations relating to the relevant markets and antitrust injury. The Amended Counterclaim alleges that there are two markets relevant to Plaintiffs' anticompetitive conduct. (Am.Countercl.¶ 33.) The first is the "supplier market in the United States for the manufacture and supply of RenalTech's proprietary polymeric resin to RenalTech." (Id. ¶ 33.) The Amended Counterclaim alleges that Plaintiffs' anticompetitive conduct is intended to coerce RenalTech into an exclusive manufacturing agreement, which would foreclose competition in the supplier market. (Id.) The second market is "the market in the United States for the finished product incorporating RenalTech's patented, proprietary hemocompatible or biocompatible polymeric resins designed to remove middle molecular weight compounds or toxins from physiological fluids, including human blood ." (Id. ¶ 34.) RenalTech states that it is "unaware of any existing or development stage product or service targeted toward or capable of removing the middle molecular weight toxins from physiological fluids as RenalTech's polymeric resin does" and that "there is no known substitute at any price for RenalTech's polymeric resin for the removal of middle molecular weight toxins." (Id.) The Amended Counterclaim further alleges that if Plaintiffs' anticompetitive conduct is successful, they will be able to control the price and output of this polymeric resin and consumers will "have no practical or available substitute for a product or service that removes middle molecular weight toxins." (Id.)

*3 The Amended Counterclaim also alleges that Plaintiffs' anticompetitive litigation tactics have damaged RenalTech in two ways. RenalTech claims to have suffered recognizable antitrust injury in the form of "the costs and expenses that RenalTech has incurred and will incur in defending this predatory, anticompetitive sham litigation." (Id. ¶ 39.) It further alleges that Plaintiffs' "coercion of an anticompetitive supply agreement will increase RenalTech's costs in producing finished products incorporating its patented polymeric resin, thereby increasing the price which will ultimately be charged to the consumer." (Id. ¶ 40.) In addition, the increased cost will reduce demand for the product, limiting sales and injuring RenalTech. (Id.)

II. LEGAL STANDARD

When deciding a Motion to Dismiss pursuant to Rule 12(b)(6), the court must accept as true all well pleaded facts in the complaint, or counterclaim, and any reasonable inferences derived from those facts, and view them in the light most favorable to the Plaintiff. FTC v. Commonwealth Marketing Group, Inc., 72 F.Supp.2d 530, 535 (W.D.Pa.1999) (citations omitted). However, the Court need not accept "bald assertions or legal conclusions." Morse v. Lower Merion School District, 132 F.3d 902, 906 (3d Cir.1997). The dismissal standard is higher in antitrust cases



than generally. Rolite, Inc. v. Wheelabrator Envir. Systems, Inc., 958 F.Supp. 992, 995 (E.D.Pa.1997). The facts underlying the elements of an antitrust claim must be pled with specificity. Syncsort Incorporated v. Sequential Software, Inc., 50 F.Supp.2d 318, 328 (D.N.J.1999) (dismissing antitrust counterclaim brought pursuant to Section 2 of the Sherman Act for failure to allege specific facts setting forth the elements of a claim for monopolization or attempted monopolization); *see also* Com. of Pennsylvania ex. rel. Zimmerman v. PepsiCo., Inc., 836 F.2d 173, 182 (3d Cir.1988) ("When the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint.") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 734 F.2d 1101, 1106 (7th Cir.1984)).

III. DISCUSSION

Plaintiffs argue that the Amended Counterclaims should be dismissed because RenalTech has failed to cure the defects in its original Counterclaim. Plaintiffs maintain that the Amended Counterclaim's allegations of product market and antitrust injury remain insufficient to support claims under the antitrust laws.

A. *Product Market*

Plaintiffs argue that the Amended Counterclaim should be dismissed because the allegations describing the relevant product market do not establish the reasonable interchangeability of use or the cross-elasticity of demand between the product and substitutes for it. [FN1] The United States Court of Appeals for the Third Circuit ("Third Circuit") has recognized that the failure to plead the relevant product market is a sufficient basis for dismissal of an antitrust claim. Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir.1997); *see also*, Syncsort, 50 F.Supp.2d at 331. The Third Circuit has explained that " '[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." ' *Id.* (quoting Brown Shoe Co. v. U.S., 370 U.S. 294, 325 (1962); Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir.1991)). In Queen City Pizza, the Third Circuit defined cross-elasticity as "a measure of the substitutability of products from the point of view of buyers," i.e., the measure of "the responsiveness of the demand for one product to changes in the price of a different product." *Id.* at 438 n. 6 (citation omitted). A complaint which fails to define the relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or which alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products, is legally insufficient. *Id.* at 436.

FN1. In order to state a claim for attempted monopolization, conspiracy to monopolize, or conspiracy to restrain trade pursuant to the Sherman Act, the Amended Counterclaim must allege the relevant product market. *See* Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); *Farr v. HealthEast, Inc.*, Civ.A.No. 91-6960, 1993 WL 220680, at *11 (E.D.Pa.1993); Petruzzi's IGA v. Darling-Delaware, 998 F.2d 1224, 1229 (3d Cir.1993).

***4** The Amended Counterclaim defines the relevant product market as follows:

> the market in the United States for the finished product incorporating RenalTech's patented, proprietary hemocompatible or biocompatible polymeric resins designed to remove middle molecular weight compounds or toxins from physiological fluids, including human blood. RenalTech is unaware of any existing or development stage product or service targeted toward or capable of removing the middle molecular weight toxins from physiological fluids as RenalTech's polymeric resin does. Thus, there is no known substitute at any price for RenalTech's polymeric resin for the removal of middle molecular weight toxins. If BroTech and RenalTech succeed in their anticompetitive conduct through this sham litigation, they will be able to control the price and output of the polymeric resin, and consumers will have no practical or available substitute for a product or service that removes middle molecular weight toxins.

(Am.Countercl.¶ 34.) Although the Amended Counterclaim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fails to allege the cross-elasticity of demand for interchangeable substitute products, that failure is not fatal in this case because the Amended Counterclaim alleges that RenalTech's polymeric resin is unique and does not have any substitutes. *See Mitel Corporation v. A & A Connections, Inc.*, No. Civ. A. 97-cv-4205, 1998 WL 136529, at *4 (E.D.Pa. Mar. 20, 1998) (recognizing that "in circumstances where the product or service is unique and therefore not interchangeable with other products or services, the single brand can constitute the relevant market") (citing *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 482 (1992); *Queen City Pizza*, 124 F.3d at 439). Accordingly, the Court finds that the Amended Counterclaim's allegation that RenalTech's polymeric resin does not have any substitutes is sufficient to allege a unique product and that the Amended Counterclaim sufficiently alleges a product market made up of just that unique product.

B. *Antitrust Injury*

Plaintiffs also argue that the Amended Counterclaim should be dismissed because RenalTech has failed to cure the deficiency in the Counterclaim's allegation of antitrust injury. Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 respectively, provide a private right of action for violations of Sections 1 and 2 of the Sherman Act. *See* 15 U.S.C. §§ 15, 26. In order to recover damages or seek injunctive relief in an antitrust suit brought pursuant to Sections 4 or 16 of the Clayton Act, a private plaintiff must prove the existence of an antitrust injury, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The Third Circuit has recognized that, because the purpose of the antitrust laws is to protect competition, the court must examine "the antitrust injury question from the viewpoint of the consumer. 'An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services,' not just his own welfare." *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 641 (3d Cir.1996) (quoting *Tunis Bros.*, 952 F.2d at 728). The Amended Counterclaim contains the following allegations of antitrust injury:

> *5 39. And although they have not yet succeeded, BroTech's and Purolite International's predatory litigation tactics are having their intended effect, and RenalTech has suffered antitrust injury. RenalTech has suffered and will suffer antitrust injury in at least two ways. First, the costs and expenses that RenalTech has incurred and will incur in defending this predatory, anticompetitive sham litigation are themselves a recognized form of antitrust injury, such costs and expenses reflecting the anticompetitive effect of the wrongful acts undertaken with an anticompetitive intent.
>
> 40. Second, BroTech's and Purolite International's ability to control the price of the polymeric resin supplied by them to RenalTech (if their anticompetitive scheme succeeds) will cause further antitrust injury directly to RenalTech and to consumers. BroTech's and Purolite International's coercion of an anticompetitive supply agreement will increase RenalTech's costs in producing finished products incorporating its patented polymeric resin, thereby increasing the price which will ultimately be charged to the consumer. Moreover, the excessive price charged to the consumer as a result of BroTech's and Purolite International's anticompetitive conduct is likely to reduce demand for the product, thereby limiting RenalTech's sales and injuring RenalTech. BroTech and Purolite International still profit, even with reduced sales, because their anticompetitive conduct allows them to charge excessive prices to RenalTech, whereas RenalTech is faced both with excessive prices charged by BroTech and Purolite International and with reduced demand from consumers.

(Am.Countercl.¶¶ 39-40.)

Plaintiffs have moved to dismiss the Amended Counterclaim on the grounds that these allegations are insufficient to allege an antitrust injury. Plaintiffs maintain that these paragraphs are insufficient to allege antitrust injury for two reasons: (1) the potential effect on consumers and RenalTech of Plaintiffs' future behavior, as alleged in paragraph 40 of the Amended Counterclaim, is too hypothetical to state an injury under the antitrust laws because RenalTech's polymeric resin products have not been approved by the FDA and (2) the costs of defending

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



this litigation, as alleged in paragraph 39 of the Amended Counterclaim, do not constitute an antitrust injury.

*1. Future antitrust injury*

Plaintiffs argue that the Amended Counterclaim should be dismissed because the potential injury to competition alleged in paragraph 40 of the Amended Counterclaim is insufficient to state an antitrust injury where unsurmounted statutory or regulatory hurdles preclude the antitrust plaintiff from entering the market. (Pls.' Supp. Mem. at 3.) RenalTech has not yet entered the market for its polymeric resin. "When competitors violate the antitrust laws and another competitor is forced from a market, the latter suffers an injury-in-fact." *Andrx Pharmaceuticals, Inc. v. Biovail Corp. International,* 256 F.3d 799, 806 (D.C.Cir.2001). A competitor such as RenalTech "that has not yet entered the market may also suffer injury but courts require a 'potential' competitor to demonstrate both its intention to enter the market and its preparedness to do so." *Id.* (citing *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 994 (D.C.Cir.1977)). The following factors are considered to be sufficient indicia of preparedness to enter the market: "adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantial affirmative steps toward entry, 'such as the consummation of relevant contracts and procurement of necessary facilities and equipment.' " *Hecht,* 570 F.2d at 994 (footnote and citation omitted); *see also Out Front Productions v. Magid,* 748 F.2d 166, 170 (3d Cir.1984) ("a company ... beginning business ... must show not only that it had the background, experience, and financial ability to make a viable entrance, but even more important, that it took affirmative actions to pursue the new line of business.") (citations omitted). Consequently, in determining whether RenalTech has sufficiently pled an injury, or threatened injury, resulting from the filing of the instant lawsuit, the Court must examine its intent and preparedness to enter the market for its polymeric resin. *Andrx,* 256 F.3d at 807.

**\*6** The Amended Counterclaim acknowledges that RenalTech must obtain FDA approval for products utilizing its polymeric resin before these products can be "sold or used in the treatment of individuals." (Am.Countercl.¶ 32.) Regulation of medical devices [FN2] is governed by the

Federal Food, Drug and Cosmetic Act, 52 Stat. 1040, as amended by the Medical Device Amendments of 1976, 90 Stat. 39, 21 U.S.C. § 301 (West 1999). *See Buckman Company v. Plaintiffs' Legal Committee,* 531 U.S. 341, 343 (2001). The degree of regulation by the FDA depends upon whether the medical device in question is a Class I, II or III device. *Id.; see also* 21 U.S.C. § 360c(a). Class I devices are subject only to general manufacturing controls, Class II devices are subject to more stringent controls, and Class III devices must complete a premarket approval (PMA) process before they may be marketed. *Id.* at 343-44. The PMA process requires the applicant to demonstrate a "reasonable assurance" that the device is both safe and effective. *Id.* at 344 (citing 21 U.S.C. §§ 360e(d)(2)(A), (B)). The FDA's process for review of a Class III device requires "an average of 1200 hours [for] each submission." *Id.* at 344-45 (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 477 (1996)).

> FN2. Device is defined by the Food, Drug and Cosmetic Act as:
> an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is--(1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,
> (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
> (3) intended to affect the structure or any function of the body of man or other animals, and
> which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.
> 21 U.S.C. § 321(h).

The Amended Counterclaim contains no allegations with respect to the classification of products incorporating RenalTech's polymeric resin, or the degree of FDA review which must be completed before those products may be marketed. The Amended Counterclaim similarly fails to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 1427136 (E.D.Pa.), 2004-1 Trade Cases P 74,474
(Cite as: 2004 WL 1427136 (E.D.Pa.))

include any allegations regarding how far RenalTech has gone in the process of obtaining FDA approval of products incorporating its polymeric resin, when such approval may be anticipated, or whether it will be prepared to enter the product market as soon as such approval has been received. The Amended Complaint simply alleges that such approval must be obtained and that RenalTech is seeking such regulatory approval from the FDA. (Am.Countercl.¶ 32.) As the Amended Complaint does not allege facts establishing RenalTech's intent and preparedness to enter the market for its polymeric resin product, that it would be prepared to enter the market for said product in the absence of the instant lawsuit, or that FDA approval of said products is probable, the Court finds that paragraph 40 of the Amended Counterclaim is insufficient to state an antitrust injury. *See Andrx* 256 F.3d at 807-08 (determining that district court correctly dismissed generic drug manufacturer's antitrust counterclaim in patent infringement action where the generic drug manufacturer failed to allege that it was prepared to enter the market or that it anticipated FDA approval for its generic drug; also finding that district court erred in dismissing said counterclaim with prejudice where the generic drug manufacturer might be able to cure its pleading deficiency).

### C. Defense Costs

Plaintiffs argue that the Amended Complaint should be dismissed because RenalTech's payment of costs and expenses of litigation in defense of the instant litigation does not constitute an antitrust injury. RenalTech maintains, however, that legal fees and other costs and expenses incurred in defending sham, anticompetitive litigation are recognized elements of antitrust injury. RenalTech relies on a line of cases originating with the opinion of the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") in *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir.1979). In *Handgards,* the Ninth Circuit found that the costs of defending a patent infringement suit which had been brought in bad faith constituted an antitrust injury: "In a suit alleging antitrust injury based upon a bad faith prosecution theory it is obvious that the costs incurred in defense of the prior patent infringement suit are an injury which 'flows' from the antitrust wrong." 601 F.2d at 997.

However, the Third Circuit has not adopted the *Handgards* determination that litigation costs alone qualify as antitrust injury.

*7 The Third Circuit requires that an allegation of antitrust injury reflect the challenged activity's "anti-competitive effect on the competitive market." *Eichorn v. AT & T Corp.,* 248 F.3d 131, 140 (3d Cir.2001). An antitrust plaintiff must show that the allegedly anticompetitive conduct harmed "the competitive landscape." *Tunis Bros.,* 952 F.2d at 728 (citation omitted). While the Amended Counterclaim alleges that RenalTech's payment of defense costs in this litigation flows from Plaintiffs' allegedly anticompetitive conduct, there is no allegation that said payment had any effect on competition, on the price, quantity or quality of RenalTech's products, or prevented RenalTech from pursuing its entry into the market for its polymeric resin. *See Mathews,* 87 F.3d at 641; *Eichorn,* 248 F.3d at 140 ("we have consistently held an individual plaintiff personally aggrieved by an alleged anticompetitive agreement has not suffered injury unless the activity has a wider impact on the competitive market.") (citation omitted).

Accordingly, the Court finds that the Amended Counterclaim fails to allege antitrust injury arising from the filing of this action and Plaintiffs' Motion to Dismiss is, therefore, granted. Since RenalTech may be able to amend its counterclaim to cure the remaining deficiencies in its allegation of antitrust injury, the dismissal is without prejudice.

An appropriate order follows.

### ORDER

AND NOW, this 21st day of June, 2004, upon consideration of Plaintiffs' Motion to Dismiss Defendant RenalTech's Amended Counterclaim (Docket No. 45), Defendant RenalTech's response thereto, the argument held in open court on February 26, 2004, and the parties' supplemental memoranda, IT IS HEREBY ORDERED that the Motion is GRANTED without prejudice and with leave to file an amended counterclaim within twenty (20) days of the date of this Order.

Not Reported in F.Supp.2d, 2004 WL 1427136 (E.D.Pa.),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 1427136 (E.D.Pa.), 2004-1 Trade Cases P 74,474
**(Cite as: 2004 WL 1427136 (E.D.Pa.))**

2004-1 Trade Cases P 74,474

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2849083 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' Motion to Strike Jury Trial Demand (Sep. 26, 2005)

• 2005 WL 2849082 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answer to Defendants' Motion to Introduce Prior Felony Convictions (Sep. 21, 2005)

• 2005 WL 2849081 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answer in Opposition to Defendants' Motion to Preclude Extrinsic Evidence and Limit the Scope of Testimony About Andrew Braverman's Past Conduct (Sep. 20, 2005)

• 2005 WL 2849080 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendants' Motion in Limine No. 4 to Strike the Expert Report and Preclude the Testimony of John W. Dewhirst (Sep. 19, 2005)

• 2005 WL 2849079 (Trial Motion, Memorandum and Affidavit) MOTION TO STRIKE PLAINTIFFS' JURY TRIAL DEMAND (Sep. 16, 2005)

• 2005 WL 2849076 (Trial Motion, Memorandum and Affidavit) Defendants' Motion in Limine No. 1 to Preclude Extrinsic Evidence and Limit the Scope of Questions About Witness Andrew Braverman's Past Conduct (Sep. 12, 2005)

• 2005 WL 2849077 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Opposition to the Motion of Plaintiffs for a Separate Trial on Their State Law Claims (Sep. 12, 2005)

• 2005 WL 2849078 (Trial Motion, Memorandum and Affidavit) Defendants' Motion in Limine No. 2 to Introduce Prior Felony Convictions of Donald Brodie, Stefan Brodie and Brotech for Impeachment of Donald and Stefan Brodie's Credibility (Sep. 12, 2005)

• 2005 WL 2682869 (Trial Motion, Memorandum and Affidavit) Motion for Summary Judgment Dismissing this Action (Aug. 12, 2005)

• 2004 WL 2718242 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Answer to Defendants' Motion to Compel Certain Redeposition Testimony of Stefan Brodie (Sep. 17, 2004)

• 2004 WL 2718234 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Compel Certain Deposition Testimony of Stefan Brodie (Sep. 03, 2004)

• 2004 WL 2718226 (Trial Motion, Memorandum and Affidavit) Response of Plaintiffs to Defendants' Motion for Entry of Amended Pretrial Scheduling Order (Aug. 27, 2004)

• 2004 WL 2718216 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Plaintiffs in Support of their Motion for an Order Compelling Discovery of Laboratory Notebooks of Russian Scientists and for their Depositions (Aug. 19, 2004)

• 2004 WL 2718221 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Memorandum in Support of Their Motion for an Order Compelling Defendants' Production of Polymer and Specifications (Aug. 19, 2004)

• 2004 WL 2718171 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiff's Motion for an Order Compelling Discovery of Braverman Documents, Renaltech Minutes and Agendas, and Antitrust Documents, and a Rule 30(b)(6) Deposition (Aug. 16, 2004)

• 2004 WL 2718178 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiffs' Motion for an Order Compelling Discovery of Laboratory Notebooks of Russian Scientists and for Their Redepositions (Aug. 16, 2004)

• 2004 WL 2718189 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiffs' Motion for an Order Compelling Defendants' Production of Polymer and Specifications (Aug. 16, 2004)

• 2004 WL 2718162 (Trial Pleading) Answer to Third Third Amended Complaint (Aug. 06, 2004)

• 2004 WL 2718154 (Trial Motion, Memorandum and



Affidavit) Plaintiffs' Motion for an Order Compelling Discovery of Laboratory Notebooks of Russian Scientists and for Their Redepositions (Jul. 16, 2004)

• 2004 WL 2718150 (Trial Motion, Memorandum and Affidavit) Motion of Plaintiffs for an Order Compelling Discovery of Braverman Documents, Renaltech Minutes and Agendas, and Antitrust Documents, and a Rule 30(b)(6) Deposition (Jul. 15, 2004)

• 2004 WL 2718146 (Trial Pleading) Answer to Second Amended Complaint (Mar. 25, 2004)

• 2004 WL 2718142 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Supplemental Memorandum in Support of Their Motion to Dismiss Defendants' Amended Counterclaims (Mar. 22, 2004)

• 2004 WL 2718137 (Trial Motion, Memorandum and Affidavit) Defendants' Supplemental Memorandum in Opposition to Plaintiffs' Motion to Dismiss Defendants' Amended Counterclaims (Mar. 18, 2004)

• 2004 WL 2718133 (Trial Pleading) Second Amended Complaint (Mar. 10, 2004)

• 2003 WL 23905571 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Opposition to Plaintiffs' Motion to Dismiss Defendants' Amended Counterclaims (Dec. 31, 2003)

• 2003 WL 23905550 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion To Dismiss Defendants' Amended Counterclaim (Dec. 15, 2003)

• 2003 WL 23905531 (Trial Pleading) Amended Counterclaim (Dec. 08, 2003)

• 2003 WL 23905512 (Trial Motion, Memorandum and Affidavit) Memorandum In Support of Plaintiffs' Motion To Execute Requests For Letters Rogatory And Hague Convention Discovery (Sep. 15, 2003)

• 2003 WL 23905494 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum In Opposition to Plaintiffs' Motion to Dismiss Defendants' Counter-Claims

(Aug. 14, 2003)

• 2003 WL 23905473 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion to Dismiss Defendants' Counter-Claims (Jul. 28, 2003)

• 2003 WL 23905453 (Trial Pleading) Answer and Counterclaim (Jul. 14, 2003)

• 2003 WL 23905437 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum In Support of Their Motion To Dismiss The Amended Complaint Under Fed. R. Civ. P. 12(b)(6) (Jun. 13, 2003)

• 2003 WL 23905417 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss Complaint (May. 30, 2003)

• 2003 WL 23905394 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum In Support of Their Motion To Dismiss The Amended Complaint Under Fed. R. Civ. P. 12(b)(6) (Apr. 11, 2003)

• 2003 WL 23905373 (Trial Pleading) Amended Complaint (Mar. 10, 2003)

• 2003 WL 23905348 (Trial Pleading) Complaint for Declaratory Judgment (Jan. 16, 2003)

• 2:03cv00232 (Docket) (Jan. 16, 2003)

• 2003 WL 23905676 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Purolite in Support of Its Motion for an Order Compelling Discovery of Braverman Documents, Renaltech Minutes, Agendas and Antitrust Documents, Together with a Rule 30(b)(6) Deposition (2003)

END OF DOCUMENT

# EXHIBIT D



Not Reported in F.Supp.

Not Reported in F.Supp., 1992 WL 8712 (S.D.N.Y.)

**(Cite as: 1992 WL 8712 (S.D.N.Y.))**

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
EMPLOYERS MUTUAL CASUALTY CO., and Mutual
Marine Office, Inc., as Attorney in
Fact for Employers Mutual Casualty Co., Plaintiffs,
v.
KEY PHARMACEUTICALS, INC. and Schering-Plough
Corp., Defendants.
**No. 91 CIV. 1630 (LBS).**

Jan. 16, 1992.

Dougherty, Ryan, Giuffra, Zambito & Barra, New York
City, for plaintiffs; James E. Ryan, Robert J. Giuffra, of
counsel.

Anderson Kill Olick & Oshinsky, P.C., New York City, for
defendants; Avraham C. Moskowitz, of counsel.

OPINION

SAND, District Judge.

**\*1** This case arises out of negotiations for settlement of a
products liability litigation brought in 1985 in Washington
state. The defendants in the present case, Key
Pharmaceuticals (hereinafter "Key") and Schering-Plough
Corp. (hereinafter "Schering"), were defendants in the
Washington litigation. Employers Mutual Casualty
Company (hereinafter "Employers"), a plaintiff in the
present case, served as one of their excess insurers and
provided coverage for the period at issue in the Washington
action. Defendants ultimately settled the lawsuit on March
7, 1991.

On March 11, 1991, the present plaintiffs filed this action
seeking a declaratory judgment that they are relieved from
any obligation to contribute to the settlement. Plaintiffs'
first, second, and fourth causes of action sound in tort, and
essentially allege that defendants failed to settle the
Washington action in good faith. Plaintiffs' third cause of
action alleges a breach of the insurance contract between
Employers and the defendants. Defendants bring this motion
to dismiss the action on grounds of improper venue, forum
non conveniens, and failure to state a claim upon which
relief can be granted. In the alternative, defendants move for
summary judgment pursuant to Fed.R.Civ.P. 56(b).
Defendants further request an award of attorneys' fees.
Plaintiffs also move for summary judgment on all claims.

For the reasons stated below, we deny defendants' motion to
dismiss for improper venue and forum non conveniens, their
motion to dismiss the contract claim for failure to state a
claim, and their request for attorneys' fees. We also deny
both plaintiffs' and defendants' summary judgment motions
as they relate to the contract claim. Defendants' motion to
dismiss the tort causes of action for failure to state a claim is
denied without prejudice to renewal upon completion of
discovery. Both plaintiffs' and defendants' motions for
summary judgment on the tort claims are also denied
without prejudice to renewal at the end of discovery.

*FACTS*

In February 1985, a products liability suit was brought on
behalf of Michael Hyde against Key in King County
Superior Court in Seattle, Washington. The complaint in
*Hyde v. Key Pharmaceuticals, Inc.,* Dkt. # 85-2-01910-5,
contained strict products liability and negligence claims, and
alleged that Hyde suffered permanent brain damage after
taking the drug Theo-Dur, an anhydrous theophylline
product manufactured by Key which is used to treat asthma.

Key is a Florida corporation, and until its acquisition by
Schering in 1986, its main offices were located in Miami,
Florida. After its purchase, Key became a subsidiary of
Schering, a New Jersey corporation with headquarters in
Madison, New Jersey. In January 1988, Hyde amended his
complaint to add Schering as a defendant, alleging
successor liability.

From October 27, 1979 through October 27, 1980, the
period in which Hyde's claim arose, Key maintained
primary products liability insurance coverage with per
occurrence and aggregate limits of $1 million through a
policy issued by Canadian Universal Insurance Co.
(hereinafter "Canadian"). During the same time period,
Canadian also provided Key with its first layer of coverage
in excess of the primary insurance policy, with per

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 8712 (S.D.N.Y.)
(Cite as: 1992 WL 8712 (S.D.N.Y.))

Page 2

occurrence and aggregate limits of an additional $1 million. Sometime in 1990, Key learned that Canadian was probably insolvent and unable to contribute any portion of its policy limits to any *Hyde* claim. Excess Insurance Co. (hereinafter "Excess") provided for a second layer of excess coverage, which also had per occurrence and aggregate limits of $1 million in excess of the underlying $2 million coverage. For the same period, Employers provided a third layer of excess coverage, with per occurrence and aggregate limits of $2 million over the underlying $3 million dollars of insurance. The Employers policy was issued by Mutual Marine Office, Inc. (hereinafter "MMO"), a New York corporation which acts as managing agent and attorney-in-fact for a pool of insurance companies to which Employers belonged. *See* Affidavit of Felix Salgado, Jr., Vice President for Claims, MMO, ¶¶ 7-8 (hereinafter "Salgado Aff.").

*2 On March 7, 1991, after several months of discussion and after the trial was underway, Key and Schering settled the case with Hyde for $4.175 million. Key and Schering maintain that, as excess insurers, plaintiffs in the present action are obligated to contribute $1.175 million dollars to the *Hyde* settlement. *See* Defendants' Memorandum of Law In Support of Their Motion to Dismiss or for Summary Judgment at 14 (hereinafter "Defendants' Memorandum").

### DISCUSSION
*Venue and the Service of Suit Clause*

Paragraph Two of the insurance policy issued to Key by Employers states:

[e]xcept as may be otherwise stated in this policy, the coverage provided shall follow the insuring agreements, (including the persons or entities insured), conditions and exclusions of the underlying insurance (whether primary or excess) immediately preceding the layer of coverage provided by this policy ...

Employers Insurance Policy ¶ 2, attached as Exhibit A to Amended Complaint for an Action for Declaratory Judgment (hereinafter "Amended Complaint"). Defendants argue that this paragraph incorporates into the Employers policy a clause contained within the immediately preceding insurance policy, sold to Key by Excess, which provides:

Service of Suit Clause (U.S.A.)

It is agreed that in the event of the failure of the Company [Excess] to pay any amount claimed to be due hereunder, the Company at the request of the Insured (or reinsured), will submit to the jurisdiction of any Court of competent jurisdiction within the United States, and will comply will all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

Excess Insurance Policy, attached as Exhibit A to Affidavit of Richard E. Wilson, Manager, Risk Management and Insurance, Schering (hereinafter "Wilson Aff."). Defendants argue that this constitutes a choice of forum clause which, when incorporated into the Employers policy, gives Key the right to select the forum for the dispute at issue in the present action. Defendants therefore move to dismiss this action because of improper venue, so that they may litigate this matter in the forum of their own choosing, the United States District Court for the Western District of Washington.

However, paragraph two of the Employers policy does not provide a blanket incorporation of the immediately preceding policy. Its language specifically limits incorporation to "the coverage provided" by the underlying policy and the "conditions and exclusions" of that coverage. The service of suit clause in the Excess policy is not a condition of insurance coverage, and we find that it is not incorporated into the Employers policy.

