Not Reported in F.Supp.2d                                                                     Page 4

Not Reported in F.Supp.2d, 2000 WL 1145725 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d)**

terms of art used by the courts in analyzing antitrust cases.

2. That Minebea has standing to pursue an antitrust claim based on an anti-trust type injury; and

3. That Papst has market share that enables it to compete or monopolize a relevant market.

Each of these elements will be discussed separately.

*A. Competitors in a relevant market.*

Papst relies heavily in its several memoranda on the facts and analysis provided in the 1999 Federal Circuit case of *Intergraph Corporation v. Intel Corporation,* 195 F.3d 1346 (Fed.Cir.1999). The facts of the case are in some respects strikingly similar and will be summarized here.

Intel is a manufacturer of computer microprocessors who sells to OEMS (original equipment manufacturers). The OEMS adapt and integrate the microprocessors into products. Intergraph is an OEM who makes and sells computer workstations used in producing computer-aided graphics.

For a period of several years, Intergraph used microprocessors using "Clipper" technology, on which it owned the patents. When it ceased using the "Clipper" technology, it began using Intel's microprocessors. In 1994, Intel designated Intergraph a "strategic customer" and gave it special benefits, such as proprietary information and products.

In 1996, Intergraph charged several Intel OEM customers with infringement of the Clipper patents based on use in Intel microprocessors. The OEMs sought indemnity from Intel. When Intergraph and Intel were not able to work out a licensing agreement, Intel cut back on its assistance and special benefits to Intergraph. Intergraph sued for infringement of the clipper patents and antitrust violations arising out of the cutting off or delay of the special benefits formerly provided to it.

The district court granted a preliminary injunction

in favor of Intergraph, ordering Intel to continue to provide the special benefits during the pendency of the litigation. The Federal Circuit reversed.

Intel, like Papst, argued that there could be no unlawful monopolization because Intel and Intergraph were not competitors.

The court provided the following statement of the law:
Unlawful monopolization requires both the existence of monopoly power and anticompetitive conduct....Monopoly power is generally defined as the power to control prices or exclude competition in a relevant market; anticompetitive conduct is generally defined as conduct whose purpose is to acquire or preserve the power to control prices or exclude competition....The prohibited conduct must be directed towards competitors and must be intended to injure competition.
...
Such conduct must affect the relevant product market, that is, the 'area of effective competition' between the defendant and plaintiff....In *Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Court summarized that the relevant market has two dimensions: first, the relevant product market, which identifies the products or services that compete with each other; and second, the geographic market, which may be relevant when the competition is geographically confined. Thus the 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. *United States v. duPont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed 1264 (1956).*Id.,* at p. 1353.

**\*5** Intel claimed it was not in competition with Intergraph in any relevant market; that its relationship was that of supplier and customer, not competitor.

The court defined "relevant market" as the:
... market in which the competition is affected by the asserted predatory or anticompetitive acts. It is the market in which sellers compete, based on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                         Page 5

Not Reported in F.Supp.2d, 2000 WL 1145725 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d)**

products that are in competition with each other. See *Brown Shoe,* 370 U.S. at 325, 82 S.Ct. 1502 (" the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.") *Id.,* at p. 1355.

The court found that Intel and Intergraph did not compete in either of the two markets suggested: the market of high-end microprocessors, and the submarket of Intel microprocessors. Firms do not compete in the same market unless, because of the reasonable interchangeability of their products, they have the actual or potential ability to take significant business away from each other. The court stated that "the patent grant is a legal right to exclude, not a commercial product in a competitive market." *Id.,* at p. 1355. FN5

> FN5. This is perhaps the most significant language in the case. However, as will be seen below, this conflicts with the Antitrust Guidelines for the Licensing of Intellectual Property issued jointly by the Dept. of Justic and the Federal Trade Commission in 1995.

Papst argues that *Intergraph* mandates a finding that Papst and Minebea do not compete in any relevant market because Papst owns and licenses patents, and Minebea manufactures motors that incorporate the Papst patents, and that these are not " interchangeable" products in a market. Minebea contends that *Intergraph* is not controlling. Further, Minebea contends that it purchased a license for the Papst patents, and Papst is engaging in anticompetitive behavior by knowingly and in bad faith demanding that Minebea customers pay a license for the use of Minebea motors incorporating the Papst patents.

*Intergraph* must be given substantial weight. The Federal Circuit has exclusive jurisdiction in the area of patent law, and in certain matters where patent and antitrust law are both involved. FN6 For example, an antitrust claim premised on stripping a patentee of its immunity from the antitrust laws is a

question of Federal Circuit law, as are all antitrust claims premised on the bringing of a patent infringement suit. *Nobelpharma v. USA, Inc.,* 141 F.3d 1059 (Fed.Cir.1998). However, other elements of antitrust law such as relevant market, market power, damages, etc., i.e., those not unique to its exclusive jurisdiction over patent law, are decided by the Federal Circuit by referring to the appropriate regional circuits.

> FN6. The Fifth Circuit has recognized that the Federal Courts Improvement Act of 1982 granted exclusive jurisdiction to the Federal Circuit in appeals from district court decisions if the jurisdiction was based on patent laws, although it expressed some uncertainty as to whether the Federal Circuit has exclusive jurisdiction where the claims are mixed between patent and other laws. *Marsh v. Austin-Fort Worth Coca-Cola Bottling Co.,* 744 F.2d 1077 (5 th Cir.1984).

Minebea has alleged it competes with Papst in three antitrust markets: the hard disk drive market; the hard disk drive motor market; and the market for technology directed to HDD motors. Papst claims that there can be no such thing as a technology market; Minebea states this is incorrect. Further, Minebea claims that they are competitors in each of these markets.

Minebea relies on the Antitrust Guidelines for the Licensing of Intellectual Property, issued jointly by the Dept. of Justice and the Federal Trade Commission on April 6, 1995. This nineteen page document states the antitrust enforcement policy of these two agencies. The Agreement sets forth three general principles in Section 2.0:

*6 a. for the purpose of antitrust analysis, the Agencies regard intellectual property as being essentially comparable to any other form of property;

b. the Agencies do not presume that intellectual property creates market power in the antitrust context;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1145725 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d)**

c. the Agencies recognize that intellectual property licensing allows firms to combine complementary factors of production and is generally procompetitive.

Section 2.1 provides that the same general antitrust principles will be applied to conduct involving intellectual property as to any other form of tangible or intangible property. These sections (2.0 and 2.1) seem to contradict the *Intergraph* statement that a patent grant is "a legal right to exclude, not a commercial product in a competitive market."

Section 3.2 of the Guidelines, entitled "Markets affected by licensing arrangement," states that there are "goods markets" and "technology markets." Technology markets, under Section 3.2.2, appears to contemplate a market made up of both the intellectual property (the licensed technology) and its close substitutes:
that is, the technologies or goods that are close enough substitutes significantly to constrain the exercise of market power with respect to the intellectual property that is licensed.

Minebea cites a district court case out of Delaware which recognizes the existence of a technology market. In *Discovision v. Disc Manufacturing, Inc.*, 42 U.S.P.Q.2d 1749 (1997), Discovision was the owner of a patent portfolio relating to compact disc (CDs) techonology and Disc Manufacturing, Inc. (DMI) participated in the same CD technology markets as a manufacturer and seller. DMI alleged that Discovision had monopoly power in the encoded CD technology market because it licensed more than 80% of the CD manufacturers in the United States. DMI claimed Discovision monopolized, by engaging in illegal acts such as: 1) fraudulently obtaining patents; 2) asserting objectively baseless lawsuits for infringement of those patents against CD manufacturers; 3) improper delaying tactics and dealing with the Patent and Trademark office; 4) coercing CD manufacturers into a package license agreement for Discovision's entire patent portfolio; and 5) improperly using its monopoly power in the encoded CD technology market to tie its patents in that market to its patents relating to other markets.

The district court denied the 12(b)(6) motion, holding that DMI had stated claims against Discovision under Sections 1 and 2 of the Sherman Act.

Although a Delaware District Court case should not, in general, be given as much weight as a Federal Circuit case, the facts of the *Discovision* case are more analogous to those here, and the analysis is consistent with the Antitrust Guidelines, which were not referred to in *Intergraph*. Presumably, at the time of the *Intergraph* argument, the guidelines had not yet become an integral part of the materials used for interpretation in antitrust litigation.

*7 Minebea has alleged it competes in the technology HDD market with Papst. Like Discovision, Papst has a patent portfolio, and it licenses its patents. Like DMI, Minebea manufactures and sells products that incorporate the Papst patents. Like DMI, Minebea alleges illegal packaging and improper use of Papst's power in order to maintain or increase its monopoly. Under the guidelines and the Delaware case, Minebea has stated sufficient facts to allege competition in a relevant market.

Although it may be a close question, I conclude that on the issue of whether Minebea and Papst are competitors in a relevant market, the Rule 12(b)(6) motion should be denied.

*B. Does Papst have a "market share" that allows it to compete or monopolize the market.*

Papst argues that it has "zero market share ... and therefore has no market power."

It is correct that a plaintiff in a section 2 antitrust claim must demonstrate that the defendant has market power in a relevant market. *United States v. Grinnell Corp.*, 334 U.S. 563, 570-571, 86 S.Ct. 1698, 1703-4 (1966). FN7 Further, ownership of a patent does not, with nothing more, "establish a presumption of market power in the antitrust sense." *Abbott Laboratories v. Brennan*, 925 F.2d 1346, 1354 (Fed.Cir.1991). The Antitrust Guidelines for the Licensing of Intellectual Property provides, as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1145725 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d)**

stated earlier, that "the Agencies do not presume that intellectual property creates market power in the antitrust context."

> FN7. Whether a defendant must have demonstrated market power under Section One of the Sherman Act is in dispute; nevertheless, I will not need to reach this question since the Complaint adequately pleads the existence of market power.

However, simply because there is no presumption that patent ownership creates market power does not exclude the possibility that a patent owner *does* have market power. The issue here is whether Minebea has adequately pled facts to support its claim that Papst has market power.

Monopoly power, often referred to as market power, is "the power to control prices or exclude competition." *United States v. E.I. du pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). It may be proven by evidence of the control of prices or the exclusion from competition. Minebea has alleged that Papst's patents cover "virtually all" of the HDDs and HDD motors in the United States, and that there are no products reasonably interchangeable with HDDs and HDD motors. It has further alleged that it has conditioned the granting of a patent license on the taking of a package license requiring the payment of a royalty for the sale of the customers' hard disk drives incorporating a Minebea Motor and the sale of the customers' hard disk drives incorporating other manufacturer's motors. This alleges the control of pricing.

Minebea has adequately alleged Papst's market power.

*C.Minebea's Standing to Pursue an Antitrust Claim.*

"Standing to assert a private antitrust action requires a proper plaintiff to show injury to its business or property caused by a violation of the antitrust laws." *McCormack v. NCAA,* 845 F.2d 1338 (5 th Cir.1988). The antitrust injury which

must be established for the plaintiff to have standing under section one or two of the Sherman Act has been defined in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 4229 U.S. 477, 489, 97 S.Ct. 690, 697 (1977):
*8 ... injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would be likely to cause.'

The antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing. *Doctor's Hospital of Jefferson v. Southeast Medical Alliance, Inc.,* 123 F.3d 301 (5 th Cir.1997). There is a distinction between antitrust injury and injury to competition, the latter of which is often a component of substantive liability. *Id.*

Thus, Minebea has standing if it has sustained an injury which reflects the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

Minebea alleges that Papst has fraudulently required Minebea customers to pay for royalties on HDDs incorporating Minebea motors as well as on HDDS incorporating other manufacturers' motors. Minebea contends that it already purchased that right by paying the first royalty, and no royalty should be due. This will discourage the purchase of Minebea motors, and will result (and has resulted) in indemnification claims being made against Minebea. Customers will choose to purchase HDD motors from manufacturers other than Minebea. This will damage Minebea, but not Papst, because Papst's patents are incorporated into HDD motors of other manufacturers. Minebea has adequately alleged antitrust injury, and therefore has standing to bring its antitrust claims.

Accordingly,

IT IS ORDERED, that Papst's Rule 12(b)(6) Motion to Dismiss is DENIED.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8

Not Reported in F.Supp.2d, 2000 WL 1145725 (E.D.La.)
**(Cite as: Not Reported in F.Supp.2d)**


E.D.La.,2000.
In re Papst Licensing, GmbH Patent litigation
Not Reported in F.Supp.2d, 2000 WL 1145725
(E.D.La.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT O



Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1996 WL 737194 (S.D.N.Y.), 1997-1 Trade Cases P 71,697, 42 U.S.P.Q.2d 1386
(Cite as: 1996 WL 737194 (S.D.N.Y.))

⋈

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
SMITH & JOHNSON, INC. f/k/a Tapestry, Inc., Plaintiff,
v.
HEDAYA HOME FASHIONS INC., and Hedaya Brothers,
Inc., Defendants.
**No. 96 Civ. 5821 MBM.**

Dec. 26, 1996.

Howard J. Goldstein, Baratta & Goldstein, New York City,
for plaintiff.

Chester Rothstein, Amster Rothstein & Ebenstein, New
York City, for defendants.

OPINION AND ORDER
MUKASEY, District Judge.

*1 Plaintiff Smith & Johnson, Inc. a/k/a Tapestry, Inc.,
manufacturer and wholesale distributor of afghans [FN1],
sues defendants Hedaya Brothers, Inc. ("Brothers"), and its
subsidiary, Hedaya Home Fashions Inc. ("Hedaya"), for
copyright infringement, unfair competition, tortious
interference with existing and prospective contractual
relations, and antitrust violations arising from defendants'
alleged sale of afghans with designs copied from plaintiff.
Defendants move to dismiss pursuant to Fed. R. Civ. P.
12(b)(6) for failure to state claims and move for sanctions
pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. § 1927. For the
reasons and to the extent set forth below, both motions are
granted.

> FN1. An afghan is defined, *inter alia*, as "a blanket
> or shawl of colored wool, knitted or crocheted in
> strips or squares which are joined by sewing or
> crocheting." *Webster's Third New International
> Dictionary* 36 (1986).

I.

The facts, as set forth in the complaint and accepted as true
for the purposes of this motion to dismiss, are as follows:
Plaintiff and both defendants are New York corporations
with their principal places of business in New York. (Com

pl. ¶¶ 3-7) Both plaintiff and Hedaya manufacture, market
and sell afghans to wholesale customers. (*Id.* ¶¶ 8-9)
Defendant Brothers manufactures, markets and sells kitchen
textiles and quilts to wholesale customers and wholly owns
Hedaya. (*Id.* ¶ 11)

In support of its copyright, tortious interference, and unfair
competition claims, plaintiff alleges that it designed
distinctive patterns and designs for use on its afghans (*id.* ¶¶
13, 14, 16), and that in April, 1994, Hedaya began to market
afghans similar in appearance (*Id.* ¶ 18). Plaintiff claims that
"said patterns and designs are considered to be copyrights
under the facts and circumstances of this action." (*Id.* ¶ 17)
Plaintiff asserts also that it developed a unique and
identifiable label for use on its afghans and that Hedaya
marketed and sold afghans with a confusingly similar label.
(*Id.* ¶¶ 16, 19, 20)

In support of its antitrust claim, plaintiff alleges that Hedaya
sold its afghans at prices below its cost with the intent of
eliminating its competitors and monopolizing the "field of
manufacturing, marketing and selling afghans to wholesale
customers." (*Id.* ¶¶ 32, 37, 38, 39) Plaintiff alleges that its
afghans were priced between $25 and $42 and that Hedaya
sold its afghans for prices as low as $14.65. (*Id.* ¶¶ 26, 31)
Plaintiff asserts that Hedaya's below-cost pricing scheme
has resulted in plaintiff's loss of existing or prospective
customers and that plaintiff is in jeopardy of being
eliminated from the afghan market. (*Id.* ¶¶ 41-44)

In 1994, plaintiff filed an action in New York State
Supreme Court, New York County, alleging unfair
competition and tortious interference with contractual
relations, existing and prospective, under New York
common law. Defendants removed that action to federal
court claiming that plaintiff's state claims were essentially
copyright claims over which the federal courts have
exclusive jurisdiction. The parties then agreed to remand the
action to state court in an "Order on Consent Remanding
Action to New York Supreme Court." (Def. Mem., Ex. E)
The Order states: "Plaintiff acknowledges and agrees that
(a) Plaintiff is not claiming any copyright infringement by
defendants; (b) Plaintiff does not have any copyrights on
any of its afghan designs; and (c) Plaintiff is not claiming
any common law copyright on any of the designs." (*Id.*)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                           Page 2
Not Reported in F.Supp., 1996 WL 737194 (S.D.N.Y.), 1997-1 Trade Cases P 71,697, 42 U.S.P.Q.2d 1386
**(Cite as: 1996 WL 737194 (S.D.N.Y.))**

Plaintiff further agreed that it would "not make any claims inconsistent with [this order] during the course of this action in the Supreme Court of the State of New York or *in any other Court.*" (*Id.*) (emphasis added) The Order provided also that defendants did not waive any defenses.

*2 Upon remand, defendants moved for summary judgment dismissing the action, arguing that the state law claims were preempted by the Copyright Act. In May, 1996, Justice DeGrasse dismissed the action, finding that the claims -- unfair competition and tortious interference with existing and prospective contractual relations under New York common law -- were preempted by the Copyright Act and that the state court had no subject matter jurisdiction over the action. (Def. Mem., Ex. A) Plaintiff did not appeal this decision. (Pl. Mem. at 3)

Plaintiff then filed this action claiming: 1) copyright infringement; 2) unfair competition under New York common law; 3) tortious interference with existing contractual relations under New York common law; 4) tortious interference with prospective contractual relations under New York common law; and 5) violation of the antitrust laws in that defendants "conspired between themselves ... to eliminate any and all competition through unfair business practices," (Amended Compl. ¶ 75). Plaintiff also seeks to pierce Hedaya's corporate veil and expose Brothers to liability. Defendants now move to dismiss for failure to state claims.

### II.

Initially, defendants argue that all of plaintiff's claims are barred by res judicata. [FN2] Federal courts must honor the Full Faith and Credit Clause, and therefore I must judge the preclusive effect of Justice DeGrasse's decision according to New York law, the law of the forum of that decision. *See Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985); 28 U.S.C. § 1738 (1994).*

> FN2. Although they label this defense collateral estoppel, defendants essentially are seeking in the first instance to preclude claims not asserted in the previous proceeding -- *i.e.,* the antitrust and copyright claims -- and thus assert a defense which falls within the doctrine of res judicata.

Under New York law, res judicata, or claim preclusion, "prohibits a party from relitigating any claim which could have been or which should have been litigated in a prior proceeding." *Coliseum Towers Assoc. v. County of Nassau, 217 A.D.2d 387, 389, 637 N.Y.S.2d 972, 974 (2d Dep't 1996)* (citations and quotations omitted). The doctrine operates to bar "all other claims arising out of the same transaction or series of transactions ..., even if based upon different theories or if seeking a different remedy." *O'Brien v. City of Syracuse, 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 688 (1981).* To have res judicata effect, a judgment must be final and on the merits. *Jimenez v. Shippy Realty Corp., 213 A.D.2d 377, 377, 622 N.Y.S.2d 983, 984 (2d Dep't 1995).* A dismissal on jurisdictional grounds is not considered a dismissal on the merits. *Dutcher v. Town of Shandaken, 97 A.D.2d 922, 924, 470 N.Y.S.2d 767, 769 (3d Dep't 1983).* A finding of preemption of state claims by federal law is essentially a finding that the state court lacked subject matter jurisdiction to hear the claims. *See Harris v. Hirsh, 83 N.Y.2d 734, 742, 613 N.Y.S.2d 842, 846 (1994); Maurizio v. Rendal, 222 A.D.2d 281, 281, 635 N.Y.S.2d 33, 34 (1st Dep't 1995).*

Here, the New York court found that plaintiff's state claims were preempted by federal law, and therefore dismissed the action for lack of subject matter jurisdiction. The state court did not reach the merits of the dispute. Accordingly, the doctrine of res judicata does not bar claims arising out of the same transactional nexus, and the antitrust and copyright claims are not barred. Although I find it disturbing that plaintiff did not raise its Sherman Act allegations when it had the chance during its first visit to this court, and in fact fought hard to leave this court at that time, that conduct does not bar it from raising those claims now when the state court did not reach the merits of plaintiff's action. [FN3]

> FN3. The Harvard Law Review article defendants rely upon is not to the contrary. *See The Collateral Estoppel Effect of Prior State Court Findings in Cases Within Exclusive Federal Jurisdiction, 91 Harv. L. Rev. 1281, 1290-92 (1978).* That article discusses issue preclusion where a state court adjudicates a state claim which has elements similar to those of a federal claim that falls within

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                Page 3
Not Reported in F.Supp., 1996 WL 737194 (S.D.N.Y.), 1997-1 Trade Cases P 71,697, 42 U.S.P.Q.2d 1386
(Cite as: 1996 WL 737194 (S.D.N.Y.))

the exclusive jurisdiction of the federal courts. That article addresses issue preclusion, not claim preclusion, and the preclusive effect it recommends is limited to situations where the state claims have been adjudicated on the merits. Thus, the article is not relevant to this situation.

*3 Plaintiff's state law claims, however, must be dismissed because, under the collateral estoppel doctrine, the state court finding that these claims are preempted by the Copyright Act is binding on plaintiff. The doctrine of collateral estoppel, also known as issue preclusion, provides that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry,* 449 U.S. 90, 94 (1980). Collateral estoppel requires: 1) an identity of issues; 2) that the issue in question was necessarily decided in the prior proceeding; and 3) that the party against whom the bar is sought had a full and fair opportunity to litigate the issue in the prior proceeding. *See Burgos v. Hopkins,* 14 F.3d 787, 792 (2d Cir. 1994); *Weiss v. Manfredi,* 83 N.Y.2d 974, 976, 616 N.Y.S.2d 325, 326 (1994); *Schwartz v. Public Adm'r of the Bronx,* 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955 (1969).

Here, all three elements are satisfied. In the state court action, Justice DeGrasse held that plaintiff's unfair competition and tortious interference claims were preempted by the Copyright Act. An identical legal issue arises here; that issue was necessarily decided by the state court in dismissing plaintiff's action for lack of subject matter jurisdiction and that decision is final as plaintiff did not appeal; and plaintiff had a full and fair opportunity to litigate the preemption issue in state court. (*See* Def. Mem., Exs. B-D) Plaintiff may not relitigate the preemption issue. Thus, plaintiff's state law claims of unfair competition and tortious interference with existing and prospective contractual relations are preempted by the Copyright Act, and those claims must be dismissed.

III.

Defendants move next to dismiss plaintiff's copyright infringement claim. They argue that plaintiff has conceded that it owns no copyright in the allegedly infringed afghan

designs. Further, plaintiff argues that this court lacks subject matter jurisdiction over the copyright claim because, even if plaintiff owns a copyright, it has not alleged that it registered the copyright, a precondition to a copyright infringement claim.

"To establish infringement of a copyright, a plaintiff must show both ownership of a copyright and that the defendant copied the protected material without authorization." *Woods v. Universal City Studios, Inc.,* 920 F. Supp. 62, 64 (S.D.N.Y. 1996) (citing *Rogers v. Koons,* 960 F.2d 301, 306 (2d Cir.), *cert. denied,* 506 U.S. 934 (1992)). Here, plaintiff has disclaimed ownership of a copyright in its afghan designs. The Order remanding the previous action to state court, signed by plaintiff, provided that "[p]laintiff acknowledges and agrees that (a) Plaintiff is not claiming any copyright infringement by defendants; (b) Plaintiff does not have any copyrights on any of its afghan designs; and (c) Plaintiff is not claiming any common law copyright on any of the designs." (Def. Mem., Ex. E) Plaintiff said it would not assert a position inconsistent with this statement in any future proceeding. (*Id.*) Further, plaintiff's president, Park B. Smith, Jr., stated in an affidavit opposing defendant's motion for summary judgment in the state proceeding that "[p] laintiff does not have a copyright on its works nor does it claim copyright infringement." (Def. Mem., Ex. F) Because plaintiff has admitted in a previous proceeding that it owns no copyright in its afghan designs and I relied on that position in remanding that action to state court, plaintiff is judicially estopped to claim otherwise, and its copyright claim must fail. *See Axa Marine and Aviation Ins. (UK) Ltd. v. Seajet Indus.,* 84 F.3d 622, 628 (2d Cir. 1996) ("A party invoking judicial estoppel must show that (1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner."); *Bates v. Long Island R.R. Co.,* 997 F.2d 1028, 1037-38 (2d Cir.), *cert. denied,* 510 U.S. 992 (1993). [FN4]

> FN4. Further, a plaintiff, in most cases, must allege registration of the alleged copyright in order for a court to have subject matter jurisdiction over a copyright infringement claim. *See* 17 U.S.C. § 411

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



(1994); _Whimsicality, Inc. v. Rubie's Costume Co._, 891 F.2d 452, 453 (2d Cir. 1989); _Woods_, 920 F. Supp. at 64. Here, the subject matter of the alleged copyright does not fall within any of the exceptions to the registration requirement, plaintiff has failed to allege registration of its claimed copyright, and therefore this court lacks subject matter jurisdiction over the copyright claim. _See, e.g., Geritrex Corp. v. Dermarite Indus., LLC_, 910 F. Supp. 955, 966 (S.D.N.Y. 1996).

### IV.

**\*4** Finally, defendants move to dismiss plaintiff's antitrust claim. Plaintiff alleges that defendants "conspired between themselves ... to eliminate any and all competition through unfair business practices." (Compl. ¶ 75) Defendants claim first that plaintiff fails to state a claim of antitrust violation under Section 1 of the Sherman Act because defendants are parent and subsidiary and such related entities cannot conspire under the antitrust laws. Defendants are correct that a parent and its wholly-owned subsidiary cannot conspire under § 1 of the Sherman Act. _See Copperweld Corp. v. Independence Tube Corp._, 467 U.S. 752, 771 (1984) ("[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act."). Thus, if plaintiff is attempting to state a claim under § 1 of the Sherman Act, it has failed to do so.

However, on a motion to dismiss, the pleadings must be liberally construed and the complaint shall not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." _Conley v. Gibson_, 355 U.S. 41, 45-46 (1957). Where the complaint alleges facts that might be construed as unlawful, anticompetitive activity, even if the plaintiff has mischaracterized the violation, the complaint should not be dismissed. _See Discon, Inc. v. Nynex Corp._, 93 F.3d 1055, 1059 (2d Cir. 1996) ("[W]e believe that the District Court may have been misled by a poorly drafted complaint into categorizing the arrangement as one that is presumptively legal. Since the complaint may be understood to allege arrangements that might be shown to be unlawful, we are obliged to reverse in part and remand."). Here,

although plaintiff alleges a claim under § 1 of the Sherman Act, the facts alleged might be construed to state a claim under § 2 of the Sherman Act for attempted monopolization. However, a close look at the elements of such a claim and plaintiff's complaint reveal that this claim must be dismissed as well. Section 2 of the Sherman Act provides,

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor ....

15 U.S.C. § 2 (1994). A claim under this section does not require proof of a conspiracy. _See Spectrum Sports, Inc. v. McQuillan_, 506 U.S. 447, 454 (1993). Section 2 prohibits monopolization or attempted monopolization of a market even by a single firm. The elements of an attempted monopolization claim under § 2 are: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." _Spectrum Sports_, 506 U.S. at 456; _see Kelco Disposal, Inc. v. Browning-Ferris Indus._, 845 F.2d 404, 407 (2d Cir. 1988), _aff'd_, 492 U.S. 257 (1989). "Proof of unlawful conduct may be used to infer specific intent to monopolize ...." _Northeastern Telephone Co. v. AT&T_, 651 F.2d 76, 85 (2d Cir. 1981), _cert. denied_, 455 U.S. 943 (1982). Here, plaintiff has asserted facts which, if proved, would satisfy the first two of these elements. Plaintiff has alleged that Hedaya charged prices below its cost in an attempt to obtain a monopoly and that it did so with intent to monopolize the wholesale afghan market.

**\*5** However, plaintiff has failed to allege facts sufficient to satisfy the third element -- a dangerous probability of achieving monopoly power. To withstand a motion to dismiss, a plaintiff must allege facts which, if proved, would directly or inferentially satisfy each element of a claim. _See Valley Disposal, Inc. v. Central Vermont Solid Waste Management Dist._, 31 F.3d 89, 94- 95 (2d Cir. 1994). "[A]n antitrust complaint must 'adequately ... define the relevant product market, ... allege antitrust injury, [and] ... allege conduct in violation of the antitrust laws.' _Sage Realty Corp. v. ISS Cleaning Servs. Group, Inc._, 936 F. Supp. 130, 135 (S.D.N.Y. 1996). As the Second Circuit has noted in an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



antitrust case, "we think that *Conley* permits a pleader to enjoy all favorable inferences from facts that have been pleaded, and does not permit conclusory statements to substitute for minimally sufficient factual allegations." *Furlong v. Long Island College Hosp.*, 710 F.2d 922, 927 (2d Cir. 1983); *see also Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984), *cert. denied*, 470 U.S. 1054 (1985); *Anti-Monopoly, Inc. v. Hasbro, Inc.*, No. 94 Civ. 2120, 1995 WL 380300, at *3 (S.D.N.Y. June 27, 1995) ("conclusory allegations that recite the litany of antitrust will [not] ... suffice." (quoting *John's Insulation, Inc. v. Siska Constr. Co.*, 774 F. Supp. 156, 163 (S.D.N.Y. 1991)). Here, plaintiff's attempted monopolization claim must fail for two reasons: first, plaintiff has failed to properly define a relevant market, and second, plaintiff has failed to allege facts from which a dangerous probability of defendants monopolizing the proposed market can be inferred.

As a prerequisite to any antitrust claim, plaintiff "must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Re-Alco Indus., Inc. v. National Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984)); *see also B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 171 (S.D.N.Y. 1995). "Without a definition of the relevant market, there is no way to measure a company's ability to act as a monopolist." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir. 1995).

"A relevant market is comprised of a product market, those commodities or services that are reasonably interchangeable by consumers for the same purposes, and a geographic market, the area in which sellers of the relevant product effectively compete." *Sunshine Cellular v. Vanguard Cellular Systems, Inc.*, 810 F. Supp. 486, 493 (S.D.N.Y. 1992). The product market must be defined in relation to interchangeable goods. "[C]ommodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." *United States v. E.I. du Pont de*

*Nemours & Co.*, 351 U.S. 377, 395 (1956). Reasonable interchangeability is determined by reference to cross-elasticity of demand [FN5] and the similarity of purpose and clientele of each product. *See E. & G. Gabriel v. Gabriel Brothers, Inc.*, No. 93 Civ. 0894, 1994 WL 369147, at *3 (S .D.N.Y. July 13, 1994). "In general, then, the question is whether two products can be used for the same purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the other." *Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 868 (W.D.N.Y. 1994).

> FN5. "Cross elasticity of demand refers to the change in the demand by consumers for one product as a result of a change in the price of another product." *Hayden Publishing Co. v. Cox Broadcasting Corp.*, 730 F.2d 64, 70 n.9 (2d Cir. 1984).

*6 A "[p]laintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal." *B.V. Optische*, 909 F. Supp. at 171; *International Audiotext Network v. AT&T*, 893 F. Supp. 1207, 1213 (S.D.N.Y. 1994) ("[A]n antitrust plaintiff must set out a theoretically rational explanation to support its proposed relevant product market." (citations and quotations omitted)), *aff'd*, 62 F.3d 69 (2d Cir. 1995); *E. & G. Gabriel*, 1994 WL 369147, at *3; *Re-Alco Indus., Inc.*, 812 F. Supp. at 391. In addition, to state an antitrust claim, the alleged product market must be plausible. *B.V. Optische*, 909 F. Supp. at 171; *Theatre Party Assoc., Inc. v. Shubert Org., Inc.*, 695 F. Supp. 150, 154 (S.D.N.Y. 1988); *Deep South Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, No. 88 Civ. 6243, 1989 WL 48400, at *7 (S.D.N.Y. May 2, 1989) ("The federal courts, in the context of Rule 12 motions to dismiss, have not hesitated to reject market allegations that make no economic sense under any set of facts.").

Here, plaintiff fails to justify its proposed product market by reference to other reasonably interchangeable products. Plaintiff defines the market as "the field of manufacturing, marketing and selling afghans to wholesale customers." (Compl. ¶¶ 38, 39) Nowhere in the complaint does plaintiff explain why afghans are not interchangeable with other similar products, *e.g.*, quilts, spreads, blankets and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                      Page 6
Not Reported in F.Supp., 1996 WL 737194 (S.D.N.Y.), 1997-1 Trade Cases P 71,697, 42 U.S.P.Q.2d 1386
**(Cite as: 1996 WL 737194 (S.D.N.Y.))**

comforters, and why afghans constitute their own market. Plaintiff makes no allegations regarding the cross elasticity of demand for afghans and these similar products. This failure requires that the complaint be dismissed.

In addition, I doubt whether plaintiff could allege facts in good faith sufficient to support a finding that its proposed market is plausible. One can imagine many products that are interchangeable with afghans in all of their decorative and utilitarian uses, such as blankets, quilts and comforters. There is little reason to believe that the wholesale afghan market is so segmented from these readily available substitutes, and so unique, that a rise in afghan prices would not shift demand to some of these alternatives. To state a claim, plaintiff must present specific and concrete factual allegations which, if proved, would demonstrate that the afghan market is truly unique and separate from the markets for similar goods, and that consumers would not substitute other products for more expensive afghans. Because plaintiff does not allege a proper product market, its antitrust claim must fail. *See, e.g., Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.,* No. 96 Civ. 1565, 1996 WL 455011, at *5 (S.D.N.Y. Aug. 13, 1996).

Plaintiff's failure properly to allege a product market dooms its claim because the anticompetitive effects of its allegedly wrongful conduct cannot be assessed without looking at the relevant market. *See Re-Alco Indus.,* 812 F. Supp. at 392 ("Absent an adequate market definition, it is impossible for a court to assess the anticompetitive effect of challenged practices."). However, plaintiff's claim would also fail even if its proposed product market were well pleaded or plausible because plaintiff has failed to allege facts sufficient to support a finding that Hedaya's anticompetitive practices present a dangerous probability that Hedaya will achieve monopoly power.

*7 Courts must apply several factors to determine the probability of a defendant successfully monopolizing a market. As a threshold matter, a plaintiff must show that the defendant possesses sufficient market power to make monopolization a dangerous probability. *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir. 1990) ("A threshold showing for a successful attempted

monopolization claim is sufficient market share by the defendant."); *International Distribution Ctrs., Inc. v. Walsh Trucking,* 812 F.2d 786, 791 (2d Cir.), *cert. denied,* 482 U.S. 915 (1987). In addition, courts must consider other market characteristics, including "the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *International Distribution Ctrs.,* 812 F.2d at 792. Where the defendant has a low market share and the industry has low barriers to entry, a plaintiff cannot demonstrate a dangerous probability of monopolization as a matter of law. *See, e.g., Id.* at 793, and cases cited therein.

Here, plaintiff has failed to allege any facts regarding the afghan industry structure, let alone Hedaya's current market share. Thus, the threshold question of whether defendants have sufficient market power to create a dangerous probability of monopoly cannot be answered. Moreover, the afghan industry has low barriers to entry. Plaintiff does not allege any other facts to support its conclusory allegation that there is a dangerous probability of monopolization of the market. Thus, plaintiff has failed to allege facts that, if proved, would satisfy the third element of an attempted monopolization claim, dangerous probability of monopolization, and the antitrust claim must be dismissed. *See, e.g., Hennessy Indus. Inc. v. FMC Corp.,* 779 F.2d 402, 404- 05 (7th Cir. 1985); *E. & G. Gabriel,* 1994 WL 369147, at *4; *Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co.,* 657 F. Supp. 136, 143 (E.D.N.Y. 1987).

## V.

Finally, defendants move for sanctions against plaintiff for asserting its copyright claim. Rule 11 states that an attorney's presentation of a pleading or motion to the court constitutes a certification formed "after an inquiry reasonable under the circumstances" that, *inter alia:* a) "the claims ... therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law"; and b) the allegations and actual factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.    Page 7
Not Reported in F.Supp., 1996 WL 737194 (S.D.N.Y.), 1997-1 Trade Cases P 71,697, 42 U.S.P.Q.2d 1386
**(Cite as: 1996 WL 737194 (S.D.N.Y.))**

11(b)(2), 11(b)(3). For sanctions to be imposed pursuant to Rule 11, "it must be patently clear that a claim has absolutely no chance of success." *Sussman v. Bank of Israel,* 56 F.3d 450, 457 (2d Cir.), *cert. denied,* 116 S. Ct. 305 (1995) (quotations and citations omitted). Similarly, on a motion under 28 U.S.C. § 1927, penalties may be imposed only when there is a clear showing of bad faith on the part of the attorney. *Shafii v. British Airways, Inc.,* 83 F.3d 566, 571 (2d Cir. 1996).

**\*8** Here, it was clear from even a minimal investigation of the law and the facts, that plaintiff's copyright claim had no chance of success. The law in copyright infringement cases is plain: a plaintiff must own a copyright in the allegedly infringed subject matter. Plaintiffs specifically stipulated in a related action before this court that they owned no copyright in the afghan designs. Faced with its stipulation, plaintiff attempts to justify its copyright claim by stating "faced with the Supreme Court decision which ousted the plaintiff from continuing its narrow case of predatory practices in State Court, plaintiff now finds it must assert such claims in order to have a forum for collecting damages." (Pl. Mem. at 8) Nothing compelled plaintiff to bring this frivolous claim. Plaintiff cannot state a claim with no probability of success merely to get back into federal court -- a court it was once so anxious to escape. In such circumstances, sanctions under Rule 11 are appropriate to deter baseless claims. "A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(2). Therefore, plaintiff's attorney, the signer of the pleading, is assessed $500 as a Rule 11 sanction, payable to defendant through its counsel. Defendants' motion for attorneys' fees under 28 U.S.C. § 1927 is denied because although the claim is frivolous, it did not "multipl[y] the proceedings ... unreasonably and vexatiously." 28 U.S.C. § 1927 (1994).

\* \* \*

For the reasons and to the extent set forth above, both defendants' motion to dismiss and its motion for sanctions are granted.

SO ORDERED.

Not Reported in F.Supp., 1996 WL 737194 (S.D.N.Y.), 1997-1 Trade Cases P 71,697, 42 U.S.P.Q.2d 1386

**Motions, Pleadings and Filings (Back to top)**

• 1:96cv05821 (Docket) (Aug. 02, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT P



Slip Copy                                                      Page 1
Slip Copy, 2005 WL 3021101 (E.D.Pa.)
**(Cite as: 2005 WL 3021101 (E.D.Pa.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Janet SMITH-COOK, Plaintiff,
v.
NATIONAL RAILROAD PASSENGER CORPORATION
(AMTRAK) and David L. Gunn, President
and CEO of the National Railroad Passenger Corporation
(AMTRAK), Defendants.
**No. 05-00880.**

Nov. 10, 2005.

Mark S. Guralnick, Law Offices of Mark S. Guralnick,
Marlton, NJ, for Plaintiff.

William J. Delany, Thomas S. Bloom, Morgan Lewis and
Bockius LLP, Philadelphia, PA, for Defendants.

Memorandum and Order

YOHN, J.

**\*1** Currently pending before the court is a motion to dismiss
the plaintiff's amended complaint pursuant to Fed.R.Civ.P.
12(b)(6), made by the defendants National Railroad
Passenger Corporation ("Amtrak") and David L. Gunn
("Gunn"), President and CEO of Amtrak. The defendants
contend that the plaintiff failed to exhaust her administrative
remedies, that numerous counts of the plaintiff's amended
complaint are time barred, that Amtrak's employment
decisions do not constitute government action, and that the
plaintiff's allegations fail to state a claim upon which relief
can be granted. For the reasons set forth below, the motion
will be granted in part and denied in part.

I. FACTUAL & PROCEDURAL BACKGROUND [FN1]

> FN1. The foregoing factual account accepts all
> allegations in the amended complaint as true. *See
> Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996).

Plaintiff Janet Smith-Cook ("Cook"), is currently employed
by Amtrak as a Ticket Agent. The amended complaint

alleges that in the year 2001, Amtrak began a course of
racial and gender-based discrimination against the plaintiff.
Cook then served as Manager, Customer Refund, a position
she held until it was purportedly abolished in June 2001.
According to the plaintiff, after she was removed from this
management post, the defendants did not allow her to return
to her former position of Lead Ticket Accounting Clerk.
Instead, she obtained a Ticket Agent position at less pay.
The plaintiff claims that two white males were subsequently
placed in the job of Manager, Customer Refund. The
plaintiff also claims she was denied severance and
compensation time after she left the management position,
[FN2] unlike two white males to whom Amtrak provided
these benefits after their management positions were
abolished. The plaintiff has since sought several other
promotions, including her former job as Manager, Customer
Refund, but was not chosen by the defendants to fill any of
those positions.

> FN2. Plaintiff claims that Amtrak deposited, but
> then withdrew, salary owed her for time worked in
> the capacity of Manager, Customer Refund.

On October 30, 2001, the plaintiff filed a charge of
discrimination with the Equal Employment Opportunity
Commission ("EEOC"), alleging discrimination by Amtrak
on the basis of race and sex. The EEOC issued a notice of
right to sue on December 2, 2004. The plaintiff filed a *pro
se* complaint on February 28, 2005, naming Amtrak as the
defendant. After retaining counsel, the plaintiff filed the
amended complaint on May 3, 2005, adding David L. Gunn
as a defendant. The amended complaint (which is long on
rhetoric and claims and short on facts) contains ten separate
counts: Counts I charges the defendants with violating Title
VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* and
42 U.S.C. § 1983; Count II alleges the defendants violated
42 U.S.C. § 1981; Count III appears to claim the defendants
violated 42 U.S.C. § 1983; [FN3] Count IV alleges the
defendants followed a policy and practice of racial and
gender discrimination in violation of Title VII; [FN4] Count
V alleges the defendants retaliated against the plaintiff for
her complaints of discrimination, in violation of Title VII;
Count VI claims the defendants violated the Pennsylvania
Human Relations Act ("PHRA"), 43 Pa. Cons.Stat. § 951, *et*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2005 WL 3021101 (E.D.Pa.)
**(Cite as: 2005 WL 3021101 (E.D.Pa.))**

Page 2

*seq.;* Count VII alleges a breach of contract claim; Count VIII alleges negligence on the part of the defendants; Count IX is for negligent infliction of emotional distress; and Count X is for intentional infliction of emotional distress.

> FN3. Count III alleges that the defendants, while acting under the color of law, "deprived the Plaintiff of the rights guaranteed by the Constitution of the United States and caused the Plaintiff to suffer the incidents of slavery in violation of the 13th and 14th Amendments, and to suffer gender-based discrimination in violation of the 14th Amendment to the United States Constitution." Amended Compl. ¶ 47-48. The defendants appear to believe that this is a claim under 42 U.S.C. § 1983. In her response memoranda, the plaintiff does not take issue with this characterization, so for the purposes of this opinion, the court will assume that Count III alleges a claim under 42 U.S.C. § 1983.

> FN4. Count IV specifies no legal basis for the claim of policy and practice discrimination. See Am. Compl. ¶¶ 49-54. However, the defendants appear to believe this is a claim under Title VII. In her response memoranda, the plaintiff does not take issue with this characterization, so for the purposes of this opinion, the court will assume that Count IV alleges a claim under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*

**\*2** On July 15, 2005, the defendants filed a motion to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The plaintiff did not respond to the motion and on August 3, 2005, this court entered an order dismissing many of the claims in the amended complaint and dismissing Gunn as a defendant. However, on August 5, 2005, the plaintiff filed a response to defendant's motion to dismiss. On August 15, 2005, the plaintiff filed a motion for reconsideration for relief from judgment, seeking to have the court reconsider the August 3, 2005 order dismissing the case. [FN5] On August 26, 2005, this court granted the plaintiff's motion and vacated the August 3, 2005 order. The defendants filed a reply brief in support of their motion to dismiss on September 9, 2005.

> FN5. The plaintiff's attorney claimed there was some confusion as to the date the defendants' motion to dismiss was actually served on the plaintiff and that attendance at the ABA annual convention, along with the inadvertence of a law firm mail clerk, led to the delay in filing the response. See Motion for Reconsideration, ¶¶ 3-7.

## II. STATEMENT OF JURISDICTION

I have jurisdiction to hear claims alleging violations of 42 U.S.C. §§ 1981, 1983, and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq,* under the court's federal question jurisdiction, 28 U.S.C. § 1331. The plaintiff's state law PHRA, breach of contract, negligence and emotional distress claims arise out of the same transaction and occurrence, and I exercise supplemental jurisdiction to hear them under 28 U.S.C. § 1367(a).

## III. STANDARD OF REVIEW

In ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), courts must accept as true all well-pled allegations in the complaint, and any reasonable inferences that may be drawn therefrom, to determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." Nami v. Fauver, 82 F.3d 63, 65 (3d Cir.1996). Although courts must construe the complaint in the light most favorable to the plaintiff, they need not "accept as true unsupported conclusions and unwarranted inferences." Schuylkill Energy Res. v. Pa. Power & Light Co., 113 F.3d 405, 417 (3d Cir.1997).

Courts will grant a motion to dismiss if a plaintiff can prove no set of facts to support the allegations that would entitle her to relief. See Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir.1997) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

Generally, in ruling on a motion to dismiss, a district court "may not consider matters extraneous to the pleadings." Id.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                          Page 3
Slip Copy, 2005 WL 3021101 (E.D.Pa.)
**(Cite as: 2005 WL 3021101 (E.D.Pa.))**

at 1426. However, the Third Circuit has recognized that a court deciding a motion to dismiss may also consider attachments to the complaint and public records deemed to be undisputedly authentic, if they are related to plaintiff's claims. *Greer v. Smith*, 59 Fed. Appx. 491, 492 n. 1 (3d Cir.2003); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993). *See also In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n. 8 (3d Cir.1993) (holding that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document). Here, the defendants provided the plaintiff's EEOC Charge of Discrimination dated October 30, 2001 as Exhibit 1 to their motion to dismiss. An EEOC Charge of Discrimination is a public record, considered to be undisputedly authentic, and a court may consider the EEOC Charge in deciding a motion to dismiss. *Hercik v. Rodale, Inc.*, No. 03- CV-06667, 2004 U.S. Dist. LEXIS 9912, at *4 (E.D.Pa. May 25, 2004).

IV. DISCUSSION

*A. Claims Brought Pursuant to Title VII and PHRA* (Counts I, IV, V, and VI)

*3 In Counts I, IV, V, and VI the plaintiff alleges she was subject to discrimination in violation of Title VII and the PHRA in five ways: (1) she was removed from her management position and two white males replaced her, (2) she was denied severance pay and "compensation time," (3) she was denied promotion to positions she sought, for which she was qualified, (4) Amtrak engaged in a pattern and practice of discrimination against African American and female employees, and (5) Amtrak retaliated against the plaintiff for her complaints of discrimination. See Amended Compl. ¶¶ 20-28, 31, 50-54, 56-59, 62-67.

The defendants contend that the plaintiff's retaliation and policy and practice claims under Title VII in Counts I, IV, and V and under the PHRA in Count VI fail because the plaintiff failed to exhaust her administrative remedies with respect to these claims. Def. Mem. Supp. Mot. to Dismiss 4-7. The defendants argue that these claims should be dismissed because she failed to raise or make any reference to retaliation or policy and practice discrimination in her

initial charge to the EEOC. *Id.* The plaintiff asserts that the retaliation and policy and practice claims are implied in the original administrative charge and that a reasonable investigation by the EEOC would address these claims. Pl.'s Mem. in Opp'n. of Mot. to Dismiss, 5-9.

Before bringing a suit for judicial relief, a plaintiff must exhaust all required administrative remedies. *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir.1997). If the plaintiff has not exhausted the required administrative remedies before bringing suit, then a Rule 12(b)(1) [FN6] motion to dismiss for lack of subject matter jurisdiction is appropriate. *See Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 779 (3d Cir.1994) (recognizing that a Rule 12(b)(1) motion is the appropriate vehicle for contesting exhaustion of required administrative remedies).

> FN6. Though the defendants brought their motion to dismiss pursuant to Rule 12(b)(6), I will analyze the failure to exhaust argument as if brought under Rule 12(b)(1).

Before filing a suit claiming violations of Title VII and PHRA, a plaintiff must file a timely discrimination charge with the EEOC and the Pennsylvania Human Relations Commission ("PHRC") to exhaust her remedies under Title VII and PHRA, respectively. [FN7] *See EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 110, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988), *Clay v. Advanced Computer Applications, Inc.*, 522 Pa. 86, 559 A.2d 917, 919 (Pa.1989). The ensuing suit is limited to claims that are within the scope of the original administrative charge. *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir.1996). Claims are considered within the scope of the prior EEOC complaint if they arise during the pendency of the EEOC investigation, are closely related to conduct alleged in the charge, or are explanations of the original charge. *See Waiters v. Parsons*, 729 F.2d 233, 234 (3d Cir.1984); *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d. Cir.1984); *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir.1976). The Third Circuit has held that "the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



the Commission." *Ostapowicz, 541 F.2d at 398-399* (citations omitted).

> FN7. Filing a discrimination charge with the Philadelphia Commission on Human Relations (PhilaCHR), as the plaintiff did, is considered tantamount to filing a complaint with the PHRC. *See Kedra v. Nazareth Hospital,* 857 F.Supp. 430 (E.D.Pa.1994) (predicting that the Pennsylvania Supreme Court would hold that filing with the PhilaCHR constitutes compliance with the PHRA because of the PhilaCHR's statutory obligation to notify the PHRC of the complaints filed with it); *Marriott Corp. v. Alexander,* 799 A.2d 205, 208 (Pa.Commw.Ct.2002) ("filing a complaint with the Philadelphia Commission satisfies the [PHRA's] requirement that a Plaintiff exhaust administrative remedies").

*4 Cook's EEOC charge claims that Amtrak discriminated against her based on her race and gender. Such claims would reasonably lead the agency to investigate claims of discrimination with respect to plaintiff's lost position and her unsuccessful applications for other positions. [FN8] However, the defendants argue that the plaintiff's charge does not plausibly encompass any claims of retaliation or an ongoing Amtrak policy and practice of discrimination, such that she did not exhaust her administrative remedies on these claims prior to bringing this suit. The plaintiff argues that a reasonable investigation by the EEOC of the administrative charge would encompass her claims of retaliation and policy and practice discrimination.

> FN8. Defendants concede this point. Def. Mem. Supp. Mot. to Dismiss 5.

The plaintiff's EEOC charge would not put an administrative agency on notice of the allegations of systematic "policy and practices" discrimination now asserted in this suit. [FN9] The plaintiff's charge did not refer to Amtrak as having any general policies or practices of discrimination against African-American and/or female employees. The charge only refers to race and sex discrimination that the plaintiff alone suffered, relating to events surrounding her removal from the position of

Manager, Customer Refund. These are discrete, isolated incidents of discrimination against Cook, as opposed to allegations of a company wide practice of discrimination. Cook did not amend her EEOC charge to add a claim alleging that Amtrak followed a policy of discrimination, or file an additional administrative charge with these allegations. The EEOC could not have reasonably been expected to investigate this type of systematic policy discrimination against African-American and female employees, since this claim is not within the scope of plaintiff's administrative charge. Therefore the plaintiff failed to exhaust her administrative remedies in relation to her policy and practice discrimination claims, as she was required to do by Title VII and PHRA. This failure to exhaust her remedies is fatal to plaintiff's policies and practices claim, so that it is not properly before the court. For this reason, I will grant the defendants' motion to dismiss Count IV and the parts of Count I and VI relating to this claim.

> FN9. Count I alleges that the defendants' "unlawful employment practices has been to limit, classify, and discriminate against African-Americans and women in ways which intend to deprive them of employment opportunities and otherwise adversely affect their status as employees because of their race and/or sex in violation of Title VII." Amended Compl. ¶ 23. Count IV alleges that the defendants follow a systematic policy and practice of race and sex discrimination by: (1) maintaining jobs that are segregated and/or defined on the basis of race and gender; (2) depressing wages of African-American and female employees; (3) excluding substantially all African-American female employees from managerial positions equivalent to those held by white males; (4) assigning African-American female employees to the lowest paid positions and routinely overlooking their performance levels that would help them qualify for a better paid job; and (5) failing to conduct routine employee evaluations to prevent African-American and/or female employees from competing equally for management or supervisory postions. Amended Compl. ¶¶ 49A-E. Count VI claims that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



defendants' systematically failed "to evaulate African American and/or female employees" in violation of PHRA. Amended. Compl. ¶¶ 63, 68.

In Count V, plaintiff contends that the defendants retaliated against her for her complaints of discrimination and disparate treatment, in violation of Title VII. Amended Compl. ¶¶ 56-60. The Third Circuit has permitted retaliation claims under Title VII to be made in court even though a plaintiff only alleges discrimination in the charge made to the EEOC. *Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d. Cir.1984).* The defendants claim that reliance on *Howze* is misplaced because the court in *Howze* was deciding whether it was proper to deny a motion to amend the complaint under the liberal amendment standards of Fed. R. Civ. Pro. 15(a) because the proposed amendment included a retaliation claim not previously asserted before the EEOC. However, the Third Circuit has warned against reading an EEOC charge too narrowly and held that, like the standards for amending a complaint, the scope of an EEOC charge is to be liberally construed. [FN10] See *Hicks v. ABT Assoc. Inc., 572 F.2d 960, 965 (3d. Cir.1978)* ("Charges are most often drafted by one who is not well versed in the art of legal description.... The scope of the original charge should be liberally construed").

> FN10. The defendants rely on the Sixth Circuit's decision in *Ang v. Procter & Gamble Co,* where the court affirmed the dismissal of a retaliation claim because the plaintiff's EEOC charge did not mention retaliation and the plaintiff did not check off the "retaliation box". *932 F.2d 540, 546 (6th Cir.1991).* However, under the Third Circuit's liberal reading of an EEOC charge, it would be inappropriate to penalize a plaintiff with no legal background for failing to check off the "retaliation box" or for not specifically mentioning retaliation.

**\*5** Courts have held that a plaintiff need not exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; "the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." *Gupta v. East Texas State Univ., 654 F.2d 411, 414 (5th Cir.1981); see also Ang v. Procter & Gamble Co., 932*

F.2d 540, 546-547 (6th Cir.1991); *Steffen v. Meridian Life Ins. Co., 859 F.2d 534, 545 n. 2 (7th Cir.1988).* Thus requiring the plaintiff to file another separate retaliation charge "would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII." *Gupta, 654 F.2d at 414.*

I find that Cook's retaliation claim is within the scope of the EEOC charge. The plaintiff alleges in her amended complaint that the defendants have retaliated against her because of her complaints of discrimination in relation to her demotion, denial of severance pay, wages, and promotions. Amended Compl. ¶ 57. The plaintiff discussed these events in her EEOC charge as evidence of Amtrak's discrimination. The amended complaint states that after her protests of discrimination, the defendants retaliated against Cook by failing to promote her or restore her benefits, severance, and wages. Amended Compl. ¶ 58. The plaintiff's EEOC charge would reasonably put the EEOC and the defendants on notice of possible future retaliation against the plaintiff for airing her complaints of discrimination. It was impossible for the plaintiff to know at the time of filing the EEOC charge whether the defendants would subsequently retaliate against her for her continuing complaints of discrimination and disparate treatment. Therefore, the plaintiff exhausted her administrative remedies in relation to the retaliation claim and the defendants' motion to dismiss with respect to Count V will be denied.

### B. Claims Brought Pursuant to *Section 1983 (Counts I and III)*

In Counts I and III, the plaintiff claims that the defendants violated her rights under 42 U.S.C. § 1983 by depriving her of equal protection of the law in violation of the Fourteenth Amendment and causing her to "suffer the incidents of slavery in violation of the Thirteenth Amendment. Amended Com pl. ¶¶ 32-33, 43-48. The defendants argue that the plaintiff's claim is time barred because the events at issue took place in the fall of 2001 and the plaintiff did not file the instant action until February of 2005. Def. Mem. Supp. Mot. to Dismiss 10-11. The plaintiff argues in opposition that her claims under Section 1983 are subject to the statute of limitations period applicable to Title VII claims therefore

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



her claims are viable. Pl.'s Mem. in Opp'n. of Mot. to Dismiss, 18. There is no support for this position. I find that the plaintiff failed to comply with the appropriate two year statute of limitations; hence, her Section 1983 claims will be dismissed.

**\*6** "It is well-established that, if Congress has created a cause of action and not specified the period of time within which a claim must be asserted, a court may infer that Congress intended state limitations periods to apply and may borrow such periods and engraft them onto the federal statute." *Burgh v. Borough Council of Montrose,* 251 F.3d 465, 471-472 (3d Cir.2001). The Supreme Court has found that 42 U.S.C. § 1983 is such a statute and that the borrowed states' statutes of limitations in Section 1983 actions are "binding rules of law." *Bd. of Regents v. Tomanio,* 446 U.S. 478, 483-484, 100 S.Ct. 1790, 64 L.Ed.2d 440 (U.S.1980). The Third Circuit has repeatedly found that a state's statute of limitations for personal injury actions applies to all actions brought under 42 U.S.C. § 1983. *Padilla v. Twp. of Cherry Hill,* 110 Fed. Appx. 272, 276 (3d Cir.2004), *Sameric Corp. of Delaware, Inc. v. City of Philadelphia,* 142 F.3d 582, 599-600 (3d Cir.1998), *Nelson v. County of Allegheny,* 60 F.3d 1010, 1012 (3d Cir.1995). Therefore, Pennsylvania's two-year statute of limitations for personal injury actions governs Cook's claims under Section 1983. [FN11] 42 Pa. Cons.Stat. § 5524 (2004).

> FN11. The plaintiff accurately argues that Title VII establishes a statutory limitations period for employment discrimination claims. However, the statute of limitations for a Title VII claim is not applicable to claims brought under 42 U.S.C. § 1983. See *Burgh,* 251 F.3d at 472 (discussing the differences between the adopted state statute of limitations inferred for Section 1983 claims versus the express statute of limitations period provided by Congress in the text of Title VII).

The facts the plaintiff supplies in support of her Section 1983 claims all relate to events that occurred, at the latest, in the fall of 2001. Amended Compl. ¶ 18. Cook's opportunity to bring a Section 1983 claim based on these events expired two years later, in the fall of 2003. Thus, the Section 1983 claims in Cook's complaint, which was initially filed on

February 28, 2005, are time barred and the plaintiff's Section 1983 claims in Counts I and III will be dismissed. [FN12]

> FN12. The defendants provide three arguments, in the following order, in support of their motion to dismiss the plaintiff's Section 1983 claim: 1) Amtrak's employment decisions do not constitute government action; 2) the amended complaint does not allege any unlawful policy that was officially sanctioned by Amtrak; and 3) the plaintiff's claims are barred by the applicable statute of limitations. However, because I find the plaintiff's Section 1983 claims are time barred, I do not address the remainder of the arguments made by the defendants.

*C. Claims Brought Pursuant to Section 1981 (Count II)*

In Count II, the plaintiff alleges she was subject to discrimination by the defendants, in violation of 42 U.S.C. § 1981, by their denying her two weeks' salary, severance and compensation pay, and opportunities to be promoted. Amended. Compl. ¶¶ 36-38. The defendants argue that the plaintiff's failure to promote claim under Section 1981 is time barred by a two-year statute of limitations and therefore should be dismissed; the defendants do not seek dismissal of the plaintiff's Section 1981 claims for two weeks' salary and "severance and compensation pay." Def. Mem. Supp. Mot. to Dismiss 11-14. The plaintiff argues that her failure to promote claim is subject to the four-year statute of limitations set forth in 28 U.S.C. § 1658 and that even if a two-year limitations period is correct, a continuing violation analysis saves the claim. Pl.'s Mem. In Opp'n. of Mot. to Dismiss, 16-18. I conclude that there is insufficient information at this time to determine which statute of limitations should apply and therefore the motion to dismiss will be denied.

42 U.S.C. § 1981 does not contain an express statute of limitations. Prior to the enactment of a federal catchall statute of limitations period in 1990, the Supreme Court instructed courts to apply the most appropriate or analogous state statute of limitations to claims based on violations of Section 1981, which in Pennsylvania is the two-year

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



limitations period for personal injury actions. _Goodman v. Lukens Steel Co., 482 U.S. 656, 660, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)._ However, on December 1, 1990, Congress enacted a federal catchall four-year statute of limitations for any "civil action arising under an Act of Congress enacted after the date of the enactment of this section." 28 U.S.C. § 1658.

*7 Last year, the Supreme Court considered whether to apply the most analogous state statute of limitations under _Goodman_ or the federal catchall statute of limitations in 28 U.S.C. § 1658, to alleged violations of Section 1981, as amended by the Civil Rights Act of 1991. The court concluded "that a cause of action 'arises under an Act of Congress enacted' after December 1, 1990--and therefore is governed by § 1658's 4-year statute of limitations--if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." _Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004)._ If a plaintiff's claims were actionable under the pre-1991 version of Section 1981, the claims are still subject to _Goodman v. Luken'_ s application of Pennsylvania's two-year state statute of limitations period. _Id._ If a plaintiff's claims "arose under" the 1991 Act amending Section 1981, in the sense that plaintiff's causes of action were made possible by the 1991 Act, then the claims are subject to Section 1658's four-year statute of limitations. _Id._

Whether a two- or four-year limitation period applies to the plaintiff's failure-to-promote claim depends upon whether such a claim would have been actionable under the pre-1991 version of Section 1981. Some failure-to-promote claims were actionable under Section 1981 prior to the 1991 amendment, but only if "the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer." _Patterson v. McLean Credit Union, 491 U.S. 164, 185, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)._ "[O]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable...." _Id._ Thus, if a "new and distinct relation" between Cook and Amtrak would have resulted from her promotion, then the Section 1981 claim would have been actionable prior to the 1991 amendment and Pennsylvania's two-year statute of

limitations for personal injury actions would apply to bar Cook's claim. [FN13] If no such new relationship would have resulted, the 1991 amendment to Section 1981 made Cook's claim actionable and the four-year limitation period would apply and her claim would be viable. [FN14]

> FN13. The plaintiff's amended complaint asserts that the discriminatory conduct last occurred in the fall of 2001. Under a two year statute of limitations, the plaintiff's claims expired in the fall of 2003.

> FN14. The plaintiff's claims would not expire until the fall of 2005. Since the plaintiff filed her claim on February 28, 2005, under a four year statute of limitations, the plaintiff's claims are not time barred.

There is insufficient information at this time to decide whether a "new and distinct relation" between Cook and Amtrak would have resulted from her promotion, which is a necessary prerequisite to determining whether the claim is time barred. Because it is unclear from the face of the plaintiff's amended complaint that the statute of limitations bars the Section 1981 claim, the motion to dismiss will be denied. I will reserve ruling on the matter of the statute of limitations until the facts are more clearly developed to permit an appropriate analysis of which statute of limitations period to apply.

### D. State Law Tort Claims (Counts VIII, IX, and X)

In Counts VIII, IX, and X the plaintiff asserts state law tort claims for negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. Amended Compl. ¶¶ 77-81, 83-84, 86-87. The defendants argue that the plaintiff's claims fail because: 1) the claims are time barred; 2) the plaintiff's negligence claims are preempted by the Federal Employer's Liability Act ("FELA"); and (3) the plaintiff fails to allege any outrageous conduct that would give rise to an emotional distress claim under Pennsylvania law. Def. Mem. Supp. Mot. to Dismiss 15-17.

*8 Pennsylvania's statute of limitations for claims of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                          Page 10
Not Reported in F.Supp.2d, 2005 WL 1076043 (D.N.J.)
**(Cite as: 2005 WL 1076043 (D.N.J.))**

**\*13** Plaintiff first argues that defendant's failure to identify a specific contract with which plaintiff interfered is lethal to its claim. Plaintiff relies on _Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT,_ 1997 WL 576402, *20 (D.N.J. Sept.12, 1997) where the court dismissed the plaintiffs' tortious interference with contract count "because the plaintiffs have failed to allege the existence of any contract that was the subject of intended interference." The Court agrees with defendant, however, that it has alleged more than the plaintiffs in _Automated Salvage_ to withstand a motion to dismiss. Unlike the plaintiffs in _Automated Salvage,_ defendant has alleged the existence of a contract with which plaintiff interfered--the non-disclosure agreements. And as the Court has already determined, defendant is not required to plead the facts of such contract with the particularity that plaintiff would require.

Plaintiff also argues that defendant has failed to allege a coherent theory of damages that could flow from interference with the non-disclosure agreement. Plaintiff appears to argue that because defendant has no protectable interest in avoiding price competition, defendant's tortious interference with contract claim must fail. As the Court reads defendant's allegations, defendant alleges that it has lost sales, good will, growth opportunities, and suffered pecuniary harm because plaintiff induced defendant's prospective customers to breach non-disclosure agreements they had entered into with defendant by disclosing defendant's pricing information to plaintiff so plaintiff could undersell defendant. That antitrust laws are designed to protect competition, not competitors, _Brunswick Corp.,_ 42 U.S. at 488, does not mean that the damages alleged by defendant cannot flow from plaintiff's tortious interference with a contract. That the conduct which amounts to tortious interference also supports an antitrust claim is of no legal consequence. For these reasons, plaintiff's motion to dismiss Count V of the Counterclaim is denied.

_III. Count VI_

Plaintiff's final challenge is to defendant's unfair competition claim. Defendant alleges that "[s]ome or all of the conduct of Syncsort alleged in the foregoing paragraphs of this counterclaim constitute common-law unfair competition," and that as a result, defendant has "lost sales,

good will, normal growth opportunities, and suffered pecuniary injury." (Countercl. at ¶¶ 45-46.)

While plaintiff would have the Court limit the cause of action of unfair competition to the passing off of one's goods or services as those of another and unprivileged imitation, _see SK & F, Co. v. Premo Pharm. Labs., Inc.,_ 625 F.2d 1055, 1062 (3d Cir.1980), New Jersey courts have indicated that unfair competition should not be defined so narrowly. Recently, in _Ryan v. Carmona Bolen Home for Funerals,_ 341 N.J.Super. 87, 92, 775 A.2d 92 (N.J.Super.A.D.2001), the Appellate Division repeated this perspective:

**\*14** [T]he essence of unfair competition is fair play. Thus, the purpose of the law regarding unfair competition is to promote higher ethical standards in the business world. Accordingly, the concept is deemed as flexible and elastic as the evolving standards of commercial morality demand. The judicial goal should be to discourage, or prohibit the use of misleading or deceptive practices which renders competition unfair. The law must be sufficiently flexible to accommodate those goals.

_Id._ (citations and quotations omitted). Thus, the Court will not dismiss defendant's unfair competition claim because it does not involve the passing off of goods or unprivileged imitation. To the extent that defendant argues that the actions giving rise to its copyright infringement claim amount to unprivileged imitation for purposes of an unfair competition claim, plaintiff argues that such claim is preempted by the Copyright Act. Section 301 of the Copyright Act reads:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

11.U.S.C. § 301. In interpreting this statute, courts have "consistently held that unfair competition actions arising

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 2005 WL 1076043 (D.N.J.)
**(Cite as: 2005 WL 1076043 (D.N.J.))**

from an allegedly unauthorized copying or other acts which would violate the exclusive rights within the general scope of copyright are preempted by the Copyright Act." *Tannock v. Review Trading Corp., Inc., 1986 WL 15150, *5 (D.N.J. May 2, 1986)*. To the extent defendant's unfair competition claim relies on the copyright infringement conduct alleged in Count III, defendant's unfair competition claim must fail.

For these reasons, plaintiff's motion to dismiss Count VI of the Counterclaim is denied in part and granted in part.

CONCLUSION

Plaintiff's motion to dismiss Counts I, IV and V of the Counterclaim is DENIED and plaintiff's motion to dismiss Count VI of the Counterclaim is GRANTED in part and DENIED in part.

Not Reported in F.Supp.2d, 2005 WL 1076043 (D.N.J.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2559485 (Trial Motion, Memorandum and Affidavit) Defendant's Brief in Opposition to Plaintiff's Motion to Dismiss Counts I, IV, V and VI of Defendant's Counterclaim (Oct. 18, 2004)

• 2004 WL 2559465 (Trial Pleading) Answer, Affirmative Defenses and Counterclaim (Aug. 26, 2004)

• 2004 WL 2559477 (Trial Motion, Memorandum and Affidavit) Defendant's Brief in Opposition to Plaintiff's Motion for A Preliminary Injunction (Aug. 18, 2004)

• 2004 WL 2559472 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiff's Order to Show cause for A Preliminary Injunction (Aug. 13, 2004)

• 2004 WL 2559458 (Trial Pleading) Complaint and Demand for Jury Trial (Jul. 29, 2004)

• 2:04cv03623 (Docket) (Jul. 29, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT S



Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

⌐

United States District Court, N.D. California.
Brent TOWNSHEND, Plaintiff,
v.
ROCKWELL INTERNATIONAL CORP. and
Conexant Systems, Inc., Defendants.
CONEXANT SYSTEMS, INC., Defendant and
Counterclaimant
v.
Brent TOWNSHEND and 3Com Corporation,
Counterdefendants
**No. C99-0400SBA.**

March 28, 2000.

*ORDER*

ARMSTRONG, J.

**\*1** Pending before the Court is Townshend's request for judicial notice (Docket 49-1), Townshend's motion to dismiss Conexant's first, second, third, fifth and sixth counterclaims and to strike Conexant's sixth and seventh affirmative defenses (Docket 47-1), 3Com's motion to dismiss Conexant's first, second, and third counterclaims (Docket 44-1), and 3Com's motion to strike Paragraphs 86, 87, and 99 from Conexant's answer (Docket 44-2). For the following reasons, the Court GRANTS Townshend's request for judicial notice. The Court GRANTS 3Com and Townshend's motion to dismiss Conexant's first, second, and third counterclaims and dismisses these claims without leave to amend. The Court GRANTS Townshend's motion to dismiss Conexant's fifth counterclaim with leave to amend and GRANTS Townshend's motion to dismiss Conexant's seventh affirmative defense without leave to amend. The Court GRANTS Townshend's motion to dismiss Conexant's sixth counterclaim without leave to amend and grants the motion to strike Conexant's sixth affirmative defense without leave to amend. The Court DENIES 3Com's motion to strike Paragraphs 86,

87, and 99.

*BACKGROUND*

Plaintiff Brent Townshend is the inventor of the technology underlying "56K modems." A 56K modem allows a computer user to access information at 56,000 bits per second ("56K"). In December 1994, Plaintiff filed a United States patent application for 56K modem technology.

In April 1996, Townshend entered into a licensing agreement with U.S. Robotics ("USR")--now part of 3Com Corporation--to make and sell the technology covered by Townshend's patents.

On October 14, 1997, Townshend commenced an action in the San Mateo Superior Court against defendant Rockwell and co-defendant Conexant Systems, Inc. (formerly known as Rockwell Semiconductor Systems, Inc.) asserting state claims for unfair competition, misappropriation of trade secrets, breach of contract and breach of confidence. Townshend alleged that Rockwell and Conexant Systems (collectively "Conexant") had misappropriated information which he had disclosed to them during negotiations over a possible licensing agreement in August 1995.

On September 1, 1998, September 15, 1998, and November 10, 1998, U.S. patents 5,801,695, 5,809,075, and 5,835,538 were issued to Townshend based on the 56K modem technology which he had developed. The 1996 licensing agreement between Townshend and USR provided that 3Com would have an option to purchase Townshend's patents between March 1, 1999 and March 31, 1999. On March 30, 1999, 3Com exercised its option to purchase Townshend's patents. In tandem with the exercise of that option, 3Com executed an Assignment and License Agreement granting all ownership rights back to Townshend, including the right to enforce the patents and collect damages for past infringement.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

Under the new agreement, 3Com retained only a non-exclusive license in the patents.

On January 27, 1999, Townshend obtained authorization from 3Com to file suit on the patents and filed a federal complaint against Rockwell and Conexant. On that same day, he dismissed the state case without prejudice.

**\*2** In the federal action pending before this Court, Townshend has asserted three claims of patent infringement and has reasserted the four state law claims that he dismissed in the state action. Defendant moved to dismiss the state claims, and this Court denied the motion on April 26, 1999.

Conexant answered the complaint, asserting several counterclaims and affirmative defenses, which are at issue in the present motion. These allegations assert that Townshend and 3Com have engaged in antitrust violations, including Sections 1 and 2 of the Sherman Act and Cal. Bus. & Prof.Code § 17200 and that Townshend has engaged in inequitable conduct and patent misuse. Conexant alleges that 3Com conspired with Townshend to obtain invalid patents purporting to cover technology facilitating the operation of 56K PCM modem chipset products, to fraudulently procure an industry standard for the operation of these products which it claims requires Townshend's technology, to deny the technology to 3Com's competitors or condition the availability of the technology on reciprocal dealing with 3Com. *See* Answer ¶ 82.

The allegations are based on Conexant's contention that 3Com and Townshend lobbied the International Telecommunications Union ("ITU") to adopt an industry standard which embodied Townshend's technology. *See* Answer ¶ 93. Conexant also alleges that 3Com and Townshend submitted a proposed licensing arrangement to the ITU in September 1997 which violated the Patent Policy of the ITU's Standards Board. *See id.* Conexant further alleges that 3Com and Townshend did not disclose to the ITU that Townshend had filed a trade secret action in state court against Conexant or that Townshend intended to file a patent infringement suit against Conexant. *See id.* at ¶ 95. In February

1998, the ITU recommended adoption of the V.90 standard for 56K chipset modems. Conexant alleges that 3Com and Townshend have asserted that the V.90 standard incorporates Townshend's technology. Conexant argues that this assertion, combined with 3Com and Townshend's lobbying activities before the ITU and their proposed licensing terms, constitute anticompetitive conduct.

Townshend first requests judicial notice of (1) Conexant's filings before the Securities Exchange Commission ("SEC") and (2) specific records from the ITU. Townshend also moves to dismiss Conexant's first, second, and third counterclaims and moves to strike two affirmative defenses. Counterdefendant 3Com also brings a motion to dismiss Conexant's first, second, and third counterclaims and moves to strike three paragraphs (86, 87, and 99) from Conexant's answer.

*ANALYSIS*
I. REQUEST FOR JUDICIAL NOTICE

LEGAL STANDARD

Fed.R.Evid. 201 provides that a judicially noticed fact is "one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." In a civil action or proceeding, the Court shall instruct the jury to accept as conclusive any fact judicially noticed. Fed.R.Evid. 201(g). Information requested to be judicially noticed must be relevant to the matter before the Court. *See* 29 Am Jur 2d Evid. § 25 (1994).

DISCUSSION

**\*3** Townshend has requested judicial notice of Conexant's SEC filings and records from the ITU. The request is unopposed.

Conexant's SEC filings contain statements regarding Conexant's market share for modem chipset products, which are relevant to Conexant's arguments regarding 3Com's market share in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

56K PCM modem product market. An SEC filing is a public document which can be readily verified. The Court finds that this filing presents information relevant to this action and that this information is capable of accurate and ready determination. The Court GRANTS Townshend's request for judicial notice of Conexant's SEC filings.

Townshend also requests that the Court take judicial notice of certain records from the ITU. The ITU records are relevant to this action given Conexant's allegations that 3Com and Townshend engaged in anti-competitive conduct by deceiving the ITU in connection with the patents at issue. Given the relevance of the ITU records and the lack of any challenge to the accuracy of this information, the Court GRANTS Townshend's request for judicial notice of the ITU records.

II. MOTION TO DISMISS COUNTERCLAIMS AND TO STRIKE AFFIRMATIVE DEFENSES

LEGAL STANDARD

A. MOTION TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should not be granted unless it appears beyond a doubt that the non-moving party "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). For purposes of such a motion, the pleading is construed in a light most favorable to the non-moving party and all properly pleaded factual allegations are taken as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969); *Everest and Jennings, Inc. v. American Motorists Ins. Co.,* 23 F.3d 226, 228 (9th Cir.1994). Although the court is generally confined to consideration of the allegations in the pleadings, when the pleading is accompanied by attached documents, such documents are deemed part of the pleading and may be considered in evaluating the merits of a Rule 12(b)(6) motion. *Hal Roach Studios v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 (9th Cir.1990).

"[A] document is not 'outside' the [pleading] if the pleading specifically refers to the document and if

its authenticity is not questioned." *Branch v. Tunnell,* 14 F.3d 449, 453 (9th Cir.1994). Moreover, the Court may consider matters of which it may properly take judicial notice without converting the motion to dismiss to one for summary judgment. *Barron v. Reich,* 13 F.3d 1370, 1377 (9th Cir.1994) (records and reports of administrative bodies); *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir.1988) (court records).

When the pleading is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986). Leave to amend is properly denied "where the amendment would be futile." *DeSoto Yellow Freight Sys.,* 957 F.2d 655, 658 (9th Cir.1992).

B. MOTION TO STRIKE

*4 Under Federal Rule of Civil Procedure 12(f), a court has the discretion to strike a pleading, or portions thereof. *Federal Sayings and Loan v. Gemini Management,* 921 F.2d 241, 243 (9th Cir.1990). Rule 12(f) provides that a court "may order stricken from any pleading ... any redundant, immaterial, impertinent, or scandalous matter." "[T]he function of a rule 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial...." *Sidney-Vinstein v. A.H. Robins, Co.,* 697 F.2d 880, 885 (9th Cir.1983).

Motions to strike are disfavored, and should not be granted unless it is clear that the matter to be stricken can have no possible bearing upon the subject matter of the litigation. *Naton v. Bank of California,* 72 F.R.D. 550 (1976), citing 2A J. Moore, *Federal Practice,* Section 12.2(2) at 244429 (2d ed.1975). In addition, motions to strike are rarely granted in the absence of a showing of prejudice to the moving party. *See* 61 Am.Jur.2d Pleading § 505 (West 1999). However, if a pleading is deficient, the Court may strike the pleading and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 4

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

require the non-moving party to submit an amended pleading which includes more specific allegations. *See Farlow v. Union Central Life Insurance Company,* 874 F.2d 791 (11th Cir.1989) (granting leave to amend in conjunction with a motion to strike state law claims from a complaint); *Williams v. California 1st Bank,* 859 F.2d 664 (9th Cir.1988) (granting motion to strike affirmative defense and giving defendantleave to amend the defense as a counterclaim); *Miles v. Ertl Company,* 722 F.2d 434 (8th Cir.1983) (granting plaintiff leave to amend after striking the complaint). In addition, a court within this district has indicated the appropriateness of granting leave to amend in conjunction with a motion to strike allegations of inequitable conduct. *See Chiron v. Abbott Laboratories,* 156 F.R.D. 219, 222 (1994) (granting plaintiff's motion to strike an affirmative defense of inequitable conduct and providing defendants with the opportunity to amend their answer to plead the defense with the requisite particularity).

DISCUSSION

A.    FIRST    COUNTERCLAIM--SHERMAN SECTION 1

Both Townshend and 3Com have moved to dismiss the first counterclaim asserted by Conexant, which alleges conspiracy in restraint of trade in violation of Section 1 of the Sherman Act. An allegation of conspiracy pursuant to Section 1 of the Sherman Act requires (1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition, and (3) which actually injures competition. *See Les Shockley Racing v. National Hot Rod Assoc.,* 884 F.2d 504, 507 (9th Cir.1989). In the first counterclaim, Conexant alleges that Townshend and 3Com have combined and conspired to obtain invalid patents, to deceive the ITU into incorporating Townshend's patent into the industry standard, to deny competitors access to this technology, to restrain competition, and to file this lawsuit in order to prevent Conexant from using Townshend's technology. *See* Answer ¶ 104.

1. Sufficiency of Conspiracy Allegation

*5 Both 3Com and Townshend move to dismiss Conexant's first counterclaim on the basis that licensors and licensees are legally incapable of conspiring under Section 1 of the Sherman Act. In response, Conexant argues the determination of whether these two entities are capable of conspiring is a question of fact which cannot be resolved in a 12(b)(6) motion to dismiss. Conexant also asserts that 3Com and Townshend have independent economic motivations which would make them legally capable of conspiring under the antitrust laws.

a) Question of Fact

In *Los Angeles Memorial Coliseum Commission v. National Football League, et al.,* 726 F.2d 1381, 1387 (9th Cir.1984), the Ninth Circuit explained that "the nature of an entity and its ability to combine or conspire in violation of § 1 [of the Sherman Act] is a fact question." In that case, the Ninth Circuit affirmed the district court's rejection of a defense which asserted that the defendants were incapable of conspiring because they were a single entity. Given the Ninth Circuit's finding that the ability of an entity to enter a conspiracy is a question of fact, the Court finds that 3Com and Townshend's contention that they are incapable of entering into a conspiracy cannot be resolved in a 12(b)(6) motion to dismiss.

b) Legal Capability to Enter Conspiracy

Even if the Court were to evaluate the allegations regarding 3Com and Townshend's capability to enter into a conspiracy, the case law regarding the ability of licensors and licensees to enter a conspiracy does not establish that 3Com and Townshend are legally incapable of conspiring under Section 1 of the Sherman Act.

3Com and Townshend rely on the Supreme Court's holding in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752 (1984) for their position that they are legally incapable of conspiring under the antitrust laws. In *Copperweld,* the Supreme Court considered the issue of whether a parent company and its subsidiary could conspire under the Sherman

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 5

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

Act and held that these two entities could not conspire. This holding was based upon the Supreme Court's reasoning that coordinated activity by parties who lack independent sources of economic power and separate interests did not warrant scrutiny under the antitrust laws. *Copperweld,* 467 U.S. at 771. The Court expressly limited its holding to parent companies and their subsidiaries and has not extended this holding to the licensor/licensee context, which is at issue in the motion before this Court. Because of the limited holding in *Copperweld,* the Court does not find that *Copperweld* requires a finding in this case that 3Com and Townshend are legally incapable of conspiring under the antitrust laws.

3Com and Townshend also rely upon a case within this district which held in the context of a motion for summary judgment that a patent holder and its exclusive licensee were legally incapable of entering into an antitrust conspiracy. *See Levi Case Co. v. ATS Products,* 788 F.Supp. 428 (N.D.Cal.1992) (Walker, J.). In *Levi Case,* the court granted summary judgment to a patentee and its exclusive licensee on the basis that they were legally incapable of engaging in the alleged conspiratorial acts in dealing with sublicensees.

**\*6** While the facts in *Levi Case* resulted in a finding by that court that a patent holder and its exclusive licensee were incapable of entering into a conspiracy with respect to their conduct with sublicensees, the court did not set forth a bright-line rule that patent holders and their licensees could never conspire. In fact, the *Levi Case* court explained that the relationship between a patent holder and its licensee *could* be a conspiracy in violation of the antitrust laws if the relationship "deprive[d] the marketplace of independent actors." *Levi Case,* 788 F.Supp. at 431.

The conspiratorial conduct alleged in this action involves "agreements [between 3Com and Townshend] to expand the market power conferred by Townshend's patents by (i) fraudulently obtaining from the ITU a standard incorporating those patents; (ii) using the market power conferred by that standard as leverage to acquire competitors'

technology; and (iii) barring competitors from access to the patents they need in order to block them from manufacturing standard-compliant products, and thus, preventing them from competing in the relevant markets." Def Opp. at 9. Conexant asserts that 3Com and Townshend lack any *legitimate* joint interest which would justify a finding that 3Com and Townshend are incapable of entering into a conspiracy because "neither a patent owner nor its licensee has any business engaging in concerted action to create market power beyond that conferred by their patents." Def. Opp. at 9. [FN1]

> FN1. Conexant also argues that 3Com became a non-exclusive licensee in March 1999, which removes any shield from conspiracy liability conferred by *Levi Case. See* Def. Opp. at 9. However, Conexant has alleged conspiratorial acts occurring prior to March 1999, at a time period when the exclusive license was still in effect.

The *Levi Case* court explained that a patent holder and licensee could be legally capable of entering into a conspiracy if the alleged conduct deprived the marketplace of independent actors. Conexant has argued that Townshend and 3Com are independent actors [FN2] and has alleged that Townshend and 3Com acted jointly to unlawfully expand the market power conferred by Townshend's patents. The independent motivations of Townshend and 3Com combined with the allegations that Townshend and 3Com acted jointly with respect to Townshend's patents render 3Com and Townshend legally capable of entering a conspiracy under the reasoning of *Levi Case.*

> FN2. At the hearing, Conexant represented that 3Com and Townshend are independent actors in that they have different interests with respect to the patented technology, 3Com, as a competitor in the market for products incorporating the patented technology, has an interest in excluding competitors, whereas Townshend, who does not manufacture or sell products incorporating

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 6

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

the patented technology, does not share this interest. Townshend has represented that his interest in this action is to maximize the licensing revenue from his patents.

Because the question of capability to enter a conspiracy is a question of fact and because the case law does not establish that Townshend and 3Com are legally incapable of entering into a conspiracy under the factual circumstances alleged by Conexant, the Court finds that 3Com and Townshend's 12(b)(6) challenge to their capability to enter a conspiracy does not warrant dismissal of Conexant's first counterclaim.

2. Sufficiency of Allegations of Injury

Townshend and 3Com also challenge Conexant's counterclaim for conspiracy on the basis that the alleged antitrust injury is insufficient to state a claim under Section 1 of the Sherman Act. The allegations plead that 3Com and Townshend have used the market power conferred by the ITU standard to injure competition generally and to injure Conexant specifically.

a) Injury to Competition

*7 Conexant argues that the allegations of antitrust injury adequately plead that 3Com and Townshend have used the market power conferred by the ITU standard to injure competition generally because Townshend's Licensing Proposal sets out proposed terms which violate ITU's Telecommunications Standards Board (TSB) Patent Policy. Conexant alleges that the proposed terms of the Licensing Proposal violate TSB's Patent Policy by denying access to Townshend's technology or conditioning the availability of the technology on reciprocal dealing, by extracting cross-licenses at fixed, artificially low rates and by attempting to double-charge Conexant and its customers by requiring them each to pay a separate license fee for Townshend's patents. *See* Answer ¶¶ 93-99.

The issue before this Court is whether Conexant has adequately plead antitrust injury through its

allegations that the licensing terms proposed by 3Com violate the TSB Patent Policy. The TSB Patent Policy provides that if a standardization proposal incorporates technology which is patented or is part of a pending patent application, the patent holder should either waive his rights or "be willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions." *See* Rees Decl., Ex. A, App. 1, 1.2.2. However, the policy goes on to state that "such negotiations are left to the parties concerned and are performed outside the ITU-T (Standardization Sector)." *See id.* The ITU does not consider the substance of the licensing provisions in deciding whether or not to adopt a particular standard. Instead, the ITU assesses whether the patent holder is willing to negotiate such terms. If a patent holder is not willing to negotiate licenses, the TSB patent policy provides that "no Recommendation can be established." *See id.* at 1.2.3.

The ITU recommended the V.90 standard in February 1998 and ratified the standard in September 1998. The proposed licensing terms were submitted to the ITU in September 1997, before adoption of the V.90 standard occurred. As required by the TSB patent policy, 3Com stated its willingness to negotiate licenses by submitting a "Proposed Key Terms and Conditions for Licensing Patents Relating to an ITU-T Standard for V.PCM." *See* Rees Decl., Ex. B. This submission contains the proposed terms which Conexant now contends are discriminatory, unfair, and unreasonable. [FN3] Here, the ITU, whose members included Rockwell (Conexant's predecessor), adopted the V.90 standard after receiving 3Com's submission. The adoption of the V.90 standard by the ITU suggests that the ITU was satisfied that the proposed terms submitted by 3Com evidenced a willingness by 3Com to negotiate non-discriminatory, fair, and reasonable terms. [FN4]

> FN3. Conexant alleges that "[t]he Townshend Licensing Proposal, along with other accompanying statements to the ITU, violated the rules of the TSB Patent Policy....3Com and Townshend ostensibly represented that Townshend was willing to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

(Cite as: 2000 WL 433505 (N.D.Cal.))

negotiate licenses with other parties on a non-discriminatory basis." Answer ¶ 93.

FN4. Conexant has also alleged that 3Com and Townshend failed to disclose Townshend's trade secret action to the ITU prior to adoption of the V.90 standard. Conexant, the defendant in the trade secret action, was a member of the ITU during this time and has not alleged any injury to competition resulting from this failure to disclose.

At the hearing and in its papers, Conexant has argued that the licensing terms are injurious to competition because 3Com and Townshend sought unfair royalty rates, double-charging of customers and manufacturers, mandatory cross-licenses, and reservation of the right to condition licenses on the resolution of litigation.

*8 Under the terms of the Patent Act, a patent owner has the legal right to refuse to license his or her patent to others. Pursuant to 35 U.S.C. § 271(d), "[n]o patent owner otherwise entitled to relief ... [shall be] deemed guilty of ... illegal extension of the patent right by reason of his having ... (4) refused to license or use any rights to the patent." 35 U.S.C. § 271(d). The Federal Circuit has indicated that "the antitrust laws do not negate a patentee's right to exclude others from patent property." In Re Independent Service Organizations Antitrust Litigation, 203 F.3d 1322 (Fed.Cir.2000) (internal quotations and citations omitted). Given that a patent holder is permitted under the antitrust laws to completely exclude others from practicing his or her technology, the Court finds that 3Com's submission of proposed licensing terms with which it was willing to license does not state a violation of the antitrust laws.

Even if the Court were to consider the unfair terms alleged by Conexant, the Court finds that these terms do not state an injury to competition. First, with respect to the proposed royalty rates, the Court notes the initial licensing proposal dated September 1997 sought a maximum $1.25 per-unit royalty for client-end products and a maximum $9.00 per-port

royalty for server-end products. See Rees Decl., Ex. B at 4. In September 1998, after the V.90 standard had been adopted, 3Com submitted a revised licensing proposal which sought a maximum $1.25 per-unit royalty for client-end products and a maximum $2.50 per-port royalty for server-end products. See Rees Decl., Ex. C at 4. Conexant has not explained how the royalty rates state unfair terms. A patent owner's pursuit of optimum royalty income is not an act in restraint of trade which violates the antitrust laws. See Genentech v. Eli Lilly, 998 F.2d 931, 948 (Fed.Cir.1993). Second, with respect to the allegations of double-charging, Conexant alleges that the licensing proposal "purports to require both Conexant and its customers to each separately pay for a license." See Answer ¶ 98. Townshend argues that this allegation mischaracterizes the licensing proposal. The licensing proposal sets forth one royalty rate for client-end products and one royalty rate for server-end products. See Rees Decl., Ex. B and C. The proposal does not suggest that modem chipset manufacturers and modem chipset makers would each be obligated to pay royalties on the same product. In addition, an attempt to double-charge is prohibited under the doctrine of patent exhaustion. See Intel v. ULSI System Tech., 995 F.2d 1566 (Fed.Cir.1993). Third, with respect to the mandatory cross-licensing provisions, Conexant has not identified any authority for the proposition that cross-licensing constitutes anticompetitive conduct. Generally, cross-licensing is considered a pro-competitive practice because it can facilitate the integration of complementary technologies. See U.S. Dep't of Justice and FTC, Antitrust Guidelines for the Licensing of Intellectual Property (1995). In fact, the terms of the licensing proposal indicate that 3Com sought cross-licenses for technologies which "are specified in the V.PCM Standard or are related to V.PCM technologies and are otherwise practically necessary or desirable, for technical or economic reasons, in order to make a commercially viable product compliant with the V.PCM Standard." See Rees Decl., Ex. B at 4. Based on this representation by 3Com and the lack of authority by Conexant in support of its argument that the cross-licensing practice is anticompetitive, the Court finds that this allegation does not state an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 8

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

antitrust injury. Finally, Conexant alleges that the licensing proposal purports to condition licenses on the resolution of litigation. Because a patent owner has the legal right to refuse to license his or her patent on any terms, the existence of a predicate condition to a license agreement cannot state an antitrust violation. *See Genentech,* 998 F.3d at 949 (finding that a patentee's right to select its licensees is not an antitrust violation). The Court finds that the proposed licensing terms do not state an injury to competition in violation of the antitrust laws.

**\*9** In addition to alleging that the proposed licensing terms constitute injury to competition, Conexant has also alleged that the filing of Townshend's infringement suit is an antitrust injury resulting from a conspiracy between 3Com and Townshend. A patentee has the legal right to bring suit against those who infringe his or her patents. *See* 35 U.S.C. § 271. Conexant's allegations that Townshend initiated a patent infringement suit--without any additional allegations of anti-competitive aspects of this suit--does not state an antitrust injury, nor does it identify any antitrust injury caused by a conspiracy between 3Com and Townshend.

The Court finds that Conexant has not stated an injury to competition, either in its allegations regarding the proposed licensing terms or its allegations regarding the filing of Townshend's infringement suit. At the hearing on the motion, Conexant did not identify any other antitrust injury which it could allege in its answer.

b) Injury to Conexant

Conexant also argues that injury to itself is sufficient to allege injury to competition under Section 1. Injury to a competitor does not necessarily allege injury to competition. *See Brunswick Corp. v. Pueblo Bowl-O-Mat. Inc.,* 429 U.S. 477 (1977). Conexant must specifically indicate how the allegedly anticompetitive acts undertaken by Townshend and 3Com resulted in antitrust injury in order to state a claim. As indicated above, Conexant has not stated any allegations of antitrust injury.

The Court finds that Conexant's first counterclaim does not state a claim for conspiracy to restrain trade in violation of Section 1 of the Sherman Act. Conexant has not sufficiently alleged an antitrust injury or provided any arguments indicating that it could amend this counterclaim to add factual allegations to state an antitrust injury. 3Com and Townshend's motion to dismiss is GRANTED, and the first counterclaim is DISMISSED without leave to amend.

B.   SECOND   COUNTERCLAIM--SHERMAN SECTION 2

The second counterclaim is for attempted monopoly and conspiracy to monopolize in violation of Section 2 of the Sherman Act. A claim for attempted monopolization requires (1) a specific intent to control prices or to destroy competition in the relevant market; (2) predatory or anticompetitive conduct; and (3) a dangerous probability of achieving monopoly power; and (4) causal antitrust injury. *See McGlinchy v. Shell Chem Co.,* 845 F.2d 802 (9th Cir.1988). A claim for conspiracy to monopolize requires (1) a conspiracy; (2) an attempt to monopolize; and (3) a causal antitrust injury. *See Morgan Strand Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484 (9th Cir.1991). Conexant alleges that 3Com and Townshend have willfully engaged in conduct creating a dangerous probability that 3Com will acquire and maintain monopoly power in the market for 56K modem chipset products and that 3Com and Townshend will acquire and maintain monopoly power in the related 56K modem technology market. *See* Answer ¶ 108. Conexant also alleges that 3Com and Townshend have acted with a specific intent to monopolize these markets. *See* Answer ¶ 109.

**\*10** This counterclaim concerns two relevant markets for 56K PCM modem chipsets: the "product" market and the "technology" market. Conexant defines the product market as "chipset devices which are capable of transmitting data and information over ordinary telephone lines at speeds up to 56 kilobits per second." Answer ¶ 78. Conexant defines the technology market as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

proprietary technology necessary to practice a 56K PCM modem and has explained that this market includes Townshend's patents as well as other proprietary technology.

1. Attempted Monopoly

The first allegation in Conexant's counterclaim is for attempted monopolization. An attempted monopolization claim requires (1) a specific intent to control prices or to destroy competition in the relevant market; (2) predatory or anticompetitive conduct; (3) a dangerous probability of achieving monopoly power; and (4) causal antitrust injury. *See McGlinchy v. Shell Chem. Co.,* 845 F.2d 802 (9th Cir.1988). In its opposition, Conexant concedes that the allegations related to attempted monopolization apply only to 3Com. *See* Def. Opp. at 12.

a) Specific Intent

A claim for attempted monopolization requires allegations of a specific intent to control prices or to destroy competition in the relevant market. *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802 (9th Cir.1988). Conexant argues that it has alleged the following facts to demonstrate anti-competitive intent: (1) 3Com and Townshend deceived the ITU by convincing the ITU to adopt an industry standard incorporating Townshend's patented technology and then refusing to license this patented technology to Conexant on fair terms; (2) 3Com prepared an internal memo in which 3Com officers indicated they would not make Townshend's technology available to Conexant. *See* Def. Opp. at 13; Answer ¶ 87.

With respect to the allegation of anti-competitive intent based upon deception of the ITU and subsequent refusal to license to Conexant, the Court finds that the alleged facts do not support an inference of anti-competitive intent. 3Com provided the ITU with the allegedly "unfair" licensing terms *before* the ITU adopted the V.90 standard, and 3Com stated its willingness to license with potential licensees in accordance with these terms. *See supra.* In addition, there is no allegation that 3Com has refused to license with Conexant in accordance with

the proposed terms submitted to the ITU. The Court finds that 3Com's alleged conduct before the ITU does not support an inference of anti-competitive intent.

With respect to the 3Com memo, Conexant argues that this memo reveals that "3Com set out to abuse the market power *conferred upon it by the ITU standard*-- namely, by refusing to license Townshend's patents to Conexant in order to restrain trade and monopolize the relevant markets." Def. Opp. at 14 (emphasis added). The internal memo, which was written in 1996 before the V.90 standard was adopted, does not specifically discuss the ITU standard or any market power conferred by this standard. This allegation does not support an inference of anti-competitive intent to abuse the market power conferred by the ITU standard.

**\*11** Conexant's counterclaim for attempted monopolization against 3Com does not provide allegations to support an inference of anticompetitive intent.

b) Anticompetitive Conduct

The second element in a claim for attempted monopolization is an allegation of anti-competitive conduct. Although the attempted monopolization claim is limited to 3Com, Conexant has identified the following anti-competitive conduct: 3Com and Townshend's conduct during the ITU standards-setting process, 3Com and Townshend's refusal to license Townshend's patents on fair terms and Townshend's current patent infringement suit against Conexant.

i) Conduct before the ITU

In support of its argument that 3Com's conduct before the ITU constitutes anti-competitive conduct, Conexant relies upon *In re Dell,* slip op., No. 931-0097 (LEXIS, Trade Library, FTC file). In that case, Dell lobbied a video electronics association for an industry standard incorporating Dell's patented technology but failed to disclose that it held this patent during its lobbying efforts. The Federal Trade Commission found that Dell's actions

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

violated Section 5 of the FTC Act and issued a consent order prohibiting Dell from attempting to enforce the non-disclosed patent for a ten-year period.

*Dell* is not analogous to the instant case for several reasons. First, Townshend's patents issued after the ITU had adopted the V.90 standard, whereas in *Dell,* the patent owner had an issued patent at the time the standard-setting proceeding took place. 3Com informed the ITU that Townshend had pending patent applications covering 56K chipset modem technology, while the patent owner in *Dell* did not disclose the existence of the patent to the standards-setting organization. Conexant has not asserted that the ITU could have adopted a V.90 standard which did not encompass Townshend's technology, whereas in *Dell,* the standards-setting body was choosing among options, and there was a possibility that they could have adopted a standard which did not incorporate Dell's patent. Because *Dell* is distinguishable from this case for several reasons, the Court finds that *Dell* does not provide support for Conexant's argument that 3Com's conduct before the ITU, including the proposed licensing terms, was anticompetitive. [FN5]

> FN5. 3Com makes the additional argument that if the Court were to find that this conduct is anti-competitive, its actions before the ITU would be immune from suit in light of the *Noerr-Pennington* doctrine. This doctrine confers immunity for acts that would otherwise be considered anti-competitive if these acts are directed towards influencing government action. Given the Court's finding that the conduct alleged by Conexant does not state any anti-competitive conduct by 3Com before the ITU, the Court does not reach the issue of Noerr-Pennington immunity.

ii) Refusal to License

Conexant next identifies 3Com's refusal to license on fair terms as an example of anticompetitive conduct. The Court again notes that 3Com made the proposed licensing terms and conditions--which

Conexant now contends are unfair-- available to the ITU and its members before the V.90 standard was adopted. There is no allegation that 3Com has refused to license to Conexant in accordance with these proposed licensing terms and conditions. The Court finds that Conexant has not identified anti-competitive conduct by 3Com regarding refusal to license.

iii) Townshend's infringement suit

Conexant's third assertion is that the patent infringement suit filed by Townshend constitutes anticompetitive conduct sufficient to support a claim for attempted monopolization against 3Com. However, Conexant has conceded in its opposition that the attempted monopolization claim applies only to 3Com, not to Townshend. Def. Opp. at 12. The Court finds that this allegation does not state any anti-competitive conduct by 3Com.

**\*12** The Court finds that Conexant has not identified any anti-competitive conduct by 3Com in support of a claim for attempted monopolization.

c) Probability of Monopolization

The third element in a claim for attempted monopolization is an allegation of a dangerous probability of achieving monopoly power, which includes allegations regarding the market power held by the antitrust defendant.

i. Product Market

Conexant alleges that 3Com has a 50% share of the "product market." *See* Answer ¶ 81. The Ninth Circuit has indicated that market share is insufficient to show market power and has found that courts should also evaluate the presence of entry barriers and the inability of competitors to expand output. *See Rebel Oil Co., Inc., v. Atlantic Richfield Co.,* 51 F.3d 1421, fn 10 (9th Cir.1995) (rejecting bright-line rule and finding that an analysis of market power should be decided by analyzing market share, entry barriers and the capacity of existing competitors to expand output). Here, Conexant has alleged that 3Com has a 50%

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

market share in the product market and that this market contains entry barriers in the form of Townshend's patents and the ITU standard. These allegations satisfy two of the three criteria for *Rebel Oil.* However, Conexant has not alleged that competitors are unable to expand output, which is the third factor set forth by the Ninth Circuit in *Rebel Oil.* At the hearing, Conexant argued that the proposed licensing terms effectively prohibit competitors from building standard-complaint products, but Conexant has not demonstrated that it can allege facts to support this argument. There is no allegation that 3Com has refused to license Townshend's technology in accordance with the proposed terms submitted to ITU or that competitors are unable to license Townshend's technology in order to build standard-compliant products. Conexant has not alleged facts to show that competitors are unable to expand output, and as such, has not alleged that 3Com has a dangerous probability of monopolization in the product market.

ii. Technology Market

Conexant has not alleged any market share in the technology market. Instead, Conexant argues that under *Dell,* an industry standard confers market power, and because Townshend's patents are allegedly incorporated into the V.90 standard, these patents have market power in the technology market.

In *Dell,* the FTC recognized that an industry standard which incorporates patented technology can confer market power in a market for *products* incorporating the industry standard. However, the FTC did not consider the issue of whether this standard conferred market power in a market consisting of *proprietary technology.*

In a market consisting of proprietary technology necessary to practice a 56 K modem, any party who has secured proprietary rights to such technology (i.e.--a patent) possesses the legal right to exclude others from practicing technology which has been protected. *See* 35 U.S.C. § 271. The adoption of a industry standard incorporating such proprietary technology does not confer any power to exclude that exceeds the exclusionary power to which

a.patent holder is otherwise legally entitled. Moreover, Conexant has not alleged that the adoption of the V.90 standard prevents the development of proprietary technology that could otherwise be developed.

**\*13** In the absence of allegations of market share in the technology market or allegations that the industry standard prevents the development of proprietary technology that could otherwise be developed, Conexant has not alleged that the alleged incorporation of Townshend's patents into the V.90 standard presents a dangerous probability of monopolization in the market for proprietary technology.

d) Causal antitrust injury

The fourth element of a claim for attempted monopolization is causal antitrust injury--an injury to competition caused by 3Com's conduct. As discussed in the analysis of the Sherman Section 1 counterclaim, Conexant has not alleged a sufficient injury under the antitrust laws and has not demonstrated that it can amend its answer to state additional factual allegations. *See supra.* The existence of the proposed licensing terms in and of themselves do not state injury to competition.

The Court finds that Conexant's second counterclaim fails to state a claim against 3Com for attempted monopolization of either the product market or the technology market. The claims for attempted monopolization lack allegations of anti-competitive intent, anti-competitive conduct, a dangerous probability of achieving monopoly power, and causal antitrust injury, and Conexant has not demonstrated that it can amend these claims to cure the identified deficiencies. [FN6] The Court GRANTS 3Com and Townshend's motion and dismisses the counterclaim for attempted monopolization without leave to amend.

> FN6. Because Conexant has not demonstrated that it can allege injury to competition, any amendment to the other elements of a claim for attempted monopolization would be futile.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 12

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

2. Conspiracy to Monopolize

The second counterclaim asserted by Conexant under Section 2 is conspiracy to monopolize, which generally requires (1) a conspiracy (2) an attempt to monopolize and (3) a causal antitrust injury. *See Morgan Strand Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484 (9th Cir.1991).

a) Conspiracy

The first element in a claim for conspiracy to monopolize is an allegation of concerted action to monopolize a relevant market. As discussed in the analysis of the Section 1 counterclaim, the question of whether two entities are capable of conspiring under the antitrust laws is a question of fact, and the case law does not establish that a patent holder and licensee under the circumstances of this case are legally incapable of entering into a conspiracy. The Court finds that 3Com and Townshend's 12(b)(6) challenge to the sufficiency of Conexant's conspiracy allegation does not warrant dismissal of this claim.

b) Attempt to monopolize

The second requirement in support of a claim for conspiracy to monopolize is an allegation that the parties attempted to monopolize a relevant market. An attempt to monopolize requires (1) a specific intent to control prices or destroy competition in the relevant market; (2) predatory or anticompetitive conduct; (3) a dangerous probability of achieving monopoly power; and (4) causal antitrust injury. *See McGlinchy v. Shell Chem. Co.,* 845 F.2d 802 (9th Cir.1988).

**\*14** As to 3Com, Conexant's allegations that 3Com attempted to monopolize the product market and the technology market [FN7] are deficient because they lack allegations of anti-competitive intent, anti-competitive conduct, a dangerous probability of achieving monopoly power, and causal antitrust injury. *See supra.*

> FN7. As previously noted, Conexant cannot maintain a Section 2 claim for

monopolization of a "technology" market.

Conexant has conceded that it is not pursuing a claim for attempted monopolization against Townshend. Def. Opp. at 12. Given that Conexant is not pursuing a claim for attempted monopolization against Townshend, Conexant also cannot maintain a claim for conspiracy to monopolize against Townshend because a claim for conspiracy to monopolize includes an allegation of attempted monopolization as one of its elements. *See Morgan Strand Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484 (9th Cir.1991). Conexant has not alleged Townshend is a market participant in either the product market or the technology market and has not alleged that Townshend had an intent to monopolize either market. The Court finds that the attempted monopolization element as to Townshend is deficient.

c) Causal antitrust injury

Finally, a claim for conspiracy to monopolize requires a causal antitrust injury. Conexant has failed to sufficiently allege an antitrust injury caused by 3Com or Townshend's conduct. *See supra.*

The Court finds that Conexant has failed to state a claim for conspiracy to monopolize against 3Com and Townshend. Conexant has failed to allege that 3Com and Townshend attempted to monopolize the product market or the technology market and has failed to allege any antitrust injury resulting from 3Com and Townshend's conduct. Conexant has not demonstrated that it can amend this claim to add additional factual allegations. The Court GRANTS 3Com and Townshend's motion and dismisses the counterclaim for conspiracy to monopolize without leave to amend.

C.    THIRD    COUNTERCLAIM--UNFAIR COMPETITION

Conexant's third counterclaim asserts a claim for unfair competition in violation of Cal. Bus. & Prof.Code § 17200. 3Com and Townshend argue that because Conexant's federal claims are deficient,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                   Page 13

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

(Cite as: 2000 WL 433505 (N.D.Cal.))

this state claim should be dismissed as well. Conexant contends that its third counterclaim should be maintained because California case law provides an interpretation of the term "unfair" which is broader than the federal antitrust laws. *See Cel-Tech Communications, Inc., v. L.A. Cellular,* 20 Cal.4th 163 (1999). In *Cel-Tech,* the California Supreme Court made the following finding:

When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition. 20 Cal.4th at 186- 87.

*15 In opposing the motion to dismiss, Conexant contends that its allegations in the § 17200 claim regarding 3Com and Townshend's "deception" before the ITU are sufficient to state a claim in that these allegations mirror the anti-competitive conduct engaged in by patent owner in *Dell.* The facts in *Dell* regarding a patent holder's failure to disclose an issued patent to a standard-setting body are distinguishable from the facts in this case, where 3Com notified the ITU of the Townshend's pending patent applications and submitted proposed licensing terms prior to the adoption of the standard. *See supra.* Under *Dell,* Conexant has not stated allegations of anti-competitive conduct.

In addition, the allegations regarding 3Com and Townshend's conduct before the ITU do not otherwise meet the definition of "unfair" set forth in *Cel-Tech.* The allegations do not state that this conduct threatens an incipient violation of the antitrust laws, violates the policy or spirit of one of those laws, or otherwise significantly threatens or harms competition. Conexant has not alleged any injury to competition resulting from 3Com or Townshend's conduct. *See supra.* Conexant has also not demonstrated that it can amend this claim to allege facts regarding additional "unfair" practices other than the allegations of conduct before the ITU specifically referenced in the opposition. The Court

DISMISSES the third counterclaim without leave to amend.

D. INEQUITABLE CONDUCT

The fifth counterclaim alleges that Townshend engaged in inequitable conduct before the Patent and Trademark Office (PTO) in obtaining his patents. The seventh affirmative defense also alleges inequitable conduct. Townshend moves to dismiss the fifth counterclaim and to strike the seventh affirmative defense.

Allegations of inequitable conduct involve fraud and as such are subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b). *Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.,* 41 U.S.P.Q.2d 1770 (N.D.Cal.1996) (Jensen, J.). Specifically, a party asserting a claim for inequitable conduct is required to state the "time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Advanced Cardiovascular Systems,* 41 U.S.P.Q.2d at 1775 (citing *Schreiber Distributing v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1996) ); see also *Sun Microsystems, Inc. v. Dataram Corp.,* 1997 U.S. Dist. LEXIS 4557 (N.D.Cal. Feb. 4, 1997) (Williams, J.) (finding that a claim of inequitable conduct should set forth details regarding when the misrepresentations or omissions took place, who made or failed to make the representations, and which patents are at issue). Here, Conexant has merely alleged that inequitable conduct took place in obtaining Townshend's patents. This allegation is insufficient for the heightened pleading standard required for fraud claims.

*16 The Court GRANTS Townshend's motion to dismiss the fifth counterclaim. In its opposition, Conexant indicates that it can cure this deficiency by alleging additional facts regarding an alleged misrepresentation by Townshend to the PTO during prosecution of U.S. Patent No. 5,801,695. *See* Def. Opp. at 21. The Court GRANTS Conexant's request to amend this claim to include specific allegations of fraud to support a claim of inequitable conduct.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

Townshend also moves to strike Conexant's seventh affirmative defense, which asserts inequitable conduct. The Court GRANTS Townshend's motion to strike without prejudice to Conexant amending its answer to plead the defense of inequitable conduct with the requisite particularity.

### E. PATENT MISUSE

The sixth counterclaim and sixth affirmative defense allege that Townshend's patents are unenforceable due to patent misuse. Townshend moves to dismiss the sixth counterclaim and to strike the sixth affirmative defense.

The doctrine of patent misuse in an extension of the equitable doctrine of unclean hands, whereby a court of equity will not lend its support to enforcement of a patent that has been misused. *Braun v. Abbott Laboratories,* 124 F.3d 1419, 1427. (Fed.Cir.1997). The purpose of this doctrine is to restrain practices that draw "anticompetitive strength from the patent right." *Braun,* 124 F.3d at 1427.

The issue before the Court is whether Conexant has identified any anti-competitive practice by Townshend that is premised upon his patent rights. Conexant contends that the allegations regarding Townshend's conduct before the ITU and his proposed licensing terms provide sufficient allegations of anti-competitive conduct to state a patent misuse claim. *See* Def. Opp. at 20.

As the Court has previously discussed, these allegations do not identify any anti-competitive conduct. Pursuant to 35 U.S.C. § 271(d), a patentee is not deemed guilty of misuse or illegal extension of the patent right by refusing to license or use any rights to the patent. Because a complete refusal to license does not constitute patent misuse, the Court finds that a statement of proposed licensing terms, which indicates a willingness to license in accordance with these terms, cannot constitute patent misuse. In addition, the ITU was aware of Townshend's pending patent applications and was also aware of the proposed licensing terms for

Townshend's patented technology prior to adoption of the V.90 standard, and it made a decision to adopt the V.90 standard after it had received this information. *See supra.*

The Court finds that these allegations do not state anti-competitive conduct by Townshend, and as such, Conexant has not alleged a claim for patent misuse. Moreover, Conexant has not demonstrated that it can amend this claim to state additional factual allegations of anti-competitive conduct by Townshend. The Court GRANTS Townshend's motion to dismiss the sixth counterclaim without leave to amend and GRANTS Townshend's motion to strike the sixth affirmative defense without leave to amend.

### III. 3COM'S MOTION TO STRIKE

*\*17 3Com moves to strike Paragraphs 86, 87, and 99 from Conexant's answer on the basis that these allegations improperly use 3Com confidential information in violation of a state court protective order entered into between the parties in the state court trade secret action filed by Townshend in San Mateo Superior Court.

At the time 3Com filed the motion to strike before this Court, it had also filed a motion in San Mateo Superior Court for contempt and for sanctions against Conexant for violating the protective order. *See* 3Com Reply, Ex. H. On October 21, 1999, the San Mateo Superior Court held a hearing on 3Com's motion for contempt and for sanctions and declined to consider the motion, citing a lack of jurisdiction and lack of standing because Townshend had dismissed the state action without prejudice. *See* Letter from Christopher Cavan to Court dated October 25, 1999.

The first issue before this Court is whether Conexant has violated the state court protective order. The state court order, which was entered into by Townshend and Rockwell on March 25, 1998, required that information designated as "Confidential" or "Highly Confidential--Attorney's Eyes Only" be used by the parties "solely in connection with this litigation." 3Com Reply, Ex.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 15

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

H, Stipulated Protective Order ¶¶ 3, 4. The order further provided that "within sixty days after receiving notice of the entry of an order, judgment or decree finally disposing of this action, including any appeals therefrom, all persons having received information designated as "Confidential" or "Highly Confidential--Attorney's Eyes Only" hereunder shall return such material and all copies thereof to counsel for the producing party, or shall certify destruction thereof." *See id.* at ¶ 25. 3Com, as a third party to this action, signed a stipulation on June 11, 1998, agreeing to be bound by the state court order. *See* 3Com Reply, Ex. H.

In *On Command Video Corporation v. Lodgenet Entertainment Corp.,* 976 F.Supp. 917 (N.D.Cal.1997) (Armstrong, J.), this Court interpreted a protective order which contained a provision stating that "any information designated as Confidential Information shall not be used by the other party for any purpose other than in connection with preparation of the parties [sic] analysis of issues presented in this litigation." *Lodgenet,* 976 F.Supp. at 920. In *Lodgenet,* the plaintiff obtained materials from the defendant under a protective order for a federal patent infringement suit and then filed a state court trade secret action which used confidential material from the protective order as the basis for its claims. This Court found that the plaintiff's actions violated the protective order because the purpose of the provision was to "limit the use of confidential information to this case. By using such information to file a separate lawsuit in another forum, plaintiff violated the plain terms of the [p]rotective [o]rder." *Lodgenet,* 976 F.Supp. at 922. Applying the reasoning of *Lodgenet* to 3Com's motion, the Court finds that Conexant has not complied with the literal terms of the state court order. Conexant has obtained confidential information from a trade secret action between Townshend and Conexant and has used this information in a federal forum to assert an antitrust counterclaim against 3Com. The protective order in the state action expressly provided that confidential information would be used "solely in connection with *this* litigation." *See* 3Com Reply, Ex. H, Stipulated Protective Order at ¶¶ 3, 4 (emphasis added). The protective order was entered into

between the parties as plaintiff and defendant in Case No. 402639 in the San Mateo Superior Court. Pursuant to *Lodgenet,* the state court protective order does not extend to the use of confidential information in the federal action.

*18 In addition, the state protective order provided that "within sixty days after receiving notice of the entry of an order, judgment or decree finally disposing of this action, including any appeals therefrom, all persons having received information designated as "Confidential" or "Highly ConfidentialAttorney's Eyes Only" hereunder shall return such material and all copies thereof to counsel for the producing party, or shall certify destruction thereof." *See id.* at ¶ 25. The state action was voluntarily dismissed by Townshend on January 27, 1999. In a letter to 3Com dated July 19, 1999, counsel for Conexant stated its intent not to return any confidential 3Com materials. *See* 3Com Reply, Ex. H. Because Conexant did not return confidential information to 3Com or certify destruction of this information within the time limitations set forth in the state court protective order, Conexant has technically violated the provision of this protective order regarding the return or destruction of information designated as "Confidential" or "Highly Confidential." However, the Court acknowledges that this technical violation is mooted by the fact that prior to the date required by the state court order for the return or destruction of this information, 3Com authorized the use of this information in the federal action. *See infra.*

The next issue before the Court is whether Conexant's non-compliance with the provisions of the state court protective order provides a basis for striking Paragraphs 86, 87, and 99 from Conexant's answer.

The record reflects that after the federal action was filed, counsel for Conexant contacted counsel for 3Com for its position on the use of Confidential and Highly Confidential information produced by 3Com in the trade secret action. 3Com responded to this inquiry on March 1, 1999 by indicating that it was not opposed to Conexant's use of documents produced by 3Com in response to subpoenas issuing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 16

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

out of the trade secret action, "provided that an identical Protective Order is entered" in the federal action. Lawrence Decl., Ex. 4.

On March 26, 1999, Magistrate Judge Zimmerman approved an interim protective order for this action. The interim protective order adopted the state court protective order in its entirety and provided that the parties could "use in this lawsuit any discovery ....from the State Action as if the discovery had been provided in this lawsuit." Stipulation and Order Re: Entry of Protective Order and Cross Use of State Court Discovery ¶ 3 (Docket 18-1).

3Com does not dispute that it advised Conexant that it had no objection to the use of confidential information in the federal action provided that an identical protective order was entered. 3Com also does not dispute that the interim federal protective order is identical to the state court order. Instead, 3Com objects to the federal protective order on the grounds that it did not consent to this order and was not given notice or an opportunity to be heard.

*19 The Court finds that 3Com's objections regarding lack of consent, notice, and opportunity to be heard do not warrant a motion to strike. Conexant sought and obtained 3Com's position with respect to the use of confidential information in the federal action prior to any such disclosures being made. Further, Conexant entered into a federal protective order which fully accommodated 3Com's stated position. Finally, Conexant has complied with the terms of the federal protective order in the use of confidential information obtained by 3Com.

Under the terms of the federal protective order, the parties were permitted to use discovery obtained in the state court action. Conexant's statement of its intent to use confidential information obtained by 3Com and its allegations based upon this information are consistent with the terms of the federal protective order.

Although the Court finds that Conexant has not complied with the literal terms of the state court order, the Court further finds that Conexant acted appropriately and that the statements by 3Com and

the subsequent actions taken by Conexant with respect to the federal protective order are compelling and adequately address 3Com's position regarding the use of confidential information in this action. The Court DENIES 3Com's motion to strike.

*CONCLUSION*

Townshend's request for judicial notice is GRANTED.

3Com and Townshend's motion to dismiss Conexant's first counterclaim alleging conspiracy to restrain trade is GRANTED WITH PREJUDICE.

3Com and Townshend's motion to dismiss Conexant's counterclaim alleging attempted monopolization and conspiracy to monopolize is GRANTED WITH PREJUDICE.

3Com and Townshend's motion to dismiss Conexant's counterclaim asserting a state law claim for unfair competition is GRANTED WITH PREJUDICE.

Townshend's motion to dismiss Conexant's counterclaim asserting inequitable conduct is GRANTED WITH LEAVE TO AMEND. Townshend's motion to strike Conexant's affirmative defense of inequitable conduct is GRANTED WITH LEAVE TO AMEND.

Townshend's motion to dismiss Conexant's counterclaim for patent misuse is GRANTED WITH PREJUDICE. Townshend's motion to strike Conexant's sixth affirmative defense of patent misuse is GRANTED WITH PREJUDICE.

3Com's motion to strike Paragraphs 86, 87, and 99 is DENIED.

Conexant shall submit an amended answer within twenty (20) days of the date of this order.

This matter is set for a telephonic case management conference on Thursday, May 4, 2000 at 3:00 p.m.

Plaintiff shall initiate the conference by calling chambers at (510) 637-3559. At least ten (10) days

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 17

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

**(Cite as: 2000 WL 433505 (N.D.Cal.))**

prior to the conference, the parties shall submit a case management conference statement. Failure to timely file such a statement may result in sanctions.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2000 WL 433505 (N.D.Cal.), 2000-1 Trade Cases P 72,890, 55 U.S.P.Q.2d 1011

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT T


negligence, negligent infliction of emotional distress and intentional infliction of emotional distress is two years. _42 Pa. Cons.Stat. § 5524(2), (7)_. Accordingly, the plaintiff may not base her claim upon incidents which occurred before February 28, 2003, two years prior to February 28, 2005, the day she filed the initial complaint. The tortious conduct alleged in the complaint and the amended complaint occurred, at the latest, in the fall of 2001, and as such, this conduct is time barred from serving as the basis of the plaintiff's amended complaint. Amended Compl. ¶ 18. In an attempt to save her tort claims with regard to events occurring in 2001, the plaintiff argues that she alleged ongoing tortious conduct in the amended complaint. Pl.'s Mem. in Opp'n. of Mot. to Dismiss, 18-20. Therefore, she believes that the continuing tort doctrine should apply to extend the accrual date of the statute of limitations. _Id_.

The continuing violation theory, which deems a complaint timely if any act which constitutes part of the continuing violation took place within the statute of limitations, is only appropriate where the alleged conduct constitutes a continuous pattern and is durational in nature. _See AMTRAK v. Morgan, 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)_ (holding that since a hostile work environment claim is comprised of a series of separate acts that collectively constitute one unlawful employment practice, a claim is timely if filed when any of the acts constituting the unlawful practice occurred within the statutory period); _Fowkes v. Pennsylvania R.R. Co., 264 F.2d 397 (3d Cir.1959)_ (finding plaintiff's arthritis was attributable to numerous small jolts and that the statute of limitations didn't run until he knew of the arthritis and that it was caused by the jolting); _Malone v. Specialty Prods. & Insulation Co., 85 F.Supp.2d 503, 505 (E.D.Pa.2000)_ (holding that defendant's failure to respond to repeated requests to accommodate plaintiff's disability constituted a continuing violation).

However, the continuing violation theory does not apply when the conduct in question consists of unrelated, isolated incidents. The Supreme Court has explained that "discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful

employment practice," ' and the continuing violation theory does not apply. _Morgan, 536 U.S. at 114_.

Cook's allegations that the defendants acted negligently or intentionally by breaching their duties in the manner in which they "monitored, measured, evaluated, promoted, demoted, assigned, transferred, and/or ultimately failed to re-assign the plaintiff" all relate to plaintiff's claims based on a failure to promote or denial of transfer in 2001. Amended Compl. ¶ 80. These are discrete discriminatory acts, not the type of acts that constitute a continuing violation, and may not be the basis of extending the accrual date of the statute of limitations. Discrete discriminatory acts "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." _Morgan, 536 U.S. at 113_. Hence, the continuing violation theory does not apply and any events that occurred prior to February 28, 2003 cannot be the basis of the state law tort claims.

**\*9** Citing _Bethel v. Jendenco Construction Co.,_ the plaintiff contends that a motion to dismiss should not be granted when the complaint alleges a "continuing tort" that would operate to toll the statute of limitations. _570 F.2d 1168 (3d Cir.1978)_. In _Bethel,_ the Third Circuit stated:

> Under _Fed.R.Civ.P. 8(c)_, the statute of limitations constitutes an affirmative defense to an action. Under the law of this and other circuits, however, the limitations defense may be raised on a motion under _Rule 12(b)(6)_, but only if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations. If the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under _Rule 12(b)(6)_.

_570 F.2d at 1174_ (citations and quotations omitted). The court went on to find that to survive a motion to dismiss it was sufficient that in various paragraphs of the plaintiff's complaint he stated "that the defendants' discriminatory acts continue 'to the present." ' _Id._

The instant case is distinguishable from _Bethel,_ because here the amended complaint does not allege a continuing tort. Unlike the plaintiff in _Bethel,_ Cook does not claim in the amended complaint that the defendants' negligence, negligent infliction of emotional distress, or intentional infliction of emotional distress continues to the present, or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2005 WL 3021101 (E.D.Pa.)
**(Cite as: 2005 WL 3021101 (E.D.Pa.))**

Page 9

even that any tortious act occurred within the two years prior to filing suit. [FN15] The times of the events specifically alleged in the amended complaint operate to bar the plaintiff's claims. The only facts the plaintiff supplies in support of her tort claims all relate to events that occurred, at the latest, in the fall of 2001. Amended Compl. ¶¶ 13-18. Though the amended complaint alleges that the plaintiff is presently employed by the defendants, there is nothing in the amended complaint that alleges a tort occurred sometime after February 28, 2003 or that her tort claims are based on anything other than discrete discriminatory acts in 2001. Thus, it is apparent on the face of the amended complaint that the plaintiff's state law tort claims are time barred and do not survive a motion to dismiss.

> FN15. The plaintiff alleges in her response that the defendants have acted in a negligent manner from 2001 through to the present. Pl.'s Mem. In Opp'n. of Mot. to Dismiss, 18. However, in considering a motion to dismiss, a court may only consider the pleadings; a court "may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997). Therefore, the plaintiff's allegation of ongoing tortious conduct in her brief is immaterial to the present discussion.

Because the plaintiff's state law tort claims are barred by the statute of limitations and are not saved under a continuing violations theory, Counts VIII, IX, and X of the amended complaint will be dismissed. [FN16]

> FN16. Because I find the plaintiff's state law tort claims are time barred, I do not address the preemption and failure to allege sufficiently outrageous conduct arguments made by the defendants. However, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir.1988). To be liable, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency,

and to be regarded as atrocious, and utterly intolerable in a civilized society." ' *Hoy v. Angelone*, 554 Pa. 134, 151, 720 A.2d 745 (Pa.1998). Given that Cook's claim for intentional infliction of emotional distress is premised on the events which are the basis of her claims for racial discrimination and retaliation, it is unclear how these acts would rise to the requisite level of outrageousness.

### E. Breach of Contract Claim (Count VII)

In Count VII the plaintiff alleges that the defendants promised to "employ the Plaintiff on a continuing and permanent basis, to train and evaluate the Plaintiff, and to make available to the Plaintiff, such continuing job opportunities, promotions and progressions in the Amtrak system as would be ordinarily available to other senior, long-term employees." Amended Compl. ¶ 71. The plaintiff alleges that the defendants breached this promise and bases her claim on theories of "express and implied contract, quasi-contract, quantum meruit, and promissory estoppel." *Id.* at ¶ 75. The defendants argue that Count VII fails to state a claim because the plaintiff was an at-will employee under Pennsylvania law. Def. Mem. Supp. Mot. to Dismiss 18-20. The plaintiff argues that even if Amtrak is classified as an at-will employer, this does not prevent the plaintiff from alleging a claim for breach of contract. Pl.'s Mem. in Opp'n. of Mot. to Dismiss, 22-23.

### 1. Breach of Express or Implied Contract

**\*10** To state a claim for breach of contract, a plaintiff must show that (1) a contract existed; (2) there was a breach of a duty imposed by the contract; and (3) damages. *Cooper v. Broadspire Servs., Inc.*, 2005 U.S. Dist. LEXIS 14752, at *6 (E.D.Pa. Jul. 20, 2005). "In Pennsylvania, there is a very strong presumption of at-will employment relationships and the level of proof required to overcome this presumption is arduous." *Violanti v. Emery Worldwide*, 847 F.Supp. 1251, 1258 (M.D.Pa.1994), *Buckwalter v. ICI Explosives USA, Inc.*, 1998 U.S. Dist. LEXIS 276, at *13 (E.D.Pa. Jan. 8, 1998) citing *Geary v. U.S. Steel Corp.*, 456 Pa. 171, 319 A.2d 174, 176 (Pa.1974). Employment at-will is a common law doctrine that defines the employer-employee

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                    Page 10
Slip Copy, 2005 WL 3021101 (E.D.Pa.)
**(Cite as: 2005 WL 3021101 (E.D.Pa.))**

relationship, and it permits the employer wide latitude in deciding how to conduct business. *See Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 658 (3d Cir.1990). In the absence of a contract to govern the employment relationship, an employee is considered an employee at-will. *Id.* at 659.

A plaintiff must provide clear evidence to show that the employment relationship was contractual to rebut the presumption of at-will employment. *Cooper,* 2005 U.S. Dist. LEXIS 14752, at *7. The presumption in favor of employment at-will may be overcome by showing the existence of an express contract or an implied in fact contract. *Dugan v. Bell Tel.,* 876 F.Supp. 713, 726 (W.D.Pa.1994); *see also Scott* 545 A.2d at 338-9. However, under Pennsylvania law, promises of permanent and lifetime employment are too vague to create a contract and the employment relationship is presumed to be at-will. *See Seiss v. McClintic-Marshall Corp.,* 324 Pa. 201, 188 A. 109, 109-10 (Pa.1936) (finding employer's promise to provide "suitable employment ... for life" too vague to be the basis of an enforceable contract); *Scott v. Extracorporeal, Inc.,* 376 Pa.Super. 90, 545 A.2d 334, 336-37 (Pa.Super.1988) (promise of "a permanent job" with overtime did not rebut the presumption of at-will employment).

"An implied in fact contract exists if 'additional consideration' passes from the employee to the employer from which the Court can infer that the parties did not intend to establish an at-will employment relationship." *Dugan* 876 F.Supp. at 726. This additional consideration only exists when an employee gives his employer a benefit or undergoes a substantial hardship, other than the services the employee is hired to perform. *Scott,* 545 A.2d at 339.

Here, the plaintiff alleges nothing to overcome the presumption that she is an at-will employee. Cook alleges that in exchange for the plaintiff's agreement to perform her regular job duties, the defendants agreed to permanently employ, train, evaluate, and promote the plaintiff. Amended Compl. ¶¶ 70-71. Though it would be quite unusual for any employer to make such a permanent commitment, even if these defendants did, this promise is too vague under Pennsylvania law to create an employment contract. *See Murray v. Commercial Union Ins. Co.,* 782 F.2d 432, 435

(3d Cir.1986) (finding assurances of a "future and lifetime career" did not create a contract). Cook does not claim that she gave any additional consideration besides her normal employment services to Amtrak which could be the basis of an implied in fact contract. A "[p]laintiff's bare allegation that her employment relationship [is] contractual in her response to defendants' motion to dismiss is insufficient to rebut the presumption of at-will employment." *Cooper,* 2005 U.S. Dist. LEXIS 14752, at *7. Therefore, the amended complaint does not allege the existence of a contract that would serve to remove the presumption of employment at will, and could therefore be the basis of a breach of contract claim.

*11 Assuming arguendo that an at-will employment relationship exists, Cook argues that she may still allege a claim for breach of contract. The two cases the plaintiff cites, *Sullivan v. Chartwell Investment Partners, L.P.,* 873 A.2d 710 (Pa.Super.Ct.2005) and *Carlson v. Community Ambulance Services, Inc.,* 824 A.2d 1228 (Pa.Super.Ct.2003), do not support her argument.

In *Sullivan,* an at-will employee asserted breach of contract claims predicated on two express agreements--a Compensation Agreement and a Severance Agreement. A.2d at 714-5. The court held that when a plaintiff pleads sufficient facts to establish the existence of an express agreement, the plaintiff's "status as an at-will employee is irrelevant to whether a contract existed to provide compensation during the term of his employment." *Id.* at 717. In this case, Cook does not allege the existence of an express contract between herself and the defendants.

In *Carlson v. Community Ambulance Services, Inc.,* 824 A.2d 1228 (Pa.Super.Ct.2003), the plaintiff argued on appeal that she was an at-will employee who was entitled to relief because she was constructively discharged, in violation of public policy. The court stated that the "at-will employment doctrine can be the basis of relief only where an employer expressly or constructively discharges an employee." *Id.* at 1232. However, it is clear from the surrounding language that the court was referring to when a plaintiff may bring a claim for constructive discharge, under "the public policy exception to the at-will employment doctrine." *Id. at 1232.* The plaintiff may not manipulate bits

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                          Page 11
Slip Copy, 2005 WL 3021101 (E.D.Pa.)
(Cite as: 2005 WL 3021101 (E.D.Pa.))

of language from an opinion to support her argument that the at-will doctrine does not apply to cases where the employee is not discharged. Pl.'s Mem. In Opp'n. of Mot. to Dismiss, 23. Here, it is not only the characterization of Cook's employment as "at-will" that prevents her claim for breach of contract. Cook's failure to adequately allege the existence of a contract in the amended complaint, which could be the basis for relief, is also what prevents recovery on her breach of contract claim.

*2. Quantum Meruit*

Count VII fails to state a claim under quantum meruit. Quantum meruit is a cause of action in quasi-contract designed to give restitution to a person who is unjustly enriched at the expense of another. *Mill Run Assocs. v. Locke Prop. Co., 282 F.Supp.2d 278, 292 (E.D.Pa.2003); Mitchell v. Moore, 729 A.2d 1200, 1202 n. 2 (Pa.Super.Ct.1999).* To recover under quantum meruit, a claimant must show that the defendant either wrongfully secured or passively received a benefit that would be unconscionable for the defendant to retain without compensating the provider. *Green Stripe, Inc. v. Berny's Internationale, 159 F.Supp.2d 51, 56 (E.D.Pa.2001); Halstead v. Motorcycle Safety Found., Inc., 71 F.Supp.2d 455, 459 (E.D.Pa.1999); Mitchell, 729 A.2d at 1203.* Here, the plaintiff claims that she performs "her job duties in a regular, timely, prompt, and efficient manner." Amended Compl. ¶ 70. These are responsibilities she was hired to perform and in exchange the plaintiff receives salary and continued employment with Amtrak. There is nothing in the amended complaint that suggests that the plaintiff performed any services, beyond her normal employment duties, for Amtrak in exchange for which it could be found to have unjustly reaped a benefit as a consequence of the plaintiff's actions.

*3. Promissory Estoppel*

**\*12** Count VII also fails to state a claim under the doctrine of promissory estoppel. This doctrine permits courts to enforce promises that are unsupported by consideration in order to remedy the injustice that results when a reasonable promisee detrimentally relies upon some promise by a promisor, which is then broken. *Lyon Fin. Servs. v.*

*Woodlake Imaging, LLC,* No. 04-3334, 2005 U.S. Dist. LEXIS 2011, at * 23 (E.D.Pa. Feb. 9, 2005). A broad and vague implied promise is insufficient to serve as a "promise" able to support a claim of promissory estoppel. *C & K Petroleum Prods., Inc. v. Equibank, 839 F.2d 188, 192 (3d Cir.1988).*

Pennsylvania does not recognize a cause of action for promissory estoppel as an exception to the employment-at-will doctrine. *See Dugan v. Bell Tel., 876 F.Supp. 713, 727 (W.D.Pa.1994)* (dismissing claim that the plaintiff relied to his detriment on defendants' alleged promises and policy not to engage in retaliatory discharges); *Anderson v. Haverford College, 851 F.Supp. 179, 183 (E.D.Pa.1994)* (dismissing promissory estoppel claim where the plaintiff did not adequately allege an express or implied contract, citing *Paul v. Lankenau Hosp., 524 Pa. 90, 569 A.2d 346, 348 (Pa.1990)).* The Pennsylvania Supreme Court reasoned that allowing an employee to claim equitable estoppel in cases where the law declares that no implied contract exists would undercut the at-will employment doctrine. *Paul, 569 A.2d at 348.*

Even viewing the facts most favorably to the plaintiff, it is clear that Count VII does not state a claim for promissory estoppel. Not only does the amended complaint fail to allege a definite enough promise that can serve as a basis for promissory estoppel, but Pennsylvania law also does not recognize a claim for promissory estoppel once it has been established that there is no employment contract.

Cook has failed to state a claim under the theories of express or implied contract, quantum meruit, or promissory estoppel. Therefore, Count VII will be dismissed.

*F. Claims Against Defendant David L. Gunn*

The defendants ask the court to dismiss all claims asserted against David L. Gunn. Def. Mem. Supp. Mot. to Dismiss 20. The plaintiff agrees that there is no need to sue Gunn personally and that she does not oppose the dismissal of Gunn if such dismissal will not prejudice the plaintiff. Pl.'s Mem. In Opp'n. of Mot. to Dismiss, 24-25.

To the extent that the plaintiff's claims under Title VII and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                Page 12
Slip Copy, 2005 WL 3021101 (E.D.Pa.)
**(Cite as: 2005 WL 3021101 (E.D.Pa.))**

PHRA are still viable, Gunn is not a proper defendant. Title VII provides, that it is an "an unlawful employment practice for an employer" to discriminate against an individual with respect to his employment. 42 U.S.C. § 2000e-2(a). The statute defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees." Id. § 2000e(b). Thus, individual employees may not be held liable under Title VII, because an individual is not an "employer" within the meaning of the statute. *Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir.2002); *Tai Van Le v. Univ. of Pa.*, 321 F.3d 403, 409 (3d Cir.2003); *Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1077 (3d Cir.1996). Thus, Gunn is not a proper defendant to a Title VII action.

*13 Like Title VII, Section 955 of the PHRA establishes direct liability solely for employers. *See Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir.1996). However, the PHRA does permit accomplice liability for individual employees who "aid, abet, incite, compel, or coerce" a Section 955(a) violation by their employer. *See* 43 Pa. Cons.Stat. § 955(e). Cook has failed to allege any facts that show Gunn acted to aid or abet Amtrak's alleged discriminatory practices, which could support a claim of accomplice liability. The defendant's motion to dismiss defendant David L. Gunn from the plaintiff's claims under Title VII and PHRA will be granted.

With respect to the plaintiff's claims under Section 1981, the defendant's motion to dismiss Gunn will be granted. To establish a right to relief under Section 1981, a plaintiff must show (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in Section 1981, including the right to make and enforce contracts. *Pryor v. NCAA*, 288 F.3d 548, 569 (3d Cir.2002). The amended complaint fails to allege any discriminatory activity on the part of Gunn. Therefore, the plaintiff has failed to state a claim against Gunn.

Because Counts III, IV, VII, VIII, IX, and X are dismissed as to all defendants, it is unnecessary to address their application to Gunn solely. Additionally, it is important to note that the plaintiff agrees that there is no need to maintain Gunn as a co-defendant, if it will not jeopardize

her claims against Amtrak. Pl.'s Mem. In Opp'n. of Mot. to Dismiss, 23-4. Here, it is not necessary for Cook to sue Gunn on her remaining viable claims under Title VII, PHRA, and Section 1981, in order for her to assert these claims against Amtrak.

Therefore, the plaintiff's claims against David L. Gunn will be dismissed and he will be dismissed as a party to this action.

IV. CONCLUSION

The defendants' motion to dismiss will be granted in part and denied in part. Cook's Section 1983 racial discrimination claims are based on actions that occurred prior to February 28, 2003. These claims are barred by the two-year statute of limitations, and therefore Count III and this portion of Count I will be dismissed.

The defendants' motion to dismiss the plaintiff's failure to promote claim under Section 1981 in Count II will be denied. At this time there is insufficient information to determine whether the plaintiff's claim is barred by the statute of limitations.

The plaintiff has stated a claim for retaliation, under Title VII. Therefore, the defendants' motion to dismiss Count V will be denied. In contrast, the plaintiff has failed to state a claim under Title VII and the PHRA that Amtrak has a policy and practice of discrimination, making dismissal of Count IV and this portion of Counts I and VI appropriate.

The defendants' motion to dismiss the plaintiff's Count VII will be granted because the plaintiff has failed to state a claim under state contract law. Cook fails to allege facts to show that an express or an implied contract existed, that she performed any services which could have unjustly enriched the defendants, or that the plaintiff detrimentally relied upon a reasonable promise.

*14 The defendants' motion to dismiss the plaintiff's state law tort claims will be granted. These claims are barred by the two-year statute of limitations, and therefore Counts VIII, IX, and X will be dismissed.

The defendants' motion to dismiss defendant David L. Gunn

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                              Page 13
Slip Copy, 2005 WL 3021101 (E.D.Pa.)
**(Cite as: 2005 WL 3021101 (E.D.Pa.))**

will be granted. An appropriate order follows.

Order

And now, this _____ day of November 2005, upon consideration of the motion of defendants National Railroad Passenger Corporation (Amtrak) and Mr. David L. Gunn to dismiss plaintiff's amended complaint for failure to state a claim upon which relief can be granted, filed pursuant to Fed.R.Civ.P. 12(b)(6), (Doc # 9) plaintiffs' response, and defendant's reply, it is hereby ORDERED that the defendants' motion is GRANTED in part and DENIED in part, as follows:

(1) Defendants' motion to dismiss plaintiff's claims of policy and practice discrimination under Title VII and the PHRA is GRANTED and Count IV and these parts of Count I and VI are DISMISSED.

(2) Defendants' motion to dismiss plaintiff's claims of retaliation under Title VII in Count V is DENIED.

(3) Defendants' motion to dismiss plaintiff's claims for racial discrimination under 42 U.S.C. § 1983 is GRANTED and Count III and this portion of Count I are DISMISSED.

(4) Defendants' motion to dismiss plaintiff's claims under 42 U.S.C. § 1981 in Count II is DENIED.

(5) Defendants' motion to dismiss plaintiff's state law contract claim is GRANTED and Count VII is DISMISSED.

(6) Defendants' motion to dismiss plaintiff's state law tort claims for negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress is GRANTED and Counts VIII, IX, and X are DISMISSED.

(7) Defendants' motion to dismiss all claims asserted against Defendant David L. Gunn is GRANTED and David L. Gunn is DISMISSED as a party to this action.

Slip Copy, 2005 WL 3021101 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2849387 (Trial Motion, Memorandum and

Affidavit) Reply Brief in Further Support of Motion of Defendants National Railroad Passenger Corporation and David L. Gunn to Dismiss Plaintiff's Amended Complaint (Sep. 09, 2005)

• 2005 WL 2684826 (Trial Motion, Memorandum and Affidavit) Defendants Memorandum of Law in Opposition to Plaintiff'S Motion for Reconsideration, to Amend Judgment And/Or for Relief from Judgment (Aug. 24, 2005)

• 2005 WL 2684823 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint (Aug. 05, 2005)

• 2005 WL 2684825 (Trial Motion, Memorandum and Affidavit) Motion for Reconsideration, to Amend Judgment And/Or for Relief from Judgment (Aug. 03, 2005)

• 2:05cv00880 (Docket) (Feb. 28, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT Q



Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2005 WL 1514225 (E.D.Pa.)
**(Cite as: 2005 WL 1514225 (E.D.Pa.))**

𝕮

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

E.D. Pennsylvania.
SURYA SYSTEMS, INC. Plaintiff
v.
Satish Chandra SUNKU & Wipro Defendants
**No. Civ.A. 05-146.**
**United States District Court.**

June 24, 2005.

Brian M. Fleischer, Fleischer & Fleischer, Philadelphia, PA, for Plaintiff.

Jeffrey H. Quinn, Dickie, McCamey & Chilcote, PC, Philadelphia, PA, for Defendants.

Memorandum and Order
YOHN, J.

*1 Presently before the court is defendants' motion to dismiss the complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. Having carefully reviewed the complaint and considered the parties' briefs, I will grant the motion in part and deny it in part, for the reasons stated herein.

I. Factual Background and Procedural History

Plaintiff Surya Systems, Inc. ("Surya"), a Georgia corporation with offices in Bristol, Bucks County, Pennsylvania, is in the business of hiring computer software consultants and placing them with clients in positions of temporary employment. Defendant Satish Chandra Sunku ("Sunku") is a former Surya consultant who is now permanently employed in Idaho by defendant Wipro, Ltd. ("Wipro"). [FN1] On November 1, 2003, Sunku entered into a non-compete and non-disclosure agreement with Surya. The agreement contains the following non-compete clause:

> FN1. The complaint does not identify Wipro's state of incorporation, but avers that Wipro has a place

of business in Mountain View, California, in addition to the facility in Idaho where Sunku is employed.

In the event of any termination of Consultant's employment, for any reason whatsoever, the Consultant shall not a period of one (1) year from the date of such termination, directly or indirectly, provide service to any Client or any of its subsidiaries or affiliates, whether for compensation or otherwise, where consultant previously provided services to the Client on behalf of the Company. Complaint, Exhibit A at ¶ 2.

In addition, the agreement contains a non-disclosure clause that incorporates a promise of non-solicitation aimed at protecting Surya's proprietary information:

> Therefore, the Consultant agrees that for a period of one (1) year following employment termination (whether voluntary or involuntary and with or without cause), he/she shall not solicit, divert or initiate any contact with (or attempt to solicit, divert or initiate any contact with) any customer, Client, independent contractor or employee of the Company for any commercial or business reason whatsoever.

*Id.* at ¶ 5.

The agreement also contains a liquidated damages clause, pursuant to which Sunku would be required to pay Surya a sum equal to thirty-five percent of his salary in the event that he were to breach the agreement. *See id.* at ¶ 3.

During the time that Sunku worked as a consultant for Surya, he was placed with Surya's California client Global Infotech, which is itself a provider of temporary staffing. Global Infotech, in turn, placed Sunku as a consultant with its client Wipro. After Sunku's contract placement with Wipro expired, Wipro offered him permanent employment, which he accepted. [FN2] Subsequent to Wipro's hiring Sunku, Surya contacted Wipro to discuss the non-compete and non-disclosure agreement, of which Wipro allegedly already knew. Wipro refused to terminate Sunku's employment, despite Surya's position that termination would be the appropriate remedy under the circumstances.

> FN2. The complaint is silent concerning the dates



Not Reported in F.Supp.2d                                                                                        Page 2
Not Reported in F.Supp.2d, 2005 WL 1514225 (E.D.Pa.)
**(Cite as: 2005 WL 1514225 (E.D.Pa.))**

of Sunku's employment with Surya and the duration of his consulting work for Global Infotech. It is also silent concerning the date on which Sunku accepted employment with Wipro. Because defendants have not alleged that Sunku's dates of employment are in any way dispositive of the legal issues presented in this motion, I will assume for purposes of deciding the motion that Sunku was still bound by the terms of the non-compete with Surya when he accepted permanent employment with Wipro.

On January 12, 2005, plaintiff filed suit in this court against Sunku and Wipro for breach of contract, tortious interference with a contract, and *quantum meruit.* Plaintiff alleges that Sunku's acceptance of employment with Wipro constituted a breach of the non-compete and non-disclosure agreement by both defendants; that Wipro's employment of Sunku constituted tortious interference with the agreement by both defendants; and that both defendants have become unjustly enriched by their wrongful conduct, at plaintiff's expense. Defendants then filed the instant motion to dismiss, which has now been fully briefed.

**II. Discussion**

**\*2** The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the complaint. *Johnsrud v. Carter,* 620 F.2d 29, 33 (3d Cir.1980) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In deciding a motion to dismiss under Rule 12(b)(6), the court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant." *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994) (citing *Rocks v. Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989)). Dismissal of the complaint is not appropriate unless it "is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Jordan,* 20 F.3d at 1261.

Because the agreement at issue in this case contains a choice of law clause in favor of Pennsylvania law, and because

neither party disputes that the clause is applicable, I will decide the motion based on Pennsylvania substantive contract law.

**A. Breach of Contract Claim**

To satisfy its burden of pleading in a breach of contract claim, plaintiff must, at a minimum, plead facts establishing (1) the existence of a contract, including its essential terms; (2) a breach of contract; and (3) resultant damages. *J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.,* 792 A.2d 1269, 1272 (Pa.Super.2002). The complaint brings a count for breach of contract against both Sunku and Wipro.

Defendants are correct to assert that plaintiff's breach of contract claim cannot lie against Wipro. Wipro was not a party to Surya's agreement with Sunku, and only a party to a contract can be charged with its breach. *See Mid-Continent Ins. Co. v. Packel,* No. 00-3239, 2001 U.S. Dist. LEXIS 24204, at \*7-8 (E.D.Pa. October 25, 2001) (invoking the general rule that no person can be sued for breach of contract unless he is a party to the contract). Plaintiff's breach of contract claim against Wipro must therefore be dismissed with prejudice.

Defendants argue that plaintiff has also failed to state a claim for breach of contract against Sunku. They maintain that the complaint is insufficient because it does not allege that Sunku accepted employment from or solicited the business of any Surya client. Plaintiff counters that Sunku's acceptance of employment with Wipro violated the agreement because the agreement prohibited Sunku from accepting employment with indirect as well as direct clients of Surya. [FN3]

> FN3. In the complaint, plaintiff specifically alleges only that Sunku breached the non-solicitation component of the non-disclosure clause, the substance of which plaintiff misrepresents. *See* Complaint at ¶ 9. The non-disclosure clause prohibits "contact with (or attempt to solicit, divert or initiate any contact with) any customer, Client, independent contractor or employee of *the Company"* (i.e., Surya) for a period of one year following termination. *See* Complaint, Appendix A

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                 Page 3
Not Reported in F.Supp.2d, 2005 WL 1514225 (E.D.Pa.)
**(Cite as: 2005 WL 1514225 (E.D.Pa.))**

at ¶ 5 (emphasis added). The complaint, however, characterizes the prohibition on solicitation as one against contact with "any customer, client, independent contractor or employee of *the client"* for a period of one year. Complaint at ¶ 9 (emphasis added). In its brief in opposition to defendants' motion to dismiss, plaintiff cites (and again misquotes) the non-disclosure clause, but it relies, too, on language in the non-compete clause barring the consultant from "directly or indirectly, provid[ing] service to any Client" for a period of one year following the consultant's termination.

Although the complaint is rather cursory in its allegations, plaintiff has met its burden on the breach of contract claim against Sunku. Surya has established the first element of a prima facie claim by alleging that Sunku and Surya entered into a valid non-compete and non-disclosure agreement, a complete copy of which is incorporated into the complaint. Surya has established the second element of a prima facie breach of contract claim by alleging that Sunku breached the terms of the agreement when he accepted permanent employment with Wipro. Because the non-compete clause bars the consultant from "directly or indirectly provid[ing] services to any client," and because Sunku's acceptance of employment with Wipro could be construed to constitute the indirect provision of services to Surya's client Global Infotech, Surya has sufficiently pled the element of breach with respect to the non-compete clause in the agreement. [FN4] Finally, Surya has established the third element of a breach of contract claim by invoking the liquidated damages clause in the agreement, which provides that the consultant will pay thirty-five percent of his or her salary in the event of a breach, to compensate Surya for the loss of business with its client and for the cost of developing its relationship with its client. Whether plaintiff can eventually produce sufficient evidence to prove its breach of contract claim is, of course, a matter for another day.

> FN4. Insofar as Surya alleges that Sunku's acceptance of employment with Wipro constituted a breach of the non-solicitation component of the non-disclosure clause, Surya does not establish the element of breach, because the complaint does not

allege that Wipro is "a customer, client, independent contractor or employee of the Company" (i.e., Surya). In fact, the complaint alleges no direct relationship whatsoever, contractual or otherwise, between Surya and Wipro. Unlike the non-compete clause, which can be construed to reach third parties with which Surya has only an indirect business relationship, the non-disclosure clause unambiguously applies exclusively to third parties having a direct business relationship with Surya.

B. Intentional Interference Claim

*3 Pennsylvania has long recognized a cause of action for interference with an existing contractual relation. *See Total Care Systems, Inc. v. Coons,* 860 F.Supp. 236, 241 (E.D.Pa.1994). To state a claim of intentional interference with a contract, the plaintiff must plead facts sufficient to establish (1) the existence of a contractual relationship between the plaintiff and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification for the interference; and (4) damages. *See Crivelli v. General Motors Corp.,* 215 F.3d 386, 394 (3d Cir.2000) (citing *Strickland v. University of Scranton,* 700 A.2d 979, 985 (Pa.Super.1997)). The complaint brings claims of intentional interference against both Sunku and Wipro.

Defendants rightly assert that a tortious interference claim against Sunku cannot lie, because Sunku was a party to the contract in question and therefore cannot have been a third-party interloper. *See Center for Concept Dev., Ltd. v. Godfrey,* No. 97-7910, 1999 U.S. Dist. LEXIS 3337, at *6-7 (E.D.Pa. March 23, 1999) (citing the established principle that a party to a contract cannot tortiously interfere with its own contract). Plaintiff's tortious interference claim against Sunku must therefore be dismissed with prejudice.

Defendants argue that plaintiff's intentional interference claim against Wipro also must fail because "Surya has not alleged either the breach of a contract or the deprivation of any contractual benefit." Plaintiff argues that it has met its burden, because it has alleged that Sunku was bound by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2005 WL 1514225 (E.D.Pa.)
**(Cite as: 2005 WL 1514225 (E.D.Pa.))**

non-compete and non-disclosure agreement when he accepted employment with Wipro, that Wipro knew of the existence of the agreement when it offered Sunku employment, and that Wipro knowingly acted in contravention of the agreement-to Surya's detriment-by hiring Sunku.

Plaintiff has met its burden at this stage with respect to its intentional interference claim against Wipro. Plaintiff has alleged the existence of an agreement between it and Sunku. It has alleged that Wipro extended an offer of employment to Sunku notwithstanding Wipro's knowledge that Sunku was bound by the agreement. It has alleged that Wipro refused to act when directly accused of interfering with the agreement. And it has alleged that it lost profits as a result of the interference. These facts satisfy the elements of the cause of action and are sufficient to defeat defendants' motion to dismiss.

C. *Quantum Meruit* Claim

To establish a claim for *quantum meruit* or unjust enrichment, a plaintiff must plead facts showing (1) the existence of a benefit conferred on the defendant by the plaintiff; (2) appreciation of the benefit by the defendant; and (3) acceptance and retention of the benefit under circumstances that create an inequity. *J.F. Walker Co., Inc., 792 A.2d at 1273.* The complaint brings claims for *quantum meruit* against both Sunku and Wipro.

**\*4** Defendants are correct to assert that plaintiff cannot state a claim for unjust enrichment against Sunku. Sunku is a party to the agreement with Surya, and a claim for *quantum meruit* is inapplicable when the parties' relationship is founded on an express contract. *See Benefit Trust Life Ins. Co. v. Union Nat'l Bank, 776 F.2d 1174, 1177 (3d Cir.1985)* (citing Pennsylvania cases holding that the existence of the right to recover on the promise precludes a claim of unjust enrichment). Plaintiff's unjust enrichment claim against Sunku must therefore be dismissed with prejudice.

Defendants argue that plaintiff has also failed to state a claim for unjust enrichment against Wipro, because plaintiff has not alleged that it provided services directly to Wipro. Such an allegation is not necessary, however, to sustain

plaintiff's claim. To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for the party to retain. *Torchia v. Torchia, 346 Pa.Super. 229, 499 A.2d 581, 582 (Pa.Super.1985).* Surya argues that, by hiring Sunku permanently, Wipro unfairly received the benefit of Surya's substantial investment in the development of its network of skilled software consultants, of whom Sunku was one-presumably until he was hired away by Wipro. Surya maintains that it would be inequitable for Wipro to reap the benefits of Surya's cultivation of Sunku without compensating it for those benefits. Having alleged the required elements of the cause of action, Surya has stated a valid claim of unjust enrichment against Wipro, at least for purposes of a motion to dismiss.

Order

AND NOW, this _____ day of June, 2005, upon consideration of defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted and plaintiff's brief in opposition to defendants' motion, it is hereby ORDERED that the motion is GRANTED as to Count I (breach of contract) against Wipro.; Count II (tortious interference) against Sunku; and Count III (unjust enrichment) against Sunku. The motion is DENIED as to Count I (breach of contract) against Sunku; Count II (tortious interference) against Wipro; and Count III (unjust enrichment) against Wipro.

Not Reported in F.Supp.2d, 2005 WL 1514225 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 245904 (Trial Pleading) Complaint (Jan. 01, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT R



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1076043 (D.N.J.)
**(Cite as: 2005 WL 1076043 (D.N.J.))**

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
SYNCSORT INCORPORATED, Plaintiff,
v.
INNOVATIVE ROUTINES INTERNATIONAL, INC.,
Defendant.
**No. Civ. 04-3623(WHW).**

May 6, 2005.

Ronald Abramson, Jersey City, NJ, for Plaintiff.

Sherry D. Williams, Newark, NJ, for Defendant.

OPINION

WALLS, J.

*1 Plaintiff moves to dismiss Counts I, IV, V and VI of defendant's Counterclaim. This motion is decided without oral argument pursuant to Fed.R.Civ.P. 78.

FACTS AND PROCEDURAL BACKGROUND

This matter involves a dispute between two competitors, Syncsort Inc. and Innovative Routines International, Inc. Both parties develop and sell sorting software for computers that operate the UNIX operating system. Plaintiff produces and licenses a sorting software product called "SyncSort UNIX." Defendant markets a directly competing sorting product called "CoSORT."

On July 29, 2004, plaintiff filed a Complaint against defendant alleging claims for misappropriation of plaintiff's trade secrets, copyright infringement, breach of licensing agreement, false advertising, trademark infringement and dilution, and unfair competition. On August 27, 2004, defendant filed its Answer and Counterclaim of six counts. Count I alleges a violation of Section 2 of the Sherman Act. More specifically, defendant alleges that plaintiff is attempting to monopolize the sort software market for UNIX operating systems by engaging in predatory pricing, leveraging its monopoly position in the mainframe sort software market, and by instituting this lawsuit. Count II

alleges that plaintiff has engaged in false advertising through its publication of statements that represent that plaintiff's product is the fastest and the only sort product designed for high performance. Count III alleges that plaintiff has infringed on defendant's copyright in its CoSORT software and related documentary materials. Count IV states a claim for tortious interference with prospective economic advantage. Count V states a claim for tortious interference with contract. Count VI alleges unfair competition.

On September 20, 2004, plaintiff moved to dismiss Counts I, IV, V and VI of the Counterclaim.

STANDARD

*Standard for a Rule 12(b)(6) Motion to Dismiss*

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court is required to accept as true all allegations in the pleading and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. [FN1] *Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n. 7 (3d Cir.2002).* The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).*

> FN1. "Rule 12 standards are not altered when a movant seeks dismissal of a counterclaim--all allegations of the counterclaim are also accepted as true and are accorded the benefit of all reasonable inferences." *Syncsort Inc. v. Sequential Software, Inc., 50 F.Supp.2d 318, 322 n. 3 (D.N.J.1999).*

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. *Miree v. DeKalb County, Ga., 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977).* Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson, 355 U.S. 41,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2005 WL 1076043 (D.N.J.)
**(Cite as: 2005 WL 1076043 (D.N.J.))**

45- 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court may consider the allegations of the pleading, as well as documents attached to or specifically referenced in the pleading, and matters of public record. *Sentinel Trust Co. v. Universal Bonding Ins. Co.,* 316 F.3d 213, 216 (3d Cir.2003); *see also* 5B WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 at 299 (3d ed.1998).

**\*2** "A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' " *Mele v. Federal Reserve Bank of N.Y.,* 359 F.3d 251, 255 n. 5 (3d Cir.2004) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997)). "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Id.*

The Supreme Court has expressly stated that motions to dismiss under Rule 12(b)(6) should be granted "very sparingly" in antitrust cases. In *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746-47, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) the Court held: "[I]n antitrust cases, where the 'proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." (citing *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)).

DISCUSSION

*I. Count I*

Count I of defendant's Counterclaim states a cause of action for a violation of Section 2 of the Sherman Act. More specifically, defendant alleges an attempted monopolization claim. The Third Circuit has said that "to prevail on attempted monopolization claim under § 2 of the Sherman Act, 'a plaintiff must prove that the defendant (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power.' " *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 442 (3d Cir.1997) (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 890, 122 L.Ed.2d 247 (1993)). "In determining whether there exists a viable claim of

monopolization or attempted monopolization, an inquiry 'into the relevant product and geographic market' is required." *Syncsort Inc. v. Sequential Software, Inc.,* 50 F.Supp.2d 318, 327 (D.N.J.1999) (quoting *Spectrum Sports,* 506 U.S. at 459, 113 S.Ct. 884, 122 L.Ed.2d 247)). Thus, in addition to pleading facts that would support the elements enumerated above, a claimant also "must plead facts sufficient to demonstrate a viable relevant market." *Sequential Software,* 50 F.Supp.2d at 327 (citing *Queen City Pizza,* 124 F.3d at 436; *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.,* 113 F.3d 405, 415 (3d Cir.1997); *Brader v. Allegheny General Hospital,* 64 F.3d 869, 877 (3d Cir.1995)).

Plaintiff contends that defendant has insufficiently pled some of the necessary elements of an attempted monopolization claim. Plaintiff first charges that defendant's allegations concerning the relevant market are deficient. Next, plaintiff argues that defendant's allegations regarding anti-competitive conduct are insufficient. Third, plaintiff contends that defendant has failed to plead an antitrust injury. The Court will address these arguments in turn.

A. Relevant Market

**\*3** The Third Circuit has provided the following guidance in terms of defining the relevant product market:

The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

*Queen City Pizza,* 124 F.3d at 436 (citations omitted). Expanding on the meaning of "interchangeability," the Third Circuit said "[i]nterchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." *Id.* at 437. "When assessing reasonable interchangeability,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 1076043 (D.N.J.)
**(Cite as: 2005 WL 1076043 (D.N.J.))**

'[f]actors to be considered include price, use, and qualities."
' *Id.* (quoting *Tunis Brothers Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir.1992)*). The *Queen City Pizza* court also noted that cross-elasticity of demand between the product itself and the substitutes for it is an indicator of interchangeability. *Id.* Furthermore, "[a] market definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market." *Syncsort I, 50 F.Supp.2d at 331 n. 11* (quoting *SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1063 (3d Cir.),* cert. denied, *439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978)*).

Defendant alleges the following definition of the relevant product market: "The relevant product market is sort software for the UNIX operating systems. While there are sort programs available for other operating systems, they are not interchangeable with sort programs for the UNIX operating system. This is because consumer databases and related applications cannot be readily moved to non-UNIX platforms simply to leverage another sort product." (Countercl. at ¶ 8(a).) Plaintiff first argues that defendant's product definition fails to describe the products at issue, the nature of the market, or terms such as price, use and quality that would help the Court determine if there is any interchangeability. Plaintiff does not however, advance any legal support for the proposition that defendant must plead facts regarding the nature of the market and the products at issue to satisfy the requirements for pleading a relevant market definition. As for defendant's failure to plead facts about price, use and quality, the Court agrees with defendant that neither the Third Circuit nor the *Syncsort I* court intended that alleging these factors is the only way to adequately refer to interchangeability. Nothing in the rationales of *Queen City Pizza* or *Syncsort I* support that reading.

**\*4** Plaintiff also contends that defendant failed to allege how there could be market barriers for new entrants. In the allegations preceding the market definition, defendant alleged "[o]n information and belief, there are no persons or business entities that will at any time in the foreseeable future enter the relevant market described in Paragraph 8 below." (Countercl. at ¶ 7(f).) While the *Syncsort I* court chastised the defendant for failing to mention any potential

market entrants, the court did not hold that a pleading party must not only state whether there were potential entrant, but also plead facts supporting that statement. *See Syncsort I, 50 F.Supp.2d at 332.* Even under the pleading standard of *Syncsort I,* that facts must be pleaded with reasonable particularity to state a federal antitrust claims, the Court does not think that a pleading party should have to plead the facts of supporting allegations such as this one with such particularity as plaintiff argues it should. *See id.* at 328.

In *Syncsort I,* the defendant made the following allegation with regard to the relevant market: "Both PdqSort and SyncSort/UNIX compete in the national market for computer sorting software for the UNIX operating systems (the 'UNIX sorting market').... [The UNIX sorting market] consists of primarily three competitors: Syncsort, Innovative Routines International, *Inc. and IBM." 50 F.Supp.2d at 331.* In finding this allegation deficient, the court stated several reasons for this finding. First, the court took note that the defendant had limited the market to the products of three competitors and made no mention of potential entrants into the market. *Id. at 332.* Second, the court highlighted that the defendant "failed to mention other products available from other suppliers which are comparable to or substitutable for the product of Syncsort, from the point of view of consumers." *Id.* Third, the court found it significant that the defendant "did not state in its pleadings the sorting product of Syncsort is unique and cannot be interchanged with other sorting products." *Id.* Unlike the defendant in *Syncsort I,* the Court finds that the present defendant has sufficiently pleaded the relevant market definition. Defendant's allegations make specific reference to the rule of reasonable interchangeability and explains why the market is limited to sort software for the UNIX operating system. Furthermore, defendant alleges that it is not aware of any potential entrants into this market. Defendant did not limit the market to only three specific companies like the *Syncsort I* defendant did, but rather alleged that there are "fewer than a half dozen companies left that sell sorting software for the UNIX operating system." (Countercl. at ¶ 7(a).) And, unlike the *Syncsort I* defendant, defendant here did not need to mention what the substitutable products were because it explained that sort software for the UNIX operating system is not interchangeable with sort software for other operating

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 1076043 (D.N.J.)
**(Cite as: 2005 WL 1076043 (D.N.J.))**

systems.

**\*5** Plaintiff's final argument is that the Court should consider additional documents that were originally attached to a letter referenced and attached to the Counterclaim. These documents appear to be printouts from defendant's website. Defendant did not attach these documents to its pleading, rather it just attached the letter. As noted earlier, "[a] 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" ' *Mele,* 359 F.3d at 255 n. 5. Plaintiff advances no legal authority that holds that a court must consider documents that a party did not attach to its pleading. While "[p]laintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them," *id.,* defendant did not explicitly rely on those printouts, and there is no indication that defendant's claims are based on those documents. In the context of a motion to dismiss, the Court is unwilling to refer to documents not attached to a pleading to inquire if statements made in those documents contradict allegations in the Counterclaim.

As to one statement in a document attached to the Counterclaim that plaintiff contends is contradictory, the Court fails to see how this statement detract from the allegations regarding the relevant product market. Plaintiff points to a July 29, 2004 letter from defendant to plaintiff that is attached to the Counterclaim as Tab C. In that letter, defendant refers to itself as the "open systems sort market pioneer and leader." Without more information about what the "open systems sort market" is referring to, an issue that could be explored in discovery, the Court fails to see how this statement renders defendant's pleading of the relevant product market defective.

The above analysis compels the conclusion that defendant has sufficiently pleaded a definition of the relevant product market.

**B. Anti-Competitive Conduct**

Plaintiff's second argument is that defendant's allegations regarding anti-competitive conduct are insufficient. Plaintiff first attacks defendant's allegations concerning below cost

sales and the licensing agreement. With respect to pricing, defendant alleged:

> On information and belief, Syncsort has sold its UNIX software product below Syncsort's costs to produce the product in order to entice consumers to purchase the Syncsort UNIX software product.... Syncsort has induced consumers who were negotiating to purchase IRI's UNIX software product to reveal to Syncsort IRI's pricing and quotation information so that Syncsort could undersell IRI with that consumer. [O]n at least one occasion, in order to eliminate IRI as a competitor with respect to a particular customer that had made a tentative agreement with IRI, Syncsort offered to provide to the customer a free copy of Syncsort's product and to pay off any debt the customer might have had to IRI with respect to the customer's tentative agreement with IRI.

**\*6** (Countercl. at ¶ 5(a)-(c).)

A defendant can violate the Sherman Act by engaging in predatory pricing. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[P]redatory pricing means pricing below some appropriate measure of cost." *Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191, 1198 (3d Cir.1995) (quoting *Matsushita,* 475 U.S. at 584 n. 8). The Third Circuit has recognized that no consensus has been reached about the proper definition of "cost" in the context of a predatory pricing claim. *Id.* The Supreme Court, however, has said that "only below-cost prices should suffice, and we have rejected elsewhere the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 223, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). In *Advo,* the Third Circuit commented that marginal cost is the most important measure of cost in an economic sense, and "[a]s long as a firm's prices exceed its marginal cost, ... [s]uch pricing is presumably not predatory." 51 F.3d at 1198.

The Court concludes that defendant has sufficiently pled a predatory pricing claim. All of the allegations cited above state that plaintiff has priced its products below the cost of production. Plaintiff relies on *Stearns Airport Equip. Co. v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



_FMC Corp., 170 F.3d 518, 533 n. 15 (5th Cir.1999)_ for the proposition that a claim of predatory pricing cannot be sustained when a party alleges that only one part of project is unprofitable without alleging that the project as a whole was unprofitable. Plaintiff's reliance, however, ignores defendant's allegation in paragraph 5(a) that plaintiff has sold its UNIX software product, not just one piece of the product, below the cost of production. Furthermore, there are no facts alleged here that make this case analogous to the facts in _Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc._, 601 F.2d 48 (2d Cir.1979), where the court found that a newspaper giving away free weekend newspapers for five weeks was not predatory pricing.

With regard to the licensing agreement, plaintiff appears to take issue with the truth of defendant's allegations. Defendant alleged:

> On information and belief, Syncsort has sold its UNIX software product below Syncsort's costs to produce the product in order to entice consumers to purchase the Syncsort UNIX software product and thereby enter into multi-year licensing agreements that would preclude those consumers from then switching to the UNIX software product of one of Syncsort's competitors, most particularly IRI.

(Countercl. at ¶ 5(a).) Plaintiff's arguments about how the term defendant uses in licensing its products and that consumers are not prevented from switching products is misplaced in the context of a motion to dismiss. How consumers are prevented from switching under term licenses is a matter more appropriately argued in a motion for summary judgment rather than a motion to dismiss. Plaintiff also argues that this allegation states nothing more than a tactic used in basic business competition. Keeping in mind the Supreme Court's advice to be "careful to avoid constructions of § 2 [of the Sherman Act] which might chill competition, rather than foster it," _Spectrum Sports, Inc. v. McQuillan_, 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1984), the Court is nonetheless satisfied that defendant has sufficiently stated a claim for predatory pricing. Defendant's allegations plead "something more than an intent to compete vigorously." _Id._ at 459.

**\*7** Plaintiff next argues that defendant's sham litigation

claim is barred by the _Noerr-Pennington_ doctrine. "Those who petition government for redress are generally immune from antitrust liability." _Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc._, 508 U.S. 49, 56, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). In _Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc._, 365 U.S. 127, 144, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court "withheld immunity from 'sham' activities because 'application of the Sherman Act would be justified' when petitioning activity, 'ostensibly directed toward influencing governmental action, is a mere sham to cover ... an attempt to interfere directly with the business relationships of a competitor.' ' _Professional Real Estate Investors_, 508 U.S. at 56 (quoting _Noerr_, 365 U.S. at 144). In _California Motor Transport Co. v. Trucking Unlimited_, 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Supreme Court extended the _Noerr-Pennington_ doctrine to petitions to the courts for redress. The Supreme Court has further defined the sham litigation exception to the _Noerr-Pennington_ doctrine:

> We now outline a two-part definition of 'sham' litigation. First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under _Noerr_, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor,' through the 'use [of] the governmental process--as opposed to the outcome of that process--as an anticompetitive weapon.'

_Professional Real Estate Investors_, 508 U.S. at 60-61 (citations omitted). "The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation." _Id._ at 62. Probable cause means "no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." _Id._ at 62-63.

Plaintiff argues that defendant has failed to allege that each

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 1076043 (D.N.J.)
**(Cite as: 2005 WL 1076043 (D.N.J.))**

of plaintiff's claims is a sham. Plaintiff also charges that because defendant admits that it made the statements that form the basis of plaintiff's false advertising claim and that it used the word "Syncsort" as a metatag on its web site, defendant cannot argue that this litigation is a sham. That defendant admits to these things, however, does not translate into probable cause for plaintiff to bring this action.

Defendant makes numerous allegations supporting its claim that this litigation is a sham: plaintiff's claims are objectively baseless; plaintiff had no good faith reason to believe that defendant reverse engineered plaintiff's product to figure out how it operates, that defendant used SyncSort's software programming interface and internal operation information to develop its own product, or that defendant executed and reproduced plaintiff's product without a license; plaintiff could not have investigated the truth of its allegations before asserting them; plaintiff initiated this lawsuit for the purpose of directly interfering with the business relationships of a defendant and forcing it from the market; in lieu of waiting for a response from defendant to a letter sent by plaintiff to defendant regarding plaintiff's allegations, plaintiff filed this lawsuit; plaintiff's real motive in bringing this suit is to prevent defendant from offering a competing product while the litigation is pending so that plaintiff can charge consumers higher prices than they would be able to if there was a competitive market. (Countercl. at ¶ 5(e).) The Court finds that defendant has sufficiently pled that this litigation is a sham according to the definition in *Professional Real Estate Investors,* 508 U.S. at 60-61. While plaintiff would have the Court determine that it had probable cause to file suit based on the letters attached to defendant's Counterclaim, the Court finds that at this time, the record is not developed enough to properly make that determination. *See Brotech Corp. v. White Eagle Int'l Technologies Group, Inc.,* 2003 WL 22797730 *4 (E.D.Pa. Nov.18, 2003).*

**\*8** Plaintiff's final attack on defendant's allegations of anti-competitive conduct is that defendant's leveraging claim is deficient. Within the context of Sherman Act section 2 claims, "the Supreme Court has recognized the impropriety of monopoly leveraging, i.e., the use of

monopoly power in one market to strengthen a monopoly share in another market." *Virgin Atlantic Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 272 (2d Cir.2001) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 483, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), *disapproved of on other grounds; Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)). The Third Circuit has held that to state a monopoly leveraging claim, a party must show that (1) the accused party has a monopoly in one market, and (2) the accused party has a "threatened or actual monopoly in the leveraged market." *Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171, 206 (3d Cir.1992). Plaintiff argues that defendant's allegations are deficient with respect to both elements. Defendant alleged:

> Syncsort seeks to leverage its position as a virtual monopolist in the mainframe sort market to obtain a similar monopoly in the UNIX sort market. On information and belief, and based on its own representations, Syncsort holds a monopoly position with respect to sales of sort software for the mainframe platform throughout the United States and the world.... On information and belief, in at least two circumstances (and likely significantly more), Syncsort has leveraged its monopoly role with respect to mainframe sort software in an attempt to eliminate competition (including, but not limited to IRI) from the UNIX sort software market. On information and belief, Syncsort has done this by means of manipulating the price it charges customers in the mainframe sort software market to for or entice those customers to then buy Syncsort's UNIX sort software (and be locked into Syncsort's multi-year license agreement).

(Countercl. at ¶ 5(d).)

Plaintiff first argues that defendant's failure to allege any facts that would support a finding of monopoly power in the mainframe sort software market renders the leveraging claim deficient. The Third Circuit has recognized the Supreme Court's definition of monopoly power: "Monopoly power has been defined as 'the power to control prices or exclude competition and may ordinarily be inferred from a predominant share of the relevant market." ' *Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171, 201 (3d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Cir.1992) (quoting _United States v. E.I. du Pont de Nemours & Co._, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). "A predominant share of the market, or a lesser market share combined with other relevant factors, may suffice to demonstrate monopoly power." _Id._ Plaintiff charges that defendant has failed to allege plaintiff's market share in the mainframe sort software market or any other fact that would support a finding that plaintiff has the power to control prices or exclude competition in that market. Defendant counters that its allegations are sufficient to state a leveraging claim under _Fineman_ and that it need not plead this claim with specificity.

**\*9** The parties disagree over whether there is a heightened pleading standard when alleging antitrust claims. In one of the most recent Third Circuit opinions to address the pleading requirements for antitrust claims, the circuit said that "antitrust complaints are not subject to especially stringent pleadings" and that courts should be "extremely liberal in construing antitrust complaints." _Lum v. Bank of America_, 361 F.3d 217, 228 (3d Cir.2004). The _Lum_ court required the plaintiffs to plead with particularity because their antitrust claim was based on fraud. _Id._ Other circuits have also held that antitrust claims need not be pled with particularity. _See Covad Communications Co. v. Bell Atlantic Corp._, 398 F.3d 666, 672 (D.C.Cir.2005) ( "whether a particular allegation states a claim under the Sherman Act depends entirely upon the competitive significance of the conduct alleged, and not at all upon the number or detail of the allegations recited in the complaint."); _Spanish Broadcasting System of Fla., Inc. v. Clear Channel Communications, Inc._, 376 F.3d 1065, 1070 (11th Cir.2004) ("The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low, and Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases."); _Midwest Gas Services, Inc. v. Indiana Gas Co., Inc._, 317 F.3d 703, 710 (7th Cir.2003) ("Though the 'short and plain statement' of an antitrust claim must demonstrate 'antitrust injury' and 'antitrust standing,' antitrust plaintiffs need not plead to a heightened level of particularity."); _Todd v. Exxon Corp._, 275 F.3d 191, 198 (2d Cir.2001) ("No heightened pleading requirements apply in antitrust cases."); _Knevelbaard Dairies v. Kraft Foods, Inc._, 232 F.3d 979,

984 (9th Cir.2000) ("Antitrust cases are not to be judged by a higher or different pleading standard than other cases."). While at least one court in this district has said that "[f]acts must be pleaded with some particularity ... in order to permit an inference that a Federal antitrust claim is cognizable," _Syncsort I_, 50 F.Supp.2d at 328, over the years "many federal courts have rejected the demand for more elaborate pleadings in antitrust cases and have repudiated earlier decisions to the contrary." 5 Wright & Miller, Federal Practice & Procedure, 3d § 1228. The Court finds that in light of the normal pleading requirements, defendant has sufficiently alleged that plaintiff possesses monopoly power in the mainframe software market.

Plaintiff also argues that defendant has failed to allege a threatened or actual monopoly in the leveraged market. Plaintiff relies on _Rolite, Inc. v. Wheelabrator Environmental Systems, Inc._, 958 F.Supp. 992, 1003 (E.D.Pa.1997), where the court held that the plaintiff failed to state a monopoly leveraging claim:

> The only pleading Rolite makes with regard to a threatened or actual monopolization of the Disposal Market is that Defendants 'have been able to fix and maintain prices in each of the relevant markets,' (Paragraph 237) and that 'defendants actions have suppressed or reduced competition and threaten to continue to suppress or reduce competition in each of the relevant markets.' (Paragraph 247). These seem to me to be the type of conclusory allegations without any alleged facts to support them that are insufficient even at the pleading stage.

**\*10** _Id._ (citation omitted). Defendant argues that the _Rolite_ court erred in holding the plaintiff to a heightened pleading standard. The Court agrees that a heightened pleading standard is not applicable. While plaintiff would have defendant include allegations to explain how manipulating prices in the mainframe sort market can force or entice consumers to buy its products, the Court does not require such specificity at the pleading stage. The Court finds that defendant's allegations are sufficient to plead a threatened or actual monopoly in the leveraged market.

**C. Antitrust Injury**

Plaintiff's third and final argument against the antitrust



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1076043 (D.N.J.)
**(Cite as: 2005 WL 1076043 (D.N.J.))**

counterclaim is that defendant has failed to plead an antitrust injury. An antitrust plaintiff must also allege an injury "of the type the antitrust laws were intended to prevent." *Bristol-Meyers Squibb Co. v. Ben Venue Labs., 90 F.Supp.2d 540, 543 (D.N.J.2000).* Antitrust laws were enacted for "the protection of the *competition,* not *competitors." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 42 U.S. 477, 488 (1977).

As to antitrust injury, defendant alleged:

> If Syncsort is permitted to continue the improper and unlawful conduct described in this counterclaim, the result would be to lessen or eliminate IRI as its primary (and only seriously viable) competitor, just as Syncsort has sought to accomplish in litigation with other potential competitors that Syncsort has now driven from the marketplace. If Syncsort were able, through the improper and unlawful conduct described in this counterclaim, to lessen competition against its product in the relevant market ..., Syncsort would then have essentially no meaningful and viable competitors in that market, and consumers would be deprived of any real choice among UNIX sort software products.

(Countercl. at ¶ 7(g)-(h).) Defendant also alleges that "by filing this sham lawsuit, Syncsort is causing to IRI the damages described below but, perhaps more important, Syncsort threatens improperly to destroy the robust competition in the relevant markets...." (*Id.* at ¶ 10.) With regard to competition, defendant alleges that there are less than six companies operating in the market and that sales of UNIX sort software by plaintiff and defendant "comprise the vast majority of sales in the relevant market...." (*Id.* at ¶ 7(a) & (e).) The Court is satisfied that these allegations, read together, sufficiently allege antitrust injury in the form of reduced competition rather than just an injury to a competitor.

The Court finds no merit to any of the arguments plaintiff has offered as grounds for dismissal. Plaintiff's motion to dismiss Count I of the Counterclaim is denied.

*II. Counts IV and V*

With regard to Counts IV and V, plaintiff charges that defendant has failed to plead the necessary elements to state claims for tortious interference with prospective economic advantage and tortious interference with contract.

A. Tortious Interference with Prospective Economic Advantage

*11 To state a claim for tortious interference with prospective economic advantage, "the plaintiff must demonstrate some reasonable expectation of economic advantage, that the defendant's actions were malicious in the sense that the harm was inflicted intentionally and without justification or excuse, a reasonable probability that the plaintiff would have obtained the anticipated economic benefit and that the injury caused the plaintiff damage." *Weil v. Express Container Corp., 360 N.J.Super. 599, 613-14, 824 A.2d 174 (N.J.Super.A.D.2003)* (citing *Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 751-52, 563 A.2d 31 (1989)).* To support its tortious interference with prospective economic advantage claim, defendant first incorporates by reference all the preceding paragraphs of its Answer and Counterclaim. (Countercl. at ¶ 30.) Next, defendant alleges:

> By engaging in the conduct described in this counterclaim, Syncsort intentionally interfered with the prospect of, or reasonable expectation of, economic advantage to IRI arising from sales of IRI's product, CoSORT UNIX. There is a reasonable probability that, but for Syncsort's conduct, IRI would have realized economic advantage in the form of additional sales of IRI's product, CoSORT UNIX. In engaging in the conduct described above, Syncsort acted for the purpose of damaging IRI and, in doing so, acted outrageously, maliciously and with ill will.

(*Id.* at ¶¶ 31-33, 563 A.2d 31.)

Plaintiff argues that the conduct defendant is alleging as interference is protected competition. *See E Z Sockets, Inc. v. Brighton-Best Socket Screw Mfg. Inc., 307 N.J.Super. 546, 558-60, 704 A.2d 1364 (N.J.Super.Ch.1996).* In *E Z Sockets,* the court adopted a test for proper competition from the Restatement (Second) of Torts:

> One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                            Page 9
Not Reported in F.Supp.2d, 2005 WL 1076043 (D.N.J.)
**(Cite as: 2005 WL 1076043 (D.N.J.))**

other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

*Id.* at 559, 704 A.2d 1364. Plaintiff appears to argue that because defendant has not stated an antitrust claim, plaintiff's conduct satisfies the elements of protected competition under *E Z Sockets.* Plaintiff's argument, however, is premised on this Court finding that defendant has failed to state an antitrust claim. As the Court finds just the opposite, the conduct alleged in defendant's antitrust claim could form the basis of defendant's tortious interference with prospective economic advantage claim. Furthermore, to the extent plaintiff argues that its purpose was to advance its own interest in competing with defendant, that argument is more properly the subject of a motion for summary judgment rather than a motion to dismiss.

**\*12** Plaintiff also argues that defendant's tortious interference claim must fail because defendant failed to identify a specific prospective customer or contract that plaintiff interfered with. In *Lucas Industries, Inc. v. Kendiesel, Inc.,* 1995 WL 350050, \*8-9 (D.N.J. June 9, 1995), the court dismissed a claim for tortious interference with prospective economic advantage because of the counterclaimant's failure to identify any customer or contract that it was likely to consummate, but failed to consummate, as a result of the plaintiff's actions. *See also Storis, Inc. v. GERS Retail Systems, Inc.,* 1995 WL 337100, \*5 (D.N.J. May 31, 1995). Plaintiff would have the Court read these cases to require a pleading party to name a specific prospective customer or contract with which another party interfered. The Court is not convinced, however, that such specificity in pleading is required under the notice pleading standard. Here, defendant alleged that plaintiff induced some prospective customers of defendant to breach non-disclosure agreements they had entered into with defendant for the purpose of learning pricing information so that plaintiff could sell its product to those

consumers at a lower price. (Countercl. at ¶ 5(b).) Defendant also alleged that plaintiff interfered with a tentative agreement that one customer had entered into with defendant by offering to provide the customer with a free copy of plaintiff's product and to pay off any debt that customer owed to defendant. (Countercl. at ¶ 5(c).) The Court is satisfied that defendant has sufficiently alleged that plaintiff has interfered with prospective customers or contracts for purposes of stating a claim for tortious interference with prospective economic advantage.

The Court finds that defendant has sufficiently stated a claim for tortious interference with prospective economic advantage and that plaintiff's motion to dismiss Count IV of the Counterclaim is denied.

B. Tortious Interference with Contract

To state a claim for tortious interference with a contract, a pleading party must prove: "(1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage." *214 Corp. v. Casino Reinvestment Development Authority,* 280 N.J.Super. 624, 628, 656 A.2d 70 (N.J.Super.L.1994).

Defendant makes numerous allegations with respect to its tortious interference with a contract claim: Defendant had prospective customers sign non-disclosure agreements that prohibited customers from revealing information such as pricing; on at least one occasion or more, plaintiff induced prospective customers to breach the non-disclosure agreements; plaintiff induced such breaches to learn about defendant's pricing so that it could undersell defendant; the non-disclosure agreements were contracts; plaintiff knew of the non-disclosure agreements and knew that the customers would have to breach such agreements to provide plaintiff with the information it desired; plaintiff purposely disrupted the contractual arrangement between defendant and its prospective customers; plaintiff acted with the purpose of improperly competing with defendant and; defendant has suffered damages as a result of plaintiff's conduct. (Countercl. at ¶¶ 34-43.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2005 WL 1828593 (D.N.J.)
**(Cite as: 2005 WL 1828593 (D.N.J.))**

Page 1

**c**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
TUMI, INC.
v.
EXCEL CORP., et al.
**No. 05-0477 (WJM).**

Aug. 1, 2005.

Mandelbaum, Salsburg, Gold, Lazris, Discenza & Steinberg, P.C., Stuart Gold, West Orange, NJ, for Plaintiff.

St. John & Wayne, Vincent S. Ziccolella, Newark, NJ, for Defendant.

LETTER OPINION

MARTINI, J.

*VIA REGULAR MAIL*

Dear Counsel:

**\*1** This matter comes before the Court on Defendant Excelcorp's [FN1] motion to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). There was no oral argument. Fed.R.Civ.P. 78. For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART. Accordingly, Count Five is DISMISSED WITHOUT PREJUDICE.

> FN1. Excelcorp states in its papers that it is incorrectly identified as "Excel Corp." in this action. For ease of reference, the Court will refer to it as "Excelcorp" herein.

*BACKGROUND*

This action, before this Court on allegations of diversity jurisdiction under 28 U.S.C. § 1332, was commenced on or about January 24, 2005 by Plaintiff Tumi, Inc. ("Tumi"), a New Jersey corporation with its principal place of business in New Jersey, against Excelcorp, a Nevada corporation

with its principal place of business in Nevada. (*See* Compl. ¶¶ 1--4.) It is also brought against unnamed Defendants John Does 1-20, Jane Roes 1-20, and ABC COS. 1-20 (referred to collectively herein as "unnamed Defendants"). (*See id.* ¶¶ 5--7.) The action arises out of Excelcorp's purported breach of a contract with Tumi concerning Excelcorp's participation in Tumi's so-called "Special Markets Program." (*See generally id.* ¶¶ 1--19.) The following are the relevant allegations.

Tumi's business consists of manufacturing and distributing globally recognized "luggage, leather goods, business cases, personal leather goods, women's products and related executive accessories" marketed under its name. (*See id.* ¶ 8.) It distributes and sells its merchandise primarily through high-end department stores, luggage speciality stores, Tumi-owned stores, dealer-operated Tumi stores, and Tumi shops located in or at other retail establishments. (*See id.* ¶ 9.) However, Tumi also markets and sells its products through entities participating in its "Special Markets Program," under which program participants may sell Tumi products to corporations or other groups for their "internal use"--that is, participating entities may not simply resell the Tumi products on the market. (*See id.* ¶¶ 10--11.) Not surprisingly, Tumi engraves its products and traces their circulation in commerce pursuant to its so-called "Tumi Tracer Program." (*See id.* ¶ 12.)

On or about March 25, 2004, Excelcorp executed and delivered to Tumi a "Special Markets Memo" detailing the terms and conditions of its participation in Tumi's Special Markets Program. (*See id.* ¶¶ 15--16.) Under the terms of the Special Markets Memo, Excelcorp was prohibited from selling or trans-shipping Tumi merchandise received under the Special Markets Program to groups of end-users other than those approved by Tumi. (*See id.* ¶ 15.) The Special Markets Memo, as delivered to Excelcorp, also provided that Tumi would be entitled to certain liquidated damages and could immediately terminate the agreement if Excelcorp sold or transshipped Tumi products to unauthorized end-users. (*See id.*) However, allegedly unbeknownst to Tumi, Excelcorp altered the terms of the Memo upon execution such that, counter to the Memo's original terms: (1) Excelcorp would *not* be liable to Tumi for liquidated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2005 WL 1828593 (D.N.J.)
**(Cite as: 2005 WL 1828593 (D.N.J.))**

damages; and (2) Tumi would *not* have the right to immediately terminate the premium account arrangement if Excelcorp sold or trans-shipped Tumi products to unauthorized end-users. (*See id.* ¶ 16.)

*\*2* A few months later, between August and October 2004, Tumi, oblivious to Excelcorp's changes to the Memo, sold $100,000 worth of products to Excelcorp. (*See id.* ¶ 17.) Sometime thereafter, Tumi learned (by means of the Tumi Tracer Program) that products obtained by Excelcorp under the Special Markets Program and pursuant to Excelcorp's Special Markets Memo were being offered for sale by Costco-Japan, an unauthorized dealer. (*See id.* ¶ 18.) Tumi also learned that Tumi products obtained by Excelcorp from unnamed Defendants were being offered for sale by Costco-Japan. (*See id.* ¶ 19.) This not only violated the terms of Excelorp's and the unnamed Defendants' participation in the Special Markets Program (*see id.* ¶¶ 22, 41), it also allegedly interfered with Tumi's agreements with certain Japanese businesses regarding the distribution of Tumi products in Japan (*see id.* ¶ 26). Specifically, throughout the relevant time period, Tumi had an on-going joint venture agreement ("Japan Agreement") with two Japanese corporations--Ace Co., Ltd. ("Ace") and Itochu Co. ("Itochu")--for the distribution and sale of Tumi merchandise in Japan. (*See id.* ¶ 13.) These agreements made Itochu the exclusive importer and Tumi Japan the exclusive distributor of Tumi products in Japan. (*See id.* ¶ 14.) Excelcorp allegedly sold its Tumi products to Costco-Japan knowing that Tumi "had an exclusive arrangement for [the] sale and distribution of its products in Japan." (*See Id.* ¶ 28.)

Based on these allegations, Tumi asserts four state law causes of action for breach of contract, tortious interference with contract, fraudulent misrepresentation, and conspiracy. (*See id.* ¶¶ 20--42.) It seeks damages, costs, attorneys' fees, and injunctive relief. (*See id.* ¶¶ 24, 31, 37, 39, 42.) Excelcorp now moves to dismiss the Complaint in its entirety. (*See generally* Memorandum of Law in Support of Defendant Excelcorp's Motion to Dismiss Plaintiff Tumi, Inc.'s Complaint Pursuant to <u>Fed.R.Civ.P. 12(b)(6)</u> [hereinafter "Def.'s Mem."].)

*ANALYSIS*

I. Standard of Review

In deciding a motion to dismiss under <u>Rule 12(b)(6)</u>, all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *See <u>Warth v. Seldin,</u> 422 U.S. 490, 501 (1975).* A court may dismiss a complaint for failure to state a claim only if, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations." *<u>Hishon v. King & Spalding,</u> 467 U.S. 69, 73 (1984); <u>Zynn v. O'Donnell,</u> 688 F.2d 940, 941 (3d Cir.1982).*

Because Excelcorp raised in its reply papers numerous (meritless) arguments for dismissal not raised in its original moving papers, the Court notes that these arguments are inappropriate for consideration on adjudication of this motion. *See, e.g., Solid Waste Transfer and Recycling, Inc. v. County of Essex,* No. 98-2990, 1999 U.S. Dist. LEXIS 17867, at \*40 (D.N.J. Oct. 26, 1999) (declining to consider new arguments raised initially on reply); <u>*Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.,* 869 F.Supp. 278, 281 (D.N.J.1994)</u> (same, "for the obvious reason that the opponent has no opportunity to respond"). In addition, the Court will not consider the affidavit accompanying Defendant's reply papers, as, given the nature of the asserted bases for dismissal, it has no bearing on the Court's review of the adequacy of the Tumi's Complaint. *See, e.g., <u>Friedman v. Landsdale Parking Authority,</u> 151 F.R.D. 42, 44 (E.D.Pa.1993)* (declining to consider exhibits attached to motion to dismiss not referenced in complaint).

II. The Motion to Dismiss Count One (Breach of Contract) is DENIED

*\*3* Count One alleges that Excelcorp breached the terms of the Special Markets Memo by trans-shipping Tumi goods to end-user(s) not approved by Tumi. (*See* Compl. ¶¶ 20--24.) Excelcorp argues that the Court should dismiss this Count because the Complaint alleges that Excelcorp rejected the liquidated damages provision of the Special Markets Memo. (*See* Def.'s Mem. at 10.) Excelcorp's argument is without merit.



In a breach of contract action, a plaintiff "satisfies its pleading requirements if it alleges: (1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that plaintiff performed its own contractual duties." *Pub. Serv. Enter. Group, Inc. v. Philadelphia Elec. Co., 722 F.Supp. 184, 219 (D.N.J.1989)* (applying New Jersey law). [FN2] In this case, the Complaint alleges, in relevant part:

> FN2. The parties have not disputed the applicability of New Jersey law to these state law claims.

• *A contract.* That Excelcorp executed a Special Markets Memo "as a precondition of ... participation in the Special Markets Program" and that the Memo "clearly prohibits the distribution of sale of Tumi brand products to any person or entity other than those identified as an end user under the Special Markets Program." (Compl.¶ 15--16, 21.)
• *Breach of contract.* That Excelcorp breached its agreement with Tumi by selling Tumi products to "one or more unauthorized dealers." (*Id.* ¶¶ 18, 22.)
• *Damages.* That Excelcorp damaged Tumi's business by breaching its agreement. (*See id.* ¶ 24.)
• *Tumi's contractual duties.* That Tumi fulfilled its obligations under the agreement. (*See Id.* ¶ 23.) Specifically, that Tumi sent $100,000 worth of its products to Excelcorp (*See Id .* ¶ 17.)

These pleadings adequately state a claim for a breach of contract. Excelcorp's contention that this Count should be dismissed simply because Excelcorp is alleged to have rejected the liquidated damages provision of the Special Markets Memo is irrelevant, as Tumi may be entitled to other damages should it succeed on its breach of contract claim. Therefore, the motion to dismiss Count One is DENIED.

III. The Motion to Dismiss Count Two (Tortious Interference) Is DENIED

Count Two alleges that Excelcorp tortiously interfered with Tumi's import and distribution agreements with Itochu and Ace by selling Tumi products to an unauthorized dealer in Japan knowing that such sales would interfere with these

agreements. (*See* Compl. ¶¶ 25--31.) Excelcorp argues that the Court should dismiss this Count because Tumi's allegations in support of the Count: (1) are "conclusory" as to Tumi's exclusive relationship with Ace and Itochu; (2) fail to establish that Excelcorp committed any specific actions to interfere with the Ace and Itochu contracts; (3) fail to detail Excelcorp's awareness of Tumi's relationship with Ace and Itochu; and (4) fail to specify Excelcorp's state of mind with respect to Excelcorp's alleged interference. (*See* Def.'s Mem. at 11--13; Reply Memorandum of Law in Further Support of Defendant Excelcorp's Motion to Dismiss Plaintiff Tumi, Inc.'s Complaint Pursuant to Fed.R.Civ.P. 12(b)(6) at 8-9 [hereinafter "Def.'s Reply"].) In light of the allegations in the Complaint discussed below, Excelcorp's arguments are devoid of merit.

*4 To make out a claim for tortious interference, a plaintiff need allege only that: (1) plaintiff had a protected right from a prospective economic or contractual relationship; (2) defendant interfered intentionally and maliciously with that contract or prospective economic right; (3) defendant caused the loss of a prospective gain as a result from the interference; and (4) plaintiff was damaged. *See Printing Mart-Morristown v. Sharp Elecs. Corp., 563 A.2d 31, 37 (N.J.1989)*. Malice in this context refers to "harm ... inflicted intentionally and without justification or excuse." *Id.* (quoting *Rainier's Dairies v. Raritan Valley Farms, Inc., 117 A.2d 889, 895 (N.J.1955)*). In this case, the Complaint alleges, in relevant part:
• *Protected right.* That Tumi had agreements with Ace and Itochu making Itochu its exclusive importer and Tumi Japan its exclusive distributor of Tumi brand products in Japan. (*See* Compl. ¶ 13--14.)
• *Intentional and malicious interference.* That Excelcorp was aware of Tumi's exclusive arrangement for the sale and distribution of its products in Japan but nevertheless sold Tumi goods to Costco-Japan. (*See id.* ¶¶ 18, 28--29.)
• *Causation & Damage.* That Excelcorp's "unlawful and improper distribution and/or sale" of Tumi goods in Japan caused Tumi irreparable damage and deprived Tumi the benefit of its agreements with Ace and Itochu. (*See id.* ¶¶ 30-31.)

The Court is satisfied that these allegations adequately state

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



a claim for tortious interference. Excelcorp's qualms with the specificity of the allegations supporting this Count provide no basis for dismissal of this claim at this time, as Excelcorp has not cited (nor has the Court discovered) any authority requiring any more specificity than that provided in the Complaint. Excelcorp's motion to dismiss Count Two is, therefore, DENIED.

IV. The Motion to Dismiss Count Three (Fraudulent Misrepresentation) is DENIED

Count Three alleges that Exelcorp committed fraudulent misrepresentation by misrepresenting its intent to abide by the terms of the Special Markets Memo-- specifically, its agreement not to distribute or sell its Tumi products to unauthorized end-users. (*See* Compl. ¶¶ 32--37.) Excelcorp argues that the Court should dismiss this Count because the pleadings fail to satisfy the requirements of <u>Federal Rule of Civil Procedure 9(b)</u>. (*See* Def.'s Mem. at 14.) Specifically, Excelcorp argues that the Complaint fails to plead the date, time, and place of the alleged misrepresentation. (*See id.*) <u>[FN3]</u> This is, however, no basis for dismissing Count Three.

> <u>FN3.</u> Excelcorp also argues that the Complaint fails to allege that it made an "incorrect statement" or engaged in a "negligent making." (*See* Def.'s Mem. at 14.) The Court will not address this argument, as it responds to a claim (negligent misrepresentation) not asserted by Tumi.

To make out a claim for fraudulent misrepresentation, a plaintiff need allege only: (1) a material misrepresentation of a present fact; (2) defendant's knowledge of its falsity; (3) "intention that the other person rely on [the misrepresentation]"; (4) reasonable reliance; and (5) damages as a result of the misrepresentation. *See Gennari v. Weichert Co. Realtors,* 691 A.2d 350, 367 (N.J.1997). Although <u>Rule 9(b)</u> requires that any circumstances constituting fraud be pleaded with some degree of particularity, the rule provides that malice, intent, and other conditions of mind may be averred generally. *See* Fed. R. Civ. R. 9(b). A plaintiff may satisfy <u>Rule 9(b)</u> by pleading the "date, place or time" of the fraud *or* through "alternative means of injecting precision and some measure of

substantiation into their allegations of fraud." <u>*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984).</u> Accordingly, a complaint need not "describe the precise words used" so long as each allegation of fraud "adequately describes the nature and subject of the alleged misrepresentation." *Id.* In fact, contrary to Exelcorp's unsupported contention, "<u>Rule 9(b)</u> falls short of requiring every material detail of the fraud such as date, location, and time." *See* <u>*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 144 (3d Cir.2004)</u> (quoting <u>*In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir.2002)</u>).

*5 In this case, the Complaint alleges, in relevant part:

> • *Material misrepresentation of a present fact.* That, although Excelcorp executed a Special Markets Memo agreeing to distribute Tumi products only to approved end-users, Excelcorp had no intent to abide by that agreement. (*See* Compl. ¶ 33.)
> • *Knowledge of falsity.* Excelcorp entered into the agreement with Tumi knowing that "it would not abide by the terms and conditions of the agreement." (*Id.* ¶ 34.)
> • *Intent that the other person rely on misrepresentation.* Excelcorp signed and returned the Memo with the intent that Tumi would rely on the terms of the agreement. (*See id.* ¶ 35.)
> • *Reasonable reliance.* Tumi relied on Excelcorp's representations and "had no reason to expect that [Excelcorp] would intentionally breach its agreement." (*Id.* ¶ 36.)
> • *Damages.* Excelcorp's fraudulent misrepresentation damaged Tumi. (*See Id.* ¶ 37.)

These allegations satisfy <u>Rule 9(b)</u>'s pleading requirements. That is, they are sufficient "to place [Excelcorp] on notice of the precise misconduct with which [it is] charged, and to safeguard [Excelcorp] against spurious charges of immoral and fraudulent behavior." <u>*Seville,* 742 F.2d at 791.</u> Accordingly, Excelcorp's motion to dismiss Count Three is DENIED.

V. The Motion to Dismiss Count Four (Injunctive Relief) Is DENIED

Tumi seeks temporary, preliminary, and permanent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                    Page 5
Slip Copy, 2005 WL 1828593 (D.N.J.)
**(Cite as: 2005 WL 1828593 (D.N.J.))**

injunctive relief in Count Four based on the claims it asserts in Counts One through Three. (*See* Compl. ¶¶ 38--39.) Bizarrely, Excelcorp, addressing the standard for obtaining preliminary injunctive relief, argues that the Court should dismiss this Count because Tumi has not demonstrated a likelihood of success on the merits of its case. (*See* Def.'s Mem. at 15--16; Def.'s Reply at 10.) There is, however, no application for preliminary injunctive relief before the Court at this time. Thus, Excelcorp's arguments regarding Tumi's failure to make the showings necessary to obtain preliminary injunctive relief are irrelevant. Accordingly, Excelcorp's motion to dismiss Count Four is DENIED.

VI. The Motion to Dismiss Count Five (Conspiracy) is GRANTED

Count Five alleges that Excelcorp "conspired" with the unnamed Defendants to obtain from them Tumi products for unauthorized trans-shipment, in violation of Excelcorp's agreement with Tumi and in violation of these unnamed Defendants' agreements with Tumi. (*See* Compl. ¶¶ 40--42.) Excelcorp argues that the Court should dismiss this Count because it is not alleged with the requisite particularity or, alternatively, because this Count is predicated on Counts One (breach of contract) and Two (tortious interference), both of which also must be dismissed. (*See* Def.'s Mem. at 16-17; Def.'s Reply at 10.) The Court agrees that this Count must be dismissed for failing to adequately plead a conspiracy claim . [FN4]

> FN4. As explained above, Tumi has sufficiently plead Counts One (breach of contract) and Two (tortious interference).

*6 To make out a claim for civil conspiracy, a plaintiff must allege: (1) an affiliation of two or more parties; (2) *having a common design or real agreement;* (3) to achieve an unlawful purpose or to achieve a lawful purpose by unlawful means; and (4) that proximately causes plaintiff to suffer damages. *See Bd. of Educ. v. Hoek,* 168 A.2d 829, 835 (N.J.Super.Ct.App.Div.1961), *rev'd in part on other grounds,* 183 A.2d 633 (N.J.1962); *Delbridge v. Office of Public Defender,* 569 A.2d 854, 866-67 (N.J.Super.Ct.1989). Although a plaintiff need not plead direct evidence of the agreement between the conspirators, a

plaintiff must *at least* plead circumstantial facts supporting the logical inference that the alleged conspirators had a meeting of the minds and thus reached an understanding to work towards a common goal. *Morgan v. Union County Bd. Of Chosen Freeholders,* 633 A.2d 985, 988 (N.J.Super.Ct.App.Div.1993). Moreover, although allegations of conspiracy are measured under the liberal Rule 8 pleading standard, conclusory allegations of conspiracy are insufficient to state a cause of action where the Complaint fails to allege "facts constituting the conspiracy, its object and accomplishment." *Black v. Yates v. Mahogany Ass'n Inc.,* 129 F.2d 227, 231 (3d Cir.1942).

Count Five fails to meet these pleading requirements. The Complaint sets out the conspiracy allegations in a single count, as follows: "The defendant, Excel, conspired with John Does 1-20, Jane Roes 1-20 and/or ABC Cos. 1-20 in order to obtain Tumi products from these individuals or entities, in contravention of agreements between Tumi and Excel and between Tumi and these other individuals or entities, with the intent to obtain Tumi products for transshipment in violation of the various agreements." (Compl.¶ 41.) [FN5] These allegations fail, however, to set forth any factual basis that could support a logical inference that Excelcorp and the unnamed Defendants had any "meeting of the minds" or that they reached any understanding to work towards a common goal. The Complaint merely alleges in a conclusory fashion that Excelcorp and the unnamed Defendants "conspired" with one another. For this reason, Excelcorp's motion to dismiss this conspiracy claim is GRANTED. Accordingly, Count Five is DISMISSED WITHOUT PREJUDICE.

> FN5. The paragraphs of the Complaint devoted to identifying the parties state that the unnamed Defendants are those entities that "conspired and acted in concert" with Excelcorp to "harm the plaintiff." (*See* Compl. ¶¶ 5--7.)

*CONCLUSION*

For the foregoing reasons, Excelcorp's motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is GRANTED IN PART and DENIED IN PART. Accordingly, Count Five is DISMISSED WITHOUT PREJUDICE.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                      Page 6
Slip Copy, 2005 WL 1828593 (D.N.J.)
**(Cite as: 2005 WL 1828593 (D.N.J.))**

An appropriate Order accompanies this Letter Opinion.

Slip Copy, 2005 WL 1828593 (D.N.J.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2510677 (Trial Pleading) Answer, Affirmative Defenses, Demand for Trial By Jury, and Certification Pursuant to Local Civil Rule 11.2 (Aug. 10, 2005)

• 2005 WL 450312 (Trial Pleading) Verified Complaint for Injunctive Relief; Demand for Trial by Jury and Certification Pursuant to Local Civil Rule 11.2 (Jan. 21, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT U



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1529185 (E.D.Pa.)
**(Cite as: 2004 WL 1529185 (E.D.Pa.))**

Page 1

**⊬**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
U.S. HORTICULTURAL SUPPLY, INC. Plaintiff
v.
THE SCOTTS COMPANY, Defendant
**No. Civ.A.03-773.**

Feb. 18, 2004.

Monica S. Mathews, Timothy C. Russell, Spector Gadon &
Rosen, PC, Philadelphia, PA, for Plaintiff.

Amy S. Kline, Joseph F. O'Dea, Jr., Saul Ewing LLP,
Philadelphia, PA, Edith Ramirez, Harold A. Barza, Kent J.
Bullard, Quinn Emanuel Urquhart Oliver And Hedges,
L.L.P., Los Angeles, CA, for Defendant.

*MEMORANDUM AND ORDER*
MCLAUGHLIN, J.

*\*1* This dispute arises out of the failure to renew a
distributor agreement between the defendant, the Scotts
Company ("Scotts"), and the plaintiff, U.S. Horticultural
Supply, Inc. ("USH"). The defendant moves to dismiss the
plaintiff's antitrust claim and to dismiss or, in the
alternative, stay the promissory estoppel claims pending
arbitration.

*I. Background*

USH is a Pennsylvania corporation engaged in the
distribution and sale of horticultural products. [FN1] Scotts
is the leading supplier of do-it-yourself horticultural
products in the world and among the leading suppliers of
professional horticultural products in the United States.
Scotts has a 52% share of the domestic market for
professional and consumer horticultural products, and it has
a 75% share of the domestic market for consumer
water-soluble fertilizer. Am. Compl. ¶¶ 2, 4-5.

    FN1. For the purposes of this motion to dismiss,

the Court will accept all allegations in the
plaintiff's amended complaint as true and all
inferences will be drawn in the light most favorable
to the plaintiff. *See Port Auth. v. Arcadian Corp.,
189 F.3d 305, 311 (3d Cir.1999).*

In 1996, USH and Scotts entered into a Horticultural
Products Distribution Agreement ("distributor agreement"),
giving USH the right to distribute Scotts' water-soluble
fertilizers and other products in the mid-Atlantic regional
market. The distributor agreement was set to expire on
September 30, 2002. *Id.* ¶¶ 26.

In 1999, USH became a non-exclusive distributor for J.R.
Peters' consumer water-soluble fertilizer. J.R. Peters was
another horticultural product supplier and a competitor of
Scotts. *Id.* ¶¶ 15, 18, 20.

During this time period, USH marketed its own brand of
water-soluble fertilizer as Olympic Water Soluble Fertilizer
("Olympic"). USH was in the process of accepting
subcontracting bids for the manufacture of Olympic from
Scotts, J.R. Peters, and others. *Id.* ¶¶ 22-23.

In 2002, Scotts discussed renewing the distributor
agreement with USH on the condition that USH no longer
distribute J.R. Peters' water-soluble products and that USH
not place the Olympic contract with J.R. Peters. USH did
not agree to those terms, and Scotts ended discussions about
renewing the distributor agreement. Scotts refused to renew
in an attempt to intimidate USH and restrain or destroy J.R.
Peters' ability to compete with Scotts. *Id.* ¶¶ 27-30.

The amended complaint makes four claims: (1) attempted
monopolization under 15 U.S.C. § 2; (2) promissory
estoppel concerning the distributor agreement; (3)
promissory estoppel concerning certain product distribution
in the United Arab Emirates; [FN2] and (4) breach of
contract. [FN3]

    FN2. Specifically, the plaintiff focuses on
    distribution of Banrot, a horticultural fungicide.

    FN3. The plaintiff contends that the defendant
    breached the Grocote contract, which dealt with
    certain controlled release horticultural fertilizers.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                       Page 2
Not Reported in F.Supp.2d, 2004 WL 1529185 (E.D.Pa.)
**(Cite as: 2004 WL 1529185 (E.D.Pa.))**

The defendant filed the present motion to dismiss count I and to dismiss or, in the alternative, stay counts II and III pending arbitration. The Court dismissed counts II and III without prejudice in an Order filed on November 13, 2003, upon agreement of both parties. The Court, therefore, will discuss only the motion to dismiss as it relates to count I.

The defendant argues that count I should be dismissed for two reasons: (1) the plaintiff lacks standing to pursue an attempted monopolization claim; and (2) the plaintiff did not allege facts to satisfy its claim of attempted monopolization.

II. *Analysis*

A. *Standing*

\*2 The inquiry of standing is a threshold issue. *See* *City of Pittsburgh v. West Penn Power Corp.,* 147 F.3d 256, 264 (3d Cir.1998). Section Four of the Clayton Act confers standing on "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws...." 15 U.S.C. ¶ 15. The courts have narrowed the class of appropriate plaintiffs through the doctrine of "antitrust standing." *See City of Pittsburgh,* 147 F.3d at 264.

In the Third Circuit, the following multi-factor balancing test is used to evaluate antitrust standing:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Id.* (citations omitted).

1. *Antitrust Injury Requirement*

The standing inquiry should begin with the second factor, commonly known as the antitrust injury requirement. *Id.* at

264 n .14. In determining whether the alleged injury is "of the type that the antitrust laws were intended to prevent," courts must look to "whether the injury flows from that which makes defendants' acts unlawful." *Id.* at 266.

The parties disagree whether the antitrust laws provide a remedy to the plaintiff, as a non-consumer and a noncompetitor. The plaintiff argues that standing extends to parties who are injured by the "very means" used to restrain competition. *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 479, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); *see also* *Carpet Group Int'l v. Oriental Rug Importers Ass'n,* 227 F.3d 62, 77 (3d. Cir.2000); *Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 724 F.2d 290, 294 (2d Cir.1983). The defendant contends that the plaintiff, like the plaintiffs in terminated distributors cases, has not suffered an antitrust injury. *See, e.g., Serpa Corp. v. McWane, Inc.,* 199 F.3d 6, 10 (1st Cir.1999); *Precision Surgical, Inc. v. Tyco, Int'l, Ltd.,* 111 F.Supp.2d 586, 588, 590 (E.D.Pa.2000).

The Court is persuaded that *McCready* and its progeny control here. Because the relationships between the parties and the timing and type of the alleged antitrust violations are so important to this analysis, the Court will discuss the facts and holdings of *McCready, Crimpers,* and *Carpet Group.*

The Supreme Court in *McCready* started its analysis by recognizing the broad remedial purpose of § 4 of the Clayton Act. 457 U.S. at 472. The Court, however, noted that there are two general limits in finding standing. The first limitation prevents double recovery. [FN4] *Id.* at 474. The second limitation looks to whether the injury suffered by the person is too remote from the antitrust violation. *Id.* at 477. The decision analogized remoteness to a proximate cause standard. The courts must look to the "physical and economic nexus between the alleged violation and the harm to the plaintiff" and "to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful." *Id.* at 478.

> FN4. The Court will discuss this limitation below, in terms of the duplicative recovery factor of the multi-factor test.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                           Page 3
Not Reported in F.Supp.2d, 2004 WL 1529185 (E.D.Pa.)
**(Cite as: 2004 WL 1529185 (E.D.Pa.))**

**\*3** The plaintiff in *McCready* was a group health plan subscriber who was not reimbursed by the defendant because of its policy to reimburse for services provided by psychiatrists and not by psychologists. The Court held that there was no risk of double recovery, because the plaintiff paid her bill fully to the psychologist and her injury was distinct from any other harm. *Id.* at 475. The Court also found that her injury was not remote. [FN5] The injury to the plaintiff was foreseeable, and the harm was a "necessary step" and, in fact, the "very means" that the defendant used to try to achieve a monopoly. *Id.* at 479.

> FN5. The Court included a footnote with a demonstrative hypothetical situation, relevant to the case at hand. The Court stated, "If a group of psychiatrists conspired to boycott a bank until the bank ceased making loans to psychologists, the bank would no doubt be able to recover the injuries suffered as a consequence of the psychiatrists' actions." *Id.* at 484 n. 21.

The Second Circuit has applied the *McCready* analysis, finding that a plaintiff had suffered an antitrust injury. *Crimpers, 724 F.2d at 294.* The plaintiff attempted to produce a trade show with the goal of forging direct links between the independent producers of cable television programming and cable television stations. The plaintiff alleged that the defendants, HBO and Showtime, boycotted the trade show and used their market power to pressure others not to appear, causing the show's failure and the plaintiff to go out of business. *Id.* at 291-92.

The court decided that there was no danger of double recovery because the plaintiff's loss was distinct from the harm to the producers of shows for being undersold or to the cable stations for overpaying. The court also held that the injury suffered was in no way remote. The court found that the plaintiff's injury was "the precisely intended consequence" of defendants' actions and was "inextricably intertwined" with the harm intended for the market. *Id.* at 294.

The Third Circuit was persuaded by and applied the analysis of *Crimpers. Carpet Group. 227 F.3d at 77.* The plaintiff in that case had organized trade shows and acted as a broker to

facilitate direct sales of oriental rugs from the foreign manufacturer to the domestic retailer, thereby bypassing the importer-exporter middle man and lowering rug prices. The defendants, who were importer-exporters, had used their market power to discourage rug manufacturers from dealing with the plaintiff. *Id.* at 64-65.

The court in *Carpet Group* stated that a plaintiff can suffer an antitrust injury even if the plaintiff is neither a competitor nor a consumer. It then held that the plaintiff could be considered a competitor of the defendant. *Id.* at 77. In finding that the plaintiff had suffered an antitrust injury, the court quoted *Crimpers* and stated that the injury was the "precisely intended consequence" of, and was "inextricably intertwined" with, the defendants' actions. *Id.* at 78.

With the *McCready* line of cases in mind, the Court is persuaded that the plaintiff in this case has alleged an antitrust injury. The plaintiff alleged that it was injured when the defendant did not renew the distributor agreement because the plaintiff refused to end its distribution of J.R. Peters' water-soluble fertilizer products. The plaintiff also alleged that the defendant's actions were intended to restrain J.R. Peters' ability to compete with the defendant. *See* Am. Compl. ¶ 27-30. The plaintiff was a principal distributor for J.R. Peters for water-soluble fertilizer products in the mid-Atlantic region. *See id.* ¶ 18.

**\*4** Taking those allegations as true, the defendant would have needed the plaintiff to cease its distribution of J.R. Peters' products in order to restrain that company's ability to compete. The plaintiff's injury was not incidental to the harm intended for J.R. Peters; rather, it was the very means by which the defendant sought to restrain or destroy competition. The plaintiff's injury, therefore, was inextricably intertwined with the harm intended for J.R. Peters and the water-soluble fertilizer market. [FN6]

> FN6. The Court finds that the injury alleged by the plaintiff in this case fits comfortably in the analytical framework established by *McCready.* The Court acknowledges that the case here may not be as strong as the facts alleged in *Crimpers* or *McCready. See Crimpers, 724 F.2d at 295* (ranking the strength of standing in those cases). The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                          Page 4
Not Reported in F.Supp.2d, 2004 WL 1529185 (E.D.Pa.)
**(Cite as: 2004 WL 1529185 (E.D.Pa.))**

*McCready* hypothetical, however, creates an approving example of the same relationship between a plaintiff's injury and an antitrust violation as is present in this case. See *McCready, 457 U.S. at 484 n. 21.*

The essence of the defendant's arguments against a finding of standing here is that there is no direct link between the plaintiff's injury and the alleged anticompetitive actions. The defendant specifically argues that: (1) the *McCready* line of cases is inapplicable; (2) the plaintiff is nothing more than a terminated distributor that lacks standing; (3) an allegation of retaliatory non-renewal is insufficient to show antitrust standing; and (4) the plaintiff's failure to allege injury to J.R. Peters destroys standing. The Court will examine each argument in turn.

The defendant disputes the applicability of the *McCready* line of cases on the grounds that the plaintiffs in those cases could be considered either competitors or consumers. It contends that the plaintiff in *McCready* was effectively a consumer, while the *Crimpers* and *Carpet Group* plaintiffs were effectively competitors.

The defendant's argument is unpersuasive for two reasons. First, the plaintiff characterizes itself as a competitor. More importantly, the Third Circuit in *Carpet Group* stated that there are situations when non-competitors and non-consumers could have antitrust standing. *227 F.3d at 77.* The *McCready* hypothetical, for instance, undercuts the defendant's contention that standing existed in that case because the plaintiff was a consumer. *See McCready, 457 U.S. at 484 n. 21.* The hypothetical bank is neither a consumer nor competitor to the psychiatrists, yet it would have standing if the psychiatrists boycotted the bank until it stopped making loans to psychologists. The holding of *McCready,* thus, does not rest solely on the plaintiff's role as a consumer.

The defendant next argues that the plaintiff lacks standing because the injury alleged is the same as in cases involving terminated distributors. Those cases held that the terminated distributor plaintiff lacked standing because the alleged injury was incidental to, and not the very means of, the antitrust violation. *See, e.g., Serpa Corp. v. McWane, Inc.,*

*199 F.3d 6, 12 (1st Cir.1999); Precision Surgical, Inc. v. Tyco. Int'l, Ltd., 111 F.Supp.2d 586, 589 (E.D.Pa.2000).*

In *Serpa,* for example, the distributor plaintiff had an exclusive sales agreement with the manufacturer defendant. That defendant terminated the agreement after it and its competitor were acquired by another company. *199 F.3d at 8-9.* Similarly, in *Precision Surgical,* the distributor plaintiffs had an exclusive distribution contract with Origin Medsystems, Inc, which manufactured surgical products for hernia repair. The defendant terminated the distribution contract after acquiring Origin and its only competitor. *111 F.Supp.2d at 587.*

*5 The injuries suffered by the distributor plaintiffs in those two cases are incidental to the antitrust violations. The plaintiffs' losses were a mere consequence of the elimination of competition, rather than a necessary step. Because the Court has found that the injury alleged by the plaintiff in this case is inextricably intertwined with the anticompetitive harm, the terminated distributor cases cited by the defendant are inapplicable.

The defendant then contends that the plaintiff's allegations about retaliatory non-renewal of the distributor agreement do not support standing. *See Gregory Mktg. Corp. v. Wakefern Food Corp., 787 F.2d 92 (3d Cir.1986).* The Third Circuit in *Gregory* held that a plaintiff lacked standing when a manufacturer defendant terminated its agreement after the plaintiff objected to, and refused to comply with, the defendant's anticompetitive actions.

The *Gregory* decision is distinguishable from the case at hand for two main reasons. First, the Third Circuit decided *Gregory* before *Carpet Group* clarified that there are certain situations in which non-consumers and non-competitors have standing. More importantly, the court explicitly held that the plaintiff's role was not essential to carry out the defendant's anticompetitive scheme. *Id.* at 96. Here, as discussed above, the injury to the plaintiff was a necessary step in the defendant's attempt to restrain J.R. Peters' ability to compete. Applying the terminology of *Gregory,* the plaintiff's role was essential to the defendant's scheme.

The defendant also argues that the plaintiff did not make

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 1529185 (E.D.Pa.)
**(Cite as: 2004 WL 1529185 (E.D.Pa.))**

any allegation of injury to J.R. Peters, and thus there can be no link to the injury allegedly suffered by the plaintiff. The plaintiff admits that it does not allege harm to J.R. Peters. *See* Tr. of July 31 Hr'g at 16. The plaintiff in *McCready*, however, did not allege that the competition between psychiatrists and psychologists was harmed. 457 U.S. at 490 n. 7 (Rehnquist, J., dissenting). As noted in *Crimpers*, if harm to the competitor, or to competition generally, was essential, the antitrust defendants would be in a better position if their scheme failed than if it succeeded. 724 F.2d at 295 n. 4. The injury to J.R. Peters is not the focus of the analysis for standing. The analysis instead focuses on the connection between the plaintiff's injury and the harm that the defendant sought to inflict on J.R. Peters and the water-soluble fertilizer market.

### 2. *Other Standing Requirements*

Antitrust injury and antitrust standing are "difficult to disentangle." *City of Pittsburgh*, 147 F.3d at 265 n. 15. Although antitrust injury often blends into the other requirements of standing, the Court finds that the plaintiff satisfied each of those requirements.

The causation of harm by intentional antitrust violations and the directness of the harm suffered are two closely related factors. These factors are satisfied when the complaint is read in a light most favorable to plaintiff. The plaintiff has pleaded it was directly injured and has argued that this injury was caused by the defendant's use of its market power in an intentional attempt to monopolize.

**\*6** The next factor to examine is whether another more direct victim of the alleged antitrust violation exists. The defendant argues that J.R. Peters and consumers would be more direct victims than the plaintiff. The defense theory is that other parties would be better plaintiffs because consumers and competitors are the presumptively proper plaintiffs. *Serpa*, 199 F.3d at 10. Although those parties might be presumptively proper, the plaintiff is also proper. The Court has determined that the plaintiff's injury was direct and not remote, and, as there are no allegations regarding any injuries to others, the Court finds that this factor is satisfied.

Finally, the plaintiff's alleged injury is based on the distribution agreement and is "distinct and different" from the injury suffered by J.R. Peters for loss of its market share. *Crimpers*, 724 F.2d at 293-94; *see also McCready*, 457 U.S. at 475. There is no possibility of duplicative recovery. This factor also weighs in favor of the plaintiff's antitrust standing.

### B. *Allegations of Attempted Monopolization*

A claim of attempted monopolization under 15 U.S.C. § 2 must allege these three elements: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Courts may examine the third factor first, as a threshold matter. [FN7]

> FN7. *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir.1987).

The Court finds that the plaintiff sufficiently alleged that the defendant had a dangerous probability of achieving monopoly power. In examining this element, the Court looks to "the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456.

The relevant product market is identified in the complaint as the water-soluble fertilizer market. *See* Am. Compl. ¶ 8-9. The defendant argues that the plaintiff did not sufficiently address the reasonable interchangeability and cross-elasticities of demand for product substitutes. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.1997). The complaint did allege how the product is absorbed, how long the effect lasts, and which types of plants are compatible with the product. *See* Am. Compl. ¶¶ 8-9. Although the plaintiff did not make specific allegations naming product substitutes, it identified a product market when all inferences are drawn in the light most favorable to the plaintiff. [FN8]

> FN8. The defendant also argues that the plaintiff did not allege whether it refers to the consumer or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2004 WL 1529185 (E.D.Pa.)
**(Cite as: 2004 WL 1529185 (E.D.Pa.))**

professional water-soluble fertilizer market or both. The complaint, however, explicitly stated that the consumer and professional water-soluble fertilizer products form submarkets. Am. Compl. ¶ 47.

The plaintiff also identified the relevant geographic market. The complaint identified the United States as the market and the mid-Atlantic region, including North Carolina, Virginia, West Virginia, Pennsylvania, New Jersey, Maryland, Delaware, Connecticut, Washington, D.C., and areas of New York, as the relevant submarket. [FN9] Am. Compl. ¶¶ 10, 47.

> FN9. The defendant contends that the plaintiff confused the United States and mid-Atlantic when describing the geographic region. As with the product market, the plaintiff alleged a geographic market and a submarket.

The geographic market is "the area in which a potential buyer may rationally look for the goods or services he or she seeks." _Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 726 (3d Cir.1991)_ (citations omitted). In reviewing a jury verdict, the decision in _Tunis Brothers_ explained that the legal standard in proving a geographic market is not satisfied by merely delineating a geographic area. _Id._ at 727. The plaintiff, however, identified a geographic area and also discussed competition in the water-soluble fertilizer market in that area. _See_ Am. Compl. ¶¶ 18-20, 26. For the purposes of a motion to dismiss, the Court finds that the plaintiff sufficiently alleged a geographic market.

*7 The defendant also argues that the plaintiff failed to allege facts to show that its injury would have been more likely to lead to harm to J.R. Peters. The complaint alleged that there was a dangerous probability that the defendant would achieve a monopoly. Am. Compl. ¶ 49. It alleged that the defendant is dominant in the relevant product and geographic market and submarkets. _Id._ at ¶¶ 5, 12, 14. The plaintiff specifically stated that the defendant has more than a 75% market share in the domestic consumer water-soluble fertilizer market. _Id._ at ¶ 5. The complaint additionally alleged that the plaintiff was a principal distributor for J.R. Peters and that the defendant viewed J.R. Peters as a threat

to its dominant position in the relevant market and submarkets. _Id._ at ¶¶ 18-19. These factors lead the Court to conclude that the plaintiff sufficiently alleged that its injury caused by the defendant would lead to harm to J.R. Peters and that the defendant has the ability to lessen or destroy competition.

The Court also looks to factors other than market share, such as "the strength of competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand." _Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 112 (3d Cir.1992)_. The plaintiff made allegations regarding the strength of competition, the barriers to entry, the nature of the conduct. _See_ Am. Compl. ¶¶ 12, 19, 21, 30- 31. The Court finds that the complaint sufficiently alleges that there is a dangerous probability that the defendant would achieve a monopoly.

As to the first element of an attempted monopolization claim, the Court finds that the plaintiff sufficiently alleged that the defendant engaged in anticompetitive conduct. The defendant argues that its offer to renew the distribution agreement contingent on the plaintiff's discontinuing to distribute J.R. Peters' products is nothing more than an offer for an exclusive distribution agreement. An exclusive agreement, while permissible in some cases, will be considered anticompetitive conduct when it is coupled with intent to harm competition. _See Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 735 (9th Cir.1987)_.

The Court finds that the complaint adequately pleaded the second element of attempted monopolization, a specific intent to monopolize. The plaintiff alleges enough facts, for the purpose of this motion, regarding the defendant's intention to injure the plaintiff, J.R. Peters, and competition. _See_ Am. Compl. ¶¶ 20, 30, 48.

The defendant relies on the Ninth Circuit's decision in _Rutman_ to demonstrate that specific intent cannot be inferred simply from a decision to terminate a distributor. In _Rutman,_ the court held that "[t]ermination of one distributor in order to establish an exclusive distributorship, even with the knowledge that harm to competition will ensue, does not create an inference that harm to competition is intended...."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1529185 (E.D.Pa.)
**(Cite as: 2004 WL 1529185 (E.D.Pa.))**

829 F.2d at 735-36.

**\*8** This case is unlike *Rutman* in that the plaintiff's allegations encompass more than a terminated distributor agreement. The plaintiff has alleged that the agreement was terminated because the plaintiff continued to distribute J.R. Peters' products and entertained a bid from J.R. Peters to manufacture Olympic. These allegations are sufficient to allege specific intent to monopolize on the part of the defendant.

An appropriate Order follows.

*ORDER*

AND NOW, this 18th day of February 2004, upon consideration of the defendant's Motion to Dismiss Count I, and Motion to Dismiss or, in the Alternative, Stay Counts II and III Pending Arbitration (Docket No. 5), the plaintiff's response thereto, and the defendant's reply, and following oral argument held on July 31, 2003, IT IS HEREBY ORDERED that the motion is DENIED, for the reasons set forth in a memorandum of today's date. The motion is DENIED insofar as it seeks to dismiss Count I. In all other respects, the motion is DENIED as moot.

Not Reported in F.Supp.2d, 2004 WL 1529185 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2718002 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Motion of U.S. Horticultural Supply Inc., to Compel the Production of Documents (Sep. 02, 2004)

• 2004 WL 2717991 (Trial Motion, Memorandum and Affidavit) Defendant the Scotts Company's Response in Opposition to U.S. Horticultural Supply, Inc.'s Motion to Compel the Production of Documents (Aug. 19, 2004)

• 2004 WL 2717978 (Trial Motion, Memorandum and Affidavit) Motion to Compel the Scotts Company to Produce Documents (Aug. 05, 2004)

• 2004 WL 2717967 (Trial Motion, Memorandum and Affidavit) Defendant the Scotts Company's Response in Opposition to U.S. Horticultural Supply, Inc.'s Motion to Compel the Production of Documents (May. 18, 2004)

• 2004 WL 2717961 (Trial Motion, Memorandum and Affidavit) Motion to Compel the Production of Documents (May. 11, 2004)

• 2004 WL 2717952 (Trial Pleading) Answer, Affirmative Defenses and Counterclaims of Defendant the Scotts Company (Mar. 26, 2004)

• 2003 WL 23905313 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Defendant the Scotts Company's Motion to Dismiss (Apr. 23, 2003)

• 2003 WL 23905295 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss (Apr. 14, 2003)

• 2003 WL 23905275 (Trial Motion, Memorandum and Affidavit) Defendant the Scotts Company's Motion to Dismiss Count I and Motion to Dismiss or, in the Alternative, Stay Counts II and III Pending Arbitration (Mar. 14, 2003)

• 2003 WL 23905253 (Trial Pleading) Amended Complaint (Feb. 28, 2003)

• 2003 WL 23905228 (Trial Pleading) Complaint (Feb. 07, 2003)

• 2:03cv00773 (Docket) (Feb. 07, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT V

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

☞

**Motions, Pleadings and Filings**

United States District Court, D. Delaware.
UNITED STATES of America, Plaintiff,
v.
DENTSPLY INTERNATIONAL, INC., Defendant.
HOWARD HESS DENTAL LABORATORIES
INCORPORATED and Philip Guttierez d/b/a
Dentures Plus, on behalf of themselves and all others
similarly situated,
Plaintiffs,
v.
DENTSPLY INTERNATIONAL, INC., Defendant.
Amnon KAMINER, Frieda Simon and Lorraine Goldsmith,
individually and on behalf
of all others similarly situated, Plaintiffs,
v.
DENTSPLY INTERNATIONAL, INC., Defendant.
**No. CIV. A. 99-005-SLR, CIV .A. 99-255-SLR, CIV. A.
99-854-SLR.**

March 30, 2001.

Carl Schnee, United States Attorney and Judith M. Kinney, Assistant United States Attorney, United States Attorney's Office, Wilmington, Delaware. William E. Berlin, Esquire and Jon B. Jacobs, Esquire of the United States Department of Justice, Antitrust Division, Washington, D.C.

Pamela S. Tikellis, Esquire and Robert J. Kriner, Esquire of Chimicles & Tikellis, Wilmington, Delaware. Counsel for plaintiffs Howard Hess Dental Laboratories et al. Thomas A. Dubbs, Esquire and Hollis L. Salzman, Esquire of Goodkind Labaton Rudoff & Sucharow, New York, New York. Of counsel for plaintiffs Howard Hess Dental Laboratories et al.

Neal J. Levitsky, Esquire of Agostini, Levitsky, Isaacs & Kulesza, Wilmington, Delaware. Counsel for plaintiffs Amnon Kaminer et al. Sigmund S. Wissner-Gross, Esquire, May Orenstein, Esquire, and Allen M. Eisenberg, Esquire of Heller, Horowitz & Feit, New York, New York. Of counsel for plaintiffs Amnon Kaminer et al.

James P. Hughes, Esquire and John W. Shaw, Esquire of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware. Counsel for defendant Dentsply International, Inc. Margaret M. Zwisler, Esquire, Richard A. Ripley, Esquire, Kelly A. Clement, Esquire, Eric J. McCarthy, Esquire, and David P. Burns, Esquire of Howrey Simon Arnold & White, Washington, D.C. Of counsel for defendant Dentsply International, Inc.

MEMORANDUM OPINION
ROBINSON, Chief J.

I. INTRODUCTION

**\*1** Plaintiff United States of America ("the government") filed an antitrust action against Dentsply International Inc. ("Dentsply") on January 5, 1999. Dentsply makes and sells artificial teeth and other dental merchandise. The government generally alleges that Dentsply uses anticompetitive tactics to keep its competitors from entering the artificial tooth market.

Plaintiff Howard Hess Dental Laboratories, Inc. and Philip Guittierez d/b/a Dentures Plus (hereinafter referred to collectively as "the Hess plaintiffs") filed an antitrust class action against Dentsply on April 21, 1999. The Hess plaintiffs are dental laboratories. Plaintiffs Amnon Kaminer, Frieda Simon, and Lorraine Goldsmith (hereinafter referred to collectively as "the Kaminer plaintiffs") filed another class action against Dentsply in the Supreme Court of the State of New York on behalf of a consumer class . [FN1] Dentsply removed that action on diversity grounds to the United States District Court for the Southern District of New York, which transferred the action to this court on November 29, 1999 pursuant to 28 U.S.C. § 1404(a).

> FN1. The Kaminer plaintiffs' counsel indicated that Amnon Kaminer will be withdrawing his claim against Dentsply. (C.A. No. 99-854, D.I. 63 at 1 n. 1)

In its suit, the government specifically alleges that Dentsply 1) acted unlawfully to maintain a monopoly in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; 2) entered into unlawful restrictive dealing agreements that substantially

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



lessen competition in violation of § 3 of the Clayton Act, 15 U.S.C. § 14; and 3) entered into unlawful agreements in unreasonable restraint of interstate trade and commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. As a result, the government seeks injunctive relief and costs.

The Hess plaintiffs in their case allege the same three antitrust violations as the government. In addition to injunctive relief, the Hess plaintiffs seek compensatory and treble damages for the alleged violations.

The Kaminer plaintiffs in their suit seek compensatory and treble damages for alleged violations of the antitrust laws of sixteen states and the District of Columbia.

Dentsply is a Delaware corporation with its principal place of business in York, Pennsylvania. Dentsply transacts business in and is found within this district. Thus, this court has jurisdiction pursuant to 15 U.S.C. § 22.

Currently before the court are Dentsply's motions for summary judgment on the merits of the antitrust causes of action. (C.A. No. 99-005, D.I. 230; C.A. No. 99-255, D.I. 130; C.A. No. 99-854, D.I. 45) [FN2] Also before the court are Dentsply's motions for summary judgment against the Hess and Kaminer plaintiffs based on standing and statute of limitations grounds. (C.A. No. 99-255, D.I. 133, 135; C.A. No. 99-854, D.I. 48, 51)

> FN2. Unless otherwise noted, docket entries refer to submissions made in C.A. No. 99-005.

## II. BACKGROUND

This case focuses on the manufacture and sale of artificial teeth in the United States. Artificial teeth are marketed to dentists and dental laboratories for use in the fabrication of dentures. As a result of the need to match variances in the teeth in a human mouth, artificial teeth are manufactured in thousands of shade and mould [FN3] combinations. They are sold on a card of six anterior or eight posterior teeth of the same shade and mould. Thus, a full denture (one that replaces all natural teeth) requires 28 teeth and four cards. Partial dentures are constructed when only a few teeth need replacement. (D.I. 231 at 3)

> FN3. A review of the artificial teeth trade literature had found that the preferred spelling of this word is "mould" instead of "mold."

*2 Generally, the process of constructing a denture begins with the dentist, who writes a denture "prescription" that specifies size, shape, and color requirements for the teeth in the denture appliance and sends it to a dental laboratory for fabrication. The dental laboratories purchase artificial teeth from dental product dealers, from artificial teeth manufacturers, or from other dental laboratories. (*Id.* at 3-4) The dental product dealers purchase artificial teeth from manufacturers such as Dentsply, Vita Zahnfabrik H. Rauter GmbH & Co. KG ("Vita"), and Ivoclar AG ("Ivoclar")). (D.I. 244 at 3)

### A. The Relevant Market and its Participants

The relevant market for purposes of this action is the sale of prefabricated, artificial teeth in the United States. [FN4] (D.I.1, ¶ 5) Dentsply is the world's leading manufacturer of dental prosthetics and other dental products. Its Trubyte Division sells, among other things, the artificial teeth used by dental laboratories to make dentures and other removable dental prosthetics. (*Id.*) Dentsply distributes its teeth exclusively through dental laboratory dealers. (D.I. 231 at 7)

> FN4. Dentsply accepts the government's market definition for the purposes of this summary judgment motion. (D.I. 231 at 23 n. 41)

The government alleges that Dentsply has maintained a market share in the artificial tooth market of 70% to 80% for the past ten years. (D.I.1, ¶ 7) Dentsply distributes its artificial teeth through approximately 30 dental laboratory dealers ("Trubyte dealers") with 200 branch outlets. Dentsply and the Trubyte dealers are not bound by a written contractual agreement. Trubyte dealers purchase teeth on a purchase order basis.

In 1995, Dentsply distributed its teeth through approximately 37 dental laboratory dealers with 238 branch outlets. (D.I. 233 at A-276-79) At that time, there were 344 "dental dealers" according to the Twenty-third Annual Directory of U.S. Dental Dealers. (*Id.* at A-280-311) Five

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

years later, Dentsply distributed Trubyte teeth to only 30 dealers with 200 branch outlets. (*Id.* at A-312-27; D.I. 234 at A-534)

Dentsply's biggest competitors are Vita and Ivoclar. Vita is a German company that manufactures and sells premium teeth throughout the world. Vita distributes its teeth in the United States through Vident, Inc. ("Vident"). Vident uses approximately 15 non-Trubyte subdealers to distribute Vita teeth. (D.I. 236 at A-1014-15) Ivoclar is a Liechtenstein company that manufactures and sells artificial tooth lines throughout the world. In the United States, Ivoclar promotes, sells, and distributes teeth through Ivoclar NA, its wholly-owned subsidiary. (D.I. 231 at 11) Ivoclar distributes its teeth directly to dental laboratories and has attempted to sell teeth through dental laboratory dealers. (D.I. 245 at B-1129) Other smaller competitors include Universal Dental Company, Austenal, Inc., and Heraeus Kulzer GmbH. (D.I. 231 at 16-18)

1. The Hess Plaintiffs

The Hess plaintiffs represent a putative class of dental laboratories seeking money damages and injunctive relief. In their complaint, the Hess plaintiffs allege that they purchased Trubyte teeth from a Dentsply dental laboratory dealer at artificially high prices caused by Dentsply's unlawful restraint of trade and monopolization. (C.A. No. 99-255, D.I.1, ¶ 4) The Hess plaintiffs purport to represent "all dental laboratory purchasers of any Dentsply products who purchased such products through Dentsply dealers .... Excluded from the Plaintiff Class are ... any co-conspirator[s] of the defendant ...." (*Id.,* ¶ 10)

**\*3** The named Hess plaintiffs purchased artificial teeth from dental laboratory dealers and, therefore, are indirect purchasers. The dental laboratory dealers, on the other hand, are the direct purchasers. In their opposition to Dentsply's motions for summary judgment, the Hess plaintiffs claim that some dental laboratories purchase artificial teeth from Dentsply. (C.A. No. 99-255, D.I. 151 at 44) This is done in one of two ways. First, Dentsply "drop ships" teeth to laboratories at the request of its dealers. Drop shipping occurs when a laboratory places an order with its dealer, which the dealer cannot fill out of its existing inventory.

(D.I. 256 at C-13) The dealer sends the order, along with its dealer purchase order number, to Dentsply and directs Dentsply to ship the teeth directly to the laboratory. Dentsply then charges the dealer for the shipment. (*Id.*) The second way that laboratories "directly" purchase teeth from Dentsply is through the Dentsply Order Network ("DON"). The DON is an internet-based system that allows laboratories to order products by scanning a bar code of the product it wants. (*Id.* at C-139) That information goes to a network communications company who sends the order to the dealer selected by the laboratory. [FN5] (*Id.* at C-148) The laboratory then fills the order just as if it received it on the telephone.

> FN5. The system also allows customers to order directly from Dentsply. (D.I. 256 at C-148) The Hess plaintiffs have not offered evidence that they or anyone else has used the DON to order directly from Dentsply.

2. The Kaminer Plaintiffs

The Kaminer plaintiffs represent a putative class comprised of

> [a]ll individuals and entities who purchased false teeth manufactured by [Dentsply], from entities or persons other than [Dentsply] in New York, Alabama, California, Florida, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, Wisconsin, and the District of Columbia.

(C.A. No. 99-854, D.I.1, Ex. A, ¶ 40) Although the class covers all indirect purchasers [FN6], the named plaintiffs are residents of New York who purchased dentures in New York from New York dentists. (C.A. No. 99-854, D.I. 64, Ex. C at 6; Ex. D at 6) The Kaminer plaintiffs allege that Dentsply has restrained trade in the United States market for prefabricated artificial teeth in violation of New York Gen. Bus. Law § 340 and the indirect antitrust laws of fifteen states and the District of Columbia.

> FN6. The court notes that since the Kaminer class purports to cover all indirect purchasers, the Hess plaintiffs would also be included in that class.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



B. Dentsply's Dealer Criteria

The focal point of this antitrust suit is Dentsply's "Dealer Criteria." Dentsply published its Dealer Criteria in 1993. The Dealer Criteria lists requirements for becoming and remaining an authorized Dentsply Trubyte dealer. (D.I. 245 at B-272) Among other things, the Dealer Criteria provides that "dealers that are recognized as authorized distributors may not add further tooth lines to their product offerings." (*Id.* at B-273) There is no contractual agreement between Dentsply and its Trubyte dealers. Thus, although Trubyte dealers may not add a competing line of teeth, they can switch to a rival manufacturer at any time. (D.I. 231 at 21)

*4 All of the plaintiffs in these cases (collectively, "plaintiffs") allege that this exclusive dealing policy was designed to and has thwarted competitors' attempts to build a dealer network and thus compete effectively in the United States. (D.I.1, ¶ 30) Plaintiffs further allege that Dentsply, through its exclusive dealing policy, has undermined the efforts of competitors to maintain or recruit dental laboratory dealers and has induced some dealers to stop distributing competitors' teeth. (D.I.1, ¶ 31) For example, in 1987, Frink Dental ("Frink"), a Trubyte dealer, agreed to start selling a competing tooth line. Dentsply terminated Frink as both a tooth and merchandise dealer. Dentsply also threatened to terminate other dealers that were supplying Frink with Trubyte teeth. Frink eventually agreed to stop selling the competing tooth line, and Dentsply reinstated Frink as a Trubyte dealer. (D.I. 244 at 6; D.I. 245 at B-1493; D.I. 245 at 1540-48)

Atlanta Dental Supply ("ADS") is another example of a Trubyte dealer whom Dentsply allegedly intimidated into foregoing a competitive tooth line. Sometime after 1993, ADS became interested in selling a competitive tooth line because it received a number of requests for them. ADS reached a tentative agreement with the competitor, but backed off the deal after Dentsply threatened to drop ADS as an authorized Trubyte dealer. (D.I. 244 at 6; D.I. 245 at B-1737-58)

In 1994, Pearson Dental Supply ("Pearson"), an authorized Trubyte dealer, took on a consignment of Vita teeth and began advertising them in its product catalog. Dentsply

threatened to terminate Pearson. Pearson dropped Vita and then decided not to add a different competitor's line. (D.I. 244 at 6; D.I. 245 at B-1827-48)

In 1995, Dentsply permitted one of its former dealers, Dental Technicians Supply ("DTS"), to resume selling Trubyte teeth only after DTS agreed to stop selling Vita, Ivoclar, and Justi teeth in its Kansas City, Denver, and Orlando locations. Dentsply placed different restrictions on DTS's New York location that allowed DTS to continue selling Vita. (D.I. 244 at 6; D.I. 245 at B-2048- 80; 333-40; 236-44)

In November 1998, DTS was acquired by Darby Dental ("Darby"), a Trubyte dealer that was not permitted to sell Vita in any location. When Darby acquired DTS's New York office, Darby management wanted to retain the Vita line in order to satisfy existing New York DTS customers. Dentsply insisted that if Darby were to sell Vita in its newly acquired New York office, Darby would be violating the Dealer Criteria. Dentsply gave Darby six months to exhaust DTS's Vita supply and offered to buy the remaining Vita inventory so that Darby would be in compliance. (C.A. No. 99-854, D.I. 64 at DPLY-A-018242-43)

C. Alleged Anticompetitive Effects of Dentsply's Restrictive Dealing Agreements

Plaintiffs allege that Dentsply, through its Dealer Criteria and other conduct, has entered into restrictive dealing arrangements with dental laboratory dealers, and sold teeth to them, on the condition that those dealers not deal with rival manufacturers. Plaintiffs allege that independent dental laboratory dealers have been, and continue to be, the primary channel of distribution of artificial teeth to dental laboratories. (D.I.1, ¶ 14) Dentsply's Trubyte Division distributes its teeth through a network of these independent dental laboratory dealers who collectively constitute approximately 80% of the outlets distributing artificial teeth and other dental laboratory products in the United States. (D.I.1, ¶ 16) Because Dentsply has a substantial market share, many dental laboratories currently use Dentsply Trubyte teeth and expect local dental laboratory dealers to have the Trubyte line available. By requiring the dental laboratory dealers to carry only the Trubyte line of teeth,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                         Page 5
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

plaintiffs allege that competitors are not able to effectively compete in the United States. (D.I.1, ¶ 24, 30) Plaintiffs further allege that Dentsply's conduct has undermined the efforts of small domestic competitors of Dentsply in the United States to maintain or recruit dental laboratory dealers. (D.I.1, ¶ 31)

*5 Dentsply contends that because its exclusive dealing policy does not foreclose its competitors from the market for artificial teeth in the United States, the policy is not forbidden under the Sherman or Clayton Acts. Dentsply argues that rather than being foreclosed from the relevant market, alternative channels of distribution exist for Dentsply's rivals. For example, Ivoclar and Vita sell teeth directly to dental laboratories without going through an intermediary--a dental laboratory dealer. Thus, even if Dentsply's restrictive dealing arrangement has the effect of foreclosing access to dental laboratory dealers, Ivoclar, Vita, and other manufacturers can reach the end users--the dental laboratories--without hindrance. Trubyte dealers are free to stop selling Dentsply teeth and switch to a rival at any time. Dentsply further supports its restrictive dealing policy by arguing that it has procompetitive benefits.

D. Standing

Dentsply filed motions for summary judgment on standing grounds against the Hess and Kaminer plaintiffs. Dentsply's standing arguments against the Hess plaintiffs center around the Supreme Court's decision in *Illinois Brick,* [FN7] while the standing arguments against the Kaminer plaintiffs relate to the named plaintiffs' ability to maintain a class action antitrust suit.

> FN7. *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977).

E. Statutes of Limitations

Dentsply filed motions for summary judgment on statute of limitations grounds against the Hess and Kaminer plaintiffs. The allegations against both sets of plaintiffs are essentially the same . [FN8]

> FN8. Because the statute of limitations for antitrust actions in Maine and Wisconsin is six years,

Dentsply does not seek summary judgment on statute of limitations grounds for claims arising under those laws. The federal antitrust laws and the antitrust laws of all other states involved here provide a limitations period of four years or less. *See* discussion *infra* Section IV.D.

Dentsply argues that the Hess and Kaminer plaintiffs' claimed injuries are derived from Dentsply's Dealer Criteria which was announced in February 1993. The Hess and Kaminer plaintiffs filed their suits in 1999, more than four years after Dentsply announced the policy. As a final, binding version of an allegedly anticompetitive policy, Dentsply argues that the suits are time-barred because they were not filed within four years after February 1993.

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita, 475 U.S. at 587* (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995).* The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

_Lobby, Inc., 477 U.S. 242, 249 (1986)._ If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. _See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)._

## IV. DISCUSSION

*6 Plaintiffs charge that by agreeing with some dental laboratory dealers that the dealers would not carry competitive tooth lines, Dentsply willfully maintained and abused a monopoly in the United States market for prefabricated artificial teeth in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. (D.I.1, ¶ 41) Plaintiffs allege that by entering into, maintaining, and enforcing these restrictive dealing agreements, Dentsply causes a substantial lessening of competition in the relevant market in violation of § 3 of the Clayton Act, 15 U.S.C. § 14, and unreasonably restrains trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

### A. Antitrust Claims

#### 1. The Legal Standard

Plaintiffs' first cause of action is Dentsply's alleged violation of § 2 of the Sherman Act. Section 2 prohibits a business with monopoly power from maintaining that monopoly power through means that go beyond competition on the merits. [FN9] To prove a claim under § 2, the plaintiffs must show that 1) Dentsply has a monopoly and 2) Dentsply maintained that monopoly through anticompetitive conduct as opposed to accident or superior business acumen. _See United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)._

> FN9. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony...." 15 U.S.C. § 2.

Plaintiffs' second cause of action alleges violations of § 1 of the Sherman Act and § 3 of the Clayton Act. Section 1 of

the Sherman Act provides that, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1. Only unreasonable restraints of trade are prohibited. _See Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988)._ Thus, to establish a claim under § 1 of the Sherman Act, plaintiffs must show that 1) there was a contract, combination, or conspiracy; 2) that unreasonably restrained trade; and 3) affected interstate commerce. _See Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp., 185 F.3d 154, 157 (3d Cir.1999)._ All exclusive dealing agreements must comply with § 1 of the Sherman Act. _Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 110 (3d Cir.1992),_ citing _American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1239 (3d Cir.1975)._

Section 3 of the Clayton Act makes it unlawful for a person to sell goods on the condition, agreement, or understanding that the purchaser shall not deal in the goods of a competitor where the effects of such conditions, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly. _See 15 U.S.C. § 14._ In order to prove a claim under § 3 of the Clayton Act, plaintiffs must prove that the probable effect of Dentsply's restrictive dealing agreements is to decrease competition. _See Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356 (1922)._ Exclusive dealing contracts are unlawful where they significantly foreclose the opportunity for rivals to enter or remain in the market. _See Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327-29 (1961). See also,_ Stephen F. Ross, _Principles of Antitrust Law,_ 304-05 (1993). If an exclusive dealing policy "does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of [§ 1 and § 2 of the Sherman Act.]" _Tampa Electric,_ 365 U.S. at 335.

#### 2. Analysis

*7 Dentsply argues in support of its motions for summary judgment that its exclusive dealing agreements do not foreclose its rivals from reaching the end users--the dental laboratories. Dentsply points to four factors identified in the caselaw that preclude a claim of foreclosure:
• Competitors use other dealers;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                          Page 7
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

• Competitors sell directly to end users;

• Competitors can pursue new dealers; and

• Dealers can switch to the defendant's competitors.

In this regard, Dentsply contends that where the record demonstrates the above factors, exclusion from the dealers of the defendant has been held not to constitute a substantial lessening of competition.

Dentsply is correct in its assertion that, in the cases it cites, no antitrust violations were found. Of the five cases cited, however, three were decided after trial on the merits. One was decided on a preliminary injunction record. [FN10] Only one was decided on a summary judgment record. *See CDC Techs. v. IDEXX Labs ., 186 F.3d 74 (2d Cir.1999).* [FN11] In that case, plaintiff CDC Technologies ("CDC") sold blood analysis machines to veterinarians. It filed suit against its competitor, IDEXX Laboratories ("IDEXX"), and alleged, among other things, unlawful restraint of trade in violation of § 3 of the Clayton Act and monopolization and conspiracy to monopolize in violation of § 1 of the Sherman Act. In particular, CDC alleged that IDEXX illegally entered into exclusive dealing arrangements with CDC's former distributors. The distributors' role with CDC had been to provide CDC with the names of veterinarians potentially interested in purchasing blood analysis machines. IDEXX, a later entrant in the market, signed up CDC's distributors to play the same role in furnishing the names of likely veterinarians. The distributors did not purchase or resell the machines; rather, they merely located prospective customers.

> FN10. In that case, *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380 (7th Cir.1984), the court specifically held that, "although we have concluded that the district judge should not have granted Roland's motion for a preliminary injunction, our discussion of the probable merits of Roland's antitrust claim is tentative. We do not exclude the possibility that on the fuller record made in the trial on the merits Roland will succeed in establishing its claim." *Id.* at 395-96.

> FN11. Therefore, while some general principles may be distilled from these decisions, all but one

are distinguishable based upon the procedural posture of this case.

The district court granted IDEXX's motion for summary judgment, concluding that CDC could not prove that the exclusive dealing arrangements had anticompetitive effects because: 1) the role of the distributors was so limited; 2) CDC had successfully used other techniques to reach end users; and 3) the exclusive dealing arrangements were of short duration and easily terminable. *Id.* at 75. On appeal, the Second Circuit affirmed the grant of summary judgment, finding that CDC's Clayton Act claim failed on a threshold level because the Clayton Act "does not regulate an arrangement with a distributor or middleman unless it involves actual sales." *Id.* at 75-76.

Of the three remaining cases, none have facts comparable to those at bar. For instance, in *U.S. Healthcare v. Healthsource,* 986 F.2d 589 (1st Cir.1993), the court found no antitrust violations where defendants controlled only 4% to 5% of the relevant market and the doctors who had signed the exclusivity contracts at issue were not prohibited from seeing patients from the plaintiff HMOs; the only consequence of their doing so was that the doctors would lose the pay differential for being an exclusive service provider. In the district court's opinion, such an "exclusive clause [was] simply not 'an exclusive dealing arrangement' cognizable under antitrust laws." ' *U.S. Healthcare v. Healthsource,* 1992 U.S. Dist. LEXIS 5826 at * 26 (citing *Reazin v. Blue Cross & Blue Shield of Kansas, Inc., 663 F.Supp. 1360, 1478 (D.Kan.1987)).* The appellate court affirmed.

**\*8** The defendant in *Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215 (8th Cir.1987), had been one of plaintiff Ryko's distributors. Under its distributor contract, Eden had an exclusive geographic territory and was prohibited from selling competitive car-wash equipment, including a water reclaim device developed by Eden. In examining the exclusive dealing provisions of the distributor contract under § 1 of the Sherman Act and § 3 of the Clayton Act, the court declared that

> exclusive dealing should be evaluated under an analysis "which takes into account not only the market share of the firm but the dynamic nature of the market in which the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                          Page 8
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

foreclosure occurs.

*Id.* at 1234. With Ryko's market share of 8% to 10%, the court concluded that Eden had not shown that the restraint had a probable adverse effect on interbrand competition.

> Eden has produced no evidence suggesting that Ryko's exclusive dealing provisions generally prevent Ryko's competitors from finding effective distributors for (or other means of promoting and selling) their products. Rather, Eden charges that these provisions foreclose competition by preventing Eden from marketing its own water reclaim unit. The short answer to Eden's argument is that the concern of the antitrust law is the protection of competition, not individual competitors; the law is not designed to relieve a particular business of the burden of making the difficult choice between manufacturing its own product or distributing the product of another concern.

*Id.*

Finally, the court in *Omega Envtl. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir.1997), concluded that Omega had not shown at trial that Gilbarco's exclusive dealing policy foreclosed competition in the market under the Clayton Act. In so concluding, the court noted that Gilbarco's policy foreclosed roughly 38% of the relevant market for sales, a "significant" foreclosure rate. Nevertheless, the court recognized under the rule of reason that other factors weighed against a finding of unreasonable restraint of trade.

> First, exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern.... The record contains undisputed evidence that direct sales to end-users are an alternative channel of distribution in this market.... The record also contains undisputed evidence of potential alternative sources of distribution.

> Second, the short duration and easy termination of these agreements negate substantially their potential to foreclose competition.

*Id.* at 1163-64.

Based upon its reading of the above caselaw, Dentsply asserts that its Dealer Criteria satisfies each of the four factors considered by courts in evaluating the competitive effects of exclusive dealing policies. First, Dentsply's

competitors use different dental laboratory dealers to sell to dental laboratories. For example, Vita sells its teeth through Vident and Vident's subdealers. Second, some of Dentsply's competitors sell directly to the end users. For example, Ivoclar distributes its artificial teeth directly to dental laboratories in the United States. Third, its competitors could pursue new dealers. Dentsply claims there are 344 "dental dealers" in the United States, of which only approximately 30 are Trubyte dealers. Finally, the Trubyte dealers can switch to competing tooth lines at any time. No contract binds a Trubyte dealer to Dentsply. Dealers are free to switch to Vita, Ivoclar, or any other tooth manufacturer at any time.

*\*9* While the court agrees that the existence of alternative channels of distribution to end users lessens the likelihood that an exclusive dealing policy forecloses competition in the relevant market, Dentsply has not met its burden of showing that it is entitled to judgment as a matter of law. A genuine issue of material fact still exists as to whether selling directly to the end users is a viable option for manufacturers of artificial teeth.

Moreover, a genuine issue of material fact exists with respect to the foreclosure rate. Dentsply claims that the foreclosure rate in this case is approximately 10% because it only controls 30 of the over 300 "dental dealers." The government claims, however, that the number of available dental laboratory dealers is far less than what Dentsply claims. Dentsply relies on the figure of "dental dealers" listed in the Directory of U.S. Dental Dealers. That number, according to the government, includes "operatory" dealers. These operatory dealers sell various merchandise and equipment to dentist offices as opposed to the dental laboratories who purchase teeth. Dentsply has not convinced the court that these "operatory" dealers "have actual or potential ability to deprive existing dental laboratory dealers of significant levels of business." *Id.* at 1163, citing *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir.1989).

Dentsply also argues that because its exclusive dealing policy has procompetitive benefits, plaintiffs must prove that rivals are foreclosed from the market to maintain their claims. For example, Dentsply markets and promotes its



Not Reported in F.Supp.2d                                                              Page 9
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

teeth to dental laboratories, dentists, and dental students through national advertising, sales calls by its sales representatives, and through training and education programs. (D.I. 231 at 35) Dentsply claims that its ability to recoup its investment in these promotional efforts necessarily depends upon its ability to restrict its dealers from distributing rival tooth products. (*Id.*) Dentsply is correct that the plaintiffs have the ultimate burden of proving that the probable effect of the Dealer Criteria is to "foreclose competition in a substantial share of the line of commerce affected." *Tampa Electric,* 365 U.S. at 327. However, even if Dentsply creates demand for its Trubyte teeth, Dentsply has not presented enough evidence to demonstrate as a matter of law that its business justifications prevent the plaintiffs from meeting their burdens.

For the foregoing reasons, the court shall deny Dentsply's motions for summary judgment on the merits of the antitrust action. (C.A. No. 99-005, D.I. 230; C.A. No. 99-255, D.I. 130; C.A. No. 99-854, D.I. 45)

B. Standing Under Federal Antitrust Laws

1. The Legal Standard

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property ... shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). Although the Clayton Act provides relief to anyone injured, the Supreme Court limited the scope of injured plaintiffs in *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977).

**\*10** In *Illinois Brick,* the State of Illinois and 700 local government entities sought treble damages from defendant concrete block manufacturers under § 4 of the Clayton Act for an alleged price-fixing conspiracy. Plaintiffs alleged that the defendants had passed on overcharges resulting from the price-fixing conspiracy to masonry contractors who then passed on the overcharges to general contractors who then passed the overcharges to plaintiffs who purchased buildings made from concrete block. The plaintiffs, therefore, were indirect purchasers of concrete block. *Id.* at 726-27.

The issue before the Supreme Court was whether indirect purchaser plaintiffs could use the "pass on" theory to state a damage claim against an alleged antitrust violator. Previously, in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481 (1968), the Court held that antitrust defendants could not argue that plaintiffs seeking treble damages were not injured because the plaintiffs had "passed on" the illegal overcharge to their own customers. *Id.* at 489. Maintaining consistency, the *Illinois Brick* Court held that antitrust plaintiffs could not claim an injury resulting from overcharges passed on to them through those who purchased directly from the defendant. *Illinois Brick,* 431 U.S. at 724-26, 735. The Court gave three reasons why the *Hanover Shoe* rule should apply to both plaintiffs and defendants. First, symmetry was necessary to avoid multiple liability. Without symmetry, both the brick masons and the state could sue the defendants and recover the full amount of the overcharge. *Id.* at 730. Second, the Court was concerned that judicial analysis of pass-on arguments would increase the complexity of antitrust litigation. *Id.* at 731-32. Finally, the majority argued that the private attorney general rationale underlying § 4 is best served by keeping all relief in the hands of the direct purchaser. *Id.* at 737-47. *See generally,* Ross, *supra,* at 218-19.

The Supreme Court has identified some exceptions to the indirect purchaser rule. In *Illinois Brick* itself, the Court noted that exceptions to the indirect purchaser rule would include situations where the indirect purchaser acquired goods through a preexisting cost-plus contract or "where the direct purchaser is owned or controlled by its customer." *Illinois Brick,* 431 U.S. at 736 & n. 16.

Since *Illinois Brick,* the Court has issued two notable opinions regarding antitrust standing. In *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519 (1983) ("*AGC* "), the Supreme Court synthesized its previous rulings on antitrust standing by analyzing five factors to resolve the standing issue before it. As the Third Circuit explained in *McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 850 (3d Cir.1996), the Supreme Court considered 1) the causal connection between the antitrust violation and the harm to the plaintiff, 2) whether the antitrust injury is "of the type that the antitrust statute was intended to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                                        Page 10
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

forestall," 3) the directness or indirectness of the asserted injury, 4) the existence of more direct victims of the alleged violation, and 5) the potential for duplicative recovery or complex apportionment of damages. *See id.* at 850 (citing *AGC,* 459 U.S. at 537-44).

**\*11** In *Kansas v. Utilicorp United, Inc.,* 497 U.S. 199 (1990), plaintiffs, state attorneys general representing residential users of natural gas, sued various producers of natural gas who allegedly conspired to fix prices. The indirect purchaser plaintiffs argued that *Illinois Brick* did not apply because the concerns regarding risk of multiple recovery and difficulty in apportionment would not be implicated where the regulated utilities passed on one hundred per cent of their costs to customers. *Id.* at 208. The Court rejected the plaintiffs' theory, holding that the absence of a particular *Illinois Brick* predicate in an individual case does not change the bar against indirect purchaser suits. "[E]ven assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions." *Id.* at 217.

In addition to *Illinois Brick* 's "control exception," several courts have recognized a "co-conspirator exception." *See, e.g., McCarthy,* 80 F.3d at 855. Under this exception, indirect buyers have standing to bring an antitrust claim against defendants who are co-conspirators in a vertical antitrust conspiracy. *Id.* at 854. The Third Circuit, however, has "refused to adopt such an exception where the alleged co-conspirators immediately upstream were not also joined as codefendants." *Id.*

2. Analysis

The Hess plaintiffs attack the standing issue with several theories. First, they assert that some dental laboratories are "direct" purchasers from Dentsply for purposes of *Illinois Brick* . [FN12] The Hess plaintiffs claim that when Dentsply drop ships teeth directly to a dental laboratory or when the laboratory orders teeth through the internet-based DON, the Hess plaintiffs are direct purchasers and, thus, are entitled to pursue a damage claim under § 4 of the Clayton Act. When teeth are drop shipped or ordered through the DON, the

shipment may go directly from Dentsply's York, Pennsylvania plant to the dental laboratory. According to § 2-103(d) of the Uniform Commercial Code, Dentsply is the "seller" of the goods. Section 2-106(1) defines a "sale" as "consist [ing] of the passing of title from the seller to the buyer for a price." Finally, § 2-401(2) dictates that such title passes to the buyer at the time and place for physical delivery of the goods. The Hess plaintiffs argue that since the Trubyte dealers never have physical custody of the teeth, title never passes to them. Since title passes directly from Dentsply to the dental laboratory, the Hess plaintiffs claim they are direct purchasers.

> FN12. The Hess plaintiffs' complaint specifically limits the class to "all dental laboratory purchasers of any Dentsply products who purchased such products through Dentsply Dealers ...." (C.A. No. 99-255, D.I.1, ¶ 10) (emphasis added). In their opposition to Dentsply's motion for summary judgment on standing grounds, the Hess plaintiffs claimed that "discovery has revealed that a substantial portion of Dentsply's sales are made directly to labs." (C.A. No. 99-255, D.I. 151 at 44 n. 21) The Hess plaintiffs offered to amend the complaint to allege that some laboratories purchased teeth directly from Dentsply. (*Id.*)

The court rejects this theory foremost because the complaint specifically alleges that the Hess plaintiffs are not direct purchasers. The named plaintiffs do not claim to have themselves purchased teeth directly from Dentsply. The court is likewise not convinced that this creative title theory is sufficient to overcome *Illinois Brick.* When a dental laboratory places an order through the DON or the teeth are drop shipped, the Trubyte dealer is still involved in the transaction. The dental laboratory pays the Trubyte dealer for the teeth and the Trubyte dealer in turn pays Dentsply. Because the Trubyte dealer acts as an intermediary between the dental laboratory and Dentsply, the court finds that the Hess plaintiffs are not direct purchasers under this theory.

**\*12** The Hess plaintiffs next argue that even if they are indirect purchasers, they have standing because the Trubyte dealers are co-conspirators of Dentsply and, therefore, *Illinois Brick* does not apply. The Hess plaintiffs did not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



join the dental laboratory dealers as co-conspirators. Instead, the named Hess plaintiffs signed stipulations with 22 of the 26 Trubyte dealers. (C.A. No. 99-255, D.I.175) The stipulations provide that the Trubyte dealers will release Dentsply from all claims for antitrust violations in exchange for the named plaintiffs agreeing not to file suit against the Trubyte dealers. According to the Hess plaintiffs' expert, Raymond S. Hartman, that group of 22 Trubyte dealers represents approximately 95% of the gross sales of Dentsply's Trubyte tooth products. (*Id.,* ¶ 3) The Hess plaintiffs argue that the stipulations alleviate the concerns of duplicative recovery and difficulty in apportionment. Without addressing the merit of that claim, [FN13] the court declines to make a new exception to *Illinois Brick* in light of 1) the Third Circuit's "refus[al] to adopt such an exception where the alleged co-conspirators immediately upstream were not also joined as codefendants," *McCarthy,* 80 F.3d at 854, and 2) the Supreme Court's ruling in *Utilicorp* whereby the Court invoked *Illinois Brick* to deny indirect purchaser standing even though the same economic assumptions in *Illinois Brick* were not present. 497 U.S. at 217.

> FN13. The court is not convinced that the stipulations will have the purported effects of eliminating duplicative recovery or difficulty in apportionment. The stipulations are only between the named plaintiffs and the 22 individual Trubyte dealers. Even if this court were to certify the class of dental laboratory dealers, the stipulations would not bind those class members who opt out of the class.

Next, the Hess plaintiffs argue that Dentsply exerts virtual control over its Trubyte dealers and, therefore, *Illinois Brick* does not apply. The co-conspirator exception has been recognized in the Third Circuit when an antitrust defendant actually owns the direct purchaser. *See In re Sugar Indus. Antitrust Litig.,* 579 F .2d 13, 18-19 (3d Cir.1978) (permitting indirect purchasers to maintain damage claims against defendant even though the plaintiffs actually purchased goods from divisions or subsidiaries of defendant). Since Dentsply does not own its authorized dental laboratory dealers, the Hess plaintiffs have failed to show that they fit within the "control exception" in its

current form. The Hess plaintiffs recognize that "the Third Circuit has [not] yet extended the 'control exception' to *Illinois Brick* beyond the scope of the parent-subsidiary relationship." The Hess plaintiffs nevertheless invite the court to expand the law to situations in which the manufacturer's control over its dealers is sufficiently strong enough to eliminate any possibility that the dealers might sue. In the absence of Third Circuit precedent, the court declines to expand the law.

The Hess plaintiffs argue further that they have standing because they also seek non-overcharge damages arising out of Dentsply's monopolistic and other conduct. In their opposition to Dentsply's motion for summary judgment on standing grounds, the Hess plaintiffs indicate that if they are barred by *Illinois Brick* from proving overcharge damages, they wish to retain the option of proving damages that, from their point of view, do not involve the difficulties of proof outlined in *Illinois Brick.* For example, the Hess plaintiffs claim that after discovery, they may be able to articulate a lost profits or other damages theory. Because the Hess plaintiffs have failed to articulate any theory of damages that would be anything other than the overcharges they incurred, the court holds that the Hess plaintiffs are barred by *Illinois Brick* from seeking money damages against Dentsply.

**\*13** The court must still decide, however, whether the Hess plaintiffs can seek injunctive relief. Section 16 of the Clayton Act provides that "[a]ny person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. *Illinois Brick* 's indirect purchaser rule is not applicable to claims for injunctive relief. *McCarthy,* 80 F.3d at 856. In order to seek injunctive relief, the Hess plaintiffs must show 1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury. *In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 400 (3d Cir.2000).

The Hess plaintiffs argue that they have been damaged in the form of over-payments for artificial teeth and will continue to be damaged as long as the conspiracy between Dentsply and its Trubyte dealers is allowed to remain in place. Dentsply argues that the Hess plaintiffs' claims for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



injunctive relief are essentially moot because the government's case also seeks injunctive relief. Dentsply suggests that the government can obtain the same relief for the Hess plaintiffs without tackling the procedural hurdles of Rule 23. Although Dentsply ultimately may be correct in its assertion, the court will reserve judgment on this issue until further argument on whether the interests of the Hess plaintiffs and those of the government are sufficiently identical to preclude the Hess plaintiffs from pursuing their claims for injunctive relief.

For the foregoing reasons, the court shall grant in part and deny in part Dentsply's motion for summary judgment on standing grounds. (C.A. No. 99- 255, D.I.133) The motion is granted to the extent that the Hess plaintiffs seek damages. The motion is denied to the extent that they seek injunctive relief.

C. Standing Under State Antitrust Laws

1. The Legal Standard

Several states have enacted statutes known as *Illinois Brick* repealers. These statutes provide that indirect purchasers may recover damages for violations of state antitrust laws where overcharges were passed on to them by direct purchasers. In *California v. ARC America Corp.*, 490 U.S. 93 (1989), the Supreme Court upheld the legality of such statutes.

Although the state laws involved here do not follow the indirect purchaser rule, most of them nevertheless look to cases construing the federal antitrust laws for guidance in interpreting their statutes. [FN14] Thus, the court will look to federal antitrust cases to determine the general standing requirements under the state antitrust laws.

> FN14. *See* D.C.Code Ann. § 28-4515 (1981); Fla. Stat. Ann. § 501.204(2) (West 1997 & Supp.1998); Mich. Comp. Laws Ann. § 445.784(2) (West 1989); N.M. Stat. Ann. § 57-1-15 (Michie 1995); S.D. Codified Laws § 37-1-22 (Michie 1994); W. Va.Code § 47-18-16 (1995); *Marshall v. Planz*, 13 F.Supp.2d 1231, 1246 (M.D.Ala.1998); *Vinci v. Waste Mgmt., Inc.*, 43 Cal.Rptr.2d 337, 338 n. 1

(Cal.Ct.App., 1st Dist.1995); *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 875 F.Supp. 8, 14 (D.Me.1994); *Keeting v. Philip Morris, Inc.*, 417 N.W.2d 132, 136 (Minn Ct.App.1987); *NAACP v. Claiborne Hardware Co.*, 393 So.2d 1290, 1301 (Miss.1980), rev'd on other grounds, 458 U.S. 886 (1982); *Chow v. Union Central Life Ins. Co*, 457 F.Supp. 1303, 1308 (E.D.N.Y.1978); *Rose v. Vulcan Materials Co.*, 194 S.E.2d 521, 530 (N.C.1973); *State ex rel. Leech v. Levi Strauss & Co.*, 1980 WL 4696 at *2 n. 2 (Tenn. Ch. Ct.1980); *Grams v. Boss*, 294 N.W.2d 473 (Wis.1980). It is not clear whether Kansas and North Dakota use the federal antitrust laws for guidance in interpreting their own antitrust statutes.

2. Analysis

The Kaminer plaintiffs maintain they have standing to seek damages under the antitrust laws of sixteen states and the District of Columbia. Dentsply attacks their standing on several grounds. First, Dentsply argues that the Kaminer plaintiffs suffered no injury under the antitrust statutes of the fifteen states other than New York and the District of Columbia. Since the Kaminer plaintiffs are New York residents who purchased dentures from a New York dentist in New York, the Kaminer plaintiffs suffered no antitrust injury in, for example, Minnesota. The Kaminer plaintiffs maintain that they only need individual standing to assert the claims of the absent class members. If the court certifies the class of indirect purchasers from the various states, the Kaminer plaintiffs contend that they will be a representative member of that class. The Kaminer plaintiffs argue that Dentsply's argument on this point is more appropriately made in opposition to class certification, not individual standing. The court agrees.

**\*14** Dentsply next argues that the Kaminer plaintiffs do not have standing because they did not participate in the relevant market. The Kaminer plaintiffs' complaint defines the relevant product market as "the sale of prefabricated artificial teeth in the United States." (C.A. No. 99-854, D.I.1, ¶ 10) The Kaminer plaintiffs purchased dentures rather than prefabricated artificial teeth. Dentsply contends that only about 6% of the price that dentists charge for



Not Reported in F.Supp.2d                                                    Page 13
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

dentures is attributable to the raw materials of the dentures, including the artificial teeth. (C.A. No. 99-854, D.I. 52 at 4) Despite the lack of complete identity between dentures and prefabricated artificial teeth, the court finds a sufficient nexus on the record presented between the Kaminer plaintiffs' purchases and the relevant product market. At this stage of the proceedings, the Kaminer plaintiffs are participants in the artificial tooth market because they arguably are unable to fill their need for dentures without becoming indirect purchasers of prefabricated artificial teeth.

Dentsply argues that the Kaminer plaintiffs' alleged injury is too remote and speculative to confer upon them antitrust standing. While the *Illinois Brick* repealers allow indirect purchasers to recover for their antitrust injuries, Dentsply argues that they do not confer automatic standing upon indirect purchasers. Instead, Dentsply asserts that the court should apply the *AGC* factors in determining standing under the state indirect purchaser statutes. The Kaminer plaintiffs argue that the purpose of the *AGC* factors is to guide the court's exercise of judgment in deciding standing in the absence of explicit statutory directives. The Kaminer plaintiffs contend that the states have issued an explicit legislative conferral of standing on indirect purchasers.

The Supreme Court in *Illinois Brick* discussed what class of persons could sue for treble damages in an antitrust action and concluded that only direct purchasers could sue. In *AGC*, however, the Court discussed the "conceptually more difficult question of 'which persons have sustained injuries too remote from an antitrust violation to give him standing to sue for damages.' " *Merican Inc. v. Caterpillar Tractor Co., 713 F.2d 958, 964 (3d Cir.1983)*. Thus, although the various states may have "repealed" *Illinois Brick* under their state schemes, that alone does not mean that they rejected the requirement that a plaintiff demonstrate injury sufficient to confer individual standing. *See, e.g., Stationary Eng'rs Local 39 Health & Welfare Trust Fund v. Philip Morris, Inc., 1998 U.S. Dist. LEXIS 8302, *17 n. 2, 27 (N.D.Cal.1998)*(stating that although *Illinois Brick* does not apply to California antitrust statute, plaintiff must still allege a direct injury to sustain a claim).

In this regard, Dentsply argues that the Kaminer plaintiffs'

theory requires proof that 1) Dentsply's Dealer Criteria and its other alleged anticompetitive behavior excluded competitive artificial tooth manufacturers from the market and limited competition in the sale of artificial teeth to dental laboratories; 2) the limited competition enabled Dentsply to exact monopoly profits from dental laboratory dealers; 3) Dentsply in fact charged supracompetitive prices for teeth; 4) all dealers, in turn, increased the prices they charged to dental laboratories; 5) when dental laboratories used Dentsply teeth in a denture, they increased the price that they charged the dentists for the denture and the price increase was attributable to the higher cost of the teeth; and 6) when the dentist sold the denature to the plaintiffs, all dentists independently chose to increase the price that they charged for the dentures.

**\*15** Regardless of whether Dentsply is correct in its analysis of plaintiffs' burden of proof, the court concludes that there are genuine issues of material fact relating to the Kaminer plaintiffs' antitrust injury that preclude the entry of summary judgment in favor of Dentsply as a matter of law under *AGC*.

As its final argument, Dentsply contends that New York law prohibits the Kaminer plaintiffs from maintaining their state law claims as a class action. When the Kaminer plaintiffs filed their complaint, they sought to maintain their various state claims, including New York's Donnelly Act, as a class action pursuant to Section 901(b) of the New York Civil Practice Law. Section 901(b) provides:

Unless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action.

New York State case law characterizes the Donnelly Act's treble damages remedy as penal. *See, e.g., Rubin v. Nine West Group, Inc., 1999 N.Y. Misc. LEXIS 655, (Sup.Ct.N.Y.Co.1999). See also, In re Microsoft Antitrust Litig., 127 F.Supp.2d 702, 727 (D.Md.2001)* (dismissing antitrust class action claims under New York law because class actions cannot be maintained if the remedy is penal).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                          Page 14
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
(Cite as: 2001 WL 624807 (D.Del.))

The Kaminer plaintiffs argue that since Dentsply removed this case to federal court, Fed.R.Civ.P. 23 governs this action rather than N.Y. C.P.L.R. § 901(b). The court must determine which law to apply.

The Third Circuit has recently reiterated the steps of analysis in choosing between a substantive state law and a potentially conflicting federal procedural rule. *See Chamberlain v. Giampapa,* 210 F.3d 154, 158-59 (3d Cir.2000). A federal court sitting in diversity must apply state substantive law and federal procedural law. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938). This substantive/procedural dichotomy of the "*Erie* rule" must be applied with the objective that "in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court [will] be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Guaranty Trust Co. v. York,* 326 U.S. 99, 109 (1945). This focus on whether application of a state rule will or may affect the outcome is intended to serve "twin aims": "discouragement of forum shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer,* 380 U .S. 460, 468 (1965).

> Erie and its progeny make clear that when a federal court sitting in a diversity case is faced with a question of whether or not to apply state law, the importance of a state rule is indeed relevant, but only in the context of asking whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court.

**\*16** *Id.* at 468 n. 9.

The Supreme Court has added two caveats to these *Erie* principles. First, even though application of the state rule may hold some potential for affecting the outcome, a strong countervailing federal interest will dictate recourse to the federal rule. *Byrd v. Blue Ridge Rural Electric Coop. Inc.,*

356 U.S. 525 (1958). Second, the *Erie* rule may not be "invoked to void a Federal Rule" of Civil Procedure. *Hanna,* 380 U.S. at 470. Where a Federal Rule of Civil Procedure provides a resolution of an issue, that rule must be applied by a federal court sitting in diversity to the exclusion of a conflicting state rule so long as the federal rule is authorized by the Rules Enabling Act and consistent with the Constitution. *Id.*

Under *Hanna,* a federal court sitting in diversity first must determine whether a Federal Rule directly "collides" with the state law it is being urged to apply. *See id.* at 470-74. If there is such a direct conflict, the Federal Rule must be applied if it is constitutional and within the scope of the Rules Enabling Act. *See Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 427 n. 7 (1996). If a "direct collision" does not exist, then the court applies the Erie rule to determine if state law should be applied. *Hanna,* 380 U.S. at 470.

The court finds no conflict between Fed.R.Civ.P. 23 and N.Y. C .P.L.R. § 901(b). Rule 23 of the Federal Rules of Civil Procedure governs the manner of determining whether class certification is appropriate in federal courts; § 901(b) establishes a bar to certain claims being considered for class action treatment on a threshold level. Given that Rule 23 and § 901(b) coexist without conflict, the court shall consider traditional *Erie* principles to determine which rule applies.

In order to ensure that the outcome of the litigation at bar will be substantially the same, "so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court," *Guaranty Trust,* 326 U.S. at 109, the court shall apply N.Y. C.P.L.R. § 901(b), which precludes these New York State residents from maintaining a class action under the Donnelly Act.

For the foregoing reasons, the court shall grant Dentsply's motion for summary judgment on standing grounds. (C.A. No. 99-854, D .I. 51)

D. Statute of Limitations

1. The Legal Standard

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247

**(Cite as: 2001 WL 624807 (D.Del.))**

Page 15

Claims for monetary and injunctive relief under the Clayton Act are governed by a four-year statute of limitations. 15 U.S.C. § 15b; _Pennsylvania Dental Ass'n v. Medical Serv. Ass'n_, 815 F.2d 270, 277-78 (3d Cir.1987)(assuming that four-year limitation period in § 15b applies to injunctive relief). When the government files suit seeking to enforce the federal antitrust laws, however, the statute of limitations for private rights of action is tolled while the government's suit is pending and for one year afterwards. 15 U.S.C. § 16(i). The government filed its antitrust action against Dentsply on January 7, 1999. Thus, in order for the Hess plaintiffs' claims under the federal antitrust statutes to be timely, their causes of action must have accrued after January 7, 1995.

*17 Ten of the state laws at issue also follow the four-year statute of limitations. [FN15] Five states have a limitations period shorter than four years. [FN16] Maine and Wisconsin have six-year statutes of limitations. [FN17] Although the Hess and Kaminer plaintiffs have different theories as to why their claims are timely, the underlying factual inquiries are the same.

> FN15. Cal. Bus. & Prof.Code § 16750.1 (West 1997); D.C.Code Ann. § 28-4511(b)(1981); Mich. Comp. Laws Ann. § 445.781(1) (West 1997); Minn.Stat. Ann. § 325D.64 (West 1997); N.M. Stat. Ann. § 57-1-12 (Michie 1995); N.Y. Gen. Bus. Laws § 340(5)(McKinney 1997); N.C. Stat. Ann. § 75-16.2 (1996); N.D. Cent.Code § 51-08.1-10 (1997); S.D. Codified Laws Ann. § 37-1-14.4 (1994); W. Va.Code Ann. § 47-18-11 (1997).

> FN16. Kan. Stat. Ann. § 60-512 (1997)(three years); Miss.Code. Ann. § 15-1-49 (1991)(three years); Ala.Code § 6-2-38(1)(two years); _State ex rel. Leech v. Levi Straus & Co._, 1980 WL 4696 at *1 (Tenn. Ch. Ct.1980)(stating that antitrust actions in Tennessee are subject to the three-year statute of limitations in Tenn.Code. Ann. § 28-305); Fla. Stat. Ann. § 501.204(2) (stating that Florida's Deceptive and Unfair Trade Practices Act is to be construed in light of federal precedent interpreting the Federal Trade Commission Act which has a

three-year limitations period under 15 U.S.C. § 57b).

> FN17. Wis. Stat. Ann. § 133.18 (West 1997); Me.Rev.Stat. Ann. tit. 14 § 752 (West 1980). Dentsply concedes that the Kaminer plaintiffs' claims under Wisconsin and Maine law are timely because the statutes of limitations encompass the time that Dentsply announced its Dealer Criteria for the first time.

2. Analysis

Dentsply argues that the Hess and Kaminer plaintiffs' claims are barred because neither of the plaintiff groups alleges an overt act by Dentsply during the limitations period. Dentsply admits that it issued its Dealer Criteria in February 1993 and has enforced the policy since that time. The issue for the court is whether the statute of limitations starts anew each time Dentsply enforces its Dealer Criteria or whether the enactment of the Dealer Criteria was a final act in itself.

Generally a cause of action accrues when the defendant 1) commits an act that 2) injures the plaintiff. _Zenith Radio Corp. v. Hazeltine Research, Inc._, 401 U.S. 321, 338 (1971). In the context of a continuing conspiracy to violate the antitrust laws, this is understood to mean that each time the plaintiff is injured by an act of the defendant, a cause of action accrues to him. _Id._

The Hess and Kaminer plaintiffs urge the court to apply the continuing violations rule to the various statutes of limitations. They allege that the overt acts could include charging monopolistic prices or enforcing the Dealer Criteria. The injuries they allege include having a lack of choice in the market and paying supracompetitive prices for prefabricated artificial teeth or dentures.

The court finds that the continuing violations rule should apply to the facts at bar and that the single event of Dentsply's announcing its Dealer Criteria does not constitute the sole overt act permissibly alleged in this litigation. The court further finds, however, that the overt act alleged by a plaintiff must be causally related to the plaintiff's claimed injury. See _In re Lower Lake Erie Iron Ore Antitrust Litig.,_

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



998 F.2d 1144, 1163 (3d Cir.1993). Under this standard, there are genuine issues of material fact as to the application of the statutes of limitations to the various plaintiffs. [FN18]

> FN18. A jury, for instance, could find that by terminating a particular dealer or forcing a dealer to give up a competitive tooth line, Dentsply committed an overt act that caused the Hess or Kaminer plaintiffs to pay higher prices or face a limited selection during the limitations period. The court notes that since the Hess plaintiffs are now only seeking injunctive relief, they only need to allege a threatened loss or injury. *Warfarin*, 214 F.3d at 400. On the other hand, if the Kaminer plaintiffs were allowed to pursue their claims, each such plaintiff would have to show that he purchased dentures sometime after January 7, 1995.

For the foregoing reasons, the court shall deny Dentsply's motions for summary judgment on statute of limitations grounds. (C.A. No. 99-255, D.I. 135; C.A. No. 99-854, D.I. 48)

V. CONCLUSION

For the foregoing reasons, the court denies Dentsply's motions for summary judgment on the merits of the antitrust causes of action. The court grants Dentsply's motion for summary judgment against the Hess plaintiffs on standing grounds to the extent that the Hess plaintiffs seek money damages. The court denies that motion to the extent that the Hess plaintiffs seek injunctive relief. The court grants Dentsply's motion for summary judgment against the Kaminer plaintiffs on standing grounds. The court denies Dentsply's motions for summary judgment against the Hess and Kaminer plaintiffs on statute of limitations grounds. An appropriate order shall issue.

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247

**Motions, Pleadings and Filings (Back to top)**

• 1:99cv00255 (Docket) (Apr. 21, 1999)

• 1:99cv00005 (Docket) (Jan. 05, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT W



Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 412811 (E.D.Pa.)

**(Cite as: 1996 WL 412811 (E.D.Pa.))**

Page 1

---

**₦**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

UNITED STATES of America, Plaintiff

v.

Harry J. METZINGER and William Ritter, Individually and t/a Metzinger

Associates, Methodist Medical Center of Illinois, Champlain Valley Physicians

Hospital Medical Center, Geisenger Medical Center, Wyoming Valley, Gnaden

Hueten Memorial Hospital, Lawrence Hospital, Ohio Valley General Hospital,

Pocono Medical Center, Porter Memorial Hospital, St. Francis Hospital, St.

James Mercy Hospital, and Warren General Hospital, Defendants.

**No. CIV. A. 94-7520.**

July 18, 1996.

*MEMORANDUM*

NEWCOMER, J.

**\*1** Presently before the Court is defendant Methodist Medical Center of Illinois' Motion to Dismiss Amended Complaint, Defendant Lawrence Hospital's Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction and Failure to Plead Fraud with Particularity, Defendant Geisenger Wyoming Valley Medical Center's Motion to Dismiss for Failure to Comply with Federal Rule of Civil Procedure 9(b) and/or for More Specific Statement, the Motion of St. James Mercy Hospital, Defendant Saint Francis Medical Center's Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction, Failure to Plead Fraud with Particularity and Failure to State a Cause of Action With Respect to Counts II and IV, plaintiff's responses thereto, and several replies thereto. [FN1]

> FN1. Defendant Methodist Medical Center of Illinois and defendant St. James Mercy Hospital

have filed replies.

For the reasons that follow, said Motions will be denied.

A. *Background* [FN2]

> FN2. This factual background is derived from the allegations of the Amended Complaint.

In March of 1976, defendant Harry Metzinger ("Metzinger") began providing consulting services to hospitals on billing procedures and Medicare reimbursement, doing business under the name "Metzinger Associates." In or about 1988, defendant William Ritter ("Ritter") joined together with Metzinger for the purpose of continuing to provide these types of services. From 1988 on, Ritter and Metzinger serviced over two hundred acute care hospitals, among them being defendants Methodist Medical Center of Illinois ("Methodist"); Champlain Valley Physicians Hospital Medical Center ("Champlain Valley"); Geisenger Medical Center, Wyoming Valley ("Geisenger"); Gnaden Hueten Memorial Hospital ("Gnaden"); Lawrence Hospital ("Lawrence"); Ohio Valley General Hospital ("Ohio Valley"); Pocono Medical Center ("Pocono"); Porter Memorial Hospital ("Porter"); St. Francis Hospital ("St.Francis"); St. James Mercy Hospital ("St.James"); and Warren General Hospital ("Warren") (collectively "defendant hospitals").

Plaintiff claims, in essence, that defendants Metzinger and Ritter and defendant hospitals caused the submission, submitted, and conspired to cause the submission of false or fraudulent claims for payment by the United States under the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395cc and 42 C.F.R. Parts 400-1004 ("Medicare Program").

Under the Medicare Program, claims for reimbursement are submitted on forms which contain a description of the provider's procedures for which reimbursement is sought. These procedures are identified by a five-digit, standard, uniform code number as set forth in the American Medical Association's fourth edition of a manual called *Physician's Current Procedure Terminology* ("CPT-4"). The manual lists the terms and codes to be used in reporting services,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1996 WL 412811 (E.D.Pa.)
**(Cite as: 1996 WL 412811 (E.D.Pa.))**

tests, and procedures performed by providers. The codes are referred to routinely throughout the industry as "CPT-4 Codes."

Defendants Metzinger and Ritter allegedly devised and implemented a scheme called "CPT-4 Maximization," in which defendant hospitals allegedly participated, whereby improper coding methods were used to effect increases in defendant hospital's Medicare reimbursements. The scheme included "upcoding," "unbundling," and "rebundling." "Upcoding" means assigning, and billing for, a CPT-4 procedure code that represents a more serious and more expensive laboratory procedure than that which actually was performed. "Unbundling" occurs under circumstances in which the Medicare Program prescribes a special reimbursement rate for a group of laboratory procedures that commonly are ordered together. "Unbundling" means billing separately for each component, as opposed to billing at the special rate. "Rebundling" means reducing blood test panels to their individual components and reassembling them as a more costly organ or specialized chemistry panel. The upshot of each of these improper billing methods is a higher payment from the Medicare Program.

**\*2** Plaintiff in its Amended Complaint brings four claims against defendants. Count I alleges that defendants caused the submission of false claims to the Medicare Program in violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("False Claims Act"). Count II avers that defendants conspired to submit false claims to the Medicare Program in violation of the False Claims Act. Count III asserts that defendants are liable under the common law theory of unjust enrichment. Finally, Count IV is brought pursuant to the Mail Fraud Injunctive Relief Act, 18 U.S.C. § 1345.

Defendants Methodist, Lawrence, Geisenger, St. James, and St. Francis move to dismiss plaintiff's Amended Complaint on one or more of the following grounds: (1) lack of personal jurisdiction; (2) improper joinder of defendants; (3) Counts I and III fail to plead fraud with particularity; and (4) Counts II and IV fail to state a claim upon which relief could be granted or fail to plead fraud with particularity. Also, defendant Geisenger moves, in the alternative, pursuant to Federal Rule of Civil Procedure 12(e) for a more definite statement, and defendant St. James moves, in the

alternative, to transfer venue.

*B. Discussion*

This Court determines that dismissal of plaintiff's Amended Complaint is not appropriate on any of moving defendants' asserted grounds, that a more definite statement is not warranted under Federal Rule of Civil Procedure 12(e), and that a transfer of venue of the action against defendant St. James is not proper.

*1. Personal Jurisdiction*

Defendants Methodist, Lawrence, St. James, and St. Francis assert first that this Court does not have personal jurisdiction over them. In order for personal jurisdiction to exist, two prerequisites must be met. First, there must be an applicable rule or statute which potentially confers jurisdiction over defendants. *Securities Investor Protection Corp. v. Vigman,* 764 F.2d 1309, 1313-14 (9th Cir.1985), *rev'd on other grounds,* 503 U.S. 258 (1992). Second, the assertion of personal jurisdiction must accord with constitutional principles of due process. *Id.* at 1314. Moving defendants contend that the latter requirement is not met. [FN3] This Court, however, finds otherwise.

> FN3. It is undisputed that the former requirement is met, that is, that applicable rules of law potentially confer jurisdiction over defendants. The False Claims Act, 31 U.S.C. § 3729 *et seq.,* pursuant to which this action is brought, provides for nationwide service of process. Specifically, the Act provides, in relevant part, as follows: "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred. A summons as required by the Federal Rules of Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United States." 31 U.S.C § 3732. Further, Federal Rule of Civil Procedure 4(f) provides that "[a]ll process other than a subpoena may be served anywhere within the territorial limits of the state in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



which the district court is held, and when authorized by statute of the United States or by these rules, beyond the territorial limits of that state." Fed.R.Civ.P. 4(f).

In order for the assertion of personal jurisdiction to comport with the strictures of the Due Process Clause of the Fifth Amendment, two requirements must be met. First, "service ... must be reasonably calculated to inform the defendant of the pendency of the proceedings in order that he may take advantage of the opportunity to be heard in his defense." Mariash v. Morrill, 496 F.2d 1138, 1143 (2d Cir.1974) (citing Hanson v. Denckla, 357 U.S. 235, 245 (1958)). Second, the defendant must "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. State of Washington, 326 U.S. 310, 316 (1945) (citations omitted). Moving defendants argue that the "minimum contacts" requirement is not met. [FN4] Specifically, they assert that Pennsylvania is the relevant forum on which to base the minimum contacts analysis and that the requisite contacts with it are lacking. Plaintiff, on the other hand, contends that the United States is the relevant forum and that the requisite minimum contacts with it do exist. Neither the Supreme Court nor the Third Circuit Court of Appeals has addressed squarely this issue of what is the relevant forum. This Court determines that the relevant forum is the United States and that the requisite minimum contacts with it are present with regard to each of the moving defendants.

> FN4. It is undisputed that the first requirement is met, that is, that service was adequate.

*3 The moving defendants' argument that Pennsylvania is the relevant forum ignores important differences between diversity cases and federal question cases. "A federal court sitting in a diversity case generally may issue process only within the territory a state court could." Lisak v. Mercantile Bancorp, Inc., 834 F.2d 668, 671 (7th Cir.1987), cert. denied, 485 U.S. 1007 (1988). "[L]imitations on the power of the state therefore carry over to diversity litigation." Id. One such limitation arises out of the fact that "[i]n enacting and enforcing laws, each state exercises a sovereign function ... [which] may be exercised only over those who

reside in the state and those who undertake activities within it." Fed. Trade Comm'n v. Jim Walter Corp., 651 F.2d 251, 256 (5th Cir.1981). As such, in order for a federal court to sit in a diversity case, due process requires that the defendant have some "contacts, ties or relations" with the forum state. Vigman, 764 F.2d at 1315.

"A federal court in a federal question case[, on the other hand,] is not implementing any state's policy; it exercises the power of the United States." Lisak, 834 F.2d at 671. As such, " 'minimum contacts' " with a particular district 'or state for purposes of personal jurisdiction is not a limitation imposed on the federal courts in a federal question case." Vigman, 764 F.2d at 1315. Rather, "the question becomes whether the party has sufficient contacts with the United States." Vigman, 764 F.2d at 1315 (emphasis added); see also, Jim Walter Corp., 651 F.2d 251, 256 (5th Cir.1981) (stating that "[b]ecause the district court's jurisdiction is always potentially, and, in this case, actually co-extensive with the boundaries of the United States, due process requires only that a defendant in a federal suit have minimum contacts with the United States"); Ethanol Partners Accredited v. Wiener, Zuckerbrot, Weiss, & Brecher, 617 F.Supp. 300, 307 (E.D.Pa.1985) (stating that "when a federal court exercises jurisdiction pursuant to a federal statute, it is the United States and not the particular state in which the court is located that is exercising jurisdiction and, therefore, all that is necessary to satisfy Due Process is that the defendants have minimum contacts with the United States" (citations omitted)); Am. Trade Partners, L.P. v. A-1 Int'l Importing Enters., Ltd., 755 F.Supp. 1292, 1302 (E.D.Pa.1990) (stating that "[w]here such nationwide service of process is authorized, a federal district court's jurisdiction is 'coextensive with the boundaries of the United States, [and] due process requires only that a defendant in a federal suit have minimum contacts with the United States' " (citations omitted)). [FN5]

> FN5. Moving defendants argue that this Court should follow Oxford First Corp. v. PNC Liquidating Corp., 372 F.Supp. 191 (E.D.Pa.1974). In Oxford, a defendant was before the Court pursuant to a nationwide service of process statute. To determine whether the Court had personal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1996 WL 412811 (E.D.Pa.)
**(Cite as: 1996 WL 412811 (E.D.Pa.))**

jurisdiction over the defendant, the Court applied a modified "minimum contacts" test called the "fairness test," which treated the state as the relevant forum. *Id.* at 203. This Court, however, chooses not to apply that test. Instead, as indicated in the text accompanying this note, it adopts the approach that has been taken by the Courts of Appeals and other District Courts in the Eastern District of Pennsylvania that have considered the issue, namely, the approach that treats the United States as the relevant forum.

In the instant federal question action, as defendants reside within the territorial boundaries of the United States, the minimum contacts with the United States, which are required to justify this Court's exercise of power over them, are present. *See, Mariash,* 496 F.2d at 1143 (stating that "where, as here, the defendants reside within the territorial boundaries of the United States, the 'minimal contacts,' required to justify the federal government's exercise of power over them, are present"); *see also, Jim Walter Corp.,* 651 F.2d at 256 (stating that defendant, "as a resident United States corporation, necessarily has sufficient contacts with the United States to satisfy the requirements of due process"); *Fitzsimmons,* 589 F.2d at 333 (stating that "there can be no question but that the defendant, a resident citizen of the United States, has sufficient contacts with the United States to support the fairness of the exercise of jurisdiction over him by a United States court"). Therefore, this Court will not grant defendants' Motions to dismiss on this ground.

2. *Joinder of Defendants*

**\*4** Defendants Methodist, St. James, and St. Francis next assert that they have been joined improperly in this action under the standards set forth in Federal Rule of Civil Procedure 20(a) ("Rule 20(a)"). Rule 20(a) provides, in relevant part, as follows: "[a]ll persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." Fed.R.Civ.P. 20(a). The remedy for which defendant Methodist moves due to the allegedly improper

joinder is the dismissal of plaintiff's claims against it. The remedy for which defendants St. James and St. Francis move is the transfer of the actions against them to the Western District of New York and the Central District of Illinois, respectively.

Assuming, *arguendo,* that the remedies for which defendants move are proper, [FN6] this Court will not grant said remedies because it determines that asserted against defendants is a "right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences" and that a "question of law or fact common to all defendants will arise in the action." *See,* Fed.R.Civ.P. 20(a). Plaintiff's asserted right to relief arises out of defendant hospitals alleged participation in the scheme, which allegedly was designed by defendants Metzinger and Ritter, called "CPT-4 Maximization," whereby improper coding methods were used to effect increases in the defendant hospitals' Medicare reimbursements. Questions of law or fact common to all defendants, with regard to the alleged scheme, certainly will arise in this action. Accordingly, this Court will not grant defendants' Motions on this ground.

> FN6. Neither defendant Methodist, defendant St. James, nor defendant St. Francis cites any authority for the proposition that said remedies follow from the improper joinder of defendants. The Federal Rules of Civil Procedure list explicitly only one remedy, namely, severance of the claims. *See,* Fed.R.Civ.P. 21.

3. *Count I and Count III*

Defendants Methodist, Lawrence, Geisenger, and St. Francis next argue that Counts I and III of the Amended Complaint should be dismissed because plaintiff does not allege fraud with the level of particularity required under Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). [FN7] This Court, however, disagrees.

> FN7. It is undisputed that Rule 9 applies to both Count I and Count III. Count I alleges that defendants caused the submission of false claims to the Medicare Program in violation of the False

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                         Page 5
Not Reported in F.Supp., 1996 WL 412811 (E.D.Pa.)
**(Cite as: 1996 WL 412811 (E.D.Pa.))**

Claims Act. Numerous federal courts have held that Rule 9 applies to claims brought pursuant to the False Claims Act. *See, e.g., United States, ex. rel. Piacentile v. Wolk,* 1995 WL 20833, at *5 (E.D.Pa. Jan. 17, 1995); *United States v. Warning,* 1994 WL 396432, at *2 (E.D.Pa. July 26, 1994); *United States v. Kensington Hospital,* 760 F.Supp. 1120, 1125 (E.D.Pa.1991); *Gold v. Morrison-Knudsen Co.,* 68 F.3d 1475, 1476 (2d Cir.1995), *cert. denied,* 116 S.Ct. 1836 (1996). Count III asserts that defendants are liable under the common law theory of unjust enrichment. As the unjust enrichment claim arises out of defendants' allegedly fraudulent activities, Rule 9 applies to this Count as well.

Rule 9(b) mandates that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Rule 9(b) standard under Third Circuit law, however, is "a generous one." *Blue Line Coal Co. v. Equibank,* 683 F.Supp. 493, 497 (E.D.Pa.1988) (citations omitted). The Third Circuit has cautioned that "focusing exclusively on [Rule 9(b)'s] 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.' " *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,* 469 U.S. 1211 (1985) (citing *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 100 (3d Cir.1983) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1298, at 407 (1969))). Rather, Rule 9(b) must be read in conjunction with Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim" and which dictates that averments in pleadings shall be "simple, concise, and direct." Fed.R.Civ.P. 8(a)(2), (e). *See, In re Cantanella and E.F. Hutton & Co., Inc., Sec. Litig.,* 583 F.Supp. 1388, 1397-98 (E.D.Pa.1984).

*5 At the pleading stage, precise delineation of which defendants committed which specific fraudulent scheme is not required. *In re Meridian Sec. Litig.,* 772 F.Supp. 223, 230 (E.D.Pa.1991). That is to say, under Rule 9(b), "a complaint need not allege all the *facts* to show liability."

*Muth v. Deckert, Price & Rhoads,* 391 F.Supp. 935, 938 (E.D.Pa.1975). Rather, "Rule 9(b) requires plaintiffs to plead with particularity [only] the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of 'date, place or time' fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville,* 742 F.2d at 791. To require otherwise might "permit sophisticated defrauders ... [who] successfully conceal the details of their fraud" to escape liability. *Christidis,* 717 F.2d at 99-100.

This Court determines that Counts I and III of plaintiff's Amended Complaint do satisfy the requirements of Rule 9(b). The Amended Complaint alleges that moving defendants participated in the "CPT-4 Maximization" program, which began in 1988. (Am.Compl.¶¶ 29, 31.) Said program involved the use of improper coding methods, including "upcoding," "unbundling," and "rebundling." [FN8] (Am.Compl.¶¶ 18-20.) These methods allegedly were used in the following contexts: (a) automated multichannel and organ profile tests; (b) chemistry tests; (c) venipuncture charges; (d) hematologic tests; (e) urinalysis antibiotic sensitivity studies; (f) thyroid tests; (g) lipid profiles; (h) drug serum surveillance; (i) STAT charges; (j) ambulatory pre-admission laboratory testing; (k) blood cultures and sensitivity studies; (l) iron-binding capacity; and (m) hepatitis B profiles and panels. These averments adequately state "the 'circumstances' of the alleged fraud" and sufficiently "inject[ ] precision and some measure of substantiation into" plaintiff's allegations. *Seville,* 742 F.2d at 791. Accordingly, this Court will not grant moving defendants' Motions to dismiss on this ground.

> FN8. These improper coding methods are described in Section A of this Memorandum.

*4. Count II and Count IV*

Defendants Methodist, Lawrence, Geisenger, St. James, and St. Francis next assert that Counts II and IV of the Amended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                          Page 6
Not Reported in F.Supp., 1996 WL 412811 (E.D.Pa.)
(Cite as: 1996 WL 412811 (E.D.Pa.))

Complaint should be dismissed because plaintiff fails to state a cause of action upon which relief could be granted or because plaintiff does not allege fraud with the level of particularity required under Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"). *See,* Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)").

a. *Failure to State a Cause of Action*
Defendants Methodist, St. James, and St. Francis contend that Count II, which alleges a Conspiracy to Submit False Claims, and Count IV, which alleges a Violation of the Mail Fraud Injunction Statutes, should be dismissed for failure to state a cause of action because neither claim lists by name any one of them as a defendant. Rather, they argue, Count II states that "*[c]ertain defendant hospitals* conspired with defendants Metzinger and Ritter ... to defraud the Government by getting false or fraudulent claims allowed or paid." (Am. Compl. ¶ 44 (emphasis added).) Likewise, they assert, Count IV states that "[d]efendants Metzinger, Ritter, and *certain defendant hospitals* devised a scheme and artifice to defraud, by means of false and fraudulent representations, in that they conspired to present, presented, and caused to be presented certain billings for laboratory services, knowing the same to [be] false and fraudulent." (Am. Compl. ¶ 51 (emphasis added).) This Court determines, however, that moving defendants' Motions to dismiss will not be granted on this ground.

*6 Pursuant to Rule 12(b)(6), a court should dismiss a claim for failure to state a cause of action only if it appears to a certainty that no relief could be granted under any set of facts which could be proved. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). Because granting such a motion results in a determination on the merits at such an early stage of a plaintiff's case, the district court "must take all the well pleaded allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Colburn v. Upper Darby Township,* 838 F.2d 663, 665-66 (3d Cir.1988), *cert. denied,* 489 U.S. 1065 (1989) (quoting *Estate of Bailey by Oare v. County of York,* 768 F.2d 503, 506 (3d Cir.1985)). The Court must give the plaintiff "the benefit of every favorable inference that can be drawn from [the] allegations." *Schrob*

*v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991). Only if the facts alleged in the Complaint, even if true, fail to support the plaintiff's claim is dismissal of the claim appropriate. *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988).

Giving plaintiff "the benefit of every favorable inference that can be drawn from [the] allegations" of the Amended Complaint, this Court determines that Counts II and IV do state a cause of action. *See, Schrob,* 948 F.2d at 1405. While paragraphs 44 and 51 of the Amended Complaint do refer only to "certain defendant hospitals," said paragraphs cannot be read in a vacuum. Under the headings for both Count II and Count IV, the Amended Complaint states that paragraphs 1 through 36 are incorporated by reference. [FN9] Those paragraphs indicate that plaintiff's allegations of conspiracy and mail fraud apply to all of the moving defendants. Most notable is paragraph 2 which states that "*[d]efendants in this action* caused the submission, submitted, and conspired to cause the submission of false or fraudulent claims, for payment by the United States under the Medicare Program." (Am. Compl. ¶ 2 (emphasis added); *see also,* Am. Compl. ¶¶ 5, 23, 32, 38, and 39.) Accordingly, this Court will not grant moving defendants' Motions to dismiss on this ground.

> FN9. Count II incorporates by reference, in addition to paragraphs 1 through 36, paragraphs 37 through 41.

b. *Failure to Plead Fraud With Particularity*

Defendants Methodist, Lawrence, Geisenger, and St. Francis contend that Count II, which alleges a Conspiracy to Submit False Claims, and Count IV, which alleges a Violation of the Mail Fraud Injunction Statutes, should be dismissed because plaintiff does not allege fraud with the level of particularity required under Rule 9(b) in that neither claim lists by name any one of them as a defendant. This Court rejects this argument, however, relying on the reasoning presented in Sections B.3 and B.4.a of this Memorandum. Accordingly, this Court will not grant moving defendants' Motions to dismiss on this ground.

5. *Alternative Motion for a More Definite Statement*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                                                    Page 7
Not Reported in F.Supp., 1996 WL 412811 (E.D.Pa.)
**(Cite as: 1996 WL 412811 (E.D.Pa.))**

**\*7** Defendant Geisenger moves, in the alternative, pursuant to Federal Rule of Civil Procedure 12(e) ("Rule 12(e)"), for a more definite statement. Rule 12(e) provides as follows: "[i]f a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." Fed.R.Civ.P. 12(e). This Court determines that the Amended Complaint is not deficient under the standards set forth in Rule 12(e). Accordingly, defendant's Motion will be denied.

6. *Alternative Motion to Transfer Venue*

Defendant St. James moves, in the alternative, pursuant to 28 U.S.C. § 1404(a), to transfer venue to the Western District of New York. Section 1404(a) provides, in relevant part, as follows: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Thus a transfer of venue is proper when (1) the case could have been brought initially in the proposed transferee forum, and (2) the transfer would promote the convenience of the parties and witnesses and would be in the interest of justice. *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 24-25 (3d Cir.1970), *cert. denied,* 401 U.S. 910 (1971). The parties dispute whether the second requirement is satisfied. [FN10] Defendant St. James asserts that the transfer would promote the convenience of the parties and witnesses and would be in the interest of justice, while plaintiff contends otherwise. This Court concurs with plaintiff.

> FN10. It is undisputed that the first requirement is satisfied, that is, that the case against defendant St. James could have been brought originally in the Western District of New York.

To determine whether to transfer venue, a court considers the following seven factors: (1) plaintiff's choice of forum; (2) the relative ease of access to sources of proof; (3) the availability of compulsory process for attendance of unwilling witnesses; (4) the cost of obtaining attendance of willing witnesses; (5) the possibility of viewing premises, if applicable; (6) all other practical problems that make trial of

a case easy, expeditious and inexpensive; and (7) public interest factors, including the relative congestion of court dockets, choice of law considerations and the relationship of the community in which the courts and jurors are required to serve to the occurrences that give rise to the litigation. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947). It is the burden of the moving party to establish that the court should transfer venue. *McClain v. Camouflage Assocs.,* 1994 WL 570874, at \*1 (E.D.Pa. Oct. 18, 1994); *Leonardo da Vinci's Horse, Inc. v. O'Brien,* 761 F.Supp. 1222, 1229 (E.D.Pa.1991).

Considering the aforementioned seven factors, this Court determines that defendant St. James has not met its burden of establishing that this Court should transfer venue. This Court notes first that plaintiff's choice of venue is the Eastern District of Pennsylvania. This Court must give great deference to that choice. *Shutte,* 431 F.2d at 25. "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil,* 330 U.S. at 508 n. 8.; *see also, Am. Packaging Corp. v. Tommy Lasorda Foods, Inc.,* 1988 WL 100735, at \*4 (E.D.Pa. Sept. 26, 1988). Accordingly, this Court will defer to plaintiff's choice unless application of the remaining six factors indicates that transfer is warranted.

**\*8** Regarding the second factor, namely, the relative ease of access to sources of proof, defendant St. James asserts that "it is likely that much of the relevant discovery on the claims against [it] will occur in New York." (Mot. of St. James Mercy Hospital at 12.) This Court notes, however, that "general allegations that transfer is needed because of books and records are not enough. The moving papers must show the location and the importance of the documents in question." *Weitz v. Burton Photo Indus., Inc.,* 1996 WL 165525, at \*5 (E.D. Pa. April 9, 1996) (citing 15 Charles A. Wright, et al., Federal Practice and Procedure § 3854, at 439 (2d ed.1988)). As defendant St. James fails to include references to or descriptions of any documents at all, this factor does not weigh in favor of transfer.

Defendant St. James makes no argument regarding the third factor.

Regarding the fourth factor, namely, the cost of obtaining

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 412811 (E.D.Pa.)
**(Cite as: 1996 WL 412811 (E.D.Pa.))**

Page 8

attendance of willing witnesses, defendant St. James asserts that "each of the fact witnesses identified by St. James Mercy reside [sic] in the Western District of New York, and the only potentially significant non-party witness, Empire Blue Cross and Blue Shield, also is a New York resident." (Mot. of St. James Mercy Hospital at 12.) This Court notes, however, that in order to allow the Court to assess the convenience to witnesses, the moving party must "clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover." *Id.* at *5 (citing 15 Charles A. Wright, et al., Federal Practice and Procedure § 3851, at 425 (2d ed. 1988)) As defendant St. James fails to provide this information to the Court, this factor does not weigh in favor of transfer.

The fifth factor is not applicable in this action, and defendant St. James makes no argument regarding the final two factors.

As none of the last six factors weighs in favor of a venue transfer, this Court will defer to plaintiff's choice of venue, and the action against defendant St. James will remain before this Court in the Eastern District of Pennsylvania.

*C. Conclusion*

As this Court has determined that dismissal of plaintiff's Amended Complaint is not appropriate on any of moving defendants' asserted grounds, that a more definite statement is not warranted under Rule 12(e), and that a transfer of venue of the action against defendant St. James is not proper, this Court will deny defendant Methodist Medical Center of Illinois' Motion to Dismiss Amended Complaint, Defendant Lawrence Hospital's Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction and Failure to Plead Fraud with Particularity, Defendant Geisenger Wyoming Valley Medical Center's Motion to Dismiss for Failure to Comply with Federal Rule of Civil Procedure 9(b) and/or for More Specific Statement, the Motion of St. James Mercy Hospital, and Defendant Saint Francis Medical Center's Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction, Failure to Plead Fraud with Particularity and Failure to State a Cause of Action With Respect to Counts II and IV.

*9 An appropriate Order follows.

*ORDER*

AND NOW, this day of July, 1996, upon consideration of defendant Methodist Medical Center of Illinois' Motion to Dismiss Amended Complaint, Defendant Lawrence Hospital's Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction and Failure to Plead Fraud with Particularity, Defendant Geisenger Wyoming Valley Medical Center's Motion to Dismiss for Failure to Comply with Federal Rule of Civil Procedure 9(b) and/or for More Specific Statement, the Motion of St. James Mercy Hospital, Defendant Saint Francis Medical Center's Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction, Failure to Plead Fraud with Particularity and Failure to State a Cause of Action With Respect to Counts II and IV, plaintiff's responses thereto, several replies thereto, and consistent with the foregoing Memorandum, it is hereby ORDERED that said Motions are DENIED.

AND IT IS SO ORDERED.

Not Reported in F.Supp., 1996 WL 412811 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 1996 WL 33485363 (Trial Motion, Memorandum and Affidavit) Defendants William Ritter, Harry Metzinger and Metzinger Associates' Motion for Sanctions for Plaintiff's Failure to Produce Documents as Represented (Nov. 12, 1996)

• 1996 WL 33485374 (Trial Motion, Memorandum and Affidavit) Motion and Memorandum for Extension of Time to Respond to Motion for Partial Summary Judgment (Oct. 25, 1996)

• 1996 WL 33485376 (Trial Motion, Memorandum and Affidavit) Defendants William Ritter, Harry Metzinger and Metzinger Associates' Reply to Plaintiff's Memorandum in Opposition to Defendants' Motion to Compel (Oct. 25, 1996)

• 1996 WL 33485371 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Defendants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 412811 (E.D.Pa.)
**(Cite as: 1996 WL 412811 (E.D.Pa.))**

Metzinger Associates' Motion to Compel Disclosure of United States' Witnesses at Trial (Oct. 22, 1996)

• 1996 WL 33485373 (Trial Motion, Memorandum and Affidavit) Defendants William Ritter, Harry Metzinger and Metzinger Associates Motion to Compel Plaintiff's Answer to Interrogatory No. 14 and to Compel the Production of Documents (Oct. 15, 1996)

• 1996 WL 33578556 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response and Memorandum in Opposition to Defendant St. James Mercy Hospital's Motion for Reconsideration, or Certification of Interlocutory Appeal (Sep. 20, 1996)

• 1996 WL 33578555 (Trial Motion, Memorandum and Affidavit) Motion of St. James Mercy Hospital (May. 13, 1996)

• 1996 WL 33578557 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of St. James Mercy Hospital in Support of Its Motion to Dismiss the Amended Complaint or Transfer Venue (May. 13, 1996)

• 1996 WL 33576535 (Trial Pleading) Answer of The Defendant, Porter Memorial Hospital, to the Plaintiff's Amended Complaint (May. 06, 1996)

• 1996 WL 33578549 (Trial Motion, Memorandum and Affidavit) Motion for Admissions Pro Hac Vice of Counsel for Defendant Warren General Hospital (May. 06, 1996)

• 1996 WL 33578552 (Trial Motion, Memorandum and Affidavit) Motion to Dismiss Amended Complaint (May. 06, 1996)

• 1996 WL 33578553 (Trial Motion, Memorandum and Affidavit) Defendant Lawrence Hospital's Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction and Failure to Plead Fraud with Particularity (May. 06, 1996)

• 1996 WL 33576534 (Trial Pleading) Defendant, Gnaden Huetten Memorial Hospital's Answer with Affirmative Defenses Filed in Response to Plaintiff's Amended Complaint (May. 02, 1996)

• 1996 WL 33578551 (Trial Motion, Memorandum and Affidavit) Motion for Admission Pro Hac Vice of Counsel for Defendant Lawrence Hospital (May. 02, 1996)

• 1996 WL 33578554 (Trial Motion, Memorandum and Affidavit) Defendant Geisinger Wyoming Valley Medical Center's Motion to Dismiss for Failure to Comply with Federal Rule of Civil Procedure 9(b) and/or for More Specific Statement (May 1996)

• 1996 WL 33578550 (Trial Motion, Memorandum and Affidavit) Motion for Admission Pro Hac Vice of Counsel for Defendant Saint Francis Hospital (Apr. 25, 1996)

• 1996 WL 33576888 (Trial Motion, Memorandum and Affidavit) Defendants William Ritter, Harry Metzinger and Metzinger Associates' Reply to Plaintiff's Memorandum in Opposition to Motion for Sanctions (Apr. 04, 1996)

• 1996 WL 33578548 (Trial Motion, Memorandum and Affidavit) Defendants William Ritter, Harry Metzinger and Metzinger Associates' Reply to Plaintiff's Memorandum in Opposition to Motion for Sanctions (Apr. 04, 1996)

• 1996 WL 33578547 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Motion for Sanctions (Apr. 01, 1996)

• 1996 WL 33576533 (Trial Pleading) Answer of Defendants Harry J. Metzinger, t/a Metzinger Associates, to the Amended Complaint of the Plaintiff, with Affirmative Defenses (Mar. 18, 1996)

• 1996 WL 33576886 (Trial Motion, Memorandum and Affidavit) Motion for Admission Pro Hac Vice of Counsel for Defendant Champlain Valley Physicians Hospital Medical Center (Feb. 21, 1996)

• 1996 WL 33576887 (Trial Motion, Memorandum and Affidavit) Motion for Admission Pro Hac Vice of Counsel for Defendant Champlain Valley Physicians Hospital Medical Center (Feb. 21, 1996)

• 1996 WL 33576532 (Trial Pleading) Amended Complaint (Feb. 20, 1996)



Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 412811 (E.D.Pa.)
(Cite as: 1996 WL 412811 (E.D.Pa.))

Page 10

• 1996 WL 33576885 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Response to Motion for Protective Order (Feb. 16, 1996)

• 1995 WL 17141894 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Compel Plaintiff to Comply with the Court's November 13, 1995 Order (Dec. 29, 1995)

• 1995 WL 17141893 (Trial Motion, Memorandum and Affidavit) Motion for Leave to Amend Complaint (Dec. 05, 1995)

• 1995 WL 17141896 (Trial Motion, Memorandum and Affidavit) Memorandum of Plaintiff United States Concerning Defendant Ritter's Motion to Compel Coopers & Lybrand (Sep. 27, 1995)

• 1995 WL 17141899 (Trial Motion, Memorandum and Affidavit) Coopers & Lybrand L.L.P.'s Memorandum of Law in Opposition to Defendant William Ritter's Motion to Compel Coopers & Lybrand L.L.P. to Comply with Subpoena Duces Tecum (Sep. 07, 1995)

• 1995 WL 17141895 (Trial Motion, Memorandum and Affidavit) Defendant William Ritter's Motion to Compel Coopers & Lybrand L.L.P. to Compaly with Subpoena Duces Tecum (Aug. 18, 1995)

• 1995 WL 17141891 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Platintiff's Motion in Limine to Permit the Admission of Statistical Proof (Aug. 15, 1995)

• 1995 WL 17141898 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiff's Motion in Limine to Permit the Admission of Statistical Proof (Aug. 15, 1995)

• 1995 WL 17141892 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion in Limine to Permit Presentation of Statistical Proof at Trial (Jul. 20, 1995)

• 1995 WL 17141897 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion in Limine of Plaintiff (Jul. 20, 1995)

• 1995 WL 17141890 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Dismiss Count IV of Plaintiff's Complaint and Motion for a More Definite Statement with Respect to Count II of Plaintiff's Complaint (Jan. 31, 1995)

• 1994 WL 16135850 (Trial Pleading) Complaint (Dec. 15, 1994)

• 2:94cv07520 (Docket) (Dec. 15, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT X

In the Matter of Union Oil Company of California
Docket No. 9305

Opinion of the Commission

BY MURIS, Chairman:

A private business allegedly has used false and misleading statements to induce a government body to issue regulatory standards that conferred market power upon the firm. Respondent argues that, even taking the Complaint's factual allegations as established as is required at this preliminary stage, its deliberate use of misrepresentations to secure monopoly power is protected from antitrust challenge under the *Noerr-Pennington* doctrine, which shelters certain petitioning for government action. We disagree.

On March 4, 2003, the Federal Trade Commission issued an administrative complaint alleging, *inter alia*, that the Union Oil Company of California ("Unocal") engaged in unfair methods of competition through knowing and willful misrepresentations, to the California Air Resources Board ("CARB") and to competing gasoline refiners, that Unocal lacked, or would not assert, patent rights concerning automobile emissions research results. The Complaint further alleged that, through these misrepresentations, Unocal (1) induced CARB to adopt reformulated gasoline standards that substantially overlapped Unocal's patent claims and (2) induced other refiners to reconfigure their refineries in ways that subsequently exposed them to Unocal's patent claims. According to the Complaint, Unocal claims it is entitled to hundreds of millions of dollars in royalties from refiners who are now required to follow CARB's standards.

Administrative litigation ensued. Unocal filed two motions to dismiss. One argued that Unocal's conduct involved petitioning the government and hence was immune from antitrust liability. The other asserted that the Complaint failed to state sufficient allegations that Unocal possessed, or dangerously threatened to possess, monopoly power.

On November 25, 2003, Administrative Law Judge D. Michael Chappell issued an Initial Decision concluding that the *Noerr-Pennington* doctrine protects much of the conduct alleged to constitute unfair methods of competition and that the FTC lacks jurisdiction over the remaining allegations because they depend on resolution of substantial questions of patent law.[1] Judge Chappell dismissed the Complaint in its entirety. Complaint Counsel have appealed. For the reasons stated below, we reverse and vacate the Initial Decision, reinstate the Complaint, and remand for further consideration of the Complaint's allegations.

---

[1] The Initial Decision denied without prejudice the remainder of Unocal's motion regarding market power.

I. BACKGROUND

A. The Commission's Complaint

This case involves Unocal's actions in state regulatory proceedings concerning low-emissions, reformulated gasoline ("RFG") standards to address California's air pollution problems. The Complaint, *inter alia*, states the following allegations.[2]

1. Unocal, CARB, and the Reformulated Gasoline Proceedings

Prior to 1997, Unocal owned and operated refineries in California as a vertically integrated producer, refiner, and marketer of petroleum products.[3] In March 1997, Unocal completed the sale of its west coast refining, marketing, and transportation assets, but it continues to engage in oil and gas exploration and production. *Id.* Moreover, Unocal's 2001 annual report, filed with the United States Securities and Exchange Commission, lists another of its key business activities as "[p]ursuing and negotiating licensing agreements for reformulated gasoline patents with refiners, blenders and importers."[4]

In late 1988, the California legislature amended the California Clean Air Act to require CARB, a department of the California Environmental Protection Agency, to reduce harmful automobile emissions, and directed CARB to achieve this goal through new standards for automobile fuels and low-emission vehicles. ¶ 21. CARB's specific legislative mandate, promulgated in California Health and Safety Code Section 43018, provided, *inter alia*, that CARB:

a. Take "necessary, cost-effective, and technologically feasible" actions to achieve "reduction in the actual emissions of reactive, organic gases of at least 55 percent, a reduction in emissions of oxides of nitrogen of at least 15 percent from motor vehicles" no later than December 31, 2000;

---

[2]  Omissions and rewordings of the Complaint's allegations are solely for ease of exposition in addressing the specific issues currently before the Commission. Nothing in this Opinion is intended to change the content of the Complaint, which remains the sole charging document in this proceeding.

[3]  ¶ 13. Paragraph references indicate paragraphs in the Complaint.

[4]  ¶ 14. Unocal is the owner, by assignment, of the following patents relating to low-emissions, reformulated gasoline:  United States Patent No. 5,288,393 (issued February 22, 1994); United States Patent No. 5,593,567 (issued January 14, 1997); United States Patent No. 5,653,866 (issued August 5, 1997); United States Patent No. 5,837,126 (issued November 17, 1998); United States Patent No. 6,030,521 (issued February 29, 2000). ¶ 15. These patents all derive from, and receive priority as if they were filed with, patent application No. 07/628,488, filed on December 13, 1990. ¶ 15.

b. Take actions "to achieve the maximum feasible reduction in particulates, carbon monoxide, and toxic air contaminants from vehicular sources"; and

c. Adopt standards and regulations that would result in "the most cost-effective combination of control measures on all classes or motor vehicles and motor vehicle fuels" including the "specification of vehicular fuel composition."

¶ 21.

Following the 1988 California Clean Air Act amendments, CARB embarked on two rulemakings relating to low-emissions RFG. In these proceedings – Phase 1 and Phase 2, respectively – CARB prescribed limits on specific gasoline properties. ¶ 22. In the Phase 2 RFG proceedings, on which this case focuses, CARB developed stringent standards for low-emissions RFG. ¶ 24.

> 2. Alleged Misrepresentations to CARB

The Complaint alleges that, beginning in 1990 and continuing throughout the CARB Phase 2 RFG rulemaking process, Unocal provided "materially misleading" information to CARB "for the purpose of obtaining competitive advantage." ¶ 35. According to the Complaint, "This information was materially misleading in light of Unocal's suppression of facts relating to its proprietary interests in its emissions research results and Unocal's active prosecution of patents based on these research results." *Id.* Unocal gave CARB this information in private meetings with CARB, through participation in CARB's public workshops and hearings, and through industry groups that also were commenting on the CARB regulations. *Id.*

On June 11, 1991, CARB held a public workshop regarding the Phase 2 RFG regulations. The specifications CARB proposed for discussion at this public workshop did not include a T50 specification, *viz.*, a specification based on the temperature at which 50 percent of a fuel evaporates. ¶¶ 30, 36. Nine days later, Unocal presented to CARB's staff the results of its "5/14 Project" emissions research program to show that "cost-effective" regulations could be achieved through adoption of a "predictive model" and to convince CARB of the importance of T50. ¶¶ 37, 78a. Unocal's then-pending patent application contained numerous claims that included T50 as a critical limitation, in addition to other fuel properties that CARB proposed to regulate. ¶ 37. Unocal's management, however, decided not to disclose Unocal's pending '393 patent application to CARB's staff. ¶ 38.

On July 1, 1991, Unocal provided CARB with the actual emissions prediction equations developed in the "5/14 Project." Unocal requested that CARB "hold these equations confidential, as we feel that they may represent a competitive advantage in the production of gasoline." ¶ 39. Nevertheless, Unocal stated:

If CARB pursues a meaningful dialogue on a predictive model approach to Phase 2 gasoline, Unocal will consider making the equations and underlying data public as

-3-

required to assist in the development of a predictive model.

*Id.*

Following CARB's agreement to develop a predictive model, the Complaint alleges, Unocal made its emissions research results, including the test data and equations underlying its "5/14 Project," publicly available. ¶ 40. In an August 27 letter, Unocal stated to CARB:

Please be advised that Unocal now considers this data to be non-proprietary and available to CARB, environmental interest groups, other members of the petroleum industry, and the general public upon request.

¶ 41. The Complaint continues: "Read separately or in conjunction with Unocal's July 1, 1991 letter, the August 27, 1991 letter created the materially false and misleading impression that Unocal agreed to give up any 'competitive advantage' it may have had relating to its purported invention and arising from its emissions research results." ¶ 42; *see* ¶ 78b. Unocal made numerous subsequent statements and comments to CARB that "reinforced the materially false and misleading impression" that Unocal had created. ¶ 78c.

The Complaint further alleges that in "reasonable reliance on Unocal's representation that the information was no longer proprietary, CARB used Unocal's equations in setting a T50 specification." ¶ 43. Subsequently, in October 1991, CARB published Unocal's equations in public documents supporting the proposed Phase 2 RFG regulations. *Id.* On November 22, 1991, CARB adopted Phase 2 RFG regulations that set standards for the composition of low-emissions RFG with specific limits for eight gasoline properties. ¶ 44. Unocal's pending patent claims recited limits for five of those eight properties, including T50. *Id.*

In June 1994, CARB amended the Phase 2 regulations to include, as an alternative method of complying, a predictive model that was intended to provide refiners with additional flexibility. ¶ 47. This "predictive model" permits a refiner to comply with the RFG regulations by producing fuel that is predicted – based on its composition and the levels of the eight properties – to have emissions equivalent to a fuel that meets the strict gasoline property limits set forth in the regulations. *Id.* During the development of the predictive model, Unocal submitted comments to CARB touting the predictive model as offering "flexibility" and furthering CARB's mandate of "cost-effective" regulations. ¶ 48. Allegedly, these statements were "materially false and misleading because Unocal suppressed the material fact that assertion of its proprietary rights would materially increase the cost and reduce the flexibility of the proposed regulations." *Id.*

-4-

In sum, the Complaint states that "[t]hroughout its communications and interactions with CARB prior to January 31, 1995, Unocal failed to disclose that it had pending patent rights, that its patent claims overlapped with the proposed RFG regulations, and that Unocal intended to charge royalties." ¶ 79. Citing as examples CARB's inclusion of a specification for T50 in its Phase 2 RFG regulations and its adoption of a "predictive model" that included T50 as one of the parameters, the Complaint alleges that "Unocal's misrepresentations and materially false and misleading statements caused CARB to adopt Phase 2 RFG regulations that substantially overlapped with Unocal's concealed patent claims." ¶ 45. The Complaint concludes: "But for Unocal's fraud, CARB would not have adopted RFG regulations that substantially overlapped with Unocal's concealed patent claims; the terms on which Unocal was later able to enforce its proprietary interests would have been substantially different; or both." ¶ 80.

### 3. Alleged Misrepresentations to Industry Groups

The Complaint also alleges that Unocal made misrepresentations to two industry groups. During the CARB RFG rulemaking, Unocal actively participated in the Auto/Oil Air Quality Improvement Research Program ("Auto/Oil"), a cooperative, joint research program involving the major domestic automobile manufacturers and fourteen oil companies. ¶ 50. The Auto/Oil joint research venture sought to conduct research to measure and evaluate automobile emissions and the potential improvements in air quality achievable through, and relative costs of, the use of reformulated gasolines and other techniques. ¶ 51. The Auto/Oil Agreement provided that "[n]o proprietary rights will be sought nor patent applications prosecuted on the basis of the work of the Program unless required for the purpose of ensuring that the results of the research by the Program will be freely available, without royalty, in the public domain." ¶ 52. Thus, "once data and information were in fact presented to the Auto/Oil Group, they became the 'work of the Program.' " ¶ 53.

On September 26, 1991, Unocal presented to Auto/Oil the results of Unocal's emissions research, including the test data, equations, and directional relationships derived from the "5/14" Project. ¶ 54. According to the Complaint, Unocal informed Auto/Oil participants that "the data had been made available to the public domain" and that "the data would be made available to Auto/Oil participants." *Id.* By these representations and through subsequent testing – as part of the Auto/Oil Program – of the 5/14 fuel property relationships, Unocal's 5/14 work allegedly became part of the "work" of the Auto/Oil Program. ¶¶ 54-55.

During the CARB RFG rulemaking, Unocal also actively participated in the Western States Petroleum Association ("WSPA"), a trade association of firms engaged in petroleum exploration, production, refining, transportation, and marketing. ¶ 56. WSPA commissioned, and submitted to CARB, three cost studies in connection with the Phase 2 RFG rulemaking. *Id.* One of these studies, used by CARB to determine the cost-effectiveness of the proposed Phase 2 RFG standards, incorporated information relating to royalty rates associated with non-Unocal patents and could have incorporated costs associated with Unocal's pending patents. ¶ 57. According to the Complaint, however, Unocal's presentation of its "5/14 Project" research results to WSPA on September 10, 1991 "created the materially false and misleading impression

that Unocal's emissions research results, including the data and equations, were nonproprietary and could be used by WSPA or its individual members without concern for the existence or enforcement of any intellectual property rights." ¶ 58.

The Complaint alleges that Unocal's interactions with Auto/Oil and WSPA prior to January 31, 1995, failed to disclose Unocal's pending patent rights and its intention to charge royalties, ¶¶ 83, 88; included "false and misleading statements concerning its proprietary interests in the results of its emissions research," ¶¶ 84, 89; and "breached fiduciary duties" to the other members of the associations. ¶¶ 84, 89. "None of the participants in the WSPA or Auto/Oil groups knew of the existence of Unocal's proprietary interests and/or pending patent rights at any time prior to the issuance of the '393 patent in February 1994, by which time most, if not all, of the oil company participants to these groups had made substantial progress in their capital investment and refinery modification plans for compliance with the CARB Phase 2 regulations." ¶ 59. Thus, "But for Unocal's fraud, these participants in the rulemaking process would have taken actions including, but not limited to, (a) advocating that CARB adopt regulations that minimized or avoided infringement on Unocal's patent claims; (b) advocating that CARB negotiate license terms substantially different from those that Unocal was later able to obtain; and/or (c) incorporating knowledge of Unocal's pending patent rights in their capital investment and refinery reconfiguration decisions to avoid and/or minimize potential infringement." ¶ 90.

### 4. Unocal's Patent Applications

The Complaint alleges that the relevant Unocal patent claims all derive from patent application No. 07/628,488, filed on December 13, 1990. ¶ 15. Following the November 1991 adoption of CARB's Phase 2 RFG specifications, Unocal amended its patent claims in March 1992 to ensure that the claims more closely matched the regulations. ¶ 60; *see supra* note 4.

The Complaint further alleges that on or about July 1, 1992, Unocal received an office action from the U.S. Patent and Trademark Office ("PTO") indicating that most of Unocal's pending patent claims had been allowed, and that, in February 1993, after submission of additional amendments, Unocal received a notice of allowance from the PTO for all its pending claims. ¶¶ 61-62. Unocal allegedly did not disclose this information to CARB or other participants to the CARB Phase 2 RFG rulemaking. *Id.*

The PTO issued the '393 patent to Unocal on February 22, 1994. Unocal, however, waited until January 31, 1995, to issue a press release announcing the patent's issuance. ¶ 64. According to the Complaint, "CARB first became aware of Unocal's '393 patent" shortly after that press release. ¶ 49.

-6-

5. Unocal's Patent Enforcement Efforts

On April 13, 1995, ARCO, Exxon, Mobil, Chevron, Texaco, and Shell sued in federal district court to invalidate Unocal's '393 patent. Unocal counterclaimed for infringement of that patent. The jury determined that Unocal's '393 patent was valid and infringed, and found that the refiners must pay a royalty of 5.75 cents per gallon for the period from March through July 1996 for sales of infringing gasoline in California. ¶ 68. The United States Court of Appeals for the Federal Circuit subsequently affirmed the trial court's judgment, and the refiner-defendants have made payments totaling $91 million to Unocal for damages, costs, and attorneys' fees. ¶ 69. An accounting action is still ongoing to determine damages for infringing the '393 patent during subsequent periods. ¶ 70.

On January 23, 2002, Unocal sued Valero Energy Company for willful infringement of both the '393 patent and the '126 patent. In its complaint, Unocal seeks damages at the rate of 5.75 cents per gallon, trebled for willful infringement. ¶ 71.

Moreover, "Unocal also has enforced its patent claims through licensing activities." ¶ 72. To date, Unocal has entered license agreements with eight refiners, blenders, and/or importers covering the use of all five RFG patents. Unocal has publicly stated that it expects to reap up to $150 million a year from licensing its RFG patents. ¶ 14.

6. The Alleged Violations

The Complaint alleges that "Unocal's fraudulent conduct has resulted in Unocal's acquisition of market power in the following markets: the technology market for the production and supply of CARB-compliant "summer-time" gasoline in California, and the downstream product market for CARB-compliant "summer-time" gasoline in California." ¶ 91; see ¶¶ 73-75. Allegedly, "The extensive overlap between the CARB RFG regulations and the Unocal patent claims makes avoidance of the Unocal patent claims technically and/or economically infeasible." ¶ 92. Refiners, having "invested billions of dollars in sunk capital investments without knowledge of Unocal's patent claims to reconfigure their refineries in order to comply with the CARB Phase 2 RFG regulations . . . cannot produce significant volumes of non-infringing CARB-compliant gasoline without incurring substantial additional costs," ¶ 93, and "CARB cannot now change its RFG regulations sufficiently to provide flexibility for refiners and others to avoid Unocal's patent claims." ¶ 94. Had Unocal disclosed its proprietary interests and pending patent rights earlier, CARB would have been able to consider the potential costs imposed by the Unocal patents, and the harm to competition and to consumers would have been avoided. Id. Instead, Unocal allegedly "has exercised, and continues to exercise, its market power through business conduct by enforcing its patents through litigation and licensing activities." ¶ 95.

After asserting harm to competition and substantial consumer injury, ¶¶ 97-98, the Complaint concludes that Unocal has violated Section 5 of the FTC Act by monopolizing, attempting to monopolize, and unreasonably restraining trade in the technology market for the

production and supply of CARB-compliant "summer-time" gasoline to be sold in California and by attempting to monopolize, and restraining trade in, the downstream goods market for CARB-compliant "summer-time" gasoline. ¶¶ 99-103.

    B.  The Initial Decision

    None of the alleged facts have been proved or disproved. No trial has been held. The Administrative Law Judge's (the "ALJ's") Initial Decision dismissed the Complaint on the basis of Unocal's motions. As a general matter, the Initial Decision (cited as the "ID") assumes that the Complaint's allegations are true and asks whether, if proved, they would be sufficient to establish a violation of Section 5.[5] It concludes, under two separate lines of reasoning, that those allegations are insufficient.

    One line of analysis entails the *Noerr-Pennington* doctrine, under which "[t]hose who petition the government for redress are generally immune from antitrust liability."[6] The Initial Decision holds that "*Noerr-Pennington* immunizes Respondent's efforts to induce CARB to adopt regulations on low-emissions, reformulated gasoline." ID at 68. Moreover, that Decision concludes, "[t]o the extent that Respondent's alleged conduct towards Auto/Oil Group and WSPA were part of Respondent's scheme to induce CARB to act, it constitutes indirect petitioning protected by *Noerr-Pennington*." *Id.*

    In reaching these conclusions, the Initial Decision rejected claims that the alleged false and misleading nature of Unocal's petitioning vitiates application of *Noerr-Pennington*. It considered and rejected two possible bases for exception to the doctrine. First, it ruled that the "sham" exception is inapplicable when the petitioner seeks to gain monopoly power through the *outcome* of the government action, rather than through abuse of the governmental *process*. ID at 48-49. Second, it rejected application of an exception to *Noerr-Pennington* drawn from principles of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965), in which the Supreme Court ruled that enforcement of a patent obtained by fraud can constitute monopolization. The Initial Decision found that to the extent that *Walker Process* principles support an exception to *Noerr-Pennington*, they do so only when governmental action is "quasi-adjudicatory and dependent on the petitioner for factual information." ID at 50, 68. Although the ALJ acknowledged that misrepresentations are outside the *Noerr-Pennington*

---

    [5] Although the Initial Decision includes little independent fact-finding, the ALJ does supplement his analysis of the Complaint with findings based on official notice of some of the statutes governing CARB, the Notice of Public Hearing through which CARB initiated the rulemaking, and CARB's Final Statement of Reasons for Rulemaking.

    [6] ID at 31, quoting *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 56 (1993). The doctrine derives its name from two Supreme Court cases, *Eastern R.R. President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

doctrine "where the agency is using an adjudicatory process," ID at 33, he found Unocal's alleged misrepresentations protected because CARB's Phase 2 RFG rulemaking process was "quasi-legislative." ID at 32-40. Responding to claims that application of *Noerr-Pennington* is particularly inappropriate here because CARB necessarily relied on the truth and accuracy of information provided by Unocal, the ALJ observed that entities other than Unocal also provided some input: "because CARB was not wholly dependent on Respondent in its rulemaking proceeding," the ALJ reasoned, *"Noerr-Pennington* applies." ID at 40-43.

The Initial Decision also rejected arguments suggesting that Unocal's conduct falls outside the scope of protected petitioning. To the argument that the doctrine does not apply when an agency is unaware that it is being asked to adopt or participate in a restraint of trade, the ALJ answered, "[I]t is clear that Respondent engaged in petitioning conduct," ID at 44, and concluded that "there is no requirement that the agency know what the effect of its legislation will be . . .. " ID at 47. In response to contentions that differences between the FTC Act and the Sherman Act suggest a narrower reach for *Noerr-Pennington* protections under the former, the Initial Decision ruled that *Noerr-Pennington* protection is as "fully available" in cases alleging unfair methods of competition under the FTC Act as in cases based on the Sherman Act. ID at 51-55.

Regarding Unocal's communications to Auto/Oil, WSPA, and their participants, the Initial Decision held that "[m]isrepresentations to third parties as a means of influencing the government's passage of laws fall within the bounds of *Noerr-Pennington*." ID at 56. It found that Unocal's alleged actions with respect to the private industry groups were "part of an alleged scheme to induce these third parties to influence CARB." ID at 57. It concludes that such conduct "constitutes indirect petitioning protected by *Noerr-Pennington*." ID at 68.

The Initial Decision applied a second line of analysis to the few allegations that remained after its *Noerr-Pennington* holdings, specifically, those allegations based on misrepresentations made to the Auto/Oil Group and to WSPA that were "independent of [Unocal's] alleged scheme to induce CARB to act." ID at 56. The Initial Decision identifies these allegations as culminating with Complaint ¶ 90(c), which states that "[b]ut for Unocal's fraud," the participants in Auto/Oil and WSPA would have taken actions "incorporating knowledge of Unocal's pending patent rights in their capital investment and refinery reconfiguration decisions to avoid and/or minimize potential infringement," with the result that "harm to competition and consumers . . . would have been avoided." The ALJ did not find these allegations covered by *Noerr-Pennington*, but rather held that the Commission lacked jurisdiction to resolve them.

According to the ALJ, "harm beyond that caused by CARB's regulations cannot be determined without knowing the scope of Respondent's patents, whether or not Auto/Oil Group and WSPA could have invented around those patents, and whether any such newly created products or methods could have avoided infringement." ID at 61. Necessarily embedded within these inquiries, he reasoned, are issues of patent claim interpretation and infringement. Citing 28

-9-

U.S.C. § 1338(a)[7] and the Supreme Court's opinion in *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988),[8] the ALJ concluded that the Complaint requires resolution of substantial questions of federal patent law; that it therefore "arises under" the federal patent law; and that only the federal courts, not the FTC, have the necessary jurisdiction. "Because the Commission does not have jurisdiction to adjudicate the scope of Respondent's patents and whether the third parties could compete with other products or methods without infringing on valid patents, the allegations of the Complaint with respect to Respondent's conduct towards Auto/Oil Group and WSPA are dismissed." ID at 67.

## II. STANDARD FOR EVALUATING MOTIONS TO DISMISS

As a matter of Commission practice, a motion to dismiss is treated analogously to a motion in federal court under Federal Rule of Civil Procedure 12(b)(6) to dismiss a complaint for failure to state a cause of action upon which relief can be granted: the Commission inquires whether the Complaint's allegations, if proved, are sufficient to make out a violation of Section 5. *See TK-7 Corp*, 1989 FTC Lexis 32, *3 (1989); *Florida Citrus Mutual*, 50 F.T.C. 959, 961 (1954) (dismissal warranted when "the facts alleged do not state a cause of action"). In making that inquiry, the Commission assumes the Complaint's factual allegations to be true and draws all reasonable inferences in favor of Complaint Counsel. *See TK-7* at *3; 2 MOORE'S FEDERAL PRACTICE § 12.34[1][b] (3d ed. 2003); 5A Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1357 (2003) ("the complaint is construed in the light most favorable to plaintiff and its allegations are taken as true"). A case in this posture does not raise the issue whether the Complaint's factual allegations are true, but whether Complaint Counsel is entitled to offer evidence to support the allegations. *See* 2 MOORE'S FEDERAL PRACTICE § 12.34[1][a]. The Commission's review of an Initial Decision that grants a motion to dismiss, like its review of other Initial Decisions by administrative law judges, is *de novo*. 16 C.F.R. § 3.54.

## III. AS A MATTER OF LAW, MISREPRESENTATION MAY SOMETIMES VITIATE THE *NOERR-PENNINGTON* DOCTRINE

Complaint Counsel appeal the Initial Decision's general application of the *Noerr-Pennington* doctrine on four principal grounds. They argue at greatest length that Unocal's conduct falls within a misrepresentation exception to the doctrine. In addition, they argue that *Noerr-Pennington* does not apply because (1) CARB's objective purpose was neither to adopt nor to participate in a restraint of trade; (2) harm from Unocal's conduct can be cured without overturning a government decision, burdening those who comply with that decision, or impairing

---

[7] 28 U.S.C. § 1338(a) vests original jurisdiction over "any civil action arising under any Act of Congress relating to patents" in the federal district courts.

[8] *Christianson* holds that a case arises under federal patent law when the "plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law." 486 U.S. at 809.

-10-

communications between a party and a government agency; and (3) the petitioning exclusion applicable to proceedings alleging FTC Act violations, in contrast to those alleging Sherman Act violations, is only as broad as constitutionally required.

As discussed below, we resolve the *Noerr-Pennington* issues before us with an exception applicable, in appropriate circumstances, to misrepresentations. In so doing, we find it unnecessary to consider, as self-standing arguments, Complaint Counsel's theories premised on CARB's objective purposes and the nature of required remedies, although we find some elements of Complaint Counsel's discussion instructive. We do not reach the issue of a possible distinction between the scope of *Noerr-Pennington* protection under the FTC Act as opposed to the Sherman Act.

A. *Noerr-Pennington*: Basic Principles and Evolution of the "Sham" Exception

Beginning with *Eastern R.R. President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), the Supreme Court has fashioned and applied a doctrine that bars Sherman Act challenges "predicated upon mere attempts to influence the passage or enforcement of laws." *Id.* at 135. *Noerr* involved allegations that a group of railroads had jointly conducted a publicity campaign "designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business" as well as "to create an atmosphere of distaste for the truckers among the general public" and "to impair the relationships existing between the truckers and their customers." *Id.* at 129. Intertwining considerations of statutory construction with First Amendment principles, the Court found the challenged conduct beyond the coverage of the Sherman Act.

The Court first explained that "an attempt to persuade the legislature or the executive to take particular action" bears "very little if any resemblance to the combinations normally held violative of the Sherman Act . . . ." *Id.* at 136. This "essential dissimilarity" cautions against treating such conduct as trade restraints, the Court continued. *Id.* at 136-37. Next, the Court suggested that a limitation on the Sherman Act's coverage was necessary for effective operation of a representative government. To hold that the Sherman Act forbids agreements "for the purpose of influencing the passage or enforcement of laws," the Court explained, "would substantially impair the power of government to take actions through its legislature and executive that operate to restrain trade." *Id.* at 137. The Court continued:

> In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act.

-11-

*Id.*

Finally, the Court turned to the First Amendment right of petitioning: "[A] construction of the Sherman Act" that forbids joint activity to influence the passage or enforcement of laws "would raise important constitutional questions." *Id.* at 138. As the Court explained, "The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Id.* The Court concluded, "[W]e think it clear that the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws." *Id.*

*Noerr* dealt primarily with efforts to influence legislation. Subsequently, the Supreme Court applied *Noerr*'s principles to petitioning directed at the executive branch,[9] as well as to administrative agencies and the courts.[10] "[I]t would be destructive of rights of association and of petition," the Court stated, "to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors."[11]

Nonetheless, the Court has clearly found a "sham" exception to *Noerr-Pennington*. As early as *Noerr* itself, the Court stated:

> There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.

*Noerr*, 365 U.S. at 144. In *California Motor Transport*, the Court found such a sham and rejected *Noerr-Pennington* protection for multiple administrative and judicial challenges that one group of trucking firms brought to oppose their competitors' applications for operating rights. The Court

---

[9] *United Mine Workers v. Pennington*, 381 U.S. 657 (1965). Whereas *Noerr* had involved petitioning aimed at state government, *Pennington* applied similar principles to petitioning federal executive branch officials and independent agencies (the Secretary of Labor and the Tennessee Valley Authority). The Court emphasized that *Noerr* principles apply to efforts to influence government officials regardless of anticompetitive intent or purpose. *Id.* at 669-70.

[10] *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972) ("The same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts . . . .").

[11] *Id.*

stressed that the antitrust plaintiff had alleged that the defendants "instituted the proceedings and actions . . . with or without probable cause, and regardless of the merits of the cases," and concluded that "the allegations are not that the conspirators sought to influence public officials, but that they sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process." *California Motor Transport*, 404 U.S. at 512 (internal quotations omitted).

More recently, the Court explained that "[t]he 'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon."[12]  Finally, in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries*, 508 U.S. 49 (1993) ("*PREI*"), a case that held that *Noerr-Pennington* sheltered a single copyright infringement lawsuit from Sherman Act counterclaims, the Court offered a two-part definition of sham litigation:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. . . . Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.  Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor" through the "use [of] the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon."

*PREI*, 508 U.S. at 60-61 (citations omitted) (emphasis original).

---

[12]  *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991) (emphasis original); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 507 n.10 (1988) (observing that *Noerr* described a sham exception covering "activity that was not genuinely intended to influence governmental action").  *Omni* clarified that the restriction on access to governmental fora at issue in *California Motor Transport* supported the sham exception only because "the conspirators' participation in the governmental process was itself claimed to be a 'sham,' employed as a means of imposing cost and delay." *Omni*, 499 U.S. at 381-82.

B. *Noerr-Pennington*: Judicial Assessment of Misrepresentation[13]

1. Legal Background

The Supreme Court has also suggested that some misrepresentations to governmental agencies fall outside of *Noerr-Pennington* protections, but it has left key questions unanswered.

Again, the line of analysis traces from *Noerr* itself. The plaintiff there alleged that the railroads' publicity campaign against the trucking industry was fraudulent, in that material prepared and produced by the railroads' public relations firm was made to appear as the spontaneously expressed views of independent persons and civic groups. Although it found this "third-party" technique unethical,[14] the Court ruled that it was "legally irrelevant." *Noerr*, 365 U.S. at 140-42. "Insofar as [the Sherman] Act sets up a code of ethics at all," the Court explained, "it is a code that condemns trade restraints, not political activity, and as we have already pointed out, a publicity campaign to influence governmental action falls clearly into the category of political activity." *Id.* at 140-41. Congress' "caution in legislating with respect to problems relating to the conduct of political activities" would "go for naught if we permitted an extension of the Sherman Act to regulate activities of that nature simply because those activities have a commercial impact and involve conduct that can be termed unethical." *Id.* at 141.

In contrast to *Noerr*'s holding that misrepresentations in a lobbying campaign in the political context were not subject to Sherman Act liability, subsequent cases apply different approaches for different contexts. As the Court explained, "Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transport*, 404 U.S. at 513. More recently, in *Allied Tube,* 486 U.S. at 499, the Court stressed that "the applicability of *Noerr* immunity varies with the context and nature of the activity." (Comma omitted.) Thus,

---

[13] Our references to "misrepresentations" include material omissions as well. *See, e.g., Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070 (Fed. Cir.) (finding that a jury instruction "was not inconsistent with various opinions of the courts stating that omissions, as well as misrepresentations, may in limited circumstances support a finding of *Walker Process* fraud"), *cert. denied*, 525 U.S. 876 (1998).

[14] Although use of the third party technique allegedly was deceptive, the Court recognized that the district court did not find that the railroads' publicity campaign contained false content, but rather that the railroads took "a dramatic fragment of truth and by emphasis and repetition distort[ed] it into falsehood." *Noerr*, 365 U.S. at 134 n.8 (internal quotation omitted). The fact that both sides in *Noerr* used the third party technique, *id.* at 142 n.22, vividly indicates the "rough and tumble" nature of the political context in which the parties fought their lobbying battle.

-14-

> A publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods. But in less political arenas, unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations.

*Id.* at 499-500 (citation omitted).

The Supreme Court followed a parallel approach in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965). In that case, decided after both *Noerr* and *Pennington*, Walker Process, the defendant in a patent infringement suit, counterclaimed that Food Machinery had violated Section 2 of the Sherman Act by threatening to sue, and then suing, for the alleged infringement of a patent obtained through knowing and deliberate fraud on the Patent Office. An infringement action, like other court litigation, could not give rise to antitrust liability if sheltered by *Noerr-Pennington*. Without mentioning *Noerr-Pennington* considerations, however, the Court concluded that "the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present."[15]

The statements in *California Motor Transport* and *Allied Tube* regarding misrepresentation were *dicta*, and the Court did not explain the relationship between its *Walker Process* holding and the *Noerr-Pennington* doctrine. Nor have the Supreme Court's latest pronouncements resolved these issues. *Omni* rejected a "conspiracy" exception to *Noerr-Pennington*, applicable "when government officials conspire with a private party to employ government action as a means of stifling competition," 499 U.S. at 382, but did not directly discuss misrepresentation. After detailing its two-part test for sham litigation, *PREI* did discuss misrepresentation, but only to state that it was *not* deciding how it should be analyzed. The Court stated:

> In surveying the "forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations," we have noted that "unethical conduct in the setting of the adjudicatory process often results in

---

[15]  *Walker Process*, 382 U.S. at 174. The Court explained that a patent " 'is an exception to the general rule against monopolies and to the right to access to a free and open market' " and noted the " 'paramount' " public interest " 'in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.' " *Id.* at 177, quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816 (1945). Consequently, the Court determined, a showing of knowing and willful misrepresentations in obtaining its patent would suffice "to strip Food Machinery of its exemption from the antitrust laws," and expose it to potential antitrust liability for seeking to enforce the fraudulently obtained patent rights. *Walker Process*, 382 U.S. at 177.

-15-

sanctions" and that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transport*, 404 U.S., at 512-13. We need not decide here whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations. Cf. Fed. Rule Civ. Proc. 60(b)(3) (allowing a federal court to "relieve a party . . . from a final judgment" for "fraud . . . , misrepresentation, or other misconduct of an adverse party"); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.* 382 U.S. 172, 176-77 . . . .

*PREI*, 508 U.S. at 61 n.6.

  Although Supreme Court law remains unsettled, the weight of lower court authority, spanning more than thirty years, has recognized that misrepresentations may preclude application of *Noerr-Pennington* in less political arenas than the legislative lobbying at issue in *Noerr* itself. For example, courts have refused to apply the doctrine to conduct involving misrepresentations to a state railroad commission in the setting of natural gas production quotas;[16] to the Interstate Commerce Commission in a ratemaking context;[17] to a state health planning agency considering an application for a certificate of need ("CON");[18] to the Food & Drug Administration involving its pharmaceutical drug approval process;[19] and to state securities administrators and the federal courts with respect to allegations of franchise law violations, racketeering, and securities fraud.[20] The United States Courts of Appeals for the District of Columbia Circuit,[21] the Second Circuit,[22]

---

  [16] *See Woods Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047 (1972).

  [17] *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240 (9th Cir. 1982), *cert. denied*, 459 U.S. 1227 (1983).

  [18] *See St. Joseph's Hosp. v. Hospital Corp. of America*, 795 F.2d 948 (11th Cir. 1986); *see also Kottle v. Northwest Kidney Centers*, 146 F.3d 1056 (9th Cir. 1998) (finding that misrepresentation in a CON proceeding would not be *Noerr*-protected but that allegations in the complaint were too vague to avoid dismissal), *cert. denied*, 525 U.S. 1140 (1999). *Armstrong Surgical Center, Inc., v. Armstrong County Memorial Hosp.*, 185 F.3d 154 (1999), *cert. denied*, 530 U.S. 1261 (2000), which takes a largely contrary approach, is discussed below.

  [19] *See Israel v. Baxter Laboratories*, 466 F.2d 272 (D.C. Cir. 1972).

  [20] *See Whelan v. Abell*, 48 F.3d 1247 (D.C. Cir. 1995).

  [21] *See, e.g., Whelan; Israel.*

  [22] *See Juster Assoc. v. City of Rutland, Vt.*, 901 F.2d 266 (2d Cir. 1990)*; Litton Sys., Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785 (2d Cir. 1983), *cert. denied*, 464 U.S. 1073 (1984).

the Fifth Circuit,[23] the Sixth Circuit,[24] the Seventh Circuit,[25] the Eighth Circuit,[26] the Ninth Circuit,[27] the Eleventh Circuit,[28] and the Federal Circuit,[29] expressing their views in diverse terms and in varying settings, all have indicated that in some contexts misrepresentations to government may vitiate *Noerr-Pennington* protection.[30]

      2. Policy Considerations

Ample policy grounds support a misrepresentation exception to the *Noerr-Pennington* doctrine.

      a. *The First Amendment:* As *Noerr* itself suggested, 365 U.S. at 137-38, and as the Court has consistently maintained, the doctrine derives in part from First Amendment considerations. In *California Motor Transport*, 404 U.S. at 510-11, the Court explained that "it

---

[23] *See Woods Exploration.*

[24] *See Potters Medical Center v. City Hospital Ass'n*, 800 F.2d 568 (6th Cir. 1986).

[25] *See Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220 (7th Cir. 1975).

[26] *See Porous Media Corp. v. Pall Corp*, 186 F.3d 1077 (8th Cir. 1999); *Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484 (8th Cir. 1985).

[27] *See Kottle; Liberty Lake Investments, Inc. v. Magnuson*, 12 F.3d 155 (9th Cir. 1993), *cert. denied*, 513 U.S. 818 (1994); *Clipper Exxpress.*

[28] *See St. Joseph's Hospital.*

[29] *See Rodime PLC v. Seagate Technology, Inc.*, 174 F.3d 1294 (Fed. Cir. 1999), *cert. denied*, 528 U.S. 1115 (2000); *Nobelpharma* (in the context of a patent obtained by fraud).

[30] As discussed below, the Third Circuit has expressed doubt whether a misrepresentation exception still exists, but even this court suggests *narrow* circumstances in which misrepresentation may vitiate *Noerr-Pennington* protection. *See infra* Section III.C. The Fourth Circuit has declined to rule on whether a "fraud exception" exists but has disposed of cases on the assumption that it does. *See Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 401-04 (4th Cir.) (concluding that "[i]f a fraud exception to *Noerr-Pennington* does exist, it extends only to the type of fraud that deprives litigation of its legitimacy," not to situations in which "regardless of the alleged fraud, the outcome would have been the same"), *cert. denied*, 533 U.S. 916 (2001); *see also A Fisherman's Best, Inc. v. Recreational Fishing Alliance*, 310 F.3d 183, 192 (4th Cir. 2002) (observing that there is no "officially recognized" *Noerr-Pennington* exception for a smear campaign, misrepresentation, threats, or corrupt practices, but nonetheless considering whether misrepresentation was present as an element of an allegedly improper lobbying campaign).

-17-