

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 412811 (E.D.Pa.)
**(Cite as: 1996 WL 412811 (E.D.Pa.))**

Page 9

Metzinger Associates' Motion to Compel Disclosure of United States' Witnesses at Trial (Oct. 22, 1996)

• 1996 WL 33485373 (Trial Motion, Memorandum and Affidavit) Defendants William Ritter, Harry Metzinger and Metzinger Associates Motion to Compel Plaintiff's Answer to Interrogatory No. 14 and to Compel the Production of Documents (Oct. 15, 1996)

• 1996 WL 33578556 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response and Memorandum in Opposition to Defendant St. James Mercy Hospital's Motion for Reconsideration, or Certification of Interlocutory Appeal (Sep. 20, 1996)

• 1996 WL 33578555 (Trial Motion, Memorandum and Affidavit) Motion of St. James Mercy Hospital (May. 13, 1996)

• 1996 WL 33578557 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of St. James Mercy Hospital in Support of Its Motion to Dismiss the Amended Complaint or Transfer Venue (May. 13, 1996)

• 1996 WL 33576535 (Trial Pleading) Answer of The Defendant, Porter Memorial Hospital, to the Plaintiff's Amended Complaint (May. 06, 1996)

• 1996 WL 33578549 (Trial Motion, Memorandum and Affidavit) Motion for Admissions Pro Hac Vice of Counsel for Defendant Warren General Hospital (May. 06, 1996)

• 1996 WL 33578552 (Trial Motion, Memorandum and Affidavit) Motion to Dismiss Amended Complaint (May. 06, 1996)

• 1996 WL 33578553 (Trial Motion, Memorandum and Affidavit) Defendant Lawrence Hospital's Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction and Failure to Plead Fraud with Particularity (May. 06, 1996)

• 1996 WL 33576534 (Trial Pleading) Defendant, Gnaden Huetten Memorial Hospital's Answer with Affirmative Defenses Filed in Response to Plaintiff's Amended Complaint (May. 02, 1996)

• 1996 WL 33578551 (Trial Motion, Memorandum and Affidavit) Motion For Admission Pro Hac Vice of Counsel for Defendant Lawrence Hospital (May. 02, 1996)

• 1996 WL 33578554 (Trial Motion, Memorandum and Affidavit) Defendant Geisinger Wyoming Valley Medical Center's Motion to Dismiss for Failure to Comply with Federal Rule of Civil Procedure 9(b) and/or for More Specific Statement (May 1996)

• 1996 WL 33578550 (Trial Motion, Memorandum and Affidavit) Motion for Admission Pro Hac Vice of Counsel for Defendant Saint Francis Hospital (Apr. 25, 1996)

• 1996 WL 33576888 (Trial Motion, Memorandum and Affidavit) Defendants William Ritter, Harry Metzinger and Metzinger Associates' Reply to Plaintiff's Memorandum in Opposition to Motion for Sanctions (Apr. 04, 1996)

• 1996 WL 33578548 (Trial Motion, Memorandum and Affidavit) Defendants William Ritter, Harry Metzinger and Metzinger Associates' Reply to Plaintiff's Memorandum in Opposition to Motion for Sanctions (Apr. 04, 1996)

• 1996 WL 33578547 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Motion for Sanctions (Apr. 01, 1996)

• 1996 WL 33576533 (Trial Pleading) Answer of Defendants Harry J. Metzinger, t/a Metzinger Associates, to the Amended Complaint of the Plaintiff, with Affirmative Defenses (Mar. 18, 1996)

• 1996 WL 33576886 (Trial Motion, Memorandum and Affidavit) Motion for Admission Pro Hac Vice of Counsel for Defendant Champlain Valley Physicians Hospital Medical Center (Feb. 21, 1996)

• 1996 WL 33576887 (Trial Motion, Memorandum and Affidavit) Motion for Admission Pro Hac Vice of Counsel for Defendant Champlain Valley Physicians Hospital Medical Center (Feb. 21, 1996)

• 1996 WL 33576532 (Trial Pleading) Amended Complaint (Feb. 20, 1996)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 412811 (E.D.Pa.)
(Cite as: 1996 WL 412811 (E.D.Pa.))

• 1996 WL 33576885 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Response to Motion for Protective Order (Feb. 16, 1996)

• 1995 WL 17141894 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Compel Plaintiff to Comply with the Court's November 13, 1995 Order (Dec. 29, 1995)

• 1995 WL 17141893 (Trial Motion, Memorandum and Affidavit) Motion for Leave to Amend Complaint (Dec. 05, 1995)

• 1995 WL 17141896 (Trial Motion, Memorandum and Affidavit) Memorandum of Plaintiff United States Concerning Defendant Ritter's Motion to Compel Coopers & Lybrand (Sep. 27, 1995)

• 1995 WL 17141899 (Trial Motion, Memorandum and Affidavit) Coopers & Lybrand L.L.P.'s Memorandum of Law in Opposition to Defendant William Ritter's Motion to Compel Coopers & Lybrand L.L.P. to Comply with Subpoena Duces Tecum (Sep. 07, 1995)

• 1995 WL 17141895 (Trial Motion, Memorandum and Affidavit) Defendant William Ritter's Motion to Compel Coopers & Lybrand L.L.P. to Compaly with Subpoena Duces Tecum (Aug. 18, 1995)

• 1995 WL 17141891 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Platintiff's Motion in Limine to Permit the Admission of Statistical Proof (Aug. 15, 1995)

• 1995 WL 17141898 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiff's Motion in Limine to Permit the Admission of Statistical Proof (Aug. 15, 1995)

• 1995 WL 17141892 (Trial Motion, Memorandum and Affidavit) Plaintiff's Motion in Limine to Permit Presentation of Statistical Proof at Trial (Jul. 20, 1995)

• 1995 WL 17141897 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Motion in Limine of Plaintiff (Jul. 20, 1995)

• 1995 WL 17141890 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Dismiss Count IV of Plaintiff's Complaint and Motion for a More Definite Statement with Respect to Count II of Plaintiff's Complaint (Jan. 31, 1995)

• 1994 WL 16135850 (Trial Pleading) Complaint (Dec. 15, 1994)

• 2:94cv07520 (Docket) (Dec. 15, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT X

In the Matter of Union Oil Company of California
Docket No. 9305

Opinion of the Commission

BY MURIS, Chairman:

A private business allegedly has used false and misleading statements to induce a government body to issue regulatory standards that conferred market power upon the firm. Respondent argues that, even taking the Complaint's factual allegations as established as is required at this preliminary stage, its deliberate use of misrepresentations to secure monopoly power is protected from antitrust challenge under the *Noerr-Pennington* doctrine, which shelters certain petitioning for government action. We disagree.

On March 4, 2003, the Federal Trade Commission issued an administrative complaint alleging, *inter alia*, that the Union Oil Company of California ("Unocal") engaged in unfair methods of competition through knowing and willful misrepresentations, to the California Air Resources Board ("CARB") and to competing gasoline refiners, that Unocal lacked, or would not assert, patent rights concerning automobile emissions research results. The Complaint further alleged that, through these misrepresentations, Unocal (1) induced CARB to adopt reformulated gasoline standards that substantially overlapped Unocal's patent claims and (2) induced other refiners to reconfigure their refineries in ways that subsequently exposed them to Unocal's patent claims. According to the Complaint, Unocal claims it is entitled to hundreds of millions of dollars in royalties from refiners who are now required to follow CARB's standards.

Administrative litigation ensued. Unocal filed two motions to dismiss. One argued that Unocal's conduct involved petitioning the government and hence was immune from antitrust liability. The other asserted that the Complaint failed to state sufficient allegations that Unocal possessed, or dangerously threatened to possess, monopoly power.

On November 25, 2003, Administrative Law Judge D. Michael Chappell issued an Initial Decision concluding that the *Noerr-Pennington* doctrine protects much of the conduct alleged to constitute unfair methods of competition and that the FTC lacks jurisdiction over the remaining allegations because they depend on resolution of substantial questions of patent law.[1] Judge Chappell dismissed the Complaint in its entirety. Complaint Counsel have appealed. For the reasons stated below, we reverse and vacate the Initial Decision, reinstate the Complaint, and remand for further consideration of the Complaint's allegations.

---

[1] The Initial Decision denied without prejudice the remainder of Unocal's motion regarding market power.

I. BACKGROUND

    A. The Commission's Complaint

This case involves Unocal's actions in state regulatory proceedings concerning low-emissions, reformulated gasoline ("RFG") standards to address California's air pollution problems. The Complaint, *inter alia*, states the following allegations.[2]

    1. Unocal, CARB, and the Reformulated Gasoline Proceedings

Prior to 1997, Unocal owned and operated refineries in California as a vertically integrated producer, refiner, and marketer of petroleum products.[3] In March 1997, Unocal completed the sale of its west coast refining, marketing, and transportation assets, but it continues to engage in oil and gas exploration and production. *Id.* Moreover, Unocal's 2001 annual report, filed with the United States Securities and Exchange Commission, lists another of its key business activities as "[p]ursuing and negotiating licensing agreements for reformulated gasoline patents with refiners, blenders and importers."[4]

In late 1988, the California legislature amended the California Clean Air Act to require CARB, a department of the California Environmental Protection Agency, to reduce harmful automobile emissions, and directed CARB to achieve this goal through new standards for automobile fuels and low-emission vehicles. ¶ 21. CARB's specific legislative mandate, promulgated in California Health and Safety Code Section 43018, provided, *inter alia*, that CARB:

    a. Take "necessary, cost-effective, and technologically feasible" actions to achieve "reduction in the actual emissions of reactive, organic gases of at least 55 percent, a reduction in emissions of oxides of nitrogen of at least 15 percent from motor vehicles" no later than December 31, 2000;

---

[2]  Omissions and rewordings of the Complaint's allegations are solely for ease of exposition in addressing the specific issues currently before the Commission. Nothing in this Opinion is intended to change the content of the Complaint, which remains the sole charging document in this proceeding.

[3]  ¶ 13. Paragraph references indicate paragraphs in the Complaint.

[4]  ¶ 14. Unocal is the owner, by assignment, of the following patents relating to low-emissions, reformulated gasoline: United States Patent No. 5,288,393 (issued February 22, 1994); United States Patent No. 5,593,567 (issued January 14, 1997); United States Patent No. 5,653,866 (issued August 5, 1997); United States Patent No. 5,837,126 (issued November 17, 1998); United States Patent No. 6,030,521 (issued February 29, 2000). ¶ 15. These patents all derive from, and receive priority as if they were filed with, patent application No. 07/628,488, filed on December 13, 1990. ¶ 15.

b. Take actions "to achieve the maximum feasible reduction in particulates, carbon monoxide, and toxic air contaminants from vehicular sources"; and

c. Adopt standards and regulations that would result in "the most cost-effective combination of control measures on all classes or motor vehicles and motor vehicle fuels" including the "specification of vehicular fuel composition."

¶ 21.

Following the 1988 California Clean Air Act amendments, CARB embarked on two rulemakings relating to low-emissions RFG. In these proceedings – Phase 1 and Phase 2, respectively – CARB prescribed limits on specific gasoline properties. ¶ 22. In the Phase 2 RFG proceedings, on which this case focuses, CARB developed stringent standards for low-emissions RFG. ¶ 24.

### 2. Alleged Misrepresentations to CARB

The Complaint alleges that, beginning in 1990 and continuing throughout the CARB Phase 2 RFG rulemaking process, Unocal provided "materially misleading" information to CARB "for the purpose of obtaining competitive advantage." ¶ 35. According to the Complaint, "This information was materially misleading in light of Unocal's suppression of facts relating to its proprietary interests in its emissions research results and Unocal's active prosecution of patents based on these research results." *Id.* Unocal gave CARB this information in private meetings with CARB, through participation in CARB's public workshops and hearings, and through industry groups that also were commenting on the CARB regulations. *Id.*

On June 11, 1991, CARB held a public workshop regarding the Phase 2 RFG regulations. The specifications CARB proposed for discussion at this public workshop did not include a T50 specification, *viz.*, a specification based on the temperature at which 50 percent of a fuel evaporates. ¶¶ 30, 36. Nine days later, Unocal presented to CARB's staff the results of its "5/14 Project" emissions research program to show that "cost-effective" regulations could be achieved through adoption of a "predictive model" and to convince CARB of the importance of T50. ¶¶ 37, 78a. Unocal's then-pending patent application contained numerous claims that included T50 as a critical limitation, in addition to other fuel properties that CARB proposed to regulate. ¶ 37. Unocal's management, however, decided not to disclose Unocal's pending '393 patent application to CARB's staff. ¶ 38.

On July 1, 1991, Unocal provided CARB with the actual emissions prediction equations developed in the "5/14 Project." Unocal requested that CARB "hold these equations confidential, as we feel that they may represent a competitive advantage in the production of gasoline." ¶ 39. Nevertheless, Unocal stated:

If CARB pursues a meaningful dialogue on a predictive model approach to Phase 2 gasoline, Unocal will consider making the equations and underlying data public as

-3-

required to assist in the development of a predictive model.

*Id.*

Following CARB's agreement to develop a predictive model, the Complaint alleges, Unocal made its emissions research results, including the test data and equations underlying its "5/14 Project," publicly available. ¶ 40. In an August 27 letter, Unocal stated to CARB:

Please be advised that Unocal now considers this data to be non-proprietary and available to CARB, environmental interest groups, other members of the petroleum industry, and the general public upon request.

¶ 41. The Complaint continues: "Read separately or in conjunction with Unocal's July 1, 1991 letter, the August 27, 1991 letter created the materially false and misleading impression that Unocal agreed to give up any 'competitive advantage' it may have had relating to its purported invention and arising from its emissions research results." ¶ 42; *see* ¶ 78b. Unocal made numerous subsequent statements and comments to CARB that "reinforced the materially false and misleading impression" that Unocal had created. ¶ 78c.

The Complaint further alleges that in "reasonable reliance on Unocal's representation that the information was no longer proprietary, CARB used Unocal's equations in setting a T50 specification." ¶ 43. Subsequently, in October 1991, CARB published Unocal's equations in public documents supporting the proposed Phase 2 RFG regulations. *Id.* On November 22, 1991, CARB adopted Phase 2 RFG regulations that set standards for the composition of low-emissions RFG with specific limits for eight gasoline properties. ¶ 44. Unocal's pending patent claims recited limits for five of those eight properties, including T50. *Id.*

In June 1994, CARB amended the Phase 2 regulations to include, as an alternative method of complying, a predictive model that was intended to provide refiners with additional flexibility. ¶ 47. This "predictive model" permits a refiner to comply with the RFG regulations by producing fuel that is predicted – based on its composition and the levels of the eight properties – to have emissions equivalent to a fuel that meets the strict gasoline property limits set forth in the regulations. *Id.* During the development of the predictive model, Unocal submitted comments to CARB touting the predictive model as offering "flexibility" and furthering CARB's mandate of "cost-effective" regulations. ¶ 48. Allegedly, these statements were "materially false and misleading because Unocal suppressed the material fact that assertion of its proprietary rights would materially increase the cost and reduce the flexibility of the proposed regulations." *Id.*

-4-

In sum, the Complaint states that "[t]hroughout its communications and interactions with CARB prior to January 31, 1995, Unocal failed to disclose that it had pending patent rights, that its patent claims overlapped with the proposed RFG regulations, and that Unocal intended to charge royalties." ¶ 79.  Citing as examples CARB's inclusion of a specification for T50 in its Phase 2 RFG regulations and its adoption of a "predictive model" that included T50 as one of the parameters, the Complaint alleges that "Unocal's misrepresentations and materially false and misleading statements caused CARB to adopt Phase 2 RFG regulations that substantially overlapped with Unocal's concealed patent claims." ¶ 45.  The Complaint concludes:  "But for Unocal's fraud, CARB would not have adopted RFG regulations that substantially overlapped with Unocal's concealed patent claims; the terms on which Unocal was later able to enforce its proprietary interests would have been substantially different; or both." ¶ 80.

### 3.  Alleged Misrepresentations to Industry Groups

The Complaint also alleges that Unocal made misrepresentations to two industry groups.  During the CARB RFG rulemaking, Unocal actively participated in the Auto/Oil Air Quality Improvement Research Program ("Auto/Oil"), a cooperative, joint research program involving the major domestic automobile manufacturers and fourteen oil companies. ¶ 50.  The Auto/Oil joint research venture sought to conduct research to measure and evaluate automobile emissions and the potential improvements in air quality achievable through, and relative costs of, the use of reformulated gasolines and other techniques. ¶ 51.  The Auto/Oil Agreement provided that "[n]o proprietary rights will be sought nor patent applications prosecuted on the basis of the work of the Program unless required for the purpose of ensuring that the results of the research by the Program will be freely available, without royalty, in the public domain." ¶ 52.  Thus, "once data and information were in fact presented to the Auto/Oil Group, they became the 'work of the Program.' " ¶ 53.

On September 26, 1991, Unocal presented to Auto/Oil the results of Unocal's emissions research, including the test data, equations, and directional relationships derived from the "5/14" Project. ¶ 54.  According to the Complaint, Unocal informed Auto/Oil participants that "the data had been made available to CARB and were in the public domain" and that "the data would be made available to Auto/Oil participants." *Id.*  By these representations and through subsequent testing – as part of the Auto/Oil Program – of the 5/14 fuel property relationships, Unocal's 5/14 work allegedly became part of the "work" of the Auto/Oil Program. ¶¶ 54-55.

During the CARB RFG rulemaking, Unocal also actively participated in the Western States Petroleum Association ("WSPA"), a trade association of firms engaged in petroleum exploration, production, refining, transportation, and marketing. ¶ 56.  WSPA commissioned, and submitted to CARB, three cost studies in connection with the Phase 2 RFG rulemaking. *Id.*  One of these studies, used by CARB to determine the cost-effectiveness of the proposed Phase 2 RFG standards, incorporated information relating to royalty rates associated with non-Unocal patents and could have incorporated costs associated with Unocal's pending patents. ¶ 57.  According to the Complaint, however, Unocal's presentation of its "5/14 Project" research results to WSPA on September 10, 1991 "created the materially false and misleading impression

-5-

that Unocal's emissions research results, including the data and equations, were nonproprietary and could be used by WSPA or its individual members without concern for the existence or enforcement of any intellectual property rights." ¶ 58.

