UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BROADCOM CORPORATION,

                              Plaintiff,

            v.

QUALCOMM INCORPORATED,

                              Defendant.

Civil Action No.  05-3350 (MLC)


Return Date: February 6, 2006
Oral Argument Requested


## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS



McCARTER & ENGLISH LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant*
*QUALCOMM Incorporated*

January 30, 2006

## Table of Contents

Page

Table of Authorities ................................................................................................. iii

Citation Conventions ................................................................................................ vi

Preliminary Statement .............................................................................................. 1

Argument .................................................................................................................... 2

I.    Broadcom Does Not State a Claim for "Monopolization of Markets For WCDMA Technology" (Count I) ............................................................................... 2

    A.    Broadcom's Monopolization Claim is Legally Unsupported. .................................. 2

    B.    The Complaint Does Not Allege Any Unlawful Acquisition Of Monopoly Power. ....................................................................................................................... 5

    C.    Broadcom Does Not Properly Plead Fraud on the SDOs. ...................................... 7

II.    Broadcom Does Not Plead Viable Claims Related to the "Market for UMTS Chipsets" (Counts II-VI) .................................................................................... 9

    A.    Broadcom Has Not Suffered "Antitrust Injury" in the Alleged UMTS Chipset Market (Counts II-VI) ................................................................................ 9

        1.    Broadcom's alleged injury was not caused by anticompetitive conduct. .... 9

        2.    Broadcom has not alleged that QUALCOMM's licensing policies have harmed competition in the alleged UMTS chipset market. ....................... 11

    B.    Broadcom Does Not State a Claim for Attempted Monopolization of the Alleged UMTS Chipset Market (Count II). ......................................................... 11

    C.    Broadcom Does Not State Claims for "Exclusive Dealing" (Counts III and V) ................................................................................................. 14

    D.    Broadcom Does Not State Claims For Tying (Counts IV and VI). ...................... 14

III.    Broadcom Does Not Have Standing to Bring Claims Related to the Alleged 3G CDMA Chipset and Technology Markets or to Challenge QUALCOMM's Acquisition of Flarion (Counts VII-VIII). ........................................................... 16

    A.    Broadcom Lacks Standing to Bring Claims Related to Any Alleged CDMA Market (Count VII). ................................................................................... 16

Page

    B.    Broadcom Lacks Standing to Bring a Section 7 Claim Related to the Flarion Acquisition (Count VIII)............................................................................18

IV.    Broadcom's State Law Claims Should be Dismissed (Counts IX-XIII). .........................20

Conclusion ....................................................................................................................................20

## Table of Authorities

Page(s)

**Cases**

Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988)................................... 3, 5

B. Braun Medical, Inc. v. Abbott Laboratories, 124 F.3d 1419 (Fed. Cir. 1997)......................... 10

Bright v. Westmoreland County, 380 F.3d 729 (3d Cir. 2004) ...................................................... 14

Bristol Tech. v. Microsoft Corp., 42 F. Supp. 2d 153 (D. Conn. 1998) ........................................ 18

Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101 (7th Cir. 1984) ..................................... 11, 13

Cargill v. Monfort, Inc., 479 U.S. 104 (1986) .............................................................................. 19

Carpet Group Int'l v. Oriental Rug Importers Ass'n, 227 F.3d 62 (3d Cir. 2000) ....................... 17

City of Pittsburgh v. West Penn Power Co., 147 F.3d 256 (3d Cir. 1998)......................... 7, 19, 20

DiscoVision Associates v. Disc Manufacturing, Inc., 42 U.S.P.Q. 2d 1749
    (D. Del. 1997) .......................................................................................................................... 15

E.I. du Pont de Nemours & Co. v. FTC, 729 F.2d 128 (2d Cir. 1984).......................................... 3

Fineman v. Armstrong World Indus., Inc., 980 F.2d 171 (3d Cir. 1992)..................................... 13

Fresh Made, Inc. v. Lifeway Foods, Inc., No. Civ.A. 01-4254,
    2002 WL 31246922 (E.D. Pa. Aug. 9, 2002) ........................................................................... 11

H.J., Inc. v. Int'l Tel. & Tel. Corp., 867 F.2d 1531 (8th Cir. 1989) ............................................ 13

Image Technical Servs. v. Eastman Kodak Co., 125 F.3d 1195 (9th Cir. 1997)......................... 10

In re Dell Computer Corp., 121 F.T.C. 616 (1996) ................................................................... 3, 5

In re Independent Service Orgs. Antitrust Litig., 203 F.3d 1322 (Fed. Cir. 2000)................... 9, 10

In re Microsoft Corp. Antitrust Litig., No. MDL 1332, Civ. JFM-05-1087, 2005
    WL 1398643 (D. Md. June 10, 2005)....................................................................................... 18

In re Rambus Inc., No. 9302 (F.T.C. Feb. 23, 2004), available at
    http://www.ftc.gov/os/adjpro/d9302/040223initialdecision.pdf........................................ 3, 4, 5

In re Union Oil Co., No. 9305, 2004 WL 1632816 (F.T.C. July 6, 2004), available
    at http://www.ftc.gov/os/adjpro/d9305/040706commissionopinion.pdf .................................... 5

iii

Page(s)

Intergraph Corp. v. Intel Corp., 195 F.3d 1346 (Fed. Cir. 1999)................................................... 10

J.L. Terrel's v. Sherwin-Williams Automotive Finishes Corp.,
    No. Civ.A.02-CV-2645, 2004 WL 870705 (E.D. Pa. March 30, 2004) ................................... 11

Lum v. Bank of America, 361 F.3d 217 (3d Cir. 2004) .......................................................... 7, 8

Medtronic AVE, Inc. v. Boston Scientific Corp., No. CIV. A. 98-478-SLR., 2001
    WL 652016 (D. Del. March 30, 2001) .................................................................................. 13

Morse v. Lower Merion School Dist., 132 F.3d 902 (3d Cir. 1997) ........................................ 7

Rambus, Inc. v. Infineon Techs. AG, 304 F. Supp. 2d 812 (E.D. Va. 2004) ................................ 4

Rambus, Inc. v. Infineon Techs. AG, 330 F. Supp. 2d 679 (E.D. Va. 2004) ................................ 4

Sansom Comm. v. Lynn, 366 F. Supp. 1271 (E.D. Pa. 1973) ...................................................... 11

Schor v. Abbott Labs., 378 F. Supp. 2d 850 (N.D. Ill. 2005)...................................................... 10

SCM Corp. v. Xerox Corp., 645 F.2d 1195 (2d Cir. 1981) ......................................................... 6

Sheet Metal Duct, Inc. v. Lindab, Inc., No. Civ. A. 99-6299, 2000 WL 987865
    (E.D. Pa. July 18, 2000)........................................................................................................ 6

SmithKline Corp. v. Eli Lilly & Co., 427 F. Supp. 1089 (E.D. Pa. 1976) ................................. 15

SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056 (3d Cir. 1978)..................................... 14, 15

Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447 (1993)................................................... 12, 13

Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320 (1961) .................................................... 14

Townshend v. Rockwell Int'l Corp., No. C99-0400SBA, 2000 WL 433505 (N.D.
    Cal. March 28, 2000) .................................................................................................. 1, 2, 3, 6

Twin City Sportservice v. Charles O. Finley & Co., 676 F.2d 1291 (9th Cir. 1982).................. 13

United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377 (1956)....................................... 5

United States v. E.I. du Pont de Nemours & Co., 366 US. 316 (1961)........................................ 5

United States v. Microsoft, 253 F.3d 34 (D.C. Cir. 2001)................................................... 10, 17

Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398
    (2004)................................................................................................................................. 5, 7

iv

Page(s)

<u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 395 U.S. 100 (1969)......................................... 10

**Statutes and Rules**

35 U.S.C. § 271.................................................................................................................... 6

Fed. R. Evid. 401 .............................................................................................................. 12

**Other Authorities**

Brief for Appellee, <u>SmithKline Corp. v. Eli Lilly & Co.</u>, 575 F.2d 1056 (3d Cir.
  1978) (No. 77-1232) ...................................................................................................... 15

Philip E. Areeda, Einer Elhauge & Herbert Hovenkamp, Antitrust Law (2002) .................. 13, 18

R. Hewitt Pate, U.S. D.O.J., Competition and Intellectual Property in the U.S.:
  Licensing Freedom and the Limits of Antitrust (June 5, 2005), <u>available at</u>
  2005 WL 2030878 ........................................................................................................... 8

Stipulation of Dismissal with Prejudice, <u>Rambus, Inc. v. Infineon Techs. AG</u>, No.
  00CV524 (E.D. Va. March 21, 2005)................................................................................ 4

**<u>Citation Conventions</u>**

- Citations in the form "¶ __." are to the First Amended Complaint filed on September 19, 2005 (the "Complaint").

- Citations to "QBr." are to QUALCOMM's Memorandum in Support of Defendant's Motion to Dismiss, dated December 9, 2005.

- Citations to "BBr." are to Broadcom's Opposition to Defendant's Motion to Dismiss, dated February 6, 2006.

- Citations to "Gonell Ex. __." are to exhibits attached to the January 30, 2006 Declaration of Fabian D. Gonell, submitted herewith.

**Preliminary Statement**

Fundamentally, Broadcom's "grievance" in this case stems from the fact that QUALCOMM engineers invented essential technology necessary for advanced cell phone communications. QUALCOMM owns the patents to that technology. Broadcom, finding that it needs a license to those patents, but not liking the terms that have been offered, decided to sue. The question presented by this motion is whether this set of facts presents a cognizable basis for Broadcom's claims. The clear answer, we respectfully submit, is no.

Neither Broadcom's claims, nor the arguments in its opposition brief, withstand scrutiny. Broadcom's claim for monopolization (Count I), purportedly by QUALCOMM's making of fraudulent promises to license its patents on FRAND terms, is wholly unsupported in law. The only case brought on a similar theory, Townshend v. Rockwell Int'l Corp., No. C99-0400SBA, 2000 WL 433505 (N.D. Cal. March 28, 2000), resulted in a resounding dismissal of the Sherman Act claims. In any event, no antitrust claim lies for a patentee's unilateral exercise of its lawful patent rights (which is all that is alleged here), and Broadcom's allegations relating to FRAND obligations are insufficient to state a claim of fraud.

Each of Broadcom's claims pertaining to the alleged "UMTS chipset market" (Counts II-VI) fails for lack of any antitrust injury. Broadcom concedes that its sole alleged "injury" is exclusion of its products from the "UMTS chipset market". But, lacking a license to QUALCOMM's patents, Broadcom does not have legal right to sell such products. Accordingly, it has no "injury" recognized by the antitrust laws. Each of these claims also fails for other reasons discussed in QUALCOMM's opening brief and below.

Broadcom's claim with respect to the alleged "3G CDMA" markets (Count VII) should be dismissed for lack of antitrust standing, because Broadcom is not a participant in any such markets. Broadcom's attempt in its opposition brief to link its participation in the "UMTS

chipset market" to the allegedly separate "3G CDMA" markets should be rejected, as it is wholly inconsistent with the allegations of the Complaint. Similarly, the allegations regarding future "B3G and 4G technology markets" (Count VIII) are too speculative to confer antitrust standing, and Broadcom's attempt to repair this defect in its brief is inconsistent with its Complaint.

Lastly, Broadcom's state-law claims (Counts IX-XIII) should be dismissed for the reasons stated in QUALCOMM's opening brief (Broadcom's response not warranting further comment within the confines of this brief).

For the reasons stated in QUALCOMM's opening brief and further elaborated below, Broadcom's complaint should be dismissed.

<u>**Argument**</u>

## I.    BROADCOM DOES NOT STATE A CLAIM FOR "MONOPOLIZATION OF MARKETS FOR WCDMA TECHNOLOGY" (COUNT I).

Broadcom's sole claim for monopolization is that QUALCOMM willfully acquired monopoly power in the "WCDMA technology markets" – allegedly, by falsely promising that it would license its essential WCDMA patents on FRAND terms. (¶¶ 82, 84-85, 140.) This claim suffers from fatal legal and logical flaws.

### A.    Broadcom's Monopolization Claim is Legally Unsupported.

Despite Broadcom's efforts to clothe its claim with the appearance of legitimacy (BBr. at 13-15), the fact is that no court has held a party liable on the novel, FRAND-based antitrust theory that Broadcom alleges here.

In the only case concerning claims similar to Broadcom's, <u>Townshend v. Rockwell Int'l Corp.</u>, No. C99-0400SBA, 2000 WL 433505 (N.D. Cal. March 28, 2000), the court dismissed the antitrust claims out of hand. In <u>Townshend</u>, Conexant brought counterclaims under Sections 1 and 2 of the Sherman Act against 3Com and Townshend. Conexant accused 3Com and Townshend of anticompetitive conduct in connection with their lobbying of the International

2

Telecommunications Union to include Townshend's patented technology in a standard for 56K

modems together with 3Com's and Townshend's licensing practices.  The court dismissed both

the Section 1 claim and the Section 2 claim for, inter alia, failure to state any antitrust injury.  Id.

at *8, *13-14.  Consistent with our argument here, the court held that no cognizable antitrust

injury flowed from Townshend's exercise of his patent rights.  Id.[1]

       Broadcom's heavy reliance on certain claims brought against Rambus (BBr. at 14-

15) fails.  The only decision on the merits of these claims is that of the FTC Administrative Law

Judge in Rambus III[2] dismissing the FTC's claims.  The FTC complaint alleged monopolization of

exactly the type of "technology markets" pled by Broadcom in this case, but was based on

different alleged conduct – a failure to disclose patent applications during the standardization

process.  See id. at 2; see also id. at 250 (discussing market definition).  The FTC's complaint

counsel argued that the failure to disclose was anticompetitive under the antitrust laws because it

violated a duty to act in "good faith" in the standards-setting process.  Id. at 255.  After surveying

the law in the area – including Townshend, Dell,[3] and Allied Tube,[4] – the ALJ found no support

for this theory:

> "No case has been cited to or was found holding that Section 5 of the FTC Act[5]
> imposes a duty upon corporations that participate in standard setting organizations
> to comply with the rules of the standard setting organizations, to disclose their

---

[1] Broadcom's assertion that the Townshend court declined to dismiss the Section 1 antitrust claim in that case is wrong.  Id. at *8.

