# Morgan & Finnegan, L.L.P.

DAVID H. PFEFFER
HARRY C. MARCUS
EUGENE MOROZ
JOHN F. SWEENEY†
ARNOLD I. RADY†
CHRISTOPHER A. HUGHES
WILLIAM S. FEILER†
JANET DORE
JAMES W. GOULD†
RICHARD C. KOMSON
CHRISTOPHER K. HU
BARTHOLOMEW VERDIRAME
DICKERSON M. DOWNING
MARIA C. H. LIN
JOSEPH A. DeGIROLAMO
MICHAEL P. DOUGHERTY
SETH J. ATLAS
ANDREW M. RIDDLES◆
BRUCE D. DeRENZI
MARK J. ABATE

JOHN T. GALLAGHER◆
STEVEN F. MEYER◆
KENNETH H. SONNENFELD
DAVID H.T. KANE
SIEGRUN D. KANE
TONY V. PEZZANO
ANDREA L. WAYDA
MICHAEL S. MARCUS†
JOHN E. HOEL◆†
JOHN W. OSBORNE
ROBERT K. GOETHALS
PETER N. FILL
RICHARD STRAUSSMAN◆
KATHLEEN E. McCARTHY
DOROTHY R. AUTH
MICHAEL O. CUMMINGS
GERARD A. HADDAD
KENT STEVENS†◆
WILLIAM G. HU†

SCOTT D. GREENBERG
JOHN T. MOEHRINGER
MATTHEW K. BLACKBURN◆
JAMES HWA†
TOD M. MELGAR
MAREN C. PERRY
DAVID M. LA BRUNO
KEITH J. McWHA†
COLIN FOLEY
ERIC G. WRIGHT◆†
REGINA M. LUTZ
MARY ANN C. BALL
JONATHAN D. BALL
JANICE A. CHRISTENSEN
CHRISTOPHER E. COPELAND
PING GU
ERIC L. LANE
ALEXANDER RUDIS
JENNIFER BIANROSA
AARON P. BUMGARNER
FRANK SEDLARCIK
PAMELA A. KAYATTA
DANIELLE VINCENTI TULLY
KATHERINE S. BROWN
JOSHUA H. HARRIS
JESSICA L. RANDO
NATHANIEL T. BROWARD
TODD L. FETTIG

BRAD M. SCHELLER
JULIA K. SMITH◆
KIMBERLY A. TUSA
SCOTT BITTMAN
QUINN E. CLANCY
STEVEN PURDY
PANKAJ SONI
MICHAEL SAUER
WAN CHIEH LEE
SETH SILVERMAN◆

*SCIENTIFIC ADVISORS*
SUNGHO HONG, PH.D.
EVELYN M. KWON, PH.D.
JOSEPH ENG, JR., PH.D
MICHAEL A. WILLIS, PH.D.
DEBORAH DRAZEN, PH.D.
ANGUS GILL
BRIAN W. BROWN
JOHN J. WAKELEY
ELLIOT L. FRANK

*COUNSEL*
JOHN C. VASSIL
J. ROBERT DAILEY
ROGER S. SMITH
JOSEPH C. REDMOND, JR.†
HERBERT BLECKER
GEORGE TACTICOS††
LEON J. BECHET

*SENIOR COUNSEL*
JEROME G. LEE
THOMAS P. DOWLING
JOHN A. DIAZ
ALFRED P. EWERT†
STEPHEN R. SMITH

A Registered Limited Liability Partnership

3 WORLD FINANCIAL CENTER
NEW YORK, NY 10281-2101
TEL: 212-415-8700
FAX: 212-415-8701
www.morganfinnegan.com

WRITER'S DIRECT DIAL NUMBER:

(212) 415-8551
wfeiler@morganfinnegan.com
June 5, 2006

†† ADMITTED IN CALIFORNIA
◆ ADMITTED IN CONNECTICUT
† ADMITTED IN WASHINGTON, D.C.
* NOT ADMITTED IN NEW YORK.

**By Hand**
Clerk of the Court
United States District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street, Room 2020
Trenton, New Jersey 08608

Re:    Broadcom Corporation v. Qualcomm Incorporated
Civ. Action No. 05-3350 (MLC)

Dear Sir or Madam:

        We represent third parties Telefonaktiebolaget LM Ericsson and Ericsson Inc. in the above referenced matter.  Enclosed for filing, please find:

        (a)    Memorandum in opposition to Qualcomm Incorporated's motion to compel the production of documents; and

        (b)    Declaration of Danielle V. Tully.

        Kindly advise us when these documents have been received and filed by the Court.

Respectfully submitted,

William S. Feiler

Enclosures
cc:    Hon. Mary L. Cooper (By Hand with Enclosures)
        Hon. John J. Hughes (By Hand with Enclosures)
        William J. O'Shaughnessy, Esq. (*via* Federal Express with Enclosures)
        Richard J. Stark, Esq. (*via* Federal Express with Enclosures)
        David S. Stone, Esq. (*via* Federal Express with Enclosures)
        Mark W. Nelson, Esq. (*via* Federal Express with Enclosures)
        David A Barrett, Esq. (*via* Federal Express with Enclosures)
        Anne Patterson, Esq. (*via* Federal Express with Enclosures)
        Richard S. Taffet (*via* Federal Express with Enclosures)

997117 v1

# Morgan & Finnegan, L.L.P.

DAVID H. PFEFFER
HARRY C. MARCUS
EUGENE MOROZ
JOHN F. SWEENEY†‡
ARNOLD I. RADY†
CHRISTOPHER A. HUGHES
WILLIAM S. FEILER†
JANET DORE
JAMES W. GOULD†
RICHARD C. KOMSON
CHRISTOPHER K. HU
BARTHOLOMEW VERDIRAME
DICKERSON M. DOWNING
MARIA C. H. LIN
JOSEPH A. DeGIROLAMO
MICHAEL P. DOUGHERTY
SETH J. ATLAS
ANDREW M. RIDDLES*
BRUCE D. DeRENZI
MARK J. ABATE

JOHN T. GALLAGHER*
STEVEN F. MEYER*
KENNETH H. SONNENFELD
DAVID H.T. KANE
SIEGRUN D. KANE
TONY V. PEZZANO
ANDREA L. WAYDA
MICHAEL S. MARCUS†
JOHN E. HOEL*†
JOHN W. OSBORNE
ROBERT K. GOETHALS
PETER N. FILL
RICHARD STRAUSSMAN*
KATHLEEN E. McCARTHY
DOROTHY R. AUTH
MICHAEL O. CUMMINGS
GERARD A. HADDAD
KENT STEVENS*†
WILLIAM G. HU†

A Registered Limited Liability Partnership

3 WORLD FINANCIAL CENTER
NEW YORK, NY 10281-2101
TEL: 212-415-8700
FAX: 212-415-8701
www.morganfinnegan.com

WRITER'S DIRECT DIAL NUMBER:

(212) 415-8551
wfeiler@morganfinnegan.com
June 5, 2006

SCOTT D. GREENBERG
JOHN T. MOEHRINGER
MATTHEW K. BLACKBURN*
JAMES HWA†
TOD M. MELGAR
MAREN C. PERRY
DAVID M. LA BRUNO
KEITH J. McWHA†
COLIN FOLEY
ERIC G. WRIGHT*†
REGINA M. LUTZ
MARY ANN C. BALL
JONATHAN D. BALL
JANICE A. CHRISTENSEN
CHRISTOPHER E. COPELAND
PING GU
ERIC L. LANE
ALEXANDER RUDIS
JENNIFER BIANROSA
AARON P. BUMGARNER
FRANK SEDLARCIK
PAMELA A. KAYATTA
DANIELLE VINCENTI TULLY
KATHERINE S. BROWN
JOSHUA H. HARRIS
JESSICA L. RANDO
NATHANIEL T. BROWAND
TODD L. FETTIG

BRAD M. SCHELLER
JULIA K. SMITH*
KIMBERLY A. TUSA
SCOTT BITTMAN
QUINN E. CLANCY
STEVEN PURDY
PANKAJ SONI
MICHAEL SAUER
WAN CHIEH LEE
SETH SILVERMAN*

SCIENTIFIC ADVISORS
SUNGHO HONG, PH.D.
EVELYN M. KWON, PH.D.
JOSEPH ENG, JR., PH.D.
MICHAEL A. WILLIS, PH.D.
DEBORAH DRAZEN, PH.D.
ANGUS GILL
BRIAN W. BROWN
JOHN J. WAKELEY
ELLIOT L. FRANK

COUNSEL
JOHN C. VASSIL
J. ROBERT DAILEY
ROGER S. SMITH
JOSEPH C. REDMOND, JR.†
HERBERT BLECKER
GEORGE TACTICOS††
LEON J. BECHET

SENIOR COUNSEL
JEROME G. LEE
THOMAS P. DOWLING
JOHN A. DIAZ
ALFRED P. EWERT†
STEPHEN R. SMITH

†† ADMITTED IN CALIFORNIA
‡ ADMITTED IN CONNECTICUT
† ADMITTED IN WASHINGTON, D.C.
* NOT ADMITTED IN NEW YORK

**By Hand**
Hon. John J. Hughes
United States District Court
402 E. State Street
Trenton, NJ 08608

Re:     Broadcom Corporation v. Qualcomm Incorporated
        Civil Action No. 05-3350 (MLC)

Dear Judge Hughes:

     We represent Telefonaktiebolaget LM Ericsson and Ericsson, Inc. in the above referenced matter.  Please find enclosed courtesy copies of the following documents which were filed today:

     (a)     Memorandum in opposition to Qualcomm Incorporated's motion to compel the production of documents; and

     (b)     Declaration of Danielle V. Tully.

Respectfully submitted,

*William S. Feiler*

William S. Feiler

Enclosures
cc:   Hon. Mary L. Cooper (By Hand with Enclosures)
      William J. O'Shaughnessy, Esq. (*via* Federal Express with Enclosures)
      Richard J. Stark, Esq. (*via* Federal Express with Enclosures)
      David S. Stone, Esq. (*via* Federal Express with Enclosures)
      Mark W. Nelson, Esq. (*via* Federal Express with Enclosures)
      David A Barrett, Esq. (*via* Federal Express with Enclosures)
      Anne Patterson, Esq. (*via* Federal Express with Enclosures)
      Richard S. Taffet (*via* Federal Express with Enclosures)

CALIFORNIA: 44 MONTGOMERY STREET, SUITE 2550, SAN FRANCISCO, CA 94104-4712  TEL: 415- 318-8800  FAX: 415- 676-5816
CONNECTICUT: 100 FIRST STAMFORD PLACE, STAMFORD, CT 06902  TEL: 203-391-2100  FAX: 203-391-2101
WASHINGTON, D.C.: 1775 EYE STREET, NW, SUITE 400, WASHINGTON, DC 20006-2401  TEL: 202-857-7887  FAX: 202-857-7929

997105 v1

William S. Feiler (WSF 7618)
MORGAN & FINNEGAN, L.L.P.
3 World Financial Center
New York, New York 10281
(212) 415-8700
(212) 415-8701 (FAX)
Attorneys for Third Parties
Telefonaktiebolaget LM Ericsson and
Ericsson Inc.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>QUALCOMM INCORPORATED,<br><br>　　　Defendant. | CASE NO.: 05-3350 (MLC)<br><br>RETURN DATE:  JUNE 19, 2006 |

**THIRD PARTIES TELEFONAKTIEBOLAGET LM ERICSSON'S AND ERICSSON,**
**INC.'S MEMORANDUM IN OPPOSITION TO QUALCOMM INCORPORATED'S**
**MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS**

　　　Third parties Telefonaktiebolaget LM Ericsson ("LM Ericsson") and Ericsson, Inc.

("Ericsson U.S.") (collectively, "Ericsson") submit this memorandum in opposition to

Qualcomm Incorporated's ("Qualcomm") motion to compel production by Ericsson of

documents sought by Qualcomm's subpoenas.

# TABLE OF CONTENTS

**Page**

I.    Introduction ............................................................................................... 2

II.   Background ............................................................................................... 3

III.  Argument .................................................................................................. 5

    A.    The Standard For Compelling A Third Party To Respond To
        A Subpoena ........................................................................................ 5

    B.    The Documents Sought Will Not Lead To Admissible
        Evidence ............................................................................................ 7

    C.    The Subpoenas Impose An Undue Burden On Ericsson ........................... 9

        1.    Ericsson Should Not Be Made To Bear The Burden
            Of a Potentially Moot Document Collection and
            Production ................................................................................ 9

        2.    Ericsson Should Not Be Made To Bear The Burden
            Of Collecting and Producing Irrelevant Documents ...................... 10

            a.    Documents related to activities occurring
                outside the United States are irrelevant ............................. 10

            b.    Documents dated before July 1, 2001 are
                irrelevant .......................................................................... 11

            c.    Documents dated after July 1, 2005 are
                irrelevant .......................................................................... 13

IV.   Conclusion .............................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**                                                                  **Pages**

American Health Systems v. Liberty Health System, Civ. A. No. 90-3112, 1991 WL
    30726 (E.D. Pa. Mar. 5, 1991) ............................................................. 12, 13

AMTRAK v. Morgan, 536 U.S. 101 (2002) ................................................................ 12

Cash Today of Tex. v. Greenberg, Civ. A. No. 02-MC-77-GMS, 2002 U.S. Dist. LEXIS
    20694 (D. Del. Oct. 23, 2002) .......................................................................... 5

Fitzgerald v. Henderson, 251 F.3d 345 (2d Cir. 2001) .............................................. 12

Gabe Staino Motors v. Volkswagen of Am., Civ. A. No. 99-5034, 2003 U.S. Dist. LEXIS
    3194 (E.D. Pa. Feb. 28, 2003) .......................................................................... 5

In re Automotive Refinishing Paint Antitrust Litig., 229 F.R.D. 482
    (E.D. Pa. 2005) ................................................................................... passim

In re Microcrystalline Cellulose Antitrust Litig., 221 F.R.D. 428
    (E.D. Pa. 2004) ....................................................................... 11, 12, 13

Konstantopoulos v. Westvaco, Corp., Civ. A. No. 90-146-CMW, 1991 U.S. Dist. LEXIS
    17760 (D. Del. Dec. 13, 1991) .......................................................................... 5

Mannington Mills, Inc. v. Armstrong World Indus., 206 F.R.D. 525 (D. Del. 2002) .... 5, 11

Nakis v. Potter, 422 F. Supp. 2d 398 (S.D.N.Y. 2006) ............................................... 12

Needles v. F.W. Woolworth Co., 13 F.R.D. 460 (E.D. Pa. 1952) ................................ 13

Singer Mfg. Co. v. Brother Int'l Corp., 191 F. Supp. 322 (S.D.N.Y. 1960) ................ 13

Societe Nationale Industrielle Aerospatiale v. United States Dist. Court, 482 U.S. 522
    (1987) ...................................................................................................... 6, 9

**REGULATIONS AND RULES**

Fed. R. Civ. P. 45(c)(3)(A)(iv) ..................................................................................... 5

**STATUTES**

15 U.S.C. § 15B ...................................................................................................... 12

N.J. Stat. Ann. §56:9-14 ........................................................................................... 12

996195 v1

## I.  INTRODUCTION

Qualcomm is the defendant in this Court accused by Broadcom of federal and state antitrust violations.  Ericsson is neither a party to this case nor a subject of any of Broadcom's allegations.  Ericsson is a global enterprise with offices that conduct business in the United States and around the world.  LM Ericsson is headquartered in Sweden. The Qualcomm subpoenas essentially demand that Ericsson undertake a massive survey of any and all documents related to its own history and the history of other competitors in the mobile telecommunications market without regard to time, place or relevance.

Ericsson has taken a reasonable and practical approach to Qualcomm's overreaching subpoenas.  Ericsson has agreed to tailor its production to documents dealing with U.S. based activities occurring between July 1, 2001 and the filing of the law suit on July 1, 2005.  This period corresponds to the statute of limitations for the claims asserted and represents a reasonable temporal limitation since Qualcomm placed no temporal limit on its requests.  Overriding these objections is Ericsson's refusal to undertake a massive discovery operation where Qualcomm has a motion to dismiss the entire litigation and the motion will be heard in a matter of days on June 26, 2006.  Should Qualcomm's motion be granted, any production by Ericsson would be rendered moot.  In light of this fact, it is incredibly burdensome and wasteful to require Ericsson to undertake such a massive review of its documents when that review could be rendered worthless in a matter of days.  This is especially true in light of Ericsson's non-party status and LM Ericsson's <u>foreign</u>, non-party status.

Qualcomm's motion fails to satisfy the burden to establish the necessity for Ericsson to produce any other documents.

996195 v1

## II.    BACKGROUND

On July 1, 2005, Broadcom filed suit against Qualcomm in this Court alleging violations of federal and state antitrust laws.   An amended complaint was also filed. Tully Exh. 1[1].   Qualcomm has filed a motion to dismiss for failure to state a claim.   The motion has been extensively briefed by the parties and is set to be heard on June 26, 2006.  Tully Exhs. 2-4.

Ericsson is not a party to that suit, nor is Ericsson the subject of any claim of that suit.[2]   On or about February 27, 2006, Qualcomm served Ericsson, Inc. with a subpoena and on or about April 4, 2006, served Telefonaktiebolaget LM Ericsson with a similar subpoena.   These subpoenas demanded disclosure of <u>all</u> documents, without regard to geographic or temporal scope, related to Ericsson's history and that of other competitors in the mobile telecommunications market.   In essence, the subpoenas demanded that Ericsson undertake a global search of all of its documents and produce documents, including licenses with competitors, business plans and other agreements which Ericsson considers to be highly confidential.

Ericsson timely filed objections to the Qualcomm subpoenas objecting to the over-breadth of the requests in addition to the unreasonableness of the requests in light

---

[1] "Tully Exh. ___" refers to exhibits to the declaration of Danielle V. Tully submitted herewith.

[2] Qualcomm makes several erroneous statements in its memorandum regarding Ericsson.   These include the assertion that certain statements made by Maurits Dolmans are attributable to Ericsson.  Memo at 9.  Mr. Dolmans is not an Ericsson attorney.  Indeed, Qualcomm's Exhibit 11 indicates he represents Nokia.  It is, therefore, improper to attribute any statements made by Mr. Dolmans to Ericsson.  Similarly, Qualcomm asserts that "Ericsson and Broadcom are apparently working in concert in a campaign against Qualcomm called 'Project 17' or 'Project Stockholm'".  Memo at 8. However, Qualcomm Exhibits 4 and 5, which Qualcomm cites for this proposition do not provide any insight as to what is "Project 17" or "Project Stockholm."

- 3-

of the pending motion to dismiss, discussed in greater detail below. Tully Exhs. 5, 6. Ericsson did not "stonewall" Qualcomm as Qualcomm asserts. Memo at 13[3]. Instead, Ericsson agreed to produce those documents which are relevant to the underlying lawsuit, namely those documents related to United States markets for WCDMA technology within the relevant time period.

For practical purposes, Ericsson did object to producing these documents, before the pending motion to dismiss is decided, as a decision to dismiss the underlying litigation would render any document collection, review and production utterly meaningless. Qualcomm's motion to dismiss is pending before this Court and is set to be argued on June 26, 2006. Should the Court decide to grant Qualcomm's motion and dismiss this case, any document collection and production done by Ericsson would be rendered moot. Given Ericsson's non-party status, and LM Ericsson's foreign, non-party status, it is particularly onerous to require Ericsson to undertake a massive collection, review and production of its documents when those efforts could be rendered meaningless in a matter of days. While Qualcomm asserts that it was willing to initially accept a "limited production of easily identifiable and easily collected documents" (Memo at 12), it did not answer Ericsson's concerns that any collection and production prior to a decision on the pending motion could potentially waste the resources of a non-party to this case. Qualcomm then moved to compel production.

---

[3] "Memo at ___" refers to Qualcomm's brief in support of its motion to compel filed May 26, 2006.

## III.   ARGUMENT

### A.   The Standard For Compelling A Third Party To Respond To A Subpoena

Those subject to subpoenas are protected from an undue burden.  Fed. R. Civ. P. 45(c)(3)(A)(iv); Konstantopoulos v. Westvaco, Corp., Civ. A. No. 90-146-CMW, 1991 U.S. Dist. LEXIS 17760, at *6 (D. Del. Dec. 13, 1991) ("[T]his Court is directed to protect all persons from undue burden in responding to a subpoena.")  An undue burden can be evaluated by considering factors such as "relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed."  In re Automotive Refinishing Paint Antitrust Litig., 229 F.R.D. 482, 495 (E.D. Pa. 2005), quoting, Gabe Staino Motors v. Volkswagen of Am., Civ. A. No. 99-5034, 2003 U.S. Dist. LEXIS 3194, at *5 (E.D. Pa. Feb. 28, 2003); see also, Mannington Mills, Inc. v. Armstrong World Indus., 206 F.R.D. 525, 529 (D. Del. 2002) ("And even if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit.")  Non-party status should also be factored into any consideration concerning expense and inconvenience. See id.

Qualcomm bears the burden of establishing that the documents it seeks are relevant.  See Konstantopoulos, 1991 U.S. Dist LEXIS 17760 at *8. This burden is particularly heavy in the case of a non-party.  See Cash Today of Tex. v. Greenberg, Civ. A. No. 02-MC-77-GMS, 2002 U.S. Dist. LEXIS 20694, at *13 (D. Del. Oct. 23, 2002) ("In this undue burden inquiry, non-parties are afforded 'special protection.'")  Here, Ericsson's non-party status is compounded by the fact that LM Ericsson is a

- 5-

foreign non-party.  With respect to foreign entities, the Supreme Court has cautioned that courts supervising pretrial discovery proceedings over foreign entities "should exercise special vigilance to protect [them] from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position."  Societe Nationale Industrielle Aerospatiale v. United States Dist. Court, 482 U.S. 522, 546 (1987); see also, In re Automotive Refinishing Paint Antitrust Litig., 229 F.R.D. at 495.

Qualcomm, however, has ignored this burden and assumes that it is entitled to demand all documents, without regard to geographic or temporal scope, related to Ericsson's history and that of its competitors in the mobile telecommunications market based on its bald assertion that such documents are "critical to Qualcomm's defense in this antitrust case."  Memo at 2.  This bald assertion, however, is insufficient to compel a non-party to produce such a tremendous amount of data, especially where that production is overly burdensome and will not lead to admissible evidence.

In fact, Qualcomm admits that its subpoenas are overbroad.  Qualcomm has limited the time period for some of its requests to a narrower period than the open ended time of the subpoenas[4].  However, the scope remains objectionable.  Qualcomm is seeking documents which are not reasonably calculated to lead to admissible evidence.  Such a fishing expedition is impermissible, because a subpoena that is overbroad presents an undue burden.  See Automotive Refinishing Paint Antitrust Litig., 229 F.R.D. at 495.

---

[4]  Qualcomm limited the time for requests 1-5, 9-10 and 27 to documents created between January 1, 1997 and March 31, 2006; requests 13 and 31 were limited to documents created between January 1, 1999 and March 31, 2006; requests 6 and 7 were limited with respect to certain documents to documents created between to January 1, 1999 and March 31, 2006.  Tully Exh. 7.

Rather than cite a single case that supports its position that it is not overly burdensome to require a world-wide enterprise to produce documents not reasonably calculated to lead to admissible evidence, especially where that production could be rendered moot should the Court grant the pending motion to dismiss, regardless of where in the world these activities occurred, Qualcomm has simply asserted that such documents are "critical".   Memo at 2.   Simply put, Qualcomm has failed to meet its burden of proof.

Qualcomm has gone so far as to presume that it has, at least initially, requested that Ericsson collect and produce "easily identifiable and easily collected documents as to which there would be little burden to Ericsson." Memo at 12. Either Qualcomm has grossly underestimated the breadth of its demands, or it is being disingenuous.   In this case, Qualcomm's supposed need for _all_ documents simply does not outweigh the burden imposed on Ericsson in producing the same.

## B.    The Documents Sought Will Not Lead To Admissible Evidence

In its motion, Qualcomm enumerates six categories of documents which it has categorized as "easily identifiable and easily collected documents as to which there would be little burden to Ericsson." Memo at 12. Specifically, these documents include:

- License agreements to "essential patents";

- Agreements for the sale of baseband modem chips;

- Communications and document productions to the United States Department of Justice in connection with the DOJ's investigation of Qualcomm's acquisition of Flarion;

- Communications and document productions to the Directorate General – Competition of the European Commission in connection with Ericsson's complaint regarding Qualcomm;

- Ericsson's high-level business plans regarding UMTS and CDMA baseband modem chips; and

- Common interest or other agreements pursuant to which Ericsson will claim that communications between itself and Broadcom or others are privileged.

While Qualcomm demands this information, it does not make any showing of the relevance of the sought-after information to Broadcom's claims or its defense. This laundry list of documents which Qualcomm claims are "critical" is, in fact, nothing more than a thinly-veiled attempt at a fishing expedition. Qualcomm has not provided a coherent theory as to how these documents, especially communications with the DOJ and the Directorate General of the European Commission, may be relevant or why it has a substantial need for such documents since Qualcomm is a party to those investigations. To require Ericsson to produce documents in this situation is unduly burdensome. See Automotive Refinishing Paint Antitrust Litig., 229 F.R.D. at 495.

Qualcomm's argument that it has a substantial need for documents related to Ericsson's consumer business with Sony Ericsson in order to evaluate the development time and life cycle of mobile phone models and licensing terms offered to manufacturers of mobile phones by other companies underscores the fact that Qualcomm is simply engaged in a fishing expedition devoid of any theory of relevance. Sony Ericsson is a separate entity from Ericsson, and has itself been served with a subpoena by Qualcomm in this action. Any information related to Sony Ericsson's consumer business is best sought from Sony Ericsson, not Ericsson. Qualcomm's demand for this information from Ericsson is improper and is not calculated to lead to admissible evidence, but rather is an attempted fishing expedition. As such, Ericsson should not be made to produce such documents.

- 8-

Moreover, Qualcomm's blanket assertion (See Memo at 6-8) that Broadcom would have "no such documents" does not somehow transform irrelevant documents into relevant ones.  First, to say that Broadcom has "no such documents" is speculative.  Second, even if Broadcom, in fact, does not have certain documents, this alone does not make those documents relevant.  Qualcomm's bald assertion that Broadcom does not have certain documents is simply insufficient to meet the requirements of Rule 45 and to overcome Ericsson's objections that the production of irrelevant documents is overly burdensome.

### C.    The Subpoenas Impose An Undue Burden On Ericsson

#### 1.    Ericsson Should Not Be Made To Bear The Burden Of a Potentially Moot Document Collection and Production

Despite any attempt by Qualcomm to characterize Ericsson as a party to the underlying law suit, Ericsson is neither a party to this case nor a subject of any of Broadcom's allegations therein.  As explained in greater detail above, Ericsson's non-party status, and LM Ericsson's foreign non-party status, is a factor to be considered in determining burden.  See Aerospatiale, 482 U.S. at 546; Automotive Refinishing Paint Antitrust Litig., 229 F.R.D. at 495.

Given Ericsson's non-party status, it is reasonable to hold off on producing any documents until a decision has been reached on Qualcomm's pending motion to dismiss.  As stated above, Ericsson is a global enterprise with offices and employees in the United States and around the world.  To begin to collect and produce the documents demanded by Qualcomm is a hefty undertaking for a company as large as Ericsson.  Even if Qualcomm was to pay Ericsson for its time in collecting these documents, such

an undertaking would be a drain on Ericsson's productivity, requiring employees and technology personnel to sift through both electronic and paper files, many of which are not searchable. Despite Qualcomm's glib characterization of certain documents as imposing "little burden to Ericsson" (Memo at 12), the fact is that such an undertaking imposes a tremendous burden on Ericsson.

Ericsson's objection to producing documents prior to a decision on the motion to dismiss takes account of this burden and attempts to minimize it. Qualcomm's motion to dismiss is currently pending before this Court and is set to be argued on June 26, 2006. Should this Court decide to grant Qualcomm's motion and dismiss this case, any document collection and production done by Ericsson would be rendered moot. Given Ericsson's non-party status, it is particularly onerous to require Ericsson to undertake a massive review and production of its documents when those efforts could be rendered meaningless in a matter of days. Qualcomm's demand for production prior to a decision on the motion to dismiss is unreasonable in light of this.

### 2. Ericsson Should Not Be Made To Bear The Burden Of Collecting and Producing Irrelevant Documents

#### a. Documents related to activities occurring outside the United States are irrelevant

Qualcomm argues that it is entitled to documents concerning activities outside the United States because Broadcom's complaint references activities occurring outside of the United States. In the same motion, Qualcomm characterizes Broadcom's complaint as "a hodge-podge of federal antitrust and state law claims generally directed at Qualcomm's licensing practices and at its pricing of baseband modem chips." Memo at 4-5. In fact, all of Broadcom's claims are directed to United States and state antitrust

claims.  As such, the relevant arena is the United States and documents regarding activities taking place outside of the United States are simply irrelevant to the causes of action asserted in the instant action.

While Qualcomm argues that the relevancy requirement is construed broadly and liberally, its argument ignores the fact that the relevancy requirement is not so broad as to override an undue burden imposed on a non-party.  See Mannington Mills, 206 F.R.D. at 529.  Further, courts have recognized that, while a broad scope of discovery in antitrust actions may be appropriate, time and scope limitations may be placed on discovery requests.  See Automotive Refinishing Paint Antitrust Litig., 229 F.R.D. at 496; In re Microcrystalline Cellulose Antitrust Litig., 221 F.R.D. 428, 430 (E.D. Pa. 2004).  Even assuming that such documents are relevant, collecting and producing documents related to activities outside the United States is an enormous burden to place on a company that conducts a great deal of business outside of the United States and that is not a party to this case.  See id.  Qualcomm has not provided any authority in which a court determined that the relevancy requirement overrides the undue burden requirement when production is demanded from a non-party, especially where the party demanding production cannot point to a substantial need for the documents or the relevance of the documents.

  **b.**  **Documents dated before July 1, 2001 are irrelevant**

Qualcomm argues that there is no basis for the time constraints which Ericsson has placed on its production.  This position, however, is incorrect.  The demand for documents created before July 1, 2001 ignores the fact that any documents created before this date cannot be relevant because any cause of action under the federal

antitrust laws or the New Jersey Antitrust Act to which such documents may be relevant would be time barred under the applicable four year statute of limitations. See 15 U.S.C. § 15B; N.J. Stat. Ann. §56:9-14. Therefore, such documents would not be relevant to the instant action, nor would they be reasonably calculated to lead to admissible evidence.

As noted above, courts have recognized that time limitations on discovery requests are entirely appropriate in the antitrust context. See Automotive Refinishing Paint Antitrust Litig., 229 F.R.D. at 496; In re Microcrystalline Cellulose Antitrust Litig., 221 F.R.D. at 430. Qualcomm, however, relies on Fitzgerald v. Henderson, 251 F.3d 345 (2d Cir. 2001) and American Health Systems v. Liberty Health System, Civ. A. No. 90-3112, 1991 WL 30726 (E.D. Pa. Mar. 5, 1991) for the proposition that statutes of limitations do not bar discovery of documents that predate that time period. Memo at 18. This proposition is not applicable, especially to non-parties. As the Southern District recently noted, Fitzgerald v. Henderson, a case dealing with employment discrimination, was narrowed by the Supreme Court in 2002:

> Prior to 2002, the continuing violation doctrine permitted recovery for discriminatory conduct that occurred outside of the applicable limitations period if the conduct was part of a "practice or policy" of discrimination. See, e.g., Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001). However, the scope of the continuing violation doctrine was substantially restricted by the Supreme Court's decision in AMTRAK v. Morgan, 536 U.S. 101 (2002). In that case the Supreme Court unanimously held that "each discrete discriminatory act starts a new clock for filing charges alleging that act." 536 U.S. at 114.
>
> Nakis v. Potter, 422 F. Supp. 2d 398, 409-10 (S.D.N.Y. 2006).

Moreover, <u>American Health Systems</u> is inapplicable to the present case where documents outside of the statute of limitations are sought from a non-party. In <u>American Health Systems</u>, plaintiffs sought to compel the production of documents and answers to interrogatories from the defendant, not a non-party. In that case, the defendant's own conduct was at issue in an antitrust litigation. Ericsson is neither a party to this litigation, nor is it the subject of any claim. As such, its conduct in a time period pre-dating the statute of limitations is not central to any claim in the underlying law suit. Therefore, it would be unduly burdensome to compel Ericsson to produce such documents.

> **c.    Documents dated after July 1, 2005 are irrelevant**

As stated above, a temporal limitation on discovery requests is entirely appropriate in the antitrust context. <u>See</u> <u>Automotive Refinishing Paint Antitrust Litig.</u>, 229 F.R.D. at 496; <u>In re Microcrystalline Cellulose Antitrust Litig.</u>, 221 F.R.D. at 430. Additionally, a number of courts have held that inquiry may not be made regarding events subsequent to the commencement of an action or occurring after an alleged wrong complained of. <u>See, e.g.</u>, <u>Singer Mfg. Co. v. Brother Int'l Corp.</u>, 191 F. Supp. 322 (S.D.N.Y. 1960); <u>Needles v. F.W. Woolworth Co.</u>, 13 F.R.D. 460 (E.D. Pa. 1952). Documents created after this filing date, at this point in the litigation, are simply irrelevant. As stated above, Ericsson's conduct is not at issue in the underlying antitrust litigation. As such, its conduct post-dating the filing of this suit is not central to any claim in the underlying antitrust litigation. Therefore, it would be unduly burdensome to compel Ericsson to produce such documents.

Further, Qualcomm's contention that "Broadcom and Qualcomm have been generally producing documents created up to October 1, 2005, and have agreed to produce certain documents post-dating even that date" (Memo at 20) is irrelevant with respect to non-party Ericsson.  Ericsson is and remains a third party to the dispute between Broadcom and Qualcomm.  Agreements or disagreements over the production of documents between the parties to this case does not change the fact that the cut off for discovery in a civil action normally ends with the filing date of the complaint.  It is unreasonable and unduly burdensome to expect third-party Ericsson to do more.

- 14-

## IV.    CONCLUSION

Qualcomm demands that non-party Ericsson undertake a massive survey of any and all documents related to its own history and the history of other competitors in the mobile telecommunications market without regard to time, place or relevance. Qualcomm compounds the burden of this demand by arguing that such a production must take place before this Court decides the pending motion to dismiss, which, if granted, would render any documents collected and produced by Ericsson moot. Such a demand is unduly burdensome given the universe of documents, Ericsson's non-party status, and LM Ericsson's foreign non-party status. Therefore, it is respectfully requested that Qualcomm's motion be denied.

Respectfully submitted,

Dated: June 5, 2006

By: _William S. Feiler_

William S. Feiler (WSF 7618)
MORGAN & FINNEGAN, L.L.P.
3 World Financial Center
New York, NY 10281
Tel:  (212) 415-8700
Fax:  (212) 415-8701

Attorneys for Third Parties
Telefonaktiebolaget LM Ericsson and
Ericsson, Inc.

- 15-

996195 v1

<u>CERTIFICATE OF SERVICE</u>

This is to certify that true and correct copies of THIRD PARTIES TELEFONAKTIEBOLAGET LM ERICSSON'S AND ERICSSON, INC.'S MEMORANDUM IN OPPOSITION TO QUALCOMM INCORPORATED'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS and DECLARATION OF DANIELLE V. TULLY IN SUPPORT OF THIRD PARTIES TELEFONAKTIEBOLAGET LM ERICSSON'S AND ERICSSON, INC.'S MEMORANDUM IN OPPOSITION TO QUALCOMM INCORPORATED'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS were delivered to the below listed counsel on this 5th day of June, 2006 as follows:

**_VIA_ FEDERAL EXPRESS:**

> William J. O'Shaughnessy, Esq.
> McCarter & English, LLP
> Four Gateway Center
> 100 Mulberry Street
> Newark, NJ 07102
> Counsel for Qualcomm Incorporated
>
> Richard J. Stark, Esq.
> Cravath Swaine & Moore LLP
> 825 Eighth Avenue
> New York, New York  10019
> Counsel for Qualcomm Incorporated
>
> Richard S. Taffet, Esq.
> Bingham McCutchen LLP
> 399 Park Avenue
> New York, New York 10022
> Counsel for Qualcomm Incorporated
>
> David S. Stone, Esq.
> Boies, Schiller, & Flexner, LLP
> 150 John F. Kennedy Parkway
> 4th Floor
> Short Hills, New Jersey  07078
> Counsel for Broadcom Corporation
>
> Mark W. Nelson, Esq.
> Cleary Gottlieb Steen & Hamilton LLP
> 2000 Pennsylvania Avenue, NW
> Washington, DC 20006
> Counsel for Broadcom Corporation

996195 v1

David A Barrett, Esq.
Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, New York 10022
Counsel for Broadcom Corporation

Anne Patterson, Esq.
Riker Danzig Scherer Hyland & Perretti LLP
Headquarters Plaza 1 Speedwell Avenue
Morristown, New Jersey 07962
Counsel for Broadcom

I certify under the penalty of perjury that the foregoing is true.

Signed:

Executed on:  June 5, 2006

Danielle V. Tully

- 17-

996195 v1

William S. Feiler (WSF 7618)
MORGAN & FINNEGAN, L.L.P.
3 World Financial Center
New York, New York 10281
(212) 415-8700
(212) 415-8701 (FAX)
Attorneys for Third Parties
Telefonaktiebolaget LM Ericsson and
Ericsson Inc.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>QUALCOMM INCORPORATED,<br><br>    Defendant. | CASE NO.: 05-3350 (MLC)<br><br>RETURN DATE:  JUNE 19, 2006 |

### DECLARATION OF DANIELLE V. TULLY IN SUPPORT OF THIRD PARTIES TELEFONAKTIEBOLAGET LM ERICSSON'S AND ERICSSON, INC.'S MEMORANDUM IN OPPOSITION TO QUALCOMM INCORPORATED'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS

Danielle V. Tully declares:

1.     I make this declaration in support of third parties Telefonaktiebolaget LM Ericsson's and Ericsson Inc.'s (collectively "Ericsson") memorandum in opposition to Qualcomm's motion to compel the production of documents.

2.     I am an attorney with the law firm of Morgan & Finnegan, L.L.P., counsel for Ericsson in this litigation.

1

996737 v1

3.    Attached as Exhibit 1 is a true and correct copy of the amended complaint filed by Broadcom on September 19, 2005 in this litigation.

4.    Attached as Exhibit 2 is a true and correct copy of Qualcomm's brief in support of its motion to dismiss dated December 9, 2005.

5.    Attached as Exhibit 3 is a true and correct copy of Broadcom's brief in opposition to Qualcomm's motion to dismiss dated January 17, 2006.

6.    Attached as Exhibit 4 is a true and correct copy of QUALCOMM's reply brief in support of its motion to dismiss dated January 30, 2006.

7.    Attached as Exhibit 5 is a true and correct copy of third party Telefonaktiebolaget LM Ericsson's objections to Qualcomm's subpoena, dated April 7, 2006.

8.    Attached as Exhibit 6 is a true and correct copy of third party Ericsson Inc.'s objections to Qualcomm's subpoena, dated April 7, 2006.

9.    Attached as Exhibit 7 is a true and correct copy of a letter from F. Gonell to W. Feiler dated April 13, 2006.


I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.


Executed:  June 5, 2006                    _Danielle V. Tully_

                                            DANIELLE V. TULLY

996737 v1

Exhibit 1

# BOIES, SCHILLER & FLEXNER LLP

150 JOHN F. KENNEDY PARKWAY • 4TH FLOOR • SHORT HILLS, NJ 07078 • PH. 973.218.1111 • FAX 973.218.1106

September 19, 2005

**VIA ELECTRONIC FILING**

Clerk of the Court
United States District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, NJ 08608

     Re:   **Broadcom Corporation v. Qualcomm Incorporated**
           **Civ. Action No. 05-3350**

Dear Sir or Madam:

     Enclosed for filing is a First Amended Complaint.  Kindly advise us when this First Amended Complaint has been received and filed by the Court.

     Thank you for your attention to this matter.

                         Very truly yours,

                         s/ David S. Stone

                         David S. Stone

Enclosures

cc:    Honorable Mary L Cooper (via Federal Express)
       Honorable John J. Hughes (via Federal Express)
       David R. Marriott (via Federal Express)
       William J. O'Shaughnessy (via Federal Express)
       David Boies
       George Cary

Boies, Schiller & Flexner LLP
150 John F. Kennedy Parkway
Short Hills, NJ 07078
(973) 218-1111
Fax: (973) 218-1106
David S. Stone, Esq. (DSS-8580)

Counsel for Plaintiff BROADCOM CORPORATION

Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500
Fax: (202) 974-1999

Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, NY 10022
(212) 446-2300
Fax: (212) 446-2350

Of Counsel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>QUALCOMM INCORPORATED,<br><br>Defendant. | Civil Action No. 05-3350 (MLC)<br><br>FIRST AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Broadcom Corporation ("Broadcom"), through its undersigned attorneys, by and for its First Amended Complaint, upon personal knowledge as to its own acts, and on information and belief as to all others based upon its own and its attorneys' investigation, alleges as follows:

I.

**SUMMARY OF THE ACTION**

1.     Plaintiff Broadcom is a California corporation with its principal place of business at 16215 Alton Parkway, Irvine, California, 92618.  Broadcom also operates a significant facility in Matawan, New Jersey, which is an important part of the Broadcom business at issue in this lawsuit.  Defendant Qualcomm Incorporated ("Qualcomm") is a Delaware corporation with its principal place of business at 5775 Morehouse Drive, San Diego, California, 92121.  Qualcomm also transacts and is registered to do business in and is found within New Jersey, where Qualcomm has appointed an agent for service of process.

2.     This complaint arises, first, from defendant Qualcomm's illegal and anticompetitive conduct in the markets for the technology and chipsets that operate cell phones employing Wideband Code Division Multiple Access ("WCDMA"), a third generation ("3G") technology that is implemented through a mobile telephone standard known as the Universal Mobile Telephone System ("UMTS"), and, second, from Qualcomm's use of mergers and acquisitions, including its recent announcement of Qualcomm's intention to acquire Flarion Technologies, Inc. ("Flarion"), to substantially lessen acquisition.  Qualcomm's acquisition of Flarion, a South Bedminster, New Jersey developer of wireless technologies called Orthogonal Frequency Division Multiplexing and Orthogonal Frequency Division Multiplexing Access

("OFDM/OFDMA"), would substantially lessen competition and extend Qualcomm's existing monopoly power into next generation wireless technologies.

***Qualcomm's Anticompetitive Conduct Relating to WCDMA Technology and Chipsets***

3.      Qualcomm holds certain patents that it has asserted are "essential" to WCDMA technology and the UMTS standard.  Thus, international and United States standard-setting bodies only adopted UMTS as a mobile telephone standard after Qualcomm represented in writing that it would license its WCDMA patents on fair, reasonable and non-discriminatory (that is, so-called "FRAND") terms.  The adoption of the UMTS standard led mobile telephone services carriers to invest billions of dollars in developing UMTS phone systems.  But after the UMTS standard was adopted, giving Qualcomm monopoly power in the WCDMA technology markets, Qualcomm disregarded its FRAND commitments.  Qualcomm has instead leveraged its WCDMA patents in an attempt to expand its monopoly power into the separate market for the sale of the UMTS chipsets that provide basic operational functionality for UMTS phones.  Indeed, Qualcomm is now employing with respect to WCDMA and UMTS the same types of unlawful and anticompetitive tactics that Qualcomm has already used to gain tight monopoly control of the markets for technology and chipsets applicable to another third-generation mobile phone standard based on Code Division Multiple Access ("CDMA") technology.

4.      Broadcom has developed UMTS chipsets that would compete with Qualcomm's.  In this action, Broadcom seeks to prevent Qualcomm from repeating its pattern of unlawful and anticompetitive conduct to exclude Broadcom from the UMTS chipset market, monopolize the UMTS chipset market, and harm consumers.

5.      Cell phones today principally use either of two leading second generation, or "2G" wireless technologies.  Many wireless carriers, including Cingular Wireless, the United States'

2

largest, currently use the second-generation system called Global System for Mobility ("GSM"). Other carriers, such as Verizon Wireless, use 2G CDMA technology. These carriers and others are currently upgrading their cell phone systems to offer 3G systems that expand cell phone capabilities to include services such as high-speed Internet connectivity.

6.      GSM carriers are upgrading their systems to UMTS. UMTS permits a dual-mode approach that is backwards compatible with GSM phones, but also features advanced WCDMA capabilities that provide 3G functionality. Carriers currently using CDMA-based technologies are largely upgrading their systems to use 3G variants of CDMA technology.

7.      Despite the similarity in their names, WCDMA- and CDMA-based systems and devices are incompatible and non-interchangeable. To develop either of these systems requires literally billions of dollars of network and infrastructure investments. Wireless service carriers made decisions to install second-generation systems using either GSM or 2G CDMA technology, and both the massive sunk investment in the system and the substantial costs that would be incurred to establish a different system, made it prohibitively expensive to switch to a different technology. Now, because the transition from GSM to UMTS requires much smaller investments than would a transition from GSM to 3GCDMA, and because the transition from 2GCDMA to 3G CDMA requires much smaller investments than would a transition from 2G CDMA to UMTS, carriers with GSM systems are virtually certain to transition to UMTS, while carriers with 2G CDMA systems are virtually certain to transition to 3G CDMA.

8.      Qualcomm has already acquired and maintained monopoly control over the sale of 2G and 3G CDMA chipsets, markets in which Qualcomm now possesses an approximately *ninety* percent market share.

9.      Qualcomm also has monopoly power in 3G markets for technology subject to patents that Qualcomm has asserted are "essential" for implementation of any WCDMA-based system, including UMTS.  Qualcomm obtained that power when it secured, based on its FRAND commitments that it never intended to meet, the incorporation of WCDMA technology into wireless phone standards.

10.     As carriers around the world are moving from GSM to UMTS, and as the number of subscribers to UMTS is growing rapidly, Qualcomm is acting to exclude competition and extend its monopoly grip – already firm in 2G and 3G CDMA markets and the markets for its WCDMA technology – into the chipsets that will power millions of UMTS-based phones around the world.

11.     Qualcomm has plainly and willfully disregarded its repeated commitments to license its WCDMA technology on FRAND terms, and has engaged in a series of anticompetitive practices that are anything but fair, reasonable and non-discriminatory.  Through those practices, Qualcomm has used its self-proclaimed essential WCDMA patents to attempt to monopolize, and effectively thwart, meaningful competition in the market for UMTS chipsets.

12.     Broadcom has made substantial investments to develop advanced, competitive UMTS chipsets, which by definition must include WCDMA capability.  As summarized below, rather than competing against Broadcom on the merits, Qualcomm has refused to license to Broadcom on FRAND terms the patents that Qualcomm asserts are essential for UMTS chipsets, and Qualcomm has used its unlawful and anticompetitive licensing and exclusivity agreements with cell phone manufacturers to undermine competition.

    *(a) Refusal to Provide Broadcom a WCDMA Patent License in Violation of FRAND*
       *Commitments*

13.     Qualcomm has refused to provide Broadcom with a license for Qualcomm's purported essential WCDMA patents on FRAND terms.  Instead, disregarding its FRAND obligations,

4

Qualcomm has demanded from Broadcom a wide array of terms that are aimed to cripple Broadcom as a competitor. Broadcom does not disclose the specifics of those terms here, because Qualcomm, in an effort to protect its discriminatory and anticompetitive practices, required Broadcom, and requires others seeking to negotiate WCDMA technology licenses, to enter into non-disclosure agreements. In general terms, however, the types of unfair, unreasonable, and discriminatory terms demanded by Qualcomm include:

    a.    demanding that the licensee agree to pay royalties on components over which Qualcomm has no claim to patent rights, which would undermine the licensee's ability and incentive to develop and include innovative functionality;

    b.    insisting that the licensee agree to grant Qualcomm a cross-license to the licensee's intellectual property in a way that is far broader than the license that Qualcomm would provide to the licensee;

    c.    requiring that the licensee sell UMTS chipsets only to customers that are also licensed by Qualcomm, so that Qualcomm can collect double royalties from the licensee's customers; and

    d.    imposing on the licensee terms that would require the licensee to reveal to Qualcomm detailed and sensitive price information about the licensee's dealings with its customers, including those customers for whose business the licensee and Qualcomm would be competing directly.

    *(b) Discriminatory Linkage of Licensing of Qualcomm's WCDMA Patents to Cell Phone Manufacturers' Purchase of Qualcomm's UMTS Chipsets*

14.    Similarly, in separate patent license agreements with the manufacturers of cell phones using Qualcomm's WCDMA technology (as all UMTS phones must pursuant to the international standards adopted based on Qualcomm's FRAND representations), Qualcomm has, without any

legitimate technical or other business justification, engaged and is engaging in discrimination based on whether these manufacturers also agree to purchase Qualcomm chipsets. Such discrimination expressly links access to Qualcomm's "essential" patents, over which it possesses monopoly control, to licensees' use of Qualcomm's UMTS chipsets rather than an actual or would-be competitor's. For example:

     a.     Qualcomm requires cell phone manufacturers to pay high up-front fees for access to Qualcomm's essential patents, but reduces or eliminates those fees if the manufacturers agree to buy Qualcomm's UMTS chipsets.

     b.     Through a practice sometimes referred to as "price netting," Qualcomm requires cell phone manufacturers to pay effectively higher royalties for Qualcomm's essential patents for WCDMA if the manufacturers use a chipset from a Qualcomm competitor.

15.     Price netting alone imposes a significant chipset price penalty on Qualcomm's would-be competitors. For example, if a cell phone manufacturer is required to pay Qualcomm a 5% royalty for Qualcomm's WCDMA patents, a price netting term would impose a penalty of 5% of the chipset price on a Qualcomm competitor.

     *(c) Exclusive Dealing*

16.     Qualcomm has also provided cell phone manufacturers substantial payments or other economic incentives to not use chipsets from a competitor. For example, Qualcomm offered a cell phone manufacturer one million free UMTS chipsets, a benefit worth tens of millions of dollars, as part of its attempts to foreclose competition.

*(d) Abuse of CDMA Monopolies to Undermine UMTS Competition*

17.     Already using its monopoly power over chipsets using the 2G and 3G CDMA

standards, Qualcomm has engaged in multiple forms of anticompetitive conduct – all violating

its FRAND commitments in CDMA – with regard to its handset manufacturer licensees and

customers.  For example, Qualcomm has:

- Threatened to cut supplies of Qualcomm chipsets to licensees who purchase CDMA chipsets from Qualcomm's competitors;

- Imposed exclusivity requirements on chipset customers;

- Linked product discounts and marketing incentives to customers' agreements not to use competitors' chipsets; and

- Coerced chipset customers and licensees, many of which are members of key standards setting bodies, to support Qualcomm's manipulation of CDMA standards and impede competitors' CDMA innovations.

18.     Qualcomm's cell phone manufacturer customers fear retribution from Qualcomm if

they use any significant quantity of chipsets from a Qualcomm competitor.  Retribution by

Qualcomm is an effective threat not only because Qualcomm has monopoly power over chipsets

on which customers depend, but also because of the competitiveness of the CDMA cell phone

manufacturing industry:  loss of price preferences, discounts, marketing incentives, or timely

supply of Qualcomm chipsets can cripple a cell phone manufacturer's ability to compete.

Qualcomm has threatened its cell phone manufacturer customers with *all* of these punishments to

avoid competition on the merits.

19.     Most of the manufacturers of UMTS cell phones are the same companies subject to

Qualcomm's monopoly power in the 2G and 3G CDMA markets.  Qualcomm has repeatedly

demonstrated its inclination to use discriminatory, anticompetitive means to acquire and maintain

its monopoly power, both in CDMA and in WCDMA technology.  It now threatens to

monopolize the UMTS chipset market, in which Broadcom would like to compete, using many

of the same and other unlawful practices.

20.    Among other things, Qualcomm's conduct with respect to CDMA has:

- Preserved monopoly pricing for CDMA chipsets and stunted price competition at both
  the cell phone and carrier level, causing consumers to pay more for cell phones than they
  would if there were free and vigorous competition;

- Caused output of CDMA chipsets to remain below the levels that would exist in a
  competitive market;

- Inhibited innovation and product development in CDMA cell phones and chipsets,
  thereby reducing consumer product choice and quality; and

- Coerced standards setting body members to delay and undermine the adoption of
  innovative CDMA technologies developed by would-be competitors, and instead to adopt
  the products being developed by Qualcomm, thereby solidifying Qualcomm's CDMA
  market dominance and depriving consumers of the benefits of timely adoption of
  innovative technologies.

21.    Left unchecked, Qualcomm's conduct will have the same or similar effects in the

UMTS chipset market.  Unless Qualcomm's misconduct is remedied, there is a dangerous

probability that Qualcomm will exclude Broadcom and others from the UMTS chipset market

and obtain monopoly power.  This conduct will harm competition in the UMTS chipset market.

*Qualcomm's Anticompetitive Acquisition of Flarion*

22.    Qualcomm now seeks to extend its monopoly power into the next generations of

wireless standards, as it has already done with regard to previous generations, through

acquisition of Flarion Technologies, based in South Bedminster, New Jersey, for up to $805

million.  As described by Qualcomm, Flarion is "a pioneer and leading developer" of

OFDM/OFDMA technologies, and "the inventor of FLASH-OFDM® technology for mobile

broadband Internet protocol (IP) services."

23.    OFDM/OFDMA technologies are widely expected to be a foundation of the next

generations of mobile wireless technology and standards, often referred to in the industry as

8

Beyond Third Generation ("B3G") and Fourth Generation ("4G") standards, and Flarion has emphasized precisely the areas of OFDM/OFDMA development – use in mobile applications and operation on Internet Protocol-based networks – that are likely to be significant for B3G and 4G standards. Indeed, Flarion has the only market-tested OFDM/OFDMA product currently available for use as the centerpiece of mobile wireless networks. Absent the acquisition, Flarion and its technologies present a fundamental competitive challenge to Qualcomm's CDMA – as well as Qualcomm's own OFDM/OFDMA – technology for B3G and 4G standards.

24.    Qualcomm has asserted that the combination of the two companies will have the "industry leading" intellectual property portfolio for OFDMA for wireless applications, and control key patents for technology implementing, among other things, OFDMA/OFDMA and the emerging mobile "WiMAX" standard. In each respect, the combination is likely to significantly reduce competition and provide Qualcomm a means to extend its monopoly power into the next generations of wireless standards.

## II.

## JURISDICTION, VENUE AND COMMERCE

25.    The Court has jurisdiction over this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337.

26.    The Court has supplemental jurisdiction over the state law claims asserted in this action pursuant to 28 U.S.C. § 1367. The federal and state law claims asserted in this action arise from a common nucleus of operative facts.

27.    Qualcomm's anticompetitive conduct with respect to UMTS chipsets and its "essential" WCDMA patents has affected and is affecting a substantial volume of interstate and foreign commerce, including commerce in this District. Qualcomm's planned acquisition of Flarion,

which is based in South Bedminster, New Jersey, would also affect a substantial volume of interstate and foreign commerce, including commerce in this District.

28.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391.  Defendant Qualcomm transacts and is registered to do business in, resides in, and is found within this District, and proposes to acquire Flarion, which is based in South Bedminster, New Jersey.  Qualcomm has also appointed an agent for service of process in New Jersey.  In addition, Plaintiff Broadcom operates a significant facility in New Jersey, which is an important part of Broadcom's UMTS chipset business.

29.    New Jersey is a center for other key players in the wireless industry.  LG Electronics ("LGE") and Motorola. Inc. ("Motorola") – two of the three largest manufacturers of UMTS-based cell phones – have substantial business operations in this District.  Qualcomm has stated publicly that LGE and Motorola are "major customers."  LGE's North American headquarters is located in Englewood Cliffs, New Jersey, and Motorola has substantial operations in New Jersey, including facilities in South Plainfield, Glen Rock and Piscataway.  Matsushita Electric Industrial Co., Ltd., another leading manufacturer of UMTS-based cell phones using the Panasonic brand name, has its principal North American subsidiary (Panasonic Corporation of North America) headquartered in Secaucus, New Jersey.  In addition, Verizon Wireless, the nation's largest CDMA carrier, is headquartered in Bedminster, New Jersey.

30.    Moreover, numerous other businesses and persons affected by this action are located within this District.  Millions of New Jersey consumers who have purchased or will purchase UMTS cell phones have been or will be injured by the higher prices, slower innovation, and reduced choices that have resulted and will result from Qualcomm's anticompetitive conduct.

10

## III.

### THE PARTIES

31.    Plaintiff Broadcom is a supplier of semiconductors for wired and wireless broadband communications. Broadcom's products provide innovative solutions in a variety of areas, including digital cable, satellite and Internet set-top boxes, high-definition televisions, digital subscriber line modems, home and wireless networking, and cellular and terrestrial wireless communications. Broadcom has an extensive history of innovation in the area of semiconductors used for broadband communications. Broadcom has made substantial investments, including the acquisition of Zyray Wireless in 2004 for approximately $96 million in stock, to develop advanced, competitive UMTS chipsets, which by definition must include WCDMA capability.

32.    Defendant Qualcomm has offices around the United States and the world, and operates several independent business units. Among others, Qualcomm licenses its intellectual property rights through a business unit called the "Technology Licensing Segment," or "QTL." Qualcomm sells chipsets through a business unit called the CDMA Technologies Segment, or "QCT."

33.    Qualcomm's QCT and QTL units are and have been extremely profitable. For example, in March 2005, Qualcomm summarized QCT and QTL revenue and profitability for fiscal year 2004 as follows:

11

### QUALCOMM CHIPSET AND LICENSING FINANCIALS, FISCAL YEAR 2004

|  | QCT<br>(CHIPSET SALES) | QTL<br>(TECHNOLOGY LICENSING) |
|---|---|---|
| REVENUES | $3.111 billion | $1.331 billion |
| REVENUES AS % OF QUALCOMM TOTAL | 64% | 27% |
| EARNINGS BEFORE TAXES | $1.049 billion | $1.195 billion |
| EARNINGS AS % OF UNIT REVENUES | 34% | 90% |

### IV.

### THE STRUCTURE OF THE WIRELESS INDUSTRY

**A.     WIRELESS CARRIERS, CELL PHONE MANUFACTURERS, AND CHIPSET MANUFACTURERS**

34.     Wireless carriers provide cell phone service to consumers.  Carriers operate the wireless systems that enable consumers to place and receive telephone calls, and send and receive data, on cell phones.  Leading wireless carriers in the United States include Cingular Wireless LLC, T-Mobile USA, Inc., Verizon Wireless, and Sprint Corp.

35.     A number of companies around the world manufacture cell phones, and the manufacturers typically sell those phones to the carriers, which in turn arrange for sale of the phones to consumers.  Cell phone manufacturers include Original Equipment Manufacturers ("OEMs"), which manufacture cell phones under their own names, as well as Original Design Manufacturers ("ODMs"), which manufacture cell phones for sale under an OEM's brand name, usually based on a design created by the OEM.  Motorola and LGE are two leading cell phone OEMs.

36.     Cell phones contain, among other components, one or more computer chipsets that deliver the cell phones' core ability to communicate with the wireless system. These chipsets are sometimes referred to as Application-Specific Integrated Circuits, or "ASICs." Various firms in the industry develop and manufacture these chipsets.

**B.     THE ROLE OF STANDARDS DEVELOPMENT ORGANIZATIONS**

37.     For a carrier's wireless system to function properly, all of the system's components (*e.g.*, base stations in various geographic locations and consumers' cell phones) must seamlessly interface with each other. This means that regardless of which manufacturer makes a cell phone, regardless of which chipset manufacturer supplies the components for the cell phone, and regardless of which company manufactures the system's components, each cell phone must be capable of interfacing with all of the other components in a carrier's wireless system.

38.     Because of this demand for interoperability, several standards development organizations ("SDOs") have worked with the wireless industry to develop wireless communications standards.

39.     On a worldwide basis, the International Telecommunications Union ("ITU") is the central telecommunications SDO. The ITU is an international organization comprised of governments and firms in the private sector which coordinates the operation of telecommunications systems and services and advances the development of communications technology. The ITU's standardization activities are designed to foster the growth of new technologies, such as mobile telephony and the Internet, as well as the emerging global information infrastructure which handles a mix of voice, data and multimedia signals. The ITU develops internationally agreed technical and operating standards to foster interconnection of the world's communications systems.

40.     The Telecommunications Industry Association ("TIA") is the leading U.S.-based SDO for the communications and information technology industry. The TIA is comprised of member companies that manufacture or supply products and services used in global communications. The European Telecommunications Standards Institution ("ETSI") is an SDO based in France with a leadership role in Europe. The Alliance of Telecommunications Industry Solutions ("ATIS") is an SDO based in the United States.

41.     In the past several years, standards bodies specific to wireless technology standards have developed. The Third Generation Partnership Project ("3GPP") has focused on the evolution of GSM and UMTS technology, and the Third Generation Partnership Project 2 ("3GPP2") has focused on the evolution of CDMA technology.

42.     The ownership of relevant intellectual property ("IP") and related IP licensing practices are critical issues in SDOs' consideration of standards proposals. If the implementation of a standard requires the use of particular IP, such as a patent, the IP owner may have the ability to prevent, delay or distort the development of technology implementing that standard and thereby undermine the purpose of the SDO. Accordingly, SDOs typically require that their members declare whether they believe they hold patents necessary for compliance with a particular standard, and if so whether they are willing to license such patents on fair, reasonable, and non-discriminatory ("FRAND") terms. Patents necessary to implement a particular standard are known as "essential patents" for the standard to which they relate. Each SDO relevant to this action requires that owners of essential patents agree to FRAND licensing before the SDO will agree to include the technology that depends upon those patents in any industry standard.

## C.    THE DEVELOPMENT OF GENERATIONS OF CELL PHONE TECHNOLOGY

43.    Cell phones have developed through several "generations" in response to demand for wireless systems that carry data at faster rates and voice traffic at higher capacity.  Wireless carriers have been increasingly focused on providing wireless data services through mobile phones, including wireless access to the Internet, multimedia entertainment, broadcast television and position location services.  The earliest wireless systems, which included analog technology with voice transmission only, are typically referred to as first generation or "1G."  While first generation technology dramatically expanded adoption of wireless telecommunications, the technology was characterized by inherent capacity limitations, minimal data transfer capabilities, low security, inconsistent service levels, and significant power consumption.

44.    The limitations of analog technology drove the development of a second generation of digital-based technologies, which are the primary technology standards in use today.  Second generation, or "2G," digital technology provided significantly enhanced efficiency through greatly increased voice capacity compared to analog systems.  Second generation technologies also enabled wireless carriers to begin to offer numerous enhanced services, including paging, e-mail connections to computer networks, greater privacy, and greater fraud protection.

45.    The leading 2G cell phone technologies are based on GSM and CDMA technologies.  In the United States, Cingular Wireless and T-Mobile (among others) use GSM networks, while Verizon Wireless and Sprint (among others) use CDMA networks.  The technologies are incompatible; a GSM phone will not work on a CDMA network and vice versa.

46.    The 2G standards have been supplemented by evolutionary improvements and advancements that permit greater data rates and increased voice capacity.  Many GSM carriers have adopted or are adopting technologies known as GSM Packet Radio Service ("GPRS") and

Enhanced Data Rates for GSM Evolution ("EDGE"), which are sometimes referred to as "2.5G" technologies. Similarly, CDMA carriers have moved from a 2G standard called "cdmaOne," to a newer IS-2000 standard, referred to as CDMA2000, the first iteration of which is another "2.5G" technology. As with the basic 2G standards, the 2.5G variants of GSM and CDMA technologies are incompatible with one another.

47.    As demand for wireless systems that carry both data at faster speeds and voice at higher capacity has increased significantly, third generation or "3G" wireless standards have been proposed and adopted by international SDO. A technology standard selected for 3G must efficiently support significantly increased data speeds and capacity over limited spectrum bandwidth, thereby enabling new and enhanced services and applications such as mobile e-commerce, broadcast television, position location, and mobile multimedia web browsing, including music and video downloads.

48.    The UMTS standard was designed to permit economical transition from 2G GSM-based systems to a 3G standard, and is the logical evolutionary step for GSM carriers. The UMTS standard permits a dual-mode approach incorporating both the GSM family of standards (including GPRS and EDGE) as well as a set of WCDMA 3G standards. Despite the similarity in name, cell phones designed for WCDMA operation under the UMTS standards are not compatible with any of the CDMA standards, regardless of generation, and the 3G standard for CDMA networks is entirely separate from either UMTS or WCDMA. For example, Verizon Wireless is in the process of transitioning from 2.5G CDMA (embodied in a variant of CDMA2000 known as CDMA2000-1xRTT) to 3G CDMA (in the form of a standard known as CDMA2000-1xEVDO).

16

49.     The transition from 2G and 2.5G to 3G systems, which is only now beginning in some countries, is requiring and will require carriers to make substantial investments. It is anticipated that UMTS and 3G CDMA will be the significant 3G standards, with 3G CDMA anticipated as the upgrade path for current 2G CDMA carriers and UMTS anticipated as the upgrade path for current carriers of GSM and related technologies.

50.     Cell phone technology will continue to develop during and after the move to 3G technology. Driven by demand for an increasing number of wireless applications and improved quality of existing applications, carriers wish to offer newer technologies that provide ever-increasing bandwidth supporting more advanced applications. The industry has already undertaken substantial development of technologies that may be implemented in B3G and 4G mobile wireless systems. SDOs working in the wireless area, including 3GPP and 3GPP2, have already begun work establishing B3G standards.

51.     While the B3G standards are not yet fully developed, it is clear that Qualcomm-owned and Flarion-owned technologies will be leading contenders for adoption in B3G mobile wireless systems, and for 4G systems after that. For example, Flarion's FLASH-OFDM technology has been a leading contender to be integrated into the IEEE 802.20 standard, which in turn could be a basis for B3G and 4G wireless systems. Qualcomm, on the other hand, has pushed CDMA-based technologies, such as multi-carrier CDMA, for future systems; started OFDM/OFDMA development of its own; and (as described below) successfully sought to grind the development of the IEEE 802.20 standard to an effective halt, thereby undermining a competitive threat to Qualcomm's dominance. Despite Qualcomm's substantial investment in Flarion to obtain OFDM/OFDMA technologies and intellectual property, as well as Qualcomm's investment in developing its own competing OFDM/OFDMA technology, Qualcomm still trumpets that it

17

believes "CDMA technology will continue to offer the most advanced, spectrally efficient wide area wireless mobile networks for the foreseeable future."

52.    Qualcomm claims to hold patents essential to CDMA and WCDMA wireless telecommunications standards that have been adopted or proposed for adoption by SDOs worldwide.  Qualcomm also claims that its combination with Flarion will result in the combined company's possession of patents essential to the leading OFDMA solutions, which are contending to be B3G and 4G standards.  In short, controlling Flarion provides a means for Qualcomm to project its monopoly position and power into future generations of mobile wireless technology.

**D.    THE CHIPSET MARKETS**

53.    Each type of wireless system (*e.g.*, GSM, 2G CDMA, 2.5G CDMA, 3G CDMA, and UMTS) has unique features and technology, and thus neither the systems, nor the phones used for each system, are interchangeable or substitutes.  For a wireless service carrier to develop any one of these systems requires billions of dollars of investments in infrastructure.  Thus, once a carrier's initial decision to install a system has been made, the sunk investment in that system, and the costs that would be incurred to establish a different system, make it virtually impossible to switch to a different technology.

54.    At this point few, if any, new wireless networks will be built from scratch.  Even for new networks, limited and costly information has prevented carriers from taking into full account the long-term costs of operating a network, including the costs of chipsets for cell phones.  As the Chairman and CEO of Qualcomm stated in 2000:  "If you look at cdmaOne operators, it's certainly more economical to go to cdma2000 because of the way the system is designed."  By making the transition to the next generation of the technology that a carrier has already selected --

18

whether CDMA or GSM for 2G services – the carrier can follow a relatively lower cost evolutionary path compared to the generally insurmountable expense entailed in switching between technologies.

55.    At the same time, only phones with the appropriate technology will work on a particular wireless system. Similarly, the chipsets that operate cell phones must conform to the technology of the system for which the phone is being manufactured. Only 3G CDMA chipsets can be used in a 3G CDMA phone; only GSM chipsets can be used on a GSM phone; and only UMTS chipsets can be used on a UMTS phone. None of the chipsets are either interchangeable with, or substitutes for, each other.

56.    While the investment in upgrading from one generation of CDMA to another is somewhat less than the investment and time required to switch from one technology (such as CDMA) to another (such as GSM), distinct demand and different pricing for each generation of chipsets makes it appropriate to define separate product markets for each chipset generation. As used herein, "CDMA chipset markets" means the markets for the sale of the chipsets that provide the core communications functions for each generation of CDMA-based cell phones. The geographic scope of each of the CDMA chipset markets is worldwide.

57.    Similarly, UMTS chipsets are in a separate product market from the chipsets for GSM, CDMA and other cellular phone technologies. The geographic scope of the market for UMTS chipsets is worldwide.

## E.    THE TECHNOLOGY MARKETS

58.    Once an SDO adopts a technology for a particular standard, the owner of each essential patent family used in that technology obtains a monopoly in the particular functionalities provided by its patent family to the standard. As such, by definition, there are no substitutes for

the standardized technology on which the family of patents read; that standard cannot be practiced without using technology based on the essential patents.

59.     The technology on which on each essential patent reads for the UMTS standard issued in the United States constitutes a relevant product market, collectively referred to as the WCDMA technology markets.  Similarly, the technology reading on each essential patent for the 2G CDMA standard, 2.5G CDMA standard, and 3G CDMA standard also constitutes a relevant product market, referred to as the 2G, 2.5G, and 3G CDMA technology markets, respectively.

60.     Technologies are currently competing for adoption as part of B3G standards, and will compete for adoption as part of 4G standards.  The technologies contending to serve essential functions for B3G wireless standards and systems constitute a relevant product market, described as the B3G technology market.  Likewise, the technologies contending to serve essential functions for 4G wireless standards and systems constitute a relevant product market, described as the 4G technology market.

V.

## QUALCOMM'S SUCCESSFUL MONOPOLIZATION OF THE CDMA CHIPSET MARKETS

61.     Through a variety of anticompetitive means, Qualcomm has dominated the CDMA chipset markets, excluding virtually all competitors.  This conduct both has paved the way for Qualcomm's attempt to monopolize the UMTS chipset market by giving Qualcomm power over manufacturers of UMTS cell phones (most of which also produce CDMA cell phones) and demonstrates how Qualcomm will accomplish the same result in UMTS.

### A.    QUALCOMM HAS OBTAINED AND MAINTAINED MONOPOLY POWER IN THE CDMA CHIPSET MARKETS

62.    By its own statements, Qualcomm holds more than 1400 patents relating to CDMA technology and components, including the majority of the patents declared "essential" for CDMA systems, cell phones and chipsets.  According to Qualcomm, the CDMA standards and the UMTS standard cannot be practiced without using Qualcomm technology based on its patents, issued in the United States and elsewhere.  As such, and based on Qualcomm's own representation, there are no substitutes for the technology and thus Qualcomm holds monopoly power in each of the markets for CDMA technology.

63.    Qualcomm has used that power over CDMA technology to obtain and protect monopoly power in the CDMA chipset markets.  According to Qualcomm's public statements, through fiscal year 2005, Qualcomm had shipped more than 400 million of its CDMA chipsets worldwide.  Qualcomm sells approximately 90% of each generation of the world's CDMA chipsets.

64.    Industry analysts also place Qualcomm's market share in the CDMA chipset markets at 90% or more.  For example, market research firm iSuppli Corporation reported that in 2003, the latest year for which iSuppli has released data, Qualcomm's CDMA chipset revenues were approximately $1.7 billion out of a total of $1.87 billion for the industry.

65.    Qualcomm's monopoly power in the sale of CDMA chipsets has allowed it to raise prices and restrict output.  Qualcomm has charged extremely high prices – on the order of double the price of GSM chipsets – that are not justified by production costs, by product functionality, or by quality.  Both Qualcomm's own public statements and reports from industry analysts and media demonstrate that the supply of CDMA chipsets is below levels that would exist in a competitive

market. Indeed, over time Qualcomm has recurrently noted capacity and supply shortages, in

each instance suggesting that the problems would be solved in short order. For example:

- In its January 26, 2001 10-Q filing with the SEC, Qualcomm stated that "[t]he Company anticipates shipments in the second quarter of fiscal 2001 to be constrained by a capacity limitation at one of its suppliers. The Company expects the supply constraint to be substantially resolved by the third quarter of fiscal 2001."

- On April 8, 2002, a trade publication reported that "[i]ndustry analysts have predicted that a shortage of devices would slow the uptake of next-generation services, even as wireless operators began to upgrade their networks on the CDMA2000 or W-CDMA migration paths to third-generation capabilities. San Diego-based Qualcomm, which owns patents for all CDMA device and network technology, said it corrected the problem and is 'shipping large production volumes' of 1X chipsets worldwide."

- On July 23, 2003, Qualcomm's Executive Vice President stated that "[a]t this time we believe carry [sic] inventories are largely in line with what CDMA carriers consider normal inventory, and in India shipments were recently being expedited to avert shortages."

- In a news report dated January 22, 2004, Qualcomm's Chief Operating Officer was quoted as saying: "In India, for instance, they're complaining that they couldn't get phones and they could've grown faster. I certainly don't expect to see shortages for very long."

- On April 22, 2004, Qualcomm's President was quoted as describing the chipset shortage situation as "very much a supply limited market" and stating that a wireless carrier had been "constrained by the number of phones they can get."

- On May 13, 2004, Qualcomm's Executive Vice President stated on an investor teleconference that, "As you know we've had some shortages in meeting specific 51 and 5500 chipset demand." The same representative stated that, "There will be some shortage in one or two parts going forward but very small shortages we expect. So we will have a future strategy, which is in much better alignment."

- In its July 23, 2004 10-Q filing, Qualcomm stated that its chipset business "continued to experience supply constraints which resulted in our inability to meet certain customer demands" and that "we expect recent channel inventory shortages of integrated circuits to be alleviated in the future."

- On October 21, 2004, the Reuters news service reported that, according to Qualcomm's Chief Financial Officer William Keitel, "Qualcomm has resolved most of its supply issues, but is still producing some chips used for transmitting and receiving calls to mobile phones too slowly. 'We'll have it resolved by the end of the first calendar quarter,' Keitel said in an interview with Reuters. 'Our window on when we expect to be back in balance has been moving out because demand has continued to increase.'. . .

Keitel said the shortage relates to radio chips in Qualcomm's 6000 series product range but did not name specific products."

As these statements illustrate, Qualcomm has repeatedly demonstrated that it possesses the power to control the output of CDMA chipsets.

66.    Qualcomm's monopoly position is protected by high barriers to entry.  Qualcomm has admitted that "a company seeking to develop, manufacture and/or sell products that use CDMA technology will require a license" from it, and regularly states that it is "widely recognized" that its intellectual property is "essential for the development, manufacture and sale of products implementing" CDMA.  The technical complexity and Qualcomm's control of essential patents make potential entrants dependent on Qualcomm for entry into the CDMA chipset markets.

67.    Entry into the CDMA chipset business has been limited.  Only a few firms – such as Texas Instruments Incorporated, PrairieComm Incorporated, VIA Telecom, Inc., Eonex Technologies, Inc., and (for its own internal use) Samsung Electronics – have entered the CDMA chipset business, and these firms have not achieved commercial success on any significant scale. Intel Corporation, a leader in semiconductor manufacturing and technology with substantial assets, attempted to develop a CDMA chipset business, but exited when it failed to achieve commercial success.

68.    The paucity of entrants in the sale of CDMA chipsets stands in sharp contrast to the number of entrants in the many markets for other semiconductor chip products that are intensely competitive and subject to rapid technological change and pricing pressures.

**B.    QUALCOMM HAS OBTAINED AND PROTECTED ITS MONOPOLY POWER WITH A PATTERN OF ANTICOMPETITIVE CONDUCT**

69.    Qualcomm's CDMA monopolies are not the result of superior business acumen or simple good fortune.  Rather, Qualcomm's durable monopoly position in the CDMA markets has resulted from a continuing course of exclusionary, anticompetitive conduct.

23

70.    For example, Qualcomm has used its power over CDMA chipset supply to discipline customers and exclude competitors.  As discussed above, Qualcomm's CDMA chipset customers (cell phone manufacturers) have frequently complained, and Qualcomm has repeatedly admitted in public statements, that the supply of Qualcomm's chipsets has not kept pace with demand.

71.    The constant threat of a supply shortage increases Qualcomm's leverage with manufacturers because Qualcomm's anticompetitive use of its monopoly has resulted in the virtual exclusion of all competitors.  As explained in a report from the industry news source Telecom Asia:

>    These companies have had to live with the shortages since Qualcomm is the only CDMA chipset supplier in Korea, although it subcontracts manufacturing to IBM and two Taiwanese companies.  Many firms hesitate to complain as they're concerned about disruptions in their already reduced orders.

72.    Competition among cell phone manufacturers is fierce.  Absent adequate supplies of chipsets, a manufacturer may be unable to meet critical obligations to deliver cell phones to carrier customers.  Accordingly, the allocation of scarce chipsets, particularly at high-demand times such as during manufacturing for the Christmas shopping season, is vital to cell phone manufacturers.  Qualcomm has frequently used distribution of limited supplies of chipsets to favor certain customers.  For example, in early 2004, news reports explained that Korean cell phone manufacturers were suffering from a CDMA chipset shortage, and that Qualcomm was only providing only 70 to 80 percent of the chipsets that certain customers had ordered, and other customers were receiving only half of the chipsets they had ordered.

73.    Qualcomm wields its power over the allocation of scarce chipsets as a tool to threaten and discipline cell phone manufacturers who otherwise would do business with competitors.  For example, Qualcomm has threatened manufacturers with the loss of important benefits such as favorable lead times, free reference designs and other design work, training, and software, if

these manufacturers purchase chipsets from a competitor. Similarly, as discussed below, Qualcomm has threatened manufacturers with supply cutbacks or price increases if these manufacturers support innovations that Qualcomm does not favor. As one example of the fear that Qualcomm's conduct has engendered, a representative of a Korean handset manufacturer was anonymously quoted in the Korea Times as saying, "A bigger problem is nobody can file a complaint to Qualcomm. Who would like to run the risk of being excluded from the customer list of Qualcomm, the monopolistic player?"

74.    As another example of Qualcomm's anticompetitive conduct, in at least some manufacturer licenses Qualcomm substantially reduces royalty rates when a licensee agrees to purchase Qualcomm chipsets exclusively. As Qualcomm has admitted, its patent licensing agreements with Chinese cell phone manufacturers are expressly discriminatory and explicitly linked to those manufacturers' use of Qualcomm chipsets. First, if the Chinese manufacturers use non-Qualcomm chipsets, they must pay Qualcomm over twice the royalty that they would pay if they used Qualcomm chipsets. In addition, these agreements provide that the royalty rate is dependent on whether the cell phone is sold inside or outside of China. If a cell phone is sold outside China, the manufacturer is subject to a significantly higher royalty rate. To get the lower rate within China, the Chinese manufacturer must agree not to deal with a competitor. As Qualcomm has publicly summarized:

> The royalty rates provided to certain Chinese manufacturers for products manufactured and sold in China for use in China are more favorable than our standard rates. However, in order to benefit from these more favorable rates in China, the Chinese manufacturer must provide substantial, additional value to QUALCOMM, including, among other things, (i) paying, for a period of time, a royalty on sales outside of China at a rate higher than our standard rate and (ii) *committing to use QUALCOMM's ASICs in their worldwide sales of CDMA subscriber units and infrastructure.* [emphasis added]

25

75.    A third example of Qualcomm's anticompetitive conduct is its successful efforts to manipulate SDOs to ensure that the 3G CDMA standard has taken the form Qualcomm prefers, thereby preserving Qualcomm's CDMA chipset monopolies.

76.    In the course of discussions within 3GPP2 about the path for 3G development of CDMA, Qualcomm advocated adoption of Qualcomm's preferred "High Data Rate (HDR)" technology, which later became known as CDMA2000-1xEVDO (or "Single Carrier Evolution, Data Only"). Qualcomm competitors supported a more flexible technology eventually known as CDMA2000-1xEVDV (or "Single Carrier Evolution, Data and Voice") ("EVDV"), that provides both voice and data signals over a single carrier frequency.  Qualcomm undertook a course of conduct designed to cause 3GPP2 to adopt the EVDO standard that Qualcomm preferred, and to stall the development and adoption of EVDV.  In doing so, Qualcomm intended to protect its technological and market lead in EVDO technology, and to avoid competition on the merits between EVDO and the more advanced EVDV.

77.    The membership of 3GPP2 (as well as other SDOs relevant to this action) includes not only owners of patents relevant to prospective standards and prospective manufacturers of the cell phones implementing new standards, but also the manufacturer customers for chipsets.  For all the reasons and as illustrated above, Qualcomm's dominant position in current CDMA chipset sales, as well as its control over vital inputs for CDMA chipsets and cell phones, gives it tremendous leverage over many such members of 3GPP2.  In part through the use of this leverage, Qualcomm was able to delay the standardization of EVDV, enabling Qualcomm's EVDO technology to maintain Qualcomm's CDMA chipset dominance.

78.    Among other things, Qualcomm delayed and distorted the standards competition between EVDO and EVDV by using Qualcomm's power over cell phone manufacturers and others to

induce them to withhold or withdraw support from technical proposals embracing EVDV (or the technology from which EVDV evolved). Qualcomm threatened 3GPP2 members with CDMA chipset price increases or supply cutbacks so that the members would support Qualcomm's desired outcomes. Qualcomm's threats, which were effective because of manufacturers' overriding concerns with short-term competition with other cell phone manufacturers, had their intended effect: manufacturer members that supported alternative technologies abruptly changed their positions. In addition, Qualcomm promoted a detailed testing and measurement methodology for EVDV which Qualcomm represented would take six months to complete but, due to Qualcomm's delaying tactics, lasted over two years.

79.    After the EVDV standard was finally approved, Qualcomm continued its attempt to delay and thwart the development of that standard to maintain its CDMA chipset dominance. For example, Qualcomm withheld supplies of CDMA chipsets from at least one customer in an attempt to induce the customer to abandon the EVDV standard.

80.    In February 2005, Qualcomm declared victory in its campaign to delay and kill EVDV by announcing that Qualcomm was excluding EVDV chipsets from its future product plans. Qualcomm cited a lack of industry support for EVDV, for which Qualcomm's unlawful conduct was responsible.

## VI.

## QUALCOMM IS REPEATING ITS PATTERN OF ANTICOMPETITIVE CONDUCT TO MONOPOLIZE THE WCDMA TECHNOLOGY MARKET AND ATTEMPT TO MONOPOLIZE THE UMTS CHIPSET MARKET

81.    Successful in its efforts to obtain and maintain its CDMA chipset monopolies, Qualcomm now has its eyes set on the UMTS chipset market. As set forth below, Qualcomm has unlawfully obtained a monopoly in WCDMA technology markets and, using a broad pattern of conduct,

including use of its monopoly power over cell phone manufacturers active in the CDMA standards and UMTS, Qualcomm has attempted to exclude and disadvantage competitors in order to obtain a monopoly in the UMTS chipset market.

### A. QUALCOMM'S UNLAWFUL MONOPOLIZATION OF THE WCDMA TECHNOLOGY MARKETS WITH FALSE PLEDGES TO LICENSE ITS ESSENTIAL WCDMA PATENTS ON "FRAND" TERMS

82.     Once a standard has been adopted that incorporates a patented technology, alternatives previously available can no longer be used.  The adoption of the standard therefore confers monopoly power on the essential patent holders.  Because the UMTS standard was adopted in reliance on Qualcomm's false promise to license its "essential" patents on FRAND terms, Qualcomm's patents are a barrier to entry into the relevant product market.

83.     Qualcomm has publicly and repeatedly asserted that it controls essential patents needed to use WCDMA in wireless systems, and that without a license to Qualcomm's patents, it would be impossible for a manufacturer to produce either cell phones or chipsets that use WCDMA technology.

84.     As the UMTS standard was being developed, Qualcomm sought to have its intellectual property included in the standard.  In order to secure the inclusion of the WCDMA technology to which Qualcomm purports to hold essential patents included in the UMTS standard, Qualcomm made repeated and express written representations to SDOs, including the ITU, ETSI, and 3GPP, that it would license any of its essential WCDMA patents on FRAND terms.

85.     Qualcomm's false commitments to FRAND were intended to, and did, secure widespread acceptance of WCDMA wireless standards, including standards that required use of Qualcomm's "essential" WCDMA patents.  In reliance on Qualcomm's assurances, SDOs around the world adopted WCDMA standards, including into the UMTS standards, and wireless

service carriers in turn invested billions of dollars in building and improving wireless networks utilizing WCDMA technology. By definition, according to Qualcomm's statements, any business that implemented those WCDMA standards would infringe Qualcomm's patents unless it obtained a license, which Qualcomm had agreed to provide on FRAND terms. Thus, by Qualcomm's statements, it has monopoly power in relevant WCDMA technology markets.

86. As described in more detail below, Qualcomm repeatedly has breached its FRAND commitments to the SDOs. Qualcomm's licensing practices have been neither fair, nor reasonable, nor non-discriminatory. Qualcomm has engaged in a cumulative pattern of unlawful licensing and marketing practices to attempt to expand its CDMA chipset and WCDMA technology monopolies into the UMTS chipset market. These practices are wholly inconsistent with Qualcomm's commitments to SDOs that Qualcomm would license its intellectual property on FRAND terms. Cumulatively, these practices have, among other things, effectively foreclosed Broadcom's entry into the UMTS chipset market.

**B.    QUALCOMM'S REFUSAL TO LICENSE ON FRAND TERMS**

87. Broadcom approached Qualcomm to obtain a license to Qualcomm's so-called essential WCDMA patents on the FRAND terms that Qualcomm had committed to provide. In willful disregard of the commitments it made to incorporate its technology into the UMTS standard, Qualcomm has refused to license any of its essential WCDMA patents on FRAND terms, and demanded of Broadcom terms that are unfair, discriminatory, and patently unreasonable.

88. Broadcom does not disclose the specifics of those terms here, because as part of Qualcomm's efforts to impose non-FRAND terms on licensees, Qualcomm insists that parties seeking to negotiate a license enter into non-disclosure agreements that prevent disclosure of certain information relating to the negotiations. Qualcomm has enforced such non-disclosure

29

agreements in an extremely aggressive manner, including bringing and widely publicizing a meritless lawsuit attempting to wholly strip a competitor of its license to manufacture CDMA and UMTS chipsets based on the competitor's alleged violations of a non-disclosure agreement. To the extent Qualcomm itself has not publicly disclosed its various licensing requirements, Qualcomm's NDA practices limit Broadcom's willingness and ability to describe in detail the unfair, discriminatory, and unreasonable terms to which Qualcomm has demanded Broadcom agree.

### (i)    *Demand for Royalties on Unpatented Components*

89.    In contradiction of its FRAND commitments, Qualcomm seeks to collect royalties on parts of the UMTS chipset beyond Qualcomm's patented technology. Such a structure discriminates against manufacturers such as Broadcom that plan to provide enhanced functionality on their UMTS chipsets.

90.    Qualcomm's insistence on collecting royalties on this basis is unreasonable, unnecessary, and anticompetitive in that it decreases the economic incentives of Qualcomm's licensees to innovate in ways that improve and add functionality to their UMTS chipsets. Both alone and in combination with Qualcomm's other anticompetitive conduct, it undermines UMTS innovation and competition.

### (ii)    *Demand for Non-Reciprocal Patent Rights*

91.    Qualcomm also violates its FRAND obligations by requiring that its UMTS licensees grant back to Qualcomm licenses that are substantially broader than the licenses that Qualcomm will provide. This overly broad and asymmetrical grant-back requirement is discriminatory in that it affects licensees with extensive relevant patent portfolios (such as Broadcom) more than it affects those without such a portfolio. Furthermore, under its FRAND obligations, Qualcomm

30

may demand a grant-back only to the same set of rights that it licenses to the licensee; it may not insist on rights that are not reciprocal. Qualcomm's insistence on an asymmetrical grant-back has the additional anticompetitive effect of discouraging innovation by Qualcomm's licensee-competitors and thus, by itself and together with Qualcomm's other anticompetitive conduct, undermines competition for UMTS chipsets and technology.

### (iii)    Demand to Collect Double Royalties

92.    Despite Qualcomm's FRAND commitments – unlike other owners of patents deemed essential to the CDMA or WCDMA standards – it also insists on licenses at both the component level and the cell phone level. Qualcomm charges some or all UMTS cell phone manufacturers a substantial royalty rate on the sales price of each cell phone sold, including the value of the UMTS chipset within the handset. In addition, Qualcomm charges some UMTS chipset manufacturers, and has insisted on charging, a substantial additional royalty on the sales price of each UMTS chipset sold.

93.    Qualcomm enforces its double royalty by demanding that its chipset manufacturer licensees agree not to sell their UMTS chipsets to non-Qualcomm licensed cell phone manufacturers, as well as by prohibiting handset licensees from using chipsets manufactured and generally sold by unlicensed manufacturers. Qualcomm's royalty scheme enables it inappropriately to charge twice for the same licensing right.

94.    UMTS cell phone manufacturers pay a royalty to Qualcomm for rights including the right to make (or have made) and use UMTS chipsets in UMTS cell phones to be sold by the licensee. Cell phone manufacturer licensees pay the same royalty rate per handset regardless of whether they make (or have made) their own customized UMTS chipsets or buy from a UMTS chipsets manufacturer that is licensed by Qualcomm. Thus, when a UMTS cell phone

manufacturer buys a UMTS chipset from a Qualcomm licensee, both the handset manufacturer and the chipset manufacturer are paying a royalty to Qualcomm for the right to make the chipset. The cell phone manufacturer does not receive a reduction in its royalty payment if it purchases chipsets from a Qualcomm-licensed chipset manufacturer (to reflect the "make" right royalty payment already collected) – even though it does receive such a reduction, as discussed below, if it purchase chipsets from Qualcomm itself. By reaping a double royalty for the same right and by charging this double royalty to some but not all licensees, Qualcomm has violated its FRAND obligations. As a cumulative consequence of this and Qualcomm's other anticompetitive conduct, Qualcomm has undermined the ability of independent UMTS chipset manufacturers such as Broadcom to compete against Qualcomm in the UMTS chipset market.

95.     In addition, by this practice Qualcomm effectively compels each customer to negotiate with Qualcomm for a separate license, even if that customer wants to purchase chipsets from a source other than Qualcomm. The division of license rights in this manner enables Qualcomm to control or influence the transaction between its chipset competitors and their manufacturer customers, and to discriminate between customers on the basis of whether they use Qualcomm or non-Qualcomm chipsets.

96.     Qualcomm has threatened UMTS cell phone manufacturers with, among other things, potential termination of their licenses, breach of contract lawsuits, and/or patent infringement lawsuits if they purchase UMTS chipsets from any company that does not have its own license from Qualcomm, including Broadcom. Qualcomm has made these threats notwithstanding its knowledge that at least some of those cell phone manufacturers have paid a royalty on UMTS chipsets and are licensed to sell UMTS cell phones incorporating UMTS chipsets.

32

97.     Other parties with patents they have declared as essential to implementing WCDMA, including Nokia, Ericsson, InterDigital, and Samsung, among others, do not charge such double royalties. Rather, these companies seek only one royalty.

98.     Qualcomm's efforts to collect double royalties violate its FRAND obligations not only because they are unfair and unreasonable, but also because they impose different royalties overall (for the same rights) depending on whether the UMTS cell phone manufacturer uses third party UMTS chipsets or produces chipsets themselves. This and Qualcomm's other conduct have undermined competition for UMTS chipsets.

   (iv)     *Unreasonable Royalty Demands Contrary to FRAND Commitments*

99.     Qualcomm's demands for unreasonable royalties are contrary to its obligation to license its WCDMA technology on FRAND terms. In addition to collecting a double royalty, as discussed above, the royalty rates charged by Qualcomm to UMTS chipset manufacturers for its WCDMA technology are far greater than the rates charged by any other company proclaiming to be an essential WCDMA patent holder. Qualcomm also has publicly represented that it is charging the same royalty rates for licensing its WCDMA technology as it charges for licenses to its 3G CDMA technology, despite the fact that its patents comprise a much smaller proportion of the UMTS standard than of the 3G CDMA technology standard. For example, at Qualcomm's May 5, 2005 Spring Analyst Meeting, Qualcomm President-elect Steve Altman stated that Qualcomm's licensees would be required to pay the same royalty rates regardless of whether any of its patents expire and regardless of the number or percentage of WCDMA essential patents held, provided that at least "one claim of one patent applies." Similarly, Qualcomm has rejected attempts by other WCDMA essential patent holders to set a government- or SDO-approved ceiling on the royalty rate at which all WCDMA technology for cell phones would be licensed in

order to encourage adoption and proliferation of the technology. Despite its commitments to various SDOs to license on FRAND terms, Qualcomm has never had any intention of applying a reasonable royalty rate.

100.    In short, Qualcomm patents add far less value to the 3G UMTS standard than to the 3G CDMA standard, but Qualcomm charges the same license rate for both, which gives Qualcomm disproportionate ability to influence the cost of UMTS products.

101.    The effect of Qualcomm's conduct is to maintain its monopoly in WCDMA technology markets, to monopolize the UMTS chipset market and to maintain its monopoly in the CDMA technology and chipset markets.

###    (v)    *Demand for Anticompetitive Information Exchange*

102.    Qualcomm has also insisted that it have the right to receive licensees' sensitive pricing information relating to UMTS chipsets, including information about sales where the licensee and Qualcomm were competing head-to-head. Such an anticompetitive information exchange would discourage price competition and lacks any legitimate business justification. The effect of this anticompetitive information exchange requirement, along with Qualcomm's other conduct, is to prevent competition to the detriment of both would-be competitors such as Broadcom and consumers.

## C.    QUALCOMM'S DISCRIMINATORY LINKAGE OF ITS PATENT LICENSES TO PURCHASE OF ITS UMTS CHIPSETS

103.    In addition to Qualcomm's demands that Broadcom enter into these non-FRAND terms, Qualcomm has also imposed non-FRAND terms on *other* WCDMA licensees, just as it has in the CDMA markets, and used such terms to undermine competition from competitors like Broadcom.

###    (i)    *Discrimination in WCDMA Patent Royalty Rates*

34

104.     Qualcomm's patent licensing practices are designed to extend Qualcomm's monopoly position into the UMTS chipset market. In its licenses with cell phone manufacturers, Qualcomm has imposed discriminatory, onerous and unreasonable terms for the right to use Qualcomm's WCDMA patents. For example, Qualcomm has required manufacturer licensees to pay up-front multi-million dollar licensing fees, which it has occasionally waived, but *only* on a discriminatory basis – *i.e.*, if cell phone manufacturers agree to purchase Qualcomm chipsets exclusively – despite the fact that no legitimate relationship exists between licensing of cell phone technology and purchase of chipsets.

105.     Qualcomm's royalty rate discrimination furthers no legitimate competitive interest or business need. Rather, Qualcomm's royalty rate discrimination, based on whether manufacturers use Qualcomm's chipsets, is intended to harm, and has the effect of harming, competition in the UMTS chipset market.

>     *(ii)     Discrimination in WCDMA Patent Royalty Calculations:  Price Netting*

106.     Qualcomm has also engaged in "price netting," another discriminatory and anticompetitive licensing practice. Qualcomm typically charges each cell phone manufacturer licensee a royalty for Qualcomm's essential WCDMA patents based on the price of the entire cell phone, including the chipset, if the cell phone uses a chipset made by a competitor of Qualcomm. By contrast, Qualcomm permits cell phone manufacturers to deduct, or "net out," the price that they pay Qualcomm for a Qualcomm chipset from the price of the cell phone before calculating the royalty amount. This explicitly ties the patent royalty (that is, the price paid for intellectual property controlled by Qualcomm) to the purchase of the UMTS chipset, the product as to which Broadcom and others have sought to compete.

107.　　Qualcomm's price netting practices further no legitimate competitive interest or business need. Rather, these practices are intended to harm, and have the effect of harming, competition for the manufacture and sale of UMTS chipsets.

108.　　As a result of Qualcomm's royalty rate discrimination and price netting practices, each non-Qualcomm chipset that a cell phone manufacturer purchases carries with it a substantial price penalty. Price netting alone ensures that Broadcom would have to sell chipsets for less than Qualcomm's chipsets.

109.　　The combined use of price netting and other discriminatory terms in Qualcomm's manufacturer agreements – even putting aside Qualcomm's other anticompetitive practices, as detailed above and below – would put Broadcom at a significant disadvantage in pricing its UMTS chipsets to a cell phone manufacturer. Qualcomm's ability and its readiness to abuse its monopoly power over essential patents and other technology, combined with its other conduct, has made meaningful competition impossible.

**D.　QUALCOMM'S ANTICOMPETITIVE EXCLUSIVITY PAYMENTS**

110.　　Qualcomm has also foreclosed competition for UMTS chipsets through the use of discounts, marketing incentives, and other rewards that are conditioned on use of Qualcomm UMTS chipsets. These incentives and concessions can amount to tens of millions of dollars for a single cell phone manufacturer licensee.

111.　　The discounts and inducements offered by Qualcomm in exchange for use of Qualcomm chipsets are designed to defeat competition that would expand UMTS chipset output, improve quality, and reduce the price of UMTS cell phones. Qualcomm's licensing practices, individually and collectively, substantially raise competitors' costs of selling and marketing UMTS chipsets, and strongly discourage chipset buyers from dealing with Qualcomm's

competitors. These practices have the purpose and the effect of protecting Qualcomm from competition on the merits by Broadcom and others.

**E.     QUALCOMM'S CONDUCT PRESENTS A DANGEROUS PROBABILITY THAT IT WILL ACHIEVE MONOPOLY POWER IN THE UMTS CHIPSET MARKET**

112.    Qualcomm's efforts to monopolize the UMTS chipset market come at a time when the market is in its relative infancy. Only limited UMTS systems are in place, but the UMTS chipset market is experiencing rapid growth. Qualcomm has stated that only approximately 3 million UMTS or WCDMA cell phones were sold in 2003, that 22 million were sold in 2004, and that that 50 million such phones will be sold in 2005.

113.    Qualcomm has recently touted that by January 2005 it had already signed UMTS design deals for chipsets and systems software with 26 cell phone manufacturers, including three of the leading UMTS cell phone manufactures, LGE, Samsung, and Siemens, from which Qualcomm has stated it expects 77% sales growth, as well as six of the top seven Chinese manufacturers, from which Qualcomm has stated it expects 126% sales growth.

114.    As a result of Qualcomm's anticompetitive conduct, Qualcomm's possession of monopoly power in the WCDMA technology markets, and Qualcomm's possession of monopoly power in the CDMA chipset and technology markets, there is a dangerous probability that Qualcomm will obtain monopoly power in the UMTS chipset market, just as it has done in the 2G, 2.5G, and 3G CDMA chipset markets.

**F.     QUALCOMM'S CONDUCT EXPANDS ITS 3G CDMA CHIPSET AND TECHNOLOGY MONOPOLIES**

115.    Qualcomm successfully obtained and has willfully maintained monopoly power in the markets for 3G CDMA chipsets and 3G CDMA technology. Given its monopoly power in 3G CDMA, Qualcomm has no incentive to curb its anticompetitive and unfair practices in the

WCDMA technology markets or UMTS chipset market. In fact, Qualcomm is a particularly dangerous monopolist because it has every incentive to discourage competitors from innovating and deter them from competing.

116.    Further, Broadcom is being injured by Qualcomm's maintenance of its 3G CDMA monopolies because Qualcomm is doing so at the expense of WCDMA technology and UMTS chipsets, areas in which Broadcom is actively innovating.

## VII.

## QUALCOMM'S ACQUISITION OF FLARION WILL SUBSTANTIALLY LESSEN COMPETITION IN THE B3G AND 4G TECHNOLOGY MARKETS

117.    On August 11, 2005, Qualcomm announced its planned acquisition of Flarion, describing Flarion as "a pioneer and leading developer" of OFDM/OFDMA technologies, and "the inventor of FLASH-OFDM® technology for mobile broadband Internet protocol (IP) services." Qualcomm has announced that the acquisition will have a total value of as much as $805 million. This is not Qualcomm's first acquisition. Rather, Qualcomm has undertaken numerous previous acquisitions, including ones which Qualcomm has used to cement its dominance in the markets for existing generations of wireless technologies and chipsets discussed above.

118.    Qualcomm has repeatedly touted Flarion's intellectual property holdings, asserting that the combination of Qualcomm and Flarion will have the "industry leading" intellectual property portfolio for OFDMA for wireless applications, and control key patents for technology implementing, among other things, the emerging mobile "WiMAX" standard. Qualcomm's acquisition of Flarion is targeted primarily at acquiring Flarion's intellectual property, and Qualcomm's agreement to acquire Flarion specifically provides for substantial payments if even a portion of Flarion's outstanding patent applications are granted.

119.    Flarion and its technologies present a fundamental competitive challenge to Qualcomm's

technology for B3G and 4G standards.  Although products using B3G technologies may not

arrive in the marketplace for three or more years, the process of adopting industry standards for

these technologies is well underway, with 4G technology standards expected to follow closely.

120.    OFDM/OFDMA offers technical advantages for high-bandwidth applications.

Accordingly, it is widely considered a leading contender for adoption as a B3G mobile wireless

standard.  So long as Qualcomm does not control necessary inputs for B3G and 4G technologies,

the evolution to B3G and 4G presents the cell phone industry with the opportunity eventually to

free itself from the costs and burdens of Qualcomm's anticompetitive practices in the CDMA

and WCDMA technology markets and the CDMA and UMTS chipset markets.

121.    Qualcomm's acquisition of Flarion is an effort by Qualcomm to cut off that escape route,

just as Qualcomm has previously cut off escape routes in markets for 2G CDMA and 3G CDMA

and UMTS/WCDMA markets.  Flarion's technology has been the basis for the only fully

operational OFDM/OFDMA-based commercial wireless broadband networks the world has ever

seen.  Flarion has emphasized precisely the areas of OFDM/OFDMA development – use in

mobile applications and operation on Internet Protocol-based networks – that are likely to be

significant for B3G and 4G standards.  By Qualcomm's own statements, Flarion is a leader in

applying OFDM/OFDMA technologies to mobile wireless applications, and a key holder of

patents for wireless and Internet Protocol applications of OFDM/OFDMA.

122.    Qualcomm also clearly perceives Flarion as a major source of competition for future

standards.  Whereas Flarion and others have sought the rapid standardization of Flarion's

FLASH-OFDM and complementary technology in the IEEE standards development process for

so called "802.20" technology, Qualcomm has repeatedly appeared in force at IEEE 802.20

standards meetings – including packing meetings with representatives and consultants who have done little more than vote in lockstep as indicated by a Qualcomm designee – to oppose and delay Flarion's standardization efforts. While seeking to slow Flarion's progress, Qualcomm has been developing OFDM/OFDMA technology and patents of its own, as well as continuing to work to develop and propagate CDMA and WCDMA technologies for use in future networks. Qualcomm's proposed acquisition of Flarion would substantially lessen competition between all of these technologies.

123.    Qualcomm also recognizes that the emerging standard known as IEEE 802.16e, the mobile application member of the WiMAX family of standards, is a potential source of B3G and 4G competition. Qualcomm has stated that Flarion's "pioneering" work applies to the developing mobile WiMAX standard. Accordingly, Qualcomm's acquisition of Flarion will position Qualcomm as the owner of essential patents and technology for yet another potential B3G and 4G standard.

124.    Independent of each other, Qualcomm and Flarion can be expected to compete for the adoption of their respective technologies – including essential patents – for B3G and 4G standards. Combined, they are likely to significantly reduce competition and provide Qualcomm a means to extend its monopoly power into the next generations of wireless standards.

### A.    QUALCOMM UNDERMINED FLARION'S EFFORTS TO ACHIEVE ADOPTION OF FLASH-OFDM AS AN INDUSTRY STANDARD

125.    The importance of Flarion as a competitor to Qualcomm and as a developer and supporter of technology competitive to Qualcomm's technology is demonstrated by Qualcomm's anticompetitive effort to undermine the adoption of Flarion's technology prior to the proposed acquisition, as well as by Qualcomm's acceleration of research and development efforts in response to Flarion's success.

126.     Flarion was a leader in persuading the IEEE standards development organization to

pursue development of a new mobile wireless standard referred to as "802.20," which was

intended to serve as a potential basis for future B3G and 4G mobile wireless telephone systems.

The goal of the IEEE's 802.20 work was to create a standard for multi-vendor, broadband,

Internet Protocol-based mobile wireless communications services.  Flarion was central in

forming the IEEE 802.20 working group and moving the 802.20 process forward, and the

FLASH-OFDM technology was a leading contender for adoption, in whole or in part, in the

developing standard.

127.     The timely and effective emergence of an 802.20 standard posed a competitive threat to

Qualcomm because it could provide the basis for a B3G or 4G standard that Qualcomm did not

control.  Thus, Qualcomm undertook to slow or stop the emergence of an effective 802.20

standard based on Flarion technology.  Beginning nearly three years ago, Qualcomm flooded the

802.20 proceedings with its own employees and "consultants," and proceeded to use its voting

block to elect a Qualcomm representative as chairperson and ultimately grind the proceedings to

an effective halt.  As a result of Qualcomm's conduct, the 802.20 committee has now fallen

behind all of its stated timelines, and to date has not even reached the point of considering

concrete technology proposals.  As a result, some industry members have written off the 802.20

standard as unlikely to emerge in any relevant way.  Qualcomm's tactics at the 802.20 committee

served no valid business purpose, and had the purpose and effect of slowing (if not preventing)

the emergence of a potentially competitive technology.

128.     The IEEE mobile wireless standard referred to as "802.16e" or "mobile WiMAX," which

uses OFDM/OFDMA technologies, is another leading contender for adoption as a B3G or 4G

standard.  According to Qualcomm, Flarion has "pioneering" work and patents that read on

WiMAX technology, and Qualcomm itself also holds patents relating to OFDM/OFDMA

technologies. In reference to its acquisition of Flarion, Qualcomm indicated that it "believe[s]

very strongly that these patents with this combination would apply to WiMAX as well as other

OFDMA solutions."

### B.   QUALCOMM'S ACQUISITION OF FLARION AS A RESPONSE TO THE COMPETITIVE THREAT POSED BY FLARION AND WIMAX

129.   On August 11, 2005, Qualcomm announced it would acquire Flarion for approximately

$600 million in stock and cash, with additional incentives of up to approximately $205 million in

value.

130.   As Qualcomm has repeatedly stated, obtaining Flarion's intellectual property relating to

OFDM/OFDMA is one of Qualcomm's primary strategic goals in acquiring Flarion.

Qualcomm's acquisition agreement was specifically structured to provide incentives for Flarion

to successfully complete pending patent applications, requiring Qualcomm to pay $75 million of

additional value if just 20 of Flarion's approximately 125 pending patent applications are

granted. Moreover, as set out in the acquisition agreement, Qualcomm has identified or will

identify 15 patent applications that, subsequent to the merger closing, Qualcomm will prosecute

on Flarion's behalf.

131.   As noted above, Qualcomm has also repeatedly stated that with the Flarion acquisition,

Qualcomm will have an industry leading OFDM/OFDMA intellectual property portfolio, with

patents essential to the leading technologies vying for, or likely to vie for, adoption as B3G and

4G standards.

132.   All of the leading candidates for adoption as a standard for B3G and 4G technologies are

based either on CDMA, WCDMA or OFDM/OFDMA technologies. These technologies are

competing not only on their technological merits, but also based on expectations about licensing demands of essential intellectual property holders for each standard.

133.    Qualcomm already asserts that a license to its intellectual property is necessary for any use of CDMA and WCDMA technologies in the mobile wireless arena.  Accordingly, Qualcomm's acquisition of Flarion and its intellectual property substantially reduces, if not eliminates completely, the available B3G and 4G technology options to which Qualcomm does not claim essential intellectual property.   Qualcomm's acquisition of Flarion thus will substantially reduce competition in the B3G and 4G technologies markets.

134.    In addition, Qualcomm's acquisition of Flarion will remove Flarion as an independent competitor in the B3G and 4G technology markets.  Flarion has unique experience in the development, application, commercialization, and market trial of OFDM/OFDMA technologies for mobile wireless and Internet Protocol-based uses.  As an independent competitor, Flarion would continue to develop, market, and standardize technology that would compete with Qualcomm's CDMA-based technologies in the B3G and 4G technology markets.  Qualcomm's acquisition of Flarion would immediately eliminate competition between Qualcomm and Flarion, and with it any further opportunities for carriers and consumers to obtain experience with independently-held Flarion technology, which could assist in the further adoption of such technology for B3G and 4G standards in competition with Qualcomm.  As one analyst has described: "Owning the technology and talent behind Flarion will help [Qualcomm] keep an invaluable edge against any companies hoping to marginalize Qualcomm's dominant position in the future."  Another likewise commented:

> I think most of the benefits Qualcomm will derive from the Flarion deal
> are defensive in nature. One of the classic strategic advantages investors
> look for in companies is a technological or strategic moat that keeps

competition out. In Qualcomm's case, it places great importance in protecting its royalty stream.

135.    If permitted to acquire Flarion, Qualcomm will be able to marginalize competition by eliminating OFDM/OFDMA as an independent threat to Qualcomm's CDMA and WCDMA monopolies and extending Qualcomm's dominance to OFDM/OFDMA and/or WiMAX technology.  In either event, Qualcomm's acquisition of Flarion will substantially lessen competition and harm consumers of the next generations of mobile wireless technology.

**C.    QUALCOMM'S ACQUISITION OF FLARION WILL INJURE BROADCOM**

136.    As a leading manufacturer of semiconductors for wireless broadband applications, Broadcom has a strong interest in healthy competition among technologies in the B3G and 4G technology in at least two respects.

137.    First, Broadcom is a customer in the B3G and 4G technology markets.  As an equipment manufacturer, Broadcom may require a license to intellectual property necessary to manufacture B3G and 4G equipment.  Reduced competition among B3G and 4G technologies, and particularly an increase in Qualcomm's market power in the markets for B3G and 4G technology, will reduce Broadcom's ability to obtain such technology licenses on competitive terms, or to obtain those licenses at all.

138.    Second, Broadcom expects to be a competitor to Qualcomm in the chipset markets for B3G and 4G technologies.  As detailed above, Qualcomm has already used its monopoly power in the WCDMA technology markets to undermine Broadcom as a competitor in the UMTS chipset markets.  An increase in Qualcomm's market power in the B3G and 4G technology markets will enable Qualcomm to continue its unlawful conduct to undermine or exclude competitors like Broadcom from the markets for B3G and 4G chipsets.

44

## VIII.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Monopolization of Markets for WCDMA Technology
in Violation of Section 2 of the Sherman Act**

139.    Plaintiff Broadcom repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

140.    By such acts, practices, and conduct, Qualcomm has unlawfully monopolized the WCDMA technology markets by inducing the relevant SDOs to adopt 3G standards that incorporate Qualcomm's patents as an essential element, relying on Qualcomm's promise to observe FRAND licensing, and then not acting in accordance with those promises, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

141.    Qualcomm has likewise maintained that monopoly through its licensing and other practices described herein.

142.    By reason of Qualcomm's violations of Section 2 of the Sherman Act, Broadcom has been injured in its business or property including through the loss of past, present and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective destruction of its UMTS chipset business.

143.    Broadcom has suffered irreparable injury by reason of the acts, practices and conduct of Qualcomm alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices and conduct.

### SECOND CLAIM FOR RELIEF
**Attempted Monopolization of Market for UMTS Chipsets
in Violation of Section 2 of the Sherman Act**

144.    Plaintiff Broadcom repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

145.    The global UMTS chipset market is a relevant antitrust market.  Qualcomm has willfully engaged, and is illegally engaging, in a cumulative course of conduct, including without limitation: (i) refusing to abide by FRAND licensing commitments made to SDOs in the United States and other countries, after having induced those organizations to adopt technological standards necessitating the use of Qualcomm WCDMA patents that Qualcomm has described as essential; (ii) refusing to provide to Broadcom a license on FRAND terms to Qualcomm patents Qualcomm has stated are essential to UMTS chipsets and cell phones, and demanding that Broadcom agree to unfair, discriminatory, and patently unreasonable terms that are aimed to cripple Broadcom as a UMTS chipset competitor; (iii) providing discounts on the excessive royalties it charges wireless cell phone manufacturers and manufacturers for use of its patents only if the licensee purchases Qualcomm chipsets; (iv) providing cell phone manufacturers with multi-million dollar marketing funds and/or other incentives, conditioned on the use of Qualcomm's UMTS chipsets; (v) waiving upfront licensing fees for its intellectual property, conditioned on the use of Qualcomm's UMTS chipsets; and (vi) using threats regarding 2G and 3G CDMA chipset supply and pricing to coerce cell phone manufacturers into purchasing Qualcomm's UMTS chipsets.  These practices have no legitimate business justification.

146.    Qualcomm has undertaken this course of conduct with the specific intent of monopolizing the UMTS chipset market.  There is a dangerous probability that, unless

restrained, Qualcomm's course of conduct will succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

147.    By reason of Qualcomm's violations of Section 2 of the Sherman Act, Broadcom has been injured in its business or property including through the loss of past, present and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective destruction of its UMTS chipset business.

148.    Broadcom has suffered irreparable injury by reason of the acts, practices and conduct of Qualcomm alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices and conduct.

### THIRD CLAIM FOR RELIEF
**Unlawful Exclusive Dealing and Other Exclusionary Agreements
in Violation of Section 1 of the Sherman Act**

149.    Plaintiff Broadcom repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

150.    Qualcomm's agreements with cell phone manufacturers – pursuant to which such companies agree to purchase Qualcomm's UMTS chipsets only, not to purchase competitors' chipsets, or to do so only on terms that materially disadvantage such products, constituting an effective refusal to deal on commercially reasonable terms – unreasonably restrain competition and foreclose a substantial share of the UMTS chipset market in violation of Section 1 of the Sherman Act.

151.    Qualcomm's agreements unreasonably restrain trade and restrict the access of Qualcomm's competitors to significant channels of distribution, thereby restraining competition in the UMTS chipset market and foreclosing substantial interstate and foreign commerce.

152.    The purpose and effect of Qualcomm's agreements is to restrain trade and competition in the UMTS chipset market.

153.    Qualcomm's agreements violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

154.    By reason of Qualcomm's violations of Section 1 of the Sherman Act, Broadcom has been injured in its business or property including through the loss of past, present and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective destruction of its UMTS chipset business.

155.    Broadcom has suffered irreparable injury by reason of the acts, practices and conduct of Qualcomm alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices and conduct.

## FOURTH CLAIM FOR RELIEF
### Unlawful Tying in Violation of Section 1 of the Sherman Act

156.    Plaintiff Broadcom repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

157.    UMTS chipsets and the technology embodied in Qualcomm's self-described essential WCDMA patents are distinct products that meet separate customer and end user demands and are separately licensed or sold by Qualcomm or others.

158.    Qualcomm's refusal to offer discounts to its excessive patent royalty rates or patent licensing fees unless the purchaser also buys Qualcomm's UMTS chipsets, and Qualcomm's provision of marketing incentives on the purchase of its UMTS chipsets, the combination of which is an effective refusal to deal on commercially reasonable terms, constitute unlawful tying arrangements in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Qualcomm possesses monopoly power or appreciable economic power over the WCDMA technology markets.  The purpose and effect of Qualcomm's tying arrangements is to maintain or acquire monopoly power

48

in the UMTS chipset market, to foreclose competition in such market and unreasonably to restrain trade and competition in such markets.

159.    The tying arrangements described above foreclose a substantial amount of interstate and foreign commerce.

160.    By reason of Qualcomm's violations of Section 1 of the Sherman Act, Broadcom has been injured in its business or property including through the loss of past, present and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective destruction of its UMTS chipset business.

161.    Broadcom has suffered irreparable injury by reason of the acts, practices and conduct of Qualcomm alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices and conduct.

**FIFTH CLAIM FOR RELIEF**
**Exclusive Dealing in Violation of Section 3 of the Clayton Act**

162.    Plaintiff Broadcom repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

163.    Qualcomm's agreements with cell phone manufacturers pursuant to which such companies agree to purchase only Qualcomm's UMTS chipsets or not to purchase competitors' chipsets (or to do so only on terms that materially disadvantage such products, constituting an effective refusal to deal on commercially reasonable terms) foreclose competition for a substantial share of the UMTS chipset market, substantially lessen competition in that market, and tend to create a monopoly in that market.

164.    The purpose and effect of Qualcomm's agreements is to restrain trade and competition in the market for UMTS chipsets, foreclosing substantial interstate and foreign commerce. These agreements violate Section 3 of the Clayton Act, 15 U.S.C. § 14.

165.    By reason of Qualcomm's violations of Section 3 of the Clayton Act, Broadcom has been injured in its business or property including through the loss of past, present and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective destruction of its UMTS chipset business.

166.    Broadcom has suffered irreparable injury by reason of the acts, practices and conduct of Qualcomm alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices and conduct.

**SIXTH CLAIM FOR RELIEF**
**Unlawful Tying in Violation of Section 3 of the Clayton Act**

167.    Plaintiff Broadcom repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

168.    UMTS chipsets and the technology embodied in Qualcomm's purported essential WCDMA patents are distinct products that meet separate customer and end user demands and are separately licensed or sold by Qualcomm or others.

169.    Qualcomm's refusal to offer discounts to its excessive patent royalty rates or patent licensing fees unless the purchaser also buys Qualcomm's UMTS chipsets, and Qualcomm's provision of marketing incentives on the purchase of its UMTS chipsets, the combination of which is an effective refusal to deal on commercially reasonable terms, constitute unlawful tying arrangements in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.  Qualcomm possesses monopoly power or appreciable economic power over the WCDMA technology markets.  The purpose and effect of Qualcomm's tying arrangements is to acquire monopoly power in the UMTS chipset market, to foreclose competition in that market, and unreasonably to restrain trade and competition in that market.

50

170.     The tying arrangements described above foreclose a substantial amount of interstate and foreign commerce.

171.     By reason of Qualcomm's violations, Broadcom has been injured in its business or property including through the loss of past, present and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective destruction of its UMTS chipset business. Broadcom has been injured and suffered damages in an amount to be proved at trial and, without injunctive relief, Broadcom will continue to suffer irreparable injury as a result of Qualcomm's unlawful conduct. Broadcom has no adequate remedy at law.

### SEVENTH CLAIM FOR RELIEF
**Maintenance of Monopoly in the Markets for 3G CDMA Technology and 3G CDMA Chipsets in Violation of Section 2 of the Sherman Act**

172.     Plaintiff Broadcom repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

173.     By acts, practices, and conduct described above, Qualcomm is unlawfully maintaining its monopoly in the 3G CDMA technology markets and 3G CDMA chipset market.

174.     By reason of Qualcomm's violations of Section 2 of the Sherman Act, Broadcom has been injured in its business or property including through the loss of past, present and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective destruction of its UMTS chipset business.

175.     By reason of Qualcomm's violations, Broadcom has been injured in its business or property including through the loss of past, present and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective destruction of its UMTS chipset business. Broadcom has been injured and suffered damages in

51

an amount to be proved at trial and, without injunctive relief, Broadcom will continue to suffer irreparable injury as a result of Qualcomm's unlawful conduct. Broadcom has no adequate remedy at law.

**EIGHTH CLAIM FOR RELIEF**
**Unlawful Purchase, Holding and Use of Stock or Assets in Violation of**
**Section 7 of the Clayton Act**

176.    Plaintiff repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

177.    Qualcomm's previous acquisition, holding, and use of other companies and assets has substantially lessened competition in relevant markets for 2G CDMA technology and chipsets and/or 3G CDMA and UMTS/WCDMA technology and chipsets. Similarly, the result of Qualcomm's acquisition, holding, and use of Flarion and its assets will be to substantially lessen competition and to tend to create a monopoly in the markets for B3G and 4G technology, will foreclose substantial interstate foreign commerce, and will violate Section 7 of the Clayton Act, 15 U.S.C. § 18.

178.    Broadcom will be injured as a result of Qualcomm's unlawful acquisition, holding and use of these acquired assets. Without injunctive relief, Broadcom will continue to suffer irreparable injury as a result of Qualcomm's unlawful conduct, for which there is no adequate legal remedy.

**NINTH CLAIM FOR RELIEF**
**Violations of New Jersey Antitrust Act and Other State Antitrust, Unfair Competition, and**
**Unfair Trade Practices Laws**

179.    Plaintiff Broadcom repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

180.    Qualcomm induced SDOs, relying on Qualcomm's promise to provide FRAND licensing, to adopt 3G standards that incorporate Qualcomm's patents, and then has unfairly refused to license its 3G CDMA and WCDMA patents on FRAND terms. In addition to deceiving the SDOs and refusing to license on FRAND terms, Qualcomm has engaged in anticompetitive, unfair, and deceptive methods of competition in order to coerce cell phone manufacturers into purchasing Qualcomm 3G CDMA chipsets and UMTS chipsets and has unfairly competed in the sale of 3G CDMA chipsets and UMTS chipsets. In addition, Qualcomm's acquisition, holding, and use of Flarion and its assets will substantially lessen competition and tend to create a monopoly in the markets for B3G and 4G technology. Both the significant ongoing harm, and the incipient and threatened harm, to competition in the markets described above from such conduct outweigh any justifications for such conduct or competitive benefits therefrom.

181.    The foregoing conduct constitutes monopolization of the WCDMA technology markets, attempted monopolization of the UMTS chipset market, maintenance of monopoly in the 3G CDMA chipset market and 3G CDMA technology markets, and restraint of trade in violation of N.J. Stat. § 56:9-4(a); constitutes unlawful tying and exclusive dealing agreements restraining competition in the markets for UMTS chipsets and WCDMA technology, in violation of N.J. Stat. § 56:9-3; and constitutes unfair and unlawful competition and fraudulent conduct under the antitrust, unfair competition, and unfair trade practices laws of the states of Alaska, Arizona, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico,

New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, and Washington.

182.    Qualcomm has licensed 3G CDMA and WCDMA technology and sold 3G CDMA and UMTS chipsets for use in each of the states listed in paragraph 181 herein.

183.    By reason of Qualcomm's violations, Broadcom has been injured in its business or property including through the loss of past, present and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective destruction of its UMTS chipset business. Broadcom has been injured and suffered damages in an amount to be proved at trial and, without injunctive relief, Broadcom will continue to suffer irreparable injury as a result of Qualcomm's unlawful conduct. Broadcom has no adequate remedy at law.

## TENTH CLAIM FOR RELIEF
### Tortious Interference With Prospective Economic Advantage

184.    Plaintiff Broadcom repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

185.    Qualcomm has undertaken a willful and malicious course of conduct to foreclose Broadcom from operating as a meaningful competitor in the UMTS chipset market. Through its negotiations with major UMTS cell phone manufacturers, Broadcom had a prospective economic relationship with each such manufacturer for the sale of UMTS chipsets. But for Qualcomm's anticompetitive conduct, there was a reasonable probability that Broadcom would have been able to successfully secure business relationships for the sale of UMTS chipsets. Through anticompetitive, unjustifiable means, Qualcomm intentionally interfered with and frustrated Broadcom's efforts to compete. Qualcomm has done so without legitimate justification or excuse.

186.    By reason of Qualcomm's violations, Broadcom has been injured in its business or property including through the loss of past, present and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective destruction of its UMTS chipset business.  Broadcom has been injured and suffered damages in an amount to be proved at trial and, without injunctive relief, Broadcom will continue to suffer irreparable injury as a result of Qualcomm's unlawful conduct.  Broadcom has no adequate remedy at law.  Broadcom is also entitled to punitive damages for Qualcomm's willful and malicious conduct.

### ELEVENTH CLAIM FOR RELIEF
#### Breach of Contract

187.    Plaintiff Broadcom repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

188.    As set forth above, Qualcomm entered into actual or implied contracts with various SDOs under which it agreed that, as a condition to those SDOs adopting 3G wireless telephony standards that required Qualcomm's purportedly essential patents to implement, Qualcomm would license such patents on FRAND terms.  Each potential licensee, including Broadcom, was an intended beneficiary of those contracts.  Qualcomm has breached those contracts by not licensing its "essential" patents on FRAND terms.

189.    As a result of these breaches, Broadcom has been injured in its business or property through the loss of past, present and future profits, by the loss of customers and potential customers, by the loss of goodwill and product image, and by the prospective destruction of its UMTS chipset business.

190.    By reason of Qualcomm's violations, Broadcom has been injured in its business or property including through the loss of past, present and future profits, by the loss of customers

and potential customers, by the loss of goodwill and product image, and by the prospective

destruction of its UMTS chipset business. Broadcom has been injured and suffered damages in

an amount to be proved at trial and, without injunctive relief, Broadcom will continue to suffer

irreparable injury as a result of Qualcomm's unlawful conduct. Broadcom has no adequate

remedy at law.

## TWELFTH CLAIM FOR RELIEF
### Promissory Estoppel

191.    Plaintiff Broadcom repeats and realleges all of the allegations in all the paragraphs above

as if set forth fully herein.

192.    Qualcomm made a clear and definite promise to potential licensees of its WCDMA

technology through its promise to various SDOs that it would license its WCDMA technology on

a FRAND basis.

193.    The intended purpose of this FRAND promise was to induce reliance. Qualcomm knew

or should have reasonably expected that this promise would induce potential licensees such as

Broadcom to take (or refrain from taking) certain actions.

194.    Broadcom did take action to develop a UMTS chipset business in reliance on

Qualcomm's promise to license its WCDMA technology on a FRAND basis.

195.    Broadcom has been damaged as a result of its reasonable reliance on Qualcomm's

promise because of Qualcomm's failure to license its WCDMA technology on FRAND terms as

it had promised.

## THIRTEENTH CLAIM FOR RELIEF
### Fraud

196.    Plaintiff Broadcom repeats and realleges all of the allegations in all the paragraphs above

as if set forth fully herein.

197.    Qualcomm represented to the SDOs and to the public that if its patented technology was incorporated into the UMTS standard, it would license that technology to all practitioners of the standard on FRAND terms.

198.    Qualcomm made the foregoing representations knowing them to be false in that it had no intent to license on FRAND terms and with the intent to induce reliance on its representations. Qualcomm did not disclose to the SDOs that it had no intention of licensing its technology on FRAND terms.

199.    Broadcom reasonably relied upon the foregoing representations. In reliance thereon, Broadcom invested millions of dollars in developing and acquiring UMTS chipset technology.

200.    The foregoing actions and conduct by Qualcomm constitute intentional and material misrepresentation that has damaged and will continue to damage Broadcom.

## VIII.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Broadcom requests that the Court:

A.    Adjudge and decree that Qualcomm has violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; Section 7 of the Clayton Act, 15 U.S.C. § 18; the New Jersey Antitrust Act, N.J. Stat. §§ 56:9-3 and 56:9-4, and the other state antitrust, unfair competition, and unfair trade practices laws set forth above; that Qualcomm has tortiously interfered with Broadcom's prospective economic advantage; and that Qualcomm's conduct constitutes breach of contract, promissory estoppel, and fraud;

B.    On plaintiff Broadcom's First through Ninth claims for relief, enter judgment against Qualcomm for treble the amount of Broadcom's damages as proven at trial in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, N.J. Stat. § 56:9-12, and, to the extent

permitted by law, the antitrust, unfair competition, and unfair trade practices laws of the other states set forth above;

C.      On plaintiff Broadcom's Tenth through Thirteenth claims for relief, enter judgment against Qualcomm for the amount of Broadcom damages as proven at trial and, on Broadcom's Tenth and Twelfth claims for relief, for punitive damages;

D.      Grant plaintiff Broadcom injunctive relief pursuant to 15 U.S.C. § 26, N.J. Stat. § 56:9-10, and the other state antitrust, unfair competition, and unfair trade practices laws set forth above sufficient to restrain Qualcomm's continuing violations of 15 U.S.C. §§ 1, 2, and 14, N.J. Stat. §§ 56:9-3 and 56:9-4, and the antitrust, unfair competition, and unfair trade practices laws of the states set forth above;

E.      Grant plaintiff Broadcom injunctive relief pursuant to 15 U.S.C. § 26, N.J. Stat. § 56:9-10, and the other state antitrust, unfair competition, and unfair trade practices laws set forth above sufficient to restrain and prevent Qualcomm's violations of 15 U.S.C. § 18, N.J. Stat. §§ 56:9-3 and 56:9-4, and the antitrust, unfair competition, and unfair trade practices laws of the states set forth above, including but not limited to injunctive relief prohibiting Qualcomm's acquisition of Flarion, requiring divestiture of some or all of the assets acquired, and/or imposing conditions on Qualcomm's use of some or all of the assets acquired.

F.      Award plaintiff Broadcom its costs and expenses of litigation, including attorneys' fees and expert witness fees; and

G.      Enter judgment against Qualcomm for such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff Broadcom Corporation hereby demands trial by jury in this action on all issues so triable.

Dated: September 19, 2005

Respectfully submitted,

David S. Stone, Esq. (DSS-8580)
Boies, Schiller & Flexner LLP
150 John F. Kennedy Parkway
Short Hills, NJ 07078
(973) 218-1111
Fax: (973) 218-1106
*Counsel for Plaintiff*

Of Counsel:
David Boies
Stephen R. Neuwirth
David A. Barrett
Steven C. Holtzman
Scott E. Gant
W. Fred Norton
Damien J. Marshall
Kieran P. Ringgenberg
Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, NY 10022
(212) 446-2300

Of Counsel:
Fax: (212) 446-2350
George S. Cary
Mark W. Nelson
Stephen J. Kaiser
Alina D. Eldred
Sabeena Rajpal
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500
Fax: (202) 974-1999

59

## CERTIFICATE OF SERVICE

I certify that on September 19, 2005, I electronically filed with the Clerk of the United States District Court, District of New Jersey, Plaintiff's First Amended Complaint, and served a copy of the First Amended Complaint upon the following parties via Federal Express:

David R. Marriott
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eight Avenue
New York, New York 10019-7475

William J. O'Shaughnessy
McCarter & English
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

Dated: September 19, 2005

By:   s/ David S. Stone
           David S. Stone

Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

BROADCOM CORPORATION,

Plaintiff,

v.

QUALCOMM INCORPORATED,

Defendant.

Civil Action No. 05-3350 (MLC)

Return Date: February 6, 2006
Oral Argument Requested

---

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS

McCARTER & ENGLISH LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant*
*QUALCOMM Incorporated*

December 9, 2005

## Table of Contents

Page

Table of Authorities ................................................................................ iii

Preliminary Statement ............................................................................. 1

Statement of Facts .................................................................................. 6

    A.    Wireless Communications Standards and Technology............................ 7

    B.    The Relevant Markets Alleged By Broadcom ..................................... 9

Argument ............................................................................................. 10

I.    Broadcom Does Not State a Claim for "Monopolization of Markets For WCDMA Technology"............................................................................ 10

    A.    Broadcom's Claim for Monopolizaton of "WCDMA Technology Markets" Fails................................................................... 11

        1.    QUALCOMM lawfully obtained the "monopoly power" alleged by Broadcom.................................................................. 12

        2.    Broadcom does not properly plead fraud on the SDOs. ............. 13

        3.    The license terms QUALCOMM offered Broadcom are fair, reasonable and non-discriminatory. .......................................... 17

    B.    Broadcom's Claim of Monopoly Maintenance in the Alleged "WCDMA Technology Markets" Fails.............................................. 19

        1.    QUALCOMM is free to license its patents on terms of its choosing. ....... 19

        2.    QUALCOMM's licensing practices have no anticompetitive effect in the alleged "WCDMA technology markets". .......................... 22

II.    Broadcom Does Not Plead Viable Claims Related to the "Market for UMTS Chipsets"............................................................................................ 23

    A.    Broadcom Has Not Suffered "Antitrust Injury" in the Alleged UMTS Chipset Market........................................................................ 23

        1.    Broadcom's alleged injury was not caused by anticompetitive conduct. ...24

        2.    Broadcom has not alleged that QUALCOMM's licensing policies have harmed competition in the alleged UMTS chipset market. ...................... 25

i

Page

    B.    Broadcom Does Not Plead the Elements of Its Claim for Attempted Monopolization of the Alleged UMTS Chipset Market ........................................26

           1.    Broadcom does not plead facts that would establish a "dangerous probability of achieving monopoly power" in the alleged UMTS chipset market. ......................................................................27

           2.    The conduct alleged by Broadcom with regard to UMTS chipsets is not "predatory" or "anticompetitive"......................................................28

    C.    Broadcom Does Not State Claims for "Exclusive Dealing" in the Alleged UMTS chipset markets ........................................................................31

    D.    Broadcom Does Not State Claims For Tying in the Alleged UMTS chipset markets........................................................................................................33

III.    Broadcom Does Not Have Standing to Bring Claims Related to the Alleged 3G CDMA Chipset and Technology Markets or to Challenge QUALCOMM's Acquisition of Flarion ........................................................................................36

    A.    Broadcom Lacks Standing to Bring Claims Related to Any Alleged CDMA Market........................................................................................38

    B.    Broadcom Lacks Standing to Bring a Section 7 Claim Related to the Flarion Acquisition ........................................................................40

IV.    Broadcom's State Law Claims Should be Dismissed........................................................43

    A.    Broadcom Does Not State Claims Under State Antitrust and Unfair Competition Law ........................................................................43

           1.    Broadcom's state law antitrust claim should be dismissed.......................44

           2.    Broadcom's state law unfair competition claim should be dismissed. ......45

    B.    Broadcom Does Not State a Claim for Tortious Interference with Prospective Economic Advantage ........................................................47

    C.    Broadcom Does Not State Claims for Promissory Estoppel or Fraud................48

    D.    Broadcom Does Not State a Claim for Breach of Contract ...................................49

Conclusion ........................................................................................................50

Table of Authorities

Page(s)

**Cases**

2660 Woodley Road Joint Venture v. ITT Sheraton Corp., 369 F.3d 732 (3d Cir. 2004) ............................................................................................................ 38, 40

Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191 (3d Cir. 1995) ........................ 29, 30

Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co., 826 F.2d 1235 (3d Cir. 1987) ........................................................................................................ 23, 41

Applera Corp. v. MJ Research Inc., No. 3:98VB1201 (JBA), 2004 WL 2935820 (D. Conn. Dec. 16, 2004) ................................................................................... 19

Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983) ..................................................................... 37, 42

Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990) ............................ 24

Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827 (1950), overruled in part on other grounds, 395 U.S. 653 (1969) ...................................... 17

Axis, S.p.A. v. Micafil, Inc., 870 F.2d 1105 (6th Cir. 1989) ....................................... 25

Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98 (3d Cir. 1992) ................................. 31, 32

Barrett v. U.S. Banknote Corp., No. 7420 (RPP), 1992 WL 232055 (S.D.N.Y. Sept. 2, 1992) ............................................................................................... 49

Barton & Pittinos, Inc., v. SmithKline Beecham Corp., 118 F.3d 178 (3rd Cir. 1997) ..................................................................................................... 23, 38, 39, 42

Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993) .................... 29

Brown Shoe Co. v. United States, 370 U.S. 294 (1962) ............................................ 25

Brunson Communications, Inc. v. Arbitron, Inc., 239 F. Supp. 2d 550 (E.D. Pa. 2002) ........................................................................................................ 27

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) .......................... 23

Chelson v. Oregonian Publ'g Co., 715 F.2d 1368 (9th Cir. 1983) ............................. 36

Chicago Title Ins. Co. v. Great Western Fin. Corp., 69 Cal. 2d 305 (1968) ............... 44

City of Pittsburgh v. West Penn Power Co., 147 F.3d 256 (3d Cir. 1998) ............ 23, 25, 37

Page(s)

Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co., 912 F. Supp. 747
(D.N.J. 1995) ............................................................................................... 47

Crossland v. Canteen Corp., 711 F.2d 714 (5th Cir. 1983) ....................................... 36

Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376 (1995) ............................. 47, 48

E. & G. Gabriel v. Gabriel Brothers, Inc., No. 93 CIV. 0894 (PKL), 1994 WL
369147 (S.D.N.Y. July 13, 1994) ......................................................... 28

ESS Tech. Inc. v. PC-Tel, Inc., No. C-99-20292 RMW, 1999 WL 33520483
(N.D. Cal. Nov. 4, 1999).................................................................. 25, 26, 46

Farmers Ins. Exchange v. Superior Court, 2 Cal. 4th 377 (1992)................................ 45

Fineman v. Armstrong World Indus., Inc., 980 F.2d 171 (3d Cir. 1992) ...................................... 31

Florida Seed Co., Inc. v. Monsanto Co., 105 F.3d 1372 (11th Cir. 1997)...................................... 42

Fresh Made, Inc. v. Lifeway Foods, Inc., No. Civ. A. 01-4254, 2002 WL
31246922 (E.D. Pa. Aug. 9, 2002).......................................................... 27, 28

Gantes v. Kason Corp., 145 N.J. 478 (1996) ...................................................... 44, 47

Genentech Inc. v. Eli Lilly & Co., 998 F.2d 931 (Fed. Cir. 1993), abrogated on
other grounds, 515 U.S. 277 (1995)......................................................... 18

Gregory Marketing Corp. v. Wakefern Food Corp., 787 F.2d 92 (3d Cir. 1986)........................ 39

Heindel v. Pfizer, Inc., 381 F. Supp. 2d 364 (D.N.J. 2004) ...................................... 43

High v. Balun, 943 F.2d 323 (3d Cir. 1991) ...................................................... 45

Hodges v. WSM, Inc., 26 F.3d 36 (6th Cir. 1994)................................................ 25

Hoffman-La Roche Inc. v. Genpharm Inc., 50 F. Supp. 2d 367 (D.N.J. 1999)........................ 45

In re Independent Service Organizations Antitrust Litig., 203 F.3d 1322 (Fed. Cir.
2000) ............................................................................................... passim

Intergraph Corp. v. Intel Corp., 195 F.3d 1346 (Fed. Cir. 1999)............................ 20, 22

Kentmaster Mfg. Co. v. Jarvis Products Corp., 146 F.3d 691 (9th Cir. 1998) ............................ 48

Kirschner v. Cable/Tel Corp., 576 F. Supp. 234 (E.D. Pa. 1983) ...................................... 49

Kunert v. Mission Fin. Servs. Corp., 1 Cal. Rptr. 3d 589 (Ct. App., 2d Dist. 2003)................... 46

Page(s)

La Salle Street Press, Inc. v. McCormick & Henderson, Inc., 293 F. Supp. 1004
(N.D. Ill. 1968) ................................................................................................ 36

Lear, Inc. v. Adkins, 395 U.S. 653 (1969)................................................................ 17

LePage's Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003) .................................................... 30

Lovell Mfg. v. Export-Import Bank of the U.S., 843 F.2d 725 (3d Cir. 1988) ........... 43

Lum v. Bank of America, 361 F.3d 217 (3d Cir. 2004) ....................................... passim

Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700 (Fed. Cir. 1992)........................ 18

Marts v. Xerox, Inc., 77 F.3d 1109 (8th Cir. 1996) ................................................. 36

Mathews v. Lancaster Gen. Hosp., 87 F.3d 624 (3d Cir. 1996) ............................... 26

Miller Insituform, Inc. v. Insituform of N. Am. Inc., 830 F.2d 606 (6th Cir. 1987) ............. 20, 24

Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 319 F. Supp. 2d 1059 (C.D.
Cal. 2003)...................................................................................................... 46

People's Choice Wireless, Inc. v. Verizon Wireless, 31 Cal. Rptr. 3d 819 (Ct.
App., 2d Dist. 2005)........................................................................................ 46

Perry v. Prudential-Bache Securities, Inc., 738 F. Supp. 843 (D.N.J. 1989)............... 43

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3d Cir. 1997)............ 26

Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc., 732 F.2d 1403
(9th Cir. 1984)................................................................................................ 34

Saporito v. Combustion Eng'g Inc., 843 F.2d 666 (3d Cir. 1988), vacated on other
grounds, 489 U.S. 1049 (1989) ........................................................................ 14

Schor v. Abbott Labs., 378 F. Supp. 2d 850 (N.D. Ill. 2005) ................................... 24

SCM Corp. v. Xerox Corp., 645 F.2d 1195 (2d Cir. 1981) ...................................... 19

Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786 (3d Cir.
1984) ............................................................................................................. 13

Simpson v. Union Oil Co., 377 U.S. 13 (1964) ...................................................... 20

Smith & Johnson, Inc. v. Hedaya Home Fashions Inc., No. 96 Civ. 5821 MBM,
1996 WL 737194 (S.D.N.Y. Dec. 26, 1996) ...................................................... 28

v

Page(s)

<u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 383 F. Supp. 2d 686 (E.D. Pa. 2004) .................. 23

<u>SmithKline Corp. v. Eli Lilly & Co.</u>, 427 F. Supp. 1089 (E.D. Pa. 1976) ............................ 34, 35

<u>SmithKline Corp. v. Eli Lilly & Co.</u>, 575 F.2d 1056 (3d Cir. 1987) ...................................... 34, 35

<u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. 447 (1993) ........................................................ 26

<u>Standard Oil Co. v. United States</u>, 337 U.S. 293 (1949) ....................................................... 31, 32

<u>State v. New Jersey Trade Waste Ass'n</u>, 96 N.J. 8 (1984) ........................................................ 44

<u>System Operations, Inc. v. Scientific Games Development Corp.</u>, 555 F.2d 1131
    (3d Cir. 1977) .......................................................................................................... 44

<u>Tampa Electric Co. v. Nashville Coal Co.</u>, 365 U.S. 320 (1961) .......................................... 31, 32

<u>Tele Atlas N.V. v. Navteq Corp.</u>, No. C-05-01673 RMW, 2005 WL 2893782
    (N.D. Cal. Nov. 2, 2005) ............................................................................................ 36

<u>Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.</u>, 959 F.2d 468 (3d
    Cir. 1992) ...................................................................................................... 26, 33, 34

<u>Townshend v. Rockwell Intern. Corp.</u>, No. C99-04005BA, 2000 WL 433505
    (N.D. Cal. March 28, 2000) ........................................................ 13, 17, 18, 46

<u>Tunis Bros. Co. Inc. v. Ford Motor Co.</u>, 952 F.2d 715 (3d Cir. 1991) ...................................... 26

<u>U.S. Philips Corp. v. International Trade Comm'n</u>, 424 F.3d 1179 (Fed. Cir.
    2005) ....................................................................................................................... 18

<u>Ungar v. Dunkin' Donuts of Am., Inc.</u>, 531 F.2d 1211 (3d Cir. 1976) ...................................... 35

<u>United Mine Workers v. Gibbs</u>, 383 U.S. 715 (1966) .............................................................. 43

<u>United States v. E.I. du Pont de Nemours & Co.</u>, 351 U.S. 377 (1956) .................................... 12

<u>United States v. Griffith</u>, 334 U.S. 100 (1948) ...................................................................... 12

<u>Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.</u>, 375 F.3d 1341 (Fed. Cir. 2004) ...................... 19

<u>Valley Products Co. Inc. v. Landmark, a Div. of Hospitality Franchise Sys., Inc.</u>,
    128 F.3d 398 (6th Cir. 1997) ..................................................................................... 25

<u>Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP</u>, 540 U.S.
    398 (2004) ....................................................................................................... 10, 12

Page(s)

<u>Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.</u>, 382 U.S.
172 (1965) ......................................................................................................... 21

<u>Watson v. City of Salem</u>, 934 F. Supp. 643 (D.N.J. 1995) ....................................... 49

<u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277 (1995) ...................................................... 18

<u>Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.</u>, 953 F. Supp. 617 (E.D.
Pa. 1997) ........................................................................................................... 31

**Statutes**

15 U.S.C. § 14 ......................................................................................................... 36

15 U.S.C. § 15 ......................................................................................................... 24

28 U.S.C. § 1367(c) ................................................................................................. 43

35 U.S.C. § 271(d) ................................................................................................... 20

Cal. Bus. & Prof. Code § 16700 .............................................................................. 44

Cal. Bus. & Prof. Code § 17200 .............................................................................. 45

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 6

Fed. R. Civ. P. 9(b) ...................................................................................... 6, 11, 13

N.J. Stat. Ann. § 56:9-18 ......................................................................................... 44

U.S. Const. art. I, § 8 ............................................................................................... 12

**Other Authorities**

<u>3GPP Working Procedures</u> Art. 55, <u>available at</u>
http://www.3gpp.org/About/WP.htm ................................................................ 16

<u>ETSI Guide on Intellectual Property Rights</u>, <u>available at</u>
http://www.etsi.org/legal/documents/ ETSI_Guide_on_IPRs.pdf ........................... 16

<u>ITU-T Patent Policy</u>, <u>available at</u> http://www.itu.int/ITU-T/dbase/patent/patent-
policy.html ......................................................................................................... 16

Michael A. Epstein, <u>Epstein on Intellectual Property</u> § 15.02 [E](c), (e) (4th ed.
2005) .................................................................................................................. 18

Page(s)

Operating Procedures for ATIS Forums and Committees, available at
  http://www.atis.org/ATISop.pdf.............................................................................................. 16

U.S. Dep't of Justice and Federal Trade Comm'n, Antitrust Guidelines for the
  Licensing of Intellectual Property (1995), available at
  http://www.hyperlaw.com/ipguide.htm ............................................................................ 19, 20

**Preliminary Statement**

Over the past 16 years, defendant QUALCOMM Incorporated ("QUALCOMM") has pioneered and led the commercialization of a digital communication technique called Code Division Multiple Access ("CDMA"). As a result of this long history of innovation, QUALCOMM has significant intellectual property, including patents, patent applications and trade secrets, that it licenses to other companies. The wireless communications industry generally recognizes that a company seeking to develop, manufacture or sell products that use CDMA technology will need a patent license from QUALCOMM. Accordingly, virtually every major wireless communications company has taken a license to QUALCOMM's patents.

Plaintiff Broadcom Corporation ("Broadcom") alleges that it seeks to produce and sell integrated circuit chips for use in cell phones that comply with the Wideband Code Division Multiple Access ("WCDMA") Third Generation ("3G") standard, a technology based on CDMA. (¶¶ 1, 12.)[1] As Broadcom concedes (¶¶ 82, 85), it needs to license certain patents from QUALCOMM to produce and sell those chips lawfully. In September 2004, Broadcom and QUALCOMM entered into licensing negotiations regarding those patents. QUALCOMM offered Broadcom its standard rates and terms – rates and terms that have been accepted by a number of other companies. Broadcom responded by asking for better terms based on the alleged strength of its own patent portfolio. Despite its acknowledged need for a license to QUALCOMM's essential patents, Broadcom took the position that it was QUALCOMM that should pay royalties to Broadcom. As the parties were discussing Broadcom's proposal, Broadcom abruptly filed this lawsuit, apparently in an effort to improve its bargaining position.

---

[1] Citations in the form (¶ [Number]) are to the First Amended Complaint filed on September 19, 2005 (the "Complaint").

Fundamentally, the basis for Broadcom's Complaint is that QUALCOMM owns patents that are essential to CDMA and WCDMA, and thus to products Broadcom wants to make and sell. Obviously, there is nothing unlawful about that. Accordingly, Broadcom has dressed up this grievance in the guise of a hodge-podge of federal antitrust and state law claims generally directed at QUALCOMM's licensing practices and at its pricing of baseband modem chips[2] used in cell phones. As discussed below, none of these claims withstand scrutiny.

### Broadcom's "First Claim for Relief": Monopolization of WCDMA "Technology Markets"

Broadcom's first claim is a claim under Section 2 of the Sherman Act alleging that QUALCOMM unlawfully monopolized WCDMA "technology markets" – which Broadcom defines as markets for technologies reading on each patent "essential" to the WCDMA standard – by fraudulently promising certain standard development organizations ("SDOs") that it would license its patents on "fair, reasonable, and non-discriminatory" terms. (¶¶ 139-40.) Broadcom also alleges that QUALCOMM is maintaining the alleged monopolies through a variety of licensing practices. (¶ 141.)

Broadcom's claim of monopolization of the alleged "WCDMA technology markets" fails because:

- Broadcom defines "WCDMA technology markets" as coextensive with QUALCOMM's patents. In such "markets", QUALCOMM's alleged "monopoly power" flows from its lawfully acquired patents, and not from the standards-setting process. Accordingly, there is no unlawful monopoly power. Any alleged "fraud" on the SDOs is irrelevant, because such fraud was not the source of the "monopoly power" alleged in the complaint. See Part I.A.1.

---

[2] A "baseband modem" chip is a chip that converts the cellular (radio) signal to purely digital form for internal processing within the cell phone.

2

- The allegedly fraudulent statements – commitments to grant licenses on "fair, reasonable, and non-discriminatory" terms – cannot support a fraud claim as a matter of law because they do not constitute promises of specific license terms to the SDOs. Nor does Broadcom plead fraud with the required level of particularity, and it cannot do so for the reasons stated above. See Part I.A.2.

- The license terms of which Broadcom complains are, in any event, fair reasonable and non-discriminatory. See Part I.A.3.

Broadcom's claim of maintenance of the alleged WCDMA technology market monopolies through allegedly anticompetitive licensing practices fails because:

- It is at odds with the fundamental premise of the constitutionally grounded patent system, which expressly permits QUALCOMM to license all, some or none of its rights, free from liability under the antitrust laws absent "exceptional circumstances" that are not present here. See Part I.B.1.

- Broadcom does not (because it cannot) allege that QUALCOMM's licensing practices had any anticompetitive effects in the alleged "WCDMA technology markets". See Part I.B.2.

**Broadcom's "Second Claim for Relief": Attempted Monopolization of the "UMTS Chipset Market"**

Broadcom's second claim is a claim under Section 2 of the Sherman Act alleging that QUALCOMM is attempting to monopolize the alleged UMTS chipset market through, among other things, its licensing and pricing practices. (¶¶ 145-46.) This claim fails because:

- Broadcom does not plead any antitrust injury in the alleged UMTS chipset market. To the extent Broadcom has been "exclude[d]" from the alleged market, such exclusion flows from Broadcom's refusal to accept QUALCOMM's license offers. Broadcom simply has not alleged any injury to competition. See Part II.A.

- Broadcom's claim for attempted monopolization of the alleged UMTS chipset market fails for the additional reason that the Complaint contains no allegations that would establish that there is a "dangerous probability" that QUALCOMM will obtain market power in such a market. See Part II.B.1.

- The acts alleged by Broadcom are not anticompetitive. As noted above, QUALCOMM's licensing practices are lawful under the patent laws. Moreover, QUALCOMM's pricing of its chipsets is, in all instances,

3

lawful, <u>above-cost</u> price competition that cannot be held to violate the antitrust laws.[3]  <u>See</u> Part II.B.2.

### Broadcom's "Third" and "Fifth" Claims for Relief:  Exclusive Dealing

Broadcom's third and fifth claims are claims under Section 1 of the Sherman Act and Section 3 of the Clayton Act alleging that QUALCOMM has entered into exclusive dealing arrangements that foreclose competition in the alleged UMTS chipset market.  (¶¶ 150-53, 163-64.)  Broadcom's failure to allege antitrust injury in the UMTS chipset market, discussed above, is also fatal to this claim.  <u>See</u> Part II.A.

Broadcom's exclusive dealing claims fail for the additional reason that Broadcom's failure to allege fundamental facts regarding the alleged UMTS chipset market, as discussed above, leaves the Complaint without any allegations that would establish that the alleged "exclusive dealing" agreements foreclose a substantial share of the relevant market. Accordingly, Broadcom does not allege the essential elements of its exclusive dealing claims. <u>See</u> Part II.C.

### Broadcom's "Fourth" and "Sixth" Claims for Relief:  Tying

Broadcom's fourth and sixth claims are claims under Section 1 of the Sherman Act and Section 3 of the Clayton Act alleging that QUALCOMM is tying discounts on licenses to its essential WCDMA patents to sales of WCDMA chipsets, thereby foreclosing competition in the alleged UMTS chipset market.  (¶¶ 157-59, 168-70.)  Broadcom's failure to allege antitrust injury in the UMTS chipset market, discussed above, is also fatal to this claim.  <u>See</u> Part II.A.

Broadcom's tying claims fail for the additional reason that Broadcom does not – and cannot – allege the *sine qua non* of a tying claim:  a refusal to sell the "tying" product unless

---

[3] Broadcom does not and cannot allege that QUALCOMM prices its chipsets below cost or that any discounts or rebates offered by QUALCOMM result in pricing below cost.

the purchaser also purchases the "tied" product.  By the Complaint's own terms, QUALCOMM does not <u>refuse</u> to grant licenses (the alleged tying product) unless the licensee also buys QUALCOMM's chipsets (the alleged tied product).  Rather, QUALCOMM allegedly has offered, in a limited number of instances, a <u>discount</u> on some royalties and license fees if the licensee also buys chipsets.  A discount for purchasing two products together is not a tying arrangement where the two products are also sold separately.  Therefore, Broadcom does not allege the essential elements of a tying claim.  <u>See</u> Part II.D.

### <u>Broadcom's "Seventh Claim for Relief": Maintenance of Alleged 3G CDMA Monopolies, and "Eighth Claim for Relief": Unlawful Acquisition</u>

To obscure the flaws in its WCDMA-related claims, Broadcom also brings claims related to alleged markets in which it is <u>not</u> a participant – the alleged markets for third generation ("3G") Code Division Multiple Access ("CDMA") technology and chipsets, and the alleged markets for "technologies contending to serve essential functions for B3G [(<u>i.e.</u>, beyond third generation) and 4G (<u>i.e.</u>, fourth generation)] wireless standards and systems".  (¶ 60.) Specifically, Broadcom alleges that QUALCOMM has unlawfully maintained "monopolies" in the alleged 3G CDMA chipset and technology markets in violation of Section 2 of the Sherman Act (¶ 173), and that QUALCOMM's recently-announced acquisition of Flarion Technologies, Inc. would substantially reduce competition in the alleged markets for "technologies contending to serve essential functions for B3G [and 4G] wireless standards and systems" in violation of Section 7 of the Clayton Act (¶ 177).  But because Broadcom is not a participant in the alleged markets relevant to these claims, it does not have "antitrust standing" to bring these claims. Accordingly, they should be dismissed.  <u>See</u> Part III.

5

### Broadcom's "Ninth" through "Thirteenth" Claims for Relief: State Statutory and Common Law Claims

Broadcom also brings a number of meritless state-law claims, including purported antitrust and unfair competition claims under the statutes of 39 different states, and several common-law claims. (¶¶ 179-200.)  Because Broadcom's federal claims should be dismissed, the Court should decline to exercise pendent jurisdiction over these state-law claims.  Moreover, Broadcom's attempt to invoke the antitrust and unfair competition laws of 39 different states fails because it has alleged only one set of conduct and one set of injuries (none of which is specifically alleged to have occurred in any state), and therefore has stated only individual antitrust and unfair competition claims subject to a choice-of-law analysis.  Application of the appropriate state's law to each of Broadcom's state-law claims shows that Broadcom does not plead the elements of any of its state-law claims.  See Part IV.

\* \* \*

For all these reasons, QUALCOMM respectfully requests that this Court dismiss the Complaint in its entirety pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

### Statement of Facts[4]

QUALCOMM is a leader in developing and implementing innovative digital wireless communications technologies.  QUALCOMM broadly licenses its intellectual property rights through its QUALCOMM Technology Licensing ("QTL") business unit. (¶ 32.) QUALCOMM also sells cell phone chipsets through its QUALCOMM CDMA Technologies

---

[4] For purposes of this motion, we rely only on the allegations in the complaint, matters of public record, and documents that form the basis of Broadcom's claims.  See Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004).

("QCT") business unit. (Id.)[5] Broadcom is in the business of, among other things, developing and supplying products in the area of "cellular and terrestrial wireless communications". (¶ 31.)

A.    Wireless Communications Standards and Technology

To insure that the wireless communications equipment of one company works with equipment from other companies, the wireless communications industry has developed "standards" that govern how wireless equipment works. (¶¶ 37-38.) Standards are developed by "standards development organizations", or "SDOs", which are primarily made up of representatives from industry. (E.g., ¶ 40.) Generally, adoption of a standard by an SDO does not assure that such standard will actually be implemented. Rather, each cellular carrier must decide for itself whether to implement a standard by deploying equipment compliant with the standard.

SDOs take varying approaches to intellectual property, such as patents, covering technology that is or might be incorporated into a standard. According to Broadcom, each SDO relevant to this action requires members to declare whether they hold patents essential for compliance with a standard and whether they are willing to make available licenses to such essential patents on "fair, reasonable, and non-discriminatory" ("FRAND") terms. (¶ 42.) As discussed in Part I.A.2, below, those SDOs do not articulate specific commercial terms that are "fair, reasonable, and non-discriminatory" but rather explicitly direct that specific licensing terms be negotiated outside the SDO by the owner of the patent and prospective licensees.

The two cellular standards used most widely today are the Global System for Mobility ("GSM") standard and the Code Division Multiple Access ("CDMA") standard, which

---

[5] QCT and QTL are not separate corporate entities. Each is an operating unit of QUALCOMM Incorporated.

was pioneered by QUALCOMM.  (¶¶ 3, 5.)  "Code Division" in CDMA refers to a method of breaking up a cell phone conversation into packets, each assigned an identity code, then spreading those packets over a wide spectrum of radio frequencies.  GSM is based on less advanced cell phone technology called "time-division multiple access" ("TDMA"), in which each conversation is broken into packets, which are sent sequentially in assigned time slots, interspersed with the packets of other conversations, over a single selected frequency.  In Europe, government regulators mandated use of GSM.  In the United States and elsewhere, however, cellular carriers were free to choose which technologies best met their needs.  Thus, in the United States, some carriers – such as Cingular Wireless, the nation's largest – use GSM, while others – such as Verizon Wireless – use CDMA.  (¶ 5.)  In Europe, however, virtually every carrier uses GSM.

GSM and CDMA are commonly referred to as "second generation" or "2G" cell phone technologies.  (¶ 44.)  Over time, cell phone technologies have improved to allow increased capacity and faster data transmission.  The leading edge of commercially available cell phone technologies deployed today are "third generation" or "3G" technologies.  (¶¶ 47, 49.)  The 3G technologies used most often by CDMA carriers are CDMA2000-1x and CDMA2000-1xEVDO.  The 3G technology towards which most GSM carriers are migrating is "Wideband Code Division Multiple Access", or WCDMA.  (¶ 48.)  Today, 70-80% of the cell phones and mobile wireless modem cards sold worldwide use GSM and related successor technologies (such as WCDMA), while the remaining 20-30% use CDMA and related successor technologies (such as CDMA2000-1xEVDO).

WCDMA technology is at the heart of this lawsuit.  WCDMA is an air interface technology that is based on the CDMA technology pioneered by QUALCOMM.  In 2004,

8

Broadcom purchased Zyray Wireless, Inc., a small company that was designing chips for use in WCDMA cell phones (UMTS "chipsets"). (¶ 31.) The Complaint alleges that Broadcom "has developed" UMTS chipsets "that would compete with QUALCOMM's".[6] (¶ 4.) Broadcom acknowledges that it needs a license to QUALCOMM's essential WCDMA patents lawfully to manufacture WCDMA chipsets. (¶¶ 82, 85.)

> B.    The Relevant Markets Alleged By Broadcom

Broadcom attempts to gerrymander two types of "markets". "Technology markets", according to Broadcom, are markets for licenses to patents that cover inventions related to wireless communications. Broadcom claims that the standards-making process creates "monopolies" in the markets for licenses to "essential" patents, because "[o]nce a standard has been adopted that incorporates a patented technology, alternatives previously available [i.e., alternative inventions covered by other patents or in the public domain] can no longer be used". (¶ 82.) Thus, according to Broadcom, "the technology reading on each essential patent" for a standard constitutes its own "market" for antitrust purposes, which Broadcom calls a "[Standard Name] technology market" (i.e., "GSM technology market", "WCDMA technology market", etc.). (¶¶ 58-60.)[7]

---

[6] The Complaint contains no allegation that Broadcom has developed or intends to develop chipsets compliant with any other wireless communications standard.

[7] Because QUALCOMM sells less than 20% of the baseband modem chips used in cell phones worldwide (far less than, for example, Texas Instruments), Broadcom's complaint attempts artfully to slice the cell phone industry (which is, in turn, only a portion of the communications industry) into many allegedly distinct "markets" that purportedly do not compete with each other. Broadcom's antitrust claims depend upon these market definitions, which any cell phone user knows to be illogical and untenable. For example, according to Broadcom, the technology used by Verizon Wireless in its cellular network does not compete with the technology used by Cingular Wireless despite the indisputable fact that cellular service providers compete head to head for subscribers in the marketplace. Notwithstanding the facial implausibility of Broadcom's market definitions, QUALCOMM accepts them (and all other well-pleaded allegations in the Complaint) as true for purposes of this motion.

9

According to Broadcom, "chipset markets" are markets for the chips used in wireless devices, such as cell phones.  (¶ 53-55.)  Allegedly, chips compliant with one wireless standard (e.g., CDMA), do not compete with chips compliant with another wireless standard (e.g., GSM).  (¶ 55.)  Thus, claims Broadcom, each type of chipset constitutes its own "market" for antitrust purposes, which Broadcom calls a "[Standard Name] chipset market" (i.e., "GSM chipset market", "UMTS chipset market", etc.).  (¶¶ 56-57.)

<u>Argument</u>

I.    **BROADCOM DOES NOT STATE A CLAIM FOR "MONOPOLIZATION OF MARKETS FOR WCDMA TECHNOLOGY"**

Broadcom's "First Claim for Relief" is a claim under Section 2 of the Sherman Act for alleged monopolization of so-called "markets for WCDMA technology".  (¶¶ 139-40.) According to Broadcom, each patent (or "patent family") essential to the WCDMA standard constitutes a separate relevant product market.  (<u>E.g.</u>, ¶¶ 58-59.)  Broadcom asserts that QUALCOMM unlawfully monopolized the alleged "WCDMA technology markets" by fraudulently promising SDOs that it would license its patents on "fair, reasonable, and non-discriminatory" terms and that QUALCOMM unlawfully maintained those monopolies through certain licensing practices.

Broadcom's assertions fail as a matter of law.  To state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must allege:  (1) the possession of monopoly power in the relevant market; and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident".  <u>Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP</u>, 540 U.S. 398, 407 (2004).  Broadcom does not plead facts that establish the second element – "willful acquisition or maintenance" of QUALCOMM's alleged monopoly

10

power. To the contrary, the power to exclude alleged by Broadcom flows directly from QUALCOMM's lawfully-obtained patents, and was therefore, by definition, a "consequence of a superior product" – QUALCOMM's pioneering inventions. Broadcom's assertion of "fraud" is legally irrelevant, not pled with the requisite particularity, and, in any event, wrong. Broadcom's monopoly maintenance theory cannot stand because the accused licensing practices are permitted under the patent laws and, in any event, have no anticompetitive effects in the alleged "WCDMA technology markets".

     A.    <u>Broadcom's Claim for Monopolizaton of "WCDMA Technology Markets" Fails</u>

     Broadcom claims that QUALCOMM willfully acquired monopoly power in the "WCDMA technology markets" through fraud – specifically, by falsely promising certain SDOs that it would license its essential WCDMA patents on "fair, reasonable, and non-discriminatory" terms. (¶¶ 82, 84-85, 140, 145.) Broadcom defines the relevant markets as the "markets" for each patent essential to the WCDMA standard. (¶ 59.) By Broadcom's own definition, the only possible source for QUALCOMM's alleged monopoly power is QUALCOMM's ownership of those patents. That power could not, as a matter of law and as a matter of common sense, have resulted from any alleged fraud on the SDOs. Therefore, because QUALCOMM acquired its alleged monopoly power lawfully by exercising its rights to obtain patents for its inventions, and not through any fraud, Broadcom's claim fails. Moreover, Broadcom does not plead the elements of fraud, nor does it plead "the circumstances constituting fraud" with particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure. Accordingly, its antitrust claims based on fraud should be dismissed. See <u>Lum v. Bank of America</u>, 361 F.3d 217, 228 (3d Cir. 2004).

11

1.    QUALCOMM lawfully obtained the "monopoly power" alleged by Broadcom.

"Monopoly power" is "the power to control prices or exclude competition".

United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956).  The possession of

"monopoly power" is not unlawful.  Indeed, "it is an important element of the free-market

system".  Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398,

407 (2004).  "The opportunity to charge monopoly prices – at least for a short period – is what

attracts 'business acumen' in the first place; it induces risk taking that produces innovation and

economic growth."  Id.  Accordingly, "[t]o safeguard the incentive to innovate, the possession of

monopoly power will not be found unlawful unless it is accompanied by an element of

anticompetitive conduct".  Id. (emphasis in original).  Anticompetitive conduct is "the use of

monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive

advantage, or to destroy a competitor".  United States v. Griffith, 334 U.S. 100, 107 (1948) .

According to Broadcom, the "relevant markets" that QUALCOMM allegedly

monopolized are markets for technology defined by certain QUALCOMM patents, and

QUALCOMM's allegedly anticompetitive conduct was defrauding SDOs by falsely promising to

offer licenses on "fair, reasonable, and non-discriminatory" terms.  (¶¶ 82, 84-85.)  Any alleged

"fraud" on the SDOs, however, did not grant QUALCOMM "monopoly power" – i.e., "power to

control prices or exclude competition" – over any alleged "markets" for technology defined by

QUALCOMM's patents.  Rather, QUALCOMM possesses such power by virtue of the lawfully

acquired patents themselves.[8]  Thus, QUALCOMM's "power to exclude", which Broadcom calls

"monopoly power" in its Complaint, predates, and is wholly independent of, any alleged fraud

---

[8] Indeed, the time-limited power to exclude others from practicing an invention is the very essence of a patent, and is granted to reward the innovator and encourage future innovation.  See U.S. Const. art. I, § 8.

12

on any SDO. QUALCOMM had such power on the date that the first relevant patent was issued, which, in this case, preceded any activity by any SDO to create standards around WCDMA. In such circumstances, any supposedly fraudulent statement QUALCOMM made to any SDO cannot be said to have been "anticompetitive", because neither the statement nor any action of any SDO foreclosed competition, gave QUALCOMM a competitive advantage that it did not already possess, or destroyed any competitor.[9] See Townshend v. Rockwell Intern. Corp., No. C99-04005BA, 2000 WL 433505, at *12 (N.D. Cal. March 28, 2000) ("The adoption of an industry standard incorporating such proprietary technology does not confer any power to exclude that exceeds the exclusionary power to which a patent holder is otherwise logally [sic] entitled.").

    2.    <u>Broadcom does not properly plead fraud on the SDOs.</u>

Even if QUALCOMM's alleged monopoly power were the result of the standardization process – which it is not – Broadcom's Section 2 claim would nevertheless fail. Broadcom does not and cannot plead facts establishing that QUALCOMM defrauded any SDO at all, let alone plead such facts with particularity, as required by Fed. R. Civ. P. 9(b). See Lum, 361 F.3d at 229 (holding that an antitrust claim based upon an alleged fraud "is subject to the heightened pleading requirement of Rule 9(b)").

The purpose of Rule 9(b) is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Id. at 223-24 (quoting Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)). Plaintiffs may satisfy Rule 9(b) only

---

[9] Conspicuously absent from Broadcom's Complaint is any allegation that there were alternatives to QUALCOMM's patented technology available to the SDOs before they adopted the WCDMA standard.

"by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud'". <u>Lum</u>, 361 F.3d at 224. Plaintiffs also must allege who made a misrepresentation to whom. <u>Id.</u>

        Broadcom meets none of these requirements. The sole allegation of allegedly fraudulent statements is that "QUALCOMM made repeated and express written representations to SDOs, including the ITU, ETSI, and 3GPP, that it would license any of its essential WCDMA patents on FRAND terms". (¶ 84.) The allegation does not identify the "date, place or time" of the allegedly fraudulent statements, nor does it identify the persons at QUALCOMM who made the statements or the persons at the SDOs who received them. Such a general allegation is woefully insufficient to support Broadcom's "monopolization through fraud" claim. <u>See</u> <u>Lum</u>, 361 F.3d at 228-29; <u>see also</u> <u>Saporito v. Combustion Eng'g Inc.</u>, 843 F.2d 666, 675 (3d Cir. 1988) (allegations of the general content of a representation with no indication of who the speakers were or who received the information do not meet the requirements of Rule 9(b)), <u>vacated on other grounds</u>, 489 U.S. 1049 (1989).

        More fundamentally, the statements alleged by Broadcom – commitments to offer licenses on "fair, reasonable, and non-discriminatory" terms – cannot support a fraud claim as a matter of law. The Third Circuit explicitly held in <u>Lum v. Bank of America</u> that where "it is reasonable for the parties to have different understandings of [a statement's] meaning", then the statement cannot support a claim for fraud (or an antitrust claim based on fraud). <u>Lum</u>, 361 F.3d at 226, 228. The allegedly fraudulent term at issue in <u>Lum</u> was "prime rate", which the plaintiffs alleged meant "the lowest rate available to a bank's most creditworthy borrowers". <u>Id.</u> at 227. The Third Circuit affirmed the dismissal of plaintiff's complaint – at the pleading stage –

because it held that the term "prime rate" was susceptible of multiple reasonable interpretations. As the court put it,

> "It is . . . unreasonable to infer that defendants' use of the equivocal term 'prime rate' was reasonably calculated to deceive persons of ordinary prudence and comprehension into believing that no borrower obtained an interest rate below the prime rate. Plaintiffs' claim boils down to a disagreement about the meaning of the term 'prime rate.' This disagreement does not rise to the level of fraud; at most, it alleges a contract dispute." Id. at 226.

Here, as in Lum, Broadcom's claim boils down to a disagreement about the meaning of a term. Indeed, the term relied upon by Broadcom in this case – "fair, reasonable and non-discriminatory" – is even more susceptible of multiple interpretations than the term "prime rate" at issue in Lum. To support a fraud claim, however, the term would not only have to have a single meaning, but that meaning would also have to be "so universally accepted that it is the only possible meaning and that a reasonable person could not understand the term to mean anything else". Id. (emphasis in original). Thus, Broadcom does not properly allege a claim of fraud.

In fact, Broadcom cannot allege that the relevant SDOs understood "fair, reasonable and non-discriminatory" to mean any given set of licensing terms because the relevant SDOs leave the determination of specific license terms to negotiations between licensors and licensees outside of SDO proceedings. For example, the ITU-T Patent Policy,[10] states that "[t]he detailed arrangements arising from patents (licensing, royalties, etc.) are being left to the parties concerned" and "negotiations [of license terms] are left to the parties concerned and are performed outside the ITU-T." ITU-T Patent Policy at preamble, ¶ 2.2, available at

---

[10] The "ITU" is the International Telecommunications Union, which is identified in the Complaint as "the central telecommunications SDO". (¶ 39.)

http://www.itu.int/ITU-T/dbase/patent/patent-policy.html.  Similarly, the <u>ETSI Guide on</u>

<u>Intellectual Property Rights</u>[11] states:

> "<u>Specific licensing terms and negotiations are commercial issues between</u>
> <u>the companies and shall not be addressed within ETSI</u>.  Technical Bodies
> are not the appropriate place to discuss IPR Issues.  Technical Bodies do
> not have the competence to deal with commercial issues.  Members
> attending ETSI Technical Bodies are often technical experts who do not
> have legal or business responsibilities with regard to licensing issues.
> Discussion on licensing issues among competitors in a standards making
> process can significantly complicate, delay or derail this process."  <u>ETSI</u>
> <u>Guide on IPRs</u> ¶ 4.1, <u>available at</u> http://www.etsi.org/legal/documents/
> ETSI_Guide_on_IPRs.pdf (emphasis added).

As another example, the Operating Procedures of the Alliance for Telecommunications Industry

Solutions ("ATIS")[12] state that "[t]o the extent a Forum or Committee participant, or any other

third party, desires a license for a patented invention referenced in a standard, guidelines or other

ATIS deliverable, <u>all negotiations and discussion of license terms shall occur between the patent</u>

<u>owner and the prospective licensee outside the deliberations of the Forum or Committee.  No</u>

<u>discussion or negotiation of license terms shall be permitted in any Forum or Committee</u>."

<u>Operating Procedures for ATIS Forums and Committees</u> at § 10.4 (emphasis added), <u>available at</u>

http://www.atis.org/ATISop.pdf.  ETSI and ATIS are both members of the Third Generation

Partnership Project,[13] which "has focused on the evolution of GSM and UMTS [<u>i.e.</u>, WCDMA]

technology" (¶ 41), and thus were directly involved in the development of the WCDMA

standard.

---

[11] "ETSI" is the European Telecommunications Standards Institution, "an SDO based in France
with a leadership role in Europe". (¶ 40.)

[12] ATIS is "an SDO based in the United States". (¶ 40.)

[13] The 3GPP is not an SDO but rather is an international umbrella organization for national and
regional SDOs and does not have an intellectual property policy independent of those of its
organizational members.  <u>See</u> <u>3GPP Working Procedures</u> Art. 55, <u>available at</u>
http://www.3gpp.org/About/WP.htm.

Through this lawsuit, Broadcom seeks to stand the policies and practices of the relevant SDOs on their heads. Broadcom asks this Court to do that which the SDOs themselves have expressly declined, and recognized that they are not competent, to do: mandate a one-size-fits-all set of commercial terms that would ignore the complex and unique attributes and needs of each licensor and licensee that require FRAND to be a flexible concept. In other words, rather than negotiate a license as the SDO policies contemplate, Broadcom wants this Court to <u>mandate</u> Broadcom's desired license terms based on a novel and untenable antitrust-violation-by-FRAND theory. If such judicial reinterpretations of standards practices were permitted, any potential licensee unhappy with proposed license terms for patents "essential" to a standard would rush to the courthouse to file an antitrust suit. This Court should reject Broadcom's attempt to override the SDOs' established policies and its misuse of the antitrust laws as a license-negotiating tactic.

3.    <u>The license terms QUALCOMM offered Broadcom are fair, reasonable and non-discriminatory.</u>

Broadcom's claim for monopolization of the alleged WCDMA technology markets fails for the additional reason that the facts that it pleads do not establish that QUALCOMM violated any FRAND commitment. None of the alleged license terms is inconsistent with FRAND. To the contrary, each of the terms about which Broadcom complains is a fair, reasonable and commercially routine requirement:

- Broadcom's complaint about the requirement "that the licensee agree to pay royalties on components over which Qualcomm has no claim to patent rights" is a dispute over the cost basis by which royalties are calculated. (¶¶ 13(a), 89-90.) Contrary to Broadcom's claims, the Supreme Court has expressly held that a patent holder may reasonably require royalties to be calculated in a manner that captures both patented and unpatented products. See <u>Automatic Radio Mfg. Co. v. Hazeltine Research</u>, 339 U.S. 827, 834 (1950), <u>overruled in part on other grounds by</u> <u>Lear, Inc. v. Adkins</u>, 395 U.S. 653 (1969).

- The requirement that a licensee grant QUALCOMM a cross-license (¶¶ 13(b), 91) is likewise a fair and procompetitive practice because "it can facilitate the integration of complementary technologies". <u>Townshend</u>, 2000 WL 433505, at *8.

17

- There is nothing unreasonable about the requirement that different licensees pay royalties for different rights (i.e., one licensee paying a royalty to make chipsets, and another licensee paying a royalty to use chipsets in connection with a patented method of communication). (¶¶ 13(c), 92-93.) The Federal Circuit has expressly held that a patent holder may reasonably place restrictions on the manner in which licensees may use the patent holder's inventions. See Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700, 703-05 (Fed. Cir. 1992). Thus, there is nothing impermissible about QUALCOMM separately licensing the right to manufacture chipsets and the right to use chipsets in manufacturing end-user products, nor is there anything unfair about QUALCOMM requiring that its licensees refrain from inducing infringement of QUALCOMM's patents by dealing with unlicensed parties.

- Broadcom's complaint regarding QUALCOMM's requirement that licensees report information from which it can be determined whether royalties have been correctly calculated – such as the prices of licensed products (¶¶ 13(d), 102) – is commercially absurd. Such a requirement is a normal part of virtually every license agreement involving royalties. See, e.g., Michael A. Epstein, Epstein on Intellectual Property § 15.02 [E] & [E](c), (e) (4th ed. 2005) (noting that reporting requirements are "often included" in license agreements). Without such information, a licensor would have no practical ability to ensure that a licensee was living up to its royalty obligations. Broadcom does not – and cannot – plead that QUALCOMM has ever used information received from its licensees in any anticompetitive or otherwise improper way.

Broadcom's allegations are essentially that the price QUALCOMM charges for a license is too high. (e.g., ¶ 99.) Charging what the market will bear, however, is not an anticompetitive or unreasonable act. It is the lawful use of rights granted under the patent laws. See, e.g., U.S. Philips Corp. v. International Trade Comm'n, 424 F.3d 1179, 1191-92 (Fed. Cir. 2005) ("Because a license to the essential patent is, by definition, a prerequisite to practice the technology in question, the patentee can charge whatever maximum amount a willing licensee is able to pay to practice the technology in question."); see also Genentech Inc. v. Eli Lilly & Co., 998 F.2d 931, 949 (Fed. Cir. 1993) (patent owner's pursuit of optimum royalty income not an antitrust violation), abrogated on other grounds by Wilton v. Seven Falls Co., 515 U.S. 277 (1995); Townshend, 2000 WL 433505, at *8 (finding allegedly "unfair" licensing practices not anticompetitive because, among other things, "[a] patent owner's pursuit of optimum royalty income is not an act in restraint of trade which violates the antitrust laws"). Since QUALCOMM

18

is free not to license its patents at all, its practice of broadly licensing its patents "is an activity that aids rather than impedes competition". <u>Applera Corp. v. MJ Research Inc.</u>, No. 3:98VB1201 (JBA), 2004 WL 2935820, at \*10 (D. Conn. Dec. 16, 2004).

     **B.**    <u>Broadcom's Claim of Monopoly Maintenance in the Alleged "WCDMA Technology Markets" Fails</u>

Broadcom alleges that QUALCOMM "maintained" monopoly power in the "WCDMA technology markets" by failing to license its essential WCDMA patents on terms that Broadcom considers "fair, reasonable, and non-discriminatory". (¶¶ 140, 145.) These allegations fail to state a claim under Section 2 of the Sherman Act.

     1.    <u>QUALCOMM is free to license its patents on terms of its choosing.</u>

Absent certain "exceptional circumstances" – none of which is present here – even an absolute refusal to license a patent (which is not alleged here) is immunized from antitrust liability. <u>See</u> <u>In re Independent Service Orgs. Antitrust Litig.</u>, 203 F.3d 1322, 1326-27 (Fed. Cir. 2000) ("<u>ISO</u>"); <u>see also</u> <u>Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.</u>, 375 F.3d 1341, 1356 (Fed. Cir. 2004) ("As a general rule, behavior conforming to the patent laws oriented towards procuring or enforcing a patent enjoys immunity from the antitrust laws."); <u>SCM Corp. v. Xerox Corp.</u>, 645 F.2d 1195, 1206 (2d Cir. 1981) ("conduct permissible under the patent laws cannot trigger any liability under the antitrust laws."). QUALCOMM's licensing practices, then, which include licensing its patents to many companies and offering a license to Broadcom – albeit on different terms than Broadcom would prefer – cannot be held to violate the antitrust laws. To the contrary, licensing "is an activity that aids rather than impedes competition." <u>Applera Corp.</u>, 2004 WL 2935820, at \*10.[14]

_____

[14] <u>See also</u> U.S. Dep't of Justice and Federal Trade Comm'n, <u>Antitrust Guidelines for the Licensing of Intellectual Property</u>, at 2, 5 (1995) ("intellectual property licensing allows firms to

The Supreme Court has explicitly held that the patent laws, which grant the right to exclude others from practicing an invention, "modify" the antitrust laws to the extent they conflict. See Simpson v. Union Oil Co., 377 U.S. 13, 24 (1964) (stating that the patent laws "are in pari materia with the antitrust laws and modify them pro tanto") (emphasis added). Indeed, courts have repeatedly recognized that patent holders do not violate the antitrust laws by unilaterally refusing to license or sell a patent. See, e.g., ISO, 203 F.3d at 1326; Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1362 (Fed. Cir. 1999); see also Miller Insituform, Inc. v. Insituform of N. Am. Inc., 830 F.2d 606, 609 (6th Cir. 1987) ("A patent holder who lawfully acquires a patent cannot be held liable under Section 2 of the Sherman Act for maintaining the monopoly power he lawfully acquired by refusing to license the patent to others.") The principles underlying the antitrust immunity conferred by the patent laws are codified in Section 271(d) of the Patent Act, which expressly provides that "[n]o patent owner otherwise entitled to relief . . . shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having . . . (4) refused to license or use any rights to the patent . . .'". ISO, 203 F.3d at 1326 (quoting 35 U.S.C. § 271(d) (emphasis and ellipses in original)).

The Federal Circuit has recognized only three exceptions to the antitrust immunity conferred by the patent laws: "illegal tying, fraud in the Patent and Trademark Office,

---

combine complementary factors of production and is generally procompetitive. . . . Licensing, cross-licensing, or otherwise transferring intellectual property . . . can facilitate integration of the licensed property with complementary factors of production. This integration can lead to more efficient exploitation of the intellectual property, benefiting consumers through the reduction of costs and the introduction of new products. Such arrangements increase the value of intellectual property to consumers and to the developers of the technology. By potentially increasing the expected returns from intellectual property, licensing also can increase the incentive for its creation and thus promote greater investment in research and development.") available at http://www.hyperlaw.com/ipguide.htm.

20

or sham litigation". Id. at 1327. Broadcom does not even attempt to allege that QUALCOMM has engaged in any fraud in the Patent Office or that it has brought sham litigation.[15]

Broadcom's attempt to allege "illegal tying" fails. In this context, illegal tying refers only to "ties" that extend beyond the scope of the relevant patents – i.e., ties of unpatented products to patents or patented products. See id. at 1326-27. "Ties" between products that are both covered by the relevant patents or, as alleged here, between a patent and a product covered by that patent are permissible even if those products are in different relevant markets. See id. at 1327 ("[W]e have expressly held that, absent exceptional circumstances, a patent may confer the right to exclude competition altogether in more than one antitrust market".). Put another way, the rule against "illegal tying" is that "the patent holder cannot use his statutory right to refuse to [license or] sell . . . to gain a monopoly in a market beyond the scope of the patent". Id. (emphasis in original).

In this case, Broadcom has not even properly alleged that QUALCOMM "tied" licenses to its WCDMA patents to purchases of UMTS chipsets. See Part II.D., infra.[16] However, even if it had, any such "tie" could not violate the antitrust laws. Broadcom admits (see ¶¶ 82, 14) that both the alleged "tying product" – licenses to QUALCOMM's patents – and the alleged "tied product" – UMTS chipsets – are within the scope of QUALCOMM's statutory patent rights. See ISO, 203 F.3d at 1327. Thus, the alleged conduct does not constitute an

---

[15] "Fraud in the Patent and Trademark Office" refers to fraud in the procurement of a patent within the meaning of Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177 (1965). ISO, 203 F.3d at 1326. "Sham litigation" is an attempt to enforce a patent in the courts that is "a mere sham to cover what is actually no more than an attempt to interfere directly with the business relationships of a competitor". Id.

[16] As we discuss in Part II.D., Broadcom does not allege that QUALCOMM ties the sale of one product to the sale of another; it does not allege that QUALCOMM refuses to license its WCDMA patents unless the licensee also purchases QUALCOMM's UMTS chipsets. It alleges only that QUALCOMM offers discounts on its patent licenses to some customers who purchase QUALCOMM's chipsets, and that is not an unlawful tying arrangement.

attempt to extend the lawful power to exclude granted by QUALCOMM's patents beyond the scope of the patents' claims. Rather, to the extent QUALCOMM's conduct is exclusionary at all, the exclusionary effect is limited only to products that are indisputably covered by the patents. That conduct is immunized from antitrust liability by the patent laws. See id. at 1326.

> 2. QUALCOMM's licensing practices have no anticompetitive effect in the alleged "WCDMA technology markets".

Even if QUALCOMM's licensing practices were somehow "exclusionary" within the meaning of the antitrust laws – which they are not – they nevertheless could not support a claim for maintenance of alleged monopolies in the so-called "WCDMA technology markets" because they do not have any anticompetitive effects in those markets. Only conduct having an anticompetitive effect in the relevant market can support a claim under Section 2 of the Sherman Act. See, e.g., Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1355 (Fed Cir. 1999). Here, Broadcom does not allege that QUALCOMM's licensing conduct has any anticompetitive effect whatsoever in the "WCDMA technology markets" – i.e., the relevant markets for purposes of its monopolization claim. Rather, the alleged effects all relate to the UMTS chipset market. (E.g., ¶ 11 (alleging that QUALCOMM's refusal to license on FRAND terms "thwart[s] meaningful competition in the market for UMTS chipsets"); ¶ 105 (alleging that QUALCOMM's royalty rate discrimination "is intended to harm . . . competition in the UMTS chipset market"); ¶ 109 (alleging that QUALCOMM's licensing terms "put Broadcom at a significant disadvantage in pricing its UMTS chipsets).) Thus, Broadcom's allegations regarding licensing practices cannot support its claim for monopolization of the "WCDMA technology markets". See Intergraph, 195 F.3d at 1355 (no claim for monopolization of market for "high-end microprocessors" where allegedly anticompetitive acts affected other markets, and not the alleged relevant market).

II.    **BROADCOM DOES NOT PLEAD VIABLE CLAIMS RELATED TO THE "MARKET FOR UMTS CHIPSETS"**

Broadcom's "Second" through "Sixth" "Claim[s] for Relief" are claims related to the "market" for UMTS chipsets.  (¶¶ 145-48, 150-55, 157-61, 163-66, 168-71.)  Specifically, Broadcom alleges attempted monopolization of that alleged market (second claim), exclusive dealing (third and fifth claims) and tying (fourth and sixth claims).  (Id.)  Each of these claims fails because, to the extent Broadcom has been excluded from the alleged market, this exclusion is not the result of any anticompetitive conduct by QUALCOMM.  Rather, it is the result of Broadcom's refusal to accept QUALCOMM's offer to license its patents.  Thus, Broadcom has not suffered any "antitrust injury".  Moreover, Broadcom's allegations are insufficient to establish attempted monopolization, exclusive dealing or tying.

A.    Broadcom Has Not Suffered "Antitrust Injury" in the Alleged UMTS Chipset Market

An "antitrust injury" is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  Thus, to allege an antitrust injury, a plaintiff must allege:  (1) that the alleged injury-causing conduct reduced competition and thereby injured consumers, see, e.g., SmithKline Beecham Corp. v. Apotex Corp., 383 F. Supp. 2d 686, 697-99 (E.D. Pa. 2004); and (2) that the plaintiff's injury was actually caused by the alleged anticompetitive conduct, see Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co., 826 F.2d 1235, 1240 (3d Cir. 1987).  An antitrust complaint that does not plead facts sufficient to show that the plaintiff has suffered antitrust injury must be dismissed.  See, e.g., City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 265 (3d Cir. 1998); Barton & Pittinos, Inc., v. SmithKline Beecham Corp., 118 F.3d 178, 184 n.9 (3rd Cir. 1997).  In this case, Broadcom's failure to allege antitrust injury in the alleged UMTS chipset market is fatal to its

attempted monopolization claim, its exclusive dealing claims and its tying claims related to that alleged market. See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (antitrust injury requirement applies to all private antitrust claims authorized by section 4 of the Clayton Act, 15 U.S.C. § 15.).

       1.     Broadcom's alleged injury was not caused by anticompetitive conduct.

Broadcom alleges that its "injury" is exclusion from the UMTS chipset market. (¶¶ 142, 147.) But Broadcom concedes that it needs a license to QUALCOMM's essential WCDMA patents in order lawfully to enter the alleged market. (¶¶ 82, 140, 145.) Thus, to the extent Broadcom has been "excluded" from the alleged market, Broadcom necessarily concedes that its exclusion results from its own failure to accept a license to QUALCOMM's lawfully acquired patent rights.

That type of exclusion is not an injury "that flows from" a violation of the antitrust laws. As discussed above, see Part I.B, supra, the patent laws immunize the enforcement of patent rights – including licensing activities – from antitrust liability, absent the "exceptional circumstances" of "illegal tying, fraud in the Patent and Trademark Office, or sham litigation". ISO, 203 F.3d at 1326-27. None of these is present here. Broadcom does not allege fraud in the Patent Office or sham litigation. Broadcom admits that the relevant patents cover WCDMA chipsets (¶ 14), so the alleged tie does not extend beyond the scope of QUALCOMM's patent rights. See ISO, 203 F.3d at 1326-27. It therefore cannot constitute the "illegal tying" necessary to pierce QUALCOMM's antitrust immunity. See id. at 1327; see also Miller Insituform, 830 F.2d at 609 (finding "no adverse effect on competition" by termination of patent license by patent holder that also competed with its licensees, because the patent holder "from the start, had [the] exclusive right to manufacture, use, and sell his invention"); Schor v. Abbott Labs., 378 F. Supp. 2d 850, 855-60 (N.D. Ill. 2005) (allegations that defendant used

24

"monopoly power" in market for patented drug to attempt to monopolize market for protease inhibitors that used that drug as a "booster" dismissed for failure to state a claim where relevant patent indisputably covered the drug whether used alone or used as a "booster").

Because Broadcom's alleged exclusion is not the result of any violation of the antitrust laws by QUALCOMM, but rather flows from QUALCOMM's lawful acquisition and exercise of its patent rights, it is not an "antitrust injury". See Axis, S.p.A. v. Micafil, Inc., 870 F.2d 1105 (6th Cir. 1989) (no antitrust injury where plaintiff was excluded from market by patents); ESS Tech. Inc. v. PC-Tel, Inc., No. C-99-20292 RMW, 1999 WL 33520483, at *3 (N.D. Cal. Nov. 4, 1999) (averments that defendant holds patents essential to comply with standards and that plaintiff cannot compete in the relevant market due to defendant's refusal to license its patents in a reasonable and non-discriminatory way do not allege antitrust injury); see also City of Pittsburgh, 147 F.3d at 268 ("[A] plaintiff cannot be injured in fact by private conduct excluding him from the market when a statute prevents him from entering that market in any event" (quotation and citation omitted)); Hodges v. WSM, Inc., 26 F.3d 36, 39 (6th Cir. 1994) (no "antitrust injury" where plaintiff was excluded from market by lawful exercise of property rights); Valley Products Co. Inc. v. Landmark, a Div. of Hospitality Franchise Sys., Inc., 128 F.3d 398, 404-07 (6th Cir. 1997) (no "antitrust injury" where plaintiff was excluded from market by defendant's termination of trademark license). For this reason alone, all of Broadcom's claims related to the alleged UMTS chipset market fail.

> 2.    **Broadcom has not alleged that QUALCOMM's licensing policies have harmed competition in the alleged UMTS chipset market.**

In addition, it is axiomatic that the antitrust laws protect competition, not competitors. See, e.g., Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962). Thus, an antitrust plaintiff must allege "'that challenged conduct affected the prices, quantity or quality of

25

goods or services,' not just his own welfare". Mathews v. Lancaster Gen. Hosp., 87 F.3d 624,

641 (3d Cir. 1996) (quoting Tunis Bros. Co. Inc. v. Ford Motor Co., 952 F.2d 715, 728 (3d Cir.

1991)).

> In this case, Broadcom does not allege that QUALCOMM's licensing terms have

excluded anyone other than Broadcom from the alleged UMTS chipset market.[17] Thus it has

failed to plead facts that establish an injury to competition, as opposed to an injury to itself. See,

e.g., Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 494 n.40 (3d

Cir. 1992) (en banc) (Even if "a certain class of competitors . . . might be doomed to competitive

oblivion", "that would be no concern of the antitrust laws unless consumers were also hurt

because of diminished competition"); ESS Tech., 1999 WL 33520483, at *3. This failure is also

fatal to all of Broadcom's claims related to the alleged UMTS chipset market.

> B.    Broadcom Does Not Plead the Elements of Its Claim for Attempted
>       Monopolization of the Alleged UMTS Chipset Market

> Broadcom's attempted monopolization claim fails not only because Broadcom

does not allege antitrust injury, as discussed above, but also because Broadcom does not plead

other essential elements of this claim.  The elements of an attempted monopolization claim are

"(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific

intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum

Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); Queen City Pizza, Inc. v. Domino's Pizza,

Inc., 124 F.3d 430, 442 (3d Cir. 1997).  Broadcom fails to plead any allegations regarding the

---

[17] Nor could it –there is, in fact, vigorous competition in the alleged market.  Several companies
have taken licenses to QUALCOMM's essential WCDMA patents (on terms mutually agreed
upon with QUALCOMM) and are currently manufacturing and selling UMTS chipsets.  Indeed,
one of the licensees – Texas Instruments – has the largest share of the alleged market (far larger
than QUALCOMM), and other companies also have a larger share than QUALCOMM.
Broadcom does not plead otherwise.

26

structure of, and competition in, the alleged UMTS chipset market, and thus it fails to plead that there is a dangerous probability of QUALCOMM's achieving monopoly power in the alleged UMTS chipset market.  And, in any event, the conduct of which Broadcom complains is neither predatory nor anticompetitive as a matter of law.

    1.    <u>Broadcom does not plead facts that would establish a "dangerous probability of achieving monopoly power" in the alleged UMTS chipset market.</u>

The only facts in the complaint regarding the alleged UMTS chipset market are the unremarkable (from a legal perspective) points that (1) the market is experiencing rapid growth, with 50 million WCDMA cell phones expected to be sold in 2005, and (2) that QUALCOMM has sales in the market.  (¶¶ 112-13.)  Not one of the 200 paragraphs in Broadcom's complaint describes QUALCOMM's competitors in that market.  Nor does Broadcom aver QUALCOMM's share of that market or that of any other competitor in that market.[18]

Although Broadcom's complaint states that "there is a dangerous probability that QUALCOMM will obtain monopoly power" in the alleged UMTS chipset market, courts have repeatedly held that such conclusory and unsupported allegations of "dangerous probability" are insufficient to withstand a motion to dismiss an attempted monopolization claim.  <u>See, e.g.,</u> <u>Brunson Communications, Inc. v. Arbitron, Inc.</u>, 239 F. Supp. 2d 550, 571-72 (E.D. Pa. 2002); <u>Fresh Made, Inc. v. Lifeway Foods, Inc.</u>, No. Civ. A. 01-4254, 2002 WL 31246922, at *8 (E.D. Pa. Aug. 9, 2002); <u>Smith & Johnson, Inc. v. Hedaya Home Fashions Inc.</u>, No. 96 Civ. 5821

---

[18] That is undoubtedly because Broadcom seeks to obscure the fact that there is vigorous competition among manufacturers of UMTS chipsets, including Texas Instruments (with the largest sales volume by far), Freescale, Agere and NEC.  Indeed, if there is a relevant market for UMTS chipsets (which we believe there is not), QUALCOMM's share of it, according to industry analysts, is less than 20%.

27

MBM, 1996 WL 737194, at *7 (S.D.N.Y. Dec. 26, 1996); <u>E. & G. Gabriel v. Gabriel Brothers,</u>

<u>Inc.</u>, No. 93 CIV. 0894 (PKL), 1994 WL 369147, at *5 (S.D.N.Y. July 13, 1994).  For example,

in <u>Fresh Made</u>, the plaintiff – a maker of dairy products – alleged only that the defendant's gross

annual revenues were five times as large as plaintiff's, and that defendant had used its influence

to threaten distributors and merchants who did not agree to its demands.  <u>Id.</u> at *8.  But the

plaintiff in <u>Fresh Made</u> failed to "allege the overall size of the proposed market, identify

[defendant's] percentage share of the proposed market, identify other participants and

competitors in the market, or allege what percentage of [defendant's] gross annual revenues are

derived from the proposed market."  <u>Id.</u>  Therefore, the court held, plaintiff's allegations

regarding "dangerous probability" were insufficient to withstand a motion to dismiss.  <u>Id.</u>

Here, Broadcom pleads even fewer facts about the market than did the plaintiff in

<u>Fresh Made</u>.  Broadcom fails to plead QUALCOMM's percentage share of the alleged UMTS

chipset market, the other participants and competitors in that alleged market, or the percentage of

QUALCOMM's revenues attributable to the alleged market.  Thus, Broadcom fails to allege

facts sufficient to establish that there is a "dangerous probability" that QUALCOMM will

monopolize the alleged UMTS chipset market.  <u>See id.</u>; <u>see also</u> <u>Smith & Johnson</u>, 1996 WL

737194, at *7 (conclusory allegations of "dangerous probability" insufficient where "plaintiff has

failed to allege any facts regarding the afghan industry structure, let alone [defendant's] current

market share").

    2. <u>The conduct alleged by Broadcom with regard to UMTS chipsets is not</u>
       <u>"predatory" or "anticompetitive".</u>

Broadcom alleges three types of allegedly anticompetitive conduct:  (1) that

QUALCOMM (i) fraudulently induced SDOs to include QUALCOMM's patented technology in

the WCDMA standard by falsely promising to license that technology on FRAND terms and

28

then failing to abide by its promise (including failing to give Broadcom a license on FRAND terms) and (ii) offered discounted royalties or waived licensing fees in exchange for the purchase of QUALCOMM UMTS chipsets (the "licensing conduct"); (2) that QUALCOMM offered "marketing funds and/or other incentives" conditioned on the use of QUALCOMM's UMTS chipsets (the "pricing conduct"); and (3) that QUALCOMM leveraged its alleged CDMA monopolies by "using threats regarding . . . chipset supply" to coerce phone manufacturers into buying QUALCOMM's UMTS chipsets (the "CDMA supply conduct"). Neither the alleged licensing conduct nor the alleged pricing conduct is "anticompetitive", and Broadcom does not plead facts that would establish that QUALCOMM could monopolize the alleged UMTS chipset market through the alleged CDMA supply conduct. Therefore, the attempted monopolization claims should be dismissed.

First, for the reasons set forth in Part I.B, supra, QUALCOMM's licensing practices are expressly authorized by the patent laws and therefore cannot be "anticompetitive" within the meaning of the antitrust laws.

Second, the pricing conduct as alleged is nothing more than lawful, pro-competitive price competition. Conspicuously absent from the Complaint, and rightly so, is any allegation that QUALCOMM has engaged in below-cost pricing. Absent such an allegation, discounting cannot support an attempted monopolization claim. See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 223-24 (1993); see also Advo. Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1195-99 & n.3 (3d Cir. 1995) (applying Brooke Group to an attempted monopolization claim). Although the Third Circuit has allowed an exception to Brooke Group in the case of pricing conduct by a monopolist, that court has made clear that the exception only applies because "a monopolist is not free to take certain actions that

29

a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior". LePage's Inc. v. 3M, 324 F.3d 141, 151-52 (3d Cir. 2003) (en banc).  Here, Broadcom does not – and cannot – plead that QUALCOMM is a "monopolist" in the alleged UMTS chipset market or that there is "no market constraint" on QUALCOMM's behavior.  To the contrary, there is vigorous competition among firms manufacturing UMTS chipsets and QUALCOMM does not even have the largest share among these manufacturers.  Indeed, perhaps the best evidence of "market constraint" on QUALCOMM's behavior is alleged in the complaint – that QUALCOMM competes by lowering the prices of its products, rather than raising them.  (¶¶ 106-07, 110.)

Third, Broadcom does not plead facts that would establish that the CDMA supply conduct has anticompetitive effects in the alleged market for UMTS chipsets.  In essence, this is an allegation of "monopoly leveraging" – i.e., an effort by a seller with power in one market (the alleged CDMA chipset market) to transfer that power to a second market (the alleged UMTS chipset market), thereby achieving economic power in the second (or "leveraged") market.  See, e.g., Advo, 51 F.3d at 1202-03.  As the Third Circuit has noted, monopoly leveraging theories "have come under increasing attack as economically groundless" because they rarely make sense.  Id.  In Advo, for example, plaintiff alleged that the defendant had a monopoly in newspaper advertising, and was using discounts on newspaper advertising to attempt to monopolize the market for advertising in another type of publication – weekly circulars.  Id. at 1192-94.  The Third Circuit found plaintiff's leveraging theory nonsensical, because "[e]ven if it successfully monopolizes the circular distribution advertising market by investing the proceeds from its [newspaper advertising] monopoly in predation, it will be unable to recoup those profits as long as there are low barriers to entering the circular distribution market".  Id. at 1203.

Here, it similarly makes no sense for QUALCOMM to forgo profits from selling CDMA chipsets to attempt to boost sales of UMTS chipsets. Even if QUALCOMM were able to "monopolize" the "market" for UMTS chipsets, it would be unable to recoup the lost CDMA profits because QUALCOMM's UMTS chipset pricing would be constrained by the presence of WCDMA licensees like Texas Instruments, who could easily reenter the market.

In addition, in Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 206 (3d Cir. 1992), the Third Circuit unequivocally held that "in order to prevail upon a theory of monopoly leveraging, a plaintiff must prove threatened or actual monopoly in the leveraged market" – i.e., the market to which the alleged monopolist is exporting its market power (here, the alleged UMTS chipset market). Here, as noted above, Broadcom does not plead any facts regarding the structure of the alleged UMTS chipset market or QUALCOMM's position in it, let alone the requisite showing of a threatened or actual monopoly.

     C.      <u>Broadcom Does Not State Claims for "Exclusive Dealing" in the Alleged UMTS Chipset Markets</u>

Broadcom's claims for alleged anticompetitive "exclusive dealing" arrangements under the Sherman Act (Third claim) and the Clayton Act (Fifth claim) also fail. An "exclusive dealing" claim under Section 3 of the Clayton Act requires a showing of an exclusive agreement or agreements for the sale of goods that forecloses a substantial share of a relevant market. Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 110-11 (3d Cir. 1992).[19] The Supreme Court has

---

[19] While a claim under section 1 of the Sherman Act "applies to actual restraints of trade, § 3 [of the Clayton Act] 'condemn[s] sales or agreements where the effect of such sale or contract would, under the circumstances disclosed, probably lessen competition or create an actual tendency to monopoly'". Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co., 953 F.Supp. 617, 662 (E.D. Pa. 1997) (quoting Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 326 (1961)). The Third Circuit has stated that if an alleged exclusive dealing arrangement is permissible under "the stiffer standards of anti-competitiveness under the Clayton Act", it will also be lawful under the less restrictive provisions of the Sherman Act. Barr, 978 F.2d at 110; see also Standard Oil Co. v. United States, 337 U.S. 293, 312 (1949) (stating that the Clayton

articulated two tests for determining whether a foreclosure is "substantial": the "quantitative" substantiality test espoused in <u>Standard Oil Co. v. United States</u>, 337 U.S. 293, 309-14 (1949), and the "qualitative" substantiality test set forth in <u>Tampa Electric Co. v. Nashville Coal Co.</u>, 365 U.S. 320, 327-29 (1961). <u>See</u> <u>Barr</u>, 978 F.2d at 110-11. The "quantitative" substantiality test requires consideration only of the share of the relevant market that has been foreclosed. The "qualitative" substantiality test requires the court to evaluate the probable effect of the exclusive dealing arrangements on "the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein." <u>Tampa Electric</u>, 365 U.S. at 329. The Third Circuit has held that the "qualitative" substantiality test has subsumed the "quantitative" substantiality test such that "the degree of market foreclosure is only one of the factors involved in determining the legality of an exclusive dealing arrangement". <u>See</u> <u>Barr</u>, 978 F.2d at 111.

In this case, as noted above, Broadcom does not plead any relevant facts regarding the structure of, or competition in, the alleged UMTS chipset market. In particular, it does not plead QUALCOMM's share of that alleged market <u>at all</u>, let alone the share of the market allegedly foreclosed by the alleged "exclusive dealing" arrangements. Nor does Broadcom plead facts – such as the number of competitors and non-foreclosed customers – necessary to evaluate "the probable immediate and future effects" of the alleged foreclosure on competition. Thus, Broadcom pleads no facts from which a factfinder could conclude that the

_____

Act was intended to prohibit antitcompetitive conduct that was not within the proscriptions of the Sherman Act).

alleged foreclosure is "substantial" under the "qualitative" substantiality test.[20] For this reason –
and because of the lack of antitrust injury, see Part II.A, supra – Broadcom's "exclusive dealing"
claims should be dismissed.

      D.     Broadcom Does Not State Claims For Tying in the Alleged UMTS Chipset
              Markets

         Broadcom's tying claims (Fourth and Sixth claims) allege that QUALCOMM
"ties" licenses to essential WCDMA patents to the sale of UMTS chipsets. As discussed above,
these claims fail because Broadcom does not plead an "antitrust injury" in the alleged UMTS
chipset market. See Part II.A, supra. These claims fail for the additional reason that Broadcom
does not – and cannot – plead that QUALCOMM refuses to license its patents to companies that
will not buy its chipsets. Accordingly, Broadcom's tying claims under both the Sherman and
Clayton Acts are insufficient as a matter of law. Plaintiff's tying claim under the Clayton Act
should be dismissed on the additional ground that the licensing of QUALCOMM's patents does
not involve the "sale" of "commodities".

         To plead adequately a claim of tying under both the Sherman and Clayton Acts, a
plaintiff must plead that: "(1) a defendant seller ties two distinct products; (2) the seller possesses
market power in the tying product market; and (3) a substantial amount of interstate commerce is
affected." Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 477 (3d
Cir. 1992). The Third Circuit has defined a "tie" as "selling one good (the tying product) on the
condition that the buyer also purchase another, separate good (the tied product)." Town Sound,
949 F.2d at 475. In interpreting this requirement under both the Sherman and Clayton Acts,
courts have found that there can only be a tie where a defendant refuses to sell the tying product

---

[20] Because Broadcom has not pleaded any facts about QUALCOMM's market share, it has also
not pleaded any facts that would satisfy the "quantitative" substantiality test.

unless the customer also purchases the tied product. See, e.g., SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1062 n.3 (3d Cir. 1987); SmithKline Corp. v. Eli Lilly & Co., 427 F. Supp. 1089, 1112-13 & n.18 (E.D. Pa. 1976). A discount for purchasing two products together – even so large a discount as to make it economically unreasonable to buy the products separately – does not constitute "tying" so long as both products are in fact available separately. Id. at 1113-14.

Broadcom does not – and cannot – allege that QUALCOMM refuses to license its patents. At most, Broadcom alleges that QUALCOMM offers discounts on royalty rates or upfront licensing fees if a licensee also purchases QUALCOMM chipsets. (¶¶ 7-18, 104-11, 145, 157, 168-69.) But a discount is not a separate product, and thus a discount cannot constitute a "tie" under the antitrust laws. See, e.g., Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc., 732 F.2d 1403 (9th Cir. 1984); SmithKline, 427 F. Supp. at 1112-13 & n.18. Therefore, Broadcom does not plead that QUALCOMM "[sold] one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)." Town Sound, 959 F.2d at 475.

The District Court for the Eastern District of Pennsylvania addressed a similar allegation in SmithKline. In SmithKline, both parties manufactured antibacterial drugs called cephalosporins. SmithKline, 427 F. Supp. at 1091 & n.5. The defendant manufactured five cephalosporins and offered customers a 3% rebate on purchases of all of the defendants' cephalosporins if the customer purchased minimum amounts of at least three of the five that the defendant manufactured. Id. at 1091. The plaintiff manufactured a drug that directly competed with one of the defendant's cephalosporins. Id. at 1103. The plaintiff argued that the rebate constituted an illegal tie under the Sherman and Clayton Acts because the rebate effectively

34

meant that plaintiff would have to offer a 16-35% rebate on its product to compete with the defendant's product. Id. at 1110.

The district court found no illegal tie – notwithstanding the size of the discount – because the plaintiff failed to show that the defendant refused to sell the tying drugs unless a customer also purchased the tied drug. See id. at 1113. The court stated that in order for the plaintiff to show that there was an illegal tie, "the plaintiff must prove that the defendant's conduct amounted to a refusal to sell [the tying drugs] unless a hospital also purchased [the tied drug]" – i.e., that the defendant "refused to sell [the tying products] and [the tied product] separately". Id. (emphasis added). The court rejected the plaintiff's argument that the rebate effectively forced customers to purchase the defendant's products, explaining that:

> "From an abstract perspective, if one disregards the economics of the market place, hospital pharmacists had the 'freedom to choose' any of [the defendant's] products without having to buy a tied product; thus they were 'free to take either product by itself.' The economics of the marketplace precluded that freedom of choice for most hospitals; such a freedom of choice, more prevalent in theory than in operational reality, is enough to circumvent the tie-in prohibitions of the relevant antitrust laws." Id. at 1114 (internal citations omitted) (quoting Ungar v. Dunkin' Donuts of Am., Inc., 531 F.2d 1211, 1226 (3d Cir. 1976)).

On appeal, the Third Circuit agreed that there could be no illegal tie without a requirement that customers purchase the tied product in order to receive the tying product:

> "The district court found, and it is not disputed, that Lilly did not condition the availability of any of its products on the purchase of any other of its products or on the refusal of purchasing hospitals to deal with its competitors. Thus, Lilly did not 'tie' purchases of Kefzol to purchases of Keflin or Keflex. . . . Lilly's marketing scheme lacks the element of coercion necessary for liability under the theory of tie-ins." SmithKline, 575 F.2d at 1061 n.3.

A straightforward application of the rule in SmithKline is fatal to Broadcom's tying claims here.

Broadcom's tying claims under Section 3 of the Clayton Act should be dismissed on the additional ground that Broadcom cannot meet the Clayton Act's requirement that both the

35

tying product and the tied product be "commodities".  15 U.S.C. § 14; see, e.g., Marts v. Xerox, Inc., 77 F.3d 1109, 1113 n.6 (8th Cir. 1996); Chelson v. Oregonian Publ'g Co., 715 F.2d 1368, 1372 (9th Cir. 1983); Crossland v. Canteen Corp., 711 F.2d 714, 719 n.1 (5th Cir. 1983).  A patent license is not a "commodity" for purposes of the Clayton Act.  See Tele Atlas N.V. v. Navteq Corp., No. C-05-01673 RMW, 2005 WL 2893782, at *6-*7 (N.D. Cal. Nov. 2, 2005); La Salle Street Press, Inc. v. McCormick & Henderson, Inc., 293 F. Supp. 1004, 1006 (N.D. Ill. 1968).  Thus, Broadcom's allegations that QUALCOMM tied licenses to its patents to sales of its chipsets do not state a claim under the Clayton Act.

* * *

In sum, Broadcom does not allege the requisite anticompetitive conduct with respect to of any of its claims related to the alleged UMTS chipset market.  Moreover, Broadcom does not allege "antitrust injury" with respect to those claims, because to the extent it has been "excluded" from the alleged market, that exclusion is entirely attributable to Broadcom's rejection of QUALCOMM's licensing terms.  For all these reasons, Broadcom's UMTS chipset-related claims should be dismissed.

## III.  BROADCOM DOES NOT HAVE STANDING TO BRING CLAIMS RELATED TO THE ALLEGED 3G CDMA CHIPSET AND TECHNOLOGY MARKETS OR TO CHALLENGE QUALCOMM'S ACQUISITION OF FLARION

In an attempt to bolster its fatally flawed Complaint, Broadcom spends dozens of paragraphs making baseless allegations regarding the alleged monopolization of the so-called "3G CDMA chipset market" and "3G CDMA technology markets".[21]  (¶¶ 61-80, 114-116, 172-75, 181.)  Broadcom spends dozens more paragraphs complaining that QUALCOMM's planned

---

[21] "3G CDMA" uses different standards than WCDMA.  (¶ 48.)  Thus, according to Broadcom's market definitions, 3G CDMA markets are distinct from WCDMA markets for antitrust purposes.  (¶ 53.)  Broadcom is wrong, but we do not challenge this market definition for purposes of this motion.

acquisition of Flarion will supposedly have anticompetitive effects in the alleged market for "technologies contending to serve essential functions for B3G[22] [and 4G] wireless standards and systems". (¶¶ 60, 117-138, 176-78.) Broadcom does not – and cannot – allege that it even participates in any of these alleged "markets". Therefore, Broadcom lacks standing to bring either its claim for monopolization of the alleged "3G CDMA chipset market" and "3G CDMA technology markets" in violation of Section 2 of the Sherman Act (the "Seventh Claim for Relief") or its claim for "unlawful purchase, holding and use" of Flarion in violation of Section 7 of the Clayton Act (the "Eighth Claim for Relief").

To determine whether a plaintiff has standing to bring a claim under the antitrust laws ("antitrust standing"), courts must analyze "plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them". See Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 534-35 & n.31 (1983) ("AGC"). In this Circuit, courts must analyze the following factors (the "AGC factors") to determine whether a plaintiff has "antitrust standing"[23]:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing;
>
> (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress;
>
> (3) the directness of the injury, which addressed the concerns that liberal application of standing principles might produce speculative claims;
>
> (4) the existence of more direct victims of the alleged antitrust violations; and
>
> (5) the potential for duplicative recovery or complex apportionment of damages.

---

[22] "B3G" stands for beyond third generation. (¶ 23.)

[23] "[T]he antitrust standing inquiry is not a black-letter rule, but rather, [it] is essentially a balancing test comprised of many constant and variable factors." City of Pittsburgh, 147 F.3d at 264-65 (internal quotation marks omitted).

2660 Woodley Road Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 740-41 (3d Cir. 2004).

The first two of these factors are equivalent to the "antitrust injury" requirement. Thus, "antitrust injury" is "a necessary but insufficient condition of antitrust standing". Id. at 741 ("[E]ven a plaintiff who can show antitrust injury may lack antitrust standing, because the remaining ACG factors may weigh against allowing him or her to sue under the antitrust laws.") (quoting Barton & Pittinos, Inc., 118 F.3d at 182).

A.    Broadcom Lacks Standing to Bring Claims Related to Any Alleged CDMA Market

To evaluate whether Broadcom has standing to bring its CDMA-related claims using the AGC factors, the Court must consider the nature of the alleged wrongdoing and the nature of the alleged injury. The alleged anticompetitive acts, for purposes of the CDMA claims, are acts that allegedly excluded CDMA chipset competitors so as to maintain QUALCOMM's alleged CDMA chipset "monopoly".[24] (e.g., ¶¶ 69-80.) But because Broadcom does not manufacture CDMA chipsets or otherwise participate in any "CDMA market", it has not – and cannot – aver that any of these allegedly anticompetitive acts caused it any direct injury. Rather, Broadcom alleges that (1) these acts enabled QUALCOMM to "maintain" its "CDMA monopolies"; (2) QUALCOMM is leveraging is "monopoly power" over CDMA chipsets to attempt to monopolize the alleged UMTS chipset market; and (3) that leveraging is harming Broadcom's ability to compete in the alleged UMTS chipset market. (¶¶ 69, 145, 174.) Applying the AGC factors to these allegations is fatal to Broadcom's CDMA-related claims.

First, Broadcom does not allege that it has suffered "antitrust injury" (AGC factors 1 and 2). The alleged acts that supposedly "maintained" QUALCOMM's "CDMA

---

[24] Broadcom also conclusorily alleges that QUALCOMM "obtained and . . . willfully maintained monopoly power in the market[] for . . . 3G CDMA technology" (¶ 115), but Broadcom has alleged no facts to support such a claim.

monopolies" were allegedly directed toward excluding <u>CDMA</u> chipset competitors, not

<u>WCDMA</u> chipset competitors.  (¶¶ 69-80.)  Broadcom makes no allegation that it is (or has any

intention of becoming) a CDMA chipset manufacturer, or a customer or similar participant in

any alleged CDMA "market".  Thus, there is no causal connection between the alleged harm –

exclusion from the alleged <u>UMTS chipset market</u> – and the alleged antitrust violation –

maintenance of a "monopoly" in the alleged <u>CDMA</u> chipset market.  <u>See</u> <u>Gregory Marketing</u>

<u>Corp. v. Wakefern Food Corp.</u>, 787 F.2d 92, 95-96 (3d Cir. 1986) (no antitrust standing where

alleged injuries were not caused by the allegedly anticompetitive conduct); <u>see also, e.g.</u>, <u>Barton</u>

<u>& Pittinos, Inc.</u>, 118 F.3d at 184 (no antitrust injury where plaintiff was not a customer or

competitor in the relevant market).

     <u>Second</u>, the alleged injury is too remote to support standing under <u>AGC</u> factors 3

(directness of injury) and 4 (existence of "more direct victims").  As noted above, Broadcom

alleges not that it suffered any <u>direct</u> injury as a result of QUALCOMM's "maintenance" of its

"CDMA monopolies", but rather that it was injured because QUALCOMM allegedly leveraged

those "monopolies" to obtain market power over UMTS chipsets.  Moreover, even if

Broadcom's allegations of anticompetitive conduct in so-called CDMA markets had any merit –

which they do not – there would be numerous "more direct victims" of the alleged

anticompetitive conduct, including manufacturers of CDMA chipsets listed in paragraph 67 of

the Complaint (<u>i.e.</u>, competitors) and handset manufacturers that purchase CDMA chipsets (<u>i.e.</u>,

customers).

     <u>Third</u>, <u>AGC</u> factor 5 weighs against standing because Broadcom's CDMA-related

claims have the potential to present problems of apportionment of damages.  Broadcom has

brought a number of different claims that arise out of alleged injuries to its putative WCDMA

chipset business, including other antitrust claims based on different conduct and state law claims. In similar circumstances, the Third Circuit held that allowing an antitrust claim "creates insurmountable problems in apportioning damages along with the real possibility of cumulative damages". 2660 Woodley Road, 369 F.3d at 743.

Because all of the AGC factors weigh against standing, Broadcom's claims related to the alleged CDMA chipset and technology markets should be dismissed.

**B.**    <u>Broadcom Lacks Standing to Bring a Section 7 Claim Related to the Flarion Acquisition</u>

Broadcom's Section 7 claim related to the Flarion Acquisition is a transparent attempt to interfere with a transaction with which Broadcom has nothing whatsoever to do.

As with the CDMA-related claims, the Court must consider the nature of the alleged wrongdoing and the nature of the alleged injury to evaluate whether Broadcom has standing to bring claims related to the Flarion acquisition using the AGC factors. The wrongdoing, according to Broadcom, is that QUALCOMM's acquisition of Flarion will reduce competition in the so-called "markets for B3G and 4G technology". (¶ 177.) Broadcom defines those alleged markets as markets for "technologies contending to serve essential functions for B3G [and 4G] wireless standards and systems". (¶ 60.) Thus, unlike the other technology markets alleged by Broadcom, which are "markets" for patents essential to a particular standard, the B3G and 4G "markets", according to Broadcom, comprise competition among "technologies" that may <u>become</u> standards sometime in the future. (<u>Id.</u>) Broadcom claims it will be injured (i) because it "expects to be a competitor to QUALCOMM in the chipset markets for B3G and 4G technologies"; and (ii) as "a customer in the B3G and 4G technology markets", because it "may require a license to intellectual property necessary to manufacture B3G and 4G equipment". (¶¶ 137-38.)

Broadcom's claim of injury as a competitor fails for at least two independent reasons. First, it is the black-letter law of this Circuit that a competitor does not have standing to bring an action under Section 7 of the Clayton Act. See Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co., 826 F.2d 1235, 1241-42 (3d Cir. 1987).

Second, Broadcom does not allege that it is a competitor in any alleged relevant market. As noted above, the relevant markets, according to Broadcom, are the markets for "technologies contending to serve essential functions for B3G [and 4G] wireless standards and systems". (¶ 60.) Broadcom does not – and cannot – allege that it is competing to provide technologies for adoption into B3G and 4G standards. Rather, Broadcom alleges only that it "expects to be" a competitor in completely different "markets" – the "chipset markets for B3G and 4G technologies". By the Complaint's own terms, however, those "chipset markets" do not – and cannot – yet exist, because no B3G or 4G standard has yet been adopted. (See ¶¶ 53-57 (alleging that "chipset markets" are defined as markets for chipsets practicing an adopted standard).) Thus, Broadcom does not plead that it is a competitor in a relevant market affected by the Flarion acquisition.

Broadcom similarly is not a customer in the markets for "technologies contending to serve essential functions for B3G [and 4G] wireless standards and systems". (¶ 60.) Broadcom claims that it is a customer because it "may require a license to intellectual property necessary to manufacture B3G and 4G equipment". (¶ 137.) Because no B3G or 4G standard has yet been adopted, however, there is no basis for Broadcom to conclude one way or another that it needs a license at all – let alone a license from either QUALCOMM or Flarion – to

41

"manufacture B3G and 4G equipment".[25]  (See ¶ 58 (alleging that a technology market is created when a standard is adopted).)

Because Broadcom's allegations of injury as a competitor or customer are insufficient, Broadcom does not allege that it will suffer antitrust injury (ACG factors 1 and 2) from QUALCOMM's acquisition of Flarion.  See, e.g., Barton & Pittinos, Inc., 118 F.3d at 184. That alone is fatal to Broadcom's Section 7 claim.[26]  See id. at 184 n.9 (stating that in the absence of antitrust injury, no further inquiry into the AGC factors is necessary).

Broadcom's claims also fail under factor 3 (directness of injury).  By their own terms, Broadcom's claims of injury are contingent on future events that may not ever come to pass (e.g., the adoption of B3G and 4G standards that incorporate patented inventions owned by Flarion).  (See, e.g., ¶ 137 (alleging that Broadcom "may require a license") (emphasis added); ¶ 138 (alleging that Broadcom "expects to be a competitor") (emphasis added).)  "Remote" and "speculative" injuries are beyond the reach of the Clayton Act.  AGC, 459 U.S. at 545 n.52; see also, e.g., Florida Seed Co., Inc. v. Monsanto Co., 105 F.3d 1372, 1374 (11th Cir. 1997) ("[T]he doctrine of antitrust standing reflects prudential concerns and is designed to avoid burdening the courts with speculative or remote claims.").  For this reason, too, Broadcom's Section 7 claim should be dismissed.

---

[25] Furthermore, read literally, the alleged "B3G" and "4G" "technology markets" contemplate customers that are standard-setting organizations.  Clearly, Broadcom is not such an organization and, therefore, is not a "customer" under this reading.

[26] Although the paragraphs under the heading "Eighth Claim for Relief" conclusorily allege that "QUALCOMM's previous acquisition, holding, and use of other companies" has had anticompetitive effects in alleged CDMA and WCDMA markets, no factual allegations regarding such acquisitions appear in the Complaint.  Accordingly, Broadcom's lack of standing as to the Flarion acquisition is fatal to the entirety of its section 7 claim.

## IV.    BROADCOM'S STATE LAW CLAIMS SHOULD BE DISMISSED

Because all of Broadcom's federal claims fail, see Parts I-III, supra, this Court should decline to exercise supplemental jurisdiction over Broadcom's state law claims pursuant to 28 U.S.C. § 1367(c). See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); Lovell Mfg. v. Export-Import Bank of the U.S., 843 F.2d 725, 734 (3d Cir. 1988) ("[O]nce all federal claims have been dropped from a case, the case simply does not belong in federal court."). Moreover, each of Broadcom's state-law claims fails under its own terms, as discussed below.

### A.    Broadcom Does Not State Claims Under State Antitrust and Unfair Competition Law

In a transparent attempt to complicate this litigation, Broadcom purports to plead claims under the antitrust laws of New Jersey, 38 other states and the District of Columbia and under the unfair competition laws of 38 states (but not New Jersey) and the District of Columbia. (¶¶ 179-83.) Each of these allegedly "separate" claims arises from exactly the same conduct. (¶¶ 180-82.) Moreover, Broadcom does not allege that it suffered any distinct harm in each of these states. (Id.) Accordingly, Broadcom does not plead 40 distinct state law antitrust claims and 39 distinct state law unfair competition claims. Rather, it pleads a single state antitrust law claim, and a single state unfair competition claim, subject to a choice-of-law analysis. See, e.g., Heindel v. Pfizer, Inc., 381 F. Supp. 2d 364, 370-78 (D.N.J. 2004) (consumer fraud claims arising from the same conduct pled under the law of New Jersey "and 'other states' consumer protection statutes'" decided as single claim under one state's law following choice-of-law analysis); Perry v. Prudential-Bache Securities, Inc., 738 F. Supp. 843, 853-54 (D.N.J. 1989) (claims arising from same conduct pled under both New York and New Jersey employment law decided as one claim under New York law following choice-of-law analysis; New Jersey claim dismissed as "inappropriately raised").

43

A federal court exercising pendent jurisdiction over a state-law claim must use the choice-of-law rules of the forum state. System Operations, Inc. v. Scientific Games Development Corp., 555 F.2d 1131, 1136 (3d Cir. 1977). Under New Jersey's choice-of-law analysis, a court "applies a flexible 'governmental-interest' standard, which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation." Gantes v. Kason Corp., 145 N.J. 478, 484 (1996) (citations omitted). This test has two prongs: (1) "an inquiry into whether there is an actual conflict between the laws of the respective states, a determination that is made on an issue-by-issue basis"; and (2) "to determine the interest that each state has in resolving the specific issue in dispute[, an] . . . analysis [that] requires the court to 'identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties.'" Id. at 485. In this case, the states most relevant to the choice of law analysis are New Jersey, in which Broadcom has chosen to bring its action, and California, the home state of both parties.

> 1.    Broadcom's state law antitrust claim should be dismissed.

In this case, there is no actual conflict between the antitrust laws of New Jersey and the antitrust laws of California. Both New Jersey's and California's antitrust statutes are construed in harmony with the federal antitrust statutes. See N.J. Stat. Ann. § 56:9-18 (2005); Cal. Bus. & Prof. Code § 16700 et seq. (2005); State v. New Jersey Trade Waste Ass'n, 96 N.J. 8, 19, (1984); Chicago Title Ins. Co. v. Great Western Fin. Corp., 69 Cal. 2d 305, 315 (1968). Accordingly, for the same reasons Broadcom's federal antitrust claims fail, see Parts I-III, supra, its state law antitrust claims would also fail under either New Jersey or California law. We have found no difference in the antitrust law of any of the other 38 jurisdictions that leads to a

44

different result.  See High v. Balun, 943 F.2d 323, 325 (3d Cir. 1991) ("Where the application of either state's law would yield the same result, no conflict exists to be resolved.").

> 2.    Broadcom's state law unfair competition claim should be dismissed.

The unfair competition laws of New Jersey and California differ.  In New Jersey, "[t]he tort of unfair competition 'consists of the misappropriation of one's property by another-property which has some sort of commercial or pecuniary value'".  Hoffman-La Roche Inc. v. Genpharm Inc., 50 F. Supp. 2d 367, 380 (D.N.J. 1999) (citations omitted).  California's unfair competition law broadly defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice".  Cal Bus. & Prof. Code § 17200.  Nevertheless, there is no conflict because Broadcom's claims fail under either state's laws.[27]  See High, 943 F.2d at 325.

Under New Jersey law, Broadcom's unfair competition claim fails because it does not plead that QUALCOMM "misappropriated" any of Broadcom's property.  See Hoffman-La Roche, 50 F. Supp. 2d at 380 (stating that "the key to the tort of unfair competition is misappropriation of property of commercial value").

Under California law, Broadcom's unfair competition claim fails because Broadcom does not plead any "unlawful", "unfair", or "fraudulent" conduct by QUALCOMM within the meaning of section 17200 of California's Business and Professions Code.

A claim under the "unlawful" prong of section 17200 requires a showing that the defendant violated a statute.  See Farmers Ins. Exchange v. Superior Court, 2 Cal. 4th 377, 383 (1992) (stating that the "unlawful" prong effectively incorporates violations of any other laws and makes them independently actionable under section 17200).  Broadcom's claim fails under

---

[27] As with the state antitrust claims, we have found no difference in the unfair competition laws of any of the other 38 jurisdictions that leads to a different result.

this prong because its only allegations of statutory violations relate to the antitrust laws, and are meritless for the reasons discussed above.[28]

        A claim under the "unfair" prong of section 17200 requires a showing of conduct that (i) threatens an incipient violation of an antitrust law; (ii) violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law; or (iii) otherwise significantly threatens or harms competition. See People's Choice Wireless, Inc. v. Verizon Wireless, 31 Cal. Rptr. 3d 819, 822-27 (Ct. App., 2d Dist. 2005). For the same reasons Broadcom's antitrust claims fail, see Parts I-III, supra, Broadcom does not allege "an incipient violation of an antitrust law" or conduct that "violates the policy or spirit" of those laws. See People's Choice Wireless, 31 Cal. Rptr. at 824-27 (stating that conduct violates the "policy or spirit" of the antitrust laws only if it results in a "significant" threat or harm to competition). Broadcom also does not allege conduct that "otherwise significantly threatens or harms competition" because is does not – and cannot – allege that there is not ample competition in the UMTS chipset market. See id. at 827; see also Townshend, 2000 WL 433505, at *15 (dismissing claim brought under section 17200 based on similar allegations, with prejudice, on the ground that the allegations did not state "unfair" conduct); ESS Tech., 1999 WL 33520483, at *3 (same). Thus, Broadcom does not plead a section 17200 claim under the "unfair" prong.

        A claim under the "fraudulent" prong of section 17200 requires a showing that the defendant made statements that were likely to cause members of the "consuming public" to be deceived. See Kunert v. Mission Fin. Servs. Corp., 1 Cal. Rptr. 3d 589, 606 (Ct. App., 2d Dist. 2003). Broadcom's claims fail under this prong because the allegedly fraudulent statements –

---

[28] Violations of common law, such as claims for fraud or breach or contract, are insufficient to state a claim under the "unlawful" prong. See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 319 F. Supp. 2d 1059, 1074-75 (C.D. Cal. 2003).

commitments to license on FRAND terms – were not likely to cause members of the consuming

public (here, presumably, the SDOs) to be deceived. As discussed in Part I.A, supra, "it is

reasonable for the parties to have different understandings" of the meaning of "fair, reasonable,

and non-discriminatory." See Lum, 361 F.3d at 226. Thus, that term cannot support a claim for

fraudulent conduct. See id. at 228.

> **B.**   Broadcom Does Not State a Claim for Tortious Interference with Prospective
> Economic Advantage

There is a conflict between the law of tortious interference of California and New

Jersey. Under California law, a claim for tortious interference with prospective contractual or

economic relations should be dismissed at the pleading stage if the plaintiff fails to plead that the

defendant both: (1) "knowingly interfered with the plaintiff's expectancy"; and (2) "engaged in

conduct that was wrongful by some legal measure other than the fact of interference itself." See

Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 393 (1995). New Jersey law,

however, does not require that the plaintiff meet the second prong of California's test for tortious

interference claims. See Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co., 912 F.

Supp. 747, 771 (D.N.J. 1995). Thus, it is necessary to proceed to the second prong of New

Jersey's choice-of-law analysis, a determination of "the interest that each state has in resolving

the specific issue in dispute." Gantes, 145 N.J. at 485.

The "specific issue in dispute" here is whether QUALCOMM's allegedly

anticompetitive conduct "interfered" with Broadcom's "prospective economic relationship" with

manufacturers of WCDMA cell phones. (¶ 185.) Both the allegedly interfering party and the

allegedly interfered-with party are California corporations, and accordingly at least some of the

allegedly unlawful conduct (e.g., QUALCOMM's licensing negotiations with Broadcom) took

place in California. In contrast, the Complaint does not specify any WCDMA-related conduct

that took place in New Jersey. Thus, California has a greater interest in the "specific issue in dispute" in that California has a strong interest in protecting contracts initiated by its residents, as well as regulating the in-state conduct of its residents who might tortiously interfere with such a contract. Accordingly, California law should apply.

For the reasons set forth in Parts I and II, none of the conduct that allegedly interfered with Broadcom's prospective WCDMA chipset contracts "was wrongful by some legal measure other than the fact of interference itself." Della Penna, 11 Cal. 4th at 393. Accordingly, Broadcom's tortious interference claim should be dismissed. See Kentmaster Mfg. Co. v. Jarvis Products Corp., 146 F.3d 691, 695 (9th Cir. 1998) (affirming dismissal of claim of interference with prospective economic advantage on the ground that the only allegations of wrongful conduct were insufficiently pled claims of violation of the antitrust laws).

C.      Broadcom Does Not State Claims for Promissory Estoppel or Fraud

Broadcom's claims for promissory estoppel and fraud fail because each is based on the alleged commitment to license patents on "fair, reasonable, and non-discriminatory" terms.[29] As discussed in Part I.A, supra, the phrase "fair, reasonable, and non-discriminatory" is not susceptible to a single, universal interpretation of what licensing terms will apply in each and every case, and thus cannot support a fraud claim as a matter of law. See Lum, 361 F.3d at 226.

For the same reason, the phrase "fair, reasonable, and non discriminatory" cannot support a claim for promissory estoppel. The elements of a promissory estoppel claim are (1) a clear and definite promise by the promisor; (2) made with the expectation that the promisee will rely thereon; (3) that the promisee in fact reasonably relied on the promise; and (4) thereby

---

[29] We have found no meaningful difference between the laws of New Jersey and the laws of California with respect to Broadcom's common-law claims of fraud, promissory estoppel and breach of contract.

incurred detriment of a definite and substantial nature.  See, e.g., Watson v. City of Salem, 934 F.Supp. 643, 661 (D.N.J. 1995).  The commitment to license patents on "fair, reasonable, and non-discriminatory" terms cannot be understood to be a "clear and definite" promise of specific license terms.  See Part I.A, supra.  In the absence of such a "clear and definite" promise, Broadcom's promissory estoppel claim fails.  See Watson, 934 F. Supp. at 661 (stating that the "clear and definite promise requirement . . . is considered the sine qua non for applicability of this theory of recovery").

Further, Broadcom's state-law fraud claim should be dismissed for failure to plead fraud with particularity.  See Part I.A.2, supra.

D.    Broadcom Does Not State a Claim for Breach of Contract

Broadcom's claim for breach of contract should be dismissed because Broadcom fails to plead adequately the most fundamental element of a breach of contract claim:  the existence of a contract.  Broadcom makes only the most conclusory of allegations that "QUALCOMM entered into actual or implied contracts with various SDOs".  (¶ 188.) Broadcom makes no allegation that QUALCOMM entered into any specific contract, with any specific terms, with any specific SDO.  Nor does Broadcom identify the dates of any of the alleged "contracts".  Indeed, Broadcom does not plead any of the particulars of any of these "contracts".  Without these basic facts, Broadcom's breach of contract claim fails. See Barrett v. U.S. Banknote Corp., No. 7420 (RPP), 1992 WL 232055, at *9 (S.D.N.Y. Sept. 2, 1992) (rejecting breach of contact claim because of failure to specifically identify the parties to each contract); Kirschner v. Cable/Tel Corp., 576 F. Supp. 234, 244-245 (E.D. Pa. 1983) (dismissing contract claim where plaintiff "failed to adequately show the existence of any third party contracts entered into by defendants for plaintiffs benefit").

49

## Conclusion

For the foregoing reasons, Broadcom's First Amended Complaint should be dismissed in its entirety.

December 9, 2005

Respectfully submitted,

McCARTER & ENGLISH LLP

by  /s/ William J. O' Shaughnessy
    William J. O' Shaughnessy (WJO-5256)

Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Richard J. Stark
David R. Marriott
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant*
*QUALCOMM Incorporated*

50

Exhibit 3

DAVID S. STONE (DSS-8580)
Boies, Schiller & Flexner LLP
150 John F. Kennedy Memorial Parkway
Short Hills, NJ 07078
(973) 218-1111

Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, NY 10022

Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, N.W.
Washington, DC 20006

Counsel for Plaintiff Broadcom Corporation

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
TRENTON DIVISION

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>QUALCOMM INCORPORATED,<br><br>    Defendant. | Civil Action No. 05-3350 (MLC)<br><br>**Oral argument requested pursuant to L. Civ. R. 7.1(b)(4)**<br><br>**Hearing Date:  February 6, 2006** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 6

I.    DISMISSAL OF AN ANTITRUST COMPLAINT IS RARELY
APPROPRIATE................................................................................. 6

II.   THE COMPLAINT SETS FORTH MULTIPLE VIOLATIONS OF THE
FEDERAL ANTITRUST LAWS ARISING FROM QUALCOMM'S BAD
FAITH FRAND COMMITMENTS, DISCRIMINATORY AND
EXCLUSIONARY LICENSING PRACTICES, AND ANTICOMPETITIVE
ACQUISITIONS............................................................................... 8

    A.   The Complaint Alleges that Qualcomm Willfully Acquired Monopoly
Power in the WCDMA Technology Markets by Inducing SDOs to
Incorporate Qualcomm's Technology in the UMTS Standard Through Its
Bad-Faith Promise to License on FRAND Terms. ................................. 11

        1.   Qualcomm's Monopoly Power Was Acquired by Inclusion in the
UMTS Standard and Does Not Derive from the Patents
Themselves. ................................................................................ 12

        2.   Qualcomm's Abuses of the Standard-Setting Process, Including Its
Bad-Faith Commitment to License Its Patented Technology on
FRAND Terms, Are Anticompetitive Acts that Can Give Rise to
Antitrust Liability....................................................................... 13

        3.   Although Broadcom Pleads that Qualcomm Committed Fraud on
the SDOs, It Need Not Do So to State an Antitrust Claim. ........... 17

        4.   Whether Qualcomm's Licensing Terms Are Consistent With Its
FRAND Obligations Is a Factual Question That Cannot Be
Resolved on a Motion to Dismiss. ............................................... 17

    B.   The Complaint Alleges that Qualcomm Is Attempting to Monopolize the
UMTS Chipset Market by Using Its Monopoly Power in the WCDMA
Technology Markets to Drive Competitors Out of the UMTS Chipset
Market............................................................................................ 19

        1.   The Complaint's Allegations of Discriminatory Licensing to
UMTS Chipset Competitors and Handset Manufacturers that Use
Competitors' Chipsets Plead Anticompetitive Conduct in the
UMTS Chipset Market................................................................ 20

        2.   The Complaint's Allegations that Qualcomm Has Excluded or
Crippled Broadcom and Other Competitors in the UMTS Chipset
Market Plead Antitrust Injury. ................................................... 23

        3.   The Complaint's Allegations that Qualcomm's Conduct Will
Result In Its Achieving Monopoly Power in the UMTS Chipset
Market Plead Dangerous Probability of Success. .......................... 24

C.   The Complaint's Allegations that Qualcomm Coerces Its Handset
     Manufacturers to Purchase UMTS Chipsets from Qualcomm and Has
     Foreclosed a Significant Portion of the UMTS Chipset Market State
     Claims for Tying and Exclusive Dealing...................................................... 27

     1.   The Complaint's Allegations that Qualcomm's Bundling and
          Discounting Schemes Coerce Handset Manufacturers to Purchase
          Qualcomm Chipsets State Claims for Tying. ............................... 27

     2.   The Complaint's Allegations that Qualcomm's Exclusivity
          Arrangements Foreclose a Significant Share of the UMTS Chipset
          Market to Rivals States Claims for Exclusive Dealing............................... 32

D.   The Complaint's Allegations that Qualcomm's Actions in the WCDMA
     Technology and Chipset Markets Are Part of a Scheme to Maintain Its
     Monopoly in 3G CDMA Technology and Chipsets Establish Broadcom's
     Standing to Pursue Its CDMA Claims.................................................... 34

E.   The Complaint's Allegations that Broadcom Is a Likely Customer in the
     Markets where Qualcomm's Acquisition of Flarion Would Substantially
     Lessen Competition Establish Broadcom's Standing to Pursue Its Section
     7 Claim............................................................................................ 38

III.   BECAUSE BROADCOM'S FEDERAL ANTITRUST CLAIMS ARE WELL-
       PLED, THE COMPLANT LIKEWISE STATES CLAIMS UNDER THE
       STATE ANTITRUST AND UNFAIR COMPETITION STATUTES. ............................ 41

IV.    THE COMPLAINT'S ALLEGATIONS OF QUALCOMM'S SPECIFIC BAD
       FAITH COMMITMENTS AND THEIR IMPACT ON BROADCOM STATE
       CLAIMS FOR BREACH OF CONTRACT, PROMISSORY ESTOPPEL,
       FRAUD, AND TORTIOUS INTERFERENCE. ............................................. 43

A.   The Complaint's Allegations that Qualcomm Made and Broke Binding
     Contractual Promises to the SDOs that Were Intended to Benefit Third
     Parties Like Broadcom and that Broadcom Relied on Those Promises to
     Its Detriment State Claims for Breach of Contract and Promissory
     Estoppel............................................................................................ 43

B.   The Complaint's Specific Identification of Qualcomm's FRAND
     Commitments to SDOs, Qualcomm's Bad Faith, the SDOs' Reliance, and
     the Effect of Qualcomm's Broken Promises State a Claim for Fraud. .................. 46

     1.   Broadcom's Fraud Claim Is Pled with Sufficient Particularity to
          Satisfy Fed. R. Civ. P. 9(b). ........................................................ 46

     2.   Qualcomm Cannot Evade Liability for Fraud by Calling Its
          FRAND Commitments Unenforceable. .......................................... 48

C.   The Complaint's Allegations that Qualcomm's Actions Have Interfered
     with Broadcom's Sales of UMTS Chipsets to Handset Manufacturers State
     Claims for Tortious Interference............................................................. 50

CONCLUSION.......................................................................................... 52

ii

## TABLE OF AUTHORITIES

### FEDERAL CASES

*2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732 (3d Cir. 2004) ..................................................................................................................37

*AAR International, Inc. v. Vacances Heliades S.A.*, 202 F. Supp. 2d 788 (N.D. Ill. 2002) ..................................................................................................................47

*Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191 (3d Cir. 1995) ....................23

*Agere System Guardian Corp. v. Proxim, Inc.*, 190 F. Supp. 2d 726 (D. Del. 2002) ..............................................................................................................44-45

*Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co.*, 826 F.2d 1235 (3d Cir. 1987) .............................................................................................................41

*Allen-Myland, Inc. v. IBM*, 33 F.3d 194 (3d Cir. 1994)..................................................32

*Allied Tube & Conduit Corp. v. Indian Head Inc.*, 486 U.S. 492 (1988) ............... 4, 14, 32

*In re Ann Taylor Stores Securities Litigation*, 807 F. Supp. 990 (S.D.N.Y. 1992) ..........47

*Ansel Communications, Inc. v. Novell, Inc.*, No. C-97-21088 RMW ENE 1999 WL 33302368 (N.D. Cal. March 24, 1999) ..............................................................29

*Applera Corp. v. MJ Research, Inc.*, 309 F. Supp. 2d 293 (D. Conn. 2004)....................31

*Aquatherm Industrial Inc. v. Florida Power & Light Co.*, 971 F. Supp. 1419 (M.D. Fla. 1997) .....................................................................................................24

*Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983)...........................................................................................37, 39

*Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572 (Fed. Cir. 1990)...........10

*Automatic Radio Manufacturing Co. v. Hazeltine Research*, 339 U.S. 827 (1950) .........18

*B. Braun Medical, Inc. v. Abbot Laboratories*, 124 F.3d 1419 (Fed. Cir. 1997)...............10

*Barr Laboratories, Inc. v. Abbott Laboratories*, 978 F.2d 98 (3d Cir. 1992) ..................33

*Barrett v. U.S. Banknote Corp.*, No. 7420 (RPP), 1992 WL 232055 (S.D.N.Y Sept. 2, 1992) ........................................................................................................44

iii

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178 (3d Cir. 1997) ................................................................................................. 35

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) .............................. 35

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3rd Cir. 1977) ................. 7, 8, 30, 34

*Bon-Ton Stores v. May Department Stores Co.*, 881 F. Supp. 860 (W.D.N.Y. 1994) ................................................................................................. 41

*Bristol Technology v. Microsoft Corp.*, 42 F. Supp. 2d 153 (D. Conn. 1998) ................. 37

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998) ............. 32

*Brotech Corp. v. White Eagle International Technology Group, Inc.*, No. Civ. A. 03-232, 2004 WL 1427136 (E.D. Pa., June 21, 2004) ................................. 32

*Brunson Communications, Inc. v. Arbiton, Inc.*, 239 F. Supp. 2d 550 (E.D. Pa. 2002) ................................................................................................. 26, 27

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ................. 24, 39, 41

*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986) ....................... 39

*Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39 (5th Cir. 1976) .......................... 32

*Carpet Group International v. Oriental Rug Importers Association, Inc.*, 227 F.3d 62 (3d Cir. 2000) ........................................................................... 35, 36

*Carter Footwear, Inc. v. Graystone World-Wide, Inc.*, 189 F.R.D. 328 (M.D. Pa. 1999) ................................................................................................. 48

*Central Telecommunications, Inc. v. TCI Cablevision, Inc.*, 800 F.2d 711 (8th Cir. 1986) ........................................................................................... 40

*Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96 (3d Cir. 1983) ................. 46

*Compuware Corp. v. IBM Corp.*, 366 F. Supp. 2d 475 (E.D. Mich. 2005) ...................... 30

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................. 7

*Data General Corp. v. Grumman System Support Corp.*, 36 F.3d 1147 (1st Cir. 1994) ................................................................................................... 9

*DiscoVision Associates v. Discount Manufacturing, Inc.*, 42 U.S.P.Q. 2d 1749 (D. Del. 1997) ............................................................................................. 30

iv

*Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627 (2005) ...........................................7

*E&G Gabriel Brothers v. Gabriel Brothers, Inc.*, 1994 WL 369147 (S.D. N.Y.
July 13, 1994)...........................................................................................26, 27

*Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451 (1992).............3, 8, 29, 32

*ESS Technology, Inc. v. PC-Tel, Inc.*, No. C-99-20292 RMW, 1999 WL
33520483 (N.D. Cal. Nov. 4, 1999)..................................................................16, 45

*Fineman v. Armstrong World Industrial, Inc.*, 980 F.2d 171 (3d Cir. 1992)....................23

*First Wall Street Capital Corp. v. International Property Corp.*, No. 97 Civ.
0702(JGK), 1998 WL. 823619 (S.D.N.Y. Nov. 25, 1998)...........................................51

*Fresh Made, Inc. v. Lifeway Foods, Inc.*, No. Civ. A. 01-4254, 2002 WL
31246922 (E.D. Pa. Aug. 9, 2002)....................................................................26, 27

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories, Inc.*, 386 F.3d
485 (2d Cir. 2004)...............................................................................................33

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116
(S.D.N.Y. 1970).................................................................................................18

*Gordon v. Lewiston Hospital*, 423 F.3d 184 (3d Cir. 2005) ...................................27, 32

*Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d
Cir. 1993)........................................................................................................24

*H.J., Inc. v. International Telephone & Telegraph Corp.*, 867 F.2d 1531 (8th Cir.
1989)..............................................................................................................26

*Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241 (Fed. Cir. 2005).........................................18

*Howard Hess Dental Laboratoriess, Inc. v. Dentsply International, Inc.*, 424 F.3d
363 (3d Cir. 2005).............................................................................................34

*Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir.
1997) ................................................................................................................9

*In re Independent Service Organizations Antitrust Litigation*, 203 F.3d 1322 (Fed.
Cir. 2000) .....................................................................................................3, 10

*Intellective, Inc. v. Massachusetts Mutual Life Insurance Co.*, 190 F. Supp. 2d
600 (S.D. N.Y. 2002) ..........................................................................................26

*Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999).....................................10

*Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984)..........................29, 32

*Kirschner v. Cable/Telegraph Corp.*, 576 F. Supp. 234 (E.D. Pa. 1983).........................44

*Knuth v. Erie-Crawford Dairy Cooperative Association*, 395 F.2d 420 (3d Cir. 1968) ........................................................................................................ 6-7

*L&W/Lindco Products, Inc. v. Pure Asphalt Co.*, 979 F. Supp. 632 (N.D. Ill. 1997) ...........................................................................................................24

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003).................................... 6, 11, 12, 20, 22

*Lear, Inc. v. Adkins*, 395 U.S. 653 (1969) ...........................................................18

*Lewis v. Philip Morris Inc.*, 355 F.3d 515 (6th Cir. 2004) ................................................19

*Little Souls Inc. v. State Automobile Mutual Insurance, Co.*, No. Civ.A. 03-5722, 2004 WL 503538 (E.D. Pa. Mar. 15, 2004)........................................................48

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ...........................................24

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228 (9th Cir. 1998)............................................................................40, 41

*Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004)............................................49-50

*Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2nd 700 (Fed. Cir. 1992)..............................18

*Mandeville Island Farms, Inc. v. America Crystal Sugar Co.*, 334 U.S. 219 (1948)........................................................................................................35

*Mannkraft Corp. v. Bearman*, No. CIV. A. 88-2997, 1988 WL 124720 (D.N.J. 1988) .......................................................................................................48

*Medtronic AVE, Inc. v. Boston Scientific Corp.*, 2001 WL 652016 (D. Del. March 30, 2001) ...................................................................................................25

*Microbyte Corp. v .New Jersey State Golf Association*, No. Civ. 84-949, 1986 WL 7231 (D.N.J. June 26, 1986) ...........................................................................28

*In re Microsoft Antitrust Litigation*, No. MDL 1332, Civ. JFM-05-1087, 2005 WL 1398643 (D. Md. June 10, 2005).......................................................................37

*Moore Corp. Ltd. v. Wallace Computer Services, Inc.*, 907 F. Supp. 1545 (D. Del. 1995) ........................................................................................................39

*Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555 (7th Cir. 1991) ........... 37-38

*Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998) ..............17

*Northern v. McGraw Edison Co.*, 542 F.2d 1336 (8th Cir. 1976) ....................................32

*In re Pabst Licensing, GMBH Patent Litigation*, No. Civ.A. 99-3118, 2000 WL 1145725 (E.D. La. Aug. 11, 2000) ...........................................................24

*R.J. Longo Construction Co., Inc. v. Transit America, Inc.*, 921 F. Supp. 1295 (D.N.J. 1996) ........................................................................................44, 45

*Rambus, Inc. v. Infineon Technologies AG*, 304 F. Supp. 2d 812 (E.D. Va. 2004) ......................................................................................... 14-15, 17

*Rambus, Inc. v. Infineon Technologies AG*, 330 F. Supp. 2d 679 (E.D. Va. 2004).... 14-15

*Resource Ventures, Inc. v. Resources Management International, Inc.*, 42 F. Supp. 2d 423 (D. Del. 1999) ...................................................................48

*Roberts v. Elaine Powers Figure Salons, Inc.*, 708 F.2d 1476 (9th Cir. 1983) ........... 31-32

*SEC v. Park*, 99 F. Supp. 2d 889 (N.D. Ill. 2000) ...........................................................47

*Seville Industrial Machine Corp. v. Southmost Machine Corp.*, 742 F.2d 786 (3d Cir. 1984) ..............................................................................................46

*Smith & Johnson, Inc. v. Hedaya Homes Fashions Inc.*, 1996 WL 737194 (S.D. N.Y. Dec. 26, 1996) ...............................................................................26, 27

*SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978) ..................... 22, 29-30

*SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161 (Fed. Cir. 1991) .......................................................................................18

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ..............................................19

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir. 1999) ..................................................................................36

*Surya System, Inc. v. Sunku*, No. Civ. A. 05-146, 2005 WL 1514225 (E.D. Pa. June 24, 2005) ........................................................................................43

vii

*Syncsort, Inc. v. Innovative Routines International, Inc.,* No. Civ 04-3623
   (WHW), 2005 WL 1076043 (D.N.J. May 6, 2005)..................................6, 51

*Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320 (1961) ...............................32-33

*Tele Atlas N.V. v. Navteq Corp.,* 397 F. Supp. 2d 1184 (N.D. Cal. 2005)......................29

*Times-Picayune Publishing Co. v. United States,* 345 U.S. 594 (1953)............................3

*Townshend v. Rockwell International Corp.,* No. C99-04005BA, 2000 WL
   433505 (N.D. Cal. Mar. 28, 2000)...........................................................16

*Tumi, Inc. v. Excel Corp.,* No. 05-0477 (WJM), 2005 WL 1828593 (D.N.J. Aug.
   1, 2005) ...............................................................................................48

*In re Tower Air, Inc.,* 416 F.3d 229 (3d Cir. 2005) ..........................................7

*Twombly v. Bell Atlantic Corp.,* 425 F.3d 99 (2d Cir. 2005)...................................7

*United Shoe Machinery Corp. v. United States,* 258 U.S. 451 (1922) ...........................31

*United States Horticultural Supply, Inc. v. Scotts Co.,* No. Civ. A. 03-773, 2004
   WL 1529185 (E.D. Pa. Feb. 18, 2004) .....................................................35

*United States v. Dentsply International, Inc.,* Nos. Civ. A. 99-005-SLR, 99-225-
   SLR, 99-854-SLR, 2001 WL 624807 (D. Del. March 30, 2001) .........................33-34

*United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377 (1956) ...........................24

*United States v. Grinnell,* 384 U.S. 563 (1966) ...........................................11, 12

*United States v. Line Materials Co.,* 333 U.S. 287 (1948) .....................................8

*United States v. Metzinger,* No. Civ. A. 94-7520, 1996 WL 412811 (E.D. Pa. July
   18, 1996) ..............................................................................................46

*United States v. Microsoft Corp.,* 253 F.3d 34 (D.C. Cir. 2001) .....................3, 9, 10, 36

*Ware v. Rodale Press, Inc.,* 322 F.3d 218,  (3d Cir. 2003)...................................43

*Watson v. City of Salem,* 934 F. Supp. 643 (D.N.J. 1995)....................................45

*William Cohen & Son v. All America Hero, Inc.,* 693 F. Supp. 201 (D.N.J. 1988)...........31

*Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.,* 953 F. Supp. 617 (E.D.
   Pa. 1997) .............................................................................................26

viii

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969) ..........................8, 20

## STATE CASES

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telegraph Co.*, 973 P.2d
527 (Cal. 1999) ......................................................................................42

*Patel v. Soriano*, 369 N.J. Super. 192, 848 A.2d 803 (N.J. Super. Ct. App. Div.
2004) ...................................................................................................51

*Pop's Cones, Inc. v. Resorts International Hotel, Inc.*, 307 N.J. Super. 461, 704
A.2d 1321 (N.J. Super. Ct. App. Div. 1998 ................................................45-46

*Smith-Cook v. National Railroad Passenger Corp.*, No. 05-00880, 2005 WL
3021101 (E.D. Pa. Nov. 10, 2005)...........................................................43

## FEDERAL TRADE COMMISSION DECISIONS

*In re Dell Computer Corp.*, 121 F.T.C. 616 (1996)............................................15

*In re Union Oil Co. of California*, No. 9305, 2004 WL 1632816 (F.T.C. July 6,
2004) ..................................................................................................15

## FEDERAL STATUTES AND RULES

15 U.S.C. § 1 (Sherman Act § 1) ...........................................................16, 32, 33

15 U.S.C. § 2 (Sherman Act § 2) ..................................................9, 11, 14, 15, 23

15 U.S.C. § 14 (Clayton Act § 3)................................................................32-33

15 U.S.C. § 15 (Clayton Act § 4)................................................................39, 40

15 U.S.C. § 18 (Clayton Act § 7)............................................................38, 40, 41

15 U.S.C. § 26 (Clayton Act § 16).............................................................39, 41

Fed. R. Civ. P. 8 ..............................................................................7, 34, 44

Fed. R. Civ. P. 9(b) ......................................................................17, 46, 47, 49

Fed. R. Civ. P. 12(b)(6)...........................................................6, 7, 26, 33, 37, 50

ix

## OTHER AUTHORITIES

5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §
    1297 (3d ed. 2005) ........................................................................................49

*United States Department of Justice & Federal Trade Commission, Antitrust
    Guidelines for the Licensing of Intellectual Property* (1995)................................9, 14

R. Hewitt Pate, Assistant Attorney General, Antitrust Division, U.S. Department
    of Justice, *Competition and Intellectual Property in the U.S.: Licensing
    Freedom and the Limits of Antitrust* (2005) ...........................................3-4

Irwin Jacobs, Remarks at Q1 2005 *Qualcomm Inc. Earnings Conference Call*
    (Jan. 19, 2005) (LEXIS-NEXIS, Fair Disclosure Wire Library, Transcript No.
    011905an.727) ........................................................................................20

x

## INTRODUCTION

To induce various standard development organizations ("SDOs") to include its patented technology in the UMTS wireless telephony standard, Qualcomm repeatedly promised to license that technology on fair, reasonable, and non-discriminatory or "FRAND" terms. Based on Qualcomm's commitments, the SDOs included Qualcomm's technology in the UMTS standard, thereby making Qualcomm's technology *essential* for compliance with the UMTS standard. Companies wishing to compete in making UMTS equipment were left with no choice but to seek a license to Qualcomm's technology. Thus, as a result of Qualcomm's promises and the SDOs' reliance on them, Qualcomm acquired monopolies in the markets for technology to provide certain functionality in the UMTS standard.[1]

Qualcomm's FRAND promises were in bad faith. And, in blatant disregard of its FRAND commitments, Qualcomm is using the monopoly power conferred *by the inclusion of its technology in the UMTS standard* (rather than the power conferred by the patents themselves) to acquire and maintain an additional monopoly in a second market, the UMTS chipset market. Qualcomm's scheme includes discrimination (1) in the license terms it imposes on handset and infrastructure manufacturers to penalize those that want to purchase competitors' chipsets rather than Qualcomm's; (2) against such handset manufacturers in the provisioning of marketing assistance and product allocation, particularly with respect to CDMA chipsets over which Qualcomm exercises monopoly power (with 90% share of sales); and (3) in the license terms it offers its UMTS chipset competitors. Through this scheme, Qualcomm set out to make billions

---

[1] The UMTS standard is made up of a variety of technologies performing different functions necessary to wireless communication. Qualcomm's patents are only a small percentage of the patents licenses to which are necessary to comply with the standard. All other patent holders have also agreed to abide by FRAND terms, and Qualcomm is able to participate in the UMTS chipset market as a result of FRAND licenses from other patent holders. If all participants were to adopt Qualcomm's opportunistic practices, total royalty payments would render the UMTS standard uneconomic. (*See* First Amended Complaint ¶¶ 92, 97, 99.)

of dollars of monopoly profits by violating its FRAND commitments, thereby undermining the very reason SDOs require FRAND commitments:  to ensure robust competition in the supply of parts and equipment implementing the standard.

Qualcomm's anticompetitive conduct has not stopped with abusive practices in the current generations of mobile wireless standards.  Its scheme to acquire and exercise monopoly power over mobile wireless telephony continues with Qualcomm's acquisition of Flarion Technologies, Inc. ("Flarion"), a New Jersey-based company that is a leader in Internet-based technology for future generation mobile wireless communications that are not based on Qualcomm's technology.  As Broadcom's complaint alleges, Qualcomm's acquisition of Flarion's assets is likely to substantially lessen competition because it will eliminate one of very few potential escape valves from Qualcomm's chokehold.  As a customer of next generation mobile wireless technologies, Broadcom seeks through this action to prevent that reduction in competition.

For purposes of this motion to dismiss, Qualcomm must treat all of Broadcom's allegations as true.  Qualcomm nevertheless disregards many of Broadcom's allegations, substituting many of its own factual assertions in arguing that the alleged misconduct is not actionable.  To support that dubious proposition, Qualcomm offers arguments predicated on a view of its patent rights that is unsupported by law and that would render antitrust law a dead letter whenever a defendant argues that patents are involved with the products or markets at issue.  Most prominently, Qualcomm argues that because it has patents on its technology, *any* conduct that would otherwise be actionable as monopolization or attempted monopolization is *automatically* exonerated.  Lies and deception are irrelevant; breaches of express commitments

2

to SDOs are meaningless; monopoly power obtained and extended through anticompetitive acts is legally invulnerable.

Contrary to Qualcomm's position, Qualcomm's patents are not a "talisman" that confers blanket immunity on its violations of law. As the D.C. Circuit made clear in its landmark decision in *United States v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir. 2001), intellectual property rights do not immunize anticompetitive conduct:

> The company claims an absolute and unfettered right to use its intellectual property as it wishes: "[I]f intellectual property rights have been lawfully acquired," it says, then "their subsequent exercise cannot give rise to antitrust liability." That is no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability. As the Federal Circuit succinctly stated: "Intellectual property rights do not confer a privilege to violate the antitrust laws." *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000).

Likewise, the Supreme Court "has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.'" *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 479 n.29 (1992) (quoting *Times-Picayune Publ'g. Co. v. United States*, 345 U.S. 594, 611 (1953)); *see also* R. Hewitt Pate, Assistant Attorney General, Antitrust Division, U.S. Department of Justice, *Competition and Intellectual Property in the U.S.: Licensing Freedom and the Limits of Antitrust*, 2005 EU Competition Workshop (June 3, 2005) ("Today, the statement that IP is essentially like other forms of property is often heard in arguments against claims for complete exemption from antitrust scrutiny. *The mere presence of an IP right that somehow figures in a course of*

*otherwise anticompetitive conduct does not act as a talisman that wards off all antitrust enforcement.*") (emphasis added).[2]

Qualcomm seeks to wield its patents as precisely such a talisman. For example, Qualcomm unabashedly asserts that it "is free to license its patents on terms of its choosing," regardless of its FRAND commitments. (Def.'s Mem. in Support of Def's Mot. to Dismiss ("Def's Mem.") at 19.) That premise, if applied to the process by which standards are set, would undercut entirely the procompetitive purpose of standardization and inherently defeat the application of antitrust laws in the standards context. Indeed, Qualcomm would have this Court ignore that Qualcomm's technology has been designated *essential* to mobile wireless standards only because of its FRAND commitment, and that Broadcom's claims rest on this fact, not on the existence of the patents themselves. Were Qualcomm's "absolute immunity" argument correct, there would be nothing to stop parties from doing what Qualcomm did here – make FRAND promises and then simply refuse to license, fatally undermining the SDOs' procompetitive purpose, which is to ensure the development and use of standardized technology.

The Supreme Court has made clear that such abuse of standard-setting processes must not be tolerated: "private standard-setting by associations comprising firms with horizontal and vertical business relations is permitted at all under the antitrust laws *only on the understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits*," and subject to procedures that "prevent the standard-setting process from being biased by members with economic interests." *Allied Tube & Conduit Corp. v. Indian Head Inc.*, 486 U.S. 492, 501, 506-07 (1988) (emphasis added). Once standards are agreed upon, the observance of FRAND commitments – the purpose of which is to ensure access to technology implementing those

---

[2] Available at www.usdoj.gov/atr/public/speeches/209359.pdf.

standards – is necessary if the standards are to serve procompetitive ends, rather than becoming a tool for the creation of monopoly power:

> [T]he standard setting process generally requires that competitors come together to coordinate on a technological standard. In such a setting, there are opportunities for anticompetitive behavior as companies exert their influence over the process. After a standard has been established, there are many issues regarding access to the technology embodied in the standard; limited access could restrict the number of competitors in a market and severely inhibit entry.

Charles James, Opening Day Comments at Joint DOJ-FTC Hearings on Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy (Feb. 6, 2002).[3]

Qualcomm's contention that because FRAND commitments – which are commonplace across industries and technologies and are essential for standards to serve the procompetitive purposes for which they generally are intended – do not specify precisely the particular licensing terms required in all cases, they are inherently unenforceable, and therefore may be flouted at will (Def.'s Mem. at 3, 14-16), is wrong. Were this (unsupported) argument to prevail, it would unleash monopoly power not only in the markets where Qualcomm dominates, but in countless others where collective standard-setting is a way of economic life. In any event, courts routinely interpret terms such as "fair, reasonable, and non-discriminatory" to give effect to the intentions and legitimate expectations of parties, and there is a well-developed body of law explaining what "discrimination" means in the antitrust context. Likewise, Qualcomm's alternative argument that its license terms are *in fact* fair, reasonable and non-discriminatory (Def.'s Mem. at 17-19) is not only incorrect as a factual matter, it also is improper on a motion to dismiss because it contradicts Broadcom's allegations that Qualcomm's practices are well outside any reasonable interpretation of FRAND in myriad specific ways.

---

[3] Available at http://www.ftc.gov/opp/intellect/james.htm.

5

The *en banc* decision of the Third Circuit in *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), puts to rest the second antitrust talisman that Qualcomm seeks to wield – that discriminatory bundling, rebating, and exclusivity schemes can never violate the antitrust laws, regardless of their anticompetitive effects, so long as they do not amount to below-cost pricing. Similarly, Qualcomm's arguments that Broadcom lacks standing to asserts claims against Qualcomm's effort to maintain its CDMA monopolies or against Qualcomm's effort to extend its dominance of mobile wireless telephony through its acquisition of Flarion cannot be squared with precedent on antitrust standing. As the target of Qualcomm's anticompetitive conduct and as a potential customer of Flarion's technology, Broadcom is precisely the type of plaintiff that the antitrust laws are designed to protect from such abuse.

Broadcom respectfully submits that the Court should reject Qualcomm's argument that its conduct is immune from scrutiny under the antitrust laws and the various state common law principles alleged in Broadcom's complaint. Qualcomm must not be permitted to use its intellectual property as either a "baseball bat" to pummel its customers and competitors or as a "talisman" to immunize its exclusionary conduct. The Court likewise should turn aside Qualcomm's attempt to have this case dismissed by disputing Broadcom's allegations and advancing factual assertions of its own.

**ARGUMENT**

**I.    DISMISSAL OF AN ANTITRUST COMPLAINT IS RARELY APPROPRIATE.**

"The Supreme Court has expressly stated that motions to dismiss under Rule 12(b)(6) should be granted 'very sparingly' in antitrust cases." *Syncsort, Inc. v. Innovative Routines Int'l, Inc.*, No. Civ 04-3623 (WHW), 2005 WL 1076043, at *2 (D.N.J. May 6, 2005);[4] *see also Knuth*

---

[4] For the convenience of the court, all unpublished decisions cited in Broadcom's memorandum are attached to the declaration of Gerald Robinson, submitted herewith.

*v. Erie-Crawford Dairy Coop. Ass'n*, 395 F.2d 420, 423 (3d Cir. 1968) ("we should be extremely liberal in construing antitrust complaints"). A plaintiff is required only to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[O]rdinary pleading rules are not meant to impose a great burden upon a plaintiff." *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1634 (2005); *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 116 (2d Cir. 2005) ("At the pleading stage, we are concerned only with whether the defendants have 'fair notice' of the claim . . . not with whether the [claim] can be established at trial.").

The test is, "whether taking all the allegations of the complaint as true, and viewing them liberally giving plaintiffs the benefit of all inferences which fairly may be drawn therefrom, it appears beyond doubt that the plaintiff(s) can prove no set of facts in support of (their) claim which would entitle (them) to relief." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 444 (3d Cir. 1977) (citations omitted). Particularly in cases like this, where the critical facts (for example, the specifics of Qualcomm's licensing practices) are almost all in the hands of the defendant, a claim cannot be dismissed simply because the facts are not alleged with the same particularity with which they will be proven at trial. Indeed, "a plaintiff will not be thrown out of court on a Rule 12(b)(6) motion for lack of detailed facts." *In re Tower Air, Inc.*, 416 F.3d 229, 237 (3d Cir. 2005); *accord Twombly*, 425 F.3d at 112; *see also Bogosian*, 561 F.2d at 446 ("It is not necessary to plead evidence, nor is it necessary to plead the facts upon which the claim is based. 'To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

As shown below, Broadcom's allegations, which span 200 paragraphs and 57 pages, more than meet the requirement of a short and plain statement of allegations that, if proven, would entitle Broadcom to relief. Qualcomm disputes those facts or argues they are not sufficiently detailed. But it does not establish that there is "no set of facts" consistent with Broadcom's allegations under which Broadcom would be entitled to relief, *Bogosian*, 561 F.2d at 444, or that it has not been given fair notice of Broadcom's claims. Qualcomm's motion to dismiss accordingly must be denied.

## II. THE COMPLAINT SETS FORTH MULTIPLE VIOLATIONS OF THE FEDERAL ANTITRUST LAWS ARISING FROM QUALCOMM'S BAD FAITH FRAND COMMITMENTS, DISCRIMINATORY AND EXCLUSIONARY LICENSING PRACTICES, AND ANTICOMPETITIVE ACQUISITIONS.

As the Supreme Court consistently has held, a patent is *not* a license to violate the antitrust laws. *See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 479 n.29 (1992) ("[This] Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.'"). The Court has held that, even the refusal to grant a patent license – the very conduct that Qualcomm claims is absolutely immune from antitrust scrutiny here – could violate the Sherman Act. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 120 (1969); *see also United States v. Line Materials Co.*, 333 U.S. 287, 308 (1948) ("It is equally well settled that the possession of a valid patent or patents does not give the patentee any exemption from the provisions of the Sherman Act beyond the limits of the patent monopoly."). The centerpiece of Qualcomm's motion to dismiss Broadcom's antitrust claims – its argument that "the patent laws immunize the enforcement of patent rights, including licensing activities, from antitrust liability, absent the exceptional circumstances of illegal tying, fraud in the Patent and Trademark Office, or sham

8

litigation" (Def.'s Mem. at 24 (quotation marks omitted); *see also id.* at 3, 11, 12, 13, 18, 19, 20, 21, 22, 23, 25, 29, and 33 (repeating same argument)) – is therefore wrong.

Several Courts of Appeals have explicitly rejected Qualcomm's sweeping immunity argument. In *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1214 (9th Cir. 1997), Kodak, like Qualcomm here, argued that "exercising lawful patents and copyrights" could not, as a matter of law, constitute exclusionary conduct under Section 2 of the Sherman Act. While recognizing that patent holders are often free to refuse to license their patents, the Ninth Circuit nonetheless rejected he same argument that Qualcomm advances, that the freedom to refuse a license is unfettered and held that conduct aimed at extending a monopoly to downstream markets (rather than simply defending intellectual property rights) is actionable under Section 2. *See Image Tech. Servs.*, 125 F.3d at 1218-20; *see also Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1184, 1187 (1st Cir. 1994) (rejecting "powerful irrebutable presumption" that "a unilateral refusal to license a copyright can never constitute exclusionary conduct"); *United States v. Microsoft Corp.*, 253 F.3d 34, 63 (D.C. Cir. 2001).

Likewise, the antitrust agencies reject Qualcomm's argument:

> If a patent or other form of intellectual property does confer market power, that market power does not *by itself* offend the antitrust laws. As with any other tangible or intangible asset that enables its owner to obtain significant supracompetitive profits, market power (or even a monopoly) that is solely "a consequence of a superior product, business acumen, or historic accident" does not violate the antitrust laws. Nor does such market power impose on the intellectual property owner an obligation to license the use of that property to others. *As in other antitrust contexts, however, market power could be illegally acquired or maintained, or, even if lawfully acquired and maintained, would be relevant to the ability of an intellectual property owner to harm competition through unreasonable conduct in connection with such property.*

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* ("*Licensing Guidelines*") § 2.2 (1995) (emphasis added).

9

Ignoring these cases and the reasoning on which they rest, Qualcomm seeks to immunize its conduct through an overbroad reading of *In re Independent Service Organizations Antitrust Litigation*, 203 F.3d 1322 (Fed. Cir. 2000) ("*ISO*"), even though such a reading would be inconsistent with all of the precedent discussed above. Indeed, the *ISO* panel itself – having recognized that tying, fraud on the patent office, and sham litigation violate the antitrust laws – made clear that patent rights do not preempt antitrust obligations when it set as its touchstone the principle that a "patent owner may not take the property right granted by patent and use it to extend his power in the marketplace improperly, *i.e.* beyond the limits of what Congress intended to give in the patent laws." *ISO,* 203 F.3d at 1327 (citing *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990)). *See also Microsoft*, 253 F.3d at 63 (citing *ISO* in concluding that Qualcomm immunity argument "border[ed] upon the frivolous"). Indeed, the Federal Circuit routinely applies antitrust law to refusals to license – giving due regard to the right to exclude others from practicing the claims of the patent – rather than rejecting the applicability of antitrust principles out of hand as Qualcomm would have this Court do. *See, e.g.*, *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999); *B. Braun Med., Inc. v. Abbot Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) (conditions on patent license "are subject to *antitrust*, patent, contract, and any other applicable law, as well as equitable considerations such as patent misuse") (emphasis added).

Whatever rules might apply to simple, unconditional refusals to license intellectual property that the patent owner has not willfully rendered essential to implementation of an industry standard bear no relation to Broadcom's allegations here. As discussed in greater detail below, Broadcom alleges that Qualcomm has engaged in repeated discriminatory, conditional refusals, coupled with a thoroughgoing campaign of anticompetitive conduct designed to exclude

10

competition, all in violation of the explicit FRAND commitments that Qualcomm made in procuring the monopoly. Those allegations state claims under the antitrust laws.

**A. The Complaint Alleges that Qualcomm Willfully Acquired Monopoly Power in the WCDMA Technology Markets by Inducing SDOs to Incorporate Qualcomm's Technology in the UMTS Standard Through Its Bad-Faith Promise to License on FRAND Terms.**

The "willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident" violates Section 2 of the Sherman Act. *United States v. Grinnell*, 384 U.S. 563, 570-71 (1966). "[A] defendant company which possesses monopoly power in the relevant market will be found in violation of § 2 of the Sherman Act if the defendant willfully acquired or maintained that power. . . . A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits." *LePage's Inc. v. 3M*, 324 F.3d 141, 146-147 (3d Cir. 2003) (*en banc*).

Broadcom's complaint alleges that Qualcomm illegally obtained monopoly power in the WCDMA technology markets by inducing several standards development organizations (the "SDOs") to include its technology in the UMTS standard through promises to license all comers on FRAND terms (First Amended Complaint ("Compl.") ¶¶ 3, 9, 81-86); that the SDOs would not have included Qualcomm's technology in the standard without that assurance (*id.* ¶¶ 42, 85); and that Qualcomm consequently willfully acquired monopoly power over the WCDMA technology markets in violation of Section 2 of the Sherman Act (*id.* ¶¶ 3, 9, 81-86).[5] Qualcomm's securing a monopoly by making FRAND licensing commitments, on which SDOs relied in agreeing to make technology "essential" to provide the particular functionality to the

---

[5] There is no dispute that Broadcom adequately has pled the relevant product and geographic markets and, indeed, Qualcomm concedes that Broadcom's market definition allegations are sufficient. (Def.'s Mem. at 9 n.7.) Similarly, Qualcomm does not dispute, nor could it, that Broadcom has alleged the required intent. (*See* Compl. ¶¶ 145, 146.)

11

standard, is willful conduct – it is neither "superior product, business acumen, or historic accident," *Grinnell*, 384 U.S. at 570-71, nor "competition on the merits," *LePage's*, 324 F.3d at 147.

Ignoring well-settled law, Qualcomm raises three issues with Broadcom's pleading, none of which withstand scrutiny. First, Qualcomm's argument that its monopolization of the WCDMA technology markets was lawful ignores the fact inclusion in the standard – which occurred only because of Qualcomm's FRAND commitments – gave Qualcomm a monopoly in providing the particular functionality to the standard, and improperly substitutes its own version of the facts for the allegations in the complaint. Second, Qualcomm's argument that Broadcom must plead fraud on the SDOs before its conduct can be a violation of the antitrust laws is supported by no precedent, and, in any event, Broadcom does plead such fraud with requisite specificity. Third, Qualcomm's argument that its FRAND commitments are meaningless is as groundless as it is cynical. Relatedly, Qualcomm's assertion that, as a matter of fact, it has not violated its FRAND obligation again relies on factual assertions outside the complaint and cannot be considered on a motion to dismiss.

1.    **Qualcomm's Monopoly Power Was Acquired by Inclusion in the UMTS Standard and Does Not Derive from the Patents Themselves.**

Broadcom's allegations – which must be accepted as true for present purposes – are that Qualcomm has an economically meaningful monopoly in the alleged WCDMA technology markets because Qualcomm induced the SDOs to *include* the technology in the standard, not because Qualcomm's technology is *patented*. The complaint further alleges that Qualcomm would not have its monopoly power had it not made its commitment to license its technology on FRAND terms. (*See* Compl. ¶¶ 3, 9, 42.)

That distinction is critical. A patent unadorned by inclusion in an industry standard raises far different legal considerations than a patent monopoly anointed as an essential part of an industry standard. The former does not inherently threaten competition because there remains the possibility of significant inter-technology and inter-patent competition to provide the functionality at issue, whereas, in the latter case, the fact of standardization precludes any such competition. That is precisely why SDOs require FRAND commitments and why Broadcom's complaint states a claim for unlawful monopolization of the WCDMA technology markets.

It is immaterial that the relevant technology markets are for technology that happens to be patented. The material factual allegation is that the relevant markets are for technology that is essential to perform particular functionalities in the UMTS standard. (Compl. ¶¶ 3, 58, 60.) Qualcomm may disagree that the inclusion of its technology in the UMTS standard is the source of its monopoly power here, but that is a factual question, not one subject to determination on a motion to dismiss.[6]

> **2.    Qualcomm's Abuses of the Standard-Setting Process, Including Its Bad-Faith Commitment to License Its Patented Technology on FRAND Terms, Are Anticompetitive Acts that Can Give Rise to Antitrust Liability.**

Qualcomm's argument that its abuse of the standard-setting process cannot violate the antitrust laws because such abuse cannot possibly cause anticompetitive harm cannot be squared with applicable precedent. As recognized by the Supreme Court, lower courts, and the antitrust enforcement agencies, standard-setting has inherent competitive pitfalls in that by agreement of competitors it eliminates inter-technology competition to perform particular functionalities within the standard, and thereby confers monopoly power on the selected technology for

---

[6] In any event, Qualcomm's factual premise makes no sense: if Qualcomm had monopoly power for the relevant functionalities through its patents alone, it would have been pointless and irrational for it to have committed to license them on FRAND terms.

providing a particular functionality. For this reason, the antitrust laws are particularly sensitive to manipulation or abuse of the standards-setting process. *See, e.g., Allied Tube & Conduit Corp. v. Indian Head Inc.*, 485 U.S. 492, 506-07 (1988) ("[P]rivate standard-setting by associations comprising firms with horizontal and vertical business relations is permitted at all under the antitrust laws only on the understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits.").

Where, as here, patented technology is incorporated in a standard (Compl. ¶¶ 3, 9), the opportunity for anticompetitive mischief is at its greatest. *See, e.g., Licensing Guidelines* § 2.2 & n.10. If left unchecked, the patentholder thereby obtains unfettered control over who can and cannot compete in the markets for products that implement the standard (in this case, UMTS chipsets). To prevent this problem, the SDOs at issue here do *not* include patented technology in the standard *unless* the patent holder agrees to license on FRAND terms. (Compl. ¶ 42.) If actually enforced – the very thing that Qualcomm is seeking to avoid through its motion to dismiss – the FRAND requirement ensures that a patent holder cannot exploit its standard-created monopoly through its licensing practices and ensures that competition in the downstream markets that require the technology to implement the standard is not distorted. (*Id.* ¶¶ 39-42.)

Recent cases and Federal Trade Commission ("FTC") actions make clear that the creation of monopoly power through disregard of FRAND commitments to SDOs can constitute willful acquisition of monopoly power in violation of Section 2. For example, in *Rambus, Inc. v. Infineon Techs. AG*, 330 F. Supp. 2d 679, 684-85 (E.D. Va. 2004) ("*Rambus II*") and *Rambus Inc. v. Infineon Techs. AG*, 304 F. Supp. 2d 812, 814-17 (E.D. Va. 2004), ("*Rambus I*") Rambus was accused of manipulating the standard-setting process by concealing its patent applications from the SDO and amending those applications to parallel the development of the standard as it

14

was being formed, all in a successful effort to ensure that the functionality included in the standard was covered by its patents. The court rejected Rambus' argument that its patent rights immunized its conduct from antitrust scrutiny and held that the plaintiff's allegations that Rambus's "manipulative and bad faith participation in the . . . standard-setting process," *Rambus I*, 304 F. Supp. 2d at 817, could proceed under Section 2 of the Sherman Act and California's unfair competition law. *See also* 304 F. Supp. 2d at 816, 828-29; *Rambus II*, 330 F. Supp. 2d at 693-97. The court emphasized the very issue here: "antitrust law has historically been concerned with the risk of one or a small number of participants *capturing the economic power of an industry-wide standard and turning the SSO [standard-setting organization] into a source of exclusionary power*." *Rambus II*, 330 F. Supp. 2d at 696 (emphasis added).

Qualcomm's argument that patent-related conduct in the standard-setting context is immune from antitrust scrutiny as a matter of law also cannot be reconciled with the FTC's recent efforts to police standard-setting abuse to anticompetitive ends. For example, in *In re Dell Computer Corp.*, 121 F.T.C. 616 (1996), the FTC based a demand for relief on its conclusion that an abuse of the standard-setting process (in that case, concealing patents that covered functionality adopted into a standard) was anticompetitive. Similarly, in *In re Union Oil Co. of California ("Unocal")*, No. 9305, 2004 WL 1632816 (F.T.C. July 6, 2004), the FTC overturned the dismissal of a claim that Unocal violated the antitrust laws by manipulating the process that led to the creation of a standard for reduced-emissions gasoline. Again, the fact that the instrument of anticompetitive action at issue involved the assertion of a patent right did not excuse the manipulation of the process that afforded monopoly power to the technology covered by the patent.

15

Qualcomm's reliance on *Townshend v. Rockwell International Corp.*, No. C99-04005BA, 2000 WL 433505 (N.D. Cal. Mar. 28, 2000), is misplaced. First, unlike Broadcom, the plaintiff in *Townshend* did not allege *any* causal relationship between the alleged misrepresentations to the SDO and the SDO's adoption of the standard. 2000 WL 433505 at *11. Second, the *Townshend* court relied on the fact that the defendant provided the SDO with the proposed licensing terms *before* the SDO adopted the standard, and the defendant had refused to license in accordance with the disclosed terms. *Id.* at *7, *10-11. Unlike here, there was no issue in *Townshend* of an industry's having been duped into adopting standards granting additional market power to a technology in reliance on FRAND commitments that were then violated.[7]

Indeed, the *Townshend* court itself explicitly recognized, citing *Dell*, that incorporation of proprietary technology into an industry standard can create market power in the market for products incorporating that technology, such as the UMTS chipset market here. 2000 WL 433505 at *12. In part on that basis, the court declined to dismiss a Section 1 claim that paralleled the claims at issue here, involving "'agreements . . . to expand the market power conferred by Townshend's patents by (i) fraudulently obtaining from the ITU [the relevant SDO] a standard incorporating those patents; (ii) using the market power conferred by that standard as leverage to acquire competitors' technology; and (iii) barring competitors from access to the patents they need in order to block them from manufacturing standard-compliant products, and thus, preventing them from competing in the relevant markets.'" *Id.* at *6.[8]

---

[7] Qualcomm's argument that "Broadcom defines 'WCDMA technology markets' as coextensive with Qualcomm's patents" and therefore cannot provide the basis for antitrust liability (Def.'s Mem. at 2, 12) is the same argument and fails for the same reason.

[8] Similarly, *ESS Technology, Inc. v. PC-Tel, Inc.*, No. C-99-20292 RMW, 1999 WL 33520483 (N.D. Cal. Nov. 4, 1999), does not help Qualcomm. In *ESS*, dismissal turned on the plaintiff's failing to allege injury to competition beyond injury to itself, for example by alleging that consumers faced diminished choices or higher prices. 1999 WL 33520483 at *3. To the extent

16

3.     **Although Broadcom Pleads that Qualcomm Committed Fraud on the SDOs, It Need Not Do So to State an Antitrust Claim.**

Qualcomm's assertion that Broadcom must plead fraud on the SDOs under Rule 9(b) state a monopolization claim is both incorrect and unsupported by any case. In *Rambus I,* 304 F. Supp. 2d at 816, 823, federal and state antitrust and unfair competition claims relating to misconduct before the SDO that led to the adoption of the standard that included the patent holder's patented technology went forward despite an explicit Federal Circuit determination during earlier proceedings in the case that there had been no common-law fraud.[9]

In any event, to the extent Broadcom need plead fraud on the SDOs in making the FRAND commitment, Broadcom has done so. *See infra* Section IV.B.

4.     **Whether Qualcomm's Licensing Terms Are Consistent With Its FRAND Obligations Is a Factual Question That Cannot Be Resolved on a Motion to Dismiss.**

Qualcomm's ultimate fallback – the curious and contradictory factual assertions that Broadcom's monopolization claim should be dismissed either because Qualcomm has offered to license Broadcom on FRAND terms or that FRAND has no meaning and is therefore unenforceable – are contrary to the complaint and can only be resolved on a full factual record. As to Qualcomm's licensing proposals to Broadcom being consistent with FRAND, the cases that Qualcomm cites (Def.'s Mem. at 17-18) go no further than holding that certain practices *may* be allowable under the patent laws, not that they are allowable in all circumstances,

---

there is such a requirement, Broadcom meets it here. (*See, e.g.*, Compl. ¶¶ 90, 91, 98, 102, 105, 109, 111.)

[9] In the analogous sham litigation context, a party enforcing patents it knows are invalid violates Section 2, even though it may have obtained the patents at issue without having committed fraud. *See, e.g., Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998). Likewise, where a party's FRAND promises secure its technology in a standard, it makes no sense to allow that party to exploit the resulting monopoly power later, regardless of whether the FRAND promise was fraudulent or in bad faith in the first place.

including where they are part of an anticompetitive scheme as alleged here.[10]  They therefore certainly cannot be held to be consistent with FRAND and not anticompetitive as a matter of law, as Qualcomm argues.  (*Id.*)

Qualcomm's assertion that FRAND commitments are incapable of judicial enforcement (Def.'s Mem. at 13-17) is also incorrect.  Even if there is a range of royalty rates and licensing conditions that would satisfy the FRAND obligation (as Qualcomm contends), that does not absolve Qualcomm of liability associated with terms that a jury or the court find are well outside the range.  When informed by a full record, the inquiry required will be no more burdensome than the inquiry courts engage in routinely in interpreting and enforcing language such as "good faith," "commercially reasonable," and "usual and customary."  *See, e.g. Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1257-58 (Fed. Cir. 2005) (discussing principles for determining a "reasonable royalty" to be paid in case of patent infringement); *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991) (approving use of the factors set forth in *Georgia-Pac. Corp. v. U. S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), for determination of a "reasonable royalty").[11]

---

[10] *See, e.g., Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 834 (1950), *overruled in part on other grounds by Lear, Inc. v. Adkins*, 395 U.S. 653 (1969) (upholding summary judgment where the record did not support claims of patent misuse as to particular licensing practices and declining to hold that it was "per se a misuse of patents to measure the consideration by a percentage of the licensee's sales"); *Mallinckrodt, Inc.,* 976 F.2d at 708 ("Unless the condition violates some other law or policy (in the patent field, notably the misuse or antitrust law), private parties retain the freedom to contract concerning conditions of sale."); *Townshend*, 2000 WL 433505 at *8 (accepting general proposition that cross-licensing is not always anticompetitive, but only, unlike here, where there were no allegations or authority that specific cross-licensing terms at issue were anticompetitive).
[11] Likewise, the cases that Qualcomm cites regarding the rights of a patent owner that has *not* made FRAND commitments (*see* Def.'s Mem. at 18) are inapposite.  As discussed in Section II.A.1., it is not the patent right that is at issue; it is the patentee's breached commitment to license the patented technology on FRAND terms.

18

Furthermore, Qualcomm does not even try to argue that it is impossible to determine whether its licensing terms are discriminatory. There is nothing vague, ambiguous or unenforceable about Qualcomm's obligations not to discriminate among its licensees, and no dictionary need be consulted to conclude that charging handset manufacturers a higher royalty when they use Broadcom's chipsets than when they use Qualcomm's, as alleged in the complaint (Compl. ¶¶ 14, 94, 104, 106), violates Qualcomm's commitment not to discriminate. *See, e.g., Lewis v. Philip Morris Inc.*, 355 F.3d 515, 521 (6th Cir. 2004) (holding that consideration of "discriminatory pricing" in Robinson-Patman Act includes price and other things of value given to one buyer but not others).

**B.**     **The Complaint Alleges that Qualcomm Is Attempting to Monopolize the UMTS Chipset Market by Using Its Monopoly Power in the WCDMA Technology Markets to Drive Competitors Out of the UMTS Chipset Market.**

Where a "defendant has engaged in predatory or anticompetitive conduct with . . . a specific intent to monopolize and . . . a dangerous probability of achieving monopoly power," illegal attempted monopolization has occurred. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Broadcom alleges that Qualcomm engaged in predatory or anticompetitive conduct by punishing customers that deal with its chipset competitors through abuse of Qualcomm's CDMA chipset monopolies and discriminatory terms for licenses to its essential UMTS technology, in violation of Qualcomm's FRAND commitments. (Compl. ¶¶ 14, 94, 104, 106.) The complaint describes in detail the anticompetitive and discriminatory practices in which Qualcomm has engaged. (*Id.* ¶¶ 104-11.) Broadcom also alleges that Qualcomm's anticompetitive conduct creates the dangerous probability that Qualcomm will achieve a

19

monopoly in the market for UMTS chipsets.[12]  Similar practices in the past led to Qualcomm's

monopoly of the CDMA chipset market, in which it now enjoys a 90% or greater share.  (*Id.* ¶

64.)

       **1.**    **The Complaint's Allegations of Discriminatory Licensing to UMTS Chipset Competitors and Handset Manufacturers that Use Competitors' Chipsets Plead Anticompetitive Conduct in the UMTS Chipset Market.**

      Qualcomm's argument that Broadcom's attempted monopolization claim does not plead

antitrust injury because the alleged exclusion results from Broadcom's not having a license to

Qualcomm's technology is a mere restatement of the incorrect argument that Qualcomm's

monopoly power flows from the patents alone and ignores the clear pattern of discriminatory and

competition-impeding licensing practices that is alleged in the complaint.[13]  (Compl. ¶¶ 86-111.)

*See also LePage's*, 324 F.3d at 152 ("Anticompetitive conduct can come in too many different

forms, and is too dependent upon context, for any court or commentator ever to have enumerated

all the varieties." (internal quotation marks omitted)).

---

[12] Indeed, Qualcomm itself has admitted it is targeting a share of the UMTS chipset market of greater than 50%, and its conduct, unless checked now, will likely lead it well beyond even that. *See* Irwin Jacobs, Remarks at Q1 2005 QUALCOMM Inc. Earnings Conference Call (Jan. 19, 2005) (LEXIS-NEXIS, Fair Disclosure Wire Library, Transcript No. 011905an.727) ("We believe we are well-positioned to further increase our share of the WCDMA chipset market, with our target of 50 percent.").

[13] However much Qualcomm argues that Broadcom wants a different license offer (Def.'s Mem. at 1, 18, 19, 23), this is its version of the facts and not what Broadcom alleges in the complaint. The complaint alleges why as a matter of fact and sound economics, had Broadcom accepted Qualcomm's license terms, it still would not be able to compete for the reasons discussed below. (*See* Compl. ¶¶ 90, 94, 95, 102, 105, 107.)  The law does not create a threshold requirement that Broadcom give in to Qualcomm's illegal tactics before it can bring an antitrust suit.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 120 n.15 (1969).  (Indeed, had Broadcom done so, Qualcomm undoubtedly would be arguing estoppel.)

The complaint sets out a clear pattern of anticompetitive conduct – in addition to and wholly aside from the license negotiations – that harms competition in the UMTS chipset market, including[14]:

- Discriminatorily requiring *double* royalties – one on the value of the chipset and one on the value of the chipset once incorporated into the handset – if handset manufacturers buy chipsets from Qualcomm's competitors but not if they buy Qualcomm's chipsets (Compl. ¶¶ 92-98, 106), thereby illegitimately advantaging Qualcomm's chipsets in a way that an equally efficient competitor cannot match (*id.* ¶¶ 108-09);

- Discriminating in the rates it charges to handset manufactures depending on whether manufacturers agree to purchase chipsets exclusively from Qualcomm (*Id.* ¶ 104);

- Discriminatory use of marketing payments, discounts, and other rewards, as well as threats of loss of CDMA chipset supply or favorable pricing, all conditioned on the use of Qualcomm's UMTS chipsets (*id.* ¶ 110);

- Abusing its CDMA chipset monopoly by conditioning supply of CDMA chipsets on manufacturers' purchase of Qualcomm's UMTS chipsets (*id.* ¶ 64) [15]; and

- Discriminatorily abusing its monopoly power in the WCDMA technology markets to require that licensees give *Qualcomm* a license to broad portfolios of its own technology, including technology that has not been declared essential to the standard, regardless of the size or strength of licensee' portfolios (*id.* ¶ 91), and requiring a percentage of royalties on the *entire* price of the chipset, without regard to how much (or how little) of that chipset's value is related to the Qualcomm technology (*id.* ¶¶ 89, 90).

The complaint alleges that *all* of these practices are anticompetitive.  Among other things, Qualcomm's discriminatory licensing practices undermines "UMTS innovation and competition" (Compl. ¶ 90; *see also id.* ¶¶ 98, 105, 107), "undermine[s] the ability of UMTS

---

[14] Qualcomm's insistence on confidentiality in its negotiations with potential licensees constrains Broadcom's ability to reveal the specifics of Qualcomm's efforts to impose a license on Broadcom that was not FRAND.  (*See* Compl. ¶ 88.)  Qualcomm has used the pretense of enforcing these confidentiality requirements against competitors to force them out of the market by seeking cancellation of their licenses as the remedy.  (*Id.*)

[15] Qualcomm knows that withholding CDMA chipset supply from one handset manufacturer costs it nothing.  The complaint alleges that Qualcomm maintains artificial shortages of CDMA chipsets.  (Compl. ¶¶ 65, 70-73.)  To the extent that a handset manufacturer chooses not to give in to the coercion, Qualcomm will simply sell the chipsets to another handset manufacturer.

21

chipset manufacturers such as Broadcom to compete against Qualcomm" (*id.* ¶ 94), "enables Qualcomm to control or influence the transaction between the chipset competitors and their manufacturer customers" (*id.* ¶ 95), "prevent[s] competition" (*id.* ¶ 102), and "has made meaningful competition impossible" (*id.* ¶ 109) by "protecting Qualcomm from competition on the merits" (*id.* ¶ 111). Broadcom likewise alleges injury to the consuming public as a result of Qualcomm's actions. (*Id.* ¶¶ 30, 102.)

The Third Circuit's *en banc* decision in *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003), put to rest Qualcomm's argument (Def.'s Mem. at 4 n.3, 29-30) that Broadcom's allegations of discriminatory bundling, rebating, and exclusivity arrangements cannot state an antitrust claim in the absence of an allegation of "below-cost" pricing. Indeed, in *LePage's*, the Third Circuit rejected that argument after considering it at length. 324 F.3d at 147-57; *see also SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1978) (holding that conditioning bundled discount on buyer purchasing certain unpatented drugs with patented drug was anticompetitive and exclusionary, even if the resulting "price" was above cost). That determination was made after full discovery and jury trial. *See LePage's*, 324 F.3d at 144. Obviously, one cannot conclude, as a matter of law and based solely on Broadcom's pleadings, that the similar practices at issue here could not possibly be anticompetitive, as Qualcomm would have it.[16]

Qualcomm is also incorrect that its actions in the CDMA market cannot help establish attempted monopolization. To support that assertion, Qualcomm injects factual assertions about market participants and entry conditions that have no place in a motion to dismiss. (*See, e.g.,*

---

[16] Qualcomm's effort to avoid *LePage's* on the ground that Qualcomm may not yet have monopoly power in the *UMTS chipset market* simply ignores that the gravamen of Broadcom's complaint in this respect is the abuse of Qualcomm's *existing* monopolies in the WCDMA technology markets and the CDMA chipset markets unlawfully to *acquire* monopoly power in the UMTS chipset market. In that context, *LePage's* unquestioned holding that bundling that is still above-cost can violate the antitrust laws, 324 F.3d at 152, is equally applicable.

22

Def.'s Mem. at 31.)  It also cites cases in which the defendant was accused of using monopoly profits simply to invest in other markets, to the possible benefit of consumers (the so-called "monopoly leveraging" argument) and *not* to monopolize those other markets.  (Def.'s Mem. at 30-31 (citing *Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191 (3d Cir. 1995); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992)).  The conduct here is different: Broadcom alleges that Qualcomm withholds or threatens to withhold CDMA chipsets from handset manufacturers to coerce them to purchase Qualcomm's UMTS chipsets, conduct that if left unchecked and in combination with Qualcomm's other anticompetitive conduct, would lead to Qualcomm squeezing out its UMTS chipset competitors, leaving Qualcomm with monopoly power in the UMTS chipset market.  *That* sort of monopoly leveraging – where the end result is the defendant's obtaining a separate monopoly in a different market – is certainly a violation of Section 2.  *See Advo*, 51 F.3d at 1202-03; *Fineman*, 980 F.2d at 204-06.

  **2.**  **The Complaint's Allegations that Qualcomm Has Excluded or Crippled Broadcom and Other Competitors in the UMTS Chipset Market Plead Antitrust Injury.**

  To meet its pleading obligation as to antitrust injury, Broadcom alleges that Qualcomm is attempting to monopolize the UMTS chipset market through a raft of anticompetitive schemes, all with the purpose and effect of excluding Broadcom and other UMTS chipset manufacturers from competing on the merits in the UMTS chipset market.  Some competitors (including Broadcom) have been excluded or substantially impeded by Qualcomm's refusal to license on FRAND terms.  Others apparently have accepted the license that Qualcomm imposed, but over time, the complaint alleges, Qualcomm's anticompetitive practices will lead to its obtaining monopoly power in the UMTS chipset market, as occurred in the CDMA chipset market.  (Compl. ¶¶ 112-14.)  The critical point is that Qualcomm's anticompetitive conduct in the UMTS chipset market is intended to exclude effective competitors in that market, has been and

23

will be effective in doing so, and that Broadcom is one of the excluded parties. *See Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993) (holding that antitrust injury requirement is generally met if the plaintiff is a competitor in the relevant market); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 484 n.14 (1977) ("[C]ompetitors may be able to prove antitrust injury before they actually are driven from the market, and competition is thereby lessened."). The allegations to that effect in the complaint plead antitrust injury.

3.   **The Complaint's Allegations that Qualcomm's Conduct Will Result In Its Achieving Monopoly Power in the UMTS Chipset Market Plead Dangerous Probability of Success.**

To maintain a claim of attempted monopolization, a plaintiff need not establish that a defendant *currently* has monopoly power but rather that the defendant is poised to gain such power. *See L&W/Lindco Prods., Inc. v. Pure Asphalt Co.*, 979 F. Supp. 632, 636 (N.D. Ill. 1997) ("Lindco need not prove that Pure Asphalt has succeeded in establishing monopoly power but must merely show that Pure Asphalt has the capacity to make a serious attempt to acquire monopoly status.") (citing *Lorain Journal Co. v. United States*, 342 U.S. 143, 153 (1951)). Allegations that the defendant has the present ability to exclude competitors or to control price in the relevant market support a claim of dangerous probability. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) (defining market power as "the power to control prices or exclude competition"); *Aquatherm Indus. Inc. v. Fla. Power & Light Co.*, 971 F. Supp. 1419, 1426 (M.D. Fla. 1997), *aff'd*, 145 F.3d 1258 (11th Cir. 1998) (concluding that ability to control prices is an element of dangerous probability); *see also In re Pabst Licensing, GMBH Patent Litig.*, No. Civ.A. 99-3118, 2000 WL 1145725, at *7 (E.D. La. Aug. 11, 2000) (holding that conditioning the grant of technology licenses on payment of royalties on sales of downstream products "alleges the control of pricing").

24

The complaint meets the pleading requirements by alleging that, if left unchecked, Qualcomm will achieve a monopoly in the UMTS chipset market. (Compl. ¶¶ 112-14.) By discriminating against its UMTS chipset competitors, Qualcomm raises those competitors' costs in ways that make it difficult if not impossible to compete on a sustained basis with Qualcomm in the UMTS chipset market. (*Id.* ¶¶ 86, 94, 98, 105, 109, 111.) Qualcomm's dangerous probability of success is demonstrated by, among other things, allegations that Qualcomm's similar tactics have already succeeded in excluding virtually all competitors, including Intel, from the CDMA chipset market, resulting in Qualcomm's 90% market share (*id.* ¶¶ 64, 67); that Qualcomm possesses economic power over UMTS handset manufacturers by virtue of its CDMA monopolies (*id.* ¶¶ 115-16); that Qualcomm's share of the UMTS chipset market is on an upward trajectory (*id.* ¶ 113), and that high barriers to entry protect Qualcomm in the chipset markets (*id.* ¶¶ 66, 82). Indeed, Qualcomm itself repeatedly has stated an expectation that it will achieve at least a 50% share of the UMTS chipset market in short order.[17]

In the face of all those allegations, Qualcomm focuses on a *single* factor – its current market share – and suggests that Broadcom's attempted monopolization claim must be dismissed for failure to allege it sufficiently. Courts, including the Third Circuit, consistently hold that market share is but one factor to be considered in evaluating dangerous probability of successful monopolization and that there is no "magic" minimum market share required. *See e.g., Medtronic AVE., Inc. v. Boston Scientific Corp.*, No. Civ. A. 98-478-SLR, 2001 WL 652016 (D. Del. March 30, 2001) (denying a motion to dismiss claims of attempted monopolization and concluding that defendant was "incorrect in its assertion that there is a minimum market share requirement for an attempted monopolization claim"). Indeed, the Eighth Circuit has held that

---

[17] *See supra* note 11.

there is no market share requirement for an attempted monopolization claim. *See H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1542-43 (8th Cir. 1989) (upholding *jury* finding of dangerous probability of successful monopolization in the face of a defendant's current market share of *zero* percent based on the plaintiff's demonstration *at trial* that the defendant was "poised forcefully" to enter the market).

As the cases make clear, the issue of dangerous probability of success requires a factual inquiry into many factors.[18] Broadcom has alleged not only that Qualcomm is "poised forcefully" to take over the UMTS chipset market, but each of the factors relevant to the dangerous probability element. No more is required to state a claim for purposes of Rule 12(b)(6). Details about Qualcomm's market share and the other pertinent factors will emerge during discovery. *See also Intellective, Inc. v. Mass. Mutual Life Ins. Co.*, 190 F. Supp. 2d 600, 614-15 (S.D.N.Y. 2002) (denying motion to dismiss claim of attempted monopolization because determination of dangerous probability "must await further factual development").[19]

---

[18] One of the cases cited by Qualcomm confirms this in holding that *summary judgment* was unavailable to the defendant where the plaintiff showed that the defendant had a growing share of sales, augmented by "[1] the strength of the competition, [2] probable development of the industry, [3] the barriers to entry, [4] the nature of the anticompetitive conduct, and [5] the elasticity of consumer demand." *Yeager's Fuel, Inc. v. Pa. Power & Light Co.*, 953 F. Supp. 617, 646-50 (E.D. Pa. 1997).

[19] The other cases that Qualcomm cites are inapposite. In each of those cases, the court dismissed complaints that utterly lacked the detail found in Broadcom's allegations of Qualcomm's likelihood of successful monopolization. *See, e.g., Brunson Commc'ns, Inc. v. Arbriton, Inc.*, 239 F. Supp. 2d 550, 570 (E.D. Pa. 2002) ("Plaintiff has not only failed to allege any facts regarding Arbriton's market share, but also, none of the other factors associated with monopoly power."); *Fresh Made, Inc. v. Lifeway Foods, Inc.*, No. Civ. A. 01-4254, 2002 WL 31246922, at *8 (E.D. Pa. Aug. 9, 2002) (no allegations about market, market power, or competition); *Smith & Johnson, Inc. v. Hedaya Homes Fashions Inc.*, No. 96 Civ. 5821 MBM, 1996 WL 737194, at *7 (S.D.N.Y. Dec. 26, 1996), *aff'd* 125 F.3d 844 (2d Cir. 1997) (plaintiff "failed to allege any facts regarding the afghan industry structure, let alone [defendant's] current market share"); *E&G Gabriel Bros. v. Gabriel Bros., Inc.*, No. 93 Civ. 0894 (PKL), 1994 WL 369147, at *5 (S.D.N.Y. July 13, 1994) (complaint contained only a "verbatim recitation of statutory language" without "any other facts in support of a claim of monopoly power"). In each

26

    **C.**    **The Complaint's Allegations that Qualcomm Coerces Its Handset Manufacturers to Purchase UMTS Chipsets from Qualcomm and Has Foreclosed a Significant Portion of the UMTS Chipset Market State Claims for Tying and Exclusive Dealing.**

Qualcomm's primary response to Broadcom's unlawful tying and exclusive dealing claims is to ask this Court to apply a highly restrictive and incorrect view of the law to a raft of factual contentions not in the complaint. Qualcomm's motion to dismiss those claims (the Third, Fourth, Fifth, and Sixth Claims for Relief) accordingly should be denied.

    **1.**    **The Complaint's Allegations that Qualcomm's Bundling and Discounting Schemes Coerce Handset Manufacturers to Purchase Qualcomm Chipsets State Claims for Tying.**

Broadcom states tying claims, whether under the *per se* standard required by Supreme Court precedent or the "rule of reason" standard. "Tying is selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)," and to state a tying claim "[u]nder the per se analysis, a plaintiff must prove that (1) the defendant sells two distinct products, (2) the seller possesses market share in the tying product market, and (3) a substantial amount of interstate commerce is affected." *Gordon v. Lewiston Hospital*, 423 F.3d 184, 213-14 (3d Cir. 2005). Under a rule of reason analysis, liability may likewise be established upon a showing of actual restraint of competition in the market for the tied product. *Id.* at 214 n.20.

Qualcomm does not dispute the adequacy of Broadcom's allegations as to those elements. Nor could it. First, Broadcom specifically alleges that UMTS chipsets and WCDMA

---

case the plaintiffs also failed properly to allege the relevant markets. *See Brunson Commc'ns*, 239 F. Supp. 2d at 569; *Fresh Made*, 2002 WL 31246922, at *5; *Smith & Johnson*, 1996 WL 737194, at *6; *E&G Gabriel Bros.*, 1994 WL 369147, at *5 & n.6. Here, Qualcomm does not challenge Broadcom's relevant market allegations. (*See* Def.'s Mem. at 9 n.7.)

technology are separate products. (Compl. ¶ 157.)[20] Second, Broadcom specifically alleges that Qualcomm possesses monopoly power in the WCDMA technology markets resulting from the inclusion of its technology in the UMTS standard. (*Id.* ¶¶ 83, 140, 158.) Third, there is no doubt that a substantial volume of commerce is at issue, well beyond the *de minimis* requirement, whether the relevant commerce is the entire market for UMTS chipsets (50 million unit sales per year and growing (*Id.* ¶ 112)), or some subset of that market. *See Microbyte Corp. v. New Jersey State Golf Ass'n*, Civ.A.No. 84-949, 1986 WL 7231, at *5 (D.N.J. June 26, 1986) ("Even $27,264 is not a paltry sum, and the court cannot find it to be *de minimis*."). As to the additional element in rule of reason tying claims, Broadcom alleges that Qualcomm's tying practices have damaged competition in the UMTS chipset market by putting competitors at "a significant disadvantage in pricing [...] UMTS chipsets to a cell phone manufacturer" and by "mak[ing] meaningful competition impossible." (Compl. ¶ 109.)

Qualcomm's challenge to Broadcom's tying claims rests on the mistaken arguments that, because Broadcom's tying allegations are based on linkage of the tying and tied products through economic threats rather than explicit and absolute requirements that one not be purchased without the other, and because Qualcomm in some instances sells its WCDMA technology licenses separately from its UMTS chipsets, Qualcomm cannot, as a matter of law, be deemed to engage in tying  (Def.'s Mem. at 4-5, 34-36); and that its tying conduct is immune from antitrust challenge because both the tying and tied products are "covered" by Qualcomm patents (*id.* at 21-22).[21]

---

[20] Qualcomm concedes that Broadcom has properly alleged that WCDMA technology and UMTS chipsets are separate product markets.  (*See supra* note 3; Def.'s Mem. at 9 n.7.)
[21] Qualcomm's separate argument that Broadcom's claim under Section 3 of the Clayton Act cannot go forward because the Clayton Act only applies to commodities (Def.'s Mem. at 36), is at best premature.  Indeed, one of the cases upon which Qualcomm relies contradicts

Contrary to Qualcomm's argument, there is no absolute requirement that explicit

agreements are required for tying. The critical question is whether some or all buyers of

Qualcomm's WCDMA technology for UMTS are economically *coerced* into buying

Qualcomm's UMTS chipsets. In *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2,

12 (1984), the Supreme Court concluded that the defendant's economic power in the tying

product and its exploitation of that power is the touchstone of a tying claim, not arbitrary black-

letter distinctions as Qualcomm seeks to impose:

> Our cases have concluded that the essential characteristic of an
> invalid tying arrangement lies in the seller's exploitation of its
> control over the tying product to force the buyer into the purchase
> of a tied product that the buyer either did not want at all, or might
> have preferred to purchase elsewhere on different terms. When
> such "forcing" is present, competition on the merits in the market
> for the tied item is restrained and the Sherman Act is violated.

*See also Eastman Kodak Co.*, 504 U.S. at 466-47 ("Legal presumptions that rest on formalistic

distinctions rather than actual market realities are generally disfavored in antitrust law. This

Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the particular

facts disclosed by the record." (citations and internal quotation marks omitted)).

Indeed, in the very case that Qualcomm cites in support of its argument, *SmithKline*

*Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978), the Third Circuit concluded that an

---

Qualcomm's proposed bright-line rule that all elements of a contract must relate solely to tangible goods for the Clayton Act to apply. In *Tele Atlas N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184, 1192 (N.D. Cal. 2005), the court explained that where the "subject of the contract is a combination of goods and intangible rights and services," a court should apply the "dominant nature" test to determine whether the transaction comes within the ambit of the Clayton Act. Because the tying arrangement at issue here involves tangible UMTS chipsets and discovery may well reveal that to be the most important aspect of the arrangement, the court should allow development of an appropriate factual record for analysis of whether the chipsets are the dominant element of the transaction for Clayton Act purposes. *See also Ansel Commc'ns, Inc. v. Novell, Inc.*, No. C-97-21088 RMW ENE, 1999 WL 33302368, at *3 (N.D. Cal. March 24, 1999) (denying summary judgment on issue of whether a software license has the "dominant nature" of a sale of goods under the Robinson-Patman Act).

explicit tie is *not* needed to establish an illegal tie for antitrust purposes, where there otherwise is coercion:

> Obviously, with respect to the [conditioning the sale of one product upon the sale of another product] element, *a formal agreement is not necessary*, although it is sufficient. But, in the absence of a formal agreement, a plaintiff must establish in some way that a tie-in was involved . . . . This can be done by proof that purchase of one product, the tied product, was not voluntary, i.e., *by proof of coercion.*

575 F.2d at 1061 n.3 (emphasis added)[22]; *see also Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449-54 (3d Cir. 1977) (affirming that illegal tying arrangement can be established by demonstrating coercion even in the absence of an explicit tie). Applying *SmithKline* as binding precedent, the court in *DiscoVision Associates v. Disc Manufacturing, Inc.*, 42 U.S.P.Q. 2d 1749 (D. Del. 1997), considered and rejected the same argument that Qualcomm raises here:

> [Defendants] argue that [plaintiff's] allegations of "economic coercion" cannot, as a matter of law, "constitute the type of coercion that is cognizable under the Sherman Act." They argue that [plaintiff's] allegations of "economic coercion" are essentially a complaint about [defendant A's] royalty rates. According to [defendants], [plaintiff] has not and cannot allege that [defendant A] has expressly conditioned the availability of any of its patents to the license of any other patents. . . . *[But] the court finds that [plaintiff] has sufficiently alleged the type of coercion necessary to sustain a tying claim under the Sherman Act.*

42 U.S.P.Q. 2d at 1759 (citations omitted; emphasis added).

Similarly, allegations of an absolute *refusal* to sell the two products separately *to all purchasers* is *not* required. For example, in *Compuware Corp. v. IBM Corp.*, 366 F. Supp. 2d 475, 480-82 (E.D. Mich. 2005), the court rejected defendant's argument *at summary judgment* – identical to the assertions made here by Qualcomm – that, because only 10% of its sales of the tying products included sales of the tied product, plaintiff's claim of tying failed as a matter of

---

[22] Whether there was coercion in the *SmithKline* case that could give rise to a tying claim was not disputed at the Third Circuit. *See* 575 F.2d at 1061 n.3.

law. "[T]he fact that only 10% of IBM's mainframe [the tying product] customers are also purchasing its tools [the tied product] is of no significance in determining whether the company is engaged in forcing sales, so long as the volume of those sales is not insignificant." 366 F. Supp. 2d at 481; *see also Applera Corp. v. MJ Research, Inc.*, 309 F. Supp. 2d 293, 296-97 (D. Conn. 2004) (denying *in limine* motion to exclude evidence of economic coercion constituting tying despite evidence showing products were often offered separately). These cases are the mere modern embodiment of *United Shoe Machinery Corp. v. United States*, 258 U.S. 451 (1922), the seminal Supreme Court tying decision, which rejected the argument that there could be no tie because the defendant offered a non-tied alternative. 258 U.S. at 464.

Broadcom's allegations therefore meet its pleading obligations. As alleged in the complaint, Qualcomm's forcing bundled packages on certain customers "make[s] meaningful competition impossible" (Compl. ¶ 109), "substantially raise[s] competitors' costs of selling and marketing UMTS chipsets, and strongly discourages chipset buyers from dealing with Qualcomm's competitors" (*id.* ¶ 111). Those allegations not only suffice to describe unlawful ties, they also are a complete answer to Qualcomm's argument that Broadcom somehow does not allege antitrust injury as part of its tying claims (Def.'s Mem. at 4).

Finally, Qualcomm's assertion that there can never be an illegal tie between a license for a patent and the downstream product that incorporates that patent (Def.'s Mem. at 21-22) is incorrect. It is settled law that intellectual property and products employing that intellectual property generally are separate products for tying purposes. *See, e.g., William Cohen & Son v. All Am. Hero, Inc.*, 693 F. Supp. 201, 205-07 (D.N.J. 1988) (concluding that conditioning purchase of franchise restaurant trademark to purchase of food supplies could constitute tying); *see also Roberts v. Elaine Powers Figure Salons*, 708 F.2d 1476, 1481 (9th Cir. 1983) (same as

31

to weight loss franchise trademark and accounting services); *Northern v. McGraw Edison Co.*, 542 F.2d 1336, 1345 (8th Cir. 1976) (same as to dry cleaning franchise trademark and equipment); *Carpa, Inc. v. Ward Foods, Inc.*, 536 F.2d 39, 45-47 (5th Cir. 1976) (same as to restaurant franchise trademark and food, equipment and supplies). It is also well established that items may exist in different markets even if one is functionally linked to the other. *See, e.g., Eastman Kodak*, 504 U.S. at 463; *Jefferson Parish*, 466 U.S. at 19, n.30; *Brotech Corp. v. White Eagle Int'l Tech. Group, Inc.*, No. Civ. A. 03-232, 2004 WL 1427136, at *4 (E.D. Pa. June 21, 2004) (recognizing separate market for finished product incorporating patent at issue in alleged sham litigation).

        If followed, Qualcomm's argument would undermine the basic reason tying is prohibited – to protect competition in the tied market from abuse by a dominant player in the tying market. *See, e.g., Gordon*, 423 F.3d at 214; *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 510 (3d Cir. 1998); *Allen-Myland, Inc. v. IBM*, 33 F.3d 194, 201 (3d Cir. 1994). That principle is of particular significance where industry standards are involved. Were Qualcomm's argument correct, any company could convert the designation of its patented technology as an essential element of an *industry* standard into a *proprietary* standard (*i.e.*, force all customers to use its own products implementing the technology) when the manifest intention of standards – and the only reason they are "permitted at all under the antitrust laws," *Allied Tube*, 486 U.S. at 506 – is to promote a competitive market in those products.

    **2.    The Complaint's Allegations that Qualcomm's Exclusivity Arrangements Foreclose a Significant Share of the UMTS Chipset Market to Rivals States Claims for Exclusive Dealing.**

        Broadcom has adequately stated a claim of exclusive dealing under Section 1 of the Sherman Act and Section 3 of the Clayton Act. Qualcomm concedes (Def.'s Mem. at 32) that, even under its view of the operative test, the fact finder must evaluate "the relevant area of

effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961). Despite the obviously fact-intensive nature of this inquiry, Qualcomm implausibly asserts that this analysis can be done here in the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). (Def.'s Mem. at 31-33.)

Qualcomm's bald assertion that Broadcom has not alleged that Qualcomm's practices have foreclosed a sufficiently "substantial share of a relevant market" (Def.'s Mem. at 31), simply ignores the allegations in Broadcom's complaint that Qualcomm has "agreements with cell phone manufacturers – pursuant to which such companies agree to purchase Qualcomm's UMTS chipsets only, not to purchase competitors' chipsets, or to do so only on terms that materially disadvantage such products, constituting an effective refusal to deal on commercially reasonable terms – unreasonably restrain competition and *foreclose a substantial share* of the UMTS chipset market in violation of Section 1 of the Sherman Act." (Compl. ¶ 150 (emphasis added); *see also id.* ¶¶ 110, 111, 163.) Qualcomm apparently disagrees with these allegations, but the rate of foreclosure of competition as a result of an exclusive dealing arrangement is a question of fact, not a question to be resolved on a motion under Fed. R. Civ. P. 12(b)(6). *See Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 508-09 (2d Cir. 2004) (denying motion for summary judgment because of fact dispute over whether a "significant fraction of buyers or sellers" were frozen out of the market); *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 111 (3d Cir. 1992) (confirming that analysis requires inquiry into actual market conditions); *United States v. Dentsply Int'l, Inc.*, Nos. Civ. A. 99-005-SLR, 99-225-SLR, 99-854-SLR, 2001

33

WL 624807, at *9 (D. Del. March 30, 2001), *aff'd sub nom. Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,* 424 F.3d 363 (3d Cir. 2005) (denying motion for summary judgment because of a fact dispute "with respect to the foreclosure rate").[23]

More generally, despite Qualcomm's protestations to the contrary, Fed. R. Civ. P. 8 simply does not require Broadcom to plead every fact it will use to establish its claims. *See supra* Section I; *Bogosian,* 561 F.2d at 446 ("It is not necessary to plead evidence."). That rule is particularly apt here, where Qualcomm has made every effort to conceal the terms of the very agreements that Broadcom alleges to be unlawfully exclusionary through strict non-disclosure and confidentiality agreements. (*See* Compl. ¶ 88.)

**D.    The Complaint's Allegations that Qualcomm's Actions in the WCDMA Technology and Chipset Markets Are Part of a Scheme to Maintain Its Monopoly in 3G CDMA Technology and Chipsets Establish Broadcom's Standing to Pursue Its CDMA Claims.**

Qualcomm does *not* argue that Broadcom's allegations that Qualcomm illegally has maintained its CDMA technology and CDMA chipset monopolies fail to state claims for illegal monopoly maintenance. Qualcomm only challenges Broadcom's *standing* to pursue those claims. (Def.'s Mem. at 36-40.)

---

[23] Qualcomm's assertion that Broadcom has made *no* allegations regarding competition in the UMTS chipset market or the effects of Qualcomm's exclusivity requirements (Def.'s Mem. at 32-33) is simply unfounded. Broadcom has identified UMTS cellphone manufacturers whom Qualcomm has identified as "major customers" and thus whose business Qualcomm's competitors would be excluded from obtaining by Qualcomm's exclusivity requirements. (Compl. ¶ 29.) As alleged in the complaint, Qualcomm already has preempted competitors from tens of millions of dollars of chipset business through its exclusivity requirements, including by signing chipset agreements with the leading UMTS cellphone manufacturers. (*See Id.* ¶¶ 16, 110, 113.) Qualcomm's practices operate to raise competitors' costs and thereby to prevent them from competing with Qualcomm on the merits. (*Id.* ¶ 111.) Ample allegations of the competitive issues involved are in Broadcom's complaint as well, including in recounting what happened in the parallel CDMA markets when Qualcomm engaged in the same sorts of activity in which it is engaging in and has engaged in the UMTS chipset markets. (*See Id.* ¶¶ 17-20, 114.)

Qualcomm rests its motion to dismiss Broadcom's CDMA monopolization claims on the

simplistic – and incorrect – argument that to have standing to pursue antitrust claims in the

CDMA technology and chipset markets, Broadcom must be a direct "participant," presumably as

a customer or competitor, in those markets. (Def.'s Mem. at 37.) To the contrary, there is no

such bright-line requirement. *See, e.g., Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*,

227 F.3d 62, 76-77 (3d Cir. 2000) (rejecting requirement that plaintiff must be a customer or

competitor in market in which competition is harmed through defendants' actions); *see also Blue*

*Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982) ("[t]he [standing] statute does not confine

its protection to consumers, or to purchasers, or to competitors, or to sellers") (quoting

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)). Rather,

where the alleged harm to the plaintiff is "inextricably intertwined" with the alleged antitrust

violation or is the means by which the defendant sought to restrain competition, the plaintiff has

standing. *See, e.g., Carpet Group Int'l*, 227 F.3d at 76-77 (3d Cir. 2000) ("[A]ntitrust injury . . .

may in some circumstances inhere where the harm is 'inextricably intertwined' with the

defendant's wrongdoing.") (citations omitted); *U.S. Horticultural Supply, Inc. v. Scotts Co.*, No.

Civ. A. 03-773, 2004 WL 1529185, at *3-4 (E.D. Pa. Feb. 18, 2004) (holding that plaintiff had

antitrust standing because plaintiff's injury was "the very means by which the defendant sought

to restrain or destroy competition").[24]

Broadcom has standing under that precedent. Qualcomm's exclusionary conduct in

UMTS chipsets has reinforced and entrenched Qualcomm's CDMA monopolies by increasing

---

[24] In supporting its absolutist "only customers or competitors have standing" argument with
*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178 (3d Cir. 1997), and similar
cases (Def.'s Mem. at 39), Qualcomm ignores the Third Circuit's later holding in *Carpet Group
Int'l*, in which the Third Circuit explicitly held that such a standing requirement "may in some
circumstances lead to results that conflict with Supreme Court and other precedent" and that
*Barton & Pittinos* therefore should not be read as imposing such a requirement. 227 F.3d at 76.

costs to parties that manufacture and supply equipment and services that use the UMTS standard. (*See* Compl. ¶¶ 115-16.)  Broadcom's harm is therefore "the very means" by which Qualcomm sought to reinforce and maintain its CDMA monopolies.  It is therefore "inextricably intertwined" with those actions and Broadcom accordingly has standing under the antitrust laws to challenge it. *See Carpet Group Int'l*, 227 F.3d at 76-77; *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 926 n.8 (3d Cir. 1999)).

The D.C. Circuit's decision in *United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001), and subsequent private cases confirm that victims of anticompetitive actions aimed at preserving a monopoly in one market but aimed at targets in another market have standing to pursue monopoly maintenance claims in the first market.  In *Microsoft*, the D.C. Circuit held that Microsoft's efforts to undermine non-Microsoft Internet browsers and the JAVA cross-platform programming language was monopoly maintenance in the operating system market even though rival browsers and JAVA were not in the same market as operating systems.  253 F.3d at 51-79. When Novell, a market participant in another market (specifically, office productivity programs) challenged Microsoft's maintenance of its operating system monopoly under the antitrust laws, Microsoft raised the identical standing arguments that Qualcomm raises, and the court roundly rejected those arguments:

> Microsoft next argues that Novell lacks antitrust standing . . . because the office productivity applications alleged to have been damaged did not compete in the operating system market. According to Microsoft, there is a black-letter rule that only competitors or consumers in a relevant market have standing to sue for harm caused by anti-competitive behavior in that market. Microsoft overstates the proposition. . . . According to Novell, WordPerfect and Quattro Pro, its popular office productivity applications, posed a threat to Microsoft's operating system monopoly . . . . Against this background, it is clear to me that Novell meets the various parts of the multi-factored test

36

established by *Associated General Contractors* for antitrust standing.

*In re Microsoft Antitrust Litig.*, No. MDL 1332, Civ. JFM-05-1087, 2005 WL 1398643, at *2-3 (D. Md. June 10, 2005); *see also Bristol Tech. v. Microsoft Corp.*, 42 F. Supp. 2d 153, 163-66 (D. Conn. 1998) (holding that party with product that threatens monopoly product had standing when monopolist took steps against that party and its product).

As with Novell's claims against Microsoft's operating system monopolization, the five factors relevant for standing set forth in *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), are all present here. There is no question regarding the sufficiency of the allegations regarding the first AGC factor – here Broadcom alleges a direct causal connection between Qualcomm's antitrust violations in CDMA through its actions in UMTS and Broadcom's harm – lost sales of UMTS chipsets as a result of discriminatory higher prices for essential UMTS technological inputs. (Compl. ¶¶ 4, 108-11, 116). As to the second factor – that the alleged harm to Broadcom is of the type the antitrust laws were intended to provide redress – Broadcom alleges that its injury is lost sales resulting from anticompetitive actions in a market adjacent to Qualcomm's CDMA monopoly (*Id.* ¶ 116), the very sort of antitrust injury that Novell suffered at the hands of Microsoft. The injury is also "direct" under the third and fourth AGC factors – Qualcomm's actions directly have caused and will cause Broadcom to lose sales of UMTS chipsets (*Id.* ¶¶ 4, 108-11, 116), and as to *those* lost sales, there are no more direct victims than Broadcom. Finally, under the fifth AGC factor, there is no risk of duplicative recovery or complex apportionment of damages.[25]

---

[25] Qualcomm's argument that, because to a certain extent Broadcom's other claims logically overlap as they relate to damages, this claim should be dismissed on standing grounds, is makeweight. Obviously the concern about "duplicative recovery" and "complex apportionment of damages" relates to other potential claims by *other* parties, not to potentially overlapping claims by the same party. *See, e.g., Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1563 (7th

E.    **The Complaint's Allegations that Broadcom Is a Likely Customer in the Markets where Qualcomm's Acquisition of Flarion Would Substantially Lessen Competition Establish Broadcom's Standing to Pursue Its Section 7 Claim.**

Qualcomm does not contest that Broadcom has stated a claim on the merits under Section 7; rather, Qualcomm argues that Broadcom does not have standing to pursue such a claim.[26] Qualcomm's argument is that Broadcom's harm with respect to Qualcomm's acquisition of Flarion is too speculative because it has not happened yet and, curiously, that Broadcom is a competitor of Qualcomm and Flarion. Qualcomm is wrong on both points, and Qualcomm's motion to dismiss the Section 7 claim (the Eighth Claim for Relief) accordingly should be denied.

Qualcomm's argument that Broadcom lacks standing because its injury is too speculative apparently stems from a misunderstanding as to which section of the Clayton Act provides the basis of Broadcom's standing with respect to the Flarion acquisition. Because Broadcom seeks injunctive relief, including divestiture of some or all of the assets acquired and/or the imposition of conditions on Qualcomm's use of some or all of the assets acquired (Compl. ¶ 178, Prayer for Relief, Part E), the pertinent question is whether Broadcom has standing under Section 16 of the Clayton Act. Qualcomm, however, relies exclusively on cases having to do with standing to

---

Cir. 1991) ("[W]e note that this case raises no concerns of duplicative recoveries or difficulties in apportioning the damages plaintiffs claim between them or others injured by defendant's merger."); *cf. 2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 742 n.17 (3d Cir. 2004) (finding "duplicative recovery" issue where plaintiffs' various theories made "duplicative recovery . . . not only possible, [but] exceedingly probable if not inevitable").

[26] There is no serious argument that Qualcomm's proposed acquisition could be challenged on the merits under Section 7 of the Clayton Act, which prohibits acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Flarion presents a fundamental competitive challenge to Qualcomm's technology, and its acquisition by Qualcomm would substantially lessen competition in B3G and 4G technology markets. (Compl. ¶¶ 119, 132-35.)

pursue *damages* under Section 4 of the Clayton Act.[27]  Because the requirements for standing

under Section 16 are different, Qualcomm's cases are inapposite.  *See Cargill, Inc. v. Monfort of*

*Colo., Inc.*, 479 U.S. 104, 111 (1986) ("It is plain that § 16 and § 4 do differ in various ways.");

*AGC*, 459 U.S. at 525 n.5 ("Plaintffs do not seek injunctive relief under Section 16 of the

Clayton Act, 15 U.S.C. § 26, and they do not ask us to consider whether they have standing to

request such relief.").[28]

Under Section 16, Broadcom need only allege that (1) there is a threatened loss or injury

cognizable in equity; and (2) the threatened loss or injury qualifies as antitrust injury reflecting

the anticompetitive effect of an alleged violation.  *See Cargill*, 479 U.S. at 111.  Broadcom's

allegations meet those requirements.  Broadcom specifically alleges that the proposed Flarion

acquisition would directly injure Broadcom by reducing competition in the alleged B3G and 4G

technology markets:

> Broadcom is a customer in the B3G and 4G technology markets.
> As an equipment manufacturer, Broadcom may require a license to
> intellectual property necessary to manufacture B3G and 4G
> equipment.  Reduced competition among B3G and 4G
> technologies, and particularly an increase in Qualcomm's market
> power in the markets for B3G and 4G technologies, will reduce
> Broadcom's ability to obtain such technology licenses on
> competitive terms, or to obtain those licenses at all.

---

[27] None of Qualcomm's cases involve claims challenging an acquisition under Section 7 of the
Clayton Act, either.  Section 7 of the Clayton act is intended to deal with potential
anticompetitive effects in their incipiency, further undermining Qualcomm's argument that
competitive harm is too speculative to be actionable.  *Brunswick Corp. v. Pueblo Bowl-O-Mat,
Inc.*, 429 U.S. 477, 485 (1977) (Section 7 is "a prophylactic measure, intended primarily to arrest
apprehended consequences of intercorporate relationships before those relationships could work
their evil." (quotation marks omitted)); *Moore Corp. Ltd. v. Wallace Computer Servs., Inc.*, 907
F. Supp. 1545, 1574 (D. Del. 1995) ("Wallace need not prove the fruition of actual
anticompetitive effects of the acquisition.").
[28] Of course, should the threatened harm from Qualcomm's acquisition of Flarion become actual
harm before this case is adjudicated, Broadcom would have standing under Section 4 to seek
money damages for any provable losses, just as it does with respect to Qualcomm's past
acquisitions.

(Compl. ¶ 137.)

This injury is an "antitrust injury" that flows from the anticompetitive effects that would occur as a result of the acquisition.  As alleged in the complaint, if the Flarion transaction were consummated, competition in the market to provide technology for B3G and 4G to chipset customers would be substantially lessened (Compl. ¶¶ 129-38).  Broadcom expects to sell chipsets for use in B3G and 4G applications.  Accordingly, Broadcom would be a customer in the market for that technology, and therefore would be injured by having to pay higher prices as a result of such a lessening of competition.  *See, e.g., Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235-37 (9th Cir. 1998) (reversing district court's summary judgment dismissing on standing grounds Section 7 claim of customer in market where acquisition caused substantial lessening of competition); *see also Cent. Telecommc'ns v. TCI Cablevision, Inc.*, 800 F.2d 711, 727-29 (8th Cir. 1986) (concluding that plaintiff, trying to become a cable television operator, had standing under Section 4 (and therefore under Section 16) where it demonstrated experience and expertise in the field).  To the extent Qualcomm argues otherwise, it merely seeks to substitute facts of its own invention for those in the complaint.  Broadcom certainly alleges the "experience and expertise" in the field (*see* Compl. ¶¶ 4, 12, 31) to convey standing.  If potential customers like Broadcom were not allowed to challenge the transaction, no private party would be.[29]

---

[29] Qualcomm's related argument that, because no standard for B3G or 4G has yet been set (*see* Def.'s Mem. at 41-42), Broadcom lacks standing, is likewise wrong.  If Flarion were to remain independent, it would compete against Qualcomm for inclusion of its technology in B3G and 4G standards, including, for example, by offering more favorable licensing terms to customers like Broadcom.  That is particularly important in light of Qualcomm's assertion in its memorandum that its FRAND commitments are meaningless (*see* Def.'s Mem. at 13-17), a position to which an independent Flarion presumably would not adhere.  In any event, even if no standard is promulgated, Broadcom will be a customer.

40

Qualcomm's reliance on *Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co.,* 826 F.2d 1235 (3d Cir. 1987), is misplaced because that case applies to *competitors* of the merging parties *in the market in which competition was reduced. See* 826 F.2d at 1243 ("It is curious that [plaintiff] would assert a loss by conduct of [defendant] which, if [plaintiff] is to be credited, reduced the number of suppliers in the marketplace. If that action helps [defendant] *as a producer,* it inevitably aids [plaintiff] *as well as every other producer*." (emphasis added)). Here the anticompetitive effect is in the technology markets in which Qualcomm and Flarion compete and in which Broadcom is a *customer.* As in *Bon-Ton Stores v. May Department Stores Co.,* 881 F. Supp. 860, 877 (W.D.N.Y. 1994), where a party in Broadcom's position was held to have standing, the acquisition would enable Qualcomm to deprive Broadcom of an essential input in the downstream markets as a customer of such technology.[30]

### III. BECAUSE BROADCOM'S FEDERAL ANTITRUST CLAIMS ARE WELL-PLED, THE COMPLAINT LIKEWISE STATES CLAIMS UNDER THE STATE ANTITRUST AND UNFAIR COMPETITION STATUTES.

As to the state antitrust causes of action, Qualcomm concedes that if Broadcom *has* stated one or more federal antitrust causes of action, it likewise *has* stated state antitrust law causes of action. (Def.'s Mem. at 45.) Should the Court deny Qualcomm's motion to dismiss Broadcom's federal antitrust claims (as it should), Qualcomm therefore concedes that the Court should likewise deny Qualcomm's motion to dismiss Broadcom's state antitrust claims (Ninth Claim for Relief).

---

[30] Broadcom's reference in the Amended Complaint to being a competitor in the downstream chipset market hardly disqualifies it from bringing a Section 7 claim based on anticompetitive effects in the upstream technology markets in which it is a customer, not a competitor. *Compare Lucas Auto.,* 140 F.3d at 1237 ("We conclude that Lucas Automotive, as a competitor at the secondary level, *i.e.,* as a customer in a market controlled by a monopolist, has standing to assert a § 7 claim for equitable relief, including divestiture, under § 16.") *with Brunswick Corp.,* 429 U.S. at 488 (holding that competitor that *benefited* from alleged lessened competition in market in which it competed lacked standing for Section 7 claim).

41

Likewise, Qualcomm does not present any grounds to dismiss Broadcom's state unfair competition claims. Rather, Qualcomm detours into a premature discussion of whether Broadcom states one claim or multiple claims, ultimately concluding that, if Broadcom states claims under California's unfair competition law, it encompasses all of Broadcom's claim under the various states' statutes.[31] (Def.'s Mem. at 46.)  As with the state antitrust causes of action, however, Qualcomm concedes that, if Broadcom states a violation of the federal antitrust laws, it necessarily has stated a claim under California's unfair competition law.  (*Id.*)

Qualcomm further concedes (Def.'s Mem. at 46) that even if Broadcom failed to plead a federal antitrust violation as to one or more of its federal antitrust claims (which it did not), Broadcom still has stated a claim under California's unfair competition law if it alleges "conduct that (i) threatens an incipient violation of an antitrust law; (ii) violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law; or (iii) otherwise significantly threatens or harms competition" or "fraud."  *See also Cel-Tech Commc'ns., Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 544 & n.12 (Cal. 1999) (adopting those standards and noting they are broader than under the federal antitrust laws).

Broadcom's complaint more than meets those requirements.  First, to the extent that Qualcomm argues that Broadcom's claims are premature because they occur in markets in their formative stages, as it does, for example, as to Broadcom's claim against Qualcomm's attempted monopolization of UMTS chipsets (*see* Def.'s Mem. at 27-28) or Qualcomm's acquisition of Flarion (*see id.* at 40-43), Broadcom unquestionably alleges an "incipient" violation of the antitrust laws in those markets.  Second, the effect of Qualcomm's conduct as alleged in the

---

[31] Other than California's unfair competition law, which Qualcomm contends applies as a choice-of-law matter to the conduct at issue here, whether one or another other state's unfair competition law also applies ultimately will depend on the facts and circumstances that are revealed in discovery.

42

amended complaint would be to undermine competition in UMTS chipsets, which is comparable, at a minimum, to the kinds of harm the antitrust laws are intended to prevent. Third, Broadcom states a claim for fraud, as discussed *infra* in Section IV.B.

## IV. THE COMPLAINT'S ALLEGATIONS OF QUALCOMM'S SPECIFIC BAD FAITH COMMITMENTS AND THEIR IMPACT ON BROADCOM STATE CLAIMS FOR BREACH OF CONTRACT, PROMISSORY ESTOPPEL, FRAUD, AND TORTIOUS INTERFERENCE.

### A. The Complaint's Allegations that Qualcomm Made and Broke Binding Contractual Promises to the SDOs that Were Intended to Benefit Third Parties Like Broadcom and that Broadcom Relied on Those Promises to Its Detriment State Claims for Breach of Contract and Promissory Estoppel.

To state a claim for breach of contract, a plaintiff must simply allege the existence of a contract, a breach of that contract, and resulting damages. *See Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003); *Smith-Cook v. Nat'l R.R. Pass. Corp.*, No. 05-00880, 2005 WL 3021101, at *10 (E.D. Pa. Nov. 10, 2005); *Surya Sys., Inc. v. Sunku*, No. Civ. A. 05-146, 2005 WL 1514225, at *2 (E.D. Pa. June 24, 2005).

Qualcomm's assertion that Broadcom's contract claims are "conclusory" (Def.'s Mem. at 49) is simply wrong. Broadcom's allegations put Qualcomm on notice of the contracts it alleges, including the parties to the contracts, the nature of the contracts breached, and the basis of Broadcom's claims as a third-party beneficiary. First, Broadcom identifies by name the SDOs with whom Qualcomm formed the contracts. (Compl. ¶¶ 39, 40, 41.) Second, Broadcom specifies that prior to adoption of the UMTS standard by the relevant SDOs, Qualcomm offered "in writing that it would license its WCDMA patents on fair, reasonable, and non-discriminatory terms." (*Id.* ¶ 3.) The complaint further describes the bargain sought by Qualcomm: "In order to secure the inclusion of the WCDMA technology to which Qualcomm purports to hold essential patents included in the UMTS standard, Qualcomm made repeated and express written representations to SDOs, including the ITU, ETSI, and 3GPP, that it would license any of its

43

essential WCDMA patents on FRAND terms." (*Id.* ¶ 84.) The SDOs accepted Qualcomm's

representations, and in exchange included its technology within the scope of the UMTS standard.

(*Id.* ¶¶ 85, 188.) Qualcomm then breached the contracts by licensing on non-FRAND terms. (*Id.*

¶¶ 13, 86, 188.) Qualcomm's breach has injured Broadcom. (*Id.* ¶¶ 86, 189.) Each of the cases

cited by Qualcomm address claims against multiple defendants and focuses on ambiguity as to

which defendants were parties to the contracts at issue, which is plainly not at issue here. *See,*

*e.g., Kirschner v. Cable/Tel Corp.*, 576 F. Supp. 234, 245 (E.D. Pa. 1983); *Barrett v. U.S.*

*Banknote Corp.*, No. 7420 (RPP), 1992 WL 232055, at *9 (S.D.N.Y Sept. 2, 1992).[32]

Any argument that Broadcom has failed to allege contracts to which it is a third-party

beneficiary likewise fails. As this court has explained, third-party beneficiary status is a factual

question and there is no requirement that a third-party beneficiary be named on the face of the

contract, where, as here, the circumstances suggest that one or more third parties were the

intended beneficiary. *R.J. Longo Constr. Co., Inc. v. Transit Am., Inc.*, 921 F. Supp. 1295, 1309

(D.N.J. 1996).[33] Indeed, Qualcomm's agreements to license on FRAND terms would make no

sense if not enforceable by those that seek to license the technology.

Courts in identical factual circumstances have found that potential licensees may be third-

party beneficiaries to a technology licensor's commitments to an SDO and have denied motions

to dismiss based on the identical arguments that Qualcomm raises here. *See, e.g., Agere Sys.*

*Guardian Corp. v. Proxim, Inc.,* 190 F. Supp. 2d 726, 738 (D. Del. 2002) (denying motion to

dismiss and explaining, "While Agere Guardian is correct that, on the merits, Proxim will have

---

[32] In *Kirschner*, the court expressly rejected one of the arguments that Qualcomm advances here
– that it was necessary under Rule 8 to have detailed allegations regarding the terms of the
contracts or the circumstances leading to the alleged breach. 576 F. Supp. at 244-45.
[33] The court analyzed third party beneficiary status in *R.J. Longo* under the Pennsylvania law of
contracts but specifically noted that ultimate determination of what law governs a contract is
likewise dependent on a factual inquiry. 921 F. Supp. at 1306 n.13.

to prove that there was a contractual relationship between the parties and that Proxim was an intended beneficiary of the contract, that does not mean that the claim, as alleged, is futile."); *ESS Tech., Inc. v. PC-Tel, Inc.,* No. C-99-20292 RMW, 1999 WL 33520483, at *4 (N.D. Cal. Nov. 4, 1999) (denying motion to dismiss a claim for specific performance by third-party licensees based on defendant's commitments to ITU to license on FRAND terms).

The complaint also states a claim for promissory estoppel, which requires *less* than is required for a breach of contract claim. *See, e.g., R.J. Longo Constr. Co.,* 921 F. Supp. at 1305 ("promissory estoppel obviates plaintiff's need to establish the formal elements of a contract"). Broadcom alleges reasonable reliance on Qualcomm's promise to license on FRAND terms. (Compl. ¶ 85.) Broadcom further alleges that Qualcomm's FRAND commitments were a promise upon which Broadcom could be expected to and did, in fact, rely. (*Id.* ¶¶ 193-94.) No more is required.

Finally, Qualcomm's argument that it did not make a "clear and definite promise" when it agreed to license on FRAND terms is wrong as a matter of fact and certainly inappropriate for a motion to dismiss. Indeed, when presented with a nearly identical promise to license on FRAND terms, the court in *ESS Technology* held that it "easily" could determine the meaning of the promise by looking at the customary practices of the defendant and the relevant industry but that such an inquiry into factual matters "would be outside the scope of the pleadings." 1999 WL 33520483 at *4.[34] *See also supra* Section II.A.4 (discussing judicial enforceability of FRAND commitment).

---

[34] The sole case that Qualcomm advances, *Watson v. City of Salem,* 934 F. Supp. 643 (D.N.J. 1995), was decided at the summary judgment stage, not on a motion to dismiss. Moreover, later courts have rejected the doctrinal underpinning of what Qualcomm advances as "the sine qua non" of promissory estoppel – a "clear and definite promise by the promisor" (*see* Def.'s Mem. at 49). *See, e.g., Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc.,* 307 N.J. Super. 461, 472, 704

**B.** **The Complaint's Specific Identification of Qualcomm's FRAND Commitments to SDOs, Qualcomm's Bad Faith, the SDOs' Reliance, and the Effect of Qualcomm's Broken Promises State a Claim for Fraud.**

Despite Broadcom's detailed allegations regarding the fraudulent statements that Qualcomm made to the SDOs in which it committed to licensing its patents on FRAND terms, Qualcomm argues that Broadcom's fraud claims should be dismissed because (1) Broadcom's pleading lacks the requisite particularity, and (2) FRAND commitments cannot support fraud claims as a matter of law. Qualcomm is wrong on both counts, and the court should deny its motion to dismiss Broadcom's fraud claim (Thirteenth Claim for Relief).

**1.** **Broadcom's Fraud Claim Is Pled with Sufficient Particularity to Satisfy Fed. R. Civ. P. 9(b).**

Broadcom has pled its fraud claim with the requisite particularity. Contrary to the implications of Qualcomm's position, a fraud claim need neither "describe the precise words used" nor pinpoint the "date, place or time" of the fraud, because such requirements represent "too narrow an approach and fail[] to take account of the general simplicity and flexibility contemplated by the rules." *Christidis v. First Penn. Mortgage Trust*, 717 F.2d 96, 100 (3d Cir. 1983). Rather, a plaintiff may satisfy the pleading requirements of Fed. R. Civ. P. 9(b) in *either* one of two ways: (1) by describing the "date, place, or time" of the fraud, *or* (2) through "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). Qualcomm essentially ignores the alternative second means of meeting the Rule 9(b) requirement. *See also United States v. Metzinger*, No. Civ. A. 94-7520, 1996 WL 412811, at *5 (E.D. Pa. July 18, 1996) ("The Rule 9(b) standard . . . is 'a generous one.'").

---

A.2d 1321, 1326 (N.J. Super. Ct. App. Div. 1998) ("the strict adherence to proof of a 'clear and definite promise' as discussed in *Malaker* [on which *Watson* relied] is being eroded by a more equitable analysis designed to avoid injustice").

46

Broadcom's extensive allegations of Qualcomm's fraudulent commitments to the SDOs to license on FRAND terms satisfy the requirement to provide "precision and some measure of substantiation." Broadcom's complaint sets forth *what* the fraudulent statements were ("representations . . . that it [Qualcomm] would license any of its essential WCDMA patents on FRAND terms" (Compl. ¶ 84)), *who* made them (Qualcomm), *to whom* (the SDOs), *how* Qualcomm made them ("repeated and express written representations" (*id.*)), *when* Qualcomm made them ("as the UMTS standard was being developed" (*id.* ¶¶ 84, 41)), and *why* Qualcomm made them ("in order to secure the inclusion of the WCDMA technology to which Qualcomm purports to hold essential patents included in the UMTS standard" (*id.* ¶ 84)).[35] Broadcom's complaint likewise provides ample allegations of the wrongdoing engaged in by Qualcomm. Specifically, Qualcomm (1) represented to the SDOs and to the public that if its patented technology was incorporated into the UMTS standard, it would license that technology to all practitioners of the standard on FRAND terms (*id.* ¶ 197), (2) Qualcomm had no intent to do so (*Id.* ¶ 198), (3) Qualcomm intended to induce reliance on its representations (*id.*), and (4) Broadcom and others, including the SDOs reasonably relied on Qualcomm's representations to their detriment (*id.* ¶¶ 199-200). From those allegations, Qualcomm knows exactly what statements are at issue – the statements wherein Qualcomm committed to the SDOs and the

---

[35] Broadcom is not, of course, required to identify the specific individual at Qualcomm who made the fraudulent statements nor the specific individuals at the SDOs who received them. Organizational identity is enough. *See, e.g., In re Ann Taylor Stores Securities Litig.*, 807 F. Supp. 990, 1005 (S.D.N.Y. 1992) ("Furthermore, identification of statements made by, or on behalf of, a corporate defendant . . . satisf[ies] Rule 9(b)."); *AAR International, Inc. v. Vacances Heliades S.A.*, 202 F. Supp. 2d 788, 800 (N.D. Ill. 2002) ("where the only defendant is a corporation or institution, the institutional identity of the caller, viz. that she or he was from the corporate defendant, is what matters" (internal quotation marks and alterations omitted)); *SEC v. Park*, 99 F. Supp. 2d 889, 901 (N.D. Ill. 2000) (denying a motion to dismiss because identifying the organizational affiliation of the defrauded "reasonably notif[ies] the defendants of their purported role in the scheme").

industry to license its intellectual property that it said was "essential" to practicing the UMTS standard on FRAND terms.

Courts in this Circuit repeatedly have denied motions to dismiss fraud claims that were alleged with substantially *less* detail than found in Broadcom's complaint. *See, e.g. Tumi, Inc. v. Excel Corp.*, No. 05-0477 (WJM), 2005 WL 1828593, at *4-5 (D.N.J. Aug. 1, 2005) (allegations limited to existence of contract and averment that defendant had no intention to abide by it); *Little Souls Inc. v. State Auto Mut. Ins., Co.*, No. Civ.A. 03-5722, 2004 WL 503538, at *3 (E.D. Pa. Mar. 15, 2004) (allegations that insurance company "marketed itself as a trustworthy and reliable insurer that will promptly and fairly evaluate and pay claims, but actually had a corporate policy to pay as little and as late as it can"); *Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 441 (D. Del. 1999) (allegations that defendants defrauded plaintiff "by concealing the actual assets and proceeds of the business," "misrepresenting the assets and proceeds of the business," and "made other misrepresentations"); *Mannkraft Corp. v. Bearman*, CIV. A. No. 88-2997, 1988 WL 124720, at *2-3 (D.N.J. 1988) (mail and wire fraud claim allowed to go forward despite plaintiff's failing "to set out who sent documents through the mail or made wire communications, what documents were sent, and when such documents or wire communications were transmitted"); *see also Carter Footwear, Inc. v. Graystone World-Wide, Inc.*, 189 F.R.D. 328, 330 (M.D. Pa. 1999) (claims against individual defendants based simply on their positions within a corporate defendant, despite lack of specific allegations about their role in the alleged fraudulent scheme).

### 2. Qualcomm Cannot Evade Liability for Fraud by Calling Its FRAND Commitments Unenforceable.

Qualcomm's argument that FRAND commitments cannot support a fraud claim as a matter of law because the meaning of FRAND is not sufficiently definite (Def.'s Mem. at 14-17)

48

is wrong. Under Qualcomm's conception, it could (as Broadcom alleges it did here) make FRAND commitments with no intention of following through on them, without regard to the reliance that others in the industry, including Broadcom, placed on them. *See also supra* Section II.A.4 (discussing judicial enforcement of FRAND commitment).

Qualcomm's reliance on *Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004), is misplaced. In *Lum*, class action plaintiffs asserted RICO claims against a number of large banks related to the banks' practices of soliciting borrowers on the basis that the interest rate that the banks would charge would be related to the "prime rate." The plaintiffs contended the term "prime rate" should be interpreted to mean the rate charged to the banks' best commercial customers, based not on anything that the plaintiffs were told, but rather on an alleged "common understanding." The banks professed a different interpretation of "prime rate," including a definition in some of their written materials that the plaintiffs contended were fraudulent. When the banks sent out routine credit card statements and like documents through the mails, plaintiffs alleged, they committed mail fraud, providing the predicate acts for claims under the RICO statute.[36]

The pivotal circumstances upon which the Third Circuit based its decision in *Lum* are missing here. In particular, the court found that the term "prime rate" was defined in the supposedly fraudulent statements in a way that *was consistent* with how it was applied and, as such, there could be no fraud. 361 F.3d at 227. Plaintiffs tried to avoid this obvious fatal flaw in their case by arguing that, despite the definition in the actual supposedly fraudulent statement,

---

[36] It "has been demonstrated in numerous judicial decisions" that federal courts "have shown a tendency to be more demanding in their application of Rule 9(b) for claims under the Racketeer Influenced and Corrupt Organizations Act (RICO Act), particularly with regard to pleading the predicate acts for claims of extortion and wire and mail fraud." 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1297 (3d ed. 2005). Broadcom does not assert RICO claims and thus should not be held to the standard employed in RICO cases.

the banks committed fraud because plaintiffs alleged they had a different definition in mind. The Third Circuit properly rejected that farcical argument. *Id.* at 226-27. In doing so, the court noted that the argument made particularly little sense in light of ambiguity over the term "prime rate" as used in common practice. *Id.* at 226.

The Third Circuit certainly did not – as Qualcomm would argue – hold that fraud is impossible just because there is more than one reasonable interpretation of the commitment upon which the fraudster has reneged. So, for example, in *Lum*, had the banks offered credit cards at the "prime rate," intending all along to charge rates that were not consistent with the definition in their correspondence with their customers and then did so, that would be fraud. Similarly, had the agreement not defined "prime rate" at all and the banks, intending all along to charge rates that were wildly out of line with any reasonable interpretation of the term "prime rate," then did so, that would be fraud as well.

Those were not the facts of *Lum,* but they are the facts here. Broadcom alleges that Qualcomm, having promised – through active misrepresentations and falsehoods to the SDOs – to license on "fair, reasonable, and non-discriminatory terms," instead intended all along to license on terms that are "unfair," "unreasonable," and quite clearly "discriminatory." (*E.g.* Compl. ¶¶ 3, 13, 82-111.) Whether Qualcomm did so or not is a factual dispute that cannot be resolved on a motion to dismiss under Rule 12(b)(6). The Court accordingly should deny Qualcomm's motion to dismiss Broadcom's fraud claim, specifically its Thirteenth Claim for Relief.

C.    **The Complaint's Allegations that Qualcomm's Actions Have Interfered with Broadcom's Sales of UMTS Chipsets to Handset Manufacturers State Claims for Tortious Interference.**

Qualcomm concedes that, if Broadcom has stated a claim under the federal antitrust laws, it has likewise stated claims for tortious interference, regardless of whether New Jersey or

50

California law is applied. (*See* Def.'s Mem. at 48-49.) As demonstrated above, Broadcom has stated such claims. Therefore, Qualcomm's motion to dismiss Broadcom's tortious interference claims (Tenth Claim for Relief) should be denied.

Qualcomm is wrong, however, to limit the inquiry to California law. As alleged in the complaint, several of the customers at issue are located in New Jersey, and New Jersey law may therefore apply to one or more of the related tortious interference claims. (Compl. ¶ 29.) It is premature at this stage of the proceedings to decide which jurisdictions' law will apply, and Broadcom is entitled to the benefit of any doubt. *See, e.g., First Wall St. Capital Corp. v. Int'l Prop. Corp.*, No. 97 Civ. 0702(JGK), 1998 WL 823619, at *7 (S.D.N.Y. Nov. 25, 1998) (denying motion to dismiss where law of one of the two plausible jurisdictions allowed claim to go forward but other did not); *Employers Mut. Cas. Co. v. Key Pharms., Inc.*, No. 91 Civ. 1630 (LBS), 1992 WL 8712, at *8 (S.D.N.Y. Jan. 16, 1992) (finding that facts relevant to determining choice of law were disputed by the parties and thus declining to decide choice of law issue until completion of discovery).

The choice-of-law question may have some relevance here, because, as Qualcomm acknowledges (Def.'s Mem. at 48), under New Jersey law, there is no requirement that the plaintiff allege that the defendant engaged in independently wrongful conduct. Rather, "[t]o establish a cause of action for tortious interference with a prospective economic advantage, a plaintiff must prove that he had a reasonable expectation of advantage from a prospective contractual or economic relationship, that defendant interfered with this advantage intentionally and without justification or excuse, that the interference caused the loss of the expected advantage, and that the injury caused damage." *Patel v. Soriano*, 369 N.J. Super. 192, 242, 848 A.2d 803, 831 (N.J. Super. Ct. App. Div. 2004); *see also Syncsort, Inc. v. Innovative Routines*

51

*Int'l, Inc.*, No. Civ. 04-3623(WHW), 2005 WL 1076043, at *11 (D.N.J. May 6, 2005) (denying motion to dismiss tortious interference claims in part because antitrust claims were stated and noting, "to the extent [counter-defendant] argues that its purpose was to advance its own interest in competing with defendant, that argument is more properly the subject of a motion for summary judgment rather than a motion to dismiss."). Broadcom's allegations meet the pleading requirement under New Jersey law independently of its antitrust claims. (*See* Compl. ¶¶ 185-86.) Thus, regardless of whether Broadcom adequately has pled antitrust claims, it alleges a claim for tortious interference under New Jersey law.

## CONCLUSION

For the foregoing reasons, Broadcom respectfully requests that the Court deny Qualcomm's motion to dismiss in its entirety.

Dated: January 17, 2006

Respectfully submitted,

DAVID S. STONE (DSS-8580)
Boies, Schiller & Flexner LLP
150 John F. Kennedy Memorial Parkway
Short Hills, NJ 07078
(973) 218-1111

Counsel for Plaintiff Broadcom Corporation

Of Counsel:

Boies, Schiller & Flexner LLP
David Boies
David A. Barrett
Steven C. Holtzman
Scott E. Gant
Damien J. Marshall
Kieran P. Ringgenberg
570 Lexington Avenue
New York, NY 10022
(212) 446-2300
Fax: (212) 446-2350

Cleary Gottlieb Steen & Hamilton LLP

George S. Cary
Mark W. Nelson
Steven J. Kaiser

2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500
Fax: (202) 974-1999

Exhibit 6

William S. Feiler
MORGAN & FINNEGAN, L.L.P.
3 World Financial Center
New York, New York 10281
(212) 415-8700
(212) 415-8701 (FAX)

Attorneys for
Ericsson Inc.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BROADCOM CORPORATION, | |
| Plaintiff, | |
| v. | CASE NO.: 05-3350 (MLC) |
| QUALCOMM INCORPORATED, | |
| Defendant. | |

## OBJECTIONS TO QUALCOMM'S SUBPOENA
## TO ERICSSON INC.
## <u>COMMANDING PRODUCTION OF DOCUMENTS</u>

Pursuant to FED. R. CIV. P. 45(c)(2)(B), third party Ericsson Inc. ("Ericsson") hereby objects to the Subpoena for documents served on February 27, 2006 by defendant ("Qualcomm").

978295 v2

Any response indicating that a document will be produced is not a representation that any such document currently exists. Such response only indicates that, subject to any and all objections, if any document does exist, it will be produced for inspection.

## GENERAL OBJECTIONS

1.     Ericsson objects to Qualcomm's Subpoena to the extent it seeks to impose, through definitions or otherwise, obligations on Ericsson beyond those specified in Fed. R. Civ. P. 26, 30, 34 & 45, other applicable Federal Rules and the Local Civil Rules of this Court.

2.     Ericsson objects to Qualcomm's Subpoena to the extent it seeks information that is neither relevant to the subject matter involved in the pending action nor reasonably calculated to lead to the discovery of admissible evidence.

3.     Ericsson objects to Qualcomm's Subpoena to the extent it seeks documents regarding activities taking place outside the United States of America.

4.     Ericsson objects to Qualcomm's Subpoena to the extent it seeks information protected from discovery under the attorney-client privilege, attorney work product immunity, common interest privilege, and/or any other applicable privilege or immunity. In all instances, Ericsson intends to preserve its attorney-client privilege, attorney work product immunity, common interest privilege, and/or any other privilege or immunity to the full extent applicable. No document will be produced that is subject to a

978295 v2

claim of attorney-client privilege, attorney work product immunity, common interest privilege, and/or any other applicable privilege or immunity.  If any such documents are disclosed, except pursuant to a specific written agreement covering such documents, the disclosure shall be deemed inadvertent and shall not constitute a waiver of any applicable privilege.  Ericsson will identify documents withheld from discovery on grounds of attorney-client privilege, work product immunity, common interest privilege, and/or any other applicable privilege or immunity, if any, and will expressly identify the basis for the privilege or immunity asserted in a manner consistent with the Federal Rules of Civil Procedure and the Local Rules of this Court, and at a time agreed upon by counsel.  Ericsson also reserves the right to assert other privileges on its own under Fed. R. Evid. 501.

5.     Ericsson objects to providing any confidential, competitively-sensitive, or proprietary information in the absence of an appropriate Protective Order entered by the Court.  Ericsson further objects to the production of documents containing confidential or proprietary information not relevant to the subject matter of this litigation.  Ericsson further objects to the production of documents that contain confidential information of third parties that cannot be disclosed by Ericsson due to contractual obligation.

6.     Ericsson reserves the right to redact information from any document provided for inspection and copying which is: (i) not responsive to Qualcomm's Subpoena; (ii) irrelevant; and/or (iii) subject to an objection specified herein.

-3-

7.    Ericsson objects to the definition of the term "QUALCOMM" to the extent that it attempts to extend coverage beyond the corporation Qualcomm Incorporated.

8.    Ericsson objects to the definition of the term "Broadcom" to the extent that it attempts to extend coverage beyond the corporation Broadcom Corporation.

9.    Ericsson objects to the definition of the term "Ericsson" to the extent that it attempts to extend coverage beyond the corporation Ericsson Incorporated.

10.    Ericsson objects to the definition of the term "NEC" to the extent that it attempts to extend coverage beyond the corporation NEC Corporation.

11.    Ericsson objects to the definition of the term "Nokia" to the extent that it attempts to extend coverage beyond the corporation Nokia Corporation.

12.    Ericsson objects to the definition of the term "Panasonic Mobile Communications" to the extent that it attempts to extend coverage beyond the corporation Matsushita Electric Industrial Co., Ltd.

13.    Ericsson objects to the definition of the term "Sony Ericsson" to the extent that it attempts to extend coverage beyond the corporation Sony Ericsson Mobile Communications AB.

978295 v2

14.     Ericsson objects to the definition of the term "Texas Instruments" to the extent that it attempts to extend coverage beyond the corporation Texas Instruments Incorporated.

15.     Ericsson objects to the definition of the term "agreement" to the extent that it attempts to extend coverage beyond executed agreements.

16.     Ericsson objects to the "Definitions" and "Instructions" sections of Qualcomm's Subpoena to the extent they attempt to impose obligations on Ericsson in responding to the Subpoena beyond those imposed by the Federal Rules of Civil Procedure and the Local Civil Rules of this Court.

17.     Ericsson objects to Qualcomm's Subpoena with respect to the identification of documents lost, destroyed, erased or no longer in Ericsson's possession, to the extent it seeks to impose obligations on Ericsson beyond those specified in Fed. R. Civ. P. 34 & 45.

18.     Ericsson objects to Qualcomm's subpoena in its entirety on the grounds that it is overly broad and unduly burdensome to the extent it calls for "all" documents as including production of multiple duplicate copies of documents and/or documents already in the possession of Qualcomm.

19.     Ericsson objects to Qualcomm's subpoena in its entirety on the grounds that it is overly broad, vague, unduly burdensome and oppressive, and calls for

-5-

the production of documents that are not relevant to this action and are not reasonably calculated to lead to the discovery of admissible evidence.

20.    Ericsson objects to the time and place requested for production of documents as being unduly burdensome.  Production of any documents required by the subpoenas will be produced at the New York office of Morgan & Finnegan, L.L.P. at a mutually convenient date.

21.    Ericsson's responses are not intended to waive or prejudice any objections Ericsson has raised or may assert now or in the future, including objections as to the admissibility at trial of any response or information or category of responses or information.

22.    Ericsson reserves the right to supplement or revise its objections and responses to the Subpoena.

23.    Ericsson objects to the requests to the extent that they seek documents already in the possession of Qualcomm, and/or documents available from public sources on the grounds that such requests are unduly burdensome.

24.    Ericsson objects to each topic to the extent that such topic seeks information dated after the filing of the Complaint in this action on July 1, 2005.

25.    Ericsson objects to the production of documents dated before July 1, 2001 on the ground of relevance and that such documents are not likely to lead to admissible evidence.  This date is four years prior to Broadcom's filing of the Complaint

-6-

in this action.  Since any action under the federal antitrust laws and the New Jersey Antitrust Act must be commenced within four years after the cause of action accrues, any documents created more than four years before the filing date are not relevant to the subject matter involved in the pending action nor would such documents lead to the discovery of admissible evidence.

26.    Ericsson objects to the production of electronically stored information kept on individual devices and other electronic records not kept on central servers of Ericsson located in the United States as unduly broad and burdensome and not likely to lead to admissible evidence.  Ericsson further objects to the production of electronically stored information not reasonably accessible including without limitation "deleted" files, embedded data, such as meta data, revision or tracking information, object coding, website source coding or the like, and system logs as unduly broad and burdensome and not likely to lead to admissible evidence.  Ericsson also objects to the production of electronically stored information contained in inactive archival information and back ups of all kinds as unduly burdensome and not likely to lead to admissible evidence.

27.    Ericsson objects to bearing the cost of production, restoration and duplication of all documents requested as unduly burdensome in view of the third party status of Ericsson.

28.    Ericssson objects to producing information in paper form and reserves the right to produce documents in the media and format as kept by Ericsson.

29.    Ericsson objects to the production of any documents prior to a final decision by the court on the pending motion to dismiss filed by Qualcomm on the basis that any production is unduly burdensome and totally irrelevant in the event that the motion is granted.

30.    Ericsson has not completed its investigation into the subject matter of the action or the underlying facts, evidence or allegations.  Accordingly, this response is made to the best of Ericsson's current knowledge, information and belief.  Ericsson reserves the right to conduct additional investigation and to assert additional objections.

## SPECIFIC OBJECTIONS TO REQUESTS
## FOR DOCUMENTS TO BE PROVIDED

REQUEST NO. 1

All documents relating to Ericsson's communications with any SDO or any committee of any SDO relating to any mobile wireless communications standard or technology.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence.  Ericsson also objects to this request to the extent it calls for publicly available information available to Qualcomm.

-8-

978295 v2

REQUEST NO. 2

All documents relating to Ericsson's communications with anyone relating to an SDO's evaluation or consideration of any mobile wireless communications standard or technology.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence.

REQUEST NO. 3

All documents relating to the adoption by any SDO of any standard that utilizes or otherwise implements WCDMA technology.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide communications to United States based SDOs relating to WCDMA technology as that term is best understood, if any.

REQUEST NO. 4

All documents relating to the adoption by any SDO of any standard that utilizes or otherwise implements CDMA technology.

-9-

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Ericsson also objects to this request to the extent it calls for publicly available information available to Qualcomm.

REQUEST NO. 5

All documents relating to the meaning of licensing on RAND terms, in the context of any commitment by anyone to any SDO.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Ericsson also objects to this request to the extent it calls for publicly available information.

REQUEST NO. 6

All documents relating to licenses or prospective licenses to any Ericsson patent essential to any mobile wireless communications standard, including, but not limited to, documents relating to (i) offers to license; (ii) requests that any other person or company obtain a license; (iii) proposals to license; (iv) licensing terms; (iv) Ericsson's licensing practices; (v) Ericsson's licensing policies; and (vi) all proposed or executed license agreements.

-10-

978295 v2

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence.

REQUEST NO. 7

All documents relating to licenses or prospective licenses to any non-Texas Instruments patent essential to any mobile wireless communications standard, including, but not limited to, documents relating to (i) offers to license; (ii) requests that Ericsson obtain a license; (iii) proposals to license; (iv) licensing terms; (iv) anyone's licensing practices; (v) anyone's licensing policies; and (vi) all proposed or executed license agreements.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide documents of licensing Qualcomm patents in the United States relating to WCDMA technology for Universal Mobile Telephone System, if any.

-11-

<u>REQUEST NO. 8</u>

All documents relating to any agreements between Ericsson and Broadcom.

<u>RESPONSE</u>

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide documents of United States patent license agreements relating to WCDMA technology for Universal Mobile Telephone System, if any.

<u>REQUEST NO. 9</u>

All documents relating to any agreements between Texas Instruments and Ericsson.

<u>RESPONSE</u>

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide documents of United States patent license agreements relating to WCDMA technology for Universal Mobile Telephone System, if any.

REQUEST NO. 10

All documents relating to any agreements between Ericsson and Nokia.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide documents of United States patent license agreements relating to WCDMA technology for Universal Mobile Telephone System, if any.

REQUEST NO. 11

All documents relating to the ability of any provider or carrier to adopt or deploy different wireless technologies, including 3G, 4G or other mobile wireless technology.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Ericsson additionally objects to this request as it is unclear in the terminology "4G." Subject to the foregoing, Ericsson will provide documents of any United States provider or carrier relating to 3G WCDMA technology for Universal Mobile Telephone System, if any.

-13-

REQUEST NO. 12

All documents concerning the ability, or lack of ability, of any wireless telecommunications carrier or carriers, whether specifically or generally, to switch from (or the costs, time, or other resources involved in switching from) one mobile wireless telecommunications technology, system or network to another, including without limitation switching from CDMA-based systems or networks to non-CDMA based systems or networks.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide documents of any United States wireless telecommunication carrier involving switching to WCDMA technology for Universal Mobile Telephone System, if any.

REQUEST NO. 13

All documents concerning Ericsson's efforts to induce any wireless telecommunications carrier to switch from one mobile wireless telecommunications technology, system or network to another, including without limitation switching from CDMA-based systems or networks to non-CDMA based systems or networks.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to

-14-

relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide documents of any United States wireless telecommunication carrier involving switching to WCDMA technology for Universal Mobile Telephone System, if any.

REQUEST 14

All documents concerning actual or potential competition in the design or sale of chipsets for use in mobile wireless telecommunications devices, including (i) market shares, competitive position, and competitors, including any comparison of relative strengths and weaknesses, number of customers, revenues, Ericsson's attempts to win customers from other companies or increase usage of Ericsson products, losses of customers to other companies, and responses to the entry of new competitors; (ii) competitive analyses of mobile wireless communications products, including improvements or innovations in features, functions, ease of operation, performance, cost, or other advantages to customers or users; and (iii) supply and demand conditions, including the impact of substitutes.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide documents of the requested activities occurring in

the United States and relating to WCDMA technology for Universal Mobile Telephone System, if any.

REQUEST NO. 15

All documents relating to an entry or potential entry of a new competitor into the market for chips or chipsets for use in mobile wireless communications.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide documents involving the United States market and relating to WCDMA technology for Universal Mobile Telephone System, if any.

REQUEST NO. 16

All documents relating to the market or potential market for WiMax.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence.

-16-

REQUEST NO. 17

All documents relating to the prices and terms offered to Ericsson by prividers [*sic*] of wireless communication chips, including documents relating to any incentives, rebates or bundling related to any wireless communication chip and all agreements for the sale or purchase of wireless communication chips.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology or products, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide documents involving the United States market and relating to WCDMA technology for Universal Mobile Telephone System, if any.

REQUEST NO. 18

All documents relating to Ericsson's communications with any provider or prospective provider of wireless communication chips relating to any person's rights to make or sell wireless communication chips or with respect to any person's right to use any such chips.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology or products, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence.

-17-

Subject to the foregoing, Ericsson will provide documents involving the United States market and relating to WCDMA technology for Universal Mobile Telephone System, if any.


REQUEST NO. 19

All documents relating to any inability of any supplier of materials or services related to wireless communication chips to meet Ericsson's demands for such materials.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology or products, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide documents involving the United States market and relating to WCDMA technology for Universal Mobile Telephone System, if any.


REQUEST NO. 20

All documents relating to QUALCOMM's entry into the UMTS chip business.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to time or geographical region, fails to request information relevant to the action, and is not

-18-

likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide documents involving the United States market and relating to WCDMA technology for Universal Mobile Telephone System, if any.

REQUEST NO. 21

All documents relating to Broadcom or QUALCOMM.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Ericsson also objects to the extent the request seeks information requested in other requests.

REQUEST NO. 22

All documents relating to any complaint by anyone to the European Commission alleging that QUALCOMM is violating the competition law of the European Union or its member states.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Ericsson

-19-

also objects to the extent the request calls for information that cannot be disclosed because of an applicable law, regulation or order.

REQUEST NO. 23

All documents relating to any communication between or among Broadcom, Ericsson, NEC, Nokia, Panasonic Mobile Communications, Sony Ericsson, and Texas Instruments relating to QUALCOMM, standards or licensing terms, including RAND terms.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Ericsson also objects to the extent the request calls for information that cannot be disclosed because of an applicable law, regulation or order.

REQUEST NO. 24

All joint defense agreements, common interest agreements or any other agreements between Ericsson and anyone relating to any dispute, litigation, or government investigation involving QUALCOMM.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to

-20-

relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence.

REQUEST NO. 25

All documents relating to any communications with any person or company about any dispute or disputes between Broadcom and QUALCOMM or between Ericsson and QUALCOMM.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence.

REQUEST NO. 26

All documents relating to communications or meetings between Ericsson and Broadcom, Sony Ericsson, Texas Instruments or Nokia relating to any of the following topics: (a) any market related to mobile wireless communications; (b) competition between or among companies in the mobile wireless communications industry; (c) products in the mobile wireless communications industry; (d) competitors of Sony Ericsson, Ericsson, Texas Instruments, Nokia, or Broadcom in any market related to mobile wireless communications; (e) customers of Sony Ericsson, Ericsson, Texas Instruments, Nokia, or Broadcom in any market related to mobile wireless communications; (f) prices in the mobile wireless communications industry; (g) licensing in the mobile wireless communications industry; (h) SDOs that

-21-

set standards for the mobile wireless communications industry; (i) any litigation or government investigation in the mobile wireless communications industry; and (j) mobile wireless technology.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence.

REQUEST NO. 27

All documents relating to any communications between Ericsson and anyone relating to QUALCOMM's licensing practices or terms or QUALCOMM's products or product sales practices or terms.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Subject to the foregoing, Ericsson will provide documents involving activities within the United States relating to WCDMA technology for Universal Mobile Telephone System, if any.

REQUEST NO. 28

All documents relating to any complaint by anyone to any government or government official of any nation or multinational organization relating to QUALCOMM.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Ericsson also objects to the extent the request calls for information that cannot be disclosed because of an applicable law, regulation or order.

REQUEST NO. 29

All documents relating to BREW, including, but not limited to, documents relating to Ericsson's communications with anyone relating to BREW.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence.

REQUEST NO. 30

All documents relating to any effort by Ericsson to make any product related to mobile wireless communications of any company ineffective, incompatible, or otherwise less desirable to consumers.

-23-

978295 v2

RESPONSE

        In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence. Ericsson additionally objects to this request as it is unclear in the terminology "mobile wireless communications."  Subject to and without waiver of the foregoing objections, as presently advised Ericsson does not possess any documents that are responsive to this Request.

REQUEST NO. 31

        All documents relating to any complaint by anyone to the European Commission Directorate General – Competition regarding Sony Ericsson, Ericsson or Nokia.

RESPONSE

        In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence.  Ericsson also objects to the extent the request calls for information that cannot be disclosed because of an applicable law, regulation or order.

REQUEST NO. 32

All documents relating to the retention or destruction of documents related to QUALCOMM or to mobile wireless communications.

RESPONSE

In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence.

REQUEST NO. 33

All documents relating to Ericsson's litigation with Samsung styled Ericsson Inc. et al. v. Samsung Electronics Co. et al., No. 02-06CV-63 (E.D. Tex. filed Feb. 20, 2006), and related foreign litigations.

-25-

RESPONSE

      In addition to the General Objections set forth above, Ericsson objects to this request as being overly broad and ambiguous, especially since it is not limited to relevant technology, time or geographical region, fails to request information relevant to the action, and is not likely to lead to the discovery of admissible evidence.


                  Respectfully submitted,


Dated: April 7, 2006               By: _William S. Feiler_

                              William S. Feiler
                              MORGAN & FINNEGAN, L.L.P.
                              3 World Financial Center
                              New York, New York 10281
                              Tel:  (212) 415-8700
                              Fax:  (212) 415-8701

                              Attorneys for Third Party
                              Ericsson Inc.

-26-

<u>**CERTIFICATE OF SERVICE**</u>

On this 7th day of April, 2006, I caused copies of the attached

**OBJECTIONS TO QUALCOMM'S SUBPOENA
TO ERICSSON INC.
<u>COMMANDING PRODUCTION OF DOCUMENTS</u>**

to be served, via Federal Express, upon the below listed counsel:

> Richard J. Stark
> Cravath Swaine & Moore LLP
> 825 Eighth Avenue
> New York, New York 10019
> Counsel for Qualcomm Incorporated
>
> David S. Stone
> Boies, Schiller, & Flexner, Esqs.
> 150 John F. Kennedy Parkway
> 4th Floor
> Short Hills, New Jersey 07078
> Counsel for Broadcom Corporation

I certify under the penalty of perjury that the foregoing is true.

Executed on April 7, 2006

_____
Danielle Vincenti Tully

-27-

Exhibit 7

# CRAVATH, SWAINE & MOORE LLP

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

THOMAS R. BROME
ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN E. BEERBOWER
EVAN R. CHESLER
PATRICIA GEOGHEGAN
D. COLLIER KIRKHAM
MICHAEL L. SCHLER
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
NEIL P. WESTREICH
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON

DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON
JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
WILLIAM B. BRANNAN
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
JOHN T. GAFFNEY
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS

KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III
WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS

DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
JOEL F. HEROLD
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL

SPECIAL COUNSEL
SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III
THOMAS D. BARR

OF COUNSEL
ROBERT ROSENMAN
CHRISTINE BESHAR

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1956

April 13, 2006

Broadcom Corporation v. QUALCOMM Incorporated

Dear Bill:

I write regarding the objections and responses of Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively, "Ericsson") to QUALCOMM's subpoenas.

Ericsson's Objections to the Costs Related to the Subpoenas. QUALCOMM is willing to discuss the costs of compliance with QUALCOMM's subpoenas with Ericsson. It must be understood, however, that Ericsson is no ordinary disinterested third party to this matter. To the contrary, Ericsson and Broadcom are apparently acting in concert in this case as well as in other, related matters. In fact, at a joint press conference by representatives of Ericsson, Broadcom and others in October, one of Broadcom's attorneys, Maurits Dolmans, stated that Broadcom was "carrying the torch in the US" on behalf of Ericsson and others. Moreover, Ericsson, together with Nokia and Texas Instruments, submitted a letter to the Court on February 24, 2006, in which Ericsson urged the Court to deny QUALCOMM's pending motion to dismiss and made several factual assertions regarding QUALCOMM, markets, license practices, FRAND terms, and standardization. Ericsson cannot now resist discovery in this matter by pretending to be an innocent bystander to this action.

Documents Regarding Activities Outside the United States. There is no basis for Ericsson's attempt to exclude from its production "documents regarding activities taking place outside the United States of America". (E.g., General Obj. 3.) As Ericsson well knows, Broadcom has alleged that the relevant markets in this action are worldwide markets. (E.g., Compl. ¶ 57.) Moreover, Broadcom's allegations explicitly implicate standards-setting outside the United States (e.g., Compl. ¶ 84) and commercial activity – including licensing – outside the United States (e.g., Compl. ¶¶ 73-74). Please let us know whether Ericsson will agree to produce relevant documents regardless of the location of the "activities" to which the documents pertain.

2

Time Scope of Production.  There is no basis for the time constraints Ericsson seeks to put on its production.  For example, standards setting and licensing related to WCDMA occurred at least as early as 1998.  Accordingly, Ericsson cannot restrict its production to documents dated on or after July 1, 2001.  There is also no basis for Ericsson's refusal to produce documents dated after July 1, 2005.  Nevertheless, to address Ericsson's objections, QUALCOMM hereby limits all of the requests to documents created between January 1, 2003, and March 31, 2006, with the exception of the following:  (1) Requests 1-5, 9-10, and 27 are limited to documents created between January 1, 1997, and March 31, 2006; (2) requests 13 and 31 are limited to documents created between January 1, 1999, and March 31, 2006; (3) license agreements responsive to requests 6 and 7 must be produced without regard to their dates; (4) with respect to other documents responsive to requests 6 and 7 related to patents essential to any WCDMA standard, the requests are limited to documents created between January 1, 1999, and March 31, 2006; and (5) agreements for the sale of chips responsive to requests 14 or 17 must be produced without regard to their dates.

Ericsson's Specific Objections.  We understand from Ericsson's specific objections that it refuses to produce any documents responsive to Requests Nos. 1-2, 4-6, 16, 21-26, 28-29, and 31-34.  As to the other requests (with the exception of Request No. 30, as to which Ericsson states that it does not have responsive documents), Ericsson states only that it will produce a small subset of responsive documents, limited to "the United States Market for WCDMA Technology for Universal Mobile Telephone System", if any such documents exist.

There is no basis for Ericsson's blanket refusal to produce responsive documents.  The documents called for by QUALCOMM's requests are relevant to Broadcom's claims and/or QUALCOMM's defenses, and must be produced.  If Ericsson has any genuine concerns about the language or scope of any of QUALCOMM's requests, we are happy to discuss them.

Production Location and Schedule.  We have no objection to production at your offices.  We will not agree, however, to Ericsson's withholding its production of documents until a decision on QUALCOMM's motion to dismiss – particularly inasmuch as Ericsson has urged the Court to deny that motion.  We believe that Ericsson should be able to collect and produce at least the following readily identifiable and unquestionably relevant documents within 30 days:

- License agreements to essential patents responsive to requests 6 and 7;

- Agreements for the sale of baseband modem chips responsive to requests 14 and 17;

- Communications and document productions to the United States Department of Justice in connection with the Department's investigation of QUALCOMM's acquisition of Flarion;

3

- Communications and document productions to the Directorate General – Competition of the European Commission in connection with Ericsson's complaint regarding QUALCOMM;

- Ericsson's high-level business plans regarding UMTS and CDMA baseband modem chips responsive to request 14; and

- The common interest or other agreements pursuant to which Ericsson will claim that responsive communications between it and Broadcom or others are privileged.

Please let us know if Ericsson agrees to produce these documents on this schedule.

* * *

I propose that we meet and confer regarding these issues this as soon as possible. Please let me know when you are available to do so.

Very truly yours,

Fabian D. Gonell

William S. Feiler, Esq.
    Morgan & Finnegan, L.L.P.
        3 World Financial Center
            New York, NY 10281

BY FAX