CLEARY GOTTLIEB STEEN & HAMILTON LLP

2000 PENNSYLVANIA AVENUE, N.W.

WASHINGTON, D.C. 20006–1801

(202) 974-1500

FACSIMILE
(202) 974-1999

WWW.CLEARYGOTTLIEB.COM

NEW YORK

PARIS

BRUSSELS

LONDON

MOSCOW

FRANKFURT

COLOGNE

ROME

MILAN

HONG KONG

BEIJING

KENNETH L. BACHMAN, JR.
SARA D. SCHOTLAND
JOHN S. MAGNEY
MARK LEDDY
JOHN C. MURPHY, JR.
DAVID M. BECKER
GEORGE S. CARY
JANET L. WELLER
MITCHELL S. DUPLER
LINDA J. SOLDO
GIOVANNI P. PREZIOSO
JOHN T. BYAM
MATTHEW D. SLATER
MICHAEL R. LAZERWITZ
DAVID I. GELFAND
MICHAEL A. MAZZUCHI
ROBERT W. COOK
MARK W. NELSON
ROBIN M. BERGEN
DEREK M. BUSH
PAUL D. MARQUARDT
BRIAN BYRNE
   RESIDENT PARTNERS

J. EUGENE MARANS
DANIEL B. SILVER
RICHARD deC. HINDS
   SENIOR COUNSEL

W. RICHARD BIDSTRUP
SCOTT N. BENEDICT
KEVIN A. GRIFFIN
STEVEN J. KAISER
   COUNSEL

JOYCE E. McCARTY
KAREN A. KERR
SCOTT R. GOODWIN
JOHN P. McGILL, JR.
   SENIOR ATTORNEYS

MATTHEW R. AYRES
JENNIFER M. BABOUNAKIS
MATTHEW I. BACHRACK
JENNIFER S. BENSON
LEE F. BERGER
MATTHEW J. BERMAN
CHINME BINITIE
KATHLEEN W. BRADISH*
LEAH BRANNON
KEVIN R. BURKE*
JEREMY CALSYN
KATHERINE M. CARROLL
JACOB M. CHACHKIN*
KERRI J. CHASE
SHAWN J. CHEN
TAMARA S. CLARK
EMILY L. COOKE*
SEAN D. COREY
ALYSON J. DAIS
LARRY C. DEMBOWSKI
ALINA D. ELDRED
DESMOND EPPEL
MICHAEL P. FRANCK*
RYAN C. GAUBERT*
MICHAEL R. HARTMAN
ELIZABETH A. HARVEY
ERIC H. HILDENBRAND

STEPHANIE SUN HINDERKS*
MEGHAN A. IRMLER
DINAH R. KNIGHT
FIANA R. KWASNIK
CHRISTOPHER T. LEAHY
JEFFREY LEASURE
JOHN R. LOATMAN
THOMAS D. McCONNELL
PATRICIA M. McDERMOTT
ANNE NEWTON McFADDEN
YASMIN MEHRAIN
ADAM J. MILLER
JENNIFER A. MORRISSEY
DAVID NUSBAUM*
AARON MARR PAGE
LAUREN L. PEACOCK
ANTONIO J. REYNOLDS
NICOLE ROTHE
PAUL R. ST. LAWRENCE III
AUDRA L. SAVAGE
OMAR SERAGELDIN
GARY SILBER
NATHANIEL F. STANKARD*
JOSHUA B. STERLING
SARAH G. TEN SIETHOFF
PETIA VRETENAROVA
JOANNE C. WALLINGTON
   ASSOCIATES

* ADMITTED ONLY TO A BAR OTHER THAN THAT OF THE DISTRICT OF COLUMBIA
   WORKING UNDER THE SUPERVISION OF PRINCIPALS OF THE WASHINGTON OFFICE

November 16, 2007

Honorable John J. Hughes
United States Magistrate Judge
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

Re:   Broadcom Corp. v. Qualcomm Inc., Civil Action No. 05-3350 (MLC)

Dear Judge Hughes:

            Pursuant to Your Honor's Order of October 18, the parties have met and conferred regarding an amended case management order.  During those discussions, the parties reached agreement on a number of issues as follows.

1.   Qualcomm shall have until December 21, 2007, to respond to Broadcom's Second Amended Complaint.  The parties will exchange any additional initial disclosure information by that date as well.

2.   If Qualcomm files a motion to dismiss, Broadcom shall have until January 25, 2008, to respond and Qualcomm shall have until February 15, 2008, to reply to that response.

3.   The deadline to assert counterclaims shall be February 29, 2008.

4.   Any motion to amend the pleadings or to join new parties shall be filed no later than October 3, 2008, and made returnable on October 27, 2008.

5.   Fact discovery shall close on December 19, 2008.

6.  Interrogatories shall be limited to 35 per side, exclusive of any interrogatories served on or before September 1, 2006.

7.  Expert discovery shall close on March 27, 2009.

8.  The form of document productions shall be as set forth in the parties' agreement of January 20, 2006.

9.  The anticipated trial date is June 2009.

With Qualcomm's assistance, we have prepared the enclosed draft amended case management order, which reflects those agreed terms.  As you will see, the draft order follows the language and conventions of Your Honor's original pretrial scheduling order of September 22, 2005.

The parties have been unable, however, to reach agreement on two issues, which we address below.  For Your Honor's convenience, the draft amended case management order notes those disagreements in the text and sets forth the parties' competing proposals.

Porting of discovery from cases with overlapping facts.  The first disagreement relates to the manner in which discovery from two other cases involving the parties will be used in this case, where those other cases had substantially overlapping facts.  Although it is eminently sensible and efficient that such discovery be deemed produced here, Qualcomm refuses to do so, even though it agreed to that approach during negotiations regarding the California unfair competition action, which Your Honor may recall was stayed in favor of this case at Qualcomm's request and over Broadcom's objection.

The two cases at issue are patent infringement actions that Qualcomm brought against Broadcom, in which it accused Broadcom of infringing patents that it alleged were essential to practice certain industry standards.  The two litigations are *Qualcomm v. Broadcom*, No. 05-CV-01392 (RMB) (S.D. Cal.) (the "1392 case") and *Qualcomm v. Broadcom*, No. 05 CV 01958B (BLM) (S.D. Cal.) (the "1958 case").  The 1392 case involved accusations by Qualcomm that Broadcom infringed certain patents that Qualcomm claimed are essential to the GSM, GPRS, EDGE, and/or UMTS standards.  The 1958 case involved accusations by Qualcomm that Broadcom infringed other patents that Qualcomm claimed are essential to a video compression standard called H.264.

The GSM, GPRS, EDGE, UMTS, and H.264 standards are the very standards at issue in this case.  Part of Broadcom's defenses in the 1392 and 1958 cases was that Qualcomm had waived its right to enforce the patents at issue by abusing the standard-setting process in connection with those standards, in particular by waiting until years after the standard was set to declare the patents essential and then only doing so as part of a strategy to undermine Broadcom as a competitor.  Qualcomm pursued the 1958 case to trial, at the conclusion of which the jury recommended that Qualcomm's patents be deemed waived because of Qualcomm's failure to disclose as required.  Qualcomm then withdrew the 1392 case just before it was scheduled for trial.

Key to both cases was Qualcomm's conduct during the standard-setting process. In the 1958 case, Judge Brewster found that Qualcomm had engaged in a pattern of deception in that process. As a consequence of that gross misconduct, Judge Brewster held that Qualcomm had waived its right to enforce the patents at issue. Judge Brewster also found that Qualcomm's misconduct extended into the litigation itself, including through Qualcomm's presentation of false testimony during trial (which followed Qualcomm's use of a similar false statement to support its motion for summary judgment) and Qualcomm's post-trial production of hundreds of thousands of pages of materials relating to standard setting that should have been produced during pre-trial discovery. Judge Brewster found that "Qualcomm counsel participated in an organized program of litigation misconduct and concealment throughout discovery, trial, and post-trial . . . ." *Qualcomm Inc. v. Broadcom Corp.*, No. 05-CV-1958-B (BLM) (S.D. Cal. Aug. 6, 2007), slip op. at 32 (attached as Exhibit A to this letter). (Qualcomm's counsel in the 1958 case were from different firms than Qualcomm's counsel in this case.) This misconduct and Qualcomm's intentional refusal to disclose its patents to the Joint Video Team ("JVT"), the standard-setting body that created the H.264 standard, led Judge Brewster to conclude that Qualcomm had willfully abused the standard-setting process: "[i]n light of all of the above evidence finally revealed, the eventual collapse of Qualcomm's concealment efforts exposes the carefully orchestrated plan and the deadly determination of Qualcomm to achieve its goal of holding hostage the entire industry desiring to practice the H.264 standard by insulating its IPR from the JVT so that the JVT would lose the opportunity to mitigate, if not avoid, Qualcomm's IPR in the development of the H.264 standard." *Id.* at 52.

Putting aside Qualcomm's troubling litigation conduct, the discovery in both the 1958 and 1392 cases is directly relevant and, in the interest of judicial economy and efficiency, should be deemed produced here. Both cases involved abuse of some of the very standard-setting processes at issue here and porting would impose zero burden on the parties. Indeed, that discovery material is already loaded on the computers of the parties' outside counsel.

Rather than agree to that simple and straightforward proposal, Qualcomm insists that Broadcom identify the specific discovery materials from those cases that Broadcom wants to have ported into this case. That makes no sense, because to do so would require Broadcom to review all of the material (which consists of millions of pages of documents and dozens or more depositions, as well as interrogatory responses and other discovery responses, all of which is covered by various protective orders entered in those other cases that strictly limit access to those materials) and would undoubtedly create numerous spurious disputes over relevance, which this Court would need to referee. As in any case, the proper time to resolve whether particular discovery materials *that have already been produced* are relevant is during the final pre-trial proceedings, where exhibit lists are set and evidentiary motions resolved. Qualcomm's proposal would impose unnecessary burdens on Broadcom and the Court for no legitimate purpose.

Indeed, directly contrary to the position it now asserts, in discussions about this same issue in connection with the California state litigation that was stayed in favor of this action, Qualcomm *agreed* that the discovery in the 1392 and 1958 cases should be deemed produced. Having agreed on that point, Qualcomm asserted that discovery from two other litigations, the so-called "0660" and "1662" actions, which involved trade-secret claims that are wholly irrelevant to the present proceedings (and which Qualcomm previously had dropped), should be cross-produced as well. In addressing that issue, Qualcomm's counsel Mr. Barbur

confirmed Qualcomm's *agreement* to port the 1392 and 1958 into the California action: "Qualcomm believes that the documents produced in the 0660 and 1662 actions – *just like the documents produced in the 1392 and 1958 matters – should be deemed produced* in the [California] matter . . . ." (8/14/07 letter from Barbur to Saxton, attached as Exhibit B (emphasis added).) (As far as Broadcom knows, Qualcomm has abandoned the argument that the 0660 or 1662 actions have any relevance here or that discovery from those actions should be ported into this action.)

Of course, now that the allegations and claims that were pending in the California action have been, at Qualcomm's insistence, moved here, the discovery should be ported here as well. Indeed, when Qualcomm's counsel Mr. Chesler (who is also lead counsel in this case) argued in favor of the stay of the California action, he stressed the similarity of discovery and how the same discovery in the California case should be available in New Jersey: "With respect to the documents, … any discovery that's taken place in intervening litigations that will be available is going to be available in either place, in either – in either this litigation or the New Jersey litigation." (*Broadcom Corp. v. Qualcomm, Inc.*, No. 07CC01249 (Cal. Sup. Ct. Oct. 5, 2007) (Sundvold, J.) (transcript of stay hearing) at 11:9-18 (attached as Exhibit C).)

Qualcomm cannot have it both ways. It cannot argue that a stay is appropriate in California because discovery would be available to be ported into the New Jersey action and then resist that porting.

Number and counting of depositions. The second disagreement relates to how many depositions each party will be allowed to take and how those depositions will be counted. Broadcom believes that the 30 depositions that the Court ordered in Your Honor's original pretrial scheduling order of September 22, 2005 remains appropriate. Indeed, given the extensive discovery that has taken place in the 1392 and 1958 cases, fewer depositions may be needed than were anticipated at that time. Certainly more are unlikely to be needed. Qualcomm's assertion that it expects to take dozens of depositions of third parties is belied by the fact that during the more than 14 months the case was pending before it was dismissed, *Qualcomm took no depositions of third parties at all*. In any event, if either party believes during discovery that there is a need to exceed 30 depositions, it may always make an application to the Court; Qualcomm's proposal to allow from the outset as many as 60 depositions per side – six times the limit permitted by the Federal Rules – is an invitation for waste and harassment.

In addition, Broadcom believes that, to the extent there are multi-day depositions, including depositions under Rule 30(b)(6), they should count against the applicable limit as one deposition per deposition day. Establishing such a baseline rule now should reduce the need to invoke Your Honor's assistance as to particular depositions in the future.

*     *     *     *     *

   We are available at Your Honor's convenience to present further information or argument on these issues.  Please do not hesitate to contact us if Your Honor would find that useful or if we or Broadcom can be of any further assistance.

     Respectfully,

     /s/ Steven J. Kaiser

     Counsel for Broadcom Corporation

cc:  Counsel for Qualcomm Incorporated (via ECF service):

  William J. O'Shaughnessy, Esq.
  Evan Chesler, Esq.
  Peter T. Barbur, Esq.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BROADCOM CORPORATION, | : Civil Action No. 05-3350 (MLC) |
| | : |
| Plaintiff, | : |
| | : |
| v. | : (PROPOSED) AMENDED PRETRIAL |
| | : SCHEDULING ORDER |
| QUALCOMM INCORPORATED | : |
| | : |
| Defendant | : |
| | : |

The Court having considered the positions of the Parties and good cause having been shown;

IT IS on this _____ day of _____,

ORDERED THAT:

1.   The Parties will complete fact discovery in this case on or before December 19, 2008.  No fact discovery will issue beyond that date, except upon motion and for good cause shown.

2.   The Parties will complete expert discovery in this case on or before March 27, 2009.

3.   Defendant must respond to Plaintiff's second amended complaint no later than December 21, 2007.  If Defendant responds by filing a motion to dismiss, Plaintiff must file its opposition no later than January 25, 2008.  Any reply by Defendant must be filed no later than February 15, 2008.

4.   In accordance with Fed. R. Civ. P. 30, the Parties shall be limited to [Broadcom proposes: no more than 30 depositions per side (multiple day depositions by specific agreement of counsel on conference call application, with each deposition day counting as one deposition against the aforesaid limit)/Qualcomm proposes: no more than 30 party depositions per side and no more than 60 depositions in total per side, taking into account the need for third-party discovery (multiple day depositions by specific agreement of counsel on conference call application)] except upon leave of the Court.  In accordance with Fed. R. Civ. P. 33, the Parties will be limited to 35 interrogatories (including all

1

subparts), per Party, exclusive of any interrogatories served on or before September 1, 2006, except with leave of the Court.

5.   In accordance with Fed. R. Civ. P. 26(a)(1), each Party will submit a letter, on or before December 21, 2007, to the undersigned certifying that initial disclosure has been made.  This material will not be filed with the Clerk of Court.

6.   Notwithstanding the pendency of any motion to dismiss, and regardless of whether Defendant has served and filed an answer, Defendant shall serve and file counterclaims no later than February 29, 2008.

7.   Any motion to amend the pleadings or to join new parties, whether by amended or third-party complaint, must be filed no later than October 3, 2008 and made returnable on October 27, 2008.

8.   [Broadcom proposal: All discovery in the cases entitled *Qualcomm v. Broadcom*, No. 05 CV 01958B (BLM) (S.D. Cal.) and *Qualcomm v. Broadcom*, No. 05-CV-01392 (RMB) (S.D. Cal.) shall be deemed to have been produced in this case and treated for all purposes as having been produced in this case, including without limitation as being subject to paragraph 23 of the Court's Order of March 13, 2006 relating to inadvertently produced materials.]

[Qualcomm proposal:  Either Party may designate relevant portions of discovery previously taken in any other litigation between the Parties to be deemed produced in this action.  Such designation shall be made by written notice to the opposing party setting forth the particular documents, testimony, or other materials the designating party believes in good faith are relevant to this action within the scope of F.R.C.P. 26(b)(1).  Any materials designated pursuant to this Paragraph shall be treated for all purposes as having been produced in this case, including without limitation as being subject to paragraph 23 of the Court's Order of March 13, 2006 relating to inadvertently produced materials.]

9.   Any discovery or case management disputes will be brought to the Magistrate Judge's attention immediately by conference call with local counsel, with letter preceding the conference call. L. Civ. R. 37.1(a)(1); *see also* L. Civ. R. 16.1(f).

10. Counsel will confer in an attempt to resolve any discovery or case management disputes before making such dispute the subject of a motion.  No discovery motion will be entertained absent counsel's full compliance with L. Civ. R. 37.1(a)(1); *see also* L. Civ. R. 16.1(f).

11. A status conference will be held before the undersigned at the Clarkson S. Fisher United States Courthouse, Trenton, New Jersey on _____ at _____.

12. The scheduling of the final pretrial conference shall be addressed during the status conference on _____.  Trial is anticipated for June 2009.

2

13. The attorneys for all Parties are further directed to meet together by agreement, initiated by counsel for the Plaintiff no later than ten (10) days before the date of the pretrial conference to:

     a.  discuss settlement;

     b.  stipulate to as many facts and issues as possible;

     c.  prepare a Final Pretrial Order in the form and content as required by the Court. Plaintiff's counsel will prepare the Final Pretrial Order and will submit it to all other counsel for approval and execution. The original and one copy of the executed Final Pretrial Order will be delivered to the pretrial conference. All counsel are responsible for the timely submission of the Final Pretrial Stipulation and Order;

     d.  examine all exhibits and documents proposed to be used at trial; and

     e.  complete all other matters which may expedite both the pretrial and trial of the case.

14. An original and one copy of the proposed Final Pretrial Order is to be submitted five (5) days in advance of the pretrial conference.

15. Appropriately colored markers (obtained from the Clerk's Office) will be affixed to the exhibits at or prior to the time they are shown to opposing counsel at the meeting of counsel referred to above, and each marker will bear the number of the exhibit to which it is affixed.

16. At the pretrial conference counsel should be prepared to discuss settlement of the case. Clients must be made available by telephone.

17. The Court may, from time to time, schedule conferences as may be required, either on its own motion or at the request of counsel.

18. Since all dates set forth herein are established with the assistance and knowledge of counsel, there will be no extensions except for good cause shown and by leave of Court, even with consent of all counsel.

19. Failure to appear at subsequent conferences, or to comply with any of the terms of this Order, may result in sanctions.

20. Counsel are advised that the Court has various audio/visual and evidence presentation equipment available for use at trial at no cost to the Bar. This equipment includes an evidence presentation system, which consists of a document camera, digital

projector, and screen. The projector may be used to display images which originate from a variety of sources, including television, VCR, and personal computer. The document camera may be used to display documents, photographs, charts, transparencies and small objects. For further information, please contact the Courtroom Deputy Clerk, Denis Glynn at 609-989-0545.

21. Counsel are invited to use the *George H. Barlow* Attorney Conference Room located on the third floor of the Courthouse Annex. The room is equipped with telephones, laptop access/printer, copier, and *fax*.

_____
JOHN J. HUGHES
United States Magistrate Judge

**ALL PROPOSED ORDERS AND LETTER MEMORANDA SENT TO CHAMBERS SHOULD BE IN WORDPERFECT FORMAT AND E-MAILED TO: njdnef_hughes@njd.uscourts.gov. ANY FILINGS WITH THE CLERK'S OFFICE SHOULD BE IN PDF FORMAT.**

1
2
3
4
5
6
7
8

9           **UNITED STATES DISTRICT COURT**

10          **SOUTHERN DISTRICT OF CALIFORNIA**

11

12   QUALCOMM INCORPORATED,           )        Civil No: 05-CV-1958-B(BLM)
                                      )
13                    Plaintiff,      )
     v.                               )        **ORDER ON REMEDY FOR**
14                                    )        **FINDING OF WAIVER**
     BROADCOM CORPORATION,            )
15                                    )
                     Defendants.      )
16                                    )
     _____)
17                                    )
                                      )
18                                    )

19

20

21   **I.     INTRODUCTION**

22          On March 21, 2007, this Court entered an Order (1) finding in favor of Defendant

23   Broadcom Corporation ("Broadcom") and against Plaintiff Qualcomm Incorporated

24   ("Qualcomm") on Broadcom's Third Affirmative Defense that U.S. Patent Nos. 5,452,104

25   (Pl's Trial Ex. 1) ("the '104 patent") and 5,576,767 (Pl's Trial Ex. 3) ("the '767 patent")

26   are unenforceable due to waiver; and (2) setting hearing on an Order to Show Cause as to

27   what the appropriate remedy for Qualcomm's waiver should be.  (Doc. No. 528 at 2.)

