William J. O'Shaughnessy
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Peter T. Barbur
Elizabeth L. Grayer
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Richard S. Taffet
Philip L. Blum
BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

Robert N. Feltoon
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, Suite 1600
Philadelphia, PA 19102
(215) 864-8064

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BROADCOM CORPORATION, | : | Civil Action No. 05-3350 (MLC) (JJH) |
| *Plaintiff,* | : | |
| vs. | : | **NOTICE OF MOTION TO DISMISS CLAIMS FOUR THROUGH EIGHT OF PLAINTIFF'S SECOND AMENDED COMPLAINT** |
| QUALCOMM INCORPORATED, | : | |
| *Defendant.* | : | |

TO:      DAVID S. STONE, ESQ.
         ROBERT A. MAGNANINI, ESQ.
         Boies, Schiller & Flexner LLP
         150 John F. Kennedy Parkway
         Short Hills, NJ 07078
         (973) 218-1111

         STEVEN JOHN KAISER, ESQ.
         Cleary Gottlieb Steen & Hamilton LLP
         2000 Pennsylvania Avenue, NW
         Washington, DC 20006
         (202) 974-1500

         Attorneys for Plaintiff

         PLEASE TAKE NOTICE that on February 19, 2008, at 10:00 a.m., or as soon

thereafter as counsel may be heard, defendant Qualcomm Incorporated will move this Court,

pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, for an order

dismissing claims four through eight of plaintiff's Second Amended Complaint, and for such

other and further relief that the court deems just and proper (the "Motion").

         PLEASE TAKE FURTHER NOTICE that in support of the Motion, Defendant

relies on the accompanying Memorandum in Support of Defendant's Motion to Dismiss Claims

Four through Eight of Plaintiff's Second Amended Complaint and the O'Shaughnessy

Declaration and exhibits and attachments thereto.


Dated:  December 21, 2007

                         McCARTER & ENGLISH, LLP
                         *Attorneys for Defendant*

                         By: s/ William J. O'Shaughnessy
                             William J. O'Shaughnessy

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BROADCOM CORPORATION,

Plaintiff,

v.

QUALCOMM INCORPORATED,

Defendant.

Civil Action No.  05-3350 (MLC)

Return Date: February 19, 2008
Oral Argument Requested

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS CLAIMS FOUR THROUGH EIGHT OF PLAINTIFF'S
SECOND AMENDED COMPLAINT**

McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, NY 10022

CONRAD O'BRIEN GELLMAN & ROHN,
P.C.
1515 Market Street, Suite 1600
Philadelphia, PA 19102

*Attorneys for Defendant
Qualcomm Incorporated*

# Table of Contents

Page

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 1

ARGUMENT .......................................................................................................................... 4

I.    BROADCOM'S STATE LAW CLAIMS SHOULD BE DISMISSED FOR
      FAILURE TO ADEQUATELY PLEAD THAT QUALCOMM'S ALLEGED
      CONDUCT CAUSED BROADCOM ANY ACTUAL INJURY ................................... 4

      A.    Broadcom Does Not Adequately Plead Injury or Causation ................................. 4

            1.    FRAND Licensing Theory ..................................................................... 6

            2.    Patent Disclosure Theory ...................................................................... 8

            3.    802.20 Theory ........................................................................................ 9

      B.    Broadcom's State Law Claims are Unripe for Adjudication ............................... 10

II.   BROADCOM ALSO FAILS TO PLEAD OTHER ESSENTIAL ELEMENTS OF
      EACH OF ITS STATE LAW CLAIMS ........................................................................ 13

      A.    Broadcom Does Not Adequately Plead a Claim for Breach of Contract ............. 13

            1.    Generally .............................................................................................. 13

            2.    Additional Deficiencies for Claims Based on Commitments to ATIS or
                  ARIB ..................................................................................................... 14

      B.    Broadcom Does Not Adequately Plead a Claim for Promissory Estoppel ........... 15

      C.    Broadcom Does Not Adequately Plead a Claim for Tortious Interference
            with Prospective Economic Advantage .............................................................. 16

      D.    Broadcom Does Not Adequately Plead a Claim for Fraud .................................. 17

      E.    Broadcom Cannot State a Claim Under the UCL ............................................... 19

            1.    Broadcom Lacks Standing Under the Express Terms of
                  the UCL ................................................................................................. 19

Page

      2.     Broadcom Fails to State a Claim Under the "Unlawful" or "Fraudulent" Prongs of the UCL ........................................................... 21

III.    BROADCOM'S CLAIMS BASED ON THE H.264 STANDARD SHOULD BE DISMISSED ON THE BASIS OF THE COMPULSORY COUNTERCLAIM RULE AND RES JUDICATA .................................................................................... 22

    A.    Broadcom Is Barred by the Compulsory Counterclaim Rule From Asserting Any Claims Relating to JVT and the H.264 Standard........................ 24

    B.    Broadcom Is Also Barred by Res Judicata From Asserting Any Claims Relating to JVT and the H.264 Standard ........................................................... 27

CONCLUSION ..................................................................................................... 30

ii

## <u>Table of Authorities</u>

Page(s)

**Cases**

*AccuImage Diagnostics Corp. v. TeraRecon, Inc.*, 260 F. Supp. 2d 941 (N.D. Cal. 2003) ................................................................................................................ 16

*Angelucci v. Century Super Club*, 41 Cal. 4th 160 (2007) ........................................... 6

*Armstrong World Indus. v. Adams*, 961 F.2d 405 (3d Cir. 1992) ............................... 11

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007)..................................................... 4

*Blank v. Kirwan*, 39 Cal. 3d 311 (1985) ..................................................................... 4

*Bowen v. First Family Fin. Svcs.*, 233 F.3d 1331 (11th Cir. 2000) .............................. 5

*Bradley v. Google, Inc.*, No. 06-05289, 2006 WL 3798134 (N.D. Cal. Dec. 22, 2006) ...................................................................................................................... 17

*Bristol Farmers Mkt. & Auction Co. v. Arlen Realty & Dev. Corp.*, 589 F.2d 1214 (3d Cir. 1978) .................................................................................................. 25

*Broadcom v. Qualcomm*, 501 F.3d 297 (3d Cir. 2007) .............................................. 10

*Brown v. Allstate Ins. Co.*, 17 F. Supp. 2d 1134 (S.D. Cal. 1998)............................. 17

*Buckland v. Threshold Enters., Ltd.* 155 Cal. App. 4th 798 (2007)................... 5, 19, 20

*Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513 (2004) ..................................... 18

*Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223 (2006) ...... 19, 20

*Careau & Co. v. Sec. Pac. Bus. Credit*, 222 Cal. App. 3d 1371 (1990)........................ 5

*Churchill v. Star Enters.*, 183 F.3d 184 (3d Cir. 1999).............................................. 29

*Constantini v. Trans World Airlines*, 681 F.2d 1199 (9th Cir. 1982) ......................... 29

*Danvers Motor Co., Inc. v. Ford Motor Co.*, 186 F. Supp. 2d 530 (D.N.J. 2000)......... 8

*Daro v. Superior Court*, 151 Cal. App. 4th 1079 (2007) .............................. 19, 21, 22

*Ferguson v. Lieff, Cabraser, Heimann & Bernstein*, 30 Cal. 4th 1037 (2003)............. 7

*Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631 (3d Cir. 1961) ....... 25

ME1 7005142v.1

Page(s)

*Hartless v. Clorox Co.*, No. 06CV2705, 2007 WL 3245260 (S.D. Cal. Nov. 2, 2007) .................................................................................................................... 21

*Henry v. Weinman*, 157 Cal. App. 2d 360 (1958) ........................................................ 5

*In re Global Crossing, Ltd. Sec. Litig.*, No. 02-910, 2004 WL 725969 (S.D.N.Y. Apr. 2, 2004) .............................................................................................................. 17

*Int'l Union of Operating Eng'rs-Employers Constr. Indus. Pension, Welfare  and Training Trust Funds v. Karr*, 994 F.2d 1426 (9th Cir. 1993)................................. 29

*Jensen Enter. Inc. v. Oldcastle, Inc.*, No. 06-00247, 2006 WL 2583681 (N.D. Cal. Sept. 7, 2006) .............................................................................................................. 21

*Johnson v. Holmes Tuttle Lincoln-Mercury, Inc.*, 160 Cal. App. 2d 290 (1958) ....... 14

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003)................. 20, 21

*Landes v. Tartaglione*, No. Civ. A. 04-3163, 2004 WL 2415074 (E.D. Pa. Oct. 28, 2004) .............................................................................................................................. 8

*Lee v. Am. Express Travel Related Svcs.*, No. C 07-04765, 2007 WL 4287557 (N.D. Cal. Dec. 6, 2007) ................................................................................................ 9

*Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115 (2007)...... 18, 22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................... 5

*Lum v. Bank of Am.*, 361 F.3d 217 (3d Cir. 2004) ................................................. 1, 17

*Masters v. San Bernardino County Employees Retirement Ass'n*, 32 Cal. App. 4th 30 (1995)...................................................................................................................... 17

*McDonald v. John P. Scripps Newspaper*, 210 Cal. App. 3d 100 (1989).................... 7

*Mirkin v. Wasserman*, 5 Cal. 4th 1082 (1993) .......................................................... 18

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376 (3d Cir. 1994) ...................................................................................................................... 28

*Olsen v. Breeze, Inc.*, 48 Cal. App. 4th 608 (1996)................................................... 22

*Pac. Legal Found. v. Cal. Coastal Comm'n*, 33 Cal. 3d 158 (1982) .................... 10, 11

*Paramount Aviation Corp. v. Augusta*, 178 F.3d 132 (3d Cir. 1999) ......................... 28

*Peasley v. Verizon Wireless LLC*, 364 F. Supp. 2d 1198 (S.D. Cal. 2005)................. 28

iv

Page(s)

*Penn. Family Inst. v. Black*, 489 F.3d 156 (3d Cir. 2007) ...................................................... 10, 11

*Philadelphia Fed. of Teachers v. Ridge*, 150 F.3d 319 (3d Cir. 1998) ....................................... 11

*Phillips Pet. Co. v. U.S. Steel Corp.*, 566 F. Supp. 1093 (D. Del.), *aff'd mem.*, 727
    F.2d 1120 (3d Cir. 1983) ................................................................................................... 26

*Post v. Hartford Ins. Co.*, 501 F.3d 154 (3d Cir. 2007) ...................................................... 29, 30

*Qualcomm Inc. v. Broadcom Corp.*, No. 05CV1958 B, 2007 WL 2296441 (S.D.
    Cal. Aug. 6, 2007) .............................................................................................................. 24

*Qualcomm Inc. v. Broadcom Corp.*, No. 05CV1958, 2007 WL 1031373 (S.D. Cal.
    Mar. 21, 2007) .................................................................................................................... 24

*Reid v. Google, Inc.*, 155 Cal. App. 4th 1342 (2007) .................................................................. 21

*Rennie & Laughlin, Inc. v. Chrysler Corp.,* 242 F.2d 208 (9th Cir. 1957) ................................. 28

*Riverside Mem'l Mausoleum, Inc. v. UMET Trust*, 581 F.2d 62 (3d Cir. 1978) ......................... 28

*Rosenbluth Int'l, Inc. v. Superior Court*, 101 Cal. App. 4th 1073 (2002).................................... 22

*Ross v. Bd. of Educ. of Twp. High Sch. Dist. 31*, No. 05 C 6111, 2006 WL 695471
    (N.D. Ill. Mar. 14, 2006)..................................................................................................... 23

*Schwarz Pharma, Inc. v. Teva Pharms., U.S.A.*, Civ. No. 01-4995 Slip Op. (D.N.J.
    June 5, 2002) ................................................................................................................. 25, 26

*S.C. Johnson & Son v. Dowbrands, Inc.*, 167 F. Supp. 2d 657 (D. Del. 2001) .................... 11, 12

*Serv. by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807 (1996).......................................... 5

*Smith v. City & Cty. of San Francisco*, 225 Cal. App. 3d 38 (1990) .................................... 15, 16

*Sofias v. Bank of America*, 172 Cal. App. 3d 583 (1985)............................................................ 13

*Step-Saver Data Sys. v. Wyse Tech.*, 912 F.2d 643 (3d Cir. 1990) ....................................... 11, 12

*Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293 (3d Cir. 2003) ............................ 5, 8

*SunCom Mobile v. FCC*, 87 F.3d 1386 (D.C. Cir. 1996) .............................................................. 8

*SWT Acquisition Corp. v. TW Svcs, Inc.*, 700 F. Supp. 1323 (D. Del. 1988) ............................. 11

*Toscano v. Greene Music*, 124 Cal. App. 4th 685 (2004) ........................................................... 15

v

Page(s)

*Transamerica Occ. Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384 (3d
  Cir. 2002) ............................................................................................................. 25

*Traverso v. Home Depot U.S.A., Inc.*, No. 07-1324, 2007 WL 3124698 (D.N.J.
  Oct. 23, 2007) ........................................................................................................ 4

*Van Deerhoof v. Chambon*, 121 Cal. App. 118 (1932) ............................................. 13

*W. Sys., Inc. v. Ulloa*, 958 F.2d 864 (9th Cir. 1992) ................................................ 30

*Waterloov Gutter Prot. Sys. Co. v. Absolute Gutter Prot.*, 64 F. Supp. 2d 398
  (D.N.J. 1999) ......................................................................................................... 26

*Westside Center Assocs. v. Safeway Stores 23 Inc.*, 42 Cal. App. 4th 507 (1996) ...... 16

*Xerox Corp. v. SCM Corp.*, 576 F.2d 1057 (3d Cir. 1978) ........................................ 25

## Statutes and Rules

Cal. Bus. & Prof. Code § 17204 ........................................................................... 4, 19

Cal. Civ. Code § 1559 ........................................................................................... 14

Cal. Civ. Proc. Code § 426.30 ............................................................................... 25

Fed. R. Civ. P. 12(h)(3) ......................................................................................... 5

Fed. R. Civ. P. 13(a) ............................................................................................. 24

Fed. R. Civ. P. 9(b) ............................................................................................... 17

vi

Page(s)

**Other Authorities**

13A Wright & Miller, Federal Practice and Procedure § 3532 ................................................... 10

13A Wright & Miller, Federal Practice and Procedure § 3532.1 ................................................ 10

23 Cal. Jur. 3d Damages § 31 .................................................................................................... 7

3 James Wm. Moore et al., Moore's Federal Practice § 13.90 ................................................. 28

5 Witkin Cal. Proc. 4th § 862 ...................................................................................................... 6

6 Wright & Miller, Federal Practice and Procedure § 1410 ……………………………………….25

**Preliminary Statement**

Nowhere in Broadcom Corporation's ("Broadcom") 72 page, 329 paragraph complaint does Broadcom allege facts, which if true, would establish that it has suffered or will suffer actual injury as a result of the alleged actions of Qualcomm Incorporated ("Qualcomm") that underlie each of Broadcom's state law claims for relief. This failure is fatal because an essential element of each state law claim is a showing of such injury. In addition, Broadcom fails to plead other essential elements of each of its state law claims. Further, certain of Broadcom's state law claims are barred by the compulsory counterclaim rule and res judicata. Accordingly, Qualcomm moves to dismiss Broadcom's state law claims for relief.

**Statement of Facts**[1]

Broadcom, a California corporation, is "a supplier of semiconductors for wired and wireless broadband communications". (¶¶ 1-2.) Qualcomm is a Delaware corporation that, among other things, develops technology related to wireless communications and holds patents on such technology. (¶¶ 1, 3, 46.) Broadcom's Second Amended Complaint ("SAC") contains five state law causes of action: breach of contract (Count IV); tortious interference with prospective economic advantage (Count V); promissory estoppel (Count VI); fraud (Count VII); and alleged violations of California's Unfair Competition Law ("UCL") (Count VIII).

Three sets of factual allegations underlie these state law claims, each arising out of Qualcomm's participation in various standards development organizations ("SDOs").[2] *First*,

---

[1] For purposes of this motion, we rely only on the allegations in the complaint, matters of public record, and documents that form the basis of Broadcom's claims. *See Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004). Citations in the form (¶ [number]) are citations to the referenced paragraph of Broadcom's Second Amended Complaint.

[2] SDOs are nongovernmental organizations responsible for the development of standards to ensure the compatibility and interoperability of the products made by different manufacturers. (¶¶ 5, 18-19.) The principal SDOs that the SAC focuses on are the European

Broadcom alleges that Qualcomm entered into certain obligations with various SDOs to license Qualcomm's patents that are essential for practicing a standard developed by that SDO on fair, reasonable and non-discriminatory ("FRAND") terms.  (*E.g.*, ¶¶ 7, 108, 166-68, 245-46.) Broadcom alleges that Qualcomm breached these obligations because Qualcomm did not offer Broadcom a FRAND license to practice the patents that Qualcomm "claims are essential" to the standards at issue (the "FRAND license theory").  (*Id.*)  However, Broadcom never alleges that any of Qualcomm's patents actually is essential to practice any standard at issue.  Nor does Broadcom identify how its development, manufacture, marketing or sale of a single product has been adversely affected by the absence of a license from Qualcomm.

*Second*, Broadcom claims that as a result of Qualcomm's participation in certain SDOs, Qualcomm was obligated to timely inform those SDOs of all patents Qualcomm held that Qualcomm believed were essential to the standards under consideration so that the SDO could determine whether to include that intellectual property ("IP") in a given standard.  (*E.g.*, ¶¶ 79-81.)  Broadcom asserts that Qualcomm breached this obligation to the SDOs by disclosing its patents later than it should have disclosed them ("patent disclosure theory").  (*E.g.*, ¶¶ 96-97, 144-47, 195-98.)  However, Broadcom does not allege that any standard developed by an SDO actually incorporates technology covered by Qualcomm's patents or that any such standard would not incorporate such technology but for Qualcomm's allegedly untimely disclosure.  And,

---

Telecommunications Standards Institute ("ETSI"), the Joint Video Team ("JVT") and the Institute of Electrical and Electronics Engineers ("IEEE") 802.20 working group.  ETSI led the standardization process for the Global System for Mobility ("GSM") family of wireless standards, including GSM Packet Radio Service ("GPRS"), Enhanced Data Rates for GSM Evolution ("EDGE"), and Universal Mobile Telecommunications System ("UMTS").  (¶ 30.) The JVT is an SDO whose purpose is to develop H.264, a video compression standard with improved compression and picture quality.  (¶¶ 173-74.)  Lastly, the IEEE 802.20 working group is developing a standard known as IEEE 802.20, which relates to fourth-generation wireless technology.  (¶¶ 247-49.)

with respect to certain standards, Broadcom does not allege that it was making or developing standard-compliant products at the time Qualcomm allegedly breached its disclosure obligations.

*Third*, Broadcom alleges that Qualcomm breached its obligation to a specific SDO, the IEEE, by not disclosing the "financial relationships" of certain participants in the group working on the 802.20 standard ("802.20 theory"). (¶¶ 261-68, 294.) However, Broadcom does not allege that it is involved in making 802.20 standard compliant products. In fact, Broadcom complains that no 802.20 standard was ever promulgated. (¶¶ 265, 268.)

These three factual theories of wrongdoing have been packaged into five state law causes of action, summarized as follows:

- <u>Breach of Contract</u> (Count IV): Broadcom alleges that Qualcomm, by virtue of its membership in various SDOs, entered into contracts with those SDOs which Qualcomm breached by failing to license its potentially essential patents on FRAND terms to Broadcom and by disclosing certain patents too late. (¶¶ 289-296.)

- <u>Tortious Interference with Prospective Economic Advantage</u> (Count V): Broadcom alleges that Qualcomm's conduct interfered with Broadcom's economic opportunities with unidentified manufacturers. (¶¶ 297-301.)

- <u>Promissory Estoppel</u> (Count VI): Broadcom alleges that Qualcomm made promises to it, through Qualcomm's promises to various SDOs, that Qualcomm would disclose its potentially essential patents and license Qualcomm's essential IP on FRAND terms and that Broadcom oriented its chipset business in reliance on these promises. (¶¶ 302-307.)

- <u>Fraud</u> (Count VII): Broadcom alleges that Qualcomm committed common law fraud by intentionally failing to disclose its potentially essential patents to the SDOs and its financial relationships with members of the IEEE 802.20 working group and further asserts that Qualcomm's commitments to SDOs and the public to license on FRAND terms were knowingly and intentionally false. (¶¶ 308-17.)

- <u>UCL</u> (Count VIII): Broadcom asserts that Qualcomm has violated the UCL by engaging in unlawful, unfair and fraudulent business acts and practices with respect to Qualcomm's FRAND licensing and patent disclosure obligations and Qualcomm's conduct before the IEEE. (¶¶ 318-29.)

<u>**Argument**</u>

**I.    BROADCOM'S STATE LAW CLAIMS SHOULD BE DISMISSED FOR FAILURE TO ADEQUATELY PLEAD THAT QUALCOMM'S ALLEGED CONDUCT CAUSED BROADCOM ANY ACTUAL INJURY**

On a motion to dismiss under Rule 12(b)(6), a court should generally accept as true all well-pled factual allegations in the complaint. *See Traverso v. Home Depot U.S.A., Inc.*, No. 07-1324, 2007 WL 3124698, *1 (D.N.J. Oct. 23, 2007) (Cooper, J.). The court, however, need not credit a plaintiff's legal conclusions, and a plaintiff's factual allegations must raise a right to relief above the speculative level. *Id.* (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). To survive a motion to dismiss, a complaint must, on its face, allege enough facts to state a claim that is plausible, and not merely conceivable. *See Twombly*, 127 S. Ct. at 1960.

Broadcom's failure to plead that Qualcomm's alleged actions have actually caused Broadcom injury requires dismissal of Broadcom's state law claims. This holds true whether Broadcom's claims are analyzed under the rubric of the need to plead injury and causation or under the ripeness doctrine.

A.    <u>Broadcom Does Not Adequately Plead Injury or Causation</u>

Causation and injury are essential elements of every state law claim asserted by Broadcom.[3] *See, e.g.*, Cal. Bus. & Prof. Code § 17204 (only persons "who ha[ve] suffered injury in fact and ha[ve] lost money or property as a result of . . . unfair competition" have standing to bring UCL claims); *Blank v. Kirwan*, 39 Cal. 3d 311, 330 (1985) (requiring, in the tortious

---

[3] Broadcom does not plead the source of law governing its state law claims. However, Broadcom's assertion of a claim under the UCL, coupled with the fact that Broadcom originally brought many of the SAC's state law claims in a California court and affirmatively argued for the applicability of California law, indicate that Broadcom considers California law controlling. *See, e.g.*, Broadcom's Opposition to Qualcomm's Motion to Stay the Proceedings, at 6-9 (filed Oct. 5, 2007) (attached as Exhibit 1 to the Declaration of William J. O'Shaughnessy in Support of Defendant's Motion to Dismiss Claims for Relief Four through Eight of Plaintiff's Second Amended Complaint (hereinafter "O'Shaughnessy Decl.")). For the purposes of this motion, Qualcomm analyzes Broadcom's state law causes of action under California law.

interference context, economic harm to the plaintiff caused by the acts of the defendant); *Careau & Co. v. Sec. Pac. Bus. Credit*, 222 Cal. App. 3d 1371 (1990) ("a cause of action for damages for breach of contract is comprised of the following elements: [the contract, plaintiff's performance, defendant's breach] and the resulting damages to plaintiff"); *Serv. by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1818 (1996) (requiring injury causation in the fraud context) (internal citations omitted); *Henry v. Weinman*, 157 Cal. App. 2d 360, 367 (1958) (promissory estoppel context).

In addition, Article III of the U.S. Constitution requires that a plaintiff bear the burden of establishing that it has standing to pursue each cause of action it seeks to advance. *See Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003); *Bowen v. First Family Fin. Servs.*, 233 F.3d 1331, 1339 (11th Cir. 2000). To establish Article III standing, a plaintiff must plead that it has suffered a concrete and particularized injury in fact that is not conjectural or hypothetical, that was caused by the defendant and that it is likely a decision in the plaintiff's favor will redress its injury. *Bowen*, 233 F.3d at 1339-40 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).[4]

Though the California constitution does not contain an express case or controversy requirement, California courts have employed the *Lujan* test for standing. *See Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 814-16 (2007) (applying *Lujan* and

---

[4] Qualcomm moves to dismiss only Broadcom's state law claims for relief. Nevertheless, Qualcomm recognizes that if this Court grants Qualcomm's motion on the grounds that Broadcom has failed to plead that Qualcomm's alleged conduct caused Broadcom any actual injury with respect to its state law claims, that ruling might implicate the viability of Broadcom's federal antitrust claims on grounds that were not argued or considered in the dismissal of the First Amended Complaint or addressed by the Third Circuit. Thus, while Qualcomm does not presently move against the federal claims on grounds of lack of subject matter jurisdiction, Qualcomm reserves the right to do so at a later time, as appropriate. *See* Fed. R. Civ. Pro. Rule 12(h)(3).

Article III case or controversy requirements in holding that plaintiff failed to plead injury-in-fact under the UCL). And the California Supreme Court has made clear that California courts, absent discrete legislative authority, can adjudicate only actual cases or controversies and not simply matters of speculative injury. *See, e.g.*, *Angelucci v. Century Super Club*, 41 Cal. 4th 160, 175 (2007) ("in order to have standing, the plaintiff must be able to allege injury -- that is, some 'invasion of the plaintiff's legally protected interests'") (internal citations omitted); 5 Witkin Cal. Proc. 4th § 862 (to have standing plaintiffs must either "show[] an invasion of [its] legally protected interests" or plead a statutory grant to pursue the cause of action absent injury). Since Broadcom fails to meet the requirements of Article III, it likewise lacks standing to pursue its claims in a California state court.

As discussed further below, Broadcom does not sufficiently allege injury and/or causation under any of these tests.

1.    FRAND Licensing Theory

Broadcom complains that Qualcomm allegedly made commitments to certain SDOs to license certain of its patents, yet subsequently failed to provide such a license to Broadcom. (*E.g.*, ¶¶ 7, 108, 166-68, 245-46.) However, if a patent is not actually essential to a standard, then standard-compliant products may be made, used and sold without infringing that patent. Broadcom admits as much in the SAC. (*See, e.g.*, ¶¶ 5, 20.)

Despite this admission Broadcom does not allege that it could not make or sell any standard-compliant products without infringing one or more Qualcomm patents. Indeed, Broadcom does not identify a single specific patent to which it claims it is entitled to a FRAND license in connection with the development of a specific standard. Broadcom does not allege that it did not or could not offer to make or sell any product as a result of its inability to obtain a license from Qualcomm. Broadcom also does not assert that it has been forced to pay anything

6

to anyone, *including* Qualcomm, as a result of Qualcomm's purported behavior, whether for a license or for any other reason.  Broadcom does not identify a single lost sale resulting from Qualcomm's alleged conduct.  Although Broadcom alleges that Qualcomm asserted that Broadcom does not have a license for Qualcomm's patents (¶¶ 104, 117, 161), and vaguely claims that Qualcomm's purported conduct reduced Broadcom's "ability" to develop, market and sell products that comply with the relevant standards (¶¶ 105-106, 120, 162-163), Broadcom neither identifies such products nor describes how Qualcomm's alleged conduct affected those products.

     At most, Broadcom alleges that it *may* have been damaged by Qualcomm's actions because Qualcomm's technology *might* be essential to a standard that Broadcom's products practice.  (*See, e.g.*, ¶ 81 (describing Qualcomm's obligation as a duty to disclose "all IPR that [it] believe[s] *might* be essential to standards under consideration")); (¶ 67 (alleging that Qualcomm's alleged actions have created a situation where "a manufacturer *may* be unable to meet" its delivery obligations)); (¶ 304 (describing Broadcom as a "potential licensee[]" of Qualcomm's) (emphasis added).)  But such claims are precisely the type of speculative injury allegations found by California courts to be insufficient to support a cause of action.  *See, e.g.*, *McDonald v. John P. Scripps Newspaper*, 210 Cal. App. 3d 100, 104 (1989) ("It is fundamental that damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery"); 23 Cal. Jur. 3d Damages § 31 ("Damages that are uncertain, contingent, or speculative cannot be recovered either in actions ex contractu or in actions ex delicto."); *see also Ferguson v. Lieff, Cabraser, Heimann & Bernstein*, 30 Cal. 4th 1037, 1048 (2003) ("[T]he mere possibility or even probability that damage will result from wrongful conduct does not render it actionable.") (internal citations omitted).

Similarly, federal courts have consistently held that such injury allegations are insufficient as a matter of law. *See, e.g.*, *Landes v. Tartaglione*, No. Civ. A. 04-3163, 2004 WL 2415074, at *3 (E.D. Pa. Oct. 28, 2004) ("Plaintiff's reliance on the terms 'if' and 'may' to couch her allegations of harm is a clear indication that the harm she alleges is merely speculative."); *Danvers Motor Co., Inc. v. Ford Motor Co.*, 186 F. Supp. 2d 530, 537-38 (D.N.J. 2000) (dismissing plaintiff's claim for lack of Article III standing and holding that plaintiff's claimed injury was too speculative because the complaint employed such terms as "may" or "predictably"); *see also Storino*, 322 F.3d at 296-98 (noting that "one cannot describe how the [plaintiffs] will be injured without beginning the explanation with the word 'if'" and affirming dismissal of the complaint where the court could envision several scenarios where plaintiffs could avoid injury); *SunCom Mobile v. FCC*, 87 F.3d 1386, 1388 (D.C. Cir. 1996) (no concrete or probable harm where plaintiff did not allege an "existing interest" in licenses but only a mere "intent to purchase unidentified licenses sometime in the future").

### 2.    Patent Disclosure Theory

According to Broadcom's patent disclosure theory, Qualcomm deprived certain SDOs of the opportunity to work around Qualcomm's potentially essential patents by disclosing the existence of such patents to the SDOs later than it should have. (*E.g.*, ¶¶ 96-97, 144-148, 197.) It is axiomatic, however, that Broadcom cannot have suffered injury under this theory unless Qualcomm's allegedly untimely disclosure actually caused the SDOs to incorporate Qualcomm's IP into the standard. Broadcom alleges that timely disclosure is necessary to mitigate the risk of a patent "hold-up" and that "SDOs often require patent holders to disclose their essential intellectual property". (¶ 5.) But, even under Broadcom's characterization, if a patent is not in fact essential for building standard-compliant products, then its "untimely"

8

disclosure logically cannot affect a company's ability to build to the standard and cannot cause injury to a company.

Tellingly, Broadcom fails to allege that any of Qualcomm's patents actually is essential to any standard at issue; that any standard actually contains Qualcomm IP; and that, but for the timing of Qualcomm's patent disclosures, those standards would not contain such technology. Broadcom also fails to allege that there were technologically feasible alternatives that would have been selected in lieu of Qualcomm's patented technology but for Qualcomm's purportedly delayed disclosure. The absence of such allegations is fatal to Broadcom's state law claims to the extent they are based on the patent disclosure theory.

Broadcom merely asserts that because of Qualcomm's supposedly belated disclosure of its patents, SDO participants "were unable to consider the impact of Qualcomm's asserted patent rights in formulating" various standards, which in some unspecified manner "distorted the process," the outcome of which was the adoption of standards "that Qualcomm now claims read on its patents." (*See, e.g.*, ¶¶ 96, 146.) But Broadcom fails to assert that any relevant standard actually would have differed had Qualcomm disclosed its patents any sooner than it did. Without this straightforward allegation, Broadcom's claim must fail. Indeed, as stated by the court in *Lee v. Am. Express Travel Related Svcs.*, No. C 07-04765, 2007 WL 4287557 (N.D. Cal. Dec. 6, 2007), an injury causation theory regarding contract terms that exist but have not yet been triggered "rests on hypothetical assumptions about what may or may not transpire" and is insufficient as a matter of law to sustain a contract claim. *Id.* at *3, 5.

3.    802.20 Theory

Broadcom also claims to have been injured by Qualcomm's alleged "manipulation" of the IEEE 802.20 working group and the working group's subsequent suspension. (¶ 268.) However, Broadcom never alleges a causal connection between suspension

9

of the working group and injury to Broadcom from its purported inability to develop 802.20-compliant products. Broadcom does not allege, for example, that but for the suspension of the working group, the 802.20 working group would have agreed on a standard, what that standard would have been or how the standard would relate to hypothetical Broadcom products.

Broadcom's claim -- that it was harmed by lost opportunities to sell non-existent unidentified products that comply with a non-existent 4G standard (*see* ¶ 247) -- cannot stand. As this Court and the Third Circuit have already held, Qualcomm cannot have injured Broadcom in the 4G area -- an area which is not yet developed and in which Broadcom holds no stake. *See Broadcom v. Qualcomm*, 501 F.3d 297, 322 (3d Cir. 2007) (affirming the relevant part of this Court's decision and stating that "as a manufacturer of equipment that *may* require a license from a firm possessing monopoly power in the B3G and 4G technology markets," Broadcom's injury is "too speculative" to be redressed) (emphasis in original). Broadcom once again claims injury in a future technology that has no standard or demand and in which Broadcom has no product. (¶ 268.) The requirement that Broadcom plead injury and causation and the prior decisions in this case require dismissal of Broadcom's IEEE 802.20 claims to the extent they are based on the 802.20 theory.

B.     Broadcom's State Law Claims are Unripe for Adjudication

A plaintiff must establish that its causes of action are ripe for adjudication. *See, e.g.*, *Penn. Family Inst. v. Black*, 489 F.3d 156, 165 (3d Cir. 2007); *Pac. Legal Found. v. Cal. Coastal Comm'n*, 33 Cal. 3d 158, 169-70 (1982). Standing and ripeness are integrally related doctrines, following similar lines of inquiry. *See, e.g.*, *Penn. Family Inst.*, 489 F.3d at 165; 13A Wright & Miller, *Federal Practice and Procedure* §§ 3532-3532.1 (noting similarity of standing and ripeness inquiries and stating that the central concern of a ripeness determination "is whether the case involves uncertain or contingent future events that may not occur as anticipated, or

indeed may not occur at all"). In determining whether a matter is ripe for adjudication a court should look to (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding consideration. *See Philadelphia Fed. of Teachers v. Ridge*, 150 F.3d 319, 322-23 (3d Cir. 1998). Whether a claim is fit for review implicates factors such as whether the claim involves uncertain contingencies, the adversity of the parties and the possibility of later factual development. *Id.* Furthermore, in determining ripeness, courts also examine the conclusivity of a judgment. *See Step-Saver Data Sys. v. Wyse Tech.*, 912 F.2d 643, 648-49 (3d Cir. 1990).

Broadcom's state law claims are unripe because they rely on an uncertain contingency of possible future harm. Broadcom alleges only that Qualcomm's patents are "purportedly" or "potentially" essential to a standard. However, any injury Broadcom might suffer in making standard-compliant products will arise only if Qualcomm's "purportedly" essential patents are later established to be actually essential to the standard. This potential contingency is insufficient to create a ripe case or controversy under federal law. *See, e.g.*, *Armstrong World Indus. v. Adams*, 961 F.2d 405, 413 (3d Cir. 1992) (holding matter unripe where plaintiff's complaint was based on a triggering contingent event that had not yet occurred); *S.C. Johnson & Son v. Dowbrands, Inc.*, 167 F. Supp. 2d 657, 668-69 (D. Del. 2001) (where contractual provision was triggered by a finding of infringement and only the possibility of a future infringement finding existed, claim was unripe for adjudication); *SWT Acquisition Corp. v. TW Svcs, Inc.*, 700 F. Supp. 1323, 1329-30 (D. Del. 1988) (dismissing as unripe plaintiff's claims with respect to a specific statutory provision where event triggering at-issue provisions was not alleged to have occurred and describing as improper plaintiff's request that the court "hypothesize as to what *might* happen *if* [the triggering event] commenced") (emphasis in original). The result would be the same under California law. *See Pac. Legal Found.*, 33 Cal.

3d at 174 (affirming dismissal of a claim of injury as insufficiently concrete where "plaintiffs' claim of injury depends for its urgency on the supposition that some of [the plaintiffs] will in the future" be frustrated).

Broadcom's state law claims are also unripe because, even if this Court were to grant Broadcom the relief it seeks, the judgment of this Court would not be conclusive and would amount to an advisory opinion. Unless Qualcomm's patents actually are essential to a standard -- something that Broadcom conspicuously does not plead and a determination that Broadcom has not asked this Court to make -- then Broadcom, upon prevailing, would be in no better position with respect to manufacturing standard-compliant products than it is today. As noted above, standard-compliant products may be developed and sold without incorporating technology that is not essential to the standard. Indeed, unless actual essentiality is alleged with respect to defined patents in this case, this Court will find itself in the position of having expended significant effort in rendering a final judgment that could be effective only after another series of lawsuits determines the patents that actually are essential to a given standard. Thus, for example, if this Court were to accept Broadcom's position that Qualcomm has not been offering FRAND licensing terms with respect to a given standard, another court will have to engage in the rigorous determination of what patents actually are essential to the standard to delineate the scope of Qualcomm's alleged FRAND obligations. Some of these patents might be found not to be essential. Accordingly, Broadcom must at a minimum plead actual essentiality with respect to the Qualcomm patents it contends were not timely disclosed or the subject of a FRAND license offer by Qualcomm, which Broadcom has not done. *See, e.g.*, *Step-Saver*, 912 F.2d at 648 (where court's determination on a claim would not have practical effect absent further litigation by other courts, claim was unripe for adjudication); *S.C. Johnson*, 167 F. Supp.

12

2d at 668-69 ("until the infringement is established, and the [other] court announces its bases of [] decision, it is difficult for the Court to make a declaration of rights in this case, and determine what remedies, if any, are implicated").

## II.    BROADCOM ALSO FAILS TO PLEAD OTHER ESSENTIAL ELEMENTS OF EACH OF ITS STATE LAW CLAIMS

Each of Broadcom's state law claims also fails because Broadcom does not allege other necessary elements of each claim.

### A.    Broadcom Does Not Adequately Plead a Claim for Breach of Contract

#### 1.    Generally

Broadcom does not plead a contract directly with Qualcomm.  Instead Broadcom alleges it is a third-party beneficiary of Qualcomm's alleged contractual commitments to various SDOs under its various theories.  (*E.g.*, ¶¶ 289-96.)  To the extent that Broadcom's breach of contract claim is based on its patent disclosure and 802.20 theories, the claim for breach of contract should be dismissed because Broadcom fails to plead adequately that it is a third-party beneficiary of any of these contracts.[5]

Under California law, third parties may enforce contracts to which they are not parties only if those contracts are made "expressly" for their benefit.  Cal. Civ. Code § 1559. "'Expressly' means in an express manner; in direct or unmistakable terms; explicitly; definitively; directly."  *Sofias v. Bank of Am.*, 172 Cal. App. 3d 583, 587 (1985) (citation omitted).  If there is any doubt about whether the contract was made for the benefit of a third party, the contract should be construed against such intent.  *Van Deerhoof v. Chambon*, 121 Cal. App. 118, 131 (1932).  Under this standard, it is clear that Broadcom's SAC is inadequate.

---

[5] Qualcomm does not make this argument with respect to Broadcom's breach of contract claim to the extent that claim relies on Broadcom's FRAND licensing theory.

The excerpts related to IP disclosure from the alleged contracts that Broadcom cites to do not demonstrate any intent -- express or not -- to benefit third parties.  *See* (¶ 80) (ETSI policy requiring IPR disclosure); (¶¶ 185-90) (JVT's Internal Operating Rules requiring IPR disclosure).  For example, Section 4.1 of the ETSI Intellectual Property Rights Policy is cited as stating: "Each MEMBER shall use its reasonable endeavors to timely inform ETSI of ESSENTIAL IPRs it becomes aware of."  (¶ 80.)  Neither this contract term nor the other allegations of the SAC supports an interpretation that this clause was intended to benefit Broadcom and other third parties that implement a standard developed by ETSI, and certainly not that it does so "expressly".   Therefore, Broadcom's breach of contract claim should be dismissed.  *See Johnson v. Holmes Tuttle Lincoln-Mercury, Inc.*, 160 Cal. App. 2d 290, 297 (1958) (holding that while it is not necessary that a third party be named and identified as an individual, the intent to benefit a third person must be established by the terms of the contract).

Similarly, Broadcom's attempt to enforce Qualcomm's alleged commitment to IEEE related to the disclosure of financial relationships fails.  According to the SAC, "the Policies and Procedures of IEEE Project 802, Working Group 802.20 and [its parent SDO] rules require that participants provide '[t]imely and adequate notice' of 'all known directly and materially affected interest' including the 'affiliation' of each member".  (¶ 252.)  Again, neither this contract term nor Broadcom's SAC supports a conclusion that the clause was intended to benefit Broadcom and other third parties.  As a result, Broadcom's breach of contract claim should be dismissed to the extent it is based on Broadcom's patent disclosure or 802.20 theories.

2.     Additional Deficiencies for Claims Based on Commitments to ATIS or ARIB

Finally, to the extent that Broadcom attempts to state a claim for breach of contract with respect to Qualcomm's alleged contractual commitments to ATIS or ARIB (¶ 290),

14

Broadcom's allegations are woefully insufficient. Broadcom attempts, albeit unsuccessfully, to allege violations of commitments to ETSI and JVT. In contrast, Broadcom does not even attempt to make substantive allegations with respect ATIS or ARIB. For example, the SAC contains no specific allegation about formation of a contract with either ATIS or ARIB and Broadcom never alleges that it is a third-party beneficiary of any such alleged contract. This is an independent and additional reason requiring dismissal of claims that Qualcomm breached commitments to ATIS and ARIB.[6]

B.    Broadcom Does Not Adequately Plead a Claim for Promissory Estoppel

Broadcom alleges that Qualcomm made promises to it, through its promises to various SDOs, that Qualcomm would disclose possibly essential IPR and license its essential IPR on FRAND terms and that Broadcom oriented its chipset business in reliance on these promises. (*E.g.*, ¶¶ 303, 305.) Broadcom's claim for promissory estoppel should be dismissed because Broadcom fails to plead reliance on Qualcomm's alleged promise.

Under California law, a claim for promissory estoppel has four elements: (1) a clear and definite promise which the promisor should reasonably expect to induce an action or forbearance; (2) actual reliance on that promise; (3) substantial detriment as a result of that reliance and (4) damages measured by the extent of the obligation assumed and not performed. *Toscano v. Greene Music*, 124 Cal. App. 4th 685, 692 (2004). To plead reliance, the plaintiff must allege facts that demonstrate the act or forbearance. *Smith v. City & Cty. of San Francisco*, 225 Cal. App. 3d 38, 48 (1990). To establish reliance, Broadcom must allege that it took actions

---

[6] Broadcom's other state law claims relating to Qualcomm's alleged conduct with respect to ATIS or ARIB are similarly insufficient because of a lack of any substantive allegations relating to ATIS and ARIB.

15

in reliance on Qualcomm's alleged promise to license its purportedly essential patents on

FRAND terms and Qualcomm's alleged promise to disclose its patents in a timely fashion.

Broadcom's only attempt to plead reliance is its conclusory statement that it took

"action to orient various aspects of its chipset business in reliance on Qualcomm's promises" (¶

305.)  This is insufficient.  For example, in *Smith*, the plaintiffs alleged they "justifiably and

reasonably relied upon the City's promises".  225 Cal. App. 3d at 48.  The court sustained a

demurrer on the grounds that "other than [the plaintiffs'] conclusory allegation that they

reasonably and justifiably relied on the City's promises, [plaintiffs] allege no facts demonstrating

such reliance.  No facts are alleged which show that [plaintiffs] changed their position in any

way because of what they had been promised by the City".  *Id.*  Like the claim in *Smith*,

Broadcom's claim is based on a mere conclusion and, as in *Smith*, that claim should be rejected.

C.     Broadcom Does Not Adequately Plead a Claim for Tortious Interference with
       Prospective Economic Advantage

To state a claim for tortious interference with prospective economic advantage

under California law, a plaintiff must identify specifically the customers or prospective economic

relationships with which the defendant allegedly interfered.  *See, e.g.*, *AccuImage Diagnostics

Corp. v. TeraRecon, Inc.*, 260 F. Supp. 2d 941, 956-57 (N.D. Cal. 2003) (dismissing interference

claims because plaintiff's "conclusory" allegations that unspecified contracts and economic

relationships existed with unspecified third parties were insufficient to provide required notice to

the defendant about the nature of the claim); *Westside Center Assocs. v. Safeway Stores 23 Inc.*,

42 Cal. App. 4th 507, 524 (1996) (finding that a plaintiff must prove an existing relationship

with an identifiable buyer).  Although Broadcom alleges that Qualcomm's conduct foreclosed

Broadcom from commercial opportunities in chipsets based on the standards at issue and

interfered with Broadcom's economic relationships with manufacturers (*e.g.*, ¶¶ 162, 238, 298),

16

Broadcom has not identified a single customer relationship or prospective economic relationship with which Qualcomm's actions allegedly interfered. This is a fatal defect.[7]

      D.      <u>Broadcom Does Not Adequately Plead a Claim for Fraud</u>

      Broadcom's claim for fraud should be dismissed because (1) Broadcom does not comply with the heightened pleading standard of Rule 9(b); and (2) Broadcom does not plead reliance on Qualcomm's alleged omissions.[8]

      Allegations of fraud must be pled with particularity. Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), a plaintiff must plead "the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud". *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004) (citation and internal quotations omitted). In addition, a plaintiff must allege who made the misrepresentation, to whom it was made and the general content of the misrepresentation. *Id.* The SAC fails to satisfy Rule 9(b)'s heightened pleading standard because the alleged misrepresentation, reliance and damages elements of a fraud claim are not pled with particularity.

---

[7] *See In re Global Crossing, Ltd. Sec. Litig.*, No. 02-910, 2004 WL 725969, at *5 (S.D.N.Y. Apr. 2, 2004) (dismissing interference claim where plaintiff "ha[d] not identified any *specific* economic opportunity with which defendants interfered" and noting that "California courts have insisted that to establish interference with prospective economic advantage, a plaintiff must specifically allege a relationship with a particular third party") (emphasis added); *Bradley v. Google, Inc.*, No. 06-05289, 2006 WL 3798134, at *4 (N.D. Cal. Dec. 22, 2006) (holding that tortious interference claim fails as a matter of California law where the plaintiff "never identifie[s] any of the third parties" with whom defendant interfered); *Brown v. Allstate Ins. Co.*, 17 F. Supp. 2d 1134, 1140 (S.D. Cal. 1998) (dismissing tortious interference claim because "[p]laintiff fail[ed] to identify any specific existing relationships with which [defendant] tortiously interfered").

[8] California law recognizes three different types of fraud -- common law fraud, actual fraud, and constructive fraud -- each with different elements. *See Masters v. San Bernardino County Employees Retirement Ass'n*, 32 Cal. App. 4th 30, 40-42 (1995). Broadcom does not allege a particular type of fraud. Qualcomm assumes here that Broadcom attempts to allege a common law fraud claim.

*First*, Broadcom has failed to plead that Qualcomm made a misrepresentation or omission with sufficient particularity.  For example, while Broadcom alleges a general obligation to disclose patents, Broadcom does not plead the requisite date, place or time, or any other facts that would add precision and substantiation to its allegations.  Instead, Broadcom offers a period of several years in duration for each of the relevant standards and fails to specify the particular patents that it claims should have been disclosed.  Similarly, Broadcom alleges that Qualcomm had an obligation to disclose its affiliations with members of the IEEE 802.20 working group (¶¶ 253-54), but fails to identify any specific affiliations between Qualcomm and members of the IEEE 802.20, the specific dates and times at which such disclosures were supposed to be made or the form and content of such disclosures.

*Second*, Broadcom also fails to plead reliance with sufficient particularity.  Broadcom only generally asserts it "reasonably relied" (¶ 152) on the fact that SDO members would abide by the policies of those respective organizations, but fails to plead any particular facts to support this conclusion, such as specific actions it took as a result of such reliance.  In order to state a cause of action for fraud, plaintiffs must plead actual reliance.  *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1092 (1993).  Actual reliance exists when "the defendant's misrepresentation is an immediate cause of the plaintiff's conduct, altering his legal relations, and when, absent such representation, the plaintiff would not, in all reasonable probability, have entered into the transaction".  *Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513, 519 (2004).  Similarly, in an action for fraudulent concealment, reliance requires that "the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact".  *Linear Tech. Corp. v. Applied Mat., Inc.*, 152 Cal. App. 4th 115, 131 (2007).

18

Under either theory, Broadcom's general allegations are not sufficient. Broadcom has not alleged any actions that it took, specifically or not, in reliance upon Qualcomm's alleged omissions. Broadcom does not allege that it would have behaved differently had it been aware of Qualcomm's IP. Nor does it allege that any standards would have been different absent Qualcomm's alleged fraudulent concealment. Likewise, it fails to allege that it would have acted differently absent Qualcomm's alleged fraudulent concealment. In all, Broadcom has not pled the element of reliance.

E.     Broadcom Cannot State a Claim Under the UCL

Broadcom's claims under section 17200 of the California Business and Professions Code (the "UCL") should be dismissed because Broadcom has not alleged the required statutory elements of standing, and also because Broadcom has not satisfied specific requirements applicable to the "unlawful" and "fraudulent" prongs of the UCL.

1.     Broadcom Lacks Standing Under the Express Terms of the UCL

"California law previously authorized any person acting for the general public to sue for relief from unfair competition. After Proposition 64, which the voters approved [in November 2004,] a private person has standing to sue only if he or she 'has suffered injury in fact and has lost money or property as a result of such unfair competition.'" *Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 227 (2006); *Daro v. Superior Court*, 151 Cal. App. 4th 1079, 1097-98 (2007). Thus, a private plaintiff asserting a claim under the UCL now must plead and prove three elements to establish standing:  injury in fact, that the plaintiff lost money or property, and causation. Cal. Bus. & Prof. Code § 17204. Broadcom has not adequately alleged injury in fact for the reasons discussed above. *See Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 814 (2007) (finding that the "injury in fact" requirement of UCL means that the plaintiff has suffered "an invasion of a legally protected interest which is (a)

19

concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical")
(citations and internal quotations omitted).

      Broadcom also lacks standing based on its failure to satisfy the element of "lost
money or property".  To meet that requirement, Broadcom must allege that it lost money or
property as to which it had a vested interest, and that such money or property was lost to
Qualcomm.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148-49 (2003).
As the California Supreme Court has stated, money damages were unavailable under the UCL
even prior to Proposition 64.  *See Mervyn's*, 39 Cal. 4th at 232.  The only available monetary
remedy under the UCL is restitution, defined as the return of monies taken by the defendant from
the plaintiff.  *Id*.  Recent appellate authority confirms that the analysis of the "lost money or
property" element of UCL standing is identical to the analysis of entitlement to restitution under
the UCL, and that the same standing requirement applies even if only injunctive relief is sought.
*See Buckland*, 155 Cal. App. 4th at 817-18.  Because remedies under the UCL "are restricted to
injunctive relief and restitution, the import of the requirement is to limit standing to individuals
who suffer losses of money or property that are eligible for restitution".  *Id.* at 817.

      Here, Broadcom does not allege it has paid anything to Qualcomm -- directly or
indirectly -- or that it has lost anything in which it had a vested interest.  Those omissions are
fatal.  Broadcom alleges only that Qualcomm's conduct has caused Broadcom to lose
unspecified sales it otherwise would have made, resulting in "the loss of past, present, and future
profits, by the loss of customers and potential customers, and by the loss of goodwill and product
image".  (¶ 327.)  The California Supreme Court, however, has squarely held that lost sales or
profits are *not* recoverable under the UCL because a party does not have a vested interest in such

monies. *Korea Supply,* 29 Cal. 4th at 1148-50. Broadcom thus lacks standing to prosecute its claim under the UCL.[9]

      2.    <u>Broadcom Fails to State a Claim Under the "Unlawful" or "Fraudulent"</u>
              <u>Prongs of the UCL</u>

Broadcom also has not satisfied the pleading requirements applicable to the "unlawful" and "fraudulent" prongs of the UCL.[10] Thus, those two prongs of Broadcom's UCL claim should be dismissed for the following additional reasons.

      a.    <u>The "Unlawful" Prong of the UCL</u>

"The 'unlawful' act prong of the UCL embraces 'anything that can properly be called a business practice and that at the same time is forbidden by law'. Thus, the UCL 'borrows' violations of other laws and makes them independently actionable as unfair competition practices." *Daro*, 151 Cal. App. 4th at 1093 (citations omitted). Broadcom contends that Qualcomm committed unlawful business acts or practices by breaching the contracts between Qualcomm and the various SDOs. (¶¶ 320-21.) However, common law claims -- including breach of contract -- do not "serve as a predicate act under the unlawful prong". *Hartless v. Clorox Co.*, No. 06CV2705, 2007 WL 3245260, at *5 & n.5 (S.D. Cal. Nov. 2, 2007) (reviewing "the case authority in this area" and concluding that common law claims,

---

[9] *See also Reid v. Google, Inc.*, 155 Cal. App. 4th 1342, 1351-52 (2007) (finding that former employee lacked standing under UCL to seek return of unvested stock options, because plaintiff "at most had an expectancy interest in the options, [but] such interest does not constitute ownership" under the UCL); *Jensen Enter. Inc. v. Oldcastle, Inc.*, No. 06-00247, 2006 WL 2583681, at *8 (N.D. Cal. Sept. 7, 2006) (UCL claim dismissed on the basis that plaintiff "alleges only damages -- i.e., that it lost sales and profits in the relevant market"). The additional forms of relief sought by Broadcom are not available under the UCL. *Korea Supply*, 29 Cal. 4th at 1148 ("[A]ttorneys fees and damages, including punitive damages, are not available under the UCL. . .".).

[10] A third prong of the UCL is the "unfair" prong.

including breach of contract and negligence, cannot serve as a predicate act under the unlawful prong).  Accordingly, Broadcom's claim under the unlawful prong fails.

b.    The "Fraudulent" Prong of the UCL

In the UCL context, "fraudulent" is a term of art that refers only to practices that are likely to deceive the public, and not to common-law fraud.  *Olsen v. Breeze, Inc.*, 48 Cal. App. 4th 608, 618 (1996); *see Daro*, 151 Cal. App. 4th at 1099 n.9 (the "'essential test'" under the fraudulent prong is "'whether the public is likely to be deceived'") (internal citations omitted).  However, "sophisticated companies" are not the "public" for UCL purposes.  *See, e.g.*, *Linear Tech. Corp.*, 152 Cal. App. 4th at 135 ("where a UCL action is based on contracts not involving either the public in general or individual consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for the relief it seeks."); *Rosenbluth Int'l, Inc. v. Superior Court*, 101 Cal. App. 4th 1073, 1078 (2002).  Broadcom does not allege any deception of the public by Qualcomm.  All of Qualcomm's challenged conduct involved dealings between Qualcomm and various SDOs; between Qualcomm and Broadcom; and between Qualcomm and various unnamed companies in the telecommunications industry.   None of these organizations or entities constitutes the public for UCL purposes.  Accordingly, Broadcom's claim under the fraudulent prong fails.

## III.    BROADCOM'S CLAIMS BASED ON THE H.264 STANDARD SHOULD BE DISMISSED ON THE BASIS OF THE COMPULSORY COUNTERCLAIM RULE AND RES JUDICATA

Paragraphs 170-246 of the SAC concern the H.264 video compression standard. The parties recently concluded a separate lawsuit involving the H.264 standard in which Broadcom asserted the identical patent disclosure theory in response to claims of patent infringement brought by Qualcomm.  *Qualcomm, Inc. v. Broadcom Corp.*, Case No. 05CV1958-B (S.D. Cal.) ("the 1958 Action").

22

The 1958 Action was commenced by Qualcomm in October 2005. In September 2006, Broadcom served supplemental interrogatory responses in the 1958 Action, contending that "Qualcomm had an obligation to disclose the patents-in-suit to the JVT, prior to October 14, 2005" and that "Qualcomm did not do so". Broadcom asserted that "Qualcomm is barred by the doctrines of equitable estoppel, implied license by equitable estoppel, common law fraud, unclean hand[s], and breach of contract from asserting the patents-in-suit against Broadcom" (hereinafter the "JVT nondisclosure issue"). *See* O'Shaughnessy Decl. Ex. 2 (Broadcom's 2d Suppl. Resp. to 3d Set of Interrogs., dated 9/13/06, at 16 (Robertson Decl. in Support of Qualcomm's Mot. Summ. Adjud., dated 11/6/06, Ex. 3).[11] In December 2006, the court, in response to Qualcomm's motion for summary judgment, permitted Broadcom to litigate the JVT nondisclosure issue as part of the affirmative defense of "waiver" pleaded in Broadcom's original Answer and Counterclaims. *See* O'Shaughnessy Decl. Ex. 3 (Tr. 12/5/06 Hearing at 77-79, 199-201). The court also granted Broadcom's motion to amend to add new defenses and counterclaims based on Qualcomm's alleged inequitable conduct before the US Patent and Trademark Office. *See* O'Shaughnessy Decl. Ex. 4 (Order dated 12/15/06); O'Shaughnessy Decl. Ex. 5 (Amended 1958 Answer dated 12/8/06). Broadcom's motion to amend did not seek to add counterclaims based on the JVT nondisclosure issue.

Trial ensued, and in January 2007 the jury issued a verdict that Broadcom had not infringed Qualcomm's two patents in suit. (*See* ¶ 202.) The jury also issued an advisory verdict in favor of Broadcom on its "affirmative defense" that Qualcomm had waived the right to

---

[11] This Court can consider the record in the 1958 Action in connection with this aspect of Qualcomm's Rule 12(b)(6) motion. *See Ross v. Bd. of Educ. of Twp. High Sch. Dist. 31*, No. 05 C 6111, 2006 WL 695471, at *3 n.4 (N.D. Ill. Mar. 14, 2006) (finding that on Rule 12(b)(6) motion, a court takes judicial notice of records from prior lawsuits between the same parties in ruling on "the preclusive doctrine of *res judicata*"), *aff'd*, 486 F.3d 279 (7th Cir. 2007).

enforce the two patents in suit based on Broadcom's JVT nondisclosure theory.  *See* O'Shaughnessy Decl. Ex. 6 (Judgment dated 8/6/07 at 2).  On March 21, 2007, the court issued an opinion finding in favor of Broadcom on the waiver issue.  *See Qualcomm Inc. v. Broadcom Corp.*, 05CV1958, 2007 WL 1031373 (S.D. Cal. Mar. 21, 2007); (¶¶ 203-08).  On August 6, 2007, the court issued its Order on Remedy concerning the waiver issue.  *Qualcomm Inc. v. Broadcom Corp.*, No. 05CV1958 B, 2007 WL 2296441 (S.D. Cal. Aug. 6, 2007) (hereinafter "Order on Remedy dated 8/6/07"); (¶¶ 209-11).  The court held that Qualcomm's patents-in-suit, as well as "their continuations, continuations-in-part, divisions, reissues, or any other dependent or derivative patents of either patent, shall be and are hereby ordered unenforceable".  *Id*. at 1. The court's rulings were embodied in a Judgment entered the same day, from which Qualcomm's appeal is pending.  O'Shaughnessy Decl. Ex. 6 (Judgment dated 8/6/07).

Having previously raised and litigated the JVT nondisclosure issue in the 1958 Action, Broadcom here seeks additional remedies, under additional legal theories, involving exactly the same JVT nondisclosure issue.  Those additional legal theories include ones Broadcom expressly mentioned in its supplemental interrogatory responses in the 1958 Action (*i.e*, breach of contract, fraud and estoppel), but failed to include in its proposed Amended Answer and Counterclaims.  Broadcom should be precluded from asserting all such claims in this case under the compulsory counterclaim rule embodied in Federal Rule of Civil Procedure 13(a) and the doctrine of res judicata.

A.     Broadcom Is Barred by the Compulsory Counterclaim Rule From Asserting Any Claims Relating to JVT and the H.264 Standard

Under Rule 13(a), Broadcom was required to "state as a counterclaim" in the 1958 Action any claim Broadcom had against Qualcomm which "ar[ose] out of the transaction or occurrence that [was] the subject matter of" Qualcomm's claims.  Rule 13(a) prevents a party

24

from asserting in a second lawsuit any claim that was a compulsory counterclaim in a previous lawsuit between the parties. *Bristol Farmers Mkt. & Auction Co. v. Arlen Realty & Dev. Corp.*, 589 F.2d 1214, 1220 (3d Cir. 1978); *accord* Cal. Civ. Proc. Code § 426.30. The Third Circuit applies the "logical relationship" test to determine the meaning of Rule 13(a)'s use of the term "transaction". *Transamerica Occ. Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384, 389-90 (3d Cir. 2002) (citing *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978)). Under this standard, counterclaims that could have been brought in a previous case are deemed compulsory when they "involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties". *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3d Cir. 1961).

      "Any counterclaim involving the same patent as involved in the original action usually is considered to arise from the same transaction as the main claim." 6 Charles A. Wright et al., *Federal Practice and Procedure* § 1410, at 73 (2d ed. 1990). In determining whether a claim in a second case was a compulsory counterclaim in a previous patent infringement case, courts look at the infringement claims in the previous case as well as the defenses raised in that case. *Schwarz Pharma, Inc. v. Teva Pharms., U.S.A.*, Civ. No. 01-4995, Slip Op. at 22-24 (D.N.J. June 5, 2002) (antitrust and related state law counterclaims in second infringement case, which were closely related to defenses raised in prior infringement case and which "existed when [defendant] filed its Amended Answer in the [prior] lawsuit", were precluded under Rule 13(a)).

      Applying these rules, it is clear that Broadcom's patent disclosure theory with respect to JVT, on which Broadcom seeks additional relief in this case under additional legal theories, should have been presented as a counterclaim in the 1958 Action in Broadcom's Amended Answer and Counterclaims. Broadcom's patent disclosure theory here is identical to

25

the JVT nondisclosure issue Broadcom litigated in the 1958 Action.  Thus, unlike the more typical situation where only a "logical connection" exists between omitted counterclaims and issues actually presented in a previous case, here those issues are exactly the same.  Since any claims Broadcom has for additional relief based on the JVT nondisclosure issue "existed when [Broadcom] filed its Amended Answer in the [1958 Action]", Broadcom should be precluded by Rule 13(a) from litigating those claims in this case.  *Id.*

Rule 13(a) also precludes Broadcom from asserting its FRAND licensing theory with respect to patents essential to the H.264 standard, even though that theory was not expressly raised in the 1958 Action.  The SAC makes clear that Broadcom's FRAND licensing and patent disclosure theories are closely intertwined, thereby easily satisfying the "logical relationship" standard.[12]  Accordingly, Broadcom's FRAND licensing theory should also have been presented to the court in the 1958 Action as a compulsory counterclaim to Qualcomm's infringement claims.  *See Phillips Pet. Co. v. U.S. Steel Corp.*, 566 F. Supp. 1093, 1096-97 (D. Del.), *aff'd mem.*, 727 F.2d 1120 (3d Cir. 1983) (finding, in patent infringement action, defendant's claim challenging plaintiff's licensing terms for the patents in suit was compulsory under Rule 13(a)).[13]

---

[12] *See, e.g.*, ¶ 5 ("SDOs often require patent holders to disclose their essential intellectual property ('IP') and commit to license such essential IP on [FRAND] terms"); ¶ 8 ("Qualcomm has engaged in conduct designed to undermine competition, including delayed disclosures of IP, [and] refusals to license on FRAND terms. . ."); ¶ 23 (similar); ¶ 138 (similar); ¶ 281 (alleging that Qualcomm failed to disclose essential IPR in order to induce SDOs to incorporate that IPR into a standard, and then refused to license that IPR on FRAND terms).   Broadcom makes these same allegations specifically directed to Qualcomm's alleged conduct concerning JVT.  (¶¶ 229, 240-41.)

[13] ¶¶ 237-29 include vague allegations that Qualcomm has wrongfully asserted to unnamed companies that products implementing the H.264 standard require a license from Qualcomm which Broadcom does not possess.  To the extent those allegations fall outside of the patent disclosure and FRAND licensing theories, they still fall within the reach of Rule 13(a) and should have been presented in the 1958 Action as a compulsory counterclaim.  *See Waterloov Gutter Prot. Sys. Co. v. Absolute Gutter Prot., LLC*, 64 F. Supp. 2d 398, 404 (D.N.J. 1999) (finding in patent infringement suit, counterclaims alleging unfair competition based on sending letters to plaintiffs' customers "threatening enforcement" of patents "arise[] out of a common

26

B.    Broadcom Is Also Barred by Res Judicata From Asserting Any Claims Relating to JVT and the H.264 Standard

Broadcom's claims in this case based on JVT and the H.264 standard are also precluded by res judicata as a result of the Judgment entered in the 1958 Action.  Although Broadcom formally asserted the JVT nondisclosure issue in the 1958 Action as an affirmative defense, both Broadcom and the court effectively treated that issue as a counterclaim seeking coercive relief, resulting in a Judgment in Broadcom's favor awarding such relief.  *See* Order on Remedy dated 8/6/07 at *1; O'Shaughnessy Decl. Ex. 6 (Judgment dated 8/6/07 at 3); (¶¶ 209-11.)  That Judgment triggered the application of res judicata which, in turn, precludes Broadcom from litigating any aspect of the same cause of action in this case.  As noted above, Qualcomm has taken an appeal from that Judgment, which remains pending.  Until and unless that Judgment is reversed, it bars Broadcom from relitigating any part of the same cause of action in this case.[14]

Res judicata ordinarily does not apply in the case of a defendant who merely asserts affirmative defenses in response to a lawsuit, as opposed to a counterclaim seeking affirmative relief.  However, it is indisputable that the court in the 1958 Action, with Broadcom's support, effectively treated the JVT nondisclosure issue as a counterclaim seeking affirmative relief, independent of the resolution of Qualcomm's infringement claims in Broadcom's favor.  As previously discussed, the court in the 1958 Action considered and ruled upon the JVT nondisclosure issue only *after* the jury had already returned a verdict of noninfringement on Qualcomm's claims against Broadcom.  That verdict totally resolved Qualcomm's claims in

---

nucleus of operative fact" with other claims in the case involving validity and enforceability of the same patents).

[14] Although reversal of the Judgment in the 1958 Action would moot the issue of res judicata, it would not moot Qualcomm's reliance on the compulsory counterclaim rule embodied in Rule 13.

27

Broadcom's favor.  Yet, the court in the 1958 Action -- with Broadcom's urging -- proceeded to adjudicate Broadcom's purported "affirmative defense", resulting in a Judgment that Qualcomm has waived its right to enforce the two patents in suit against anyone in the world including Broadcom.

In entering such a Judgment in Broadcom's favor, the court in the 1958 Action plainly treated the JVT nondisclosure issue as an independent "cause of action" and not merely as an affirmative defense to Qualcomm's claims.  That Judgment, which affirmatively awarded coercive relief to Broadcom, should be afforded the same res judicata effect as any Judgment awarding similar relief.  As a result, Broadcom should be precluded from relitigating the same cause of action in this case.[15]

In determining the res judicata effect of the Judgment entered in the 1958 Action, "the federal rule [is] that the law of the issuing court -- here, federal law -- determines the preclusive effects of a prior judgment" entered in another federal district court.  *Paramount Aviation Corp. v. Augusta*, 178 F.3d 132, 135 (3d Cir. 1999).  Under federal preclusion law, "a final judgment on the merits in a prior suit" between the same parties precludes a subsequent suit

---

[15] *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376, 393-94 (3d Cir. 1994) (an affirmative defense "is neither an 'action' nor a claim" and can serve only to "'diminish plaintiff's cause of action or defeat recovery'"; in contrast, a "counterclaim *is a* 'claim'" "'presented by a defendant in opposition to or deduction from the claim of the plaintiff'") (emphasis in original) (citations omitted); *Riverside Mem'l Mausoleum, Inc. v. UMET Trust*, 581 F.2d 62, 68 (3d Cir. 1978) ("a counterclaim may entitle the defendant in the original action to some amount of affirmative relief; a defense merely precludes or diminishes the plaintiff's recovery"); 3 James Wm. Moore et al., Moore's Federal Practice § 13.90 (3d ed. 1999) ("[U]nlike Rule 13 claims, [affirmative defenses] do not allow for recovery"); *see also Peasley v. Verizon Wireless LLC*, 364 F. Supp. 2d 1198, 1200-01 (S.D. Cal. 2005) ("'it is settled that waiver can be employed only for defensive purposes.  It can preclude the assertion of legal rights but it cannot be used to impose legal duties.  The shield cannot serve as a sword.'" (quoting *Rennie & Laughlin, Inc. v. Chrysler Corp.*, 242, F.2d 208, 210 (9th Cir. 1957)).  Qualcomm's pending appeal in the 1958 Action explicitly argues that the district court committed reversible error by entering a Judgment granting coercive relief in response to Broadcom's purported affirmative defense of waiver.

brought "based on the same cause of action." *Post v. Hartford Ins. Co.*, 501 F.3d 154, 169 (3d Cir. 2007). Whether two lawsuits are based on the same cause of action "turns on the essential similarity of the underlying events giving rise to the various legal claims." *Churchill v. Star Enters.*, 183 F.3d 184,194 (3d Cir. 1999) (citation omitted). The Third Circuit "take[s] a broad view" of whether two lawsuits involve the same cause of action. *Id.* "Moreover, res judicata bars not only claims that were brought in the previous action, but also claims that could have been brought". *Post*, 501 F.3d at 169.[16]

Applying these standards here, all of Broadcom's claims relating to the JVT are precluded by res judicata. Broadcom's patent disclosure theory in this case concerning JVT involves the identical "underlying events" as its JVT nondisclosure claim in the 1958 Action. Although Broadcom's FRAND licensing theory was not expressly presented in the 1958 Action, the SAC itself establishes the "essential similarity of the underlying events" connecting Broadcom's FRAND licensing and patent disclosure theories. As noted above in connection with the compulsory counterclaim rule, the FRAND licensing and patent disclosure theories are closely related according to Broadcom. (*See, e.g.*, ¶ 240 (alleging that "Qualcomm's refusal to honor its commitments to the JVT, the ITU, and the ISO/IEC to disclose and license its essential IPR on FRAND terms" has caused Broadcom harm by "interfering with Broadcom's ability to develop and market semiconductors for H.264-compliant devices")). According to Broadcom, both theories "are related to the same set of facts and . . . could conveniently be tried together".

---

[16] The Ninth Circuit, in which the court in the 1958 Action is located, similarly describes federal preclusion standards. *See, e.g.*, *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201-02 (9th Cir. 1982) (stating that for res judicata purposes, "the most important" criterion for determining whether successive suits involve same cause of action is "whether the two suits arise out of the same transactional nucleus of facts") (citation omitted); *Int'l Union of Operating Eng'rs-Employers Constr. Indus. Pension, Welfare and Training Trust Funds v. Karr*, 994 F.2d 1426, 1430-31 (9th Cir. 1993) ("Res judicata bars not only all claims that were actually litigated, but also all claims that 'could have been asserted' in the prior action") (citation omitted).

*W. Sys., Inc. v. Ulloa*, 958 F.2d 864, 871 (9th Cir. 1992). Indeed, Broadcom pleads both of these theories together in each of its state law causes of action. Thus, Broadcom's claims based on JVT and the H.264 standard may not be relitigated in this case as a result of the Judgment entered in the 1958 Action. *See Post*, 501 F.3d at 169.

<u>Conclusion</u>

For the foregoing reasons, the state law claims (Claims for Relief IV-VIII) in Broadcom's Second Amended Complaint should be dismissed in their entirety.

December 21, 2007

Respectfully submitted,

McCARTER & ENGLISH, LLP

by

s/ William J. O'Shaughnessy
William J. O'Shaughnessy

Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Peter T. Barbur
Elizabeth L. Grayer
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Richard S. Taffet
Philip L. Blum
BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

Robert N. Feltoon
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, Suite 1600
Philadelphia, PA 19102
(215) 864-8064

ME1 7005142v.1

William J. O'Shaughnessy
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Peter T. Barbur
Elizabeth L. Grayer
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Richard S. Taffet
Philip L. Blum
BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

Robert N. Feltoon
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, Suite 1600
Philadelphia, PA  19102
(215) 864-8064

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| BROADCOM CORPORATION, | : | Civil Action No. 05-3350 (MLC) (JJH) |
|  | : |  |
| *Plaintiff*, | : |  |
| vs. | : |  |
|  | : |  |
| QUALCOMM INCORPORATED, | : |  |
|  | : |  |
| *Defendant*. | : |  |
|  | : |  |

**DECLARATION OF WILLIAM J. O'SHAUGHNESSY IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS CLAIMS FOUR THROUGH EIGHT OF
PLAINTIFF'S SECOND AMENDED COMPLAINT**

William J. O'Shaughnessy, declares pursuant to 28 U.S.C. § 1746, as follows:

1.  I am an attorney admitted to practice before all courts in the State of New Jersey.

I am a member of the law firm of McCarter & English, LLP, attorneys for defendant

QUALCOMM Incorporated, and am familiar with the matters stated herein.  I submit this

declaration is support of Defendant's Motion to Dismiss Claims Four through Eight of Plaintiff's

Second Amended Complaint.

2.  Attached hereto are true and correct copies of the following documents:

**Exhibit 1:**  Broadcom's Opposition to Qualcomm's Motion to Stay the Proceedings, filed September 24, 2006, in *Broadcom v. Qualcomm*, No. 07-CC-01249 (California Superior Court for the County of Orange).

**Exhibit 2:**  Exhibit 3 of the Robertson Declaration in Support of Qualcomm's Motion for Summary Adjudication, filed November 6, 2006, in *Qualcomm v. Broadcom*, No. 05 CV 1958 B (S.D. Cal.).

**Exhibit 3:**  Transcript of December 5, 2006 Hearing before the Honorable Rudi M. Brewster in *Qualcomm v. Broadcom*, No. 05 CV 1958 B (S.D. Cal.).

**Exhibit 4:**  Order Granting Motion for Leave to File First Amended Answer and Counterclaims, dated December 15, 2006, in *Qualcomm v. Broadcom*, No. 05 CV 1958 B (S.D. Cal.).

**Exhibit 5:**  Broadcom's First Amended Answer and Counterclaims, filed December 8, 2006, in *Qualcomm v. Broadcom*, No. 05 CV 1958 B (S.D. Cal.).

**Exhibit 6:**  Judgment Entered on August 6, 2007 in *Qualcomm v. Broadcom*, No. 05 CV 1958 B (S.D. Cal.).

3.  Attached hereto as Appendix A are true and correct copies of the following

unreported cases:

*Bradley v. Google, Inc.*, No. 06-05289, 2006 WL 3798134 (N.D. Cal. Dec. 22, 2006)

*Hartless v. Clorox Co.*, Civ. No. 06CV2705, 2007 WL 3245260 (S.D. Cal. Nov. 2, 2007)

*In re Global Crossing Limited Securities Litigation*, No. 02-910, 2004 WL 725969 (S.D.N.Y. April 2, 2004)

*Jensen Entertainment. Inc. v. Oldcastle, Inc.*, No. 06-00247, 2006 WL 2583681 (N.D. Cal. Sept. 7, 2006)

-2-

*Landes v. Tartaglione*, No. Civ.A. 04-3163, 2004 WL 2415074 (E.D. Pa. Oct. 28, 2004)

*Lee v. Am. Express Travel Related Svcs.*, No. C 07-04765, 2007 WL 4287557 (N.D. Cal. 2007)

*Ross v. Board of Educ. of Township High School Dist. 31*, No. 05 C 6111, 2006 WL 695471 (N.D. Ill. Mar. 14, 2006)

*Qualcomm Inc. v. Broadcom Corp.*, 05-CV-1958, 2007 WL 1031373 (S.D. Cal. Mar. 21, 2007)

*Qualcomm Inc. v. Broadcom Corp.*, 05-CV-1958, 2007 WL 2296441 (S.D. Cal. Aug. 6, 2007)

*Schwarz Pharma, Inc. v. Teva Pharms., U.S.A.*, Civ. No. 01-4995, Slip Op. (D.N.J. June 5, 2002)

*Traverso v. Home Depot U.S.A., Inc.*, No. 07-1324, 2007 WL 3124698 (D.N.J. Oct. 23, 2007)


Dated:  December 21, 2007

s/ William J. O'Shaughnessy
William J. O'Shaughnessy

ME1 7005062v.1

WILMER CUTLER PICKERING HALE AND DORR LLP
William F. Lee (william.lee@wilmerhale.com)
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000; Facsimile: (617) 526-5000

WILMER CUTLER PICKERING HALE AND DORR LLP
James L. Quarles III (james.quarles@wilmerhale.com)
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000; Facsimile (202) 663-6363

WILMER CUTLER PICKERING HALE AND DORR LLP
Mark D. Selwyn (244180) (mark.selwyn@wilmerhale.com)
1117 California Avenue
Palo Alto, California 94304
Telephone: (650) 858-6000; Facsimile: (650) 858-6100

CLEARY GOTTLIEB STEEN & HAMILTON LLP
George S. Cary (73858) (gcary@cgsh.com)
Mark W. Nelson (mnelson@cgsh.com)
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 974-1500; Facsimile: (202) 974-1999

O'MELVENY & MYERS LLP
Michael G. Yoder (83059) (myoder@omm.com)
Marcus S. Quintanilla (205994) (mquintanilla@omm.com)
610 Newport Center Drive, 17th Floor
Newport Beach, California 92660
Telephone: (949) 760-9600; Facsimile: (949) 823-6994

Attorneys for Plaintiff
BROADCOM CORPORATION

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

| | |
|---|---|
| BROADCOM CORPORATION, a California corporation,<br><br>        Plaintiff,<br><br>        vs.<br><br>QUALCOMM, INC., a Delaware corporation; and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No. 07-CC-01249<br><br>**ASSIGNED FOR ALL PURPOSES TO JUDGE STEPHEN J. SUNDVOLD DEPARTMENT CX-105**<br><br>**BROADCOM'S OPPOSITION TO QUALCOMM'S MOTION TO STAY THE PROCEEDINGS**<br><br>Hearing Date: October 5, 2007<br>Hearing Time: 9:00 a.m.<br>Department: CX105<br><br>Action Filed: April 12, 2007<br>Trial Date: None set |

**INTRODUCTION**

Qualcomm's request for a stay seeks to prevent a California company from suing another company headquartered in California under California law in a California court. That is not a situation in which California law favors forcing a California plaintiff to proceed in a forum outside California. Qualcomm's motion should be denied.

In considering a stay motion pursuant to Cal. Civ. Proc. Code § 410.30, this Court has broad discretion to weigh the array of public and private interests that determine whether an action may be "more appropriately and justly tried elsewhere." *Stangvik v. Shiley, Inc.* (1991), 54 Cal. 3d 744, 751. But substantial justice requires that the California proceedings be stayed only when the moving party shows that "California is a *seriously inconvenient* forum." *Ford Motor Co. v. Insurance Co. of North America* (1995), 35 Cal. App. 4th 604, 610. Here, on the contrary, the balance of both public and private interests favors California state court over New Jersey federal court as the forum for resolution of Broadcom's California-law claims.

*First*, contrary to Qualcomm's contention, permitting this action to proceed will not result in "multiple litigations designed solely to harass an adversary," *Thomson v. Cont'l Ins. Co.* (1967), 66 Cal. 2d 738, 746-47. Far from bringing its claims in this Court to harass Qualcomm, Broadcom did so in accordance with the express suggestion by the New Jersey federal court. When, at Qualcomm's urging, the New Jersey court dismissed Broadcom's pendent state-law claims without prejudice, it indicated that Broadcom should have the opportunity to re-file those claims in California state court. (Ex. A, *Broadcom Corp. v. Qualcomm Inc.*, Civ. No. 05-3350, 2006 WL 2528545 at *19 (D.N.J. Aug. 31, 2006) (tolling statute of limitations to permit re-filing of state law claims in state court).)[1] Broadcom followed the New Jersey federal court's suggestion.

Once the New Jersey federal action returns to the trial court, Broadcom will seek to dismiss its pendent state-law claims without prejudice there, if those claims are proceeding forward in this litigation. The federal antitrust claims that will remain in the New Jersey federal action are distinct from Broadcom's California common-law and Unfair Competition Law

---

[1] All citations to exhibits in this opposition refer to exhibits to the Declaration of Louis W. Tompros in Support of Broadcom's Opposition to Qualcomm's Motion to Stay, filed concurrently.

1  ("UCL") claims in several respects.  Moreover, Broadcom is willing to enter into an agreement

2  governing discovery—subject to this Court's supervision, the supervision of the Magistrate Judge

3  in the New Jersey action, or both—to avoid duplication of discovery efforts.

4       *Second*, several interrelated public-interest considerations favor proceeding in this Court.

5  As the briefing on Qualcomm's demurrer makes plain, this case presents several issues of

6  California law, including issues of standing under Cal. Bus. & Prof. Code § 17204 and

7  interpretation of Proposition 64.  California has a powerful interest in having these claims under

8  its laws resolved in its own courts.  Moreover, some of Qualcomm's injurious conduct took place

9  in this State.  California has a substantial interest in seeing its laws applied to conduct within its

10  borders and to conduct that harms its citizens.

11       *Third*, the relevant private interests also favor litigation in this Court.  Broadcom is a

12  California corporation with its principal place of business in California.  Qualcomm also has its

13  principal place of business in California.  And the bulk of the relevant documents and likely

14  witnesses are located in California.  Thus, California is a convenient forum for both parties and

15  witnesses.

16       *Finally*, contrary to Qualcomm's contention, this Court has the authority to grant the relief

17  that Broadcom seeks.  As explained below and in Broadcom's Opposition to Qualcomm's

18  demurrer, Broadcom seeks injunctive relief under California law, not relief either under or

19  improperly interfering with federal patent law.

20                                    **ARGUMENT**

21  I.     **Qualcomm's Request for a Stay Should Be Denied.**

22       In adjudicating a motion under Cal. Civ. Proc. Code § 410.30, "the moving party bears the

23  burden of proving that California is an inconvenient forum."  *Ford Motor Co.*, 35 Cal. App. 4th at

24  610.  "The inquiry is not whether [the other jurisdiction] provides a better forum than does

25  California, but whether California is a *seriously inconvenient* forum."  *Id.* (emphasis added); *see*

26

27

28

1  *also Hansen v. Owens-Corning Fiberglas Corp.* (1996), 51 Cal. App. 4th 753, 758. Qualcomm

2  has utterly failed to meet that burden.[2]

3      The Court must "consider the private interests of the litigants and the interests of the public

4  in retaining the action for trial in California." *Stangvik* 54 Cal. 3d at 751. Specifically:

5      The private interest factors are those that make trial and the enforceability of the
       ensuing judgment expeditious and relatively inexpensive, such as the ease of
6      access to sources of proof, the cost of obtaining attendance of witnesses, and the
       availability of compulsory process for attendance of unwilling witnesses. The
7      public interest factors include avoidance of overburdening local courts with
       congested calendars, protecting the interests of potential jurors so that they are not
8      called upon to decide cases in which the local community has little concern, and
       weighing the competing interests of California and the alternate jurisdiction in the
9      litigation.

10  *Id; see also* Judicial Council Comment to Cal. Civ. Pro. Code § 410.30 (listing thirteen factors for

11  court to consider in evaluating motion). Here, both the public- and private-interest factors favor

12  permitting Broadcom (a California company) to pursue its action under California unfair

13  competition, fraud, and contract law, against Qualcomm (a California defendant) in the California

14  courts.

15      A.   ***Permitting This Action To Proceed Will Not Lead to Duplicative Litigations.***

16      The basic premise of Qualcomm's motion—that the claims in the New Jersey federal

17  action and this one are "substantially identical" (Qualcomm Br. at 2 (quoting *Thomson v. Cont'l*

18  *Ins. Co.*, 66 Cal. 2d 738, 746 (1967))—rests on the presence in the New Jersey case of

19  Broadcom's state-law claims. But, as noted, if Broadcom's California-law claims proceed

20

21      [2] As a preliminary matter, Qualcomm's motion may also be denied as untimely. By failing

22  to file its motion when it filed its demurrer, Qualcomm waived its right to seek a stay of these
    proceedings under § 410.30. *See* Cal. Civ. Pro. Code § 418.10(a), (e) ("A defendant, on or before

23  the last day of his or her time to plead or within any further time that the court may for good cause
    allow, may serve and file a notice of motion for one or more of the following purposes: . . . (2) To

24  stay or dismiss the action on the ground of inconvenient forum."; "Failure to make a motion under
    this section at the time of filing a demurrer . . . constitutes a waiver of the issues . . . of . . .

25  inconvenient forum."); Judicial Council Comment to Cal. Civ. Pro. Code § 410.30 ("The procedure

26  for making a motion to stay or dismiss an action under this section is stated in Section 418.10.").
    Qualcomm has offered no good cause to excuse the belatedness of its motion to stay—nor could it.

27  Qualcomm has plainly known of Broadcom's pending New Jersey litigation since before the
    deadline under § 418.10 expired, and Qualcomm was well aware that there was a reasonable

28  probability that Broadcom would prevail on appeal the dismissal of its New Jersey litigation.

1  forward in this court, Broadcom intends to dismiss without prejudice its California-law claims

2  from the New Jersey action. Thus, the very basis for Qualcomm's motion will disappear.

3      With the state-law claims removed from Broadcom's complaint in the New Jersey federal

4
5  antitrust case, the distinctiveness of the two actions is plain. The actions will then arise under

6  distinct legal rubrics. Broadcom's common-law fraud and breach of contract actions plainly have

7  different elements from its federal antitrust claims. And Broadcom's UCL claims also are distinct

8  from its federal Sherman Act claims. Broadcom has raised claims under the "fraudulent" and

9  "unlawful" prongs of the UCL, which have no connection to federal antitrust law. Moreover, as

10 the California Supreme Court made clear in *Cel-Tech Communications v. Los Angeles Cellular*

11
12 *Tel. Co.* (1999), 20 Cal. 4th 163, the reach of the UCL's "unfair" prong is broader than that of the

13 federal antitrust laws. A claim under the "unfair" prong of the UCL may rest on conduct that

14 "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those

15 laws . . . or otherwise threatens or harms competition," *id.* at 186—whether or not the conduct

16 gives rise to a federal antitrust claim. Indeed, in *Cel-Tech* itself, the Court held that the particular

17 conduct at issue could constitute a UCL violation even though it might not violate the Cartwright

18 Act. As Qualcomm's own counsel has correctly stated, "although there are some state claims

19 asserted [in New Jersey]—[it] is *far and away an antitrust case*." (Ex. B, Tr. of Hearing Before

20
21 Hon. Mary L. Cooper, *Broadcom Corp. v. Qualcomm, Inc.*, Case No. 05-CV-3350 (MLC), June

22 26, 2006, at 10:12-13.) Thus, resolution of the federal action will not determine the outcome of

23 this action under California law. To the contrary, the state-law action will have to proceed to its

24 own conclusion regardless of the outcome of the federal action, as the New Jersey district court

25

26

27

28

1  recognized by giving Broadcom time to re-file its state-law claims even as it dismissed

2  Broadcom's federal antitrust claims.[3]

3      Moreover, the claims in the California action encompass Qualcomm's misconduct not only

4  before the European Telecommunications Standards Institute ("ETSI") with respect to the

5  Wideband Code Division Multiple Access ("WCDMA") cellular standard, but also before (1)

6  

7  ETSI with respect to the GSM, GPRS, and EDGE standards; (2) the 802.20 Working Group of the

8  Institute of Electrical and Electronics Engineers ("IEEE"); and (3) the Joint Video Team ("JVT")

9  created by the International Standards Organization, the International Electrotechnical

10 Commission, and the International Telecommunications Union.[4]

11     Finally, permitting this action to proceed will not require duplication of discovery efforts

12 or motions practice. Discovery is not far advanced in the New Jersey action. Only one deposition

13 

14 has taken place—a brief deposition of a Broadcom in-house attorney concerning his duties within

15 the company, for purposes of determining whether he should have access to Qualcomm

16 information under the protective order in the New Jersey action. The cases cited by Qualcomm

17 drive home the point that the New Jersey federal action remains at a sufficiently preliminary stage

18 that its progress provides no reason to stay this case. In *Berg v. MTC Electronics Technologies*

19 *Co.* (1998), 61 Cal. App. 4th  349, at the time of the stay motion "[n]inety-two days of depositions

20 

21 

22    [3] Qualcomm cites *Caiafa Professional Law Corp. v. State Farm Fire & Casualty Co.*
(1993), 15 Cal. App. 4th 800, for the proposition that a stay may be proper even when "the causes

23 of action in the cases were dissimilar." (Qualcomm Br. 2-3.) But *Caiafa* actually supports denial
of a stay here. In *Caiafa*, the court approved entry of a stay in part because the outcome of the

24 earlier-filed federal action "almost certainly would determine" the issues presented in state action.
The opposite is true here. The resolution of the New Jersey federal action almost certainly will

25 *not* determine the outcome in the California-law suit pending before this Court. *See Cel-Tech*

26 *Commc'ns v. Los Angeles Cellular Tel. Co.* (1999), 20 Cal. 4th 163, 186.

27    [4] Although Qualcomm's abusive practices in these other standard-setting bodies may be
relevant to the federal antitrust claims in the New Jersey action concerning the WCDMA standard

28 because they help establish a pattern of abusive practices, those practices are not alleged to be
antitrust violations in the New Jersey case.

1   had been taken, and one thousand deposition exhibits had been marked." *Id.* at 363.  In *Dendy v.*

2   *MGM Grand Hotels, Inc.* (1982), 137 Cal. App.3d 457, "a huge amount of discovery ha[d] already

3   occurred," so much so that the documents exchanged were stored in a "warehouse" located in the

4   other jurisdiction. *Id.* at 462.  In the New Jersey federal action, by contrast, discovery has not

5   progressed nearly as far.

6

7          Moreover, any possible duplication of discovery would be eliminated by this Court's

8   entering an order—which Broadcom would welcome—requiring the parties to make any

9   discovery in both actions available in the other action and prohibiting duplicative discovery

10  requests or motions.  Broadcom is willing to work out the precise contours of any such agreement

11  with Qualcomm and to submit a joint proposal for the Court's consideration.

12

13         B.    *Important Public-Interest Factors Favor Allowing Broadcom's California-Law*
               *Claims To Proceed in This Court.*

14

15         Several public-interest considerations militate in favor of allowing Broadcom's California-

16  law claims to be heard by a California court.

17         *First*, California has an important interest in having its law developed in its own courts.

18  Thus, when "California law applies to the adjudication" of a case, that is significant "evidence of

19  California's interest in [the] litigation" for purposes of forum non conveniens analysis. *Ford*

20  *Motor Co. v. Insurance Co.*, (1995) 35 Cal App. 4th at 614.  As the parties' briefing on

21  Qualcomm's demurrer makes clear, this case involves substantial issues of California law,

22  including:  (1) the standing requirement under Cal. Bus. & Prof. Code § 17204; (2) the effect of

23  the amendment of § 17204 by Proposition 64; (3) the injury requirement under § 17200; (4) the

24  causation requirement under § 17200; and (5) the requirements for statutory fraud under California

25  law.  In fact, both Qualcomm and Broadcom viewed the issues of California law raised by

26  Broadcom's complaint in this action to be sufficiently substantial that they requested (and

27  received) additional pages and additional time for briefing on the demurrer.  (*See* Ex. C,

28

                                        - 6 -

1   Stipulation and [Proposed] Order for Leave of Court To: (1) Extend Time Limit to Respond to

2   Complaint; (2) Extend Page Limit for Responsive Pleading, May 25, 2007.)  Given the California-

3   law issues involved, the importance of having California's courts take the lead in interpreting

4   California's laws has particular weight in this case.

5

6       *Second*, California has an important interest in protecting its citizens and its economy from

7   fraud and anticompetitive conduct.  *See, e.g., Thomson*, 66 Cal. 2d at 745 (holding that "[t]he

8   public factors weigh in favor of trial in California" when action was needed to vindicate

9   consumers' rights); Judicial Council Comment to Cal. Civ. Pro. Code § 410.30 (listing "[t]he

10  interest, if any, of this state in regulating the situation or conduct involved" as a factor that a court

11  should weigh in evaluating a request under § 410.30).  The UCL is fundamentally a consumer

12  protection statute, and this action under the UCL seeks to preclude anticompetitive conduct by

13  Qualcomm, some of which occurred in this State, where Qualcomm has its headquarters and

14

15  where some of the meetings of the standards-setting bodies at issue took place.[5]  That

16  anticompetitive conduct has harmed, among others, California consumers, including Broadcom.

17  *See* Compl.  ¶¶ 1, 4, 83, 114, 182, 210, 216.

18      *Third*, California has an interest in providing a forum for its citizens.  *See* Judicial Council

19  Comment to Cal. Civ. Pro. Code § 410.30 (listing "[t]he interest, if any, of this state in providing a

20  forum for some or all of the parties to the action" as a factor that a court should weigh in

21  evaluating a request under § 410.30).  Plaintiff Broadcom is a corporation incorporated in and with

22

23  its principal place of business in this State.  This consideration too weighs against granting

24

25      [5] While the standard-setting meetings at issue in this litigation occurred in various

26  locations around the world, the majority of the meetings held in the United States were held in
California.  (*See, e.g.*, Ex. D, IEEE 802.20 Mobile Broadband Wireless Access ("MWBA")

27  Working Group Documents, http://www.ieee802.org/20/Documents.htm (listing meetings in San
Francisco, Garden Grove, Monterey, and Orange County; Ex. E, Index of /av-arch/jvt-site,

28  http://ftp3.itu.ch/av-arch/jvt-site/ (listing meetings in San Diego and San Jose).)

1  Qualcomm's request.  *See, e.g., Berg v. MTC Electronics Technologies* (1998), 61 Cal. App. 4th

2  349, 362 ("A stay of an action filed by a California resident is rare.").

3     *Fourth*, the alternative forum is a federal court outside California.  While a stay would be

4
5  inappropriate even if the alternative forum were a federal court in this State, the California courts

6  have been even less willing to grant stays when the federal forum is outside California and thus

7  less likely to be familiar with California law.  *See, e.g, Thomson*, 66 Cal.2d at 747; *Caiafa*, 15 Cal.

8  App. 4th at 807.  Thus, that consideration also weighs against a stay.[6]

9     Altogether, when "weighing the competing interests of California and the alternate

10  jurisdiction in the litigation," *Stangvik*, 54 Cal. 3d at 751, the balance tips sharply in favor of

11  California.

12

13     C.  ***Important Private Interests Favor Permitting Broadcom To Bring Its California-
          Law Claims in This Court.***

14
        Private-interest considerations also weigh against granting Qualcomm's request.  Those

15
    considerations include the relative convenience of the alternative forum to the parties and

16
17  witnesses, "the relative ease of access to sources of proof," and "the availability of compulsory

18  process for attendance of unwilling witnesses."  *Ford Motor Co. v. Ins. Co. of N. Am.*, 35 Cal.

19  App. 4th 604, 161 (citing *Northrop Corp. v. Am. Motorists Ins. Co.*, 220 Cal. App. 3d 1553, 1560

20  n.3); *Stangvik*, 54 Cal.3d at 751.

21

22     [6] Moreover, it is not clear that the U.S. District Court in New Jersey would actually
    provide an alternative forum for Broadcom's state-law claims.  The New Jersey federal court
23  declined to exercise jurisdiction over Broadcom's state law claims under 28 U.S.C. § 1367(c)(3),
    because it had dismissed all related federal claims over which it had original jurisdiction.  (*See* Ex.
24  F, at Memorandum Opinion, *Broadcom Corporation v. Qualcomm, Inc.*, Civil Action No. 05-3350
    (MLC), Aug. 31, 2006, at 46-47).)  When the Third Circuit reversed the dismissal of those federal
25  claims, it removed the rationale for the New Jersey federal court's dismissal of the state-law
    claims.  But the New Jersey federal court might still decline to exercise supplemental jurisdiction
26  under 28 U.S.C. § 1367(c)(1) ("The district court may decline to exercise supplemental
    jurisdiction over a claim . . . if . . . the claim raises a novel or complex issue of State law.").  Thus,
27  if this Court were to stay Broadcom's state law claims, it is not clear that there would be *any*
28  forum open to Broadcom to litigate those claims.

1    Both Broadcom and Qualcomm have their principal places of business in California—

2    Broadcom in Irvine, and Qualcomm in San Diego. *See* Judicial Council Comment to Cal. Civ.

3    Pro. Code § 410.30 (listing "[w]here the residence or the principal place of business of each party

4    is located"; "[w]hether some or all of the parties regularly conduct business or other activities in

5    this state"; and "[w]hether the parties participating in the action . . . have a relationship to this state

6    which imposes upon them an obligation to participate in judicial proceedings in the courts of this

7

8    state" as factors that a court should weigh in evaluating a request under § 410.30). Thus,

9    Qualcomm can hardly claim that California is an inconvenient forum for it to appear as a

10   defendant.

11    The witnesses and documents in the case are likely to come heavily from California. *See*

12   Judicial Council Comment to Cal. Civ. Pro. Code § 410.30 (listing "[w]hether witnesses would be

13   inconvenienced if the action were prosecuted (a) in this state or (b) in the forum in which the

14   moving party asserts it ought to be prosecuted" as a factor that a court should weigh in evaluating

15   a request under § 410.30). Broadcom anticipates that the vast majority of its own relevant

16   witnesses and documents will come from one of its five California locations. Qualcomm's

17   response to one of Broadcom's initial discovery requests in the New Jersey actions suggests the

18   same is likely to be true for it. In its Supplemental Responses to Broadcom's First Set of Special

19   Interrogatories, Qualcomm provided the address for 142 Qualcomm employees and consultants

20   who participated in standard-setting for the standards at issue in this litigation. Of those addresses,

21   99 were in California—and only two were in New Jersey.[7] (*See* Ex. G, Defendant Qualcomm's

22   Supplemental Responses and Objections to Plaintiff's First Set of Special Interrogatories, Sep. 14,

23   2007, at 3-16.) Thus, the private-interest factors most relevant to this case—convenience of the

24   parties and witnesses, access to sources of proof, and the availability of compulsory process—

25

26

27

28

1  favor California over New Jersey, particularly since Broadcom's challenge to Qualcomm's

2  acquisition of Flarion, a New Jersey company, is no longer a part of the federal case.

3

4        D.     ***This Court Has the Authority to Give Broadcom the Relief It Seeks.***

5        In support of its stay request, Qualcomm repeats the argument from its demurrer brief that

6  Broadcom's action in this Court includes a claim for injunctive relief that the Court lacks the

7  power to grant. (Qualcomm Br. at 6.) Qualcomm is wrong about the scope of this Court's

8  authority, for the reasons articulated in Broadcom's Opposition to Qualcomm's demurrer. (*See*

9  Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in Opposition to

10  Defendant Qualcomm Inc's Demurrer to Complaint, Aug. 10, 2007, at 13-14.) As explained more

11  fully there, when no issue of federal patent law appears on the face of the complaint, exclusive

12  federal jurisdiction would attach only if Broadcom's right to relief "***necessarily*** depends on

13

14  resolution of a substantial question of federal patent law," *Christianson v. Colt Indus. Operating*

15  *Corp.* (1988), 486 U.S. 800, 801 (emphasis added). That is plainly not the case here. Broadcom

16  has asked this Court to enjoin Qualcomm from continuing to assert that its patents are essential to

17  implement the specific industry standards identified in the Complaint, and from seeking patent

18  licenses from or threatening parties wishing to practice the relevant standards. This relief does not

19  run afoul of the prohibition precluding this Court from enjoining Qualcomm from *suing*

20

21  Broadcom or others in federal court. *See General Atomic Co. v. Felter* (1977), 434 U.S. 12.

22        Qualcomm is likewise wrong to claim that the "mere existence" of the purported "question

23  of exclusive federal jurisdiction" warrants a stay. (Qualcomm Br. at 6.) Not surprisingly,

24  Qualcomm offers no authority to support this novel argument. Qualcomm should not be permitted

25  to manufacture a ground for staying this proceeding by claiming (incorrectly) that the Court lacks

26

27

28     [7] Qualcomm did not provide any address for the additional 39 consultants and former
Qualcomm employees that it identified.

1   the authority to enter Broadcom's requested relief.  On the contrary, the contention Qualcomm

2   raises is one that this Court should dispose of on the merits.

3

4                                    **CONCLUSION**

5        For the foregoing reasons, Qualcomm's Motion to Stay the Proceedings should be denied.

6                                              Respectfully submitted,

7

8   Dated:  September 24, 2007                 WILMER CUTLER PICKERING
                                               HALE AND DORR LLP
9
                                               CLEARY GOTTLIEB STEEN &
10                                             HAMILTON LLP

11                                             O'MELVENY & MYERS LLP

12

13                                             By: _____

14                                                    Marcus S. Quintanilla

15                                             Attorneys for Plaintiff
                                               BROADCOM CORPORATION
16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 2

1  STANLEY YOUNG (Bar No. 121180)
2  JAIDEEP VENKATESAN (Bar No. 211386)
   KYLE ROBERTSON (Bar No. 238914)
3  HELLER EHRMAN LLP
   275 Middlefield Road
4  Menlo Park, CA 94025-3506
   Telephone: +1.650.324.7000
5  Facsimile: +1.650.324.0638

6  JAMES R. BATCHELDER (Bar No. 136347)
7  DAY CASEBEER MADRID & BATCHELDER LLP
   20300 Stevens Creek Blvd., Suite 400
8  Cupertino, CA 95014
   Telephone: +1.408.873.0110
9  Facsimile: +1.408.873.0220

10

11 Attorneys for Plaintiff
   QUALCOMM INCORPORATED

12          UNITED STATES DISTRICT COURT

13          SOUTHERN DISTRICT OF CALIFORNIA

14 QUALCOMM INCORPORATED,            Case No.: 05 CV 1958 B (BLM)

15                    Plaintiff,     -Filed Via Fax-

16     v.                            DECLARATION OF KYLE S.
                                     ROBERTSON IN SUPPORT OF
17 BROADCOM CORPORATION,             QUALCOMM INCORPORATED'S
                                     MOTION FOR SUMMARY
18                    Defendant.     ADJUDICATION

19 ────────────────────────────
   BROADCOM CORPORATION,
20                                   Date:    December 4, 2006
                    Counterclaimant, Time:    2:00 p.m.
21                                   Ctrm:    2
       v.                            Judge:   Hon. Rudi M. Brewster
22
   QUALCOMM INCORPORATED,
23
                  Counterdefendant.
24

25

26

27

28

ROBERTSON DECLARATION IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION
CASE NO. 05 CV 1958 B (BLM)

FILED
NOV 0 6 2006
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                      DEPUTY

ORIGINAL

Heller
Ehrman LLP

I, Kyle S. Robertson, declare and state as follows:

1.      I am an attorney at the law firm of Heller Ehrman LLP. I make this declaration in support of QUALCOMM Incorporated's Motion for Summary Judgment. I have personal knowledge of all facts set forth in this declaration, and I would and could testify competently thereto if called upon to do so.

2.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the deposition of Gary Sullivan taken on August 29, 2006.

3.      Attached hereto as Exhibit 2 is a true and correct copy of Broadcom's Answer and Counterclaims to QUALCOMM'S Complaint for Patent Infringement, filed on December 5, 2005.

4.      Attached hereto as Exhibit 3 is a true and correct copy of Broadcom's Second Supplemental Objections and Responses to QUALCOMM's Third Set of Interrogatories, served on September 13, 2006.

5.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts from the deposition of Cliff Reader, Ph.D. taken on September 28, 2006.

6.      Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the deposition of Phoom Sagetong taken on August 4, 2006.

7.      Attached hereto as Exhibit 6 is a true and correct copy of exhibit 25 from the deposition of Gary Sullivan taken on August 29, 2006.

8.      Attached hereto as Exhibit 7 is a true and correct copy of the Expert Report of Cliff Reader, Ph.D, served on August 10, 2006.

9.      Attached hereto as Exhibit 8 is a true and correct copy of exhibit 11 from the deposition of Gary Sullivan taken on August 29, 2006.

10.     Attached hereto as Exhibit 9 is a true and correct copy of exhibit 12 from the deposition of Gary Sullivan taken on August 29, 2006.

11.     Attached hereto as Exhibit 10 is a true and correct copy of excerpts from the deposition of Viji Raveendran taken on July 18, 2006.

12.     Attached hereto as Exhibit 11 is a true and correct copy of excerpts from the

1  ROBERT S. BREWER, JR. (SBN 65294)
2  JAMES S. MCNEILL (SBN 201663)
   MCKENNA LONG & ALDRIDGE LLP
3  750 B Street, Suite 3300
   San Diego, CA 92101
   Telephone: (619) 595-5400
4  Facsimile: (619) 595-5450

5  WILLIAM F. LEE (admitted *pro hac vice*)
   JOHN J. REGAN (admitted *pro hac vice*)
6  WILMER CUTLER PICKERING
     HALE AND DORR LLP
7  60 State Street
   Boston, MA 02109
8  Telephone: (617) 526-6000
   Facsimile: (617) 526-5000
9
   MARK D. SELWYN (admitted *pro hac vice*)
10 WILMER CUTLER PICKERING
     HALE AND DORR LLP
11 1117 California Avenue
   Palo Alto, California 94304
12 Phone: (650) 858-6000
   Fax: (650) 858-6100
13
   Attorneys for Defendant/Counterclaim Plaintiff
14 BROADCOM CORPORATION

15            UNITED STATES DISTRICT COURT

16          SOUTHERN DISTRICT OF CALIFORNIA

17 QUALCOMM INCORPORATED,          Case No. 05 CV 01958 B (BLM)

18            Plaintiff,           **DEFENDANT BROADCOM CORPORATION'S**
                                   **SECOND SUPPLEMENTAL OBJECTIONS**
19      v.                         **AND RESPONSES TO QUALCOMM**
                                   **INCORPORATED'S THIRD SET OF**
20 BROADCOM CORPORATION,           **INTERROGATORIES (NOS. 23-34)**

21            Defendant.
   _____
22 AND RELATED COUNTERCLAIMS

23

24      Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant and

25 Counter-Plaintiff Broadcom Corporation ("Broadcom") responds to the Third Set of

26 Interrogatories by Plaintiff and Counter-Defendant Qualcomm Corporation ("Qualcomm") as

27 follows:

28                                          1                          05 CV 1958

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN DIEGO

US1DOCS 5838948v1

EXHIBIT 3 PAGE 1

1    Broadcom further objects to this interrogatory on the grounds that it is compound and

2    contains multiple discrete interrogatories.  Broadcom will treat this interrogatory's request for

3    identification of employees as a second interrogatory and identification of documents as a third

4    interrogatory.

5    Subject to the foregoing general and specific objections, Broadcom answers as follows:

6    Broadcom is not aware of any efforts to reverse engineer any QUALCOMM PRODUCT.

7    Discovery on this matter is ongoing, and Broadcom reserves the right to amend or

8    supplement this response.

9    **Interrogatory No. 33:**

10

11    **Please IDENTIFY and describe in detail BROADCOM'S contentions, if any,
RELATING to QUALCOMM's duties, requirements, assurances, and/or obligations
resulting from its membership, participation, contribution, interaction, presence, and/or**

12    **involvement in any video encoding or compression standards-setting activity or
organization, INCLUDING contentions RELATED to any claim or defense asserted by**

13    **BROADCOM in this litigation.**

14

15    **Response to Interrogatory No. 33:**

16

17    Broadcom objects to this interrogatory to the extent that it seeks information protected by

18    the attorney-client privilege, the work product doctrine, or any other applicable privilege or

19    protection.

20    Subject to the foregoing general and specific objections, Broadcom answers as follows:

21    Broadcom incorporates by reference the Expert Report of Cliff Reader, Ph.D. ("Reader

22    Report").  Broadcom states that Qualcomm and/or its employees or agents were members of the

23    Joint Video Team (JVT), the International Telecommunications Union (ITU), and/or the

24    International Organization for Standardization/International Electrotechnical Commission

25    (ISO/IEC).  Broadcom further states that Qualcomm and/or its employees or agents participated

26    in the standard-setting process of the JVT, beginning in at least as early as December 2002.

27    Broadcom contends that, as a result of its membership and/or participation in the JVT, ITU, and

28
15                                                    05 CV 1958

MCKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN DIEGO

LISI DOCS 5831948v1

**EXHIBIT 3 PAGE 15**

1    ISO/IEC, Qualcomm had an obligation to disclose the patents-in-suit to the JVT, prior to October

2    14, 2005, and that Qualcomm did not do so.  Accordingly, Broadcom contends that Qualcomm is

3    barred by the doctrines of equitable estoppel, implied license by equitable estoppel, common law

4    fraud, unclean hands, and breach of contract from asserting the patents-in-suit against Broadcom.

5    Broadcom further contends that Qualcomm's behavior has given rise to an implied license to

6    Broadcom to practice the patents-in-suit.

7

8        Broadcom reserves the right to supplement its response to this interrogatory, because

9    Qualcomm has not yet complied with its obligation to provide meaningful discovery on this issue,

10    including twice providing a 30(b)(6) witness on Qualcomm's JVT membership and participation

11    who was incapable of stating whether and when Qualcomm became a member of the JVT.

12    **Interrogatory No. 34:**

13

14    **Separately for each Interrogatory propounded by QUALCOMM in this action,
IDENTIFY each PERSON who supplied information used in preparing the response.**

15

16    **Response to Interrogatory No. 34:**

17        Broadcom objects to the phrases "supplied information" and "used in preparing the

18    response" as vague and ambiguous.

19        Broadcom objects to this interrogatory as overly broad and unduly burdensome, insofar as

20    it asks Broadcom to determine which of the numerous individual employees interviewed in

21

22    connection with this litigation provided information used to formulate a responses to each of

23    Qualcomm's interrogatories.

24        Broadcom objects to this interrogatory to the extent that it seeks information protected by

25    the attorney-client privilege, the work product doctrine, or any other applicable privilege or

26    protection.

27

28        Subject to the foregoing general and specific objections, Broadcom answers as follows:

16                                                                                03 CV 1958

McKENNA LONG &
ALDRIDGE LLP
ATTORNEYS AT LAW
SAN DIEGO

US1DOCS 5836948v1

**EXHIBIT 3 PAGE 16**



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

FILED

DEC 1 2 2006

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

QUALCOMM, INC., et al.,                     )
                                            )
                        Plaintiffs,         )
                                            )
vs.                                         ) Case No. 05CV1958-B(BLM)
                                            )
BROADCOM CORPORATION,                       )
                                            )
                        Defendant.          )
- - - - - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF MOTION HEARING
Held in San Diego, California
December 5, 2006

BEFORE THE HONORABLE RUDI M. BREWSTER

ECHO
REPORTING, INC.
6336 Greenwich Drive, Suite B
San Diego, CA 92122
(858)453-7590

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3

4  QUALCOMM, INC. et al.,          )   Case No. 05CV1958-B(BLM)
                                   )
5            Plaintiffs,           )   San Diego, California
   vs.                             )
6                                  )   Tuesday,
   BROADCOM CORPORATION,           )   December 5, 2006
7                                  )   9:45 a.m.
            Defendant.             )
8  _____)

9

10            TRANSCRIPT OF MOTION HEARING
        BEFORE THE HONORABLE RUDI M. BREWSTER
11            UNITED STATES DISTRICT JUDGE

12 APPEARANCES:

13 For the Plaintiffs:           JAMES R. BATCHELDER, ESQ.
                                 BRADLEY A. WAUGH, ESQ.
14                               LEE PATCH, ESQ.
                                 LOUIS TOMPROS, ESQ.
15                               Day, Casebeer, Madrid and
                                  Batchelder
16                               20300 Stevens Creek Boulevard
                                 Suite 400
17                               Cupertino, California  95014
                                 (408) 843-0110
18

19                               STANLEY YOUNG, ESQ.
                                 Heller Ehrman, LLP
20                               4350 La Jolla Village Drive
                                 Seventh Floor
21                               San Diego, California 92122
                                 (858) 450-8400
22

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

ii

```
 1  APPEARANCES: (Cont'd.)

 2  For the Plaintiffs:          ROGER MARTIN, ESQ.
                                 Qualcomm, Inc.
 3                               5775 Morehouse Drive
                                 San Diego, California  92121
 4                               (858) 845-3536

 5
     For the Defendant:          DONALD STEINBERG, ESQ.
 6                               JOHN J. REGAN, ESQ.
                                 Wilmer, Cutler, Pickering,
 7                                Hale and Dorr, LLP
                                 60 State Street
 8                               Boston, Massachusetts  02109
                                 (617) 526-6453
 9

10  Transcript ordered by:       JAMES R. BATCHELDER, ESQ.

11
     Court Recorder:             Suzie Dinsmore/George Perrault
12                               United States District Court
                                 940 Front Street
13                               San Diego, California  92101

14
     Transcriber:                Shonna D. Mowrer
15                               Echo Reporting, Inc.
                                 6336 Greenwich Drive
16                               Suite B
                                 San Diego, California  92122
17                               (858) 453-7590

18

19

20

21

22

23

24

25
```

13

1 next month, it could be more protracted so that your Honor

2 could hear inequitable conduct in a bench trial later.

3          MR. REGAN:  Your Honor --

4          THE COURT:  I don't want to do that.  We've got --

5 I've got a -- I've got too many rings in this circus going

6 right now.  I mean, Barnum & Bailey is nothing compared to

7 the circus that I'm running.  Nothing.  And I've never heard

8 trying a case with discovery open.  Of course, I've had many

9 times when you had to have discovery during a trial because

10 of something unexpected, but I've never started a trial with

11 the discovery open.  I mean, I've never done that.

12          MR. REGAN:  Fine.

13          THE COURT:  I'm too old to start that.

14          MR. REGAN:  Fine, your Honor.  We'll comply with

15 what the Court has ordered and get our amendment promptly,

16 and we'll certainly work with opposing counsel as you've

17 directed.

18          THE COURT:  All right.

19          MR. REGAN:  Thank you.

20          THE COURT:  Get your amendment filed as soon as

21 you can.  Can you do it this week?

22          MR. REGAN:  We will do it this week, your Honor.

23          THE COURT:  All right.

24          MR. REGAN:  We'll do it by Friday.

25          THE COURT:  All right.  Now, let's move to another

14

1  motion.  I'd like to take up the Qualcomm motion for summary

2  adjudication as the various defenses of the Broadcom case.

3  This involves all equitable issues.  The motion is entitled

4  "Broadcom's Defenses of Equitable Estoppel, Implied License,

5  Fraud, Unclean Hands, Breach of Contract, Laches and

6  Waiver."

7           Well, one of the points made by Qualcomm in these

8  papers is that the pleadings that are filed in this case

9  specifically mention only laches and waiver, and that these

10 other equitable defenses, if they're in the case at all,

11 they're under the rubric of the answers, other equitable

12 defenses, but not specifying what they are.

13          Number one, I'm concerned -- I'm concerned about

14 notice to the parties -- notice to the parties on equitable

15 defenses which are not called out in the answer except with

16 the general caption, all other equitable defenses.  I mean,

17 that doesn't, in my view, give sufficient notice, which is

18 the function of pleadings -- it doesn't give sufficient

19 notice to Qualcomm or to the party that's the recipient of

20 them as to what's ahead that they have to marshal evidence

21 for, that they have to prepare discovery for, that they have

22 to prepare to take depositions of or defend depositions on

23 and so forth.

24          So my first reaction is, I'm inclined to want to

25 limit this motion to those equitable defenses which are

15

1 related to laches and waiver.  Now, central to all of these

2 motions by Broadcom -- excuse me -- by Qualcomm's motion is

3 the theory by Broadcom that Qualcomm participated in work

4 done by a standard -- standardization program in which, as I

5 understand it, there was -- there is an ongoing effort to

6 standardize various concepts.  And that's typical in the

7 world.  There are efforts to standardize everything.  We're

8 all going to use the metric system, we're all going to speak

9 that language that -- I don't remember what it's called.

10 Someday the world is all going to speak this one language.

11 It's not English, but it's some word that -- maybe somebody

12 remembers the word.  Anybody remember that word?

13          MR. STEINBERG:  Esperanta, I think, your Honor.

14          THE COURT:  That's it.  Something like that.  Some

15 word that I've never even heard of.  But in a thousand

16 years, we're all going to speak that language.  There's

17 efforts at standardization on everything all over the world.

18 And electronics is no exception, and cellular telephone is

19 no exception.

20          And so what I would like to start first of all is

21 to say that the papers don't give me much background, and

22 frankly I am extremely uninformed on the -- we've got some

23 stuff off the computer which we tried to understand, the

24 International Telecommunication Union, and there's all

25 kinds -- the alphabet soup of some of these organizations,

16

1  Joint Video Team and the Video Coding Expert Group, the

2  VCEG, and the International Telecommunication Union

3  Telecommunication Standardization Sector, the ITU-T and the

4  Moving Picture Experts Group, MPEG, of the International

5  Organization for Standardization, ISO, International

6  Electro-technical Commission, IEC.

7           MR. REGAN:  Your Honor --

8           THE COURT:  Suzie, aren't you glad you got to

9  write this out on a machine?

10           THE REPORTER:  I am, your Honor.

11           MR. REGAN:  Your Honor, if you give me five

12  minutes, I think I can give you --

13           THE COURT:  I need some background on what these

14  organizations are.

15           MR. REGAN:  I understand.

16           THE COURT:  Because I don't know -- I don't have a

17  clue what all this stuff is.

18           MR. BATCHELDER:  Your Honor, it is Qualcomm's

19  motion.  Perhaps Mr. Young could explain that to you.

20           THE COURT:  I think that's probably appropriate.

21  Can you tell me what all this standardization stuff is?

22           MR. YOUNG:  Yes, your Honor.  There are several

23  organizations that have come together to form the Joint

24  Video Team, which is the JVT, which -- whose activities are

25  central to this motion.  And I would actually refer your

1  what their view was of what this practice was.

2         You need to evaluate Mr. Sullivan.  He was

3  videotaped at his deposition.  That ought to be played, and

4  you and/or the jury should consider that and then make a

5  determination, A, is there a disclosure obligation in the

6  sense of an obligation under Rambus as a practice within

7  this technical community that is enforceable in terms of a

8  waiver against Qualcomm and make judgments about

9  credibility.

10         THE COURT:  Is your -- of course, you, in your

11  answer, you do specifically allege equitable relief in the

12  form of waiver and laches.

13         MR. REGAN:  We do.

14         THE COURT:  In this sense, they're pretty much

15  equivalent, aren't they?

16         MR. REGAN:  Well, I think laches --

17         THE COURT:  You wait too long to assert.  Laches,

18  you wait too long to assert your rights.

19         MR. REGAN:  Right.  Laches has been dropped as a

20  defense.

21         THE COURT:  Oh, it's been dropped?

22         MR. REGAN:  Correct.  That was -- that was part of

23  our final pretrial process.  All right.

24         THE COURT:  Okay.

25         MR. REGAN:  This is a waiver case.

70

1          THE COURT:  So it's a waiver case.

2          MR. REGAN:  It's a waiver case.  And the other --

3  the other equitable doctrines.  All right.

4          THE COURT:  Well, now, we're going to get to that

5  later, but --

6          MR. REGAN:  Yeah.

7          THE COURT:  You've got the laboring oar on those

8  other ones because you don't give any --

9          MR. REGAN:  Well, they're all derived -- they're

10  all derived out of waiver.  It's a -- it's an unclean hands

11  question, and it's an implied license question.  All right.

12  Those are the two other equitable defenses.

13          THE COURT:  Well, we'll cross that bridge.  But I

14  think those -- those specific equitable propositions are --

15  they are distinguishable, and they are -- they are not --

16  they don't all flow from finding a waiver.  I mean, just

17  because you find a waiver, you don't get the whole boat load

18  of all these other things that -- all these big words,

19  equitable estoppel --

20          MR. REGAN:  Well, I think, your Honor, what I

21  would -- what I would urge you, your Honor, is to look at

22  our --

23          THE COURT:  Breach of contract.

24          MR. REGAN:  No.  Breach of --

25          THE COURT:  You've got equitable estoppel, implied

71

1 license. That's a -- implied license for fraud, unclean

2 hands, breach of contract, those don't all flow out of

3 waiver.

4          MR. REGAN:  Well, let me simplify things for you.

5 As a part of final pretrial process, everybody shapes up

6 their case a little bit, which is the point of the pretrial

7 order.  So out of this case, you don't have to worry about

8 fraud --

9          THE COURT:  Okay.  No fraud.

10          MR. REGAN:  -- you don't have to worry about

11 breach of contract --

12          THE COURT:  Okay.

13          MR. REGAN:  -- and you don't have to worry about

14 laches.  All right.

15          THE COURT:  Okay.

16          MR. REGAN:  So those aren't before you.

17          THE COURT:  Okay.

18          MR. REGAN:  All right.

19          THE COURT:  But you've got unclean hands, implied

20 license and equitable estoppel.

21          MR. REGAN:  And we certainly do.  And Mr. Young

22 made a comment --

23          THE COURT:  But you didn't allege any of those

24 things in your -- in your answer.  You just said which

25 laches -- I mean waiver.

72

1          MR. REGAN:  What we alleged in our answer very

2  clearly was waiver or other equitable defenses.

3          THE COURT:  Yeah, I know.  I know.  I recognize

4  that from reading it.

5          MR. REGAN:  Can I explain --

6          THE COURT:  Or other equitable.

7          MR. REGAN:  Right.

8          THE COURT:  But you know, it's kind of loose, you

9  know.  I mean, you don't have any --

10          MR. REGAN:  Well, but -- but I think --

11          THE COURT:  You don't give them any warning as to

12  what facts they ought to be worried about there.

13          MR. REGAN:  Your Honor, what happened in the

14  course of discovery -- and you saw yesterday how accelerated

15  everything was.  The issue of standards was put on the

16  table.  We are litigating a standard here.  All right.  So

17  the question of where the standard came from and what

18  happened during the standard-setting process --

19          THE COURT:  Well, I can see a theory that -- I can

20  see a theory that they've waived the right to protect their

21  I.P. with respect to the standard because they just sat

22  there mute when they should have been speaking, and that

23  could -- I could see a theory of waiver.  I can see the

24  theory of that.

25          MR. REGAN:  Right.

1        THE COURT:  However, just from that, if you've got

2  your waiver -- if you've got that either from the Court or

3  from the jury, if you went to the jury on it, that would

4  give you -- I think if they -- what would they waive?  The

5  waiver would be they waived their I.P. rights.

6        MR. REGAN:  Precisely.

7        THE COURT:  That's the end of the story.

8        MR. REGAN:  Well, it is.  It is.  But as --

9        THE COURT:  I mean, what's all this equitable

10  estoppel?  To do what, to assert their I.P.?  They've got

11  nothing to assert if they've waived it.  And so why are they

12  estopped at something they don't get because they waived it?

13        MR. REGAN:  I would agree with you --

14        THE COURT:  Well, then what about unclean hands?

15        MR. REGAN:  Well --

16        THE COURT:  Certainly if they waived it, what's

17  the unclean -- unclean hands disabling them from doing what,

18  enforcing their I.P.?  They already lost their I.P. under

19  waiver under your theory of the case.  I mean, these things

20  are --

21        MR. REGAN:  Your Honor --

22        THE COURT:  I think your whole pitch -- I think

23  our whole effort here is on the issue of waiver.

24        MR. REGAN:  Well, I agree in part.  I agree that

25  the focus of the case is on waiver.

1          THE COURT:  If you don't get waiver, would you say

2    that you still are entitled to unclean hands?  And if you

3    are, what remedy would you get for that?  Would you -- would

4    they have to go wash up or something?

5          MR. REGAN:  The --

6          THE COURT:  What remedy would you get if we find

7    they have unclean hands?

8          MR. REGAN:  That might have been the chancellor's

9    rule in England, but I don't know what the rule is here.

10          THE COURT:  Well, what's the remedy of unclean

11    hands?

12          MR. REGAN:  The remedy on implied license,

13    equitable estoppel, unclean hands and waiver is the same.

14    They can't enforce the patent, right?  On all four of

15    them --

16          THE COURT:  Well, if they can't enforce -- if they

17    can't enforce the patent, then what is this implied license

18    going to apply to?

19          MR. REGAN:  The implied -- implied license, as you

20    know, is a complete defense to a charge of infringement.

21    And the doctrine of implied license in effect says that if

22    someone has acted or not acted, either by silence or by

23    conduct, in a manner to leave other companies or the public

24    with the impression that they're not -- that they're not

25    going to be enforcing their patent and not exerting their

1 patent rights, that an implied license can exist, which is a

2 defense to infringement.

3          What we -- in the answer, your Honor, it is

4 alternative defense pleading.  Any one of those is

5 sufficient as an affirmative defense.  We said all other

6 equitable defenses because discovery hadn't started yet

7 and --

8          THE COURT:  Are you seeking -- with your waiver,

9 are you seeking to be free of any license obligation?

10          MR. REGAN:  We are.

11          THE COURT:  Well, then what use is an implied

12 license to you?

13          MR. REGAN:  Well, if for some -- if for some --

14          THE COURT:  Now you're willing to give an implied

15 license.  What it means is you want to pay royalty fees and

16 be allowed to go in.

17          MR. REGAN:  All we want is to be able to practice

18 the standard with the hundreds of other companies and not be

19 confronted with a patent that was concealed from the

20 standard-setting process.

21          THE COURT:  Well, are you willing to do it by

22 paying a little license fee?

23          MR. REGAN:  They have given no indication that

24 they're willing to accept, quote, a little license fee.

25          THE COURT:  I'm not talking about negotiating a

1  settlement here.  I'm not playing let's make a deal.

2       MR. REGAN:  Right.

3       THE COURT:  I'm asking you -- implied license --

4  it sounds to me if there's an implied license, that says to

5  me that there is a license and that there is a royalty.

6       MR. REGAN:  No.

7       THE COURT:  Well, then what -- what is your use

8  of --

9       MR. REGAN:  That's not the implied license

10 doctrine.

11      THE COURT:  What's your use of it, then?  I don't

12 understand.

13      MR. REGAN:  The implied license doctrine means

14 that either because of silence, which is our case, or

15 conduct, that the patent holder has left others with the

16 impression that they either have no applicable patents or

17 that they're not going to be enforced.  Put yourself in the

18 shoes -- well, it's also implied license.

19      THE COURT:  Well, what -- what -- license to do

20 what?

21      MR. REGAN:  As a --

22      THE COURT:  Practice the invention.

23      MR. REGAN:  Correct.

24      THE COURT:  Practice the intellectual property.

25      MR. REGAN:  Correct.

77

1          THE COURT:  For what price?

2          MR. BATCHELDER:  Free.

3          MR. REGAN:  Yeah.

4          MR. BATCHELDER:  That's what they're --

5          THE COURT:  What kind of a license is that?

6          MR. BATCHELDER:  That's what they're looking for,

7 your Honor, is a free license.

8          THE COURT:  What kind of a license is that?  A

9 license without royalty?  I've never seen such a license.

10          MR. REGAN:  No.  What you're not -- what --

11          THE COURT:  In patent law, I've never seen it.

12          MR. REGAN:  What I'm not communicating well to you

13 is the following.  All right.

14          THE COURT:  Well, I've probably got two-tenths.

15          MR. REGAN:  In a standard-setting body, okay, if

16 those folks sit there for a couple of years, all right, and

17 Qualcomm is a participant at the time and on a continuing

18 basis and they sit there and they never raise the question

19 that they have applicable patents, all right, then that

20 body -- all these companies, it's reasonable for them to

21 infer one of two things.  One, that Qualcomm doesn't have

22 any applicable patents or believe it does.  Okay.  Or two,

23 that it does, but --

24          THE COURT:  But they don't care.

25          MR. REGAN:  -- they don't care because it's more

78

1 important to Qualcomm to have a standard so it can plug in

2 and sell whatever it wants and make a lot of money.  Either

3 one of those facts, if proven, would constitute the defense

4 of implied license.  The defense of implied license doesn't

5 import the concept of paying royalties.  What it imports is

6 that someone has agreed to give, in effect, a royalty

7 prelicense by not -- by not enforcing their patent or saying

8 that it doesn't apply.  That's what the legal doctrine says.

9 Okay.

10          THE COURT:  So there is such a thing as a royalty-

11 free license.

12          MR. REGAN:  There is.

13          THE COURT:  Okay.

14          MR. REGAN:  All right.

15          THE COURT:  But why didn't you plead it?

16          MR. REGAN:  We didn't plead it because we didn't

17 understand at that time that that information was out there.

18 This whole issue of the --

19          THE COURT:  Then why did you plead waiver?

20          MR. REGAN:  Well, we pleaded waiver because we

21 knew at the time that Qualcomm didn't send us any letter

22 before the lawsuit and that these patents had been out there

23 for quite a while.  We didn't make the connection to the

24 standards organization until while in discovery.  And Mr.

25 Young said --

1          THE COURT:  Wait a second.  You're not answering

2  my question.  You pled long before discovery started, let

3  alone ended, right?

4          MR. REGAN:  We pled waiver.

5          THE COURT:  And you pled waiver.

6          MR. REGAN:  We pled waiver.

7          THE COURT:  So you had -- you had some -- you had

8  some Rule 11 basis to plead waiver.

9          MR. REGAN:  We did, but --

10         THE COURT:  So if you had --

11         MR. REGAN:  But the plea of waiver at the time was

12  connected with the general lack of assertion by Qualcomm of

13  these patents for a period of time.  It was not connected to

14  what occurred or more appropriately did not occur in the

15  standard-setting body organizations.  That came to light in

16  the course of discovery, in particular Mr. Sullivan's

17  deposition, which happened in the August time period, late

18  in August.

19         And that's why we filed the supplemental

20  interrogatory answer, laying this all out in lavender on

21  September 5th or so.  Mr. Young said something that bears

22  correction.  He left you with the impression that Qualcomm

23  was somehow denied discovery opportunities with respect to

24  the standards organization matters that I've been talking

25  about.

1          First, as a participant, Qualcomm had a full body

2  of all the documents dealing with the JVT, had all the

3  rules, had all the minutes, had all the bulletins.  It's

4  public information, as he's pointed out.

5          THE COURT:  And all the minutes of the business

6  that they were conducting.

7          MR. REGAN:  Absolutely.

8          THE COURT:  Which was in consideration of the

9  standardization proposals.

10          MR. REGAN:  Correct.  So first of all, they have

11  all the information.  They don't need discovery on it.

12  Secondly, they took a deposition of a gentleman named

13  Sherman Chin of Broadcom, who was a representative -- one of

14  several -- of Broadcom to the standard-settings

15  organization.  And Mr. Chin was asked about his chairmanship

16  of one of the committees with respect to the standard-

17  setting process.

18          So they had an opportunity to ask the Broadcom

19  fellow about how he handled Broadcom's participation in the

20  standard-setting process, and questions were asked of a

21  gentleman named Steven Gordon, who was a senior engineer at

22  the Hanover, Massachusetts, facility of Broadcom who was

23  quite involved with respect to H.264 for Broadcom, so

24  involved that he made a recommendation, which has become an

25  essential aspect of the standard, the so-called high-level

81

1  profile.

2          So third-party discovery of any other company,

3  Nokia, Samsung, Sony, was readily available during the

4  period when discovery was occurring in this case if Qualcomm

5  chose to take it.  We issued subpoenas to the standard-

6  setting bodies, and we issued a subpoena to Mr. Sullivan.

7  So we exercised our discovery rights to develop a record for

8  the Court and the jury because these are factual questions

9  as this whole colloquy has indicated.  All right.  This is

10 not a summary judgment conversation that we should be

11 having.  It's factual.

12          And as we've indicated at the outset in the

13 slides, there are three key questions which are intensely

14 factual.  But this notion that Qualcomm was somehow

15 restrained from exercising its discovery rights, that's just

16 completely baseless.  They made an election where they

17 wanted to spend their discovery time and resources.  They

18 didn't want to go out -- they didn't take third-party

19 discovery because they didn't want to develop that record

20 because they knew if they went out and asked those 400 team

21 members, they were going to get the same response that Mr.

22 Sullivan gave, which is if you want to be on the team,

23 you've got to wear this uniform and you've got play by these

24 rules.

25          THE COURT:  I can't help wondering how this is

82

1  going to play out.  If you're permitted to go to trial on

2  this defense of waiver, what kind of evidence are you going

3  to need to come within the reach of <u>Rambus</u>?

4          MR. REGAN:  We're going to need -- we're going to

5  need the evidence from --

6          THE COURT:  One or two people or -- in a group of

7  400?  Are one or two people going to be allowed so the jury

8  could find what the group as a group believed was the rule?

9          MR. REGAN:  I think it's going to be a combination

10 of documentary evidence and testimonial evidence.  Okay.

11 And the minutes are relevant because in the minutes there's

12 a procedure, as I've described, which sets forth how they

13 ask for the IPR information.  It's in writing.  The minutes

14 are the record of what occurred at the meetings.  And those

15 have been authenticated, and they're admissible.  They're

16 business records.

17          So the first thing is, the whole proceedings of

18 the JVT --

19          THE COURT:  Do you think -- do you think that

20 evidence as to what the group was continually reminded of

21 through the minds -- that they're continually reminded that

22 they should come forward if they've got any I.P. because the

23 integrity of what we're doing depends upon knowing if we're

24 stomping on somebody's I.P. rights?  And the fact they're

25 continually hammered with that admonition and they sit there

192

1 anyway, they want to be kumbaya about the whole thing.

2          But the Court is going to come in, and we're not

3 going to be kumbaya at all.  We're going to be -- I don't

4 know what we're going to be.  We're going to make a rule up

5 on our own, and that's what's happening here.

6          MR. REGAN:  I agree.  I -- but the Court of

7 Appeals has made the rule and I --

8          THE COURT:  Well, they've got the power to do it.

9          MR. REGAN:  And you and I both have to live with

10 it.

11          THE COURT:  That's right.

12          MR. REGAN:  As you well know, and that's all that

13 we're asking, if that's the rule, that we have the

14 opportunity to practice under it.

15          MR. YOUNG:  Your Honor, let me raise a couple of

16 other things in response to what Mr. Regan said a few

17 minutes ago.  He talked about _Lido_ and _Camarillo_ and the

18 need for prejudice and the Rule 8 standard.  As I said

19 earlier, the issue of prejudice here is that the elements

20 that were -- are a part of equitable estoppel and implied

21 license do not -- and I'm not quite sure where your Honor

22 stands on that.  I think that they're out of the --

23          THE COURT:  I'm satisfied that I'm not going to --

24 I still feel that I'm not going to deal with these other

25 theories of equity which haven't even been pled.  They're

193

1  not even mentioned in the answer.

2       MR. REGAN:  Well, all I would ask, your Honor, is

3  that before you reach that conclusion finally --

4       THE COURT:  We're not going to amend that answer

5  today or --

6       MR. REGAN:  Right.  All I would say, your Honor,

7  is before you reach that conclusion, I would urge you to

8  read the Lido and the Camarillo case which I gave you the

9  cites for.

10       THE COURT:  Do you think that they're going to

11  sneak into the waiver thing?  Is that what you're saying?

12       MR. REGAN:  No.  What they talk about are -- are

13  cases much more egregious.  If we had only pled waiver,

14  okay, and didn't say or other equitable defenses --

15  presumably we were referring to something when we said or

16  other equitable defenses.

17       THE COURT:  I think your word processor just puts

18  that in automatically.

19       MR. REGAN:  Not at all.

20       MR. YOUNG:  It's other relief, that the Court may

21  desire other --

22       THE COURT:  Exactly, exactly.  Nobody's got a word

23  processor that doesn't have that expression in it.

24       MR. YOUNG:  Right.

25       MR. REGAN:  No.  This was done -- this was done

194

1  with the intention in discovery to determine whether

2  there -- whether the facts would give rise to other

3  defenses.  We then went through this whole process that I

4  only briefly touched on, starting with that 30(b)(6)

5  deposition, and -- and we then filed on September 5th a -- a

6  supplemental interrogatory answer that I'd like to put up

7  please, where we told them in this answer -- this is a

8  supplement to interrogatory six.  This sets out --

9           THE COURT:  Can you blow it up instead of moving

10 around?

11          MR. REGAN:  This sets out the basis for the

12 implied license --

13          THE COURT:  What am I reading, line four?

14          MR. REGAN:  Yeah.  You can start at line four.

15          THE COURT:  How far do we need to go down?

16          MR. REGAN:  Well, the whole paragraph.

17          THE COURT:  Well, can you blow it up?

18          MR. YOUNG:  The problem with this, of course, is

19 that it came after the discovery period ended.  So we didn't

20 have the chance to take deposition -- fact depositions about

21 this.  Mr. Regan is correct there have been some expert

22 depositions on the issue of JVT activities.  It was not,

23 though, in the context of the specific claims that are being

24 sought to be added here, which are equitable estoppel and

25 implied license.  That was not done until after even the

195

1 expert depositions.

2          There was no opportunity at all to do any fact

3 witness depositions because these claims were not made at

4 that time.  Yes, it is true the issue of JVT came up, and

5 what Mr. Regan refers to as discovery that was done about

6 the JVT activities, that's because the H.264 standard was at

7 issue in this case.  It was at issue in the complaint in

8 this case.  It should have been raised, if they were going

9 to raise these defenses, in the answer because all of these

10 minutes that Mr. Regan keeps talking about are in the public

11 domain.  You can go to the Web site of the JVT and pick

12 these things up.  They didn't do that, and they should have,

13 and the fact that they are bringing -- attempting to bring

14 all of these JVT related claims via September 5, 2006

15 interrogatory supplemental response, coming after the close

16 of fact discovery, is that we did not get to depose Mr. Chan

17 about the particular issues involved with these claims.  We

18 did not get to depose Mr. Gordon.  Yes, we talked about

19 other issues relating to the JVT at H.264 with them, but

20 this is far too late.  Their original complaint cannot be

21 amended, should not be amended.  The Lido --

22          THE COURT:  What am I looking at here?  What is

23 this?

24          MR. REGAN:  You're looking at a supplemental

25 interrogatory answer that we filed by agreement.  Both

196

1 parties --

2            THE COURT:  When was it filed?

3            MR. BATCHELDER:  After the close of fact

4 discovery.

5            MR. REGAN:  It was filed September 5th, okay.  And

6 what it does, it codifies what had been occurring in July

7 and August in the case.

8            THE COURT:  What question was asked of you here?

9            MR. REGAN:  Say again, your Honor?

10           THE COURT:  What question is this responding to?

11           MR. REGAN:  State all facts supporting your

12 contention blah, blah, blah pursuant to a license.  This is

13 the implied license issue, all right.

14           Now, the issue, your Honor, according -- listening

15 to Mr. Young, you would think that they did not have a

16 lawyer at the deposition of Mr. Sullivan.  They had a lawyer

17 there.  I conducted four hours or so of Mr. Sullivan's

18 deposition.  We went into all the minutes, all the policies

19 in as excruciating a level of detail as we've had today.

20 They asked very few questions in response.

21           The assertion that they were denied an opportunity

22 for discovery about a standards question is just baseless.

23 When -- when they had the opportunity to take -- when we

24 noticed Mr. Sullivan's deposition and it became clear that

25 the policies with respect to the ITU and the ISO and the JVT

197

1  were going to be relevant, they could have subpoenaed third

2  parties to ask for documents and the like.  What they wanted

3  to do was to, frankly, sandbag.  What they wanted was not to

4  develop any discovery on their own with respect to standards

5  and then be able to come in here and argue prejudice.

6        We put them on notice with the answer that there

7  were going to be other equitable defenses in the course of

8  the case if discovery would support it.  We did the

9  discovery in July and August.  By agreement the supplemental

10  interrogatory was filed on September 5th.  And I want to

11  underscore that the experts have weighed in fully on this

12  question.  There isn't any prejudice here.

13        MR. YOUNG:  Your Honor, Mr. Sullivan's

14  deposition -- and this is clear from Exhibit 1 of Mr.

15  Robertson's declaration -- the Sullivan deposition took

16  place on August 29, 2006.  That's two days before the close

17  of discovery.  We couldn't have -- yes, we did have a lawyer

18  at the Sullivan deposition.  We did listen to the questions

19  that were being asked, but by that -- at that point we

20  didn't have a pleading from them.  We didn't have that

21  interrogatory response.  We did not have notice that these

22  sorts of issues were going to be asserted until they gave us

23  that interrogatory response on September 5th.

24        In the meantime, on August 31, discovery had

25  closed, and the depositions that I mentioned earlier where

198

1  we suffered prejudice, Mr. Chan happened August 11.  Mr.

2  Gordon's was earlier --

3              THE COURT:  What about that -- what about that May

4  23rd --

5              MR. REGAN:  That said very clearly that standards

6  were going to be an issue in the case, including Qualcomm's

7  knowledge regarding the development of the standard and

8  actions taken by Qualcomm or its principal.

9              MR. YOUNG:  That goes, your Honor, certainly to

10  the infringement issue.  One of the issues, as your Honor

11  knows, is that --

12              THE COURT:  That goes to the 264 situation.

13              MR. REGAN:  Right.  And it talks about the

14  attendance or participation --

15              THE COURT:  Attendance at the meetings of the

16  standards group and so forth.

17              MR. REGAN:  Membership at any committees, any

18  actions taken, it goes to what -- what they did or didn't

19  do, and we attempted to take depositions of their people.

20  And you know what happened?  They put up witnesses who

21  didn't know anything about this.  Ms. Irvine, Christine

22  Irvine testified she had no knowledge of any of the

23  subjects, and we had to demand a knowledgeable witness upon

24  pain of going to the magistrate about it.

25              So the question -- so this -- this -- this picture

199

1  that they're trying to paint is that it was only on

2  September 5th.

3           THE COURT:  Look, I don't want to discuss this

4  particular subject any more.  I just want to tie down

5  what -- I'm satisfied that I'm not going to grant summary

6  judgment on these equitable defenses.  However, I'm still

7  concerned about anything to be at stake other than the

8  equitable theory of waiver.

9           I know you mentioned that they're equitably

10 estopped from doing this and that and the other thing.  That

11 may be true.  They may be equitably estopped from making an

12 argument here or there, but that's a far cry from pleading a

13 separate affirmative defense of -- of unenforceability

14 because of equitable estoppel.

15          Somebody mentioned that if you have that cause of

16 action there's got to be some kind of a notice and basis to

17 rely.  I'm not sure about that.  If you -- if you watch

18 somebody do something to their detriment and to your

19 advantage or if you watch somebody do something that you

20 would like to stop and have the opportunity to stop it and

21 protect yourself and you sit there and let your opportunity

22 go by, you may be equitably estopped from doing --

23          MR. YOUNG:  Your Honor, let me raise two things.

24 One -- and this was mentioned much earlier, and I don't want

25 to lose sight of it.  This is in footnote three of their

200

1 brief in this case.  In that same interrogatory response

2 that they served in early September, they also asserted

3 based on these very same facts fraud, breach of contract,

4 and laches.  They --

5          THE COURT:  Well, fraud is -- I think that we've

6 already established fraud is going to be out of this case

7 and so is breach of contract and so is laches.  The only

8 thing we're arguing about -- and I don't think we've forgot

9 about that.

10          MR. YOUNG:  Okay, your Honor.

11          THE COURT:  The only thing we're talking about is

12 what in addition to waiver are they going to be allowed to

13 deal with, and the only -- the only equitable defense that

14 they've alleged is waiver.  They -- they talk about

15 equitable estoppel and implied license.  They don't even

16 mention anywhere unclean hands.  I don't know why we have to

17 deal with that.  Let's drop that.  But --

18          MR. YOUNG:  They're not moving to amend their

19 answer, your Honor.

20          MR. REGAN:  We don't have to move --

21          MR. YOUNG:  They're just trying to --

22          THE COURT:  I know.  I know you don't.  But the

23 question is of what use are these doctrines.  Are they

24 relevant to waiver?  Is the waiver based upon equitable

25 estoppel?  Is the waiver based upon implied license or vice

1 versa?  Is the implied estoppel based upon waiver?

2          MR. YOUNG:  There is an important element of

3 prejudice here which I don't want the Court to lose sight of

4 which is that an element of equitable estoppel at least  is

5 the issue of reliance.  That is, Broadcom has to prove that

6 it relied on whatever omissions or statements were made.

7          Now, in their brief --

8          THE COURT:  Well, I don't -- I don't think it

9 takes a rocket scientist.  If they're exploring this

10 committee, you know, they're taking that in discovery,

11 they're digging up the details on that, I think it's your

12 obligation to draw your inferences and your legal analysis

13 from evidence that's being sought in discovery, and they

14 don't have to say "We're seeking this discovery because we

15 want to show reliance on you later" or something.  They have

16 no obligation to do that.  They have an obligation to

17 discover facts, and if they can -- if they can twist those

18 facts into any of their alleged causes of action, they're

19 entitled to do that.  The issue is whether, having not

20 mentioned equitable estoppel as a separate affirmative

21 defense, even if they establish the facts in discovery to

22 establish it, are they going to be allowed to -- well, you

23 know, you've heard of the old rule we all learned in law

24 school that you are allowed freely to amend pleadings even

25 during trial to conform to the proof.  We've all been taught

202

1 that.

2         MR. YOUNG:   Setting waiver aside -- setting waiver
3 aside, the problem --

4         THE COURT:   Does that doctrine sound familiar to
5 you?

6         MR. YOUNG:   I see that, and there's a rule in the
7 Federal Rules on amendment to conform to proof.   I'm aware
8 of that, your Honor.   The problem is --

9         THE COURT:   Well, are we dealing with that?

10         MR. YOUNG:   The problem --

11         THE COURT:   You're saying they don't have evidence
12 of reliance.   Well, maybe that's for the jury to say.   That
13 would be an element if -- or that would be an element for
14 either the jury or the judge.   I'd like to let the jury be
15 the fact finder and let them tell me what the facts are, and
16 then I'll -- to the extent that they're equitable, I'll deal
17 with the equity based upon their findings of fact.

18         MR. YOUNG:   The problem, your Honor, is the
19 prejudice, and the problem is the good cause, that is, they
20 could have done this earlier.   They could have amended this
21 pleading earlier to put us on notice of these claims.   Now,
22 I recognize your Honor says that, well, they're taking
23 discovery for some purpose, and I would ask the Court
24 respectfully to recognize the fact that discovery relating
25 to H.264 and JVT is relevant to infringement issues.

216

1 | number two after 9:00 o'clock.

2 |         All right.  That takes care of that.  Are there

3 | any other housekeeping things we need to decide today?

4 |         MR. REGAN:  None that come to mind, your Honor.

5 |         THE COURT:  Okay.  Well, then let's be in recess,

6 | right?  Okay.  Let's be in recess until Monday, the 18th of

7 | December.

8 |     (Proceedings concluded.)

9 |

10 |

11 |

12 |

13 |

14 |         I certify that the foregoing is a correct

15 | transcript from the electronic sound recording of the

16 | proceedings in the above-entitled matter.

17 |

18 | *Sh_____ _____*          *12-6-06*
   | Transcriber              Date

19 |

20 | FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

21 |

22 | *_____ _____*
   | L.L. Francisco, President

23 | Echo Reporting, Inc.

24 |

25 |

Echo Reporting, Inc.

1
2
3
4
5
6
7
8
9          **UNITED STATES DISTRICT COURT**

10         **SOUTHERN DISTRICT OF CALIFORNIA**

11

| | | |
|---|---|---|
| 12 QUALCOMM INCORPORATED, | ) | Civil No: 05-CV-1958-B(BLM) |
| 13                        Plaintiff, | ) | |
| v. | ) | **ORDER GRANTING MOTION** |
| 14 | ) | **FOR LEAVE TO FILE FIRST** |
| BROADCOM CORPORATION, | ) | **AMENDED ANSWER AND** |
| 15 | ) | **COUNTERCLAIMS** |
| 16                        Defendant. | ) | |
| _____ | ) | |
| 17 | ) | |
| | ) | |
| 18 | ) | |

19

20

21  **I.     INTRODUCTION**

22          On December 4 - 5, 2006, the Court held a hearing on Defendant Broadcom

23  Corporation's ("Broadcom") Motion for Leave to File Its First Amended Answer and

24  Counterclaims filed on September 14, 2006.  Broadcom seeks to assert an affirmative

25  defense and counterclaim based upon inequitable conduct committed by individual(s) at

26  Qualcomm Incorporated ("Qualcomm"), including Chong U. Lee, a Qualcomm employee

27  and the sole named inventor of U.S. Patent No. 5,452,104 ("the '104 patent"), who were

28                                          1

1    involved in prosecuting the '104 patent application before the United States Patent and

2    Trademark Office ("PTO").  For the reasons set forth below, the Court hereby **GRANTS**

3    Broadcom's present Motion for Leave to File Its First Amended Answer and Counterclaims

4    and orders Broadcom to file its First Amended Answer and Counterclaims forthwith.

5

6    **II.    BACKGROUND**

7        In May 1992, Lee wrote an article entitled "Intraframe Compression of HDTV

8    Image Based On Adaptive Block Size Discrete Cosine Transform."  See Broadcom Br.,

9    Saxton Decl., Ex. I ("Lee article").  In that article, he cited to two other articles: (1) an

10   article written by C. T. Chen entitled "Transform Coding of Digital Images Using Variable

11   Block Size DCT With Adaptive Thresholding and Quantization" ("Chen article") and (2)

12   an article written by Vaisey and Gersho entitled "Variable Block-Size Image Coding"

13   ("Vaisey article").  See id. at 22.  On August 4, 1993, Lee filed the '104 patent application

14   with the PTO, and the patent was issued on September 19, 1995.  See '104 Patent.

15       Qualcomm filed this suit for patent infringement of two patents, including the '104

16   patent at issue in the present Motion, on October 14, 2005.  Doc. No. 1.  On November 16,

17   2005, Broadcom received a fax copy of the Chen and Vaisey articles from the Canada

18   Institute for Scientific and Technical Information.  See Qualcomm Opp'n, Smith Decl.,

19   Exs. 10-12.  Broadcom filed its Answer on December 5, 2005.  Doc. No. 10.

20       On February 17, 2006, Magistrate Judge Major issued a Case Management

21   Conference Order Regulating Discovery and Other Pretrial Proceedings.  Doc. No. 54.

22   Pursuant to that order, any motion to amend was to be filed by March 20, 2006.  See id. at

23   4.  Fact discovery was to be completed by August 14, 2006, and expert discovery was to be

24   completed by September 29, 2006.  See id. at 7.  All expert disclosures were to be served

25   by August 4, 2006, and any rebuttal expert reports were to be disclosed by September 1,

26   2006.  See id. at 6.  Trial was scheduled to begin on January 9, 2007.  See id. at 11.

27       On April 28, 2006, Broadcom served its Preliminary Invalidity Contentions, in

28                                           2                      05-CV-1958-B (BLM)

1   which it named both the Chen and Vaisey articles as invalidating prior art for the '104

2   patent.  <u>See</u> Qualcomm Opp'n, Smith Decl., Ex. 2.  On June 26, 2006, Qualcomm produced

3   the Lee Article to Broadcom.  <u>See</u> Qualcomm Opp'n, Smith Decl., Ex. 5.  On June 30,

4   2006, Broadcom took its first deposition of Lee.  <u>See</u> Broadcom Br. at 2; Qualcomm Opp'n

5   at 5.

6        On July 24, 2006, Qualcomm informed Broadcom that they "recently discovered

7   and collected additional documents relating to Chong Lee and his work."  Broadcom's

8   brief, Ex. A, p. 1.  Broadcom then rescheduled Lee's continued deposition from July 26,

9   2006, to August 1, 2006.  <u>See</u> Broadcom Br. at 3.

10       In the week before Lee's deposition of August 1, 2006, Qualcomm produced over

11  76,000 pages of documents ("Qualcomm's late July 2006 production").  <u>See</u> Broadcom Br.,

12  Exs. B-E.  Among these documents was the Chen article and a photocopy of an envelope

13  postmarked July 11, 1990, from Chen to Lee.  <u>See</u> Broadcom Br. at 3-4.

14       On September 8, 2006, Magistrate Judge Major ordered Qualcomm to produce Lee

15  for four more hours of deposition testimony.  Doc. No. 94.  That deposition was scheduled

16  for September 22, 2006, at which Broadcom questioned Lee about the Chen and Vaisey

17  articles.  <u>See</u> Qualcomm Opp'n, Smith Decl., Ex. 3; Qualcomm Opp'n at 5-6.

18

19  **III.    DISCUSSION**

20       **A.    STANDARDS OF LAW**

21       Federal Rule of Civil Procedure 16(b)[1] requires district courts to enter a scheduling

22  _____

23       [1] Federal Rule of Civil Procedure 16(b) states in relevant part:

24       Except in categories of actions exempted by district court rule as inappropriate, the
         district judge, or a magistrate judge when authorized by district court rule, shall, after

25       receiving the report from the parties under Rule 26(f) or after consulting with the
         attorneys for the parties and any unrepresented parties by a scheduling conference,

26       telephone, mail, or other suitable means, enter a scheduling order that limits the time

27       (1) to join other parties and to amend the pleadings;

28                                        3                        05-CV-1958-B (BLM)

order that sets, among other things, the deadlines for parties to amend pleadings and file

motions.  After a deadline set in a scheduling order has passed, the party seeking to amend

the scheduling order must show "good cause" for the requested additional time.  See FED.

R. CIV. P. 16(b) ("A schedule shall not be modified except upon a showing of good cause

and by leave of the district judge or, when authorized by local rule, by a magistrate

judge.").

The Ninth Circuit has held that "[o]nce the district court ha[s] filed a pretrial

scheduling order pursuant to Federal Rule of Civil Procedure 16 which established a

timetable for amending pleadings that rule's standards control[]" in considering a motion to

amend.  Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 607 (9th Cir. 1992).  In such

cases, the movant's ability to amend is "governed by Rule 16(b), not Rule 15(a)."  Id. at

608.

As the Ninth Circuit has held, "[u]nlike Rule 15(a)'s liberal amendment policy

which focuses on the bad faith of the party seeking to interpose an amendment and the

prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the

diligence of the party seeking the amendment."  Id. at 609.  Carelessness offers no reason

for a grant of relief.  See id.  Although prejudice to the opposing party may supply

additional reasons to deny a motion, "the focus of the inquiry is upon the moving party's

reasons for seeking modification."  Id.  If the movant was not diligent, the inquiry should

end.  See id.

## B.    ANALYSIS

The Court shall consider Broadcom's present Motion under the Rule 16(b) "good

cause" standard discussed above.  Pursuant to Rule 16(b), Magistrate Judge Major issued a

Case Management Conference Order on February 17, 2006.  Doc. No. 54.  Under that

---

(2) to file motions; and
(3) to complete discovery.

order, "[a]ny motion to join other parties, to amend the pleadings, or to file additional pleadings shall be filed on or before March 20, 2006." <u>Id.</u> at 4.  Broadcom did not file the present Motion to Amend until after the deadline on September 14, 2006.  Doc. No. 95.  Therefore, as dictated by the Ninth Circuit, this Court considers Broadcom's motion under the "good cause" standard set forth under Rule 16(b).  <u>See</u> <u>Johnson</u>, 975 F.2d at 607.

Despite Broadcom's late filing of the present motion to add the affirmative defense and counterclaim of inequitable conduct, this Court finds that Broadcom was diligent in gathering discovery and expert testimony relevant to this newly proposed defense and counterclaim.  Broadcom contends and Qualcomm does not deny that Lee did not disclose the Chen or Vaisey articles to the PTO as prior art during the prosecution of the '104 patent application.  <u>See</u> Broadcom Br. at 4; Qualcomm Opp'n at 6.  The key question before the Court is when Broadcom learned that Lee knew of the Chen and Vaisey articles during the '104 patent application prosecution.

Broadcom has been aware of the Chen and Vaisey articles as potentially invalidating prior art well before the filing of the present Motion.  On November 16, 2005, Broadcom received a fax copy of the Chen and Vaisey articles from the Canada Institute for Scientific and Technical Information.  <u>See</u> Qualcomm Opp'n, Smith Decl., Exs. 10-12.  Furthermore, on April 28, 2006, Broadcom served its Preliminary Invalidity Contentions, in which it named both the Chen and Vaisey articles as invalidating prior art for the '104 patent.  <u>See</u> Qualcomm Opp'n, Smith Decl., Ex. 2.

However, Broadcom's inequitable conduct contention rests on Lee's awareness of the Chen and Vaisey articles.  On June 26, 2006, Qualcomm produced to Broadcom the 1992 Lee Article, in which Lee cites the Chen and Vaisey articles.  <u>See</u> Qualcomm Opp'n, Smith Decl., Ex. 5.  This should have been Broadcom's first notice that Lee knew of the Chen and Vaisey articles as early as May 1992.  According to Qualcomm, Broadcom failed to ask Lee about the Chen or Vaisey articles in his June 30, 2006, deposition.  <u>See</u> Qualcomm Opp'n at 5.  However, as both parties described to the Court, the Lee article

5

1  was produced to Broadcom amongst over 8,000 pages of production only four days before

2  Lee's June 30 deposition.  Thus, the Court finds that Broadcom did not lack diligence in

3  failing to question Lee about the Chen and Vaisey articles in his June 30 deposition.

4       Broadcom asserts that it did not realize that Lee was aware of the Chen and Vaisey

5  articles until it found the Chen article and the envelope addressed from Chen to Lee in

6  Qualcomm's late July 2006 production.  According to Qualcomm, Broadcom also failed to

7  ask Lee about the Chen or Vaisey articles in Lee's second deposition that took place

8  several days later on August 1, 2006.  See Qualcomm Opp'n at 5.  However, Qualcomm

9  produced the Chen article and envelope amongst more than 76,000 pages over a four-day

10  period the week before Lee's August 1 deposition.  See Broadcom Br., Exs. B-E;

11  Broadcom Br. at 3-4.  Therefore, the Court finds that Broadcom did not lack diligence in

12  failing to question Lee about the Chen and Vaisey articles in his August 1 deposition.

13       The Court finds that Broadcom did not lack diligence in filing the present Motion to

14  add the affirmative defense and counterclaim of inequitable conduct on September 14,

15  2006.  Qualcomm refused to produce Lee for further deposition until the Magistrate Judge

16  granted Broadcom's request to re-depose him for an additional four hours "[i]n light of the

17  voluminous documents recently produced by both parties, and good cause appearing" on

18  September 8, 2006.  Doc. No. 94, p. 2.  That deposition took place on September 22, 2006,

19  at which Broadcom did question Lee about the Chen and Vaisey articles.  See Qualcomm

20  Opp'n, Smith Decl., Ex. 3; Qualcomm Opp'n at 5-6.

21       It is because of this Court's busy calendar that Broadcom's present Motion could not

22  be heard until December 4, 2006, approximately a month before this case is set to begin

23  trial on January 9, 2007.  Therefore, the Court will consider this Motion as if it were heard

24  on an expedited basis after its filing in September.  However, the Court notes that it has

25  always been amenable to holding expedited hearings when appropriate, which Broadcom is

26  fully aware of, and that Broadcom should have requested one here.  Nevertheless, as the

27  Court has found that Broadcom did not act without diligence in filing the present Motion to

28

6

1   amend, the Court holds that Broadcom has demonstrated good cause to amend its answer

2   and counterclaims to include the affirmative defense and counterclaim of inequitable

3   conduct under the Ninth Circuit Rule 16(b) standard discussed above.

4

5   **IV.    CONCLUSION**

6          Accordingly, the Court hereby **GRANTS** Broadcom's present Motion for Leave to

7   File Its First Amended Answer and Counterclaims.  If either party demonstrates a genuine

8   need for extra discovery, depositions, or expert reports, the Court shall allow this in order

9   to facilitate a full and fair trial.  Both parties shall work together to get discovery produced,

10  depositions scheduled, and expert reports served in a timely and cooperative manner.  The

11  parties declined the Court's offer to reset the trial date because of the Court's late hearing

12  date on this Motion.  Therefore, the trial date remains January 9, 2007.  Any disputes

13  between the parties as to this additional discovery process shall be presented to the

14  Magistrate Judge, who shall rule in compliance with this Order.

15

16         **IT IS SO ORDERED**

17

18  DATED:  December 15, 2006

19

20                                    Hon. Rudi M. Brewster
                                      United States Senior District Court Judge
21

22  cc: Hon. Barbara Lynn Major
23         United States Magistrate Judge

24
         All Counsel of Record
25

26

27

28
                                    7                        05-CV-1958-B (BLM)

1   ROBERT S. BREWER, JR. (SBN 65294)
    JAMES S. MCNEILL (SBN 201663)
2   MCKENNA LONG & ALDRIDGE LLP
    750 B Street, Suite 3300
3   San Diego, CA  92101
    Telephone:    (619) 595-5400
4   Facsimile:    (619) 595-5450

5   WILLIAM F. LEE (admitted *pro hac vice*)
    JOHN J. REGAN (admitted *pro hac vice*)
6   WILMER CUTLER PICKERING
      HALE AND DORR LLP
7   60 State Street
    Boston, MA  02109
8   Telephone:   (617) 526-6000
    Facsimile:   (617) 526-5000
9
    MARK D. SELWYN (admitted *pro hac vice*)
10  WILMER CUTLER PICKERING
      HALE AND DORR LLP
11  1117 California Avenue
    Palo Alto, CA  94304
12  Telephone:   (650) 858-6000
    Facsimile:   (650) 858-6100
13
    Attorneys for Defendant/Counterclaimant
14  BROADCOM CORPORATION

15              **UNITED STATES DISTRICT COURT**

16            **SOUTHERN DISTRICT OF CALIFORNIA**

17

18  QUALCOMM INCORPORATED,              Case No.  05 CV 01958B (BLM)

19              Plaintiff,              **BROADCOM CORPORATION'S FIRST
                                        AMENDED ANSWER AND**
20      v.                             **COUNTERCLAIMS TO QUALCOMM
                                        INCORPORATED'S COMPLAINT FOR**
21  BROADCOM CORPORATION,              **PATENT INFRINGEMENT**

22              Defendant.             **DEMAND FOR JURY TRIAL**

23  ─────────────────────────          Judge:   Hon. Rudi M. Brewster

24  BROADCOM CORPORATION,

              Counterclaimant,
25
26      v.

27  QUALCOMM CORPORATION,

28              Counterdefendant.

1    Pursuant to Rules 8, 12, and 13 of the Federal Rules of Civil Procedure and the Local

2    Civil Rules of this Court, the defendant and counterclaim plaintiff Broadcom Corporation

3    ("Broadcom") answers the allegations of Qualcomm Incorporated's ("Qualcomm") Complaint for

4    Patent Infringement (the "Complaint") and asserts counterclaims as follows:

5                                           **PARTIES**

6         1.    Upon information and belief, Broadcom admits the allegations in paragraph 1 of

7    the Complaint.

8         2.    Broadcom admits the allegations in paragraph 2 of the Complaint.

9         3.    Broadcom admits the allegations in paragraph 3 of the Complaint.

10                                **JURISDICTION AND VENUE**

11        4.    Broadcom admits that Qualcomm has alleged patent infringement in this action.

12    No answer is required to the remaining allegations contained in paragraph 4 of the Complaint,

13    which merely state conclusions of law.

14        5.    Broadcom denies that it has committed, and is continuing to commit, acts of

15    infringement in this district.  No answer is required to the remaining allegations contained in

16    paragraph 5 of the Complaint, which merely state conclusions of law.

17                                **GENERAL ALLEGATIONS**

18        6.    Broadcom denies the allegations contained in paragraph 6 of the Complaint.

19                                      **THE PATENTS**

20        7.    Broadcom admits that United States Patent No. 5,452,104 (the "'104 Patent") is

21    entitled "Adaptive Block Size Image Compression Method and System"; that the '104 Patent

22    indicates that it was issued by the United States Patent and Trademark Office ("USPTO") on

23    September 17, 1995; that the '104 Patent names Chong U. Lee as its purported inventor; and that

24    an uncertified copy of the '104 Patent is attached to the Complaint as Exhibit 1.  Broadcom

25    denies the remaining allegations contained in paragraph 7 of the Complaint.

26        8.    Broadcom admits that United States Patent No. 5,576,767 (the "'767 Patent") is

27    entitled "Interframe Video Encoding and Decoding System"; that the '767 Patent indicates that it

28    was issued by the USPTO on November 19, 1996; that the '767 Patent names Chong U. Lee and

Donald Pian as its purported inventors; and that an uncertified copy of the '767 Patent is attached to the Complaint as Exhibit 2.  Broadcom denies the remaining allegations contained in paragraph 8 of the Complaint.

9.    Broadcom denies the accuracy of Qualcomm's characterization of the patents-in-suit but otherwise admits the allegations contained in paragraph 9 of the Complaint.

10.    Broadcom denies the allegations contained in paragraph 10 of the Complaint.

11.    Broadcom denies the allegations contained in paragraph 11 of the Complaint.

## COUNT I

12.    Broadcom incorporates its responses to paragraphs 1-11 of the Complaint as though fully set forth herein.

13.    Broadcom denies the allegations contained in paragraph 13 of the Complaint.

14.    Broadcom denies the allegations contained in paragraph 14 of the Complaint.

15.    Broadcom denies the allegations contained in paragraph 15 of the Complaint.

16.    Broadcom denies the allegations contained in paragraph 16 of the Complaint.

## DEFENSES AND AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

17.    Qualcomm is not entitled to any relief against Broadcom because Broadcom has not directly or indirectly infringed the '104 Patent and/or the '767 Patent (collectively, "the Qualcomm patents").

## SECOND AFFIRMATIVE DEFENSE

18.    One or more of the claims of the Qualcomm patents are invalid and/or unenforceable for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 102, 103, and 112.

## THIRD AFFIRMATIVE DEFENSE

19.    One or more of the Qualcomm patents are unenforceable against Broadcom because of waiver or other applicable equitable doctrines.

1

**FOURTH AFFIRMATIVE DEFENSE**

2      20.      Qualcomm's right to seek damages is limited, including without limitation by 35

3    U.S.C. §§ 286 and 287.  Upon information and belief, Qualcomm has not previously marked its

4    products or otherwise given notice to Broadcom of the Qualcomm patents.

5

**FIFTH AFFIRMATIVE DEFENSE**

6      21.      Broadcom is exempt from liability for infringement in whole or in part to the

7    extent that any of the alleged inventions described in and allegedly covered by the Qualcomm

8    patents is used, manufactured, or sold by or for Broadcom, its suppliers, and/or its customers

9    pursuant to a license.

10

**SIXTH AFFIRMATIVE DEFENSE**

11      22.      The claims of the '104 Patent are unenforceable because of inequitable conduct by

12    individual(s) at Qualcomm involved in the prosecution of the '104 Patent application before the

13    United States Patent and Trademark Office ("PTO"), including Chong U. Lee, a Qualcomm

14    employee, sole named inventor of the '104 Patent, and the applicant, as set forth in detail below

15    in Broadcom's Counterclaims

16

**COUNTERCLAIMS**

17      Broadcom Corporation for its counterclaims against Qualcomm Incorporated alleges as

18    follows:

19

**PARTIES**

20      1.      Counterclaim-plaintiff Broadcom Corporation ("Broadcom") is a corporation

21    organized and existing under the laws of the state of California, with its principal place of

22    business in Irvine, California.

23      2.      Upon information and belief, counterclaim-defendant Qualcomm Incorporated

24    ("Qualcomm") is a corporation organized and existing under the laws of the state of Delaware,

25    with a principal place of business in San Diego, California.

26

**JURISDICTION AND VENUE**

27      3.      This Court has subject matter jurisdiction over these counterclaims pursuant to 28

28    U.S.C. §§ 1331, 1338(a), and 2201.

4.      Qualcomm is subject to personal jurisdiction in this District.

5.      Venue for this action is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b).

### FACTS

6.      Upon information and belief, Qualcomm claims to be the owner of all rights, titles, and interests in and to U.S. Patent Nos. 5,452,104 ("the '104 Patent") and 5,576,767 ("the '767 Patent") (collectively, "the Qualcomm patents").

7.      Qualcomm has accused Broadcom of infringement of the Qualcomm patents.

8.      An actual case or controversy exists between the parties concerning the infringement, validity, and enforceability of one or more of the claims of the '104 Patent and the '767 Patent.

### COUNT ONE

### (Non-infringement, Invalidity, and Unenforceability of the '104 Patent)

9.      Broadcom repeats and re-alleges the allegations of the preceding counterclaim paragraphs 1-8 as if fully set forth herein.

10.     Broadcom has not directly or indirectly infringed and is not directly or indirectly infringing the '104 Patent, including to the extent that any of the alleged inventions allegedly covered by the '104 Patent is used, sold, or manufactured by Broadcom, its suppliers, and/or its customers pursuant to a license.

11.     One or more claims of the '104 Patent are invalid and unenforceable for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for patentability under Title 35 of the United States Code, including without limitation, §§ 102, 103, and/or 112.

12.     Broadcom is entitled to a declaratory judgment that it has not infringed and is not infringing the '104 Patent, and that the '104 Patent is invalid.

### Inequitable Conduct

13.     The '104 Patent is unenforceable due to inequitable conduct committed by individual(s) at Qualcomm involved in the preparation, filing, and/or prosecution of the '104

Patent application before the United States Patent and Trademark Office ("PTO"), including Dr. Chong U. Lee, a Qualcomm employee, sole named inventor of the '104 Patent, and the applicant.

14.    Individual(s) at Qualcomm involved in the preparation, filing, and/or prosecution of the '104 Patent application before the PTO, including Dr. Lee, and/or the prosecuting attorneys and/or agents, had a duty to disclose to the PTO information that was material to the patentability of the '104 Patent application.

15.    Individual(s) at Qualcomm involved in the preparation, filing, and/or prosecution of the '104 Patent application before the PTO, including Dr. Lee, and/or the prosecuting attorneys and/or agents, failed to disclose to the PTO information that was material to the patentability of the '104 Patent application.

16.    Upon information and belief, individual(s) at Qualcomm involved in the preparation, filing, and/or prosecution of the '104 Patent application before the PTO, including Dr. Lee, and/or the prosecuting attorneys and/or agents, failed to disclose to the PTO information that was material to the patentability of the '104 Patent application, with an intent to deceive and/or mislead the PTO by doing so.

17.    The '104 Patent, entitled "Adaptive Block Size Image Compression Method and System," issued to inventor Dr. Chong U. Lee on September 19, 1995.

18.    The '104 Patent lists Qualcomm as the assignee and Russell B. Miller and Sean English as the prosecuting attorneys and/or agents.

19.    The '104 Patent issued from application number 08/102,124, which was filed on August 4, 1993.

20.    Application number 08/102,124 was a continuation of application number 08/004,213, which was filed on January 13, 1993, and abandoned.

21.    Application number 08/004,213 was a continuation of application number 07/710,216, which was filed on June 4, 1991, and abandoned.

22.    Application number 07/710,216 was a continuation-in-part of application number 07/487,012, which was filed on February 27, 1990, and issued as U.S. Patent No. 5,021,891 on June 4, 1991.

23.     On all of the above applications and on U.S. Patent No. 5,021,891, Dr. Lee is identified as the sole inventor.

24.     As the named inventor of the systems, apparatuses, means, and methods claimed in the '104 Patent, Dr. Lee had a duty to disclose to the PTO information that was material to the patentability of the '104 Patent application, from the time the first application was filed in the chain of related applications until the '104 Patent issued.

25.     As the named prosecuting attorney for the '104 Patent, Mr. Miller had a duty to disclose to the PTO information that was material to the patentability of the '104 Patent application, from the time the first application was filed in the chain of related applications until the '104 Patent issued.

26.     As the named prosecuting attorney and/or agent for the '104 Patent, Mr. English had a duty to disclose to the PTO information that was material to the patentability of the '104 Patent application, from the time the first application was filed in the chain of related applications until the '104 Patent issued.

27.     On or about July 11, 1990, Dr. Lee received by first class mail two conference papers from C.T. Chen (1958QB0115624-48).

28.     The first conference paper that Dr. Lee received from C.T. Chen in July 1990 was entitled "A K-th Order Adaptive Transform Coding Algorithm for Image Data Compression" and was presented by Cheng-Tie Chen at the Conference on Applications of Digital Image Processing in San Diego, California, in August 1989 ("Chen '89") (1958QB0115637-48).

29.     The second conference paper that Dr. Lee received from C.T. Chen in July 1990 was entitled "Transform Coding of Digital Images Using Variable Block Size DCT With Adaptive Thresholding and Quantization," and was presented by Cheng-Tie Chen at the Conference on Applications of Digital Image Processing in San Diego, California, in July 1990 ("Chen '90") (1958QB0115625-36).

30.     Before July 1990, Dr. Lee was aware of C.T. Chen and some of his work related to DCT-based image compression approaches.

1    31.    Dr. Lee read at least some portions of Chen '90 after receiving it in July 1990,

2    including "Figure 4.  The quadtree corresponding to Fig. 3."

3    32.    Chen '90 was related to research that Dr. Lee was doing at the time, specifically

4    the variable block size image compression algorithm called "Adaptive Block Size Discrete

5    Cosine Transform" embodied in the '104 Patent.

6    33.    Figure 4 in Chen '90 was related to research that Dr. Lee was doing in July 1990

7    concerning quadtree structures, some of which is embodied in the '104 Patent.

8    34.    On or about July 12, 1990, an Information Disclosure Statement Under 37 C.F.R.

9    § 1.56 was filed with the PTO in application number 07/487,012.

10    35.    That Information Disclosure Statement was signed by Mr. Miller, dated July 6,

11    1990, and listed nine references—(1) U.S. Patent No. 4,774,574; (2) U.S. Patent No. 4,922,341;

12    (3) U.S. Patent No. 4,924,309; (4) the article "Discrete Cosine Transform" by N. Ahmed et al.;

13    (5) the article "Adaptive Coding of Monochrome and Color Images" by Wen-Hsiung Chen et al.;

14    (6) the article "Interframe Cosine Transform Image Coding" by John A. Roese et al.; (7) the

15    article "Distributions of the Two-Dimensional DCT Coefficients for Images" by Randall C.

16    Reininger et al.; (8) the article "Scene Adaptive Coder" by Wen-Hsiung Chen et al.; and (9) the

17    article "Hamming Coding of DCT-Compressed Images Over Noisy Channels" by David R.

18    Comstock et al.

19    36.    Two of the references—U.S. Patent No. 4,922,341 and U.S. Patent No.

20    4,924,309—issued in May 1990, just two months before the Information Disclosure Statement

21    was filed.

22    37.    The July 1990 Information Disclosure Statement did not cite Chen '90.

23    38.    On or about December 15, 1990, the primary patent examiner, Edward L. Coles,

24    Sr., considered the nine references in the Information Disclosure Statement, and all nine

25    references are cited in the issued '104 Patent.

26    39.    On or about January 24, 1992, an Information Disclosure Statement Under 37

27    C.F.R. § 1.56 was filed with the PTO in application number 07/710,216.

28

40.     This second Information Disclosure Statement was signed by Mr. Miller, dated January 22, 1992, and listed the same references as the July 1990 Information Disclosure Statement as well as two additional references—(1) the article "Variable Block-Size Transform Image Coder" by Its'Hak Dinstein et al. and (2) the article "Quadtree-Structured Recursive Plane Decomposition Coding of Images" by Peter Strobach.

41.     The article by Its'Hak Dinstein was published in November 1990, approximately four months after Chen '90 was presented in San Diego, California, and Dr. Lee received it.

42.     The article by Peter Strobach was published in June 1991, almost one year after Chen '90 was presented in San Diego, California, and Dr. Lee received it.

43.     The January 1992 Information Disclosure Statement did not cite Chen '90.

44.     On or about September 1, 1992, the assistant patent examiner, Kim Yen Vu, considered the 11 references in the Information Disclosure Statement, and all 11 references are cited in the issued '104 Patent.

45.     The file history for the '104 Patent contains no other information disclosure statements or prior art submissions besides the July 1990 and January 1992 Information Disclosure Statements.

46.     The '104 Patent cites no "other publications" besides the articles identified in the July 1990 and July 1992 Information Disclosure Statements.

47.     Chen '90 was never disclosed to the PTO during the prosecution of the '104 Patent application, by Dr. Lee, Mr. English, Mr. Miller, or anyone else acting on behalf of Qualcomm, and was not considered by the PTO during prosecution of the '104 Patent application.

48.     On or about May 1992, Dr. Lee published a paper entitled "Intraframe Compression of HDTV Images Based On Adaptive Block Size Discrete Cosine Transform," in Proc. of the Korean Federation of Science and Technology Societies Workshop ("Korean Paper") (1958QB0043418-40).

49.     The Korean Paper describes the state of the art for video compression in 1992 and discusses Dr. Lee's purported invention claimed in the '104 Patent, including the alleged benefits and improvements of his alleged invention over the art.

50.    In the Korean Paper, Dr. Lee cited several articles describing "other variable block size algorithms," including Chen '90 and an April 1987 article by D. Jacques Vaisey and Allen Gersho entitled "Variable Block-Size Image Coding," ("Vaisey '87") (BCM2-SD3 12212-15), which was published in Proc. International Conference On Acoustics, Speech, and Signal Processing.  (*See* 1958QB0043422, 1958QB0043438.)

51.    Neither the Korean Paper nor Vaisey '87 were disclosed to the PTO during the prosecution of the '104 Patent application, by Dr. Lee, Mr. English, Mr. Miller, or anyone else acting on behalf of Qualcomm, and neither was considered by the PTO during prosecution of the '104 Patent application.

52.    Dr. Lee knew that he had a duty to disclose to the PTO information that was material to the patentability of the '104 Patent application.

53.    On or about April 10, 1990, Dr. Lee signed a Combined Declaration/Power of Attorney, which was filed in application number 07/487,012.  In that document, Dr. Lee swore: "I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.  I acknowledge the duty to disclose information which is material to the examination of the this [sic] application in accordance with Title 37, Code of Federal Regulations, Sec. 1.56(a)."

54.    On or about June 4, 1991, Dr. Lee signed a Combined Declaration/Power of Attorney, which was filed in application number 07/710,216.  In that document, Dr. Lee swore: "I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above.  I acknowledge the duty to disclose information which is material to the examination of the this [sic] application in accordance with Title 37, Code of Federal Regulations, Sec. 1.56(a)."

55.    Mr. Miller, who signed the July 1990 and January 1992 Information Disclosure Statements, knew that he had a duty to disclose to the PTO information that was material to the patentability of the '104 Patent application.

56.     Sean English, who was a registered patent agent, knew that he had a duty to disclose to the PTO information that was material to the patentability of the '104 Patent application.

57.     Dr. Lee, Mr. Miller, and/or Mr. English knew about Vaisey '87 and Chen '90, and failed to disclose the references to the PTO during the prosecution of the '104 Patent application and related applications—in breach of their duty to disclose under applicable Federal Circuit law and 37 C.F.R. § 1.56.

58.     Vaisey '87 is highly material to the patentability of the invention claimed in the '104 Patent because it discloses a variable block size image coder that uses a quadtree-based segmentation algorithm to partition an image into variable blocks according to the local detail of the image. Vaisey also discloses a method of using transform coding and vector quantization to encode the segmented blocks.

59.     Chen '90 is highly material to the patentability of the invention claimed in the '104 Patent because it discloses, among other things, a quadtree-based adaptive block size system in which variable block size Discrete Cosine Transforms ("DCTs") are performed. Additionally, Chen '90 discloses adaptive thresholding and adaptive quantization. Chen '90 also discloses a DCT-based quadtree adaptive block size system that uses redundancy in DC coefficients (specifically, by considering similarity in the mean of adjacent sub-blocks) to increase the amount of compression.

60.     Neither Vaisey '87 nor Chen '90 is cumulative of any or all of the references disclosed to, or otherwise before, the PTO during the prosecution of the '104 Patent. None of the references cited in the July 1990 and January 1992 Information Disclosure Statements, or otherwise before the PTO, taught the benefits of a DCT-based quadtree adaptive block size system. Furthermore, none of the references before the PTO during prosecution of the '104 Patent discloses, as Chen '90 does, a DCT-based quadtree adaptive block size system that exploits redundancy in the DC coefficients to improve compression efficiency.

61.     Upon information and belief, Dr. Lee knew that Vaisey '87 and Chen '90—which he cited in his Korean Paper—were relevant to the invention claimed in the '104 Patent and material to patentability.

62.     Upon information and belief, Mr. Miller and/or Mr. English also knew that Vaisey '87 and Chen '90 were relevant to the invention claimed in the '104 Patent and material to the patentability of the invention claimed in the '104 Patent.

63.     Upon information and belief, at least one person among Dr. Lee, Mr. Miller, and/or Mr. English, owing a duty of disclosure to the PTO during prosecution of the '104 Patent and who had knowledge of Vaisey '87 and Chen '90 possessed an intent to deceive and/or mislead the PTO.  Such intent may be inferred from all of the circumstances relating to the alleged invention and prosecution and issuance of the application for the '104 Patent, including but not limited to such persons' knowledge of Vaisey '87 and Chen '90, his inclusion and discussion of them in his Korean Paper, and their high materiality to the patentability of the inventions claimed in the '104 Patent.

64.     The '104 Patent is unenforceable due to inequitable conduct committed by individual(s) at Qualcomm involved in the preparation, filing, and/or prosecution of the '104 Patent application before the PTO, and Broadcom is entitled to a declaration to that effect.

## COUNT TWO

### (Non-infringement, Invalidity, and Unenforceability of the '767 Patent)

65.     Broadcom repeats and re-alleges the allegations of the preceding counterclaim paragraphs 1-8 as if fully set forth herein.

66.     Broadcom has not directly or indirectly infringed and is not directly or indirectly infringing the '767 Patent, including to the extent that any of the alleged inventions allegedly covered by the '767 Patent is used, sold, or manufactured by Broadcom, its suppliers, and/or its customers pursuant to a license.

67.     One or more claims of the '767 Patent are invalid and unenforceable for failing to meet one or more of the requisite statutory and decisional requirements and/or conditions for

1  patentability under Title 35 of the United States Code, including without limitation, §§ 102, 103,

2  and/or 112.

3      68.    Broadcom is entitled to a declaratory judgment that it has not infringed and is not

4  infringing the '767 Patent, and that the '767 Patent is invalid.

**PRAYER FOR RELIEF**

6      WHEREFORE, Broadcom requests the Court to enter a judgment in its favor and against

7  Qualcomm as follows:

8          a.    Dismiss the Complaint in its entirety, with prejudice;

9          b.    Enter judgment in favor of Broadcom and against Qualcomm;

10         c.    Declare that Broadcom has not infringed, and is not infringing, the

11               Qualcomm patents;

12         d.    Declare that one or more of the claims of the Qualcomm patents are

13               invalid, void, and/or unenforceable against Broadcom;

14         e.    Award Broadcom its costs (including expert fees), disbursements, and

15               reasonable attorneys' fees incurred in this action, pursuant to 35 U.S.C.

16               § 285; and

17         f.    Grant such further relief as is just and proper.

**DEMAND FOR JURY TRIAL**

19     In accordance with Fed. R. Civ. P. 38(b), Broadcom demands a trial by jury on all issues

20 so triable.

21 Dated:  December 8, 2006          MCKENNA LONG & ALDRIDGE LLP

22                                   WILMER CUTLER PICKERING
                                     HALE AND DORR LLP
23

24                                   By:    s/James S. McNeill
                                            James S. McNeill
25
                                     Attorneys for Defendant/Counterclaimant
26                                   BROADCOM CORPORATION
                                     E-mail:  jmcneill@mckennalong.com
27

28

<u>**QUALCOMM INCORPORATED V. BROADCOM CORPORATION**</u>
**United States District Court Case No. 05-CV-1958 B (BLM)**

<u>**CERTIFICATE OF SERVICE**</u>

I, James S. McNeill, certify that I caused to be served upon the following counsel and parties of record a copy of the following document(s):

- **BROADCOM CORPORATION'S FIRST AMENDED ANSWER AND COUNTERCLAIMS TO QUALCOMM INCORPORATED'S COMPLAINT FOR PATENT INFRINGEMENT**

via personal service, overnight mail (VIA UPS), facsimile, first class mail or e-mail, as indicated below:

Barry Jerome Tucker, Esq.                          *Attorneys for Plaintiff*
HELLER EHRMAN LLP
4350 La Jolla Village Drive, 7th Floor
San Diego, CA 92122
Tel.: (858) 450-8478/**Fax: (858) 450-8499**
**barry.tucker@hellerehrman.com**

**Via Personal Delivery**

James R. Batchelder, Esq.                          *Attorneys for Plaintiff*
Adam A. Bier, Esq.
Kevin K. Leung, Esq.
Lee Patch, Esq.
DAY CASEBEER MADRID & BATCHELDER LLP
20300 Stevens Creek Boulevard, Suite 400
Cupertino, CA 95014
Tel: (408) 873-0110/**Fax: (408) 873-0220**
**jbatchelder@daycasebeer.com**
**cmammen@daycasebeer.com**
**abier@daycasebeer.com**
**kleung@daycasebeer.com**
**lpatch@daycasebeer.com**

**Via UPS Overnight Mail**

Pursuant to the Joint Discovery Plan dated January 30, 2006 a courtesy copy of the document described above will be provided Via Facsimile

Executed on **December 8, 2006,** in San Diego, California.


_____
             s/James S. McNeill
             James S. McNeill

1
2
3
4
5
6
7
8
9          **UNITED STATES DISTRICT COURT**
10         **SOUTHERN DISTRICT OF CALIFORNIA**
11

| | |
|---|---|
| 12  QUALCOMM INCORPORATED, | )  Civil No: 05-CV-1958-B(BLM) |
| 13              Plaintiff, | )  **JUDGMENT AFTER JURY TRIAL (1)** |
| 14  v. | )  **FOR DEFENDANT BROADCOM** |
|     | )  **CORPORATION ("BROADCOM") AND** |
| 15  BROADCOM CORPORATION, | )  **AGAINST PLAINTIFF QUALCOMM** |
|     | )  **INCORPORATED ("QUALCOMM") ON** |
| 16              Defendant. | )  **PATENT INFRINGEMENT CLAIMS** |
|     | )  **REGARDING U.S. PATENT NOS.** |
| 17  _____ | )  **5,452,104 AND 5,576,767; (2) FOR** |
|     | )  **COUNTERDEFENDANT QUALCOMM** |
|     BROADCOM CORPORATION, | )  **AND AGAINST COUNTERCLAIMANT** |
| 18  | )  **BROADCOM ON INVALIDITY** |
|     | )  **COUNTERCLAIMS REGARDING U.S.** |
| 19  | )  **PATENT NOS. 5,452,104 AND 5,576,767;** |
|     | )  **(3) FOR COUNTERDEFENDANT** |
| 20              Counterclaimant, | )  **QUALCOMM AND AGAINST** |
|     | )  **COUNTERCLAIMANT BROADCOM** |
| 21  v. | )  **ON INEQUITABLE CONDUCT** |
|     QUALCOMM INCORPORATED, | )  **COUNTERCLAIM REGARDING U.S.** |
| 22  | )  **PATENT NO. 5,452,104; AND (4) FOR** |
|     | )  **DEFENDANT BROADCOM AND** |
| 23              Counterdefendant. | )  **AGAINST PLAINTIFF QUALCOMM** |
|     | )  **ON AFFIRMATIVE DEFENSE OF** |
| 24  | )  **UNENFORCEABILITY OF U.S.** |
|     | )  **PATENT NOS. 5,452,104 AND 5,576,767** |
| 25  | )  **DUE TO WAIVER** |
| 26  | )  **JUDGMENT ENTERED ON AUGUST 6,** |
|     | )  **2007** |
| 27  | |
| 28  | |

1

05-CV-1958-B (BLM)

This matter came on for jury trial on January 9, 2007, and was submitted to the jury on January 26, 2007.  The jury returned a verdict: (1) for Broadcom and against Qualcomm on Qualcomm's literal and doctrine of equivalents direct infringement claims regarding U.S. Patent Nos. 5,452,104 ("the '104 patent") and 5,576,767 ("the '767 patent"); (2) for Broadcom and against Qualcomm on Qualcomm's inducing and contributory indirect infringement claims regarding the '104 and '767 patents; and (3) for Qualcomm and against Broadcom on Broadcom's invalidity counterclaims of the '104 and '767 patents based on obviousness.  (Doc. No. 499.)  Because the jury found for Broadcom and against Qualcomm on Qualcomm's infringement claims, the jury did not reach the issue of damages.

Furthermore, the jury returned an advisory verdict: (1) for Broadcom and against Qualcomm on Broadcom's counterclaim of unenforceability of the '104 patent due to inequitable conduct; and (2) for Broadcom and against Qualcomm on Broadcom's affirmative defense that the '104 and '767 patents are unenforceable due to waiver.  (Doc. No. 499.)

On February 9, 2007, the Court held an Evidentiary Hearing on Broadcom's affirmative defense of waiver and counterclaim of inequitable conduct.  The Court issued an Order on March 21, 2007, (1) finding in favor of Qualcomm and against Broadcom on Broadcom's counterclaim of unenforceability of the '104 patent due to inequitable conduct; and (2) finding in favor of Broadcom and against Qualcomm on Broadcom's affirmative defense that the '104 and '767 patents are unenforceable due to waiver.  (Doc. No. 528.) The Court then issued an Order on Remedy for Finding of Waiver filed concurrently with this Judgment, finding appropriate remedy for waiver to be unenforceability of the '104 or '767 patents and their continuations, continuations-in-part, divisions, reissues, or any other derivations of the '104 or '767 patents.

The Court also issued an Order Granting Broadcom's Motion for Exceptional Case Finding and for an Award of Attorneys' Fees (35 U.S.C. § 285) concurrently with the

2

present Judgment, for which the determination of fees and costs to be awarded shall not toll

the time to appeal this Judgment.

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS**

**FOLLOWS**: (1) as to Qualcomm's direct infringement claims, for Broadcom and against

Qualcomm of no direct infringement, either literally or under the doctrine of equivalents, as

to Claims 3, 4, 5, 7, 13, 59, and 60 of the '104 patent and as to Claims 1, 2, 5, 6, 7, 8, and 9

of the '767 patent; (2) as to Qualcomm's indirect infringement claims, for Broadcom and

against Qualcomm of no indirect infringement, either inducing or contributory, as to

Claims 3, 4, 5, 7, 13, 59, and 60 of the '104 patent and as to Claims 1, 2, 5, 6, 7, 8, and 9 of

the '767 patent; (3) as to Broadcom's invalidity counterclaims, for Qualcomm and against

Broadcom of no invalidity on the grounds of obviousness as to Claims 3, 4, 5, 7, 13, 59,

and 60 of the '104 patent and as to Claims 1, 2, 5, 6, 7, 8, and 9 of the '767 patent; (4) as to

Broadcom's inequitable conduct counterclaim, for Qualcomm and against Broadcom of no

unenforceability of the '104 patent; and (5) as to Broadcom's affirmative defense of

waiver, for Broadcom and against Qualcomm of unenforceability of the '104 and '767

patents and their continuations, continuations-in-part, divisions, reissues, or any other

derivations of the '104 or '767 patents.

//
//
//
//
//
//
//
//
//
//

3

1    The Court finds that there is no just reason for delay and upon an express direction

2    for the entry of judgment, the Court therefore enters final judgment on Qualcomm's direct

3    and indirect infringement claims, Broadcom's invalidity and inequitable conduct

4    counterclaims, and Broadcom's affirmative defense of waiver.

5

6    **IT IS SO ORDERED**, **ADJUDGED AND DECREED.**

7

8    DATED:  August 6, 2007

9

10                              Hon. Rudi M. Brewster
                                United States Senior District Court Judge

11

12

13

14   cc:  Hon. Barbara Lynn Major
          United States Magistrate Judge

15

16        All Counsel of Record

17

18

19

20

21

22

23

24

25

26

27

28                                    4                         05-CV-1958-B (BLM)

# APPENDIX A

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 3798134 (N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC Rep.Serv.2d 682
**(Cite as: Not Reported in F.Supp.2d)**

**C**Bradley v. Google, Inc.
N.D.Cal.,2006.

United States District Court,N.D. California.
Theresa BRADLEY, Plaintiff,
v.
GOOGLE, INC., and Google Adsense, Defendants.
**No. C 06-05289 WHA.**

Dec. 22, 2006.

Theresa B. Bradley, Washington, DC, pro se.
Ashok Ramani, Keker & Van Nest, LLP, San
Francisco, CA, for Defendants.

**ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO
DISMISS**
WILLIAM ALSUP, United States District Judge.

**INTRODUCTION**

*1 This is a lawsuit over five dollars. It alleges fraud,
breach of contract, and various other claims.
Defendants Google, Inc., and Google AdSense now
move to dismiss plaintiff Theresa Bradley's
complaint pursuant to FRCP 12(b)(6). Plaintiff's first
through seventh claims fail to plead facts that if true
would entitle plaintiff to relief. Plaintiff's eighth
claim survives to the extent that she has pleaded a
claim of injury to property. Plaintiff will be granted
limited leave to amend. Accordingly, defendants'
motion to dismiss is **GRANTED IN PART** as to
plaintiff's first through seventh claims, and **DENIED
IN PART** as to plaintiff's eighth claim.

**STATEMENT**

Bradley was a psychiatrist who also had a juris
doctorate. Plaintiff owned a small business called
Bravacorp that provided corporate consulting
services and listed a number of large companies and
government agencies as its clients. Bradley and
Bravacorp ran a website called www.bravacorp.com.
The website provided information about Bradley's
and Bravacorp's services, and advertised those
services (First Amd. Compl. ¶ 5-6).

Google provided advertising space on the internet to
third parties through its service Google AdSense (id.
at ¶ 6). Participants in the program allowed Google
AdSense to place ads from third parties on their
websites after completing an application and
inserting some hypertext markup code into their site.
The ads were tailored to the host website's content.
Participants were able to block ads from competitors,
or other ads based on their content or origin (id. at
Exh. A). Participants also had the option of choosing
default ads to appear on their site if they did not
approve of the ads that Google AdSense placed there,
or if no ads relevant to the website's content were
found. Significantly, Google AdSense paid
participants each time an internet user clicked on the
third-party ads posted to the participants' website. To
eliminate the problem of participants attempting to
profit from this arrangement by clicking on the ads
on their own websites, Google AdSense's contracts
explicitly forbade participants from doing so (Req.
Jud. Not. Exh. A ¶ 5).

Bradley signed her website up for Google AdSense
on August 10, 2006 (First Amd. Compl. ¶ 7). Google
AdSense did not provide her with any way to see
which ads would be posted to her site before they
appeared there (id. at ¶ 9). Wanting to investigate the
third-party ads placed on her website, Bradley
clicked on them (id . at ¶ 13-14). Also, she
communicated with Google AdSense and asked them
to remove some of the ads placed on her website (id.
at ¶ 15). The ads were not removed (id. at ¶ 16). On
August 19, 2006, Google AdSense terminated her
account, removed all ads, and failed to pay plaintiff
the approximately five dollars in revenue that the ads
on her site had generated (id. at ¶ 17). Plaintiff filed
her complaint against Google and Google AdSense
shortly thereafter.

*2 Bradley also held an email account through
Google's email service, Gmail, through which she
conducted all relations with Google AdSense related
to her website (id. at ¶ 59-60). On August 24, 2006,
plaintiff discovered that all of the emails in which she
had communicated with Google AdSense had been
removed or deleted from her account (id. at ¶ 64).
She claimed that other emails had been deleted, and
that communications with third parties had been
"mixed up" with her emails (id. at ¶ 66-67).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 3798134 (N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC Rep.Serv.2d 682
(Cite as: Not Reported in F.Supp.2d)

On September 7, 2006, Bradley filed her first amended complaint alleging claims of violations of the Lanham Act, 15 U.S.C. 1121*et seq.,* fraud, interference with prospective business advantage, violations of California Commercial Code Section 2207, breach of contract, unlawful interception of electronic communications under 18 U.S.C. 2520, invasion of privacy under California Penal Code Sections 630-637.2, and intentional destruction of evidence, professional property, and personal property. Though proceeding *pro se,* Bradley is no stranger to the court system. She has filed at least 35 lawsuits in various federal district courts with 15 of those lawsuits being filed within the last two years (Def.Br.n4).

### ANALYSIS

Defendants now move to dismiss Bradley's first amended complaint for failure to state a claim. They also ask in their motion that Bradley not be given leave to amend.

A motion to dismiss under FRCP 12(b)(6) tests for legal sufficiency of the claims alleged in the complaint. A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)."All allegations and reasonable inferences are taken as true, and the allegations are construed in the light most favorable to the non-moving party, but conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."*Adams v. Johnson,* 355 F .3d 1179, 1183 (9th Cir.2004).

### 1. LANHAM ACT VIOLATIONS.

Plaintiff's first claim alleged violations of the Lanham Act 43(a), which appears to be a claim for false advertising. To plead false advertising under that section, plaintiff must allege:
(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or had a tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by a direct diversion of goodwill from itself, or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir.1997).

*3 Defendants argue that Bradley has not alleged the kind of injury that the Lanham Act was intended to address. In her opposition brief, Bradley does not respond to defendants' arguments, instead the bulk of her opposition attempts to present new facts in her favor. In particular, she argues against defendants' request for judicial notice saying that had she known of the information contained therein, she would not have brought this lawsuit. She goes on to accuse Google of subterfuge and "hiding the ball" with respect to the terms of her contract with them. Though such diatribes are not helpful to showing the legal sufficiency of her claims, this order still addresses her claims under the standard of a motion to dismiss under FRCP 12(b)(6).

Plaintiff alleged that Google sent an advertisement to her which contained a false statement, namely, that she would be able to preview the ads that Google AdSense placed on her website. She further alleged that the method that Google provided to preview the ads did not work. Plaintiff alleged that she, not her customers, was deceived. Bradley alleged that her goodwill and relationships with her customers were damaged because of the ads that Google AdSense placed on her site. In sum, Bradley alleged that Google's false advertising deceived her into signing up for its services, which later caused her to lose the goodwill of her customers not because of Google's false statements, but because of the ads placed on her website and Google's subsequently closing her Google AdSense account. This theory of damages is simply too attenuated. Bradley did not allege that she lost her customers' goodwill as a result of Google's false statements. She alleged she lost goodwill by defendants' placing ads of which she did not approve on her website and then removing them. Accordingly, defendants' motion to dismiss is **GRANTED** as to this claim.

### 2. FRAUD.

Under FRCP 9(b), fraud must be pleaded with particularity as to the circumstances of fraud, such as

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 3798134 (N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC Rep.Serv.2d 682
(Cite as: Not Reported in F.Supp.2d)

time, place, persons, false statements, and why those statements are false. _In re GlenFed Inc. Sec. Litig._, 42 F.3d 1541, n. 7 (1994). To allege a claim of fraud, plaintiff must plead (1) a misrepresentation; (2) knowledge of falsity or scienter; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damages. _Engalla v. Permanente Med. Group_, 15 Cal.4th 951, 974 (1997).

Bradley alleged that "[d]efendants made false, untrue and misleading representations as a statement of existing and material fact" (First Amd. Compl. ¶ 30). Even incorporating by reference all of her previous allegations, plaintiff still does not identify with particularity which statements were false. Assuming she referred to Google AdSense's representation that she would be able to preview the ads placed on her site, she still has not alleged when those statements were made. She has merely alleged that she was told that there would be a way to preview the ads placed on her site but that the method did not work. As to the second element, plaintiff has not alleged with specificity that defendants knew their statements were false, plaintiff merely stated in her complaint that Google and Google AdSense made knowingly false statements. This does not meet the heightened standard under FRCP 9(b). Accordingly, defendants' motion to dismiss is **GRANTED.**

### 3. INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE.

*4 To state a claim for interference with prospective business advantage, plaintiff must plead the following elements:
(1) an economic relationship between the plaintiff and a third party, with the probability of future economic benefit to plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant to disrupt the relationship; (4) actual disruption of the relationship; (5) economic harm to plaintiff proximately caused by defendant.

_Youst v. Longo_, 43 Cal.3d 64, n. 6 (1987). A claim for interference with prospective business advantage cannot be brought against a party to the relationship which has allegedly been disrupted. _Kasparian v. County of Los Angeles_, 38 Cal.App. 4th 242, 262 (1995). Generic allegations that there was an interference with an unnamed third party are insufficient as a matter of law._Accuimage Diagnostics Corp. v. Terarecon, Inc._, 260 F.Supp.2d 941, 957 (N.D.Cal.2003).

In her third claim, Bradley alleged that she was in a business relationship with Google and its "subsidiary" Google AdSense. Google AdSense's actions in placing ads on her website, damaged her relationships with third parties and with Google AdSense. Plaintiff never identified any of the third parties. To the extent that Bradley alleged that her relationship with defendants was disrupted, her claim fails as a matter of law. Bradley has also not identified any specific relationships in which Google interfered, so she has failed to plead facts that would entitle her to relief on this claim. Accordingly, defendants' motion is **GRANTED.**

### 4. VIOLATIONS OF CALIFORNIA COMMERCIAL CODE SECTION 2207.

California Commercial Code Section 2207 governs the addition of terms in the acceptance of a contract and the modification of contracts. It is part of California's enaction of the Uniform Commercial Code which explicitly applies only to contracts dealing with movable goods. Cal. Com.Code 2102. " 'Goods' means all things (including specially manufactured goods) that are movable at the time of identification to the contract other than money in which the price is to be paid."Cal. Com.Code 2105.

In her fourth claim, Bradley alleged that Google and Google AdSense violated Section 2207 by materially altering the terms of the contract. At no point, however, did she allege that her contract with Google involved the sale or purchase of goods by either party. From her complaint, it is clear that Bradley's contract with Google was for services, not for goods. The UCC does not apply to plaintiff's contract with Google, and neither does Section 2207. Even taking as true all of Bradley's allegations, her fourth claim does not state a claim on which relief can be granted because Section 2207 simply does not apply to her contract with Google and Google AdSense. Defendants motion is **GRANTED** on Bradley's fourth claim.

### 5. BREACH OF CONTRACT.

Plaintiff's fifth claim against Google alleges breach of contract. To state a claim for breach of contract, plaintiff must allege (1) the existence of a contract; (2) plaintiff's performance or excuse for non-performance; (3) defendant's breach; (4) and damages

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3798134 (N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC Rep.Serv.2d 682
(Cite as: Not Reported in F.Supp.2d)

that result from the breach. *Acoustics, Inc. v. Trepte Construction Co.,* 14 Cal.App.3d 887, 913 (1971).

*5 Bradley alleged in her complaint that she had a valid contract with Google and Google AdSense. Defendants breached the contract by failing to provide her a way to preview the ads placed on her website. She also alleged that she suffered damages because her clients were diverted from her website. Defendants argue that plaintiff never alleged that she performed under the contract or that she was excused from performing. Bradley stated in her complaint that she clicked on her own ads which was strictly forbidden under the contract with Google. Furthermore, Bradley never alleged that she did not know of the consequences of clicking on her own ads. Plaintiff has failed to plead that she performed under the contract.

Plaintiff did not adequately plead excuse for nonperformance. She alleged in her complaint and argued in her brief that she had no way to preview ads placed on her site. It appeared that she attempted to plead that performance was impossible. In response, defendants argue that previewing the ads placed on her site was not impossible; Bradley could have cut-and-pasted the links displayed below the ads into her web browser, enabling her to preview the ads. Thus, plaintiff has not adequately pleaded either performance under the contract, or that her non-performance was excused. Defendants' motion to dismiss is **GRANTED.**

### 6. VIOLATION OF 18 U.S.C. 2520 FOR UNLAWFUL INTERCEPTION OF ELECTRONIC COMMUNICATIONS.

Bradley alleged that defendants violated 18 U.S.C. 2520 by removing or deleting messages from her Gmail account. "[A]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in the violation of this chapter may in a civil action recover from the appropriate entity ..."18 U.S.C. 2520. This statute, part of the Electronic Communications Privacy Act, only applies to situations where electronic communications are *intercepted,* not electronic communications which are in storage. *Theofel v. Farey-Jones,* 359 F.3d 1066, 1077 (9th Cir.2004). To intercept a communication, "it must be acquired during transmission, not while it is in storage."*Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 878 (9th Cir.2002).

In her sixth claim, Bradley alleged that Google removed emails relevant to her dealings with the Google AdSense program that were saved to her account. Plaintiff did not allege that Google intercepted any of her emails, she alleged only that the messages were saved to her account on the evening of August 23, 2006, but then had been removed by the next morning. Deletion or removal of stored or saved electronic communications is not actionable under 18 U.S.C. 2520, thus plaintiff has failed to state a claim for interception of electronic communications. Defendants' motion is **GRANTED.**

### 7. INVASION OF PRIVACY UNDER CALIFORNIA PENAL CODE SECTIONS 630-637.2.

In her seventh claim, plaintiff alleged a violation of California's Invasion of Privacy Act. Such act allows for civil damages for invasion of privacy.*Ion Equipment Corp. v. Nelson,* 110 Cal.App.3d 868, 879 (1980). The sections that plaintiff alleged that Google violated are analogous to her federal claims under 18 U.S.C. 2520. The relevant sections forbid unauthorized wiretapping, eavesdropping or recording electronic communications, intercepting wireless telephone and cordless telephone transmissions, manufacturing devices designed for electronic eavesdropping, and disclosing intercepted electronic communications. Cal.Penal Code 630-637.2.

*6 Like its federal counterpart, these sections of California's Invasion of Privacy Act require the *interception* of an electronic communication. As with Bradley's sixth claim, she has not alleged that Google intercepted her communications, only that her stored emails were deleted from her account. Thus, Bradley has failed to state a claim, and defendants' motion as to her seventh claim is **GRANTED.**

### 8. INTENTIONAL DESTRUCTION OF EVIDENCE, PROFESSIONAL, AND PERSONAL PROPERTY.

Plaintiff's final claim is for intentional destruction of evidence, professional, and personal property. "[T]here is no tort remedy for the intentional spoliation of evidence by a party to the cause of action to which the spoliated evidence is relevant, in cases which, as here, the spoliation victim knows or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 5
Not Reported in F.Supp.2d, 2006 WL 3798134 (N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC Rep.Serv.2d 682
**(Cite as: Not Reported in F.Supp.2d)**

should have known of the alleged spoliation before the trial or other decision on the merits of the underlying action."*Cedars-Sinai Med. Center v. Superior Court*, 18 Cal.4th 1, 17-18 (1998).

It is true, as defendants argue, that there is no tort remedy for spoliation of evidence before trial if the victim knew of the alleged spoliation before trial. Thus, even if all of Bradley's allegations are true and Google did intentionally delete the emails from her account pertaining to her relationship with Google AdSense, she cannot plead a claim for intentional spoliation of evidence. Bradley's allegations of spoliation of evidence appear in her complaint, so she necessarily knew of the alleged spoliation before trial. That portion of her eighth claim must be dismissed.

Defendants' argument does not address the possibility that Bradley also alleged a claim for the destruction of personal property. California law does recognize a tort remedy for injury to personal property. *See*Cal. Civ.Code 3333; *Hand Electronics v. Snowline Joint Unified Sch. Dist.*, 21 Cal.App 4th 862, 868-869 (Cal.App. 4 Dist 1994). Assuming that plaintiff's emails are her personal property, she can plead such a claim. She has alleged the Google entered her email account and deleted some of her emails without her permission. She further alleged that she suffered damages to her business as a result. Thus, Bradley has stated a claim for injury to personal property, and this portion of the claim cannot be dismissed. Defendant's motion is **GRANTED IN PART** as to plaintiff's claim for spoliation of evidence and **DENIED IN PART** as to her claim for destruction of personal property.

### 9. LEAVE TO AMEND.

Defendants ask that Bradley not be granted leave to amend her complaint. In support of this, defendants list approximately 35 cases that Bradley has filed in other jurisdictions against a variety of parties. Most of them, according to defendants, were dismissed at early stages. Only two of those lawsuits, including this one, were filed in this district. Additionally, plaintiff has already amended her complaint once in the course of this lawsuit in order to add new allegations and claims. Despite defendants's arguments, it is customary to allow plaintiff leave to amend particularly where they proceed *pro se.*Leave to amend, however, is discretionary.

\*7 "Leave to amend need not be granted when an amendment would be futile."*In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097 (9th Cir.2002). Plaintiff's claim for violation of California Code Section 2207 fails as a matter of law. Pleading a claim under that section would require alleging that defendants and Bradley were in a contract for the sale of goods under the UCC. Plaintiff cannot credibly do this. Similarly, plaintiff's claims for interception of electronic communications and invasion of privacy cannot be saved by amendment. Now that Bradley has alleged that defendants deleted her stored emails, she could not truthfully allege that they intercepted those communications. Plaintiff will not be allowed to amend these claims, and they will be stricken from her complaint.

Plaintiff will be allowed limited leave to amend her remaining claims. She would be wise to address the flaws in her complaint identified by this order. Plaintiff must file any amended complaint no later than **JANUARY 22, 2007.**

Finally, defendants ask that Google AdSense be dismissed from this lawsuit because it is not a subsidiary of Google or a registered corporate entity; it is only a program that Google runs. In support, defendants present public records from the California Secretary of State's website to show that Google AdSense is not an actual corporate entity (Req.Jud.Not.Exh.D). Judicial notice of this information is appropriate pursuant to FRE 201(b). Seeing that Google AdSense is not an actual corporate entity, the only appropriate defendant is Google, Inc. Google AdSense is hereby **DISMISSED** from this action. This does not foreclose plaintiff from amending the complaint to name proper parties to this action, if she should find any before January 22, 2007.

### CONCLUSION

For all the above-stated reasons, defendants' motion to dismiss is **GRANTED IN PART, AND DENIED IN PART.**Defendant Google AdSense is **DISMISSED** from this lawsuit. If she chooses to do so, plaintiff must file any amended complaint by **JANUARY 22, 2007.**

**IT IS SO ORDERED.**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 6
Not Reported in F.Supp.2d, 2006 WL 3798134 (N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC Rep.Serv.2d 682
**(Cite as: Not Reported in F.Supp.2d)**

N.D.Cal.,2006.
Bradley v. Google, Inc.
Not Reported in F.Supp.2d, 2006 WL 3798134
(N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC
Rep.Serv.2d 682

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2007 WL 3245260 (S.D.Cal.), Prod.Liab.Rep. (CCH) P 17,868
(Cite as: Slip Copy)

Hartless v. Clorox Co.
S.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. California.
Shawndee HARTLESS, on Behalf of Herself, All
Others Similarly Situated and the General Public,
Plaintiff,
v.
CLOROX COMPANY, Defendant.
Civil No. 06CV2705 JAH(CAB).

Nov. 2, 2007.

Timothy Gordon Blood, Coughlin StoiaGeller
Rudman and Robbins, San Diego, CA, for Plaintiff.
Adam G. Levine, O'Melveny and Myers, Los
Angeles, CA, for Defendant.

**ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO
DISMISS [DOC. # 6]**
JOHN A. HOUSTON, United States District Judge.

*INTRODUCTION*

*1 Pending before the Court is the motion of
defendant Clorox Company ("defendant") to dismiss
the instant complaint for failure to state a claim upon
which relief may be granted pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure. The
motion has been fully briefed by the parties. After a
careful consideration of the pleadings presented and
for the reasons set forth below, this Court GRANTS
IN PART and DENIES IN PART defendant's motion.

*BACKGROUND*

Plaintiff Shawndee Hartless ("plaintiff") alleges she
purchased defendant's product "Clorox Automatic
Toilet Bowl Cleaner With Bleach" (the "Product")
from stores in San Diego beginning in November
2004 and used the product according to the
instructions on the Product's packaging, believing it
to be safe. Compl. ¶¶ 21-23. Plaintiff alleges that
Clorox represents the Product does not harm
plumbing when, in fact, defendant knew it could
cause damage. Id. ¶¶ 10-13.Plaintiff claims the
Product she purchased caused the rubber flapper
inside her toilet tank to become warped and

deteriorated to the extent that plaintiff was required
to replace the part. Id. ¶¶ 24-25.

On December 13, 2006, plaintiff filed the instant
class action complaint alleging causes of action for
(1) violation of the Consumer Legal Remedies Act
("CLRA"), California Civil Code § 1750 et seq.
(Count I); (2) breach of the implied warranty of
merchantability (Count II); and (3) violation of
California's Unfair Competition Law ("UCL"),
California Business & Professions Code § 17200 et
seq. (Count III).See id. ¶¶ 42-62.Defendant filed its
motion to dismiss on March 19, 2007. Plaintiff filed
an opposition to the motion on May 3, 2007 and
defendant filed a reply on May 10, 2007. This Court
subsequently took the motion under submission
without oral argument. See CivLR 7.1(d.1).

*DISCUSSION*

Defendant moves to dismiss the instant complaint for
failure to state a claim upon which relief may be
granted pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure.

**1. Legal Standard**

A motion to dismiss pursuant to Rule 12(b)(6) tests
the legal sufficiency of the claims asserted in the
complaint. Fed.R.Civ.P. 12(b)(6); Navarro v. Block,
250 F.3d 729, 731 (9th Cir.2001). A court may
dismiss a complaint for failure to state a claim when
"it appears beyond doubt that the plaintiff can prove
no set of facts in support of his claim which would
entitle him to relief."Conley v. Gibson, 355 U.S. 41,
45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Navarro,
250 F.3d at 732 (citing Conley );see also Haddock v.
Board of Dental Examiners, 777 F.2d 462, 464 (9th
Cir.1985) (stating that a court should not dismiss a
complaint if it states a claim under any legal theory,
even if plaintiff erroneously relies on a different
theory). Generally, dismissal is proper only when the
plaintiff has failed to assert a cognizable legal theory
or failed to allege sufficient facts under a cognizable
legal theory. See SmileCare Dental Group v. Delta
Dental Plan of Cal., Inc., 88 F.3d 780, 782 (9th
Cir.1996); Balisteri v. Pacifica Police Dep't, 901
F.2d 696, 699 (9th Cir.1988). While a plaintiff need
not give "detailed factual allegations," he must plead

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2007 WL 3245260 (S.D.Cal.), Prod.Liab.Rep. (CCH) P 17,868
(Cite as: Slip Copy)

sufficient facts that, if true, "raise a right to relief above the speculative level."*Bell Atlantic Corp. v. Twombly,* ---U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).

*2 The court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis,* 295 F.3d 890, 895 (9th Cir.2002); *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir.1996). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.,* 349 F.3d 1191, 1200 (9th Cir.2003); *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981).

In deciding a motion to dismiss for failure to state a claim, the court's review is limited to the contents of the complaint. *Campanelli v. Bockrath,* 100 F.3d 1476, 1479 (9th Cir.1996); *Allarcom Pay Television, Ltd. v. General Instrument Corp.,* 69 F.3d 381, 385 (9th Cir.1995). The court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *Lee v. City of Los Angeles,* 250 F.3d 668, 688-89 (9th Cir.2001).

### 2. Analysis

Defendant moves to dismiss: (a) plaintiff's claim for breach of implied warranty of merchantability; (b) plaintiff's UCL claim and her restitution claim under the UCL; and (c) plaintiff's claim for violation of the CLRA.

#### a. Implied Warranty of Merchantability

Defendant first moves to dismiss plaintiff's breach of implied warranty of merchantability claim because plaintiff fails to allege privity as required.[FN1] Defendant contends that vertical privity of contract is required to state a claim for breach of implied warranty. *See* Mot. at 4 (citing *U.S. Roofing, Inc. v. Credit Alliance Corp.,* 228 Cal.App.3d 1431, 1441, 279 Cal.Rptr. 533 (1991)). Defendant claims vertical privity is lacking here and no recognized exception to the privity rule exists. *Id.* at 4-5, 279 Cal.Rptr. 533. Defendant argues that the lack of privity or exception to the privity rule requires dismissal of plaintiff's

claim with prejudice. *Id.* at 6, 279 Cal.Rptr. 533. Plaintiff contends, in opposition, that this case fits within an exception to the privity rule. Opp. at 16 (citing *Collum v. Pope & Talbot,* 135 Cal.App.2d 653, 657, 288 P.2d 75 (1955); *In re HP Inkjet Printer Litig.,* 2006 WL 563048 *6 (N.D.Cal. Mar.7, 2006); *Atkinson v. Elk Corp. of Texas,* 152 Cal.App.4th 212, 229, 48 Cal.Rptr.3d 247 (2006); *Seeley v. White Motor Co.,* 63 Cal.2d 9, 15, 45 Cal.Rptr. 17, 403 P.2d 145 (1965)). According to plaintiff, an exception to the privity rule exists where there is reliance upon a manufacturer's warranty representation in its labels or advertising materials. *Id.* Plaintiff claims this case fits that exception. *Id.*

> FN1. Defendant also presents arguments in its moving papers contending plaintiff failed to give proper notice of her implied warranty claim. *See* Mot. at 6. In opposition, plaintiff claims that, even though she disputes that notice is required here, adequate notice was provided by letter to defendant's counsel dated December 13, 2006. Opp. at 17 (citing *Greenman v. Yuba Power Prods., Inc.,* 59 Cal.2d 57, 61, 27 Cal.Rptr. 697, 377 P.2d 897 (1963)). Defendant does not dispute plaintiff's representation in reply. However, because this Court ultimately finds plaintiff's claim must be dismissed for failure to adequately allege privity, this Court need not determine whether notice was required or properly given. Therefore, this Court does not address that contention.

In reply, defendant argues that the exception upon which plaintiff rests applies only to claims for breach of express warranty. Reply at 1-2. After a careful review of the case authority cited, this Court agrees with defendant. Two of the cases cited by plaintiff explicitly limited the manufacturer's warranty exception to express warranty claims. *See Collum,* 135 Cal.App.2d at 657, 288 P.2d 75 (the manufacturer's warranty exception allows "recovery from the manufacturer ... on the theory of express warranty without a showing of privity."); *Seeley,* 63 Cal.2d at 14, 45 Cal.Rptr. 17, 403 P.2d 145 (the manufacturer's warranty exception to the privity rule "is applicable only to express warranties...."). Although the *HP Inkjet Printer* court found no privity requirement for an implied warranty claim under the manufacturers' warranty exception, the court contradictorily supported its finding by citing to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3245260 (S.D.Cal.), Prod.Liab.Rep. (CCH) P 17,868
(Cite as: Slip Copy)

California appellate decision explicitly limiting the exception to express warranty claims. *See In re HP Injet Printer Litig.*, 2006 WL 563048 at *6 (citing *Fieldstone Co. v. Briggs Plumbing Prods., Inc.*, 54 Cal.App.4th 357, 369, 371, 62 Cal.Rptr.2d 701 (1997)). The *Atkinson* case provides no support for plaintiff's contention because the court merely indicated, in *dicta*, that the privity requirement might be relaxed if the dismissed implied warranty claim were brought alongside a related express warranty claim. *Id.*, 142 Cal.App.4th at 232, 48 Cal.Rptr.3d 247. Thus, this Court finds none of the case authority cited by plaintiff supports her theory. This Court's own independent research has also failed to unearth any support for plaintiff's contention. Therefore, this Court finds plaintiff's reliance upon the manufacturer's warranty exception to avoid dismissal based on lack of privity is unavailing. Accordingly, plaintiff's claim for breach of implied warranty of merchantability must be dismissed pursuant to Rule 12(b)(6) for failure to allege privity.

### b. UCL Claim

#### 1. Legal Standard

*3 California's Unfair Competition Law, California Business & Professions Code § 17200, states:
[Unfair] competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising ...

Cal. Bus. & Prof.Code 17200. The purpose of the UCL is to protect against conduct that "significantly threatens or harms competition." *Ariz. Cartridge Remanufacturer's Ass'n v. Lexmark Int'l, Inc.*, 421 F.3d 981, 986 (9th Cir.2005) (citing *Cel-Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999)). Three types of conduct can constitute unfair competition: unlawful, unfair or fraudulent.*Lippett v. Raymond James Fin. Servs.*, 340 F.3d 1033, 1043 (9th Cir.2003); *Cel-Tech*, 20 Cal.4th at 180, 83 Cal.Rptr.2d 548, 973 P.2d 527.

#### 2. Analysis

Defendant contends that plaintiff's UCL claim fails under each of the three types of conduct that constitute unfair competition. Defendant also contends plaintiff is not entitled to restitution under the UCL.

### A. Unlawful Conduct

Defendant asserts that plaintiff's UCL claim based on unlawful conduct must be dismissed because plaintiff's claim is improperly predicated on (1) the Federal Insecticide, Fungicide, and Rogenticide Act ("FIFRA"); (2) the Song-Beverly Act, codified at Cal. Civil Code § 1791 *et seq.*; and (3) common law products liability law. *See* Compl. ¶ 58.

#### 1. FIFRA Violation

The unlawful practices prohibited by the UCL "are any practices forbidden by law, be it civil or criminal, federal, state or municipal, statutory, regulatory or court-made."*Saunders v. Superior Court*, 27 Cal.App.4th 832, 838-39, 33 Cal.Rptr.2d 438 (1994). Under the unlawful prong, violations of other laws are treated as unlawful practices that are independently actionable under the UCL. *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir.2000); *Cel-Tech*, 20 Cal.4th at 180, 83 Cal.Rptr.2d 548, 973 P.2d 527. A violation of a "court-made" law, for example, is a violation of a prior court order. *See, e.g., Hewlett v. Squaw Valley Ski. Corp.*, 54 Cal.App.4th 499, 533-35, 63 Cal.Rptr.2d 118 (1997). Defendant contends that, because plaintiff's use of FIFRA as a predicate to a UCL claim is an attempted "end run" around the express prohibition of private actions under FIFRA, her claim must fail. Mot. at 8 (citing *Cel-Tech*, 20 Cal.4th at 182, 83 Cal.Rptr.2d 548, 973 P.2d 527;*Summit Technology, Inc. v. High-Line Medical Instruments Co., Inc.*, 922 F.Supp. 299, 305-07, 316 (C.D.Cal.1996) (dismissing UCL claim seeking to enforce a statute that expressly prohibits private actions)). Defendant notes that a private cause of action to enforce FIFRA has been expressly precluded by Congress. *Id.* (citing *Almond Hill Sch. v. United States Dep't of Agric.*, 768 F.2d 1030, 1035, 1038 (9th Cir.1985) (noting Congress had rejected the use of FIFRA in private actions); *Safe Alternatives for Fruit Fly Eradication v. Berryhill*, 1984 U .S. Dist. LEXIS 16830 *6 (C.D.Cal.) (same)).

*4 Plaintiff, in opposition, claims that a private plaintiff may still bring a UCL action "even though 'the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action.'" Opp. at 5

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 4
Slip Copy, 2007 WL 3245260 (S.D.Cal.), Prod.Liab.Rep. (CCH) P 17,868
**(Cite as: Slip Copy)**

(quoting _Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,_ 17 Cal.4th 553, 565, 71 Cal.Rptr.2d 731, 950 P.2d 1086 (1998)). Defendant, in reply, agrees with plaintiff that, in some instances, a statute that does not provide a private right of action could serve as a predicate for a UCL claim. Reply at 4. However, defendant contends that where private rights of action to enforce a statute have been expressly barred by Congress, that statute may not serve as a predicate for a UCL claim. _Id._ Defendant points out that _Stop Youth Addiction,_ as well as the other cases cited by plaintiff,[FN2] does not address an express prohibition by Congress on private causes of action to enforce the predicate statute at issue. _Id._

> FN2. Plaintiff also cites to _Kasky v. Nike, Inc.,_ 27 Cal.4th 939, 119 Cal.Rptr.2d 296, 45 P.3d 243 (2002); _Committee on Children's Television v. General Foods Corp.,_ 35 Cal.3d 197, 197 Cal.Rptr. 783, 673 P.2d 660 (1983); _Saunders v. Superior Court,_ 27 Cal.App.4th 832, 33 Cal.Rptr.2d 438 (1994); and _McKell v. Washington Mutual, Inc.,_ 142 Cal.App.4th 1457, 49 Cal.Rptr.3d 227 (2006). However, as defendant points out, none of these cases involved an express prohibition by Congress on private causes of action to enforce the statute at issue as in the case here. _See Kasky,_ 27 Cal.4th 939, 119 Cal.Rptr.2d 296, 45 P.3d 243 (no discussion of private right of action; _Comm. on Children's Television,_ 35 Cal.3d 197, 197 Cal.Rptr. 783, 673 P.2d 660 (the parties disputed the statute provided a private right of action but there was no discussion of an express prohibition against a private cause of action); _Saunders,_ 27 Cal.App.4th 832, 33 Cal.Rptr.2d 438 (no issue concerning private right of action); _McKell,_ 142 Cal.App.4th 1457, 49 Cal.Rptr.3d 227 (finding that even if the statute at bar does not create a private right of action it could still serve as a predicate under the UCL but there was no indication a private action was expressly rejected by Congress).

This Court agrees with defendant. This Court finds that plaintiff is precluded from enforcing FIFRA privately by using it as a predicate for her UCL claim based on Congress' express rejection of private actions to enforce it. _See Chabner v. United of Omaha Life Ins. Co.,_ 225 F.3d 1042, 1048 (9th

Cir.2000) (a private action under the unlawful prong of the UCL will be forestalled if the predicate statute actually bars the private action); _Southern California Water Co. v. Aerojet-General Corp.,_ 2003 WL 255371634 *9-10 (C.D.Cal.) (finding only an absolute bar to private actions will preclude the use of a statute as a predicate to a UCL claim); _Almond Hill,_ 768 F.2d at 1035-38 (finding plaintiff precluded from bringing a 42 U.S.C. § 1983 claim to enforce FIFRA because Congress had foreclosed private rights of action to enforce it). Therefore, this Court finds that plaintiff's UCL claim based on a violation of FIFRA must be dismissed.

### 2. Song-Beverly Act Violation

Plaintiff also alleges defendant's acts constitute unfair competition under Section 1791.2 of the California Civil Code. Defendant contends that the section of the civil code referred to by plaintiff falls under the Song-Beverly Act, California Civil Code § 1790 _et seq.,_ which defendant claims codifies and expands common law breach of implied warranty claims. Mot. at 9 (citing _American Suzuki Motor Corp. v. Superior Court,_ 37 Cal.App.4th 1291, 1295 n. 2, 44 Cal.Rptr.2d 526 (the Song-Beverly Act " 'supplements, rather than supersedes, the provisions of the California Uniform Commercial Code' by broadening a consumer's remedies to include costs, attorney's fees and civil penalties.' ") (quoting _Kreiger v. Nick Alexander Imports, Inc.,_ 234 Cal.App.3d 205, 213, 285 Cal.Rptr. 717 (1991)). Defendant argues that a violation of the Song-Beverly Act's provisions cannot serve as a predicate for a UCL claim because breach of implied warranty has been found not actionable as unlawful activity under the UCL.[FN3] _Id._ at 9, 285 Cal.Rptr. 717 (citing, _inter alia, Klein v. Earth Elements, Inc.,_ 59 Cal.App.4th 965, 969, 69 Cal.Rptr.2d 623 (1997)). Plaintiff argues, in response, that the case authority cited by defendant fails to support this contention. _See_ Opp. at 6-7. In reply, defendant disagrees with plaintiff interpretation of the case law and disputes the applicability of plaintiff's cited case authority. Reply at 4-5.

> FN3. Defendant further contends that, because plaintiff's breach of implied warranty of merchantability claims lacks privity (and notice), it cannot serve as a predicate act for the unlawful prong of the UCL. Mot. at 9. Plaintiff claims privity is not required under Section 1791.2 but cites

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 5
Slip Copy, 2007 WL 3245260 (S.D.Cal.), Prod.Liab.Rep. (CCH) P 17,868
**(Cite as: Slip Copy)**

only to a legal treatise as authority for her claim. *See* Opp. at 7 (citing 4 Witkin, *Summary of California Law*, Ch.V, § 98 (10th ed.2006)). However, because this Court ultimately finds that the Song-Beverly Act, cannot serve as a predicate statute for a UCL claim, this Court need not address whether privity or notice is required.

*5California Civil Code § 1791.2, the code section cited by plaintiff in her complaint, *see* Compl. ¶ 58, deals with express, not implied, warranties. Here, in support of a violation of § 1791.2, plaintiff alleges, *inter alia*, that defendant violated the UCL by "continuing to voluntarily and expressly warrant the Product without the intent to uphold its warranty, and continuing to sell the Product after learning that the Product damaged toilet tank components."Compl. ¶ 58. Thus, the Song-Beverly Act provision cited by plaintiff does not deal with common law breach of implied warranty claims as defendant asserts. The cases cited by the parties do not address express warranties and this Court's own independent research has uncovered no statutory or case authority that bars the use of an alleged violation of an express warranty, such as the claim presented here, as a predicate act for a UCL claim. Therefore, this Court finds defendant's contention concerning the plaintiff's use of the Song-Beverly Act as a predicate act for her UCL claim fails.

**3. Common Law Products Liability Violation**

Plaintiff also predicates her UCL claim under the unlawful prong on defendant's alleged "failure to use reasonable care to test the Product prior to sale ..." Compl. ¶ 58. Defendant contends this language amounts to common law negligence which cannot serve as a predicate act under the unlawful prong of the UCL. Mot. at 10 (citing *Klein*, 59 Cal.App.4th at 969, 69 Cal.Rptr.2d 623).

In her opposition, plaintiff contends that conduct alleged to violate common law can serve as a predicate act under the unlawful prong. Opp. at 7-8 (citing, *inter alia*,[FN4] *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1159, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003); *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1107 (9th Cir.2007)). Plaintiff argues that the decision in *Klein* is not binding law because, in *Klein*, the court found that common law violations could not serve as predicate unlawful acts under the

UCL based on undisputed facts on summary judgment demonstrating no unlawful act had occurred. Opp. at 8. According to plaintiff, *Klein* did not hold that common law violations can never serve as a predicate act under the unlawful prong of the UCL but, instead, found there was no predicate unlawful act under the facts presented. *Id.* Defendant, in reply, points out that *Klein* is still good law and, as such, acts as a bar to plaintiff's UCL claim based on common law as a predicate act for the unlawful prong. Reply at 5-6. Defendant contends the cases cited by plaintiff fail to support her contrary position. *Id.* at 6-7, 69 Cal.Rptr.2d 623.

> FN4. Plaintiff additionally cites to *McKell v. Washington Mutual, Inc.*, 142 Cal.App.4th 1457, 49 Cal.Rptr.3d 227 (2006); *Saunders v. Superior Court*, 27 Cal.App.4th 832, 33 Cal.Rptr.2d 438 (1994); *Bondanza v. Peninsula Hosp. & Med. Ctr.*, 23 Cal.3d 260, 152 Cal.Rptr. 446, 590 P.2d 22 (1979); and *Hewlett v. Squaw Valley Ski Corp.*., 54 Cal.App.4th 499, 63 Cal.Rptr.2d 118 (1997). As noted by defendant, none of these cases

This Court's review of the case authority in this area reveals that defendant's position is the correct one. In *National Rural Telecommunications Co-op. v. DirectTV*, 319 F.Supp.2d 1059 (C.D.Cal.2003), the district court rejected a similar argument by the plaintiff [FN5] and found that a common law breach of contract claim cannot serve as an unlawful predicate act if it is independent of any law. *Id.* at 1074;*see also Wang & Wang LLP v. Bando Do Brasil, S.A.*, 2007 WL 915232 *4 (E.D.Cal.) ("... all that remains is a naked claim for breach of contract, which, standing alone, is an insufficient basis for a § 17200 claim."). These cases, along with *Klein*, convince this Court that common law negligence provides an insufficient basis under the unlawful prong of the UCL. Therefore, this Court finds that plaintiff's UCL claim based on a common law products liability claim as a predicate act under the unlawful prong fails.

> FN5. The plaintiff in *National Rural* argued "that 'a claim under the 'unlawful' prong of 17200 may be based on an underlying violation of common law, [*e.g.*, breach of contract], and does not have to rise to the level of a statutory violation,' " an argument the district court firmly rejected. *Id.*, 319 F.Supp.2d at 1074 (footnotes omitted).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 6
Slip Copy, 2007 WL 3245260 (S.D.Cal.), Prod.Liab.Rep. (CCH) P 17,868
**(Cite as: Slip Copy)**

**B. Fraudulent Business Practices**

\*6 Plaintiff also predicates her UCL claim under the fraudulent business practice prong. *See* Compl. ¶ 60. Defendant contends that plaintiff's allegations fails to meet the requirements of pleading fraud under Rule 9(b) of the Federal Rules of Civil Procedure. Mot. at 10. According to defendant, fraudulent conduct allegations underlying a UCL claim is subject to Rule 9(b)'s heightened pleading standard, requiring that the facts be plead with particularity. *Id.* at 11,69 Cal.Rptr.2d 623 (citing *Vess v. Ciba-Geigy Corp.,* 317 F.3d 1097, 1103-05 (9th Cir.2003) (claims sounding "in fraud," including those brought under the CLRA and UCL, must satisfy Rule 9(b) such that "the particulars of when, where, or how the alleged conspiracy occurred" must be sufficiently plead)). Defendant contends plaintiff's fraud allegations are "scant," in that plaintiff merely refers to defendant's conduct as "falsely 'represent[ing] ... that the Product will not harm plumbing.'"*Id.* at 12 (quoting Compl. ¶ 1). Defendant claims this averment clearly lacks the requisite particularity to meet Rule 9(b)'s standard. *Id.*

The parties agree that *Vess* governs plaintiff's fraud claim and that, under *Vess,* when fraud is not a necessary element to the claim, as here, the fraudulent conduct is subject to Rule 9(b)'s requirements. Mot. at 11; Opp. at 11-12; Reply at 7. However, plaintiff claims her averments sufficiently meet the pleading requirements of Rule 9(b).*See* Opp. at 12. According to plaintiff, the complaint pleads the alleged fraudulent conduct with enough specificity because the case involves only "factually simple conduct," such that it is clear from the facts when, where and how the alleged fraudulent conduct occurred. *Id.*

In reply, defendant disagrees with plaintiff's assessment. *See* Reply at 8. Defendant claims the complaint fails to allege with particularity whether the alleged fraudulent representations were made to plaintiff and, if so, when or where they were made. *Id.* In addition, defendant points out that plaintiff's allegations concerning the purchase of the product at issue are vague. *Id.*

The instant complaint alleges defendant "represents and warrants that the Product will not harm plumbing," a statement plaintiff alleges is untrue.

Compl. ¶¶ 1-3. The complaint also alleges defendant "represented facts about its Product that were not true and which [defendant] knew or should have known were not true" and, instead, "sold [its] defective Product to plaintiff."*Id.* ¶¶ 15, 17.In addition, the complaint alleges "[p]laintiff purchased the Product from stores in San Diego beginning in November of 2004, and paid the retail price for it."*Id.* ¶ 21.This Court finds these allegations vague and lacking of the required particularity to meet Rule 9(b)'s pleading standard. This Court, therefore, finds that plaintiff's averments of fraudulent conduct underlying her UCL claim fail for lack of particularity under Rule 9(b). Accordingly, defendant's motion to dismiss this claim for lack of particularity is GRANTED.

**C. Unfair Business Practices**

\*7 The instant complaint alleges that defendant's conduct "offends public policy" through the conduct alleged to be unlawful. *See* Compl. ¶ 61. Although the California Supreme Court has not defined what is unfair under the UCL as it relates to consumer injuries, *see People ex. rel. Bill Lockyer v. Fremont Life Ins. Co. .,* 104 Cal.App.4th 508, 515, 128 Cal.Rptr.2d 463 (2002), courts are given "broad discretion to prohibit new schemes to defraud" under the unfair prong. *Paulus v. Bob Lynch Ford, Inc.,* 139 Cal.App.4th 659, 682, 43 Cal.Rptr.3d 148 (2006). Defendant contends that to state a claim under the unfairness prong of the UCL, plaintiff must allege a violation of a legislative policy. Mot. at 13 (citing *Schnall v. Hertz Corp.,* 78 Cal.App.4th 1144, 1166, 93 Cal.Rptr.2d 439 (2000)). Defendants claims plaintiff's allegations fail to do so. *Id.*

Plaintiff claims the "tethering ... to a specific constitutional, statutory or regulatory provision" test referred to by defendant is only applicable to cases between competitors, and not actions brought by consumers which are subject to a traditional balancing test. Opp. at 9-10 (citing *Knevelboard Dairies v. Kraft Foods, Inc.,* 232 F.2d 979, 994 (9th Cir.2000); *McKell,* 142 Cal.App.4th at 1473, 49 Cal.Rptr.3d 227;*Progressive West Ins. Co. v. Superior Court,* 135 Cal.App.4th 263, 286, 37 Cal.Rptr.3d 434 (2005); *Smith v. State Farm Auto. Ins. Co.,* 93 Cal.App.4th 700, 720 n. 23, 113 Cal.Rptr.2d 399 (2001)). Nevertheless, plaintiff contends she meets the tethering test because her unfairness claim is tethered to any of the statutory violations alleged, including FIFRA and the Song-Beverly Act. *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 7

Slip Copy, 2007 WL 3245260 (S.D.Cal.), Prod.Liab.Rep. (CCH) P 17,868

**(Cite as: Slip Copy)**

In reply, defendant notes that "recent case law establishes a split in the appellate courts on the appropriate test for UCL actions under the 'unfair' prong" but nevertheless contends the "tethering" test is not limited in its application as plaintiff suggests. Reply at 9 (citing *Bardin v. DaimlerChrysler Corp.,* 136 Cal.App.4th 1255, 1271-72, 39 Cal.Rptr.3d 634 (2006) (applying both approaches in a consumer case because the California Supreme Court has yet to clarify which test is properly applied)). Defendant contends that, in any event, plaintiff can cite to no case in which a court has allowed a UCL claim to go forward based on the unfair prong alone. *Id.*

This Court finds it need not determine which test to apply because defendant's sole argument in support of its motion fails. Because this Court has already determined that plaintiff's UCL claim under the unlawful prong based on an alleged violation of the Song-Beverly Act survives defendant's challenge under Rule 12(b)(6), this Court finds that plaintiff's claim based on unfairness is adequately tethered to that statutory violation. Accordingly, defendant's motion to dismiss plaintiff's UCL claim under the unfairness prong is DENIED.

### D. Restitution

Defendant further contends that plaintiff's claim for restitution based on a violation of the UCL must necessarily fail because plaintiff has not and cannot allege she paid any monies directly to defendant. Mot. at 13. According to defendant, monetary relief under the UCL is strictly limited to "recovery of money that can 'clearly be traced' to funds in the defendant's possession that were wrongfully acquired from 'actual direct victims' who paid money to the defendant."*Id.* at 13-14, 39 Cal.Rptr.3d 634 (quoting *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1150, 1152, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003)). Thus, defendant contends that, because plaintiff does not allege she paid any money directly to defendant, plaintiff is not entitled to restitution under the UCL. *Id.*

**\*8** In opposition, plaintiff argues that the case authority cited by defendant holds differently than defendant posits. Opp. at 13. According to plaintiff, the *Korea Supply* court found it could order the defendant " 'to return money obtained through an unlawful business practice to those persons of interest from whom the money was taken, that is, to persons who had an ownership interest in the property or

those claiming through that person.'" *Id.* (quoting *Korea Supply,* 29 Cal.4th at 1148, 131 Cal.Rptr.2d 29, 63 P.3d 937 (citations omitted)). Thus, plaintiff claims defendant's case authority supports the position of plaintiff, not defendant. *Id.* at 14, 131 Cal.Rptr.2d 29, 63 P.3d 937.

This Court agrees with plaintiff. The California Supreme Court did, in fact, state that "[a]ctual direct victims of unfair compensation may obtain restitution as well" as injunctive relief to remedy a violation under the UCL.*Korea Supply,* 29 Cal.4th at 1152, 131 Cal.Rptr.2d 29, 63 P.3d 937. However, this Court does not construe this to mean that only those persons who directly purchased the offending product from the defendant can recover restitution. Instead, this Court finds, based on the case authority provided, as well as the Court's own independent research, that restitution is available to plaintiff if she can prove she was an "actual direct victim." Thus, plaintiff's allegations that she purchased defendant's product is, in this Court's view, sufficient to support her claim that she is a direct victim of the alleged UCL violation. This Court must, in ruling on the instant motion, take as true the factual allegations presented by plaintiff and view them in the light most favorable to her. *Thompson,* 295 F.3d at 895;*Cahill,* 80 F.3d at 337-38. Taking the facts presented here as true and viewed in plaintiff's favor, this Court cannot reasonably find beyond doubt that plaintiff cannot prove she is entitled to restitution under the UCL. *See Conley v. Gibson,* 355 U.S. at 45-46. Accordingly, this Court finds defendant's contention that restitution is unavailable to plaintiff here fails.

### c. CLRA Violation

Lastly, defendant moves to dismiss plaintiff's claim for a CLRA violation contained in Count I. *See* Mot. at 14-15. Defendant points out that plaintiff's CLRA claim is based on allegations of fraud which, like her UCL claim based on fraudulent business practices, are subject to Rule 9(b)'s heightened pleading requirements. *Id.* at 15.Defendant notes that the complaint merely lists the provisions of the CLRA that defendant is alleged to have violated. Defendant contends the listing of the CLRA provisions is insufficient to meet the pleading requirements for fraud. *Id.* at 14-15 (citing Compl. ¶ 44). Plaintiff disagrees. *See* Opp. at 15. However, this Court has already determined that plaintiff's UCL claim based on fraud allegations is subject to, and fails to meet, the pleading requirements of Rule 9(b). Thus,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                        Page 8
Slip Copy, 2007 WL 3245260 (S.D.Cal.), Prod.Liab.Rep. (CCH) P 17,868
**(Cite as: Slip Copy)**

plaintiff's CLRA claim based on the same fraud allegations are also inadequately pled and must be dismissed for lack of specificity.

### *CONCLUSION AND ORDER*

*\*9* Based on the foregoing, IT IS HEREBY ORDERED that defendant's motion to dismiss [doc. # 6] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Defendant's motion to dismiss plaintiff's claim for breach of the implied warranty of merchantability contained in Count II is **GRANTED**; and

2. Defendant's motion to dismiss plaintiff's claim for violation of California's Unfair Competition Law, California Business & Professions Code § 17200 *et seq.,* contained in Count III is **GRANTED IN PART** and **DENIED IN PART** as follows:

a. Defendant's motion to dismiss plaintiff's allegations concerning violations of the Federal Insecticide, Fungicide, and Rogenticide Act and common law products liability allegations is **GRANTED**;

b. Defendant's motion to dismiss plaintiff's allegations concerning the Song-Beverly Act, codified at Cal. Civil Code § 1791 *et seq.* is **DENIED**;

c. Defendant's motion to dismiss plaintiff's common law products liability allegations is **GRANTED**;

d. Defendant's motion to dismiss plaintiff's fraudulent conduct allegations is **GRANTED**;

e. Defendant's motion to dismiss plaintiff's unfair business practice allegations is **DENIED**; and

f. Defendant's motion to dismiss plaintiff's restitution claim under the UCL is **DENIED**.

3. Defendant's motion to dismiss plaintiff's claim for violation of the Consumer Legal Remedies Act, California Civil Code § 1750 *et seq.,* contained in Count I is **GRANTED**.

S.D.Cal.,2007.
Hartless v. Clorox Co.
Slip Copy, 2007 WL 3245260 (S.D.Cal.), Prod.Liab.Rep. (CCH) P 17,868

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

221 F.3d 1348                                                                                                    Page 1
221 F.3d 1348, 2000 WL 576425 (C.A.9 (Cal.)), 2000 Copr.L.Dec. P 28,079
**(Cite as: 221 F.3d 1348)**

**H**Hawkins v. Spelling Entertainment Group, Inc.
C.A.9 (Cal.),2000.
NOTICE: THIS IS AN UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTA9 Rule
36-3 for rules regarding the citation of unpublished
opinions.)
    United States Court of Appeals, Ninth Circuit.
      Jimmy HAWKINS; the Jimmy Hawkins, Co.,
            Plaintiffs-Appellants,
                     v.
    SPELLING ENTERTAINMENT GROUP, INC.;
    Republic Entertainment Inc.; Hamilton Projects,
            Defendants-Appellees.
                 No. 98-56580.
          D.C. No. CV-97-09197-R(SHx).

          Submitted April 12, 2000.[FN2]

      FN2. The panel unanimously finds this case
      suitable for decision without oral argument.
      Fed. R.App. P. 34(a)(2).
            Decided May 11, 2000.

Appeal from the United States District Court for the
Central District of California, Manuel L. Real, Chief
District Judge, Presiding.

Before FERNANDEZ and WARDLAW, Circuit
Judges, and WEINER,[FN3] District Judge.

      FN3. The Honorable Charles R. Weiner,
      Senior United States District Judge for the
      Eastern District of Pennsylvania, sitting by
      designation.

          MEMORANDUM [FN1]

      FN1. This disposition is not appropriate for
      publication and may not be cited to or by the
      courts of this circuit except as provided by
      Ninth Circuit Rule 36-3.

*1 Jimmy Hawkins appeals the district court's
dismissal under Federal Rule of Civil Procedure
12(b)(6) of his complaint, which sought a declaration
that Spelling Entertainment Group, Inc., Republic

Entertainment, Inc., and Hamilton Projects, Inc.,
(collectively Spelling) have no copyright interest in
connection with the story or the motion picture "It's
A Wonderful Life."

Hawkins sued Spelling over "It's A Wonderful Life"
once before, and lost. See*Hawkins v. Portal
Publications, Inc.*, No. 97-56758, 189 F.3d 473, 1999
WL 568824 (9th Cir. Aug. 3, 1999) (unpublished
disposition). What he claimed then was that Spelling
had committed various torts when it contacted others
and asserted that it had the trademark for and the
copyright in "It's A Wonderful Life," whereas, he
said, it did not.[FN4]In that litigation, the district court
did specifically find that Spelling owned trademark
rights; it did not specifically find that Spelling owned
the copyright.

      FN4. The case started in the state court, but
      was removed to the district court because of
      Hawkins' assertions that Spelling's copyright
      claims were invalid.

Nevertheless, when Hawkins brought this copyright
action, the district court correctly held that he was
barred by res judicata. Why? Res judicata bars further
litigation of the same claim or cause of action. That
includes all grounds that could have been asserted,
even if they were not. See*McClain v. Apodaca*, 793
F.2d 1031, 1033 (9th Cir.1986). Here Hawkins is
asserting the same claim or cause of action because: a
determination against Spelling would have at least
some effect upon the prior judgment in its favor,
albeit a somewhat indirect one;[FNS] the same essential
evidence would be presented in the two actions, as
the strength of the copyright and trademark claims is
central to both, although in different degrees; the
same alleged basic right of Hawkins-the right to
exploit the name and pictures from "It's A Wonderful
Life," which is precisely what he wants to do-is
involved in both; and most importantly, the same
transactional nucleus of facts is at the heart of both
actions-Spelling's attempts to keep Hawkins from
exploiting "It's A Wonderful Life" and Hawkins'
insistence upon his right so to do-all of which could
easily have been resolved in the prior action.
See*International Union of Operating Eng'rs-
Employers Const. Indus. Pension, Welfare and
Training Trust Funds v. Karr*, 994 F.2d 1426, 1429

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

221 F.3d 1348
221 F.3d 1348, 2000 WL 576425 (C.A.9 (Cal.)), 2000 Copr.L.Dec. P 28,079
**(Cite as: 221 F.3d 1348)**

(9th Cir.1993); _Costantini v. Trans World Airlines,_ 681 F.2d 1199, 1201-02 (9th Cir.1982); _see also_ _Los_ _Angeles Branch NAACP v. Los Angeles Unified_ _School Dist.,_ 750 F.2d 731, 736-37 (9th Cir.1984).

> FN5. _See_ _Maljack Prods., Inc. v. Goodtimes_ _Home Video Corp.,_ 81 F.3d 881, 886-87 (9th Cir.1996); _see also_ _Comedy III Prods .,_ _Inc. v. New Line Cinema,_ 200 F.3d 593, 596 (9th Cir.2000).

In fine, Spelling has previously been forced to parley with Hawkins on the "It's A Wonderful Life" field of battle; it need not respond to his chamade to meet him again.

AFFIRMED.

C.A.9 (Cal.),2000.
Hawkins v. Spelling Entertainment Group, Inc.
221 F.3d 1348, 2000 WL 576425 (C.A.9 (Cal.)), 2000 Copr.L.Dec. P 28,079

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**In re Global Crossing, Ltd. Securities Litigation
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re GLOBAL CROSSING, LTD. SECURITIES
LITIGATION
Roy L. OLOFSON, Plaintiff,
v.
Gary WINNICK, et al. Defendants.
**No. 02 Civ. 910(GEL), 03 Civ. 1185(GEL).**

April 2, 2004.

Paul D. Murphy, Noah B. Salamon, O'Neill & Sun
LLP, Santa Monica, Ca., for plaintiff.
Ralph C. Ferrara, Jonathan E. Richman, Jeffrey S.
Jacobson, Collette B. Cunningham, Debevoise &
Plimpton, New York, NY, for defendants Casey,
Cohrs, and Perrone.
Terry Christensen, Patricia L. Glaser, Sean Riley,
Christensen, Miller, Fink, Jacobs, Glaser, Weil &
Shapiro, LLP., Los Angeles, Ca, for defendant
Winnick.

*OPINION AND ORDER*

LYNCH, J.
**\*1** This case, originally brought in California state
court and later removed and consolidated with the
class action complaint in *In re Global Crossing Ltd.
Securities Litigation,* arises from alleged accounting
improprieties at the telecommunications firm Global
Crossing, Ltd. ("GC"). Plaintiff Roy Olofson, who
served during the time relevant to the complaint as
Vice-President of Finance for Global Crossing
Development Company ("GCDC"), a subsidiary of
GC, claims he was wrongfully terminated in
retribution for raising concerns about "swap"
transactions allegedly used by company management
to inflate the company's stock price. Plaintiff asserts
claims under California law for intentional and
negligent interference with contract and intentional
and negligent interference with prospective economic
advantage against Gary Winnick, the Chair of GC's
board, and various of its officers and directors. He
further brings a claim for defamation against
Winnick. Defendants move to dismiss the complaint.
For the reasons discussed below, defendants' motions
to dismiss plaintiff's claims for interference with
contract and economic advantage will be granted, and

the motion to dismiss plaintiff's defamation claim
will be denied.

*BACKGROUND*

The facts as presented in the complaint, which must
be taken as true for purposes of this motion, are as
follows.

Olofson served as Vice-President of Finance for
GCDC from May 1998 until November 2001. In May
2000, defendant Joseph P. Perrone was hired as
Senior Vice President of Finance, and was soon
promoted to Executive Vice-President of Finance of
GC, at which time he took over responsibility for
GC's accounting and reporting requirements from
Olofson. At around this time, Olofson became
concerned about GC's increasing use of "swap"
transactions, or transactions in which GC would sell
capacity on its network to other telecommunications
providers, but would "roundtrip" the proceeds by
engaging in mirror-image purchases from those
providers, with each booking the proceeds from the
transaction as revenue.[FN1]These transactions were
entered into at the end of the financial quarter;
Olofson believed GC's accounting for these
transactions violated Generally Accepted Accounting
Principles ("GAAP") and that they had no valid
business purpose, but rather were entered into solely
to create the appearance that GC's revenues met Wall
Street's expectations. He was further concerned that
defendant Thomas Casey, GC's Chief Executive
Officer, had falsely told analysts that there had been
no swap transactions in the first quarter of 2001.

> FN1. For a fuller description of the nature
> and significance of these swap transactions,
> see*In re Global Crossing Sec. Litig.,* No. 02
> Civ. 910, 2004 WL _____ (S.D.N.Y.
> March 23, 2004).

Olofson first raised these concerns with Perrone in
meetings on May 31 and June 1, 2001. At the June 1
meeting, Perrone "brushed off [Olofson's] concerns,"
and angrily informed him that he was in danger of
being laid off. Olofson contacted defendant Dan
Cohrs, GC's Chief Financial Officer, after the
meeting to ask whether he would be laid off; Cohrs
responded that he should contact Perrone after July 6.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

When Olofson attempted to do so, Perrone did not return his calls. Thereafter, Olofson "was given no work and was essentially cut off from any meaningful participation in the affairs of Global Crossing Ltd. or Global Crossing Development Company."(¶ 30.) On August 6, 2001, Olofson complained to GC's Chief Ethics Officer, James Gorton. Gorton responded the next day, assuring plaintiff that GC took seriously the issues he had raised.

*2 Olofson alleges that the decision to fire him was initially made in July or August 2001, but was "shelved" in response to his letter of August 6. On August 15, Gorton notified him that GC had begun an investigation into the practices he had identified, and simultaneously demanded that he formally notify GCDC whether or not he would continue his employment at the company. GC did not, however, provide any assurance that it "was actually going to investigate, let alone change any of its accounting practices."(¶ 63.) Olofson then "formally notified defendants that he would not participate in and/or have any complicity in a continuation of the conduct described in the August 6, 2001 letter."(¶ 64.) He was subsequently placed on paid administrative leave, and was fired shortly thereafter, purportedly as part of a "planned reduction in force." (*Id.*) Olofson alleges that he was not only terminated but also defamed as a result of his attempts to seek an investigation: at a "town hall" meeting for GC employees on February 15, 2002, following GC's bankruptcy filing, Winnick publicly stated that "[t]he definition of an extortionist is Roy Olofson."

GC declared bankruptcy in early 2002. Unable to sue GC, Olofson now asserts claims against individual defendants Winnick, Perrone, Cohrs, and Casey for intentional and negligent interference with contract and intentional and negligent interference with prospective economic advantage, arising from his firing by GCDC. He further asserts a defamation claim against Winnick for the statement made at the February 15, 2002, town hall meeting. Defendants move to dismiss all claims.

## DISCUSSION

### I. *Standard of Review*

#### A. *Standard for Dismissal*

On a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must accept "as true the facts alleged in the complaint,"*Jackson Nat'l Life Ins. Co. v. Merrill, Lynch & Co.,* 32 F.3d 697, 699-700 (2d Cir.1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Thomas v.. City of New York,* 143 F.3d 31, 36 (2d Cir.1998) (citations omitted); *see also* *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (when adjudicating motion to dismiss under Fed.R.Civ.P. 12(b)(6), the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims" (internal quotation marks and citations omitted)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference. *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993). All reasonable inferences are to be drawn in the plaintiff's favor, which often makes it "difficult to resolve [certain questions] as a matter of law."*In re Indep. Energy Holdings PLC,* 154 F.Supp.2d 741, 747 (S.D.N.Y.2001).

### II. *Economic Tort Claims*

#### A. *Interference with Contract*

*3 Plaintiff alleges that his termination by Winnick, Perrone, Casey, and Cohrs amounted to intentional or negligent interference with his contract for employment with GCDC. In order to state a claim for intentional interference with contract, California law requires a plaintiff to allege "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."*Pacific Gas & Electric Co. v. Bear Stearns & Co.,* 791 P.2d 587, 589-90 (Cal.1990). Defendants argue that claims for intentional or negligent interference with contract will not lie against a manager in the employment context because managers act as their employers' agents when terminating an employee, and therefore cannot "induce" a breach of the employment contract.[FN2]

FN2. Defendants argue in the alternative that managers act under a privilege from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

liability for acts of interference with the employment contract. Because defendants' first argument is dispositive on the motion, the Court need not resolve the issue of whether managers' actions are privileged under California law, or whether such privilege is qualified or absolute.

Defendants are correct that a cause of action for interference with contract does not exist in this context. Under California law, "corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract."*Shoemaker v. Myers*, 801 P.2d 1054, 1068-69 (Cal.1990), citing *Gruenberg v. Aetna Ins. Co.* 510 P.2d 1032 (Cal.1973); *Wise v. Southern Pacific Co.*, 35 Cal.Rptr. 652 (Cal.Ct.App.1963). This conclusion derives from the requirement that there be a valid contract between plaintiff and a third party, and the corollary rule that one party to a contract may not sue the other for inducing a breach of the contract *See Shoemaker*, 801 P.2d 1069. Managers and supervisors "stand in the place of the employer, because the employer - the other party to the supposed contract - cannot act except through such agents."*Id.* Thus, where a manager or supervisor terminates an employee, there is no third party to the contract: to the extent that there is a breach, the manager does not "induce" the breach, but rather, executes it "for and on behalf of [the] principal."*Mallard v. Boring*, 6 Cal.Rptr. 171, 173-74 (Cal.Ct.App.1960).

Olofson argues that this rule should not apply here because he worked for a separate corporate entity than defendants: Olofson was employed by GCDC, while defendants were employed by GC. In plaintiff's view, the defendants may therefore be liable for inducing a breach of the contract between himself and GCDC, because defendants, as employees of GC, were not agents of a party to that contract. In support of this argument, plaintiff relies on the doctrine of corporate estoppel, which holds that a corporation may properly be said to interfere with the contract of another related corporation, even where one is a wholly owned subsidiary of the other. *See Shapoff v. Scull*, 272 Cal.Rptr. 480, 486-87 (Cal.Ct.App.1990) ("[O]ne who has attempted to benefit from the corporate form of doing business may be estopped to deny a corporation's existence."), *disapproved on other grounds by Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 464 n. 10 (Cal.1994).

*4 The doctrine of corporate estoppel has little force in the present situation. As discussed above, the principle that a supervisor or manager cannot be liable for inducing breach of contract between an employee and the corporation derives from notions of agency. So long as the manager or supervisor had actual supervisory authority over the plaintiff and acted in the course of his or her employment in causing plaintiff's termination, the manager is an agent of the plaintiff's employer. Plaintiff cites no California authority indicating that corporate estoppel would trump this principle, and none of the corporate estoppel cases cited by plaintiff occurred in the employment context. *See Webber v. Inland Empire Investments*, 88 Cal.Rptr.2d 594 (Cal.Ct.App.1999) (lien on real property); *Shapoff v. Scull*, 272 Cal.Rptr. 480 (development contract). In the case most directly on point, a California appellate court recently held that a manager with supervisory authority was shielded from liability for terminating the plaintiff on a contract-interference claim, even though in that case the plaintiff and the manager-defendant worked for separate but related corporate entities. *See Hill v. Columbia Tristar Television, Inc.*, No. B155066, 2003 WL 1958881 (Cal.Ct.App. Apr. 28, 2003). Although the court did not specifically address the corporate estoppel issue, the analysis in *Hill* supports the position that corporate estoppel does not trump agency principles in the employment context.

In the present case, regardless of the fact that plaintiff nominally worked for GCDC and defendants for GC, the complaint alleges that defendants had actual supervisory authority over plaintiff. (*See* ¶¶ 18, 20) For example, plaintiff's offer of employment was signed by GC's co-Chairman, Lodwrick Cook (*Id.;* Compl. Ex. D), and plaintiff reported at various times to Winnick, Cohrs, and Perrone to discuss his job responsibilities. (*Id.*) Given that defendants hired him, supervised him during the course of his employment, and ultimately made the decision to terminate him, Olofson cannot seriously claim that defendants were interfering with his contract with another company in so doing. It is apparent on the face of the complaint that defendants exercised the authority of GCDC in making these decisions, and that they therefore "stood in its shoes" and acted as its agents in firing Olofson, regardless of their own employment relationship to GCDC. There was therefore no "third party" to the contract with which they could interfere, and plaintiff's interference with contract claims fail as a matter of law.[FN3]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN3. Because no contractual interference could have taken place as a matter of law, the Court need not reach the question of whether or not a cause of action exists in California for negligent interference with contract.

### B. *Interference with Prospective Economic Advantage*

The elements of the tort of intentional interference with prospective economic advantage are (1) an economic relationship between plaintiff and a third party containing the probability of future economic benefit to the plaintiff, (2) knowledge by the defendant of the existence of the relationship, (3) intentional acts on the part of the defendant designed to disrupt the relationship, (4) actual disruption of the relationship, (5) damages to the plaintiff proximately caused by the defendant's acts. *Korea Supply Co. v. Lockheed Martin Corp.,* 63 P.3d 937, 950-51 (Cal.2003); *Buckaloo v. Johnson,* 537 P.2d 865, 872 (Cal.1975), *disapproved on other grounds by Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 902 P.2d 740, 751 n. 5 (Cal.1995). In addition, a plaintiff must plead and prove "that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Della Penna,* 902 P.2d at 751. This additional element "bring[s] a greater solicitude to those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant." *Della Penna,* 902 P.2d at 751.

*\*5 Plaintiff's claims for interference with prospective economic advantage are indistinguishable from his interference with contract claims, and therefore fail for the same reasons. As the California Supreme Court stated in *Shoemaker,* "plaintiff's pleading has identified no 'prospective economic advantage' other than the continuation of his employment relationship. Thus ... it is in reality identical in substance to plaintiff's claim for inducement of breach of contract." *Shoemaker,* 801 P.2d at 1068; *see also Kacludis v. GTE Sprint Communications Corp.,* 806 F.Supp. 866, 872-73 (N.D.Cal.1992) (dismissing claim for intentional interference with prospective economic advantage brought by employee against supervisor, following *Shoemaker* ). Just as Olofson failed to identify defendants' breach

of a contract between the plaintiff and a third party, so has he failed to identify their interference with a prospective economic relationship between plaintiff and a third party.

To the extent that plaintiff attempts to argue that defendants interfered with his prospective relationships with other potential future employers (¶¶ 87, 94), his claim fails for the independent reason that he has not identified any specific economic opportunity with which defendants interfered. California courts have insisted that to establish interference with prospective economic advantage, a plaintiff must specifically allege a relationship with a particular third party that has a *"probability* of future economic benefit to the plaintiff." *Westside Center Associates v. Safeway Stores Inc.,* 49 Cal.Rptr.2d 793, 803 (Cal.Ct.App.1996) (emphasis in original). This heightened requirement distinguishes situations in which a defendant's wrongful acts disrupt a plaintiff's reasonable expectation of entering into a specific contract from those in which the defendant's acts merely harm or reduce the plaintiff's more general opportunities. The tort thus "protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will arise." *Korea Supply Co.,* 63 P.3d at 950, quoting *Westside Center Associates,* 49 Cal.Rptr.2d at 804. Plaintiff here has failed to allege any particular economic relationship between himself and any potential employer with which defendants' actions has interfered. He therefore fails to state a claim for either intentional or negligent interference with prospective economic advantage.[FN4]

FN4. Because each of plaintiff's economic tort claims fail as a matter of law, the Court need not consider defendants' other arguments.

### III. *Defamation Claims*

Olofson sues Winnick for defamation based on his February 15, 2002, statement at a "town hall" meeting of 60-70 GC employees that "The definition of an extortionist is Roy Olofson."(¶ 65.) Plaintiff also states on information and belief "that defendant Winnick and others actually under his control have made similar defamatory statements to multiple third parties, and in statements made in the press," and expresses his intention to file an amended complaint "to include additional parties and additional

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

statements" after discovery is completed. (*Id.*) Plaintiff asserts his claims under the California statute defining slander as "a false and unprivileged publication, orally uttered" which "[c]harges any person with crime, or with having been indicted, convicted, or punished for crime; ... [t]ends directly to injure him in respect to his office, profession trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; ... or ... by natural consequence, causes actual damage."Cal. Civ.Code § 46 (West 2003). Plaintiff asserts that Winnick's statement at the town hall meeting constitutes slander *per se* under the statutory definition.

*6 Winnick argues that the statement is non-actionable, claiming protection under the First Amendment. In order for a statement to escape the reach of the First Amendment and thus to constitute actionable defamation, it must contain facts susceptible of being proven false. *Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 284 (1974); *Campanelli v. Regents of University of California,* 51 Cal.Rptr.2d 891, 894 (Cal.Ct.App.1996). "Rhetorical hyperbole," "vigorous epithets," and "lusty and imaginative expressions of contempt" have all been held to be protected speech. *SeeMilkovich v. Lorain Journal Co.,* 497 U .S. 1, 17 (1990); *Letter Carriers,* 418 U.S. at 284;*Greenbelt Co-op. Pub. Ass'n v. Bresler* 398 U.S. 6, 14 (1970); *Ferlauto v. Hamsher,* 88 Cal.Rptr.2d 843, 849 (Cal.Ct.App.1999). Whether a statement implies a provably false factual assertion is a question of law that may be determined by the court on motion to dismiss, *Morningstar, Inc. v. Superior Court,* 29 Cal.Rptr.2d 547, 552 (Cal.Ct.App.1994), but where the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury. *Ferlauto,* 88 Cal.Rptr.2d at 849;*Campanelli,* 51 Cal.Rptr.2d at 895;*Good Government Group of Seal Beach, Inc. v. Superior Court,* 586 P.2d 572, 576 (1978). In making such a determination, a court must engage in a two-step inquiry based on the "totality of the circumstances":

The words themselves must be examined to see if they have a defamatory meaning, or if the sense and meaning ... fairly presumed to have been conveyed to those who read it have a defamatory meaning.... In addition to the language, the context of a statement must be examined. The court must look at the nature

and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed.

*Campanelli,* 51 Cal.Rptr.2d at 894, citing *Hofmann Co. v. E .I. Du Pont de Nemours & Co.,* 248 Cal.Rptr. 384, 388 (Cal.Ct.App.1988).

Courts have allowed defamation claims involving charges of "extortion" to survive where the statement was capable of being understood by a reasonable listener as an accusation that the plaintiff had committed a crime. *SeeGood Government Group,* 586 P.2d at 576;*Edwards v. Hall,* 285 Cal.Rptr. 810, 819 (Cal.Ct.App.1991). In the present case, the words "the definition of an extortionist" could on their face be understood as an accusation that Olofson had wrongfully attempted to extort money from GC by threatening to make public false accusations of accounting improprieties. The terms cast doubt on both Olofson's truthfulness and his motivations, and thus the words themselves could be understood by the average listener to be defamatory. In addition, the allegation that Olofson was an "extortionist" would be capable of being proven false - for example, should the concerns plaintiff had raised in his whistle-blower letter prove to be true. *SeeMilkovich,* 497 U.S. at 20-21 (allegations that plaintiff had lied under oath at a hearing sufficiently factual to constitute actionable defamation).

*7 Winnick argues, however, that his comment falls into the category of protected "hyperbole," "vigorous epithets," or "lusty and imaginative expressions of contempt,"*Milkovich,* 497 U.S. at 17, and that plaintiff's claim therefore fails. The statement "the definition of an extortionist is Roy Olofson" could indeed be used figuratively as well as factually, and it is quite conceivable that under the circumstances, reasonable listeners could not have perceived it as an actual accusation of extortion. Whether this was the case, however, depends entirely upon the context in which the statement was made. The complaint does not describe in any detail the composition of the "town hall" meeting, its purpose, what else was discussed there, or the tenor of the discussions generally. It is therefore impossible to ascertain from the pleadings whether, under the circumstances, the statement in question could reasonably be perceived as an actual accusation, or whether could only have been understood as an exaggeration.

In cases where "the language ... is capable of two

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

meanings, one of which is harmless and the other libelous, and it is alleged that the same was used and understood as conveying the latter meaning, a cause of action is stated, and it is the province of the jury to determine in which sense the language was used and understood by the [listener]."*Arno v. Stewart*, 54 Cal.Rptr. 392, 395 (Cal.Ct.App.1966), citing *Mellen v. Times-Mirror Co.*, 140 P. 277, 279 (1914); *see also Ferlauto*, 88 Cal.Rptr.2d at 849 ("If the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury."). The fact-based nature of the "totality of the circumstances" test makes it difficult to dispose of defamation cases at the pleading stage: indeed, many of the cases defendant cites dismissing defamation claims involving blackmail or extortion were decided on a more complete factual record, either at summary judgment or on review after a verdict. *See e.g., Letter Carriers v. Austin*, 418 U.S. at 284-87 (reversing jury verdict on claim arising from use of term "traitor" to describe plaintiff); *Greenbelt*, 398 U.S. at 14-15 (reversing jury verdict on claim arising from use of term "blackmail" to describe plaintiff's negotiating position); *Underwager v. Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir.1995) (dismissing at summary judgment claim arising from statement that panelist was "lying"); *Mattel, Inc. v. MCA Records, Inc.*, 28 F.Supp.2d 1120, 1161-62 (C.D.Cal.1998) (dismissing at summary judgment claim arising from statement referring to plaintiff as "bank robber" who had committed a "crime," "heist," or "theft"). Resolution of this issue must await the development, through discovery, of a more complete factual record.

Winnick further contends that the defamation claim must be dismissed for failure to plead "actual malice." The Supreme Court has held that where a defamation plaintiff is a public figure, s/he must prove by clear and convincing evidence that the defendant made the statement with actual knowledge or reckless disregard of its falsity. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1967). A plaintiff may be a public figure by virtue of his or her position, or may "voluntarily injects himself or [be] drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."*Gertz v. Robert Welch, Inc .*, 418 U.S. 323, 351 (1974); *Mattel*, 28 F.Supp.2d at1162. Under California law, however, malice need not be affirmatively pled unless it appears on the face of the complaint that some privilege is at play in the challenged publication. *Locke v. Mitchell*, 61 P.2d

922, 923 (Cal.1936); *Peoples v. Tautfest*, 79 Cal.Rptr. 478, 481 (Cal.Ct.App.1969).

*8 In this case, actual malice is a matter of proof, not pleading. There are no allegations in the complaint that Olofson had become a public figure at the time of the town hall meeting, or that his whistle-blower letter had become public knowledge. Although Winnick points to a press release issued by Olofson on February 4, the week prior to the town hall meeting, it is at best disputed whether this communication was sufficiently to place Olofson in the public eye such that he would be required to show actual malice. Should he prove after discovery that Olofson's termination was sufficiently before the public at the time of Winnick's statement that he had in fact become a limited public figure, he will have to prove by clear and convincing evidence that Winnick made his statement with actual malice. However, because this is not apparent on the face of the complaint, it is not necessary that he allege malice at the pleading stage. *See Peoples*, 79 Cal.Rptr. at 481 (rejecting argument that defamation plaintiff was required to plead actual malice where the complaint did not allege that he was a public figure)."The sufficiency of a complaint is to be tested by its allegations and not by what theoretically might have been alleged."*Id.*

At any rate, even if it were necessary for plaintiff to plead actual malice, the complaint alleges facts sufficient to permit an inference that Winnick had actual knowledge of the statement's falsity. That is, if the allegations in the complaint are true, Winnick would have known that his statement that Olofson was "the definition of an extortionist" was false. A plaintiff need not specifically plead actual malice so long as "it appears from the pleading that the defendant published the alleged libel with knowledge of its falsity or without an honest belief in its truth or without reasonable grounds for believing it to be true."*Noonan v.. Rousselot*, 48 Cal.Rptr. 817, 821 (Cal.Ct.App.1966). Winnick's motion to dismiss the defamation claim will therefore be denied.

*CONCLUSION*

Defendants' motions to dismiss plaintiff's first through fourth causes of action for interference with contract and interference with prospective economic advantage are granted. Defendant Winnick's motion to dismiss plaintiff's fifth cause of action for defamation is denied.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

SO ORDERED:

S.D.N.Y.,2004.
In re Global Crossing, Ltd. Securities Litigation
Not Reported in F.Supp.2d, 2004 WL 725969
(S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Slip Copy                                                    Page 1
Slip Copy, 2006 WL 2583681 (N.D.Cal.)
**(Cite as: Slip Copy)**

**H**Jensen Enterprises Inc. v. Oldcastle, Inc.
N.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
JENSEN ENTERPRISES INC., Plaintiff,
v.
OLDCASTLE, INC.; Pacific Bell Telephone
Company; SBC Services, Inc.; and Nevada Bell
Telephone Company, Defendants.
**No. C 06-00247 SI.**

Sept. 7, 2006.

William A. Markham, Maldonado & Markham, LLP,
San Diego, CA, for Plaintiff.
Janine Laura Scancarelli, Samuel Ray Miller, Folger
Levin & Kahn LLP, Bobby C. Lawyer, San
Francisco, CA, for Defendants.

ORDER GRANTING DEFENDANTS' MOTION
TO DISMISS IN PART AND DENYING MOTION
IN PART
SUSAN ILLSTON, J.
*1 On July 21, 2006, the Court heard argument on
defendants' motion to dismiss plaintiff's second
amended complaint. Having considered the
arguments of counsel and the papers submitted, and
for good cause appearing, the Court hereby GRANTS
defendants' motion in part and DENIES defendants'
motion in part.

BACKGROUND

A. Telephone Vault Market

Plaintiff Jensen Enterprises Inc. ("Jensen")
manufactures and sells pre-cast concrete vaults that
are used by telephone companies to connect newly
constructed homes and businesses to the existing
land-line telephone network. The vaults are
underground rooms that contain telephone equipment
and wiring and serve as modern replacements for
traditional telephone poles. According to Jensen,
these vaults are an "indispensable part of the modern-
day telecommunications infrastructure."Second
Amended Complaint ("SAC"), ¶ 45. Defendant
Oldcastle, Inc. ("Oldcastle") also manufactures the
vaults and is a direct competitor of Jensen.
Defendants Pacific Bell, Nevada Bell and SBC

Services (collectively referred to as "AT & T") [FN1]
are allegedly the sole providers of land-line telephone
service in most of California and Nevada. SAC ¶ 11.
According to the SAC, the market for telephone
vaults in California and Nevada works in the
following way. When a new property is constructed,
the vaults are purchased and installed either by the
property developer or, on infrequent occasions, by
AT & T itself. SAC, ¶ 17. When a developer
performs the installation, the developer is typically
required to resell the installed vault to AT & T before
AT & T will provide land-line telephone service to
the property. Id. As a result of this requirement, AT
& T is the ultimate purchaser of most telephone
vaults sold in Nevada and California.

> FN1. As a result of various mergers, all
> three defendants are now affiliates of AT &
> T.

For many years, Jensen sold vaults to AT & T in
California and Nevada, primarily through developers
but also through direct sales. SAC, ¶ 54. In 2000, AT
& T allegedly offered Jensen a new contract covering
direct sales. SAC, ¶ 56. Jensen alleges that the
proposed contract contained "onerous, one-sided
provisions" that Jensen could not reasonably accept
given prevailing market conditions. Id. In particular,
the contract purportedly required Jensen to offer
blanket indemnities to AT & T and to make direct
sales to AT & T at unreasonably low prices. Id.
Although Jensen rejected the offer, a similar offer
was allegedly accepted by Oldcastle. SAC, ¶ 58.

Jensen further alleges that, following the formation of
the AT & T/Oldcastle agreement (which covered
only direct sales), AT & T announced that Oldcastle
was the sole approved vendor of telephone vaults in
California and that it would only accept vaults
installed by developers who used Oldcastle. SAC, ¶
59. Following the filing of this lawsuit, AT & T
purportedly announced a similar policy for
developer-installed telephone vaults in Nevada. SAC,
¶ 60.

According to Jensen, AT & T's new policies have had
several deleterious effects on the market for
developer-installed telephone vaults in California.
Because Oldcastle is now AT & T's sole authorized

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2583681 (N.D.Cal.)
**(Cite as: Slip Copy)**

supplier of vaults and because AT & T is the sole provider of land-line telephone services, Oldcastle has allegedly been able to raise the prices it charges developers to above-market rates. SAC, ¶ 62. Moreover, AT & T has lowered its developer reimbursement rates to the price levels listed in its direct sales agreement with Oldcastle.[FN2] *Id.* Thus, AT & T allegedly receives both indemnification from Oldcastle as well as below-market prices from developers, while Oldcastle can charge developers "excessively high prices" that more than cover the cost of indemnification. *Id.*, ¶ 65. The property developers are, of course, the ones who bear the cost of this new arrangement. *Id.* Jensen asserts that developers pass these costs on to real estate purchasers, thereby raising real estate prices in California. *Id.*, ¶ 71. In addition, Jensen and Oldcastle's other competitors in California have allegedly suffered significant financial losses as a result of AT & T's new exclusionary policies. *Id.*, ¶¶ 61, 73. Although too early to tell, Jensen expects that the Nevada market will be similarly affected, particularly because Oldcastle does not maintain manufacturing facilities in Nevada (Jensen does) and will therefore be required to incur the purportedly significant expense of shipping its products to Nevada from northern California. SAC, ¶ 62.

> FN2. Plaintiff alleges that the lowering of reimbursement rates was the sole purpose of the AT & T/Oldcastle direct sales contract. According to plaintiff, Oldcastle has made few, if any, direct sales to AT & T under the contract. SAC, ¶ 64.

B. Electrical Vault Market

**\*2** Jensen and Oldcastle also produce precast concrete vaults for electric utilities. Jensen alleges that Oldcastle has been using the excess profits generated from its arrangement with AT & T in order to significantly lower its prices on electrical vaults in northern California. SAC, ¶ 63. Because it is convenient for developers to choose the same supplier for both telephone and electric vaults, Oldcastle's alleged predatory pricing, combined with its purported monopoly of the telephone vault market, allegedly threatens the market for electrical vaults. SAC, ¶ 108.

C. This Lawsuit

In January 2006, Jensen initiated this lawsuit against Oldcastle and AT & T. In May 2006, Jensen filed a second amended complaint which listed 17 causes of action against the defendants. These claims allege violations of Sections 1 and 2 of the Sherman Antitrust Act (Claims 1-8, 15, 16), violations of California's Cartwright Antitrust Act (Claim 10), violations of Nevada's Unfair Trade Practice Act (Claim 17), violations of California's Business & Professions Code Section 17200 et seq. (Claim 11), tortious interference with contract (Claim 12), tortious interference with prospective business opportunity (Claim 13) and commercial defamation (Claim 14). Defendants have filed a 12(b)(6) motion to dismiss 16 of the 17 claims in the second amended complaint on the grounds that Jensen fails to properly allege facts sufficient to establish one or more elements of each cause of action.[FN3]

> FN3. Defendants Oldcastle and AT & T filed separate motions to dismiss. However, defendants' arguments and related case support overlap significantly. The major exceptions are those claims, such as claims 8 and 9, that apply to only one party.

LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).*

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir.1987).* Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *See United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir.1981).*

DISCUSSION

A. Sherman Antitrust Claims

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2583681 (N.D.Cal.)
(Cite as: Slip Copy)

1. Relevant Market & Antitrust Injury

A plaintiff in an antitrust action must properly allege both a "relevant market" and an antitrust injury. *See Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1063 (9th Cir.2001)* ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim.") (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1105 (9th Cir.1999)*); *see also McGlinchy v. Shell Chem. Co., 845 F.2d 802, 811* ("To state an antitrust claim [under Section 1 or Section 2] ... appellants must allege antitrust injury.") (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)*). Defendants argue that all of Jensen's antitrust claims should be dismissed because Jensen has failed to allege either of these required elements.

*3 While the Court acknowledges that a significant factual dispute exists as to the nature and functioning of the telephone vault market, the Court must, for the purposes of this motion, accept the facts alleged in the plaintiff's complaint as true. As a result, the Court concludes that plaintiff has adequately alleged both a relevant market and an antitrust injury.[FN4] With respect to the market, the SAC alleges that the relevant market is sales of telephone vaults *to property developers and contractors* in Nevada and California who wish to connect to the AT & T wireline network. SAC, ¶ 49. Jensen further alleges that Oldcastle, Jensen and others, including Teichert, Inc., actively compete with one another for these sales to developers. *Id.,* ¶ 61.

> FN4. Defendants' opposition to Jensen's seventh claim, "Conspiracy to Monopolize," is based solely on Jensen's failure to allege either a relevant market or antitrust injury. Because the Court concludes that Jensen has properly pled both a relevant market and antitrust injury, Jensen's seventh claim is not subject to dismissal.

Defendants argue that the telephone vault market is actually a single-purchaser market and is therefore insufficient as the basis of an antitrust claim. Defendants base their argument on the fact that, as acknowledged in the SAC, AT & T is the ultimate purchaser of most telephone vaults in California and Nevada. Defendants also characterize the relationship between AT & T and Oldcastle as an exclusive

supplier arrangement. Such arrangements are not typically subject to antitrust actions. *See NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 137, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998)*. Lastly, defendants argue that the "area of effective competition" between Oldcastle, Jensen and others was for the exclusive contract with AT & T, not for sales to developers.

Although defendants' characterization of the market and the relationship between AT & T and Oldcastle may ultimately be proved true as a matter of fact, the SAC nonetheless properly alleges the elements of a relevant market: a specific product (telephone vaults), multiple purchasers (property developers and contractors) and an appropriate geographic region (properties seeking connections to the AT & T network in California and Nevada). SAC, ¶ 49; *see Tanaka, 252 F.3d at 1063*. This same reasoning applies to defendants' argument that Jensen defines the market too narrowly by failing to include both sales of other types of vaults and sales of telephone vaults to other telecommunications companies. Although AT & T and Oldcastle may be able to demonstrate that a broader market definition is appropriate, the facts alleged in the complaint do not compel such a conclusion.

Defendants also argue that Jensen has improperly pled antitrust injury by failing to allege both direct harm to itself and injury to market competition in general. *See McGlinchy, 845 F.2d 802 at 811-13* ("[F]ailure to allege injury to competition is a proper ground for dismissal by judgment on the pleadings") (citing *Seattle Totems Hockey Club v. National Hockey League, 783 F.2d 1347, 1350 (9th Cir.1986)*). The Court disagrees.

Jensen alleges at several points in its SAC that it has been directly and proximately harmed by the defendants' conduct. See, e.g., SAC, ¶¶ 73, 40, 55, 78, 82, 87. This purported harm includes the loss of several million dollars in profits. SAC, ¶ 73. Jensen also alleges that it is both a competitor of defendant Oldcastle and a target of AT & T and Oldcastle's alleged antitrust activity. SAC, ¶¶ 52, 60, 70. Therefore, the Court concludes that Jensen has alleged facts sufficient to establish direct harm. *See Amarel v. Connell, 102 F.3d 1494, 1510 (9th Cir.1996)* ("Although a plaintiff normally lacks standing where the plaintiff's customer is the immediate victim of the defendant's conduct, standing is appropriate where that plaintiff also

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                         Page 4
Slip Copy, 2006 WL 2583681 (N.D.Cal.)
(Cite as: Slip Copy)

competes with the defendant.") (citing *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 542-544, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

**\*4** In addition, plaintiff has sufficiently alleged harm to competition. Defendants argue that the pertinent competition was for the exclusive AT & T contract, not for vault sales to developers, and that Jensen has not alleged injury to this competition. Defendants' argument is unpersuasive because it again attempts to redefine the relevant market rather than recognizing the market as defined in the SAC. Accepting the SAC's definition of the relevant market, the Court concludes that Jensen has adequately pled injury to competition. Jensen alleges that competition in the market for telephone vault sales to developers has been eliminated, that customers (i.e., the property developers) are now required to pay "excessively high prices" and are forced to take a loss on vault purchases and that the market has been "radically transform[ed]" to the detriment of all but the defendants. SAC, ¶¶ 29, 31, 32, 59, 20.

2. Sherman Act Section 1 Claims [FN5]

FN5.Section 1 of the Sherman Antitrust Act reads: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."15 U.S.C.A. § 1.

The Court finds that Jensen has successfully pled at least one Section 1 claim.[FN6]However, the Court strongly suggests that Jensen consolidate its remaining Section 1 claims into as few claims as possible. In particular, in its next amended complaint, plaintiff should avoid claims that simply recharacterize or re-label other claims.

FN6. A Section 1 claim requires a plaintiff to establish the following: "(1) that there was a contract, combination or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce."*Tanaka, 252 F.3d at 1062.*

a. Claims 1 & 4: "Improper Exclusive Distributorship" & "Misuse of Essential Facility"

Plaintiff's first and fourth claims are general rule-of-reason claims that do not allege traditional antitrust restraints, such as refusals-to-deal or tie-in arrangements. Since a rule-of-reason theory requires that the fact-finder "decide whether under all circumstances of the case the restrictive practice imposes an unreasonable restraint on competition," any agreement or combination that restrains trade might qualify as a Section 1 violation. *See McGlinchy*, 845 F.2d at 811 (citations and internal quotations omitted). Defendants object to these claims largely on the grounds that the labels chosen by plaintiff do not conform to the alleged facts.

While the Court agrees that the labels could be more accurate, a rule-of-reason claim does not require specific categorizations. *See Kaplan v. Burroughs Corp.*, 611 F.2d 286, 290-91 (9th Cir.1979). Therefore, plaintiff's first and fourth claims are not subject to dismissal. However, the Court reiterates its suggestion that plaintiff consolidate overlapping claims into a single claim.

b. Claim 2: "Improper Refusal to Deal"

The Court concludes that Jensen's concerted refusal-to-deal claim is subject to dismissal with leave to amend. Jensen alleges that the agreement between AT & T and Oldcastle represents a concerted refusal to deal with Jensen and that the defendants have made it impractical for developers to purchase from Jensen. However, Jensen fails to allege that Oldcastle has either refused to deal with Jensen directly or has refused to deal with developers who buy products from Jensen. Such allegations are required in a concerted refusal-to-deal claim. *See Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1568 (11th Cir.1991) (noting that a concerted refusal to deal "describes a situation where two or more parties have agreed that *each of them* will refuse to deal with a particular customer or customers") (citations omitted)(emphasis added). Since Jensen's SAC contains no allegations that Oldcastle has refused to deal with Jensen or its customers, the Court dismisses this claim with leave to amend.

c. Claim 3: "Price Manipulation"

**\*5** The Court dismisses the plaintiff's third claim, entitled "Price Manipulation," without leave to amend. Plaintiff concedes that this claim is simply an

Slip Copy
Slip Copy, 2006 WL 2583681 (N.D.Cal.)
(Cite as: Slip Copy)

"alternate characterization" of the other antitrust claims. Defendants argue, and the Court agrees, that Jensen does not have standing to sue for "price manipulation" because Jensen does not allege any direct harm resulting from such price manipulation alone. See *Associated General Contractors*, 459 U.S. at 540-41. Even if true, Jensen's allegations would provide only the property developers, who are the ones directly harmed by changes in market prices, with standing. See SAC, ¶¶ 80-83.

d. Claim 5: "Tie-in Arrangement"

The Court dismisses Jensen's fifth claim, a per se improper tying arrangement, without leave to amend. "A tying arrangement is an agreement by a party to sell one product [ (the tying product) ] but only on the condition that the buyer also purchases a different (or tied) product." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 461-62, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (citing *Jefferson Parish Hosp. Dist. No.2 v. Hyde*, 466 U.S. 2, 21-22, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). In order to establish an improper tying arrangement, the plaintiff must demonstrate that the two products in question exist in separate product markets with independent demand curves.[FN7] *Id.*

> FN7. Separate product markets (and hence tying arrangements) can exist even if one product is useless without the other. For example, separate markets for cameras and film exist even though film is useless without a camera. See *Eastman Kodak*, 504 U.S. at 463.

In the present case, Jensen not only fails to allege two independent product markets, but actually alleges the opposite. In its SAC, Jensen contends that AT & T requires property developers to purchase Oldcastle telephone vaults (the tied product) in order to receive access to its land-line telephone network (the tying product). However, Jensen defines the relevant market as the sale of telephone vaults to property developers who wish to connect to the AT & T wireline network. SAC, ¶ 49. Jensen then alleges that property developers "must" install telephone vaults in order to connect to the AT & T network. SAC, ¶ 14. Therefore, according to the face of plaintiff's second amended complaint, a property developer in the market for a connection to AT & T's wireline network must, by definition, be in the market for telephone vaults. Separate product markets do not

exist for telephone vaults and connections to the AT & T network among property developers. Therefore, AT & T's arrangement with Oldcastle, as alleged in the SAC, cannot as a matter of law be described as a per se tying arrangement.

3. Sherman Act Section 2 Claims [FN8]

> FN8.Section 2 reads: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C.A § 2.

a. Claim 6: "Monopolization"

Jensen has alleged monopolization claims against both AT & T and Oldcastle. A Section 2 monopolization claim requires a plaintiff to demonstrate each of the following: (1) possession of monopoly power by the defendant in a relevant market, (2) willful acquisition or maintenance of that power that is not the result of the growth of a superior product or historical accident, and (3) causal antitrust injury. See *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir.1992) (including "causal anti-trust injury" element).

*6 Jensen has pled facts sufficient to establish each of the above elements with respect to Oldcastle. Relying on *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.1995), Oldcastle contends that Jensen, in order to establish Oldcastle's monopoly power, must allege either that the market involves restricted output and supracompetitive prices or that Oldcastle has a dominant share of the market and that there are significant barriers to entry. Jensen has done so. Jensen alleges both that Oldcastle is now the sole provider of telephone vaults in the relevant market (dominant market share), and that competitors are prevented from entering the market as a result of AT & T's alleged edict (significant barriers to entry). SAC, ¶¶ 20-26; see *Rebel Oil*, 51 F.3d at 1439 (barriers to entry are "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns").

Jensen also alleges that Oldcastle's acquisition of the

Slip Copy
Slip Copy, 2006 WL 2583681 (N.D.Cal.)
(Cite as: Slip Copy)

purported monopoly was improper. For example, Jensen contends that Oldcastle acquired a monopoly concession from AT & T in order to charge developers "excessively high prices" for its vaults. SAC, ¶¶ 29, 65. Jensen also alleges that Oldcastle signed its direct sales agreement with AT & T "solely or principally" for the purpose of manipulating prices. SAC, ¶ 89. Thus, Jensen has sufficiently alleged a monopolization claim against Oldcastle.

Jensen's monopolization claim against AT & T fails, however, because Jensen does not sufficiently allege that AT & T acquired its monopoly power as a result of activities other than growth of a superior product or a historical accident. *See U.S. v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1996).* Jensen alleges only that AT & T's monopoly power over the telephone vault market is a necessary result of its control of the wireline network. SAC, ¶ 24. Jensen's <u>Section 2</u> monopolization claim against AT & T is therefore dismissed with leave to amend.

b. Claims 8 & 9 (Against Oldcastle only): "Misuse of Monopoly Power" & "Attempted Monopolization/Predatory Pricing/Market Leverage in a Related Market"

The Court grants Oldcastle's motion to dismiss claim eight without leave to amend, but denies defendant's motion to dismiss claim nine. The allegations set forth under both claims are virtually identical. In essence, Jensen argues that Oldcastle is taking advantage of its monopoly power in the telephone vault market to gain an unfair advantage and a monopoly in the electrical vault market. SAC, ¶¶ 105, 111. Since claim nine specifically alleges an attempted monopoly cause of action, claim eight amounts to an independent claim of "monopoly leveraging"-i.e., the use of monopoly power in one market to gain a competitive advantage in a second market. *See Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536, 546 (9th Cir.1991).* The Ninth Circuit has previously rejected "monopoly leveraging" as an independent theory of liability under <u>Section 2</u>. *See id.* Monopoly leveraging can only be pled as part of a monopolization or attempted monopolization claim. *See Alaska Airlines, 948 F.2d at 546.* Therefore, the Court dismisses Jensen's eighth claim without leave to amend.

*7 However, the Court concludes that Jensen has pled facts sufficient to establish each element of an attempted monopolization claim against Oldcastle.[FN9]

For this claim, Jensen defines the market as "that of selling electrical vaults to property developers in Northern California for installation alongside telephone vaults used to connect properties to the Wireline Network."SAC, ¶ 107. While this does appear to be a very narrow market definition, it nonetheless provides both a delineated product (electrical vaults) and a specific geographic area where competition is alleged to take place (property developers in Northern California who install electrical vaults alongside telephone vaults and who wish to connect to the AT & T wireline network). While Oldcastle may very well show that such a market is too narrow for <u>Section 2</u> purposes, such a determination cannot be made on Jensen's pleadings alone.

FN9. A <u>Section 2</u> attempted monopolization claim consists of the following elements: (1) a specific intent to monopolize a relevant market; (2) predatory or anticompetitive conduct; (3) a dangerous probability of success; and (4) causal antitrust injury. *Paladin Assocs., Inc. v. Montana Power Co., 328 F.3d 1145, 1163 n. 22 (9th Cir.2003).*

Jensen satisfies element two of an attempted monopolization claim by asserting that Oldcastle is engaging in predatory pricing in the electrical vault market. SAC, ¶ 105; *see Brook Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 209-10, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).* Jensen supports this allegation by contending that Oldcastle is charging "uneconomically low" prices. SAC, ¶ 105; *see Brook Group, 509 U.S. at 210* (identifying below-cost pricing as an element of a predatory pricing claim). While Oldcastle argues that "uneconomically low" does not equate with "below-cost," Jensen's allegation does not rule out the possibility that it does.

Oldcastle further contends that Jensen has not properly alleged element three, a dangerous probability of success, because Jensen has not indicated that significant barriers to entry exist in the relevant market. *See nSight, Inc. v. Peoplesoft, Inc., 2005 WL 3299164 at *1 (N.D.Cal. Aug. 5, 2005)* (dismissing attempt-to-monopolize claim on the grounds that plaintiff failed to plead facts suggesting that there were barriers to entry into the market) (citing *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'ns, Inc., 108*

Slip Copy
Slip Copy, 2006 WL 2583681 (N.D.Cal.)
(Cite as: Slip Copy)

F.3d 1147, 1154 (9th Cir.1997). Jensen, however, does plead such facts. Jensen alleges that property developers "invariably lay their electrical vaults alongside their telephone vaults" and that it is more convenient for a developer to choose the same supplier for both types of vaults. SAC, ¶ 106. Since Jensen also alleges that there is a significant barrier to entry-i.e., AT & T's new policies-into the telephone vault market, it follows that a new electrical vault maker would have a very difficult time entering the relevant electrical vault market (at least as Jensen defines it).*See Rebel Oil, 51 F.3d at 1439* (barriers to entry are "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns").

Finally, Jensen satisfies element four, causal antitrust injury, when it asserts that Oldcastle's predatory pricing policies in the electrical vault market are intended to "destroy" competition in the market so as to eventually "raise prices for its electrical vaults, and enjoy monopoly profits from these prices."SAC, ¶ 105. Jensen also alleges that it has been proximately harmed by this conduct. SAC, ¶ 115.

### 5. Sherman Act Sections 1 & 2 Claim: Claim 15- "Improper Retaliation"

*8 The Court dismisses Jensen's fifteenth claim, entitled "Improper Retaliation," without leave to amend. Jensen alleges that AT & T's decision to name Oldcastle as the sole authorized provider of telephone vaults in Nevada, among other actions, was an act of retaliation for Jensen's filing of this lawsuit. While that may be true, it is unclear how such retaliation can be considered a separate antitrust action. Plaintiffs cite no cases in which retaliation formed the basis of an antitrust case. Jensen's allegations may provide indications of the defendants' intent (and therefore be important for its other antitrust claims), but they do not support an independent claim. As the Supreme Court noted, "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws."*Brooke Group Ltd., 509 U.S. at 225.*

### 6. Sherman Act Claim: Claim 16-Injunctive Relief

The Court finds that Jensen's sixteenth cause of action for Injunctive Relief under 15 U.S.C. § 26 is not subject to dismissal since at least some of its

antitrust claims are properly alleged. *See*15 U.S.C. § 26 ("Any person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws").

### B. State Antitrust Claims: Claim 10 (California Cartwright Act) & Claim 17 (Nevada Unfair Trade Practices Act)

All parties agree that Jensen's California Cartwright Act claim and its Nevada Unfair Trade Practices Act claim are governed by the Court's decision on its federal antitrust claims. *See Cellular Plus, Inc. v. Superior Court,* 14 Cal.App.4th 1224, 1240, 18 Cal.Rptr.2d 308 (1993); *see also Boulware v. State of Nev., Dept. Of Human of Resources,* 960 F.2d 793, 800-01 (9th Cir.1992). Therefore, given that at least some of Jensen's Sherman Act claims are not subject to dismissal, Jensen's tenth and seventeenth claims are not dismissed.

### C. Other State Law Claims

#### 1. Claim 11: Violations of CA Bus. & Prof.Code § 17200

The Court finds that Jensen's claim under CA Bus. & Prof.Code § 17200 (the "UCL") should be dismissed without leave to amend. Although Jensen has adequately identified unfair business practices [FN10]i.e., AT & T and Oldcastle's purported antitrust violations-and has alleged that it has been directly harmed by the defendants' actions, see SAC, ¶ 73, a UCL claimant cannot request disgorgement of illicitly-gained profits unless those funds were previously owned by the plaintiff. *See Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1145, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003). Jensen alleges only damages-i.e., that it lost sales and profits in the relevant market-not any facts that give rise to the remedies of restitution or disgorgement. Therefore, Jensen's eleventh claim under the UCL is dismissed without leave to amend.

> FN10. The UCL defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by" section 17500. CA Bus. & Prof.Code § 17200.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2583681 (N.D.Cal.)
**(Cite as: Slip Copy)**

### 2. Claim 12: Tortious Interference with Contract

The Court concludes that plaintiff has sufficiently pled the elements of tortious interference with contract.[FN11] Jensen expressly alleges that a valid contract existed between itself and multiple property developers. SAC, ¶ 125. Although Jensen does not specifically allege that AT & T or Oldcastle knew of these contracts, such knowledge can be inferred from other allegations. *See Quelimane Co. v. Stewart Title Guaranty Co., 19 Cal.4th 26, 56-57, 77 Cal.Rptr.2d 709, 960 P.2d 513 (1998)*. Jensen alleges that AT & T and Oldcastle conspired to exclude competitors from the developer-installed vault market, implying that they knew of contracts between developers and non-Oldcastle vault manufacturers. These allegations also support the implication that AT & T and Oldcastle knew that their actions would lead to disruption of those contracts. *See id. at 56, 77 Cal.Rptr.2d 709, 960 P.2d 513.*

> FN11. "The elements of a cause of action for intentional interference with contract are: (1) a valid contract between plaintiff and third party; (2) defendants' knowledge of this contract; (3) defendants' intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas & Electric, Co. v. Bear Sterns & Co., 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791 P.2d 587.*

### 3. Claim 13: Tortious Interference with Prospective Business Advantage

*9 The Court concludes that Jensen has sufficiently alleged the elements of interference with prospective economic advantage. This tort is almost identical to the interference with contract tort with the exception that the plaintiff must show that the defendant committed an independently unlawful act. *See Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1144, 1159 (2003). Jensen satisfies this additional requirement through its properly alleged antitrust claims. Antitrust activity is "proscribed by some constitutional, statutory, regulatory, common law or other determinable legal standard" and therefore meets the definition of an independently wrongful act. *See Korea Supply,* 29 Cal.4th at 1159, 131 Cal.Rptr.2d 29, 63 P.3d 937.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motion in part and DENIES defendants' motion in part. (Docket Nos. 32 and 37).*Plaintiff must file its amended complaint no later than September 20, 2006.*

The Court recognizes that there are significant factual disputes surrounding the operation of the relevant product and geographic markets in this case, and that the early resolution of these disputes may expedite the proceedings in this case. Accordingly, counsel should address in their Case Management Conference statements, and be prepared to discuss at the October 20, 2006 Case Management Conference, avenues by which prompt resolution of these preliminary questions can be achieved.

IT IS SO ORDERED.

N.D.Cal.,2006.
Jensen Enterprises Inc. v. Oldcastle, Inc.
Slip Copy, 2006 WL 2583681 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                       Page 1
Not Reported in F.Supp.2d, 2004 WL 2415074 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**Landes v. Tartaglione
E.D.Pa.,2004.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Lynn E. LANDES
v.
Margaret TARTAGLIONE, et al.
**No. Civ.A. 04-3163.**

Oct. 28, 2004.

Lynn E. Landes, Philadelphia, PA, pro se.
Michael L. Detweiler, Michele L. Dean, John O.J. Shellenberger, Philadelphia, PA, Susan J. Forney, Harrisburg, PA, Annetta Foster Givhan, Philadelphia, PA, Craig M Blackwell, Washington, DC, for Defendants.

*MEMORANDUM*
ONEILL, J.

### I. INTRODUCTION

*1 Plaintiff Lynn E. Landes filed suit seeking a declaratory judgment that the local, state and federal laws and regulations that permit the use of voting machines are unconstitutional. She also seeks to enjoin the use of voting machines in elections for public office. Plaintiff claims the use of voting machines prevents election officials, the press and the public from effectively observing whether persons entitled to vote are being permitted to vote and whether their votes are being properly tabulated. Defendants are Margaret Tartaglione, Chair of the City Commissioners of the City and County of Philadelphia, Pedro A. Cortés, Secretary of the Commonwealth of Pennsylvania and John Ashcroft, Attorney General of the United States. Now before me are motions to dismiss filed by all defendants. For the reasons stated below, I will grant defendants' motions.

### II. BACKGROUND

The use of electronic voting systems and voting machines in Pennsylvania is permitted by 25 Pa. Stat. Ann. §§ 3002 and 3031.2. Plaintiff alleges that the computerized voting machines used in Philadelphia

do not allow voters to cast their ballots directly and that they conceal the voting process. She further asserts that voting machines may or may not be accurate and they are vulnerable to technical failure or vote manipulation. Plaintiff alleges that it is not possible to observe whether voting machines manipulate or switch votes.

Plaintiff alleges that she is a registered voter in the City and County of Philadelphia and a freelance journalist who specializes in voting systems and democracy issues. She does not specifically allege that she intends to vote in future elections in Philadelphia or that she has voted in previous elections in the city.

### III. STANDARD FOR RULE 12(b)(6)

A Rule 12(b)(6) motion to dismiss examines the sufficiency of the complaint.*Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In determining the sufficiency of the complaint I must accept all of the plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences therefrom. *Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997).
The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Id.,quotingConley,* 355 U.S. at 47. I should not inquire as to whether the plaintiff will ultimately prevail, but only whether he is entitled to offer evidence to support his claims. See*Oatway v. Am. Int'l Group, Inc.,* 325 F.3d 184, 187 (3d Cir.2003)."Thus, [I will] not grant a motion to dismiss 'unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"*Graves,* 117 F.3d at 726,quoting,*Conley,* 355 U.S. at 45-46.

### IV. DISCUSSION

*2 Plaintiff lacks standing to challenge the use of voting machines.[FN1] In order to have standing to raise a claim before this court, plaintiff must establish that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2415074 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

she meets both the three constitutional requirements for standing and the prudential considerations that courts have applied in determining standing. *Storino v. Borough of Point Pleasant Beach,* 322 F.3d 292, 296 (3d Cir.2003). To meet the constitutional requirements for standing, first plaintiff must have suffered an injury in fact-an invasion of a legally protected interest that is concrete and particularized, affecting the plaintiff in a personal and individual way, and actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of. The injury must be traceable to the challenged action of the defendant and not the result of the independent action of a third party. Third, it must be likely and not speculative that the injury will be remedied by a favorable decision. *Id.See also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The prudential principles applied in determining whether there is standing are:

> FN1. Defendants Cortes and Ashcroft move to dismiss on the grounds that plaintiff lacks standing to challenge the use of voting machines. Defendant Tartaglione did not raise the issue of standing in her motion to dismiss; however, because plaintiff lacks standing to bring the entire action, I will dismiss the complaint against Tartaglione as well.

(1) the Plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties; (2) even when the Plaintiff has alleged redressable injury sufficient to meet the requirements of Article III, the federal courts will not adjudicate abstract questions of wide public significance which amount to generalized grievances shared and most appropriately addressed in the representative branches; and (3) the Plaintiff's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. *Miller v. Nissan Motor Acceptance Corp.,* 362 F.3d 209, 221 (3d Cir.2004) (citations omitted). Plaintiff fails to satisfy both the constitutional and prudential standing requirements.

Plaintiff has not established she has suffered or will suffer an injury in fact. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or

imminent, not conjectural or hypothetical...." *Storino v. Borough of Point Pleasant Beach,* 322 F.3d 293, 296 (3d Cir.2003). In plaintiff's complaint, she alleges that she is a registered voter of the City and County of Philadelphia, but she fails to allege that she intends to vote by voting machine in the upcoming election. She also fails to allege that she has ever voted in any prior election either by voting machine or by other means. Absent such allegations, plaintiff cannot establish an injury in fact. *Cf.American Ass'n of People with Disabilities v. Hood,* 278 F.Supp.2d 1345, 1351-52 (M.D.Fla.2003) (holding plaintiffs had standing where they were registered voters, consistently voted in the past and intended to vote in future elections).[FN2]

> FN2. Because the pleadings of a pro se party must be construed liberally, I do not dismiss plaintiff's motion on this basis alone as in her responses to Cortes' and Ashcroft's motions to dismiss she asserts that she has voted in the past and she intends to vote in the upcoming election.

**\*3** Even assuming plaintiff has voted in the past and will vote in this election, however, she alleges only a "conjectural or hypothetical" injury. She argues that voting machines are vulnerable to manipulation or technical failure, but she does not assert that the voting machines in question have actually suffered from these issues in the past or that they will definitively malfunction or be tampered with during the upcoming election. In *Storino,* 322 F.3d at 297-98, the Court held that the only injury demonstrated by plaintiffs was prospective and conjectural where plaintiffs alleged a local zoning ordinance would cause them future damages but the Court could identify various scenarios where the possibility of injury would be eliminated. The Court noted, "one cannot describe how the Storinos will be injured without beginning the explanation with the word 'if.' The prospective damages, described by the Storinos as certain, are, in reality, conjectural."*Id.*

Similarly, plaintiff's allegations here are not sufficient to demonstrate injury in fact because they are conjectural. If plaintiff's vote and the votes of all other voters in the upcoming election are correctly recorded, plaintiff will suffer no injury. Plaintiff's reliance on the terms "if" and "may" to couch her allegations of harm is a clear indication that the harm she alleges is merely speculative. *Cf.Lujan v. Defenders of Wildlife,* 504 U.S. 555, 564, 112 S.Ct.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2415074 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

2130, 119 L.Ed.2d 351 (1992) (holding that plaintiffs' " 'some day'intentions" to return to locations where they might be deprived of the opportunity to observe endangered animals did "not support a finding of the 'actual or imminent' injury that our cases require").

Plaintiff argues, however, that the voting machines need not malfunction or be tampered with for an injury in fact to exist. She alleges she has been injured in past elections and will be injured in this election because voting machines prevent her from observing whether or not her vote has actually been cast. She asserts the use of voting machines deprives her of her rights to vote, to have votes counted properly, to observe the voting process effectively and to have those rights fully enforced under 42 U.S.C. Section 1983. Characterized in this manner plaintiff's alleged injury amounts to a " 'generalized grievance' shared in substantially equal measure by all or a large class of citizens" and is not sufficient to confer standing. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).*See also**Lujan,* 504 U.S. at 560 (injury must be "concrete and *particularized"* )(emphasis added); *Whitmore v. Arkansas* 495 U.S. 149, 160, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ("the 'generalized interest of all citizens in constitutional governance'... is an inadequate basis on which to grant" standing); *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court"); *Public Interest Research Group v. Magnesium Elektron,* 123 F.3d 111, 121 (3d Cir.1997) ("The legal 'right' to have corporations obey environmental laws cannot, by itself, support standing.").

*4 Because plaintiff has not established the required elements to demonstrate she has standing to challenge the use of voting machines in Philadelphia, I will grant defendants' motions to dismiss.

### ORDER

AND NOW, this day of October 2004, after considering the motions to dismiss of defendants Margaret Tartaglione, Pedro A. Cortés and John Ashcroft and plaintiff's responses thereto and for the reasons set forth in the accompanying memorandum, it is ORDERED that:

1. defendant Margaret Tartaglione's motion to dismiss is GRANTED;

2. defendant Pedro A. Cortés' motion to dismiss is GRANTED;

3. defendant John Ashcroft's motion to dismiss is GRANTED;

4. plaintiff's complaint is DISMISSED with prejudice; and

5. plaintiff's motion for a temporary restraining order is DENIED as moot.

E.D.Pa.,2004.
Landes v. Tartaglione
Not Reported in F.Supp.2d, 2004 WL 2415074 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2007 WL 4287557 (N.D.Cal.)
**(Cite as: Slip Copy)**

Lee v. American Express Travel Related Services
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
David J. LEE and Daniel R. Lloyd, Plaintiffs,
v.
AMERICAN EXPRESS TRAVEL RELATED
SERVICES, et al., Defendants.
No. C 07-04765 CRB.

Dec. 6, 2007.

Matthew Scott Hale, Attorney at Law, Newport
News, VA, for Plaintiffs.
Stephen Julian Newman, Julia B. Strickland, Stroock
& Stroock & Lavan LLP, Los Angeles, CA, for
Defendants.

### MEMORANDUM AND ORDER
CHARLES R. BREYER, District Judge.
*1 This class action challenges the legality of
American Express card-member agreements. Now
pending before the Court is defendants' motion to
dismiss for, among other reasons, lack of standing.
The motion presents the issue of whether a plaintiff
has standing to challenge an unconscionable term in a
contract which has not, and may never, come into
play. After carefully considering the parties' papers,
including plaintiffs' letter brief filed in violation of
the Local Rules, and having had the benefit of oral
argument, the Court finds that in the circumstances of
this case, plaintiffs do not have standing as a matter
of law.

### BACKGROUND

Named plaintiffs Daniel R. Lloyd and David J. Lee
obtained American Express credit cards for personal
use in 2003 and 2006 respectively. Lee also obtained
American Express "gift," "charge" and "dining"
cards. Use of American Express cards requires an
annual fee (sometimes waived for promotional
purposes). According to the plaintiffs, the applicable
fees for charge and credit cards range from $30 to
$450. Complaint ¶¶ 24-26. Gift and dining cards
require a onetime payment of $3.95. Id. ¶ 27.

The gravamen of the Complaint is that the card-
member agreements contain unconscionable

arbitration provisions in violation of California
consumer protection laws. In particular, plaintiffs
allege violations of the California Unfair Competition
Law ("UCL"), and the California Consumer Legal
Remedies Act ("CLRA"). Plaintiffs also allege that
defendants intentionally misrepresented the
unconscionability of several of the challenged
provisions and thereby fraudulently induced plaintiffs
to enter into the card agreements. Plaintiffs contend
that their fraudulent inducement claim requires the
recision of the contracts and the restitution of all fees
paid. Complaint ¶ 5. With respect to their statutory
causes of action, plaintiffs allege that they are entitled
to restitution, punitive damages and attorney's fees. *Id*

### The Challenged Provisions and Plaintiffs' Legal
### Theory

Plaintiffs' unconscionability arguments essentially
attack five provisions in the card-member
agreements. While there has been some minor
changes in the operative language over time, these
provisions have generally read as follows:
"If arbitration is chosen by any party with respect to a
claim, neither you nor we will have the right to
litigate that claim in court or have a jury trial on that
claim. Further, you and we will not have the right to
participate in a representative capacity or as a
member of any class of claimants pertaining to any
claim subject to arbitration. Except as set forth
below, the arbitrator's decision will be final and
binding."
"If either party elects to resolve a Claim by
arbitration, that Claim shall be arbitrated on an
individual basis. *There shall be no right or authority
for any Claims to be arbitrated on a class action
basis.*"
"We may change the terms or add new terms to this
Agreement at any time, in accordance with applicable
law. We may apply any changed or new terms to any
then-existing balances on your Account as well as to
future balances."
*2 "Our failure to exercise any of our rights ... or our
waiver of our rights ... shall not constitute a waiver of
such rights."
"These terms and conditions ... and all questions
about their legality ... are governed by the laws of the
State of Utah [New York with respect to gift and
dining cards] ... and by applicable federal law."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 4287557 (N.D.Cal.)
**(Cite as: Slip Copy)**

Complaint at ¶¶ 62-65.

Among other theories of unconscionability, plaintiffs emphasize that the arbitration provision includes an unconscionable class action waiver. *Id.* ¶¶ 66-72.According to the plaintiffs, this violates CLRA § 1770(a)(19) which makes it unlawful to "[i]nsert[ ] an unconscionable provision into a contract."The arbitration provision is also allegedly an "unfair practice" that "offends an established public policy" in violation of the UCL. *See*Cal. Bus. & Prof.Code § § 1670.5, 1668; Complaint ¶ 78.

Plaintiffs also allege that defendants have for some time been aware of the unconscionability of several of the challenged terms; and, in particular, the unconscionability of the unilateral modifications provision, the waiver provision, and the choice of law provision. Complaint ¶ 105. Despite this knowledge, defendants allegedly made representations that the terms were conscionable and enforceable. According to plaintiffs, these misstatements were made on the American Express website and in one-on-one interactions with customers. Complaint ¶ 104.

Defendants move to dismiss on various grounds. First, they argue that plaintiffs have not suffered an injury in fact and therefore do not have Article III standing to bring any of their claims. They also contend that the CLRA does not apply to credit cards as a matter of law and that the plaintiffs have failed to plead their fraud claim with the required particularity. Finally, in a separate motion to dismiss they argue that all of plaintiffs' claims are preempted by federal law. Because the Court concludes that plaintiffs lack Article III standing, this Memorandum and Order addresses only the standing issue.

### Article III Standing

Defendants argue that plaintiffs lack Article III standing to bring this action; specifically, they contend that plaintiffs have not demonstrated "injury in fact." "Injury in fact" is part of the irreducible minimum of the "case and controversy requirement of Article III."*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). An "injury in fact" must be "concrete and particularized" as well as "actual or imminent." *Id.* A generalized, hypothetical or conjectural injury is insufficient to establish Article III standing. *Id.* A

party invoking federal jurisdiction bears the burden of demonstrating an injury in fact. *Id.* at 561.To establish standing at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice."*Id.*

Defendants assert that plaintiffs have not demonstrated injury in fact because they have not shown that the challenged arbitration provisions have been implicated in any actual dispute or have otherwise caused plaintiffs harm; plaintiffs have made, in effect, a facial challenge to the legality of the card agreements. Such a challenge is not tied to any actual dispute between the parties and thus does not rest on any concrete injury that is cognizable under the *Lujan* standard. Put another way, defendants argue that even if the terms of the agreement are unconscionable and illegal, they are just "out there" and have not had any recognizable impact on plaintiffs.

**\*3** Plaintiffs respond with the following "theory" of injury in fact:
1. When plaintiffs paid for their charge/credit cards and/or gift cards, they paid, at least in part, for the right to mandatory arbitration of all disputes with defendants.
2. The mandatory arbitration provision in the contracts, however, is unconscionable and unenforceable because, among other things, it is a contract of adhesion with a class action waiver.
3. Plaintiffs have a fraud in the inducement claim that they would like to arbitrate; namely, that defendants misrepresented that the card member agreements contain conscionable terms.
4. But, in order to arbitrate their fraud claim, they would have to invoke the unconscionable and thus unenforceable arbitration provision.
5. Seeking to enforce an unconscionable provision is illegal, against public policy and otherwise a waste of time and money.
6. Thus, the unconscionable arbitration provision has denied plaintiffs the value of the right to arbitrate their fraud claim-something that they paid for in signing a contract with a mandatory arbitration provision.
7. Because plaintiffs did not get what they paid for, they have been injured in fact.

Plaintiffs' injury theory is thus premised on their assertion that they want to arbitrate their fraud claim but cannot. This theory fails for several reasons.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Page 3
Slip Copy, 2007 WL 4287557 (N.D.Cal.)
**(Cite as: Slip Copy)**

First, plaintiffs' theory rests on hypothetical assumptions about what may or may not transpire. To accept plaintiffs' position, the Court must first assume that plaintiffs will actually seek to arbitrate their fraud claim. The Court must also assume that the arbitrator will find that certain provisions of the contract, such as the class action waiver, are unconscionable. Next, the Court must assume that as a result of that finding, or perhaps other findings, defendants will insist that the arbitration clause is unenforceable and therefore that the fraud claim must be litigated in court, thereby depriving plaintiffs of their right to arbitrate. Or, if defendants do not insist on courtroom litigation, that the arbitrator will sua sponte refuse to arbitrate the case any further even if both parties agree to arbitrate. In other words, since plaintiffs profess to want to arbitrate their claims, their injury rests on the assumption that defendants will thwart arbitration or the arbitrator will refuse to arbitrate even if the parties want arbitration. These assumptions, especially the last assumption, are questionable, and, in any event, certainly premature. As such, it is impossible to conclude that plaintiffs have described an injury that is "imminent" within the meaning of *Lujan*.

Second, as support for their injury theory, plaintiffs rely on *Lozano v. AT & T Wireless Services, Inc.*, 504 F.3d 718 (9th Cir.2007).*See* Plaintiffs' Opposition at 4 ("Little need be said to refute Defendants' legal theory and argument since a recent decision of the Ninth Circuit-rendered several weeks after the filing of this Complaint-is dispositive of and conclusively establishes that Plaintiffs do have the requisite "injury in fact" and thus have standing to maintain all of their causes of action: *Lozano v. AT & T Wireless Services, Inc.*, 2007 U.S.App.LEXIS 22430 (9th Cir. September 20, 2007)."). *Lozano*, however, does not help plaintiffs and, indeed, demonstrates that plaintiffs lack standing.

*4 In *Lozano*, the plaintiff brought a class action in federal court under the CLRA and UCL challenging AT & T's practice of billing its cell phone customers for calls during a billing period other than the billing period in which the calls were made. In other words, if a customer had 400 free minutes a month, AT & T sometimes charged a call made during that month to the next month; such practice made it difficult for customers to keep track of their minutes and, in the plaintiff's case, caused him to exceed his minutes in some months and incur additional charges. This practice is known as "out-of-cycle billing." *Id.* at 722.

AT & T responded to the complaint by moving to compel arbitration. Plaintiff opposed the motion. The district court refused to compel arbitration on the ground that the arbitration agreement contained an unconscionable class action waiver. *Id.* at 723;*see also Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1176 n. 15 (9th Cir.2003) (holding that a unilateral bar on class-wide arbitration is substantively unconscionable).

Plaintiff subsequently moved for class certification. Among other theories, the district court certified a California class action "based on [AT & T's] inclusion of an unconscionable term in its agreement, i.e., the class action waiver."*Id.* at 730.The Ninth Circuit reversed the certification of this claim. The court noted that the district court "certified this class pursuant to a theory that was neither pled, nor properly considered by the district court when granting class certification."The complaint challenged out-of-cycle billing, not the inclusion of the class action waiver; as a result, the district court never analyzed whether a challenge to the class action waiver satisfied the prerequisites for class certification. *Id.* Moreover, because the district court "stuck in" the class action waiver class, the district court certified a theory with no definable class. The class definition adopted by the court was based solely on out-of-cycle billing, the original theory of the complaint:

The [class action waiver] class the district court certified under subsection (a)(19) [of the CLRA] is wholly unrelated to this definition. Any class certified under *subsection (a)(19)* [of the CLRA] necessitates a class definition that includes individuals who sought to bring class actions in California, but were precluded from doing so because of the class action waiver in AWS's arbitration agreement, *and suffered some resulting damage." See Wilens v. TD Waterhouse Group, Inc.*, 120 Cal.App.4th 746, 15 Cal.Rptr.3d 271, 276-77 (Cal.Ct.App.2003) (holding a court may not presume damages based on the mere insertion of an unconscionable clause in a contract).

*Id.* at 730-31 (emphasis added).
051 Extra cent-Y found within cent-Y markup.
Plaintiffs contend that this latter statement means that they have standing to challenge the unconscionable class action waiver. *See* Opp. at 5 ("That disposes of Defendants' CLRA standing argument. Just as the CLRA class members 'who sought to bring class

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 4287557 (N.D.Cal.)
(Cite as: Slip Copy)

actions, but were precluded from doing so because of the class action waiver, and suffered some resulting damage' had standing so do Plaintiffs here"). The Court does not understand how plaintiffs read such a holding into *Lozano.*The quoted statement has nothing to do with standing; it is in the context of defining a hypothetical class, and, in any event, it states that the "class action waiver" class must have been precluded from bringing a class action *and suffered some resulting damage." Id.* at 731 (emphasis added). The Ninth Circuit did not hold that the class action waiver class *had in fact* suffered some damage; instead, the Ninth Circuit was instructing the district court that the class members *must have suffered* some damage to be part of the class. This damage must be something more than simply being precluded from bringing a class action because the court stated that the class must have been so precluded *and* have suffered some damage. This conclusion is further reinforced by the Ninth Circuit's citation to *Wilens* and the parenthetical explanation that "a court may not presume damages based on the mere insertion of an unconscionable clause in a contract."*Id.*

*5 Here, plaintiffs have not and cannot allege any damage because they do not have a dispute with defendants that they tried unsuccessfully to litigate as a class action. Their dispute is merely the presence of the class action waiver which could render the arbitration provision unenforceable, even though they may never bring a class action or any action whatsoever, and even if defendants may not oppose arbitration, even if certain terms are unconscionable and thus unenforceable. They ask this Court to presume damages from the mere insertion of the allegedly unconscionable clauses in a contract. *Lozano* holds that such presumption is wrong.

In their post-hearing submission, plaintiffs contend that the *Lozano* court "found standing in the absence of an arbitration so that the plaintiff could maintain challenges under the UCL and CLRA relative to the arbitration provision."Plaintiffs' characterization of *Lozano* is wrong. As even a cursory reading of the opinion demonstrates, the court held that the plaintiffs had standing to challenge the out-of-cycle billing because the named plaintiff suffered actual injury from the practice in the form of additional charges and being unable to utilize all the monthly minutes for which the plaintiff had contracted. *Id.* at 731-34.Neither the district court nor the Ninth Circuit ever addressed plaintiff's standing to make a

challenge to the arbitration provision because, as the Ninth Circuit explained, the plaintiff did not make such a claim; rather, the district court apparently certified such a claim even though none was made.

Third, even if the Court accepted that plaintiffs have demonstrated that they are barred from arbitrating their proposed fraud claim, that bar cannot constitute an injury in fact unless the fraud claim *itself* is based on some cognizable injury. Plaintiffs' fraud claim, however, is-at its core-simply a claim that defendants fraudulently misrepresented that the agreements do not contain unconscionable terms. *See* Complaint ¶¶ 103-07. Plaintiffs have not been injured by this representation. Since none of those provisions has been implicated in any dispute, the harm is simply that plaintiffs entered into agreements with unconscionable terms that may or may not have any impact in the future. Consequently, for plaintiffs' theory of injury to fly, the Court must conclude that the inclusion of unconscionable terms in plaintiffs' contract, standing alone, caused injury in fact. The Ninth Circuit in *Lozano* says that it does not.

### CONCLUSION

At bottom, plaintiffs' argument is that they were damaged by the mere existence of the allegedly unconscionable terms in their card agreements. But those terms have not been implicated in any actual dispute between the parties. The challenged terms have not, for instance, been invoked against plaintiffs and they have not prohibited plaintiffs from asserting their rights. No court, state or federal, has held that a plaintiff has standing in such circumstances and plaintiffs have not convinced this Court that it should be the first. Accordingly, defendants' motion to dismiss for lack of standing is GRANTED.

*6IT IS SO ORDERED.

N.D.Cal.,2007.
Lee v. American Express Travel Related Services
Slip Copy, 2007 WL 4287557 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Not Reported in F.Supp.2d                                                                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 695471 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**Ross v. Board of Educ. of Tp. High School Dist. 211
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
Lindsey ROSS, by an through her parents and next friends, Michael and Diane Ross, Plaintiff,
v.
BOARD OF EDUCATION OF TOWNSHIP HIGH SCHOOL DISTRICT 211, Dr. Daniel E. Cates, Director of Special Education, Township High School District 211 and Dr. Bennett L. Leventhal, M.D., Defendants.
**No. 05 C 6111.**

March 14, 2006.

Juli Wilson Marshall, Nicholas Benjamin Gorga, Peter N. Moore, Latham & Watkins LLP, Chicago, IL, for Plaintiff.
Jack J. Carriglio, James Gregory Argionis, Meckler, Bulger & Tilson, Michael T. Trucco, Julie Anne Howie, Stamos & Trucco, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*
PLUNKETT, Senior J.
**\*1** Plaintiff, Lindsey Ross ("Lindsey" or "Miss Ross") is an eighteen year-old female who was born with Rett Syndrome, a rare genetic neurological disorder that impairs her ability to communicate and move. By and through her parents and next friends, Michael and Diane Ross, on October 25, 2005, she filed a six-count complaint against the Board of Education of Township High School District 211 ("District 211"), Dr. Daniel Cates ("Dr.Cates") and Dr. Bennett Leventhal ("Dr.Leventhal"), arising from various difficulties connected with her special education at District 211. Before the Court are District 211 and Dr. Cates' motion to dismiss Counts I, II and III and Dr. Leventhal's motion to dismiss Counts IV, V and VI. All motions have been pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons provided below, the motions are granted in part and denied in part.

*Legal Standard*

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *Blodgett v. Wachovia Nat. Bank, N.A., No. 04 C 6836, 2006 WL 140545, at \*3 (N.D.Ill. Jan.13, 2006)*(citing *Forseth v. Village of Sussex, 199 F.3d 363, 368 (7th Cir.2000)*). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."*Id.* (quoting *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)*). Moreover, any ambiguities in the complaint will be construed in favor of the plaintiff.*Thompson v. Ill. Dep't of Prof'l Regulation, 300 F.3d 750, 753 (7th Cir.2002)*.

*Background*

I. Pre-Litigation/Settlement Facts.

The factual and procedural background of this case is complicated and has been divided into four chronological sections. As noted, Lindsey is an eighteen year-old female who has Rett Syndrome. Compl. ¶ 3. Notwithstanding her disorder, from first grade through eighth grade, Lindsey was enrolled in Schaumburg District 54's ("District 54") regular education program. *Id.* ¶ 10.This meant that she attended classes with her non-disabled peers, though District 54 adapted its regular education program in order to meet her individual needs. *Id.* Beginning in the spring of 2001, Lindsey's parents, employees of District 54 and employees of District 211, including its director of special education, Dr. Cates, met to discuss Lindsey's transition between schools (middle school to high school) and educational districts (District 54 to District 211).*Id.* ¶ 12.According to her complaint, Lindsey alleges that at the outset Dr. Cates "believed [that she] would be better suited to a segregated environment due to her disability" rather than continuing to educate her in a regular education program with her non-disabled peers. *Id.* ¶¶ 13, 18.Thus, Dr. Cates turned down various offers of assistance from both officials at District 54 and from Lindsey's parents, who also offered, at their own expense, to pay for additional staff to help ensure a smooth transition for their daughter. *Id.* ¶¶ 14-15.

**\*2** Thereafter, in May and June 2001, Lindsey's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2006 WL 695471 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Individualized Education Program ("IEP") team met to review Lindsey's educational needs for the upcoming high school year as well as to set various goals and objectives.[FN1]*Id.* ¶ 18.In formulating Lindsey's IEP, Dr. Cates called for new and different educational goals than those of District 54. *Id.* ¶ 20.Though Lindsey alleges that these goals were initially were "unworkable," as Dr. Cates proposed reducing Lindsey's therapy services from the levels previously afforded to Lindsey by District 54, after being redrafted by Dr. Cates' staff, they were ultimately incorporated into her IEP. *Id.* ¶¶ 20-21.Yet, notwithstanding District 211 and Dr. Cates' alleged desires to place Lindsey in a segregated learning environment, the final IEP formulation required Lindsey to be educated in Conant High School's ("Conant") regular educational program with all of the services necessary to facilitate her education. *Id.* ¶ 19.

> FN1. The Individuals with Disabilities Education Act, 20 U.S.C. § 1415(j), requires states that accept federal funding for educating disabled children to "provide them with a 'free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living.' ' *Casey K. ex rel. Norman K. v. St. Anne Cmty. High School Dist. No. 302*, 400 F.3d 508, 509 (7th Cir.2005) (quoting 20 U.S.C. § 1400(d)(1)(A)). "The particulars of the child's program are required to be set forth in an 'Individualized Education Program' devised by school officials in collaboration with the child's parents." *Id.* (citing 20 U.S.C. § 1414(d)).

During the first semester of Lindsey's freshman year at Conant, staff informed her parents in multiple progress reports tracking Lindsey's IEP goals and objectives, that they were pleased with her progress. *Id.* ¶ 32.The staff noted that Lindsey had met almost all of her objectives, adding in one report that Lindsey "was 'a pleasure to have in class." ' *Id.* ¶ 33.Yet, despite Lindsey's first semester progress, during the middle of Lindsey's freshman year, it appears that progress started to erode as Lindsey allegedly began hitting her aides, resulting in numerous suspensions. *Id.* ¶¶ 35, 38.However, Conant later determined that the suspensions were a result of her disability, and Lindsey's behavior was

attributed to three serious infections and the antibiotics used to treat those infections. *Id.* ¶¶ 35, 39.Indeed, one expert on Rett Syndrome retained by Lindsey's parents concluded that Lindsey's medical problems "contributed substantially to adverse behavior" adding "that he was 'confident that the [tonsillectomy] and addition of new medications will benefit her behavior in the future." ' *Id.* ¶ 39.

In an effort to determine Lindsey's placement for her sophomore year of high school, in May 2002, District 211 retained the University of Chicago's Developmental Disorders Clinic (the "Clinic") for a multidisciplinary evaluation in order to assess and update Lindsey's IEP. *Id.* ¶¶ 40-41.Dr. Leventhal, a member of the Clinic's evaluation team, purportedly observed Lindsey as "occasionally aggressive to others or hit[ting] herself" and made numerous psychopharmacological recommendations based on those observations.[FN2]*Id.* ¶ 44.The report ultimately concluded that Lindsey's behavior mandated a self-contained environment, such that "behavior control should be the primary focus of her programming for the next period of time in her educational plan with academics taking a distinctly secondary role."*Id.* ¶¶ 42, 45.Lindsey alleges that as a result of the Clinic's report, and Dr. Leventhal's "purported evaluation" therein, District 211 proposed on August 23, 2002, that Lindsey be placed in one of two self-contained, segregated schools for disabled children rather than return to Conant. *Id.* ¶ 51.

> FN2. Lindsey disputes the extent of Dr. Leventhal's observations. She alleges that his observations in the Clinic's report "were not based on actual medical observation or any other medically accepted form of evaluation, but appear to have merely parroted District 211's assertions."Compl. ¶ 46.

II. District 211's Suit Against Lindsey and Her Parents and The Parties' Agreement Temporarily Settling that Suit.

*3 Disagreeing with the District 211's recommendation, Lindsey's parents sought administrative review of the recommendation and attempted to invoke the Individuals with Disabilities Education Act's ("IDEA") "stay put" provision in an effort to keep their daughter enrolled in Conant's regular education program.[FN3]*Id.* ¶ 52.However, before Lindsey's parents could invoke the "stay put"

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 695471 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

provision, on August 27, 2002, District 211 filed suit in federal court, seeking a temporary restraining order to prevent Lindsey's parents from invoking the "stay put" provision.[FN2] *Id.* This first lawsuit was assigned to U.S. District Judge Kennelly and after several extensions of the temporary restraining order initially entered in the case, in November 2002, District 211 and the Rosses entered into a settlement agreement. *Id.* In pertinent part, they agreed that a panel of expert consultants (the "expert panel" or "panel") would be appointed, including Dr. Leventhal, all in an attempt to: (1) help plan for Lindsey's return to Conant; (2) train staff who would be working with Lindsey; and (3) recommend any changes to Lindsey's IEP such as to enable Lindsey to succeed at Conant.[FN3] *Id.* ¶ 52.Because of the settlement agreement, Judge Kennelly dismissed District 211's complaint with prejudice, but "retained jurisdiction to enforce the terms of the settlement."Minute Order, No. 02 C 6098 (N.D.Ill. Nov. 22, 2002) [doc # 9].

FN3. The "stay put" provision of the IDEA requires that a child remains in his or her "then-current educational placement" during the pendency of various proceedings under the IDEA and lifts when the proceedings are complete. 20 U.S.C.A. § 1415. This provision "has been interpreted as imposing an automatic statutory injunction, like the automatic stay in bankruptcy."*Casey K. ex rel. Norman K.,* 400 F.3d at 511.

FN4. Since the Complaint as set forth by Lindsey is relatively silent as to this first lawsuit, this Court takes judicial notice of the record of the first suit, *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Michael R. and Diane R.,* No. 02 C 6098 (Kennelly, J.). This Court can take judicial notice of matters of public record without converting the Defendants' Rule 12(b)(6) motions into motions for summary judgment. *See, e.g., Anderson v. Simon,* 217 F.3d 472, 474-75 (7th Cir.2000); *Henson v. CSC Credit Serv.,* 29 F.3d 280, 284 (7th Cir.1994). To the extent the Court uses these facts to aid its decision, it does so solely to determine the appropriateness of the preclusive doctrines of *res judicata.*

FN5. Rather than have their daughter educated in segregated learning

environment, Lindsey's parents temporarily withdrew her from schooling at District 211.

**III. Post-Settlement Facts, The Reinstatement of Litigation by District 211, the Administrative Hearing, Lindsey's Appeal Thereof and Judge Kennelly's Memorandum Opinion and Order Terminating That Litigation.**

Though the parties entered into the settlement agreement in November 2002, the panel did not issue recommendations for Lindsey's return to Conant until March 2003 and Lindsey did not return to Conant until April 2003, doing so only on a part-time basis. Compl. ¶¶ 53, 55. Lindsey's return was generally regarded as successful and she "developed a positive rapport" with a particular special education teacher and also an aide. *Id.* ¶ 56.Similar to the first semester of her freshman year, Lindsey again met virtually all of her IEP goals and in comparison to the second semester of that year, Lindsey's behavior improved and she exhibited minimal behavioral problems. *Id.* ¶ 57.

Following Lindsey's April 2003 part-time return to Conant, her parents desired to increase the amount Lindsey's educational workload. *Id.* ¶ 60.To this end, they sought action by the panel "to address when and to what extent [Lindsey] could increase her participation at Conant."*Id.* ¶ 60.Yet, as Lindsey alleges, the panel's members had little contact with each other, particularly with Dr. Leventhal, who failed to attend meetings, observe Lindsey at home or school and did not participate in training Lindsey's staff. *Id.* Dr. Leventhal's alleged actions (or inactions) if true, clearly reflect his stated desire to "get out of this mess." *Id.* ¶¶ 61-62.

*4 Despite Lindsey's progress in the spring of 2003, Lindsey alleges that District 211 officials denied her "the benefit of an appropriate summer program, even though the Expert Panel had agreed that [she] would benefit from extended school year programming over the summer."*Id.* ¶ 59.Further, during that summer, Lindsey's parents sought to ensure that District 211 retained staff they felt had worked so well with their daughter in the past. *Id.* ¶ 68.Instead, they allegedly refused to rehire Lindsey's aide and also replaced Lindsey's speech therapist. *Id.* ¶ 69.Moreover, she alleges that they waited "until the last minute" to hire aides for Lindsey, instead relying on "unqualified administrators" despite the fact that Lindsey's old aide and speech therapist were still available. *Id.* ¶

Not Reported in F.Supp.2d                                                                     Page 4
Not Reported in F.Supp.2d, 2006 WL 695471 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

70.

Toward the end of the summer of 2003, Lindsey's
parents and school officials again met to discuss
Lindsey's IEP. *Id.* ¶¶ 64, 66.After what she asserts
was only after considerable pressure from her parents
and legal counsel, Lindsey contends that the
members of the panel, with the exception of Dr.
Leventhal, met to plan Lindsey's return to Conant for
the fall semester 2003.*Id.* ¶ 63.Indeed, according to
Lindsey's complaint, the dysfunction of the expert
panel is demonstrated not only by Dr. Leventhal's
absence, but also by another member's belief that,
according to Lindsey, "he could not ethically
continue in his role as a panel member due to the
process being dysfunctional."*Id.* ¶ 66.Again, Conant
officials reiterated their position that Lindsey should
not be placed at Conant, and instead offered to place
Lindsey anywhere outside their district. *Id.* ¶ 64.

Notwithstanding this position, Lindsey's parents and
District 211 ultimately agreed that Lindsey should
still continue at Conant on a reduced schedule, but
one that significantly increased her workload in
comparison to her schedule of the previous spring. *Id.*
¶ 67.Again, Lindsey alleges that she received less
services that semester, stating that "Conant staff
arbitrarily reduced [her] occupational, physical, and
speech therapy during this time without any feedback
from the Expert Panel as to whether this denial of
benefits was desirable, even though [Lindsey's]
course load had been increased."*Id.* ¶ 74.Yet, despite
Lindsey's return to Conant, in October 2003, District
211 informed Lindsey's parents that it planned on
again recommending that Lindsey be placed in a
segregated learning environment. Thus, in the
November 2003 IEP meeting, the district "again
attempted to change [Lindsey's] educational
placement, although, as Lindsey provides, the expert
panel "indicated that [her] needs could be met in an
individualized education program in a regular high
school."*Id.* ¶ 77.

Thereafter, on November 9, 2003, approximately one
year after the entry of the settlement agreement for
the first lawsuit, District 211 and the Rosses found
themselves back in court before Judge Kennelly.
District 211 reinitiated litigation by filing an
emergency motion for relief pursuant to the terms of
the settlement agreement. *See* District 211's
Emergency Mot. For Relief *in* No. 02 C 6098 (filed
Nov. 9, 2003) [doc. # 10]. Therein, District 211
sought to resolve the disagreement as to whether

Lindsey should continue to be educated at Conant.
*See id.* at 1. In response, Lindsey, by and through her
parents, sought a temporary restraining order and
preliminary injunction which would require Lindsey's
return to Conant, find that Conant should be her "stay
put" educational placement, and to set aside the
settlement agreement as null, void and unenforceable.
*See* Lindsey's Mot. for TRO & Prelim. Inj. *in* No. 02
C 6098 (filed Nov. 10, 2003) [doc. # 14]. At that
time, Lindsey also answered District 211 original
complaint, adding several counterclaims as
well.[FN6] *See* Lindsey's Ans. & Countercl. *in* No. 02 C
6098 (filed Nov. 10, 2003) [doc. # 15]. The
counterclaims sought relief for District 211's alleged
failures to: (1) provide Lindsey with a free
appropriate public education; (2) utilize appropriate
functional behavioral analyses or behavior
intervention plans; (3) obtain Lindsey's parents'
consent prior to the administration of a psychiatric
evaluation by Dr. Leventhal and the University of
Chicago's Developmental Disorders Clinic; (4)
provide Lindsey with accommodations or support in
a timely matter; and (5) to consider less restrictive
educational options than an out of district placement.
*Id.* The counterclaim also alleged a breach of the
settlement agreement. *Id.*

> FN6. Lindsey's use of "cross complaint"
> rather than counterclaim is a malapropism.
> However, because the pleading made
> allegations against District 211, an opposing
> party, rather than against a co-defendant or
> co-party, it is properly labeled a
> counterclaim. *See generally*FED. R. CIV. P.
> 13 (governing the filing of counterclaims
> and cross-claims). Moreover, while Lindsey
> filed a counterclaim at this time, the Court
> notes that the counterclaim was later
> amended after an administrative hearing was
> conducted. The Court also notes that in
> comparing the paragraphs of Lindsey's
> counterclaims in the first action with those
> found in her complaint in this action there
> are no less than 28 paragraphs which are
> factually analogous. *Compare* Ans. &
> Countercl. *in* No. 02 C 6098 (filed Nov. 10,
> 2003)*with* Compl.

**\*5** Around that same time, Lindsey's parents
requested (and received) the reinstatement of the due
process hearing which they initiated in August 2003
in their failed attempt to invoke the IDEA's "stay put"
provision. An independent hearing officer was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 695471 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

reappointed and presided over forty-two days of testimony-the longest special education due process hearing in Illinois history. *See Bd of Educ. of Twp. High Sch. Dist. No. 211 v. Michael R. & Diane R., No. 02 C 6098, 2005 WL 2008919, at \*7 (N.D.Ill. Aug.15, 2005)*. On August 23, 2003, the hearing officer issued a sixty-one page decision in which she concluded that District 211's educational placement decision was appropriate. Thereafter, on October 12, 2004, Lindsey amended her counterclaim to appeal the independent hearing officer's decision to Judge Kennelly and to change the specific counterclaims she asserted against District 211. Among the changes to her counterclaim, Lindsey added a claim that various actions of District 211, the independent hearing officer and the Illinois State Board of Education (who Lindsey added as a cross-defendant) were in violation of the Americans with Disabilities Act and also with Section 504 of the Rehabilitation Act. Furthermore, Lindsey added a count that contended that the decision of the independent hearing officer should be overturned by alleging that District 211 created a hostile environment for Lindsey.

After reviewing cross-motions for summary judgment, Judge Kennelly found that District 211 satisfied its burden to provide Lindsey with a free adequate public education, see *id.* at \*16, noting that "[t]he preponderance of the evidence supports the conclusion that Lindsey gained no meaningful educational benefit from her time at Conant and that she would be better served in a multi-needs school, as proposed by the District."*Id.* at \*20.Judge Kennelly also found no material breach of the settlement agreement entered into by the parties in November 2002. *Id.* at \*22.

In holding for District 211, Judge Kennelly also reviewed various procedural challenges to the independent hearing officer's decision, including Lindsey's argument that the hearing officer improperly prevented her "from presenting evidence of past behavior of District 211 administrators which allegedly would have shown its bad faith in implementing Lindsey's program" as well as her ADA and Rehabilitation Act claims. *Id.* at \*25.As to the issue of past evidence, Judge Kennelly found that the independent hearing officer's decision was not unreasonable and thus did not warrant reversal since "the purpose of the hearing was to determine the appropriateness of Lindsey's placement."*Id.* As to the ADA and Rehabilitation Act claims, Judge Kennelly

noted:
The Court's ruling that the District did not violate the IDEA in placing Lindsey in a self-contained, special education setting, also requires denial of defendants' ADA and Rehabilitation Act claims. In addition, as the District argues, defendants have offered no evidence from which a fact finder reasonably could determine that the District intentionally discriminated against or failed to accommodate Lindsey based on her disability."

\*6*Id.* Thus, Judge Kennelly granted District 211's motion for summary judgment while denying Lindsey's and entered judgment in favor of District 211. *Id.* On September 13, 2005, Lindsey appealed Judge Kennelly's decision to the Seventh Circuit and her appeal remains pending.

IV. Procedural Background of the Present Litigation.

Thereafter, and as noted above, on October 25, 2005, Lindsey filed her six-count complaint against District 211, Dr. Cates and Dr. Leventhal in what she characterizes as an attempt "to redress a pattern and practice of discrimination."Pl.'s Mem. Resp. Dist. 211/Cates' Mot. to Dismiss at 2. Now, in Counts I and II, Lindsey alleges that District 211 violated the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794, in that "[t]he actions of District 211's staff and employees resulted in the discrimination against and exclusion of Miss Ross from the services, programs and activities to which she was statutorily and constitutionally entitled for ... solely by reason of her disability."Compl. ¶ ¶ 94, 99. In Count III, she also alleges that Dr. Cates, as director of District 211's special education program, violated the Civil Rights Act, 18 U.S.C. § 1983, "in bad faith and in violation of Miss Ross's rights, and/or as part of a custom and practice to deny or refuse services to children with disabilities at Conant" such as to deprive Lindsey "of her right to services, programs and activities to which she was otherwise entitled without due process of law and denied her the equal protection of the law."*Id.* ¶ 105.

While Counts I through III are against District 211 and Dr. Cates and are based on federal law, in her present complaint, Lindsey added state law claims in Counts IV through VI to focus on Dr. Leventhal actions. Count IV alleges medical malpractice against Dr. Leventhal in that he breached his duty of care owed to his patient, Lindsey, by: (1) conducting a

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2006 WL 695471 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

psychiatric and physical examination of Lindsey absent her parents' consent; (2) making a pharmacological recommendation without a proper examination; (3) reporting on Lindsey's health and behavior and thereby recommending an educational placement not based on medical observations or data; and (4) submitting false testimony at a due process hearing regarding Lindsey's educational placement. *Id.* ¶ 110.Additionally, like in her malpractice count, Count V and VI respectively allege violations of the Illinois Mental Health Code, 405 ILL. COMP. STAT.. 5/2-107, and common law battery against Dr. Leventhal for his administration of a psychiatric and physical exam of Lindsey in the absence of parental consent.*Id.* ¶¶ 112-121.

In response to Lindsey's complaint, on November 30, 2005, District 211 and Dr. Cates moved to dismiss the counts against them on the grounds of *res judicata* and collateral estoppel. *See generally*Dist. 211/Cates' Mem. Supp. Mot. to Dismiss. Thereafter, on January 9, 2006. Dr. Leventhal likewise moved to dismiss all claims against him. As with District 211 and Dr. Cates, Dr. Leventhal argues that *res judicata* bars all claims against him. Additionally, he claims that dismissal as to all claims against him is appropriate because Lindsey released her claims by virtue of the November 2002 Settlement Agreement and also because Lindsey failed to comply with Illinois Code of Civil Procedure Section 2-622's affidavit requirements in malpractice actions. As to arguments for particular claims asserted against him, Dr. Leventhal contends that Lindsey failed to adequately plead her medical malpractice claim, that the count alleging a violation of the Illinois' Mental Health Code should be dismissed because it does not contain a private right of action and that the Court should strike Lindsey's request for attorney's fees against him. *See generally* Leventhal Mem. Supp. Mot. to Dismiss. With this background in mind, the Court turns to the issues presented by the Defendants in their motions to dismiss.

*Discussion*

I. Res Judicata

**\*7** According to the Defendants, Lindsey's complaint must be dismissed because of the preclusive effect of the lawsuit brought by District 211 against Lindsey's parents, individually and as next friends of Lindsey. *See Bd. of Educ. of Tp. High School Dist. No. 211 v. Michael R. & Diane R.*, No. 02 C 6098, 2005 WL

2008919, at *1 (N.D.Ill. Aug.15, 2005) (Kennelly, J.). Moreover, they argue for a preclusive effect of the administrative due process hearing before the Illinois State Board of Education.

"Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."*San Remo Hotel, L.P. v. City and County of San Francisco*, 545 U.S. 323, ----, 125 S.Ct. 2491, 2500, 162 L.Ed.2d 315 (2005) (citing *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980))."Because the prior litigation was brought in federal court on a federal claim, the federal rule of *res judicata* determines whether *res judicata* applies to the present action."*Cent. States, SE & SW Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 628 (7th Cir.2002) (citing *In the Matter of Energy Co-op., Inc.*, 814 F.2d 1226, 1230 (7th Cir.1987))."The three requirements for *res judicata* under federal law are: (1) an identity of the parties or their privies; (2) an identity of the causes of actions; and (3) a final judgment on the merits."*Id.* The Court will examine each element in order, but only to the extent such elements pertain to Lindsey's claims against District 211 and Dr. Cates and without addressing the applicability of *res judicata* on Lindsey's claims against Dr. Leventhal.

A. *Identity of Parties or Their Privies*

The first issue this Court must address in considering any *res judicata* argument is to identify whether the parties in the present case were either parties in the prior litigation or in privity with a party therein. While the definition of a "party" is clear enough, the definition of "privity" needs elaboration. In defining "privity," the Seventh Circuit has noted that it "is now seen as 'a descriptive term for designating those with a sufficiently close identity of interests.' " *Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 971 (7th Cir.1998) (quoting *In Matter of L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir.1993)).

Clearly, District 211, as plaintiff in the first suit and now defendant in this suit, can be considered a "party" for *res judicata* purposes. Moreover, the Court finds that there is privity between the first suit and this suit with respect to Lindsey and her parents, who at all times appear to have been represented by counsel. In the first suit, District 211 sued Lindsey's parents "individually and as next friends of Lindsey R., a minor."In the present suit, Lindsey "by and

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 695471 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

through her parents as next friends" is suing District 211, Dr. Cates and Dr. Leventhal. *See Whisby-Myers v. Kiekenapp, 293 F.Supp.2d 845, 853 (N.D.Ill.2003)* (citing Rule 17 of the Federal Rules of Civil Procedure and noting that parents have standing to sue on behalf of their children).*See also Doe v. Montessori School, 287 Ill.App.3d 289, 223 Ill.Dec. 74, 678 N.E.2d 1082, 1089-90 (Ill.App.Ct.1997)* (noting under Illinois law that a minor cannot litigate except through a guardian, guardian ad litem, or next friend under Illinois law); *Blue v. Illinois, 585 N.E.2d 625, 596 (Ill.App.Ct.1992)* (noting under Illinois law that a parent proceeding as a "next friend" must obtain counsel before proceeding in the case). Indeed, it is through her parents that Lindsey is currently asserting a claim that she was intentionally discriminated against because of her disability. Thus, there is privity with respect to Lindsey in this and the earlier litigation.

*\*8* But what about Dr. Cates? Admitting (as he must) that he was not a party to the first lawsuit, Dr. Cates argues that he is in privity with District 211 because of his position as director of special education for District 211 and also because of the allegations made as to him in the first and present lawsuits. Dist. 211/Cates Mem. Supp. Mot. to Dismiss at 12. Because Lindsey has sued Dr. Cates under Section 1983, it is necessary to determine whether she is suing him in his personal or official capacity. If she is suing him in his official capacity, privity exists, see *Gray v. Lacke, 885 F.2d 399, 405 (7th Cir.1989)*, but if she is suing him in his personal capacity, it does not, see *Connor v. Reinhard, 847 F.2d 384, 395 (7th Cir.1988)*. Further, use of a defendant's "official title" in a complaint is evidence that the defendant is being sued in his or her official capacity, as is a "challenge[ ] to an official policy or custom."*Miller v. Smith, 220 F.3d 491, 494 (7th Cir.2000)*.

The Court finds that Lindsey is suing Dr. Cates in his official capacity. In drafting the caption for her complaint, Lindsey lists Dr. Cates as a defendant, thereafter listing his position as "Director of Special Education, Township High School District 211."*See* Compl. Moreover, in several paragraphs of her Section 1983 claim, Lindsey specifically references Dr. Cates' position when making allegations against him. *See, e.g.,* Compl. ¶¶ 105, 106 ("By his actions and the actions of persons directly and indirectly responsible to him *in his role as Director of Special Education for District 211*, Dr. Cates, in bad faith and in willful violation of Miss Ross's rights ...."); *id.*

¶ 107 ("As a direct and proximate result of the actions and inactions of Dr. Cates *in his role as Director of Special Education for District 211 ...." )* (emphases added). She also sues him, in part, for his actions which she alleges are "part of a custom and practice to deny or refuse services to children with disabilities at Conant"-a clear challenge to what she appears to believe is an official custom at District 211. *Id.* ¶¶ 105-06.Thus, the Court finds that Dr. Cates is in privity with District 211 in the prior lawsuit, especially when Lindsey herself does not dispute this element in her response brief. Accordingly, as to District 211 and Dr. Cates, the Court will turn to the next requirement for *res judicata* under federal law, namely, whether there is an identity of the causes of action between this lawsuit and the previous lawsuit.

### B. Identity of the Causes of Actions

The next issue the Court will address is whether an identity of causes of action exist between the first lawsuit and this lawsuit. According to District 211 and Dr. Cates, an identity is shown in a number of ways. First, they contend that the core facts of the two lawsuits are the same in that both actions challenge the District's actions toward Lindsey while she was enrolled at Conant. Dist. 211/Cates Mem. Supp. Mot. to Dismiss at 9-10. Second, they argue that Lindsey has alleged the same claims as were alleged in the first suit, *i.e.* violations of the ADA and the Rehabilitation Act, claims conclusively decided by Judge Kennelly. *Id.* at 11.Finally, District 211 and Dr. Cates contend that Lindsey's addition of a Section 1983 violation by Dr. Cates does not create a new cause of action where the "same set of core facts forms the basis of both proceedings."*Id.*

*\*9* In response, Lindsey argues that her current claims were not raised in the first lawsuit because that lawsuit was governed by the November 2002 settlement agreement, which she argues limited the scope of the first lawsuit. Pl.'s Resp. Dist. 211/Cates Mot. to Dismiss at 8-9. Thus, she asserts that her present claims could not have been brought in the first suit because "[t]he application of the Settlement Agreement to the First Lawsuit closed the door on a host of issues that might otherwise been addressed" adding that her current counts "are based primarily on facts occurring prior to the November 2002 Settlement Agreement."*Id.* Moreover, she notes "[n]either the Administrative Hearing, nor the subsequently brought cross claims, addressed pre-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 695471 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 8

settlement facts."*Id.* Indeed, she points out that District 211 successfully objected to any attempt to introduce pre-settlement facts in the administrative hearing. *Id.* at 13.[FN7]

> FN7. However, settlements have a way of merging with pre-settlement claims. This argument that because the facts are "pre-settlement facts," Ross' claim may move forward is unavailing. When looking at the language of the settlement we note that not only are the facts the same, but so are the parties, or their privies. The settlement clearly states that the parties released Defendant from any and all claims "which have or may have arisen as a result of the past actions or inactions of the School District ..." (Plf.'s Ex. 1.) We have not been presented with a matter that is outside of the terms of the settlement agreement.

"A claim has 'identity' with a previously litigated matter if it emerges from the same 'core of operative facts' as that earlier action."*Brzostowski v. Laidlaw Waste Systems, Inc.,* 49 F.3d 337, 339 (7th Cir.1995) (quoting *Colonial Penn Life Ins. Co. v. Hallmark Ins. Admin., Inc.,* 31 F.3d 445, 447 (7th Cir.1994))."Two claims are one for the purposes of res judicata if they are based on the same, or nearly the same, factual allegations."*Id.*"Because the function of res judicata is to require the joinder of all legal challenges to a wrong, and all claims for relief arising out of those events, *without* compelling the joinder of claims arising from separate wrongs, ... claims 'based on the same, or nearly the same, factual allegations' must be joined."*Roboserve, Inc. v. Kato Kagaku Co., Ltd.,* 121 F.3d 1027, 1034 (7th Cir.1997) (quoting *Perkins v. Board of Trustees of the Univ. of Illinois,* 116 F.3d 235, 236-37 (7th Cir.1997)) (citations omitted, emphasis in original).

Here, Lindsey's present claims against District 211 and Dr. Cates arise out of the same or nearly the same factual allegations as District 211's complaint seeking an injunction. As a result, Lindsey's current claims, based primarily on pre-settlement facts, should have been brought in the first lawsuit. In reaching this conclusion, the Court notes the operation of Rule 13(a) of the Federal Rules of Civil Procedure, which required Lindsey to assert all of her claims in the first lawsuit in order to avoid being unable to litigate them later. The Seventh Circuit has discussed the relationship between Rule 13(a) and the

doctrine of *res judicata,* noting as follows:
Despite the impression one might get from the name of the doctrine, no one is "compelled" to present a compulsory counterclaim. Only a litigant that wants to avoid a later defense of preclusion need do so. The definition of a compulsory counterclaim-a claim that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim"-mirrors the condition that triggers a defense of claim preclusion (res judicata) if a claim was left out of a prior suit.

*10*Publicis Commc'n v. True North Commc'ns Inc.,* 132 F.3d 363, 365 (7th Cir.1997). Thus, "Rule 13(a) establishes that a defendant's omission [of a counterclaim in the first suit] has the same consequences as a plaintiff's" omissions: they are prevented from raising that claim at a later date. *Id.* See also *CIVIX-DDI, LLC v. Expedia, Inc.,* No. 04 C 8031, 2005 WL 1126906, at *3 (N.D.Ill. May 2, 2005) ("Rule 13(a) promotes judicial economy by avoiding multiple actions involving disputes arising from a common factual background.") (citing *In re Price,* 42 F.3d 1068, 1073 (7th Cir.1994)).

Here, in examining District 211's verified complaint for injunctive relief, the Court notes that its facts parallel those found in Lindsey's present complaint. Indeed, examples are abundant and are set forth as follows. First, in Paragraph 11 its complaint, District 211 pleads
11. On May 21 and July 11, 2001, District 211 met to review the District 54 eligibility statement as it existed at the time and also to clarify the adverse effect of disability on educational performance, due to somewhat unclear language received from District 54. District 211 then confirmed the "Other Health Improvement" and "Speech Language" as Lindsey's disability categories ... And, in deference to Parents, the Team recommended placement in a "mainstream" educational environment, with supplementary resource help and the related services of occupational therapy, physical therapy and speech/language therapy. Lindsey's parents were in attendance at both of these meetings, had meaningful and detailed participation at the meetings, and were in agreement with the recommendation.

Dist. 211 V. Compl. Inj. ¶ 11. Similarly, in her present complaint, Lindsey discusses in Paragraphs 10 through 21 her transition from District 54 to District 211, particularly the IEP meeting that spring. Specifically, she notes in Paragraphs 18 and 19

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 695471 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

that18. On May 21 and July 11, 2001, Miss Ross's Individualized Education Program ("IEP") team met to review Miss Ross's eligibility for special education in high school, to review the potential adverse effects of her disability, and to determine educational placement needs. Miss Ross believes, and on that basis alleges, that Dr. Cates believed and desired at that time and following that Miss Ross should be placed in a self-contained environment, rather than be included in the same programs and activities as her peers as she had been in grade school and middle school.

19. However, in purported deference to Miss Ross's parents, Miss Ross's IEP called for her placement in regular education at the James B. Conant High School ("Conant") with all appropriate services.

Compl. ¶¶ 18-19.

Secondly, in Paragraphs 15 and 16 of District 211's complaint, the District discusses Lindsey's "extremely high number of self-injurious and physically aggressive behaviors" noting that those "behaviors increased dramatically after she returned from Winter Break in January 2002" and documenting those behaviors between September 2001 and May 2002. Dist. 211 V. Compl. Inj. Relief ¶¶ 15-16. But now, in Paragraph 36, Lindsey alleges that

*11 36. Despite the school staff's knowledge of Miss Ross's disabilities and despite their perception that Miss Ross's behavior was deteriorating, the school did not take steps to understand the underlying cause of Miss Ross's behavior, but instead continued to institute punitive measures and continued to build a record against Miss Ross by collecting data on the frequency of behavior incidents without regard to cause or effective treatment.

Compl. ¶ 36.

Third, in Paragraph 18 of its complaint, District 211 noted that "[a]s Lindsey's injurious behaviors increased, they had an increasingly negative impact on her ability to be included in the mainstream" adding that "[w]hen she became a substantial risk to the safety of other students and staff, Lindsey was removed from her regular education classes and taken to a quiet, alternative learning environment, referred to as a 'calming room,' that was constructed especially for her by District 211 and included private washroom facilities."Dist. 211 V. Compl. Inj. ¶ 18. Now, Lindsey attempts to use this "calming

room" as evidence of District 211's "willful discrimination in attending to Miss Ross's behavioral needs during her Freshman year...." Resp. Dist. 211/Cates Mot. to Dismiss at 4 (citing Compl. ¶¶ 24-27).

Fourth, in Paragraph 25 of its complaint, District 211 notes that it "sought a private evaluation from the University of Chicago Developmental Disorders Clinic headed by Marrea Winnega, Ph.D." Dist. 211 V. Compl. Inj. ¶ 25. Similarly, Lindsey alleges in Paragraphs 40 and 41 that "District 211 hired the University of Chicago Developmental Disorders Clinic ... to conduct an evaluation of Miss Ross" adding that the subsequently conducted evaluations were conducted, in part, by Marrea Winnega, Ph.D. Compl. ¶¶ 40-41.Moreover, the report issued by the University of Chicago's Clinic, along with the recommendations contained therein, are discussed in both District 211's and Lindsey's respective complaints. Compare District 211 Compl. ¶ 33 with Compl. ¶ ¶ 41, 44-46, 51. Lindsey now alleges that the decision to educate her in a segregated learning environment "was purportedly based in large part upon the recommendations of the Report," Compl. ¶ 51, and the August 23, 2002 IEP meeting, where Lindsey's parents were first informed of this decision, is reflected in detail in both District 211's verified complaint and in Lindsey's present complaint. Compare District 211's V. Compl. Inj. ¶¶ 34-38 with Com pl. ¶¶ 40-51.

Finally, in Paragraph 49 of its verified complaint, District 211 states its recommendation for educating Lindsey at either the Kirk School or Little Friends. Dist. 211 V. Compl. Inj. ¶ 49. However, Lindsey characterizes this placement decision differently in her present attempt to paint a broad picture of discrimination. Thus, she contends that District 211's decision to place her at either the Kirk School or Little Friends, "two self-contained, segregated schools for children with disabilities" was "not surprising" "[g]iven Dr. Cates's pervasive disdain for educating Miss Ross with her non-disabled peers."Compl. ¶ 51.

*12 Before the Court turns to the next element of res judicata, it will address Lindsey's arguments regarding "pre-settlement" facts and their role in the prior litigation. Lindsey contends that res judicata is inapplicable because she was unable to present evidence of "pre-settlement" facts in both the administrative hearing and before Judge Kennelly.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 695471 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

She asserts that her "present claims against District 211 and Dr. Cates *are based primarily on facts occurring prior to the November 2002 Settlement Agreement*" adding that the facts occurring after the November 2002 settlement "either provide context and support, for the pattern of discrimination and hostility that began during Miss Ross's Eighth Grade year."[FN8]Pl.'s Resp. Dist. 211/Cates Mot. to Dismiss at 8 (emphasis added). Yet, and as outlined above, District 211's complaint for an injunction, which provides the basis for determining what claims she would be "compelled" to present via Rule 13(a), solely relied on pre-settlement facts. Indeed, by its very nature, it had to because the settlement had yet to occur. Moreover, while the independent hearing officer did not let Lindsey present evidence of pre-settlement behavior, Judge Kennelly noted that he allowed Lindsey and her parents to depose District 54's superintendent, permitting them to supplement the record before him. *See*2005 WL 2008919, at *25. After reviewing the testimony, Judge Kennelly concluded that "it did not require the IHO's decision to be overturned."*Id.* Thus, the core set of operative, pre-settlement facts, which gave rise to District 211's request for an injunction also required Lindsey to assert all claims which arose out of those facts. *See*FED. R. CIV. P. 13(a).

> FN8. Note, if Lindsey's complaint was based *solely* rather than "primarily" on pre-settlement facts, she would have a difficult time defending against statute of limitation based attacks, as claims under the ADA and Rehabilitation Act are required to be brought within two years of the November 2002 settlement. *See Soignier v. Am. Bd. of Plastic Surgery,* 92 F.3d 547, 551 (7th Cir.1996); *Dunn v. Grant Hosp. of Chicago,* No. 95 C 3699, 1997 WL 51450, at *2 (N.D.Ill. Jan.30, 1997).

### C. *Final Judgment on the Merits*

The final issue this Court must determine in analyzing District 211 and Dr. Cates' *res judicata* arguments is whether a final judgment on the merits was made in the litigation initiated by District 211. "A final judgment on the merits is based upon legal rights as opposed to simple matters of practice, procedure, jurisdiction, or form," *see Little v. Tapscott,* No. 01 C 9738, 2002 WL 1632519, at *3 (N.D.Ill. July 23, 2002) (citing *Harper Plastics, Inc. v. Amoco Chemicals Corp.,* 657 F.2d 939, 943 (7th

Cir.1981)), and "[s]ummary judgment constitutes a final judgment on the merits for purposes of applying res judicata."*Id.* (citing *Lester v. Brown* 929 F.Supp. 291, 293 (N.D.Ill.1996)). In the prior litigation, Judge Kennelly issued a 47-page memorandum opinion and order after reviewing the parties' cross-motions for summary judgment, making his decision based upon the relevant facts and controlling legal principles. As a result, the Court finds that Judge Kennelly's opinion, disposing of the underlying litigation, was a final judgment on the merits.[FN9]Accordingly, the Court finds that *res judicata* precludes Lindsey from bringing her present claims against District 211 and Dr. Cates, thus, Counts I, II and III are dismissed with prejudice.

> FN9. Moreover, in reaching this decision, the Court notes that Lindsey's response to District 211's motion to dismiss does not contain any argument that would dispute the finding that Judge Kennelly's decision was a final judgment on the merits.

### II. The Court Declines to Exercise Supplemental Jurisdiction To Hear Lindsey's Claims Against Dr. Leventhal.

**\*13** Having dismissed Lindsey's claims against District 211 and Dr. Cates, claims based primarily on federal question jurisdiction, the Court also dismisses her claims against Dr. Leventhal, claims based not on federal question jurisdiction or even diversity jurisdiction, but on supplemental jurisdiction.[FN10]Generally, where district courts have original jurisdiction, they also have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."28 U.S.C. § 1367. When a district court has dismissed the claims over which it had original jurisdiction, it can also decline to exercise its supplemental jurisdiction over the state-law claims. *See*28 U.S.C. § 1367(c)(3).*See also Williams v. Aztar Ind. Gaming Corp.* 351 F.3d 294, 300 (7th Cir.2003) (quoting *Wright v. Associated Insurance Companies Inc.,* 29 F.3d 1244, 1251 (7th Cir.1994) for its proposition that "the general rule is that once all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolv[e] them on the merits")."In exercising that discretion, the court should consider a number of factors, including 'the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 695471 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 11

nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of judicial resources....'' ' *Rothman v. City of Chicago,* No. 02 C 3533, 2004 WL 2271851, at *3 (N.D.Ill. Oct.6, 2004) (quoting *Timm v. Mead Corp.,* 32 F.3d 273, 277 (7th Cir.1994)).

> FN10. Lindsey also bases her claims against District 211 and Dr. Cates on 28 U.S.C. § 1343, which grants jurisdiction in civil rights cases. *See* Compl. ¶ 8. Further, and as noted, three counts in Lindsey's complaint pertain to Dr. Leventhal and are based on state law. *See id.* ¶ ¶ 108-11 (medical malpractice); 112-16 (Illinois Mental Health Code); 117-120 (battery).

Here, in declining to exercise supplemental jurisdiction over Lindsey's state law claims against Dr. Leventhal, the Court does so in part because of the nature of the state law claims at issue and Dr. Leventhal's specific arguments supporting dismissal thereof. Indeed, several issues raised by Dr. Leventhal are best left to the state courts to resolve, particularly his dispute with Lindsey about whether the Illinois Mental Health Act creates a private right of action and whether her medical malpractice claim has met the requirements of Section 2-622 of the Illinois Civil Procedure Code. Accordingly, because the Court declines to exercise supplemental jurisdiction over Counts IV, V and VI of Lindsey's complaint and dismisses those counts without prejudice.

### *Conclusion*

For the reasons provided above, the Court grants District 211 and Dr. Cates' motion to dismiss Counts I, II and III of Lindsey's complaint with prejudice. The Court also grants in part and denies in part Leventhal's motion dismiss Counts IV, V and VI of Plaintiff's complaint. The Court has declined to continue to exercise supplemental jurisdiction over Lindsey's state law claims against Dr. Leventhal. Counts IV, V, and VI are dismissed without prejudice, leaving Lindsey free to file her claims against Dr. Leventhal in state court.

N.D.Ill.,2006.
Ross v. Board of Educ. of Tp. High School Dist. 211
Not Reported in F.Supp.2d, 2006 WL 695471 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

**H**Qualcomm Inc. v. Broadcomm Corp.
S.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. California.
QUALCOMM INCORPORATED, Plaintiff,
v.
BROADCOM CORPORATION, Defendant.
**No. Civ. 05CV1958-B(BLM).**

March 21, 2007.

James R. Batchelder, Adam Arthur Bier, Christian E. Mammen, Lee Patch, Ryan Scher, Victoria Q. Smith, Day Casebeer Madrid and Batchelder, Kevin Kook Tai Leung, Law Office of Kevin Kook Tai Leung, Cupertino, CA, John Allcock, Kathryn Bridget Riley, Randall Evan Kay, DIa Piper US, Barry Jerome Tucker, David E. Kleinfeld, Heller Ehrman, San Diego, CA, Geoffrey M. Howard, Bingham McCutchen, San Francisco, CA, for Plaintiff.
Alicia Hunt, Juliana Maria Mirabilio, Will L. Crossley, Wilmer Cutler Pickering Hale and Dorr, Washington, DC, Allen C. Nunnally, Donald R. Steinberg, John J. Regan, Kate Saxton, Louis W. Tompros, Stephen M. Muller, Vinita Ferrera, Wayne L. Stoner, William F. Lee, Wilmer Cutler Pickering Hale and Dorr, Boston, MA, Gregory C. Schodde, Jean Dudek Kuelper, Lawrence M. Jarvis, McAndrews Held and Malloy, Chicago, IL, James Sullivan McNeill, Robert S. Brewer, Jr., McKenna Long and Aldridge, San Diego, CA, Maria K. Vento, Mark D. Selwyn, Wilmer Cutler Pickering Hale and Dorr, Palo Alto, CA, for Defendant.

ORDER (1) FINDING IN FAVOR OF
QUALCOMM ON BROADCOM'S
COUNTERCLAIM OF INEQUITABLE
CONDUCT; (2) FINDING IN FAVOR OF
BROADCOM ON BROADCOM'S AFFIRMATIVE
DEFENSE OF WAIVER; AND (3) SETTING
HEARING FOR ORDER TO SHOW CAUSE
BREWSTER, Senior J.

I. INTRODUCTION

*1 Before the Court are (1) Defendant Broadcom Corporation's ("Broadcom") counterclaim against Plaintiff Qualcomm Incorporated ("Qualcomm") that U.S. Patent No. 5,452,104 (Pl's Ex. 1)("the '104

patent") is unenforceable due to inequitable conduct; and (2) Broadcom's Third Affirmative Defense that the '104 patent and U.S. Patent No. 5,576,767 (Pl's Ex. 3)("the '767 patent") are unenforceable due to waiver. (Doc. No. 370.)

For the reasons set forth below, the Court hereby (1) FINDS IN FAVOR OF QUALCOMM and against Broadcom on Broadcom's counterclaim of inequitable conduct against the '104 patent; (2) FINDS IN FAVOR OF BROADCOM and against Qualcomm on Broadcom's affirmative defense of waiver against the '104 and the '767 patents, with the appropriate equitable remedy to be determined as outlined in Section III-B-9 below; and (3) SETS hearing on ORDER TO SHOW CAUSE for Wednesday, May 2, 2007, at 9:00 A.M., for which the parties may file briefs in accordance with the local rules so long as the Court receives the last brief no later than Wednesday, April 25, 2007, at 12:00 P.M.

II. BACKGROUND

Qualcomm filed the present suit against Broadcom for patent infringement of the '104 and '767 patents on October 14, 2005. (Doc. No. 1.) Chong U. Lee is the named inventor of the '104 patent, and Lee and Donald Pian are the named inventors of the '767 patent. See '104 patent at 1; '767 patent at 1. Qualcomm is the assignee of both the '104 and '767 patents. See '104 patent at 1; '767 patent at 1. Broadcom filed its First Amended Answer and Counterclaims on December 8, 2006, in which it alleged (1) a counterclaim that the '104 patent is unenforceable due to inequitable conduct; and (2) a Third Affirmative Defense that the '104 and '767 patents are unenforceable due to waiver. (Doc. No. 370 .)

A jury trial was held on the legal issues from January 9, 2007, to January 26, 2007. The jury unanimously returned a verdict (1) in favor of Broadcom and against Qualcomm of non-infringement of the '104 and '767 patents; and (2) in favor of Qualcomm and against Broadcom of validity and non-obviousness of the '104 and '767 patents. (Doc. No. 499.) The jury also unanimously returned an advisory verdict on the equitable issues, (1) finding in favor of Broadcom

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

and against Qualcomm that the '104 patent is unenforceable due to inequitable conduct by clear and convincing evidence; and (2) finding in favor of Broadcom and against Qualcomm that the '104 and '767 patents are unenforceable due to waiver by clear and convincing evidence. (*Id.* at 14.)

The Court held an evidentiary hearing on the equitable issues of inequitable conduct and waiver on February 9, 2007.

### III. DISCUSSION

### A. THE COURT DOES NOT FIND BY CLEAR AND CONVINCING EVIDENCE THAT THE '104 PATENT IS UNENFORCEABLE DUE TO INEQUITABLE CONDUCT

Broadcom asserts that the '104 patent is unenforceable due to Qualcomm's inequitable conduct in not disclosing two articles to the PTO during the prosecution of the '104 patent: (1) D. Jacques Vaisey & Allen Gersho, *Variable block-size image coding*, 12 IEEE INT'L CONF. ACOUSTICS, SPEECH, AND SIGNAL PROCESSINGG ICASSP '87 1051 (1987) (Def's Ex. 5061) ("Vaisey"); and (2) Cheng-Tie Chen, *Transform Coding of Digital Images Using Variable Block Size DCT with Adaptive Tresholding and Quantization,* PROC. SPIE VOLUME 1349, APPLICATIONS OF DIGITAL IMAGE PROCESSING XIII, Nov. 1990, at 43 (Def's Ex. 5064) ("Chen '90"). (Def's Br. at 14.)

#### 1. Standards of law

**\*2** "To hold a patent unenforceable due to inequitable conduct, there must be clear and convincing evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the U.S. Patent and Trademark Office" ("PTO").*Cargill, Inc. v. Canbra Foods, Ltd.,* Nos.2006-1265, 2006-1302, 2007 WL 466248, at \*2 (Fed.Cir. Feb.14, 2007) (citing *Impax Labs., Inc. v. Aventis Pharm. Inc.,* 468 F.3d 1366, 1374 (Fed.Cir.2006)). Materiality can be found either under the current version of PTO Rule 56 or under the earlier "reasonable examiner" standard. *Id.* at \*3 (citing *Digital Control Inc. v. Charles Machine Works,* 437 F.3d 1309, 1316 (Fed.Cir.2006)).

Under the current version of PTO Rule 56,
[I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
(1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
(2) It refutes, or is inconsistent with, a position the applicant takes in:
(I) Opposing an argument of unpatentability relied on by the Office, or
(ii) Asserting an argument of patentability.
A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

37 C.F.R. § 1.56(b) (2006)."A withheld reference may be highly material when it discloses a more complete combination of relevant features, even if those features are before the patent examiner in other references."*Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd.,* 204 F.3d 1368, 1374 (Fed.Cir.2000).

Under the earlier "reasonable examiner" standard, "information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent."37 C.F.R. § 1.56(a) (1991); see*Cargill,* 476 F.3d 1359, 2007 WL 466248, at \*3. "Information concealed from the PTO may be material even though it would not invalidate the patent."*Li Second Family Ltd. P'ship v. Toshiba Corp.,* 231 F.3d 1373, 1380 (Fed.Cir.2000).

The intent element of inequitable conduct requires that "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive."*Cargill,* 476 F.3d 1359, 2007 WL 466248, at \*3 (quoting *Impax Labs.,* 468 F.3d at 1374-75). Intent "rarely can be, and need not be, proven by direct evidence."*Id.* Instead, an intent to deceive is "usually inferred from the facts and circumstances surrounding the conduct at issue."*Id.*

**\*3** If a district court finds that the requirements of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

materiality and intent have been established by clear and convincing evidence, it must then "balance the equities to determine whether the patentee has committed inequitable conduct that warrants holding the patent unenforceable."*Id.* (quoting *Impax Labs., 468 F.3d at 1374-75).* Under the balancing test, "[t]he more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa."*Id.* (quoting *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1256 (Fed.Cir.1997)).*

2. The Court finds no clear and convincing evidence that Lee or his attorneys failed to disclose material information to the PTO in the prosecution of the '104 patent

Materiality can be found either under the current version of PTO Rule 56 or the earlier "reasonable examiner" standard. *SeeCargill, 476 F.3d 1359, 2007 WL 466248, at *3.* Under PTO Rule 56, in order to be material, information must "not [be] cumulative to information already of record or being made of record in the application."37 C.F.R. § 1.56(b) (2006).

Here, the Court finds that Vaisey and Chen '90 were not material to the prosecution of the '104 patent, because they are cumulative of the prior art that was already disclosed to the PTO, including (1) Its'hak Dinstein et al., *Variable block-size transform image coder,* 38 IEEE TRANSACTIONS COMM. 2073 (1990) (Pl's Ex. 842) ("Dinstein"); and (2) Peter Strobach, *Quadtree-structured recursive plane decomposition coding of images,* 39 IEEE TRANSACTIONS SIGNAL PROCESSING 1380 (1991) (Pl's Ex. 843) ("Strobach").*See*'104 patent at 1.

a. The Court finds that Chen '90 discloses adaptive block size, quadtrees, and discrete cosine transforms ("DCTs") and that Vaisey discloses adaptive block size, quadtrees, and general transforms, of which DCTs are a type

Both parties' experts agree that Chen '90 teaches adaptive block size, quadtrees, and discrete cosine transforms ("DCT"). Qualcomm's expert Dr. Bystrom testified at trial:
Q So, Professor, is it fair to say that Chen ['90] and Vaisey had DCT adaptive block size and quad trees?
A Chen certainly did[.]

(Trial Tr., 177, Jan. 18, 2007.) Broadcom's expert Dr. Ramchandran testified at trial:Q [Chen '90] [d]isclosed DCT, correct?
A It uses DCT.
Q Variable block size coding, correct?
A Correct.
Q Quadtrees, correct?
A Correct.

(Trial Tr., 68-69, Jan. 17, 2007.)

Both parties' experts also agree that, while Vaisey teaches adaptive block size and quadtrees, it only teaches general transforms and does not specifically mention DCTs, which are a type of transform. Dr. Bystrom testified at trial:
Well, Vaisey discusses transform coding, so it doesn't necessarily explicitly mention the DCT, but does include the quad tree and variable adaptive block size.

(Trial Tr., 172, Jan. 18, 2007.) She explains later that "Vaisey had adaptive block size and quad trees and had transform coding, one example of which is the DCT."(*Id.* at 177.)Dr. Ramchandran testified at trial:*4 Q So he's describing variable block size or adaptive block size?
A He's using adaptive block size. He's using quadtree segmentations motivated at using big blocks where they belong and little blocks where they belong.

(Trial Tr., 71, Jan. 17, 2007.) He further testified:Q Now, does Doctor Vaisey describe the precise transform that he says you should use?
A He actually does not. He just mentions the use of general transforms and just leaves it at that.
Q And can we have DX-8073.
A Yes. So-but I do want to mention that the most popular transform that would have been most obvious to use at the time would have been the DCT. It was the most popular transform in image compression at the time.

(*Id.* at 72-73.)

b. The Court finds no clear and convincing evidence that Vaisey and Chen '90 are not cumulative of Strobach

Both parties' experts agree that Strobach teaches adaptive block size and quadtrees. Qualcomm's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

expert Dr. Bystrom asserts that Strobach also teaches DCTs, while Broadcom's expert asserts that Strobach teaches away from the use of DCTs. Dr. Bystrom testified at trial:

So, if we can go back to the first page. So, we saw in that paragraph that I just read that [Strobach is] disclosing variable block size, and then, now if we go to the bottom of that column-right there is fine-what we see is that a similar order recursive (phonetic) law exists in the case of the discreet cosign [sic] reference, and I'll spare you me reading the rest of this paragraph. But, he's also revealing or disclosing and actually discussing extensively transform coding and the discreet cosign [sic] transform. So, he's revealed variable block size. He's revealed the discreet cosign [sic] transform. And if we could possibly step to the next page following-stepping a little bit. We'll see Figure number 1 right there. As I said, he reveals or-excuse me-he reveals or discloses right in the title that he's considering quad trees, but we can see in Figure number 1 an explicit example of partitioning via quad tree and a quad tree example itself. So, he is disclosing the DCT and discussing extensively about the DCT and about variable block sizes and about quad trees and making use of these quad trees.

(Trial Tr., 174-75, Jan. 18, 2007.) Dr. Ramchandran testified at trial:Well, you have to be very careful here because [Strobach] did not disclose an adaptive block size DCT. He actually described an adaptive block size quadtree segmentation, and then he took the entire image and did fixed block size DCTs on them. So I would not put a tick on this.

(Trial Tr., 230, Jan. 17, 2007.) He later qualified as follows:Q Let me put up a second chart where [Qualcomm's counsel] was asking you about the prior art, and I want to ask you about the Strobach reference where he put a check mark. Do you agree with that check mark?
A The Strobach reference uses a quadtree, as I recall, that's correct, and I do not recall it using a DCT.
*5 Q In fact, what does it say about a DCT?
A The Strobach reference actually tells you that it's a way of doing quadtree segmentation for certain difference images, and it actually teaches away from the need for any transforms because of the clever nature in which he has done a quadtree segmentation, because the DCT in all transforms are typically used to remove redundancies that are already left over. He is very proud of a particular way of segmenting which essentially obviates the need. It says you don't

need. There's no more correlations left. So you don't even need a transform. In fact, he compares what he does without a transform with the DCT operations with a fixed block size and concludes that there is no further advantage to doing a DCT on it.

(*Id.* at 248-49.)Therefore, Dr. Ramchandran admits that Strobach analyzes the use of fixed block size DCTs on images segmented by adaptive block size quadtree segmentation, even if Strobach ultimately advises against the use of DCTs.

Furthermore, as Dr. Bystrom testified, Strobach cites to Vaisey and a 1989 article by Chen, Cheng-Tie Chen, *Adaptive transform coding via quadtree-based variable block size DCT*, 3 Proc. IEEE INT'L CONF. ACOUSTICS, SPEECH, SIGNAL PROCESSINGG ICASSP '87 1854 (1989) (Def's Ex. 5063) ("Chen '89"):
Q Could we have the Strobach reference up, please?
A [ ... ] And I'd like to point out that-if you don't mind, I'd like to point out that reference 13 is Chen ['89] reference and reference 15 is actually Vaisey reference, a reference to Vaisey.
BY MR. PATCH:
Q Could we go to the reference section of the paper and make sure the jury has the opportunity to confirm that?
A Sure.
Q Could we see references 13 and 15, please?
A So, reference 13 is Chen 89 and reference 15 is the Vaisey reference.

(Trial Tr., 173-74, Jan. 18, 2007.) As both parties' experts assert, Chen '89 discloses extremely similar information to Chen '90. Dr. Ramchandran testified at trial:Q And have you prepared a slide that shows the title and abstract of the Chen 1989 article?
A Yes. I think there's one slide I have on it.
Q Can I have DX-8070.
A Yeah. So this is the title slide of Chen's paper from one year before the paper we just discussed, and it's titled, "Adaptive Transform Coding by a Quadtree-Based Variable Block Size DCT." In fact, if you just read the title, it has all the elements of the claim right there in the title. And the description of the algorithm in Chen's work is very, very close to what he did in 1990. Minute differences.

(Trial Tr., 69, Jan. 17, 2007.) Dr. Bystrom later testified as follows:Q Have you heard Doctor Ramchandran testify that from his perspective, Chen 89 and Chen 90 were fundamentally the same

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 5
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

information?
A Yes, and I agree with-agree with him on that.

(Trial Tr., 145, Jan. 18, 2007.)

Therefore, Strobach cites to Vaisey and Chen '89, which as Broadcom's expert admits is "very, very close" to Chen '90, and the Court finds no clear and convincing evidence that Strobach does not disclose adaptive block size, quadtrees, and DCTs. Accordingly, the Court FINDS no clear and convincing evidence that Vaisey and Chen '90 are not cumulative of Strobach.

c. The Court finds no clear and convincing evidence that Vaisey and Chen '90 are not cumulative of Dinstein

\*6 Qualcomm's expert Dr. Bystrom presented unopposed testimony that Dinstein disclosed adaptive block size and DCT. Dr. Bystrom further testified that Dinstein disclosed quadtrees, with which Broadcom's expert Dr. Ramchandran disagreed. Dr. Bystrom testified at trial as to Dinstein:
So, a variable block size image code is proposed in reference 13, which is Vaisey. The image is partitioned into various sizes, 2 by 2, running from 2, 3, 4 and 5 of squares, and the partition is based on the quad tree presentation of the image. So, the use of quad tree imposes restrictions on possible locations of larger blocks. So, Dinsteen [sic] is really pointing out here DCTs, variable block sizes, and the use of quad trees, the fact that quad trees and all of these were actually widely used in the image compression arena and discussing some of the advantages and disadvantages of all of these through the rest of the introduction.

(Trial Tr., 176, Jan. 18, 2007.) Dr. Ramchandran testified that:Q And what about for Dinstein?
A Dinstein didn't do a quadtree.
Q All right.
A And Dinstein had adaptive-I don't recall the details, but I remember she was getting around quadtree because she didn't like it.
Q Okay.
A And I don't remember all the other details.
Q DCT?
A I don't know. I don't think he did it. I don't remember.
Q You don't remember?
A I don't remember, but I know for sure he didn't do

a quadtree.

(Trial Tr., 232, Jan. 17, 2007.) As Dr. Ramchandran does not seem to recall many of the details of the Dinstein article, the Court is more persuaded by Dr. Bystrom's testimony.

Furthermore, like Strobach, Dinstein also cites to Vaisey. As Dr. Bystrom testified:
Q Can we have [Dinstein] up, please.
A [ ... ] So, a variable block size image coder is proposed in 13, and again, this is the Vaisey reference.
Q Could we go to the reference page and allow the jury to confirm that this is a pointer to Vaisey?
A This is the same Vaisey reference that we've been discussing.

(Trial Tr., 175-76, Jan. 18, 2007.)

Therefore, Dinstein cites to Vaisey, and the Court finds no clear and convincing evidence that Dinstein does not disclose adaptive block size, quadtrees, and DCTs. Accordingly, the Court FINDS no clear and convincing evidence that Vaisey and Chen '90 are not cumulative of Dinstein.

Since the Court has found no clear and convincing evidence that Vaisey and Chen '90 are not cumulative of Dinstein and Strobach, both of which were disclosed to the PTO during the prosecution of the '104 patent, the Court finds no clear and convincing evidence that Vaisey and Chen '90 are material information. Accordingly, the Court does not find that Lee and his attorneys failed to disclose material information to the PTO in not disclosing Vaisey and Chen '90, and the Court need not address the issue of intent.

Therefore, despite the jury's advisory verdict to the contrary, the Court FINDS no clear and convincing evidence of inequitable conduct in the prosecution of the '104 patent and FINDS IN FAVOR OF QUALCOMM and against Broadcom on Broadcom's counterclaim of inequitable conduct against the '104 patent.

B. THE COURT FINDS BY CLEAR AND CONVINCING EVIDENCE IN FAVOR OF BROADCOM ON BROADCOM'S AFFIRMATIVE DEFENSE OF WAIVER AGAINST THE '104 AND '767 PATENTS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

### 1. Standards of law-*Rambus* and the duty of disclosure

**\*7** This case involves the law of waiver as a consequence of silence in the face of a duty to speak. A duty to speak can arise from a group relationship in which the working policy of disclosure of related intellectual property rights ("IPR") is treated by the group as a whole as imposing an obligation to disclose information in order to support and advance the purposes of the group.

In the patent infringement suit *Rambus, Inc., v. Infineon Technologies, AG,* 318 F.3d 1081 (Fed.Cir.2003), the Federal Circuit considered the duty of disclosure Plaintiff Rambus, a designer of computer memory systems, owed to the Joint Electronic Devices Engineering Council ("JEDEC"), a standard-setting body for semiconductor technologies associated with the Electronic Industries Association ("EIA").*See id.* at 1085.Both JEDEC and EIA have a written patent policy "encouraging the adoption of standards free of patented items or processes."*Id.*

At least by 1993, the EIA/JEDEC patent policy required members to disclose patents and patent applications "related to" the standardization work of the committees. *Id.* The EIA/JEDEC patent policy manual stated:
EIA and JEDEC standards ... that require the use of patented items should be considered with great care ... [C]ommittees should ensure that no program of standardization shall refer to a product on which there is a known patent unless all the relevant technical information covered by the patent is known.

*Id.* at 1097.The manual also included a policy revision expressly adding "pending patent[s]" to the policy language. *See id.*The manual further stated:The Chairperson ... must ... call attention to the obligation of all participants to inform the meeting of any knowledge they may have of any patents, or pending patents, that might be involved in the work they are undertaking. Appendix E (Legal Guidelines Summary) provides copies of viewgraphs that should be used at the beginning of the meeting to satisfy this requirement.

*Id.*

Appendix E of the manual read, in relevant part, as follows:
EIA/JEDEC PATENT POLICY SUMMARY
Standards that call for the use of a patented item or process may not be considered by a JEDEC committee unless all of the relevant technical information covered by the patent or pending patent is known to the committee, subcommittee, or working group.

*Id.* Appendix E also provided that patentees or applicants must agree to license others to use the patent "for the purpose of implementing the standard(s)."*Id.*Thus, the Federal Circuit found that Appendix E prohibited standards that "call for use of a patented item or process" unless all information "covered by the patent or pending patent" was known and a "license ... for the purpose of implementing the standard(s)" was available under reasonable terms. *Id.*

Although Rambus was not held liable for failing to reveal IPR because they were not related to the standards being developed by the study committee, the case is explicit in its treatment of the duty of members of the standards committee to share their IPR on related issues before the standards committee. Referring to the policy statements of JEDEC, the court stated significantly as follows:
**\*8** The language of these policy statements actually does not impose any direct duty on members. While the policy language advises JEDEC as a whole to avoid standards "calling for the use of" a patent and the manual obligates the chairperson to remind members to inform the meeting of any patents or applications relevant to the work of the committee, this court finds no language-in the membership application or manual excerpts-expressly requiring members to disclose information. There is no indication that members ever legally agreed to disclose information.
Nevertheless, because JEDEC members treated the language of Appendix E as imposing a disclosure duty, this Court likewise treats this language as imposing a disclosure duty ... That language links the disclosure duty to patents or applications whose claims cover the proposed JEDEC standard. Further, the JEDEC policy permitted adoption of a standard covered by a patent if the claimed technology was available under reasonable license terms. Thus, JEDEC's policy identifies the duty to disclose based on the scope of claimed inventions that would cover any standard and cause those who use the standard to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

infringe.

*Id.* at 1098.

The Federal Circuit agreed with the evidence provided by Infineon's arguments and witnesses of the JEDEC members' understanding of the JEDEC policy, which indicated that "the relevant disclosure duty hinges on whether the issued or pending claims are needed to practice the standard."*Id.* at 1100.The Federal Circuit found that "[t]his construction accord[ed] with the primary JEDEC goal of adopting open standards that can be practiced without unreasonable license fees or terms."*Id.* The court concluded that, on this record, "a reasonable jury could find only that the duty to disclose a patent or application arises when a license under its claims reasonably might be required to practice the standard."*Id.*

Therefore, the Federal Circuit held that "Rambus's duty to disclose extended only to claims in patents or applications that reasonably might be necessary to practice the standard," which "encompassed any patent or application with claims that a competitor or other JEDEC member reasonably would construe to cover the standardized technology."*Id.* The Court concluded that "the disclosure duty operate[d] when a reasonable competitor would not expect to practice the standard without a license under the undisclosed claims."*Id.* at 1100-01.Consequently, the Court specified that "the disclosure duty does not arise for a claim that recites individual limitations directed to a feature of the JEDEC standard as long as that claim also includes limitations not needed to practice the standard."*Id.* at 1101.In *Rambus*, Rambus' intellectual property rights were not related to the standard, and thus no liability was imposed on Rambus. See*id.* at 1104-05.

### 2. Waiver of patent rights must be shown by clear and convincing evidence

*9 According to the Federal Circuit, "[t]he burden of establishing an affirmative defense is on the party raising the defense."*Jazz Photo Corp. v. Int'l Trade Comm'n,* 264 F.3d 1094, 1102 (Fed.Cir.2004). Constitutional rights can be waived only "if it can be established by clear and convincing evidence that the waiver is voluntary, knowing, and intelligent."*Schell v. Witek,* 218 F.3d 1017, 1023 (9th Cir.2000) (quoting *Gete v. Immigration and Naturalization*

*Serv.,* 121 F.3d 1285, 1293 (9th Cir.1997)). The Ninth Circuit has also held that California law demands a clear and convincing evidence standard in the waiver of insurance coverage rights. See*Am. Cas. Co. of Reading, Pa. v. Krieger,* 181 F.3d 1113, 1121 (9th Cir.1999).

Under 35 U.S.C. § 271*et seq.,* patentees have a right to enforce their patent rights against infringers. While the Federal Circuit has not yet addressed the standard that should be used in finding waiver of patent rights, the Northern District of California has upheld a Bankruptcy Court's application of a clear and convincing standard in such cases. See In re*Read-Rite Corp.,* No. C-06-0364, 2006 WL 1214839, at *7 (N.D.Cal. May 5, 2006). Similarly here, since waiver of patent rights could result in the very serious consequence of rendering the patent completely unenforceable, the Court FINDS that waiver of patent rights must be proven by clear and convincing evidence.

### 3. Under *Rambus,* JVT participants' duty of disclosure only encompasses patents that reasonably may be necessary to practice the H.264 standard

In *Rambus,* although the JEDEC policy did not use the language "related to," the Federal Circuit found that the parties consistently agreed that the JEDEC policy language required disclosure of patents "related to" the standardization work of the JC-42.3 committee. See*Rambus,* 318 F.3d at 1098. Based on the conduct of the JC-42.3 committee members, the Federal Circuit held that patents "related to" the standardization work only encompassed patents that "reasonably might be necessary to practice the standard."*Id.* at 1099.The Court explained that "[t]o hold otherwise would contradict the record evidence and render the JEDEC disclosure duty unbounded. Under such an amorphous duty, any patent or application having a vague relationship to the standard would have to be disclosed."*Id.* at 1101.

Similar to the "related to" language in *Rambus,* the IPR Policy and Guidelines of the Joint Video Team ("JVT") described in more detail below refer to IPR information "associated with" any standardization proposal or "affecting the use" of JVT work. (Def's Ex. 5183 ("JVT ToR") at 9, 12.) Therefore, following the reasoning of the Federal Circuit in *Rambus,* this Court FINDS that this language only requires JVT members to disclose patents that "reasonably might be necessary" to practice the H.264 standard. To hold

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

otherwise would render the JVT disclosure duty inappropriately "unbounded," "amorphous," and "vague."

4. The Joint Video Team ("JVT") and its Intellectual Property Rights ("IPR") Policy and Guidelines

**\*10** The JVT was formed in late 2001 as a joint project between two existing international standard-setting bodies: (1) the Video Coding Expert Group ("VCEG") of the International Telecommunication Union Telecommunication Standardization Sector ("ITU-T"), and (2) the Moving Picture Experts Group ("MPEG") of the International Organization for Standardization ("ISO")/ International Electrotechnical Commission ("IEC"). (JVT ToR at 1; Trial Tr., 267, Jan. 17, 2007.)

Qualcomm and Broadcom have been active dues-paying members of the American National Standards Institute, the representative member body of both the ISO and the IEC for the United States, for many years prior to 2001. In fact, Qualcomm submitted information about digital cinema IPR to an MPEG Test Sub-group in approximately June 2001 at or about the time of the creation of a JVT working committee, which was tasked with the responsibility to research and develop an industry standard for video compression technology. (Pl's Ex.1931.)

The IPR referred to in the JVT Terms of Reference ("ToR") encompass patents and copyrights. (JVT ToR at 8.) Section 3 of the ToR is entitled "IPR Policy and Guidelines." (*Id.*) Subsection 3.2, entitled "Collection of IPR information during the standardization process," reads as follows:
According to the ITU-T and ISO/IEC IPR policy, members/experts are encouraged to disclose as soon as possible IPR information (of their own or anyone else's) associated with any standardization proposal (of their own or anyone else's). Such information should be provided on a best effort basis.
For collecting such information, JVT has decided to use it's [sic] own Patent Declaration form-note that this is distinct from the *ITU ISO IEC Patent Statement and Licensing Declaration* that is to be submitted to the ISO Secretary General and ITU TSB Director when the contributed technology becomes part of the final standard.
Therefore, JVT requires all technical (algorithmic) proposals include the following:
Attached at the end of each technical contribution, a fully filled-out "JVT Patent Disclosure form" (as

shown below). At the contribution stage, this form is for information only, and may be signed by an expert or left unsigned. The form must be included in the contribution to JVT.
Additionally, all submitted source code must include a written transfer of copyright in the form described in section 5 below.
Note that the submission of the JVT Patent Disclosure form at the proposal stage does not have the same formal status as the final IPR declaration to the ITU TSB and ISO/IEC, which must be done in the approval process for the ITU-T Recommendation and ISO/IEC International Standard.
Such information provided to the Chair | Rapporteur will be tabulated in a "IPR status list" (e.g. a simple Word table) of the information received. Information not currently relevant (e.g. if a proposed method was not accepted) will be removed from the "IPR status list" as early as possible. The "IPR status list" is a living document of the JVT.

**\*11** (*Id.* at 9) (emphasis omitted.)

The ToR contains a sample blank JVT Patent Disclosure Form. (*Id .* at 12-15.)The title of the Patent Disclosure Form contains the qualification "(Typically one per contribution and one per Standard | Recommendation)."(*Id.* at 12.)The introductory text of the form reads as follows:
This form provides the ITU-T | ISO/IEC Joint Video Coding Experts Group (JVT) with information about the patent status of techniques used in or proposed for incorporation in a Recommendation | Standard. JVT requires that all technical contributions be accompanied with this form. Anyone *with knowledge of any patent affecting the use of JVT work, of their own or of any other entity ("third parties"), is strongly encouraged to submit this form as well.*
This information will be maintained in a "living list" by JVT during the progress of their work, on a best effort basis. If a given technical proposal is not incorporated in a Recommendation | Standard, the relevant patent information will be removed from the "living list". The intent is that the JVT experts should know in advance of any patent issues with particular proposals or techniques, so that these may be addressed well before final approval.
This is not a binding legal document; it is provided to JVT for information only, on a best effort, good faith basis. Please submit corrected or updated forms if your knowledge or situation changes.
This form is *not* a substitute for the *ITU ISO IEC Patent Statement and Licensing Declaration,* which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 9
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

should be submitted by Patent Holders to the ITU TSB Director and ISO Secretary General before final approval.

(*Id.*) (emphasis added.)

It is clear from the above that, like the *Rambus* case, the identification of participants' patents and pending applications is critical to the feasability and effectivity of industry standards so that the rights of IPR owners may be protected (1) by independently licensing or (2) by joining a pool of IPR available to be licensed on a non-exclusive, non-discriminatory basis to any who wish to practice the industry standard. If any owners of IPR refuse to license their IPR, such a position could either block adoption of a standard or require the standards organization to create a standard which does not practice the IPR, if such be possible. And, of course, the effectivity of industry standards could be substantially impaired if related undisclosed patents were revealed after publication of the standards internationally.

As this Court instructed the jury as to waiver,
In this case, Broadcom has raised the affirmative defense that Qualcomm waived its rights to enforce the 104 and 767 patents. In order to prove waiver, Broadcom must show by clear and convincing evidence either that Qualcomm, with full knowledge of the material facts, intentionally relinquished its rights to enforce the 104 and 767 patents or that its conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished.
*12 Intent to relinquish rights may be shown by Qualcomm's statements or conduct. Mere silence or inactivity does not constitute a waiver unless there is an obligation to speak or otherwise take action. A participant in a standards setting body may have a duty to disclose relevant patents if the participants as a whole consider the standards setting body to impose such a duty, even if the duty to disclose is not expressly stated in the written policies of the standards setting body.
The duty to disclose owned patents or applications or to inform of known patents owned by others arises when intellectual property involved reasonably might be necessary to practice the standard under study. In other words, the duty would arise when a participant in the standards setting body reasonably would not expect a competitor to practice the industry standard without a license under the patent.
The defense of waiver, therefore, requires you to focus on the mental attitude of the party alleged to have waived its rights, in this case Qualcomm. You must consider whether Broadcom has proven by clear and convincing evidence that Qualcomm knowingly violated a duty to disclose its 104 and/or 767 patents to the Joint Video Team, the JVT, or its parent organization during the JVT's preparation and eventual adoption of a video compression industry standard known as the H.264 standard. Detrimental reliance on the part of Broadcom or prejudice suffered by Broadcom is not an element of waiver.

(Trial Tr., 8-9, Jan. 26, 2007.)

5. Like *Rambus,* the Court finds clear and convincing evidence that JVT participants treated the JVT IPR Policies as imposing a duty to disclose

Similar to *Rambus*, the JVT IPR Policy and Guidelines provide no express requirement to disclose patents unless a member submits a technical proposal. (JVT ToR at 9.) Instead, members/experts are encouraged to disclose as soon as possible IPR information (of their own or of anyone else's) associated with any standardization proposal (of their own or anyone else's). Such information should be provided on a best effort basis.

(*Id.*)

Furthermore, like *Rambus,* in addition to the written guidelines, JVT participants also learned of the patent disclosure policy from attendance at JVT meetings. Gary Sullivan, chairman of the JVT, testified at trial by way of his video deposition that he discussed the JVT's IPR policies at every meeting, which was recorded in every meeting report:
Q Now, was there a practice that you followed when you chaired JVT meetings with respect to announcing IPR disclosure obligation?
A Yes.
Q What was that practice?
A At every meeting, I would summarize the policies and make people aware that we had policies that we were required to follow, help people find information about those policies and ask if there was any additional reports that needed to be submitted to notify us of patent rights that apply to the standard, and we would record that those reminders in every meeting report.
*13 Q And the policies and reports that you're referring to in that answer, are they intellectual

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

property rights, so-called IPR that is referred to in the documents we've been through so far?
A Yes.
Q Now, I would like to direct your attention to Exhibit 4 under the bold heading of "IPR Policy," the second paragraph, and in particular the second sentence. And I'm going to read it to you. It says, "The chair will summarize the IPR policy at each meeting and will ask the members at that time if anyone present is aware of IPR that should be reported, and any reports made verbally at that time will be recorded in a meeting output document (either in the meeting report or a group-approved IPR status report)." Do you see that sentence?
A Yes.
Q Is that the practice that you follow at each meeting of the JVT which you chair?
A Yes.

(Trial Tr., 43-44, Jan. 18, 2007.)

Qualcomm's employee Dr. Sagetong, whose role it was to monitor the JVT, confirmed Mr. Sullivan's practice at trial:
Q Now, you told us that you attended a series of JVT meetings. At each meeting, Mr. Sullivan-Doctor Sullivan spoke at the outset, correct?
A Yes.
Q And at each meeting, he reiterated the policy on disclosure of patents, correct?
A Yes.

(Trial Tr., 26, Jan. 24, 2007.) Dr. Yiliang Bao, another Qualcomm employee who attended JVT meetings on behalf of Qualcomm, testified at trial that Sullivan would "usually" remind the participants to "provide the patent disclosure form along with the technical contribution" and "to check the patent policies of the parent bodies" at these meetings. (*Id.* at 66.)

Conveniently, when asked if Mr. Sullivan "encouraged people to comply with the policy" at each meeting, Dr. Sagetong testified that he "didn't pay attention to all what [sic] he [Sullivan] was saying."(*Id.*) Conveniently again, Ms. Raveendran, another Qualcomm employee who admitted attending one JVT meeting, testified that she had arrived late at that meeting and therefore "probably" missed Mr. Sullivan's introduction and description about the disclosure of patents:
Q Now, let's go to your involvement on the ad hoc membership list. You do know Gary Sullivan,

correct?
A I know him as the chair of JVT now.
Q And the JVT meeting you attended was chaired or co-chaired by him, correct?
A The one I attended in July 2005, he was co-chairing that JVT session, yes.
Q And you were there when he began the meeting, correct?
A No. I walked in in the middle of the session.
Q Did you miss the introduction and the description about the disclosure of patents?
A Probably. I don't recall.

(*Id.* at 52.)Ms. Raveendran had been designated in 2001 by higher management at Qualcomm to "monitor" the meetings of the JVT Committee, and Qualcomm ultimately produced twenty-one emails from the Committee to Ms. Raveendran dated from September 2002 through at least March 2003. (Trial Tr., 80-81, Jan. 18, 2007; Trial Tr., 198-200, Jan. 24, 2007; Def's Exs. 5844-64.)

*14 Similar to *Rambus,* despite the language of the IPR policy merely encouraging participants to disclose patents to the JVT, the issue before the Court is whether JVT participants treated the IPR Policy as imposing a duty of disclosure. Mr. Sullivan testified at trial that JVT participants sometimes submitted disclosures without an accompanying technical proposal:
Also, the JVT disclosure form is filed often for things that are not even included in the standard. For example, if somebody brings a proposal for something they want adopted into the standard, they would attach the patent disclosure form to the disclose the fact that they had a patent on their proposal, but if their proposal was not adopted into the draft, then their patent may not apply to the draft standard after that takes place. So the reporting in the inside of the JVT is considered sort of an informal best-effort basis.
Also, people can and sometimes have submitted a disclosure form by itself without a proposal attached to it to report that they believe they have a patent-patent rights that apply to the draft standard or patent rights that apply to somebody else's proposal.
If they see someone else submitting a proposal, they think they have patent rights on that proposal-I think we've had a couple of occasions where someone would submit a patent disclosure form saying that they believe they have a patent on someone else's proposed technique.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

(Trial Tr., 33-34, Jan. 18, 2007.)

He further testified that JVT participants sometimes submitted disclosures directly to the JVT before filing formal disclosures with the JVT's parent bodies:

Q Were there, in fact, instances of IPR disclosures that were made first to the JVT and subsequently to the parent organizations on a document such as Exhibit 19?

A Yes. I believe there were a number of cases where we would get an IPR report in JVT, and it was understood that is not a substitute for reporting the information formally to the parent bodies. A formal report needed to be filed before the standard was finalized.

Q And were formal reports like you described, in fact, filed?

A Oh, yes.

Q And could you, by way of illustration, name some companies who made such formal reports in connection with the H.264 standard?

A Well, Microsoft did. I think there were tens of companies that did. I don't remember for sure who it was-did exactly.

(*Id.* at 41-42.)

Furthermore, after reviewing "hundreds" of JVT documents, Qualcomm's own Dr. Sagetong admitted to reviewing at least one patent disclosure form that was not attached to or referencing a technical proposal. (Trial Tr., 20, Jan. 24, 2007.)

Accordingly, the Court FINDS that JVT members treated the JVT IPR Policy as imposing a duty of disclosure.

6. The Court finds clear and convincing evidence that the '104 and '767 patents reasonably may be essential to the practice of the H.264 standard.

Qualcomm's H.264 expert Dr. Richardson testified at trial that the '104 patent was essential to the practice of the H.264 standard:

*15 Q All right. Let's now turn to the analysis you did on infringement of the 104 patent. And let's start with the H.264 standard that you address in your book.

To what extent have you formed any opinions about the relationship between the 104 patent on the one hand and the H.264 standard on the other?

A Well, in my opinion, the 104 patent-the claims of the patent map onto the H.264 standard, so that devices or systems that practice H.264 actually practice claims of the 104 patent.

(Trial Tr., 62, Jan. 11, 2007.) It is beyond dispute that Qualcomm conducts significant research and development on the compression and improvement of video communications and that it has been so devoted for many years prior, during, and after the work done by the JVT on video compression standards technology. The Court is persuaded by Dr. Richardson's extensive testimony that practicing the H.264 standard necessarily reads on the '104 patent. (Trial Tr., Jan. 11 and 24, 2007).

Likewise, sufficient evidence was presented at trial to persuade the Court that the '767 patent is reasonably essential to practice the H.264 standard. Dr. Richardson testified that the '767 patent describes an encoder choice that is an option of the H.264 standard:

Q Now, it's also true that the only people that you have ever heard say that the 767 patent is essential to H.264 worked for Qualcomm, correct?

A To be honest, I wouldn't actually agree with the statement that the 767 patent is essential to H.264.

Q So it's not?

A What is the question, please?

Q I'm sorry. Let me restate it fully. Is the 767 patent essential to the practice of H.264?

A You recall that earlier I described the 767 patent. The 767 patent describes the way an encoder may choose to encode blocks in different ways. Now, such a choice is supported by H.264, but H.264 does not specify the choices that an encoder has to make. So that choice is really an implementation issue. It's an optional choice in my opinion.

(Trial Tr., 123-24, Jan. 11, 2007.) More emphatically, Qualcomm employee Yuriy Reznik sent an email to Qualcomm employees Harinath Garudadri, Phoom Sagetong, and Hyukjune Chung in July 2005 describing the '767 patent as a "core patent relevant to H.264":To the best of my understanding Qualcomm has a core patent relevant to H.264, MPEG-4 AVC [FN1] and their extensions.

> FN1. "AVC" stands for Advanced Video Coding.

This patent is the patent # 5,576,767 issued in 1996,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

and essentially covering all hybrid transform-DPCM video codecs [FN2] with variable transform sizes. This is clearly a case with H.264 and H.264 FRX codecs whose block sizes are either 4x4, 8x8, or 16x16.

FN2. "Codec" means coder-decoder.

(Pl's Ex. 616 at 1.) Dr. Sagetong testified at trial that he interpreted Mr. Reznik to be suggesting that the '767 patent is essential to the H.264 standard:
Q And so he [Reznik] suggests back in 2005 that it's the '767 patent that's essential to H.264, correct?
A. Yes.

(Trial Tr., 30, Jan. 24, 2007.) As Dr. Sagetong further testified, he is in corporate research and development at Qualcomm and is assigned to "monitor what's going on in JVT," Mr. Garudadri is his technical manager, and Mr. Reznik and Mr. Chung are his colleagues. (*Id.* at 22-23.)

**\*16** Therefore, the Court FINDS by clear and convincing evidence that the '104 and '767 patents reasonably may be essential to the practice of the H.264 standard.

7. The Court finds clear and convincing evidence that Qualcomm participated in the JVT from as early as September 2002 to at least July 2006

Christine Irvine, Qualcomm's original Federal Rule of Civil Procedure 30(b)(6) witness testified through her July 6, 2006, deposition as follows:
Q Are you the person at Qualcomm most knowledgeable about the attendance or participation by any Qualcomm principal, employee or representative at any H.264 standards committee meetings?
A I believe I am.
Q Are you the person at Qualcomm most knowledgeable about Qualcomm's knowledge regarding the development of the H.264 standard?
A I believe I am.
Q And are you the person at Qualcomm most knowledgeable about any actions taken by Qualcomm or any of its principals, employees or representatives as a result of Qualcomm's knowledge regarding the development of the standard?
A I believe I am.
Q Is Qualcomm a member of the JVT?
A No, Qualcomm is not.
Q Has Qualcomm ever attended any meetings of the

JVT?
A Qualcomm is not aware of any attendance to any JVT meetings.
Q Has Qualcomm ever hosted any meeting of the JVT?
A Qualcomm's not aware of hosting a JVT meeting.
Q Okay. Has Qualcomm made any submissions to the JVT?
A No, Qualcomm has not made any submissions to the JVT that Qualcomm is aware of.
Q When did Qualcomm first become aware of the development of the H.264 standard?
A Approximately 2001 in trade journals.

(Trial Tr., 79-81, Jan. 18, 2007.) However, Ms. Irvine immediately thereafter put the above "non-awareness" implication in context by her continuing deposition testimony as follows:Q Were you aware in 2001 that the H.264 standard was being developed?
A I was aware at some point in time that the standard was being developed. I believe it was approximately 2001.
Q How did you become aware that the H.264 standard was being developed?
A While in Australia for an MPEG meeting, a JVT representative was in attendance and stated that they were working on a standard.
Q Who was that JVT representative?
A Gary Sullivan.
Q Were any other Qualcomm representatives present at that MPEG meeting?
A Yes.
Q Who?
A Viji Raveendran and Jim Determan.

(*Id.* at 80-81.)

Furthermore, many of Ms. Irvine's above representations were directly contradicted by Scott Ludwin, Qualcomm's second Rule 30(b)(6) witness. Mr. Ludwin confirmed through his deposition of August 17, 2006, that at least four Qualcomm employees had attended at least ten JVT meetings beginning from December 2003 to July 2006. (Trial Tr., 113-14, Jan. 18, 2007; Pl's Ex. 845 at 2-3.) Mr. Ludwin also confirmed that Viji Raveendran, a Qualcomm engineer, was listed by her Qualcomm email address as a member of a JVT ad hoc working group for "AVC Verification Tests" as early as December 2002. (Trial Tr., 115-17, Jan. 18, 2007; Def's Ex. 5836.) The Ad Hoc Group's purpose was "to evaluate the coding efficiency of the AVC in comparison with MPEG-4 part 2 and MPEG-2 part 2

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

by the following task leading to the final verification test."(Def's Ex. 5836 at 1.) Mr. Ludwin further confirmed that Qualcomm had submitted at least five technical proposals to the JVT from January 2006 to July 2006. (Trial Tr., 113, Jan. 18, 2007; Pl's Ex. 845 at 2.)

**\*17** Ms. Raveendran also contradicted some of Ms. Irvine's assertions. A senior staff engineering manager at Qualcomm, Ms. Raveendran testified by way of her July 18, 2006, deposition she knew of at least one submission Qualcomm had made to the JVT:

Q Has Qualcomm ever made any submission at-any written submission for consideration at any meeting of the JVT?

A Yes.

Q How many submissions do you know of that Qualcomm has made to the JVT?

A One.

Q What did that submission relate to?

A This was to scalable video coding.

(Trial Tr., 121-22, Jan. 18, 2007.)

At trial, Ms. Raveendran confirmed her own participation in the JVT:

Q Did you have any personal involvement with JVT?

A I attended one of their meetings when they were working on the scalable video coding effort....

Q I believe it was in your deposition you testified that you attended a JVT meeting in Poznan, Poland, in July of 2005; is that correct?

A Yes.

Q Why were you at the JVT meeting in Poland in 2005?

A To monitor this error resilience work in scalable video coding....

Q Have you participated in any other JVT meeting other than the one in Poznan, Poland

A No.

(Trial Tr., 41-42, Jan. 24, 2007.) However, she qualified that she was in Poland "primarily attending [other] MPEG meetings" and did not "actively participate," make a technical contribution, or vote at the JVT meeting.(Id. at 42.)

Ms. Raveendran confirmed that her email address was on the email list printed in the December 2002 JVT Ad Hoc Group on AVC Verification Test report, but testified that she "was not involved in this" or

"any JVT ad hoc group." (Id. at 43-45; Def's Ex. 5836.) She then testified as follows:

Q Ms. Raveendran, did you place your e-mail address on this list?

A No.

Q Do you have any understanding as to how it is that your e-mail address appears on such a list?

A The list is pretty vast. From what I can see is because Vittorio Baroncini is the first author, he knew me as a-as someone who is trained in compression artifacts and an expert viewer. So because the primary goal of this ad hoc was to evaluate compression technologies, he probably added my name. Chairs can do that. Chairs of ad hoc groups can add people to their list.

Q Did you ever send mail to this e-mail list?

A No.

Q Do you have any knowledge of having read mail that came back to you from this e-mail list?

A No, not that I can recall.

(Trial Tr., 46, Jan. 24, 2007.) However, as she admitted in cross-examination, her email address also appears on the list published with the March 2003 report for the same ad hoc group. (Id. at 53-55; Def's Ex. 5837.)

Finally, it was not until Ms. Raveendran's cross examination on one of the last days of trial, January 24, 2007, that she revealed that emails sent to her as a result of her being on the Ad Hoc Group email list had been pulled from her computer in preparation for her testimony:

**\*18** Q Did you receive mailings from the ad hoc committee identified in this exhibit?

A During the preparation for this testimony, there were some e-mails pulled out of my e-mail box. E-mail archive.

Q Were they produced to Broadcom?

A I don't know.

Q All right. But during the preparation for your testimony in this case, e-mails to you as a result of your being on this list were pulled out of your e-mail box, correct?

A Yes.

(Trial Tr., 53, Jan. 24, 2007). This court testimony came less than a week after Qualcomm's counsel represented to this Court at side bar on January 18, 2007, that "there's no evidence that any e-mail was actually sent to this list. This is just a list of e-mail ... addresses. There's no evidence of anything being sent."(Trial Tr., 92, Jan. 18, 2007.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

After these emails were finally produced to Broadcom and to the Court during the lunch recess on January 24, Ms. Raveendran retook the stand to confirm that she had received at least twenty-one emails from the JVT ad hoc group dated September 2002 through March 2003. (Trial Tr., 198-200, Jan. 24, 2007; Def's Exs. 5844-64.)

Moreover, as discussed above, another Qualcomm engineer Dr. Sagetong testified at trial that his "main role [was] to learn and to monitor what's going on in JVT groups, to learn the JVT activities and to make contact with other JVT folks."(Trial Tr., 12, Jan. 24, 2007.) He stated that he attended at least seven JVT meetings from December 2003 to January 2006. (*Id.* at 11.)He further testified:
Q Now, when you were attending JVT meetings, did you do anything to compile or collect documents relating to the JVT?
A Yes.
Q Okay. And tell the jury what you did in that regard, please.
A After first meeting, I download all the previous JVT meetings back to the first one in December 2001 to my-to Qualcomm computer. And then after every single meeting, I just download the document for each meeting.

(*Id.* at 13.)

Dr. Sagetong admitted that he uploaded these documents to the Qualcomm server after downloading them, making them available to anyone at Qualcomm. (*Id.* at 16.)He further admitted that Qualcomm submitted a technical proposal to the JVT in January 2006 and that Mr. Reznik, another Qualcomm employee, had attended JVT meetings with him beginning in 2005. (*Id.* at 19, 28.)

Yet another Qualcomm employee Dr. Yiliang Bao admitted that he participated in JVT meetings on behalf of Qualcomm beginning in January 2006 and that he submitted five technical proposals to the JVT on Qualcomm's behalf in 2006.(*Id.* at 61-64.)He attached patent disclosure forms for his proposals, but the '104 and '767 patents were not among them. (*Id.* at 77.)

Finally, Mr. Sullivan, chairman of the JVT, testified through his video deposition at trial that Qualcomm sponsored the ninth meeting of the JVT in San Diego

in September 2003, which entailed making a financial donation of "around a few thousand dollars" to pay for a harbor boat cruise and commemorative shirts. (Trial Tr., 53-55, Jan. 18, 2007.) Broadcom submitted into evidence one of these commemorative shirts at trial, which listed Qualcomm as a sponsor on its sleeve. (Def's Ex. 5265.)

**\*19** Based on the testimony of Mr. Ludwin, Ms. Raveendran, Dr. Sagetong, Mr. Sullivan, and Dr. Bao and the totality of the evidence, the Court FINDS clear and convincing evidence that Qualcomm participated in the JVT as early as September 2002 and filed technical proposals attaching patent disclosure forms but not including either the '104 or the '767 patents.

8. The Court finds clear and convincing evidence that Qualcomm had knowledge that the '104 and '767 patents reasonably might be necessary to the practice of the H.264 standard since at least 2002 and July 2005 respectively

As discussed above, the Court finds clear and convincing evidence that the '104 and '767 patent may be essential to the practice of the H.264 standard. Therefore, the issue before this Court is whether Qualcomm had knowledge that the '104 and '767 patents may reasonably be essential to the practice of the H.264 standard while it was a member of the JVT. Qualcomm is assignee of the '104 and '767 patents, which were invented by Qualcomm employees, prosecuted by Qualcomm attorneys, and issued by the patent office on September 19, 1995 and November 19, 1996, respectively. ('104 patent at 1; '767 patent at 1.)

It is axiomatic under the law that a person is responsible for being aware of his/her property, including intellectual property. Corollary to that responsibility is the duty to police his/her patent portfolio in order to protect this property. *See, e.g.,Wanless v. Gen. Elec. Co.,* 148 F.3d 1334, 1338-40 (Fed.Cir.1998) and cases cited therein. Qualcomm is responsible for being aware of its intellectual property, especially as in this case, in which the patents in issue were invented and prosecuted by Qualcomm employees in the course of their employment for Qualcomm, were issued within six years prior to the JVT study in the exact field of the patents' technology, and were assigned to Qualcomm. (Trial Tr., 51-52 and 168, Jan. 10, 2007; Trial Tr., 106-07, Jan. 11, 2007; '104 patent at 1; '767 patent at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

1.)

This is especially reasonable in this case, since the H.264 standard for the technology of video compression is extremely critical to multiple electronic devices of international importance. Qualcomm is one of the major research and development companies in this extremely lucrative market.

As a matter of fact, Broadcom has shown by clear and convincing evidence that Qualcomm participated in the work of the JVT, monitored it with at least four staff engineers, received its correspondence, knew of the area of study, filed at least five study proposals with required IPR forms attached, and knew about its own valuable IPR central to both the resulting H.264 standard versions published in 2003 and 2005, respectively. Yet the '104 and '767 patents were not revealed by Qualcomm before this lawsuit was filed against Broadcom in October 2005 for producing products which are H.264 compliant.

Shortly after the issuance of the '104 and '767 patents, Qualcomm designed a product implementing an audio compression system based on the '104 patent. Qualcomm's expert Dr. Richardson described the product, known as the QDEC-1000, in the following testimony:
*20 Q Well, you understand that the QDEC-1000 was the product that implemented the DCT described in Doctor [Chong] Lee's paper. Did you know that?
A I recall the fact that that product implements a system such as the one described in the paper and the ['104] patent.

(Trial Tr., 126-27, Jan. 11, 2007.) Qualcomm employee Christine Irvine amplified at trial by deposition on the QDEC-1000 as follows:Q Was the QDEC-1000 ever sold?
A I believe so.
Q To whom?
A Technical or Digital Cinema.

(Trial Tr., 84-85, Jan. 18, 2007.) Dr. Chong Lee, currently Vice-President of Technology at Qualcomm and sole named inventor of the '104 patent, also confirmed at trial regarding the time period from 1988 to 1995:Q And during that period of time, you don't know of any product using your 104 invention that was developed by Qualcomm and then offered for sale to anyone, correct?

A No, that's incorrect. We did offer it for sale.
Q To Darpa.
A No, beyond Darpa.
Q To?
A Hollywood movie industries in the form of electronic cinema solution, which is designed to deliver high-quality images to theaters directly using the invention.

(Trial Tr., 135, Jan. 10, 2007.) Dr. Lee further testified:Q Now, you had a co-inventor on this one [the '767 patent], Donald Pian (phonetic), correct?
A That's correct.
Q And he worked with you on this project, correct?
A He worked with me on the Darpa project.

(Id. at 168.)

Yet ironically, Dr. Bao, a Qualcomm employee who attended JVT meetings on behalf of Qualcomm, testified at trial that he had not heard of the '104 or '767 patents before the inception of the present lawsuit. (Trial Tr., 70, Jan. 24, 2007.) Qualcomm employee Dr. Sagetong, monitor for Qualcomm of the JVT, testified that he was not aware of the '104 patent during the time that he was attending JVT meetings. (Id. at 24.)However, while he was monitoring the JVT, he admitted that he received an email from his colleague Mr. Reznik in July 2005, which alerted him and his supervisor of the importance of the '767 patent to the H.264 standard as follows:
To the best of my understanding Qualcomm has a core patent relevant to H.264, MPEG-4 AVC and their extensions.
This patent is the patent # 5,576,767 issued in 1996, and essentially covering all hybrid transform-DPCM video codecs with variable transform sizes. This is clearly a case with H.264 and H.264 FRX codecs whose block sizes are either 4x4, 8x8, or 16x16.

(Id. at 22; Pl's Ex. 616 at 1.) Since the email was also sent to Dr. Sagetong's supervisor Mr. Garudadri, Dr. Sagetong did not respond to Mr. Reznik's email, characterizing it as "not my responsibility." (Trial Tr., 23-24, Jan. 24, 2007.)

Ms. Raveendran, another monitoring member of the Qualcomm Digital Media Group who admitted attending one JVT meeting, testified at trial that she received at least twenty-one emails from the JVT ad hoc group email list concerning the development of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

the H.264 standard. (Trial Tr., 198-200, Jan. 24, 2007; Def's Exs. 5844-64.)

**\*21** As for the '104 patent, she testified at trial, "And I saw the front page [of the '104 patent] on a colleague's desk, and I was-I went there for a consultation, and I saw the words 'adaptive block size DCT and DQT' on the front page." (Trial Tr., 34, Jan. 24, 2007 .) She testified that "[t]he words ABS kind of stood out for me" based on her MPEG-related research, but qualified, "I did not review the patent. It was on-it was laying on my colleague's desk, and I just saw the front page. I never picked it up." (*Id.* at 34, 37) However, in Ms. Raveendran's earlier deposition, which was read into evidence at trial on January 18, 2007, she testified slightly differently:

Q Ms. Raveendran, you've been handed what has been marked as Raveendran Exhibit Number 7. This is a multipage document, a United States patent, and at the top right it indicates Patent Number 5,452,104. Do you have that document?

A Yes.

Q Have you seen this document before?

A I have seen the front page. I haven't seen the entire document.

Q When did you first see this document?

A During my work at Qualcomm Digital Media, somewhere in that time frame.

Q And that would be sometime between 1999 and 2002?

A Yes.

Q But you've never read the full document, Raveendran Exhibit Number 7?

A No, I haven't reviewed it thoroughly.

(Trial Tr., 122-23, Jan. 18, 2007.) Thus, while she testified at trial that she did not review the '104 patent, she admitted during deposition that she hadn't "reviewed it thoroughly," which suggests to the Court that Ms. Raveendran did review the '104 patent, just not "thoroughly." Ms. Raveendran also testified at deposition that she first saw the '104 patent "sometime between 1999 and 2002." (*Id.* at 122.)The '104 and '767 patents are central to the field of specialization of Ms. Raveendran, no doubt one reason why she was ordered by higher management at Qualcomm to monitor the work of the JVT.

The Court observes that all of this involvement, and lack of recollection, by some of the above scientists for Qualcomm is in the context of a co-employment relationship of the scientists with the inventor of the

'104 patent Dr. Lee, now the Vice-President of Technology at Qualcomm.

From this testimony and evidence, the Court FINDS clear and convincing evidence that Qualcomm had knowledge that the '104 and '767 patents were related to the H.264 standard since at least 2002 and July 2005 respectively and therefore might be reasonably necessary to practice the H.264 standard.

Accordingly, under *Rambus,* the Court FINDS clear and convincing evidence that Qualcomm had a duty to disclose the '104 and '767 patents to the JVT since at least 2002 and July 2005 respectively. The JVT formed in late 2001, published the first version of the H.264 standard in May 2003, and published the most recent version in March 2006. (Trial Tr., 267, Jan. 17, 2007; PI's Ex. 492 at 1; PI's Ex. 493 at 1.) Qualcomm filed the present action for patent infringement on October 14, 2005. (Doc. No. 1.) However, it was not until April 25, 2006, six months after the commencement of this lawsuit, that Qualcomm filed an IPR disclosure form with the ITU-T and ISO/IEC regarding the H.264 standard, declaring that Qualcomm "holds granted patents and/or pending applications, the use of which would be required to implement" the H.264 standard. (PI's Ex. 36 at 3-4.) Even this disclosure did not identify any patent, let alone the '104 and '767 patents.

**\*22** The policy of the JVT Standards Study Committee was to draft a technical standard to optimize and maximize the excellence and compatibility of electronic structures to enable companies the world over to produce high-quality video compression products with interchangeable properties so that mankind could enjoy the technology to the utmost. To this end, the JVT sought to minimize impact on intellectual property and, where it could not be avoided, to facilitate a license pooling system [FN3] for sharing royalties for impacted inventions. The participants in the JVT project shared the aims and policies of the JVT and considered themselves obligated to identify IPR owned or known by them, whether or not they made technical proposals for study.

FN3. MPEG LA is a license pool which contains most of the IPR related to the H.264 standard. It does not contain the '104 or '767 patents.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

The non-disclosure of a participant's core patents in such a program could put the participant in a position in which it could literally block the use of the published H.264 standard by any company unless the company obtained a separate license from the participant. Such an undesirable consequence is likely one factor behind the basis for the Federal Circuit ruling in *Rambus,* which the Court applies in this case.

THEREFORE, on the basis of the law and the totality of the circumstances herein, Court FINDS by clear and convincing evidence that Qualcomm waived its rights to enforce the '104 and '767 patents against H.264 products by its silence in the face of a "clear duty to speak" to identify to the JVT its IPR related to the development of the H.264 standard, specifically the '104 and '767 patents.

Thus, in accord with the jury's advisory verdict, the Court FINDS IN FAVOR OF BROADCOM and against Qualcomm as to Broadcom's affirmative defense of waiver against the '104 and '767 patents, subject to the appropriate equitable remedy as to persons producing H.264 compliant products, as set forth in Section III-B-9 below.

9. The Court sitting in equity determines the remedy for violation of an equitable duty.

Inequitable conduct by an inventor and his/her agents before the PTO may result in a decree of unenforceability of the patent, but the remedy depends on equitable considerations arising from the circumstances involved. *SeeFerring B.V., et al. v. Barr Labs., 437 F.3d 1181, 1186 (Fed.Cir.2006)* (holding that the second step in the inequitable conduct analysis is "a weighing of the materiality and intent in light of all the circumstances to determine whether the applicant's conduct is *so culpable* that the patent should be held unenforceable") (quoting *Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1363 (Fed.Cir.2003)*). In that context, the Court here considers with respect to waiver the extent of the materiality of the omitted information and the circumstances surrounding the omissions in connection with the proceedings in the JVT.

The Court is unable to find case guidance for an equitable remedy to a finding of waiver by a patentee or assignee, but it appears to the Court that the remedy should not be automatic, but should be fashioned to give a fair, just, and equitable response reflective of the offending conduct. In this case, the theoretical remedies that appear vary from total unenforceability of the patents to no sanction of any kind.

**\*23** The Court sees the obvious connection between the '104 and '767 patents and H.264 compliant products. Therefore, the Court is inclined to consider a remedy consisting of (1) independent unenforceability of the '104 and '767 patents against any H.264 compliant products, and (2) inclusion of the '104 and '767 patents in the MPEG LA patent pool, which receives royalties from H.264 compliant producers that are divided between all owners of patents related to the H.264 standard who are members of the pool. The extent of Qualcomm's share of the royalties based on the '104 and '767 patents would be determined in accordance with procedures in effect in the MPEG LA pool.

There may be other fair and just remedies not apparent to the Court. The Court therefore schedules an ORDER TO QUALCOMM TO SHOW CAUSE why the Court should not decree the above-described remedy for the waiver found in this case. Hearing on this matter is scheduled for Wednesday, May 2, 2007, at 9:00 A.M. Counsel may brief the issue in accordance with the local rules, so long as the Court receives the last brief no later than Wednesday, April 25, 2007 at 12:00 P.M.

IV. CONCLUSION

For the reasons set forth above, the Court hereby (1) FINDS IN FAVOR OF QUALCOMM and against Broadcom on Broadcom's counterclaim of inequitable conduct against the '104 patent; (2) FINDS IN FAVOR OF BROADCOM and against Qualcomm on Broadcom's affirmative defense of waiver against the '104 and the '767 patents, with the appropriate equitable remedy to be determined as outlined in Section III-B-9 above; and (3) SETS hearing on ORDER TO SHOW CAUSE for Wednesday, May 2, 2007, at 9:00 A.M., for which the parties may file briefs in accordance with the local rules so long as the Court receives the last brief no later than Wednesday, April 25, 2007, at 12:00 P.M.

IT IS SO ORDERED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1031373 (S.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

S.D.Cal.,2007.
Qualcomm Inc. v. Broadcomm Corp.
Not Reported in F.Supp.2d, 2007 WL 1031373
(S.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

**H**Qualcomm Inc. v. Broadcom Corp.
S.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. California.
QUALCOMM INCORPORATED, Plaintiff,
v.
BROADCOM CORPORATION, Defendants.
Civil No. 05-CV-1958-B(BLM).

Aug. 6, 2007.

Adam Arthur Bier, Christian E. Mammen, James R. Batchelder, Lee Patch, Ryan Scher, Victoria Q. Smith, Day Casebeer Madrid and Batchelder, Kevin Kook Tai Leung, Law Office of Kevin Kook Tai Leung, Cupertino, CA, Brian A. Foster, Christopher James Beal, John Allcock, Kathryn Bridget Riley, Randall Evan Kay, Timothy Scott Blackford, William S. Boggs, DLA Piper RudnickGray Cary, Barry Jerome Tucker, David E. Kleinfeld, Heller Ehrman, Roger Wayne Martin, San Diego, CA, Geoffrey M. Howard, Bingham McCutchen, San Francisco, CA, Stanley Young, Heller Ehrman, Menlo Park, CA, for Plaintiff.

Alicia Hunt, Juliana Maria Mirabilio, Will L. Crossley, Wilmer Cutler Pickering Hale and Dorr, Washington, DC, Allen C. Nunnally, Donald R. Steinberg, John J. Regan, Kate Saxton, Louis W. Tompros, Stephen M. Muller, Vinita Ferrera, Wayne L. Stoner, William F. Lee, Wilmer Cutler Pickering Hale and Dorr, Boston, MA, Gregory C. Schodde, Jean Dudek Kuelper, Lawrence M. Jarvis, McAndrews Held and Malloy, Chicago, IL, James Sullivan McNeill, Robert S Brewer, Jr., McKenna Long and Aldridge, San Diego, CA, Maria K. Vento, Mark D. Selwyn, Wilmer Cutler Pickering Hale and Dorr, Palo Alto, CA, for Defendants.

**ORDER ON REMEDY FOR FINDING OF WAIVER**
RUDI M. BREWSTER, United States Senior District Court Judge.

**I. INTRODUCTION**

*1 On March 21, 2007, this Court entered an Order (1) finding in favor of Defendant Broadcom Corporation ("Broadcom") and against Plaintiff Qualcomm Incorporated ("Qualcomm") on Broadcom's Third Affirmative Defense that U.S. Patent Nos. 5,452,104 (Pl's Trial Ex. 1) ("the 104 patent") and 5,576,767 (Pl's Trial Ex. 3) ("the 767 patent") are unenforceable due to waiver;

and (2) setting hearing on an Order to Show Cause as to what the appropriate remedy for Qualcomm's waiver should be. (Doc. No. 528 at 2.)

Following hearing on the Order to Show Cause and careful consideration of relevant court and deposition transcripts, declarations, and other documents submitted by both parties, the Court hereby issues the following remedy for Qualcomm's waiver: that the 104 and 767 patents, their continuations, continuations-in-part, divisions, reissues, or any other dependent or derivative patents of either patent, shall be and are hereby ordered unenforceable.

**II. BACKGROUND**

Qualcomm filed the present suit against Broadcom for patent infringement of the 104 and 767 patents on October 14, 2005, based on Broadcom's manufacture, sale, and offers to sell H.264-compliant products. (Doc. No. 1.) Broadcom filed its First Amended Answer and Counterclaims on December 8, 2006, in which it alleged (1) a counterclaim that the 104 patent is unenforceable due to inequitable conduct; and (2) a Third Affirmative Defense that the 104 and 767 patents are unenforceable due to waiver. (Doc. No. 370.)

A jury trial was held on the legal issues from January 9, 2007, to January 26, 2007. The jury unanimously returned a verdict (1) in favor of Broadcom and against Qualcomm of non-infringement of the 104 and 767 patents; and (2) in favor of Qualcomm and against Broadcom for non-obviousness of the 104 and 767 patents. (Doc. No. 499.) The jury also unanimously returned an advisory verdict on the equitable issues: (1) finding by clear and convincing evidence in favor of Broadcom and against Qualcomm that the 104 patent is unenforceable due to inequitable conduct; and (2) finding by clear and convincing evidence in favor of Broadcom and against Qualcomm that the 104 and 767 patents are unenforceable due to waiver. (Id. at 14.)

The Court held an evidentiary hearing on the equitable issues of inequitable conduct and waiver on February 9, 2007. On March 21, 2007, the Court entered an Order: (1) finding in favor of Qualcomm and against Broadcom on Broadcom's counterclaim of inequitable conduct as to the 104 patent; (2) finding in favor of Broadcom and against Qualcomm on Broadcom's affirmative defense that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 2
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

104 and 767 patents are unenforceable due to waiver based on Qualcomm's conduct before the Joint Video Team ("JVT"), the standards-setting body that created the H.264 standard; and (3) setting hearing on an Order to Show Cause as to what the appropriate remedy for Qualcomm's waiver should be. (Doc. No. 528 at 2.) The Court conducted a hearing on its Order to Show Cause on June 25, 2007.

**\*2** After the verdict was entered, Broadcom again demanded discovery of Qualcomm's records that previously had been concealed, but whose possible existence was only revealed during Broadcom's cross-examination of Qualcomm witness Viji Raveendran on one of the last days of trial. Thereafter, after over three more months of denials, refusals, and opposition, Qualcomm reversed its position, allegedly to avoid further dispute over the matter, and produced on April 13, 2007, over 110,000 pages of emails, company correspondence, and memoranda, and on May 15, 2007, over 120,000 more pages, some of which have now been filed with the Court, none of which have been disputed by Qualcomm.

### III. DISCUSSION

#### A. STANDARD OF LAW

As the Court found in its March 21 Order, Broadcom has the burden of proving its affirmative defense of waiver and remedy therefor by clear and convincing evidence. (Doc. No. 528 at 13.)

A district court may in its discretion hold a patent unenforceable in considering an affirmative defense of inequitable conduct by inventors and/or their agents before the United States Patent and Trademark Office ("PTO"), but the remedy depends on equitable considerations arising from the circumstances involved. *See Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1581, 1585 (affirming a finding of unenforceability based on an inequitable conduct affirmative defense and holding that a "district court must ... weigh the threshold findings of materiality and intent in light of all the circumstances to determine whether they warrant a conclusion" of inequitable conduct).

As the Court stated in its Order finding waiver, "[i]n that context, the Court here considers with respect to waiver the extent of the materiality of the omitted information and the circumstances surrounding [Qualcomm's] omissions in connection with the proceedings in the JVT." (Doc. No. 528 at 33.) While the Court is still unable to find, nor have the parties presented, case guidance for an equitable remedy to a finding of waiver by a patentee or assignee as an affirmative defense, it appears to the Court, as it stated in its Order, that "the remedy should not be automatic, but should be fashioned to give a fair, just, and equitable response reflective of [Qualcomm's] offending conduct."(*Id.*)

The Court has not found a patent decision assessing the remedy for a finding of waiver based upon conduct of silence in the face of a duty to speak. The *Rambus* case, in which the Federal Circuit established the obligation to speak, did not involve a remedy for a breach of that obligation, because the party which allegedly violated the rule had not possessed intellectual property rights that read on or directly applied to the activities of the standards development process. *See Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1102-05 (Fed.Cir.2003). Therefore, this Court, by analogy to the available remedies for redressing inequitable conduct before the United States Patent and Trademark Office ("PTO"), holds that the remedy available here may vary from no remedy to declaring the involved patents totally unenforceable.

**\*3** Qualcomm argues that Broadcom may not have any remedies beyond itself, because it raised the waiver issue only by a separate affirmative defense and not by a counterclaim or cross-claim. This contention is without merit. The Federal Circuit has upheld the unenforceability of a patent to the world due to inequitable conduct before the PTO even when pled as an affirmative defense by the defendant. *See McKesson Info. Solutions, Inc. v. Bridge Med., Inc. .*, 487 F.3d 897, 908, 926 (Fed.Cir.2007); *Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd.*, 204 F.3d 1368, 1372, 1378 (Fed.Cir.2000); *Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1578, 1585 (Fed.Cir.1996). Therefore, the Court finds that it may award remedy for a waiver affirmative defense beyond unenforceability only as to Broadcom.

#### B. ANALYSIS

**1. Overview of the Joint Video Team ("JVT"), related standards organizations, their Intellectual Property Rights ("IPR") Policy and Guidelines, and Qualcomm**

In late 2001, the joint project JVT was launched by two parent standards bodies: (1) the Video Coding Experts Group ("VCEG") of the International Telecommunication Union Telecommunication Standardization Sector ("ITU-T") and (2) the Moving Picture Experts Group ("MPEG")

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

Page 3

of the International Organization for Standardization ("ISO") / International Electrotechnical Commission ("IEC"). (Def's Trial Ex. 5163 (JVT Terms of Reference ["ToR"] ); Trial Tr., 267, Jan. 17, 2007.)

The JVT was created to enhance standard video coding performance in the face of limited bandwidth or storage capacity.[FN1] As a joint project, the JVT would be able to more efficiently produce a single "technically aligned, fully interoperable" standard that would offer "the best possible technical performance under the practical constraints of being implementable on various platforms and for various applications."(JVT ToR at 1.)

> FN1.See Press Release, ITU-T, ITU-T and ISO/IEC to produce next generation video coding standard: Joint Video Team to Deliver Quality Improvement (Feb. 8, 2002), http://www.itu.int/ITU-T/news/jvtpro.html.

According to the JVT ToR, JVT meetings are "open to, and contributions accepted from, all parties qualified for participation in meetings according to the rules of either parent body."(JVT ToR at 3.) As sector members of the ITU-T, Qualcomm and Broadcom can "influence a great variety" of the activities of the Telecommunication Standardization Sector, including the JVT, by "presenting [their] views" and "participating actively."[FN2] Qualcomm and Broadcom must annually pay a minimum of 31,800 Swiss Francs (approximately $26,500) to enjoy the benefits of Sector Membership in the ITU-T, but may annually pay up to 2,544,000 Swiss Francs (approximately $2,4119,000), with higher contributions correlating to a higher class of sector member.[FN3]

> FN2.See ITU-T Membership, http://www.itu.int/ITU-T/membership/sector.html (last visited Jul. 17, 2007); ITU Global Directory, http://www.itu.int/cgi-bin/h tsh/mm/scripts/mm.list?-search=SEC & _languageid=1 (last visited Aug. 6, 2007).

> FN3.See How to join as a Sector Member, http://www.itu.int/ITU-T/membership/join-sector.html (last visited Aug. 6, 2007).

The American National Standards Institute ("ANSI") is the United States' representative member in both the ISO and IEC, as the national body most representative of standardization and electrotechnical standardization, respectively, in the United States.[FN4] As Company

Members of ANSI, Qualcomm and Broadcom enjoy the privilege of "active participation in ANSI and its programs," including the ISO and IEC and by extension the JVT, by paying annual dues ranging from $750 to $25,000 depending on their global sales revenue.[FN5]

> FN4.See Member bodies, http://www.iso.org/iso/en/ab outiso/isomembers/MemberList.MemberSumma ry?MEMBERCODE=10 (last visited Jul. 17, 2007); Members of the IEC, http://www.iec.ch/cgi-bin/pr ocgi.pl/www/iecwww.p?wwwlang=e & wwwprog=membrs3.p (last updated Jul. 18, 2007); Overview of the ISO System, http://www.iso.org/iso/en/aboutiso/introduction/index. html (last modified Sept. 12, 2006); IEC Membership, http://www.iec.ch/about/members-e.htm (last visited Aug. 6, 2007).

> FN5.See ANSI Membership Roster, https://eseries.ansi.org/Source/directory/Search.cfm (last visited Jul. 17, 2007); ANSI Membership-A Value Proposition, http://www.ansi.org/membership/overview/overview.a spx?menuid=2 (last visited Aug. 6, 2007); ANSI Company Membership Application, http://publicaa.ansi.org/sit es/apdl/Documents/Membership/ANSIM ember-Company-2006.pdf (last visited Aug. 6, 2007).

*4 Qualcomm has paid hundreds of thousands of dollars to ANSI and the ITU-T to reap the benefits of membership, including the entitlement to actively participate in the JVT and the creation of the H.264 standard. These standards organizations pool resources to efficiently create universal technology standards for the benefit of (1) the world through the advancement of technology and (2) companies worldwide such as Qualcomm through greater cross-platform product compatibility and therefore revenue.

According to the JVT ToR, the JVT "progress[es] in compliance with the Intellectual Property Rights ("IPR") policies and IPR reporting requirements and procedures of both [parent] organisations [sic]" regarding patent and copyright issues. (JVT ToR at 4.) More specifically, the JVT collects IPR information during the standardization process as follows:
According to the ITU-T and ISO/IEC IPR policy, members/experts are encouraged to disclose as soon as possible IPR information (of their own or anyone else's) associated with any standardization proposal (of their own

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

Page 4

or anyone else's). Such information should be provided on a best effort basis.

For collecting such information, JVT has decided to use it's [sic] own Patent Declaration form-note that this is distinct from the *ITU ISO IEC Patent Statement and Licensing Declaration* that is to be submitted to the ISO Secretary General and ITU TSB Director when the contributed technology becomes part of the final standard.

(JVT ToR at 9.) This language applies to Qualcomm, as a member of the ITU-T and participant in the JVT.

In the sample Patent Disclosure Form included in the ToR, the JVT reiterates:

JVT requires that all technical contributions be accompanied with this form. *Anyone* with knowledge of any patent affecting the use of JVT work, of their own or of any other entity ("third parties"), is strongly encouraged to submit this form as well.

(JVT ToR at 12.) The JVT explains that form submissions should be made on "a best effort, good faith basis," as "[t]he intent is that the JVT experts should know in advance of any patent issues with particular proposals or techniques, so that these may be addressed well before final approval."(*Id.*) If the submitter has a patent "associated with the technical content" of the standard being created by the JVT, the submitter must indicate on the form whether it will: (1) grant royalty-free licenses to practice the patent; (2) grant licenses "on a worldwide, non-discriminatory basis and on reasonable terms and conditions"; (3) grant royalty-free licenses on the condition that all other patent holders do the same; or (4) not grant any of the aforementioned licenses, in which case the standard will be designed so as not to cover the patent. (JVT ToR at 13.)

As for the "ITU ISO IEC Patent Statement and Licensing Declaration" that must be submitted separately to the ITU and ISO before final approval of the standard being created by the JVT, "any party participating in the work of the ITU, ISO or IEC should" alert these bodies to the existence of patents "embodied fully or partly" in a standard under consideration.[FN6]Patent holders submitting this form to the ITU and ISO have similar licensing options as offered by the JVT form above: they must (1) grant royalty-free licenses to practice their patent; (2) grant licenses "on a non-discriminatory basis on reasonable terms and conditions"; or (3) not grant any of the aforementioned licenses, in which case the standard will be designed so as not to cover the patent.[FN7]This language also applies to Qualcomm, as a "party participating in the work of the ITU, ISO or IEC" by way

of the JVT.

> FN6. Common Patent Policy for the ITU-T/ITU-R/ISO/IEC, http:// www.itu.int/ITU-T/dbase/patent/patent-policy.html (last visited Aug. 6, 2007).

> FN7.*See id.*

**\*5** As held by this Court in its March 21 Order and described in more detail below, (1) waiver of patent rights must be shown by clear and convincing evidence; (2) JVT participants treated the JVT IPR policies as imposing a duty to disclose patents that reasonably may be essential to practice the H.264 standard; (3) the 104 and 767 patents reasonably may be essential to practice the H.264 standard; (4) Qualcomm participated in the JVT as early as January 2002; (5) Qualcomm had knowledge that the 104 and 767 patents reasonably might be essential to practice the H.264 standard; and (6) therefore, Qualcomm had a duty to disclose the 104 and 767 patents to the JVT.

However, instead of disclosing the 104 and 767 patents to the JVT and offering to license them royalty-free or under non-discriminatory, reasonable terms during the development phase of the JVT work on the H.264 standard, Qualcomm closely monitored and participated in the development of the H.264 standard, all the while concealing the existence of at least two patents it believed were likely to be essential to the practice of the standard, until after the development was completed and the standard was published internationally. Then, without any prior letter, email, telephone call, or even a smoke signal, let alone attempt to license Broadcom, Qualcomm filed the instant lawsuit against Broadcom for infringement of the 104 and 767 patents, seeking damages and permanent injunction against Broadcom based on its development and manufacture of H.264 compliant products. Qualcomm sought to unfairly benefit from having subverted the standards-making process of the JVT and, as the Court found in its March 21 Order, waived its right to enforce the patents-in-suit.

**2. The Court FINDS by clear and convincing evidence that Qualcomm participated in the JVT as early as January 2002**

In the Court's March 21 Order finding in favor of Broadcom on its affirmative defense of waiver, the Court had already found by clear and convincing evidence that Qualcomm participated in the JVT as early as September 2002. (Doc. No. 528 at 22.) However, with the new

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

evidence produced by Qualcomm post-trial, the Court **FINDS** well beyond clear and convincing evidence that Qualcomm participated in the JVT as early as January 2002, well before the release of the H.264 standard in May 2003. The evidence unequivocally contradicts Qualcomm's assertions at summary judgment, during trial, and at the post-trial hearing on waiver and inequitable conduct that it did not participate in the JVT until after May 2003.

As early as January 2002, Qualcomm hired an outside consultant, Jordan Isailovic, to attend JVT meetings on Qualcomm's behalf and to send reports to Qualcomm summarizing the progress of the JVT. For example, after ostensibly attending a JVT meeting in Geneva, Switzerland that took place from January 29 to February 1, 2002, Mr. Isailovic sent an email to three Qualcomm employees, including Qualcomm's initial Rule 30(b)(6) witness Christine Irvine, on February 11, 2002, with the subject heading "JVT Geneva Report," stating the following:

*6 The Report on the JVT Geneva Meeting is included as an attachment. As you can see, the Report has many details. I hope that you and your team can get a good idea about JVT ...
If you or any member of your team needs any of the documents mentioned in the Report, please let me know and I will get it.

(Doc. 543-2, Ex. A, Tab 3 at 24, Tab 4 74.)

Two days later on February 13, 2002, Ms. Irvine forwarded Mr. Isailovic's email to six other Qualcomm employees, including Qualcomm trial witness and senior staff engineering manager Viji Raveendran and Qualcomm deposition witness James Determan. (*Id.*, Tab 5 at 77.) On February 25, 2002, Ms. Irvine forwarded by email over three pages of notes she took on her most recent JVT phone conference to fellow Qualcomm employees Raveendran and Jay Yun. (*Id.*, Tab 7 at 83.) The next day on February 26, 2002, Ms. Raveendran sent an email to two Qualcomm employees with the subject heading "JVT mtg tomorrow" that stated, "Chris is going to the JVT mtg. and will be driving tomorrow."(*Id.*, Tab 8 at 88.)

On March 5, 2002, Qualcomm consultant Isailovic sent an email to five Qualcomm employees, Ms. Irvine, Ms. Raveendran, Mr. Determan, John Ratzel, and Amnon Silberger with the subject heading "Requested Documents and Info" that stated in part as follows:
John, Chris at all [sic],

Here is the response to list of documents and info you requested today:
1. JVT, sw for the TML 9.x ...
2. MPEG Web site: ...
3. JVT, ABT example document: See the attachment ...
4. Contact information for the Thomson JVT expert who has software for the H.26L [working name for the standard that became H.264]: ...
Let me know if you need anything else.
Jordan

(*Id.*, Tab 9 at 90-91.) The following day on March 6, 2002, Mr. Isailovic sent another email to Qualcomm colleagues Irvine, Ratzel, Raveendran, Silberger, Determan, and Steve Morley, with the subject heading "JVT/H26L" and an attached file "jm17.zip" that stated:This may be the latest version (evaluable [sic] ) ...
PS: Chris, please forward this to the rest of the group; I don't have all addresses.

(*Id.*, Tab 10 at 94.)

Post-trial, Qualcomm produced at least 118 additional emails discussing the work of the JVT sent between (1) Qualcomm employees, including Ms. Irvine, Ms. Raveendran, and Mr. Determan; (2) Qualcomm consultant Isailovic; and/or (3) a Qualcomm email list "dc-system-eng" dated from March 11, 2002, to July 22, 2004. (*Id.*, Tabs 12-129.) One hundred seven of these emails were sent before the H.264 standard was released in May 2003. (*Id.*, Tabs 12-118.)

Not only did Qualcomm consultant Isailovic attend JVT meetings as early as January 2002, Qualcomm employees have been attending JVT meetings "for a while" before April 2002, well before the H.264 standard was released in May 2003. Qualcomm employee Amnon Silberger wrote an email to four other Qualcomm employees, including Mr. Yun, on April 30, 2002, which stated:
*7 We have been attending these standard body meetings for a while now. These are the MPEG/JVT/JPEG meetings and the SMPTE meetings. To ease the load, all the system engineers in our group rotate in attending these (Chris, Jay, Viji, Jim Determan and myself).

(*Id.*, Tab 44 at 306.) Messrs. Yun and Silberger attended the May 2002 JVT meeting in Fairfax, Virginia. On May 8, 2002, Mr. Yun sent a three-page meeting report email to eight Qualcomm employees, including Ms. Irvine, Ms. Raveendran, Mr. Determan, and Mr. Silberger, with the subject header "WG11 (MPEG Fairfax-day 3)" that stated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

Page 6

explicitly, "I've attended some JVT meetings and saw some demo (so did Amnon)."(*Id.,* Tab 57 at 361.)

Furthermore, Qualcomm voted on ballots affecting JVT as early as June 2002. On June 11, 2002, Mr. Yun wrote an email to Ms. Irvine, Ms. Raveendran, Mr. Silberger, and Mr. Determan stating the following:
Below is an email ballot for L3.1 (USNB [United States National Body] for MPEG). It calls for an ad hog [sic] group to collect and generate comments on U.S. comments on JVT CD (Committee Draft). By not re lying to this email, we agree to the formation of the AHG [ad hoc group].

(*Id.,* Tab 70 at 415.) Mr. Yun sent another email to those same four Qualcomm employees the same day, stating:One more email ballot from L3.1.
This has two questions, the first one approves the REGISTRATION of JVT CD and the second one approves the CD with a conditional disapprove, which means that the USNB has some comments that it wishes to be reflected.
I don't see any reason we should disagree with the two questions. We need not do anything to do so. Let me know if any of you want to investigate this further and discuss.

(*Id.,* Tab 71 at 419.)

Qualcomm's post-trial production of documents directly and unequivocally exposes as blatantly false Qualcomm's steadfast assertions at summary judgment, during trial, and at the post-trial hearing on waiver and inequitable conduct that it did not participate in the JVT until after May 2003. The Court **FINDS** well beyond clear and convincing evidence that Qualcomm participated in the JVT from as early as January 2002, even earlier than the Court originally found in its March 21 Order and, more importantly, well before the JVT released the H.264 standard in May 2003. Participation does not require submission of proposals, speeches, objections or leadership roles. The Court finds Qualcomm's involvement to be vigorous participation-a difference appears to the Court to be the motive for participation-i.e., to insulate its IPR from the work of the JVT so as to preserve it for unilateral enforcement if that became possible after the H.264 standard was settled upon.

**3. The Court FINDS by clear and convincing evidence that Qualcomm was aware as early as August 2002 that JVT participants treated the JVT IPR policies as imposing a duty to disclose patents that reasonably may be essential to the H.264 standard**

*8 In the Court's March 21 Order finding in favor of Broadcom on its affirmative defense of waiver, the Court found by clear and convincing evidence that JVT participants treated the JVT IPR policies as imposing a duty to disclose patents that reasonably may be essential to the H.264 standard. With the new evidence produced by Qualcomm post-trial, the Court now **FINDS** by clear and convincing additional evidence that Qualcomm was aware of this treatment by JVT participants as early as August 2002.

In August 2002, Qualcomm consultant Isailovic forwarded an email to Qualcomm employees Ratzel, Determan, Irvine, Raveendran, Silberger, and Yun with the subject heading "Fwd: [jvt-ipr] Re: Face-to-Face JVT IPR Meeting."(Doc. No. 543-2, Ex. A, Tab 92 at 529.) The body of the forwarded email stated in pertinent part:
The future licensing terms [for H.264 / MPEG-4 AVC] will be defined by the holders of essential patents; at this time it is unknown who are these patent holders, so this needs to be determined first. The question is how. In my understanding, the objective is to invite "potential holders of essential patents" to the face to face-meeting [sic] to discuss this issue. Therefore in my understanding the most important agenda point is the procedure to identify essential patent holders in an objective manner.

(*Id.,* Tab 92 at 530-31.)

Then in September 2002, Mr. Isailovic forwarded another email to Qualcomm employees Morley, Ratzel, Determan, Irvine, Raveendran, Silberger, and Yun with the subject heading "Fwd: [jvt-ipr] Call for H.264 / MPEG-4 AVC [Advanced Video Coding] patents."(Doc. No. 543-2, Ex. A, Tab 94 at 545.) The body of the forwarded email stated in pertinent part:
This is to let you (as you may have noticed already that MPEG LA is calling for essential MPEG-4 AVC/ H.264 patents, with the aim to come to a joint license soon.

(*Id.,* Tab 94 at 546.)

One month later in October 2002, Mr. Isailovic forwarded an email to Qualcomm employees Ratzel, Raveendran, Determan, Irvine, Silberger, and Yun, which Ms. Raveendran in turn forwarded to two other Qualcomm employees with the subject heading "Fwd: [jvt-ipr] Confirmation of JVT IPR meeting in Geneva."(Doc. No. 543-2, Ex. A, Tab 97 at 567.) In the body of her email, Ms. Raveendran wrote, "FYI. Some information on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                Page 7
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

licensing issues and IPR in JVT."(*Id.*)The body of the forwarded email listed a suggested agenda for the JVT-IPR meeting open to all JVT and IPR experts at the Geneva JVT conference, which included (1) an "(ongoing) determination of essential patent holders" and (2) the "expected process once essential patent holders are identified."(*Id.*, Tab 97 at 568.) These three emails demonstrate that Qualcomm was aware as early as August 2002 that the JVT was actively attempting to identify holders of patents essential to the H.264 standard.

Later, in September 2003, Qualcomm employee Harinath Garudadri wrote an email to another Qualcomm employee and a Qualcomm email list "multimedia.all" with his "notes from the first day of the JVT meeting."(*Id.*, Tab 120 at 682.) One of Mr. Garudadri's bullet points was:
**9 IPR policies of [JVT parent body] VCEG and ITU. Gary said formal notification was required.**List of IPR holders for H.264/AVC is in Appendix F of MPEG doc and ITU-T web site. Each contribution has the IPR statements at the end.

(*Id.*) (emphasis added.) JVT chairman Gary Sullivan confirmed at trial that he delineated the IPR policy of the JVT at the beginning of every JVT meeting, and from Garudadri's email, Qualcomm was aware at least by September 2003 that formal JVT IPR notification was consistently requested of all IPR holders even if they did not make technical proposals. (Trial Tr., 43-44, Jan. 18, 2007.) Since, as established above, Qualcomm had been attending JVT meetings as early as January 2002 in which Mr. Sullivan routinely repeated this IPR policy at each meeting, the Court concludes that Qualcomm was well aware of the policy even earlier than that.

Furthermore, amongst the documents Qualcomm produced post-trial was Philips International's June 21, 2002, letter to the ISO International Technology Task Force accompanying its JVT Patent Disclosure form, which made it clear that Philips treated the JVT's IPR policies as imposing a duty to disclose. (Doc. No. 543-2, Ex. A, Tab 74.) Under the subject heading "Re: JVT," Philips wrote:
In response to the RFTI [Request for Technical Information] made at the MPEG meeting May 6-10, 2002 we submit in the **required** JVT Patent Disclosure Form, a list of Philips' patents which have been deemed necessary for the implementation of MPEG2 Video, and which have been **deemed necessary for the implementation of the JVT Baseline and/or Main Profiles.**
Philips has made the listed patents available for implementation of the MPEG2 Video standard, in accordance with ISO IPR rules, on reasonable and non-

discriminatory terms. To be consistent and to avoid discriminating against licensees under the MPEG2 Video standards, Philips is again prepared to make these patents available under reasonable and non-discriminatory terms for the JVT Baseline and Main Profiles.

(*Id.*, Tab 74 at 435) (emphasis added.) From this, Qualcomm was aware that JVT participant Philips viewed the JVT Patent Disclosure Form as "required" for patents "deemed necessary for the implementation of the JVT Baseline and/or Main Profiles."Qualcomm was further aware that Philips was prepared to license its patents for the JVT standard "[t]o be consistent" with "[JVT parent] ISO IPR rules."

Later in this letter, expressing concern that "the JVT will not be in a position to take an informed decision on the feasibility of a royalty-free Baseline Profile," Philips stated
Video compression technology has attracted wide interest in the electronics industry for quite some years. As a consequence many patents and patent applications exist in many countries of the world covering not only the basics of compression technology, but also many varieties within such compression schemes.
To our mind it is an illusion to assume[ ] that it would be possible to ensure a royalty free JVT Baseline Profile by the evaluation effort based on the patents now being submitted. First, there is a very substantial risk that the submitted list of patents is not complete. Second, an effort, undertaken to avoid the use of patent rights that are not available under royalty-free conditions, could well result in the use of other not yet identified patent rights. Both issues place at the end the so defined JVT Standard in an even much worse position when patents of not-involved companies start playing a role.

**10 (*Id.*, Tab 74 at 435-36.) From this, Qualcomm was aware of the concern of JVT participant Philips that the H.264 standard would practice patents that had not yet been disclosed to the JVT and offered for licensing under royalty-free or reasonable and non-discriminatory terms.

Furthermore, Philips closed its letter by stating, "In the interests of transparency Philips is copying this letter to members of the JVT Group, many of whom are licensees under the MPEG2 Video patents, in order to demonstrate Philips [sic] continued commitment to transparency and non-discrimination in the licensing of IPR on standards."(*Id.*, Tab 74 at 436.) Therefore, while it is not apparent when Qualcomm received the copy of Philips' letter, since Philips copied the letter to all JVT members, the Court concludes that Qualcomm probably received a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

copy not long after it was sent on June 21, 2002.

The Court already found by clear and convincing evidence in its March 21 Order that JVT participants treated the JVT IPR policy as imposing a duty of disclosure for patents that reasonably might be necessary to practice the H.264 standard. Now, considering the new evidence produced late by Qualcomm post-trial, the Court **FINDS** by additional clear and convincing evidence that Qualcomm was aware of this treatment as early as August 2002.

**4. The Court FINDS by clear and convincing evidence that Qualcomm had knowledge by early March 2002 that its Adaptive Block Size Transform ("ABT") related patents, including the 104 and 767 patents, reasonably might be necessary to practice the H.264 standard**

In the Court's March 21 Order finding in favor of Broadcom on its affirmative defense of waiver, the Court found by clear and convincing evidence that Qualcomm had knowledge that the 104 and 767 patents might reasonably be necessary to practice to H.264 standard as early as 2002 and July 2005 respectively. (Doc. No. 528 at 27.) With Qualcomm's post-trial production of additional documents, the Court now **FINDS** by additional clear and convincing evidence that Qualcomm had knowledge as early as March 2002 that its ABT related patents, including the 104 and 767 patents, reasonably might be necessary to practice the H.264 standard.

Qualcomm's own witness Chong Lee, an inventor of both the 104 and 767 patents, testified at trial that the 104 and 767 patents related to ABT technology. Mr. Lee testified that his May 1992 paper "Intraframe Compression of HDTV Images Based on Adaptive Block Size Discrete Cosine Transform" described the 104 patent invention. (Trial Tr., 94, Jan. 10, 2007.) He stated that the paper "discusses the technology involved in both 104 and 104 that included ABS DCT [Adaptive Block Size Discrete Cosine Transform] and DQT [Differential Quadtree Transform]" and reiterated that the 104 patent describes "intraframe compression." (*Id.* at 70, 94.)

In contrast, Mr. Lee specified that the 767 patent describes "interframe compression." (Trial Tr., 70, Jan. 10, 2007.) Mr. Lee testified:

*11 I approached the problem [addressed in the 767 patent] by using multiple block sizes in an adaptive fashion to solve theroblem of obtaining both quality and efficiency of the [video interframe] compression.

(*Id.* at 107-08.)When asked whether the 767 patent approach was similar to ABS DCT, Mr. Lee responded:Yes. Exactly. Just like we were describing ABS DCT as adaptive block size technique that involves transforms on different block sizes, **this technique involves adaptive block sizes** by applying what's called motion compensation, looking for similarities in large blocks versus small blocks.

(*Id.*) (emphasis added.)

Qualcomm recognized as early as March 2002 that its ABT related patents might be reasonably necessary to practice the H.264 standard. A report entitled "Report of activities for the last six months" and dated March 6, 2002, that was produced from Qualcomm's records stated: Since our group is actively involved in the ITU, MPEG, and SMPTE standards meetings, we are looking into proposing some of the features of **our ABSDCT compression algorithm** to one of these standard bodies. I had the task of compiling the details of MPEG, JVT (Joint Video Team) and ABSDCT compression features. I reviewed the JVT draft and prepared a spreadsheet detailing the aspects of these algorithms. We haven't had a chance to discus [sic] this yet. The purpose behind this is for us to decide **whether our ABSDCT Intra and interframe algorithms will fit in the JVT scenario.**

(Doc. No. 543-2, Ex.A, Tab 11 at 96.) As stated above, the 104 patent deals with intraframe video compression, while the 767 patent deals with interframe video compression. From this report, Qualcomm demonstrates its awareness of the connection between these patents and the H.264 standard being developed by the JVT.

On March 26, 2002, Qualcomm engineer Silberger sent an email to three Qualcomm employees, including Ms. Irvine and Jay Yun, with the subject heading "JVT ABS submission," which stated:
For several days now, Jay and myself have been looking at ways to incorporate **our ABS** into H.26L [another name for H.264] for submission in the JVT May Meeting.

(Doc. No. 543-2, Ex. A, Tab 17 at 122) (emphasis added.) Clearly, Mr. Silberger is here acknowledging that Qualcomm's adaptive block size technology is so related to the work being done in the JVT that it should be offered for incorporation into the developing H.264 standard.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

Page 9

The next day on March 27, 2002, Mr. Yun responded to Mr. Silberger's email, stating:
After discussing JVT ideas with Amnon, I remembered that there were some recent proposals that have to do with **variable block sizes.** I re-read those proposals, Jordan's report and **our patents** and come up with the following observations.

(*Id.*, Tab 20 at 131) (emphasis added). Addressing JVT proposals already made by others to add an 8x8 transform, a 16x16 transform, and a 2x2 transform, Mr. Yun wrote:*12 1. [ ... ] They are all integer transforms that mimic DCT. With these, perhaps we can recommend **our variable block size scheme** that is different than the proposal which only uses fixed-size sub-blocks for the entire 16x16 block (i.e., you can only have all 8x8s, all 4x4s, all 8x4s or all 4x8s, etc.)?...
But Jordans' report says that this adaptive block-size ideas will not be included in the baseline but in some high quality applications, so we may be able to prove that there is a significant gain in quality by using out [sic] scheme.

(*Id.*) (emphasis added). Mr. Yun continued:2. **Our original patents mention DCT almost exclusively** and says that it is for "pixel data." Should we "extend" our patents to include all transforms and all data types (like residuals)?
3. We should go to all JVT meetings at least for the time being to be on top of their work on ABT, which Jordan says is brand new.
4. Similar to ideas in 1, we can use **our interframe ABS patent** and then either recommend BSA [sic ABS] for motion block size assignment/representation and/or attach or block JVT's scheme for using variable block size for motion estimation (they use fixed size sub-blocks, though).

(*Id.*, Tab 20 at 131-32) (emphases added). Both the 104 and 767 patents mention DCTs multiple times: in the claim language and repeatedly throughout every section of the <u>104 patent</u>, and in the description of preferred embodiments in the 767 patent. (<u>'104 patent;</u> 767 patent.) Furthermore, as Mr. Lee explained at trial, the 767 patent describes interframe compression using adaptive block sizes.

Then, in July 2002, Ms. Raveendran sent an email to Qualcomm JVT consultant Isailovic, in which she wrote: **About patent reviews for JVT and studying ABT with respect to our patent,** it was decided that we would like a summary of various aspects of ABT in JVT. There are a lot of details and if you can help narrow down the focus, that would be a good start.

(*Id.*, Tab 86 at 504) (emphasis added.)

A few months later in November 2002, Qualcomm engineer Yun wrote an email with the subject heading "JVT slides," stating that "monitoring ABT is of importance since there may be **patent infringement issues related to ABSDCT.**"(*Id.*, Tab 102 at 600) (emphasis added.) Qualcomm engineer Silberger responded to Mr. Yun's email on the same day, carbon copying Ms. Raveendran and writing, "One thing, didn't we kind of conclude that they are not infringing our ABSDCT?"(*Id.*, Tab 102 at 599.) This email exchange makes it clear that, prior to November 2002, Qualcomm had already given consideration to whether the H.264 standard in development would infringe Qualcomm's ABS DCT patents, which include the 104 and 767 patents. This is further confirmed by the December 2002 document entitled "JVT 12/9-14/02 meeting goals, prioritized list," in which the item "ABT" is followed by the question, "Is there a **potential IPR issue with ABSDCT?**"(*Id.*, Tab 109 at 635) (emphasis added.)

*13 Then, in April 2003, Qualcomm employee Tom Kilpatrick sent an email to Viji Raveendran and another Qualcomm employee addressing a new "bi-weekly working engineering meeting." (*Id.*, Tab 118 at 673.) Mr. Kilpatrick wrote, "One of the things to be addressed in Viji's meetings are progress on **Digital Cinema patents vs** JVT standard."(*Id.*) (emphasis added.) Qualcomm's outside expert Dr. Iain Richardson testified at trial that Qualcomm designed a product implementing an audio compression system, the QDEC-1000, based on the <u>104 patent.</u> (Trial Tr., 126-27, Jan. 11, 2007.) Qualcomm employee Irvine then confirmed through deposition testimony at trial that the QDEC-1000 was sold to "Technical or Digital Cinema." (Trial Tr., 84-85, Jan. 18, 2007.) Therefore, Qaulcomm knew of a link between the <u>104 patent</u> and the H.264 standard and set up bi-weekly meetings to "address" the issue in April 2003.

This newly discovered evidence augments the already convincing evidence explicitly naming the 104 and 767 patents that the Court discussed in its March 21 Order, indicating Qualcomm's knowledge of a link between those patents and the H.264 standard. Therefore, the Court **FINDS** by additional clear and convincing evidence that Qualcomm had knowledge that the 104 and 767 patents reasonably might be necessary to practice the H.264 standard as early as March 2002, well before the JVT released the H.264 standard in May 2003.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

At no time before the H.264 standard was initially published as adopted did Qualcomm reveal to the JVT or its parent bodies Qualcomm's IPR, specifically the 104 and 767 patents.

**5. The Court FINDS by clear and convincing evidence that Qualcomm intentionally organized a plan of action to shield the 104 and 767 patents from consideration by the JVT with the anticipation that (1) the resulting H.264 standard would infringe those patents and (2) Qualcomm would then have the opportunity to become an indispensable licensor to anyone in the world seeking to produce H.264-compliant products**

The Court has already found above and in its March 21 Order that Qualcomm waived its rights to enforce the 104 and 767 patents against Broadcom by its silence when it had a duty to speak before the JVT. However, faced with the additional evidence produced post-trial by Qualcomm, the Court concludes that the conduct of Qualcomm's employees before trial, and its employees and hired witnesses during pre-trial, trial, and post-trial outlines misconduct even more extensive than the Court previously found in its March 21 Order.

Merely the reiteration of the chronology of events above and below tells the story of the gravity of the conduct. The facts speak for themselves. The totality of the circumstances leads the Court to conclude by clear and convincing evidence that Qualcomm intentionally organized a plan of action to shield the 104 and 767 patents from consideration by the JVT with the anticipation that (1) the resulting H.264 standard would infringe those patents and (2) Qualcomm would then have an opportunity to be an indispensable licensor to anyone in the world seeking to produce an H.264-compliant product.

**\*14** The track of this conduct following the adoption of the H.264 standard exposes aggravated litigation abuse. This abuse commenced with Qualcomm's abrupt commencement of suit, then continued (1) in discovery through Qualcomm's constant stonewalling, concealment, and repeated misrepresentations concerning existing corporate documentary evidence that would have revealed the fullness of the corporate plan; and (2) in trial through Qualcomm's presentation of numerous witnesses who steadfastly testified falsely denying even awareness, let alone participation in the JVT project and through the actions of Qualcomm's lead and co-counsel up to the time Qualcomm substituted new lead counsel, who adamantly denied the obvious and then, when the truth was

discovered and exposed by the document production, sequentially contended denial of relevance, justification, mistake, and finally non-awareness.

**a. Misconduct of Qualcomm, its employees, and its witnesses**

The Court **FINDS** by clear and convincing evidence that Qualcomm, its employees, and its witnesses actively organized and/or participated in a plan to profit heavily by (1) wrongfully concealing the patents-in-suit while participating in the JVT and then (2) actively hiding this concealment from the Court, the jury, and opposing counsel during the present litigation.

**(1) Misconduct before the JVT**

As established above, there is clear and convincing evidence that Qualcomm was aware of its duty to disclose the 104 and 767 patents to the JVT as early as 2002, well before the H.264 standard was published in May 2003. However, it was not until April 25, 2006, six months after the commencement of this lawsuit, that Qualcomm filed an IPR disclosure form with the ITU-T and ISO/IEC regarding the H.264 standard, declaring that Qualcomm "holds granted patents and/or pending applications, the use of which would be required to implement" the H.264 standard. (Pl's Trial Ex. 36 at 3-4.) *Even this disclosure did not identify any specific patent, let alone the 104 and 767 patents.*

The Court **FINDS** by clear and convincing evidence that Qualcomm and its employees orchestrated a plan to ignore Qualcomm's duty to disclose these patents to the JVT, in order to become an indispensable licensor of the H.264 standard. Qualcomm employee Yun sent an email in March 2002 to Qualcomm colleagues Silberger, Ratzel, and Irvine, discussing the transform proposals before the JVT. (Doc. No. 543-2, Ex. A, Tab 20.) In it, Mr. Yun suggested "extending" Qualcomm's patents in order to cover the standard being developed by the JVT:
Our original patents mention DCT [discrete cosine transform] almost exclusively and says that it is for "pixel data". Should we "extend" our patents to include all transforms and all data types (like residuals)?

(Doc. No. 543-2, Ex. A, Tab 20 at 131.) He then advocated monitoring the JVT and its work in relation to Qualcomm's patents:We should go to all JVT meeting at least for the time being to be on top of their work on ABT [adaptive block-size transform], which Jordan [Isailovic] says is brand new.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 11
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

**\*15**(*Id.*)

One month later in April 2002, Qualcomm engineer Silberger sent an email to Qualcomm colleagues Determan, Irvine, Raveendran, Yun, and Ratzel. (Doc. No. 543-2, Tab 38.) In it, he advocated "monitoring" the JVT "from a distance":

The JVT effort is mostly done for the physical layer, and going towards a committed draft in May. There is no indication that they are even looking at DC [Digital Cinema] applications. New technical suggestions are dealing mostly with better efficiency (reduced complexity) and file formats. We should monitor this from a distance.

(*Id.*, Tab 38 at 273.) Later, under the heading "Recommendations," Mr. Silberger advised increasing Qualcomm's monitoring of the JVT and refraining from making any submissions, which would include any potential patent disclosures, to JVT parent body MPEG:We should be monitoring MPEG meetings, especially regarding DC testings, and also sample the JVT and JPEG activities. We may pull in some other groups within Qualcomm to participate, since both H.26L [working name for what later became the H.264 standard] and JPEG2000 may both be promising for low date [sic] rates. At this point, I don't see the need for submitting anything to MPEG.

(*Id.*, Tab 38 at 274.) Mr. Silberger then explicitly recommended "consider [ing] efficient ways for lobbying our technology in the appropriate forums."(*Id.*)

Later, in July 2002, Qualcomm engineer Raveendran sent an email to Qualcomm consultant Isailovic stating, "About patent reviews for JVT and studying ABT with respect to our patent, it was decided that we would like a summary of various aspects of ABT in JVT."(*Id.*, Tab 504 at 504.) From Ms. Raveendran's use of the phrase "it was decided," the Court concludes that Qualcomm held meetings to decide strategy as to how to monitor the JVT with respect to Qualcomm's patents. Ms. Raveendran then conceded to Mr. Isailovic, "There are a lot of details and if you can help narrow down the focus, that would be a good start."(*Id.*)

This monitoring and reporting on the activities of the JVT with respect to Qualcomm's patents without disclosure of these patents continued through the release of the H.264 standard in May 2003 and Qualcomm's filing of this patent infringement suit in October 2005 against Broadcom as to the 104 and 767 patents. (Doc. No. 543-2, Ex. A.) Qualcomm filed this suit (1) based on the theory that the patents-in-suit cover the H.264 standard and therefore Broadcom's H.264-compliant products and (2) long before any disclosure of these two patents to the JVT or its parent organizations and without any offer to license its patents to Broadcom or to JVT members. In combination with the above evidence presented to the Court as to Qualcomm's participation in the JVT and Qualcomm's knowledge that the 104 and 767 patents reasonably might be necessary to practice the H.264 standard, the Court **FINDS** by clear and convincing evidence that Qualcomm and its employees organized and attempted to execute a plan to actively conceal its patents from the JVT in order to later become an indispensable licensor to those practicing the H.264 standard. This plan, of course, deprived the JVT of the opportunity to attempt to design around the 104 and 767 patents in developing the H.264 standard.

**(2) Misconduct during the present litigation**

**\*16** The Court's finding as to Qualcomm's wrongful conduct is further supported by evidence of widespread and undeniable misconduct of Qualcomm, its employees, and its witnesses throughout the present litigation, including during discovery, pre-trial motions-practice, trial, and post-trial proceedings.

**(a) Christine Irvine**

For example, staff engineer Christine Irvine, Qualcomm's original Federal Rule of Civil Procedure 30(b)(6) witness testified at trial through her July 6, 2006, deposition that Qualcomm did not attend any JVT meetings:

Q Are you the person at Qualcomm most knowledgeable about attendance or participation by any Qualcomm principal, employee or representative at any H.264 standards committee meetings?

A I believe I am.

Q Are you the person at Qualcomm most knowledgeable about Qualcomm's knowledge regarding the development of the H.264 standard?

A I believe I am.

Q And are you the person at Qualcomm most knowledgeable about any actions taken by Qualcomm or any of its principals, employees or representatives as a result of Qualcomm's knowledge regarding the development of the standard?

A I believe I am.

Q Is Qualcomm a member of the JVT?

A No, Qualcomm is not.

Q Has Qualcomm ever attended any meetings of the JVT?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

A Qualcomm is not aware of any attendance to any JVT meetings.
Q Has Qualcomm ever hosted any meeting of the JVT?
A Qualcomm's not aware of hosting a JVT meeting.
Q Okay. Has Qualcomm made any submissions to the JVT?
A No, Qualcomm has not made any submissions to the JVT that Qualcomm is aware of.
Q When did Qualcomm first become aware of the development of the H.264 standard?
A Approximately 2001 in trade journals.

(Trial Tr., 79-81, Jan. 18, 2007.)

The falsity of Ms. Irvine's testimony is now revealed as blatant. As detailed above at length, Qualcomm produced over one hundred emails post-trial related to Qualcomm's participation in the JVT and attendance of JVT meetings, the vast majority of which were received or sent by Ms. Irvine. (Doc. No. 543-2, Ex. A.) For example, in February 2002, Ms. Irvine received by email Qualcomm consultant Isailovic's report on the January/February 2002 JVT meeting in Geneva, which Mr. Isailovic also sent to Qualcomm employees Ratzel and Silberger. (Doc. No. 543-2, Ex. A, Tab 4 at 74.) Two days later, Ms. Irvine forwarded Mr. Isailovic's report to six Qualcomm employees, including Ms. Raveendran, Mr. Determan, Mr. Silberger, and Mr. Yun. (_Id._, Tab 5.) In May 2002, Ms. Irvine received a three-page report on the May 2002 JVT meeting in Fairfax from Qualcomm colleague Yun, which was also sent to other Qualcomm employees including Amnon Silberger, Mr. Ratzel, and Ms. Raveendran. (_Id._, Tab 57 at 361-63.) In that email, Mr. Yun explicitly stated, "I've attended some JVT meetings and saw some demo (so did Amnon)."(_Id._, Tab 57 at 361.)

**(b) James Determan**

Similar to Ms. Irvine, Qualcomm employee James Determan gave deposition testimony that is belied by the documents Qualcomm produced post-trial. In his August 2006 deposition, Mr. Determan testified that he did not know if Qualcomm was a member of the JVT and that he did not believe he was personally a member of the JVT:
*17 Q Do you know if Qualcomm is a member of the JVT?
MR. LEUNG: Objection. Calls for speculation.
THE WITNESS: I do not know.
BY MS. HUNT:
Q Are you personally a member of the JVT?
A I do not believe so.

(Doc. No. 543-2, Ex. S at 27.)

However, in conflict with this testimony, Mr. Determan received an email in January 2004 from Qualcomm colleague Laura Chiu with the subject title "FW: JVT Membership Renewal." (Doc. No. 543-2, Ex. A, Tab 128 at 727.) In that email, which was also sent to five other Qualcomm employees including Viji Raveendran, Amnon Silberger, Rick Kane, and Seyfullah Oguz, Ms. Chiu wrote:
Please let me know if you are still interested in being a **JVT member.**
Rick, would it be ok to make Viji the principal? I will be processing payment for MediaFLO members: Viji, Amnon, and peyfullah.

(_Id._) (emphasis added.) Attached to the end of Ms. Chiu's email was a forwarded email with the same subject heading. In that forwarded email thread, Ms. Chiu first wrote to Parthenia Purcell, Associate Manager of Membership Services for the Information Technology Industry Council ("ITIC"):When you have the chance, please send me the invoices for **JVT membership** renewal for Viji Raveendrand [sic] (Principal), Amnon Silberger (Alternate), and an application for Seyfullah Oguz (new member).

(_Id._, Tab 128 at 730) (emphasis added.) Ms. Purcell forwarded Ms. Chiu's request to add new member Qualcomm employee Oguz to Lynn Barra, Associate Director of Information Technology Industry Standards Operations, who replied to Ms. Chiu as follows:Prior to making any changes to the **Qualcomm membership,** we would like to verify the information we have on file with you. Below is the current member information we have in our database.
Rick Kane-principal ($800)
Amnon Silberger-alternate (free, included with principal membership)
Hari Garudadri-additional alternate ($800)
**Jim Determan-**additional alternate ($800)
Viji Raveendran-additional alternate ($800)

(_Id._, Tab 128 at 728) (emphases added.)

Moreover, Mr. Determan received many of the emails discussed above, which included JVT meeting reports from Qualcomm employees and consultant Isailovic as well as discussion of Qualcomm monitoring of the JVT. Therefore, the Court can only conclude that, at the time of Mr. Determan's August 2006 deposition, he was fully aware that (1) Qualcomm was heavily involved with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

Page 13

JVT since as early as January 2002 and (2) as recently as 2004, Qualcomm was still a paying member of the JVT and so was Mr. Determan as a Qualcomm representative.

Mr. Determan also testified in his August 2006 deposition that he did not recall ever attending a JVT meeting nor was he aware of any Qualcomm employee attending any:
Q Have you ever attended any meeting of the JVT?
A Not that I recall.
Q Do you know of any Qualcomm employees that have attended JVT meetings?
*18 MR. LEUNG: Objection. Calls for speculation.
THE WITNESS: Not that I'm aware.

(Doc. No. 543-2, Ex. S at 27.) However, Qualcomm's post-trial production of documents reveals that, not only was Mr. Determan aware that Qualcomm employees had attended JVT meetings, but Mr. Determan probably attended some himself.

Qualcomm employee Silberger wrote in an April 2002 email:
We have been attending these standard body meetings for a while now. There are the MPEG/JVT/JPEG meetings and the SMPTE meetings. To ease the load, all the system engineers in our group rotate in attending these (Chris, Jay, Viji, Jim Determan and myself.)

(Doc. No. 543-2, Ex. A, Tab 44 at 306.) Mr. Determan also received five emails from Qualcomm colleagues Yun and Silberger with daily reports from their attendance of the May 2002 JVT meeting in Fairfax, Virginia. (*Id.* Tabs 56-60.)

Mr. Determan then testified at his August 2006 deposition that he did not know when any JVT meetings took place nor did he recall ever hearing reports of any JVT meetings:
Q Do you know when any of the JVT meetings took place?
A No.
Q Have you ever heard any reports, whether via email or written report or any discussion, of what occurred at any JVT meeting?
A Not that I recall.

(Doc. No. 543-2, Ex. S at 29.) However, in contrast to this testimony, as stated above, Mr. Determan received multiple reports of the May 2002 JVT meeting in Fairfax. (Doc. No. 543-2, Ex. A, Tabs 56-60.) He also "rotated" attending MPEG/JVT/JPEG and SMPTE standard body meetings with the other engineers in his group, Mr.

Silberger, Mr. Yun, Ms. Raveendran, and Ms. Irvine. (*Id.* Tab 44 at 206.) Furthermore, in February 2002, he received Qualcomm consultant Isailovic's report of the January 2002 JVT meeting in Geneva forwarded to him by Qualcomm colleague Irvine. (*Id.* Tab 5.)

### (c) Viji Raveendran

In addition to her colleagues Ms. Irvine and Mr. Determan, Qualcomm trial witness and senior staff engineering manager Viji Raveendran also gave testimony at deposition and trial that was later blatantly contradicted by Qualcomm's post-trial document production. Ms. Raveendran testified in her July 2006 deposition that she did not even learn of the JVT until 2003 through journals and publications:
Q. [ ] Referring only to the Joint Video Team that developed the H.264 standard, when did you first learn of the Joint Video Team that developed the H.264 standard?
A. Somewhere in the 2003 time frame.
Q. How did you learn of it?
A. Through literature.
Q. What literature?
A. Basically journals and video processing related-
THE REPORTER: Related what?
THE WITNESS: Journals and publications, basically publications.

(Doc. No. 543-2, Ex. P at 36-37.)

However, the evidence produced by Qualcomm post-trial reveals that Ms. Raveendran knew of the JVT as early as February 2002 through reports on JVT meetings from Qualcomm consultant Isailovic, not through "journals and publications" in "the 2003 time frame" as she testified. Qualcomm produced post-trial almost one hundred emails and JVT meeting reports Ms. Raveendran either received or sent in 2002 addressing JVT's work and its relation to Qualcomm. (*Id.* Tabs 5-111.) For example, in February 2002, Ms. Raveendran received Qualcomm consultant Isailovic's report on the January 2002 JVT Meeting in Geneva in an email forwarded by Qualcomm colleague Irvine. (Doc. No. 543-2, Tab 5.) Furthermore, Ms. Raveendran sent many emails herself to other Qualcomm employees regarding the JVT, including her February 2002 email to Mr. Yun and Ms. Irvine, in which she says, "Chris is going to the JVT mtg. and will be driving tomorrow. We will meet at Starbucks off Jefferson Rd. exit on I-78 (off of I-5) at 11:30 a.m."(*Id.* Tab 8 at 88.)

*19 Later in her deposition, Ms. Raveendran testified that she did not know of nor did she receive a report of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

JVT meeting (1) in January 2002 in Geneva, Switzerland; (2) in May 2002 in Fairfax, Virginia; (3) in August 2002 in Klagenfurt, Austria; (4) in October 2002 in Geneva, Switzerland; (5) in December 2002 in Awaji Island, Japan; and (6) in September 2003 in San Diego, California. *(Id.* at 41-44.)In direct contradiction to her testimony, Qualcomm's post-trial production of documents reveal that Ms. Raveendran did in fact receive (1) a report of the January 2002 JVT meeting in Geneva (Doc. No. 543-2, Tab 5); (2) many emails discussing and reporting on the May 2002 JVT meeting in Fairfax, including at least one sent by Ms. Raveendran herself *(Id.,* Tabs 18, 22, 25, 32, 35, 36, 41, 56-61); (3) emails discussing the August 2002 JVT meeting in Klagenfurt, including ones forwarding documents registered for the Klagenfurt meeting "[p]er your request, Viji" and forwarding lists of Klagenfurt meeting registrants under "Viji, [t]his is for you"*(Id.,* Tabs 54, 69, 80 at 468, 82, 84 at 492); (4) emails discussing the October 2002 JVT meeting in Geneva, including one from Ms. Raveendran herself (Tabs 54, 97); (5) an email mentioning the December 2002 JVT meeting on Awaji Island (Doc. No. 100); and (6) an email mentioning the September 2003 JVT meeting in San Diego (Doc. No. 123).

Later in her July 2006 deposition, Ms. Raveendran testified that she did not know of any JVT IPR policy:
Q. Does the JVT have a policy regulating intellectual property rights?
A. I don't know of that.

(Doc. No. 543-2, Ex. P at 76.) However, again, documents produced by Qualcomm post-trial tell a different story. Ms. Raveendran forwarded an email to two Qualcomm colleagues in October 2002 with the subject heading "Fwd: [jvt-ipr] Confirmation of JVT IPR meeting in Geneva."(Doc. No. 543-2, Ex. A, Tab 97 at 567.) In that email, she wrote, "FYI. Some information on licensing issues and IPR in JVT."*(Id.)*The forwarded email included a suggested meeting agenda:1) short summary of the IPR status in JVT
2) potential licensing models, examples and wishes: MPEG-4, other
3) (ongoing) determination of essential patent holders
4) expected process once essential patent holders are identified
5) involvement of licensees and the role of this "JVT-IPR group"

*(Id.,* Tab 97 at 568.) Therefore, Ms. Raveendran was aware that the JVT wanted to identify "essential patent holders" and was developing licensing models to regulate IPR.

Then in November 2002, Ms. Raveendran wrote an email to three Qualcomm employees, including Mr. Yun and Mr. Silberger, in which she wrote, "Attached is the Patent list Statement on MPEG. Part 10 covers JVT (under AVC, that's how JVT is referred to in MPEG world)."*(Id.,* Tab 101 at 590.) Jay Yun then sent out an email in response to a question as to the completeness of Ms. Raveendran's list:
**\*20** Initially JVT set out to come up with a royalty-free baseline profile. Many submitted their technologies knowing that this is going to be the case, or some even withheld their submissions into the Baseline profile because they didn't want to submit as royalty-free. And then over time it became evidence that royalty free baseline is not going to be possible. Some patents are carry over from MPEG-2 and 4. So now, some want to re-define the baseline profile and make sure all who didn't submit technologies before b/c they thought they couldn't would be allowed to submit again. A big mess.

*(Id.,* Tab 101 at 589.) Ms. Raveendran then clarified Mr. Yun's response in her own email:A quick note: yes, this is not a complete list as Jay clarified. Also, the contributions that did not make it into JVT's baseline profile (due to royalty issues), are now incorporated into the "Common" profile.

*(Id.,* Tab 101 at 588.) Therefore, in contradiction to her deposition testimony, Ms. Raveendran was clearly aware of how the JVT was organizing its IPR into various profiles and licensing schemes and did "know of" the JVT's policy regarding its IPR.

Furthermore, Ms. Raveendran's trial testimony is directly rebutted by Qualcomm's post-trial production of documents. She testified that Qualcomm did not get involved in the JVT until "much later" after the JVT was formed in late 2001:
Q Was Qualcomm involved with JVT at that time [when the JVT was formed in 2001]?
A No, we were not.
Q Did Qualcomm ever become involved with JVT?
A Much later, when-I mean, my-my participation has been-I don't know who else participated in Qualcomm recently, but-is that much later when the scalable video coding effort got merged into JVT-the scalable video coding was a different standard that MPEG was working on, and when they-when that work item got moved to JVT, that's when we started participating.

(Trial Tr., 40-41, Jan. 24, 2007.) However, as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

Page 15

demonstrated by Mr. Isailovic's report on the January 2002 JVT meeting in Geneva, which was forwarded to Ms. Raveendran in February 2002, Qualcomm was involved in the JVT as early as January 2002, which Ms. Raveendran was well aware of when she testified at trial. (Doc. No. 543-2, Tab 5.)

At trial, Ms. Raveendran also testified that her only personal involvement with the JVT was attending one JVT meeting in July 2005 in Poland:
Q Did you have any personal involvement with JVT?
A I attended one of their meetings when they were working on the scalable video coding effort. Scalable video coding is to enable different quality levels and different display levels of recorded video, depending on the display sizes, for example.
So that was a new technology that the group was working on, and my interest was more in the sense of how robust that technology is to errors. Because in a wireless scenario, there are errors that will cut up the data, and how robust is that data. So that was my involvement.

**\*21** (Trial Tr., 41, Jan. 24, 2007.) However, as is made abundantly clear by Qualcomm's post-trial document production described above, that was far from the extent of Ms. Raveendran's involvement with the JVT. The documentary email evidence shows that Ms. Raveendran was in fact integrally involved with Qualcomm's intense monitoring of the JVT since as early as February 2002: sending JVT reports, receiving JVT reports, and acting as a liaison between Qualcomm and consultant Isailovic who attended JVT meetings on Qualcomm's behalf.

### b. Misconduct of Qualcomm counsel

#### (1) Misconduct during discovery

The Court **FINDS** by clear and convincing evidence that Qualcomm counsel participated in an organized program of litigation misconduct and concealment throughout discovery, trial, and post-trial before new counsel took over lead role in the case on April 27, 2007.

On October 14, 2005, Qualcomm counsel filed a Complaint on behalf of Qualcomm alleging Broadcom's infringement of the 104 and 767 patents based on Broadcom's manufacture, sale, and offers to sell H.264-compliant products, requesting preliminary and permanent injunction and damages. (Doc. No. 1.) On January 23, 2006, Broadcom submitted its First Set of Requests for the Production of Documents and Things (Nos.1-88), in which it requested *"[a]ll documents*

*concerning Qualcomm membership, participation, interaction, and/or involvement in setting any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm Patent."*(Doc. No. 543-2, Ex. V at 17.) Qualcomm counsel submitted in Qualcomm's Response to Broadcom's request on February 24, 2006, the following response:
QUALCOMM will produce responsive non-privileged documents that were given to or received from standards-setting body responsible for the ISO/IEC MPEG-4 Part 10 standard, and which concern any QUALCOMM participation in setting the ISO/IEC MPEG-4 Part 10 standard, following the entry of, and pursuant to the terms of, a mutually agreed-upon protective order.

(Doc. No. 543-2, Ex. W at 44.) This response deflected the request as though it only addressed the MPEG-4 Part 10 standard and completely concealed Qualcomm's extensive involvement with the JVT and the H.264 standard.

On January 23, 2006, Broadcom also submitted Request for Production No. 49 requesting "[a]ll documents given to or received from a standards setting body or group that concern any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm Patent, including without limitation communications, proposals, presentations, agreements, commitments, or contracts to or from such bodies."(Doc. No. 543-2, Ex. E at 1.) Later on July 14, 2006, Broadcom submitted Request for Production No. 93 requesting "[a]ll documents referring to or evidencing any participation by Qualcomm in the proceedings of the JVT, the ISO, the IEC, and/or the ITU-T."(*Id.*) Despite these requests, Qualcomm counsel produced none of the over two hundred thousand pages of emails and electronic documents concerning the JVT and the H.264 standard, which were clearly within the scope of the requests, and that were finally produced four months post-trial.

**\*22** On January 23, 2006, Broadcom submitted its First Set of Interrogatories Under Fed.R.Civ.P. 33 (Nos.1-16), in which it listed as Interrogatory No. 13:
Please identify and describe in detail Qualcomm's membership, participation, interaction, and/or involvement in setting any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm patent [ ... ] This interrogatory includes without limitation any MPEG [Moving Pictures Working Group] video processing standard, and expressly includes H.264.

(Doc. No. 565-2, Ex. C at 15.) Broadcom further asks in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 16
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

this same interrogatory for "the nature, purpose, effect, and sum and substance of Qualcomm's participation and/or involvement,""the identity of each Person who participated or was involved on behalf of Qualcomm," and the "relevance" and "identity" of any Qualcomm patent "related to such standard." (*Id.* at 15-16.)

The Court quotes the verbatim response submitted by Qualcomm counsel to Interrogatory No. 13 in Qualcomm's Fourth Supplemental Response to Broadcom's First Set of Interrogatories (Nos.1-16), pages 33-35, dated September 5, 2006, because it demonstrates vividly the stonewalling denial and diversions of requests for evidence repeatedly directed to Qualcomm:

QUALCOMM refers to and incorporates by reference each of the foregoing general objections as though each is set forth fully herein, including privilege and work product.

QUALCOMM further objects to the definition of "identify" to the extent it renders the interrogatories overly broad, unduly burdensome and/or would require QUALCOMM to provide information that is not within its possession, custody, and control and/or cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the purported requirement that it respond "in detail" as vague, ambiguous, unduly burdensome, overly broad, and requiring information not within its possession, custody, or control. In particular, it is unclear how much detail is requested, and QUALCOMM will respond only to the extent information is explicitly requested.

QUALCOMM objects to the term "Qualcomm Patent" as vague and ambiguous, and instead will refer to the "QUALCOMM Patents-in-Suit."

QUALCOMM objects to the definition of "Person" to the extent that its definition is circular with respect to "Entity" and "entities." "Person" is defined to include any "legal entity," "government entity," and "business entity." "Entity" is defined to include "natural persons." QUALCOMM will construe "Person" in accordance with its reasonable ordinary meaning.

QUALCOMM objects to the phrase "any standard relating to the processing of digital video signals" as vague and ambiguous. QUALCOMM further objects to the defined terms "standard" or "standards" as vague, ambiguous, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence; and to the defined terms "MPEG video processing" as vague, ambi uous, overbroad, unduly burdensome and not reasonably calculateYto lead to the discovery of admissible evidence. QUALCOMM will construe those terms as stated in the general objections.

*23 QUALCOMM objects to the term "relevance" as vague, overly broad, and neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

QUALCOMM objects to the purported requirement that it res ond as to the time period(s) at issue as vague, ambiguous, overly broad, unduly burdensome, and requiring information not within its possession, custody, or control.

QUALCOMM objects to the phrase "nature, purpose, effect, and sum and substance" as vague, ambiguous, overly broad, unduly burdensome, and requiring information not within its possession, custody, or control.

QUALCOMM objects to the phrase "participation and/or involvement" as vague, ambiguous, overly broad, and unduly burdensome.

QUALCOMM objects to the phrase "membership, participation, interaction, and/or involvement" as vague, ambiguous, overly broad, and unduly burdensome because the phrase "membership ... in setting any standard" is impossible to parse.

QUALCOMM objects to the purported requirement that it identify "each" person, to the extent it calls for information that is not within QUALCOMM's possession, custody, and control and/or that cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the purported requirement that it respond as to "standards raised but never adopted" as vague and to the extent it calls for information not within QUALCOMM's possession, custody, and control and/or that cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the purported requirement that it identify the particular standard(s) that resulted from Qualcomm's involvement, to extent it calls for information that is not within QUALCOMM's possession, custody, and control and/or that cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the phrase "relevance" in interrogatory 13(I) as vague, ambiguous, overly broad, unduly burdensome, calling for information that is not within QUALCOMM's possession, custody, and control and/or cannot be identified or located with a reasonably diligent search, and neither relevant to any claim or defense at issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence. In particular, the basis for determining relevance is unclear, the interrogatory potentially requires a response that is virtually unlimited in scope, and it is unclear as to the entities from whose perspective relevance is to be determined.

QUALCOMM objects to the term "related" as vague, ambiguous, overly broad, and unduly burdensome, and neither relevant to any claim or defense at issue in this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

litigation nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the general and specific objections set forth herein, QUALCOMM responds as follows. Beyond passive monitoring, QUALCOMM participated in ISO/IEC JTC1/SC29 WG11 of MPEG. The time period at issue includes 2001. The nature of QUALCOMM's participation includes the contribution of two proposals with document numbers 7340 and 7341. The author of these proposals was A. Chris Irvine.

*24 QUALCOMM contributed four proposals to the JVT in 2006. One each during the January and April meetings, and two during the July meeting. The authors of these proposals were Yiliang Bao and Yan Ye. During the April 2006 meeting of the JVT, QUALCOMM also contributed a verification of an earlier proposal by LG.

QUALCOMM's investigation concerning this interrogatory is ongoing and QUALCOMM reserves the right to supplement its response to this interrogatory as warranted by its investigation.

On March 10, 2006, Qualcomm counsel submitted its Initial Disclosure of Asserted Claims and Accused Products Relating to the 767 and 104 Patents, in which it listed as Accused Broadcom Products those products that "conform to, comply with, and/or support H.264." (Doc. 565-2, Ex. A at 1.) At that point, Qualcomm apparently was very much aware of the relevance of the H.264 standard.

On May 23, 2006, Broadcom submitted its Notice of Rule 30(b)(6) Deposition to Qualcomm, [Notice No. 1: Qualcomm's Products, Processes, and Instrumentalities], in which it notices topics for 30(b)(6) deposition, including:
The attendance or participation by any Qualcomm principal, employee, or representative at any H.264 standards committee meetings, including, but not limited to, the dates, locations and agendas of such meetings, notes taken at such meetings, membership of any Qualcomm principal, employee, or representative in any H.264 standards committees, and any actions taken by Qualcomm or any of its principals, employees, or representatives as a result of such meetings.

(Doc. No. 565-2, Ex. D at vii.) In July 2006, Qualcomm's proferred Rule 30(b)(6) witness Christine Irvine falsely testified at deposition as described above in Section III-B-5-a-(2)(a) that Qualcomm was not a member of the JVT; Qualcomm was not aware of any attendance of JVT meetings; and that nobody at Qualcomm sought to become involved in the development of the H.264 standard. (Doc. No. 543-2, Ex. Q at 30, 34, 40.)

On July 12, 2006, Broadcom filed an additional Rule 30(b)(6) notice specifically addressing the JVT in its Notice of Rule 30(b)(6) Deposition to Qualcomm, [Notice No. 5: H.264 Participation]. (Def's Binder, 06-25-07 Hr'g, Tab 6.) Qualcomm's subsequent Rule 30(b)(6) witness Scott Ludwin testified at his August 2006 deposition that he had never heard any discussion nor seen documentation of Qualcomm membership in the JVT:
Q. I take it further you haven't seen any written documentation of Qualcomm's membership in the JVT.
MR. LEUNG: Objection; lacks foundation.
THE WITNESS: I've never been at any discussions with respect to the membership in JVT or seen any documents if they do exist.

(Doc. No. 543-2, Ex. R at 26.) He also testified that he did not know whether any Qualcomm employees were JVT members:Q. [ ... ] [D]o you know whether any Qualcomm employees are currently members of the JVT?
MR. LEUNG: Objection; vague and ambiguous.
*25 THE WITNESS: I don't know. Again I'm not familiar with the membership structure of the JVT and your attendance in those particular organizations.

(Def's Binder, 06-25-07 Hr'g, Tab 13 at 26-27.) He later testified in the same deposition that December 2003 was Qualcomm's first participation in the JVT:Q. [ ... ] So did any Qualcomm employee prior to December, 2003 participate in any JVT activity?
A. I believe that December of 2003 was our first participation in any formal JVT meeting. I believe Qualcomm sponsored an event, a JVT event when that organization met in San Diego [in September 2003]. I'm not certain-I don't know if anyone from Qualcomm actually went to that event. That is the only participation that I know of any Qualcomm company employee in any JVT activity.

(Ex. 565-3, Ex. H at 51.)

On August 16, 2006, Qualcomm counsel submitted Qualcomm's Response to Broadcom's Second Set of Requests for Production of Documents and Things (Nos.89-115). (Doc. 543-2, Ex. X.) Qualcomm there stated:
QUALCOMM will produce non-privileged relevant and responsive cuments describing QUALCOMM's participation in the JVT, if any, which can be located after a reasonable search.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

(*Id.* at 12.)As is clear to the Court now, Qualcomm failed to produce even one of the over two hundred thousand pages of emails, memoranda, and electronic documents related to Qualcomm's participation in the JVT, which were finally produced after trial. But Qualcomm's assurance of performing a "reasonable search" represents that Qualcomm was acting in good faith to produce discovery.

On September 5, 2006, Qualcomm counsel then submitted Qualcomm's First Supplemental Response to Broadcom's Second Set of Interrogatories (Nos.17-29), in which Qualcomm represented that the first JVT meeting attended by a Qualcomm employee was by Phoom Sagetong in December 2003. (Doc. No. 543-2, Ex. Y at 12.) Qualcomm listed Mr. Sagetong as attending eight JVT meetings from December 2003 to January 2006 and asserted that the only other Qualcomm employees to attend JVT meetings were: (1) Yuriy Reznick, who attended the July 2005 and October 2005 meetings; (2) Ms. Raveendran, who attended the July 2005 meeting; and (3) Yiliang Bao, who attended three meetings from January 2006 to July 2006. (*Id.* at 12-13.)As shown in great detail hereabove, these supplemental responses were calculatedly misleading and totally false in the context of their denial of any attendance of a JVT meeting by any Qualcomm representative prior to December 2003.

Qualcomm counsel's discovery responses demonstrate that they were able to locate with alacrity company records from December 2003 forward and find four or more Qualcomm employees participating in proceedings of the JVT. Yet inexplicably, they were unable to find over 200,000 pages of relevant emails, memoranda, and other company documents, hundreds of pages of which explicitly document massive participation in JVT proceedings since at least January 2002. These examples of Qualcomm counsel's indefensible discovery conduct belie counsel's later implied protestation of having been "kept in the dark" by their client.

### (2) Misconduct during motions practice

*26 The gross litigation misconduct by Qualcomm counsel continued through motions practice before the Court.

On September 1, 2006, Qualcomm counsel submitted a Declaration of Dr. Iain Richardson in support of Qualcomm's Motion for Summary Adjudication of no waiver, in which Dr. Richardson declared under penalty of perjury in pertinent part:

I have been unable to find any documentary evidence of the involvement of Qualcomm personnel in the H.264/AVC [Advanced Video Coding] standardization process prior to September 2003, by which time the technical content of the baseline, main and extended profiles was considered to be frozen and the first issue of the H.264/AVC standard had been published.

(Doc. No. 543-2, Ex. T at 5) (footnote omitted.) Dr. Richardson continued:The involvement of Qualcomm employees in JVT activities from September 2003 to December 2005 appears to be minimal, with no technical contribution documents submitted by any Qualcomm employee.

(*Id.* at 5.) Dr. Richardson then concluded:Indeed, Qualcomm was not significantly involved in the JVT until 2006, and then its involvement has been limited to the SVC [Scalable Video Coding] standardization project, not the H.264/AVC standard. Therefore, it is my opinion that Qualcomm did not meaningfully participate in the development of the H.264/AVC standard, and Qualcomm did not violate any of JVT's or ITU-T's rules or expectations regarding the disclosure of intellectual property rights.

(*Id.* at 9.) Here, even Qualcomm's scientific expert Dr. Iain Richardson, who was qualified as an expert in video compression technology and who testified at trial that Broadcom's H.254-compliant products infringed the 104 and 767 patents, was used by Qualcomm counsel to step out of his field of expertise and sign a declaration vouching for the absence of any corporate records regarding Qualcomm's participation in the JVT.

Qualcomm counsel then filed this Richardson declaration on November 6, 2006, as Exhibit 15 to the Declaration of Kyle S. Robertson in Support of Qualcomm Incorporated's Motion for Summary Adjudication regarding Broadcom's defenses of equitable estoppel, implied license, fraud, unclean hands, breach of contract, laches, and waiver. (Doc. No. 168.)

On November 6, 2006, Qualcomm counsel filed Qualcomm's Motion for Summary Adjudication as to Broadcom's defenses including waiver (Doc. No. 165), to be heard by the Court on December 5, 2006. In the Introduction of the opening brief, Qualcomm counsel argued as follows: "The facts are undisputed: QUALCOMM employees never participated, in any form, in the JVT until *after* the H.264 standard was already released."(Doc. No. 543-2, Ex. Z at 1.) Qualcomm

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

counsel continued, "There is no evidence that any QUALCOMM participant knew of the applicability of the patents-in-suit to the H.264 standard prior to the initiation of this lawsuit."(*Id.*)

Qualcomm counsel then argued emphatically in the body of Qualcomm's opening brief for summary adjudication, as summarized in the chart below:

| Section title of Qualcomm's brief | Arguments made by Qualcomm counsel |
| --- | --- |
| JVT Practices and Procedures and QUALCOMM's Participation | The evidence is undisputed that QUALCOMM was not involved, in any manner, with the work of the JVT leading up to this release of the H .264 standard in May of 2003. There is no evidence that QUALCOMM attended any of the JVT meetings between December, 2001 and May, 2003. Until September of 2003, no QUALCOMM employee ever attended a meeting of the JVT. There is also no evidence that QUALCOMM employees |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

Page 20

engaged in any email corresponde nce or other means for working with the JVT to develop the standard.

(Doc. No. 543-2, Ex. Z at 4) (citations omitted.)

The first recorded instance of a named QUALCOM M employee attending a meeting of the JVT occurs with Phoom Sagetong in December, 2003 [ ... ] Between 2003 and 2005, Mr. Sagetong was the only QUALCOM M employee to attend a meeting of the JVT.

(*Id.*) (citations omitted.)

QUALCOM M never submitted a JVT patent disclosure form related to the baseline H.264 profile

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

|  | because QUALCOMM never participated in the JVT meetings where that standard was created [ ... ] In April 2006, QUALCOMM declared that it had patents it believed were "required to implement" the H.264 standard, and that it was prepared to license any such patents on a "worldwide, non-discriminatory basis and on reasonable terms and conditions." |
|  | (*Id.* at 7) (citations omitted.) |
| It Is Undisputed that QUALCOMM Did Not Make a Misleading Communication | There is no evidence that any QUALCOMM employee was a JVT participant prior to September, 2003, and therefore there is no reasonable basis for Broadcom |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

to assert that QUALCOMM had a duty to disclose the patents-in-suit prior to this point in time. There is no evidence of any particular QUALCOMM employee attending a meeting of the JVT prior to Phoom Sagetong, in December, 2003.

(Doc. No. 543-2, Ex. Z at 10) (citations omitted.)

It is undisputed that none of the QUALCOMM employees attending JVT meetings knew of the potential applicability of the patents-in-suit to the H.264 standard [ ... ][N]one of them [Qualcomm employees] can be accused of making any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

| | misleading statements or engaging in any misleading omissions. |
| | (*Id.*) (citations omitted.) |
| | The relevant H.264 standard had already been in place and the technical content of the standard established when the attendees in question, QUALCOMM engineers, attended their first meeting of the JVT. |
| | (*Id.* at 10.) |
| Broadcom's Claim Of Fraud Is Insufficient As A Matter Of Law | [T]here is no evidence showing the requirements of scienter and intent to defraud, as none of the QUALCOMM employees attending JVT meetings knew of these patents. |
| | (Doc. No. 543-2, Ex. Z at 15.) |
| Broadcom's Claim Of | QUALCOMM |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

Page 24

| Unclean Hands Is Insufficient As A Matter Of Law | employees participating in the JVT acted in good faith at all times[.] (Doc. No. 543-2, Ex. Z at 16.) |
|---|---|

**\*27** In conjunction with the Motion for Summary Adjudication, Qualcomm counsel also filed a supporting Statement of Undisputed Facts, in which it listed as undisputed fact:

10. Qualcomm was not involved with the work of the JVT leading up to the release of the H.264 standard in May of 2003.

11. Qualcomm had no influence or effect on the technical content of the H.264 standard prior to its publication in May 2003.

(Doc. No. 543-2, Ex. AA at 2) (citations omitted.)

Then, on November 27, 2006, Qualcomm counsel filed their reply brief in support of Qualcomm's Motion for Summary Adjudication, in which they addressed the appearance of Qualcomm employee Raveendran's email address in an email list for a JVT ad hoc group:

It does not show that Raveendran ever received any JVT documents or JVT information of any sort, let alone anything covering the relevant parts of the H.264 standard. The document thus does not contradict Raveendran's testimony that she did not receive information related to JVT meetings, and did not know of JVT meetings or have any involvement with the JVT prior to her participation in the SVC project. The document also provides no evidence regarding what emails were allegedly sent to the "avc_ce" email list, whether Raveendran was actually on this list or received any emails, and whether she viewed and understood any emails that actually support the elements of the defenses Broadcom has to prove, including that QUALCOMM understood at the time that either of the patents-in-suit may relate to the H.264 standard. In short, this document, even if admissible (which it is not), fails to support *any* reasonable inference for Broadcom and does not contradict Broadcom's own expert when he agreed that "QUALCOMM had not influence or effect on the technical content of the H.264 standard prior to its publication in May 2003."

(Doc. No. 543-2, Ex. CC at 6-7) (footnote and citations

omitted.) Later, in a section entitled "It Is Undisputed That No QUALCOMM Employee Knew Of The Applicability of The Patents-In-Suit To The H.264 Standard Prior To This Lawsuit," Qualcomm counsel argued:All Raveendran stated [in her deposition] was "I have seen the front page [of the 104 patent], I haven't seen the entire document."This testimony does not show that Raveendran was familiar with the technical details of the H.264 standard or with the relevance of the 104 Patent to the H.264 standard. It falls far short of establishing that Raveendran "knew of the applicability of the patents-in-suit to the H.264 standard," only showing that Raveendran never read the 104 Patent.

(Doc. No. 543-2, Ex. CC at 9) (footnote and citation omitted.)

The lynchpin of Qualcomm's adamant and determined motions and arguments for summary adjudication was the claim that Broadcom had no evidence of JVT participation. Not surprising. Every attempt to obtain evidence, which as it came later to be revealed was voluminous and dispositive, had been repelled by Qualcomm by its steadfast denial of the existence of any evidence and the false denials of all factual allegations, both in its witnesses' depositions and in its discovery responses. To then urge upon the Court that Broadcom had no evidence to support its position demonstrates the reason for calculated orchestration of a deliberate plan to conceal evidence in the case.

**\*28** On November 19, 2006, Qualcomm counsel filed Qualcomm's Motion in Limine to Exclude Evidence Relating to Qualcomm's Participation in the JVT, the Timing of its Disclosures, and the Testimony of Cliff Reader, or, in the Alternative, for Adjudication of Broadcom's Equitable Defenses in a Bench Trial, in which they again argued:

Broadcom has conducted extensive discovery relating to QUALCOMM's alleged involvement in the JVT, apparently in an effort to claim that QUALCOMM had some obligation to disclose, prior to filing the present action in October 2005, that it had patents required to

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

Page 25

implement the H.264 standard [ ... ]
It is undisputed that QUALCOMM did not become involved at all in the JVT's proceedings until after the JVT had finalized the H.264 technical specifications, and Broadcom's expert, Dr. Reader, admitted that QUALCOMM had "no influence or effect on the technical content of the H.264 standard prior to its publication in May 2003."[ ... ] There is no evidence that QUALCOMM attended any of the JVT meetings between December 2001 and May 2003. In fact the first QUALCOMM participation did not occur until September 2003.

(Doc. No. 543-2, Ex. EE at 2) (footnotes omitted.) These two paragraphs contain nothing but false statements.

On the same day, Qualcomm counsel filed Qualcomm's Memorandum of Contentions of Fact and Law, in which they similarly asserted under the section entitled "QUALCOMM's Lack of Involvement in H.264 Standardization Process":
66. There is no evidence of any involvement of QUALCOMM personnel in the H.264/AVC standardization process prior to September 2003, by which time the technical content of the baseline, main and extended profiles was considered to be frozen and the first issue of the H.264/AVC Standard had been published.
67. QUALCOMM employees had only minimal involvement in JVT activities from September 2003 to December 2005, with no technical contribution documents submitted by any QUALCOMM employee.
68. QUALCOMM had no significant involvement with the development of the H.264/AVC Standard.

(Doc. No. 543-2, Ex. BB at 16-17.) Qualcomm counsel then filed Qualcomm's Rebuttal Memorandum of Contentions of Fact and Law on December 4, 2006, in which they asserted:31. QUALCOMM was not a JVT partici ant leading up to the release of the H.264 standard when it was technically fixed in December 2003 or when it was officially released in May 2003 [ ... ]
32. Broadcom's allegation that QUALCOMM was involved with the JVT prior to the development and release of the standard is based solely on the appearance of the e-mail address of QUALCOMM employee Viji Raveendran on an e-mail list for the Ad Hoc Group on AVC verification tests [ ... ] Broadcom offers no other evidence of participation in the JVT by Ms. Raveendran or any other employee as early as December 2002.
33. Ms. Raveendran was not involved in any standards development projects relating to the H.264 standard, nor did she recall receiving submissions or documents related to the standard. Raveendran did not receive information

related to the JVT meetings or know of JVT meetings prior to her participation in a separate JVT project, the scalable video coding project, unrelated to the patents in suit or to this litigation.
**\*29** 34. Broadcom's only other allegation with respect to QUALCOMM participation in the JVT occurs long after the standard was technically fixed and officially released: the apparent sponsorship of a JVT meeting by QUALCOMM and alleged and unverified recording of a single objection made by QUALCOMM to aroposed change in the profile in September 2003, and the appearance of QUALCOMM employee Phoom Sagetong in JVT meetings between December 2003 and in 2004.
35. None of these allegations show that QUALCOMM participated in the JVT when the H.264 standard was developed and approved. QUALCOMM's only involvement in the JVT was as part of the unrelated SV C project, and it began in 2005. Mr. Sagetong attended the JVT meetings on behalf of the United States National Body and not as a representative of QUALCOMM.

(Doc. No. 543-2, Ex. DD at 8-9.)

Qualcomm's motion for summary adjudication was denied on December 5, 2006. As detailed in previous sections of this Order, all of these assertions of no participation that were made and re-made by Qualcomm counsel during motions practice for the present litigation were proven patently false by documents produced by Qualcomm only after a jury trial was held, after a verdict was reached, after a post-trial hearing on the equitable issues was held, and after a finding was made by the Court as to these equitable issues. And certainly the statement that "Broadcom has conducted extensive discovery relating to Qualcomm's alleged involvement in the JVT ..." is particularly ironic, since Broadcom's repeated requests were uniformly denied on the stated ground that there was nothing to produce.

### (3) Misconduct during trial

Qualcomm counsel continued to vigorously argue during trial that Qualcomm did not participate in the JVT until well after the H.264 standard was published in May 2003. Qualcomm counsel stated in his opening statement:
Later, in May of 03, the standard is approved and published. And then Qualcomm, in the fall of 2003, it begins to participate not in JVT because it's done. H.264 is approved and published. Qualcomm begins to participate in what are called professional extensions, things that sit on top of the standard, additional improvements.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

(Trial Tr., 107, Jan. 9, 2007.)

Then at side bar on January 18, 2007, Qualcomm counsel, in an attempt to keep out of evidence a list of email addresses for a JVT ad hoc group that included the email address of Qualcomm employee Raveendran, represented to the Court, "Actually, there are no emails-there are no emails."(Trial Tr., 91, Jan. 18, 2007.) He further stated, "there's no evidence that any e-mail was actually sent to this list. This is just a list of e-mail ... addresses. There's no evidence of anything being sent."(Trial Tr., 92, Jan. 18, 2007.) These statements were made four days after Qualcomm counsel, while preparing Ms. Raveendran for her testimony, had stripped over fifty pages of emails regarding the JVT from her email archives.

*30 Six days later on the morning of January 24, 2007, one of the last days of trial, Qualcomm counsel filed Qualcomm's Motion for Judgment as a Matter of Law ("JMOL") Pursuant to Rule 52(c), in which they argued: Broadcom failed to show (1) that Ms. Raveendran ever received a single email related to this list, (2) that anone on this list ever communicated regarding the H.264 standard, and (3) that the email list in question was even a JVT list at all.

(Doc. No. 479 at 11.)

However, later that very same morning, in direct opposition to Counsel's representations at side bar and Qualcomm's argument in its JMOL, Ms. Raveendran testified as follows:
Q [by Broadcom counsel]: Did you receive mailings from the [JVT] ad hoc committee identified in this exhibit?
A: During the preparation for this testimony, there were some e-mails pulled out of my e-mail box. E-mail archive.
Q: Were they produced to Broadcom?
A: I don't know.

(Trial Tr., 53, Jan. 24, 2007.) These emails had not yet been produced to the Court or Broadcom, and, immediately addressing this issue at side bar later on January 24, Qualcomm counsel still argued to the Court,[I]t's not clear to me [the emails are] responsive to anything. So that's something that needs to be determined before they would be produced ... I'm talking about whether they were actually requested in discovery.

(Trial Tr., 83, Jan. 24, 2007.) Counsel continued,I'm simply representing I haven't seen [the emails], and

[whether Broadcom requested them] hasn't been determined.

(*Id.* at 84.)

Qualcomm counsel apparently determined that the emails were in fact responsive, because they produced the emails to Broadcom over the lunch recess on January 24, and Ms. Raveendran was brought back to court to testify about them. Before Broadcom counsel was able to question Ms. Raveendran about the emails, Qualcomm counsel voiced an objection to the Court out of the presence of the jury in pertinent part as follows:
There's nothing wrong with the way in which this production has taken place, your Honor. There's been no wrongdoing on the part of Qualcomm in the way in which these have been provided.

(Trial Tr., 193-94, Jan. 24, 2007.)

After trial, on February 1, 2007, Qualcomm counsel finally admitted by telephone to Broadcom that "on January 14, 2007, attorneys for Qualcomm learned of an archive of emails [sent to this email list for the JVT ad hoc group] belonging to Viji Raveendran."(Doc. No. 543-2, Ex. E at 2.) Therefore, on January 14, four days before Qualcomm counsel argued to the Court that "there are no emails" and eight days before Qualcomm counsel argued that Broadcom had failed to prove "[Ms.] Raveendran had ever received a single email related to this list" in Qualcomm's JMOL, Qualcomm attorneys already knew that there were in fact emails and had pulled them from Ms. Raveendran's email archive.

It is clear to the Court now, despite the attempts made by Qualcomm to minimize the significance of these twenty-one emails, that they were just the "tip of the iceberg," that over two hundred thousand more pages of emails and electronic documents were produced post-trial that indisputably demonstrate that Qualcomm participated in the JVT from as early as January 2002, that Qualcomm witnesses Irvine, Raveendran, Determan, and other engineers were all aware of and a part of this participation, and that Qualcomm knowingly attempted in trial to continue the concealment of evidence. None of these emails or electronic documents were produced in discovery as requested by Broadcom in multiple requests for production and interrogatories.

### (4) Misconduct post-trial

*31 Shortly after trial on January 29, 2007, Qualcomm

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
(Cite as: Slip Copy)

Page 27

counsel filed an Amended JMOL Pursuant to Rule 52(c) backtracking on their original assertion that Ms. Raveendran had not received any emails sent to the JVT ad hoc group email list. (Doc. No. 491 at 11.) Qualcomm counsel also sent a letter of apology to the Court on January 29, 2007, admitting that Qualcomm counsel's argument at sidebar on January 18 and Qualcomm's arguments in its original JMOL were "incorrect" as to the alleged non-existence of any emails sent to Ms. Raveendran through the ad hoc group email list. (Doc. No. 543-2, Ex. D.)

Nevertheless, Qualcomm counsel continued to assert no participation in the JVT in its February 2, 2007, Post-Trial Brief Concerning Waiver and Inequitable Conduct. (Doc. No. 503.) In a section entitled "QUALCOMM Did Not Participate In The Development Of The H.264 Standard Prior To The Publication of That Standard In May 2003," Qualcomm counsel argued:
QUALCOMM did not attend JVT meetings and did not participate in the development of the H.264 standard prior to May 2003. The first evidence of any JVT participation on behalf of QUALCOMM is the September 2003 JVT meeting minutes, four months after the H.264 standard's publication.

(Id. at 4-5) (footnotes omitted.) Citing Ms. Raveendran's testimony that she "never attended any JVT-related meeting until July 2005," Qualcomm counsel asserted:The passive and involuntary receipt of unsolicited and unread emails, without more, did not make QUALCOMM a "member" of the JVT and could not create any duty of disclosure under its rules.

(Id. at 5.) Then, in a section entitled "No QUALCOMM Participant Was Aware Of The Potential Application Of The Patents-In-Suit To The H.264 Standard During The Relevant Time Period," Qualcomm counsel further asserted:Prior to July 2005, the QUALCOMM employees who participated in the JVT had no awareness that the patents-in-suit might apply to the H.264 standard ... Because no QUALCOMM employee ever actually compared the claims of the patents to the standard, QUALCOMM did not know that the patents-in-suit read on the standard, and could not have "knowingly violated" any disclosure duty.

(Id. at 6) (footnote omitted.)

Qualcomm counsel then ironically stated in their post-trial brief that "[s]tandards-setting misconduct is a serious charge, suggesting sophisticated foul play."(Id.) The Court completely agrees with this statement and finds that Qualcomm's standard-setting misconduct with the JVT was indeed "serious" and suggests extremely sophisticated foul play on the part of Qualcomm and its employees. At the post-trial evidentiary hearing on the equitable issues of inequitable conduct and waiver, Qualcomm counsel continued to vigorously argue no participation and no foul play. The Court ultimately found in favor of Broadcom and against Qualcomm that Qualcomm had indeed waived its patent rights as to the 104 and 767 patents in its March 21, 2007 Order. (Doc. No. 528.)

*32 Furthermore, in a letter to Broadcom dated February 8, 2007, Qualcomm counsel asserted that, while perhaps "there was some fleeting mention of emails in my presence," he was somehow "not cognizant that the emails from Ms. Raveendran's archive had been identified" when he flatly asserted to the Court at sidebar on January 18 that no such emails existed:
[S]ince the issue of my knowledge [of the twenty-one emails produced on January 24] has been raised, I should add that I cannot completely exclude the possibility that, during those times that I was in the Day Casebeer firm's trial preparation suites rather than my own firm's, there was some fleeting mention of emails in my presence. What I can say with certainty now is that, when I told the Court on January 18, 2007 that there was no such emails in evidence, I was not cognizant that the emails from Ms. Raveendran's archive had been identified.

(Doc. No. 543-2, Ex. F at 1.)

As stated above, these twenty-one emails were just a hint of the over two hundred thousand pages of emails and electronic documents that were finally produced four months after trial containing direct evidence that multiple representatives of Qualcomm participated in the JVT from the beginning, and that multiple Qualcomm witnesses knew of this participation even as they testified to the contrary at deposition and trial. However, before this production occurred and even after the discovery of the twenty-one emails in Ms. Raveendran's email archive, Qualcomm counsel continued to insist that they had conducted a reasonable search for responsive documents during discovery and that the twenty-one emails were not responsive because they were irrelevant. Qualcomm counsel wrote in a letter to Broadcom on February 16, 2007:
As explained earlier in our meet and confer, QUALCOMM voluntarily produced the [twenty-one] emails during trial in the interest of expeditiousness. We continue to believe that QUALCOMM performed a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

reasonable search of QUALCOMM's documents in response to Broadcom's Requests for Production and that the twenty-one unsolicited emails received by Ms. Raveendran from individuals on the avc_ce reflector are not responsive to any valid discovery obligation or commitment.

(Doc. No. 543-2, Ex. G at 1.) Qualcomm counsel made these assertions all the while acknowledging: (1) Broadcom's July 14, 2006, Request for Production No. 93 requesting "[a]ll documents referring to or evidencing any participation by Qualcomm in the proceedings of the JVT, the ISO, the IEC, and/or the ITU-T"; (2) Broadcom's January 23, 2006, Request for Production No. 49 requesting "[a]ll documents given to or received from a standards setting body or group that concern any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm Patent, including without limitation communications, proposals, presentations, agreements, commitments, or contracts to or from such bodies"; and (3) Broadcom's January 23, 2006, Request for Production No. 50 requesting "[a]ll documents concerning any Qualcomm membership, participation, interaction, and/or involvement in setting any standard relating to the processing of digital video signals that pertains in any way to any Qualcomm Patent."(*Id.*, Ex. E at 1.)

**\*33** Correctly rejecting Qualcomm counsel's continuing insistence that Qualcomm had already conducted a reasonable search for responsive documents with negative result, Broadcom requested in a March 5, 2007 letter that Qualcomm perform searches for nine key phrases in the email archives of twelve key Qualcomm employees:
Broadcom requests that Qualcomm immediately search for and produce responsive documents in the email archives of Ms. Raveendran and any other Qualcomm employee who has ever been involved in any way in standard-setting for video compression (whether or not as an actual participant at a standard-setting meeting), dated between January 1, 2000 and December 31, 2004.

(Doc. No. 543-2, Ex. H at 4-5.) In response to this letter, Qualcomm counsel continued to defend Qualcomm's discovery conduct and object to Broadcom's request for further discovery in a March 7, 2007, reply as follows:For the reasons discussed at length previously, we disagree with each of your arguments concerning the responsiveness of those emails and believe your negative characterization of QUALCOMM's compliance with its discovery obligation to be wholly without merit ...
Your request for completely new and patently overbroad discovery-plainly beyond the scope of anything

propounded during the appropriate period before trial-cannot on any basis be justified now, more than a month after trial has concluded.

(*Id.*, Ex. I at 1.) Nevertheless, upon Broadcom's threat to involve the Court, Qualcomm agreed to search the email archives of Qualcomm witnesses Raveendran, Bao, Irvine, Ludwin, and Sagetong for the search terms "JVT," "Joint Video Team," "AVC," "Advanced Video Coding," "H.264," "H264," "MPEG-4 Part 10," "MPEG4 Part 10," and "Gary Sullivan." (*Id.*, Ex. I at 2.) The Court finds it incredible that Qualcomm never conducted such an obvious search for these key terms in the email archives of these key Qualcomm witnesses during the many months of discovery that occurred before trial, since Broadcom clearly had requested all of it and more.

One month later on April 6, 2007, Qualcomm counsel informed Broadcom through email that this search had produced "a large volume that numbers in the thousands" of responsive documents, which clearly indicate to the Court Qualcomm's participation in the JVT. (Doc. No. 543-2, Ex. J at 1.) It was only then that the Court received any notice of this post-trial production of documents in a letter addressed to the Court directly from Qualcomm lead trial counsel on April 9, 2007. (Doc. No. 543-2, Ex. K.) In that letter, Counsel stated that Qualcomm had discovered "a substantial number of electronic documents" that "appear to be inconsistent with arguments that we made at trial, and at the post-trial hearing, regarding Broadcom's affirmative defense of waiver."(*Id.* at 1 .) Counsel then apologized to the Court "[p]rofessionally and personally ... for asserting positions that we would not have taken had we known of the existence of these documents."(*Id.*) However, Counsel insisted that "we presented our arguments in good faith and certainly would not have knowingly presented argument that we believed to be contrary to fact."(*Id.* at 1-2.)

**\*34** That same day, the Court received a separate letter of apology directly from Qualcomm's General Counsel and Executive Vice President Louis Lupin, in which Mr. Lupin conveyed "[his] regret and apologies regarding the circumstances described in [Qualcomm lead trial counsel's April 9 letter]." (Doc. No. 543-2, Ex. L at 1 .) Mr. Lupin claimed that "QUALCOMM takes its obligations to the Court, opposing parties, and the community seriously, and will take all necessary steps to live up to the high expectations QUALCOMM has always set for itself."(*Id.*) However, in an interview with the San Diego Union-Tribune about this post-trial production, Mr. Lupin reportedly stated that these newly discovered documents " 'on the whole' bolstered Qualcomm's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2296441 (S.D.Cal.)
**(Cite as: Slip Copy)**

Page 29

arguments during trial" and that " '[w]e kind of hurt ourselves' by not finding them before trial."Kathryn Balint, *Another face-off in patent battles,*THE SAN DIEGO UNION-TRIBUNE, May 31, 2007, at C1. The Court finds, in sharp disagreement to Mr. Lupin's characterization of the new evidence, that the documents in fact fully bolstered Broadcom's waiver arguments and completely refuted Qualcomm's waiver defenses at trial.

Qualcomm General Counsel Lupin made an illuminating statement as to Qualcomm's "nothing-to-lose" mentality in filing this patent infringement suit against Broadcom. According to a January 27, 2007, article in the San Diego Union-Tribune following the jury verdict of no infringement, Mr. Lupin characterized the case as follows:
There certainly was a significant upside potential for us, but it was all upside, no downside.... For Broadcom, it was all downside, no upside. It probably won't have any impact on us one way or the other. It's just the latest round in a series of battles.

(Doc. No. 543-2, Ex. Q at 2.) Indeed, if Qualcomm is correct in its contention that its 104 and 767 patents are infringed by the H.264 standard, it would be in a lone position to extract licenses from all companies producing H.264-compliant products, a considerable "upside" opportunity for Qualcomm's bottom line.

## IV. CONCLUSION

In light of all of the above evidence finally revealed, the eventual collapse of Qualcomm's concealment efforts exposes the carefully orchestrated plan and the deadly determination of Qualcomm to achieve its goal of holding hostage the entire industry desiring to practice the H.264 standard by insulating its IPR from the JVT so that the JVT would lose the opportunity to mitigate, if not to avoid, Qualcomm's IPR in the development of the H.264 standard. Broadcom, ignorant of the existence of the 104 and 767 patents, designed and is in the process of manufacturing numerous H.264-compliant products.

The Federal Circuit has held that unenforceability of a patent due to inequitable conduct before the PTO extends to continuations and reissues of the original patent. *See Afga Corp. v. Creo Prods. Inc., 451 F.3d 1366, 1379 (Fed.Cir.2006);* Hewlett-Packard, 882 F.2d at 1563;*Hoffman-La Roche v. Lemmon Co., 906 F.2d 684, 688-89 (Fed.Cir.1990).* While divisions of the original patent may not be unenforceable "where the claims are subsequently separated from those tainted by inequitable

conduct ... and where the issued claims have no relation to the omitted prior art,"*Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1332 (Fed.Cir.1998),* by analogizing misconduct before a standards setting body resulting in waiver to misconduct before the PTO resulting in inequitable conduct, this Court finds all claims of the 104 and 767 patents tainted by Qualcomm's waiver and that any divisional, continuation, continuation-in-part, or reissue application of either patent would be similarly tainted.

**\*35** Therefore, under the totality of evidence produced both before and after the jury verdict, by reason of Qualcomm's intentional and persistent insulation of their directly related IPR from the activities and the analyses of the JVT when they were obligated to reveal it, this Court FINDS, pursuant to *Rambus,* that Qualcomm has waived its rights to enforce the 104 and 767 patents and their continuations, continuations-in-part, divisions, reissues, or any other derivatives of either patent.

This type of conduct was the direct focus and basis for the rule of law set out clearly in January 2003 in *Rambus,* in which the Federal Circuit sets out the disclosure duty for patents that read on or apply directly to the activities of the standards-setting process. *See Rambus, 318 F.3d at 1096-1102.* The facts of this case demonstrate the importance of the *Rambus* decision to the success of the industry standards protocols that have been achieving significant benefits for businesses and consumers globally.

Judgment will be entered concurrently with this Order.

**IT IS SO ORDERED.**

S.D.Cal.,2007.
Qualcomm Inc. v. Broadcom Corp.
Slip Copy, 2007 WL 2296441 (S.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

SCHWARZ PHARMA, INC., SCHWARZ
PHARMA AG and WARNER-LAMBERT
COMPANY,

               Plaintiffs,

    -against-                     Civ. No. 01-4995 (DRD)

TEVA PHARMACEUTICALS, U.S.A.        **O P I N I O N**

           Defendant.

Michael C. Clarke, Esq.
Drinker, Biddle & Shanley LLP
500 Campus Drive
Florham Park, NJ  07932

Robert L. Baechtold, Esq.
Nicholas M. Camnella, Esq.
Joseph M. O'Malley, Jr.
Fitzpatrick, Cella, Harper & Scinto
30 Rockefeller Plaza
New York, NY  10112
      Attorneys for Plaintiff/Counterclaim Defendants, Warner-Lambert Company

Charles M. Lizza, Esq.
Michael T. Carton, Esq.
LeBoeuf, Lamb, Greene & Macrae LLP
One Riverfront Plaza
Newark, NJ  07102-5490

Brian M. Poissant, Esq.
F. Dominic Cerrito, Esq.
John D. Garretson, Esq.
Pennie & Edmonds LLP
1155 Avenue of the Americas

New York, NY  10036-2711
      Attorneys for Plaintiffs/Counterclaim Defendants, Schwarz Pharma, Inc. and
      Schwarz Pharma AG

Arnold B. Calmann, Esq.
Lauren Kende, Esq.
Saiber Schlesinger Satz & Goldstein, LLC
One Gateway Center, 13th Floor
Newark, NJ  07102-5311

Kenneth A. Cohen, P.C.
Thomas L. Creel, P.C.
Goodwin Procter, LLP
Exchange Place
Boston, MA  02109

W. Edward Bailey, Esq.
A. Joy Arnold, Esq.
Fish & Neave
1251 Avenue of the Americas
New York, NY  10020
      Attorneys for Defendant/Counterclaim Plaintiff, Teva Pharmaceuticals USA

**DEBEVOISE, Senior District Judge**

      This is a patent infringement action which plaintiffs, Schwarz Pharma, Inc. and Schwarz Pharma AG (collectively, "Schwarz Pharma") and Warner-Lambert Company ("Warner-Lambert") instituted against defendant Teva Pharmaceuticals, U.S.A. ("Teva").  Teva filed a counterclaim against Schwarz Pharma and Warner-Lambert (sometimes referred to collectively as "Plaintiffs").

      Warner-Lambert has moved to dismiss Teva's antitrust counterclaims (counterclaims II, III and IV) pursuant to Fed.R.Civ.P. 12(b)(6) for failure to define a relevant product market.  In the alternative, Warner-Lambert moves under Fed.R.Civ.P. 12(f) to strike Teva's antitrust and unfair competition counterclaims (II, III and V) "to the extent they include allegations concerning Warner-Lambert's prosecution of the

separate, earlier-filed quinapril lawsuit." (Mem. in Supp. of Warner-Lambert's Motion to Dismiss and Strike ("Warner-Lambert Br.") at 1.)  Warner-Lambert also seeks to dismiss Teva's patent misuse counterclaim (VI) and strike Teva's third affirmative defense of misuse.  Relying on Warner-Lambert's Brief, Schwarz Pharma filed a similar motion, pursuant to Fed.R.Civ.P. 12(c), to dismiss Teva's counterclaims II, III, IV and VI and to dismiss Teva's affirmative defense based on misuse.

For the reasons set forth below, the plaintiffs' motion to dismiss counterclaims II through IV pursuant to Fed.R.Civ.P. 12(b)(6) for failure to define a relevant product market under the antitrust laws is denied.  In addition, Warner-Lambert's motion under Fed.R.Civ.P. 12(f) to strike various allegations against it in Teva's antitrust and unfair competition counterclaims (II, III and V) is granted.  Plaintiffs' motion to dismiss Teva's third affirmative defense and sixth counterclaim is denied.

## Background

**A. The Quinapril Lawsuit**

More than three years ago, Warner-Lambert filed a complaint against Teva (the "quinapril lawsuit"), <u>Warner-Lambert Co. v. Teva Pharmaceuticals USA</u>, Civ. No. 99-922, alleging that a drug that Teva produced infringed upon a Warner-Lambert patent (the "'450 patent").  In its answer, Teva admitted to infringing Warner-Lambert's '450 patent, but asserted defenses of: (1) patent invalidity, and (2) unclean hands, based on Warner-Lambert allegedly asserting its "invalid" patent. (Ans. at ¶¶ 7, 14-18.)

On May 6, 1999, a scheduling order was entered in the quinapril lawsuit. The scheduling order set a deadline of October 12, 1999 for any motion to amend a

pleading. (Dec. of F. Christopher Mizzo, Exh. 3, at ¶ 5 (hereinafter, "Mizzo Dec.").)  On

October 12, 1999, Teva filed its Amended Answer.  The Amended Answer denied

infringement and added the defense of unenforceability based on Warner-Lambert's

alleged inequitable conduct before the United States Patent and Trademark Office

("PTO"). (Am. Ans. ¶ 19, 21-29.)  Teva's unenforceability defense alleged that Warner-

Lambert "did not disclose" or "misrepresented the state of" various prior art, including a

"Renitec monograph" and Merck's Vasotec product. (Id. at ¶ 22, 24 & 28.)  Teva did not

assert any counterclaims in either its Answer or Amended Answer.

**B.    The Moexipril Suit**

On October 26, 2001, Schwarz Pharma filed a complaint alleging that

Teva infringed the '450 patent.  Schwarz Pharma AG and Schwarz Pharma, Inc., the

exclusive licensee and sublicensee of the '450 patent respectively, exercising their

alleged contractual rights, also named Warner-Lambert as a co-plaintiff (the "moexipril

suit").[1]  On December 28, 2001, Teva filed its Answer and Counterclaims, which Teva

---

[1]Schwarz Pharma named Warner-Lambert as a co-plaintiff in the moexipril suit
despite Warner-Lambert's stated belief that there was, and continues to be, no viable
claim of patent infringement. (Warner- Lambert's Reply to Counterclaims ¶ 37(18).)
Despite Schwarz Pharma's and Warner-Lambert's apparently adversarial positions,
Warner-Lambert must be joined as an indispensable party to this litigation. See Abbot

amended on February 7, 2002.

Teva asserts four affirmative defenses and six counterclaims in its Amended Answer and Counterclaims. The third affirmative defense and the second through sixth counterclaims are the subject of Warner-Lambert's motion to dismiss. The third affirmative defense alleges that Schwarz Pharma and Warner-Lambert brought the instant suit to enforce a patent that both Plaintiffs knew or should have known is invalid, unenforceable and not infringed, and therefore both Plaintiffs have failed to bring the instant suit in good faith and both have "unclean hands." Counterclaim II alleges that Warner-Lambert, by itself and in conjunction with Schwarz Pharma, violated § 2 of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. § 2, through monopolization. Counterclaim III alleges that Warner-Lambert, by itself and in conjunction with Schwarz Pharma, violated § 2 of the Sherman Act, 15 U.S.C. § 2, through attempted monopolization of certain markets. Counterclaim IV alleges that Warner-Lambert violated § 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to

---

Laboratories v. Diamedix Corp., 47 F.3d 1128, 1133 (Fed. Cir. 1995) (holding that to create standing, "a patentee that does not voluntarily join an action prosecuted by its exclusive licensee can be joined as a defendant or . . . made an involuntary plaintiff if it is not subject to service of process").

restrain trade in certain markets.  Counterclaim V alleges that Warner-Lambert

engaged in unfair competition.  Counterclaim VI alleges that Warner-Lambert and

Schwarz Pharma committed patent misuse by improperly asserting rights under the

patent laws to secure an exclusive right or monopoly to which they are not entitled and

which is contrary to public policy.

Teva's antitrust counterclaims (II-IV) all rely on the same definition of the

relevant product markets. (Id. at ¶¶ 53, 54, 74, 79.)  Specifically, Teva alleges that there

are three different relevant product markets located in the United States: (1)

compositions containing angiotensin converting enzyme inhibitors ("ACE inhibitors") for

treating hypertension (the "ACE inhibitors product market"); (2) compositions containing

moexipril for treating hypertension (the "moexipril product market"); and (3)

compositions containing quinapril for treating hypertension (the "quinapril product

market"). (Id. at ¶¶ 53-54.)

The gravamen of the antitrust and unfair competition counterclaims (II, III,

IV and V) is that Teva has been wrongfully restrained from competing with its generic

moexipril and quinapril products through a pattern of wrongful conduct including:  (1)

the wrongful prosecution and maintenance of the '450 patent application and fraud on

the PTO through intentional misrepresentations and omissions; (2) contracts between

the Plaintiffs and possibly with others which allowed this pattern of conduct to be

implemented; (3) a conspiracy between the plaintiffs themselves and possibly with

others to exclude TEVA from bringing either a generic quinapril or a generic moexipril

product for the treatment of hypertension to the market, despite the fact that plaintiffs

have taken inconsistent positions in order to allege that the '450 patent covers both products and is valid and enforceable; and (4) the institution and maintenance of objectively baseless sham litigation to exclude competition, including both the litigation against Teva in this case and the litigation brought by Warner-Lambert to prevent FDA approval of a different TEVA accelerated new drug application ("ANDA") relating to quinapril, purporting to rely on the '450 patent. (Am. Ans. ¶ 60.)  According to Teva, these actions violate the antitrust laws as developed by the case law in <u>Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.</u>, 382 U.S. 172, 175-76 (1965) (recognizing an antitrust cause of action for enforcement of a fraudulently obtained patent), <u>Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127, 144 (1961) (recognizing antitrust cause of action for suits that are "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor"), and their progeny.

Warner-Lambert now moves pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss counterclaims II-IV set forth in Teva's Amended Answer and Counterclaims for failure to state a claim upon which relief can be granted because Teva has failed to define a relevant product market over which Warner-Lambert has monopolized or attempted to monopolize.  Schwarz Pharma has separately moved to join Warner-Lambert's motion to dismiss under Fed.R.Civ.P. 12(c).  Warner-Lambert also moves, in the alternative, to strike portions of counterclaims, II, III and V in accordance with Fed.R.Civ.P. 12(f) because it contends that portions of those counterclaims were compulsory counterclaims that Teva should have asserted in the earlier quinapril lawsuit.  Warner-

7

Lambert also moves to dismiss counterclaim VI and Teva's third affirmative defense for legal insufficiency because it contends that allegations of sham litigation can never constitute patent misuse.

### Dismissal Standards

The standard under which the Court must analyze the plaintiff's complaint and the defendant's arguments in a Rule 12(c) motion for judgment on the pleadings is the same as the standard applied on a motion to dismiss under Fed.R.Civ.P. 12(b)(6). See Fed.R.Civ.P. 12(h)(2); see also Turbe v. Government of the Virgin Islands, 938 F.2d 427, 428 (3d Cir.1991); Institute for Scientific Info., Inc. v. Gordon & Breach, Science Publishers, Inc., 931 F.2d 1002, 1006 (3d Cir. 1991). Pursuant to Rule 12(b)(6), a claim embodied in a complaint or counterclaim must be dismissed for failure to state a claim if the opposing party demonstrates "beyond a doubt that [the claimant] can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see In re Craftmatic Sec. Litig., 890 F.2d 628, 634 (3d Cir. 1989); Johnsrud v. Carter, 620 F.2d 29, 33 (3d Cir. 1980). All allegations set forth in the complaint must be accepted as true, see Cruz v. Beto, 405 U.S. 319, 322 (1972), and all reasonable inferences must be drawn in the claimant's favor. See Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991). On a Rule 12(b)(6) motion, the district court is limited to the facts alleged in the complaint or counterclaim, not those raised for the first time by counsel in its legal memorandum. See Seevers v. Arkenberg, 726 F. Supp. 1159, 1165 (S.D. Ind. 1989); Hauptmann v.

8

Wilentz, 570 F. Supp. 351, 364 (D.N.J. 1983).  Nevertheless, the court may also consider the exhibits attached to a complaint and documents referenced by the Complaint. See Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990); cf. Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1996 (3d Cir. 1993) (stating that a "court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss," without converting the motion into a motion for summary judgment, "if the plaintiff's claims are based on the document").

Rule 12(f) exists as a means for testing the legal sufficiency of a defense. It provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). Rule 12(f) motions are generally disfavored because "they require the court to evaluate legal issues before the factual background of a case has been developed through discovery." F.D.I.C. v. White, 828 F. Supp. 304, 307 (D.N.J.1993) (citing Cippolone v. Liggett Group, Inc., 789 F.2d 181, 188 (3d Cir. 1986)); United States v. 416.81 Acres of Land, 514 F.2d 627, 631 (7th Cir. 1975); Glenside West Corp. v. Exxon Corp., 761 F. Supp. 1100, 1115 (D.N.J.1991).  Although a motion to strike should only be granted "when a defense is legally insufficient under any set of facts which may be inferred from the allegations of the pleading," Glenside, 761 F. Supp. at 1115, in such cases it properly serves to avoid unnecessary discovery and thereby streamlines the process of litigation. See White, 828 F. Supp. at 307; Glenside, 761 F. Supp. at 1115.

## Analysis

9

## A. Whether Teva Failed to Define a Relevant Product Market

Warner-Lambert and Schwarz Pharma both assert that Teva has failed to define a relevant product market. In this circuit, to sustain a claim under § 1 of the Sherman Act, "the plaintiff must show: (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy." Fleer Corp. v. Topps Chewing Gum, Inc. 658 F.2d 139, 147 (3d Cir. 1981). To establish a monopolization claim under § 2 of the Sherman Act, a plaintiff must show: "(1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 596 (1985) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). To establish a § 2 attempted monopolization claim, a plaintiff must prove (1) that the defendant engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993). To determine whether there is a dangerous probability of achieving monopoly power, it is necessary for the court to define the relevant product market. See id. Thus, to establish any claim under either section 1 or 2 of the Sherman

10

Act, Teva must define a relevant product market.

In Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 437 (3d Cir. 1997), the Court of Appeals for the Third Circuit stated that the outer boundaries of a relevant product market are determined by reasonable interchangeability of use. See also Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 482 (1992) (stating same); United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956) (stating that test for relevant market is "commodities reasonably interchangeable by consumers for the same purposes"). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively. A person needing transportation to work could accordingly buy a Ford or a Chevrolet automobile, or could elect to ride a horse or bicycle, assuming those options were feasible." Allen-Myland, Inc. v. International Business Machines, Corp., 33 F.3d 194, 206 (3d Cir. 1994) (internal quotations omitted). When assessing reasonable interchangeability, "[f]actors to be considered include price, use, and qualities." Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991). Reasonable interchangeability is also indicated by "cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). In other words, products in a relevant market are characterized by a cross-elasticity of demand when "the rise in the price of a good within a relevant market would tend to create a greater demand for other like goods in that market." Tunis Bros., 952 F.2d at 722.

Plaintiffs contend that Teva has failed to define the relevant market over

11

which the Plaintiffs have allegedly exerted control or attempted to exert control. According to Plaintiffs, Teva should have detailed the interchangeability and cross-elasticity of demand of ACE inhibitors, moexipril and quinapril. Without these details, Plaintiffs assert that Teva has failed to plead and establish properly the prerequisite elements of an antitrust claim.

Although a district court may insist upon some specificity in the pleadings of an antitrust case before allowing a potentially massive factual controversy to proceed, see Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526 n. 17 (1983), here it is unnecessary. In its counterclaims, Teva states that there are three distinct relevant product markets: the ACE inhibitor product market; the quinapril product market; and the moexipril product market. (Am. Ans. ¶¶ 53-54.) By defining each market in terms of a single product, Teva in effect is alleging that there are no other products that are reasonably interchangeable with them. Whether this is correct must be determined after development of the facts. Teva defines the geographic boundaries of each product market as the United States. By naming each of the relevant product markets and their geographic loci, Teva has satisfied the pleading requirement of Rule 8(a) of the Federal Rules of Civil Procedure, which only requires that a claimant plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Unlike securities fraud claims asserted under section 10(b) of the Exchange Act of 1934, there is no heightened pleading standard in antitrust cases, and the general principles governing Rule 12(b)(6) motions apply. See In re Mercedes-Benz Anti-Trust Litigation, 157 F.

Supp. 2d 355, 359 (D.N.J. 2001); see also MCM Partners, Inc. v. Andrews-Bartlett &

Assocs., Inc., 62 F.3d 967, 976 (7th Cir. 1995) (holding same).

   The Plaintiffs rely heavily on Queen City in support of their contention that

Teva has failed to properly plead a relevant product market.  The Queen City court,

however, noted that "in most cases, proper market definition can be determined only

after a factual inquiry into the commercial realities faced by consumers." Queen City,

124 F.3d at 436 (quoting Kodak, 504 U.S. at 482).  Furthermore, the facts of Queen

City are clearly distinguishable from those in the instant action.  In Queen City, both the

District Court and the Court of Appeals determined that the plaintiff's definition of the

relevant market subject to antitrust scrutiny-- "ingredients, supplies, materials and

distribution services used by and in the operation of Domino's pizza stores"--was

deficient because the alleged relevant product market was artificially created by a

franchise agreement made between the parties and because there were obviously

interchangeable products that plaintiff failed to include in its definition of relevant

product market.[2] Id. at 438.

   The counterclaims in the instant action, however, do not suffer from a

similar flaw.  Here, without additional factual inquiry that could only be provided through

expert testimony, it is not readily apparent from the face of the counterclaims that Teva

---

[2]Similarly, Plaintiffs' reliance on the holding of Syncsort Inc. v. Sequential
Software, Inc., 50 F. Supp.2d 318, 333 (D.N.J. 1999), fails to support their contention
that Teva has failed to define a relevant product market.  As in Queen City, it was
readily apparent from the pleadings that the counterclaimant "ignored the broader
sorting market" and that it failed to "explain the rationale underlying its narrow proposed
market definition." See id. at 332-33.

has failed to define relevant product markets. See Conley, 355 U.S. at 45-46 (stating

that a complaint "should not be dismissed for failure to state a claim unless it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief").  Consequently, Plaintiffs' motion to dismiss the antitrust

claims for failure to plead a relevant market is denied.

**B.**    **Whether Teva's Counterclaims II, III and V Were Compulsory Counterclaims that Should Have Been Asserted in the Quinapril Lawsuit**

Warner-Lambert notes the quinapril-related Walker Process and sham

litigation claims are related to the quinapril lawsuit and contends, therefore, that under

Rule 13(a), they should be stricken from the instant case under Fed.R.Civ.P. 12(f). See

Bristol-Myers Squibb Co. v. Ivax Corp., 77 F. Supp.2d 606, 619-20 (D.N.J. 2000)

(striking portions of counterclaims which were compulsory).  Further, Warner-Lambert

argues that under C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340 (Fed. Cir. 1998), cert.

denied, 526 U.S. 1130 (1999), sham litigation and Walker Process claims only give rise

to antitrust claims -- not patent misuse.

A counterclaim is compulsory if the claim: (1) exists at the time of

pleading, (2) arises out of the "transaction or occurrence that is the subject matter of

the opposing party's claim," and (3) "does not require for its adjudication the presence

of third parties of whom the court cannot acquire jurisdiction." Fed.R.Civ.P. 13(a).  A

claim arises out of the same transaction or occurrence if it is "logically related." Great

Lakes Rubber Corp. v. Herbert Cooper Co., 286 F.2d 631, 634 (3d Cir. 1961).  A claim

is logically related if it involves: "(1) many of the same factual issues; (2) the same

factual and legal issues; or (3) offshoots of the same basic controversy between the parties." Xerox Corp. v. SCM Corp., 576 F.2d 1057, 1059 (3d Cir. 1978).

Here, Warner-Lambert asserts that the Walker Process and sham litigation claims and the factual issues involved in developing these claims are so closely related to the quinapril lawsuit that they must be considered compulsory and therefore should have been raised in the earlier quinapril lawsuit. Teva contends, however, that although the antitrust counterclaims may be classified as compulsory under Fed.R.Civ.P. 13(a), the Supreme Court has crafted an exception to Rule 13(a) in the case of Mercoid Corporation v. Mid-Continent Investment Co., 320 U.S. 661, 669-72 (1943), where it allowed the defendant to assert a tying antitrust counterclaim notwithstanding the fact that the counterclaim was not raised in an earlier patent infringement litigation. The Supreme Court's holding in Mercoid has been narrowly interpreted in subsequent cases. See, e.g., Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc., 233 F.3d 697, 702 (2d Cir. 2000); Rohm & Haas Co. v. Brotech Corp., 770 F. Supp. 928, 933 (D. Del. 1991). The Second Circuit Court of Appeals's interpretation of Mercoid in Critical-Vac and a similar interpretation by district courts in the Third Circuit appear reasonable. Applying their reasoning, Teva's antitrust and misuse counterclaims will be deemed compulsory rather than permissive.[3]

---

[3]The Courts of Appeals in the Fifth and Ninth Circuits interpret Mercoid more broadly, holding that the Supreme Court created an exception to Rule 13(a) for antitrust counterclaims in which the gravamen is the patent infringement lawsuit initiated by the counterclaim defendant. See Tank Insulation Int'l, Inc. v. Insultherm, Inc., 104 F.3d 83, 86-87 (5th Cir. 1997); Hydranautics v. Filmtec Corp., 70 F.3d 533, 536 (9th Cir. 1995). Critical-Vac and the line of cases that follow it are in accord with sound principles of judicial economy without doing violence to Mercoid's holding.

In <u>Mercoid</u>, the Court allowed the defendant in a patent infringement lawsuit, Mercoid Corporation ("Mercoid"), to raise an antitrust counterclaim that it had failed to raise in a prior patent infringement lawsuit brought by the same plaintiff, the Mid-Continent Investment Corporation ("Mid-Continent") and in which Mercoid provided the defense. Mid-Continent was the holder of a patent for a domestic heating system composed of a furnace and a separate thermostatic control device, which included a combustion stoker (the "Cross patent"). <u>See</u> <u>Mercoid</u>, 320 U.S. at 663. However, not all of the individual elements of the Cross patent, such as the combustion stoker, were patented. <u>See</u> <u>id.</u>

In the earlier proceeding, Mid-Continent had sued Smith, a Mercoid customer, for patent infringement as a result of his installation of a heating system in his home that used a combustion stoker device manufactured by Mercoid, but otherwise relied upon the Cross patent. <u>See</u> <u>Mid-Continent Inv. Co. v. Smith</u>, 35 U.S.P.Q. 204 (W.D. Mo. 1937). Mercoid was not a party to the lawsuit but directed and paid for its customer's unsuccessful defense. <u>See</u> <u>Mid-Continent Inv. Co. v. Mercoid Corp.</u>, 43 F. Supp. 692, 693 (N.D. Ill. 1942). After prevailing against Smith and subsequently failing to negotiate a licensing agreement with Mercoid for installing thermostatic control devices in other homes, Mid-Continent filed a patent infringement suit against Mercoid. <u>See</u> <u>id.</u> at 694-95. Mercoid responded with an antitrust counterclaim challenging Mid-Continent's licensing practices and seeking damages under the Sherman Act. <u>See</u> <u>id.</u>

Mercoid prevailed in the district court but lost on appeal. <u>See</u> <u>Mercoid</u>, 320 U.S. at 662-63. The Supreme Court reversed. <u>See</u> <u>id.</u> at 661. Justice Douglas, writing

16

for a 5-4 majority, noted that "[t]he grant of a patent is the grant of a special privilege," id. at 665, and that Mid-Continent's actions were "a graphic illustration of the evils of an expansion of the patent monopoly by private engagements," id. at 666. Reasoning that Mid-Continent's patent covered only the heating system, not its individual components, Justice Douglas explained that Mid-Continent's misuse of its patent "for the purpose of monopolizing unpatented material," in essence an antitrust tying claim, barred relief against Mercoid. Id. at 668.

Justice Douglas rejected Mid-Continent's argument that res judicata barred Mercoid's defenses and counterclaims for damages. That argument, he reasoned, would place the Court's "imprimatur on a scheme which involves a misuse of the patent privilege and a violation of the antitrust laws. It would aid in the consummation of a conspiracy to expand a patent beyond its legitimate scope." Id. at 670. Turning specifically to Mercoid's counterclaim, Justice Douglas wrote:

> Though Mercoid were barred in the present case from asserting any defense which might have been interposed in the earlier litigation, it would not follow that its counterclaim for damages would likewise be barred. That claim for damages is more than a defense; it is a separate statutory cause of action. The fact that it might have been asserted as a counterclaim in the prior suit by reason of Rule 13(b) of the Rules of Civil Procedure does not mean that the failure to do so renders the prior judgment res judicata as respects it. . . . The case is then governed by the principle that where the second cause of action between the parties is upon a different claim the prior judgment is res judicata not as to issues which might have been tendered but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered."

Id. at 671. Concluding that the previous lawsuit had resolved different "matters in issue

17

or points controverted" than those involved in the dispute before it, the Court held that the principles of res judicata did not bar Mercoid's antitrust counterclaim for damages. Id.

By applying the permissive counterclaim rule, Fed.R.Civ.P. 13(b), to an antitrust claim arising out of the same transaction or occurrence as earlier patent infringement litigation between the same parties, Mercoid created an exception to the more stringent requirements of Fed.R.Civ.P. 13(a). The Supreme Court, however, has never articulated a clear explanation of why it elected to consider Mercoid's counterclaim permissive instead of compulsory or whether all antitrust counterclaims are permissive. As a consequence, many lower courts have limited the Mercoid exception to the facts of the case.

In Critical-Vac, the Court of Appeals for the Second Circuit was confronted with the issue of whether an antitrust counterclaim asserted by the defendant was a compulsory counterclaim that should have been asserted in an earlier lawsuit. The Court addressed the issue by distinguishing between claims of patent misuse and claims of patent invalidity. Applying this distinction to Mercoid, the Court noted that Mercoid's antitrust counterclaim was based on Mid-Continent's misuse of a validly issued patent by tying the purchase of an unpatented product to the purchase of a patented product over which Mid-Continent had a monopoly. In contrast, the facts of Critical-Vac were of a patentee obtaining an invalid reissue patent and then instituting a patent infringement litigation to enforce the invalid patent. See Critical-Vac, 233 F.3d at 703. The Court reasoned that "although the Mercoid court did not explain why the 'evil'

18

at issue in that case – the misuse of a valid patent – should render permissive an otherwise compulsory counterclaim, it was nevertheless that particular 'evil,' and <u>not</u> the attempted enforcement of an invalid patent that the Court sought to address by carving out an exception to Rule 13(a)." <u>Id.</u>  Thus, <u>Critical-Vac</u> held that the <u>Mercoid</u> exception to Rule 13(a) does not apply to antitrust claims that raise the issue of patent validity because these are logically connected to the issue of patent infringement. <u>See id.</u> at 704.

In further support of its ruling that only antitrust counterclaims based on patent misuse are not compulsory, the Court noted that antitrust claims based on patent misuse, such as the counterclaims in <u>Mercoid</u>, are likely to involve factual issues distinct from those involved in patent infringement litigation between the same parties. <u>Accord</u> <u>Mercoid</u>, 320 U.S. at 671 (noting that Mercoid's counterclaims involved different "matters in issue or controverted" from those involved in the earlier patent infringement litigation).  In contrast, antitrust claims based on patent invalidity because of fraud or inequitable conduct, such as the case <u>sub judice</u>, will generally involve the same factual issues as those involved in the patent infringement litigation between the same parties. Consequently, an exception to Rule 13(a) for at least some antitrust counterclaims in patent infringement actions will be consistent with the purpose of Rule 13(a) – the resolution of all "logically connected" claims between the same parties in the same proceeding – whereas a per se exception to Rule 13(a) for antitrust counterclaims in patent infringement suits would often contradict the purpose of that rule.  This is a practical interpretation of <u>Mercoid</u>'s holding that also adheres to the underlying

19

principles of the Federal Rules of Civil Procedure. Thus it is reasonable to adopt the Second Circuit Court of Appeals's interpretation of <u>Mercoid</u>.

In the instant case, Teva has alleged antitrust counterclaims against Warner-Lambert based on <u>Walker Process</u> allegations and sham litigation allegations, charging monopolization and attempted monopolization of the  quinapril product market.[4] In <u>Walker Process</u>, the Court established that antitrust liability under section 2 of the Sherman Act may arise when:  (1) a patent has been procured by knowing and willful fraud; (2) the patentee has market power in the relevant market; and (3) the patentee has used its fraudulently obtained patent to restrain competition. <u>See</u> 382 U.S. at 175-76. Thus, Teva's <u>Walker Process</u> claim requires proof of facts that are logically related to proof of patent invalidity, which was a defense raised in Teva's Amended Answer in the quinapril lawsuit. (Mizzo Dec., Ex. 4, at ¶¶ 22-30.) Because the facts supporting Teva's <u>Walker Process</u> counterclaim existed when it filed its Amended Answer in the quinapril lawsuit, the counterclaim is logically related to the legal issues raised in the quinapril lawsuit, i.e., the validity of the '405 patent. Pursuit of that claim in the quinapril lawsuit did not "require for its adjudication the presence of third parties."

---

[4] Because this is a suit initiated by Schwarz Pharma and Schwarz Pharma is not a party to the quinapril lawsuit, Teva's antitrust counterclaims against Schwarz Pharma

20

Teva's <u>Walker Process</u> claim against Warner-Lambert was, therefore, a compulsory

counterclaim that should have been asserted in the quinapril lawsuit.

   To prevail on a sham litigation claim, a claimant must show that the suit is

"objectively baseless in the sense that no reasonable litigant could realistically expect

success on the merits" and is subjectively motivated by a desire to impose collateral,

anti-competitive injury rather than to obtain a justifiable legal remedy. <u>Professional Real</u>

<u>Estate Investors, Inc. v. Columbia Pictures Industries, Inc.</u>, 508 U.S. 49, 60-61 (1993)

("<u>PRE</u>"); <u>see also</u> <u>Nobelpharma AB v. Implant Innovations, Inc.</u>, 141 F.3d 1059, 1072

(Fed. Cir. 1998) ("[A] sham suit must be both subjectively brought in bad faith and

based on a theory of either infringement or validity that is objectively baseless.").

Applying Fed.R.Civ.P. 13(a), it is evident that by the time Teva filed its Amended

Answer in the quinapril lawsuit, it should have been able to determine whether it could

assert a sham litigation counterclaim against Warner-Lambert with respect to its alleged

monopolization and attempted monopolization of the  quinapril product market.  Teva's

sham litigation allegations are directly related to and are dependant upon the merits of

the issues in the quinapril lawsuit and do not require for their adjudication the presence

of third parties.  Consequently, like Teva's <u>Walker Process</u> allegations, Teva's sham

litigation allegations regarding Warner-Lambert's alleged monopolization and attempted

monopolization of the quinapril product market in the instant action should have been

---

are not barred by Fed.R.Civ.P. 13.

21

asserted in the quinapril lawsuit as compulsory counterclaims.

Teva's fifth counterclaim, alleging that Warner-Lambert engaged in unfair competition in connection with the quinapril lawsuit, depends upon allegations that were compulsory in nature and should have been asserted against Warner-Lambert in the quinapril lawsuit. Teva's unfair competition counterclaim against Warner-Lambert existed when Teva filed its Amended Answer in the quinapril lawsuit; its unfair competition counterclaim is logically related to Warner-Lambert's claims of patent infringement; and its counterclaim did not require for its adjudication the presence of third parties. Therefore, Teva's unfair competition counterclaim against Warner-Lambert was a compulsory counterclaim that should have been asserted in the quinapril lawsuit.

Thus in the instant case, Teva has asserted against Warner-Lambert antitrust counterclaims (II and III) and an unfair competition counterclaim (V) which are based on allegations of Walker Process and sham litigation violations that should have been asserted as compulsory counterclaims in the quinapril lawsuit. The relief that Warner-Lambert seeks is an order striking from Counterclaims II, III and V and from Teva's related patent misuse affirmative defense allegations concerning Warner-Lambert's prosecution of the quinapril lawsuit. Thus relief is appropriate under the circumstances, and it can be determined at a later date whether anything remains of these counterclaims and affirmative defense as against Warner-Lambert.

**C.    Whether Teva's Patent Misuse Counterclaim is Legally Insufficient Under Federal Circuit Precedent**

22

The Federal Circuit Court of Appeals has held that the "defense of patent misuse arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage." C.R. Bard, Inc. v. M3 Systems, Inc., 157 F.3d 1340, 1372 (Fed. Cir. 1998). Patent misuse relates primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant. See id. (citing Mallinckrodt, Inc. v. Medipart, Inc., 976 F.2d 700, 703-04 (Fed. Cir. 1992)). Patent misuse is viewed as a broader wrong than an antitrust violation because of the economic power that may be derived from the patentee's right to exclude. Consequently, misuse may arise when the conditions of an antitrust violation are not met. See id. According to the Federal Circuit Court of Appeals, "[t]he key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect." See id.

Warner-Lambert and Schwarz Pharma both maintain that Teva's sixth counterclaim and third affirmative defense alleging patent misuse must be dismissed because sham litigation claims and Walker Process claims are not within the ambit of patent misuse. In support of this proposition, Plaintiffs rely upon Bard. Teva contests this assertion and also relies on Bard to support its position.

The Bard court's decision overturned a trial court's jury instructions regarding patent misuse. According to the Court, the trial court's jury instructions regarding what acts constituted "wrongful" misuse were too vague, noting that

23

"[a]lthough the law should not condone wrongful commercial activity, the body of misuse law and precedent need not be enlarged into an open-ended pitfall for patent-supported commerce." Id. at 1373. The Court, however, neither stated nor implied that sham litigation would not constitute a type of patent misuse, though it did note that the defendant did not propose any of the "classic grounds of patent misuse," such as tying or enforced package licensing or price restraints. Instead, it merely held that "[t]here was no evidence that Bard's competitive activities were either per se patent misuse or that they were not "reasonably" within the patent grant." Id.

Consequently, although Teva has not pled any facts that would be considered patent misuse per se or "classic grounds of patent misuse," it is possible that Teva may be able to demonstrate some set of facts going beyond Warner-Lambert's prosecution of the quinapril lawsuit that would demonstrate an instance of patent misuse. At this stage in the litigation, it is inappropriate to dismiss Teva's misuse counterclaim or affirmative defense.

## CONCLUSION

For the reasons set forth above, Warner-Lambert's and Schwarz Pharma's motion to dismiss Teva's antitrust counterclaims for failure to define a relevant product market is denied. Warner-Lambert's motion to strike from antitrust counterclaims II and III, from the unfair competition counterclaim V and from Teva's third separate affirmative defense allegations concerning Warner-Lambert's prosecution of the quinapril lawsuit will be granted. Warner-Lambert's motion to dismiss Teva's patent misuse counterclaim VI and to strike Teva's third affirmative defense in its

24

entirety will be denied.  Schwarz Pharma's motion for judgment on the pleadings with respect to the antitrust counterclaims II, III and IV and with respect to the patent misuse counterclaim VI will be denied.  Schwarz-Pharma's motion for dismissal of Teva's third affirmative defense will be denied.  An appropriate order shall follow.

_____

DICKINSON R. DEBEVOISE, U.S.S.D.J.

DATED:      June   , 2002

25

Westlaw.

Slip Copy                                                                 Page 1
Slip Copy, 2007 WL 3124698 (D.N.J.)
(Cite as: Slip Copy)

Traverso v. Home Depot U.S.A., Inc.
D.N.J.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
Fred TRAVERSO, Plaintiff,
v.
HOME DEPOT U.S.A., INC., d/b/a The Home
Depot, Defendant.
**Civil Action No. 07-1324 (MLC).**

Oct. 23, 2007.

Olimpio Lee Squitieri, Squitieri & Fearon, LLP,
Marlton, NJ, for Plaintiff.
Nicholas Stevens, Starr, Gern, Davison & Rubin, PC,
Roseland, NJ, for Defendant.

### ORDER

MARY L. COOPER, United States District Judge.
**\*1THE PLAINTIFF** having commenced this action
"individually and on behalf of all others similarly
situated" against the defendant, Home Depot U.S.A.,
Inc., d/b/a The Home Depot ("Home Depot"),
alleging (1) breach of contract, and (2) violations of
the New Jersey Consumer Fraud Act ("NJCFA")
(dkt. entry no. 1, Compl.); and Home Depot moving
to dismiss the complaint pursuant to Federal Rule of
Civil Procedure ("Rule") 12(b)(6) (dkt. entry no. 6);
and plaintiff opposing the motion (dkt. entry no. 8);
and

**IT APPEARING** that on a motion to dismiss under
Rule 12(b)(6), the Court generally must accept as true
all of the factual allegations in the complaint, and
must draw all reasonable inferences in favor of the
plaintiff, *Cal. Pub. Employees' Ret. Sys. v. Chubb
Corp.,* 394 F.3d 126, 134 (3d Cir.2004), *Doe v. Delie,*
257 F.3d 309, 313 (3d Cir.2001); but it also
appearing that the Court need not credit bald
assertions or legal conclusions alleged in the
complaint, *In re Burlington Coat Factory Sec. Litig.,*
114 F.3d 1410, 1429-30 (3d Cir.1997), *Morse v.
Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d
Cir.1997); and it appearing that the plaintiff's
"[f]actual allegations must be enough to raise a right
to relief above the speculative level, on the
assumption that all the allegations in the complaint
are true (even if doubtful in fact)", *Bell Atl. Corp. v.
Twombly,* 127 S.Ct. 1955, 1965 (2007); and it

appearing that the Court when considering a motion
to dismiss, may generally not "consider matters
extraneous to the pleadings", *In re Burlington Coat
Factory Sec. Litig.,* 114 F.3d at 1426, but may
consider (1) exhibits attached to the complaint, (2)
matters of public record, and (3) all documents that
are integral to or explicitly relied upon in the
complaint without converting the motion to dismiss
into one for summary judgment, *Angstadt v. Midd-
West Sch. Dist.,* 377 F.3d 338, 342 (3d Cir.2004); and

**HOME DEPOT** arguing that (1) plaintiff admits that
the parties entered into a valid agreement for carpet
installation, but plaintiff fails to allege "that Home
Depot did anything constituting a breach of the
Agreement or that he suffered any damages as a
result of Home Depot's conduct" (Home Depot Br., at
5-9), (2) plaintiff has not sufficiently alleged that
Home Depot engaged in any unlawful practice or
conduct under the NJCFA (*id.* at 9-11), (3) to the
extent plaintiff's NJCFA claim alleges that Home
Depot's unlawful conduct was an omission, plaintiff's
claim is deficient for failing to allege that Home
Depot knowingly made such omission with the intent
to induce reliance (*id.* at 11-12), (4) plaintiff's
NJCFA claim must fail because he has not alleged
that he suffered any ascertainable loss or any causal
nexus between any loss and Home Depot's actions or
practices (*id.* at 12-14), (5) the economic loss
doctrine bars plaintiff's NJCFA claim (*id.* at 14-16),
(6) plaintiff's NJCFA claim does not meet the
heightened pleading requirements of Rule 9(b), and
(7) the voluntary payment doctrine bars plaintiff's
claims (*id.* at 17-19); and

**\*2PLAINTIFF** arguing in response that, *inter alia,*
(1) the United States District Court for the Southern
District of Florida has already determined that a
plaintiff asserting a substantially similar breach of
contract claim against Home Depot sufficiently stated
a claim to survive a Rule 12(b)(6) motion to dismiss
(Pl. Br., at 6-11), (2) Home Depot breached its
contract with plaintiff and other members of the class
by overestimating the area to be carpeted, and thus,
charging them for services they did not receive (*id.* at
13), (3) Home Depot misrepresented how the charges
for installation would be calculated in its customer
agreements causing "ascertainable loss to Plaintiff
and members of the class in the amount of
overcharge for carpet installation services, and that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2
Slip Copy, 2007 WL 3124698 (D.N.J.)
**(Cite as: Slip Copy)**

loss was a direct result of [Home Depot's] unlawful conduct in violation of the [NJCFA]"(*id.* at 19-20), (4) plaintiff is not required to show intent to establish his NJCFA claim because such claim is based on Home Depot's affirmative acts, not omissions (*id.* at 21-22), (5) Home Depot proximately caused plaintiff's ascertainable losses (*id.* at 23-25), (6) the economic loss doctrine does not apply to a NJCFA claim (*id.* at 26-29), (7) the complaint satisfies the heightened pleading requirements of Rule 9(b) (*id.* at 29-31), and (8) the voluntary payment doctrine is inapplicable here (*id.* at 31-32); and

**THE COURT** noting that a plaintiff asserting a NJCFA claim must show that (1) the defendant committed an unlawful practice that violates the NJCFA, (2) the plaintiff suffered an ascertainable loss as a result of the unlawful conduct, and (3) a causal relationship exists between the unlawful practice and the plaintiff's loss, <u>Szczubelek v. Cendant Mortg. Corp.</u>, 215 F.R.D. 107, 121 (D.N.J.2002); and the Court also noting that "unlawful practices" include affirmative acts, omissions, and violations of state regulations, <u>id. at 125;</u> and it appearing that the economic loss doctrine prevents a plaintiff from recovering in tort for economic losses flowing from a contract, <u>Duquesne Light Co. v. Westinghouse Elec. Corp.</u>, 66 F.3d 604, 618 (3d Cir.1995), but "[n]o New Jersey Supreme Court case holds that a fraud claim cannot be maintained if based on the same underlying facts as a contract claim", <u>Gleason v. Norwest Mortg., Inc.</u>, 243 F.3d 130, 144 (3d Cir.2001); and it appearing further that the distinction between fraud in the inducement and fraud in the performance of a contract remains relevant to the application of the economic loss doctrine in New Jersey because courts have continued to affirm "the conceptual distinction between a misrepresentation of a statement of intent at the time of contracting, which then induces detrimental reliance on the part of the promisee, and the subsequent failure of the promisor to do what he has promised", <u>Lo Bosco v. Kure Eng'g Ltd.</u>, 891 F .Supp. 1020, 1032 (D.N.J.1995); and the Court acknowledging that New Jersey federal and state courts permit fraud claims to proceed with a breach of contract claim when the fraud arises out of fraud in the inducement or pre-contractual misrepresentations, but the "mere 'subsequent failure of the promisor to do what he has promised' is not recoverable in tort", <u>Vukovich v. Haifa, Inc.</u>, No. 03-737, 2007 U.S. Dist. LEXIS 13344, at *24 (D.N.J. Feb. 28, 2007) (concluding that the court could only consider claims of fraud in the inducement in evaluating NJCFA and

common law fraud claims), *see Shan Indus., LLC v. Tyco Int'l (US), Inc.,* 04-1018, 2005 U.S. Dist. LEXIS 37983, at *17-*26 (D.N.J. Sept. 12, 2005); and

**\*3THE COURT** noting that plaintiff has not alleged that Home Depot made any pre-contractual misrepresentations, but instead, plaintiff's NJCFA claim is based solely on alleged misstatements contained in the Special Services Customer Invoice and Home Depot Special Services/Home Improvement Agreement, which plaintiff and Home Depot entered into on April 2, 2005; and the Court therefore determining that plaintiff's NJCFA claim is barred by the economic loss doctrine because (1) plaintiff has only asserted a fraud in the performance claim, (2) plaintiff has not shown that at the time the invoice and agreement were executed, Home Depot had a present intent not to perform its obligations under that invoice and agreement, and (3) the misrepresentations underlying plaintiff's claim arose during performance of the agreement, *see Vukovich,* 2007 U.S. Dist. LEXIS 13344, at *24-*25 (explaining that the Court can only consider a fraud in the inducement claim alongside a breach of contract claim); and

**THE COURT** also determining that, assuming all facts asserted in the complaint are true, plaintiff has set forth sufficient factual allegations in support of his breach of contract claim to "raise a right to relief above the speculative level", <u>Twombly,</u> 127 S.Ct. at 1965 (*see* dkt. entry no. 1, Compl., at ¶¶ 25-26 (asserting that plaintiff's contract with Home Depot provides that Home Depot would charge him for carpet installation services based on an estimate of the room's dimensions, but Home Depot "charged plaintiff for carpet installation services in an amount based upon the measure of the carpet ordered under the contract and thereby charged plaintiff for services [Home Depot] did not render, overcharged plaintiff, and breached its contract with plaintiff"); and the Court thus intending to (1) deny the motion insofar as it seeks to dismiss the breach of contract claim (count 1), and (2) grant the motion insofar as it seeks to dismiss the NJCFA claim (count 2);<sup>FN1</sup> and the Court deciding the motion without oral hearing and on the papers, *see* Fed.R.Civ.P. 78; and for good cause appearing;

FN1. Plaintiff requests permission to amend the complaint "to the extent that the Court finds any of Plaintiffs' allegations in the breach of contract and/or the New Jersey

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 3124698 (D.N.J.)
**(Cite as: Slip Copy)**

Consumer Fraud Act are deficient or to the extent that discovery reveals additional facts or claims which Plaintiffs should assert."(Dkt. entry no. 8, Pl. Br., at 11 n. 7.) If, based on this order, plaintiff would like to seek leave to amend the complaint, he may move before the Magistrate Judge and attach a copy of the proposed amended complaint pursuant to Local Civil Rule 7.1(f).

**IT IS THEREFORE** on this 22nd day of October, 2007 **ORDERED** that defendant's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (dkt. entry no. 6) is **GRANTED IN PART** and **DENIED IN PART** as follows

**DENIED TO THE EXTENT** that it seeks to dismiss the breach of contract claim (count 1), and

**GRANTED TO THE EXTENT** that it seeks to dismiss the New Jersey Consumer Fraud Act claim (count 2); and

**IT IS FURTHER ORDERED** that the complaint insofar as it asserts a New Jersey Consumer Fraud Act claim is **DISMISSED WITHOUT PREJUDICE.**

D.N.J.,2007.
Traverso v. Home Depot U.S.A., Inc.
Slip Copy, 2007 WL 3124698 (D.N.J.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BROADCOM CORPORATION,                    :          Civil Action No. 05-3350 (MLC) (JJH)
                                         :
                          *Plaintiff*,   :
            vs.                          :                    **ORDER**
                                         :
QUALCOMM INCORPORATED,                   :
                                         :
                         *Defendant*.    :
                                         :

        Defendant Qualcomm Incorporated ("Defendant") having moved this Court by

motion pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure for an order

dismissing Plaintiff Broadcom Corporation's Claims Four through Eight of Plaintiff's Second

Amended Complaint ("Defendant's Motion to Dismiss"); and the Court having reviewed the

papers, **GRANTS** Defendant's Motion to Dismiss and hereby dismisses Claims Four through

Eight of the Second Amended Complaint.


Dated:


                                              _____
                                              Hon. Mary L. Cooper

William J. O'Shaughnessy
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Peter T. Barbur
Elizabeth L. Grayer
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Richard S. Taffet
Philip L. Blum
BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

Robert N. Feltoon
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, Suite 1600
Philadelphia, PA 19102
(215) 864-8064

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| BROADCOM CORPORATION, | : | Civil Action No. 05-3350 (MLC) (JJH) |
| *Plaintiff,* | : | |
| vs. | : | **CERTIFICATION OF SERVICE** |
| QUALCOMM INCORPORATED, | : | |
| *Defendant.* | : | |

RICHARD HERNANDEZ, of full age, certifies as follows:

1.    I am an attorney at law of the State of New Jersey and am associated with the firm

of McCarter & English, LLP, attorneys for Defendant Qualcomm Incorporated.

2.    On December 21, 2007, I caused to be delivered by ECF and electronic mail a

copy of the foregoing papers to the following:

> David S. Stone, Esq.
> Robert A. Magnanini, Esq.
> Boies, Schiller & Flexner LLP
> 150 John F. Kennedy Parkway
> Short Hills, New Jersey 07078
>
> Steven John Kaiser, Esq.
> Cleary Gottlieb Steen & Hamilton LLP
> 2000 Pennsylvania Avenue, NW
> Washington, DC 20006

I hereby certify that the foregoing statements made by me are true.  I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED: December 21, 2007

Richard Hernandez

ME1 7003263v.1