WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
Fax: (617) 526-5000
William F. Lee (admitted *pro hac vice*)

WILMER CUTLER PICKERING HALE AND DORR LLP
1117 California Avenue
Palo Alto, CA 94304
(650) 858-6000
Fax: (650) 858-6100
Mark D. Selwyn (admitted *pro hac vice*)

CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 974-1500
Fax: (202) 974-1999
Mark W. Nelson (admitted *pro hac vice*)

BOIES, SCHILLER & FLEXNER LLP
570 Lexington Avenue
New York, NY 10022
(212) 446-2300
Fax: (212) 446-2350
David Barrett (admitted *pro hac vice*)

BOIES, SCHILLER & FLEXNER LLP
150 John F. Kennedy Parkway
Short Hills, NJ 07078
(973) 218-1111
Fax: (973) 218-1106
David S. Stone

**Counsel for Plaintiff BROADCOM CORPORATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>QUALCOMM INCORPORATED,<br><br>　　　　　Defendant. | Civil Action No. 05-3350 (MLC/JJH)<br><br>Return Date: February 19, 2008<br>*(Document Filed Electronically)* |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CLAIMS FOUR THROUGH EIGHT OF PLAINTIFF'S SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 1

ARGUMENT ............................................................................................................. 3

I.    BC Has Adequately Alleged That QC's Misconduct Has Injured And Continues to Injure BC ............................................................................................................ 3

    A.    BC Has Alleged Injury Caused by QC's Breaches of Its FRAND Licensing Commitments ................................................................ 4

    B.    BC Has Alleged Injury Caused by QC's Failures to Disclose Its Claimed Intellectual Property Rights ........................................... 7

    C.    BC Has Alleged Injury Based on QC's Misconduct in the IEEE 802.20 Working Group ............................................................................. 9

II.    BC's Claims Are Ripe for Adjudication ........................................................ 11

III.    The Complaint Alleges All Essential Elements of Each State-Law Claim ...... 13

    A.    The Complaint States a Claim for Breach of Contract ......................... 13

    B.    The Complaint States a Claim for Promissory Estoppel ...................... 15

    C.    The Complaint States a Claim for Tortious Interference With Prospective Economic Advantage ................................................................. 17

    D.    The Complaint States a Claim for Fraud ........................................... 18

    E.    The Complaint States a Claim Under the UCL ................................... 20

        1.    BC has standing under the UCL ............................................. 20

        2.    BC states a claim under each prong of the UCL ...................... 24

IV.    BC's Claims Concerning the H.264 Video Standard Are Not Barred by Either Rule 13 or Res Judicata ............................................................................. 25

    A.    Rule 13 ............................................................................................ 27

    B.    Res Judicata ................................................................................... 29

CONCLUSION ...................................................................................................... 30

# TABLE OF AUTHORITIES

Page

## Federal Cases

*AccuImage Diagnostics Corp. v. TeraRecon, Inc.*,
260 F. Supp. 2d 941, 957 (N.D. Cal. 2003) ................................................................. 18

*Armstrong World Indus., Inc. by Wolfson v. Adams*,
961 F.2d 405 (3d Cir. 1992).......................................................................................... 12

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519, 535 n.31 (1983) ...................................................................................... 11

*Bradley v. Google*,
No. C 06-05289 WHA, 2006 WL 3798134, at *4 (N.D. Cal. Dec. 22, 2006)............. 17

*Broadcom Corp. v. Qualcomm, Inc.*,
501 F.3d 297, 317-18 (3d Cir. 2007) ..................................................................... passim

*Brown v. Allstate Ins. Co.*,
17 F. Supp. 2d 1134, 1140 (S.D. Cal. 1998)................................................................ 18

*Browning v. Levey*,
283 F.3d 761 (6th Cir. 2002) ........................................................................................ 30

*Chevron U.S.A., Inc. v. Traillour Oil Co.*,
987 F.2d 1138, 1153-54 (5th Cir. 1993) ...................................................................... 11

*CRST Van Expedited, Inc. v. Werner Enters.*,
479 F.3d 1099, 1107 (9th Cir. 2007) ............................................................................ 24

*Danvers Motor Co., Inc. v. Ford Motor Co.*,
186 F. Supp. 2d 530, 536 (D.N.J. 2002) ........................................................................ 6

*Danvers Motor Co., Inc. v. Ford Motor Co.*,
432 F.3d 286, 291 (3d Cir. 2005)......................................................................... 3, 6, 7

*Doe v. County of Centre*,
242 F.3d 437, 453 (3d Cir. 2001)................................................................................. 12

*Dow Chem. Co. v. Exxon Corp.*,
139 F.3d 1470, 1478 (Fed. Cir. 1998).......................................................................... 30

*EP Medsystems, Inc. v. Echocath, Inc.*,
235 F.3d 865, 882-83 (3d Cir. 2000) ........................................................................... 19

*G & C Auto Body Inc. v. GEICO Gen'l Ins. Co.*,
    No. C06-04898, 2007 WL 4350907, at *4 (N.D. Cal. Dec. 12, 2007) ..................................... 21

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363, 379 (1982) ............................................................................................ 10

*Honeywell Int'l., Inc. v. Universal Avionics Sys. Corp.*,
    398 F. Supp. 2d 305, 314-15 (D. Del. 2005) ........................................................... 30

*Hydranautics Corp. v. Filmtec Corp.*, 70 F.3d 533, 536-37 (9th Cir. 1995)........................29

*In re Global Crossing, Ltd. Sec. Litig.*,
    No. 02 Civ. 910 (GEL), 2004 WL 725969, at *5 (S.D.N.Y. Apr. 2, 2004)............................ 17

*In re Yarn Processing Patent Validity Litig. (No. II)*,
    602 F. Supp. 159, 170-71 (D.C.N.C. 1984) .............................................................. 30

*Landes v. Tartaglione*,
    No. Civ. A. 04-3163, 2004 WL 2415074, at *3 (E.D. Pa. Oct. 28, 2004).................................. 6

*Longwood Mfg. Corp. v. Wheelabrator Clean Water Systems, Inc.*,
    954 F. Supp. 17, 18 (D. Me. 1997)........................................................................…..29

*Los Feliz Towers Homeowners Assoc.*,
    426 F. Supp. 2d 1061, 1068-69 (C.D. Cal. 2005) ..................................................... 10

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555, 561 (1992)............................................................................................... 7

*McCarty v. First of Ga. Insur. Co.*,
    713 F.2d 609, 612-13 (10th Cir. 1983) ..................................................................... 30

*Medimmune, Inc. v. Genentech*,
    127 S.Ct. 764 (2007) ..................................................................................................... 6

*MGA Entm't, Inc. v. Mattel, Inc.*,
    CV 05-2727, 2005 WL 5894689 (C.D. Cal. Aug. 26, 2005)............................................ 23, 24

*Milmoe v. Gevity HR, Inc.*,
    No. C 06-04721 SBA, 2006 WL 2691393, at *4 (N.D. Cal. Sept. 20, 2006)............................ 14

*Nokia Corp. v. Qualcomm, Inc.*,
    No. Civ. A 06-509-JJF, 2006 WL 2521328, at *2 (D. Del. Aug. 29, 2006)............................... 5

*Philadelphia Fed. of Teachers v. Ridge*,
    150 F.3d 319, 324 (3d Cir. 1998)................................................................................ 12

*Rambus v. Infineon Tech. AG,*
   304 F. Supp. 2d 812, 816-17, 828 (E.D. Va. 2004) ................................................... 6

*Read Corp. v. Portec, Inc.,*
   970 F.2d 816, 826-27 (Fed. Cir. 1992) .......................................................... 6

*S.C. Johnson & Son, Inc. v. Dowbrands, Inc.,*
   167 F. Supp. 2d 657, 668 (D. Del. 2001) ......................................................... 12

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,*
   742 F.2d 786, 791 (3d Cir. 1984) ............................................................... 19

*Stahl v. Ohio River Co.,*
   424 F.2d 52, 54 (3d Cir. 1970) ................................................................. 27

*Storino v. Borough of Point Pleasant Beach,*
   322 F.3d 293, 297 (3d Cir. 2003) ............................................................... 6

*SunCom Mobile & Data, Inc. v. F.C.C.,*
   87 F.3d 1386, 1388 (D.C. Cir. 1996) ............................................................ 7

*SWT Acquisition Corp. v. TW Servs., Inc.,*
   700 F. Supp. 1323, 1329 (D. Del. 1988) ......................................................... 12

*Union Corp. v. Brown,*
   No. 87-5525, 1988 U.S. Dist. LEXIS 2542, at *5 (E.D. Pa. Mar. 29, 1988) .......................... 27

*White v. Trans Union LLC,*
   462 F. Supp. 2d 1079, 1084 (C.D. Cal. 2006) ................................................ 21, 22

*Witriol v. LexisNexis Group,*
   No. C05-02392, 2006 WL 4725713 (N.D. Cal. Feb. 10, 2006) ...................................... 23

*Xerox Corp. v. SCM Corp.,*
   576 F.2d 1057, 1059 (3d Cir. 1978) ............................................................. 29

<u>State Cases</u>

*ABC Int'l Traders v. Matsushita Elec. Corp. of Am.,*
   931 P.2d 290, 302 (Cal. 1997) ................................................................. 21

*Aron v. U-Haul Co. of Cal.,*
   143 Cal. App. 4th 796, 803 (2007) ............................................................. 23

*Buckaloo v. Johnson,*
   14 Cal. 3d 815, 827 (1975) .................................................................... 18

*Buckland v. Threshold Enters., Ltd.,*
   155 Cal. App. 4th 798, 814 (2007) ............................................................. 23

*Caifornia Emergency Physicians Med. Group v. Pacificare of Cal.,*
  111 Cal. App. 4th 1127, 1137 (2003) .................................................................. 15

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
  20 Cal. 4th 163, 187 (1999) ................................................................................ 24

*Ferguson v. Lieff, Cabraser, Heimann & Bernstein,*
  30 Cal. 4th 1037, 1048 (2003) .............................................................................. 6

*Hicks v. E.T. Legg & Assocs.,*
  89 Cal. App. 4th 496, 507 (2001) ........................................................................ 22

*Huntingdon Life Scis., Inc. v. Stop Huntingdon Animal Cruelty,*
  129 Cal. App. 4th 1228 (2005) ............................................................................ 23

*Kajima/Ray Wilson v. Los Angeles County Metro. Transp. Auth.,*
  1 P.3d 63 (Cal. 2000) .......................................................................................... 16

*Korea Supply Co. v. Lockheed Martin Corp.,*
  29 Cal. 4th 1134, 1164-66, (2003) ...................................................................... 18

*Linear Tech. Corp. v. Applied Materials, Inc.,*
  152 Cal. App. 4th 115 (2007) .............................................................................. 25

*Markowitz v. Fid. Nat. Title Co.,*
  142 Cal. App. 4th 508, 527 (2006) ...................................................................... 14

*McDonald v. John P. Scripps Newspaper,*
  210 Cal. App. 3d 100, 104 (1989) ......................................................................... 6

*Overstock.com, Inc. v. Gradient Analytics, Inc.,*
  151 Cal. App. 4th 688 (2007) .............................................................................. 23

*Pacific Legal Found. v. Cal. Coastal Comm'n.,*
  655 P.2d 306, 313-16 (1982) .............................................................................. 12

*Paulus v. Bob Lynch Ford, Inc.,*
  139 Cal. App. 4th 659, 681 (2006) ...................................................................... 24

*People v. Union Pacific R.R. Co.,*
  141 Cal. App. 4th 1228, 1242 (2006) .................................................................. 24

*Rosenbluth Int'l v. Superior Court,*
  101 Cal. App. 4th 1073 (2002) ............................................................................ 25

*Rotolo v. San Jose Sports and Entm't LLC,*
  151 Cal. App. 4th 307, 324 (2007) ...................................................................... 21

*Schauer v. Mandarin Gems of Cal., Inc.*,
    125 Cal. App. 4th 949, 957-58 (2005) ........................................................................ 15

*Shell v. Schmidt*,
    272 P.2d 82, 89 (1954) ............................................................................................... 15

*Smith v. City and County of San Francisco*,
    225 Cal. App. 3d 38 (1990) ........................................................................................ 17

*Smith v. Microskills San Diego LP*,
    153 Cal. App. 4th 892, 897-98 (2007) ........................................................................ 14

*Westside Ctr. Assoc. v. Safeway Stores, Inc.*,
    42 Cal. App. 4th 507, 520-521 (1996) ........................................................................ 18

<u>Federal Statutes and Rules</u>

35 U.S.C. § 284 ................................................................................................................. 6

Fed. R. Evid. 801(d)(2) ...................................................................................................... 5

<u>State Statutes</u>

Cal. Bus. & Prof. Code § 17203 ....................................................................................... 22

Cal. Bus. & Prof. Code § 17204 ....................................................................................... 21

Cal. Civ. Code § 1559 ....................................................................................................... 14

## INTRODUCTION

Plaintiff Broadcom Corporation ("BC") respectfully submits this Opposition to the Motion to Dismiss Claims Four through Eight of Plaintiff's Second Amended Complaint filed by defendant Qualcomm Inc. ("QC"). The Second Amended Complaint ("SAC") explains in detail how QC's abuse of the standard-setting process has injured and continues to injure Broadcom, and BC's allegations readily satisfy the elements of each of BC's state-law claims. Indeed, QC's primary arguments about injury and causation should be considered disingenuous given its repeated acknowledgments in earlier briefing to this Court and the Third Circuit that BC *had* alleged injury to itself from QC's misconduct. Many of QC's complaints about the SAC, moreover, are identical to ones the Third Circuit already rejected in reversing the order granting QC's first motion to dismiss. Lastly, QC seeks to preclude BC from bringing its H.264-related claims, which are based on hundreds of thousands of pages of documents QC deliberately concealed from BC and from the federal court in San Diego during QC's failed infringement action against BC, for which both it and its prior counsel have been severely sanctioned. In a 54-page opinion, Judge Brewster found that QC's withholding of those documents until months after trial reflected QC's "carefully orchestrated plan and ... deadly determination ... to achieve its goal of holding hostage the entire industry desiring to practice the H.264 standard."[1] Neither Rule 13 nor res judicata shields such misconduct.

## STATEMENT OF FACTS

BC's allegations are extensive and complete. For each of the four standards or families of standards at issue, the SAC sets out the chronology of the standard's development,[2] QC's and

---

[1]    *See* Ex. A to Declaration of David S. Stone, January 25, 2008, filed herewith ("Stone Decl."), Order on Remedy for Finding of Waiver ("Remedy Order") at 52 (Aug. 6, 2007).

[2]    *See* SAC ¶¶ 139-41, 150 (GSM/GPRS/EDGE standards), 71, 88, 92, 93 (UMTS standard), 170-79 (H.264 standard), 247-50 (802.20 standard).

BC's membership in the standard-setting organizations ("SSOs"),[3] the intellectual property rights ("IPR") and financial disclosure policies governing the standard-setting processes,[4] and QC's intentional violations of those obligations.[5]

*First*, QC intentionally breached obligations under SSO rules by failing to disclose patents on its technologies, thereby causing the SSOs to adopt standards incorporating technologies that QC now claims its patents cover.[6]

*Second*, QC simultaneously took improper measures to steer standard-setting bodies toward standards it claims incorporate its patented technologies.[7]

*Third*, QC has breached the FRAND licensing commitments that it made to induce the SSOs to adopt standards incorporating its patented technologies and has tried to extract from BC and others unfair, unreasonable, and discriminatory licensing terms.[8]

*Fourth*, having breached its disclosure and FRAND licensing commitments, QC has told BC's actual and potential customers that making or selling products practicing the relevant

---

[3]     *See* SAC ¶¶ 72-74, 153 (GSM/GPRS/EDGE), 72-74, 87-88, 92, 153 (UMTS), 180-82, 207 (H.264), 254-56, (802.20).

[4]     *See* SAC ¶¶ 75-86, 142 (GSM/GPRS/EDGE), 75-86 (UMTS), 183-90, 204 (H.264), 251-53 (802.20).

[5]     *See* SAC ¶¶ 85-86, 143-49, 151, 163-68 (GSM/GPRS/EDGE), 85-86, 89, 90, 93-98, 106-107 (UMTS), 190-91, 195-99, 208-11, 228 (H.264), 257-62, 265-66, 268 (802.20).

[6]     *See* SAC ¶ 8 ("[QC] has engaged in conduct designed to undermine competition, including delayed disclosures of IP"); *see also, e.g.,* ¶¶ 143-49,  (GSM and GPRS/EDGE standards), ¶¶ 93-98 (UMTS standard), ¶¶ 195-99 (H.264 standard).

[7]     *See, e.g.,* SAC ¶¶ 88-90 ("[QC] made proposals [and false FRAND commitments] in an attempt to steer the UMTS standard then under development toward purportedly patented [QC] technologies and away from alternative technologies that were at least as effective."); ¶¶ 257, 260-62 (IEEE 802.20 standard).

[8]     *See, e.g.,* SAC ¶ 167 ("[I]n willful disregard of its commitments to ETSI, [QC] has refused to offer licensing terms that are fair, reasonable, and nondiscriminatory"); ¶ 163 (GSM, GPRS, and EDGE-compliant mobile wireless devices); ¶ 106 (UMTS-compliant mobile wireless devices); ¶¶ 229, 240 (H.264 standard-compliant devices).

standards requires licenses to QC's purportedly essential patents and that BC lacks a license, thereby dissuading customers from buying BC's products.[9]

*Fifth*, to protect its monopoly profits, QC has frustrated the emergence of next-generation wireless standards based on non-QC technology by interfering with and delaying the development of standards by the IEEE 802.20 Working Group, thereby causing BC to waste time and money participating in the Working Group and to lose opportunities to sell new products. (SAC ¶¶ 257-62, 265-68.)

## ARGUMENT

**I.    BC Has Adequately Alleged That QC's Misconduct Has Injured And Continues to Injure BC**

Article III's injury-in-fact requirement exists to "assure that litigants have a 'personal stake' in the litigation." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005) (Alito, J.). Economic injury is one of the "paradigmatic forms" of injury-in-fact. *Id.* To plead causation, a plaintiff need only allege "a causal connection between the injury and the conduct complained of." *Id.* Contrary to QC's contention (Mem. Supp. Def's Mot. Dismiss Claims Four Through Eight of the Second Am. Compl. 4-6, Dec. 21, 2007 ("Mem.")), the SAC includes copious, detailed allegations that easily satisfy the injury-in-fact and causation requirements.

As an initial matter, until now QC has always conceded that BC alleged injury to itself from QC's misconduct. In its first motion to dismiss, citing two allegations in the First Amended Complaint ("FAC") that are identical to two allegations in the SAC, QC acknowledged that BC had alleged an injury consisting of "exclusion from the UMTS chipset market." (Mem. Supp.

---

[9]      *See, e.g.*, SAC ¶¶ 160-63, 237-38 (QC's refusal to license on FRAND terms "has injured and continues to injure BC, including by interfering with BC's ability to develop and market semiconductors for GSM, GPRS, and EDGE-compliant mobile wireless devices."), ¶¶ 103-105 (UMTS standard-compliant devices), ¶¶ 237-40 (H.264 standard-compliant devices).

- 3 -

Def.'s Mot. to Dismiss 24, Dec. 9, 2005 (citing FAC ¶¶ 142, 147)); *compare* SAC ¶¶ 278, 283.[10]

In ruling on that motion, this Court similarly held that BC had alleged injury to itself. (*See* Mem.

Op. 22-23, 24-25, Aug. 31, 2006 ("Mem Op.").) The Third Circuit agreed. *See Broadcom Corp.*

*v. Qualcomm, Inc.*, 501 F.3d 297, 317-18 (3d Cir. 2007). In particular, the Third Circuit

recognized that QC's misconduct during standard-setting processes injured BC and others

seeking to practice the UMTS standard. It observed that "the alleged anticompetitive conduct

was the intentional false promise that QC would license its WCDMA technology on FRAND

terms, on which promise the relevant SSOs relied in choosing the WCDMA technology for

inclusion in the UMTS standard, followed by QC's insistence on non-FRAND licensing terms."

*Id.* at 315 (citations omitted); *see also id.* at 313-14 (explaining crucial role FRAND

commitments play in protecting suppliers of standards-compliant products from exploitation by

patent holders).

     Only now, in its second motion to dismiss BC's state-law claims, does QC change course

and argue that BC has not alleged harm to itself from QC's malfeasance. QC's belated

contention is groundless.

### A.    BC Has Alleged Injury Caused by QC's Breaches of Its FRAND Licensing Commitments

     QC argues that BC has failed to plead injury from QC's misconduct because BC has not

alleged that QC's patents are essential to practicing the relevant standards. (Mem. 6-8.) That

argument fails for two reasons.

---

[10]    For other examples of QC's conceding that BC alleged injury, see Mem. Supp. Def.'s Mot. to Dismiss 6, 25, 26, 36, 39; Reply Mem. Supp. Def's Mot. to Dismiss at 1, 11, Jan. 30, 2006; Ex. B. to Stone Decl., Brief of Def.-Appellee in Broadcom v. Qualcomm, No. 06-4292, at 21, 22, 32-33, 47 (3d Cir. Jan. 30, 2007).

First, as recounted in the SAC, QC has repeatedly asserted the essentiality of its patents,

to relevant SSOs (SAC ¶¶ 95, 143-44), to its and BC's customers (*id.* ¶¶ 103, 160, 237), to the

consuming public,[11] and even to this Court.[12] Having done so, QC cannot now argue that BC

must concede that QC's patents are essential in order to allege injury. *See* Fed. R. Evid.

801(d)(2). The District of Delaware correctly so concluded when considering the very argument

QC advances here. *See Nokia Corp. v. Qualcomm, Inc.*, No. Civ. A 06-509-JJF, 2006 WL

2521328, at *2 (D. Del. Aug. 29, 2006) (For QC now to "contend Plaintiff's claims cannot be

resolved without determining whether the patents at issue are essential seems incongruent with

Defendant's own declarations to the ETSI.").

Second, QC's argument ignores the SAC's allegations and mischaracterizes BC's theory

of harm. The SAC specifically alleges that QC's deceitful FRAND commitments induced SSOs

to incorporate technologies that QC *claims* are essential to practicing the standards. (SAC ¶¶ 90,

197, 276.) This in turn allowed QC—in retaliation for BC's refusal to acquiesce to QC's

unreasonable, discriminatory demands (*id.* ¶¶ 108, 245-46)—to threaten BC's current and

potential customers (*id.* ¶¶ 103-105, 160-62, 237-38) and thereby impair BC's ability to make

sales of existing standards-compliant products and develop new ones. (*Id.* ¶¶ 105-106, 120, 162-

63, 239-240.) BC has been harmed because QC flouted SSOs' FRAND and disclosure rules

---

[11]    *See, e.g.*, Ex. C to Stone Decl., QC Annual Report on Form 10-K for the Year Ended Sep. 26, 2004, at 16 ("The standards bodies and the ITU have been informed that we hold essential intellectual property rights for the 3G standards that are based on CDMA. We have committed to the ITU to license our essential patents for these CDMA standards on a fair and reasonable basis free from unfair discrimination"); Ex. D to Stone Decl., QC Press Release, dated July 11, 2005, entitled "Qualcomm Sues Broadcom for Patent Litigation" ("Qualcomm's lawsuit asserts infringement of patents that are 'essential' to the manufacture or use in equipment that complies with the GSM, GPRS and EDGE cellular standards ('the GSM Standards') . . . .").

[12]    *See* Mem. Supp. Def.'s Mot. to Dismiss 1, Dec. 9, 2005 ("As Broadcom concedes . . ., it needs to license certain patents from Qualcomm to produce and sell [WCDMA] chips lawfully.").

designed to prevent licensees from being put to the Hobson's choice of taking a license on unfair, unreasonable, and discriminatory terms, or losing customers to QC's threats of infringement.  (*See* SAC ¶¶ 5, 6, 20, 22.)

Indeed, if QC's argument were correct, a patentholder could abuse the standards-setting process and industry participants in exactly the way the Third Circuit condemned, *see Broadcom Corp.*, 501 F.3d at 315; reap the ill-gotten gains from doing so by extracting unfair, unreasonable, and discriminatory licensing terms or making infringement threats to scare away customers from suppliers that will not acquiesce to its licensing demands; and escape liability unless suppliers of standards-compliant products first concede essentiality and infringement and thereby expose themselves to treble-damage actions for willful patent infringement.[13]

---

[13]    *See, e.g.,* 35 U.S.C. § 284; *see generally Read Corp. v. Portec, Inc.,* 970 F.2d 816, 826-27 (Fed. Cir. 1992) (knowing infringement justifies treble damages).  That cannot be and is not the law.  *See Nokia, supra; Rambus v. Infineon Tech. AG,* 304 F. Supp. 2d 812, 816-17, 828 (E.D. Va. 2004) (permitting alleged patent infringer to amend counterclaim to add UCL claim based on alleged deceit in standard-setting process while alleged infringer denied infringement and claimed patent invalidity); *cf. Medimmune, Inc. v. Genentech,* 127 S.Ct. 764 (2007) (Article III does not require licensee to terminate license and subject itself to infringement action before seeking declaratory judgment that underlying patent is invalid, unenforceable, or not infringed).

QC's authority is also inapposite.  It all involves plaintiffs that, unlike BC, alleged only contingent injuries that *might* occur in the future.  *See McDonald v. John P. Scripps Newspaper,* 210 Cal. App. 3d 100, 104 (1989) (unsuccessful contestant's lawsuit against the sponsor of spelling bee dismissed when there was no indication that contestant would have won if allegedly ineligible participant had not competed); *Ferguson v. Lieff, Cabraser, Heimann & Bernstein,* 30 Cal. 4th 1037, 1048 (2003) (two members of 12,000-person class could not recover malpractice award from their attorneys on theory that punitive damages might have been recovered from class action defendant if attorneys had not waived punitive damages as condition of settlement); *Landes v. Tartaglione,* No. Civ. A. 04-3163, 2004 WL 2415074, at *3 (E.D. Pa. Oct. 28, 2004) (plaintiff lacked standing to challenge city's use of electronic voting machines when she failed to allege she intended to vote in upcoming election or had "ever voted in any prior election"); *Danvers Motor Co., Inc. v. Ford Motor Co.,* 186 F. Supp. 2d 530, 536 (D.N.J. 2002) (plaintiff car dealers lacked standing to challenge certification program where they alleged only that the program might harm them at some point in future); *cf. Danvers Motor Co., Inc. v. Ford Motor Co.,* 432 F.3d 286, 288 (3d Cir. 2005) (when plaintiffs "revised their complaint and filed it anew," alleging injuries incurred because of successful efforts to achieve certification, dealers' allegations of harm conferred standing); *Storino v. Borough of Point Pleasant Beach,* 322 F.3d 293, 297 (3d Cir. 2003) (boarding house owners challenging zoning classification lacked standing where statute did not affect their property and plaintiffs "admitted that they have not yet incurred damages as a result …of the Ordinance"); *SunCom Mobile & Data, Inc. v. F.C.C.,* 87

Insofar as QC argues that the SAC fails to allege injury adequately because it does not specify particular patents to which BC is entitled to a FRAND license, identify specific lost sales, or particularize the products BC has been impaired in developing, making, or selling, (Mem. 6-7), its argument is without merit. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *accord Danvers Motor Co.*, 432 F.3d at 291. Moreover, the Third Circuit has already held that the allegations of the First Amended Complaint (largely subsumed within the SAC) were sufficient to satisfy even the heightened Rule 9(b) pleading standard. *See Broadcom*, 501 F.3d at 315 n.9.

## B.    BC Has Alleged Injury Caused by QC's Failures to Disclose Its Claimed Intellectual Property Rights

BC has alleged injury based on QC's breaches of its obligations to disclose IPRs during the relevant standards-development processes. The SAC alleges that, for the WCDMA, GSM, GPRS, and EDGE standards, the policy of the relevant SSO, ETSI, required QC and other participants to disclose "all IPR that participants believed might be essential to standards under consideration." (SAC ¶¶ 81, 142.) Similarly, for the H.264 standard, the SSO's policies required "participants in the standard-setting process to disclose any patents believed to be essential to the standards." (*Id.* ¶ 186.) BC further alleges that QC breached those obligations by failing to disclose patents that it claims are essential to practicing the relevant standards. (*Id.* ¶¶ 93-98, 143-49, 195-99.)

---

F.3d 1386, 1388 (D.C. Cir. 1996) (plaintiff did not suffer injury from FCC's refusal to grant two requests related to group of licenses when the plaintiff alleged no actual, existing interest in any affected licenses "nor even a contract to acquire such").

QC wrongly argues that BC's allegations are deficient because BC has not alleged that the outcome of the relevant standards-development processes would have been different had QC met its disclosure obligations. (Mem. 8-9.) QC disregards both the allegations of the SAC and the Third Circuit's opinion in this case. The SAC alleges that, with respect to the WCDMA standard, through its deceit "[QC] was able unfairly and fraudulently to cause ETSI to adopt standards incorporating technology that QC now claims reads on its patents." (SAC ¶ 96; *see also id.* ¶ 146 (similar allegations as to GSM, GPRS, and EDGE standards); *id.* ¶¶ 197, 243 (similar allegations as to H.264 standard)). And, contrary to QC's argument, (Mem. 9), BC has specifically alleged that the SSOs had attractive alternatives to QC's patented technologies for incorporation into the relevant standards (SAC ¶¶ 71, 88), but that instead the SSOs selected QC's technologies due to QC's deceit. (*Id.* ¶¶ 96, 197.)

The Third Circuit has already held similar allegations with respect to QC's false FRAND commitments to be sufficient. For example, The Third Circuit held that BC's general allegation that an SSO's adoption of a standard eliminates competing technologies was sufficient to defeat the argument that alternatives had not been alleged with sufficient particularity. *Broadcom*, 501 F.3d at 316 ("[QC] makes much of the Complaint's failure to allege that there were viable technologies competing with WCDMA for inclusion in the UMTS standard. As QC concedes, however, the Complaint does allege that an SSO's adoption of a standard eliminates competing technologies."). The SAC not only contains similar allegations (SAC ¶¶ 20, 43), but it also specifically alleges that QC's deceit prevented the SSOs from adopting alternative technologies. (*Id.* ¶¶ 71, 88.)

QC also disregards BC's allegations that it has been harmed by QC's deceit whether or not the SSOs would have included QC's patented technologies. In particular, had QC disclosed

its WCDMA-related patents and ETSI decided nevertheless to include QC's technologies, ETSI would have required that QC make FRAND licensing commitments before the standards were set. (SAC ¶¶ 84, 90.) Those commitments would have protected BC and other implementers of the standards from exploitation by QC. (*See also id.* ¶ 228.) Indeed, in finding that BC has alleged that QC engaged in monopolization, the Third Circuit recognized that BC has alleged that "even if QC's WCDMA technology was the only candidate for inclusion in the standard, it still would not have been selected by the relevant SSOs absent a FRAND commitment." *Broadcom*, 501 F.3d at 316.

Finally, contrary to QC's argument, BC's state-law injury claims do not depend on allegations that QC's patents are *actually* essential. BC's injuries were caused by QC's breaches of obligations to disclose patented technologies it now claims are essential, and by QC's subsequent continuing threats to BC's actual and potential customers based on those claimed patent rights, threats that have damaged BC's business of supplying standards-compliant products. *See supra* at 5-8. Accordingly, BC's refusal to concede that QC's patents are essential has no bearing on whether BC has alleged causation because what matters for BC's state-law claims of injury is the perceptions of those customers—influenced by QC's threats—that QC's patents are essential to practicing the relevant standards, not whether those patents are in fact essential or infringed.

### C.    BC Has Alleged Injury Based on QC's Misconduct in the IEEE 802.20 Working Group

QC wrongly argues that BC has failed to allege a causal connection between QC's manipulation of the IEEE 802.20 Working Group and BC's inability to develop products compliant with the 802.20 standard. (Mem. 9-10.) Notably, QC does not challenge BC's allegations that BC was injured through its expenditure of time and money attending meetings of

a technical working group that, unbeknownst to BC and to participants other than QC, had been fundamentally corrupted. (SAC ¶¶ 267-68.) Those allegations, alone, establish injury.[14]

Contrary to QC's contention, (Mem. 10), BC has also specifically alleged a causal connection between QC's manipulation and injury to BC in the form of lost sales and other commercial opportunities. The SAC alleges that, but for QC's misconduct, "the IEEE would have developed the 802.20 standard, demand would have developed for 802.20 compliant products, and BC would have been able successfully to develop and bring to market products to satisfy the demand." (SAC ¶ 268.) Because of QC's "unprecedented" subversion of the work of 802.20, IEEE-SA suspended the Working Group. That suspension "delayed the adoption of an industry standard" (*Id.* ¶¶ 265-66) that, had it issued, would have created commercial opportunities for BC, which has successfully innovated in the development of integrated circuits and microprocessors for other wireless standards such as GSM/GPRS/EDGE and UMTS. (*See id.* ¶¶ 2, 101-02, 154-56.)

QC erroneously relies on this Court's and the Third Circuit's determination that BC lacked an *antitrust injury* that would allow BC to unwind QC's acquisition of Flarion under *Section 7 of the Clayton Act.* (*See* Mem. Op. 46 n.6); *see also Broadcom*, 501 F.3d at 321. That determination has no bearing on whether BC has alleged *injury-in-fact* for purposes of Article III and the elements of California-law claims. Establishing antitrust injury requires far more than demonstrating injury in fact. Although injury-in-fact requires only an allegation of harm, "antitrust injury" focuses on both the nature of the harm and its connection to the purposes of the

---

[14]   *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (diversion of resources constitutes Article III injury-in-fact); *Cal. Hous. Rights Ctr. v. Los Feliz Towers Homeowners Assoc.*, 426 F. Supp. 2d 1061, 1068-69 (C.D. Cal. 2005) (diversion of resources constitutes injury-in-fact under California UCL).

antitrust laws.[15]  In addition, the Third Circuit found that BC's Section 7 claim depended on contingencies beyond the adoption of new standards, namely that the standards would incorporate QC IPR and that QC would breach FRAND commitments if BC were to seek a license. *Broadcom*, 501 F.3d at 322.  In contrast, the injury alleged in the SAC does not depend on any uncertain or future events, but only on QC's past misconduct.  Whether or not the 802.20 standard would have contained QC patented technology, QC's misconduct, and the entirely foreseeable response to that misconduct by a standards body concerned with protecting the integrity of its standards-development process, harmed BC by delaying the issuance and adoption of the 802.20 standard.

## II.    BC's Claims Are Ripe for Adjudication

BC's state-law claims are ripe for adjudication.  Contrary to QC's argument, (Mem. 10-11), there is nothing contingent about BC's injuries.  The SAC plainly alleges that *BC has already suffered and is currently continuing to suffer injuries. See supra* at 3-7, 9-10.  Those injuries consist of lost profits and wasted expenditures resulting from QC's misconduct during the standard-setting processes, refusals to license intellectual property on FRAND terms, and continuing threats to BC and its actual and potential customers based on QC's claimed patent rights. *See supra* at 4-10.  As discussed above, (*see supra* at 4-7), BC's injuries do not depend on a determination that QC's patents are actually essential to practicing the standards at issue.

When, as here, a plaintiff alleges past and continuing injuries, its claims are ripe for determination. *See Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1153-54 (5th Cir. 1993) ("the ripeness inquiry focuses on whether an injury *that has not yet occurred* is sufficiently likely to happen to justify judicial intervention") (emphasis added); *see generally*

---

[15]    *See, e.g., Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983).

*Doe v. County of Centre*, 242 F.3d 437, 453 (3d Cir. 2001).  QC's authority is inapposite:  In the

cases QC cites, courts held claims unripe only after determining that the plaintiff had not yet

suffered any injury, either because the plaintiff sought a declaration that governmental action

was unlawful before the plaintiff was actually affected by the action,[16] or because the plaintiff

requested relief contingent on the outcome of a separate pending litigation.[17]

      QC also mistakenly contends that this Court's judgment as to BC's state-law claims

"would not be conclusive and would amount to an advisory opinion" because BC has not pled

that QC's patents are essential to the standards at issue.  (Mem. 12-13.)  In addition to monetary

damages, BC is seeking equitable relief that includes, among other things, an injunction "(a)

barring QC from asserting the patents and other [IPRs] *that it claims* are essential to practice the

UMTS, GSM, GPRS/EDGE, and H.264 standards against parties manufacturing or selling

products compliant with those standards and standards that evolve from those standards; or (b)

requiring QC to grant BC a license to those patents and other [IPRs] on FRAND terms."  (SAC

Prayer For Relief, ¶ D (emphasis supplied).)  The relief BC seeks would prevent QC from

continuing to injure BC by unlawfully claming essentiality, hold QC to its FRAND licensing

---

[16]    *See Philadelphia Fed. of Teachers v. Ridge*, 150 F.3d 319, 324 (3d Cir. 1998) (claim unripe when plaintiffs asked "the court to declare constitutionally deficient procedures that have yet to be applied"); *Armstrong World Indus., Inc. by Wolfson v. Adams*, 961 F.2d 405 (3d Cir. 1992) (request for declaratory and injunctive relief based on alleged unconstitutionality of state anti-takeover statute unripe when plaintiff had never been the subject of a takeover attempt triggering the Act); *SWT Acquisition Corp. v. TW Servs., Inc.*, 700 F. Supp. 1323, 1329 (D. Del. 1988) (prospective hostile tender offeror's request for declaratory judgment that anti-takeover statute was invalid unripe because plaintiff had not actually made tender offer); *Pac. Legal Found. v. Cal. Coastal Comm'n.*, 655 P.2d 306, 313-16 (1982) (claim seeking declaratory and injunctive relief based on coastal access guidelines not ripe when guidelines were not actually enforced against plaintiffs' property and plaintiffs asked court "to speculate as to the type of developments for which access conditions might be imposed, and then to express an opinion on the validity and proper scope of such hypothetical exactions").

[17]    *See S.C. Johnson & Son, Inc. v. Dowbrands, Inc.*, 167 F. Supp. 2d 657, 668 (D. Del. 2001) (declaratory judgment action unripe when plaintiff sought declaration of defendant's obligations if separate pending patent infringement litigation brought by third party was successful).

promises, and compensate BC for past injuries; none of that relief requires a determination whether any QC patents are essential to practicing the relevant standards. *See supra* at 4-7.

QC's argument that, absent proof of essentiality, the relief BC seeks would put BC "in no better position with respect to manufacturing standard-compliant products than it is today," (Mem. 12), misses the point. The relief would remedy QC's unlawful conduct by allowing BC to sell standards-compliant products free of QC's threats to actual and potential customers.

## III.    The Complaint Alleges All Essential Elements of Each State-Law Claim

### A.    The Complaint States a Claim for Breach of Contract

QC's assertion that BC has failed to properly plead that it is a third-party beneficiary of QC's "contractual commitments to various [SSOs]," (Mem. 13), is without merit. The entire purpose of SSO's IPR rules is to ensure that firms producing standard-compliant products—such as BC—are not subject to the very kind of hold-up and exploitation in which QC is alleged to have engaged. In that regard, numerous allegations in the SAC aver that the IPR disclosure and licensing obligations that QC committed to—and then breached—were intended to benefit all SSO participants (both current and future), as well as third parties implementing the completed standard by, among other things, ensuring that the finished standard either excluded proprietary technology, or that such technology could be licensed on FRAND terms. (*See* SAC ¶¶ 5, 23, 83.)[18] Such intent is evident from the ETSI and ITU/ISO/IEC guidelines, which require both timely disclosure of purportedly essential IPR and that the IPR owner grant a FRAND license to such IPR. (*Id.* ¶¶ 79-81, 84, 185-189). As these policies make clear, the purpose of such requirements is to protect future implementers of standards by ensuring the fair development of the standard and preventing "monopolistic abuse [of purportedly essential]" IPR by participants.

---

[18]    Indeed, QC appears to concede as much with respect to FRAND licensing obligations. (*See* Mem. 13 n.5).

(*Id.* ¶¶ 20, 134). The SSOs require members to commit to such requirements specifically to prevent IPR owners from doing what QC did here: exploiting SSO members and third parties by participating in the standards-setting process, concealing purportedly essential IPR, discriminating against firms that compete with the licensor or those firms' customers, and later seeking to extract monopoly rents for the technology.[19]

Determining whether BC is an intended beneficiary of QC's contracts with the relevant SSOs is a classic factual issue, "involv[ing] construction of the intention of the parties, gathered from a reading of the contract as a whole in light of the circumstances under which it was entered." *Milmoe v. Gevity HR, Inc.*, No. C 06-04721 SBA, 2006 WL 2691393, at *4 (N.D. Cal. Sept. 20, 2006). The Court must interpret the contract so "as to give effect to the mutual intention of the parties as it existed at the time of contract[.]" *Markowitz v. Fid. Nat. Title Co.*, 142 Cal. App. 4th 508, 527 (2006) (citing Cal. Civ. Code, § 1636); *Smith v. Microskills San Diego LP,* 153 Cal. App. 4th 892, 897-98 (2007) (citing *Lucas v. Hamm*, 364 P.2d 685, 689-90 (Cal. 1961) (noting "it is sufficient that the promisor must have understood that the promisee had such intent")).[20] Indeed, although Cal. Civ. Code § 1559 requires that the contract at issue be "made expressly for the benefit of a third person," the contract need not, as QC suggests, "be exclusively for the benefit of the third party," *Smith*, 153 Cal. App. 4th at 897-98 (internal

---

[19] QC asserts that BC has failed to allege that it is a third-party beneficiary of the contract between QC and ARIB and ATIS. (Mem. 14-15.) QC fails to mention, however, that both ARIB and ATIS operate under IPR disclosure polices similar to those of ETSI, the ISO/ITU/IEC, the JVT, and the IEEE. *See* Exs. E and F to Stone Decl., Guidelines for Treatment of Industrial Property Rights in Connection with the ARIB Standard, Sep. 5, 1995, at 1; and ATIS Operating Procedures for ATIS Forums and Committees, Jan. 3, 2006, at 8. As an ARIB and ATIS member, QC is no doubt aware of such policies, its associated obligations, and the benefits to its fellow members, including BC.

[20] "Although 'the intention of the parties is to be ascertained from the writing alone, if possible' (*id.,* § 1639), [a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.'" *Markowitz*, 142 Cal. App. 4th at 527.

quotation marks omitted), nor need the third-party beneficiary "be specifically named as a beneficiary." *Shell v. Schmidt*, 272 P.2d 82, 89 (1954).[21]

QC's assertion that BC has failed to allege that the IEEE's financial relationship disclosure obligations were intended to benefit BC, (Mem. 14), is similarly flawed. As QC is aware, the IEEE Project 802 Policies and Procedures prohibit "dominance" by any single organization. (SAC ¶ 252.) In order to prevent single-entity dominance, the IEEE Project 802 Policies and Procedures and ANSI Rules require participants to provide "[t]imely and adequate notice" of "all known directly and materially affected interest," including "affiliation." (*Id.* ¶ 253.) These obligations are designed to prevent any single company, such as QC, from improperly influencing any IEEE working group to the detriment of others. They both bind and benefit each participant in IEEE standards development, including QC and BC. (*Id.* ¶¶ 254-55.)

**B.      The Complaint States a Claim for Promissory Estoppel**

QC wrongly contends that BC has failed to allege the reliance element of promissory estoppel because the SAC alleges only that BC "took 'action to orient various aspects of its chipset business in reliance on QC's promises.'" (Mem. 15 (quoting SAC ¶ 305)). But QC misleadingly omits the final three words of that allegation —"as described above"— and disregards the SAC's detailed allegations of detrimental reliance on QC's fraudulent promises and non-disclosures to which Paragraph 305 of the SAC refers.

BC alleges that it detrimentally relied on QC's promises to license on FRAND terms and failures to disclose IPR in making many critical investments and other business decisions, including:

---

[21]      *See also Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 957-58 (2005); *Cal. Emergency Physicians Med. Group v. Pacificare of Cal.*, 111 Cal. App. 4th 1127, 1137 (2003).

- Making substantial investments to develop and market UMTS products, including the acquisition of Zyray Wireless, Inc. (SAC ¶ 100.)

- Introducing UMTS-compliant chips for the U.S. market. (SAC ¶ 101.)

- Making substantial investments to develop and market GSM, GPRS, and EDGE products, including the acquisition of Mobilink Telecom, Inc. (SAC ¶¶ 151, 154.)

- Introducing the first EDGE-compliant chip into the U.S. market. (SAC ¶¶ 151, 155.)

- Developing, marketing, and selling microchips, chipsets, and software that can perform video encoding and/or decoding in conformance with the H.264 standard. (SAC ¶¶ 232, 233.)

- Making substantial investments to develop and market H.264 products, including the acquisition of Sand Video, Inc. and Alphamosaic, Ltd. (SAC ¶¶ 232, 234.)

- Introducing H.264-compliant chips into the U.S. market. (SAC ¶¶ 232, 235.)

- Investing resources and employees' time in attending SSO meetings related to the 802.20 standard. (SAC ¶ 267.)

In addition, BC alleges that it and other SSO members detrimentally relied on QC's disclosure and FRAND licensing promises by forgoing opportunities to design around QC's intellectual property or demand specific conditions before incorporating QC's technology into the relevant standards, and thus lost "the opportunity to mitigate, if not avoid, QC's IPR." (SAC ¶ 228. *See id.* ¶¶ 90, 96, 146, 147, 151, 152, 164, 197, 232, 243.) As the SAC alleges, SSO members relied on QC's promises in agreeing to standards that allowed QC to claim its patents are essential. (SAC ¶¶ 76, 80-81, 84-85, 88-90, 94, 145-51, 165, 185-90, 197, 204-205.)

These specific allegations of detrimental reliance are plainly sufficient to plead the reliance element of promissory estoppel. *See, e.g., Kajima/Ray Wilson v. Los Angeles County Metro. Transp. Auth.*, 1 P.3d 63 (Cal. 2000) (collecting cases in which an "action ... of a definite and substantial character on the part of the promisee" had been induced, including contractors submitting bids in reliance on commitments by subcontractors). QC's reliance on *Smith v. City and County of San Francisco*, 225 Cal. App. 3d 38 (1990), is misplaced. Unlike here, the *Smith*

- 16 -

plaintiff did not allege that it took or refrained from any action whatsoever, and instead alleged a

mere conclusion that it had relied to its detriment on the defendants' promises. *Id.* at 48.

### C.     The Complaint States a Claim for Tortious Interference With Prospective Economic Advantage

QC's sole argument concerning tortious interference is that the Complaint does not

identify by name the customers and relationships with which QC interfered. (Mem. 16.)  QC,

however, disregards the SAC's specific allegations that BC had ongoing economic relationships

with manufacturers of devices that require chipsets.  (SAC ¶¶ 103, 160, 299, 300.)  Moreover, all

those customers are among a narrow class of manufacturers of equipment that use specific

chipsets, who are well-known to QC.  Thus, QC is well on notice of the conduct BC complains

about and the injury BC suffered.  Moreover, BC has identified particular customers to QC in its

interrogatory responses.[22]  QC's confidentiality agreements with its customers, (*see* SAC ¶ 109),

have deprived BC of additional similar information, which BC expects will emerge in discovery.

Again, the cases upon which QC relies are not on point.  In none of them did the plaintiff

allege an existing relationship.  The flaw in each case was that the plaintiff alleged only an

unbounded class with which the plaintiff might have transacted at some future time, and the

defendant lacked notice of the relationships with which it was alleged to have interfered.[23]  By

---

[22]     *See* Ex. G to Stone Decl., BC's Objections and Responses to QC's First Set of Interrogatories, Feb. 16, 2006, at 28 (response to Int. No. 12).  [This Ex. G contains highly Confidential Information and is therefore being filed with the Court in paper version only.]

[23]     *Bradley v. Google*, No. C 06-05289 WHA, 2006 WL 3798134, at *4 (N.D. Cal. Dec. 22, 2006) (plaintiff website operator to which Google stopped providing ad-placement service failed to allege any existing relationship that was interfered with or even the nature of the relationships that might have arisen); *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2004 WL 725969, at *5 (S.D.N.Y. Apr. 2, 2004) (terminated employee alleged interference with relationships with "potential future employers," but failed to allege any relationship with any such potential employer); *AccuImage Diagnostics Corp. v. TeraRecon, Inc.*, 260 F. Supp. 2d 941, 957 (N.D. Cal. 2003) (plaintiff alleging trade secret theft failed to allege a relationship with any customer to which it might have sold product, and thus "defendants are not on notice of which relationships they allegedly disrupted"); *Brown v. Allstate Ins. Co.*, 17 F. Supp. 2d 1134,

contrast, in cases where, as here, the plaintiff alleges that a relationship exists, the elements of the cause of action have been satisfied. *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1164-66, (2003) (plaintiff stated tortious interference claim where defendant allegedly interfered with existing relationship); *Buckaloo v. Johnson*, 537 P.2d 865, 871-72 (Cal. 1975) (same).

### D.    The Complaint States a Claim for Fraud

QC's argument that BC has failed to plead fraud with particularity, (Mem. 17-19), disregards not only the specific allegations in the SAC, but also the Third Circuit's decision holding that the allegations of BC's First Amended Complaint were sufficient to satisfy Rule 9(b)'s heightened pleading standard. *Broadcom*, 501 F.3d at 315 n.9. The 71-page SAC only adds further detail to and bolsters the allegations the Third Circuit found sufficient.

Contrary to QC's contention, (Mem. 18), BC has specifically alleged the following: the rules of the SSOs that QC violated and the precise duties of disclosure and FRAND licensing commitments those rules imposed on participants;[24] how QC intentionally breached those duties of disclosure and made false FRAND commitments with respect to particular SSOs;[25] the type of information that QC failed to disclose and false representations it made;[26] and the periods during which such non-disclosures and false representations took place.[27] Further, with respect to the

---

1140 (S.D. Cal. 1998) (plumbing company terminated by insurer failed to allege any relationships or existing customers interfered with); *Westside Ctr. Assoc. v. Safeway Stores, Inc.*, 42 Cal. App. 4th 507, 520-521 (1996) (plaintiff complaining that defendant's actions degraded the value of its property failed to allege any relationship with a potential purchaser of property).

[24]    *See* SAC ¶¶ 75-86 (UMTS), 75-86, 142 (GSM/GPRS/EDGE), 183-90, 204 (H.264), 251-53 (802.20).

[25]    *See* SAC ¶¶ 93-96 (UMTS), 143-45 (GSM/GPRS/EDGE), 195-99 (H.264), 262 (802.20).

[26]    *See* SAC ¶¶ 93-95 (UMTS), 143-45 (GSM/GPRS/EDGE), 191-93 (H.264), 262 (802.20).

[27]    *See* SAC ¶¶ 71, 92-95 (UMTS), 139-41, 143-45 (GSM/GPRS/EDGE), 173, 178, 181, 191-93, 244 (H.264), 249-50, 265 (802.20). QC complains that BC has not set forth allegations

802.20 standard, BC has alleged a specific improper affiliation between QC and a member of the IEEE 802.20 Working Group—QC improperly paid the chairman of the Working Group, and improperly failed to disclose that relationship. (SAC ¶ 262.)

Moreover, Rule 9(b)'s requirements are relaxed here given that QC's arguments about particularity go to "'factual information [that] is peculiarly within [QC's] knowledge or control.'" *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 882-83 (3d Cir. 2000) (quoting *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989)). The gravamen of BC's fraud claim is that QC concealed certain facts from the standard-setting bodies in which it participated: it concealed its IPR, it promised to license its technology on FRAND terms while concealing that it had no intention of doing so, and it concealed the affiliations of its employees and agents participating in the standard-setting process. (SAC ¶¶ 308-17.) When it concealed this information, QC knew well which of its employees and agents had participated in standard-setting activities, the identities of the SSOs and SSO participants from which it had concealed information, and what information it had concealed. Given QC's far-ranging pattern of concealment, it is particularity ill-situated to complain on particularity grounds. One court has already found that QC engaged in the very conduct BC alleges: "QC, its employees, and its witnesses actively organized and/or participated in a plan to profit heavily by (1) wrongfully concealing the patents-in-suit while participating in the JVT and then (2) actively hiding this concealment from the Court, the jury, and opposing counsel."[28]

---

about the precise date, place, and time of each and every QC concealment and misrepresentation, "but nothing in the [Rule 9(b)] requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). BC has done just that.

[28]    Ex. A to Stone Decl., Remedy Order at 22.

QC faults BC for failing to identify the particular patents QC improperly concealed from the SSOs. (Mem. 18.)  But the SAC identifies the patents as QC identified them to the SSOs:  by the number of patents and the date on which QC claimed that they were essential.  (*See* SAC ¶¶ 143-45 (104 patents disclosed June 4, 2004), 93-95 (161 patents disclosed October 19, 2001)). The SAC specifically identifies patent numbers and describes the patents when doing so is instructive—*e.g.*, for the '104 and '767 patents QC alleges are essential to the H.264 standard. (SAC ¶¶ 191-95.)

Finally, QC once again argues that BC has failed adequately to allege reliance.  (Mem. 18.)  As we have shown, the SAC is replete with allegations of specific actions BC took in reliance on QC's false promises and fraudulent non-disclosures, including major business decisions and its behavior during the standard-setting processes.  *See supra* at 15-17.  Although QC contends that BC has not alleged how the standards would have been different absent QC's deception, BC has made detailed allegations in that regard.  *See supra* at 7-9.  Indeed, as the Third Circuit has already held, BC has adequately alleged an "intentional false promise," "on which promise the relevant SDOs relied in choosing the WCDMA technology for inclusion in the UMTS standard." *Broadcom*, 501 F.3d at 315.  The Third Circuit has also recognized that "QC's deceptive conduct induced relevant SDOs" to adopt standards that read on its technology. *Id.*  The SAC alleges similar conduct as to the other standards.  *See supra* at 2 & n.8, 5-6.

### E.    The Complaint States a Claim Under the UCL

#### 1.    BC has standing under the UCL

BC has standing to sue under the California UCL.  As QC recognizes, (Mem. 19), a private party has standing to sue under the UCL if it has "suffered injury in fact and lost money and property as a result of such unfair competition."  Cal. Bus. & Prof. Code § 17204.  QC argues that BC fails the "lost money or property" requirement for UCL standing because BC has

not "allege[d] that it lost money or property as to which it had a vested interest, and that such money or property was lost to QC." (Mem. 20.) QC ignores the language of § 17204 and confuses the requirements for standing under § 17204 with the requirements for a restitution remedy under § 17203.

Section 17204, as amended by Proposition 64, requires that a UCL plaintiff have (1) "suffered injury in fact" and (2) "lost money or property as a result of the unfair competition." Cal. Bus. Code § 17204. Nothing in the language of § 17204 or its Findings and Declaration of Purpose remotely suggests that the voters intended to require plaintiffs to prove that they had "lost money or property" *to the UCL defendant* to establish standing under the UCL. Had Proposition 64's drafters intended to require all UCL plaintiffs to satisfy the requirements for restitution under § 17203, they "plainly knew how to do so and would have done so expressly and directly." *Rotolo v. San Jose Sports and Entm't LLC*, 151 Cal. App. 4th 307, 324 (2007).

Indeed, courts have specifically recognized that there is "no basis to presume that the People of California, when adopting Proposition 64, meant for the new Section 17204 standing requirements to track the requirements established for obtaining restitution under Section 17203." *G & C Auto Body Inc. v. GEICO Gen'l Ins. Co.*, No. C06-04898, 2007 WL 4350907, at *4 (N.D. Cal. Dec. 12, 2007); *see also White v. Trans Union LLC*, 462 F. Supp. 2d 1079, 1084 (C.D. Cal. 2006) (UCL standing "does not require that the losses in question were the product of the defendant's wrongful acquisition of the plaintiff's property"). Courts also recognize that the remedial structure of the UCL, which permits plaintiffs to seek injunctive relief, restitution, or both, *ABC Int'l Traders v. Matsushita Elec. Corp. of Am.*, 931 P.2d 290, 302 (Cal. 1997), would be frustrated if plaintiffs seeking only an injunction were nevertheless required to prove their

entitlement to restitution in order to have standing, *see White*, 462 F. Supp. 2d at 1083-84 (declining to require that plaintiffs seeking injunctive relief also seek restitution).

QC's reliance on *Korea Supply*, (Mem. 20), is misleading. That case addressed the scope of the restitution remedy available under **§ 17203**. Because the decision pre-dates Proposition 64, it could not have addressed the question of whether Proposition 64 amended **§ 17204** to require a plaintiff to establish a right to restitution in order to have standing. In fact, Sections 17203 and 17204 have very different wordings and purposes. Section 17203 defines the scope of the UCL's restitution remedy by permitting courts to issue orders that "may be necessary to restore to any person in interest any money or property, real or personal, *which may have been acquired* by means of unfair competition." Cal. Bus. & Prof. Code § 17203. Accordingly, § 17203 limits the UCL *restitution remedy* to cases in which the defendant has "acquired" money or property and therefore should "restore" the money or property to the plaintiff. It does not suggest that § 17204's use of the term "lost money or property" (which does not even appear in § 17203) means that a plaintiff must have lost money or property *to the defendant* to have *standing* to sue under the UCL. When the drafters of legislation "carefully employed a term in one place [but] excluded it in another, it should not be implied where excluded." *Hicks v. E.T. Legg & Assocs.*, 89 Cal. App. 4th 496, 507 (2001).

Indeed, California appellate courts and federal district courts have repeatedly upheld standing when the plaintiff did not allege that its "lost money or property" accrued *to the defendant* and when the plaintiff did not otherwise state a claim for restitution under § 17203. Instead, courts require only that a plaintiff allege an "actual economic injury as a result of an unfair and illegal business practice." *Aron v. U-Haul Co. of Cal.*, 143 Cal. App. 4th 796, 803

(2007).[29] QC's interpretation, moreover, would read out of the UCL all antitrust violations in which one competitor accuses another of exclusion from the market.

The one case QC identifies that supposedly supports its reading of § 17204, *Buckland v. Threshold Enters., Ltd.,* 155 Cal. App. 4th 798, 814 (2007), turned on "special facts," *id.* at 818 n.11, not present here, specifically a plaintiff "who voluntarily buys a defendant's product to pursue a UCL action in the public interest against the defendant." *Id.* BC, by contrast, did not participate in standards development, develop standards-compliant products, or try to market and sell those products to manufacture legal claims against QC.

Even if the Court were persuaded that UCL plaintiffs are required to satisfy the requirements of § 17203 in order to have standing, QC's motion to dismiss BC's UCL claim must still be denied. BC has stated a claim for restitution. The SAC contains numerous allegations that BC was deprived of sales opportunities in which it had an interest when QC diverted those sales opportunities away from BC. (*See, e.g.,* SAC, ¶¶ 162, 239.) BC should be permitted to show through discovery that QC's misconduct deprived it of specific money and property in which it has an interest.[30]

---

[29]    For example, in *Huntingdon Life Scis., Inc. v. Stop Huntingdon Animal Cruelty,* 129 Cal. App. 4th 1228 (2005), the plaintiff sought injunctive relief to prevent continued damage to her home and vehicle. The court upheld standing based on the damage to her personal property, though there was no allegation that the property had been taken from her by the defendant. *Id.* at 1262. Similarly, in *Overstock.com, Inc. v. Gradient Analytics, Inc.,* 151 Cal. App. 4th 688 (2007), the plaintiff alleged that the defendant issued false and misleading statements about its financial health in order to profit when plaintiff's stock fell. The court held that "diminution of [plaintiff's] assets and decline in its market capitalization" were sufficient for standing under § 17204. *Id.* at 716. In *Witriol v. LexisNexis Group,* No. C05-02392, 2006 WL 4725713, at *6 (N.D. Cal. Feb. 10, 2006), the amounts plaintiffs expended to repair their credit histories after the defendant's release of their personal information were sufficient to satisfy the "lost money or property" requirement. In *MGA Entm't, Inc. v. Mattel, Inc.,* CV 05-2727, 2005 WL 5894689, at *10 (C.D. Cal. Aug. 26, 2005), a competitor's conduct that had affected the defendant's "ability to attract, hire, and retain employees" was found sufficient to confer UCL standing.

[30]    *Cf. MGA Entm't, Inc. v. Mattel, Inc.,* CV 05-2727, 2005 WL 5894689, at *9 (C.D. Cal. Aug. 26, 2005) (declining to dismiss UCL claim for restitution where "it is too early in these

### 2.    BC States a claim under each prong of the UCL

QC does not dispute that BC has stated a claim under the UCL's "unfairness" prong.  Nor

could it.  Given the Third Circuit's holding that BC has adequately pleaded federal antitrust

claims, BC has also stated a claim under the UCL's unfairness prong.  *See Cel-Tech Commc'ns,*

*Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal. 4th 163, 187 (1999).  Therefore BC's UCL claim

must not be dismissed.  In any event, QC's challenges to BC's claims under the UCL's

"unlawful" and "fraudulent" prongs, (Mem. 21-22), are meritless.

BC has stated a claim under the UCL's "unlawful" prong because, regardless of whether

unlawful-prong violations can be predicated on common-law violations,[31] BC has also alleged

that QC has violated the Sherman Act.  Violations of federal statutes can serve as "unlawful"

prong predicates.  *People v. Union Pac. R.R. Co.,* 141 Cal. App. 4th 1228, 1242 (2006).

BC has also stated a claim under the UCL's "fraudulent" prong.  For the purposes of

QC's false and deceptive statements regarding its FRAND licensing commitments, its failure to

disclose IPR, and its subversion of the IEEE 802.20 Working Group, the "public" consists of the

participants in those standards-development efforts and the third parties that develop standards-

compliant products.[32]  As the Third Circuit observed, in referring approvingly to the FTC's

---

proceedings to determine whether MGA might be entitled to restitution and disgorgement based
upon its UCL-related allegations").

[31]    The review of California authority in the *Hartless* decision QC cites, (Mem. 21), either
fails to cite, or cites but ignores, California and federal authority interpreting the UCL to permit
common-law violations to be the predicate for "unlawful" prong UCL violations.  *See CRST Van
Expedited, Inc. v. Werner Enters.,* 479 F.3d 1099, 1107 (9th Cir. 2007) ("We conclude that
CRST adequately alleged a violation by Werner of the UCL by alleging Werner engaged in an
'unlawful' business practice, to wit, intentional interference with existing contracts of
employment."); *Paulus v. Bob Lynch Ford, Inc.,* 139 Cal. App. 4th 659, 681 (2006).

[32]    The large numbers of companies that participated in the development of the standards
discussed in BC's complaint distinguishes this case from *Linear Tech. Corp. v. Applied
Materials, Inc.,* 152 Cal. App. 4th 115 (2007), where the allegedly deceptive statements "did
result from contracts specifically [between] the plaintiff" and three of its suppliers.  *Id.* at 135.
By contrast, QC's deceptive FRAND declarations and failures to disclose putatively essential

*Rambus* decision, standards-development is a "consensus-oriented environment, where participants rely on structural protections, such as rules requiring the disclosure of [IPRs] to facilitate competition and constrain the exercise of monopoly power." *Broadcom*, 501 F.3d at 312. Directly contradicting QC's argument that the participants in standards development are "sophisticated companies," (Mem. 22), that can fend for themselves, the Third Circuit noted that participants in standards development "are less likely to be wary of deception." *Broadcom*, 501 F.3d at 312. As alleged in the SAC, not only was QC's conduct in standards-development organizations likely to deceive other participants, but it did deceive them.

## IV.     BC's Claims Concerning the H.264 Video Standard Are Not Barred by Either Rule 13 or Res Judicata

In QC's lengthy discussion of its previous infringement suit against BC relating to video compression (the "1958 Action"), (Mem. 22-24), QC fails to mention the critical fact that QC concealed the very evidence that BC needed to pursue the H.264 claims it makes here. Indeed, QC's deception was so extensive that the district court ordered QC to pay all of BC's legal fees and costs incurred in the litigation of the case and referred multiple QC attorneys for possible professional discipline.[33] In light of these facts, QC's assertion that BC is barred from pursuing its claims related to the H.264 standard here is groundless.

---

patents were made to dozens of companies participating in the development of widely-deployed industry standards.

*Rosenbluth Int'l v. Superior Court,* 101 Cal. App. 4th 1073 (2002), did not construe § 17200's "fraudulent" prong at all, but rather concerned the representative action provision of (pre-Proposition 64) § 17204. *Rosenbluth* rejected an individual's effort to bring a representative action on behalf of the sophisticated corporations that were the defendant's customers because such an action could deprive the corporations of the opportunity to bring their own actions and raise "serious fundamental due process considerations." *Id.* at 1078-79. Nothing in *Rosenbluth* suggests that the California legislature meant to deny corporations from seeking a remedy under the UCL's "fraudulent" prong in their own capacity (as BC is doing here).

[33]     *See* Ex. H to Stone Decl., Order Granting In Part and Den. In Part Def.'s Mot. for Sanctions and Sanctioning QC and Individual Lawyers ("Sanctions Order"), at 24-31, 35-38 (Jan. 7, 2008).

During discovery in the 1958 Action, QC steadfastly maintained that it was not involved in the development of the H.264 standard and therefore had not waived its right to enforce its claimed-essential H.264 patents.[34]  Indeed, QC sought summary judgment on BC's waiver defense on that basis.[35]  It was only on the last day of trial, when a QC engineer conceded on cross-examination that certain emails that evidenced QC's involvement in the H.264 standard-setting process had been withheld from QC's production, that the extent of QC's involvement began to emerge.  Only after the trial did QC finally produce the *more than two hundred thousand pages* of evidence on which BC now bases its claims.[36]

QC's concerted, and nearly successful, efforts to conceal the documents that support the H.264-related claims BC asserts here made it impossible for BC to assert those claims in the earlier action.  To quote the district court, QC's "blatant[ly]" false testimony, discovery "responses that were calculatedly misleading and totally false," and "organized program of litigation misconduct and concealment throughout discovery, trial, and post-trial [proceedings]" unlawfully deprived BC of the evidence that now supports its H.264-related claims—evidence that was suppressed by QC until months after the end of trial in the video compression case.[37]

---

[34]    *See* Ex. A to Stone Decl., Remedy Order at 24-38.

[35]    *See* Ex. A to Stone Decl., Remedy Order at 39-43.

[36]    *See* Ex. A to Stone Decl., Remedy Order at 38:20-27.  On cross-examination, the QC engineer revealed that QC's counsel had searched her computer in preparation for her testimony and had found twenty-one emails sent to her from a JVT-sponsored email list.  *See id.* at 45:7-47:15.  These emails provided significant evidence of QC's early participation in the JVT—a fact that until this revelation, BC had suspected but had been unable to prove.  These emails turned out to be "the tip of the iceberg" that ultimately led to QC's belated production of "over two hundred thousand more pages of emails and electronic documents . . . containing direct evidence that multiple representatives of QC participated in the JVT from the beginning, and that multiple QC witnesses knew of this participation even as they testified to the contrary at deposition and trial." *Id.* at 47:7; 49:9-15.

[37]    *See* Ex. A to Stone Decl., Remedy Order at 25:22; 32:21-22; 38:17-19.

### A.    Rule 13

QC cites no case, nor is BC aware of any, in which the compulsory counterclaim rule has

been held to preclude a claim where the movant has been sanctioned for concealing the tens of

thousands of documents its opponent needed in order to raise the allegedly compulsory

counterclaim.  Rather, QC's concealment places this case into the well-established exception to

Rule 13 that a party cannot be required to assert counterclaims that had not matured when it filed

its Answer in the underlying action.[38]

In response, QC makes two specious arguments.  QC argues that the court's March 2007

finding (made after QC's misconduct was initially revealed) that BC had proved its affirmative

defense of waiver shows that BC had sufficient evidence in December 2006 (when QC was still

hiding documents) to amend its Answer to add the JVT-related counterclaims.  (Mem. 23-26.)

QC ignores the critical fact that, in order for BC to have amended its Answer to add the JVT-

related claims, it needed access to the evidence QC had kept hidden.  BC's waiver defense was

predicated on the one piece of evidence BC had been able to discover despite QC's strategy to

suppress all documents evincing its early participation in the JVT.[39]  Although this one document

tended to support BC's affirmative defense that QC had an obligation to disclose its IPR to the

JVT before it eventually did so, it only suggested that QC engineer Viji Raveendran was likely

---

[38]    *See, e.g.*, *Stahl v. Ohio River Co.*, 424 F.2d 52, 54 (3d Cir. 1970) ("The counterclaim
procedure . . . refers only to claims which have 'matured' at the time they are pleaded as
counterclaims."); *see also Union Corp. v. Brown*, No. 87-5525, 1988 U.S. Dist. LEXIS 2542, at
*5 (E.D. Pa. Mar. 29, 1988).

[39]    BC had obtained a document entitled "Ad Hoc Report on AVC [Advanced Video
Coding] Verification Test," which included as an Annex A thereto, a list of "Ad Hoc Members"
identified by their email addresses.  Ms. Raveendran's email was included and identified her as a
participant in the group's list of email recipients.  "This document became critical to BC as *it
was the only evidence in BC's possession indicating the truth*—that QC had been actively
involved in the JVT and the development of the H.264 standard in 2002."  *See* Ex. H to Stone
Decl., Sanctions Order at 6:11-21 n. 2 (emphasis added).

participating in the JVT as of December 2002.[40]  Without additional evidence of QC's early

participation in the JVT, evidence that was produced months after trial in the 1958 Action, BC

could not have asserted the H.264 claims it now brings.

Even more tenuous is QC's second argument, that BC's interrogatory response alleging

that QC had an obligation to disclose its IPR to the JVT prior to October 2005 is somehow proof

that BC was, at the time it amended its Answer, compelled to assert the H.264-related claims as

compulsory counterclaims.  BC's interrogatory response was premised on the same solitary piece

of evidence described above—that Ms. Raveendran's email address was included in a list of

recipients of JVT-related email.  *See supra* at n.39.  Indeed, BC's lack of evidence prior to the

unraveling of QC's concealment efforts was continually touted by QC during the critical few

months before and during trial, including in QC's Motion for Summary Adjudication as to BC's

Affirmative Defenses, its Contentions of Law and Fact, and its Motion for Judgment As A

Matter of Law.[41]  Typical of these numerous false contentions was QC's assertion in its Motion

for Summary Adjudication that "[t]here is no evidence that any QUALCOMM employee was a

JVT participant prior to September, 2003, and therefore there is no reasonable basis for

---

[40]     BC presented this document to all of QC's Rule 30(b)(6) witnesses offered to testify
about QC's knowledge of and involvement in the JVT; each unequivocally denied early
involvement in the JVT.  *See* Ex. A to Stone Decl., Remedy Order, at 32:1-2.  Furthermore, BC
made numerous document requests and requests for information seeking additional evidence to
bolster its affirmative defense, but was continually stonewalled by QC's false certifications that
it had produced all documents responsive to such requests.  *See* Ex. H to Stone Decl., Sanctions
Order, at 16:12-17:1 ("Despite these responses [committing to "produce non-privilege relevant
and responsive documents describing QC's participation in the JVT"], QC did not produce over
46,000 responsive documents, many of which directly contradict the non-participation argument
that QC repeatedly made to the court and jury.").

[41]     *See* Ex. A to Stone Decl., Remedy Opinion at 39-52.

Broadcom to assert that QUALCOMM had a duty to disclose the patents-in-suit prior to this point in time."[42]

The compulsory counterclaim rule is also inapplicable because BC's H.264-related allegations do not bear the requisite "logical relationship" to the patent infringement claims QC asserted in the 1958 Action. *See, e.g., Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978). Those allegations are part of a pattern of varied misconduct involving a broad range of standards, do not depend on whether BC's accused products actually infringe the two QC patents at issue in the 1958 Action, and require application of law unrelated to the patent law governing the 1958 Action.[43]

### B.     Res Judicata

QC's res judicata argument is equally unfounded and fails for two reasons. First, as QC concedes, (Mem. 27), res judicata does not apply to affirmative defenses, such as waiver. QC tries to escape this well-established rule by arguing that BC won "affirmative relief" in 1958 Action. (*Id.* at 27-28.) But in the analogous contexts of inequitable conduct, equitable estoppel, and patent misuse, the successful presentation of an affirmative defense will often render a patent unenforceable, without recasting the procedural posture of the case or the position of the litigants. A successful inequitable conduct defense results in a declaration of unenforceability: "Inequitable conduct . . . provides the specific relief of making the patent unenforceable." *Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470, 1478 (Fed. Cir. 1998). Similar preclusive remedies are available when a defendant successfully asserts an affirmative defense of equitable

---

[42]     *See* Ex. A to Stone Decl., Remedy Opinion at 41:1-5. Judge Brewster catalogued QC's numerous false statements concerning lack of evidence on this score. *See id.* at 40-41, 43.

[43]     *See also Hydranautics Corp. v. Filmtec Corp.*, 70 F.3d 533, 536-37 (9th Cir. 1995); *Longwood Mfg. Corp. v. Wheelabrator Clean Water Systems, Inc.*, 954 F. Supp. 17, 18 (D. Me. 1997).

estoppel because the plaintiff is barred from recovering for past and future infringement. *See, e.g., In re Yarn Processing Patent Validity Litig. (No. II)*, 602 F. Supp. 159, 170-71 (D.C.N.C. 1984) ("estoppel generally bars not only relief for past acts but prospective relief for future acts as well"); *see also Honeywell Int'l., Inc. v. Universal Avionics Sys. Corp.*, 398 F. Supp. 2d 305, 314-15 (D. Del. 2005). Despite QC's dissatisfaction with the remedy, BC did no more than assert an affirmative defense. (Mem. 27.)

QC's argument also fails because res judicata will not preclude subsequent litigation where the party seeking to raise the bar engaged in misconduct in the initial action, as QC blatantly did here.[44]

## CONCLUSION

For the foregoing reasons, QC's Motion to Dismiss Claims Four through Eight of Plaintiff's Second Amended Complaint should be denied.

Respectfully submitted,

By: /s/ David S. Stone
David S. Stone, Esq.
BOIES, SCHILLER & FLEXNER LLP

William F. Lee
Mark D. Selwyn
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 2006

George S. Carey
Mark W. Nelson
Steven J. Kaiser
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Ave., N.W.
Washington, D.C. 2006

---

[44] *See, e.g., McCarty v. First of Ga. Insur. Co.*, 713 F.2d 609, 612-13 (10th Cir. 1983) ("*Res judicata* . . . does not shield a blameworthy defendant from the consequences of [its] own misconduct); *Browning v. Levey*, 283 F.3d 761 (6th Cir. 2002) (res judicata not applicable where plaintiff can show "(1) wrongful concealment of material facts that (2) prevented plaintiffs from asserting their claims in the first action," though ultimately holding such concealment did not occur).

WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts  02109
(617) 526-6000
Fax:  (617) 526-5000
William F. Lee (admitted *pro hac vice*)

WILMER CUTLER PICKERING HALE AND DORR LLP
1117 California Avenue
Palo Alto, CA  94304
(650) 858-6000
Fax:  (650) 858-6100
Mark D. Selwyn (admitted *pro hac vice*)

CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 974-1500
Fax:  (202) 974-1999
Mark W. Nelson (admitted *pro hac vice*)
Steven J. Kaiser

BOIES, SCHILLER & FLEXNER LLP
570 Lexington Avenue
New York, NY  10022
(212) 446-2300
Fax:  (212) 446-2350
David Barrett (admitted *pro hac vice*)

BOIES, SCHILLER & FLEXNER LLP
150 John F. Kennedy Parkway
Short Hills, NJ  07078
(973) 218-1111
Fax:  (973) 218-1106
David S. Stone

**Counsel for Plaintiff BROADCOM CORPORATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>        Plaintiff,<br><br>vs.<br><br>QUALCOMM INCORPORATED,<br><br>        Defendant. | Civil Action No. 05-3350 (MLC/JJH)<br><br>Return Date: February 19, 2008<br>*(Document Filed Electronically)* |

**DECLARATION OF DAVID S. STONE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CLAIMS FOUR THROUGH EIGHT OF SECOND AMENDED COMPLAINT**

I, David S. Stone, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.     I am a member of the law firm Boies, Schiller & Flexner LLP, attorneys for Plaintiff Broadcom Corporation ("Broadcom") and I am admitted to practice before all courts in the State of New Jersey.  I am familiar with the matters stated herein and submit this declaration in support of Broadcom's Opposition to Qualcomm Incorporated's ("Qualcomm") Motion to Dismiss Claims Four Through Eight of Broadcom's Second Amended Complaint, dated January 25, 2008.

2.     Attached hereto as exhibits to Broadcom's Opposition to Qualcomm's Motion to Dismiss Claim's Four through Eight are true and correct copies of the following documents:

Exhibit A.  United States District Court Judge Rudi M. Brewster's Decision, Order on Remedy for a Finding of Waiver, filed on August 6, 2007, in *Qualcomm v. Broadcom*, No. 05 CV 1958 B (S.D. Cal.).

Exhibit B.  Brief of Defendant-Appellee, filed on January 30, 2007, in *Broadcom v. Qualcomm*, No. 06-4292 (3d Cir.).

Exhibit C.  Excerpted page 16 from Qualcomm's Annual Report on Form 10-K for the Fiscal Year Ended September 24, 2004.

Exhibit D.  Qualcomm Press Release, dated July 11, 2005, entitled "Qualcomm Sues Broadcom for Patent Litigation."

Exhibit E.  Guidelines for Treatment of Industrial Property Rights in Connection with the ARIB Standard, September 5, 1995.

Exhibit F.  ATIS Operating Procedures for ATIS Forums and Committees, January 3, 2006.

Exhibit G.  Broadcom's Objections and Responses to Qualcomm's First Set of

Interrogatories, dated February 16, 2006, in *Broadcom v. Qualcomm*, No. 05-3350 (MLC)

(D.N.J.).  **[This Exhibit G contains <u>Highly Confidential Information</u>, and therefore will not**

**be filed electronically; it will be filed with the Court, and served upon Qualcomm's Outside**

**Counsel, in paper form.]**

Exhibit H.  Magistrate Judge Barbara L. Major's Decision, Order Granting In Part and

Denying In Part Defendant's Motion For Sanctions and Sanctioning Qualcomm Incorporated and

Individual Lawyers, filed on January 7, 2008, in *Qualcomm v. Broadcom*, No. 05 CV 1958 B

(S.D. Cal.).

3.    Attached as Appendix 1 hereto, are true and correct copies of the following

unreported cases:

- *Bradley v. Google*, No. C 06-05289 WHA, 2006 WL 3798134 (N.D. Cal. Dec. 22, 2006).

- *G & C Auto Body Inc. v. GEICO Gen'l Ins. Co.*, No. C06-04898, 2007 WL 4350907 (N.D. Cal. Dec. 12, 2007).

- *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2004 WL 725969 (S.D.N.Y. Apr. 2, 2004).

- *Landes v. Tartaglione*, No. Civ. A. 04-3163, 2004 WL 2415074 (E.D. Pa. Oct. 28, 2004).

- *MGA Entm't, Inc. v. Mattel, Inc.*, CV 05-2727, 2005 WL 5894689 (C.D. Cal. Aug. 26, 2005).

- *Milmoe v. Gevity HR, Inc.,* No. C 06-04721 SBA, 2006 WL 2691393 (N.D. Cal. Sept. 20, 2006).

- *Nokia Corp. v. Qualcomm, Inc.*, No. Civ. A 06-509-JJF, 2006 WL 2521328 (D. Del. Aug. 29, 2006).

- *Union Corp. v. Brown*, Civ. A. No. 87-5525, 1988 U.S. Dist. LEXIS 2542 (E.D. Pa. Mar. 29, 2988).

- *Witriol v. LexisNexis Group,* No. C05-02392, 2006 WL 4725713 (N.D. Cal. Feb. 10, 2006).

January 25, 2008                                      Respectfully submitted,

                                                     BOIES, SCHILLER & FLEXNER LLP


                                                     David S. Stone, Esq.
                                                     Boies, Schiller & Flexner LLP
                                                     150 JFK Parkway, 4th Floor
                                                     Short Hills, NJ 07078
                                                     Tel:  973-218-1111
                                                     Fax:  973-218-1106
                                                     dstone@bsfllp.com
                                                     *Counsel for Broadcom Corporation*

# EXHIBIT A

1
2
3
4
5
6
7
8
9               UNITED STATES DISTRICT COURT
10             SOUTHERN DISTRICT OF CALIFORNIA
11
12  QUALCOMM INCORPORATED,              )    Civil No: 05-CV-1958-B(BLM)
                                        )
13              Plaintiff,              )
    v.                                  )
14                                      )    **ORDER ON REMEDY FOR**
    BROADCOM CORPORATION,               )    **FINDING OF WAIVER**
15                                      )
                Defendants.             )
16                                      )
                                        )
17  ─────────────────────────────────   )
                                        )
18                                      )
19
20
21  **I.    INTRODUCTION**
22         On March 21, 2007, this Court entered an Order (1) finding in favor of Defendant
23  Broadcom Corporation ("Broadcom") and against Plaintiff Qualcomm Incorporated
24  ("Qualcomm") on Broadcom's Third Affirmative Defense that U.S. Patent Nos. 5,452,104
25  (Pl's Trial Ex. 1) ("the '104 patent") and 5,576,767 (Pl's Trial Ex. 3) ("the '767 patent")
26  are unenforceable due to waiver; and (2) setting hearing on an Order to Show Cause as to
27  what the appropriate remedy for Qualcomm's waiver should be.  (Doc. No. 528 at 2.)
28                                     1

1    Following hearing on the Order to Show Cause and careful consideration of relevant

2 court and deposition transcripts, declarations, and other documents submitted by both

3 parties, the Court hereby issues the following remedy for Qualcomm's waiver: that the '104

4 and '767 patents, their continuations, continuations-in-part, divisions, reissues, or any other

5 *dependent or derivative patents of either patent, shall be and are hereby ordered*

6 unenforceable.

7

8  **II.    BACKGROUND**

9    Qualcomm filed the present suit against Broadcom for patent infringement of the

10 '104 and '767 patents on October 14, 2005, based on Broadcom's manufacture, sale, and

11 offers to sell H.264-compliant products. (Doc. No. 1.) Broadcom filed its First Amended

12 Answer and Counterclaims on December 8, 2006, in which it alleged (1) a counterclaim

13 that the '104 patent is unenforceable due to inequitable conduct; and (2) a Third

14 Affirmative Defense that the '104 and '767 patents are unenforceable due to waiver. (Doc.

15 No. 370.)

16    A jury trial was held on the legal issues from January 9, 2007, to January 26, 2007.

17 The jury unanimously returned a verdict (1) in favor of Broadcom and against Qualcomm

18 of non-infringement of the '104 and '767 patents; and (2) in favor of Qualcomm and

19 against Broadcom for non-obviousness of the '104 and '767 patents. (Doc. No. 499.) The

20 jury also unanimously returned an advisory verdict on the equitable issues: (1) finding by

21 clear and convincing evidence in favor of Broadcom and against Qualcomm that the '104

22 patent is unenforceable due to inequitable conduct; and (2) finding by clear and convincing

23 evidence in favor of Broadcom and against Qualcomm that the '104 and '767 patents are

24 unenforceable due to waiver. (Id. at 14.)

25    The Court held an evidentiary hearing on the equitable issues of inequitable conduct

26 and waiver on February 9, 2007. On March 21, 2007, the Court entered an Order: (1)

27 finding in favor of Qualcomm and against Broadcom on Broadcom's counterclaim of

28                                    2                        *05-CV-1958-B (BLM)*

1   inequitable conduct as to the '104 patent; (2) finding in favor of Broadcom and against

2   Qualcomm on Broadcom's affirmative defense that the '104 and '767 patents are

3   unenforceable due to waiver based on Qualcomm's conduct before the Joint Video Team

4   ("JVT"), the standards-setting body that created the H.264 standard; and (3) setting hearing

5   on an Order to Show Cause as to what the appropriate remedy for Qualcomm's waiver

6   should be. (Doc. No. 528 at 2.) The Court conducted a hearing on its Order to Show

7   Cause on June 25, 2007.

8          After the verdict was entered, Broadcom again demanded discovery of Qualcomm's

9   records that previously had been concealed, but whose possible existence was only

10  revealed during Broadcom's cross-examination of Qualcomm witness Viji Raveendran on

11  one of the last days of trial. Thereafter, after over three more months of denials, refusals,

12  and opposition, Qualcomm reversed its position, allegedly to avoid further dispute over the

13  matter, and produced on April 13, 2007, over 110,000 pages of emails, company

14  correspondence, and memoranda, and on May 15, 2007, over 120,000 more pages, some of

15  which have now been filed with the Court, none of which have been disputed by

16  Qualcomm.

17

18  **III.    DISCUSSION**

19          **A.    STANDARD OF LAW**

20          As the Court found in its March 21 Order, Broadcom has the burden of proving its

21  affirmative defense of waiver and remedy therefor by clear and convincing evidence.

22  (Doc. No. 528 at 13.)

23          A district court may in its discretion hold a patent unenforceable in considering an

24  affirmative defense of inequitable conduct by inventors and/or their agents before the

25  United States Patent and Trademark Office ("PTO"), but the remedy depends on equitable

26  considerations arising from the circumstances involved. See Refac Int'l. Ltd. v. Lotus Dev.

27  Corp., 81 F.3d 1576, 1581, 1585 (affirming a finding of unenforceability based on an

28                                    3

1  inequitable conduct affirmative defense and holding that a "district court must . . . weigh
2  the threshold findings of materiality and intent in light of all the circumstances to determine
3  whether they warrant a conclusion" of inequitable conduct).

4      As the Court stated in its Order finding waiver, "[i]n that context, the Court here
5  considers with respect to waiver the extent of the materiality of the omitted information and
6  the circumstances surrounding [Qualcomm's] omissions in connection with the proceedings
7  in the JVT." (Doc. No. 528 at 33.)  While the Court is still unable to find, nor have the
8  parties presented, case guidance for an equitable remedy to a finding of waiver by a
9  patentee or assignee as an affirmative defense, it appears to the Court, as it stated in its
10 Order, that "the remedy should not be automatic, but should be fashioned to give a fair,
11 just, and equitable response reflective of [Qualcomm's] offending conduct."  (Id.)

12     The Court has not found a patent decision assessing the remedy for a finding of
13 waiver based upon conduct of silence in the face of a duty to speak.  The Rambus case, in
14 which the Federal Circuit established the obligation to speak, did not involve a remedy for
15 a breach of that obligation, because the party which allegedly violated the rule had not
16 possessed intellectual property rights that read on or directly applied to the activities of the
17 standards development process.  See Rambus Inc. v. Infineon Techs. AG, 318 F.3d 1081,
18 1102 - 05 (Fed. Cir. 2003).  Therefore, this Court, by analogy to the available remedies for
19 redressing inequitable conduct before the United States Patent and Trademark Office
20 ("PTO"), holds that the remedy available here may vary from no remedy to declaring the
21 involved patents totally unenforceable.

22     Qualcomm argues that Broadcom may not have any remedies beyond itself, because
23 it raised the waiver issue only by a separate affirmative defense and not by a counterclaim
24 or cross-claim.  This contention is without merit.  The Federal Circuit has upheld the
25 unenforceability of a patent to the world due to inequitable conduct before the PTO even
26 when pled as an affirmative defense by the defendant.  See McKesson Info. Solutions, Inc.
27 v. Bridge Med., Inc., 487 F.3d 897, 908, 926 (Fed. Cir. 2007); Semiconductor Energy Lab.

28              4                        05-CV-1958-B (BLM)

1 Co., Ltd. v. Samsung Elecs. Co., Ltd., 204 F.3d 1368, 1372, 1378 (Fed. Cir. 2000); Refac

2 Int'l, Ltd. v. Lotus Dev. Corp., 81 F.3d 1576, 1578, 1585 (Fed. Cir. 1996). Therefore, the

3 Court finds that it may award remedy for a waiver affirmative defense beyond

4 unenforceability only as to Broadcom.

5

6       **B.    ANALYSIS**

7              **1.    Overview of the Joint Video Team ("JVT"), related standards**

8                       **organizations, their Intellectual Property Rights ("IPR") Policy**

9                       **and Guidelines, and Qualcomm**

10       In late 2001, the joint project JVT was launched by two parent standards bodies: (1)

11 the Video Coding Experts Group ("VCEG") of the International Telecommunication Union

12 Telecommunication Standardization Sector ("ITU-T") and (2) the Moving Picture Experts

13 Group ("MPEG") of the International Organization for Standardization ("ISO") /

14 International Electrotechnical Commission ("IEC"). (Def's Trial Ex. 5163 (JVT Terms of

15 Reference ["ToR"]); Trial Tr., 267, Jan. 17, 2007.)

16       The JVT was created to enhance standard video coding performance in the face of

17 limited bandwidth or storage capacity.[1]  As a joint project, the JVT would be able to more

18 efficiently produce a single "technically aligned, fully interoperable" standard that would

19 offer "the best possible technical performance under the practical constraints of being

20 implementable on various platforms and for various applications." (JVT ToR at 1.)

21       According to the JVT ToR, JVT meetings are "open to, and contributions accepted

22 from, all parties qualified for participation in meetings according to the rules of either

23 parent body." (JVT ToR at 3.) As sector members of the ITU-T, Qualcomm and

24 Broadcom can "influence a great variety" of the activities of the Telecommunication

25 ———————————————

26       [1] See Press Release, ITU-T, ITU-T and ISO/IEC to produce next generation

27 video coding standard: Joint Video Team to Deliver Quality Improvement (Feb. 8, 2002), http://www.itu.int/ITU-T/news/jvtpro.html.

28                           5

1  Standardization Sector, including the JVT, by "presenting [their] views" and "participating

2  actively."[2]  Qualcomm and Broadcom must annually pay a minimum of 31,800 Swiss

3  Francs (approximately $26,500) to enjoy the benefits of Sector Membership in the ITU-T,

4  but may annually pay up to 2,544,000 Swiss Francs (approximately $2,4119,000), with

5  higher contributions correlating to a higher class of sector member.[3]

6      The American National Standards Institute ("ANSI") is the United States'

7  representative member in both the ISO and IEC, as the national body most representative of

8  standardization and electrotechnical standardization, respectively, in the United States.[4]  As

9  Company Members of ANSI, Qualcomm and Broadcom enjoy the privilege of "active

10  participation in ANSI and its programs," including the ISO and IEC and by extension the

11  JVT, by paying annual dues ranging from $750 to $25,000 depending on their global sales

12  revenue.[5]

13

---

14      [2] See ITU-T Membership, http://www.itu.int/ITU-T/membership/sector.html (last

15  visited Jul. 17, 2007); ITU Global Directory,
    http://www.itu.int/cgi-bin/htsh/mm/scripts/mm.list?_search=SEC&_languageid=1 (last

16  visited Aug. 6, 2007).

17      [3] See How to join as a Sector Member,

18  http://www.itu.int/ITU-T/membership/join-sector.html (last visited Aug. 6, 2007).

19      [4] See Member bodies,
    http://www.iso.org/iso/en/aboutiso/isomembers/MemberList.MemberSummary?MEMBE

20  RCODE=10 (last visited Jul. 17, 2007); Members of the IEC,
    http://www.iec.ch/cgi-bin/procgi.pl/www/iecwww.p?wwwlang=e&wwwprog=membrs3.

21  p (last updated Jul. 18, 2007); Overview of the ISO System,
    http://www.iso.org/iso/en/aboutiso/introduction/index.html (last modified Sept. 12,

22  2006); IEC Membership, http://www.iec.ch/about/members-e.htm (last visited Aug. 6,

23  2007).

24      [5] See ANSI Membership Roster,

25  https://eseries.ansi.org/Source/directory/Search.cfm (last visited Jul. 17, 2007); ANSI
    Membership - A Value Proposition,

26  http://www.ansi.org/membership/overview/overview.aspx?menuid=2 (last visited Aug. 6,
    2007); ANSI Company Membership Application,

27  http://publicaa.ansi.org/sites/apdl/Documents/Membership/ANSI%20Member-Company-

28                                      6

1    Qualcomm has paid hundreds of thousands of dollars to ANSI and the ITU-T to reap

2  the benefits of membership, including the entitlement to actively participate in the JVT and

3  the creation of the H.264 standard.  These standards organizations pool resources to

4  efficiently create universal technology standards for the benefit of (1) the world through the

5  advancement of technology and (2) companies worldwide such as Qualcomm through

6  greater cross-platform product compatibility and therefore revenue.

7    According to the JVT ToR, the JVT "progress[es] in compliance with the

8  Intellectual Property Rights ("IPR") policies and IPR reporting requirements and

9  procedures of both [parent] organisations [sic]" regarding patent and copyright issues.

10  (JVT ToR at 4.)  More specifically, the JVT collects IPR information during the

11  standardization process as follows:

12    According to the ITU-T and ISO/IEC IPR policy, members/experts are
    encouraged to disclose as soon as possible IPR information (of their own or
13    anyone else's) associated with any standardization proposal (of their own or
    anyone else's).  Such information should be provided on a best effort basis.
14
    For collecting such information, JVT has decided to use it's [sic] own Patent
15    Declaration form – note that this is distinct from the *ITU ISO IEC Patent
    Statement and Licensing Declaration* that is to be submitted to the ISO
16    Secretary General and ITU TSB Director when the contributed technology
    becomes part of the final standard.
17
18  (JVT ToR at 9.)  This language applies to Qualcomm, as a member of the ITU-T and

   participant in the JVT.
19
    In the sample Patent Disclosure Form included in the ToR, the JVT reiterates:
20
    JVT requires that all technical contributions be accompanied with this form.
21    *Anyone* with knowledge of any patent affecting the use of JVT work, of their
    own or of any other entity ("third parties"), is strongly encouraged to submit
22    this form as well.

23  (JVT ToR at 12.)  The JVT explains that form submissions should be made on "a best

24  effort, good faith basis," as "[t]he intent is that the JVT experts should know in advance of

25  any patent issues with particular proposals or techniques, so that these may be addressed

26  ───────────────

27  2006.pdf (last visited Aug. 6, 2007).

28                                    7                    05-CV-1958-B (BLM)

1   well before final approval." (Id.) If the submitter has a patent "associated with the

2   technical content" of the standard being created by the JVT, the submitter must indicate on

3   the form whether it will: (1) grant royalty-free licenses to practice the patent; (2) grant

4   licenses "on a worldwide, non-discriminatory basis and on reasonable terms and

5   conditions"; (3) grant royalty-free licenses on the condition that all other patent holders do

6   the same; or (4) not grant any of the aforementioned licenses, in which case the standard

7   will be designed so as not to cover the patent.  (JVT ToR at 13.)

8       As for the "ITU ISO IEC Patent Statement and Licensing Declaration" that must be

9   submitted separately to the ITU and ISO before final approval of the standard being created

10  by the JVT, "any party participating in the work of the ITU, ISO or IEC should" alert these

11  bodies to the existence of patents "embodied fully or partly" in a standard under

12  consideration.[6]  Patent holders submitting this form to the ITU and ISO have similar

13  licensing options as offered by the JVT form above: they must (1) grant royalty-free

14  licenses to practice their patent; (2) grant licenses "on a non-discriminatory basis on

15  reasonable terms and conditions"; or (3) not grant any of the aforementioned licenses, in

16  which case the standard will be designed so as not to cover the patent.[7]  This language also

17  applies to Qualcomm, as a "party participating in the work of the ITU, ISO or IEC" by way

18  of the JVT.

19      As held by this Court in its March 21 Order and described in more detail below, (1)

20  waiver of patent rights must be shown by clear and convincing evidence; (2) JVT

21  participants treated the JVT IPR policies as imposing a duty to disclose patents that

22  reasonably may be essential to practice the H.264 standard; (3) the '104 and '767 patents

23  reasonably may be essential to practice the H.264 standard; (4) Qualcomm participated in

24

25  _____

26      [6]  Common Patent Policy for the ITU-T/ITU-R/ISO/IEC,
    http://www.itu.int/ITU-T/dbase/patent/patent-policy.html (last visited Aug. 6, 2007).

27      [7]  See id.

28                                    8

1  the JVT as early as January 2002; (5) Qualcomm had knowledge that the '104 and '767

2  patents reasonably might be essential to practice the H.264 standard; and (6) therefore,

3  Qualcomm had a duty to disclose the '104 and '767 patents to the JVT.

4      However, instead of disclosing the '104 and '767 patents to the JVT and offering to

5  license them royalty-free or under non-discriminatory, reasonable terms during the

6  development phase of the JVT work on the H.264 standard, Qualcomm closely monitored

7  and participated in the development of the H.264 standard, all the while concealing the

8  existence of at least two patents it believed were likely to be essential to the practice of the

9  standard, until after the development was completed and the standard was published

10  internationally.  Then, without any prior letter, email, telephone call, or even a smoke

11  signal, let alone attempt to license Broadcom, Qualcomm filed the instant lawsuit against

12  Broadcom for infringement of the '104 and '767 patents, seeking damages and permanent

13  injunction against Broadcom based on its development and manufacture of H.264

14  compliant products.  Qualcomm sought to unfairly benefit from having subverted the

15  standards-making process of the JVT and, as the Court found in its March 21 Order,

16  waived its right to enforce the patents-in-suit.

17

18      **2.    The Court FINDS by clear and convincing evidence that**

19          **Qualcomm participated in the JVT as early as January 2002**

20      In the Court's March 21 Order finding in favor of Broadcom on its affirmative

21  defense of waiver, the Court had already found by clear and convincing evidence that

22  Qualcomm participated in the JVT as early as September 2002.  (Doc. No. 528 at 22.)

23  However, with the new evidence produced by Qualcomm post-trial, the Court **FINDS** well

24  beyond clear and convincing evidence that Qualcomm participated in the JVT as early as

25  January 2002, well before the release of the H.264 standard in May 2003.  The evidence

26  unequivocally contradicts Qualcomm's assertions at summary judgment, during trial, and at

27  the post-trial hearing on waiver and inequitable conduct that it did not participate in the

28                                    9

                                              05-CV-1958-B (BLM)

1    JVT until after May 2003.

2    As early as January 2002, Qualcomm hired an outside consultant, Jordan Isailovic,

3    to attend JVT meetings on Qualcomm's behalf and to send reports to Qualcomm

4    summarizing the progress of the JVT. For example, after ostensibly attending a JVT

5    meeting in Geneva, Switzerland that took place from January 29 to February 1, 2002, Mr.

6    Isailovic sent an email to three Qualcomm employees, including Qualcomm's initial Rule

7    30(b)(6) witness Christine Irvine, on February 11, 2002, with the subject heading "JVT

8    Geneva Report," stating the following:

9    The Report on the JVT Geneva Meeting is included as an attachment. As you
     can see, the Report has many details. I hope that you and your team can get a
10   good idea about JVT . . .

11   If you or any member of your team needs any of the documents mentioned in
     the Report, please let me know and I will get it.
12
13   (Doc. 543-2, Ex. A, Tab 3 at 24, Tab 4 74.)

14   Two days later on February 13, 2002, Ms. Irvine forwarded Mr. Isailovic's email to

15   six other Qualcomm employees, including Qualcomm trial witness and senior staff

16   engineering manager Viji Raveendran and Qualcomm deposition witness James Determan.

17   (Id., Tab 5 at 77.) On February 25, 2002, Ms. Irvine forwarded by email over three pages

18   of notes she took on her most recent JVT phone conference to fellow Qualcomm

19   employees Raveendran and Jay Yun. (Id., Tab 7 at 83.) The next day on February 26,

20   2002, Ms. Raveendran sent an email to two Qualcomm employees with the subject heading

21   "JVT mtg tomorrow" that stated, "Chris is going to the JVT mtg. and will be driving

22   tomorrow." (Id., Tab 8 at 88.)

23   On March 5, 2002, Qualcomm consultant Isailovic sent an email to five Qualcomm

24   employees, Ms. Irvine, Ms. Raveendran, Mr. Determan, John Ratzel, and Amnon Silberger

25   with the subject heading "Requested Documents and Info" that stated in part as follows:

26   John, Chris at all [sic],

27   Here is the response to list of documents and info you requested today:

28                                  10                          05-CV-1958-B (BLM)

1       1. JVT, sw for the TML 9.x . . .
         2. MPEG Web site: . . .
2       3. JVT, ABT example document: See the attachment . . .
         4. Contact information for the Thomson JVT expert who has software for the
3       H.26L [working name for the standard that became H.264]: . . .

4       Let me know if you need anything else.

5       Jordan

6  (Id., Tab 9 at 90 - 91.)  The following day on March 6, 2002, Mr. Isailovic sent another

7  email to Qualcomm colleagues Irvine, Ratzel, Raveendran, Silberger, Determan, and Steve

8  Morley, with the subject heading "JVT/H26L" and an attached file "jm17.zip" that stated:

9       This may be the latest version (evaluable [sic]) . . .

10      PS: Chris, please forward this to the rest of the group; I don't have all
         addresses.
11

12  (Id., Tab 10 at 94.)

13       Post-trial, Qualcomm produced at least 118 additional emails discussing the work of

14  the JVT sent between (1) Qualcomm employees, including Ms. Irvine, Ms. Raveendran,

15  and Mr. Determan; (2) Qualcomm consultant Isailovic; and/or (3) a Qualcomm email list

16  "dc-system-eng" dated from March 11, 2002, to  July 22, 2004.  (Id., Tabs 12 - 129.)  One

17  hundred seven of these emails were sent before the H.264 standard was released in May

18  2003.  (Id., Tabs 12 - 118.)

19       Not only did Qualcomm consultant Isailovic attend JVT meetings as early as

20  January 2002, Qualcomm employees have been attending JVT meetings "for a while"

21  before April 2002, well before the H.264 standard was released in May 2003.  Qualcomm

22  employee Amnon Silberger wrote an email to four other Qualcomm employees, including

23  Mr. Yun, on April 30, 2002, which stated:

24      We have been attending these standard body meetings for a while now.
         These are the MPEG/JVT/JPEG meetings and the SMPTE meetings.  To ease
25      the load, all the system engineers in our group rotate in attending these
         (Chris, Jay, Viji, Jim Determan and myself).

26  (Id., Tab 44 at 306.)  Messrs. Yun and Silberger attended the May 2002 JVT meeting in

27  Fairfax, Virginia.  On May 8, 2002, Mr. Yun sent a three-page meeting report email to

28                      11

eight Qualcomm employees, including Ms. Irvine, Ms. Raveendran, Mr. Determan, and Mr. Silberger, with the subject header "WG11 (MPEG Fairfax - day 3)" that stated explicitly, "I've attended some JVT meetings and saw some demo (so did Amnon)." (Id., Tab 57 at 361.)

Furthermore, Qualcomm voted on ballots affecting JVT as early as June 2002. On June 11, 2002, Mr. Yun wrote an email to Ms. Irvine, Ms. Raveendran, Mr. Silberger, and Mr. Determan stating the following:

> Below is an email ballot for L3.1 (USNB [United States National Body] for MPEG). It calls for an ad hog [sic] group to collect and generate comments on US comments on JVT CD (Committee Draft). By not replying to this email, we agree to the formation of the AHG [ad hoc group].

(Id., Tab 70 at 415.) Mr. Yun sent another email to those same four Qualcomm employees the same day, stating:

> One more email ballot from L3.1.

> This has two questions, the first one approves the REGISTRATION of JVT CD and the second one approves the CD with a conditional disapprove, which means that the USNB has some comments that it wishes to be reflected.

> I don't see any reason we should disagree with the two questions. We need not do anything to do so. Let me know if any of you want to investigate this further and discuss.

(Id., Tab 71 at 419.)

Qualcomm's post-trial production of documents directly and unequivocally exposes as blatantly false Qualcomm's steadfast assertions at summary judgment, during trial, and at the post-trial hearing on waiver and inequitable conduct that it did not participate in the JVT until after May 2003. The Court **FINDS** well beyond clear and convincing evidence that Qualcomm participated in the JVT from as early as January 2002, even earlier than the Court originally found in its March 21 Order and, more importantly, well before the JVT released the H.264 standard in May 2003. Participation does not require submission of proposals, speeches, objections or leadership roles. The Court finds Qualcomm's involvement to be vigorous participation -- a difference appears to the Court to be the

12

1    motive for participation -- i.e., to insulate its IPR from the work of the JVT so as to

2    preserve it for unilateral enforcement if that became possible after the H.264 standard was

3    settled upon.

4

5            **3.**     **The Court FINDS by clear and convincing evidence that**

6                **Qualcomm was aware as early as August 2002 that JVT**

7                **participants treated the JVT IPR policies as imposing a duty to**

8                **disclose patents that reasonably may be essential to the H.264**

9                **standard**

10    In the Court's March 21 Order finding in favor of Broadcom on its affirmative

11    defense of waiver, the Court found by clear and convincing evidence that JVT participants

12    treated the JVT IPR policies as imposing a duty to disclose patents that reasonably may be

13    essential to the H.264 standard. With the new evidence produced by Qualcomm post-trial,

14    the Court now **FINDS** by clear and convincing additional evidence that Qualcomm was

15    aware of this treatment by JVT participants as early as August 2002.

16    In August 2002, Qualcomm consultant Isailovic forwarded an email to Qualcomm

17    employees Ratzel, Determan, Irvine, Raveendran, Silberger, and Yun with the subject

18    heading "Fwd: [jvt-ipr] Re: Face-to-Face JVT IPR Meeting." (Doc. No. 543-2, Ex. A, Tab

19    92 at 529.) The body of the forwarded email stated in pertinent part:

20        The future licensing terms [for H.264 / MPEG-4 AVC] will be defined by the

    holders of essential patents; at this time it is unknown who are these patent

21        holders, so this needs to be determined first. The question is how. In my

    understanding, the objective is to invite "potential holders of essential

22        patents" to the face-to face-meeting [sic] to discuss this issue. Therefore in

    my understanding the most important agenda point is the procedure to

23        identify essential patent holders in an objective manner.

24    (Id., Tab 92 at 530 - 31.)

25    Then in September 2002, Mr. Isailovic forwarded another email to Qualcomm

26    employees Morley, Ratzel, Determan, Irvine, Raveendran, Silberger, and Yun with the

27    subject heading "Fwd: [jvt-ipr] Call for H.264 / MPEG-4 AVC [Advanced Video Coding]

28                                13                            *05-CV-1958-B (BLM)*

1  patents." (Doc. No. 543-2, Ex. A, Tab 94 at 545.)  The body of the forwarded email stated

2  in pertinent part:

3      *This is to let you (as you may have noticed already that MPEG LA is calling*
       *for essential MPEG-4 AVC/ H.264 patents, with the aim to come to a joint*

4      *license soon.*

5  (Id., Tab 94 at 546.)

6          One month later in October 2002, Mr. Isailovic forwarded an email to Qualcomm

7  employees Ratzel, Raveendran, Determan, Irvine, Silberger, and Yun, which Ms.

8  Raveendran in turn forwarded to two other Qualcomm employees with the subject heading

9  "Fwd: [jvt-ipr] Confirmation of JVT IPR meeting in Geneva." (Doc. No. 543-2, Ex. A,

10  Tab 97 at 567.)  In the body of her email, Ms. Raveendran wrote, "FYI.  Some information

11  on licensing issues and IPR in JVT."  (Id.)  The body of the forwarded email listed a

12  suggested agenda for the JVT-IPR meeting open to all JVT and IPR experts at the Geneva

13  JVT conference, which included (1) an "(ongoing) determination of essential patent

14  holders" and (2) the "expected process once essential patent holders are identified."  (Id.,

15  Tab 97 at 568.)  These three emails demonstrate that Qualcomm was aware as early as

16  August 2002 that the JVT was actively attempting to identify holders of patents essential to

17  the H.264 standard.

18          Later, in September 2003, Qualcomm employee Harinath Garudadri wrote an email

19  to another Qualcomm employee and a Qualcomm email list "multimedia.all" with his

20  "notes from the first day of the JVT meeting."  (Id., Tab 120 at 682.)  One of Mr.

21  Garudadri's bullet points was:

22      IPR policies of [JVT parent body] VCEG and ITU.  Gary said **formal**
       **notification was required**.  List of IPR holders for H.264/AVC is in

23      Appendix F of MPEG doc and ITU-T web site.  Each contribution has the
       IPR statements at the end.

24
   (Id.) (emphasis added.)  JVT chairman Gary Sullivan confirmed at trial that he delineated

25  the IPR policy of the JVT at the beginning of every JVT meeting, and from Garudadri's

26  email, Qualcomm was aware at least by September 2003 that formal IPR notification was

27

28                                      14                              05-CV-1958-B (BLM)

1    consistently requested of all IPR holders even if they did not make technical proposals.

2    (Trial Tr., 43 - 44, Jan. 18, 2007.) Since, as established above, Qualcomm had been

3    attending JVT meetings as early as January 2002 in which Mr. Sullivan routinely repeated

4    this IPR policy at each meeting, the Court concludes that Qualcomm was well aware of the

5    policy even earlier than that.

6    Furthermore, amongst the documents Qualcomm produced post-trial was Philips

7    International's June 21, 2002, letter to the ISO International Technology Task Force

8    accompanying its JVT Patent Disclosure form, which made it clear that Philips treated the

9    JVT's IPR policies as imposing a duty to disclose. (Doc. No. 543-2, Ex. A, Tab 74.)

10   Under the subject heading "Re: JVT," Philips wrote:

11   > In response to the RFTI [Request for Technical Information] made at the
     > MPEG meeting May 6-10, 2002 we submit in the **required** JVT Patent

12   > Disclosure Form, a list of Philips' patents which have been deemed necessary
     > for the implementation of MPEG2 Video, and which have been **deemed**

13   > **necessary for the implementation of the JVT Baseline and/or Main**
     > **Profiles.**

14

15   > Philips has made the listed patents available for implementation of the
     > MPEG2 Video standard, in accordance with ISO IPR rules, on reasonable and
     > non-discriminatory terms. To be consistent and to avoid discriminating

16   > against licensees under the MPEG2 Video standards, Philips is again
     > prepared to make these patents available under reasonable and non-

17   > discriminatory terms for the JVT Baseline and Main Profiles.

18   (Id., Tab 74 at 435) (emphasis added.) From this, Qualcomm was aware that JVT

19   participant Philips viewed the JVT Patent Disclosure Form as "required" for patents

20   "deemed necessary for the implementation of the JVT Baseline and/or Main Profiles."

21   Qualcomm was further aware that Philips was prepared to license its patents for the JVT

22   standard "[t]o be consistent" with "[JVT parent] ISO IPR rules."

23   Later in this letter, expressing concern that "the JVT will not be in a position to take

24   an informed decision on the feasibility of a royalty-free Baseline Profile," Philips stated

25   > Video compression technology has attracted wide interest in the electronics
     > industry for quite some years. As a consequence many patents and patent

26   > applications exist in many countries of the world covering not only the basics
     > of compression technology, but also many varieties within such compression

27   > schemes.

28
                                            15

1
2
3
4
5

> To our mind it is an illusion to assume[] that it would be possible to ensure a royalty free JVT Baseline Profile by the evaluation effort based on the patents now being submitted. First, there is a very substantial risk that the submitted list of patents is not complete. Second, an effort, undertaken to avoid the use of patent rights that are not available under royalty-free conditions, could well result in the use of other not yet identified patent rights. Both issues place at the end the so defined JVT Standard in an even much worse position when patents of not-involved companies start playing a role.

6
7
8
9

(Id., Tab 74 at 435 - 36.) From this, Qualcomm was aware of the concern of JVT participant Philips that the H.264 standard would practice patents that had not yet been disclosed to the JVT and offered for licensing under royalty-free or reasonable and non-discriminatory terms.

10
11
12
13
14
15
16

Furthermore, Philips closed its letter by stating, "In the interests of transparency Philips is copying this letter to members of the JVT Group, many of whom are licensees under the MPEG2 Video patents, in order to demonstrate Philips [sic] continued commitment to transparency and non-discrimination in the licensing of IPR on standards." (Id., Tab 74 at 436.) Therefore, while it is not apparent when Qualcomm received the copy of Philips' letter, since Philips copied the letter to all JVT members, the Court concludes that Qualcomm probably received a copy not long after it was sent on June 21, 2002.

17
18
19
20
21
22

The Court already found by clear and convincing evidence in its March 21 Order that JVT participants treated the JVT IPR policy as imposing a duty of disclosure for patents that reasonably might be necessary to practice the H.264 standard. Now, considering the new evidence produced late by Qualcomm post-trial, the Court **FINDS** by additional clear and convincing evidence that Qualcomm was aware of this treatment as early as August 2002.

23
24
25
26
27

> **4.    The Court FINDS by clear and convincing evidence that Qualcomm had knowledge by early March 2002 that its Adaptive Block Size Transform ("ABT") related patents, including the '104 and '767 patents, reasonably might be necessary to practice the**

28

05-CV-1958-B (BLM)

1

### H.264 standard

2    In the Court's March 21 Order finding in favor of Broadcom on its affirmative

3 defense of waiver, the Court found by clear and convincing evidence that Qualcomm had

4 knowledge that the '104 and '767 patents might reasonably be necessary to practice to

5 H.264 standard as early as 2002 and July 2005 respectively. (Doc. No. 528 at 27.) With

6 Qualcomm's post-trial production of additional documents, the Court now **FINDS** by

7 additional clear and convincing evidence that Qualcomm had knowledge as early as March

8 2002 that its ABT related patents, including the '104 and '767 patents, reasonably might be

9 necessary to practice the H.264 standard.

10    Qualcomm's own witness Chong Lee, an inventor of both the '104 and '767 patents,

11 testified at trial that the '104 and '767 patents related to ABT technology. Mr. Lee testified

12 that his May 1992 paper "Intraframe Compression of HDTV Images Based on Adaptive

13 Block Size Discrete Cosine Transform" described the '104 patent invention. (Trial Tr., 94,

14 Jan. 10, 2007.) He stated that the paper "discusses the technology involved in both 104 and

15 -- 104 that included ABS DCT [Adaptive Block Size Discrete Cosine Transform] and DQT

16 [Differential Quadtree Transform]" and reiterated that the '104 patent describes "intraframe

17 compression." (Id. at 70, 94.)

18    In contrast, Mr. Lee specified that the '767 patent describes "interframe

19 compression." (Trial Tr., 70, Jan. 10, 2007.) Mr. Lee testified:

20       I approached the problem [addressed in the '767 patent] by using multiple
         block sizes in an adaptive fashion to solve the problem of obtaining both
21       quality and efficiency of the [video interframe] compression.

22 (Id. at 107 - 08.) When asked whether the '767 patent approach was similar to ABS DCT,

23 Mr. Lee responded:

24       Yes. Exactly. Just like we were describing ABS DCT as adaptive block size
         technique that involves transforms on different block sizes, **this technique**
25       **involves adaptive block sizes** by applying what's called motion
         compensation, looking for similarities in large blocks versus small blocks.
26
   (Id) (emphasis added.)
27

28                                    17                    05-CV-1958-B (BLM)

1    Qualcomm recognized as early as March 2002 that its ABT related patents might be

2  reasonably necessary to practice the H.264 standard. A report entitled "Report of activities

3  for the last six months" and dated March 6, 2002, that was produced from Qualcomm's

4  records stated:

> 5 Since our group is actively involved in the ITU, MPEG, and SMPTE
>    standards meetings, we are looking into proposing some of the features of
> 6 **our ABSDCT compression algorithm** to one of these standard bodies. I had
>    the task of compiling the details of MPEG, JVT (Joint Video Team) and
> 7 ABSDCT compression features. I reviewed the JVT draft and prepared a
>    spreadsheet detailing the aspects of these algorithms. We haven't had a
> 8 chance to discus [sic] this yet. The purpose behind this is for us to decide
>    whether **our ABSDCT Intra and interframe algorithms will fit in the**
> 9 **JVT scenario.**

10  (Doc. No. 543-2, Ex. A, Tab 11 at 96.) As stated above, the '104 patent deals with

11  intraframe video compression, while the '767 patent deals with interframe video

12  compression. From this report, Qualcomm demonstrates its awareness of the connection

13  between these patents and the H.264 standard being developed by the JVT.

14    On March 26, 2002, Qualcomm engineer Silberger sent an email to three Qualcomm

15  employees, including Ms. Irvine and Jay Yun, with the subject heading "JVT ABS

16  submission," which stated:

> 17 For several days now, Jay and myself have been looking at ways to
>    incorporate **our ABS** into H.26L [another name for H.264] for submission in
> 18 the JVT May Meeting.

19  (Doc. No. 543-2, Ex. A, Tab 17 at 122) (emphasis added.) Clearly, Mr. Silberger is here

20  acknowledging that Qualcomm's adaptive block size technology is so related to the work

21  being done in the JVT that it should be offered for incorporation into the developing H.264

22  standard.

23    The next day on March 27, 2002, Mr. Yun responded to Mr. Silberger's email,

24  stating:

> 25 After discussing JVT ideas with Amnon, I remembered that there were some
>    recent proposals that have to do with **variable block sizes.** I re-read those
> 26 proposals, Jordan's report and **our patents** and come up with the following
>    observations.

27

28                                  18

1    (Id., Tab 20 at 131) (emphasis added.)  Addressing JVT proposals already made by others

2    to add an 8x8 transform, a 16x16 transform, and a 2x2 transform, Mr. Yun wrote:

3          1. [. . .] They are all integer transforms that mimic DCT.  With these, perhaps
          we can recommend **our variable block size scheme** that is different than the

4          proposal which only uses fixed-size sub-blocks for the entire 16x16 block
          (i.e., you can only have all 8x8s, all 4x4s, all 8x4s or all 4x8s, etc.)? . . .

5
          But Jordans' report says that this adaptive block-size ideas will not be

6          included in the baseline but in some high quality applications, so we may be
          able to prove that there is a significant gain in quality by using out [sic]

7          scheme.

8    (Id.) (emphasis added.)  Mr. Yun continued:

9          2. **Our original patents mention DCT almost exclusively** and says that it is
          for "pixel data."  Should we "extend" our patents to include all transforms

10         and all data types (like residuals)?

11         3. We should go to all JVT meetings at least for the time being to be on top
          of their work on ABT, which Jordan says is brand new.

12
          4. Similar to ideas in 1, we can use our **interframe ABS patent** and then

13         either recommend BSA [sic ABS] for motion block size
          assignment/representation and/or attach or block JVT's scheme for using

14         variable block size for motion estimation (they use fixed size sub-blocks,
          though).

15
    (Id., Tab 20 at 131 - 32) (emphases added.)  Both the '104 and '767 patents mention DCTs

16
    multiple times: in the claim language and repeatedly throughout every section of the '104

17
    patent, and in the description of preferred embodiments in the '767 patent.  ('104 patent;

18
    '767 patent.)  Furthermore, as Mr. Lee explained at trial, the '767 patent describes

19
    interframe compression using adaptive block sizes.

20
          Then, in July 2002, Ms. Raveendran sent an email to Qualcomm JVT consultant

21
    Isailovic, in which she wrote:

22
          **About patent reviews for JVT and studying ABT with respect to our**

23         **patent**, it was decided that we would like a summary of various aspects of
          ABT in JVT.  There are a lot of details and if you can help narrow down the

24         focus, that would be a good start.

25   (Id., Tab 86 at 504) (emphasis added.)

26         A few months later in November 2002, Qualcomm engineer Yun wrote an email

27   with the subject heading "JVT slides," stating that "monitoring ABT is of importance since

28                                         19

1    there may be **patent infringement issues related to ABSDCT.**" (Id., Tab 102 at 600)

2    (emphasis added.)  Qualcomm engineer Silberger responded to Mr. Yun's email on the

3    same day, carbon copying Ms. Raveendran and writing, "One thing, didn't we kind of

4    conclude that they are not infringing our ABSDCT?" (Id., Tab 102 at 599.)  This email

5    exchange makes it clear that, prior to November 2002, Qualcomm had already given

6    consideration to whether the H.264 standard in development would infringe Qualcomm's

7    ABS DCT patents, which include the '104 and '767 patents.  This is further confirmed by

8    the December 2002 document entitled "JVT 12/9-14/02 meeting goals, prioritized list," in

9    which the item "ABT" is followed by the question, "Is there a **potential IPR issue with**

10    **ABSDCT?**" (Id., Tab 109 at 635) (emphasis added.)

11          Then, in April 2003, Qualcomm employee Tom Kilpatrick sent an email to Viji

12    Raveendran and another Qualcomm employee addressing a new "bi-weekly working

13    engineering meeting." (Id., Tab 118 at 673.)  Mr. Kilpatrick wrote, "One of the things to

14    be addressed in Viji's meetings are progress on **Digital Cinema patents** vs JVT standard."

15    (Id.) (emphasis added.)  Qualcomm's outside expert Dr. Iain Richardson testified at trial

16    that Qualcomm designed a product implementing an audio compression system, the QDEC-

17    1000, based on the '104 patent. (Trial Tr., 126 - 27, Jan. 11, 2007.)  Qualcomm employee

18    Irvine then confirmed through deposition testimony at trial that the QDEC-1000 was sold

19    to "Technical or Digital Cinema." (Trial Tr., 84 - 85, Jan. 18, 2007.)  Therefore,

20    Qaulcomm knew of a link between the '104 patent and the H.264 standard and set up bi-

21    weekly meetings to "address" the issue in April 2003.

22          This newly discovered evidence augments the already convincing evidence

23    explicitly naming the '104 and '767 patents that the Court discussed in its March 21 Order,

24    indicating Qualcomm's knowledge of a link between those patents and the H.264 standard.

25    Therefore, the Court **FINDS** by additional clear and convincing evidence that Qualcomm

26    had knowledge that the '104 and '767 patents reasonably might be necessary to practice the

27    H.264 standard as early as March 2002, well before the JVT released the H.264 standard in

28                                          20                        05-CV-1958-B (BLM)

1    May 2003.

2          At no time before the H.264 standard was initially published as adopted did

3    Qualcomm reveal to the JVT or its parent bodies Qualcomm's IPR, specifically the '104

4    and '767 patents.

5

6    **5.      The Court FINDS by clear and convincing evidence that**

7              **Qualcomm intentionally organized a plan of action to shield the**

8              **'104 and '767 patents from consideration by the JVT with the**

9              **anticipation that (1) the resulting H.264 standard would infringe**

10             **those patents and (2) Qualcomm would then have the opportunity**

11             **to become an indispensable licensor to anyone in the world seeking**

12             **to produce H.264-compliant products**

13         The Court has already found above and in its March 21 Order that Qualcomm

14   waived its rights to enforce the '104 and '767 patents against Broadcom by its silence when

15   it had a duty to speak before the JVT.  However, faced with the additional evidence

16   produced post-trial by Qualcomm, the Court concludes that the conduct of Qualcomm's

17   employees before trial, and its employees and hired witnesses during pre-trial, trial, and

18   post-trial outlines misconduct even more extensive than the Court previously found in its

19   March 21 Order.

20         Merely the reiteration of the chronology of events above and below tells the story of

21   the gravity of the conduct.  The facts speak for themselves.  The totality of the

22   circumstances leads the Court to conclude by clear and convincing evidence that

23   Qualcomm intentionally organized a plan of action to shield the '104 and '767 patents from

24   consideration by the JVT with the anticipation that (1) the resulting H.264 standard would

25   infringe those patents and (2) Qualcomm would then have an opportunity to be an

26   indispensable licensor to anyone in the world seeking to produce an H.264-compliant

27   product.

28                                      21

1    The track of this conduct following the adoption of the H.264 standard exposes

2    aggravated litigation abuse. This abuse commenced with Qualcomm's abrupt

3    commencement of suit, then continued (1) in discovery through Qualcomm's constant

4    stonewalling, concealment, and repeated misrepresentations concerning existing corporate

5    documentary evidence that would have revealed the fullness of the corporate plan; and (2)

6    in trial through Qualcomm's presentation of numerous witnesses who steadfastly testified

7    falsely denying even awareness, let alone participation in the JVT project and through the

8    actions of Qualcomm's lead and co-counsel up to the time Qualcomm substituted new lead

9    counsel, who adamantly denied the obvious and then, when the truth was discovered and

10    exposed by the document production, sequentially contended denial of relevance,

11    justification, mistake, and finally non-awareness.

12        **a.    Misconduct of Qualcomm, its employees, and its witnesses**

13    The Court **FINDS** by clear and convincing evidence that Qualcomm, its employees,

14    and its witnesses actively organized and/or participated in a plan to profit heavily by (1)

15    wrongfully concealing the patents-in-suit while participating in the JVT and then (2)

16    actively hiding this concealment from the Court, the jury, and opposing counsel during the

17    present litigation.

18        **(1)    Misconduct before the JVT**

19    As established above, there is clear and convincing evidence that Qualcomm was

20    aware of its duty to disclose the '104 and '767 patents to the JVT as early as 2002, well

21    before the H.264 standard was published in May 2003. However, it was not until April 25,

22    2006, six months after the commencement of this lawsuit, that Qualcomm filed an IPR

23    disclosure form with the ITU-T and ISO/IEC regarding the H.264 standard, declaring that

24    Qualcomm "holds granted patents and/or pending applications, the use of which would be

25    required to implement" the H.264 standard. (Pl's Trial Ex. 36 at 3 - 4.) <u>Even this</u>

26    <u>disclosure did not identify any specific patent, let alone the '104 and '767 patents.</u>

27    The Court **FINDS** by clear and convincing evidence that Qualcomm and its

28                              22                    05-CV-1958-B (BLM)

1  employees orchestrated a plan to ignore Qualcomm's duty to disclose these patents to the

2  JVT, in order to become an indispensable licensor of the H.264 standard.  Qualcomm

3  employee Yun sent an email in March 2002 to Qualcomm colleagues Silberger, Ratzel, and

4  Irvine, discussing the transform proposals before the JVT.  (Doc. No. 543-2, Ex. A, Tab

5  20.)  In it, Mr. Yun suggested "extending" Qualcomm's patents in order to cover the

6  standard being developed by the JVT:

7        Our original patents mention DCT [discrete cosine transform] almost
         exclusively and says that it is for "pixel data".  Should we "extend" our
8        patents to include all transforms and all data types (like residuals)?

9  (Doc. No. 543-2, Ex. A, Tab 20 at 131.)  He then advocated monitoring the JVT and its

10  work in relation to Qualcomm's patents:

11        We should go to all JVT meeting at least for the time being to be on top of
          their work on ABT [adaptive block-size transform], which Jordan [Isailovic]
12        says is brand new.

13  (Id.)

14        One month later in April 2002, Qualcomm engineer Silberger sent an email to

15  Qualcomm colleagues Determan, Irvine, Raveendran, Yun, and Ratzel.  (Doc. No. 543-2,

16  Tab 38.)  In it, he advocated "monitoring" the JVT "from a distance":

17        The JVT effort is mostly done for the physical layer, and going towards a
          committed draft in May.  There is no indication that they are even looking at
18        DC [Digital Cinema] applications.  New technical suggestions are dealing
          mostly with better efficiency (reduced complexity) and file formats.  We
19        should monitor this from a distance.

20  (Id., Tab 38 at 273.)  Later, under the heading "Recommendations," Mr. Silberger advised

21  increasing Qualcomm's monitoring of the JVT and refraining from making any

22  submissions, which would include any potential patent disclosures, to JVT parent body

23  MPEG:

24        We should be monitoring MPEG meetings, especially regarding DC testings,
          and also sample the JVT and JPEG activities.  We may pull in some other
25        groups within Qualcomm to participate, since both H.26L [working name for
          what later became the H.264 standard] and JPEG2000 may both be promising
26        for low date [sic] rates.  At this point, I don't see the need for submitting
          anything to MPEG.

27

28                                    23                      05-CV-1958-B (BLM)

1  (Id., Tab 38 at 274.)  Mr. Silberger then explicitly recommended "consider[ing] efficient

2  ways for lobbying our technology in the appropriate forums." (Id.)

3         Later, in July 2002, Qualcomm engineer Raveendran sent an email to Qualcomm

4  consultant Isailovic stating, "About patent reviews for JVT and studying ABT with respect

5  to our patent, it was decided that we would like a summary of various aspects of ABT in

6  JVT." (Id., Tab 86 at 504.)  From Ms. Raveendran's use of the phrase "it was decided," the

7  Court concludes that Qualcomm held meetings to decide strategy as to how to monitor the

8  JVT with respect to Qualcomm's patents.  Ms. Raveendran then conceded to Mr. Isailovic,

9  "There are a lot of details and if you can help narrow down the focus, that would be a good

10  start." (Id.) .

11         This monitoring and reporting on the activities of the JVT with respect to

12  Qualcomm's patents without disclosure of these patents continued through the release of

13  the H.264 standard in May 2003 and Qualcomm's filing of this patent infringement suit in

14  October 2005 against Broadcom as to the '104 and '767 patents.  (Doc. No. 543-2, Ex. A.)

15  Qualcomm filed this suit (1) based on the theory that the patents-in-suit cover the H.264

16  standard and therefore Broadcom's H.264-compliant products and (2) long before any

17  disclosure of these two patents to the JVT or its parent organizations and without any offer

18  to license its patents to Broadcom or to JVT members.  In combination with the above

19  evidence presented to the Court as to Qualcomm's participation in the JVT and

20  Qualcomm's knowledge that the '104 and '767 patents reasonably might be necessary to

21  practice the H.264 standard, the Court **FINDS** by clear and convincing evidence that

22  Qualcomm and its employees organized and attempted to execute a plan to actively conceal

23  its patents from the JVT in order to later become an indispensable licensor to those

24  practicing the H.264 standard.  This plan, of course, deprived the JVT of the opportunity to

25  attempt to design around the '104 and '767 patents in developing the H.264 standard.

26                    **(2)    Misconduct during the present litigation**

27         The Court's finding as to Qualcomm's wrongful conduct is further supported by

28                                        24                        05-CV-1958-B (BLM)

1  evidence of widespread and undeniable misconduct of Qualcomm, its employees, and its

2  witnesses throughout the present litigation, including during discovery, pre-trial motions-

3  practice, trial, and post-trial proceedings.

4  (a)    **Christine Irvine**

5  For example, staff engineer Christine Irvine, Qualcomm's original Federal Rule of

6  Civil Procedure 30(b)(6) witness testified at trial through her July 6, 2006, deposition that

7  Qualcomm did not attend any JVT meetings:

8  Q    Are you the person at Qualcomm most knowledgeable about
       attendance or participation by any Qualcomm principal, employee or

9       representative at any H.264 standards committee meetings?
   A    I believe I am.

10 Q    Are you the person at Qualcomm most knowledgeable about
       Qualcomm's knowledge regarding the development of the H.264

11      standard?
   A    I believe I am.

12 Q    And are you the person at Qualcomm most knowledgeable about any
       actions taken by Qualcomm or any of its principals, employees or

13      representatives as a result of Qualcomm's knowledge regarding the
       development of the standard?

14 A    I believe I am.
   Q    Is Qualcomm a member of the JVT?

15 A    No, Qualcomm is not.
   Q    Has Qualcomm ever attended any meetings of the JVT?

16 A    Qualcomm is not aware of any attendance to any JVT meetings.
   Q    Has Qualcomm ever hosted any meeting of the JVT?

17 A    Qualcomm's not aware of hosting a JVT meeting.
   Q    Okay. Has Qualcomm made any submissions to the JVT?

18 A    No, Qualcomm has not made any submissions to the JVT that
       Qualcomm is aware of.

19 Q    When did Qualcomm first become aware of the development of the
       H.264 standard?

20 A    Approximately 2001 in trade journals.

21 (Trial Tr., 79 - 81, Jan. 18, 2007.)

22 The falsity of Ms. Irvine's testimony is now revealed as blatant. As detailed above

23 at length, Qualcomm produced over one hundred emails post-trial related to Qualcomm's

24 participation in the JVT and attendance of JVT meetings, the vast majority of which were

25 received or sent by Ms. Irvine. (Doc. No. 543-2, Ex. A.) For example, in February 2002,

26 Ms. Irvine received by email Qualcomm consultant Isailovic's report on the

27 January/February 2002 JVT meeting in Geneva, which Mr. Isailovic also sent to

28                                    25

1  Qualcomm employees Ratzel and Silberger. (Doc. No. 543-2, Ex. A, Tab 4 at 74.) Two

2  days later, Ms. Irvine forwarded Mr. Isailovic's report to six Qualcomm employees,

3  including Ms. Raveendran, Mr. Determan, Mr. Silberger, and Mr. Yun. (Id., Tab 5.) In

4  May 2002, Ms. Irvine received a three-page report on the May 2002 JVT meeting in

5  Fairfax from Qualcomm colleague Yun, which was also sent to other Qualcomm

6  employees including Amnon Silberger, Mr. Ratzel, and Ms. Raveendran. (Id., Tab 57 at

7  361 - 63.) In that email, Mr. Yun explicitly stated, "I've attended some JVT meetings and

8  saw some demo (so did Amnon)." (Id., Tab 57 at 361.)

9                              **(b)    James Determan**

10        Similar to Ms. Irvine, Qualcomm employee James Determan gave deposition

11  testimony that is belied by the documents Qualcomm produced post-trial. In his August

12  2006 deposition, Mr. Determan testified that he did not know if Qualcomm was a member

13  of the JVT and that he did not believe he was personally a member of the JVT:

14        Q     Do you know if Qualcomm is a member of the JVT?
          MR. LEUNG:        Objection. Calls for speculation.
15        THE WITNESS:    I do not know.
          BY MS. HUNT:
16        Q     Are you personally a member of the JVT?
          A     I do not believe so.

17
    (Doc. No. 543-2, Ex. S at 27.)
18
          However, in conflict with this testimony, Mr. Determan received an email in January
19
    2004 from Qualcomm colleague Laura Chiu with the subject title "FW: JVT Membership
20
    Renewal." (Doc. No. 543-2, Ex. A, Tab 128 at 727.) In that email, which was also sent to
21
    five other Qualcomm employees including Viji Raveendran, Amnon Silberger, Rick Kane,
22
    and Seyfullah Oguz, Ms. Chiu wrote:
23
          Please let me know if you are still interested in being a **JVT member.**
24
          Rick, would it be ok to make Viji the principal? I will be processing payment
25        for MediaFLO members: Viji, Amnon and Seyfullah.

26  (Id.) (emphasis added.) Attached to the end of Ms. Chiu's email was a forwarded email

27  with the same subject heading. In that forwarded email thread, Ms. Chiu first wrote to

28                                         26

1  Parthenia Purcell, Associate Manager of Membership Services for the Information

2  Technology Industry Council ("ITIC"):

3      When you have the chance, please send me the invoices for **JVT**
       **membership** renewal for Viji Raveendrand [sic] (Principal), Amnon
4      Silberger (Alternate), and an application for Seyfullah Oguz (new member).

5  (Id., Tab 128 at 730) (emphasis added.)  Ms. Purcell forwarded Ms. Chiu's request to add

6  new member Qualcomm employee Oguz to Lynn Barra, Associate Director of Information

7  Technology Industry Standards Operations, who replied to Ms. Chiu as follows:

8      Prior to making any changes to the **Qualcomm membership**, we would like
       to verify the information we have on file with you.  Below is the current
9      member information we have in our database.

10     Rick Kane - principal ($800)

11     Amnon Silberger - alternate (free, included with principal membership)

12     Hari Garudadri - additional alternate ($800)

13     **Jim Determan** - additional alternate ($800)

14     Viji Raveendran - additional alternate ($800)

15  (Id., Tab 128 at 728) (emphases added.)

16     Moreover, Mr. Determan received many of the emails discussed above, which

17  included JVT meeting reports from Qualcomm employees and consultant Isailovic as well

18  as discussion of Qualcomm monitoring of the JVT.  Therefore, the Court can only conclude

19  that, at the time of Mr. Determan's August 2006 deposition, he was fully aware that (1)

20  Qualcomm was heavily involved with the JVT since as early as January 2002 and (2) as

21  recently as 2004, Qualcomm was still a paying member of the JVT and so was Mr.

22  Determan as a Qualcomm representative.

23     Mr. Determan also testified in his August 2006 deposition that he did not recall ever

24  attending a JVT meeting nor was he aware of any Qualcomm employee attending any:

25     Q    Have you ever attended any meeting of the JVT?
       A    Not that I recall.
26     Q    Do you know of any Qualcomm employees that have attended JVT
            meetings?
27     MR. LEUNG:        Objection.  Calls for speculation.

28                                    27

                                                       05-CV-1958-B (BLM)

1    THE WITNESS:    Not that I'm aware.

2  (Doc. No. 543-2, Ex. S at 27.) However, Qualcomm's post-trial production of documents

3  reveals that, not only was Mr. Determan aware that Qualcomm employees had attended

4  JVT meetings, but Mr. Determan probably attended some himself.

5    Qualcomm employee Silberger wrote in an April 2002 email:

6  ·    We have been attending these standard body meetings for a while now.
        There are the MPEG/JVT/JPEG meetings and the SMPTE meetings. To ease
7        the load, all the system engineers in our group rotate in attending these
        (Chris, Jay, Viji, Jim Determan and myself.)
8
9  (Doc. No. 543-2, Ex. A, Tab 44 at 306.) Mr. Determan also received five emails from

10 Qualcomm colleagues Yun and Silberger with daily reports from their attendance of the

   May 2002 JVT meeting in Fairfax, Virginia. (Id., Tabs 56 - 60.)
11
12    Mr. Determan then testified at his August 2006 deposition that he did not know

13 when any JVT meetings took place nor did he recall ever hearing reports of any JVT

   meetings:
14
15    Q    Do you know when any of the JVT meetings took place?
      A    No.
16    Q    Have you ever heard any reports, whether via email or written report
           or any discussion, of what occurred at any JVT meeting?
      A    Not that I recall.
17
18 (Doc. No. 543-2, Ex. S at 29.) However, in contrast to this testimony, as stated above, Mr.

19 Determan received multiple reports of the May 2002 JVT meeting in Fairfax. (Doc. No.

   543-2, Ex. A, Tabs 56 - 60.) He also "rotated" attending MPEG/JVT/JPEG and SMPTE
20
21 standard body meetings with the other engineers in his group, Mr. Silberger, Mr. Yun, Ms.

   Raveendran, and Ms. Irvine. (Id., Tab 44 at 206.) Furthermore, in February 2002, he
22
23 received Qualcomm consultant Isailovic's report of the January 2002 JVT meeting in

   Geneva forwarded to him by Qualcomm colleague Irvine. (Id., Tab 5.)
24
25
26        **(c)    Viji Raveendran**

27    In addition to her colleagues Ms. Irvine and Mr. Determan, Qualcomm trial witness

28                        28                    05-CV-1958-B (BLM)

and senior staff engineering manager Viji Raveendran also gave testimony at deposition
and trial that was later blatantly contradicted by Qualcomm's post-trial document
production. Ms. Raveendran testified in her July 2006 deposition that she did not even
learn of the JVT until 2003 through journals and publications:

> Q:     [] Referring only to the Joint Video Team that developed the H.264
>        standard, when did you first learn of the Joint Video Team that
>        developed the H.264 standard?
> A.     Somewhere in the 2003 time frame.
> Q.     How did you learn of it?
> A.     Through literature.
> Q.     What literature?
> A.     Basically journals and video processing related --
> THE REPORTER:   Related what?
> THE WITNESS:    Journals and publications, basically publications.

(Doc. No. 543-2, Ex. P at 36 - 37.)

However, the evidence produced by Qualcomm post-trial reveals that Ms.
Raveendran knew of the JVT as early as February 2002 through reports on JVT meetings
from Qualcomm consultant Isailovic, not through "journals and publications" in "the 2003
time frame" as she testified. Qualcomm produced post-trial almost one hundred emails and
JVT meeting reports Ms. Raveendran either received or sent in 2002 addressing JVT's
work and its relation to Qualcomm. (Id., Tabs 5 - 111.) For example, in February 2002,
Ms. Raveendran received Qualcomm consultant Isailovic's report on the January 2002 JVT
Meeting in Geneva in an email forwarded by Qualcomm colleague Irvine. (Doc. No. 543-
2, Tab 5.) Furthermore, Ms. Raveendran sent many emails herself to other Qualcomm
employees regarding the JVT, including her February 2002 email to Mr. Yun and Ms.
Irvine, in which she says, "Chris is going to the JVT mtg. and will be driving tomorrow.
We will meet at Starbucks off Jefferson Rd. exit on I-78 (off of I-5) at 11:30 a.m." (Id.,
Tab 8 at 88.)

Later in her deposition, Ms. Raveendran testified that she did not know of nor did
she receive a report of the JVT meeting (1) in January 2002 in Geneva, Switzerland; (2) in
May 2002 in Fairfax, Virginia; (3) in August 2002 in Klagenfurt, Austria; (4) in October

29

1  2002 in Geneva, Switzerland; (5) in December 2002 in Awaji Island, Japan; and (6) in

2  September 2003 in San Diego, California. (Id. at 41 - 44.) In direct contradiction to her

3  testimony, Qualcomm's post-trial production of documents reveal that Ms. Raveendran did

4  in fact receive (1) a report of the January 2002 JVT meeting in Geneva (Doc. No. 543-2,

5  Tab 5); (2) many emails discussing and reporting on the May 2002 JVT meeting in Fairfax,

6  including at least one sent by Ms. Raveendran herself (Id., Tabs 18, 22, 25, 32, 35, 36, 41,

7  56 - 61); (3) emails discussing the August 2002 JVT meeting in Klagenfurt, including ones

8  forwarding documents registered for the Klagenfurt meeting "[p]er your request, Viji" and

9  forwarding lists of Klagenfurt meeting registrants under "Viji, [t]his is for you" (Id., Tabs

10  54, 69, 80 at 468, 82, 84 at 492); (4) emails discussing the October 2002 JVT meeting in

11  Geneva, including one from Ms. Raveendran herself (Tabs 54, 97); (5) an email mentioning

12  the December 2002 JVT meeting on Awaji Island (Doc. No. 100); and (6) an email

13  mentioning the September 2003 JVT meeting in San Diego (Doc. No. 123).

14  　　　Later in her July 2006 deposition, Ms. Raveendran testified that she did not know of

15  any JVT IPR policy:

16  　　Q.　Does the JVT have a policy regulating intellectual property rights?
   　　A.　I don't know of that.
17

18  (Doc. No. 543-2, Ex. P at 76.) However, again, documents produced by Qualcomm post-

19  trial tell a different story. Ms. Raveendran forwarded an email to two Qualcomm

20  colleagues in October 2002 with the subject heading "Fwd: [jvt-ipr] Confirmation of JVT

21  IPR meeting in Geneva." (Doc. No. 543-2, Ex. A, Tab 97 at 567.) In that email, she wrote,

22  "FYI. Some information on licensing issues and IPR in JVT." (Id.) The forwarded email

23  included a suggested meeting agenda:

24  　　1) short summary of the IPR status in JVT
   　　2) potential licensing models, examples and wishes: MPEG-4, other
25  　　3) (ongoing) determination of essential patent holders
   　　4) expected process once essential patent holders are identified
26  　　5) involvement of licensees and the role of this "JVT-IPR group"

27  (Id., Tab 97 at 568.) Therefore, Ms. Raveendran was aware that the JVT wanted to identify

28  　　　　　　　　　　　　　　　30　　　　　　　　　　　　05-CV-1958-B (BLM)

1    "essential patent holders" and was developing licensing models to regulate IPR.

2        Then in November 2002, Ms. Raveendran wrote an email to three Qualcomm

3    employees, including Mr. Yun and Mr. Silberger, in which she wrote, "Attached is the

4    Patent list Statement on MPEG.  Part 10 covers JVT (under AVC, that's how JVT is

5    referred to in MPEG world)."  (Id., Tab 101 at 590.)  Jay Yun then sent out an email in

6    response to a question as to the completeness of Ms. Raveendran's list:

7        Initially JVT set out to come up with a royalty-free baseline profile.  Many
         submitted their technologies knowing that this is going to be the case, or
8        some even withheld their submissions into the Baseline profile because they
         didn't want to submit as royalty-free.  And then over time it became evidence
9        that royalty free baseline is not going to be possible.  Some patents are carry
         over from MPEG-2 and 4.  So now, some want to re-define the baseline
10       profile and make sure all who didn't submit technologies before b/c they
         thought they couldn't would be allowed to submit again.  A big mess.
11
12   (Id., Tab 101 at 589.)  Ms. Raveendran then clarified Mr. Yun's response in her own email:

13       A quick note: yes, this is not a complete list as Jay clarified.  Also, the
         contributions that did not make it into JVT's baseline profile (due to royalty
14       issues), are now incorporated into the "Common" profile.

15   (Id., Tab 101 at 588.)  Therefore, in contradiction to her deposition testimony, Ms.

16   Raveendran was clearly aware of how the JVT was organizing its IPR into various profiles

17   and licensing schemes and did "know of" the JVT's policy regarding its IPR.

18       Furthermore, Ms. Raveendran's trial testimony is directly rebutted by Qualcomm's

19   post-trial production of documents.  She testified that Qualcomm did not get involved in the

20   JVT until "much later" after the JVT was formed in late 2001:

21       Q    Was Qualcomm involved with JVT at that time [when the JVT was
              formed in 2001]?
22       A    No, we were not.
         Q    Did Qualcomm ever become involved with JVT?
23       A    Much later, when -- I mean, my -- my participation has been -- I don't
              know who else participated in Qualcomm recently, but -- is that much
24            later when the scalable video coding effort got merged into JVT -- the
              scalable video coding was a different standard that MPEG was
25            working on, and when they -- when that work item got moved to JVT,
              that's when we started participating.

26   (Trial Tr., 40 - 41, Jan. 24, 2007.)  However, as demonstrated by Mr. Isailovic's report on

27   the January 2002 JVT meeting in Geneva, which was forwarded to Ms. Raveendran in

28                                          31                          05-CV-1958-B (BLM)

1   February 2002, Qualcomm was involved in the JVT as early as January 2002, which Ms.

2   Raveendran was well aware of when she testified at trial. (Doc. No. 543-2, Tab 5.)

3          At trial, Ms. Raveendran also testified that her only personal involvement with the

4   JVT was attending one JVT meeting in July 2005 in Poland:

5      Q   Did you have any personal involvement with JVT?
       A   I attended one of their meetings when they were working on the
6          scalable video coding effort. Scalable video coding is to enable
           different quality levels and different display levels of recorded video,
7          depending on the display sizes, for example.
           So that was a new technology that the group was working on, and my
8          interest was more in the sense of how robust that technology is to
           errors. Because in a wireless scenario, there are errors that will cut up
9          the data, and how robust is that data. So that was my involvement.

10  (Trial Tr., 41, Jan. 24, 2007.) However, as is made abundantly clear by Qualcomm's post-

11  trial document production described above, that was far from the extent of Ms.

12  Raveendran's involvement with the JVT. The documentary email evidence shows that Ms.

13  Raveendran was in fact integrally involved with Qualcomm's intense monitoring of the

14  JVT since as early as February 2002: sending JVT reports, receiving JVT reports, and

15  acting as a liaison between Qualcomm and consultant Isailovic who attended JVT meetings

16  on Qualcomm's behalf.

17

18              **b.    Misconduct of Qualcomm counsel**

19              **(1)    Misconduct during discovery**

20         The Court **FINDS** by clear and convincing evidence that Qualcomm counsel

21  participated in an organized program of litigation misconduct and concealment throughout

22  discovery, trial, and post-trial before new counsel took over lead role in the case on April

23  27, 2007.

24         On October 14, 2005, Qualcomm counsel filed a Complaint on behalf of Qualcomm

25  alleging Broadcom's infringement of the '104 and '767 patents based on Broadcom's

26  manufacture, sale, and offers to sell H.264-compliant products, requesting preliminary and

27  permanent injunction and damages. (Doc. No. 1.) On January 23, 2006, Broadcom

28                                      32                    05-CV-1958-B (BLM)

1  submitted its First Set of Requests for the Production of Documents and Things (Nos. 1 -

2  88), in which it requested "[a]ll documents concerning Qualcomm membership,

3  participation, interaction, and/or involvement in setting any standard relating to the

4  processing of digital video signals that pertains in any way to any Qualcomm Patent."

5  (Doc. No. 543-2, Ex. V at 17.)  Qualcomm counsel submitted in Qualcomm's Response to

6  Broadcom's request on February 24, 2006, the following response:

7       QUALCOMM will produce responsive non-privileged documents that were
        given to or received from standards-setting body responsible for the ISO/IEC
8       MPEG-4 Part 10 standard, and which concern any QUALCOMM
        participation in setting the ISO/IEC MPEG-4 Part 10 standard, following the
9       entry of, and pursuant to the terms of, a mutually agreed-upon protective
        order.
10
   (Doc. No. 543-2, Ex. W at 44.)  This response deflected the request as though it only
11
   addressed the MPEG-4 Part 10 standard and completely concealed Qualcomm's extensive
12
   involvement with the JVT and the H.264 standard.
13
        On January 23, 2006, Broadcom also submitted Request for Production No. 49
14
   requesting "[a]ll documents given to or received from a standards setting body or group
15
   that concern any standard relating to the processing of digital video signals that pertains in
16
   any way to any Qualcomm Patent, including without limitation communications, proposals,
17
   presentations, agreements, commitments, or contracts to or from such bodies."  (Doc. No.
18
   543-2, Ex. E at 1.)  Later on July 14, 2006, Broadcom submitted Request for Production
19
   No. 93 requesting "[a]ll documents referring to or evidencing any participation by
20
   Qualcomm in the proceedings of the JVT, the ISO, the IEC, and/or the ITU-T."  (Id.)
21
   Despite these requests, Qualcomm counsel produced none of the over two hundred
22
   thousand pages of emails and electronic documents concerning the JVT and the H.264
23
   standard, which were clearly within the scope of the requests, and that were finally
24
   produced four months post-trial.
25
        On January 23, 2006, Broadcom submitted its First Set of Interrogatories Under Fed.
26
   R. Civ. P. 33 (Nos. 1-16), in which it listed as Interrogatory No. 13:
27

28                                    33                    05-CV-1958-B (BLM)

1    Please identify and describe in detail Qualcomm's membership, participation,
     interaction, and/or involvement in setting any standard relating to the
2    processing of digital video signals that pertains in any way to any Qualcomm
     patent [. . .] This interrogatory includes without limitation any MPEG
3    [Moving Pictures Working Group] video processing standard, and expressly
     includes H.264.
4

(Doc. No. 565-2, Ex. C at 15.)  Broadcom further asks in this same interrogatory for "the

nature, purpose, effect, and sum and substance of Qualcomm's participation and/or

involvement," "the identity of each Person who participated or was involved on behalf of

Qualcomm," and the "relevance" and "identity" of any Qualcomm patent "related to such

standard." (Id. at 15 - 16.)

The Court quotes the verbatim response submitted by Qualcomm counsel to

Interrogatory No. 13 in Qualcomm's Fourth Supplemental Response to Broadcom's First

Set of Interrogatories (Nos. 1-16), pages 33 - 35, dated September 5, 2006, because it

demonstrates vividly the stonewalling denial and diversions of requests for evidence

repeatedly directed to Qualcomm:

QUALCOMM refers to and incorporates by reference each of the
foregoing general objections as though each is set forth fully herein,
including privilege and work product.

QUALCOMM further objects to the definition of "identify" to the
extent it renders the interrogatories overly broad, unduly burdensome and/or
would require QUALCOMM to provide information that is not within its
possession, custody, and control and/or cannot be identified or located with a
reasonably diligent search.

QUALCOMM objects to the purported requirement that it respond "in
detail" as vague, ambiguous, unduly burdensome, overly broad, and requiring
information not within its possession, custody, or control. In particular, it is
unclear how much detail is requested, and QUALCOMM will respond only
to the extent information is explicitly requested.

QUALCOMM objects to the term "Qualcomm Patent" as vague and
ambiguous, and instead will refer to the "QUALCOMM Patents-in-Suit."

QUALCOMM objects to the definition of "Person" to the extent that
its definition is circular with respect to "Entity" and "entities." "Person" is
defined to include any "legal entity," "government entity," and "business
entity." "Entity" is defined to include "natural persons." QUALCOMM will
construe "Person" in accordance with its reasonable ordinary meaning.

QUALCOMM objects to the phrase "any standard relating to the

processing of digital video signals" as vague and ambiguous. QUALCOMM further objects to the defined terms "standard" or "standards" as vague, ambiguous, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence; and to the defined terms "MPEG video processing" as vague, ambiguous, overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. QUALCOMM will construe those terms as stated in the general objections.

QUALCOMM objects to the term "relevance" as vague, overly broad, and neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

QUALCOMM objects to the purported requirement that it respond as to the time period(s) at issue as vague, ambiguous, overly broad, unduly burdensome, and requiring information not within its possession, custody, or control.

QUALCOMM objects to the phrase "nature, purpose, effect, and sum and substance" as vague, ambiguous, overly broad, unduly burdensome, and requiring information not within its possession, custody, or control.

QUALCOMM objects to the phrase "participation and/or involvement" as vague, ambiguous, overly broad, and unduly burdensome.

QUALCOMM objects to the phrase "membership, participation, interaction, and/or involvement" as vague, ambiguous, overly broad, and unduly burdensome because the phrase "membership . . . in setting any standard" is impossible to parse.

QUALCOMM objects to the purported requirement that it identify "each" person, to the extent it calls for information that is not within QUALCOMM's possession, custody, and control and/or that cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the purported requirement that it respond as to "standards raised but never adopted" as vague and to the extent it calls for information not within QUALCOMM's possession, custody, and control and/or that cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the purported requirement that it identify the particular standard(s) that resulted from Qualcomm's involvement, to extent it calls for information that is not within QUALCOMM's possession, custody, and control and/or that cannot be identified or located with a reasonably diligent search.

QUALCOMM objects to the phrase "relevance" in interrogatory 13(I) as vague, ambiguous, overly broad, unduly burdensome, calling for information that is not within QUALCOMM's possession, custody, and control and/or cannot be identified or located with a reasonably diligent search, and neither relevant to any claim or defense at issue in this litigation nor reasonably calculated to lead to the discovery of admissible evidence. In particular, the basis for determining relevance is unclear, the interrogatory

35

1    potentially requires a response that is virtually unlimited in scope, and it is
2    unclear as to the entities from whose perspective relevance is to be
     determined.

3        QUALCOMM objects to the term "related" as vague, ambiguous,
     overly broad, and unduly burdensome, and neither relevant to any claim or
4    defense at issue in this litigation nor reasonably calculated to lead to the
     discovery of admissible evidence. Subject to and without waiving the general
5    and specific objections set forth herein, QUALCOMM responds as follows.
     Beyond passive monitoring, QUALCOMM participated in ISO/IEC
6    JTC1/SC29 WG11 of MPEG. The time period at issue includes 2001. The
     nature of QUALCOMM's participation includes the contribution of two
7    proposals with document numbers 7340 and 7341. The author of these
     proposals was A. Chris Irvine.
8
         QUALCOMM contributed four proposals to the JVT in 2006. One
9    each during the January and April meetings, and two during the July meeting.
     The authors of these proposals were Yiliang Bao and Yan Ye. During the
10   April 2006 meeting of the JVT, QUALCOMM also contributed a verification
     of an earlier proposal by LG.
11
         QUALCOMM's investigation concerning this interrogatory is ongoing
12   and QUALCOMM reserves the right to supplement its response to this
     interrogatory as warranted by its investigation.
13
14   On March 10, 2006, Qualcomm counsel submitted its Initial Disclosure of Asserted

15   Claims and Accused Products Relating to the '767 and '104 Patents, in which it listed as

16   Accused Broadcom Products those products that "conform to, comply with, and/or support

17   H.264." (Doc. 565-2, Ex. A at 1.)  At that point, Qualcomm apparently was very much

18   aware of the relevance of the H.264 standard.

19   On May 23, 2006, Broadcom submitted its Notice of Rule 30(b)(6) Deposition to

20   Qualcomm, [Notice No. 1: Qualcomm's Products, Processes, and Instrumentalities], in

21   which it notices topics for 30(b)(6) deposition, including:

22       The attendance or participation by any Qualcomm principal, employee, or
         representative at any H.264 standards committee meetings, including, but not limited
23       to, the dates, locations and agendas of such meetings, notes taken at such meetings,
         membership of any Qualcomm principal, employee, or representative in any H.264
24       standards committees, and any actions taken by Qualcomm or any of its principals,
         employees, or representatives as a result of such meetings.

25   (Doc. No. 565-2, Ex. D at vii.)  In July 2006, Qualcomm's proffered Rule 30(b)(6) witness

26   Christine Irvine falsely testified at deposition as described above in Section III-B-5-a-(2)-

27   (a) that Qualcomm was not a member of the JVT; Qualcomm was not aware of any

28                                  36                        05-CV-1958-B  (BLM)

1    attendance of JVT meetings; and that nobody at Qualcomm sought to become involved in

2    the development of the H.264 standard. (Doc. No. 543-2; Ex. Q at 30, 34, 40.)

3         On July 12, 2006, Broadcom filed an additional Rule 30(b)(6) notice specifically

4    addressing the JVT in its Notice of Rule 30(b)(6) Deposition to Qualcomm, [Notice No. 5:

5    H.264 Participation]. (Def's Binder, 06-25-07 Hr'g, Tab 6.) Qualcomm's subsequent Rule

6    30(b)(6) witness Scott Ludwin testified at his August 2006 deposition that he had never

7    heard any discussion nor seen documentation of Qualcomm membership in the JVT:

8

9       Q.      I take it further you haven't seen any written documentation of
               Qualcomm's membership in the JVT.

      MR. LEUNG:       Objection; lacks foundation.

10      THE WITNESS:      I've never been at any discussions with respect to the
               membership in JVT or seen any documents if they do

11                exist.

12    (Doc. No. 543-2, Ex. R at 26.) He also testified that he did not know whether any

13    Qualcomm employees were JVT members:

14       Q.      [. . .] [D]o you know whether any Qualcomm employees are currently
               members of the JVT?

15      MR. LEUNG:       Objection; vague and ambiguous.
     THE WITNESS:      I don't know. Again I'm not familiar with the

16                membership structure of the JVT and your attendance in
               those particular organizations.

17

18    (Def's Binder, 06-25-07 Hr'g, Tab 13 at 26 - 27.) He later testified in the same deposition

   that December 2003 was Qualcomm's first participation in the JVT:

19

20       Q.      [. . .] So did any Qualcomm employee prior to December, 2003
               participate in any JVT activity?

21       A.      I believe that December of 2003 was our first participation in any
               formal JVT meeting. I believe Qualcomm sponsored an event, a JVT

22                event when that organization met in San Diego [in September 2003].
               I'm not certain – I don't know if anyone from Qualcomm actually

23                went to that event. That is the only participation that I know of any
               Qualcomm company employee in any JVT activity.

24    (Ex. 565-3, Ex. H at 51.)

25         On August 16, 2006, Qualcomm counsel submitted Qualcomm's Response to

26    Broadcom's Second Set of Requests for Production of Documents and Things (Nos. 89-

27    115). (Doc. No. 543-2, Ex. X.) Qualcomm there stated:

28                          37               05-CV-1958-B (BLM)

1          QUALCOMM will produce non-privileged relevant and responsive
      documents describing QUALCOMM's participation in the JVT, if any, which
2          can be located after a reasonable search.

3    (Id. at 12.) As is clear to the Court now, Qualcomm failed to produce even one of the over

4    two hundred thousand pages of emails, memoranda, and electronic documents related to

5    Qualcomm's participation in the JVT, which were finally produced after trial. But

6    Qualcomm's assurance of performing a "reasonable search" represents that Qualcomm was

7    acting in good faith to produce discovery.

8          On September 5, 2006, Qualcomm counsel then submitted Qualcomm's First

9    Supplemental Response to Broadcom's Second Set of Interrogatories (Nos. 17-29), in

10   which Qualcomm represented that the first JVT meeting attended by a Qualcomm

11   employee was by Phoom Sagetong in December 2003. (Doc. No. 543-2, Ex. Y at 12.)

12   Qualcomm listed Mr. Sagetong as attending eight JVT meetings from December 2003 to

13   January 2006 and asserted that the only other Qualcomm employees to attend JVT

14   meetings were: (1) Yuriy Reznick, who attended the July 2005 and October 2005 meetings;

15   (2) Ms. Raveendran, who attended the July 2005 meeting; and (3) Yiliang Bao, who

16   attended three meetings from January 2006 to July 2006. (Id. at 12 - 13.) As shown in

17   great detail hereabove, these supplemental responses were calculatedly misleading and

18   totally false in the context of their denial of any attendance of a JVT meeting by any

19   Qualcomm representative prior to December 2003.

20         Qualcomm counsel's discovery responses demonstrate that they were able to locate

21   with alacrity company records from December 2003 forward and find four or more

22   Qualcomm employees participating in proceedings of the JVT. Yet inexplicably, they were

23   unable to find over 200,000 pages of relevant emails, memoranda, and other company

24   documents, hundreds of pages of which explicitly document massive participation in JVT

25   proceedings since at least January 2002. These examples of Qualcomm counsel's

26   indefensible discovery conduct belie counsel's later implied protestation of having been

27   "kept in the dark" by their client.

28                          38

1          **(2)    Misconduct during motions practice**

2          The gross litigation misconduct by Qualcomm counsel continued through motions

3    practice before the Court.

4          On September 1, 2006, Qualcomm counsel submitted a Declaration of Dr. Iain

5    Richardson in support of Qualcomm's Motion for Summary Adjudication of no waiver, in

6    which Dr. Richardson declared under penalty of perjury in pertinent part:

7          I have been unable to find any documentary evidence of the involvement of
           Qualcomm personnel in the H.264/AVC [Advanced Video Coding]
8          standardization process prior to September 2003, by which time the technical
           content of the baseline, main and extended profiles was considered to be
9          frozen and the first issue of the H.264/AVC standard had been published.

10   (Doc. No. 543-2, Ex. T at 5) (footnote omitted.) Dr. Richardson continued:

11         The involvement of Qualcomm employees in JVT activities from September
           2003 to December 2005 appears to be minimal, with no technical contribution
12         documents submitted by any Qualcomm employee.

13   (Id. at 5.) Dr. Richardson then concluded:

14         Indeed, Qualcomm was not significantly involved in the JVT until 2006, and then its
           involvement has been limited to the SVC [Scalable Video Coding] standardization
15         project, not the H.264/AVC standard. Therefore, it is my opinion that Qualcomm
           did not meaningfully participate in the development of the H.264/AVC standard,
16         and Qualcomm did not violate any of JVT's or ITU-T's rules or expectations
           regarding the disclosure of intellectual property rights.
17
18   (Id. at 9.) Here, even Qualcomm's scientific expert Dr. Iain Richardson, who was qualified

19   as an expert in video compression technology and who testified at trial that Broadcom's

20   H.254-compliant products infringed the '104 and '767 patents, was used by Qualcomm

21   counsel to step out of his field of expertise and sign a declaration vouching for the absence

22   of any corporate records regarding Qualcomm's participation in the JVT.

23         Qualcomm counsel then filed this Richardson declaration on November 6, 2006, as

24   Exhibit 15 to the Declaration of Kyle S. Robertson in Support of Qualcomm Incorporated's

25   Motion for Summary Adjudication regarding Broadcom's defenses of equitable estoppel,

26   implied license, fraud, unclean hands, breach of contract, laches, and waiver. (Doc. No.

27   168.)

28                              39

1    On November 6, 2006, Qualcomm counsel filed Qualcomm's Motion for Summary

2    Adjudication as to Broadcom's defenses including waiver (Doc. No. 165), to be heard by

3    the Court on December 5, 2006.  In the Introduction of the opening brief, Qualcomm

4    counsel argued as follows: "The facts are undisputed: QUALCOMM employees never

5    participated, in any form, in the JVT until *after* the H.264 standard was already released."

6    (Doc. No. 543-2, Ex. Z at 1.)  Qualcomm counsel continued, "There is no evidence that any

7    QUALCOMM participant knew of the applicability of the patents-in-suit to the H.264

8    standard prior to the initiation of this lawsuit."  (Id.)

9    Qualcomm counsel then argued emphatically in the body of Qualcomm's opening

10   brief for summary adjudication, as summarized in the chart below:

| Section title of Qualcomm's brief | Arguments made by Qualcomm counsel |
|---|---|
| JVT Practices and Procedures and QUALCOMM's Participation | The evidence is undisputed that QUALCOMM was not involved, in any manner, with the work of the JVT leading up to this release of the H.264 standard in May of 2003.  There is no evidence that QUALCOMM attended any of the JVT meetings between December, 2001 and May, 2003.  Until September of 2003, no QUALCOMM employee ever attended a meeting of the JVT.  There is also no evidence that QUALCOMM employees engaged in any email correspondence or other means for working with the JVT to develop the standard.  (Doc. No. 543-2, Ex. Z at 4) (citations omitted.)  The first recorded instance of a named QUALCOMM employee attending a meeting of the JVT occurs with Phoom Sagetong in December, 2003 [. . .] Between 2003 and 2005, Mr. Sagetong was the only QUALCOMM employee to attend a meeting of the JVT.  (Id.) (citations omitted.)  QUALCOMM never submitted a JVT patent disclosure form related to the baseline H.264 profile because QUALCOMM never participated in the JVT meetings where that standard was created [. . .] In April 2006, QUALCOMM declared that it had patents it believed were "required to implement" the H.264 standard, and that it was prepared to license any such patents on a "worldwide, non-discriminatory basis and on reasonable terms and conditions." |

| | (Id. at 7) (citations omitted.) |
|---|---|
| It Is Undisputed that QUALCOMM Did Not Make a Misleading Communication | There is no evidence that any QUALCOMM employee was a JVT participant prior to September, 2003, and therefore there is no reasonable basis for Broadcom to assert that QUALCOMM had a duty to disclose the patents-in-suit prior to this point in time. There is no evidence of any particular QUALCOMM employee attending a meeting of the JVT prior to Phoom Sagetong, in December, 2003. |
| | (Doc. No. 543-2, Ex. Z at 10) (citations omitted.) |
| | It is undisputed that none of the QUALCOMM employees attending JVT meetings knew of the potential applicability of the patents-in-suit to the H.264 standard [. . .] [N]one of them [Qualcomm employees] can be accused of making any misleading statements or engaging in any misleading omissions. |
| | (Id.) (citations omitted.) |
| | The relevant H.264 standard had already been in place and the technical content of the standard established when the attendees in question, QUALCOMM engineers, attended their first meeting of the JVT. |
| | (Id. at 10.) |
| Broadcom's Claim Of Fraud Is Insufficient As A Matter Of Law | [T]here is no evidence showing the requirements of scienter and intent to defraud, as none of the QUALCOMM employees attending JVT meetings knew of these patents. |
| | (Doc. No. 543-2, Ex. Z at 15.) |
| Broadcom's Claim Of Unclean Hands Is Insufficient As A Matter Of Law | QUALCOMM employees participating in the JVT acted in good faith at all times[.] |
| | (Doc. No. 543-2, Ex. Z at 16.) |

In conjunction with the Motion for Summary Adjudication, Qualcomm counsel also filed a supporting Statement of Undisputed Facts, in which it listed as undisputed fact:

10. Qualcomm was not involved with the work of the JVT leading up to the release of the H.264 standard in May of 2003.

11. Qualcomm had no influence or effect on the technical content of the H.264 standard prior to its publication in May 2003.

41

1  (Doc. No. 543-2, Ex. AA at 2) (citations omitted.)

2  Then, on November 27, 2006, Qualcomm counsel filed their reply brief in support of

3  Qualcomm's Motion for Summary Adjudication, in which they addressed the appearance

4  of Qualcomm employee Raveendran's email address in an email list for a JVT ad hoc

5  group:

6  It does not show that Raveendran ever received any JVT documents or JVT
   information of any sort, let alone anything covering the relevant parts of the
7  H.264 standard.  The document thus does not contradict Raveendran's
   testimony that she did not receive information related to JVT meetings, and
8  did not know of JVT meetings or have any involvement with the JVT prior to
   her participation in the SVC project.  The document also provides no
9  evidence regarding what emails were allegedly sent to the "avc_ce" email
   list, whether Raveendran was actually on this list or received any emails, and
10 whether she viewed and understood any emails that actually support the
   elements of the defenses Broadcom has to prove, including that
11 QUALCOMM understood at the time that either of the patents-in-suit may
   relate to the H.264 standard.  In short, this document, even if admissible
12 (which it is not), fails to support *any* reasonable inference for Broadcom and
   does not contradict Broadcom's own expert when he agreed that
13 "QUALCOMM had not influence or effect on the technical content of the
   H.264 standard prior to its publication in May 2003."

14 (Doc. No. 543-2, Ex. CC at 6 - 7) (footnote and citations omitted.)  Later, in a section

15 entitled "It Is Undisputed That No QUALCOMM Employee Knew Of The Applicability of

16 The Patents-In-Suit To The H.264 Standard Prior To This Lawsuit," Qualcomm counsel

17 argued:

18 All Raveendran stated [in her deposition] was "I have seen the front page [of
   the '104 patent], I haven't seen the entire document."  This testimony does
19 not show that Raveendran was familiar with the technical details of the H.264
   standard or with the relevance of the '104 Patent to the H.264 standard.  It
20 falls far short of establishing that Raveendran "knew of the applicability of
   the patents-in-suit to the H.264 standard," only showing that Raveendran
21 never read the '104 Patent.

22 (Doc. No. 543-2, Ex. CC at 9) (footnote and citation omitted.)

23 The lynchpin of Qualcomm's adamant and determined motions and arguments for

24 summary adjudication was the claim that Broadcom had no evidence of JVT participation.

25 Not surprising.  Every attempt to obtain evidence, which as it came later to be revealed was

26 voluminous and dispositive, had been repelled by Qualcomm by its steadfast denial of the

27

28                                    42                    05-CV-1958-B (BLM)

1    existence of any evidence and the false denials of all factual allegations, both in its

2    witnesses' depositions and in its discovery responses. To then urge upon the Court that

3    Broadcom had no evidence to support its position demonstrates the reason for calculated

4    orchestration of a deliberate plan to conceal evidence in the case.

5         On November 19, 2006, Qualcomm counsel filed Qualcomm's Motion in Limine to

6    Exclude Evidence Relating to Qualcomm's Participation in the JVT, the Timing of its

7    Disclosures, and the Testimony of Cliff Reader, or, in the Alternative, for Adjudication of

8    Broadcom's Equitable Defenses in a Bench Trial, in which they again argued:

9         Broadcom has conducted extensive discovery relating to QUALCOMM's
          alleged involvement in the JVT, apparently in an effort to claim that
10        QUALCOMM had some obligation to disclose, prior to filing the present
          action in October 2005, that it had patents required to implement the H.264
11        standard [. . .]

12        It is undisputed that QUALCOMM did not become involved at all in the
          JVT's proceedings until after the JVT had finalized the H.264 technical
13        specifications, and Broadcom's expert, Dr. Reader, admitted that
          QUALCOMM had "no influence or effect on the technical content of the
14        H.264 standard prior to its publication in May 2003." [. . .]. There is no
          evidence that QUALCOMM attended any of the JVT meetings between
15        December 2001 and May 2003. In fact the first QUALCOMM participation
          did not occur until September 2003.

16
17   (Doc. No. 543-2, Ex. EE at 2) (footnotes omitted.) These two paragraphs contain nothing

18   but false statements.

19        On the same day, Qualcomm counsel filed Qualcomm's Memorandum of

20   Contentions of Fact and Law, in which they similarly asserted under the section entitled

21   "QUALCOMM's Lack of Involvement in H.264 Standardization Process":

22        66. There is no evidence of any involvement of QUALCOMM personnel in
          the H.264/AVC standardization process prior to September 2003, by which
23        time the technical content of the baseline, main and extended profiles was
          considered to be frozen and the first issue of the H.264/AVC Standard had
          been published.

24
25        67. QUALCOMM employees had only minimal involvement in JVT
          activities from September 2003 to December 2005, with no technical
26        contribution documents submitted by any QUALCOMM employee.

27        68. QUALCOMM had no significant involvement with the development of
          the H.264/AVC Standard.

28                                           43

(Doc. No. 543-2, Ex. BB at 16 - 17.)  Qualcomm counsel then filed Qualcomm's Rebuttal Memorandum of Contentions of Fact and Law on December 4, 2006, in which they asserted:

> 31.  QUALCOMM was not a JVT participant leading up to the release of the H.264 standard when it was technically fixed in December 2003 or when it was officially released in May 2003 [. . .]

> 32.  Broadcom's allegation that QUALCOMM was involved with the JVT prior to the development and release of the standard is based solely on the appearance of the e-mail address of QUALCOMM employee Viji Raveendran on an e-mail list for the Ad Hoc Group on AVC verification tests [. . .]  Broadcom offers no other evidence of participation in the JVT by Ms. Raveendran or any other employee as early as December 2002.

> 33.  Ms. Raveendran was not involved in any standards development projects relating to the H.264 standard, nor did she recall receiving submissions or documents related to the standard.  Raveendran did not receive information related to the JVT meetings or know of JVT meetings prior to her participation in a separate JVT project, the scalable video coding project, unrelated to the patents in suit or to this litigation.

> 34.  Broadcom's only other allegation with respect to QUALCOMM participation in the JVT occurs long after the standard was technically fixed and officially released: the apparent sponsorship of a JVT meeting by QUALCOMM and alleged and unverified recording of a single objection made by QUALCOMM to a proposed change in the profile in September 2003, and the appearance of QUALCOMM employee Phoom Sagetong in JVT meetings between December 2003 and in 2004.

> 35.  None of these allegations show that QUALCOMM participated in the JVT when the H.264 standard was developed and approved.  QUALCOMM's only involvement in the JVT was as part of the unrelated SVC project, and it began in 2005.  Mr. Sagetong attended the JVT meetings on behalf of the United States National Body and not as a representative of QUALCOMM.

(Doc. No. 543-2, Ex. DD at 8 - 9.)

Qualcomm's motion for summary adjudication was denied on December 5, 2006. As detailed in previous sections of this Order, all of these assertions of no participation that were made and re-made by Qualcomm counsel during motions practice for the present litigation were proven patently false by documents produced by Qualcomm only after a jury trial was held, after a verdict was reached, after a post-trial hearing on the equitable issues was held, and after a finding was made by the Court as to these equitable issues.

05-CV-1958-B (BLM)

1  And certainly the statement that "Broadcom has conducted extensive discovery relating to

2  Qualcomm's alleged involvement in the JVT . . ." is particularly ironic, since Broadcom's

3  repeated requests were uniformly denied on the stated ground that there was nothing to

4  produce.

5

6                              (3)    **Misconduct during trial**

7         Qualcomm counsel continued to vigorously argue during trial that Qualcomm did

8  not participate in the JVT until well after the H.264 standard was published in May 2003.

9  Qualcomm counsel stated in his opening statement:

10        Later, in May of '03, the standard is approved and published. And then
          Qualcomm, in the fall of 2003, it begins to participate not in JVT because it's
11        done. H.264 is approved and published. Qualcomm begins to participate in
          what are called professional extensions, things that sit on top of the standard,
12        additional improvements.

13  (Trial Tr., 107, Jan. 9, 2007.)

14        Then at side bar on January 18, 2007, Qualcomm counsel, in an attempt to keep out

15  of evidence a list of email addresses for a JVT ad hoc group that included the email address

16  of Qualcomm employee Raveendran, represented to the Court, "Actually, there are no

17  emails -- there are no emails." (Trial Tr., 91, Jan. 18, 2007.) He further stated, "there's no

18  evidence that any e-mail was actually sent to this list. This is just a list of e-mail . . .

19  addresses. There's no evidence of anything being sent." (Trial Tr., 92, Jan. 18, 2007.)

20  These statements were made four days after Qualcomm counsel, while preparing Ms.

21  Raveendran for her testimony, had stripped over fifty pages of emails regarding the JVT

22  from her email archives.

23        Six days later on the morning of January 24, 2007, one of the last days of trial,

24  Qualcomm counsel filed Qualcomm's Motion for Judgment as a Matter of Law ("JMOL")

25  Pursuant to Rule 52(c), in which they argued:

26        Broadcom failed to show (1) that Ms. Raveendran ever received a single
          email related to this list, (2) that anyone on this list ever communicated
27        regarding the H.264 standard, and (3) that the email list in question was even

28                                              45

1    a JVT list at all.

2    (Doc. No. 479 at 11.)

3    However, later that very same morning, in direct opposition to Counsel's

4    representations at side bar and Qualcomm's argument in its JMOL, Ms. Raveendran

5    testified as follows:

6    Q [by Broadcom counsel]: Did you receive mailings from the [JVT] ad hoc
     committee identified in this exhibit?

7    A:    During the preparation for this testimony, there were some e-mails
           pulled out of my e-mail box. E-mail archive.

8    Q:    Were they produced to Broadcom?
     A:    I don't know.

9    (Trial Tr., 53, Jan. 24, 2007.) These emails had not yet been produced to the Court or

10   Broadcom, and, immediately addressing this issue at side bar later on January 24,

11   Qualcomm counsel still argued to the Court,

12   [I]t's not clear to me [the emails are] responsive to anything. So that's
     something that needs to be determined before they would be produced . . . I'm

13   talking about whether they were actually requested in discovery.

14   (Trial Tr., 83, Jan. 24, 2007.)  Counsel continued,

15   I'm simply representing I haven't seen [the emails], and [whether Broadcom

16   requested them] hasn't been determined.

17   (Id. at 84.)

18   Qualcomm counsel apparently determined that the emails were in fact responsive,

19   because they produced the emails to Broadcom over the lunch recess on January 24, and

20   Ms. Raveendran was brought back to court to testify about them.  Before Broadcom

21   counsel was able to question Ms. Raveendran about the emails, Qualcomm counsel voiced

22   an objection to the Court out of the presence of the jury in pertinent part as follows:

23   There's nothing wrong with the way in which this production has taken place,
     your Honor.  There's been no wrongdoing on the part of Qualcomm in the

24   way in which these have been provided.

25   (Trial Tr., 193 - 94, Jan. 24, 2007.)

26   After trial, on February 1, 2007, Qualcomm counsel finally admitted by telephone to

27   Broadcom that "on January 14, 2007, attorneys for Qualcomm learned of an archive of

28   46

1  emails [sent to this email list for the JVT ad hoc group] belonging to Viji Raveendran."

2  (Doc. No. 543-2, Ex. E at 2.)  Therefore, on January 14, four days before Qualcomm

3  counsel argued to the Court that "there are no emails" and eight days before Qualcomm

4  counsel argued that Broadcom had failed to prove "[Ms.] Raveendran had ever received a

5  single email related to this list" in Qualcomm's JMOL, Qualcomm attorneys already knew

6  that there were in fact emails and had pulled them from Ms. Raveendran's email archive.

7       It is clear to the Court now, despite the attempts made by Qualcomm to minimize the

8  significance of these twenty-one emails, that they were just the "tip of the iceberg," that

9  over two hundred thousand more pages of emails and electronic documents were produced

10  post-trial that indisputably demonstrate that Qualcomm participated in the JVT from as

11  early as January 2002, that Qualcomm witnesses Irvine, Raveendran, Determan, and other

12  engineers were all aware of and a part of this participation, and that Qualcomm knowingly

13  attempted in trial to continue the concealment of evidence.  None of these emails or

14  electronic documents were produced in discovery as requested by Broadcom in multiple

15  requests for production and interrogatories.

16

17                **(4)    Misconduct post-trial**

18       Shortly after trial on January 29, 2007, Qualcomm counsel filed an Amended JMOL

19  Pursuant to Rule 52(c) backtracking on their original assertion that Ms. Raveendran had not

20  received any emails sent to the JVT ad hoc group email list.  (Doc. No. 491 at 11.)

21  Qualcomm counsel also sent a letter of apology to the Court on January 29, 2007, admitting

22  that Qualcomm counsel's argument at sidebar on January 18 and Qualcomm's arguments in

23  its original JMOL were "incorrect" as to the alleged non-existence of any emails sent to

24  Ms. Raveendran through the ad hoc group email list.  (Doc. No. 543-2, Ex. D.)

25       Nevertheless, Qualcomm counsel continued to assert no participation in the JVT in

26  its February 2, 2007, Post-Trial Brief Concerning Waiver and Inequitable Conduct.  (Doc.

27  No. 503.)  In a section entitled "QUALCOMM Did Not Participate In The Development Of

28                              47                    05-CV-1958-B (BLM)

1  The H.264 Standard Prior To The Publication of That Standard In May 2003," Qualcomm

2  counsel argued:

> QUALCOMM did not attend JVT meetings and did not participate in the
> development of the H.264 standard prior to May 2003. The first evidence of
> any JVT participation on behalf of QUALCOMM is the September 2003 JVT
> meeting minutes, four months after the H.264 standard's publication.

5

6  (Id. at 4 - 5) (footnotes omitted.) Citing Ms. Raveendran's testimony that she "never

7  attended any JVT-related meeting until July 2005," Qualcomm counsel asserted:

> The passive and involuntary receipt of unsolicited and unread emails, without
> more, did not make QUALCOMM a "member" of the JVT and could not
> create any duty of disclosure under its rules.

9

10  (Id. at 5.) Then, in a section entitled "No QUALCOMM Participant Was Aware Of The

11  Potential Application Of The Patents-In-Suit To The H.264 Standard During The Relevant

12  Time Period," Qualcomm counsel further asserted:

> Prior to July 2005, the QUALCOMM employees who participated in the JVT
> had no awareness that the patents-in-suit might apply to the H.264 standard . .
> . Because no QUALCOMM employee ever actually compared the claims of
> the patents to the standard, QUALCOMM did not know that the
> patents-in-suit read on the standard, and could not have "knowingly violated"
> any disclosure duty.

16  (Id. at 6) (footnote omitted.)

17      Qualcomm counsel then ironically stated in their post-trial brief that

18  "[s]tandards-setting misconduct is a serious charge, suggesting sophisticated foul play."

19  (Id.) The Court completely agrees with this statement and finds that Qualcomm's standard-

20  setting misconduct with the JVT was indeed "serious" and suggests extremely sophisticated

21  foul play on the part of Qualcomm and its employees. At the post-trial evidentiary hearing

22  on the equitable issues of inequitable conduct and waiver, Qualcomm counsel continued to

23  vigorously argue no participation and no foul play. The Court ultimately found in favor of

24  Broadcom and against Qualcomm that Qualcomm had indeed waived its patent rights as to

25  the '104 and '767 patents in its March 21, 2007 Order. (Doc. No. 528.)

26      Furthermore, in a letter to Broadcom dated February 8, 2007, Qualcomm counsel

27  asserted that, while perhaps "there was some fleeting mention of emails in my presence,"

28                                      48                          05-CV-1958-B (BLM)

1  he was somehow "not cognizant that the emails from Ms. Raveendran's archive had been

2  identified" when he flatly asserted to the Court at sidebar on January 18 that no such emails

3  existed:

> [S]ince the issue of my knowledge [of the twenty-one emails produced on
> January 24] has been raised, I should add that I cannot completely exclude
> the possibility that, during those times that I was in the Day Casebeer firm's
> trial preparation suites rather than my own firm's, there was some fleeting
> mention of emails in my presence. What I can say with certainty now is that,
> when I told the Court on January 18, 2007 that there was no such emails in
> evidence, I was not cognizant that the emails from Ms. Raveendran's archive
> had been identified.

(Doc. No. 543-2, Ex. F at 1.)

> As stated above, these twenty-one emails were just a hint of the over two hundred

thousand pages of emails and electronic documents that were finally produced four months

after trial containing direct evidence that multiple representatives of Qualcomm

participated in the JVT from the beginning, and that multiple Qualcomm witnesses knew of

this participation even as they testified to the contrary at deposition and trial.  However,

before this production occurred and even after the discovery of the twenty-one emails in

Ms. Raveendran's email archive, Qualcomm counsel continued to insist that they had

conducted a reasonable search for responsive documents during discovery and that the

twenty-one emails were not responsive because they were irrelevant.  Qualcomm counsel

wrote in a letter to Broadcom on February 16, 2007:

> As explained earlier in our meet and confer, QUALCOMM voluntarily
> produced the [twenty-one] emails during trial in the interest of
> expeditiousness.  We continue to believe that QUALCOMM performed a
> reasonable search of QUALCOMM's documents in response to Broadcom's
> Requests for Production and that the twenty-one unsolicited emails received
> by Ms. Raveendran from individuals on the avc_ce reflector are not
> responsive to any valid discovery obligation or commitment.

(Doc. No. 543-2, Ex. G at 1.)  Qualcomm counsel made these assertions all the while

acknowledging: (1) Broadcom's July 14, 2006, Request for Production No. 93 requesting

"[a]ll documents referring to or evidencing any participation by Qualcomm in the

proceedings of the JVT, the ISO, the IEC, and/or the ITU-T"; (2) Broadcom's January 23,

1  2006, Request for Production No. 49 requesting "[a]ll documents given to or received from

2  a standards setting body or group that concern any standard relating to the processing of

3  digital video signals that pertains in any way to any Qualcomm Patent, including without

4  limitation communications, proposals, presentations, agreements, commitments, or

5  contracts to or from such bodies"; and (3) Broadcom's January 23, 2006, Request for

6  Production No. 50 requesting "[a]ll documents concerning any Qualcomm membership,

7  participation, interaction, and/or involvement in setting any standard relating to the

8  processing of digital video signals that pertains in any way to any Qualcomm Patent." (Id.,

9  Ex. E at 1.)

10       Correctly rejecting Qualcomm counsel's continuing insistence that Qualcomm had

11  already conducted a reasonable search for responsive documents with negative result,

12  Broadcom requested in a March 5, 2007 letter that Qualcomm perform searches for nine

13  key phrases in the email archives of twelve key Qualcomm employees:

14       Broadcom requests that Qualcomm immediately search for and produce
         responsive documents in the email archives of Ms. Raveendran and any other
15       Qualcomm employee who has ever been involved in any way in standard-
         setting for video compression (whether or not as an actual participant at a
16       standard-setting meeting), dated between January 1, 2000 and December 31,
         2004.
17
18  (Doc. No. 543-2, Ex. H at 4 - 5.)  In response to this letter, Qualcomm counsel continued to

    defend Qualcomm's discovery conduct and object to Broadcom's request for further
19
    discovery in a March 7, 2007, reply as follows:
20
21       For the reasons discussed at length previously, we disagree with each of your
         arguments concerning the responsiveness of those emails and believe your
22       negative characterization of QUALCOMM's compliance with its discovery
         obligation to be wholly without merit . . .
23
         Your request for completely new and patently overbroad discovery–plainly
24       beyond the scope of anything propounded during the appropriate period
         before trial--cannot on any basis be justified now, more than a month after
25       trial has concluded.

26  (Id., Ex. I at 1.)  Nevertheless, upon Broadcom's threat to involve the Court, Qualcomm

27  agreed to search the email archives of Qualcomm witnesses Raveendran, Bao, Irvine,

28                                        50                        05-CV-1958-B (BLM)

Ludwin, and Sagetong for the search terms "JVT," "Joint Video Team," "AVC," "Advanced Video Coding," "H.264," "H264," "MPEG-4 Part 10," "MPEG4 Part 10," and "Gary Sullivan." (Id., Ex. I at 2.) The Court finds it incredible that Qualcomm never conducted such an obvious search for these key terms in the email archives of these key Qualcomm witnesses during the many months of discovery that occurred before trial, since Broadcom clearly had requested all of it and more.

One month later on April 6, 2007, Qualcomm counsel informed Broadcom through email that this search had produced "a large volume that numbers in the thousands" of responsive documents, which clearly indicate to the Court Qualcomm's participation in the JVT. (Doc. No. 543-2, Ex. J at 1.) It was only then that the Court received any notice of this post-trial production of documents in a letter addressed to the Court directly from Qualcomm lead trial counsel on April 9, 2007. (Doc. No. 543-2, Ex. K.) In that letter, Counsel stated that Qualcomm had discovered "a substantial number of electronic documents" that "appear to be inconsistent with arguments that we made at trial, and at the post-trial hearing, regarding Broadcom's affirmative defense of waiver." (Id. at 1.) Counsel then apologized to the Court "[p]rofessionally and personally . . . for asserting positions that we would not have taken had we known of the existence of these documents." (Id.) However, Counsel insisted that "we presented our arguments in good faith and certainly would not have knowingly presented argument that we believed to be contrary to fact." (Id. at 1 - 2.)

That same day, the Court received a separate letter of apology directly from Qualcomm's General Counsel and Executive Vice President Louis Lupin, in which Mr. Lupin conveyed "[his] regret and apologies regarding the circumstances described in [Qualcomm lead trial counsel's April 9 letter]." (Doc. No. 543-2, Ex. L at 1.) Mr. Lupin claimed that "QUALCOMM takes its obligations to the Court, opposing parties, and the community seriously, and will take all necessary steps to live up to the high expectations QUALCOMM has always set for itself." (Id.) However, in an interview with the San

51

1   Diego Union-Tribune about this post-trial production, Mr. Lupin reportedly stated that

2   these newly discovered documents "'on the whole' bolstered Qualcomm's arguments

3   during trial" and that "'[w]e kind of hurt ourselves' by not finding them before trial."

4   Kathryn Balint, <u>Another face-off in patent battles</u>, THE SAN DIEGO UNION-TRIBUNE, May

5   31, 2007, at C1. *The Court finds, in sharp disagreement to Mr. Lupin's characterization of*

6   *the new evidence, that the documents in fact fully bolstered Broadcom's waiver arguments*

7   *and completely refuted Qualcomm's waiver defenses at trial.*

8        Qualcomm General Counsel Lupin made an illuminating statement as to

9   Qualcomm's "nothing-to-lose" mentality in filing this patent infringement suit against

10  Broadcom. According to a January 27, 2007, article in the San Diego Union-Tribune

11  following the jury verdict of no infringement, Mr. Lupin characterized the case as follows:

> There certainly was a significant upside potential for us, but it was all upside,
> no downside. . . . For Broadcom, it was all downside, no upside. It probably
> won't have any impact on us one way or the other. It's just the latest round in
> a series of battles.

(Doc. No. 543-2, Ex. Q at 2.) Indeed, if Qualcomm is correct in its contention that its '104

and '767 patents are infringed by the H.264 standard, it would be in a lone position to

extract licenses from all companies producing H.264-compliant products, a considerable

"upside" opportunity for Qualcomm's bottom line.

**IV.    CONCLUSION**

In light of all of the above evidence finally revealed, the eventual collapse of

Qualcomm's concealment efforts exposes the carefully orchestrated plan and the deadly

determination of Qualcomm to achieve its goal of holding hostage the entire industry

desiring to practice the H.264 standard by insulating its IPR from the JVT so that the JVT

would lose the opportunity to mitigate, if not to avoid, Qualcomm's IPR in the

development of the H.264 standard. Broadcom, ignorant of the existence of the '104 and

'767 patents, designed and is in the process of manufacturing numerous H.264-compliant

1    products.

2        The Federal Circuit has held that unenforceability of a patent due to inequitable

3    conduct before the PTO extends to continuations and reissues of the original patent.  See

4    Afga Corp. v. Creo Prods. Inc., 451 F.3d 1366, 1379 (Fed. Cir. 2006); Hewlett-Packard,

5    882 F.2d at 1563; Hoffman-La Roche v. Lemmon Co., 906 F.2d 684, 688 - 89 (Fed. Cir.

6    1990).  While divisions of the original patent may not be unenforceable "where the claims

7    are subsequently separated from those tainted by inequitable conduct . . . and where the

8    issued claims have no relation to the omitted prior art," Baxter Int'l, Inc. v. McGaw, Inc.,

9    149 F.3d 1321, 1332 (Fed. Cir. 1998), by analogizing misconduct before a standards setting

10   body resulting in waiver to misconduct before the PTO resulting in inequitable conduct,

11   this Court finds all claims of the '104 and '767 patents tainted by Qualcomm's waiver and

12   that any divisional, continuation, continuation-in-part, or reissue application of either patent

13   would be similarly tainted.

14       Therefore, under the totality of evidence produced both before and after the jury

15   verdict, by reason of Qualcomm's intentional and persistent insulation of their directly

16   related IPR from the activities and the analyses of the JVT when they were obligated to

17   reveal it, this Court **FINDS**, pursuant to Rambus, that Qualcomm has waived its rights to

18   enforce the '104 and '767 patents and their continuations, continuations-in-part, divisions,

19   reissues, or any other derivatives of either patent.

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27       This type of conduct was the direct focus and basis for the rule of law set out clearly

28                                           53                        05-CV-1958-B  (BLM)

1  in January 2003 in <u>Rambus</u>, in which the Federal Circuit sets out the disclosure duty for

2  patents that read on or apply directly to the activities of the standards-setting process. <u>See</u>

3  <u>Rambus</u>, 318 F.3d at 1096 - 1102.  The facts of this case demonstrate the importance of the

4  <u>Rambus</u> decision to the success of the industry standards protocols that have been

5  achieving significant benefits for businesses and consumers globally.

6          Judgment will be entered concurrently with this Order.

7

8

9      **IT IS SO ORDERED**

10

11  DATED:  August 6, 2007

12

13                                              Hon. Rudi M. Brewster
                                                United States Senior District Court Judge
14

15

16  cc:  Hon. Barbara Lynn Major
          United States Magistrate Judge
17

18      All Counsel of Record

19

20

21

22

23

24

25

26

27

28                                    54                        05-CV-1958-B (BLM)

# EXHIBIT B

No. 06-4292

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

BROADCOM CORPORATION,

*Plaintiff-Appellant*,

QUALCOMM INCORPORATED,

*Defendant-Appellee*.

Appeal from the United States District Court
for the District of New Jersey
No. 05-cv-03350
The Honorable Mary L. Cooper

BRIEF OF DEFENDANT-APPELLEE

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler
Richard J. Stark
Roger G. Brooks
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000

McCARTER & ENGLISH, LLP
William J. O'Shaughnessy
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444

## CORPORATE DISCLOSURE STATEMENT

Appellee QUALCOMM, INC., a public corporation, states that it has no parent corporation and that no publicly held corporation owns 10% or more of its outstanding stock.

# TABLE OF CONTENTS

Page

Corporate Disclosure Statement................................................................ i

Table of Citations .................................................................................... iv

Citation Forms......................................................................................... x

Jurisdictional Statement .......................................................................... 1

Statement of Related Cases and Proceedings ......................................... 2

Statement of Issues Presented ................................................................. 4

Introduction ............................................................................................. 6

Statement of the Case.............................................................................. 9

Statement of Facts ................................................................................... 14

Summary of Argument............................................................................. 20

Standard of Review ................................................................................. 25

Argument.................................................................................................. 25

I.    BROADCOM'S CLAIM FOR "MONOPOLIZATION OF
      MARKETS FOR WCDMA TECHNOLOGY" WAS PROPERLY
      DISMISSED. ................................................................................... 26

      A.    QUALCOMM Lawfully Obtained the "Monopoly Power"
            Alleged by Broadcom.................................................................. 27

      B.    The District Court Correctly Held That QUALCOMM's
            Alleged FRAND Commitments Do Not and Cannot Give
            Rise to a Monopolization Claim.................................................. 30

      C.    Broadcom's Monopolization Theory is Without Support in
            the Precedents. ........................................................................... 35

II.   THE DISTRICT COURT CORRECTLY HELD THAT
      BROADCOM FAILED TO STATE A CLAIM FOR

# TABLE OF CONTENTS
(continued)

Page

ATTEMPTED MONOPOLIZATION OF THE MARKET FOR
UMTS CHIPSETS. ................................................................... 39

A.    Broadcom Did Not Plead Harm to Competition in the
UMTS Chipset Market. ................................................ 40

B.    Broadcom Did Not Plead That There is a Dangerous
Probability That QUALCOMM Will Obtain Monopoly
Power in the UMTS Chipset Market. ........................... 42

C.    Broadcom Did Not Plead Antitrust Injury in the UMTS
Chipset Market. ........................................................... 47

III.    THE COURT CORRECTLY DISMISSED BROADCOM'S 3G
CDMA MONOPOLY MAINTENANCE CLAIM (COUNT 7). ............. 51

A.    Broadcom Has No Standing to Assert Claims Relating to
Any 3G CDMA Market. ................................................ 52

B.    The Complaint Does Not Adequately Allege Any 3G
CDMA Markets in Which "Maintenance" Could Occur. ............ 52

C.    The Complaint Does Not Adequately Allege
Anticompetitive Conduct in Any 3G CDMA Market. ................. 53

D.    Broadcom's Attempt to Transform Count 7 Into a UMTS-
Related Claim is Impermissible and Without Substance. ............. 55

IV.    THE DISTRICT COURT CORRECTLY DISMISSED
BROADCOM'S EIGHTH CLAIM. ........................................ 58

Conclusion ................................................................................ 63

Combined Certifications ........................................................... 64

iii

# TABLE OF CITATIONS

Page(s)

**Cases**

Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours and Co.,
826 F.2d 1235 (3d Cir. 1987)...............................................................58

Allied Tube & Conduit Corp. v. Indian Head, Inc.,
486 U.S. 492 (1988)..................................................................35, 36

American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,
456 U.S. 556 (1982)..........................................................................36

Applera Corp. v. MJ Research Inc.,
No. 3:98 VB 1201 (JBM), 2004 WL 2935820 (D. Conn. Dec. 16,
2004) ................................................................................................49

Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
Carpenters,
459 U.S. 519 (1983)..........................................................................54

Axis, S.p.A. v. Micafil, Inc.,
870 F.2d 1105 (6th Cir. 1989) .........................................................50

Brown Shoe Co. v. United States,
370 U.S. 294 (1962)....................................................................32, 40

Brunson Commc'ns, Inc. v. Arbitron, Inc.,
239 F. Supp. 2d 550 (E.D. Pa. 2002) ...............................................42

Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.,
429 U.S. 477 (1977)..........................................................................23

Car Carriers, Inc. v. Ford Motor Co.,
745 F.2d 1101 (7th Cir. 1984) .........................................................47

City of Pittsburgh v. West Penn Power Co.,
147 F.3d 256 (3d Cir. 1998)...............................................51, 59, 62

Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,
150 F.3d 130 (3d Cir. 2006)..............................................................25

iv

Eastman Kodak Co. v. Image Technical Servs., Inc.,
   504 U.S. 451.................................................................................43

ESS Tech. Inc. v. PC-Tel, Inc.,
   No. C-99-20292 (RMW) 1999 WL 33520483 (N.D. Cal. Nov. 4,
   1999) ............................................................................41, 50

Federal Trade Commission v. Arch Coal, Inc.,
   329 F. Supp. 2d 109 (D.D.C. 2004)..............................................62

Fresh Made, Inc. v. Lifeway Foods, Inc.,
   No. Civ. A. 01-4254, 2002 WL 31246922 (E.D. Pa. Aug. 9, 2002) ...........42, 46

Grinnell v. United States,
   384 U.S. 563 (1966)................................................................27

H.J., Inc. v. Int'l Tel. & Tel. Corp.,
   867 F.2d 1531 (8th Cir. 1989) ....................................................44

Hedges v. Musco,
   204 F.3d 109 (3d Cir. 2000)......................................................25

Hodges v. WSM, Inc., 26 F.3d 36 (6th Cir. 1994)................................................51

Ideal Dairy Farms Inc. v. John Labatt, Ltd.,
   90 F.3d 737 (3d Cir. 1996).........................................................62

Ill. Tool Works Inc. v. Independent Ink, Inc.,
   126 S. Ct. 1281 (2006) ............................................................29

In re Dell Computer Corp.,
   121 F. T. C. 616 (1996)............................................................38

In re Indep. Serv. Orgs. Antitrust Litig.,
   203 F.3d 1322 (Fed. Cir. 2002)........................................32, 48, 49, 50

In re Microsoft Antitrust Litig.,
   No. MDL 1332, Civ. JFM-05-1087, 2005 WL 1398643 (D. Md.
   June 10, 2005) .....................................................................58

In re Union Oil Co.,
   No. 9305, 2004 WL 1632816 (F.T.C. July 6, 2004) ("Unocal").....................38

In re Westinghouse Sec. Litig.,
   90 F.3d 696 (3d Cir. 1996)..............................................................1

In the Matter of Rambus, Inc.,
   No. 9302, 2006 WL 2330117 (F.T.C. Aug. 2, 2006) ....................36, 37

Intellective, Inc. v. Mass. Mutual Life Ins. Co.,
   190 F. Supp. 2d 600 (S.D.N.Y. 2002) ........................................43

Intergraph Corp. v. Intel Corp.,
   195 F.3d 1346 (Fed. Cir. 1999)..................................................49

J.L. Terrel's v. Sherwin-Williams Automo. Finishes Corp.,
   No. Civ. A. 02 CV 2645, 2004 WL 870705 (E.D. Pa. March 30,
   2004) .............................................................................53

Lum v. Bank of America,
   361 F.3d 217 (3d Cir. 2004)..............................14, 25, 33, 34

Mathews v. Lancaster Gen. Hosp.,
   87 F.3d 624 (3d Cir. 1996).......................................................40

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
   475 U.S. 574 (1986)..............................................................32

Medtronic Ave., Inc. v. Boston Scientific Corp.,
   No. Civ. A. 98-478-SLR, 2001 WL 652016 (D. Del. Mar. 30, 2001) ..............43

Miller Insituform, Inc. v. Insituform of N. Am., Inc.,
   830 F.2d 606 (6th Cir. 1987) ..............................................49, 50

Moore Corp. Ltd. v.Wallace Computer Services, Inc.,
   907 F. Supp. 1545 (D. Del. 1995)...............................................61

Narion v. Lower Merion School Dist.,
   206 F.3d 323 (3d Cir. 2000)......................................................25

Pastore v. Bell Tel. Co.,
   24 F.3d 508 (3d Cir. 1994).................................................42, 43

Pennsylvania v. Zimmerman,
   836 F.2d 173 (3d Cir. 1988).......................................................26

Port Authority of NY and NJ v. Arcadian Corp.,
    189 F.3d 305 (3d Cir. 1999)...................................................................25

Rambus, Inc. v. Infineon Techs. AG,
    304 F. Supp. 2d 812 (E.D. Va. 2004) .................................................37

Rambus, Inc. v. Infineon Techs. AG,
    330 F. Supp. 2d 679 (E.D. Va. 2004) .................................................37

Rebel Oil Co. v. Atl. Richfield Co.,
    51 F.3d 1421 (9th Cir. 1995) ................................................................43

SCM Corp. v. Xerox Corp.,
    645 F.2d 1195 (2d Cir. 1981)...........................................................29, 48

Serpa Corp. v. McWane, Inc.,
    199 F.3d 6 (D. Mass. 1999) .................................................................62

Sheet Metal Duct, Inc. v. Lindab, Inc.,
    No. CIV. A. 99-6299, 2000 WL 987865 (E.D. Pa. July 18, 2000) ...................30

Simpson v. Union Oil Co.,
    377 U.S. 13 (1964) ..............................................................................49

Smith & Johnson, Inc. v. Hedaya Home Fashions Inc.,
    No. 96 Civ. 5821 MBM, 1996 WL 737194 (S.D.N.Y. Dec. 26,
    1996) ....................................................................................................42

Spectrum Sports, Inc. v. McQuillan,
    506 U.S. 447 (1993).........................................................................44, 46

Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.,
    959 F.2d 468 (3d Cir. 1992)................................................................41

Townshend v. Rockwell Int'l Corp.,
    No. C99-0400SBA, 2000 WL 433505
    (N.D. Col. Mar. 28, 2000).........................................................21, 28, 35

Tunis Bros. Co. v. Ford Motor Co.,
    952 F.2d 715 (3d Cir. 1991)................................................................40

Twin City Sportservice v. Charles O. Finley & Co.,
    676 F.2d 1291 (9th Cir. 1982) ............................................................44

United States v. Dentsply Int'l, Inc.,
  399 F.3d 181 (3d Cir. 2005)...........................................................43, 53, 54

United States v. E.I. du Pont de Nemours & Co.,
  351 U.S. 377 (1956)...................................................................................27

United States v. E.I. du Pont de Nemours & Co.,
  366 U.S. 316 (1961)...................................................................................38

United States v. Microsoft Corp.,
  253 F.3d 34 (D.C. Cir. 2001).............................................................56, 57

United States v. Oracle Corp.,
  331 F. Supp. 2d 1098 (N.D. Cal. 2004).................................................62

Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.,
  375 F.3d 1341 (Fed. Cir. 2004)................................................................48

Valley Products Co. v. Landmark,
  128 F.3d 398 (6th Cir. 1997) ...................................................................51

Verizon Communications Inc. v. Law Offices of Curtis V. Trinko,
LLP,
  540 U.S. 398 (2004)...........................................................................passim

Walker Process Equipment, Inc. v. Food Machinery & Chemical
Corp.,
  382 U.S. 172 (1965)...................................................................................50

Zenith Radio Corp. v. Hazeltine Research, Inc.,
  395 U.S. 100 (1969)...................................................................................58

**Statutes**

15 U.S.C. § 18 ...............................................................................................58

15 U.S.C. § 4 ...................................................................................................1

28 U.S.C. § 1291 .............................................................................................1

28 U.S.C. § 1331 .............................................................................................1

28 U.S.C. § 1337 ........................................................................................... 1

28 U.S.C. § 1367 ........................................................................................... 1

35 U.S.C. § 154(a)(1) .................................................................................... 7

35 U.S.C. § 271(d) ...................................................................................... 49

35 U.S.C. §§ 154 ......................................................................................... 29

35 U.S.C. §§ 271 ......................................................................................... 29

Fed. R. Civ. P. 12(b)(6) ........................................................................ 10, 25

# CITATION FORMS

Citations in the form "A___" refer to pages of the Joint Appendix filed with the United States Court of Appeals for the Third Circuit.

Citations in the form of "Pl. Br. ___" refer to Plaintiff-Appellant's Opening Brief to the United States Court of Appeals for the Third Circuit.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction to determine the validity of Broadcom's claims under 28 U.S.C. § 1331, 28 U.S.C. § 1337 and Section 4 of the Sherman Act, 15 U.S.C. § 4.  Supplemental jurisdiction over Broadcom's claims under state statutory and common law was proper under 28 U.S.C. § 1367.

Broadcom stated that jurisdiction in this Court is proper under 28 U.S.C. § 1291, because "this appeal is from a final order or judgment of a United States District Court that disposes of all parties' claims".  (Pl. Br. 2)  In support of that statement, Broadcom has stated that it will "stand on its complaint", "to the extent that Broadcom is required for purposes of establishing jurisdiction"  (Pl. Br. 2 n.1 (emphasis added)).  Assuming that Broadcom's footnote, notwithstanding the words "[t]o the extent", is a waiver of any right to replead, this is an appeal from a final judgment and Broadcom's appeal was timely filed under Rule 4.  See, e.g., In re Westinghouse Sec. Litig., 90 F.3d 696, 705 (3d Cir. 1996).

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been previously before this Court.

However, Broadcom and QUALCOMM are adverse parties in several ongoing actions that are currently pending in the United States and abroad.

QUALCOMM is aware of five lawsuits initiated by Broadcom against it. There are currently two actions pending in the United States District Court for the Central District of California brought by Broadcom against QUALCOMM alleging patent infringement. Broadcom has also filed a complaint in the United States International Trade Commission (ITC) alleging infringement of patents. Broadcom has filed a complaint before the European Commission, alleging that the company violated European Union competition law in its WCDMA licensing practices. Broadcom has also apparently filed a complaint with the Korean Fair Trade Commission alleging that the QUALCOMM business practices challenged in the court below violate Korean antitrust regulations.

QUALCOMM has initiated three lawsuits against Broadcom in the Southern District of California. The first of those actions alleges the infringement of certain patents by Broadcom's WCDMA/UMTS chipsets. The second action alleges the infringement of two patents, each of which relates to video encoding and decoding for high-end multimedia processing. The third action alleges that Broadcom misappropriated QUALCOMM's confidential and trade secret

2

information relating to WCDMA chipsets, and relating to the company's multimedia capabilities for such chips.

## STATEMENT OF ISSUES PRESENTED

1.    Whether the District Court correctly dismissed Broadcom's claim for monopolization under Section 2 of the Sherman Act where the alleged monopoly in each relevant market about which Broadcom complains was conferred by patent, Broadcom has alleged no alternatives to the patented technology and Broadcom's sole allegation that QUALCOMM engaged in anticompetitive conduct in the relevant markets is that QUALCOMM did not license its patented technology on "fair, reasonable, and non-discriminatory" terms.  (A20-21, Pl. Br. 36-37)

2.    Whether the District Court correctly held that, in the absence of any allegations regarding the number of competitors in the relevant market, the relevant market shares of those competitors, whether other companies have been excluded from the market by the conduct alleged in the Complaint, and whether other companies have entered or exited the market, the Complaint does not adequately allege the (1) harm to competition; and (2) dangerous probability of achieving monopoly power necessary to sustain a claim for attempted monopolization.  (A23, Pl. Br. 48)

3.    Whether Broadcom alleged antitrust injury with respect to the alleged UMTS chipset market where the only allegations of injury were exclusion

4

from the alleged market by QUALCOMM's refusal to license lawfully-obtained patents on terms specified by Broadcom.[1]  (A26, Pl. Br. 51)

   4. Whether the District Court correctly dismissed Broadcom's claim for monopoly maintenance under Sherman Act Section 2 where Broadcom is not a participant in the markets alleged, the markets alleged are definitionally coextensive with QUALCOMM's exclusive rights under valid patents, no allegations are made about the structure of or QUALCOMM's share in the remaining market, and no facts are alleged which could support an inference of damage to competition in the alleged markets.  (A26, Pl. Br. 52)

   5. Whether the District Court correctly dismissed Broadcom's claim under Section 7 of the Clayton Act because Broadcom failed to allege that it suffered antitrust injury.  (A45-46, Pl. Br. 57)

---

[1] UMTS chipsets are often referred to as WCDMA chipsets.  For purposes of this brief, the two terms are interchangeable.

5

## INTRODUCTION

Over the past 22 years, defendant QUALCOMM Incorporated ("QUALCOMM") has pioneered and led the commercialization of a digital communication technique called Code Division Multiple Access ("CDMA"). As a result of this long history of innovation, QUALCOMM has significant intellectual property, including patents, patent applications and trade secrets, that it licenses to other companies. The wireless communications industry generally recognizes that a company seeking to develop, manufacture or sell products that use CDMA technology will need a patent license from QUALCOMM. Accordingly, virtually every major wireless communications company has negotiated a license to QUALCOMM's patents.

Plaintiff Broadcom Corporation ("Broadcom") alleges that it seeks to produce and sell integrated circuit chips for use in cell phones that comply with the Wideband Code Division Multiple Access ("WCDMA") Third Generation ("3G") standard (A70, 73), a standard that, as incorporation of the letters "CDMA" implies, makes considerable use of CDMA technologies. Thus, as Broadcom concedes (A97-98), it needs a license to QUALCOMM's patents to produce and sell those chips lawfully.

QUALCOMM offered such a license to Broadcom, but Broadcom refused it. (A98) Broadcom asserts that QUALCOMM's license terms are

6

unreasonable—despite the conceded fact that other competitors have entered into license agreements with QUALCOMM and despite the fact that in its 200-paragraph Complaint, Broadcom was unable to identify a single other competitor that was purportedly excluded from any market by QUALCOMM's licensing practices. As a result of Broadcom's refusal to take a license, it is precluded by the patent laws from making and selling WCDMA chips. (A98)

Ultimately, Broadcom's difficulty is that QUALCOMM owns patents that are essential to WCDMA, and thus to WCDMA products Broadcom wants to make and sell. Obviously, there is nothing unlawful about that.

Broadcom has attempted to dress up this "grievance" in the guise of federal antitrust claims, none of which can withstand scrutiny.

Principally, Broadcom claims that QUALCOMM monopolized "WCDMA technology markets" (A97)—markets which, as defined, are <u>exactly</u> coextensive with QUALCOMM's patents (A89). This assertion is fundamentally defective. QUALCOMM's exclusionary power over its patented technologies is a statutory right inherent in its patents. <u>See</u> 35 U.S.C. § 154(a)(1) ("Every patent shall contain . . . a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States"). As a matter of black-letter law, the exercise of the lawful right to

7

exclude pursuant to a patent grant does not violate the antitrust laws. (A20-21) Thus, the District Court properly dismissed Broadcom's claim. (A47)

In this appeal, Broadcom walks away from the allegations in the Complaint and seeks reversal of the decision below on the red-herring contention that the District Court's dismissal amounts to a "holding that antitrust law provides no recourse against monopoly gained through deception of an SDO [standards-development organization]". (Pl. Br. 7)  But the District Court did not so hold, and this Court can affirm the dismissal of Broadcom's Complaint without reaching any such conclusion, simply by focusing on the allegations (or lack thereof) in the Complaint.[2]

---

[2] The briefs submitted by the Amici suffer from the same fatal deficiency.

## STATEMENT OF THE CASE

On July 1, 2005, Broadcom filed a complaint in this action (the "initial complaint"). The initial complaint purported to bring causes of action under Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act and various state and common law causes of action. On September 19, 2005, after QUALCOMM announced its intent to merge with Flarion Technologies, Inc. ("Flarion"), Broadcom filed an amended complaint (the "Complaint"). This amendment added an additional cause of action alleging that QUALCOMM's proposed acquisition of Flarion was anticompetitive. Broadcom did not seek a preliminary injunction of the Flarion acquisition, and that transaction was consummated on January 19, 2006, following review by the Department of Justice.

For the purposes of this appeal, the purported causes of action in the Complaint can be broken into three distinct categories:

1)    **Sherman Act § 2 Claims:**  Broadcom's first (alleged monopolization of "the WCDMA technology markets"); second (alleged attempted monopolization of the "UMTS Chipset Market"); and seventh (maintenance of alleged 3G CDMA monopolies) claims all purport to allege violations of Section 2 of the Sherman Act.

9

**2)    Acquisition of Flarion:** Broadcom's eighth claim alleges that QUALCOMM's acquisition of Flarion would "significantly reduce competition" under Section 7 of the Clayton Act. (A78)

**3)    State Law Claims:** Broadcom's ninth through thirteenth claims were brought under various state statutory and common law provisions.

Broadcom also asserted claims under Section 3 of the Clayton Act and Section 1 of the Sherman Act (counts 3 through 6) but has not appealed the dismissal of those claims. On December 9, 2005, QUALCOMM moved to dismiss all 13 claims in the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

On August 31, 2006, the District Court issued a Memorandum Opinion (the "Opinion") dismissing the Complaint in its entirety. The District Court held that Broadcom had failed to state a claim with respect to its federal claims (A19, A22), and declined to exercise supplemental jurisdiction over the five state law claims. (A46-47) An Order and Judgment dismissing the Complaint without prejudice was filed the same day. (A48)

With respect to Broadcom's first claim—for monopolization of the so-called "WCDMA technology markets"—the court found that the alleged conduct was not the source of whatever market power QUALCOMM has in the

10

alleged markets. (A20-21) It further concluded that QUALCOMM's alleged breach of promises "may give rise to a cause of action based on another legal theory, but . . . [does] not provide an antitrust cause of action". (A21) The District Court further held that "[t]o maintain the claims, Qualcomm's conduct must be anticompetitive. It must affect prices, quantity, or quality of goods and services, not just Broadcom's own welfare" (A19), and that "[r]eading the amended complaint in the light most favorable to Broadcom, the facts alleged do not raise such inferences". (A19)

In regard to Broadcom's second claim—that QUALCOMM is attempting to monopolize the UMTS chipset market—the District Court found that, given the allegations that the market is "experiencing rapid growth" (A23), and that QUALCOMM had licensed manufacturers other than Broadcom, and in the absence of any allegations as to the structure and competitiveness of the market, the allegations "do not support an inference that competition in the UMTS chipset market is, or will be injured by Qualcomm's licensing practices". (A22-25)

The District Court also dismissed Broadcom's seventh claim—for maintenance of monopolies in "3G CDMA technology markets" and a 3G CDMA chipset market. As to the technology markets, the District Court again found that based on the allegations of the Complaint, whatever power QUALCOMM

11

possesses is the lawful result of patents rather than of the alleged conduct. (A26) As to the alleged chipset market, the Court found that the alleged conduct (rationing short supply, charging lower royalties to customers who purchase QUALCOMM chipsets) simply "is not anticompetitive conduct for purposes of the antitrust laws" and that insufficient information about the structure of the market was alleged to permit any inference of injury to competition. (A27-28)

With respect to the acquisition of Flarion, the District Court rejected Broadcom's claims because the injuries were purely "speculative". (A44) "The injury may not occur, and if it did, the degree would be difficult to measure". (A44)

Despite a dismissal without prejudice (A48), Broadcom declined to file an amended complaint.[3] Instead, Broadcom elected to stand on the Complaint now before this Court. (Pl. Br. 2 n.1)

On September 29, 2006, Broadcom filed its Notice of Appeal. Broadcom has appealed the District Court's rulings with respect to all three of the purported Sherman Act § 2 claims and the single claim regarding the acquisition of Flarion. Broadcom has not appealed the District Court's ruling dismissing counts

---

[3] By the time the District Court dismissed Broadcom's Complaint, Broadcom had had the benefit of substantial discovery, including interrogatory responses and the production of millions of pages of documents from QUALCOMM and third parties.

12

three through six.  With respect to the state law claims, Broadcom has asked that they be reinstated if this Court rules in its favor on any of the federal claims, but has not appealed the District Court's decision to decline supplemental jurisdiction. (Pl. Br. 63)

## STATEMENT OF FACTS[4]

Various companies sell (or make for their own use) so-called "chipsets"—the core electronics of a cell phone.  Chipsets are used by manufacturers to make cell phones, which are commonly sold to "operators" or carriers, which in turn sell cellular service and cell phones to consumers.  (A2, A81)

Chipsets embody technology, which often is patented.  (A2)  By entering into licenses and cross-licenses, manufacturers acquire the rights necessary to make and sell chipsets.

"For a carrier's wireless system to function properly, all of the system's components ... must seamlessly interface with each other".  (A82)  To ensure interoperability, the wireless communications industry—like many other industries—has developed technical "standards" that govern how wireless equipment works.  (A82)  These standards are developed by private industry consortia called "standards-development organizations" ("SDOs").  SDOs are primarily made up of representatives from sophisticated members of the wireless communications industry.  (A82-83)

---

[4] For purposes of this appeal, we rely only on the allegations in the Complaint, matters of public record, and documents that form the basis of Broadcom's claims. See Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004).

Multiple competing standards for cellular telephony have been developed by SDOs. (A3-4) The Complaint describes two primary _families_ of cellular standards: "GSM" and "CDMA". Some U.S. carriers adhere to GSM standards (e.g., Cingular) while others adhere to CDMA standards (e.g., Verizon). (A84) Within each family, the standards have over time "been supplemented by evolutionary improvements" which create related but alternative standards, which some carriers may adopt and others may not. (A84-85)

In the course of developing a standard, an SDO may have the opportunity to select among multiple viable technical (and likely patented) means for providing certain functionality . . . or it may not. There is no allegation in the Complaint that viable technical alternatives to QUALCOMM's patented inventions existed for providing the same or similar functionality.

The current "next generation" GSM-family standard, the so-called "third generation" or "3G" "UMTS" standard, incorporates technologies collectively referred to as "WCDMA" technologies. (A4) The great bulk of handsets currently sold are "2G"; "[t]he transition from 2G and 2.5G to 3G systems . . . is only now beginning". (A86) Speculative future capabilities and standards are sometimes referred to as "B3G" ("beyond 3G") and "4G". (A86)

QUALCOMM holds patents that read on technologies required by both CDMA and GSM/WCDMA/UMTS standards. (A73, A90) There is no

15

allegation that anything about QUALCOMM's acquisition of these patents was improper. There is no allegation that QUALCOMM improperly concealed any of its patents from any SDO while a standard was being developed. Broadcom acknowledges that it needs a license to QUALCOMM's lawfully obtained patents to manufacture UMTS chipsets. (A97-98)

QUALCOMM has made undertakings to SDOs to license patents it holds that are "essential" to the practice of either the CDMA or UMTS standards on "fair, reasonable and non-discriminatory" ("FRAND") terms and conditions. (A73, A76, A83) The policies of the relevant SDOs referenced in the Complaint do not define what constitute FRAND terms and conditions. For example, the ITU-T Patent Policy[5] states that "[t]he detailed arrangements arising from patents (licensing, royalties, etc.) are being left to the parties concerned" and "negotiations [of license terms] are left to the parties concerned and are performed outside the ITU-T". ITU-T Patent Policy at preamble, ¶ 2.2, available at http://www.itu.int/ITU-T/dbase/patent/patent-policy.html. Similarly, the ETSI Guide on Intellectual Property Rights[6] states:

_____

[5] The "ITU" is the International Telecommunications Union, which is identified in the Complaint as "the central telecommunications SDO". (A82)

[6] "ETSI" is the European Telecommunications Standards Institution, "an SDO based in France with a leadership role in Europe". (A83)

"<u>Specific licensing terms and negotiations are commercial issues</u> <u>between the companies and shall not be addressed within ETSI</u>. Technical Bodies are not the appropriate place to discuss IPR Issues. Technical Bodies do not have the competence to deal with commercial issues." <u>ETSI Guide on IPRs</u> ¶ 4.1, <u>available at</u> http://www.etsi.org/legal/ documents/ETSI Guide on IPRs.pdf (emphasis added).

QUALCOMM has licensed its patents to various manufacturers in the cellular telephony industry. (A22-23; A74-77) It has licensed manufacturers of CDMA chipsets. (A92) Indeed, QUALCOMM offered to license Broadcom, but Broadcom refused the offer. (A22; A73-74) As the Complaint discloses, QUALCOMM's licensing policies for UMTS chipsets are essentially the same as for CDMA chipsets (A76-77); there is no allegation that QUALCOMM's policies, including the rates and terms challenged by Broadcom, were not well known in the industry at the time the UMTS standard using QUALCOMM-patented technology was adopted.

The Complaint carefully avoids any allegations concerning QUALCOMM's share of the UMTS chipset market as a manufacturer (it is modest), but does allege that the market for UMTS chipsets is exploding in size (A73), notwithstanding Broadcom's rhetoric that QUALCOMM has sought to "raise[ ] the costs of complying with the UMTS standard" so as to "weaken[ ] nascent threats" posed by the UMTS standard to QUALCOMM's CDMA chipsets. (Pl. Br. 55) There is no allegation that any UMTS chipset manufacturer other than

17

Broadcom has been unable successfully to negotiate a license with QUALCOMM or that the terms of their licenses have rendered licensed UMTS chipset manufacturers unable to compete.

The Complaint alleges an unspecified (in fact enormous) number of extremely narrow "technology markets": "[t]he technology on which each essential patent reads for the UMTS standard issued in the United States constitutes a relevant product market." (A89) (emphasis added) The technology covered by "each essential patent" relevant to CDMA standards is likewise defined as a discrete market. (A89) Notably, the scope of each such "market" is by definition exactly congruent with the scope of exclusivity or legal monopoly granted by the particular patent.

The Complaint also alleges a "3G CDMA chipset market" (A88, A120) and a "UMTS chipset market" (A88). The Complaint asserts that chipsets for different standards are not "interchangeable with, or substitutes for, each other". (A88) However, Broadcom simultaneously argues that QUALCOMM seeks to strangle the UMTS standard in the cradle as a "nascent threat" to its CDMA chipset business (Pl. Br. 55), an argument that assumes competition between these two types of chipsets.[7] The Complaint does not allege that

---

[7] Any cell phone customer who has chosen between, e.g., Cingular (GSM) and Verizon (CDMA) service knows that handsets and thus chipsets do compete and

18

Broadcom sells or intends to sell (or purchase) 3G CDMA chipsets or products incorporating such chipsets.

Broadcom also refers to "technologies contending to serve essential functions for B3G [or 4G] wireless standards" as separate product markets. (A89) However, these standards are as yet undefined (4G is nothing more than a gleam in the industry's eye). (A86) As a result, what these "essential functions" may be, and hence, what the profiles and dynamics of these alleged markets may be, is entirely unknown and unknowable. Certainly the Complaint does not say.

---

"substitute" across standards. But for present purposes, we rely on Broadcom's contradictions, not on common knowledge and common sense.

## SUMMARY OF ARGUMENT

Each of Broadcom's claims is fatally deficient. The District Court's dismissal of them should be affirmed.

### Claim 1:  Monopolization of "WCDMA Technology Markets"

The District Court correctly dismissed Broadcom's claim for monopolization of "WCDMA technology markets", based on the specific markets Broadcom alleged. Broadcom expressly defined the relevant markets as coextensive with QUALCOMM's patents, with each technology market defined by a single patent. (A89)  Thus, the District Court was entirely correct to hold that "Qualcomm's 'power' to control the licensing of its patents is derived from the rights it enjoys as a patent holder" (A20), and not from any anticompetitive conduct.

Broadcom's effort to find anticompetitive conduct in its FRAND allegations is untenable. First, as discussed above, Broadcom's market allegations define away all competition, making anticompetitive conduct within those markets an impossibility and the FRAND allegations irrelevant. As the District Court saw, on the facts alleged here, QUALCOMM's actions could not have resulted in any lessening of competition. Second, the antitrust laws protect against injury to competition, not injury to an individual competitor. As to the "WCDMA technology markets", Broadcom does not allege that any competing technologies

20

existed, let alone that any such technologies were excluded. As to the downstream "UMTS chipset market," Broadcom's Complaint alleges only that <u>Broadcom</u> was excluded—and that exclusion occurred only because Broadcom "refused the licensing terms proposed by Qualcomm". (A22-23) Such allegations amount to, at most, an injury to Broadcom. They cannot support a conclusion that competition itself has been injured. <u>Third</u>, Broadcom's FRAND allegations are insufficient to plead fraud (or "deception") as a matter of law—even assuming <u>arguendo</u> that fraud or deception may be the basis of an antitrust claim.

Moreover, Broadcom's contention that the presence of FRAND commitments somehow gives rise to a monopolization claim is utterly groundless. Broadcom's FRAND-based theory is wholly without support in the case law. The only case on point, <u>Townshend v. Rockwell Int'l Corp.</u>, No. C99-0400SBA, 2000 WL 433505 (N.D. Col. Mar. 28, 2000), resulted in dismissal of similar antitrust claims. None of the cases upon which Broadcom relies supports its position. Indeed, Broadcom here seeks a significant and unwarranted expansion of antitrust law that would make every patent holder who participates in an SDO subject to antitrust claims, and the possibility of treble damages, by any rival prepared to allege merely that the license terms offered to it were unreasonable.

21

## Claim 2:  Attempted Monopolization of the "UMTS Chipset Market"

This Court should affirm the dismissal of Broadcom's claim for attempted monopolization of the alleged "UMTS chipset market" (Claim 2) for three independent reasons.  <u>First,</u> as the District Court correctly held, the antitrust laws protect against injury to competition, not injury to an individual competitor. Again, as discussed above, the Complaint alleges only that <u>Broadcom</u> was excluded from the "UMTS chipset market" and does not contain allegations sufficient to support a conclusion that competition itself has been injured.  (A22-23)

<u>Second,</u> as the District Court also properly held, Broadcom failed to allege a dangerous probability of monopolization of the "UMTS chipset market". Broadcom, as it concedes, simply did not allege any facts about the market or its likely development, other than that it is growing rapidly. (<u>See</u> Pl. Br. 41)  Lacking such allegations, the Complaint cannot support the conclusion that a dangerous <u>probability</u> of monopolization exists, and thus the attempted monopolization claim must fail.

<u>Third,</u> Broadcom failed to plead antitrust injury in the "UMTS chipset market".  Broadcom concedes that it needs a license to QUALCOMM's patents to enter the alleged market lawfully.  To the extent that Broadcom was excluded from that market, it was because Broadcom declined to take the offered license.  This is

22

not an antitrust injury—that is, it is not the type of injury that the antitrust laws were designed to prevent.  See Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc., 429 U.S. 477, 489 (1977).

## Claim 7:  Monopoly Maintenance in the Alleged 3G CDMA Markets

The District Court also correctly ruled that Broadcom's claim that "Qualcomm has maintained a monopoly in the market for 3G CDMA chipsets and 3G CDMA technology" "fails to state a claim on which relief can be granted". (A26)

As an initial matter, Broadcom's claim for monopoly maintenance fails because Broadcom lacks standing to bring a claim with respect to the alleged 3G CDMA markets.  Broadcom does not allege that it is either a participant or a planned entrant in such markets.  Broadcom also alleges that the 3G CDMA markets are separate and distinct from the UMTS markets, meaning that there is no substitution between such markets.  In short, Broadcom does not participate in the alleged 3G CDMA markets and could not be injured in another market.  That alone is fatal to Broadcom's claim.

Additionally, as the District Court held, Broadcom did not sufficiently allege anticompetitive effects in the alleged 3G CDMA chipset market.  (A27) The Complaint simply does not have "enough details as to the composition of the 3G CDMA chipset market to conclude competition is injured".  (A27)

23

Finally, as the District Court also concluded, the Complaint does not allege any cognizable anticompetitive conduct in the alleged "3G CDMA technology markets". As in the "WCDMA technology markets", if QUALCOMM possesses market power, it is through its lawfully acquired patents, which, according to Broadcom, define the relevant market. "Qualcomm's possession of patents essential to 3G CDMA technology does not make it an unlawful monopolist". (A26) Any ability of QUALCOMM to restrict access to the patents—and thus the defined market—arises from QUALCOMM's rights as a patent owner.

### Claim 8:  The Flarion Acquisition

The District Court also correctly determined that "[t]he potential injuries Broadcom would endure as a result of Qualcomm's acquisition of Flarion do not allege sufficient antitrust injury to maintain Count 8 of the complaint". (A44) Broadcom's argument that the Flarion acquisition may impact the development of a standard that may include QUALCOMM's technology, which QUALCOMM may unfairly refuse to license, which may harm Broadcom, asks the courts to find antitrust injury by heaping speculation on speculation. The District Court correctly refused to do so. This Court should affirm that decision.

24

## STANDARD OF REVIEW

"The standard of review of a district court order dismissing a complaint under Fed. R. Civ. P. 12(b)(6) is plenary." Port Authority of NY and NJ v. Arcadian Corp., 189 F.3d 305, 311 (3d Cir. 1999). This Court may affirm the District Court's decision "on any basis appearing" in the record, Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 150 F.3d 130, 133 (3d Cir. 2006), including arguments made by the parties that were not reached by the District Court, see Hedges v. Musco, 204 F.3d 109, 116 (3d Cir. 2000); Narion v. Lower Merion School Dist., 206 F.3d 323 n.8 (3d Cir. 2000).

## ARGUMENT

The District Court correctly dismissed Broadcom's Complaint under Fed. R. Civ. P. 12(b)(6). "A court may dismiss the complaint [under Rule 12(b)(6)] . . . if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Lum v. Bank of America, 361 F.3d 217, 223 (3d Cir. 2004). In making this judgment, the court "need not credit the non-movant's conclusions of law or unreasonable factual inferences". Curay-Cramer, 450 F.3d at 133. A plaintiff may not, as Broadcom attempts to do here, bolster an inadequate complaint with new facts or arguments in its later papers. "It is axiomatic that the complaint may not be amended by the briefs in opposition to a

25

motion to dismiss." <u>Pennsylvania v. Zimmerman</u>, 836 F.2d 173, 181 (3d Cir. 1988).

For the reasons contained in the District Court's opinion and those set forth below, this Court should affirm the District Court's decision.

## I.    BROADCOM'S CLAIM FOR "MONOPOLIZATION OF MARKETS FOR WCDMA TECHNOLOGY" WAS PROPERLY DISMISSED.

The District Court held that Broadcom's "First Claim for Relief" was legally defective because Broadcom failed to plead that QUALCOMM engaged in any anticompetitive conduct sufficient to give rise to a monopolization claim under Section 2 of the Sherman Act.  (A19-20)  That decision should be affirmed.

To state a claim for monopolization, a plaintiff must allege:  (1) "the possession of monopoly power in a relevant market"; and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident".  <u>Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP</u>, 540 U.S. 398, 407 (2004).  Broadcom has not alleged facts that establish the second element—"willful acquisition or maintenance" of monopoly power.  To the contrary, the monopoly power alleged by Broadcom flows entirely from QUALCOMM's lawfully-obtained patents, and is therefore, by definition, a "consequence of a superior product"—QUALCOMM's pioneering inventions.

26

None of Broadcom's misplaced criticisms of the District Court's decision changes this simple, and dispositive, fact.

## A.    QUALCOMM Lawfully Obtained the "Monopoly Power" Alleged by Broadcom.

"Monopoly power is the power to control prices or exclude competition." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956). The possession of "monopoly power" is not unlawful. Indeed, "it is an important element of the free-market system". Trinko, 540 U.S. at 407. "The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth." Id. Accordingly, monopoly power acquired "from growth or development as a consequence of a superior product, business acumen, or historic accident" cannot support a monopolization claim as a matter of law. Id.; accord Grinnell v. United States, 384 U.S. 563, 571 (1966).

In its "First Claim for Relief", Broadcom alleges that QUALCOMM has "unlawfully monopolized" an unspecified number of "WCDMA technology markets". (A114) Broadcom defines those "WCDMA technology markets" as follows: "The technology on which on [sic] each essential patent reads for the UMTS standard issued in the United States constitutes a relevant product market, collectively referred to as the WCDMA technology markets". (A89) Thus,

27

according to Broadcom, each individual patented technology is a separate "market" unto itself.

Broadcom's market definition is inherently fatal to its monopolization claim. The lawful monopoly granted by a patent extends <u>exactly</u> to "the technology on which [the patent] reads". To the extent that QUALCOMM possesses "monopoly power" in any of the alleged "WCDMA technology markets", it had that power from the moment each relevant patent issued. Notably, Broadcom's brief fails to mention its actual—and dispositive—market definition.

Instead, Broadcom emphasizes that the inclusion of QUALCOMM's patented technologies in the UMTS standard gave QUALCOMM monopoly power "to exclude firms from practicing the UMTS standard". (Pl. Br. 36) But neither inclusion of the patented technology in a standard, nor any steps or alleged representations made by QUALCOMM to encourage such inclusion, could or did increase or "maintain" the already complete power conferred by QUALCOMM's patents in the markets alleged. While inclusion of a technology in an industry standard may make that technology commercially important, the act of standardization adds nothing to the patentee's exclusionary power. <u>See</u> <u>Townshend</u>, 2000 WL 433505, at *12 ("The adoption of a[n] industry standard incorporating such proprietary technology does not confer any power to exclude that exceeds the exclusionary power to which a patent holder is otherwise [legally]

28

entitled").[8] The Townshend holding is particularly apt where, as here, the relevant markets are alleged to be identical to and coextensive with QUALCOMM's patents, and there are no allegations of a viable alternative technology.

By way of illustration, suppose that technology T is adopted as a standard. If T is unpatented, any manufacturer may use that technology, and no one has the power to exclude anyone else from using it. If, instead, T is patented, then the owner of the patent on T would have the power to exclude others from using T. It is the patent, not the fact of standardization, that provides exclusivity.

Accordingly, as the District Court correctly observed, "Qualcomm's 'power' to control the licensing of its patents is derived from the rights it enjoys as a patent-holder"—not from the "adoption of an industry standard". (A20) Indeed, the essence of a patent is the lawful right to exclude others from using the patented invention. See 35 U.S.C. §§ 154, 271. Because antitrust liability may not be premised on a party's ownership and unilateral exercise of its patent rights, Broadcom's monopolization claim was properly dismissed. See SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1206 (2d Cir. 1981); Sheet Metal Duct, Inc. v.

---

[8] Ill. Tool Works Inc. v. Independent Ink, Inc., 126 S. Ct. 1281 (2006), is not to the contrary. In that case, the Supreme Court explained generally that "a patent does not necessarily confer market power upon the patentee". Id. at 1293. However, where, as here, the relevant market itself is defined by the plaintiff as the "technology" on which the patent reads, that patent does confer a lawful monopoly on the patentee in that market.

29

Lindab, Inc., No. CIV. A. 99-6299, 2000 WL 987865, at *6 (E.D. Pa. July 18, 2000).

**B.    The District Court Correctly Held That QUALCOMM's Alleged FRAND Commitments Do Not and Cannot Give Rise to a Monopolization Claim.**

Despite the fact that QUALCOMM's lawful patent monopolies in the alleged relevant markets predate—and are wholly independent of—the UMTS standard, Broadcom alleges that QUALCOMM willfully monopolized those markets by "induc[ing] several SDOs to include its technology in the UMTS standard through promises to license that technology on FRAND terms". (Pl. Br. 24-25) That is a red herring.

As the Supreme Court has observed, "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct". Trinko, 540 U.S. at 407. Here, the District Court correctly held that Broadcom's "inducement of the SDO" theory did not give rise to a monopolization claim because QUALCOMM's conduct was not anticompetitive. (A21-22) None of Broadcom's assertions to the contrary has any merit.

First, QUALCOMM's conduct did not eliminate any competition in the alleged relevant markets because there was no competition to eliminate. As pled, the alleged WCDMA technology markets are comprised solely of technology

30

over which QUALCOMM owns a lawful patent monopoly. (A89) Thus,

Broadcom's assertion that the District Court failed to consider that QUALCOMM

allegedly used improper means to become the "winner" in the "competition to

become a monopolist" ignores what the Complaint alleges. (Pl. Br. 35 (emphasis

in original)); see also id. at 39.

Further, Broadcom did not allege a "market for technology to be

included in the UMTS standard"—a market that would suffer from its own severe

definitional difficulties. Nor did Broadcom allege that there were any viable

technologies that competed to provide "the particular functionalities provided by

[the QUALCOMM] patents" to the UMTS standard. (A88-89) The most relevant

paragraphs of the Complaint, ¶¶ 58 and 82, state only that standard setting in

general eliminates competing technologies. There are no allegations going to the

facts of QUALCOMM's technology. In the absence of any alleged alternative

technology, no reasonable inference can be drawn to the effect that

QUALCOMM's actions excluded any technology from the UMTS standard.

Simply put, Broadcom does not, and cannot, allege that the

"WCDMA technology markets" would be any more competitive had

QUALCOMM not made any FRAND commitments or had its technology not been

incorporated into the UMTS standard. If anything, QUALCOMM's agreement to

add its technology to that standard and commit to license on FRAND terms had a

31

procompetitive (not anticompetitive) effect, since QUALCOMM could simply have refused to license its patents on any terms. See In re Indep. Serv. Orgs. Antitrust Litig., 203 F.3d 1322, 1325 (Fed. Cir. 2002).

In fact, imposing antitrust liability under these circumstances—where the patent-holder has agreed to license its technology on FRAND terms, but a particular licensee is dissatisfied with the terms offered—would only serve to discourage patent owners from participating in the standardization process. Such a perverse result would reduce competition, rather than protect and promote it. See Trinko, 540 U.S. at 414 ("Mistaken inferences and the resulting false condemnations 'are especially costly, because they chill the very conduct the antitrust laws were designed to protect'" (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 (1986)).

Second, as is discussed in more detail infra at 40-42, it is axiomatic that the antitrust laws protect competition, not competitors. Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962). Thus, anticompetitive conduct is conduct that injures competition itself, not merely an individual competitor. Here, regarding the "WCDMA technology markets", as discussed supra at 31, Broadcom does not allege that any competing technologies existed, let alone that any such technologies were excluded. Thus, there can be no injury to competition in those markets. In the downstream "UMTS chipset market", as discussed in more detail

32

infra at 41-42, Broadcom's Complaint alleges only that <u>Broadcom</u> was excluded—and that exclusion occurred only because Broadcom "refused the licensing terms proposed by Qualcomm". (A22-23) Such allegations amount to, at most, an injury to Broadcom and do not support a conclusion that competition itself has been injured.

Third, Broadcom's characterization of QUALCOMM's commitments to offer licenses on "fair, reasonable, and non-discriminatory" terms as "deceptive" is simply a legal conclusion—and one unsupported by the facts alleged.[9] This Court held in <u>Lum v. Bank of America</u>, 361 F.3d 217 (3d Cir. 2004), that where "it is reasonable for the parties to have different understandings of [a statement's] meaning", then the statement cannot support a claim for fraud (or an antitrust claim based on fraud). <u>Lum</u>, 361 F.3d at 226, 228. The allegedly fraudulent term at issue in <u>Lum</u> was "prime rate", which the plaintiffs alleged meant "the lowest rate available to a bank's most creditworthy borrowers". <u>Id.</u> at 227. This Court affirmed the dismissal of plaintiff's complaint pursuant to FRCP 12(b)(6) because it held that the term "prime rate" was susceptible of multiple reasonable

---

[9] To the extent Broadcom contends that "deception" has a different meaning than "fraud" in this context, its arguments are inconsistent with the allegations in the Complaint. The Complaint alleges fraud. <u>See</u> A97; <u>see also</u> <u>Lum,</u> 361 F.3d at 228-29 (rejecting plaintiffs' attempt to recharacterize a fraud-based monopolization claim as a "conspiracy" claim).

interpretations. Id. at 226 (disagreement over interpretation "does not rise to the level of fraud; at most, it alleges a contract dispute").

Here, as in Lum, Broadcom's claim boils down to a disagreement about the meaning of a term. Indeed, the term relied upon by Broadcom in this case—"fair, reasonable and non-discriminatory"—is even more susceptible of multiple interpretations than the term "prime rate" at issue in Lum, and the SDOs referenced by Broadcom have been at pains to emphasize that they do not accord it a precise definition. (Supra at 16-17) To support a fraud claim, however, the term would not only have to have a single meaning, but that meaning would also have to be "so universally accepted that it is the only possible meaning and that a reasonable person could not understand the term to mean anything else". Id. (emphasis in original). That is not the case here.

If the law were otherwise, any potential licensee unhappy with proposed license terms for patents "essential" to a standard and subject to an ambiguous FRAND commitment could rush to the courthouse to file a dismissal-proof antitrust suit. In Trinko, the Supreme Court warned of the "especially costly" dangers resulting from such "an undue expansion of § 2 liability". 540 U.S. at 414. We respectfully submit that this Court should decline Broadcom's invitation to expand the scope of the antitrust laws.

34

C.    **Broadcom's Monopolization Theory is Without Support in the Precedents.**

Broadcom's monopolization claim is premised on the novel theory that anyone who contributes patented technology to a standardized product may be subject to liability based solely on his or her alleged unwillingness to license that technology on FRAND terms. (Pl. Br. 6) No court has ever accepted that theory.

In Townshend, 2000 WL 433505, a case similar to Broadcom's, the court dismissed the antitrust claims out of hand. In Townshend, Conexant brought counterclaims under Sections 1 and 2 of the Sherman Act against 3Com and Townshend. Conexant accused 3Com and Townshend of anticompetitive conduct in connection with their lobbying of the International Telecommunications Union to include Townshend's patented technology in a standard for 56K modems together with 3Com's and Townshend's licensing practices. The court dismissed both the Section 1 claim and the Section 2 claim for, inter alia, failure to state any antitrust injury. Id. at *8, *13-14. Notably, the court held that no cognizable antitrust injury flowed from Townshend's exercise of its patent rights. Id.

The cases of Allied Tube, Hydrolevel and Rambus are not to the contrary, and all address challenged conduct entirely different than what is alleged to underlie Broadcom's claims here. In Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988), the Supreme Court considered only the issue of whether Noerr-Pennington immunity applied to standard-setting activity. 486 U.S.

35

at 495. The Supreme Court expressly declined to address whether the alleged

conduct violated the Sherman Act.[10] See id. at 499 n.3, 509.

The case of American Society of Mechanical Engineers, Inc. v.

Hydrolevel Corp., 456 U.S. 556 (1982), is equally inapposite. In Hydrolevel, a

manufacturer of safety devices abused the position of an employee who was also

an officer of a subcommittee of the relevant SDO. The employee helped draft an

opinion (which he requested), erroneously stating—on the SDO's stationery—that

the competitor's product was unsafe and in violation of the SDO's code. Id. at

560-61. In deciding the case, the Supreme Court addressed whether the American

Society of Mechanical Engineers could be held liable under the antitrust laws, on

an apparent authority theory, for the acts of its agents. Id. at 558-59. That issue

(as well as those facts) is totally irrelevant to this case.

Finally, the case on which Broadcom relies most heavily, In the

Matter of Rambus, Inc., No. 9302, 2006 WL 2330117 (F.T.C. Aug. 2, 2006), is

entirely tangential. In that case, the Federal Trade Commission ("FTC") initiated a

proceeding against Rambus based on Rambus's failure to disclose the existence of

its patents and applications, in the face of a promise to do so, while amending its

---

[10] Furthermore, the conduct challenged involved concerted manipulation of the standards process by multiple companies to exclude certification of a competitor's product, allegedly in violation of Section 1 of the Sherman Act. Allied Tube, 486 U.S. at 499. The case had nothing to do with patents in a standard—much less a commitment to license on FRAND terms—nor did it concern unilateral action, as is alleged in Broadcom's Section 2 claim.

36

patent applications with information obtained from the standards organization to ensure that the subsequently-issued patents would cover the ultimate standard. Id. at *4. Rambus' strategy was "to conceal its patent applications until after the standards were adopted" and then "reveal its patents—through patent infringement lawsuits". Id. Nothing of the sort is alleged here. To the contrary, Broadcom concedes that QUALCOMM fully disclosed its patents.

The district court decisions in the private litigation against Rambus (which was based on the same facts as the FTC action) are likewise unavailing for Broadcom. The decision in Rambus, Inc. v. Infineon Techs. AG, 304 F. Supp. 2d 812 (E.D. Va. 2004) ("Rambus I"), considered only whether to grant leave to add a claim under California's unfair competition law, and the court expressly noted that "the substantive merits of a proposed claim are typically best left for later resolution, e.g., under motions to dismiss or for summary judgment". Id. at 819 (emphasis added). The second decision, Rambus, Inc. v. Infineon Techs. AG, 330 F. Supp. 2d 679 (E.D. Va. 2004) ("Rambus II"), denied a motion in limine, while expressly declining to reach the merits of Infineon's claims, holding that it was "too late" to raise summary judgment motions on the merits. Id. at 693 n.21. There was no final disposition on the merits, as the case settled. Contrary to the suggestion in Broadcom's brief (at 31), neither of these decisions considered in any way an alleged promise to license on FRAND terms. The claims against Rambus

37

involved misappropriation of information and failure to disclose patent applications.

Accordingly, the non-disclosure theory in Rambus differs fundamentally from Broadcom's theory. Here, there is no suggestion that either the SDOs or the companies participating in the SDOs—all sophisticated players in the wireless communications industry—were not well aware of QUALCOMM's essential patents prior to the adoption of the standard. With notice of the patents, the industry's players were able to—and did—negotiate license terms with QUALCOMM. Broadcom's claim is simply that those license terms are unfair. We have found no case, nor has Broadcom cited any, in which a claim under Section 2 of the Sherman Act was sustained in such circumstances.[11]

In the end, therefore, Broadcom is reduced to erecting a straw man. Specifically, Broadcom suggests that the District Court held that "manipulation and abuse of a standard-setting process can never be cognizable under federal antitrust law because standards inevitably create 'monopolies'". (Pl. Br. 29) But

---

[11] In re Union Oil Co., No. 9305, 2004 WL 1632816 (F.T.C. July 6, 2004) ("Unocal"), and In re Dell Computer Corp., 121 F.T.C. 616 (1996), are failure-to-disclose cases similar to the Rambus district court decisions and do not advance Broadcom's position. Moreover, Dell is a consent decree, and, as such, has no precedential value. See United States v. E.I. du Pont de Nemours & Co., 366 U.S. 316, 331 n.12 (1961) ("the circumstances surrounding . . . negotiated [consent decrees] are so different that they cannot be persuasively cited in a litigation context"). In addition, the Unocal decision is limited to the issue of whether certain standards-setting activity enjoyed Noerr-Pennington immunity. See Unocal, 2004 WL 1632816, at *8-30.

the Court did not hold that conduct during the standard-setting process can "never" be a cognizable antitrust law violation (A19-22), and this Court need not reach that question because Broadcom simply does not allege facts that could give rise to a monopolization claim—whether inside or outside the context of the standard-setting process.

## II.    THE DISTRICT COURT CORRECTLY HELD THAT BROADCOM FAILED TO STATE A CLAIM FOR ATTEMPTED MONOPOLIZATION OF THE MARKET FOR UMTS CHIPSETS.

The District Court dismissed Broadcom's claim for attempted monopolization of the alleged "UMTS chipset market" because "(1) the amended complaint lacks sufficient allegations of anticompetitive conduct to sustain a claim for attempted monopolization, and (2) Broadcom has not sufficiently illustrated that Qualcomm has a dangerous probability of succeeding in monopolizing the UMTS [chipset] market". (A24)  This Court should affirm the District Court.

As the District Court recognized, "[Broadcom's] allegations of anticompetitive injury are broad and non-specific". (A23)  Indeed, the District Court explicitly noted—and Broadcom does not dispute on appeal—that Broadcom failed to plead "(1) the number of companies manufacturing and selling UMTS chipsets, (2) the relevant market shares of those companies, (3) whether other companies have been unable to obtain patent licenses from Qualcomm, or (4) what companies have entered or left the market". (A23)  Nor did Broadcom accept the

39

District Court's express invitation to amend its Complaint to address these omissions. Broadcom's failure to plead facts sufficient to permit an inference that the alleged misconduct harms competition or is likely to lead to a monopoly is fatal to Broadcom's attempted monopolization claim.

### A.    Broadcom Did Not Plead Harm to Competition in the UMTS Chipset Market.

It is axiomatic that the antitrust laws protect competition, not competitors. See, e.g., Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962). Thus, an antitrust plaintiff must allege "'that challenged conduct affected the prices, quantity or quality of goods or services,' not just his own welfare". Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 641 (3d Cir. 1996) (quoting Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715, 728 (3d Cir. 1991)).

In this case, Broadcom does not allege that QUALCOMM's licensing terms (or other alleged practices) have excluded anyone other than Broadcom from the alleged UMTS chipset market. To the contrary, as the District Court noted, Broadcom conceded in its Complaint and in its arguments below that "various firms in the industry develop and manufacture these chipsets" (A23 (quoting Compl. at 13)), and "[o]thers" have successfully negotiated licenses with QUALCOMM (A22-23). As discussed above, Broadcom's Complaint alleges no facts that would support an inference that these admittedly existing competitors are being driven from the alleged market or that consumers are not enjoying the

40

benefit of competition among the "various firms in the industry" that are already

participating in the alleged market.[12] Thus, Broadcom has failed to plead facts that

establish an injury to competition, as opposed to an injury to itself. See, e.g., Town

Sound and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 494 n.40

(3d Cir. 1992) (en banc) (even if "a certain class of competitors . . . might be

doomed to competitive oblivion", "that would be no concern of the antitrust laws

unless consumers were also hurt because of diminished competition"); ESS Tech.

Inc. v. PC-Tel, Inc., No. C-99-20292 (RMW) 1999 WL 33520483, at *3 (N.D. Cal.

Nov. 4, 1999).

Broadcom essentially concedes in its brief that the Complaint alleges

only that Broadcom has been excluded from the market, describing the allegations

as showing that "had Broadcom accepted Qualcomm's" licensing terms, "it would

not have been able to compete". (Pl. Br. 44 (emphasis added)) With respect to the

admitted licensee-competitors that are already competing in the alleged market,

Broadcom argues only that the fact that other companies have accepted

QUALCOMM's licensing terms "does not establish that the licenses are benign".

(Id. at 45) That is irrelevant. The test is not whether the licenses are "benign" or

---

[12] Nor could it—there is, in fact, vigorous competition in the alleged market: one of QUALCOMM's licensees—Texas Instruments—has the largest share of the alleged market (far larger than QUALCOMM), and other companies also have a larger share than QUALCOMM. Broadcom does not plead otherwise. That is why Broadcom refused the District Court's invitation to amend its Complaint.

41

not. Rather, the issue is whether competition is being harmed. Broadcom has

simply not pled facts sufficient to support such an inference.

**B.    Broadcom Did Not Plead That There is a Dangerous Probability That QUALCOMM Will Obtain Monopoly Power in the UMTS Chipset Market.**

The District Court also correctly held that Broadcom did not allege a

dangerous probability that QUALCOMM will obtain monopoly power in the

UMTS chipset market. Broadcom's bare and unsupported statement that "there is

a dangerous probability that Qualcomm will obtain monopoly power" (A106) is

woefully insufficient to withstand a motion to dismiss. See, e.g., Brunson

Commc'ns, Inc. v. Arbitron, Inc., 239 F. Supp. 2d 550, 571-72 (E.D. Pa. 2002);

Fresh Made, Inc. v. Lifeway Foods, Inc., No. Civ. A. 01-4254, 2002 WL

31246922, at *8 (E.D. Pa. Aug. 9, 2002); Smith & Johnson, Inc. v. Hedaya Home

Fashions Inc., No. 96 Civ. 5821 MBM, 1996 WL 737194, at *7 (S.D.N.Y. Dec. 26,

1996).

None of Broadcom's arguments to the contrary has merit. First,

Broadcom contends that the District Court improperly imposed a "heightened

pleading requirement" "fixat[ed] on current market share" contrary to Pastore v.

Bell Tel. Co., 24 F.3d 508, 513 (3d Cir. 1994) (see Pl. Br. 45, 48, 51). This

argument is a mischaracterization of the District Court's decision. The District

Court did not, as Broadcom pretends, "fixate[]" on the sole issue of market share.

42

Rather, the District Court cited Broadcom's failure to allege a number of facts about the alleged market, including "the size of the UMTS market, who participates in the UMTS market, and Qualcomm's share of that market". (A24 (emphasized portion omitted from quote in Pl. Br. 48)) Thus, the District Court's decision is consonant with Pastore's holding that the "factors to be reviewed" in evaluating "dangerous probability of success" include "the strength of the competition" and "probable development of the industry". Pastore, 24 F.3d at 513. Moreover, to the extent the District Court emphasized Broadcom's failure to plead any information about the market shares of the various competitors in the alleged relevant market, such emphasis is fully consistent with the holding of Pastore that "[m]ost significant, however, is the defendants' share of the relevant market." Id.[13]

---

[13] The other cases cited by Broadcom are not to the contrary. Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1438 n.10 (9th Cir. 1995), confirms that market share is a relevant factor in any analysis of market power, noting that "[w]hen the claim involves attempted monopolization, most cases hold that a market share of 30 percent is presumptively insufficient to establish the power to control price." In Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 465-66, the discussion did not focus on market share, because the defendant was arguing that plaintiff's claim failed "even if [defendant] concedes monopoly share." In United States v. Dentsply Int'l, Inc., the discussion quoted by Broadcom (Pl. Br. 50) concerned the defendant's alleged exclusionary conduct. The court had already found that the defendant's "share of the market is more than adequate to establish a prima facie case of power." 399 F.3d 181, 188 at *1 (3d Cir. 2005). In Medtronic Ave., Inc. v. Boston Scientific Corp., No. Civ. A. 98-478-SLR, 2001 WL 652016 (D. Del. Mar. 30, 2001), the court acknowledged that market share was a "factor" in the determination. In Intellective, Inc. v. Mass. Mutual Life Ins. Co., the court acknowledged that with a number of other factors alleged, allegations of 15% or 20% share in the relevant market could raise a factual issue. 190 F. Supp. 2d 600, 614-15 (S.D.N.Y. 2002).

The one case cited by Broadcom in which there were neither allegations nor a record of market share, H.J., Inc. v. Int'l Tel. & Tel. Corp., 867 F.2d 1531 (8th Cir.

Second, Broadcom argues that it met its burden of alleging "dangerous probability" by pleading that QUALCOMM has the ability to exclude competitors from the alleged market by refusing to license its patents. This argument fails because, by Broadcom's own admission, QUALCOMM's patents do not give QUALCOMM the ability to exclude the many competitors already in the market for UMTS chipsets. As noted above, Broadcom has conceded that there are other firms competing in the alleged market that have successfully negotiated licenses with QUALCOMM. QUALCOMM's patents do not give QUALCOMM the ability to exclude those competitors, as those competitors are already licensees. Because Broadcom has not pled any facts regarding the number and identities of these competitors, their market shares and whether any of them have exited the market, there are insufficient allegations to support an inference that QUALCOMM has any "market power" whatsoever over these admittedly existing competitors, or an inference that there is a dangerous probability that QUALCOMM will obtain such market power in the future. As noted above, the only company that Broadcom has alleged has been excluded from the market is Broadcom itself. An allegation that a single competitor has been excluded from a

---

1989), is no longer good law. The Court in H.J. relied on Ninth Circuit precedent that was overruled four years later by the Supreme Court in Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447 (1993) (rejecting the idea that a "dangerous probability" could be established by conduct). See H.J., 867 F.2d at 1543 (citing Twin City Sportservice v. Charles O. Finley & Co., 676 F.2d 1291, 1309 (9th Cir. 1982)).

market where "various firms" are competing cannot possibly be sufficient to establish "dangerous probability of success".

Broadcom's argument that QUALCOMM has the power to exclude competitors from manufacturing UMTS chips because QUALCOMM's patents are essential to the UMTS standard applies to <u>every</u> company with even <u>one</u> essential patent. Indeed, were Broadcom's argument correct, any company with a patent essential to any standard would be subject to non-dismissable attempted monopolization claims with respect to any product covered by the standard,[14] from any potential licensee dissatisfied with the offered license terms, <u>even if</u> many other companies had accepted those terms and were successfully competing in the market. <u>That is not the law.</u>

<u>Third</u>, Broadcom argues that because "UMTS is [allegedly] just now being implemented", the Court should disregard Broadcom's failure to plead market shares and focus instead on "market realities". (Pl. Br. 49) This is a red herring. The only "market realities" Broadcom alleged were that the alleged UMTS chipset market is experiencing rapid growth, that other manufacturers are licensed and competing, and that QUALCOMM has sales within that market. (<u>See</u> A106) Such statements do not allege a dangerous probability of achieving

---

[14] Indeed, all such companies would be deemed to have a dangerous probability of achieving monopoly power, irrespective of any other facts.

monopoly power. <u>See</u>, <u>e.g.</u>, <u>Fresh Made</u>, 2002 WL 31246922, at *8 (attempted monopolization claim dismissed where plaintiff did not "allege the overall size of the proposed market, identify [defendant's] percentage share of the proposed market, identify other participants and competitors in the market, or allege what percentage of [defendant's] gross annual revenues are derived from the proposed market").[15]

    <u>Fourth</u>, Broadcom claims—without benefit of any legal citation whatsoever—that its allegations that QUALCOMM has "monopolized" the alleged CDMA chipset market somehow establish a "dangerous probability" that QUALCOMM will monopolize the alleged UMTS chipset market, because QUALCOMM allegedly did so using "similar tactics". (Pl. Br. 47)  This argument fails both as a matter of logic and as a matter of pleading.  Logically, historical experience in one market simply cannot predict the future of an allegedly entirely different, second market without a showing that conditions in the second market are parallel to those in the first market.  Indeed, the absence of any parallel is underscored by Broadcom's failure to plead facts about participants and strength of competitors in the alleged UMTS chipset market.

---

[15] To the extent that Broadcom is arguing that the allegedly anticompetitive acts pled in the Complaint are "market realities" that would support a finding of "dangerous probability of success", that argument is foreclosed by <u>Spectrum</u>.  In <u>Spectrum</u>, the Supreme Court held that a "dangerous probability" was a separate element of attempted monopolization and therefore could not be satisfied by "proof of unfair or predatory conduct alone." <u>Id.</u> at 456-59.

Broadcom's suggestion in a footnote that discovery would show that "Qualcomm's market share is at or near the point where monopoly power is generally inferred" is doubly misleading. (Pl. Br. 47 n.12) First, contrary to Broadcom's suggestion, Broadcom had the benefit of ample discovery, including interrogatory responses and the production of millions of pages of documents regarding QUALCOMM's licensing and chip businesses. The District Court expressly invited Broadcom to seek leave to amend its Complaint to cure its pleading deficiencies, and Broadcom declined to do so.

Second, the figure cited by Broadcom of a "90%" share of handsets that use High-Speed Downlink Packet Access ("HSDPA") (Pl. Br. 47 n.12) is: (1) nowhere alleged in the Complaint; (2) calculated by the number of models of handsets, rather than the number of handsets (or chips) sold; and (3) irrelevant because handsets that use HSDPA account for only a small part of the overall "UMTS chipset" market alleged by Broadcom. Broadcom cannot allege new facts or revise its market definition on appeal. See, e.g., Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984).

**C.    Broadcom Did Not Plead Antitrust Injury in the UMTS Chipset Market.**

Broadcom's attempted monopolization claim fails for the additional reason that Broadcom failed to plead antitrust injury. Broadcom alleges that its "injury" is exclusion from the UMTS chipset market. (A116) But Broadcom

47

concedes that it needs a license to QUALCOMM's essential WCDMA patents in order lawfully to enter the alleged market. (A98) Thus, to the extent Broadcom has been "excluded" from the alleged market, Broadcom necessarily concedes that its exclusion results from its own failure to negotiate a license to QUALCOMM's lawfully acquired patent rights.

That type of exclusion is not an injury "that flows from" a violation of the antitrust laws. Absent certain "exceptional circumstances"—none of which are present here—even an absolute refusal to license a patent (which is not alleged here) is immunized from antitrust liability. See In re Indep. Serv. Orgs. Antitrust Litig., 203 F.3d at 1326-27 ("ISO"); see also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1356 (Fed. Cir. 2004), overturned on other grounds, 546 U.S. 394 (2006). ("As a general rule, behavior conforming to the patent laws oriented towards procuring or enforcing a patent enjoys immunity from the antitrust laws."); SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1206 (2d Cir. 1981) ("conduct permissible under the patent laws cannot trigger any liability under the antitrust laws."). QUALCOMM's licensing practices, then, which include licensing its patents to many companies and offering a license to Broadcom—albeit on different terms than Broadcom would prefer—cannot be held to violate the antitrust laws. To the contrary, licensing "is an activity that aids rather than

48

impedes competition." Applera Corp. v. MJ Research Inc., No. 3:98 VB 1201

(JBM), 2004 WL 2935820, at *10 (D. Conn. Dec. 16, 2004).

The Supreme Court has explicitly held that the patent laws, which

grant the right to exclude others from practicing an invention, "modify" the

antitrust laws to the extent they conflict. See Simpson v. Union Oil Co., 377 U.S.

13, 24 (1964) (stating that the patent laws "are in pari materia with the antitrust

laws and modify them pro tanto") (emphasis added). Indeed, courts have

repeatedly recognized that patent holders do not violate the antitrust laws by

unilaterally refusing to license or sell a patent. See, e.g., ISO, 203 F.3d at 1326,

Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1362 (Fed. Cir. 1999); see also

Miller Insituform, Inc. v. Insituform of N. Am., Inc., 830 F.2d 606, 609 (6th Cir.

1987) ("A patent holder who lawfully acquires a patent cannot be held liable under

Section 2 of the Sherman Act for maintaining the monopoly power he lawfully

acquired by refusing to license the patent to others."). The principles underlying

the antitrust immunity conferred by the patent laws are codified in Section 271(d)

of the Patent Act, which expressly provides that "'[n]o patent owner otherwise

entitled to relief . . . shall be denied relief or deemed guilty of misuse or illegal

extension of the patent right by reason of his having . . . (4) refused to license or

use any rights to the patent . . .'". ISO, 203 F.3d at 1326 (quoting 35 U.S.C.

§ 271(d) (emphasis and ellipses in original)).

49

The Federal Circuit has recognized only three exceptions to the antitrust immunity conferred by the patent laws: "illegal tying, fraud in the Patent and Trademark Office, or sham litigation". Id. at 1327. None of these is present here. Broadcom does not allege fraud in the Patent Office or sham litigation.[16] And Broadcom does not allege that QUALCOMM's offer to Broadcom constituted an illegal "tie". Thus, QUALCOMM's license offer cannot constitute a violation of the antitrust laws. See ISO, 203 F.3d at 1326-27; see also Miller Insituform, 830 F.2d at 609 (finding "no adverse effect on competition" by termination of patent license by patent holder that also competed with its licensees, because the patent holder "from the start, had [the] exclusive right to manufacture, use, and sell his invention").

Because Broadcom's alleged exclusion is not the result of any violation of the antitrust laws by QUALCOMM, but rather flows from QUALCOMM's lawful acquisition and exercise of its patent rights, it is not an "antitrust injury". See Axis, S.p.A. v. Micafil, Inc., 870 F.2d 1105, 1111 (6th Cir. 1989) (no antitrust injury where plaintiff was excluded from market by patents); ESS Tech., 1999 WL 33520483, at *3 (averments that defendant holds patents

---

[16] "Fraud in the Patent and Trademark Office" refers to fraud in the procurement of a patent within the meaning of Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177 (1965). ISO, 203 F.3d at 1326. "Sham litigation" is an attempt to enforce a patent in the courts that is "a mere sham to cover what is actually no more than an attempt to interfere directly with the business relationships of a competitor". Id.

essential to comply with standards and that plaintiff cannot compete in the relevant market due to defendant's refusal to license its patents in a reasonable and non-discriminatory way do not allege antitrust injury); <u>see also</u> <u>City of Pittsburgh v. West Penn Power Co.</u>, 147 F.3d 256, 268 (3d Cir. 1998) ("[A] plaintiff cannot be injured in fact by private conduct excluding him from the market when a statute prevents him from entering that market in any event" (quotation and citation omitted)); <u>Hodges v. WSM, Inc.</u>, 26 F.3d 36, 39 (6th Cir. 1994) (no "antitrust injury" where plaintiff was excluded from market by lawful exercise of property rights); <u>Valley Products Co. v. Landmark</u>, 128 F.3d 398, 404-07 (6th Cir. 1997) (no "antitrust injury" where plaintiff was excluded from market by defendant's termination of trademark license). For this additional reason, the District Court's dismissal of Broadcom's attempted monopolization claim should be affirmed.

## III.    THE COURT CORRECTLY DISMISSED BROADCOM'S 3G CDMA MONOPOLY MAINTENANCE CLAIM (COUNT 7).

Broadcom's Count 7, accusing QUALCOMM of "unlawfully maintaining its monopoly in the 3G CDMA technology markets and 3G CDMA chipset markets" (A120), is utterly untenable; the District Court invoked just a few of its fatal defects.[17]

---

[17] Broadcom complains that the merits of this claim were not briefed below. As will be discussed <u>infra</u>, the claim Broadcom presses now hinges on a finding that QUALCOMM engaged in anticompetitive conduct in the UMTS markets, an issue which was briefed extensively by both sides for Counts I and II. Several of

**A.    Broadcom Has No Standing to Assert Claims Relating to Any 3G CDMA Market.**

At the outset, while the District Court did not address the issue, it is clear that Broadcom lacks standing to assert its seventh cause of action. Broadcom is neither a seller nor a buyer of 3G CDMA chipsets, nor does it allege that it intends to become one. Broadcom alleges that 3G CDMA chipsets are not "interchangeable with, or substitutes for" UMTS chipsets—the product Broadcom sells. (A88) If these allegations are accepted, Broadcom <u>cannot</u> be affected by any alleged monopoly maintenance in CDMA markets. On the other hand, if UMTS and CDMA chipsets <u>were</u> substitutable, the conduct alleged with respect to 2G and 2.5G CDMA handsets (elevated prices, supply shortages (A90-92)) could only <u>favor</u> the competing UMTS technology and markets.

**B.    The Complaint Does Not Adequately Allege Any 3G CDMA Markets in Which "Maintenance" Could Occur.**

For the reasons previously reviewed, each of the "3G CDMA technology markets" is defined by Broadcom exactly coextensively with the technology covered by a lawfully obtained patent. (<u>See</u> A89, <u>supra</u> at 18-19) There can be no unlawful "maintenance" of these statutory monopolies. As to the "3G CDMA chipset market", the District Court accurately noted that "there are not

---

the substantive issues were also canvassed in the discussion of antitrust injury (<u>see</u> A179-82). Regardless, Broadcom does not suggest that the District Court exceeded its power or that this Court lacks the authority to uphold its rulings.

enough details as to the composition" of this market to permit evaluation of the allegations. (A27) Indeed, while the Complaint clearly alleges that "3G" CDMA chipsets constitute a separate market from that for "2G" or "2.5G" CDMA chipsets (A88-90), it actually contains no allegations at all about the size or structure of a "3G CDMA chipset market", or about QUALCOMM's share of that market. The Court need not accept purely conclusory allegations of "monopoly power" in a market. See J.L. Terrel's v. Sherwin-Williams Automo. Finishes Corp., No. Civ. A. 02 CV 2645, 2004 WL 870705, at *4 (E.D. Pa. March 30, 2004).

**C.    The Complaint Does Not Adequately Allege Anticompetitive Conduct in Any 3G CDMA Market.**

The District Court also correctly held that the Complaint does not allege any anticompetitive conduct in this undefined "3G CDMA chipset market." In order to make out a claim for monopoly maintenance, Broadcom must allege that QUALCOMM "engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power." United States v. Dentsply Int'l, Inc., 399 F.3d at 187. Mere allegations of general misconduct will not suffice. "There must be proof that competition, not merely competitors, has been harmed". Id. In fact, the Complaint does not allege any conduct at all in the 3G CDMA chipset market, except conceivably the alleged failed attempt to block approval of an "EVDV"-based standard (although disputes over setting 3G CDMA standards obviously predate the existence of a 3G CDMA chipset market). The

53

other conduct allegations discussed by the court actually pertained to 2G or 2.5G CDMA chipsets. (A27) (Note that the specific incidents of alleged CDMA-related "conduct" all pre-date the approval of the only 3G CDMA standard placed in time—the allegedly QUALCOMM-disfavored "EVDV"-based standard. See A91-97.) Be that as it may, the District Court was also correct that Broadcom did not sufficiently allege that any of the alleged "CDMA"-related conduct "has anticompetitive effects in the market for 3G CDMA chipsets". (A27) Certainly, failure to meet customer demand (A91) and refusal to implement an approved 3G CDMA standard (A96) would create opportunities for—not exclude— competition.[18] And as the District Court accurately noted, the Complaint does not sufficiently allege how supposed reductions in royalty fees to promote sales of QUALCOMM CDMA chipsets injure competition, rather than competitors. "The test [for anticompetitive conduct to maintain a monopoly] is . . . whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit". Dentsply, 399 F.3d at 191. A court need not imagine for itself necessary facts which a plaintiff did not allege. See Associated Gen. Contractors of Cal., Inc. v. State Council of Competitors, 459 U.S. 529, 526 (1983). Broadcom simply has not alleged facts sufficient to demonstrate—if accepted as true—that

---

[18] Tellingly, Broadcom's Sherman and Clayton Act claims for exclusive dealing and tying were dismissed, and Broadcom does not even challenge that dismissal.

54

QUALCOMM unlawfully barred its rivals from the 3G CDMA chipset market. The District Court's ruling was thus correct.

**D.    Broadcom's Attempt to Transform Count 7 Into a UMTS-Related Claim is Impermissible and Without Substance.**

Because its 3G CDMA monopoly maintenance claim is glaringly inadequate, Broadcom in this appeal attempts a "makeover", presenting the claim as being "really" about UMTS markets. Broadcom criticizes the District Court for "focus[ing] on Broadcom's allegations of Qualcomm's abuses of its CDMA monopolies" rather than on "the effect that Qualcomm's actions directed to UMTS had on preserving Qualcomm's CDMA monopolies." (Pl. Br. 55 n.16) This is frankly incoherent, as is Broadcom's single-sentence allegation that "Broadcom is being injured by Qualcomm's maintenance of its 3G CDMA monopolies, because Qualcomm is doing so at the expense of WCDMA technology and UMTS chipsets." (A107) Is Broadcom now asserting that QUALCOMM engaged in improper conduct in the 3G CDMA chipset market that injured competition in the UMTS chipset market? Leaving aside the utter lack of factual allegations, Count 7 does not make that claim, and cannot be reformulated now. And on its face, as explained above, maintenance and exploitation of monopoly power in the 3G CDMA chipset market is either irrelevant to or favorable to the UMTS chipset market. (Supra at 55)

55

Or is Broadcom now alleging that QUALCOMM engaged in improper conduct in the UMTS chipset market (somehow "rais[ing] the costs of complying with the UMTS standard"), presumably to reduce competition against QUALCOMM's CDMA products?  (See Pl. Br. 55)  Again, Count 7 does not allege such a claim, the theory is incompatible with the market definitions selected by Broadcom, and, as reviewed previously, the District Court was correct that Broadcom has not adequately alleged anticompetitive conduct in the alleged UMTS chipset market.

Broadcom's position would require the Court to believe both that QUALCOMM is so eager to secure a "lucrative [UMTS] chipset business" (Pl. Br. 13) that it has broken the law to do so—the heart of Broadcom's argument throughout most of the rest of its brief—and that QUALCOMM is seeking to cripple, if not outright destroy, the UMTS markets in order to maintain its CDMA monopoly.  Clearly, these two claims cannot stand—though they may fall—together.

Broadcom attempts to excuse its lack of standing in any CDMA market by invoking United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001), but without merit.  Broadcom asserts that the Microsoft court held that "anticompetitive actions aimed at preserving a monopoly in one market by weakening nascent threats in other markets constitutes [sic] monopoly

56

maintenance". (Pl. Br. 55)  It did no such thing.  In fact, the decision does not, contrary to Broadcom's claims, even concern conduct in "other markets" at all.

The court in <u>Microsoft</u> analyzed Microsoft's behavior towards potential competitors in the operating systems market.  <u>See Microsoft</u>, 253 F.3d at 52.  Because middleware products had not yet developed to the point that they could effectively compete with Windows in the operating systems market, the court excluded them from the market for the purpose of its market share calculation.  <u>Id.</u> at 53-54.  However, the court did not exclude middleware products from the market for any other purpose.  Rather, it recognized that middleware products should be <u>included</u> in the market as potential substitutes, because they "threatened to become viable substitutes for Windows," <u>id.</u>, and that it was this "nascent" competition that Microsoft was seeking to eliminate.  <u>Id.</u> at 54 ("[n]othing in § 2 . . . limits its prohibition to actions taken against threats that are already . . . present substitutes").

Broadcom here attempts to allege that QUALCOMM is maintaining its monopoly in the 3G CDMA markets by engaging in anticompetitive behavior in the UMTS markets, which Broadcom itself insists are separate from each other.  Broadcom does not even allege that UMTS technologies and chipsets might someday compete in the CDMA markets; indeed, it alleges that they cannot.  Thus,

57

Microsoft, which found monopoly maintenance where a company sought to eliminate nascent competition in its own market, is simply not applicable.[19]

## IV.    THE DISTRICT COURT CORRECTLY DISMISSED BROADCOM'S EIGHTH CLAIM.

Section 7 of the Clayton Act forbids acquisitions "where in any line of commerce or in any activity affecting commerce . . . the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. Broadcom's Complaint alleges that QUALCOMM's proposed (and now completed) acquisition of Flarion violates Section 7 with respect to a "line of commerce" that does not yet and may never exist—the technologies and chipset markets for a potential fourth generation mobile phone standard. (A107-09) The District Court held that Broadcom lacks standing to assert this claim because its alleged injuries "are too speculative". (A44) That holding should be affirmed.

It is black-letter law that a private plaintiff seeking an injunction pursuant to § 16 of the Clayton Act must show "a threat of antitrust injury", Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours and Co., 826 F.2d 1235, 1240 (3d Cir. 1987), and that threat of antitrust injury must be "significant". Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130 (1969). Even

---

[19] The ruling in the other Microsoft case cited by Broadcom, In re Microsoft Antitrust Litig., No. MDL 1332, Civ. JFM-05-1087, 2005 WL 1398643 at *2 (D. Md. June 10, 2005), concerned antitrust standing, an issue not reached by the District Court in this case.

58

though Broadcom brings this claim under § 16 to prevent threatened (rather than actual) injuries, that section still requires a showing that the "threatened injury would be <u>caused by</u> the alleged antitrust violation." <u>City of Pittsburgh</u>, 147 F.3d at 268 (internal citation omitted). Broadcom's "threatened injuries" arising from the Flarion acquisition—alleged injuries that would materialize, if ever, several <u>years</u> in the future, in a market that does not yet even exist, are far too attenuated to support its Section 7 claim.

In support of its Section 7 claim, Broadcom alleges that QUALCOMM's acquisition of Flarion will reduce competition in the so-called "markets for 4G technology". (A113)[20] Broadcom defines those alleged markets as markets for "technologies contending to serve essential functions for 4G and [B3G] wireless standards and systems". (A89) Thus, unlike the other technology markets alleged by Broadcom, which are individual "markets" for technology covered by particular patents and "essential" to particular standards, the B3G and 4G "markets" allegedly encompass competition among "technologies" to be selected to provide "essential functions" that <u>may</u> become part of standards that <u>may</u> be adopted at some time in the future. (<u>Id.</u>) These "markets" for inclusion in thus-far undefined standards are hopelessly amorphous, and Broadcom concedes

---

[20] B3G stands for "beyond third generation." As alleged in the Complaint, and discussed in the Statement of Facts, most cell phones sold today use "2G" technology while "3G" products are only now entering the market. (<u>Supra</u> at 15)

59

that "products using B3G technologies may not arrive in the marketplace for three or more years". (A108) Yet, Broadcom claims it will be injured (i) because it "expects to be a competitor to Qualcomm in the chipset markets for B3G and 4G technologies"; and (ii) as "a customer in the B3G and 4G technology markets", because it "may require a license to intellectual property necessary to manufacture B3G and 4G equipment". (A113) Notably, Broadcom has <u>not</u> alleged that <u>it</u> possesses technology that may compete for inclusion in any B3G or 4G standard.

Based on these allegations, the District Court listed "several events [that] would have to take place" <u>before</u> Broadcom would have suffered a cognizable antitrust injury flowing from QUALCOMM's acquisition of Flarion:

> "Broadcom would be injured if (1) a B3G or 4G technology standard is adopted, (2) the B3G or 4G standard that is adopted incorporates patented technology, (3) the patented technology incorporated into the standard is owned by Flarion, (4) Flarion owned the technology incorporated into the standard before it was acquired by Qualcomm, (5) Broadcom seeks to manufacture chipsets based on B3G or 4G technology, (6) Broadcom needs a license to Qualcomm's patents, (7) Qualcomm does not license the patents 'on competitive terms.'" (A45)

Citing Third Circuit precedent, the District Court correctly held that Broadcom's alleged injuries were too speculative to give rise to antitrust injury. (A43-47)

On appeal, Broadcom contends that it alleged each of the steps that may lead, eventually, to an antitrust injury arising from the Flarion acquisition. (Pl. Br. 59-60) That is wrong. Although Broadcom asserts that it alleged that a

60

"B3G or 4G technology standard" will be adopted (Pl. Br. 59), the paragraph it cites at most alleges that "the process for adopting industry standards for these technologies is well underway". (A108)  Similarly, despite Broadcom's assertion that it "specifically alleged" that it will seek to manufacture "chipsets based on B3G or 4G technology" (Pl. Br. 60), Broadcom in fact only alleges that it is a "customer" in those as yet unformed "technology markets" and "may" later require a license "to manufacture B3G and 4G equipment".  (A113)[21]

Broadcom also asserts that "upholding the District Court's dismissal" would "nullify Section 7 as a forward-looking statute" (Pl. Br. 60), and that, on the District Court's reasoning, "no transaction could ever be challenged under Section 7" (Pl. Br. at 61).  But this is nonsense: the District Court's reasoning was particular to the allegations before it.  Broadcom's alleged injury turns on whether Broadcom might be harmed sometime in the future in an alleged market that does not exist and in which it does not compete.  By contrast, where two current competitors in an existing market decide to merge, other participants in that market may have standing to seek redress for their actual antitrust injuries (assuming the other elements of such a claim are satisfied).  See Serpa Corp. v. McWane, Inc.,

---

[21] Moore Corp. Ltd. v. Wallace Computer Services, Inc., 907 F. Supp. 1545 (D. Del. 1995), is the only case Broadcom cites in support of its assertion that the District Court's holding was erroneous.  (Pl. Br. 59)  However, the Section 7 claim in that case was asserted by the target of a hostile takeover, and the court in fact held that "the target of a hostile takeover has no standing to bring a Section 7 Clayton Act claim".  Moore, 907 F. Supp. at 1566.

61

199 F.3d 6, 12 (D. Mass. 1999) (§ 7 injury not established by distributor who was not a customer of competitor in the market).   Moreover, the Federal Trade Commission or Department of Justice can also seek to enjoin mergers pursuant to Section 7. <u>See, e.g.</u>, <u>United States v. Oracle Corp.</u>, 331 F. Supp. 2d 1098 (N.D. Cal. 2004); <u>Federal Trade Commission v. Arch Coal, Inc.</u>, 329 F. Supp. 2d 109 (D.D.C. 2004).   Far from "nullify[ing] Section 7 as a forward-looking statute" (Pl. Br. 60), the District Court's decision simply applies the well-established rule that attenuated and speculative injuries do not constitute "antitrust injury".

Because Broadcom's alleged antitrust injury is both remote and highly speculative, the District Court properly dismissed its Section 7 claim. <u>See</u> <u>City of Pittsburgh</u>, 147 F.3d at 267; <u>Ideal Dairy Farms, Inc. v. John Labatt, Ltd.</u>, 90 F.3d 737, 750 (3d Cir. 1996) (conclusory assertions of harm or injury alone do not support a Clayton Act claim).[22]

---

[22] Broadcom attempts to distinguish <u>City of Pittsburgh</u> by arguing that it was the "entirely unrelated regulatory regime" which broke the link of causation in that case. (Pl. Br. 61)  But the Court's reasoning was not limited to circumstances in which a regulatory regime renders antitrust injury speculative.  Rather, the Court looked to the "attenuated nature of the causation," <u>City of Pittsburgh</u>, 147 F.3d at 265, that was the <u>result</u> of the regulation.  That reasoning is equally applicable here.

62

## CONCLUSION

For the reasons stated above, QUALCOMM respectfully requests that the August 31, 2006, Judgment and Order of the District Court be affirmed in its entirety.

January 30, 2007

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP

*Richard J. Stark*

Evan R. Chesler
Richard J. Stark
Roger G. Brooks
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000


McCARTER & ENGLISH LLP
William J. O'Shaughnessy
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

*Counsel for QUALCOMM Incorporated*

63

## COMBINED CERTIFICATIONS

RICHARD J. STARK hereby certifies as follows:

**1. Bar Membership** — I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

**2. Type-Volume Limitations** — This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, as counted by the Microsoft Word 2002 word count tool, this brief contains 13,719 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2002 in Times New Roman 14-point font.

**3. Service and Filing** — Pursuant to Fed. R. App. P. 25(c)(1)(C) and 31(b) and Local Rule 31.1(a) of the Rules of this Court, on January 30, 2007, two copies of this brief were served by Federal Express upon the following counsel:

David Boies, Esq.
BOIES SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300
Fax: (212) 446-2350

David S. Stone, Esq.
BOIES SCHILLER & FLEXNER LLP
150 John F. Kennedy Memorial Parkway
Short Hills, NJ 07078
(973) 218-1111
Fax: (973) 218-1106

George S. Cary, Esq.
Mark W. Nelson, Esq.
Steven J. Kaiser, Esq.
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 974-1500
Fax: (202) 974-1999

Pursuant to Fed. R. App. P. 25(a)(2)(B)(ii), on January 30, 2007, ten copies of this

brief were sent to the Clerk of the Court.  Pursuant to Local Rule 31.1(b), on

January 30, 2007, this brief was electronically transmitted to the Court in PDF

format as an attachment to an email sent to electronic_briefs@ca3.uscourts.gov.

   **4. Identical Compliance of Briefs** — The text of the brief

electronically transmitted to the Court in PDF format and the hard copies of the

brief are identical.

   **5. Virus Check** — The PDF version of this brief was scanned for

viruses using Symantec AntiVirus version 10.1.5.5000 and no virus was detected.

Dated: January 30, 2007

<span style="text-align:right; display:block;">*Richard J. Stark*</span>

<span style="text-align:right; display:block;">Richard J. Stark</span>

65

EXHIBIT C

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

(Mark One)

**[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended September 26, 2004

OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____ .

Commission file number 0-19528

# QUALCOMM Incorporated
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 95-3685934 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 5775 Morehouse Drive San Diego, California | |
| (Address of principal executive offices) | 92121-1714 (Zip Code) |

Registrant's telephone number, including area code: (858) 587-1121

Securities registered pursuant to Section 12(b) of the Act:
None

Securities registered pursuant to Section 12(g) of the Act:
Common Stock, $0.0001 par value
(Title of Class)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
YES [X] NO [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (Section 229.405 of this

chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). YES [X] NO [ ]

Table of Contents

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was last sold, or the average bid and asked prices of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter.

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant as of March 26, 2004 was $48,250,582,026.*

The number of shares outstanding of the registrant's common stock was 1,639,081,639 as of November 1, 2004.

### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's Definitive Proxy Statement to be filed with the Commission pursuant to Regulation 14A in connection with the registrant's 2005 Annual Meeting of Stockholders, to be filed subsequent to the date hereof, are incorporated by reference into Part III of this Report. Such Definitive Proxy Statement will be filed with the Securities and Exchange Commission not later than 120 days after the conclusion of the registrant's fiscal year ended September 26, 2004.

---

\*    Excludes the Common Stock held by executive officers, directors and stockholders whose ownership exceeds 5% of the Common Stock outstanding at March 26, 2004. This calculation does not reflect a determination that such persons are affiliates for any other purposes.

Table of Contents

offer built-in, on-board communications and position location reporting systems that may impact our margins and intensify competition in our current and new markets.

Competitors to our BREW platform are continuing to develop their products with a focus on client, provisioning, and billing products and services. These competitors are attempting to offer value added products and services similar, in many cases, to our existing or developing BREW technologies. In some cases, competitors are continuing to explicitly attempt to displace only certain components or areas of the greater BREW offering, such as only the runtime client/device environment portion of BREW. In addition, certain competitors in the computing industry and device manufacturing space are now beginning to more aggressively attempt to replicate the entire BREW system offering that includes both runtime device environments and billing/distribution systems. Similarly, some operators are creating internally developed solutions by piecing together several components or are being pressured by governments to adopt alternatives to our products and services. Emergence of these and other new competitors may adversely impact our margins and market share.

## Patents, Trademarks and Trade Secrets

We rely on a combination of patents, copyrights, trade secrets, trademarks and proprietary information to maintain and enhance our competitive position. We have been granted more than 1,300 United States patents and have over 2,000 patent applications pending in the United States. The vast majority of such patents and patent applications relate to our CDMA digital wireless communications technology. We also have and will continue to actively file for patent protection outside the United States and have received numerous CDMA patents with broad coverage throughout most of the world, including China, Japan, South Korea, Europe, Brazil, India and elsewhere.

The standards bodies and the ITU have been informed that we hold essential intellectual property rights for the 3G standards that are based on CDMA. We have committed to the ITU to license our essential patents for these CDMA standards on a fair and reasonable basis free from unfair discrimination.

Under our CDMA license agreements, licensees are generally required to pay us a non-refundable license fee as well as ongoing royalties based on a percentage of the net selling price of CDMA subscriber, infrastructure, test and integrated circuits products. License fees are paid in one or more installments, while royalties generally continue throughout the life of the licensed patents. Our CDMA license agreements generally provide us rights to use certain of our licensees' technology and intellectual property rights to manufacture and sell certain CDMA products (e.g. CDMA application specific integrated circuits or ASICs, subscriber units and/or infrastructure equipment). In most cases, our use of our licensees' technology and intellectual property is royalty free. However, under some of the licenses, if we incorporate certain of the licensed technology or intellectual property into certain of our products, we are obligated to pay royalties on the sale of such products. Under their existing agreements with us, two entities are entitled to share in a percentage of the royalty revenues that we receive from third parties for their sale of certain CDMA products. Our sharing obligations under one of these arrangements expire in fiscal 2005 and the other in fiscal 2006.

As part of our strategy to generate licensing revenues and support worldwide adoption of our CDMA technology, we license to other companies the rights to design, manufacture and sell products utilizing certain portions of our CDMA intellectual property. The following table lists the majority of our current CDMA licensees:

16

EXHIBIT D



**Qualcomm Incorporated**

**Press Release**

5775 Morehouse Drive
San Diego, CA 92121-1714
(858) 587-1121

www.qualcomm.com

### Qualcomm Sues Broadcom for Patent Infringement

*Complaint Identifies GSM/GPRS Chips and Wi-Fi Semiconductors as Infringing Products*

SAN DIEGO — JULY 11, 2005 — Qualcomm Incorporated (Nasdaq: QCOM), pioneer and innovator of Code Division Multiple Access (CDMA) and other cutting-edge wireless technologies, today filed suit against Broadcom Corporation in federal court in San Diego for infringement of seven Qualcomm patents. Qualcomm's lawsuit asserts infringement of patents that are "essential" to the manufacture or use of equipment that complies with the GSM, GPRS and EDGE cellular standards (the "GSM Standards") and to certain interoperability standards for wireless local area networks popularly known as Wi-Fi. Patents that are "essential" to a standard are those that must necessarily be infringed to comply with the requirements of the standard. Qualcomm's complaint states that Broadcom is infringing six of the patents by the manufacture and sale of integrated circuits for use in GSM Standards handsets and is infringing the remaining patent by the manufacture and sale of semiconductors for Wi-Fi devices. Qualcomm seeks an injunction against Broadcom's continued manufacture and sale of these products as well as monetary damages.

Second-generation GSM systems rely on a form of technology known as time division multiple access (TDMA). For third-generation (3G) services, many GSM wireless carriers have chosen to deploy a form of CDMA, called WCDMA. However, even before the 3G transition, GSM systems have been adding data and other capabilities, via GPRS and EDGE technologies, with advancements such as higher data transmission rates, increased spectral efficiency/greater capacity, resistance to interference, access to packet switched networks and multimedia distribution. As a result, these evolving GSM Standards now incorporate a number of Qualcomm's patented inventions, originally developed to enable such capabilities in CDMA networks. The patents in this suit cover some of Qualcomm's innovations that have now been incorporated into the GSM Standards through GPRS and EDGE. As explained in Qualcomm's complaint, Broadcom's integrated circuits for GSM Standards-compliant devices unavoidably infringe Qualcomm's patents essential to the GSM Standards.

Qualcomm's extensive investments in research and development have yielded valuable innovations in virtually all aspects of wireless technology, greatly aiding the ability of the Company's licensees to offer advanced services. These innovations are applicable to high data rate wireless networks of many kinds, including popular wireless local area networks. The Broadcom Wi-Fi chips cited in the complaint utilize certain of these patented innovations.

"Our complaint, based upon our initial review of Broadcom's business, discloses that a number of Broadcom's major product lines infringe Qualcomm's patents. We are continuing to examine Broadcom's other businesses," said Louis M. Lupin, senior vice president and general counsel for Qualcomm. "Those who believe that Qualcomm's intellectual property portfolio is limited to CDMA have overlooked the breadth of our business activity and the extent of our research and development from which our intellectual property is generated. Our intellectual property rights are broad, and we will not hesitate to assert their full breadth when appropriate." .

Qualcomm's extensive patent portfolio includes more than 3,000 United States patents and patent applications for CDMA and other technologies augmented by corresponding patents and applications around the globe. Qualcomm has entered into more than 130 royalty-bearing license agreements with the world's leading telecommunications equipment makers and consumer electronics manufacturers.

Qualcomm Incorporated (www.qualcomm.com) is a leader in developing and delivering innovative digital wireless communications products and services based on CDMA and other advanced technologies. Headquartered in San Diego, Calif., Qualcomm is included in the S&P 500 Index and is a 2005 FORTUNE 500® company traded on The Nasdaq Stock Market® under the ticker symbol QCOM.

###

EXHIBIT E

*(Translation)*

*[In case of discrepancy or dispute, the Japanese text shall prevail]*

**Guidelines for Treatment of Industrial Property Rights
in connection with the ARIB Standard**

*September 5, 1995*

*Decided by the 1st Standard Assembly Meeting*

The ARIB Standard is to be drafted in a fair and open manner, and established only when agreed upon by the general consensus of the Standard Committee members.

Therefore , if any or all parts of the contents of the ARIB Standard are Included in the scope of an Essential Industrial Property Right (Industrial Property Right (hereinafter "IPR")   means any patent right ,utility model right and design patent right ,whether allowed or pending ; and "Essential IPR" means any of those which technically makes it impossible to manufacture, to sell or to use equipment, apparatus, devices, systems or software, in compliance with the ARIB Standard without infringing the same),the adoption of the ARIB Standard should be decided in a fair and open manner which clearly reflects the intention of a majority of the Standard Assembly members.

Furthermore ,to promote the ARIB Standard for universal use, the Standard Committee deems it desirable that the Essential IPR which relates to any or all parts of the contents of the ARIB Standard should be used free of charge by anyone and that it would not block the use of such Essential IPR in any other country where such an ARIB Standard is adopted.

Accordingly, the Standard Assembly has established the following guidelines for dealing with such Essential IPR to which the ARIB Standard relates.

1   Treatment

1.1 Basis for Selection

In case where any or all parts of the contents of the provisions of a particular ARIB Standard are included in the scope of any Essential IPR , the ARIB Standard shall apply only when the holder of such Essential IPR(hereinafter "the Right

1

Holder")agrees to elect either of the following two alternative cases(1) and (2); and shall not apply when the Right Holder elects case(3).

(1)  The Right Holder agrees not to assert such Essential IPR and to grant a license unconditionally to the use of such Essential IPR to anyone who uses such an ARIB Standard.

However, if anyone who uses such an ARIB Standard owns any other Essential IPR which covers any or all parts of the contents of the provisions of such an ARIB Standard , and lays claims thereto , such user may be excluded from the application of the aforesaid provision by the Right Holder.

(2)  The Right Holder , upon disclosing the contents and the terms and conditions of such Essential IPR , agrees to grant a non-exclusive and non-discriminatory license to the use of such Essential IPR on reasonable terms and conditions to anyone who uses such an ARIB Standard.

However, if anyone who uses such an ARIB Standard owns any other Essential IPR which covers any or all parts of the contents of the provisions of such an ARIB Standard , and lays claims thereto ,such a user may be excluded from the application of aforesaid provision by the Right Holder.

(3)  The Right Holder does not agree to either of the aforesaid alternatives referred to in (1) or (2).

### 1.2  Disputes regarding IPR

The Standard Assembly is not responsible for the confirmation of whether or not any or all parts of such an ARIB Standard are included in a scope of any Essential IPR , nor liable for any disputes regarding IPR.

### 1.3  Applicable Scope and Territory

The treatment provided in Section 1.1 of these Guidelines shall be applied to equipment, apparatus, devices, systems or software used in Japan in compliance with such an ARIB Standard. However , in case where other countries adopt such an ARIB Standard , mutual consultation about the treatment of the Essential IPR can be conducted in the spirit stated in the preface.

### 2  Procedures

Below are the procedures to be applied when any or all parts of the contents of the provisions of a particular ARIB Standard are included in the scope of any Essential IPR.

2.1  Submission of Confirmation Form

When drafting the provision(s) of an ARIB Standard ,the Right Holder should submit to the chairman of the Standard Assembly one of the following confirmation forms relating to a license to the use of the Essential IPR provided in the attached forms No.1 through No.3 (IPR 's other than patents shall be listed on the back page of the confirmation form in the same manner as patents.).

2.2    Submission Date for Confirmation Form

As a general rule , one of the three forms above should be submitted before or on the date to be decided by the Standard Assembly or the date to be decided by the subcommittee of the Standard Assembly prior to the establishment of such a draft ARIB Standard .

Where the Essential IPR provided in Section 2.1 has not been laid open (hereinafter "lay open" includes international publication and national (domestic) publication , and means the earliest one among them ) at the time of that submission , the form shall be re-submitted after such Essential IPR is laid open again.

If the application of such Essential IPR is withdraw or rejected or the right has expired , a notification thereof shall be submitted without delay.

2.3  Custody of Confirmation Form and Notation in the ARIB Standard

When the secretariat of the Standard Assembly receives a confirmation form provided in Section 2.1 form the Right Holder, the secretariat will retain the form in custody. If the secretariat receives the attached confirmation form No.1 or No.2, such an ARIB Standard shall include the following notation.

"Note: Although this   ARIB Standard contains no specific reference to any Essential Industrial Property Right relating thereto, the holder of such Essential Industrial Property Right states that "YYY" is the holder of the Industrial Property   Right "XXX" covering this ARIB  Standard and agrees [  (in case of the attached form No.1) not to assert such right "XXX" and to grant a license unconditionally to the use of such right "XXX" to anyone using this ARIB Standard] [ (in case of the attached form No.2)to grant a non-exclusive and non-discriminatory license to the use of such right "XXX" on reasonable terms and conditions to anyone using this ARIB Standard ]. However this does not apply to anyone who uses this ARIB Standard

3

*and also owns and lays claim to any other Essential Industrial Property Right whose scope is included in any or all parts of the contents of the provisions of this ARIB Standard."*

*2.4   Liability for not receiving Confirmation Form*

*The Standard Assembly shall not be responsible to anyone for any and all consequences that may arise from not submitting any of the confirmation forms provided in section 2.1 by the Right Holder.*

*3 Others*

*The treatment and procedure based on "Guidelines for Treatment of Industrial Property Rights in connection with the RCR Standard "(decided as of June 28,  1991 by the Research and Development Center for Radio Systems Standard Committee Meeting)" is regarded as the treatment and procedure based on these Guidelines.*

---

*NOTE: The original "Guidelines for Treatment of Industrial Property Rights in connection with the ARIB Standard" is written in Japanese, which was decided by the 1 st Standard Assembly Meeting, and this document is its translated version in English.*

*Attached Form No.1*

*Confirmation form relating to a license to the use of the Essential IPR*

*To the chairman of the Standard Assembly*

*Date of submission    :*
*Submitter*
    *Name of company        :*
    *Name of representative :*                *(seal or signature)*
    *Address of company     :*

    *In terms of the Essential IPR stated below in connection with the ARIB Standard ,we confirm that the company elects case (1) in Section 1.1 provided in "Guidelines for Treatment of Industrial Property Rights in connection with the ARIB Standard (decided as of September 5 , 1995 by the Standard Assembly Meeting)".*
    *If any amendment of the contents of our statement arise ,we shall submit a confirmation form again without delay,*

*1    Title of ARIB Standard*

*2    IPR of Interest*
    *As per the table of relevant IPR stated on the back page*

---

*(NOTE): The definition of the Essential IPR stated in this confirmation form is in accordance with the definition provided in "Guidelines for Treatment of Industrial Property Rights in connection with the ARIB Standard (decided as of September 5, 1995 by the Standard Assembly Meeting)"*

*(Back page)*

Table of relevant IPR

| Applied country | Application Number | Name of invention | Content in detail |
|---|---|---|---|
| | | | as per attached sheet - |
| | | | as per attached sheet - |
| | | | as per attached sheet - |
| | | | as per attached sheet - |
| | | | as per attached sheet - |
| | | | as per attached sheet - |
| | | | as per attached sheet - |
| | | | as per attached sheet - |

*Attached sheet –*

| | |
|---|---|
| *Title of invention* | |
| *Date of application* | |
| *Patent registration number (note #1)* | |
| *Name or title of the patent applicant (Note #2)* | |
| *Name and address (or domicile) of inventor (Note #3)* | |
| *Reference material(s) (Note #3,4) (1) Specification*<br><br>*(2)Drawings necessary* | *as per attached Specification(brief explanations of drawings ,detailed explanations of invention and scope of claims are to be stated) (table of attached drawings is to be stated)* |
| *Description of the provisions of the RCR Standard subject to the right applied (Note #5)* | |
| *Remarks* | *(name of foreign countries where in case of applied is to be stated)* |

*Note #1: Patent publication number ,laying-open number or application*
          *number is to be stated in case of not registered.*

*Note #2: Company name and representative name are to be stated in case of juridical person.*

*Note #3: Not necessary to fill in the blank in case of not laid-open.*

*Note #4: Patent official report   which reflects the latest specification may be attached.*

*Note #5: Not necessary to fill in the blank in case of registered.*

7

*Attached Form No.2*

*Confirmation form relating to a license to the use of the Essential IPR*

*To the chairman of the Standard Assembly*

*Date of submission          :*
*Submitter*
*    Name of company          :*
*    Name of representative   :*                          *(seal or signature)*
*    Address of company       :*

*    In terms of the Essential IPR stated below in connection with the ARIB Standard ,
we confirm that the company elects case (2) in Section 1.1
Provided in "Guidelines for Treatment of Industrial Property Rights in connection
with the ARIB Standard ( decided as of September 5 ,1995 by the Standard
Assembly Meeting )".*
*    The terms and conditions to use the Essential IPR of interest are stated below.*
*    If any amendment of the contents of our statement arise ,we shall submit a
confirmation form again without delay.*

*1    Title of ARIB Standard*

*2    IPR of Interest*
*        As per table of relevant IPR stated on the back page*

*3    Terms and Conditions to use the Essential IPR*

---

*(NOTE): The definition of the Essential IPR stated in this confirmation form is in
accordance with the definition provided in "Guidelines for Treatment of Industrial
Property Rights in connection with the ARIB Standard (decided as of September 5,
1995 by the Standard Assembly Meeting)"*

*Attached Form No.3*

*Confirmation form relating to a license to the use of the Essential IPR*

*To the chairman of the Standard Assembly*

*Date of submission      :*
*Submitter*
  *Name of company          :*
  *Name of representative :*                          *(seal or signature)*
  *Address of company      :*

  *In terms of the Essential IPR stated below in connection with the ARIB Standard ,*
*we confirm that the company elects case (3) in Section 1.1*
*provided in "Guidelines for Treatment of Industrial Property Rights in connection*
*with the ARIB Standard(decided as of September 5,1995 by the Standard Assembly*
*Meeting)".*
  *If any amendment of the contents of our statement arise ,we shall submit a*
*confirmation form again without delay.*

*1   Title of ARIB Standard*

*2   IPR of Interest*
    *As per table of relevant IPR stated on the back page*

*(NOTE): The definition of the Essential IPR stated in this confirmation form is in*
*accordance with the definition provided in "Guidelines for Treatment of Industrial*
*Property Rights in connection with the ARIB Standard (decided as of September 5,*
*1995 by the Standard Assembly Meeting)"*

EXHIBIT F



# Operating Procedures for
# ATIS Forums and Committees

# TABLE OF CONTENTS

1    Organizational Structure --------------------------------------------------------------------------1

2    Participation --------------------------------------------------------------------------------------1

3    Leadership-----------------------------------------------------------------------------------------1
   3.1    Chair and Vice Chair of ATIS Forum or Committee ----------------------------------------1
      3.1.1    Terms and Limitations ----------------------------------------------------------------1

   3.2    Co-Chairs of Subtending Committee or Subcommittee -----------------------------------2
      3.2.1    Terms and Limitations ---------------------------------------------------------------2

   3.3    Leader(s) of Task Force-----------------------------------------------------------------------2
      3.3.1    Terms and Limitations ---------------------------------------------------------------2

4    Election of Leadership--------------------------------------------------------------------------2
   4.1    Announcement/Notification of Election of Leadership Position(s)------------------------2

   4.2    Nominations -----------------------------------------------------------------------------------2

   4.3    Elections ---------------------------------------------------------------------------------------2

5    Issue Process ------------------------------------------------------------------------------------3
   5.1    Submitting an Issue --------------------------------------------------------------------------3

   5.2    Acceptance of Issue --------------------------------------------------------------------------3

   5.3    Working an Issue------------------------------------------------------------------------------3
      5.3.1    Active -----------------------------------------------------------------------------------3
      5.3.2    Initial Closure--------------------------------------------------------------------------3
      5.3.3    Initial Pending-------------------------------------------------------------------------3
      5.3.4    Final Closure --------------------------------------------------------------------------4
      5.3.5    Withdrawn------------------------------------------------------------------------------4
      5.3.6    Tabled -----------------------------------------------------------------------------------4
      5.3.7    No Industry Agreement----------------------------------------------------------------4

6    ATIS Deliverables -------------------------------------------------------------------------------4
   6.1    ATIS Standards -------------------------------------------------------------------------------4

   6.2    ATIS Implementable End-to-End Standard ------------------------------------------------4

7    Resolution Process------------------------------------------------------------------------------5
   7.1    Consensus -------------------------------------------------------------------------------------5

   7.2    Voting ------------------------------------------------------------------------------------------5

8    Meetings -------------------------------------------------------------------------------------------5
   8.1    Notice ------------------------------------------------------------------------------------------5

   8.2    Quorum-----------------------------------------------------------------------------------------5

   8.3    Industry Expert Attendance ----------------------------------------------------------------6

9    Meeting Notes------------------------------------------------------------------------------------6
   9.1    Meeting Note Content ----------------------------------------------------------------------6

10   Intellectual Property Rights Policy ---------------------------------------------------------6

10.1    General Policy Statement ------------------------------------------------------------------------------ 6

10.2    Confidentiality ------------------------------------------------------------------------------------------ 6

10.3    Copyright ------------------------------------------------------------------------------------------------ 6
10.3.1   Copyright Policy ----------------------------------------------------------------------------------------- 6
10.3.2   ATIS Deliverables---------------------------------------------------------------------------------------- 7
10.3.3   Notice ----------------------------------------------------------------------------------------------------- 7

10.4    Patents -------------------------------------------------------------------------------------------------- 7
10.4.1   Patented Inventions Generally------------------------------------------------------------------------- 7
10.4.2   American National Standards-------------------------------------------------------------------------- 8

11   COMMUNICATIONS------------------------------------------------------------------------------------------- 9

11.1    Internal to ATIS --------------------------------------------------------------------------------------- 9

11.2    External to ATIS -------------------------------------------------------------------------------------- 9

12   LIAISONS ----------------------------------------------------------------------------------------------------- 9

12.1    Internal Liaisons-------------------------------------------------------------------------------------- 9

12.2    External Liaisons-------------------------------------------------------------------------------------- 9

13   APPEALS PROCESS ----------------------------------------------------------------------------------------- 9

13.1    Informal Complaint ----------------------------------------------------------------------------------- 9

13.2    Formal Complaint-------------------------------------------------------------------------------------- 9
13.2.1   Written Complaint--------------------------------------------------------------------------------------- 9
13.2.2   Response ----------------------------------------------------------------------------------------------- 10
13.2.3   Hearing -------------------------------------------------------------------------------------------------- 10
13.2.4   Panel----------------------------------------------------------------------------------------------------- 10
13.2.5   Conduct of Hearing------------------------------------------------------------------------------------ 10
13.2.6   Decision ------------------------------------------------------------------------------------------------- 10

14   PARTNERSHIP SPECIFICATIONS ----------------------------------------------------------------------- 11

14.1    Acceptance of Partnership Specifications ----------------------------------------------------- 11

14.2    Adoption of Partnership Project Specifications ---------------------------------------------- 11

15   INTERACTION WITH ITU-T ---------------------------------------------------------------------------------- 11

16   REVISIONS TO THE OPERATING PROCEDURES -------------------------------------------------------- 11

APPENDIX A – ATIS PROCEDURES FOR THE DEVELOPMENT OF AN AMERICAN NATIONAL STANDARD -----------------------V

APPENDIX B – ATIS ORGANIZATIONAL STRUCTURE CHART -------------------------------------------------- XI

APPENDIX C – FORUM AND COMMITTEE MISSION STATEMENTS ----------------------------------------------XII

APPENDIX D – ATIS FORUM/COMMITTEE – ISSUE IDENTIFICATION FORM----------------------------------- XV

APPENDIX E – DEVELOPING AN "ATIS STANDARD" --------------------------------------------------------------XVI

APPENDIX F – INTERACTION WITH THE ITU------------------------------------------------------------------------XIX

APPENDIX G – ATIS DOCUMENT NUMBERING ------------------------------------------------------------------- XXIV

# Operating Procedures for ATIS Forums and Committees

The purpose of this document is to describe the Operating Procedures that apply to the ATIS Forums and Committees. These Operating Procedures have been developed to assist leadership, participants and administrators with understanding the processes of the ATIS Forums and Committees. If a Forum or Committee determines it is appropriate to develop an American National Standard ("ANS"), the "ATIS Procedures for the Development of an American National Standard" shall apply for that work activity. The ATIS Procedures for the Development of an American National Standard are found at **Appendix A** to these Operating Procedures.

## 1    ORGANIZATIONAL STRUCTURE

In general, the standards work of ATIS is accomplished in various Functional Groups of Forums and Committees. ATIS Forums and Committees are established by the ATIS Board of Directors and are defined in the ATIS Bylaws. Forums and Committees may form Subgroups (Committees or Subcommittees) as needed, based on work programs. Task Forces are created by either a Forum or Committee to accomplish a definite objective, usually within a defined period of time.

The current ATIS organizational structure is provided in **Appendix B** and the Forum and Committee mission statements are provided in **Appendix C** to these Operating Procedures.

## 2    PARTICIPATION

Participation in the ATIS Forums and Committees or any subtending Committees or Subcommittees formed thereunder, is open to Full and Affiliate ATIS Member Companies (referred to collectively as "ATIS Member Companies"). The ATIS membership qualifications and funding requirements are found on the ATIS web site. Companies may opt-out of ATIS Membership and pay an annual non-member supplemental payment in order to participate in an ATIS Forum or Committee, or any subtending Committee or Subcommittee formed thereunder. The opt-out option and the annual non-member supplemental payment are described on the ATIS web site at www.atis.org.

A Forum or Committee funding and/or participation fee may be assessed to cover the costs of the meeting and administrative support. Forum or Committee funding or participation fees are in addition to the ATIS membership dues or the non-member supplemental payment. The written funding and/or participation fee policies of the various ATIS Forums and Committees are available at www.atis.org.

An ATIS Member Company, or a company that has paid its annual non-member supplemental payment, and that is also in compliance with any Forum or Committee funding or participation requirement is considered a Funding Company of that Forum or Committee (referred to as a "Forum or Committee Funding Company" throughout these Operating Procedures).

## 3    LEADERSHIP

### 3.1    Chair and Vice Chair of ATIS Forum or Committee

The Chair and Vice Chair preside over each ATIS Forum or Committee and have, at a minimum, the responsibility to ensure that these Operating Procedures are followed and that meetings are conducted in a fair and efficient manner. The Chair and Vice Chair should remain neutral in all discussions and should not influence the disposition of Issues and events based on his/her leadership position. A Forum or Committee may agree by consensus to select two Co-Chairs rather than a Chair and Vice Chair where work area, responsibilities, and available resources require a split of the leadership authority.

#### 3.1.1    Terms and Limitations

The Chair and Vice Chair (or Co-chairs) are elected by the Forum or Committee, in accordance with Section 4 of these Operating Procedures. Each shall serve two years in their position, with a limit of two

consecutive terms. Candidates should come from the Forum or Committee participants and should have previous Forum or Committee and industry experience.

## 3.2    Co-Chairs of Subtending Committee or Subcommittee

Co-Chairs preside over each meeting of a subtending Committee or Subcommittee and have, at a minimum, the responsibility to ensure that these Operating Procedures are followed and that meetings are conducted in a fair and efficient manner. The Co-Chairs should remain neutral in all discussions and should not influence the disposition of Issues and events based on his/her leadership position. A Committee or Subcommittee may agree by consensus to select a Chair and Vice Chair rather than Co-Chairs where work area, responsibilities and available resources require.

### 3.2.1   Terms and Limitations

The Co-Chairs (or Chair and Vice Chair) are elected by the Forum or Committee, unless delegated by the Forum or Committee to the subtending Committee or Subcommittee, in accordance with Section 4 of these Operating Procedures. Each shall serve two years in their position, with a two consecutive term limitation. Candidates should come from the subtending Committee or Subcommittee participants and should have previous subtending Committee or Subcommittee and industry experience.

## 3.3    Leader(s) of Task Force

The leadership of a Task Force may be elected in accordance with Section 4 of these Operating Procedures, or appointed by the formulating Forum or Committee.

### 3.3.1   Terms and Limitations

The term of a leader of a Task Force is for the life of the group or one year, whichever is shorter.

## 4    ELECTION OF LEADERSHIP

Forum, Committee, subtending Committee or Subcommittee and Task Force (where not appointed) leadership elections will follow the general guidelines below:

## 4.1    Announcement/Notification of Election of Leadership Position(s)

All leadership elections should be announced at the meeting prior to the election, but must be announced at least 30 calendar days in advance of the election. The election announcement shall be distributed by email exploder to the relevant electing body.

## 4.2    Nominations

Nominations shall be solicited from the appropriate electing body following an election announcement. Nominations shall also be sought from the floor at the time of the election.

## 4.3    Elections

The election of leadership is by secret ballot, unless there is one candidate in which case the election may be by acclamation. The election of leadership is by a simple majority of those Forum or Committee Funding Companies in good standing and present at the time of election; each has one vote. A Forum or Committee Funding Company in good standing is defined as an ATIS Member Company, or a company that has paid its annual non-member supplemental payment and that is also in compliance with any Forum or Committee funding or participation requirement. For purposes of determining the simple majority, abstentions or invalid ballots are not counted. If there are multiple candidates and no one candidate receives a simple majority on the first ballot, a second ballot is held between the top two vote-receiving candidates. Proxies are not permitted, unless a quorum requirement is invoked as provided for in Section 8.2 of these Operating Procedures.

Elections may be held via electronic mail or other forms of electronic balloting. In order for a valid election to have occurred via electronic means, at least one half of the relevant Forum and Committee Funding Companies in good standing must vote in the election. The election of leadership is by a simple majority of those Forum or Committee Funding Companies who voted; each Forum or Committee Funding Company has one vote. A minimum of 10 business days must be allowed for a Forum or Committee Funding Company to vote via electronic means.

## 5  ISSUE PROCESS

An Issue is the means by which work is progressed in the ATIS Forums and Committees, and any subtending Committee, Subcommittee or Task Force. An Issue may be thought of as similar to a project proposal, where the problem/Issue and proposed resolution are defined, and a suggested timeline for completing the Issue resolution is developed. Work corresponding to Issue resolution is tracked via the Issue process defined below.

### 5.1    Submitting an Issue

An ATIS Issue Identification Form must be completed by the Issue Champion in order for a new Issue to be introduced into an ATIS Forum or Committee. An ATIS Issue Identification Form is provided in **Appendix D** to these Operating Procedures. An Issue Champion may be an ATIS Member Company Representative or a Forum or Committee participant. An Issue that requires expedited handling should be brought to the attention of the leadership when presented to the Forum or Committee.

### 5.2    Acceptance of Issue

Once an Issue is submitted, the appropriate Forum or Committee must determine whether to accept the Issue based on the following criteria:

> ➢ The Issue is clearly defined via the ATIS Issue Identification Form (**Appendix D**);

> ➢ The Issue is within the scope of the Forum or Committee; and

> ➢ There is no existing solution or the existing solution can be enhanced to gain efficiencies, i.e., operational, functionality, etc.

### 5.3    Working an Issue

Once a Forum or Committee accepts an Issue, work may begin on resolving the Issue. Forums and Committees are encouraged to prioritize work to ensure efficient and timely completion of industry priorities. If an Issue is identified as potentially resulting in the revision of an American National Standard or a new American National Standard, the Forum or Committee must follow the procedures provided for in **Appendix A** – "ATIS Procedures for the Development of an American National Standard" – for that specific Issue.

An ATIS Committee may delegate to its Subcommittee(s) the responsibility to accept, work and close Issues.

Once an Issue is accepted, the Issue is automatically placed into Active Status and addressed by the industry in an effort to reach a final resolution. The status of an Issue is indicated by one of the following categories:

#### 5.3.1    Active

An Issue that has been accepted and is currently being addressed.

#### 5.3.2    Initial Closure

An Issue that has reached a consensus resolution. The purpose of Initial Closure is to provide the industry an opportunity to review the resolution prior to the Issue being placed into Final Closure.

*Issues in Initial Closure can be removed from the Initial Closure status and placed back into Active status when the Forum or Committee that accepted the Issue decides the proposed resolution needs additional work.*

#### 5.3.3    Initial Pending

An Issue that has been placed into Initial Closure may be automatically moved into the Initial Pending category as long as 21 calendar days have passed since the Issue's Initial Closure resolution was posted on the ATIS Web Site and notification of Initial Closure was distributed via the email exploder list, if one of the following occurs:

> ➢ Prior to the time that the Issue would go to Final Closure, new and substantive information that directly impacts the resolution is brought to the attention of the Forum or Committee; or

> ➢ If the Forum or Committee determines that it is appropriate to hold the Issue in the Initial Pending category in anticipation of the output of another industry group, regulatory body or similar organization.

In either of the above situations, the Forum, Committee, or Subcommittee that accepted the Issue shall subsequently determine, via consensus, if the Issue should be revisited, in which case it would be placed in the Active category; or go to Final Closure if no further work is required, as long as 21 calendar days have passed since the Issue's Initial Closure resolution was posted on the ATIS Web Site and notification of Initial Closure was distributed via the email exploder list.

Corrections to spelling, punctuation or grammar would not require an Issue to be placed into the Initial Pending category.

### 5.3.4    Final Closure

An Issue is automatically placed into Final Closure provided:

> ➢ 21 calendar days have passed since the Issue's Initial Closure resolution was posted on the ATIS Web Site and notification of Initial Closure was distributed via the email exploder list; and

> ➢ No new information surfaces that would require the Issue to be placed into the Active or Initial Pending category.

### 5.3.5    Withdrawn

An Issue that was accepted by the Forum, Committee or Subcommittee and later withdrawn pursuant to the consensus agreement of the accepting Forum, Committee or Subcommittee.

### 5.3.6    Tabled

An Issue that has been addressed by the Forum, Committee or Subcommittee that accepted it but cannot be further pursued until additional information becomes available.

### 5.3.7    No Industry Agreement

No Industry Agreement exists when a Forum or Committee is unable to reach consensus on the resolution of an Issue. If this situation should occur, the ATIS Issue Identification Form should document that the Forum or Committee could not agree on a resolution and state the alternative viewpoints with the pros and cons of each. In this situation, the Issue will be closed under the category, "No Industry Agreement."

## 6    ATIS DELIVERABLES

### 6.1    ATIS Standards

An "ATIS Standard" is an ATIS deliverable developed by an ATIS Forum or Committee that defines a technical or operational solution for voluntary implementation by the industry. An "ATIS Standard" includes, but is not limited to, an American National Standard, a Technical Requirement, a Technical Specification, a Technical Report, an industry guideline or a white paper.

An "ATIS Standard" is developed according to the Issue Process as defined in Section 5 above, and numbered in accordance with the ATIS Document Numbering System in **Appendix G**.

### 6.2    ATIS Implementable End-to-End Standard

An "ATIS Implementable End-to-End Standard" is an ATIS deliverable comprised of "ATIS Standard(s)" and/or deliverable(s) from other Forums or Committees external to ATIS that defines a complete, implementable end-to-end solution for the industry. An "ATIS Implementable End-to-End Standard" defines frameworks for services and performance requirements, interfaces and physical characteristics for technologies, systems and business processes, and ensures interoperability. An "ATIS Implementable End-to-End Standard" may require work in

multiple venues or disciplines. Issues related to the development of an "ATIS Implementable End-to-End Standard" may be introduced by the ATIS Board of Directors Technical Operations ("TOPS") Council, a representative of an ATIS Member Company, or a participant of an ATIS Forum or Committee.

An "ATIS Implementable End-to-End Standard" is developed according to the Issue Process as defined in Section 5 above. A process flow relating to the development of an "ATIS Implementable End-to-End Standard" in multiple venues is attached at **Appendix E.**

## 7    RESOLUTION PROCESS

### 7.1    Consensus

Consensus is the method used by the ATIS Forums and Committees to reach resolution of Issues, unless specifically otherwise provided for in these Operating Procedures or in the "ATIS Procedures for the Development of an American National Standard" (**Appendix A**). Consensus is established when substantial agreement has been reached among those participating in the Issue at hand. Substantial agreement means more than a simple majority, but not necessarily unanimous agreement.

Consensus requires that all views and objections be considered, and that a concerted effort be made toward their resolution. Under some circumstances, consensus is achieved when the minority no longer wishes to articulate its objection. In other cases, the opinions of the minority should be recorded with the report of the substantial agreement, or consensus, of the majority.

When there are questions or disputes regarding consensus, leaders or participants should ask an objecting participant(s) to state the rationale for the objection and provide an opportunity for full discussion aimed at achieving full understanding and consideration of the objection.

A participant's silence is perceived as agreement by the committee and its leadership. If participants do not agree, they should be encouraged to speak up and voice their opinion.

### 7.2    Voting

During any Forum or Committee voting process, each Forum or Committee Funding Company is given a single vote. Each entity shall designate a Voting Member. *Proxies are not permitted, unless a quorum requirement is* invoked as provided for in Section 8.2 of these Operating Procedures.

## 8    MEETINGS

Meetings, whether face-to-face, virtual or conference call, are scheduled on an as-needed basis, based upon the Forum or Committee workload and industry priorities.

### 8.1    Notice

Where possible, all face-to-face meetings shall be announced via the e-mail exploder and posted to the ATIS Web Site no less than 30 calendar days prior to the meeting date. All other meetings, including virtual meetings and conference calls, should be announced via the e-mail exploder and posted to the ATIS Web Site no less than 14 calendar days prior to the meeting date. Special exceptions may be made on an as-needed basis. When an exception is necessary, the Forum or Committee Leadership will announce the meeting as soon as practicable.

### 8.2    Quorum

A quorum is not required for a Forum or Committee to conduct business. However, a Forum or Committee may agree via consensus to observe a quorum requirement, provided such requirement is announced in the meeting notice. One-third of the members of the Forum or Committee shall constitute a quorum for conducting business at a meeting. Proxies are counted in determining whether a quorum requirement is met.

## 8.3    Industry Expert Attendance

Forum or Committee Leadership may at its discretion invite an industry subject matter expert(s) to attend specific Forum or Committee meetings when his/her expertise is required to assist the Forum or Committee in resolving a specific Issue. The expert shall not participate in consensus decisions or voting processes.

## 9    MEETING NOTES

ATIS Forums and Committees shall publish fair, objective and unbiased meeting notes developed by consensus and ensure they accurately reflect the activities, resolutions and action items that result from meetings. All meeting notes shall be published in a timely manner.

## 9.1    Meeting Note Content

Meeting notes shall include at a minimum:

> ➤ Date(s), type of meeting (i.e., virtual meeting, conference call, face-to-face), leadership, person taking the notes;
> ➤ Attendance list;
> ➤ Approved agenda;
> ➤ Identification of Issues discussed at the meeting and their status;
> ➤ A notation of corrections/additions made to a previous meeting record;
> ➤ Points noted/alternatives discussed including opposing viewpoints;
> ➤ Agreements reached;
> ➤ Action items indicating responsible party and due date;
> ➤ Participants' contributions or similar documents or, a reference to where those documents are available on the ATIS web site;
> ➤ Copies of presentations made during the meeting or, a reference to where the presentations are available on the ATIS web site.

## 10    INTELLECTUAL PROPERTY RIGHTS POLICY

## 10.1    General Policy Statement

In all matters of intellectual property rights, it is the intention of ATIS and its Forums and Committees to benefit the public while respecting the legitimate rights of intellectual property owners.

## 10.2    Confidentiality

As a general rule, neither ATIS nor its Forums or Committees will consider any contributions, presentations or other documentation that is subject to any requirement of confidentiality or any restriction on its dissemination. Neither ATIS nor its Forums or Committees assume any obligations of confidentiality with respect to any contribution, presentation, documentation or other submissions. Exceptions to the general rule are determined on a case-by-case basis by the relevant Forum or Committee leadership in conjunction with ATIS General Counsel and are only appropriate where the work cannot be accomplished through other means. Prior to the distribution or discussion of any materials accorded exception status and considered as confidential or otherwise restricted, full disclosure of the status must be made to the audience Forum or Committee.

## 10.3    Copyright

### 10.3.1   Copyright Policy

In order that ATIS may facilitate, promote and disseminate the work of its Forums and Committees, it is necessary that each contributor grant ATIS the rights necessary to adapt, copy, and publicly distribute any contribution or submittal made to an ATIS Forum or Committee. In accordance with this policy, each contribution or document submitted to an ATIS Forum or Committee is subject to an unlimited perpetual, non-exclusive, royalty-free, world-wide right and license to ATIS of any copyrights in such contribution. This license includes the right to copy, publish and distribute the contribution in any way, and to prepare derivative works that are based on or incorporate all or part of the contribution, the license to such derivative works to be of the same scope as the license of the original contribution.

### 10.3.2  ATIS Deliverables

All ATIS guidelines, standards or other ATIS deliverables are copyrighted by ATIS. Except as expressly permitted by ATIS, no guideline, standard or other ATIS deliverable, or any portion thereof, may be reproduced or distributed in any form, without the prior express written permission of ATIS.

### 10.3.3  Notice

The following copyright notice shall be included in all guidelines, standards or other ATIS deliverables:

"Copyright © ATIS [date of publication]. All Rights Reserved."

## 10.4  Patents

### 10.4.1  Patented Inventions Generally

As a general matter, there is no objection for an ATIS Forum or Committee to develop guidelines, standards or other ATIS deliverables that refer to or, primarily in the case of American National Standard, require the use of patented inventions.

In the case of standards, guidelines and other ATIS deliverables that make reference to a patented invention, but do not require use of the invention for purposes of adopting, complying with or following the guideline or deliverable, the following statements shall be expressly included in the published work:

➢ The patented invention is for reference only.
➢ Neither ATIS nor the relevant Forum or Committee is responsible for identifying the existence or evaluating the applicability of any patents referenced in or that may be relevant to any standard, guideline or other ATIS deliverable.
➢ Neither ATIS nor the relevant Forum or Committee shall be responsible for interpreting or making any determination concerning the validity, enforceability or scope of any patented invention referenced in or that may be relevant to any standard, guideline or other ATIS deliverable.

Further in the case of standards, guidelines and other ATIS deliverables the following procedures shall apply:

➢ If reference to a patented invention shall be made in a standard, guideline or other ATIS deliverable, disclosure of the patented invention should be encouraged at the earliest possible time in the development of the standard, guideline or other ATIS deliverable. The party making any such disclosure should provide an explanation regarding the relevancy of the patented invention to the work under development.
➢ Where possible, the standard, guideline or other ATIS deliverable referencing a patented invention should identify the patent number and name, as well as the identity of the patent owner.
➢ To the extent a Forum or Committee participant, or any other third party, desires a license for a patented invention referenced in a standard, guideline or other ATIS deliverable, all negotiations and discussion of license terms shall occur between the patent owner and the prospective licensee *outside* the deliberations of the Forum or Committee. No discussion or negotiation of license terms shall be permitted in any Forum or Committee.
➢ In the event that use of the patented invention is required for purposes of adopting, complying with or otherwise utilizing the standard, guideline or other ATIS deliverable, the provisions of the ANSI Patent Policy, as adopted by ATIS and as set forth below, shall apply.

Any deviation from the foregoing procedures shall occur only after prior consultation with and approval of the ATIS General Counsel.

### 10.4.2  American National Standards

In connection with the development of American National Standards, or other deliverables that require use of patented inventions, the use of patented inventions shall be governed by the American National Standards Institute ("ANSI") Patent Policy as adopted by ATIS and as set forth below. In addition, disclosure of relevant patented inventions at the earliest possible time in the development process should be encouraged. Further, as with standards, guidelines and other ATIS deliverables, no discussion or negotiation of license terms shall occur in the relevant Forum or Committee. All such discussions and negotiations shall occur directly between the owner of the patented invention and each prospective licensee.

The terms of the ANSI Patent Policy adopted by ATIS are as follows:

*ANSI Patent Policy – Inclusion of Patents in American National Standards*

There is no objection in principle to drafting a proposed American National Standard in terms that include the use of a patented item, if it is considered that technical reasons justify this approach.

If ATIS or ANSI receives a notice that a proposed American National Standard may require the use of a patented invention, the procedures in this clause shall be followed.

#### 10.4.2.1  Statement from patent holder

Prior to approval of such a proposed American National Standard, ATIS or ANSI shall receive from the identified party or patent holder (in a form approved by ATIS or ANSI) either: assurance in the form of a general disclaimer to the effect that such party does not hold or does not currently intend holding any invention the use of which would be required for compliance with the proposed American National Standard or assurance that:

> ➢ A license will be made available without compensation to the applicants desiring to utilize the license for the purpose of implementing the standard; or
> ➢ A license will be made available to applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination.

#### 10.4.2.2  Record of Statement

A record of the patent holder's statement shall be placed and retained in the files of ANSI and ATIS.

#### 10.4.2.3  Notice

When ANSI receives from a patent holder the assurance set forth above, the standard shall include a note as follows:

NOTE – The user's attention is called to the possibility that compliance with this standard may require use of an invention covered by patent rights.

By publication of this standard, no position is taken with respect to the validity of this claim or of any patent rights in connection therewith. The patent holder has, however, filed a statement of willingness to grant a license under these rights on reasonable and nondiscriminatory terms and conditions to applicants desiring to obtain such a license. Details may be obtained from the standards developer.

#### 10.4.2.4  Responsibility for Identifying Patents

Neither ATIS nor ANSI shall be responsible for identifying all patents for which a license may be required by an American National Standard or for conducting inquiries into the legal validity or scope of those patents that are brought to its attention.

## 11    COMMUNICATIONS

### 11.1    Internal to ATIS

*Informal internal communications between leadership of the ATIS Forums, Committees and Subcommittees is* encouraged. ATIS Forum, Committee and Subcommittee leadership is encouraged to communicate directly, via electronic mail or otherwise, regarding general information and questions (e.g., status updates). Formal internal communications conveying a Forum or Committee position must be approved by the appropriate Forum or Committee.

### 11.2    External to ATIS

Formal communications to external organizations must be agreed upon and sent from an ATIS Forum or Committee. The ATIS General Counsel must review any communication to a regulatory, legislative or governmental body, as well as any other sensitive material, prior to distribution unless otherwise authorized by the ATIS General Counsel.

## 12    LIAISONS

Liaisons are established internally within ATIS Forums or Committees and externally to ATIS Forums or Committees to facilitate the gathering and sharing of information required by the Forums and Committees in the production of their work products.

### 12.1    Internal Liaisons

Any Forum or Committee may designate a participant to act as a liaison to other ATIS Forum(s) or Committee(s). The liaison shall seek to represent the Forum or Committee and respond to questions in a manner that would be acceptable to the Forum or Committee. Each time a liaison attends a meeting representing the originating Forum or Committee, a report shall be given to the originating Forum or Committee. The report should contain any significant Issues discussed or resolved, or those that are expected to arise, any conflicts, and the views expressed.

### 12.2    External Liaisons

Any Forum or Committee may designate a participant to act as a liaison to an organization external to ATIS. The *liaison shall seek to represent the Forum or Committee and respond to questions in a manner that would be* acceptable to the Forum or Committee. Each time a liaison attends an external meeting representing the originating Forum or Committee, a report shall be given to the originating Forum or Committee. The report should contain any significant issues discussed or resolved, or those that are expected to arise, any conflicts, and the views expressed.

## 13    APPEALS PROCESS

Individuals and entities possessing directly and materially affected interests and believing that they have been or will be adversely affected by the actions or inaction of an ATIS Forum or Committee, as related to the process of the Forum or Committee, shall have the right to appeal such action or inaction. Individuals and entities are encouraged to first approach the Forum or Committee leadership with an informal complaint before pursuing the official appeals process detailed in this section.

### 13.1    Informal Complaint

Any participant with a concern regarding the Forum or Committee process is encouraged to first discuss their concern with the Forum or Committee leadership.

### 13.2    Formal Complaint

After exhausting the appeals options internal to the Forum or Committee, any individuals and entities *not satisfied that their grievance has been properly addressed* may file a written complaint with ATIS.

#### 13.2.1    Written Complaint

The written complaint must be filed with the ATIS General Counsel within thirty calendar days after the date of notification of the final determination of the Forum or Committee appeals process. The complaint shall state the nature of the objections, including any adverse effects, the section of the ATIS Operating Procedures or ATIS Procedures for the Development of an American National Standard or other Forum

9

or Committee document that may be at issue, the action or inaction itself and the specific remedial actions that would satisfy the appealing party's concerns. Previous efforts to resolve the objections and the outcome of each should be included.

### 13.2.2 Response

Within thirty days after receipt of the complaint, a written response shall be issued to the appealing party by the ATIS General Counsel addressing each allegation of fact in the complaint. The ATIS General Counsel shall have the option to facilitate discussion between the parties, clarify the ATIS Operating Procedures or the ATIS Procedures for the Development of an American National Standard or recommend an appeals panel. If the process is not proceeding to the satisfaction of a party, that party retains the right to have a hearing with an appeals panel.

### 13.2.3 Hearing

If the parties are unable to resolve the written complaint informally in a manner consistent with these Operating Procedures, ATIS shall schedule a hearing with an appeals panel on a date agreeable to all parties, giving at least ten business days notice. Appropriate notice of this hearing will be distributed to the Forum or Committee leadership if not party to the action.

### 13.2.4 Panel

The appeals panel shall consist of three individuals who have not been directly involved in the matter in dispute, and who will not be materially or directly affected by any decision made or to be made in the dispute. At least two members shall be acceptable to the appealing party and at least two members shall be acceptable to the responding party.

ATIS shall supply each member of the appeals panel with a copy of the complaint filed, a copy of these Operating Procedures, and any Forum or Committee meeting notes directly pertaining to the matter. The appeals panel may serve written questions to the parties before the hearing to assist in focusing the issue. Any answers received will be made available to the other party and that party will be allowed to submit a brief response. No party shall communicate with any member of the appeals panel once convened and until a decision has been rendered except as provided for in the Section 13.1.

### 13.2.5 Conduct of Hearing

The appealing party has the burden of demonstrating adverse effects, improper actions or inactions, and the efficacy of the requested remedial action. The responding party has the burden of demonstrating that the Forum or Committee and ATIS, if applicable, took all actions in compliance with these Operating Procedures and that the requested remedial action would be ineffective or detrimental. Each party may introduce other pertinent arguments, and members of the appeals panel may address questions to individuals.

The hearing shall be conducted in an informal manner and subject to such reasonable rules as the appeals panel sets forth. The appeals panel and the parties shall not be bound by any formal rules of evidence. Representatives of other interested parties shall be allowed to observe the hearing but will not be permitted to directly participate unless requested to participate by the appeals panel.

### 13.2.6 Decision

The appeals panel shall render its decision in writing within thirty calendar days, stating the findings of fact and conclusions, with reasons therefore, based on a preponderance of the evidence. Consideration may be given to the following positions, among others, in formulating the decision: (1) finding for the appealing party, remanding the action to the Forum or Committee with a specific statement of the issues and facts in regard to which fair and equitable action was not taken; (2) finding for the responding party with a specific statement of the facts that demonstrate fair and equitable treatment of the appealing party and the party's objections; (3) finding that new, substantive evidence has been introduced, and remanding the entire action to the Forum or Committee for appropriate consideration and action.

## 14    PARTNERSHIP SPECIFICATIONS

### 14.1    Acceptance of Partnership Specifications

Under the organizational partners' terms for a partnership project, ATIS and its Forums and Committees agree to cooperate in the production of specifications applicable for regional or global adoption.

These specifications are approved by the appropriate Forum or Committee as ATIS Technical Specifications. The list of specifications proposed for acceptance must be announced in the official announcement of the Forum or Committee meeting and the URL of their location must be provided. No changes are permitted in the text of the partnership's specification. If changes are necessary, they must be adopted in accordance with Section 14.2 below.

The appropriate Forum or Committee is responsible for notifying ATIS of the availability of the ATIS Technical Specifications. ATIS Technical Specifications are published electronically for free download via the ATIS website and are available in paper format by request. The ATIS Technical Specifications may then be converted, transposed, or adopted into relevant American National Standards (ANS), or other ATIS documents that reflect the specific needs of North America. The ATIS Technical Specifications may also be submitted to the International Telecommunications Union (ITU) via the national process or referenced directly by the ITU.

### 14.2    Adoption of Partnership Project Specifications

Whenever an ATIS Technical Specification is determined to be directly applicable, in whole or in part, to the specific needs of North America, the ATIS Technical Specification will be the basis for development of a proposed ANS or other ATIS document. In most cases, the appropriate Forum or Committee will adopt a "delta-document" approach in which the ANS or other ATIS document is reduced to a selection of options from the ATIS Technical Specification. The ATIS Technical Specification is then cited as a normative reference.

## 15    INTERACTION WITH ITU-T

Interaction with the International Telecommunications Union – Telecommunications Standardization Sector (ITU-T) may be necessary in connection with the work of an ATIS Forum or Committee. These activities include preparing transmittal through national coordination bodies to international meetings, receiving external positions and developing comments and participating in external meetings as a representative of an ATIS Forum or Committee. Guidelines to assist in this activity are found in **Appendix F.**

## 16    REVISIONS TO THE OPERATING PROCEDURES

These Operating Procedures are maintained by ATIS. Proposed revisions to these Operating Procedures may be submitted in writing by any ATIS Member or Forum/Committee Funding Company to the ATIS General Counsel along with the supporting rationale for the proposed change. The ATIS General Counsel will present the proposed revisions to the ATIS Board Advisory and Liaison Committee for review and consideration. Any approved revisions to these Operating Procedures shall be effective upon publication.

**APPENDIX A – ATIS PROCEDURES FOR THE DEVELOPMENT OF AN AMERICAN NATIONAL STANDARD**

## A.1    INTRODUCTION

These Operating Principles and Procedures describe the Alliance for Telecommunications Industry Solutions' (ATIS) procedures to develop American National Standards ("American National Standards" or "Standards"). Where these Operating Principles and Procedures are silent on an issue, the American National Standards Institute's ("ANSI") Essential Requirements shall serve as the precedent document.

## A.2    ORGANIZATION

### A.2.1    Forums and Committees

Forums and Committees now in place or those to be established by ATIS shall be responsible for developing and maintaining Standards that fall within the scope of these procedures. When necessary, Forums and Committees may form Subgroups (Committees, Subcommittees) that shall report back to their parent Forum or Committee. Forums or Committees may delegate approval authority to a subtending Committee or Subcommittee. The Forum or Committee shall operate in a manner consistent with operating principles and procedures found herein.

### A.2.2    Secretariat

ATIS shall be the Secretariat for all Forums and Committees operating in accordance with these procedures.

The Secretariat shall:

Organize the Forums and Committees.
Oversee compliance with these procedures, including legal review as necessary.
Apply for accreditation by ANSI and maintain accreditation in accordance with ANSI requirements.
Maintain rosters of all Forums, Committees and Subcommittees.
Submit standards approved by the Forums/Committees with supporting documentation for ANSI review and approval as American National Standards.
Ensure adherence to periodic maintenance of Standards.
Maintain all records pertaining to the Forums and Committees.
Provide administrative support, and secretarial services as necessary, for the Forums and Committees.
Publish approved Standards and revisions thereto.
Perform other functions as required.

### A.2.3    Records

Material associated with the development of a Standard (including reaffirmations and withdrawals) shall be retained for one complete Standards cycle, or until the Standard is revised. Records regarding the withdrawal of all Standards shall be retained for at least five years from the date of withdrawal.

### A.2.4    Membership

Participation in the ATIS Forums/Committees, and their subtending Committees and Subcommittees, is open to Full and Affiliate ATIS Member Companies. Companies eligible for Full Membership include providers of telecommunications services with a plant investment in transport and/or switching equipment, as well as providers engaged in the resale of those services; manufacturers of telecommunications equipment; developers of telecommunications software; providers of enhanced services; and providers of operations support used in the provision of such telecommunications services. Affiliate membership is open to any organization that does not qualify for Full Member status.

Organizations may also opt-out of ATIS membership. In order to participate in an ATIS Forum or Committee or its subtending Committees or Subcommittees, an organization that elects to opt-out of ATIS membership will be

required to pay an annual non-member supplemental payment in addition to its Forum or Committee participation fee(s).

The membership of the ATIS Forums and Committees shall be sufficiently diverse to ensure reasonable balance without dominance by any single interest group. Unless it is claimed by a directly and materially affected party that a single interest category dominated the standards development process, no test for dominance is required. ATIS, however, strives to assure that any single interest category does not constitute a majority of the membership of the formulating group dealing with Standards. Reasonable dues and fees directly relating to the support provided and activities of a given Forum or Committee shall be assessed with the approval of the Forum or Committee.

## A.2.5    Interest Categories

For purposes of developing an American National Standard, all members of ATIS Forums and Committees shall be classified as Producers, Users or General Interest representatives in accordance with the definitions below. An individual in professional practice or a consultant, retained under an agreement indefinitely continuing with an organization, shall be classified in accordance with the classification of the organization retaining the individual and shall be so identified.

### A.2.5.1 Producers

An entity that produces or supplies telecommunications equipment or infrastructure for the provision of telecommunications services. Examples include various types of testing, monitoring, routing, and central office equipment manufacturers, software developers, etc.

### A.2.5.2 Users

An entity that uses telecommunications equipment or infrastructure and provides services to an end user. Examples include incumbent local exchange carriers (ILECs), competitive local exchange carriers (CLECs), interexchange carriers (IXCs), wireless service providers, etc.

### A.2.5.3 General Interest

General Interest members are neither Producers nor Users. This category includes, but is not limited to, regulatory agencies (state and federal), researchers, other organizations and associations, and educators.

## A.2.6    Membership Roster

The Secretariat shall prepare and maintain a membership roster documenting the classification of each Forum and Committee member.

## A.3    MEETINGS

## A.3.1    Frequency

The Forums and Committees will meet to develop American National Standards on an as needed basis.

## A.3.2    Notification

Where possible, all face-to-face meetings shall be announced via the e-mail exploder and posted to the ATIS Web Site no less than four (4) weeks prior to the meeting date. All other meetings, including virtual meetings and conference calls, should be announced via the e-mail exploder and posted to the ATIS Web Site no less than two (2) weeks prior to the meeting date. Special exceptions for extraordinary circumstances may be made on an as-needed basis. When an exception for extraordinary circumstances is necessary, the Forum or Committee Leadership will announce the meeting as soon as practicable. A draft agenda shall be prepared and distributed with the meeting notice.

## A.3.3    Open Meetings

All meetings of ATIS Forums and Committees shall be open and attendance by any interested party shall be welcome, subject to any relevant membership requirement and the individual policy of each Forum and Committee (e.g., regarding registration, meeting fee if required, etc.). Non-Forum and Non-Committee members shall not have the right to vote.

### A.3.4    Quorum

One-third of the members of a Forum or Committee shall constitute a quorum for conducting business at a meeting. Matters shall be deemed approved by the affirmative vote of a majority of the members present, except with respect to matters covered in Section A.6. If a quorum is not present, actions on agenda items may be taken but shall be subject to ratification by the Forum or Committee.

### A.3.5    Parliamentary Procedures

For any procedural issues not covered under these procedures, Robert's Rules of Order (Revised) shall apply on questions of parliamentary procedure.

## A.4    NOTIFICATION OF STANDARDS DEVELOPMENT

Notification of Standards activity shall be announced in suitable media as appropriate to demonstrate provision of opportunity for participation by all directly and materially affected persons. At the initiation of a project to develop or revise a Standard, notification shall be transmitted to ANSI using the Project Initiation Notification System (PINS) form, or its equivalent, for listing in Standards Action. A PINS form may be submitted, but is not required, at the initiation of a project to reaffirm or withdraw a Standard.

## A.5    SUBSTANTIVE CHANGE

A substantive change in a Standard is one that directly and materially affects the use of the Standard. Examples of substantive changes are below:

"shall" to "should" or "should" to "shall";
the addition, deletion or revision of requirements, regardless of the number of changes; or
the addition of mandatory compliance with referenced standards.

## A.6    VOTING PROCEDURES FOR LETTER BALLOTS

### A.6.1    Letter Ballots

Documentation associated with American National Standards will undergo the letter ballot process. Substantive changes to and interpretations of all Standards shall be approved by letter ballot of the Forum or Committee.

Editorial changes to Standards may be decided by a majority of the members present at a regularly scheduled meeting of a Forum or Committee or by letter ballot.

### A.6.2    Voting

Each member shall vote one of the following positions on letter ballots:

Affirmative.
Affirmative with comment.
Negative, with reasons. If possible, the negative ballot shall include specific actions that will resolve the negative.
Abstain.

### A.6.3    Voting Rights

A member's representative shall ordinarily cast that member's vote. The member's alternate representative shall cast that member's vote only if the member's representative fails to vote.

### A.6.4    Proxies

Proxies are not permitted.

### A.6.5    Voting Period

The closure date for letter ballots shall be at least 30 days from the date of the issuance of the ballots. The Secretariat shall be authorized to grant an extension of the voting period if deemed necessary.

### A.6.6    Approved Actions

Approvals of, substantive changes to, and interpretations of all Standards shall be considered approved when all of the following conditions have been met:

At least 50 percent of the members have returned their letter ballot.
At least 75 percent of the votes cast, excluding abstentions and negatives without reasons, are affirmative.
All negative votes with reasons have been addressed in accordance with 6.9.

### A.6.7    Reporting Votes

The results of each vote on all Standards shall be reported as follows:

Number of members.
Number of members voting affirmatively.
Number of members voting negatively with reasons.
Number of members voting negatively without reasons.
Number of members abstaining.
Number of members not returning ballots.

### A.6.8    Negative Votes

A negative ballot shall be required to be accompanied by a reason and, if possible, should include specific wording or actions that would resolve the objection. A negative ballot not supported by a reason is not required to be recirculated but is recorded as a negative without comment on the BSR-9 during submittal to ANSI. The ballot shall be counted as returned for the purpose of establishing a quorum.

### A.6.9    Consideration of Views and Objections

The Forum or Committee shall use the following procedures in attempting to resolve negative votes:

All negative ballots and comments will be forwarded to the Forum or Committee that drafted the proposed Standard for response and resolution. The Forum or Committee Officers (with other Forum or Committee members as necessary) will draft the response on behalf of the Forum or Committee. Negative ballots may be judged as valid, invalid or nongermane. All comments are given a comprehensive response.
The responses to unresolved negative ballots (and other comments that result in a substantive change) will be circulated to the Forum or Committee by a new ballot to give the commentor the opportunity to change the vote based on the reply. Additionally, all members of the Forum or Committee will have the opportunity to change their vote. In the case of public review comments, which are not votes, these comments with the accompanying responses will be circulated for new ballot as well.

All substantive changes shall be submitted to ANSI via the BSR-8 for further public review.
Voting members or public review participants who have unresolved negative votes (comments) shall be notified of their right to appeal and of the appeals process.

### A.7    DRAFT AMERICAN NATIONAL STANDARDS FOR TRIAL USE

The technical work of an ATIS Forum or Committee is advanced by a Subcommittee. At some point in time, the Subcommittee completes a draft document and presents it to the ATIS Forum or Committee for a vote authorization.

Upon approval by an ATIS Forum or Committee, the document is normally forwarded for approval as a draft proposed American National Standard. However, upon ATIS Forum or Committee approval, a draft standard may be forwarded for approval as a "draft standard for trial use." ATIS complies with the procedural and publication requirements as established in the ANSI Essential Requirements with regard to draft American National Standards for trial use.

Materially affected interests wishing to initiate a challenge at ANSI to a decision at the ATIS Forum or Committee level to register with ANSI a draft standard for trial use shall first exhaust all methods of challenge at the ATIS Forum or Committee level prior to submitting an appeal to the ANSI ExSC. The only basis on which such an appeal shall be filed is the alleged failure of the Accredited Standards Developer to follow either its own procedures or any other relevant ANSI requirements. The burden of proof shall be on the appellant. An announcement regarding the appeal will appear in Standards Action.

"Draft standards for trial use" are published by ATIS. Draft standards for trial use shall not be issued to address a need for an emergency standard.

## A.8    INTERPRETATIONS

### A.8.1    Processing Interpretations

Requests for interpretations of Standards shall be submitted in writing to the Secretariat and shall be forwarded by the Secretariat to Forum or Committee Officers. Proposed interpretations may be prepared by any Forum or Committee member with particular expertise on the subject in question. All proposed interpretations shall be prepared in writing and shall be submitted to the Secretariat for a letter ballot of the Forum or Committee. Interpretations shall be approved in accordance with section 6.

### A.8.2    Notification of Interpretations

Notification of approved interpretations shall be sent in writing to the requester. Notification shall also be given to other users of the Standards via the appropriate ATIS Forum or Committee email exploder list(s) and posted on the ATIS web site.

## A.9    METRIC POLICY

In accordance with 3.4 of the ANSI Essential Requirements, ATIS accepts ANSI's Metric Policy which states that, "Units of the International System of Units (SI), the modernized metric system, are the preferred units of measurement in American National Standards."

## A.10    PUBLIC REVIEW AND COMMENT

Proposals for new Standards or reaffirmation, revision, or withdrawal of existing Standards shall be transmitted to ANSI for listing in Standards Action for comment. The Secretariat shall determine whether listing of proposed standards actions shall be concurrent with the final committee letter ballot and whether announcement in other suitable media is appropriate. All comments that are received shall be considered by the Forum or Committee and the commenter shall be notified, in writing, of the Forum's or Committee's decision/response.

## A.11    PATENT POLICY

ATIS has adopted the ANSI Patent Policy, as outlined in section 3.1 of the ANSI Essential Requirements.

## A.12    CORRESPONDENCE

### A.12.1    Committee Correspondence

Correspondence from a Forum or Committee member to the entire membership of the Forum or Committee shall be forwarded to the Secretariat for screening and distribution. All official Forum or Committee correspondence, including meeting notices, agendas, reports and letter ballots, shall be distributed by the Secretariat. Copies of all other correspondence between Forum or Committee members, relating to ATIS Standards activities, shall be forwarded to the Secretariat.

### A.12.2    External Correspondence

All official Forum and Committee correspondence to external parties must be approved by the Forum or Committee or its delegated representative and distributed by the Secretariat. Inquiries relating to the Forum or Committee and Standards shall be directed to the Secretariat. Forum or Committee members should advise individuals who contact them that responses to all inquiries are handled by the Secretariat.

## A.13    APPEALS

### A.13.1    Complaint

Persons who have been or may be affected by any Forum or Committee action or inaction shall have the right to appeal such action or inaction. The appellant shall file a written complaint with the Secretariat within 30 days after the date of notification of any action, or at any time with respect to inaction. The complaint shall state the nature of the objection, the procedures or the sections of the Standards that are at issue, the action or inaction at issue, and the specific remedial action(s) that would satisfy the appellant's concerns. Previous efforts to resolve the objections and the outcome of each shall be noted.

### A.13.2    Response

Within 30 days after the receipt of the complaint, the Secretariat shall respond in writing to the appellant, specifically addressing each allegation in the complaint to the extent possible. The Secretariat shall attempt to resolve, informally, the complaint of the appellant.

### A.13.3    Appeals Panel and Hearing

If the Secretariat is unable to informally resolve the complaint, it shall appoint an appeals panel to hold a hearing on a date agreeable to all participants, with at least 15 working days notice. The appeals panel shall consist of three individuals who have not been directly involved in the dispute and who will not be materially affected by any decision made in the dispute. At least two members of the panel shall be acceptable to the appellant and at least two shall be acceptable to the Secretariat.

### A.13.4    Conduct of the Hearing

The appellant has the responsibility of demonstrating improper action or inaction, the adverse effects there from, and the efficacy of the requested remedial action. The Secretariat has the responsibility to demonstrate that the Committee took all actions in question in compliance with these procedures.

### A.13.5    Decision

The appeals panel shall render its decision in writing within 30 days of the hearing, based upon a preponderance of the evidence, stating its findings of fact and conclusions, with reasons therefore and citing the evidence. The Secretariat shall notify the appellant and the Forum or Committee of the decision of the appeals panel, which shall be binding and final on all concerned.

Further appeal may be made directly to ANSI. If the appellant gives notice to ATIS that such a further appeal to ANSI is intended, all relevant materials, including the decision made by the appeals panel set forth above, shall be submitted to ANSI by ATIS.

## A.14    REVISIONS TO PROCEDURES

These Operating Procedures are maintained by ATIS. Proposed revisions to these Operating Procedures may be submitted in writing by any ATIS Member or Forum/Committee Funding Company to the ATIS General Counsel along with a the supporting rationale for the proposed change. The ATIS General Counsel will present the proposed revisions to the ATIS Board Advisory and Liaison Committee for review and consideration. The revised procedures are then submitted to ANSI for public comment, and ANSI review and approval. Any approved revisions to these Operating Procedures shall be effective upon publication.

The Secretariat shall be responsible for the interpretation of these Operating Principles and Procedures.

1/3/2006    ATIS OPERATING PROCEDURES    VERSION 4.0
APPENDIX B

APPENDIX B – ATIS ORGANIZATIONAL STRUCTURE CHART



xi

## APPENDIX C – FORUM AND COMMITTEE MISSION STATEMENTS

### C.1    COMMITTEE O5 – WOOD POLES (O5)

Committee O5 develops standards and specifications for industry use in areas dealing with wood poles, cross arms and other wood products.

### C.2    EMERGENCY SERVICES INTERCONNECTION FORUM (ESIF)

The ESIF is an industry committee comprised of wireless and wireline network service providers, manufacturers and providers of support services that facilitate the identification and resolution of technical issues related to the interconnection of telephony and emergency services networks.

### C.3    IMSI OVERSIGHT COUNCIL (IOC)

The IOC is an open industry committee of telecommunications companies and other organizations responsible for overseeing management of International Mobile Subscriber Identifier (IMSI) codes.

### C.4    IPTV INTEROPERABILITY FORUM (IIF)

The IIF enables the interoperability, interconnection, and implementation of IPTV systems/services by developing ATIS standards and facilitating related technical activities. This forum will place an emphasis on North American and ATIS Member Company needs in coordination with other regional and international standards development organizations.

### C.5    INTERACTIVE VOICE RESPONSE (IVR) FORUM

The IVR Forum identifies features that make IVR and voice mail easier to use by persons with disabilities. It will also address the FCC's disabled-access concerns regarding voice mail services and interactive menu products.

### C.6    Network INTERFACE, POWER, AND PROTECTION COMMITTEE (NIPP)

The Network Interface, Power, and Protection Committee develops and recommends standards and technical reports. The standards and technical reports are related to power systems, electrical and physical protection for the exchange and interexchange carrier networks, and interfaces associated with user access to telecommunications networks.

### C.7    INTERNATIONAL FORUM FOR ANSI-41 STANDARDS TECHNOLOGY (IFAST)

IFAST functions as an open, international, technical forum with the voluntary participation of wireless carriers, network service providers, and infrastructure vendors. IFAST provides intersystem operations implementing the Advanced Mobile Phone Service (AMPS) family of standards, and facilitates interoperation of wireless systems around the world using the ANSI-41 (Analog, NAMPS, CDMA, TDMA) interworking protocol.

### C.8    NETWORK INTEGRATION, OPERATIONS AND ADMINISTRATION FORUM (NIOAF)

The NIOAF is the collection of standalone Forums and Committees established by the ATIS Board of Directors to address concerns regarding network integration and OAM&P interfaces and procedures. The NIOAF Forums and Committees proactively examine new technologies and services to determine where network integration and OAM&P concerns may reside and develop solutions supporting the rollout of these technologies and services. Current groups within NIAOF include the Industry Numbering Committee (INC), the Network Interconnection Interoperability Forum (NIIF), the Internetwork Interoperability Test Coordination Committee (IITC), and the Bar Code/Standard Coding Committee (BCSC).

### C.8.1  INDUSTRY NUMBERING COMMITTEE (INC)

INC provides an open forum to address and resolve telecommunications industry-wide issues associated with the planning, administration, allocation, assignment and use of resources and related dialing considerations for public telecommunications within the North American Numbering Plan (NANP) area.

### C.8.2  NETWORK INTERCONNECTION INTEROPERABILITY FORUM (NIIF)

NIIF provides an open forum to encourage the discussion and resolution, on a voluntary basis, of industry-wide issues associated with telecommunications network interconnection and interoperability which involve network architecture, management, testing and operations and facilitates the exchange of information concerning these topics.

### C.8.3  INTERNETWORK INTEROPERABILITY TEST COORDINATION (IITC) COMMITTEE

IITC provides an open forum in which North American telecommunications industry service providers, vendors, and the user community communicate. This committee coordinates internetwork, interoperability testing of telecommunications services and architectures resulting from the introduction of new network interconnections and technologies to determine potential effects on the reliability of the PSTN. Any services or technologies which have a potential to impair the PSTN's service performance are candidates for the IITC Committee's testing.

### C.8.4  BAR CODE/STANDARD CODING (BCSC) COMMITTEE

The BCSC establishes guidelines for common shipping labels, product marking labels, product changes and software issuance standards.

### C.9    NETWORK PERFORMANCE, RELIABILITY, AND QUALITY OF SERVICE COMMITTEE (PRQC)

The Network Performance, Reliability, and Quality of Service Committee develops and recommends standards, requirements, and technical reports related to the performance, reliability, and associated security aspects of communications networks, as well as the processing of voice, audio, data, image, and video signals, and their multimedia integration. The Network Performance, Reliability, and Quality of Service Committee also develops and recommends positions on, and fosters consistency with, standards and related subjects under consideration in other North American and international standards bodies.

### C.10   NETWORK RELIABILITY STEERING COMMITTEE (NRSC)

The NRSC performs analyses of network outages and provides recommendations for corrective actions. NRSC issues quarterly and annual reports to the industry and the FCC, in liaison with the FCC's Network Reliability Council.

### C.11   OPTICAL TRANSPORT AND SYNCHRONIZATION COMMITTEE (OPTXS)

The Optical Transport and Synchronization Committee develops and recommends standards and prepares technical reports related to telecommunications network technology pertaining to network synchronization interfaces and hierarchical structures for U.S. telecommunications networks, some of which are associated with other telecommunications networks. The Optical Transport and Synchronization Committee focuses on those functions and characteristics necessary to define and establish the interconnection of signals comprising network transport. This includes aspects of both asynchronous and synchronous networks. The Optical Transport and Synchronization Committee also makes recommendations on related subject matter under consideration in various North American and international standards organizations.

## C.12   ORDERING AND BILLING FORUM (OBF)

The OBF provides a forum for representatives from the telecommunications industry to identify, discuss and resolve national issues, which affect ordering, billing, provisioning and exchange of information about access service, other connectivity and related matters.

## C.13   PACKET TECHNOLOGIES AND SYSTEMS COMMITTEE (PTSC)

The Packet Technologies and Systems Committee develops and recommends standards and technical reports related to packet services and packet service architectures, in addition to related subjects under consideration in other North American and international standards bodies.

## C.14   TELECOMMUNICATIONS FRAUD PREVENTION COMMITTEE (TFPC)

The TFPC provides a working forum to identify issues involving fraud, pertinent to the telecommunications industry, and to discuss and develop resolutions for voluntary implementation by the industry.

## C.15   TELECOM MANAGEMENT AND OPERATIONS COMMITTEE (TMOC)

The Telecom Management and Operations Committee develops operations, administration, maintenance and provisioning standards, and other documentation related to Operations Support System (OSS) and Network Element (NE) functions and interfaces for communications networks – with an emphasis on standards development related to U.S.A. communication networks in coordination with the development of international standards.

## C.16   TEXT TELEPHONE (TTY) FORUM

The TTY Forum develops alternatives that provide the deaf and hard-of-hearing, as well as those with speech or language disabilities, with access to telephone and wireless communications, through the use of a TTY device.

## C.17   WIRELESS TECHNOLOGIES AND SYSTEMS COMMITTEE (WTSC)

The Wireless Technologies and Systems Committee develops and recommends standards and technical reports related to wireless and/or mobile services and systems, including service descriptions and wireless technologies. The Wireless Technologies and Systems Committee also develops and recommends positions on related subjects under consideration in other North American, regional and international standards bodies.

## APPENDIX D – ATIS FORUM/COMMITTEE – ISSUE IDENTIFICATION FORM

**Issue Title:**

| Forum/Committee: | | Issue Number: | |
| Committee/Subcommittee Assigned: | | *Issue Status:* | |
| Submission Date: | | Initial Closure/Initial Pending Date: | |
| Acceptance Date: | | Target Date for Moving Issue to Final From Initial Closure or Initial Pending: | |
| Targeted Resolution Date: | | Final Closure Date: | |

**Issue Statement/Business Need:**

*Suggested Solution:*

Resolution Statement:

**Associated Committees/Issues:**

**Related work required for the solution to this issue to be implementable by the industry**--consider functional platform; interoperability; performance, reliability, and security; OAM&P; ordering and billing; and user interface work.

**Issue Champion(s):**

*Name:*
*Company:*
*E-mail address*
*(optional):*
*Telephone number*
*(optional):*

*Name:*
*Company:*
*E-mail address*
*(optional):*
*Telephone number*
*(optional):*

**Activity Log** (can be very brief but this must be regularly updated on a meeting-by-meeting basis and include all agreements reached and action items.

APPENDIX E – DEVELOPING AN "ATIS STANDARD"

Developing an "ATIS Implementable, End-to-End Standard"
Internal ATIS Process
1 of 3



# Developing an "ATIS Implementable, End-to-End Standard"
## 2 of 3



(A) → Will all work be performed in ATIS forums? — Y → (B)

N → Relationship Agreements in place with all involved groups? — Y → (B)

N → Relationship Agreements Initiated → (B)

xvii

1/3/2006

VERSION 4.0

# Developing an "ATIS Implementable, End-to-End Standard"
## 3 of 3



**B**

Leaders of impacted ATIS forums, with support of professional staff, work with each other and with leaders of any impacted external forums to:
1) determine responsible group for various work items, and
2) develop a project management plan for completing work by the required due date(s)

In addition, for ATIS Implementable, End-to-End Standards not associated with TOPS-priority work, leaders of impacted ATIS Forums select one of the impacted forums to serve as the "Lead Forum" for the Standard responsible for convening leaders of the impacted Forums as necessary to track completion of the Standard and to resolve any issues hindering completion of the Standard as called for in the project management plan.

Leaders of impacted Forums track work progress, assisting each other as required to ensure completion of work items in a timely manner

Advisory & Liaison Committee assists ATIS Forums as required to mobilize resources and resolve issues to ensure timely completion of work

ATIS Forum leaders:
1) provide periodic reports on status of work as requested by TOPS;
2) notify TOPS of any obstacles to timely completion of the work plan; and
3) notify TOPS upon work completion

ATIS Implementable, End-to-End Standard Issued

## APPENDIX F – INTERACTION WITH THE ITU

Interaction with the International Telecommunications Union Telecommunications Standardization Sector (ITU-T) may be necessary in connection with the work of an ATIS Forum/Committee. These activities include preparing transmittals through national coordination bodies to international meetings, receiving external positions and developing comments, and participating in external meetings as a representative of an ATIS Forum/Committee.

Section 1 below provides procedures for communicating with the U.S. ITAC-T Study Groups regarding technical contributions into the ITU-T. Section 2 is concerned with procedures to establish and conduct liaisons with ITU-T.

### F.1    INTERACTION WITH THE U.S. ITAC-T STUDY GROUPS

### F.1.1    GENERAL

The U.S. telecommunications industry traditionally has been a very active contributor to the development of international standards in the ITU-T. It is in the interests of the U.S. to continue this work.

The U.S. contributions and participation in ITU-T are channeled through ITAC-T, a national organization referred to as the International Telecommunications Advisory Committee – Telecommunications administered by the U.S. Department of State. ITAC-T has several subordinate ITAC-T Study Groups which review and approve contributions to ITU-T Study Group meetings. The current subject areas and relevant ITU-T Study Groups assigned to each ITAC-T Study Group are:

| U.S. ITAC-T Study Group | Assigned Subject Area | Relevant ITU-T Study Groups |
|---|---|---|
| A | Telephony Services | 2, 3, 12 |
| B | Network Infrastructure | 4, 6, 10, 11, 13, 15 |
| D | Data Communications | 5, 7, 8, 9, 16 |

Contributions to ITU-T are of two types: individual-member contributions from organizations that have ITU-T ("small m") membership, and "Member State" contributions that are developed by national standards organizations or government agencies, for our purposes the U.S Department of State. This flow of contributions is illustrated in the following Figure.



A private organization is encouraged to submit a proposed contribution to the work of ITU-T through the appropriate ATIS Forum/Committee when it can be identified. This will help facilitate the establishment of a unified U.S. position so that it may be approved by the ITAC-T Study Group as a U.S. Contribution.

Note: State Department procedures do not establish "U.S." positions for ITU-T Rapporteurs' meetings. Rather, documents are normally submitted as "individual-member contributions." Nonetheless, the Chairs of the ITAC-T Study Groups retain certain responsibilities regarding such contributions. See "Guidelines for the U.S. Preparatory Process for the ITU Telecommunication Standardization Sector," published by the Department of State, for those procedures.

## F.1.2 DEVELOPMENT OF CONTRIBUTIONS WITHIN AN ATIS FORUM/COMMITTEE

Each ATIS Forum/Committee is expected to develop technical contributions and positions within its scope and range of interest to ITU-T study questions. Contributions developed in this manner are approved by the membership of the ATIS Forum/Committee. Formal voting or letter ballots are not required, and generally the process should be to obtain consensus. Proposed contributions approved by the ATIS Forum/Committee are then submitted by the ATIS Forum/Committee leader to the appropriate ITAC-T Study Group for its review and approval.

## F.1.3 CITING ATIS FORUM/COMMITTEE REVIEW OF INDIVIDUAL-MEMBER CONTRIBUTIONS TO ITU-T MEETINGS

Under certain circumstances, participating organizations may be allowed to identify their ITU-T contributions as having received technical review in an ATIS Forum/Committee or subgroup.

### F.1.3.1 CONTRIBUTIONS TO ITU-T RAPPORTEUR'S MEETINGS

As a matter of policy, State Department procedures do not establish "USA" positions for ITU-T Rapporteurs' meetings; documents are normally submitted as "individual-member contributions." However, to reduce the possibility that one's contribution will be weakened by adverse comments from other U.S. participants, organizations should seek to discuss them with other interested parties in the U.S.A. before the Rapporteur's meeting.

The role of an ATIS Forum/Committee is to provide the venue for such a discussion. Organizations present their proposed contributions to the appropriate ATIS Forum/Committee, just as they would if it were intended as a contribution to a full Study Group meeting. If the group agrees that the document should be a contribution to the Rapporteur's meeting, they "endorse" it and the contributing organization is allowed to cite that endorsement with an attribution on the contribution. This also enhances the credibility of the contribution, because it clarifies to other participants at the Rapporteur's meeting the level of technical support it has in the U.S.

The following guidelines apply:
- The attribution reads either "This document represents a consensus view of the ATIS [name of Forum/Committee]" or "This document represents a consensus view of Working Group [WG]."
- Permission to use the attribution is only granted for Rapporteur's meetings; it is not used on documents being submitted to U.S. ITAC-T Study Groups as proposed U.S. positions, even if they have been discussed and have achieved consensus in an interim meeting of a subgroup of an ATIS Forum or Committee.
- Once the attribution has been authorized, the contributing organization retains the decision as to whether or not to use it. If they decide to change the document after the discussion, they cannot, of course, use the attribution.
- The attribution is placed on the bottom of the first page of the contribution, immediately below the Contact information.

### F.1.3.2 CONTRIBUTIONS UNDER REVIEW BY U.S. ITAC BY CORRESPONDENCE

Companies sometimes prepare contributions that they wish to submit to ITU-T Study Groups as individual-member contributions, rather than as "USA" positions. An ATIS Forum/Committee or subgroup discusses the paper, makes comments, and agrees that it should be submitted as an individual-member contribution, but does not take ownership of the paper and "approve" it. Sometimes, papers do not achieve enough support in an ATIS Forum/Committee or subgroup to be recommended to be "USA" positions, but the ATIS Forum/Committee or subgroup agrees to recommend that the document be submitted as an individual-member contribution.

When the appropriate U.S. ITAC-T Study Group conducts a face-to-face meeting to review proposed contributions, these facts – especially that the document has been reviewed in an ATIS Forum/Committee or subgroup – can be established by comments from the floor. However, the U.S. ITAC-T Study Groups sometimes work by correspondence. In this case, the ATIS Forum/Committee or subgroup may allow the use of an attribution in the cover letter to the U.S. ITAC-T SG members to clarify the status of the document.

The following guidelines apply:
- The attribution reads "ATIS Forum, Committee, or Subcommittee [name] has reviewed Document [identifying number] and has agreed that it should be submitted as an individual-member contribution."
- Once the attribution has been authorized, the contributing organization retains the decision as to whether or not to use it. If they decide to change the document after the discussion, they cannot, of course, use the attribution.
- The attribution is placed in the cover letter to the U.S. ITAC-T Study Group.

### F.1.4  PROPOSED CONTRIBUTIONS OF CONCERN TO MORE THAN ONE ATIS FORUM/COMMITTEE

An ATIS Forum, Committee or Subcommittee may judge that a proposed contribution to a U.S. ITAC-T Study Group warrants review by other ATIS Forums/Committees.

In such cases, the originating ATIS Forum, Committee, or Subcommittee leader should post the proposed contribution to its Forum/Committee web site and send an email request for review and comments to the other relevant ATIS Forum(s)/Committee(s). This is especially relevant when the contribution is generated in one ATIS Forum/Committee as part of a program that is being managed through another ATIS Forum/Committee. If comments are received, the leader of the ATIS Forum/Committee that approved the contribution should arrange to have them presented to the appropriate ITAC-T Study Group at the same time as the proposed contribution.

In rare cases, it may be deemed necessary to receive ATIS Board of Director review of the proposed contribution. In these cases, the originating ATIS Forum/Committee leader should transmit the document to the Advisory and Liaison Committee of the ATIS Board of Directors via the ATIS General Counsel.

### F.2    WRITTEN LIAISONS TO ITU-T

ITU-T has a material interest in telecommunications and the membership of ATIS has an interest in global telecommunications standards. As such, liaison with ITU-T may occur in the normal course of ATIS Forum/Committee activities in the preparation of voluntary standards.

Exchange of technical documents among standardization organizations is encouraged. For indication of the status of such documents they should be labeled into three categories:

| | |
|---|---|
| **Preliminary** | The initial concept or idea has been discussed in the working entity, but text has not been developed or has not been agreed to by the working entity. |
| **Maturing** | The document, while in development, contains incomplete areas but reflects a general consensus on the concept. Future changes and additions are expected. |
| **Stable** | The document contains relatively stable text and addresses all necessary areas and reflects a consensus agreement of the entity; substantive changes are not expected within the entity. |

### F.2.1    AUTHORIZING A WRITTEN LIAISON

A written liaison with ITU-T may be initiated by an ATIS Forum/Committee. For technical or non-policy liaisons with non-governmental and non-regulatory organizations on subjects either in the mission and scope of an ATIS Forum/Committee or where a lead ATIS Forum/Committee has been designated, approval of the liaison request is by that ATIS Forum/Committee membership. See also Section 12 of the Operating Procedures for ATIS Forums and Committees.

When there is a need for more than one ATIS Forum/Committee to communicate with an external organization, one of the ATIS Forums/Committees should be designated with lead responsibility. The designated ATIS Forum/Committee shall ensure that contributions are developed and circulated to other interested ATIS Forums/Committees and forwarded to the appropriate organization in a timely manner. Conflicting documents on the same topic must not be transmitted by different ATIS Forums/Committees and suspected overlapping submissions are to be resolved by the involved ATIS Forums/Committees.

Any material directed to an external standards committee should normally have a transmittal letter signed by an appropriate ATIS Forum/Committee leader on ATIS letterhead.

### F.2.2    PROCEDURE FOR FORMULATING AND TRANSMITTING WRITTEN LIAISONS TO ITU-T

The responsible ATIS Forum/Committee is expected to develop advanced plans for external documentation work. This will allow candidate contributions to be reviewed in detail by concerned ATIS Forum/Committee membership prior to transmission to the external organization.

The ATIS Forum/Committee may authorize a delay of up to ten days to afford a participant with direct and material interest the opportunity to more thoroughly review a proposed distribution of documents to external organizations.

When such a delay is authorized, the participant(s) are required to formally respond to the ATIS Forum/Committee leader within the review period if they have specific technical objections. If, in the opinion of the ATIS Forum/Committee leader, the concerns are of a reasonable technical nature, that leader will attempt to resolve the concerns. If the concerns presented are not resolved, the leader will hold the document for further review and advise the ATIS Forum/Committee. If the participant(s) does (do) not respond with specific technical objections, or if, in the opinion of the leader, the objections are not appropriate to hold the contribution, the contribution is to be forwarded as recommended by the ATIS Forum/Committee. If no concerns are received by the leader during the review period, the contribution should be forwarded as recommended by the ATIS Forum/Committee.

### F.2.3    ITU-T AND U.S. ITAC-T REQUIREMENTS FOR DIRECT CORRESPONDENCE WITH ITU-T STUDY GROUPS

ITU-T Recommendation A.6 permits approved and draft documents to be exchanged between qualified Standards Development Organizations (SDOs) and ITU-T Study Groups (SGs). It is implied that the documents might be adopted, in whole or in part, into the products (Recommendations, Supplements, etc.) of ITU-T. ATIS has been recognized by the Director of the ITU-T Telecommunication Standardization Bureau (TSB) as a qualified SDO.

Documents that are exchanged in this manner are not contributions. ITU-T procedures require that they are sent directly to the appropriate Study Group Chairperson who, if the documents are considered useful, will authorize them to be distributed as Temporary Documents at a Study Group or Rapporteur's meeting. To comply with U.S. Department of State guidelines, documents exchanged in this manner must never contain any wording that could reasonably be construed as a proposal that the material be adopted or a suggestion that it is for consideration. Such proposals and suggestions, which might be sent in parallel to an A.6-compliant submission, must be submitted in the normal contribution process described in Section 1.

Documents that are sent to the ITU-T in this manner may be approved documents, drafts, or works in progress. They may be American National Standards, ATIS Standards, or ATIS Forum/Committee Technical Reports. They also may be large or small excerpts from qualified documents.

For compliance with U.S. Department of State guidelines, documents to be sent to the ITU-T under Recommendation A.6 must be sent first to the appropriate U.S. ITAC-T Study Group for information and the leader of that U.S. ITAC-T SG must acknowledge that the document has been noted before it may be sent to the ITU-T.

There are four steps to be completed to submit documents to ITU-T Study Group Chairmen under Recommendation A.6.

1.  Prepare the transmittal in four parts: a transmittal letter to the appropriate ITAC-T SG Chair, a liaison to the appropriate ITU-T SG Chairman, a draft of the Temporary Document that the Chairman will send to the TSB, and the document itself (if it is not imbedded in the ITU-T Temporary Document). The liaison to the ITU-T SG Chairman must indicate the ATIS Forum/Committee sending the document, the degree of stability of the text (i.e., preliminary, mature, stable), proposed date of adoption, etc., and the status of the document (e.g., working document, draft, interim or approved standard).
2.  Obtain approval of the ATIS Forum/Committee, as described in clauses 2.1 and 2.2.
3.  Send the package to the Chair of the appropriate ITAC-T SG.
4.  After the submission has been noted by the U.S. process, add a sentence to the cover letter indicating that it has been noted by the U.S. process and send it to the appropriate ITU-T SG Chair. As suggested in ITU-T Recommendation A.2, it is always good practice to send courtesy copies to the appropriate Councilor, Working Party Chair, and appropriate Rapporteurs for their use in planning the meeting.

## APPENDIX G – ATIS DOCUMENT NUMBERING

The ATIS Document Numbering System is used for numbering "ATIS Standards." The system catalogues ATIS Standards by Functional Group and also accommodates the requirements for the labeling of ATIS Standards as American National Standards when appropriate.

Documents developed prior to the implementation of the ATIS Document Numbering System will continue to have their current designation until they are revised. When a new document is issued, or an existing document is revised, the new numbering system will be used.

The format for numbering ATIS Standards according to the ATIS Document Numbering System is as follows:



## ATIS-0100000.YY.XXXX

| Two-digit Functional Group Number (example: "01" is the Functional Group "Performance, Reliability and Security") | The 5-digit number of the standard assigned in numerical order. | Two character field designating supplement or series number for an ANS. | 1. Year / Revised / or Reaffirmed. Year is required only when the standard is an ANS. 2. Special number designation (example: 0027 for Release 27) |

Functional Group Numbers used in the ATIS Document Numbering System are:

| Functional Group | Assigned Number |
|---|---|
| Performance, Reliability, and Security | 01 |
| Interoperability | 02 |
| OAM&P | 03 |
| Ordering and Billing | 04 |
| User Interface | 05 |
| Circuit Switched and Plant Infrastructure | 06 |
| Wireless | 07 |
| Multimedia | 08 |
| Optical | 09 |
| Packet Based Networks | 10 |

Document numbers are assigned and administered by designated ATIS staff, typically a Forum or Committee administrator. In the case of ATIS Standards designated as American National Standards, the ATIS Manager of Standards Disciplines, will oversee numbering designations.

Relevant historical information regarding a document, including previous document numbers, if any (e.g., T1.231), will be contained in the introductory language found after the title page of the publication.

In some cases, such as supplements to American National Standards, special notations that are consistent with ANSI requirements will be added as necessary. Again, this type of notation will be provided by ATIS staff.

Examples of the new numbering system are:

Example 1 – New ATIS Standard not designated to become an American National Standard: ATIS-0100001

Example 2 – New ATIS Standard designated to become an American National Standard: ATIS-0100002.200x (x standing for the year in which designation was approved)

Example 3 – Former T1 Standard reaffirmed by its new ATIS consensus body: T1.417-2003 (R200x) [Note that the cover page will show ATIS as the publisher/ANSI accredited body and inside front cover will show the consensus body, i.e, forum/committee, responsible for the reaffirmation.]

Example 4 – Former T1 Standard (T1.417-xxxx) revised by its new ATIS consensus body: ATIS-0600417.200x

Example 5 – For former T1 Technical Subcommittees (TSCs), the series numbering [e.g., T1.105.01 where 01 is a document within the T1.105 (SONET) series] that was used in the past will be preserved in the 5-digit number of the standard or publication assigned following the 2-digit Functional Group number. For example, former T1 Standard (T1.105.01-xxxx) revised as part of a series by its new ATIS consensus body: ATIS-0900105.01.200x.

EXHIBIT G

*THIS EXHIBIT CONTAINS HIGHLY CONFIDENTIAL INFORMATION AND IS BEING SUBMITTED TO THE COURT, AND SERVED UPON QUALCOMM'S OUTSIDE COUNSEL, IN PAPER FORM ONLY.*

EXHIBIT H

1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                            SOUTHERN DISTRICT OF CALIFORNIA

10

11   QUALCOMM INCORPORATED,                    )   Case No. 05cv1958-B (BLM)
                                               )
12                      Plaintiff,             )   ORDER GRANTING IN PART AND
                                               )   DENYING IN PART DEFENDANT'S
13   v.                                        )   MOTION FOR SANCTIONS AND
                                               )   SANCTIONING QUALCOMM,
14   BROADCOM CORPORATION,                     )   INCORPORATED AND INDIVIDUAL
                                               )   LAWYERS
15                      Defendant.             )
     ————————————————————————————              )   [DOC. NOS. 489, 540, 599, 614]
16                                             )
     and RELATED COUNTERCLAIMS.                )
17   ————————————————————————————              )

18       At the conclusion of trial, counsel for Broadcom Corporation

19   ("Broadcom") made an oral motion for sanctions after Qualcomm

20   Incorporated ("Qualcomm") witness Viji Raveendran testified about emails

21   that were not produced to Broadcom during discovery. Doc. No. 489. The

22   trial judge, United States District Court Judge Rudi M. Brewster,

23   referred the motion to this Court pursuant to 28 U.S.C. § 636(b) and

24   Civil Local Rule 72.1(b) of the United States District Court for the

25   Southern District of California. Doc. No. 494. On May 29, 2007,

26   Broadcom filed a written motion requesting that the Court sanction

27   Qualcomm for its failure to produce tens of thousands of documents that

28   Broadcom had requested in discovery. Doc. No. 540. Qualcomm timely

1 || opposed, and Broadcom filed a reply.  Doc. Nos. 568, 578, 581.  This

2 || Court heard oral argument on Broadcom's motion on July 26, 2007.

3 ||     After hearing oral argument and reviewing Judge Brewster's Order

4 || on Remedy for Finding of Waiver ("Waiver Order") and Order Granting

5 || Broadcom Corporation's Motion for Exceptional Case Finding and for an

6 || Award of Attorney's Fees (35 U.S.C. § 285) ("Exceptional Case Order"),

7 || this Court issued an Order to Show Cause Why Sanctions Should Not be

8 || Imposed against Qualcomm's retained attorneys ("OSC").  Doc. No. 599.

9 || Specifically, this Court ordered James R. Batchelder, Adam A. Bier,

10 || Craig H. Casebeer, David E. Kleinfeld, Kevin K. Leung, Christian E.

11 || Mammen, Lee Patch, Kyle Robertson, Victoria Q. Smith, Barry J. Tucker,

12 || Jaideep Venkatesan, Bradley A. Waugh, Stanley Young, Roy V. Zemlicka,

13 || and any and all other attorneys who signed discovery responses, signed

14 || pleadings and pretrial motions, and/or appeared at trial on behalf of

15 || Qualcomm to appear and show cause why sanctions should not be imposed

16 || for their failure to comply with this Court's orders.  Id.

17 ||     On October 3, 2007, nineteen attorneys filed declarations and

18 || briefs responsive to the OSC.  Doc. Nos. 670, 673-74, 676-80, 682, 685-

19 || 87, 689-91, 693-700.  Qualcomm filed a brief and four declarations.

20 || Doc. Nos. 675, 681, 683-84, 692.  The attorneys filed objections to

21 || Qualcomm's brief on October 5, 2007 [Doc. No. 704], and both Broadcom

22 || and Qualcomm filed responsive briefs on October 9, 2007 [Doc. Nos. 705-

23 || 06].  This Court heard extensive oral argument on the sanctions issue

24 || on October 12, 2007.  Doc. No. 709 (October 12, 2007 Hearing

25 || Transcript).

26 ||     Having considered all of the written and oral arguments presented

27 || and supporting documents submitted, and for the reasons set forth more

28 || fully below, the Court **GRANTS IN PART** and **DENIES IN PART** Broadcom's

1 motion for sanctions against Qualcomm, **REFERS TO THE STATE BAR OF**

2 **CALIFORNIA** six attorneys, and **SANCTIONS** Qualcomm and six of its retained

3 lawyers.  Doc. Nos. 489, 540, 599, 614.

4                              <u>BACKGROUND</u>

5 A.    <u>The Patent Infringement Case</u>

6        Qualcomm initiated this patent infringement action on October 14,

7 2005, alleging Broadcom's infringement of Qualcomm patent numbers

8 5,452,104 (the "'104 patent'") and 5,576,767 (the "'767 patent'") based

9 on its manufacture, sale, and offers to sell H.264-compliant products.

10 Compl. ¶¶ 7-16.   Qualcomm sought injunctive relief, compensatory

11 damages, attorneys' fees and costs.  <u>Id.</u> at 3.   On December 8, 2006,

12 Broadcom filed a First Amended Answer and Counterclaims in which it

13 alleged (1) a counterclaim that the '104 patent is unenforceable due to

14 inequitable conduct, and (2) an affirmative defense that both patents

15 are unenforceable due to waiver.  Doc. No. 370.   Broadcom's waiver

16 defense was predicated on Qualcomm's participation in the Joint Video

17 Team ("JVT") in 2002 and early 2003.  Doc. No. 540-2 at 3.   The JVT is

18 the standards-setting body that created the H.264 standard, which was

19 released in May 2003 and governs video coding.  Waiver Order at 5-9.

20 B.    <u>Evidence of Qualcomm's Participation in the JVT</u>

21        Over   the   course   of   discovery,   Broadcom   sought   information

22 concerning Qualcomm's participation in and communications with the JVT

23 through a variety of discovery devices.   For example, as early as

24 January 23, 2006, Broadcom served its First Set of Requests for the

25 Production of Documents and Things (Nos. 1-88), in which it requested:

26         [a]ll documents given to or received from a standards setting
          body or group that concern any standard relating to the
27        processing of digital video signals that pertains in any way
          to   any   Qualcomm   Patent,   including   without   limitation
28        communications,   proposals,   presentations,   agreements,

1    commitments, or contracts to or from such bodies... . [and]

2    [a]ll documents concerning any Qualcomm membership,
     participation, interaction, and/or involvement in setting any
3    standard relating to the processing of digital video signals
     that pertains in any way to any Qualcomm Patent.    This
4    request also covers all proposed or potential standards,
     whether or not actually adopted.
5

6    Decl. of Kate Saxton Supp. Broadcom's Mot. for Sanctions [Doc. No. 540]

7    ("Saxton Decl."), Ex. BB-2 (Request for Production Nos. 49 & 50).   On

8    July 14, 2006, Broadcom served its Second Set of Requests for Production

9    of Documents and Things (Nos. 89-115), calling for production of:

10   [a]ll documents referring to or evidencing any participation
     by Qualcomm in the proceedings of the JVT, the ISO, the IEC,
11   and/or the ITU-T; and

12   [a]ll documents constituting, referring to, or evidencing any
     disclosure by any party to the JVT, the ISO, the IEC, and/or
13   the ITU-T of any Qualcomm Patent and/or any Related Qualcomm
     Patent.
14

15   Id., Exs. D & DD (Request for Production Nos. 93-94).   Broadcom also

16   requested similar information via interrogatories and multiple Rule

17   30(b)(6) deposition notices.   See id., Ex. EE (Broadcom Interrogatory

18   Nos. 19-20); Saxton Suppl. Decl., Ex. K (Broadcom Interrogatory No. 13);

19   Broadcom's Mem. Supp. Mot. for Sanctions [Doc. No. 540] ("Def.'s Mem.")

20   at 4 n.4 (sample excerpt from Broadcom deposition notice directed to the

21   Qualcomm witness knowledgeable about "attendance or participation by any

22   Qualcomm principal, employee, or representative at any H.264 standards

23   committee meetings").

24       On their face, Qualcomm's written discovery responses did not

25   appear unusual.   In response to Broadcom's request for JVT documents,

26   Qualcomm, in a discovery response signed by attorney Kevin Leung, stated

27   "Qualcomm will produce non-privileged relevant and responsive documents

28   describing QUALCOMM's participation in the JVT, if any, which can be

-4-                                            05cv1958-B (BLM)

1    located after a reasonable search."  Doc. No. 543-3, Ex. X (Qualcomm's

2    Response to Broadcom's Request for Production No. 93); Decl. of Kevin

3    Leung at 5-6, Ex. 3.    Similarly, Qualcomm committed to producing

4    "responsive non-privileged documents that were given to or received from

5    standards-setting body responsible for the ISO/IEC MPEG-4 Part 10

6    standard, and which concern any Qualcomm participation in setting the

7    ISO/IEC MPEG-4 Part 10 standard."[1]  Leung Decl. at 6; Decl. of Christian

8    Mammen at 7-8.  When asked for "the facts and circumstances of any and

9    all communications between Qualcomm and any standards setting body

10   relating to video technology, including ... the JVT ...," Qualcomm

11   responded that it first attended a JVT meeting in December 2003 and that

12   it first submitted a JVT proposal in January 2006.  Decl. of Stanley

13   Young at 14 and Ex. 6 (Response to Interrogatory No. 19).  In response

14   to Interrogatory No. 13, Qualcomm stated that it submitted four

15   proposals to the JVT in 2006 but had no earlier involvement.  Leung

16   Decl. at 6-7; Decl. of Kyle S. Robertson at 11 and Ex. 2.  This response

17   included the statement that "Qualcomm's investigation concerning this

18   interrogatory is ongoing and Qualcomm reserves the right to supplement

19   its response to this interrogatory as warranted by its investigation."

20   Id.   Kevin Leung signed both of these interrogatory responses.   See

21   Robertson Decl., Ex. 2 (Response to Interrogatory No. 13) and Young

22   Decl., Ex. 6 (Response to Interrogatory No. 19).

23        Qualcomm's responses to Broadcom's Rule 30(b)(6) deposition notices

24   were more troubling.  Initially, Qualcomm designated Christine Irvine

25

26

27   [1]      The standard adopted by the JVT and at issue in this case is known by two
     names: H.264 and MPEG-4 Part 10.  The MPEG-4 Part 10 nomenclature is used by the
     ISO/IEC organization but both names refer to the same standard.  Leung Decl. at 6;
28   Mammen Decl. at 7.  The Court will use the H.264 designation throughout this Order.

1  as  the  corporation's  most  knowledgeable  person  on  the  issue  of

2  Qualcomm's  involvement  in  the  JVT.    Leung  Decl.  at  3-4.    Although

3  attorney Leung prepared Irvine for her deposition (id.), Qualcomm did

4  not search her computer for any relevant documents or emails or provide

5  her with any information to review (Decl. of Christine Irvine at 2-3;

6  Decl. of Christine Glathe at 3).  Irvine testified falsely that Qualcomm

7  had  never  been  involved  in  the  JVT.    Leung  Decl.  at  4.    Broadcom

8  impeached Irvine with documents showing that Qualcomm had participated

9  in the JVT in late 2003.  Id.  Qualcomm ultimately agreed to provide

10  another Rule 30(b)(6) witness.  Id.

11      Qualcomm  designated  Scott  Ludwin  as  the  new  representative  to

12  testify about Qualcomm's knowledge of and involvement in the JVT.  Id.

13  Leung prepared and defended Ludwin at his deposition.  Id.  Qualcomm did

14  not search Ludwin's computer for any relevant documents nor take any

15  other action to prepare him.  Decl. of Scott Ludwin at 2-3 (listing all

16  of the preparation he did not do); Glathe Decl. at 3.  Ludwin testified

17  falsely that Qualcomm only began participating in the JVT in late 2003,

18  after the H.264 standard had been published.  Id.  In an effort to

19  impeach him (and extract the truth), Broadcom showed Ludwin a December

20  2002 email reflector list from the Advanced Video Coding ("AVC") Ad Hoc

21  Group that listed the email address viji@qualcomm.com.[2]  Decl. of

22  Stanley Young at 19-20; Robertson Decl. at 14, Ex. 3; Leung Decl. at 8.

23

24      [2]    The document is an "Input Document to JVT" entitled "Ad Hoc Report on AVC
    Verification Test."  Robertson Decl., Ex. 3.  The report discusses a meeting set to
25  take place on Awaji Island.  Id.  Annex A to the document is entitled a "list of Ad Hoc
    Members."  Id.    It includes Raveendran's email address, viji@qualcomm.com, and
26  identifies her as a member of list avc_ce.  Id.  While the document is not an email
    sent to or from Raveendran, it indicates that a Qualcomm employee was receiving JVT/AVC
27  reports in 2002.  This document became critical to Broadcom as it was the only evidence
    in Broadcom's possession indicating the truth-that Qualcomm had been actively involved
28  in the JVT and the development of the H.264 standard in 2002.

1  Although Ludwin did not recognize the document, Broadcom utilized the
2  document throughout the litigation to argue that Qualcomm had
3  participated in the JVT during the development of the H.264 standard.
4  Young Decl. at 19-20; Robertson Decl. at 14-17; Decl. of Jaideep
5  Venkatesan at 14-15.

6      As the case progressed, Qualcomm became increasingly aggressive in
7  its argument that it did not participate in the JVT during the time the
8  JVT was creating the H.264 standard.[3]  This argument was vital to
9  Qualcomm's success in this litigation because if Qualcomm had
10 participated in the creation of the H.264 standard, it would have been

---

[3]      For example, on September 1, 2006, Qualcomm submitted an expert declaration confirming the absence of any corporate records indicating Qualcomm's participation in the JVT.  Saxton Decl., Ex. Z.  The declaration was prepared by the Heller Ehrman lawyers and reviewed by numerous Day Casebeer and Qualcomm in-house attorneys. Venkatesan Decl. at 9-12; Robertson Decl. at 9; Young Decl. at 15-16.  In November, Qualcomm filed a Motion for Summary Adjudication ("MSA") and supporting reply arguing that the evidence established Qualcomm's non-participation in the JVT during the relevant period.  Saxton Decl., Exs. FF & GG.  Numerous in-house and outside counsel reviewed the pleadings and attorneys Young, Batchelder and Patch argued the motion. Young Decl. at 18-22; Vekatesan Decl. at 12-15; Robertson Decl. at 10-16; Batchelder Decl. at 14-15; Patch Decl. at 4; Decl. of Barry J. Tucker at 4 (Tucker signed the MSA pleadings); Decl. of David E. Kleinfeld at 4 (Kleifeld signed the reply pleadings). In its reply, Qualcomm dismissed the appearance of Raveendran's email address on the JVT *ad hoc* group email reflector list and denied any suggestion that the email reflector list indicated Raveendran received any JVT-related information or otherwise had any involvement in the JVT *ad hoc* committee.  Saxton Decl., Ex. II.  On November 19, 2006, Qualcomm filed (1) a Motion in Limine to exclude evidence relating to, among other things, Qualcomm's participation in the JVT, declaring that the "facts demonstrate" Qualcomm "did not participate in JVT deliberations while the H.264 standard was being created" and (2) a Memorandum of Contentions of Fact and Law in which it similarly asserted its lack of involvement in the H.264 standardization process.  Id., Exs. HH & KK at 2.  Numerous in-house and outside counsel also reviewed these pleadings.  Mammen Decl. at 15 (Mammen signed the Memorandum); Decl. of Craig H. Casebeer at 4-5; Decl. of Roy V. Zemlicka at 2, 5-6; Batchelder Decl. at 15; Venkatesan Decl. at 15-16; Robertson Decl. at 16-17; Tucker Decl. at 4 (Tucker signed the motion and related pleadings on behalf of Zemlicka).  Qualcomm reiterated these arguments in its Rebuttal Memorandum of Contentions of Fact and Law filed on December 4, 2006 and signed by Mammen.  Saxton Decl., Ex. JJ; Mammen Decl. at 15.  On January 24, 2007, after the discovery of the Raveendran emails, Qualcomm filed its Motion for Judgment as a Matter of Law ("JMOL") asserting the same lack of participation argument. Decl. of Victoria Q. Smith at 2-5; Casebeer Decl. at 7; Robertson Decl. at 19.  Smith signed the JMOL.  Smith Decl. at 2.

1 | required to identify its patents that reasonably may be essential to the
2 | practice of the H.264 standard, including the '104 and '767 patents, and
3 | to license them royalty-free or under non-discriminatory, reasonable
4 | terms.   Waiver Order at 5-9.   Thus, participation in the JVT in 2002 or
5 | early 2003 during the creation of the H.264 standard would have
6 | prohibited Qualcomm from suing companies, including Broadcom, that
7 | utilized the H.264 standard.   In a nutshell, the issue of whether
8 | Qualcomm participated in the JVT in 2002 and early 2003 became crucial
9 | to the instant litigation.

10 | C.    **Trial and Decision Not to Produce avc_ce Emails**

11 | Trial commenced on January 9, 2007, and throughout trial, Qualcomm
12 | argued that it had not participated in the JVT in 2002 and early 2003
13 | when the H.264 standard was being created.   In his opening statement,
14 | Qualcomm's lead attorney, James Batchelder, stated:

15 | Later, in May of '03, the standard is approved and published.
And then Qualcomm, in the fall of 2003, it begins to
16 | participate not in JVT because it's done.   H.264 is approved
and published.   Qualcomm begins to participate in what are
17 | called professional extensions, things that sit on top of the
standard, additional improvements.
18 |

19 | Waiver Order at 45; Batchelder Decl. at 15.

20 | While preparing Qualcomm witness Viji Raveendran to testify at
21 | trial, attorney Adam Bier discovered an August 6, 2002 email to
22 | viji@qualcomm.com welcoming her to the avc_ce mailing list.   Decl. of
23 | Adam Bier at 4, Ex. A.   Several days later, on January 14, 2007, Bier
24 | and Raveendran searched her laptop computer using the search term
25 | "avc_ce" and discovered 21 separate emails, none of which Qualcomm had
26 | produced in discovery.   Id. at 7.   The email chains bore several dates
27 | in November 2002 and the authors discussed various issues relating to
28 | the H.264 standard.   Mammen Decl. at 16-19, Ex. 8.   While Raveendran was

-8-                                      05cv1958-B (BLM)

1 | not a named author or recipient, the emails were sent to all members of
2 | two JVT email groups (jvt-experts and avc_ce) and Raveendran maintained
3 | them on her computer for more than four years. Id. The Qualcomm trial
4 | team decided not to produce these newly discovered emails to Broadcom,
5 | claiming they were not responsive to Broadcom's discovery requests.
6 | Bier Decl. at 7; Mammen Decl. at 18-19; Patch Decl. at 6-7; Batchelder
7 | Decl. at 16. The attorneys ignored the fact that the presence of the
8 | emails on Raveendran's computer undercut Qualcomm's premier argument
9 | that it had not participated in the JVT in 2002. Mammen Decl. at 18-19;
10 | Bier Decl. at 7; Patch Decl. at 7. The Qualcomm trial team failed to
11 | conduct any investigation to determine whether there were more emails
12 | that also had not been produced.

13 | Four days later, during a sidebar discussion, Stanley Young argued
14 | against the admission of the December 2002 avc_ce email reflector list,
15 | declaring: "Actually, there are no emails -- there are no emails ...
16 | there's no evidence that any email was actually sent to this list. This
17 | is just a list of email ... addresses. There's no evidence of anything
18 | being sent." Trial Tr. vol. VII at 91-92; Young Decl. at 25-29. None
19 | of the Qualcomm attorneys who were present during the sidebar mentioned
20 | the 21 avc_ce emails found on Raveendran's computer a few days earlier.
21 | Id.; Batchelder Decl. at 16-17; Casebeer Decl. at 6.

22 | During Raveendran's direct testimony on January 24th, attorney Lee
23 | Patch pointedly did not ask her any questions that would reveal the fact
24 | that she had received the 21 emails from the avc_ce mailing list;
25 | instead, he asked whether she had "any knowledge of having **read**" any
26 | emails from the avc_ce mailing list. Patch Decl. at 8-9; Trial Tr. vol.
27 | VIII at 46. But on cross-examination, Broadcom asked the right question
28 | and Raveendran was forced to admit that she had received emails from the

1   avc_ce mailing list.  Trial Tr. vol. VIII at 53.  *Immediately following*

2   this admission, in response to Broadcom's request for the emails, and

3   despite the fact that he had participated in the decision three days

4   earlier not to produce them, Patch told the Court at sidebar:

> [I]t's not clear to me [the emails are] responsive to
> anything.  So that's something that needs to be determined
> before they would be produced ... I'm talking about whether
> they were actually requested in discovery... . I'm simply
> representing that I haven't seen [the emails], and [whether
> Broadcom requested them] hasn't been determined.

9   Order at 46; Patch Decl. at 10.  Over the lunch recess that same day,

10  Qualcomm's counsel produced the 21 emails they previously had retrieved

11  from Raveendran's email archive.  Trial Tr. vol. VIII at 114.

12       On January 26, 2007, the jury returned unanimous verdicts in favor

13  of Broadcom regarding the non-infringement of the '104 and '767 patents,

14  and in favor of Qualcomm regarding the validity and non-obviousness of

15  the same.  Doc. No. 499.  The jury also returned a unanimous advisory

16  verdict in favor of Broadcom that the '104 patent is unenforceable due

17  to inequitable conduct and the '104 and '767 patents are unenforceable

18  due to waiver.  *Id.* at 14.

19       On March 21, 2007, Judge Brewster found (1) in favor of Qualcomm

20  on Broadcom's inequitable conduct counterclaim regarding the '104

21  patent, and (2) in favor of Broadcom on Broadcom's waiver defense

22  regarding the '104 and '767 patents.  Doc. No. 528.  On August 6, 2007,

23  Judge Brewster issued a comprehensive order detailing the appropriate

24  remedy for Qualcomm's waiver.  Doc. No. 593.  After a thorough overview

25  of the JVT, the JVT's policies and guidelines, and Qualcomm's knowledge

26  of the JVT and evidence of Qualcomm's involvement therein, *see id.* at

27  5-22, Judge Brewster found:

28       *by clear and convincing evidence that Qualcomm, its*

-10-

> employees, and its witnesses actively organized and/or
> participated in a plan to profit heavily by (1) wrongfully
> concealing the patents-in-suit while participating in the JVT
> and then (2) actively hiding this concealment from the Court,
> the jury, and opposing counsel during the present litigation.

Id. at 22.  Judge Brewster further found that Qualcomm's "counsel participated in an organized program of litigation misconduct and concealment throughout discovery, trial, and post-trial before new counsel took over lead role in the case on April 27, 2007."  Id. at 32. Based on "the totality of the evidence produced both before and after the jury verdict," and in light of these findings, Judge Brewster concluded that "Qualcomm has waived its rights to enforce the '104 and '767 patents and their continuations, continuations-in-part, divisions, reissues, or any other derivatives of either patent."  Id. at 53.

Also on August 6, 2007, Judge Brewster granted Broadcom's Motion for an Award of Attorneys' Fees pursuant to 35 U.S.C. § 285.  Doc. No. 594.  Judge Brewster found clear and convincing evidence that Qualcomm's litigation misconduct, as set forth in his Waiver Order, see Doc. No. 593, justified Qualcomm's payment of all "attorneys' fees, court costs, expert witness fees, travel expenses, and any other litigation costs reasonably incurred by Broadcom" in the defense of this case.  Doc. No. 594 at 4.  On December 11, 2007, Judge Brewster adopted this court's recommendation and ordered Qualcomm to pay Broadcom $9,259,985.09 in attorneys' fees and related costs, as well as post-judgment interest on the final fee award of $8,568,633.24 at 4.91 percent accruing from August 6, 2007.  Doc. Nos. 715 & 717.

**D.   Qualcomm's Post-Trial Misconduct**

Following trial, Qualcomm continued to dispute the relevancy and responsiveness of the 21 Raveendran emails.  Bier Decl., Exs. B-E. Qualcomm also resisted Broadcom's efforts to determine the scope of

1   Qualcomm's discovery violation.   Id., Exs. B-F.   By letter dated
2   February 16, 2007, Bier told Broadcom "[w]e continue to believe that
3   Qualcomm performed a reasonable search of Qualcomm's documents in
4   response to Broadcom's Requests for Production and that the twenty-one
5   unsolicited emails received by Ms. Raveendran from individuals on the
6   avc_ce reflector are not responsive to any valid discovery obligation
7   or commitment."   Id., Ex. C.   In response to Broadcom's request that
8   Qualcomm conduct additional searches to determine the scope of
9   Qualcomm's discovery violation, Bier stated in a March 7, 2007 letter,
10  we "believe your negative characterization of Qualcomm's compliance with
11  its discovery obligation to be wholly without merit" but he advised that
12  Qualcomm agreed to search the current and archived emails of five trial
13  witnesses using the requested JVT, avc_ce and H.264 terms.   Id., Exs.
14  D & E.   Bier explained that Qualcomm has "not yet commenced these
15  searches, and [does] not yet know the volume of results we will obtain."
16  Id., Ex. E.   Throughout the remainder of March 2007, Bier repeatedly
17  declined to update Broadcom on Qualcomm's document search.   Id., Ex. F.

18      But, on April 9, 2007, James Batchelder and Louis Lupin, Qualcomm's
19  General Counsel, submitted correspondence to Judge Brewster in which
20  they admitted Qualcomm had thousands of relevant unproduced documents
21  and that their review of these documents "revealed facts that appear to
22  be inconsistent with certain arguments that [counsel] made on Qualcomm's
23  behalf at trial and in the equitable hearing following trial."   Saxton
24  Decl., Exs. H & I.   Batchelder further apologized "for not having
25  discovered these documents sooner and for asserting positions that
26  [they] would not have taken had [they] known of the existence of these
27  documents."   Id., Ex. H.

28  ///

1    As of June 29, 2007, Qualcomm had searched the email archives of

2    twenty-one employees and located more than forty-six thousand documents

3    (totaling more than three hundred thousand pages), which had been

4    requested but not produced in discovery.   Broadcom's Reply Supp. Mot.

5    for Sanctions at 1 n.2.    Qualcomm continued to produce additional

6    responsive documents throughout the summer.   Doc. No. 597 (Qualcomm's

7    August 7, 2007 submission of three additional avc_ce emails it had not

8    produced to Broadcom).

9                              **DISCUSSION**

10    As summarized above, and as found by Judge Brewster, there is clear

11   and convincing evidence that Qualcomm intentionally engaged in conduct

12   designed  to  prevent  Broadcom  from  learning  that  Qualcomm  had

13   participated in the JVT during the time period when the H.264 standard

14   was being developed.   To this end, Qualcomm withheld tens of thousands

15   of emails showing that it actively participated in the JVT in 2002 and

16   2003 and then utilized Broadcom's lack of access to the suppressed

17   evidence to repeatedly and falsely aver that there was "no evidence"

18   that it had participated in the JVT prior to September 2003.  Qualcomm's

19   misconduct in hiding the emails and electronic documents prevented

20   Broadcom from correcting the false statements and countering the

21   misleading arguments.

22   **A.    Legal Standard**

23    The  Federal  Civil  Rules  authorize  federal  courts  to  impose

24   sanctions on parties and their attorneys who fail to comply with

25   discovery obligations and court orders.   Rule 37 authorizes a party to

26   file a motion to compel an opponent to comply with a discovery request

27   or obligation when the opponent fails to do so initially.   Fed. R. Civ.

28   P. 37(a).   If such a motion is filed, the rule requires the court to

-13-                              05cv1958-B (BLM)

1 | award reasonable attorney's fees to the prevailing party unless the
2 | court finds the losing party's position was "substantially justified"
3 | or other circumstances make such an award unjust.  Id.  Depending upon
4 | the circumstances, the court may require the attorney, the client, or
5 | both to pay the awarded fees.  Id.  If the court grants a discovery
6 | motion and the losing party fails to comply with the order, the court
7 | may impose additional sanctions against the party.  Fed. R. Civ. P.
8 | 37(b).  There is no requirement under this rule that the failure be
9 | willful or reckless; "sanctions may be imposed even for negligent
10 | failures to provide discovery." Fjelstad v. Am. Honda Motor Co., Inc.,
11 | 762 F.2d 1334, 1343 (9th Cir. 1985).

12 | The Federal Rules also provide for sanctions against individual
13 | attorneys who are remiss in complying with their discovery obligations:

> [e]very discovery request, response or objection made by a
> party ... shall be signed by at least one attorney [and]
> [t]he signature of the attorney ... constitutes a
> certification that to the best of the signer's knowledge,
> information, and belief, **formed after a reasonable inquiry,**
> the request, response, or objection is: consistent with the
> rules and law, not interposed for an improper purpose, and
> not unreasonable or unduly burdensome or expensive.

Fed. R. Civ. P. 26(g)(2) (emphasis added).  "[W]hat is reasonable is a
matter for the court to decide on the totality of the circumstances."
Fed. R. Civ. P. 26 Advisory Committee Notes (1983 Amendment).  The
Committee explained that:

> Rule 26(g) imposes an affirmative duty to engage in pretrial
> discovery in a responsible manner that is consistent with the
> spirit and purposes of Rules 26 through 37.  In addition,
> Rule 26(g) is designed to curb discovery abuse by explicitly
> encouraging the imposition of sanctions.  This subdivision
> provides a deterrent to both excessive discovery and evasion
> by imposing a certification requirement that obliges each
> attorney to stop and think about the legitimacy of a
> discovery request, a response thereto, or an objection.  The
> term "response" includes answers to interrogatories and to
> requests to admit as well as responses to production
> requests.  [¶]  If primary responsibility for conducting

-14-

05cv1958-B (BLM)

1    discovery is to continue to rest with the litigants, they
     must be obliged to act responsibly and avoid abuse. With
2    this in mind, Rule 26(g), which parallels the amendments to
     Rule 11, requires an attorney ... to sign each discovery
3    request, response, or objection.

4    Id. If an attorney makes an incorrect certification without substantial

5    justification, the court must sanction the attorney, party, or both and

6    the sanction may include an award of reasonable attorney's fees. Fed.

7    R. Civ. P. 26(g)(3). If a party, without substantial justification,

8    fails "to amend a prior response to discovery as required by Rule

9    26(e)(2)," the court may prevent that party from using that evidence at

10   trial or at a hearing and impose other appropriate sanctions, including

11   the payment of attorney's fees. Fed. R. Civ. P. 37(c)(1). As the

12   Supreme Court confirmed, Rule 26(g), like Rule 11, requires that the

13   court impose "an appropriate sanction" on the attorney; in other words,

14   one which is commensurate with the discovery harm. See Fed. R. Civ. P.

15   26(g)(3); Chambers v. NASCO, Inc., 501 U.S. 32, 51 (1991).

16       In addition to this rule-based authority, federal courts have the

17   inherent power to sanction litigants to prevent abuse of the judicial

18   process. See Chambers, 501 U.S. at 44-46. All "federal courts are

19   vested with inherent powers enabling them to manage their cases and

20   courtrooms effectively and to ensure obedience to their orders... . As

21   a function of this power, courts can dismiss cases in their entirety,

22   bar witnesses, award attorney's fees and assess fines." Aloe Vera of

23   Am., Inc. v. United States, 376 F.3d 960, 964-65 (9th Cir. 2004)

24   (citation omitted). Sanctions are appropriate in response to "willful

25   disobedience of a court order ... or when the losing party has acted in

26   bad faith, vexatiously, wantonly, or for oppressive reasons." Fink v.

27   Gomez, 239 F.3d 989, 991 (9th Cir. 2001). When a court order is

28   violated, a district court considering the imposition of sanctions must

1  also examine the risk of prejudice to the complying party and the
2  availability of less drastic sanctions.  See Commodity Futures Trading
3  Comm'n v. Noble Metals, 67 F.3d 766, 771 (9th Cir. 1995).

4       Regardless of whether sanctions are imposed under the Federal Rules
5  or pursuant to a court's inherent power, the decision to impose
6  sanctions lies within the sound discretion of the court.  See Lasar v.
7  Ford Motor Co., 399 F.3d 1101, 1109-14 (9th Cir. 2005) (reviewing
8  sanctions imposed under the court's inherent power); Payne v. Exxon
9  Corp., 121 F.3d 503, 510 (9th Cir. 1997) (upholding sanctions imposed
10 under the Federal Rules).

11 **B.    Broadcom Did Not File a Motion to Compel Discovery**

12      As summarized above, Broadcom served interrogatories and requested
13 documents relating to Qualcomm's participation in the JVT.   Qualcomm
14 responded that "Qualcomm will produce non-privileged relevant and
15 responsive documents describing QUALCOMM's participation in the JVT, if
16 any, which can be located after a reasonable search."  Doc. No. 543-3,
17 Ex. X (Qualcomm's Response to Broadcom's Request for Production No. 93).
18 Qualcomm also committed to producing "responsive non-privileged
19 documents that were given to or received from standards-setting body
20 responsible for the [H.264] standard, and which concern any Qualcomm
21 participation in setting the [H.264] standard."   Mammen Decl. at 7-8.

22      Despite these responses, Qualcomm did not produce over 46,000
23 responsive documents, many of which directly contradict the non-
24 participation argument that Qualcomm repeatedly made to the court and
25 jury.  Because Qualcomm agreed to produce the documents and answered the
26 interrogatories (even though falsely), Broadcom had no reason to file
27 ///
28 ///

1   a motion to compel.[4]  And, because Broadcom did not file a motion to

2   compel, Broadcom's possible remedies are restricted.  If Broadcom had

3   filed a motion to compel, it could have obtained sanctions against

4   Qualcomm and its attorneys.  Fed. R. Civ. P. 37(a) & (b).  Because

5   Broadcom did not file a motion to compel, it may only seek Rule 37

6   sanctions against Qualcomm.  Fed. R. Civ. P. 37(c).  Thus, Qualcomm's

7   suppression of documents placed its retained attorneys in a better legal

8   position than they would have been in if Qualcomm had refused to produce

9   the documents and Broadcom had filed a motion to compel.

10       This dilemma highlights another problem with Qualcomm's conduct in

11  this case.  The Federal Rules of Civil Procedure require parties to

12  respond to discovery in good faith; the rules do not require or

13  anticipate judicial involvement unless or until an actual dispute is

14  discovered.  As the Advisory Committee explained, "[i]f primary

15  responsibility for conducting discovery is to continue to rest with the

16  litigants, they must be obliged to act responsibly and avoid abuse."

17  Fed. R. Civ. P. 26(g) Advisory Committee Notes (1983 Amendment).  The

18  Committee's concerns are heightened in this age of electronic discovery

19  when attorneys may not physically touch and read every document within

20  the client's custody and control.  For the current "good faith"

21  discovery system to function in the electronic age, attorneys and

22

23       [4]    Qualcomm attempts to capitalize on this failure, arguing "Broadcom never
    raised any concern regarding the scope of documents Qualcomm agreed to produce in
24  response to Request No. 50, and never filed a motion to compel concerning this request.
    Accordingly, there is no order compelling Qualcomm to respond more fully to it."
25  Mammen Decl. at 9.  Qualcomm made the same argument with regard to its other discovery
    responses.  Id. at 9-11; see also Bier Decl., Ex. C.  This argument is indicative of
26  the gamesmanship Qualcomm engaged in throughout this litigation.  Why should Broadcom
    file a motion to compel when Qualcomm agreed to produce the documents?  What would the
27  court have compelled: Qualcomm to do what it already said it would do?  Should all
    parties file motions to compel to preserve their rights in case the other side hides
28  documents?

1  clients must work together to ensure that both understand how and where
2  electronic documents, records and emails are maintained and to determine
3  how best to locate, review, and produce responsive documents. Attorneys
4  must take responsibility for ensuring that their clients conduct a
5  comprehensive and appropriate document search.  Producing 1.2 million
6  pages of marginally relevant documents while hiding 46,000 critically
7  important ones does not constitute good faith and does not satisfy
8  either the client's or attorney's discovery obligations.  Similarly,
9  agreeing to produce certain categories of documents and then not
10 producing all of the documents that fit within such a category is
11 unacceptable.  Qualcomm's conduct warrants sanctions.

12 **C.    Sanctions**

13     The Court's review of Qualcomm's declarations, the attorneys'
14 declarations, and Judge Brewster's orders leads this Court to the
15 inevitable conclusion that Qualcomm intentionally withheld tens of
16 thousands of decisive documents from its opponent in an effort to win
17 this case and gain a strategic business advantage over Broadcom.
18 Qualcomm could not have achieved this goal without some type of
19 assistance or deliberate ignorance from its retained attorneys.
20 Accordingly, the Court concludes it must sanction both Qualcomm and some
21 of its retained attorneys.[5]

22

23       [5]    The Court is limited in its review and analysis of the debacle that
    occurred in this litigation because Judge Brewster only referred the discovery
24  violation to this Court.  Doc. No. 494 ("Dft's Oral Motion [489] for Sanctions re
    Production of Documents re Witness Viji Raveendran - made and submitted on 01-24-07 -
25  Referred to the Magistrate Judge").  Judge Brewster did not refer any sanction motions
    relating to false statements made to the trial judge or in pleadings resolved by the
26  trial judge.  Id.  Accordingly, this Court is limited in its review, analysis, and
    conclusion to discovery violations and applicable discovery rules and remedies.  See
27  Fed. R. Civ. P. 11(d) (Rule 11 does "not apply to disclosures and discovery requests,
    responses, objections, and motions").
28

1    **1.    Misconduct by Qualcomm**

2        Qualcomm violated its discovery obligations by failing to produce

3    more than 46,000 emails and documents that were requested in discovery

4    and that Qualcomm agreed to produce. See Fed. R. Civ. P. 26(g) Advisory

5    Committee Notes (1983 Amendment) ("Rule 26(g) imposes an affirmative

6    duty to engage in pretrial discovery in a responsible manner that is

7    consistent with the spirit and purposes of Rules 26 through 37). Rule

8    37 dictates that "[a] party that without substantial justification fails

9    to ... amend a prior response to discovery as required by Rule 26(e)(2),

10   is not, unless such failure is harmless, permitted to use" the

11   suppressed evidence in court proceedings. Fed. R. Civ. P. 37(c)(1).

12   The court also may impose other appropriate sanctions, including the

13   imposition of reasonable attorneys' fees. Id.

14       Qualcomm has not established "substantial justification" for its

15   failure to produce the documents. In fact, Qualcomm has not presented

16   *any* evidence attempting to explain or justify its failure to produce the

17   documents. Despite the fact that it maintains detailed records showing

18   whose computers were searched and which search terms were used (Glathe

19   Decl. at 3 (identifying the individuals whose computers were not

20   searched for specific types of documents)), Qualcomm has not presented

21   any evidence establishing that it searched for pre-September 2003 JVT,

22   avc_ce, or H.264 records or emails on its computer system or email

23   databases. Qualcomm also has not established that it searched the

24   computers or email databases of the individuals who testified on

25   Qualcomm's behalf at trial or in depositions as Qualcomm's most

26   knowledgeable corporate witnesses; in fact, it indicates that it did not

27   conduct any such search. Id.; Irvine Decl. at 2; Ludwin Decl. at 3;

28   Decl. of Viji Raveendran at 1, 4. The fact that Qualcomm did not

1  perform these basic searches at any time before the completion of trial

2  indicates that Qualcomm intentionally withheld the documents.    This

3  conclusion is bolstered by the fact that when Qualcomm "discovered" the

4  21 Raveendran emails, it did not produce them and did not engage in any

5  type of review to determine whether there were additional relevant,

6  responsive, and unproduced documents.    Bier Decl. at 7; Mammen Decl. at

7  16-18; Patch Decl. at 5-7.    The conclusion is further supported by the

8  fact that after trial Qualcomm did not conduct an internal investigation

9  to determine if there were additional unproduced documents (Bier Decl.,

10  Ex. E (Qualcomm still had not searched as of March 7, 2007)); but,

11  rather, spent its time opposing Broadcom's efforts to force such a

12  search and insisting, without any factual basis, that Qualcomm's search

13  was reasonable.    Id. at 10-11, Exs. B-F; Patch Decl. at 11-14.

14      Qualcomm's claim that it inadvertently failed to find and produce

15  these documents also is negated by the massive volume and direct

16  relevance of the hidden documents.    As Judge Brewster noted, it is

17  inexplicable that Qualcomm was able to locate the post-September 2003

18  JVT documents that either supported, or did not harm, Qualcomm's

19  arguments but were unable to locate the pre-September 2003 JVT documents

20  that hurt its arguments.    Waiver Order at 38.    Similarly, the

21  inadvertence argument is undercut by Qualcomm's ability to easily locate

22  the suppressed documents using fundamental JVT and avc search terms when

23  forced to do so by Broadcom's threat to return to court.    See October

24  12, 2007 Hearing Transcript at 192.    Finally, the inadvertence argument

25  also is belied by the number of Qualcomm employees and consultants who

26  received the emails, attended the JVT meetings, and otherwise knew about

27  the information set forth in the undisclosed emails.    Waiver Order at

28  10-12, 21-32.    It is inconceivable that Qualcomm was unaware of its

1    involvement in the JVT and of the existence of these documents.

2         Assuming *arguendo*, that Qualcomm did not know about the suppressed

3    emails, Qualcomm failed to heed several warning signs that should have

4    alerted it to the fact that its document search and production were

5    inadequate.   The first significant concern should have been raised in

6    connection with the Rule 30(b)(6) depositions of Christine Irvine and

7    Scott Ludwin.   Both individuals testified as the Qualcomm employee most

8    knowledgeable about Qualcomm's involvement in the JVT.   But, Qualcomm

9    did not search either person's computer for JVT documents, did not

10   provide either person with relevant JVT documents to review, and did not

11   make any other efforts to ensure each person was in fact knowledgeable

12   about Qualcomm's JVT involvement.   Irvine Decl. at 2; Ludwin Decl. at

13   3; Glathe Decl. at 3.   These omissions are especially incriminating

14   because many of the suppressed emails were to or from Irvine.   Waiver

15   Order at 10-12, 25-26.   If a witness is testifying as an organization's

16   most knowledgeable person on a specific subject, the organization has

17   an obligation to conduct a reasonable investigation and review to ensure

18   that the witness does possess the organization's knowledge. [6]   Fed. R.

19   Civ. P. 30(b)(6); In re JDS Uniphase Corp. Sec. Litig., 2007 WL 219857,

20   *1 (N.D. Cal. 2007) (the corporation "must prepare the designee to the

21

---

22        [6]    Qualcomm's self-serving statements that "outside counsel selects ... the
     custodians whose documents should be searched" and the paralegal does not decide "what
23   witnesses to designate to testify on behalf of the company" (Glathe Decl. at 1) does
     not relieve Qualcomm of its obligations.   Qualcomm has not presented any evidence
24   establishing what actions, if any, it took to ensure it designated the correct
     employee, performed the correct computer searches, and presented the designated
25   employee with sufficient information to testify as the corporation's most knowledgeable
     person.   Qualcomm also has not presented any evidence that outside counsel knew enough
26   about Qualcomm's organization and operation to identify all of the individuals whose
     computers should be searched and determine the most knowledgeable witness.   And, more
27   importantly, Qualcomm is a large corporation with an extensive legal staff; it clearly
     had the ability to identify the correct witnesses and determine the correct computers
28   to search and search terms to use.   Qualcomm just lacked the desire to do so.

1  extent matters are reasonably available, whether from documents, past
2  employees, or other sources") (internal citation omitted); 1 <u>Discovery</u>
3  <u>Proceedings in Federal Court</u> § 8.6 (3rd ed. 2007) ("[a] party responding
4  to a request for a deposition of a corporate representative to testify
5  on behalf of the corporation must make a good-faith endeavor to
6  designate the persons having knowledge of the matters sought by the
7  interrogator and to prepare those persons in order that they can answer
8  fully, completely, and unevasively, the questions posed by the
9  interrogator as to the relevant subject matters").    An adequate
10  investigation should include an analysis of the sufficiency of the
11  document search and, when electronic documents are involved, an analysis
12  of the sufficiency of the search terms and locations.    In the instant
13  case, a reasonable inquiry should have included using the JVT, avc and
14  H.264 search terms and searching the computers of Raveendran, Irvine,
15  Ludwin (and other Qualcomm employees identified in the emails discovered
16  on the computers of these witnesses).    This minimal inquiry would have
17  revealed the existence of the suppressed documents.    Moreover, the fact
18  that Broadcom alleged, and Qualcomm agreed or acquiesced, that Irvine
19  was not sufficiently knowledgeable about Qualcomm's JVT involvement or
20  adequately prepared for her deposition, should also have alerted
21  Qualcomm to the inadequacy of its document search and production.

22       Another ignored warning flag was the December 2002 avc_ce email
23  reflector containing Raveendran's email address.    Broadcom utilized this
24  document in several ways to argue that Qualcomm was involved in the JVT
25  prior to September 2003.    Patch Decl. at 19-20 (document was shown to
26  Ludwin during his deposition); Leung Decl. at 8; Robertson Decl. at 14
27  (document attached to Broadcom's opposition to Qualcomm's MSA).    Even
28  though this document indicated that in December 2002, a Qualcomm

1   employee was a member of the avc_ce email group, which related to the
2   JVT and the development of the H.264 standard, there is no evidence that
3   its presence triggered a search by Qualcomm for "avc_ce," "JVT," or any
4   other relevant term on Raveendran's computer or any other Qualcomm
5   database.   Again, if Qualcomm had performed this search, it would have
6   located the suppressed emails.   The fact that Qualcomm chose not to
7   investigate this document supports the conclusion that Qualcomm
8   intentionally withheld the 46,000 emails. This conclusion is reinforced
9   by the fact that, without any investigation, Qualcomm repeatedly tried
10   to discredit the document and Broadcom's reliance on it.   Waiver Order
11   at 45; Young Decl. at 25-29.

12       Qualcomm had the ability to identify its employees and consultants
13   who were involved in the JVT, to access and review their computers,
14   databases and emails, to talk with the involved employees and to refresh
15   their recollections if necessary, to ensure that those testifying about
16   the corporation's knowledge were sufficiently prepared and testified
17   accurately, and to produce in good faith all relevant and requested
18   discovery.   See Nat'l Assoc. of Radiation Survivors v. Turnage, 115
19   F.R.D. 543, 557-58 (N.D. Cal. 1987) (holding in case where sanctions
20   imposed for withholding of documents that "a reasonable inquiry into the
21   factual basis of its discovery responses as well as the factual basis
22   of subsequent pleadings, papers, and motions based on those responses
23   ... would have required, at a minimum, a reasonable procedure to
24   distribute discovery requests to all employees and agents of the
25   defendant potentially possessing responsive information, and to account
26   for the collection and subsequent production of the information").
27   Qualcomm chose not to do so and therefore must be sanctioned.
28   ///

-23-

1      ## 2.    Attorneys' Misconduct

2          The next question is what, if any, role did Qualcomm's retained

3      lawyers play in withholding the documents?    The Court envisions four

4      scenarios.    First, Qualcomm intentionally hid the documents from its

5      retained lawyers and did so so effectively that the lawyers did not know

6      or suspect that the suppressed documents existed.    Second, the retained

7      lawyers failed to discover the intentionally hidden documents or suspect

8      their existence due to their complete ineptitude and disorganization.

9      Third, Qualcomm shared the damaging documents with its retained lawyers

10     (or at least some of them) and the knowledgeable lawyers worked with

11     Qualcomm to hide the documents and all evidence of Qualcomm's early

12     involvement in the JVT.    Or, fourth, while Qualcomm did not tell the

13     retained lawyers about the damaging documents and evidence, the lawyers

14     suspected there was additional evidence or information but chose to

15     ignore the evidence and warning signs and accept Qualcomm's incredible

16     assertions regarding the adequacy of the document search and witness

17     investigation.

18         Given the impressive education and extensive experience of

19     Qualcomm's retained lawyers (see exhibit A[7]), the Court rejects the

20     first and second possibilities.    It is inconceivable that these

21     talented, well-educated, and experienced lawyers failed to discover

22     through their interactions with Qualcomm any facts or issues that caused

23     (or should have caused) them to question the sufficiency of Qualcomm's

24

25

26     [7]    Additional information regarding each attorney's role and involvement in
       this litigation is set forth in his or her declaration and summarized in Exhibit A to
       this Order. To address the attorneys' Due Process concerns arising from Qualcomm's
27     self-serving and misleading declarations (Doc. No. 704), the Court will not consider
       the Qualcomm declarations (Glathe, Raveendran, Irvine and Ludwin) in evaluating the
28     conduct of Qualcomm's retained counsel.

1    document search and production.  Qualcomm did not fail to produce a
2    document or two; it withheld over 46,000 critical documents that
3    extinguished Qualcomm's primary argument of non-participation in the
4    JVT.    In addition, the suppressed documents did not belong to one
5    employee, or a couple of employees who had since left the company; they
6    belonged to (or were shared with) numerous, current Qualcomm employees,
7    several of whom testified (falsely) at trial and in depositions.  Given
8    the volume and importance of the withheld documents, the number of
9    involved Qualcomm employees, and the numerous warning flags, the Court
10   finds it unbelievable that the retained attorneys did not know or
11   suspect that Qualcomm had not conducted an adequate search for
12   documents.

13       The Court finds no direct evidence establishing option three.
14   Neither party nor the attorneys have presented evidence that Qualcomm
15   told one or more of its retained attorneys about the damaging emails or
16   that an attorney learned about the emails and that the knowledgeable
17   attorney(s) then helped Qualcomm hide the emails.  While knowledge may
18   be inferred from the attorneys' conduct, evidence on this issue is
19   limited due to Qualcomm's assertion of the attorney-client privilege.[8]

20

21

---

[8]    Qualcomm asserted the attorney-client privilege and decreed that its
22   retained attorneys could not reveal any communications protected by the privilege.
     Doc. No. 659; October 12, 2007 Hearing Transcript at 38.  Several attorneys complained
23   that the assertion of the privilege prevented them from providing additional
     information regarding their conduct.  See, e.g., Young Decl. at 12; Leung Decl. at 3-5;
24   Robertson Decl. at 14-16.    This concern was heightened when Qualcomm submitted its
     self-serving declarations describing the failings of its retained lawyers.  Doc. No.
25   704. Recognizing that a client has a right to maintain this privilege and that no
     adverse inference should be made based upon the assertion, the Court accepted
26   Qualcomm's assertion of the privilege and has not drawn any adverse inferences from it.
     October 12, 2007 Hearing Transcript at 4-5.  However, the fact remains that the Court
27   does not have access to all of the information necessary to reach an informed decision
     regarding the actual knowledge of the attorneys.  As a result, the Court concludes for
28   purposes of this Order that there is insufficient evidence establishing option three.

-25-

1 .    Thus, the Court finds it likely that some variation of option four

2 occurred; that is, one or more of the retained lawyers chose not to look

3 in the correct locations for the correct documents, to accept the

4 unsubstantiated assurances of an important client that its search was

5 sufficient, to ignore the warning signs that the document search and

6 production were inadequate, not to press Qualcomm employees for the

7 truth, and/or to encourage employees to provide the information (or lack

8 of information) that Qualcomm needed to assert its non-participation

9 argument and to succeed in this lawsuit. These choices enabled Qualcomm

10 to withhold hundreds of thousands of pages of relevant discovery and to

11 assert numerous false and misleading arguments to the court and jury.

12 This conduct warrants the imposition of sanctions.[9]

13         a.    <u>Identity of Sanctioned Attorneys</u>

14    The Court finds that each of the following attorneys contributed

15 to Qualcomm's monumental discovery violation and is personally

16

---

17        [9]    The applicable discovery rules do not adequately address the attorneys'
misconduct in this case.  Rule 26(g) only imposes liability upon the attorney who
18 signed the discovery request or response.  Fed. R. Civ. P. 26(g).  Similarly, Rule
37(a) authorizes sanctions against a party or attorney only if a motion to compel is
19 filed; Rule 37(b) authorizes sanctions against a party or an attorney if the party
fails to comply with a discovery order; and, Rule 37(c) only imposes liability upon a
20 party for the party's failure to comply with various discovery obligations.  Fed. R.
Civ. P. 37.  Under a strict interpretation of these rules, the only attorney who would
21 be responsible for the discovery failure is Kevin Leung because he signed the false
discovery responses.  Doc. No. 543-3, Exs. W, X & Y; Robertson Decl., Ex. 2.  However,
22 the Court believes the federal rules impose a duty of good faith and reasonable inquiry
on all attorneys involved in litigation who rely on discovery responses executed by
23 another attorney.  <u>See</u> Fed. R. Civ. P. 26 Advisory Committee Notes (1983 Amendment)
(Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a
24 responsible manner that is consistent with the spirit and purposes of Rules 26 through
37); Fed. R. Civ. P. 11 (by signing, filing, submitting or advocating a pleading, an
25 attorney is certifying that the allegations have factual, evidentiary support).
Attorneys may not utilize inadequate or misleading discovery responses to present false
26 and unsupported legal arguments and sanctions are warranted for those who do so.  <u>Id.</u>
The facts of this case also justify the imposition of sanctions against those attorneys
27 pursuant to the Court's inherent power.  <u>See</u>, <u>Fink</u>, 239 F.3d at 993-94 ("an attorney's
reckless misstatements of law and fact, when coupled with an improper purpose ... are
28 sanctionable under a court's inherent power").

1  responsible:    James Batchelder, Adam Bier, Kevin Leung, Christopher

2  Mammen, Lee Patch, and Stanley Young ("Sanctioned Attorneys").

3      Attorneys Leung, Mammen and Batchelder are responsible for the

4  initial discovery failure because they handled or supervised Qualcomm's

5  discovery responses and production of documents.    The Federal Rules

6  impose an affirmative duty upon lawyers to engage in discovery in a

7  responsible manner and to conduct a "reasonable inquiry" to determine

8  whether discovery responses are sufficient and proper.  Fed. R. Civ. P.

9  26(g); Fed. R. Civ. P. 26 Advisory Committee Notes (1983 Amendment).

10 In the instant case, a reasonable inquiry should have included searches

11 using fundamental terms such as JVT, avc_ce or H.264, on the computers

12 belonging to knowledgeable people such as Raveendran, Irvine and Ludwin.

13 As the post-trial investigation confirmed, such a reasonable search

14 would have revealed the suppressed documents.    Had Leung, Mammen,

15 Batchelder, or any of the other attorneys insisted on reviewing

16 Qualcomm's records regarding the locations searched and terms utilized,

17 they would have discovered the inadequacy of the search and the

18 suppressed documents.[10]  Similarly, Leung's difficulties with the Rule

19

20      [10]    Leung's attorney represented during the OSC hearing that Leung requested
   a more thorough document search but that Qualcomm refused to do so.  October 12, 2007
21 Hearing Transcript at 14-15.  If Leung was unable to get Qualcomm to conduct the type
   of search he deemed necessary to verify the adequacy of the document search and
22 production, then he should have obtained the assistance of supervising or senior
   attorneys.  If Mammen and Batchelder were unable to get Qualcomm to conduct a competent
23 and thorough document search, they should have withdrawn from the case or taken other
   action to ensure production of the evidence.  See The State Bar of California, Rules
24 of Professional Conduct, Rule 5-220 (a lawyer shall not suppress evidence that the
   lawyer or the lawyer's client has a legal obligation to reveal); Rule 3-700 (a lawyer
25 shall withdraw from employment if the lawyer knows or should know that continued
   employment will result in a violation of these rules or the client insists that the
26 lawyer pursue a course of conduct prohibited under these rules).  Attorneys' ethical
   obligations do not permit them to participate in an inadequate document search and then
27 provide misleading and incomplete information to their opponents and false arguments
   to the court.  Id.; Rule 5-200 (a lawyer shall not seek to mislead the judge or jury
28 by a false statement of fact or law); see also, In re Marriage of Gong and Kwong, 157

-27-                                      05cv1958-B (BLM)

1  30(b)(6) witnesses, Irvine and Ludwin, should have alerted·him (and the
2  supervising or senior attorneys) to the inadequacy of Qualcomm's
3  document production and to the fact that they needed to review whose
4  computers and databases had been .searched and for what.    Accordingly,
5  the Court finds that the totality of the circumstances establish that
6  Leung, Mammen and Batchelder did not make a reasonable inquiry into
-7  Qualcomm's discovery search and production and their conduct contributed
8  to the discovery violation.

9      Attorneys Bier, Mammen and Patch are responsible for the discovery
10 violation because they also did not perform a reasonable inquiry to
11 determine whether Qualcomm had complied with its discovery obligations.
12 When Bier reviewed the August 6, 2002 email welcoming Raveendran to the
13 avc_ce email group, he knew or should have known that it contradicted
14 Qualcomm's trial arguments and he had an obligation to verify that it
15 had been produced in discovery or to immediately produce it.    If Bier,
16 as a junior lawyer, lacked the experience to recognize the significance
17 of the document, then a more senior or knowledgeable attorney should
18 have assisted him.    To the extent that Patch was supervising Bier in
19 this endeavor, Patch certainly knew or should have recognized the
20 importance of the document from his involvement in Qualcomm's motion
21 practice and trial strategy sessions.

22     Similarly, when Bier found the 21 emails on Raveendran's computer
23 that had not been produced in discovery, he took the appropriate action
24 and informed his supervisors, Mammen and Patch.    Bier Decl. at 7.    Patch
25 discussed the discovery and production issue with Young and Batchelder.

26

27 Cal. App. 4th 939, 951 (1st Dist. 2007) ("[a]n attorney in a civil case is not a hired
   gun required to carry out every direction given by the client;" he must act like the
28 professional he is).

1  Patch Decl. at 6-7. While all of these attorneys assert that there was
2  a plausible argument that Broadcom did not request these documents, only
3  Bier and Mammen actually read the emails.    Patch Decl. at 6-7;
4  Batchelder Decl. at 16.    Moreover, all of the attorneys missed the
5  critical inquiry:  was Qualcomm's document search adequate? If these 21
6  emails were not discovered during Qualcomm's document search, how many
7  more might exist?   The answer, obviously, was tens of thousands.    If
8  Bier, Mammen, Patch, Young or Batchelder had conducted a reasonable
9  inquiry after the discovery of the 21 Raveendran emails, they would have
10  discovered the inadequacy of Qualcomm's search and the suppressed
11  documents.   And, these experienced attorneys should have realized that
12  the presence on Raveendran's computer of 21 JVT/avc_ce emails from 2002
13  contradicted Qualcomm's numerous arguments that it had not participated
14  in the JVT during that same time period.   This fact, alone, should have
15  prompted the attorneys to immediately produce the emails and to conduct
16  a comprehensive document search.

17      Finally, attorneys Young, Patch, and Batchelder bear responsibility
18  for the discovery failure because they did not conduct a reasonable
19  inquiry into Qualcomm's discovery production before making specific
20  factual and legal arguments to the court.  Young decided that Qualcomm
21  should file a motion for summary adjudication premised on the fact that
22  Qualcomm had not participated in the JVT until after the H.264 standard
23  was adopted in May 2003.  Given that non-participation was vital to the
24  motion, Young had a duty to conduct a reasonable inquiry into whether
25  that fact was true.  And, again, had Young conducted such a search, he
26  would have discovered the inadequacy of Qualcomm's document search and
27  production and learned that his argument was false.  Similarly, Young
28  had a duty to conduct a reasonable inquiry into the accuracy of his

1  statement before affirmatively telling the court that no emails were
2  sent to Raveendran from the avc_ce email group.[11]  Young also did not
3  conduct a reasonable (or any) inquiry during the following days before
4  he approved the factually incorrect JMOL.[12]  A reasonable investigation
5  would have prevented the false filing.

6      Patch was an integral part of the trial team–familiar with
7  Qualcomm's arguments, theories and strategies.  He knew on January 14th
8  that 21 avc_ce emails had been discovered on Raveendran's computer.
9  Without reading or reviewing the emails, Patch participated in the
10  decision not to produce them.  Several days later, Patch carefully
11  tailored his questions to ensure that Raveendran did not testify about
12  the unproduced emails.  And, after Broadcom stumbled into the email
13  testimony, Patch affirmatively misled the Court by claiming that he did
14  not know whether the emails were responsive to Broadcom's discovery
15  requests.  This conduct is unacceptable and, considering the totality
16  of the circumstances, it is unrealistic to think that Patch did not know
17  or believe that Qualcomm's document search was inadequate and that
18  Qualcomm possessed numerous, similar and unproduced documents.

19
20  _____
21      [11]    Patch claims that he told Young about the 21 Raveendran emails, but Young
        denies it.  Under either scenario, however, Young had a duty to conduct a reasonable
22      investigation before making that affirmative statement to the court.  Sadly, Young did
        not conduct any investigation; he merely assumed that others had conducted an adequate
23      investigation.

24      [12]    While the Court recognizes that the Day Casebeer attorneys were primarily
        responsible for discovery in this case, the Heller Ehrman attorneys took on the task
25      of preparing witnesses and briefing regarding the JVT and, thus, were in a position to
        evaluate during this process whether the underlying discovery upon which they relied
26      was adequate.  Young, unlike Venkatesan and Robertson, was the primary liaison with Day
        Casebeer and also was privy to the evolving theories of the case.  As such, he was made
27      aware of some of the red flags such as the discovery of the JVT emails on Raveendran's
        computer and was in the best position both to understand their significance and to
28      communicate any concerns to the Day Casebeer attorneys or Qualcomm in-house counsel.

1    Batchelder also is responsible because he was the lead trial
2  attorney and, as such, he was most familiar.with Qualcomm's important
3  arguments and witnesses.    Batchelder stated in his opening statement
4  that Qualcomm had not participated in the JVT before late 2003.    Despite
5  this statement and his complete knowledge of Qualcomm's legal theories,
6  Batchelder did not take any action when he was informed that JVT
7  documents that Qualcomm had not produced in discovery were found on
8  Raveendran's computer.    He did not read the emails, ask about their
9  substance, nor inquire as to why they were not located during discovery.
10  And, he stood mute when four days later, Young falsely stated that no
11  emails had been sent to Raveendran from the avc_ce email group.
12  Finally, all of the pleadings containing the lie that Qualcomm had not
13  participated in the JVT in 2002 or early 2003 were sent to Batchelder
14  for review and he approved or ignored all of them. [13]    The totality of
15  the circumstances, including all of the previously-discussed warning
16  signs, demanded that Batchelder conduct an investigation to verify the
17  adequacy of Qualcomm's document search and production.    His failure to
18  do so enabled Qualcomm to withhold the documents.

19    For all of these reasons, the Court finds that these attorneys did
20  not conduct a reasonable inquiry into the adequacy of Qualcomm's
21  document search and production and, accordingly, they are responsible,
22  along with Qualcomm, for the monumental discovery violation.

23  ///

24  ///

25

26
27    [13]    Several declarations state or imply that senior lawyers failed to review
or comment on pleadings prepared by junior lawyers and sent to them prior to filing.
If this is true, it constitutes additional evidence that the senior lawyers turned a
28  blind eye to Qualcomm's discovery failures.

-31-                                          05cv1958-B (BLM)

1          b.    **Identity of Non-Sanctioned Attorneys**

2          Based upon the Court's review of the submitted declarations (see

3     Exhibit A), the Court finds that the following attorneys do not bear any

4     individual responsibility for the discovery violation and, on that

5     basis, declines to sanction them:  Ruchika Agrawal, Howard Loo, William

6     Nelson, Ryan Scher, Bradley Waugh, David Kleinfeld, Barry Tucker, Heidi

7     Gutierrez, Victoria Smith, Roy Zemlicka, Craig Casebeer, Jaideep

8     Venkatesan, and Kyle Robertson.

9          The Court declines to sanction attorneys Agrawal, Loo, Nelson,

10    Scher, Waugh and Guiterrez because they did not significantly

11    participate in the preparation or prosecution of the instant case or

12    primarily participated in aspects of the case unrelated to those at

13    issue in this Order and Judge Brewster's Waiver Order and Exceptional

14    Case Order.  See Exhibit A.

15         The Court also declines to sanction Heller Ehrman attorneys

16    Kleinfeld and Tucker.  These attorneys primarily monitored the instant

17    case for its impact on separate Qualcomm/Broadcom litigation.  However,

18    for logistical reasons, both attorneys signed as local counsel pleadings

19    that contained false statements relating to Qulacomm's non-participation

20    in the JVT.  Given the facts of this case as set forth above and in the

21    declarations, the limitations provided by the referral, and the totality

22    of the circumstances, the Court finds that it was reasonable for these

23    attorneys to sign the pleadings, relying on the work of other attorneys

24    more actively involved in the litigation.[14]

25

26         [14]    The Court is declining to sanction these attorneys for their role in
      signing and filing false pleadings, but the Court notes that sanctioning local counsel
27    for such conduct is possible and may be imposed in another case under different
      circumstances.  Attorneys must remember that they are required to conduct a reasonable
28    inquiry into the accuracy of the pleadings prior to signing, filing or arguing them.

-32-                                    05cv1958-B (BLM)

1    While a closer call, the Court also declines to sanction Day
2  Casebeer attorneys Casebeer, Smith and Zemlicka.  Unlike the Sanctioned
3  Attorneys, Casebeer did not begin working on this case until after
4  discovery had closed and he did not learn about the Raveendran emails
5  until after she testified at trial.  Thus, he would not have been privy
6  to any of the red flags, which should have alerted the Sanctioned
7  Attorneys to the fact that significant discovery gaps existed and
8  further investigation was necessary.

9    Smith and Zemlicka prepared and signed pleadings containing false
10  statements about Qualcomm's non-participation in the JVT.  While they
11  did more substantive work on the false motions than Kleinfeld and
12  Tucker, all four relied on work conducted by other lawyers who were more
13  involved in the discovery and litigation.  In addition, Smith and
14  Zemlicka worked under the direction of Casebeer who told them to rely
15  on and conform the motion to the discussion of facts set forth in
16  Qualcomm's MSA.[15]  Although the Court questions the reasonableness of
17  the attorneys' decision to rely on the MSA without conducting any
18  independent investigation under the facts of this case, the Court
19  concludes that the totality of the circumstances do not justify
20

21
22  Fed. R. Civ. P. 11.  While it may be reasonable for attorneys to rely on the work
   conducted by other attorneys (Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1364
23  (9th Cir. 1990)(en banc)(describing various applications of the "reasonableness"
   inquiry)), that determination is dependent on the circumstances of each case.

24    [15]    The Court notes that Casebeer stated that "[i]t was not then, or now, my
   practice to independently confirm factual representations that had previously been made
25  to a court by colleagues working on a case, where I had no reason to question the
   accuracy of such representations."  Casebeer Decl. at 5.  It is the last phrase that
26  the Court considers critical.  As discussed in previous sections, the fault that the
   Court finds throughout this case was the failure of Qualcomm and many of its attorneys
27  to realize (or take appropriate action based upon the realization) that there was a
   reason (actually several reasons) to question the accuracy of the representations and
28  the adequacy of the discovery search and production.

1   sanctioning Zemlicka or Smith.  This conclusion is bolstered by the fact

2   that the pleadings were reviewed and approved by attorneys with more

3   litigation experience and more familiarity with this case.

4        For  similar  reasons,  the  Court  finds  it  inappropriate  to

5   individually sanction Heller Ehrman attorneys Kyle Robertson and Jaideep

6   Venkatesan.  These attorneys, working for Stanley Young, began work on

7   JVT-related issues in August 2006.  Robertson, under the supervision of

8   Venkatesan, made significant efforts to confirm the accuracy of the

9   facts upon which he relied in drafting various pleadings, including:

10  (1) reviewing numerous deposition transcripts and discovery responses,

11  (2) circulating drafts of all pleadings he prepared to more senior

12  outside and inside counsel with the expectation that they would inform

13  him of any factual inaccuracies, and (3) upon learning from Broadcom's

14  opposition to the MSA of the December 2002 report listing Raveendran's

15  email address, searching the JVT website for information about the Ad-

16  Hoc Group email list, contacting numerous Day Casebeer and Heller Ehrman

17  attorneys for more information, and finally calling Raveendran at home.

18  The Court again finds it troubling that these attorneys failed to

19  investigate the adequacy of Qualcomm's document search and production

20  before  filing  the  pleadings  but,  given  the  totality  of  the

21  circumstances, the Court declines to sanction Robertson and Venkatesan.

22       **3.   Imposed Sanctions**

23       As set forth above, the evidence establishes that Qualcomm

24  intentionally withheld tens of thousands of emails and that the

25  Sanctioned Attorneys assisted, either intentionally or by virtue of

26  acting with reckless disregard for their discovery obligations, in this

27  discovery violation.   The remaining issue, then, is what are the

28  appropriate sanctions.

1              a.    Monetary Sanctions Against Qualcomm

2         In its sanction motion, Broadcom requested that this Court order

3    Qualcomm to (1) reimburse Broadcom for its attorneys' and experts' fees

4    incurred in litigating this case, to the extent not already awarded

5    pursuant to the Exceptional Case Order, (2) pay a substantial fine to

6    the Court, (3) implement a discovery compliance program to prevent

7    Qualcomm's future litigation misconduct, and (4) identify all false

8    statements and arguments.    Doc. No. 540 at 2, 14.    Broadcom also

9    requested an opportunity to conduct additional discovery regarding

10   Qualcomm's discovery violations.    Id.    Because Broadcom prevailed at

11   trial and in post-trial hearings, despite the suppressed evidence, and

12   because the case is on appeal, oversight sanctions such as monitoring

13   Qualcomm's discovery efforts, or identifying false testimony and

14   arguments are not appropriate.       Monetary sanctions, however, are

15   appropriate.

16        The suppressed emails directly rebutted Qualcomm's argument that

17   it had not participated in the JVT during the time the H.264 standard

18   was being developed.  As such, their absence was critical to Qualcomm's

19   hope and intent of enforcing its patents against Broadcom (as well as

20   presumably all other cellular companies utilizing the H.264 technology

21   in their products).    Because Broadcom prevailed at trial and in the

22   post-trial hearings despite the suppressed evidence, it is reasonable

23   to infer that had Qualcomm intended to produce the 46,000 incriminating

24   emails (and thereby acknowledge its early involvement in the JVT and its

25   accompanying need to disclose its intellectual property), the instant

26

27

28

-35-

1    case may never have been filed.[16]  Even if Qualcomm did file this case,

2    the hidden evidence would have dramatically undermined Qualcomm's

3    arguments and likely resulted in an adverse pretrial adjudication, much

4    as it caused the adverse post-trial rulings.    See Waiver Order;

5    Exceptional Case Order.  Accordingly, Qualcomm's failure to produce the

6    massive number of critical documents at issue in this case significantly

7    increased the scope, complexity and length of the litigation and

8    justifies a significant monetary award.  See, Fed. R. Civ. P. 26(g)(3)

9    & 37(c).

10    The Court therefore awards Broadcom all of its attorneys' fees and

11    costs incurred in the instant litigation.  Because Judge Brewster

12    already has awarded these costs and fees to Broadcom in the Exceptional

13    Case Order and a double recovery would be improper, this Court directs

14    that Qualcomm receive credit toward this penalty for any money it pays

15    to Broadcom to satisfy the exceptional case award.  Accordingly, for its

16    monumental and intentional discovery violation, Qualcomm is ordered to

17    pay $8,568,633.24 to Broadcom; this figure will be reduced by the amount

18    actually paid by Qualcomm to Broadcom to satisfy the exceptional case

19    award.[17]

20    ///

21    ///

22

23

24    [16]    Qualcomm argues that while it was aware of the H.264 standard and its
      application to the instant litigation, it was not aware of the issue that if it had
25    participated in the JVT's development of the H.264 standard, it could not have enforced
      its H.264 patents until Broadcom raised this issue as an affirmative defense.  Mammen
26    Decl. at 11-12.  This argument strains credulity as the potential defense screams for
      consideration prior to filing this suit.

27    [17]    Because the attorneys' fees sanction is so large, the Court declines to
      fine Qualcomm.  If the imposition of an $8.5 million dollar sanction does not change
28    Qualcomm's conduct, the Court doubts that an additional fine would do so.

                  **b.    Referral to the California State Bar**

As set forth above, the Sanctioned Attorneys assisted Qualcomm in committing this incredible discovery violation by intentionally hiding or recklessly ignoring relevant documents, ignoring or rejecting numerous warning signs that Qualcomm's document search was inadequate, and blindly accepting Qualcomm's unsupported assurances that its document search was adequate. The Sanctioned Attorneys then used the lack of evidence to repeatedly and forcefully make false statements and arguments to the court and jury. As such, the Sanctioned Attorneys violated their discovery obligations and also may have violated their ethical duties. See e.g., The State Bar of California, Rules of Professional Conduct, Rule 5-200 (a lawyer shall not seek to mislead the judge or jury by a false statement of fact or law), Rule 5-220 (a lawyer shall not suppress evidence that the lawyer or the lawyer's client has a legal obligation to reveal or to produce). To address the potential ethical violations, the Court refers the Sanctioned Attorneys to The State Bar of California for an appropriate investigation and possible imposition of sanctions.[18] Within ten days of the date of this Order, each of the Sanctioned Attorneys must forward a copy of this Order and Judge Brewster's Waiver Order to the Intake Unit, The State Bar of California, 1149 South Hill Street, Los Angeles, California 90015 for

---

[18] Monetary sanctions would be appropriate to address the discovery violations. However, the Court declines to impose monetary sanctions against the Sanctioned Attorneys for several reasons. First, if the imposed sanctions do not convince the attorneys to behave in a more ethical and professional manner in the future, monetary sanctions are unlikely to do so. Second, it is possible that Qualcomm will seek contribution from its retained attorneys after it pays Broadcom's attorneys' fees and costs and, in light of that significant monetary sanction, an additional fine is unlikely to affect counsel's future behavior. Third, the Court acknowledges the limitations on its authority (see sections A and B and footnotes 5 and 9) and, based on those concerns, declines to impose significant monetary sanctions.

1 | appropriate *investigation.*

2 |        c.   <u>Case Review and Enforcement of Discovery Obligations</u>

3 |        The Court also orders Qualcomm and the Sanctioned Attorneys to

4 | participate in a comprehensive Case Review and Enforcement of Discovery

5 | Obligations ("CREDO") program.   This is a collaborative process to

6 | identify the failures in the case management and discovery protocol

7 | utilized by Qualcomm and its in-house and retained attorneys in this

8 | case, to craft alternates that will prevent such failures in the

9 | future, to evaluate and test the alternatives, and ultimately, to create

10 | a case management protocol which will serve as a model for the future.

11 |        Because they reviewed and approved the false pleadings, the Court

12 | designates the following Qualcomm attorneys to participate in this

13 | process as Qualcomm's representatives:   Alex Rogers, Roger Martin,

14 | William Sailer, Byron Yafuso, and Michael Hartogs (the "Named Qualcomm

15 | Attorneys").[19]   Qualcomm employees were integral participants in hiding

16 | documents and making false statements to the court and jury.   Qualcomm's

17 | in-house lawyers were in the unique position of (a) having unlimited

18 | access to all Qualcomm employees, as well as the emails and documents

19 | maintained, possessed and used by them, (b) knowing or being able to

20 | determine all of the computers and databases that were searched and the

21 | search terms that were utilized, and (c) having the ability to review

22 | all of the pleadings filed on Qualcomm's behalf which did (or should

23 | have) alerted them to the fact that either the document search was

24 |

25 | _____

26 |        [19]      Qualcomm chose not to provide any information to the Court regarding the
actions of Qualcomm's counsel or employees so the Court must rely on the retained
attorneys' statements that these attorneys were involved in the case.   Robertson Decl.

27 | at 13, 22; Venkatesan Decl. at 14; Young Decl. at 18, 21, 35.   Qualcomm's General
Counsel at the time, Lou Lupin, is not included in this list since he has resigned from

28 | the company.   October 12, 2007 Hearing Transcript at 108, 198.

-38-                                                         05cv1958-B (BLM)

1   inadequate or they were knowingly not producing tens of thousands of
2   relevant and requested documents.   Accordingly, Qualcomm's in-house
3   lawyers need to be involved in this process.

4        At a minimum, the CREDO protocol must include a **detailed analysis**
5   (1) identifying the factors [20] that contributed to the discovery
6   violation (e.g., insufficient communication (including between client
7   and retained counsel, among retained lawyers and law firms, and between
8   junior lawyers conducting discovery and senior lawyers asserting legal
9   arguments); inadequate case management (within Qualcomm, between
10  Qualcomm and the retained lawyers, and by the retained lawyers);
11  inadequate discovery plans (within Qualcomm and between Qualcomm and its
12  retained attorneys); etc.), (2) creating and evaluating proposals,
13  procedures, and processes that will correct the deficiencies identified
14  in subsection (1), (3) developing and finalizing a comprehensive
15  protocol that will prevent future discovery violations (e.g.,
16  determining the depth and breadth of case management and discovery plans
17  that should be adopted; identifying by experience or authority the
18  attorney from the retained counsel's office who should interface with
19  the corporate counsel and on which issues; describing the frequency the
20  attorneys should meet and whether other individuals should participate
21  in the communications; identifying who should participate in the
22  development of the case management and discovery plans; describing and
23  evaluating various methods of resolving conflicts and disputes between
24  the client and retained counsel, especially relating to the adequacy of

25

26

27        [20]    In the CREDO program, the Court does not seek the identities of individuals
    who contributed to the discovery failure, nor the content of communications between or
    among counsel and client so this program does not implicate the attorney-client
28  privilege.

1  discovery searches; describing the type, nature, frequency, and
2  participants in case management and discovery meetings; and, suggesting
3  required ethical and discovery training; etc.), (4) applying the
4  protocol that was developed in subsection (3) to other factual
5  situations, such as when the client does not have corporate counsel,
6  when the client has a single in-house lawyer, when the client has a
7  large legal staff, and when there are two law firms representing one
8  client, (5) identifying and evaluating data tracking systems, software,
9  or procedures that corporations could implement to better enable inside
10 and outside counsel to identify potential sources of discoverable
11 documents (e.g. the correct databases, archives, etc.), and (6) any
12 other information or suggestions that will help prevent discovery
13 violations.

14     To facilitate development of the CREDO program, the Sanctioned
15 Attorneys and Named Qualcomm Attorneys are required to meet[21] at 9:00
16 a.m. on Tuesday, January 29, 2008, in the chambers of the Honorable
17 Barbara L. Major, United States Magistrate Judge, 940 Front Street,
18 Suite 5140, San Diego, California, 92101.  The Court will participate
19 only to the extent necessary to ensure that the participants are
20 complying with the instructions in this Order.  The Court will provide
21 whatever time is necessary for the participants to fully and completely
22 examine, analyze and complete the CREDO protocol.  At the conclusion of
23 the process, the participating attorneys will submit their proposed
24 protocol to the Court.  The Court will review the proposed protocol and,

25

26
_____
27     [21]    While not required to do so, a Broadcom attorney may participate in the
   process.  If Broadcom decides to participate, Qualcomm and the Sanctioned Attorneys
   must pay the Broadcom attorney's reasonable costs and fees incurred in traveling to and
28 participating in this program.

1   if sufficient, order it filed.    The Court will notify the Sanctioned

2   Attorneys and Named Qualcomm Attorneys if the proposed protocol is

3   insufficient so further revisions can be implemented.    When completed

4   protocol is submitted, the Sanctioned Attorneys and Named Qualcomm

5   Attorneys shall each file a declaration under penalty of perjury

6   affirming that they personally participated in the entire process that

7   led to the CREDO protocol and specifying the amount of time they spent

8   working on it.

9       While no one can undo the misconduct in this case, this process,

10  hopefully, will establish a baseline for other cases.    Perhaps it also

11  will establish a turning point in what the Court perceives as a decline

12  in and deterioration of civility, professionalism and ethical conduct

13  in the litigation arena.    To the extent it does so, everyone benefits –

14  Broadcom, Qualcomm, and all attorneys who engage in, and judges who

15  preside over, complex litigation.    If nothing else, it will provide a

16  road map to assist counsel and corporate clients in complying with their

17  ethical and discovery obligations and conducting the requisite

18  "reasonable inquiry."

19                              **CONCLUSION**

20      For the reasons set forth above, the Court **GRANTS IN PART** and

21  **DENIES IN PART** Broadcom's sanction motion and **ORDERS** Qualcomm to pay

22  Broadcom $8,568,633.24.    · Qualcomm will receive credit toward this

23  sanction for any amount it pays to Broadcom to satisfy the Exceptional

24  Case sanction.    The Court also **REFERS to The State Bar of California** for

25  an investigation of possible ethical violations attorneys James R.

26  Batchelder, Adam A. Bier, Kevin K. Leung, Christian E. Mammen, Lee Patch

27  and Stanley Young.    The Court **ORDERS** these six attorneys and Qualcomm

28  in-house attorneys Alex Rogers, Roger Martin, William Sailer, Byron

1 | Yafuso, and Michael Hartogs to appear 9:00 a.m. on Tuesday, January 29,

2 | 2008, in the chambers of the Honorable Barbara L. Major, United States

3 | Magistrate Judge, 940 Front Street, Suite 5140, San Diego, California,

4 | 92101 to develop the comprehensive Case Review and Enforcement of

5 | Discovery Obligations protocol in accordance with this Order.

6 |     **IT IS SO ORDERED.**

7 | DATED:   January 7, 2008

8 |

9 |                     BARBARA L. MAJOR
                    United States Magistrate Judge

10 |

11 |

12 |

13 | COPY TO:

14 | HONORABLE RUDI M. BREWSTER
U.S. DISTRICT JUDGE

15 | ALL COUNSEL

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1                          **Exhibit A**[22]

2  **Day Casebeer Madrid & Batchelder**

3

**James R. Batchelder**-Partner and founding member of Day Casebeer, B.A.
4 from Franklin & Marshall College, J.D. from University of California,
Los Angeles, School of Law. Qualcomm's lead attorney throughout this
5 case. Delivered Qualcomm's opening and closing arguments and refined
Qualcomm's trial strategies and theories. Delegated case preparation and
6 trial issues to other attorneys or teams of attorneys but was available
for consultation on discovery and all trial issues. Was told on January
7 14, 2007 that JVT documents that Qualcomm had not produced in discovery
were located on Raveendran's computer, but he did not review them and
8 directed other attorneys to handle the issue. Present for the January
18, 2007 sidebar during which Young stated that there was no evidence
9 that any emails were sent to the viji@qualcomm.com address and he did
not correct the statement nor mention the 21 Raveendran emails. Present
10 for the January 24, 2007 sidebar after Raveendran's testimony during
which Patch implied that the 21 emails had not been reviewed.
11 Participated in drafting several pleadings that ultimately were
determined to contain false statements and arguments, including
12 Qualcomm's Post-Trial Brief Concerning Waiver and Inequitable Conduct.
Doc. No. 678.

13

14 **Lee Patch**-Partner, B.S. from Carnegie Mellon University, J.D. from
Duquesne University School of Law. Defended Raveendran's deposition.
15 Responsible for defending Qualcomm against Broadcom's inequitable
conduct allegations. Supervised Bier in the trial preparation of Viji
16 Raveendran and conducted the direct examination of Raveendran. Learned
about the 21 Raveendran emails on January 14, 2007, told Batchelder and
17 Young about the email discovery, and did not review the emails but
participated in the decision not to produce them. Did not ask
18 Raveendran about the 21 emails discovered on her laptop or whether she
had received any avc_ce emails; asked her whether she had *read* any
19 avc_ce emails. In the sidebar immediately after Raveendran admitted she
received avc_ce emails, Patch stated that he had not seen the emails and
20 did not know whether they were responsive to Broadcom's discovery
requests; he did not tell the court that Qualcomm already had reviewed
21 the emails and decided not to produce them to Broadcom. Participated
in drafting and arguing pleadings that contained false and misleading
22 statements regarding Qualcomm's non-participation in the JVT. Doc. No.
676.

23

24

25

26 _____

      [22]     All of the information in this exhibit was obtained from the attorneys'
27 declarations.

28

**Christian E. Mammen**-Senior Associate during trial and currently a Partner, B.A. from Trinity University, J.D. from Cornell Law School, D. Phil. in law from Oxford University. Drafted the complaint, handled day-to-day discovery activities, and supervised Leung in additional discovery matters. Prepared memoranda regarding document retention, collection and production. Reviewed the 21 Raveendran emails on January 14, 2007 and made the decision not to produce them. Helped prepare, reviewed, and signed some of the pleadings which contained false statements. Participated in the post-trial correspondence and resistance to Broadcom's requested additional document searches. Doc. No. 682.

**Kevin Leung**-Associate, B.A. from University of California at Berkeley, J.D. from University of California at Los Angeles. Had primary responsibility for discovery duties, including drafting and signing written discovery responses; supervised by Mammen. Prepared and defended Christine Irvine's personal and Rule 30(b)(6) depositions. Supervised by Mammen and Batchelder in this regard. Discovered shortly before Irvine's deposition 400,000 pages of publicly available JVT documents that a Qualcomm employee had downloaded to Qualcomm's computer system but Broadcom refused to continue the deposition. Irvine testified that Qualcomm had never been involved in the JVT but subsequent review of the publicly available JVT documents established that Qualcomm was involved in the JVT in late 2003. The subsequent review also revealed December 2002 and March 2003 reports of an *ad hoc* group concerning coding efficiency analysis and testing of H.264 that listed Raveendran's email address. Based upon at least Irvine's false statement, Leung agreed to Broadcom's request for a new Rule 30(b)(6) witness on Qualcomm's involvement in the JVT. Scott Ludwin was the replacement Rule 30(b)(6) witness and Leung defended his deposition. Ludwin testified that Qualcomm had not participated in the JVT prior to late 2003. After Ludwin's deposition, Leung worked with Qualcomm and produced additional documents concerning Qualcomm's involvement in the JVT in and after December 2003. Leung explains that the earlier document were not discovered because the mid-2006 search involved computers belonging to the Multimedia Development and Standardization Group, not the Digital Cinema Group. Doc. No. 680.

**Adam Bier**-Junior associate, undergraduate degree from University of California, Berkeley, J.D. from the New York University School of Law. Bier did not participate in pre-trial document collection. During trial, he was responsible for the twice-daily disclosures of evidence to be used and witnesses to be called at trial. Patch also asked him to assist in preparing Raveendran to testify at trial. In that regard, he met with Raveendran on several days in January 2007. On or about January 7, 2007, Bier became aware of an August 6, 2002 email received by Raveendran welcoming her to the avc_ce email group. Bier does not recall what, if anything, he did after learning about this document. On January 14, 2007, Bier and Raveendran searched her computer using the search term "avc_ce" and discovered 21 separate emails that had not been produced to Broadcom. Bier brought those emails to the attention of Mammen and Patch. The three attorneys decided not to produce the emails to Broadcom. After Raveendran testified on January 24, 2007, Bier

1  helped produce to Broadcom the 21 emails found on Raveendran's computer.
The August 6, 2002 email was not included in this document production.
2  After trial, Bier, under the supervision of Batchelder, Patch and
Mammen, corresponded with Broadcom's counsel, arguing that the 21
3  Raveendran emails were not covered by any Broadcom discovery request and
resisting Broadcom's attempts to force Qualcomm to conduct additional
4  searches for JVT documents.  In March 2007, Bier advised Broadcom that
Qualcomm would conduct limited additional document searches.  Doc. No.
5  686.

6

**Craig Casebeer**–Partner and founding member of Day Casebeer, B.A. from
7  Stanford University, J.D. from University of California at Berkeley,
Boalt Hall.  Joined this litigation shortly before trial and provided
8  assistance and trouble-shooting experience to Batchelder and the rest
of Qualcomm's trial team.  Supervised the preparation of motions in
9  limine.  Directed Zemlicka to use Qualcomm's MSA to draft the motion in
limine to exclude evidence relating to Qualcomm's participation in the
10  JVT.  Conducted the trial testimony of two witnesses who were not
mentioned in Judge Brewster's Waiver Order.  Present for the January 18,
11  2007 sidebar during which Young stated that there was no evidence of
emails being sent to the group, including Raveendran.  Supervised Smith
12  in the drafting, editing and finalizing of the JMOL, although the waiver
portion was prepared by the Heller Ehrman lawyers.  Participated in the
13  decision to produce the 21 emails after Raveendran's testimony.
Authored the letter to Judge Brewster submitting the Amended JMOL, which
14  corrected the statements determined to be false based upon the
Raveendran emails. Participated in drafting Qualcomm's Post-Trial Brief
15  Concerning Waiver and Inequitable Conduct, which contained statements
later determined to be false and misleading.  Doc. No. 679.

16

17  **Victoria Q. Smith**–Junior associate, B.S. from University of Tulsa, J.D.
from University of Michigan.  Assisted in the preparation of expert
18  witnesses and other technical witnesses. Helped prepare and signed both
of Qualcomm's Motions for Judgment as a Matter of Law.  Smith did not
19  draft the portion of the JMOL that concerned waiver.  Doc. No. 691.

20

**Roy V. Zemlicka**–Junior associate, bachelor's degree from University of
21  California at Santa Cruz, J.D. from Santa Clara University.  Performed
discrete tasks to assist senior lawyers in pre-trial litigation.  Signed
22  two pleadings relating to Qualcomm's Motion in Limine to Exclude
Evidence relating to Qualcomm's participation in the JVT.  Also helped
23  prepare the motion, although the majority of his work was on an issue
that was subsequently moved to another motion in limine and then
24  resolved prior to court argument.  Inserted language from Qualcomm's MSA
into the Motion in Limine and this language subsequently was determined
25  to be false and misleading.  Zemlicka did not perform any independent
factual investigation; he relied on prior Qualcomm pleadings.  Doc. No.
26  694.

27

28

**Ruchika Agrawal**–First year associate, Bachelor's degree from Rutgers University, Master's degree from Stanford University, J.D. from University of Virginia Law School. Attended two chamber's conferences regarding jury instructions. Assisted with discrete tasks during trial, including assisting in the mock cross-examination of Raveendran. Was present in court during Raveendran's testimony and sat with her during break in testimony but did not discuss her testimony or the 21 emails. Doc. No. 677.

**William P. Nelson**–Associate, J.D. from University of California, Boalt Hall. Had minimal involvement in the instant litigation and none related to Qualcomm's participation in the JVT. Signed Qualcomm's opposition to Broadcom's motion for leave to file an amended answer and counterclaims and argued the motion in court. Doc. No. 689.

**Howard T. Loo**–Associate, B.A. from Stanford University, J.D. University of California at Berkeley's Boalt Hall. Only billed 11.8 hours to this case but signed a pleading unrelated to the JVT or H.264 standard. Doc. No. 687.

**Ryan L. Scher**–First year associate, J.D. from Tulane University. Attended two chamber's conferences regarding jury instructions. Also performed discrete tasks related to trial for more senior lawyers. Doc. No. 690.

**Bradley A. Waugh**–Associate, B.S. from Georgia Institute of Technology, M.S. from Rice University, J.D. from Stanford University. Heavily involved in instant case but vast majority of work related to claim construction, infringement and some invalidity. Waugh also provided technical assistance to lawyers responsible for the JVT issues. Signed several pleadings unrelated to the issues addressed in Judge Brewster's order. Doc. No. 693.

**Heller Ehrman LLP**

**Stanley Young**–Firm shareholder, A.B., A.M. from Stanford University, J.D. from Harvard Law School. Became involved with this case in early 2006. Initially only responsible for damages issues. Understood that Day Casebeer was responsible for written discovery and document production. In August 2006, Young agreed to Batchelder's request to have Heller Ehrman assume responsibility for handling JVT issues. Decided to file the MSA arguing that Qualcomm had not participated in the JVT at any time before the H.264 standard was established. Supervised Venkatesan and Robertson in the preparation of expert reports and pleadings relating to JVT issues, including the MSA and reply. Argued the MSA to Judge Brewster on December 5, 2006. Agreed to present the JVT witnesses at trial, although they ultimately were not used at trial. Argued at sidebar on January 18, 2007 to exclude the December

1   2002 email reflector list containing Raveendran's email address and
affirmatively stated that there was no evidence that any emails had been
2   sent to Raveendran's email address. Although Young denies knowing about
the 21 Raveendran emails, his statement occurred four days after Patch
3   claims he notified Young of the discovery. . Directed Day Casebeer and
Heller Ehrman lawyers to prepare an Amended JMOL to correct the false
4   statements regarding Qualcomm's non-participation that had been included
in the original JMOL filed on January 24, 2007. *Doc. No. 699-4.*

5

6   **Jaideep Venkatesan**–Associate, *J.D.* from University of California at Los
Angeles. At Young's direction, worked on the damages aspect of this
7   case and later on responding to the expert report relating to JVT
issues. Venkatesan and Young discussed the JVT discovery and issues
8   with Patch and other Day Casebeer lawyers. Supervised Robertson in
preparing Dr. Richardson's expert declaration. Transmitted the draft
9   declaration to Day Casebeer lawyers Patch, Leung and Waugh and Qualcomm
in-house lawyers Alex Rogers and Roger Martin for review. Worked with
10  Robertson to prepare Qualcomm's MSA and the related reply. The Reply,
which addressed the December 2002 email reflector list including
11  Raveendran's address, was sent to Day Casebeer lawyers Leung, Mammen,
Patch and Batchelder and Qualcomm lawyers Rogers, Martin and Byron
12  Yafuso. Also prepared or assisted in preparing and/or reviewing other
pleadings ultimately determined to contain false or misleading JVT
13  statements. *Doc. No. 699-3.*

14

15  **Kyle S. Robertson**–Junior associate, *B.A.* from Grinnel College, *J.D.* from
Boalt Hall School of Law at the University of California at Berkeley.
15  In August 2006, Young directed Robertson to become involved in the JVT
16  issues. To become familiar with the subject, Robertson went to the JVT
website and learned about its work and intellectual property rights
17  policies. In late August, he attended the deposition of Gary Sullivan,
the Chairman of the JVT. It was the first deposition Robertson had
18  attended and he obtained background information and specific questions
from Patch. He also reviewed a number of JVT-related depositions taken
19  by other attorneys. Under Venkatesan and Young' supervision, Robertson
prepared several pleadings, including the MSA and related Reply, and an
20  expert declaration, all of which were sent to other attorneys for
review. In preparing those documents, Robertson relied on depositions
21  taken and discovery prepared by Day Casebeer lawyers. He circulated the
MSA pleadings to Qualcomm attorneys Rogers, Martin, Louis Lupin, William
22  Sailer and Michael Hartogs and Day Casebeer attorneys Batchelder, Patch
and Mammen. When Robertson received Broadcom's opposition to the MSA,
23  which included the December 2002 email reflector, he searched the JVT
website to learn about the AVC *ad hoc* group, discussed it with senior
24  lawyers at Heller Ehrman and Day Casebeer, and contacted Raveendran.
Robertson also prepared a portion of the JMOL and post-trial briefs,
25  which later were determined to contain the false and misleading
statements regarding Qualcomm's non-participation in the JVT. The
26  documents were transmitted to a number of Day Casebeer and Qualcomm in-
house lawyers for review prior to filing. *Doc. No. 699-2.*

27

28

1   **Heidi M. Gutierrez**-Firm shareholder, B.S. from United States Naval Academy, J.D. University of San Diego Law School. Had minimal
2   responsibility with the instant case and none related to the JVT or H.264 standard. Doc. No. 670-6
3

4   **David E. Kleinfeld**-Firm shareholder. Not actively involved in this case but monitored instant litigation for developments that might affect
5   other Qualcomm/Broadcom litigation. Signed several pleadings, including Qualcomm's Reply to its MSA, as local counsel. The pleadings were
6   prepared by other lawyers in Northern California but signed by Kleinfeld for logistical reasons. Doc. No. 670-4.
7

8   **Barry J. Tucker**-Firm shareholder, B.A. University of California, Los Angeles, J.D. from University of California, Hastings College of Law.
9   Not actively involved in this case but coordinated instant litigation with other Qualcomm/Broadcom litigation. Signed approximately 15
10  Qualcomm pleadings, including the MSA and Motion in Limine to Exclude Evidence relating to Qualcomm's participation in the JVT, as local
11  counsel. The documents were prepared by Heller Ehrman or Day Casebeer lawyers located outside of San Diego but signed by Tucker for logistical
12  reasons. Doc. No. 670-5.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# APPENDIX 1

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2006 WL 3798134 (N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC Rep.Serv.2d 682
(Cite as: 2006 WL 3798134 (N.D.Cal.))

C United States District Court,
N.D. California.
Theresa BRADLEY, Plaintiff,
v.
GOOGLE, INC., and Google Adsense, Defendants.
No. C 06-05289 WHA.

Dec. 22, 2006.

Theresa B. Bradley, Washington, DC, pro se.

Ashok Ramani, Keker & Van Nest, LLP, San Francisco, CA, for Defendants.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

WILLIAM ALSUP, United States District Judge.

### INTRODUCTION

\*1 This is a lawsuit over five dollars. It alleges fraud, breach of contract, and various other claims. Defendants Google, Inc., and Google Adsense now move to dismiss plaintiff Theresa Bradley's complaint pursuant to FRCP 12(b)(6). Plaintiff's first through seventh claims fail to plead facts that if true would entitle plaintiff to relief. Plaintiff's eighth claim survives to the extent that she has pleaded a claim of injury to property. Plaintiff will be granted limited leave to amend. Accordingly, defendants' motion to dismiss is GRANTED IN PART as to plaintiff's first through seventh claims, and DENIED IN PART as to plaintiff's eighth claim.

### STATEMENT

Bradley was a psychiatrist who also had a juris doctorate. Plaintiff owned a small business called Bravacorp that provided corporate consulting services and listed a number of large companies and government agencies as its clients. Bradley and Bravacorp ran a website called www.bravacorp.com. The website provided information about Bradley's and Bravacorp's services, and advertised those services (First Amd. Compl. ¶ 5-6).

Google provided advertising space on the internet to third parties through its service Google AdSense (id. at ¶ 6). Participants in the program allowed Google AdSense to place ads from third parties on their websites after completing an application and inserting some hypertext markup code into their site. The ads were tailored to the host website's content. Participants were able to block ads from competitors, or other ads based on their content or origin (id. at Exh. A). Participants also had the option of choosing default ads to appear on their site if they did not approve of the ads that Google AdSense placed there, or if no ads relevant to the website's content were found. Significantly, Google AdSense paid participants each time an internet user clicked on the third-party ads posted to the participants' website. To eliminate the problem of participants attempting to profit from this arrangement by clicking on the ads on their own websites, Google AdSense's contracts explicitly forbade participants from doing so (Req. Jud. Not. Exh. A ¶ 5).

Bradley signed her website up for Google AdSense on August 10, 2006 (First Amd. Compl. ¶ 7). Google AdSense did not provide her with any way to see which ads would be posted to her site before they appeared there (id. at ¶ 9). Wanting to investigate the third-party ads placed on her website, Bradley clicked on them (id . at ¶ 13-14). Also, she communicated with Google AdSense and asked them to remove some of the ads placed on her website (id. at ¶ 15). The ads were not removed (id. at ¶ 16). On August 19, 2006, Google AdSense terminated her account, removed all ads, and failed to pay plaintiff the approximately five dollars in revenue that the ads on her site had generated (id. at ¶ 17). Plaintiff filed her complaint against Google and Google AdSense shortly thereafter.

\*2 Bradley also held an email account through Google's email service, Gmail, through which she conducted all relations with Google AdSense related to her website (id. at ¶ 59-60). On August 24, 2006, plaintiff discovered that all of the emails in which she had communicated with Google AdSense had been removed or deleted from her account (id. at ¶ 64). She claimed that other emails had been deleted, and that communications with third parties had been "mixed up" with her emails (id. at ¶ 66-67).

On September 7, 2006, Bradley filed her first amended complaint alleging claims of violations of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                          Page 2
Not Reported in F.Supp.2d, 2006 WL 3798134 (N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC Rep.Serv.2d 682
(Cite as: 2006 WL 3798134 (N.D.Cal.))

the Lanham Act, 15 U.S.C. 1121*et seq.*, fraud, interference with prospective business advantage, violations of California Commercial Code Section 2207, breach of contract, unlawful interception of electronic communications under 18 U.S.C. 2520, invasion of privacy under California Penal Code Sections 630-637.2, and intentional destruction of evidence, professional property, and personal property. Though proceeding *pro se*, Bradley is no stranger to the court system. She has filed at least 35 lawsuits in various federal district courts with 15 of those lawsuits being filed within the last two years (Def.Br.n4).

## ANALYSIS

Defendants now move to dismiss Bradley's first amended complaint for failure to state a claim. They also ask in their motion that Bradley not be given leave to amend.

A motion to dismiss under FRCP 12(b)(6) tests for legal sufficiency of the claims alleged in the complaint. A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). "All allegations and reasonable inferences are taken as true, and the allegations are construed in the light most favorable to the non-moving party, but conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Adams v. Johnson*, 355 F .3d 1179, 1183 (9th Cir.2004).

## 1. LANHAM ACT VIOLATIONS.

Plaintiff's first claim alleged violations of the Lanham Act 43(a), which appears to be a claim for false advertising. To plead false advertising under that section, plaintiff must allege:
(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or had a tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by a direct diversion of goodwill from itself, or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir.1997).

*3 Defendants argue that Bradley has not alleged the kind of injury that the Lanham Act was intended to address. In her opposition brief, Bradley does not respond to defendants' arguments, instead the bulk of her opposition attempts to present new facts in her favor. In particular, she argues against defendants' request for judicial notice saying that had she known of the information contained therein, she would not have brought this lawsuit. She goes on to accuse Google of subterfuge and "hiding the ball" with respect to the terms of her contract with them. Though such diatribes are not helpful to showing the legal sufficiency of her claims, this order still addresses her claims under the standard of a motion to dismiss under FRCP 12(b)(6).

Plaintiff alleged that Google sent an advertisement to her which contained a false statement, namely, that she would be able to preview the ads that Google AdSense placed on her website. She further alleged that the method that Google provided to preview the ads did not work. Plaintiff alleged that she, not her customers, was deceived. Bradley alleged that her goodwill and relationships with her customers were damaged because of the ads that Google AdSense placed on her site. In sum, Bradley alleged that Google's false advertising deceived her into signing up for its services, which later caused her to lose the goodwill of her customers not because of Google's false statements, but because of the ads placed on her website and Google's. subsequently closing her Google AdSense account. This theory of damages is *simply* too attenuated. Bradley did not allege that she lost her customers' goodwill as a result of Google's false statements. She alleged she lost goodwill by defendants' placing ads of which she did not approve on her website and then removing them. Accordingly, defendants' motion to dismiss is GRANTED as to this claim.

## 2. FRAUD.

Under FRCP 9(b), fraud must be pleaded with particularity as to the circumstances of fraud, such as time, place, persons, false statements, and why those statements are false. *In re GlenFed Inc. Sec. Litig.*, 42 F.3d 1541, n. 7 (1994). To allege a claim of fraud, plaintiff must plead (1) a misrepresentation; (2) knowledge of falsity or scienter; (3) intent to induce reliance; (4) justifiable reliance; and (5) and resulting

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 3798134 (N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC Rep.Serv.2d 682
(Cite as: 2006 WL 3798134 (N.D.Cal.))

damages. *Engalla v. Permanente Med. Group,* 15 Cal.4th 951, 974 (1997).

Bradley alleged that "[d]efendants made false, untrue and misleading representations as a statement of existing and material fact" (First Amd. Compl. ¶ 30). Even incorporating by reference all of her previous allegations, plaintiff still does not identify with particularity which statements were false. Assuming she referred to Google AdSense's representation that she would be able to preview the ads placed on her site, she still has not alleged when those statements were made. She has merely alleged that she was told that there would be a way to preview the ads placed on her site but that the method did not work. As to the second element, plaintiff has not alleged with specificity that defendants knew their statements were false, plaintiff merely stated in her complaint that Google and Google AdSense made knowingly false statements. This does not meet the heightened standard under FRCP 9(b). Accordingly, defendants' motion to dismiss is GRANTED.

### 3.   INTERFERENCE   WITH   PROSPECTIVE BUSINESS ADVANTAGE.

*4 To state a claim for interference with prospective business advantage, plaintiff must plead the following elements:

(1) an economic relationship between the plaintiff and a third party, with the probability of future economic benefit to plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant to disrupt the relationship; (4) actual disruption of the relationship; (5) economic harm to plaintiff proximately caused by defendant.

*Youst v. Longo,* 43 Cal.3d 64, n. 6 (1987). A claim for interference with prospective business advantage cannot be brought against a party to the relationship which has allegedly been disrupted. *Kasparian v. County of Los Angeles,* 38 Cal.App. 4th 242, 262 (1995). Generic allegations that there was an interference with an unnamed third party are insufficient as a matter of law. *Accuimage Diagnostics Corp. v. Terarecon, Inc.,* 260 F.Supp.2d 941, 957 (N.D.Cal.2003).

In her third claim, Bradley alleged that she was in a business relationship with Google and its "subsidiary" Google AdSense. Google AdSense's actions in placing ads on her website, damaged her relationships with third parties and with Google

AdSense. Plaintiff never identified any of the third parties. To the extent that Bradley alleged that her relationship with defendants was disrupted, her claim fails as a matter of law. Bradley has also not identified any specific relationships in which Google interfered, so she has failed to plead facts that would entitle her to relief on this claim. Accordingly, defendants' motion is GRANTED.

### 4.  Violations of  California  Commercial Code Section 2207.

California Commercial Code Section 2207 governs the addition of terms in the acceptance of a contract and the modification of contracts. It is part of California's enaction of the Uniform Commercial Code which explicitly applies only to contracts dealing with movable goods. Cal. Com.Code 2102. " 'Goods' means all things (including specially manufactured goods) that are movable at the time of identification to the contract other than money in which the price is to be paid." Cal. Com.Code 2105.

In her fourth claim, Bradley alleged that Google and Google AdSense violated Section 2207 by materially altering the terms of the contract. At no point, however, did she allege that her contract with Google involved the sale or purchase of goods by either party. From her complaint, it is clear that Bradley's contract with Google was for services, not for goods. The UCC does not apply to plaintiff's contract with Google, and neither does Section 2207. Even taking as true all of Bradley's allegations, her fourth claim does not state a claim on which relief can be granted because Section 2207 simply does not apply to her contract with Google and Google AdSense. Defendants motion is GRANTED on Bradley's fourth claim.

### 5. BREACH OF CONTRACT.

Plaintiff's fifth claim against Google alleges breach of contract. To state a claim for breach of contract, plaintiff must allege (1) the existence of a contract; (2) plaintiff's performance or excuse for non-performance; (3) defendant's breach; (4) and damages that result from the breach. *Acoustics, Inc. v. Trepte Construction Co.,* 14 Cal.App.3d 887, 913 (1971).

*5 Bradley alleged in her complaint that she had a valid contract with Google and Google AdSense. Defendants breached the contract by failing to

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2006 WL 3798134 (N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC Rep.Serv.2d 682
(Cite as: 2006 WL 3798134 (N.D.Cal.))

provide her a way to preview the ads placed on her website. She also alleged that she suffered damages because her clients were diverted from her website. Defendants argue that plaintiff never alleged that she performed under the contract or that she was excused from performing. Bradley stated in her complaint that she clicked on her own ads which was strictly forbidden under the contract with Google. Furthermore, Bradley never alleged that she did not know of the consequences of clicking on her own ads. Plaintiff has failed to plead that she performed under the contract.

Plaintiff did not adequately plead excuse for nonperformance. She alleged in her complaint and argued in her brief that she had no way to preview ads placed on her site. It appeared that she attempted to plead that performance was impossible. In response, defendants argue that previewing the ads placed on her site was not impossible; Bradley could have cutand-pasted the links displayed below the ads into her web browser, enabling her to preview the ads. Thus, plaintiff has not adequately pleaded either performance under the contract, or that her non-performance was excused. Defendants' motion to dismiss is GRANTED.

### 6. Violation of 18 U.S.C. 2520 For Unlawful Interception of Electronic Communications.

Bradley alleged that defendants violated 18 U.S.C. 2520 by removing or deleting messages from her Gmail account. "[A]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in the violation of this chapter may in a civil action recover from the appropriate entity ..." 18 U.S.C. 2520. This statute, part of the Electronic Communications Privacy Act, only applies to situations where electronic communications are intercepted, not electronic communications which are in storage. Theofel v. Farey-Jones, 359 F.3d 1066, 1077 (9th Cir.2004). To intercept a communication, "it must be acquired during transmission, not while it is in storage." Konop v. Hawaiian Airlines, Inc., 302 F.3d 868, 878 (9th Cir.2002).

In her sixth claim, Bradley alleged that Google removed emails relevant to her dealings with the Google AdSense program that were saved to her account. Plaintiff did not allege that Google intercepted any of her emails, she alleged only that the messages were saved to her account on the evening of August 23, 2006, but then had been

removed by the next morning. Deletion or removal of stored or saved electronic communications is not actionable under 18 U.S.C. 2520, thus plaintiff has failed to state a claim for interception of electronic communications. Defendants' motion is GRANTED.

### 7. Invasion of Privacy Under California Penal Code Sections 630-637.2.

In her seventh claim, plaintiff alleged a violation of California's Invasion of Privacy Act. Such act allows for civil damages for invasion of privacy. Ion Equipment Corp. v. Nelson, 110 Cal.App.3d 868, 879 (1980). The sections that plaintiff alleged that Google violated are analogous to her federal claims under 18 U.S.C. 2520. The relevant sections forbid unauthorized wiretapping, eavesdropping or recording electronic communications, intercepting wireless telephone and cordless telephone transmissions, manufacturing devices designed for electronic eavesdropping, and disclosing intercepted electronic communications. Cal.Penal Code 630-637.2.

*6 Like its federal counterpart, these sections of California's Invasion of Privacy Act require the interception of an electronic communication. As with Bradley's sixth claim, she has not alleged that Google intercepted her communications, only that her stored emails were deleted from her account. Thus, Bradley has failed to state a claim, and defendants' motion as to her seventh claim is GRANTED.

### 8. INTENTIONAL DESTRUCTION OF EVIDENCE, PROFESSIONAL, AND PERSONAL PROPERTY.

Plaintiff's final claim is for intentional destruction of evidence, professional, and personal property. "[T]here is no tort remedy for the intentional spoliation of evidence by a party to the cause of action to which the spoliated evidence is relevant, in cases which, as here, the spoliation victim knows or should have known of the alleged spoliation before the trial or other decision on the merits of the underlying action." Cedars-Sinai Med. Center v. Superior Court, 18 Cal.4th 1, 17-18 (1998).

It is true, as defendants argue, that there is no tort remedy for spoliation of evidence before trial if the victim knew of the alleged spoliation before trial. Thus, even if all of Bradley's allegations are true and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2006 WL 3798134 (N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC Rep.Serv.2d 682
(Cite as: 2006 WL 3798134 (N.D.Cal.))

Google did intentionally delete the emails from her account pertaining to her relationship with Google AdSense, she cannot plead a claim for intentional spoliation of evidence. Bradley's allegations of spoliation of evidence appear in her complaint, so she necessarily knew of the alleged spoliation before trial. That portion of her eighth claim must be dismissed.

Defendants' argument does not address the possibility that Bradley also alleged a claim for the destruction of personal property. California law does recognize a tort remedy for injury to personal property. See Cal. Civ.Code 3333; *Hand Electronics v. Snowline Joint Unified Sch. Dist.*, 21 Cal.App 4th 862, 868-869 (Cal.App. 4 Dist 1994). Assuming that plaintiff's emails are her personal property, she can plead such a claim. She has alleged the Google entered her email account and deleted some of her emails without her permission. She further alleged that she suffered damages to her business as a result. Thus, Bradley has stated a claim for injury to personal property, and this portion of the claim cannot be dismissed. Defendant's motion is GRANTED IN PART as to plaintiff's claim for spoliation of evidence and DENIED IN PART as to her claim for destruction of personal property.

9. LEAVE TO AMEND.

Defendants ask that Bradley not be granted leave to amend her complaint. In support of this, defendants list approximately 35 cases that Bradley has filed in other jurisdictions against a variety of parties. Most of them, according to defendants, were dismissed at early stages. Only two of those lawsuits, including this one, were filed in this district. Additionally, plaintiff has already amended her complaint once in the course of this lawsuit in order to add new allegations and claims. Despite defendants's arguments, it is customary to allow plaintiff leave to amend particularly where they proceed *pro se.* Leave to amend, however, is discretionary.

*7 "Leave to amend need not be granted when an amendment would be futile." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097 (9th Cir.2002). Plaintiff's claim for violation of California Code Section 2207 fails as a matter of law. Pleading a claim under that section would require alleging that defendants and Bradley were in a contract for the sale of goods under the UCC. Plaintiff cannot credibly do this. Similarly, plaintiff's claims for interception of electronic

communications and invasion of privacy cannot be saved by amendment. Now that Bradley has alleged that defendants deleted her stored emails, she could not truthfully allege that they intercepted those communications. Plaintiff will not be allowed to amend these claims, and they will be stricken from her complaint.

Plaintiff will be allowed limited leave to amend her remaining claims. She would be wise to address the flaws in her complaint identified by this order. Plaintiff must file any amended complaint no later than JANUARY 22, 2007.

Finally, defendants ask that Google AdSense be dismissed from this lawsuit because it is not a subsidiary of Google or a registered corporate entity; it is only a program that Google runs. In support, defendants present public records from the California Secretary of State's website to show that Google AdSense is not an actual corporate entity (Req.Jud.Not.Exh.D). Judicial notice of this information is appropriate pursuant to FRE 201(b). Seeing that Google AdSense is not an actual corporate entity, the only appropriate defendant is Google, Inc. Google AdSense is hereby DISMISSED from this action. This does not foreclose plaintiff from amending the complaint to name proper parties to this action, if she should find any before January 22, 2007.

CONCLUSION
For all the above-stated reasons, defendants' motion to dismiss is GRANTED IN PART, AND DENIED IN PART, Defendant Google AdSense is DISMISSED from this lawsuit. If she chooses to do so, plaintiff must file any amended complaint by JANUARY 22, 2007.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2006 WL 3798134 (N.D.Cal.), 2007-1 Trade Cases P 75,574, 61 UCC Rep.Serv.2d 682

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                          Page 1
Slip Copy, 2007 WL 4350907 (N.D.Cal.)
(Cite as: 2007 WL 4350907 (N.D.Cal.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
G & C AUTO BODY INC., Plaintiff,
v.
GEICO GENERAL INSURANCE COMPANY,
Defendant.
No. C06-04898 MJJ.

Dec. 12, 2007.

Colleen Duffy Smith, Christine Peek, David Joseph
Perez, Michael Gannon Reedy, McManis, Faulkner
& Morgan, James H. McManis, McManis, Faulkner
& Morgan A Professional Corporation, San Jose, CA,
for Plaintiff.

Samantha Kuper Feld, Robert J. Gibson, Snell &
Wilmer L.L.P., Costa Mesa, CA, Joshua Grabel, Paul
L. Stoller, Sheila K. Carmody, Snell & Wilmer
L.L.P., Phoenix, AZ, for Defendant.

ORDER:
(1) GRANTING IN PART AND DENYING IN
PART DEFENDANTS' PARTIAL SUMMARY
JUDGMENT
MOTION ON SECTION 17200 CLAIM;
(2) GRANTING DEFENDANTS' PARTIAL
SUMMARY JUDGMENT MOTION ON FRAUD
CLAIM; and
(3) DENYING PLAINTIFFS' MOTION FOR
LEAVE TO AMEND.

MARTIN J. JENKINS, District Judge.

INTRODUCTION
*1 Before the Court are three motions: (1)
Defendants' Motion For Partial Summary Judgment
On Plaintiffs' First Cause Of Action For Alleged
Violation Of California Business & Professions Code
Section 17200 (Docket No. 79); (2) Defendants'
Motion For Partial Summary Judgment On Plaintiffs'
Fraud Claim (Docket No. 72), and (3) Plaintiffs'
Motion For Leave To Amend (Docket No. 201.)

For the following reasons, the Court GRANTS IN
PART AND DENIES IN PART Defendants'
summary judgment motion with respect to the
Section 17200 claim, GRANTS Defendants'

summary judgment motion with respect to the fraud
claim, and DENIES Plaintiffs' motion for leave to
amend.

FACTUAL BACKGROUND
Plaintiffs are two auto body repair companies that
have sued the defendant insurance companies.
Defendants provide automobile coverage for their
policyholders. Plaintiffs on occasion perform work
for some of Defendants' policyholders. Plaintiffs have
asserted four claims against Defendants in this action:
(1) unfair competition under Section 17200, (2)
interference with economic relationship, (3) fraud
and deceit, and (4) commercial defamation.

The gravamen of Plaintiffs' allegations against
Defendants is that the labor repair rates that
Defendants use to resolve the claims of their
policyholder are below the prevailing auto body rates
in the region, and below the allegedly reasonable
labor repair rates that Plaintiffs are entitled to charge
for auto repair work. Plaintiffs also contend that
Defendants are steering their policyholders away
from taking their business to Plaintiffs in an effort to
avoid having to pay Plaintiffs' allegedly reasonable
rates.

LEGAL STANDARD
Rule 56(c) of the Federal Rules of Civil Procedure
authorizes summary judgment if there is no genuine
issue as to any material fact and the moving party is
entitled to judgment as a matter of law. See Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106
S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party
bears the initial burden of demonstrating the basis for
the motion and identifying the portions of the
pleadings, depositions, answers to interrogatories,
affidavits, and admissions on file that establish the
absence of a triable issue of material fact. See Celotex
Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548,
91 L.Ed.2d 265 (1986). If the moving party meets
this initial burden, the burden then shifts to the non-
moving party to present specific facts showing that
there is a genuine issue for trial. Fed.R.Civ.P. 56(e);
see also Celotex, 477 U.S. at 324;Matsushita Elec.
Indus. Co. v.Zenith Radio Corp., 475 U.S. 574, 586-
87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-
movant's bare assertions, standing alone, are
insufficient to create a material issue of fact and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 4350907 (N.D.Cal.)
(Cite as: 2007 WL 4350907 (N.D.Cal.))

Page 2

defeat a motion for summary judgment. *See Anderson,* 477 U.S. at 247-48. An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome. *See id.* at 248. Factual disputes are genuine if they "properly can be resolved in favor of either party." *Id.* at 250. Thus, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in its favor. *See id.* However, "[i]f the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

## ANALYSIS
### I. Plaintiffs' Section 17200 Claim.

*2 Defendants challenge Plaintiffs' first cause of action--a Section 17200 unfair competition claim--on four different grounds. Defendants contend that summary judgment on this claim should be granted in their favor because: (1) Plaintiffs' lack standing to bring the claim, (2) the Court should abstain from hearing the claim, (3) Plaintiffs' Section 17200 claim seeks to circumvent the prohibition on private actions for violation of the Insurance Code's regulation of unfair competition in the business of insurance, and (4) Plaintiffs Section 17200 claim is moot.

### A. Standing.

Section 17200 claims permit restitutionary and injunctive relief, but not damages. As did the parties, the Court will separately analyze Plaintiffs' standing to seek the two forms of relief.

### 1. Restitution.

Given the nature of Plaintiffs' allegations, Plaintiffs lack standing to seek restitution under Section 17200. The California Supreme Court's decision in *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003) is directly on point and controls here. In *Korea Supply,* the Court considered the question of standing for Section 17200 claims, and held that nonrestitutionary disgorgement is not available as a remedy in an individual action under Section 17200.

The type of monetary award that Plaintiffs seek here is remarkably similar to that in *Korea Supply.* As in

*Korea Supply,* Plaintiffs do not seek to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Id.* at 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937. Instead, Plaintiffs seek monetary relief for two alleged harms: (1) unpaid accounts receivable that Plaintiffs have accumulated with respect to car owners that have insurance policies with Defendants, based on Defendants' failure to pay its policyholders the full labor rates charged by Plaintiffs for that repair work; and (2) loss of business caused by Defendants' steering of customers away from Plaintiffs' auto repair shops. Plaintiffs are not GEICO policyholders and have no contractual claims pursuant to any GEICO insurance policy. Instead, Plaintiffs enter into contracts with the policyholders that require repairs.

Any monetary award that Plaintiffs would recover from Defendants in this litigation therefore "would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff." *Id.* Moreover, contrary to Plaintiffs' contentions, nothing in the record before the Court establishes that Plaintiffs have a "vested interest" in the money they seek to obtain, within the meaning discussed by *Korea Supply.* While the concept of restitution, as used in Section 17200, is broad enough to allow a plaintiff to recover money or property in which he or she has a "vested interest", such as earned wages, here Plaintiffs have nothing more than an "expectancy", or "contingent interest", in the receipt of monies paid by Defendants to their policyholders. *See id.* [FN1] As in *Korea Supply,* Plaintiffs' expectancy in this case is further attenuated because Plaintiffs never anticipated payment directly from Defendants; rather, Plaintiffs expected Defendants' policyholders to pay Plaintiffs the amounts they are reimbursed by Defendants under the insurance policies. An order awarding money to Plaintiffs here would improperly award funds that constitute a "contingent expectancy of payment from a third party", rather than "funds that were directly owed to them by the defendant." *Id.* This kind of recovery is not restitutionary in nature and is therefore not available under Section 17200. [FN2]

> FN1. Plaintiffs attempt to fit their allegations in this case inside the boundaries drawn by *Korea Supply* by contending that they have a "vested interest in recovering money owed to them for work already completed", as well as a vested interest in "business that would have gone to them but

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                    Page 3
Slip Copy, 2007 WL 4350907 (N.D.Cal.)
(Cite as: 2007 WL 4350907 (N.D.Cal.))

for GEICO's unfair practice of steering customers away from them." (Opp. at 23:10-11.) This argument stretches the noted of a "vested" ownership interest beyond its reasonable meaning, and beyond the meaning given to it in *Korea Supply*. Plaintiffs may have a vested interest in the amounts directly owed by car owners for work already performed, but they do not have a vested ownership interest in insurance proceeds that Defendants have declined to pay to their policyholders. As to Plaintiffs' contention that they have a "vested interest" in lost business due to steering, *Korea Supply* directly rejects this argument: "Compensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims." 29 Cal.4th at 1151, 131 Cal.Rptr.2d 29, 63 P.3d 937.

FN2. The California Supreme Court's policy rationale for its holding in *Korea Supply* applies with equal force here: "Allowing the plaintiff in this case to recover nonrestitutory disgorgement under the UCL would enable it to obtain tort damages while bypassing the burden of proving the elements of liability under its traditional tort claim for intentional interference with prospective economic advantage." 29 Cal.4th at 1151, 131 Cal.Rptr.2d 29, 63 P.3d 937.

*3 Plaintiffs' authorities fail to support their assertion of standing. In each case cited by Plaintiffs, the money sought to be recovered by means of a Section 17200 claim had either originally been in the plaintiffs' possession, or an ownership interest in the money had been created by a direct obligation between the plaintiff and defendant, *See Rosales v. Citibank*, 133 F.Supp.2d 1177, 1181 (N.D.Cal.2001) (money taken from plaintiffs' bank account by unknown persons); *Shersher v. Superior Court*, 154 Cal.App.4th 1491, 1499- 1500, 65 Cal.Rptr.3d 634 (2007) (plaintiff previously had ownership interest in money paid to retailer for software that did not perform as expected); *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 178, 96 Cal.Rptr.2d 518, 999 P.2d 706 (2000) (defendant could be required to restore unpaid wages unlawfully withheld from its employees); *Matoff v. BrinkerRestaurant Corp.*, 439 F.Supp.2d 1035, 1038 (C.D.Cal.2006) (customer had standing to pursue

restitution for tips it paid, even if defendant had since directed those funds to third parties). None of these cases permit Plaintiffs to escape the limits on restitutionary recovery established in *Korea Supply*.

Accordingly, the Court finds that Plaintiffs cannot obtain monetary relief in connection with their Section 17200 claim. The sole remaining issue discussed below with regard to this claim, therefore, is whether Plaintiffs can obtain injunctive relief.

**2. Injunctive Relief.**

The standing requirements to maintain a Section 17200 action, as modified by the passage of Proposition 64, are set forth in Section 17204. For standing purposes, Section 17204 requires that a plaintiff "has suffered injury in fact and has lost money or property as a result of such unfair competition." Defendants contend that have Plaintiffs cannot establish injury in fact, and cannot establish that they have lost money or property as a result of unfair competition, because Defendants are not party to any insurance contract with Defendants. The Court disagrees.

Plaintiffs have adequately established both injury in fact, and a loss of money as a result of the acts that Plaintiffs contend constitute unfair competition. Both unpaid accounts receivable that Plaintiffs have accumulated with respect to car owners that have insurance policies with Defendants, as well as Plaintiffs' loss of business caused by Defendants' steering of customers away from Plaintiffs' auto repair shops, have a direct causal connection to the acts that Plaintiffs contend constitute unlawful competition here. Neither *Cazares v. Household Finance Corp.*, 2005 U.S. Dist. LEXIS 39222 (C.D.Cal, July 26, 2005) nor *Hamelin v. Allstate Ins. Co.*, U.S. Dist. LEXIS 5093 (C.D.Cal. Mar. 12, 2002), cited by Defendants, support Defendants' contention that Plaintiffs lack standing under such circumstances simply because they are not in a contractual relationship with Defendants.

Defendants also argue, by citing to *Walker v. USAA Cas. Ins. Co.*, 474 F.Supp.2d 1168 (E.D.Cal.2007), that Proposition 64's modification to the Section 17204 standing requirements now restrict the availability of injunctive relief to those that would qualify for restitutionary relief under *Korea Supply*. In *Walker*, the court found that the amendment to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 4350907 (N.D.Cal.)
(Cite as: 2007 WL 4350907 (N.D.Cal.))

Section 17204 wrought by Proposition 64, which now requires that a plaintiff show that he or she has "suffered injury in fact and has lost money or property as a result of unfair competition", intended to use the terms "lost money and property" in the same precise and technical sense that California courts had already defined "lost money and property" for purposes of seeking restitution. *Id.* at 1172. Citing *Korea Supply* and *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 177, 96 Cal.Rptr.2d 518, 999 P.2d 706 (2000), the *Walker* court found that the term "lost money or property", as used in Section 17204, had already been defined in the context of seeking restitution to require a plaintiff to have either prior possession or a vested legal interest in the money or property lost. 474 F.Supp.2d at 1172. This analysis, if correct, would suggest that Plaintiff lack standing to seek even injunctive relief for the reasons discussed above in Section I.A.1.

*4 This Court, however, declines to adopt the reasoning or holding of *Walker*. Central to the chain of reasoning in *Walker* was the assumption that the statutory language "lost money or property" had already been judicially construed by the California courts in *Korea Supply* and *Cortez* before Proposition 64's passage. This Court's own review of *Korea Supply* and *Cortez*, however, turned up no express discussion or definition of the phrases "lost money or property" or "loss of money or property" in these decisions. Nor can the Court consider the wording of the relevant portions of Sections 17203 and 17204 to be parallel. To the contrary, Section 17203's wording authorizing restitutionary relief--which permits a court to "restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition"--is worded differently, and more narrowly, than Section 17204's requirement that a person have "lost money or property" as a result of unfair competition to have standing to sue. This Court therefore finds no basis to presume that the People of California, when adopting Proposition 64, meant for the new Section 17204 standing requirements to track the requirements established for obtaining restitution under Section 17203 set by *Korea Supply, Cortez* and their progeny.

The *Walker* analysis is also in tension with *White v. Trans Union LLC*, 462 F.Supp.2d 1079, 1084 (C.D.Cal.2006). In *White*, the Court rejected the argument that the Plaintiff must show that the Defendant took money directly from plaintiff in order to obtain injunctive relief under Section 17200. *Id.* at

1083. *White* found that, at the motion to dismiss stage, allegations of lost income were enough to establish injury-in-fact, and therefore to establish standing to seek injunctive relief. *White* found that, for purposes of injunctive relief, lost income "is all the statute requires. In particular, the statute does not require that the losses in question were the product of the defendant's wrongful acquisition of the plaintiff's property." *Id.* at 1084. This Court agrees with *White's* reading of Section 17204.

Accordingly, the Court finds that Plaintiffs have standing to seek injunctive relief in connection with their Section 17200 claim.

**B. Abstention**

Defendants argue that the Court should abstain from exercising jurisdiction over Plaintiffs' Section 17200 claim because the conduct at issue is subject to extensive regulation by the California Department of Insurance ("DOI"). The briefing submitted by Defendants leaves it unclear exactly which abstention doctrine, or doctrines, they seek to invoke. Although Defendants never refer to them by name, the abstention doctrines discussed in the authorities cited by Defendants are *Burford* abstention and the primary jurisdiction doctrine.

Given that the Court has determined that the sole remedy available to Plaintiffs in connection with their Section 17200 claim is injunctive relief, the abstention analysis is simplified considerably by Plaintiffs' concession at oral argument, on the record in open court, that the only form of injunctive relief that they will seek based on Section 17200 is an injunction requiring Defendants to cease and desist from making defamatory remarks about Plaintiffs' workmanship and business practices. Defendants' evidence indicates that injunctive relief directed at Defendants' reimbursement practices or calculation of labor repair rates might have considerably overlapped, and potentially interfered with, the Department of Insurance's expertise in and regulatory authority over Defendants. (Feld Decl., Exh. B; *see also* Defendants' Supplemental Statement of Facts, Exh. 12.) [FN3] However, there is no indication in the record before this Court that the Department of Insurance ("DOI") has special expertise in, or regulates, potentially defamatory statements made by insurers regarding auto body shops. Accordingly, the Court finds that neither *Burford* principles nor the primary jurisdiction doctrine warrant abstention here.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2007 WL 4350907 (N.D.Cal.)
(Cite as: 2007 WL 4350907 (N.D.Cal.))

Page 5

See _Knudsen Corp. v. Nevada State Dairy Comm'n,_ 676 F.2d 374, 377 (9th Cir.1982) (_Burford_ abstention can apply where, _inter alia,_ issues "are not easily separable from complicated state law issues with which the state courts may have special competence"); _Farmers Ins. Exch. v. Superior Court,_ 2 Cal.4th 377, 6 Cal.Rptr.2d 487, 826 P.2d 730 (1992) (primary jurisdiction doctrine can apply where enforcement of claim requires "enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed with the special competence of an administrative body").

> FN3. On November 26, 2007, after oral argument on the motion, Defendant submitted supplemental evidence regarding this point without prior leave of Court. Defendant's submission did not comply with Civil Local Rule 7-3. Accordingly, the Court **GRANTS** Plaintiff's motion to strike the November 26, 2007 submission. (Docket No. 269.)

## C. Insurance Code Section 790.03.

*5 Defendants contend that Plaintiffs' Section 17200 claim runs afoul of the California prohibition against a private right of action for violations of California Insurance Code Section 790.03. Section 790.03 defines and prohibits certain acts of unfair competition in the business of insurance. There is no private right of action under California Insurance Code Section 790.03. See _Moradi-Shalal v. Fireman's Fund Ins. Co.,_ 46 Cal.3d 287, 304-05, 250 Cal.Rptr. 116, 758 P.2d 58 (1988). Instead, the procedures to enforce alleged violations of Section 790.03 are vested within the exclusive authority of the Insurance Commissioner.

The law is clear that Plaintiffs cannot rely on alleged violations of Insurance Code Section 790.03 to establish "unlawful" conduct for purposes of their Section 17200 claim. See _Maler v. Superior Court,_ 220 Cal.App.3d 1592, 1598, 270 Cal.Rptr. 222 (1990); _Safeco Ins. Co. v. Superior Court,_ 216 Cal.App.3d 1491, 1494, 265 Cal.Rptr. 585 (1990). However, neither _Maler_ and _Safeco,_ nor any other authority of which this Court is aware, bar Plaintiffs from pursuing a Section 17200 claim for unlawful conduct to the extent that Plaintiffs can establish the unlawfulness is based upon a different statutory provision. Here, for purposes of supporting their request for injunctive relief prohibiting defamatory

remarks, Plaintiffs identify California Civil Code Section 46(3) as an independent statutory basis for deeming the allegedly defamatory remarks unlawful. [FN4] An unfair competition claim may be based on defamatory statements if such statements constitute a business practice. See _Isuzu Motors, Ltd. v. Consumers Union of U.S., Inc.,_ 12 F.Supp.2d 1035, 1048 (C.D.Cal.1998). The Court finds that Insurance Code 790.03 does not bar Plaintiffs from establishing a violation of Section 17200, and obtaining the injunctive relief identified at oral argument, by proving a predicate violation of Civil Code Section 46(3).

> FN4.California Civil Code Section 46(3) provides that slander includes any false and unprivileged publication which "[t]ends to directly injure [plaintiff] in respect to [plaintiff's] office, profession, trade or business, either by imputing to [plaintiff] general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to [plaintiff's] office, profession, trade, or business that has a natural tendency to lessen its profits."

## D. Mootness.

Though Defendants contend Plaintiffs' Section 17200 cause of action is moot, they fail to offer evidence establishing that the allegedly defamatory remarks regarding Plaintiffs have actually ended. The administrative remedies pursued and implemented by the Department of Insurance do not address issues of defamation. (Feld Decl., Exh. B.) On this record, the Court cannot conclude that the alleged wrongful conduct has ended.

## E. Sufficiency Of Plaintiffs' Evidence.

Plaintiffs' lengthy presentation of its factual evidence demonstrating Defendants' misconduct is largely irrelevant to resolution of Defendants' summary judgment motion challenging the Section 17200 claim, which by Defendants' own admission raised solely legal challenges. [FN5] For the first time on reply, Defendants contend that Plaintiffs have failed to come forward with proof of certain elements of a Section 17200 claim. The Court will not consider such arguments as they were not raised in Defendants' opening brief. [FN6]

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 6
Slip Copy, 2007 WL 4350907 (N.D.Cal.)
(Cite as: 2007 WL 4350907 (N.D.Cal.))

FN5. For the same reason, the Court need not reach the merits of Defendants' objections to certain exhibits submitted in opposition to the Motion (Docket No. 230) nor Defendants' objections to Plaintiffs' request for judicial notice (Docket No. 231). Resolution of Defendants' legal challenges to the Section 17200 claim does not depend on the admissibility of this evidence.

FN6. Plaintiffs' opposition included a Rule 56(f) request for additional time to present expert testimony to the Court. The Court denies Plaintiffs' Rule 56(f) request because Plaintiffs have not demonstrated how expert testimony would be relevant to resolution of these legal challenges. In any event, the Rule 56(f) request appears to be moot as Plaintiffs, shortly before the hearing, submitted declarations from their two experts. Because the contents of these expert declarations is irrelevant to the Court's resolution of the legal challenges raised by Defendants, the Court DENIES Defendants' motion to strike the expert declarations (Docket No. 249) as moot.

## II. Plaintiffs' Fraud Claim.

*6 For the reasons discussed on the record at the hearing, and as indicated at the hearing, the Court GRANTS Defendants' motion for summary judgment with respect to Plaintiffs' fraud claim, their third cause of action, and DENIES Plaintiffs' motion for leave to amend as futile. Plaintiffs' proposed amended complaint, like their current complaint, fails to adequately plead the existence of false or misleading statements with sufficient particularity. Moreover, Plaintiffs have failed meet their burden under Celotex to come forward with evidence of (1) actionable false or misleading statements, (2) intent to induce reliance by Plaintiffs, or (3) justifiable reliance. [FN7]

FN7. Plaintiffs cite to Exhibit V of the Colleen Duffy Smith declaration as evidence that Defendant made statements to policyholders, "in the form of estimates drafted for Plaintiffs", that the reimbursement rate was $75 per hour. But Exhibit V is a chart of small-claims

complaints prepared by Plaintiffs' counsel and does not prove the existence of the false or misleading statements.

### CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PARTDefendants' summary judgment motion with respect to the Section 17200 claim, GRANTS Defendants' summary judgment motion with respect to the fraud claim, and DENIES Plaintiffs' motion for leave to amend.

**IT IS SO ORDERED.**

Slip Copy, 2007 WL 4350907 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
(Cite as: 2004 WL 725969 (S.D.N.Y.))

**H**Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re GLOBAL CROSSING, LTD. SECURITIES
LITIGATION
Roy L. OLOFSON, Plaintiff,
v.
Gary WINNICK, et al. Defendants.
No. 02 Civ. 910(GEL), 03 Civ. 1185(GEL).

April 2, 2004.

Paul D. Murphy, Noah B. Salamon, O'Neill & Sun
LLP, Santa Monica, Ca., for plaintiff.

Ralph C. Ferrara, Jonathan E. Richman, Jeffrey S.
Jacobson, Collette B. Cunningham, Debevoise &
Plimpton, New York, NY, for defendants Casey,
Cohrs, and Perrone.

Terry Christensen, Patricia L. Glaser, Sean Riley,
Christensen, Miller, Fink, Jacobs, Glaser, Weil &
Shapiro, LLP., Los Angeles, Ca, for defendant
Winnick.

*OPINION AND ORDER*

LYNCH, J.

*1 This case, originally brought in California state
court and later removed and consolidated with the
class action complaint in *In re Global Crossing Ltd.
Securities Litigation,* arises from alleged accounting
improprieties at the telecommunications firm Global
Crossing, Ltd. ("GC"). Plaintiff Roy Olofson, who
served during the time relevant to the complaint as
Vice-President of Finance for Global Crossing
Development Company ("GCDC"), a subsidiary of
GC, claims he was wrongfully terminated in
retribution for raising concerns about "swap"
transactions allegedly used by company management
to inflate the company's stock price. Plaintiff asserts
claims under California law for intentional and
negligent interference with contract and intentional
and negligent interference with prospective economic
advantage against Gary Winnick, the Chair of GC's
board, and various of its officers and directors. He
further brings a claim for defamation against

Winnick. Defendants move to dismiss the complaint.
For the reasons discussed below, defendants' motions
to dismiss plaintiff's claims for interference with
contract and economic advantage will be granted, and
the motion to dismiss plaintiff's defamation claim
will be denied.

*BACKGROUND*

The facts as presented in the complaint, which must
be taken as true for purposes of this motion, are as
follows.

Olofson served as Vice-President of Finance for
GCDC from May 1998 until November 2001. In May
2000, defendant Joseph P. Perrone was hired as
Senior Vice President of Finance, and was soon
promoted to Executive Vice-President of Finance of
GC, at which time he took over responsibility for
GC's accounting and reporting requirements from
Olofson. At around this time, Olofson became
concerned about GC's increasing use of "swap"
transactions, or transactions in which GC would sell
capacity on its network to other telecommunications
providers, but would "roundtrip" the proceeds by
engaging in mirror-image purchases from those
providers, with each booking the proceeds from the
transaction as revenue. [FN1] These transactions
were entered into at the end of the financial quarter;
Olofson believed GC's accounting for these
transactions violated Generally Accepted Accounting
Principles ("GAAP") and that they had no valid
business purpose, but rather were entered into solely
to create the appearance that GC's revenues met Wall
Street's expectations. He was further concerned that
defendant Thomas Casey, GC's Chief Executive
Officer, had falsely told analysts that there had been
no swap transactions in the first quarter of 2001.

> FN1. For a fuller description of the nature
> and significance of these swap transactions,
> *see In re Global Crossing Sec. Litig.,* No. 02
> Civ. 910, 2004 WL _____ (S.D.N.Y.
> March 23, 2004).

Olofson first raised these concerns with Perrone in
meetings on May 31 and June 1, 2001. At the June 1
meeting, Perrone "brushed off [Olofson's] concerns,"
and angrily informed him that he was in danger of
being laid off. Olofson contacted defendant Dan

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
(Cite as: 2004 WL 725969 (S.D.N.Y.))

Cohrs, GC's Chief Financial Officer, after the meeting to ask whether he would be laid off; Cohrs responded that he should contact Perrone after July 6. When Olofson attempted to do so, Perrone did not return his calls. Thereafter, Olofson "was given no work and was essentially cut off from any meaningful participation in the affairs of Global Crossing Ltd. or Global Crossing Development Company." (¶ 30.) On August 6, 2001, Olofson complained to GC's Chief Ethics Officer, James Gorton. Gorton responded the next day, assuring plaintiff that GC took seriously the issues he had raised.

*2 Olofson alleges that the decision to fire him was initially made in July or August 2001, but was "shelved" in response to his letter of August 6. On August 15, Gorton notified him that GC had begun an investigation into the practices he had identified, and simultaneously demanded that he formally notify GCDC whether or not he would continue his employment at the company. GC did not, however, provide any assurance that it "was actually going to investigate, let alone change any of its accounting practices." (¶ 63.) Olofson then "formally notified defendants that he would not participate in and/or have any complicity in a continuation of the conduct described in the August 6, 2001 letter," (¶ 64.) He was subsequently placed on paid administrative leave, and was fired shortly thereafter, purportedly as part of a "planned reduction in force." (Id.) Olofson alleges that he was not only terminated but also defamed as a result of his attempts to seek an investigation: at a "town hall" meeting for GC employees on February 15, 2002, following GC's bankruptcy filing, Winnick publicly stated that "[t]he definition of an extortionist is Roy Olofson."

GC declared bankruptcy in early 2002. Unable to sue GC, Olofson now asserts claims against individual defendants Winnick, Perrone, Cohrs, and Casey for intentional and negligent interference with contract and intentional and negligent interference with prospective economic advantage, arising from his firing by GCDC. He further asserts a defamation claim against Winnick for the statement made at the February 15, 2002, town hall meeting. Defendants move to dismiss all claims.

*DISCUSSION*

I. *Standard of Review*

A. *Standard for Dismissal*

On a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must accept "as true the facts alleged in the complaint," *Jackson Nat'l Life Ins. Co. v. Merrill, Lynch & Co., 32 F.3d 697, 699-700 (2d Cir.1994),* and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York, 143 F.3d 31, 36 (2d Cir.1998)* (citations omitted); *see alsoBernheim v. Litt, 79 F.3d 318, 321 (2d Cir.1996)* (when adjudicating motion to dismiss under Fed.R.Civ.P. 12(b)(6), the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims" (internal quotation marks and citations omitted)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference. *Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993).* All reasonable inferences are to be drawn in the plaintiff's favor, which often makes it "difficult to resolve [certain questions] as a matter of law." *In re Indep. Energy Holdings PLC, 154 F.Supp.2d 741, 747 (S.D.N.Y.2001).*

II. *Economic Tort Claims*

A. *Interference with Contract*

*3 Plaintiff alleges that his termination by Winnick, Perrone, Casey, and Cohrs amounted to intentional or negligent interference with his contract for employment with GCDC. In order to state a claim for intentional interference with contract, California law requires a plaintiff to allege "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pacific Gas & Electric Co. v. Bear Stearns & Co., 791 P.2d 587, 589-90 (Cal.1990).* Defendants argue that claims for intentional or negligent interference with contract will not lie against a manager in the employment context because managers act as their employers' agents when terminating an employee, and therefore cannot "induce" a breach of the employment contract. [FN2]

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
(Cite as: 2004 WL 725969 (S.D.N.Y.))

FN2. Defendants argue in the alternative that managers act under a privilege from liability for acts of interference with the employment contract. Because defendants' first argument is dispositive on the motion, the Court need not resolve the issue of whether managers' actions are privileged under California law, or whether such privilege is qualified or absolute.

Defendants are correct that a cause of action for interference with contract does not exist in this context. Under California law, "corporate agents and employees acting for and on behalf of a corporation cannot be held liable for inducing a breach of the corporation's contract," *Shoemaker v. Myers,* 801 P.2d 1054, 1068-69 (Cal.1990), citing *Gruenberg v. Aetna Ins. Co.* 510 P.2d 1032 (Cal.1973); *Wise v. Southern Pacific Co.,* 35 Cal.Rptr. 652 (Cal.Ct.App.1963). This conclusion derives from the requirement that there be a valid contract between plaintiff and a third party, and the corollary rule that one party to a contract may not sue the other for inducing a breach of the contract *See Shoemaker,* 801 P.2d 1069. Managers and supervisors "stand in the place of the employer, because the employer - the other party to the supposed contract - cannot act except through such agents." *Id.* Thus, where a manager or supervisor terminates an employee, there is no third party to the contract: to the extent that there is a breach, the manager does not "induce" the breach, but rather, executes it "for and on behalf of [the] principal." *Mallard v. Boring,* 6 Cal.Rptr. 171, 173-74 (Cal.Ct.App.1960).

Olofson argues that this rule should not apply here because he worked for a separate corporate entity than defendants: Olofson was employed by GCDC, while defendants were employed by GC. In plaintiff's view, the defendants may therefore be liable for inducing a breach of the contract between himself and GCDC, because defendants, as employees of GC, were not agents of a party to that contract. In support of this argument, plaintiff relies on the doctrine of corporate estoppel, which holds that a corporation may properly be said to interfere with the contract of another related corporation, even where one is a wholly owned subsidiary of the other. *See Shapoff v. Scull,* 272 Cal.Rptr. 480, 486-87 (Cal.Ct.App.1990) ("[O]ne who has attempted to benefit from the corporate form of doing business may be estopped to deny a corporation's existence."), *disapproved on other grounds by Applied Equipment Corp. v. Litton*

*Saudi Arabia Ltd.,* 869 P.2d 454, 464 n. 10 (Cal.1994).

*4 The doctrine of corporate estoppel has little force in the present situation. As discussed above, the principle that a supervisor or manager cannot be liable for inducing breach of contract between an employee and the corporation derives from notions of agency. So long as the manager or supervisor had actual supervisory authority over the plaintiff and acted in the course of his or her employment in causing plaintiff's termination, the manager is an agent of the plaintiff's employer. Plaintiff cites no California authority indicating that corporate estoppel would trump this principle, and none of the corporate estoppel cases cited by plaintiff occurred in the employment context. *See Webber v. Inland Empire Investments,* 88 Cal.Rptr.2d 594 (Cal.Ct.App.1999) (lien on real property); *Shapoff v. Scull,* 272 Cal.Rptr. 480 (development contract). In the case most directly on point, a California appellate court recently held that a manager with supervisory authority was shielded from liability for terminating the plaintiff on a contract-interference claim, even though in that case the plaintiff and the manager-defendant worked for separate but related corporate entities. *See Hill v. Columbia Tristar Television, Inc.,* No. B155066, 2003 WL 1958881 (Cal.Ct.App. Apr. 28, 2003). Although the court did not specifically address the corporate estoppel issue, the analysis in *Hill* supports the position that corporate estoppel does not trump agency principles in the employment context.

In the present case, regardless of the fact that plaintiff nominally worked for GCDC and defendants for GC, the complaint alleges that defendants had actual supervisory authority over plaintiff. (*See* ¶¶ 18, 20) For example, plaintiff's offer of employment was signed by GC's co-Chairman, Lodwrick Cook (*Id.;* Compl. Ex. D), and plaintiff reported at various times to Winnick, Cohrs, and Perrone to discuss his job responsibilities. (*Id.*) Given that defendants hired him, supervised him during the course of his employment, and ultimately made the decision to terminate him, Olofson cannot seriously claim that defendants were interfering with his contract with another company in so doing. It is apparent on the face of the complaint that defendants exercised the authority of GCDC in making these decisions, and that they therefore "stood in its shoes" and acted as its agents in firing Olofson, regardless of their own employment relationship to GCDC. There was therefore no "third party" to the contract with which

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                Page 4
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
(Cite as: 2004 WL 725969 (S.D.N.Y.))

they could interfere, and plaintiff's interference with contract claims fail as a matter of law._[FN3]

> FN3. Because no contractual interference could have taken place as a matter of law, the Court need not reach the question of whether or not a cause of action exists in California for negligent interference with contract.

## B.  *Interference with Prospective Economic Advantage*

The elements of the tort of intentional interference with prospective economic advantage are (1) an economic relationship between plaintiff and a third party containing the probability of future economic benefit to the plaintiff, (2) knowledge by the defendant of the existence of the relationship, (3) intentional acts on the part of the defendant designed to disrupt the relationship, (4) actual disruption of the relationship, (5) damages to the plaintiff proximately caused by the defendant's acts. *Korea Supply Co. v. Lockheed Martin Corp.,* 63 P.3d 937, 950-51 (Cal.2003); *Buckaloo v. Johnson,* 537 P.2d 865, 872 (Cal.1975), disapproved on other grounds by *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 902 P.2d 740, 751 n. 5 (Cal.1995). In addition, a plaintiff must plead and prove "that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Della Penna,* 902 P.2d at 751. This additional element "bring[s] a greater solicitude to those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant." *Della Penna,* 902 P.2d at 751.

*5 Plaintiff's claims for interference with prospective economic advantage are indistinguishable from his interference with contract claims, and therefore fail for the same reasons. As the California Supreme Court stated in *Shoemaker,* "plaintiff's pleading has identified no 'prospective economic advantage' other than the continuation of his employment relationship. Thus ... it is in reality identical in substance to plaintiff's claim for inducement of breach of contract." *Shoemaker,* 801 P.2d at 1068; see also *Kacludis v. GTE Sprint Communications Corp.,* 806 F.Supp. 866, 872-73 (N.D.Cal.1992) (dismissing claim for intentional interference with prospective economic advantage brought by

employee against supervisor, following *Shoemaker* ). Just as Olofson failed to identify defendants' breach of a contract between the plaintiff and a third party, so has he failed to identify their interference with a prospective economic relationship between plaintiff and a third party.

To the extent that plaintiff attempts to argue that defendants interfered with his prospective relationships with other potential future employers (¶¶ 87, 94), his claim fails for the independent reason that he has not identified any specific economic opportunity with which defendants interfered. California courts have insisted that to establish interference with prospective economic advantage, a plaintiff must specifically allege a relationship with a particular third party that has a "*probability* of future economic benefit to the plaintiff." *Westside Center Associates v. Safeway Stores Inc.,* 49 Cal.Rptr.2d 793, 803 (Cal.Ct.App.1996) (emphasis in original). This heightened requirement distinguishes situations in which a defendant's wrongful acts disrupt a plaintiff's reasonable expectation of entering into a specific contract from those in which the defendant's acts merely harm or reduce the plaintiff's more general opportunities. The tort thus "protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will arise." *Korea Supply Co.,* 63 P.3d at 950, quoting *Westside Center Associates,* 49 Cal.Rptr.2d at 804. Plaintiff here has failed to allege any particular economic relationship between himself and any potential employer with which defendants' actions has interfered. He therefore fails to state a claim for either intentional or negligent interference with prospective economic advantage._[FN4]

> FN4. Because each of plaintiff's economic tort claims fail as a matter of law, the Court need not consider defendants' other arguments.

## III. *Defamation Claims*

Olofson sues Winnick for defamation based on his February 15, 2002, statement at a "town hall" meeting of 60-70 GC employees that "The definition of an extortionist is Roy Olofson." (¶ 65.) Plaintiff also states on information and belief "that defendant Winnick and others actually under his control have made similar defamatory statements to multiple third parties, and in statements made in the press," and

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
(Cite as: 2004 WL 725969 (S.D.N.Y.))

Page 5

expresses his intention to file an amended complaint "to include additional parties and additional statements" after discovery is completed. (*Id.*) Plaintiff asserts his claims under the California statute defining slander as "a false and unprivileged publication, orally uttered" which "[c]harges any person with crime, or with having been indicted, convicted, or punished for crime; ... [t]ends directly to injure him in respect to his office, profession trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; ... or ... by natural consequence, causes actual damage." Cal. Civ.Code § 46 (West 2003). Plaintiff asserts that Winnick's statement at the town hall meeting constitutes slander *per se* under the statutory definition.

*6 Winnick argues that the statement is non-actionable, claiming protection under the First Amendment. In order for a statement to escape the reach of the First Amendment and thus to constitute actionable defamation, it must contain facts susceptible of being proven false. *Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 284 (1974); *Campanelli v. Regents of University of California,* 51 Cal.Rptr.2d 891, 894 (Cal.Ct.App.1996), "Rhetorical hyperbole," "vigorous epithets," and "lusty and imaginative expressions of contempt" have all been held to be protected speech, See*Milkovich v. Lorain Journal Co.,* 497 U .S. 1, 17 (1990); *Letter Carriers,* 418 U.S. at 284;*Greenbelt Co-op. Pub. Ass'n v. Bresler* 398 U.S. 6, 14 (1970); *Ferlauto v. Hamsher,* 88 Cal.Rptr.2d 843, 849 (Cal.Ct.App.1999). Whether a statement implies a provably false factual assertion is a question of law that may be determined by the court on motion to dismiss, *Morningstar, Inc. v. Superior Court,* 29 Cal.Rptr.2d 547, 552 (Cal.Ct.App.1994), but where the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury. *Ferlauto,* 88 Cal.Rptr.2d at 849;*Campanelli,* 51 Cal.Rptr.2d at 895;*Good Government Group of Seal Beach, Inc. v. Superior Court,* 586 P.2d 572, 576 (1978). In making such a determination, a court must engage in a two-step inquiry based on the "totality of the circumstances":

The words themselves must be examined to see if they have a defamatory meaning, or if the sense and meaning ... fairly presumed to have been conveyed to those who read it have a defamatory

meaning.,,. In addition to the language, the context of a statement must be examined. The court must look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed.

*Campanelli,* 51 Cal.Rptr.2d at 894, citing *Hofmann Co. v. E .I. Du Pont de Nemours & Co.,* 248 Cal.Rptr. 384, 388 (Cal.Ct.App.1988).

Courts have allowed defamation claims involving charges of "extortion" to survive where the statement was capable of being understood by a reasonable listener as an accusation that the plaintiff had committed a crime. See*Good Government Group,* 586 P.2d at 576;*Edwards v. Hall,* 285 Cal.Rptr. 810, 819 (Cal.Ct.App.1991). In the present case, the words "the definition of an extortionist" could on their face be understood as an accusation that Olofson had wrongfully attempted to extort money from GC by threatening to make public false accusations of accounting improprieties. The terms cast doubt on both Olofson's truthfulness and his motivations, and thus the words themselves could be understood by the average listener to be defamatory. In addition, the allegation that Olofson was an "extortionist" would be capable of being proven false - for example, should the concerns plaintiff had raised in his whistle-blower letter prove to be true. See*Milkovich,* 497 U.S. at 20-21 (allegations that plaintiff had lied under oath at a hearing sufficiently factual to constitute actionable defamation).

*7 Winnick argues, however, that his comment falls into the category of protected "hyperbole," "vigorous epithets," or "lusty and imaginative expressions of contempt," *Milkovich,* 497 U.S. at 17, and that plaintiff's claim therefore fails. The statement "the definition of an extortionist is Roy Olofson" could indeed be used figuratively as well as factually, and it is quite conceivable that under the circumstances, reasonable listeners could not have perceived it as an actual accusation of extortion. Whether this was the case, however, depends entirely upon the context in which the statement was made. The complaint does not describe in any detail the composition of the "town hall" meeting, its purpose, what else was discussed there, or the tenor of the discussions generally. It is therefore impossible to ascertain from the pleadings whether, under the circumstances, the statement in question could reasonably be perceived as an actual accusation, or whether could only have been understood as an exaggeration.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
(Cite as: 2004 WL 725969 (S.D.N.Y.))

Page 6

In cases where "the language ... is capable of two meanings, one of which is harmless and the other libelous, and it is alleged that the same was used and understood as conveying the latter meaning, a cause of action is stated, and it is the province of the jury to determine in which sense the language was used and understood by the [listener]." *Arno v. Stewart,* 54 Cal.Rptr. 392, 395 (Cal.Ct.App.1966), citing *Mellen v. Times-Mirror Co.,* 140 P. 277, 279 (1914); *see also Ferlauto,* 88 Cal.Rptr.2d at 849 ("If the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury."). The fact-based nature of the "totality of the circumstances" test makes it difficult to dispose of defamation cases at the pleading stage: indeed, many of the cases defendant cites dismissing defamation claims involving blackmail or extortion were decided on a more complete factual record, either at summary judgment or on review after a verdict. *See e.g., Letter Carriers v. Austin,* 418 U.S. at 284-87 (reversing jury verdict on claim arising from use of term "traitor" to describe plaintiff); *Greenbelt,* 398 U.S. at 14-15 (reversing jury verdict on claim arising from use of term "blackmail" to describe plaintiff's negotiating position); *Underwager v. Channel 9 Australia,* 69 F.3d 361, 367 (9th Cir.1995) (dismissing at summary judgment claim arising from statement that panelist was "lying"); *Mattel, Inc. v. MCA Records, Inc.,* 28 F.Supp.2d 1120, 1161-62 (C.D.Cal.1998) (dismissing at summary judgment claim arising from statement referring to plaintiff as "bank robber" who had committed a "crime," "heist," or "theft"). Resolution of this issue must await the development, through discovery, of a more complete factual record.

Winnick further contends that the defamation claim must be dismissed for failure to plead "actual malice." The Supreme Court has held that where a defamation plaintiff is a public figure, s/he must prove by clear and convincing evidence that the defendant made the statement with actual knowledge or reckless disregard of its falsity. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80 (1967). A plaintiff may be a public figure by virtue of his or her position, or may "voluntarily injects himself or [be] drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351 (1974); *Mattel,* 28 F.Supp.2d at 1162. Under California law, however, malice need not be affirmatively pled unless it appears on the face of the

complaint that some privilege is at play in the challenged publication. *Locke v. Mitchell,* 61 P.2d 922, 923 (Cal.1936); *Peoples v. Tautfest,* 79 Cal.Rptr. 478, 481 (Cal.Ct.App.1969).

*8 In this case, actual malice is a matter of proof, not pleading. There are no allegations in the complaint that Olofson had become a public figure at the time of the town hall meeting, or that his whistle-blower letter had become public knowledge. Although Winnick points to a press release issued by Olofson on February 4, the week prior to the town hall meeting, it is at best disputed whether this communication was sufficiently to place Olofson in the public eye such that he would be required to show actual malice. Should it prove after discovery that Olofson's termination was sufficiently before the public at the time of Winnick's statement that he had in fact become a limited public figure, he will have to prove by clear and convincing evidence that Winnick made his statement with actual malice. However, because this is not apparent on the face of the complaint, it is not necessary that he allege malice at the pleading stage. *See Peoples,* 79 Cal.Rptr. at 481 (rejecting argument that defamation plaintiff was required to plead actual malice where the complaint did not allege that he was a public figure). "The sufficiency of a complaint is to be tested by its allegations and not by what theoretically might have been alleged." *Id.*

At any rate, even if it were necessary for plaintiff to plead actual malice, the complaint alleges facts sufficient to permit an inference that Winnick had actual knowledge of the statement's falsity. That is, if the allegations in the complaint are true, Winnick would have known that his statement that Olofson was "the definition of an extortionist" was false. A plaintiff need not specifically plead actual malice so long as "it appears from the pleading that the defendant published the alleged libel with knowledge of its falsity or without an honest belief in its truth or without reasonable grounds for believing it to be true." *Noonan v. Rousselot,* 48 Cal.Rptr. 817, 821 (Cal.Ct.App.1966). Winnick's motion to dismiss the defamation claim will therefore be denied.

### CONCLUSION

Defendants' motions to dismiss plaintiff's first through fourth causes of action for interference with contract and interference with prospective economic advantage are granted. Defendant Winnick's motion to dismiss plaintiff's fifth cause of action for

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)
**(Cite as: 2004 WL 725969 (S.D.N.Y.))**

defamation is denied.

 SO ORDERED:

 Not Reported in F.Supp.2d, 2004 WL 725969 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2415074 (E.D.Pa.)
(Cite as: 2004 WL 2415074 (E.D.Pa.))

Page 1

**H**Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Lynn E. LANDES
v.
Margaret TARTAGLIONE, et al.
No. Civ.A. 04-3163.

Oct. 28, 2004.

Lynn E. Landes, Philadelphia, PA, pro se.

Michael L. Detweiler, Michele L. Dean, John O.J. Shellenberger, Philadelphia, PA, Susan J. Forney, Harrisburg, PA, Annetta Foster Givhan, Philadelphia, PA, Craig M Blackwell, Washington, DC, for Defendants.

*MEMORANDUM*

ONEILL, J.

### I. INTRODUCTION

*1 Plaintiff Lynn E. Landes filed suit seeking a declaratory judgment that the local, state and federal laws and regulations that permit the use of voting machines are unconstitutional. She also seeks to enjoin the use of voting machines in elections for public office. Plaintiff claims the use of voting machines prevents election officials, the press and the public from effectively observing whether persons entitled to vote are being permitted to vote and whether their votes are being properly tabulated. Defendants are Margaret Tartaglione, Chair of the City Commissioners of the City and County of Philadelphia, Pedro A. Cortés, Secretary of the Commonwealth of Pennsylvania and John Ashcroft, Attorney General of the United States. Now before me are motions to dismiss filed by all defendants. For the reasons stated below, I will grant defendants' motions.

### II. BACKGROUND

The use of electronic voting systems and voting machines in Pennsylvania is permitted by 25 Pa. Stat. Ann. §§ 3002 and 3031.2. Plaintiff alleges that the computerized voting machines used in Philadelphia do not allow voters to cast their ballots directly and

that they conceal the voting process. She further asserts that voting machines may or may not be accurate and they are vulnerable to technical failure or vote manipulation. Plaintiff alleges that it is not possible to observe whether voting machines manipulate or switch votes.

Plaintiff alleges that she is a registered voter in the City and County of Philadelphia and a freelance journalist who specializes in voting systems and democracy issues. She does not specifically allege that she intends to vote in future elections in Philadelphia or that she has voted in previous elections in the city.

### III. STANDARD FOR RULE 12(b)(6)

A Rule 12(b)(6) motion to dismiss examines the sufficiency of the complaint. *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In determining the sufficiency of the complaint I must accept all of the plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences therefrom. *Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997).

> The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Id.,quoting Conley,* 355 U.S. at 47. I should not inquire as to whether the plaintiff will ultimately prevail, but only whether he is entitled to offer evidence to support his claims. *See Oatway v. Am. Int'l Group, Inc.,* 325 F.3d 184, 187 (3d Cir.2003). "Thus, [I will] not grant a motion to dismiss 'unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Graves,* 117 F.3d at 726,quoting Conley, 355 U.S. at 45-46.

### IV. DISCUSSION

*2 Plaintiff lacks standing to challenge the use of voting machines. [FN1] In order to have standing to raise a claim before this court, plaintiff must establish that she meets both the three constitutional requirements for standing and the prudential considerations that courts have applied in

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2004 WL 2415074 (E.D.Pa.)
(Cite as: 2004 WL 2415074 (E.D.Pa.))

determining standing. *Storino v. Borough of Point Pleasant Beach,* 322 F.3d 292, 296 (3d Cir.2003). To meet the constitutional requirements for standing, first plaintiff must have suffered an injury in fact--an invasion of a legally protected interest that is concrete and particularized, affecting the plaintiff in a personal and individual way, and actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of. The injury must be traceable to the challenged action of the defendant and not the result of the independent action of a third party. Third, it must be likely and not speculative that the injury will be remedied by a favorable decision. *Id.See also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The prudential principles applied in determining whether there is standing are:

> FN1. Defendants Cortes and Ashcroft move to dismiss on the grounds that plaintiff lacks standing to challenge the use of voting machines. Defendant Tartaglione did not raise the issue of standing in her motion to dismiss; however, because plaintiff lacks standing to bring the entire action, I will dismiss the complaint against Tartaglione as well.

(1) the Plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties; (2) even when the Plaintiff has alleged redressable injury sufficient to meet the requirements of Article III, the federal courts will not adjudicate abstract questions of wide public significance which amount to generalized grievances shared and most appropriately addressed in the representative branches; and (3) the Plaintiff's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

*Miller v. Nissan Motor Acceptance Corp.,* 362 F.3d 209, 221 (3d Cir.2004) (citations omitted). Plaintiff fails to satisfy both the constitutional and prudential standing requirements.

Plaintiff has not established she has suffered or will suffer an injury in fact. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical...." *Storino v. Borough of Point Pleasant Beach,* 322 F.3d 293,

296 (3d Cir.2003). In plaintiff's complaint, she alleges that she is a registered voter of the City and County of Philadelphia, but she fails to allege that she intends to vote by voting machine in the upcoming election. She also fails to allege that she has ever voted in any prior election either by voting machine or by other means. Absent such allegations, plaintiff cannot establish an injury in fact. *Cf.American Ass'n of People with Disabilities v. Hood,* 278 F.Supp.2d 1345, 1351-52 (M.D.Fla.2003) (holding plaintiffs had standing where they were registered voters, consistently voted in the past and intended to vote in future elections). [FN2]

> FN2. Because the pleadings of a pro se party must be construed liberally, I do not dismiss plaintiff's motion on this basis alone as in her responses to Cortes' and Ashcroft's motions to dismiss she asserts that she has voted in the past and she intends to vote in the upcoming election.

*3 Even assuming plaintiff has voted in the past and will vote in this election, however, she alleges only a "conjectural or hypothetical" injury. She argues that voting machines are vulnerable to manipulation or technical failure, but she does not assert that the voting machines in question have actually suffered from these issues in the past or that they will definitively malfunction or be tampered with during the upcoming election. In *Storino,* 322 F.3d at 297-98, the Court held that the only injury demonstrated by plaintiffs was prospective and conjectural where plaintiffs alleged a local zoning ordinance would cause them future damages but the Court could identify various scenarios where the possibility of injury would be eliminated. The Court noted, "one cannot describe how the Storinos will be injured without beginning the explanation with the word 'if.' The prospective damages, described by the Storinos as certain, are, in reality, conjectural." *Id.*

Similarly, plaintiff's allegations here are not sufficient to demonstrate injury in fact because they are conjectural. If plaintiff's vote and the votes of all other voters in the upcoming election are correctly recorded, plaintiff will suffer no injury. Plaintiff's reliance on the terms "if" and "may" to couch her allegations of harm is a clear indication that the harm she alleges is merely speculative. *Cf.Lujan v. Defenders of Wildlife,* 504 U.S. 555, 564, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding that plaintiffs' " 'some day' intentions" to return to locations where

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

*Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2415074 (E.D.Pa.)
(Cite as: 2004 WL 2415074 (E.D.Pa.))

Page 3

they might be deprived of the opportunity to observe endangered animals did "not support a finding of the 'actual or imminent' injury that our cases require").

Plaintiff argues, however, that the voting machines need not malfunction or be tampered with for an injury in fact to exist. She alleges she has been injured in past elections and will be injured in this election because voting machines prevent her from observing whether or not her vote has actually been cast. She asserts the use of voting machines deprives her of her rights to vote, to have votes counted properly, to observe the voting process effectively and to have those rights fully enforced under 42 U.S.C. Section 1983. Characterized in this manner plaintiff's alleged injury amounts to a " 'generalized grievance' shared in substantially equal measure by all or a large class of citizens" and is not sufficient to confer standing. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). *See also Lujan,* 504 U.S. at 560 (injury must be "concrete and particularized" )(emphasis added); *Whitmore v. Arkansas* 495 U.S. 149, 160, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ("the 'generalized interest of all citizens in constitutional governance' ... is an inadequate basis on which to grant" standing); *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ("an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court"); *Public Interest Research Group v. Magnesium Elektron,* 123 F.3d 111, 121 (3d Cir.1997) ("The legal 'right' to have corporations obey environmental laws cannot, by itself, support standing.").

*4 Because plaintiff has not established the required elements to demonstrate she has standing to challenge the use of voting machines in Philadelphia, I will grant defendants' motions to dismiss.

*ORDER*
AND NOW, this day of October 2004, after considering the motions to dismiss of defendants Margaret Tartaglione, Pedro A. Cortés and John Ashcroft and plaintiff's responses thereto and for the reasons set forth in the accompanying memorandum, it is ORDERED that:

1. defendant Margaret Tartaglione's motion to dismiss is GRANTED;

2. defendant Pedro A. Cortés' motion to dismiss is GRANTED;

3. defendant John Ashcroft's motion to dismiss is GRANTED;

4. plaintiff's complaint is DISMISSED with prejudice; and

5. plaintiff's motion for a temporary restraining order is DENIED as moot.

Not Reported in F.Supp.2d, 2004 WL 2415074 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)
(Cite as: 2005 WL 5894689 (C.D.Cal.))

C Only the Westlaw citation is currently available.

United States District Court,
C.D. California.
MGA ENTERTAINMENT, INC., Plaintiff,
v.
MATTEL, INC., a Delaware Corporation, and Does
1-10, Defendants.
No. CV 05-2727 NM (RNBx).

Aug. 26, 2005.
Diana M. Torres, Paula Elise Ambrosini, O'Melveny
and Myers, Patricia L. Glaser, Christensen Glaser
Fink Jacobs Weil & Shapiro, Los Angeles, CA, for
Plaintiff.

Daniel P. Collins, Munger Tolles & Olson, Duane R.
Lyons, John B. Quinn, Michael T. Zeller, Timothy L.
Alger, Quinn Emanuel Urquhart Oliver and Hedges,
Los Angeles, CA, Tania Marie Krebs, NBC
Universal Television Group, Universal City, CA, for
Defendants.

ORDER AND OPINION GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION TO
DISMISS AND STRIKE PORTIONS OF
COMPLAINT

NORA M. MANELLA, United States District Judge.

I. INTRODUCTION
*1 On April 13, 2005, plaintiff MGA Entertainment,
Inc. ("MGA") initiated this action against rival toy
doll maker, defendant Mattel, Inc. ("Mattel"). MGA
contends that it "seeks by this action to halt Mattel's
habitual and unfair tactics of competition-by-
intimidation and serial copycatting of MGA's
products," Compl. ¶ 7. The Complaint asserts causes
of action for: (1) False Designation of Origin or
Affiliation in Violation of 15 U.S.C. § 1125(a); (2)
Unfair Competition in Violation of 15 U.S.C. §
1125(a), Cal. Bus. & Prof.Code § 17200 et seq., and
California Common Law; (3) Dilution in Violation of
15 U.S.C. § 1125(c), Cal. Bus. & Prof.Code § 14330,
and California Common Law; and (4) Unjust
Enrichment. On May 13, 2005, Mattel filed the
instant Motion to Dismiss and Strike Portions of
Complaint Pursuant to Fed.R.Civ.P. 12(b)(6), 12(f),

and 12(b)(1). For the reasons set forth below, Mattel's
motion is GRANTED in part and DENIED in part.

II. FACTUAL & PROCEDURAL
BACKGROUND [FN1]

FN1. The following facts from the
Complaint are assumed true for purposes of
this motion only.

MGA's Complaint is divided into four parts: (1)
background factual allegations, see Compl. ¶¶ 7-30;
(2) allegations regarding Mattel's "serial copycatting"
of MGA's products, see id. ¶¶ 31-73; (3) allegations
regarding Mattel's "strong-arm tactics, and other
illegitimate, unfair and anti-competitive" conduct, id.
¶¶ 74-100; and (4) MGA's causes of action and
claims for relief, id. ¶¶ 101-25.

A. Background Factual Allegations
In paragraphs 7 through 30 of the Complaint, MGA
provides various background factual allegations. See
id. ¶¶ 7-30. In particular, this section of the
Complaint details how Mattel came to dominate the
fashion doll market in the twentieth century through
sales of its mainstay product, "Barbie"; how both the
public's interest in Barbie and Mattel's success began
to wane in the late 1990s; and how MGA's 2001
release of its new and "fresh-looking" doll line, the
"Bratz," came at just the right time to take advantage
of the public's growing apathy for Barbie. See id.
[FN2] The Complaint uses these facts to set the scene
for MGA's claim that Mattel was "in trouble," and
had to do something to regain the market share it was
losing to MGA. MGA then alleges that Mattel, rather
than "respond ... with a new, creative product of its
own," decided to "wage[ ] war against MGA using a
wide-array of tortious, unfair and anti-competitive
practices including systematic, serial copycatting and
intellectual property infringement, aided by
intimidation, threats and other acts of unfair
competition and anti-competitive conduct." Id. ¶ 32.

FN2. MGA describes the Bratz as "multi-
ethnic fashion dolls that sport a fresh new
urban and contemporary look and fashion."
Compl. ¶ 8.

B. Serial Copycatting

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)
(Cite as: 2005 WL 5894689 (C.D.Cal.))

In the second section of the Complaint, paragraphs 33 through 73, MGA alleges that Mattel responded to the competition posed by the Bratz by creating and marketing various dolls and products that infringed on the trade dress of the Bratz and MGA's other products. *See id.* ¶¶ 33-73. In particular, MGA alleges that Mattel introduced a line of dolls in October 2002 called "My Scene" that infringed on the Bratz's trade dress. *Id.* MGA also contends that Mattel's "serial copycatting" "extended to MGA's packaging, themes, accessories, advertising and even other product lines." *Id.* Finally, MGA mentions a failed Mattel doll line called the "Flavas." *See id.* ¶ 35. MGA suggests that Mattel's My Scene dolls "may have been ... intended to buy Mattel time while it worked to release ... 'Flavas.' " *Id,* However, according to MGA, the Flavas failed in the market because they "took the urban, 'hip-hop' look too far, and were widely viewed as portraying a trampy, 'bad-girl' image." *Id.*

### C. Unfair, Manipulative, and Anti-Competitive Conduct

\*2 In the third section of the Complaint, entitled "Mattel's additional unfair, manipulative, anti-competitive conduct," MGA alleges that Mattel has engaged in "strong-arm tactics, and other illegitimate, unfair and anti-competitive means ... to manipulate the market and ensure that its control and domination of the industry can continue unabated." *Id,* ¶ 74. *See id.* ¶¶ 74-100. Because Mattel's Motion focuses on this portion of the Complaint, a detailed description is in order.

MGA first alleges that "Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, *including the names and positions of Mattel employees.*" *Id.* ¶ 75 (emphasis in original). Additionally, MGA alleges, "Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004." *Id.* According to MGA, this lawsuit was dismissed with prejudice because Mattel's Complaint "fail[ed] to state a viable claim" and Mattel could not "muster up a shred of evidence sufficient to support an amended complaint." *Id.*

MGA next alleges that Mattel has intimidated various companies, such as publishing entities, into not doing business with MGA. *Id .* ¶ 76. [FN3] Similarly, MGA alleges that "Mattel has used ...

intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute Bratz, to reduce shelf and display space for Bratz and to place Bratz in unfavorable locations at retail outlets." *Id.* ¶ 77.

> FN3. In particular, MGA alleges:
> Mattel has ... warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution. The threats are not idle. In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "Bratz." While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.
> Compl. ¶ 76.

MGA also alleges that Mattel has tried to lock MGA out of the market by buying up the supply of necessary products. In particular, MGA contends: "When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies." *Id.* ¶ 78.

MGA further accuses Mattel of "manipulat[ing] the retail market." *Id.* ¶ 79. For example, MGA asserts: "Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise." *Id.* ¶ 79. Additionally, "Mattel ... falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing and falsely told a United Kingdom retailer that MGA was discontinuing one of its lines, in order to make such line less attractive to buyers and thereby attempt to increase sales of the competitive Mattel product and improve its own sales, at MGA's expense." *Id.*

MGA then details how "[e]ven supposedly unbiased and impartial industry organizations have fallen prey to Mattel's abusive wield[ing] of power, to MGA's detriment," *Id.* ¶ 80. For example, MGA alleges: NPD Funworld ("NPD") ... is the leading supplier of sales statistics in the toy industry. Accurate NPD statistics are essential for efficient product-line management. Without these statistics, it is difficult, if not impossible, for toy companies to assess and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)
**(Cite as: 2005 WL 5894689 (C.D.Cal.))**

measure the relative success of their products in key categories. It is, however, a subscription service, and NPD restricts the manner in which its subscribers may use the data it provides. Mattel has regularly ignored the restrictions .... *Mattel generates substantially more annual subscription revenue for NPD than does MGA, and carries more clout. After MGA had subscribed to the service for more than 12 years,* NPD terminated MGA's subscription in 2003 theoretically on the grounds that MGA misused NPD data in a press release. MGA is informed and believes that the termination was the result of pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's restrictions.

*3 In addition to this, the market share numbers that NPD generates are heavily dependent on the category in which NPD places a particular product. MGA is informed and believes that Mattel also pressured NPD into changing certain product *classifications for its Bratz products in order to manipulate the data and preserve Mattel's market share rankings in the critical fashion doll category--and thereby lower MGA's.*

The Children's Advertising Review Unit ("CARU") is ... is the toy industry's supposedly independent self-regulatory body in charge of maintaining standards in advertising.... CARU is heavily subsidized by Mattel.... Upon information and belief, Mattel has used its influence as a major contributor to CARU's budget to induce CARU to place onerous restrictions on MGA advertisements, and require MGA to amend aspects of commercials that have gone unchallenged in other parties' commercials....

Even [the Toy Industry Association ("TIA") ], the *toy industry's trade association, is apparently not untainted by Mattel's influence and power.* Each year, TIA presents the Toy-of-the-Year Awards, the 10 most prestigious of which had been the award for Toy of the Year. Winning the Toy of the Year Award is a significant achievement that not only very likely increases the sales of the winning toy, but also denotes the winning company as a leader in toy innovation and generates substantial goodwill with retailers, distributors, licensees, and customers.

For the years 2000 ..., 2001 and 2002, the Toy of the Year award was chosen by consumer vote.... *Leap Frog won the 2000 ... Award and MGA won* [in] 2001 and 2002.... With the 2003 ... Award, however, the rules suddenly changed. Now, the award is selected by members of the industry.

Upon information and belief, this change was orchestrated by a Fisher Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of TIA. Perhaps not surprisingly given *this change in the winner selection procedures,* "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year 2003 ..., beating out the other leading nominee, "Bratz Formal Funk Super Stylin' Runway Disco."

TIA has refused to provide MGA with the vote count procedure and totals for this award, despite repeated requests.

MGA is also informed and believes that Mattel was instrumental in attempting to keep MGA from participating as a sponsor in this year's 28 "Kids' Choice Awards."

Compl. ¶¶ 81-97.

Finally, MGA alleges:

Mattel has clearly engaged in tortious, illegal and unethical behavior in its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently Mattel's current *modus operandi* when it comes to "competing" in the industry. The once immensely successful "LeapFrog" interactive learning product, for example, has apparently been one of Mattel's other recent victims.

*Id.* ¶ 98.

### D. Causes of Action and Claims for Relief

*4 In the last section of the Complaint, MGA asserts the following four causes of action: (1) "False Designation of Origin in Violation of 15 U.S.C. § 1125(a)"; (2) "Unfair Competition in Violation of 15 U.S.C. § 1125(a) and Unfair Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof.Code § 17200 *et seq.* and California Common Law"; (3) "Dilution in Violation of 15 U.S.C. § 1125(c); Cal. Bus. & Prof.Code § 14330 and California Common Law"; and (4) "Unjust Enrichment." Among other remedies, MGA requests restitution and disgorgement. *Id.* ¶ 118; Prayer ¶ 3(b).

On April 13, 2005, MGA filed the Complaint against Mattel. On May 13, 2005, Mattel filed the instant Motion to Dismiss and Strike Portions of Complaint Pursuant to Fed.R.Civ.P. 12(b)(6), 12(f), and 12(b)(1).

### III. LEGAL STANDARD

A Rule 12(b)(1) motion is a challenge to the court's jurisdiction over a matter. *See*Fed.R.Civ.P. 12(b)(1). The plaintiff bears the burden of establishing that the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                            Page 4
Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)
(Cite as: 2005 WL 5894689 (C.D.Cal.))

court has subject matter jurisdiction to hear the action. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Stock West v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir.1989).

Under Rule 12(b)(6), a motion to dismiss should be granted only if it appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also*Fed.R.Civ.P. 12(b)(6). For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Everest and Jennings, Inc. v. American Motorists Ins. Co.*, 23 F.3d 226, 228 (9th Cir.1994). All reasonable inferences are to be drawn in favor of the plaintiff. *Jacobson v. Hughes Aircraft*, 105 F.3d 1288, 1296 (9th Cir.1997).

Finally, under Rule 12(f), the court has the discretion to strike a pleading or portions thereof. *Federal Sav. and Loan v. Gemini Management*, 921 F.2d 241, 243 (9th Cir.1990). *See also*Fed.R.Civ.P. 12(f). Rule 12(f) provides that a court "may order stricken from any pleading ... any redundant, immaterial, impertinent or scandalous matter." Fed.R.Civ.P. 12(f). " 'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir.1993) (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382, at 706-07 (1990)), *rev'd on other grounds*,510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). " 'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Id.* "[T]he function of a Rule 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial ...." *Sidney-Vinson v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir.1983). Such motions are "generally not granted unless it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation." *Rosales v. Citibank, Federal Sav. Bank*, 133 F.Supp.2d 1177, 1179 (N.D.Cal.2001). Any doubt concerning the import of the allegations to be stricken weighs in favor of denying the motion to strike. *See In re 2TheMart.com, Inc. Sec. Litig.*, 114 F.Supp.2d 955, 965 (C.D.Cal.2000).

### IV. ANALYSIS
*5 Mattel argues that the court should dismiss and/or strike: (1) the majority of the first section of the Complaint, which consists of the background factual allegations; (2) the third section of the Complaint, entitled "Mattel's additional unfair, manipulative, anti-competitive conduct," as well as related parts of the Complaint, including MGA's request for restitution and disgorgement; (3) specifically paragraph 98 of the Complaint, which includes allegations regarding Mattel's "modus operandi" and LeapFrog; and (4) paragraph 75 of the Complaint, which alleges that Mattel has harassed employees who have left Mattel for MGA.

### A. First Section of Complaint--Background Factual Allegations
Mattel argues that the court should strike the background factual allegations contained in paragraphs 11-20 and 30-31 of the Complaint. According to Mattel, these paragraphs, which primarily discuss Mattel's financial and corporate history, are immaterial to MGA's case. MGA responds that these paragraphs should not be stricken because they help elucidate Mattel's motive/intent in creating the My Scene dolls and the various other products that allegedly infringe upon the trade dress of the Bratz and MGA's other products, in violation of the Lanham Act, 15 U.S.C. § 1125(a).

In the Ninth Circuit, trade dress "refers to the 'total image of a product' and may include features such as size, shape, color, color combinations, texture or graphics." *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir.1993); *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir.1989). To establish trade dress infringement, a plaintiff must show: (1) that its product design is non-functional, (2) that the design is inherently distinctive or has acquired a secondary meaning, and (3) that there is a likelihood of confusion. *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 (9th Cir.1998); *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046-47 (9th Cir.1998); *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 823 (9th Cir.1993). The "intent" of the alleged infringer may be relevant to both the second and third elements of this test. *See Fuddruckers, Inc. v. Doc's B.R.Others, Inc.*, 826 F.2d 837, 844-45 (9th Cir.1987) (evidence of deliberate copying may support inference of secondary meaning); *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)
(Cite as: 2005 WL 5894689 (C.D.Cal.))

341, 348-49 (9th Cir.1979) (factors considered in
determining "likelihood of confusion" include intent
of defendant in selecting allegedly infringing mark);
_id. at 354_ (when infringer knowingly adopts mark,
court can presume public will be deceived).

MGA's background factual allegations regarding
Mattel's corporate and financial history set the scene
and circumstantially bolster MGA's claim that Mattel
intentionally copied MGA's trade dress. In particular,
these allegations paint a picture of an industry giant
which had recently fallen on hard times and was
willing to do whatever was necessary to stop the
hemorrhaging and eliminate the rising tide of
competition stemming from a new company with a
drastically different product. According to MGA,
Mattel, because of its corporate culture and history,
was unable to "nimbly respond ... with a new,
creative product of its own." Compl. ¶ 31. Instead,
Mattel (intentionally) copied the Bratz and released
its My Scene line. Mattel's financial and corporate
history--and, particularly, its vulnerability at the time
of the Bratz's release--play into MGA's theory that
Mattel intentionally copied MGA's trade dress.
Accordingly, paragraphs 11-20 and 30-31 of the
Complaint are not "immaterial," and Mattel's motion
to strike these paragraphs is denied. [FN4]

> FN4. For the same reason, the court denies
> Mattel's motion to strike paragraph 35 of the
> Complaint, which provides relevant
> background information regarding the
> purpose of Mattel's release of the My Scene
> dolls and its release of the "Flavas." See
> Compl. ¶¶ 35-36 ("[Mattel's My Scene
> dolls,] [the] confusingly similar Bratz
> imitators[,] may have been originally
> intended to buy Mattel time while it worked
> to release another product the following
> summer, called 'Flavas.' ... The [Flavas]
> were not well-received.... Mattel has
> seemingly abandoned this line. Realizing
> that 'My Scene' was its best bet for riding
> MGA's successful coattails and capitalizing
> on the unique and inherently distinctive look
> that MGA had developed in its 'Bratz' dolls--
> and MGA's substantial goodwill--Mattel has
> systematically proceeded to modify the 'My
> Scene' dolls since their original release,
> particularly their eyes, to increase their
> similarity to 'Bratz' more and more over
> time.").

### B. Third Section of Complaint--"Mattel's Additional Unfair, Manipulative, Anti-Competitive Conduct"

*6 Mattel argues that the court should dismiss and/or
strike the third section of the Complaint, entitled
"Mattel's additional unfair, manipulative, anti-
competitive conduct," as well as various other related
allegations. According to Mattel, these allegations,
contained in paragraphs 74-100, 113- 114, and 118 of
the Complaint, are not material to any of MGA's
causes of action. Furthermore, Mattel contends that
the court should strike MGA's request for restitution
and disgorgement.

### 1. Materiality and/or Relevance

MGA responds to Mattel's first argument by
asserting that the allegations in the third section of
the Complaint are relevant and/or material to both its
trade dress claims and its unfair competition claims.

#### a. Relevance to Trade Dress Claims

MGA argues that the allegations in the third section
of the Complaint are relevant to its trade dress claims
because they help elucidate Mattel's "intent."

The relevant "intent" for purposes of a trade dress
claim (and the likelihood of confusion analysis) is the
defendant's "intent to deceive the public" or the
"intent of deriving benefit from the reputation of the
[plaintiff's] trade-mark or tradename." _Brookfield
Commc'n, Inc. v. West Coast Entm't Corp., 174 F.3d
1036, 1059 (9th Cir.1999). See also Toho Co., Ltd. v.
Sears, Roebuck & Co., 645 F.2d 788, 791 n. 2 (9th
Cir.1981)_ ("In order to raise the inference of a
likelihood of confusion, a plaintiff must show that the
defendant intended to profit by confusing
consumers."); J. Thomas McCarthy, _McCarthy on
Trademarks and Unfair Competition_ § 23:113 (2005)
("[W]hen the accused infringer's state of mind is
introduced as relevant to the liability issue of the
likelihood of confusion, ... the only relevant intent is
intent to confuse.").

The allegations contained in the third section of the
Complaint do not help demonstrate that Mattel had
this particular "intent" when it created the My Scene
dolls or any other allegedly infringing product. For
example, Mattel's alleged "intent to deceive the
public" in creating the My Scene dolls or its intent to
"derive benefit from the reputation" of MGA's Bratz
_is not evidenced by the fact that "Mattel has sent_

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)
(Cite as: 2005 WL 5894689 (C.D.Cal.))

threatening letters to several of its former employees" or has intimidated others into not dealing with MGA. These alleged facts, and the others asserted in the third section of the Complaint, demonstrate that Mattel is a fierce (and perhaps unfair) competitor, not that it acted with an "intent to deceive" in creating its products. Therefore, the third section of the Complaint cannot be sustained on the ground that it supports MGA's trade dress claims. [FN5]

> FN5. This same reasoning applies to defeat MGA's arguments that the third section of the Complaint supports MGA's claims for attorneys' fees, injunctive relief, and "unfair competition" under the Lanham Act, 15 U.S.C. § 1125(a). The relevant "intent" raised by each of these claims is the same as that raised by MGA's trade dress claims.

*b. Relevance to Unfair Competition Claims*

MGA also argues that the allegations in the third section of the Complaint support its claim for "unfair competition" under Cal. Bus. & Prof.Code § 17200 et seq.

California Business and Professions Code section 17200 et seq. (the "Unfair Competition Law" or "UCL") prohibits, among other things, "unfair business acts or practices." Id. California courts have generally defined "unfair" broadly under the UCL in order to "provide the courts with the maximum discretion to prohibit new schemes to defraud." National Rural Telecomm. Coop. v. DirecTV, Inc., 319 F.Supp.2d 1059, 1075 (C.D.Cal.2003) (Baird, J.) (citing Motors, Inc. v. Times Mirror Co., 102 Cal.App.3d 735, 740, 162 Cal.Rptr. 543 (1980)). See also People ex rel. Renne v. Servantes, 86 Cal.App.4th 1081, 1095, 103 Cal.Rptr.2d 870 (2001) ("The [UCL] is intentionally broad to give the court maximum discretion to control whatever new schemes may be contrived, even though they are not yet forbidden by law.").

*7 In Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. ("Cel-Tech"), 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999), the California Supreme Court clarified the definition of "unfair" insofar as it applies to cases between direct competitors, such as that now before the court. In particular, the Cel-Tech court turned for guidance to section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a), and stated:

When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

Id. at 186-87, 83 Cal.Rptr.2d 548, 973 P.2d 527.

Here, MGA claims that Mattel's conduct alleged in the third section of the Complaint "violated the policy or spirit" of the antitrust laws "because its effects were comparable" to a violation of those laws, and/or "otherwise significantly threatened or harmed competition." At this early stage in the proceedings, assuming all facts and all reasonable inferences in MGA's favor, the court agrees.

MGA alleges that Mattel has chosen to "compete" with MGA (and others in the industry) not by creating a better product or lowering its prices, but by using its extraordinary market power to unfairly preclude other companies and brands from entering and competing. For example, MGA alleges that Mattel has used its massive influence to corruptively cause industry groups to discriminate against MGA even though MGA needs to be associated with these groups to exist, survive, and thrive in the industry. See Compl. ¶¶ 81-96. Similarly, MGA contends that Mattel has used its great market power, which included a 90% share of the fashion doll market in 1997, to intimidate others into not dealing with MGA. Id. ¶¶ 74-77, 83 Cal.Rptr.2d 548, 973 P.2d 527. MGA also asserts that Mattel has intentionally engaged in schemes to buy up supplies to lock MGA (and others) out of the market. Id. ¶ 78, 83 Cal.Rptr.2d 548, 973 P.2d 527. Finally, Mattel employees have allegedly been caught tampering with MGA's displays, and have lied to others about MGA's products. Id. ¶ 79, 83 Cal.Rptr.2d 548, 973 P.2d 527.

At this early stage in the proceedings, the court cannot say that this collective conduct is consistent with the "policy and spirit" of the antitrust laws, and/or provides no "significant threat or harm" to competition. In Cel-Tech, itself, the California Supreme Court stated that "the purpose of the antitrust law is 'to foster and encourage competition' by prohibiting 'practices by which fair and honest competition is destroyed or prevented.' " Cel-Tech, 20 Cal.4th at 186, 83 Cal.Rptr.2d 548, 973 P.2d 527

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)
(Cite as: 2005 WL 5894689 (C.D.Cal.))

(quoting Cal. Bus. & Prof.Code § 17001). *See also Northeast Airlines, Inc. v. World Airways, Inc.*, 262 F.Supp. 316, 319 (D.Mass.1966) ("we believe that the purpose of destroying a competitor by means that are not within the area of fair and honest competition is a purpose that clearly subverts the goal of the [antitrust laws]"). Similarly, *it is recognized that the federal antitrust laws were "designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade."* SeeWilliam Meade Fletcher, 10A *Fletcher Cyclopedia f the Law of Private Corporations* § 4981 (2004) (discussing the Sherman Act). Mattel, by its above-mentioned conduct, has prevented "fair competition" from occurring and has undermined "free and unfettered competition."

*\*8* Additionally, *the antitrust laws and the FTCA have been applied to enjoin conduct arguably similar to Mattel's. Compare* Compl. ¶¶ 75-77 (alleging that Mattel, using its extraordinary market power, has intimidated employees, publishing entities, distributors, and retailers into not doing business with and discriminating against MGA), *with Federal Trade Commission ("FTC") v. Brown Shoe Co.*, 384 U.S. 316, 321, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966) ("basic policies" of antitrust laws violated when second largest shoe manufacturer employed extremely attractive program that required retailers "substantially to limit their trade with [manufacturer's] competitors"); *Adolph Coors Co. v. FTC*, 497 F.2d 1178 (10th Cir.1974) (affirming FTC finding that powerful supplier violated FTCA by coercing distributors and retailers into participating in a variety of anticompetitive conduct, including excluding products of supplier's competitor); *Union Circulation Co. v. FTC*, 241 F.2d 652, 655-56 (2d Cir.1957) (affirming FTC finding that defendants violated FTCA by "coercing" others into not doing business with defendants' competitor); *Hastings Mfg. Co. v. FTC*, 153 F.2d 253 (6th Cir.1946) (affirming FTC finding that defendant violated FTCA by using various means to induce distributors from refusing to handle competitors' products); *Carter Carburetor Corp. v. FTC*, 112 F.2d 722, 734-36 (8th Cir.1940) (affirming FTC finding that powerful supplier violated FTCA by "inducing, coercing and compelling many independent [retailers] to cancel existing sales contracts with ... competitor and to cease and refuse to deal in the products of such competitor"); *FTC v. Wallace*, 75 F.2d 733 (8th Cir.1935) (affirming FTC finding that defendant coal dealers violated FTCA by intimidating and threatening to boycott suppliers that dealt with competitors); *Amarel v. Connell*, 202 Cal.App.3d 137, 142, 145, 248 Cal.Rptr. 276 (1988) (plaintiff rice growers stated antitrust claim against powerful vertically-integrated competitors, in part, because competitors refused to do business with those who dealt with plaintiffs' customers); *Kolling v. Dow Jones & Co., Inc.*, 137 Cal.App.3d 709, 187 Cal.Rptr. 797 (1982) (violation of antitrust laws for supplier to threaten, intimidate, and coerce distributor into participating in anticompetitive conduct); *R.E. Spriggs Co., Inc. v. Adolph Coors Co.*, 94 Cal.App.3d 419, 425, 156 Cal.Rptr. 738 (1979) (violation of antitrust laws for supplier to force distributors into anticompetitive behavior "through suggestions which the distributors could not refuse"). *Compare* Compl. ¶ 78 (alleging Mattel bought up supply of doll hair from two largest suppliers to lock MGA out of market), *with Amarel*, 202 Cal.App.3d at 142, 145, 248 Cal.Rptr. 276 (plaintiff rice growers stated antitrust claim against integrated competitors, in part, *because competitors locked plaintiffs' customers out of ports necessary for business). Compare* Compl. ¶ 79 (alleging Mattel manipulated market by lying about MGA's products), *with Northeast Airlines, Inc.*, 262 F.Supp. at 319 ("[W]e believe that the purpose of destroying a competitor by means that are not within the area of fair and honest competition is a purpose that clearly subverts the goal of the [anti-trust laws].... The making of false and disparaging statements about a competitor ... [is] 'not within the area of fair and honest competition.' ").

*\*9* Thus, at least at this stage in the proceedings, the court finds that the allegations in the third section of MGA's Complaint support a claim for "unfair competition" under the UCL, [FN6] Accordingly, the court denies Mattel's motion to strike paragraphs 74-100, 113-114, and 118 of the Complaint. [FN7]

> FN6. Mattel attempts to avoid this result by relying upon *Cel-Tech*'s statement that "the antitrust laws were enacted for the protection of competition, not competitors." *Cel-Tech*, 20 Cal.4th at 186, 83 Cal.Rptr.2d 548, 973 P.2d 527 (internal quotation marks omitted) (emphasis omitted) (quoting *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 115, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986)). Although true, this statement does not aid Mattel because MGA's UCL claim does seek to protect "competition," not just "competitors." The

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)
(Cite as: 2005 WL 5894689 (C.D.Cal.))

Page 8

essence of MGA's claim is that Mattel has engaged in conduct stifling fair "competition," not that competitors can only compete with Mattel (when Mattel is competing fairly) with court assistance. That MGA may benefit from fair "competition" does not imply that MGA seeks only the protection of "competitors." *See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 352-53, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)* (Stevens, J., dissent) ("The antitrust laws were enacted for the protection of competition, not competitors. This proposition ... cannot be read to deny all remedial actions by competitors. When competitors are injured by [conduct that violates the antitrust laws] rather than by the free play of market forces, the antitrust laws protect competitors precisely for the purpose of protecting competition.") (citations and quotation marks omitted). Mattel additionally argues that MGA's UCL claim fails because MGA has not alleged that Mattel's conduct harmed "consumers." However, by contending that Mattel's conduct inappropriately hindered inter-brand competition, MGA has necessarily alleged harm to consumers. *See generally Amarel, 202 Cal.App.3d at 142, 248 Cal.Rptr. 276* (consumers benefit from "full and unrestricted competition").

FN7. Because of this holding, the court need not address MGA's other arguments as to why these paragraphs should not be stricken.

*2. Request for Restitution and Disgorgement*

Mattel argues that regardless, the court should strike MGA's request for restitution and disgorgement insofar as it relates to MGA's UCL claim. Mattel's argument is rejected. First, it is undisputed that MGA's request for restitution and disgorgement will remain in the Complaint regardless, because the request is potentially relevant to MGA's other claims. *Compare* Opp. at 21 ("[Restitution and disgorgement] [are] entirely proper [forms of relief] under the Lanham Act and California common law, and Mattel does not contest this."), *with* Rep. at 10 (failing to respond to this argument). Second, and more important, restitution and disgorgement are sometimes appropriate remedies under the UCL. *See Korea Supply Co. v. Lockheed Martin Corp., 29*

*Cal.4th 1134, 1148, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003)* (under UCL, "an individual may recover profits unjustly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest."); *id. at 1444, 1148, 131 Cal.Rptr.2d 29, 63 P.3d 937* (UCL allows for "disgorgement" of profits that is "restitutionary in nature"). *See also Inline, Inc. v. A.V.L. Holding Co., 125 Cal.App.4th 895, 903, 23 Cal.Rptr.3d 216 (2005)* ("The [California Supreme] [C]ourt has further specified that '[t]he only nonpunitive monetary relief available ... is the disgorgement of money that has been wrongfully obtained or, in the language of the statute, an order 'restor[ing] ... money ... which may have been acquired by means of ... unfair competition.' ' ") (quoting *Bank of the West v. Superior Court, 2 Cal.4th 1254, 1266, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992)*). Here, MGA's UCL claim survives, and it is too early in these proceedings to determine definitively whether MGA might be entitled to restitution and disgorgement based upon its UCL-related allegations. [FN8] Accordingly, the court denies Mattel's motion to strike MGA's request for restitution and disgorgement.

FN8. The court notes, however, that the UCL does not allow for an individual to recover "disgorgement of profits allegedly *obtained by means of an unfair business practice* ... where [those] profits are neither money taken from a plaintiff nor funds in which the plaintiff has an ownership interest." *Korea Supply Co., 29 Cal.4th at 1140, 131 Cal.Rptr.2d 29, 63 P.3d 937.*

*C. Paragraph 98—"LeapFrog"*

Mattel asserts that the court should strike paragraph 98 of the Complaint, which provides:

Mattel has clearly engaged in tortious, illegal and unethical behavior in its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently Mattel's current *modus operandi* when it comes to "competing" in the industry. The once immensely successful "LeapFrog" interactive learning product, for example, has apparently been one of Mattel's other recent victims.

Compl. ¶ 98. Mattel argues that this paragraph should be stricken because MGA lacks standing to assert a UCL claim on behalf of LeapFrog and because the allegations are immaterial.

Mattel's arguments fail. First, MGA is not attempting

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)
(Cite as: 2005 WL 5894689 (C.D.Cal.))

Page 9

to assert a claim on behalf of LeapFrog. Instead, MGA proffers its allegation regarding LeapFrog as an example of how Mattel treats its competition, of which MGA is a part. Therefore, MGA need not have "standing" with respect to this allegation. Moreover, at this stage of the proceedings, it would be *premature to conclude that the allegation is necessarily immaterial.* Accordingly, the court denies Mattel's motion to strike paragraph 98 of the Complaint.

### D. Paragraph 75--Suing and Sending Demand Letters to Former Employees

*10 Finally, Mattel argues that the court should strike paragraph 75 (and related allegations in paragraph 113) of the Complaint. Paragraph 75 provides:

[W]ielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees. Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004. Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint. As a result, Mattel's case against its former executive was dismissed with prejudice.

Compl. ¶ 75 (emphasis in original). As mentioned, these allegations, while not capable of supporting MGA's trade dress claims, arguably support MGA's UCL claim. *See supra* Part IV.B.1. Mattel argues that these allegations should nevertheless be stricken because: (1) *MGA lacks standing under the UCL to assert such allegations;* and (2) the conduct alleged in paragraph 75 is rendered inactionable by California's "litigation privilege" and the *Noerr-Pennington* doctrine.

### 1. Standing

Section 17204 of the California Business and Professions Code provides that a party has standing to bring an action pursuant to the UCL if it "has suffered injury in fact and has lost money or property as a result of a violation [of the UCL]." MGA specifically alleges that as a result of Mattel's conduct, including that alleged in paragraph 75, MGA's "ability to attract, hire, and retain employees has been affected." Compl. ¶ 100. *See also id .* ¶ 113,

10 Cal.Rptr.2d 538, 833 P.2d 545 (Mattel has ... used its power and influence to attempt to, if not actually, intimidate and threaten MGA's current and potential employees so as to cause MGA competitive injury."). Therefore, even if it is necessary for MGA to demonstrate it has "standing" to assert the allegations in paragraph 75, MGA has adequately alleged that it "has suffered injury in fact and has lost money or property as a result" of Mattel's alleged conduct. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (where 12(b) motion to dismiss is based on lack of standing, court must defer to plaintiff's factual allegations, and must "presume that general allegations embrace those specific facts that are necessary to support the claim") (quotation marks omitted). Therefore, MGA has "standing" under the UCL to assert the allegations contained in paragraph 75.

### 2. The Litigation Privilege and the Noerr-Pennington Doctrine

Mattel argues that regardless, the conduct alleged in paragraph 75 is inactionable under California's litigation privilege and the *Noerr-Pennington* doctrine.

California's litigation privilege is codified at section 47(b) of the California Civil Code, which provides that "[a] privileged publication or broadcast is one made ... in any judicial proceeding." Cal. Civ.Code § 47(b). This privilege applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) to have some connection or logical relation to the action." *Silberg v. Anderson.* 50Cal.3d 205, 212, 266 Cal.Rptr. 638, 786 P.2d 365 (1990).

*11 The *Noerr-Pennington* doctrine is a federal court creation. Originally, it was "[t]he First Amendment aspect of antitrust law." *Freeman v. Lasky, Haas & Cohler,* 410 F.3d 1180, 1183-84 (9th Cir.2005). The doctrine was announced in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), where the Supreme Court interpreted the Sherman Act, in view of "the right of the people ... to petition the Government for a redress of grievances," to not cover political lobbying:

To hold that the government retains the power to act in [its] representative capacity [to make laws that operate to restrain trade] and yet hold, at the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)
(Cite as: 2005 WL 5894689 (C.D.Cal.))

same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act.... [S]uch a construction of the Sherman Act would [also] raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.

*Noerr Motor Freight, Inc.,* 365 U.S. at 137-38. "The doctrine extends to all three branches of government, and thus also exempts bringing a lawsuit-- that is, petitioning a court--from antitrust liability." *Freeman,* 410 F.3d at 1183 (citing *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972)). To date, some courts have even applied this doctrine to immunize pre-litigation demand letters from lawsuits unrelated to antitrust law. See, e.g., *DirectTV v. Lewis,* No. 03-CV-6241-CJS-JWF, 2005 WL 1006030, at 5-7 (W.D.N.Y. Apr.29, 2005).

These doctrines apply differently to MGA's allegations regarding Mattel's suing one of its former employees and its allegations regarding Mattel sending demand letters to its former employees.

*a. The Brewer Litigation*

In the second part of paragraph 95, MGA refers to a lawsuit filed by Mattel against one of its former senior executives, Ronald Brewer, who left Mattel for MGA. In that lawsuit, Mattel sought declaratory relief that certain information allegedly possessed by Brewer was confidential to Mattel and that Brewer did not have the "ability ... to undertake the responsibilities inherent in his new position with MGA without disclosing or using the confidential ... [i]nformation that [he] learned while employed by Mattel." See Mot., Ex. A (*Mattel, Inc. v. Brewer,* Compl. ¶¶ 47, 48). [FN9] The Los Angeles Superior Court dismissed Mattel's case against Brewer with prejudice, and the decision is currently on appeal. Mot. at 5.

FN9. The court takes judicial notice of this document. See *Parrino v. FHP Inc.,* 146 F.3d 699, 706 (9th Cir.1998) ("a district court ruling on a motion to dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies").

Despite MGA's arguments to the contrary, its allegations regarding the *Brewer* litigation are rendered inactionable by California's litigation privilege. The Complaint essentially asserts that the *Brewer* lawsuit was meritless and that Mattel instituted the suit simply to harass Brewer and intimidate others who might consider leaving Mattel for MGA. The initiation of such a lawsuit and the statements made therein are clearly protected by the litigation privilege. See *Rubin v. Green,* 4 Cal.4th 1187, 1195, 17 Cal.Rptr.2d 828, 847 P.2d 1044 (1993) ("filing the complaint and subsequent pleadings in the litigation" is protected by the litigation privilege); *Abraham v. Lancaster Community Hospital,* 217 Cal.App.3d 796, 822, 266 Cal.Rptr. 360 (1990) ("[I]t cannot be disputed that the filing of a lawsuit is a publication in the course of a judicial proceeding."); *Microsoft Corp. v. BEC Computer Co., Inc.,* 818 F.Supp. 1313, 1319 (C.D.Cal.1992) (Kenyon, J.) ("the filing of improper or meritless pleadings ... is privileged"). Thus, MGA's allegations regarding the *Brewer* litigation are based upon privileged conduct, and such allegations are ordered stricken from the Complaint. [FN10]

FN10. MGA attempts to avoid this result by arguing that the *Brewer* litigation does not provide a "basis" for its UCL claim, but merely "evidence" of Mattel's unfair business practices. See Opp. at 20-21 (citing *White v. Western Title Ins. Co.,* 40 Cal.3d 870, 888, 221 Cal.Rptr. 509, 710 P.2d 309 (1985) ("[There is] a careful distinction between a cause of action based squarely on a privileged communication, such as an action for defamation, and one based upon an underlying course of conduct evidenced by the communication."); *Stacy & Witbeck, Inc. v. City and County of San Francisco,* 36 Cal.App. 1074, 1091 (1995) ( "[A]lthough section 47, subdivision (b), bars certain tort causes of action predicated on a judicial statement or publication, it does not create an evidentiary privilege for those statements. Thus, as an example, those statements can be used for evidentiary purposes to determine a person's intent."); *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma,* 42 Cal.3d 1157, 232 Cal.Rptr. 567, 728 P.2d 1202 (1986) (in abuse of process action, plaintiff may use statements made during settlement

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)
(Cite as: 2005 WL 5894689 (C.D.Cal.))

negotiations in prior suit as "evidence" of defendant's improper "ulterior" purpose in initiating prior suit). MGA, however, misrepresents the nature of its Complaint. Reading the Complaint as a whole, it is clear that the allegations in paragraph 75 provide one of the "bases" upon which MGA rests its claim that Mattel engaged in "unfair competition." The allegations in paragraph 75 are not mere "evidence" tending to show an element of some other cause of action, such as malicious prosecution or abuse of process. Indeed, MGA itself appears to admit as much in a separate portion of its opposition. *See* Opp. at 1-2 (describing its allegations, including those based upon the *Brewer* litigation, as being "at the heart of Mattel's anti-competitive behavior"). Consequently, MGA's allegations regarding the *Brewer* litigation are subject to the litigation privilege. *See Dong v. Board of Trustees of Leland Stanford Junior University,* 191 Cal.App.3d 1572, 1594, 236 Cal.Rptr. 912 (1987) (documents subject to litigation privilege if they provide "the nuclei" for causes of action); *Block v. Sacramento Clinical Labs, Inc.,* 131 Cal.App.3d 386, 392-93, 182 Cal.Rptr. 438 (1982) (privilege applies where litigation-related conduct is "the actionable wrong").

#### b. Demand Letters

*12 Paragraph 75 also includes the allegation that "Mattel has sent threatening letters to several of its former employees who now work for MGA [,] warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees." Compl. ¶ 75 (emphasis in original). At least at this stage in the proceedings, neither the litigation privilege nor the *Noerr-Pennington* doctrine provides a basis for striking this allegation.

First, because this allegation relates to "pre-litigation conduct," the scope of the litigation privilege is narrowed. In particular, pre-litigation demand letters are "protected by the litigation privilege [only] when the statement is made in connection with a proposed litigation that is contemplated in good faith and under serious consideration.' " *Blanchard v. DirectTV, Inc.,* 123 Cal.App.4th 903, 919, 20 Cal.Rptr.3d 385 (2004) (quoting *Aronson v. Kinsella,* 58 Cal.App.4th 254, 262, 68 Cal.Rptr.2d 305 (1997)) (citing *Silberg,* 50

Cal.3d at 212, 266 Cal.Rptr. 638, 786 P.2d 365; *Laffer v. Levinson, Miller, Jacobs & Phillips,* 34 Cal.App.4th 117, 124, 40 Cal.Rptr.2d 233 (1995); *Fuhrman v. California Satellite Systems,* 179 Cal.App.3d 408, 420-21, 231 Cal.Rptr. 113 (1986), *overruled on other grounds by Silberg v. Anderson,* 50 Cal.3d 205, 212, 266 Cal.Rptr. 638, 786 P.2d 365 (1990)). Here, it is at least arguable that Mattel's demand letters did not meet the "good faith" requirement because they allegedly threatened to sue former employees even if the employees disclosed only "publicly available information." *Cf. Herzog v. "A" Company, Inc.,* 138 Cal.App.3d 656, 188 Cal.Rptr. 155 (1982) ("good faith" requirement not met when employer sends demand letter to former employee threatening suit if employee engages in conduct not barred by agreement between employer and former employee). *See also Aronson v. Kinsella,* 58 Cal.App.4th 254, 270, 68 Cal.Rptr.2d 305 (1997) (must determine whether party writing demand letter "honestly believed he had a viable legal claim"). In any event, this determination is not one that should be made on the pleadings. *See, e.g., Fuhrman,* 179 Cal.App.3d at 422, 231 Cal.Rptr. 113 (whether demand letters were sent in good faith and serious contemplation of litigation is factual question that cannot be decided on demurrer). Therefore, the litigation privilege cannot be used as a basis at this time to strike the allegations regarding Mattel's demand letters.

Second, the *Noerr-Pennington* doctrine, even if applicable, does not provide a basis at this time for striking the allegations regarding Mattel's demand letters, because MGA's allegations suggest that these letters fall within the "sham" exception to the doctrine. As stated by the Ninth Circuit:

While *Noerr-Pennington* immunity is broad, it is not so broad as to cover all litigation: "Sham" petitions don't fall within the protection of the doctrine. We have recognized three circumstances when litigation might be sham:

First, if the alleged anticompetitive behavior consists of bringing a single sham lawsuit (or a small number of such suits), the antitrust plaintiff must demonstrate that the lawsuit was (1) objectively baseless, and (2) a concealed attempt to interfere with the plaintiff's business relationships.

*13 Second, if the alleged anticompetitive behavior is the filing of a series of lawsuits, "the question is not whether any one of them has merit-- some may turn out to, just as a matter of chance--but whether they are brought pursuant to a policy of starting

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)
(Cite as: 2005 WL 5894689 (C.D.Cal.))

legal proceedings without regard to the merits and for the purpose of injuring a market rival."

Finally, in the context of a judicial proceeding, if the alleged anticompetitive behavior consists of making intentional misrepresentations to the court, litigation can be deemed a sham if "a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy."

*Freeman,* 410 F.3d at 1183-84 (citations omitted).

Here, MGA's allegations suggest that the first exception is applicable: the requests in Mattel's demand letters were "objectively baseless," and the demand letters were a "concealed attempt to interfere" with MGA's business relationships. Therefore, at least at this stage in the proceedings, the court cannot say that the *Noerr-Pennington* doctrine, even if applicable, serves as a basis for striking MGA's allegations regarding Mattel's demand letters. Accordingly, the court denies Mattel's motion to strike MGA's allegations regarding Mattel's demand letters.

## V. CONCLUSION

For the reasons set forth above, Mattel's Motion is GRANTED in part and DENIED in part. Mattel's Motion is granted insofar as it requests that MGA's allegations regarding the *Brewer* litigation be stricken; otherwise, Mattel's Motion is denied. No later than September 19, 2005, Mattel shall file an Amended Answer.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 5894689 (C.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 2691393 (N.D.Cal.)
(Cite as: 2006 WL 2691393 (N.D.Cal.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Michael W. MILMOE, Plaintiff,
v,
GEVITY HR, INC., Defendant.
No. C 06-04721 SBA.
[Docket Nos. 8, 10].

Sept. 20, 2006.

Kyra Alexis Subbotin, Law Offices of Kyra A.
Subbotin, Berkeley, CA, for Plaintiff.

Eden Edwards Anderson, Lorraine P. Ocheltree,
Duane Morris LLP, San Francisco, CA, Eric P.
Berezin, Duane Morris LLP, Atlanta, CA, for
Defendant.

ORDER

SAUNDRA BROWN ARMSTRONG, District
Judge.

*1 This matter is before the Court on Defendant's
Motion to Dismiss ("Gevity's Motion") [Docket No.
8] and Defendant's Request for Judicial Notice
[Docket No. 10]. Having read and considered the
arguments presented by the parties in the papers
submitted to the Court, the Court finds this matter
appropriate for resolution without a hearing.

BACKGROUND [FN1]

FN1. These allegations are listed in the
Complaint,

Plaintiff Michael W. Milmore ("Plaintiff") is and at
all relevant times was a resident of San Francisco,
California. Financial Interactive, Inc. ("FI") and
defendant Gevity HR, Inc. ("Gevity") were co-
employers of Plaintiff, whose title was Vice President
of Business Development.

Gevity is a Florida corporation doing business
throughout California and in the county of San
Francisco, California. Gevity provides human
resources counseling and services for companies
throughout California, and was under contract to
provide those services to FI beginning January 8,
2004. Gevity became a co-employer of Plaintiff as of
that date.

Plaintiff worked for FI from approximately May 1,
2001, though July 8, 2004. On or about January 8,
2004, Plaintiff also became an employee of Gevity
pursuant to a contract executed by FI and Gevity.

Pursuant to the FI-Gevity contract ("Personal
Services Agreement" or "PSA"), of which Plaintiff
claims to be a direct and third party beneficiary,
Gevity undertook to become Plaintiff's co-employer
and to advise FI regarding employment matters,
including but not limited to payment of employee
wages, handling of employee benefits, and
termination of employees. Gevity specifically
reserved to itself the right of direction and control
over employees such as Plaintiff and retained
authority to hire and fire employees. It also agreed to
provide FI advice regarding human resources
decisions. Gevity also issued payroll checks to FI
employees, including Plaintiff.

In early 2004, Plaintiff went on an approved leave of
absence from work. Prior to leaving, he received
assurances that his medical benefits would be
continued during his absence, a fact of importance to
him, given that his wife was then pregnant with their
first child. Notwithstanding these assurances,
Plaintiff's medical coverage was cancelled without
his knowledge, causing him to incur great expense
and emotional distress.

On July 8, 2004, Plaintiff was abruptly terminated
without warning, shortly after filing a claim for
unpaid commissions that were due and owing to him.

Plaintiff filed a Complaint against Gevity in
California Superior Court in San Francisco County,
stating two claims: 1) breach of contract and 2)
wrongful termination.

With respect to the breach of contract claim, Plaintiff
alleges that Gevity breached its contract and
obligations to Plaintiff by, among other things, failing
to ensure that Plaintiff's benefits continued while
Plaintiff was on leave of absence, as promised by FI,

© 2008 Thomson/West. No Claim to Orig. US Gov, Works.

Not Reported in F.Supp.2d                                                      Page 2
Not Reported in F.Supp.2d, 2006 WL 2691393 (N.D.Cal.)
(Cite as: 2006 WL 2691393 (N.D.Cal.))

Gevity likewise allegedly breached its obligations to Plaintiff by abruptly and wrongfully terminating his wages and allowing/advising termination of his employment and/or failing or refusing to provide FI with advice regarding the proper termination of employees, thereby preventing such termination. Gevity thereafter failed or refused to advise payment of commissions and other benefits to Plaintiff and allowed and/or counseled FI to make defamatory comments to Plaintiff's new employer.

*2 With respect to the wrongful termination claim, Plaintiff alleges that the stated reasons for his termination--which are not specified in the Complaint--were pretextual and that Plaintiff was, in fact, terminated in retaliation for seeking commissions due and owing to him. Plaintiff argues that Gevity's actions violated California public policy.

The Complaint was filed in Superior Court on July 6, 2006.

On August 3, 2006, Gevity removed the action to this Court.

On August 8, 2006, Gevity filed the instant Motion to Dismiss ("Gevity's Motion").

On August 28, 2006, Plaintiff filed his Opposition.

On September 5, 2006, Gevity filed its Reply.

### LEGAL STANDARDS
A. Rule 12(b)(6).

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should be granted only if it appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true. *Jenkins v.. McKeithen,* 395 U.S. 411, 421 (1969); *Everest & Jennings, Inc. v. American Motorists Ins. Co.,* 23 F.3d 226, 228 (9th Cir.1994). All reasonable inferences are to be drawn in favor of the plaintiff. *Jacobson v. Hughes Aircraft,* 105 F.3d 1288, 1296 (9th Cir.1997). When a plaintiff attaches exhibits to the complaint, those exhibits may be considered as part of the pleadings. *Cooper v. Bell,* 628 F.2d 1208, 1210 n. 2 (9th Cir.1980).

The court does not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981); *see Miranda v. Clark County, Nev.,* 279 F.3d 1102, 1106 (9th Cir.2002) ("[C]onclusory allegations of law and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim."); *Sprewell v. Golden State Warriors,* 266 F.3d 979, 987 ("Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."), *as amended by,*275 F.3d 1187 (9th Cir.2001); *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 810 (9th Cir.1988) ("[C]onclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim.").

When a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986). The court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kavport Package Express,* 885 F.2d 531, 538 (9th Cir.1989). Of these factors, prejudice to the opposing party is the most important. *See Jackson v. Bank of Hawaii,* 902 F.2d 1385, 1387 (9th Cir.1990) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330-31 (1971)). Leave to amend is properly denied "where the amendment would be futile." *DeSoto Yellow Freight Sys.,* 957 F.2d 655, 658 (9th Cir.1992).

### ANALYSIS
*3 Gevity seeks to dismiss both of Plaintiff's claims against it, pursuant to Fed.R.Civ.P, 12(b)(6). Plaintiff's two claims will be addressed in turn. As preliminary matter, Gevity also seeks judicial notice of the PSA, which is attached as an exhibit to the Declaration of Eden E. Anderson. The Court hereby GRANTS Gevity's request for judicial notice, as the contents of the PSA are referenced throughout the Complaint and as neither party questions the document's authenticity--both Gevity and Plaintiff cite to the noticed copy of the PSA in their briefs.

Not Reported in F.Supp.2d                                                                  Page 3
Not Reported in F.Supp.2d, 2006 WL 2691393 (N.D.Cal.)
(Cite as: 2006 WL 2691393 (N.D.Cal.))

*Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir.1998) (A "district court ruling on a motion to dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies.").

## A. Breach of Contract

Gevity argues that the contract between Gevity and FI, referenced in the Complaint, was a Professional Services Agreement, in which FI "outsourc[ed] to Gevity various administrative functions." Mot. at 2. Because this contract was between Gevity and FI, and because Plaintiff was not a party to this agreement, Gevity argues that Plaintiff can only seek to enforce the contract against Gevity as a third-party beneficiary. Mot. at 4. To enforce a contract as a third party beneficiary, Plaintiff "must plead a contract which was made expressly for his benefit and one in which it clearly appears that he was a beneficiary." *California Emergency Physicians Med. Group v. Pacificare of California*, 111 Cal.App. 4th 1127, 1138 (Cal.Ct.App.2003) (affirming demurrer where company providing medical services to patients was not a third party beneficiary to patients' contracts with their insurer) (citation omitted). Specifically,

[A] third party beneficiary must show the contract was made expressly for his or her benefit. "Expressly" means "in an express manner; in direct or unmistakable terms; explicitly; definitely; directly." "[An] intent to make the obligation inure to the benefit of the third party must have been clearly manifested by the contracting parties."

*Softas v. Bank of America*, 172 Cal.App.3d 583, 587 (Cal.Ct.App.1985) (citations omitted). In *Softas*, the California Court of Appeals held that the plaintiff could not state a claim for breach of contract, where he failed to show that the contract was made expressly for his benefit: 1) the contract itself stated "no other person or persons shall have any right or action hereon," 2) the parties to the contract could not assign their rights without written consent of the other party, and 3) no benefit directly flowed to plaintiff by virtue of the contract. *Id.* In the instant case, Gevity argues that Plaintiff cannot show that he was a third party beneficiary, because the PSA states expressly, "This Agreement is intended solely for the mutual benefit of the parties hereto and does not create any rights in a third party." Anderson Decl., Ex. A, ¶ 20.

*4 In its Opposition, Plaintiff cites to *Prouty*, in which the California Court of Appeals held that a

contract provision stating that the contract was "not intended to confer upon any Person other than the parties hereto ... any rights or remedies hereunder" does not necessarily preclude a third party beneficiary action for breach of that contract. *Prouty v. Gores Technology Group*, 121 Cal.App. 4th 1225, 1127 (Cal.Ct.App.2004). In *Prouty*, the California Court of Appeals explained that,

It is not necessary that the beneficiary be named and identified as an individual; a third party may enforce a contract if he can show he is a member of a class for whose benefit it was made.... The test for determining whether a contract was made for the benefit of a third person is whether an intent to benefit a third person appears from the terms of the contract. *If the terms of the contract necessarily require the promisor to confer a benefit on a third person, then the contract, and hence the parties thereto, contemplate a benefit to the third person.* Whether the third party is an intended beneficiary or merely an incidental beneficiary involves construction of the intention of the parties, gathered from reading the contract as a whole in light of the circumstances under which it was entered. Generally, it is a question of fact whether a particular third person is an intended beneficiary of a contract.

*Id.* at 1233 (emphasis added) (citations omitted). In *Prouty*, the Court of Appeals held that a corporate acquisition contract between two companies gave rise to a third party breach of contract action by former employees of the acquired company, because the contract contained a provision precluding early termination of and mandating certain severance benefits for employees of the acquired company. *Id.* The Court of Appeals explained that this provision "benefits [the employee plaintiffs], and only them." *Id.* The Court of Appeals held that under "well established principles of contract interpretation, "when a general and a particular provision are inconsistent, the particular and specific provision is paramount to the general provision." *Id.* at 1235. The Court of Appeals thus held that provision of the contract benefitting employees is "an exception" to the contract's more general bar on creating third party rights, and that the plaintiffs may therefore bring third party beneficiary claims enforcing the benefits provision of the contract. *Id.* at 1235-37. In the instant case, Plaintiff cites to a provision in the PSA in which Gevity agrees to a) handle claims submitted by FI employees and b) "assume responsibility for the payment of wages to [FI's employees] without regard to payments by [FI] to Gevity." Opp. at 7

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 4
Not Reported in F.Supp.2d, 2006 WL 2691393 (N,D,Cal.)
(Cite as: 2006 WL 2691393 (N.D.Cal.))

(citing Anderson Decl., Ex. A, ¶ 6(C)). At this stage in the proceedings, the Court need not rule on whether this provision, or any other provision, of the PSA was intended to benefit Plaintiff, as a third party to the contract. Such a determination is a question of fact to be determined "from reading the contract as a whole in light of the circumstances under which it was entered." *Prouty,* 121 Cal.App. 4th at 1233, At present, the Court must determine merely whether "it appears beyond a doubt that the plaintiff 'can prove no set of facts in support of his claim which would entitle him to relief,' " *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In the instant case, drawing all reasonable inferences in favor of Plaintiff, *Jacobson v. Hughes Aircraft,* 105 F.3d 1288, 1296 (9th Cir.1997), it is at least plausible that the Plaintiff might prove a) that certain provisions of the PSA-- such as the provision pertaining to payment of wages--were intended to benefit Plaintiff and b) that these provisions thus give rise to Plaintiff's third party breach of contract claim against Gevity, in spite of the PSA's language that it "does not create any rights in a third party. Therefore, the Court DENIES Gevity's Motion to Dismiss with respect to Plaintiff's breach of contract claim.

*5 Plaintiff argues, in the alternative and without elaboration, that Gevity had an implied contract not to discharge Plaintiff without good cause. Opp. at 4. Plaintiff cites the California Supreme Court's opinion in *Foley* for the proposition an employee may have an enforceable, implied-in-fact contract preventing termination of that employee without good cause. *Foley v. Interactive Date Corp.,* 47 Cal.3d 654, 675 (Cal.1988). Plaintiff does not allege any facts in the Complaint indicating the existence of an implied contract between Plaintiff and Gevity. To the extent that Plaintiff wishes to pursue this claim, the Court GRANTS Plaintiff LEAVE TO AMEND the Complaint to state a claim for breach of an implied contract.

**B. Wrongful Termination in Violation of Public Policy**

Second, Gevity argues that Plaintiff fails to state a claim for wrongful termination in violation of public policy. Gevity argues that Plaintiff has failed to allege a public policy sufficient to support his wrongful termination claim. The California Supreme Court has held that "in order to provide an exception to [California Labor Code section] 2922's at-will mandate, the policy must be 'public' in that it 'affects

society at large' rather than the individual, must have been articulated at the time of discharge, and must be 'fundamental' and 'substantial.' " *Green v. Ralee Engineering Co.,* 19 Cal.4th 66, 76 (Cal.1998). Gevity argues, without citation to any relevant case law, that because Plaintiff bases his claim for wrongful termination on "unpaid commissions," Plaintiff has failed to allege a public policy that could support a claim for wrongful discharge.

In his Opposition, Plaintiff cites specific case law demonstrating that California law does recognize a claim for wrongful termination in violation of public policy arising out of a failure to pay commissions. In *Gould,* the California Court of Appeals reversed the trial court's demurrer on a cause of action for wrongful termination in violation of public policy, where the plaintiff alleged that his employer "terminated him to avoid paying him accrued commissions and vacation pay," *Gould v. Maryland Sound Industries, Inc.,* 31 Cal.App. 4th 1137, 1146 (Cal.Ct.App.1994). The Court of Appeals rejected the employer's argument that this did not involve a "fundamental public polic[y] of the type which will support a claim for tortious wrongful discharge. *Id.* at147. The Court of Appeals held that "[s]tatutory provisions and case law support Gould's contention th[at] prompt payment of wages _ [FN2] due an employee is a fundamental public policy of this state.... [W]e conclude if [the employer] discharged [the plaintiff] in order to avoid paying him the commissions, vacation pay, and other amounts he had earned, it violated a fundamental public policy of this state. *Id.* at 1146-48.

> FN2. Pursuant to California Labor Code § 200(a), commissions are "wages." Cal. Labor Code § 200(a) (" 'Wages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.").

In its Reply, Gevity argues even if Plaintiff succeeds in identifying a sufficiently fundamental public policy, Plaintiff still fails to allege that 1) Gevity terminated Plaintiff's employment, 2) Gevity did so in retaliation for Plaintiff having requested commissions, 3) Gevity owed Plaintiff any commissions. This argument is unavailing as a factual matter. Plaintiff clearly alleges that he was "an employee of Gevity" and was "terminated in

Not Reported in F.Supp.2d                                                 Page 5
Not Reported in F.Supp.2d, 2006 WL 2691393 (N.D.Cal.)
(Cite as: 2006 WL 2691393 (N.D.Cal.))

retaliation for seeking commissions due and owing to him." Compl. at ¶¶ 4, 12. While the Complaint does not specify whether these commissions were owed for work performed for Gevity or Plaintiff's other co-employer, FI, the Complaint does allege that Gevity was responsible for issuing "payroll checks to FI employees," including Plaintiff. Compl. at ¶ 5. From this, the court can infer that Gevity should have issued the commissions to Plaintiff, even if the commissions were owed for work performed for FI.

*6 On balance, the Court finds that it does not "appear[ ] beyond a doubt that the plaintiff 'can prove no set of facts in support of his claim which would entitle him to relief.' " *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). To the contrary, Plaintiff has alleged facts sufficient to make out a claim for wrongful termination in violation of public policy. The Court thus DENIES Gevity's Motion, to the extent that it pertains to Plaintiff's claim for wrongful termination in violation of public policy.

### CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT Gevity's Motion is DENIED and Plaintiff is GRANTED LEAVE TO AMEND the Complaint to state a claim for breach of an implied contract. Plaintiff shall file his Amended Complaint by October 4, 2006.

IT IS FURTHER ORDERED THAT Gevity's Request for Judicial Notice is GRANTED.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2006 WL 2691393 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 2521328 (D.Del.)
**(Cite as: 2006 WL 2521328 (D.Del.))**

**C**Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
NOKIA CORP. and Nokia, Inc., Plaintiffs,
v.
QUALCOMM, INC. Defendant.
**No. CIV A 06-509-JJF.**

Aug. 29, 2006.

A. William Urquhart, Frederick Lorig, Patrick
Shields, and Erica Taggart, of Quinn Emanuel
Urquhart Oliver & Hedges, L.L.P., Los Angeles,
California, Richard I. Werder, Jr., and Sanford I.
Weisburst, of Quinn Emanuel Urquhart Oliver &
Hedges, L.L.P., New York, New York, Thomas A.
Beck, Lisa A. Schmidt, Jeffrey L. Moyer, and Steven
J. Fineman, of Richards, Layton & Finger, P.A.,
Wilmington, Delaware, for Plaintiffs.

Evan R. Chesler, and Richard J. Stark, of Cravath,
Swaine & Moore, L.L.P., New York, New York,
Richard L. Horwitz, Mathew E. Fischer, and Kenneth
L. Dorsney, of Potter Anderson & Corroon, L.L.P.,
Wilmington, Delaware, for Defendant.

*MEMORANDUM OPINION*

FARNAN, J.

*1 Pending before the Court is Plaintiff's Motion to
Remand (D.I.5). For the reasons discussed, the Court
will grant Plaintiff's Motion to Remand.

I. BACKGROUND

 Plaintiff Nokia filed suit in the Court of Chancery of
the State of Delaware seeking declaratory relief and
specific performance to enforce terms of alleged
contracts existing between it and Defendant
Qualcomm. (*See* D.I. 6, Ex. B). The contractual
agreements at issue relate to the standard-setting
procedures of the European Telecommunications
Standardization Institute ("ETSI") regarding the
licensing of essential patents. Defendant filed a
Notice of Removal contending that patent law is a
necessary element of Plaintiff's claims. (D.I.1).

II. DISCUSSION

 The issue presented by the parties is whether
Plaintiff's claim "arises under" federal patent law
pursuant to 28 U.S.C. § 1338(a) such that this Court
may exercise its jurisdiction. A claim arises under
patent law when plaintiff's well-pleaded complaint
establishes a cause of action based on patent law.
*Christianson v. Colt Indus. Operating Corp.*, 486
U.S. 800, 809 (1988). However, even if the complaint
establishes no patent law claim on its face, federal
jurisdiction is proper where "the plaintiff's right to
relief necessarily depends on resolution of a
substantial question of patent law, in that patent law
is a necessary element of one of the well-pleaded
claims." *Id.*

 Because Plaintiff's complaint cites no claims of
patent infringement, invalidity, or unenforceability on
its face, the predominate issue is whether patent law
is a necessary element of Plaintiff's claims. Plaintiff's
complaint is based on an alleged breach of
contractual agreements surrounding Defendant's
licensing of essential patents. However, a clever
plaintiff cannot avoid federal jurisdiction simply by
failing to plead patent law issues. *Id.* at n. 3. Thus, it
is necessary to determine whether resolution of
Plaintiff's claims depends on a "substantial question
of patent law."

 In *U.S. Valves, Inc. v. Dray*, 212 F.3d 1368, 1372
(Fed.Cir.2000), the Federal Circuit found a
"substantial question of patent law" where it was
necessary for the court to interpret patents and
determine whether infringement occurred. In *U.S.
Valves*, plaintiff alleged that defendant sold valves
which infringed its patents in violation of a license
agreement. *Id.* Thus, interpretation of the patents was
integral to resolution of the suit. *Id.* Similarly, in
*Highland Supply Co. v. Klerk's Flexible Packaging,
B.V.*, a case cited by Defendant, the court found
patent law was necessary to resolve a breach of
contract claim where plaintiffs had to prove the
products in question were covered by its patent. No.
05-482, 2005 WL 3534211, at *4 (S.D.Ill.Dec. 21,
2005). In addition, the court had to conduct a "fact-
intensive and technical inquiry" to determine whether
the patent was, in fact, infringed. *Id.*

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2006 WL 2521328 (D.Del.)
(Cite as: 2006 WL 2521328 (D.Del.))

In contrast, the present case involves interpretation of the terms of the licensing agreement between Plaintiff and Defendant which arises from Defendant's use of the ETSI procedures to declare certain patents "essential." It is not necessary, as Defendant contends, to determine whether the patents at issue are in fact "essential" because Defendant has already voluntarily declared them essential. Rather, Plaintiff merely seeks an interpretation of Defendant's obligations arising after declaring certain patents essential.

*2 The ETSI IPR Database states that declared patents include "an undertaking from the owner to grant licenses." (D.I.14, Ex. 6). These licenses are to be granted to ETSI members on terms that are fair, reasonable, and non-discriminatory ("FRAND terms"). (D.I.6, p. 3). For Defendant to now contend Plaintiff's claims cannot be resolved without determining whether the patents at issue are essential seems incongruent with Defendant's own declarations to the ETSI. Although the ETSI IPR Database includes a disclaimer that it "cannot confirm, or deny, that the patents/patent applications [contained therein], are, in fact, essential, or potentially essential," (D.I.14, Ex. 6), such a determination is not necessary to the interpretation of the parties' contractual obligations for declared-essential patents. See *United Techs. Corp. v. Chrome Alloy Gas Turbine Corp.,* 105 F.Supp.2d 346, 358 (D.Del.2000) (finding no question of patent law where interpretation of patents was not necessary to determine breach of the licensing agreement).

In sum, Plaintiff seeks a determination by the Court of Chancery of the terms of the contractual agreements undertaken by Defendant as a result of declaring certain patents essential. In addition, Plaintiff seeks declaratory relief and specific performance to enforce those obligations. In the Court's view, resolution of this claim depends on interpretation of the terms of the licensing agreement, rather than interpretation of the patents. Accordingly, the Court concludes that there is no substantial question of patent law warranting federal jurisdiction, and therefore, Plaintiff's Motion to Remand will be granted.

III. CONCLUSION

For the reasons discussed, the Court will grant Plaintiff's Motion to Remand (D.I.5).

An appropriate Order will be entered.

*ORDER*
At Wilmington, this 29th day of August 2006, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that Defendants' Motion To Remand (D.I.5) is *GRANTED.*

Not Reported in F.Supp.2d, 2006 WL 2521328 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

LEXSEE



Cited
As of: Jan 24, 2008

**Union Corporation and The Metal Bank of America, Inc. v. Terrence Milton Brown, Kenneth Robert Krivitzky, David Nathan Berkowitz, and Versatile Oxide, Inc.**

**Civil Action No. 87-5525**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**1988 U.S. Dist. LEXIS 2542**

**March 29, 1988, Decided and Filed**

**CORE TERMS:** counterclaim, breach of fiduciary duty, compulsory counterclaims, matured, statute of limitations, causes of action, occurrence, inducing, action alleging, breach of contract, breach of lease, present action, limitations period, prior action, prior suit, subject matter, failed to state, applicability, estopped, invoking, briefing, tolling, serving, veil, opposing

**COUNSEL:** [*1] John Mattioni, Esq., MATTIONI, MATTIONI, MATTIONI, LTD., Phila., Pa., for Plaintiff.

Thomas W. Murrell, III, Esq., MORGAN, LEWIS & BOCKIUS, Phila., Pa., for Defendants.

**OPINION BY:** KELLY

**OPINION**

*MEMORANDUM AND ORDER*

*J. M. KELLY, J.*

*Presently before the court is defendants' motion to dismiss plaintiffs' Amended Complaint, pursuant to Rules 12(b)(6), 12(b)(1), and 9(b) of the Federal Rules of Civil Procedure. Plaintiffs filed this nine count complaint on September 2, 1987 against defendants Versatile Oxide, Inc., a wholly-owned subsidiary of Versatile Metals, Inc., Terence Milton Brown, Kenneth Robert Krivitsky, and*

*David Nathan Berkowitz. The individually named defendants are officers and shareholders of Versatile Metals, Inc. and defendant Versatile Oxide, Inc.*

*Over two years ago, on September 4, 1985, Versatile Oxide and Versatile Metals filed a complaint in this court against plaintiffs in this action alleging, inter alia,* breach of contract and fraud arising from the discovery of hazardous PCP contaminants upon the property they leased and goods they purchased from plaintiffs. (Civil Action No. 85-4085). In turn, plaintiffs filed counterclaims in the related action alleging, *inter alia,* [*2] breach of lease, fraud, and cost recovery under CERCLA, 42 U.S.C. § 9607. On the thirty-ninth day of trial, the jury reached a verdict on February 8, 1987. Judgment has not been entered on the verdict at this date. Plaintiffs' Amended Complaint in the present action closely mirrors the allegations brought by plaintiffs in their counterclaims in the related case of Civil Action No. 85-4085 except plaintiffs have substituted the individual defendants for their corporate entities, and added two claims for a breach of fiduciary duty and breach of contract. This court now addresses the sufficiency of the allegations of plaintiffs' amended complaint in the present action.

Defendant contend that plaintiffs' claims under Count I (inducing breach of contract), Count II (inducing breach of lease Agreement), Count III (inducing breach

Page 1

of lease), Count IV (trespass to property), Count VII (fraud) and Count VIII (breach of fiduciary duty) are all barred by the two year Pennsylvania statute of limitations.

Since these claims arise under the law of Pennsylvania, this court must apply the law of Pennsylvania to any statute of limitation issue. *See Guaranty Trust Co. v. York,* 326 U.S. 99 (1945); [*3] *Witherow v. Firestone Tire and Rubber Co.,* 530 F.2d. 160 (3d Cir. 1976).

The statute of limitations is an affirmative defense, and the burden of establishing its applicability to a particular claim rests with the defendant. *Melhorn v. AMREP Corp.,* 373 F. Supp. 1378, 1380 (M.D. Pa., 1974). *Where a plaintiff seeks to establish that the statute should be tolled by fraud or estoppel, however, the burden shifts to the plaintiff. Id.*

Plaintiffs claim that defendants are estopped from invoking the bar of the limitation of the action because defendants actively concealed the facts incident to the claims, and plaintiff could not, through the use of reasonable diligence, have ascertained those facts. Under Pennsylvania law, if through fraud or concealment the defendant causes the plaintiff to relax vigilance or deviate from the right of inquiry, the defendant is estopped from invoking the bar of limitation of action. *Schaffer v. Larzelere,* 410 Pa. 402, 405, 189 A.2d 267, 269 (1963).

Whether or when a plaintiff knows or has reason to know of the existence and cause of his or her injury will often turn on inferences drawn from the disputed facts which is beyond this court's ability [*4] on this motion to dismiss. On a motion to dismiss, dismissal of a claim on the ground that the statute of limitations has expired should not occur unless it is clear from the face of the complaint that the statutory period has elapsed and that *there was no basis for tolling the running of the* limitations period. *Carroll v. Colon,* 608 F. Supp. 1277, 1280 (E.D.Pa. 1985). From the face of plaintiffs' complaint, this court cannot find as a matter of law that there is no basis for tolling the limitations period. Therefore, defendants' motion to dismiss on this basis will be dismissed.

Defendant Versatile Oxide contends that plaintiffs' complaint is barred pursuant to *Rule 13(a) of the Federal Rules of Civil Procedure* since they are compulsory counterclaims to plaintiffs' action in the prior suit

between plaintiffs and Versatile Oxide (Civil Action No. 85-4085). *Rule 13(a)* states in pertinent part:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim . . . .

Plaintiffs do not contest that [*5] all counts except Count VIII and Count IX are compulsory counterclaims to the prior action. Therefore, this court will dismiss all counts except Counts VIII and IX of plaintiff's amended complaint as to defendant Versatile Oxide on this basis. [1]

> 1    Count IX is dismissed on other grounds as stated in this Memorandum.

Plaintiffs claim that Count VIII (breach of fiduciary duty) is not a compulsory counterclaim since it was acquired after serving their pleading in the prior action and is therefore governed by *Rule 13(e) of the Federal Rules of Civil Procedure.*

Although the claim arises out of the transaction or occurrence sued on, an exception to the compulsory counterclaim requirement is made when the counterclaim is not in existence at the time the "counterclaimant" serves his pleading. 3 *Moore's Federal Practice,* para. 13.14[1]. *Rule 13(a)* applies to counterclaims that have "matured at the time" the defendant serves his pleadings. *Stahl v. Ohio River Co.,* 424 F.2d 52, 54 (3d Cir. 1970); 6 Wright & Miller *Federal Practice and Procedure* § 1411 at 545. Thus,

[a] counterclaim acquired after he has answered will not be considered compulsory, even if it arises out of the [*6] same transaction as does plaintiff's claims. A counterclaim which is likely to arise or is contingent at the time the defendant serves his answer, is not 'matured' for the purposes of *Rule 13(a).* Defendant's counterclaim must be completely vested at the time defendant serves his answer for such claim to be 'matured' for the purposes of *Rule 13(a).*

Thus if P sues A and A does not have a claim arising out of the transaction or occurrence that is the subject matter of P's suit at the time A serves his answer, A is not obliged to plead such a claim, although one arises subsequent to the service of his answer.

*Steinberg v. St. Paul Mercury Insurance Co.*, 108 F.R.D. 355, 358. (S.D.Ga.1985) (citations omitted). Therefore, the ultimate question for the court is whether plaintiffs' counterclaim for breach of fiduciary duty "matured or acquired" before or after the time plaintiff filed their answer in the prior suit. This court feels that this issue has not been adequately briefed by the parties. Therefore, defendants will be granted ten days from the date of this Memorandum and Order in which to file additional briefing. Plaintiffs are granted a further ten days in which to file a [*7] response.

Defendants claim that plaintiffs' amended complaint fails to aver sufficient facts to sustain a basis for piercing the corporate veil of Versatile Metals and Versatile Oxides. Further, it is contended that plaintiffs have failed to state valid causes of action under the "participation theory" under which corporate officers could be held personally liable for the torts of the corporation. Defendants claim that plaintiffs have failed to state a cause of action for interference with contract. Finally, defendants claim that the counts of plaintiff's amended complaint based on fraud is not pleaded with sufficient particularity pursuant to Rule 9(b). The court finds that plaintiffs' amended complaint is sufficient to withstand defendants' motion to dismiss and will deny defendants' motion on these grounds.

Defendants claim that Count IX of plaintiffs' complaint is a prohibited action which may not be prosecuted outside of the bankruptcy court or maintained by parties other than the trustee or the

debtor-in-possession pursuant to 11 U.S.C.A. § 362 since it is a claim against property of the debtor's (Versatile Metals) estate. In response, plaintiffs contend that Count IX "forms [*8] the basis for plaintiffs asking this Court to pierce Versatile Metals' corporate veil". (Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss the Amended Complaint, p.27). Therefore, this Court will hereby incorporate Count IX into the factual background of plaintiffs' amended complaint, and dismiss Count IX to the extent that it purports to state a separate cause of action.

*ORDER*

AND NOW, this 29th day of March, 1988, upon consideration of defendants' motion to dismiss plaintiffs' amended complaint, pursuant to *Fed. R. Civ. P. 12(b)(6)* and *Fed. R. Civ. P. 9(b)*, it is ORDERED that

1. All Counts except Count VIII are DISMISSED as to defendant Versatile Oxide, Inc.

2. Defendant Versatile Oxide, Inc. is granted ten (10) days and plaintiffs are granted twenty (20) days from the date of this Order to submit additional briefing as to the applicability of *Rule 13(e)* to Count VIII.

3. Count IX of plaintiffs' amended complaint is DISMISSED as to all defendants.

4. The remaining basis of defendants' motion is DENIED.

## Westlaw.

Slip Copy
Slip Copy, 2006 WL 4725713 (N.D.Cal.)
(Cite as: 2006 WL 4725713 (N.D.Cal.))

▷Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Mark WITRIOL, Plaintiff,
v.
LEXISNEXIS GROUP, a corporation; Reed Elsevier, Inc., a corporation; and
Seisint Inc., a corporation, Defendants.
No. C05-02392 MJJ.

Feb. 10, 2006.

Clyde Hobbs Charlton, Matthew Roland Bainer, Scott Edward Cole, Scott Cole & Associates, APC, John D. Moore, Henn, Etzel & Moore, Oakland, CA, for Plaintiff.

James R. McGuire, Rita Lin, Morrison & Foerster LLP, San Francisco, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

MARTIN J. JENKINS, United States District Judge.

*1 Pending before the Court is Defendants LexisNexis Group, Reed Elsevier, Inc., and Seisint, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint (Doc. # 23), Plaintiff Mark Witriol has filed an Opposition (Doc. # 29), and Defendants have filed a Reply (Doc. # 32). For the following reasons, the Court grants Defendants' Motion in part, and denies it in part.

### I. Background

Plaintiff filed this class action against Defendants on June 13, 2005, alleging that Defendants disclosed consumer reports and personal information about Plaintiff and the proposed Class Members, without their consent or authorization, to third parties who lacked any permissible purpose for receiving and using such information. As a result, Plaintiff alleges that "Defendants have thereby violated federal and state statutes ... and have further violated the privacy rights of ... Plaintiff and the Class Members, who hold reasonable expectations that their credit information shall be maintained in a secure and confidential manner." In his Amended Complaint, Plaintiff asserts the following claims: (1) negligence (count one); (2) willful violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 b, 1681n (count two); (3) negligent noncompliance with the FCRA, 15 U.S.C. § 1681b, 1681o (count three); (4) violation of the California Credit Reporting Agencies Act ("CCRAA"), California Civil Code §§ 1785.11, 1785.14, 1785.19, and 1785.22 (count four); (5) violation of the California Investigative Consumer Reporting Agencies Act ("CICRA"), California Civil Code §§ 1786.12, 1786.20 (count five); (6) violation of the Information Practices Act, California Civil Code § 1798.53 (count six); and (7) violation of California Business and Professions Code §§ 17200 et seq. (count seven).

Defendants now move to dismiss Plaintiff's Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

### II. Legal Standard--Motion to Dismiss

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a claim. Navarro v. Block, 250 F.3d 729, 732 (9th Cir.2001). Because the focus of a 12(b)(6) motion is on the legal sufficiency, rather than the substantive merits of a claim, the Court ordinarily limits its review to the face of the complaint. See Van Buskirk v. Cable News Network, Inc., 284 F.3d 977, 980 (9th Cir.2002). Generally, dismissal is proper only when the plaintiff has failed to assert a cognizable legal theory or failed to allege sufficient facts under a cognizable legal theory. See SmileCare Dental Group v. Delta Dental Plan of Cal., Inc., 88 F.3d 780, 782 (9th Cir.1996); Balisteri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.1988); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir.1984). Further, dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of a claim. See Abramson v. Brownstein, 897 F.2d389, 391 (9th Cir.1990). In considering a 12(b)(6) motion, the Court accepts the plaintiff's material allegations in the complaint as true and construes them in the light most favorable to the plaintiff. See Shwarz v. United States, 234 F.3d 428, 435 (9th Cir.2000).

### III. Discussion

Slip Copy
Slip Copy, 2006 WL 4725713 (N.D.Cal.)
(Cite as: 2006 WL 4725713 (N.D.Cal.))

Page 2

1. Claims Under the Consumer Reporting Statutes

*2 Counts two through five of Plaintiff's Amended Complaint assert claims for willful and negligent violation of the federal FCRA, violation of the CCRAA, and violation of the CICRAA. Defendants argue that under these statutes a credit reporting agency is only liable for impermissibly "furnishing" a consumer report for purposes not expressly provided in the statutes. Defendants advance that, "[w]here information is obtained from a consumer reporting agency under false pretenses and without the agency's actual knowledge of impropriety, there is no agency liability under the FCRA." (Mot. at 10.) Because Defendants contend that they did not furnish any credit reports, in that, they were the victims of a criminal trespass when one or more individuals impersonated legitimate subscribers and obtained consumer reports from Defendants, they assert that they cannot be held liable under the statutes. Instead, Defendants assert that, "[t]he only person against whom [P]laintiff could state a civil claim is the person or persons who used fake credentials to view [P]laintiff's consumer report." (Mot. at 10 (citing 15 U.S.C. 1681n(a).)

In response, Plaintiff argues that Defendants' argument is improper in the 12(b)(6) context because it relies on extrinsic facts not found in the Amended Complaint. Specifically, Plaintiff contends that the Amended Complaint contains no allegations about third parties fraudulently obtaining credit reports from Defendants. As a result, Plaintiff submits that these allegation cannot serve as a basis to dismiss the Amended Complaint. The Court agrees with Plaintiff. Furthermore, taking the allegations in the Amended Complaint as true, and construing them in Plaintiff's favor, Plaintiff has expressly alleged that "Defendants furnished consumer reports and other personal information regarding [ ] Plaintiff [ ] to unauthorized third parties[.]" (Am.Compl.¶ 38.) In fact, in their Motion, Defendants concede that "Plaintiff claims that LexisNexis violated the FCRA, CCRAA, and ICRAA by furnishing 'consumer reports,' 'consumer credit reports,' or 'investigative consumer reports' to unauthorized third parties who lacked a permissible purpose for obtaining such reports." (Mot. at 7 (emphasis added).) At the pleading stage, this allegation is sufficient to sustain Plaintiff's claims.

Apart from their Motion, Defendants have filed a Request for Judicial Notice pursuant to Federal Rule of Evidence 201, wherein Defendants ask the Court to take judicial notice of two press releases that Defendants issued concerning theft of information from its computer database, and a letter from LexisNexis to persons potentially affected by the alleged theft. (Doc. # 24.) Generally, Rule 201 of the Federal Rules of Evidence allows a court to take judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Even when judicial notice is not appropriate under Rule 201, a court may nevertheless consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings." Branch v. Tunnel, 14 F.3d 449, 454 (9th Cir.1994).

*3 Here, Defendants contend that judicial notice is appropriate because: (1) the press releases and the letter form the basis for Plaintiff's claims; (2) the Amended Complaint refers to the subject matter of the press releases and the letter; and (3) the authenticity of the press releases and letter cannot be questioned. Plaintiff, however, argues that "[t]he facts contained in these documents are not judicially noticeable, as they are not referred to in the Complaint and they do not constitute matters of public record ." Additionally, Plaintiff argues that "the content of the documents and the accuracy of the proffered 'facts' are highly disputed in this case." The Court agrees with Plaintiff. Neither the press releases nor the letter from LexisNexis are specifically referenced in the Amended Complaint. Further, the subject matter of all three documents--namely, that third parties fraudulently accessed information from Defendants' database--is directly contradicted by the allegations in the Amended Complaint that Defendants' intentionally disclosed such information to third parties. Accordingly, the Court declines to take judicial notice of these documents.

In sum, Plaintiff has adequately pled that Defendants violated the consumer reporting statutes by furnishing consumer reports to unauthorized recipients for impermissible purposes. The Court therefore DENIES Defendants' Motion to Dismiss with respect to counts two through five.

2. Claim Under the Information Practices Act

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                   Page 3
Slip Copy, 2006 WL 4725713 (N.D.Cal.)
(Cite as: 2006 WL 4725713 (N.D.Cal.))

Next, Defendants move to dismiss count six, wherein Plaintiff asserts a claim for violation of the Information Practices Act, California Code § 1798.53. According to Defendants, § 1798.53 does not apply to non-governmental entities like Defendants. Plaintiff, however, argues that § 1798.53 creates civil liability for *"any person ... who intentionally discloses information, not otherwise public[.]"* Citing California Civil Code § 1798.3(f), Plaintiff argues that "person" is defined as: "any natural person, corporation, partnership, limited liability company, firm, or association." Thus, Plaintiff contends that Defendants qualify as a "person" and therefore can be held liable for violation of the IPA.

In support of its argument that only government agencies are subject to the IPA, Defendants cite *Jennifer M. v. Redwood Women's Health Center,* 88Cal.App.4th 81, 105 Cal.Rptr.2d 544 (Cal.Ct.App.2001). Because they are not government agencies, Defendants argue that Plaintiff's claim under the IPA fails as a matter of law. The Court, however, disagrees with Defendants.

In *Jennifer M.* the plaintiff sued a private health care center for violations of several sections of the IPA, alleging that the center had disclosed confidential medical information about her to third parties. *Id.* at 547. The trial court granted the center's motion for summary judgment, finding that the IPA applied only to government agencies and not to private medical facilities. On appeal, the court framed the issue as whether the IPA applied to a private hospital, such the center, on the basis of its contractual relationship with the California Department of Health Services to provide medical services. *Id.* at 548. The court affirmed summary judgment for the center, holding that the "IPA was not intended to cover private entities such as [the center] and is inapplicable under the circumstances of this case." *Id.* Seizing on this language, Defendants argue that Plaintiff's IPA claim against them fails.

*4 However, a closer read of the *Jennifer M.* decision reveals otherwise. Specifically, in analyzing the plaintiff's claim, the court noted that "Jennifer's complaint cites and relies on 10 separate provisions of the [IPA]. (§§ 1798.1, 1798.3, 1798.19, 1798.24, 1798.45, 1798.46, 1798.47, 1798.48, 1798.53, 1798.63.)." The court then reviewed each of these provisions, noting that "[t]he key remedial provisions of the [IPA] are sections 1798.53 and 1798.45." *Id.*

Particularly, it recognized that "Section 1798.53 sets out a civil action for damages for the intentional disclosure of confidential personal information 'maintained by a state agency or from 'records' within a 'system of records' ... maintained by a federal government agency ...." *Id.* at 549. The court noted that § 1798.45, on the other hand, "provides for a direct civil action against 'an agency' whenever it '[f]ails to comply with any provision of the [IPA] 'in such a way as to have an adverse effect of an individual.' " *Id.* After reviewing the provisions, the court reasoned:

> On its face, the [IPA] is aimed at barring or limiting the dissemination of confidential personal information-and preventing the misuse of such information-by government *agencies.* [ ] *Anti-Defamation League of B'nai B'rith v. Superior Court,* 67 Cal.App.4th 1072, 1079, 79 Cal.Rptr.2d 597, (1998). Clearly, as a privately owned medical clinic, Redwood is not itself a government agency or entity as defined by section 1798.3, subdivision (b). Thus, the provisions of the [IPA] cited by [the plaintiff], all of which deal with information maintained by "agencies," are inapplicable to this action.

*Id.* at 550. However, the court went on to analyze § 1798.53 independently, and concluded that this provision, standing alone, did not help the plaintiff's case. *Id.* at 551. Specifically, the court found that the center was not an agency, and "[t]here is no evidence the information at issue was 'maintained by' either a state or federal government agency, or was 'obtained' by [the center] from any such agency-maintained source of information." *Id.* Accordingly, the court held that the plaintiff's claim pursuant to § 1798.53 failed. *Id.* Based on this discussion, it appears that if the plaintiff could have shown that the information was obtained from or maintained by a government agency, the claim would have been viable, despite the fact that the center was not itself a government agency. Thus, the proposition that only government agencies are subject to the IPA is undermined by the court's analysis of the plaintiff's claim pursuant to § 1798.53.

Further, other California decisions have allowed claims pursuant to § 1798.53 against non-government entities. In fact, in *Anti-Defamation League of B'Nai B'rith,* the decision cited in *Jennifer M.* as establishing that the IPA only applies to government agencies, the plaintiffs brought an action for invasion of privacy in violation of § 1798.53 against a civil rights organization. 67 Cal.App.4th at 1078, 79

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2006 WL 4725713 (N.D.Cal.)
(Cite as: 2006 WL 4725713 (N.D.Cal.))

Cal.Rptr.2d 597. Further, in that matter, the court held that, in certain circumstances journalists are immune from liability under § 1798.53 based on First Amendment protections. *Id.* at 1077, 79 Cal.Rptr.2d 597. If § 1798.53 only applied to government agencies this discussion would be unnecessary. Likewise, in *Fahizah Alim v. Superior Court of Sacramento County,* 185 Cal.App.3d 144, 229 Cal.Rptr. 599(1986), the plaintiff sued a reporter, an editor, and a publisher, for invasion of privacy pursuant to § 1798.53, claiming that a newspaper article that the defendants published disclosed personal or confidential information about the plaintiff in a false and inaccurate manner. *Id.* at 147, 229 Cal.Rptr. 599. The trial court denied summary judgment on the § 1798.53 claim, rejecting the defendants argument that their publication was protected under the First Amendment. Defendants thereafter appealed. On appeal, the court addressed whether the constitutional protections afforded the press under the First Amendment apply to claims under § 1798.53. *Id.* at 149, 229 Cal.Rptr. 599. Again, if the defendants were not subject to liability under the statute because they were not a government agency, this discussion would have been moot.

*5 As the foregoing decisions illustrate, California courts have permitted claims pursuant to § 1798.53 against non-governmental agencies. Moreover, as Plaintiff points out, this is consistent with the plain language of § 1798.53, which authorization a civil cause of action against *"any person ... who intentionally discloses information, not otherwise public."* Had Plaintiff proceeded under one of the IPA's other sections which expressly apply to government agencies, Defendants would be correct. However, Plaintiff has asserted a claim under § 1798.53, which contains no such limitation. [FN1] Accordingly, the Court finds that Plaintiff may assert a claim under § 1798.53 against Defendants.

> FN1. Further, § 1798.53 expressly exempts an "employee of the state or of a local government agency acting solely in his or her official capacity," from its reach. If the statute only applied to government agencies, such an express exclusion would be unnecessary. This language further supports the conclusion that Plaintiff may maintain his claim under § 1798.53 against Defendants.

Nevertheless, Defendants contend that "even if

section 1798.53 applied to non-governmental entities ... [Plaintiff's] claim would still fail because his allegations do not satisfy the elements of the statute." Specifically, Defendants argue that Plaintiff has failed to allege: (1) that information about him was intentionally disclosed; and (2) that information disclosed about him was nonpublic information that [D]efendants obtained from a government agency.

In response, Plaintiff argues that he has adequately alleged the necessary elements to sustain a claim under § 1798.53, and points to ¶ 30 of his Amended Complaint in support. These paragraph provides:

> Defendants knowingly and intentionally disclosed the Representative Plaintiffs and the Class Members' consumer reports to unauthorized third parties, which persons and/or entities did not have permissible purposes for receiving and/or using such information ... Defendant's [*sic* ] knowing and intentional disclosure of private consumer information was done in a systematic manner to generate revenue and profits for Defendants, at the expense of Representative Plaintiff and the Plaintiff Classes, in conscious disregard of their rights.

Reviewing this paragraph, Plaintiff has sufficiently alleged that Defendants' disclosure of the information was intentional. However, Plaintiff has failed to identify any language in his Amended Complaint, and the Court has found none, alleging that Defendants knew or should reasonably have known that the information was obtained from personal information maintained by a state or federal agency. The Court therefore GRANTS Defendants' Motion to Dismiss count 6 of the Amended Complaint. Concomitantly, the Court grants Plaintiff leave to amend to cure this deficiency.

3. Count Seven--Violation of California Business and Professions Code § 17200

In count seven, Plaintiff asserts a claim against Defendants for violation of California Business and Professions Code § 17200. Specifically, he alleges that:

> 62. Defendants' unauthorized disclosure of the Representative Plaintiffs and the Class Members' private information, their systematic violation of the FCRA, CCRAA, ICRAA and IPA, as alleged herein, their unlawful invasion of Representative Plaintiffs and the California Class Members' privacy rights and the other wrongful conduct alleged in this Complaint, reveal a pattern and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 5
Slip Copy, 2006 WL 4725713 (N.D.Cal.)
(Cite as: 2006 WL 4725713 (N.D.Cal.))

practice of unfair, unlawful and fraudulent business practices in violation of <u>California Business & Professions Code § 17200 et seq.</u>

*6 63. Defendants' knowing failure to safeguard the Representative Plaintiffs and the Class Members' personal and confidential information, and to adopt policies in accordance with and/or to adhere to the fair credit reporting laws, all of which are binding upon and burdensome to Defendant's [sic] competitors, engenders an unfair competitive advantage for Defendant [sic], thereby constituting an unfair business practice, as set forth in <u>California Business & Professions Code §§ 17200-17208.</u>

(Am. Compl. at ¶¶ 62-63.)

Defendants first argue that "[b]ecause all of Plaintiff's other statutory claims fail as a matter of law, he has failed to plead any 'unlawful' act required for a <u>section 17200</u> claim." (Mot. at 13.) However, as previously discussed, Plaintiff has plead viable claims under California's consumer reporting statutes. Accordingly, the Court rejects Defendants' argument as a basis to dismiss count seven.

Next, Defendants charge that Plaintiff lacks standing to bring a claim under <u>§ 17200.</u> According to Defendants, standing to bring a <u>§ 17200</u> claim is limited to any person "who has suffered injury in fact and has lost money or property." (Citing <u>Cal. Bus. & Prof.Code § 17204.</u>) Because they claim that Plaintiff has neither alleged that he suffered an injury in fact, nor alleged that he has lost money or property as a result of Defendants' actions, Defendants urge the Court to dismiss count seven.

In opposition, Plaintiff maintains that he has sufficiently alleged facts demonstrating that he has standing to pursue his claim under <u>§ 17200.</u> In support, he cites to paragraphs 27, 36, 37, 47, 52, 56, 60, 64 and 65, which he claims "refer to the injuries and damages incurred by Plaintiff and the Plaintiff Classes." The Court has reviewed these paragraphs. With the exception of ¶ 36, the Court agrees with Defendants that the paragraphs Plaintiff proffers do not allege any "lost money or property." As to ¶ 36, however, Plaintiff has expressly alleged that, he and the Class Members have incurred "costs associated with monitoring and repairing credit impaired by the unauthorized release of private information." Thus, Plaintiff has sufficiently alleged that he has suffered actual injury and sustained monetary loss as a result of Defendants' actions. The Court therefore DENIES

Defendants' Motion with respect to count seven.

4. Count One--Negligence

In count one of the Amended Complaint, Plaintiff asserts a negligence claim against Defendants. Defendants move to dismiss this claim on the grounds that it is preempted, and because Plaintiff has failed to plead the basic elements of a negligence claim.

a) Preemption

Under Article VI of the Constitution, the laws of the United States "shall be the supreme Law of the land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." <u>U.S. Const. Art. VI, cl. 2.</u> Accordingly, any state law that conflicts with federal law has no effect. See <u>Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).</u>

*7 Federal law may preempt state law under the Supreme Clause in three circumstances. <u>English v. Gen. Elec. Co., 496 U.S. 72, 78, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).</u> First, Congress may state its intent that federal law preempt state law through an express statutory provision. <u>Id.</u> Second, "in the absence of explicit statutory language, state law is preempted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." <u>Id.,</u> at 79. As the Supreme Court explained:

Such an intent may be inferred from a "scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.

<u>Id.</u> (quoting <u>Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)),</u> Third, when state law actually conflicts with federal law, it is preempted. <u>Id.</u> "Thus, the Court has found preemption when it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." <u>Id.</u> (internal citation and quotation omitted). When engaging in a preemption analysis, the Court remains mindful that "[t]he

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                    Page 6
Slip Copy, 2006 WL 4725713 (N.D.Cal.)
(Cite as: 2006 WL 4725713 (N.D.Cal.))

purpose of Congress is the ultimate touchstone of pre-emption analysis." *Cipollone, 505 U.S. at 516.*

Here, Defendants contend that the Gramm-Leach-Billey Act, 15 U.S.C. § 6801, *et seq.*, preempts Plaintiff's state-law negligence claim. Specifically, proceeding under an implied preemption theory, Defendants argue that the GLBA's regulatory scheme establishes comprehensive standards to protect the security and confidentiality of consumer information that financial institutions maintain. Toward this end, and pursuant to Section 501 of the GLBA, Defendants point out that the Federal Trade Commission has promulgated Standards for Safeguarding Consumer Information, which regulated entities are required to "develop, implement, and maintain." 16 C.F.R. § 314.3. According to Defendants, "[a]llowing individual negligence actions against LexisNexis would not only create the patchwork of state regulation that the Safeguards Rule was designed to avoid, but it would also undermine Congress's manifest intent to preempt enforcement of security requirements by courts and individual litigants." (Mot. at 16.) Citing *Briggs v. Emporia State Bank & Trust Co.,* No. 05-2125-JWL, 2005 WL 2035038, at *3 (D.Kan. Aug.23, 2005), Defendants also assert that "Congress intended for the [FTC's] regulatory scheme to be the exclusive method for enforcing the statute." Defendants thus argue that "permitting individual actions under state law in state court to regulate the very conduct that the Safeguards Rule was intended to comprehensively govern and that the FTC was intended to exclusively regulate would subvert the core of Congress's regulatory scheme." (Mot. at 16.)

*8 The Court, however, is unpersuaded by Defendants' argument. As Defendants correctly note, under the GLBA, the FTC has sole jurisdiction to enforce the statute. That being said, Defendants have provided no authority, and the Court has found none, supporting their contention that because the GLBA does not provide a private cause of action to enforce its provisions, it therefore preempts all other state causes of action based on disclosure of consumer information--even claims completely unrelated to the GLBA. To be sure, Plaintiff is not alleging any claim under the GLBA. If that were the case, Plaintiff's claims would be subject to dismissal because the GLBA contains no provision supporting such a claim. In fact, Plaintiff does not reference the GLBA at any point in his Amended Complaint. Because the GLBA and the standards it imposes form no part of

Plaintiff's claim, and because Defendants have failed to proffer any authority indicating that Congress intended the GLBA to preempt state law claims unrelated to the Act, the Court rejects Defendants' argument that the GLBA preempts Plaintiff's negligence claim. [FN2]

> FN2. Defendants' reliance on *Briggs* is misplaced. There, while the district court held that the plaintiffs could not assert a claim under the GLBA because no private cause of action existed under the Act, and could not assert a claim pursuant to the FTC's regulatory sections enacted pursuant to the GLBA, the court did not hold that the plaintiffs were precluded from asserting non-GLBA state-law claims against the defendant bank. Because the court dismissed all of the plaintiffs' federal claims, it declined to address supplemental jurisdiction over the remaining state-law claims. However, the court expressly noted that the dismissal was "without prejudice to plaintiff's reasserting these various state law claims if the plaintiffs elect to reassert their federal Consumer Credit Protection Act or Fair Credit Reporting Act claim." *See* 2005 WL 2035038 at *4. Accordingly, the *Briggs* court never addressed the preemption issue Defendants raise in this matter.

Second, Defendants argue that, even if the negligence claim is not preempted, Plaintiff has failed to adequately allege the duty and damage elements of a negligence claim. With respect to the duty element, in ¶ 33 of the Amended Complaint, Plaintiff alleges:

> As custodians of the Representative Plaintiff's and the Class Members' personal and confidential information, which Defendants sell and/or disclose to their customers, for profit, in the regular course of their business, Defendants owe a duty of care to the Representative Plaintiff and the Class Members to prevent access to such information by unauthorized third parties.

Thus, Plaintiff has sufficiently alleged that Defendants owed him a duty of care.

Defendants also argue that Plaintiff's allegations that he suffered economic and emotional injuries based on Defendants' conduct, are insufficient to sustain a negligence claim. Defendants assert that "[a]bsent a showing of injury to person or property ... neither of

those forms of damages is cognizable in tort." Construing Plaintiff's damages allegations in the light most favorable to Plaintiff, however, the Court finds that Plaintiff had adequately alleged that he suffered actual damages as a result of Defendants' conduct. [FN3] Consequently, the Court **DENIES** Defendants' Motion with respect to count one.

> FN3. Nothing in this Order shall be construed as precluding Defendants from arguing that they are entitled to judgment on Plaintiff's negligence claim because Plaintiff failed to provide sufficient evidence that he (and the relevant Class Members) sustained legally cognizable damages recoverable under a general negligence theory.

IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss as follows: The Court **GRANTS** Defendants' Motion with respect to count six, with leave to amend. The Court **DENIES** Defendants' Motion as to all other counts. Plaintiff shall file any Second Amended Complaint within 10 days of the filing date of this Order.

**IT IS SO ORDERED.**

Slip Copy, 2006 WL 4725713 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

## CERTIFICATION OF SERVICE

I, David S. Stone, hereby certify that, on January 25, 2008, I served electronically a true and correct copy of Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss Claims Four Through Eight of Plaintiff's Second Amended Complaint on the following:

William J. O'Shaughnessy, Esq.
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ  07102
woshaughnessy@mccarter.com

Peter T. Barbur, Esq.
Elizabeth Grayer, Esq.
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
(212) 747-1000
pbarbur@cravath.com
egrayer@cravath.com

Richard S. Taffet
Philip L. Blum
BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, NY  10022
(212) 705-7000
richard.taffet@bingham.com
philip.blum@bingham.com

Robert N. Feltoon
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, Suite 1600
Philadelphia, PA  19102
(215) 864-8064
rfeltoon@cogr.com

William F. Lee, Esq.
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA  02109
william.lee@wilmerhale.com

Mark D. Selwyn, Esq.
WILMER CUTLER PICKERING HALE AND DORR LLP
1117 California Avenue
Palo Alto, CA 94304
mark.selwyn@wilmerhale.com

Steven J. Kaiser, Esq.
CLEARY, GOTTLIEB, STEIN & HAMILTON
200 Pennsylvania Avenue, NW
Washington, DC  20006
skaiser@cgsh.com

David S. Stone, Esq.
Boies, Schiller & Flexner LLP
150 JFK Parkway, 4th Floor
Short Hills, NJ 07078
Tel:  973-218-1111
Fax:  973-218-1106
dstone@bsfllp.com
*Counsel for Broadcom Corporation*