## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

BROADCOM CORPORATION,

<div align="center">Plaintiff,</div>

v.

QUALCOMM INCORPORATED,

<div align="center">Defendant.</div>

Civil Action No.  05-3350 (MLC) (JJH)

Return Date: February 19, 2008
Oral Argument Requested

---

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS CLAIMS FOUR THROUGH EIGHT OF PLAINTIFF'S
## SECOND AMENDED COMPLAINT

---

McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, NY 10022

CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, Suite 1600
Philadelphia, PA 19102

*Attorneys for Defendant*
*Qualcomm Incorporated*

## Table of Contents

Page(s)

Preliminary Statement...................................................................................................1

Argument .........................................................................................................................2

I.     BROADCOM'S STATE LAW CLAIMS FAIL BECAUSE BROADCOM HAS NOT
       ADEQUATELY ALLEGED CAUSATION OR INJURY ................................2

       A.     Breach of Contract .................................................................................2

       B.     Promissory Estoppel ...............................................................................4

       C.     Tortious Interference with Prospective Economic Advantage ................4

       D.     Fraud .......................................................................................................5

       E.     UCL..........................................................................................................6

       F.     Broadcom's 802.20 Theory .....................................................................6

       G.     Broadcom's Invocation of Inapposite Filings and Unrelated Cases.......7

II.    BROADCOM'S JVT CLAIMS SHOULD BE DISMISSED UNDER THE
       COMPULSORY COUNTERCLAIM RULE AND RES JUDICATA ...............8

       A.     The Compulsory Counterclaim Rule ......................................................8

       B.     Res Judicata ..........................................................................................10

Conclusion .....................................................................................................................12

## Table of Authorities

<div align="right">Page(s)</div>

**Cases**

AccuImage Diagnostics Corp. v. TeraRecon, Inc., 260 F. Supp. 2d 941 (N.D. Cal. 2003) ........... 5

Bradley v. Google, Inc., No. C 06-05289, 2006 WL 3798134 (N.D. Cal. Dec. 22, 2006) ........... 4

Broadcom Corp. v. Qualcomm, Inc., 501 F.3d 297 (3d Cir. 2007) ....................................... 5, 6, 8

Browning v. Levy, 283 F.3d 761 (6th Cir. 2002) ................................................................. 10, 11

Buckland v. Threshold Enters., Ltd., 155 Cal. App. 4th 798 (2007) .......................................... 6

Concrete Unlimited, Inc. v. Cementcraft, Inc., 776 F.2d 1537 (Fed. Cir. 1985) ........................... 4

Duse v. IBM Corp., 212 F.R.D. 58 (D. Conn. 2002) ............................................................... 12

Frederico v. Home Depot, 507 F.3d 188 (3d Cir. 2007) ............................................................ 5

Freedman Seating Co. v. American Seating Co., 420 F.3d 1350 (Fed. Cir. 2005) ..................... 10

Gamble v. General Foods Corp., 229 Cal. App. 3d 893 (1991) ................................................ 12

Guale v. Rolls-Royce Engine Servs.-Oakland, Inc., No. A105370, 2005 WL 984373
   (Cal. Ct. App. 2005) ............................................................................................................ 4

Harnett v. Billman, 800 F.2d 1308 (4th Cir. 1986) ................................................................. 11

Jones v. Aetna Cas. & Sur. Co., 26 Cal. App. 4th 1717 (1994) ................................................. 3

Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134 (2003) ...................................... 6

Lewis Jorge Constr. Mgmt. v. Pomona Unified School Dist., 34 Cal. 4th 960 (2005) ................. 3

Lum v. Bank of Am., 361 F.3d 217 (3d Cir. 2004) .................................................................... 5

McCarty v. First of Georgia Ins. Co., 713 F.2d 609 (10th Cir. 1983) ...................................... 11

Nokia Corp. v. Qualcomm, Inc., No. Civ. A 06-509-JJF, 2006 WL 2521328 (D. Del.
   Aug. 29, 2006) .................................................................................................................... 7

Russell v. Sunamerica Sec., Inc., 962 F.2d 1169 (5th Cir. 1992) ............................................. 12

Schmitz v. Mars, Inc., 261 F. Supp. 2d 1226 (D. Or. 2003) .................................................... 12

Shook v. Pearson, 99 Cal. App. 2d 348 (1950) ........................................................................ 3

Page(s)

**Cases**

Smith v. City & County of San Francisco, 225 Cal. App. 3d 38 (1990) ........................................ 4

Tierney v. Omnicom Group Inc., No. 06 Civ. 14302 (LTS) (THK), 2007 WL 2012412
    (S.D.N.Y. July 11, 2007) ........................................................................................ 10

Travelers Indem. Co. v. Gore, 761 F.2d 1549 (11th Cir. 1985) .................................................. 12

US Ecology, Inc. v. State, 129 Cal. App. 4th 887 (2005).............................................................. 4

Walsh v. Truck Ins. Exch. Co., No. A097316, 2003 WL 121997 (Cal. Ct. App. 2003) ................ 3

Westside Ctr. Assocs. v. Safeway Stores 23, Inc., 42 Cal. App. 4th 507 (1996) .......................... 5

Zenith Elecs. Corp. v. Exzec, Inc., 182 F.3d 1340 (Fed. Cir. 1999)............................................. 5

**Other Authorities**

Fed. R. Civ. P. 9(b) ...................................................................................................................... 5

### Preliminary Statement[1]

In its opening brief, Qualcomm argued that, because Broadcom fails to allege that any of Qualcomm's patents are essential, Broadcom does not plead direct injury to itself. In its opposition, Broadcom concedes the point. Notwithstanding the sweeping allegations in the SAC relating to Qualcomm's supposedly improper practices in disclosing and licensing its patents, Broadcom concedes that, on the face of the SAC, it does not need a license to any of those patents because none of them is essential to practice any standard. That concession is fatal because Broadcom cannot be directly injured by anything Qualcomm has done with respect to patents Broadcom does not need to practice in the first place.

Unable to support a claim of direct injury, Broadcom instead falls back on two much narrower and ultimately flawed theories: (1) it suffered *indirect* injury in the form of lost profits arising from "threats to [Broadcom's] actual and potential customers"; and (2) it was injured through the "expenditure of time and money attending meetings" of the allegedly "corrupted" 802.20 working group. However, as discussed below, in addition to narrowing the scope of this case dramatically, Broadcom's new injury arguments fail because, with respect to each of Broadcom's state law claims, Broadcom fails to allege facts essential to support its newfound theories.

In addition, Broadcom fails to respond in any meaningful way to Qualcomm's argument that the compulsory counterclaim rule and res judicata preclude Broadcom from burdening this Court with its JVT nondisclosure claim, which was previously litigated in another action in which the Judgment granted affirmative coercive relief to Broadcom.

---

[1] Citations and abbreviations used herein are in the same form as those used in Qualcomm's opening brief, unless otherwise indicated. "Mem." refers to Qualcomm's opening brief and "Opp." refers to Broadcom's opposition brief.

<center>**Argument**</center>

I.    **BROADCOM'S STATE LAW CLAIMS FAIL BECAUSE BROADCOM HAS NOT ADEQUATELY ALLEGED CAUSATION OR INJURY**

Broadcom recognizes its "refusal to concede that [Qualcomm's] patents are essential". (Opp. 9.)  As such, Broadcom does not argue that it has been directly injured by Qualcomm's alleged refusal to license its patents on FRAND terms or to disclose its patents in a timely manner.[2]  Instead, Broadcom adopts a new and much narrower theory of indirect injury: that Qualcomm has attempted "to threaten BC's current and potential customers . . . and thereby impair BC's ability to make sales".[3]  (*Id.* at 5.)  Broadcom's theory of indirect injury fails because, with respect to each of Broadcom's state law claims, such a theory would require additional allegations that Broadcom cannot and does not make.

   A.    **Breach of Contract**

Abandoning its direct theory of liability, Broadcom acknowledges that its damages are limited to "lost profits" allegedly flowing from Qualcomm's "threats" against Broadcom customers. (Opp. 5, 11.)  But Broadcom never alleges that such "threats" constitute a breach of any contract.  Moreover, it is black letter law that, to recover lost profits on a contract claim, Broadcom must plead that those lost profits were "actually foreseen [] or reasonably

---

[2] As Broadcom alleges, SDO policies are aimed at preventing injuries caused by "holders of *essential* patents" and attempt to do so by "requir[ing] patent holders to . . . commit to license such *essential* IP" on FRAND terms.  (SAC ¶¶ 5, 20 (emphasis added).)

[3] Broadcom also asserts that its injuries consist of "refusals to license intellectual property on FRAND terms" (Opp. 11), but Broadcom could not be injured thereby absent an allegation that the patents are essential. (Mem. 4-8.)  Broadcom's only other injury theory—*i.e.*, that it incurred unnecessary (and presumably small) expenditures by attending 802.20 meetings—is discussed below. (*See infra* at 6-7.)

foreseeable" when the contract was made *and* plead the losses with particularity.[4]  Broadcom

fails on both counts.  *First*, Broadcom never alleges that lost profits arising from threats to

customers were foreseen or reasonably foreseeable under any alleged Qualcomm SDO

commitments; rather, Broadcom alleges only that such commitments created obligations to

disclose potentially essential IPR, license it on FRAND terms and (in the 802.20 context)

disclose financial relationships with committee members.  (SAC ¶¶ 85, 106-07, 183.)  *Second*,

Broadcom's lost profit allegations are utterly bereft of particularity: they identify no current or

potential customers, no relationships with such customers, no instances of contact between

Qualcomm and those customers and no resulting injury.

Broadcom also fails to allege (as it must) contract terms and facts supporting the

conclusion that it is a third party beneficiary.  *See Walsh v. Truck Ins. Exch. Co.*, No. A097316,

2003 WL 121997, at *4 (Cal. Ct. App. Jan. 13, 2003).  Instead, Broadcom simply asserts as a

bald conclusion—without reference to any contract language—that SDO disclosure policies and

the 802.20 working group rules exist for Broadcom's benefit.[5]  That is clearly inadequate.  *See*

*id*; *see also Jones v. Aetna Cas. & Sur. Co.*, 26 Cal. App. 4th 1717, 1724-25 (1994).[6]

---

[4] *Lewis Jorge Constr. Mgmt. v. Pomona Unified School Dist.*, 34 Cal. 4th 960, 968-70, 975 (2005); *Shook v. Pearson*, 99 Cal. App. 2d 348, 352 (1950) ("The facts as to special damages must be stated with particularity. . . . The amount of such damages must be given, and the means of occasioning them must be set forth.").

[5] Broadcom misses the point with its argument that its patent disclosure theory properly pleads injury because the Third Circuit "held that BC's general allegation that an SSO's adoption of a standard eliminates competing technologies" was alleged with sufficient particularity.  (Opp. 8.)  That holding related only to antitrust injury.  Furthermore, the SAC does not plead that the "attractive alternatives" available to the SDOs did not *also* contain Qualcomm technology.  (*See, e.g.*, SAC ¶¶ 88, 146.)  Notably, Broadcom does not contend that this omission was inadvertent.

[6] Although Broadcom accuses Qualcomm of "fail[ing] to mention" the terms of the ARIB and ATIS IPR policies that purportedly give rise to an obligation to Broadcom (Opp. 14 n.19), Broadcom failed to *plead* those terms—which is fatal to its ARIB and ATIS claims.

### B.     Promissory Estoppel

Broadcom's vague and conclusory allegations of indirect injury also fail to support a claim for promissory estoppel. Having identified no "threatened" customers or adequately alleged any damage flowing from such threats, Broadcom's allegations are speculative, not definite—and therefore are insufficient as a matter of law. *See US Ecology, Inc. v. State*, 129 Cal. App. 4th 887, 904 (2005) (promissory estoppel damages "may include . . . loss of profits *when the loss is definite rather than speculative*") (emphasis added). Moreover, having failed to allege that Qualcomm's patents are essential, Broadcom cannot possibly allege (as it must to sustain its complaint) that it detrimentally relied on any promises made by Qualcomm relating to those patents. *See Guale v. Rolls-Royce Engine Servs.-Oakland, Inc.*, No. A105370, 2005 WL 984373, at *3 (Cal. Ct. App. Apr. 28, 2005) ("[D]etrimental reliance is an essential element of promissory estoppel."); *Smith v. City & County of San Francisco*, 225 Cal. App. 3d 38, 48 (1990) ("No facts are alleged which show that [plaintiffs] changed their position in any way *because* of what they had been promised by the City.") (emphasis added).

### C.     Tortious Interference with Prospective Economic Advantage

"Generic allegations that there was an interference with an unnamed third party are insufficient as a matter of law" to plead tortious interference with prospective economic advantage. *Bradley v. Google, Inc.*, No. C 06-05289, 2006 WL 3798134, at *4 (N.D. Cal. Dec. 22, 2006). Broadcom's tortious interference claim must accordingly be dismissed for two independently sufficient reasons. *First*, the SAC alleges, at most, that Qualcomm "did only what any patent owner has the right to do to enforce its patent[s], and that includes threatening alleged infringers with suit". *Concrete Unlimited, Inc. v. Cementcraft, Inc.*, 776 F.2d 1537, 1539 (Fed. Cir. 1985). Broadcom has failed to allege (as it must) that Qualcomm did so in "bad faith"—*i.e.*, that it knew its patents to be invalid. *See, e.g., Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340,

1355 (Fed. Cir. 1999). *Second*, the SAC fails to identify any third parties with whom Broadcom had an existing relationship or a single instance of interference with such a relationship. Broadcom's contention that those prospective customers "are among a narrow class of manufacturers of equipment that use specific chipsets" (Opp. 17) is insufficient. *See Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 520-23 (1996); *AccuImage Diagnostics Corp. v. TeraRecon, Inc.*, 260 F. Supp. 2d 941, 946, 957 (N.D. Cal. 2003).

### D.    Fraud

Fraud must be pleaded with particularity. Fed. R. Civ. P. 9(b); *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). As set forth above, Broadcom fails to allege with particularity any facts supporting its new indirect injury theory. Nor does it adequately plead reliance. (Mem. 18-19.)[7] The SAC also does not allege "the date, place or time of the fraud" arising from alleged threats to Broadcom customers. *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004). The facts Broadcom must allege—including the identity and actions of Broadcom's customers, Qualcomm's purported threats to those customers and the precise technology Qualcomm allegedly should have disclosed—are not "factual information that is peculiarly within QC's knowledge or control" (Opp. 19 (alterations and quotation marks omitted)); rather, they are known to Broadcom and must be pleaded with particularity.[8]

---

[7] The Third Circuit opinion, which raises but does not resolve the "interesting question" whether Broadcom's antitrust claims must be pleaded with particularity under Rule 9(b), is inapposite. *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 315 n.9 (3d Cir. 2007) (*cited in* Opp. 18). The Third Circuit's *dicta* related to whether Broadcom had alleged with particularity a "deceptive FRAND commitment"—and does not indicate, as Broadcom contends, that the Third Circuit found that Broadcom had adequately alleged every element of a state law fraud claim.

[8] Indeed, if Broadcom were truly as uninformed as it implies (Opp. 19) and as is indicated by the complete lack of detail surrounding its lost profits theory, then the SAC would raise serious issues under Rule 11, let alone Rule 9(b).

E.    **UCL**

To have standing to maintain any claim under the UCL, even for injunctive relief, a plaintiff must allege both that it "lost money or property" as to which it had a "vested interest", *and* that the defendant possesses money or property that could properly be the subject of a restitutionary remedy. *See Buckland v. Threshold Enters., Ltd.*, 155 Cal. App. 4th 798, 817 (2007); *see also* Mem. 19-20.[9]  Broadcom has alleged neither, and Broadcom's strawman argument concerning whether it needs to allege that it paid monies *directly* to Qualcomm misses the point. The injury claimed by Broadcom is limited to "sales opportunities" it claims were "diverted" (Opp. 23), but Broadcom has no *vested* interest in such lost sales. (*See* Mem. 20-21 & n.9 (citing cases including *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003) (no vested interest in lost profits but only "an expectancy interest")).  In addition, Broadcom fails to allege that Qualcomm holds any Broadcom monies that could be "restored", as required to establish standing. Broadcom alleges only "a contingent expectancy of payment from a third party", which cannot be the subject of a restitution award. *Id.* at 1150.

F.    **Broadcom's 802.20 Theory**

Broadcom attempts to evade the Third Circuit's holding that Broadcom could not have been harmed by any delay of the 802.20 standard. (Opp. 9, 11.) But the Third Circuit clearly held that Broadcom could not have suffered 802.20-related injury because "Broadcom does not compete" in the B3G (*i.e.*, "beyond 3G") and 4G areas and because Broadcom's allegation that it "may require a license" was too speculative. *Broadcom*, 501 F.3d at 322.

---

[9] Broadcom's claim that *Buckland* "turned on 'special facts'" (Opp. 23) is incorrect. The "special facts" related only to whether "the standing requirement at issue incorporates a requirement of actual reliance"—which is not at issue here. *Id.* at 818 n.11.

Broadcom, again lacking an injury theory arising from Qualcomm's licensing conduct, adopts a fatally flawed theory—*i.e.*, that Broadcom "was injured through its expenditure of time and money attending meetings of" the 802.20 working group.  (Opp. 9.) However, again, Broadcom fails to allege sufficient facts—*i.e.*, when it attended meetings and its reasonable expenditures—to support a claim under its "unnecessary expenditure" theory.

Accordingly, all of Broadcom's 802.20-related claims—which arise only under state law—should be dismissed.

## G.    Broadcom's Invocation of Inapposite Filings and Unrelated Cases

Broadcom's argument that Qualcomm's statements in other papers and proceedings excuse Broadcom from its pleading burden (Opp. 3-5) is meritless.  *First*, the subject of this motion is *Broadcom's pleading*, not what Qualcomm allegedly has said.  And here, as in other instances, Broadcom does *not* allege that any Qualcomm patents are essential or that Broadcom needs a license to them.[10]  As such, Broadcom has failed to allege direct injury. *Second*, Qualcomm has never admitted that its alleged conduct injured Broadcom.  Thus, Qualcomm's initial motion to dismiss merely *treated* Broadcom's allegations as true (as was required on motion to dismiss)—it plainly did not *concede* them.[11]  *Third, Nokia Corp. v. Qualcomm, Inc.*, No. Civ. A 06-509, 2006 WL 2521328, at *2 (D. Del. Aug. 29, 2006), is inapposite.  That court never held that Qualcomm's declarations of essentiality removed the

---

[10] *See* Supplemental Declaration of William J. O'Shaughnessy in Support of Defendant's Motion to Dismiss Claims Four Through Eight of Plaintiff's Second Amended Complaint ("Supp. O'Shaughnessy Decl."), Ex. 2 [Broadcom's Memorandum in Opposition to Qualcomm's Demurrer to Complaint, *Broadcom v. Qualcomm*, No. 07-CC-01249 (Orange Cty. Super. Ct. Apr. 12, 2007)], at 9 ("Broadcom has not conceded [that] Qualcomm's patents are essential").

[11] *See, e.g.*, Memorandum in Support of Defendant's Motion to Dismiss at 24 (Dec. 9, 2005); Reply Memorandum in Support of Defendant's Motion to Dismiss at 1 (Jan. 30, 2006); Brief of Defendant-Appellee at 47, *Broadcom v. Qualcomm*, No. 06-4292 (3d Cir. Jan. 30, 2007).

plaintiff's obligation to plead injury—indeed, it followed a remand hearing at which the complaint's sufficiency was not at issue.[12]

## II.  BROADCOM'S JVT CLAIMS SHOULD BE DISMISSED UNDER THE COMPULSORY COUNTERCLAIM RULE AND RES JUDICATA

### A.  The Compulsory Counterclaim Rule

Broadcom cannot avoid the compulsory counterclaim rule by contending that its JVT "allegations do not bear the requisite 'logical relationship' to the patent infringement claims QC asserted in the 1958 Action". (Opp. 29; citation omitted.) As Qualcomm previously noted (Mem. 25; citation omitted), Broadcom's JVT theory involves "'the same patent[s]'" at issue in the 1958 Action and the identical affirmative defense that Broadcom asserted in that case. Broadcom ignores these points as well as Qualcomm's supporting authority.[13]

Broadcom's remaining argument against application of the compulsory counterclaim rule is that, at the time Broadcom filed its Amended Answer and Counterclaims in the 1958 Action in December 2006, it "could not have asserted the H.264 claims it now brings". (Opp. 28.) Broadcom contends that, based upon its knowledge at the time, it was "impossible"

---

[12] Broadcom's citations to the Third Circuit's decision are similarly inapposite. That opinion focused on whether Broadcom had adequately alleged *anticompetitive conduct*, not injury-in-fact. *See, e.g., Broadcom*, 501 F.3d at 315 (*cited in* Opp. 6) (Broadcom alleged a Section 2 antitrust claim), 317-18 (*cited in* Opp. 4) (Broadcom alleged anticompetitive conduct).

[13] The cases cited by Broadcom (Opp. 29 n.43) concern an exception to the compulsory counterclaim rule for certain antitrust counterclaims in patent litigation. That exception has been confined to antitrust claims, as to which it has been narrowly construed. *See Schwarz Pharma, Inc. v. Teva Pharms., U.S.A.*, Civ. No. 01-4995, slip op. at 15-20 (D.N.J. June 5, 2002) (cited in Mem. 25; copy previously supplied). As previously noted (Mem. 26 & n.13), Rule 13(a) also applies to Broadcom's FRAND licensing theory involving patents essential to the H.264 standard, as well as to Broadcom's claims involving statements allegedly made by Qualcomm to Broadcom's customers concerning the same patents. Broadcom's brief is silent on those points.

for it to assert an affirmative counterclaim raising the JVT nondisclosure issue.  (Opp. 25-28.)

But Broadcom's position is flatly inconsistent with its own statements in that case:

- In its Supplemental Interrogatory Answers in the 1958 Action, dated September 13, 2006—three months before filing its Amended Answer and Counterclaims— Broadcom asserted that "Qualcomm had an obligation to disclose the patents-in-suit to the JVT, prior to October 14, 2005, and that Qualcomm did not do so", and, as a result, "Qualcomm is barred by the doctrines of equitable estoppel, implied license by equitable estoppel, common law fraud, unclean hands, and breach of contract from asserting the patents-in-suit against Broadcom".  *See* Ex. 2 to O'Shaughnessy Decl. at 15-16.  Broadcom's JVT-related state law claims in this case rely on many of the same legal theories.

- In the same document, Broadcom stated that "Qualcomm . . . participated in the standard-setting process of the JVT, beginning in at least as early as December 2002".  *Id.*  Broadcom repeated that contention in its opposition to Qualcomm's Summary Judgment Motion directed at the JVT nondisclosure issue, filed a month before Broadcom's Amended Answer and Counterclaims.  *See* Supp. O'Shaughnessy Decl., Ex. 1 [Broadcom's Opposition to Qualcomm's Motion for Summary Adjudication, *Qualcomm Inc. v. Broadcom Corp.*, No. 05 CV 1958 B (S.D. Cal. Dec. 4, 2006)], at 1, 11, 15.  Contrary to its argument here (Opp. 27), Broadcom did not contend in either document that the evidence available to it at the time merely "suggested" Qualcomm's "likely" participation in JVT activities in 2002 (even assuming those "hedge" words to be material).

- In the same brief in the 1958 Action, Broadcom further stated that, in fact, "whether or not Qualcomm was involved in the JVT prior to 2003 was irrelevant to the issue of whether it had a duty to disclose the patents-in-suit" or whether that duty had been breached.  As Broadcom stated, "[i]t is the March 2005 version of H.264 that Qualcomm's infringement expert relies on to argue that Broadcom infringes the patents-in-suit", and "even if it were true that Qualcomm's participation in the JVT began only in 2003 (which is contrary to the evidence), the evidence demonstrates that the JVT's patent disclosure policy imposed an ongoing duty of disclosure, which extended to time periods *after the standard was initially published*".  (*Id.* at 1-2; emphasis in original.)

- Broadcom's brief also informed the Court in the 1958 Action that "Broadcom does not intend to pursue at trial in this action a claim of fraud, laches or breach of contract based on Qualcomm's failure to disclose the patents-in-suit to the Joint Video Team".  (*Id.* at 3 n.3.)

Broadcom's statements in the 1958 Action contradict its argument here that its

JVT nondisclosure claim "had not matured" when it filed its Amended Answer and

Counterclaims.  Broadcom consciously decided not to assert the counterclaim—but at the same

time made *all* of the allegations necessary to support it in connection with an "affirmative defense" of "waiver". (*See* Opp. 2, 7; summarizing Broadcom's nondisclosure theory in the SAC.) Broadcom, by its own admissions in the 1958 Action, "knew enough to bring suit against [Qualcomm]" based upon the JVT nondisclosure theory when it filed its Amended Answer and Counterclaims. *Browning v. Levy*, 283 F.3d 761, 771 (6th Cir. 2002) (*cited in* Opp. 30 n.44); *see also Haefner v. North Cornwall Twp.*, 40 Fed. Appx. 656, 658 (3d Cir. 2002) (defendant's concealment of information did not preclude plaintiff from including a certain claim in a prior lawsuit because "[t]he assertions in the original complaint in the [prior] action would have, by themselves, been more than sufficient to plead" the claim asserted in the second case).

**B.    Res Judicata**

Broadcom does not deny that it sought—and received—coercive affirmative relief on its JVT nondisclosure theory. (*See* Mem. 24, 27-28.) Nor does Broadcom contend that such coercive relief could have been entered based solely upon an affirmative defense of "waiver".[14]

Instead, Broadcom sidesteps these issues by claiming that principles *other* than "waiver", such as inequitable conduct and equitable estoppel, can provide "affirmative relief" without triggering res judicata. (Opp. 29-30.) But inequitable conduct, unlike "waiver", can be asserted in a patent case either as a defense or as an affirmative claim. *See, e.g., Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1362 & n.6 (Fed. Cir. 2005). And equitable estoppel operates to preclude injunction against the future infringing sale, manufacture, use or importation by the defendant of the *accused product*. The Court in the 1958 Action, however, did not simply permit continued sale of the accused H.264 products by Broadcom, but

---

[14] *See* Mem. 28 n.15; *see also Tierney v. Omnicom Group Inc.*, No. 06 Civ. 14302, 2007 WL 2012412, at *10 (S.D.N.Y. July 11, 2007) (dismissing cause of action based upon "waiver" because it can be asserted only as an affirmative defense).

rather declared Qualcomm's patents unenforceable against the entire world. (Judgment, Ex. 6 to O'Shaughnessy Decl., at 2-3.) That Court, without objection from Broadcom, thus treated the waiver issue not as a defense but as a *de facto* counterclaim, thereby triggering res judicata.

Moreover, Broadcom's invocation of an exception to res judicata "where the party seeking to raise the bar engaged in misconduct in the initial action" (Opp. 30 & n.44) fails, for two reasons. *First*, under *all* of the cases cited by Broadcom, the opposing party's misconduct in a prior lawsuit must actually have "prevented" a litigant from asserting a particular claim. *Browning*, 283 F.3d at 769-71; *McCarty v. First of Georgia Ins. Co.*, 713 F.2d 609, 612-13 (10th Cir. 1983); *see also Haefner*, 40 Fed. Appx. at 658; *Harnett v. Billman*, 800 F.2d 1308, 1313-14 (4th Cir. 1986). For the reasons already discussed, Broadcom was not "prevented" from asserting claims based upon its JVT nondisclosure theory. To the contrary, Broadcom did assert its JVT nondisclosure theory, prevailed on it and was awarded affirmative coercive relief on it.

*Second*, if Broadcom wanted additional relief, it should have sought such relief in the 1958 Action prior to the entry of final judgment. The trial in that case ended in January 2007. (Mem. 23-24; SAC ¶ 223.) After that, the Court conducted extensive hearings on the "waiver" issue, including consideration of Qualcomm's alleged litigation misconduct and the appropriate remedy. Moreover, Qualcomm *completed* its supplemental production to Broadcom *before* the August 6, 2007, Judgment, which awarded affirmative coercive relief to Broadcom. (*See* SAC ¶ 209.) Broadcom thus had ample opportunity to seek additional relief on its JVT nondisclosure claim in light of information produced during or after trial. Under longstanding

principles of finality and claim preclusion, Broadcom should not be permitted to seek additional relief in this Court.[15]

<div align="center">**Conclusion**</div>

For the foregoing reasons, Qualcomm's motion should be granted.

February 15, 2008

Respectfully submitted,

McCARTER & ENGLISH, LLP

By: s/ William J. O'Shaughnessy
        William J. O'Shaughnessy

Four Gateway Center
100 Mulberry Street
   Newark, NJ 07101-0652
      (973) 622-4444
Email: woshaughnessy@mccarter.com

Evan R. Chesler
Peter T. Barbur
Elizabeth L. Grayer
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
   825 Eighth Avenue
      New York, NY 10019
         (212) 474-1000

Robert N. Feltoon
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, Suite 1600
   Philadelphia, PA 19102
      (215) 864-8064

Richard S. Taffet
Philip L. Blum
BINGHAM MCCUTCHEN LLP
399 Park Avenue
   New York, NY 10022
      (212) 705-7000

*Attorneys for Defendant Qualcomm Incorporated*

---

[15] *See, e.g., Duse v. IBM Corp.*, 212 F.R.D. 58, 61-62 (D. Conn. 2002), *aff'd*, 75 Fed. Appx. 44 (2d Cir. 2003); *Russell v. Sunamerica Sec., Inc.*, 962 F.2d 1169, 1176-77 (5th Cir. 1992); *Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1552 (11th Cir. 1985); *Schmitz v. Mars, Inc.*, 261 F. Supp. 2d 1226, 1231-32 (D. Or. 2003); *Gamble v. General Foods Corp.*, 229 Cal. App. 3d 893, 902 (1991).

