# CRAVATH, SWAINE & MOORE LLP

ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN E. BEERBOWER
EVAN R. CHESLER
MICHAEL L. SCHLER
RICHARD LEVIN
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON

JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III

## WORLDWIDE PLAZA
## 825 EIGHTH AVENUE
## NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1058

WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DeMASI
LIZABETHANN R. EISEN

DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
JOEL F. HEROLD
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
TEENA-ANN V. SANKOORIKAL
ANDREW R. THOMPSON
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ERIC L. SCHIELE

SPECIAL COUNSEL

SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III

OF COUNSEL

CHRISTINE BESHAR

April 11, 2008

<u>Broadcom Corp. v. Qualcomm Inc., No. 05-3350 (MLC) (JJH)</u>

Dear Judge Hughes:

As provided in the parties' joint letter of March 21, 2008, this letter sets forth Qualcomm's response to Broadcom's letter to the Court dated April 4, 2008.

Despite the fact that the parties jointly identified five unresolved discovery issues in their March 21 letter to the Court, Broadcom's April 4 letter inexplicably addresses only *one* of those issues—*i.e.*, Broadcom's demand that Qualcomm search the files of 120 separate custodians. Broadcom's letter fails to address in any way the four other issues that were jointly identified (relating to IEEE Project 802, Project Stockholm and Project Koala), thus depriving Qualcomm of the ability to respond in this letter to arguments Broadcom could have included in its April 4 letter. This is contrary to Qualcomm's understanding of how this briefing process was supposed to work and, accordingly, Qualcomm reserves the right to respond in writing to whatever arguments Broadcom offers on these four other issues in its April 11 letter to the Court.

Broadcom's April 4 letter also discusses three issues that it did not identify either during the meet-and-confer process or in the March 21 joint letter to the Court. As discussed in our letter of April 4, Broadcom's attempt to raise these additional issues is contrary to the clear deadline to which the parties previously agreed. (*See* February 22, 2008, Joint Letter to the Court (setting "a deadline of March 21, 2008 for these meet and confer discussions to be completed, after which they will notify the Court if any judicial intervention is required to resolve any remaining disagreements") (attached as Exhibit G to April 4, 2008, Barbur Letter to the Court).) Broadcom does not mention this fact,

much less offer an explanation for its failure timely to raise these issues during the meet-and-confer discussions or in the joint letter.

This is not just a technical issue. To the contrary, as discussed below, having failed to meet and confer on a timely basis in an attempt to resolve these additional issues, Broadcom is now left arguing theories of "relevance" that are both inconsistent with its own document requests as written and contradicted by positions Broadcom took during the extensive meet-and-confer process. That is improper and should not be permitted.

## 1.    Broadcom's Request for Additional Qualcomm Custodians

In its April 4 letter, Broadcom continues to demand that Qualcomm search the files of 120 separate custodians in connection with the "second wave" of discovery, including running more than 230 new search terms across prior document collections and updating those collections with all documents created in the past two years. That request—although consistent with Broadcom's apparent goal of constantly expanding the scope of issues in this case and imposing the greatest burden possible on Qualcomm— cannot be squared with the Court-ordered December 19, 2008, deadline for the close of fact discovery. As in the parties' meet-and-confer discussions, Broadcom's letter to the Court does not dispute the impossibility of complying with Broadcom's demands within the time allotted for fact discovery. Nor, as in the parties' meet-and-confer discussions, does Broadcom offer any practical compromise proposal. Broadcom just stubbornly demands that Qualcomm review the files of all 120 custodians even if that cannot possibly or practically be done by December 19, 2008.

Broadcom's assertion that "Qualcomm has provided Broadcom with no reason" why it should not search the files of 120 custodians is utterly false. From the very beginning of the meet-and-confer process, Qualcomm repeatedly raised with Broadcom the complete impracticability of Broadcom's demand and proposed numerous alternatives—all of which were rejected out of hand by Broadcom. (*See, e.g.*, February 22, 2008, Barbur Letter at 4-5 (attached as Exhibit E to April 4, 2008, Barbur Letter to the Court); March 7, 2008, Barbur Letter at 2 (attached as Exhibit F to April 4, 2008, Barbur Letter to the Court).) Moreover, even if it were somehow possible to search the files of all 120 custodians in just a few months, the fact that Broadcom has added a few new claims does not entitle it to impose a crushing new discovery burden and expense (in excess of $10 million) that would dwarf the substantial production already completed in the first wave.

Unable to offer a meaningful argument on the merits, Broadcom instead opts to throw mud—pointing to discovery sanctions imposed on *other* lawyers in *other* litigation. Beyond showing the depths to which Broadcom will stoop in order to attempt to gain a perceived tactical advantage in this case, Broadcom's argument about the Southern District of California case illustrates the ways in which Broadcom is seeking to expand the issues in this case in order to impose an unjustified discovery burden on Qualcomm. As the quotes in Broadcom's letter make clear, Broadcom has already fully discovered, litigated and obtained relief for the alleged discovery abuses that occurred

before a different federal court, involving other outside counsel. Nonetheless, Broadcom devotes pages and pages of its Second Amended Complaint ("SAC") in this case to re-alleging the same issues, including all of the substantive disputes and the alleged discovery abuses that, as Broadcom's complaint and letter clearly show, have already been fully resolved—or are currently being actively litigated—in another federal court. (SAC ¶¶ 170-246.)

Qualcomm, of course, understands that some additional discovery is warranted in light of the additional issues raised in Broadcom's Second Amended Complaint and in light of the passage of time since the prior document production was completed. However, we submit that, especially in light of the procedural posture of this case, such additional discovery should be targeted and limited. It is for that reason that Qualcomm has proposed that the parties begin by identifying 30 priority custodians for each side and producing their documents. That would allow the parties to focus on the discovery that is really necessary and which can reasonably be completed under the current discovery deadlines. Once those documents are produced, Qualcomm would be willing (if time permits) to search the files of a reasonable number of additional custodians.

## 2.    Broadcom Request No. 47

In the portion of its letter relating to Request No. 47, Broadcom for the first time has sought to clarify what it is looking for in response (beyond what Qualcomm has already agreed to produce)—*i.e.*, planning documents relating to "the development, marketing, or licensing" of CDMA technologies, which essentially encompasses nearly every facet of Qualcomm's wireless technology and licensing business. Of course, Request 47 is not so limited on its face. Nor, contrary to the unsupported assertion in Broadcom's April 4 letter (at page 3), did Broadcom, during the parties' meet-and-confer sessions, ever propose modifying Request No. 47 to encompass just CDMA and the other standards included in Qualcomm's response. Even as recently as March 28—a week *after* the parties completed their meet-and-confer discussions and submitted their joint letter to the Court—Broadcom demanded that Qualcomm produce documents in response to Request No. 47 that related to "*any actual or potential* Mobile Wireless Standard or Video Compression Standard". (*See* March 28, 2008, Saxton Letter at 2 (attached as Exhibit I to April 4, 2008, Barbur Letter to the Court); emphasis added.) Qualcomm properly rejected that untenable position and Broadcom should not now be permitted to stake out some different position in order to try to justify bringing this "dispute" to the Court.

In any event, Broadcom's arguments relating to CDMA are specious and could not possibly justify imposing the additional burden of producing every planning document at Qualcomm related to CDMA. To begin with, Broadcom's suggestion that the Third Circuit found that CDMA-related evidence is relevant here is dead wrong. The Third Circuit actually *dismissed* Broadcom's only claim relating to CDMA, characterizing it as "highly attenuated". *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 319-20 (3d Cir. 2007) (affirming dismissal of Broadcom's CDMA monopoly

maintenance theory). The relevance arguments made in Broadcom's April 4 letter to the Court are even more "attenuated".

Moreover, contrary to the implication of Broadcom's letter, it is *not* the case that Qualcomm has refused to produce all "documents relating to CDMA technologies". For example, almost all of the discussion in Broadcom's letter relating to Request No. 47 is devoted to arguing about the supposed relevance of Qualcomm's "licensing practices for CDMA-based technologies". (*See* April 4, 2008, Selwyn Letter to the Court at 4.) But Qualcomm has *agreed* to produce CDMA licensing-related documents in response to other Broadcom document requests and, indeed, has already produced thousands of pages of CDMA-related licensing documents as part of the first wave of discovery.[1] For example, in its response to Request No. 46, Qualcomm has agreed to produce "non-privileged, responsive documents describing the terms under which defendant has been licensing, licensed and/or refused to license IPR declared with respect to" CDMA 2G and 3G standards. (*See* March 24, 2008, Qualcomm Document Requests/Responses Chart at 5 (attached hereto as Exhibit C).) Qualcomm has also agreed, in response to Request No. 41, to produce documents concerning its understanding of FRAND or RAND, regardless of whether they relate to CDMA or to any other standard. (*Id.* at 3; *see also* April 4, 2008, Selwyn Letter to the Court at 5 (arguing that Qualcomm's CDMA FRAND obligations "are similar to its obligations for WCDMA-related technology" and therefore "are relevant to showing what it understood its WCMDA-related [*sic*] obligations to be").) In short, Qualcomm has already agreed to produce the only CDMA-related documents that Broadcom credibly can argue are relevant to its claims. Broadcom's Request No. 47, however, goes much further and seeks (under Broadcom's recent clarification) all documents relating to any *plan* for Qualcomm's CDMA business. Such CDMA planning documents are simply too far afield to justify their additional burden.

Broadcom offers essentially three arguments for the production of CDMA planning (as opposed to licensing) documents: (1) Broadcom alleges that Qualcomm made threats relating to CDMA chipset supply and pricing in order to coerce others into

---

[1] Indeed, this same issue of whether Qualcomm's CDMA licensing-related documents would be produced was already raised and resolved in connection with the first wave of discovery in 2006. On January 3, 2006, Broadcom wrote to the Court suggesting that Qualcomm was withholding all CDMA-related documents. (*See* January 3, 2006, Kaiser Letter to the Court (attached hereto as Exhibit A).) On January 6, 2006, Qualcomm sent a letter to the Court noting that Broadcom was wrong and that Qualcomm had actually agreed to produce documents concerning its "licensing practices" for CDMA. (*See* January 6, 2006, Stark Letter to the Court at 3-4 (attached hereto as Exhibit B) (referring in particular to the fact that Qualcomm would produce CDMA licensing-related documents in response to Broadcom's Requests Nos. 3, 4 and 6).) Qualcomm thereafter produced thousands of pages of CDMA licensing-related documents in response to Broadcom's first wave document requests and will continue to produce additional documents responsive to those requests as part of the second wave.

buying its UMTS chipsets; (2) Broadcom argues that the purported "similarity" of Qualcomm's alleged CDMA conduct supports a finding of "similar exclusionary licensing practices" or "similar specific intent" for technologies upon which Broadcom brings its claims; and (3) Broadcom argues that comparing Qualcomm's CDMA license rates with its UMTS rates somehow relates to whether Qualcomm's UMTS rates were FRAND.[2]  (*See* April 4, 2008, Selwyn Letter to the Court at 4-5.)  Notably, none of those arguments purports to explain why *planning* as opposed to licensing documents are relevant.  Quite the opposite.  We think it is clear from the face of Broadcom's letter that Broadcom's focus is on the actual licensing terms Qualcomm has offered—rather than "plans"—such that the licensing-related documents Qualcomm has already agreed to produce will provide Broadcom with all of the information it reasonably needs relating to CDMA.

Broadcom's specific relevance arguments are specious and unpersuasive.  In addition to the fact that Broadcom's argument has nothing to do with "planning" as opposed to actual licensing practices, Broadcom's argument that Request No. 47 is justified by alleged threats of CDMA price or supply fluctuations used to secure UMTS business simply makes no sense.  Qualcomm has *agreed* to produce responsive documents relating to UMTS.  As a result, if a document indicates that Qualcomm was "using threats regarding 2G and 3G CDMA chipset supply and pricing to coerce cell phone manufacturers into purchasing Qualcomm's UMTS chipsets" (SAC ¶ 281), then it clearly will relate to UMTS as well, and thus will be produced.  Planning documents that have nothing to do with UMTS will, on the other hand, do nothing to support Broadcom's UMTS claims and therefore Qualcomm should not have to search for and produce such documents.

Moreover, Broadcom's argument that Qualcomm's pricing is somehow inappropriate merely because "its patents comprise a much smaller proportion of the UMTS standard than of the 3G CDMA standard" makes no sense.  The bare number of patents that relate to a standard has nothing to do with the value of that patent portfolio—as Broadcom and its Project Stockholm co-conspirators have argued in other cases.  *See, e.g.*, *Broadcom Corp. v. Qualcomm, Inc.*, No. 05 Civ. 467 (C.D. Cal.), Trial Tr. at 27 (May 11, 2007) (Broadcom expert Mark Wagner) (4.9% is the average license rate "for patents in the telecom industry" and is a "normal amount" for "one patent" or "1,000 patents") (attached hereto as Exhibit D); *see also* Expert Report of Erik Stasik § 43, *Nokia Corp. v. Vias De Telecommunicacion Vitelcom, S.L.*, Mercantile Court of Barcelona (Compl. filed Nov. 18, 2004) (Nokia expert and former Ericsson Director of GSM IP Licensing) (usual rates "are between 2.5% and 5%" and depend, *inter alia*, upon

---

[2] Broadcom also contends that there is an "extensive factual entanglement between CDMA and UMTS" that justifies producing additional CDMA-related documents.  (*See* April 4, 2008, Selwyn Letter to the Court at 5.)  Even if true, that is irrelevant.  A document that is "entangled" with both UMTS and CDMA will by definition be produced pursuant to Broadcom's UMTS requests.  And a document that is relevant *only* to CDMA is, by definition, not relevant to UMTS.

