# WILMERHALE

**Mark D. Selwyn**

+1 650 858 6031 (t)
+1 650 858 6100 (f)
mark.selwyn@wilmerhale.com

April 11, 2008

The Honorable John J. Hughes
United States District Court, District of New Jersey
Clarkson S. Fischer Federal Building & U.S. Courthouse
402 East State Street
Trenton, New Jersey 08608

Re: *Broadcom Corporation v. Qualcomm Incorporated*, C.A. No. 05-3350 (MLC) (JJH)

Dear Judge Hughes:

Pursuant to the parties' stipulated briefing schedule for pending discovery disputes, this letter brief responds to Qualcomm's arguments in its letter brief to the Court dated April 4, 2008.

## Qualcomm's Document Requests

In its letter brief, Qualcomm seeks documents relating to four areas: (1) Broadcom's participation in Institute of Electrical and Electronics Engineers ("IEEE") Project 802 working groups other than the 802.20 group, (2) certain communications between Broadcom and its current employee Patricia Thaler, (3) "Project Stockholm," and (4) "Project Koala." The second dispute is moot: days before the submission of Qualcomm's letter brief, Broadcom informed Qualcomm that, although it disputes the relevance of communications involving Ms. Thaler, it will produce non-privileged documents responsive to Qualcomm's request.

The other areas remain in dispute. For each area, Qualcomm seeks to expand greatly the scope of discovery in this already substantial case, seeking documents unconnected to the actual issues. Moreover, insofar as Broadcom has any documents called for by these disputed requests that are even arguably relevant to the issues at hand, those documents are already captured by Qualcomm's other, more narrowly tailored, document requests.

### 1. IEEE Working Groups

The only IEEE working group that Broadcom identifies in its Second Amended Complaint ("SAC") is the 802.20 working group, which was drafting a standard for a packet-based air interface for Internet Protocol services. (SAC ¶ 247.) Qualcomm improperly manipulated this working group in an effort to have Qualcomm's patented technology incorporated as part of the standard. (*E.g., id.* ¶¶ 260-265.) This misconduct ultimately led the IEEE to suspend the working group. (*Id.* ¶ 265.) The SAC makes no allegations about any other 802 working groups, which concern other technical subject matters.

WILMERHALE

The Honorable John J. Hughes
April 11, 2008
Page 2

Qualcomm nonetheless seeks massive discovery concerning Broadcom's participation in five other 802 working groups—802.1, 802.2, 802.3, 802.11, and 802.16—arguing that Broadcom's and others' conduct in these other groups is "highly relevant" to the appropriate standard of conduct in the 802.20 group. (Qualcomm Br. at 3-4.) To inject these five irrelevant working groups into the discovery process would greatly broaden the scope of no fewer than 27 discovery requests and impose an unwarranted heavy burden.[1] Broadcom has been active in these other groups, and thus would need to review and produce voluminous documents held by additional custodians who would not have responsive documents otherwise. Indeed, documents relating to these irrelevant working groups relate to time periods, products, research efforts, and divisions of Broadcom that are otherwise irrelevant to this case.

To begin, except for 802.16, these other 802 working groups do not fall within the boundaries of the technical subject matter of this case that this Court has recognized. As the Court stated in its Order, dated April 16, 2006, rejecting a prior Qualcomm effort to expand discovery beyond the subject matter of this case, "for purposes of Rule 26(b)(1) of the Federal Rules of Civil Procedure ... the claims and defenses in this case *relate to mobile-wireless communications*" (emphasis added).[2] Qualcomm does not explain why the subjects of the 802.1, 802.2, 802.3, and 802.11 working groups have any bearing on mobile wireless communications. Those working groups dealt with other technologies, such as network management and security for local area and wide area networks (802.1), framing of data packets for local area networks (802.2), Ethernet (802.3), and wireless local area networks (802.11). *See* http://standards.ieee.org/getieee802/portfolio.html.

Independent of this subject matter problem, Qualcomm's argument that participants' behavior in sundry other 802 working groups is peculiarly relevant to assessing Qualcomm's conduct in the 802.20 working group rests on the false premise that the 802 working groups are subject to uniform standards of conduct. To the contrary, as the IEEE website expressly states, the working groups have the authority to set their own procedures: "The Chair of each group is given latitude to set the procedure for the group." (http://www.ieee802.org/802%20overview.pdf ("Overview and Guide to the IEEE 802 LMSC") at 6.) Indeed, participants in the 802.20 working group were governed by policies and procedures that were unique to that working group (SAC ¶¶ 251,

---

[1]   If the definition of "SDO" were to include IEEE 802 working groups other than IEEE 802.20, Broadcom would need to search additional custodians in response to at least Qualcomm Requests Nos. 1, 3, 43-48, 51, 54, 55, 66-68, 86-90, 95, 99, 100, 110-11, 116, 119, and 122.

