# CRAVATH, SWAINE & MOORE LLP

ROBERT D. JOFFE
ALLEN FINKELSON
RONALD S. ROLFE
PAUL C. SAUNDERS
DOUGLAS D. BROADWATER
ALAN C. STEPHENSON
MAX R. SHULMAN
STUART W. GOLD
JOHN E. BEERBOWER
EVAN R. CHESLER
MICHAEL L. SCHLER
RICHARD LEVIN
KRIS F. HEINZELMAN
B. ROBBINS KIESSLING
ROGER D. TURNER
PHILIP A. GELSTON
RORY O. MILLSON
FRANCIS P. BARRON
RICHARD W. CLARY
WILLIAM P. ROGERS, JR.
JAMES D. COOPER
STEPHEN L. GORDON
DANIEL L. MOSLEY
GREGORY M. SHAW
PETER S. WILSON

JAMES C. VARDELL, III
ROBERT H. BARON
KEVIN J. GREHAN
STEPHEN S. MADSEN
C. ALLEN PARKER
MARC S. ROSENBERG
SUSAN WEBSTER
TIMOTHY G. MASSAD
DAVID MERCADO
ROWAN D. WILSON
PETER T. BARBUR
SANDRA C. GOLDSTEIN
PAUL MICHALSKI
THOMAS G. RAFFERTY
MICHAEL S. GOLDMAN
RICHARD HALL
ELIZABETH L. GRAYER
JULIE A. NORTH
ANDREW W. NEEDHAM
STEPHEN L. BURNS
KATHERINE B. FORREST
KEITH R. HUMMEL
DANIEL SLIFKIN
JEFFREY A. SMITH
ROBERT I. TOWNSEND, III

WORLDWIDE PLAZA
825 EIGHTH AVENUE
NEW YORK, NY 10019-7475

TELEPHONE: (212) 474-1000
FACSIMILE: (212) 474-3700

CITYPOINT
ONE ROPEMAKER STREET
LONDON EC2Y 9HR
TELEPHONE: 44-20-7453-1000
FACSIMILE: 44-20-7860-1150

WRITER'S DIRECT DIAL NUMBER

(212) 474-1058

WILLIAM J. WHELAN, III
SCOTT A. BARSHAY
PHILIP J. BOECKMAN
ROGER G. BROOKS
WILLIAM V. FOGG
FAIZA J. SAEED
RICHARD J. STARK
THOMAS E. DUNN
JULIE SPELLMAN SWEET
RONALD CAMI
MARK I. GREENE
SARKIS JEBEJIAN
JAMES C. WOOLERY
DAVID R. MARRIOTT
MICHAEL A. PASKIN
ANDREW J. PITTS
MICHAEL T. REYNOLDS
ANTONY L. RYAN
GEORGE E. ZOBITZ
GEORGE A. STEPHANAKIS
DARIN P. MCATEE
GARY A. BORNSTEIN
TIMOTHY G. CAMERON
KARIN A. DEMASI
LIZABETHANN R. EISEN

DAVID S. FINKELSTEIN
DAVID GREENWALD
RACHEL G. SKAISTIS
PAUL H. ZUMBRO
JOEL F. HEROLD
ERIC W. HILFERS
GEORGE F. SCHOEN
ERIK R. TAVZEL
CRAIG F. ARCELLA
TEENA-ANN V. SANKOORIKAL
ANDREW R. THOMPSON
DAMIEN R. ZOUBEK
LAUREN ANGELILLI
TATIANA LAPUSHCHIK
ERIC L. SCHIELE

SPECIAL COUNSEL

SAMUEL C. BUTLER
GEORGE J. GILLESPIE, III

OF COUNSEL

CHRISTINE BESHAR

April 16, 2008

Broadcom Corp. v. Qualcomm Inc., No. 05-3350 (MLC) (JJH)

Dear Judge Hughes:

