# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>       Plaintiff,<br><br>   v.<br><br>QUALCOMM, INC.,<br><br>       Defendant. | CIVIL ACTION NUMBER<br><br>05-3350 (MLC/JJH) |

## REPLY IN SUPPORT OF PLAINTIFF'S MOTION
## TO TRANSFER UNDER 28 U.S.C. § 1404(a)

**Boies, Schiller & Flexner LLP**
150 JFK Parkway, 4th Floor
Short Hills, NJ 07078
(973) 218-1111

**Wilmer Cutler Pickering Hale and Dorr LLP**
60 State Street
Boston, MA 02109
(617) 526-6000

**Wilmer Cutler Pickering Hale and Dorr LLP**
1117 California Avenue
Palo Alto, CA 94304
(650) 858-6000

*Attorneys for Plaintiff Broadcom Corporation*

On the Brief:
William F. Lee
David S. Stone

## Table of Contents

                                                                          **Page**

I.     Introduction...............................................................................................................1

II.    Broadcom Has Met Any Burden It Had To Demonstrate Changed Circumstances............2

III.   Other Factors Favor Transferring the Case...........................................................7

IV.    Conclusion ...............................................................................................................9

## Table of Authorities

Cases

Devorris v. Cummings, Inc.,
   Civil Action No.3:2006-183, 2007 WL 1875816 (W.D. Pa. June 27, 2007) ............................... 6

Lexington v. Cheek & Zeehandelar, LLP,
   No. 1:06cv2029, 2007 WL 593560 (N.D. Ohio Feb. 21, 2007) ................................................. 7

Mata v. Budd Co.,
   44 F.R.D. 225 (E.D. Pa. 1968) ................................................................................................. 3

Ricoh Co., Ltd. v. Honeywell, Inc.,
   817 F. Supp. 473, 487 (D.N.J. 1993) ....................................................................................... 7

Roberts Bros., Inc. v. Kurtz Bros.,
   231 F. Supp. 163 (D.N.J. 1964) ............................................................................................... 3

Schwilm v. Holbrook,
   661 F.2d 12 (3d Cir. 1981) ....................................................................................................... 2

Silver Knight Sales & Mktg., Ltd. v. Globex Int'l, Inc.,
   No. 2:06-cv-123, 2006 WL 3230770 (S.D. Ohio Nov. 6, 2006) ................................................ 6

Summit v. U.S. Dynamics Corp.,
   No. 97 Civ. 9224, 2000 WL 502862 (S.D.N.Y. April 27, 2000) ............................................ 6, 7

United States. v. Yuill,
   Civil Action No.07-432, 2007 WL 3274156 (W.D. Pa. Nov. 5, 2007) ...................................... 6

Zimmer Enters., Inc. v. Atlandia Imports, Inc.,
   478 F. Supp. 2d 983, 989 (S.D. Ohio 2007) ............................................................................. 6

Statute

28 U.S.C. § 1404(a) ............................................................................................................. 1, 2, 4, 10

## I.    INTRODUCTION

Changed circumstances make the Southern District of California a much more appropriate venue than the District of New Jersey for the claims Broadcom presently raises against Qualcomm. Qualcomm now argues against a California venue, but that position contradicts its acknowledgment at the outset of the case that California was the more appropriate venue. Since then, a number of changes have only increased the connections between the dispute and California and weakened the links to New Jersey.

The dismissal of Broadcom's claim based on Qualcomm's acquisition of New Jersey-based Flarion Technologies is one of those changes, but by no means the only one or necessarily the most important. The array of claims in the case—both state and federal—has been altered, as Qualcomm itself has previously trumpeted when it suited its interests. The state-law claims, previously asserted under the laws of many states, now sound only in California law. Many of those claims include allegations connected to three standard-setting processes— GSM/GPRS/EDGE, the H.264 video standard, and ETSI's 802.20 working group—that were not addressed in Broadcom's original Complaint and that involve misconduct by Qualcomm that was directed from California. One of the three federal causes of action now asserted was not present in the original Complaint, and it too focuses on Qualcomm's misconduct with respect to the GSM/GPRS/EDGE standard.

Qualcomm argues that this re-configuration of claims should not count as a changed circumstance because Broadcom initiated the re-configuration. No doubt it was Broadcom that filed an amended complaint. But Broadcom did not choose New Jersey as the venue for these new claims. On the contrary, Broadcom sought to bring them in California. It was only the success of Qualcomm's motion to stay the California state proceeding in which Broadcom raised these claims that brought them to this venue. Thus, the shift in the balance of claims toward

much stronger links to California properly counts as a changed circumstance and weighs strongly in favor of transfer to California.

On top of these changes in the character of this case, the filing of two class-action suits premised on largely the same misconduct by Qualcomm that is at issue here represents another important change warranting transfer.

In addition to all of these changes, a number of basic considerations about the parties, witnesses, and documentary evidence show that California is the superior forum. Qualcomm and Broadcom have their headquarters in southern California; both the lead class-action plaintiffs and many of the witnesses reside there; and, in Qualcomm's own words, "there is little doubt that relevant evidence and witnesses are located" there.[1] Trying all three cases in the Southern District of California would therefore serve the interest of justice by promoting judicial efficiency and conserving the parties' resources.

## II.     BROADCOM HAS MET ANY BURDEN IT HAD TO DEMONSTRATE CHANGED CIRCUMSTANCES

Qualcomm's assertion (Br. 1) that there have been "*no* material 'changes in circumstances' since Broadcom first elected to file suit in th[is] District" is demonstrably false.[2]

---

[1] Qualcomm Incorporated's Memorandum of Points and Authorities in Support of Its Motion to Transfer, at 1, *Meyer v. Qualcomm Inc.*, No. 08-cv-0655-WQH (LSP) (S.D. Cal. May 1, 2008); Qualcomm Incorporated's Memorandum of Points and Authorities in Support of Its Motion to Transfer, at 1, *Valikhani v. Qualcomm Inc.*, No. 08-cv-0786-WQH (JMA) (S.D. Cal. May 2, 2008) (Exhibits A and B to opening brief).

[2] That Qualcomm spends several pages of its brief (Br. 4-8) chastising Broadcom for failing to acknowledge the importance of changed circumstances to the governing legal standard is puzzling since Broadcom devoted most of its opening brief precisely to demonstrating the presence of significant changed circumstances.

Even if changed circumstances did not exist (which they do), Qualcomm overstates the law when it argues (Br. 7) that "[i]f a plaintiff fails to show the existence of changed circumstances justifying transfer, the motion for transfer should be denied on that basis alone." In *Schwilm v. Holbrook*, 661 F.2d 12 (3d Cir. 1981), the Third Circuit allowed a plaintiff's motion to transfer without any mention of a "changed circumstances" requirement. Instead, consistent with the requirements of 28 U.S.C. § 1404(a), the court allowed the plaintiff's motion

2

*First*, the dismissal of Broadcom's claim based on Qualcomm's acquisition of New Jersey-based Flarion Technologies is one change that has diminished the nexus between the dispute and New Jersey. The dismissal of that count removed 21 paragraphs of allegations. While the Flarion claim was only added to the case in Broadcom's First Amended Complaint, that is because Qualcomm did not acquire Flarion until August 2005, a month after Broadcom filed its original Complaint. That the Flarion claim was neither an original nor the only consideration making New Jersey an acceptable venue in no way alters the fact that its removal materially diminishes the connections between the case and New Jersey.

*Second*, the dismissal of the Flarion claim is only one element in a broader re-configuration of the claims that has shifted the focus of the case away from New Jersey and toward California. Unlike Broadcom's original Complaint, which contained no California statutory claims (or its First Amended Complaint, which asserted claims under the laws of many states), Broadcom's Second Amended Complaint ("SAC") includes a claim under California's Unfair Competition Law. SAC ¶¶ 318-29. Qualcomm suggests (Br. 13-16) that this claim is not "California-centric," but in addition to being stated under California law, the claim rests on the

---

simply on the ground that the transfer was in the interest of justice.

    A closer look at several of the cases cited by Qualcomm demonstrates that, contrary to Qualcomm's claim, they do not support the existence of a "change of circumstances" requirement. In *Roberts Bros., Inc. v. Kurtz Bros.*, 231 F. Supp. 163 (D.N.J. 1964), the motion to transfer was denied because it would not "further the convenience of the parties and witnesses [and was not in] the interest of justice." *Id.* at 167-68. The transfer did not convenience the parties or witnesses and was not in the interest of justice because, unlike this case, in which the desired venue is over 3,000 miles away, the plaintiff in *Roberts Bros.* was only trying to move the case to a district ten minutes away from the current venue. *Id.* at 168. In contrast, there was only a passing reference regarding the absence of changed circumstances. *Id.*

    Qualcomm's reliance on *Mata v. Budd Co.*, 44 F.R.D. 225 (E.D. Pa. 1968), is, similarly, misleading. Qualcomm states (Br. 6-7)that the transfer was denied in *Mata* because the plaintiff "kn[ew] full well all the relevant facts at the time she commenced this action." *Id.* at 226-27. In fact, the court denied the motion primarily on the ground that the plaintiff encountered a statute of limitations problem of which she had not been aware and wanted to avoid that problem by transferring the case.

3

allegation that Qualcomm's unfair business acts or practices "significantly threaten[ed] and harm[ed] competition in California," SAC ¶ 320, and that as a result of Qualcomm's wrongful conduct, competition in markets for various functionalities caused harm to consumers in California, *id.* ¶ 326. Moreover, the claim rests on allegations concerning Qualcomm's misconduct in three standard-setting processes—GSM/GPRS/EDGE, the H.264 video standard, and ETSI's 802.20 working group—that were not addressed in Broadcom's original Complaint and that involve misconduct by Qualcomm that was directed from California. *See, e.g.*, SAC ¶¶ 138-69; 173-86.

Broadcom's state common-law claims similarly have been revised to incorporate allegations concerning GSM/GPRS/EDGE, the H.264 video standard, and ETSI's 802.20 working group. And one of the three federal causes of action in Broadcom's Second Amended Complaint is also new, and it concerns Qualcomm's misconduct with respect to the GSM/GPRS/EDGE standard. Thus, unlike the claims stated in Broadcom's earlier complaints, the claims asserted now overwhelmingly involve California law, allegations of misconduct rooted in California, or both.

Qualcomm argues (Br. 17) that this basic re-configuration of claims should not count as a changed circumstance because it was "entirely Broadcom's choice." Not so. Certainly Broadcom revised its claims. But Broadcom did not choose New Jersey as the venue for its new and revised claims. On the contrary, Broadcom sought to bring them in California. *See Broadcom v. Qualcomm*, Case No. 07CC01249 (Cal. Super. Orange Cty.), Complaint for (1) Unfair Competition, (2) Fraud, (3) Breach of Contract, April 12, 2007, attached hereto as Exhibit 1. It was only the success of Qualcomm's motion to stay the California state proceeding in which Broadcom raised these claims that brought them to this venue. *See Broadcom v.*

4

*Qualcomm*, Case No. 07CC01249 (Cal. Super. Orange Cty.), Notice of Entry of Order Granting

Qualcomm's Motion to Stay the Proceedings, October 19, 2007, attached hereto as Exhibit 2.

Thus, the shift in the balance of claims toward much stronger links to California properly counts

as a changed circumstance and weighs strongly in favor of transfer to California.

In line with the re-configuration of Broadcom's claims, the Second Amended Complaint

includes numerous allegations about Qualcomm's misconduct that are based on information

discovered since the filing of the original Complaint.  Those additional allegations also tie the

case more firmly to California.  Qualcomm discounts the significance of these allegations

because by and large they do not specify that the conduct described took place in California.  But

because Qualcomm is headquartered in California, it is likely that California was the locale for

many internal Qualcomm discussions about setting royalties in an unreasonable, unfair, and

discriminatory manner, *id.* ¶¶ 7, 27, 207, false commitments to license on FRAND terms, *id.* ¶ 7,

and assertions that its patents are essential to comply with the relevant standards, *id.* ¶¶ 46, 103.

Since the filing of its original Complaint, Broadcom has also gained new information that

Qualcomm has attempted to collect royalties on items that are beyond its patented technology, *id.*,

¶ 110, demanded non-reciprocal patent rights, *id.* ¶ 112, and collected double royalties by

insisting on licenses at the component and handset level, *id.* ¶ 113; *see also id.* ¶¶ 58, 61, 65, 67,

70, 103, 117, 123.  These activities were likely based out of Qualcomm's headquarters in

California.

*Third*, the recent filing in the Southern District of California of two class actions

concerning largely the same misconduct by Qualcomm that forms the basis for this case

constitutes a changed circumstance favoring transfer.  In urging the transfer of those actions to

this District, Qualcomm itself has acknowledged that this case constitutes "a largely identical

action." Qualcomm Incorporated's Memorandum of Points and Authorities in Support of Its

Motion to Transfer, *Meyer v. Qualcomm Inc.*, No. 08-cv-0655-WQH (LSP) (S.D. Cal. May 1,

2008), at 8; Qualcomm Incorporated's Memorandum of Points and Authorities in Support of Its

Motion to Transfer, *Valikhani v. Qualcomm Inc.*, No. 08-cv-0786-WQH (JMA) (S.D. Cal. May 2,

2008), at 7 (Exhibits A and B to opening brief).

     Qualcomm tries to diminish the significance of the cases pending in the Southern District

of California by invoking the "first-filed" rule. But "[w]hile the first-filed rule can be considered

as one factor in the more general transfer analysis under § 1404(a), a finding that the first-filed

rule is applicable does not preclude a transfer to the forum where the second answer was filed.

The inquiries are separate and distinct, and the former does not control the latter." *Devorris v.*

*Cummings, Inc.*, Civil Action No. 3:2006-183, 2007 WL 1875816, at *7 (W.D. Pa. June 27,

2007); *see United States. v. Yuill*, Civil Action No. 07-432, 2007 WL 3274156, at *5 (W.D. Pa.

Nov. 5, 2007) ("The question of whether the 'first-filed' rule applies is separate and distinct from

the transfer inquiry required under § 1404(a)."); *Zimmer Enters., Inc. v. Atlandia Imports, Inc.*,

478 F. Supp. 2d 983, 989 (S.D. Ohio 2007) (same); *Silver Knight Sales & Mktg., Ltd. v. Globex*

*Int'l, Inc.*, No. 2;06-cv-123, 2006 WL 3230770, at *4 (S.D. Ohio Nov. 6, 2006) (rejecting

application of first-filed rule after going through the transfer analysis and finding other venue

preferable); *Summit v. U.S. Dynamics Corp.*, No. 97 Civ. 9224, 2000 WL 502862, at *3

(S.D.N.Y. April 27, 2000) (transferring case to venue of later-filed case based on overall

assessment of where interest of justice lay); *Ricoh Co., Ltd. v. Honeywell, Inc.*, 817 F. Supp. 473, 487 (D.N.J. 1993) (same).[3]

## III.    OTHER FACTORS FAVOR TRANSFERRING THE CASE

In addition to the important changed circumstances described above, a number of other considerations show that transfer to the Southern District of California would serve the interest of justice.  As Broadcom noted in its opening brief, both Qualcomm and Broadcom are headquartered in southern California, the lead plaintiffs in the California cases reside there, and many witnesses reside in southern California.  As Qualcomm acknowledges in its transfer motions in the California class actions, the Southern District of California "ordinarily would be a convenient venue" for it and "there is little doubt that relevant evidence and witnesses are located in [that] [d]istrict."[4]  Indeed, Qualcomm itself has stated that 53 Qualcomm employees with office addresses in San Diego are likely to have discoverable information, and Qualcomm acknowledges that many relevant Qualcomm documents could be at Qualcomm's San Diego campus.[5]  Thus, transferring this action to the Southern District of California will promote judicial efficiency while conserving the resources that witnesses and parties must expend in litigating this dispute.