Even assuming *arguendo* that there is some ambiguity about the scope of incorporation in paragraph two, the Excess service of suit clause does not provide the insured with the right to select the forum in an action in which they are defendants. This provision is not a traditional forum selection clause which states that all disputes arising under the policy will be resolved in a designated tribunal. Rather, the clause provides only that the insurer will submit to jurisdiction in a suit brought by the insured against the insurer for failure to pay. By its plain language, the clause does not apply to actions brought by the insurer, as in the present case, and it is clearly distinguishable from a forum selection clause covering all disputes related to the policy.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 8712 (S.D.N.Y.)
**(Cite as: 1992 WL 8712 (S.D.N.Y.))**

Page 3

Thus the caselaw cited by defendants, which concerns the enforceability of forum selection clauses and derives from the Supreme Court's holding in *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10 (1972) is not applicable here.

**\*3** Defendants argue in the alternative that even if the service of suit clause does not apply to the present case, the absence of any forum selection provision in the Employers policy creates an ambiguity that must be construed against the drafter, the insurer. Therefore, argue the defendants, the Court should resolve this ambiguity by deferring to defendants' choice of forum.

However, the absence of a forum selection clause does not create any ambiguity, but merely maintains the traditional right of the plaintiff to select a forum of competent jurisdiction in which to bring the action. We are not of the opinion that the absence of a clause designating a particular tribunal somehow allows a defendant to undermine that traditional plaintiff right. Hence, we deny the defendants' motion to dismiss because of improper venue.

*Forum Non Conveniens*

Defendants also move to dismiss this action on forum non conveniens grounds. In *Gulf Oil v. Gilbert,* 330 U.S. 501, 508-09 (1947), the Supreme Court outlined the private and public interests that the district court should weigh in determining whether to refuse jurisdiction pursuant to the doctrine of forum non conveniens. The private interests to be considered include "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; ... and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert,* 330 U.S. at 508. The court will weigh the "relative advantages and obstacles to a fair trial." *Id.* The district court should also consider such public interest factors as the burden on congested courts, local interest and relation to the controversy, and the advantages of trying a diversity case in a forum familiar with the applicable state law. *Gilbert,* 330 U.S. at 508-09.

This balancing of factors "leaves much to the discretion" of the trial judge. *Gilbert,* 330 U.S. at 508; *Calavo Growers of California v. Generali Belgium,* 632 F.2d 963, 966 (2d Cir.1980), *cert. denied,* 449 U.S. 1084 (1981). However, the Supreme Court made clear that the doctrine places a heavy burden upon the defendant: "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gilbert,* 330 U.S. at 508; *Calavo Growers,* 632 F.2d at 969 (Newman, J., concurring).

Further, as Judge Newman pointed out in his *Calavo Growers* concurrence, the balancing of factors must be made with the realities of modern transportation and communications in mind:

[i]t will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit. Jet travel and satellite communications have significantly altered the meaning of "non conveniens."

*Calavo Growers,* 632 F.2d at 969 (Newman, J., concurring); *see also Fitzgerald v. Texaco, Inc.,* 521 F.2d 448, 457-58 (2d Cir.1975) (Oakes, J., dissenting).

**\*4** It is clear that a number of witnesses relevant to the plaintiffs' tort claims regarding the settlement negotiations in the *Hyde* case are located in the state of Washington. These include the attorneys representing Key, Schering and MMO in the *Hyde* action, the attorneys representing a doctor who was another defendant in that action, and attorneys for the *Hyde* plaintiff. Defendants in the present action argue that these witnesses cannot be compelled to appear at a trial in this district.

However, plaintiffs contend that members of Schering's in-house legal department as well as other Schering executives made decisions regarding settlement strategy, and the attorney representing Key in the *Hyde* litigation states that Schering's legal department supervised her handling of the case. *See* Affidavit of Carol Lee Moody, Attorney for Key in the *Hyde* Litigation ¶ 3 (hereinafter "Moody Aff."). Thus, the testimony of several Schering employees who are located at Schering headquarters in suburban New Jersey are also relevant to the tort claims in this case. Further, the Vice-President for Claims at MMO, who plaintiffs argue had ultimate responsibility for defense of the claims against Employers in the *Hyde* action, is located at MMO headquarters in New York City. *See*



Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 8712 (S.D.N.Y.)
**(Cite as: 1992 WL 8712 (S.D.N.Y.))**

Page 4

Salgado Aff. ¶ 3.

Finally, other witnesses who may be relevant to plaintiffs' tort claims are located outside either the New York or Washington area. These include another attorney representing Schering during the *Hyde* negotiations, who is located in Falls Church, Virginia; the court-appointed mediator in the *Hyde* case, who resides in California; and representatives of Canadian, Key's primary insurer, who are located in Rhode Island.

Defendants argue that all of the relevant witnesses to plaintiffs' contract claim are located outside New York. Key, a Florida corporation purchased its insurance from Employers, an Iowa corporation through insurance brokers Johnson & Higgins of Florida, located in Miami. Thus, according to defendants, the witnesses concerning the formation of the contract are likely to reside in Iowa or Florida. *See* Defendants' Memorandum at 23.

However, plaintiffs argue that, as one of a pool of insurance companies for whom MMO acts as managing agent, Employers had no real involvement in the formation of the contract. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion and in Support of the Cross Motion for Declaratory Judgment by the Plaintiffs at 23 (hereinafter "Plaintiffs' Memorandum"). Plaintiffs contend that the Employers insurance policy was formed, executed, and administered in New York by MMO. *Id.* at 24. Further, plaintiffs argue that all ultimate decisions which relate to the alleged *breach* of the contract by Schering were made at Schering headquarters in New Jersey. Therefore several of the witnesses relevant to the breach of contract claim are located in New York and the New York area.

*5 The parties' dispute over which entities constitute the real decision-makers in the present litigation contributes to their differing evaluations of the public interest factors in forum non conveniens analysis. Defendants argue that New York has no interest in an action "which seeks to determine whether an Iowa corporation (Employers) is required to pay a Florida corporation (Key), on an insurance policy negotiated, entered into, and paid for in Florida, in connection with a products liability claim litigated in Washington." *See* Defendants' Memorandum at 24.

However, plaintiffs argue that New York has an inherent interest in this action which concerns a dispute between a New York corporation, MMO, and a one located in the greater New York area, Schering. *See* Plaintiffs' Memorandum at 24.

In evaluating the private interest factors relevant to this litigation, we conclude that they do not substantially weigh in favor of refusing jurisdiction in this district. A number of witnesses are located in the New York area, or on the East Coast in easy proximity to New York. While some critical witnesses do reside in Washington state, the attorneys who represented Key, Schering, and MMO, parties to the present action, have a fiduciary relationship to their clients which obligates them to appear at trial.

Further, as this Court noted at oral argument, frequently it is the convenience of discovery rather than the convenience of trial that is most relevant to forum non conveniens considerations, because discovery extends over a far longer period of time than trial in almost all cases. *See* Transcript of Proceedings, October 3, 1991, at 13 (hereinafter "Tr."). At oral argument, both parties expressed their willingness to take depositions of witnesses at a place convenient to those witnesses, with each party bearing its own costs. *See* Tr. at 14, 16-17, 39-40. This would substantially limit the inconvenience to the witnesses located in Washington and narrow the problems with obtaining discovery there.

While a large part of the documentary evidence may be located with the attorneys in Seattle, defendants concede that relevant evidence may also be located at the Schering headquarters in New Jersey, and with the Schering counsel in Virginia. *See* Defendants' Memorandum at 21-22. It is also likely that relevant documentary evidence may be found at MMO headquarters in New York. Thus, the location of documents does not change the balance of private interest factors in this case.

The disagreement between the parties in locating the true decision-makers in the *Hyde* negotiations and the present litigation makes it difficult to evaluate the public interest factors at issue here. However, for the purposes of this forum non conveniens analysis, we cannot say that MMO, a New York corporation, does not have a real interest in this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                                Page 5
Not Reported in F.Supp., 1992 WL 8712 (S.D.N.Y.)
(Cite as: 1992 WL 8712 (S.D.N.Y.))

case. In a sworn affidavit, Felix Salgado, Jr., MMO's Vice-President for Claims, states that MMO has full decision-making responsibility for the settlement and defense of claims involving its pool companies. *See* Salgado Aff. at policies, at ¶ 7. At oral argument, the attorney for plaintiffs stated:

**\*6** They [MMO] have the obligation, they have the contractual right with the group, to place the insurance, collect the premium, make all decisions. Employers Mutual has no idea that this case is being litigated, none whatsoever. What happens, there is a pool of companies. They put in so much into the pool. Mutual Marine Office has complete control of the pool. At the end of the year, if there is a profit, each of the companies gets a percentage.

Tr. at 38-39. Therefore, New York has an interest and a connection to the present controversy.

As discussed below, we have reserved decision on the choice of law applicable to this action. However, assuming *arguendo* that New York law will not apply, that will not significantly affect our forum non conveniens determination. As the Second Circuit recently affirmed, it is well settled that the need to apply foreign law will not alone suffice to dismiss on grounds of forum non conveniens. *R. Maganlal & Co. v. M.G. Chemical Co.,* 942 F.2d 164, 168 (2d Cir.1991). In *Maganlal,* the Court was considering the possibility of a United States forum applying the law of another country, India. *Id.; see also Manu Int'l v. Avon Prods., Inc.,* 641 F.2d 62, 67-8 (2d Cir.1981) (reversing the grant of a motion to dismiss on forum non conveniens grounds despite the fact that Taiwanese law would apply to some issues in case). Here, where the foreign law that may be applied is the substantive law of another American state, this factor will weigh even less heavily.

Finally, we are mindful of Judge Newman's cautionary words:

[t]here is an understandable temptation in a busy district like the Southern District of New York to transfer cases that can as appropriately or even slightly more appropriately be tried elsewhere. That temptation must be resisted. The plaintiff's choice of forum should normally be respected.

*Calavo Growers,* 632 F.2d at 969 (Newman, J, concurring).

In weighing all of these factors we cannot say that defendants have met the heavy burden necessary to overcome the plaintiffs' right to select the forum for litigation. We deny defendants' motion to dismiss on grounds of forum non conveniens.

### The Motion to Dismiss and the Motion for Summary Judgment

In considering a motion to dismiss for failure to state a claim, the Court must take plaintiff's allegations as true. *See Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 740 (1976); *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 22 (1977). The Court must construe the complaint in a manner favorable to the non-moving party. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The Court may dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) (footnote omitted); *Goldman v. Belden,* 754 F.2d 1059, 1065 (1985).

Summary judgment is appropriate only where the moving papers and affidavits submitted by the parties "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The appropriate inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52. The moving party has the burden of showing the absence of a genuine issue as to any material fact, and the Court must view the evidence in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).

### Choice of Law

**\*7** As a first step, we must consider which state's law should control. A federal court sitting in diversity must apply the choice of law rules of the forum state. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496 (1941). [FN1] New York law requires courts to apply the law of the forum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 8712 (S.D.N.Y.)
**(Cite as: 1992 WL 8712 (S.D.N.Y.))**

Page 6

"which has the most significant contacts with the matter in dispute." *Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99, 102 (1954) (quoting *Rubin v. Irving Trust Co.*, 305 N.Y. 288, 305, 113 N.E.2d 424, 431 (1953)); *see also Babcock v. Jackson*, 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963).

In *Babcock*, New York departed from the traditional conflicts rule in tort actions which would automatically apply the law of the place of the wrong; instead, the Court held that "controlling effect" must be given "to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Babcock*, 12 N.Y.2d at 481. In subsequent cases, the Court made clear that this conflicts determination would be made not by counting the number of contacts, but by evaluating their significance in relation to the purpose of the particular law in conflict. *See, Schultz v. Boy Scouts of America*, 65 N.Y.2d 189, 196, 480 N.E.2d 679, 491 N.Y.S.2d 90 (1985); *Miller v. Miller*, 22 N.Y.2d 12, 237 N.E.2d 877, 290 N.Y.S.2d 734 (1968).

In *Olin Corp. v. Insurance Co. of North America*, 743 F.Supp. 1044, 1048-49 (S.D.N.Y.1990), *aff'd*, 929 F.2d 62 (2d Cir.1991), this Court applied New York's most significant contacts rule to an action involving the interpretation of an insurance contract, and identified the principal factors for conflicts analysis in that area:

the location of the insured risk; the insured's principal place of business; where the policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and the insurer's place of business.

*Olin Corp.*, 743 F.Supp. at 1049; *see also Golotrade Shipping and Chartering, Inc. v. Travelers Indem. Co.*, 706 F.Supp. 214, 218 (S.D.N.Y.1989).

A. *Application of Contracts Choice of Law Analysis*

In the present case, risk covered by the insurance policy was not confined to any particular location, but encompassed any potential products liability exposure by Key, which distributed its products nationwide. Key, the insured, is a

Florida corporation which, at the time of the contracts formation, has its principal place of business there. Plaintiffs argue, however, that because Schering acquired Key in 1986, Schering, with its principal place of business in New Jersey, "effectively became the insured." Plaintiffs' Memorandum at 29.

Johnson & Higgins of Florida, Inc. served as the broker for the insurance policy and premiums on the policy were paid to their offices in Florida. Defendants' Memorandum at 29; Wilson Aff. ¶ 8. While plaintiffs concede these facts, they argue that Johnson & Higgins of Florida was merely a subsidiary of Johnson & Higgins, Inc., a New York corporation, and that the first notice of claim in the *Hyde* matter came to MMO from Johnson & Higgins' New York offices. Plaintiffs' Memorandum at 24.

*8 While defendants admit that the policy was issued by MMO in New York, they argue that it was Johnson & Higgins of Florida that was responsible for contract negotiations, and that the policy was delivered in Florida. Defendants' Memorandum at 3, 29; Wilson Aff. ¶ 8. Plaintiffs, however, contend that the policy was negotiated and entered into in New York. Amended Complaint ¶ 6. Further, plaintiffs argue that the policy was signed, executed and delivered in New York. Salgado Aff. ¶ 10. While defendants consider Employers, an Iowa corporation, the insurer, plaintiffs argue that MMO, the New York corporation which handled the formation of the contract and administered the policy, to be the insurer.

Finally, the parties differ in their views as to the location of the alleged breach. Defendants place the alleged breach in Washington state, where the settlement negotiations occurred, while plaintiffs argue that all decision-making related to settlement and to its effect on the insurer took place in either New Jersey or New York.

It is clear that many of the contacts in the formation and administering of the contract are in Florida. However, we are troubled by the parties' differing perceptions of the role played by MMO in New York, and we are particularly concerned by their direct contradiction over the location of negotiations, execution, and delivery of the contract. If the facts as alleged by the plaintiffs are true, New York clearly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 8712 (S.D.N.Y.)
**(Cite as: 1992 WL 8712 (S.D.N.Y.))**

would have significant contacts with this contract claim. The papers now before us do not enable us to resolve these factual disputes. Therefore, we reserve judgment on the choice of law question as it relates to the contract claim until after the completion of discovery in this case.

*B/ Application of Torts Choice of Law Analysis*

There are strong indications that Washington was the place of the alleged tort. It was in Washington that the *Hyde* litigation was pending, and where the settlement was negotiated and ultimately effected. Plaintiffs contend that because Schering directed settlement strategy, the failure to settle in good faith may more appropriately be located in the New Jersey headquarters.

However, even if we accept defendants' location of the alleged tort in Washington, our choice of law analysis is not complete. Under modern conflicts analysis, the location of the alleged tort is not the sole determinant of choice of law. We must also consider which state's contacts are most significant and which state has the greatest interest in the litigation in relation to the particular law in conflict. *See Schultz,* 65 N.Y.2d at 197.

Defendants argue that Washington has a strong interest in this litigation because it wants to assure that insurance companies operating in-state abide by the terms of their policies and provide coverage to policyholders there. Defendants' Reply Memorandum at 10. However, coverage to the Washington policyholder is not at issue in the present litigation. Instead, this action concerns the distribution of the obligation among the defendants in the *Hyde* litigation and their insurers. Central to the conflict in this case is whether Employers, the excess insurer, may maintain a direct action against Key, acting as a self-insured or primary insurer after Canadian, the original primary insurer, became insolvent. New York recognizes such an action. *See Hartford Accident & Indem. Co. v. Michigan Mut. Ins. Co.,* 93 A.D.2d 337, 462 N.Y.S.2d 175 (App.Div.1983), *aff'd,* 61 N.Y.2d 569, 463 N.E.2d 608, 475 N.Y.S.2d 267 (1984). In Washington, however, the rights of an excess insurer to recover from a primary insurer arise only from its subrogation to the rights of the insured, and it may bring only those actions that are available to the insured against its

insurer. *See Millers Casualty Ins. Co. v. Briggs,* 100 Wash.2d 9, 665 P.2d 887 (1983).

*\*9* Without a direct action against the primary insurer available, an excess insurer will have to bear any increased costs that result from the primary insurer's bad faith. Excess insurers are likely to react to this increased risk by increasing insurance premiums, which may discourage the purchase of excess insurance. This may in turn expose an insured to more liability and reduce an injured party's ability to collect from an insured, who may not be able to pay without excess coverage. *See* Annotation: Liability Insurance: Excess Carrier's Right of Action Against Primary Carrier for Improper or Inadequate Defense of Claim, 49 A.L.R.4th 304, 308; *Commercial Union Ins. Co. v. Medical Protective Co.,* 136 Mich.App. 412, 419, 356 N.W.2d 648, 651-52 (1984), *aff'd in part,* 426 Mich. 109, 393 N.W.2d 479 (1986).

By recognizing a direct action by an excess insurer, New York has demonstrated a strong interest in protecting its own excess insurers, as well as its insured, and its citizens who may be injured. Thus, if New York is the home of the excess insurer in the present action, it would have a strong interest in applying its own law to the tort claims here. Undoubtedly, the state in which the primary insurer resides may have an interest in protecting the primary insurer from this increased exposure to liability. However, Washington is not the home of the party functioning as primary insurer in this case. Washington does not have an interest in the distribution of loss among insurers. Under this analysis then, Washington would not have an interest in applying its own law to the tort claims here.

It is simply not clear from the evidence before us whether MMO, a New York corporation, was functioning as the excess insurer in this case. The defendants contend that it is Employers, an Iowa corporation, that must pay the claim, and so is the real party in interest. Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss or for Summary Judgment at 9 (hereinafter "Defendants' Reply Memorandum"). However, at oral argument, plaintiffs' counsel argued that Employers had no involvement in the present litigation, and that it simply contributed as a member of pool of companies over which

---



Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 8712 (S.D.N.Y.)
**(Cite as: 1992 WL 8712 (S.D.N.Y.))**

Page 9

It is our client's position that Key's handling of this claim, its breaches of contracts, its bad faith conduct, and its unreasonable refusal to settle the Hyde claim excuses and relieves Employers of any obligation to respond to the current settlement demand from the plaintiff and/or a net verdict against Key.

Letter from William J. O'Brien, Attorney for MMO, to Jean-Pierre Garnier, Attorney for Schering, March 6, 1991, at 1-2, attached as Exhibit 16 to Affidavit of William J. O'Brien. Defendants argue that this letter constitutes a breach of the contract, which waives any approval rights. They move for summary judgment on the grounds that there are no material facts in dispute in relation to this claim.

It is clear from Mr. O'Brien's letter, however, that plaintiffs believed that defendants had already breached the contract:

[f]irstly, it is clear that Key has breached its insurance contract with our client, Employers by unjustifiably refusing to settle the claims against Key within the limits of the insurance policies underlying Employer's policy, i.e., $3 million ...

Letter from William J. O'Brien to Jean-Pierre Garnier, March 6, 1991, at 22. Plaintiffs believed that it was defendants' breach which had relieved them of their contractual obligations. Of course, defendants contest this characterization of settlement negotiations, and argue instead that they never had the actual opportunity to settle for less money because Hyde's attorneys consistently demanded policy limits of all insurers, including the excess layers. *See* Defendants Memorandum at 5-14. Clearly, material facts concerning this alleged breach remain in dispute between the parties. Therefore, we deny defendants' motion for summary judgment on this issue. We also deny plaintiffs' motion for summary judgment as to the contract claim.

*The Tort Claims*

Because the plaintiffs' tort causes of action depend upon their ability to bring a direct action against defendants acting as self-insureds or primary insurers, we cannot determine whether they fail to state a claim before resolving

which state's law is applicable here. As discussed above, material facts remain in dispute in relation to the choice of law issue. Therefore, we deny defendants' motion to dismiss these claims without prejudice to renewal at the close of discovery. We also deny defendants' and plaintiffs motions for summary judgment without prejudice to renewal at that time.

*CONCLUSION*

For the reasons discussed above, defendants' motion to dismiss on grounds of improper venue and forum non conveniens is denied. Defendants' motion to dismiss the contract claim, the third cause of action, and their motion for summary judgment on this claim are denied. Defendants' motion to dismiss and motion for summary judgment on the tort claims, the first, second, and fourth causes of action, are denied without prejudice to renewal upon the completion of discovery. Defendants' request for an award of attorneys' fees is also denied. Plaintiffs' motion for summary judgment on the contract claim is denied, and their motion for summary judgment on the tort claims is denied without prejudice to renewal upon the completion of discovery. The parties shall submit to the Court no later than February 6, 1992 a written schedule for completion of all discovery.

**\*12** SO ORDERED.

> FN1. Defendants argue that the service of suit clause in the Excess insurance policy was incorporated into the Employers contract, giving them the authority to select the forum and that forum's choice of law rules. Defendants maintain that they have the right to select the United States District Court for the Western District of Washington as a forum, and thus, Washington state's choice of law rules. *See* Defendants' Memorandum at 26- 27, 27 n. 2; Excess Insurance Policy, attached as Exhibit A to Wilson Aff. We reject this argument (see discussion *supra* ) and apply New York's choice of law rules as mandated by *Klaxon*.

Not Reported in F.Supp., 1992 WL 8712 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                    Page 10
Not Reported in F.Supp., 1992 WL 8712 (S.D.N.Y.)
**(Cite as: 1992 WL 8712 (S.D.N.Y.))**


• 1:91cv01630 (Docket) (Mar. 08, 1991)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33520483 (N.D.Cal.)
**(Cite as: 1999 WL 33520483 (N.D.Cal.))**

Page 1

**H**

<u>**Motions, Pleadings and Filings**</u>

Only the Westlaw citation is currently available.

United States District Court, N.D. California.
ESS TECHNOLOGY, INC., a California Corporation,
Plaintiff,
v.
PC-TEL, INC., a Delaware Corporation, Defendant.
**No. C-99-20292 RMW.**

Nov. 4, 1999.

ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANT'S MOTION TO DISMISS
<u>WHYTE</u>, J.

**\*1** Defendant's motion to dismiss pursuant to <u>Rules 12(b)(1)</u>
and <u>12(b)(6) of the Federal Rules of Civil Procedure</u> was
submitted on the papers without oral argument. The court
has read the moving and responding papers. For the reasons
set forth below, the court grants the motion as to Counts I
and V and denies it as to Counts II, III and IV. Plaintiff is
given twenty (20) days leave to amend.

### I. BACKGROUND

Plaintiff ESS Technology, Inc. manufactures and sells
modem semiconductor chipsets and associated modem
software drivers for use in personal computers. Plaintiff's
First Amended Complaint ("FAC"), ¶ 8. ESS does not sell
its modem chipsets or completed systems directly to
end-users, but rather to intermediate manufacturers, original
equipment manufacturers, systems integrators, and retail
distributors who package complete modem boards. *Id.*

Defendant PC-TEL, Inc. holds patents that are necessary for
modem producers to comply with the V.34 and V.90
standards established by the International
Telecommunications Union ("ITU"). FAC, ¶¶ 9 & 12. The
V.34 and V.90 are the latest modem standards in wide use
in the computer industry and allow for high speed
communications. FAC, ¶ 10. Defendant acquired the patents
at issue when it purchased and merged with General
DataComm, Inc. ("GDC"), the original assignee of the

patents. FAC, ¶ 12. Plaintiff claims that defendant, and
formerly GDC, represented to the ITU that its patents
claimed at least part of the V.34 and V.90 standards and
they agreed to the ITU patent policy 2.2, which requires
patentees of ITU standards to negotiate licenses to
competitors on a non-discriminatory basis and on
reasonable terms and conditions. FAC, ¶ 13.

Plaintiff alleges that in 1996, GDC offered plaintiff two
license options for the V.34 patents. FAC, ¶ 15. Although
the offers were reasonable at the time, plaintiff had not yet
entered the V.34 market. In September 1997, GDC again
offered plaintiff two license options. FAC, ¶ 16. However,
while the proposed royalty payments may have been
appropriate when chipsets sold for approximately $50 per
unit, chipsets were selling for approximately $10 per unit by
March 1998. FAC, ¶ 17. Accordingly, plaintiff alleges that
due to the changed modem market, the proposed royalty
payments were unreasonably expensive and did not allow
for new market entrants to compete with existing market
participants. FAC, ¶¶ 16-18. Plaintiff and GDC continued to
negotiate through much of 1998 and nearly reached an
agreement. FAC, ¶ 19.

Before plaintiff and GDC could resolve all their differences,
defendant PC-TEL acquired GDC toward the end of 1998.
FAC, ¶ 20. Plaintiff alleges that defendant then reversed
course and started demanding increasingly unreasonable and
discriminatory terms for licensing the V.34 and V.90
patents. FAC, ¶ 20-22. Plaintiff further alleges that
defendant sent plaintiff two proposed license agreements for
the V.34 and V.90 patents which were more onerous than
any other proposal, including the original 1997 offer from
GDC. FAC, ¶ 23. Plaintiff asserts that defendant's agent,
William Conway, represented to plaintiff that the proposal
was a "take-it-or-leave-it-offer," that defendant's only
recourse was to "go for a cease and desist order" and would
have to "go to court and let them decide." FAC, ¶ 23.
Plaintiff claims that defendant then began contacting
plaintiff's customers and informing them that if they
continued to purchase products from plaintiff without
acquiring licenses for the V.34 and V.90 patents, they would
face patent infringement actions. FAC, ¶ 26.

**\*2** On April 9, 1999, plaintiff filed its original action in this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 1999 WL 33520483 (N.D.Cal.)
**(Cite as: 1999 WL 33520483 (N.D.Cal.))**

court. On July 2, 1999, defendant moved to dismiss. Plaintiff then voluntarily dismissed its original action, and on July 20, 1999, filed the FAC. In the FAC, plaintiff sets forth five claims: (1) antitrust violation pursuant to section 2 of the Sherman Act; (2) declaratory judgment that defendant misused the patents at issue; (3) declaratory judgment that defendant is estopped form asserting the patents; (4) specific performance of defendant's agreement with the ITU; and (5) unfair competition violation pursuant to both the common law and section 17200 of the California Business and Professions Code.

On August 12, 1999, defendant filed the motion to dismiss currently before the court. In the motion, defendant asserts that plaintiff has failed to state an antitrust claim, an unfair competition claim, and a claim for specific performance. Defendant also argues that plaintiff has failed to show that an actual controversy exists for this court to exercise jurisdiction over the declaratory relief claims.

## II. ANALYSIS
A. First Claim for Antitrust Violation Under Sherman Act Section 2

Defendant moves to dismiss plaintiff's first claim, the antitrust claim, on the grounds that plaintiff has failed to allege actual injury, that plaintiff lacks antitrust standing, and that plaintiff has failed to sufficiently plead an "essential facilities" antitrust claim.

### 1. Actual Injury

To be a proper antitrust plaintiff, a plaintiff must allege that it was actually harmed in some way by defendant's alleged antitrust violation. *See Associated General Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519 (1983). Defendant argues that ESS has not alleged facts that it has lost business as a result of defendant's conduct. "ESS's general allegations, for example, do not state that ESS has lost sales or customers." Defendant's Motion to Dismiss, p.5:10-16. However, the court finds defendant's arguments unavailing. Plaintiff has clearly alleged that it has lost sales and customers as a result of defendant's alleged antitrust violations. "ESS, upon information and belief, has suffered or will suffer antitrust injury as a result of PC-TEL's actions

in that ESS has lost or will lose sales and customers...." FAC, ¶ 37. Thus, the court finds that plaintiff has adequately alleged that it has suffered actual injury as a result of defendant's alleged antitrust violations.

### 2. Antitrust Standing and Essential Facilities Claim

Defendant also argues that plaintiff has failed to sufficiently allege that defendant caused an injury that the antitrust laws were designed to protect, i.e. antitrust injury. Specifically, an antitrust plaintiff must show injury to competition in the relevant market, not just injury to plaintiff. *See Metro Indus., Inc. v. Sammi Corp.,* 82 F.3d 839, 847 (9th Cir.1996); and *McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 811-13 (9th Cir.1988).

**\*3** The court finds that plaintiff has failed to sufficiently allege injury to competition beyond the impact on plaintiff. Plaintiff's allegations that defendant's "unfair business practices unfairly discriminate against latecomers to the V.34 and V.90 modem market, in favor of earlier market entrants" (FAC, ¶ 27) and that "market entry has been foreclosed and consumer choice has been diminished" (FAC, ¶ 36) does not show injury to competition. There is no allegation that consumers have been forced to pay higher prices or that the quality of the choices available to them has been adversely affected.

Plaintiff claims it has adequately alleged antitrust injury under the "essential facilities" doctrine. The Ninth Circuit has stated that the "essential facilities doctrine imposes liability when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain in order to compete with the first." *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 542 (9th Cir.1991). There are four elements to the essential facilities doctrine: (1) control of an essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. *See City of Anaheim v. Southern Cal. Edison,* 955 F.2d 1373, 1380 (9th Cir.1992). A facility is essential if it is controlled by one firm which also has the power to eliminate competition in the downstream market. *Id.* at 1380 n.5.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



In the current case, plaintiff has alleged that defendant holds the patents that are essential to comply with the V.34 and V.90 standards, that plaintiff cannot produce modems that comply with the V.34 and V.90 standards without infringing defendant's patents, and that plaintiff cannot compete in the relevant market due to defendant's refusal to license its patents in a reasonable and non-discriminatory way. FAC, ¶ 29-37. However, these allegations are not enough to show anti-trust injury, actual harm to competition.