The Complaint alleges that Unocal's interactions with Auto/Oil and WSPA prior to January 31, 1995, failed to disclose Unocal's pending patent rights and its intention to charge royalties, ¶¶ 83, 88; included "false and misleading statements concerning its proprietary interests in the results of its emissions research," ¶¶ 84, 89; and "breached fiduciary duties" to the other members of the associations. ¶¶ 84, 89. "None of the participants in the WSPA or Auto/Oil groups knew of the existence of Unocal's proprietary interests and/or pending patent rights at any time prior to the issuance of the '393 patent in February 1994, by which time most, if not all, of the oil company participants to these groups had made substantial progress in their capital investment and refinery modification plans for compliance with the CARB Phase 2 regulations." ¶ 59. Thus, "But for Unocal's fraud, these participants in the rulemaking process would have taken actions including, but not limited to, (a) advocating that CARB adopt regulations that minimized or avoided infringement on Unocal's patent claims; (b) advocating that CARB negotiate license terms substantially different from those that Unocal was later able to obtain; and/or (c) incorporating knowledge of Unocal's pending patent rights in their capital investment and refinery reconfiguration decisions to avoid and/or minimize potential infringement." ¶ 90.

### 4. Unocal's Patent Applications

The Complaint alleges that the relevant Unocal patent claims all derive from patent application No. 07/628,488, filed on December 13, 1990. ¶ 15. Following the November 1991 adoption of CARB's Phase 2 RFG specifications, Unocal amended its patent claims in March 1992 to ensure that the claims more closely matched the regulations. ¶ 60; *see supra* note 4.

The Complaint further alleges that on or about July 1, 1992, Unocal received an office action from the U.S. Patent and Trademark Office ("PTO") indicating that most of Unocal's pending patent claims had been allowed, and that, in February 1993, after submission of additional amendments, Unocal received a notice of allowance from the PTO for all its pending claims. ¶¶ 61-62. Unocal allegedly did not disclose this information to CARB or other participants to the CARB Phase 2 RFG rulemaking. *Id.*

The PTO issued the '393 patent to Unocal on February 22, 1994. Unocal, however, waited until January 31, 1995, to issue a press release announcing the patent's issuance. ¶ 64. According to the Complaint, "CARB first became aware of Unocal's '393 patent" shortly after that press release. ¶ 49.

5. Unocal's Patent Enforcement Efforts

On April 13, 1995, ARCO, Exxon, Mobil, Chevron, Texaco, and Shell sued in federal district court to invalidate Unocal's '393 patent. Unocal counterclaimed for infringement of that patent. The jury determined that Unocal's '393 patent was valid and infringed, and found that the refiners must pay a royalty of 5.75 cents per gallon for the period from March through July 1996 for sales of infringing gasoline in California. ¶ 68. The United States Court of Appeals for the Federal Circuit subsequently affirmed the trial court's judgment, and the refiner-defendants have made payments totaling $91 million to Unocal for damages, costs, and attorneys' fees. ¶ 69. An accounting action is still ongoing to determine damages for infringing the '393 patent during subsequent periods. ¶ 70.

On January 23, 2002, Unocal sued Valero Energy Company for willful infringement of both the '393 patent and the '126 patent. In its complaint, Unocal seeks damages at the rate of 5.75 cents per gallon, trebled for willful infringement. ¶ 71.

Moreover, "Unocal also has enforced its patent claims through licensing activities." ¶ 72. To date, Unocal has entered license agreements with eight refiners, blenders, and/or importers covering the use of all five RFG patents. Unocal has publicly stated that it expects to reap up to $150 million a year from licensing its RFG patents. ¶ 14.

6. The Alleged Violations

The Complaint alleges that "Unocal's fraudulent conduct has resulted in Unocal's acquisition of market power in the following markets: the technology market for the production and supply of CARB-compliant "summer-time" gasoline in California, and the downstream product market for CARB-compliant "summer-time" gasoline in California." ¶ 91; *see* ¶¶ 73-75. Allegedly, "The extensive overlap between the CARB RFG regulations and the Unocal patent claims makes avoidance of the Unocal patent claims technically and/or economically infeasible." ¶ 92. Refiners, having "invested billions of dollars in sunk capital investments without knowledge of Unocal's patent claims to reconfigure their refineries in order to comply with the CARB Phase 2 RFG regulations . . . cannot produce significant volumes of non-infringing CARB-compliant gasoline without incurring substantial additional costs," ¶ 93, and "CARB cannot now change its RFG regulations sufficiently to provide flexibility for refiners and others to avoid Unocal's patent claims." ¶ 94. Had Unocal disclosed its proprietary interests and pending patent rights earlier, CARB would have been able to consider the potential costs imposed by the Unocal patents, and the harm to competition and to consumers would have been avoided. *Id.* Instead, Unocal allegedly "has exercised, and continues to exercise, its market power through business conduct by enforcing its patents through litigation and licensing activities." ¶ 95.

After asserting harm to competition and substantial consumer injury, ¶¶ 97-98, the Complaint concludes that Unocal has violated Section 5 of the FTC Act by monopolizing, attempting to monopolize, and unreasonably restraining trade in the technology market for the

-7-

production and supply of CARB-compliant "summer-time" gasoline to be sold in California and by attempting to monopolize, and restraining trade in, the downstream goods market for CARB-compliant "summer-time" gasoline. ¶¶ 99-103.

B. The Initial Decision

None of the alleged facts have been proved or disproved. No trial has been held. The Administrative Law Judge's (the "ALJ's") Initial Decision dismissed the Complaint on the basis of Unocal's motions. As a general matter, the Initial Decision (cited as the "ID") assumes that the Complaint's allegations are true and asks whether, if proved, they would be sufficient to establish a violation of Section 5.[5]  It concludes, under two separate lines of reasoning, that those allegations are insufficient.

One line of analysis entails the *Noerr-Pennington* doctrine, under which "[t]hose who petition the government for redress are generally immune from antitrust liability."[6]  The Initial Decision holds that "*Noerr-Pennington* immunizes Respondent's efforts to induce CARB to adopt regulations on low-emissions, reformulated gasoline." ID at 68.  Moreover, that Decision concludes, "[t]o the extent that Respondent's alleged conduct towards Auto/Oil Group and WSPA were part of Respondent's scheme to induce CARB to act, it constitutes indirect petitioning protected by *Noerr-Pennington*." *Id.*

In reaching these conclusions, the Initial Decision rejected claims that the alleged false and misleading nature of Unocal's petitioning vitiates application of *Noerr-Pennington*. It considered and rejected two possible bases for exception to the doctrine. First, it ruled that the "sham" exception is inapplicable when the petitioner seeks to gain monopoly power through the *outcome* of the government action, rather than through abuse of the governmental *process*. ID at 48-49. Second, it rejected application of an exception to *Noerr-Pennington* drawn from principles of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965), in which the Supreme Court ruled that enforcement of a patent obtained by fraud can constitute monopolization. The Initial Decision found that to the extent that *Walker Process* principles support an exception to *Noerr-Pennington*, they do so only when governmental action is "quasi-adjudicatory and dependent on the petitioner for factual information." ID at 50, 68. Although the ALJ acknowledged that misrepresentations are outside the *Noerr-Pennington*

---

[5]  Although the Initial Decision includes little independent fact-finding, the ALJ does supplement his analysis of the Complaint with findings based on official notice of some of the statutes governing CARB, the Notice of Public Hearing through which CARB initiated the rulemaking, and CARB's Final Statement of Reasons for Rulemaking.

[6]  ID at 31, quoting *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 56 (1993).  The doctrine derives its name from two Supreme Court cases, *Eastern R.R. President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

doctrine "where the agency is using an adjudicatory process," ID at 33, he found Unocal's alleged misrepresentations protected because CARB's Phase 2 RFG rulemaking process was "quasi-legislative." ID at 32-40. Responding to claims that application of *Noerr-Pennington* is particularly inappropriate here because CARB necessarily relied on the truth and accuracy of information provided by Unocal, the ALJ observed that entities other than Unocal also provided some input: "because CARB was not wholly dependent on Respondent in its rulemaking proceeding," the ALJ reasoned, *"Noerr-Pennington* applies." ID at 40-43.

The Initial Decision also rejected arguments suggesting that Unocal's conduct falls outside the scope of protected petitioning. To the argument that the doctrine does not apply when an agency is unaware that it is being asked to adopt or participate in a restraint of trade, the ALJ answered, "[I]t is clear that Respondent engaged in petitioning conduct," ID at 44, and concluded that "there is no requirement that the agency know what the effect of its legislation will be . . .. " ID at 47. In response to contentions that differences between the FTC Act and the Sherman Act suggest a narrower reach for *Noerr-Pennington* protections under the former, the Initial Decision ruled that *Noerr-Pennington* protection is as "fully available" in cases alleging unfair methods of competition under the FTC Act as in cases based on the Sherman Act. ID at 51-55.

Regarding Unocal's communications to Auto/Oil, WSPA, and their participants, the Initial Decision held that "[m]isrepresentations to third parties as a means of influencing the government's passage of laws fall within the bounds of *Noerr-Pennington*." ID at 56. It found that Unocal's alleged actions with respect to the private industry groups were "part of an alleged scheme to induce these third parties to influence CARB." ID at 57. It concludes that such conduct "constitutes indirect petitioning protected by *Noerr-Pennington*." ID at 68.

The Initial Decision applied a second line of analysis to the few allegations that remained after its *Noerr-Pennington* holdings, specifically, those allegations based on misrepresentations made to the Auto/Oil Group and to WSPA that were "independent of [Unocal's] alleged scheme to induce CARB to act." ID at 56. The Initial Decision identifies these allegations as culminating with Complaint ¶ 90(c), which states that "[b]ut for Unocal's fraud," the participants in Auto/Oil and WSPA would have taken actions "incorporating knowledge of Unocal's pending patent rights in their capital investment and refinery reconfiguration decisions to avoid and/or minimize potential infringement," with the result that "harm to competition and consumers . . . would have been avoided." The ALJ did not find these allegations covered by *Noerr-Pennington*, but rather held that the Commission lacked jurisdiction to resolve them.

According to the ALJ, "harm beyond that caused by CARB's regulations cannot be determined without knowing the scope of Respondent's patents, whether or not Auto/Oil Group and WSPA could have invented around those patents, and whether any such newly created products or methods could have avoided infringement." ID at 61. Necessarily embedded within these inquiries, he reasoned, are issues of patent claim interpretation and infringement. Citing 28

U.S.C. § 1338(a)[7] and the Supreme Court's opinion in *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988),[8] the ALJ concluded that the Complaint requires resolution of substantial questions of federal patent law; that it therefore "arises under" the federal patent law; and that only the federal courts, not the FTC, have the necessary jurisdiction. "Because the Commission does not have jurisdiction to adjudicate the scope of Respondent's patents and whether the third parties could compete with other products or methods without infringing on valid patents, the allegations of the Complaint with respect to Respondent's conduct towards Auto/Oil Group and WSPA are dismissed." ID at 67.

## II. STANDARD FOR EVALUATING MOTIONS TO DISMISS

As a matter of Commission practice, a motion to dismiss is treated analogously to a motion in federal court under Federal Rule of Civil Procedure 12(b)(6) to dismiss a complaint for failure to state a cause of action upon which relief can be granted: the Commission inquires whether the Complaint's allegations, if proved, are sufficient to make out a violation of Section 5. *See TK-7 Corp*, 1989 FTC Lexis 32, *3 (1989); *Florida Citrus Mutual*, 50 F.T.C. 959, 961 (1954) (dismissal warranted when "the facts alleged do not state a cause of action"). In making that inquiry, the Commission assumes the Complaint's factual allegations to be true and draws all reasonable inferences in favor of Complaint Counsel. *See TK-7* at *3; 2 MOORE'S FEDERAL PRACTICE § 12.34[1][b] (3d ed. 2003); 5A Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1357 (2003) ("the complaint is construed in the light most favorable to plaintiff and its allegations are taken as true"). A case in this posture does not raise the issue whether the Complaint's factual allegations are true, but whether Complaint Counsel is entitled to offer evidence to support the allegations. *See* 2 MOORE'S FEDERAL PRACTICE § 12.34[1][a]. The Commission's review of an Initial Decision that grants a motion to dismiss, like its review of other Initial Decisions by administrative law judges, is *de novo*. 16 C.F.R. § 3.54.

## III. AS A MATTER OF LAW, MISREPRESENTATION MAY SOMETIMES VITIATE THE *NOERR-PENNINGTON* DOCTRINE

Complaint Counsel appeal the Initial Decision's general application of the *Noerr-Pennington* doctrine on four principal grounds. They argue at greatest length that Unocal's conduct falls within a misrepresentation exception to the doctrine. In addition, they argue that *Noerr-Pennington* does not apply because (1) CARB's objective purpose was neither to adopt nor to participate in a restraint of trade; (2) harm from Unocal's conduct can be cured without overturning a government decision, burdening those who comply with that decision, or impairing

---

[7] 28 U.S.C. § 1338(a) vests original jurisdiction over "any civil action arising under any Act of Congress relating to patents" in the federal district courts.

[8] *Christianson* holds that a case arises under federal patent law when the "plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law." 486 U.S. at 809.

communications between a party and a government agency; and (3) the petitioning exclusion applicable to proceedings alleging FTC Act violations, in contrast to those alleging Sherman Act violations, is only as broad as constitutionally required.

As discussed below, we resolve the *Noerr-Pennington* issues before us with an exception applicable, in appropriate circumstances, to misrepresentations. In so doing, we find it unnecessary to consider, as self-standing arguments, Complaint Counsel's theories premised on CARB's objective purposes and the nature of required remedies, although we find some elements of Complaint Counsel's discussion instructive. We do not reach the issue of a possible distinction between the scope of *Noerr-Pennington* protection under the FTC Act as opposed to the Sherman Act.

A. *Noerr-Pennington*: Basic Principles and Evolution of the "Sham" Exception

Beginning with *Eastern R.R. President's Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), the Supreme Court has fashioned and applied a doctrine that bars Sherman Act challenges "predicated upon mere attempts to influence the passage or enforcement of laws." *Id.* at 135. *Noerr* involved allegations that a group of railroads had jointly conducted a publicity campaign "designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business" as well as "to create an atmosphere of distaste for the truckers among the general public" and "to impair the relationships existing between the truckers and their customers." *Id.* at 129. Intertwining considerations of statutory construction with First Amendment principles, the Court found the challenged conduct beyond the coverage of the Sherman Act.

The Court first explained that "an attempt to persuade the legislature or the executive to take particular action" bears "very little if any resemblance to the combinations normally held violative of the Sherman Act . . . ." *Id.* at 136. This "essential dissimilarity" cautions against treating such conduct as trade restraints, the Court continued. *Id.* at 136-37. Next, the Court suggested that a limitation on the Sherman Act's coverage was necessary for effective operation of a representative government. To hold that the Sherman Act forbids agreements "for the purpose of influencing the passage or enforcement of laws," the Court explained, "would substantially impair the power of government to take actions through its legislature and executive that operate to restrain trade." *Id.* at 137. The Court continued:

> In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act.

-11-

*Id.*

Finally, the Court turned to the First Amendment right of petitioning: "[A] construction of the Sherman Act" that forbids joint activity to influence the passage or enforcement of laws "would raise important constitutional questions." *Id.* at 138. As the Court explained, "The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Id.* The Court concluded, "[W]e think it clear that the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws." *Id.*

*Noerr* dealt primarily with efforts to influence legislation. Subsequently, the Supreme Court applied *Noerr*'s principles to petitioning directed at the executive branch,[9] as well as to administrative agencies and the courts.[10] "[I]t would be destructive of rights of association and of petition," the Court stated, "to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-a-vis their competitors."[11]

Nonetheless, the Court has clearly found a "sham" exception to *Noerr-Pennington*. As early as *Noerr* itself, the Court stated:

> There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.

*Noerr*, 365 U.S. at 144. In *California Motor Transport*, the Court found such a sham and rejected *Noerr-Pennington* protection for multiple administrative and judicial challenges that one group of trucking firms brought to oppose their competitors' applications for operating rights. The Court

---

[9] *United Mine Workers v. Pennington*, 381 U.S. 657 (1965). Whereas *Noerr* had involved petitioning aimed at state government, *Pennington* applied similar principles to petitioning federal executive branch officials and independent agencies (the Secretary of Labor and the Tennessee Valley Authority). The Court emphasized that *Noerr* principles apply to efforts to influence government officials regardless of anticompetitive intent or purpose. *Id.* at 669-70.

[10] *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972) ("The same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts . . . .").

[11] *Id.*

stressed that the antitrust plaintiff had alleged that the defendants "instituted the proceedings and actions . . . with or without probable cause, and regardless of the merits of the cases," and concluded that "the allegations are not that the conspirators sought to influence public officials, but that they sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process." *California Motor Transport*, 404 U.S. at 512 (internal quotations omitted).

More recently, the Court explained that "[t]he 'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon."[12]  Finally, in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries*, 508 U.S. 49 (1993) ("*PREI*"), a case that held that *Noerr-Pennington* sheltered a single copyright infringement lawsuit from Sherman Act counterclaims, the Court offered a two-part definition of sham litigation:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. . . . Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor" through the "use [of] the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon."

*PREI*, 508 U.S. at 60-61 (citations omitted) (emphasis original).

---

[12]  *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991) (emphasis original); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 507 n.10 (1988) (observing that *Noerr* described a sham exception covering "activity that was not genuinely intended to influence governmental action"). *Omni* clarified that the restriction on access to governmental fora at issue in *California Motor Transport* supported the sham exception only because "the conspirators' participation in the governmental process was itself claimed to be a 'sham,' employed as a means of imposing cost and delay." *Omni*, 499 U.S. at 381-82.

B. *Noerr-Pennington*:  Judicial Assessment of Misrepresentation[13]

1. Legal Background

The Supreme Court has also suggested that some misrepresentations to governmental agencies fall outside of *Noerr-Pennington* protections, but it has left key questions unanswered.