[2] In re Rambus Inc., No. 9302 (F.T.C. Feb. 23, 2004), available at http://www.ftc.gov/os/adjpro/d9302/040223initialdecision.pdf (Gonell Ex. 1.)

[3] In re Dell Computer Corp., 121 F.T.C. 616 (1996) (cited in BBr. at 15).

[4] Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988) (cited in BBr. at 4, 14, 32).

[5] Section 5 of the FTC Act takes action against not only violations of the antitrust laws, but also "conduct which, although not a violation of the letter of the antitrust laws, is close to a violation or is contrary to their spirit."  E.I. du Pont de Nemours & Co. v. FTC, 729 F.2d 128, 136-37 (2d Cir. 1984).  Thus, conduct that does not violate the FTC act a fortiori does not violate the antitrust laws.

patent applications, or to act in good faith towards other members. . . . [N]o such duty is created by the provisions of the FTC Act." <u>Rambus III</u>, at 258 (footnote added).

The ALJ found against the complaint counsel, dismissing the action for a host of reasons.

Broadcom's reliance on the district court decisions in the private litigation against Rambus (which was based on the same facts as the FTC action) is misplaced.  The decision in <u>Rambus, Inc. v. Infineon Techs. AG</u>, 304 F. Supp. 2d 812 (E.D. Va. 2004) ("<u>Rambus I</u>"), considered only whether to grant leave to add a claim under California's unfair competition law, and the court expressly noted that "the substantive merits of a proposed claim are typically best left for later resolution, <u>e.g.</u>, <u>under motions to dismiss</u> or for summary judgment". <u>Id.</u> at 819 (emphasis added).  The second decision, <u>Rambus, Inc. v. Infineon Techs. AG</u>, 330 F. Supp. 2d 679 (E.D. Va. 2004) ("<u>Rambus II</u>"), resolved a motion <u>in</u> <u>limine</u>, which the court denied.  <u>Id.</u> at 699. The court expressly declined to reach the merits of Infineon's claims, holding that is was "too late" to raise summary judgment motions on the merits.  <u>Id.</u> at 693 n.21.  Both of these decisions were preliminary in nature.  There was no final disposition on the merits, as the case settled.  <u>See</u> Stipulation of Dismissal with Prejudice, <u>Rambus, Inc. v. Infineon Techs. AG</u>, No. 00CV524 (E.D. Va. March 21, 2005) (Gonell Ex. 2).  Moreover, contrary to the suggestion in Broadcom's brief (at 14-15), neither of these decisions considered in any way an alleged promise to license on FRAND terms.  The claims against Rambus involved misappropriation of information and failure to disclose patent applications.

The non-disclosure theory in <u>Rambus</u> differs fundamentally from Broadcom's theory in the present case.  Here, there is no suggestion that either the SDOs or the companies participating in the SDOs – all sophisticated players in the wireless communications industry – were not well aware of QUALCOMM's essential patents prior to the adoption of the standard. With notice of the patents, the industry's players were able to – and did – negotiate license terms

with QUALCOMM.  Broadcom's claim is simply that those license terms are unfair.  We have found no case, nor has Broadcom cited any, in which a claim under Section 2 of the Sherman Act was sustained in such circumstances.[6]

      B.     <u>The Complaint Does Not Allege Any Unlawful Acquisition Of Monopoly Power.</u>

To state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must allege willful acquisition or maintenance of monopoly power in a relevant market.  <u>Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP</u>, 540 U.S. 398, 407 (2004).  This Broadcom has not done.

For purposes of its monopolization claim, Broadcom alleges an unspecified number of "WCDMA technology markets".  The Complaint expressly states as follows:  "The technology on which on [sic] each essential patent reads for the UMTS standard issued in the United States constitutes a relevant product market, collectively referred to as the WCDMA technology markets." (¶ 59.)  Thus, according to Broadcom, <u>each</u> individual technology is a separate market unto itself, governed by a corresponding QUALCOMM patent.

---

[6] <u>In re Union Oil Co.</u>, No. 9305 (F.T.C. July 6, 2004), <u>available at</u> http://www.ftc.gov/os/adjpro/d9305/040706commissionopinion.pdf ("<u>Unocal</u>"; Gonell Ex. 3), and <u>In re Dell</u>, 121 F. T. C. 616 (1996), are failure-to-disclose cases similar to the <u>Rambus</u> district court decisions and do not advance Broadcom's position.  Moreover, <u>Dell</u> is a consent decree, and, as such, has no precedential value.  <u>See United States v. E.I. du Pont de Nemours & Co.</u>, 366 US. 316, 331 n.12 (1961) ("the circumstances surrounding . . . negotiated [consent decrees] are so different that they cannot be persuasively cited in a litigation context"); <u>see</u> also <u>Rambus III</u>, at 257.  In addition, the <u>Unocal</u> decision is limited to the issue of whether certain standards-setting activity enjoyed <u>Noerr-Pennington</u> immunity.  <u>See Unocal</u> at 8-30.  <u>Allied Tube</u> (BBr. at 4, 14, 32) likewise considered only the issue of whether <u>Noerr-Pennington</u> immunity applied to standards-setting activity.  486 U.S. at 495.  The Supreme Court expressly declined to address whether the alleged conduct violated the Sherman Act.  <u>See id.</u> at 499 n.3, 509.  Even as to the <u>Noerr</u> issue, the Supreme Court limited <u>Allied Tube</u> to its facts, noting that its "holding is expressly limited to cases where an economically interested party exercises decisionmaking authority in formulating a product standard" – which is not the situation here.  <u>Id.</u> at 510 n.13.  <u>See also Rambus III</u> at 256 ("<u>Allied Tube</u> cannot be read to hold that violation of a standard setting organization's rules or policies forms a basis for antitrust liability.").

"Monopoly power is the power to control prices or exclude competition" in the relevant market. United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956).  To the extent that QUALCOMM has such power in the alleged WCDMA technology markets, that power derives solely from its patents.

As we pointed out in our opening brief (QBr. at 12-13), there is no allegation in the Complaint that QUALCOMM's patents were unlawfully obtained.  Broadcom's opposition does not dispute this.  The mere fact of owning a lawfully obtained patent is simply not willful acquisition or maintenance of monopoly power.  See SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1206 (2d Cir. 1981); Sheet Metal Duct, Inc. v. Lindab, Inc., No. CIV. A. 99-6299, 2000 WL 987865, at *6 (E.D. Pa. July 18, 2000) ("the very purpose of a patent is precisely to give a monopoly to the inventor for a finite time, and there can be no liability under the antitrust laws for the existence or maintenance of this statutory monopoly").  Indeed, the essence of a patent is the lawful right to exclude others from using the patented invention.  See 35 U.S.C. § 271.