28                                        1

Following hearing on the Order to Show Cause and careful consideration of relevant court and deposition transcripts, declarations, and other documents submitted by both parties, the Court hereby issues the following remedy for Qualcomm's waiver: that the '104 and '767 patents, their continuations, continuations-in-part, divisions, reissues, or any other dependent or derivative patents of either patent, shall be and are hereby ordered unenforceable.

## II.    BACKGROUND

Qualcomm filed the present suit against Broadcom for patent infringement of the '104 and '767 patents on October 14, 2005, based on Broadcom's manufacture, sale, and offers to sell H.264-compliant products.  (Doc. No. 1.)  Broadcom filed its First Amended Answer and Counterclaims on December 8, 2006, in which it alleged (1) a counterclaim that the '104 patent is unenforceable due to inequitable conduct; and (2) a Third Affirmative Defense that the '104 and '767 patents are unenforceable due to waiver.  (Doc. No. 370.)

A jury trial was held on the legal issues from January 9, 2007, to January 26, 2007. The jury unanimously returned a verdict (1) in favor of Broadcom and against Qualcomm of non-infringement of the '104 and '767 patents; and (2) in favor of Qualcomm and against Broadcom for non-obviousness of the '104 and '767 patents.  (Doc. No. 499.)  The jury also unanimously returned an advisory verdict on the equitable issues: (1) finding by clear and convincing evidence in favor of Broadcom and against Qualcomm that the '104 patent is unenforceable due to inequitable conduct; and (2) finding by clear and convincing evidence in favor of Broadcom and against Qualcomm that the '104 and '767 patents are unenforceable due to waiver.  (Id. at 14.)

The Court held an evidentiary hearing on the equitable issues of inequitable conduct and waiver on February 9, 2007.  On March 21, 2007, the Court entered an Order: (1) finding in favor of Qualcomm and against Broadcom on Broadcom's counterclaim of

2

1  inequitable conduct as to the '104 patent; (2) finding in favor of Broadcom and against

2  Qualcomm on Broadcom's affirmative defense that the '104 and '767 patents are

3  unenforceable due to waiver based on Qualcomm's conduct before the Joint Video Team

4  ("JVT"), the standards-setting body that created the H.264 standard; and (3) setting hearing

5  on an Order to Show Cause as to what the appropriate remedy for Qualcomm's waiver

6  should be.  (Doc. No. 528 at 2.)  The Court conducted a hearing on its Order to Show

7  Cause on June 25, 2007.

8       After the verdict was entered, Broadcom again demanded discovery of Qualcomm's

9  records that previously had been concealed, but whose possible existence was only

10 revealed during Broadcom's cross-examination of Qualcomm witness Viji Raveendran on

11 one of the last days of trial.  Thereafter, after over three more months of denials, refusals,

12 and opposition, Qualcomm reversed its position, allegedly to avoid further dispute over the

13 matter, and produced on April 13, 2007, over 110,000 pages of emails, company

14 correspondence, and memoranda, and on May 15, 2007, over 120,000 more pages, some of

15 which have now been filed with the Court, none of which have been disputed by

16 Qualcomm.

17

18 **III.    DISCUSSION**

19       **A.    STANDARD OF LAW**

20       As the Court found in its March 21 Order, Broadcom has the burden of proving its

21 affirmative defense of waiver and remedy therefor by clear and convincing evidence.

22 (Doc. No. 528 at 13.)

23       A district court may in its discretion hold a patent unenforceable in considering an

24 affirmative defense of inequitable conduct by inventors and/or their agents before the

25 United States Patent and Trademark Office ("PTO"), but the remedy depends on equitable

26 considerations arising from the circumstances involved.  See Refac Int'l, Ltd. v. Lotus Dev.

27 Corp., 81 F.3d 1576, 1581, 1585 (affirming a finding of unenforceability based on an

28

                                   3                          05-CV-1958-B (BLM)

1  inequitable conduct affirmative defense and holding that a "district court must . . . weigh

2  the threshold findings of materiality and intent in light of all the circumstances to determine

3  whether they warrant a conclusion" of inequitable conduct).

4      As the Court stated in its Order finding waiver, "[i]n that context, the Court here

5  considers with respect to waiver the extent of the materiality of the omitted information and

6  the circumstances surrounding [Qualcomm's] omissions in connection with the proceedings

7  in the JVT." (Doc. No. 528 at 33.) While the Court is still unable to find, nor have the

8  parties presented, case guidance for an equitable remedy to a finding of waiver by a

9  patentee or assignee as an affirmative defense, it appears to the Court, as it stated in its

10 Order, that "the remedy should not be automatic, but should be fashioned to give a fair,

11 just, and equitable response reflective of [Qualcomm's] offending conduct." (Id.)

12     The Court has not found a patent decision assessing the remedy for a finding of

13 waiver based upon conduct of silence in the face of a duty to speak. The Rambus case, in

14 which the Federal Circuit established the obligation to speak, did not involve a remedy for

15 a breach of that obligation, because the party which allegedly violated the rule had not

16 possessed intellectual property rights that read on or directly applied to the activities of the

17 standards development process. See Rambus Inc. v. Infineon Techs. AG, 318 F.3d 1081,

18 1102 - 05 (Fed. Cir. 2003). Therefore, this Court, by analogy to the available remedies for

19 redressing inequitable conduct before the United States Patent and Trademark Office

20 ("PTO"), holds that the remedy available here may vary from no remedy to declaring the

21 involved patents totally unenforceable.

22     Qualcomm argues that Broadcom may not have any remedies beyond itself, because

23 it raised the waiver issue only by a separate affirmative defense and not by a counterclaim

24 or cross-claim. This contention is without merit. The Federal Circuit has upheld the

25 unenforceability of a patent to the world due to inequitable conduct before the PTO even

26 when pled as an affirmative defense by the defendant. See McKesson Info. Solutions, Inc.

27 v. Bridge Med., Inc., 487 F.3d 897, 908, 926 (Fed. Cir. 2007); Semiconductor Energy Lab.

28

4

1  Co., Ltd. v. Samsung Elecs. Co., Ltd., 204 F.3d 1368, 1372, 1378 (Fed. Cir. 2000); Refac

2  Int'l, Ltd. v. Lotus Dev. Corp., 81 F.3d 1576, 1578, 1585 (Fed. Cir. 1996).  Therefore, the

3  Court finds that it may award remedy for a waiver affirmative defense beyond

4  unenforceability only as to Broadcom.

5

6  **B.    ANALYSIS**

7        **1.    Overview of the Joint Video Team ("JVT"), related standards**

8              **organizations, their Intellectual Property Rights ("IPR") Policy**

9              **and Guidelines, and Qualcomm**

10       In late 2001, the joint project JVT was launched by two parent standards bodies: (1)

11  the Video Coding Experts Group ("VCEG") of the International Telecommunication Union

12  Telecommunication Standardization Sector ("ITU-T") and (2) the Moving Picture Experts

13  Group ("MPEG") of the International Organization for Standardization ("ISO") /

14  International Electrotechnical Commission ("IEC").  (Def's Trial Ex. 5163 (JVT Terms of

15  Reference ["ToR"]); Trial Tr., 267, Jan. 17, 2007.)

16       The JVT was created to enhance standard video coding performance in the face of

17  limited bandwith or storage capacity.[1]  As a joint project, the JVT would be able to more

18  efficiently produce a single "technically aligned, fully interoperable" standard that would

19  offer "the best possible technical performance under the practical constraints of being

20  implementable on various platforms and for various applications."  (JVT ToR at 1.)

21       According to the JVT ToR, JVT meetings are "open to, and contributions accepted

22  from, all parties qualified for participation in meetings according to the rules of either

23  parent body."  (JVT ToR at 3.)  As sector members of the ITU-T, Qualcomm and

24  Broadcom can "influence a great variety" of the activities of the Telecommunication

25  ──────────────

26       [1]  See Press Release, ITU-T, ITU-T and ISO/IEC to produce next generation
    video coding standard: Joint Video Team to Deliver Quality Improvement (Feb. 8, 2002),
27  http://www.itu.int/ITU-T/news/jvtpro.html.

28                                         5                        05-CV-1958-B (BLM)

1   Standardization Sector, including the JVT, by "presenting [their] views" and "participating

2   actively."[2]   Qualcomm and Broadcom must annually pay a minimum of 31,800 Swiss

3   Francs (approximately $26,500) to enjoy the benefits of Sector Membership in the ITU-T,

4   but may annually pay up to 2,544,000 Swiss Francs (approximately $2,4119,000), with

5   higher contributions correlating to a higher class of sector member.[3]

6         The American National Standards Institute ("ANSI") is the United States'

7   representative member in both the ISO and IEC, as the national body most representative of

8   standardization and electrotechnical standardization, respectively, in the United States.[4]  As

9   Company Members of ANSI, Qualcomm and Broadcom enjoy the privilege of "active

10  participation in ANSI and its programs," including the ISO and IEC and by extension the

11  JVT, by paying annual dues ranging from $750 to $25,000 depending on their global sales

12  revenue.[5]

13

_____

14        [2]  See ITU-T Membership, http://www.itu.int/ITU-T/membership/sector.html (last

15  visited Jul. 17, 2007); ITU Global Directory,
    http://www.itu.int/cgi-bin/htsh/mm/scripts/mm.list?_search=SEC&_languageid=1 (last

16  visited Aug. 6, 2007).

17        [3]  See How to join as a Sector Member,

18  http://www.itu.int/ITU-T/membership/join-sector.html (last visited Aug. 6, 2007).

19        [4]  See Member bodies,

20  http://www.iso.org/iso/en/aboutiso/isomembers/MemberList.MemberSummary?MEMBE
    RCODE=10 (last visited Jul. 17, 2007); Members of the IEC,

21  http://www.iec.ch/cgi-bin/procgi.pl/www/iecwww.p?wwwlang=e&wwwprog=membrs3.
    p (last updated Jul. 18, 2007); Overview of the ISO System,

22  http://www.iso.org/iso/en/aboutiso/introduction/index.html (last modified Sept. 12,
    2006); IEC Membership, http://www.iec.ch/about/members-e.htm (last visited Aug. 6,

23  2007).

24        [5]  See ANSI Membership Roster,

25  https://eseries.ansi.org/Source/directory/Search.cfm (last visited Jul. 17, 2007); ANSI
    Membership - A Value Proposition,

26  http://www.ansi.org/membership/overview/overview.aspx?menuid=2 (last visited Aug. 6,
    2007); ANSI Company Membership Application,

27  http://publicaa.ansi.org/sites/apdl/Documents/Membership/ANSI%20Member-Company-

28                                              6                        05-CV-1958-B (BLM)

1    Qualcomm has paid hundreds of thousands of dollars to ANSI and the ITU-T to reap

2    the benefits of membership, including the entitlement to actively participate in the JVT and

3    the creation of the H.264 standard.  These standards organizations pool resources to

4    efficiently create universal technology standards for the benefit of (1) the world through the

5    advancement of technology and (2) companies worldwide such as Qualcomm through

6    greater cross-platform product compatibility and therefore revenue.

7    According to the JVT ToR, the JVT "progress[es] in compliance with the

8    Intellectual Property Rights ("IPR") policies and IPR reporting requirements and

9    procedures of both [parent] organisations [sic]" regarding patent and copyright issues.

10    (JVT ToR at 4.)  More specifically, the JVT collects IPR information during the

11    standardization process as follows:

12    According to the ITU-T and ISO/IEC IPR policy, members/experts are
      encouraged to disclose as soon as possible IPR information (of their own or
13    anyone else's) associated with any standardization proposal (of their own or
      anyone else's).  Such information should be provided on a best effort basis.

14
      For collecting such information, JVT has decided to use it's [sic] own Patent
15    Declaration form – note that this is distinct from the *ITU ISO IEC Patent
      Statement and Licensing Declaration* that is to be submitted to the ISO
16    Secretary General and ITU TSB Director when the contributed technology
      becomes part of the final standard.

17
      (JVT ToR at 9.)  This language applies to Qualcomm, as a member of the ITU-T and
18
      participant in the JVT.
19
      In the sample Patent Disclosure Form included in the ToR, the JVT reiterates:
20
      JVT requires that all technical contributions be accompanied with this form.
21    *Anyone* with knowledge of any patent affecting the use of JVT work, of their
      own or of any other entity ("third parties"), is strongly encouraged to submit
22    this form as well.

23    (JVT ToR at 12.)  The JVT explains that form submissions should be made on "a best

24    effort, good faith basis," as "[t]he intent is that the JVT experts should know in advance of

25    any patent issues with particular proposals or techniques, so that these may be addressed

26    _____

27    2006.pdf (last visited Aug. 6, 2007).

28                                      7

1    well before final approval." (Id.)  If the submitter has a patent "associated with the

2    technical content" of the standard being created by the JVT, the submitter must indicate on

3    the form whether it will: (1) grant royalty-free licenses to practice the patent; (2) grant

4    licenses "on a worldwide, non-discriminatory basis and on reasonable terms and

5    conditions"; (3) grant royalty-free licenses on the condition that all other patent holders do

6    the same; or (4) not grant any of the aforementioned licenses, in which case the standard

7    will be designed so as not to cover the patent.  (JVT ToR at 13.)

8            As for the "ITU ISO IEC Patent Statement and Licensing Declaration" that must be

9    submitted separately to the ITU and ISO before final approval of the standard being created

10   by the JVT, "any party participating in the work of the ITU, ISO or IEC should" alert these

11   bodies to the existence of patents "embodied fully or partly" in a standard under

12   consideration.[6]  Patent holders submitting this form to the ITU and ISO have similar

13   licensing options as offered by the JVT form above: they must (1) grant royalty-free

14   licenses to practice their patent; (2) grant licenses "on a non-discriminatory basis on

15   reasonable terms and conditions"; or (3) not grant any of the aforementioned licenses, in

16   which case the standard will be designed so as not to cover the patent.[7]  This language also

17   applies to Qualcomm, as a "party participating in the work of the ITU, ISO or IEC" by way

18   of the JVT.

19           As held by this Court in its March 21 Order and described in more detail below, (1)

20   waiver of patent rights must be shown by clear and convincing evidence; (2) JVT

21   participants treated the JVT IPR policies as imposing a duty to disclose patents that

22   reasonably may be essential to practice the H.264 standard; (3) the '104 and '767 patents

23   reasonably may be essential to practice the H.264 standard; (4) Qualcomm participated in

24

25   ─────────────────

26           [6]  Common Patent Policy for the ITU-T/ITU-R/ISO/IEC,
         http://www.itu.int/ITU-T/dbase/patent/patent-policy.html (last visited Aug. 6, 2007).

27           [7]  See id.

28                                        8

1    the JVT as early as January 2002; (5) Qualcomm had knowledge that the '104 and '767

2    patents reasonably might be essential to practice the H.264 standard; and (6) therefore,

3    Qualcomm had a duty to disclose the '104 and '767 patents to the JVT.

4        However, instead of disclosing the '104 and '767 patents to the JVT and offering to

5    license them royalty-free or under non-discriminatory, reasonable terms during the

6    development phase of the JVT work on the H.264 standard, Qualcomm closely monitored

7    and participated in the development of the H.264 standard, all the while concealing the

8    existence of at least two patents it believed were likely to be essential to the practice of the

9    standard, until after the development was completed and the standard was published

10   internationally.  Then, without any prior letter, email, telephone call, or even a smoke

11   signal, let alone attempt to license Broadcom, Qualcomm filed the instant lawsuit against

12   Broadcom for infringement of the '104 and '767 patents, seeking damages and permanent

13   injunction against Broadcom based on its development and manufacture of H.264

14   compliant products.  Qualcomm sought to unfairly benefit from having subverted the

15   standards-making process of the JVT and, as the Court found in its March 21 Order,

16   waived its right to enforce the patents-in-suit.

17

18       **2.      The Court FINDS by clear and convincing evidence that**

19               **Qualcomm participated in the JVT as early as January 2002**

20       In the Court's March 21 Order finding in favor of Broadcom on its affirmative

21   defense of waiver, the Court had already found by clear and convincing evidence that

22   Qualcomm participated in the JVT as early as September 2002.  (Doc. No. 528 at 22.)

23   However, with the new evidence produced by Qualcomm post-trial, the Court **FINDS** well

24   beyond clear and convincing evidence that Qualcomm participated in the JVT as early as

25   January 2002, well before the release of the H.264 standard in May 2003.  The evidence

26   unequivocally contradicts Qualcomm's assertions at summary judgment, during trial, and at

27   the post-trial hearing on waiver and inequitable conduct that it did not participate in the

28

JVT until after May 2003.

As early as January 2002, Qualcomm hired an outside consultant, Jordan Isailovic, to attend JVT meetings on Qualcomm's behalf and to send reports to Qualcomm summarizing the progress of the JVT. For example, after ostensibly attending a JVT meeting in Geneva, Switzerland that took place from January 29 to February 1, 2002, Mr. Isailovic sent an email to three Qualcomm employees, including Qualcomm's initial Rule 30(b)(6) witness Christine Irvine, on February 11, 2002, with the subject heading "JVT Geneva Report," stating the following:

> The Report on the JVT Geneva Meeting is included as an attachment. As you can see, the Report has many details. I hope that you and your team can get a good idea about JVT . . .
>
> If you or any member of your team needs any of the documents mentioned in the Report, please let me know and I will get it.

(Doc. 543-2, Ex. A, Tab 3 at 24, Tab 4 74.)

Two days later on February 13, 2002, Ms. Irvine forwarded Mr. Isailovic's email to six other Qualcomm employees, including Qualcomm trial witness and senior staff engineering manager Viji Raveendran and Qualcomm deposition witness James Determan. (Id., Tab 5 at 77.) On February 25, 2002, Ms. Irvine forwarded by email over three pages of notes she took on her most recent JVT phone conference to fellow Qualcomm employees Raveendran and Jay Yun. (Id., Tab 7 at 83.) The next day on February 26, 2002, Ms. Raveendran sent an email to two Qualcomm employees with the subject heading "JVT mtg tomorrow" that stated, "Chris is going to the JVT mtg. and will be driving tomorrow." (Id., Tab 8 at 88.)

On March 5, 2002, Qualcomm consultant Isailovic sent an email to five Qualcomm employees, Ms. Irvine, Ms. Raveendran, Mr. Determan, John Ratzel, and Amnon Silberger with the subject heading "Requested Documents and Info" that stated in part as follows:

John, Chris at all [sic],

Here is the response to list of documents and info you requested today:

10

1          1. JVT, sw for the TML 9.x . . .
           2. MPEG Web site: . . .
2          3. JVT, ABT example document: See the attachment . . .
           4. Contact information for the Thomson JVT expert who has software for the
3          H.26L [working name for the standard that became H.264]: . . .

4          Let me know if you need anything else.

5          Jordan

6    (Id., Tab 9 at 90 - 91.)  The following day on March 6, 2002, Mr. Isailovic sent another

7    email to Qualcomm colleagues Irvine, Ratzel, Raveendran, Silberger, Determan, and Steve

8    Morley, with the subject heading "JVT/H26L" and an attached file "jm17.zip" that stated:

9          This may be the latest version (evaluable [sic]) . . .

10         PS: Chris, please forward this to the rest of the group; I don't have all
           addresses.
11
     (Id., Tab 10 at 94.)
12
           Post-trial, Qualcomm produced at least 118 additional emails discussing the work of
13
     the JVT sent between (1) Qualcomm employees, including Ms. Irvine, Ms. Raveendran,
14
     and Mr. Determan; (2) Qualcomm consultant Isailovic; and/or (3) a Qualcomm email list
15
     "dc-system-eng" dated from March 11, 2002, to  July 22, 2004.  (Id., Tabs 12 - 129.)  One
16
     hundred seven of these emails were sent before the H.264 standard was released in May
17
     2003.  (Id., Tabs 12 - 118.)
18
           Not only did Qualcomm consultant Isailovic attend JVT meetings as early as
19
     January 2002, Qualcomm employees have been attending JVT meetings "for a while"
20
     before April 2002, well before the H.264 standard was released in May 2003.  Qualcomm
21
     employee Amnon Silberger wrote an email to four other Qualcomm employees, including
22
     Mr. Yun, on April 30, 2002, which stated:
23
           We have been attending these standard body meetings for a while now.
24         These are the MPEG/JVT/JPEG meetings and the SMPTE meetings.  To ease
           the load, all the system engineers in our group rotate in attending these
25         (Chris, Jay, Viji, Jim Determan and myself).