William J. O'Shaughnessy
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Peter T. Barbur
Elizabeth L. Grayer
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Richard S. Taffet
Philip L. Blum
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10019
(212) 705-7000

Robert N. Feltoon
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, Suite 1600
Philadelphia, PA 19102
(215) 864-8064

*Attorneys for Defendant Qualcomm Incorporated*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>                                Plaintiff.<br><br>             v.<br><br>QUALCOMM INCORPORATED,<br><br>                                Defendant. | Civil Action No. 05-3350 (MLC) (JJH) |

**SUPPLEMENTAL DECLARATION OF WILLIAM J. O'SHAUGHNESSY IN
SUPPORT OF DEFENDANT'S MOTION TO DISMISS CLAIMS FOUR
THROUGH EIGHT OF PLAINTIFF'S SECOND AMENDED COMPLAINT**

William J. O'Shaughnessy, declares pursuant to 28 U.S.C. § 1746, as follows:

1.      I am an attorney admitted to practice before all courts in the State of New Jersey.  I am a member of the law firm of McCarter & English, LLP, attorneys for defendant QUALCOMM Incorporated, and am familiar with the matters stated herein.  I submit this declaration is further support of Defendant's Motion to Dismiss Claims Four through Eight of Plaintiff's Second Amended Complaint.

2.      Attached hereto are true and correct copies of the following documents:

**Exhibit 1:**    Broadcom's Opposition to Qualcomm's Motion for Summary Adjudication, filed December 4, 2006, in *Qualcomm Inc. v. Broadcom Corp.*, No. 05 CV 1958 B (S.D. Cal.).

**Exhibit 2:**    Broadcom's Opposition to Qualcomm's Demurrer to the Complaint, filed August 10, 2007, in *Broadcom Corp. v. Qualcomm, Inc.*, No. 07-CC-01249 (California Superior Court for Orange County).

3.      Attached hereto as Appendix A are true and correct copies of the following unreported cases:

*Alea N. Am. Ins. Co. v. Salem Masonry Co.*, No. 03-CV-2977, 2006 WL 3359640 (D.N.J. Nov. 20, 2006)

*Guale v. Rolls-Royce Engine Servs.-Oakland, Inc.*, No. A105370, 2005 WL 984373 (Cal. App. 1 Dist. 2005)

*Nokia Corp. v. Qualcomm, Inc.*, No. Civ. A 06-509-JJF, 2006 WL 2521328 (D. Del. Aug. 29, 2006)

*Tierney v. Omnicom Group Inc.*, No. 06-CV-14302, 2007 WL 2012412 (S.D.N.Y. July 11, 2007)

*Walsh v. Truck Ins. Exch. Co.*, No. A097316, 2003 WL 121997 (Cal. App. 1 Dist. 2003)

Dated:  February 15, 2008

By: s/ William J. O'Shaughnessy
    William J. O'Shaughnessy

-1-

# EXHIBIT 1

# (FILED UNDER SEAL)

1  WILMER CUTLER PICKERING HALE AND DORR LLP
   William F. Lee (william.lee@wilmerhale.com)
2  Kate Saxton (kate.saxton@wilmerhale.com) (admitted *pro hac vice*)
   Louis W. Tompros (louis.tompros@wilmerhale.com) (admitted *pro hac vice*)
3  60 State Street
   Boston, Massachusetts 02109
4  Telephone: (617) 526-6000; Facsimile: (617) 526-5000

5  WILMER CUTLER PICKERING HALE AND DORR LLP
   James L. Quarles III (james.quarles@wilmerhale.com)
6  1875 Pennsylvania Avenue, N.W.
   Washington, D.C. 20006
7  Telephone: (202) 663-6000; Facsimile (202) 663-6363

8  WILMER CUTLER PICKERING HALE AND DORR LLP
   Mark D. Selwyn (244180) (mark.selwyn@wilmerhale.com)
9  1117 California Avenue
   Palo Alto, California 94304
10 Telephone: (650) 858-6000; Facsimile: (650) 858-6100

11 CLEARY GOTTLIEB STEEN & HAMILTON LLP
   George S. Cary (73858) (gcary@cgsh.com)
12 Mark W. Nelson (mnelson@cgsh.com) (admitted *pro hac vice*)
   2000 Pennsylvania Avenue, N.W.
13 Washington, D.C. 20006
   Telephone: (202) 974-1500; Facsimile: (202) 974-1999
14
   O'MELVENY & MYERS LLP
15 Michael G. Yoder (83059) (myoder@omm.com)
   Marcus S. Quintanilla (205994) (mquintanilla@omm.com)
16 610 Newport Center Drive, 17th Floor
   Newport Beach, California 92660
17 Telephone: (949) 760-9600; Facsimile: (949) 823-6994

18 Attorneys for Plaintiff
   BROADCOM CORPORATION
19
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
20                   FOR THE COUNTY OF ORANGE

21 BROADCOM CORPORATION, a California   )    Case No. 07-CC-01249
   corporation,                        )
22                                      )    **ASSIGNED FOR ALL PURPOSES TO**
                                        )    **JUDGE STEPHEN J. SUNDVOLD**
23            Plaintiff,                )    **DEPARTMENT CX-105**
                                        )
24      vs.                             )
                                        )    **PLAINTIFF BROADCOM**
25 QUALCOMM, INC., a Delaware corporation; )  **CORPORATION'S MEMORANDUM OF**
   and DOES 1 through 10, inclusive,    )    **POINTS AND AUTHORITIES IN**
26                                      )    **OPPOSITION TO DEFENDANT**
              Defendants.               )    **QUALCOMM, INC.'S DEMURRER TO**
27 _____  )    **COMPLAINT**
                                             Action Filed:  April 12, 2007
28                                           Trial Date:    None set

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
NB1:723574.1                Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint

USLDOCS 6310546-1

1

# TABLE OF CONTENTS

2

TABLE OF AUTHORITIES ......................................................................................... iii

3  I.     INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

4  II.    BROADCOM'S ALLEGATIONS ...................................................................... 4

5         A.    Development of the Standards ................................................................. 4

6         B.    Qualcomm's Misconduct ......................................................................... 4

7         C.    Injury to Broadcom and Consumers ........................................................ 6

8  III.   BROADCOM HAS ADEQUATELY ALLEGED THAT QUALCOMM'S
9         MISCONDUCT INJURED AND CONTINUES TO INJURE
          BROADCOM ..................................................................................................... 7

10        A.    Broadcom Has Alleged Causation Based on Qualcomm's Deception ..... 7

11        B.    Broadcom Has Alleged Causation Based on Qualcomm's Breach of
12              Commitments to License on FRAND Terms ............................................ 9

13        C.    Broadcom Has Alleged Causation Based On Qualcomm's
                Misconduct in the IEEE 802.20 Working Group ................................... 10

14  IV.   BROADCOM HAS STATED A CLAIM UNDER THE UNFAIR
15        COMPETITION LAW ..................................................................................... 10

16        A.    Broadcom has Standing Under the Unfair Competition Law ................ 10

17        B.    Broadcom Has Alleged Multiple Bases for Relief Under the UCL ....... 13

18        C.    Broadcom States Claims Under All Three Prongs of the UCL ............. 16

19  V.    BROADCOM HAS STATED A CLAIM FOR BREACH OF CONTRACT ................. 20

20        A.    Broadcom Has Alleged that Qualcomm Breached Its Contractual
                Obligations ............................................................................................. 20

21        B.    Broadcom Has Properly Alleged that It Is a Third-Party Beneficiary ... 20

22  VI.   BROADCOM HAS STATED A CLAIM FOR FRAUD ................................. 23

23        A.    Broadcom's Complaint Makes Sufficiently Specific Allegations ......... 24

24        B.    Broadcom Has Properly Alleged Qualcomm's Duty to Disclose ......... 25

25        C.    Broadcom Has Properly Pled Scienter ................................................... 27

26        D.    Broadcom Has Properly Pled Reliance .................................................. 28

27        E.    Broadcom Has Properly Pled Actual Damages ..................................... 29

28

i

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint

NB1:723574.1

USDOCS 6310546v1

1

F.    Qualcomm Committed Actual Fraud, Resulting in Harm to
           Broadcom ........................................................................................................ 30

2

VII.    CONCLUSION ................................................................................................... 30

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NB1:723574.1

US1DOCS 6310846v1

1

## TABLE OF AUTHORITIES

2

3

Federal Cases

4    *Arias v. Superior Court,*
     No. C054185, 2007 WL 2111017 (July 24, 2007)........................................ 11

5    *Auto. Club of S. Cal. v. The Auto Club, Ltd.*, No. CV 05-3940, 2007 WL 704895

6    (C.D. Cal. Jan. 3, 2007) ..................................................................... 12

7    *Broadcom Corp. v. Qualcomm, Inc.*, No. 05-3350(MLC), 2006 WL 2528545
     (D.N.J. Aug. 31, 2006)................................................................. 17, 18

8    *Christianson v. Colt Indus. Operating Corp.* (1988), 486 U.S. 800 ........................................... 14

9    *Ericsson, Inc. v. Samsung Electr.*, No. 2:06-CV-64, 2007 WL 1202728(E.D. Tex.,
     April 20, 2007)............................................................................ 14

10

11   *ESS Tech., Inc. v. PC-TEL, Inc.*, No. C-99-20292 RMW, 1999 WL 33520483 (N.D.
     Cal., Nov. 4, 1999)................................................................... 21, 22

12   *General Atomic Co. v. Felter* (1977), 434 U.S. 12 ..................................... 14

13   *In re Napster, Inc. Copyright Litig.* (N.D. Cal. 2005), 354 F.Supp. 2d. 1113 .............................. 16

14   *MGA Entm't, Inc. v. Mattel, Inc.*, No. CV 05-2727, 2005 U.S.Dist. LEXIS 18594
     (C.D. Cal. Aug. 26, 2005).............................................................. 12

15

16   *Nokia Corp. v. Qualcomm, Inc.*, No. Civ. A 06-509-JJF, 2006 WL 2521328 (D.
     Del. Aug. 29, 2006)................................................................ 10, 14

17   *Qualcomm Inc. v. Broadcom Corp.*, Civ. No. 05-CV-1958-B, 2007 WL 1031373
     (S.D. Cal. Mar. 21, 2007)................................................................. 9

18

19   *Rambus v. Infineon Tech. AG* (E.D. Va. 2004), 304 F.Supp. 2d 812 ........................................ 9, 17

20   *Smith v. Microskills San Diego LP*, No. D047756, 2007 WL 2127809 (4th Dist.
     Cal. App. July 26, 2007) .............................................................. 21

21   *Walker v. USAA Cas. Ins. Co.* (E.D. Cal. 2007), 474 F. Supp. 2d 1168...................................... 12

22   *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer* (C.D. Cal. 2001), 178 F. Supp.
     2d 1099.............................................................................. 19, 20

23

24   *Witriol v. LexisNexis Group*, No. C05-02392, 2006 U.S. Dist. LEXIS 26770 (N.D.
     Cal. Feb. 10, 2006).................................................................... 12

25   California Cases

26   *ABC Int'l Traders vs. Matsushita Elec. Corp.* (1997), 14 Cal. 4th 1247 ....................................... 13

27   *Allied Grape Growers v. Bronco Wine Company* (1988), 203 Cal. App. 3d 432........................ 19

28

NB1:723574.1

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint

1   *Aron v. U-Haul Company of Cal.* (2007), 143 Cal. App. 4th 796 ................................. 11

2   *Berryman v. Merit Property Management* (2007), 62 Cal. Rptr. 3d 177 ...................................... 16

3   *Bioscene Webster, Inc. v. Superior Court* (2006), 135 Cal. App. 4th 827..................................... 14

4   *Bradley v. Hartford Acc. & Indem. Co.* (1973), 30 Cal. App. 3d 818 ............................... 25, 26, 27

5   *Cal. Emergency Physicians Med. Group v. Pacificare of Cal.* (2003), 111 Cal. App.
       4th 1127 ...................................................................................................................... 21
6
    *Cel-Tech Commc'ns., Inc. v. Los Angeles Cellular Tel. Co.* (1999), 20 Cal. 4th 163................... 18
7
    *Chavez v. Whirlpool Corp.* (2001), 93 Cal. App. 4th 363 .......................................................... 18
8
    *City and County of San Francisco v. Western Air Lines, Inc.* (1962), 204 Cal. App.
9       2d 105........................................................................................................................... 21

10  *Committee on Children's Television v. General Foods Corp.* (1983), 35 Cal. 3d 197 ......... 4, 5, 25

11  *Deloitte & Touche LLP* (1997), 56 Cal. App. 4th 1468............................................................... 28

12  *Goodwest Rubber Corp. v. Munoz* (1985), 124 Cal. App. 3d 919 ........................................ 15, 16

13  *Hahn v. Mirda* (2007), 147 Cal. App. 4th 740.......................................................................... 24

14  *Hicks v. E.T. Legg & Assocs.* (2001), 89 Cal. App. 4th 496....................................................... 13

15  *Holiday Matinee, Inc. v. Rambus, Inc.* (2004), 118 Cal. App. 4th 1413 ...................................... 14

16  *Huntington Life Sciences, Inc. v. Stop Huntington Animal Cruelty USA* (2005), 129
       Cal. App. 4th 1228 ...................................................................................................... 11
17
    *Kaiser Engineering, Inc. v. Grinnell Fire Protection Systems, Co.* (1985), 173 Cal.
18      App. 3d 1050................................................................................................................ 23

19  *Kemp Bros. Constr., Inc. v. Titan Elec. Corp.* (2007), 146 Cal. App. 4th 1474 ........................... 17

20  *Korea Supply Co. v. Lockheed Martin Corp.* (2003), 29 Cal. 4th 1134 1148 ............................... 16

21  *Linear Tech. Corp. v. Applied Materials, Inc.* (2007), 152 Cal. App. 4th 115............................. 15

22  *Lucas v. Hamm* (1961), 56 Cal. 2d 583 ................................................................................... 21

23  *Lucido v. Superior Court* (1990), 51 Cal. 3d 335 ...................................................................... 17

24  *Markowitz v. Fidelity National Title Co.* (2006), 142 Cal. App. 4th 508 ............................... 21, 22

25  *Medallion, Inc. v. Clorox Co.* (1996), 44 Cal. App. 4th 1807 ..................................................... 30

26  *Meyer v. Sprint Spectrum L. P.* (2007), 150 Cal. App. 4th 1136................................................. 11

27  *Murphy v. BDO Seidman, LLP* (2003), 113 Cal. App. 4th 687, 693 ............................................ 25

28  *Nedlloyd Lines B.V. v. Superior Ct. of San Mateo Cty.* (1992), 3 Cal. 4th 459............................ 21

- iv -

1  *Neither Gregory v. Albertson's, Inc.* (2002), 104 Cal. App. 4th 845 ............................................. 15

2  *Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007), 151 Cal. App. 4th 688 .................... 11, 12

3  *Paulus v. Bob Lynch Ford, Inc.* (2006), 139 Cal. App. 4th 659 .................................................. 16

4  *People v. Dollar Rent-A-Car Systems, Inc.* (1989), 211 Cal. App. 3d 119 .................................. 19

5  *People v. Rizo* (2000), 22 Cal. 4th 681 ....................................................................................... 11

6  *People v. Wisecarver* (1944), 67 Cal. App.2d 203 ...................................................................... 24

7  *Quelimane Co. v. Stewart Title Guaranty Co.* (1998), 19 Cal. 4th 26......................................... 2, 7

8  *Reynolds v. Bement* (2005), 36 Cal. 4th 1075 ........................................................................... 1, 20

9  *RLH Indus., Inc. v. SBC Commc'n, Inc.* (2005), 133 Cal. App. 4th 1277.............................. 18, 19

10  *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976), 57 Cal. App. 3d 104 ............................ 28

11  *Rosenbluth Int'l, Inc. v. Superior Court* (2002), 101 Cal. App. 4th 1073 .................................... 20

12  *Rotolo v. San Jose Sports & Entm't, LLC* (2007), 151 Cal. App. 4th 307 .................................. 11

13  *Samura v. Kaiser Family Health Plan, Inc.* (1993), 17 Cal. App. 4th 1284................................ 15

14  *Saunders v. Taylor* (1996), 42 Cal. App. 4th 1538 ...................................................................... 30

15  *Schifando v. City of Los Angeles* (2003), 31 Cal. 4th 1074 ...................................................... 2, 10

16  *Shell v. Smith* (1954), 126 Cal. App. 2d 279........................................................................... 21, 23

17  *Snyder v. Michael's Stores, Inc.* (1997), 16 Cal. 4th 991 .............................................................. 1

18  *Soderberg v. McKinney* (1996), 44 Cal. App. 4th 1760................................................................ 23

19  *Southern Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.* (1999),74 Cal. App. 4th
        1232.......................................................................................................................................... 15

20  *Steve Schmidt & Co. v. Berry* (1986), 183 Cal. App. 3d 1299..................................................... 23

21  *Strutzel v. Williams* (1952), 109 Cal. App. 2d 512 ..................................................................... 28

22  *Turner v. Milstein* (1951), 103 Cal. App. 2d 651 ....................................................................... 25

23  *United Stats Golf Ass'n v Arroyo Software Corp.* (1999), 69 Cal. App. 4th 607......................... 18

24  *Venice Town Council v. City of Los Angeles* (1996), 47 Cal. App. 4th 1547 .............................. 13

25  *Whiteley v. Philip Morris Inc.* (2004), 117 Cal. App. 4th 635..................................................... 31

26  *Wilson v. Houston Funeral Home* (1996), 42 Cal. App. 4th 1124 ............................................... 28

27  *Zigas v. Superior Court of the State of California* (1981), 120 Cal. App. 3d 827........................ 23

28

- v -

NB1:723574.1

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint

Federal Statutes

15 U.S.C. § 2 ............................................................................................................................... 17

California Statutes

Cal. Bus. & Prof. Code § 17203 ............................................................................................... 13

Cal. Bus. & Prof. Code § 17204 ............................................................................................... 10

Cal. Civ. Code § 1559 ........................................................................................................... 21, 22

NB1:723574.1

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

That Defendant Qualcomm, Inc. has abused its participation in standard-setting bodies is no longer subject to debate. In a blistering 55-page opinion released on August 6, 2007 Judge Rudi Brewster wrote with respect to one of the standards at issue in this case:

> In light of all of the above evidence finally revealed, the eventual collapse of Qualcomm's concealment efforts exposes the carefully orchestrated plan and the deadly determination of Qualcomm to achieve its goal of holding hostage the entire industry desiring to practice the H.264 standard by insulating its IPR from the JVT so that the JVT would lose the opportunity to mitigate, if not to avoid, Qualcomm's IPR in the development of the H.264 standard.[1]

This kind of abuse betrays the important role that standard-setting organizations ("SSO"s) play in our high-tech economy. When their members participate openly and according to the rules, SSOs enable the more efficient development and dissemination of technologies for products requiring uniform methods of operation across manufacturers, thus promoting competition among both technology developers and manufacturers. But, as courts and the antitrust enforcement agencies have long recognized, because SSOs depend on collaboration among horizontal competitors and because the standards SSOs establish convey enormous market power, the standards-setting process is rife with opportunities for participants to subvert the process for unfair commercial gain. Again and again, as Broadcom's Complaint lays out in detail, Qualcomm has used deception to seize those opportunities for unlawful advantage, thereby harming both Broadcom and consumers.

Qualcomm's demurrer avoids the core of Broadcom's charges, and instead frequently criticizes Broadcom for failing to allege facts with sufficient particularity. In reviewing a demurrer, however, a court's task is only to determine whether the complaint states a cause of action. *Snyder v. Michael's Stores, Inc.* (1997), 16 Cal. 4th 991, 995. Accordingly, the court must assume the truth of all "properly pleaded material facts *and the reasonable inferences that may be drawn therefrom.*" *E.g.*, *Reynolds v. Bement* (2005), 36 Cal. 4th 1075, 1083 (emphasis added). Those inferences include any "implied factual allegations" as well. *Schifando v. City of Los*

---

[1] Order on Remedy for Finding Waiver, at 52, *Qualcomm, Inc. v. Broadcom Corp.*, No. 05-CV-1958-B (S.D. Cal. Aug. 6, 2007) (Exhibit 1).

1 | *Angeles* (2003), 31 Cal. 4th 1074, 1081 (citing *Blank v. Kirwan* (1985), 39 Cal. 3d 311, 318).

2 | Thus, a general demurrer should not be sustained if the Complaint states a cause of action on any

3 | theory.[2]  Assessed under these familiar standards, Qualcomm's demurrer should be overruled.

4 |    ***Injury Causation* (Mem. 8-13)**.  Contrary to Qualcomm's assertion, the Complaint alleges

5 | numerous ways in which Qualcomm's pattern of misconduct—combining deception, contractual

6 | breaches, and marketplace intimidation—has directly injured and continues to injure Broadcom.

7 | The Complaint *does* allege that Qualcomm's deceit caused the SSOs to incorporate into their

8 | standards technologies that Qualcomm now claims are essential to practicing those standards.  But

9 | in any event, Broadcom's injury claims do not depend on whether such alternatives would have

10 | been incorporated had Qualcomm met its disclosure obligations.  Qualcomm's concealment of its

11 | own intellectual property rights ("IPR") until after the standards were set enabled it to evade SSO

12 | IPR policies that would have prevented Qualcomm from exploiting its market power after

13 | adoption.  Nor does it matter to Broadcom's claims whether Qualcomm's patents are actually

14 | essential to implement any of the relevant standards.  What matters is that, having deceived

15 | Broadcom into making substantial investments in product development and marketing on the

16 | assumption that Qualcomm's patents were not essential to the standards, Qualcomm now *claims*

17 | that its patents are essential, and it is able to use that claim to intimidate Broadcom's actual and

18 | potential customers.

19 |    ***UCL* (Mem. 14-19)**.  Unable to challenge Broadcom's substantive allegations, Qualcomm

20 | focuses instead on standing and remedy.  Qualcomm contends that § 17204's requirement that a

21 | plaintiff have "*lost* money or property" means that the money or property must have been *gained*

22 | by the defendant.  But that reading ignores the plain language of § 17204 and the California

23 | decisions construing it.  Qualcomm's mistaken insistence that a UCL plaintiff must satisfy the

24 | requirements for a restitution *remedy* under § 17203 to have *standing* under § 17204 would have

25 | the absurd effect of barring plaintiffs from bringing purely injunctive suits under the UCL.

26 |    [2] *See, e.g., Quelimane Co. v. Stewart Title Guaranty Co.* (1998), 19 Cal. 4th 26, 38-39,
27 | (reviewing claim under Bus. & Prof. Code § 17200 et seq.); *see also* Cal. Civ. Proc. Code § 452 ("In the construction of a pleading, for the purpose of determining its effect, its allegations must be
28 | liberally construed, with a view to substantial justice between the parties.").

NB1:723574.1

1    Qualcomm argues that this Court may not grant some of the injunctive relief that

2  Broadcom seeks because the relief would prevent Qualcomm from going to federal court or

3  require resolution of federal patent law issues. But there are many forms of injunctive remedy this

4  Court could issue—including, for example, barring Qualcomm from asserting that its patents are

5  essential to the particular industry standards at issue—that would stop Qualcomm's misconduct

6  without preventing it from going to federal court to sue for infringement. Broadcom's claims arise

7  under state law, and do not require resolution of any federal law issues of patent validity or

8  enforceability. Broadcom has pled a valid restitution claim by seeking the return of money or

9  property in which it had an ownership interest, such as customer contracts that have been disrupted

10  by Qualcomm's illegal behavior.

11    Contrary to Qualcomm's contention, Broadcom has stated claims under each of the UCL's

12  prongs. Broadcom has stated a claim under the UCL's "unlawful" prong because Qualcomm's

13  violations of its contractual obligations are unlawful in the relevant sense. As for the "unfair

14  prong," Qualcomm's collateral estoppel argument disregards the fundamental distinctions between

15  the industry standards, alleged wrongdoing, and legal theories at issue in the New Jersey federal

16  antitrust case and those at issue here. Broadcom's "fraudulent" prong claim is viable as well

17  because, again contrary to Qualcomm's argument, Qualcomm's intentional deception of the

18  hundreds of companies that participated alongside it in standard-setting activities satisfies the

19  requirement of deceiving the public.

20    ***Breach of Contract*** (**Mem. 20-24**). Broadcom's breach of contract claims do not depend

21  on the actual essentiality of Qualcomm's patents, determined after the fact, because the scope of

22  the IPR disclosure obligations is defined by each SSO participant's reasonable judgments about

23  whether IPR is likely essential. Both the terms of the SSOs' disclosure policies and the context in

24  which they were made show that fellow SSO participants, including technology consumers such

25  as Broadcom, were intended third-party beneficiaries and so are eligible to sue for breach of those

26  policies.

27

28

- 3 -

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint

NB1:723574.1

1    *Fraud* (**Mem. 24-29**).  The Complaint contains allegations addressing each element of

2    fraud to the required degree of specificity.  In any event, because this is a case of fraud by

3    concealment, where the "defendant must necessarily possess full information concerning the facts

4    of the controversy," *Committee on Children's Television v. General Foods Corp.* (1983), 35 Cal.

5    3d 197, 217, the heightened specificity requirement for pleading fraud is relaxed.

6    **II.     BROADCOM'S ALLEGATIONS**

7         **A.     Development of the Standards**

8         Broadcom's allegations concern Qualcomm's misconduct with respect to four standards or

9    families of standards:  the GSM/GPRS/EDGE family (Compl. ¶¶ 44-86) and the UMTS 3G

10   wireless data transmission standards (*id.* ¶¶ 87-116), both developed within the European

11   Telecommunications Standards Institute ("ETSI"); the H.264 video compression standard,

12   developed by the Joint Video Team ("JVT") formed by the International Standards Organization,

13   the International Electrotechnical Commission, and the International Telecommunications Union

14   (*id.* ¶¶ 117-87); and the standards for 4G wireless data transmission being developed by the 802.20

15   Working Group of the Institute of Electrical and Electronic Engineers ("IEEE") (*id.* ¶¶ 188-207).

16   For each of these standards, the Complaint sets out the chronology of the development of the

17   standard,[3] Qualcomm's and Broadcom's membership in the SSOs,[4] the IPR and financial

18   disclosure policies that established contractual obligations governing the standard-setting

19   processes,[5] and Qualcomm's intentional violations of those obligations.[6]

20        **B.     Qualcomm's Misconduct**

21        In an effort to minimize the nature of its misconduct, Qualcomm attempts to parse

22   Broadcom's allegations into discrete theories of non-disclosure, FRAND violations, and 802.20

23   _____

24        [3] *See* Compl. ¶¶ 44-53 (GSM/GPRS/EDGE), 87-90 (UMTS), 120-26 (H.264), 188-91, 203-04 (802.20).

25        [4] *See* Compl. ¶¶ 51-53, 72 (GSM/GPRS/EDGE), 72, 91 (UMTS), 124, 171 (H.264), 195 (802.20).

26        [5] *See* Compl.  ¶¶ 54-63 (GSM/GPRS/EDGE), 91-93 (UMTS), 131-37 (H.264), 192-94 (802.20).

27        [6] *See* Compl. ¶¶ 64-69, 84-86 (GSM/GPRS/EDGE), 98-103, 115-16 (UMTS), 138-54, 184-

28   87 (H.264), 195-203 (802.20).

- 4 -

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint

NB1:723574.1

1   Working Group corruption. But Qualcomm's numerous derelictions must be understood as part of

2   a "pattern of misconduct" (Compl. ¶ 1), an overarching "strategy of manipulat[ion]." *Id.* ¶ 2.

3       *First*, Qualcomm intentionally breached obligations under SSO rules by failing to disclose

4   patents on its technologies, thereby causing the SSOs to adopt standards incorporating

5   technologies that Qualcomm now claims read on its patents.[7]

6       *Second*, Qualcomm simultaneously took improper measures to steer standard-setting

7   bodies towards standards it claims incorporate its patented technologies.[8]

8       *Third*, Qualcomm has breached the FRAND licensing commitments that it made to induce

9   the SSOs to adopt standards incorporating its patented technologies and has tried to extract from

10  Broadcom and others unfair, unreasonable, and discriminatory licensing terms.[9]

11      *Fourth*, having breached its disclosure and FRAND licensing commitments, Qualcomm

12  has told Broadcom's actual and potential customers that making or selling products practicing the

13  relevant standards requires licenses to Qualcomm's purportedly essential patents, and that

14  Broadcom does not have a license, thereby intimidating customers from buying Broadcom's

15  products.[10]

---

16      [7] *See* Compl. ¶ 7 ("During Qualcomm's participation in the development of these
    international standards, Qualcomm repeatedly violated its disclosure obligations by failing to
17  reveal patents that Qualcomm now claims are essential to practice certain international standards
    related to mobile communications and video compression."); *see also, e.g.,* ¶¶ 66-69 (specific
18  allegations of failure to disclose as to GSM and GPRS/EDGE standards), ¶¶ 98-103 (UMTS
    standard), ¶¶ 142 (H.264 standard).
19
        [8] *See, e.g.,* Compl. ¶ 9 ("["I]n addition to failing to disclose its purported patent rights,
20  Qualcomm improperly and, in some cases, secretly adopted strategies and positions before the
    SSOs calculated to steer the standards under development toward technologies that Qualcomm
21  believed were protected by Qualcomm patents."), ¶ 96 ("In 1997 and 1998, Qualcomm made
    proposals in an attempt to steer the UMTS standard then under development toward purportedly
22  patented Qualcomm technologies and away from alternative technologies that were at least as
    effective."), ¶ 196 (IEEE 802.20 standard).