"the relative importance of the technologies covered [and] the strength of the individual patents") (attached hereto as Exhibit E).)

Broadcom's argument that Qualcomm should produce CDMA-related planning documents so that Broadcom can compare Qualcomm's CDMA-related conduct to its conduct relating to the standards actually at issue in this case is also untenable. Again, even beyond the fact that Qualcomm has *agreed* to produce documents concerning its actual "licensing practices for CDMA-based technologies"—which is all that Broadcom is arguing about—Broadcom cannot possibly justify having a whole separate discovery program and trial related to CDMA based upon the highly tenuous theory that a showing of "similar specific intent" and "similar exclusionary licensing practices" will, by analogy, support Broadcom's claims. (*See* April 4, 2008, Selwyn Letter to the Court at 4.) The questionable value of such an exercise would certainly be outweighed by the burden upon the parties and the Court.

In short, Broadcom has not come close to justifying discovery relating to Qualcomm's CDMA "planning" documents.

## 3.    Broadcom Request No. 68

As with Request No. 47, Broadcom uses its April 4 letter to attempt to clarify for the first time what it is seeking in response to Request No. 68 (beyond what Qualcomm has already agreed to produce)—namely, communications "suggesting to potential Broadcom customers that Broadcom's products infringe Qualcomm's patents". (*See* April 4, 2008, Selwyn Letter to the Court at 6.) Again, Broadcom's actual document request does not correspond to Broadcom's newfound reading of it. To the contrary, Request No. 68 on its face seeks all documents concerning *any* communication with Qualcomm's customers that mentions the word "Broadcom" in *any* context. During the parties' weeks of meet-and-confer discussions, Broadcom never proposed narrowing Request No. 68 along the lines suggested in its April 4 letter. To the contrary, as recently as March 28—a week after the meet-and-confer process supposedly ended—Broadcom still simply "objected" to Qualcomm's response to Request No. 68 and noted that this request was broader than Request No. 50. (*See* March 28, 2008, Letter from Saxton to Barbur at 4.)

In short: (a) Broadcom failed to mention Request No. 68 during the parties' weeks-long meet-and-confer process and offers no explanation for that failure; (b) when Broadcom finally raised this issue a week after the meet-and-confer process ended, Broadcom demanded that Qualcomm respond to Broadcom's overbroad request in its entirety as written and made no proposal to narrow the request; and (c) Broadcom now stakes out a different position, suggesting that only a small subset of the requested documents are actually relevant—while still making no concrete proposal actually to narrow Request No. 68. This sort of gamesmanship should not be countenanced.

**4.    Broadcom Request No. 80**

As discussed in our April 4 letter to the Court, Broadcom also never raised any issue with respect to Qualcomm's response to Request No. 80—*i.e.*, that Qualcomm would produce documents concerning its evaluation of its declared IPR concerning the standards at issue—until March 28, 2008, a week after the agreed deadline to complete the meet-and-confer process.  At that time, Broadcom wrote the following:

> "Broadcom objects *to the 'Clarification'* Qualcomm offers in response to Request 80.  Broadcom believes it has clearly communicated that Qualcomm's evaluation of *third party patent portfolios* is relevant, and does not agree that the parties will not produce documents related to any *third party's patent positions or portfolios.  Qualcomm's proposed response, as written, is acceptable, but the 'Clarification' is not acceptable*."

(*See* March 28, 2008, Saxton Letter at 4; emphasis added.)

As Qualcomm's April 4 letter to the Court described, the "Clarification" at issue was to the effect that Qualcomm would not produce documents relating to third party patent or patent portfolios—a "clarification" that was unnecessary (since the request only seeks documents relating to Qualcomm patents or patent portfolios) and was thus subsequently withdrawn.

However, whereas Broadcom's March 28 letter to Qualcomm said that Broadcom's only concern was the "Clarification" and that Qualcomm's response was otherwise "acceptable", Broadcom's April 4 letter to the Court takes a diametrically opposed position.  It takes issue only with Qualcomm's *response*—which had previously been deemed "acceptable"—and says nothing about the "Clarification".  With respect to the response, Broadcom argues that Qualcomm should be required to produce documents relating to Qualcomm patents that were never disclosed to any relevant SDO—a position Broadcom never articulated prior to submitting its April 4 letter to the Court.

This is again pure gamesmanship that should not be rewarded.  In any event, Broadcom's new argument makes no sense.  Broadcom's expressed concern is that limiting Qualcomm's response to declared patents might not be adequate because Qualcomm might have failed to declare certain patents early in a standard-setting process but then "'surface[d]'" those "purportedly standards-essential IPRs" after the fact.  (*See* April 4, 2008, Selwyn Letter to the Court at 7.)  But any such "surfaced" patents are already within the scope of what Qualcomm has agreed to produce in response to Request No. 80, which includes responsive documents relating to *every* "purportedly standards-essential IPR", no matter when such IPR was actually disclosed.

Thank you for your attention to this matter.

Respectfully,

Peter T. Barbur / KCH

Peter T. Barbur

The Honorable John J. Hughes
    United States District Court – District of New Jersey
        Clarkson S. Fisher Federal Building & U.S. Courthouse
            402 East State Street
                Trenton, NJ 08608


Copy w/encls. to counsel for all parties.

Exhibit A

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

2000 PENNSYLVANIA AVENUE, N.W.

WASHINGTON, D C  20006-1801

(202) 974-1500

FACSIMILE
(202) 974-1999

WWW.CLEARYGOTTLIEB.COM

<table>
<tr><td>NEW YORK</td><td>FRANKFURT</td></tr>
<tr><td>PARIS</td><td>COLOGNE</td></tr>
<tr><td>BRUSSELS</td><td>ROME</td></tr>
<tr><td></td><td>MILAN</td></tr>
<tr><td>LONDON</td><td>HONG KONG</td></tr>
<tr><td>MOSCOW</td><td>TOKYO</td></tr>
</table>

KENNETH L BACHMAN, JR
SARA D SCHOTLAND
JOHN S MAGNEY
MARK LEDDY
JOHN C MURPHY JR
DAVID M BECKER
GEORGE S CARY
JANET L WELLER
MITCHELL S DUPLER
LINDA J SOLDO
JOHN T BYAM
MATTHEW D SLATER
MICHAEL R LAZERWITZ
DAVID I GELFAND
MICHAEL A MAZZUCHI
ROBERT W COOK
MARK W NELSON
ROBIN M BUSH
DEREK M BUSH
PAUL D MARQUARDT
BRIAN BYRNE
RESIDENT PARTNERS

J  EUGENE MARANS
DANIEL B SILVER
RICHARD S C HINDS
SENIOR COUNSEL

W RICHARD BIDSTRUP
SCOTT N BENEDICT
KEVIN A GRIFFIN
STEVEN J KAISER
COUNSEL

JOYCE E MCCARTY
KAREN A KERR
SCOTT R GOODWIN
SENIOR ATTORNEYS

NEIL P ASHAR
MATTHEW I BACHRACK
JENNIFER S BENSON*
LEE F BERGER
MATTHEW J BERMAN
PATRICK R BOCK
PETER E BOIVIN
KIERSTEN L BOYCE
LEAH BRANNON
JOANNE C BYARS
JEREMY CALSYN
KATHERINE M CARROLL
SHAWN J CHEN
FARAH F COOK
SEAN D COREY
ALYSON J DAIS
LARRY C DEMBOWSKI
CARL EDMAN
ALINA D ELDRED*
DESMOND EPPEL*
NICLAS E ERICSSON
ERIC F GERDING
STEPHANIE HALLOUËT
ERIC H HILDENBRAND
MEGHAN A IMMLER
MEETU KAUL
DINAH R KNIGHT

BRENT LATTIN
JEFFREY LEASURE*
SARAH E LEWIS*
JOHN R LOATMAN
JELENA MADIR
LEE ANN A MCCALL
PATRICIA M MCDERMOTT
AMY E MCFARLANE
JOHN P MCGILL, JR
ADAM J MILLER
JANET P MORRIS
JENNIFER A MORRISSEY
ANNE NEWTON*
ANDREW K NIEGLER
JONATHAN L H NYGREN
CHINWE OKASI*
NICHOLAS R OLMSTED*
PAUL PASTERNAK
HELEN M PATAKI
SUZANNE B PERRY
SABEENA RAJPAL*
BROOK G ROSENBAUM
TAMARA D SCHMIDT
OMAR SERAGELDIN
ILYA SHAPIRO
GARY SILBER*
SARA STAINBACK
JOSHUA B STERLING
SARAH G TEN SIETHOFF
PETIA VRETENAROVA
DANA D C WESTFALL*
MARK J WOODWARD
ASSOCIATES

* ADMITTED ONLY TO A BAR OTHER THAN THAT OF THE DISTRICT OF COLUMBIA
WORKING UNDER THE SUPERVISION OF PRINCIPALS OF THE WASHINGTON OFFICE.

Writer's Direct Dial: (202) 974-1554
E-Mail: skaiser@cgsh.com

January 3, 2006

Honorable John J. Hughes
United States Magistrate Judge
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

> Re:  Broadcom Corporation v. Qualcomm Incorporated, Civil Action No. 05-
> 3350 (MLC)

Dear Judge Hughes:

Along with our colleagues at Boies, Schiller, and Flexner, we represent Broadcom Corporation in this matter. In accordance with Local Rule 37.1(a)(1) and Your Honor's order of September 22, 2005, we wish to draw the Your Honor's attention to certain discovery disputes that have arisen in this case and ask for specific relief as set forth herein.

DOJ Documents Relating to Flarion Transaction. Your Honor may recall that, at the initial status conference on September 22, 2005, the subject of Qualcomm's producing copies of its submissions to the Department of Justice relating to its proposed acquisition of Flarion arose. On October 6, Broadcom served a series of document requests on Qualcomm. Those requests included Request 28, which was addressed to those so-called "DOJ documents":

> Any and all DOCUMENTS submitted to the U.S. Department of
> Justice or Federal Trade Commission in connection with either
> agency's investigation of Qualcomm's proposed acquisition of
> Flarion, including a complete copy of any initial filing submitted to
> either agency under the Hart-Scott-Rodino Antitrust Improvements

Act of 1976, as amended, 15 U.S.C. 18a, including all documentary attachments; any and all other documents submitted to the U.S. Department of Justice or Federal Trade Commission, and any and all correspondence from or to either agency.

Qualcomm steadfastly has refused to provide such materials, even after having conceded at the initial status conference that doing so would present little or no incremental burden to Qualcomm. Qualcomm takes this position even though Broadcom has brought claims under federal and state laws challenging the transaction and even though documents are likely to be relevant to other aspects of Broadcom's case.

Qualcomm's stated reason for refusing to provide this discovery is that it would not produce such materials until after Qualcomm's pending motion to dismiss Broadcom's claims against the proposed transaction are resolved. The hearing on that motion is scheduled for February 6. In effect, Qualcomm has imposed a unilateral stay-of-discovery on those claims, which of course is improper under the Federal Rules. Additionally, as Broadcom has told Qualcomm on several occasions, even if Qualcomm's motion to dismiss Broadcom's Flarion-related claims were granted (which, Broadcom submits, is unlikely), the materials sought have independent relevance to Broadcom's other claims in the case.

Broadcom asks that Your Honor order Qualcomm to produce the documents responsive to Request 28, in the form in which they were provided to the DOJ, by January 15. There is simply no reason for further delay in producing this discrete and easily identifiable set of materials.

<u>Timing and Format of Qualcomm's Production</u>. To date Qualcomm has not produced a *single* document in response to Broadcom's now nearly three-months old document requests. It has stated that it will start producing documents in January but has not committed to a date by which it will complete its production.

With fact discovery set to close on December 31, 2006, it is imperative that the large majority of Qualcomm's initial document production be completed in the first quarter of 2006. Therefore, Broadcom asks Your Honor to order Qualcomm to begin its production no later than January 15, 2006 (beginning with the aforementioned DOJ documents in response to Request 28) and, most importantly, to complete it by March 31, 2006. That schedule would give Qualcomm ample time to comply with Broadcom's requests.

Relatedly, Qualcomm has refused to agree to a document production format, but instead has promised (but not actually executed on) obtaining estimates of the costs of complying with Broadcom's proposal.[1] Other than the cost issue, Qualcomm has indicated that it found

---

[1] This promise was made more than a month ago. At the time Broadcom agreed that any production made while the parties were sorting out the cost issue could be under an alternative that Qualcomm had proposed. As noted, to date there have been no productions from

Broadcom's proposal reasonable and, in the several months since it was made, has identified no technical difficulties with complying with it.[2]

Broadcom further asks Your Honor to order that production to be made in the form specified in Broadcom's proposal (if Qualcomm prefers, it can produce the DOJ documents in the form in which they were produced to the DOJ).

Time Scope of Qualcomm's Search. Qualcomm refuses to produce any documents from before June 1, 2003, "except for documents relating to the adopting of the WCDMA standard." Given the conduct in the complaint, particularly Qualcomm's licensing and chipset sales practices and internal deliberations relating to those practices, well predate that time, Qualcomm's unilateral cutoff is unreasonable. Broadcom therefore asks Your Honor to order Qualcomm to conduct a complete search of its files for responsive documents, including all documents created on or after January 1, 1996.

Subject-Matter Scope of Production. Qualcomm likewise refuses to produce certain materials related to CDMA and future mobile wireless technologies, particularly

---

Qualcomm. Broadcom certainly did not expect Qualcomm to take more than a month to engage on the cost issue when it made that interim agreement.