[2]   Since that Order, Broadcom amended its Complaint to include allegations regarding Qualcomm's conduct in the Joint Video Team ("JVT"). The JVT has developed the H.264 video-compression standard, which is not exclusively directed to mobile-wireless communications. Qualcomm does not contend that its requested 802 discovery is relevant to Broadcom's JVT-based claims.

WILMERHALE

The Honorable John J. Hughes
April 11, 2008
Page 3

253), and the IEEE suspended the 802.20 working group based on a finding that Qualcomm committed misconduct in the context of standards governing that particular working group (not some other 802 working group) (SAC ¶ 265). Thus, the conduct of participants in various other working groups is irrelevant to assessing Broadcom's conduct in connection with the 802.20 working group. Even assuming Broadcom's own actions are relevant to evaluating whether Qualcomm engaged in misconduct concerning 802.20, only Broadcom's conduct *in 802.20* has any probative value—and Broadcom has agreed to provide discovery relating to its own 802.20 conduct.

Indeed, if Qualcomm were entitled to discovery into Broadcom's activities in 802 working groups other than 802.20, the same logic would entitle Broadcom to discovery into *Qualcomm's* activities in multiple other standard-setting proceedings. For instance, Qualcomm has been active in a wide range of standards-development efforts under the umbrella of the European Telecommunications Standards Institute ("ETSI"). Broadcom has alleged that Qualcomm has engaged in misconduct relating to certain specific ETSI standards (including the Universal Mobile Telecommunications System, or "UMTS," standard), and accordingly has sought discovery relating to those particular standards. Broadcom has *not* sought discovery into Qualcomm's many other activities within ETSI, even with respect to other mobile wireless standards. Notably, ETSI promulgates "ETSI Directives" that "cover the entire lifecycle of ETSI's standards." (*See* http://www.etsi.org/WebSite/AboutETSI/HowWeWork/Howwework.aspx ("How we work" section of ETSI website).) Given these Directives (which govern all ETSI working groups), if conduct in other 802 working groups were truly relevant to assessing Qualcomm's conduct in 802.20, then conduct in other ETSI standard-setting proceedings would be at least as relevant to assessing Qualcomm's conduct with regard to the ETSI standards actually at issue here. To require document discovery into all of these standard-setting proceedings, both 802 and ETSI, would result in extraordinary and unnecessary costs and burdens for both parties and likely delay resolution of this matter.

Although Qualcomm has not established that any of the additional 802 groups shares the same policies and procedures as the 802.20 group, in an effort to facilitate final resolution of the 802 discovery issues, Broadcom hereby agrees to produce documents related to the 802.16 working group. Of the five 802 working groups Qualcomm identified in addition to 802.20, 802.16 is the *only* working group with any apparent connection to mobile wireless communications, and the *only* group for which Qualcomm asserts a concrete relationship with 802.20. (*See* Qualcomm Br. at 3 (alleging that "Broadcom and other 802.16 Working Group participants actively interfered with the development of a standard by the 802.20 Working Group").) For these reasons, and notwithstanding Qualcomm's failure to establish that the 802.16 policies and procedures parallel those in 802.20, Broadcom will produce responsive, non-privileged documents relating to 802.16.

WILMERHALE

The Honorable John J. Hughes
April 11, 2008
Page 4

Particularly given this accommodation, Qualcomm can make no legitimate claim to further 802 discovery. Indeed, it is ironic that Qualcomm seeks this significant expansion (and others, discussed below) in the scope of discovery while simultaneously arguing that time and cost constraints should excuse it from producing documents from 90 of the 120 custodians whom it acknowledges hold relevant documents responsive to otherwise uncontested discovery requests. (Qualcomm Br. at 8.)