      This letter sets forth Qualcomm's response to three issues that Broadcom addressed for the first time in its letter to the Court dated April 11, 2008. The parties' joint letter to the Court dated March 21, 2008, identified five "areas of disputes" and stated the parties' intention to "file simultaneous letter briefs concerning these issues on April 4, 2008, and response letter briefs on April 11, 2008". (March 21, 2008, Joint Letter to the Court at 1 (attached as Exhibit A to April 4, 2008, Barbur Letter to the Court).) Qualcomm understood that the parties would each submit letters discussing *all five* issues on April 4 (as Qualcomm's letter did), so that each party could respond to the other's contentions on April 11. However, Broadcom addressed only one of the five identified issues in its April 4 letter. Accordingly, Qualcomm has not yet had an opportunity to respond to Broadcom's arguments with respect to the issues that Broadcom omitted from its April 4 letter—*i.e.*, discovery relating to IEEE Project 802 rules and practices, Project Stockholm and Project Koala.[1] This letter does not address the arguments set forth in Broadcom's April 4 letter, to which Qualcomm has already responded.

---

[1] In its April 11 letter to the Court, Broadcom withdrew its objections with respect to the other outstanding issue from the March 21 joint letter (*i.e.*, pre-employment communications with Broadcom employee and IEEE Project 802 operative Patricia Thaler). (April 11, 2008, Selwyn Letter to the Court at 1.)

1.  **IEEE Project 802**

Broadcom accuses Qualcomm of attempting to expand the scope of this case by pursuing discovery relating to the application of uniform IEEE Project 802 rules as they are applied in certain working groups that do not involve "mobile wireless communications". But it was *Broadcom*, not Qualcomm, that put the policies and practices of "IEEE Project 802" squarely at issue when it alleged that Qualcomm violated IEEE 802 policies relating to dominance and affiliation disclosure. (*See* SAC ¶¶ 251-53, 265.) Those allegations, which appeared for the first time in Broadcom's Second Amended Complaint filed in November 2007, were not before the Court when it issued its April 16, 2006, Order finding that "the claims and defenses in this case relate to mobile-wireless communications". (*See* April 11, 2008, Selwyn Letter to the Court at 2.) Unlike in 2006, Broadcom's IEEE claims now extend specifically to the policies of "IEEE Project 802" and, therefore, discovery relating to Broadcom's interpretation of those rules is clearly relevant.[2]

According to Broadcom, Qualcomm's representation that IEEE Project 802 working groups "are subject to uniform standards of conduct" is a "false premise". (*Id.*) But it is Broadcom, and not Qualcomm, that has presented a "false premise". At all times relevant to Broadcom's 802.20 allegations, Qualcomm's understanding is that *exactly the same* dominance and affiliation disclosure rules applied to every Project 802 working group, and Broadcom alleges as much. (*See* SAC ¶¶ 252-53 (alleging that "[t]he IEEE Project 802 Policies and Procedures"—which apply to *all* 802 projects including 802.20—"prohibit 'dominance' of a working group by a single organization or committee").) The *only* rule unique to 802.20 is a new affiliation disclosure rule that itself relied heavily upon the rules of ANSI (the umbrella standards organization that includes IEEE), but that rule was not adopted until January 2004, nearly a year *after* Qualcomm consultant Jerry Upton was elected chair of the 802.20 Working Group. Contrary to Broadcom's assertion that it is relying on "policies and procedures that were unique to [802.20]" (*see* April 11, 2008, Selwyn Letter to the Court at 2), Broadcom's principal complaint has to do with Qualcomm's alleged "dominance" of the 802.20 Working Group. (*See* SAC ¶¶ 252, 265.) But the IEEE Project 802 "dominance" rules were, and are, commonly applicable to all working groups, and Broadcom concedes that

---

[2] Indeed, Broadcom's Opposition to Qualcomm's Motion To Dismiss Claims Four Through Eight of Broadcom's Second Amended Complaint (at 9-10) makes clear that Broadcom's claimed damages relating to IEEE arise explicitly from Broadcom's "expenditure of time and money attending meetings" of 802.20 that "had been fundamentally corrupted" by Qualcomm's alleged violation of IEEE Project 802 rules. That has nothing to do with "mobile-wireless communications"—and everything to do with interpreting the disclosure rules of IEEE Project 802, which apply to all Project 802 working groups.