---

[3] It is hardly unusual to permit a plaintiff to transfer a case from the forum in which it was first filed to a forum in which a later action was filed. *See, e.g., Lexington v. Cheek & Zeehandelar, LLP*, No. 1:06cv2029, 2007 WL 593560 (N.D. Ohio Feb. 21, 2007) (allowing plaintiff to transfer to second-in-time court because it was more convenient); *Summit v. U.S. Dynamics Corp.*, No. 97 Civ. 9224, 2000 WL 502862, at *3(S.D.N.Y. Apr. 27, 2000) (finding that interest of justice would be best served by transferring first-in-time case because of the "considerable amount of duplicative, and possibly contradictory, litigation" if the two cases proceeded simultaneously).

[4] Qualcomm Incorporated's Memorandum of Points and Authorities in Support of Its Motion to Transfer, *Meyer v. Qualcomm Inc.*, No. 08-cv-0655-WQH (LSP) (S.D. Cal. May 1, 2008), at 8 (Exhibit A to opening brief); Qualcomm Incorporated's Memorandum of Points and Authorities in Support of Its Motion to Transfer, *Valikhani v. Qualcomm Inc.*, No. 08-cv-0786-WQH (JMA) (S.D. Cal. May 2, 2008), at 7 (Exhibit B to opening brief).

[5] *See* Qualcomm Incorporated's Amended and Supplemental Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1), at 2-18, attached hereto as Exhibit 3.

7

In an effort to minimize these powerful connections to California, Qualcomm states that it will make its employees available to testify in New Jersey. Regardless, requiring witnesses to travel to New Jersey while they must appear simultaneously in the California court imposes a significant inconvenience on the large number of likely witnesses located in California.

Many of the same witnesses will likely be deposed in the California cases as in this one, and Broadcom, Qualcomm, and the plaintiffs in the California cases will likely seek discovery of many of the same documents and records. Qualcomm admits that "both suits would require much of the same motion practice, document discovery and deposition and in-court testimony" and that "there is little doubt that relevant evidence and witnesses are located" in southern California. Exhibit A, at 6, 8; Exhibit B, at 7, 8.

In resisting transfer, Qualcomm points out that this case has been pending for three years. But most of that time was consumed by having Qualcomm's motion to dismiss adjudicated by this Court and on appeal. Only one deposition has occurred to date, and the parties have only recently re-initiated discovery. Furthermore, Qualcomm has not yet even filed its Answer. Because discovery is in a relatively early stage, the case can easily be transferred to California.[6]

---

[6] Qualcomm does not fairly present (Br. 21) a May 20, 2008 telephone call with counsel for Broadcom. Counsel for Qualcomm asked counsel for Broadcom whether Broadcom would agree that all previously entered discovery rulings and deadlines would remain in effect upon any transfer of this action, and alleges that "Broadcom did not agree." The truth is, Broadcom neither agreed nor disagreed, since the issue is premature. Broadcom would be amenable to such a discussion at the appropriate time.

Qualcomm also mischaracterizes the import of Judge Rudi M. Brewster's declining to consent to a transfer to him of *Meyer v. Qualcomm*. Qualcomm implied that Judge William Q. Hayes is less qualified to preside over the case because he, unlike Judge Brewster, had not presided over any previous Broadcom and Qualcomm cases. While Judge Brewster did not provide a reason for declining the transfer, he is a senior judge and is not taking any new cases.

The parties' and likely witnesses' fundamental ties to California, combined with the recent changes that have decisively shifted the center of gravity of Broadcom's claims to California, make transfer to the Southern District of California both convenient and just.

## IV.    CONCLUSION

For the foregoing reasons, as well as those presented in Broadcom's opening brief, this case should be transferred to the Southern District of California.

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By:____/s David S. Stone_____
David S. Stone, Esq.
dstone@bsfllp.com
*Counsel for Plaintiff Broadcom Corporation*

Dated: June 9, 2008

## CERTIFICATE OF SERVICE

I, David S. Stone, hereby certify that the foregoing Reply in Support of Plaintiff's Motion

To Transfer Under 28 U.S.C. § 1404(a), which was filed and served electronically on June 9,

2008 on counsel for all named parties through the Court's *ECF system*, including:

> William J. O'Shaughnessy, Esq.
> McCARTER & ENGLISH, LLP
> Four Gateway Center
> 100 Mulberry Street
> Newark, NJ 07102-4056
>
> Peter T. Barbur, Esq.
> Elizabeth Grayer, Esq.
> CRAVATH, SWAINE & MOORE LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York, NY 10019
>
> Steven J. Kaiser, Esq.
> CLEARY, GOTTLIEB, STEEN & HAMILTON
> 200 Pennsylvania Avenue, NW
> Washington, DC 20006

    /s David S. Stone
David S. Stone, Esq.
dstone@bsfllp.com
Boies, Schiller & Flexner LLP
150 JFK Parkway, 4th Floor
Short Hills, NJ 07078
Tel: 973-218-1111
Fax: 973-218-1106
*Counsel for Plaintiff Broadcom Corporation*

10

# EXHIBIT 1

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

APR 1 2 2007

ALAN SLATER, Clerk of the Court

BY: ___J. HAINES___, DEPUTY

1  WILMER CUTLER PICKERING HALE AND DORR LLP
   William F. Lee (william.lee@wilmerhale.com)
2  60 State Street
   Boston, Massachusetts 02109
3  Telephone: (617) 526-6000; Facsimile: (617) 526-5000

4  WILMER CUTLER PICKERING HALE AND DORR LLP
   James L. Quarles III (james.quarles@wilmerhale.com)
5  1875 Pennsylvania Avenue, N.W.
   Washington, D.C. 20006
6  Telephone: (202) 663-6000; Facsimile (202) 663-6363

7  WILMER CUTLER PICKERING HALE AND DORR LLP
   Mark D. Selwyn (244180) (mark.selwyn@wilmerhale.com)
8  1117 California Avenue
   Palo Alto, California 94304
9  Telephone: (650) 858-6000; Facsimile: (650) 858-6100

10 CLEARY GOTTLIEB STEEN & HAMILTON LLP
   George S. Cary (73858) (gcary@cgsh.com)
11 Mark W. Nelson (mnelson@cgsh.com)
   2000 Pennsylvania Avenue, N.W.
12 Washington, D.C. 20006
   Telephone: (202) 974-1500; Facsimile: (202) 974-1999
13
   O'MELVENY & MYERS LLP
14 Michael G. Yoder (83059) (myoder@omm.com)
   Marcus S. Quintanilla (205994) (mquintanilla@omm.com)
15 610 Newport Center Drive, 17th Floor
   Newport Beach, California 92660
16 Telephone: (949) 760-9600; Facsimile: (949) 823-6994

17 Attorneys for Plaintiff
   BROADCOM CORPORATION
18

19            SUPERIOR COURT OF THE STATE OF CALIFORNIA

20                    FOR THE COUNTY OF ORANGE

21
22 BROADCOM CORPORATION, a California      )  Case No. 07CC01249
   corporation,                           )
23                                         )  COMPLAINT FOR
                 Plaintiff,                )
24                                         )  1.  UNFAIR COMPETITION
        vs.                                )  2.  FRAUD
25                                         )  3.  BREACH OF CONTRACT
   QUALCOMM, INC., a Delaware corporation; )
26 and DOES 1 through 10, inclusive,       )
                                           )  JUDGE STEPHEN J. SUNDVOLD
27               Defendants.               )     DEPT. CX105
                                           )
28

Plaintiff BROADCOM CORPORATION ("Broadcom") alleges as follows:

**NATURE OF THE ACTION**

1. This action in law and equity is brought by Broadcom to remedy various unfair and improper actions of Defendant Qualcomm, Inc. ("Qualcomm") that were and are calculated to undermine competition in markets for technical functionality and integrated circuit chips used in mobile wireless devices. As part of a pattern of misconduct, Qualcomm has engaged in unfair competition, has breached its contracts, and has engaged in fraudulent concealment in connection with standard-setting organizations responsible for mobile communications, broadband wireless communication, and video compression. Qualcomm's actions have injured Broadcom and other companies that implement technical standards, and have caused injury to competition and consumers in California and elsewhere.

2. In furtherance of its unfair competition, Qualcomm has pursued a strategy of manipulating the activities of leading standard-setting organizations ("SSOs") responsible for the development and release of critical standards for mobile communications, broadband wireless communications, and video compression. As described more fully below, SSOs establish standards applicable to all participants in the field covered by the SSO. The purpose of a standard is to ensure compatibility and interoperability of the products of numerous manufacturers. Thus, once adopted, a standard exerts substantial pressure on manufacturers to make their products compliant with the standard, and, absent constraint, creates opportunities to extract monopoly rents and terms for any company owning intellectual property that has been incorporated into the standard.

3. A participant in an SSO owning Intellectual Property Rights ("IPR"), such as a patent, has a substantial incentive to cause the standard to be established such that practicing the standard results in practicing – and thereby infringing – the claims of the patent. As a result, SSOs require that participants disclose their IPR when participating in the creation of a standard so that, in determining the nature of the standard to be adopted and in choosing among competing technologies, the SSO and its participants will be aware of the presence of patents and other IPR that may be implicated by choices made during the setting of the standard. To prevent holders of

1  IPR from exploiting the market power of having that IPR included in the standard, SSOs also

2  require that the participants holding IPR undertake to make any IPR necessary to practice the

3  standard available for license, most frequently under what are described as Fair, Reasonable, And

4  Non-Discriminatory (or "FRAND") terms.

5       4.     Notwithstanding these clear requirements of the SSOs and the clear understanding

6  of the participants in the industry regarding these requirements, Qualcomm, in violation of its

7  contractual obligations and in violation of the policies and practices of the SSOs, has deliberately

8  followed a pattern and practice of delaying disclosure to these SSOs of its purported intellectual

9  property rights until after substantial development of a standard has occurred or the standard has

10 already been adopted. In certain cases, while concealing its IPR, Qualcomm has covertly

11 attempted to steer SSOs toward adopting standards that would cover its own patented technology,

12 notwithstanding the availability of other non-infringing alternatives that performed at least as well.

13 Qualcomm has engaged in this wrongful and deceptive conduct, in violation of its commitments to

14 SSOs, with the purpose and intent of perpetuating its scheme of extorting unfair, unreasonable,

15 and discriminatory licensing revenue and terms from companies such as Broadcom that design,

16 manufacture or have manufactured, and/or sell standard-compliant products. These practices, in

17 turn, have injured consumers of standards technology (such as Broadcom), consumers of standard-

18 compliant products and services (including chip manufacturers, handset manufacturers, network

19 service providers, and mobile phone users), and competition in California and elsewhere.

20      5.     For many years, Qualcomm has dominated the markets for chipsets implementing

21 mobile communications standards using technology known as Code Division Multiple Access

22 ("CDMA"). Qualcomm has numerous patents, many of which were issued ten or more years ago,

23 that Qualcomm claims cover aspects of the CDMA technology used in the CDMA family of

24 standards.

25      6.     In recent years, Qualcomm has used improper means to attempt to obtain licensing

26 agreements and royalties on products implementing wireless communication standards outside of

27 the CDMA family. Qualcomm has also used improper means to attempt to obtain licensing

28 agreements and royalties on products implementing the H.264 video compression standard.

1    7.    The rules, policies, and/or practices of the various SSOs in which Qualcomm has
2  participated required Qualcomm to make timely disclosure of any purported IPR – including
3  patent rights – related to the technologies under consideration for the standard to be developed.
4  As a participant in the standard-setting process, Qualcomm was contractually obligated to abide by
5  these rules.  During Qualcomm's participation in the development of these international standards,
6  Qualcomm repeatedly violated its disclosure obligations by failing to reveal patents that
7  Qualcomm now claims are essential to practice certain international standards related to mobile
8  communications and video compression.

9    8.    Qualcomm also violated the rules of and breached its agreement with an SSO
10  responsible for developing mobile wireless communications standards by engaging in vote-
11  stacking, nondisclosure of financial relationships, and other deceptive practices designed to distort
12  the standard-setting process in favor of Qualcomm technology.

13    9.    Moreover, in addition to failing to disclose its purported patent rights, Qualcomm
14  improperly and, in some instances, secretly adopted strategies and positions before the SSOs
15  calculated to steer the standards under development toward technologies that Qualcomm believed
16  were protected by Qualcomm patents.

17    10.    After the SSOs had finalized and published the standards, Qualcomm again
18  breached its contractual obligations to the SSOs by failing to offer fair, reasonable, and non-
19  discriminatory licenses to its purportedly essential patents.

20                                    **PARTIES**

21    11.    Broadcom is a corporation organized and existing under the laws of the State of
22  California, having a principal place of business at 5300 California Avenue, Irvine, California,
23  92617.  Broadcom is a leading supplier of semiconductors for wired and wireless broadband
24  communications.

25    12.    Qualcomm is a corporation organized and existing under the laws of Delaware,
26  having a principal place of business at 5775 Morehouse Drive, San Diego, California, 92121.  At
27  all times relevant to this Complaint, Qualcomm operated a business in the State of California.

28

1    13.    The true names and capacities of defendants Does 1 through 10 are unknown to
2  Broadcom, and Broadcom therefore sues these defendants by such fictitious names. Broadcom
3  will seek leave of court to amend this complaint to allege such names and capacities as soon as
4  they are ascertained. Each reference in this amended complaint to "Defendants" or to a
5  specifically named defendant also refers to all defendants sued under such fictitious names.

6                              **JURISDICTION AND VENUE**

7    14.    The Court has personal jurisdiction over Qualcomm pursuant to Cal. Code. Civ.
8  Proc. § 410.10 because Qualcomm's principal place of business is located within the State of
9  California.

10    15.    Venue is proper in this State and County under Cal. Code. Civ. Proc. § 395.5
11  because Broadcom has suffered the injuries alleged in this complaint within this County.
12  Qualcomm has conducted and continues to conduct business in this County, including in Irvine,
13  California.

14            **THE IMPORTANCE OF STANDARDS AND TIMELY PATENT DISCLOSURE**

15    16.    Standards play a critical role in the development of technologies that affect
16  virtually all aspects of modern life. In general, standards permit multiple companies to develop
17  products that compete more effectively in the same area of technology.

18    17.    Standards facilitate the adoption and advancement of technology and facilitate the
19  development of products that can interoperate. Companies that produce products implementing a
20  standard can make products by referencing only the standard, without the need to communicate
21  separately with every other company with which their products may need to work. Companies
22  producing products implementing a standard can therefore guarantee that their products will
23  operate with products produced by other companies that also implement the standard.

24    18.    When participants in SSOs comply with the practices, policies, and procedures of
25  the SSOs and do not abuse the standard-setting process, standard-setting can have pro-competitive
26  effects. As described herein, the adoption of standards can provide for interoperability, can
27  improve quality, and can simplify product development.

28

1        19.    Once a standard has been adopted, patents that are essential to that standard gain
2    value. The adoption of a patent holder's technology into a standard can enable the holders of
3    essential patents, if not otherwise constrained, to extract a dependable stream of monopoly rents
4    from a significant base of parties that must license their patents in order to compete. Companies
5    that produce products implementing a standard can become "locked in" to a particular technology
6    if, due to cost or other considerations, it is not practical to develop or switch to another
7    technology, or if customers for their products (such as wireless telecommunications carriers) are
8    locked into standardized technology and therefore have no practical choice other than to purchase
9    standard-conformant equipment. Accordingly, the adoption of a standard requiring the use of
10   technology covered by a patent confers upon that patent holder the ability, if not otherwise
11   constrained, to extract monopoly rates and terms from prospective licensees, or to capture for itself
12   downstream markets that require the technical functionality as an input by foreclosing the ability
13   of others to compete, or to shut down the market entirely.