B. Fifth Claim for Unfair Competition

Defendant essentially argues that plaintiff fails to state a claim for unfair competition pursuant to California Business and Professions Code section 17200 because plaintiff fails to adequately set forth a violation of antitrust law or harm to competition. The court agrees. Plaintiff has not adequately alleged that defendant's conduct threatens the incipient violation of an anti-trust law or violates the policy or spirit of one of those laws or otherwise significantly harms or threatens competition. See Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163 (1999).

C. Fourth Claim for Specific Performance

Defendant contends that even assuming that plaintiff is a third party beneficiary to defendant's agreement with the ITU to license its patents on a non-discriminatory basis and on reasonable terms and conditions, the agreement is too vague to support a claim for specific performance, since it does not provide any express terms of the contract. However, under California law, a court can enforce a contract even if some of the terms are not provided. See Martin v. Baird, 124 Cal.App.2d 598, 601 (1954) (holding that a court can imply terms from the usual and reasonable conditions of such a contract). Moreover, courts should seek to uphold the enforcement of contracts and avoid finding that contracts are unenforceable due to uncertainty. Goodwest Rubber Corp. v. Munoz, 170 Cal.App.3d 919, 921 (1985) (holding that "fair market value," "reasonable value," and "current market value" are sufficiently certain price terms to support specific performance).

*4 At this stage of the proceedings, the court declines to hold as a matter of law that plaintiff cannot state a claim for specific performance under any circumstances. While none of the cases cited by the parties deal with a similar factual scenario, where no terms of the contract are expressly agreed upon, the court finds that if it is able to rely on defendant's other contracts to determine what is fair, reasonable and non-discriminatory, under California law it must try to enforce the contract. See Goodwest Rubber, 170 Cal.App.3d at 921. Toward that end, the court can envision a scenario where a defendant has offered nearly identical licensing agreements to all other competitors. In such a situation, the court could easily determine what a fair and non-discriminatory contract would be. Additionally, the court observes that determining the customs and practices of defendant and the modem industry would appear to be factual matters outside the scope of the pleadings. Therefore, resolving any doubts in plaintiff's favor, the court finds plaintiff may be able to support a claim for specific performance. Accordingly, defendant's motion to dismiss the specific performance claim is denied.

D. Second and Third Claims for Declaratory Relief

Defendant argues that this court lacks subject matter jurisdiction over plaintiff's declaratory relief claims because no actual controversy exists as to these patent law claims. Alternatively, defendant asserts that even if an actual controversy exists, the court should exercise its discretion and dismiss the declaratory relief claims.

In order to state a claim for declaratory relief under 28 U.S.C. § 2201, a plaintiff must show that an actual controversy exists based on the totality of the circumstances. Spectronics Corp. v. H .B. Fuller Co., 940 F.2d 631, 633- 34 (Fed.Cir.1991). The Federal Circuit has developed a two-part test to determine if an actual controversy exists as to a declaration of patent non-infringement or invalidity: (1) the accused infringer must show that it is prepared to produce or has actually produced the alleged infringing products; and (2) the patentee's conduct must create an objectively reasonable apprehension on the part of the accused infringer that the patentee will initiate suit if the allegedly infringing activity continues. Id. at 634. [FN1]

      FN1. The court observes that plaintiff does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33520483 (N.D.Cal.)
**(Cite as: 1999 WL 33520483 (N.D.Cal.))**

Page 4

seek a declaration that the patents are invalid or that its products do not infringe defendant's patents. However, since at this stage of the proceedings the court finds that plaintiff did allege an objective apprehension of immediate suit by defendant, the court need not address whether such a finding is required for plaintiff's patent misuse and estoppel declaratory relief claims.

In the current case, defendant does not dispute that plaintiff has been producing allegedly infringing products. With respect to the second prong, the court finds that plaintiff has adequately alleged that it had an objectively reasonable apprehension that defendant would initiate a lawsuit. Plaintiff indicates that the final offer made by defendant was more onerous than the previously unacceptable offers and that defendant stated that it was a "take-it-or-leave-it offer." FAC, ¶ 23. Certainly, if true, such an offer leaves no room for further negotiations. Moreover, plaintiff alleges that defendant stated that defendant's only recourse was to "go for a cease and desist order" and to "go to the court and let them decide." *Id.* Plaintiff's apprehension of suit is also supported by the allegation that defendant contacted plaintiff's customers and warned them that if they did not acquire licenses for the V.34 and V.90 patents, they would face infringement actions. Taken together, defendant's actions establish an actual controversy which supports the court's jurisdiction to hear plaintiff's declaratory relief claims of patent misuse and estoppel.

*5 Moreover, the court notes that plaintiff's declaratory relief claims arise from and are related to defendant's alleged improper conduct giving rise to plaintiff's other claims for relief. Therefore, judicial economy is best served by allowing plaintiff to pursue its declaratory relief claims together with its other claims for relief. Thus, the court currently declines to exercise its discretion and dismiss these claims.

### III. ORDER
Based on the foregoing, the court grants defendant's motion to dismiss as to Counts I and V and denies it as to Counts II, III and IV. Plaintiff is given twenty (20) days leave to amend.

Not Reported in F.Supp.2d, 1999 WL 33520483 (N.D.Cal.)

**Motions, Pleadings and Filings (Back to top)**

• 5:99CV20292 (Docket) (Apr. 09, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F



Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 1998 WL 823619 (S.D.N.Y.)
**(Cite as: 1998 WL 823619 (S.D.N.Y.))**

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
FIRST WALL STREET CAPITAL CORPORATION,
Plaintiff,
v.
INTERNATIONAL PROPERTY CORPORATION, LTD.
and Paul Reichmann, Defendants.
**No. 97 Civ. 0702(JGK).**

Nov. 25, 1998.

Thomas A. Kissane, Schlam Stone & Dolan, New York,
NY, for the Plaintiff.

Kenneth Conboy, Lauren Krasnow, Geoffrey Berman,
Latham & Watkins, New York, NY, for the Defendants.

*OPINION AND ORDER*

KOELTL, J.

**\*1** This is an action for damages arising out of a contract in
which defendants International Property Corporation, Ltd.
("IPC") and Paul Reichmann ("Reichmann") allegedly
agreed to compensate plaintiff First Wall Street Capital
Corporation ("FWS") for its assistance in obtaining bridge
financing for the defendants in connection with IPC's
acquisition of certain property in London, England. The
plaintiff alleges that the defendants breached their contract
with FWS by failing to pay FWS an agreed-upon fee of one
percent of the principal amount of any primary debt and
three percent of any mezzanine debt that Cargill Financial
Services Corporation ("Cargill") agreed to provide to
Reichmann or Reichmann's entities. The plaintiff seeks to
recover the approximately $6 million that this fee
represents. The defendants have now moved pursuant to
Federal Rule of Civil Procedure 12(c) for judgment on the
pleadings.

I.

When reviewing a Rule 12(c) motion for judgment on the
pleadings, the Court applies the same standards as on a Rule
12(b)(6) motion to dismiss. *See Narvarte v. Chase*

*Manhattan Bank, N.A.,* 969 F.Supp. 10, 11 (S.D.N.Y.1997).
The Court "must view the pleadings in the light most
favorable to, and draw all reasonable inferences in favor of,
the nonmoving party." *Davidson v. Flynn,* 32 F.3d 27, 29
(2d Cir.1994); *see also Madonna v. United States,* 878 F.2d
62, 65 (2d Cir.1989); *National Ass'n of Pharmaceutical
Mfrs., Inc. v. Ayerst Labs.,* 850 F.2d 904, 909 n. 2 (2d
Cir.1988) (indicating that the Court treats a motion for
judgment on the pleadings as if it were a motion to dismiss);
*Slavsky v. New York City Police Dep't,* 967 F.Supp. 117,
118 (S.D.N.Y.1997). In deciding the motion, the Court can
consider documents referenced in the complaint and
documents that are in the plaintiff's possession or that the
plaintiff knew of and relied on in bringing suit. *See Brass v.
American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d
Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d
42, 47-48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112
S.Ct. 1561, 118 L.Ed.2d 208 (1992); *I. Meyer Pincus &
Assoc., P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762
(2d Cir.1991); *Skeete v. IVF America, Inc.,* 972 F.Supp.
206, 208 (S.D.N.Y.1997).

A court should not dismiss a complaint unless it appears
beyond doubt that the plaintiff can prove no set of facts in
support of his claim that would entitle him to relief. *See
Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (citing
*Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80
(1957)).

II.

Because the defendants' motion is for judgment on the
pleadings, the following relevant facts as alleged in the
plaintiff's amended complaint are accepted as true for
purposes of this motion.

Plaintiff FWS is a Delaware corporation with its principal
place of business in New York City. (Am.Compl.¶ 1.) FWS
is a merchant banking firm and a licensed real estate broker
in New York. (Am.Compl.¶ 1.) Defendant IPC is a
corporation that was formed under the laws of Great Britain
to acquire Canary Wharf, a real estate development located
in London, England. (Am.Compl.¶ 2.) FWS alleges that it
dealt with IPC through Reichmann, a Canadian citizen, who
is IPC's principal. (Am.Compl.¶¶ 3-4.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 823619 (S.D.N.Y.)
**(Cite as: 1998 WL 823619 (S.D.N.Y.))**

**\*2** The plaintiff alleges that in November 1993, at Reichmann's office in Manhattan, FWS introduced Reichmann to representatives of Cargill for the purpose of initiating a relationship in which Cargill might provide financing for some of Reichmann's investments. (Am.Compl.¶ 7.) Reichmann and FWS purportedly agreed from the beginning of their relationship that FWS would serve as a "financial advisor" to Reichmann, his affiliates, and his subsidiaries "in connection with any financing transactions between Reichmann, or the Reichmann entities, and Cargill." (Am.Compl.¶ 7.)

The parties met again in June 1994 in Toronto, Canada. (Am.Compl.¶ 8.) At that time, the plaintiff alleges that FWS and Reichmann agreed that FWS would receive compensation that was "customary and reasonable for an investment bank or financial advisor" for its services to Reichmann and his entities. (Am.Compl.¶ 8.) Reichmann allegedly agreed to pay FWS one percent of the principal amount of any primary debt and three percent of any mezzanine debt which Cargill agreed to finance for Reichmann or any of the Reichmann entities. (Am.Compl.¶ 8.)

In February 1995, the plaintiff alleges that Reichmann requested that FWS serve as his "financial advisor" in putting together the proposed bridge financing from Cargill in connection with a purchase offer that he intended to make for Canary Wharf. (Am.Compl.¶ 9.) The plaintiff asserts that at Reichmann's request, the plaintiff contacted Cargill in the spring of 1995 to gauge Cargill's interest in providing bridge financing for the transaction. (Am.Compl.¶ 15.) Cargill informed FWS that it was interested in providing such financing. (Am.Compl.¶ 15.) In April and May of 1995, FWS, at Reichmann's request, provided Cargill with information about the proposed transaction, the anticipated competition for obtaining the Canary Wharf project, and Reichmann's proposal to buy Canary Wharf. (Am.Compl.¶ 16.)

In May 1995, Reichmann asked Glenn Myles, the President of FWS, and Michael Lipstein, the Vice Chairman of FWS, to meet him in London for the purpose of introducing Reichmann to Cargill's London representative. (Am.Compl.¶ 17.) Myles and Lipstein thus arranged and

attended a May 31, 1995 meeting in London between Reichmann, a number of Reichmann's associates, and Alex Appleby ("Appleby"), Cargill's London representative. (Am.Compl.¶¶ 18-19.) At the meeting, the plaintiff "introduced Reichmann to Appleby." (Am.Compl.¶ 20.) After the meeting, Reichmann told FWS that he would negotiate the terms of the bridge financing with Cargill himself. (Am.Compl.¶ 22.)

Before leaving London after the May 31, 1995 meeting, Myles and Reichmann again discussed the terms of FWS's compensation if Reichmann or a Reichmann entity acquired the Canary Wharf project based on Cargill's willingness to provide financing. (Am.Compl.¶ 24.) Reichmann confirmed that FWS's fee would be one percent of the principal amount of any primary debt and three percent of any mezzanine debt of the bridge financing that Cargill was willing to provide to Reichmann or the Reichmann entities to purchase Canary Wharf. (Am.Compl.¶ 24.)

**\*3** During the summer of 1995, Reichmann asked FWS to introduce him to other potential sources of equity investments in Canary Wharf. (Am.Compl.¶ 29.) FWS worked with Reichmann to locate such potential investors. (Am.Compl.¶ 29.) In late August or early September 1995, Sylvester Investments Limited ("Sylvester"), then the owner of Canary Wharf, informed Reichmann that IPC's purchase offer for Canary Wharf had been accepted. (Am.Compl.¶ 30.) Reichmann immediately informed the plaintiff that he would need only limited services from the plaintiff in the future and would contact the plaintiff as needed. (Am.Compl.¶ 31.)

On October 25, 1995, Myles and Lipstein met with Reichmann to discuss FWS's compensation "for its work in introducing Reichmann to Cargill as a source of bridge financing with respect to IPC's successful Purchase Offer for Canary Wharf." (Am.Compl.¶ 34.) Reichmann allegedly acknowledged that FWS had performed the services for which Reichmann had engaged it, but he offered the plaintiff only $500,000, rather than the agreed upon one percent of the £>>400 million financing provided by Cargill, which was equivalent to $6 million. (Am.Compl.¶ 36.) FWS refused that offer. (Am.Compl.¶ 37.) This lawsuit followed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 1998 WL 823619 (S.D.N.Y.)
**(Cite as: 1998 WL 823619 (S.D.N.Y.))**

### III.

The defendants argue first that they are entitled to judgment on the pleadings because FWS is precluded from recovering compensation for its work related to the Canary Wharf project pursuant to New York Real Property Law § 442-d (McKinney's 1998). The defendants contend that although FWS has alleged that it was a licensed real estate broker at the time of the acts in question, FWS has not alleged that Myles and Lipstein, who acted on FWS's behalf, were also licensed real estate brokers. On this point, the defendants have introduced uncontroverted documentary evidence from the New York Department of State indicating that Myles has not been a licensed real estate broker since at least January 1, 1992. (Decl. of Kathleen M. McCoy, Special Deputy Secretary of State, dated May 4, 1998, attached as Ex. 1 to Decl. of Lauren G. Krasnow dated Aug. 11, 1998 (hereinafter "Krasnow Decl.").) So long as even one person involved in the transaction was not a licensed broker, the defendants contend, FWS cannot recover.

In its papers, the plaintiff does not dispute that Myles and Lipstein are not licensed real estate brokers. The plaintiff also does not dispute that New York Real Property Law § 442-d requires that all participants in a real estate transaction be licensed brokers in order for an oral agreement concerning compensation for their brokerage services to be enforceable.

The plaintiff contends, however, that § 442-d does not apply to the services that were rendered in this case. The plaintiff claims that it rendered financial advisory services, not real estate brokerage services, to the defendants. The plaintiff argues that § 442-d does not apply to the provision of financial advisory services.

**\*4** The defendants dispute this characterization of the plaintiff's services. In particular, the defendants argue that the plaintiff acted as a "finder" of real estate financing by introducing the defendants to Cargill as a potential source of bridge financing. The defendants point to numerous references in the complaint to Myles and Lipstein arranging introductions for Reichmann. Such "finder" services, the defendants contend, are clearly covered by § 442-d.

New York Real Property Law § 442-d provides as follows:

No person, copartnership or corporation shall bring or maintain an action in any court of this state for the recovery of compensation for services rendered, in any place in which this article is applicable, in the buying, selling, exchanging, leasing, renting or negotiating a loan upon any real estate without alleging and proving that such person was a duly licensed real estate broker or real estate salesman on the date when the alleged cause of action arose.

The law was designed, among other things, "to protect dealers from unlicensed persons acting as brokers and to protect the public from inept, inexperienced persons." Eaton Assocs. v. Highland Broadcasting Corp., 81 A.D.2d 603, 604, 437 N.Y.S.2d 715, 716 (2d Dep't 1981); see also M.K.D. Capital Corp. v. Miller, 170 Misc.2d 1002, 652 N.Y.S.2d 919 (Sup.Ct.N.Y.Co.1996) (noting that purpose of laws requiring licensing of brokers was "to assure the public of services competently, skillfully and ethically rendered by real estate brokers"). The statute is strictly construed and compliance is "mandatory." See, e.g., American Property Consultants, Ltd. v. Walden Lisle Assocs., Ltd. Partnership, 95 Civ. 329, 1997 WL 394617, at *7 (S.D.N.Y. July 14, 1997).

New York Real Property Law § 442-d requires that all of the people or entities involved in providing brokerage services be licensed real estate brokers in New York. For example, New York state courts have held that under § 442-d, "[a]n employer may not recover in an action brought for a brokerage commission if the employee, acting as broker, is an unlicensed salesperson, otherwise the statute could not be given practical effect, and the obvious purpose of the Legislature would be frustrated." Small v. Marchese, 98 Misc.2d 295, 296-97, 413 N.Y.S.2d 808, 809 (App. Term 1st Dep't 1978); Philip Mehler Realty, Inc. v. Kayser, 176 A.D.2d 104, 105, 574 N.Y.S.2d 1, 2 (1st Dep't 1991) (finding that § 442-d barred an unlicensed plaintiff corporation from bringing an action to recover compensation for brokerage services despite the fact that the corporation's president was a licensed broker). Further, "[t]he participation of an unlicensed broker or salesman as a substantial factor in effectuating the transaction renders it unlawful." Meltzer v. Crescent Leaseholds, Ltd., 315 F.Supp. 142, 146 (S.D.N.Y.1970), aff'd, 442 F.2d 293 (2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                      Page 4
Not Reported in F.Supp.2d, 1998 WL 823619 (S.D.N.Y.)
**(Cite as: 1998 WL 823619 (S.D.N.Y.))**

Cir.1971); *see* N.Y. Real Prop. Law § 442-e (McKinney's 1998) (the violation of any provision of Article 12-A of the New York Real Property Laws on real estate brokers and salesmen constitutes a misdemeanor).

*\*5* In this case, there is no allegation that Myles or Lipstein are licensed real estate brokers. Further, the amended complaint alleges only that Myles and Lipstein, not anyone else, acted on FWS's behalf in rendering the services in question. Thus if the services rendered were brokerage services covered by § 442-d, namely "services rendered ... in the buying, selling, exchanging, leasing, renting or negotiating a loan upon any real estate," then Myles and Lipstein performed those services. Because Myles and Lipstein are not licensed, their participation would render the transaction unenforceable under § 442- d. *See, e.g., Meltzer,* 315 F.Supp. at 146; *Chappo & Co. v. Allan Riley Co.,* 225 A.D.2d 468, 468, 639 N.Y.S.2d 383, 384 (1st Dep't 1996) (holding that where the "documentary evidence clearly establishes that a mortgage was the dominant security under the loan allegedly negotiated by the plaintiff" and the assignment of rents was "incidental" to the transaction, then the unlicensed plaintiff was acting as a real estate broker and § 442-d barred its claim); *Philip Mehler Realty, Inc.,* 176 A.D.2d at 106, 574 N.Y.S.2d at 2.

However, the plaintiff claims that § 442-d does not apply to this case because the plaintiff and its employees provided financial advisory services to the defendants, not real estate brokerage services. The plaintiff relies primarily on *Eaton Associates v. Highland Broadcasting Corp.,* 81 A.D.2d 603, 437 N.Y.S.2d 715 (1st Dep't 1981), which held that financial consulting services are not within the purview of § 442-d. *See Eaton Assocs.,* 81 A.D.2d at 604, 437 N.Y.S.2d at 716. *Eaton* held that such financial services included "the preparation of a financial plan and the rendering of financial advice to [the defendant's] employees and officers...." *Id.* The Court in *Eaton* noted more generally that not "every situation in which an interest in real estate may be part of the transaction" is covered by § 442-d. *Id.; see also Gerstein v. 532 Broad Hollow Road Co.,* 75 A.D.2d 292, 296-97, 429 N.Y.S.2d 195, 198-99 (1st Dep't 1980) (finding that § 442-d did not apply where the plaintiff's services consisted primarily of providing the defendants with his expertise

about the building at issue). Instead, where real estate brokerage services are merely "an incidental feature" of a plaintiff's responsibilities, § 442-d does not apply. *Eaton Assocs.,* 81 A.D.2d at 604, 437 N.Y.S.2d at 716.

The plaintiff contends that the amended complaint sufficiently alleges that the services that were provided by the plaintiff in this case were financial advisory services that are not covered by § 442-d. (Am.Compl.¶¶ 9-11, 15, 16, 19-23.) For example, the plaintiff has alleged that "[f]rom the beginning of the relationship [between FWS and Reichmann] ... it was contemplated ... that [FWS] would act as a financial advisor to Reichmann...." (Am.Compl.¶ 7.) The particular financial services allegedly provided by the plaintiff included, among other things, putting together financing for Reichmann, contacting third parties that might be interested in providing financing to Reichmann, and providing Cargill with information about Reichmann's proposed financing for the Canary Wharf transaction. (Am.Compl.¶¶ 9, 15, 16.) Further, the amended complaint alleges that the parties agreed that FWS's compensation would be "customary and reasonable for an investment bank or financial advisor...." (Am.Compl.¶ 8.) In addition to these allegations in the complaint, the plaintiff points to an affidavit from Myles providing further details about the financial services that were allegedly provided in this case. (Decl. of Glenn Myles dated Sept. 9, 1998, attached as Ex. 1 to Decl. of Thomas A. Kissane.)

*\*6* The defendants point to numerous allegations in the complaint that they claim are clearly references to real estate brokerage services, namely "finder" services. "Finders" of financing for real estate transactions have been held to be within the purview of § 442-d. *See, e.g., Meltzer,* 315 F.Supp. at 150 (finding that under § 442-d, the unlicensed plaintiff could not sue to be compensated for "activities to obtain [a] real estate mortgage" where those activities were "a principal part of the entire transaction"). If the services the plaintiff rendered were primarily real estate brokerage services, the plaintiff cannot evade § 442-d simply by labeling the services financial advisory services. *See, e.g., American Property Consultants, Ltd.,* 1997 WL 394617, at *7 n. 11.

However, this is a Rule 12(c) motion for judgment on the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



pleadings. The Court should only examine the pleadings to determine whether the plaintiff could prove any set of facts in support of its claims that would entitle it to relief. Here the plaintiff has pleaded sufficient facts to meet that burden. The plaintiff's complaint is replete with references to the financial advisory services the plaintiff allegedly rendered and provides some detail about those services. The plaintiff could prove sufficient facts in support of these allegations to entitle it to relief under cases like *Eaton*. The plaintiff could demonstrate, for example, that its financial planning and advisory services dominated the transaction and that the fact that the transaction concerned real estate was incidental to those services. Thus, the defendants' motion for judgment on the pleadings based on New York Real Property Law § 442-d is denied. [FN1]

> FN1. Since the Court denies the defendants' motion for judgment on the pleadings based on N.Y. Real Prop. Law § 442-d, the Court need not address the defendants' argument that the plaintiff's quantum meruit claims must be dismissed as an attempt to circumvent the requirements of § 442- d.

### IV.

The defendants next contend that they are entitled to judgment on the pleadings because the alleged fee agreement between FWS and IPC was not set out in a writing and thus violates the New York Statute of Frauds. *See* N.Y. Gen. Obligs. Law § 5-701 (McKinney's 1998). The plaintiff responds that English, not New York, law governs this case. English law, the plaintiff argues, does not have a Statute of Frauds that would bar the present action.

Because this Court is sitting in diversity, it must apply the choice of law rules of New York, the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir.), *cert. denied*, 522 U.S. 864, 118 S.Ct. 169, 139 L.Ed.2d 112 (1997); *Insurance Co. of North Am. v. Pyramid Ins. Co. of Bermuda, Ltd.*, 92 Civ. 1816, 1994 WL 88701, at *2 (S.D.N.Y. Mar. 16, 1994). Under New York choice of law rules, the Court must first determine whether there is "an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223, 597

N.Y.S.2d 904, 613 N.E.2d 936 (1993); *see Insurance Co. of North Am.*, 1994 WL 88701, at *2. Here the parties do not dispute that the New York Statute of Frauds would bar the plaintiff's lawsuit based on the alleged oral contract. In addition, the parties do not dispute that because England has no equivalent to the New York Statute of Frauds, the plaintiff's lawsuit could proceed under English law. Thus the laws of the two jurisdictions in this case are in actual conflict.

*7 As a result, the Court must apply New York's choice of law rules to determine whether New York or English law applies to this case. New York's choice of law rules in contract cases require that the Court examine the "grouping of contacts" in the case to determine what law should apply. *See, e.g., Lazard Freres & Co.*, 108 F.3d at 1539 (citations omitted); *First City Acceptance Corp. v. Gulf Ins. Co.*, 245 A.D.2d 649, 650-51, 665 N.Y.S.2d 114, 115-16 (3d Dep't 1997). The contacts to be considered include, but are not limited to, "the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of the business of the contracting parties." *Lazard Freres & Co.*, 108 F.3d at 1539 (citation omitted); *see In re Allstate Ins. Co.*, 81 N.Y.2d at 227, 597 N.Y.S.2d 904, 613 N.E.2d 936.

At this stage in the proceedings, it is not possible for the Court to determine whether New York or English law applies here. England does have a significant number of contacts to this case. First, the contract at issue here related to obtaining financing for the purchase of property located in England. Second, the defendant IPC is formed under the laws of Great Britain. In addition, the plaintiff alleges that it is suing on an agreement that was negotiated in part and agreed to in England. (Am.Compl.¶¶ 17-21, 24.) The plaintiff also alleges that the agreement upon which the plaintiff now sues was reached in England because the defendant requested that the plaintiff travel to England. (Am.Compl.¶ 17.) The defendants dispute the plaintiff's contentions, including when and where the agreement between the parties was allegedly reached. The defendants also argue that New York law should apply because New York has a special interest in applying its Statute of Frauds to "finder's fee agreements," so long as there are "sufficient

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                          Page 6
Not Reported in F.Supp.2d, 1998 WL 823619 (S.D.N.Y.)
**(Cite as: 1998 WL 823619 (S.D.N.Y.))**

contacts" with New York. *See, e.g., Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 382- 84, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969). As noted above, however, the plaintiff disputes that it acted as a "finder" in this case, and disputes the significance of the New York contacts in this case, particularly in view of its position now that the contract ultimately sued on was confirmed in London and that the London agreement is sufficient to sue upon.

The resolution of the above factual disputes will plainly determine whether English or New York law applies to this case. The factual disputes bearing on the choice of law issue in this case require more development than they have received at this stage, however. *See Employers Mut. Casualty Co. v. Key Pharmaceuticals, Inc.,* 91 Civ. 1630, 1992 WL 8712, at *8 (S.D.N.Y. Jan. 16, 1992) (finding that facts relevant to determining choice of law were disputed by the parties and thus declining to decide choice of law issue until completion of discovery). For the purposes of this motion for judgment on the pleadings, it is sufficient to note that drawing every inference in the plaintiff's favor, the plaintiff could prove some set of facts under its pleading that would require the application of English law and not New York law to this case. Thus the defendants' Rule 12(c) motion based on the New York Statute of Frauds is denied.

Conclusion
**\*8** For the reasons explained above, the defendants' Rule 12(c) motion for judgment on the pleadings is denied.

SO ORDERED.

Not Reported in F.Supp.2d, 1998 WL 823619 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:97cv00702 (Docket) (Feb. 03, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G



Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2002 WL 31246922 (E.D.Pa.), 2002-2 Trade Cases P 73,779
(Cite as: 2002 WL 31246922 (E.D.Pa.))



**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
FRESH MADE, INC., Plaintiff
v.
LIFEWAY FOODS, INC., et al., Defendants.
**No. Civ.A. 01-4254.**

Aug. 9, 2002.

MEMORANDUM AND ORDER
MCLAUGHLIN, J.

**\*1** The present case arises out of a long-running business and legal dispute between two competing manufacturers of specialty dairy products such as kefir, a fermented yogurt-style drink. Plaintiff Fresh Made, Inc. alleges that the defendants have engaged in unfair competition and have violated federal antitrust laws, various state laws, and the Lanham Act. Defendants Lifeway Foods, Inc. and Michael Smolyansky have filed a Motion to Dismiss the Amended Complaint.

Because the Court concludes that the Amended Complaint does not sufficiently allege a relevant antitrust market, the federal antitrust claims will be dismissed. The Court also finds that the state law claims, which are largely predicated upon the conduct underlying the federal antitrust claims, are insufficiently pled and must also be dismissed. However, the Amended Complaint does state a valid claim under the Lanham Act, and the motion to dismiss will be denied insofar as it seeks to dismiss that claim. The Court will grant Fresh Made leave to amend the complaint.

I. Background

Plaintiff Fresh Made, Inc. ("Fresh Made") is a closely held Pennsylvania corporation which has, since 1982, been engaged in the business of manufacturing, distributing and selling certain specialty dairy products, such as kefir, a fermented yogurt-style drink. Fresh Made targets these products to immigrants from the former Soviet Union. Defendant Lifeway Foods, Inc. ("Lifeway") is a publicly traded Illinois corporation that is a principal competitor of Fresh Made. Defendant Michael Smolyansky is the President and CEO of Lifeway.

Fresh Made alleges that Lifeway has been engaged in an illegal campaign of unfair competition designed to suppress and stifle Fresh Made's attempt to compete with Lifeway in the sale of kefir and other specialty dairy products. As part of this campaign, Fresh Made alleges that Lifeway threatened to pull its business from distributors who also did business with Fresh Made, threatened legal proceedings against distributors who did business with Fresh Made, and threatened to "call in" lines of credit it had provided to certain specialty food markets if they did not stop carrying Fresh Made products. Fresh Made further alleges that Lifeway conspired with manufacturers of kefir containers to restrict the sale of such containers to Fresh Made in an effort to restrict competition.