Again, the line of analysis traces from *Noerr* itself.  The plaintiff there alleged that the railroads' publicity campaign against the trucking industry was fraudulent, in that material prepared and produced by the railroads' public relations firm was made to appear as the spontaneously expressed views of independent persons and civic groups.  Although it found this "third-party" technique unethical,[14] the Court ruled that it was "legally irrelevant." *Noerr*, 365 U.S. at 140-42.  "Insofar as [the Sherman] Act sets up a code of ethics at all," the Court explained, "it is a code that condemns trade restraints, not political activity, and as we have already pointed out, a publicity campaign to influence governmental action falls clearly into the category of political activity." *Id*. at 140-41.  Congress' "caution in legislating with respect to problems relating to the conduct of political activities" would "go for naught if we permitted an extension of the Sherman Act to regulate activities of that nature simply because those activities have a commercial impact and involve conduct that can be termed unethical." *Id*. at 141.

In contrast to *Noerr*'s holding that misrepresentations in a lobbying campaign in the political context were not subject to Sherman Act liability, subsequent cases apply different approaches for different contexts.  As the Court explained, "Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transport*, 404 U.S. at 513.  More recently, in *Allied Tube,* 486 U.S. at 499, the Court stressed that "the applicability of *Noerr* immunity varies with the context and nature of the activity." (Comma omitted.)  Thus,

_____

[13] Our references to "misrepresentations" include material omissions as well. *See, e.g., Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070 (Fed. Cir.) (finding that a jury instruction "was not inconsistent with various opinions of the courts stating that omissions, as well as misrepresentations, may in limited circumstances support a finding of *Walker Process* fraud"), *cert. denied*, 525 U.S. 876 (1998).

[14] Although use of the third party technique allegedly was deceptive, the Court recognized that the district court did not find that the railroads' publicity campaign contained false content, but rather that the railroads took "a dramatic fragment of truth and by emphasis and repetition distort[ed] it into falsehood." *Noerr*, 365 U.S. at 134 n.8 (internal quotation omitted).  The fact that both sides in *Noerr* used the third party technique, *id.* at 142 n.22, vividly indicates the "rough and tumble" nature of the political context in which the parties fought their lobbying battle.

-14-

A publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods. But in less political arenas, unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations.

*Id.* at 499-500 (citation omitted).

The Supreme Court followed a parallel approach in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965). In that case, decided after both *Noerr* and *Pennington*, Walker Process, the defendant in a patent infringement suit, counterclaimed that Food Machinery had violated Section 2 of the Sherman Act by threatening to sue, and then suing, for the alleged infringement of a patent obtained through knowing and deliberate fraud on the Patent Office. An infringement action, like other court litigation, could not give rise to antitrust liability if sheltered by *Noerr-Pennington*. Without mentioning *Noerr-Pennington* considerations, however, the Court concluded that "the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present."[15]

The statements in *California Motor Transport* and *Allied Tube* regarding misrepresentation were *dicta*, and the Court did not explain the relationship between its *Walker Process* holding and the *Noerr-Pennington* doctrine. Nor have the Supreme Court's latest pronouncements resolved these issues. *Omni* rejected a "conspiracy" exception to *Noerr-Pennington*, applicable "when government officials conspire with a private party to employ government action as a means of stifling competition," 499 U.S. at 382, but did not directly discuss misrepresentation. After detailing its two-part test for sham litigation, *PREI* did discuss misrepresentation, but only to state that it was *not* deciding how it should be analyzed. The Court stated:

In surveying the "forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations," we have noted that "unethical conduct in the setting of the adjudicatory process often results in

---

[15] *Walker Process*, 382 U.S. at 174. The Court explained that a patent " 'is an exception to the general rule against monopolies and to the right to access to a free and open market' " and noted the " 'paramount' " public interest " 'in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope.' " *Id.* at 177, quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 816 (1945). Consequently, the Court determined, a showing of knowing and willful misrepresentations in obtaining its patent would suffice "to strip Food Machinery of its exemption from the antitrust laws," and expose it to potential antitrust liability for seeking to enforce the fraudulently obtained patent rights. *Walker Process*, 382 U.S. at 177.

-15-

sanctions" and that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transport*, 404 U.S., at 512-13. We need not decide here whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations. Cf. Fed. Rule Civ. Proc. 60(b)(3) (allowing a federal court to "relieve a party . . . from a final judgment" for "fraud . . . , misrepresentation, or other misconduct of an adverse party"); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.* 382 U.S. 172, 176-77 . . . .

*PREI*, 508 U.S. at 61 n.6.

Although Supreme Court law remains unsettled, the weight of lower court authority, spanning more than thirty years, has recognized that misrepresentations may preclude application of *Noerr-Pennington* in less political arenas than the legislative lobbying at issue in *Noerr* itself. For example, courts have refused to apply the doctrine to conduct involving misrepresentations to a state railroad commission in the setting of natural gas production quotas;[16] to the Interstate Commerce Commission in a ratemaking context;[17] to a state health planning agency considering an application for a certificate of need ("CON");[18] to the Food & Drug Administration involving its pharmaceutical drug approval process;[19] and to state securities administrators and the federal courts with respect to allegations of franchise law violations, racketeering, and securities fraud.[20] The United States Courts of Appeals for the District of Columbia Circuit,[21] the Second Circuit,[22]

---

[16] *See Woods Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047 (1972).

[17] *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240 (9th Cir. 1982), *cert. denied*, 459 U.S. 1227 (1983).

[18] *See St. Joseph's Hosp. v. Hospital Corp. of America*, 795 F.2d 948 (11th Cir. 1986); *see also Kottle v. Northwest Kidney Centers*, 146 F.3d 1056 (9th Cir. 1998) (finding that misrepresentation in a CON proceeding would not be *Noerr*-protected but that allegations in the complaint were too vague to avoid dismissal), *cert. denied*, 525 U.S. 1140 (1999). *Armstrong Surgical Center, Inc., v. Armstrong County Memorial Hosp.*, 185 F.3d 154 (1999), *cert. denied*, 530 U.S. 1261 (2000), which takes a largely contrary approach, is discussed below.

[19] *See Israel v. Baxter Laboratories*, 466 F.2d 272 (D.C. Cir. 1972).

[20] *See Whelan v. Abell*, 48 F.3d 1247 (D.C. Cir. 1995).

[21] *See, e.g., Whelan; Israel.*

[22] *See Juster Assoc. v. City of Rutland, Vt.*, 901 F.2d 266 (2d Cir. 1990)*; Litton Sys., Inc. v. American Tel. & Tel. Co.*, 700 F.2d 785 (2d Cir. 1983), *cert. denied*, 464 U.S. 1073 (1984).

the Fifth Circuit,[23] the Sixth Circuit,[24] the Seventh Circuit,[25] the Eighth Circuit,[26] the Ninth Circuit,[27] the Eleventh Circuit,[28] and the Federal Circuit,[29] expressing their views in diverse terms and in varying settings, all have indicated that in some contexts misrepresentations to government may vitiate *Noerr-Pennington* protection.[30]

        2.  Policy Considerations

Ample policy grounds support a misrepresentation exception to the *Noerr-Pennington* doctrine.

        a.  *The First Amendment:*  As *Noerr* itself suggested, 365 U.S. at 137-38, and as the Court has consistently maintained, the doctrine derives in part from First Amendment considerations.  In *California Motor Transport*, 404 U.S. at 510-11, the Court explained that "it

---

[23]  *See Woods Exploration.*

[24]  *See Potters Medical Center v. City Hospital Ass'n*, 800 F.2d 568 (6th Cir. 1986).

[25]  *See Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220 (7th Cir. 1975).

[26]  *See Porous Media Corp. v. Pall Corp*, 186 F.3d 1077 (8th Cir. 1999); *Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484 (8th Cir. 1985).

[27]  *See Kottle; Liberty Lake Investments, Inc. v. Magnuson*, 12 F.3d 155 (9th Cir. 1993), *cert. denied*, 513 U.S. 818 (1994); *Clipper Exxpress.*

[28]  *See St. Joseph's Hospital.*

[29]  *See Rodime PLC v. Seagate Technology, Inc.*, 174 F.3d 1294 (Fed. Cir. 1999), *cert. denied*, 528 U.S. 1115 (2000); *Nobelpharma* (in the context of a patent obtained by fraud).

[30]  As discussed below, the Third Circuit has expressed doubt whether a misrepresentation exception still exists, but even this court suggests *narrow* circumstances in which misrepresentation may vitiate *Noerr-Pennington* protection.  *See infra* Section III.C.  The Fourth Circuit has declined to rule on whether a "fraud exception" exists but has disposed of cases on the assumption that it does.  *See Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 401-04 (4th Cir.) (concluding that "[i]f a fraud exception to *Noerr-Pennington* does exist, it extends only to the type of fraud that deprives litigation of its legitimacy," not to situations in which "regardless of the alleged fraud, the outcome would have been the same"), *cert. denied*, 533 U.S. 916 (2001); *see also A Fisherman's Best, Inc. v. Recreational Fishing Alliance*, 310 F.3d 183, 192 (4th Cir. 2002) (observing that there is no "officially recognized" *Noerr-Pennington* exception for a smear campaign, misrepresentation, threats, or corrupt practices, but nonetheless considering whether  misrepresentation was present as an element of an allegedly improper lobbying campaign).

would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view . . . ." Similarly, in *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411(1990) ("*SCTLA*"), the Court described the *Noerr-Pennington* doctrine as "[i]nterpreting the Sherman Act in the light of the First Amendment's Petition Clause." *Id.*, 493 U.S. at 424. *Accord, BE & K Construction Co. v. National Labor Relations Bd.*, 536 U.S. 516, 525 (2002).

The Supreme Court has also made it clear that the First Amendment does not shelter knowing misrepresentations. Thus, the Court has declared that "the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected."[31]

In the free speech arena, public officials can recover damages for defamatory falsehoods made "with actual malice," that is, with knowledge of falsity or with reckless disregard for whether the communication is false or not. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). This rule permits some defamatory falsehoods to escape challenge: some falsehood may be sheltered to avoid chilling truthful speech, but that reflects a by-product, rather than a goal, of First Amendment protections. As the Court has explained, although "there is no constitutional value in false statements of fact," there is harm from chilling truthful speech, and "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340-41 (1974); *see also BE & K*, 536 U.S. at 531 ("while false statements may be unprotected for their own sake," protection may be required to shelter "*speech that matters*") (emphasis original). Stated differently, "erroneous statement . . . must be protected if the freedoms of expression are to have the breathing space that they need . . . to survive."[32] That protection, however, has limits, and the presence of malice vitiates it.

The Court has applied analogous reasoning to petitioning, ruling that "petitions to the President that contain intentional and reckless falsehoods do not enjoy constitutional protection."[33] As the Court explained, "The Petition Clause . . . was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble," and "there is no sound basis for granting greater constitutional protection to statements made in a petition to

---

[31] *Garrison v. State of Louisiana*, 379 U.S. 64, 75 (1964).

[32] *New York Times*, 376 U.S. at 271-72 (internal quotations omitted). *See also Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988) (ensuring necessary "breathing space" for First Amendment freedoms by requiring public figures who seek to demonstrate intentional infliction of emotional distress to show false statements of fact made with "actual malice").

[33] *McDonald v. Smith*, 472 U.S. 479, 484 (1985) (internal quotation omitted) (upholding a libel action based on the petition).

the President than other First Amendment expressions."[34]

The courts of appeals have recognized that these limits on First Amendment protection may set bounds on *Noerr-Pennington*.  Thus, in declining to apply the doctrine to knowing misrepresentations to state securities administrators and the federal courts, the U.S. Court of Appeals for the District of Columbia Circuit reasoned:

> We see no reason to believe that the right to petition includes a right to file deliberately false complaints. . . . However broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods.

*Whelan*, 48 F.3d at 403, 404.  Similarly, when the Ninth Circuit rejected protection for knowingly false statements to the Interstate Commerce Commission it explained:

> There is no first amendment protection for furnishing with predatory intent false information to an administrative or adjudicatory body.  The first amendment has not been interpreted to preclude liability for false statements.

*Clipper Exxpress*, 690 F.2d at 1261.  The court rejected defendants' argument that failure to shelter such statements would chill legitimate debate, because they allegedly "knew the falsity of their statements, and made those statements in a deliberate attempt to mislead a regulatory body."  *Id.* at 1262.  In essence, the focus on *deliberate* misrepresentation provides the same type of "breathing space" for petitioning in the *Noerr-Pennington* context as it provides in the free speech arena.

        b.  *Preserving Federalism and Protecting the Governmental Decision-Making Process:*  The Supreme Court has explained that the *Noerr-Pennington* doctrine also serves, in part, as a corollary to the state action doctrine[35] and reflects the maxim that "where a

---

[34]  *Id.* at 485.  Further linking its treatment of speech and petitioning, the Court tells us, "[j]ust as false statements are not immunized by the First Amendment right to freedom of speech, baseless litigation is not immunized by the First Amendment right to petition."  *Bill Johnson's Restaurants v. National Labor Relations Bd.*, 461 U.S. 731, 743 (1983) (citations omitted) (construing the National Labor Relations Act in light of potential First Amendment protection of an allegedly retaliatory lawsuit).  In *BE & K*, the Court clarified that this statement did not indicate that baseless litigation is "*completely*" unprotected," but rather, at most, that "such litigation should be protected 'just as' false statements are."  *Id.*, 536 U.S. at 531 (determining that the National Labor Relations Act does not permit penalizing all unsuccessful, but reasonably based, retaliatory litigation).

[35]  *See Omni*, 499 U.S. at 379-80 (finding it would be "peculiar" and "perhaps in derogation of . . . constitutional right . . . to establish a category of lawful state action that citizens are not permitted to urge"); *Noerr*, 365 U.S. at 135-37.

-19-

restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out."[36] Unocal makes the latter point a central theme in its brief to the Commission.[37] Misrepresentation, however, undermines this line of analysis by blurring the distinction between private and governmental conduct. Misrepresentation undermines government's ability accurately and meaningfully to assess public benefit; it vests control over the outcome in the private purveyor of false information.

Courts have understood this point. For example, in *Woods Exploration*, defendant natural gas producers allegedly filed false demand forecasts with the Texas Railroad Commission to reduce competitors' gas production quotas, set by formula based on the demand forecasts. The Court of Appeals for the Fifth Circuit rejected defendants' contention that they did not violate the Sherman Act because it was the Railroad Commission's actions, not those of the defendant producers, that caused plaintiffs' injuries. Rather, the court concluded that in view of the misrepresentations, the Commission "neither was the real decision maker nor would have intended its order to be based on false facts."[38] Similarly, when the defendant cigarette manufacturers' submission of false purchase intentions allegedly caused the Department of Agriculture to set tobacco production quotas harmful to growers, the district court ruled that the defendants "do not have immunity for deceptive information provided to the USDA simply because the USDA

---

[36] *Noerr*, 365 U.S. at 136, citing *Parker v. Brown*, 317 U.S. 341 (1943).

[37] Unocal asks whether the challenged conduct would have had the same anticompetitive consequences even absent government action. "If the answer is 'no,'" Unocal contends, "the conduct is *Noerr*-protected." Answering Brief of Union Oil Company of California ("Unocal Brief") at 1; see also *id.* at 11, 43, 49. Unocal derives its question from language in *SCTLA*, 493 U.S. at 425, where the Court rejected a *Noerr-Pennington* claim because the unlawful boycott there at issue had occurred *before* any governmental action. The court observed that the anticompetitive effects *while* the boycott lasted would have been precisely the same even if no legislation had been enacted. Unocal argues that rejection of the doctrine when the government action was immaterial means that the doctrine automatically applies in every instance that government action shapes the competitive effects of the challenged conduct. Nowhere does the language of *SCTLA* support this conclusion. Nor does Unocal's conclusion comport with simple logic: "always" is not the only alternative to "never." Indeed, Unocal states a test that neither *Walker Process* nor the various appellate misrepresentation cases cited *supra* in Section III.B.1. would satisfy. *See* Transcript of Oral Argument at 30 (March 10, 2004) ("Tr.") (conceding that under Unocal's proposed test, *Walker Process* may not stand).

[38] *Woods Exploration*, 438 F.2d at 1295; *see also Armstrong*, 185 F.3d at 164 n.8 (distinguishing *Walker Process* as a case in which the government was "wholly dependent on the applicant for the facts" and thus "effectively and necessarily delegates to the applicant the factual determinations underlying the issuance of a patent").

-20-

ultimately sets the quota."[39]  In like vein, the Ninth Circuit has determined that misrepresentations that go to the core of a lawsuit or administrative proceeding may so deprive the government activity of legitimacy as to vitiate *Noerr-Pennington* protection.[40]

Leading commentators have agreed.  Thus, Professor C. Douglas Floyd explains:

The [Supreme] Court's decisions according immunity to state governmental action under *Parker v. Brown* assume that state action antitrust immunity is appropriate only if a governmental actor with statewide authority prospectively has determined that particular anticompetitive conduct should be approved as a matter of state policy.  In cases involving the deliberate provision of false information to induce anticompetitive regulation by a state agency, however, no such deliberate determination has been made, because the authorization in question is based on a non-existent predicate.  In effect, the processes of the government have been assumed by the private parties they purport to regulate.  Thus, to the extent that *Noerr* immunity is accorded to private petitioning as a "corollary'" to the immunity normally accorded to the effects of the completed governmental action that the petitioning seeks, the rationale for protection is significantly undermined where the governmental action in question has been induced by intentional misrepresentations, and therefore does not represent a deliberate determination of governmental policy.[41]

The Areeda & Hovenkamp *Antitrust Law* treatise summarizes succinctly:  although no antitrust liability normally attaches when a *bona fide* lobbying campaign or presentation to an agency obtains the requested result – because "the government's action, not the private campaign, is the cause of the plaintiff's harm" – an "important exception" exists when "the agency would not have acted the way it did but for the impropriety."[42]

Although we generally agree with the reasoning of these judicial and scholarly authorities, any rule regarding petitioning based on misrepresentation must be fashioned and applied with care, so as not to undermine principles of federalism and effective government decision making.  Indeed, the Supreme Court has expressed profound concern with allowing plaintiffs to "look behind the actions of state sovereigns" to assert antitrust claims.  *Omni*, 499 U.S. at 379.  It has sought to avoid inquiries that require "deconstruction of the governmental process and probing of the official intent."  *Id.* at 377 (internal quotation omitted).  Considerations of federalism, respect

---

[39] *DeLoach v. Philip Morris Cos.*, 2001-2 Trade Cas. (CCH) ¶ 73,409 at 91,434 (M.D.N.C. 2001).