Broadcom emphasizes the fact that QUALCOMM's patented technologies were included in the UMTS standard, claiming that this inclusion gave QUALCOMM monopoly power.  However, while inclusion of a technology in an industry standard may make that technology commercially important, the act of standardization does not give anyone exclusionary power – the patent does.  Townshend, 2000 WL 433505, at *12 ("The adoption of a[n] industry standard incorporating such proprietary technology does not confer any power to exclude that exceeds the exclusionary power to which a patent holder is otherwise [legally] entitled").

By way of illustration, suppose that technology T is adopted to perform function F in a standard.  If T is unpatented, any manufacturer may use that technology, and no one has the power to exclude anyone else from using it.  If, instead, T is patented, then the owner of the patent on T would have the power to exclude others from using T.  It is the patent, not the fact of

standardization, that provides exclusivity.[7]  Because antitrust liability may not be premised on a

party's unilateral exercise of its patent rights, Broadcom's monopolization claim should be

dismissed.

      C.     <u>Broadcom Does Not Properly Plead Fraud on the SDOs.</u>

      As set forth in QUALCOMM's opening brief (at 13-17), Broadcom premises its

monopolization claim on allegations that QUALCOMM defrauded unspecified SDOs by falsely

promising to license its essential patents on FRAND terms.[8]  Under <u>Lum v. Bank of America</u>, 361

F.3d 217, 228-29 (3d Cir. 2004), Broadcom's assertions are untenable.

      The reasoning of <u>Lum</u> applies directly to the present case.  In <u>Lum</u>, the plaintiffs

assigned a particular meaning to the term "prime rate" and advanced fraud allegations on the

premise that Bank of America had acted inconsistently with plaintiffs' definition of the term.  As

the Third Circuit found, the plaintiffs were asserting "that this meaning is so universally accepted

that it is the *only* possible meaning and that a reasonable person could not understand the term to

mean anything else."  <u>Id</u>. at 226 (emphasis in original).  The court concluded, as a matter of law,

---

[7] Broadcom suggests that standardization precludes "inter-technology and inter-patent competition to provide the functionality at issue" (BBr. at 13) and that this can give rise to monopoly power.  However, Broadcom has not alleged that this happened with respect to any of the so-called WCDMA technology markets or, indeed, that there were any alternatives to even one of QUALCOMM's patented technologies.  If there were no viable alternatives, then QUALCOMM's position is the result of its superior technology and innovation.  In other words, even under Broadcom's theory, the Complaint does not allege facts that would show that QUALCOMM's supposed monopoly power in the alleged WCDMA technology markets is the result of "willful acquisition … as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident".  <u>Trinko</u>, 540 U.S. at 407.

Broadcom's attempt to cast this as a "factual question" (BBr. at 13) is meritless.  The Court need not assume that the plaintiff can prove facts that were not alleged in the complaint.  <u>City of Pittsburgh v. West Penn Power Co.</u>, 147 F.3d 256, 263 n.13 (3d Cir. 1998).  Nor must the Court credit "bald assertions" or accept "unwarranted inferences" when deciding a motion to dismiss.  <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d 902, 906 & n.8 (3d Cir. 1997).

[8] In its opposition, Broadcom tries to run away from the fraud allegations of the Complaint, arguing that it need not have pled fraud.  (BBr. at 17.)  This assertion is of no moment.  Broadcom based its monopolization claim on allegations of fraud, and the pleading must be evaluated accordingly.  <u>See</u> <u>Lum</u>, 361 F.3d at 228-29 (rejecting plaintiffs' attempt to evade the reach of Rule 9(b) by recharacterizing a fraud-based monopolization claim as a "conspiracy" claim).

that the term "prime rate" was susceptible of <u>multiple</u> reasonable meanings, and therefore could not support the plaintiffs' fraud claim.[9] <u>Id.</u> at 226-27.

Similarly, here Broadcom contends that the term FRAND has a meaning that is plain and universally accepted, so that, in view of QUALCOMM's actual patent licensing practices, its commitments to license on FRAND terms were fraudulent. Neither in its brief or in the Complaint, however, does Broadcom say what that meaning is. Moreover, as QUALCOMM demonstrated in its opening brief, SDOs expressly recognize that license terms will be based upon negotiations between patent owners and licensees, and accordingly FRAND cannot be said to have a single, "universally accepted meaning". (QBr. at 15-17.)[10] Thus, under <u>Lum</u>, a FRAND commitment cannot support a claim of fraud.[11]

For all the foregoing reasons, and those set forth in QUALCOMM's opening brief, Broadcom's monopolization claim should be dismissed.

---

[9] Broadcom's attempt to distinguish <u>Lum</u> on the theory that the bank's use of the term "prime rate" was in some instances "consistent" with its actions (BBr. at 49) is just wrong. The portion of the opinion to which Broadcom refers is expressly identified by the court as an "even if" argument. <u>Lum</u>, at 227. The court had already decided that the term "prime rate" could not support plaintiffs' fraud claim. <u>Id.</u> at 226-27.

[10] The DOJ speech cited by Broadcom acknowledges as much. <u>See</u> R. Hewitt Pate, U.S. D.O.J., Competition and Intellectual Property in the U.S.: Licensing Freedom and the Limits of Antitrust (June 5, 2005), <u>available at</u> 2005 WL 2030878, at *5 ("A difficulty of RAND, however, is that the parties tend to disagree later about what level of royalty rate is 'reasonable.'").

[11] Contrary to Broadcom's strawman arguments (BBr. at 5, 17, 18-19, 48-50), QUALCOMM's argument is not that any FRAND commitment is automatically "judicially unenforceable". The issue before this Court is whether FRAND can support a claim of fraud (or for antitrust violations based on fraud), which, under <u>Lum</u>, it cannot. Cases determining patent infringement damages (<u>see</u> BBr. at 18) are inapposite. The "reasonable royalty" standard is a multi-factor test used to measure damages, which simply has nothing to do with determining whether a number of licenses, considering all their terms and conditions, the circumstances of the individual licensees, and the give and take of negotiation, are "fair, reasonable and non-discriminatory".

II.  **BROADCOM DOES NOT PLEAD VIABLE CLAIMS RELATED TO THE "MARKET FOR UMTS CHIPSETS" (COUNTS II-VI).**

    A.  <u>Broadcom Has Not Suffered "Antitrust Injury" in the Alleged UMTS Chipset Market (Counts II-VI).</u>

As QUALCOMM established in its opening brief, Broadcom has not alleged that it suffered an antitrust injury in the alleged UMTS chipset markets.  (QBr. at 23-24.)  This failure is fatal to all of Broadcom's claims related to that market (Counts II-VI).