26   (Id., Tab 44 at 306.)  Messrs. Yun and Silberger attended the May 2002 JVT meeting in

27   Fairfax, Virginia.  On May 8, 2002, Mr. Yun sent a three-page meeting report email to

28                                               11

eight Qualcomm employees, including Ms. Irvine, Ms. Raveendran, Mr. Determan, and Mr. Silberger, with the subject header "WG11 (MPEG Fairfax - day 3)" that stated explicitly, "I've attended some JVT meetings and saw some demo (so did Amnon)." (Id., Tab 57 at 361.)

Furthermore, Qualcomm voted on ballots affecting JVT as early as June 2002. On June 11, 2002, Mr. Yun wrote an email to Ms. Irvine, Ms. Raveendran, Mr. Silberger, and Mr. Determan stating the following:

> Below is an email ballot for L3.1 (USNB [United States National Body] for MPEG). It calls for an ad hog [sic] group to collect and generate comments on US comments on JVT CD (Committee Draft). By not replying to this email, we agree to the formation of the AHG [ad hoc group].

(Id., Tab 70 at 415.) Mr. Yun sent another email to those same four Qualcomm employees the same day, stating:

> One more email ballot from L3.1.
>
> This has two questions, the first one approves the REGISTRATION of JVT CD and the second one approves the CD with a conditional disapprove, which means that the USNB has some comments that it wishes to be reflected.
>
> I don't see any reason we should disagree with the two questions. We need not do anything to do so. Let me know if any of you want to investigate this further and discuss.

(Id., Tab 71 at 419.)

Qualcomm's post-trial production of documents directly and unequivocally exposes as blatantly false Qualcomm's steadfast assertions at summary judgment, during trial, and at the post-trial hearing on waiver and inequitable conduct that it did not participate in the JVT until after May 2003. The Court **FINDS** well beyond clear and convincing evidence that Qualcomm participated in the JVT from as early as January 2002, even earlier than the Court originally found in its March 21 Order and, more importantly, well before the JVT released the H.264 standard in May 2003. Participation does not require submission of proposals, speeches, objections or leadership roles. The Court finds Qualcomm's involvement to be vigorous participation -- a difference appears to the Court to be the

1  motive for participation -- i.e., to insulate its IPR from the work of the JVT so as to

2  preserve it for unilateral enforcement if that became possible after the H.264 standard was

3  settled upon.

4

5          **3.      The Court FINDS by clear and convincing evidence that**

6                  **Qualcomm was aware as early as August 2002 that JVT**

7                  **participants treated the JVT IPR policies as imposing a duty to**

8                  **disclose patents that reasonably may be essential to the H.264**

9                  **standard**

10         In the Court's March 21 Order finding in favor of Broadcom on its affirmative

11  defense of waiver, the Court found by clear and convincing evidence that JVT participants

12  treated the JVT IPR policies as imposing a duty to disclose patents that reasonably may be

13  essential to the H.264 standard.  With the new evidence produced by Qualcomm post-trial,

14  the Court now **FINDS** by clear and convincing additional evidence that Qualcomm was

15  aware of this treatment by JVT participants as early as August 2002.

16         In August 2002, Qualcomm consultant Isailovic forwarded an email to Qualcomm

17  employees Ratzel, Determan, Irvine, Raveendran, Silberger, and Yun with the subject

18  heading "Fwd: [jvt-ipr] Re: Face-to-Face JVT IPR Meeting."  (Doc. No. 543-2, Ex. A, Tab

19  92 at 529.)  The body of the forwarded email stated in pertinent part:

20         The future licensing terms [for H.264 / MPEG-4 AVC] will be defined by the
           holders of essential patents; at this time it is unknown who are these patent
21         holders, so this needs to be determined first.  The question is how.  In my
           understanding, the objective is to invite "potential holders of essential
22         patents" to the face-to face-meeting [sic] to discuss this issue.  Therefore in
           my understanding the most important agenda point is the procedure to
23         identify essential patent holders in an objective manner.

24  (Id., Tab 92 at 530 - 31.)

25         Then in September 2002, Mr. Isailovic forwarded another email to Qualcomm

26  employees Morley, Ratzel, Determan, Irvine, Raveendran, Silberger, and Yun with the

27  subject heading "Fwd: [jvt-ipr] Call for H.264 / MPEG-4 AVC [Advanced Video Coding]

28                                      13                          05-CV-1958-B (BLM)

patents." (Doc. No. 543-2, Ex. A, Tab 94 at 545.) The body of the forwarded email stated in pertinent part:

> This is to let you (as you may have noticed already that MPEG LA is calling for essential MPEG-4 AVC/H.264 patents, with the aim to come to a joint license soon.

(Id., Tab 94 at 546.)

One month later in October 2002, Mr. Isailovic forwarded an email to Qualcomm employees Ratzel, Raveendran, Determan, Irvine, Silberger, and Yun, which Ms. Raveendran in turn forwarded to two other Qualcomm employees with the subject heading "Fwd: [jvt-ipr] Confirmation of JVT IPR meeting in Geneva." (Doc. No. 543-2, Ex. A, Tab 97 at 567.) In the body of her email, Ms. Raveendran wrote, "FYI. Some information on licensing issues and IPR in JVT." (Id.) The body of the forwarded email listed a suggested agenda for the JVT-IPR meeting open to all JVT and IPR experts at the Geneva JVT conference, which included (1) an "(ongoing) determination of essential patent holders" and (2) the "expected process once essential patent holders are identified." (Id., Tab 97 at 568.) These three emails demonstrate that Qualcomm was aware as early as August 2002 that the JVT was actively attempting to identify holders of patents essential to the H.264 standard.

Later, in September 2003, Qualcomm employee Harinath Garudadri wrote an email to another Qualcomm employee and a Qualcomm email list "multimedia.all" with his "notes from the first day of the JVT meeting." (Id., Tab 120 at 682.) One of Mr. Garudadri's bullet points was:

> IPR policies of [JVT parent body] VCEG and ITU. Gary said **formal notification was required**. List of IPR holders for H.264/AVC is in Appendix F of MPEG doc and ITU-T web site. Each contribution has the IPR statements at the end.

(Id.) (emphasis added.) JVT chairman Gary Sullivan confirmed at trial that he delineated the IPR policy of the JVT at the beginning of every JVT meeting, and from Garudadri's email, Qualcomm was aware at least by September 2003 that formal IPR notification was

1  consistently requested of all IPR holders even if they did not make technical proposals.

2  (Trial Tr., 43 - 44, Jan. 18, 2007.)  Since, as established above, Qualcomm had been

3  attending JVT meetings as early as January 2002 in which Mr. Sullivan routinely repeated

4  this IPR policy at each meeting, the Court concludes that Qualcomm was well aware of the

5  policy even earlier than that.

6         Furthermore, amongst the documents Qualcomm produced post-trial was Philips

7  International's June 21, 2002, letter to the ISO International Technology Task Force

8  accompanying its JVT Patent Disclosure form, which made it clear that Philips treated the

9  JVT's IPR policies as imposing a duty to disclose.  (Doc. No. 543-2, Ex. A, Tab 74.)

10  Under the subject heading "Re: JVT," Philips wrote:

11         In response to the RFTI [Request for Technical Information] made at the
           MPEG meeting May 6-10, 2002 we submit in the **required** JVT Patent
12         Disclosure Form, a list of Philips' patents which have been deemed necessary
           for the implementation of MPEG2 Video, and which have been **deemed**
13         **necessary for the implementation of the JVT Baseline and/or Main**
           **Profiles**.

14
           Philips has made the listed patents available for implementation of the
15         MPEG2 Video standard, in accordance with ISO IPR rules, on reasonable and
           non-discriminatory terms.  To be consistent and to avoid discriminating
16         against licensees under the MPEG2 Video standards, Philips is again
           prepared to make these patents available under reasonable and non-
17         discriminatory terms for the JVT Baseline and Main Profiles.

18  (Id., Tab 74 at 435) (emphasis added.)  From this, Qualcomm was aware that JVT

19  participant Philips viewed the JVT Patent Disclosure Form as "required" for patents

20  "deemed necessary for the implementation of the JVT Baseline and/or Main Profiles."

21  Qualcomm was further aware that Philips was prepared to license its patents for the JVT

22  standard "[t]o be consistent" with "[JVT parent] ISO IPR rules."

23         Later in this letter, expressing concern that "the JVT will not be in a position to take

24  an informed decision on the feasibility of a royalty-free Baseline Profile," Philips stated

25         Video compression technology has attracted wide interest in the electronics
           industry for quite some years.  As a consequence many patents and patent
26         applications exist in many countries of the world covering not only the basics
           of compression technology, but also many varieties within such compression
27         schemes.

28                                              15                    05-CV-1958-B (BLM)

> To our mind it is an illusion to assume[] that it would be possible to ensure a royalty free JVT Baseline Profile by the evaluation effort based on the patents now being submitted. First, there is a very substantial risk that the submitted list of patents is not complete. Second, an effort, undertaken to avoid the use of patent rights that are not available under royalty-free conditions, could well result in the use of other not yet identified patent rights. Both issues place at the end the so defined JVT Standard in an even much worse position when patents of not-involved companies start playing a role.

(Id., Tab 74 at 435 - 36.) From this, Qualcomm was aware of the concern of JVT participant Philips that the H.264 standard would practice patents that had not yet been disclosed to the JVT and offered for licensing under royalty-free or reasonable and non-discriminatory terms.

Furthermore, Philips closed its letter by stating, "In the interests of transparency Philips is copying this letter to members of the JVT Group, many of whom are licensees under the MPEG2 Video patents, in order to demonstrate Philips [sic] continued commitment to transparency and non-discrimination in the licensing of IPR on standards." (Id., Tab 74 at 436.) Therefore, while it is not apparent when Qualcomm received the copy of Philips' letter, since Philips copied the letter to all JVT members, the Court concludes that Qualcomm probably received a copy not long after it was sent on June 21, 2002.

The Court already found by clear and convincing evidence in its March 21 Order that JVT participants treated the JVT IPR policy as imposing a duty of disclosure for patents that reasonably might be necessary to practice the H.264 standard. Now, considering the new evidence produced late by Qualcomm post-trial, the Court **FINDS** by additional clear and convincing evidence that Qualcomm was aware of this treatment as early as August 2002.

> **4.    The Court FINDS by clear and convincing evidence that Qualcomm had knowledge by early March 2002 that its Adaptive Block Size Transform ("ABT") related patents, including the '104 and '767 patents, reasonably might be necessary to practice the**

16

1

**H.264 standard**

2    In the Court's March 21 Order finding in favor of Broadcom on its affirmative

3    defense of waiver, the Court found by clear and convincing evidence that Qualcomm had

4    knowledge that the '104 and '767 patents might reasonably be necessary to practice to

5    H.264 standard as early as 2002 and July 2005 respectively.  (Doc. No. 528 at 27.)  With

6    Qualcomm's post-trial production of additional documents, the Court now **FINDS** by

7    additional clear and convincing evidence that Qualcomm had knowledge as early as March

8    2002 that its ABT related patents, including the '104 and '767 patents, reasonably might be

9    necessary to practice the H.264 standard.

10    Qualcomm's own witness Chong Lee, an inventor of both the '104 and '767 patents,

11    testified at trial that the '104 and '767 patents related to ABT technology.  Mr. Lee testified

12    that his May 1992 paper "Intraframe Compression of HDTV Images Based on Adaptive

13    Block Size Discrete Cosine Transform" described the '104 patent invention.  (Trial Tr., 94,

14    Jan. 10, 2007.)  He stated that the paper "discusses the technology involved in both 104 and

15    -- 104 that included ABS DCT [Adaptive Block Size Discrete Cosine Transform] and DQT

16    [Differential Quadtree Transform]" and reiterated that the '104 patent describes "intraframe

17    compression."  (Id. at 70, 94.)

18    In contrast, Mr. Lee specified that the '767 patent describes "interframe

19    compression."  (Trial Tr., 70, Jan. 10, 2007.)  Mr. Lee testified:

20    
21    > I approached the problem [addressed in the '767 patent] by using multiple
    > block sizes in an adaptive fashion to solve the problem of obtaining both
    > quality and efficiency of the [video interframe] compression.

22    (Id. at 107 - 08.)  When asked whether the '767 patent approach was similar to ABS DCT,

23    Mr. Lee responded:

24    
25    > Yes.  Exactly.  Just like we were describing ABS DCT as adaptive block size
    > technique that involves transforms on different block sizes, **this technique
    > involves adaptive block sizes** by applying what's called motion
    > compensation, looking for similarities in large blocks versus small blocks.

26    
(Id) (emphasis added.)

27

28    
17    05-CV-1958-B (BLM)

1    Qualcomm recognized as early as March 2002 that its ABT related patents might be

2    reasonably necessary to practice the H.264 standard.  A report entitled "Report of activities

3    for the last six months" and dated March 6, 2002, that was produced from Qualcomm's

4    records stated:

5    Since our group is actively involved in the ITU, MPEG, and SMPTE
     standards meetings, we are looking into proposing some of the features of

6    **our ABSDCT compression algorithm** to one of these standard bodies.  I had
     the task of compiling the details of MPEG, JVT (Joint Video Team) and

7    ABSDCT compression features.  I reviewed the JVT draft and prepared a
     spreadsheet detailing the aspects of these algorithms.  We haven't had a

8    chance to discus [sic] this yet.  The purpose behind this is for us to decide
     **whether our ABSDCT Intra and interframe algorithms will fit in the**

9    **JVT scenario**.

10   (Doc. No. 543-2, Ex.A, Tab 11 at 96.)  As stated above, the '104 patent deals with

11   intraframe video compression, while the '767 patent deals with interframe video

12   compression.  From this report, Qualcomm demonstrates its awareness of the connection

13   between these patents and the H.264 standard being developed by the JVT.

14   On March 26, 2002, Qualcomm engineer Silberger sent an email to three Qualcomm

15   employees, including Ms. Irvine and Jay Yun, with the subject heading "JVT ABS

16   submission," which stated:

17   For several days now, Jay and myself have been looking at ways to
     incorporate **our ABS** into H.26L [another name for H.264] for submission in

18   the JVT May Meeting.

19   (Doc. No. 543-2, Ex. A, Tab 17 at 122) (emphasis added.)  Clearly, Mr. Silberger is here

20   acknowledging that Qualcomm's adaptive block size technology is so related to the work

21   being done in the JVT that it should be offered for incorporation into the developing H.264

22   standard.

23   The next day on March 27, 2002, Mr. Yun responded to Mr. Silberger's email,

24   stating:

25   After discussing JVT ideas with Amnon, I remembered that there were some
     recent proposals that have to do with **variable block sizes**.  I re-read those

26   proposals, Jordan's report and **our patents** and come up with the following
     observations.

27

28                                    18                        05-CV-1958-B (BLM)

(Id., Tab 20 at 131) (emphasis added.)  Addressing JVT proposals already made by others

to add an 8x8 transform, a 16x16 transform, and a 2x2 transform, Mr. Yun wrote:

> 1. [. . .] They are all integer transforms that mimic DCT.  With these, perhaps we can recommend **our variable block size scheme** that is different than the proposal which only uses fixed-size sub-blocks for the entire 16x16 block (i.e., you can only have all 8x8s, all 4x4s, all 8x4s or all 4x8s, etc.)? . . .
>
> But Jordans' report says that this adaptive block-size ideas will not be included in the baseline but in some high quality applications, so we may be able to prove that there is a significant gain in quality by using out [sic] scheme.

(Id.) (emphasis added.)  Mr. Yun continued:

> 2. **Our original patents mention DCT almost exclusively** and says that it is for "pixel data."  Should we "extend" our patents to include all transforms and all data types (like residuals)?
>
> 3.  We should go to all JVT meetings at least for the time being to be on top of their work on ABT, which Jordan says is brand new.
>
> 4.  Similar to ideas in 1, we can use **our interframe ABS patent** and then either recommend BSA [sic ABS] for motion block size assignment/representation and/or attach or block JVT's scheme for using variable block size for motion estimation (they use fixed size sub-blocks, though).

(Id., Tab 20 at 131 - 32) (emphases added.)  Both the '104 and '767 patents mention DCTs

multiple times: in the claim language and repeatedly throughout every section of the '104

patent, and in the description of preferred embodiments in the '767 patent.  ('104 patent;

'767 patent.)  Furthermore, as Mr. Lee explained at trial, the '767 patent describes

interframe compression using adaptive block sizes.

Then, in July 2002, Ms. Raveendran sent an email to Qualcomm JVT consultant

Isailovic, in which she wrote:

> **About patent reviews for JVT and studying ABT with respect to our patent**, it was decided that we would like a summary of various aspects of ABT in JVT.  There are a lot of details and if you can help narrow down the focus, that would be a good start.

(Id., Tab 86 at 504) (emphasis added.)

A few months later in November 2002, Qualcomm engineer Yun wrote an email

with the subject heading "JVT slides," stating that "monitoring ABT is of importance since

1   there may be **patent infringement issues related to ABSDCT**.” (Id., Tab 102 at 600)

2   (emphasis added.)  Qualcomm engineer Silberger responded to Mr. Yun's email on the

3   same day, carbon copying Ms. Raveendran and writing, “One thing, didn't we kind of

4   conclude that they are not infringing our ABSDCT?” (Id., Tab 102 at 599.)  This email

5   exchange makes it clear that, prior to November 2002, Qualcomm had already given

6   consideration to whether the H.264 standard in development would infringe Qualcomm's

7   ABS DCT patents, which include the '104 and '767 patents.  This is further confirmed by

8   the December 2002 document entitled “JVT 12/9-14/02 meeting goals, prioritized list,” in

9   which the item “ABT” is followed by the question, “Is there a **potential IPR issue with**

10  **ABSDCT**?” (Id., Tab 109 at 635) (emphasis added.)

11        Then, in April 2003, Qualcomm employee Tom Kilpatrick sent an email to Viji

12  Raveendran and another Qualcomm employee addressing a new “bi-weekly working

13  engineering meeting.” (Id., Tab 118 at 673.)  Mr. Kilpatrick wrote, “One of the things to

14  be addressed in Viji's meetings are progress on **Digital Cinema patents** vs JVT standard.”

15  (Id.) (emphasis added.)  Qualcomm's outside expert Dr. Iain Richardson testified at trial

16  that Qualcomm designed a product implementing an audio compression system, the QDEC-

17  1000, based on the '104 patent.  (Trial Tr., 126 - 27, Jan. 11, 2007.)  Qualcomm employee

18  Irvine then confirmed through deposition testimony at trial that the QDEC-1000 was sold

19  to “Technical or Digital Cinema.” (Trial Tr., 84 - 85, Jan. 18, 2007.)  Therefore,

20  Qaulcomm knew of a link between the '104 patent and the H.264 standard and set up bi-

21  weekly meetings to “address” the issue in April 2003.

22        This newly discovered evidence augments the already convincing evidence

23  explicitly naming the '104 and '767 patents that the Court discussed in its March 21 Order,

24  indicating Qualcomm's knowledge of a link between those patents and the H.264 standard.

25  Therefore, the Court **FINDS** by additional clear and convincing evidence that Qualcomm

26  had knowledge that the '104 and '767 patents reasonably might be necessary to practice the

27  H.264 standard as early as March 2002, well before the JVT released the H.264 standard in

28

1  May 2003.

2      At no time before the H.264 standard was initially published as adopted did

3  Qualcomm reveal to the JVT or its parent bodies Qualcomm's IPR, specifically the '104

4  and '767 patents.

5

6      **5.    The Court FINDS by clear and convincing evidence that**

7      **Qualcomm intentionally organized a plan of action to shield the**

8      **'104 and '767 patents from consideration by the JVT with the**

9      **anticipation that (1) the resulting H.264 standard would infringe**

10     **those patents and (2) Qualcomm would then have the opportunity**

11     **to become an indispensable licensor to anyone in the world seeking**

12     **to produce H.264-compliant products**

13     The Court has already found above and in its March 21 Order that Qualcomm

14  waived its rights to enforce the '104 and '767 patents against Broadcom by its silence when

15  it had a duty to speak before the JVT.  However, faced with the additional evidence

16  produced post-trial by Qualcomm, the Court concludes that the conduct of Qualcomm's

17  employees before trial, and its employees and hired witnesses during pre-trial, trial, and

18  post-trial outlines misconduct even more extensive than the Court previously found in its

19  March 21 Order.

20     Merely the reiteration of the chronology of events above and below tells the story of

21  the gravity of the conduct.  The facts speak for themselves.  The totality of the

22  circumstances leads the Court to conclude by clear and convincing evidence that

23  Qualcomm intentionally organized a plan of action to shield the '104 and '767 patents from

24  consideration by the JVT with the anticipation that (1) the resulting H.264 standard would

25  infringe those patents and (2) Qualcomm would then have an opportunity to be an

26  indispensable licensor to anyone in the world seeking to produce an H.264-compliant

27  product.