23      [9] *See, e.g.,* Compl. ¶¶ 84-86 ("[I]n willful disregard of its commitments to ETSI,
    Qualcomm has refused to offer licensing terms that are fair, reasonable, and non-discriminatory,
24  and has otherwise failed to offer terms that comport to the ETSI licensing requirements."), ¶¶ 115-
    116 ("In willful disregard of its commitments to ESTI, Qualcomm offered terms that were unfair,
25  unreasonable, and discriminatory."), ¶¶ 184-87 (H.264 standard).

26      [10] *See, e.g.,* Compl. ¶¶ 79-82 (describing Qualcomm's assertions to Broadcom and its
    customers and alleging that Qualcomm's refusal to licensing on FRAND terms "has injured and
27  continues to injure Broadcom, including by interfering with Broadcom's ability to develop and
    market semiconductors for GSM, GPRS, and EDGE compliant mobile wireless devices."), ¶¶ 110-
28  14 (UMTS standard), ¶¶ 177-180 (H.264 standard).

1    *Fifth*, and also to protect its monopoly profits, Qualcomm has frustrated the emergence of

2    competing standards by interfering with and delaying the development of standards by the IEEE

3    802.20 Working Group, thereby causing Broadcom to have wasted planning efforts and lost

4    opportunities to sell new products.  Compl. ¶¶ 196-207.

5         **C.    Injury to Broadcom and Consumers**

6         The Complaint alleges that Qualcomm's pattern of illegal behavior has severely harmed

7    Broadcom and consumers.[11]  As a result of Qualcomm's non-disclosure of IPR in the

8    GSM/GPRS/EDGE, UMTS, and H.264 standard-setting processes, the SSOs were led

9    unknowingly to adopt standards incorporating technology that Qualcomm now claims reads on its

10   patents.[12]  That non-disclosure also permitted Qualcomm to avoid having FRAND licensing

11   commitments imposed on it before the standards were set.  Having allowed Broadcom to make

12   substantial investments in product development and marketing in reliance on Qualcomm's acts of

13   non-disclosure,[13] Qualcomm has now refused to license Broadcom on FRAND terms[14] and has

14   threatened Broadcom's current and potential customers, thereby reducing Broadcom's ability to

15   make sales of existing standards-compliant products and to develop new ones.[15]  Qualcomm's

16   conduct has also harmed competition and consumers by, among other things, inflating prices for

17   standards-compliant products.[16]  And Qualcomm's surreptitious efforts to exploit its financial

18   links to members of the IEEE 802.20 Working Group in order to steer that standard toward its

19

20

21        [11] Paragraph 215 of the Complaint summarizes many of Broadcom's allegations of harm:
     "As a direct, proximate, and foreseeable result of Qualcomm's wrongful conduct, as alleged
22   above, Broadcom has suffered harm, including the inclusion of undisclosed IPR in the standards,
     the unavailability of a FRAND license, a reduction in Broadcom's ability to make sales of
23   standards-compliant products, a reduction in Broadcom's profits, and a diminution of Broadcom's
     ability to develop and market semiconductors for GSM, GPRS, EDGE, UMTS, H.264, and
24   802.20-compliant products." *See also* Comp. ¶¶ 83, 114, 181-82.

25        [12] *See* Compl. ¶¶ 67, 83 (GSM/GPRS/EDGE), 110, 114 (UMTS), 143, 183 (H.264).

          [13] *See* Compl. ¶¶ 73-77 (GSM/GPRS/EDGE), 104-08 (UMTS), 171-76 (H.264).
26
          [14] *See* Compl. ¶¶ 84-86 (GSM/GPRS/EDGE), 113, 115-16 (UMTS), 184-87 (H.264).
27
          [15] *See* Compl. ¶¶ 79-82 (GSM/GPRS/EDGE), 110-12 (UMTS), 177-80 (H.264).
28
          [16] *See* Compl. ¶¶ 83 (GSM/GPRS/EDGE), 114 (UMTS), 181-82 (H.264).

NBI:723574.1

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint

1    own technology has led to the unprecedented suspension of that standard-setting effort, thereby

2    squandering Broadcom's investments in developing standards-compliant products.[17]

3    **III.    BROADCOM HAS ADEQUATELY ALLEGED THAT QUALCOMM'S
         MISCONDUCT INJURED AND CONTINUES TO INJURE BROADCOM**

4         Qualcomm argues (Mem. 8-13) that Broadcom has "pleaded no fact to show how and

5    why" Qualcomm's conduct caused Broadcom injury. Qualcomm is wrong. The Complaint

6    includes copious, detailed allegations that Qualcomm's continuing pattern of unfair competition,

7    fraud, and breaches of contract has directly caused injury to Broadcom.

8         **A.    Broadcom Has Alleged Causation Based on Qualcomm's Deception**

9         Qualcomm first argues (Mem. 10-11) that Broadcom's causation allegations are deficient

10   because Broadcom has not alleged that the outcome of the relevant standards-development

11   processes would have been different had Qualcomm met its disclosure obligations. Qualcomm

12   simply disregards the allegations of the Complaint.[18]

13        In fact, Broadcom has squarely alleged that Qualcomm's deceit "allowed Qualcomm

14   unfairly and fraudulently to cause ETSI to adopt standards incorporating technology that

15   Qualcomm now claims reads on its patents." Compl. ¶¶ 67, 83 (allegations as to GSM, GPRS,

16   and EDGE standards); *see also id.* ¶¶ 100, 114 (similar allegations as to UMTS standard), ¶¶143,

17   183 (similar allegation as to H.264 standard). Furthermore, contrary to Qualcomm's argument

18   (Mem. 11), Broadcom has also specifically alleged that the SSOs had attractive alternatives to

19   Qualcomm's patented technologies for incorporation into the relevant standards. *See* Compl. ¶¶ 4,

20   67, 96, 100, 143.

21        Qualcomm also ignores Broadcom's allegations that it has been injured by reason of

22   Qualcomm's deceit *whether or not* the SSOs would have responded to Qualcomm's disclosures by

23   excluding Qualcomm's patented technologies from the standards. As the Complaint alleges, had

24

25        [17] *See* Compl. ¶¶ 205-07, 215.

26        [18] Qualcomm briefly argues that Broadcom has failed to allege causation with sufficient
     particularity (Mem. at 9-10 & n.6), but suggests no basis for its argument other than standards for
27   pleading fraud. We show *infra* at part VI that Qualcomm has alleged fraud with sufficient
     particularity. The particularity requirements for pleading fraud do not apply to Qualcomm's other
28   causes of action. *See, e.g., Quelimane Co.*, 19 Cal. 4th at 46-47 (UCL).

- 7 -
Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint
NB1:723574.1

1  Qualcomm disclosed its patents and the SSOs determined nonetheless to include Qualcomm's

2  technologies, they would have required that Qualcomm make FRAND licensing commitments

3  *before* the standards were set.  Those commitments would have protected implementers of the

4  standards from exploitation by Qualcomm.  Compl. ¶¶ 3, 21.  In addition, technology consumers

5  could have negotiated licenses before the technologies were incorporated into the standards and

6  Qualcomm obtained market power.  *Id.*[19]  By breaching its disclosure obligations, Qualcomm

7  prevented the SSOs and technology consumers from taking these crucial protective measures,

8  gained unfair monopoly power, and thereby injured Broadcom and other parties seeking to

9  practice the standards.[20]

10      Broadcom also alleges injuries caused by Qualcomm's breaches of obligations to disclose

11  to the SSOs patented technologies it now claims are essential to practicing the relevant standards

12  and Qualcomm's subsequent continuing threats to Broadcom and its actual and potential

13  customers based on its claimed patent rights.  Contrary to Qualcomm's argument (Mem. 11),

14  Broadcom's injury claims do not depend on allegations that Qualcomm's patents are *actually*

15  essential to the standards or that Broadcom cannot make or sell standards-compliant products *at*

16  *all*.  Rather, Broadcom alleges injury resulting from Qualcomm's threats to Broadcom customers,

17  which have discouraged those customers from buying from Broadcom and otherwise damaged

18  Broadcom's business of supplying standards-compliant products.  Compl. ¶¶ 79-81, 110-114, 177-

19  183.  Accordingly, what matters for Broadcom's claims of injury is the perceptions of those

20

21      [19] *Cf.* American National Standards Institute, *Guidelines for Implementation of the ANSI Patent Policy* at III.B ("As a consequence [of early disclosure of potentially essential patents],

22  patent holders and prospective licensees would be provided greater opportunities to negotiate acceptable license terms.") (Exhibit 7).

23      [20] *See In the Matter of Rambus, Inc.,* No. 9302, slip op. at 97 & n.543 (FTC, Aug. 2, 2006) (Exhibit 4) (respondent's failure to disclose patents during standard-setting process wrongfully

24  deprived SSO members of opportunity to obtain licensing commitments before standards were set, thereby injuring SSO members and competition); *see also* Letter from Thomas O. Barnett,

25  Assistant Attorney General, Antitrust Division, U.S. Department of Justice, to Michael A. Lindsay, at 9 (Apr. 30, 2007) (Exhibit 5), available at

26  http://www.usdoj.gov/atr/public/busreview/222978.htm (explaining how disclosure of relevant patents and commitments concerning licensing terms before standards are set protect parties

27  wishing to practice the standards).

28

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint

1   customers—largely shaped by Qualcomm's threats—that Qualcomm's patents are essential to
2   practicing the relevant standards—not whether those patents are in fact essential. Accordingly,
3   that Broadcom has not conceded Qualcomm's patents are essential has no bearing on whether it
4   has alleged causation.[21]

5       **B.    Broadcom Has Alleged Causation Based on Qualcomm's Breach of**
            **Commitments to License on FRAND Terms**
6

7           Qualcomm's argument that Broadcom has failed to allege causation in connection with its

8   FRAND licensing allegations (Mem. 12) similarly mischaracterizes the Complaint. Broadcom

9   does not claim injury from Qualcomm's breach of its FRAND licensing commitments based on

10  having paid Qualcomm for a license (or on being unable to make or market any standards-

11  compliant products *altogether*). Rather, because Broadcom has refused to acquiesce to

12  Qualcomm's demands for unfair, unreasonable, and discriminatory royalties in breach of its

13  FRAND obligations (Compl. ¶¶ 115-16, 187), Qualcomm has threatened Broadcom's current and

14  potential customers and thereby reduced Broadcom's ability to make sales of existing standards-

15  compliant products and develop new ones. *Id.* ¶ 215. Whether Qualcomm's patents are actually

16  essential to practicing the standards at issue is irrelevant to these claims of injury.[22]

17          This is precisely the type of Hobson's choice that the SSOs' FRAND licensing

18  requirements were intended to prevent. Compl. ¶¶ 3, 73. Having breached its FRAND

19  commitments, Qualcomm should not now be heard to argue that Broadcom cannot allege

20  causation because it has not conceded that Qualcomm's patents are essential. *See Nokia Corp. v.*

21  *Qualcomm, Inc.*, No. Civ. A 06-509-JJF, 2006 WL 2521328, at *1 (D. Del. Aug. 29, 2006)

22          [21] *See Qualcomm Inc. v. Broadcom Corp.*, Civ. No. 05-CV-1958-B, 2007 WL 1031373
    (S.D. Cal. Mar. 21, 2007) (Exhibit 2) (upholding affirmative defense of waiver to patent
23  infringement claim based on Qualcomm's breach of disclosure obligations in standard-setting
    proceeding); *Rambus v. Infineon Tech. AG* (E.D. Va. 2004), 304 F.Supp. 2d 812 (permitting
24  alleged patent infringer to amend counterclaim to add UCL claim based on alleged deceit in
    standard-setting process while alleged infringer was denying infringement and claiming patent
25  invalidity).

26          [22] Qualcomm argues (Mem. 12) that Broadcom's allegations that a court has found that
    Broadcom did not infringe two of Qualcomm's patents illustrates that Broadcom has not been
27  injured absent a determination that Qualcomm's patents are essential to practicing the relevant
    standards. But Qualcomm again ignores that Broadcom has alleged injuries that do not depend on
28  whether Qualcomm's patents are actually essential.

                                            - 9 -

1   (Qualcomm's declarations that its patents are essential eliminated need to determine whether

2   patents were in fact essential).

3

4   **C.    Broadcom Has Alleged Causation Based On Qualcomm's Misconduct in the IEEE 802.20 Working Group**

5        Qualcomm wrongly argues (Mem. 13) that Broadcom has failed to allege any connection

6   between Qualcomm's manipulation of the IEEE 802.20 Working Group and Broadcom's inability

7   to develop products that would have been compliant with the IEEE 802.20 standard.  Broadcom

8   has alleged that as a result of Qualcomm's improper dominance and other misconduct in

9   connection with the Working Group, the IEEE took the "unprecedented step" of suspending the

10  Working Group and "delaying the adoption of an industry standard." Compl. ¶¶ 204-05.  The

11  suspension, in turn, injured Broadcom by derailing its plans to develop new products that would

12  have been compliant with the 802.20 standard. *Id.* ¶¶ 206-07.  Without citing authority,

13  Qualcomm argues (Mem. 13) that Broadcom's allegations are insufficient because they do not

14  separately allege every single link in the causation chain between Qualcomm's wrongdoing and

15  Broadcom's injury, but these links are subsumed within Broadcom's allegations. *See Schifando*,

16  31 Cal. 4th at 1081 (implied factual allegations must be taken as true).

17  **IV.    BROADCOM HAS STATED A CLAIM UNDER THE UNFAIR COMPETITION LAW**

18       **A.    Broadcom has Standing Under the Unfair Competition Law**

19       Broadcom has standing under Bus. & Prof. Code § 17204.  Qualcomm erroneously argues

20  (Mem. 14) that Broadcom lacks standing because it supposedly fails to allege that it has "lost

21  money or property" *to Qualcomm*.  Qualcomm ignores the language of § 17204 and the California

22  cases construing that section and confuses the requirements for standing under § 17204 with the

23  requirements for a restitution remedy under § 17203.

24       As amended by Proposition 64, § 17204 requires that a UCL plaintiff allege it has "(1)

25  'suffered injury in fact' and (2) 'lost money or property as a result of the [alleged] unfair

26  competition.'" *Meyer v. Sprint Spectrum L. P.* (2007)*,* 150 Cal. App. 4th 1136, 1141.  Nothing in

27  the language of § 17204 or its Findings and Declaration of Purpose remotely suggests that the

28

- 10 -

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint

NB1:723574.1

1   voters intended to require plaintiffs to prove that they had "lost money or property" *to the UCL*

2   *defendant* to establish standing under the UCL. Had Proposition 64's drafters intended to require

3   all UCL plaintiffs to satisfy the requirements for *restitution* under § 17203, they "plainly knew

4   how to do so and would have done so expressly and directly." *Rotolo v. San Jose Sports &*

5   *Entm't, LLC* (2007), 151 Cal. App. 4th 307, 324. They could, for instance, have provided that

6   standing is conferred only on plaintiffs that "have lost money or property *to the defendant* as a

7   result of such unfair competition." That they did not do so is a powerful reason not to read such a

8   requirement into § 17204. *See id.* (declining to read into one section of a statute requirement from

9   another in absence of like language).[23]

10      Consistent with § 17204's plain language, the California courts have construed the section

11   to require only that a plaintiff allege "actual economic injury as a result of an unfair and illegal

12   business practice." *Aron v. U-Haul Company of Cal.* (2007), 143 Cal. App. 4th 796, 803; *see also*

13   *Arias v. Superior Court*, No. C054185, 2007 WL 2111017 at *2 (July 24, 2007) (§ 17204 "now

14   requires that a plaintiff have suffered damages"). For instance, in *Huntington Life Sciences, Inc. v.*

15   *Stop Huntington Animal Cruelty USA* (2005), 129 Cal. App. 4th 1228, 1262, plaintiff sought

16   injunctive relief to prevent continued vandalism to her home and vehicle. The Fourth District

17   Court of Appeal upheld standing based on the damage to her property, even through there was no

18   allegation that her property went to defendants. Similarly, in *Overstock.com, Inc. v. Gradient*

19   *Analytics, Inc.* (2007), 151 Cal. App. 4th 688, defendants allegedly engaged in a short-selling

20   scheme that involved issuing false and misleading information about the plaintiff's financial

21   health. The plaintiff did not allege that the defendant had taken its money or property. The court

22   held that "diminution in value of [a firm's] assets and decline in its market capitalization and other

23   vested interests" gave rise to standing under § 17204. *Id.* at 716.[24]

24      [23] California courts apply standard principles of statutory construction when interpreting

25   voter initiatives. *People v. Rizo* (2000), 22 Cal. 4th 681, 685.

26      [24] *See also Auto. Club of S. Cal. v. The Auto Club, Ltd.*, No. CV 05-3940, 2007 WL 704895
   at *1 (C.D. Cal. Jan. 3, 2007) (upholding standing based on evidence that plaintiff lost profits as a

27   result of defendants' illegal operation of automobile club); *Witriol v. LexisNexis Group*, No. C05-
   02392, 2006 U.S. Dist. LEXIS 26770 at *18-19 (N.D. Cal. Feb. 10, 2006) (monetary loss from

28   need to monitor and repair credit allegedly caused by defendant's release of personal information

- 11 -

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint
NB1:723574.1

1  Similarly, Broadcom has alleged injury to its business by reason of Qualcomm's violations

2  of the UCL through, among other things, a reduction in its sales of standards-compliant products,

3  a diminution of its ability to develop and market semiconductors that implement certain industry

4  standards, a reduction in its profits, and wasted expenditures resulting from Qualcomm's

5  misconduct. These allegations are plainly sufficient to confer standing under Section 17204.

6  Relying solely on *Walker v. USAA Cas. Ins. Co.* (E.D. Cal. 2007), 474 F. Supp. 2d 1168,

7  Qualcomm claims that requirements for *restitution* under § 17203 should be imported into the

8  requirements for *standing* under § 17204 because both sections use the term "money or property."

9  But Qualcomm ignores the two sections' different wordings and purposes. Section 17203 defines

10  the scope of the UCL's restitution remedy by permitting courts to issue orders that "may be

11  necessary to restore to any person in interest any money or property, real or personal, *which may*

12  *have been acquired* by means of unfair competition." Accordingly, § 17203 limits the UCL

13  *remedy* of *restitution* to cases in which the defendant has "acquired" money or property and

14  therefore should "restore" the money or property to the plaintiff. It nowhere suggests that

15  § 17204's use of the term "lost money or property" (which does not even appear in § 17203)

16  means that the plaintiff must have lost money or property *to the defendant* to have *standing* to sue

17  under the UCL.[25] When, as here, the drafters of legislation "carefully employed a term in one

18  place [but] excluded it in another, it should not be implied where excluded." *Hicks v. E.T. Legg &*

19  *Assocs.* (2001), 89 Cal. App. 4th 496, 507.

20  Finally, Qualcomm argues (Mem. 13-14) that failing to align the requirements for standing

21  with the requirements for a restitution remedy could create the "paradox" of a "plaintiff having

22  standing to prosecute a cause of action but not being entitled to relief if successful." This

23  _____

24  sufficient to confer standing when plaintiffs alleged they "incurred costs associated with
monitoring and repairing credit impaired by the unauthorized release of information"); *MGA*

25  *Entm't, Inc. v. Mattel, Inc.*, No. CV 05-2727, 2005 U.S.Dist. LEXIS 18594 at *32-33 (C.D. Cal.
Aug. 26, 2005) (§ 17204 standing satisfied by claim that defendant competitor's actions had

26  harmed plaintiff's "ability to attract, hire, and retain employees").

27  [25] Likewise, contrary to Qualcomm's contention (Mem. 14), *Korea Supply*, which construes
the restitution remedy under § 17203, does not remotely define "lost money or property" for

28  purposes of § 17204's standing requirements. *See Korea Supply Co.*, 29 Cal. 4th at 1148-49.

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint
NB1:723574.1

1  argument simply disregards the UCL's remedial structure. The remedies available under the UCL
2  are not limited to restitution, but include injunctive relief as well. *See* Bus. & Prof. Code § 17203;
3  *ABC Int'l Traders vs. Matsushita Elec. Corp.* (1997), 14 Cal. 4th 1247, 1268 (observing that the
4  UCL authorizes injunctive relief "*and/or*" restitution). Qualcomm's construction of § 17204
5  would have the perverse effect of requiring even those UCL plaintiffs seeking *only* injunctive
6  relief *and not restitution* to plead a claim for restitution to establish standing under the UCL.
7  When faced with the obverse claim that "restitution or disgorgement under section 17203 is
8  contingent on injunctive relief," the Supreme Court wrote that accepting the argument would
9  result in limiting the "broad equitable powers to remedy violations under section 17203 … in an
10  illogical, unfair and counterproductive manner." *ABC Intern. Traders*, 14 Cal. 4th at 1269-1270
11  (internal citation omitted). Making injunctive relief under the UCL contingent on satisfying the
12  requirements for restitution would be just as "illogical, unfair, and counterproductive."

13       **B.    Broadcom Has Alleged Multiple Bases for Relief Under the UCL**

14       In any event, Broadcom has alleged bases for both injunctive relief and restitution under
15  the UCL.[26] Qualcomm first challenges (Mem. 15-16) the Court's ability to issue injunctive relief.
16  Qualcomm misconstrues the law and the injunctive relief available to Broadcom.

17       *General Atomic Co. v. Felter* (1977), 434 U.S. 12, would prohibit this Court from
18  enjoining Qualcomm from suing in federal court, but not from ordering other injunctive relief.[27]
19  For instance, the Court could enjoin Qualcomm from continuing to assert that its patents are
20  essential to implement the specific industry standards identified in the Complaint or from seeking
21  patent licenses from or threatening parties wishing to practice the relevant standards.

22       Qualcomm next argues (Mem. 16) that this Court lacks jurisdiction to grant some of the
23  relief Broadcom seeks because such relief "involves substantial questions of patent law." But

24

25  [26] The purpose of a demurrer is "to test[] the sufficiency of the factual allegations in the
26  complaint rather than the relief suggested in the prayer of the complaint." *Venice Town Council v. City of Los Angeles* (1996), 47 Cal. App. 4th 1547, 1562.

27  [27] Likewise, in *Bioscene Webster, Inc. v. Superior Court* (2006), 135 Cal. App. 4th 827,
28  839, the court held only that a temporary restraining order was improper insofar as it restrained filing or prosecution of a suit in federal court.

- 13 -
Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint
NB1:723574.1

1    when, as here, no issue of federal patent law appears on the face of the complaint, exclusive

2    federal jurisdiction attaches only when "plaintiff's right to relief *necessarily depends* on resolution

3    of a substantial question of federal patent law, in that patent law is a necessary element of one of

4    the well-pleaded claims." *Christianson v. Colt Indus. Operating Corp.* (1988), 486 U.S. 800, 801

5    (emphasis added).  Qualcomm does not and cannot point to any issue of federal patent law that is a

6    necessary element of Broadcom's claims for relief.  Broadcom is not challenging here the validity

7    of Qualcomm's patents or claiming that they are unenforceable *under federal patent law*.  Rather,

8    it is bringing claims under California law based on Qualcomm's misconduct in causing SSOs to

9    incorporate its patented technology into industry standards and seeking state-law remedies for that

10   misconduct.[28]

11        Qualcomm concedes that this Court possesses authority to compel it to comply with its

12   FRAND licensing undertakings—a concession that is fatal to its patent-law preemption

13   argument—but urges the Court not to consider such relief (Mem. 16) because such an order would

14   be too hard to administer.  The injunctive relief Broadcom seeks would simply hold Qualcomm to

15   its own commitment to license on FRAND terms.  Qualcomm identifies no reason why the Court

16   cannot determine whether licensing terms are "fair," "reasonable," and "non-discriminatory" as

17

18

19        [28] Qualcomm has had a similar argument rejected before.  In *Nokia v. Qualcomm*, 2006
     WL 2521328 (D. Del. 2006), Nokia sued in Delaware court seeking a declaration requiring
20   Qualcomm to comply with FRAND licensing commitments Qualcomm gave to ETSI.  Qualcomm
     removed to federal court, arguing that Nokia's claims arose under federal patent law, and Nokia
21   moved to remand.  In granting Nokia's motion, the court reasoned that "Plaintiff merely seeks an
     interpretation of Defendant's obligations arising after declaring certain patents essential." *Id.* at
22   *1.  Accordingly, there was "no substantial question of patent law warranting federal jurisdiction."
     *Id.* at *2; *see also Ericsson, Inc. v. Samsung Electr.*, No. 2:06-CV-64, 2007 WL 1202728, at *2
23   (E.D. Tex., April 20, 2007) (dispute over whether patentee complied with FRAND licensing
     obligations did not present substantial issue of federal patent law).
24
          Qualcomm's reliance on *Holiday Matinee, Inc. v. Rambus, Inc.* (2004), 118 Cal. App.
25   4th 1413 is misplaced.  In that case, unlike here, the court found that issues of patent validity and
     enforceability were essential elements of the claims as pled because the plaintiff had alleged that
26   the defendant had "obtained" patent protection fraudulently.  *Id.* at 1426.  Broadcom's claims in
     this litigation in no way suggest that Qualcomm obtained its allegedly essential patents
27   fraudulently.  *See Linear Tech. Corp. v. Applied Materials, Inc.* (2007), 152 Cal. App. 4th 115,
     129 (distinguishing *Holiday Matinee* and finding state court jurisdiction over state law claims
28   relating to patents).

- 14 -

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint
NB1:723574.1

1  those terms are used among SSO participants.[29]  In other contexts, California courts regularly

2  impose remedies that require them to enforce agreements with imprecise terms.  *See, e.g.,*

3  *Goodwest Rubber Corp. v. Munoz* (1985), 124 Cal. App. 3d 919, 921 (enforcing a real estate

4  contract containing an option to buy at "fair market value").[30]

5       Finally, Qualcomm wrongly claims (Mem. 15) that restitution is unavailable because

6  Broadcom has failed to allege that Qualcomm "possesses any 'money or property' belonging to

7  Broadcom, much less facts supporting such a conclusion."  In fact, the Complaint alleges in detail

8  that Qualcomm has interfered with Broadcom's relationships with Broadcom customers by

9  asserting that licenses are required to practice standards and Broadcom does not have a license

10  (Compl. ¶¶ 78-82, 109-12, 176-79); that Qualcomm's unfair conduct has injured Broadcom

11  "including through the loss of past, present, and future profits and by the loss of customers and

12  potential customers" (*id.* ¶ 217); and that Broadcom is entitled to restitution "of all revenues,

13  earnings, profits, compensation, and benefits that may have been obtained by Defendants from

14  Broadcom, its actual customers, and its potential customers as a result of such unfair business acts

15  or practices" (*id.* ¶ 219).  Accordingly, Broadcom has plainly alleged a basis for restitution,

16  namely, that Qualcomm has taken money or property  in which Broadcom had an ownership

17  interest (*e.g.*, revenues from customer contracts).  *See Korea Supply Co. v. Lockheed Martin Corp.*

18  (2003), 29 Cal. 4th 1134 1148.[31]

19

20    [29] Neither *Gregory v. Albertson's, Inc.* (2002), 104 Cal. App. 4th 845, nor *Samura v. Kaiser*
21  *Family Health Plan, Inc.* (1993), 17 Cal. App. 4th 1284, supports Qualcomm's argument.  Far
    from asking this Court to assume "the complex role of supervising and directing efforts to market
22  commercial property," *Gregory,* 104 Cal. App. 4th at 855, the relief Broadcom seeks is limited to
    requiring Qualcomm to comply with the licensing assurances it provided to ETSI and JVT.
23  *Samura* held only that a UCL "unfair" prong claim cannot be based on alleged unfair contract
    terms, standing alone.  *Samura,* 17 Cal. App. 4th at 1299 n.6 .  Here, Broadcom bases its UCL
24  claims on allegations that Qualcomm has breached its FRAND licensing commitments as part of
    an ongoing scheme of unfair competition, not that the terms of particular contracts were unfair.
25

26    [30] *See also Southern Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.* (1999), 74 Cal. App.
    4th 1232, 1240-45 (using parties' conduct and industry usage to determine meaning of "fair
27  market value").

    [31] Qualcomm's citation to *In re Napster, Inc. Copyright Litig.* (N.D. Cal. 2005), 354
28  F.Supp. 2d. 1113  is unavailing.  There, unlike here, the counterplaintiffs failed to allege that the

- 15 -

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint
NB1:723574.1

1    **C.   Broadcom States Claims Under All Three Prongs of the UCL**

2         Section 17200 prohibits unlawful, unfair, and fraudulent business practices.  The section is

3    "written in the disjunctive," meaning that a UCL plaintiff need only state a claim under one of the

4    three prongs.  *Berryman v. Merit Property Management* (2007), 62 Cal. Rptr. 3d 177, 187.  Here,

5    Broadcom has stated claims under all three prongs of the UCL.

6              *1.    Broadcom Has Stated a Claim Under the "Unlawful" Prong*

7         Qualcomm erroneously contends (Mem. 16-17) that a breach of contract may not form the

8    predicate for a violation of § 17200's "unlawful" prong.  But "virtually any law or regulation—

9    federal or state, statutory or *common* law—can serve as [a] predicate for a [§] 17200 'unlawful'

10   violation."  *Paulus v. Bob Lynch Ford, Inc.* (2006), 139 Cal. App. 4th 659, 681 (emphasis added)

11   (internal quotation omitted).  Accordingly, Qualcomm's breaches of contract give rise to an

12   "unlawful" claim.