[2] Broadcom's proposed protocol for producing documents is as follows:

> All documents produced shall be numbered consecutively, without overlap, using a consistent numbering scheme. Electronic files shall be produced as .tif images, with standard Summation data files that reflect the custodian of the document and the beginning and ending page number, and, to the extent available in the metadata of the file: the date of the document (create date), the author and any recipients of the document, and any subject line, and the beginning and ending page number, and shall include the document's extracted text in a separate text file, all per standard Summation protocols. Paper files shall be produced as .tif images, with standard Summation data files that reflect the custodian of the document and beginning and ending page number, and shall include separate OCR text files. Documents can be produced in black and white, but the producing party will provide a color version of any document on request where the color version is reasonably needed to interpret or understand the document. Likewise, the producing party will provide copies of any electronic documents in native format, as they reside on the producing party's electronic system (with all associated meta-data or other internally stored information) on request.

documents relating to Qualcomm's participation in the standard-setting process as to these technologies or regarding its licensing practices in relation to these technologies. Qualcomm is simply incorrect in asserting that such materials are not relevant to any claim or defense. Broadcom asserts claims relating to CDMA and future generations technologies, which include allegations that Qualcomm has abused its CDMA dominance in licensing its patents and is seeking to obtain further monopolies in future generations technology. Broadcom also asserts that Qualcomm has obtained and maintains monopolies in CDMA chipsets through this conduct, which provides evidence of what will happen in WCDMA chipsets if Qualcomm's like conduct continues unchecked. The documents are likewise relevant to the stranglehold that Qualcomm has over the handset industry, which it wields through its monopoly power in CDMA and in WCDMA.

Qualcomm's refusing to provide the requested materials amounts to another self-imposed discovery stay of materials that are directly relevant to Broadcom's claims. This is all the more improper in light of Qualcomm's agreement, in exchange for extensions to the date in which its response to Broadcom's complaint was due, not to seek a discovery stay as to those claims. Broadcom therefore asks Your Honor to order Qualcomm to produce the requested materials as part of its broader production of documents.

Broadcom appreciates Your Honor's attention to these issues.

Respectfully,

Steven J. Kaiser
Counsel for Broadcom Corporation

cc:  Evan Chesler, Esq.
     Counsel for Qualcomm Incorporated

Exhibit B

# CRAVATH, SWAINE & MOORE LLP

**WORLDWIDE PLAZA**
**825 EIGHTH AVENUE**
**NEW YORK, NY 10019-7475**

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

THOMAS R. BROME
ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN W. WHITE
JOHN E. BEERBOWER
EVAN R. CHESLER
PATRICIA GEOGHEGAN
D. COLLIER KIRKHAM
MICHAEL L. SCHLER
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
NEIL P. WESTREICH
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER

STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON
JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
WILLIAM B. BRANNAN
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
JOHN T. GAFFNEY
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
ANDREW W. NEEDHAM

STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III
WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ

GEORGE A. STEPHANAKIS
DARIN P. McATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN
DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
JOEL F. HEROLD
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL

SPECIAL COUNSEL
SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III
THOMAS D. BARR

OF COUNSEL
ROBERT ROSENMAN
CHRISTINE BESHAR

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1564

January 6, 2006

<u>Broadcom Corp. v. QUALCOMM Inc., No. 05-3350 (MLC)</u>

Dear Judge Hughes:

We write in response to Broadcom's letter of January 3, 2006, raising certain discovery disputes. For the Court's convenience, we will use the same headings used by Broadcom in its letter. For the reasons set forth below, the Court should deny all of Broadcom's requests for relief.

## DOJ Documents Relating to Flarion Transaction

Broadcom mischaracterizes QUALCOMM's position regarding Broadcom Request 28. As set forth in QUALCOMM's brief in support of its motion to dismiss, Broadcom does not have standing to bring its claim challenging the Flarion transaction, because Broadcom is not a participant in the alleged relevant market.[1] QUALCOMM has therefore appropriately objected to the production of documents responsive to Request 28 that are relevant only to the challenge to the transaction. QUALCOMM has agreed to produce documents responsive to Request 28 that are relevant to Broadcom's other

---

[1] Broadcom defines the relevant markets for this claim as the markets for "technologies contending to serve essential functions for B3G [and 4G] wireless standards and systems". (Complaint ¶ 60.) Read literally, these alleged markets contemplate customers that are standard-setting organizations. Clearly, Broadcom is not such an organization and, therefore, is not a "customer" in these alleged markets. Moreover, Broadcom does not allege that it owns "technologies" that are "contending" in these markets. Thus, Broadcom is not a "competitor" in these alleged markets. In any event, it is the black-letter law of this Circuit that a competitor does not have standing to bring an action under Section 7 of the Clayton Act. See <u>Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co.</u>, 826 F.2d 1235, 1241-42 (3d Cir. 1987).

claims. Accordingly, the Court should deny Broadcom's request for an order compelling QUALCOMM to produce all DOJ documents by Sunday, January 15.

Alternatively, the Court should permit QUALCOMM to move to stay discovery on the Flarion-related claim. As the Court may recall, QUALCOMM explicitly stated at the September 22, 2005 conference that it reserved the right to seek such a stay. That reservation is reflected in the Court's Order of October 25, 2005. Rather than engage in unnecessary motion practice, QUALCOMM told Broadcom that QUALCOMM would produce Flarion-related documents in the event that QUALCOMM's motion to dismiss is denied. That motion will be fully briefed on January 30. It would be wasteful and inefficient for the parties to file separate briefs regarding a motion to stay when the relevant issue (Broadcom's standing to sue) is already before the Court on QUALCOMM's motion to dismiss. Nevertheless, if the Court believes that QUALCOMM should file a formal motion on this issue, it respectfully requests the opportunity to do so.

**Timing and Format of QUALCOMM's Production**

QUALCOMM will commence producing documents on or before January 20, 2005. QUALCOMM will process and produce documents expeditiously.

The date by which QUALCOMM's document production will be complete depends on Broadcom's requests. Those requests as written are sweeping in scope. Even as narrowed by QUALCOMM's objections and the parties' agreements, Broadcom's requests will require the processing of millions of pages. It is patently unreasonable for Broadcom to serve such requests and then seek an order requiring production to be completed by the end of March. If Broadcom seeks an early end to the production of documents it should narrow its requests.

With respect to the format of production, QUALCOMM has proposed the following:

> All documents produced shall be numbered consecutively, without overlap, using a consistent numbering scheme. All documents, whenever practicable, shall be produced in Group 4 single page tiff format with a load file indicating the beginning and ending image number. Documents shall be produced in black and white. If a color copy or a copy in the native format of an electronic document is reasonably needed to interpret or understand a document, the producing party will provide a color copy or a copy in the native format, as it resides on the producing party's electronic system (with all associated meta-data or other internally stored information) on request.

Broadcom has agreed to a similar form of production in other ongoing litigation with QUALCOMM, and has agreed to accept production in this format in this case pending

further agreement. Accordingly, if the Court decides to order any particular form of production, it should order QUALCOMM's proposal. Broadcom's proposal is unduly burdensome to QUALCOMM because production in the manner suggested by Broadcom (i.e., with additional metadata in Summation format) is more costly and we anticipate that QUALCOMM will produce many more documents than Broadcom. Notwithstanding the foregoing, QUALCOMM believes that the parties should be able to resolve this issue between themselves.

### Time Scope of Qualcomm's Search

The primary issues in this case are (1) whether QUALCOMM obtained unlawful "monopolies" in so-called "WCDMA technology markets" by giving commitments to standards-setting organizations that it would license its patents on fair, reasonable and non-discriminatory terms; and (2) whether QUALCOMM's broad patent-licensing program and discounting of its UMTS chips to make them more attractive to customers in a highly-competitive environment is part of an "attempt to monopolize" the alleged "UMTS chipset market". With respect to its attempted monopolization claim, Broadcom also alleges that QUALCOMM is leveraging alleged CDMA monopolies to obtain UMTS chipset sales.

As to issue (1), QUALCOMM has agreed to produce responsive documents relating to the adoption of the UMTS/WCDMA standard, regardless of age.

As to issue (2), Broadcom's complaint does not allege any relevant conduct that occurred before the latter half of 2003. As the complaint states, UMTS chip sales began in 2003 with only 3 million UMTS phones sold that year, as compared to 22 million sold in 2004. (Complaint ¶ 112.) Thus, none of QUALCOMM's challenged business practices with respect to UMTS chips took place before 2003. As to CDMA-related conduct, Broadcom makes a series of allegations regarding supply shortages that began in late 2003 and continued through 2004. (E.g., Complaint ¶¶ 71-73.) Relevant documents were therefore created after July 1, 2003. Thus, Broadcom's statement that the "conduct in the complaint . . . well predate[s] that time" is wrong. Indeed, QUALCOMM has repeatedly asked Broadcom to identify the relevant conduct in the complaint that it believes took place before July 1, 2003 and Broadcom has been unable or unwilling to do so. Under such circumstances, the Court should deny Broadcom's request for an order requiring QUALCOMM to search through and produce documents created before July 1, 2003.

### Subject-Matter Scope of Production

Broadcom mischaracterizes QUALCOMM's position with respect to "materials related to CDMA and future mobile wireless technologies". Where such documents are relevant, QUALCOMM has stated that it will produce responsive documents located after a reasonable search, subject to QUALCOMM's other objections. (E.g., BC Reqs. 15-20.) Where such documents are not relevant to any claim or defense of any party, or relevant only to the Flarion-related claim that Broadcom lacks standing to bring, QUALCOMM has appropriately objected to Broadcom's requests.

4

With respect to documents regarding "licensing practices", Broadcom's assertion that QUALCOMM has refused to produce documents is simply false. Broadcom has stated that it will produce licensing documents responsive to Broadcom's Requests 3, 4 and 6 without regard to any particular technology.

As to CDMA-related documents regarding conduct that Broadcom claims is "like" conduct QUALCOMM is engaging in with respect to WCDMA, QUALCOMM has similarly stated that it will produce relevant documents. Where Broadcom has allegations of "like" conduct in its complaint (for example, allegations regarding chipset supply and rebates), QUALCOMM has stated that it will produce responsive documents, including CDMA documents, located after a reasonable search, subject to QUALCOMM's other objections. Where Broadcom has not made such allegations, CDMA documents are irrelevant. For example, there is no allegation (nor could there be, consistent with Rule 11), that QUALCOMM defrauded SDOs or did not meet FRAND commitments with respect to CDMA.

Broadcom's allegations in the complaint regarding standards-setting conduct related to "future" technologies are specifically directed at the alleged "B3G" and "4G" markets (see Complaint ¶¶ 125-27), and, thus, are related to the Flarion-related claims that Broadcom lacks standing to bring. Accordingly, as with the DOJ documents, QUALCOMM has stated that it will produce such documents in the event that its motion to dismiss the Flarion claim is denied.

Respectfully,

*Rich J. Stark /z*

Richard J. Stark

The Honorable John J. Hughes
    United States District Court – District of New Jersey
        Clarkson S. Fisher Federal Building & U.S. Courthouse
            402 East State Street
                Trenton, NJ 08608

BY FAX AND FEDERAL EXPRESS

Copies to:

Steven J. Kaiser, Esq.
    Cleary Gottlieb Steen & Hamilton LLP
        2000 Pennsylvania Avenue, N.W
            Washington, DC 20006

5

David S. Stone, Esq.
Boies, Schiller & Flexner LLP
150 John F. Kennedy Parkway
Short Hills, NJ 07078

BY FAX

Exhibit C

Broadcom v. Qualcomm, No. 05-3350 (MLC) (D.N.J.)
Document Requests/Responses Chart[1]
March 24, 2008

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 34**:<br>All documents and things concerning the operations, practices, procedures, or policies of any SDO regarding disclosure or licensing of IPR for a Mobile Wireless Standard or a Video Compression Standard, including but not limited to essential patents and patent applications. | **No. 34**:  O, D, NRC, B, P<br><br>QC will produce non-privileged, responsive documents concerning ETSI, ISO/IEC, ITU, VCEG, MPEG, JVT and IEEE. | No clarification necessary. |
| **Request No. 35**:<br>All documents and things concerning the evaluation, adoption, or implementation of any actual or prospective Mobile Wireless Standard or Video Compression Standard by any SDO or any actual or potential member of any SDO, including but not limited to Qualcomm's communications with any SDO, any committee, working group, or subdivision of any SDO, or any actual or potential officer, agent or member of any SDO relating thereto. | **No. 35**:  O, D, B, NRC, V, A<br><br>QC will produce non-privileged, responsive documents concerning the adoption of the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups.<br><br>QC will produce non-privileged, responsive documents concerning the evaluation, adoption, or implementation by ETSI, JVT or IEEE of the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards.  (QC 3/20 Ltr.) |
| **Request No. 36**:<br>All documents and things concerning Qualcomm's identification, disclosure, or notification to any SDO of any of its IPR for a Mobile Wireless Standard or a Video Compression Standard. | **No. 36**:  O, B, NRC, P<br><br>QC will produce non-privileged, responsive documents. | No clarification necessary. |

---

[1] Qualcomm reserves the right to supplement or correct this chart as necessary.

O = overbroad; B = unduly burdensome; NR = not relevant; NRC = not reasonably calculated to lead to the discovery of admissible evidence; D = duplicative; V = vague; A = ambiguous; PR = privilege; P = calls for the production of publicly available information; U = unintelligible.