### 2. "Project Stockholm"

Qualcomm's next attempt to expand the scope of discovery needlessly is its request for documents relating to an alleged "Project Stockholm." As is typical in business and perfectly appropriate, Broadcom discusses from time to time with other companies legal issues of common concern. In an attempt to create a discovery sideshow, Qualcomm claims that Broadcom is a member of what it labels "a conspiracy," code-named "Project Stockholm," with several "entrenched equipment makers (*e.g.*, Nokia, Ericsson, Panasonic and NEC)" that supposedly seek to protect their own market positions "at the expense of Qualcomm and the new entrants that have been enabled by Qualcomm's technology and licensing policy." (Qualcomm Br. at 5.) Qualcomm seeks broad discovery into all aspects of this supposed "conspiracy." Based on the assertions in its letter brief and the allegations in the pleading it has styled "Counterclaims and Affirmative Defense of Defendant/Counterclaim-Plaintiff Qualcomm Incorporated," Qualcomm seeks documents that encompass multiple large companies, multiple proceedings in multiple jurisdictions throughout the world, and communications covering many years. (*See id.* ¶¶ 23-24 (complaining about Nokia's and Ericsson's conduct in European Union); ¶¶ 47-48 (complaining of Nokia's and Ericsson's conduct in 1998 ETSI proceedings); ¶ 98 (complaining of 2005 complaint filed with European Union's antitrust authority); ¶¶ 103-104 (asserting relevance of advocacy position adopted by Nokia in an unrelated European Commission merger review process and in a separate and equally unrelated lawsuit filed in Spain); ¶¶ 69-72 (complaining of lawsuits filed during a two-year span in South Korea, Europe, New Jersey, and California).)

Qualcomm's only explanation for seeking this wide-ranging discovery is that it supposedly will show that the "conspiracy" motivated Broadcom to "refus[e] Qualcomm's FRAND license offers and bring this case," purportedly "directly contradict[ing] one of Broadcom's central allegations in this case—*i.e.*, that the reason Broadcom does not have a license from Qualcomm is that Qualcomm has refused to offer FRAND licensing terms." (Qualcomm Br. at 5.) To the extent any non-privileged documents relating to the alleged "Project Stockholm" are actually relevant to this case, Qualcomm will obtain such documents through document requests that are tailored to the issues in this case. (*See, inter alia,* Qualcomm Requests Nos. 97 ("All communications relating to licensing discussions or negotiations between Qualcomm and Broadcom."), 9 ("All documents regarding Broadcom's licensing negotiations with Qualcomm."), 93 ("All documents relating to Broadcom's interpretation of the term 'FRAND' without regard to time limitation."); *see also* Requests Nos. 4, 9, 91, 92.) Thus, in requesting all documents relating to Project

WILMERHALE

The Honorable John J. Hughes
April 11, 2008
Page 5

Stockholm, Qualcomm's apparent objective is not to gain documents relevant to the issues in the case, but simply to put Broadcom to the burden and expense of searching additional custodians and creating a supplemental privilege log. To the extent Broadcom and various other companies are involved in litigation or other proceedings that concern Qualcomm, those companies' communications about those proceedings are likely subject to the attorney-client privilege and the work-product doctrine. In short, Qualcomm fails to explain why it is entitled to broad-based discovery into any documents relating to "Project Stockholm"—whether or not such documents are tethered to any claims in suit.

Qualcomm also fails to explain why *Broadcom's* motivations, apart from its own FRAND-related analyses, are relevant to the case. Whether Qualcomm has breached its obligations to offer licenses on FRAND terms turns on an objective issue—whether Qualcomm's licensing offers were in fact FRAND—not on any subjective non-FRAND-related reasons why Broadcom refused any Qualcomm licensing offers. *See, e.g., Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 314 n.8 (3d Cir. 2007) (noting that determination whether Qualcomm offers were on FRAND terms can be made with reference to objective factors); *ESS Tech., Inc. v. PC-Tel, Inc.*, 1999 WL 33520483, at *4 (N.D. Cal. Nov. 4, 1999) (noting factors that may be relevant to FRAND determination). Moreover, the reasons why Broadcom brought this case are irrelevant to the adjudication of its claims. *See Mariana v. Fisher*, 338 F.3d 189, 198 (3d Cir. 2003) (motives for bring litigation are irrelevant to determining liability).