it has been active in many of the groups beyond 802.20, including 802.1, .2, .3 and .11. (April 11, 2008, Selwyn Letter to the Court at 2.)[3]

Accordingly, documents relating to all of these working groups are highly relevant to interpreting the IEEE Project 802 disclosure rules that Broadcom contends Qualcomm violated. Having put the common policies of "IEEE Project 802" at issue, Broadcom should not be permitted to block discovery relating to its own actions in other 802 working groups in which it "has been active".

2.   **"Project Stockholm" and "Project Koala"**

As alleged in Qualcomm's Counterclaims and Affirmative Defense, Project Stockholm and Project Koala are directed specifically at Qualcomm's licensing practices. Together, they comprise an anticompetitive conspiracy and litigation-driven negotiating strategy intended explicitly to drive down Qualcomm's royalty rates below those rates that have been accepted by dozens of other similarly-situated licensees. Accordingly, every aspect of Broadcom's participation in both projects is clearly relevant to this case, which, at bottom, amounts to a licensing dispute. Broadcom's desire to withhold directly relevant Project Stockholm documents on privilege grounds—and its refusal even to log such documents—is thus highly suspect.

Broadcom's attempts to narrow Qualcomm's Counterclaims and Affirmative Defense into simple denials of Broadcom's allegations are baseless. Qualcomm's Counterclaims and Affirmative Defense include detailed factual allegations relating to Broadcom's participation in Project Stockholm and Project Koala, including the effect such participation had on Broadcom's decision to reject Qualcomm's repeated license offers on FRAND terms. Qualcomm's well-pleaded allegations (just like Broadcom's allegations in its Second Amended Complaint) govern the scope of proper discovery. Moreover, Broadcom's argument that discovery should be limited because Broadcom intends to move to dismiss Qualcomm's Counterclaims and Affirmative Defense is totally inconsistent with the parties' express agreement that "*neither party will object to or seek to stay discovery* pending the briefing, argument or resolution of *any motion directed to Qualcomm's Counterclaims or Affirmative Defense* on the ground that such motion has not been heard and ruled upon by the Court". (March 19, 2008, Stipulation Extending Time To Answer, Move, or Otherwise Reply at 1 (emphasis added).)

Finally, Broadcom's assertion that "the reasons why Broadcom brought the case are irrelevant" is dead wrong in the context of this case. The parties' claims arise from a licensing dispute and center on Broadcom's allegations that the *reason* Broadcom does not have a license from Qualcomm—and supposedly was harmed because it lacks a license—is that Qualcomm did not offer FRAND licensing terms (*see*,

---

[3] In its April 11 letter, Broadcom agreed to provide discovery relating to 802.16. (April 11, 2008, Selwyn Letter to the Court at 2.)

4

*e.g.*, SAC ¶¶ 7-8, 106-31, 163, 229, 240-41, 276, 281, 293, 306, 315, 322-25); accordingly, the reason why Broadcom has refused to accept Qualcomm's licensing offers is critically relevant. As set forth in Qualcomm's Counterclaims and Affirmative Defense, Broadcom's refusal to take a license and its allegation that Qualcomm has not lived up to its FRAND commitments are not based upon any infirmity in Qualcomm's offers, which were as good as or better than terms to which dozens of similarly-situated licensees had previously, and have since, agreed. Rather, Broadcom's unreasonable negotiating posture—and its concomitant rejection of offers that clearly were FRAND—arose directly from its participation in Project Stockholm and Project Koala. Broadcom's motivation is also key to its allegations of causation and damages. If Broadcom rejected Qualcomm's offers for reasons other than those alleged in the complaint—*i.e.*, in furtherance of Project Stockholm and Project Koala—then *Broadcom*, not Qualcomm, is to blame for any injury arising from Broadcom's lack of a license. In any event, Broadcom's decision to reject Qualcomm's licensing offers is at the heart of this case, and Broadcom's theory—*i.e.*, that Broadcom rejected Qualcomm's offers because they were not FRAND—is belied by Broadcom's participation in Project Stockholm and Project Koala. Broadcom should not be permitted to shield its central allegation from discovery that tests its very foundation.[4]