14       20.    To help defend against unfair abuse of the standard-setting process by participants,
15   SSOs frequently adopt rules, policies, and/or procedures requiring participants to timely disclose
16   any intellectual property relevant to the standard under consideration. The rules, policies, and/or
17   procedures of an SSO relating to intellectual property rights are known as the "IPR policies" of the
18   SSO. SSOs' IPR policies also routinely require participants to disclose their affiliations with any
19   company or organization that has a financial interest in the technology under consideration
20   (including potential IPR).

21       21.    The IPR policies applicable to the standards at issue in this litigation require that:
22   (1) participants have a duty to disclose IPR, such as patents or patent applications, relevant to the
23   standard under consideration; (2) if a license for IPR that is essential or potentially essential to
24   implementing the standard cannot be obtained the standard should be rewritten to exclude the
25   technology or be withdrawn; and (3) if the SSO decides to adopt a standard that incorporates IPR
26   held by a participant, the participant must commit to grant licenses for IPR that is essential or
27   potentially essential to implementing the standard on terms and conditions that are FRAND.
28

1

**CELLULAR WIRELESS STANDARDS**

2     22.     Standards are especially critical to and prevalent in the cellular wireless industry,
3  and standards have played an important role in the adoption of cellular technology. Standards are
4  essential to ensure that a carrier's wireless system can seamlessly interface and function properly
5  with cell phones made by different manufacturers. Regardless of which manufacturer makes a cell
6  phone, which chipset maker supplies the components for the cell phone, and which company
7  manufacturers the service provider's infrastructure, each cellular phone must be capable of
8  interfacing with all of the other components in a carrier's wireless system.

9     23.     Over the last decades, cellular phones have developed through several generations.
10  The first generation (or "1G") of cellular phones employed analog signals. The second generation
11  (or "2G") of cellular telephones migrated to digital technology. The third generation (or "3G") of
12  cellular wireless standards have enhanced abilities to deliver text and other media, and to connect
13  to the Internet.

14     24.     Currently, most wireless networks worldwide provide and support 2G wireless
15  functionality. Many networks are beginning to support 3G wireless technology.

16     25.     There are several basic families of standards that govern 2G and 3G wireless
17  technology. The two most widely adopted are the Global System for Mobility ("GSM") family
18  and the Code Division Multiple Access ("CDMA") family. Mobile phones developed for use in
19  GSM systems will not work in CDMA systems, and vice versa.

20     26.     The GSM family of standards is used in most European countries and by some
21  major carriers in the United States, China, South America, and elsewhere throughout the world.
22  Many GSM carriers have adopted or are adopting evolutionary improvements and advancements
23  (prior to and not in lieu of adopting 3G functionality) that permit greater data rates and increased
24  voice capability. These advances are embodied in technologies known as GSM Packet Radio
25  Service ("GPRS") and Enhanced Data Rates for GSM Evolution ("EDGE"), which are standards
26  in the GSM family. In addition, the industry has adopted a third-generation standard in the GSM
27  family, known as Universal Mobile Telephone System ("UMTS").

28

1    27.    The CDMA family of standards is used by several carriers in the United States and

2 Korea. Standards known as IS-95A, IS-95B, and CDMA2000 1xRTT are 2G standards in the

3 CDMA family. CDMA2000 1xEV-DO and CDMA2000 1xEV-DV are 3G standards in the

4 CDMA family.

5                            **RELEVANT FUNCTIONALITY MARKETS**

6    28.    As a core part of the development of an industry standard, SSO participants seek to

7 determine the appropriate technology to be used for each individual function required to practice

8 the relevant standard. SSO participants evaluate and select among viable alternative, competing

9 technologies that are capable of performing each required function, and typically select among the

10 alternatives on the basis of technical merit and intellectual property considerations, including

11 whether the alternative includes proprietary technology and whether and on what terms such

12 proprietary technology is available. Thus, prior to adoption of the standard, there are multiple

13 competing alternative technology solutions in the market to perform the functionality at issue.

14    29.    Once SSO participants select a technology to perform a particular function needed

15 to practice a standard, all alternative technological solutions for that function are excluded from

16 use in connection with that standard. Thus, the selection of a particular technology in the

17 standardization process reduces to a single option the technology to perform each function

18 necessary to practice the standard. If the chosen technology is essential to practice the standard

19 and reads on essential patents, then the owner of such essential patent rights becomes the sole

20 source of the technology needed for the particular function incorporated in the standard. This is

21 true for each function comprising the standard for which patented technology was selected.

22    30.    Because each of the cellular wireless standards specifies a set of distinct

23 technologies to perform the various functions within the standard, once a standard is adopted there

24 are, by definition, no substitutes for the standardized technologies on which each particular

25 standard is based. For instance, if a manufacturer wishes to produce products, including chipsets,

26 that incorporate UMTS technologies, it cannot do so without gaining access to UMTS

27 technologies; 3G CDMA technologies are not a substitute. Likewise, there are no substitutes for

28

Complaint for Unfair Competition, Fraud, and Breach of Contract

1  GSM technologies, GPRS technologies, EDGE technologies, or H.264 technologies for companies
2  or consumers wishing to implement or use each corresponding standard.

3       31.     Various technologies compete to be selected by the SSO as the technology to
4  provide each functionality required for a given standard. These technologies compete in separate
5  relevant product markets, which are collectively referred to as the "functionality markets." The
6  geographic scope of these functionality markets is worldwide.

7       32.     Qualcomm claims to own patents essential to practice the technologies that are
8  used for individual functions required to practice a relevant standard. As a result, Qualcomm
9  claims monopoly positions in the relevant functionality markets.

10      33.     Because Qualcomm claims patents on technologies incorporated in the relevant
11 standards, its claimed monopoly positions in the corresponding functionality markets are protected
12 by high barriers to competitive entry. Among other things, each technology is locked into the
13 standard as the only way to provide the particular functionality and any solution based on the
14 standardized technology will therefore implicate those patent rights.

15      34.     Only phones with the appropriate technology will work on a particular wireless
16 system. Similarly, the chipsets that operate mobile phones must conform to the technology of the
17 system for which the phone is being manufactured. For instance, only GSM chipsets can be used
18 in a GSM phone; only UMTS chipsets can be used in a UMTS phone; and only 3G CDMA
19 chipsets can be used in a 3G CDMA phone. None of the chipsets is either interchangeable with,
20 or substitutes for, each other. There is distinct demand and different pricing for each type of
21 chipset.

22      35.     Likewise, when the manufacturer of video encoding and/or decoding systems
23 develops systems that use one of these standards, it must make substantial investments in the
24 development of products and content compatible with that standard. Thus, once a manufacturer
25 implements a system that uses a particular standard, the manufacturer has made a substantial sunk
26 investment in that system, and the costs that would be incurred to establish alternative products
27 that use a different video compression standard make it prohibitive to switch to a different
28 technology.

1    36.    Only encoders and decoders with the appropriate technology can correctly encode
2    and decode video that is compliant with a specific video compression standard. Similarly, the
3    chipsets that operate within those encoders and/or decoders must conform to the technology of the
4    standard for which the encoder or decoder is being manufactured. Only H.264 chipsets can be
5    used to perform H.264 encoding or decoding in an H.264 video encoder or decoder. No chipsets
6    that perform video encoding or decoding conformant to any other standard is either
7    interchangeable with, or a substitute for, another. There is distinct demand and different pricing
8    for each type of chipset.

9                          **THE CDMA FAMILY OF STANDARDS**

10    37.    Interim Standard 95 ("IS-95"), or TIA-EIA-95, was the first CDMA standard for
11    mobile communications. The commercial name for IS-95 is cdmaOne.

12    38.    The IS-95 standard (cdmaOne) is a 2G mobile communications standard.

13    39.    The Telecommunications Industry Association ("TIA") is a trade association in the
14    United States that developed the IS-95 standard, beginning in 1989. The IS-95 standard was
15    published in 1993.

16    40.    Subsequent to the development of IS-95, the TIA and successor SSOs developed
17    additional standards in the CDMA family, including CDMA2000 and 1xEV-DO.

18    41.    Qualcomm has benefited tremendously from the adoption of CDMA technology in
19    wireless communication standards in the United States and in other locations throughout the
20    world.

21    42.    Qualcomm has at least a 90% market share in sales of the integrated circuit
22    baseband chips found in CDMA phones. In addition, it receives license payments for every
23    CDMA family handset that is sold. Qualcomm earns more than one billion dollars annually from
24    licenses to its CDMA patents.

25    43.    Over the past several years, Qualcomm has sought to obtain licensing revenues
26    from mobile phone products implementing standards outside of the CDMA family. Specifically,
27    Qualcomm has sought to expand its efforts to collect monopoly rents into the GSM family by
28

1  claiming to own patents essential to GSM standards for both 2G (GSM, GPRS, and EDGE) and

2  3G (UMTS).

3  ## THE GSM, GPRS, AND EDGE STANDARDS

4  *I.*    *Development of the 2G GSM Family*

5      44.    The European Telecommunications Standards Institute ("ETSI") is an independent,

6  non-profit SSO founded in 1988 and headquartered in France. The mission of ETSI is to produce

7  global communications standards.

8      45.    ETSI led and continues to lead the standardization process for the GSM family of

9  standards, including revisions to GSM, GPRS, and EDGE.

10      46.    Membership in ETSI is open to any company or organization, although full

11  membership in ETSI is limited to companies or organizations located in certain geographic areas.

12  Today, ETSI has more than 600 members, including many of the world's leading producers of

13  technology for mobile communications.

14      47.    Members of ETSI develop, evaluate, and approve ETSI's standards. Members of

15  ETSI directly influence the technical content of ETSI standards.

16      48.    ETSI began work on GSM in 1989. The first version of the GSM standard was

17  released in 1990.

18      49.    ETSI released the first version of GPRS in March 1998.

19      50.    ETSI released the first version of EDGE in February 1999.

20  *II.*    *Qualcomm Was a Member and Participant in ETSI*

21      51.    Qualcomm has been and is a full member of ETSI through its affiliates, Qualcomm

22  Israel Ltd., Qualcomm Europe S.A.R.L., and Qualcomm UK Ltd.

23      52.    Qualcomm, through its affiliates, joined ETSI in April 1997.

24      53.    Qualcomm has participated and continues to participate today in ETSI's

25  development of communications standards, including standards in the GSM family.

26  *III.*    *ETSI Members Were Obligated to Timely Disclose IPR and To Offer FRAND Licenses*

27      54.    ETSI's Statutes and Rules of Procedure govern the organization and operation of

28  ETSI.

1      55.    The Statutes and Rules of Procedure of ETSI are applicable to all ETSI members,

2  and full ETSI members are required to commit themselves to compliance with the Statutes and

3  Rules of Procedure as a condition of membership.

4      56.    The Statutes and Rules of Procedure of ETSI create a contractual obligation

5  between ETSI and its members and participants.  In addition, the policies and practices of ETSI

6  give rise to implied contractual obligations for ETSI members and participants, and for third

7  parties that seek to practice the standard.

8      57.    Annex 6 of the ETSI Rules of Procedure describes the ETSI Intellectual Property

9  Rights Policy.

10     58.    The ETSI Intellectual Property Rights Policy required all ETSI members to make

11  timely disclosures of essential IPR.

12     59.    The version of section 4.1 of the ETSI Intellectual Property Rights Policy in effect

13  at the relevant time stated, in relevant part:

> Each MEMBER shall use its reasonable endeavours to timely
> inform ETSI of ESSENTIAL IPRs it becomes aware of.

15

16     60.    ETSI maintains a publicly accessible database of all IPR disclosures made by ETSI

members.

17     61.    ETSI's IPR disclosure policy was and is intended to benefit all ETSI members and

18  participants, as well as other third parties that implement a standard developed by ETSI.

19

20     62.    Before ETSI adopts a standard that includes IPR essential to practicing that

standard, Section 6.1 of the ETSI Intellectual Property Rights Policy required the owner of that

21  IPR to make:

> [A]n undertaking in writing that it is prepared to grant irrevocable
> licences on fair, reasonable and non discriminatory terms and
> conditions under such IPR to at least the following extent:
>
> - MANUFACTURE, including the right to make or have made
>   customized components and sub-systems to the licensee's own
>   design for use in MANUFACTURE,
>
> - sell, lease, or otherwise dispose of EQUIPMENT so
>   MANUFACTURED,
>
> - repair, use, or operate EQUIPMENT, and

- use METHODS.

The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.

63.     Qualcomm has expressly agreed and contracted to license its essential patents for ETSI standards on terms and conditions that comply with the licensing obligation of Section 6.1 of the ETSI Intellectual Property Rights Policy.

## IV.    *Qualcomm Deliberately Failed to Meet ETSI's IPR Disclosure Requirement*

64.     As a result of its membership and participation in ETSI, Qualcomm entered into an actual and/or implied contract with ETSI. Qualcomm was and is bound by the ETSI Statutes and Rules of Procedure, including the ETSI Intellectual Property Rights Policy. Qualcomm was also bound by its agreement to offer FRAND licenses in accordance with ETSI's IPR policy.

65.     Qualcomm is the assignee of at least 104 patents or patent applications that it now, belatedly, claims are essential to practice GSM, GPRS, and/or EDGE.

66.     Although Qualcomm had been an ETSI member since 1997 and knew of and monitored ETSI's development of the GSM family of standards, it was not until at least June 4, 2004, that Qualcomm first disclosed to ETSI the patent numbers of any patents that Qualcomm considered essential to practice GSM, GPRS, and/or EDGE.

67.     Because Qualcomm failed to disclose its patents until many years after ETSI adopted the GSM, GPRS, and/or EDGE standards, the participants in the ETSI standard setting process were unable to consider the impact of Qualcomm's asserted patent rights in formulating standards that incorporate technology that Qualcomm now claims read on those patent rights. This distorted the process by which the participants selected among alternative technologies to incorporate in the standards based on considerations of technical merit and intellectual property rights, and allowed Qualcomm unfairly and fraudulently to cause ETSI to adopt standards incorporating technology that Qualcomm now claims reads on its patents.

68.     Qualcomm's disclosure of patents purportedly essential to GSM, GPRS, and/or EDGE was untimely and in violation of the policies and practices of ETSI, including ETSI's Intellectual Property Rights Policy.

1      69.    Qualcomm's nondisclosure was deliberate and intentional.

2  V.    **Qualcomm's Nondisclosure and Refusal to Offer FRAND Licenses Has Harmed**

3        **Broadcom and Competition**

4      70.    After April 1997, ETSI developed all core technical content of the GPRS and

5  EDGE standards.

6      71.    One of the factors that ETSI members considered in agreeing to and establishing

7  the technical content of the GPRS and EDGE standards was the quantity, nature, scope, and

8  ownership of IPR disclosed by ETSI participants.

9      72.    Broadcom has been a member of ETSI since 1998.

10     73.    Members of ETSI and others seeking to practice ETSI standards reasonably rely on

11 other ETSI members having complied with ETSI's rules and regulations, including ETSI's

12 Intellectual Property Rights Policy and ETSI's requirement that members license IPR on FRAND

13 terms and on terms that are otherwise in accordance with ETSI's Intellectual Property Rights

14 Policy.

15     74.    Broadcom relied upon all ETSI members – including Qualcomm – complying with

16 the ETSI rules and regulations.

17     75.    Broadcom develops, markets, and sells microchips, chipsets, and software for

18 mobile wireless devices complying with the GSM, GPRS, and EDGE standards.