The Amended Complaint states that 20% of Lifeway's outstanding common stock is owned by Danone Foods, Inc. ("Danone"), which allegedly either controls or exercises significant influence over Lifeway's business activities. It also states that Danone and Lifeway entered into an agreement not to compete with each other. This agreement allegedly gave Lifeway direct entry into Danone's extensive distribution network.

In addition, Fresh Made alleges that Lifeway has filed a series of lawsuits against it, with the intent of driving Fresh Made out of business by forcing it to expend large amounts of money on legal fees. The first of these lawsuits, filed in the Northern District of Illinois, claimed that Fresh Made had copied Lifeway's use of milk-bottle shaped kefir containers. That suit was dismissed for want of personal jurisdiction in October of 1996. Shortly thereafter, Lifeway filed a similar lawsuit against Fresh Made in the Eastern District of Pennsylvania. That suit was ultimately dismissed in June of 1997 because Lifeway failed to serve a timely complaint.

**\*2** In March of 1998, Lifeway once again filed suit over Fresh Made's use of milk-bottle shaped kefir containers, again in the Eastern District of Pennsylvania. The parties ultimately settled this lawsuit for a modest sum.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2002 WL 31246922 (E.D.Pa.), 2002-2 Trade Cases P 73,779
**(Cite as: 2002 WL 31246922 (E.D.Pa.))**

In August of 1999, Lifeway filed a fourth lawsuit against Fresh Made, this time in the Eastern District of New York. The suit alleged that Fresh Made was improperly marketing some of its dairy products under a Russian term that had been trademarked by Lifeway. [FN1] In that action, Fresh Made brought a counterclaim seeking to invalidate Lifeway's trademark. In April of 2000, the parties entered into a settlement agreement and mutual release. Pursuant to the terms of the release, the parties dismissed their claims against each other, and Lifeway agreed to purchase from Fresh Made all unused product labels for Fresh Made cheese products bearing the disputed Russian term. Fresh Made alleges that the $30,000 paid by Lifeway for these labels was really compensation for Fresh Made's agreement not to prosecute its trademark invalidation counterclaim.

> FN1. The Russian term is [SEE ILLUSTRATION IN ORIGINAL]. The English transliteration of this term is Krest yanskiy.

Following the execution of the settlement agreement, Fresh Made alleges that Smolyansky threatened to make Fresh Made pay back the $30,000. Smolyansky also allegedly said that in America, it was the destiny of a big company to swallow up a little company like Fresh Made.

In May of 2001, Lifeway brought another lawsuit against Fresh Made, this time in Illinois state court. The suit alleges that Fresh Made has breached the terms of the settlement agreement by using labels on its butter products that are not in conformity with the terms of the agreement. This action is still pending in Illinois.

In the present action, Fresh Made alleges that Lifeway has violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, by conspiring to restrict competition and attempting to obtain a monopoly in the market which includes kefir and other specialty dairy goods (Counts I and II). Fresh Made also brings state law claims for Restraint of Trade (Count III), Malicious Abuse of Process (Count IV), Interference with Existing and Prospective Business Relationships (Count V), Civil Conspiracy (Count VI), and Unfair Competition and Attempted Monopoly (Count VII). Finally, Fresh Made alleges that Lifeway has violated the Lanham Act, 15 U.S.C. § 1125(a), through the use of an advertisement for kefir that contains allegedly false representations (Count VIII). [FN2]

> FN2. The Amended Complaint also includes a claim for violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (Count X). Fresh Made, however, wishes to withdraw the claim, and it will be dismissed.

Presently before the Court is a Motion to Dismiss the Amended Complaint filed by defendants Lifeway and Smolyansky. [FN3] They argue that this suit is barred by the terms of the settlement agreement and release signed by the parties in April of 2000. The defendants also argue that Counts I through VII should be dismissed for failure to state a claim, Finally, the defendants have moved for a more definitive statement on Count VIII, should the Court find that the Lanham Act claim is not barred by the settlement agreement and release.

> FN3. Lifeway and Smolyansky joined in the motion to dismiss, but the Court will refer throughout this memorandum to the parties collectively as "Lifeway." Danone was originally a defendant as well, but Fresh Made moved to dismiss Danone as a defendant, and by order of March 11, 2002, Danone was dismissed from the case. See Docket # 25.

## II. Settlement Agreement and Release

*3 The settlement agreement entered into by the parties in April of 2000 was intended not only as a settlement of the trademark suit that was then pending in the Eastern District of New York, but also as a global settlement of all differences between the parties. Am. Compl. ¶ 87. Indeed, the release language of the agreement is broad and global in scope. The release provides that Lifeway and Freshmade release each other from "any and all actions, causes of actions, [and] suits ... [which the parties] now know of or which should have been known for, upon, and by reason of any matter, cause or thing whatsoever, from the beginning of the world to the date of this Settlement Agreement and Mutual Release." Ex. A. to Def.'s Mot. to Dismiss ("Agreement"), ¶ 12.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d, 2002 WL 31246922 (E.D.Pa.), 2002-2 Trade Cases P 73,779
**(Cite as: 2002 WL 31246922 (E.D.Pa.))**

Fresh Made makes several arguments about why the release should not bar its claims in the instant suit. First, Fresh Made argues that to read the release to bar its antitrust claims would be against public policy. [FN4] The Third Circuit, however, has held that "there is nothing in the public policy behind antitrust laws that prohibits general releases encompassing antitrust claims, provided that the release does not seek to waive damages from future violations of antitrust laws." *Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885, 896 n. 27 (3d Cir.1975). *See Ingram Corp. v. J. Ray McDermott & Co.,* 698 F.2d 1295, 1310 (5th Cir.1983) (recognizing that "a general release [is] sufficient to release antitrust claims"). Because the release language in question does not seek to immunize future antitrust violations, applying the release to Fresh Made's antitrust claims is not against public policy. [FN5]

> FN4. The settlement agreement has a choice of law clause which selects New York law to govern the terms of the agreement. *See* Agreement at ¶ 17. At oral argument, Fresh Made's counsel conceded that New York law governs the agreement. Tr. of March 8, 2002 Hr'g ("Tr."). 3. However, in supplemental briefing, Fresh Made argued that federal common law should govern the agreement insofar as it is applied to bar any antitrust claim. The Third Circuit has held that there is no federal policy which mandates a uniform national rule to govern the effect of a contractual release as applied to antitrust claims. *Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885, 889 (3d Cir.1975). Therefore, as long as state law "guards against the antitrust violator's use of deception to avoid the federally-created cause of action", state law is properly applied to interpret releases of antitrust claims. *Id.* at 892 (applying Pennsylvania law). Because contractual releases procured by fraud are not enforceable under New York law, the Court finds that New York law appropriately governs the interpretation of the release at issue. *See Ladenburg Thalmann & Co. v. Imaging Diagnostic Sys., Inc.,* 176 F.Supp.2d 199, 204 (S.D.N.Y.2001); *Steen v. Bump,* 233 A.D.2d 583, 649 N.Y.S.2d 731, 732 (N.Y.App.Div.1996). *See also, VKK Corp. v.*

*Nat'l Football League* 244 F.3d 114, 121-22 (2d Cir.2001) (applying New York law to determine the validity of a release encompassing antitrust claims).

> FN5. By its terms, the release does not bar any cause of action arising after the date of the release agreement. For that reason, to the extent that Fresh Made alleges claims that post-date the release, such claims survive Lifeway's motion to dismiss based on the release.

The plaintiff also argues that the release is part and parcel of the larger pattern of antitrust activity, and as such the release is illegal and invalid. The part and parcel doctrine provides that a release is invalid if the release itself was "an integral part of a scheme to violate the antitrust laws." *VKK Corp.,* 244 F.3d at 125 (citations omitted). To satisfy this standard, the "release must be an object of the combination or conspiracy or an integral part of the scheme in restraint of trade." *Id.* (citation and internal quotation marks omitted). If the release is "merely an outgrowth, rather than a cause of the violation, it is not part and parcel of the antitrust conspiracy." *Id.* (citation and internal quotation marks omitted). In addition, "the part and parcel doctrine [cannot] be read so broadly as ... to render void all releases relating to conspiracies alleged to continue post-release." *Id.* at 126. [FN6]

> FN6. As the Second Circuit recently noted, the "part and parcel" doctrine has been "rarely discussed and more rarely applied." *VKK Corp.,* 244 F.3d at 125. In fact, the *VKK* Court observed that no court of appeals "has ever applied the part and parcel theory to invalidate a release." *Id.* at 126.

Fresh Made argues that its allegations "establish that Lifeway entered into the agreement solely because it sought to procure a release of Fresh Made's challenge to [Lifeway's] trademark and not because it intended to end all litigation and claims between the parties." Plf.'s Supp. Br. at 5. Even if true, this does not establish that the release itself was an integral part of the allegedly illegal antitrust activity. The plaintiff does not explain how the release was integral

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2002 WL 31246922 (E.D.Pa.), 2002-2 Trade Cases P 73,779
**(Cite as: 2002 WL 31246922 (E.D.Pa.))**

to the vexatious use of litigation or the attempts to prevent Fresh Made from competing with Lifeway, nor does the plaintiff argue that the alleged conspiracy could not have proceeded without the release. *VKK Corp.,* 244 F.3d at 126. For that reason, the Court finds that Fresh Made cannot invoke the part and parcel doctrine to avoid the terms of the release.

\*4 Fresh Made also asserts that Lifeway's filing of the May 2001 suit in Illinois breached the terms of the settlement agreement, suspending Fresh Made's obligations under the release. Fresh Made alleges that although the Illinois lawsuit is styled as a breach of contract action, Lifeway is seeking to revisit the trademark infringement issues that were settled and released by the April 2000 agreement. However, as that action is currently pending in Illinois, it would be improper for this Court to look beyond the pleadings in an effort to examine the substance of that proceeding.

Similarly, Fresh Made asserts that by filing the May 2001 suit in Illinois, Lifeway violated the forum selection clause of the April 2000 agreement. However, the clause in question does not mandate New York as the exclusive forum for litigating issues pertaining to the agreement. The clause only provides that the parties "consent[ ] to the jurisdiction [of] the United States District Court of the Eastern District of New York" and "waive any rights to challenge [that] jurisdiction and venue". Agreement at ¶ 17. Therefore, Lifeway did not, simply by filing in Illinois, plainly violate the terms of the settlement agreement. [FN7]

> FN7. At oral argument, Fresh Made also argued that the release should not be applied at the motion to dismiss stage to bar its claims. Under New York law, Fresh Made argues, courts interpreting broad release language are required to go behind the language to determine what the intent of the parties to the agreement was. The caselaw relied on by Fresh Made, however, merely holds that when parties enter into a release "purporting to exempt a party from liability for injuries *which may occur in the future",* the release covers only those claims which were "within the contemplation of the parties at the time" of execution. *Bradley Realty Corp. v. State of New York,* 54 A.D.2d 1104, 389

N.Y.S.2d 198, 199 (N.Y.App.Div.1976) (emphasis added). *See Beardslee v. Blomberg,* 70 A.D.2d 732, 416 N.Y.S.2d 855, 856-57 (N.Y.App.Div.1979). The release in this case does not seek to exempt either party from liability for future conduct, but releases only past claims. Therefore, because the release language is clear and unambiguous on its face, the Court need not look to extrinsic evidence to give meaning to its terms. *See, e.g., Goldberg v. Mir's Life Ins. Co.,* 242 A.D.2d 175, 672 N.Y.S.2d 39, 44 (N.Y.App.Div.1998).

Finally, Fresh Made argues that the agreement is unenforceable because it was procured by fraud. Under New York law, "allegations of fraud in the inducement of a release warrant denial of a motion to dismiss that is grounded on a release." *Ladenburg Thalmann & Co. v. Imaging Diagnostic Sys., Inc.,* 176 F.Supp.2d 199, 205 (S.D .N.Y.2001). *See Steen v. Bump,* 233 A.D.2d 583, 649 N.Y.S.2d 731, 732 (N.Y.App.Div.1996).

In the Amended Complaint, Fresh Made alleges that even when negotiating the April 2000 settlement agreement that was supposed to be a settlement of all differences between the parties, Lifeway intended to bring further litigation against Fresh Made. Am. Compl. at ¶¶ 87, 92. This allegation of fraud is sufficient, at this point, to avoid Lifeway's motion to dismiss insofar as it is based on the settlement agreement and release. [FN8]

> FN8. Because a release procured by fraud in the inducement is voidable at the option of the defrauded party, that party can choose to affirm or disaffirm the contract. *See Ladenberg,* 176 F. Supp .2d at 204. In order to disaffirm the contract, the defrauded party must offer to return the consideration received. *Id.* Fresh Made asserts that it may maintain the current action without returning the $30,000 it received under the agreement because it is entitled to affirm the contract and seek to recover damages in an amount equal to the difference between the actual value of the contract and the value as fraudulently represented by Lifeway. Fresh Made argues that there is a question of fact about whether or not the



$30,000 was given by Lifeway as consideration for the release or consideration for the purchase of labels. For that reason, Fresh Made believes that it is entitled to affirm the contract for the purchase of labels and to maintain its suit while avoiding the release. Under New York law, a party is entitled to affirm a contract and bring an action alleging fraud, while avoiding the defense of release. *See Goldsmith v. Nat'l Container Corp.*, 287 N.Y. 438, 442-43, 40 N.E.2d 242 (N.Y.Ct.App.1942)* ( "the releases given by the plaintiff, which the defendants' answer pleads as a defense, do not bar the present action at law whereby the plaintiff seeks damages due to alleged fraudulent misrepresentations and concealments which induced him to give such releases"). For that reason, Fresh Made need not, at this point, return the $30,000 received under the April 2000 agreement in order to avoid the release through its allegations of fraud.

III. Sherman Act Section 1

Section 1 of the Sherman Act Provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Fresh Made alleges that Lifeway's agreements with manufacturers of kefir containers, distributors, and store owners to restrict Fresh Made's access to the market constitute a continuing conspiracy in restraint of trade that violations Section 1.

To establish a Section 1 violation, a plaintiff must prove (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir.1997). Lifeway argues that Fresh Made has failed to sufficiently allege a relevant antitrust market, antitrust injury, or concerted action.

*5 To state a violation of Section 1, a plaintiff must allege that there has been an antitrust injury. [FN9] An antitrust

injury is the type of injury that the antitrust laws were enacted to prevent--an injury to competition rather than competitors. *See Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours and Co.*, 826 F.2d 1235, 1241 (3d Cir.1987) ("antitrust law aims to protect competition, not competitors"). In order to allege an injury to competition, a plaintiff must allege an injury to competition in a particular relevant market. *See Eichorn v. AT & T Corp.*, 248 F.3d 131, 147-48 (3d Cir.2001). The plaintiff bears the burden of defining the relevant market. *Queen City*, 124 F.3d at 436. Failure to do so may result in the dismissal of an antitrust complaint.

> FN9. To recover damages, a private antitrust plaintiff must also allege that it has suffered an "injury in fact" that is attributable to something the antitrust laws were designed to prevent. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 68 L.Ed.2d 442, 101 S.Ct. 1923 (1981). The Amended Complaint alleges that Fresh Made suffered economic losses such as "lost income, revenues and profits," that it has been deprived of the opportunity to expand, grow or otherwise become more profitable, and that its participation in the market has been restricted or reduced. Am. Compl. at ¶¶ 100, 101, 105(b). These allegations sufficiently state that Fresh Made has suffered an injury in fact. *See ABA Section of Antitrust Law, Antitrust Law Developments, 762 (4th ed.1997). In addition, as a direct competitor of Lifeway, the injuries to Fresh Made's business and participation in the market fall into the category of injuries that flow from the conduct that the antitrust laws are intended to prevent. *See Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 964 & n. 14 (3d Cir.1983).

A relevant market for antitrust purposes is comprised of a geographic and a product market. The relevant product market is defined as "those commodities reasonably interchangeable by consumers for the same purposes." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.1992). The relevant geographic market is defined as the "area in which a potential buyer may rationally look for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                              Page 6
Not Reported in F.Supp.2d, 2002 WL 31246922 (E.D.Pa.), 2002-2 Trade Cases P 73,779
**(Cite as: 2002 WL 31246922 (E.D.Pa.))**

goods or services he or she seeks." *Id. at 726.* This geographic market must "conform to commercial reality." *Eichorn,* 248 F.3d at 147.

Lifeway argues that Fresh Made has failed to define a proper product or geographic market, and that the Section 1 claim must, therefore, be dismissed. Fresh Made counters that it has fairly alleged a relevant market. It asserts that the relevant geographic market is the United States, and the relevant product market is specialty Russian dairy foods, including kefir. [FN10] *See* Am. Compl. ¶¶ 17, 19, 116.

> FN10. The United States can, in appropriate instances, be a relevant geographic market. *See, e.g., United States v. Grinnel Corp.,* 384 U.S. 563, 575, 16 L.Ed.2d 778, 86 S.Ct. 1698 (1966).

The Third Circuit has instructed that although "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers", there is no "prohibition against dismissal of antitrust claims for failure to plead a relevant market". *Queen City,* 124 F.3d at 436. "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability' and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Id.* Therefore, where a "complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand" a motion to dismiss may be properly granted. *Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ.,* 812 F.Supp. 387, 391 (S.D.N.Y.1993) (cited by *Queen City,* 124 F.3d at 437).

In the Amended Complaint, Fresh Made does not ground its allegations regarding product market with reference to the rule of reasonable interchangeability and cross-elasticity of demand. [FN11] Fresh Made does not allege facts establishing that the market for specialty Russian dairy products, such as kefir, is distinct from the market for yogurt, other drinkable yogurt products, or from other dairy products in general. [FN12] The amended complaint contains no allegations relating to the price of and/or the demand for kefir and other specialty Russian dairy products relative to products in the larger dairy market as a whole. Fresh Made simply fails to allege whether there are reasonably interchangeable alternatives for its products. It is also unclear from the allegations what relationship kefir has to other specialty Russian dairy products or why they are appropriately in the same product market.

> FN11. Reasonable interchangeability of use implies that "one product is roughly equivalent to another for the use to which it is put." *Queen City,* 124 F.3d at 437. Reasonable interchangeability can be indicated by cross-elasticity of demand between the product itself and substitutes for it. *Id.* Products in a relevant market are "characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Id.* (quoting *Tunis Bros.,* 952 F.2d at 722).

> FN12. Fresh Made does allege that its products serve the needs of the "Russian-speaking immigrant community that has taken residence in the United States." Am. Compl. ¶ 17. Fresh Made also alleges that it is these immigrants who represent the market for the "niche of specialty dairy products" that it produces. *Id.* at ¶ 19. These allegations suggest that Fresh Made may be able to plead a relevant submarket within the overall dairy market. *See Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 8 L.Ed.2d 510, 82 S.Ct. 1502 (1962) (holding that within a "broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes"). Factors indicating whether the finding of a sub-market is appropriate include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



vendors." *Id. See Tower Air, Inc. v. Federal Express Corp., 956 F.Supp. 270, 280 (E.D.N.Y.1996); Tasty Baking Co. v. Ralston Purina, Inc., 653 F.Supp. 1250, 1258 (E.D.Pa.1987).* However, a complaint alleging a submarket is not excused from grounding its allegations with facts regarding reasonable interchangeability and cross-elasticity of demand.

**\*6** Without pleadings asserting otherwise, the Court cannot at this point conclude that the proposed market of kefir and other specialty Russian dairy products is an appropriately separate and distinct market, and therefore a relevant market for antitrust purposes. *See, e.g., Queen City, 124 F.3d at 436-37,* citing, *B.V. Optische Industrie De Oude Delft v. Hologic, Inc., 909 F.Supp. 162, 172 (S.D.N.Y.1995)* (dismissing antitrust claim because there were no pleadings that the "chest equalization radiography" market was independent from the "overall X-ray market"); *E. & G. Gabriel v. Gabriel Bros., Inc., 1994 U.S. Dist. LEXIS 9455, No. 93 Civ. 0894(PKL), 1994 WL 369147, at \* \*3-5 (S.D.N.Y. July 13, 1994)* (dismissing antitrust claim because proposed market contained varied items with no cross-elasticity of demand); *Re-Alco Indus., 812 F.Supp. at 392* (dismissing antitrust claim where the complaint failed to "discuss the existence or nonexistence" of alternate products "and any relevant differences in demand"). The Court concludes that the Amended Complaint fails to sufficiently define a relevant product market in support of the Section 1 claim.

Fresh Made argues that even if the Amended Complaint fails to adequately allege a relevant market, it has alleged activity that constitutes a *per se* antitrust violation, and as such, it need not plead or establish a relevant market. If a plaintiff can show a *per se* antitrust violation, market power in a relevant market need not be established. *See Fed. Trade Comm'n v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 431-35, 107 L.Ed.2d 851, 110 S.Ct. 768 (1990); Eichorn, 248 F.3d at 147 n. 4; In re: Mercedes-Benz AntiTrust Litig., 157 F.Supp.2d 355, 359 (D.N.J.2001).* Fresh Made argues that because the complaint alleges a concerted refusal to deal (a boycott), it has alleged a *per se* violation, and any failure to plead a relevant market is

immaterial.

The Supreme Court has, however, held that "precedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135, 142 L.Ed.2d 510, 119 S.Ct. 493 (1998).* Therefore, "antitrust law does not permit the application of the *per se* rule in the boycott context in the absence of a horizontal agreement." *Id.* at 138. In addition, no vertical restraint can be "illegal *per se* unless it includes some agreement on price or price levels." *Id.* at 136 (citing *Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 735-36, 99 L.Ed.2d 808, 108 S.Ct. 1515 (1988)).*

The Amended Complaint alleges only a vertical boycott between Lifeway, the kefir container manufacturers, distributors and store owners. [FN13] *See, e.g., TV Communications Newtork, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1027 (10th Cir.1992)* (agreement between "entities at different market levels" is a vertical restraint, which is not illegal *per se* absent an agreement as to pricing levels). In addition, there is no allegation that this boycott was designed to affect the price of kefir or other specialty dairy goods. For these reasons, the Amended Complaint does not properly allege a *per se* antitrust violation. Therefore, the failure to sufficiently allege a relevant antitrust market is fatal to Fresh Made's claim under Section 1 of the Sherman Act.

> FN13. There is no allegation that Danone is a competitor of Lifeway in the relevant market, so any argument that any alleged agreement between those two parties is sufficient to state a horizontal boycott would be unavailing.

**\*7** Lifeway also argues that Fresh Made has failed to sufficiently allege an antitrust conspiracy or concert of action. To state a federal antitrust claim under Section 1, a plaintiff must allege a conspiracy or concerted activity by the defendant. *See Queen City, 124 F.3d at 442.* A "general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action". *Fuentes v. South Hills Cardiology, 946 F.2d 196, 201-202 (3d Cir.1991)* (citation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                        Page 8
Not Reported in F.Supp.2d, 2002 WL 31246922 (E.D.Pa.), 2002-2 Trade Cases P 73,779
(Cite as: 2002 WL 31246922 (E.D.Pa.))

omitted). Therefore, a plaintiff "must plead the facts constituting the conspiracy, its object and accomplishment." Id.

The Amended Complaint alleges that Lifeway conspired, with the "express or implicit consent" of Danone, with manufacturers of kefir containers, with distributors, and with store owners, in violation of Section 1.

To the extent that a conspiracy is alleged to exist between Lifeway and Smolyansky, such allegation is insufficient. Such an internal agreement "to implement a single firm's policies does not raise the antitrust dangers that [Section 1] was designed to police." Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1132 (3d Cir.1995) (quoting Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769, 81 L.Ed.2d 628, 104 S.Ct. 2731 (1984)). Although some courts have recognized that in cases where the agent is acting "for personal reasons", an "exception to the general rule that a corporation cannot conspire with its employees, officers or agents" may exist, any such exception is not applicable here. 54 F.3d at 1135. Because Fresh Made has not alleged that Smolyansky was acting to "further his own economic interest in a marketplace actor which benefits from the alleged restraint", the personal interest exception does not apply. 54 F.3d at 1136-37.

In addition, to the extent that Fresh Made alleges a Section 1 conspiracy between Lifeway and Danone, such allegations may be insufficient. Copperweld held that a corporation cannot conspire for antitrust purposes with a wholly-owned subsidiary. Copperweld, 467 U.S. at 771-72. The Amended Complaint states that Danone is the owner of 20% of Lifeway's outstanding common stock. Danone's alleged 20% interest in Lifeway does not appear to be enough to invoke the Copperweld rule. [FN14] However, the allegation that Danone controls or exercises significant or substantial influence over Lifeway arguably makes Danone and Lifeway a single entity with unity of interests, incapable of conspiring under Copperweld. [FN15] See Eichorn, 248 F.3d at 138 (recognizing that a parent and its wholly owned subsidiary cannot conspire because they have "complete unity of interest" and one "corporate consciousness").

FN14. Courts have, however, extended

Copperweld to situations where the parent corporation owned all but a de minimis portion of the subsidiary. See Siegel Transfer, 54 F.3d at 1132-33 (applying Copperweld because 99.92% stock ownership was de minimis variation from 100% owner-ship); Julian O. von Kalinowski, et al., 1 Antitrust Laws and Trade Regulation, § 11.02[2][a][iii] at 11-16 through 11-17 (2d Ed. Matthew Bender, 2001) (citing cases).

FN15. Fresh Made also cites a pre-Copperweld case from the Northern District of California to support its argument that single firm behavior can be litigated under Section 1 under a "thin conspiracy" theory. See Gen. Communications Eng'g, Inc. v. Motorola Communications and Elecs., Inc., 421 F.Supp. 274 (N.D.Cal.1976). However, as it pre-dates Copperweld, it is of little value.

In any event, Fresh Made also alleges that Lifeway has conspired with manufacturers of kefir containers, distributors, and store owners. [FN16] Am. Compl. ¶¶ 97(a)-(d). No Copperweld problem arises with regard to these entities. [FN17]

FN16. Lifeway argues that because these persons or entities are unnamed, the allegation is insufficient. At oral argument, Fresh Made stated that if granted leave to amend the complaint, it would name at least some of the manufacturers, distributors, and store owners involved in the conspiracy. Tr. at 52. Such an amendment should alleviate Lifeway's concern.

FN17. Lifeway also argues that Fresh Made's allegations of conspiracy between Lifeway and manufacturers, distributors, and store owners describe statements made exclusively by Lifeway, and action by the other entities only under duress. See Am. Compl. PP 36-40. However, "even if one is coerced by economic threats or pressure to participate in an illegal scheme, that does not make him any less a coconspirator" for purposes of Section 1. E.g., Otto Milk Co. v. United Dairy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 9
Not Reported in F.Supp.2d, 2002 WL 31246922 (E.D.Pa.), 2002-2 Trade Cases P 73,779
**(Cite as: 2002 WL 31246922 (E.D.Pa.))**

*Farmers Coop. Ass'n* 261 F.Supp. 381, 385 (E.D.Pa.1966), *aff'd,* 388 F.2d 789 (3d Cir.1967).

*8 Fresh Made has requested leave to amend its complaint to the extent that it has failed to adequately allege a proper market in support of its antitrust allegations. Plf.'s Br. at 50. Although the Court recognizes that Fresh Made has already amended its complaint once as a matter of right and has yet to plead a valid antitrust claim, the Court will permit Fresh Made an opportunity to amend its complaint. If Fresh Made can, in good faith, plead a relevant antitrust market with appropriate well-founded allegations to support a Sherman Act claim, it may attempt to do so.

### IV. Sherman Act Section 2

In order to prevail on an attempted monopolization [FN18] claim under Section 2 of the Sherman Act, a plaintiff must prove that the defendant (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize, and with (3) a dangerous probability of achieving monopoly power. *Queen City Pizza,* 124 F .3d at 442; *Barr Labs., Inc. v. Abbott Labs.* 978 F.2d 98, 112 (3d Cir.1992). "In order to determine whether there is a dangerous probability of monopolization, a court must inquire into the relevant product and geographic market and the defendant's economic power in that market." *Queen City,* 124 F.3d at 442 (citations and internal quotation marks omitted). Lifeway argues that the Section 2 claim must be dismissed because Fresh Made cannot establish a dangerous probability of achieving monopoly power without defining the relevant product and geographic markets. [FN19]

> FN18. Section 2 can support a claim for monopolization or attempted monopolization. The Amended Complaint states only a claim for attempted monopolization. Am. Compl. PP 112-117.

> FN19. Lifeway did not challenge the Amended Complaint's allegations of anti-competitive conduct. In addition, Fresh Made alleges that Lifeway had specific intent to achieve monopoly power, and the alleged statements of Smolyansky are a sufficient factual basis for this assertion. *See* Am. Compl. PP 74 & 112.

Under Section 2, as under Section 1, the relevant market is defined by reasonable inter-changeability and cross-elasticities of demand. *Id.,* at 442 n. 18. Because the Court has found that Fresh Made has not alleged a sufficient market in terms of reasonable interchangeability and cross-elasticity of demand, the Section 2 claim will also be dismissed. *See id.* at 442.

Even had Fresh Made sufficiently described a relevant antitrust market, the Amended Complaint has not sufficiently alleged that there is a dangerous probability that Lifeway would achieve monopoly power. Although the Amended Complaint states that, there "exists a dangerous probability that Lifeway will succeed in achieving a monopoly over the Russian specialty dairy product market in the United States", such a conclusory allegation standing alone is insufficient to state a Section 2 attempted monopolization claim. *See, e.g., E. & G. Gabriel.* 1994 U.S. Dist. LEXIS 9455, 1994 WL 369147 at *5 (allegation that defendant had "a dangerous probability of achieving monopoly power" insufficient where claim was otherwise deficient).

The Amended Complaint alleges that Lifeway's gross annual revenues are five times as large as Fresh Made's, that Lifeway has achieved access to Danone's large distribution network, and that Lifeway has used its influence to threaten distributors and food markets who did not agree to its demands. Am. Compl. at ¶ ¶ 6, 10, 113 & 117. Fresh Made does not, however, allege the overall size of the proposed market, identify Lifeway's percentage share of the proposed market, identify other participants and competitors in the market, or allege what percentage of Lifeway's gross annual revenues are derived from the proposed market. Therefore, the allegations regarding the relative size of the parties do not sufficiently illustrate that Lifeway has a dangerous probability of achieving monopoly power in the relevant market.