[40] *See Kottle*, 146 F.3d at 1060-63; *Liberty Lake*, 12 F.3d at 159.

[41] C. Douglas Floyd, *Antitrust Liability for the Anticompetitive Effects of Governmental Action Induced by Fraud*, 69 ANTITRUST L.J. 403, 414-15 (2001) (footnotes omitted).

[42] 1 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 203h at 192 (2d ed. 2000) (emphasis omitted).

-21-

for the legitimacy of actions completed by coordinate branches of government, and the general unsuitability of antitrust statutes as tools for regulating political behavior all argue against excessive antitrust intrusion.[43]  Although they are clearly reasons for caution, these reservations may be overcome in appropriate settings, as reflected by the substantial appellate case law identified in Section III.B.1. above and as further discussed in Section V.C. below.

In addition, considerations of effective government and the balance of likely costs and benefits may argue against opening the door too widely to antitrust actions flowing from misrepresentations to the government.  In 1999 the FTC joined the United States in a brief that opposed *certiorari* in the Third Circuit's *Armstrong* litigation and that questioned whether the vindication of plaintiffs' rights in a few adjudicable and meritorious misrepresentation cases would warrant the judicial effort that would be involved and the private expense of litigating the many claims that likely would be rejected.[44]  The brief also expressed doubt whether it would be worthwhile to focus antitrust law on the political nature of state actions and on abuses of state processes for which there are "presumably" other remedies.[45]  Nonetheless, the brief concluded that there may be situations in which policy reservations are "muted" and "would be outweighed by the substantial public interest" in antitrust enforcement, and it refrained from concluding "that relief should never be available" in cases "alleging that competitive damages caused directly by some state action were procured by private parties, in violation of the antitrust laws, through abuse of the State's administrative or judicial processes."[46]  Indeed, just one year later, in opposing

---

[43]  *See Omni*, 499 U.S. at 377 (warning that subjecting a local zoning decision to *ex post facto* antitrust review would go far to compromise a state's ability to regulate its domestic commerce), 378-79 (observing that the Sherman Act is directed at preventing trade restraints, not vindicating principles of good government); *Armstrong*, 185 F.3d at 162 ("Considerations of federalism require an interpretation of the Sherman Act that forecloses liability predicated on anticompetitive injuries that are inflicted by states acting as regulators. . . . Federalism requires this result both with respect to state actors and with respect to private parties who have urged the state action."); 1 AREEDA & HOVENKAMP, ANTITRUST LAW ¶¶ 203b at 165 (antitrust laws "poorly designed"for policing the political process), 203h at 193 ("As a general matter the federal government must be slow to interfere in state political processes . . . ."); Floyd, 69 ANTITRUST L.J. at 440-44.

[44]  *See* Brief for the United States and the Federal Trade Commission as Amici Curiae at 18, *Armstrong Surgical Center v. Armstrong County Memorial Hosp.*, 530 U.S. 1261 (2000) (No. 99-905).

[45]  *Id.*

[46]  *Id.* at 18-19.  Although Unocal lays considerable stress on the United States/FTC *Armstrong* brief, the emphasis is misplaced.  This brief emphasized facts suggesting that the plaintiff in *Armstrong* was "not well placed" to argue that defendants had usurped the public decision making process.  *Id.* at 20.  Thus, the brief noted that the plaintiff was "able to challenge the representations and threats made by its opponents" but never sought clarification or

*certiorari* in a challenge to the validity of one of Unocal's RFG patents, the Brief for the United States stated that "other government agencies, such as the Federal Trade Commission, may impose non-patent remedies against parties who make affirmative misrepresentations to a public or private regulatory body involved in setting industry standards."[47]

                 c. *The Importance of Maintaining Competition:* Antitrust law plays a critical role in maintaining a competitive marketplace, to the benefit of consumers and the nation's economy. Indeed, the Supreme Court has termed the Sherman Act a "comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *Northern Pac. Ry. v. United States*, 356 U.S. 1, 4 (1958). Because of the fundamental role assigned the antitrust laws, exceptions to, and limitations on, their broad reach are generally disfavored. As the Court has explained, "It is settled law that 'immunity from the antitrust laws is not lightly implied.' This canon of construction . . . reflects the felt indispensable role of antitrust policy in the maintenance of a free economy . . . ." *United States v. Philadelphia National Bank*, 374 U.S. 321, 348 (1963).

       Clearly, the Court found an implied limitation when it developed the *Noerr-Pennington* doctrine. Just as plainly, however, when confronting issues within the interstices of that doctrine, the benefits of competition and the harms from anticompetitive conduct must be among the factors considered. Expansive application of *Noerr-Pennington* has a cost, and awareness of that cost should play a role in assessing the boundary between exemption and potential liability.

       Awareness of potential competitive harm is particularly important in settings like the one presented here. Government regulations such as CARB's standards may impose potent entry barriers capable of preserving market power over extended periods of time. *See, e.g.*, IIA PHILLIP E. AREEDA, HERBERT HOVENKAMP, & JOHN L SOLOW, ANTITRUST LAW ¶ 421h at 73-74 (2d ed. 2002); DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION 74, 100 (3d ed, 2000); ROBERT H. BORK, THE ANTITRUST PARADOX 347-49 (1978). Whereas an

---

reconsideration, and it observed that it was "not clear whether the Board's decision depended on the alleged misrepresentation." *Id.* Moreover, the brief expressly distinguished, and did not thereafter address, the situation in *Walker Process* in which *private enforcement* of the fraudulently procured patent was the basis of the antitrust claim. *Id.* at 13. Subsequently, its language addressed only cases in which the alleged injury was caused "directly" or "most directly" by government action – there, the denial of a CON application – rather than cases like the present, in which harm requires private enforcement of a patent. *Id.* at 13, 14, 15, 18. Overall, the brief's primary message was that *Armstrong*, under the specific facts there presented, was not a case "in which the argument for liability can be forcefully advanced" and that review by the Supreme Court "should await the illumination of further experience with such claims" in the courts of appeals. *Id.* at 19-20.

    [47] *See* Brief for the United States as *Amicus Curiae* at 19, *Atlantic Richfield Co. v. Union Oil Co. of California*, 531 U.S. 1183 (2001) (No. 00-249).

exercise of unprotected market power may sow the seeds of its own erosion if firms are free to enter and compete on equal terms with the incumbent, governmentally-enforced limits on entry may impede and even prevent that process. *See* Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 31-33 (1984). Consequently, misrepresentations that distort government decision making in ways that create or shield market power may inflict severe and long-lasting public harm. Such considerations support our conclusion that the substantial public interest in antitrust enforcement may outweigh countervailing policy reservations when those concerns are sufficiently muted.

### C. The Interface between Misrepresentation and the "Sham" Exception

The courts of appeals have developed varying approaches when deciding whether *Noerr-Pennington* does or does not shield petitioning based on misrepresentations. In particular, they have analyzed two issues that the Supreme Court has left open: (i) the relationship between misrepresentations and the sham exception as formulated by *PREI,* and (ii) how to apply the distinction between the "less political arenas" in which, according to *California Motor Express* and *Allied Tube*, misrepresentations may vitiate *Noerr-Pennington* protection and those more political contexts in which, as in *Noerr* itself, misrepresentations have no such effect.

The Initial Decision holds that the *Noerr-Pennington* doctrine shields Unocal's alleged conduct and that no exception to that protection applies. Although Complaint Counsel argued that the Complaint's allegations fit within a "separate misrepresentation exception that is distinct from the 'sham' exception,"[48] the Initial Decision construed the argument narrowly as claiming either a sham or an exception derived from an extension of *Walker Process* principles. It held the sham exception inapplicable on grounds that it is confined to "situations in which persons use the governmental *process* as opposed to its *outcome* as an anticompetitive weapon," whereas the Complaint alleges that Unocal sought monopoly through the outcome of the government action. ID at 48-49. It found that *Walker Process* principles require a quasi-adjudicatory setting and dependence on the petitioner for factual information, facts that it found absent in this case.

Unocal agrees with the ALJ's conclusion that neither the sham exception nor any misrepresentation exception applies to its alleged conduct. Unocal Brief at 28 (sham), 23-43 (misrepresentation). It repeatedly, and pointedly, avoids conceding that any separate misrepresentation exception exists. *Id*. at 24-29. Indeed, it argues that *Walker Process* may not survive under its approach. *See supra* note 37.

---

[48] Complaint Counsel's Memorandum in Opposition to Union Oil Company of California's ("Unocal") Motion for the Dismissal of the Complaint Based Upon Immunity under *Noerr-Pennington* at 22.

-24-

As explained below, the Initial Decision and Unocal misread the law and misapply the underlying policies in two chief respects. First, they both are mistaken in the broad assertion that the case law precludes treating misrepresentation as a variant of sham. Moreover, whereas the Initial Decision perceives room for a very narrowly defined misrepresentation exception under facts that approximate those in *Walker Process*, Unocal refuses even to acknowledge that certain misrepresentations can ever vitiate *Noerr-Pennington* protection. As this section explains, although courts have attached varying labels to their analyses, the decided weight of precedent concludes that deliberate misrepresentation that cuts to the core of an administrative proceeding's legitimacy can fall outside *Noerr-Pennington* protections. Second, both the Initial Decision and Unocal are mistaken in the narrower conclusion that, even assuming that a misrepresentation exception exists, the CARB proceeding necessarily falls outside any allowable boundaries. We address this issue *infra* in Sections IV and V.

The courts have followed varying routes to the conclusion that misrepresentations may preclude application of *Noerr-Pennington*. Some courts have held that the misrepresentations at issue were not petitioning or otherwise fell entirely outside *Noerr-Pennington*. For example, the U. S. Court of Appeals for the Second Circuit ruled that AT&T's "unsupportable claims to the FCC regarding network harm" and "feigned cooperation" with an FCC advisory committee to further AT&T's opposition to proposed standards for interconnection devices "embraced much more than merely advocating a position before the FCC" and involved "actions not within the scope of the [*Noerr-Pennington*] doctrine."[49] Similarly, the Eleventh Circuit found a misrepresentation to a state health planning agency entirely beyond *Noerr-Pennington* coverage. The appeals court did not apply the sham exception, but rather explained, "[T]o find that a situation falls within an exception to a general rule, it must first be clear that the general rule itself is applicable."[50] Other courts analyze the issue in terms of a misrepresentation exception[51] or find deliberate misrepresentation "beyond the protection of *Noerr*" without labeling their doctrinal route.[52]

---

[49] *Litton*, 700 F.2d at 806, 809. The court also held, in the alternative, that the sham exception applied because AT&T had acted not in the hope of influencing governmental action, but in the hope of delaying it. *Id.* at 809-12.

[50] *St. Joseph's Hospital*, 795 F.2d at 955; *see also DeLoach*, 2001-2 Trade Cas. (CCH) at 91,433-34 (finding that submission of false purchase intentions to a government agency to affect administrative determination of a tobacco production quota involved no policy-making process and fell outside *Noerr-Pennington* protections).

[51] *See, e.g., Clipper Exxpress*, 690 F.2d at 1259-63; *Livingston Downs Racing Ass'n v. Jefferson Downs Corp.*, 192 F.Supp.2d 519, 535-36 (M.D. La. 2001).

[52] *See, e.g., Whelan*, 48 F.3d at 1253-55.

Still other courts analyze misrepresentations under the rubric of sham petitioning. Thus, the Ninth Circuit recognizes at least three distinct types of sham: (1) "bringing a single sham lawsuit (or a small number of such suits)"; (2) "the filing of a series of lawsuits . . . brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival"; and (3) the use of "knowing fraud" or "intentional misrepresentations" that "deprive the litigation of its legitimacy." *Kottle*, 146 F.3d at 1060-61. In *Kottle*, the court applied this third sham variant in the context of an administrative proceeding. *Id.* at 1061-63. Similarly, the Sixth Circuit has stated that "the knowing and willful submission of false facts to a government agency falls within the sham exception to the *Noerr-Pennington* doctrine," *Potters Medical Center*, 800 F.2d at 580, and the Third Circuit has analyzed misrepresentation as raising the "sham" exception. *See Armstrong; Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119 (3d Cir.), *cert. denied*, 528 U.S. 871 (1999).

Whatever the nomenclature, the various approaches should lead to the same place. As the Areeda and Hovenkamp treatise states:

> Of course, the policy is more important than the underlying labels, and in most cases it makes little difference whether we say that the provision of false information is unprotected by *Noerr* to begin with or that it falls into the sham exception to *Noerr*.

1 AREEDA AND HOVENKAMP, 1 ANTITRUST LAW ¶ 203f at 173. The label likely would make a significant difference, however, if misrepresentation were not merely classed with shams but also analyzed strictly under *PREI*'s "sham exception" standards. Such an approach, though consistent with, and suggested by, Unocal's arguments, is contrary to compelling policies of the law.

As suggested by three courts of appeals, the two-part test articulated in *PREI* for assessing claims of sham litigation is not well suited to address settings involving misrepresentations. Thus, the Ninth Circuit has adopted a rule that vitiates *Noerr-Pennington* protection when misrepresentations to a government agency deprive an administrative proceeding of its "legitimacy," treating this as an alternative, in the proper context, to *PREI*'s two-part test. See *Kottle*, 146 F.3d 1060-63; *Liberty Lake*, 12 F.3d at 158-59. Similarly, the D.C. Circuit treated "PREI's two-part 'sham' test" as "inapplicable" when knowing fraud or intentional misrepresentations destroyed prior litigation's legitimacy. *See Whelan*, 48 F.3d at 1255 (citing *Liberty Lake*, 12 F.3d at 159). The Federal Circuit reached much the same result in a context that involved *Walker Process* fraud: "*PRE[I]* and *Walker Process* provide alternative legal grounds on which a patentee may be stripped of its immunity from the antitrust laws . . . . we need not find a way to merge these decisions. Each provides its own basis for depriving a patent owner of immunity from the antitrust laws . . . ."[53]

---

[53] *Nobelpharma*, 141 F.3d at 1071. *Nobelpharma* emphasizes that *PREI*'s two-part test potentially provides a separate and independent basis for antitrust liability in addition to *Walker Process* principles. *Id.* By treating fraud before the PTO as support for a violation of Section 2 of the Sherman Act, the Supreme Court in *Walker Process* and the Federal Circuit in

Leading commentators agree that courts must look beyond literal application of *PRE*'s sham test to analyze misrepresentations. Professors Areeda and Hovenkamp recognize that misrepresentations differ from traditional "sham" activities in that the purpose of misrepresentations *is* to obtain government action. *See* 1 AREEDA & HOVENKAMP, ANTITRUST LAW ¶¶ 203a at 164, 203f at 173. They emphasize, however, that rather than necessarily entitling misrepresentations to *Noerr-Pennington* protection, this fact merely should subject misrepresentations to a different analysis.[54] Professors Areeda and Hovenkamp observe that misrepresentation of facts peculiarly in petitioner's control poses a much more significant threat to competition than bringing lawsuits that no reasonable lawyer would have filed, *id.* ¶¶ 204a at 199, 205c2 at 230, and conclude that the literal standards of *PREI* should be confined to *PRE*'s general fact pattern, which involved the issue of *baseless theories*. *Id.*, ¶¶ 205b at 218-19, 205c at 228. Consequently, "The decision should not be read as disposing of a case in which the legal theories claimed in a lawsuit were perfectly reasonable but the plaintiff alleged facts known to be false or failed to disclose facts that it knew would defeat its claim." *Id.*, ¶ 205b at 219.

In contrast, one appellate court, the U.S. Court of Appeals for the Third Circuit, treats misrepresentations as shams *and* conducts its analysis under the *PREI* standards. While the court expresses skepticism about the idea that misrepresentation may deprive a petitioner of *Noerr-Pennington* protection, *Armstrong*, 185 F.3d at 158, even its opinions leave room for finding misrepresentation a sham under appropriate circumstances. Two cases warrant emphasis. In *Cheminor*, the Third Circuit analyzed claims that the antitrust defendant had made false statements to the International Trade Commission regarding injury from alleged dumping of ibuprofen. Refusing to "carve out a new exception" to *Noerr-Pennington*, the court applied *PRE*'s objective test for "sham" litigation by setting aside the facts allegedly misrepresented and asking whether, absent those facts, the antitrust defendant's claims still had an objective basis. *Cheminor*, 168 F.3d at 123. The court explained, "If the government's action was not dependent upon the misrepresented information, the misrepresented information was not material and did not go to the core of [antitrust defendant's] petition." *Id.* at 124. In contrast, "[A] *material* misrepresentation that affects the very core of a litigant's . . . case will preclude *Noerr-Pennington* immunity . . . ." *Id.* (emphasis original).

Subsequently, in *Armstrong*, the Third Circuit applied *PRE*'s subjective standard. There, an applicant for a certificate of need covering a new ambulatory surgical facility alleged that a competing hospital opposed the CON because the hospital's own outpatient facility was nearing completion, despite knowledge that construction had stopped with only the building's shell finished. The court found the sham exception unavailable under *PRE*'s subjective standard, given that the hospital's purpose was to secure the requested outcome, denial of plaintiff's CON.

---

*Nobelpharma* indicate how seriously they view intentional fraud before administrative agencies.

[54] *See id.*, ¶ 203f at 173-78; *see also* Floyd, 69 ANTITRUST L.J. at 421-22 (recognizing that imposition of antitrust liability in misrepresentation cases does not rest on application of the traditional "sham" exception).

*Armstrong*, 185 F.3d at 158 n.2. The court summarized, "[T]he sham petitioning exception does not apply in a case like the one before us where the plaintiff has not alleged that the petitioning conduct was for any purpose other than obtaining favorable government action." *Id.* at 158. Nonetheless, and despite misgivings based on considerations of federalism,[55] the court acknowledged that in narrow circumstances, such as when a government agency is wholly dependent on a petitioner for factual information on which the agency predicates its actions, the resulting government order may so reflect financially-interested decision making that an exception from *Noerr-Pennington* is warranted.[56]

## IV. *NOERR-PENNINGTON* IN THE CONTEXT OF MISREPRESENTATION: ANALYSIS AND SYNTHESIS

### A. The Legal Framework

The ALJ applied *PREI*'s two-part test for evaluating sham litigation and found the subjective standard unsatisfied because Unocal allegedly sought to achieve a monopoly through the *outcome* of the CARB proceeding. ID at 48-49. We find that if misrepresentations are to be treated as a form of sham, then the appropriate approach must recognize that they raise issues different from traditional sham litigation. Rote application of *PREI*'s test under these circumstances would be inconsistent with the policy goals of the *Noerr-Pennington* doctrine.