    1.  <u>Broadcom's alleged injury was not caused by anticompetitive conduct.</u>

Broadcom does not dispute that the reason it is "excluded" from the alleged UMTS chipset market is that it does not have a license to QUALCOMM's patents.  Moreover, Broadcom does not even address – much less distinguish – the cases cited by QUALCOMM establishing that a party that is excluded from a relevant market does not suffer antitrust injury if it could not lawfully enter that market in any event because, for example, it lacks a patent license.  (QBr. at 25.)  Instead, it attempts to avoid the effect of these cases by arguing that it was excluded not by monopoly power flowing from patents, but rather from standardization.  (BBr. at 20.)  This is the same argument Broadcom makes with respect to its monopolization claim, and it is meritless for the reasons stated in Part I, <u>supra</u>.

Because QUALCOMM's power to exclude stems from its patents, its exercise of that power to offer terms of its choosing to Broadcom cannot be held to be an anticompetitive act. The choice of terms on which to offer a license – indeed, the choice not to offer a license at all – is at the core of the rights granted by the patent laws, and therefore generally is immunized from antitrust liability.  <u>See</u> <u>In re Independent Service Orgs. Antitrust Litig.</u>, 203 F.3d 1322, 1326-27 (Fed. Cir. 2000) ("<u>ISO</u>"); <u>see also</u> QBr. at 19-22, 24-25.  The fact that Broadcom is excluded from practicing QUALCOMM's patented inventions cannot give rise to antitrust liability.  To the

contrary, courts have repeatedly recognized that patent holders do not violate the antitrust laws by unilaterally refusing to license or sell a patent.  See, e.g., ISO, 203 F.3d at 1326; QBr. at 20.[12]

Broadcom makes two arguments to the contrary, neither of which has merit.  First, Broadcom pretends that QUALCOMM is arguing "that because it has patents on its technology, any conduct that would otherwise be actionable as monopolization or attempted monopolization is automatically exonerated".  (BBr. at 2 (emphasis in original); see also id. at 3-4, 8-10.)  That is not our contention.  Rather, QUALCOMM argues that its unilateral exercise of patent rights cannot be a violation of the antitrust laws.  To that point Broadcom has no answer.[13]

Second, Broadcom mischaracterizes caselaw to suggest that a unilateral refusal to license a patent could violate the antitrust laws.  For example, it claims that the Supreme Court imposed liability for a "refusal to license" in Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100 (1969).  (BBr. at 8.)  Zenith, however, involved a conspiracy to exclude competitors in violation of Section 1 of the Sherman Act, and not a liability imposed for unilateral action under Section 2, as Broadcom implies.  395 U.S. at 104-06, 113 n.8.  Because there are no allegations of a Section 1 conspiracy here, Zenith is irrelevant.[14]

---

[12] In ISO, the Federal Circuit expressly considered and rejected the reasoning of Image Technical Servs. v. Eastman Kodak Co., 125 F.3d 1195 (9th Cir. 1997), upon which Broadcom relies (BBr. at 9).  ISO, 203 F.3d at 1326-28; see also Schor v. Abbott Labs., 378 F. Supp. 2d 850, 857-60 (N.D. Ill. 2005) (following ISO and rejecting the application of Image Technical Servs.).

[13] Thus, cases like United States v. Microsoft, 253 F.3d 34 (D.C. Cir. 2001), which involved conduct that went beyond the scope of the relevant intellectual property, are simply irrelevant.

[14] Similarly misleading is Broadcom's claim that "the Federal Circuit routinely applies antitrust law to refusals to license", with citations to Intergraph Corp. v. Intel Corp., 195 F.3d 1346 (Fed. Cir. 1999), and B. Braun Medical, Inc. v. Abbott Laboratories, 124 F.3d 1419 (Fed. Cir. 1997).  (BBr. at 10.)  Neither of those cases imposed liability for unilateral licensing activity.  Indeed, the Intergraph court specifically noted the absence of such cases. 195 F.3d at 1362.

2.    Broadcom has not alleged that QUALCOMM's licensing policies have harmed competition in the alleged UMTS chipset market.

Broadcom's UMTS claims fail for the additional reason that Broadcom has not alleged that QUALCOMM's licensing terms have injured <u>competition</u>, as opposed to injuring Broadcom.  Broadcom responds by asserting that QUALCOMM has excluded or impaired other competitors and by pointing to ¶¶ 112-14 of the Complaint.  (BBr. at 23-24.)  Those paragraphs, however, do not contain any such allegations, and Broadcom cannot cure its pleading deficiencies by pleading new facts in its brief.  <u>See, e.g.</u>, <u>Car Carriers, Inc. v. Ford Motor Co.</u>, 745 F.2d 1101, 1107 (7th Cir. 1984) (citing <u>Sansom Comm. v. Lynn</u>, 366 F. Supp. 1271, 1278 (E.D. Pa. 1973)).

B.    <u>Broadcom Does Not State a Claim for Attempted Monopolization of the Alleged UMTS Chipset Market (Count II).</u>

Broadcom's attempted monopolization claim also fails because the Complaint contains <u>no</u> allegations regarding QUALCOMM's share of the alleged UMTS chipset market,[15] QUALCOMM's competitors in that market, or any of the competitors' shares of that market.  (<u>See</u> QBr. at 27-28.)  Without such allegations, Broadcom does not plead a dangerous probability that QUALCOMM will obtain monopoly power in the alleged UMTS chipset market.  <u>See</u> <u>Fresh Made, Inc. v. Lifeway Foods, Inc.</u>, No. Civ.A. 01-4254, 2002 WL 31246922, at *8 (E.D. Pa. Aug. 9, 2002); <u>see also</u> QBr. at 27-28.  The attempted monopolization claim should therefore be dismissed.  <u>See, e.g.</u>, <u>J.L. Terrel's v. Sherwin-Williams Automo. Finishes Corp.</u>, No. Civ.A.02-CV-2645, 2004 WL 870705, at *4 (E.D. Pa. March 30, 2004); QBr. at 27-28.

---

[15] In yet another effort to replead facts in its brief, Broadcom pretends that the allegations in paragraph 113 of the Complaint show that QUALCOMM's market share is "on an upward trajectory".  (BBr. at 25.)  That is false.  Those allegations are only that QUALCOMM expects sales <u>to certain customers</u> to increase.  Without facts regarding the market shares of those customers – which Broadcom does not plead – there is no way to extrapolate <u>anything</u> about QUALCOMM's market share from these allegations.

11

Broadcom makes three meritless counterarguments.  First, Broadcom claims –
without benefit of any legal citation whatsoever – that its allegations that QUALCOMM has
"monopolized" the alleged CDMA chipset market somehow establish a "dangerous probability"
that QUALCOMM will monopolize the alleged UMTS chipset market because QUALCOMM
allegedly did so using "similar tactics".  (BBr. at 25.)  This argument fails both as a matter of logic
and as a matter of pleading.  Logically, historical experience in one market simply cannot predict
the future of an allegedly entirely different, second market without a showing that conditions in
the second market are parallel to those in the first market.  No such parallelism is pled here.  Cf.
Fed. R. Evid. 401 (evidence of other occurrences only relevant if sufficiently similar).  More
fundamentally, Broadcom does not – and cannot – plead "similar tactics" in the CDMA and
UMTS chipset markets.  Broadcom's claims with respect to the UMTS markets – as Broadcom
makes abundantly clear in its brief – depend on its claim that QUALCOMM's UMTS-related
licenses are not on FRAND terms.  Broadcom does not – and cannot – allege that QUALCOMM
did not meet its FRAND commitments with respect to CDMA.