28

05-CV-1958-B (BLM)

1     The track of this conduct following the adoption of the H.264 standard exposes

2   aggravated litigation abuse.  This abuse commenced with Qualcomm's abrupt

3   commencement of suit, then continued (1) in discovery through Qualcomm's constant

4   stonewalling, concealment, and repeated misrepresentations concerning existing corporate

5   documentary evidence that would have revealed the fullness of the corporate plan; and (2)

6   in trial through Qualcomm's presentation of numerous witnesses who steadfastly testified

7   falsely denying even awareness, let alone participation in the JVT project and through the

8   actions of Qualcomm's lead and co-counsel up to the time Qualcomm substituted new lead

9   counsel, who adamantly denied the obvious and then, when the truth was discovered and

10   exposed by the document production, sequentially contended denial of relevance,

11   justification, mistake, and finally non-awareness.

12          **a.     Misconduct of Qualcomm, its employees, and its witnesses**

13          The Court **FINDS** by clear and convincing evidence that Qualcomm, its employees,

14   and its witnesses actively organized and/or participated in a plan to profit heavily by (1)

15   wrongfully concealing the patents-in-suit while participating in the JVT and then (2)

16   actively hiding this concealment from the Court, the jury, and opposing counsel during the

17   present litigation.

18          **(1)     Misconduct before the JVT**

19          As established above, there is clear and convincing evidence that Qualcomm was

20   aware of its duty to disclose the '104 and '767 patents to the JVT as early as 2002, well

21   before the H.264 standard was published in May 2003.  However, it was not until April 25,

22   2006, six months after the commencement of this lawsuit, that Qualcomm filed an IPR

23   disclosure form with the ITU-T and ISO/IEC regarding the H.264 standard, declaring that

24   Qualcomm "holds granted patents and/or pending applications, the use of which would be

25   required to implement" the H.264 standard.  (Pl's Trial Ex. 36 at 3 - 4.)  Even this

26   disclosure did not identify any specific patent, let alone the '104 and '767 patents.

27          The Court **FINDS** by clear and convincing evidence that Qualcomm and its

28                                              22                        05-CV-1958-B (BLM)

1  employees orchestrated a plan to ignore Qualcomm's duty to disclose these patents to the

2  JVT, in order to become an indispensable licensor of the H.264 standard.  Qualcomm

3  employee Yun sent an email in March 2002 to Qualcomm colleagues Silberger, Ratzel, and

4  Irvine, discussing the transform proposals before the JVT.  (Doc. No. 543-2, Ex. A, Tab

5  20.)  In it, Mr. Yun suggested "extending" Qualcomm's patents in order to cover the

6  standard being developed by the JVT:

7  > Our original patents mention DCT [discrete cosine transform] almost
   > exclusively and says that it is for "pixel data".  Should we "extend" our
8  > patents to include all transforms and all data types (like residuals)?

9  (Doc. No. 543-2, Ex. A, Tab 20 at 131.)  He then advocated monitoring the JVT and its

10  work in relation to Qualcomm's patents:

11  > We should go to all JVT meeting at least for the time being to be on top of
    > their work on ABT [adaptive block-size transform], which Jordan [Isailovic]
12  > says is brand new.

13  (Id.)

14         One month later in April 2002, Qualcomm engineer Silberger sent an email to

15  Qualcomm colleagues Determan, Irvine, Raveendran, Yun, and Ratzel.  (Doc. No. 543-2,

16  Tab 38.)  In it, he advocated "monitoring" the JVT "from a distance":

17  > The JVT effort is mostly done for the physical layer, and going towards a
    > committed draft in May.  There is no indication that they are even looking at
18  > DC [Digital Cinema] applications.  New technical suggestions are dealing
    > mostly with better efficiency (reduced complexity) and file formats.  We
19  > should monitor this from a distance.

20  (Id., Tab 38 at 273.)  Later, under the heading "Recommendations," Mr. Silberger advised

21  increasing Qualcomm's monitoring of the JVT and refraining from making any

22  submissions, which would include any potential patent disclosures, to JVT parent body

23  MPEG:

24  > We should be monitoring MPEG meetings, especially regarding DC testings,
    > and also sample the JVT and JPEG activities.  We may pull in some other
25  > groups within Qualcomm to participate, since both H.26L [working name for
    > what later became the H.264 standard] and JPEG2000 may both be promising
26  > for low date [sic] rates.  At this point, I don't see the need for submitting
    > anything to MPEG.

27

28

05-CV-1958-B (BLM)

1    (Id., Tab 38 at 274.)  Mr. Silberger then explicitly recommended "consider[ing] efficient

2    ways for lobbying our technology in the appropriate forums."  (Id.)

3        Later, in July 2002, Qualcomm engineer Raveendran sent an email to Qualcomm

4    consultant Isailovic stating, "About patent reviews for JVT and studying ABT with respect

5    to our patent, it was decided that we would like a summary of various aspects of ABT in

6    JVT."  (Id., Tab 86 at 504.)  From Ms. Raveendran's use of the phrase "it was decided," the

7    Court concludes that Qualcomm held meetings to decide strategy as to how to monitor the

8    JVT with respect to Qualcomm's patents.  Ms. Raveendran then conceded to Mr. Isailovic,

9    "There are a lot of details and if you can help narrow down the focus, that would be a good

10   start."  (Id.)

11       This monitoring and reporting on the activities of the JVT with respect to

12   Qualcomm's patents without disclosure of these patents continued through the release of

13   the H.264 standard in May 2003 and Qualcomm's filing of this patent infringement suit in

14   October 2005 against Broadcom as to the '104 and '767 patents.  (Doc. No. 543-2, Ex. A.)

15   Qualcomm filed this suit (1) based on the theory that the patents-in-suit cover the H.264

16   standard and therefore Broadcom's H.264-compliant products and (2) long before any

17   disclosure of these two patents to the JVT or its parent organizations and without any offer

18   to license its patents to Broadcom or to JVT members.  In combination with the above

19   evidence presented to the Court as to Qualcomm's participation in the JVT and

20   Qualcomm's knowledge that the '104 and '767 patents reasonably might be necessary to

21   practice the H.264 standard, the Court **FINDS** by clear and convincing evidence that

22   Qualcomm and its employees organized and attempted to execute a plan to actively conceal

23   its patents from the JVT in order to later become an indispensable licensor to those

24   practicing the H.264 standard.  This plan, of course, deprived the JVT of the opportunity to

25   attempt to design around the '104 and '767 patents in developing the H.264 standard.

26                **(2)    Misconduct during the present litigation**

27       The Court's finding as to Qualcomm's wrongful conduct is further supported by

28                                    24                          05-CV-1958-B (BLM)

1  evidence of widespread and undeniable misconduct of Qualcomm, its employees, and its

2  witnesses throughout the present litigation, including during discovery, pre-trial motions-

3  practice, trial, and post-trial proceedings.

4                         **(a)    Christine Irvine**

5          For example, staff engineer Christine Irvine, Qualcomm's original Federal Rule of

6  Civil Procedure 30(b)(6) witness testified at trial through her July 6, 2006, deposition that

7  Qualcomm did not attend any JVT meetings:

8          Q       Are you the person at Qualcomm most knowledgeable about
                   attendance or participation by any Qualcomm principal, employee or
9                  representative at any H.264 standards committee meetings?
           A       I believe I am.
10         Q       Are you the person at Qualcomm most knowledgeable about
                   Qualcomm's knowledge regarding the development of the H.264
11                 standard?
           A       I believe I am.
12         Q       And are you the person at Qualcomm most knowledgeable about any
                   actions taken by Qualcomm or any of its principals, employees or
13                 representatives as a result of Qualcomm's knowledge regarding the
                   development of the standard?
14         A       I believe I am.
           Q       Is Qualcomm a member of the JVT?
15         A       No, Qualcomm is not.
           Q       Has Qualcomm ever attended any meetings of the JVT?
16         A       Qualcomm is not aware of any attendance to any JVT meetings.
           Q       Has Qualcomm ever hosted any meeting of the JVT?
17         A       Qualcomm's not aware of hosting a JVT meeting.
           Q       Okay.  Has Qualcomm made any submissions to the JVT?
18         A       No, Qualcomm has not made any submissions to the JVT that
                   Qualcomm is aware of.
19         Q       When did Qualcomm first become aware of the development of the
                   H.264 standard?
20         A       Approximately 2001 in trade journals.

21  (Trial Tr., 79 - 81, Jan. 18, 2007.)

22         The falsity of Ms. Irvine's testimony is now revealed as blatant.  As detailed above

23  at length, Qualcomm produced over one hundred emails post-trial related to Qualcomm's

24  participation in the JVT and attendance of JVT meetings, the vast majority of which were

25  received or sent by Ms. Irvine.  (Doc. No. 543-2, Ex. A.)  For example, in February 2002,

26  Ms. Irvine received by email Qualcomm consultant Isailovic's report on the

27  January/February 2002 JVT meeting in Geneva, which Mr. Isailovic also sent to

28                                25                      05-CV-1958-B (BLM)

1    Qualcomm employees Ratzel and Silberger.  (Doc. No. 543-2, Ex. A, Tab 4 at 74.)  Two

2    days later, Ms. Irvine forwarded Mr. Isailovic's report to six Qualcomm employees,

3    including Ms. Raveendran, Mr. Determan, Mr. Silberger, and Mr. Yun.  (Id., Tab 5.)  In

4    May 2002, Ms. Irvine received a three-page report on the May 2002 JVT meeting in

5    Fairfax from Qualcomm colleague Yun, which was also sent to other Qualcomm

6    employees including Amnon Silberger, Mr. Ratzel, and Ms. Raveendran.  (Id., Tab 57 at

7    361 - 63.)  In that email, Mr. Yun explicitly stated, "I've attended some JVT meetings and

8    saw some demo (so did Amnon)."  (Id., Tab 57 at 361.)

9                             **(b)    James Determan**

10          Similar to Ms. Irvine, Qualcomm employee James Determan gave deposition

11   testimony that is belied by the documents Qualcomm produced post-trial.  In his August

12   2006 deposition, Mr. Determan testified that he did not know if Qualcomm was a member

13   of the JVT and that he did not believe he was personally a member of the JVT:

14          Q     Do you know if Qualcomm is a member of the JVT?
             MR. LEUNG:          Objection.  Calls for speculation.
15          THE WITNESS:      I do not know.
             BY MS. HUNT:
16          Q     Are you personally a member of the JVT?
             A     I do not believe so.

17
      (Doc. No. 543-2, Ex. S at 27.)
18
            However, in conflict with this testimony, Mr. Determan received an email in January
19
      2004 from Qualcomm colleague Laura Chiu with the subject title "FW: JVT Membership
20
      Renewal."  (Doc. No. 543-2, Ex. A, Tab 128 at 727.)  In that email, which was also sent to
21
      five other Qualcomm employees including Viji Raveendran, Amnon Silberger, Rick Kane,
22
      and Seyfullah Oguz, Ms. Chiu wrote:
23
            Please let me know if you are still interested in being a **JVT member**.
24
            Rick, would it be ok to make Viji the principal?  I will be processing payment
25          for MediaFLO members: Viji, Amnon and Seyfullah.

26   (Id.) (emphasis added.)  Attached to the end of Ms. Chiu's email was a forwarded email

27   with the same subject heading.  In that forwarded email thread, Ms. Chiu first wrote to

28                                          26                        05-CV-1958-B (BLM)

1    Parthenia Purcell, Associate Manager of Membership Services for the Information

2    Technology Industry Council ("ITIC"):

3           When you have the chance, please send me the invoices for **JVT
             membership** renewal for Viji Raveendrand [sic] (Principal), Amnon
4           Silberger (Alternate), and an application for Seyfullah Oguz (new member).

5    (Id., Tab 128 at 730) (emphasis added.)  Ms. Purcell forwarded Ms. Chiu's request to add

6    new member Qualcomm employee Oguz to Lynn Barra, Associate Director of Information

7    Technology Industry Standards Operations, who replied to Ms. Chiu as follows:

8           Prior to making any changes to the **Qualcomm membership**, we would like
             to verify the information we have on file with you.  Below is the current
9           member information we have in our database.

10          Rick Kane - principal ($800)

11          Amnon Silberger - alternate (free, included with principal membership)

12          Hari Garudadri - additional alternate ($800)

13          **Jim Determan** - additional alternate ($800)

14          Viji Raveendran - additional alternate ($800)

15   (Id., Tab 128 at 728) (emphases added.)

16          Moreover, Mr. Determan received many of the emails discussed above, which

17   included JVT meeting reports from Qualcomm employees and consultant Isailovic as well

18   as discussion of Qualcomm monitoring of the JVT.  Therefore, the Court can only conclude

19   that, at the time of Mr. Determan's August 2006 deposition, he was fully aware that (1)

20   Qualcomm was heavily involved with the JVT since as early as January 2002 and (2) as

21   recently as 2004, Qualcomm was still a paying member of the JVT and so was Mr.

22   Determan as a Qualcomm representative.

23          Mr. Determan also testified in his August 2006 deposition that he did not recall ever

24   attending a JVT meeting nor was he aware of any Qualcomm employee attending any:

25          Q      Have you ever attended any meeting of the JVT?
             A      Not that I recall.
26          Q      Do you know of any Qualcomm employees that have attended JVT
                    meetings?
27          MR. LEUNG:        Objection.  Calls for speculation.

28                                          27                        05-CV-1958-B (BLM)

1    THE WITNESS:    Not that I'm aware.

2    (Doc. No. 543-2, Ex. S at 27.)  However, Qualcomm's post-trial production of documents

3    reveals that, not only was Mr. Determan aware that Qualcomm employees had attended

4    JVT meetings, but Mr. Determan probably attended some himself.

5    Qualcomm employee Silberger wrote in an April 2002 email:

6    We have been attending these standard body meetings for a while now.
     There are the MPEG/JVT/JPEG meetings and the SMPTE meetings.  To ease
7    the load, all the system engineers in our group rotate in attending these
     (Chris, Jay, Viji, Jim Determan and myself.)

8    (Doc. No. 543-2, Ex. A, Tab 44 at 306.)  Mr. Determan also received five emails from

9    Qualcomm colleagues Yun and Silberger with daily reports from their attendance of the

10   May 2002 JVT meeting in Fairfax, Virginia.  (Id., Tabs 56 - 60.)

11   Mr. Determan then testified at his August 2006 deposition that he did not know

12   when any JVT meetings took place nor did he recall ever hearing reports of any JVT

13   meetings:

14   Q    Do you know when any of the JVT meetings took place?
15   A    No.
     Q    Have you ever heard any reports, whether via email or written report
16        or any discussion, of what occurred at any JVT meeting?
     A    Not that I recall.
17
     (Doc. No. 543-2, Ex. S at 29.)  However, in contrast to this testimony, as stated above, Mr.
18
     Determan received multiple reports of the May 2002 JVT meeting in Fairfax.  (Doc. No.
19
     543-2, Ex. A, Tabs 56 - 60.)  He also "rotated" attending MPEG/JVT/JPEG and SMPTE
20
     standard body meetings with the other engineers in his group, Mr. Silberger, Mr. Yun, Ms.
21
     Raveendran, and Ms. Irvine.  (Id., Tab 44 at 206.)  Furthermore, in February 2002, he
22
     received Qualcomm consultant Isailovic's report of the January 2002 JVT meeting in
23
     Geneva forwarded to him by Qualcomm colleague Irvine.  (Id., Tab 5.)
24

25                              **(c)    Viji Raveendran**

26   In addition to her colleagues Ms. Irvine and Mr. Determan, Qualcomm trial witness
27

28                                        28                        05-CV-1958-B (BLM)

1    and senior staff engineering manager Viji Raveendran also gave testimony at deposition

2    and trial that was later blatantly contradicted by Qualcomm's post-trial document

3    production.  Ms. Raveendran testified in her July 2006 deposition that she did not even

4    learn of the JVT until 2003 through journals and publications:

> Q.     [] Referring only to the Joint Video Team that developed the H.264
>         standard, when did you first learn of the Joint Video Team that
>         developed the H.264 standard?
> A.     Somewhere in the 2003 time frame.
> Q.     How did you learn of it?
> A.     Through literature.
> Q.     What literature?
> A.     Basically journals and video processing related --
> THE REPORTER:   Related what?
> THE WITNESS:      Journals and publications, basically publications.

(Doc. No. 543-2, Ex. P at 36 - 37.)

However, the evidence produced by Qualcomm post-trial reveals that Ms.

Raveendran knew of the JVT as early as February 2002 through reports on JVT meetings

from Qualcomm consultant Isailovic, not through "journals and publications" in "the 2003

time frame" as she testified.  Qualcomm produced post-trial almost one hundred emails and

JVT meeting reports Ms. Raveendran either received or sent in 2002 addressing JVT's

work and its relation to Qualcomm.  (Id., Tabs 5 - 111.)  For example, in February 2002,

Ms. Raveendran received Qualcomm consultant Isailovic's report on the January 2002 JVT

Meeting in Geneva in an email forwarded by Qualcomm colleague Irvine.  (Doc. No. 543-

2, Tab 5.)  Furthermore, Ms. Raveendran sent many emails herself to other Qualcomm

employees regarding the JVT, including her February 2002 email to Mr. Yun and Ms.

Irvine, in which she says, "Chris is going to the JVT mtg. and will be driving tomorrow.

We will meet at Starbucks off Jefferson Rd. exit on I-78 (off of I-5) at 11:30 a.m."  (Id.,

Tab 8 at 88.)

Later in her deposition, Ms. Raveendran testified that she did not know of nor did

she receive a report of the JVT meeting (1) in January 2002 in Geneva, Switzerland; (2) in

May 2002 in Fairfax, Virginia; (3) in August 2002 in Klagenfurt, Austria; (4) in October

29

1    2002 in Geneva, Switzerland; (5) in December 2002 in Awaji Island, Japan; and (6) in

2    September 2003 in San Diego, California.  (Id. at 41 - 44.)  In direct contradiction to her

3    testimony, Qualcomm's post-trial production of documents reveal that Ms. Raveendran did

4    in fact receive (1) a report of the January 2002 JVT meeting in Geneva (Doc. No. 543-2,

5    Tab 5); (2) many emails discussing and reporting on the May 2002 JVT meeting in Fairfax,

6    including at least one sent by Ms. Raveendran herself (Id., Tabs 18, 22, 25, 32, 35, 36, 41,

7    56 - 61); (3) emails discussing the August 2002 JVT meeting in Klagenfurt, including ones

8    forwarding documents registered for the Klagenfurt meeting "[p]er your request, Viji" and

9    forwarding lists of Klagenfurt meeting registrants under "Viji, [t]his is for you" (Id., Tabs

10   54, 69, 80 at 468, 82, 84 at 492); (4) emails discussing the October 2002 JVT meeting in

11   Geneva, including one from Ms. Raveendran herself (Tabs 54, 97); (5) an email mentioning

12   the December 2002 JVT meeting on Awaji Island (Doc. No. 100); and (6) an email

13   mentioning the September 2003 JVT meeting in San Diego (Doc. No. 123).

14        Later in her July 2006 deposition, Ms. Raveendran testified that she did not know of

15   any JVT IPR policy:

16        Q.    Does the JVT have a policy regulating intellectual property rights?
          A.    I don't know of that.
17

18   (Doc. No. 543-2, Ex. P at 76.)  However, again, documents produced by Qualcomm post-

19   trial tell a different story.  Ms. Raveendran forwarded an email to two Qualcomm

20   colleagues in October 2002 with the subject heading "Fwd: [jvt-ipr] Confirmation of JVT

21   IPR meeting in Geneva."  (Doc. No. 543-2, Ex. A, Tab 97 at 567.)  In that email, she wrote,

22   "FYI.  Some information on licensing issues and IPR in JVT."  (Id.)  The forwarded email

23   included a suggested meeting agenda:

24        1) short summary of the IPR status in JVT
          2) potential licensing models, examples and wishes: MPEG-4, other
25        3) (ongoing) determination of essential patent holders
          4) expected process once essential patent holders are identified
          5) involvement of licensees and the role of this "JVT-IPR group"
26

27   (Id., Tab 97 at 568.)  Therefore, Ms. Raveendran was aware that the JVT wanted to identify

28                                          30                        05-CV-1958-B (BLM)

1    "essential patent holders" and was developing licensing models to regulate IPR.