13             *2.    Broadcom Has Stated a Claim Under the "Unfair" Prong*

14        Qualcomm makes two arguments that Broadcom has failed to state a claim under the

15   UCL's "unfair" prong.  First, it argues (Mem. 17-18) that collateral estoppel bars Broadcom's

16   *California UCL* claim because a federal district court found that allegations of FRAND licensing

17   violations with respect to only one of the industry standards at issue here by themselves failed to

18   state a claim under the *federal antitrust laws.*  Second, it claims (*id.* at 18-19) that Qualcomm has

19   failed to allege that Broadcom breached any duty to disclose in connection with SSO proceedings.

20   Neither argument has merit.

21        In California, collateral estoppel may apply only if "'first, the issue sought to be precluded

22   from relitigation must be *identical* to that decided in the former proceeding.  Second, this issue

23   must have been *actually litigated* in the former proceeding.  Third, it must have been *necessarily*

24   *decided* in the former proceeding.'"  *Kemp Bros. Constr., Inc. v. Titan Elec. Corp.* (2007), 146

25   Cal. App. 4th 1474, 1482 (quoting *Pacific Lumber Co. v. State Water Res. Control Bd.* (2006), 37

26   Cal. 4th 921, 943 (emphasis in original)).

27   _____

     counterdefendants held any money or property in which the counterplaintiffs had held an
28   ownership interest.  *Id.* at 1127.

NB1:723574.1

1    The federal monopolization issues the New Jersey federal court decided are plainly not

2   identical to the issues here.  The federal court determined only whether Broadcom's alleged

3   breach of FRAND licensing commitments stated a claim under § 2 of the federal Sherman Act, 15

4   U.S.C. § 2.  *Broadcom Corp. v. Qualcomm, Inc.*, No. 05-3350(MLC), 2006 WL 2528545, at *9-

5   *10 (D.N.J. Aug. 31, 2006).  That is a very different question than whether Broadcom's

6   allegations here about Qualcomm's pattern of unfair conduct—which, in addition to involving

7   breaching FRAND licensing commitments, includes failing to disclose what Qualcomm now

8   claims are essential patents, steering SSOs toward its hidden IPR, intimidating Broadcom's

9   customers, and corrupting the 802.20 standards-development process—gives rise to a California

10   UCL claim.[32]  Because the identical-issue requirement mandates that "'identical factual

11   allegations' are at stake in the two proceedings," *Lucido v. Superior Court* (1990), 51 Cal. 3d 335,

12   342, the federal action cannot give rise to collateral estoppel here.[33]

13    The federal court's determination of federal antitrust claims also cannot collaterally estop

14   Broadcom's UCL claim because the legal standards are different.  *See, e.g., United Stats Golf*

15   *Ass'n v Arroyo Software Corp.* (1999), 69 Cal. App. 4th 607, 617-18 (collateral estoppel does not

16   apply where the "previous proceeding" was based on "different substantive law")  As the Supreme

17   Court made clear in *Cel-Tech Commc'ns., Inc. v. Los Angeles Cellular Tel. Co.* (1999), 20 Cal. 4th

18   163, 186, the reach of the UCL is broader than the reach of the federal antitrust laws.  Thus, at the

19   demurrer stage, a plaintiff satisfies the unfair prong of the UCL by alleging conduct that "threatens

20   an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws

21   because its effects are comparable to or the same as a violation of the law, or otherwise threatens

22   
23    [32] *See Rambus Inc.*, 304 F. Supp. 2d at 820 (observing that allegations supporting UCL claim based on multifaceted abuse of standards-development process were broader than allegations supporting Sherman Act monopolization claim).

24    [33] During oral argument in the Third Circuit appeal of the New Jersey federal antitrust
25   action, Qualcomm's counsel conceded that the claims alleged in this case "are nonantitrust claims."  *Broadcom Corp. v. Qualcomm, Inc.*, No. 06-4292 (3d Cir.) (argued June 28, 2007)
26   (Exhibit 3), Tr. at 52.  Qualcomm appears to be arguing simultaneously to the Third Circuit that Broadcom's claims in this case are not antitrust claims and arguing in this Court that Broadcom's
27   UCL "unfairness" prong claim is nevertheless barred by the New Jersey District Court's decision
28   on Broadcom's antitrust claims.

- 17 -

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint
NB1:723574.1

1    or harms competition"—whether or not the conduct gives rise to a federal antitrust claim. *Id.*

2    Indeed, the Supreme Court in *Cel-Tech* held that the conduct at issue could give rise to a UCL

3    violation even though it did not violate the Cartwright Act. *Id.* at 189-91.  The New Jersey federal

4    court determined only that the allegations there did not satisfy the requirements for a federal

5    antitrust claim; it did not resolve the (very different) question whether the particular allegations in

6    this case give rise to a claim under the UCL.[34]  Indeed, the federal court expressly declined to rule

7    on Broadcom's state-law claims and envisioned that Broadcom would bring them in state court.

8    *See Broadcom Corp.*, 2006 WL 2528545, at *19.

9        Qualcomm's reliance on *Chavez v. Whirlpool Corp.* (2001), 93 Cal. App. 4th 363 and *RLH*

10    *Indus., Inc. v. SBC Commc'n, Inc.* (2005), 133 Cal. App. 4th 1277, is misplaced.  Neither case

11    concerned the requirements for collateral estoppel.  *Chavez* held only that conduct that was not

12    anticompetitive and was condoned by the Cartwright Act claim did not give rise to a UCL claim; it

13    expressly did "not hold that . . . an 'unfair' business act . . . must violate an antitrust law to be

14    actionable under the unfair competition law." *Chavez*, 93 Cal. App. 4th at 375.  Similarly, the

15    court in *RLH Industries* simply found that the conduct at issue held no potential to harm

16    consumers and therefore did not give rise to a UCL claim. *RLH Industries*, 133 Cal. App. 4th at

17    1286.  It did not find that the antitrust laws and the UCL "unfair" prong are coextensive.  Neither

18    case supports the proposition that a decision finding certain allegations insufficient to state a

19    federal antitrust claim collaterally estops a UCL claim based on different allegations.

20        Finally, Qualcomm argues (Mem. 18-19) that Broadcom's "unfairness" claims based on

21    alleged nondisclosures are insufficient because Broadcom supposedly fails to allege that

22    Qualcomm breached any disclosure obligations.  As set forth *supra* at part II.B and *infra* at part

23    V.A, however, Broadcom has alleged repeated breaches of disclosure obligations by Qualcomm.

24

25

26

---

27    [34] For similar reasons, the other two requirements for collateral estoppel are not satisfied.
Broadcom's UCL claim was not "actually litigated" in the federal case; it was not litigated at all.

28    Nor was resolution of the UCL claim "necessary to decision" in the federal case.

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint
NB1:723574.1

1

### 3.    Broadcom Has Stated a Claim Under the "Fraudulent" Prong

2      Qualcomm mistakenly argues (Mem. 19) that Broadcom fails to state a claim under the

3   "fraudulent" prong because it supposedly does not allege that Qualcomm deceived the public.  In

4   fact, Broadcom has alleged that Qualcomm repeatedly defrauded SSOs with numerous members

5   (e.g., Compl. ¶ 46.), including many consumers for the technologies that Qualcomm claims are

6   essential to practicing the standards.  E.g., Compl. ¶¶ 56, 61.  This is a quintessential case for

7   applying the UCL's "fraudulent" prong.  Indeed, as the Federal Trade Commission found in

8   Rambus, participants in standard-setting are "likely to be less wary of deception" because they

9   expect "each other to act cooperatively."  In the Matter of Rambus, slip op. at 34.

10     The UCL is "broadly interpreted to bar all ongoing wrongful business activity in any

11   context in which it appears." People v. Dollar Rent-A-Car Systems, Inc. (1989), 211 Cal. App. 3d

12   119, 129.  The Court of Appeals has therefore upheld the application of the "fraudulent" prong to

13   fraud in circumstances very similar to this case:  fraud on a cooperative corporation with many

14   industry members.  See Allied Grape Growers v. Bronco Wine Company (1988), 203 Cal. App. 3d

15   432, 449-55.  Even more specifically, in a UCL case alleging misconduct in connection with an

16   SSO, the court denied a motion to dismiss as to the "fraudulent" prong because, as is the case here,

17   the SSO membership included consumers of the relevant technologies. Rambus, Inc., 304 F.

18   Supp. 2d at 821.

19     Watson Laboratories, Inc. v. Rhone-Poulenc Rorer (C.D. Cal. 2001), 178 F. Supp. 2d

20   1099, cited by Qualcomm, actually supports applying the "fraudulent" prong here.  There, the

21   court wrote that "it should be necessary under the 'fraudulent' prong to show deception to some

22   members of the public, or harm to the public interest, and not merely to the direct competitor or

23   other non-consumer party to a contract." Id. at 1121.  Here, even if Qualcomm's deception of

24   consumers of its technology were somehow insufficient to support a claim under the "fraudulent"

25   prong, Broadcom has alleged harm to the public interest from Qualcomm's deception. See Compl.

26   ¶¶ 1, 4, 83, 114, 182, 216.[35]

27   _____

28        [35] Qualcomm's reliance on Rosenbluth Int'l, Inc. v. Superior Court (2002), 101 Cal. App. 4th 1073 is misplaced.  That case did not construe § 17200's "fraudulent" prong at all, but rather

- 19 -

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint
NB1:723574.1

1   **V.    BROADCOM HAS STATED A CLAIM FOR BREACH OF CONTRACT**

2          **A.    Broadcom Has Alleged that Qualcomm Breached Its Contractual Obligations**

3          Nothing in the language of the Complaint supports Qualcomm's suggestion (Mem. 20-21)

4  that the scope of Qualcomm's disclosure and FRAND licensing obligations is defined by whether

5  *Broadcom believes* that Qualcomm's patents are essential to the standards.  On the contrary, the

6  allegations make plain that, under the relevant IPR Policies, Qualcomm, like other SSO

7  participants, obligated itself to disclose any IPR that it, as the IPR holder, believed was essential to

8  the standards. *See* Compl. ¶¶ 54-69; ¶¶ 92, 98-103; ¶¶ 131-154.  Thus, Broadcom alleges that

9  Qualcomm, by belatedly disclosing (and refusing to license on FRAND terms) patents that

10  "*Qualcomm claims*" are essential to the standards that Qualcomm violated its contractual

11  obligations. *Id.* ¶¶ 65, 99, 142.[36]

12          **B.    Broadcom Has Properly Alleged that It Is a Third-Party Beneficiary**

13          Qualcomm's assertion that Broadcom cannot qualify as a third-party beneficiary of

14  Qualcomm's patent disclosure obligations because the SSO IPR policies were not "expressly"

15  made for Broadcom's benefit is without merit.[37]  Cal. Civ. Code § 1559 requires that the contract

16  at issue be "made expressly for the benefit of a third person," but the contract need not "be

17  exclusively for the benefit of the third party," *Smith v. Microskills San Diego LP*, No. D047756,

---

18  concerned the representative action provision of (pre-Proposition 64) § 17204. *Rosenbluth*

19  rejected an individual's effort to bring a representative action on behalf of sophisticated
corporations because such an action could deprive the corporations of the opportunity to bring

20  their own actions and raise "serious fundamental due process considerations." *Id.* at 1078-79.

21  Nothing in *Rosenbluth* suggests that the California legislature meant to deny sophisticated
corporations a remedy under § 17200's "fraudulent" prong.

22      [36] To the extent there is any ambiguity in the Complaint, it must be resolved in Broadcom's
favor at the demurrer stage. *See, e.g, Reynolds*, 36 Cal. 4th at 1083.

23      [37] Qualcomm assumes that California law governs its obligations under the SSO IPR

24  policies at issue here.  As explained in this section, Qualcomm's arguments about limitations on
third-party beneficiary claims under California law are meritless.  But the IPR policies of ETSI,

25  the SSO that developed two of the standards at issue in this case, expressly provide that disputes
concerning their violation are governed by French law, which is even more generous than

26  California law in recognizing third-party beneficiary status. *See Nedlloyd Lines B.V. v. Superior
Ct. of San Mateo Cty.* (1992), 3 Cal. 4th 459, 464-66 (application of choice-of-law provisions).

27  Under Article 1121 of the French Civil Code, third-party claims may be recognized where the
intent to benefit the third party is merely implicit, as long as it is clear.  French courts have found

28  such intent from the nature of the contract and the circumstances surrounding its creation.

1  2007 WL 2127809, at *3 (4th Dist. Cal. App. July 26, 2007) (internal quotation marks omitted),

2  nor need the third-party beneficiary "be specifically named as a beneficiary." *City and County of*

3  *San Francisco v. Western Air Lines, Inc.* (1962), 204 Cal. App. 2d 105, 121; *Shell v. Smith* (1954),

4  126 Cal. App. 2d 279, 290.

5        Rather, to prevail as a third-party beneficiary, Broadcom need only establish that

6  Qualcomm, as the promisor, "intended to benefit" Broadcom through its patent disclosure

7  commitments, and that "such intent appears on the terms of the contract." *Cal. Emergency*

8  *Physicians Med. Group v. Pacificare of Cal.* (2003), 111 Cal. App. 4th 1127, 1137.  In determining

9  such intent, "it is sufficient that the promisor must have understood that the promise had such

10 intent." *Smith*, 2007 WL 2127809, at *3 (citing *Lucas v. Hamm* (1961), 56 Cal. 2d 583, 591.  The

11 Court must interpret the contract so "as to give effect to the mutual intention of the parties as it

12 existed at the time of contract." *Markowitz v. Fidelity National Title Co.* (2006), 142 Cal. App. 4th

13 508, 527 (citing Cal. Civ. Code, § 1636).

14       "Although 'the intention of the parties is to be ascertained from the writing alone, if

15 possible' (*id.,* § 1639), [a] contract may be explained by reference to the circumstances under

16 which it was made, and the matter to which it relates.'" *Markowitz*, 142 Cal. App. 4th at 527.

17 Indeed, in *ESS Tech., Inc. v. PC-TEL, Inc.*, No. C-99-20292 RMW, 1999 WL 33520483 (N.D.

18 Cal., Nov. 4, 1999), a case also involving a breach-of-contract claim for failure to comply with

19 FRAND licensing obligations, the court denied the defendant's motion to dismiss plaintiff's claim

20 that it was a third-party beneficiary of such licensing obligations and recognized that it should

21 consider the "customs and practices of the defendant" and relevant industry.  *Id.* at *3-*4.  The

22 court observed that such customs and practices were "outside the scope of the pleadings" and thus

23 were not appropriately determined on a motion to dismiss when the "plaintiff may be able to

24 support a claim for specific performance." *Id.* at * 4.

25       Numerous allegations in the Complaint aver that the IPR disclosure and licensing

26 obligations that Qualcomm committed to—and then breached—were intended to benefit all SSO

27 participants, as well as third parties implementing the completed standard by, among other things,

28

NB1:723574.1

1  ensuring that the finished standard either excluded proprietary technology, or that such technology

2  could be licensed on FRAND terms. *See* Compl. ¶¶ 7, 61, 134.[38] Such intent is evident from the

3  ETSI and ITU/ISO/IEC guidelines, which require timely disclosure of purportedly essential IPR,

4  and further require the owner of such IPR to grant a FRAND license to such IPR. *Id.* ¶¶ 59, 62,

5  132-136, and 184. As these policies make clear, the purpose of such requirements is to protect

6  future implementers of standards by ensuring the fair development of the standard and preventing

7  "monopolistic abuse [of purportedly essential]" IPR by participants. *Id.* ¶¶ 20, 134. The SSOs

8  require members to commit to such requirements specifically to prevent patentholders from doing

9  what Qualcomm did here: exploiting SSO members and third parties by participating in the

10  standards-setting process, concealing purportedly essential IPR, and later seeking to extract

11  monopoly rents for the technology.

12       That these IPR disclosure obligations are intended to benefit third parties such as

13  Broadcom is also evidenced by "circumstances under which" the IPR disclosure obligations were

14  made, as well as "the matter to which [they] relate[]." *Markowitz*, 142 Cal. App. 4th at 527

15  (internal citations omitted). Qualcomm cannot credibly dispute that the purpose of the IPR

16  disclosure requirements is not only to allow participants in the standards-setting process accurately

17  to evaluate competing technologies, but also to provide notice of potential IPR issues to later

18  implementers of the standards. Such notice is necessary to allow third parties implementing the

19  standard to determine whether and from whom they must obtain a license.[39]

20       [38] Qualcomm's suggestion that third-party beneficiary obligations do not arise in the

21  standards-setting context is incorrect. For example, the American National Standards Institute,
which accredits leading SSOs such as the IEEE, has specifically stated that IPR disclosure and

22  licensing commitments by participants "create a commitment by the patent holder and third-party
beneficiary rights in implementers of the standard." ANSI-GSC-11 Submission, at 4 (June 24,

23  2006) (Exhibit 6).

24       [39] Indeed, recent Qualcomm public statements show that Qualcomm itself recognizes that
commitments under IPR policies are intended to benefit other SSO participants and third parties
implementing the standards. In a July 25, 2007, earnings call, Qualcomm's General Counsel,

25  Louis Lupin, stated, with regard to certain *Broadcom* patents that Qualcomm has infringed, that
those patents would, if essential, be subject to a "FRAN[D] commitment whether they've

26  [Broadcom] made the declaration to the relevant standards body or not." July 25, 2007 Final
Transcript at 19 (Exhibit 8). Mr. Lupin went on to state that if Broadcom "had an obligation [to

27  timely disclose IPR] and they didn't fulfill it and it was a knowing failure to fulfill, that might in
fact, affect the enforceability of the patent." *Id.* Qualcomm also suggested that if Broadcom had

28  failed "to live up to their obligations to the relevant standards bodies" such failure could "be a

1    Qualcomm's assertion (Mem. 22-23) that Broadcom cannot claim to be a third-party

2  beneficiary of such IPR disclosure requirements because any benefit from Qualcomm's

3  "performance" is, at best, an "indirect, diffused benefit" conferred on "all future manufacturers" of

4  compliant equipment is similarly unavailing. Because it "is not necessary that an express

5  beneficiary be specifically identified in the contract; [any party] may enforce it if he or she is a

6  *member of the class for whose benefit the contract was created.*" *Soderberg v. McKinney* (1996),

7  44 Cal. App. 4th 1760, 1773 (internal citations omitted); *Shell*, 126 Cal. App. 2d at 290 (same).[40]

8    Here, the relevant "class" of third party beneficiaries is a clear and defined group, namely,

9  participants in the standards-setting process and third parties implementing the completed standard

10  (including Broadcom). It is these specific parties that the IPR disclosure obligations of the

11  relevant standards-setting organizations are intended to benefit, both to ensure that participants

12  developing the standard can make what may be irrevocable decisions to support the inclusion of

13  particular technologies in a standard based on full knowledge of relevant patents, and to ensure

14  that third parties implementing the completed standard know about any essential patents to which

15  they may need a license.

16  **VI.    BROADCOM HAS STATED A CLAIM FOR FRAUD**

17    Broadcom sufficiently pleads its cause of action for fraud, under both common-law and

18  statutory principles. As Broadcom's Complaint makes clear, Qualcomm defrauded both

19  Broadcom and the SSOs in which Qualcomm participated by concealing its purportedly essential

20  IPR, in violation of its disclosure obligations, and by secretly trying to steer standards towards its

21  subject of future litigation." *Id.* at 18. Such statements show that Qualcomm views itself as a
22  third-party beneficiary of IPR policies of SSOs in which it participates, with a right to enforce
    those policies itself. Having taken that position with respect to its own interests, Qualcomm
23  should not be heard to deny that others have such rights when Qualcomm breaches commitments
    under IPR policies.

24    [40] *See, e.g., Steve Schmidt & Co. v. Berry* (1986), 183 Cal. App. 3d 1299,1313 (broker
    cooperating with a broker which was party to listing contract with a vendor was member of class
25  of intended third-party beneficiaries); *Kaiser Engineering, Inc. v. Grinnell Fire Protection
    Systems, Co.* (1985), 173 Cal. App. 3d 1050, 1055 (engineering company a member of a class of
26  third-party beneficiaries to indemnity agreement between construction company and Department
    of Energy); *Zigas v. Superior Court of the State of California* (1981), 120 Cal. App. 3d 827,836
27  (tenants part of class of third-party beneficiaries to agreement between landlord and government).

28
NB1:723574.1

1  hidden IPR. Having stayed silent while SSOs adopted standards in reliance on Qualcomm's non-

2  disclosure, Qualcomm has now asserted to Broadcom's customers that Broadcom products

3  practicing those standards require a license from Qualcomm. This is textbook fraud.[41]

4      **A.    Broadcom's Complaint Makes Sufficiently Specific Allegations**

5      Broadcom's 37-page complaint more than satisfies the heightened pleading standards for

6  fraud claims. Specifically, Broadcom has pled that:

7      *The rules of ETSI, the JVT, the ISO, the IEC, the ITU, and the IEEE 802.20 Working
       Group, as understood by participants, imposed duties of disclosure on participants,
8      including Qualcomm.* Compl. ¶¶ 54-63, 92-93, 131-37, 192-94.

9      *Qualcomm intentionally breached those duties of disclosure. Id.* at ¶¶ 64-69, 98-103,
       138-54, 195-203.

10
       *The SSOs and Broadcom reasonably relied on Qualcomm's acts of non-disclosure. See*
11     *id.* at ¶¶ 70-74, 104-05, 169-74, 204-05.

12     *Broadcom has suffered actual damages as a result of Qualcomm's nondisclosures. See*
       *id.* at ¶¶ 75-83, 106-14, 175-83, 206-07.
13

14 Each of these sets of allegations is sufficiently clear and particular to apprise Qualcomm of what it

15 must answer, and to enable the Court to understand Broadcom's prima facie case—which is all

16 that the heightened pleading requirement for fraud demands.[42]

17     In any event, the particularity requirement is relaxed when, as here, the defendant is well

18 aware of the facts giving rise to the fraud claim. As the Supreme Court explained in *Committee on*

19 *Children's Television v. General Foods Corp.* (1983), 35 Cal. 3d 197 ("*CCT*"):

20     We observe, however, certain exceptions which mitigate the rigor of the rule
       requiring specific pleading of fraud. Less specificity is required when "it appears
21     from the nature of the allegations that the defendant must necessarily possess full
       information concerning the facts of the controversy."

22

23     [41] *See, e.g., People v. Wisecarver* (1944), 67 Cal. App.2d 203, 207 ("The word
       'fraudulently' as used in the statute is all encompassing. It includes all surprise, trick, cunning,
24     dissembling and unfair ways by which another is deceived." (citations omitted)); *Hahn v. Mirda*
       (2007), 147 Cal. App. 4th 740, 748.

25     [42] *See Murphy v. BDO Seidman, LLP* (2003), 113 Cal. App. 4th 687, 693 (complaint
26     adequately pled fraud when "[t]he complaint [provided] enough information for respondents to
       know what purported falsehoods they must defend against," and explaining that "[f]or a lengthy
27     complaint, 'perfect compliance with the specificity requirement . . . as a practical matter . . . [may]
       provide less effective notice and be less useful in framing the issues than would a shorter, more
28     generalized version.'" (quoting *CCT*, 35 Cal. 3d at 216-217)).

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
                  Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint

1    *Id.* at 217 (quoting *Bradley v. Hartford Acc. & Indem. Co.* (1973), 30 Cal. App. 3d 818, 825); *see*

2    *also Turner v. Milstein* (1951), 103 Cal. App. 2d 651, 658 ("Even under the strict rules of common

3    law pleading, one of the canons was that less particularity is required when the facts lie more in

4    the knowledge of the opposite party . . . ."). As Broadcom's allegations make clear, it is

5    Qualcomm that "must necessarily possess full information concerning the facts of the

6    controversy." The heart of Broadcom's fraud claim is that Qualcomm concealed certain facts

7    from standard-setting bodies in which it participated: it concealed its IPR and it concealed the

8    affiliations of its employees and agents participating in the standard-setting process. Qualcomm

9    knows well which of its employees and agents participated in standard-setting activities, and

10   which of its patents it concealed from the SSOs. Moreover, although Broadcom knows and has

11   pled that Qualcomm harmed Broadcom by telling Broadcom's customers that Broadcom requires

12   a license, Qualcomm certainly knows which customers it has threatened and when. Relaxation of

13   the fraud particularity requirement is particularly appropriate given Qualcomm's extensive efforts

14   at concealment. As Judge Brewster recently found, "Qualcomm, its employees, and its witnesses

15   actively organized and/or participated in a plan to profit heavily by (1) wrongfully concealing the

16   patents-in-suit while participating in the JVT and then (2) actively hiding this concealment from

17   the Court, the jury, and opposing counsel."[43]

18       **B.    Broadcom Has Properly Alleged Qualcomm's Duty to Disclose**

19           *1.    Broadcom Has Alleged A Duty to Disclose IPR that Qualcomm Believed
                    Was Essential to ETSI and JVT Standards*

20       Qualcomm first repeats once again its accusation (Mem. 24) that Broadcom cannot allege

21   that Qualcomm violated its disclosure and FRAND licensing obligations unless it acknowledges

22   that Qualcomm's patents are actually essential to the standards. As explained above, *see supra*

23   parts III.A and V.A, this accusation misses the mark. It is enough that Qualcomm itself claims

24   that the patents are essential.

25

26

27   _____

        [43] Order on Remedy for Finding Waiver, at 22, *Qualcomm, Inc. v. Broadcom Corp.*, No.
28   05-CV-1958-B (S.D. Cal. Aug. 6, 2007) (Exhibit 1).

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint
NB1:723574.1

1    Qualcomm also faults Broadcom (Mem. 24) for failing to identify particular patents

2  Qualcomm improperly concealed from the SSOs. But the Complaint identifies the patents so far

3  revealed by Qualcomm just as Qualcomm did: by how many and when Qualcomm claimed they

4  were essential. *See* Compl. ¶¶ 65-66 (104 patents disclosed from June 4, 2004), 98-99 (161

5  patents disclosed on October 19, 2001). Broadcom cannot identify patents by patent number that

6  Qualcomm has never revealed, but nonetheless brandishes at customers. The specific patents that

7  Qualcomm has concealed from the standard-setting bodies (*see id.* ¶¶ 64-69, 98-103, 138-54) and

8  the specific patents that Qualcomm had in mind when it threatened Broadcom's customers (*see id.*

9  ¶¶ 79-80, 110-11, 177-78), are facts that that Qualcomm "must necessarily possess." *Bradley*, 30

10  Cal. App. 3d at 825.

11
### 2. Broadcom Has Alleged that Qualcomm Owed a Duty of Disclosure to the 802.20 Working Group

12
13    Each of Qualcomm's arguments concerning its duty to disclose to the 802.20 Working

Group ignores the allegations of the Complaint or that the factual details are within Qualcomm's

14
knowledge. First, Qualcomm argues (Mem. 25) that "QC is nowhere alleged to be a participant in

15
the 802.20 working group." In fact, the Complaint alleges that "Qualcomm employees and agents

16
participated in and were members of the IEEE 802.20 working group." Compl. ¶ 195.

17
    Second, Qualcomm contends (Mem. 25) that "BC does not plead any fact to show that QC

18
itself owed any disclosure duty to the 802.20 working group." But the Complaint expressly

19
alleges that "the Policies and Procedures of IEEE Project 802, Working Group 802.20 and the

20
ANSI rules require that participants provide '[t]imely and adequate notice' of 'all known directly

21
and materially affected interest' including the 'affiliation' of each member." Compl. ¶ 194. This

22
allegation, combined with the allegation that Qualcomm participated in the Working Group (*id.* at

23
¶ 195) plainly is sufficient to allege that Qualcomm had a duty to disclose. *See id.* at ¶ 222.