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 37:** All documents and things concerning Qualcomm's identification, disclosure, or notification to any SDO of any IPR claimed by Qualcomm at any time to be essential or potentially essential for a Mobile Wireless Standard or a Video Compression Standard. | **No. 37:** O, D, B, NRC, V, A, P<br><br>QC will produce non-privileged, responsive documents. | No clarification necessary. |
| **Request No. 38:** All documents and things concerning any withdrawal or retraction by Qualcomm of any identification, disclosure, notification, or statement to any SDO of any IPR previously claimed by Qualcomm to be essential or potentially essential for a Mobile Wireless Standard or a Video Compression Standard. | **No. 38:** O, B, NRC, V, A | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups.<br><br>QC will produce non-privileged, responsive documents concerning any withdrawal or retraction by Qualcomm of any declaration of any IPR to ETSI, JVT or IEEE relating to the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. (QC 3/20 Ltr.) |
| **Request No. 39:** All documents and things concerning any claims or statements by Qualcomm in any litigation or judicial proceeding that any of its IPR is essential for a Mobile Wireless Standard or a Video Compression Standard. | **No. 39:** O, B, NRC, P<br><br>QC will produce non-privileged, responsive documents sufficient to show any such claims or statements. | No clarification necessary. |
| **Request No. 40:** All documents and things concerning any claims or statements by Qualcomm in any litigation or judicial proceeding that any of its IPR is not essential for a Mobile Wireless Standard or a Video Compression Standard. | **No. 40:** O, B, NRC, P<br><br>QC will produce non-privileged, responsive documents sufficient to show any such claims or statements. | No clarification necessary. |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 41**:<br>All documents and things concerning Qualcomm's licenses, offers to license, requests that any other person or company obtain a license, proposals to license, licensing terms, licensing practices or licensing policies for any patent or patents that Qualcomm claims to be essential for any actual or prospective Mobile Wireless Standard or Video Compression Standard, including but not limited to all proposed or executed license agreements and all documents concerning Qualcomm's commitments to, positions, policies, procedures, or practices with respect to, or interpretation of the meaning of, licensing on reasonable and non-discriminatory ("RAND") terms or fair, reasonable, and non-discriminatory ("FRAND") terms. | **No. 41**: O, D, B, NRC<br><br>QC will produce non-privileged, responsive executed licenses and documents. | QC will produce non-privileged, responsive executed licenses and documents (i) concerning the negotiation of licenses, whether or not executed, relating to IPR that defendant has declared to TIA, ETSI, JVT or any IEEE 802 working group relating to the GSM, GPRS, EDGE, UMTS, H.264, IEEE 802, IS-95, IS-95A, IS-95B, CDMA2000 1xRTT, CDMA2000 1xEV-DO and CDMA2000 1xEV-DV standards; and (ii) concerning defendant's understanding of FRAND or RAND.<br><br>QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |
| **Request No. 42**:<br>All documents and things concerning licenses, offers to license, requests that Qualcomm obtain a license, proposals for licenses, terms of licenses, licensing practices, or licensing policies for any person's or company's (other than Qualcomm's) patent or patents reading on or relating to any Mobile Wireless Standard or Video Compression Standard. | **No. 42**: O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups.<br><br>QC agrees to produce non-privileged, responsive documents relating to license negotiations for patents declared with respect to the IS-95, IS-95A, IS-95B, CDMA2000 1xRTT, CDMA2000 1xEV-DO and CDMA2000 1xEV-DV, GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. (QC 3/20 Ltr.) |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 43**:<br>All documents and things concerning the ability, or lack of ability, of any mobile wireless telecommunications carrier or carriers or manufacturers of mobile wireless telecommunications devices, whether specifically or generally, to switch from (or the costs, time, or other resources involved in switching from) one mobile wireless telecommunications technology, system, or network to another, including without limitation switching from CDMA-based systems or networks to non-CDMA based systems or networks. | **No. 43**:  O, D, B, NRC, V, A<br><br>QC will produce non-privileged, responsive documents. | No clarification necessary. |
| **Request No. 44**:<br>All documents and things concerning the ability, or lack of ability, of any manufacturers of video compression, decompression, encoding, or decoding devices, whether specifically or generally, to switch from (or the costs, time, or other resources involved in switching from) one video compression technology, system, or network to another, including without limitation switching from H.264-based systems to non-H.264 based systems. | **No. 44**:  O, B, NRC, V, A<br><br>QC will produce non-privileged, responsive documents switching from video compression technology compliant with the H.264 standard. | No clarification necessary. |
| **Request No. 45**:<br>All documents and things concerning, evaluating, analyzing, or discussing the prospects of any technologies for adoption as any essential element of any actual or prospective Mobile Wireless Standard or Video Compression Standard. | **No. 45**:  O, B, NRC, V, A<br><br>QC will produce non-privileged, responsive documents concerning any technology that QC is aware was considered for adoption in the GSM, GPRS, EDGE, UMTS, H.264 or IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 46**:<br>All documents and things concerning any Qualcomm position, policy, or practice regarding the licensing of any mobile wireless telecommunications device manufacturer or carrier or any video compression device manufacturer, whether generally or specifically, that are or were considering or who are or were licensing technology from Qualcomm for use in Devices or Equipment compliant with any Mobile Wireless Standard or Video Compression Standard. | **No. 46**: O, B, NRC<br><br>QC will produce non-privileged, responsive documents describing the terms under which defendant has been licensing, licensed and/or refused to license IPR related to the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups.<br><br>Qualcomm will produce non-privileged, responsive documents describing the terms under which defendant has been licensing, licensed and/or refused to license IPR declared with respect to the IS-95, IS-95A, IS-95B, CDMA2000 1xRTT, CDMA2000 1xEV-DO and CDMA2000 1xEV-DV, GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards.  (QC 3/20 Ltr.) |
| **Request No. 47**:<br>All documents and things concerning any Qualcomm plan, or the plan of any other person or company, whether adopted or not, for the development, marketing, or licensing of technology for any actual or potential Mobile Wireless Standard or Video Compression Standard, including without limitation, business plans, short term and long range strategies and objectives, budgets and financial projections, research and development plans, technology licensing plans, and presentations to management committees, executive committees, and boards of directors. | **No. 47**: O, D, B, NRC | Qualcomm will produce any Qualcomm plan or draft thereof, or the plan of any other person or company or any draft thereof, whether adopted or not, for the development, marketing, or licensing of IPR declared with respect to the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards, of the following nature:  business plans, short term and long range strategies and objectives, budgets and financial projections, research and development plans, technology licensing plans, and presentations to management committees, executive committees, and boards of directors.  (BC 3/20 Ltr.) |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 48**:<br>As to any actual or potential litigation or arbitration by or against Qualcomm (including the Litigations) in which any party other than Broadcom asserted claims or counterclaims under any federal or state antitrust or unfair competition laws, or claims, defenses or counterclaims based on improper conduct by Qualcomm before any SDO, any and all documents produced by Qualcomm, all requests for documents received, all indexes of documents produced, all interrogatory requests and responses sent or received, and all transcripts of any deposition, hearing, or other recorded proceedings. | **No. 48**: O, D, B, NRC, PR, P | Qualcomm will produce as follows: As to any actual or potential litigation or arbitration by or against Qualcomm (including the Litigations) in which any party other than Broadcom asserted claims or counterclaims under any federal or state antitrust or unfair competition laws, or claims, defenses or counterclaims based on improper conduct by Qualcomm before any SDO, any and all documents that Qualcomm produced in that action that would be responsive to any Request for Production served by Broadcom in the instant action, as well as all indexes of documents produced, all interrogatory requests and responses sent or received, and all transcripts of any deposition, hearing, or other recorded proceedings. (BC 3/20 Ltr.) |
| **Request No. 49**:<br>All documents and things produced, whether formally or informally, or voluntarily or by compulsion, to any private party, foreign government, administrative agency, or regulatory entity, in connection with any investigation into potential antitrust or competition-related violations, including but not limited to investigations by the European Commission, the Korea Fair Trade Commission, and the Japanese Fair Trade Commission into complaints relating to Qualcomm's licensing and sales practices. | **No. 49**: O, D, B, NRC, P, PR | Qualcomm will produce all documents and things that would be responsive to any Request for Production served by Broadcom in the instant action that Qualcomm produced, whether formally or informally, or voluntarily or by compulsion, to any private party, foreign government, administrative agency, or regulatory entity, in connection with any investigation into potential antitrust or competition-related violations, including but not limited to investigations by the European Commission, the Korea Fair Trade Commission, and the Japanese Fair Trade Commission into complaints relating to Qualcomm's licensing and sales practices. (BC 3/20 Ltr.) |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 50**:<br>All documents and things concerning any communications by or between Qualcomm and any person or company about any dispute or disputes between Broadcom and Qualcomm. | **No. 50**: O, D, B, NRC, PR<br><br>QC will produce non-privileged, responsive documents concerning communications between defendant and third parties not employed or retained by defendant relating to the use by QC or BC of either party's patented technology and the terms under which either party would license technology concerning the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |
| **Request No. 51**:<br>All documents and things concerning or supporting any Qualcomm defense or defenses in this action. | **No. 51**: D<br><br>QC will produce non-privileged documents responsive to this Request. | No clarification necessary. |
| **Request No. 52**:<br>All documents concerning any discussion at any meeting of Qualcomm concerning Broadcom, any dispute or disputes between Broadcom and Qualcomm, other Litigations, or this action. | **No. 52**: O, B, D<br><br>QC will produce non-privileged, responsive documents concerning plaintiff relating to the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |
| **Request No. 53**:<br>All documents and things concerning any meetings of the Qualcomm Board of Directors, including but not limited to any Board packages, concerning: Broadcom, any dispute or disputes between Broadcom and Qualcomm, other Litigations, or this action. | **No. 53**: D<br><br>QC will produce non-privileged, responsive documents concerning plaintiff relating to the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |
| **Request No. 54**:<br>Documents sufficient to identify and describe in detail all steps taken by Qualcomm to retain, locate, and produce documents in this action or other Litigation. | **No. 54**: O, NRC, B, PR | Unless narrowed by BC, no response is necessary. |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 55**:<br>All documents and things concerning any Qualcomm document preservation or document destruction policies or practices in this Action and the Litigations, or the enforcement or violation of any such policies or practices. | **No. 55**:  O, D, B, NRC, PR<br><br>QC will produce non-privileged, responsive documents sufficient to show defendant's document preservation or document destruction policies and practices. | Qualcomm will produce non-privileged documents concerning its document preservation and document destruction policies and its efforts to preserve documents in connection with this Action. |
| **Request No. 56**:<br>All documents and things given to or received from a SDO concerning any actual or potential Mobile Wireless Standard or Video Compression Standard, including but not limited to communications, proposals, presentations, agreements, commitments, or contracts to or from such bodies. | **No. 56**:  O, B, NRC<br><br>QC will produce non-privileged, responsive documents given to or received form ETSI, JVT, and IEEE 802 working groups concerning the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups.<br><br>QC will produce non-privileged, responsive documents given to or received from ETSI, JVT and the IEEE 802 working groups concerning the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards.  QC will also produce non-privileged, responsive documents (a) given to or received from VCEG, ITU, MPEG and ISO/IEC concerning the H.264 standard and (b) given to or received from IEEE relating to the 802.20 standard.  (QC 3/20 Ltr.) |
| **Request No. 57**:<br>All documents and things concerning any Qualcomm membership, participation, interaction, and/or involvement in setting any standard relating to the processing of digital video signals.  This request also covers all proposed or potential standards, whether or not actually adopted.  As used herein, "processing of digital video signals" includes but is not limited to H.264, H.263, H.26L, MPEG 2 and MPEG 4. | **No. 57**:  O, B, NRC<br><br>QC will produce non-privileged, responsive documents concerning defendant's membership, interaction and/or involvement in the JVT in connection with the H.264 standard. | No clarification necessary. |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 58**:<br>All documents and things concerning any Qualcomm membership, participation, interaction, and/or involvement in setting any standard relating to mobile wireless communications. This request also covers all proposed or potential standards, whether or not actually adopted. | **No. 58**: O, B, NRC<br><br>QC will produce non-privileged, responsive documents concerning defendant's membership, interaction and/or involvement in ETSI or IEEE 802 working groups in connection with the GSM, GPRS, EDGE, UMTS and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |
| **Request No. 59**:<br>All documents and things concerning, constituting, referring to, or evidencing any submission relating to video compression by Qualcomm to the JVT, the ISO, the IEC, MPEG, VCEG, and/or the ITU-T. | **No. 59**: O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents constituting, referring to or evidencing any submission by QC to JVT relating to the H.264 standard. | No clarification necessary. |
| **Request No. 60**:<br>All documents and things concerning, constituting, referring to, or evidencing any submission by Qualcomm relating to mobile wireless communications to ETSI. | **No. 60**: O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents constituting, referring to or evidencing any submission to ETSI relating to the GSM, GPRS, EDGE and UMTS standards. | No clarification necessary. |
| **Request No. 61**:<br>All documents and things concerning, constituting, referring to, or evidencing any submission by Qualcomm to the 802.20 Working Group. | **No. 61**: O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents constituting, referring to or evidencing any submission by QC to the 802.20 Working Group. | No clarification necessary. |
| **Request No. 62**:<br>All documents and things concerning, constituting, referring to, or evidencing any communications by or between Qualcomm and Jerry Upton. | **No. 62**:<br><br>QC will produce non-privileged, responsive documents. | No clarification necessary. |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 63**: All documents and things concerning, constituting, referring to, or evidencing any communications by or between Qualcomm and Jordan Isailovic. | **No. 63**: QC will produce non-privileged, responsive documents. | No clarification necessary. |
| **Request No. 64**: All documents and things concerning, constituting, referring to, or evidencing IPR disclosures made by or for Qualcomm to any SDO relating to any actual or prospective Mobile Wireless Standard or Video Compression Standard. | **No. 64**: O, D, B, NRC, V, A QC will produce non-privileged, responsive documents. | No clarification necessary. |
| **Request No. 65**: All documents and things concerning any existing or contemplated position, plan, policy, or practice of Qualcomm relating to IPR disclosures to any SDO relating to any actual or prospective Mobile Wireless Standard or any actual or prospective Video Compression Standard. | **No. 65**: V, A, O, B, NRC QC will produce non-privileged, responsive documents. | No clarification necessary. |
| **Request No. 66**: All documents and things concerning, constituting, referring to or evidencing any participation by Qualcomm in the proceedings of any SDO relating to any actual or prospective Mobile Wireless Standard or Video Compression Standard. | **No. 66**: O, D, B, NRC, V, A QC will produce non-privileged, responsive documents constituting, referring to or evidencing participation by QC in the proceedings of ETSI, JVT and any IEEE 802 working group concerning the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |
| **Request No. 67**: All documents and things concerning, constituting, referring to, or evidencing any participation by Qualcomm in the 802.20 Working Group. | **No. 67**: D QC will produce non-privileged, responsive documents. | No clarification necessary. |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 68**:<br>All documents and things related to or comprising communications between Qualcomm and its customers or prospective customers and/or its licensees or prospective licensees regarding Broadcom. | **No. 68**: O, D, B, NRC | Beyond QC's response to Request No. 50, no further response is required. |
| **Request No. 69**:<br>All documents and things served, submitted, filed, or provided by Qualcomm or on behalf of Qualcomm to any SDO relating to any actual or prospective Mobile Wireless Standard or Video Compression Standard. | **No. 69**: O, D, B, NRC, V, A<br><br>QC will produce non-privileged, responsive documents concerning QC's submissions to ETSI, JVT and any IEEE 802 working group concerning the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |
| **Request No. 70**:<br>All documents and things concerning any Qualcomm membership, participation, interaction, and/or involvement in any SDO relating to any actual or prospective Mobile Wireless Standard or Video Compression Standard. | **No. 70**: O, D, B, NRC, V, A<br><br>QC will produce non-privileged, responsive documents relating to QC's participation in ETSI, JVT and any IEEE 802 working group concerning the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |
| **Request No. 71**:<br>All documents and things concerning actual and potential competition between Qualcomm and any person or company in the design or sale of chips or chipsets for use in mobile wireless communications devices, including but not limited to devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. | **No. 71**: O, D, B, NRC | Qualcomm will produce non-privileged, responsive documents and things stating, discussing or analyzing actual and potential competition between Qualcomm and any person or company in the design or sale of chips or chipsets for use in mobile wireless communications devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. (BC 3/20 Ltr.) |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 72**:<br>All documents and things concerning actual and potential competition between Qualcomm and any person or company in actual or potential market shares, including but not limited to market shares of devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. | **No. 72**: V, A, O, D, B | Qualcomm will produce non-privileged, responsive documents and things stating, discussing or analyzing past, current, or future market shares of Qualcomm and any person or company in any actual or potential market for devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. (BC 3/20 Ltr.) |
| **Request No. 73**:<br>All documents and things concerning actual and potential competition between Qualcomm and any person or company regarding the competitive positions of Qualcomm or any of its competitors, relative strengths and weaknesses of Qualcomm or other companies, analysis of product, technology, or market standardization plans of Qualcomm or any of its actual or potential competitors, including but not limited to competition in the market for devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. | **No. 73**: V, A, U, O, D, B | Qualcomm will produce non-privileged, responsive documents and things stating, discussing or analyzing the competitive positions of Qualcomm or any of its competitors, relative strengths and weaknesses of Qualcomm or other companies, analysis of product, technology, or market standardization plans of Qualcomm or any of its actual or potential competitors, in any actual or potential market for devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. (BC 3/20 Ltr.) |
| **Request No. 74**:<br>All documents and things concerning actual and potential competition between Qualcomm and any person or company regarding supply and demand conditions (including capacity constraints), including but not limited to supply and demand of devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. | **No. 74**: V, A, U, O, D, B, NRC | Qualcomm will produce non-privileged, responsive documents and things stating, discussing or analyzing supply and demand conditions (including capacity constraints on Qualcomm or any of its actual or potential competitors), for devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. (BC 3/20 Ltr.) |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 75**:<br>All documents and things concerning actual and potential competition between Qualcomm and any person or company regarding numbers of customers of Qualcomm or its competitors, including but not limited to actual and potential customers of devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. | **No. 75**: V, A, O, D, B, NRC | Qualcomm will produce non-privileged, responsive documents and things stating, discussing or analyzing numbers and identifies customers of Qualcomm or any of its competitors in any actual or potential market for devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard.  (BC 3/20 Ltr.) |
| **Request No. 76**:<br>All documents and things concerning actual and potential competition between Qualcomm and any person or company regarding actual or potential revenue of Qualcomm or its competitors, including but not limited to revenue generated by devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. | **No. 76**: V, A, U, O, D, B, NRC | Qualcomm will produce non-privileged, responsive documents and things stating, discussing or analyzing actual or potential revenue of Qualcomm or any of its competitors generated by devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. (BC 3/20 Ltr.) |
| **Request No. 77**:<br>All documents and things concerning actual and potential competition between Qualcomm and any person or company regarding actual or potential losses of customers of Qualcomm or its competitors, including but not limited to actual and potential lost customers of devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. | **No. 77**: V, A, U, O, D, B, NRC | Qualcomm will produce non-privileged, responsive documents and things stating, discussing or analyzing actual or potential losses of customers of Qualcomm or its competitors, in any actual or potenial market for devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. (BC 3/20 Ltr.) |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 78**:<br>All documents and things concerning actual and potential competition between Qualcomm and any person or company regarding analysis of actual or potential competition relating to improvements or innovations in features, functions, ease of operation, performance, cost, or other advantages to customers or uses between Qualcomm and its competitors, including but not limited to improvements in devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. | **No. 78**:  V, A, U, O, D, B, NRC | Qualcomm will produce non-privileged, responsive documents and things stating, discussing or analyzing actual or potential competition between Qualcomm or any of its competitors related to improvements or innovations in features, functions, ease of operation, performance, cost, or other advantages to customers or users of devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. (BC 3/20 Ltr.) |
| **Request No. 79**:<br>All documents and things concerning actual and potential competition between Qualcomm and any person or company regarding policies and strategies for responding to entry, including but not limited to entry into the market for devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. | **No. 79**:  V, A, U, O, D, B, NRC | Qualcomm will produce non-privileged, responsive policies and strategies of Qualcomm or any other person or company for responding to entry into any actual or potential market for devices complying, conforming with, or using any Mobile Wireless or Video Compression Standard. (BC 3/20 Ltr.) |
| **Request No. 80**:<br>All documents and things concerning any evaluation of any Qualcomm patent or patent portfolio relating to intellectual property rights for any Mobile Wireless Standard or Video Compression Standard.  This request also covers all proposed or potential standards, whether or not actually adopted. | **No. 80**:  V, O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents concerning QC's evaluation of any IPR that QC has declared to ETSI, JVT and any IEEE 802 working group concerning the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | As agreed in '1249, the parties will not produce documents related to any third party's patent positions or portfolios, unless such third party has been acquired by Qualcomm or Broadcom.<br><br>QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |
| **Request No. 81**:<br>All documents and things concerning any investigation or analysis of any Mobile Wireless Standard that pertains in any way to any Qualcomm patent or patent application.  This request also covers all proposed or potential standards, whether or not actually adopted. | **No. 81**:  V, O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents concerning QC's analysis of the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 82**:<br>All documents and things concerning any Video Compression Standard that pertains in any way to any Qualcomm patent or patent application. This request also covers all proposed or potential standards, whether or not actually adopted. | **No. 82**: V, O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents concerning the H.264 standard. | No clarification necessary. |
| **Request No. 83**:<br>All documents and things related to or comprising communications between or among Edward Tiedemann, A. Chris Irvine, Viji Raveendran, and any SDO relating to any actual or prospective Mobile Wireless Standard or any actual or prospective Video Compression Standard. | **No. 83**: O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents reflecting communications between or among Edward Tiedemann, A. Chris Irvine or Viji Raveendran on the one hand, and officials of the ETSI, JVT or any IEEE 802 working groups on the other hand, concerning the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |
| **Request No. 84**:<br>All documents and things concerning the level of Qualcomm royalty rates for any patent or patents that Qualcomm contends or has declared to be potentially or actually essential for any Mobile Wireless Standard or Video Compression Standard. | **No. 84**: O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents sufficient to show defendant's royalty rates for IPR that it has declared to ETSI, JVT or any IEEE 802 working group concerning the GSM, GPRS, EDGE, UMTS, H.264 and IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |
| **Request No. 85**:<br>All documents and things concerning the WCDMA Patent License Programme. | **No. 85**:<br><br>QC will produce non-privileged, responsive documents. | No clarification necessary. |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 86:**<br>All documents and things concerning Qualcomm's or any other person's or company's price lists, pricing plans, pricing policies, pricing strategies, pricing analyses, pricing forecasts, pricing decisions, promotions, discounts or incentives for sales of its chipsets for use in mobile wireless or video compression devices, including without limitation any discounts, license fee reductions, rebates, or other incentives offered by Qualcomm to any mobile wireless telecommunications device manufacturer in connection with the purchase of Qualcomm chipsets. | **No. 86:**  O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents sufficient to show the prices at which QC has sold chipsets that are compliant with the GSM, GPRS, EDGE, UMTS, H.264 or IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |
| **Request No. 87:**<br>All documents and things concerning Qualcomm's ability or willingness to meet any demand for chipsets for use in mobile wireless or video compression devices, including without limitation documents concerning Qualcomm's ability to produce or otherwise obtain additional chipsets at any time, any instances where Qualcomm delivered fewer chipsets than a party requested, any Qualcomm explanations for such under-delivery, any party's efforts to obtain greater volumes of chipsets from Qualcomm, any assessment of analysis of Qualcomm's inventories, and any position, policy or practice regarding the level of production of chipsets. | **No. 87:**  V, O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents concerning any refusal by QC to meet demand for chipsets. | QC will produce non-privileged, responsive documents concerning any inability, refusal or threatened refusal by QC to meet demand for chipsets on or before December 31, 2005. |