Qualcomm also asserts without explanation that documents relating to "Project Stockholm" are relevant to its "counterclaims." (Qualcomm Br. at 6.) The scope of the counterclaims refutes Qualcomm's contention, and thus the counterclaims add nothing to Qualcomm's argument for the relevance of "Project Stockholm" documents. One of Qualcomm's two counterclaims seeks a declaration "that Qualcomm's disclosure of IPR was timely, as set forth in the ETSI IPR Policy." (Counterclaims and Affirmative Defense of Defendant/Counterclaim-Plaintiff Qualcomm Incorporated ¶ 117.) Qualcomm does not even offer a theory as to how "Project Stockholm" documents could have any relevance to whether *Qualcomm* made timely disclosures to ETSI. Qualcomm's other counterclaim seeks "a declaration that the terms offered by Qualcomm to Broadcom for rights to Qualcomm's UMTS patents are 'fair, reasonable and non-discriminatory', as those terms are used in the ETSI IPR policy." (*Id.* ¶ 121.) This counterclaim is simply the flip side of Broadcom's claim that Qualcomm violated the antitrust laws by failing to offer its UMTS-related patents on FRAND terms (*see* SAC First and Second Claims for Relief). Accordingly, the counterclaim could not provide any basis for discovery broader than that relevant to Broadcom's claims. Again, as discussed above, to the extent any non-privileged documents relating to the alleged Project Stockholm are actually relevant, Qualcomm will receive them in response to other requests.

Finally, in seeking a platform to justify its excessive discovery requests, Qualcomm has contrived a non-cognizable "affirmative defense" of "unclean hands," which seems to be

WILMERHALE

The Honorable John J. Hughes
April 11, 2008
Page 6

grounded in allegations relating to "Project Stockholm" and "Project Koala." As Broadcom will discuss in greater detail in its response to the filing in which Qualcomm asserts both its counterclaims and this affirmative defense, the defense is both procedurally improper and legally insufficient. It is procedurally improper because Qualcomm seeks to assert it in advance of answering Broadcom's claims. It is legally insufficient for several reasons, not least that "unclean hands" is not a proper defense to antitrust claims. *See, e.g., Kiefer-Stewart Co. v. Seagram & Sons, Inc.*, 340 U.S. 211, 214 (1951) (holding that "the alleged illegal conduct of [plaintiff] . . . could not legalize" defendants' alleged Sherman Act violations, "nor immunize them against liability to those they injured"), *rev'd in part on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). By noting that it reserves the right to assert additional defenses when it answers Broadcom's state-law claims, Qualcomm's filing (at pp. 38-39) indicates that its "unclean hands" defense relates solely to Broadcom's antitrust claims, which Qualcomm has not moved to dismiss. It thus falls within the proscription on "unclean hands" defenses to antitrust actions.

3.  **"Project Koala"**

Qualcomm alleges that "Project Koala" is "a Broadcom initiative to extort better licensing terms from Qualcomm by using litigation for leverage rather than negotiating in good faith." (Qualcomm Br. at 6.) Qualcomm asks that Broadcom be forced to "search for the term 'koala' in the files of relevant custodians." (*Id.*)

Once again, Qualcomm fails to offer any justification for such a sweeping request. As with many companies, Broadcom sometimes refers internally to other companies by code names, "Koala" in the case of Qualcomm. Qualcomm's claims that the alleged "Project Koala" documents bear on whether Broadcom negotiated in good faith, and that it is "entitled to any document relating to Broadcom's 'litigation enabled' licensing strategy in this lawsuit." (*Id.* at 6-7.) But, as with the alleged "Project Stockholm," any non-privileged documents that are actually relevant to the case will be captured by Qualcomm's separate discovery requests. (*See, e.g.*, Qualcomm Requests Nos. 97 ("All communications relating to licensing discussions or negotiations between Qualcomm and Broadcom."), 9 ("All documents regarding Broadcom's licensing negotiations with Qualcomm.").)

Finally, to the extent Qualcomm is seeking actual litigation-strategy documents relating to litigations against Qualcomm, those are privileged by definition. If Qualcomm's intent in pressing for "Koala" discovery is to impose upon Broadcom the burden of generating a substantial privilege log of documents reflecting legal strategy, it would clearly be contrary to the agreement reached in every case between the parties about *not* logging such documents that post-date lawsuit commencement.