---

[4] The cases Broadcom cites for the proposition that its "motivation" can never be relevant as a matter of law are unpersuasive. (April 11, 2008, Selwyn Letter to the Court at 5.) For example, the Court in *ESS Tech., Inc. v. PC-Tel, Inc.*, No. C-99-20292, 1999 WL 33520483, *4 (N.D. Cal. Nov. 5, 1999) (attached hereto as Exhibit A), indicated that a FRAND determination could be made by reference to the terms of "defendant's other contracts", in particular, "where a defendant has offered nearly identical licensing agreements to all other competitors". As noted above, that is essentially the situation here—except Broadcom has refused to accept those license terms, which places Broadcom's motivation squarely in issue as part of Qualcomm's defense. *Mariana v. Fisher*, 338 F.3d 189 (3d Cir. 2003), simply does not stand for the proposition that "motives for bring [*sic*] litigation are irrelevant to determining liability". (April 11, 2008, Selwyn Letter to the Court at 5.) *Mariana* focused specifically on whether to apply *Noerr-Pennington* immunity to claims that *litigation itself* was unlawful and held that motivation generally does not affect the *Noerr-Pennington* analysis. *Mariana*, 338 F.3d at 198-99. Here, Broadcom's motivation in *refusing Qualcomm's offers* is independently relevant to both parties' claims and defenses, regardless of any overlap with Broadcom's motivations in actually bringing suit. *See, e.g., Cable Holdings of Georgia, Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1564 n.7 (11th Cir. 1987) (evidence regarding "motivation defendants had in initiating the state lawsuit" was proper "as rebuttal to plaintiff's allegations"); *Parsons v. Jefferson-Pilot Corp.*, 141 F.R.D. 408, 416 (M.D.N.C. 1992) (motivation to bring lawsuit relevant to "unclean hands" defense, which is specifically alleged as part of Qualcomm's Counterclaims and Affirmative Defense).

Thank you for your attention to this matter.

Very truly yours,

Peter T. Barbur

The Honorable John J. Hughes
   United States District Court – District of New Jersey
      Clarkson S. Fisher Federal Building & U.S. Courthouse
         402 East State Street
           Trenton, NJ 08608

Copy w/encls. to counsel for all parties.

**Exhibit A**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 33520483 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d, 1999 WL 33520483)

Page 1

ESS Technology, Inc. v. PC-Tel, Inc.
N.D.Cal.,1999.
Only the Westlaw citation is currently available.
United States District Court, N.D. California.
ESS TECHNOLOGY, INC., a California Corporation, Plaintiff,
v.
PC-TEL, INC., a Delaware Corporation, Defendant.
No. C-99-20292 RMW.

Nov. 4, 1999.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

WHYTE, J.
*1 Defendant's motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure was submitted on the papers without oral argument. The court has read the moving and responding papers. For the reasons set forth below, the court grants the motion as to Counts I and V and denies it as to Counts II, III and IV. Plaintiff is given twenty (20) days leave to amend.

I. BACKGROUND

Plaintiff ESS Technology, Inc. manufactures and sells modem semiconductor chipsets and associated modem software drivers for use in personal computers. Plaintiff's First Amended Complaint ("FAC"), ¶ 8. ESS does not sell its modem chipsets or completed systems directly to end-users, but rather to intermediate manufacturers, original equipment manufacturers, systems integrators, and retail distributors who package complete modem boards. *Id.*

Defendant PC-TEL, Inc. holds patents that are necessary for modem producers to comply with the V.34 and V.90 standards established by the International Telecommunications Union ("ITU"). FAC, ¶¶ 9 & 12. The V.34 and V.90 are the latest modem standards in wide use in the computer industry and allow for high speed communications. FAC, ¶ 10. Defendant acquired the patents at issue when it purchased and merged with General DataComm, Inc. ("GDC"), the original assignee of the patents. FAC, ¶ 12. Plaintiff claims that defendant, and formerly GDC, represented to the ITU that its patents claimed at least part of the V.34 and V.90 standards and they agreed to the ITU patent policy 2.2, which requires patentees of ITU standards to negotiate licenses to competitors on a non-discriminatory basis and on reasonable terms and conditions. FAC, ¶ 13.