19     76.    Broadcom has made substantial investments to develop and market GSM, GPRS,

20 and EDGE products, including the acquisition of Mobilink Telecom, Inc. in May 2002.

21     77.    In November 2003, following its acquisition of Mobilink Telecom, Inc., Broadcom

22 introduced the first EDGE compliant chip into the U.S. market.

23     78.    Broadcom continues today to develop, market, and sell microchips, chipsets, and

24 software for mobile wireless devices complying with the GSM, GPRS, and EDGE standards.

25     79.    Qualcomm has asserted to companies including Broadcom and its customers that

26 products implementing the GSM, GPRS, and/or EDGE standards require a license to Qualcomm's

27 purportedly essential patents.

28

- 13 -

1      80.    Qualcomm has also asserted to companies including Broadcom and its customers
2  that Broadcom does not have a license from Qualcomm to implement the GSM, GPRS, and/or
3  EDGE standards.

4      81.    Qualcomm's claims that Broadcom requires a license to Qualcomm's purportedly
5  essential GSM, GPRS, and/or EDGE patents have injured and continue to injure Broadcom,
6  including by interfering with Broadcom's ability to make sales and reducing Broadcom's profits.

7      82.    Qualcomm's refusal to honor its commitments to ETSI to license its purportedly
8  essential IPR on FRAND terms and conditions and in accordance with the other terms of the ETSI
9  IPR policies has injured and continues to injure Broadcom, including by interfering with
10  Broadcom's ability to develop and market semiconductors for GSM, GPRS, and EDGE compliant
11  mobile wireless devices.

12      83.    Qualcomm's misconduct has injured and is continuing to injure competition and
13  consumers in California and elsewhere by, among other things, inflating prices for products,
14  including chipsets, that practice the GSM, GPRS, and EDGE standards, and resulting in delayed
15  implementation of the standard and lack of confidence among adopters. Its failure to disclose its
16  patents to ETSI has allowed Qualcomm unfairly and fraudulently to obtain, or claim to have
17  obtained, a monopoly in markets for functionality that is incorporated in the GSM, GPRS, and
18  EDGE standards. Through Qualcomm's deceptive conduct, ETSI members were denied critical
19  information for the development of and choice between competing technologies to be incorporated
20  in these standards. In addition, Qualcomm's failure to disclose its patent rights to ETSI and its
21  current refusal to offer licenses to its patents that comply with the ETSI requirements has allowed
22  Qualcomm unfairly and fraudulently to obtain or demand monopoly rents and terms from parties
23  practicing the GSM, GPRS, and EDGE standards. Qualcomm deliberately violated the rules of
24  the standard-setting organization designed to prevent such exploitation by patent holders.

25  **VI.    _Qualcomm Deliberately Failed to Meet Its License Obligations_**

26      84.    Qualcomm has not offered Broadcom a license to practice the patents that
27  Qualcomm claims are essential to GSM, GPRS, and/or EDGE in accordance with its commitments
28  to ETSI.

- 14 -

1  85.  Instead, in willful disregard of its commitments to ETSI, Qualcomm has refused to

2  offer licensing terms that are fair, reasonable, and nondiscriminatory, and has otherwise failed to

3  offer terms that comport to the ETSI licensing requirements.

4  86.  Qualcomm has violated its licensing obligations by refusing to provide Broadcom

5  with a license in accordance with the terms of ETSI's IPR policy.

6  **THE UMTS STANDARD**

7  87.  UMTS is a third-generation mobile telephone standard.  UMTS is part of the GSM

8  family of standards.

9  88.  The air interface for the UMTS standard is known as Wideband Code Division

10  Multiple Access, or "WCDMA." Despite the similarity between the abbreviations, WCDMA is

11  not part of the CDMA family of standards.  Rather, WCDMA is a distinct technology that has

12  been adopted and implemented as a component of UMTS, a 3G standard in the GSM family of

13  standards.

14  *I.    Development of UMTS*

15  89.  In conjunction with other organizations that comprise the 3rd Generation

16  Partnership Project ("3GPP"), ETSI has been and is responsible for the standardization process for

17  UMTS.

18  90.  ETSI began work on UMTS in 1997.  The first version of UMTS was released in

19  December 1999.  Subsequent versions were released in March 2001, March 2002, and December

20  2004.

21  *II.    Qualcomm Was (and Is) a Member and Participant in ETSI*

22  91.  As alleged more fully in ¶¶ 51-53, Qualcomm was (and is) a member and

23  participant in ETSI.

24  *III.    ETSI Members Were Obligated to Timely Disclose IPR and to Offer FRAND Licenses*

25  92.  As alleged more fully in ¶¶ 54-63, ETSI members were obligated to make timely

26  disclosures of essential IPR and to offer licenses to essential IPR on FRAND terms and on terms

27  that are otherwise in accordance with the ETSI IPR policy.

28

1    93.    ETSI's rules, policies, and practices governing IPR disclosure and licensing applied
2  to the UMTS standard.

3  *IV.    Qualcomm's Efforts to Force ETSI to Adopt Qualcomm IPR*

4    94.    In the late 1990s, ETSI began considering candidate technologies for the UMTS
5  standard that would have worldwide application. ETSI and its members considered a number of
6  solutions, including, among others, WCDMA, Wideband Time Division Multiple Access
7  ("WTDMA"), Wideband TDMA/CDMA ("TD-CDMA"), and Orthogonal Frequency Division
8  Multiple Access ("OFDMA").

9    95.    Concept groups within ETSI were formed to test and evaluate technology
10 alternatives. Each group produced a technical proposal demonstrating how the relevant
11 technology complied with the technical requirements established by ETSI for the 3G standard, and
12 none was considered superior. The committee chairman in ETSI reported that "when the
13 uncertainty on simulations and the differences in the assumptions made in order to evaluate that
14 performance of the concepts are considered SMG2 [Special Mobile Group 2] have not be[en] able
15 to conclude that any single one of these concept provides a better solution than the other concepts.
16 . . . Therefore SMG2 request SMG to decide on the basis of which of the concepts . . . SMG2
17 shall continue the work on the UMTS Terrestrial Radio Access."

18    96.    In 1997 and 1998, Qualcomm made proposals in an attempt to steer the UMTS
19 standard then under development toward purportedly patented Qualcomm technologies and away
20 from alternative technologies that were at least as effective.

21    97.    The first version of UMTS was released in December 1999.

22 *V.    Qualcomm Deliberately Failed to Meet ETSI's IPR Disclosure Requirement*

23    98.    It was not until October 19, 2001 that Qualcomm disclosed any patents to ETSI as
24 being purportedly essential to the UMTS standard. By that point, ETSI had already released two
25 versions of the UMTS standard.

26    99.    In its October 19, 2001 disclosure, Qualcomm identified 161 patents or applications
27 as purportedly essential to UMTS.

28

- 16 -

1    100.    Because Qualcomm failed to disclose its patents until many years after ETSI
2  adopted the standards for UMTS, the participants in the ETSI standard setting process were unable
3  to consider the impact on Qualcomm's asserted patent rights in formulating the UMTS standard.
4  This distorted the process by which the participants selected among alternative technologies to
5  incorporate in the standard based on considerations of technical merit and intellectual property
6  rights, and allowed Qualcomm unfairly and fraudulently to cause ETSI to adopt a standard
7  incorporating technology that Qualcomm now claims read on its patents.

8    101.    Qualcomm's disclosure of patents purportedly essential to UMTS was untimely
9  and in violation of the policies and practices of ETSI, including ETSI's Intellectual Property
10  Rights Policy.

11    102.    Other ETSI participants disclosed the patent numbers of patents during the
12  development of the UMTS standard and prior to the release of any version.  For example, Ericsson
13  identified more than 40 potentially essential UMTS patents to ETSI in 1998.  Other ETSI
14  participants, including Lucent Technologies, Inc., OKI Electric Industry Co., Ltd., Golden Bridge
15  Technology, and Mitsubishi Electric Corporation, likewise identified specific patents by patent
16  number prior to the release of the UMTS standard.

17    103.    Qualcomm's nondisclosure was deliberate and intentional.

18  **VI.    _Qualcomm's Nondisclosure and Refusal to Offer FRAND Licenses Has Harmed_**
19      **_Broadcom and Competition_**

20    104.    After April 1997, ETSI developed all core technical content of the UMTS standard,
21  including the radio interface, services, and network aspects of the UMTS standard.

22    105.    One of the factors that ETSI members considered in developing the technical
23  content of the UMTS standard was the quantity, nature, scope, and ownership of IPR disclosed by
24  ETSI participants.

25    106.    Broadcom develops, markets, and sells microchips, chipsets, and software for
26  mobile wireless devices complying with the UMTS standard.

27

28

- 17 -

1    107.    After Qualcomm had joined and begun participating in ETSI, Broadcom made
2  substantial investments to develop and market UMTS products, including the acquisition of Zyray
3  Wireless, Inc. in June 2004.

4    108.    In April 2006, Broadcom, following its acquisition of Zyray Wireless, Inc.,
5  introduced its first UMTS compliant chip for the U.S. market.

6    109.    Broadcom continues today to develop, market, and sell microchips, chipsets, and
7  software for mobile wireless devices complying with the UMTS standards.

8    110.    Qualcomm has asserted to companies including Broadcom and its customers that
9  products implementing the UMTS standard require a license to Qualcomm's purportedly essential
10  patents.

11    111.    Qualcomm has also asserted to companies including Broadcom and its customers
12  that Broadcom does not have a license from Qualcomm to implement the UMTS standard.

13    112.    Qualcomm's claims that Broadcom requires a license to Qualcomm's purported
14  UMTS patents have injured and continue to injure Broadcom, including by interfering with
15  Broadcom's ability to make sales and reducing in Broadcom's profits.

16    113.    Qualcomm's refusal to honor its commitments to ETSI to license its purportedly
17  essential IPR on FRAND terms and conditions and in accordance with the other terms of the ETSI
18  IPR policies has injured and continues to injure Broadcom, including by interfering with
19  Broadcom's ability to develop and market semiconductors for UMTS-compliant mobile wireless
20  devices.

21    114.    Qualcomm's misconduct has injured and is continuing to injure competition and
22  consumers in California and elsewhere by, among other things, inflating prices and for products
23  that practice the UMTS standards. Its failure to disclose its patents to ETSI has allowed
24  Qualcomm unfairly and fraudulently to obtain, or claim to have obtained, a monopoly in the
25  aspects of the UMTS functionality markets governed by each element of the standard that
26  Qualcomm claims is covered by its patents. Through Qualcomm's deceptive conduct, ETSI
27  members were denied critical information for the development of UMTS. In addition,
28  Qualcomm's failure to disclose its patent rights to ETSI and its current refusal to offer FRAND

1  licenses to its patents has allowed Qualcomm unfairly and fraudulently to obtain or demand

2  monopoly rents and terms from parties practicing the UMTS standard.  Qualcomm deliberately

3  violated the rules of the standard-setting organization designed to prevent such exploitation by

4  patent holders.

5  **VII.    _Qualcomm Deliberately Failed to Meet Its FRAND License Obligations_**

6      115.    Without conceding that products implementing the UMTS standard infringe

7  Qualcomm's purportedly essential patents, Broadcom has requested the terms of a license to

8  practice those patents.

9      116.    In willful disregard of its commitments to ETSI, Qualcomm offered terms that were

10  unfair, unreasonable, and discriminatory.  Qualcomm has violated its licensing obligations by

11  refusing to provide Broadcom with a license in accordance with the terms of ETSI's IPR policy.

12  **THE H.264 STANDARD**

13      117.    H.264 is a standard for video compression.  It is also known as MPEG-4 Part 10, or

14  Advanced Video Coding ("AVC").

15  **_I.     Development of H.264_**

16      118.    The International Standards Organization ("ISO") and the International

17  Electrotechnical Commission ("IEC") are SSOs involved in setting standards for digital video

18  compression.  The Moving Pictures Expert Group ("MPEG") is a joint subcommittee of the ISO

19  and the IEC focused on the coding of audio, picture, and multimedia information.

20      119.    The International Telecommunications Union ("ITU") is also a SSO involved in

21  setting standards for digital video compression.  The Video Coding Experts Group ("VCEG") is a

22  subdivision of the ITU focused on multimedia systems.

23      120.    In December 2001, the ITU, through VCEG, and the ISO/IEC, through MPEG,

24  jointly founded the Joint Video Team ("JVT").

25      121.    The goal of the JVT was to develop a video coding standard that would improve

26  upon the compression and picture quality provided by prior video coding standards, such as

27  H.263, MPEG-2, and MPEG-4, Part 2.

28

122. The JVT also sought to develop a "royalty free 'baseline' profile . . . in order to promote the wide implementation and use" of the H.264 standard.

123. Members of MPEG and members of VCEG are permitted to participate in the activities of the JVT, including the JVT's efforts to develop a new video compression standard.

124. The JVT has a wide variety of industry participants, including Nokia, Panasonic, Sharp, Microsoft, LG Electronics, Canon, Motorola, Hitachi, Apple Computer, Intel, Philips, Qualcomm, and Broadcom.

125. The first version of the H.264 standard was released in May 2003, and a subsequent version of the H.264 standard was released in March 2005.

126. The JVT's work regarding the H.264 standard continues today.

## II.    *Qualcomm Was (and Is) a Participant in the JVT*

127. Qualcomm is a member of MPEG and therefore had the right to participate in the JVT.

128. Qualcomm participated in the JVT's development of the H.264 standard beginning at least as early as September 2002.

129. Qualcomm's participation included membership in JVT working groups, sponsorship of a JVT meeting, attendance and participation at JVT meetings, and submission of technical proposals to the JVT. Qualcomm continues to participate in the JVT to the present day.

130. As a result of its membership and participation in MPEG and the JVT, Qualcomm was and is bound by the JVT Terms of Reference, the JVT Internal Operating Rules, and the IPR disclosure policies of the ITU and the ISO/IEC.

## III.    *JVT Participants Were Obligated to Timely Disclose IPR*

131. The JVT's activities are governed by the Terms of Reference for Joint Video Team Activities ("JVT Terms of Reference").

132. The JVT's Internal Operating Rules (Annex 3 of the JVT Terms of Reference) require that participants disclose "IPR Information (of their own or anyone else's) associated with any standardization proposal (of their own or anyone else's)" on a "best efforts basis." In

1  addition, the Internal Operating Rules require submission of a "final IPR declaration" to the ITU

2  and the ISO/IEC.

3      133.    The JVT Terms of Reference also provide that the IPR disclosure policies of both

4  the ITU and the ISO/IEC are applicable to JVT participants. Both the ITU and the ISO/IEC

5  require participants in the standard-setting process to disclose any patents believed to be essential

6  to the standard.

7      134.    The ITU's Patent Policy states:

8          ITU-T Recommendations are non-binding international standards.
           Their objective is to ensure compatibility of international
9          telecommunications on a worldwide basis. To meet this objective,
           which is in the common interests of all those participating in
10         international telecommunications (network and service providers,
           suppliers and users), it must be ensured that Recommendations, their
11         applications, use, etc. are accessible to everybody. It follows,
           therefore, that a commercial (monopolistic) abuse by a holder of a
12         patent embodied fully or partly in a Recommendation must be
           excluded. To meet this requirement in general is the sole objective
13         of the code of practice. The detailed arrangements arising from
           patents (licensing, royalties, etc.) are being left to the parties
14         concerned, as these arrangements might differ from case to case.