### V. Lanham Act

*9 Count VIII of the Amended Complaint alleges that Lifeway has violated the Lanham Act by publishing certain advertisements for kefir that are false and misleading. The allegedly false advertisements state that Lifeway's kefir is "America's only real kefir." Am. Compl. ¶ 170 & Ex. C.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Case 3:08-cv-01607-JAH-JMA   Document 35-4   Filed 01/18/2006   Page 3 of 23

Not Reported in F.Supp.2d                                                                Page 10
Not Reported in F.Supp.2d, 2002 WL 31246922 (E.D.Pa.), 2002-2 Trade Cases P 73,779
(Cite as: 2002 WL 31246922 (E.D.Pa.))

Lifeway does not argue that Fresh Made has failed to plead the requisite elements of a Lanham Act claim. [FN20] Rather, Lifeway argues that because the Amended Complaint does not allege that the advertisements were published after the date of the April 2000 settlement agreement, the claim is barred by the release. The Amended Complaint does, however, allege that "Lifeway represents that it sells 'America's only real kefir.' " ' Am. Compl. at ¶ 170. Read in a light most favorable to the plaintiff, this allegation asserts on-going conduct. As such, it alleges that the advertisements post-date the release. [FN21]

> FN20. To establish a Lanham Act violation, a plaintiff must prove that: (1) the defendant has made false or misleading statements as to his own product or another's; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, or the like. _U.S. Healthcare, Inc. v. Blue Cross of Greater Phila._ 898 F.2d 914, 922-23 (3d Cir.1990).

> FN21. Of course, because Fresh Made has alleged that the release was procured by fraud, the release cannot, at this stage, act to bar the Lanham Act claim.

Lifeway also claims that because Count VIII incorporates by reference the previous allegations contained in the Amended Complaint, "it is impossible" for Lifeway to respond to the allegations as presently pled. Def.'s Br. at 23. Therefore, Lifeway argues that Fresh Made should be required to re-plead Count VIII. The Court disagrees. The allegations in Count VIII, standing alone, are sufficient to put Lifeway on notice as to the nature of Fresh Made's Lanham Act claim. Lifeway's request that Fresh Made be required to re-plead the claim will be denied.

VI. Unfair Competition and Restraint of Trade
Lifeway argues that because Fresh Made is unable to state a valid federal antitrust claim, Counts III (Restraint of Trade) and VII (Unfair Competition) should also be dismissed. The Court agrees.

Fresh Made alleges that the actions underlying its Sherman Act claims also constitute an unreasonable restraint of trade under Pennsylvania law. Am. Compl. ¶ 125. Pennsylvania Courts have recognized that the Sherman Act is "merely the application of the common-law doctrine concerning the restraint of trade to the field of interstate commerce." _Collins v. Main Line Bd. of Realtors_ 452 Pa. 342, 304 A.2d 493, 496 (Pa.1973). See _Yeager's Fuel, Inc. v. Pa. Power & Light Co._ 953 F.Supp. 617, 668 (E.D.Pa.1997); _Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Serv., Inc._ No.1994-2166, 1995 WL 842000, *4 (Pa.Ct.Comm.Pleas, Oct. 18, 1995). Therefore, the restraint of trade claim will be dismissed for the reasons given in the Court's Sherman Act discussion. [FN22] See _Yeager's Fuel,_ 953 F.Supp. at 668 ("the Court's decision regarding Plaintiffs' common-law restraint of trade claim mirrors the conclusion reached in assessing Plaintiffs' claim under § 1 of the Sherman Act").

> FN22. The Court also recognizes that it is questionable whether a plaintiff can recover damages under a common law restraint of trade theory in Pennsylvania. Some courts have concluded that there is no private remedy for damages under a common law restraint of trade theory, while others have left the question open. See _Collins,_ 304 A.2d at 498 (finding an agreement in restraint of trade to be invalid, but awarding only injunctive relief, holding that the record did "not provide any legal basis for an award of damages"); _Lakeview Ambulance,_ 1995 WL842000 at *4 (recognizing that certain courts have recognized a common law anti-trust cause of action, "but only in the limited circumstances of trademarks, trade secrets, or restraint of trade pursuant to statute"); _XF Enters. Inc. v. BASF Corp.,_ 47 Pa. D. & C.4th 147, No. 9906-1477, 2000 WL 33155746, *1 (Pa. Ct. Comm. Pleas July 13, 2000) ("No court to date has held that a private remedy is available for damages under Pennsylvania's common law on



Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2002 WL 31246922 (E.D.Pa.), 2002-2 Trade Cases P 73,779
(Cite as: 2002 WL 31246922 (E.D.Pa.))

antitrust violations."). Even if a private plaintiff in Pennsylvania could recover under common law restraint of trade theory, the Amended Compliant has failed to state such a claim. Therefore, the Court need not, at this point, decide whether it would be possible for a plaintiff to recover under such a theory.

Pennsylvania has recognized a common-law claim of unfair competition under the Restatement (Third) of Unfair Competition. *See Yeager's Fuel, 953 F.Supp. at 668; Lakeview Ambulance, 1995 WL 842000 at \*2; Restatement (Third) Unfair Competition § 1(a)* & Comment g. Fresh Made alleges that Lifeway's efforts to "restrict [Fresh Made's] market share" and to "establish a monopoly over the specialized dairy products" market constitute acts of unfair competition. Am. Compl. ¶¶ 156 & 157. As these allegations essentially mirror Fresh Made's Sherman Act claims, they suffer from the same deficiencies in how Fresh Made has attempted to define market share and the relevant market. For that reason, the Unfair Competition claim will also be dismissed. *Cf. Yeager's Fuel, 953 F.Supp. at 668* (allowing unfair competition claim to go forward because there were "fact issues concerning whether [the defendant] violated the various federal antitrust statutes").

### VII. Civil Conspiracy

\*10 Count VI of the Amended Complaint alleges that the "defendants have, among themselves, agreed to embark on a course of conduct with the specific intent of restraining Fresh Made's business." Am. Compl. ¶ 150. Lifeway argues that this claim should be dismissed because it is merely a restatement of Fresh Made's antitrust claims, because the defendants, having unity of interest, cannot conspire with one another, and because Fresh Made has failed to allege the requisite degree of malice.

"A civil conspiracy under Pennsylvania law requires that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, *i.e.,* an intent to injure is essential in proof of a conspiracy." *Keating v. Bucks County Water & Sewer Auth.,* 2000 U.S. Dist. LEXIS 18690, No. Civ. A. 99-1584, 2000 WL 1888770, \* 16 (E .D. Pa. Dec. 29, 2000) (citing *Skipworth by Williams v. Lead Indus. Ass'n., Inc.,*

547 Pa. 224, 690 A.2d 169, 174 (Pa.1997) and *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466, 472 (Pa.1979)). In addition, under Pennsylvania law, as under federal antitrust law, a corporation cannot conspire with itself, or with it officers or agents acting solely for the corporation. *See, e.g., Keating,* 2000 U.S. Dist. LEXIS 18690, 2000 WL 1888770 at \*16; *Fox v. Keystone Turf Club, Inc.,* 1997 U.S. Dist. LEXIS 19370, No. Civ. A. 97-1424, 1997 WL 793590, \*2 (E.D Pa. Dec. 4, 1997); *Thompson Coal, 412 A.2d at 473.*

Because there are no allegations that Smolyansky was acting outside of his role as a director of Lifeway, any alleged conspiracy between him and Lifeway fails as a matter of law. *See, e.g., Fox, 1997 U.S. Dist. LEXIS 19370, 1997 WL 793590 at \*2.* Similarly, because Fresh Made alleges that Danone controls and exercises significant influence over Lifeway, any allegation of conspiracy between Danone and Lifeway raises similar concerns. [FN23]

> FN23. To the extent that Fresh Made's conspiracy claim is based on a conspiracy between Fresh Made and the unnamed manufacturers, distributors and store owners, the claim is also on unsound footing. *See, e.g., Fox, 1997 U.S. Dist. LEXIS 19370, 1997 WL 793590 at \*2* (dismissing civil conspiracy claim where the identity of the co-conspirators was "unclear at best"). As mentioned above, Fresh Made has indicated that it would name certain of the manufacturers, distributors and store owners if granted leave to amend, Tr. 52. This could cure any defect in the identification of any such conspirators.

In any event, under Pennsylvania law, a claim of civil conspiracy cannot be pled without also alleging art underlying actionable wrong. *See Boyanowski v. Capital Area Intermediate Unit, 215 F.3d 396, 405 (3d Cir.2000).* When a court dismisses the causes of action which underlie a civil conspiracy claim, the civil conspiracy claim must also be dismissed. *See, e.g., Samuel v. Clark,* 1996 U.S. Dist. LEXIS 11487, No. Civ. A. 95-6887, 1996 WL 448229, \*4 (E.D.Pa. Aug. 7, 1996) (dismissing conspiracy claim where underlying claims for fraud and discrimination were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

Not Reported in F.Supp.2d
Page 12
Not Reported in F.Supp.2d, 2002 WL 31246922 (E.D.Pa.), 2002-2 Trade Cases P 73,779
**(Cite as: 2002 WL 31246922 (E.D.Pa.))**

dismissed); Rose v. Wissinger, 294 Pa.Super. 265, 439 A.2d 1193, 1199 (Pa.Super.Ct.1982) (dismissing conspiracy claim where defamation and outrageous conduct claims were dismissed); Raneri v. Depolo, 65 Pa. Commw. 183, 441 A.2d 1373, 1376 (Pa.Cmwlth.1982) (dismissing conspiracy claim where underlying claim for defamation was dismissed); *see generally* Boyanowski, 215 F.3d at 405 (overturning civil conspiracy verdict where jury found no liability on underlying tortious interference claim); GMH Assocs., Inc. v. Prudential Realty Grp., 2000 PA Super 59, 752 A.2d 889, 905 (Pa.Super.2000) (setting aside civil conspiracy verdict where underlying fraud verdict was reversed on appeal).

***11** Fresh Made's civil conspiracy claim is predicated upon the same conduct underlying the antitrust, unfair competition, and restraint of trade claims. Because the Court will dismiss those claims, the claim for civil conspiracy must also be dismissed. *See, e.g.,* Samuel, 1996 U.S. Dist. LEXIS 11487, 1996 WL 448229 at *4.

VIII. Malicious Abuse of Process

In Count IV of the Amended Complaint, Fresh Made alleges that the series of lawsuits filed against it by Lifeway constitute the tort of malicious abuse of process. To establish a claim for malicious abuse of process under Pennsylvania law, it must be shown that "the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed, and (3) harm has been caused to the plaintiff." Hart v. O'Malley, 436 Pa.Super. 151, 647 A.2d 542, 551 (Pa.Super.Ct.1994) (citing Restatement (Second) Torts § 682). Although the word "process" as used in this tort "has been interpreted broadly [to] encompass the entire range of procedures incident to the litigation process", the restatement makes clear that the gravamen of this tort is not "the wrongful initiation" of proceedings. Restatement (Second) Torts § 682, Comment a.

Recognizing this fact, and the distinction between the tort of abuse of process and the tort of wrongful use of civil proceedings, [FN24] courts have held that a complaint alleging only that one party initiated suit against another for improper purposes is insufficient to state a claim for malicious abuse of process. *See Todi v. Stursberg,* 2001 U.S. Dist. LEXIS 20098, No. Civ. A. 01-2539, 2001 WL 1557517, *2 (E.D.Pa. Dec. 4, 2001).

FN24. The tort of wrongful use of civil proceedings makes a person liable for initiating or continuing a civil proceeding if he acts (1) in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and (2) the proceedings have terminated in favor of the person against whom they are brought. *See* Rosen v. Am. Bank of Rolla, 426 Pa.Super. 376, 627 A.2d 190, 191-92 (Pa.Super.Ct.1993) (citing 42 Pa. Cons.Stat. Ann. § 8351). Here there are no allegations that any of the court proceedings initiated by Lifeway terminated in favor of Fresh Made (indeed, the parties settled two of the lawsuits and one is ongoing), and the tort of wrongful initiation of civil proceedings is not applicable.

The Amended Complaint alleges only that the lawsuits at issue were "commenced" by Lifeway with an improper purpose. Am. Compl. ¶ 133. In the absence of allegations that process was abused after the suits were commenced, Fresh Made has not adequately stated a claim for malicious abuse of process. *See* 2001 U.S. Dist. LEXIS 20098, [WL] at *2 ("Absent allegations that a party has abused the process *after* its issuance ... an abuse of process claim cannot stand.") (citations and internal quotation marks omitted). Therefore, the Court will dismiss Count IV of the Amended Complaint.

IX. Interference with Business Relationships

In Count V, Fresh Made alleges that Lifeway "with purposeful intent to interfere with [Fresh Made's] business, induced merchants and distributors to cease doing business with [Fresh Made] under threat of economic sanctions." Am. Compl. ¶ 142. Fresh Made also alleges that Lifeway "interfered with Fresh Made's ability to develop future or prospective contractual business relationships with merchants and distributors. *Id.* at ¶ 143. Lifeway argues that Count V must be dismissed because Fresh Made has not identified the specific existing and prospective business

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

relationships which have been harmed by Lifeway's conduct.

***12** To establish a claim for interference with contractual or prospective contractual relations under Pennsylvania law, a plaintiff must show: (1) the existence of a contractual or prospective contractual relationship between the plaintiff and a third party; (2) a purpose or intent to harm an existing relationship or to prevent a prospective relationship from accruing; (3) the absence of privilege or justification on part of the defendant; and (4) the occurrence of actual harm or damage to the plaintiff as a result of the defendant's conduct. *See Pellegrino Food Prods. Co. v. City of Warren,* 136 F.Supp.2d 391, 408 (W.D.Pa.2000); *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.,* 1992 U.S. Dist. LEXIS 6479, Civ. No. 90-7952, 1992 WL 97826, *10 (E.D.Pa. Apr. 30, 1992).

When alleging interference with existing contractual relations, a plaintiff should identify which existing contractual relationships were hindered. *See Allstate Transp. Co. v. Southeastern Pa. Transp. Auth.,* 1997 U.S. Dist. LEXIS 16638, No. 971482, 1997 WL 666178, * *10-11 (E.D.Pa. Oct. 20, 1997). When alleging interference with prospective contractual relations, the allegations need not be as precise. A plaintiff must not, however, "rest a claim for tortious interference with prospective contractual relations on a mere hope that additional contracts or customers would have been forthcoming but for defendant's interference." *Advanced Power Sys,* 1992 U.S. Dist. LEXIS 6479, 1992 WL 97826 at *11. The complaint "must allege facts that, if true, would give rise to a reasonable probability that particular anticipated contracts would have been entered into." *Id.* Such a probability "may arise from an unenforceable express agreement or an offer", or where "there is a reasonable probability that a contract will arise from the parties' current dealings." *Allstate Transp.,* 1997 U.S. Dist. LEXIS 16638, 1997 WL 666178 at *11. However, "merely pointing to an existing business relationship or past dealings does not reach this level of probability." *Id.*

Fresh Made alleges that its existing contractual relationships with certain distributors and stores were interfered with by Lifeway. Fresh Made does not further identify any of the stores or distributors, or otherwise identify any contractual relationships that were interfered with. Although the federal rules require only a short and plain statement of the claim, that statement "must be sufficient to give the defendant[s] notice of the claim and the grounds upon which it is based." *Id.* Because the potential universe of identified relationships is enormous, [FN25] the Court concludes that the Amended Complaint does not give sufficient notice of the existing business relationships at issue here. [FN26] *See, e .g., Id.* (claim dismissed where claim identified relationships with "essential contractors" and "other ParaTransit business relationships"); *Centennial Sch. Dist. v. Independence Blue Cross,* 885 F.Supp. 683, 688 (E.D.Pa.1994) (claim dismissed where complaint "failed to identify what contractual relationships were threatened"); *see generally, Fluid Power, Inc. v. Vickers, Inc.,* 1993 U.S. Dist. LEXIS 2012, Civ. A. No. 92-0302, 1993 WL 23854, *4 (E.D.Pa. Jan. 28, 1993) (claim sufficient where one contract was identified with particularity and where plaintiff provided customer lists with the names of plaintiff's other existing and prospective customers).

FN25. As an illustration, Lifeway distributes its products to some 15,000 stores nationwide. Tr. at 55. Because the proposed relevant market encompasses the entire country, each of these stores is potentially implicated by Fresh Made's allegations.

FN26. Fresh Made's intention to name certain stores and distributors in any amended pleading could address this shortcoming.

***13** Fresh Made's allegations with regards to prospective business relationships are also insufficient. The Amended Complaint states only that Fresh Made "was developing future or prospective business relationships" with certain distributors and merchants, and that Lifeway interfered with Fresh Made's "ability to develop" those contractual relationships. Am. Compl. ¶¶ 141 & 143. These allegations do not identify any particular potential relationships, nor do they provide any basis for concluding that there was "an objectively reasonable probability that [such relationships would] come into existence". *Allstate Transp.,* 1997 U.S. Dist. LEXIS 16638, 1997 WL 666178 at *11. For that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



reason, Fresh Made's claim for interference with potential business relationships will be dismissed. *See, e.g., Jaramillo v. Experian Inf. Solutions, Inc.,* 155 F.Supp.2d 356, 365 (E.D.Pa.2001) (claim dismissed where plaintiff failed to plead the "existence of any specific contract or prospective contract"); *Advanced Power Sys.,* 1992 U .S. Dist. LEXIS 6479, 1992 WL 97826 at *12 (claim dismissed where plaintiff "failed to either identify particular potential customers or to allege the existence of a mechanism that would routinely bring it new customers"); *see generally, Joyce v. Alti Am., Inc.,* 2001 U.S. Dist. LEXIS 17432, No. Civ. A. 00-5420, 2001 WL 1251489, *4 (E.D.Pa.2001) (claim sufficient where plaintiff identified a "specific third party" with whom it had been attempting to enter a contract); *Pellegrino,* 136 F.Supp.2d at 408 (claim sufficient where plaintiff alleged that it received inquiries about potential contracts from certain entities).

### X. Request for Leave to Amend

In its Brief in Opposition to the Motion to Dismiss, Fresh Made reports that it has discovered another potential Lanham Act violation allegedly committed by Lifeway. Fresh Made states that Lifeway has been using a limited trademark which does not apply to butter on its butter products. Fresh Made has requested leave to amend the complaint to include additional claims, under the Lanham Act and common law unfair competition, for this alleged conduct. Lifeway did not oppose this request in its reply brief. The Court will grant Fresh Made's request for leave to amend to add these claims. *See* Fed.R.Civ.P. 15(a) ( "leave shall be freely given when justice so requires").

An appropriate Order follows.

### ORDER

AND NOW, this 8th day of August, 2002, upon consideration of the Motion of Defendants Lifeway Foods, Inc., and Michael Smolyansky to Dismiss the Amended Complaint in its Entirety, or in the Alternative for a More Definitive Statement as to Count VIII (Docket # 15), the plaintiff's Memorandum of Law in Opposition thereto, various supplemental filings by the parties, and after oral argument, IT IS HEREBY ORDERED that said Motion is GRANTED IN PART and DENIED IN PART, as follows, in accordance with the Memorandum of today's date:

1. The Motion is GRANTED as to Counts I (Sherman Act Section 1), II (Sherman Act Section 2), III (Restraint of Trade), IV (Malicious Abuse of Process), V (Interference with Existing and Prospective Business Relationships), VI (Civil Conspiracy), VII (Unfair Competition), and X (Unfair Trade Practices Act). Those counts are HEREBY DISMISSED.

**\*14** 2. The Motion is DENIED insofar as it seeks to dismiss Count VIII (Lanham Act).

3. The Motion is DENIED insofar as it seeks a more definitive statement as to Count VIII (Lanham Act).

4. The plaintiff shall be permitted to file an amended complaint within forty-five (45) days.

Not Reported in F.Supp.2d, 2002 WL 31246922 (E.D.Pa.), 2002-2 Trade Cases P 73,779

### Motions, Pleadings and Filings (Back to top)

• 2:01CV04254 (Docket) (Aug. 21, 2001)

END OF DOCUMENT

# EXHIBIT H

Westlaw.

Not Reported in F.Supp.                                                                                                              Page 1
Not Reported in F.Supp., 1994 WL 369147 (S.D.N.Y.), 1994-1 Trade Cases P 70,650
(Cite as: 1994 WL 369147 (S.D.N.Y.))

C

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
E. & G. GABRIEL, a partnership, Plaintiff,
v.
GABRIEL BROTHERS, INC. f/k/a Gabriel Brothers
Discounts, Inc., Arthur Gabriel,
Sr., James Gabriel, Gilbert Gabriel, Paul Gabriel, John
Gabriel, Arthur
Gabriel, II, Ronald Gabriel, Samuel Goldstein,
Certified-Fashion Guild, Inc.,
and Richard and Company, Defendants.
No. 93 CIV. 0894 (PKL).

July 13, 1994.

McDermott, Will & Emery New York City, Lloyd
Constantine, Russell G. Tisman, Yang Chen, of counsel, for
plaintiffs.

Howrey & Simon, Washington, DC, Stuart H. Harris,
Kenneth A. Gallo, Kimberly D. Reed, of counsel, Leader &
Berkon, New York City, James K. Leader, of counsel, for
Defendant Gabriel Bros., Inc.

Shea & Gould, New York City, John E. Daniel, of counsel,
Silverman, Coopersmith & Frimmer, Philadelphia, PA,
Lawrence Silverman, of counsel, for defendant Goldstein.

OPINION AND ORDER
LEISURE, District Judge,

*1   This antitrust action arises out the alleged
anticompetitive conduct of Gabriel Brothers, Inc., f/k/a
Gabriel Brothers Discounts, Inc., following a schism in the
Gabriel family business which resulted in the formation of
two distinct companies, Gabriel Brothers, Inc. ("Brothers
Stores"), and E. & G. Gabriel. Plaintiff E. & G. Gabriel
alleges that defendants violated §§ 1 and 2 of the Sherman
Antitrust Act, as well as §§ 340-47 of the New York
General Business Law, commonly known as the Donnelly
Act. Defendants Brothers Stores and Samuel Goldstein
[FN1] move this Court for an order, pursuant to
Fed.R.Civ.P. 12(b)(6), dismissing the action for failure to
state a claim upon which relief can be granted. For the

reasons stated below, defendants' motion is hereby granted.

BACKGROUND
Prior to 1985, Elias Gabriel owned stock and operated a
retail department store in Pennsylvania along with his
brothers Arthur Gabriel, Sr., and James Gabriel. Amended
Complaint at 7. In June of 1985, Elias sold this stock to
defendants Arthur, James, and Brothers Stores. Id. After
selling his shares, Elias established a new retail business
with his son Gregory, that being the partnership E. & G.
Gabriel ("E. & G."). Since 1985, this retail store has
expanded its operation to include five (5) stores in Western
Pennsylvania and Ohio. Id. at 8. Defendant Brothers Stores
also operate a chain of retail stores in this geographic area
but not in exactly the same communities as plaintiff. Id. at 4.
Both chains sell a wide variety of discounted goods, ranging
from women and children's clothing to housewares and
household items. Id. at 4-5.

Shortly after E. & G. was formed in 1985, defendants
Brothers Stores, Arthur Gabriel, Sr., James Gabriel, Gilbert
Gabriel, Paul Gabriel, John Gabriel, Arthur Gabriel II,
Ronald Gabriel ("the Brothers") and the buyer for the
Brothers Stores, Samuel Goldstein, [FN2] allegedly
launched a campaign of anticompetitive behavior aimed at
damaging plaintiff's business. Id. at 8. Plaintiff contends
that, through this campaign, defendants intended to
eliminate plaintiff's supplies, destroy competition, and
monopolize the tri-state market, comprising Eastern Ohio,
Southwest Pennsylvania and Eastern West Virginia, for the
sale of name-branded deep discounted merchandise
("NBDDM"). [FN3] Id. at 10. Plaintiff alleges that in
furtherance of this goal, defendants threatened to stop
purchasing goods for Brothers Stores unless the suppliers
refused to sell to plaintiff. Plaintiff also alleges that in
furtherance of their anti-competitive campaign, Brothers
Stores, through Goldstein and another buyer, Certified
Fashion Guild, Inc. [FN4], purchased merchandise beyond
their needs and agreed to pay prices in excess of the goods'
fair market value. This was allegedly done with the motive
of driving E. & G. out of the NBDDM market. Id. at 8-10.
Plaintiff alleges in its amended complaint that these acts
resulted in the unlawful restraint of trade in the NBDDM
market in the tri-state area. Id. at 11. Defendants now move

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                 Page 2
Not Reported in F.Supp., 1994 WL 369147 (S.D.N.Y.), 1994-1 Trade Cases P 70,650
**(Cite as: 1994 WL 369147 (S.D.N.Y.))**

this Court for an order dismissing the action pursuant to Fed.R.Civ.P. 12(b)(6).

DISCUSSION

I. STANDARD FOR A MOTION TO DISMISS

**\*2** Defendants have moved for an order dismissing plaintiff's claim pursuant to Fed.R.Civ.P. 12(b)(6). In deciding defendants' motion, this Court must apply "the familiar standard for review of a Rule 12(b)(6) motion, which requires a court to construe any well-pleaded factual allegations in the complaint in favor of the plaintiff and dismiss the complaint only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Gagliardi v. Village of Pawling,* 18 F.3d 188, 191 (2d Cir.1994) (quoting *Allen v. West-Point-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, (1957))).

"The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Festa v. Local 3 International Brotherhood of Electrical Workers,* 905 F.2d 35, 37 (2d Cir.1990). Thus, a motion to dismiss must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). "When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiffs' amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991), cert. denied, 503 U.S. 960, 112 S.Ct. 1561 (1992)).

Defendants raise a number of defenses to plaintiff's claims, *inter alia:* (1) plaintiff's failure properly to allege a relevant product market; (2) plaintiff's failure sufficiently to allege anticompetitive behavior attributable to defendants; (3)

plaintiff's failure properly to allege facts supporting a dangerous probability of achieving monopoly power.

II. THE AMENDED COMPLAINT FAILS TO ALLEGE A RELEVANT PRODUCT MARKET

Defendants contend that plaintiff has failed properly to allege a relevant product market as required by the Sherman Antitrust Act. Generally, under § 1 and § 2 of the Sherman Antitrust Act, a plaintiff must allege a contract, combination, or conspiracy constituting an unlawful restraint of trade. *See* 15 U.S.C. § 1; *Acquaire v. Canada Dry Bottling Co.,* No. 93- 7368, slip op. at 4026 (2d Cir. May 13, 1994). As a prerequisite to any antitrust claim, however, plaintiff "must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Re-Alco Industries, Inc. v. National Center for Health Educ., Inc.,* 812 F.Supp. 387, 391 (S.D.N.Y.1993) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 29 (1984)). Furthermore, the alleged product market must be theoretically plausible. *See Theatre Party Assocs., Inc. v. Shubert Org., Inc.,* 695 F.Supp. 150, 154 (S.D.N.Y.1988) (complaint dismissed where plaintiff failed to set out a "theoretically rational explanation to support its proposed relevant product market"). Because of these constraints, in the context of Rule 12 motions to dismiss, federal courts "have not hesitated to reject market allegations that make no economic sense." *Id.; see also Shaw v. Rolex Watch, U.S.A., Inc.* 673 F.Supp. 674, 679 (S.D.N.Y.1987) (dismissing claim for failure properly to allege a relevant product market); *Gianna Enterprises v. Miss World (Jersey) Ltd.,* 551 F.Supp. 1348, 1354 (S.D.N.Y.1982) (claim dismissed for failure to explain why market for international beauty pageants excludes state and national beauty pageant).

**\*3** In determining the relevant market, the general rule is that "commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 395 (1956); *see Frito-Lay, Inc. v. Bachman Co.,* 659 F.Supp. 1129, 1136 (S.D.N.Y.1986).

Reasonable interchangeability is determined by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1994 WL 369147 (S.D.N.Y.), 1994-1 Trade Cases P 70,650
**(Cite as: 1994 WL 369147 (S.D.N.Y.))**

following criteria: (1) low cross-elasticity of demand; (2) the impact of price change of one product on the price of the other; (3) the similarity of use or purpose for each product; and, (4) the similarity in clientele for each product. *See Rosen v. Hyundai Group (Korea), 829 F.Supp. 41, 47 (E.D.N.Y.1993)* ("goods are in the same relevant product market if they are reasonably interchangeable for the purposes for which they were produced"); *Frito-Lay, Inc., 659 F.Supp at 1136; Borden v. F.T.C., 674 F.2d 498, 507 (6th Cir.1982); Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962)* ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.")

In its amended complaint, plaintiff has not explicitly stated the relevant market forming the basis of its monopoly claim. Plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal. *See Re-Alco, 812 F.Supp. at 391* ("If a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand ... a court may grant a Rule 12(b)(6) motion." (citing *Ford Piano Supply Co. v. Steinway & Sons, 1987 Trade Cas. (CCH) 67, 828 at 59, 503, 1988 W.L. 3488 (S.D.N.Y.1988)*))). Nevertheless, for the purposes of this motion, the Court construes plaintiff's references to name-branded deep discounted merchandise as the market allegedly being monopolized, and, accordingly, addresses whether plaintiff's alleged market survives interchangeability analysis.

Applying the interchangeability criteria, the Court finds plaintiff's alleged market to be implausible. Plaintiff's proposed market is comprised of products as varied as household hardwares and children's sleepwear. Hammers are obviously not reasonable substitutes for children's pajamas; they are not used for similar purposes, nor will the price of hammers affect the price of pajamas. Plaintiff's assertion that NBDDM constitutes a cognizable market subject to monopolization is economically nonsensical.