Indeed, the ALJ's decision would mean that most misrepresentation to government, even when used to monopolize or otherwise cause anticompetitive harm,[57] would fall outside antitrust review. If the petitioner desires a governmental outcome, then building a monopoly through blatant lying would be protected. This result ignores the holdings of the many courts that have found intentional falsehoods actionable. It also rejects the well-established limitations on First Amendment protections for known falsehoods. It would protect petitioning leading to governmental action so distorted by misinformation that the result is contrary to the government's intention. Certainly, neither the facts nor the language of *PREI* requires that its test for sham

---

[55] *See Armstrong*, 185 F.3d at 160-62, discussed *supra* in note 43.

[56] *Id.* at 164 n.8. The *Armstrong* opinion states that the facts allegedly misrepresented may not have been important to the outcome and that the government decision makers "recognized that there was a dispute and made a credibility determination concerning it." *Id.* at 163. *See infra* at Section IV.B.3.

[57] The harms may be substantial. *See 1* AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 205a at 215 (observing that, although it generally is easy to defend against baseless litigation, the "potential threat to competition is far greater when the adjudication plaintiff alleges nonpublic facts that it knows not to be true or fails to state nonpublic facts that it knows will defeat its claim.").

-28-

litigation apply to the very different circumstances posed by misrepresentation.[58] Rather, the Court's express statement that it "need not decide here whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations," *PREI*, 508 U.S. at 61 n.6, recognizes that misrepresentations do not easily fit the "sham" analysis. Clearly, a proceeding fundamentally tainted by misrepresentation lacks the "genuine" nature that is the hallmark of what the Supreme Court seeks to protect.[59] As does the leading antitrust treatise, we read the *PREI* tests "in the context in which they were stated – that of a factually true but legally controversial claim" – and reject their rote application to claims for which "the underlying factual allegations were false."[60]

In so doing we do *not* suggest conflict with, or violation of, the *PREI* standards. We merely recognize that deliberate misrepresentations that substantially affect the outcome of a proceeding or so infect its core to deprive the proceeding of legitimacy may not, in appropriate circumstances, qualify for *Noerr-Pennington* protection. This rule is consistent with the logic that underlies both *PREI*'s objective and subjective tests. According to *PREI*, the objective standard protects "reasonable effort[s] at petitioning for redress."[61] It distinguishes "objectively reasonable claims" from those in which "the administrative and judicial processes have been abused," *PREI*, 508 U.S. at 58, and it supplies "intelligible guidance." *Id.* at 60. Requiring that a misrepresentation infect the core of a proceeding similarly addresses conduct that is not a reasonable effort at petitioning and provides meaningful guidance.[62] This requirement also assures that the governmental process has truly been abused.

*PREI*'s subjective standard considers the litigant's "subjective motivation." *PREI*, 508 U.S. at 60. It "protects petitioning that is unmotivated by anticompetitive intent." *BE & K*, 536 U.S. at 528. Absent misrepresentation, *PREI*'s focus on whether a litigant seeks to use the outcome rather than the process does serve to identify anticompetitive intent. When misrepresentation is at issue, however, the outcome/process analysis is useless for assessing motivation; the very purpose of making the misrepresentation likely *is* to obtain the desired

---

[58] *See Liberty Lake*, 12 F.3d at 158 ("As we read the Court's footnote 6, however, it does no more than reserve the issue of whether antitrust liability may be premised on a litigant's deceptive conduct which goes to the core of a lawsuit's legitimacy . . . .").

[59] *PREI*, 508 U.S. at 61; *see also BE & K*, 536 U.S. at 532 (describing the *PREI* tests as "protect[ing] petitioning whenever it is *genuine*" and "protecting suits from antitrust liability whenever they are objectively or subjectively *genuine*") (emphasis added).

[60] 1 AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 205b at 227.

[61] *PREI*, 508 U.S. at 60 n.5. Similarly, *BE & K* tells us the objective test protects "reasonably based petitioning from antitrust liability." *BE & K*, 536 U.S. at 528.

[62] *See BE & K*, 536 U.S. at 530-32 (drawing an analogy between baseless litigation and misrepresentation); *Bill Johnson's Restaurants*, 461 U.S. at 743 (same).

outcome. To treat this intention as dispositive is to shelter petitioning *because* of its anticompetitive goals. Indeed, granting protection to intentional misrepresentations would create perverse incentives to lie, in abuse of judicial and administrative processes. Not surprisingly, therefore, most courts and commentators have concluded that the outcome/process analysis is inappropriate in contexts involving misrepresentations. In such settings, a different inquiry – one focused on the knowing, deliberate nature of the falsity – serves to identify anticompetitive intent and fulfill the purposes of the subjective standard.[63]

In sum, we find no impediment in the law of sham petitioning to an antitrust challenge based on deliberate misrepresentation. Whether we view misrepresentation as a distinct variant of sham petitioning or as a separate exception to *Noerr-Pennington*, the fabric of existing law is rich enough to extend antitrust coverage, in appropriate circumstances, to anticompetitive conduct flowing from deliberate misrepresentations that undermine the legitimacy of government proceedings.

What are those appropriate circumstances? Both the ALJ and Unocal take too narrow a view of the second major issue left open by the Supreme Court – the treatment of misrepresentation in "less political arenas" than the legislative lobbying campaign at issue in *Noerr*. The Initial Decision focuses on the administrative law distinction between legislative and adjudicatory activities and opines that misrepresentations can vitiate *Noerr-Pennington* protection only in adjudicatory contexts. ID at 31-40. Unocal advances much the same arguments. Unocal Brief at 24-40.

The case law, however, takes a much broader view than just administrative law distinctions. It considers both the context of the proceeding and the nature of the relevant communications. In the next sections, we pursue these two inquiries to develop boundaries for a misrepresentation exception that promotes the purposes of the *Noerr-Pennington* doctrine.

B. The Context of the Proceeding

The ALJ/Unocal and Complaint Counsel apply sharply conflicting analytical frameworks in building upon the Supreme Court's statement that the "applicability" of *Noerr-Pennington* "varies with the context and nature of the activity." *Allied Tube*, 486 U.S. at 499. The Initial

---

[63] In fact, the Supreme Court recently adapted *PRE*'s subjective test to fit the context of a National Labor Relations Act dispute. In *BE & K* the Court reasoned that petitioning is subjectively genuine if the petitioner's "*purpose* is to stop conduct he reasonably believes is illegal." *BE & K*, 536 U.S. at 533-34 (emphasis original). The Court's subjective inquiry there was not whether the petitioner sought to win, but whether the petitioning was premised upon a belief in its legitimacy. Similarly, a focus here on knowing, deliberate falsity would bring much the same subjective inquiry to the consideration of misrepresentations: one cannot believe in the legitimacy of a petition based on known falsity.

Decision and Unocal emphasize the distinction between legislation and adjudication.[64] Applying administrative law principles, they cast the CARB proceeding as legislative.[65] At places the Initial Decision seems automatically to extend *Noerr-Pennington* protection to misrepresentations in all rulemakings, indeed in all administrative proceedings other than formal adjudications. *See* ID at 36-40. Unocal essentially equates rulemaking with legislation, terms this a political function, and urges that the ALJ correctly rejected application of a misrepresentation exception to an industry-wide rulemaking. *See* Unocal Brief at 24, 30-32.

As Complaint Counsel argue, however, the case law has focused more directly on the distinction between activities within and outside of the political arena. *See* CCAB at 26-29. Thus, when *California Motor Transport* discusses adjudication, it is in contrast to the "political arena."[66] When *Allied Tube* discusses a publicity campaign seeking legislation or executive action, it is in contrast to "less political arenas."[67] *Kottle* explains, '[T]his circuit has generally shaped the sham exception [broadly defined] according to our estimation of whether the executive entity in question more resembled a judicial body, or more resembled a political entity."[68] The legislative/adjudicatory comparison may sometimes be a useful proxy for the distinction between activities inside and outside of the political arena. When it is not, however, the courts have not hesitated to reject the faulty proxy in favor of a more nuanced inquiry into the political or non-political nature of the context.[69] In sum, the case law suggests an inquiry focused on whether a

---

[64] *Compare* ID at 32 (misrepresentations made in the context of legislative activities are protected from antitrust liability) *with* ID at 33 ("By contrast, where the agency is using an adjudicatory process, misrepresentations are not immunized"); *compare* Unocal Brief at 25 ("If a fraud exception to *Noerr* immunity exists, it is confined to adjudicative proceedings.") *with id.* at 33 ("In the legislative setting, as *Noerr* held, even deception is tolerated by antitrust tribunals).

[65] *See, e.g.*, ID at 68 ("CARB's Phase 2 RFG rulemaking process was a legislative exercise"); ID at 40 ("CARB was not acting in an adjudicatory manner, but in a legislative manner"); Unocal Brief at 30-33.

[66] *See California Motor Transport*, 404 U.S. at 513 ("Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process.").

[67] *Allied Tube*, 486 U.S. at 499-500 ("But in less political arenas, unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations.").

[68] *Kottle*, 146 F.3d at 1061. *See also Clipper Exxpress* at 690 F.2d at 1261 (treating "political" and "adjudicatory" as the opposing spheres); *Livingston Downs*, 192 F.Supp.2d at 533 (asking whether the petitioned commission was "more akin to a political entity or to a judicial body").

[69] Unocal acknowledges that *Clipper Exxpress* treated a ratemaking, technically a rulemaking proceeding, as adjudicatory for purposes of applying *Noerr-Pennington* to a

-31-

proceeding is political or non-political, rather than on whether it is quasi-legislative or quasi-adjudicatory.[70]

The political/non-political distinction turns on several attributes directly linked to *Noerr-Pennington* policy concerns. The political arena is distinguishable from the non-political arena on the basis of the nature of government expectations; the degree of governmental discretion; the extent of necessary reliance on petitioners' factual assertions; and the ability to determine causation, linking the government's actions to petitioner's communications. We discuss each point in turn.

### 1. Governmental Expectations of Truthful Representation

Courts and commentators have recognized that the nature of politics places government on its guard, enabling it more readily to accommodate misrepresentations. As explained in *Kottle*, "Misrepresentations are a fact of life in politics," and the "political arena has a higher tolerance for outright lies than the judicial arena does."[71] As the Areeda and Hovenkamp treatise explains, "Society recognizes that politics is often a rough and tumble affair. . . . legislatures . . . have more political experience than the courts and . . . may be better able to appreciate the balance of contending forces." 1 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 203e at 167. In contrast, less political arenas present higher, and often clearer, norms of conduct: "the criteria of impropriety are most fully developed in the adjudicatory context and are loosest in the legislative arena. The executive and administrative worlds partake of both: sometimes one, sometimes the other, sometimes a hybrid." *Id.*, ¶ 203f at 174 (footnote omitted).

### 2. The Degree of Governmental Discretion

"[T]he scope of immunity depends on the degree of political discretion exercised by the government agency." *Kottle*, 146 F.3d at 1062 (internal citation omitted). The degree of discretion shapes the meaning of a proceeding's legitimacy and the possibility of judicial review: with unfettered discretion, decision makers are free to act for whatever reasons they choose, without triggering court intervention. As Judge Robert Bork explains:

an executive officer . . . entrusted with what amounts to legislative discretion . . . is properly free to arrive at his conclusions in the manner he finds most expeditious. If he acts within the area of his lawful discretion, no court will interfere, and no court will

---

misrepresentation to the Interstate Commerce Commission. Unocal Brief at 27.

[70] *See supra* section III.B.1 (providing additional discussion of the relevant case law).

[71] *Kottle*, 146 F.3d at 1061-62. Similarly, the Ninth Circuit has expressed confidence that a city council and redevelopment agency, "acting in the political sphere, can accommodate false statements and reveal their falsity." *Boone v. Redevelopment Agency of San Jose*, 841 F.2d 886, 894 (9th Cir.) (internal citation omitted), *cert. denied*, 488 U.S. 965 (1988).

-32-

impose liability, under the Sherman Act or any other statute, upon those who attempt by lawful means to persuade him to take one decision rather than another.

BORK, THE ANTITRUST PARADOX at 361. In such contexts, "legitimacy" of the decision-making process has no clear meaning.[72] Accountability in the face of such broad discretion is secured through the electorate, via the political, not the legal, system.

In contrast, when discretion is substantially limited, there is a meaningful basis to define legitimacy and assess whether a misrepresentation has undermined it.[73] Such limits may come from enforceable, substantive standards in an underlying statute or from procedural requirements tying the decision-making process to facts in a record. *See Kottle*, 146 F.3d at 1062 ("executive entities are treated like judicial entities only to the extent that their actions are guided by enforceable standards subject to review"); *Boone*, 841 F.2d at 896 (stressing the absence of standards more definite than what is "necessary or desirable" and the lack of judicial review); *Metro Cable*, 516 F.2d at 228 (contrasting a legislative body, which operates in "a political setting" with freedom "to base its actions on information and arguments that come to it from any source," with an adjudicatory body, which, "as a prerequisite to taking action" must "compile an evidentiary record through formal proceedings"). When a decision is predicated on fact-finding and dependent on a record, it is vital that those facts be accurate. *See Israel*, 466 F.2d at 278 (stating that "[n]o actions which impair the fair and impartial functioning of an administrative agency should be able to hide behind the cloak of an antitrust exemption"); *Woods Exploration*, 438 F.2d at 1297-98 (describing the alleged misrepresentations as an "attempt to undermine" a rule's efficacy and an "abuse of the administrative process"); *DeLoach*, 2001-2 Trade Cas. ¶ 73,409 at 91,433-34 (explaining that submission of false data undermines governmentally determined production quotas). Legitimacy in such settings has objective meaning and may be assessed through judicial review relying on the factual record.

---

[72] *See Kottle*, 146 F.3d at 1062 (stating that "[o]nly when administrative officials must follow rules is it meaningful to ask whether a petition before an agency was 'objectively baseless,' " and indicating that similar considerations apply to intentional misrepresentations).

[73] Consequently, a focus on discretion provides an operable tool for distinguishing the political and non-political arenas. In contrast, portions of Unocal's Brief speak of "policy questions," "policy considerations," "policy judgments," and "political judgments." *See* Unocal Brief at 30, 31, 32, 35-36. Framing the inquiry in that fashion begs the questions of what is "policy" and what is "political."

-33-

3. The Extent of Necessary Reliance on the Petitioner's Factual Assertions

Proceedings outside the political arena may be more prone to reliance on a petitioner's factual assertions than activities characterized as political, and the need to so rely increases the likely harm of misrepresentations. *Clipper Exxpress* draws the contrast starkly:

> [T]he adjudicatory sphere is much different from the political sphere. There is an emphasis on debate in the political sphere, which could accommodate false statements and reveal their falsity. In the adjudicatory sphere, however, information supplied by the parties is relied on as accurate for decision making and dispute resolving. The supplying of fraudulent information thus threatens the fair and impartial function of these agencies and does not deserve immunity from the antitrust laws.

*Clipper Exxpress*, 690 F.2d at 1261; *see also Boone*, 841 F.2d at 894 (explaining that agencies acting in political contexts can protect themselves against misrepresentations).

Similarly, the Areeda and Hovenkamp treatise places considerable emphasis on an agency's need to rely on information petitioners communicate:

> There certainly is no privilege for misrepresentations to administrative agencies that base their decisions on information provided by the parties. Moreover, there is no reason here to differentiate for these purposes between adjudication and rule making or between rules grounded exclusively in a hearing record and those grounded in less formal procedures.

1 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 203e at 169 (footnotes omitted). The leading antitrust treatise thus rejects explicitly the more formal, administrative law distinctions on which the ALJ and Unocal rely.

At the same time, courts have also recognized that an agency's practical ability to probe behind petitioners' assertions may shape the result. In *Woods Exploration* and *DeLoach*, where the agencies had no reasonable means to confirm or contradict the petitioners' demand projections and purchase intentions, the courts refused to apply *Noerr-Pennington*.[74] In contrast, the Third Circuit's *Armstrong* opinion noted that the government agencies "recognized that there was a dispute and made a credibility determination concerning it . . . conducted their own investigation, and afforded all interested parties an opportunity to set the record straight." *Armstrong*, 185 F.3d

---

[74] *See Woods Exploration*, 438 F.2d at 1295 (finding "no opportunity for meaningful supervision or verification" and a "necessity" of "rely[ing] on the truthfulness" of the petitioners); *DeLoach*, 2001-2 Trade Cas. ¶ 73,409 at 91,434 (finding that the USDA "did not and, in fact, could not . . . investigate the accuracy of the submissions"); *see also In re Buspirone Patent Litigation*, 185 F.Supp.2d 363, 374 (S.D.N.Y 2002) (refusing to apply *Noerr-Pennington* when the government agency had "neither the authority nor the ability to determine the accuracy of the representations" but rather was "required by law to rely directly upon them").

-34-

at 163. The court found that the CON proceeding at issue provided "extensive opportunities for error correction." *Id.* at 164. In these circumstances, it afforded *Noerr-Pennington* protection.

### 4. The Ability to Determine Causation

Differences in the ability to establish a causal link between petitioning conduct and an ensuing governmental action also distinguish political from non-political arenas. In a truly political environment, it may be impossible to establish that a given misrepresentation caused the government to act as it did.[75] "The necessary connections would be almost impossible to establish in the legislative context, where no one can say what combination of facts, arguments, politics, or other factors produced the legislation." AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 203f3 at 177. As we move to less political arenas, such determinations become feasible:

> [I]t is often much more plausible to conclude in the adjudicative context that the provision of false information "caused" the judge or administrative officer to make the decision it did. Such a claim would be strongest in the case of ex parte proceedings where the proponent's statements are not disputed, or when the information in question was exclusively in the control of the proponent.[76]

Similarly, courts making *Noerr-Pennington* assessments have considered the ability to determine causation. *Compare Nobelpharma*, 141 F.3d at 1071-72 (finding *Walker Process* fraud because "the patent would not have issued but for the misrepresentation or omission") and *Kottle*, 146 F.3d at 1062-63 (relying in part on the presence of public hearings and written findings in determining that inquiry into the effect of misrepresentations on the proceeding's legitimacy was appropriate), *with Cheminor*, 168 F.3d at 123-24, 127 (determining that the government's action "was not dependent upon the misrepresented information" and finding the petitioning protected) *and Baltimore Scrap*, 237 F.3d at 402-03 (finding that the alleged fraud did not affect the outcome and therefore could not vitiate *Noerr-Pennington* protection).