Second, Broadcom claims that its allegations of anticompetitive conduct suffice to
plead dangerous probability.  (BBr. at 25.)  This argument is foreclosed by Spectrum Sports, Inc.
v. McQuillan, 506 U.S. 447 (1993), in which the Supreme Court held that "dangerous probability"
was a separate element of attempted monopolization and therefore could not be satisfied by "proof
of unfair or predatory conduct alone".  Id. at 457-59.

Third, Broadcom complains that QUALCOMM improperly focuses on Broadcom's
failure to plead a "single factor" – QUALCOMM's market share.  This is another straw man.  As
QUALCOMM pointed out, Broadcom fails to plead not only QUALCOMM's market share, but
also the identity and market shares of other competitors in the alleged market as well as the
percentage of QUALCOMM's revenues attributable to that market.  In any event, the case

12

Broadcom cites for the proposition that <u>no</u> market share is required, <u>H.J., Inc. v. Int'l Tel. & Tel. Corp.</u>, 867 F.2d 1531 (8th Cir. 1989), is no longer good law.  The Court in <u>H.J.</u> relied on Ninth Circuit precedent that was overruled by the Supreme Court in <u>Spectrum Sports</u>, 506 U.S. at 458-59.  <u>See</u> <u>H.J.</u> 867 F.2d at 1543 (citing <u>Twin City Sportservice v. Charles O. Finley & Co.</u>, 676 F.2d 1291, 1309 (9th Cir. 1982)).[16]

Finally, Broadcom once again attempts to plead new facts in its brief, citing a statement by QUALCOMM's Chairman and then-CEO, Dr. Irwin Jacobs, that QUALCOMM has set a target of 50 percent of the WCDMA chipset market.  (BBr. at 20 n.12, 25.)  Such new facts cannot be considered on a motion to dismiss.  <u>See, e.g.</u>, <u>Car Carriers, Inc.</u>, 745 F.2d at 1107.  In any event, a target of 50 percent market share is merely an aspiration and shows neither intent to monopolize nor dangerous probability of achieving monopoly power.  To the contrary, it is an acknowledgement that the market will remain competitive for the foreseeable future.  <u>See, e.g.</u>, <u>Fineman v. Armstrong World Indus., Inc.</u>, 980 F.2d 171, 201 (3d Cir. 1992) ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power."); Philip E. Areeda, Einer Elhauge & Herbert Hovenkamp, Antitrust Law ¶ 1736e1 (2002) ("There is substantial merit in a presumption that market shares below 50 or 60 percent do not imply such market power.") ("Areeda").

For all these reasons, and because, for the reasons set forth in QUALCOMM's opening brief, none of the conduct alleged by Broadcom with regard to UMTS chipsets is "predatory" or "anticompetitive" (QBr. at 28-31), Broadcom's attempted monopolization claim should be dismissed.

_____

[16] The other case relied upon by Broadcom, <u>Medtronic AVE, Inc. v. Boston Scientific Corp.</u>,  No. CIV. A. 98-478-SLR., 2001 WL 652016 (D. Del. March 30, 2001), is inapposite because in that case, the antitrust plaintiff did, in fact, allege the defendant's market share.

C.    Broadcom Does Not State Claims for "Exclusive Dealing" (Counts III and V).

Broadcom does not dispute that its <u>only</u> allegations with respect to whether QUALCOMM's alleged exclusive dealing arrangements foreclosed a substantial share of the relevant market are the bare allegations in ¶¶ 150 and 163 that those arrangements "foreclose a substantial share" of the relevant market.  Contrary to Broadcom's arguments, that is not enough.  Whether a foreclosure is "substantial" is not an issue of <u>fact</u>, as Broadcom contends, but rather is a <u>legal conclusion</u> based on underlying facts.  <u>See, e.g.</u>, <u>Tampa Elec. Co. v. Nashville Coal Co.</u>, 365 U.S. 320, 328-29 (1961) (reversing holding of substantial foreclosure without disturbing lower courts' underlying factual determinations).  Thus, the only allegations in the Complaint with respect to the level of foreclosure are unsupported legal conclusions, which are not given any weight on a motion to dismiss.[17]  <u>See, e.g.</u>, <u>Bright v. Westmoreland County</u>, 380 F.3d 729, 735 (3d Cir. 2004).

D.    Broadcom Does Not State Claims For Tying (Counts IV and VI).

Broadcom primarily defends its tying claims by mischaracterizing the applicable law.  <u>First</u>, Broadcom claims that the Third Circuit held in <u>SmithKline Corp. v. Eli Lilly & Co.</u>, 575 F.2d 1056 (3d Cir. 1978), that "an explicit tie is <i>not</i> needed to establish an illegal tie for antitrust purposes" (emphasis in original).  (BBr. at 29-30.)  That is false.  The language quoted by Broadcom states only that "a formal agreement is not necessary", but in the absence of such an agreement proof of coercion is required.  <u>SmithKline</u>, 575 F.2d at 1061 n.3.  Moreover, the court made abundantly clear that "coercion" <u>cannot</u> be established where the allegedly "tied" products are also available separately, <u>even if</u> it is economically unfeasible to purchase them separately.  <u>See id.</u> at 1061 (stating that "hospitals were free to purchase SmithKline's Ancef with their Keflin

---

[17] As QUALCOMM demonstrated in its opening brief, none of the allegations in the Complaint – including the allegations regarding "competition" and "effects" listed by Broadcom in footnote 23 of its brief – establish that any alleged foreclosure is "substantial".  (QBr. at 32-33.)

and Keflex orders with Lilly, <u>thus avoiding the penalties of a tie-in sale</u>") (emphasis added).[18]  As

the court explained,

> "Lilly did not condition the availability of any of its products on the purchase of
> any other of its products or on the refusal of purchasing hospitals to deal with its
> competitors. Thus, Lilly did not 'tie' purchases of Kefzol to purchases of Keflin or
> Keflex. We accept the decision of the district court that, <u>in the absence of such a
> requirement, there is no illegal tie-in</u>. . . .  Lilly's marketing scheme <u>lacks the
> element of coercion</u> necessary for liability under the theory of tie-ins."  <u>Id.</u> at 1061
> n.3 (emphasis added).