2        Then in November 2002, Ms. Raveendran wrote an email to three Qualcomm

3    employees, including Mr. Yun and Mr. Silberger, in which she wrote, "Attached is the

4    Patent list Statement on MPEG.  Part 10 covers JVT (under AVC, that's how JVT is

5    referred to in MPEG world)."  (Id., Tab 101 at 590.)  Jay Yun then sent out an email in

6    response to a question as to the completeness of Ms. Raveendran's list:

> Initially JVT set out to come up with a royalty-free baseline profile.  Many
> submitted their technologies knowing that this is going to be the case, or
> some even withheld their submissions into the Baseline profile because they
> didn't want to submit as royalty-free.  And then over time it became evidence
> that royalty free baseline is not going to be possible.  Some patents are carry
> over from MPEG-2 and 4.  So now, some want to re-define the baseline
> profile and make sure all who didn't submit technologies before b/c they
> thought they couldn't would be allowed to submit again.  A big mess.

(Id., Tab 101 at 589.)  Ms. Raveendran then clarified Mr. Yun's response in her own email:

> A quick note: yes, this is not a complete list as Jay clarified.  Also, the
> contributions that did not make it into JVT's baseline profile (due to royalty
> issues), are now incorporated into the "Common" profile.

(Id., Tab 101 at 588.)  Therefore, in contradiction to her deposition testimony, Ms.

Raveendran was clearly aware of how the JVT was organizing its IPR into various profiles

and licensing schemes and did "know of" the JVT's policy regarding its IPR.

        Furthermore, Ms. Raveendran's trial testimony is directly rebutted by Qualcomm's

post-trial production of documents.  She testified that Qualcomm did not get involved in the

JVT until "much later" after the JVT was formed in late 2001:

> Q    Was Qualcomm involved with JVT at that time [when the JVT was
>        formed in 2001]?
> A    No, we were not.
> Q    Did Qualcomm ever become involved with JVT?
> A    Much later, when -- I mean, my -- my participation has been -- I don't
>        know who else participated in Qualcomm recently, but -- is that much
>        later when the scalable video coding effort got merged into JVT -- the
>        scalable video coding was a different standard that MPEG was
>        working on, and when they -- when that work item got moved to JVT,
>        that's when we started participating.

(Trial Tr., 40 - 41, Jan. 24, 2007.)  However, as demonstrated by Mr. Isailovic's report on

the January 2002 JVT meeting in Geneva, which was forwarded to Ms. Raveendran in

1    February 2002, Qualcomm was involved in the JVT as early as January 2002, which Ms.

2    Raveendran was well aware of when she testified at trial.  (Doc. No. 543-2, Tab 5.)

3         At trial, Ms. Raveendran also testified that her only personal involvement with the

4    JVT was attending one JVT meeting in July 2005 in Poland:

5         Q    Did you have any personal involvement with JVT?
     A    I attended one of their meetings when they were working on the
6         scalable video coding effort.  Scalable video coding is to enable
          different quality levels and different display levels of recorded video,
7         depending on the display sizes, for example.
          So that was a new technology that the group was working on, and my
8         interest was more in the sense of how robust that technology is to
          errors.  Because in a wireless scenario, there are errors that will cut up
9         the data, and how robust is that data.  So that was my involvement.

10   (Trial Tr., 41, Jan. 24, 2007.)  However, as is made abundantly clear by Qualcomm's post-

11   trial document production described above, that was far from the extent of Ms.

12   Raveendran's involvement with the JVT.  The documentary email evidence shows that Ms.

13   Raveendran was in fact integrally involved with Qualcomm's intense monitoring of the

14   JVT since as early as February 2002: sending JVT reports, receiving JVT reports, and

15   acting as a liaison between Qualcomm and consultant Isailovic who attended JVT meetings

16   on Qualcomm's behalf.

17

18                    **b.      Misconduct of Qualcomm counsel**

19                       **(1)      Misconduct during discovery**

20        The Court **FINDS** by clear and convincing evidence that Qualcomm counsel

21   participated in an organized program of litigation misconduct and concealment throughout

22   discovery, trial, and post-trial before new counsel took over lead role in the case on April

23   27, 2007.

24        On October 14, 2005, Qualcomm counsel filed a Complaint on behalf of Qualcomm

25   alleging Broadcom's infringement of the '104 and '767 patents based on Broadcom's

26   manufacture, sale, and offers to sell H.264-compliant products, requesting preliminary and

27   permanent injunction and damages.  (Doc. No. 1.)  On January 23, 2006, Broadcom

28                                    32                        05-CV-1958-B (BLM)

submitted its First Set of Requests for the Production of Documents and Things (Nos. 1 -

88), in which it requested "[a]ll documents concerning Qualcomm membership,

participation, interaction, and/or involvement in setting any standard relating to the

processing of digital video signals that pertains in any way to any Qualcomm Patent."

(Doc. No. 543-2, Ex. V at 17.)  Qualcomm counsel submitted in Qualcomm's Response to

Broadcom's request on February 24, 2006, the following response:

> QUALCOMM will produce responsive non-privileged documents that were
> given to or received from standards-setting body responsible for the ISO/IEC
> MPEG-4 Part 10 standard, and which concern any QUALCOMM
> participation in setting the ISO/IEC MPEG-4 Part 10 standard, following the
> entry of, and pursuant to the terms of, a mutually agreed-upon protective
> order.

(Doc. No. 543-2, Ex. W at 44.)  This response deflected the request as though it only

addressed the MPEG-4 Part 10 standard and completely concealed Qualcomm's extensive

involvement with the JVT and the H.264 standard.

On January 23, 2006, Broadcom also submitted Request for Production No. 49

requesting "[a]ll documents given to or received from a standards setting body or group

that concern any standard relating to the processing of digital video signals that pertains in

any way to any Qualcomm Patent, including without limitation communications, proposals,

presentations, agreements, commitments, or contracts to or from such bodies."  (Doc. No.

543-2, Ex. E at 1.)  Later on July 14, 2006, Broadcom submitted Request for Production

No. 93 requesting "[a]ll documents referring to or evidencing any participation by

Qualcomm in the proceedings of the JVT, the ISO, the IEC, and/or the ITU-T."  (Id.)

Despite these requests, Qualcomm counsel produced none of the over two hundred

thousand pages of emails and electronic documents concerning the JVT and the H.264

standard, which were clearly within the scope of the requests, and that were finally

produced four months post-trial.

On January 23, 2006, Broadcom submitted its First Set of Interrogatories Under Fed.

R. Civ. P. 33 (Nos. 1-16), in which it listed as Interrogatory No. 13:

Please identify and describe in detail Qualcomm's membership, participation, interaction, and/or involvement in setting any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm patent [. . .] This interrogatory includes without limitation any MPEG [Moving Pictures Working Group] video processing standard, and expressly includes H.264.

(Doc. No. 565-2, Ex. C at 15.)  Broadcom further asks in this same interrogatory for "the nature, purpose, effect, and sum and substance of Qualcomm's participation and/or involvement," "the identity of each Person who participated or was involved on behalf of Qualcomm," and the "relevance" and "identity" of any Qualcomm patent "related to such standard." (Id. at 15 - 16.)

The Court quotes the verbatim response submitted by Qualcomm counsel to Interrogatory No. 13 in Qualcomm's Fourth Supplemental Response to Broadcom's First Set of Interrogatories (Nos. 1-16), pages 33 - 35, dated September 5, 2006, because it demonstrates vividly the stonewalling denial and diversions of requests for evidence repeatedly directed to Qualcomm:

QUALCOMM refers to and incorporates by reference each of the foregoing general objections as though each is set forth fully herein, including privilege and work product.

QUALCOMM further objects to the definition of "identify" to the extent it renders the interrogatories overly broad, unduly burdensome and/or would require QUALCOMM to provide information that is not within its possession, custody, and control and/or cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the purported requirement that it respond "in detail" as vague, ambiguous, unduly burdensome, overly broad, and requiring information not within its possession, custody, or control. In particular, it is unclear how much detail is requested, and QUALCOMM will respond only to the extent information is explicitly requested.

QUALCOMM objects to the term "Qualcomm Patent" as vague and ambiguous, and instead will refer to the "QUALCOMM Patents-in-Suit."

QUALCOMM objects to the definition of "Person" to the extent that its definition is circular with respect to "Entity" and "entities." "Person" is defined to include any "legal entity," "government entity," and "business entity." "Entity" is defined to include "natural persons." QUALCOMM will construe "Person" in accordance with its reasonable ordinary meaning.

QUALCOMM objects to the phrase "any standard relating to the

34

processing of digital video signals" as vague and ambiguous. QUALCOMM further objects to the defined terms "standard" or "standards" as vague, ambiguous, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence; and to the defined terms "MPEG video processing" as vague, ambiguous, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. QUALCOMM will construe those terms as stated in the general objections.

QUALCOMM objects to the term "relevance" as vague, overly broad, and neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

QUALCOMM objects to the purported requirement that it respond as to the time period(s) at issue as vague, ambiguous, overly broad, unduly burdensome, and requiring information not within its possession, custody, or control.

QUALCOMM objects to the phrase "nature, purpose, effect, and sum and substance" as vague, ambiguous, overly broad, unduly burdensome, and requiring information not within its possession, custody, or control.

QUALCOMM objects to the phrase "participation and/or involvement" as vague, ambiguous, overly broad, and unduly burdensome.

QUALCOMM objects to the phrase "membership, participation, interaction, and/or involvement" as vague, ambiguous, overly broad, and unduly burdensome because the phrase "membership . . . in setting any standard" is impossible to parse.

QUALCOMM objects to the purported requirement that it identify "each" person, to the extent it calls for information that is not within QUALCOMM's possession, custody, and control and/or that cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the purported requirement that it respond as to "standards raised but never adopted" as vague and to the extent it calls for information not within QUALCOMM's possession, custody, and control and/or that cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the purported requirement that it identify the particular standard(s) that resulted from Qualcomm's involvement, to extent it calls for information that is not within QUALCOMM's possession, custody, and control and/or that cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the phrase "relevance" in interrogatory 13(I) as vague, ambiguous, overly broad, unduly burdensome, calling for information that is not within QUALCOMM's possession, custody, and control and/or cannot be identified or located with a reasonably diligent search, and neither relevant to any claim or defense at issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence. In particular, the basis for determining relevance is unclear, the interrogatory

35

potentially requires a response that is virtually unlimited in scope, and it is unclear as to the entities from whose perspective relevance is to be determined.

QUALCOMM objects to the term "related" as vague, ambiguous, overly broad, and unduly burdensome, and neither relevant to any claim or defense at issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the general and specific objections set forth herein, QUALCOMM responds as follows. Beyond passive monitoring, QUALCOMM participated in ISO/IEC JTC1/SC29 WG11 of MPEG. The time period at issue includes 2001. The nature of QUALCOMM's participation includes the contribution of two proposals with document numbers 7340 and 7341. The author of these proposals was A. Chris Irvine.

QUALCOMM contributed four proposals to the JVT in 2006. One each during the January and April meetings, and two during the July meeting. The authors of these proposals were Yiliang Bao and Yan Ye. During the April 2006 meeting of the JVT, QUALCOMM also contributed a verification of an earlier proposal by LG.

QUALCOMM's investigation concerning this interrogatory is ongoing and QUALCOMM reserves the right to supplement its response to this interrogatory as warranted by its investigation.

On March 10, 2006, Qualcomm counsel submitted its Initial Disclosure of Asserted Claims and Accused Products Relating to the '767 and '104 Patents, in which it listed as Accused Broadcom Products those products that "conform to, comply with, and/or support H.264." (Doc. 565-2, Ex. A at 1.) At that point, Qualcomm apparently was very much aware of the relevance of the H.264 standard.

On May 23, 2006, Broadcom submitted its Notice of Rule 30(b)(6) Deposition to Qualcomm, [Notice No. 1: Qualcomm's Products, Processes, and Instrumentalities], in which it notices topics for 30(b)(6) deposition, including:

The attendance or participation by any Qualcomm principal, employee, or representative at any H.264 standards committee meetings, including, but not limited to, the dates, locations and agendas of such meetings, notes taken at such meetings, membership of any Qualcomm principal, employee, or representative in any H.264 standards committees, and any actions taken by Qualcomm or any of its principals, employees, or representatives as a result of such meetings.

(Doc. No. 565-2, Ex. D at vii.)  In July 2006, Qualcomm's preferred Rule 30(b)(6) witness Christine Irvine falsely testified at deposition as described above in Section III-B-5-a-(2)-(a) that Qualcomm was not a member of the JVT; Qualcomm was not aware of any

36

1  attendance of JVT meetings; and that nobody at Qualcomm sought to become involved in

2  the development of the H.264 standard.  (Doc. No. 543-2, Ex. Q at 30, 34, 40.)

3          On July 12, 2006, Broadcom filed an additional Rule 30(b)(6) notice specifically

4  addressing the JVT in its Notice of Rule 30(b)(6) Deposition to Qualcomm, [Notice No. 5:

5  H.264 Participation].  (Def's Binder, 06-25-07 Hr'g, Tab 6.)  Qualcomm's subsequent Rule

6  30(b)(6) witness Scott Ludwin testified at his August 2006 deposition that he had never

7  heard any discussion nor seen documentation of Qualcomm membership in the JVT:

8
9
> Q.       I take it further you haven't seen any written documentation of
>          Qualcomm's membership in the JVT.
> MR. LEUNG:        Objection; lacks foundation.
> THE WITNESS:      I've never been at any discussions with respect to the
>                   membership in JVT or seen any documents if they do
>                   exist.

10
11

12  (Doc. No. 543-2, Ex. R at 26.)  He also testified that he did not know whether any

13  Qualcomm employees were JVT members:

14
> Q.       [. . .] [D]o you know whether any Qualcomm employees are currently
>          members of the JVT?
> MR. LEUNG:        Objection; vague and ambiguous.
> THE WITNESS:      I don't know.  Again I'm not familiar with the
>                   membership structure of the JVT and your attendance in
>                   those particular organizations.

15
16
17

18  (Def's Binder, 06-25-07 Hr'g, Tab 13 at 26 - 27.)   He later testified in the same deposition

19  that December 2003 was Qualcomm's first participation in the JVT:

20
> Q.       [. . .] So did any Qualcomm employee prior to December, 2003
>          participate in any JVT activity?
> A.       I believe that December of 2003 was our first participation in any
>          formal JVT meeting.  I believe Qualcomm sponsored an event, a JVT
>          event when that organization met in San Diego [in September 2003].
>          I'm not certain – I don't know if anyone from Qualcomm actually
>          went to that event.  That is the only participation that I know of any
>          Qualcomm company employee in any JVT activity.

21
22
23

24  (Ex. 565-3, Ex. H at 51.)

25          On August 16, 2006, Qualcomm counsel submitted Qualcomm's Response to

26  Broadcom's Second Set of Requests for Production of Documents and Things (Nos. 89-

27  115).  (Doc. No. 543-2, Ex. X.)  Qualcomm there stated:

28

1

QUALCOMM will produce non-privileged relevant and responsive documents describing QUALCOMM's participation in the JVT, if any, which can be located after a reasonable search.

2

3    (Id. at 12.)  As is clear to the Court now, Qualcomm failed to produce even one of the over

4    two hundred thousand pages of emails, memoranda, and electronic documents related to

5    Qualcomm's participation in the JVT, which were finally produced after trial.  But

6    Qualcomm's assurance of performing a "reasonable search" represents that Qualcomm was

7    acting in good faith to produce discovery.

8            On September 5, 2006, Qualcomm counsel then submitted Qualcomm's First

9    Supplemental Response to Broadcom's Second Set of Interrogatories (Nos. 17-29), in

10   which Qualcomm represented that the first JVT meeting attended by a Qualcomm

11   employee was by Phoom Sagetong in December 2003.  (Doc. No. 543-2, Ex. Y at 12.)

12   Qualcomm listed Mr. Sagetong as attending eight JVT meetings from December 2003 to

13   January 2006 and asserted that the only other Qualcomm employees to attend JVT

14   meetings were: (1) Yuriy Reznick, who attended the July 2005 and October 2005 meetings;

15   (2) Ms. Raveendran, who attended the July 2005 meeting; and (3) Yiliang Bao, who

16   attended three meetings from January 2006 to July 2006.  (Id. at 12 - 13.)  As shown in

17   great detail hereabove, these supplemental responses were calculatedly misleading and

18   totally false in the context of their denial of any attendance of a JVT meeting by any

19   Qualcomm representative prior to December 2003.

20           Qualcomm counsel's discovery responses demonstrate that they were able to locate

21   with alacrity company records from December 2003 forward and find four or more

22   Qualcomm employees participating in proceedings of the JVT.  Yet inexplicably, they were

23   unable to find over 200,000 pages of relevant emails, memoranda, and other company

24   documents, hundreds of pages of which explicitly document massive participation in JVT

25   proceedings since at least January 2002.  These examples of Qualcomm counsel's

26   indefensible discovery conduct belie counsel's later implied protestation of having been

27   "kept in the dark" by their client.

28

1

**(2)    Misconduct during motions practice**

2    The gross litigation misconduct by Qualcomm counsel continued through motions

3   practice before the Court.

4    On September 1, 2006, Qualcomm counsel submitted a Declaration of Dr. Iain

5   Richardson in support of Qualcomm's Motion for Summary Adjudication of no waiver, in

6   which Dr. Richardson declared under penalty of perjury in pertinent part:

7    I have been unable to find any documentary evidence of the involvement of
     Qualcomm personnel in the H.264/AVC [Advanced Video Coding]
8    standardization process prior to September 2003, by which time the technical
     content of the baseline, main and extended profiles was considered to be
9    frozen and the first issue of the H.264/AVC standard had been published.

10   (Doc. No. 543-2, Ex. T at 5) (footnote omitted.)  Dr. Richardson continued:

11    The involvement of Qualcomm employees in JVT activities from September
      2003 to December 2005 appears to be minimal, with no technical contribution
12    documents submitted by any Qualcomm employee.

13   (Id. at 5.)  Dr. Richardson then concluded:

14    Indeed, Qualcomm was not significantly involved in the JVT until 2006, and then its
      involvement has been limited to the SVC [Scalable Video Coding] standardization
15    project, not the H.264/AVC standard.  Therefore, it is my opinion that Qualcomm
      did not meaningfully participate in the development of the H.264/AVC standard,
16    and Qualcomm did not violate any of JVT's or ITU-T's rules or expectations
      regarding the disclosure of intellectual property rights.