24
    Third, Qualcomm complains (Mem. 25) that Broadcom has failed to identify the

25
Qualcomm employees or consultants who participated in the 802.20 Working Group, the

26
particular meetings those Qualcomm agents attended, or the financial relationships between

27
Qualcomm and its agents. Plainly, Qualcomm "must necessarily possess full information

28

Plaintiff Broadcom Corporation's Memorandum of Points and Authorities in
Opposition to Defendant Qualcomm Inc.'s Demurrer to Complaint

1  concerning" its relationship with those it dispatched to the 802.20 Working Group and what it

2  directed its agents to do. *Bradley*, 30 Cal. App. 3d at 825.  In fact, it is precisely this set of facts

3  that Broadcom has alleged that Qualcomm has concealed. Compl. ¶¶ 200-201, 204.[44]

4      Finally, Qualcomm wrongly asserts (Mem. 26) that Broadcom's failure to allege that

5  Broadcom was a member of the 802.20 Working Group is "fatal" because Qualcomm owed no

6  duty to any party other than other Working Group members.  As a preliminary matter, if

7  Qualcomm were correct that Broadcom was required to allege its membership in the 802.20

8  Working Group, that omission could easily be corrected:  Broadcom was and is a member of the

9  802.20 Working Group and can amend its Complaint to make that allegation if necessary.  But as

10  a matter of law, Broadcom was not required to plead that it is a member of the 802.20 Working

11  Group.  Qualcomm defrauded Broadcom by breaching its duty to the 802.20 Working Group

12  because Broadcom was an intended third-party beneficiary of the financial disclosure rules.[45]

13      **C.**    **Broadcom Has Properly Pled Scienter**

14      Qualcomm disputes (Mem. 26) the sufficiency of Broadcom's allegations that, for each

15  standard and for each standard-setting body "Qualcomm's nondisclosure was deliberate and

16  intentional."  The circumstances of Qualcomm's nondisclosure alleged in the complaint are strong

17  evidence of scienter—including the allegation that Qualcomm's misconduct is part of a "pattern

18  and practice of delaying disclosure to . . . SSOs of its purported intellectual property rights until

19  after substantial development of a standard has occurred or the standard has already been

20  adopted."  Compl. ¶ 4; *see also id.* ¶ 203 (alleging "pattern and practice of manipulation of SSOs'

21  voting process[es]")  Broadcom's allegation that Qualcomm's conduct was deliberate and

22  intentional, combined with its allegations concerning Qualcomm's pattern and practice of

23      [44] Although Broadcom believes that the allegations in its Complaint are sufficient as written, if necessary, it is willing and able to amend its Complaint to identify the names of the
24  802.20 Working Group participants that it believes to be Qualcomm employees or agents.
   However, because Qualcomm's efforts to conceal its relationships with 802.20 Working Group
25  participants have been largely successful, Broadcom anticipates that it will learn of more 802.20
   Working Group participants through the course of discovery.

26      [45] *Cf. Strutzel v. Williams* (1952), 109 Cal. App. 2d 512, 515 ("The rule is established that
   representations made to one person with intention that they will be repeated to another and acted
27  upon by him and which are repeated and acted upon to his injury gives the person so acting the
28  same right to relief as if the representations had been made to him directly.")

- 27 -

1 nondisclosure, are more than sufficient to meet its pleading obligations. *See, e.g., Wilson v.*

2 *Houston Funeral Home* (1996), 42 Cal. App. 4th 1124, 1139 (allegations of "prior similar conduct"

3 sufficient to meet heightened fraud pleading requirement).[46]

4 Qualcomm is also simply incorrect when it claims (Mem. 26) that "BC fails to make any

5 allegation of scienter/intent to defraud at all to support its 802.20 allegations." Broadcom

6 expressly alleges that "Qualcomm intentionally failed to disclose its patents to ETSI and the ITU,

7 ISO/IEC, and JVT, *and intentionally failed to disclose its financial relationship with members of*

8 *the IEEE 802.20 working group.*" Compl. ¶ 221 (emphasis added).

9 ### D. Broadcom Has Properly Pled Reliance

10 Qualcomm repeats its claim (Mem. 27) that Broadcom has not alleged that the standards

11 adopted by ETSI and the JVT would have been different if Qualcomm had complied with its

12 discovery obligations. As explained above, *see supra* at part III.A, Broadcom has made these

13 allegations,[47] but in any event they are not essential for detrimental reliance. Qualcomm's non-

14

15 [46] The two cases on which Qualcomm relies—*Anderson v. Deloitte & Touche LLP* (1997),

16 56 Cal. App. 4th 1468 and *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976), 57 Cal. App. 3d 104—do not stand for the principle that Broadcom's specific allegation that "Qualcomm's nondisclosure was deliberate and intentional" is insufficient. *Anderson* was an appeal of a

17 summary judgment determination, and stands only for the unremarkable principle that a party cannot prove fraud with no evidence of scienter. *See Anderson*, 56 Cal. App. 4th at 1476.

18 Likewise, the *Roberts* decision sustained a demurrer to a fraud claim because the plaintiff "failed to plead that defendants [committed their fraudulent act] with fraudulent intent." *Roberts*, 57 Cal.

19 App. 3d at 110. By contrast, Broadcom has alleged that Qualcomm's acts of nondisclosure were deliberate and intentional.

20 [47] *See, e.g.*, Compl. ¶ 100 ("Because Qualcomm failed to disclose its patents until many years after ETSI adopted the standards for UMTS, the participants in the ETSI standard setting

21 process were unable to consider the impact on Qualcomm's asserted patent rights in formulating the UMTS standard. This distorted the process by which participants selected among alternative

22 technologies to incorporate in the standard based on considerations of technical merit and intellectual property rights, and allowed Qualcomm unfairly and fraudulently to cause ETSI to

23 adopt a standard incorporating technology that Qualcomm now claims reads on its patents."); *see also id.* at ¶¶ 67, 143.

24 Qualcomm's remaining challenges to Broadcom's reliance allegations are likewise without

25 merit. Qualcomm's claim (Mem. 27) that Broadcom's allegations "show reliance only by ETSI or the JVT, not reliance by [Broadcom]" misses the point: Broadcom has alleged specifically that

26 "Broadcom relied upon all ETSI members—including Qualcomm—complying with the ETSI rules and regulations." Compl. at ¶ 74; *see also id.* at ¶¶ 171-72 (same allegation for JVT).

27 Qualcomm's claim (Mem. 27 n.17) that Broadcom's investments in UMTS technology occurred after Qualcomm's late patent disclosures are also irrelevant. As Broadcom has alleged,

28 before Qualcomm disclosed its patents, ETSI had relied on Qualcomm's nondisclosure and

- 28 -

1 │ disclosures, in and of themselves, harmed Broadcom by enabling Qualcomm to seek more onerous

2 │ licensing conditions than it would have been able to do if it had disclosed.

3 │       **E.   Broadcom Has Properly Pled Actual Damages**

4 │       Qualcomm wrongly contends (Mem. 28) that the damages alleged in the complaint are

5 │ "potential" or "hypothetical." In the context of Qualcomm's nondisclosure to ETSI and the JVT,

6 │ Broadcom has expressly alleged that: (1) Broadcom develops standard-compliant products

7 │ (Compl. ¶¶ 76-78, 108-09; 173-76); (2) Qualcomm has claimed to Broadcom and its customers

8 │ that Qualcomm has essential patents and that Broadcom's products are not licensed (*id.* ¶¶ 79-80,

9 │ 110-11, 177-78); (3) Qualcomm's actions have prevented Broadcom from making sales (*id.* ¶¶ 81,

10 │ 112, 179). These allegations are sufficient to show the particular facts from which the nature and

11 │ extent of Broadcom's injury can be ascertained, and the particular facts showing the "detriment

12 │ proximately caused" by Qualcomm's fraud.[48]

13 │       Likewise, Broadcom's allegation of lost business opportunities as a result of Qualcomm's

14 │ misconduct before the 802.20 Working Group is not "hypothetical" or "potential." Broadcom has

15 │ alleged that it has planned and intends to develop products for 802.20 applications, but that it

16 │ cannot do so as a result of Qualcomm's fraud. Compl. ¶¶ 206-07. The lost profits from these

17 │ sales is precisely the kind of "harm . . . from which the evidence shows [Broadcom] is certain to

18 │ suffer in the future" for which Broadcom is entitled to compensation by actual damages. *Saunders*

19 │ *v. Taylor* (1996), 42 Cal. App. 4th 1538, 1543.

20 │ ────────────────────────────────────

21 │ released two versions of the UMTS standard. Compl. ¶¶ 98-99. The fact that Broadcom did not
   │ implement the already fixed standard until later is immaterial.

22 │      Finally, Qualcomm is wrong to suggest that Broadcom has not alleged reliance on
   │ Qualcomm's nondisclosure of the affiliations of its participants in the 802.20 Working Group.

23 │ Broadcom expressly alleges that it "relied on the standard-setting process within . . . the IEEE
   │ 802.20 working group to be . . . in accordance of with the rules, policies, and procedures of" the

24 │ Working Group. Compl. ¶ 225. Broadcom has likewise alleged that Qualcomm's manipulation of
   │ the standards-setting process in violation of those rules has prevented Broadcom from developing

25 │ 802.20 products. *Id.* ¶ 207.

26 │     [48] *See Service by Medallion, Inc. v. Clorox Co.* (1996), 44 Cal. App. 4th 1807, 1818
   │ ("Whatever form it takes, the injury or damage must not only be distinctly alleged but its causal

27 │ connection with the reliance on the representation must be shown.") (quoting 5 B. Witkin, Cal.
   │ Procedure (3d ed. 1985) Pleading, § 680).

28 │

NB1:723574.1

1     **F.**     <u>Qualcomm Committed Actual Fraud, Resulting in Harm to Broadcom</u>

2         Qualcomm was and is a party to contracts with each of the SSOs in which it participated.

3 *See supra* at part V.A.; Compl. ¶ 230. The breach of those contracts constituted actual fraud, by

4 which Broadcom—a third-party beneficiary to the contracts—was harmed. *See supra* at part V.B;

5 Compl. ¶¶ 231-35. Broadcom is entitled to the same relief as it would be if Qualcomm had

6 breached a contract directly with Broadcom. "The maker of a fraudulent misrepresentation is

7 subject to liability ... to another who acts in justifiable reliance upon it if the misrepresentation,

8 although not made directly to the other, is made to a third person and the maker intends or has

9 reason to expect that its terms will be repeated or its substance communicated to the other, and that

10 it will influence his conduct in the transaction or type of transactions involved." *Whiteley v. Philip*

11 *Morris Inc.* (2004), 117 Cal. App. 4th 635, 681 (quoting Restatement (2d) of Torts § 533 (1977)).

12 **VII.**     **CONCLUSION**

13         For the foregoing reasons, Qualcomm's demurrer should be overruled.

14

15 Dated: August 10, 2007            WILMER CUTLER PICKERING
                          HALE AND DORR LLP

16                           CLEARY GOTTLIEB STEEN &
                          HAMILTON LLP

17

18                           O'MELVENY & MYERS LLP

19

20                           By: _____
                               Michael G. Yoder

21                                Attorneys for Plaintiff
                               BROADCOM CORPORATION

22

23

24

25

26

27

28

NB1:723574.1

1

## PROOF OF SERVICE

2

3          I, Karen Watkins, declare:

4          I am a resident of the State of California and over the age of eighteen years, and
not a party to the within action; my business address is 610 Newport Center Drive, 17th Floor,
Newport Beach, California 92660-6429. On **August 10, 2007**, I served the within documents:

5

6      **PLAINTIFF BROADCOM CORPORATION'S MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO DEFENDANT QUALCOMM, INC.'S DEMURRER
TO COMPLAINT**

7          ☒      by E-mail or Electronic Transmission, I transmitted the document(s) electronically
to the person(s) at the e-mail addresses set forth below. The transmission was
reported as complete and without error.

8

9

| | |
|---|---|
| Evan R. Chesler, Esq.<br>Peter T. Barbur, Esq.<br>Richard J. Stark, Esq.<br>David Greenwald, Esq.<br>Andrei Harasymiak, Esq.<br>CRAVATH, SWAINE & MOORE LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>Telephone: (212) 474-1000<br>Facsimile: (212) 474-3700<br>Email: echesler@cravath.com | Attorneys for Defendant QUALCOMM,<br>INCORPORATED |
| Todd E. Gordinier, Esq.<br>Richard S. Taffet, Esq.<br>BINGHAM McCUTCHEN LLP<br>600 Anton Boulevard, 18th Floor<br>Costa Mesa, CA 92626<br>Telephone: (714) 830-0600<br>Facsimile: (714) 830-0700<br>Email: todd.gordinier@bingham.com | Attorneys for Defendant QUALCOMM,<br>INCORPORATED |
| William S. Boggs, Esq.<br>DLA PIPER<br>401 B Street, Suite 1700<br>San Diego, CA 92101-4297<br>Telephone: (619) 699-2700<br>Facsimile: (619) 699-2701<br>Email: william.boggs@dlapiper.com | Attorneys for Defendant QUALCOMM,<br>INCORPORATED |

25          I declare under penalty of perjury under the laws of the State of California that the
above is true and correct. Executed on **August 10, 2007**, at Newport Beach, California.

26

27                                              _____
                                                        Karen Watkins

28

NB1:723512.1                          - 1 -

US1DOCS 6319546v1

Slip Copy                                                                           Page 1

Slip Copy, 2006 WL 3359640 (D.N.J.)
**(Cite as: Slip Copy)**

Alea North America Ins. Co. v. Salem Masonry
Co., Inc.
D.N.J.,2006.
Only the Westlaw citation is currently avail-
able.NOT FOR PUBLICATION
United States District Court,D. New Jersey.
ALEA NORTH AMERICA INS. CO. Plaintiff,
v.
SALEM MASONRY, CO., INC., Padovano Frankel
Vouga Agency, Avrin Slatkin, Covenant Broker
Program, Inc., Nuno Alexandre, Granite State In-
surance Co. Defendants.
No. Civ.A.03-CV-2927 (PG.

Nov. 20, 2006.

Arthur David Bromberg, Marie Ann Hoenings,
Thomas Blase Coppola, L'Abbate, Balkan, Colavita
& Contini, LLP, Livingston, NJ, for Plaintiff.

Carmine David Campanile, Commisa & Campanile,
P.C., Livingston, NJ, Louis P. Digiaimo, Avrin
Slatkin, McElroy, Deutsch, Mulvaney & Carpenter,
LLP, Morristown, NJ, John D. O'Dwyer, Ginarte
O'Dwyer & Winograd, Newark, NJ, Christopher H.
Westrick, Golden, Rothschild, Spagnola, Lundell,
Levitt & Boylan, PC, Bridgewater, NJ, for Defend-
ants.

OPINION

SHERIDAN, U.S.D.J.

*1 This matter comes before this Court pursu-
ant to Fed. Civ. P. 60(b) for relief from the Court's
previous orders. Defendant, Granite State Insurance
Co. ("Granite"), moves to vacate the prior rulings
of Judge Martini due to a change of law.

I.

Salem Masonry Co., Inc. ("Salem"), employed
Nuno Alexandre ("Alexandre"). Salem contracted
with Joseph Percario, Inc. ("Percario"), a general
contractor, to perform masonry/concrete work at a
worksite in Elizabeth, New Jersey. In order to per-

fect its contract with Percario, Salem was required
to produce evidence that it had workers compensa-
tion insurance. To that end, Salem contracted with
Alea North America Insurance Company ("Alea")
to provide workers' compensation insurance. Gran-
ite provided workers' compensation insurance for
Percario. On November 18, 2002, Alexandre fell
down an elevator shaft which was about 5-6 stories
high. Alexandre incurred catastrophic injuries re-
quiring doctors to induce a coma for a period of
time. On November 18, 2002, a claim for workers'
compensation benefits on behalf of Alexandre was
made to Alea. Alea commenced payment of bene-
fits and, simultaneously, authorized an internal in-
vestigation of Salem's operations. The investigation
revealed that Alexandre was working at heights
more than fifteen feet above ground level. As it
turns out, the application submitted on behalf of
Salem indicated that employees of Salem did not
perform any work at heights more than fifteen feet
above ground level.

Realizing Alexandre fell from a far greater
height than 15 feet, Alea brought this action to res-
cind its policy due to fraud and to declare the gen-
eral contractor's carrier, Granite, responsible to pay
worker compensation benefits to Alexandre, as well
as reimbursing Alea for benefits paid.

Judge Martini entered several opinions prior to
this case being transferred to this Court. Most note-
worthy was the April 29, 2005 decision to grant
summary judgement on Alea's claim of equitable
fraud thereby rescinding the workers' compensation
policy issued to Salem.[FN1] Thereafter, the litigation
grinded along with various claims being asserted
against the brokers, Salem and the claim by Alea
against Granite for reimbursement of monies paid
to Alexandre.

FN1. Despite this ruling, compensation
payments to Alexandre continued because
Granite was required to step up pursuant to
statute.N.J.S.A. 34:15-79.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

On July 17, 2006, the unpredictable occurred. At that time, the Superior Court of New Jersey Appellate Division issued a precedential decision that held, in broad terms, that a workers' compensation carrier could not void a policy where the application by the employer contained fraudulent statements. *American Millennium Insurance v. Berganza,* 386 N.J.Super. 405 (App.Div.2006). The *American Millennium* decision gives rise to the present motion by Granite to set aside Judge Martini's decision. Granite argues that *American Millennium* is squarely on point with the case at hand, and this Court should defer to the decisions of law of the State of New Jersey.

In order to decide the motion, a close look at the *American Millennium* case is required. In *American Millennium,* Stegers Brothers Drywall Company, Inc. ("Stegers") subcontracted drywall work to Mainor Berganza ("Berganza"), who employed Jose Arias. *Id.* at 488, 902 A.2d 266. On January 18, 2003, Berganza went to City Line Insurance, Inc. ("City Line"), a producer of business for Morstan General Agency of New Jersey, Inc. ("Morstan"), a wholesale broker that places workers' compensation policies with American Millennium. *Id.* An application and questionnaire was filled out requesting a policy with an effective date of January 19, 2003. *Id.* On that same date, City Line faxed a workers' compensation policy certificate to Stegers evidencing that Berganza was insured, and the application and questionnaire were forwarded to Morstan.*Id.* On January 20, 2003, Morstan completed the paperwork and forwarded same to American Millennium. *Id.* The following day, Arias was injured in a work related incident when he fell off a ladder at Stegers' worksite. *Id.* Berganza reported the accident to City Line on January 24, 2003. *Id.* On January 29 or 30, 2003, American Millennium issued a workers' compensation policy to Berganza with a retroactive effective date of January 19, 2003.*Id.* On February 4, 2003, City Line faxed to Morstan a "First Report of injury" which was subsequently sent by City Line directly to American Millennium on February 20, 2003. *Id.* at 489, 902 A.2d 266. At that point, American Millennium declined coverage and filed suit for rescission of the policy. *Id.*

**\*2** Following a bench trial which found that fraud had been committed on the application and questionnaire, the court permitted rescission as to Berganza, denied rescission as to Arias, ordered that Stegers' workers' compensation carrier be responsible for half of any compensation awarded to Arias, and allowed both carriers to seek reimbursement from Berganza. *Id.* at 487, 902 A.2d 266. Appeals were thereafter taken by multiple parties. *Id.*

Ultimately, the New Jersey Appellate Division held that American Millennium was fully liable to the injured employee. *Id.* at 493, 902 A.2d 266. In reaching this conclusion, the court held that "[t]he contract is clear, and our statute is clear."*Id.* at 490, 902 A.2d 266. The court specifically cited to *N.J.S.A.* 34:15-83 and -84 which creates a direct relationship between the insurer and the insured's employees. The workers compensation policies must " 'be construed to provide' that such policies are 'made for the benefit of the several employees of the insured employer.'"*Id.* at 489, 492, 902 A.2d 266. The court believed this holding was "driven home" by the language of the policy which states that the insurance company is "directly and primarily liable" to injured employees, binds the insurance company to adverse decisions against the employer in compensation actions, and that "as between an injured worker and us [insurer], we have notice of the injury when you [the employer] have notice."*Id.* at 493, 902 A.2d 266.

Since the statute creates a contractual relationship between the insurer and the employee, the court found that a "policy issued upon the untrue statements made by the employer is no defense."*American Millennium* 386 N.J.Super. at 490-91, 902 A.2d 266 (quoting *Aiors v. Sardo,* 223 A.D. 201, 227 N.Y.S. 708aff'd249 N.Y. 270, 164 N.E. 48 (N.Y.1928)).*See, Bates v. Nelson,* 240 Iowa 926, 38 N.W.2d 631, 635 (Ia.1949). Legal commentators agree with this proposition also. Professor Larson concurs that an insurer may only escape liability in rare circumstances. That is, in the situation where the employer attempts to find insurance

for an employee's injuries that already occurred without disclosing the work related accident. 4 Larsons Workmen's Compensation Law § 92.22-92.24 (Bender 1986). In short, the *American Millennium* court found several reasons to reject recision, even if untrue statements were made by the employer or its brokers. They are (a) the statute imposes a relationship between insured and employee; (b) the employee did not commit any fraud; and (c) the statute allows the employee to directly sue the insured for coverage. *American Millennium,* 386 N.J.Super. at 493, 902 A.2d 266.

In the case at bar, Alea argues that the *American Millennium* case is distinguishable and that this court is not bound to apply a decision of the Appellate Division of the Superior Court. This court rejects both arguments. First, *American Millennium* is closely analogous to this case. As in *American Millennium,* the accident occurred after the insurance certificate was forwarded, Alexandre (employee) did not commit any fraud, the statutes at issue are the same, and neither party argues that the terms of the policy are different.

**\*3** Alea's second argument is that this Court is not bound to apply the Appellate Division's decision especially where the Supreme Court has not ruled. More particularly, Alea's brief states that the "Court is not bound by any decision of the New Jersey Appellate Division ... [and] it is unclear that the New Jersey Supreme Court would adopt the Appellate Division's holding in *American Millennium.*"Alea's Reply Brief at Pg. 7. Although this assertion is true in the abstract, there are strong policy reasons to defer to the judgement of the Appellate Division in this instance.

"When ascertaining matters of state law, the decisions of the state's highest court constitute the authoritative source. If the [state] Supreme Court has not yet passed on the question before us, we must consider the pronouncements of the lower state courts. Such decisions should be given proper regard, but not conclusive effect."*Connecticut Mut. Life Ins. Co. v. Wyman,* 718 F.2d 63, 65 (3d Cir.1983) (citing *Commissioner v. Estate of Bosch,*

387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 662 (3d Cir.), cert. denied, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980); *Adams v. Cuyler,* 592 F.2d 720, 725-26 (3d Cir.1979), aff'd, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981)). While the federal courts are not bound by the decisions of lower state courts, "[a] decision of 'an intermediate appellate state court ... is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'"*Pittston Co. Ultramar America Ltd. v. Allianz Ins. Co.,* 124 F.3d 508, 516 (3d Cir.1997) (citing *Dillinger v. Caterpillar, Inc.,* 959 F.2d 430, 435 n. 11 (3d Cir.1992)). Absent clear guidance from the New Jersey Supreme Court, federal courts must predict how the New Jersey Supreme Court would decide the issues "and will, when persuasive, rely on decisions of the intermediate appellate court, unless we are convinced that the supreme court would decide otherwise."*Fleck v. KDI Sylvan Pools, Inc.,* 981 F.2d 107, 113 (3d Cir.1992) (citing *West v. American Telephone & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940); *McKenna,* 622 F.2d at 662).

In support of its contention, Alea relies upon the prior findings, holdings and opinions of the District Court in this case and another opinion by the District Court in *In re Tri-State Armored Svc.,* Inc., 332 B.R. 690 (D.N.J.2005), which distinguished *First American Title Ins. Co. v. Lawson,* 177 N.J. 125, 827 A.2d 230 (2003), one of two cases that Granite relied heavily upon prior to *American Millennium.*

Since "a federal court's prediction of state law, until and unless overruled by the state supreme court, tends to 'verge on the lawmaking function' of the highest state court, it is critical that the federal court do all within its power to view the problem before it as a state court would, and not through the eyes of a court steeped in federal law. See Dolores K. Sloviter, *A Federal Judge Views Diversity Jurisdiction Through the Lens of Federalism,* 78

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Va.L.Rev. 1671, 1681-82 (1992). Accordingly, it must be recognized that a decision of a lower state court on a point of state law is generally more predictive of what the state supreme court would hold than is a conflicting opinion of a federal court on the same point." *Packard v. Provident Nat. Bank,* 994 F.2d 1039, 1046-47 (3d Cir.1993).

**\*4** The language of cases out of this Circuit make clear that substantial deference is to be afforded decisions of an intermediate appellate court where the state's supreme court has not yet ruled on a particular issue. Some courts have deemed such decisions "evidence of state law," *Robinson v. Jiffy Executive Limousine Co.,* 4 F.3d 237, 242 (3d Cir.1993), or even "presumptive evidence" of state law. *National Surety Corp. v. Midland Bank,* 551 F.2d 21, 30 (3d Cir.1977). Others have required "convincing," *Fleck,* 981 F.2d at 113, or "persuasive data that the highest court of the state would decide otherwise.' " *Pittston,* 124 F.3d at 516. In this instance, Judge Martini did not have the benefit of the *American Millennium* decision. The issue which inures is whether the opinion in *American Millennium* is sufficient to reopen the district court's prior decisions.

"The general purpose of Rule 60(b)... is to strike a proper balance between the conflicting principles that litigation must be brought to an end and that justice must be done."*Boughner v. Sec'y of Health, Educ. & Welfare,* 572 F.2d 976, 977 (3d Cir.1978) (quoted in *Coltec Industries, Inc. v. Hobgood,* 280 F.2d 262, 271 (3d Cir.), cert. denied, 537 U.S. 947, 123 S.Ct. 411, 154 L.Ed.2d 291 (2002)).

A motion filed pursuant to Rule 60(b) is "addressed to the sound discretion of the trial court guided by accepted legal principles applied in light of all the relevant circumstances."*Ross v. Meagan,* 638 F.2d 646, 648 (3d Cir.1981).Rule 60(b), however, "does not confer upon the district courts a 'standardless residual of discretionary power to set aside judgments.'"*Moolenaar v. Government of the Virgin Islands,* 822 F.2d 1342, 1346 (3d Cir.1987). Rather, relief under Rule 60(b) is available only under such circumstances that the " 'overriding in-

terest in the finality and repose of judgments may properly be overcome.'"*Harris v. Martin,* 834 F.2d 361, 364 (3d Cir.1987) (quoting *Martinez-McBean v. Government of the Virgin Islands,* 562 F.2d 908, 913 (3d Cir.1977))."The remedy provided by Rule 60(b) is 'extraordinary, and [only] special circumstances may justify granting relief under it.'"*Moolenaar,* 822 F.2d at 1346 (citations omitted).

Granite has appealed to the discretionary powers of the Court under Rule 60(b)(6), to modify the previous orders rescinding the policy pursuant to new case law out of the New Jersey Superior Court, Appellate Division. It is argued that *American Millennium* is directly on point and constitutes a legitimate and valid "reason justifying relief from the operation of the judgment."Rule 60(b)(6). The Court agrees. The rationale set forth by Judge Coburn, an experience and respected jurist, in *American Millennium* is sound, and most likely captures the sentiments of New Jersey's highest court if it were to hear the case. Moreover, workers' compensation laws were enacted at the turn of the twentieth century to protect workers. In exchange for limited benefits without showing negligence, workers forfeited their right to sue employers. Those laws have functioned well for both employers and employees over the last century. If the federal court were to adopt a different position than the state courts on any point of worker compensation law, the rudimentary principles underpinning workers compensation law may unravel, at least as far as it applies to the construction industry. This is not a prudent course. Hence, upsetting the "repose" of this litigation by vacating Judge Martini's decision is relatively minor compared to the potential uncertainty in workers' compensation law which arises if federal and state courts differ on substantive application of workers' compensation statutes.

**\*5** Granite's motion for Rule 60(b) relief is granted. The previous orders of this Court are not set aside. Judgment in favor of Granite and against Alea is granted.

D.N.J.,2006.

Slip Copy
Slip Copy, 2006 WL 3359640 (D.N.J.)
**(Cite as: Slip Copy)**

Alea North America Ins. Co. v. Salem Masonry
Co., Inc.
Slip Copy, 2006 WL 3359640 (D.N.J.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                        Page 1
Not Reported in Cal.Rptr.3d, 2005 WL 984373 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

▶

Guale v. Rolls-Royce Engine Services-Oakland, Inc.
Cal.App. 1 Dist.,2005.
Only the Westlaw citation is currently available.

California Rules of Court, rule 8.1115, restricts citation of unpublished opinions in California courts.

Court of Appeal, First District, Division 3, California.
Abetu GUALE, Plaintiff and Appellant,
v.
ROLLS-ROYCE ENGINE SERVICES-OAK-LAND, INC., Defendant and Respondent.
**No. A105370.**
**(Alameda County Super. Ct. No. 2002063189).**

April 28, 2005.

William Barnes, Oakland, CA, for Plaintiff-Appellant.
Oswald Bancroft Cousins, Orrick Herrington et al LLP, San Francisco, CA, for Defendant-Respondent.
PARRILLI, J.

**\*1** Abetu Guale appeals from a judgment in favor of Rolls-Royce Engine Services-Oakland, Inc., entered after the trial court granted Rolls-Royce's motion for summary judgment on Guale's claims of fraud, negligent misrepresentation, promissory estoppel, and breach of the implied covenant of good faith and fair dealing. We affirm.

**BACKGROUND**

In August 2001, Guale was working for Chromalloy Gas Turbine Corporation as an inventory analyst. During the first week of that month, Ronald Slothower, a Chromalloy Vice President, informed Guale that he might be laid off as part of a reduction in force. According to Slothower, this was the first of at least five meetings he had with Guale where they discussed the possibility of

Guale's termination. Chromalloy employees, including Guale, were given a letter dated on or around August 6 offering them an incentive package to leave the company. Employees had 45 days to accept the package. Slothower testified at his deposition that at the end of August or the beginning of September, he met with Guale and told him that because another more senior employee had not accepted the package, Guale's employment would have to be terminated. However, Guale never accepted the incentive package.