| BC Request | QC Response | Clarification |
|---|---|---|
| **Request No. 88:**<br>All documents and things concerning Qualcomm's communications with any actual or potential purchaser of chipsets for use in mobile wireless or video compression devices regarding the sale or purchase of any chipsets for use in any mobile wireless telecommunications device, the actual or potential licensing of, or licensing terms or royalties for, any patent reading on any chipset, or any person's or company's rights to make or sell chipsets for use in mobile wireless or video compression devices. | **No. 88:** V, O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents sufficient to show (i) the prices and terms offered to customers and potential customers of QC's chipsets; and (ii) the licensing terms offered to mobile wireless handset manufacturers. | QC clarifies that (i) with respect to Qualcomm customers and potential customers for chipsets used in mobile wireless or video compression devices, QC will provide documents sufficient to show prices and terms offered and agreed to; and (ii) with respect to any actual or potential manufacturer of chipsets for use in mobile wireless or video compression devices that licensed or negotiated to license any Qualcomm IPRs, Qualcomm will provide documents sufficient to show prices and terms offered and agreed to; and (iii) Qualcomm will provide all documents related to communications or assertions by Qualcomm that a license to any Qualcomm IPRs is or might be required by any actual or potential customers of Broadcom or any other chipset manufacturer.  (BC 3/20 Ltr.) |
| **Request No. 89:**<br>All documents and things concerning any actual, proposed, or draft agreement (including without limitation non-disclosure agreements, confidentiality agreements, and market development agreements) or terms thereof between Qualcomm and any other party with regard to chipsets for use in mobile wireless or video compression devices. | **No. 89:** V, O, D, B, NRC<br><br>QC will produce non-privileged, responsive documents comprising agreements for the purchase of QC chipsets compliant with the GSM, GPRS, EDGE, UMTS, H.264 or IEEE 802 standards. | QC proposes that IEEE-related discovery include the 802.1, 802.2, 802.3, 802.11, 802.16 and 802.20 working groups. |

Exhibit D

COPY

1

1

2

3            UNITED STATES DISTRICT COURT

4            CENTRAL DISTRICT OF CALIFORNIA

5                SOUTHERN DIVISION

6                    - - -

7    THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

8

9        BROADCOM CORPORATION,
                        Plaintiff,
10           vs.

                                SACV-05-467-JVS(RNBx)
11       QUALCOMM INCORPORATED,    DAY 8 (UNDER SEAL)
                        Defendant.
12       ------------------------

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                Santa Ana, California

17                  May 11, 2007

18

19                SHARON A. SEFFENS, RPR
                   United States Courthouse
20                 411 West 4th Street, Suite 1-1053
                   Santa Ana, CA  92701
21                 (714) 543-0870

22

23

24

25

26

1  reasonable royalty rate for the '317 Patent?
2  A    I assumed that based on all the information I have
3  reviewed that the appropriate rate would be 1.5 percent in
4  my judgment.
5  Q    And you began with a starting point of 2 percent.
6       Can you explain why you concluded ultimately that a
7  reasonable royalty rate would be 1.5 percent?
8  A    Yes.  I have a number of reasons again why I think the
9  rate would go up from that.  Again, the most important
10 factor to me, the one I weighed most heavily, was GP Factor
11 No. 13 and the additional technology that Qualcomm brought
12 to bear on the success of this chip, so I lowered the rate.
13      MS. VREELAND:  Your Honor, I think I have moved to
14 the portion of the exhibits that would not be confidential.
15      THE COURT:  Very good.
16      If somebody would let the folks in the hall know.
17      (End of portion under seal.)
18                    • • •
19
20
21
22
23
24
25

*SHARON SEFFENS, U.S. COURT REPORTER*

27

1                    (Jury Present.)
2            (The following portion was under seal:)
3            CROSS-EXAMINATION (Continued)
4  BY MS. RILEY:
5  Q    Mr. Wagner, once again we are talking about Factor 12
6  and the customary royalty rates for the industry.
7       Are we talking about back at the time of the
8  hypothetical negotiation?
9  A    We are.
10 Q    So for the '317 Patent, that would be in August of
11 2003?
12 A    Yes.
13 Q    I see the first category that you looked to is the
14 average telecom industry royalty rate is 4.9 percent?
15 A    Yes.
16 Q    So as an expert, your opinion is that the average rate
17 for patents in the telecom industry is 4.9 percent?
18 A    Yes.
19 Q    Is that for one patent?
20 A    No.  It's for a whole host of arrangements.  Sometimes
21 it's one patent.  Sometimes it could 1,000 patents.  It's
22 just a normal amount paid in a telecom license agreement.
23
24            **UNDER SEAL**
25

*SHARON SEFFENS, U.S. COURT REPORTER*

28

1
2            **UNDER SEAL**
3
4
5       MS. RILEY:  Let's take that off the screen for a
6  second.
7  BY MS. RILEY:
8
9            **UNDER SEAL**
10
11
12            **UNDER SEAL**
13
14
15            **UNDER SEAL**
16
17
18
19            **UNDER SEAL**
20
21 Q    Well, I was just trying to understand.  I thought we
22 were talking about rates at the time of the hypothetical
23 negotiation, and then it seemed that maybe we were taking
24 into consideration some other rates, so I was just trying to
25 get clarification from you on that.