WILMERHALE

The Honorable John J. Hughes
April 11, 2008
Page 7

### Broadcom's Document Requests

Qualcomm argues that it should not be required to (1) search the files of all Qualcomm custodians whom Qualcomm itself has identified as having relevant documents, (2) produce significant documents related to the CDMA telecommunications standard, and (3) produce documents relating to Qualcomm's interference with Broadcom's customer relationships.[3]

In its opening letter brief, Broadcom discussed an issue relating to its Document Request No. 80, which seeks "documents and things concerning any evaluation of any Qualcomm patent or patent portfolio relating to intellectual property rights for any Mobile Wireless Standard or Video Compression Standard." At the end of the meet-and-confer process, Broadcom understood Qualcomm to be limiting its response to Qualcomm IPRs that were actually *disclosed* to standards-setting organizations. That limitation would exclude documents highly probative to Broadcom's claims that Qualcomm *failed to disclose* all relevant IPR to standards organizations, as required by the applicable standard-setting rules. (*See, e.g.,* SAC ¶¶ 276, 281, 286, 292, 303, 309, and 322.) Thus, for example, under this discovery limitation, if a Qualcomm analysis determined that a Qualcomm patent was relevant to a particular draft standard, but Qualcomm did not disclose the patent to the standards organization, Broadcom would not receive the analysis in discovery.

We are uncertain whether there remains any dispute about Request No. 80, as Qualcomm's letter brief makes no mention of its prior position regarding disclosed/non-disclosed IPRs. Broadcom's position remains the same: both types of IPRs are relevant, and documents concerning both must be produced.

1.  **Qualcomm Custodians**

As Broadcom explained in its opening letter brief, Qualcomm itself has identified 120 custodians as likely to have responsive documents. As required by Fed. R. Civ. Proc. 26 and 33, Qualcomm must conduct a reasonable search of the documents of these custodians, using the electronic protocol to which the parties have agreed (which is designed to reduce the parties' search burden). Qualcomm objects to this search as infeasible, and asks the Court to limit the search to 30 "priority" custodians for each party—with additional custodians to be added as "time permitting" only. (Qualcomm Br. at 8.)

---

[3]   Qualcomm wrongly suggests that Broadcom was "tardy" in raising the latter two issues. Qualcomm Br. at 9. Qualcomm ignores that, after submitting their March 21, 2008 list of then-ripe disputes, the parties continued to meet and confer. When Broadcom realized there was no prospect of amicably resolving these two additional issues, it promptly brought them (and an issue concerning Request No. 80) to the Court's attention.

**WILMERHALE**

The Honorable John J. Hughes
April 11, 2008
Page 8

There are several serious problems with Qualcomm's proposal. *First,* Qualcomm fails to establish that it is truly impracticable to search the documents of all custodians that Qualcomm has identified. Indeed, Qualcomm's explanation suggests the opposite. As Qualcomm acknowledges, during the "first wave" of discovery Qualcomm searched and reviewed the files of *81* Qualcomm custodians that it identified as having responsive documents. (*Id.*) Qualcomm suggests that it now needs to repeat the searches of the 81 original custodians, but that is simply not the case: Qualcomm need only (a) search the files it has already identified using any new search terms, (b) search any new files generated since the first search, using the complete search term list, and (c) review for privilege *only those documents not already reviewed.* (The parameters of the new search-term list have no bearing on the previous privilege analysis—the previously-reviewed documents either are, or are not, privileged on their own terms.) Qualcomm's estimate of the number of documents it would need to review rests on the incorrect assumption that it must repeat its privilege review for all previously-reviewed documents.

Moreover, having previously completed a comprehensive search of *81* custodians, Qualcomm provides no plausible reason why it cannot (a) supplement that initial search to account for new issues and new documents and (b) search an additional 39 custodians—less than half the number originally searched. Qualcomm certainly provides no basis for restricting the search to 30 "priority" custodians—far less than half the number originally searched. Qualcomm is a multi-billion dollar company that is represented by three top law firms; it can afford to execute a document search (based on an agreed electronic protocol) that complies with the Federal Rules of Civil Procedure.

*Second*, Broadcom has great concerns about the implications of an incomplete search, and these concerns are not merely theoretical. As outlined in Broadcom's opening letter brief, in *Qualcomm, Inc. v. Broadcom Corp.*, No. 05-1958, 2008 WL 66932 (S.D. Cal. Jan. 7, 2008), the district court concluded that "Qualcomm withheld tens of thousands of emails showing that it actively participated in the JVT in 2002 and 2003"—one of the same standards bodies at issue in this case—"and then ultimately utilized Broadcom's lack of access to the suppressed evidence to repeatedly and falsely aver that there was 'no evidence' that it had participated in the JVT prior to September 2003." *Id.* at *6. Against this backdrop, Broadcom cannot risk the consequences of Qualcomm failing to search custodians that Qualcomm itself has identified as having relevant documents.