Plaintiff alleges that in 1996, GDC offered plaintiff two license options for the V.34 patents. FAC, ¶ 15. Although the offers were reasonable at the time, plaintiff had not yet entered the V.34 market. In September 1997, GDC again offered plaintiff two license options. FAC, ¶ 16. However, while the proposed royalty payments may have been appropriate when chipsets sold for approximately $50 per unit, chipsets were selling for approximately $10 per unit by March 1998. FAC, ¶ 17. Accordingly, plaintiff alleges that due to the changed modem market, the proposed royalty payments were unreasonably expensive and did not allow for new market entrants to compete with existing market participants. FAC, ¶¶ 16-18. Plaintiff and GDC continued to negotiate through much of 1998 and nearly reached an agreement. FAC, ¶ 19.

Before plaintiff and GDC could resolve all their differences, defendant PC-TEL acquired GDC toward the end of 1998. FAC, ¶ 20. Plaintiff alleges that defendant then reversed course and started demanding increasingly unreasonable and discriminatory terms for licensing the V.34 and V.90 patents. FAC, ¶ 20-22. Plaintiff further alleges that defendant sent plaintiff two proposed license agreements for the V.34 and V.90 patents which were more onerous than any other proposal, including the original 1997 offer from GDC. FAC, ¶ 23. Plaintiff asserts that defendant's agent, William Conway, rep-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d       Page 2
Not Reported in F.Supp.2d, 1999 WL 33520483 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 33520483)**

resented to plaintiff that the proposal was a "take-it-or-leave-it-offer," that defendant's only recourse was to "go for a cease and desist order" and would have to "go to court and let them decide."FAC, ¶ 23. Plaintiff claims that defendant then began contacting plaintiff's customers and informing them that if they continued to purchase products from plaintiff without acquiring licenses for the V.34 and V.90 patents, they would face patent infringement actions. FAC, ¶ 26.

*2 On April 9, 1999, plaintiff filed its original action in this court. On July 2, 1999, defendant moved to dismiss. Plaintiff then voluntarily dismissed its original action, and on July 20, 1999, filed the FAC. In the FAC, plaintiff sets forth five claims: (1) antitrust violation pursuant to section 2 of the Sherman Act; (2) declaratory judgment that defendant misused the patents at issue; (3) declaratory judgment that defendant is estopped form asserting the patents; (4) specific performance of defendant's agreement with the ITU; and (5) unfair competition violation pursuant to both the common law and section 17200 of the California Business and Professions Code.

On August 12, 1999, defendant filed the motion to dismiss currently before the court. In the motion, defendant asserts that plaintiff has failed to state an antitrust claim, an unfair competition claim, and a claim for specific performance. Defendant also argues that plaintiff has failed to show that an actual controversy exists for this court to exercise jurisdiction over the declaratory relief claims.

II. ANALYSIS

A. First Claim for Antitrust Violation Under Sherman Act Section 2

Defendant moves to dismiss plaintiff's first claim, the antitrust claim, on the grounds that plaintiff has failed to allege actual injury, that plaintiff lacks antitrust standing, and that plaintiff has failed to sufficiently plead an "essential facilities" antitrust claim.