15     135.    The ITU's Guidelines for Implementation of the ITU-T's Patent Policy state:

16         Any ITU Member State, Sector Member, or Associate aware of a
           patent or pending patent application held by itself or others, which
17         may fully or partly cover elements of the draft Recommendation(s)
           proposed for approval, is requested to disclose such information to
18         the TSB, in no case later than the date scheduled for approval of the
           Recommendation(s) in accordance with ITU-T Patent Policy.

19

20     136.    The ISO IPR Guidelines state:

21         The originator of a proposal for a document shall draw the attention
           of the committee to any patent rights of which the originator is
           aware and considers to cover any item of the proposal. Any party
22         involved in the preparation of a document shall draw the attention of
           the committee to any patent rights of which it becomes aware during
23         any stage in the development of the document.

24     137.    The members of the JVT understood and treated the language of the JVT's Internal

25  Operating Rules, as well as the policies of the ITU and ISO/IEC, as imposing a disclosure duty.

26

27

28

                                    - 21 -

1   **IV.    _Qualcomm's Deliberately Failed to Meet the JVT's Disclosure Requirement_**

2       138.    Qualcomm claims to own at least two patents, U.S. Patent No. 5,452,104 (the "'104

3   patent") and U.S. Patent No. 5,576,767 (the "'767 patent"), that it alleges are essential to practice

4   H.264.

5       139.    The invention claimed in the '104 patent concerns the use of multiple discrete

6   cosine transforms to compress data within an adaptive block size system.

7       140.    The invention claimed in the '767 patent concerns a specific method of interframe

8   video coding, meaning the compression of a frame of video data based on data present in another

9   frame of video.

10      141.    Qualcomm does not currently design or sell any product that implements the

11  inventions claimed in the '104 and '767 patents.

12      142.    Qualcomm did not disclose that it owned those or any other patents supposedly

13  essential to practice H.264 to the JVT, the ITU, or the ISO/IEC until April 25, 2006.

14      143.    Because Qualcomm failed to disclose its patents until many years after the JVT

15  adopted the H.264 standard, the participants in the JVT standard setting process were unable to

16  consider the impact of Qualcomm's alleged essential patent rights in formulating the standard.

17  This distorted the process by which the participants selected among alternative technologies to

18  incorporate in the standards based on considerations of technical merit and intellectual property

19  rights, and allowed Qualcomm unfairly and fraudulently to cause the JVT to adopt a standard

20  incorporating technology that Qualcomm now claims reads on its patents.

21      144.    Qualcomm's disclosure of patents purportedly essential to H.264 was untimely and

22  in violation of the policies and practices of the JVT, the ITU, and the ISO/IEC.

23      145.    Qualcomm's nondisclosure was deliberate and intentional.

24  **V.    _A Jury Has Recommended and a Court Has Found That Qualcomm Waived Its Rights_**

25  **_To Enforce Its Patents as a Result of Its Nondisclosure to the JVT_**

26      146.    Qualcomm asserted two of its patents against the H.264 standard in an action

27  against Broadcom filed on October 14, 2005, six months before it disclosed those patents to the

28  JVT.

- 22 -

1    147.    Qualcomm's action against Broadcom for infringement of the '104 and '767

2  patents was tried to a jury in January 2007 in the United States District Court for the Southern

3  District of California.

4    148.    On January 26, 2007, after considering the evidence presented to it, the jury found

5  that the accused Broadcom products did not infringe Qualcomm's patents. In addition, the jury

6  issued an advisory verdict finding that Broadcom had proven by clear and convincing evidence

7  that, by its conduct in connection with the JVT, Qualcomm had waived its right to enforce the two

8  patents that it asserted against Broadcom.

9    149.    On March 22, 2006, the District Court issued an opinion affirming the jury's

10 advisory verdict that Broadcom had proven by clear and convincing evidence that Qualcomm, by

11 its conduct in connection with the JVT, had waived its right to enforce the two patents that it had

12 asserted against Broadcom.

13   150.    The District Court held that, under the principles set forth by the United States

14 Court of Appeals for the Federal Circuit in *Rambus, Inc. v. Infineon Technologies, AG*, 318, F.3d

15 1081 (Fed. Cir. 2003), there was clear and convincing evidence that JVT participants treated the

16 JVT IPR policies as imposing a duty of disclosure regarding a participant's IPR that may be

17 reasonably essential to practice the H.264 standard.

18   151.    In discussing the goals of the IPR policies of the JVT, the District Court noted:

19       The policy of the JVT Standards Study Committee was to draft a
         technical standard to optimize and maximize the excellence and
20       compatibility of electronic structures to enable companies all over
         the world to produce high-quality video compression products with
21       interchangeable properties so that mankind could enjoy the
         technology to the utmost. To this end, the JVT sought to minimize
22       the impact on intellectual property and, where it could not be
         avoided, to facilitate a licensing pool system for sharing royalties for
23       impacted inventions. *The participants in the JVT project shared
         the aims and policies of the JVT and considered themselves*
24       *obligated to identify IPR owned o known by them, whether or not
         they made technical proposals for study.*

25       *The non-disclosure of a participant's core patents in such a
26       program could put the participant in a position where it could
         literally block the use of the published H.264 standard by any
27       company unless that company obtained a separate license from the
         participant.* Such an undesirable consequence is likely one factor
28       behind the basis for the Federal Circuit ruling in <u>Rambus</u>, which the
         Court applies in this case.

- 23 -

1      152.    The District Court further held that there was clear and convincing evidence that
2  the "'104 and '767 patents reasonably may be essential to the practice of H.264 standard" and that
3  Qualcomm had knowledge that the '104 patent and the '767 patent might be necessary to practice
4  the H.264 standard "since at least 2002 and July 2005 respectively."

5      153.    The District Court further held that "Broadcom has shown by clear and convincing
6  evidence that Qualcomm participated in the work of the JVT, monitored it with at least four staff
7  engineers, received its correspondence, knew of the area of study, filed at least five study
8  proposals with required IPR forms attached, and knew about its own valuable IPR central to both
9  the resulting H.264 standard versions published in 2003 and 2005 respectively. Yet the '104 and
10  '767 patents were not revealed by Qualcomm before this lawsuit was filed against Broadcom in
11  October 2005."

12      154.    The District Court concluded by finding that "on the basis of the law and the
13  totality of circumstances herein, [the] Court finds by clear and convincing evidence that
14  Qualcomm waived its right to enforce the '104 and '767 patents against H.264 products by its
15  silence in the face of a 'clear duty to speak' to identify to the JVT its IPR related to the
16  development of the H.264 standard."

17  **VI.     _Qualcomm's Pattern and Practice of Nondisclosure Regarding Its Participation in the_**
18  **_JVT Continued During the Litigation_**

19      155.    Throughout discovery in the litigation, Broadcom repeatedly sought documents
20  and testimony concerning Qualcomm's participation in the JVT and Qualcomm's nondisclosure of
21  its allegedly essential patents.

22      156.    As fact discovery progressed, Qualcomm's story regarding its role in the
23  development of the H.264 standard changed numerous times as the facts and documents
24  repeatedly undermined each of its theories.

25      157.    First, Qualcomm claimed that it was not a member of the JVT at all, that it had not
26  participated in or sponsored any JVT meetings, and that it had never made a technical proposal to
27  the JVT. As the evidence presented by Broadcom at trial demonstrated, these assertions were not
28  true.

1    158.   Second, Qualcomm claimed that, although it had participated in the JVT, such

2    participation did not occur until December 2002, when the technical content of the H.264 standard

3    was purportedly "frozen." Again, this assertion proved untrue.

4    159.   Finally, on the eve of trial, Qualcomm advanced yet a third story, claiming that it

5    had disclosed the '104 patent to the one of the JVT's parent organizations via a June 8, 2001 letter

6    to an "MPEG Test Sub-group" in response to a Call for Proposals for Digital Cinema. As with

7    Qualcomm's other assertions, as the evidence developed by Broadcom demonstrated, this third

8    story also proved untrue.

9    160.   During trial, based on its contention that no Qualcomm employees participated in

10   the JVT prior to December 2002, Qualcomm sought to exclude from admission into evidence a

11   JVT document containing a list of email subscribers to a JVT ad hoc working group (the so-called

12   "JVT email reflector"), including a Qualcomm employee. In an effort to exclude this document,

13   Qualcomm insisted "there's no evidence that any e-mail was actually sent to this list."

14   161.   On January 24, 2007, Qualcomm filed a Motion for Judgment as a Matter of Law

15   seeking to have the Court dismiss Broadcom's waiver defense based, in part, on its assertion that

16   "Broadcom has failed to show that . . . [any Qualcomm employee] ever received a single email

17   related to this list [the JVT email reflector]."

18   162.   That same day, during cross-examination in open court of a Qualcomm employee,

19   Broadcom discovered that, contrary to Qualcomm's representations to the Court, Qualcomm

20   possessed twenty-one emails that a Qualcomm employee had received from a JVT working group

21   between September 27, 2002 and March 27, 2003. These emails, which related to various aspects

22   of the development of the H.264 standard, had never been disclosed or produced to Broadcom.

23   163.   On January 24, 2007, after Broadcom's cross-examination of the Qualcomm

24   employee and during the Court's mid-day recess, Qualcomm produced to Broadcom the twenty-

25   one emails received by the Qualcomm employee from the JVT working group during the seven

26   month period from September 2002 through March 2003.

27   164.   On January 29, 2007, several days after the jury had returned a verdict, Qualcomm,

28   by letter to the Court, withdrew its statements during trial and in its Motion for Judgment as a

1  Matter of Law asserting that no Qualcomm employee had received any emails from the JVT
2  sponsored email reflector.

3      165.    Since the conclusion of the trial on January 26, 2007, Broadcom has made
4  numerous attempts to obtain any additional documents concerning Qualcomm's participation in
5  the JVT that may be stored in the electronic archives of Qualcomm employees.

6      166.    On April 6, 2007, Qualcomm informed Broadcom that Qualcomm had identified a
7  substantial volume of documents that were responsive to Broadcom's requests for any additional
8  documents concerning Qualcomm's participation in the JVT.

9      167.    On April 9, 2007, counsel for Qualcomm informed that Court that Qualcomm
10  would produce a "substantial number of electronic documents" concerning Qualcomm's
11  participation in the JVT.  Counsel for Qualcomm further informed the Court that "these
12  documents [have] revealed facts that appear to be inconsistent with certain arguments that
13  [Qualcomm] made . . . [during] trial and in the equitable hearing following trial."

14      168.    The same day, Louis Lupin, Qualcomm's Executive Vice President and General
15  Counsel, sent a letter to the Court to "personally convey, on behalf of QUALCOMM Incorporated
16  and the QUALCOMM legal department in particular, [his] regret and apologies regarding the
17  circumstances" surrounding Qualcomm's failure to produce the substantial number of electronic
18  documents concerning Qualcomm's participation in the JVT.

19  ***VII.    Qualcomm's Nondisclosure and Refusal to Offer FRAND Licenses Has Harmed***
20        ***Broadcom and Competition***

21      169.    Between December 2002 and April 25, 2006, the JVT made numerous decisions
22  about the content of the H.264 standard.  Qualcomm employees participated in those decisions.

23      170.    One of the factors that JVT members considered in developing the technical
24  content of the H.264 standard was the quantity, nature, scope, and ownership of IPR disclosed by
25  JVT participants.

26      171.    Broadcom is a member of the JVT.

27      172.    Participants in the JVT and others seeking to practice the H.264 standard
28  reasonably rely on JVT participants having complied with the rules and regulations of the JVT, the

1  ITU and the ISO/IEC, including the intellectual property rights disclosure policies of those
2  organizations.

3      173.    Broadcom develops, markets, and sells microchips, chipsets, and software that can
4  perform video encoding and/or decoding in conformance with the H.264 standard.

5      174.    After December 2002, Broadcom made substantial investments to develop and
6  market H.264 products, including the acquisition of Sand Video, Inc., in April 2004, and
7  Alphamosaic, Ltd. in September 2004.

8      175.    Following the April 2004 acquisition of Sand Video, Inc. and the September 2004
9  acquisition of Alphamosaic, Ltd., Broadcom introduced its first H.264 compliant chips into the
10 U.S. market.

11     176.    Broadcom continues today to develop, market, and sell microchips, chipsets, and
12 software for devices complying with the H.264 standard.

13     177.    Qualcomm has asserted to companies including Broadcom and its customers that
14 products implementing the H.264 standard require a license to Qualcomm's purportedly essential
15 patents.

16     178.    Qualcomm has also asserted to companies including Broadcom and its customers
17 that Broadcom does not have a license from Qualcomm to implement the H.264 standard.

18     179.    Qualcomm's claims that Broadcom requires a license to Qualcomm's H.264
19 patents have injured and continue to injure Broadcom, including by interfering with Broadcom's
20 ability to make sales and reducing Broadcom's profits.

21     180.    Qualcomm's refusal to honor its commitments to the JVT, the ITU, and the
22 ISO/IEC to license its essential IPR on FRAND terms has injured and continues to injure
23 Broadcom, including by interfering with Broadcom's ability to develop and market
24 semiconductors for H.264-compliant devices.

25     181.    Qualcomm's failure to disclose its patents to the JVT, the ITU, and the ISO/IEC
26 and its current refusal to offer FRAND licenses to its patents also injured competition by allowing
27 Qualcomm to obtain or seek to obtain monopoly rents and terms from parties practicing the H.264
28

1  standard, when Qualcomm deliberately violated the rules of the standard-setting organization

2  designed to prevent such exploitation by patent holders.

3      182.   Qualcomm's misconduct has threatened and continues to threaten to injure

4  competition and consumers in California and elsewhere.

5      183.   Its failure to disclose its patents to the JVT, the ITU, and the ISO/IEC has allowed

6  Qualcomm unfairly and fraudulently to obtain, or claim to have obtained, a monopoly in the

7  aspects of the H.264 functionality markets governed by each element of the standard that

8  Qualcomm claims is covered by its patents. Through Qualcomm's deceptive conduct, JVT

9  participants were denied critical information for the development of H.264. Its failure to disclose

10  its patents to the JVT, the ITU, and the ISO/IEC has allowed Qualcomm unfairly and fraudulently

11  to obtain, or claim to have obtained, a monopoly in markets for functionality that is incorporated

12  in the H.264 standard. Through Qualcomm's deceptive conduct, JVT members were denied

13  critical information for the development of and choice between competing technologies to be

14  incorporated in these standards.

15  **VIII.   *Qualcomm Deliberately Breached Its Commitment to Offer to a FRAND License to Its***

16      ***Purportedly Essential H.264 Patents***

17      184.   In its April 25, 2006 disclosure to the JVT, Qualcomm committed "to grant a

18  license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on

19  reasonable terms and conditions to make, use and sell implementations of" H.264.

20      185.   Without conceding that products implementing the H.264 standard infringe

21  Qualcomm's purportedly essential patents, Broadcom requested the terms of a license to practice

22  those patents.

23      186.   In willful disregard of its commitments to the JVT, the ITU, and the ISO/IEC,

24  Qualcomm offered terms that were unfair, unreasonable, and discriminatory.

25      187.   Qualcomm has insisted on royalty rates that are substantially in excess of industry

26  norms and refused to provide Broadcom with a license that exhausts Qualcomm's patent rights.

27

28

**THE IEEE 802.20 STANDARD**

188.    IEEE 802.20 is a standard currently under development for packet-based air interface for Internet Protocol (IP) services.  IEEE 802.20 is sometimes referred to as a fourth generation or "4G" wireless standard.

189.    The IEEE 802.20 working group is the body that is developing that standard.  The IEEE 802.20 working group is also known as the Mobile Broadband Wireless Access Working Group.

190.    The Institute of Electrical and Electronics Engineers ("IEEE") approved the establishment of the IEEE 802.20 working group in December 2002.