In addition, plaintiff's reliance on *Telsat v. Entertainment and Sports Programming Network, 753 F.Supp. 109, 112*

*(S.D.N.Y.1990) (Leisure, J.),* is misplaced. Plaintiff would have the Court believe that a market for quality television sports programming comprehends the same extensive variety of noninterchangeable products as "NBDDM." However, in *Telsat,* plaintiff's market was confined by logical parameters such as television programming, as opposed to radio, and sports events, as opposed to other types of entertainment generally. In the instant case, plaintiff's alleged market is not defined by rational parameters, and the products included in NBDDM lack the requisite commonality which distinguishes one market from another.

**\*4** Furthermore, plaintiff's attempt to identify the market as "discount priced items" must fail. Discounted pricing cannot be used as a valid parameter in alleging a relevant product market. *See Brown Shoe Co., 370 U.S. at 326.* In *Brown Shoe Co.,* the Supreme Court explicitly rejected the contention that a discount priced product can constitute a market distinct from medium priced or high priced products. *See Brown Shoe Co., 370 U.S. at 326* ("It would be unrealistic to accept Brown's contention that, for example, men's shoes selling below $8.99 are in a different product market from those selling above $9.00."); *see also United States v. Jos. Schlitz Brewing Co., 253 F.Supp. 129, 145-46 (N.D.Cal.), aff'd per curiam, 385 U.S. 37 (1966)* (finding private label and premium beer are part of same market).

Plaintiff's argument further fails in that plaintiff endeavors to argue that items of the same name-brand, yet priced at a discount, can constitute a separate and distinct market. Plaintiff has not advanced the argument based on a "price/quality" distinction, but rather only based on a price distinction. In marketing the same items, i.e. name-brand items, price alone necessarily cannot serve as a logical parameter of a market. Because price affects demand within the market for name-brand goods, it cannot define a market for those same goods.

Plaintiff's failure to allege a plausible product market is fatal to its claim. Without an appropriate product market, "it is impossible for a court to assess the anticompetitive effect of challenged practices." *Re-Alco, 812 F.Supp. at 392* (citing *Gianna Enterprises, 551 F.Supp. at 1354).*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



## II. PLAINTIFF'S § 1 CLAIM OF CONSPIRACY AGAINST DEFENDANT GOLDSTEIN

Defendant Goldstein also challenges plaintiff's § 1 claim on grounds additional to those asserted by defendant Brothers Stores. Goldstein contends that plaintiff's allegation of a conspiracy fails, because the acts of defendant Brothers Stores and Goldstein are well within the bounds of standard business practice. Having concluded that plaintiff's § 1 claim against defendant Goldstein is dismissed for the reasons set forth above, i.e., because of its failure to allege properly a relevant product market, the Court need not and, accordingly, does not reach the issue raised by Goldstein herein.

## III. PLAINTIFF'S § 2 CLAIM OF ATTEMPTED MONOPOLIZATION

In addition to dismissing plaintiff's § 2 claim for failure to allege a relevant product market, plaintiff's § 2 claim must also be dismissed for the reasons set forth below. [FN5] The basic elements of a claim of attempted monopolization under § 2 are as follows: (1) predatory or anticompetitive conduct; (2) specific intent to monopolize; and (3) dangerous probability of successful monopolization. *See Spectrum Sports, Inc. v. McQuillan,* 113 S.Ct. 884, 890-91 (1993); *Volvo North America Corp. v. International Professional Tennis Council,* 857 F.2d 55, 73 (2d Cir.1988).

**\*5** In its amended complaint, plaintiff has not sufficiently alleged a dangerous probability that monopolization will succeed. Plaintiff alleges only that the "intentional and unlawful conduct of defendants ... have a dangerous probability of achieving monopoly power." Amended Complaint at 12. The verbatim recitation of statutory language cannot save a patently deficient claim. *See Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir.1972) ("A complaint cannot escape the charge that it is entirely conclusory in nature, merely by quoting ... words from the statute[ ]").

Under appropriate circumstances, the Second Circuit has been willing to infer a dangerous probability of success when the first two elements of a § 2 claim, coupled with monopoly power, have been shown. *See Volvo N. Amer.* 857 F.2d at 73-74; *but see International Distribution Centers,*

*Inc. v. Walsh Trucking Co.,* 812 F.2d 786 (2d Cir.1987) (adhering to the traditional rule "that an action under section 2 of the Sherman Act for attempting to monopolize a market will lie only where there is anticompetitive conduct, a specific intent to monopolize *and* a dangerous probability that monopoly will be achieved") (emphasis added). [FN6] Even assuming, *arguendo,* this Court were willing to infer the third element, the insufficiency of plaintiff's allegations obviates this possibility. Plaintiff has not adequately alleged the first two elements nor has it alleged either an estimated share of the market, or any other facts in support of a claim of monopoly power. Therefore, the Court could not infer a dangerous probability of successful monopolization.

Plaintiff's failure to allege sufficiently this element flows directly and necessarily from its failure to allege a relevant product market. It is axiomatic that, without first delineating a relevant market with minimal specificity, one cannot allege monopolization of this market. Therefore, in addition to the reasons stated above, plaintiff's § 2 claim should be dismissed for failure to allege a dangerous probability of success.

Having dismissed on the grounds discussed above, the Court need not reach the issue of the anticompetitive acts alleged. However, the Court is doubtful that plaintiff will ever be able to allege sufficient facts to support its antitrust claims, in that plaintiff's amended complaint contains myriad conclusory assertions with few factual allegations to support them. Although no special pleading is required in antitrust cases, *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1047 (S.D.N.Y.1993), "conclusory allegations which merely recite the litany of antitrust will not suffice." *John's Insulation, Inc. v. Siska Constr. Co.,* 774 F.Supp. 156, 163 (S.D.N.Y.1991). Even construing plaintiff's allegations liberally, this Court is skeptical that plaintiff will be able to satisfy the *de minimis* level of specificity this Court may demand "before allowing a potentially massive factual controversy to proceed." *John's Insulation,* 774 F.Supp. at 163 (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 528 n. 17 (1983)).

## IV. PENDENT STATE CLAIMS

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                Page 5
Not Reported in F.Supp., 1994 WL 369147 (S.D.N.Y.), 1994-1 Trade Cases P 70,650
(Cite as: 1994 WL 369147 (S.D.N.Y.))

**\*6** In addition to alleging federal claims under 15 U.S.C. § 1, § 2, plaintiff also asserts state law claims. Where a court has jurisdiction over one or more aspects of a case, it may properly assert jurisdiction over any other aspects of the case that share a common nucleus of operative facts. *See United Mine Workers v. Gibbs,* 383 U.S. 715 (1966); *Roco Carriers, Ltd. v. M/V Nurnberg Express,* 899 F.2d 1292 (2d Cir.1990). Although the exercise of pendent jurisdiction is a matter of the district court's discretion, once a court dismisses all federal claims, "the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Morse v. University of Vermont,* 973 F.2d 122, 127 (2d Cir.1992) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988)). Therefore, in exercising its discretion, this Court dismisses plaintiff's state law claims. [FN7]

### CONCLUSION
For the reasons stated above, this Court grants defendants' motion in its entirety.

SO ORDERED.

FN1. Defendants Brothers' Stores and Goldstein's motions raise similar arguments, the most notable exception being that Goldstein moves for an order dismissing plaintiffs' claims *with prejudice.* Where parties' arguments overlap, the Court will address the defendants collectively; where arguments applying to only one party are raised, the Court will address defendants separately.

FN2. Goldstein is named only in E. & G.'s Sherman Act § 1 claim.

FN3. Although plaintiff has not explicitly identified the specific market allegedly monopolized, this Court construes plaintiff's references to name-branded deep discounted merchandise as the proposed market.

FN4. Although only Brothers Stores and Goldstein have moved to dismiss, this opinion applies with equal force and effect to the remaining defendants, Certified Fashion Guild, Inc. and Richard and Company, under res judicata or law of the case doctrines. *See Arizona v. California,* 460 U.S. 605, 618-19 (1983).

FN5. As previously indicated in footnote 2, *supra,* the § 2 claim asserted by plaintiff does not apply to defendant Goldstein.

FN6. In *International Distribution,* the Second Circuit offered several criteria by which dangerous probability may be determined: the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of demand. *See International Distribution Center,* 812 F.2d at 792. Because plaintiff has failed to allege adequately a relevant product market, it is impractical, if not impossible, for this Court to apply these criteria to determine dangerous probability of defendants' success.

FN7. The Court notes that, dismissal of plaintiff's Donnelly Act claim is appropriate on the same grounds as dismissal of the federal antitrust claims. The Donnelly Act has been construed as a "Little Sherman Act", and thus, failure to allege a relevant product market is fatal to its claim. *See International Television Productions Ltd. v. Television Div. of Twentieth Century-Fox Film Corp.,* 622 F.Supp. 1532, 1540 (S.D.N.Y.1985). Furthermore, under the Donnelly Act, a plaintiff must allege an impact on trade *in New York. See International Television Prods. Ltd.,* 622 F.Supp. at 1540 (citing *Baker v. Walter Reade Theatres, Inc.,* 37 Misc.2d 172, 237 N.Y.S.2d 795, 796 (1962)). While plaintiff alleges acts committed in New York, it alleges no impact on New York as a result of these acts.

Not Reported in F.Supp., 1994 WL 369147 (S.D.N.Y.), 1994-1 Trade Cases P 70,650

**Motions, Pleadings and Filings (Back to top)**

• 1:93cv00894 (Docket) (Feb. 16, 1993)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                                    Page 6
Not Reported in F.Supp., 1994 WL 369147 (S.D.N.Y.), 1994-1 Trade Cases P 70,650
**(Cite as: 1994 WL 369147 (S.D.N.Y.))**


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 503538 (E.D.Pa.)
**(Cite as: 2004 WL 503538 (E.D.Pa.))**

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
LITTLE SOULS INC., Plaintiff,
v.
STATE AUTO MUTUAL INSURANCE, CO., successor in
interest to Meridian Mutual
Insurance Co. Defendants.
**No. Civ.A. 03-5722.**

March 15, 2004.

Howard C. Silverman, Kane & Silverman PC, Philadelphia, PA, for Plaintiff.

Patricia Baxter, Post & Schell PC, Philadelphia, PA, for Defendant.

*MEMORANDUM*

GREEN, J.

**\*1** Presently pending is Defendant's Motion to Dismiss Counts III and IV and Numerous Paragraphs of Plaintiff's Amended Complaint pursuant to FRCP 12(b)(6) and 12(f) and Plaintiff's response thereto. For the following reasons, Defendant's motion will be denied.

I. Factual and Procedural Background

On or about May 15, 2001, a fire occurred at the Continental Business Center in Bridgeport, Pennsylvania, where plaintiff Little Souls, Inc. ("Little Souls") was a tenant and conducted business. Plaintiff submitted a claim to defendant State Auto Mutual Insurance Co. ("State Mutual") pursuant to a policy for alleged damage, including business income loss, sustained as a result of the fire pursuant to a Pacemaker Businessowners policy of insurance. A dispute arose as to the "period of restoration." While both parties agree the "period of restoration" begins on the date of the loss and ended when Plaintiffs moved to another location, the parties disagreed as to the date of Plaintiff's move. To settle this dispute, State Mutual filed a

Declaratory Judgment action before this court. Little Souls moved to dismiss and requested a remand to appraisal. On February 5, 2003, we denied the motion to dismiss the declaratory judgement complaint, entered an order compelling both parties to proceed to appraisal, and placed the litigation in the civil suspense file. Thereafter, the parties were able to reach an agreement as to the appropriate length of time for the "period of restoration" in settlement discussions; however, the parties were not successful in agreeing to the amount of business income loss. Those negotiations are ongoing but have stalled.

On October 15, 2003, plaintiff Little Souls filed the instant complaint against defendant State Mutual alleging breach of contract, bad faith, fraud, intentional misrepresentation, negligent misrepresentation and breach of duty of good faith and fair dealing. Defendant filed a Motion to Dismiss the Complaint based on the fact that the counts were duplicative and unnecessary under the "gist of the action" doctrine. Thereafter, Plaintiff filed an Amended Complaint, alleging breach of contract, bad faith, intentional misrepresentation, and fraud. Still believing the causes of action duplicative, Defendant filed the current Motion to Dismiss. Due to the filing of the Amended Complaint and the Motion to Dismiss the Amended Complaint, the Motion to Dismiss the original complaint will be dismissed as moot. The Motion to Dismiss Counts III and IV and Numerous Paragraphs of Plaintiff's Amended Complaint and the response thereto is addressed below.

II. Legal Standard

A court should grant a motion to dismiss for failure to state a cause of action only if it appears to a certainty that no relief could be granted under any set of facts which could be proved. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The "notice pleading" approach governs the standard of specificity regarding motions to dismiss civil rights claims pursuant to 42 U.S.C. § 1983. In *Swierkiewicz v. Sorema,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), a unanimous Supreme Court stated,

**\*2** [g]iven the Federal Rules' simplified standard for pleading, a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2004 WL 503538 (E.D.Pa.)
**(Cite as: 2004 WL 503538 (E.D.Pa.))**

that could be proved consistent with the allegations. If the pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding. Moreover, claims lacking merit may be dealt with through summary judgment under Rule 56. The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus on the merits of a claim.

*Id.* at 998-99 (internal citations omitted).

A court must accept as true all well pleaded allegations of the complaint in evaluating a motion to dismiss. *See Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). Nevertheless, "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997) (citations omitted). Furthermore, because granting a motion to dismiss results in a determination on the merits at an early stage of the plaintiff's case, the district court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township,* 838 F.2d 663, 665-66 (3d Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989) (citations omitted).

III. Discussion

A. Gist of the Action Doctrine

Defendant State Mutual contends Plaintiff's complaint sounds in contract, rather than tort, and the allegations of fraud and intentional misrepresentation merely mirror the claims for breach of contract. Defendant argues Plaintiff's intentional misrepresentation and fraud claims should be dismissed under Pennsylvania's "gist of the action" doctrine. (Def. Mem. at 7.) The doctrine states that "[w]hen a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort; a tort claim is maintainable only if the contract is 'collateral' to conduct that is primarily tortious." *Sunquest Info. Sys., Inc. v. Dean*

*Witter Reynolds, Inc.,* 40 F.Supp.2d 644. 651 (W.D.Pa.1999) (citing cases). The opinion further iterates, "contract actions arise from breach of duties mutually agreed to, while torts have their basis in violations of duties imposed as a matter of social policy. *Id.,* citing *Phico Ins. Co. v. Presbyterian Medical Serv. Corp.,* 444 Pa.Super. 221, 663 A.2d 753, 757 (Pa.Super.Ct.1995).* [FN1] Plaintiff Little Souls argues the tort claims are the gist of the action and are not dependent on the resolution of the contract claims.

> FN1. The Pennsylvania Supreme Court has not yet adopted the "gist of the action" doctrine; however, courts have predicted based on holdings of the Superior Court that the court will adopt the test.

Plaintiff's intentional misrepresentation claim states that the Defendants confirmed representations regarding making timely payments for legitimate claims when the parties entered into the insurance policy. (Compl. at ¶ 54.) Crediting the allegations of the complaint as true, Plaintiff alleges the Defendant never had any intention of making timely payments. In addition, the intentional misrepresentations alleged by Plaintiff were not limited solely to the claim that State Mutual breached its contract. Plaintiff also alleges State Mutual made false statements in the declaratory judgment lawsuit, and sought relief on a claim that was not in dispute. (Am.Comp.¶ 58.) The Amended Complaint also alleges the defendant's conduct in marketing itself as a trustworthy and reliable company and its corporate policy are fraudulent. These representations allegedly induced the Plaintiff into purchasing their insurance with Defendant. (Am. Comp. at ¶ 60-62.)

*3 At this point in the litigation, it is difficult to ascertain whether the gist of the action doctrine would preclude plaintiff from asserting these arguably similar causes of action. While based on a collateral contract, the plaintiff Little Souls is alleging misrepresentations occurred both before and after the formation of the contract that, if sufficiently distinct, would not hinge on the outcome of the breach of contract claim. As a sufficient factual basis is alleged, the tort claims will not be prohibited by the "gist of the action" doctrine. Plaintiff has stated a cause of action upon which relief can be granted; therefore, defendant's



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 503538 (E.D.Pa.)
**(Cite as: 2004 WL 503538 (E.D.Pa.))**

Page 3

motion to dismiss will be denied. As allegations in count III differ from the allegations in the breach of contract claims they are not redundant; therefore, the allegation will not be stricken from the Amended Complaint.

B. Rule 9(b) Fraud

As to the sufficiency of the claims, State Auto Mutual Insurance has moved to dismiss plaintiff's cause of action for fraud pursuant to F.R.C.P 12(b)(6) for failure to plead with particularity, and in the alternative, moved to strike Count IV as redundant, pursuant to F.R.C.P. 12(f). Rule 9(b) requires a plaintiff to plead "(1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir.), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992) (citation omitted).

The complaint alleges the Defendant marketed itself as a trustworthy and reliable insurer that will promptly and fairly evaluate and pay claims, but actually had a corporate policy to pay as little and as late as it can. The complaint also alleges the Plaintiff was induced by these representations into purchasing Defendant's insurance to his detriment. (Am. Comp. at ¶¶ 60--62.) Contrary to defendant's contention, the allegations "inject precision and some measure of substantiation." *Sun Co. v. Badger Design & Constructors*, 939 F.Supp. 365, 369 (E.D.Pa.1996)(quoting *In re Chambers Dev. Sec. Litig.*, 848 F.Supp. 602, 616 (W.D.Pa.1994)). When accepting as true all the factual allegations, plaintiff has sufficiently alleged a claim for fraud in the inducement and defendants motion to dismiss count IV will be denied.

C. Bad Faith

Plaintiff's Complaint avers that State Mutual acted in bad faith under 42 Pa.C.S.A. § 8371 by delaying or denying portions of Plaintiff's insurance claim knowing there was no reasonable basis to do so. (Compl. at ¶ 50.) Among its claims of bad faith, Plaintiff Little Souls alleges that State Mutual: denied or delayed Plaintiff's claim with reckless

disregard of the lack of reasonable basis; violated the Pennsylvania Unfair Insurance Practices Act; violated the Unfair Claims Settlement Act; misinterpreted and misrepresented terms of the insurance contract; utilized ambiguous wording in the insurance contract; failed to properly and timely investigate the claim; compelled Plaintiff to defend a lawsuit; and instituted a lawsuit and made statements in such that were not true. (Compl. at ¶ 52.)

*4 Defendant contends several paragraphs of Plaintiff's bad faith claim, relating to the filing of the Declaratory Judgment action, must fail as a matter of law. Defendant claims it should not be held liable for committing bad faith under 42 Pa.C.S.A. § 8371 because the liability of an insurance company under its policy is a proper subject of a declaratory judgment action pursuant to 42 Pa.C.S.A. § 7531 *et seq.* Plaintiff claims the Defendant did not have a basis to file the Declaratory Judgment action and that it is inappropriate to dismiss any of the allegations relating or referring to the Declaratory Judgment action.

While it is true the filing of a declaratory judgment alone cannot sustain an action for bad faith, the plaintiff may use that as part of its case to prove bad faith. Just because the filing alone does not prove bad faith, the filing in conjunction with other evidence may. *See Krisa v. The Equitable Life Assurance Society*, 109 F.Supp.2d 316, 321 (M.D.Pa.2000). Even though defendant claims they did not engage in that other conduct constituting bad faith, that is not an appropriate inquiry in a motion to dismiss. Defendants' motion to strike will be denied.

An appropriate order follows.

*ORDER*

AND NOW, this _____ day of March, 2004, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss Counts III and IV and Numerous Paragraphs of Plaintiff's Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f) is DENIED. IT IS FURTHER ORDERED that Defendant's original Motion to Dismiss is DISMISSED as Moot. IT IS FURTHER ORDERED that the Deputy Clerk schedule a settlement conference with counsel for the parties.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 503538 (E.D.Pa.)
**(Cite as: 2004 WL 503538 (E.D.Pa.))**

Not Reported in F.Supp.2d, 2004 WL 503538 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

- 2004 WL 1494761 (Trial Motion, Memorandum and Affidavit) Order (Jun. 01, 2004)

- 2004 WL 1494760 (Trial Motion, Memorandum and Affidavit) Order (May. 21, 2004)

- 2004 WL 1490030 (Trial Pleading) Plaintiff's Answer to Counterclaim (Apr. 30, 2004)

- 2004 WL 1490028 (Trial Pleading) Defendant, State Auto Mutual Insurance Company's Answer to Plaintiff's Amended Complaint with Affirmative Defenses and Counterclaim (Apr. 19, 2004)

- 2004 WL 1494759 (Trial Motion, Memorandum and Affidavit) Memorandum (Mar. 2004)

- 2003 WL 23640170 (Trial Motion, Memorandum and Affidavit) Order (Dec. 31, 2003)

- 2003 WL 23638450 (Trial Pleading) Amended Complaint (Nov. 26, 2003)

- 2:03cv05722 (Docket) (Oct. 15, 2003)

- 2003 WL 23638439 (Trial Pleading) Complaint (Jan. 01, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J

Westlaw.

1988 WL 124720                                                                                          Page 1
Not Reported in F.Supp., 1988 WL 124720 (D.N.J.)
**(Cite as: 1988 WL 124720 (D.N.J.))**

Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.
Mannkraft CORPORATION, Plaintiff,
v.
Edward E. BEARMAN, et al., Defendant.
**CIV. A. No. 88-2997.**

Nov. 18, 1988.
David M. Mc Cann, Douglas H. Amster, Carpenter, Bennett & Morrissey, Newark, N.J., for plaintiff.

Frank G. Capece, Waters, Mc Pherson, Mc Neil, Fitzpatrick, Secaucus, N.J., for defendant Newark Disaposal Service, Inc.

*OPINION*
WOLIN, District Judge.

**\*1** Currently before the Court is the motion of defendant Newark Disposal Service, Inc. ("Newark Disposal") to dismiss as against it the complaint of plaintiff Mannkraft Corporation ("Mannkraft"). Newark Disposal argues that the complaint's civil RICO claims should be dismissed for failure to state a claim on which relief can be granted, and failure to plead fraud with particularity. Additionally, defendant contends that this Court lacks subject matter jurisdiction over plaintiff's pendent common law state claims. For the reasons set forth below, defendant Newark Disposal's motion to dismiss is denied.

*I. BACKGROUND*
Plaintiff Mannkraft is engaged in the business of manufacturing and selling corrugated shipping containers and purchase displays. In order to manufacture its products, Mannkraft regularly purchases such supplies as dies, glue, ink and paper. As with any manufacturing concern, Mannkraft also requires regular sanitation and waste disposal services.

Edward E. Bearman ("Bearman"), also a defendant in this action, was the general manager of Mannkraft during the period of 1983 to May 1987. Mannkraft alleges that Bearman caused Mannkraft to deal almost exclusively with certain suppliers of goods and services, and to purchase higher than necessary amounts of those goods and services

in exchange for bribes, payoffs and kickbacks.

Mannkraft commenced this action against Bearman, Newark Disposal and several other named and unnamed companies and individuals involved in the alleged scheme with Bearman to defraud Mannkraft.

Newark Disposal had supplied virtually all of Mannkraft's sanitation and garbage disposal services during Bearman's tenure as general manager of Mannkraft. Mannkraft alleges Bearman and Newark Disposal violated 28 U.S.C. § 1962(c) and (d) through a pattern of racketeering carried out through numerous acts of mail and wire fraud. Plaintiff alleges that "Bearman and Disposal were associated in a continuing corrupt enterprise, the principal purpose of which was systematically to defraud plaintiff by causing [Newark Disposal] to supply unnecessary and overpriced sanitation services to plaintiff and thus to inflate artificially the amount of income that Disposal would receive from plaintiff by reason of sanitation services to be supplied to plaintiff." Complaint ¶ 57.

Defendant Newark Disposal now moves to dismiss plaintiff's civil RICO claims against it. Specifically, Newark Disposal argues that: (1) Mannkraft has failed to plead the existence of an "enterprise" separate and apart from any alleged pattern of racketeering; (2) Mannkraft has failed to allege a pattern of racketeering activity; and (3) Mannkraft has failed to plead fraud with particularity.

*II. DISCUSSION*
Mannkraft's civil RICO claim is authorized by 18 U.S.C. § 1964(c), which provides:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

**\*2** Mannkraft alleges a violation by Newark Disposal of Section 1962(c) and 1962(d) of the RICO statute. [FN1] In order to prove a violation of § 962(c), a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.,* 473

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



1988 WL 124720                                                                    Page 2
Not Reported in F.Supp., 1988 WL 124720 (D.N.J.)
**(Cite as: 1988 WL 124720 (D.N.J.))**

U.S. 479, 496 (1985). Additionally, to prove a violation of § 1962(d), a plaintiff must show that the defendants conspired "to knowingly further the affairs of the enterprise." *Seville Industrial Machinery v. Southmost Machinery,* 724 F.2d 786, 7982 n. 8 (3d Cir.), *cert. denied,* 469 U.S. 1211 (1985).

Defendant Newark Disposal initially argues that Mannkraft has not sufficiently plead the existence of an "enterprise" and thus, as a threshold matter, plaintiff's RICO complaint must fail. In *United States v. Riccobene,* 709 F.2d 213 (3d Cir.), *cert. denied sub nom. Carcaglini v. United States,* 464 U.S. 849 (1983), the Third Circuit set forth what elements the government must demonstrate in order to establish the existence of an enterprise: (1) that the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) that the members of the enterprise function as a continuing unit with established duties; and finally, that (3) the enterprise must be shown to have an existence separate and apart from the pattern of racketeering activity in which it engages. 709 F.2d at 221.

Newark Disposal contends that plaintiff's complaint does not demonstrate the existence of an enterprises according to the requirements set out in *Riccobene.* However, the Third Circuit, in the *Seville* case, explicitly held that "the *Riccobene* proof standard is simply inapplicable to test the sufficiency of pleadings in a RICO case." *Seville,* 742 F.2d at 790. The defendant also argues that Mannkraft's complaint fails to satisfy even the liberal pleading requirements of *Seville.* The Court disagrees. In *Seville,* the Third Circuit stated that a "bare allegation" as to the existence of an enterprise was all that was required to satisfy pleading requirements. *Id.* It is plain that Mannkraft's complaint sufficiently alleges the existence of an enterprise with which Newark Disposal is alleged to have been associated with.

Newark Disposal also challenges the sufficiency of Mannkraft's pleading of the predicate acts of mail and wire fraud, as well as the sufficiency of Mannkraft's fraud allegations under Fed.R.Civ.P. 9(b). Once again, defendant's argument fails under the weight of *Seville.* Indeed, the *Seville* case, itself, dealt with a RICO claim involving predicate acts of mail and wire fraud. The Court stated:

Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of 'date, place or time' fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

*3 *Seville,* 742 F.2d at 791. Using the flexible approach advocated by the Third Circuit in *Seville,* the Court finds the complaint supplies adequate notice to defendants, and is precise and substantive enough to sufficiently allege the predicate acts of mail and wire fraud, and satisfy Rule 9(b), despite defendant's objection that the complaint fails to set out who sent documents through the mail or made wire communications, what documents were sent, and when such documents or wire communications were transmitted.

Finally, the Court concludes that plaintiff has sufficiently plead its conspiracy claim under § 1962(d). Given the length of time of the alleged scheme to defraud Mannkraft, and the various acts which Mannkraft alleges the Newark Disposal-Bearman scheme consisted of, plaintiff's conspiracy claim survives the *Seville* court's admonition that "mere agreement to commit the predicate acts is not sufficient to support a charge of conspiracy under § 1962(d)." *Seville,* 742 F.2d at 792 n. 8.

The Court finds that Mannkraft's complaint, taken as a whole and read under the liberal pleading standard of the Third Circuit, as set forth in *Seville,* provides adequate notice to defendant and gives defendant Newark Disposal an adequate basis to respond to plaintiff's complaint. This is the meaning of "notice pleading," and it is this standard which Mannkraft has satisfied.

### III. *CONCLUSION*
For the reasons set forth above, defendant's motion to dismiss is denied.

An appropriate order is attached.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



1988 WL 124720                                                                Page 3
Not Reported in F.Supp., 1988 WL 124720 (D.N.J.)
**(Cite as: 1988 WL 124720 (D.N.J.))**

*ORDER*

This matter having been opened to the Court on November 14, 1988 by Waters, McPherson, McNeill, Fitzpatrick, attorneys for defendant Newark Disposal Service, Inc. (Frank G. Capece, Esq. appearing), and upon notice to and in the presence of Carpenter, Bennett & Morrissey and Fox & Horan, attorneys for plaintiff (David M. McCann, Esq. appearing), and upon notice and in the presence of attorneys for all defendants, for an order dismissing the complaint pursuant to Fed.R.Civ.P. 8, 9(b) and 12(b)(1) and 12(b)(6), and the Court having considered the briefs and other papers submitted both in support of and in opposition to the motion and having heard oral argument and good cause having been shown,

It is on this 18th day of November, 1988,

ORDERED, that the motion of defendant Newark Disposal is denied.

> FN1. In relevant part, 18 U.S.C. §§ 1962(c) and (d) provide:
> (c) It shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities or which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

Not Reported in F.Supp., 1988 WL 124720 (D.N.J.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT K



Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2001 WL 652016 (D.Del.), 2001-2 Trade Cases P 73,388
(Cite as: 2001 WL 652016 (D.Del.))

Ⓗ

**Motions, Pleadings and Filings**

United States District Court, D. Delaware.
MEDTRONIC AVE, INC., Plaintiff,
v.
BOSTON SCIENTIFIC CORPORATION; Scimed Life
Systems, Inc.; Boston Scientific
Scimed, Inc.; and Medinol, Ltd., Defendants.
**No. CIV.A. 98-478-SLR.**

March 30, 2001.

MEMORANDUM ORDER
ROBINSON, District J.