---

[75] *Cf. Omni*, 499 U.S. at 378 (noting that unlawful activity to influence governmental conduct may not change the ensuing governmental action) and 383 (noting the obstacles to identifying lobbying that has produced "selfishly motivated agreement with public officials").

[76] AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 203e at 170 (footnote omitted); *see also id.*, ¶ 203f3 at 177 (although agencies engaging in quasi-legislative activities often behave as legislatures, "the relevant procedures may approximate the adjudicatory and the path of decision may be clearer"), ¶ 203h at 193 (with a formal record and a statement of reasons, "it may be quite possible to see the causal connection between a particular impropriety and the tribunal's order").

-35-

C.  The Nature of the Relevant Communications

The *Noerr-Pennington* inquiry also requires consideration of the nature of the relevant communications.  Three issues stand out:  a misrepresentation or omission must be deliberate, subject to factual verification, and central to the legitimacy of the affected governmental proceeding.

### 1.  Deliberate Misrepresentation/Omission

The Supreme Court has left no doubt that something more than mere error is necessary. The Court spoke in terms of "unethical conduct" and "forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes," *California Motor Transport*, 404 U.S. at 512-13; "unethical and deceptive practices [that] can constitute abuses of administrative or judicial processes," *Allied Tube*, 486 U.S. at 500; and "knowingly and willfully misrepresenting facts," *Walker Process*, 382 U.S. at 177.  *See also Liberty Lake*, 12 F.3d at 159 (looking to "knowing fraud" and "intentional misrepresentations"); *Potters Medical Center*, 800 F.2d at 581 ("Only known falsity supports an antitrust offense.").  Professors Areeda and Hovenkamp explain, "There is no policy ground to impose antitrust punishments on those who make innocent errors in their dealings with governments.  Without knowing falsity, moreover, there would not be the 'abuse' of government process that is the key to ousting *Noerr* . . . ." 1 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 203f1 at 174.

### 2.  Factual Verifiability

As the leading treatise states, "If false information is to be actionable in an antitrust suit, the falsity must be clear and apparent with respect to particular and sharply defined facts." 1 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 203f2 at 175 (footnote omitted).  In contrast, "the antitrust court . . . should not review the 'truth' of arguments or of general statements about the world." *Id.*

### 3.  Centrality to Legitimacy

Finally, to vitiate *Noerr-Pennington* protection a misrepresentation must be of central significance, such that it undermines the very legitimacy of the government proceeding.  The courts have made this an essential element in the inquiry.  Some require that the misrepresentations "deprive the litigation of its legitimacy." *See Kottle*, 146 F.3d at 1060; *Liberty Lake*, 12 F.3d at 159.  Others ask whether the misrepresentations infect "the very core" of the case. *See Cheminor*, 168 F.3d at 124.  Still others ask whether the government action would have resulted "but for" the misrepresentation or omission.  *See Nobelpharma*, 141 F.3d at 1071 (requiring, in a *Walker Process* analysis, that "the patent would not have issued but for the misrepresentation or omission"); *see also* 1 AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 205c2 at 232 (requiring that the antitrust plaintiff show that "the tribunal's adverse decision depended on the provision of false information") and ¶ 203h at 192 (framing the inquiry in terms of whether "the agency would not have acted the way it did *but for* the impropriety") (emphasis original).

-36-

Having established a framework of analysis and identified the factors that require consideration, we turn in the next section to assess whether the Complaint is insufficient as a matter of law.

## V. *NOERR-PENNINGTON* DOES NOT BAR THE COMPLAINT AS A MATTER OF LAW

### A. The Complaint's Allegations about the Context of the Proceeding

For purposes of evaluating the political nature of governmental activities, legislative lobbying presents one extreme, judicial trials the other. Rulemaking, of the type at issue in the CARB proceeding, typically falls within a more difficult middle ground.[77] To evaluate CARB's activities, we must examine the Complaint's factual allegations under each of the factors identified above and form an overall assessment based on "the totality of the circumstances." *See Kottle*, 146 F.3d at 1062. Under this analytical framework, the facts the Complaint alleges, if established, and with all inferences drawn in Complaint Counsel's favor, would support a conclusion that CARB's activities fell outside the political arena.

This is a substantially broader inquiry than that conducted by the ALJ. In determining that CARB's proceeding was legislative rather than adjudicative, the Initial Decision focused on the degree of CARB's discretion; even there, its analysis was incomplete. It asked whether the CARB proceeding was more akin to rulemaking/legislation or to adjudication, rather than considering whether the proceeding was political or non-political in the *Noerr-Pennington* sense. Unocal discusses a broader range of factors but fails to demonstrate that CARB, in this situation, acted as a political entity.

#### 1. CARB's Expectations of Truthful Representation

The Complaint alleges facts that, if established, would support a finding that CARB's rulemaking proceeded under expectations of truthfulness. Specifically:

- Paragraph 17 alleges, "Given the scientific and technical nature of the issues involved, CARB relies on the accuracy of the data and information presented to it in the course of rulemaking proceedings."

- Paragraph 25 alleges that "In its Phase 2 RFG proceedings, CARB did not conduct any independent studies of its own, but relied on industry to provide the needed research and

---

[77] *See generally Kottle*, 146 F.3d at 1061 (explaining that whereas in the legislative branch the sham exception is "extraordinarily narrow," and in the judicial branch *Noerr-Pennington* exceptions are well-recognized, the executive branch is "radically diverse," uses widely varying procedures, and exhibits "greatly varying levels of discretion," so that the sham exception must be shaped based on the circumstances presented).

-37-

resulting knowledge."[78]

- Paragraph 17 alleges that California's Administrative Procedures Act requires "the development of an evidentiary basis for any proposed regulations,"[79] and Paragraph 18 alleges that CARB's regulations are subject to judicial review to determine, *inter alia*, whether the agency's action was "lacking in evidentiary support."[80]

- Paragraphs 39 through 42 suggest that one Unocal communication that allegedly created a "materially false and misleading impression" was the *quid pro quo* for CARB's "agreement to develop a predictive model."[81]

- Paragraphs 21, 37 and 48 (first and second sentences), 42, and 48 (third sentence), respectively, allege that CARB's statutory mandate requires that it consider the cost-effectiveness of its actions; that discussions between Unocal and CARB focused on the cost-effectiveness of regulations under consideration; that Unocal created the misleading impression that it had "agreed" to give up any "competitive advantage" it may have had "relating to its purported invention and arising from its emissions research results"; and that Unocal's statements suppressed the "material fact that assertion of its proprietary rights would materially increase the cost and reduce the flexibility of the proposed regulations."

As Judge Bork explains, "Our society requires a wide-open political process, robust and free. It also requires that there be more formal, constrained procedures for the establishment of certain types of facts and the application of particular policies. Processes of the latter type must be guarded from abuse if they are to be effective." BORK, THE ANTITRUST PARADOX at 360. The cited allegations – directed toward the nature of the issues involved, CARB's reliance on industry research and knowledge, the procedures under which CARB operated, its course of dealing with

---

[78] Unocal disputes this allegation. *See* Unocal Brief at 5 (quoting CARB's Final Statement of Reasons for Rulemaking (October 1992)); Surreply of Union Oil Company at 1-2. Complaint Counsel challenge Unocal's assertions. *See* Reply Brief of Counsel Supporting the Complaint at 2 (quoting a brief filed by Unocal in other litigation). Rather than attempting to resolve this dispute – which would require facts placing the bare language of the quoted materials in proper context – we note that the debate highlights a factual issue that appears to require resolution through trial, not through briefing on a motion to dismiss.

[79] *See* Cal. Gov't Code §§ 11340 *et seq.*

[80] *See* Cal. Gov't Code § 11350.

[81] Unocal argues that the communication alleged in Paragraph 41 preceded the formal opening of CARB's Phase 2 RFG proceeding and therefore could not have been subject to any constraints attendant upon the rulemaking  Unocal Brief at 39. The Complaint, however, alleges a continuing pattern of conduct that maintained the alleged false and misleading impression throughout the rulemaking. *See, e.g.,* Complaint, ¶¶ 2-4, 46, 48, 61, 64, 78c, and 79.

Unocal, and the specific context in which CARB received necessary assurances regarding Unocal's intentions – all depict a process of Judge Bork's "latter type," an effort to establish essential facts under norms indicating expectations of truthfulness.

2. The Degree of CARB's Discretion

CARB operated with substantial limits on its discretion derived from a combination of enforceable statutory standards, required reliance on an evidentiary record, and the presence of judicial review.

Analysis drawn from the California Clean Air Act alone is ambiguous. The statute mandates that CARB take "necessary, cost-effective, and technologically feasible" actions to achieve specific percentage reductions of reactive, organic gases and nitrogen oxides by specific dates, but it leaves CARB with discretion how this may be achieved. Cal. Health & Safety Code § 43018(b). For particulates, carbon monoxide, and toxic air contaminants, the statute sets no specific percentages or dates, but rather mandates "maximum feasible reductions" and the "most cost-effective combination of control measures." *Id*. at §§ 43018 (b)-(c). *See* Complaint, ¶ 21.

Complaint Counsel concede that the statute leaves discretion regarding "determination of the gasoline properties to be regulated and the limits to be set for these properties," but argue that these were technical decisions circumscribed by the statutory mandate. To Complaint Counsel, the legislature made the central policy decisions – whether to regulate automobile emissions and the amount by which to reduce them and/or the applicable deadlines – leaving it to CARB to exercise technical expertise in implementing the legislature's policies. CCAB at 35-38. Unocal, on the other hand, argues that CARB possessed and exercised broad discretion under a statute that left it to the agency to balance conflicting mandates and make tradeoffs between emission reductions and economic objectives.[82]

It appears that the California legislature imposed significant standards concerning the amount and timing of pollution reductions and specified the factors to be applied in resolving the remaining issues, but left subsidiary, though still important, choices to CARB. Plainly some measure of discretion is inherent in all but ministerial government decision making. A modicum of discretion, by itself, does not necessarily render a proceeding political when the legislature has mandated the ultimate objectives and identified specific considerations to be balanced. *See Livingston Downs*, 192 F.Supp.2d at 534 (treating the fact that statutes "enumerate several criteria the Commission was obligated to weigh" as evidence that its discretion was circumscribed, so that the proceeding should be regarded as adjudicatory for *Noerr-Pennington* purposes). An overall

_____

[82] Unocal Brief at 33-37. The Initial Decision merely listed the determinations that the statute left open to CARB's discretion and observed that the statute provided "only" benchmarks and interests that CARB must keep in mind. The Initial Decision never addressed what those benchmarks/interests were, much less the nature of their interplay with matters left to CARB's discretion. ID at 34-35.

judgment must depend on the *degree* of discretion removed by legislative mandate and the *degree* of discretion left to the agency, and in close cases clear answers may prove elusive.

In this case, however, other discretion-limiting factors are present. CARB's discretion *was* substantially confined by its need to base its actions on facts in the record. CARB was required by statute to maintain a record of its Phase 2 RFG proceeding. Cal. Gov't Code § 11347.3. It had to make written findings justifying its actions. *Id.* at § 11346.7 (1991 through 1993). It needed an evidentiary basis for its decisions: Cal Gov't Code §§ 11349.1 and 11350 provide, respectively, that review by the Office of Administrative Law and then by the courts be based on the file of rulemaking required by § 11347.3. *See* Complaint, ¶¶ 17, 26.

Moreover, the presence and nature of judicial review further limit CARB's discretion. The Complaint alleges that all CARB regulations are subject to review, both by California's Office of Administrative Law and then by the courts. ¶ 18. Pursuant to California Government Code § 11350(b) (1991) and § 11350(b)(1) (1992 to the present), a regulation may be declared invalid if the agency's "determination that the regulation is reasonably necessary to effectuate the purpose of the statute . . . is not supported by substantial evidence." A leading analyst of California administrative law explains that the legislative history of the 1982 amendment that added the substantial evidence requirement to the judicial review statute "makes clear that the legislature intended a significant intensification of the factual support for a regulation."[83]

---

[83] Michael Asimow, *The Scope of Judicial Review of Decisions of California Administrative Agencies*, 42 UCLA L. REV. 1157, 1230 (1995). Unocal argues that, although the governing statute requires "substantial evidence," in practice review is more deferential. Unocal Brief at 38 n.17. The one case that Unocal relies upon for interpreting the "substantial evidence nomenclature," *Western Oil & Gas Ass'n v. Air Resources Bd.*, 37 Cal.3d 502, 508 (1984), however, was issued in 1984, and does not reference the amendments that first added the substantial evidence test, effective in 1983. The case is an appeal from a 1980 trial court order, following CARB actions in 1976-1977, *id.* at 508, and the intermediate appellate opinion states that even amendments to the Government Code in 1980 came too late to be "specifically applicable." *See Western Oil & Gas Ass'n v. Air Resources Bd.*, 181 Cal.Rptr. 199, 202-03 (Cal. Ct. App. 1982), *vacated on other grounds*, 37 Cal.3d 502. In any case, even the language relied upon by Unocal acknowledges a requirement of judicial review to determine whether an action is "lacking in evidentiary support." 37 Cal.3d at 509. Unocal elsewhere cites a second California case for the proposition that judicial review of CARB proceedings is highly deferential. Unocal Brief at 31, *citing Western States Petroleum Ass'n v. Superior Court of Los Angeles County*, 9 Cal.4th 559, 572 (1995). That opinion merely rejects judicial consideration of extra-record evidence; it in no sense detracts from judicial review on the basis of evidence in the record. *See id.* The specific judicial review provision discussed, Public Resources Code § 21168.5, was not California Government Code § 11350, at issue here. *See id.*

-40-

The requirements that CARB base its actions on an evidentiary record and subject its regulations to judicial review based on substantial evidence in that record are significant limits on its discretion of a type that courts have found telling. For example, the U.S. Court of Appeals for the Seventh Circuit contrasted the situation of a city council that "need not, as a prerequisite to taking action, compile an evidentiary record through formal proceedings" with "an adjudicatory setting," in which the government "can act only on the basis of a record made at hearings." *Metro Cable*, 516 F.2d at 228, 232. Similarly, the presence of judicial review has contributed to findings that a proceeding was not political. *See Livingston Downs*, 192 F.Supp.2d at 534. In like fashion, the procedural constraints on CARB's discretion are significant indicia that its Phase 2 RFG proceeding fell outside the political arena.[84]

### 3. The Extent of CARB's Reliance on Unocal's Factual Assertions

Paragraph 80 of the Complaint alleges that CARB "reasonably relied" on Unocal's misrepresentations. Factual inquiry may demonstrate that CARB was dependent on Unocal for information regarding its patent applications and its intentions with regard to enforcing its patent rights. The Initial Decision erred in concluding that the numerous comments submitted by other parties on various subjects during the rulemaking proceeding necessarily indicated that CARB was not "wholly dependent" on Unocal for the relevant facts. ID at 40-43. Dependence must be assessed with reference to the specific information allegedly misrepresented. For example in *Woods Exploration*, the fact that plaintiffs' natural gas demand forecasts may have been accurate did not protect defendants' misrepresentations of their own share of total anticipated demand. *See Woods Exploration*, 438 F.2d at 1289, 1292. Similarly, Clipper Exxpress "made numerous filings with the ICC during the protest period," yet that fact did not preclude antitrust scrutiny of the protestants' misrepresentations. *Clipper Exxpress*, 690 F.2d at 1257. Indeed, the Initial Decision's reasoning seemingly would eliminate any misrepresentation exception in any litigation or contested adjudication, because the presence of an opposing party ensures that the judge or adjudicator is not

---

[84] Unocal argues that *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), treats Environmental Protection Act rulemakings under the federal Clean Air Act as part of the political process, Unocal Brief at 2, 32, 37, and observes that CARB termed its authority in the RFG Phase 2 proceeding "analogous" to that in Environmental Protection Agency rulemakings. *See* Tr. at 59-60, *citing* CARB's Final Statement of Reasons for Rulemaking at 193. *Chevron*, however, does not reach as broadly as Unocal contends. It deals with a question of law – a statutory interpretation involving definition of a statutory term – not a matter based upon a fact-finding process and subject to substantial evidence review. Indeed, *Chevron*'s own language shows its limits: "In contrast, an agency *to which Congress has delegated policy-making responsibilities* may, *within the limits of that delegation*, properly rely upon the incumbent administration's views of wise policy to inform its judgment." *Chevron*, 467 U.S. at 865 (emphasis added). This presupposes, and is limited to, a policy-making context. Unocal fails to demonstrate why the fact that an agency as a general matter has some policy-making authority necessarily means that, in any specific context, it is operating within the political arena in the sense relevant to the *Noerr-Pennington* inquiry.

"wholly dependent" on the petitioner in all respects.

Factual inquiry may show that no other party could provide information regarding Unocal's patent claims and its intention to enforce them. Under the rules of the patent system then in force, the Patent and Trademark Office maintained patent applications under terms of strict confidentiality. *See* 35 U.S.C. § 122 (prior to 1999 amendments). Moreover, the Complaint, ¶¶ 60-67, alleges that, even following adoption of the CARB Phase 2 RFG requirements, Unocal amended its claims "to ensure that [they] more closely matched the regulations" and filed additional, related patent applications with priority dating from the original 1990 application. Given these evolving claims, the ultimate content of Unocal's patent claims may have been foreseeable only to Unocal at the time of CARB's rulemaking. Furthermore, even if all claims were known, Unocal allegedly did not reveal its intentions with regard to enforcement of its patent rights, *see, e.g.,* Complaint, ¶¶ 2-3. No party other than Unocal may have been able to shed light on this issue, and CARB may have been wholly dependent on Unocal's factual assertions with respect to the issues most relevant to this proceeding.