Notably, <u>SmithKline</u> involved precisely what Broadcom alleges here:  so-called

"economic coercion" with no requirement that the allegedly "tied" products actually be purchased

together.  As Judge Higginbotham held in what the Third Circuit called "a meticulous and

comprehensive treatment of the relevant facts and law", 575 F.2d at 1058 n.1, SmithKline's

pricing scheme was not a tie even though "[t]he economics of the marketplace precluded . . .

freedom of choice for most hospitals" precisely because the allegedly "tied" products were

available separately and customers were therefore not forced to buy the allegedly tied product.

<u>SmithKline Corp. v. Eli Lilly & Co.</u>, 427 F. Supp. 1089, 1113-14 (E.D. Pa. 1976); <u>see also</u> QBr. at

34-35.  Similarly, here, Broadcom does not – and cannot – allege that customers are forced to buy

QUALCOMM's UMTS chips, and, without the required element of "forcing", its tying claims

cannot stand.[19]

_____

[18] Broadcom's contention in a footnote (BBr. at 30 n.22) that "coercion" was "not disputed"
before the Third Circuit is wrong.  SmithKline did, in fact, argue, as "a second and separate
ground for affirmance", that the District Court's holding with respect to tying was incorrect.  <u>See</u>
Brief for Appellee at 1, 45-48, <u>SmithKline Corp. v. Eli Lilly & Co.</u>, 575 F.2d 1056 (3d Cir. 1978)
(No. 77-1232) (attached as Gonell Ex. 4).

[19] Broadcom's assertion that the Delaware district court in <u>DiscoVision Associates v. Disc
Manufacturing, Inc.</u>, 42 U.S.P.Q. 2d 1749 (D. Del. 1997), "[a]ppl[ied] <u>SmithKline</u> as binding
precedent" (BBr. at 30) is mistaken.  The <u>DiscoVision</u> court did not cite <u>SmithKline</u> <u>at all</u>.
Moreover, <u>DiscoVision</u> involved not only "economic coercion", but also coercion through threats
to sue downstream customers for infringement of fraudulently obtained patents.  <u>Id.</u>  Here,
Broadcom does not – and cannot – allege that QUALCOMM threatens to sue the customers of
handset manufacturers, nor does Broadcom allege that any of QUALCOMM's patents was
obtained by fraud.  Accordingly, <u>DiscoVision</u> cannot save Broadcom's tying claims.

Second, Broadcom's argument regarding whether a refusal to sell products separately to all purchasers is required (BBr. at 30-31) is a red herring. Broadcom does not – and cannot – allege that QUALCOMM requires any customer to purchase QUALCOMM's UMTS chipsets to obtain a license to its WCDMA patents. Thus, cases where defendants did refuse to sell products separately to some customers (cited in BBr. at 30-31) are irrelevant.

Finally, Broadcom cites a number of trademark cases for the proposition that there can be an illegal tie between intellectual property and products. (BBr. at 31.) This is another red herring. Trademarks differ fundamentally from patents in that a trademark owner does not, by virtues of its trademark, have any legal right to exclude others from making, using or selling an invention. Notably, Broadcom did not cite any cases involving patents, and that fact shows Broadcom's contention to be unfounded.

For these reasons, as well as those stated in out opening brief, Broadcom's tying claims should be dismissed.

## III. BROADCOM DOES NOT HAVE STANDING TO BRING CLAIMS RELATED TO THE ALLEGED 3G CDMA CHIPSET AND TECHNOLOGY MARKETS OR TO CHALLENGE QUALCOMM'S ACQUISITION OF FLARION (COUNTS VII-VIII).

### A. Broadcom Lacks Standing to Bring Claims Related to Any Alleged CDMA Market (Count VII).

Broadcom does not dispute – and therefore concedes – that it is not a participant in any alleged CDMA market and that none of the actions alleged in the Complaint with respect to CDMA has harmed Broadcom. Accordingly, Broadcom attempts to reframe its meritless CDMA claims as claims that QUALCOMM's alleged "exclusionary conduct in UMTS chipsets" "maintain[ed]" QUALCOMM's alleged "CDMA monopolies". (BBr. at 35-36.) Broadcom argues that under this recharacterization of its CDMA claims, it has standing because the alleged

harm suffered by Broadcom with respect to UMTS is "inextricably intertwined" with the alleged CDMA monopoly maintenance.  (Id.)  Broadcom is wrong.

Broadcom's new "inextricably intertwined" theory is directly contradicted by Broadcom's allegations in the Complaint.  According to the Complaint, "[e]ach type of wireless system (e.g., GSM, 2G CDMA, 2.5G CDMA, 3G CDMA and UMTS) has unique features and technology, and thus neither the systems nor the phones used for each system are interchangeable or substitutes".  (¶ 53.)  Under Broadcom's view of the world, then, actions with respect to UMTS chipsets cannot possibly have any "reinforc[ing] and entrench[ing]" (BBr. at 35) effects in the alleged "3G CDMA" markets, because UMTS technologies and products have "unique features" and are neither interchangeable with nor substitutes for CDMA technologies and products. Broadcom cannot plead one set of facts for purposes of market definition and then argue a contrary set of facts for purposes of standing.  Moreover, according to the Complaint, QUALCOMM's alleged "exclusionary" UMTS conduct was undertaken not to maintain any alleged CDMA monopolies, but rather to "obtain a monopoly in the UMTS chipset market".  (¶ 81 (emphasis added).)

These allegations render this case far outside the ambit of the cases upon which Broadcom relies.  In Carpet Group Int'l v. Oriental Rug Importers Ass'n, 227 F.3d 62 (3d Cir. 2000), there was a causal link between the harm to the plaintiff's business and the benefit in the alleged monopoly market because there was "a cross-elasticity of demand between the plaintiffs' offering and the defendants' offering".  Id. at 77.  Moreover, the court found "no logical explanation" for defendants' conduct other than that it was an effort to preserve the alleged monopoly.  Id. at 78.  In the private Microsoft case[20] from the District of Maryland, In re

---

[20] The Microsoft case brought by the government, United States v. Microsoft, 253 F.3d 34 (D.C. Cir. 2001) (cited in BBr. at 36), is irrelevant to the standing analysis. This Microsoft case was

Microsoft Corp. Antitrust Litig., Civ. JFM-05-1087, 2005 WL 1398643 (D. Md. June 10, 2005),

Novell's complaint (i) specifically alleged that Microsoft targeted Novell's products "for the

purpose of maintaining its monopoly in the operating system market"; and (ii) explained how

Novell's products threatened Microsoft's operating system monopoly (because they "were being

developed to run independently of any operating system").  Id. at *2.  Here, in contrast, there are

no allegations linking the alleged harm (exclusion from the UMTS chipset market) to any benefit

in the alleged CDMA markets.  Moreover, there are no allegations – nor could there be, given the

Complaint's market definitions – that QUALCOMM's motivation for its actions with respect to

UMTS chipsets was a desire to exclude competition in the alleged CDMA markets.[21]

    B.    <u>Broadcom Lacks Standing to Bring a Section 7 Claim Related to the Flarion
          Acquisition (Count VIII).</u>

            In its opening brief, QUALCOMM demonstrated that Broadcom has not alleged an

antitrust injury in connection with QUALCOMM's acquisition of Flarion, and that Broadcom

therefore lacks standing to bring its Section 7 claim.  (QBr. at 40-42.)  In response, Broadcom

contends that (1) QUALCOMM's standing analysis is faulty because Broadcom is seeking

injunctive relief and not damages; and (2) that it has properly alleged that the acquisition "would

directly injure Broadcom by reducing competition in the alleged B3G and 4G technology

markets".[22]  (BBr. at 38-41.)  Broadcom is wrong on both counts.