17
     (Id. at 9.)  Here, even Qualcomm's scientific expert Dr. Iain Richardson, who was qualified
18
     as an expert in video compression technology and who testified at trial that Broadcom's
19
     H.254-compliant products infringed the '104 and '767 patents, was used by Qualcomm
20
     counsel to step out of his field of expertise and sign a declaration vouching for the absence
21
     of any corporate records regarding Qualcomm's participation in the JVT.
22
     Qualcomm counsel then filed this Richardson declaration on November 6, 2006, as
23
     Exhibit 15 to the Declaration of Kyle S. Robertson in Support of Qualcomm Incorporated's
24
     Motion for Summary Adjudication regarding Broadcom's defenses of equitable estoppel,
25
     implied license, fraud, unclean hands, breach of contract, laches, and waiver.  (Doc. No.
26
     168.)
27

28                                              39

On November 6, 2006, Qualcomm counsel filed Qualcomm's Motion for Summary Adjudication as to Broadcom's defenses including waiver (Doc. No. 165), to be heard by the Court on December 5, 2006. In the Introduction of the opening brief, Qualcomm counsel argued as follows: "The facts are undisputed: QUALCOMM employees never participated, in any form, in the JVT until *after* the H.264 standard was already released." (Doc. No. 543-2, Ex. Z at 1.) Qualcomm counsel continued, "There is no evidence that any QUALCOMM participant knew of the applicability of the patents-in-suit to the H.264 standard prior to the initiation of this lawsuit." (<u>Id.</u>)

Qualcomm counsel then argued emphatically in the body of Qualcomm's opening brief for summary adjudication, as summarized in the chart below:

| Section title of Qualcomm's brief | Arguments made by Qualcomm counsel |
|---|---|
| JVT Practices and Procedures and QUALCOMM's Participation | The evidence is undisputed that QUALCOMM was not involved, in any manner, with the work of the JVT leading up to this release of the H.264 standard in May of 2003. There is no evidence that QUALCOMM attended any of the JVT meetings between December, 2001 and May, 2003. Until September of 2003, no QUALCOMM employee ever attended a meeting of the JVT. There is also no evidence that QUALCOMM employees engaged in any email correspondence or other means for working with the JVT to develop the standard.<br><br>(Doc. No. 543-2, Ex. Z at 4) (citations omitted.)<br><br>The first recorded instance of a named QUALCOMM employee attending a meeting of the JVT occurs with Phoom Sagetong in December, 2003 [. . .] Between 2003 and 2005, Mr. Sagetong was the only QUALCOMM employee to attend a meeting of the JVT.<br><br>(<u>Id.</u>) (citations omitted.)<br><br>QUALCOMM never submitted a JVT patent disclosure form related to the baseline H.264 profile because QUALCOMM never participated in the JVT meetings where that standard was created [. . .] In April 2006, QUALCOMM declared that it had patents it believed were "required to implement" the H.264 standard, and that it was prepared to license any such patents on a "worldwide, non-discriminatory basis and on reasonable terms and conditions." |

05-CV-1958-B (BLM)

| | |
|---|---|
| | (Id. at 7) (citations omitted.) |
| It Is Undisputed that QUALCOMM Did Not Make a Misleading Communication | There is no evidence that any QUALCOMM employee was a JVT participant prior to September, 2003, and therefore there is no reasonable basis for Broadcom to assert that QUALCOMM had a duty to disclose the patents-in-suit prior to this point in time.  There is no evidence of any particular QUALCOMM employee attending a meeting of the JVT prior to Phoom Sagetong, in December, 2003. |
| | (Doc. No. 543-2, Ex. Z at 10) (citations omitted.) |
| | It is undisputed that none of the QUALCOMM employees attending JVT meetings knew of the potential applicability of the patents-in-suit to the H.264 standard [. . .] [N]one of them [Qualcomm employees] can be accused of making any misleading statements or engaging in any misleading omissions. |
| | (Id.) (citations omitted.) |
| | The relevant H.264 standard had already been in place and the technical content of the standard established when the attendees in question, QUALCOMM engineers, attended their first meeting of the JVT. |
| | (Id. at 10.) |
| Broadcom's Claim Of Fraud Is Insufficient As A Matter Of Law | [T]here is no evidence showing the requirements of scienter and intent to defraud, as none of the QUALCOMM employees attending JVT meetings knew of these patents. |
| | (Doc. No. 543-2, Ex. Z at 15.) |
| Broadcom's Claim Of Unclean Hands Is Insufficient As A Matter Of Law | QUALCOMM employees participating in the JVT acted in good faith at all times[.] |
| | (Doc. No. 543-2, Ex. Z at 16.) |

In conjunction with the Motion for Summary Adjudication, Qualcomm counsel also filed a supporting Statement of Undisputed Facts, in which it listed as undisputed fact:

10.  Qualcomm was not involved with the work of the JVT leading up to the release of the H.264 standard in May of 2003.

11.  Qualcomm had no influence or effect on the technical content of the H.264 standard prior to its publication in May 2003.

05-CV-1958-B (BLM)

1    (Doc. No. 543-2, Ex. AA at 2) (citations omitted.)

2        Then, on November 27, 2006, Qualcomm counsel filed their reply brief in support of

3    Qualcomm's Motion for Summary Adjudication, in which they addressed the appearance

4    of Qualcomm employee Raveendran's email address in an email list for a JVT ad hoc

5    group:

6        It does not show that Raveendran ever received any JVT documents or JVT
         information of any sort, let alone anything covering the relevant parts of the
7        H.264 standard. The document thus does not contradict Raveendran's
         testimony that she did not receive information related to JVT meetings, and
8        did not know of JVT meetings or have any involvement with the JVT prior to
         her participation in the SVC project. The document also provides no
9        evidence regarding what emails were allegedly sent to the "avc_ce" email
         list, whether Raveendran was actually on this list or received any emails, and
10       whether she viewed and understood any emails that actually support the
         elements of the defenses Broadcom has to prove, including that
11       QUALCOMM understood at the time that either of the patents-in-suit may
         relate to the H.264 standard. In short, this document, even if admissible
12       (which it is not), fails to support *any* reasonable inference for Broadcom and
         does not contradict Broadcom's own expert when he agreed that
13       "QUALCOMM had not influence or effect on the technical content of the
         H.264 standard prior to its publication in May 2003."

14   (Doc. No. 543-2, Ex. CC at 6 - 7) (footnote and citations omitted.) Later, in a section

15   entitled "It Is Undisputed That No QUALCOMM Employee Knew Of The Applicability of

16   The Patents-In-Suit To The H.264 Standard Prior To This Lawsuit," Qualcomm counsel

17   argued:

18       All Raveendran stated [in her deposition] was "I have seen the front page [of
19       the '104 patent], I haven't seen the entire document." This testimony does
         not show that Raveendran was familiar with the technical details of the H.264
20       standard or with the relevance of the '104 Patent to the H.264 standard. It
         falls far short of establishing that Raveendran "knew of the applicability of
21       the patents-in-suit to the H.264 standard," only showing that Raveendran
         never read the '104 Patent.

22   (Doc. No. 543-2, Ex. CC at 9) (footnote and citation omitted.)

23       The lynchpin of Qualcomm's adamant and determined motions and arguments for

24   summary adjudication was the claim that Broadcom had no evidence of JVT participation.

25   Not surprising. Every attempt to obtain evidence, which as it came later to be revealed was

26   voluminous and dispositive, had been repelled by Qualcomm by its steadfast denial of the

27

28                                          42                      05-CV-1958-B (BLM)

1   existence of any evidence and the false denials of all factual allegations, both in its

2   witnesses' depositions and in its discovery responses.  To then urge upon the Court that

3   Broadcom had no evidence to support its position demonstrates the reason for calculated

4   orchestration of a deliberate plan to conceal evidence in the case.

5          On November 19, 2006, Qualcomm counsel filed Qualcomm's Motion in Limine to

6   Exclude Evidence Relating to Qualcomm's Participation in the JVT, the Timing of its

7   Disclosures, and the Testimony of Cliff Reader, or, in the Alternative, for Adjudication of

8   Broadcom's Equitable Defenses in a Bench Trial, in which they again argued:

9          Broadcom has conducted extensive discovery relating to QUALCOMM's
           alleged involvement in the JVT, apparently in an effort to claim that
10         QUALCOMM had some obligation to disclose, prior to filing the present
           action in October 2005, that it had patents required to implement the H.264
11         standard [. . .]

12         It is undisputed that QUALCOMM did not become involved at all in the
           JVT's proceedings until after the JVT had finalized the H.264 technical
13         specifications, and Broadcom's expert, Dr. Reader, admitted that
           QUALCOMM had "no influence or effect on the technical content of the
14         H.264 standard prior to its publication in May 2003." [. . .]  There is no
           evidence that QUALCOMM attended any of the JVT meetings between
15         December 2001 and May 2003.  In fact the first QUALCOMM participation
           did not occur until September 2003.
16
17  (Doc. No. 543-2, Ex. EE at 2) (footnotes omitted.)  These two paragraphs contain nothing

18  but false statements.

19         On the same day, Qualcomm counsel filed Qualcomm's Memorandum of

20  Contentions of Fact and Law, in which they similarly asserted under the section entitled

21  "QUALCOMM's Lack of Involvement in H.264 Standardization Process":

22         66.  There is no evidence of any involvement of QUALCOMM personnel in
           the H.264/AVC standardization process prior to September 2003, by which
23         time the technical content of the baseline, main and extended profiles was
           considered to be frozen and the first issue of the H.264/AVC Standard had
24         been published.

25         67.  QUALCOMM employees had only minimal involvement in JVT
           activities from September 2003 to December 2005, with no technical
26         contribution documents submitted by any QUALCOMM employee.

27         68.  QUALCOMM had no significant involvement with the development of
           the H.264/AVC Standard.

28                                          43                        05-CV-1958-B (BLM)

(Doc. No. 543-2, Ex. BB at 16 - 17.)  Qualcomm counsel then filed Qualcomm's Rebuttal Memorandum of Contentions of Fact and Law on December 4, 2006, in which they asserted:

> 31.  QUALCOMM was not a JVT participant leading up to the release of the H.264 standard when it was technically fixed in December 2003 or when it was officially released in May 2003 [. . .]

> 32.  Broadcom's allegation that QUALCOMM was involved with the JVT prior to the development and release of the standard is based solely on the appearance of the e-mail address of QUALCOMM employee Viji Raveendran on an e-mail list for the Ad Hoc Group on AVC verification tests [. . .]  Broadcom offers no other evidence of participation in the JVT by Ms. Raveendran or any other employee as early as December 2002.

> 33.  Ms. Raveendran was not involved in any standards development projects relating to the H.264 standard, nor did she recall receiving submissions or documents related to the standard.  Raveendran did not receive information related to the JVT meetings or know of JVT meetings prior to her participation in a separate JVT project, the scalable video coding project, unrelated to the patents in suit or to this litigation.

> 34.  Broadcom's only other allegation with respect to QUALCOMM participation in the JVT occurs long after the standard was technically fixed and officially released: the apparent sponsorship of a JVT meeting by QUALCOMM and alleged and unverified recording of a single objection made by QUALCOMM to a proposed change in the profile in September 2003, and the appearance of QUALCOMM employee Phoom Sagetong in JVT meetings between December 2003 and in 2004.

> 35.  None of these allegations show that QUALCOMM participated in the JVT when the H.264 standard was developed and approved.  QUALCOMM's only involvement in the JVT was as part of the unrelated SVC project, and it began in 2005.  Mr. Sagetong attended the JVT meetings on behalf of the United States National Body and not as a representative of QUALCOMM.

(Doc. No. 543-2, Ex. DD at 8 - 9.)

Qualcomm's motion for summary adjudication was denied on December 5, 2006. As detailed in previous sections of this Order, all of these assertions of no participation that were made and re-made by Qualcomm counsel during motions practice for the present litigation were proven patently false by documents produced by Qualcomm only after a jury trial was held, after a verdict was reached, after a post-trial hearing on the equitable issues was held, and after a finding was made by the Court as to these equitable issues.

1    And certainly the statement that "Broadcom has conducted extensive discovery relating to

2    Qualcomm's alleged involvement in the JVT . . ." is particularly ironic, since Broadcom's

3    repeated requests were uniformly denied on the stated ground that there was nothing to

4    produce.

5

6                          **(3)    Misconduct during trial**

7         Qualcomm counsel continued to vigorously argue during trial that Qualcomm did

8    not participate in the JVT until well after the H.264 standard was published in May 2003.

9    Qualcomm counsel stated in his opening statement:

10        Later, in May of '03, the standard is approved and published.  And then
          Qualcomm, in the fall of 2003, it begins to participate not in JVT because it's
11        done.  H.264 is approved and published.  Qualcomm begins to participate in
          what are called professional extensions, things that sit on top of the standard,
12        additional improvements.

13   (Trial Tr., 107, Jan. 9, 2007.)

14        Then at side bar on January 18, 2007, Qualcomm counsel, in an attempt to keep out

15   of evidence a list of email addresses for a JVT ad hoc group that included the email address

16   of Qualcomm employee Raveendran, represented to the Court, "Actually, there are no

17   emails -- there are no emails."  (Trial Tr., 91, Jan. 18, 2007.)  He further stated, "there's no

18   evidence that any e-mail was actually sent to this list.  This is just a list of e-mail . . .

19   addresses.  There's no evidence of anything being sent."  (Trial Tr., 92, Jan. 18, 2007.)

20   These statements were made four days after Qualcomm counsel, while preparing Ms.

21   Raveendran for her testimony, had stripped over fifty pages of emails regarding the JVT

22   from her email archives.

23        Six days later on the morning of January 24, 2007, one of the last days of trial,

24   Qualcomm counsel filed Qualcomm's Motion for Judgment as a Matter of Law  ("JMOL")

25   Pursuant to Rule 52(c), in which they argued:

26        Broadcom failed to show (1) that Ms. Raveendran ever received a single
          email related to this list, (2) that anyone on this list ever communicated
27        regarding the H.264 standard, and (3) that the email list in question was even

28                                           45                        05-CV-1958-B (BLM)

1    a JVT list at all.

2    (Doc. No. 479 at 11.)

3    However, later that very same morning, in direct opposition to Counsel's

4    representations at side bar and Qualcomm's argument in its JMOL, Ms. Raveendran

5    testified as follows:

6    Q [by Broadcom counsel]:  Did you receive mailings from the [JVT] ad hoc committee identified in this exhibit?
7    A:    During the preparation for this testimony, there were some e-mails pulled out of my e-mail box.  E-mail archive.
8    Q:    Were they produced to Broadcom?
     A:    I don't know.

9
10   (Trial Tr., 53, Jan. 24, 2007.)  These emails had not yet been produced to the Court or

11   Broadcom, and, immediately addressing this issue at side bar later on January 24,

12   Qualcomm counsel still argued to the Court,

13   [I]t's not clear to me [the emails are] responsive to anything.  So that's something that needs to be determined before they would be produced . . . I'm talking about whether they were actually requested in discovery.

14   (Trial Tr., 83, Jan. 24, 2007.)  Counsel continued,

15   I'm simply representing I haven't seen [the emails], and [whether Broadcom requested them] hasn't been determined.

16
17   (Id. at 84.)

18   Qualcomm counsel apparently determined that the emails were in fact responsive,

19   because they produced the emails to Broadcom over the lunch recess on January 24, and

20   Ms. Raveendran was brought back to court to testify about them.  Before Broadcom

21   counsel was able to question Ms. Raveendran about the emails, Qualcomm counsel voiced

22   an objection to the Court out of the presence of the jury in pertinent part as follows:

23   There's nothing wrong with the way in which this production has taken place, your Honor.  There's been no wrongdoing on the part of Qualcomm in the way in which these have been provided.
24
25   (Trial Tr., 193 - 94, Jan. 24, 2007.)

26   After trial, on February 1, 2007, Qualcomm counsel finally admitted by telephone to

27   Broadcom that "on January 14, 2007, attorneys for Qualcomm learned of an archive of

28
                                        46                        05-CV-1958-B (BLM)

1    emails [sent to this email list for the JVT ad hoc group] belonging to Viji Raveendran."

2    (Doc. No. 543-2, Ex. E at 2.)  Therefore, on January 14, four days before Qualcomm

3    counsel argued to the Court that "there are no emails" and eight days before Qualcomm

4    counsel argued that Broadcom had failed to prove "[Ms.] Raveendran had ever received a

5    single email related to this list" in Qualcomm's JMOL, Qualcomm attorneys already knew

6    that there were in fact emails and had pulled them from Ms. Raveendran's email archive.

7        It is clear to the Court now, despite the attempts made by Qualcomm to minimize the

8    significance of these twenty-one emails, that they were just the "tip of the iceberg," that

9    over two hundred thousand more pages of emails and electronic documents were produced

10    post-trial that indisputably demonstrate that Qualcomm participated in the JVT from as

11    early as January 2002, that Qualcomm witnesses Irvine, Raveendran, Determan, and other

12    engineers were all aware of and a part of this participation, and that Qualcomm knowingly

13    attempted in trial to continue the concealment of evidence.  None of these emails or

14    electronic documents were produced in discovery as requested by Broadcom in multiple

15    requests for production and interrogatories.

16

17                         **(4)    Misconduct post-trial**

18        Shortly after trial on January 29, 2007, Qualcomm counsel filed an Amended JMOL

19    Pursuant to Rule 52(c) backtracking on their original assertion that Ms. Raveendran had not

20    received any emails sent to the JVT ad hoc group email list.  (Doc. No. 491 at 11.)

21    Qualcomm counsel also sent a letter of apology to the Court on January 29, 2007, admitting

22    that Qualcomm counsel's argument at sidebar on January 18 and Qualcomm's arguments in

23    its original JMOL were "incorrect" as to the alleged non-existence of any emails sent to

24    Ms. Raveendran through the ad hoc group email list.  (Doc. No. 543-2, Ex. D.)

25        Nevertheless, Qualcomm counsel continued to assert no participation in the JVT in

26    its February 2, 2007, Post-Trial Brief Concerning Waiver and Inequitable Conduct.  (Doc.

27    No. 503.)  In a section entitled "QUALCOMM Did Not Participate In The Development Of

28                                    47                         05-CV-1958-B (BLM)

The H.264 Standard Prior To The Publication of That Standard In May 2003," Qualcomm counsel argued:

> QUALCOMM did not attend JVT meetings and did not participate in the development of the H.264 standard prior to May 2003. The first evidence of any JVT participation on behalf of QUALCOMM is the September 2003 JVT meeting minutes, four months after the H.264 standard's publication.

(Id. at 4 - 5) (footnotes omitted.) Citing Ms. Raveendran's testimony that she "never attended any JVT-related meeting until July 2005," Qualcomm counsel asserted:

> The passive and involuntary receipt of unsolicited and unread emails, without more, did not make QUALCOMM a "member" of the JVT and could not create any duty of disclosure under its rules.

(Id. at 5.) Then, in a section entitled "No QUALCOMM Participant Was Aware Of The Potential Application Of The Patents-In-Suit To The H.264 Standard During The Relevant Time Period," Qualcomm counsel further asserted:

> Prior to July 2005, the QUALCOMM employees who participated in the JVT had no awareness that the patents-in-suit might apply to the H.264 standard . . . Because no QUALCOMM employee ever actually compared the claims of the patents to the standard, QUALCOMM did not know that the patents-in-suit read on the standard, and could not have "knowingly violated" any disclosure duty.

(Id. at 6) (footnote omitted.)

Qualcomm counsel then ironically stated in their post-trial brief that "[s]tandards-setting misconduct is a serious charge, suggesting sophisticated foul play." (Id.) The Court completely agrees with this statement and finds that Qualcomm's standard-setting misconduct with the JVT was indeed "serious" and suggests extremely sophisticated foul play on the part of Qualcomm and its employees. At the post-trial evidentiary hearing on the equitable issues of inequitable conduct and waiver, Qualcomm counsel continued to vigorously argue no participation and no foul play. The Court ultimately found in favor of Broadcom and against Qualcomm that Qualcomm had indeed waived its patent rights as to the '104 and '767 patents in its March 21, 2007 Order. (Doc. No. 528.)

Furthermore, in a letter to Broadcom dated February 8, 2007, Qualcomm counsel asserted that, while perhaps "there was some fleeting mention of emails in my presence,"

he was somehow "not cognizant that the emails from Ms. Raveendran's archive had been

identified" when he flatly asserted to the Court at sidebar on January 18 that no such emails

existed:

> [S]ince the issue of my knowledge [of the twenty-one emails produced on January 24] has been raised, I should add that I cannot completely exclude the possibility that, during those times that I was in the Day Casebeer firm's trial preparation suites rather than my own firm's, there was some fleeting mention of emails in my presence. What I can say with certainty now is that, when I told the Court on January 18, 2007 that there was no such emails in evidence, I was not cognizant that the emails from Ms. Raveendran's archive had been identified.

(Doc. No. 543-2, Ex. F at 1.)

As stated above, these twenty-one emails were just a hint of the over two hundred

thousand pages of emails and electronic documents that were finally produced four months

after trial containing direct evidence that multiple representatives of Qualcomm

participated in the JVT from the beginning, and that multiple Qualcomm witnesses knew of

this participation even as they testified to the contrary at deposition and trial. However,

before this production occurred and even after the discovery of the twenty-one emails in

Ms. Raveendran's email archive, Qualcomm counsel continued to insist that they had

conducted a reasonable search for responsive documents during discovery and that the

twenty-one emails were not responsive because they were irrelevant. Qualcomm counsel

wrote in a letter to Broadcom on February 16, 2007:

> As explained earlier in our meet and confer, QUALCOMM voluntarily produced the [twenty-one] emails during trial in the interest of expeditiousness. We continue to believe that QUALCOMM performed a reasonable search of QUALCOMM's documents in response to Broadcom's Requests for Production and that the twenty-one unsolicited emails received by Ms. Raveendran from individuals on the avc_ce reflector are not responsive to any valid discovery obligation or commitment.