On August 10, Guale applied for an operations analyst position with Rolls-Royce. On August 27, he interviewed with Stacy Fifer, Rolls-Royce's Human Resources recruiter, and Lorne Dyke, Vice President of Flight Operations. On September 10, Dyke recommended hiring Guale, and on the same day Fifer sent Guale an offer by e-mail. Guale testified in his deposition that he did not think this offer was "legal" because it was not on a document with Rolls-Royce's company letterhead. At Guale's request, Fifer sent him a second offer on September 14 on Rolls-Royce letterhead, stating that his employment would begin on October 8, 2001. The letter noted that "all Rolls-Royce ... employees are 'at will' employees."It also stated, "please indicate your acceptance of this offer by signing your name in the space provided below along with noting your anticipated start date," and told Guale to bring the letter with him on October 8. Guale admitted he did not return a signed acceptance.

In his brief, Guale asserts he met with Fifer and another Rolls-Royce employee on September 18, got the impression that "a valid offer and acceptance of employment had occurred," and accordingly gave Chromalloy notice on September 19 that he would be leaving to take another job. However, these dates are not established by the record cites Guale provides. Guale did claim in his deposition testimony that he had a meeting at Rolls-Royce sometime in mid-September. But nothing in his testimony supports a September 19 resignation from Chromalloy; to the contrary, Guale said he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                    Page 2
Not Reported in Cal.Rptr.3d, 2005 WL 984373 (Cal.App. 1 Dist.)
(Cite as: Not Reported in Cal.Rptr.3d)

could remember nothing about giving notice. Instead, he testified that sometime in that last two weeks of September he mutually agreed with Slothower that he would work at Chromalloy until September 28.

**\*2** On the afternoon of September 20, Peter Caldwell, the Senior Manager of Human Resources for Rolls-Royce, left a phone message asking Guale to call him. When Guale came home from work that evening, he called Caldwell and learned Rolls-Royce was withdrawing its offer of employment. Caldwell told Guale that September 11 had changed the situation in the airline industry, and that the salary he had been offered was too high. Caldwell offered Guale the opportunity to interview for a different position as a scheduler, which Guale accepted.

On September 25, Slothower gave Guale a letter informing him that his employment at Chromalloy was terminated effective September 28, and that he would receive three months' severance pay. Slothower testified that Guale had no choice in the matter; he would not under any circumstances have been employed at Chromalloy after September 28. On September 30, 2001, Guale successfully applied for unemployment insurance, stating "laid off" as his reason for separation from Chromalloy.

On October 1, Guale interviewed for the scheduler position at Rolls-Royce. He did not impress his interviewers and they declined to extend an offer to him. Caldwell sent Guale a letter informing him that Rolls-Royce had no further positions for him. In August 2002, Guale filed his complaint in this action.

In granting Rolls-Royce's motion for summary judgment, the trial court ruled: (1) Guale could not prevail on his fraud, negligent misrepresentation, and promissory estoppel claims because the undisputed evidence established that Rolls Royce's offers of employment were not made with the intent to deceive, and Guale did not rely on these offers to his detriment; (2) the promissory estoppel claim failed because the undisputed evidence established that

Guale did not detrimentally rely on the offer and suffered no unconscionable injury; and (3) Guale could not recover for breach of the implied covenant of good faith and fair dealing because the undisputed evidence established that Rolls-Royce's offer was expressly for at-will employment.

## DISCUSSION

Summary judgment is properly granted when the papers show there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion and the uncontradicted inferences the evidence reasonably supports. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612.) Once a moving defendant has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense, the burden shifts to the plaintiff to show the existence of a triable issue. To meet that burden, the plaintiff may not rely upon the mere allegations or denials of its pleadings, but must set forth the specific facts showing a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (o)(2); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854-855; *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476-477.)

### 1. *Guale Failed To Show Detrimental Reliance*

**\*3** It is well established that reliance damages are necessary elements of claims for fraud and negligent misrepresentation. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [fraud]; *Fox v. Pollack* (1986) 181 Cal.App.3d 954, 962 [negligent misrepresentation]; Cal. Civ.Code § 1709.) Similarly, detrimental reliance is an essential element of promissory estoppel. (*Smith v. City & County of San Francisco* (1990) 225 Cal.App.3d 38, 48; see also *Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 694 [reliance damages on promissory estoppel claim "must not be speculative, remote, contingent, or merely possible"].)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                                          Page 3
Not Reported in Cal.Rptr.3d, 2005 WL 984373 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

We agree with the trial court's ruling that Guale could not prevail on his fraud, negligent misrepresentation, and promissory estoppel causes of action because he failed to show a triable issue of fact regarding his detrimental reliance on Rolls-Royce's offer of employment. This is not a case of "factually devoid discovery," as Guale contends in his briefs. (See, e.g., *Scheiding v. Dinwiddie Construction Co.* (1999) 69 Cal.App.4th 64, 81-83.)Rather, the facts as developed by both parties affirmatively showed that Guale suffered no damages in reliance on Rolls-Royce's employment offer. His employment at Chromalloy was terminated whether or not Rolls-Royce withdrew its offer. Guale simply cannot show any damages, even under the circumstances as he interprets them in his briefs.

Guale claims he resigned from Chromalloy on September 19, intending to go to work for Rolls-Royce, but then came to a mutual agreement with Slothower to characterize his separation from Chromalloy as a lay-off after the Rolls-Royce offer was withdrawn. This scenario, however, does not include any damage to Guale flowing from the withdrawal of the Rolls-Royce offer. Slothower's testimony that Guale would never have been employed by Chromalloy after September 28 was uncontradicted. Guale states in his brief that "he might well have been able to work out more favorable terms (perhaps including some continuing employment) had he not, prior to being given notice of any layoff, resigned his position with Chromalloy."Absolutely no evidence supports this speculation. Guale himself mentioned no such possibility of more favorable terms in the deposition testimony he cites in his brief.

Guale also suggests that Rolls-Royce's actions deprived him of the opportunity to take the incentive package offered by Chromalloy to departing employees, which may have been more favorable than the severance package Guale ultimately received. He notes the 45-day window for accepting the incentive package expired on September 20. If, however, Guale resigned on the 19th, as he claims in his briefs, he would still have been able to take

advantage of the incentive package. Indeed, regardless of his claimed resignation date, if Guale were relying on Rolls-Royce's offer from the time it was made on September 14 until it was withdrawn at the end of the day on September 20, he had nearly a week during which he could have taken advantage of the incentive package.[FN1] His failure to do so cannot be blamed on Rolls-Royce.

> FN1. In his brief, Guale claims the offer was withdrawn on September 22. The evidence does not substantiate that date. Guale testified he got the phone call from Caldwell withdrawing the offer "on or about September 20." Even if that testimony can be stretched to include September 22, Guale had ample opportunity to accept the incentive package if he was relying on the Rolls-Royce offer.

**\*4** Rolls-Royce's showing of the circumstances in which Guale's employment with Chromalloy ended was sufficient to shift to Guale the burden of showing a triable issue on the existence of damages or detrimental reliance. Guale did not meet that burden.

2. *Guale Could Not Recover for Breach of the Implied Covenant*

Guale contends the court erred when it ruled that the at-will nature of the employment offered by Rolls-Royce precluded any recovery for breach of the covenant of good faith and fair dealing. He does not dispute that the Rolls-Royce job would have been at will. He argues that an at-will employee who is never permitted to commence promised employment is in a different position than an at-will employee who has begun working. To support that proposition under California law, Guale relies on two cases, *Sheppard v. Morgan Keegan & Co.* (1990) 218 Cal.App.3d 61, and *Comeaux v. Brown & Williamson Tobacco Co.* (9th Cir.1990) 915 F.2d 1264 (applying California law). Both cases, however, are distinguishable.

In *Sheppard,* the plaintiff accepted an oral offer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of employment from the defendant, and moved from California to Tennessee only to be "separated" from his new job before it began. (*Sheppard v. Morgan Keegan & Co., supra,* 218 Cal.App.3d at pp. 64-65.)The court reasoned that the implied covenant of good faith and fair dealing included "the understanding that an employer cannot expect a new employee to sever his former employment and move across the country only to be terminated before the ink dries on his new lease, or before he has had a chance to demonstrate his ability to satisfy the requirements of the job."(*Id.* at p. 67.)Here, as noted in the first part of our discussion, Guale was unable to show any detrimental reliance on the Rolls-Royce offer. Furthermore, unlike Sheppard, he never accepted the offer from his prospective new employer. His attempts to argue around the requirement of written acceptance stated in the September 14 letter are unconvincing.

In *Comeaux,* the plaintiff signed an application providing that his contract would begin when he was assigned work, and that his employment would be at-will. (*Comeaux v. Brown & Williamson Tobacco Co., supra,* 915 F.2d at pp. 1269-1270.)Subsequent oral discussions between the parties established additional terms, according to the court that if Comeaux passed a physical examination, resigned his current job, and moved to Fremont within a specified time, he would be assigned work. (*Id.* at p. 1270.)Comeaux satisfied those conditions but the defendant refused to assign him any work. The court decided the parties never reached the point where the written at-will provisions would begin to govern the employment, and permitted him to seek contract damages. However, the court held that Comeaux could recover only reliance damages under California law. (*Id.* at pp. 1271-1272.)

The court also ruled that "Comeaux cannot use the covenant of good faith and fair dealing to transform a terminable-at-will employment contract into a terminable-only-for-cause employment contract by construing a discharge without cause as a breach of the covenant."(*Id.* at p. 1272.)Therefore, the court held that any recovery for breach of the covenant of good faith and fair dealing would also be limited to reliance damages. (*Ibid.*) Guale, lacking any reliance damages, is in no position to take advantage of the *Comeaux* holding. Furthermore, nothing in this case suggests the at-will character of Guale's prospective employment would not begin until he started working, as was the situation in *Comeaux.*

***5** We conclude the trial court properly ruled that the at-will character of Guale's prospective employment at Rolls-Royce precluded any recovery for breach of the covenant of good faith and fair dealing. Even if Guale could show that a contract was formed by his acceptance of Rolls-Royce's offer, he would be limited to reliance damages under the reasoning of *Comeaux.*The *Sheppard* court also emphasized the plaintiff's detrimental reliance. If Guale could have been fired by Rolls-Royce after one day for purely arbitrary reasons (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 350), we fail to see how Rolls-Royce's withdrawal of an unaccepted offer could entitle Guale to pursue a claim of breach of the implied covenant of good faith and fair dealing, absent any evidence of detrimental reliance.[FN2]

FN2. As our discussion indicates, a more fundamental reason for granting summary judgment on this cause of action was the absence of any accepted offer, which prevented the implied covenant of good faith and fair dealing from arising in the first place. The *Guz* court emphasized the obvious and settled point of law that the implied covenant has no existence independent of the contract. (*Guz v. Bechtel Nat., Inc., supra,* 24 Cal.4th at p. 349-350.)Nevertheless, because the trial court did not rely on this ground, we refrain from basing our holding on it. (See Code Civ. Proc., § 437c(m)(2).)

**DISPOSITION**

The judgment is affirmed. Rolls-Royce shall recover its costs on appeal.

We concur: McGUINESS, P.J., and CORRIGAN, J.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d, 2005 WL 984373 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

Cal.App. 1 Dist.,2005.
Guale v. Rolls-Royce Engine Services-Oakland,
Inc.
Not Reported in Cal.Rptr.3d, 2005 WL 984373
(Cal.App. 1 Dist.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 1
Not Reported in F.Supp.2d, 2006 WL 2521328 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Nokia Corp. v. Qualcomm, Inc.
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
NOKIA CORP. and Nokia, Inc., Plaintiffs,
v.
QUALCOMM, INC. Defendant.
**No. CIV A 06-509-JJF.**

Aug. 29, 2006.

A. William Urquhart, Frederick Lorig, Patrick Shields, and Erica Taggart, of Quinn Emanuel Urquhart Oliver & Hedges, L.L.P., Los Angeles, California, Richard I. Werder, Jr., and Sanford I. Weisburst, of Quinn Emanuel Urquhart Oliver & Hedges, L.L.P., New York, New York, Thomas A. Beck, Lisa A. Schmidt, Jeffrey L. Moyer, and Steven J. Fineman, of Richards, Layton & Finger, P.A., Wilmington, Delaware, for Plaintiffs.

Evan R. Chesler, and Richard J. Stark, of Cravath, Swaine & Moore, L.L.P., New York, New York, Richard L. Horwitz, Mathew E. Fischer, and Kenneth L. Dorsney, of Potter Anderson & Corroon, L.L.P ., Wilmington, Delaware, for Defendant.

*MEMORANDUM OPINION*

FARNAN, J.

*1 Pending before the Court is Plaintiff's Motion to Remand (D.I.5). For the reasons discussed, the Court will grant Plaintiff's Motion to Remand.

I. BACKGROUND

Plaintiff Nokia filed suit in the Court of Chancery of the State of Delaware seeking declaratory relief and specific performance to enforce terms of alleged contracts existing between it and Defendant Qualcomm. (*See* D.I. 6, Ex. B). The contractual agreements at issue relate to the standard-setting procedures of the European Telecommunications Standardization Institute ("ETSI") regarding the licensing of essential patents. Defendant filed a Notice of Removal contending that patent law is a necessary element of Plaintiff's claims. (D.I.1).

II. DISCUSSION

The issue presented by the parties is whether Plaintiff's claim "arises under" federal patent law pursuant to 28 U.S.C. § 1338(a) such that this Court may exercise its jurisdiction. A claim arises under patent law when plaintiff's well-pleaded complaint establishes a cause of action based on patent law.*Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 809 (1988). However, even if the complaint establishes no patent law claim on its face, federal jurisdiction is proper where "the plaintiff's right to relief necessarily depends on resolution of a substantial question of patent law, in that patent law is a necessary element of one of the well-pleaded claims."*Id.*

Because Plaintiff's complaint cites no claims of patent infringement, invalidity, or unenforceability on its face, the predominate issue is whether patent law is a necessary element of Plaintiff's claims. Plaintiff's complaint is based on an alleged breach of contractual agreements surrounding Defendant's licensing of essential patents. However, a clever plaintiff cannot avoid federal jurisdiction simply by failing to plead patent law issues. *Id.* at n. 3. Thus, it is necessary to determine whether resolution of Plaintiff's claims depends on a "substantial question of patent law."

In *U.S. Valves, Inc. v. Dray,* 212 F.3d 1368, 1372 (Fed.Cir.2000), the Federal Circuit found a "substantial question of patent law" where it was necessary for the court to interpret patents and determine whether infringement occurred. In *U.S. Valves,* plaintiff alleged that defendant sold valves which infringed its patents in violation of a license agreement. *Id.* Thus, interpretation of the patents was integral to resolution of the suit. *Id.* Similarly, in *Highland Supply Co. v. Klerk's Flexible Packaging, B.V.,* a case cited by Defendant, the court found patent law was necessary to resolve a breach

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2521328 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

of contract claim where plaintiffs had to prove the products in question were covered by its patent. No. 05-482, 2005 WL 3534211, at *4 (S.D.Ill.Dec. 21, 2005). In addition, the court had to conduct a "fact-intensive and technical inquiry" to determine whether the patent was, in fact, infringed. *Id.*

In contrast, the present case involves interpretation of the terms of the licensing agreement between Plaintiff and Defendant which arises from Defendant's use of the ETSI procedures to declare certain patents "essential." It is not necessary, as Defendant contends, to determine whether the patents at issue are in fact "essential" because Defendant has already voluntarily declared them essential. Rather, Plaintiff merely seeks an interpretation of Defendant's obligations arising after declaring certain patents essential.

**\*2** The ETSI IPR Database states that declared patents include "an undertaking from the owner to grant licenses."(D.I.14, Ex. 6). These licenses are to be granted to ETSI members on terms that are fair, reasonable, and non-discriminatory ("FRAND terms"). (D.I.6, p. 3). For Defendant to now contend Plaintiff's claims cannot be resolved without determining whether the patents at issue are essential seems incongruent with Defendant's own declarations to the ETSI. Although the ETSI IPR Database includes a disclaimer that it "cannot confirm, or deny, that the patents/patent applications [contained therein], are, in fact, essential, or potentially essential," (D.I.14, Ex. 6), such a determination is not necessary to the interpretation of the parties' contractual obligations for declared-essential patents. *See United Techs. Corp. v. Chrome Alloy Gas Turbine Corp.,* 105 F.Supp.2d 346, 358 (D.Del.2000) (finding no question of patent law where interpretation of patents was not necessary to determine breach of the licensing agreement).

In sum, Plaintiff seeks a determination by the Court of Chancery of the terms of the contractual agreements undertaken by Defendant as a result of declaring certain patents essential. In addition, Plaintiff seeks declaratory relief and specific performance to enforce those obligations. In the

Court's view, resolution of this claim depends on interpretation of the terms of the licensing agreement, rather than interpretation of the patents. Accordingly, the Court concludes that there is no substantial question of patent law warranting federal jurisdiction, and therefore, Plaintiff's Motion to Remand will be granted.

III. CONCLUSION

For the reasons discussed, the Court will grant Plaintiff's Motion to Remand (D.I.5).

An appropriate Order will be entered.

*ORDER*

At Wilmington, this 29th day of August 2006, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that Defendants' Motion To Remand (D.I.5) is *GRANTED.*

D.Del.,2006.
Nokia Corp. v. Qualcomm, Inc.
Not Reported in F.Supp.2d, 2006 WL 2521328 (D.Del.)

END OF DOCUMENT

Slip Copy                                                                                           Page 1
Slip Copy, 2007 WL 2012412 (S.D.N.Y.)
**(Cite as: Slip Copy)**

H

Tierney v. Omnicom Group Inc.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Michael P. TIERNEY, Plaintiff,
v.
OMNICOM GROUP INC., Defendant.
**No. 06 Civ. 14302(LTS)(THK).**

July 11, 2007.

### *MEMORANDUM ORDER*

LAURA TAYLOR SWAIN, United States District
Judge.

**\*1** In this action brought against Defendant Omni-
com Group Inc., Plaintiff Michael P. Tierney, in his
Amended Complaint, raises several causes of action un-
der New York common law concerning stock options
that Omnicom allegedly promised to him. The Court has
diversity jurisdiction of this action pursuant to 28
U.S.C. § 1332.

Defendant now moves pursuant to Rule 12(b)(6) of
the Federal Rules of Civil Procedure to dismiss
Plaintiff's Amended Complaint in its entirety. The Court
has thoroughly considered all of the parties' submissions
and written and oral arguments. For the following rea-
sons, Defendant's motion is granted in part and denied in
part.

### *BACKGROUND*

The following facts, alleged in Plaintiff's Amended
Complaint, are taken as true for the purposes of the in-
stant motion practice. *Bernheim v. Litt,* 79 F.3d 318,
321 (2d Cir.1996). In mid-2000, Defendant Omnicom
Group Inc. ("Omnicom" or "Defendant"), through its
Chief Executive Officer John Wren, asked Plaintiff Mi-
chael P. Tierney ("Tierney" or "Plaintiff") to manage
some of Omnicom's investments in digital marketing
companies (the "digital investments") as President of
Communicade    Management    Company

("Communicade"), an Omnicom subsidiary responsible
for managing those investments. (Am.Compl.¶¶ 9-14.)
On July 17, 2000, Wren and Tierney executed a term
sheet (the "Employment Agreement") (*id.* ¶ 12) which
provided, *inter alia,* that Tierney would become the
President of Communicade and manage Omnicom's di-
gital investments for a $450,000 base annual salary and
stock options. The term of employment was fixed at
three years. With regard to the stock options, the Em-
ployment Agreement stated: *"Stock Options:* Initial
award upon joining of 10,000 shares; shares vest over
three years. Additional awards based on performance
."(*Id.* Ex. A.) Tierney commenced his work on October
1, 2000.(*Id.* ¶ 16.)

Omnicom thereafter executed three separate stock
option agreements (the "Stock Option Agreements")
with Tierney. (Am.Compl.¶¶ 16-19.) [FN1] On October 2,
2000, Omnicom executed a Stock Option Agreement
granting Tierney an option to purchase 10,000 shares at
$73,625 per share. (Declaration of Christopher R. Harris
in Supp. of Def.'s Mot. to Dismiss ("Harris Decl.") Ex.
1.) On February 2, 2001, Omnicom executed a Stock
Option Agreement granting Tierney an option to pur-
chase 15,000 shares at $87,160 per share. (*Id.* Ex. 2.)
On April 4, 2001, Omnicom executed a Stock Option
Agreement granting Tierney an option to purchase
15,000 shares at $79,500 per share. (*Id.* Ex. 3.) Aside
from the grant date, the number of shares, and the strike
price, these Stock Option Agreements contained
identical terms. [FN2]

> **FN1.** Although copies of the Stock Option
> Agreements were proffered by Defendant
> rather than Plaintiff, the Court may refer to
> these documents at the motion to dismiss stage
> because they are integral to Plaintiffs plead-
> ings, *I. Meyer Pincus & Assocs. v. Oppen-
> heimer & Co.,* 936 F.2d 759, 762 (2d
> Cir.1991), and Plaintiff does not challenge their
> authenticity.

> **FN2.** Exhibits 1, 2 and 3 to Defendant's Notice
> of Motion to Dismiss, which are reproductions
> of the three Stock Option Agreements, are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2012412 (S.D.N.Y.)
**(Cite as: Slip Copy)**

hereinafter referenced to collectively as the "Stock Option Agreements."

The Stock Option Agreements each provided that in the event of "Involuntary Termination of Employment" FN3 following the first anniversary of the stock option's grant date, the stock options would remain exercisable by Tierney for 36 months (three years) following the termination. (Stock Option Agreements § 3(b)(i).) However, in the event of Tierney's voluntary termination of his employment, the stock options would be cancelled immediately. (*Id* . § 3(b).) The Stock Option Agreements defined "Termination of Employment" as the time "when the employee-employer relationship between the Employee and Omnicom or an Omnicom Subsidiary ceases to exist for any reason ...." (*Id.* § 6(a).) "Omnicom Subsidiary" was defined in the Omnicom Group Inc.1998 Incentive Compensation Plan (explicitly incorporated by the Stock Option Agreements at § 1), as including "any entity that is organized as a limited liability company in which [Omnicom], directly or indirectly, possesses 50% or more of the voting power of all members of such limited liability company entitled to vote." (Harris Decl. Ex. 4 § 2(t).)

> FN3. "Involuntary Termination of Employment" meant a "Termination of Employment for a reason other than death, Retirement, Total Disability, voluntary resignation, or Termination of Employment for Cause."(Stock Option Agreements § 6(d).)

**\*2** The value of Communicade and its digital investments began to decline dramatically. As a result, Omnicom decided to form a limited liability company called Seneca Investments LLC ("Seneca"), which would take over the management of the digital investments. (Am.Compl.¶¶ 20-22.) In January 2001, Omnicom and Tierney began a series of oral exchanges in which both parties reaffirmed their commitments to the terms of the Employment Agreement but also introduced some modifications reflecting more recent developments (the "Oral Modifications"). Omnicom repeatedly asked Tierney to carry out the "responsibilities specified in the [Employment] Agreement," but, in light of Omnicom's plan to save the digital investments through the creation of Seneca, Tierney was to continue

his responsibilities as the eventual CEO of Seneca. (*Id.* ¶ 27-28, 177.)Omnicom assured Tierney that the "compensation terms specified under the [Employment] Agreement remained in effect"(*Id.* ¶ 30), but in acknowledgment of the specific stock option grants that had been made by that time, Omnicom also assured Tierney that "it would take any steps necessary to ensure that the [stock options] remained exercisable by [Tierney], or that it would provide [Tierney] their value."FN4 (*Id.* ¶¶ 30-31.)Omnicom did not sign a new employment agreement with Tierney concerning his transfer to Seneca. (*Id.* ¶ 41.)On or about May 1, 2001,FN5 Omnicom and two other entities, Pegasus E-Services Holdings LLC and Pegasus Partners II, L.P., executed an agreement to create Seneca ("Seneca Formation Agreement").FN6 (Harris Decl. Ex. 5.) The agreement contained a Schedule 3.7 concerning the terms under which Tierney and certain others would be employed by Seneca. (*Id.*)

> FN4. At oral argument, Plaintiff's counsel proffered that, under the alleged agreement to provide the value of the stock, Omnicom was to pay Plaintiff the value of the stock as of the time of the Seneca transition, calculated under the "Black-Scholes" valuation formula, in accordance with the eligibility and payment terms set forth in the Stock Option Agreements. (Oral Argument Tr. 15-16.)

> FN5. Plaintiff cites May 1, 2001, as Seneca's creation date and Plaintiff's commencement date at Seneca. (Am.Compl.¶¶ 94, 122, 172, 191, 227.) However, the Seneca Formation Agreement and the Seneca Charter (Harris Decl. Ex. 5, 6), which are proffered by Defendant, explicitly refer to Seneca's creation date as being May 2, 2001. The Court construes Plaintiff's allegations as true at this stage of litigation, the discrepancy is not material to this order's analysis, and Defendant has not argued that the Seneca Formation Agreement and the Seneca Charter are "integral to" Plaintiff's Amended Complaint. *See I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991) (construing the terms of a document proffered by the defendant as part of

Slip Copy
Slip Copy, 2007 WL 2012412 (S.D.N.Y.)
**(Cite as: Slip Copy)**

the plaintiff's complaint upon a motion to dismiss because it was "integral to" the complaint). For these reasons, and also for the sake of simplicity, the Court will refer to Seneca's creation date as being May 1, 2001.

> FN6. Technically, the Seneca Formation Agreement first creates an LLC called "Pegasus E-Services Investments LLC." That entity was to then be renamed "Seneca Investments LLC" promptly after closing. (Harris Decl. Ex. 5 § I.l.l.)

Seneca had two classes of stock: non-voting preferred stock and common stock, which had voting rights. (Harris Decl. Ex. 6 § 6(b).) Although Omnicom owned all of the non-voting preferred stock at all relevant times (Am.Compl.¶ 119), Omnicom decided which entities would hold the common stock from May 1, 2001, to March 31, 2004. At some point before June 2002, Omnicom paid an entity, Pegasus Ventures, $6,000,000 in "management fees" to hold the Seneca common stock and serve as Omnicom's agent with respect to Seneca. (Id. ¶¶ 120-28.)After Pegasus Ventures acquired Seneca's common stock, Omnicom played an active role in managing transactions involving Agency.com, Organic, and Live Web, which turned out to be Seneca's most financially significant investments. Omnicom prepared all the term sheets and legal documentation, and it handled all substantive negotiations concerning these transactions. Meanwhile, Pegasus Ventures, the entity that held 100% of the voting stock of Seneca, had no involvement in these transactions whatsoever. (Id. ¶¶ 172-80.)

In June of 2002, Pegasus Ventures surrendered its common shares in Seneca and, for a period of time, Omnicom was Seneca's only shareholder. Omnicom then agreed to pay a company called Chaucer an unspecified amount of "management fees" to hold Seneca's common stock and serve as Omnicom's agent with respect to Seneca. Omnicom thereafter cancelled the agreement with Chaucer, resuming its role as Seneca's only shareholder. (Am.Compl.¶¶ 130-34.) There was no express provision in the Seneca Formation Agreement or the Seneca Charter concerning voting rights when the only shareholder of Seneca held only non-voting, pre-

ferred stock. (See Harris Decl. Ex. 5, 6.)

**\*3** In the second half of 2002, Omnicom paid Tierney and Jerry Neumann, the Chief Financial Officer of Seneca and Communicade, a "bonus" of $250,000 so that they could purchase Seneca's common shares, which were valued at $250,000 at that time. (Id. ¶¶ 135-36.)

Tierney and Neumann formed a company called PGNT Management LLC ("PGNT"), with Tierney as the majority shareholder, to acquire Seneca's common shares. As the majority shareholder of PGNT, which in turn was the sole owner of Seneca's common shares, Tierney did not allow PGNT to take any actions with respect to Seneca of which Omnicom did not approve. (Id. ¶¶ 139-45.)On March 31, 2004, Omnicom converted its preferred stock in Seneca into a $24,000,000 Note and 40% of Seneca's common equity, then transferred the 40% equity interest to Wharton Business School. (Id. ¶¶ 218-22.)

The three-year term specified in the Employment Agreement between Omnicom and Tierney expired on October 1, 2003. (Am.Compl.¶ 74.) At a time unspecified in the Amended Complaint, Omnicom told Tierney that it would not renew the Employment Agreement because Tierney's continued work for Omnicom in any capacity would hurt Omnicom's position in a separate securities litigation.(Id. ¶¶ 73, 75.)Nonetheless, Omnicom continued paying Tierney the same salary and provided him the same benefits as had been provided prior to the formation of Seneca until March 31, 2004 (Id. ¶ 63), when Omnicom and Tierney's employer-employee relationship finally ended. (Id. ¶ 109.)

On November 8, 2006, Tierney sent a notice to Omnicom formally exercising the October 2, 2000, and February 2, 2001, stock options and, on January 23, 2007, Tierney sent a notice to Omnicom formally exercising the April 4, 2001, stock options. Omnicom refused to recognize Tierney's attempts to exercise the options or pay their cashless exercise value. (Id. ¶¶ 97-106.)

Plaintiff asserts ten causes of action arising under New York common law, including multiple breach of contract claims, multiple claims of breach of the im-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 4
Slip Copy, 2007 WL 2012412 (S.D.N.Y.)
**(Cite as: Slip Copy)**

plied covenant of good faith and fair dealing, and claims of quantum meruit, unjust enrichment, and promissory estoppel. Plaintiff additionally invokes the doctrines of waiver, estoppel, unclean hands, and specific performance as causes of action.