*SHARON SEFFENS, U.S. COURT REPORTER*

29

1  A    Well, you should, and the clarification is that I use
2  the book of wisdom.  I inform myself of even events that
3  occurred during the damage period which I think is
4  appropriate.
5  Q    So when you are looking at this, you are looking at the
6  current rates at the time of the hypothetical negotiation,
7  or you're looking into the future of what years later the
8  current rates are?
9  A    I look at both.
10 Q    Qualcomm's License Agreements cover thousands of
11 patents; is that correct?
12 A    They do.
13 Q    And many of Qualcomm's License Agreements also include
14 Qualcomm providing products to its licensees?
15 A    Well, they sell them.  I don't think they provide them,
16 but, yes, they do sell them.
17 Q    Now I want to talk a little bit about competition, and
18 I think that relates to Factor 5 which is the relationship
19 between the parties.
20 A    You are right.
21 Q    The hypothetical negotiation date for the '010 Patent
22 is in May 2002?
23 A    It is.
24 Q    And the hypothetical negotiation date for the '317
25 patent is August of '03?

*SHARON SEFFENS, U.S. COURT REPORTER*

Exhibit E

## EXPERT REPORT OF ERIC STASIK

1. I, the undersigning expert, have been requested to draft the following expert report, and I swear or promise to tell the truth, and confirm that I have acted and I will act in any event, as objectively as possible, taking into account anything that can be favourable or prejudicial to any of the parties, and I know the criminal sanctions that I may incur into if I do not comply with my duties as an expert

2. I, Eric Stasik, of Skeppargatan 22C, 114 52 Stockholm, Sweden, have drafted this report at the request of Nokia Corporation for the purpose of the patent infringement proceedings that Nokia Corporation intends to commence in Spain against the companies VÍAS DE TELECOMUNICACIÓN VITELCOM, S.L. and VITELCOM MOBILE TECHNOLOGY, S.A.

### BACKGROUND

3. I am currently the director of Patent08, a consulting firm located in Stockholm, Sweden providing patent engineering, development, and licensing services to high technology firms. Immediately prior to founding Patent08 in 2002, I was director of corporate IPR and licensing for Telefonaktiebolaget LM Ericsson in Stockholm, Sweden as a member of the corporate staff responsible for global patent licensing and patent strategies for the Ericsson concern. I have a Master's Degree in Electrical Engineering from the Georgia Institute of Technology in Atlanta, Georgia, USA. I have been a registered US patent agent since 1994 and I have over a decade of direct experience in dealing with patenting and licensing issues relating to mobile cellular communications systems in general and GSM in particular. I refer to my curriculum vitae marked Attachment A and annexed to this report. In the interest of disclosure, I have a long professional relationship with certain current and past members of the Nokia staff and as of this writing I have given one one-hour training seminar to Nokia's IP staff in Finland respecting the themes in my book Patent or Perish.

### RELEVANT EXPERIENCE

4. Between 1995 and 1999 I was Manager of IPR Activities for Ericsson Radio Systems AB in Stockholm, Sweden responsible for patenting, patent licensing, and patent litigation business management for Ericsson's GSM Infrastructure Business Unit. In this position, I routinely negotiated patent licenses and was involved in patent infringement litigation relating to GSM infrastructure (base stations, base station controllers, and mobile switching networks) in Europe and the United States with patent holders (companies, academic institutions, and individuals) external to the Ericsson concern.

### INSTRUCTIONS

5. I have been asked to assess the likely royalty payable for a licence to patent number EP 0 722 634 on the assumption that claims 1, 9 or 12 of the patent have been infringed, patent number EP 1 114 565 on the assumption that claim 12 of the patent has been infringed, and EP 458 563 on the assumption that claim 1 of the patent has been infringed. In drafting this report I have reviewed patent numbers EP 0 722 634 B1, EP 1 114 565 B1, EP 0 458 563 B2, the corresponding ETSI IPR

Declarations annexed to this report and marked Attachment B, and the ETSI IPR Policy annexed to this report and marked as Attachment C.

## A BRIEF ANALYSIS OF EP 0 722 634

6.  EP 0 722 634, entitled "Method and Apparatus for Speech Transmission in a Mobile Communications System" relates to the technology known as channel coding used in conjunction with certain speech codecs employed in GSM.

7.  In order to save transmission bandwidth, digitized speech signals are compressed, or coded before transmitting and un-compressed, or decoded after reception. This process is often referred to as speech coding and the apparatus which performs this process is called a speech codec (short for coder-decoder.) When GSM was first introduced, it used a so-called "full rate" codec called GSM Full Rate, or GSM-FR. GSM-FR compressed speech in to a 13kbps (kilobit per second) rate. GSM-FR was standardized by ETSI as GSM 06.10. Later, an alternative speech codec GSM Half Rate, or GSM-HR which compressed speech even further to 5.6 kbps was introduced. GSM-HR was standardised by ETSI as GSM 06.20. GSM-HR enabled operators to serve twice as many customers using the same bandwidth.

8.  When consumer demand for improved voice quality diminished operator interest in reduced bandwidth speech codecs, the GSM Enhanced Full Rate (GSM-EFR) codec was introduced. At 12.2 kbps, GSM-EFR offered a slight improvement in compression ratio over GSM-FR, but far superior speech quality. GSM-EFR was standardized by ETSI as GSM 06.60.

9.  In order to use a speech codec in a wireless system, channel coding must be added to the output of the speech codec. Channel coding refers to the error detection and error correction schemes used to detect and correct errors that are introduced by the radio channel between the transmitter and the receiver. Since speech coding methods having different bitrate can be used in GSM, in order to provide a common transmitted bitrates (provided both by speech encoding and channel encoding), a variable channel coding scheme must be used, that is different amounts of channel encoding with different speech codecs. This is what EP 0 722 634 describes. More specifically, Claim 1 of EP 0 722 634 describes a method by which this variable rate channel coding is accomplished. Claim 9 of EP 0 722 634 describes the channel coding apparatus used in the transmitter and Claim 12 of EP 0 722 634 describes the channel de-coding apparatus used in the receiver.

10. Nokia's declaration to ETSI (Attachment B) indicates that EP 0 722 634 is ESSENTIAL for GSM 05.03 which is that part of the GSM specification dealing with channel coding.

11. Assuming that EP 0 722 634 is valid and indeed ESSENTIAL to GSM 05.03 (I have made no assessment of either), all base stations and mobile terminals (telephones, personal digital assistants, and other end user devices providing voice communication) which comply with the present version of the GSM standard must necessarily infringe EP 0 722 634.

2 of 2

## A BRIEF ANALYSIS OF EP 1 114 565

12.   EP 1 114 565, entitled "Improved Method and Arrangement for Changing Cells" relates to how a mobile terminal selects its serving cell based on service preference. In cellular communication systems, mobile terminals are served by radio base stations having a limited range of radio coverage known as a cell. The use of cells with a limited range of radio coverage allows frequencies to be re-used in different geographic areas thus increasing the total number of users served by a system with a limited number of available frequencies. In GSM a mobile terminal measures the signal strengths of neighbouring cells and reports these measurements back to the system. When the system detects that the signal strength of the current connection becomes too weak – usually due to the user moving out of range – the system instructs the mobile terminal to change to a new frequency transmitted by an adjacent cell. This process is known as hand-over. As a user moves she is "handed-off" from one cell to the next and in this manner maintains an uninterrupted radio connection. Hand-off is a basic function of all cellular radio communication systems and is what differentiates cellular radio from all other types of radio communication systems.

13.   In 2001, an upgrade to GSM known as General Packet Radio Services (GPRS) was launched. GPRS was developed to provide non-voice data services to GSM users and can be compared to a "broadband internet" connection for mobile phones. Like a broadband internet connection, GPRS is "always on" and provides 171.2 kbps packet data service to mobile users. GPRS is commonly referred to as 2.5G and is a stepping stone between GSM and the third generation (3G) services presently being launched throughout Europe and in many other parts of the world. While nearly all GSM mobile terminals sold today provide GPRS capability, GPRS coverage from the radio network remains somewhat limited.

14.   In order to provide the user with a seamless GPRS connection, the mobile terminal must identify which GSM cells have GPRS capability and which do not. EP 1 114 565 describes the way in which terminals identify which cells have GPRS capability.

15.   More specifically, claim 12 of EP 1 114 565 describes a mobile station (or terminal) with means for identifying which cells have GPRS capability according to the GSM standard.

16.   Further, Nokia's declaration to ETSI (Attachment B) indicates that EP 1 114 565 corresponds to ETSI deliverable GSM 04.60 entitled "General Packet Radio Service (GPRS); Mobile Station (MS) - Base Station System (BSS) interface; Radio Link Control/ Medium Access Control (RLC/MAC) protocol."

17.   Assuming that EP 1 114 565 is valid and indeed ESSENTIAL to GSM 04.60 (I have made no assessment of either), all base stations and mobile terminals (telephones, personal digital assistants, wireless data cards and other end user devices providing data communication) which comply with the GSM GPRS standard must necessarily infringe EP 1 114 565. Note that although all nearly all mobile terminals sold today include GPRS capability, there remain a large number of installed base stations which do not. As GPRS data services are fast becoming a substantial part of traffic

carried over GSM networks, and an important step in the migration to 3G, EP 1 114 565 represents a vitally important technology for GSM users.

## A BRIEF ANALYSIS OF EP 0 458 563

18.  EP 0 458 563 entitled "A Multi-Function Telephone Apparatus" refers to a semi-automatic function used in a mobile terminal that offers familiar and substantial user convenience. It enables a telephone number contained in a text message to be displayed on the receiving phone, saved to the phone's memory and used to respond to the caller.

19.  Most users are familiar with the feature by which text messages (SMS) can be answered without having to re-enter the originating number.

20.  This feature is common today and available on almost all mobile phones.

21.  Further, Nokia's declaration to ETSI (Attachment B) indicates that EP 0 458 563 is ESSENTIAL to the GSM standard, although I note that no specific ETSI deliverable is indicated on Nokia's declaration.

22.  I understand that Nokia considers that EP 0 458 563 covers ETSI deliverable GSM 02.07 (Annex 3.5) which is an optional portion of the standard. This means that a company can produce a basic GSM compliant device without using this particular feature of the standard. It is a commercial choice on the part of a manufacturer whether or not to include optional features.

23.  I understand that Nokia considers the claims of EP 0 458 563 to also cover techniques that do not fall within the scope of GSM 02.07. This is not unusual.

24.  I understand that Nokia's position is that what Vitelcom does is not in compliance with GSM 02.07, but nevertheless infringes EP 0 458 563.

25.  This is an interesting situation which does not commonly occur. According to Nokia's obligations under the ETSI IPR Policy (Attachment C), Nokia are only obligated to offer licenses to the extent that an IPR is ESSENTIAL to the standard. This means that for non-standard implementations, Nokia are under no obligation to offer a license to EP 0 458 563. Moreover, if a license is offered, Nokia are under no obligation to offer a license under RAND terms in accordance with the ETSI IPR Policy for ESSENTIAL patents.

### Patent Licensing in GSM

26.  I understand that EP 0 722 634 and EP 1 114 565, or more precisely the equivalent Spanish national patents, are being asserted as so-called "ESSENTIAL patents" necessarily infringed by telecommunications equipment manufactured to comply with the European Telecommunications Standards Institute (ETSI) standard known as GSM (Global System for Mobile communications.)

27.  I also understand that EP 0 458 563, or again, more precisely, the equivalent Spanish national patent, is being asserted as a non-ESSENTIAL patent nevertheless infringed by telecommunications equipment manufactured by VITELCOM.

28. ESSENTIAL patents cannot be avoided. Nokia has made a commitment to make licenses available for ESSENTIAL patents in accordance with the ETSI IPR Policy.

29. Non-ESSENTIAL patents are optional and if not licensed may be "designed out" of the infringing product at the discretion of the infringer.

**The ETSI IPR Policy**

30. I understand that Nokia is a member of ETSI and has submitted IPR declarations (Attachment B) to ETSI regarding EP 0 458 563, EP 1 114 565, EP 0 722 634 in accordance with the ETSI IPR Policy attached to this report as Attachment C. The ETSI IPR Policy is extracted from the ETSI Rules of procedure, Annex 6 (April 2000).