*Third*, even if a "priority" search might otherwise be appropriate, Broadcom is not in any position to cull the list of custodians that Qualcomm has provided. Given that Qualcomm has far superior information concerning which Qualcomm custodians have documents most relevant to Broadcom's claims, it would be manifestly unfair to require Broadcom to guess which custodians have the key documents. In any event, as the San Diego case starkly illustrated, custodians who are not the primary focus of discovery can prove to have critical documents— which, again, compels that Qualcomm search the documents of all custodians it has identified.

WILMERHALE

The Honorable John J. Hughes
April 11, 2008
Page 9

2. **CDMA Discovery**

Broadcom's Document Request No. 47 seeks:

> "Any Qualcomm plan or draft thereof, or the plan of any other person or company or any draft thereof, whether adopted or not, for the development, marketing, or licensing of technology for any actual or potential Mobile Wireless Standard or Video Compression Standard, of the following nature: business plans, short term and long range strategies and objectives, budgets and financial projections, research and development plans, technology licensing plans, and presentations to management committees, executive committees, and boards of directors."

Qualcomm objects to this request and proposes to limit its production to responsive documents related to the GSM, GPRS, EDGE, UMTS, H.264, and IEEE 802 standards.

For the reasons described in Broadcom's opening letter brief at 3-5, Qualcomm's proposed limitation would exclude categories of documents directly relevant to Broadcom's claims, *in particular, documents related to CDMA-based technologies*. These CDMA documents are important to (1) Broadcom's claim that Qualcomm attempted to monopolize the market for UMTS chipsets (SAC ¶ 282), and (2) Broadcom's claim that Qualcomm monopolized markets for technologies necessary to practice the other standards at issue in this case, including the WCDMA standard (SAC ¶¶ 48, 276, 286).[4] Broadcom's SAC specifies in detail why Qualcomm's CDMA-related practices are relevant to Broadcom's claims. (SAC ¶¶ 58, 62, 69, 121, 122.) As discussed in our opening letter brief at 4-5, evidence relating to CDMA-based technologies directly bears on, among other issues, whether Qualcomm met its obligations to license technologies on FRAND terms and whether it intended to monopolize UMTS chip markets and presents a dangerous probability of doing so.

In its letter brief, Qualcomm's only argument against Document Request No. 47 is that Qualcomm does not know which standards are encompassed by this Request. (Qualcomm Br. at 9.) But Broadcom plainly identified those standards for which it seeks discovery during the meet-and-confer process, and the only remaining dispute is as to CDMA-based technologies.[5] There is no longer any ambiguity on this point, and Qualcomm cannot provide any justification for withholding CDMA discovery.

---

[4] These documents are also relevant to Broadcom's related common law and California unfair-competition claims.

[5] Although Broadcom's definitions for "Mobile Wireless Standards" and "Video Compression Standards" include additional standards, Broadcom has agreed to narrow its request.

WILMERHALE

The Honorable John J. Hughes
April 11, 2008
Page 10

3.   **Broadcom Request No. 68**

Broadcom Document Request No. 68 seeks "[a]ll documents and things related to or comprising communications between Qualcomm and its customers or prospective customers and/or its licensees or prospective licensees regarding Broadcom." Qualcomm has refused to provide *any* documents responsive to this request, and has declined to propose any modifications. Instead, it contends that all necessary discovery will be produced in response to Broadcom's Document Request No. 50, which relates only to communications about *disputes* between Broadcom and Qualcomm—and does not encompass any other communications between Qualcomm and its actual or prospective customers and licensees regarding Broadcom.

Aside from incorrectly asserting that Broadcom failed to meet and confer on this issue sufficiently, Qualcomm argues only an unsupported conclusion that "offering to produce communications with customers relating to *disputes* with Broadcom" is "perfectly reasonable." (Qualcomm Br. at 10.)

Qualcomm ignores the basic fact that this case concerns Qualcomm's unlawful conduct that has directly injured Broadcom (and others, including consumers). As Broadcom explained in its opening letter brief at 6, a core issue in this case is Qualcomm's use of its purportedly essential IPRs to intimidate current or potential Broadcom customers and discourage them from doing business with Broadcom. Evidence of Qualcomm's statements to customers about Broadcom is plainly relevant and discoverable—whether or not those statements concern "disputes" with Broadcom. In addition, a meaningful response to Request No. 68 is necessary to obtain documents that can be used to identify Qualcomm's employees and third parties whose depositions will be required.

Qualcomm does not claim that it would be unduly burdensome to produce such documents. The Court should order Qualcomm to produce them.

Sincerely yours,

Mark D. Selwyn

cc:   All Counsel