1. Actual Injury

To be a proper antitrust plaintiff, a plaintiff must allege that it was actually harmed in some way by defendant's alleged antitrust violation. *SeeAssociated General Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519 (1983). Defendant argues that ESS has not alleged facts that it has lost business as a result of defendant's conduct. "ESS's general allegations, for example, do not state that ESS has lost sales or customers."Defendant's Motion to Dismiss, p.5:10-16. However, the court finds defendant's arguments unavailing. Plaintiff has clearly alleged that it has lost sales and customers as a result of defendant's alleged antitrust violations. "ESS, upon information and belief, has suffered or will suffer antitrust injury as a result of PC-TEL's actions in that ESS has lost or will lose sales and customers...." FAC, ¶ 37. Thus, the court finds that plaintiff has adequately alleged that it has suffered actual injury as a result of defendant's alleged antitrust violations.

2. Antitrust Standing and Essential Facilities Claim

Defendant also argues that plaintiff has failed to sufficiently allege that defendant caused an injury that the antitrust laws were designed to protect, i.e. antitrust injury. Specifically, an antitrust plaintiff must show injury to competition in the relevant market, not just injury to plaintiff. *SeeMetro Indus., Inc. v.. Sammi Corp.,* 82 F.3d 839, 847 (9th Cir.1996); and *McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 811-13 (9th Cir.1988).

*3 The court finds that plaintiff has failed to sufficiently allege injury to competition beyond the impact on plaintiff. Plaintiff's allegations that defendant's "unfair business practices unfairly discriminate against latecomers to the V.34 and V.90 modem market, in favor of earlier market entrants" (FAC, ¶ 27) and that "market entry has been foreclosed and consumer choice has been diminished" (FAC, ¶ 36)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 3
Not Reported in F.Supp.2d, 1999 WL 33520483 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 33520483)**

does not show injury to competition. There is no allegation that consumers have been forced to pay higher prices or that the quality of the choices available to them has been adversely affected.

Plaintiff claims it has adequately alleged antitrust injury under the "essential facilities" doctrine. The Ninth Circuit has stated that the "essential facilities doctrine imposes liability when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain in order to compete with the first."*Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 542 (9th Cir.1991). There are four elements to the essential facilities doctrine: (1) control of an essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. See*City of Anaheim v. Southern Cal. Edison*, 955 F.2d 1373, 1380 (9th Cir.1992). A facility is essential if it is controlled by one firm which also has the power to eliminate competition in the downstream market. *Id.* at 1380 n.5.

In the current case, plaintiff has alleged that defendant holds the patents that are essential to comply with the V.34 and V.90 standards, that plaintiff cannot produce modems that comply with the V.34 and V.90 standards without infringing defendant's patents, and that plaintiff cannot compete in the relevant market due to defendant's refusal to license its patents in a reasonable and non-discriminatory way. FAC, ¶ 29-37. However, these allegations are not enough to show anti-trust injury, actual harm to competition.

B. Fifth Claim for Unfair Competition

Defendant essentially argues that plaintiff fails to state a claim for unfair competition pursuant to California Business and Professions Code section 17200 because plaintiff fails to adequately set forth a violation of antitrust law or harm to competition.

The court agrees. Plaintiff has not adequately alleged that defendant's conduct threatens the incipient violation of an anti-trust law or violates the policy or spirit of one of those laws or otherwise significantly harms or threatens competition. See*Cel-Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999).

C. Fourth Claim for Specific Performance

Defendant contends that even assuming that plaintiff is a third party beneficiary to defendant's agreement with the ITU to license its patents on a non-discriminatory basis and on reasonable terms and conditions, the agreement is too vague to support a claim for specific performance, since it does not provide any express terms of the contract. However, under California law, a court can enforce a contract even if some of the terms are not provided. See*Martin v. Baird*, 124 Cal.App.2d 598, 601 (1954) (holding that a court can imply terms from the usual and reasonable conditions of such a contract). Moreover, courts should seek to uphold the enforcement of contracts and avoid finding that contracts are unenforceable due to uncertainty. *Goodwest Rubber Corp. v. Munoz*, 170 Cal.App.3d 919, 921 (1985) (holding that "fair market value," "reasonable value," and "current market value" are sufficiently certain price terms to support specific performance).