191.    The IEEE 802.20 working group worked continuously to develop the IEEE 802.20 standard until its operations were suspended in June 2006.

**I.    _IEEE 802.20 Rules and Procedures_**

192.    The IEEE 802.20 working group is governed by the IEEE Project 802 Policies and Procedures, the IEEE 802.20 Operating Rules, and the Policies and Procedures of IEEE Project 802, Working Group 802.20.  In addition, the Policies and Procedures of IEEE Project 802, Working Group 802.20 mandate that the American National Standards Institute (ANSI) rules for identification of affiliation applicable to IEEE 802.20 working group activities.

193.    The IEEE Project 802 Policies and Procedures prohibit "dominance" of a working group by a single organization or committee.

194.    In addition, the Policies and Procedures of IEEE Project 802, Working Group 802.20 and the ANSI rules require that participants provide "[t]imely and adequate notice" of "all known directly and materially affected interest" including the "affiliation" of each member.  "Affiliation" refers to the "entity that the [participant] represents (which may or may not be that person's employer)."

**II.    _Qualcomm's Deceptive and Improper Conduct in the IEEE 802.20 Working Group_**

195.    Qualcomm employees and agents participated in and were members of the IEEE 802.20 working group.

1      196.    Qualcomm and its employees and agents attempted to steer the IEEE 802.20

2 working group toward adopting Qualcomm technology for the IEEE 802.20 standard.

3      197.    The 802.20 working group, however, had been moving toward adopting a

4 competing technology – Flash OFDM – developed by Flarion Technologies, Inc. ("Flarion").

5      198.    Throughout the summer of 2005, Flarion and other members of the 802.20 working

6 group sought the rapid standardization of Flarion's Flash-OFDM technology.

7      199.    Qualcomm took several improper steps to prevent the 802.20 working group from

8 adopting Flarion's Flash-OFDM technology in an attempt to unfairly influence the IEEE 802.20

9 working group to adopt Qualcomm's technology instead of Flarion's technology.

10     200.    Qualcomm engaged in multiple acts of misconduct. First, Qualcomm improperly

11 sent as many as twenty employees and consultants as representatives to cast multiple votes on its

12 behalf and in opposition to Flarion's proposed technology at IEEE 802.20 working group

13 meetings. Many of these representatives failed to disclose their financial relationships with

14 Qualcomm.

15     201.    Second, Qualcomm paid Jerry Upton, the chairman of the IEEE 802.20 working

16 group, as an "independent consultant." Neither Qualcomm nor Mr. Upton timely disclosed this

17 financial relationship to the IEEE 802.20 working group.

18     202.    Finally, in August 2005, Qualcomm announced its acquisition of Flarion – the

19 proponent of the competing technology Qualcomm had originally opposed because it competed

20 with Qualcomm's technology.

21     203.    Qualcomm's deceptive conduct and violations of IEEE rules were part of a pattern

22 and practice of manipulation of SSOs' voting process, which included its manipulation of the

23 CDMA2000-1xEV-DV standard.

24     204.    As a result of Qualcomm's deceptive conduct and violations of IEEE rules, the

25 IEEE suspended the IEEE 802.20 working group on June 8, 2006. Among the reasons for the

26 suspension was Qualcomm's improper "dominance" of the working group and, as a result of the

27 failure of the Qualcomm agents to declare their affiliation, a "lack of transparency." Specifically,

28 the IEEE Standards Board Chair reported that:

1
2
3
4
5

The decision to suspend 802.20 was made primarily for two reasons. First, the Working Group has been the subject of several appeals from the very beginning of the group, with three appeals now pending at one level or another, and recent activity in the group appears to have become highly contentious – significantly beyond what is normally experienced in IEEE-SA. Second, a preliminary investigation into the group's operation revealed a lack of transparency, possible "dominance," and other irregularities in the Working Group.

6   205.   The suspension of a working group was an unprecedented step by the IEEE, and

7   has delayed the adoption of an industry standard.

8   206.   Broadcom has planned and intends to develop products for 802.20 applications

9   compliant with the 802.20 standard that is adopted.

10   207.   Qualcomm's manipulation of the standards setting process has prevented

11   Broadcom from developing products for 802.20 applications.

12   **FIRST CAUSE OF ACTION**

13   **(Unfair Competition)**

14   **(Against All Defendants)**

15   208.   Broadcom incorporates by reference herein the allegations of Paragraphs 1 through

16   207, above.

17   209.   By the acts alleged in paragraphs 1 through 207, Defendants have engaged in unfair

18   competition within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

19   210.   Specifically, Qualcomm's conduct in connection with ETSI, the ITU, ISO/IEC, and

20   JVT, and the IEEE 802.20 working group and its claim of ownership of intellectual property rights

21   in the GSM, GRPS, EDGE, UMTS, and H.264 standards constitute: (1) unlawful business acts or

22   practices; (2) unfair business acts or practices, including unfair business practices violating the

23   policy or spirit of the antitrust laws, and otherwise significantly threatening and harming

24   competition in California and elsewhere; and (3) fraudulent business acts or practices.

25   211.   Qualcomm committed unlawful business acts or practices by breaching the

26   contracts described above and in paragraphs 229 through 235, below.

27   212.   Qualcomm committed unfair and deceptive business acts or practices by failing to

28   disclose purported intellectual property rights in violation of the IPR disclosure obligations of

1  ETSI and the ITU, ISO/IEC, and JVT, then claiming during licensing discussions with Broadcom
2  and/or Broadcom's customers that it owned patents essential to the GSM, GPRS, EDGE, UMTS,
3  and H.264 standards. In addition, Qualcomm committed unfair business acts or practices by
4  failing to offer a license to its IPR on FRAND terms. Qualcomm also committed unfair business
5  acts or practices in its conduct before the IEEE 802.20 working group, by attempting improperly
6  to influence the technical content of the IEEE 802.20 standard. Qualcomm's repeated
7  nondisclosure before multiple SSOs, and in connection with multiple standards, constitutes a
8  pattern of unfair business practices. Each of these acts and practices is unfair in the circumstances
9  when the effect of the act or practice on Broadcom is balanced against Qualcomm's reasons,
10  justifications, and motives.

11      213.    The acts complained of above violate and threaten to violate the policy or spirit of
12  the antitrust laws, and otherwise significantly threaten and/or harm competition. The global GSM,
13  GPRS, EDGE, UMTS, and H.264 functionality markets are relevant antitrust markets, as
14  described in paragraphs 28 through 36, above. By the deceptive acts, practices, and conduct
15  alleged above, Qualcomm has monopolized or, in the alternative, is attempting with specific intent
16  to monopolize each of these markets by inducing the relevant SSOs to adopt standards that
17  incorporate technologies that read on Qualcomm's purportedly essential patents, but failing to
18  disclose those patents, in violation of the SSOs' IPR disclosure policies, and refusing to offer
19  licenses to its patents on FRAND terms and in violation of its commitments to the SSOs.

20      214.    Qualcomm's nondisclosure of its patents to ETSI and the ITU, ISO/IEC, and JVT,
21  and its attempts to improperly influence the IEEE 802.20 working group, as alleged with
22  particularly above, also constitute fraudulent business acts or practices. Qualcomm had a duty to
23  disclose its patents and its financial relationships with committee members to the relevant SSOs.
24  Qualcomm deliberately and intentionally breached this duty by concealing information from the
25  SSOs in violation of its obligations under the SSOs' disclosure policies. Specifically, Qualcomm
26  failed to timely disclose its purportedly essential GSM, GPRS, EDGE, and UMTS patents to
27  ETSI, failed to timely disclose its purportedly essential H.264 patents to the ITU, ISO/IEC, and
28  JVT, and failed to timely disclose its financial relationships with committee members to the

1  802.20 working group.  Qualcomm engaged in each of these acts deliberately and with the intent
2  to deceive the SSOs, so that the SSOs would unknowingly adopt Qualcomm IPR into standards.

3       215.    As a direct, proximate, and foreseeable result of Qualcomm's wrongful conduct, as
4  alleged above, Broadcom has suffered harm, including the inclusion of undisclosed IPR in the
5  standards, the unavailability of a FRAND license, a reduction in Broadcom's ability to make sales
6  of standards-compliant products, a reduction in Broadcom's profits, and a diminution of
7  Broadcom's ability to develop and market semiconductors for GSM, GPRS, EDGE, UMTS,
8  H.264, and 802.20-compliant products.

9       216.    As a direct, proximate, and foreseeable result of Qualcomm's wrongful conduct, as
10  alleged above, competition in markets for GSM, GPRS, EDGE, UMTS, H.264, and 802.20-
11  compliant functionality as well as in markets for products that practice those standards has been
12  injured, thereby causing harm to consumers in California and elsewhere.

13       217.    By reason of Qualcomm's violations of Cal. Bus. & Prof. Code § 17200, *et seq.*,
14  Broadcom has been injured in its business and property including through the loss of past, present,
15  and future profits, by the loss of customers and potential customers, and by the loss of goodwill
16  and product image.

17       218.    Broadcom has suffered irreparable injury by reason of the acts, practices, and
18  conduct of Qualcomm alleged above and will continue to suffer such injury until and unless the
19  Court enjoins such acts, practices, and conduct.  Broadcom is informed and believes that
20  Qualcomm will continue to do the acts alleged herein unless the Court orders Qualcomm to cease
21  and desist.

22       219.    Broadcom is entitled to relief, including an injunction and full restitution and/or
23  disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been
24  obtained by Defendants from Broadcom, its actual customers, and its potential customers as a
25  result of such unfair business acts or practices.

26
27
28

1                            **SECOND CAUSE OF ACTION**

2                                      **(Fraud)**

3                               **(Against All Defendants)**

4          220.    Broadcom incorporates by reference herein the allegations of Paragraphs 1 through

5    219, above.

6          221.    Qualcomm intentionally failed to disclose its patents to ETSI and the ITU,

7    ISO/IEC, and JVT, and intentionally failed to disclose its financial relationship with members of

8    the IEEE 802.20 working group, as alleged with particularly above.

9          222.    Qualcomm had a duty to disclose its patents and its financial relationships with

10   committee members to the relevant SSOs.

11         223.    Qualcomm deliberately and intentionally breached this duty by concealing

12   information from the SSOs in violation of its obligations under the SSOs' disclosure policies.

13   Specifically, Qualcomm failed to timely disclose its purportedly essential GSM, GPRS, EDGE,

14   and UMTS patents to ETSI, failed to timely disclose its purportedly essential H.264 patents to the

15   ITU, ISO/IEC, and JVT, and failed to timely disclose its financial relationships with committee

16   members to the 802.20 working group.

17         224.    Qualcomm engaged in each of these acts deliberately, willfully, intentionally, and

18   in bad faith, with the intent to deceive the SSOs, so that the SSOs would unknowingly adopt

19   Qualcomm IPR into standards.

20         225.    Broadcom reasonably and justifiably relied on the standard-setting process within

21   ETSI, the ITU, ISO/IEC, and JVT, and the IEEE 802.20 working group to be fair, in accordance

22   with the rules, policies, and procedures of those organizations. In turn, participants in each of the

23   standard-setting bodies reasonably and justifiably relied on Qualcomm fulfilling its obligations,

24   including its obligations pursuant to the applicable IPR disclosure policies. Broadcom had the

25   right to expect that Qualcomm would abide by its obligations to timely disclose any essential IPR

26   and financial relationships.

27         226.    Broadcom has sustained damages as a result of Qualcomm's failure to disclose its

28   purportedly essential patents to ETSI and the ITU, ISO/IEC, and JVT, combined with

                                              - 34 -

1    Qualcomm's subsequent refusal to license those patents on FRAND terms. Broadcom also has
2    sustained damages, including lost business opportunities, as a result of Qualcomm's improper
3    influence over the IEEE 802.20 working group.

4        227.    By the actions described above, Qualcomm has committed common law fraud,
5    including fraudulent concealment, actual fraud in violation of Cal. Civil Code § 1572, and
6    constructive fraud in violation of Cal. Civil Code § 1573.

7        228.    The acts and conduct of Defendants alleged hereinabove constituted an intentional
8    misrepresentation or concealment of material facts known to Defendants and were in conscious
9    disregard of Broadcom's rights, were malicious, willful, fraudulent and oppressive and were done
10   with the intention of causing injury to Broadcom, so as to justify an award of exemplary and
11   punitive damages in an amount to be proven at trial.

12                            **THIRD CAUSE OF ACTION**
13                              **(Breach of Contract)**
14                              **(Against All Defendants)**

15       229.    Broadcom incorporates by reference herein the allegations of Paragraphs 1 through
16   228, above.

17       230.    As set forth above, Qualcomm entered into actual or implied contractual
18   commitments with ETSI and the ITU, ISO/IEC, and JVT, relating to the GSM, GPRS, EDGE,
19   UMTS, and H.264 standards.

20       231.    Each participant in the standard-setting process for each of these standards –
21   including Broadcom – was an intended beneficiary of those contracts. Each potential third party
22   implementing each of the standards – including Broadcom – was also an intended beneficiary of
23   those contracts.

24       232.    Qualcomm breached these contracts by failing to timely disclose the IPR that it
25   now claims is essential, in accordance with the IPR disclosure policies, procedures, and practices
26   of the SSOs.

27       233.    Qualcomm further breached these contracts by failing to offer to license the IPR
28   that it now claims is essential in accordance with its FRAND commitments.

1    234.    As a result of those breaches, Broadcom has been injured in its business or property

2 through the loss of past, present, and future profits, by the loss of customers and potential

3 customers, and by the loss of goodwill and product image.

4    235.    Broadcom has suffered and continues to suffer actual damages as a result of

5 Qualcomm's actions.

6                                    **PRAYER FOR RELIEF**

7        WHEREFORE, Broadcom prays for judgment against Defendants, and each of them, and

8 for the relief set forth below:

9        1.    For damages, according to proof at the time of trial;

10       2.    For restitution, according to proof at the time of trial;

11       3.    For disgorgement of profits, according to proof at the time of trial;

12       4.    For an injunction barring Qualcomm from seeking to enforce or license any

13 purported intellectual property rights in the GSM, GPRS, or EDGE standards against Broadcom or

14 its customers;

15       5.    For an injunction barring Qualcomm from seeking to enforce or license any

16 purported intellectual property rights in the UMTS standards against Broadcom or its customers;

17       6.    For an injunction barring Qualcomm from seeking to enforce or license any

18 purported intellectual property rights in the H.264 standard against Broadcom or its customers;

19       7.    For an injunction barring Qualcomm from seeking to enforce or license any

20 purported intellectual property rights in the 802.20 standard against Broadcom or its customers;

21       8.    For an injunction compelling Qualcomm to comply with the FRAND obligations it

22 undertook as a member of the SSOs;

23       9.    For exemplary and punitive damages;

24       10.    For reasonable attorneys' fees according to proof;

25       11.    For costs of suit herein incurred; and

26       12.    For such other and further relief as the Court may deem just and proper.