*1 At Wilmington this 30th day of March, 2001, having
reviewed plaintiff's motion to strike defendants'
counterclaims and sixth and seventh affirmative defenses
(D.I.55) and to dismiss defendants' counterclaim and to
strike defendants' seventh affirmative defense (D.I.56);

IT IS ORDERED that:

1. Plaintiff's motion to strike (D.I.55) is denied, as it is not
supported by relevant case law.

2. Plaintiff's motion to dismiss (D.I.56) likewise is denied,
for the reasons that follow:

a. The Federal Rules of Civil Procedure permit a party to
move for dismissal of a claim or counterclaim for "failure to
state a claim upon which relief can be granted."
Fed.R.Civ.P. 12(b)(6). To prevail on such a motion,
however, the movant must show beyond a doubt that the
claimant cannot prove any set of facts in support of the
claim that would entitle it to relief. *Conley v. Gibson*, 335
U.S. 41, 45-46 (1957). Moreover, all of the claimant's
well-pled allegations must be taken as true, and all
reasonable inferences from those allegations must be drawn
in the claimant's favor. *Jenkins v. McKeithen*, 395 U.S. 411,
421-22 (1969); *Advanced Cardiovascular Sys. v. Scimed
Life Sys.*, 988 F.2d 1157, 1161 (Fed.Cir.1993); *Dow
Chemical Co. v. Exxon Corp.*, 30 F.Supp.2d 673, 694
(D.Del.1998).

b. Count II of defendants' counterclaims is an action for
violation of Section 2 of the Sherman Act, codified at Title
15, Section 2 of the United States Code. (D.I. 50 at 8-10). In
essence, defendants allege that AVE is attempting to
monopolize the market for coronary stents in the United
States by enforcing the patents-in-suit against defendants
and others, with full knowledge that those patents were
fraudulently procured. Two separate acts of fraud are
alleged: (1) fraud on the Patent Office during prosecution of
the patents by virtue of intentionally and fraudulently failing
to identify one or more inventors of the subject matter
claimed in the patents, and (2) fraud perpetrated on the prior
owner of the claimed subject matter to induce a transfer of
ownership.

c. Plaintiff argues for dismissal of the antitrust counterclaim
on three grounds. First, plaintiff argues that the
counterclaim fails as a matter of law because defendants
have not alleged that plaintiff possesses a sufficiently high
market share. Plaintiff is incorrect in its assertion that there
is a minimum market share requirement for an attempted
monopolization claim. The case law is clear that market
share is just one factor a court considers in evaluating the
existence of monopoly power. *See Fineman v. Armstrong
World Indus., Inc.*, 980 F.2d 171, 201 (3d Cir.1992) ("As a
matter of law, absent other relevant factors, a 55 percent
market share will not prove the existence of monopoly
power.") (emphasis added).

d. Second, plaintiff argues that the nature of the alleged
fraud on the Patent Office is not sufficiently "material" to
support an antitrust claim. Under *Walker Process Equip.,
Inc. v. Food Machinery and Chemical Corp.*, 382 U.S. 172
(1965), a patentee who brings an infringement suit can be
subject to antitrust liability if the asserted patent was
obtained through intentional fraud on the Patent Office and
the patent would not have issued but for that act or
omission. *See Nobelpharma AB v. Implant Innovations, Inc.*,
141 F.3d 1059, 1071 (Fed.Cir.1998). Defendants assert that,
during the prosecution of the patents-in-suit, the applicant
"intentionally and fraudulently fail[ed] to identify one or
more joint inventors of the subject matter claimed in the
patents." (D.I.50, ¶ 15) The factual basis for this allegation
arises from two pending state court actions where the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 2
Not Reported in F.Supp.2d, 2001 WL 652016 (D.Del.), 2001-2 Trade Cases P 73,388
**(Cite as: 2001 WL 652016 (D.Del.))**

question of inventorship is at issue. The Federal Circuit has declared that, "[a]s a critical requirement for obtaining a patent, inventorship is material.... Examiners are required to reject applications under 35 U.S.C. § 102(f) on the basis of improper inventorship." *Perspective Biosystems, Inc. v. Pharmacia Biotech, Inc.,* 225 F.3d 1315, 1321 (Fed.Cir.2000). Under controlling Federal Circuit precedent, then, the alleged fraudulent conduct is sufficient to withstand plaintiff's motion to dismiss.

**\*2** e. Plaintiff's final argument is that defendants have failed to provide plaintiff with adequate notice of the basis for the antitrust claim. In accordance with the "notice pleading" approach embodied in the Federal Rules of Civil Procedure, a claimant is required to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Additionally, where a claim involves an averment of fraud, "the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b).

f. The requirement for particularity in pleading fraud does not demand an exhaustive cataloging of facts, but only specificity sufficient to provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred. *Resource Ventures, Inc. v. Resources Management Int'l, Inc.,* 42 F.Supp.2d 423, 441 (D. Del 1999) (denying motion to dismiss where pleading described the act of fraud, but not specifics such as the date, place or time). Moreover, a claimant is free to use alternative means of injecting precision and some measure of substantiation into its allegations of fraud. The court finds that defendants' pleadings pass muster under Fed.R.Civ.P. 9(b).

Not Reported in F.Supp.2d, 2001 WL 652016 (D.Del.), 2001-2 Trade Cases P 73,388

### Motions, Pleadings and Filings (Back to top)

• 2000 WL 34417250 (Trial Pleading) Answer to Second Amended Complaint, Affirmative Defenses and Counterclaims (Jul. 13, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L

Westlaw.

1986 WL 7231                                                                                                                    Page 1
Not Reported in F.Supp., 1986 WL 7231 (D.N.J.), 55 USLW 2078, 1986-2 Trade Cases P 67,228
**(Cite as: 1986 WL 7231 (D.N.J.))**

C

United States District Court, D. New Jersey.
MICROBYTE CORPORATION, trading as Microbyte
Computer Systems Corp., Plaintiff,
v.
NEW JERSEY STATE GOLF ASSOCIATION, et al.,
Defendants.
**Civ. A. No. 84-949.**

June 26, 1986.

Connell, Foley & Geiser, Newark, N.J., for defendants.

Gil Douglas Messina, Shrewsbury, N.J., for plaintiff.

OPINION
SAROKIN, District Judge.

*1 Before the court are the cross-motions of the parties for
summary judgment in this matter. At issue is whether
certain actions of the New Jersey Golf Association
(NJGSA) in connection with its marketing of a golf
handicapping service developed by the United States Golf
Association (USGA) constitute violations of Section One
and Section Two of the Sherman Anti-trust Act, 15 U.S.C.
§§ 1, 2.

The amended complaint in this action names two
defendants, the NJSGA and the New Jersey Professional
Golfers' Association (NJPGA). NJSGA is a New Jersey
corporation operating as a voluntary association of golf and
country clubs in New Jersey which sanctions amateur and
professional golf tournaments in New Jersey, as well as
acting as a rules authority in the state. NJPGA is a
corporation operating as an association of golf professionals
working at New Jersey golf and country clubs.

Not named as a defendant in the amended complaint is the
United States Golf Association (USGA), a corporation
operating as a voluntary association of state and regional
amateur golf associations, which sanctions national amateur
and professional golf tournaments. USGA was named in the
original complaint, but has since been released by a
Stipulation of Dismissal filed August 29, 1985. It is still
identified as a co-conspirator with the other two defendants,
however.

The plaintiff, Microbyte Corp., is a New Jersey corporation
engaged in the marketing and sale of computer systems to
golf and country clubs in several states, including the state
of New Jersey.

Several years ago, USGA developed a system for assigning
handicaps to golfers of various skill levels, making it
possible for golfers of differing abilities to compete with
one another. This system produces what is known as a
"USGA Handicap", a trademark of USGA and the most
widely recognized golf handicap. As a prerequisite for
participation in NJSGA and USGA-sponsored tournaments,
local golf and country clubs must adhere to the USGA
handicapping system and USGA standards for
handicapping.

With the advent of the computer age, various computer
systems companies began to develop computerized means
of calculating and assigning handicaps using the USGA
system. Among them was the plaintiff, which developed an
on-site microcomputer system called DATAFORE that
could score and schedule tournaments, arrange pairings of
players, maintain pro-shop inventories, and display
continuous electronic messages to club members, in
addition to computing golf handicaps using the USGA
system. At approximately the same time plaintiff began
marketing the DATAFORE system, in 1981, USGA began
marketing its own computer handicapping service, known as
the Golf Handicap and Information Network (GHIN), which
had the capability only of computing handicaps. USGA has
adopted a policy of marketing this system exclusively
through golf associations, and has required that its agent
associations market the GHIN system exclusively.

NJSGA has entered into a written contract with USGA to
market GHIN in New Jersey to its member clubs at a charge
of $6.00 per male golfer per year and $4.00 per female or
junior golfer, as compared to the one time charge assessed
by plaintiff for its on-site system. Since NJGSA began
marketing GHIN, it has captured 33.6 percent of the market
of clubs purchasing some handicapping service. Pursuant to
USGA's policy of marketing GHIN only through golf
associations, plaintiff has been refused access to the GHIN
system except through NJSGA or, in other states, through
golf associations under contract with USGA. As a condition

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



1986 WL 7231                                                                                           Page 2
Not Reported in F.Supp., 1986 WL 7231 (D.N.J.), 55 USLW 2078, 1986-2 Trade Cases P 67,228
**(Cite as: 1986 WL 7231 (D.N.J.))**

of marketing GHIN, NJSGA, in turn, has required that plaintiff do so only on prices and terms identical to the prices and terms offered by NJSGA.

**\*2** Plaintiff charges that the GHIN system has attained its great success in New Jersey despite the relatively limited services it offers and its relatively high cost, because NJSGA has made use of the GHIN handicapping system a condition of full participation in NJSGA tournaments for clubs which are "associate members" of NJSGA. Historically, NJSGA admitted only private golf clubs as members. This membership restriction was later lifted so that public clubs or associations could be admitted as "associate" members, but "associate member" clubs were limited in the number of golf teams they could field in any NJSGA tournament on the theory that players from the public clubs would not be as skilled as players from the private clubs, who theoretically played more regularly. With the advent of GHIN, NJSGA apparently decided that the quality of play could be controlled by use of the computerized handicapping information available through GHIN, and so eliminated the team number restrictions for associate clubs subscribing to GHIN. Thus, plaintiff claims, an associate club's ability to participate fully in NJSGA tournaments hinges on its subscription to GHIN.

In its amended complaint, plaintiff also charged that NJSGA entered into an agreement with defendant NJPGA whereby NJSGA would pay a sum of money to the NJPGA for each golfer using GHIN in return for NJPGA members' promotion of GHIN in the clubs with which they were affiliated, all allegedly unbeknownst to the clubs. In its opposition papers, plaintiff changes its charge somewhat to allege that NJSGA agreed with NJPGA to pay NJPGA ninety cents per male golfer using GHIN if NJPGA would cease to represent a rival company providing handicapping services known as Golf Log, Inc., and to remain out of the handicapping business in New Jersey as long as NJSGA remained in it. [FN1]

Plaintiff contends that NJSGA, NJPGA and USGA have engaged in a combination, contract or conspiracy in unreasonable restraint of trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1, by refusing to grant plaintiff access to GHIN on competitive terms, by tying

participation in NJSGA tournaments for associate member clubs to use of GHIN, and by arranging to keep NJPGA from competing with NJSGA. In addition, plaintiff contends that these actions by NJSGA, NJPGA and USGA, constitute the willful acquisition and maintenance, or a willful attempt or conspiracy to acquire and maintain, with a dangerous probability of success, a monopoly in the computerized golf handicapping industry in New Jersey in violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

In its motion, defendant NJSGA seeks summary judgment on the claims against it. First, NJSGA contends that its limitation on the number of teams fielded in its tournaments by associate members not using GHIN does not constitute an illegal tying arrangement because the number limitation and GHIN are not "tied" within the meaning of the antitrust caselaw; because NJSGA does not have sufficient "market power" to appreciably restrain free trade in the market for golf handicapping services; and because the amount of commerce affected is not "substantial". Second, NJSGA contends that its market share is not sufficiently large to establish monopolization, or the dangerous probability of success in monopolization required to recover for an attempt to monopolize, and that plaintiff has failed to allege facts indicating a specific intent to monopolize. Third, in response to plaintiff's argument concerning USGA's and NJSGA's refusal to deal with plaintiff except on noncompetitive terms, NJSGA lays the responsibility for such refusal on USGA alone, claiming that the exclusive marketing policy is a policy of USGA alone, and not of NJSGA, and that NJSGA, through its Director, Carol Rhodes, in fact attempted to facilitate plaintiff's interfacing with GHIN. Finally, in response to plaintiff's recast theory of the import of the agreement between NJSGA and NJPGA, [FN2] NJSGA attacks as factually unsupported plaintiff's characterization of the agreement as intended only to preclude NJPGA's competition with NJSGA, and disputes whether a sales representative's agreement to promote one supplier's product exclusively can ever constitute an unreasonable restraint of trade. Plaintiff cross-moves for summary judgment on the issue of defendant NJSGA's liability as to each of the claims stated. For the following reasons, the court will grant plaintiff summary judgment with regard to two of the necessary elements of its claim of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



1986 WL 7231                                                                                           Page 3
Not Reported in F.Supp., 1986 WL 7231 (D.N.J.), 55 USLW 2078, 1986-2 Trade Cases P 67,228
**(Cite as: 1986 WL 7231 (D.N.J.))**

an illegal tying arrangement: the existence of a tie between full access to NJSGA tournaments and use of the GHIN handicapping system, and the substantiality of the amount of commerce affected by said tie. The motions of the parties for summary judgment will be denied in all other respects.

DISCUSSION

I. *Connection Between Access to NJSGA Tournaments and Use of GHIN as an Illegal Tying Arrangement*

*3 Section One of the Sherman Act declares to be illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ..." 15 U.S.C. § 1. One of the practices encompassed in this prohibition is the establishment of an invalid "tying arrangement", that is, a conditioning of the purchase of an otherwise unavailable and desirable product, the "tying product", on purchase of a second product, the "tied product". *International Salt Co. v. United States,* 332 U.S. 392, *appeal dism'd,* 332 U.S. 747 (1947). As recently noted by the Supreme Court, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 12 (1984). The rationale for outlawing such arrangements as restraints of trade is readily apparent: "They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price, but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products." *Northern Pacific Railway v. United States,* 356 U.S. 1, 5-6 (1958).

In order to streamline the process of proving the invalidity of a tying arrangement, the Supreme Court has developed a three-pronged test for finding a *per se* violation where "the existence of forcing is probable." *Jefferson Parish Hospital,* 466 U.S. at 15 and n. 25; *Northern Pacific Railway Co. v. United States,* 356 U.S. at 5. The parties agree that the test for a *per se* tying violation involves the following elements of proof: "the existence of a tie, 'that the seller has sufficient

economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product,' and 'that a "not insubstantial amount of interstate commerce is affected." ' " *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 449 (3d Cir.1977), *cert. denied,* 434 U.S. 1086 (1978), quoting *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211 (3d Cir.1976). Where the plaintiff is unable to prove the elements of a violation *per se,* "an antitrust violation can be established only by evidence of an unreasonable restraint on competition in the relevant market." *Jefferson Parish Hospital,* 466 U.S. at 18.

Defendant argues that none of the three elements of a *per se* violation exists in this case. First, defendant contends that no tie exists between the associate members' GHIN use and their access to NJSGA tournaments because the NJSGA does not completely foreclose associate members not subscribing to GHIN from participating in NJSGA tournaments. Second, defendant contends that it does not have sufficient "market power" in the relevant market for golf tournaments to appreciably restrain free trade in the market for handicapping services. Third, defendant submits that the amount of commerce affected by NJSGA's practice of lifting its tournament number limitations for GHIN users is not substantial enough to satisfy the third prong of the *per se* test. Finally, defendant contends that plaintiff cannot establish a tying violation even apart from the elements of the *per se* test because of its inability to establish the threshold requirement of a tie. The court will consider each argument in turn.

A. *The Existence of a Tie*

*4 As the Supreme Court reiterated in *Jefferson Parish Hospital,*

    ... not every refusal to sell products separately can be said to restrain competition. If each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market, particularly if competing suppliers are free to sell the entire package or its several parts.

466 U.S. at 11-12; *see also Northern Pacific Railway,* 356 U.S. at 6 n. 4. The mere fact that a seller's power "is just

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



used to maximize its return in the tying market", *Jefferson Parish Hospital, 466 U.S. at 14,* does not establish the existence of an invalid tie. Rather, the existence of an improper "tie" depends on whether the seller has "condition[ed] the *availability* of any of its products on the purchase of any other of its products." *SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1061 n. 3 (3d Cir.1978)* (emphasis supplied).

Relying on this logic, defendant argues that no tie exists in this case because

"Associate" member clubs are free to enjoy NJSGA tournaments while declining to participate in the GHIN handicapping system. NJSGA coerces no clubs that wish to participate in its tournaments to take its handicap system as well ... The mere existence of incentives or other "practical" inducements that enhance the attractiveness of the putative "tied" product does not establish a violation of the Sherman Act.

Defendant's Mem. at 23-24 (citations omitted). The flaw in this logic is obvious, however. While associate members of NJSGA are not completely foreclosed from participation in NJSGA tournaments absent subscription to GHIN, they are subject to a ceiling on the number of teams they can field. Full admission to NJSGA tournaments is not available from any source other than NJSGA. Thus, the tie between subscription to GHIN and full admission to NJSGA tournaments is truly a condition on the "availability" of access to NJSGA tournaments. This "inducement" to purchase the tied product, GHIN, accordingly reflects an invalid tie.

B. *NJSGA's "Market Power"*

The second prong of the test for a *per se* tying violation is whether "the seller has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product." *Bogosian v. Gulf Oil Co.,* 561 F.2f at 449. Defendant argues that it does not have sufficient "market power" to meet this prong of the test because NJSGA has only "a 10.66 percent share of the market for amateur tournaments in New Jersey (13 NJSGA tournaments out of 122 total tournaments)," and that "[t]his market share, as a matter of law, establishes an absence of

market power in the putative tying product." Defendant's Mem. at 28 ("market share" figure based on 1984 data). Defendant goes on to cite cases discussing the percent market share as a measure of "market power". *See Jefferson Parish Hospital, 466 U.S. at 26* (30 percent market share did not manifest sufficiently dominant market position); *Times-Picayune Pub. Co. v. United States,* 354 U.S. 594 (1953) (33 1/3 market share did not establish dominance).

\*5 In so arguing, defendant has completely ignored the thrust of plaintiff's argument, however. Plaintiff does not contend that defendant's market power comes from its percent share in the tournament market; rather, plaintiff has submitted evidence to the effect that NJSGA-sponsored tournaments are a unique "product" because of the prestige and tradition associated with them. *See* Affidavit of Joseph DeAngelis, 11/7/85. The uniqueness or desirability of a product controlled by a defendant can establish the defendants' "market power" completely apart from its market share:

Market dominance--some power to control price and to exclude competition--is by no means the only test of whether the seller has the requisite economic power. Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes.

*Digidyne Corp. v. Data General Corp., 734 F.2d 1336, 1340 (9th Cir.1984),* quoting *United States v. Loew's, Inc., 371 U.S. 38, 45 (1962).* The evidence submitted by plaintiff creates a question of fact as to whether NJSGA has sufficient market power to satisfy this prong of the *per se* test by virtue of the uniqueness and desirability of NJSGA-sponsored tournaments. [FN3] This question of material fact precludes any grant of summary judgment on this issue in favor of either party. Fed.R.Civ.P. 56.

C. *Amount of Commerce Affected*

The court must also reject defendant's arguments with regard to the final prong of the *per se* test: whether a "not insubstantial amount of interstate commerce is affected." *Bogosian, 561 F.2d at 449.* In determining whether the amount of commerce affected by the defendant's tying

Westlaw.

1986 WL 7231                                                                                                           Page 5
Not Reported in F.Supp., 1986 WL 7231 (D.N.J.), 55 USLW 2078, 1986-2 Trade Cases P 67,228
**(Cite as: 1986 WL 7231 (D.N.J.))**

scheme is "substantial", the court must look to "the *totality of the defendant's sales of the tied product* sold by means of the challenged practice." Von Kalinowski, 16A BUSINESS: ORGANIZATIONS: ANTITRUST LAWS AND TRADE REGULATION § 6G.05[2] at 6G-84, citing *Fortner Enterprises, Inc. v. U.S. Steel Corp.,* 394 U.S. 495, 501-02 (1969) (*Fortner I*) (emphasis in original). The dollar-volume of sales under this measure must be only "substantial enough ... so as not to be merely *de minimis.* " *Digidyne Corp. v. Data General Corp.,* 734 F.2d at 1341, quoting *Fortner I,* 394 U.S. at 501.

In this case, even under defendant's estimate, [FN4] the totality of its sales to associate member clubs on GHIN for the year 1984 alone was $27,264. Defendant's est. at 30. Although the lowest dollar sum found not to be *de minimis* as yet under this test was $50,000, *Aamco Automatic Transmissions, Inc. v. Taylor,* 407 F.Supp. 430, 436 (E.D.Pa.1976), this amount, contrary to defendant's suggestion, is by no means a floor for determining substantiality. Even $27,264 is not a paltry sum, and the court cannot find it to be *de minimis.*

Moreover, the court cannot agree with defendant's suggestion that this amount should be reduced to reflect only the amount of sales plaintiff can show specifically to have been lost to competitors on account of defendant's tying arrangement. Where, as here, the plaintiff can show that the defendant has expressly conditioned the "sale" of one product on the sale of another, there is no requirement that the plaintiff show actual coercion in order to establish a tie-in. *Bogosian v. Gulf Oil Corp.,* 561 F.2d at 451-52. Correspondingly, the amount of commerce affected should be measured by the total dollar-volume in sales of the tied product, as established in *Fortner I, supra,* not simply the amount of sales lost to competitors by the defendant's actual coercion. The court having found that the amount of commerce affected under this measure is not insubstantial, plaintiff has satisfied this last prong of the *per se* test.

**D.** *Existence of a Tie for Purposes of the "Rule of Reason"*

**\*6** As noted previously, even a plaintiff who has not succeeded in making out the elements of the *per se* test may succeed in establishing a tying violation by adducing

"evidence of an unreasonable restraint on competition in the relevant market," *Jefferson Parish Hospital,* 466 U.S. at 18, to show that "the general standards of the Sherman Act have been violated." *Fortner I,* 394 at 500. Such an inquiry is guided by what is known as the "rule of reason". *U.S. Steel Corp. v. Fortner Enterprises,* 429 U.S. 610, 612 n. 1 (1977) (*Fortner II* ). The threshold for proving a tying violation even under this test, however, is to establish the existence of a tie. *Innovation Data Processing v. IBM,* 603 F.Supp. 646, 649 (D.N.J.1984). Accordingly, defendant argues that plaintiff cannot establish a tying violation even under the "rule of reason" because, under its theory of the case, no tie exists.

As noted previously, however, the court finds that a tie does exist in this case, consisting of NJSGA's requirement that associate members subscribe to GHIN as a prerequisite to being afforded full access to NJSGA tournaments. Thus, defendant is not entitled to summary judgment on this ground. At the same time, however, plaintiff is not entitled to summary judgment under a "rule of reason" analysis either. Assuming the plaintiff is unable ultimately to demonstrate that defendant has sufficient "market power" to appreciably restrain free competition in the market for golf handicapping services, the second prong of the *per se* test, as to which an issue of fact currently exists, plaintiff must demonstrate in some other way that the tie between GHIN use and full access to NJSGA tournaments has resulted in an unreasonable restraint on competition in the golf handicapping market. The "incredibly complicated and prolonged economic investigation", *Northern Pacific Railway v. United States,* 356 U.S. at 5, involved in proving a violation under the "rule of reason" makes it especially unsuitable for determination in the context of a motion for summary judgment. In any event, plaintiff has not focused on this theory in its moving papers.

**II.** *Monopolization by NJSGA*

Defendant's next argument is aimed at plaintiff's charges of monopolization and attempted monopolization based on Section Two of the Sherman Act. Section Two forbids "[e]very person [to] monopolize, or attempt to monopolize any part of the trade or commerce ..." 15 U.S.C. § 2. The offense of monopoly "has two elements: (1) the possession

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp., 384 U.S. 563, 570- 71 (1966)*. The offense of attempted monopolization has two elements as well: "a specific intent to monopolize the relevant market and sufficient market power to come dangerously close to success." *Harold Friedman, Inc. v. Kroeger Co., 581 F.2d 1068, 1079 (3d Cir.1978)*. Presumably in light of the fact that even under its own estimation, defendant has not acquired more than a 33.6 percent market share, plaintiff has apparently dropped its claim of monopoly, for its papers focus only on the issue of attempted monopolization. [FN5] In response to plaintiff's claim of attempted monopolization, defendant contends that, as a matter of law, its market share is not sufficiently large to establish a dangerous probability of success in the alleged monopolization attempt, and that, in addition, plaintiff possesses no evidence indicating that defendant had the required intent to monopolize the golf handicapping industry.

A. *Defendant's Market Power and Probability of Success in Monopolization*

*7 Defendant attempts to reduce the question of its probability of success in accomplishing the alleged monopolization effort to a mere calculation of its market share. While plaintiff's claim for monopolization may appropriately be disposed of on such a ground, given the defendant's 33.6 percent share, *see* footnote 5, *supra*, plaintiff's claim for attempted monopolization may not be so easily dismissed. The appropriate focal point is defendant's "market *power* ", *Harold Friedman, Inc. v. Kroeger, 581 F.2d at 1079*, which is not necessarily equivalent to its market *share*. Thus, "a share of less than the fifty percent generally required for actual monopolization may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 490 (5th Cir.1984)*.

Plaintiff argues that the speed with which NJSGA attained

its share of the market upon entry into the field, [FN6] coupled with the alleged high cost of entry into the market, consisting of high initial software development costs, in combination with the market share attained by defendant will, as a matter of law, support a finding of attempted monopolization. Added to this must be the unique circumstances of NJSGA as the sole controller of a uniquely desirable "product", access to NJSGA tournaments, which has been tied to NJSGA's golf handicapping product, assuming that plaintiff will be able to prove the unique desirability of access to NJSGA tournaments. Taking all of these factors into account, the court cannot find that plaintiff will be unable to establish that defendant possesses "sufficient market power to come dangerously close to success" in the alleged monopolization attempt. At the same time, however, the question of whether defendant does possess such market power involves open questions of fact, including the question of the unique desirability of NJSGA tournaments, which must await the time of trial for resolution.

B. *Defendant's Intent*

Defendant next contends that plaintiff has no evidence of defendant's intent to monopolize the computer golf handicapping industry. This is clearly not the case. The affidavits of Joseph DeAngelis and Edward Cochrane, as well as plaintiff's documentary exhibits, contain evidence of such an intent, including statements by NJSGA's director, Carol Rhodes, that she sought to "unify" golf handicapping in New Jersey under the GHIN system, Plaintiff's Exhibits Y; Defendant's Exhibit Y, and that she sought to "put companies like Microbyte out of business", DeAngelis Aff., ¶ 15, as well as statements by an employee of NJSGA that the reason for the association's rule imposing tournament number limitations on non-GHIN using associate members was "to limit the size of the field and also to induce associate clubs to participate in the NJSGA GHIN handicapping system", Cochrane Aff., ¶ 18. The question of whether defendant possessed the requisite intent to commit the violation of attempted monopolization is clearly a question of fact, as to which plaintiff has ample evidence to survive defendant's motion for summary judgment.

III. *Defendant's Refusal to Deal*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**\*8** Defendant next contends that plaintiff's "refusal to deal" allegation states no cause of action as against NJSGA because the policy of marketing GHIN only through local golf associations, rather than through private computer concerns, is a USGA policy, not an NJSGA policy. Defendant again misses the gist of plaintiff's argument, however. Plaintiff's claim of "refusal to deal" arose when, concerned that it would be foreclosed from describing the handicaps calculated by DATAFORE as "USGA Handicaps" by new USGA efforts to enjoin use of the designation as a trademark, plaintiff commenced discussions with USGA and NJSGA to gain approval for use of the USGA designation. Plaintiff eventually gained USGA approval to use the designation, upon certain agreed conditions, but, prior to that agreement, plaintiff discussed the possibility of marketing the GHIN handicapping system in a package with its DATAFORE system, which, as noted, is capable of performing many functions apart from simple handicapping. USGA's Handicap Director, Dean Knuth, made clear that plaintiff would be able to market GHIN in New Jersey only through NJSGA, and only on the terms specified by it. NJSGA, in turn, made clear that plaintiff would be allowed to market GHIN only on the condition that it would require clubs subscribing to GHIN through plaintiff to pay the same fees to NJSGA that the clubs would have to pay to NJSGA if they subscribed through NJSGA, that is, on terms that could only profit, and could not provide competition for, NJSGA.