> 4. The Ability to Determine the Effect of the Misrepresentations on CARB's Decision

The Complaint's allegations, if established, would appear to demonstrate an ability to identify a causal link between Unocal's alleged misrepresentations and CARB's actions. The Complaint alleges that CARB was required to develop "an evidentiary basis" for its regulations and that CARB "issued written findings on the results of its rulemaking proceedings." ¶¶ 17, 26. CARB, by statute, had to maintain, and be able to justify its actions based upon evidence in, an administrative record. Cal. Gov't Code §§ 11347.3 and 11350. Indeed, CARB's Final Statement of Reasons for Rulemaking, attached as Appendix 1 to Unocal's Brief and taken as the subject of official notice by the ALJ, ID at 8-10, may establish some key elements of causation. For example, it identifies Unocal's study as "the only study that evaluated T50 and provided a statistical analysis" and states that it is the results of Unocal's study that "form the basis for the T50 specification." CARB Final Statement of Reasons for Rulemaking at 69. Moreover, Paragraph 27 of the Complaint alleges that Unocal's management and employees understood that information and data relating to the compliance costs or to the cost-effectiveness of the Phase 2 regulations were material to the rulemaking. If so, information in Unocal's possession would contribute to a showing about causation.

All of these considerations, of course, must be placed in proper context through fact-finding procedures. What we conclude now – when we must take the Complaint's allegations as established and draw all inferences in favor of Complaint Counsel – is that CARB's Phase 2 RFG proceedings exhibit the expectations of truthfulness, limits on governmental discretion, need to rely on petitioners' factual assertions, and ability to determine causation typically associated with activities outside the political arena.

B.  The Complaint's Allegations about the Nature of the Relevant Communications

The Complaint alleges precisely the type of misrepresentation that courts and analysts have found to vitiate *Noerr-Pennington* protection in contexts outside the political arena.  To begin, the Complaint plainly alleges that Unocal's conduct was deliberate, knowing, and willful.  *See, e.g.,* ¶ 1 (alleging a "pattern of bad-faith, deceptive conduct"), ¶¶ 3, 77, 78, ("alleging "knowing and willful misrepresentations"), and ¶¶ 5 and 80 (alleging "fraud").

Next, the alleged misrepresentations/omissions relate to specific, verifiable facts.  The Complaint alleges that Unocal, through misrepresentations/omissions, conveyed and maintained the false impression that it did not claim, or did not intend to assert, intellectual property rights implicated by CARB's standards.  If Unocal asserted patent rights that it had previously represented either did not exist or would not be asserted, then the discrepancy would be clear, apparent, and factually verifiable.

Finally, the Complaint states allegations that, if established, would demonstrate the necessary central significance to CARB's decision making.  *See, e.g.,* ¶ 45 (Unocal's alleged misrepresentations "caused CARB to adopt" regulations that substantially overlapped Unocal's patent claims).  Indeed, ¶¶ 5 and 80 aver, "But for Unocal's fraud, CARB would not have adopted RFG regulations that substantially overlapped with Unocal's concealed patent claims; the terms on which Unocal was later able to enforce its proprietary interests would have been substantially different; or both."[85]  Moreover, the governing statute makes cost-effectiveness a key element.  Cal. Health & Safety Code § 43018(b).  Paragraph 79 of the Complaint alleges that Unocal failed to disclose information that "would have impacted" CARB's analysis of this key element.  We need not – and do not – decide, at this point, precisely what level of causality is essential to make *Noerr-Pennington* inapplicable.  We do conclude that the very clear causation alleged in the Complaint would satisfy this aspect of the inquiry.

C.  Denial of *Noerr-Pennington* Protection Would Not Raise Policy Concerns

The nature and context of Unocal's alleged communications work to minimize the policy concerns that the FTC, the courts, and commentators have voiced against an overly broad misrepresentation exception to *Noerr-Pennington.*

*First:*  The deliberate and knowing nature of the alleged misrepresentations negates impact on even the broadest First Amendment considerations.  There should be no chilling of legitimate petitioning and no sacrifice of necessary breathing space from a case confined to deliberate fraud.

---

[85]  Paragraph 90 of the Complaint explains that participants in Auto/Oil and WSPA would have advocated that CARB "negotiate license terms substantially different from those that Unocal was later able to obtain."

*Second:* The alleged misrepresentations cut so clearly to the core of CARB's proceeding that there is no question of imposing antitrust liability based on valid government action. According to the Complaint, CARB did not know that it was taking action that would subject the California oil industry and California consumers to Unocal's patent claims and ensuing market power.[86] Nor do there appear to have been means for CARB or others to counterbalance the effect of Unocal's alleged fraud and to provide the "independent investigation, . . . open process, and extensive opportunities for error correction" highlighted in *Armstrong*, 185 F.3d at 164; here, the relevant information was uniquely in Unocal's knowledge and control.[87] As pled, the facts show that this is not a case like *Omni*, in which it was impractical to identify lobbying that produced a selfishly motivated city council ordinance, but rather a case like *Walker Process, Woods Exploration,* and *DeLoach*, in which misrepresentation effectively supplanted government action and the courts attributed anticompetitive harm to the underlying private conduct. *See supra* Section III.B.2.b.

*Third:* The context minimizes federalism concerns and reservations concerning regulation of political behavior. The conduct challenged does not flow directly from CARB's regulations. Rather, the Complaint emphasizes that the proximate cause of alleged competitive harm was Unocal's *enforcement* of its patent rights.[88] Moreover, the remedy sought – requiring that Unocal cease and desist from enforcing its RFG patents on gasoline sold in, or imported or exported to or from, California[89] – will not require a change in, or repeal of, any CARB regulations. Consequently, there is no reassessment of CARB's determination of public welfare and no regulation of the outcome of the state's political processes.

---

[86]    Indeed, California has stated to the Supreme Court that Unocal sought to "commandeer" CARB's regulations and to "hijack," "distort," and "plunder" California's regulatory process. *Amici Curiae* Brief of [California and 33 States] and the District of Columbia in Support of Petition for Writ of Certiorari at 4-5, *Atlantic Richfield Co. v. Union Oil Co. of California*, 531 U.S. 1183 (2001) (No. 00-249).

[87]    After-the-fact corrections also appear to have been impossible. The Complaint alleges that CARB cannot now change its regulations sufficiently to provide flexibility for third parties to avoid Unocal's patent claims.  ¶ 94.  Refiners have invested billions of dollars in sunk capital investments to comply with CARB Phase 2 RFG regulations, ¶ 93, and trial may show that "[r]epeal of the regulations would not undo the economic commitment to them." Brief of California *et al.* as Amici Curiae in support of the Complaint at 22 ("States' Brief").

[88]    ¶ 95.  Complaint Counsel, CCAB at 22-24, analogize to *Walker Process*, in which the antitrust offense was based on *enforcement* of the fraudulently obtained patent. *Id.*, 382 U.S. at 174.  Of course, the violation alleged here, as in *Walker Process*, is not a mere refusal to license. The contention that misrepresentation, or fraud, contributed to the acquisition of monopoly power is a key element of the allegations.

[89]    Complaint, at Notice of Relief ¶¶ 1-3.

-44-

*Fourth:* The availability of objective information should lessen, and perhaps eliminate, any need to look behind CARB's decision making process. The presence of an administrative record and a written statement of reasons presenting CARB's reasoning may establish critical facts concerning the role played by Unocal's communications. Development of a factual record in this proceeding will enable an assessment of these, and any similar, evidentiary materials, with knowledge of their context and an understanding of their significance to the allegations in the Complaint.

*Fifth:* This is not a case in which unwanted interference with a state decision maker is likely. CARB, joined by California and 21 other States, has filed an *amicus* brief in support of Complaint Counsel's position ("States' Brief"). The *amici* assert a "governmental interest in insuring that citizens who participate in administrative rule-making processes do not make misrepresentations or fraudulently withhold important facts," and CARB specifically expresses concern for "the integrity of its administrative processes." States' Brief at 4, 22. According to the *amici,* "Limiting the immunity provided by the *Noerr-Pennington* Doctrine helps to protect the integrity of these administrative proceedings." *Id.* at 22. Of course, participants' briefs do not establish any fact of record, but the filing of this *amicus* brief does suggest that any prudential concerns over unwanted intrusion are attenuated here. Courts have found similar representations persuasive. *See Clipper Exxpress,* 690 F.2d at 1262 n.34 (discussing an ICC *amicus* brief that voiced concern over misrepresentations in administrative proceedings and supported antitrust review).

All of these factors mute policy concerns that in other circumstances might raise reservations over the denial of *Noerr-Pennington* protection for a misrepresentation to the government. Moreover, as discussed in Section III.B.2.c. above, there are also compelling reasons to avoid a blanket antitrust exemption for such misrepresentations. We conclude therefore that there is no basis either in policy or in the nature and context of Unocal's alleged communications to CARB for dismissing the Complaint as a matter of law, without trial or determination of any facts, because of *Noerr-Pennington.*

## VI. UNOCAL'S COMMUNICATIONS WITH INDUSTRY GROUPS

The Initial Decision splits its treatment of Unocal's communications with the private industry groups, Auto/Oil and WSPA. It concludes that "[t]o the extent that" Unocal's alleged conduct toward Auto/Oil and WSPA was "part of [Unocal's] scheme to induce CARB to act, it constitutes indirect petitioning protected by *Noerr-Pennington.*" ID at 68. In contrast, "[t]o the extent" that the alleged misrepresentations to the industry groups "were not part of [Unocal's] scheme to solicit favorable government action," the Initial Decision does not apply *Noerr-Pennington.* ID at 56, 59. The Initial Decision thus highlights the allegation that but for Unocal's fraud, the Auto/Oil and WSPA participants would have incorporated knowledge of Unocal's pending patent rights in their capital investment and refinery reconfiguration decisions, either to avoid or to minimize potential infringement. *See* ID at 60, citing Complaint, ¶ 90(c). Unocal argues that even those aspects of its communications that allegedly were directed toward affecting competitors' investment decisions were incidental effects of protected petitioning and therefore

-45-

protected under *Noerr-Pennington*. Unocal Brief at 49.

Of course, if factual development shows that Unocal's direct communications to CARB fall outside *Noerr-Pennington* protection, there would be no question of indirect petitioning or incidental effects. If, however, Unocal's communications to CARB ultimately are protected by *Noerr-Pennington*, the status of communications to the industry groups remains a relevant issue. We conclude that Unocal misstates the controlling principles in ways that overstate potential protection for its communications to the industry groups and that the Initial Decision's formulation of the issue is ambiguous and, at a minimum, requires clarification.

In this context, both the ALJ and Unocal misapply *Noerr*. *Noerr* involved a publicity campaign sponsored by railroads as a means of influencing the adoption, retention, and enforcement of laws unfavorable to the trucking business. *Id*, 365 U.S. at 129. The Court rejected the contention that, because the railroads also wished "to destroy the goodwill of the truckers among the public generally and among the truckers' customers" and actually inflicted such injury, the publicity campaign was not protected. *Id*. at 142. As the Court explained, "There are no specific findings that the railroads attempted directly to persuade anyone not to deal with the truckers." *Id*. "Moreover," the Court continued, "all of the evidence in the record, both oral and documentary, deals with the railroads' efforts to influence the passage and enforcement of laws." *Id*. "In the light of this," the Court concluded, harm to the truckers' relationships with the public and with customers was no more than "an incidental effect" of a type "inevitable, whenever an attempt is made to influence legislation by a campaign of publicity . . . ." *Id*. at 143.

Here, the allegations are sharply different. There allegedly *was* direct misrepresentation to the industry groups and their participants. If the allegations are established, then there *would* be evidence of efforts to influence private business conduct. As alleged by the Complaint, the harm incurred as a result of communications to private parties was neither "incidental" nor "inevitable" but rather a distinct, free-standing, and potentially substantial source of competitive harm.

Under the Supreme Court's subsequent analysis in *Allied Tube*, such conduct is not protected. Like the Auto/Oil research joint venture and the WSPA trade association, *Allied Tube* involved conduct – private standard-setting activity – that antitrust traditionally has scrutinized. *Id.*, 486 U.S. at 500, 505-07. The privately-determined standards in *Allied Tube* sometimes were adopted into state codes and sometimes were not. The plaintiff, however, sought damages only for harm resulting from the private standard alone (*e.g.*, the stigma experienced even in states that did not adopt the standard).[90] Terming the relevant conduct "commercial activity with a political impact" rather than "political," *id*. at 507, the Supreme Court refused to apply *Noerr-Pennington* to

---

[90] *Allied Tube*, 486 U.S. at 498 n.2. Although the Court suggested that such effects might still enjoy *Noerr-Pennington* protection if "incidental to a valid effort to influence governmental action," it found that the defendants' petitioning activity was invalid and therefore unprotected without resolving the question of "incidental status" of the competitive harm. *See id*. at 502-03.

-46-

"any antitrust liability flowing from the effect the [private] standard has of its own force in the marketplace." *Id.* at 509-10.

Under this analysis, even if communications to CARB are protected, misrepresentations to the industry groups would be actionable if they caused substantial competitive harm from their "own force in the marketplace." That is precisely what the Complaint alleges. Independent of its allegations concerning effects on CARB, the Complaint avers that Unocal induced other oil companies to make technology adoption decisions premised on the reasonable belief that Unocal had no relevant patent rights or no intention to enforce such rights.[91] If CARB had never existed, competitors still may have been harmed if induced unwittingly to subject themselves to Unocal's patent claims. Alternatively, even given CARB's regulation, had competitors known of Unocal's patent claims and enforcement intentions from the start – before locking in to specific refinery configurations – they allegedly may have found ways to comply with CARB's requirements without infringing Unocal's patents. In either case, harm derives from unnecessarily infringing Unocal's hidden patent claims and is independent of CARB regulation.

Consequently, Unocal's claims lack merit and the Initial Decision potentially protects too much. The same conduct simultaneously may be "part of [Unocal's] alleged scheme to induce CARB to act," and yet have substantial marketplace effects independent of CARB's actions. Under the principles of *Allied Tube*, such conduct would support an antitrust violation based upon the independent effects.[92] To the extent that the Initial Decision suggests otherwise, it errs.[93]

---

[91] Unocal contends that "a vague patent disclosure policy" cannot serve as a basis for a finding of fraud in the private standard-setting context. The Complaint, however, traces liability to Unocal's affirmative presentations and representations to the industry groups. *See, e.g.*, ¶¶ 54 and 58. These considerations may require both factual development and careful analysis of the substantive reach of the antitrust laws.

[92] This remains so notwithstanding that antitrust liability predicated on inducing CARB to act potentially could be protected as indirect petitioning. *See Allied Tube*, 486 U.S. at 503.

[93] Much of the Initial Decision's wording in this context is ambiguous, leaving it unclear whether conduct that was "part of [Unocal's] scheme to induce CARB to act" remains actionable to the extent that it also causes independent competitive harm. Some of the language suggests that the ALJ incorrectly assumed that conduct with one kind of effect is cleanly separable from conduct with the other. *See, e.g.*, ID at 2 ("conduct directed toward Auto/Oil Group and WSPA, independent of the conduct directed toward CARB"), 59 (beginning with the heading "Conduct directed at Auto/Oil Group and WSPA separate from conduct directed at CARB"). The Initial Decision identifies Complaint Paragraphs 83, 84 (partial), 88, 89 (partial), and 90(c) as surviving its *Noerr-Pennington* analysis. *See* at 59-60. To this list our analysis would add Paragraphs 50-59, 81-82, 84 (phrase relating to violation of the integrity of Auto/Oil's procedures), 85-87, 89 (phrase relating to violation of the integrity of WSPA's procedures), and 90 (first and last sentences) from the paragraphs specifically devoted to Unocal's communications with Auto/Oil and WSPA.

-47-

\* \* \* \* \* \* \*

Unocal's *Noerr-Pennington* motion rests on the proposition that a private business may lie to a government rule maker, misrepresent its intentions regarding the enforcement of its patent rights, and then swing the trap shut after the government has enacted regulations that overlap with the patents. According to Unocal, a firm may thereby amass market power and enforce patent rights buttressed by a government mandate in ways never understood nor intended by the government agency, with absolute impunity from antitrust review. Unocal argues that regard for First Amendment freedoms and concern with interference with, or deconstruction of, governmental decision making require this result.

The First Amendment Right to Petition helps to protect, preserve, and promote representative democracy. This protection, however, is not limitless, especially with respect to intentional, egregious misrepresentation. Too broad a shield for false petitioning would actually jeopardize the representative system that it seeks to guard. The more that petitioners mislead the government, the more that government mis-leads the public. Consequently, it is not surprising that the First Amendment finds no value in false statements for their own sake, and protects misrepresentations only when necessary to protect speech that matters. When fraud controls the outcome, and the misrepresentation is intentional, denying protection to the "liar in petitioner's clothing" jeopardizes no speech that matters. Virtually all recent cases hold that in some circumstances false petitioning does not enjoy protection. Moreover, virtually all agree that First Amendment and federalism considerations require that the circumstances justifying denial of *Noerr-Pennington* protection be reasonably-bounded and clearly drawn. We join this consensus.

As a matter of law, therefore, we hold that misrepresentation can warrant denial of *Noerr-Pennington* protection, pursuant either to a separate doctrinal exception or a variant of the sham exception. We hold, however, that false petitioning loses *Noerr-Pennington* protection only in limited circumstances, such as when the petitioning occurs outside the political arena; the misrepresentation is deliberate, factually verifiable, and central to the outcome of the proceeding or case; and it is possible to demonstrate and remedy this effect without undermining the integrity of the deceived governmental entity. In addition, we emphasize that, even if *Noerr-Pennington* considerations do not protect the false petitioning, no liability arises under the FTC, Sherman, or Clayton Acts unless that conduct is anticompetitive. These limitations will ensure, with a substantial margin for error, that the possibility of antitrust challenge will neither chill petitioning that merits protection nor undermine the decision-making functions of other governmental entities. This approach, moreover, will also help make certain that intentionally and egregiously false petitioning does not cause competitive injury.

-48-

VII. THE COMMISSION HAS JURISDICTION OVER THE ISSUES PLED IN THE COMPLAINT

The Initial Decision ruled that "[t]o the extent that the alleged misrepresentations made to the Auto/Oil Group and to WSPA were not part of [Unocal's] scheme to solicit favorable governmental action," the allegations of the Complaint require resolution of substantial questions of federal patent law over which the Commission lacks jurisdiction. ID at 59. According to the Initial Decision, "The scope of [Unocal's] patents, the scope of any competitor's patents, whether any of the competitor products or methods that could be created or invented infringed, and whether refineries could be reconfigured so as to avoid or minimize infringement of [Unocal's] patents" are "substantial patent law issues" that the Complaint raises yet lie beyond Commission jurisdiction. ID at 69. Unocal supports the Initial Decision's analysis and urges that "this matter may only be brought, if at all, in a federal district court which has original jurisdiction over patent questions." Unocal Brief at 52. As discussed below, the ALJ and Unocal err through an unduly narrow reading of the FTC Act; an overly broad reading of the statute that confers patent law jurisdiction upon the federal courts; and a fundamental misinterpretation of the nature of the Commission's inquiry when patents are among the relevant assets of firms alleged to have unlawfully created or exercised market power.