_____

brought by the United States, which does not have to meet the standing requirements for private
parties.  Areeda, ¶ 335a ("[T]he United States government[ ] . . . is authorized to sue anyone
violating the antitrust laws . . . .").

[21] In <u>Bristol Tech. v. Microsoft Corp.</u>, 42 F. Supp. 2d 153 (D. Conn. 1998) (<u>cited in</u> BBr. at 37),
the court held that the plaintiff was, in fact, a competitor in the relevant (operating system) market.
<u>Id.</u> at 164-65 & n.25.  In contrast, Broadcom is <u>not</u> a competitor in the alleged CDMA markets.
Thus, <u>Bristol Tech</u> cannot support Broadcom's "inextricably intertwined" argument.

[22] Broadcom does not dispute that its allegation of injury because it "expects to be a competitor to
Qualcomm in the chipset markets for B3G and 4G technologies" (¶ 138) does not state an antitrust
injury as a matter of law.  (<u>See</u> QBr. at 41.)

In <u>Cargill v. Monfort, Inc.</u>, 479 U.S. 104 (1986) – the very case upon which Broadcom relies (BBr. at 39) – the Supreme Court explicitly held that a claim for injunctive relief under Section 16 of the Clayton Act requires a showing of antitrust injury. <u>Cargill</u>, 479 U.S. at 111. Indeed, Broadcom admits that its claim requires a showing that the threatened injury "qualifies as antitrust injury". (BBr. at 39.) Thus, Broadcom's failure to allege antitrust injury dooms its Flarion claim regardless of the relief Broadcom seeks. <u>See, e.g.</u>, <u>City of Pittsburgh v. West Penn Power Co.</u>, 147 F.3d 256, 264-69 (3d Cir. 1998) (dismissing Section 7 claim seeking both damages and injunctive relief on standing grounds for failure to allege antitrust injury).

The threatened injury alleged by Broadcom – "having to pay higher prices" for "technology for B3G and 4G" (BBr. at 40) – is not an antitrust injury because Broadcom does not – and cannot – plead a direct connection between that "threatened injury" and the acquisition. <u>See City of Pittsburgh</u>, 147 F.3d at 268 ("antitrust injury must be caused by the antitrust violation – not a mere causal link, but a direct effect").[23] Any such "threatened injury" is contingent on future, intervening events that may or may not come to pass, such as at least (1) the adoption of a B3G or 4G standard that incorporates as "essential functions" patented inventions previously owned by Flarion; (2) the exclusion from that same standard of any intellectual property that was owned by QUALCOMM prior to its acquisition of Flarion;[24] and (3) a lack of competition between this

---

[23] Broadcom's argument that it is a potential "chipset customer" for B3G and 4G technologies fails for the simple reason that Broadcom <u>did not</u> allege that the Flarion acquisition would affect competition "in the market to provide technology for B3G and 4G to chipset customers" (BBr. at 40). Rather, Broadcom defined the markets in which competition would be affected as the markets for "technologies contending to serve essential functions for B3G [and 4G] wireless standards and systems" (¶ 60) – <u>i.e.</u>, markets comprising competition between technologies to <u>become</u> standards. Indeed, Broadcom <u>could not</u> allege the existence of a "market to provide technology for B3G and 4G" in the absence of a standard because the Complaint alleges that those kinds of so-called "technology markets" are only created <u>when a standard is adopted</u>. (See ¶ 58.)

[24] QUALCOMM offers licenses to any or all of its patents for a single royalty, regardless of how many (or how few) a licensee actually uses for a given product. Thus, if a standard is adopted that includes both QUALCOMM and Flarion technology, the acquisition will <u>reduce</u>, and not raise, prices, because a single royalty will cover both sets of patents.

hypothetical standard and other wireless technologies and methodologies.  The need for such

intervening events is fatal to Broadcom's argument that it will suffer antitrust injury.  <u>See</u> <u>id.</u> at

267-69 (holding that there was no antitrust injury where the need for intervening events broke the

direct causal link between the alleged threatened injury and the acquisition).

## IV.    BROADCOM'S STATE LAW CLAIMS SHOULD BE DISMISSED (COUNTS IX-XIII).

Broadcom does not dispute that once its federal claims are dismissed, this Court

should not exercise pendant jurisdiction over Broadcom's state law claims.  (<u>See</u> QBr. at 43.)

Moreover, those claims should be dismissed for the additional reasons set forth in

QUALCOMM's opening brief.  (QBr. at 43-49.)

<u>Conclusion</u>

For the foregoing reasons, Broadcom's First Amended Complaint should be

dismissed in its entirety.

January 30, 2006

Respectfully submitted,

McCARTER & ENGLISH LLP
by

/s/ William J. O'Shaughnessy
William J. O'Shaughnessy (WJO-5256)

Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Richard J. Stark
David R. Marriott
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant*
*QUALCOMM Incorporated*

William J. O'Shaughnessy (WJO 5256)
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4056
973-622-4444

Evan R. Chesler
Richard J. Stark
David R. Marriott
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

Attorneys for Defendant Qualcomm Incorporated


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY


| | | |
|---|---|---|
| BROADCOM CORPORATION, | : | |
| | : | Civil Action No. 05-3350 (MLC) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| QUALCOMM INCORPORATED, | : | |
| | : | |
| Defendant. | : | |


**CERTIFICATION OF SERVICE**

Richard Hernandez, of full age, certifies as follows:

1.      I am an attorney at law of the State of New Jersey and am associated with the firm

of McCarter & English, LLP, attorneys for defendant Qualcomm Incorporated.

2.      On January 30, 2006, I caused to be delivered by regular mail copies of the Reply

Brief in Further Support of Defendant's Amended Motion to Dismiss and the Declaration of

Fabian D. Gonell in Further Support of Defendant's Amended Motion to Dismiss to the

following:

**_VIA_ FAX AND FIRST CLASS MAIL:**

David S. Stone, Esq.
Boies, Schiller & Flexner LLP
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078

**_VIA_ FIRST CLASS MAIL:**

Mark W. Nelson, Esq.
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006

David Boies, Esq.
David A. Barrett, Esq.
Stephen R. Neuwirth, Esq.
Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, New York 10022

Anne Patterson, Esq.
Riker Danzig Scherer Hyland & Perretti LLP
Headquarters Plaza 1 Speedwell Avenue
Morristown, New Jersey 07962

I hereby certify that the foregoing statements made by me are true. I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

s/ Richard Hernandez_____

DATED: January 30, 2006