(Doc. No. 543-2, Ex. G at 1.) Qualcomm counsel made these assertions all the while

acknowledging: (1) Broadcom's July 14, 2006, Request for Production No. 93 requesting

"[a]ll documents referring to or evidencing any participation by Qualcomm in the

proceedings of the JVT, the ISO, the IEC, and/or the ITU-T"; (2) Broadcom's January 23,

1  2006, Request for Production No. 49 requesting "[a]ll documents given to or received from

2  a standards setting body or group that concern any standard relating to the processing of

3  digital video signals that pertains in any way to any Qualcomm Patent, including without

4  limitation communications, proposals, presentations, agreements, commitments, or

5  contracts to or from such bodies"; and (3) Broadcom's January 23, 2006, Request for

6  Production No. 50 requesting "[a]ll documents concerning any Qualcomm membership,

7  participation, interaction, and/or involvement in setting any standard relating to the

8  processing of digital video signals that pertains in any way to any Qualcomm Patent."  (Id.,

9  Ex. E at 1.)

10        Correctly rejecting Qualcomm counsel's continuing insistence that Qualcomm had

11  already conducted a reasonable search for responsive documents with negative result,

12  Broadcom requested in a March 5, 2007 letter that Qualcomm perform searches for nine

13  key phrases in the email archives of twelve key Qualcomm employees:

14        Broadcom requests that Qualcomm immediately search for and produce
      responsive documents in the email archives of Ms. Raveendran and any other
15        Qualcomm employee who has ever been involved in any way in standard-
      setting for video compression (whether or not as an actual participant at a
16        standard-setting meeting), dated between January 1, 2000 and December 31,
      2004.

17
18  (Doc. No. 543-2, Ex. H at 4 - 5.)  In response to this letter, Qualcomm counsel continued to

    defend Qualcomm's discovery conduct and object to Broadcom's request for further
19
    discovery in a March 7, 2007, reply as follows:
20
21        For the reasons discussed at length previously, we disagree with each of your
      arguments concerning the responsiveness of those emails and believe your
22        negative characterization of QUALCOMM's compliance with its discovery
      obligation to be wholly without merit . . .

23        Your request for completely new and patently overbroad discovery–plainly
      beyond the scope of anything propounded during the appropriate period
24        before trial--cannot on any basis be justified now, more than a month after
      trial has concluded.
25
26  (Id., Ex. I at 1.)  Nevertheless, upon Broadcom's threat to involve the Court, Qualcomm

27  agreed to search the email archives of Qualcomm witnesses Raveendran, Bao, Irvine,

28

1  Ludwin, and Sagetong for the search terms "JVT," "Joint Video Team," "AVC,"

2  "Advanced Video Coding," "H.264," "H264," "MPEG-4 Part 10," "MPEG4 Part 10," and

3  "Gary Sullivan." (Id., Ex. I at 2.) The Court finds it incredible that Qualcomm never

4  conducted such an obvious search for these key terms in the email archives of these key

5  Qualcomm witnesses during the many months of discovery that occurred before trial, since

6  Broadcom clearly had requested all of it and more.

7      One month later on April 6, 2007, Qualcomm counsel informed Broadcom through

8  email that this search had produced "a large volume that numbers in the thousands" of

9  responsive documents, which clearly indicate to the Court Qualcomm's participation in the

10  JVT. (Doc. No. 543-2, Ex. J at 1.) It was only then that the Court received any notice of

11  this post-trial production of documents in a letter addressed to the Court directly from

12  Qualcomm lead trial counsel on April 9, 2007. (Doc. No. 543-2, Ex. K.) In that letter,

13  Counsel stated that Qualcomm had discovered "a substantial number of electronic

14  documents" that "appear to be inconsistent with arguments that we made at trial, and at the

15  post-trial hearing, regarding Broadcom's affirmative defense of waiver." (Id. at 1.)

16  Counsel then apologized to the Court "[p]rofessionally and personally . . . for asserting

17  positions that we would not have taken had we known of the existence of these

18  documents." (Id.) However, Counsel insisted that "we presented our arguments in good

19  faith and certainly would not have knowingly presented argument that we believed to be

20  contrary to fact." (Id. at 1 - 2.)

21      That same day, the Court received a separate letter of apology directly from

22  Qualcomm's General Counsel and Executive Vice President Louis Lupin, in which Mr.

23  Lupin conveyed "[his] regret and apologies regarding the circumstances described in

24  [Qualcomm lead trial counsel's April 9 letter]." (Doc. No. 543-2, Ex. L at 1.) Mr. Lupin

25  claimed that "QUALCOMM takes its obligations to the Court, opposing parties, and the

26  community seriously, and will take all necessary steps to live up to the high expectations

27  QUALCOMM has always set for itself." (Id.) However, in an interview with the San

28

Diego Union-Tribune about this post-trial production, Mr. Lupin reportedly stated that these newly discovered documents "'on the whole' bolstered Qualcomm's arguments during trial" and that "'[w]e kind of hurt ourselves' by not finding them before trial." Kathryn Balint, <u>Another face-off in patent battles</u>, THE SAN DIEGO UNION-TRIBUNE, May 31, 2007, at C1. The Court finds, in sharp disagreement to Mr. Lupin's characterization of the new evidence, that the documents in fact fully bolstered Broadcom's waiver arguments and completely refuted Qualcomm's waiver defenses at trial.

Qualcomm General Counsel Lupin made an illuminating statement as to Qualcomm's "nothing-to-lose" mentality in filing this patent infringement suit against Broadcom. According to a January 27, 2007, article in the San Diego Union-Tribune following the jury verdict of no infringement, Mr. Lupin characterized the case as follows:

> There certainly was a significant upside potential for us, but it was all upside, no downside. . . . For Broadcom, it was all downside, no upside. It probably won't have any impact on us one way or the other. It's just the latest round in a series of battles.

(Doc. No. 543-2, Ex. Q at 2.) Indeed, if Qualcomm is correct in its contention that its '104 and '767 patents are infringed by the H.264 standard, it would be in a lone position to extract licenses from all companies producing H.264-compliant products, a considerable "upside" opportunity for Qualcomm's bottom line.

## IV.    CONCLUSION

In light of all of the above evidence finally revealed, the eventual collapse of Qualcomm's concealment efforts exposes the carefully orchestrated plan and the deadly determination of Qualcomm to achieve its goal of holding hostage the entire industry desiring to practice the H.264 standard by insulating its IPR from the JVT so that the JVT would lose the opportunity to mitigate, if not to avoid, Qualcomm's IPR in the development of the H.264 standard. Broadcom, ignorant of the existence of the '104 and '767 patents, designed and is in the process of manufacturing numerous H.264-compliant

1  products.

2        The Federal Circuit has held that unenforceability of a patent due to inequitable

3  conduct before the PTO extends to continuations and reissues of the original patent.  See

4  Afga Corp. v. Creo Prods. Inc., 451 F.3d 1366, 1379 (Fed. Cir. 2006); Hewlett-Packard,

5  882 F.2d at 1563; Hoffman-La Roche v. Lemmon Co., 906 F.2d 684, 688 - 89 (Fed. Cir.

6  1990).  While divisions of the original patent may not be unenforceable "where the claims

7  are subsequently separated from those tainted by inequitable conduct . . . and where the

8  issued claims have no relation to the omitted prior art," Baxter Int'l, Inc. v. McGaw, Inc.,

9  149 F.3d 1321, 1332 (Fed. Cir. 1998), by analogizing misconduct before a standards setting

10  body resulting in waiver to misconduct before the PTO resulting in inequitable conduct,

11  this Court finds all claims of the '104 and '767 patents tainted by Qualcomm's waiver and

12  that any divisional, continuation, continuation-in-part, or reissue application of either patent

13  would be similarly tainted.

14        Therefore, under the totality of evidence produced both before and after the jury

15  verdict, by reason of Qualcomm's intentional and persistent insulation of their directly

16  related IPR from the activities and the analyses of the JVT when they were obligated to

17  reveal it, this Court **FINDS**, pursuant to Rambus, that Qualcomm has waived its rights to

18  enforce the '104 and '767 patents and their continuations, continuations-in-part, divisions,

19  reissues, or any other derivatives of either patent.

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27        This type of conduct was the direct focus and basis for the rule of law set out clearly

28                                                    53                    05-CV-1958-B (BLM)

1  in January 2003 in <u>Rambus</u>, in which the Federal Circuit sets out the disclosure duty for

2  patents that read on or apply directly to the activities of the standards-setting process.  <u>See</u>

3  <u>Rambus</u>, 318 F.3d at 1096 - 1102.  The facts of this case demonstrate the importance of the

4  <u>Rambus</u> decision to the success of the industry standards protocols that have been

5  achieving significant benefits for businesses and consumers globally.

6          Judgment will be entered concurrently with this Order.

7

8

9          **IT IS SO ORDERED**

10

11  DATED:  August 6, 2007

12

13                                          Hon. Rudi M. Brewster
                                            United States Senior District Court Judge

14

15  cc:  Hon. Barbara Lynn Major

16        United States Magistrate Judge

17        All Counsel of Record

18

19

20

21

22

23

24

25

26

27

28

# CRAVATH, SWAINE & MOORE LLP

THOMAS R. BROME
ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN E. BEERBOWER
EVAN R. CHESLER
PATRICIA GEOGHEGAN
MICHAEL L. SCHLER
RICHARD LEVIN
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW

PETER S. WILSON
JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
WILLIAM B. BRANNAN
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
JOHN T. GAFFNEY
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475
———
TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700
———
CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150
———
WRITER'S DIRECT DIAL NUMBER

(212) 474-1058

JEFFREY A. SMITH
ROBERT I. TOWNSEND, III
WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI

LIZABETHANN R. EISEN
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
JOEL F. HEROLD
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
TEENA-ANN V. SANKOORIKAL
ANDREW R. THOMPSON
DAMIEN R. ZOUBEK

———

SPECIAL COUNSEL

SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III
THOMAS D. BARR

———

OF COUNSEL

ROBERT ROSENMAN
CHRISTINE BESHAR

August 14, 2007

Broadcom Corporation v. Qualcomm Incorporated, Case No. 07-CC-01249

Dear Elizabeth and Kate:

Brian Fogarty has forwarded to me Elizabeth's letter of yesterday relating to documents produced in the 0660 and 1662 cases. The suggestion in that letter that Qualcomm is obligated to destroy documents produced in the 0660 and 1662 matters before the September 18 status conference with Judge Sundvold in the 1249 matter is inconsistent both with the numerous meet and confer discussions I have had with Kate Saxton and Mark Selwyn and with Broadcom's own approach to the parties' obligations to destroy documents in the 1392 matter.

Shortly before the May 31, 2007, status conference with Judge Sundvold, Broadcom announced for the first time that it did not believe it should be required to comply with its obligations under the applicable protective order to destroy documents previously produced in the 1392 matter. Indeed, Mark Selwyn wrote to Magistrate Judge Major on May 30 arguing that, because Broadcom believed that the 1392 documents might be relevant to the 1249 matter, Broadcom should be excused from its document destruction obligations pending resolution by Judge Sundvold of whether the 1392 documents would be deemed produced in the 1249 matter.

In connection with the May 31 status conference, Broadcom expanded this position and urged Judge Sundvold to order that other documents, including those produced in the 1958 matter as well as the 1392 matter, be deemed produced in 1249, and further argued that any otherwise applicable obligation to destroy those documents should be suspended immediately. Ultimately, the parties agreed to -- and represented to Judge Sundvold on May 31 that they would -- meet and confer concerning which documents produced in other Broadcom/Qualcomm matters would be deemed produced in 1249. The parties agreed to -- and represented to Judge Sundvold on May 31 that they would -- present to the Court a proposed Case Management Order that would govern

which documents from other matters are deemed produced in the 1249 matter. The parties also agreed to -- and represented to Judge Sundvold on May 31 that they would -- present any disagreements about the Case Management Order to the Court for resolution at the next status conference. That conference is now scheduled for September 18.

Consistent with the parties' representations to the Court on May 31, counsel for Broadcom and Qualcomm in the 1249 matter have, over the last several weeks, had several meet and confer sessions relating to discovery. In each of those meet and confer sessions, there has been a discussion relating to the proposed Case Management Order. During those discussions, it became clear that, although Qualcomm believes that the documents produced in the 0660 and 1662 actions -- just like the documents produced in the 1392 and 1958 matters -- should be deemed produced in the 1249 matter, Broadcom disagrees. As the parties have repeatedly discussed and agreed, that disagreement needs to be resolved by Judge Sundvold. Indeed, as the parties have repeatedly discussed and agreed, the appropriate way to present this issue to Judge Sundvold is through a joint submission that highlights the areas of agreement and disagreement with respect to the Case Management Order and presents the parties' respective positions on the areas of disagreement. Our discussions and agreements in this regard have already been confirmed through correspondence. See Barbur letter to Saxton dated August 3, 2007 (noting the disagreement about the 0660 and 1662 documents and the fact that the parties "agreed to make a joint submission to the Court" about it); Saxton letter to Barbur dated August 8, 2007 (confirming the parties' agreement "to file a joint submission outlining our areas of agreement and disagreement" with respect to the Case Management Order and promising "shortly [to] provide a draft of such joint submission for your review" so that it can be filed "within the week"). Indeed, we just received a few hours ago from Kate Saxton a draft Case Management Order submission proposing that Judge Sundvold resolve the parties' apparent disagreement.

The bottom line is that Qualcomm has been proceeding in good faith in meeting and conferring about whether and the extent to which documents from other Broadcom-Qualcomm actions should be deemed produced in the 1249 action. We had understood from our discussions with Kate that Broadcom was also meeting and conferring in good faith and that Broadcom intended to live up to its representations to Judge Sundvold on May 31 to present any areas of disagreement to Judge Sundvold in connection with a proposed Case Management Order.

However, Elizabeth's letter of August 10 (as well as the letter dated August 6 from Ben Hur of Keker & Van Nest) cannot be squared with the parties' discussions and agreements in the 1249 matter. Indeed, those letters suggest that, far from meeting and conferring in good faith, Broadcom intends to try to make an end run around the parties' 1249 discussions and agreements by seeking an order from Magistrate Judge Battaglia requiring Qualcomm to destroy some of the documents at issue before any dispute can even be presented to Judge Sundvold.

If you are not willing to reconsider, we suggest that the parties set up a conference call with Magistrate Judge Battaglia next week to address this issue.

Very truly yours,

*Peter T. Barbur / CQS*

Peter T. Barbur

Kate Saxton, Esq.
   Wilmer Cutler Pickering Hale and Dorr LLP
      60 State Street
         Boston, MA 02109

BY FIRST CLASS AND E-MAIL

Elizabeth Rogers, Esq.
   Wilmer Cutler Pickering Hale and Dorr LLP
      1117 California Avenue
         Palo Alto, CA 94304

BY FIRST CLASS AND E-MAIL

Copies to:

Mark Selwyn, Esq.
   Wilmer Cutler Pickering Hale and Dorr LLP
      1117 California Avenue
         Palo Alto, CA 94304

BY FIRST CLASS AND E-MAIL

Brian M. Fogarty, Esq.
   DLA Piper
      401 B Street, Suite 1700
         San Diego, CA 92101-4297

BY FIRST CLASS AND E-MAIL

DO NOT DUPLICATE - PURSUANT TO GOVERNMENT CODE 69954(d)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE, COMPLEX JUSTICE CENTER

DEPARTMENT CX105

BROADCOM CORPORATION, a       )
California corporation,       )
                              )
            Plaintiff,        )
                              )
    vs.                       )   NO. 07CC01249
                              )
                              )
QUALCOMM, INC., a Delaware    )
corporation; and DOES 1       )
through 10, inclusive,        )
                              )
            Defendants.       )
_____)

HONORABLE STEPHEN J. SUNDVOLD, JUDGE PRESIDING

REPORTER'S TRANSCRIPT

OCTOBER 5, 2007

APPEARANCES OF COUNSEL:

For the Plaintiff:

WILMER, CUTLER, PICKERING, HALE and DORR
BY: WILLIAM F. LEE
    JONATHAN CEDARBAUM
    LOUIS W. TOMPROS

O'MELVENY & MYERS LLP
BY: MARCUS SALVATO QUINTANILLA

(Appearances continued on the following page:)

CHARLOTTE FREEMAN, CSR NO. 3084, RDR, CRR
OFFICIAL REPORTER



DO NOT DUPLICATE - PURSUANT TO GOVERNMENT CODE 69954(d)

APPEARANCES OF COUNSEL (Continued):

For the Plaintiff:

CLEARY, GOTTLIEB, STEEN & HAMILTON LLP
BY:  GEORGE S. CARY


For the Defendant:
CRAVATH, SWAINE & MOORE LLP
BY:  EVAN R. CHESLER
     PETER T. BARBUR


BINGHAM McCUTCHEN LLP
BY:  TODD E. GORDINIER

DO NOT DUPLICATE - PURSUANT TO GOVERNMENT CODE 69954(d)

1

1     SANTA ANA, CALIFORNIA - FRIDAY, OCTOBER 5, 2007

2                      MORNING SESSION

3                   (In open court:)

4     **THE COURT:**  Number three, Broadcom versus Qualcomm.

5     **MR. GORDINIER:**  Todd Gordinier here, for defendant

6     Qualcomm.

7     **MR. CHESLER:**  Good morning, Your Honor.  I'm

8     Evan Chesler, for Qualcomm.

9     **MR. BARBUR:**  I'm Peter Barbur, for Qualcomm, Your

10    Honor.

11    **THE COURT:**  Good morning.

12    **MR. LEE:**  Your Honor, Bill Lee, for Broadcom.

13    **THE COURT:**  Mr. Lee, good morning.

14    **MR. LEE:**  Good morning.

15    **MR. CARY:**  Good morning, Your Honor.  George Cary, for

16    Broadcom.

17    **THE COURT:**  Mr. Cary, good morning.

18    **MR. QUINTANILLA:**  Marcus Quintanilla, Your Honor, for

19    Broadcom.

20    **THE COURT:**  Good morning.  Mr. Lee, would you like to

21    be heard with respect to the tentative?

22    **MR. LEE:**  I would, Your Honor.  Your Honor, the

23    tentative focuses on three issues, and I'd like to just go

24    through them briefly.

25          The first is our selection in July 2005 of the

26    New Jersey forum; the second, the progress that had been

1   made in New Jersey before the case went on appeal; and the

2   third was the factual overlap.  And if I could take Your

3   Honor through just a little further detail on each of

4   those, it would be appreciated.

5           As to the first, I think the chronology that we'd

6   just like to focus the Court on on the question of when

7   this New Jersey forum was selected is important.  As Your

8   Honor knows, there are four families of standards that are

9   involved in our Complaint:  WCDMA, GPRS/EDGE, H.264, and

10  then 802.20.

11          When the Complaint was filed in New Jersey, was

12  filed in July of 2005, the focus of the claims and the

13  State-law claims was WCDMA, also UMTS.  That was the

14  focus.  So it was one of the four families that are

15  subject to the Complaint before Your Honor.  That

16  Complaint on Qualcomm's motion was dismissed by the

17  District Court in August 2006, and we suggest that's a

18  critical date.

19          The three other families that are the subject of

20  our Complaint -- GSM, GPRS/EDGE, H.264, 802.20 -- the

21  information that had led us to be in a position to file

22  the Complaint that's before Your Honor all was

23  generated -- or virtually all was generated after August

24  of 2006.

25          In fact, Your Honor, just yesterday in San Diego

26  before Judge Brewster, and Magistrate Judge Major,

1   Qualcomm and its attorneys, in response to an Order to
2   Show Cause, filed materials that basically stated, on this
3   issue of the JVT H.264, discovery didn't really begin
4   until August of 2006.  The information didn't become
5   available to them till after August of 2006.  It certainly
6   didn't become available to us.

7           So, Your Honor, what happened after the point in
8   time when the New Jersey Court had dismissed the case,
9   after the point in time when Judge Cooper in New Jersey
10  said if you would like to file your State-law claims, go
11  ahead and file them, the information that was the basis of
12  our Complaint for these three other families all came to
13  light.  And what happened, Your Honor, after August of
14  2006, is this:

15          The information began to become available during
16  the course of discovery; but it really didn't become
17  public until January of 2007, during a three-week jury
18  trial before Judge Brewster; and much of the information
19  concerning H.264 became public then.

20          And as Your Honor knows from Judge Brewster's
21  opinion, which we provided to you, that wasn't all the
22  information that became public.  And in February and March
23  and April, hundreds of thousands of documents became
24  available to us that went to the question of whether
25  Qualcomm manipulated the H.264 process.  Those events led
26  us to a further investigation of GSM, GPRS, and EDGE.

1        And, Your Honor, in March of 2007 there was

2    another trial scheduled before Judge Brewster.  It was a

3    trial involving GSM, GPRS, and EDGE.  Qualcomm was the

4    plaintiff.  And the material -- much of the material that

5    became public in connection with that proceeding laid the

6    foundation for the allegations that are before Your Honor.