### DISCUSSION

In evaluating a motion to dismiss a pleading pursuant to Rule 12(b)(6), the Court must take as true the facts alleged in the claimant's pleading and draw all reasonable inferences in his favor. *W. Mohegan Tribe & Nation v. Orange County,* 395 F.3d 18, 20 (2d Cir.2004); *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994). The recent U.S. Supreme Court decision in *Bell Atlantic Co. v. Twombly,* 127 S.Ct. 1955 (2007), and a Second Circuit decision, *Iqbal v. Hasty,* No. 05-5768-CV (L), 2007 WL 1717803 (2d Cir. June 14, 2007), which interprets and applies *Twombly,* indicate that, at least where the facts alleged in the challenged pleading are ambiguous as to whether the conduct alleged is sufficient to warrant a finding of culpability, the determination as to whether a pleading articulates facts sufficient to state a claim upon which relief may be granted includes an assessment as to whether sufficient facts are alleged to make the plaintiff's allegations of wrongdoing "plausible."

### Whether Plaintiff's Allegations are "Well-Pleaded" or "Plausible"

**\*4** Defendant argues that the entire Amended Complaint should be dismissed because it is not "well-pleaded." While a court must deem the plaintiff's allegations to be true on a motion to dismiss, "the standard to govern the sufficiency of the complaint presumes 'well-pleaded' allegations, and it is only those pleadings the courts are charged to deem true."*Rieger v. Drabinsky,* 151 F.Supp.2d 371, 405 (S.D.N.Y.2001).

Thus, a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice.

*Id.* at 405-06.Rule 201(b) of the Federal Rules of Evidence provides that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."A court may take judicial notice of public records in deciding a motion to dismiss. *See, e.g., Blue Tree Hotel Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991) ("[t]he practice of taking judicial notice of public documents is not new").

Defendant argues the Court should take judicial notice of certain prior statements by Plaintiff that are reflected in publicly-filed documents. These prior statements purportedly establish that Plaintiff's employment relationship with Omnicom ceased in May 2001. (*See* Harris Decl. Ex. 8-10.) Defendant argues that Plaintiff's allegations that he worked for Omnicom until March 31, 2004, are not "well-pleaded" because they are contradicted by these earlier statements.

Prior inconsistent statements, while material to credibility, are not the proper subject matter of judicial notice. Furthermore, given Plaintiff's allegations of an overall corporate strategy of keeping the Seneca business "off the books" as far as Omnicom was concerned, and his specific allegations regarding disguised agency arrangements relating to voting power, statements he made while acting as president of Seneca would not at this stage be an appropriate basis for making a definitive finding as to the nature or status of his relationship to the Omnicom group at this stage of the litigation.

Defendant further argues that Plaintiff's allegations that he worked for Omnicom until March 31, 2004, are not "well-pleaded" because they are also contradicted by other allegations in Plaintiff's own complaint. *See Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1095 (2d Cir.1995) (affirming dismissal of complaint where "attenuated allegations" supporting a claim were "contradicted by more specific allegations in the complaint"); *Rieger v. Dabrinsky.* 151 F.Supp.2d 371, 405 (S.D.N.Y.2001) ("a court need not feel constrained to accept as truth conflicting pleadings that ... are contra-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dicted ... by statements in the complaint itself"). Defendant argues that allegations in the Amended Complaint which describe Plaintiff as working for Seneca after May 1, 2001, contradict other allegations in the Amended Complaint that describe Plaintiff as working for Omnicom after May 1, 2001. (*See, e.g.,* Am. Compl. ¶¶ 10, 33, 62, 163, 177.) However, the gravamen of Plaintiff's employment status allegations is the contention that Omnicom's actions blurred the line between Seneca and Omnicom, so those cited allegations are not necessarily contradictory. Therefore, the Court finds that Plaintiff's allegations that he worked for Omnicom until March 31, 2004 to be sufficiently "well-pleaded" to be construed as true for purposes of this motion practice.

**\*5** Defendant also argues that the prior statements and the allegedly contradictory allegations in the Amended Complaint render Plaintiff's allegations that he worked for Omnicom until March 31, 2004, implausible under *Twombly,* and that the Amended Complaint should accordingly be dismissed. *See Iqbal,* 2007 WL 1717803, at \*11(*Twombly*"obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible"). However, Plaintiff's allegations of an employment relationship with Omnicom through March 31, 2004, and his concurrent allegations that he also worked for Seneca through March 31, 2004, are sufficiently plausible to the extent that the *Twombly* standard is applicable in this factual context, because of Plaintiffs specific factual allegations regarding Omnicom's disguised agency relationships with controlling shareholders of Seneca. Accordingly, the Court denies Defendant's motion to dismiss the Plaintiff's Amended Complaint in its entirety as not well pleaded or as implausible.

The Court now considers, in turn, Defendant's arguments for the dismissal of each cause of action asserted in the Amended Complaint.

*First Cause of Action: Breach of the Employment Agreement*

Plaintiff claims that Defendant breached the Employment Agreement by refusing to honor Plaintiff's exercise of the stock options. In moving to dismiss this claim, Defendant argues that the option provision of the Employment Agreement is too indefinite to support a contract claim. Under New York law, a court must determine whether a contract claim is based on "a sufficiently definite offer such that its unequivocal acceptance will give rise to an enforceable contract."*Express Indus. and Terminal Corp. v. N.Y. State Dep't of Transp.,* 93 N.Y.2d 584, 589 (N.Y.1999)."[D]efiniteness as to material matters is of the very essence in contract law. Impenetrable vagueness and uncertainty will not do."*Martin, Delicatessen, Inc v. Schumacher,* 52 N.Y.2d 105, 109 (N.Y.1981).

The stock option provision of the Employment Agreement reads in its entirety as follows: "*Stock Options:* Initial award upon joining of 10,000 shares; shares vest over three years. Additional awards based on performance."(Am.Compl.Ex. A.) The strike price, a critical element of any stock option, of the initial award is not identified. The Employment Agreement does not address what kind of performance was intended to merit additional awards, when the additional awards would be given, how many shares would be granted, or what their strike prices would be. Therefore, putting aside the question of whether any other elements of the Employment Agreement are sufficiently definite as to be enforceable in a contract action, the option provision is clearly insufficient to support an action for breach of contract and the First Cause of Action will be dismissed.

*Second Cause of Action: Breach of the Employment Agreement as Modified by the Oral Modifications*

**\*6** Plaintiff claims that Defendant breached the Employment Agreement, as modified by the Oral Modifications, by refusing to honor Plaintiff's exercise of the stock options or, alternatively, by refusing to pay Plaintiff the value of those stock options as orally promised. This Second Cause of Action is premised on allegations that, in connection with Plaintiff's transition to Seneca, Plaintiff and Omnicom entered into an oral agreement to continue all of their respective rights and obligations under the three-year Employment Agreement, and that, as part of those Oral Modifications, Om-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2012412 (S.D.N.Y.)

**(Cite as: Slip Copy)**

nicom agreed to provide Plaintiff with payments equivalent to the value of any stock options that might not otherwise be exercisable by virtue of the shift to Seneca. The stock option element of this Oral Modification claim does not fail for definiteness in that the specific grant dates, numbers of shares, and strike prices of the three sets of stock options had already been determined. (*See* Am. Compl. ¶ 16, 31.) However, the Second Cause of Action fails as plead because the alleged Oral Modifications run afoul of the statute of frauds. Under the New York statute of frauds:

Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement promise or undertaking: 1) By its terms is not to be performed within one year from the making thereof ...

*N.Y. Gen. Oblig. Law § 5-701(a) (McKinney 2001 & Supp.2007).* If there is any possibility that the oral agreement, according to the parties' terms, can be performed within one year, the oral agreement does not need to be memorialized in writing to be enforceable. *D & N Boening, Inc. v. Kirsch Beverages, Inc.,* 63 N.Y.2d 449, 455 (N .Y.1984). Here, the alleged Oral Modifications were part and parcel of an agreement that was, by its terms, to be performed over a three-year period. Such an agreement fails to satisfy the documentation requirement of the statute of frauds. Plaintiff's argument that he has alleged facts sufficient to support a finding of enforceability by reason of part performance also fails, in that the facts alleged in the complaint are insufficient to support a finding that the parties' actions following the alleged Oral Modifications are "unequivocally referable" to the existence of such an oral agreement. *See Anostario v. Vicinanzo,* 450 N.E.2d 215, 216 (N.Y.1983). Accordingly, the Second Cause of Action, as plead in the Amended Complaint, will be dismissed.

At oral argument, Plaintiff appeared to advance a somewhat different theory-that Omnicom had agreed at the time of the transition to pay him the then-value of the stock options, at the times and pursuant to the conditions under which they would have been payable had his Seneca employment been Omnicom employment. Because it appears possible that such an agreement could

have been performed within one year, the Court will grant Plaintiff leave to amend the Oral Modification claim to allege such facts.

*Third Cause of Action: Breach of Implied Covenant of Good Faith and Fair Dealing under the Employment Agreement and Oral Modifications*

**\*7** Plaintiff claims Defendant breached the implied covenant of good faith and fair dealing under the Employment Agreement (this claim is asserted as to the original agreement and as to the allegedly modified agreement) by refusing to honor Plaintiff's exercise of the stock options promised in the Employment Agreement. An implied covenant of good faith and fair dealing is implied in every contract governed by New York law, and it precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement. *Leberman v. John Blair & Co.,* 880 F.2d 1555, 1560 (2d Cir.1989).

The following rule precludes a good faith and fair dealing claim in this case:

if the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claims in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated.

*Hall v. EarthLink Network, Inc.,* 396 F.3d 500, 508 (2d Cir.2005). In this case, Plaintiff's Third Cause of Action is based on precisely the same factual allegations as those supporting his breach of Employment Agreement claim. The Amended Complaint alleges no additional facts, nor does it highlight or distinguish any particular facts when making this good faith and fair dealing claim. On the contrary, it "repeats and realleges each and every allegation of the preceding paragraphs."(Am.Compl.¶ 264.) Therefore, Defendant's motion to dismiss is granted as to this cause of action.

*Fourth Cause of Action: Breach of Stock Option Agreements*

Plaintiff claims that Defendant breached the Stock

Option Agreements by refusing to honor Plaintiff's exercise of the stock options as promised in the Stock Option Agreements. Defendant's argument for dismissal of this cause of action rests primarily on two contentions.

Defendant first argues that Plaintiff's employment with "Omnicom or an Omnicom Subsidiary" was terminated when he transferred to Seneca on May 1, 2001, and that Seneca was not an "Omnicom Subsidiary" as defined by the Stock Option Agreements. Under this theory, Plaintiff's stock options would have expired on May 1, 2001. According to the Stock Option Agreements, a termination of the employment relationship immediately cancels the stock options, with exceptions provided only in cases where termination occurs after the first anniversary of the grant date. (Stock Option Agreements § 3(b).) The grant dates of the three stock options were October 2, 2000, February 2, 2001, and April 4, 2001, so a termination on May 1, 2001, would have occurred before the first anniversary of any of these stock options' grant dates, and Plaintiff's attempts to exercise the stock options in November 2006 and January 2007 would have been ineffective.

However, Plaintiff's allegations, taken as true for purposes of this motion to dismiss, are sufficient to support Plaintiff's claim that he continued in a covered employment relationship with Omnicom or an Omnicom Subsidiary following the creation of, and his transition to, Seneca in May 1, 2001. Plaintiff alleges in the Amended Complaint that he was treated as an Omnicom employee for payroll purposes and that he continued to report to Omnicom following the Seneca transition. (Am.Compl.¶¶ 62-70.) Moreover, the Amended Complaint proffers extensive allegations concerning Omicom's legal ability to control fundamental corporate activities of Seneca and its practical (albeit indirect) voting control over Seneca at all relevant times through agency relationships with the entities that held Seneca's voting stock during the relevant period, as well as during the periods in which Omnicom was Seneca's sole shareholder.(*Id.* ¶¶ 118-247.)

**\*8** Defendant next argues that, even if Plaintiff's employment with Omnicom or an Omnicom Subsidiary is deemed to have continued through March 31, 2004, Plaintiff has not plead sufficient facts to raise a plaus-

ible claim that he was terminated involuntarily and thus had the right to exercise the outstanding options for a period of three years following the termination of his employment (*see* Stock Option Agreements § 3(b)).

Dismissal of this Fourth Cause of Action as currently plead is appropriate. Although the Amended Complaint repeatedly describes Plaintiff's term of employment as ending on March 31, 2004 (Am.Compl.¶¶ 10, 63, 64, 76, 79, 109), there is no allegation that Plaintiff was terminated *involuntarily.*At oral argument, when Plaintiff's attorney was pressed on this point, he proffered that when Omnicom restructured its investment in Seneca on March 31, 2004, Omnicom "unilaterally stopped paying Mr. Tierney," and requested permission to amend the Amended Complaint to present facts supporting this theory of involuntary termination. (June 25, 2007 Oral Argument Tr. 11.) Defendant's motion to dismiss is granted as to Plaintiff's Fourth Cause of Action, without prejudice to repleading to assert facts supporting a claim of involuntary termination.

*Fifth Cause of Action: Breach of Implied Covenant of Good Faith and Fair Dealing under the Stock Option Agreements*

Plaintiff claims that Defendant breached the implied covenant of good faith and fair dealing under the Stock Option Agreements by refusing to honor Plaintiffs exercise of the stock options as promised in the Stock Option Agreements. Defendant's motion to dismiss this cause of action is granted for substantially the same reasons explained above in connection with Plaintiff's Third Cause of Action.

*Sixth and Seventh Causes of Action: Quantum Meruit and Unjust Enrichment*

Plaintiff's sixth and seventh claims are quasi-contract claims, and they may be considered together for purposes of this motion practice. Plaintiff's Sixth Cause of Action is a claim in quantum meruit, alleging that Plaintiff rendered substantial services to Defendant from October 1, 2000, to March 31, 2004, and that Defendant did not pay Plaintiff the reasonable value of his

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2012412 (S.D.N.Y.)

**(Cite as: Slip Copy)**

services. Plaintiff claims that, because he was prevented from exercising his stock options, he was essentially paid approximately $1,000,000 less than the reasonable value of his services. Plaintiff's Seventh Cause of Action is an unjust enrichment claim, in which Plaintiff asserts that he rendered services to Defendant at Plaintiff's expense, and that, while Plaintiff received compensation, equity and good conscience require an additional payment to Plaintiff of $1,000,000, an amount which approximates the value of the unexercised stock options.

The quasi-contractual theory of quantum meruit requires the claimant to show: (1) performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services. *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.,* 171 A.D.2d 479, 484 (N.Y.App. Div. 1st Dep't 1991). The quasi-contractual theory of unjust enrichment requires the claimant to show "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 586 (2d Cir.2006). Both causes of action are subject, however, to the following rule: "It is impermissible ... to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Beth Israel,* 448 F.3d at 587 (quoting *Clark-Fitzpatrick, Inc. v. Lone Island R.R. Co.,* 70 N.Y.2d 382, 389 (N.Y.1987)).

**\*9** Defendant argues that Schedule 3.7 of the Seneca Formation Agreement, executed on May 1, 2001, covers the scope of Plaintiff's quasi-contract claims concerning his employment after the Seneca transition because it explicitly names Tierney and describes the terms of his anticipated employment with Seneca. However, because Tierney was not a signatory of the Seneca Formation Agreement, Schedule 3.7 does not "clearly cover" the dispute between Tierney and Omnicom. Therefore, Defendant's motion to dismiss is denied as to Plaintiff's quantum meruit and unjust enrichment claims.

*Eighth Cause of Action: Promissory Estoppel*

Plaintiff asserts a promissory estoppel claim, alleging that in early 2001, after Defendant had promised Plaintiff that his stock options would not be adversely affected by his transfer to Seneca, Plaintiff relied on that promise by agreeing to transfer to Seneca. Therefore, Plaintiff argues, promissory estoppel prevents Defendant from refusing to honor Plaintiff's exercise of his stock options. A claim of promissory estoppel requires the plaintiff to establish three elements: "(1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance." *Kaye v. Grossman,* 202 F.3d 611, 615 (2d Cir.2000). In seeking the dismissal of the promissory estoppel claim, Defendant again invokes the rule against quasi-contractual recovery where an express contract fully covers the subject matter. *See Brown v. Brown,* 12 A.D.3d 176, 176 (N.Y.App. Div. 1st Dep't 2004) (applying *Clark-Fitzpatrick* rule to promissory estoppel claim); *but see Hubbard v. Town of Sand Lake,* 246 A.D.2d 708, 710 (N.Y.App. Div. 3rd Dep't 1998) (applying *Clark-Fitzpatrick* rule to other quasi-contract claims but not promissory estoppel claim). For the reasons explained in connection with the Sixth and Seventh Causes of Action, dismissal on this ground is not appropriate at the pleading stage.

Defendant further argues that Plaintiff's allegations are insufficient to establish a "clear and unambiguous promise," because Plaintiff only refers to "promises" or "representations" generally without any specification. *See Ward v. N.Y. Univ.,* No. 99 Civ. 8733(RCC), 2000 WL 1448641, at *6 (S.D.N.Y. Sept. 28, 2000) (mere reference to "promises or representations," without more, is insufficient to plead promissory estoppel claim). However, Defendant mischaracterizes Plaintiff's allegations. Plaintiff alleges, *inter alia,* that "Omnicom specifically promised Plaintiff that it would take any steps necessary to ensure that the Options remained exercisable by Plaintiff, or that it would provide Plaintiff their value."(Am.Compl.¶ 31.) The Amended Complaint defines "Options" in ¶ 16, which states:
Pursuant to the [Employment] Agreement, Omnicom issued to Plaintiff the following stock options (the "Options"):

| Grant Date | No. of Shares | Strike Price |
| --- | --- | --- |
| October 2, 2000 | 10,000 | $73.625 |
| February 2, 2001 | 15,000 | $87.160 |
| April 4, 2001 | 15,000 | $79.500 |

**\*10** (*Id.* ¶ 16.)This level of specificity is sufficient to allege a clear and unambiguous promise. Defendant's motion to dismiss is therefore denied as to this claim.

*Ninth and Tenth* FN7 *Causes of Action: Waiver, Estoppel, Unclean Hands, and Specific Performance*

> FN7. Plaintiff erroneously labels these causes of action as his Eighth and Ninth Causes of Action.

Plaintiff's remaining causes of action invoke the doctrines of waiver, estoppel, unclean hands, and specific performance. Defendant is correct in arguing that none of these doctrines are actually causes of action. Waiver, estoppel, and unclean hands are affirmative defenses. *See, e.g., Fed. Deposit Ins. Corp. v. Bernstein,* 944 F.2d 101, 105 (2d Cir.1991); *U.S. v. Bedford Assocs.,* 657 F.2d 1300, 1303 (2d Cir.1981). Specific performance is a remedy, and a remedy itself cannot be a cause of action. *Hi Pockets, Inc. v. Music Conservatory of Westchester, Inc.,* 192 F.Supp.2d 143, 160 (S.D.N.Y.2002). Therefore, Defendant's motion to dismiss Plaintiffs claims based on waiver, estoppel, and unclean hands is granted, but without prejudice to Plaintiff's appropriate use of these doctrines in the course of this litigation, and Defendant's motion to dismiss Plaintiff's claim of specific performance is granted without prejudice to Plaintiff's ability to request the remedy of specific performance in connection with any of his other surviving claims.

### CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Plaintiff's Amended Complaint is granted as to the breach of the Employment Agreement claim (First Cause of Action); the breach of the Employment Agreement and Oral Modifications claim (Second Cause of Action); the breach of the implied covenant of good faith and fair dealing claims (Third and Fifth Causes of Action); the breach of the Stock Option Agreements claim (Fourth Cause of Action); and the waiver, estoppel, unclean hands and specific performance claims (Eighth and Ninth Causes of Action) FN8; and is denied in all other respects.

> FN8. So denominated in Amended Complaint, but actually the Ninth and Tenth Causes of Action therein asserted.

Plaintiff shall serve and file any Second Amended Complaint within 14 days from the date of this Memorandum Order.

Plaintiff is granted leave to replead his Second and Fourth Causes of Action in a manner consistent with the foregoing discussion, and nothing in this decision bars Plaintiff from asserting the doctrines of waiver, estoppel, and unclean hands, or from seeking the remedy of specific performance, in an appropriate manner in the course of this litigation.

The parties shall promptly meet with Magistrate Judge Katz, to whom this case is now referred for general pretrial management purposes, to discuss settlement. Any disputes as to the scope of discovery, as well as all other nondispositive pre-trial matters, shall also be taken up with Judge Katz.

SO ORDERED.

S.D.N.Y.,2007.
Tierney v. Omnicom Group Inc.
Slip Copy, 2007 WL 2012412 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d, 2003 WL 121997 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

Walsh v. Truck Ins. Exchange Co.
Cal.App. 1 Dist.,2003.
Only the Westlaw citation is currently available.

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

Court of Appeal, First District, Division 1, California.
Susan WALSH, Plaintiff and Appellant,
v.
TRUCK INSURANCE EXCHANGE COMPANY, Defendant and Respondent.
No. A097316.
**(San Francisco County Super. Ct. No. 318289).**

Jan. 13, 2003.

Owner of condominium unit brought action against insurer for breach of the implied covenant of good faith and fair dealing and for aiding and abetting a breach of fiduciary duty, based upon the insurer's decision to provide a "courtesy defense" to uninsured non-board members of a condominium association in an underlying civil action brought by the unit owner against the board of directors of the association and the uninsured members. The Superior Court, City and County of San Francisco, No. 318289, sustained, without leave to amend, insurer's demurrer to the complaint and entered a final judgment of dismissal. Owner appealed. The Court of Appeal, Stein, Acting P.J., held that: (1) owner did not have standing to sue insurer for breach of the covenant of good faith and fair dealing; (2) owner failed to establish insurer aided and abetted any alleged breach of fiduciary duty; and (3) owner failed to show how she would amend complaint to state action for breach of the implied covenant of good faith and fair dealing, breach of a duty of care, fraudulent concealment, or negligence.

Affirmed.

West Headnotes

**[1] Insurance 217 ⚖══3419**

217 Insurance
   217XXVIII Miscellaneous Duties and Liabilities
     217k3416 Of Insurers
      217k3419 k. Bad Faith in General. Most Cited Cases
Condominium unit owner, who was a mandatory member of condominium association, did not have standing to sue association's insurer for breach of covenant of good faith and fair dealing based on insurer's decision to provide defense in owner's underlying lawsuit to nonmembers of association's board; owner was not a party, named insured, or additional insured. West's Ann.Cal.C.C.P. § 367.

**[2] Insurance 217 ⚖══1865**

217 Insurance
   217XIII Contracts and Policies
     217XIII(H) Relations Between Parties; Implied Terms
      217k1865 k. Third-Party Beneficiaries. Most Cited Cases

**Insurance 217 ⚖══3419**

217 Insurance
   217XXVIII Miscellaneous Duties and Liabilities
     217k3416 Of Insurers
      217k3419 k. Bad Faith in General. Most Cited Cases
Condominium unit owner did not have standing, as an alleged express third party beneficiary of policy, to sue association's insurer for breach of covenant of good faith and fair dealing based on insurer's decision to provide defense in owner's underlying lawsuit to nonmembers of board; mere fact that policy might have been purchased to benefit members of association as a group did not establish that individual members were third party beneficiaries of agreement, and owner, as plaintiff in underlying

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:08-cv-01607-JAH-JMA    Document 133-9    Filed 02/15/2008    Page 2 of 11
Not Reported in Cal.Rptr.2d                                                      Page 2
Not Reported in Cal.Rptr.2d, 2003 WL 121997 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

action, would not be entitled to any benefits under policy. West's Ann.Cal.C.C.P. § 367; West's Ann.Cal.Civ.Code § 1559.

**[3] Insurance 217 ⋙3087**

217 Insurance
    217XXVI Estoppel and Waiver of Insurer's Defenses
        217k3087 k. Reliance or Prejudice, Necessity Of. Most Cited Cases

**Insurance 217 ⋙3111(1)**

217 Insurance
    217XXVI Estoppel and Waiver of Insurer's Defenses
        217k3105 Claims Process and Settlement
            217k3111 Defense of Action Against Insured
                217k3111(1) k. In General. Most Cited Cases

Owner of condominium unit failed to establish that association's insurer was estopped to deny that owner was an insured who had standing to sue insurer for breach of covenant and good faith and fair dealing based on insurer's decision to provide defense in owner's underlying lawsuit to other owners who were not members of association's board; owner was not ignorant of the true state of facts, owner did not detrimentally rely upon insurer's conduct extending defense to non-board members, and owner was the plaintiff in underlying suit and had no defense to tender. West's Ann.Cal.C.C.P. § 367.

**[4] Insurance 217 ⋙1866**

217 Insurance
    217XIII Contracts and Policies
        217XIII(H) Relations Between Parties; Implied Terms
            217k1866 k. Fiduciary Relationships in General. Most Cited Cases

**Insurance 217 ⋙3417**

217 Insurance
    217XXVIII Miscellaneous Duties and Liabilities

217k3416 Of Insurers
    217k3417 k. In General. Most Cited Cases
Condominium association's insurer could not be held liable for allegedly aiding and abetting association board's alleged breach of fiduciary duty to unit owner; insurer did not have a fiduciary relationship with association, nothing suggested insurer had actively participated in breach of fiduciary duty in pursuit of its own financial gain, and mere possibility that insurer might reduce its costs in underlying lawsuit by providing defense to uninsured members was not the type of personal self-dealing that might subject insurer to liability.

**[5] Insurance 217 ⋙3419**

217 Insurance
    217XXVIII Miscellaneous Duties and Liabilities
        217k3416 Of Insurers
            217k3419 k. Bad Faith in General. Most Cited Cases
Terms of condominium association's liability insurance policies, in conjunction with association's covenants, codes, and restrictions, did not establish that unit owner had standing to sue insurer for breach of implied covenant of good and fair dealing, even though policy defined an "insured" as any person who had been "duly" appointed or elected to a position in association; policy terms confirmed that policies were issued to association and that they covered association and other persons acting solely in conduct of management responsibility for association.

**[6] Insurance 217 ⋙3424**

217 Insurance
    217XXVIII Miscellaneous Duties and Liabilities
        217k3416 Of Insurers
            217k3424 k. Fraud or Misrepresentation. Most Cited Cases
Condominium association's insurer did not commit fraudulent concealment against unit owner by allegedly failing to disclose fact that insurer intended to defend and indemnify nonmembers of board in owner's underlying lawsuit against board, where there was no fiduciary relationship between insurer

and unit owner.

**[7] Insurance 217 ☞3417**

217 Insurance
    217XXVIII Miscellaneous Duties and Liabilities
        217k3416 Of Insurers
           217k3417 k. In General. Most Cited Cases

**Insurance 217 ☞3418**

217 Insurance
    217XXVIII Miscellaneous Duties and Liabilities
        217k3416 Of Insurers
           217k3418 k. Negligence in General. Most Cited Cases

Condominium association's insurer did not assume a duty of care or fiduciary duty to one unit owner by extending a "courtesy defense" to other individual members of association in owner's underlying action against association's board and individual members.

**[8] Insurance 217 ☞3418**

217 Insurance
    217XXVIII Miscellaneous Duties and Liabilities
        217k3416 Of Insurers
           217k3418 k. Negligence in General. Most Cited Cases

Condominium association's insurer did not owe a duty of care to individual unit owner; policy was a general liability policy and director's and officer's policy, which by its terms insured board members and other persons acting solely in conduct of management responsibilities of association, and end aim of such policy was not the protection of an individual homeowner's interests.

STEIN, Acting P.J.

    **\*1** Susan Walsh, an owner of a condominium unit in the North Beach condominium complex, appeals from a judgment of dismissal after the court sustained, without leave to amend, Truck Insurance Exchange's (Truck) FN1 demurrer to her complaint, which alleged causes of action for breach of the covenant of good faith and fair dealing, and aiding and abetting a breach of fiduciary duty, based upon

Truck's decision to extend a courtesy defense to defendants who were not members of the North Beach Condominium Association Board of Directors (Board) in Walsh's underlying action against the Boards.

    FN1. The complaint erroneously named Farmer's Insurance Company as the defendant. Truck Insurance Exchange voluntarily appeared, and by stipulation was substituted for Farmer's Insurance Company as the defendant.

**FACTS**

**A. The Underlying Action against the North Beach Condominium Association Board of Directors**

    In the underlying action, Walsh filed a complaint against the Board and several individual defendants, including the owners of two upstairs units and the property managers. This complaint alleged, among other things, that, with the Board's permission, the owners of the upstairs units had removed carpet and padding, and that the Board had failed to enforce the rules of operation for the condominium complex, which caused Walsh damage as a result of increased noise and reduction in the value of her unit.