31. With regard to the assessment of royalties, Paragraph 3.2 the ETSI IPR Policy states:

"3.2 IPR holders whether members of ETSI and their AFFILIATES or third parties, should adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS."

32. ETSI's primary interest is to ensure that ESSENTIAL IPRs will be made available for license. To meet this objective, ETSI members are required to make a declaration to ETSI in accordance with Paragraph 6.1 of the ESTI IPR Policy which states:

"6.1 When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable, and non-discriminatory terms and conditions under such IPR to at least the following extent:

• MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;

• Sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

• Repair, use, or operate EQUIPMENT; and

• Use METHODS.

The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate."

33. With regard to the assessment of royalties, the key phrase in the ETSI IPR Policy is "fair, reasonable, and non-discriminatory terms" commonly referred to as RAND (or less commonly as FRAND) licensing terms.

34. RAND license terms have been adopted by many Standard Setting Organisations (SSOs) including ETSI, the IEEE-SA (the Institute of Electrical and Electronic

Engineers - Standards Association), the ITU (International Telecommunications Union), and others.

**ETSI and RAND**

35.  Although the terms "fair" and "reasonable" commonly appear in the IPR policies of many SSOs, nowhere are they precisely defined. Moreover, there is no standard anywhere of which I am aware for what is "fair" and "reasonable." Indeed there is often substantial and bitter disagreement between ESSENTIAL patent holders and potential licensees over what these terms mean.

36.  RAND is not determined by ETSI, it is determined by the parties themselves through bi-lateral negotiations conducted in accordance with relevant law and in the shadow of the legal remedies available to the patent holder - or by appropriate courts where the parties cannot agree.

37.  These are the conditions under which patent licensing within GSM has been conducted since at least 1995 and are well known within the industry.

**ROYALTIES ASSESSED**

38.  Although this report specifically concerns only the Spanish national patents and infringing activities conducted in Spain, to avoid regional discrimination it is common practice that the same royalty be used in all EPC contracting states where a European patent is in force. Although many telecommunications companies, notably Qualcomm, have made special exceptions for developing countries such as China, it would be unusual, and, in my opinion, potentially discriminatory to assess different royalties among the different contracting states of the EPC.

39.  For the purposes of this report, I will consider only the phones manufactured by Vitelcom in Spain and assume that a wholesale price is payable as they leave the Spanish factory, regardless of their final destination.

40.  Based on my experience, the most common method of estimating damages in the telecommunications industry is to assess a royalty based on a percentage of the infringing product's profits (or net sales if a reasonable proxy for profit.) This is an income-producing calculation based on the cash flows generated by the sales of the infringing product. As I have been asked to assess royalties payable as an estimate of the damages resulting from the infringement of the patents in question this report is strictly limited to what royalties should be assessed for the three patents in question.

41.  Due to its simplicity, the dominant method for determining royalties in the telecommunications industry is to assess a percentage royalty on net sales (before tax.). Note that "net sales" price as opposed to retail sales price refers to the paid customer invoices received by the manufacturer and not those paid by the final consumer. Moreover, the net sales price refers to the average net sales price offered to all customers for the infringing device. A licensee cannot be allowed to export licensed products at no profit, or below cost, to avoid paying royalties where the licensed products are manufactured and then sell them at full retail price in regions where there are no patents. Similarly, the manufacturer's intra-group sales must be

disregarded and the relevant sales price to consider is the one which applies when the products are finally sold by the Vitelcom group.

## ROYALTIES PAYABLE FOR ESSENTIAL PATENTS

42. It is common practice in GSM (and in the telecommunications industry in general) for individual licensors to bundle together all of their ESSENTIAL patents into a single license agreement under a single RAND royalty regardless of the number of patents bundled together. Essentially, the royalty allows the licensee to use any and all patents necessary to comply with the published standard. It would be unusual, and indeed highly problematic, to conclude a license agreement for a single unbundled patent with a patent holder owning several ESSENTIAL patents. A license to a single ESSENTIAL patent is of little value to the licensee if additional licenses are needed from the same patent holder for the same product.

43. Based on my experience, bundled royalty rates for GSM ESSENTIAL patents owned by a single patent holder are between 2.5% to 5% assessed on the net sales price of infringing products. The actual rate depends on the number of patents bundled together, the relative importance of the technologies covered, the strength of the individual patents, and the regions involved. This royalty is assessed on products made, used, or sold in the countries where the patent is in force.

44. It is frankly difficult to determine the unbundled value of any single patent. In practice, the relationship between the number of patents and the total royalty rate is not linear. For example, a license to a single ESSENTIAL patent may be 2.5%, a license to two ESSENTIAL patents may be 3.5%, and a license to three ESSENTIAL patents may be 4%, while a license to ten or more ESSENTIAL patents rarely exceeds 5%.

45. As previously mentioned, this percentage royalty is normally assessed on net sales price as a proxy for profit to avoid invasive accounting. There is a mutual interest in this as most licensees are reluctant to open their books and share detailed information about profit margins with a licensor who may also be a competitor. For the licensor, using the net sales price eases verification of compliance with the license terms and conditions. Information regarding net sales price and volumes is generally available from a number of independent research firms. Finally, basing the royalty on net sales price provides the easiest way for both the licensor and the licensee to benchmark their rates against other competitors and other technologies.

46. As the objective is to assess a RAND royalty based on the licensee's profit, net sales price must be precisely defined. It is common to see terms in license agreements such as net sales price, price ex works, gross receipts, net receipts and other commonly used accounting terms which appear concrete and well-defined but which are, in practice, subject to varying interpretations. Deductions such as taxes, shipping costs, rebates, reimbursements, etc which may impact the licensee's profits must also be precisely defined.

47. Moreover, as previously mentioned, a licensee can not be allowed to export licensed products at no profit, or below cost, to avoid paying royalties where the licensed products are manufactured and then sell them at full retail price in regions where there are no patents so a precise definition of net sales is vital.

48.  GSM licensees are confronted with the additional problem in that there are many companies claiming to have ESSENTIAL patents on various aspects of GSM. In addition to Nokia, Motorola, Ericsson, Siemens, Alcatel, and others claim to have ESSENTIAL patents on GSM. In order to make, use, or sell a product in compliance with the GSM specification, a manufacturer needs to have a separate license with each ESSENTIAL patent holder. The cumulative effect of this is known as "royalty stacking".

49.  This is, however, not new information and is well known within the industry.

50.  Bekkers and Liotard (1999) noted, "Even when individual licenses are reasonably priced, the cumulative effect of having many IPRs in one standard can drive up the total fee. Unconfirmed sources report U.S. $50 paid for the license fees needed to produce a GSM terminal. For a product that is sold for an average price of about U.S. $ 150, the license fees for non-IPR owners represent the highest single cost in this industry."[1]

51.  A report presented at the 2001 AIPPI Congress in Melbourne, Australia, clarified that "cumulative GSM royalties now differ roughly between 8% and 28%" according to the International Telecommunication Standards User Group.[2] This wide royalty range suggests that cross-licensing between ESSENTIAL patent holders often occurs. Companies holding ESSENTIAL patents are able to trade value for value, while companies with no ESSENTIAL patents of their own a generally forced to pay a higher cumulative royalty.

52.  In 2002 Bekkers, et al. (2002) confirm that, "Our own research has indicated that the cumulative fee paid for GSM handset licenses is very high, and this was recently confirmed by the actor (sic) director of ETNO [the European Public Telecommunications Network Operator's Association], who revealed that royalty fees make up 29% of the costs of GSM handset."[3]

53.  These have been the conditions under which GSM ESSENTIAL patents have been licensed since at least 1995. Any company entering the market after this time should have been well aware of this and made appropriate calculations in their business model to accommodate the cost of cumulative royalties for ESSENTIAL patents.

---

1 Bekkers, Rudi and Liotard, Isabelle, "European Standards for Mobile Communications: The Tense Relationship between Standards and Intellectual Property Rights" E.I.P.R Issue 3, Sweet & Maxwell, Ltd. 1999, p. 124

2 van Voorst, F. Th., Beckers, H.F.M., Capel, C.L., van der Horst, M.H.J, and Dohmen, J.H. "The Relationship between Technical Standards and Patent Rights," AIPPI, Report Q 157, Congress Australia, 2001

3 Bekkers, Rudi, Verspagen, Bart, and Smits Jan, "Intellectual Property Rights and Standardization: the case of GSM," Telecommuinications Policy 26, Pergammon Press, 2002, p. 182

## ROYALTIES PAYABLE FOR NON-ESSENTIAL PATENTS

54.   ESSENTIAL patents must be licensed according to RAND terms, but no such necessity exists for non-ESSENTIAL patents. The royalties payable for the use of a non-ESSENTIAL patent are calculated based on the replacement value of the technology.

55.   It is my understanding that the technical differences between the non-standard compliant implementation used by Vitelcom which infringes EP 0 458 563 and a fully standard compliant implementation also infringing EP 0 458 563 are not significant.

56.   I am also assuming that Vitelcom derive no additional commercial benefit from using a non-standard compliant implementation that infringes EP 0 458 563 than would be derived from a fully standard compliant implementation EP 0 458 563.

57.   In light of the assumptions of paragraphs 55 and 56, the replacement value of the non-standard implementation that infringes EP 0 458 563 is best estimated by comparing it to that of a fully standard compliant implementation also infringing EP 0 458 563.

58.   The royalty payable for a fully standard compliant implementation of EP 0 458 563 would be RAND terms.

59.   For the purpose of determining the royalty payable for EP 0 458 563, in light of the conclusions of paragraph 57 it is my opinion that this non-ESSENTIAL patent should be bundled together with the ESSENTIAL patents into a single RAND licence and the bundled royalty rate determined in accordance with paragraphs 43 and 44 For the avoidance of doubt, the royalty payable for three patents licensed under RAND terms for example, a licence for three "ESSENTIAL" patents may be 4%.

60.   If however, it could be shown that the assumptions under paragraphs 55 and 56 are incorrect and that Vitelcom derive additional commercial benefit from their non-standard compliant infringement of EP 0 458 563, Nokia may be justified on this basis to demand a higher rate than RAND for EP 0 458 563.

Signed:

Name:   Eric Stasik

Date:   17 November 2004

**ANNEX A**

**Eric Stasik, MSEE**
**Director of Intellectual Property**
Skeppargatan 22C
114 52 Stockholm, Sweden
tel. +46 70 818 4863
e-mail: eric@patento8.com

| Professional Experience | 2002-Present | **Director and founder** of a consulting firm providing patent engineering, product development assistance, and licensing services to high technology firms and research organizations. | **Patento8** Skeppargatan 22C 114 52 Stockholm, Sweden |
|---|---|---|---|
| | 1999-2002 | **Director, Corporate IPR & Licensing** Member of the staff responsible for global patent licensing and patent strategy for the Ericsson concern. Substantial, hands-on experience with the management of IPR issues in large mergers and divestitures, cooperative licensing arrangements, patent valuation, and pre-litigation license negotiations, litigation business management, and mediations. | **Telefonaktiebolaget LM Ericsson** Corporate Marketing and Strategic Business Development S-126 25 Stockholm |
| | 1995 – 1999 | **Manager, IPR Activities** Responsible for patenting, patent licensing, and patent litigation business management for Ericsson's GSM Infrastructure Business Unit during its most active period of growth and expansion. Closely managed an international staff of patent attorneys, engineers, and administrators annually filing in excess of 200 new applications for patent and managing a total portfolio in excess of 5000 international patents which have generated licensing revenues in excess of €100 Million. | **Ericsson Radio Systems AB** GSM and UMTS Systems S-164 80 Stockholm |

| | | | |
|---|---|---|---|
| **Professional Experience** (continued) | 1992-1995 | **Senior Patent Engineer** Responsible for patenting for the mobile phone business unit. Drafted and prosecuted US applications for patent. | **Ericsson GE Mobile Communications, Inc** Research Triangle Park, North Carolina |
| | 1988-1992 | **Chief Engineer** and co-founder of a manufacturer of microwave and communication components. | **Microwave Resources, Inc.** Norcross, Georgia USA |
| | 1986-1988 | **Senior Microwave Engineer** Responsible for the design and manufacture of high power microwave subsystems. | **Electromagnetic Sciences, Inc.** Norcross, Georgia USA |
| | 1984-1986 | **Associate Engineer** | **RCA Missile and Surface Radar** Moorestown, New Jersey USA |
| **Degrees** | 1992 | **Master of Science Electrical Engineering** | Georgia Institute of Technology Atlanta, Georgia USA |
| | 1984 | **Bachelor of Science Electrical Engineering** | Georgia Institute of Technology Atlanta, Georgia USA |
| **Other Information** | Licenses | Registered US Patent Agent since March, 1992 Registration Number 37,944 | |
| | Books | Stasik, Eric 2003. *Patent or Perish: A Guide for Gaining and Maintaining Competitive Advantage in the Knowledge Economy*, Althos, North Carolina, USA: (ISBN 0-972-80533-8) | |
| | | Stasik, Eric 2003: *Practical Patent Strategies used by Successful Companies*, Althos, North Carolina, USA: Althos (ISBN 0-974-69433-9) | |
| | | Stasik, Eric 2004: *Strategic Patent Planning for Software Companies*, Althos, North Carolina, (ISBN 0-974-xxxxx) | |
| | | Tehrani, Rich (editor) 2004. *IP Telephony Dictionary*, North Carolina, USA: Althos (ISBN 0-974-27871-8) (co-author) | |

| Other Information (Continued) | Professional Awards | Honorable Mention 1992 RF Design Magazine's RF Design Awards Contest |
| | | COAXLPF: A computer-aided design program for distributed coaxial low-pass filters. |
| | Patents | U.S. Patent 5,722,049 Mobile-link system for a radio communication system wherein diversity combining is performed only for edge/boundary zone signals and not for central zone signals, February 24, 1998 |
| | Professional Activities | News Editor for the Intellectual Property Law Server (http://www.intelproplaw.com) 01/04 – present |
| | Speeches | Quatrièmes Rencontres Internationales de la Propriété Industrielle "Stratégies judiciaries muscles en matière de litiges et contenieux" Palais des Congrés, Paris, October 6th, 2003 |
| | Languages | English – mother tongue<br>Swedish – complete fluency, spoken and written<br>German – some proficiency |
| | Personal | US Citizen<br>Permanent Resident of Sweden<br>Married |



**ANNEX B**

IPR in ETSI Deliverables                                                          Page 1 of 1

## Search IPR Declarations

THE ETSI IPR DATABASE contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards. Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Article 6.1 of the ETSI IPR POLICY (Annex 6 of the Rules of Procedure).