*4 At this stage of the proceedings, the court declines to hold as a matter of law that plaintiff cannot state a claim for specific performance under any circumstances. While none of the cases cited by the parties deal with a similar factual scenario, where no terms of the contract are expressly agreed upon, the court finds that if it is able to rely on defendant's other contracts to determine what is fair, reasonable and non-discriminatory, under California law it must try to enforce the contract. See*Goodwest Rubber*, 170 Cal.App.3d at 921. Toward that end, the court can envision a scenario where a defendant has offered nearly identical licensing agreements to all other competitors. In such a situation,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the court could easily determine what a fair and non-discriminatory contract would be. Additionally, the court observes that determining the customs and practices of defendant and the modem industry would appear to be factual matters outside the scope of the pleadings. Therefore, resolving any doubts in plaintiff's favor, the court finds plaintiff may be able to support a claim for specific performance. Accordingly, defendant's motion to dismiss the specific performance claim is denied.

D. Second and Third Claims for Declaratory Relief

Defendant argues that this court lacks subject matter jurisdiction over plaintiff's declaratory relief claims because no actual controversy exists as to these patent law claims. Alternatively, defendant asserts that even if an actual controversy exists, the court should exercise its discretion and dismiss the declaratory relief claims.

In order to state a claim for declaratory relief under 28 U.S.C. § 2201, a plaintiff must show that an actual controversy exists based on the totality of the circumstances. *Spectronics Corp. v. H .B. Fuller Co.,* 940 F.2d 631, 633-34 (Fed.Cir.1991). The Federal Circuit has developed a two-part test to determine if an actual controversy exists as to a declaration of patent non-infringement or invalidity: (1) the accused infringer must show that it is prepared to produce or has actually produced the alleged infringing products; and (2) the patentee's conduct must create an objectively reasonable apprehension on the part of the accused infringer that the patentee will initiate suit if the allegedly infringing activity continues. *Id.* at 634.[FN1]

> FN1. The court observes that plaintiff does not seek a declaration that the patents are invalid or that its products do not infringe defendant's patents. However, since at this stage of the proceedings the court finds that plaintiff did allege an objective apprehension of immediate suit by defendant, the court need not address whether such a finding is required for plaintiff's patent misuse and estoppel declaratory relief claims.

In the current case, defendant does not dispute that plaintiff has been producing allegedly infringing products. With respect to the second prong, the court finds that plaintiff has adequately alleged that it had an objectively reasonable apprehension that defendant would initiate a lawsuit. Plaintiff indicates that the final offer made by defendant was more onerous than the previously unacceptable offers and that defendant stated that it was a "take-it-or-leave-it offer." FAC, ¶ 23. Certainly, if true, such an offer leaves no room for further negotiations. Moreover, plaintiff alleges that defendant stated that defendant's only recourse was to "go for a cease and desist order" and to "go to the court and let them decide."*Id.* Plaintiff's apprehension of suit is also supported by the allegation that defendant contacted plaintiff's customers and warned them that if they did not acquire licenses for the V.34 and V.90 patents, they would face infringement actions. Taken together, defendant's actions establish an actual controversy which supports the court's jurisdiction to hear plaintiff's declaratory relief claims of patent misuse and estoppel.

*5 Moreover, the court notes that plaintiff's declaratory relief claims arise from and are related to defendant's alleged improper conduct giving rise to plaintiff's other claims for relief. Therefore, judicial economy is best served by allowing plaintiff to pursue its declaratory relief claims together with its other claims for relief. Thus, the court currently declines to exercise its discretion and dismiss these claims.

III. ORDER

Based on the foregoing, the court grants defendant's motion to dismiss as to Counts I and V and denies it as to Counts II, III and IV. Plaintiff is given twenty (20) days leave to amend.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 5
Not Reported in F.Supp.2d, 1999 WL 33520483 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 33520483)**

N.D.Cal.,1999.
ESS Technology, Inc. v. PC-Tel, Inc.
Not Reported in F.Supp.2d, 1999 WL 33520483 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.