27

28

Complaint for Unfair Competition, Fraud, and Breach of Contract

DATED:  April 12, 2007

WILMER CUTLER PICKERING
HALE AND DORR LLP

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

O'MELVENY & MYERS LLP

By: _____
    Michael G. Yoder

Attorneys for Plaintiff
BROADCOM CORPORATION

NB1.713137.1

Complaint for Unfair Competition, Fraud, and Breach of Contract

# EXHIBIT 2

1   Evan R. Chesler (admitted *pro hac vice*)
    Peter T. Barbur (admitted *pro hac vice*)
2   Richard J. Stark (admitted *pro hac vice*)
    David Greenwald (admitted *pro hac vice*)
3   Andrei Harasymiak (admitted *pro hac vice*)
    CRAVATH, SWAINE & MOORE LLP
4   Worldwide Plaza, 825 Eighth Avenue
    New York, NY 10019-7475
5   Telephone: 212.474.1000; Facsimile: 212.474.3700
    Email: echesler@cravath.com
6
    Todd E. Gordinier (SB# 82200)
7   Richard S. Taffet (admitted *pro hac vice*)
    BINGHAM McCUTCHEN LLP
8   600 Anton Boulevard, 18th Floor
    Costa Mesa, CA 92626
9   Telephone: 714.830.0600; Facsimile: 714.830.0700
    Email: todd.gordinier@bingham.com
10
    William S. Boggs (SB# 53013)
11  DLA PIPER
    401 B Street, Suite 1700
12  San Diego, CA 92101-4297
    Telephone: 619.699.2700; Facsimile: 619.699.2701
13  Email: william.boggs@dlapiper.com

14  Robert N. Feltoon (admitted *pro hac vice*)
    CONRAD O'BRIEN GELLMAN & ROHN, P.C.
15  1515 Market Street, Suite 1600
    Philadelphia, PA 19102
16  Telephone: 215.864.8064; Facsimile: 215.864.0064
    Email: rfeltoon@cogr.com

17  Attorneys for Defendant
    QUALCOMM INCORPORATED

18           SUPERIOR COURT OF THE STATE OF CALIFORNIA

19                   FOR THE COUNTY OF ORANGE

20  BROADCOM CORPORATION, a California     CASE NO. 07CC01249
    corporation,                           ASSIGNED FOR ALL PURPOSES TO:
21                                          JUDGE STEPHEN J. SUNDVOLD
                    Plaintiff,              DEPT. CX105
22
            v.                              **NOTICE OF ENTRY OF ORDER**
23                                          **GRANTING DEFENDANT**
    QUALCOMM, INC., a Delaware              **QUALCOMM'S MOTION TO STAY**
24  corporation; and DOES 1 through 10,     **THE PROCEEDINGS**
    inclusive,
25                                          Date:       October 5, 2007
                    Defendants.             Time:       9:00 a.m.
26                                          Dept:       CX105
27                                          Complaint Filed:   April 12, 2007
                                            Trial Date:        None Set
28

NOTICE OF ENTRY OF ORDER GRANTING DEFENDANT QUALCOMM'S MOTION TO STAY THE
PROCEEDINGS

A/72206299.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on October 5, 2007, the Court entered the Order granting Defendant Qualcomm Incorporated's Motion to Stay the Proceedings. A true and correct copy of the Order is attached hereto as Exhibit A.

DATED: October 18, 2007                    Bingham McCutchen LLP

By: _____
     Todd E. Gordinier
     Attorneys for Defendant
     QUALCOMM INCORPORATED

- 1 -

NOTICE OF ENTRY OF ORDER GRANTING DEFENDANT QUALCOMM'S MOTION TO STAY THE
PROCEEDINGS

A/72206299.1

**Exhibit A**

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF ORANGE**
**MINUTE ORDER**
05-OCT-2007

**Dept:**  CX105    CIVIL COMPLEX CENTER                              **Convened at:**    9:00:00

**Judge/Comm:**    STEPHEN J SUNDVOLD       **Clerk:**        LARRY BROWN

**Bailiff:**         CHRISTOPHER             **Reporter:**     C. FREEMAN, CSR#3084
                   SANCHEZ

**Court Type:**        COMPLEX LITIGATION

**Court Category:**    BUSINESS TORT

**Case Number:**      07CC01249

**Case Title:**        **BROADCOM CORPORATION VS QUALCOMM INC**

**Doct Seq No:**        120

**Event:**    654              MOTION TO STRIKE
             **Filing Party:**    QUALCOMM INC
             671              MOTION TO STAY ACTION
             **Filing Party:**    QUALCOMM INC
             680              DEMURRER TO COMPLAINT
             **Filing Party:**    QUALCOMM INC

Appearances noted by way of copy of business cards attached hereto and incorporated herein
by reference.

The Court heard argument from counsel regarding the tentative ruling posted on the Internet and
took Defendant Qualcomm Inc.'s Demurrer, Motion to Strike, and Motion to Stay under
submission.

Later the same day, the Court ruled as follows: the tentative ruling shall be the final order of the
Court. Motion to Stay proceedings granted. The hearings on the Demurrer and Motion to Strike
are ordered off calendar, as are Qualcomm's three Motions to Compel Responses to
Interrogatories and Requests for Production of Documents, set for hearing on October 26, 2007.
Clerk to give notice. Entered: 10-05-07

***ORIGINAL / FILE***

1

## PROOF OF SERVICE

2    I am over eighteen years of age, not a party in this action, and employed in Orange

3    County, California at 600 Anton Boulevard, 18th Floor, Costa Mesa, California  92626-1924.

4    On **October 19, 2007,** I served the attached:

5    **NOTICE OF ENTRY OF ORDER GRANTING DEFENDANT QUALCOMM'S
     MOTION TO STAY THE PROCEEDINGS**

6

7    ☒    (E-Mail) on **October 19, 2007,** at _____ m, by transmitting via electronic mail the
         document(s) listed above to the email addresses set forth below on this date.  The
8        transmission was reported complete and without error.

9

10   Mark D. Selwyn                                      Kate Saxton, Esq.
     Wilmer Cutler Pickering Hale and Dorr LLP           Wilmer Cutler Pickering Hale and Dorr LLP
11   Email: mark.selwyn@wilmerhale.com                   Email: kate.saxton@wilmerhale.com

12   George S. Cary, Esq.                                Michael G. Yoder, Esq.
     Cleary, Gottlieb, Steen & Hamilton                  O'Melveny & Myers LLP
13   Email: gcary@cgsh.com                               Email: myoder@omm.com

14

15   I declare under penalty of perjury under the laws of the State of California that the

16   foregoing is true and correct and that this declaration was executed on **October 19 2007,** at

17   Costa Mesa, California.

18

19                                          _____
                                                      Brandy Nelson

20

21

22

23

24

25

26

27

28

---

PROOF OF SERVICE

# EXHIBIT 3

William J. O'Shaughnessy (WJO 5256)
**McCARTER & ENGLISH, LLP**
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

Evan R. Chesler
Peter T. Barbur
Elizabeth L. Grayer
Karin A. DeMasi
**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Richard S. Taffet
Philip L. Blum
**BINGHAM McCUTCHEN LLP**
399 Park Avenue
New York, NY 10022
(212) 705-7000

Robert N. Feltoon
**CONRAD O'BRIEN GELLMAN & ROHN, P.C.**
1515 Market Street, Suite 1600
Philadelphia, PA 19102
(215) 864-8064

Attorneys for Defendant

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BROADCOM CORPORATION,<br><br>                              Plaintiff.<br><br>                    v.<br><br>QUALCOMM INCORPORATED,<br><br>                              Defendant. | Civil Action No. 05-3350 (MLC) |

**QUALCOMM INCORPORATED'S AMENDED AND SUPPLEMENTAL
INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)(1)**

Defendant QUALCOMM Incorporated ("Qualcomm") hereby submits the

following amended initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of

Civil Procedure.  The following amended and supplemental initial disclosures are

intended to supersede Qualcomm Incorporated's Initial Disclosures pursuant to

Rule 26(a)(1) of the Federal Rules of Civil Procedure, dated October 28, 2005.

Qualcomm has not fully completed its investigation into its claims and/or defenses herein

and makes these disclosures based solely on information reasonably available to it to date

and reserves the right to amend or further supplement these disclosures.  Qualcomm

makes these disclosures subject to, and without waiver of, any attorney-client, work

product or other applicable privileges or immunities.

**A.i.    The name and, if known, the address and telephone number of each
individual likely to have discoverable information—along with the subjects
of that information—that the disclosing party may use to support its claims
or defenses, unless the use would be solely for impeachment.**

The following individuals may have discoverable information, relating to

the bracketed subjects, that Qualcomm may use to support its defenses herein.

Qualcomm provides each individual's current position:[1]

> 1.    Derek Aberle
> *Vice President & General Manager, CDMA Licensing*
> QUALCOMM Incorporated
> 5775 Morehouse Drive
> San Diego, CA 92121
> Phone: (858) 587-1121
> [Qualcomm's licensing discussions with Broadcom; Qualcomm licensing
> practices and policies; Licensing practices of wireless communications
> and video technology industry participants]

---

[1] All persons whose names are underlined are current or former employees of
Qualcomm.  All communications with those individuals should be made only through
Qualcomm counsel.

2

2.    Avneesh Agrawal
      *Senior Vice President, Engineering*
      QUALCOMM Incorporated
      5775 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Qualcomm's acquisition of Flarion and research and development
      activities; Qualcomm's development of OFDMA technology]

3.    Jeff Altman
      *Sr. Director, Business Development*
      QUALCOMM Incorporated
      5775 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Qualcomm's licensing discussions with Broadcom]

4.    Steve Altman
      *President*
      QUALCOMM Incorporated
      5775 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Qualcomm's competitive position, business strategy, and licensing
      practices and policies; European Telecommunications Standards Institute
      ("ETSI") selection of WCDMA for the UMTS standard; Qualcomm's
      licensing discussions with Broadcom; Licensing practices of wireless
      communications and video technology industry participants]

5.    Cristiano Amon
      *Sr. Vice President, Product Management*
      QUALCOMM Incorporated
      5775 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Marketing of Qualcomm's WCDMA chipset products; Relative merits of
      wireless solutions provided by Broadcom, Qualcomm and other third party
      wireless communications industry participants]

6.    Niels Peter Skov Andersen
      *Vice President, Technical Standards*
      QUALCOMM Denmark
      Lxvparken 14
      DK Roskilde
      Phone: 45-4018-4793
      [ETSI, including, Qualcomm's participation in and commitments to ETSI;
      ETSI's selection of WCDMA for the UMTS standard]

7.   Kent Baker
     *Vice President, Patent Counsel*
     QUALCOMM Incorporated
     5775 Morehouse Drive
     San Diego, CA 92121
     Phone: (858) 587-1121
     [ETSI's selection of WCDMA for the UMTS standard; Qualcomm's IPR
     disclosures; Content of relevant IPR policies of standards development
     organizations; Industry practice with regard to IPR disclosure and the
     making of FRAND commitments to standards development organizations]

8.   Yiliang Bao
     *Engineer, Sr. Staff Manager*
     QUALCOMM Incorporated
     10145 Pacific Heights Blvd.
     San Diego, CA 92121
     Phone: (858) 587-1121
     [Qualcomm's participation in and commitments to the Joint Video Team
     ("JVT")]

9.   Jeff Belk
     *Senior Vice President, Marketing*
     QUALCOMM Incorporated
     5775 Morehouse Drive
     San Diego, CA 92121
     Phone: (858) 587-1121
     [Marketing of and competition in wireless communications technology,
     including industry trends]

10.  Paul Bender
     *Sr. Vice President, Technology*
     QUALCOMM Incorporated
     5665 Morehouse Drive
     San Diego, CA 92121
     Phone: (858) 587-1121
     [Wireless communications technologies; Qualcomm's research and
     development activities]

4

11.   Liat Ben-Zur
      *Director, Business Development*
      QUALCOMM Incorporated
      5775 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Qualcomm's WCDMA chipset business, including competitive position
      and business strategy; Business reputation of Broadcom; Relative merits
      of wireless solutions offered by Qualcomm, Broadcom and third party
      wireless communications industry participants]

12.   Peter Black
      *Sr. Vice President, Technology*
      QUALCOMM Incorporated
      5665 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Wireless communications technologies; Qualcomm's research and
      development activities]

13.   Marv Blecker
      *President, Qualcomm Technology Licensing*
      QUALCOMM Incorporated
      5775 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Qualcomm licensing practices and policies; Qualcomm's licensing
      discussions with Broadcom; Licensing practices of wireless
      communications and video technology industry participants]

14.   Kirk Burroughs
      *Engineer, Principal*
      QUALCOMM Incorporated
      675 Campbell Technology Parkway
      Campbell, CA 95008
      Phone: (858) 587-1121
      [Qualcomm's participation in and commitments to ETSI]

15.   David Bush
      *Sr. Vice President, Sales*
      QUALCOMM Incorporated
      5775 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Qualcomm's WCDMA chipset business, including competitive position
      and business strategy; Qualcomm's sales and pricing of WCDMA chipset
      products; Qualcomm's efforts to meet customers' demand for WCDMA
      chipsets]

16.   Lorenzo Casaccia
      *Sr. Staff Engineer*
      QUALCOMM Italy
      Via Tirso #6, 3rd Floor
      Rome, Italy 00198
      Phone: 39-06-49-218121
      [Qualcomm's participation in and commitments to ETSI]

17.   James Clifford
      *Senior Vice President & General Manager, Operations*
      QUALCOMM Incorporated
      5775 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Qualcomm's efforts to meet customers' demand for chipsets]

18.   Gregory Cobb
      *Vice President and Assistant General Manager, Technology Licensing*
      QUALCOMM Incorporated
      5775 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Qualcomm licensing practices and policies; Qualcomm's licensing
      discussions with Broadcom]

19.   William ("Bill") Davidson
      *Sr. Vice President, Global Marketing and Investor Relations*
      QUALCOMM Incorporated
      5775 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Marketing of and competition in wireless communications technology,
      including industry trends]

6

20.  Sean English
     *Vice President, Legal Counsel*
     QUALCOMM Incorporated
     5775 Morehouse Drive
     San Diego, CA 92121
     Phone: (858) 587-1121
     [Qualcomm's IPR disclosures]

21.  Mark Epstein
     *Senior Vice President, Development*
     QUALCOMM Incorporated
     9209 Fox Meadow Lane
     Potomac, MD 20854
     Phone: (858) 587-1121
     [Qualcomm's participation in and commitments to IEEE]

22.  Mark Frankel
     *Vice President, Product Management*
     QUALCOMM Incorporated
     5775 Morehouse Drive
     San Diego, CA 92121
     Phone: (858) 587-1121
     [Marketing of Qualcomm's WCDMA chipset products; Relative merits of
     wireless solutions provided by Broadcom, Qualcomm and other third party
     wireless communications industry participants]

23.  Harinath Garudardri
     *Engineer, Sr. Staff Manager*
     QUALCOMM Incorporated
     5665 Morehouse Drive
     San Diego, CA 92121
     Phone: (858) 587-1121
     [Qualcomm's analysis of its IPR with respect to JVT standards]

24.  Andrew Gilbert
     *Sr. Vice President, President, Qualcomm Europe*
     QUALCOMM Incorporated
     Waterfront 4th floor
     Hammersmith Embankment
     Chancellors Road
     London, W6 9RU
     Phone: 44-7909-910517
     [Qualcomm's competitive position, business strategy, and licensing
     practices]

25.    Klein Gilhousen
       *Sr. Vice President, Technology*
       QUALCOMM Incorporated
       5665 Morehouse Drive
       San Diego, CA 92121
       Phone: (858) 587-1121
       [Wireless communications technologies]

26.    Olivier Glauser
       *Sr. Director, Business Development*
       Former Employee
       QUALCOMM Incorporated
       5775 Morehouse Drive
       San Diego, CA 92121
       Phone: (858) 587-1121
       [ETSI's selection of WCDMA for the UMTS standard]

27.    Jin Guo
       *Director, Technical Marketing*
       QUALCOMM Incorporated
       5775 Morehouse Drive
       San Diego, CA 92121
       Phone: (858) 587-1121
       [Marketing of and competition in wireless communications technology,
       including industry trends]

28.    Michael Hartogs
       *Sr. Vice President, Div. Counsel (Qualcomm Technology Licensing)*
       QUALCOMM Incorporated
       5775 Morehouse Drive
       San Diego, CA 92121
       Phone: (858) 587-1121
       [Qualcomm licensing practices and policies; Qualcomm's licensing
       discussions with Broadcom; Licensing practices of wireless
       communications and video technology industry participants; Content of
       relevant IPR policies of standards development organizations]

29.    Chris Irvine
       *Principal Engineer (QTC/QDM/QGOV)*
       QUALCOMM Incorporated
       Non-Qualcomm Site
       Phone: (858) 651-3425
       [Qualcomm's analysis of its IPR with respect to JVT standards]

8

30.  Jordan Isailovic
     *Consultant*
     QUALCOMM Incorporated
     P.O. Box 17516
     Anaheim, CA 92807
     Phone: (858) 587-1121
     [Qualcomm's participation in and commitments to JVT]

31.  Irwin Jacobs
     *Chairman*
     QUALCOMM Incorporated
     5775 Morehouse Drive
     San Diego, CA 92121
     Phone: (858) 587-1121
     [History of Qualcomm, CDMA and wireless communications]

32.  Paul Jacobs
     *Chief Executive Officer*
     QUALCOMM Incorporated
     5775 Morehouse Drive
     San Diego, CA 92121
     Phone: (858) 587-1121
     [Qualcomm's competitive position and business strategy]

33.  Sanjay Jha
     *Executive Vice President and Group President, Qualcomm CDMA Technologies*
     QUALCOMM Incorporated
     5775 Morehouse Drive
     San Diego, CA 92121
     Phone: (858) 587-1121
     [Qualcomm's WCDMA chipset business, including competitive position, business strategy, and WCDMA chipset features; Marketing of Qualcomm's WCDMA chipset products; Qualcomm's research and development activities; Relative merits of wireless solutions provided by Broadcom, Qualcomm and other third party wireless communications industry participants; Business reputation of Broadcom]

34.  Tingfang Ji
     *Engineer, Staff Manager*
     QUALCOMM Incorporated
     6965 Lusk Blvd
     San Diego, CA 92121
     Phone: (858) 587-1121
     [Qualcomm's development of OFDMA technology]

9

35.    <u>Alex Katouzian</u>
*Vice President, Product Management*
QUALCOMM Incorporated
5775 Morehouse Drive
San Diego, CA 92121
Phone: (858) 587-1121
[Marketing of Qualcomm's WCDMA chipset products; Relative merits of
wireless solutions provided by Broadcom, Qualcomm and other third party
wireless communications industry participants; Business reputation of
Broadcom]

36.    <u>Farrokh Khatibi</u>
*Director, Engineering (QSE)*
QUALCOMM Incorporated
5665 Morehouse Drive
San Diego, CA 92121
Phone: (858) 587-1121
[Qualcomm's participation in and commitments to IEEE]

37.    <u>Mark Klerer</u>
*Sr. Director, Technology*
QUALCOMM Incorporated
500 Somerset Corporate Blvd.
Bridgewater, NJ 08807
Phone: (908) 443-8092
[Qualcomm's participation in and commitments to IEEE]

38.    <u>Warren Kneeshaw</u>
*Vice President, Finance*
QUALCOMM Incorporated
5775 Morehouse Drive
San Diego, CA 92121
Phone: (858) 587-1121
[Qualcomm's analysis of the costs to carriers of switching between
wireless communications standards]

39.    <u>Anil Kripalani</u>
*Sr. Vice President, Global Tech. Affairs*
Former Employee
QUALCOMM Incorporated
5775 Morehouse Drive
San Diego, CA 92121
Phone:  (858) 587-1121
[ETSI's selection of WCDMA for the UMTS standard]

40.    James Lederer
       *Senior Vice President, Finance*
       QUALCOMM Incorporated
       5775 Morehouse Drive
       San Diego, CA 92121
       Phone: (858) 587-1121
       [Pricing and costs of Qualcomm's WCDMA chipset products]

41.    Louis Lupin
       *Legal Consultant, former Executive Vice President, General Counsel*
       QUALCOMM Incorporated
       5775 Morehouse Drive
       San Diego, CA 92121
       Phone: (858) 587-1121
       [Qualcomm's licensing discussions with Broadcom; Qualcomm licensing
       practices and policies; ETSI's selection of WCDMA for the UMTS
       standard; Qualcomm's IPR disclosures; Content of relevant IPR policies
       of standards development organizations]

42.    Clint McClellan
       *Sr. Director, Marketing*
       QUALCOMM Incorporated
       5775 Morehouse Drive
       San Diego, CA 92121
       Phone: (858) 587-1121
       [Marketing of and competition in wireless communications technology,
       including industry trends]

43.    Sanjay Mehta
       *Vice President, Finance*
       QUALCOMM Incorporated
       5775 Morehouse Drive
       San Diego, CA 92121
       Phone: (858) 587-1121
       [Pricing, costs and sales of Qualcomm's WCDMA chipset products;
       Qualcomm's efforts to meet customers' demand for WCDMA chipsets]

44.    Max Miyazono
       *Sr. Manager, Technical Marketing (CTR)*
       Former Employee
       QUALCOMM Incorporated
       5775 Morehouse Drive
       San Diego, CA 92121
       Phone: (858) 587-1121
       [Marketing of and competition in wireless communications technology,
       including industry trends]

45.  <u>Ayman Naguib</u>
*Sr. Staff Engineer (CORP R&D SYS Engineering)*
QUALCOMM Incorporated
6965 Lusk Blvd.
San Diego, CA 92121
Phone: (858) 587-1121
[Qualcomm's participation in and commitments to IEEE]

46.  <u>Sanjiv Nanda</u>
*Sr. Director, Engineering (Corporate System Engineering)*
QUALCOMM Incorporated
5665 Morehouse Drive
San Diego, CA 92121
Phone: (858) 587-1121
[Qualcomm's participation in and commitments to JVT]

47.  <u>Andy Oberst</u>
*Vice President, Business Strategy*
QUALCOMM Incorporated
5775 Morehouse Drive
San Diego, CA 92121
Phone: (858) 587-1121
[Qualcomm's WCDMA chipset business, including competitive position and business strategy; Business reputation of Broadcom; Relative merits of wireless solutions provided by Broadcom, Qualcomm and other third party wireless communications industry participants]

48.  <u>Roberto Padovani</u>
*Executive Vice President and Chief Technology Officer*
QUALCOMM Incorporated
5775 Morehouse Drive
San Diego, CA 92121
Phone: (858) 587-1121
[Wireless communications technologies; Qualcomm's research and development activities; History of Qualcomm, CDMA and wireless communications]

12

49.  Luis Pineda
     *Senior Vice President, Marketing and Product Management*
     QUALCOMM Incorporated
     5775 Morehouse Drive
     San Diego, CA 92121
     Phone: (858) 587-1121
     [Qualcomm's WCDMA chipset business, including competitive position
     and business strategy; Marketing of Qualcomm's WCDMA chipset
     products; Relative merits of wireless solutions provided by Broadcom,
     Qualcomm and other third party wireless communications industry
     participants]

50.  Gene Ratliffe
     *Sr. Manager, Finance*
     QUALCOMM Incorporated
     5775 Morehouse Drive
     San Diego, CA 92121
     Phone:  (858) 587-1121
     [Pricing, costs and sales of Qualcomm's WCDMA chipset products;
     Qualcomm's efforts to meet customers' demand for WCDMA chipsets]

51.  Viji Raveendran
     *Sr. Staff Engineer (QDM & QCT)*
     QUALCOMM Incorporated
     10145 Pacific Heights Blvd
     San Diego, CA 92121
     Phone: (858) 587-1121
     [Qualcomm's participation in and commitments to JVT; Qualcomm's
     analysis of its IPR with respect to JVT standards]

52.  Yuriy Reznik
     *Staff Engineer*
     QUALCOMM Incorporated
     5775 Morehouse Drive
     San Diego, CA 92121
     Phone: (858) 587-1121
     [Qualcomm's participation in and commitments to JVT]

53. <u>Hank Robinson</u>
*Vice President, Sales*
QUALCOMM Incorporated
5775 Morehouse Drive
San Diego, CA 92121
Phone: (858) 587-1121
[Qualcomm's sales and pricing of WCDMA chipset products and Qualcomm's efforts to meet customers' demand for WCDMA chipsets]

54. <u>Thomas Rouse</u>
*Vice President, Chief Patent Counsel*
QUALCOMM Incorporated
5775 Morehouse Drive
San Diego, CA 92121
Phone: (858) 587-1121
[Qualcomm's IPR disclosures]

55. <u>Phoom Sagetong</u>
*Staff Engineer (Corp. R&D)*
Former Employee
QUALCOMM Incorporated
5775 Morehouse Drive
San Diego, CA 92121
Phone:  (858) 587-1121
[Qualcomm's participation in and commitments to JVT]

56. <u>Donald Schrock</u>
*Executive Vice President, QCT*
Former Employee
QUALCOMM Incorporated
5775 Morehouse Drive
San Diego, CA 92121
Phone: (858) 587-1121
[Qualcomm's WCDMA chipset business, including competitive position and business strategy]

57. <u>Amnon Silberger</u>
*Sr. Staff Engineer (QDM/MFT)*
QUALCOMM Incorporated
9940 Barnes Canyon Rd
San Diego, CA 92121
Phone: (858) 587-1121
[Qualcomm's participation in and commitments to JVT; Qualcomm's analysis of its IPR with respect to JVT standards]

14

58.   Kevin Thompson
      *Vice President, Sales Operations*
      QUALCOMM Incorporated
      5775 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Qualcomm's efforts to meet customers' demand for WCDMA chipsets]

59.   Edward Tiedemann
      *Senior Vice President, Engineering*
      QUALCOMM Incorporated
      5775 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Qualcomm's participation in and commitments to ETSI and IEEE;
      ETSI's selection of WCDMA for the UMTS standard; Content of relevant
      IPR policies of standards development organizations]

60.   James Tomcik
      *Director Engineering*
      QUALCOMM Incorporated
      5665 Morehouse Drive
      San Diego, CA 92121
      Phone: (858) 587-1121
      [Qualcomm's participation in and commitments to the IEEE]

61.   Stephane Tronchon
      *Legal Counsel*
      QUALCOMM France
      40 Rue d'Oradour sur Glane
      1st and 4th floors
      Paris, 75015
      Phone: 33-4-92-96-91-16
      [ETSI's selection of WCDMA for the UMTS standard; Qualcomm's
      processes and practices for determining whether and when to disclose
      patents to standards development organizations; Content of relevant IPR
      policies of standards development organizations; Industry practice with
      regard to IPR disclosure and the making of FRAND commitments to
      standards development organizations]

62.   Jerry Upton
      *Consultant*
      317 North Meacham
      Park Ridge, IL 60068
      Phone: (847) 772-4800
      [Qualcomm's participation in and commitments to the IEEE]

63.    <u>Herbert Vanhove</u>
       *Vice President, Product Management*
       QUALCOMM Incorporated
       Waterfront 4th floor
       Hammersmith Embankment
       Chancellor's Road
       London, W6 9RU
       Phone: 44-20-8237-7123
       [Qualcomm's participation in and commitments to ETSI]

64.    <u>Tom Wasilewski</u>
       *Sr. Director Government Affairs*
       QUALCOMM Incorporated
       2001 Pennsylvania Ave, NW
       Suite 650
       Washington, DC 20006-1850
       Phone: (202) 263-0028
       [Qualcomm's participation in and commitments to the IEEE]

65.    <u>Serge Willenegger</u>
       *Sr. Director, Technology*
       QUALCOMM Switzerland
       Vignes-Dessous
       1425 ONNENS
       Switzerland
       Phone:  41-244-363541
       [Qualcomm's participation in and commitments to ETSI; ETSI's selection
       of WCDMA for the UMTS standard]

66.    <u>David Wise</u>
       *Vice President, Finance*
       QUALCOMM Incorporated
       5775 Morehouse Drive
       San Diego, CA 92121
       Phone: (858) 587-1121
       [Qualcomm's acquisition of Flarion]

67.    <u>Charles ("Chuck") Wheatley</u>
       *Sr. Vice President, Technology*
       QUALCOMM Incorporated
       5665 Morehouse Drive
       San Diego, CA 92121
       Phone: (858) 587-1121
       [History of Qualcomm, CDMA and wireless communications; Wireless
       communications technologies]

68.    Rao Yallapragada
       *Sr. Director Technical Marketing*
       QUALCOMM Incorporated
       6965 Lusk Blvd
       San Diego, CA 92121
       Phone: (858) 587-1121
       [Marketing of and competition in wireless communications technology,
       including industry trends]

69.    Jay Yun
       *Staff Engineer (QDM & QCT)*
       QUALCOMM Incorporated
       10145 Pacific Heights Blvd
       San Diego, CA 92121
       Phone: (858) 587-1121
       [Qualcomm's participation in and commitments to JVT; Qualcomm's
       analysis of its IPR with respect to JVT standards]

70.    Byeong-Ho Yuu
       *Sr. Patent Counsel*
       QUALCOMM Incorporated
       5775 Morehouse Drive
       San Diego, CA 92121
       Phone: (858) 587-1121
       [Qualcomm's participation in and commitments to ETSI]

71.    Broadcom Corporation, its subsidiaries and its employees
       16215 Alton Parkway
       Irvine, California USA 92618
       [Broadcom's practices and policies respecting, and commitments to,
       standards development organizations; Broadcom's wireless
       communications business and strategy; Licensing discussions between
       Broadcom and Qualcomm; Discussions between Broadcom and other
       wireless communications industry participants concerning Qualcomm or
       the adoption by ETSI of the WCDMA standard; Broadcom's attempts to
       design, develop, manufacture, market and sell chipset solutions
       implementing or compliant with the WCDMA standard; Broadcom's
       policies and practices with respect to licensing; Broadcom's ability or
       inability fairly to compete in the market for wireless communications
       chipset solutions; Broadcom's policies and practices with respect to the
       sales of ASICs (for any application), including bundling and rebate
       practices; and Broadcom's motivation in bringing this action]

17

**A.ii.    A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

The following categories of documents, copies of which are located in the files of the persons listed in Section A above or in general Qualcomm files, may be used by Qualcomm to support its defenses in this action:

- Documents regarding the licensing practices of wireless communications technology industry participants

- Documents regarding the IPR disclosure practices of participants in standards development organizations

- Documents regarding practices and conduct of participants in standards development organizations

- Documents regarding competition in digital video technology

- Documents regarding the licensing practices of participants in the digital video technology industry

- Documents regarding proposals to standards development organizations, and the consideration thereof by standards development organizations and their respective members or participants

- Documents regarding the relative merits of different technologies or specifications that were considered by standards development organizations

- Documents regarding the relative merits of various vendors' wireless application-specific integrated circuits

These documents are likely to be located at Qualcomm's San Diego campus and at its offices at 9 Damon Mill Square - Suite 2A, Concord, MA 01742-2864.

As Qualcomm has previously advised plaintiff, some of the documents requested by plaintiff exist in an electronic form. Some of the documents that Qualcomm may use to support its claims or defenses exist in an electronic form, but Qualcomm does not currently expect to use them in that form to support its claims or defenses.

18

**A.iii.    A computation of any category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.**

None known at this time.

**A.iv.    For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

No such agreements exist.

December 21, 2007

CRAVATH, SWAINE & MOORE LLP,

by

Evan R. Chesler
Peter T. Barbur
Elizabeth L. Grayer
Karin A. DeMasi

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
(212) 474-1000

MCCARTER & ENGLISH, LLP
William J. O'Shaughnessy (WJO 5256)
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
(973) 622-4444

*Attorneys for Defendant*

19