Plaintiff charges that USGA's and NJSGA's refusal to deal with plaintiff except on terms that would not compete with NJSGA's marketing of GHIN in New Jersey constituted a conspiracy or combination in unreasonable restraint of trade in violation of Section One of the Sherman Act, as well as manifesting an intent to monopolize the golf handicapping industry, in violation of Section Two of the Act. *See United States v. Parke Davis & Co.,* 362 U.S. 29 (1958) (scheme whereby supplier refused to deal with retailers who failed to observe its suggested minimum retail price and induced wholesalers not to sell to offending retailers constituted unlawful conspiracy or combination in unreasonable restraint of trade). Given the role that plaintiff describes NJSGA as playing in the refusal to allow plaintiff to market GHIN except on noncompetitive terms, the court fails to

understand how defendant can attribute this refusal to USGA alone. It was only the combination of NJSGA's policy on the terms under which plaintiff could market GHIN, as well as USGA's policy of deferring to NJSGA, that resulted in the allegedly offensive refusal to deal. Thus, if there is a claim for a conspiracy or combination in unreasonable restraint of trade stated by these actions, NJSGA, as well as USGA, is a proper defendant. Defendant's assertion that NJSGA attempted to facilitate plaintiff's interfacing with GHIN is no defense, given that NJSGA prescribed the terms under which plaintiff could market the product so as not to compete with NJSGA. [FN7]

IV. *The Agreement Between NJSGA and NJPGA*

**\*9** Finally, defendant attacks plaintiff's recast theory of the import of NJGSA's agreement with NJPGA in connection with the marketing of GHIN as factually unsupported. Plaintiff claims that NJSGA induced NJPGA to end its connection with a competitor of NJSGA's, Golf Log, Inc., in order to ensure that NJPGA would not compete with NJSGA. Plaintiff claims that the fee of 90 cents per golfer using GHIN which is paid to NJPGA pursuant to the agreement is simply a payment to keep NJPGA from competing with NJSGA, and not a fee in return for NJPGA's services in promoting the use of GHIN. Plaintiff claims that NJPGA in fact engages in little, if any, promotion of GHIN. Defendant, on the other hand, contends that NJPGA's agreement with NJSGA is merely the equivalent of a sales representative's agreement to promote a particular supplier's product, and that the agreement is no more offensive than was NJPGA's agreement with Golf Log, Inc.

The parties' dispute on this question is purely a factual one, involving the intent of NJSGA and NJPGA in reaching their agreement, and its effect on the market. Contrary to defendant's suggestion, plaintiff does have evidence that the agreement was primarily intended to ensure noncompetition between NJPGA and NJSGA, *see* DeAngelis Aff., ¶ 17-24 (reporting statements of Vito "Red" Gaeta and George Craig, NJPGA members). Given the question of fact that exists, any grant of summary judgment on this issue is foreclosed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



1986 WL 7231                                                                                          Page 8
Not Reported in F.Supp., 1986 WL 7231 (D.N.J.), 55 USLW 2078, 1986-2 Trade Cases P 67,228
**(Cite as: 1986 WL 7231 (D.N.J.))**

CONCLUSION

For the foregoing reasons, plaintiff is granted summary judgment on the issue of the existence of a tie between full access to NJSGA tournaments and use of the GHIN handicapping system, enforced by defendant NJSGA, and on the issue of the substantiality of the amount of commerce affected by said tie. The motions of the parties for summary judgment are denied in all other respects.

ORDER

This matter having been opened to the court upon the cross-motions of the parties for summary judgment, and the court having considered the moving papers and the opposition thereto, and having heard argument of counsel, and for the reasons expressed in the Opinion of the court even dated herewith,

IT IS this 25 day of June, 1986, hereby ORDERED that the motion of the plaintiff for summary judgment be and it hereby is granted with regard to the issue of the existence of a tie between full access to NJSGA tournaments, enforced by defendant NJSGA, and use of the GHIN handicapping system, and the issue of the substantiality of the amount of commerce affected by said tie, in connection with plaintiff's claim of an illegal tying arrangement by defendant New Jersey State Golf Association; and it is further

ORDERED that the motions of the parties for summary judgment be and they hereby are denied in all other respects.

> FN1. Plaintiff has apparently dropped its allegation that NJPGA's receipt of monies for the promotion of GHIN was not made known to the clubs in question, in the light of factual material to that effect submitted by defendant NJSGA.

> FN2. As noted, plaintiff has apparently withdrawn its charges that the agreement was made without the knowledge of the NJPGA members' employing golf clubs.

> FN3. Defendant objects to the evidence submitted by plaintiff on this score, presented in the affidavit of plaintiff's President, Joseph DeAngelis, as "self-serving opinions concerning the market for

golf tournaments." Defendant's Mem. at 5. Given that DeAngelis indicates that he has been an "avid golfer" in the state of New Jersey for nearly twenty years, his sworn statement as to the prestige associated with NJSGA tournaments is deserving of some weight. Although it may not be sufficiently conclusive to establish the uniqueness or desirability of NJSGA tournaments within the meaning of the *per se* test, it certainly raises a material issue of fact.

FN4. Plaintiff would measure the "amount of commerce affected" by the one-time price of one of its on-site machines times the number of associate member clubs currently on GHIN (37), or $147,815.00.

FN5. Relevant Supreme Court cases suggest that a market share of at least fifty percent is required to establish that a defendant is guilty of monopolization. *See, e.g., Otter Tail Power Co. v. United States,* 410 U.S. 366 (1973); *United States v. Grinnell Corp.,* 384 U.S. 563 (1966).

FN6. Plaintiff points out that defendant became "the number one handicapping service in the State, after a mere four or five months of marketing", achieving a 20.2 percent share in that time. Plaintiff's Mem. at 37.

FN7. At oral argument, the court expressed some concern that a release given by plaintiff to the USGA in settlement of its claims against the USGA might operate to release plaintiff's claims against its alleged co-conspirator, NJSGA. The parties agree that this issue is controlled by *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321 (1971), in which the Supreme Court refused to apply in the context of a federal antitrust violation the common law rule that a release of one tortfeasor operates to release all joint tortfeasors. Rather, the Court adopted a rule requiring some indication that such was the intent of the parties. *See* 401 U.S. at 342-48. As there is nothing in plaintiff's release of USGA indicating an intent to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp., 1986 WL 7231 (D.N.J.), 55 USLW 2078, 1986-2 Trade Cases P 67,228
**(Cite as: 1986 WL 7231 (D.N.J.))**

       release NJSGA as well, especially in the context of plaintiff's continued active litigation against NJSGA, the court finds that plaintiff's release of USGA is no defense for NJSGA.

Not Reported in F.Supp., 1986 WL 7231 (D.N.J.), 55 USLW 2078, 1986-2 Trade Cases P 67,228

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT M



Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1398643 (D.Md.), 2005-1 Trade Cases P 74,830
**(Cite as: 2005 WL 1398643 (D.Md.))**

H

United States District Court,
D. Maryland.
In re: MICROSOFT CORP. ANTITRUST LITIGATION
NOVELL, INC.
v.
MICROSOFT CORP.
**No. MDL 1332, Civ. JFM-05-1087.**

June 10, 2005.

Dear Counsel:

Jeffrey M. Johnson, Dickstein Shapiro Morin and Oshinsky
LLP, Washington, DC, for Novell, Inc.

David B. Tulchin, Steven L. Holley, Sullivan and
Cromwell, New York, NY, Kit A. Pierson, Heller Ehrman
White and McAuliffe, Washington, DC, Robert A.
Rosenfeld, Heller Ehrman White McAuliffe LLP, San
Francisco, CA, Thomas W. Burt, Redmond, WA, for
Microsoft Corp.

MOTZ, J.

**\*1** As I mentioned at the close of the hearing held on June 7,
2005, there is a series of motions pending in another
proceeding in which I am involved to which I will have to
turn my attention in the coming weeks. I expressed to you
my concern that as a result, it might take me more time than
I would like to rule upon Microsoft's motion to dismiss in
this case. After the hearing, however, I concluded that close
and difficult though the issues are, I am prepared to decide
them now, particularly while your excellent arguments are
still fresh in my mind.

It is neither in your interest nor in the public interest to
delay resolution of your dispute any longer. Therefore,
instead of postponing my rulings until my schedule would
permit me to write a more extensive opinion, I have decided
to issue my rulings now, setting forth my reasoning in this
short memorandum to you. I hope you understand that the
form and nature of the opinion does not mean that I have not
considered the questions presented as thoroughly and
carefully as I can. As I have previously done in these MDL
proceedings, I am simply following my own adage of

"writing for the parties, not for the ages."

Microsoft's motion is denied as to Counts I and VI but
granted as to Counts II, III, IV, and V.

*Counts I and VI*

In Count I Novell alleges that Microsoft unlawfully
"obtained and maintained its monopoly power in the
Intel-compatible operating systems market by engaging in
anticompetitive conduct" and that as a result Novell was
damaged, specifically through lost sales of "office
productivity applications" (including WordPerfect, a word
processing program, and Quattro Pro, a spreadsheet
program). Microsoft acknowledges that the claim asserted in
Count I is not time-barred because the focus of the
government case against Microsoft (during the pendency of
which limitations of private rights of action were tolled
under 15 U.S.C. § 16(i)) was upon Microsoft's monopoly in
the operating system market. Count VI is based upon
Microsoft's exclusionary agreements with OEMs, which
allegedly were in unreasonable restraint of trade. Although
Microsoft does not expressly concede the point, such
agreements also were a subject of the government case.
Thus, limitations has been tolled as to the claim asserted in
Count VI.

In regard to Count I Microsoft makes two contentions,
neither of which is meritorious. First, it argues that Novell
no longer owns the claim asserted in that count because it
transferred the claim to Caldera in connection with the sale
of the DOS operating system, related technology, and
claims relating "directly or indirectly" to it. The fallacy in
this argument is that the claim asserted in Count I, while
arising from Microsoft's monopoly in the operating system
market, is for damage not to DOS or any other operating
system but for damage to applications software. It is a far
stretch to infer (and Microsoft has presented nothing to
establish) that simply because DOS competed in the
operating system market, such a claim was either a "direct"
or "indirect" claim intended to be transferred from Novell to
Caldera. Of course, Novell did also have claims against
Microsoft for damage caused to DOS and related
technology, but these claims (which were settled after
Caldera sued Microsoft) are not part of the present action.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                              Page 2
Not Reported in F.Supp.2d, 2005 WL 1398643 (D.Md.), 2005-1 Trade Cases P 74,830
**(Cite as: 2005 WL 1398643 (D.Md.))**

**\*2** Microsoft next argues that Novell lacks antitrust standing as to Count I because the office productivity applications alleged to have been damaged did not compete in the operating system market. According to Microsoft, there is a black-letter rule that only competitors or consumers in a relevant market have standing to sue for harm caused by anti-competitive behavior in that market. Microsoft overstates the proposition. Certainly, competitors and consumers in a given market "are favored plaintiffs," and, just as certainly, "the list of those presumptively disfavored is far longer." *SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co., 48 F.3d 39, 45 (1st Cir.1995). See also White v. Rockingham Radiologists, Ltd., 820 F.2d 98, 104 (4th Cir.1987); Lucas v. Bechtel Corp., 800 F.2d 839, 845-46 (9th Cir.1986).* However, the Supreme Court has not established a litmus test for antitrust standing based upon a plaintiff's status. Rather, in *Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983),* the Court--while pointing out that the plaintiff whom it found not to have antitrust standing "was neither a consumer nor a competitor in the market in which trade was restrained," *id.* at 539--did not simply rely upon that fact but instead articulated a series of factors to be considered in deciding the standing question. *Id.* at 537-45.

In the present case the gravamen of the claim asserted in Count I is that Microsoft specifically targeted Novell for the purpose of maintaining its monopoly in the operating system market. According to Novell, WordPerfect and Quattro Pro, its popular office productivity applications, posed a threat to Microsoft's operating system monopoly because Novell had engineered them to exploit Novell's existing cross-platform technologies, such as OpenDoc and AppWare. Moreover, because these applications were being developed to run independently of any operating system, particularly Windows, and because the consumer demand for them was great, Microsoft saw the need to attack them. In support of this view, Novell, citing an internal Microsoft email, contends that "Microsoft recognized that it had to control the office productivity applications market to fend off that threat to its operating systems monopoly." The Microsoft email stated as follows:

If we own the key 'franchises' built on top of the operating system, we dramatically widen the "moat" that protects the operating system business....We hope to make a lot of money off these franchises, but even more important is that they should protect our Windows royalty per PC....And success in those businesses will help increase the opportunity for future pricing discretion.
E-mail from Jeff Raikes, Microsoft, to Warren Buffet (Aug. 17, 1997).

Novell also alleges that it was a company of particular concern to Microsoft. Paragraph 7 of the Complaint avers:
Bill Gates, Microsoft's Chairman and Chief Executive Officer, targeted Novell's applications by name in documents recording Microsoft's anticompetitive schemes, in which he explained that the integration of browsing functions into Windows, coupled with Microsoft's refusal to publish certain of these functions, was a primary strategy for excluding Novell's applications from the markets. He candidly admitted that Microsoft's own products could not compete without the benefit of these anticompetitive acts.

**\*3** Against this background, it is clear to me that Novell meets the various parts of the multi-factored test established by *Associated General Contractors* for antitrust standing. First, there is a direct causal connection between the anticompetitive acts Microsoft allegedly took against Novell's office productivity applications for the purpose of maintaining its operating systems monopoly and the damage claimed in Count I. Second, Microsoft allegedly targeted Novell specifically because it perceived Novell as an innovator in the industry. This targeting demonstrates that, at the least, Microsoft perceived Novell to be a competitor. *See Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 962-63 (10th Cir.1990).* Third, destruction of a competitor's product for the purpose of maintaining a monopoly self-evidently is the type of harm for which the antitrust laws are intended to provide redress. Fourth, Novell's claim is direct and straightforward. Fifth, although there were other victims of other anticompetitive acts committed by Microsoft for the purpose of maintaining its monopoly in the operating system market, Novell is the only victim who could bring suit for the acts taken by Microsoft in regard to WordPerfect and Quattro Pro--acts which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



ultimately had an enormous impact upon the shape of the applications software market. [FN1] Finally, no problem of speculative damages or complex apportionment of damages is presented because Novell is the only person with a claim for the damages it allegedly suffered in connection with WordPerfect and Quattro Pro between 1994 and 1996 when it sold those products to Corel.

> FN1. It would seem that an implication of Microsoft's contention that Novell lacks antitrust standing as to the claim asserted in Count I is that Sun and Netscape also lacked antitrust standing to the extent that they were not direct competitors in the operating system market, i.e., owners of alternative operating systems, but rather developers of middleware products that threatened to render Microsoft's operating system obsolete. Even if that is not so, however, I am satisfied that for the reasons I have stated, Novell may (just as Netscape and Sun did) assert antitrust claims for harm allegedly caused to its non-operating system products as a result of Microsoft's anticompetitive behavior designed to protect its Windows monopoly.

*2. Counts II, III, IV, and V*

Under 15 U.S.C. § 16(i) the limitations period is tolled for "every private right of action ... based in whole or in part on any matter complained of" in an antitrust action brought by the United States. For the reasons I have just stated, I find that the claims asserted in Counts I and VI are tolled under this section. As Microsoft contends, however, the mere fact that limitations are tolled as to two counts in a complaint is not sufficient to toll all other counts in the complaint. Section 16(i) refers not to "complaints" but to "right[s] of action," and self-evidently a party cannot be permitted to circumvent the purpose of the statute by simply joining tolled and untolled claims in the same complaint.

The broad principles governing the tolling issue may be briefly stated. The governing test is whether the matters complained of in the private action "bear a real relation" to a matter complained of in the government suit. *Leh v. Gen. Petroleum Corp.,* 382 U.S. 54, 59, 86 S.Ct. 203, 15 L.Ed.2d

134 (1965). "The private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants," *id.* at 59, but simply must allege "a significant, although incomplete, overlap of subject matter" to toll the statute, "even as to the differences." *Morton's Market, Inc. v. Gustafson's Dairy, Inc.,* 198 F.3d 823, 830 (11th Cir.1999). "In general, consideration of the applicability of ... [section 16(i) ] must be limited to a comparison of the two complaints on their face." *Leh,* 382 U.S. at 65; *Greyhound Corp. v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 331, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978). [FN2] Section 16(i) is not to be given a "niggardly construction" and must be "read in light of Congress' belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws.' " *Leh,* 382 U.S. at 59 (quoting *Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.,* 381 U.S. 311, 318, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965)).

> FN2. As Novell notes, several courts have glimpsed at the record in the government suit in order to evaluate the comparability of the government and private actions. *See, e.g., Morton's Market,* 198 F.3d at 830-32. That approach, however, does not provide any greater support for Novell than does a simple comparison of its complaint and the complaint in the United States' action against Microsoft. The record in the government suit confirms that while an occasional expert may have referred to abuses that occurred in related software markets, those references did not result in any charge of monopolization or attempted monopolization in the office productivity applications market. Indeed, the greatest difference between the complaint in the government action and the ultimate resolution of the case was that whereas the complaint alleged anticompetitive behavior both in the operating system market and in a browser market, the Court of Appeals ultimately found that the evidence did not substantiate the existence of the latter market. *United States v. Microsoft,* 253 F.3d 34, 81-81 (D.C.Cir.2001).



**\*4** In its complaint in this action, Novell refers frequently to allegations and findings made in the government case against Microsoft. These reference are incorporated by reference into counts II through V. Those counts, however, assert claims for monopolization and attempted monopolization in the word processing and spreadsheet applications markets: claims that were never asserted by the government. While there was a single conclusory averment in the government's complaint that Microsoft engaged in anticompetitive activities both to protect its operating system monopoly and "to extend ... [that] monopoly into other software markets," Gvt. Complaint, at ¶ 5, the only markets defined and focused upon in the government complaint were the operating system and browser markets. Word processing and spreadsheet programs are specifically mentioned only once in the government complaint, and only in the section describing the operating system market and only as applications that are "control[led]" and "direct[ed]" by operating systems. *Id. at* ¶ 54.

Novell accepts, as of course it must, that operating systems and office productivity applications are distinct products and are in separate markets. It also accepts as "unremarkable" the bright-line rule stated by Professor Areeda that limitations are not tolled when "the government and subsequent private suits ... arose in distinct markets." 2 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 321a, at 241 (2d ed.2000). That proposition is supported by such cases as *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 781 F.Supp. 481 (C.D.Cal.1991), and *Charley's Tour and Transportation, Inc. v. Interisland Resorts, Ltd.,* 618 F.Supp. 84 (D.Haw.1985), which held, respectively, that differences between geographic and product markets in the government suits and private actions prevented tolling under Section 16(i). Novell argues, however, that because the operating system and applications markets are closely, indeed symbiotically related, this bright-line rule should not apply. *Cf. In re Arizona Dairy Prods. Litig.,* No. CIV 74-569A (D.Ariz. Nov. 5, 1984)(finding claim for private action for price-fixing conspiracy in retail milk market tolled based on government suit for price-fixing conspiracy in wholesale milk market); *In re Antibiotic Antitrust Actions,* 333 F.Supp. 317, 320-21 (S.D.N.Y.1971)(finding claim for damage

suffered in a foreign market for agricultural consumption tolled by government suit for conduct in domestic market relating to human consumption). I am not persuaded. The nature of the relationship between the markets is important to an understanding of the dynamics of the industry, and it is central to my earlier holding that Novell has antitrust standing for harm allegedly caused to WordPerfect and Quattro Pro by Microsoft's maintenance of its Windows monopoly. However, the government case focused solely upon the operating system market (and an asserted browser market, ultimately found by the Court of Appeals to be unsubstantiated by the evidence), and Novell has provided no adequate explanation for not applying the bright-line rule recited by Professor Areeda in this case.

**\*5** Undoubtedly, if the government had pursued additional charges of monopolization and attempted monopolization in the word processing and spreadsheet markets, there would have been some overlap in evidence concerning the conduct in which Microsoft engaged. However, the government deliberately chose not to lodge any such charges, [FN3] and in my judgment the existence of such a potential overlap does not justify tolling under Section 16(i). While Section 16(i) properly serves the purpose of permitting private plaintiffs to wait to bring private claims encompassed within a government enforcement action until that action has come to an end, it should not be construed to permit private plaintiffs to sit on their rights and assert claims so much broader than those asserted by the government that they open entirely new vistas of litigation. If Novell wanted to assert claims for monopolization and attempted monopolization in the word processing and spreadsheet markets, it should have done so long ago. Its inaction entitles Microsoft to the comfort of repose. *Cf. Greyhound Corp. v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 334, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978)(citing *Dungan v. Morgan Drive-Away, Inc.,* 570 F.2d 867, 869 (1978) for the proposition that the limitations statute is one of "repose").

> FN3. That such a charge could have been asserted certainly was not unknown. State Attorney Generals originally included a claim for harm for a market for office productivity applications in the complaint they filed. (*See* Complaint filed in *New*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2005 WL 1398643 (D.Md.), 2005-1 Trade Cases P 74,830
**(Cite as: 2005 WL 1398643 (D.Md.))**

*York v. Microsoft Corp.* ¶¶ 88-95, 98, 117- 19, No. 98-1233 (D.D.C. filed May 18, 1998)). Of course, the filing of this claim did not toll limitations because <u>section 16(i)</u> applies only to actions brought by the United States. In any event, within two months the Attorney Generals abandoned that claim when filing an amended complaint. (*See* First Amended Complaint filed in *New York v. Microsoft Corp.,* No. 98-1233 (D.D.C. filed July 17, 1998)).

Despite the informal nature of this letter, it should be flagged as an opinion and docketed as an order.

Not Reported in F.Supp.2d, 2005 WL 1398643 (D.Md.), 2005-1 Trade Cases P 74,830

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT N

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1

Not Reported in F.Supp.2d, 2000 WL 1145725 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d)**

Ħ

Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.
In re PABST LICENSING, GMBH PATENT
LITIGATION
**No. Civ.A.99-3118.**

Aug. 11, 2000.

MEMORANDUM AND ORDER

SEAR, J.

*BACKGROUND*

**\*1** The Minebea parties ("Minebea") filed their
eighty-three page Second Amended and
Supplemental Complaint against the Papst
defendants ("Papst"), alleging numerous causes of
action. Papst responded with a Rule 12(b)(6)
motion to dismiss the antitrust claims asserted in
Counts XV through XVII (pp. 65-74) of the
complaint.

The Minebea parties, collectively, design,
manufacture, market and sell motors and other parts
for use in computer hard disk drives (HDDs). Papst
licenses and enforces patents relating to motors,
including motors used for computer HDDs.

Minebea alleges FN1 that on October 2, 1990, it
entered into a joint venture with Papst for the
research and development, engineering,
manufacture and sale of HDD motors. Prior to the
joint venture, Minebea and Papst had each
produced and sold HDD motors in relatively small
quantities. Minebea's contribution was its
manufacturing and marketing strengths, and Papst's
contribution was its worldwide patents relating to
HDD motors. It was understood that the customers
who purchased the products of the joint venture
would be able to use them free of any claim of
infringement.

FN1. Minebea's allegations must be taken
as true and correct for the purpose of
determining whether it has failed to state a
claim upon which relief can be granted.
*Tuchman v. DSC Communications Corp.,*
14 F.3d 1061 (5 [th] Cir.1994). Phrases in
the following narration of the facts that are
in quotation marks reflect direct quotation
from the allegations of the complaint.

As part of the agreement, Minebea paid Papst
approximately $14,000,000 for the transfer of the
Papst patent portfolio to the joint venture. George
Papst was appointed chief operating officer of the
joint venture companies. Minebea's right to use all
of Papst's patents was confirmed in a subsequent
document called the "Agreement for the Sale of
Intangible Assets." Minebea alleges that this
agreement provided that if the joint venture were
terminated, Minebea's rights to the patents would
continue upon payment of a royalty. Minebea states
that the Agreement for the Sale of Intangible Assets
is "incorporated [into the complaint] ... by reference.
" However, since Minebea failed to attach the
agreement as an exhibit to the complaint, under
FRCP 10(c) it is not incorporated into or a part of
the complaint.

Approximately eight months after the
commencement of the joint venture agreement,
George Papst represented to Minebea that certain
patents had not been licensed to Minebea, and were
"reserved solely for Papst's exploitation." Minebea
accepted this representation as being true, but now
believes it to be a misrepresentation. However,
Minebea claims that it relied upon that
misrepresentation in all of its subsequent dealings
with Papst.

Until 1993, the joint venture company, PMDM, was
"directed and controlled" by George Papst. At some
point, Papst developed financial problems in its
other ventures, and wanted to sell its interest in
PMDM in order to acquire needed finances. In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2000 WL 1145725 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d)**

May, 1993, Minebea acquired full ownership of PMDM from Papst and has continued the business without substantial change.

As part of the transfer of Papst's interest in the joint venture, the parties entered into an agreement known as the Alteration Agreement, pursuant to which Minebea, for another payment of money, was granted licenses under certain patents free from any further royalty, but reserving to Papst the patents called the Drive Patents. The Alteration Agreement provides that the Drive Patents "are not licensed under the Intangible Assets Agreement and are not licensed under this present agreement." Minebea claims that Papst represented to it that these Drive Patents were not included in the original joint venture agreement, and that the Drive Patents were not necessary for the continued business of Papst. Minebea alleges that it has since learned that the Drive Patents *were* included in the original agreement, and they were necessary to the ongoing HDD motor business. Despite Minebea's reliance on the Alteration Agreement, it failed to attach it as an exhibit to the complaint. Accordingly, under FRCP 10(c), the agreement is not incorporated into or a part of the complaint.

**\*2** Almost two years after Minebea acquired Papst's interest in the joint venture, Papst and Minebea signed one final agreement, this one called the Settlement Agreement. Various conflicting provisions of this agreement are described by Minebea in its complaint, and it is difficult to understand the context of the bits and pieces of the contract quoted in the allegations.[2] However, Minebea affirmatively alleges that the purpose of the contract was to enable plaintiffs and their customers to continue to be free of any claims of infringement by Papst with respect to the motors. Despite Minebea's reliance on the provisions of this agreement, it failed to attach it as an exhibit to the complaint. Accordingly, under FRCP 10(c), the agreement is not incorporated into or made a part of the complaint.

Beginning in the Spring of 1995, Minebea alleges that Papst, through attorneys and agents, began to make "unfounded infringement claims" of certain patents ("Asserted Papst Patents") against

Minebea's customers. These customers use HDD motors that were designed, manufactured, marketed and sold by Minebea. These customers have made demands upon Minebea for indemnification. At the time these claims were made, Minebea alleges it learned for the first time that Papst had purported to carve out of the agreements between the parties, (presumably, the Settlement Agreement in particular), patent rights that were necessary for the ongoing HDD motor business, and were asserting these patents against the use of HDD motors purchased by these customers from Minebea. Minebea claims that Papst has falsely asserted to these customers that Minebea is not licensed under the Asserted Papst Patents.

Minebea also claims that Papst has engaged in baseless litigation tactics. For example, after this lawsuit was filed in the District of Columbia, Papst wrote Minebea's customers and told them they were necessary parties to the litigation. Minebea alleges defendant never intended to name them but made the threats solely for the purpose of coercing unlawful royalty payments. Further, Papst engaged in what Minebea characterizes as a "continual and objectively unjustifiable pattern of delay in the District of Columbia," by filing frivolous objections to every discovery request, violating orders to provide discovery, and filing repetitive motions for the purpose of delay.

*MINEBEA'S ANTITRUST CLAIMS*

Minebea asserts against Papst one violation of Section 1 of the Sherman Act, (15 U.S.C. § 1) FN2 and two violations of Section 2 of the Sherman Act, (15 U.S.C. § 2). FN3 The Section 1 violation is summarized by Minebea in paragraph 26 of its Complaint, as follows:

> FN2. Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 3

Not Reported in F.Supp.2d, 2000 WL 1145725 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d)**

FN3. Section 2 provides for liability of "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states....

The gist of the Section 1 antitrust count is that George Papst, Papst Licensing and Papst Licensing MBH have entered into a contract or contracts in restraint of trade by forcing customers to enter into a package license covering both (1) the sale of the customer's hard disk drives incorporating a Minebea Motor, and (2) the sale of the customer's hard disk drives incorporating other manufacturer's motors, in a circumstance where a right to enforce the Asserted Papst Patents against a Minebea Motor Customer has been exhausted to the extent the Minebea Motor Customer incorporates a Minebea Motor in a hard disk drive.

*3 Minebea summarizes its two counts of a Section 2 violation by stating that Papst has or seeks monopoly power in the HDD, HDD motor, and HDD motor technology markets, and to maintain or acquire that power it has:
(1) engaged in a scheme to systematically extract second royalty payments from Minebea Motor Customers, thereby harming Minebea and its subsidiaries and driving up the price of hard disk drives, and
(2) commenced and pursued baseless lawsuits in bad faith asserting that certain Minebea customers infringed one or more of the patents based on their sale of HDDs incorporating Minebea motors, even though Papst knew the Papst rights under such patents had been exhausted by virtue of the first royalty payment made by Minebea, and
(3) through the California lawsuits and other assertions of infringement sought to regulate the number and identity of those companies participating in each of these markets, and
(4) conditioning the granting of one or more licenses under the patents on the licensee agreeing to waive a right to bring a claim against a third party supplier, and,
(5) the assertion of patents knowingly obtained through inequitable conduct, and
(6) the totality of the circumstances.

*FEDERAL RULE OF CIVIL PROCEDURE 10(b)(6)*

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chemical Sales v. Avondale Shipyards,* 677 F.2d 1045, 1050 (5th Cir.1982); *Beanal v. Freeport-McMoran, Inc.,* 197 F.3d 161, 164 (5th Cir.1999). The motion will not be granted unless it is clear from the factual allegations that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). When considering a motion to dismiss, the court must accept as true not only the allegations of the complaint, but also "any reasonable inferences that may be drawn therefrom." *Watts v. Graves,* 720 F.2d 1416, 1419 (5th Cir.1983); *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994).

However, in an antitrust case, it is insufficient to merely cite the relevant antitrust language to state a claim for relief. A plaintiff must allege "sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated these laws are insufficient." *TV Communications Network, Inc. v. Turner Network Television, Inc.* 964 F.2d 1022, 1024 (10th Cir.1992), cert. denied, 506 U.S. 999 (1992); (Plaintiff failed to allege a relevant product market which defendant was capable of monopolizing). See also *Campbell v. Wells Fargo Bank,* 781 F.2d 442 (5th Cir.1986); *Montecino v. State of Louisiana,* 55 F.Supp.2d 547, 551 (E.D.La.1999).

*PABST'S ARGUMENT*

Papst argues that its motion should be granted because Minebea has failed to adequately allege three elements which are essential to a cause of action under Sections one and two of the Sherman Act:

*4 1. That Minebea and Papst are competitors in a properly defined relevant market; FN4

FN4. The terms that are in "bold" reflect

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.