A. The FTC Act Confers Broad Jurisdiction

The FTC Act confers broad power to prevent unfair methods of competition. Congress had "an abiding purpose to vest both the Commission and the courts with adequate powers to hit at every trade practice, then existing or thereafter contrived, which restrained competition or might lead to such restraint if not stopped in its incipient stages." *FTC v. Cement Institute*, 333 U.S. 683, 693 (1948). The ALJ and Unocal misread congressional intent in arguing that the lack of express language relating to patent questions evinces an intent to limit the FTC's role. Rather, the Supreme Court explains that the statutory prohibition of "unfair methods of competition" confers a "broad delegation of power" to the FTC: Congress "intentionally left development of the term 'unfair' to the Commission rather than attempting to define the many and variable unfair practices which prevail in commerce." *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 367 (1965) (internal quotation omitted).[94]

---

[94] *See also FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 240 (1972), *citing* S. Rep. No. 597, 63d Cong., 2d Sess.13 (1914) (explaining that a general declaration condemning unfair practices was preferable to an effort to enumerate them because "after writing 20 of them into the law it would be quite possible to invent others"), *and* H.R. Conf. Rep. No. 1142, 63rd Cong., 2d Sess. 19 (1914) ("There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again.").

Congress certainly was aware that antitrust and unfair competition cases could involve patent issues,[95] yet neither the ALJ nor Unocal identify anything in the statute or legislative history suggesting the claimed jurisdictional limit. As several provisions in the FTC Act demonstrate,[96] when Congress wishes to limit FTC jurisdiction, it knows how to do so. Given Congress' purpose to empower the Commission broadly and its deliberate choice to avoid enumerating specific suspect practices, no jurisdictional constraint should be implied.

Indeed, both the Commission and the federal courts have reached this conclusion before. In *American Cyanamid Co.*, 63 F.T.C. 1747, 1855-57 (1963), the Commission expressly found that it had jurisdiction over allegations of unfair methods of competition that were based on a substantial issue of patent law. Although the appeals court vacated the Commission's opinion on other grounds, it affirmed the jurisdictional finding: "The Federal Trade Commission Act contains no statutory exemption of Patent Office proceedings, and we find nothing in the Act indicating any intention to set aside the Patent Office as a 'city of refuge.' " *American Cyanamid Co. v. FTC*, 363 F.2d 757, 771 (6th Cir. 1966).

The issue in *American Cyanamid* – inequitable conduct before the Patent Office – did not involve the scope or infringement of a patent, but the Initial Decision errs in distinguishing its jurisdictional findings on that basis. *See* ID at 65-66 (concluding that resolution of allegations in the Complaint "goes far beyond what was required in *American Cyanamid*"). The U.S. Court of Appeals for the Federal Circuit has ruled that issues of patent enforceability (which include inequitable conduct), just like issues of patent validity and infringement, are substantial issues of patent law for purposes of jurisdictional determinations. *See Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1330-31 (Fed. Cir. 1998) ("We see no reason why our jurisdictional jurisprudence should distinguish [validity and enforceability] from [infringement]"), *cert. denied*, 525 U.S. 1143 (1999), *overruled in part on other grounds, Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999). The ALJ has drawn a distinction without a difference, and *American Cyanamid*'s conclusion that the FTC Act reaches unfair methods of competition that involve patent issues applies equally to this case.

---

[95]  A catalog of antitrust/unfair competition cases compiled while Congress considered and passed the FTC and Clayton Acts in 1914 includes substantial discussion of patent-related cases. *See, e.g.*, JOSEPH E. DAVIES, BUREAU OF CORPORATIONS, TRUST LAWS AND UNFAIR COMPETITION at LI, 115-17, 389-94, 471-72, 495 (1915) (citing cases dealing with the terms under which patent rights may be licensed or involving bad faith threats of infringement suits directed at customers or distributors of competitors).

[96]  *See, e.g.*, 15 U.S.C.§ 44 (exempting from FTC jurisdiction the activities of firms not organized to carry on business for profit), § 45(a)(2) (exempting from FTC jurisdiction banks, savings and loan institutions, meat packers, certain common carriers, and air carriers), and § 46 (exempting from FTC investigatory authority "the business of insurance").

B.  Section 1338(a) is Inapplicable on its Face

Finding no basis in the FTC Act for limiting the Commission's jurisdiction, the ALJ and Unocal rely heavily on the statute that vests federal district courts with jurisdiction over patent matters, 28 U.S.C. § 1338(a).  Section 1338(a) provides:

> The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks.  Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

The Initial Decision treats this case as arising under the patent laws and concludes that § 1338(a) vests exclusive jurisdiction in the federal district courts and thereby precludes jurisdiction within the FTC.  ID at 63.  It is apparent, however, from its very face that § 1338(a) has no bearing on Commission jurisdiction:  this proceeding is not a "civil action"; the FTC is not one of the "courts of the states"; and this proceeding does not "aris[e] under" a patent statute.

1.  This Proceeding is not a Civil Action

The Commission's adjudicatory actions are "proceedings," not the "civil action[s]" referenced in § 1338(a).  *See Pepsico, Inc. v. FTC*, 472 F.2d 179, 184 (2d Cir. 1972) (distinguishing a Commission proceeding from a civil action), *cert. denied*, 414 U.S. 876 (1973).  The FTC Act carefully distinguishes between "proceedings" before the Commission and "civil actions" before federal district courts.[97]  Section 1338(a) deals only with civil actions, and the present administrative *proceeding* falls entirely outside its coverage.

2.  Jurisdiction exclusive of the "courts of the states" is not exclusive of the FTC

Nor does § 1338(a)'s grant of jurisdiction "exclusive of the courts of the states" pertain to the Commission.  The FTC is a federal administrative agency, not a court of a state.  Indeed, by insisting that § 1338(a) excludes FTC jurisdiction notwithstanding that statute's clearly limited language, the ALJ disregards a prior Commission holding.  In *American Cyanamid*, the Commission squarely held that "no inference can be drawn from the statute [§ 1338(a)] that Congress made federal court jurisdiction of actions arising under patent laws exclusive of this Commission as well as state courts."  63 F.T.C. at 1856.  As an appellate court explains, "Simple logic dictates that because federal courts have jurisdiction exclusive of the states provides no help in deciding whether their jurisdiction is also exclusive of an administrative proceeding within the

---

[97]  *Compare* 15 U.S.C. § 45(b) (authorizing the Commission to conduct an administrative "proceeding" when it has reason to believe that a person has engaged in unfair methods of competition) with 15 U.S.C. § 45(m) (authorizing the Commission to commence a "civil action . . . in a district court of the United States" to obtain civil penalties for violations of the Commission's rules and orders).

executive branch."[98]

Relying on rhetoric to supply what the words of the statute do not, the ALJ warned that unless § 1338(a) were read to exclude more than the courts of the states, "tax courts, the Court of Claims, etc." would be able to decide patent cases. ID at 63. As even Unocal acknowledges, Unocal Brief at 57, however, the Court of Claims *does* have jurisdiction over patent claims, see 28 U.S.C. § 1498(a), and the U.S. Tax Court *does* consider factors such as "the scope of the patents, the potential availability of noninfringing substitutes, the potential for litigation over the validity of the patents, and how such matters might affect the royalty rate that would be set by parties bargaining at arm's length" in forming a judgment about reasonable arm's-length consideration.[99]

Unocal would overcome the clear words of the statute with the assertion that FTC jurisdiction would undermine congressional goals of uniform enforcement of the patent laws. The answer here is the same that the Supreme Court recently gave in refusing to confer exclusive appellate jurisdiction on the Federal Circuit whenever there is a patent-law counterclaim: "Our task here is not to determine what would further Congress's goal of ensuring patent-law uniformity, but to determine what the words of the statute must fairly be understood to mean." *Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.*, 535 U.S. 826, 833 (2002). Here, the grant of jurisdiction "exclusive of the courts of the states" cannot fairly be understood to mean "exclusive of the Federal Trade Commission."

### 3. This case does not "arise under" the patent laws

Another reason for our finding that § 1338(a) is inapplicable is that this proceeding does not "aris[e] under any Act of Congress relating to patents." According to the Supreme Court, a case arises under the patent laws only when a "well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 808-09 (1988). The ALJ and Unocal assert that this proceeding depends on resolution of substantial questions of patent law.[100] The Court tells us, however, that "a claim supported by

---

[98] *Miss America Org. v. Mattel, Inc.*, 945 F.2d 536, 541 (2d Cir. 1991) (involving activities of the Treasury Department and the U.S. Customs Service).

[99] *See Podd v. Commissioner*, 75 T.C.M. (CCH) 2575 (1998).

[100] The nature of this dependence has been something of a moving target. Unocal's motion to dismiss argued that establishing market power and defining markets required patent construction and infringement determinations. *See, e.g.,* Unocal's Motion for Dismissal of the Complaint and Memorandum in Support for Failure to Make Sufficient Allegations that Respondent Possesses or Dangerously Threatens to Possess Market Power at 8-10, 12-15 ("Unocal's Market Power Motion"). The Initial Decision focused on the allegations involving communications to Auto/Oil and WSPA and concluded that demonstrating harm to their

alternative theories in the complaint may not form the basis for § 1338(a) jurisdiction unless patent law is essential to each of those theories." *Id.* at 810.

Here there are alternative theories that do not require resolution – or necessarily even consideration – of issues regarding patent construction or infringement. Misrepresentation might be established by comparing Unocal's conduct in creating the allegedly false and misleading impression that it would not enforce any patent rights with its subsequent enforcement activities. *See, e.g.,* Complaint, ¶¶ 2-4, 9, 42, 58, 66-72, 77-78, 82-83, and 85. Market power and competitive harm might be established through the course of dealing among Unocal and third parties, as reflected by Unocal's licensing activities and the responses of third parties to Unocal's threats and suits.[101] The findings of the federal courts regarding third-party infringement of one of Unocal's RFG patents might supplement these inquiries. *See, e.g.,* ¶¶ 9, 68-70. Under *Christianson*, the fact that the claims are supported by theories that do not require resolution of substantial questions of patent law demonstrates that this proceeding does not arise under the patent laws.

C. Assessment of Likely Competitive Effects Does Not Require Resolving Patent Issues

The ALJ/Unocal jurisdictional arguments falter on one further ground: the assessment of likely competitive effects in this case will not require actual resolution of substantial questions of patent law. In assessing market power and competitive harm, the FTC determines only likelihoods. It does not resolve patent questions in the sense at issue in *Christianson* and § 1338(a), but only reaches conclusions regarding how they likely would be resolved. Actual rulings on construction and infringement, of course, remain with the courts.

We need look no farther than Unocal's own brief for illustrative examples. In one cite, Unocal provides the parenthetical "ITC may not award infringement damages, which 'may only be

---

participants requires proof of infringement. ID at 61-62, 64, 69. On appeal Unocal recasts the issue, contending now that "the Complaint's fraud allegations necessarily require a determination of what Unocal did and did not patent as well as a claim construction and infringement analysis," and that proof of harm requires construing Unocal's patents and determining their scope and the infringing or noninfringing status of alternatives. Unocal Brief at 52-54.

[101] *See, e.g.,* ¶¶ 8-9, 14, 68-72, 95. Unocal does not raise on appeal its prior contention that market definition requires determining the scope of its patents. In any case, Paragraph 74 of the Complaint, which defines a technology market, merely identifies the relevant Unocal technology by reference to Unocal's RFG patent claims. It requires inclusion of alternatives to that technology, but no infringement determinations. The question of which alternatives compete with Unocal's technologies is a familiar question in antitrust law, not a substantial question of patent law.

provided by the United States District Courts . . . .' "[102] Of course, the FTC has no intention of "award[ing] infringement damages." We may conclude that certain technologies are likely to infringe and therefore may not provide a significant competitive check on whatever market power Unocal may possess, but this does not find infringement. Similarly, another Unocal parenthetical describes a case as "explaining ITC's lack of jurisdiction to render binding legal conclusions on validity, given district court's original jurisdiction under § 1338."[103] Again, nothing the FTC will do in this case will constitute a "binding legal conclusion" of either validity or invalidity.

In fact, the specific portion of the Complaint that the Initial Decision dismissed for want of jurisdiction on its very face deals with likelihoods. It alleges that participants in Auto/Oil and WSPA would have taken actions "incorporating knowledge of Unocal's *pending* patent rights in their capital investment and refinery reconfiguration decisions to avoid and/or minimize *potential* infringement." ¶ 90(c) (emphasis added). There is no hint of reliance on definitive claim construction or infringement rulings, but rather an allegation based upon patent rights that remained in prosecution, infringement that remained potential, and competitive harms that entail an assessment of likelihoods. This is not an inquiry that requires resolution of substantial questions of patent law.

## VIII. INSTRUCTIONS ON REMAND AND CONCLUSION

We reverse and vacate the Initial Decision. Neither the *Noerr-Pennington* doctrine nor the claimed absence of FTC jurisdiction provides an adequate basis for Unocal's motions to dismiss. The *Noerr-Pennington* claims cannot be sustained if the Complaint's allegations are taken as established. The jurisdictional argument is flawed as a matter of law.

This proceeding now requires factual development, and we remand for that purpose. The ALJ's deadline for filing motions for summary decision passed before the Initial Decision was issued, and we expect that the proceeding will now move quickly to the adjudicatory hearing.[104] The Administrative Law Judge should conduct appropriate proceedings for resolving disputed facts

---

[102]  Unocal Brief at 61, *citing Bio-Technology General Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1564 (Fed. Cir.), *cert. denied*, 519 U.S. 911 (1996).

[103]  Unocal Brief at 61, *citing In re Convertible Rowing Exerciser Patent Litigation*, 814 F. Supp. 1197, 1206-07 (D. Del. 1993).

[104]  *See* Scheduling Order at 2 (April 9, 2003) (establishing September 19, 2003 as the deadline for "motions for summary decision"). Although the ALJ denied portions of Unocal's Market Power Motion without prejudice, large portions of that motion rely upon the claimed limits on FTC jurisdiction that this opinion rejects. *See* Unocal Market Power Motion at 2, 8-10, 15 (explaining how the market power arguments rely on the asserted absence of jurisdiction). In light of the many months that this proceeding already has been delayed, we urge the ALJ to resolve arguments regarding the surviving portions of Unocal's Market Power Motion, if any, without delay of the adjudicatory hearing.

and substantiating or rejecting the allegations of the Complaint. Unocal, of course, may raise all appropriate defenses, including any renewed arguments concerning *Noerr-Pennington* protections, based on the forthcoming factual record.

If Unocal continues to assert *Noerr-Pennington* protection, the ALJ will need to resolve any relevant, disputed facts regarding the context of CARB's proceeding and the nature of Unocal's alleged misrepresentations/omissions. In addition to determining the specific content and contextual significance of the communications/omissions relied upon by Complaint Counsel, the ALJ's inquiry should include, without limitation, consideration of:

- CARB's expectations of truthful representation, focusing, *inter alia*, on: the governing procedures, the nature of the issues and information involved, CARB's fact-finding process and the extent of its dependence on industry research and knowledge, and the course of dealing between CARB and Unocal with regard to the subject matter of the communications;

- the degree of CARB's discretion in light of relevant statutory standards, required reliance on an evidentiary record, and the presence of judicial review;

- the extent of CARB's dependence on Unocal for information regarding its patent applications and its intentions with regard to enforcing its patent rights;

- the ability to determine the effect of the misrepresentations on CARB's decision; and

- the extent to which any relevant misrepresentation/omission was deliberate, factually verifiable, and central to the outcome of CARB's proceeding.

From the totality of the circumstances revealed by the fact-finding, the ALJ should draw conclusions of law pursuant to the framework of analysis described in Sections IV and V above. If the ALJ determines that *Noerr-Pennington* protects Unocal's communications with CARB, he must also determine whether the facts establish *Noerr-Pennington* protection for Unocal's communications to Auto/Oil and WSPA, pursuant to the principles articulated in Section VI.

Thorough and careful analysis of these questions should greatly facilitate the Commission's ultimate resolution of this case. The Commission retains the responsibility to decide both legal and factual questions in administrative litigation. *See* 16 C.F.R. § 3.54(a) (2002); *Amrep Corp.*, 102 F.T.C. 1362, 1670 (1983) ("the Commission, not the ALJ, has the ultimate responsibility for finding of facts").[105] Ideally, an Initial Decision will reflect the ALJ's reasoned, independent

---

[105] *See also Schering Plough* Corp., Docket No. 9297, slip op. at 8 (F.T.C. Dec. 18, 2003) ("The Commission may review *de novo* both the factual findings and the legal conclusions of the Administrative Law Judge. 16 C.F.R. § 3.54(a). This *de novo* review includes findings on the credibility of witnesses.") (footnote omitted), *petition for review docketed*, No. 04-10688-AA (11ᵗʰ Cir. Feb. 13, 2004); *R. R. Donnelley & Sons Co.*, 120 F.T.C. 36, 137 (1995) ("The

-55-

marshaling of the record, with appropriate findings of fact and conclusions of law, so that the Commission can assess the evidence and bring this complex matter to a timely close.

Depending on the factual record to be developed, Unocal may or may not be subjecting competitors and consumers to massive, anticompetitive royalties and increases in the price of gasoline based on an exercise of unlawfully obtained market power. It is unfortunate that an erroneous Initial Decision has substantially delayed development of that record. It is now time for the ALJ assiduously to assemble the facts and compile a record necessary and sufficient for resolving the underlying issues.

---

Commission reviews this matter *de novo.*"). *See generally Hernandez v. National Transp. Safety Bd.*, 15 F.3d 157, 158 (10th Cir. 1994) (explaining that the Board serves as the ultimate finder of fact, even with respect to credibility determinations).

# EXHIBIT Y