7    That, in turn, led us to the investigation of 802.20 and

8    the allegations that formed the basis for those claims.

9        So if I take Your Honor to April 12th, 2007, when

10   we filed this Complaint, the information that formed the

11   basis for the Complaint, particularly as to these latter

12   three families, almost entirely was generated and became

13   public after the District Court had dismissed the

14   Complaint in New Jersey.

15       We were in this situation:  The District Court

16   had dismissed the Complaint.  Judge Cooper had said if

17   you'd like to file your claims, file them in State Court.

18   We had this wealth of additional information.  It was very

19   California-focused.  Much of it had come from California

20   witnesses and involved California clients.  And so we

21   filed before Your Honor when the District Court action was

22   still on appeal.  That was, in fact, what Judge Cooper

23   invited us to do; and we thought was the correct thing to

24   do.

25       But the critical thing, Your Honor, is this:  If

26   we had had all the information that was accumulated after

DO NOT DUPLICATE - PURSUANT TO GOVERNMENT CODE 69954(d)

5

1   August of 2006 in July 2005, we may well not have filed in

2   New Jersey.  We made a decision then based upon what we

3   know, but the claims are substantially different now.

4        The second issue Your Honor focused on was the

5   progress in New Jersey case and the one million documents

6   that had been produced.  There has been one deposition.

7        The fact of the matter, Your Honor, that actually

8   fails in comparison to what's already available in this

9   case.  Your Honor may recall that at the first status

10  conference, a question came up as to whether it made

11  common sense to preserve the discovery from the other

12  cases between the parties and to have it useable.

13       There have been three trials between these

14  parties:  One at the International Trade Commission, one

15  before Judge Brewster, one before Judge Selna.

16       There have been millions of documents produced.

17  Many of the witnesses who would be relevant to this case

18  have testified by deposition, and a whole group of them

19  have testified at trial already.

20       All of that occurred after the New Jersey case

21  was on appeal.  All of that information is available

22  candidly in both places.  It should be available in

23  New Jersey.  It should be available here as well.

24       But the fact that that case is -- has progressed,

25  was filed earlier, actually doesn't mean it's progressed

26  further.  And, in part, the reason we're before Your Honor

1   is, in addition to the California connections, we think
2   that we'll get to a trial quicker in California than we
3   will in New Jersey.

4           The last thing Your Honor identified was the
5   factual overlap.

6           As I mentioned, Your Honor, the next trial will
7   be the fourth trial among these parties.  There is factual
8   overlap because the fundamental dispute is about who's
9   going to occupy the wireless communication space.  Will it
10  be one person?  Will it be several people?  All of these
11  issues relate to that.

12          Many of the witnesses who have testified at these
13  three trials are the same because there is some factual
14  overlap.

15          But on these three families -- GSM/GPRS/EDGE,
16  H.264, 802.20 -- they are not the focus of the New Jersey
17  case.  The fourth family WCDMA is.  And if Your Honor was
18  concerned about that factual overlap, well, we have
19  suggested we could deal with the discovery by agreeing
20  that the discovery would be usable in both cases.  We
21  would be prepared to remove the WCDMA allegations from
22  this case and just proceed on the three families:  GSM,
23  H.264, and 802.20 which have not been the focus of
24  New Jersey.

25          And then the last point, Your Honor, is for those
26  reasons, we think that the case should proceed here.  And

DO NOT DUPLICATE - PURSUANT TO GOVERNMENT CODE 69954(d)

7

1   while we understand that some of the purposes that

2   underlie section 410.30 are to avoid to having folks

3   forum-shop, we really weren't forum shopping.  The case

4   had been dismissed.  The District Court said, file.  We

5   had this wealth of information.  And its connections to

6   California both as a matter of law and a matter of fact

7   were really much stronger than we had anticipated at the

8   outset.

9           The last point I would make is this, Your Honor:

10          If we get to the position where Your Honor's

11  tentative becomes the ruling, we would hope -- we would

12  have to amend in New Jersey to add these three latter

13  families because they weren't part of these original

14  State-law claims.

15          We would hope that we wouldn't get in the

16  position with that.  Qualcomm would say to Your Honor,

17  they're better off in New Jersey, and then when we move to

18  amend in New Jersey, it's opposed on the grounds of they

19  shouldn't be there.  I'm a little concerned about getting

20  caught between a rock and a hard place.

21          But I think the easiest way to deal with it or

22  our preferred way of dealing would be to proceed before

23  Your Honor with all of the claims that we have before you

24  or a subset of three.

25          And I will represent, Your Honor, that given what

26  has gone on in the other cases and the discovery, these

DO NOT DUPLICATE - PURSUANT TO GOVERNMENT CODE 69954(d)

8

1   cases can be discovered and tried pretty quickly.  All

2   this information has been out there as a result of these

3   other cases.  Thank you.

4       **THE COURT:**  Thank you.

5       **MR. CHESLER:**  Your Honor, if I may.  Evan Chesler, for

6   Qualcomm.

7       **THE COURT:**  Yes, sir.

8       **MR. CHESLER:**  I'd like to start with where Mr. Lee

9   ended and make absolutely clear to the Court.  We have no

10  intention of engaging in the kind of gamesmanship that

11  Mr. Lee suggested.  If they want to amend in New Jersey to

12  add the claims, that's fine.  Indeed that's what we think

13  they should do.  Because as Your Honor suggested at the

14  last conference, these issues are, in fact, intimately

15  interrelated; and they should should be litigated in one

16  court.

17          They chose New Jersey.  Indeed, I'm counsel in

18  New Jersey.  When the case was first filed, we read the

19  Complaint, and we concluded we needed some additional time

20  to decide what to do about the Complaint; and I called

21  counsel -- not Mr. Lee but other counsel for the same

22  company, for Broadcom -- and I said, can we have an

23  extension of time, fairly customary thing to do, so we can

24  decide what to do.  And at the very first moment, their

25  first reaction was only if you agree that you will not

26  seek to transfer the New Jersey case to California.  And

1   we said, okay.  And we got additional time.  We then

2   moved, and that was the motion that was ultimately granted

3   by the Court.

4       So the idea that somehow the circumstances have

5   changed and now they want to be in California, they then

6   wanted to be in New York, respectfully, Mr. Lee, that just

7   isn't so.  The -- they wanted to be in New Jersey when --

8   when on the face of that Complaint, their allegations for

9   why these two California companies should be litigating in

10  New Jersey had to do with things like they had a facility

11  in Matawan, one facility in Matawan, and we were licensed

12  to do business there.

13      I mean Your Honor can read the New Jersey

14  Complaint for yourself that they laid out -- in a dispute

15  between two companies that is based in California, that

16  had their headquarters here, they laid out New Jersey

17  connections.  They made an affirmative forum-selection

18  choice that they wanted to be in New Jersey.  They

19  insisted we not agree to try to transfer it so we get a

20  customary extension of time.

21      When the District Court dismissed the federal

22  antitrust claims and then exercised its discretion not to

23  hold onto the supplemental State claims, they appealed

24  that; and they argued affirmatively to the Third Circuit

25  that they wanted the State claims reinstated in the

26  New Jersey case.  And when they were asked in the Court of

1  Appeals during that argument, which I was also at, what
2  was the story about these claims, they said, we took the
3  New Jersey claims, and we filed them in California.

4          They didn't say they were different claims.  They
5  said they were the same claims.  And, in fact, the legal
6  claims are identical.  They are unfair competition under
7  California law, breach of contract, and fraud.

8          Now, with respect to Mr. Lee's point that these
9  are somehow different because there have been subsequent
10 developments involving particular standards activity, the
11 core issue in both cases, Your Honor, are my client's
12 licensing practices.

13         Mr. Lee said, quite candidly, this is a fight
14 about who's in the space.  What -- let me give you my
15 version of that.

16         This is a fight about how much Broadcom has to
17 pay for access to my client's technology.  The whole case,
18 as Your Honor, I'm sure, can see from reading the
19 Complaint, is our -- are our licensing practices
20 appropriate?  Did we do anything in the standards context
21 to mean that we're not entitled to these licenses; and,
22 most importantly, are we or are we not offering licenses
23 on so-called FRAND terms?  That is the issue.  That is the
24 issue in New Jersey, and that is the issue here.

25         And the fact that there are some additional
26 factual allegations here that relate to the very same

DO NOT DUPLICATE - PURSUANT TO GOVERNMENT CODE 69954(d)

11

1    issue that arose later is not, I would submit to Your

2    Honor, a reason why we have to defend two cases involving

3    the same legal claims and substantially overlapping

4    factual issues, the same witnesses.  Our licensing

5    policies are formulated and executed by the same group of

6    people.  Whether it's for -- for an event that took place

7    in a particular standards body in 2006 or one that took

8    place in 2004, we're talking about the same people.

9            With respect to the documents, they're not

10   arguing -- I didn't hear Mr. Lee argue that they can't get

11   production of the same documents from us or make

12   production of the same documents to us in New Jersey.

13   Indeed the parties have already exchanged over a million

14   pages of documents in the New Jersey action.  And as

15   Mr. Lee just suggested, any discovery that's taken place

16   in intervening litigations that will be available is going

17   to be available in either place, in either -- in either

18   this litigation or the New Jersey litigation.

19           With respect to these intervening cases that

20   Mr. Lee referred to, he left out one very important fact.

21   Every one of those cases was an intellectual property

22   case.  They're all patent cases over whether one party or

23   the other is infringing particular patents.

24           That's not the issue here.  Indeed, as Your Honor

25   knows, it couldn't be the issue here because that's an

26   exclusively federal question.

1           The issue -- the only two cases where the issue

2    is competition between the parties, whether by virtue of

3    the Federal antitrust claim or State unfair competition

4    claim or call it a contract claim or call it a fraud

5    claim, the only two places where the relationship between

6    these two companies is at issue, as opposed to whether one

7    is infringing a patent that belongs to another, is here

8    and New Jersey.  That's it.

9           The discussion of these other cases is, quite

10   frankly, a straw man.  It has -- while there may be facts

11   that are relevant there, the fact that those cases took

12   place in federal courts -- one of them actually in

13   Washington, D.C., not here in the ITC -- and the others

14   took place in courts here is irrelevant.  That information

15   is portable.  And to the extent it's relevant, it is just

16   because there may be some facts with respect to the

17   intellectual property that are relevant to the competition

18   claims; but the competitions remain here.

19          With respect finally, Your Honor, to the

20   New Jersey case, the progress on the New Jersey case, we

21   have something like 14 pages of docket entries.  We've

22   been before Magistrate Judge Hughes multiple times.

23   Indeed we were supposed to be before him next week; but

24   there was a scheduling issue, and he moved it a week or

25   two.  Judge Cooper had a stack of papers in the motion to

26   dismiss that was a yard long, per an extensive evidence.

1   I argued it on our side.  There are enormous admissions

2   there.  It's not a question of whether Your Honor could

3   get up to speed in due course.

4          But the fundamental issue is should we be

5   litigating the legality of our licensing practices and how

6   we conduct ourselves in standards bodies in two places or

7   in one?  And we haven't asked Your Honor to dismiss this

8   case.  We've only asked you to stay it.  And if at any

9   time the resolution in New Jersey is -- is at hand, and

10  there's anything left, because they chose not to amend

11  there -- and I've just said we're not going to oppose

12  their amendment -- if there were, for some reason, a

13  judgment on their part tactically not to take these issues

14  to New Jersey -- and I don't know why they'd do that --

15  Your Honor still has the case.  You can take it off the

16  stay calendar with the stroke of a pen.  We don't have any

17  position to the contrary on that.

18          So we ask Your Honor to stay with the tentative.

19  This is a matter of just efficiency.  God knows, these

20  firms -- both companies have enough lawyers, and they're

21  spending enough money -- but it doesn't make any sense for

22  Your Honor to be sitting here conducting supervisory

23  activities over how we license our products while

24  Judge Cooper and Magistrate Judge Hughes are doing the

25  same thing in New Jersey because there's some factual

26  difference which they can put into New Jersey without

DO NOT DUPLICATE - PURSUANT TO GOVERNMENT CODE 69954(d)

14

1   opposition from us.

2        **THE COURT:**  Mr. Lee.

3        **MR. LEE:**  Yes, Your Honor.  Four points.  The first is

4   this is not just a licensing dispute.  It's not a question

5   of how much Broadcom should pay.  And there's no better

6   evidence than Judge Brewster's opinion in the H.264 case.

7   That opinion demonstrates that, as Judge Brewster found,

8   there was effort to conceal participation in the standards

9   body.  There then was an effort to use that concealed

10  participation to then later suggest that there was

11  intellectual property that covered the standard.

12       This is a point in time, Your Honor, when

13  Broadcom was selling the video decoding chip into every

14  Apple video iPod on the marketplace.  This was a concealed

15  effort, as Judge Brewster found.  This is more than just

16  about how much we'll pay.  This is about how people

17  participate in licensed -- in standards bodies.  And it's

18  not just about FRAND.  It's about whether you can hide in

19  the weeds and then come out later and try to put it to

20  your competitors in the marketplace.

21       The second thing is the other cases were not just

22  patent cases, and again Judge Brewster's opinion

23  demonstrates that in detail.  And, in fact, Your Honor, as

24  to much of what is in Judge Brewster's opinion, unless

25  we're reversed on appeal, they're collaterally estopped.

26  As to one of the claims on H.264, they would be

1 | collaterally estopped.

2 | The third point is this, Your Honor -- and this
3 | may focus us on why California is the right place based
4 | upon what we've learned.  And if I could just take two
5 | minutes, Your Honor.

6 | **THE COURT:**  Certainly.

7 | **MR. LEE:**  In *San Diego III*, the case that was tried in
8 | January, the way that all of this came to be is Qualcomm
9 | called a witness, a witness that would be subject to the
10 | subpoena power in California but not subject to the
11 | subpoena power in New Jersey.  And on cross-examination of
12 | this rebuttal witness on the last day of trial, we got her
13 | to admit that, contrary to representations made to
14 | Judge Brewster at the side bar that they had no e-mails
15 | from the standards body, she had them and had given them
16 | to the lawyers two weeks ago.

17 | Now, the case before Your Honor is one that in
18 | order for us to prove, we are going to call a number of
19 | Qualcomm witnesses adversely because they are the people
20 | who participated in the standards-setting body.  They are
21 | the people, based upon the documents that we have already,
22 | who made decisions not to disclose intellectual property.

23 | This isn't just about FRAND obligations, as
24 | Mr. Chesler said.  This is about affirmative decisions by
25 | people at the highest levels of the company knowing that
26 | Qualcomm was participating in a standards body not to

 1 | disclose.

 2 |         And we know that because we've alleged it, and we

 3 | alleged it upon information that we have.

 4 |         If we're in New Jersey, none of those people

 5 | would be within the subpoena power.  We're going to be

 6 | trying a case on videotaped deposition.  Here some of them

 7 | will be, some of them won't be.

 8 |         But the heart of what went on for these three

 9 | claims -- actually the four claims -- happened in

10 | California.  That is not something we knew in July 2005.

11 | It is something we knew in April 2007.

12 |         And, lastly, if I heard Mr. Chesler's last point

13 | correctly, it was that if we decide not to bring the

14 | claims in New Jersey, he would not oppose our coming back

15 | to Your Honor and saying, lift the stay, and let's proceed

16 | here.

17 |         And if Your Honor's tentative becomes the final,

18 | that's something that we would consider.  We might be back

19 | to you on that basis.

20 |     MR. CHESLER:  May I, Your Honor, very briefly?

21 |     THE COURT:  Yes, sir.

22 |     MR. CHESLER:  Thank you.  Just a couple of things.

23 |         I mean again to start where Mr. Lee just ended,

24 | let me be clear what I said, if I misspoke, I apologize.

25 | That is not what I said.

26 |         I said if the New Jersey case comes to ultimate

1    resolution and for reasons I don't understand, they have

2    chosen not to take these claims and put them into

3    New Jersey.  Your Honor still has the case.  It's been

4    stayed and not dismissed.

5         I say again, we don't oppose their amending to

6    put them in.  So I can't imagine why they would.  I was

7    just making the point that this is not the end of the road

8    if, for some reason, I don't comprehend they chose not to

9    make the amendment.

10        Mr. Lee first said he was concerned we would

11   sandbag, and I've assured Your Honor we have no intention

12   of doing that.

13        Secondly, with respect to the other cases, again,

14   Mr. Lee never said they're not intellectual property

15   cases.  Did they make allegations of things that my

16   clients did or didn't do in those contexts?  Yes, they

17   did.

18        They are intellectual property cases.  They were

19   not unfair competition or antitrust cases.  And to the

20   extent there was anything relevant in those cases, it's

21   available both here and in New Jersey.  That's -- that's

22   not a distinction that makes any difference.

23        Second and third -- and I've only got two more

24   points.  With respect to whether this case is or is not

25   about licensing, it absolutely is.  And when Your Honor

26   reads the Complaint, and you see the allegations they make

1   about alleged failures to disclose our patents in a timely

2   manner?  The only allegation about what the significance

3   of that is is that then supposedly standards get adopted,

4   and we have not met our commitment to license those

5   patents on FRAND terms.

6           The disclosure -- the alleged disclosure issue

7   is, in fact, the licensing issue.  That's the whole point.

8           And so to say that the two lawsuits, the only

9   lawsuits in which the licensing issue arises, and that

10  they are really entirely about that, are not here, in

11  New Jersey, is simply incorrect.

12          And finally with respect to these adverse witness

13  points, Your Honor, my client is a public corporation with

14  many, many shareholders and responsibilities to the

15  public.  We're not going to take the position that

16  employees of our company that have relevant information

17  can't be brought into New Jersey to testify in a case in

18  which we're the defendant because the person sits in

19  California.

20          I mean if that were the case, every

21  national-scope company that has employees sitting in many

22  places would be playing games with whether or not

23  employees who are working for them can or cannot show up

24  in a court that happens to be different from the -- in a

25  different State than the one from which that employee

26  happens to work.

1    To the extent that there are employees who have

2    relevant information, and they want to call them, they

3    know where we are.  They know that they can get those

4    witnesses there.  That's a -- that's another straw-man

5    debate because -- and, by the way, to the extent they were

6    concerned about getting -- getting Qualcomm witnesses to

7    testify about the practices in the standards

8    organizations, which by Mr. Lee's only -- his own

9    suggestion was what the issue was when they filed this

10   lawsuit in 2005?  With respect to WCDMA?

11   Those employees were sitting out in California

12   just as they are now.  That wasn't a concern to them when

13   they filed the lawsuit in New Jersey then.  New Jersey

14   was, last I checked, on the East Coast next to the

15   Atlantic Ocean in 2005 just as it is now.  And my client

16   was based in La Jolla in San Diego just as it is now.  And

17   those people were sitting in California in 2005 just as

18   they are now.  They weren't worried about it then.  But

19   they're worried about it now because of this -- these

20   procedural developments that have occurred.

21   **THE COURT:**  Gentlemen, I appreciate the argument.  It

22   was interesting.  I'm going to take the matter under

23   submission and give it one final look before I make a

24   final ruling.  Thank you very much.  It will be out, I'm

25   sure, sometime this afternoon.  And if we have e-mails for

26   you, the clerk will get those out.  Larry, do you want

DO NOT DUPLICATE - PURSUANT TO GOVERNMENT CODE 69954(d)

20

1   e-mail addresses from them?

2       **THE CLERK:**  I'll fax it to them, Your Honor.

3       **THE COURT:**  All right.  They'll get faxed to you.

4   Thank you very much.

5                    (Proceedings concluded)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DO NOT DUPLICATE - PURSUANT TO GOVERNMENT CODE 69954(d)

1           REPORTER'S CERTIFICATE

2

3    STATE OF CALIFORNIA    )

4                          )    SS.

5    COUNTY OF ORANGE       )

6

7

8        I, CHARLOTTE FREEMAN, CSR No. 3084, Official Court

9    Reporter for the Superior Court of the State of

10   California, County of Orange, do hereby certify that the

11   foregoing transcript, pages 1 through 20, inclusive, is a

12   true and correct transcript of my shorthand notes thereof

13   and a full, true and correct statement of the proceedings

14   had in said cause.

15

16       Dated this 15th day of October, 2007.

17

18

19

20   _Charlotte Freeman  10/17/2007_____

21   Charlotte Freeman, CSR NO. 3084

22   Official Court Reporter

23   (Certified transcripts signed in blue ink)

24

25

26