    The Board and its individual members tendered their defense to Truck. Truck accepted the tender and appointed Allman & Nielsen to provide a defense for the Board. Truck also agreed to provide a defense to the other named defendants who were not Board members, including the property managers and owners of the upstairs units. Walsh objected to the extension of this "courtesy" defense to non-Board members, and filed a motion to disqualify defendants' counsel, on the grounds that the joint representation created a conflict and breached the Board's fiduciary duty to Walsh. She further contended that the Board of Directors had waived its attorney-client privilege by allowing the joint representation of Board members and non-Board members. The court denied that motion.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2003 WL 121997 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

**B. The Instant Action**

On January 23, 2001, Walsh filed the instant complaint against Truck alleging causes of action for breach of the implied covenant of good faith and fair dealing, and aiding and abetting the Board's breach of its fiduciary duty to her, based upon Truck's decision to provide a defense to non-Board members who were also defendants in Walsh's underlying action

The complaint alleged that Allman & Nielsen were representing all defendants in the underlying action under "the [Board's] Errors & Omissions policy," including non-Board members, and that Walsh had objected to Truck's paying the legal fees of the non-Board members of the homeowners association. It further alleged that because Walsh is a mandatory member of the North Beach Condominium Association, she "is a member of the class for whom the ... insurance policy was created to benefit," or that she is a third party beneficiary of the insurance policy, or that Truck is estopped to deny her "membership in a class of insureds" because it had agreed to pay the defense costs of other non-Board-member homeowners in her underlying action. Based upon the foregoing, she alleged that Truck owed her a duty of good faith and fair dealing which it had breached in the underlying action by appointing counsel to provide a defense to the non-Board members, AND colluding with defense counsel and the Board in concealing facts, and misleading Walsh.

**\*2** With respect to the cause of action for aiding and abetting a breach of fiduciary duty, the complaint alleged that Truck owed Walsh a duty to provide legal representation to the Board consistent with the Board's fiduciary duty to her. It further alleged that Truck had "solicited, encouraged, aided and abetted" the Board's breach of its fiduciary duty to her by providing the defendants in the underlying action with legal representatives who concealed facts and misled Walsh, and "counseled or countenanced" other acts by the Board that constituted a breach of its fiduciary duty to her.

Truck filed a demurrer to the complaint on several grounds. The court sustained the demurrer, without leave to amend, on the grounds that: "1) Plaintiff lacks standing to sue Truck based on the insurance contract issued by Truck to the North Beach Condominium Association ..., 2) there is no basis for pleading coverage by estoppel, and 3) plaintiff cannot identify a contractual benefit to which she would be entitled even if she was found to have standing to sue Truck under the policy issued by Truck to [the homeowners' association]"FN2 The court thereafter entered a final judgment of dismissal and Walsh filed a timely notice of appeal.

> FN2. We do not reach Truck's additional contention that the denial of Walsh's motion to disqualify counsel in the underlying action collaterally estopped her from relitigating the same issues under the guise of a new lawsuit against Truck, because we shall affirm the judgment on other grounds.

**ANALYSIS**

Appellant contends that the court erred in sustaining the demurrer to her cause of action for breach of the implied covenant of good faith and fair dealing. She argues that as a homeowner and mandatory member of the North Beach Condominium Association she had standing to enforce the terms of the insurance contract because she was (1) a member of a class the policy was created to benefit, (2) a third party beneficiary, or (3) she was entitled to status as an insured by "estoppel."

She further contends that the court should at least have granted her leave to amend to allege that she was an express or third party beneficiary of the policy upon the basis of CC & R 3.13, which provides that the named insured shall be the homeowners association' or its authorized representative as trustee for the members, and that the polices shall be for the benefit of the homeowners, or to allow her to allege a cause of action for fraud. She also argues, for the first time in her reply brief,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that she could amend the complaint to state a cause of action against Truck for negligence.

With respect to her cause of action for aiding and abetting a breach of fiduciary duty, she contends that the court abused its discretion by denying leave to amend to permit her to allege that Truck and its attorneys derived a financial benefit from their conduct, which aided and abetted the Board's breach of its fiduciary duty to her.

We shall affirm the judgment.

**1. Standard of Review.**

In reviewing an order sustaining a demurrer without leave to amend, this court must accept as true all allegations of fact that are properly pleaded, and any matter that has been judicially noticed, but not contentions, deductions or conclusions of fact or law. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967, 9 Cal.Rptr.2d 92, 831 P.2d 317;*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318, 216 Cal.Rptr. 718, 703 P.2d 58.) We review de novo, the legal question whether the complaint alleges facts sufficient to state a cause of action. If the appellant demonstrates that there is a reasonable possibility that the defect in the complaint can be cured by amendment, it is an abuse of discretion to deny leave to amend. (*Ibid.*)

**\*3** As a preliminary procedural matter, we note that appellant's arguments fail to distinguish between the allegations actually set forth in her complaint and facts that she intends to allege if granted leave to amend. For example, in support of her argument that she has standing to sue Truck for breach of the covenant of good faith and fair dealing, she relies upon what she contends are the definitions of "insured" and the scope of coverage contained in a general liability policy and a director's and officer's policy issued by Truck to the North Beach Condominium Association, and upon the North Beach Condominium Association's Covenants, Codes, and Restrictions (CC & R's), yet the terms of the policies and the contents of the CC & R's were not alleged in the complaint, nor were they

judicially noticed by the trial court. Prior to oral argument this Court granted appellant's request for judicial notice of the CC & R's. The insurance policies upon which appellant relies have not, however, been made as part of the record on appeal. We shall consider these matters only as relevant to her contention that she can amend the complaint to state a cause of action, and in that context, we shall assume arguendo that she truthfully and accurately states the terms of the relevant insurance policies.

Respondent also relies, in part, upon the factual assertion that it accepted the Board's tender of the defense of appellant's underlying action pursuant to a reservation of rights, yet this fact also is not alleged in the complaint, nor was it judicially noticed by the trial court, and we therefore may not consider it.

**2. Breach of the Covenant of Good Faith and Fair Dealing**

It is well established that the real party in interest is the person possessing the right sued upon, and only the real party has standing to sue. (*Code Civ. Proc., § 367.*)It follows that "[s]omeone who is not a party to [a] contract has no standing to enforce the contract or to recover extra-contract damages for wrongful withholding of benefits to the contracting party.'" (*Seretti v. Supeiror Nat. Ins. Co.* (1999) 71 Cal.App.4th 920, 930, 84 Cal.Rptr.2d 315, quoting *Hatchwell v. Blue Shield of California* (1988) 198 Cal.App.3d 1027, 1034, 244 Cal.Rptr. 249.)

A cause of action for breach of the covenant of good faith and fair dealing derives from a contractual relationship between the parties. Therefore, " '[p]rivity of contract with the insurer is essential to an implied covenant action against the insurer.'(Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1998), ¶ 12:55, p. 12A-14.) 'Whether for better or worse ... liability for "bad faith" has been strictly tied to the implied-in-law covenant of good faith and fair dealing arising out of an underlying contractual relationship. Where no such relationship exists, no recov-

ery for "bad faith" may be had. [Citation.] [¶] ... [¶] [Thus], an insurer's duty of good faith and fair dealing is owed *solely to its insured and, perhaps, any express beneficiary of the insurance policy.*'(*Austero v. National Cas. Co.* (1976) 62 Cal.App.3d 511, 516-517 [133 Cal.Rptr. 107.)")(*Seretti v. Superior Nat. Ins. Co.* (1999) 71 Cal.App.4th 920, 929, 84 Cal.Rptr.2d 315, italics added.) Also, "[a] nonparty who is nevertheless entitled to policy benefits, such as an 'insured' person under the terms of the policy or an express beneficiary, has standing only if [he or] she is the *claimant* whose benefits are wrongfully withheld."(*Gantman v. United Pacific Ins. Co.* (1991) 232 Cal.App.3d 1560, 1566, 284 Cal.Rptr. 188.)

*4 [1] Appellant did not allege that she was a party to the "Board's D & O Policy," or that she was a named insured or within the class of persons defined as insureds. Indeed, the premise underlying all of her allegations objecting to the extension of a courtesy defense to non-Board members is that the terms of the policy provide that *only* Board members are insureds, not individual members of the homeowners association like herself. The allegations of her complaint established that she was not a party to the contract, a named insured, or an additional insured. Instead, she alleged that "[a]s a mandatory member of the [homeowners association] ... she is a member of a class ... the ... insurance policy was created to benefit."This allegation fails as a matter of law to establish standing to sue on the policies purchased by the homeowners association. (*Gantman v. United Pacific Ins. Co., supra,* 232 Cal.App.3d 1560, 284 Cal.Rptr. 188.) In *Gantman, supra,* individual members of a homeowners association filed a complaint against an insurer who issued homeowners insurance to the association. The individual members sought to recover damages under the policy for defects in the construction of the tile portions of roofs in the residential development. The complaint alleged causes of action on several legal theories, all of which were predicated upon the existence of a contractual relationship. (*Id.* at pp. 1565-1566, 284 Cal.Rptr. 188.) The named insured was the homeowners association. (*Id.* at pp. 1566-1567, 284 Cal.Rptr. 188.) The court rejected

the individual homeowners' contention that the homeowners association was their agent and under general agency principles they therefore could, in effect, stand in its shoes. (*Id.* at p. 1568, 284 Cal.Rptr. 188.) The court further observed that the homeowners association was a separate entity from its members with the capacity to sue. It held that individual members of a homeowners association stand in the same position as shareholders to a corporation. Although members of a homeowners association "benefit" from the policy purchased by the homeowners in the sense that the policy serves some need or purpose they have in common, an individual member nevertheless has no standing to sue upon or enforce the insurance contract unless they are also insureds or designated beneficiaries in the terms of the policy. (*Id.* at pp. 1567-1568, 284 Cal.Rptr. 188.) Thus, the allegation of appellant's complaint that she is a member of the homeowners association is insufficient as a matter of law to establish that she has standing to sue Truck, as an individual homeowner, on her own behalf.

[2] Nor did the allegations of the complaint establish standing to sue as an express third party beneficiary of the policy. (See Civ.Code, § 1559.) The complaint alleged nothing more than the legal conclusion that she was a third party beneficiary of the contract, without reference to the terms of the contract she claimed conferred that status and without alleging any fact other than her status as "a mandatory member" of the homeowners association. In the insurance context, a person who is not a party to the insurance contract may nevertheless have standing to sue the insurance company as a third party beneficiary if he or she falls within a class of persons who are defined as insured under the policy, and he or she is the claimant whose benefits are wrongfully withheld. (*Hatchwell v. Blue Shield of California, supra,* 198 Cal.App.3d 1027, 1034, 244 Cal.Rptr. 249.) Appellant's complaint, however, did not allege policy terms or facts supporting the conclusion that she is an insured, or entitled to any benefits under the policy that had wrongfully been withheld. She alleged that only Board members are insureds, that she is *not* a Board member, but rather a member of the homeowners association, and is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2003 WL 121997 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

the plaintiff in the underlying action. The mere fact that an insurance policy is purchased by the homeowners association with dues paid by individual members, or even that it is purchased to benefit the members as a group, is insufficient to establish that *individual* members are third party beneficiaries of the insurance contract. The fact that "the contract, if carried out to its terms, would inure to the third party's benefit is insufficient to entitle him or her to demand enforcement," even if the third party has paid for the policy. (*Jones v. Aetna Casualty & Surety Co.* (1994) 26 Cal.App.4th 1717, 1724, 33 Cal.Rptr.2d 291 [commercial lessee who was required by terms of lease to pay the cost of rental income insurance policy maintained by lessor had no standing as third party beneficiary to sue insurer for breach of the covenant of good faith and fair dealing].) Moreover, as the plaintiff in the underlying action, she would not, in any event, be entitled to any benefits under the liability policy because she has no defense to tender and no liability to be indemnified.

**\*5** None of the cases upon which appellant relies support the proposition that a third party who is neither an insured nor a claimant entitled to benefits that have been wrongfully withheld may sue an insurer for breach of the covenant. In *Northwestern Mut. Ins. Co. v. Farmer's Ins. Group* (1978) 76 Cal.App.3d 1031, 143 Cal.Rptr. 415, the court recognized that a third party who was *insured under the permissive user provision of the policy* was a third party beneficiary to whom the insurer owed a duty to accept a reasonable settlement.(*Id.* at pp. 1041-1042, 143 Cal.Rptr. 415.) In *Truestone, Inc. v. Travelers Ins. Co.* (1976) 55 Cal.App.3d 165, 170, 127 Cal.Rptr. 386, the shareholders of a closely held corporation had standing to sue for breach of the covenant based upon failure to settle a third party claim against the corporation within policy limits because they were also *expressly named as insureds.*(*Id.* at p. 170, 127 Cal.Rptr. 386.) In *Cancino v. Farmers Insurance* (1978) 80 Cal.App.3d 335, 345, 145 Cal.Rptr. 503, the plaintiff was not a party to the contract, but was an *express insured* under the uninsured motorist coverage provision of the policy. (See also *Seretti v. Su-*

*perior National Ins. Co., supra,* 71 Cal.App.4th 920, 929, fn. 8, 84 Cal.Rptr.2d 315 [noting that to the extent that *Cancino* relied upon Ins.Code, § 790.03, its holding may no longer be viable after the decision in *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 313].) In *Johansen v. California State Auto. Assn. Inter. Ins. Bureau* (1975) 15 Cal.3d 9, 14, 123 Cal.Rptr. 288, 538 P.2d 744 the plaintiff was an *assignee.*Rather than supporting appellant's arguments, these cases illustrate the principle that " '[p]rivity of contract with the insurer is essential,' " and that the " 'duty of good faith and fair dealing is owed solely to its insured, and perhaps, any express beneficiary of the policy.' " (*Seretti v. Superior National Ins., supra,* 71 Cal.App.4th at p. 929, 84 Cal.Rptr.2d 315, quoting *Austero v. National Cas. Co., supra,* 62 Cal.App.3d 511, 516-517, 133 Cal.Rptr. 107.)

[3] The complaint also alleged that Truck was "estopped" to deny that appellant is an insured and has standing to sue, because it had extended a defense to other individual homeowners who were not Board members. Appellant cites *Huffman v. City of Poway* (2000) 84 Cal.App.4th 975, 101 Cal.Rptr.2d 325 for the proposition that "when an insurer by its words or conduct leads a putative insured to believe the insurer is providing coverage, and the putative insured relies on the insurer's conduct and changes his position to his detriment, the insurer may be estopped from denying that it provided coverage."(*Id.* at p. 987, 101 Cal.Rptr.2d 325.) Appellant reasons that she stands in the same position as the other non-Board members who are individual members of the homeowners association that Truck agreed to defend, and Truck, by its conduct in providing a courtesy defense to other individual homeowners, led her to believe that she also is an insured and entitled to a defense.

Setting aside for the moment the fact that appellant is the *plaintiff,* not a defendant, in the underlying action, and therefore has no *defense* to tender, the complaint also failed to allege the elements necessary for estoppel. Under traditional estoppel principles, the party asserting estoppel must prove the following four elements: "(1) the party to be es-

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2003 WL 121997 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

topped must be apprised of the facts; (2) he must intend that his conduct be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.... There can be no estoppel where one of these elements is missing."(*Green v. Travelers Indemnity Co.* (1986) 185 Cal.App.3d 544, 556, 230 Cal.Rptr. 13.) Among other defects, appellant's complaint failed to allege that she was ignorant of the true state of facts, i.e., that individual members of the homeowners association like herself, who are not Board members, are not insureds. To the contrary, her allegation that she objected to the extension of a defense to non-Board members on the ground that the policy covers only Board members affirmatively demonstrates she was aware that the "true facts" were that individual members of the homeowners association are *not* insureds.

**\*6** Nor did appellant allege any facts demonstrating that she detrimentally relied upon Truck's conduct extending a defense to non-Board members of the homeowners association in filing the underlying action. Instead, she argues, she relied not upon any affirmatively misleading conduct by Truck, but rather upon her own understanding that individual homeowners were *not* insureds. She reasons that she now is unexpectedly disadvantaged by the provision of a courtesy defense to these homeowners, and therefore is somehow entitled either to compel Truck to pay her litigation costs too or to stop Truck from providing a defense to the non-Board members she has sued. She, however, cites no authority for the novel assertion that a person who is not a party to the contract of insurance can, in effect, use the theory of coverage by estoppel offensively and in *reverse* to *stop* an insurer from providing a defense or indemnification to another non-insured.

In any event, even if we were to accept arguendo appellant's contention that it is reasonable to construe the terms of the policy defining who is an insured to create or imply a contractual obligation, which she describes in her reply brief as a

"collateral right," *not to defend* non-insureds, that *contractual* obligation would be owed only to a party or insured under the terms of the contract. Appellant therefore still cannot overcome the hurdle that she lacks standing to enforce what she construes to be a contractual guarantee that Truck will only defend Board members.

Finally, to the extent appellant's estoppel theory is based upon the premise that she stands in the same shoes as the other non-Board members who also are individual members of the homeowners association, to whom Truck extended the courtesy defense, that premise is incorrect: The other homeowners are *codefendants* with Truck's insureds in appellant's underlying action who are alleged to have acted with the Board's permission or upon its advice. They may even have claims for indemnity against the Board members, who are insureds, and there is at least a potential for coverage of these claims. Appellant, by contrast, is the *plaintiff* in the underlying action. As such she has no defense to tender and no liability that could be indemnified.

**3. Aiding and Abetting a Breach of Fiduciary Duty**

[4] The court also did not err in sustaining the demurrer to the cause of action for aiding and abetting the Board's breach of its fiduciary duty to appellant. In this cause of action appellant alleged that the Board owed Walsh a fiduciary duty and that Truck, through the lawyers it appointed to provide a defense, assisted the Board in engaging in conduct in defense of the underlying action that breached the Board's fiduciary duty to Walsh.

Assuming arguendo that the complaint adequately alleged a basis for finding that the *Board* owed a fiduciary duty to Walsh and had breached that duty, Truck, as an insurer, has a special relationship with its insureds but does not owe them a fiduciary duty. (See *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1147, 271 Cal.Rptr. 246;*Henry v. Associated Indemnity Corp.* (1990) 217 Cal.App.3d 1405, 1419, 266 Cal.Rptr. 578.) If

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:08-cv-01607-JAH-JMA    Document 133-9    Filed 02/15/2008    Page 9 of 11
Not Reported in Cal.Rptr.2d    Page 8
Not Reported in Cal.Rptr.2d, 2003 WL 121997 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

the insurer owes no such duty to its own insured, it, a fortiori, owes no such duty to person who is *not* its insured. Nor can Truck, a non-fiduciary, be held liable for aiding and abetting the Board in breaching the Board's fiduciary duty because "[a] nonfiduciary cannot conspire to breach a duty owed only by a fiduciary."(*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1597, 47 Cal.Rptr.2d 752.)

**\*7** There is an exception to this rule that applies if the nonfiduciary third party actively participates in the fiduciary's breach of trust in furtherance of the nonfiduciary's personal financial gain. (See, e.g., *Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1104-1105, 3 Cal.Rptr.2d 236;*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 483, 80 Cal.Rptr.2d 329; but see *Everest Investors 8 v. Whitehall Real Estate Limited Partnership XI* (2002) 100 Cal.App.4th 1102, 123 Cal.Rptr.2d 297 [court questions whether this exception has any application where third party is neither an agent nor employee of principal owing a fiduciary duty].) The complaint, however, did not allege any facts that would have brought the complaint within this exception. The mere possibility that, by providing the courtesy defense to the noninsured defendants, Truck may reduce the costs of the defense and, in its judgment, provide a more effective defense of its insureds, is not the type of personal self-dealing necessary to bring allegations of the complaint within this exception.

**4. Leave to Amend**

Appellant also fails to demonstrate that it was an abuse of discretion to deny leave to amend her complaint. Appellant bears the burden of proving a reasonable possibility of amendment and may make this showing for the first time on appeal. To satisfy that burden, appellant must show how she can amend the complaint and how that amendment will change the legal effect of her pleading. She must clearly and specifically set forth the elements of the cause of action, the authority for it, and the factual allegations that sufficiently state all required elements of that cause of action. Those allegations must be factual and specific, not vague and conclusionary. (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43-44, 96 Cal.Rptr.2d 354.)

[5] On the issue of standing to sue Truck for breach of the implied covenant of good and fair dealing, appellant refers in her opening brief to terms of the insurance policies, and cites the contents of the CC & R's which, she contends, establish that she could allege standing if granted leave to amend. Specifically, she asserts that the policy purchased by the homeowners association from Truck includes a general liability and a director's and officer's policy.[FN3] She represents that the directors and officers policy provides that Truck will cover any sums the insured becomes legally obligated to pay as damages because of "wrongful acts" committed by "any insured while acting *solely* in the conduct of management responsibilities for the Association," and defines an "insured" as "any person who has been, now or shall become a duly elected or appointed director, officer or trustee of the association," or "a duly elected or appointed officer of the Association."Appellant also relies upon "CC & R section 3.13" which provides that "... the named insured shall be the Association or its authorized representative, as trustee for the Members. However all policies shall be for the benefit of the Owners and their Mortgagees, as their interests appear."

FN3. Although appellant quotes the definition of an insured under the general liability policy, she advances no separate argument based upon it.

**\*8** These policy terms, and CC & R 3.13 only reconfirm that the polices are issued to the homeowners association, which purchases the polices for the collective benefit of its members, that the homeowners association is the named insured, and that other insureds are duly elected Board members and persons acting solely in the conduct of management responsibility for the association.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d                                                                                                    Page 10
Not Reported in Cal.Rptr.2d, 2003 WL 121997 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

For the reasons we have already stated, these facts establish only that appellant is neither an insured nor a third party beneficiary, nor is she entitled to any benefits under the policy that have wrongfully been withheld.

Appellant argues that by using the single term "duly" preceding the definition of insureds as including elected or appointed directors, officers or trustees of the association, Truck "clearly incorporated by reference all of the North Beach Condominium Associations' CC & R's into the insurance contract," thereby giving her standing to sue Truck to enforce those CC & R's, as if Truck were another homeowner. (See, e.g., *Posey v. Leavitt* (1991) 229 Cal.App.3d 1236, 1247, 280 Cal.Rptr. 568 [homeowner has a cause of action against the homeowners association and other homeowners who violate the CC & R's].) The argument borders upon frivolous. Appellant cites no authority in support of her argument that use of this single term amounted to a wholesale incorporation of the CC & R's into the contract and we find nothing in the cited contract language to support such a sweeping interpretation. (See, e.g., *Chan v. Drexel Burnham Lambert* (1986) 178 Cal.App.3d 632, 641, 223 Cal.Rptr. 838 [incorporation by reference must be clear and unequivocal].)

[6] Appellant also suggests she could amend to state a cause of action for fraud on, the theory that "Truck had a duty to disclose the fact that it intended to defend and indemnify anyone it chose to if that was in its best interests," and that by failing to disclose its true intentions, Truck induced appellant to participate, presumably through the payment of dues, in obtaining director's and officer's insurance.FN4 This proposed amendment would also fail to state a cause of action based upon fraudulent concealment. In the absence of a fiduciary relationship there is no duty to disclose, and for the reasons we have already stated Truck did not owe such a duty to appellant. (See, e.g., *San Diego Hospice v. County of San Diego, supra,* 31 Cal.App.4th 1048, 1055, 37 Cal.Rptr.2d 501.)

FN4. Appellant also does not explain how

as a "mandatory" member of the homeowners association she could have elected not to pay dues, which are used to pay for the insurance purchased by the homeowners association.

[7] Appellant also relies in her reply brief upon *Mosier v. Southern Calif. Physicians Ins. Exchange* (1998) 63 Cal.App.4th 1022, 74 Cal.Rptr.2d 550 for the proposition that Truck somehow assumed a duty of care or fiduciary duty *to her* by extending a "courtesy defense" to other individual members of the homeowners association. In *Mosier, supra,* several doctors had participated in the delivery and neo-natal care of a child who suffered serious and permanently disabling injuries. In the underlying malpractice action the insurer, in addition to defending several of its insureds, agreed to provide a "courtesy defense" to another doctor, Jouvenat, who was planning to represent himself at trial, but did not agree to provide any indemnification for damages. The insurer did not disclose to Mosier the potential conflict between him and its insureds, and actively assisted the attorney who jointly represented them in a trial strategy that shifted blame from its insureds to Jouvenat, resulting in a large damage award against him. Jouvenat, through the trustee of his bankruptcy estate, then sued the insurer and obtained a judgment against it for fraud and conspiracy with Jouvenat's counsel to breach the fiduciary duty owed by defense counsel. ((*Id.* at pp. 1028-1029,1036-1039, 74 Cal.Rptr.2d 550.) The Court of Appeal held, among other things, that on these unique facts (1) the insurer, by extending a courtesy defense, had assumed a duty to Jouvenat, which included the duty to disclose the potential conflict between Jouvenat and its insureds, and duties similar to those owed to him by his attorneys, and (2) the insurer, by actively assisting Jouvenat's counsel in presenting a defense that shifted liability from its insured to Jouvenat, conspired with defense counsel to breach a fiduciary duty to Jouvenat. (*Id.* at p. 1040, 74 Cal.Rptr.2d 550.) This case illustrates only that, depending upon the facts, Truck may have assumed a duty *to the defendants to whom it has extended a courtesy defense,* not appellant, and that having done so, it may not conspire

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.2d
Not Reported in Cal.Rptr.2d, 2003 WL 121997 (Cal.App. 1 Dist.)
**(Cite as: Not Reported in Cal.Rptr.2d)**

with defense counsel to present a defense that re-
duces the liability of its insureds at the expense of
*these other defendants.*

**\*9** [8] Finally, appellant argues that she could
amend the complaint to state a cause of action for
negligence on the theory that, even though she is
not a party or an insured under the terms of the in-
surance contract, she has standing to sue Truck for
negligence because Truck owed her a duty of care
based upon the factors set forth in *Biakanja v.
Irving* (1958) 49 Cal.2d 647, 650, 320 P.2d 16, and
*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370,
396-399, 11 Cal.Rptr.2d 51, 834 P.2d 745. Basic
principles of fairness require that we disregard ar-
guments raised for the first time in a reply because
the respondent is deprived of a reasonable oppor-
tunity to respond. (See, e.g., *Board of Administra-
tion v. Wilson* (1997) 52 Cal.App.4th 1109, 1144,
61 Cal.Rptr.2d 207.) In any event, in *Adelman v.
Associated Internat. Ins. Co* (2001) 90 Cal.App.4th
352, 108 Cal.Rptr.2d 788 the court, in an analogous
context, rejected the contention of individual mem-
bers of a homeowners association that the insurer
on a property insurance policy issued to the
homeowners association to cover common areas
owed them a duty of care, and that they therefore
had standing to sue the insurer for negligence in
handling a claim. (*Id.* at pp. 366-370, 108
Cal.Rptr.2d 788.) Appellant attempts to distinguish
*Adelman, supra,* on the ground that the insurance
policy in *Adelman* covered only the common areas,
and therefore it was intended only to protect the
collective or group interests of the plaintiff whereas
here, she asserts, the end aim of the insurance
policy is to protect the individual rights of the
homeowners. That is the same fallacy that underlies
many of her other arguments. According to appel-
lant, the insurance policy is a general liability
policy, and a director's and officer's policy, which
by its terms insures Board members and other per-
sons *acting solely in the conduct of management re-
sponsibilities* of the homeowners association. The
end aim of such policy is *not* the protection of an
individual homeowner's interests, but rather protec-
tion of those persons acting in their collective in-
terest in the conduct of management responsibilities

of the homeowners association.

**CONCLUSION**

The judgment is affirmed. Costs are awarded to
respondent.
We concur: SWAGER and MARGULIES, JJ.
Cal.App. 1 Dist.,2003.
Walsh v. Truck Ins. Exchange Co.
Not Reported in Cal.Rptr.2d, 2003 WL 121997
(Cal.App. 1 Dist.)

END OF DOCUMENT

William J. O'Shaughnessy
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Peter T. Barbur
Elizabeth L. Grayer
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Richard S. Taffet
Philip L. Blum
BINGHAM MCCUTCHEN LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

Robert N. Feltoon
CONRAD O'BRIEN GELLMAN & ROHN, P.C.
1515 Market Street, Suite 1600
Philadelphia, PA 19102
(215) 864-8064

*Attorneys for Defendant Qualcomm Incorporated*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>                     Plaintiff,<br><br>        v.<br><br>QUALCOMM INCORPORATED,<br><br>                     Defendant. | Civil Action No. 05-3350 (MLC) (JJH)<br><br>**CERTIFICATION OF SERVICE** |

RICHARD HERNANDEZ, of full age, certifies as follows:

1.     I am an attorney at law of the State of New Jersey and am associated with the firm

of McCarter & English, LLP, attorneys for Defendant Qualcomm Incorporated.

2.     On February 15, 2008, I caused to be delivered by ECF and electronic mail a copy

of the foregoing papers to the following:

<div align="center">

DAVID S. STONE, ESQ.
ROBERT A. MAGNANINI, ESQ.
Boies, Schiller & Flexner LLP
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
dstone@bsfllp.com
rmagnanini@bsfllp.com

STEVEN J. KAISER, ESQ.
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
skaiser@cgsh.com

</div>

3.     In addition, on February 15, 2008 I caused to be delivered by electronic mail a

copy of the foregoing papers to the following:

<div align="center">

WILLIAM F. LEE, ESQ.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
william.lee@wilmerhale.com

MARK D. SELWYN, ESQ.
Wilmer Cutler Pickering Hale and Dorr LLP
1117 California Avenue
Palo Alto, CA 94304
mark.selwyn@wilmerhale.com

MARK W. NELSON, ESQ.
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue, NW
Washington, DC 20006
mnelson@cgsh.com

</div>

<div align="center">-2-</div>

DAVID BARRETT, ESQ.
Boies, Schiller & Flexner LLP
570 Lexington Avenue
New York, NY 10022
dbarrett@bsfllp.com

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED: February 15, 2007

_Richard Hernandez_
Richard Hernandez

-3-