The present database provides data that is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI Standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation, or IPR searches, have been carried out by ETSI and therefore no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

Potential Licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

Please note that when using the work item/projects field for your search you might obtain duplicate entries. This results from the fact that IPR declarations made to ETSI may be relevant to one and/or several projects/work item.

| Selected by · | • Patent No.: 722534 | | Sorted by | Work Item or Deliverable No. (ascending) | | | |

**1 IPR Declaration found**

| ▶ Company | ▶ Patent No. ▶ Application No. | ▲ Work Item OR ETSI Deliverable No. | Section | Version | ▶ Project(s) | ▶ Declaration date | ▣ ▣ |
|---|---|---|---|---|---|---|---|
| Nokia | EP 722534 | GSM 05.03 | | | GSM | | |

▶ **Patent title**
Method And Apparatus For Speech Transmission In A Mobile Communications System

▶ **Country of registration**    Countries applicables to App./Patent

European Patent Office    SWITZERLAND - GERMANY - DENMARK - SPAIN - FRANCE - UNITED KINGDOM - GREECE - IRELAND - ITALY - LIECHTENSTEIN - LUXEMBOURG - MONACO - NETHERLANDS - PORTUGAL - SWEDEN - AUSTRIA - BELGIUM



## Search IPR Declarations

THE ETSI IPR DATABASE contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards. Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Article 6.1 of the ETSI IPR POLICY (Annex 6 of the Rules of Procedure).

The present database provides data that is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI Standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation, or IPR searches, have been carried out by ETSI and therefore no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

Potential Licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

Please note that when using the work item/projects field for your search you might obtain duplicate entries. This results from the fact that IPR declarations made to ETSI may be relevant to one and/or several projects/work item.

Selected
by            ● Patent No.: 458563                         Sorted by   Project (ascending)

1 IPR Declaration found

| Company | Patent No. / Application No. | Work item OR ETSI Deliverable No. | Section | Version | Project(s) | Declaration date | | |
|---------|------|------|------|------|------|------|---|---|
| Nokia Corporation | 458563 | | | | GSM | 2000-04-03 | | |

Patent title
A multi-fonction telephone apparatus

| Country of registration | Countries applicables to App./Patent |
|------|------|
| European Patent Office | GERMANY - DENMARK - SPAIN - FRANCE - UNITED KINGDOM - ITALY - NETHERLANDS - SWEDEN |

Notes
The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licences under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.



ANNEX C

**ETSI IPR Policy**

Extracted from the ETSI Rules of Procedure, 22 November 2000

## ANNEX 6: ETSI INTELLECTUAL PROPERTY RIGHTS POLICY

### 1 Introduction

The General Assembly of ETSI has established the following Intellectual Property Rights POLICY.

### 2 Definitions

Terms in the POLICY that are written in capital letters shall have the meaning set forth in clause 15 entitled DEFINITIONS.

### 3 Policy Objectives

3.1   STANDARDS and TECHNICAL SPECIFICATIONS shall be based on solutions which best meet the technical objectives of the European telecommunications sector, as defined by the General Assembly. In order to further this objective the ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable. In achieving this objective, the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.

3.2   IPR holders whether members of ETSI and their AFFILIATES or third parties, should be adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS.

3.3   ETSI shall take reasonable measures to ensure, as far as possible, that its activities which relate to the preparation, adoption and application of STANDARDS and TECHNICAL SPECIFICATIONS, enable STANDARDS and TECHNICAL SPECIFICATIONS to be available to potential users in accordance with the general principles of standardization.

### 4 Disclosure of IPRs

4.1   Each MEMBER shall use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.

4.2   The obligations pursuant to Clause 4.1 above do however not imply any obligation on MEMBERS to conduct IPR searches.

### 5 Procedures for Committees

ETSI shall establish guidelines for the chairmen of COMMITTEES with respect to ESSENTIAL IPRs.

### 6 Availability of Licences

6.1   When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory terms and conditions under such IPR to at least the following extent:

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;
- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;
- repair, use, or operate EQUIPMENT; and
- use METHODS.

The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.

6.2   At the request of the European Commission and/or EFTA, initially for a specific STANDARD or TECHNICAL SPECIFICATION or a class of STANDARDS/TECHNICAL SPECIFICATIONS, ETSI shall arrange to have carried out in a competent and timely manner an investigation including an IPR search, with the objective of ascertaining whether IPRs exist or are likely to exist which may be or may become ESSENTIAL to a proposed STANDARD or TECHNICAL SPECIFICATIONS and the possible terms and conditions of licences for such IPRs. This shall be subject to the European Commission and/or EFTA meeting all reasonable expenses of such an investigation, in accordance with detailed arrangements to be worked out with the European Commission and/or EFTA prior to the investigation being undertaken.

## 7   Information on IPR by ETSI

7.1   Any published STANDARD or TECHNICAL SPECIFICATION shall include information pertaining to ESSENTIAL IPRs which are brought to the attention of ETSI prior to such publication.

7.2   ETSI shall establish appropriate procedures to allow access to information at any time with respect to ESSENTIAL IPRs which have been brought to the attention of ETSI.

## 8   Non-availability of Licences

### 8.1   MEMBERS' refusal to license

8.1.1   Where a MEMBER notifies ETSI that it is not prepared to license an IPR in respect of a STANDARD or TECHNICAL SPECIFICATION, the General Assembly shall review the requirement for that STANDARD or TECHNICAL SPECIFICATION and satisfy itself that a viable alternative technology is available for the STANDARD or TECHNICAL SPECIFICATION which:

- is not blocked by that IPR; and
- satisfies ETSI's requirements.

8.1.2   Where, in the opinion of the General Assembly, no such viable alternative technology exists, work on the STANDARD or TECHNICAL SPECIFICATION shall cease, and the Director-General of ETSI shall request that MEMBER to reconsider its position. If the MEMBER decides not to withdraw its refusal to license the IPR, it shall inform the Director-General of ETSI of its decision and provide a written explanation of its reasons for refusing to license that IPR, within three months of its receipt of the Director-General's request.

The Director-General shall then send the MEMBER's explanation together with relevant extracts from the minutes of the General Assembly to the ETSI Counsellors for their consideration.

**8.2    Non-availability of licences from third parties**

Where, in respect of a STANDARD or TECHNICAL SPECIFICATION, ETSI becomes aware that licences are not available from a third party in accordance with Clause 6.1 above, that STANDARD or TECHNICAL SPECIFICATION shall be referred to the Director-General of ETSI for further consideration in accordance with the following procedure:

i)    The Director-General shall request full supporting details from any MEMBER who has complained that licences are not available in accordance with Clause 6.1 above.

ii)    The Director-General shall write to the IPR owner concerned for an explanation and request that licences be granted according to Clause 6.1 above.

iii)    Where the IPR owner refuses the Director-General's request or does not answer the letter within three months, the Director-General shall inform the General Assembly. A vote shall be taken in the General Assembly on an individual weighted basis to immediately refer the STANDARD or TECHNICAL SPECIFICATION to the relevant COMMITTEE to modify it so that the IPR is no longer ESSENTIAL.

iv)    Where the vote in the General Assembly does not succeed, then the General Assembly shall, where appropriate, consult the ETSI Counsellors with a view to finding a solution to the problem. In parallel, the General Assembly may request appropriate MEMBERS to use their good offices to find a solution to the problem.

v)    Where (iv) does not lead to a solution, then the General Assembly shall request the European Commission to see what further action may be appropriate, including non-recognition of the STANDARD or TECHNICAL SPECIFICATION in question.

In carrying out the foregoing procedure due account shall be taken of the interest of the enterprises that have invested in the implementation of the STANDARD or TECHNICAL SPECIFICATION in question.

**9    ETSI ownership of IPRs**

9.1    The ownership of the copyright in STANDARDS and TECHNICAL SPECIFICATIONS documentation and reports created by ETSI or any of its COMMITTEES shall vest in ETSI but due acknowledgement shall be given to copyrights owned by third parties that are identifiable in ETSI copyrighted works.

9.2    In respect of IPRs other than copyright in STANDARDS and TECHNICAL SPECIFICATIONS documentation and reports, ETSI shall only seek ownership of IPRs generated either by its employees or by secondees to ETSI from organizations who are not MEMBERS.

9.3    ETSI shall, on request by a non-member, grant licences to that non-member on fair and reasonable terms and conditions in respect of any IPRs, other than those referred to in Clause 9.1 above, owned by ETSI. MEMBERS shall be allowed to use IPRs owned by ETSI free of charge.

**10    Confidentiality**

• ownership of more than 50 % of the nominal value of the issued equity share capital or of more than 50 % of the shares entitling the holders to vote for the election of directors or persons performing similar functions, or

• right by any other means to elect or appoint directors, or persons who collectively can exercise such control. A state, a division of a state or other public entity operating under public law, or any legal entity, linked to the first legal entity solely through a state or any division of a state or other public entity operating under public law, shall be deemed to fall outside the definition of an AFFILIATE.

2  "COMMITTEE" shall mean any Technical Body of ETSI and shall include ETSI Projects, Technical Committees, ETSI Partnership Projects, and their Working Groups.

3  "CONFIDENTIAL INFORMATION" shall mean all information deemed to be confidential pursuant to Clause 10 of the POLICY disclosed directly or indirectly to the MEMBER.

4  "EQUIPMENT" shall mean any system, or device fully conforming to a STANDARD.

5  "METHODS" shall mean any method or operation fully conforming to a STANDARD.

6  "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

7  "IPR" shall mean any intellectual property right conferred by statute law including applications therefor other than trademarks. For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR.

8  "MANUFACTURE", shall mean production of EQUIPMENT.

9  "MEMBER" shall mean a member or associate member of ETSI. References to a MEMBER shall wherever the context permits be interpreted as references to that MEMBER and its AFFILIATES.

10  "POLICY" shall mean ETSI's Intellectual Property Rights Policy.

11  "STANDARD" shall mean any standard adopted by ETSI including options therein or amended versions and shall include European Standards (ENs) (telecommunications series), ETSI Standards (ESs), Common Technical Regulations (CTRs) which are taken from ENs (telecommunications series) and including drafts of any of the foregoing, and documents made under the previous nomenclature, including ETSs, I-ETSs, parts of NETs and TBRs, the technical specifications of which are available to all MEMBERS, but not including any standards, or parts thereof, not made by ETSI.

The date on which a STANDARD is considered to be adopted by ETSI for the purposes of this POLICY shall be the date on which the technical content of that STANDARD was available to all MEMBERS.

12  "TECHNICAL SPECIFICATION" shall mean any Technical Specification (TS) adopted by ETSI including options therein or amended version including drafts, the Technical

The proceedings of a COMMITTEE shall be regarded as non-confidential except as expressly provided below and all information submitted to a COMMITTEE shall be treated as if non-confidential and shall be available for public inspection unless:

- the information is in written or other tangible form; and
- the information is identified in writing, when submitted, as confidential; and
- the information is first submitted to, and accepted by, the chairman of the COMMITTEE as confidential.

CONFIDENTIAL INFORMATION incorporated in a STANDARD or TECHNICAL SPECIFICATION shall be regarded as non-confidential by ETSI and its MEMBERS, from the date on which the STANDARD or TECHNICAL SPECIFICATION is published.

## 11  Reproduction of Standards Documentation

MEMBERS may make copies of STANDARDS and TECHNICAL SPECIFICATIONS documentation produced by ETSI for their own use free of charge but may not distribute such copies to others.

## 12  Law and Regulation

The POLICY shall be governed by the laws of France. However, no MEMBER shall be obliged by the POLICY to commit a breach of the laws or regulations of its country or to act against supranational laws or regulations applicable to its country insofar as derogation by agreement between parties is not permitted by such laws.

Any right granted to, and any obligation imposed on, a MEMBER which derives from French law and which are not already contained in the national or supranational law applicable to that MEMBER is to be understood as being of solely a contractual nature.

## 13  Policy Decisions

Without prejudice to ETSI's Statutes and Rules of Procedure, no decisions shall be taken by ETSI in relation to implementation of the POLICY unless supported by a 71 % majority of the weighted individual votes cast by MEMBERS.

## 14  Violation of Policy

Any violation of the POLICY by a MEMBER shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI. The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the MEMBER in breach, in accordance with the ETSI Statutes.

## 15  Definitions

1  "AFFILIATE" of a first legal entity means any other legal entity:

- directly or indirectly owning or controlling the first legal entity, or
- under the same direct or indirect ownership or control as the first legal entity, or
- directly or indirectly owned or controlled by the first legal entity,

for so long as such ownership or control lasts.

Ownership or control shall exist through the direct or indirect: